**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) ECF Case |
| --- | --- |

**This document relates to:**

*All actions*

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF EVAN KOHLMANN AND MATTHEW LEVITT [ECF NO. 9246], AND TO DEFENDANT YASSIN ABDULLAH KADI'S MOTION TO EXCLUDE THE TESTIMONY OF VICTOR COMRAS [ECF NO. 9248]**

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

September 15, 2023

**TABLE OF CONTENTS**

I.     INTRODUCTION......................................................................................................................1

II.    STANDARD OF REVIEW .....................................................................................................3

III.   ARGUMENTS.........................................................................................................................4

    a.  Kohlmann is an eminently qualified expert on terrorism and has not exhibited a "pattern of dishonesty" as Defendants claim...................................................................................4

       i.   Kohlmann has been qualified on numerous topics by numerous federal courts over his multi-decade career ..............................................................................................4

       ii.   Kohlmann is honest about his credentials and has expertise on the areas in which he opines ....................................................................................................................6

       iii.  Kohlmann is qualified to offer expert opinions on the financial practices of alleged terrorist entities .....................................................................................................12

       iv.  Kohlmann is qualified to offer opinions on how the alleged "charities" operate ..............13

       v.   Kohlmann is qualified to offer opinions on Islam as it relates to Islamic terrorist organizations ..........................................................................................................15

       vi.  Kohlmann does not manufacture or manipulate materials .....................................17

       vii.  Kohlmann does not manipulate facts to create associations ...............................21

       viii.  Kohlmann opines on evidence using his expertise, he does not draw legal conclusions ...........................................................................................................23

       ix.  Kohlmann does not opine as to motive or mental state .....................................25

       x.   Defendants launder factual disputes via *Daubert* challenges, asserting that he is a "conduit of hearsay" for facts they dispute ........................................................26

       xi.  Kohlmann's testimony is relevant..........................................................................30

       xii.  Kohlmann does not speculate about the import of Defendants' financial documents........................................................................................................31

       xiii.  Kohlmann's conclusions are based on his analysis of the evidence.....................34

    b.  Levitt possesses the requisite training, education, and experience to opine on terrorism, terrorist financing, and the Department of Treasury's Designation process. .............................36

       i.   Levitt's Testimony Relating to Treasury's Designation Process Complies with Rule 403. 36

       ii.   The Treasury Department denied access to Levitt's testimony as a fact witness regarding the substantive data underlying the Treasury's August 3, 2006, Executive Order 13224 designations of IIRO's branch offices in the Philippines and Indonesia.................................................................................................................38

       iii.  Levitt was questioned extensively during his deposition regarding the designation process.................................................................................................................41

       iv.  Levitt's testimony regarding the Treasury Department designations will assist the trier of fact...........................................................................................................43

v.   Levitt's conclusions are appropriately developed following analysis under his accepted methodology....................................................................................................44

vi.   An expert may rely on inadmissible evidence so long as experts in the field reasonably rely on such evidence in forming their opinions .................................45

vii.  Levitt's Report Provides Necessary Background and Information Useful to the Trier of Fact in Evaluating His Opinions................................................................47

viii. Levitt's Education, Training, and Experience Qualify Him as an Expert on Terrorism and Terrorism Financing, and Levitt is not offered as an expert on religion, Islam, or Shariah .......................................................................................48

ix.   Levitt is offered as an expert on accounting, finance, and audits only as those subjects relate to the financing of terrorism ...................................................49

x.    Levitt is qualified to offer opinions on Al Qaeda and Saudi Charities.................49

xi.   Levitt's Treatment of WAMY is in Accord with the Standards Set Forth by the Court .................................................................................................................50

c.  Comras Has Substantial Relevant Qualifications, And His Opinions Are The Product Of Reliable Data And Methodologies. ..................................................................................51

i.    Comras Has Substantial Relevant Qualifications Identifying And Combating Terror Financing.............................................................................................................52

ii.   Comras's Opinions Are the Product Of Reliable Data And Methodologies .....................54

iii.  Kadi Argues His View Of The Facts In A Challenge That Goes To The Weight Of Comras's Opinions Rather Than Their Admissibility............................................61

IV.   CONCLUSION ...........................................................................................................70

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ........................4, 18

*Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488 (S.D.N.Y. 2005) .......................21

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415
    (S.D.N.Y. Dec. 15, 2011) .............................................................................................26

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ............................................21

*Cates v. Trs. of Columbia Univ. in City of N.Y.*, 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019)
    (adopted at 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) (Judge Daniels)) ......................4

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269 (S.D.N.Y.2011)...........50

*Cooper Crouse-Hinds, LLC v. City of Syracuse*, 568 F. Supp. 3d 205 (N.D.N.Y. 2021) .................44

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................passim

*Discover Fin. Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501(S.D.N.Y. 2008) .......................63

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ..........................................................9

*Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107 (D.D.C. 2018) ..............23, 45

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012) ..............................................65

*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) ..................................................30

*I.M. v. United States*, 362 F. Supp. 3d 161 (S.D.N.Y. 2019) ...............................................11

*In re Depakote* 2015 WL 4775868 (S.D. Ill. Feb. 13, 2015) ..................................................40

In re Leap Wireless Int'l, Inc., 301 B.R. 80.................................................................43

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ..........................passim

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................12

*In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ..........26, 70

*In re Zicam*, 2011 WL 798898 (D. Az. Feb. 24, 2011) ........................................................40

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y.2007) ...................................49

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ....................................30

*Konrick v. Exxon Mobil Corp.*, 2016 WL 439361 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222
    (5th Cir. 2016) ....................................................................................................17, 18

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................................61, 63

*Linde v. Arab Bank*, PLC, 922 F. Supp. 2d 316 (2013) .....................................................11, 16

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) ..............................................35

*M.B. v. CSX Transportation, Inc.*, 130 F. Supp. 3d 654 (N.D.N.Y. 2015) ...................................18

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ..............................................46

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995)...........................................4, 21, 50

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) ..........................................13

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), certified question answered, 194 A.3d 38
    (D.C. 2018), and vacated on other grounds and remainded sub nom, Opati v. *Republic of Sudan*,
    140 S. CT. 1601, 206 L. Ed. 2d 904 (2020)..........................................................34, 44

*Peerless Ins. Co. v. Marley Engineered Prods. LLC*, No. 05-CV-4848 (AKT), 2008 WL 7440158
    (E.D.N.Y. June 12, 2008).........................................................................................13

*Regina v. Al Bashir Mohammed Al-Faqih* (Woolwich Crown Court, U.K., 2007) ........................6, 8

*Republic of Sudan v. Owens*, No. 17-1236 (U.S. Apr. 5, 2018).............................................10

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) .......................................................3

*Sana-Bell, Inc. v. BMI Real Estate, et al.*, No. 8:98-cv-04177(PJM) (D. Md. Dec. 23, 1998) ..............33

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016) .......................................63

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir.1997).....................................................49

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2003) ................................................................................ 30

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.), *cert. denied*, 113 S. Ct. 82 (1992) ............ 21

*U.S. Commodities Futures Trading Comm'n v. Wilson*, 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ........ 70

*U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3*, AFL-CIO, 313 F. Supp. 2d 213
(S.D.N.Y. 2004) .......................................................................................................................... 63

*United States v. Abu Ghayth*, 2014 WL 978629 (S.D.N.Y. Feb. 28, 2014) ..........................5, 6, 17, 30

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) ........................................4, 35, 65

*United States v. Amawi*, 2009 WL 1373154 (N.D. Ohio, May 15, 2009) ........................................... 5

*United States v. Amawi*, 541 F. Supp. 2d 945 (N.D. Ohio, Mar. 27, 2008) ...................................... 5

*United States v. Amawi*, 552 F. Supp. 2d 669 (N.D. Ohio, May 2, 2008) ......................................... 5

*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012), cert. denied, 133 S. Ct. 1474 (2013) ............. 5

*United States v. Damrah*, 412 F.3d 618 (6th Cir. 2005) ...................................................2, 45, 46, 47

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) .................................................................5, 10, 11

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) .................................................................. 17

*United States v. Hossain*, 579 F. Supp. 3d 477 (S.D.N.Y. 2022) ...................................................... 35

*United States v. Kassir*, 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) .............................................4, 5, 8, 13

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ..................................................................65, 67

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ..................................................................... 28

*United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ........................................................... 68

*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347
(2d Cir. 2008) ...................................................................................................................... passim

*United States v. Paracha*, 313 Fed. Appx. 347 (2d Cir. 2008) ......................................................... 4

*United States v. Patel*, 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ........................................25, 70

*United States v. Sabir*, 2007 WL 1373184 (S.D.N.Y. May 10, 2007) .........................................4, 17, 24

*United States v. Subasic*, 568 F. App'x 234 (4th Cir. 2014) ........................................................... 17

*US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 986232 (S.D.N.Y. Apr. 1, 2022) ...................... 44

*US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022 WL 1042273
(S.D.N.Y. Apr. 5, 2022) .............................................................................................................. 47

*Vale v. United States*, 2015 WL 5773729 (E.D.N.Y. Sept. 30, 2015), *aff'd*, *Vale v. United States*,
673 F. App'x 114 (2d Cir. 2016) ...............................................................................................11, 12

*Vale v. United States*, 2015 WL 5773902 (E.D.N.Y. Aug. 28, 2015), *adopted*, 2015 WL 5773729
(E.D.N.Y. Sept. 30, 2015), *aff'd*, 673 F. App'x 114 (2d Cir. 2016) ............................................. 12

**Rules**

Fed. R. Civ. P. 26(a)(2) .................................................................................................................. 36

Fed. R. Evid. 702 ..................................................................................................................... passim

Fed. R. Evid. 703 ...............................................................................................................46, 47, 61

**Statutes**

18 U.S.C. § 2339B(a)(1) ............................................................................................................... 24

International Emergency Economic Powers Act, 50 U.S.C. 1701 et seq, (IEEPA) ........................... 51

**Other Authorities**

European Union Court of Justice, Judgment July 18, 2013 ............................................................ 59

Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001, 107th Congress,
no. 351 (2002) ........................................................................................................................... 23

Thomas H. Kean, and Lee Hamilton, The 9/11 Commission Report: Final Report of the National
Commission on Terrorist Attacks upon the United States, Washington, DC (2004) ..................... 22

United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi ................. 59

United Nations Security Council Resolution 1822 (2008) ........................................................................ 59
United Nations Security Council Resolutions 1267 (1999) and 1333 (2000) ....................................... 59

**Key to Exhibit Citations**

Exhibits cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele, filed with the Memorandum, cited herein as "Ex. ___"

| Ex. 1 (Kohlmann Rpt.) | Expert Report of Evan Francois Kohlmann (served Mar. 10, 2020) |
|---|---|
| Ex. 2 (Revisions to Kohlmann Rpt.) | Correspondence to Defense Counsel enclosing revised page 23 (¶ 71) and page 58 (n. 295) (Oct. 18, 2021) |
| Ex. 3 (Kohlmann Rebuttal Rpt.) | Rebuttal Report of Evan Francois Kohlmann (Feb. 2, 2021) |
| Ex. 4 (CV of Kohlmann) | Curriculum Vitae of Evan Francois Kohlmann |
| Ex. 4a (Kohlmann Kassir CV) | Curriculum Vitae of Evan Francois Kohlmann submitted in *United States v. Kassir*, 1:04-cr-00356-AT (S.D.N.Y. 2009), ECF No. 67. |
| Ex. 5 (Levitt Rpt.) | Expert Report of Dr. Matthew Levitt (Mar. 9, 2020) |
| Ex. 6 (Levitt Rebuttal Rpt.) | Expert Rebuttal Report of Dr. Matthew Levitt (Jan 18, 2021) |
| Ex. 7 (Levitt CV) | Curriculum Vitae of Dr. Matthew Levitt |
| Ex. 8 (Gurulé Rpt.) | Expert Opinion Report of Prof. Jimmy Gurulé (Feb. 1, 2021) |
| Ex. 9 (Comras Rpt.) | Expert Report of Victor D. Comras (Oct. 29, 2020) |
| Ex. 10 (Comras Rebuttal Rpt.) | Expert Rebuttal Report of Victor D. Comras Concerning Yasin Kadi and Wael Julaiden (Feb. 16, 2021) |
| Ex. 11 (Comras CV) | Curriculum Vitae of Victor Comras |
| Ex. 12 (Kohlmann Tr.) | Transcript of the Deposition of Evan Francois Kohlmann (Aug. 5, 6, 2021) – excerpted pages. |
| Ex. 13 (Levitt Tr.) | Transcript of the Deposition of Dr. Matthew Levitt (Apr. 7, 2021) – excerpted pages. |
| Ex. 14 (Comras Tr.) | Transcript of the Deposition of Victor D. Comras (July 23, 2021) – excerpted pages. |
| Ex. 15 (Al Harbi Tr.) | Transcript of the Deposition of Fahd Mohammad Sanad Alharbi (March 26, 2019) – excerpted pages |
| Ex. 16 (Ibrahim Abdullah Tr.) | Transcript of the Deposition of Ibrahim Abdullah (October 21, 2019) – excerpted pages. |
| Ex. 17 (Barron Tr.) | Transcript of the Deposition of John Barron (April 29, 2021) – excerpted pages. |
| Ex. 18 (Brown Tr.) | Transcript of the Deposition of Jacob Vahid Brown (May 25, 2021) – excerpted pages. |
| Ex. 19 (Kadi Tr.) | Transcript of the Deposition of Yassin Abdullah Kadi (July 10, 2018) – excerpted pages. |
| Ex. 20 (Hr'g Tr., June 26, 2023) | Transcript of June 26, 2023, Hearing in front of Magistrate Judge Netburn |
| Ex. 21 (PECs' Oct. 12, 2021 Ltr to Salerno) | Plaintiffs' Executive Committees' Letter to Yassin Kadi's counsel, Peter Salerno, regarding Victor Comras (Oct. 12, 2021). |
| Ex. 22 | Excerpt of *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*. |
| Ex. 23 (US v. Osmakac) | *USA v. Osmakac*, 8:12-CR-00045-MSS-AEP (M.D. Fl. 2012), ECF No. 270 |
| Ex. 24 (Georgetown SFS website) | Archived Georgetown School of Foreign Service "Majors and Certificates" Website – Timestamped October 3, 2002. |

| Ex. 25 (FBI Surv. Log) | FBI Awlaki Surveillance Log, Dec. 18, 2001 (previously filed at ECF No. 3912-43) |
| Ex. 26 (Certificate Requirements) | Pamphlet of Certificate Requirements in Islam and Muslim-Christian Understanding from Georgetown's School of Foreign Service. |
| Ex. 27 (Minor Requirements) | Minor Requirements in Islam and Muslim-Christian Understanding from Georgetown's School of Foreign Service. |
| Ex. 28 (IANA Speakers) | Islamic Association of North America (IANA) W. Coast List of Speakers, 2000. |
| Ex. 29 (Marks Tr.) | Transcript of the Deposition of Jonathan Marks (July 22, 2021) – excerpted pages. |
| Ex. 30 | Plaintiffs' responsive catalog to Defendants' catalog that was submitted as Exhibits 1 at ECF No. 9254-1 (and 9250-1). |

## I.    INTRODUCTION

This Court's bellwether *Daubert* Order, ECF No. 9060, offered the parties guidance to prevent the Court and parties from wasting time and resources on tenuous or insubstantial applications to preclude experts or their testimony. *See id.* at 40; Ex. 20 (Hr'g Tr., June 26, 2023) at 5:2-19. The Court's ruling underscored the Federal Rules' liberal approach to expert testimony (ECF No. 9060 at 8), and the Court admonished the parties that any further *Daubert* challenges should not just be "another round of briefing." Ex. 20 (Hr'g Tr., June 26, 2023) at 5:15-19. The Court also made clear that discrete challenges to particularized issues or areas of focus were more appropriately raised, and should be deferred to, later stages of the litigation. *See* Ex. 20 (Hr'g Tr., June 26, 2023) at 7:10-18.

The Defendants' further *Daubert* motions seeking to exclude Evan Kohlmann ("Kohlmann"), Matthew Levitt ("Levitt"), and Victor Comras ("Comras") make clear that Defendants have not heeded the Court's directives or the standards for expert testimony under the Federal Rules and elaborated in the Court's bellwether *Daubert* Order. As a starting point, those experts' backgrounds, and each of their decades of experience at the highest levels of the counterterrorism field, should have made clear to Defendants that there was no credible basis to seek the wholesale exclusion of any of these expert on either qualification or methodology grounds, especially given the bellwether decision's recognition of the liberal standard applied to admissibility of experts, ECF No. 9060 at 8, and the Court's bellwether guidance about "acceptable academic or professional credentials," *id.* at 40.

Each of the three experts addressed in Defendants' second round of *Daubert* motions has long been recognized as being at the top of their fields in countering terrorism and terror financing. Literally dozens of federal courts, including the Second Circuit itself, have found Kohlmann qualified to testify and endorsed his methodology in civil and criminal terrorism matters, including as an expert for the United States. *See, e.g.*, Ex. 4 (Kohlmann CV). Levitt, who has spent years of his professional career in government service, at the Treasury Department, FBI, and in numerous research and academic settings, has also been qualified in

1

multiple U.S. federal court proceedings (*see, e.g.,* Ex. 7 (Levitt CV) 3), where his methodology has been recognized as the "gold standard" in the field of international terrorism. *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005). Comras has, likewise, pursued a long public service career as an internationally recognized expert on global efforts to combat terrorism, has held multiple U.S. State Department positions and worked with the U.N. on counterterrorism and sanctions issues, and testified before the U.S. Congress and the Canadian Parliamentary Committees as an expert on money laundering, terrorism, and terror financing. *See* Ex. 11 (Comras CV) 1.

Each of these experts has applied their experience to issues at the heart of this litigation, analyzing the precise types of materials and evidence that have been a focus of their work over many years, and their opinions concern matters at the heart of that experience. Stated simply, there is no basis for any sweeping *Daubert* challenge directed to these experts, and most certainly not grounds that would satisfy the standard anticipated by the Court's bellwether *Daubert* Order as articulated in the Court's June 26, 2023 hearing. *See generally* Ex. 20 (Hr'g Tr., June 26, 2023). The fact that Defendants' bellwether motion did not result in the exclusion of any of Plaintiffs' experts and broadly rejected Defendants' various challenges should have made this especially clear.

The nature of the arguments Defendants raise in their additional *Daubert* motions underscore their resistance to the Court's rulings and admonitions. In most cases, Defendants purported *Daubert* challenges reflect nothing more than their factual disagreement with Plaintiffs' experts' analysis of particular pieces of evidence and related opinions, resting on Defendants' own preferred interpretations. Such disputes may be appropriate for cross examination, but do not remotely support challenges under *Daubert* (much less the sweeping challenges Defendants attempt to justify). In their especially overreaching effort to manufacture a basis to challenge Kohlmann on qualification grounds, Defendants construct an elaborate and false narrative around the inadvertent misidentification nearly two decades ago of the publisher of Kohlmann's first book, which he corrected long ago. The attempted character assassination is unfounded, has nothing to do with

the record here, and ignores the thoughtful determinations by numerous federal courts endorsing his qualifications and wealth of experience. Defendants' flailing attempt to preclude Levitt, meanwhile, effectively argues that he is too qualified, positing that an expert who actually worked at the Treasury Department implementing Executive Order 13224 should not be permitted to testify as to the designation process. The efforts against Comras fail for similar reasons outlined below.

Stated simply, Defendants' *Daubert* motions raise precisely the types of insubstantial and marginal challenges this Court intended to eliminate through the bellwether *Daubert* process. For the very reasons the Court implemented that process and issued those admonitions, the Court should reject Defendants' arguments here. With respect to particularized challenges that seek to compel the Court to spend time studying a vast record to resolve issues of limited reach, Plaintiffs urge that the Court should refuse the Defendants' efforts to drag it down that wormhole now. Instead, the Court should simply direct Defendants to raise such challenges in the context of their motions to dismiss or in the context of pretrial/trial proceedings, where they are more appropriate in any case and the Court will have the benefit of critical context. If the Court is inclined to reach those issues, it should reject Defendants' challenges as unfounded, for the reasons set forth more fully below.[1]

## II.    STANDARD OF REVIEW

This Court has set out the legal standards governing expert testimony, *see* ECF No. 9092, at 2-6, which are to be "construed with an eye towards the liberal thrust of the federal rules of evidence and their general approach of relaxing the traditional barriers to opinion testimony." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588–89 (1993)). The inquiry "is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions

---

[1] Defendants offer their exhibit 1, which they boldly titled a "Catalog of Impermissible Testimony of Plaintiffs' Experts Evan Kohlmann and Matthew Levitt." The so-called catalog makes naked assertions about sections from the reports of plaintiffs' experts, Kohlmann and Levitt, without offering any legal argument in the catalog for plaintiffs to address. However, supplemental to Plaintiffs' arguments herein, Plaintiffs offer exhibit 30 to respond to Defendants' catalog.

that they generate." *Daubert*, 509 U.S. at 580. "[O]nly serious flaws in reasoning or methodology will warrant exclusion." *Cates v. Trs. of Columbia Univ. in City of N.Y.,* 2019 WL 8955333, at *11 (S.D.N.Y. Oct. 25, 2019) (adopted at 2020 WL 1528124, at *7 (S.D.N.Y. Mar. 30, 2020) (Judge Daniels)); *see Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002). "Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995).

## III.   ARGUMENTS

### a.   Kohlmann is an eminently qualified expert on terrorism and has not exhibited a "pattern of dishonesty" as Defendants claim

#### i.   Kohlmann has been qualified on numerous topics by numerous federal courts over his multi-decade career

Kohlmann has been qualified to testify in nearly forty federal cases in the United States—including thirty-five instances where the United States government retained Kohlmann to testify for the prosecution in criminal or military prosecutions—and in a dozen cases in international courts.[2] Defendants point to no case where a court relied on any of Kohlmann's individual qualifications in a vacuum. Indeed, in at least one case in this district, *United States v. Paracha,* this Court conducted a full-day *Daubert* hearing, in which the Court focused deeply on Kohlmann's experience, training, education, and methodology, and determined that Rule 702 was satisfied, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006); the Second Circuit upheld that determination. *United States v. Paracha,* 313 Fed. Appx. 347 (2d Cir. 2008). Despite extensive experience as an expert in both criminal and civil terrorism matters in which he has faced multiple *Daubert* challenges,[3] Kohlmann has never been excluded, pursuant to *Daubert,* for lack of qualification or any alleged

---

[2] Ex. 4 (CV of Kohlmann).

[3] *See, e.g., United States v. Kassir,* 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009); *United States v. Abu-Jihaad,* 553 F. Supp. 2d 121 (D. Conn. 2008); *United States v. Sabir,* 2007 WL 1373184 (S.D.N.Y. May 10, 2007); *Paracha,* 2006 WL 12768.

methodological flaw.[4]

In *Paracha*, in 2006, after conducting an extensive *Daubert* hearing, the Court found his methodology reliable and qualified Kohlmann. The Court recognized that he "relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant [to the subject] for several years."[5] That Court also noted that "[t]he testimony and evidence at the [*Daubert*] hearing demonstrate that Kohlmann's opinions and conclusions are subjected to **various forms of peer review** and that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community"[6] In 2009, in another case in this District, *United States v. Kassir*, the Court again held that Kohlmann's testimony on the "origins, history, structure, leadership and various operational methods of al Qaeda and other terrorist groups is sufficiently reliable."[7] In *Kassir*, the Court also found that Kohlmann's testimony regarding al Qaeda's "operational methods" would aid the jury in determining whether the defendant "provided material assistance to [al Qaeda]."[8] Also in 2009, the Second Circuit, in *United States v. Farhane,* upheld the district court's decision qualifying Kohlmann's testimony, finding that he satisfied the requirements of Rule 702.[9] In 2014, in *United States v. Abu Ghayth*, this District again qualified Kohlmann, noting that the decision to qualify him in *Paracha* "focused deeply on Kohlmann's experience, training, education, and methodology,

---

[4] In *United States v. Amawi*, although the Court ultimately allowed Kohlmann to testify as an expert, 2009 WL 1373154, at *6 (N.D. Ohio, May 15, 2009); *United States v. Amawi*, 552 F. Supp. 2d 669, 671 n. 2 (N.D. Ohio, May 2, 2008), Kohlmann's testimony was limited based on relevance, not based on his qualifications or methodology. *United States v. Amawi*, 695 F. 3d 457, 479 (6th Cir. 2012), cert. denied, 133 S. Ct. 1474 (2013). In reaching its decision, the Court considered that, because "the government ha[d] not alleged that any of the defendants had ... a connection with any specific foreign or domestic terrorist group."), *United States v. Amawi*, 541 F. Supp. 2d 945, 949 (N.D. Ohio, Mar. 27, 2008), Kohlmann's testimony concerning those other groups was not relevant, and could suggest such an unalleged relationship. *Amawi*, 552 F. Supp. 2d at 672.

[5] *Paracha*, 2006 WL 12768, at *22.

[6] *Id.* at *20 (emphasis added).

[7] *Kassir*, 2009 WL 910767, at *7.

[8] *Id.*

[9] *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011).

and determined that Rule 702 was satisfied."[10]

Here, Defendants attempt to argue that this court should not credit the careful consideration of the numerous previous courts that have repeatedly qualified Kohlmann, under the fanciful theory that, according to the Defendants here, each of the judges in those cases was duped (in the context of adversarial proceedings) into doing so. To manufacture a basis for their farfetched claim, Defendants concoct an elaborate conspiracy theory which supposes that inconsequential mistakes over the course of nearly 20 years of testimony as an expert witness (which Kohlmann immediately acknowledged and corrected when identified to him) were in reality part of a malicious and intentional campaign to deceive. Straining credulity, Defendants go on to claim that Kohlmann fooled numerous federal judges and juries, in high profile terrorism cases, into believing he was qualified to offer relevant opinions on terrorism and terrorist funding. But the record across the numerous instances where his qualifications were considered reflects that the courts have been careful in their consideration, no one was duped, and the courts have found him to be qualified. The Court here should do likewise here.

### ii. Kohlmann is honest about his credentials and has expertise on the areas in which he opines

Defendants, at 2-3, open their brief arguing that a 16-year-old error by Kohlmann, that no court has ever relied on to preclude him from testifying, should be a cornerstone for striking him. Defendants exaggerate that "in case after case," Kohlmann "falsely claimed" that Oxford University Press published Kohlmann's debut book, _Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network_ (hereinafter "_Al-Qaida's Jihad_"). Defs. Br. at 3. The reality is, in a single case in 2006, Kohlmann mistakenly misidentified the publisher of his book, conflating two similarly named entities. The error went unnoticed until it was pointed out to him when he was deposed in a second case in the U.K. in 2007, and he has correct the error ever since.[11]

---

[10] _United States v. Abu Ghayth_, 2014 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014).

[11] The two cases at issue are _Paracha_, 2006 WL 12768, and _Regina v. Al Bashir Mohammed Al-Faqih_ (Woolwich Crown Court, U.K., 2007). He mentioned it once in _Paracha_ and made the correction immediately after the error was called to his

When pressed in *this* litigation on his *past* statement that his book was published by Oxford University Publishers, Kohlmann stated that he misspoke, simply made a mistake, and has since corrected it.[12] In summary, the 16-year-old error has nothing to do with this litigation, was no more than an inadvertent error resulting from the fact that Berg Publisher's was an imprint of the similarly named Oxford International Publishers[13] (which was also based in the U.K.[14]), and was never the basis for any order qualifying Kohlmann (or disqualifying Kohlmann) as an expert.[15]

Most importantly, regarding Defendant's false assertion about Kohlmann's alleged deceit, since the issue was identified, Kohlmann corrected the error and has **never** represented—either here or in other litigation—that Oxford University Press published his book. Here, Kohlmann (accurately) represented *only* that Berg Publishers published the book.[16] Defendants, not Kohlmann, injected the decades-old publishing issue here solely to create a faux *Daubert* issue.[17] When it was raised, Kohlmann identified the publisher correctly, as Berg. Further, nothing in the record suggests that any court, either in *Paracha* or elsewhere, has placed any value on the distinction between Oxford University Press and Oxford International Publishers. Even where Kohlmann has correctly identified Berg Publishers as the book publisher his book, no court

---

attention in *Faqih*. Since then, Kohlmann has only ever identified the publisher by its imprint name, Berg, and described it as a "university press," meaning it published books in academia.

[12] *See* Ex. 12 (Kohlmann Tr.) 89:20-24

[13] *See* Ex. 22 Excerpt of *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*.

[14] Bloomsbury Publishing acquired Oxford International Publishers in 2008. https://www.rttnews.com/721287/bloomsbury-publishing-to-acquire-oxford-international-publishers-update.aspx Since 2013 all Berg Publishing titles were published under the imprint "Bloomsbury Academic." https://web.archive.org/web/20130429214016/http://www.bloomsbury.com/rebranding-continuum-berg-bcp/

[15] Defendants also quibble with Kohlmann's characterization of the publisher of his book being for academic purposes. However, as Kohlmann has explained. Berg Publishers published books to be used in academic and university settings. *See* https://web.archive.org/web/20080521095620/http://www.bergpublishers.com/AboutUs/tabid/530/ Default.aspx ("We publish a wide range of different books: **large introductory textbooks and readers, advanced level undergraduate and graduate texts,** cutting-edge monographs, books designed for a general readership, desk-top and library reference, and journals.") (Emphasis added).

[16] *See* Ex. 4 (CV of Kohlmann).

[17] *See* Ex. 12 (Kohlmann Tr.) 89:20-23 ("Q. Mr. Kohlmann, we talked briefly during the first hour about your book and your book was published by Berg Publishers, is that right? A. That's correct, yes.")

has disqualified him as a result, because it is *immaterial*.[18]

Demanding that Kohlmann recall precisely *how* he came to make this mistake, Defendants hypocritically suggest that a witness's inability to recall details perfectly under cross-exam is inherently "evasive."[19] If not remembering things during cross-examination is inherently "evasive[]," as defendants suggest, then many of each of Defendants' witnesses has been "evasive[]."[20] But, even Defendants acknowledge, Kohlmann has not made this error in **sixteen years**, and he has been qualified to testify in numerous cases since this issue was identified.[21] Nevertheless, Defendants press on with their sensationalized and baseless speculation that Kohlmann has been plotting his purported stolen academic valor, arguing that Kohlmann was "sowing the seeds for this redefinition" of "university press" in the past.[22] But this argument fails, as Kohlmann stated plainly, and under oath, in his deposition "[i]n no way am I asserting that my book was published by Oxford University, never have I intended to do so certainly."[23]

Next, Defendants, at 4 n. 15, acknowledge that this Court has stated that peer review is not required of terrorism experts and that it generally is "poorly suited to terrorism experts."[24] Floundering for a way to turn this in their favor, Defendants, at 4, point to a 2007 case where Kohlmann stated that every paper he writes is peer reviewed by "academics and by others around the world." Defendants attempt to make this into a "gotcha" moment, arguing that Kohlmann's current works are not all *formally* peer reviewed publications in academic journals. But Kohlmann has made clear that he sends his work out to other peers

---

[18] *See* Ex. 4a (Kohlmann Kassir CV) submitted in *U.S. v. Kassir* where he correctly indicates that Berg Publishers published his book. *See Kassir*, 2009 WL 910767 (denying motion to preclude Kohlmann's testimony).

[19] Defs. Br. 3 (stating he was "intentionally misleading") and at n. 12 (stating Kohlmann was "evasive[]" for qualifying his answers with "I believe" as he searched his memory for the correct response).

[20] *See, e.g.* Ex. 16 (Ibrahim Abdullah Tr.) at 158:13-15, 193:9-11, 208:9-10, 19-20 (WAMY witness unable to remember details during deposition); *see also* Ex. 15 (Al Harbi Tr.) at 144:24 – 145:10, 146:3, 157:24-159:5, 186:9-12, 188:1-2, 190:13-23 (MWL/IIRO witness unable to remember details during deposition).

[21] *Regina v. Al Bashir Mohammed Al-Faqih* (Woolwich Crown Court, U.K., 2007) was the last case where Kohlmann mistakenly represented that his book was published by Oxford University Press. *Compare* with Curriculum Vitae of Evan Kohlmann.

[22] Defs. Br. 4, n. 13.

[23] Ex. 12 (Kohlmann Tr.) 113:4-20.

[24] ECF No. 9060 at 4.

to edit and offer comment, as is common among social scientists.[25] Courts that have qualified Kohlmann have addressed this issue, consistent with Kohlmann's testimony, as is apparent from the *Paracha* court's finding that Kohlmann's works have been subject to "various forms" of peer review.[26] These "various forms" could be formal (e.g., when the publisher employs reviewers and editors to review a proposed work) or it could mean informal peer review (e.g., sending a draft paper to a colleague for notes, edits, and thoughts or having the draft otherwise subjected to peer commentary). "Informal peer review" is undertaken in many social sciences and academia and is not a construct of Kohlmann, as Defendants suggest.[27] Regardless, Kohlmann's works *have* been peer reviewed, formally or informally, and many of his major works have been formally peer reviewed.[28] Kohlmann has always been candid and honest about this fact.[29]

Next, in arguing that Kohlmann lacks expertise, at 5 n. 20, Defendants resort to the fact Kohlmann was criticized in an *amici* brief filed by a handful of academics in support of defendant Sudan in *Republic of*

---

[25] A Multi-Disciplinary Perspective On Emergent And Future Innovations In Peer Review, JP Tennant, et al, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5686505/ (*See* Table 2, where "Pre-Peer Review Commenting" is described as "informal commenting" with associated benefits and risks.) See also Section 1.1.1., noting that peer-review underwent a "formalizing" process when it had once been a "civil, collegial discussion in the form of letters between authors and the publication editors."

[26] *Paracha*, 2006 WL 12768, at *20. Clearly, the *Paracha* court did not understand Kohlmann to mean everything he writes is *formally* peer reviewed.

[27] *See, e.g.,* https://pre-review.iq.harvard.edu/index.php/iqss/Whatisapeerprereview regarding informal peer review.

[28] More importantly, Kohlmann has had nearly a dozen of his works formally peer reviewed. Kohlmann has been published at the Combating Terrorism Center (CTC) Sentinel four times (*see* Ex. 4 (CV of Kohlmann)). MWL/IIRO's own expert, Vahid Brown, has published works with the CTC Sentinel, which he acknowledged had staff peer review each paper. Ex. 18 (Brown Tr.) 121:7-23. Kohlmann has also written for The Annals of the American Academy of Political and Social Science, which states "all submitted papers are peer reviewed to provide the best quality." *See* https://research.com/journal/annals-of-the-american-academy-of-political-and-social-science#:~:text=Law%20and%20Politics.,Annals%20of%20the%20American%20Academy%20of%20Political%20and%20Social%20Science,to%20provide%20the%20best%20quality. Additionally, Kohlmann has testified before the U.S. House Committee on Homeland Security and the U.S. Senate Committee on the Judiciary, Subcommittee on Crime and Drugs.

[29] Defendants even excerpt *Paracha*, where the court had a full grasp of Kohlmann's meaning, to suggest that he was somehow still misleading the court. "THE COURT: It's not as if it's a formal jury peer review of an article . . . . THE WITNESS: Right, right.") as quoted in Defs. Br. 5 n. 20. If anything, this transcript evidences that 1) Kohlmann has always been candid about his use of informal peer review, and 2) that courts have acknowledged this fact and still qualified him, as the Court did in *Paracha*. Importantly, Defendants cannot point to any instance where Kohlmann has claimed his work was formally peer reviewed when it was not. Defendants offer only inapposite dicta (and a hypothetical, at that) from a case that has nothing to do with Kohlmann, *Elcock v. Kmart Corp.*, 233 F.3d 734, 751 n.8 (3d Cir. 2000), to argue that lying about peer review is an excludable issue. Even if that were the law here, it is irrelevant because Kohlmann has not lied about, misled, or been dishonest about his peer reviewed works. Ironically, in addition to being without relevance or merit, Defendants' argument is, itself misleading.

*Sudan v. Owens*, No. 17-1236 (U.S. Apr. 5, 2018),[30] to support Sudan's efforts to avoid accountability for its sponsorship of Al Qaeda, which is not a binding legal authority. Experts in a contentious social-science field with multi-decades worth of work routinely draw critiques.[31] Those comments are more than counterbalanced by the extensive praise heaped on Kohlmann's work over the years.[32] Defendants cite no legal support for their argument that public critique (even if in an *amici* brief in other litigation) renders an expert excludable under *Daubert* principles.

Defendants next, at 5 n. 23, try to discredit Kohlmann for the Second Circuit's arguably imprecise language in its opinion in *Farhane*, 634 F.3d at 158-59 ("Kohlmann's proposed expert testimony had a considerable factual basis: (1) his **graduate** studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School….") (Emphasis added). As Kohlmann has explained, he earned an undergraduate degree and a Certificate in Islam and Christian-Muslim Understanding, both from Georgetown University,[33] and a *juris doctorate* from Penn Law School. The Court in *Farhane* used arguably imprecise language leading to a possible suggestion that his studies at Georgetown were for a graduate degree program. But Kohlmann has never claimed, either in *Farhane* or elsewhere, that he possesses a graduate degree from Georgetown or a graduate degree in

---

[30] Defendants cite the *amici* brief as though the *amici* themselves stated this. In fact, the *amici* were quoting an article in New York magazine. That article goes on to state that "Over the past decade, Kohlmann has patiently assembled one of the world's largest collections of jihadi material—terabytes' worth of sermons, fatwas, newsletters, message-board discussions, and video. Especially video: hundreds of hours of terrorist-training camps, martyrdom wills, live footage from the battlefields of Iraq and Afghanistan, beheadings, explosions, and burned bodies. He has catalogued this material for easy retrieval by law-enforcement agencies hoping to match a name to a face or producers looking to illustrate a television-news report." Defendants did not include this portion of the article in their brief.

[31] *See* Defendants' Expert Marc Sageman being "torched" by terrorism scholar Bruce Hoffman, https://www.nytimes.com/2008/06/08/weekinreview/08sciolino.html. Hoffman states Sageman's "historical ignorance is surpassed only by his cursory treatment of social-networking theory." Dr. Sageman responded "Maybe he's mad that I'm the go-to guy now."

[32] *Al-Qaida's Jihad* earned Kohlmann much praise, with Dr. Mark Hoare, a faculty member at the University of Cambridge, stating "Written by a genuine expert in the subject…this is a lucid and informed account of the involvement of the mujahedin in Bosnia, one that lays the myths to rest… This excellent book is essential reading for anyone wishing to understand the truth about an episode of the Bosnian war that is so frequently misrepresented by those with a political motive for doing so." *See* Ex. 4 (CV of Kohlmann). Indeed, *Al-Qaida's Jihad* was used in courses taught at Princeton University, Harvard University, and Johns Hopkins University, among others. *See id. See also* Ex. 1 (Kohlmann Rpt.) ¶¶ 7-10 for federal court praise for Kohlmann.

[33] Ex. 4 (CV of Kohlmann).

Islamic studies. The minor imprecision in the *Farhane* decision is not Kohlmann's error and is immaterial. Indeed, the evidence in *Farhane* about Kohlmann's education was accurate and Kohlmann has been qualified by many Courts with a correct understanding of his education.

Continuing their misguided attempts to denigrate Kohlmann's education, Defendants engage in truly next-level pedantry, at 5-6, arguing that Kohlmann listing his "minor" as "Islamic Studies" rather than his Certificate in Islam and Muslim-Christian Understanding is "recredentialing." Again, the facts work against Defendants' claims. **First**, as Kohlmann said in his deposition, the Georgetown School of Foreign Service did not offer minors when he was in school.[34] **Second**, the coursework required the equivalent of a minor.[35] **Third**, the Certificate did involve taking graduate level courses, as stated in *Paracha*.[36] **Lastly**, and most importantly, Kohlmann has been qualified based on his certificate. *See Linde v. Arab Bank,* PLC, 922 F. Supp. 2d 316, 331 (2013) ("He holds a J.D. from the University of Pennsylvania Law School and a certificate of Islamic studies from the Prince Alweleed [sic] bin Talal Center for Muslim–Christian Understanding at Georgetown University.").

Defendants' next argument, at 6, that Kohlmann misrepresented his academic credentials, is merely a bad faith attempt to tarnish Kohlmann's expertise in Islam. To support their position, Defendants cite, at 6 n. 32, a Southern District of New York opinion referring to an Eastern District opinion where a medical doctor misled the court about his medical credentials.[37] The Defendants' footnote omits the full context to suggest that the medical doctor was disqualified as an expert because he was merely "not forthcoming … about his professional background." The reality is much more egregious. The full quote from the case reads:

---

[34] *See* Ex. 24 (Archived Georgetown School of Foreign Service Website) (A 2002 archive showing that "SFS students can choose from a number of optional *certificate* programs.").

[35] *Compare* Ex. 26 (Certificate Requirements), *with* Exhibit 27, (Minor Requirements ).

[36] *See* Ex. 26 (Certificate Requirements) (stating "These courses are often double-numbered to be in accord with the requirements of graduate students who may take the course, as in History 268/568. In such cases students taking the courses as a Certificate Capstone will be expected to undertake work similar to that done by the graduate students in the course.").

[37] The cases in question are *I.M. v. United States,* 362 F. Supp. 3d 161, 193 (S.D.N.Y. 2019), and *Vale v. United States,* 2015 WL 5773729 (E.D.N.Y. Sept. 30, 2015), *aff'd, Vale v. United States,* 673 F. App'x 114 (2d Cir. 2016).

> Judge Bloom's thorough Report [and Recommendation] contains a litany of facts that also render Dr. Lipsius unqualified to testify as a medical expert, including: (1) he has not practiced medicine since 1999; (2) he is a former habitual user of and/or dependent on narcotics, barbiturates or drugs having similar effects, in violation of New York Education Law § 6530(8), which resulted in him surrendering his medical license; (3) he has been convicted of two counts of falsifying business records and one count of wire fraud; (4) he was not forthcoming with Judge Bloom about his professional background; and (5) he has never been qualified to testify as an expert in any court. (Report 12-14.).

*Vale v. United States*, 2015 WL 5773729, at *3 n.3.[38]

Defendants are disingenuous, at best, in arguing that Kohlmann's listing of "Islamic Studies" rather than "Islam and Christian-Muslim Understanding" rises to the level of the misconduct described in *Vale*. In *Vale,* the doctor's failure to be "forthcoming" about his professional credentials was just one of *many* issues that factored into the Court's decision and the present case shares none of the facts of *Vale*—namely, Kohlmann has (1) never had a professional license revoked, (2) has never violated laws related to controlled substance use resulting in the revocation of a professional license, (3) has never been convicted of any crime of dishonesty, (4) has been completely forthcoming and honest about his professional qualifications, and (5) **has been qualified to testify in almost 40 federal cases,** in many of which he testified as an expert for the United States government.

### iii. Kohlmann is qualified to offer expert opinions on the financial practices of alleged terrorist entities

Experts may be qualified to opine on a topic via their education <u>or</u> experience. Fed. R. Evid. 702. Formal education in a field of study is not required to be qualified as an expert, and "[t]he Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004); *see also Peerless*

---

[38] Digging deeper, the R&R in *Vale* states "[t]he 'misrepresentation' to the Court is Dr. Lipsius's failure to include medical facilities on his curriculum vitae where he was accused of drug use while on the job. Both incidents resulted in the loss of medical licenses in those states." *Vale v. United States*, 2015 WL 5773902, n. 26 (E.D.N.Y. Aug. 28, 2015), *adopted*, 2015 WL 5773729 (E.D.N.Y. Sept. 30, 2015), *aff'd*, 673 F. App'x 114 (2d Cir. 2016).

*Ins. Co. v. Marley Engineered Prods. LLC*, No. 05-CV-4848 (AKT), 2008 WL 7440158, at *2 (E.D.N.Y. June 12, 2008). Kohlmann has obtained much of his experience through decades of studying terrorism financing and terrorism funding. Defendants inaccurately quote Kohlmann's full response concerning whether he had training in accounting, where he answered:

> I mean, I don't have any formal training in accounting, but if you are asking have I looked at accounting documents that have been recovered in investigations like this and, you know, **helped examine them or even just studied them on the side? The answer is yes.** If you are asking if I have formal training in accounting, the answer is no.[39]

In his years of field experience, Kohlmann has conducted numerous financial examinations of entities that have supported terrorism, giving him expertise and context well beyond that of a layperson. Based on his decades of practical experience, Kohlmann knows the red flags to consider in financial documents (such as repeatedly ignoring recommendations of government regulators). And whether he has studied *non*-terrorist funding entities is irrelevant given his line of work and area of expertise.

Moreover, Kohlmann has written academic articles about terrorist financing,[40] and has been qualified to opine on terror financing in the Second Circuit and elsewhere. For example, in *Kassir*, 2009 WL 910767, at *2, Kohlmann proffered testimony as to "terrorist fundraising techniques." In *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011), the court recognized Kohlmann's financial knowledge when it relied on his expert opinion to find that Al Qaeda "set up several businesses and charities in Sudan as its financial and operative base for terrorist activities."[41] The District Court in *Owens* (in qualifying Kohlmann) quoted Kohlmann's Report regarding the means of Al Qaeda's income via fraudulent humanitarian relief.[42]

### iv.   Kohlmann is qualified to offer opinions on how the alleged "charities" operate

Defendants next, at 8-9, split hairs to argue that Kohlmann is unqualified to offer opinions on the

---

[39] Ex. 12 (Kohlmann Tr.) 715:16-24 (emphasis added).

[40] Kohlmann, Evan F., *The Role of Islamic Charities in International Terrorist Recruitment And Financing*, Danish Institute for International Studies, 2006. http://www.jstor.org/stable/resrep13293. (Last accessed 14 Sept. 2023).

[41] *Owens*, 826 F. Supp. 2d at 143.

[42] *Id.* at 143-44.

"structures" of the Defendant charities. Kohlmann's formal training and work identifying illegitimate charitable operations necessarily has the requisite nexus to understanding the "structure and organization" of legitimate charities, and, in effect, Defendants ask this Court to disqualify him for having experience that is *too* relevant.[43] Indeed, in the context of terrorism, the "Red Flag Indicators" identified by the Financial Action Task Force ("FATF") do not focus on how charities are run generally, but rather how they're *misused*.[44] Kohlmann has testified to Congress about the misuse of charities, and has been qualified by federal courts to testify on this very topic.[45]

Regardless, Kohlmann does have the requisite expertise to opine on the structure and organization of foreign "charities." Arguing that Kohlmann has no nexus to support his testimony regarding charitable structures, Defendants again fail to offer Kohlmann's full testimony, including only that he said his expertise regarding charitable organizations "is mostly focused on how it applies in the U.S." 187:18-22. However, Kohlmann's full answer is as follows:

> My expertise in charitable [organizations] is mostly focused on how it applies here in the U.S. **I've extensively reviewed 990 and 1023 forms, I am familiar with the requirements behind them, I've taken a look at <u>well-filed 990s</u> versus poorly-filed 990s, I have spent extensive time working with Star database, I have spoken with, interviewed and even taught IRS, CIA investigators who are focused on abuse of charitable institutions for terrorist financing purposes. But I think obviously I know something about what has been done outside the U.S., <u>primarily in Saudi Arabia</u>....**[46]

---

[43] As opposed to their proffered "general" experts who have no experience identifying terrorist funding organizations. For example, WAMY's expert, Jonathan Marks, was clear that "[he] ha[s] never been involved in an investigation that has led to anything related to terrorist financing." (Ex. 29 (Marks Tr.) at 41:9-18)). MWL/IIRO's accounting expert, John Barron, stated the same. Ex. 17 (Barron Tr.) at 112:11-17. ("Q:...I take it that you would not hold yourself out as an expert on countering the funding of terrorism or counterterrorism funding; is that right? A: Not specifically, no.")

[44] *See generally* https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Risk-of-terrorist-abuse-in-non-profit-organisations.pdf.coredownload.pdf; *see also* discussion, *infra*, at n. 200, identifying "red flags" experts in the field have traditionally evaluated to determine the likelihood of terrorist financing.

[45] *See* Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs, Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930", The Role of Saudi Arabian State-Sponsored Charitable Fronts in Providing Material Support to Foreign Paramilitary and Terrorist Organizations (Prepared Statement) https://www.judiciary.senate.gov/imo/media/doc/07-14-10%20Kohlmann%20Testimony.pdf; and the Hearing Transcript at https://www.congress.gov/111/chrg/CHRG-111shrg64296/CHRG-111shrg64296.pdf.

[46] Ex. 12 (Kohlmann Tr.) 186:20 - 187:13 (emphasis bolded and underlined).

Regarding his expertise on the laws that regulate legitimate charities, Kohlmann directly told defendants "Yes, I am familiar with that, yes" and when asked if he "ha[d] training in that" he responded "**Yeah, on-the-job training, yes**."[47]

Kohlmann's professional experience related to terrorist funding through purported legitimate charities is vast. He has testified before the Senate about charitable organizations: "The Role of Saudi Arabian State-Sponsored Charitable Fronts in Providing Material Support to Foreign Paramilitary and Terrorist Organizations." Kohlmann "was an invited instructor at the Brunswick Training Center for IRSCI [Internal Revenue Service Criminal Investigation] investigators specifically on the issue of terrorist financing and means of charities for terrorist financing," and has "spoken with folks from… the F.B.I., from Foreign Law Enforcement, from U.S. Congressional investigators, U.S. military."[48] Given his experience, and that *he, himself, has trained other U.S. government agencies on this issue,* Defendants' statement that Kohlmann has "no training or other relevant experience" regarding the "structures" of charities is abjectly false.

### v. Kohlmann is qualified to offer opinions on Islam as it relates to Islamic terrorist organizations

Defendants, at 9, inject factual issues improper for *Daubert* consideration and ignore Kohlmann's experience. Here, they argue that Kohlmann "seeks to impart violent meaning to the discussion by speakers at WAMY events and WAMY officials about Islamic concepts" and that religious matters are "outside of his expertise." To the first point, whether the rhetoric WAMY officials spread constitutes violent rhetoric is a factual issue for the jury. But Kohlmann may rely on the rhetoric to reach his opinions. To the latter point, Kohlmann has formal higher education regarding Islam and practical experience regarding Islamic culture and is qualified to opine on tenets of Islam as they relate to his counter-terrorism work.

**First**, the English-language manual Kohlmann obtained from a WAMY bookstore in the U.K. calls

---

[47] *Id.* at 186:8-15. (Emphasis added.)
[48] *Id.* at 16:2-10.

on the youth to "unsheathe the swords" to "defend the flag" and asks if they are "miserly with blood" on the "Day of Jihad."[49] Kohlmann applies his expertise in Islamic extremism to conclude that this is violent rhetoric, not benign "campground songs." This manual, sanctioned and sold by WAMY, was intended to be sung by children at camp and Kohlmann properly contextualized it as part of WAMY's broader support for Islamic extremism. It is in this context that others, like Dr. Maneh al-Johani, called for jihad to free Kashmir, and Suleman Ahmer stated that "without jihad the evil forces will overwhelm you."[50] Defendants cannot be allowed to unilaterally redefine the term "jihad" to suit their narrative. Moreover, in making their argument, Defendants implicitly acknowledge they are not making a *Daubert* argument but are using *Daubert* as a proxy to argue their favored theological definitions. Nevertheless, whether the phrases and terms used in WAMY/MWL/IIRO materials contain violent rhetoric common amongst terrorist supporters is a factual dispute that Kohlmann's testimony addresses and informs, and thus fits precisely within Kohlmann's expertise. Indeed, Kohlmann's decades of experience qualify him to comment on extremist materials, which includes identifying and contextualizing them and will be helpful to a jury.[51]

**Second,** Kohlmann is an expert regarding Islam as it implicates terrorism and extremism, even if he is not an expert on Islam as a religious faith. As discussed above, Kohlmann has received formal higher education in Islam.[52] Defendants attempt to equate Kohlmann's religious qualifications precisely to Jonathan Winer's, but Winer (though he, too, has practical expertise regarding Islam's intersection with terrorism) does not have Kohlmann's formal education in Islam. Further, to discuss the meaning of terms such as "Wahhabi" in terrorism contexts is precisely within Kohlmann's purview as an expert in terrorism.[53]

---

[49] Ex. 1 (Kohlmann Rpt.) ¶ 160.

[50] *Id.* at ¶¶ 161, 164.

[51] *Linde*, 922 F. Supp. 2d at 332 ("[Kohlmann] synthesizes this material and pulls together common themes in reaching his conclusions.").

[52] *Supra* at 10.

[53] Kohlmann has previously been qualified by Federal courts to testify as to common language used by terrorists. *See* Ex. 23 (*USA v. Osmakac*) ("the Court finds that Kohlmann is qualified to testify as to the definition and explanation of various terms, phrases, and references, specifically, the terms hijrah, big hijrah, kufar, takfiri, and jihaad; as well as the import of black flags.").

Kohlmann is not proffered as an expert in Islam *as a religious faith*, but he has been qualified by federal courts to testify when tenets of Islam are coopted into violent political movements.[54] Further, Kohlmann explicitly stated his expertise in Islam in his deposition, saying:

> As far as in-depth knowledge of Islamic culture, I have that, it is very helpful, the fact that I have a certificate in Islam, the fact that I know about Islamic terminology, I have spent time in the Islam[ic] world, I know the difference between someone, as you pointed out, saying the Shahada in a religious context, versus saying in a more political context, I understand that.[55]

Moreover, Kohlmann has been qualified to testify precisely on Islamic extremism by the Second Circuit. *See United States v. Subasic,* 568 F. App'x 234, at *4 (4th Cir. 2014) (finding no abuse of discretion in qualifying Kohlmann). In the Fourth Circuit, Kohlmann has been qualified to testify on the "meaning and context of various words and phrases used by the defendants which are commonly used by persons practicing extreme Islam"; the "structure and leadership of groups adhering to the principles of Islamic extremism"; and the "manner and means employed by extremist Islamic groups to recruit individuals and the process of radicalization which occurs within such groups." *United States v. Hassan,* 742 F.3d 104, 130-31 (4th Cir. 2014). Thus, Kohlmann has the expertise, as observed by the Second and Fourth Circuits, to testify as to Islamic extremism.

### vi.   Kohlmann does not manufacture or manipulate materials

Defendants, at 10-13, argue that mistakes in Kohlmann's report, which he acknowledged in his deposition and corrected, are grounds for total exclusion of his opinion. Defendants have no Second Circuit law to support their (false) assertion that Kohlmann allegedly "manipulated materials" (which are, in fact, mistakes) would require this Court to strike his opinions. Defendants, at 10, cite to an Eastern District of Louisiana case, *Konrick v. Exxon Mobil Corp.,* 2016 WL 439361 (E.D. La. Feb. 4, 2016), *aff'd,* 670 F. App'x 222 (5th Cir. 2016), to argue that mischaracterizing the contents of a source is grounds for exclusion. Even

---

[54] *See Sabir*, 2007 WL 1373184; *United States v. Abu Ghayth*, 2014 WL 978629.
[55] Ex. 12 (Kohlmann Tr.) 276:5-14.

if *Konrick* were binding on this Court, the examples Defendants provided do not support exclusion of Kohlmann's testimony. The at-issue expert in *Konrick* was deficient for several reasons, which the court used to justify his exclusion, contrary to Defendants parenthetical.[56] The mistakes Kohlmann made and acknowledged are not at all comparable to the exclusion of the expert in *Konrick*.

First, Defendants state that Kohlmann "manipulated" the facts when he mistakenly linked September 11th hijacker Waleed Alshehri to the IIRO, by referencing the name of IIRO employee Fayez Ahmed Alshehri. Kohlmann admitted the mistake in his deposition. Ex. 12 (Kohlmann Tr.) 437 ("It is a mistake, it is a typo. … I will remove it from my report…."). In fact, contrary to the Defendants' baldly false assertion, at 11, that "in the intervening time since his deposition [Kohlmann] has made no attempt to correct this reckless 'mistake' …," Kohlmann did correct the error in correspondence to each of the Defendants' lawyers dated October 18, 2021. The letter enclosed revised pages of Kohlmann's Report to address the very issue they claim he did nothing to correct.[57] While Defendants are free to cross-examine Kohlmann on this mistake at trial, they cite no legal justification to exclude expert testimony based on mistakes in their reports.[58]

Next, Defendants, at 11, ask the Court to reject Kohlmann's testimony based on his use of ellipses. They argue that Kohlmann's omission of the phrase "not for financing terrorism" from a quote included in his report from a 2018 Saudi Government Report was "deceitful[]," even though he properly indicated that it was a partial quotation by including ellipses. Defendants premise their allegation that Kohlmann is deceitful on a header in Kohlmann's Rebuttal Report, arguing that Kohlmann intended to imply that the forced shuttering of IIRO and WAMY was due to terrorist financing. In reality, the discussion in the report

---

[56] For example, "Dr. Harrison's methodology is flawed because he relies on multiple studies that do not reliably support his conclusion." and "Dr. Harrison relies on studies that do not exhibit statistically significant results." Neither of these reasons were discussed in Defendants brief. *Konrick*, 2016 WL 439361, at *7.

[57] Ex. 2 (Revisions to Kohlmann Rpt.).

[58] The law is against the Defendants. *M.B. v. CSX Transportation, Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) ("a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.") (*citing Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir. 2002)).

Kohlmann was quoting concerned the charity defendant's failure to adhere to applicable legal and financial regulations and procedures governing their work, a probative issue that the defendants have themselves sought to introduce into the litigation. Kohlmann quoted the report for that point. The discussion at issue did not concern terrorism funding activities themselves, and the Defendants' mischaracterize the context and purpose of the relevant discussion in service of their arguments. Kohlmann's decision to exclude words with the ellipsis was entirely reasonable, because it was extraneous to the point being addressed. Defendants mischaracterize Kohlmann's explanation as "doubl[ing] down" when he was simply explaining the logic in his decision to omit the phrase. Ironically, Defendants again do not cite Kohlmann's full responses, cutting off relevant portions of his answer.[59] Kohlmann states:

> I thought it was pretty clear the way I stated it especially since the point of this paragraph has nothing to do specifically with funding terrorism. It is specifically about -- the title of the section -- or the lead sentence in the section is about violating highly publicized rules in cash fundraising and proper accounting procedures. **The point of this was not to suggest that the report indicated that there was terrorist fundraising going on, but merely that they continued to violate their own fundraising laws. So, I mean, I don't disagree with the fact that it says this, yeah, of course, but that's what I said. I said to ensure that financial and administrative imbalance is not exploited.**[60]

This is clearly not deceptive nor malicious, and in trying to cast it as such Defendants distort the point of Kohlmann's argument. What is relevant is that Saudi Arabia acknowledges deviations from financial requirements and protocols on the part of the charity co-defendants. The import of that acknowledgement is an appropriate issue for the factfinder to weigh.[61]

Next, Defendants, at 12, use loaded language ("sleight of hand") to accuse Kohlmann of "contort[ing]" evidence about a Guantanamo Bay detainee. Defendants take issue with the word "offered," Kohlmann used to discuss detainee Said Muhammad Husayn Qahtani's intention to fight in Chechnya via

---

[59] Defendants cite to 760:11-761:20; but Kohlmann's answer ran to 762:5.

[60] Ex. 12 (Kohlmann Tr.) 761:11 – 762:5.

[61] The fact that the Kingdom of Saudi Arabia, itself a defendant sued here based on alleged terrorist activities of its charities, included language claiming that the closures were unrelated to terrorist financing is neither surprising (given its own interests), and in any case beside the point of the relevant discussion.

fraudulent employment documentation IIRO allegedly "offered," on the grounds that Qahtani did not ultimately follow through on the plan. Kohlmann, again, explained in his deposition:

> So this individual wished to go into Chechnya. At the time the only way to get into Chechnya was to have credentials from some kind of relief organization that would get you over the border, this is exactly the same problem that happened to the deputy commander of Al Qaeda when he tried to go there and he got arrested. So the idea here is that these guys needed a way in, they needed ID cards, the same thing as what happened in Bosnia. So the organization provided ID cards to these folks.[62]

IIRO ID cards were recovered from Saudi fighters in Bosnia, indicating that the organization had given them out to those who indeed went on to go fight.[63] It is not sleight of hand to assert that these ID cards were indeed "offered," despite the fact that Qahtani didn't take them up on the availability of such ID cards. This argument is another example of Defendants' disagreement with isolated wording in Kohlmann's report and their preferred view of the evidence, and not a deficiency in his expertise, analysis, or methodology. Such factual disputes are not suited to *Daubert* challenges.

Next, Defendants, at 12-13, again use *Daubert* as a proxy to argue factual issues about the Canadian Revenue Agency ("CRA") investigation of WAMY Canada. Defendants argue it is improper for Kohlmann to suggest that "fail[ing] to 'maintain essential books and records'" is an indicator of support for terrorism. However, as argued in this brief, *supra* at 12-14, Kohlmann has the precise expertise to analyze the materials he analyzed to reach his conclusion. Further, WAMY has itself interjected its financial practices into the litigation, by calling its own experts to offer opinions about the adequacy of its financial practices and to criticize the CRA's findings. Disagreements about his conclusions regarding the CRA documents go to weight, not admissibility, of his opinion. Kohlmann's opinion that the CRA report evidences a close association between BIF and WAMY can be weighed by a factfinder.

**Lastly,** the Charity defendants again mislead the Court by suggesting that Kohlmann insisted that WAMY itself published the book the "Arab Volunteers in Afghanistan." As Kohlmann explained in his

---

[62] *Id.* at 455:20 to 457:15.
[63] Ex. 1 (Kohlmann Rpt.) ¶ 78.

Report, the book was *written by* WAMY employee Adel Batterjee under the pseudonym "Basil Muhammad."[64]

Next, Defendants again reiterate their mistaken belief that Kohlmann should be barred from testifying here based on mistakes he has made in prior litigation, even when that litigation permitted him to testify despite those minor mistakes.[65] This argument is irrelevant and unsupported by any law.

### vii.   Kohlmann does not manipulate facts to create associations

Defendants misuse *Daubert* to argue Kohlmann's opinions are excludable merely because they disagree with his conclusions and the facts he relied on to reach those conclusions, arguing that the facts he relied on were "manipulated." But, "contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citing *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.), cert. denied, 113 S. Ct. 82 (1992). Defendants' merely present "a challenge to the facts or data [Kohlmann] relied upon," and such challenges "do not go to the admissibility of his testimony, but only to the weight of his testimony." *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005).[66]

Defendants, at 13-15, allege that Kohlmann "manipulates facts" by analyzing associations between WAMY and individuals with links to terrorism using his expertise and forming an opinion. Defendants allege (1) that Kohlmann "invokes" Abdullah bin Laden's name as "proof" that WAMY has links to Al Qaeda, and (2) that Saad Buraik was not an "employee of WAMY," and that (3) infamous extremist Anwar Al-Aulaqi was not yet radicalized when he was speaking at WAMY events.[67] Defendants ignore that influential radical Salafi preacher Ali al-Timimi also spoke at Al-Aulaqi's al-Ribat mosque in San Diego in

---

[64] *See* Ex. 3 (Kohlmann Rebuttal Rpt.) ¶ 8-9.

[65] Defendants' own brief, at 13 n. 75, acknowledges that Kohlmann was "permitted to testify" despite minor textual errors.

[66] *See also McCulloch,* 61 F.3d at 1044 ("Disputes as to the strength of [the expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.")

[67] Defs. Br. 14.

2000.[68] Once again, these are mere factual arguments not appropriate for *Daubert*. To the extent that the Court is inclined to entertain them, Plaintiffs offer the following.

**First**, Kohlmann mentions Abdullah bin Laden to indicate the specific WAMY office that he was discussing, and he reiterated this point in his deposition.[69] It is a fact that Abdullah bin Laden ran WAMY's office in Northern Virginia. Simply because Defendants do not like a fact, does not render opposing experts unable to testify on that fact.

**Second**, Saudi cleric Saad al-Buraik spoke at several events for the Saudi-controlled charity WAMY.[70] Saad Buraik also served on the Union of Good, a designated Hamas-supporting entity, with WAMY Secretary General Saleh Wohaibi.[71] Whether al-Buraik was an "official employee" of WAMY is "splitting hairs;" he was, in fact, giving lectures that included violent rhetoric at WAMY summer camps.[72] The extent to which WAMY's had connections to Saad al-Buraik make it more or less likely that WAMY supported terrorism and that is an appropriate issue for the factfinder to weigh.[73]

**Third**, Defendants argue, at 14, that the U.S. Government's invitation to Anwar al-Aulaqi to speak demonstrates that he was a moderate. This is a red herring on several levels. To begin with, Aulaqi was undoubtedly recognized as an extremist by U.S. intelligence at the time he was traveling to WAMY offices. The 9/11 Commission Report confirms that the FBI had open investigations into Aulaqi in 1999 when he was in contact with Al Qaeda procurement agent Ziyad Khaleel.[74] Aulaqi was also investigated for his

---

[68] *See* Ex. 28 (IANA 2000 W. Coast List of Speakers)

[69] Ex.12 (Kohlmann Tr.) 589:14 to 590:5.

[70] Ex. 1 (Kohlmann Rpt.) n. 145, ¶¶ 183 – 185.

[71] *Id.* at n. 276.

[72] Ex. 1 (Kohlmann Tr.) 601:17-25 and 602:10-18 (Kohlmann saying that the article stating WAMY "employs" al-Buraik "may be an incorrect assertion" but "that's besides the point" because he undoubtedly gave lectures at WAMY summer camps.).

[73] Whether the source for Saad al-Buraik giving inflammatory speeches at WAMY summer camps is run by an Islamaphobe is irrelevant, as Kohlmann points out in his deposition, "it is not a fact in dispute." Ex. 12 (Kohlmann Tr.) 607:14-23.

[74] National Commission on Terrorist Attacks upon the United States, Thomas H. Kean, and Lee Hamilton, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States,* Washington, DC (2004), p. 517.

relationship to the plotter of the 1993 World Trade Center bombing, Omar Abdel Rahman.[75] Aulaqi even had a 24/7 FBI tail when he went to a WAMY office in December 2001.[76] During this time, Aulaqi had also spent a good portion of the 2000-2001 period providing direct assistance to the September 11th hijackers in California and Virginia. More fundamentally, the fact that some third party may have viewed Aulaqi as a moderate does not eliminate the evidence that he was, in fact, a radical, and that WAMY knew as much. Terrorist supporters often present themselves as moderates to outsiders, while showing their true stripes to fellow extremists.

These are not "mistakes" or "misrepresentations," they are **factual disputes** that have no place in a *Daubert* argument. At no point does Kohlmann "hid[e] crucial text" or "blind the reader" to any pertinent fact. Kohlmann has formed his opinion based on evidence, and Defendants cannot demand its exclusion based solely on their disagreement with it.

### viii.   Kohlmann opines on evidence using his expertise, he does not draw legal conclusions

Defendants, at 15-16, argue Kohlmann improperly reaches legal conclusions by concluding that Defendants "materially support[ed]" Al Qaeda. They also argue, at 16, that Kohlmann's testimony that dawah organizations were "convenient vehicles for illicit money laundering" is conclusory and thus, excludable.

**First**, Kohlmann's expertise includes examining whether individuals and organizations are supporting terrorist groups. In the study of terrorism, "material support" is a term of art used by professionals in his field.[77] Kohlmann looked at evidence, analyzed it, and, as a result of his analysis,

---

[75] The U.S. House of Representatives Permanent Select Committee on Intelligence and the Select Senate Committee on Intelligence, *Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001,* 107th Congress, no. 351, at 178 (2002).

[76] Ex. 25 (FBI Surv. Log) 2 (Dec. 18, 2001) (Aulaqi surveilled arriving a WAMY's office in Falls Church, Virginia).

[77] *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 132 (D.D.C. 2018) (holding that "Plaintiffs have demonstrated further that this terrorist action would not have been possible without the material support provided to Hamas by Iran" and relying on Expert Dr. Levitt's testimony that "The majority of Hamas financing in general, and certainly in this period of time [around March 6, 2008] came from Iran ... and by financing, ..., I really mean financing and resourcing more generally" which includes not only cash but funding, weaponry, and training.").

concluded that the Defendant charities were "convenient vehicles for illicit money laundering and provid[ed] material support to terrorists and other violent extremists."[78] Kohlmann, in coming to his ultimate opinion, discussed identifiers for terrorist support and funding in his deposition:

> I haven't seen a lot of instances where law enforcement agencies have written lengthy reports about how one particular charity seems to be involved in all sorts of . . . burning records, cheating, forgery, and they're using those words.[79]

And:

> Why would the IIRO create a hidden bank account in Bahrain in 2005 after they had already been told not to. Again, these kind of activities, ..., a major charity violating anti-money laundering law twice after it has already been told not to and creating a secret bank account, that's not normal, you don't see Save the Children doing that. Like I said, . . . that doesn't happen, certainly not with an organization that should have much better oversight.[80]

This fits squarely within testimony that would enable the factfinder to determine whether Defendants have materially supported Al Qaeda according to the legal definition. Indeed, Kohlmann has been permitted to offer similar testimony by this very Court.[81]

Defendants next, at 16, assert that Kohlmann "improperly concluded" that IIRO permitted crimes, citing only to his report. But Kohlmann dealt with this directly in his deposition, saying:

> So, sorry, let me be clear, this is an IIRO employee describing al-Farouq as a charity-funded company and DOD also found evidence separately that al-Farouq was also funded, primarily funded by IIRO, right. Based on those two pieces of evidence together, it sure sounds like it is IIRO that's funding al-Farouq. Again, this is part of – excuse me -- [82]

Defendants then cut Kohlmann off because did not like Kohlmann's answers. Defendants now fabricate a legal standard to exclude factual disputes under the guise of *Daubert* principles. Kohlmann even pointed out Defense counsel's disregard for facts they didn't like in his deposition:

---

[78] Ex. 1 (Kohlmann Report) ¶ 205.

[79] Ex. 12 (Kohlmann Tr.) 377:2–15.

[80] *Id.* at 379:19 to 380:11.

[81] *Sabir*, 2007 WL 1373184, at *11 ("Mr. Kohlmann's proffered testimony will also assist the jury in determining facts in issue. For example, it will assist them in determining whether the Government has proven that Dr. Sabir provided material support or resources to al Qaeda with 'knowledge that [it] is a designated terrorist organization . . . that [it] has engaged or engages in terrorist activity . . ., or that [it] has engaged or engages in terrorism.' 18 U.S.C. § 2339B(a)(1).").

[82] Ex. 12 (Kohlmann Tr.) 343:11-21.

But what I can tell you is you're asking me for an example of where money went from IIRO's accounts to something illicit that was terrorism-related and I just gave you an example and I gave you exact amounts.[83]

Next, Defendants, at 16, argue that Kohlmann's conclusion that top WAMY officials "explicitly endorse[d] the concept of violent jihad" and engaged in the "diversion of money, weapons, and [production] of travel documents to al Qaeda" was without factual basis. In fact, Kohlmann possessed the requisite evidence to conclude that WAMY endorsed violent jihad, as outlined in his report and his deposition.[84] One example described above indicated Kohlmann personally obtained extremist materials advocating violent jihad from a WAMY bookstore.[85] Kohlmann's testimony cannot be excluded simply because Defendants disagree with Kohlmann's assessment of the evidence.

### ix. Kohlmann does not opine as to motive or mental state

Defendants argue, at 17-18, that Kohlmann "cannot possibly divine what [MWL, IIRO, and WAMY officials] knew or did not know…" and assert that state of mind speculation is impermissible. This is ironic given that, throughout their brief, Defense counsels' ascriptions to Kohlmann of deceit and other intentions have regularly divined Kohlmann's mental state.[86] However, Defendants are mistaken that Kohlmann is speculating as to certain individuals' states of mind.[87] Indeed, experts, may testify as to whether circumstances are consistent with a given state of mind.[88] Each of the instances Defendants cited as "state

---

[83] *Id.* at 350:23 - 351:4.

[84] *Supra* at 15-16.

[85] "I obtained an item that is described in my expert report, to wit, a WAMY summer camp training manual, including descriptions of courses and songs to be sung by campers." Ex. 12 (Kohlmann Tr.) 505:19-23.

[86] *See, e.g.*, Defs. Br. 6 ("deceitful attempts" that they allege are a "campaign and a pattern to deceive both the courts and the public at large"), 11 ("deceitfully omitted").

[87] Specifically, Defendants argue, at 17-18, that Kohlmann opines as to the (1) "awareness and knowledge of senior officials" of MWL/IIRO and WAMY's material support of al Qaeda and affiliated organizations, (2) the charities' awareness of the ideological agenda being pushed by their employees, (3) the suspicious financial practices of their employees, (4) the connections between the entities and violent jihadists, like Al Qaeda, (5), testimony about the "wishful thinking of IIRO and MWL employees," (6) MWL, IIRO, and Rabita Trust's attempt to "limit their exposure" after 9/11, and that they took action to "evade law enforcement and intelligence agencies."

[88] *United States v. Patel*, 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023) ("while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind.") (citing *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8-9, at *12-14 (S.D.N.Y. Dec. 15,

of mind" testimony fits squarely into the exception permitted by district courts in the Second Circuit. For example, if WAMY was selling books promoting violence and *jihad* in their official bookstores, the organization likely had an "awareness of the ideological agenda being pushed by their employees."[89] Further, if the United States designated as terrorists any of the charities' employees or offices, it follows that the broader organization *should* be aware of it, despite the "feigned ignorance" of their officers.[90] The same goes for the "wishful thinking" of the charities' leadership – if the officials were downplaying the severity, contrary to the litany of evidence of financial wrongdoing, "wishful thinking" is a fair assessment. At any rate, all of Defendants supposed incidences of "state of mind" testimony are nothing more than Kohlmann's observation that a given state of mind is consistent with a given practice, as permitted by law.

### x. Defendants launder factual disputes via *Daubert* challenges, asserting that he is a "conduit of hearsay" for facts they dispute

Kohlmann reviewed hundreds of documents and sources to reach his conclusions. To arrive at his conclusions, he describes the evidence he relied on, quotes it, analyzes it, contextualizes it, and synthesizes it. In doing so, Kohlmann adds to that evidence by discussing its implications, and how it relates to other documents or evidence that he's reviewed (e.g., depositions). Defendants endeavor to strip Plaintiffs' experts of their ability to quote from documents at all by broadly arguing that Kohlmann "regurgitates hearsay," conclusively repeating that stating Kohlmann "parrots" documents.[91] In a sense, they "Parrot" the "Parrot"

---

2011)); *see also In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) ("[A]n expert can testify to whether a given state of mind is consistent with a given practice-i.e., a defendant likely knows X if they do Y."). An expert can also "reference" an actor's state of mind when that state of mind is in "the record" and is "the basis for [the expert's] ultimate opinion." *Bd. of Trs. of AFTRA Ret. Fund*, 2011 WL 6288415, at *8.)

[89] In other words, they likely know X, if they do Y. *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14.

[90] Ex. 1 (Kohlmann Rpt.) ¶ 129, stating that Abdelhadi Daguit, MWL/IIRO Philippines official, "feigned ignorance when asked about the 2006 designation of the IIRO office during his deposition."

[91] Defendants in one breath say that Kohlmann "'regurgitat[es]' hearsay," rather than "'gather[ing] information from multiple sources' and 'cross-check[ing] factual information' against other accounts," and then only a few pages later vilify him for "parrot[ing]" his own statements, newspaper articles, and other tertiary sources, to support his opinion that WAMY had close relations with organizations engaged in "providing resources to entities engaged in terrorist activities." In other words, Kohlmann did **exactly what he's supposed to do as an expert**. He weighed multiple sources, used his expertise, and reached a conclusion. Defendants, at 19 n. 119, even try to denigrate Kohlmann by saying that "he himself has testified about the problematic use of government sources that are tertiary in nature." Defendants miss the nuance, yet again. What Kohlmann actually does is caution against relying on *only government sources* or *only journalistic sources*. But

argument repeatedly and inappropriately.

For example, Defendants, at 19, assert that Kohlmann "parrots unreliable Department of Defense (DOD) assessments" regarding WAMY employee Adel Hamad, and Mammar Ameur. Defendants support this assertion by arguing that the assessments are "unproven allegations" that have "been rejected by federal courts."[92] They then baselessly claim the DOD assessments "may" be the product of torture without any supporting evidence.[93] Defendants continue by deploying their arguments scattershot, at 19, stating that Kohlmann "manipulates quotes from DOD assessments to misrepresent their meaning," and "parrots unverified 'adverse reporting' from the 500-page CRA report." These arguments fail, as Kohlmann does not "naked[ly] cut and paste" information from these reports, nor does he exclusively rely on them to support his conclusions.[94] Indeed, as Defendants have pointed out, the CRA report did *not* conclude WAMY supported terrorism, nor did the DOD assessments conclude that MWL/IIRO supported Al Qaeda, which are Kohlmann's opinions. Kohlmann relied on the DOD assessments and the CRA report as individual building blocks in forming his opinion, but he does not rely exclusively on them (or "parrot" them) to form his opinions. Kohlmann cited to these documents, quoted them, explained their relevance, and weighed them against other evidence to arrive at his conclusion. Thus, his opinions formed from his review of these documents are not excludable.

Continuing their factual disagreements under the guise of *Daubert,* Defendants, at 20, criticize Kohlmann for quoting material from statements of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") about the Philippine and Indonesian branches of the IIRO and the "former Executive Director of the Eastern Province Branch of IIRO" (who they neglect to mention was Abd Al

---

Kohlmann analyzes evidence exactly as his methodology lays out (and Defendants acknowledge) – he weighs multiple types of sources (primary, secondary, and tertiary), assesses them individually and collectively, and reaches a conclusion.

[92] Defs. Br. 19, n. 113.

[93] Defs. Br. 19, n. 115 ("…may very likely also be the product of torture….").

[94] Defendants are, in effect, requesting that the Court exclude all quotations from expert reports, even if they are properly analyzed and contextualized.

Hamid Sulaiman Al-Mujil). Defendants assert that Kohlmann does not "analyze the source materials so much as repeat their contents."[95] But this is not true. Kohlmann does analyze the materials he's quoting and contextualizes their significance. Kohlmann contextualizes the Department of Treasury's finding and explains that it culminated in Treasury's enforcement action against al Mujil in August 2006 (at ¶ 125). He then contrasts these two facts against the deposition answers from IIRO fact witnesses related to al Mujil.[96] Thus, Kohlmann's opinions as to al Mujil and the OFAC statements go beyond "parroting" as he analyzes and compares them to other evidence. This is true (if not more true) for his analysis of the information in the CRA report. The CRA report includes significant information regarding "Benevolence International Foundation" ("BIF") and WAMY's funding and relationship to BIF. Taken alone in these quotes, BIF (and its relationship to WAMY) is meaningless to the lay factfinder. However, Kohlmann applies his expertise by using the CRA investigation as context for BIF's (and WAMY's) support for terrorism.[97] Thus, the CRA investigation serves as important context for discussions of BIF and WAMY, and he does not merely "parrot" its findings.

Defendants then, beginning at 20, make three more arguments. They make the conclusory statement that (1) Kohlmann is "just like Winer" because he quoted from the 9/11 Commission Report in his Affirmative Report without "synthesizing or analyzing" the excerpts; (2) claim that Kohlmann "extensively quotes from partially declassified CIA Intelligence Reports,"[98] regarding IIRO Philippines employee, and Al Qaeda supporter, Mohamed Jamal Khalifa. Defendants end, at 21, by (3) reprimanding Kohlmann for using a "half page of additional quoted text" and a "full page of quoted text" from a video source.

**First,** Kohlmann quotes the 9/11 Commission Report to highlight the dual purposes Osama bin

---

[95] Defs. Br. 20 (quoting *United States v. Mejia*, 545 F.3d 179, 198 (2d Cir. 2008)).

[96] Ex. 1 (Kohlmann Rpt.) ¶¶ 128, 129.

[97] *Id.* at ¶¶ 196-200.

[98] *Id.* at ¶¶ 112-113.

Laden ("OBL") had for using charities to fund Al Qaeda. He then analyzes the 9/11 Commission's conclusion in light of other evidence (e.g., statements from Jamal al Fadl) that identified "prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity."[99] Kohlmann synthesizes these pieces of evidence to arrive at his conclusion that "[t]hese organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf…."

**Second,** Kohlmann quotes declassified CIA reports to show the sheer amount of evidence that exists tying Mohammed Jamal Khalifa to Al Qaeda and other terror groups. This information is beyond the ken of the factfinder and directly contradicts testimony of IIRO Philippines official Abdelhadi Daguit, an associate of Khalifa, who took no action to address the number of financial integrity issues that were, as evidenced by the CIA reports, well known.[100]

**Third,** Kohlmann had no choice but to include quotes from Abu Zubaydah al-Falastini in full text because they were transcribed from *video interviews*. Further, this material was quoted because it is an "emphatic video testimonial" that directly rebuts Defendants' own experts' claims.[101] Kohlmann is pointing out that Defendants' experts ignored, or otherwise did not analyze and discuss, obvious and publicly available information in assessing Zubaydah's long relationship with Al Qaeda.

The Charity Defendants have misread the Court's April 27, 2023 Order (ECF No. 9060), suggesting that the order prohibits experts from quoting *any* material. This is not the case and would be an unreasonable reading of the Opinion and Order. Kohlmann presents quoted evidence because "jurors are unlikely to have amassed a thorough and accurate understanding of al Qaeda from news and other sources that would enable

---

[99] *Id.* at ¶ 21.

[100] Ex. 1 (Kohlmann Report) ¶ 129 (Kohlmann's analysis reads "Daguit claims that despite being affiliated with the IIRO in the Philippines for many years at the time of the designation, he did not conduct any inquiry to determine whether the designation of the IIRO's office was proper, and did not conduct any inquiry to determine if the people he worked with had any information concerning the allegations that Abd Al Hamid Sulaiman Al-Mujil was tied to terrorists.").

[101] *See* Ex. 3 (Kohlmann Rebuttal Expert) ¶ 40.

them to make sense of the evidence absent some testimony to place it in context."[102] Once properly contextualized, Kohlmann then analyzes the quoted material in light of other evidence and arrives at a conclusion. This is proper expert work and is not excludable.

### xi.   Kohlmann's testimony is relevant

Defendants, at 21, misapply the recent decision in *Twitter v. Taamneh* throughout their brief. *Taamneh* has nothing to do with experts, *Daubert* standards, or the misuse of charitable funds. Its relevance to this briefing is non-existent.[103] In order to shoehorn *Taamneh* into their brief, Defendants misleadingly quote a portion of a sentence in that Opinion to suggest that the *evidence* relied on by Kohlmann renders his *opinions* excludable.[104] Plainly, this is a misreading of *Taamneh* and a misapplication of the Court's bellwether *Daubert* order (ECF No. 9060). But, even if the Court is inclined to entertain Defendants *Taamneh* argument, *Taamneh* renders Kohlmann's testimony even *more* relevant as it elucidates the "knowing and substantial assistance" MWL/IIRO and WAMY provided to Al Qaeda, as his report discusses Defendants early and ongoing interactions with Al Qaeda and illuminates the relationship between Defendants and Al Qaeda.

Defendants then, at 22, list an entire page of topics from Kohlmann's report before concluding that they are "tangential" and "not directly relevant" without doing any other analysis. In fact, this evidence, when viewed in totality, relates directly to the tort at issue – without support from the charities, Al Qaeda would not have achieved the global strike capabilities it needed to carry out the 9/11 Attacks. Kohlmann's

---

[102] *United States v. Abu Ghayth*, 2014 WL 978629, at *1.

[103] Even as a substantive matter, the Defendants' reliance on and treatment of the Supreme Court's decision in *Taamneh* misconstrues that decision. *Taamneh* involved a highly particularized and unique factual context, involving claims against social media platforms, onto which "hundreds of millions (or billions) of people [] upload vast quantities of information on a daily basis." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023). The plaintiffs' claims in *Taamneh* rested "less on affirmative misconduct and more on passive nonfeasance." *Id.* The Court's ruling was limited to that particular context, *id.*, as Justice Jackson's concurrence makes explicitly clear. *Id.* at 507. *Taamneh's* import here is thus extremely limited, and it did nothing to alter the Second Circuit's holdings in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), which remain the law of this Circuit for claims of terrorist funding and support like those at issue here.

[104] Plaintiffs are pursuing multiple theories of liability, under both federal and state law, but the Defendants' conclusory and misguided arguments about what should be considered "relevant" to the legal issues in this case mentions only their misunderstanding of JASTA's aiding and abetting cause of action. Defendants do not even mention, much less engage, Plaintiffs' numerous other theories, and thus provide no competent basis to exclude testimony on purported relevance grounds.

analysis of MWL/IIRO's founding and management in the 1980s and 1990s provides helpful context for the factfinder to understand the operations of these organizations. Further, facts such as WAMY's publications supporting extremism in the early 1990s make it more likely that WAMY supported Al Qaeda throughout the 90s. WAMY's, MWL's, and IIRO's support in Chechnya, Bosnia, and other areas also make it more likely that they supported Al Qaeda and illuminate how they would come to be misused by Al Qaeda. These close-in-time facts "provide helpful context"[105] by drilling down on the charities' activities when their support for Al Qaeda began. This is completely different from the irrelevant material excluded from Sidel's Report, which discussed the "Islamicization of the Philippine archipelago …at the time of the Spanish conquest in the mid-16th century."[106]

Moreover, the Court's bellwether *Daubert* Order excludes irrelevant *opinions*, not what Defendants deem to be irrelevant *evidence*. The *evidence* Defendants listed directly relates to and informs Kohlmann's *opinions* that the charity defendants supported Al Qaeda and gave them the global strike capabilities needed to carry out the September 11th Attacks. This *opinion* clearly relates to the ultimate issues of the case, even if the evidence, standing alone, does not.

### xii. Kohlmann does not speculate about the import of Defendants' financial documents

As discussed above, *supra* at 12-14, Kohlmann has the relevant expertise to analyze financial documents and opine on whether they are typical of organizations supporting terrorism. Kohlmann's opinions are supported by the documentary evidence he reviewed in drafting his expert testimony.[107] Defendants again deploy a scattershot of non sequitur factual disputes disguised as *Daubert* challenges.

First, Defendants, at 23, baldly assert that Kohlmann's opinion regarding dawah organizations' failure to implement basic controls are "nothing more than conjecture." Defendants further assert that

---

[105] ECF No. 9060 at 38.

[106] *Id.*

[107] Kohlmann's report contains over 300 footnotes, including citations to documents produced by both Plaintiffs and Defendants, deposition transcripts, documents produced in the course of federal investigations, and primary sources.

Kohlmann "parrots hearsay" when discussing the accounting irregularities and deficiencies. In fact, the documents Kohlmann cited and then discussed in his deposition, support his conclusions. For example, Kohlmann cites to an IIRO-produced document when contextualizing the IIRO Indonesia office's ineffective accounting system that was missing references to funding sources. Ex. 1 (Kohlmann Rpt.) ¶ 142. Kohlmann then contrasts the findings of the internal auditors with the testimony of IIRO officers Fahd al-Harbi and Abdelhadi Daguit.[108] Evidence of the MWL/IIRO's deficient accounting practices are laid out and contextualized with supporting documentation to support Kohlmann's ultimate conclusion that "financial irregularities and atypical accounting practices exercised by these dawah organizations were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists." *Id.* at ¶ 205. Kohlmann conducts a similarly well-sourced analysis as to WAMY,[109] which shows that his proffered testimony goes beyond conjecture.

Next, Defendants, at 24, 29, mix and match several arguments in an attempt to chastise Kohlmann for relying on documents given to him by Plaintiffs' counsel, not reviewing every document produced in the litigation, and because Kohlmann considered some secondary and tertiary sources more reliable than some primary sources. Defendants try to connect these bizarre critiques to a *Daubert* argument by claiming that Kohlmann fails the Rule 702 reliability requirement because, they allege, he did not account for "obvious alternative explanations" (*i.e.,* Defendants' favored documents), and that therefore Kohlmann's opinion is merely *ipse dixit*. First, Defendants should know, from the Court's bellwether *Daubert* Order, that experts need not review every document produced in this litigation.[110] Further, Defendants' own experts have conceded that they have not reviewed every document, but rather what defense counsel has flagged as

---

[108] Ex. 1 (Kohlmann Rpt.) ¶¶ 143 – 148.

[109] *Id.* at ¶¶ 158 – 203.

[110] "No witness, expert or otherwise, could readily review all the discovery in this case plus all publications relevant to the issues it presents." ECF No. 9060 at 18.

important.[111] Still further, Kohlmann's opinions find "support… in documentary evidence" about which Defendants disagree. This is precisely the same argument this Court rejected when these Defendants proffered it against Jonathan Winer. *See* ECF No. 9060 at 19 (stating that Winer's statements find support in the documentary evidence and concluding that Defendants disagreement is a factual dispute for the jury and "fitting fodder for cross-examination"). Weighing various sources, primary, secondary, tertiary, or otherwise, to come to a clear picture of the facts is precisely Kohlmann's methodology.[112] In assessing the documents, Kohlmann weighed alternative explanations and adequately connected the facts and evidence in his report.[113] Once again, Defendants are laundering factual disputes as *Daubert* issues, but their disagreement with Kohlmann's conclusions are not grounds for exclusion of his opinions. Again, a factfinder is perfectly capable of weighing the testimony of Plaintiffs' terrorist-financing expert against Defendants' CPA.

Lastly, Defendants, at 25, dispute Kohlmann's conclusion that funds were transferred from IIRO/MWL to BMI, Inc., and thereafter disappeared. Kohlmann cites to a sworn statement from an FBI Special Agent that the federal government believed the money to have been used to support the embassy bombings in Africa. MWL/IIRO asserts that the $2.1m was, in fact, "stolen." In support of their factual dispute, Defendants cite to a Complaint and Proposed Findings of Fact from *Sana-Bell, Inc. v. BMI Real Estate, et al.,* No. 8:98-cv-04177(PJM) (D. Md. Dec. 23, 1998), and argue that Kohlmann's support is from a "double hearsay statement by an FBI agent."[114] Here, Defendants have presented their evidence, Proposed Findings of Fact in civil litigation, and Kohlmann has presented his evidence, a sworn statement from a

---

[111] Ex. 17 (Deposition of John Barron) 40:12 – 22 (stating that he reviewed documents provided to him by counsel related only to "fraud in the Pakistan office").

[112] When tertiary sources are supported by *other* primary and secondary source information, they can be shown to be reliable and credible. Ex. 1 (Kohlmann Rpt.) 5 ("…researchers generally avoid relying wholesale on the content of tertiary sources, absent some supporting primary or secondary source information.").

[113] Defendants' factual argument is laid bare when they parrot their own expert's (John Barron) opinion of Kohlmann's conclusions. Defs. Br. 25.

[114] Defs. Br. 25.

federal law enforcement officer. A factfinder can weigh both to reach a determination. This is merely another example of a factual dispute that is not excludable.

    **xiii.**   **Kohlmann's conclusions are based on his analysis of the evidence**

Defendants next argue, at 26-30, that Kohlmann's affirmative report "contains several additional sensational conclusory claims that lack factual bases." Here, Defendants first allege that Kohlmann's opinion that the Charity Defendants "have endorsed the concept of violent jihad, have pushed young Muslims to join violent jihadist organizations, and have provided critical support and resources to al Qaeda and its affiliates"[115] is not supported by "specific evidence." Defendants use this assertion to make the conclusory claim, at 27, that "[t]his opinion is without foundation." Defendants are dissatisfied with Kohlmann's references to "the above" material in his report that supports this conclusion but cite to no law that commands that an expert report cite to Defendants' nebulous "specific evidence" standard. Moreover, Kohlmann *already discussed and analyzed evidence supporting his conclusions throughout the report.*[116] Thus, this argument is without legal and factual merit.

Next, at 27, Defendants again create their own legal standard by asserting that Kohlmann must cite an example of funds flowing directly from Charity Defendants to Al Qaeda to conclude that they supported Al Qaeda. As discussed above, *supra* at 23-25, Kohlmann offered an example of this in his deposition and Defendants chose to ignore it.[117] Still, there is no requirement that such a "direct flow" of money is required to reach the conclusions that Kohlmann reaches. It is also well-recognized that terror support, by its very nature, does not lend itself to a clear paper trail.[118] Experts in this field often must rely on circumstantial

---

[115] Ex. 1 (Kohlmann Rpt.) ¶ 204.

[116] *See, e.g.,* Ex. 1 (Kohlmann Rpt.) ¶¶ 49, 161, 164, 182, 183.

[117] *Supra* n. 84 (350:23 - 351:4).

[118] *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), and *vacated on other grounds and remanded sub nom, Opati v. Republic of Sudan*, 140 S. Ct. 1601, 206 L. Ed. 2d 904 (2020) ("Perpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection. Eyewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation. The sovereigns themselves often fail to appear and to participate in discovery, as Sudan did here. With a dearth

evidence to render their conclusions.[119] Regardless, Defendants cannot unilaterally raise the standard of proof that an expert must make to satisfy their own requirements. This is not *ipse dixit* but rather Kohlmann's conclusion based on the evidence discussed in his report.

Defendants, at 28, take a second shot at factually disputing that Benevolence International Foundation ("BIF") was not an instrumentality of WAMY. Defendants claim they "understand[] that the Court disagreed" with this same challenge to Winer, and yet press on with the exact same argument.[120] Defendants then go on to describe several factual disagreements they have with Kohlmann, again showing their hand that they fully intended to misuse their second *Daubert* challenge to exclude opinions they disagree with.[121] Further, Kohlmann *did* discuss all points made in the Charity Defendants' Brief as to BIF in his deposition.[122] Defendants, at 29, continue by asserting that Kohlmann disregarded "primary sources" and, thus, his opinion lacks foundation. No matter how many times Defendants insist otherwise, primary sources are not inherently trustworthy, accurate, or unimpeachable simply by virtue of being primary sources. Kohlmann weighed these sources (as discussed in his deposition) and, using his expertise, relied or declined to rely on them in forming his opinion. WAMY seeks to completely sever itself from BIF by making the conclusive statement that "WAMY" was not sponsoring terrorism, despite BIF being an instrumentality

---

of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception.").

[119] Expert testimony is often sufficient to meet this burden in "terrorism cases, . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain." *Id.*; *see also Linde v. Arab Bank, PLC,* 97 F. Supp. 3d 287 (E.D.N.Y. 2015); *United States v. Hossain,* 579 F. Supp. 3d 477 (S.D.N.Y. 2022); see also ECF No. 9060 ("terrorism experts 'must, perforce, rely often on hearsay' to learn information about inherently clandestine organizations.") (citing *Abu-Jihaad,* 553 F. Supp. 2d at 126).

[120] This *precise* argument was already dispatched in the Court's bellwether Order, ECF No. 9060. Regarding Winer's opinion that BIF and WAMY are related entities, Defendants argued that Winer "failed to review relevant financial records, employment records, and documents that elucidate the relationship between WAMY and Benevolence International Foundation." ECF No. 9060 at 18. Judge Netburn was unmoved, stating "If there are additional relevant documents that contradict Winer's opinions, Defendants can effectively test his conclusions via cross-examination." *Id* at 19.

[121] At 28, saying BIF and LBI are "two separate entities."

[122] *See, e.g.,* Ex. 12 (Kohlmann Tr.) 736:24 to 738:9 ("Now, **I understand the assertion by WAMY** is that they are two separate organizations. I understand that. I appreciate that. Based on my analysis, that is not credible.") (Emphasis added).

and arm of WAMY.[123] Once again, Kohlmann directly refuted these factual points in his deposition, saying:

> Mr. Goetz, I'm answering your question. My answer to you is that BIF was an arm of WAMY, …. But if you don't count the main method by which WAMY was funding this stuff or allegedly funding this stuff, I don't, you know, I would also note that in paragraph 172, "According to the U.S. Department of Defense, Guantanamo Bay prisoners who were working under the auspices of WAMY were 'likely using their appointment in non-government organizations to facilitate funds and personnel for Al-Qaida and its global terrorist network.'" … I would also point, frankly, to the other paragraph we referenced before, which is the WAMY fundraising thing with Ali Bapir. I know that you pointed out that Ansar al-Islam was not designated [until] two years afterward, but it was a designated Al-Qaida subgroup.[124]

Kohlmann is qualified to discuss these matters, applied his methodology, and this testimony is relevant. Defendants cannot exclude it simply because they dispute it.

> **b. Levitt possesses the requisite training, education, and experience to opine on terrorism, terrorist financing, and the Department of Treasury's Designation process.**

> **i. Levitt's Testimony Relating to Treasury's Designation Process Complies with Rule 403**

Defendants demand exclusion of Levitt's testimony under the perverse rationale that Levitt has first-hand experience regarding the Treasury Department's designation process.[125] In essence, Defendants assert that Levitt cannot testify generally regarding Treasury's designation of certain Defendants or the designation process because he is *too* qualified and his overqualification will overwhelm the factfinder's ability to apply reason. In addition, Defendants argue that Levitt is a fact witness and complain they have been denied "access to documents and testimony relating to Levitt's first-hand experience as a percipient witness."[126] This is not factually accurate. First, Defendants received all disclosures required pursuant to Rule 26(a)(2). Second, Levitt's testimony regarding the designation process is premised in his training, education,

---

[123] *See* Ex. 1 (Kohlmann Rpt.) ¶¶ 187-196.
[124] See Ex. 12 (Kohlmann Tr.) 532:20 - 534:2.
[125] Defs. Br. 42.
[126] *Id.*

and experience.[127] Moreover, Levitt's experience is not limited to his observation and participation in matters that concern Defendants to the instant litigation.[128] Third, both parties were denied access to information and documents set forth in a 2019 *Touhy* request regarding certain matters investigated by Treasury and resulting designations.[129] Since Levitt did not rely on those or any other classified materials in forming his opinion but instead relied on his training, education, and experience, and Levitt's "first-hand experience as a percipient witness" is offered for the purpose of illuminating the procedure, not the content of the process that occurred with respect to these particular designations, the circumstances Defendants raise do not provide any basis to exclude any of Levitt's testimony, much less a basis to preclude him entirely.

Levitt does not offer testimony on the evidentiary package supporting the designation of IIRO's branch offices or Abd Al Hamid Sulaiman al Mujil, information about which was specifically requested by both Plaintiffs and Defendants.[130] Nor does Levitt address or propose to offer testimony on the facts and evidentiary predicates for testimony of Treasury officials.[131] Similarly, Levitt is not being offered to testify regarding the factual and evidentiary predicate for the Treasury's designations of the Benevolence International Fund, Benevolence International Fund (Canada), and Bosanka Idealna Futura (Bosnia) or facts and evidence related to Treasury's investigations, analyses, and assessments concerning WAMY's links to these organizations. Instead, Levitt's report and proposed testimony refers only to publicly available information regarding Treasury designations, necessarily including information about the process by which Treasury designations occur.[132] In addition, for reasons explained below, his rebuttal report addresses this

---

[127] Ex. 5 (Levitt Rpt.) 1-2, 17; *see also* Ex. 13 (Levitt Tr.) 465:5-469:16 (discussing his knowledge based on experience with the designation process).

[128] Ex. 13 (Levitt Tr.) 89:12-90:12 (During Levitt's fifteen months with the Department of Treasury, he worked on and signed off on more than ten classification designations that went to OFAC for final review).

[129] *See* Defs. Br., Exhibit 35 (attached to the Declaration of Aisha Bembry ("Bembry Decl.") [ECF No. 9250-34]).

[130] Defs. Br., Exhibit 35 (attached to the Bembry Decl. [ECF No. 9250-34]) (including specific requests made at the behest of Defendants).

[131] *Id.*

[132] Ex. 5 (Levitt Rpt.) 17-18 (addressing the Treasury's designation process), 25 n. 80 (citing the Treasury Department Statement Regarding the Designation of the Global Relief Foundation), 30 (citing the Treasury Department's designation

process in much greater detail.[133]

### ii. The Treasury Department denied access to Levitt's testimony as a fact witness regarding the substantive data underlying the Treasury's August 3, 2006, Executive Order 13224 designations of IIRO's branch offices in the Philippines and Indonesia

Defendants argue that Levitt should be precluded under *Daubert* principles from testifying about the designation process, not because he is unqualified, but because the government did not allow his deposition on the factual and evidentiary predicates for the designations. This is a wholly different area of testimony.

In support of this argument, Defendants cite *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016), which found, in part, that a proposed regulatory expert's testimony would be limited with regard to a single topic to the extent her testimony would rely on her experience with involvement in a non-public government activity which she was not at liberty to fully disclose.[134] In *Mirena* the proposed regulatory expert was a physician and former officer of the Food and Drug Administration (FDA) who was involved in the New Drug Application (NDA) process for the Mirena intrauterine device about which she would be called to testify. The plaintiffs in that matter argued her testimony should be excluded in its entirety due to her failure to disclose the basis for her opinion and the facts that she considered in forming her opinions.[135] A proposed area of the doctor's testimony included information related to specific discussions that occurred during the FDA's review of *Mirena's* NDA. Ultimately, that particular testimony was determined inadmissible as the doctor, when deposed, "refused to discuss 'who said what or who did what' during the FDA review process…yet 'remember[ed] discussions'" regarding language stricken from the label.[136] The court determined that allowing testimony about the discussions that occurred during *Mirena's* NDA process

---

of Wael Hamza al-Julaidan), 36 (quoting a Treasury Department press release regarding the designation of the IIRO Philippines and Indonesia offices), 40 (citing the public Fact Sheet on the designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation), 43 (referencing a Treasury Department press release regarding the designations of al Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands).
[133] Ex. 6 (Levitt Rebuttal Rpt.) 4-7.
[134] *In re Mirena* at 472.
[135] *In re Mirena* at 468-70.
[136] *Id.* at 472-3.

would be harmful because the doctor's presence during the FDA's *Mirena* review would, in the eyes of the fact finder, provide the doctor "insider" information, lending an aura of credibility which the plaintiffs could not undermine on cross-examination.[137] In addition, the court noted that the doctor's refusal to identify others involved in the discussions prevented the plaintiffs from finding other witnesses thereto which unfairly prejudiced the opposing party.[138] This is a markedly different situation than presented by the proposed testimony of Levitt.

In his initial report Levitt refers to the designation of "tens of charities with ties to al Qaeda, Hezbollah, and Hamas…including the Holy Land Foundation for Relief and Development," speaking broadly regarding the quality of information relied on by the U.S. Treasury Department as part of a robust and vigorous designation process that errs on the side of caution.[139] Similarly, in his Rebuttal Report, Levitt offers an opinion regarding the reliability of Treasury Department designations to counter the opinion offered by defense expert Vahid Brown regarding the same.[140] He also provides a more detailed overview of this complex process. Finally, Levitt's rebuttal discusses joint designations, citing eight such designations issued jointly by the United States and Saudi Arabia.[141] Included in this discussion is Saudi Arabia's reaction to the Treasury and United Nations designations of two IIRO offices and the Executive Director of the IIRO office in the Eastern Province of Saudi Arabia.[142] All of the foregoing is based upon publicly available documents and processes upon which Defendants are free to cross-examine Levitt.[143]

In contrast, in *Mirena*, while the court excluded testimony from the physician regulatory expert

---

[137] *Id.* at 473.

[138] *Id.* at 473.

[139] Ex. 5 (Levitt Rpt.) 17.

[140] Ex. 6 (Levitt Rebuttal Rpt.) 4-7.

[141] *Id.* at 6-7.

[142] *Id.* at 10 (Saudi officials denied that IIRO was a Saudi institution, and the Saudi government announced it had opened in investigation into the head of the IIRO Eastern Province office and frozen his assets).

[143] Ex. 13 (Levitt Tr.) 196:4-7 ("The process as we have discussed it is not itself a classified matter, which is why I'm able to discuss it."); *See also*, e.g., United States Government Office, Report to Congressional Requesters, *Combatting Terrorism: Foreign Terrorist Organization Designation Process and U.S. Agency Enforcement Actions*. (June 2015). https://www.gao.gov/assets/gao-15-629.pdf

regarding the FDA's review of *Mirena's* NDA, it did not exclude the doctor's testimony on the "FDA's statutory framework," "the adequacy of a drug's label," or "the reasonableness of a pharmaceutical company's conduct[.]"[144] The court noted that such testimony is "useful in assisting the trier of fact" in navigation of complex regulatory schemes.[145] Such is the case here.[146] The *Mirena* Court recognized an important aspect of regulatory expert testimony that is far more analogous to the situation presented by Levitt's testimony.[147] Furthermore, there is nothing in Levitt's testimony which would limit cross-examination as it is premised in an agency's process and, beyond that, only public documents. Defendants' credulity of Levitt's clarity on the designation process itself but inability to remember the content of specific evidentiary packages is unwarranted. This familiarity with process is akin to an attorney conversant with briefing procedures but unable to recall the content of specific briefs filed over the course of a litigation career. During his deposition, Levitt said as much, "[T]he nature of the human brain is such that there is no way I'd remember those details now[.]"[148] In addition, Levitt testified that he had signed off on more than ten classification designation memos during his fifteen months with Treasury.[149]

Since Levitt does not propose to testify on the content of evidentiary packages or memos supporting any particular designation, it is immaterial whether or not the Defendants can cross-examine him on those documents or facts or whether the evidentiary packages supporting designation contained any information that might be exculpatory. That exculpatory documents might have been included is not the point. Even if they were, that does not mean the designation process is not what Levitt explained in his report and testimony. Indeed, he could have been questioned on it at his deposition and can be cross-

---

[144] *In re Mirena* at 473-4.

[145] *In re Mirena* at 474; *see In re Depakote* 2015 WL 4775868, at *8 (S.D. Ill. Feb. 13, 2015); *see also In re Zicam,* 2011 WL 798898, at *22 (D. Az. Feb. 24, 2011).

[146] Ex. 6 (Levitt Rebuttal Rpt.) 5 ("The process is complex, and is not limited to the Treasury Department.").

[147] The statutory framework set forth by the U.S. government with respect to terrorist designations is one of the areas in which Levitt asserts expertise. *See* Ex. 13 (Levitt Tr.)  64:11-17.

[148] Ex. 13 (Levitt Tr.)  109:18-20.

[149] *Id.* at 89:12-90:12.

examined on it at trial.

Defendants incorrectly insist that Levitt, "[h]ad access and relied upon classified information unavailable to Defendants."[150] In fact, although the inquiry is ultimately irrelevant, throughout his deposition, when repeatedly questioned about his memories of classified material viewed during his career, Levitt candidly testified to his inability to recall the contents of such documents.[151] In addition, Levitt explained that he chose to terminate his security clearance when he left the Treasury Department, had not had an ongoing security clearance, and had been granted temporary clearance when the situation required since termination of his ongoing clearance.[152] Levitt made no indication during his deposition that he retained any specific memory of classified materials he may have previously viewed, nor did he indicate that he had retained, had access to, or relied on classified material for purposes of preparing his report. In fact, he explicitly indicated this was not the case, on numerous occasions, as set forth above. Finally, it bears noting that, to the extent the Defendants did not have access to classified materials previously viewed by Levitt, neither did the Plaintiffs. For the foregoing reasons, the probative value of Levitt's testimony is not substantially outweighed by the danger of unfair prejudice.

### iii. Levitt was questioned extensively during his deposition regarding the designation process

Despite the Defendants' protestations regarding denial of access to documents and testimony related to Levitt's first-hand experience, they did, in actuality, elicit substantial testimony on Levitt's first-hand experience with the designation process.[153] At no time during this testimony did Levitt reference his

---

[150] Defs. Br. 33.

[151] Ex. 13 (Levitt Tr.)  110:13-18; 110:23-111:2.

[152] *Id.* at 42:20-44:6.

[153] *Id.* at 56:15-57:4 (the structure of the Treasury Department's Office of Intelligence and Analysis in which Levitt worked); 57:5-18 (the authority responsible for deciding to implement or not implement  a sanctions recommendation); 57:19-58:5 (the office that wrote up the recommendation package and dossier); 85:5-86:6 (Levitt's role as Deputy Assistant Secretary for the Office of Intelligence and Analysis ); 86:7-87:25 (steps in compiling information in a memo from the Office of Intelligence and Analysis to the OFAC); 88:2-9 (length of the process); 88:13-22 (review of evidentiary packages); 90:13-92:18 (preparation of evidentiary packages); 129:15-133:21 (standards of proof for designations and other products); 133:22-135:18 (potential for selection bias); 149:2-153:7 (talking to potential designees and those who

reliance on any document not available to the Defendants. Defendants even acknowledged during Levitt's deposition that they had no intention of asking him about specific investigations.[154] Defendants then proceeded to do exactly that in multiple lines of inquiry irrelevant to his opinion.[155] As the documents related to the IIRO branch office designation remain classified and Levitt may not testify regarding the circumstances resulting in those designations, the probative value of the classified documents that comprised the evidentiary package is null.

Disingenuously, Defendants present Levitt's statement, "[t]he good news is I can't remember because the bad news is if I did I wouldn't be able to tell[,]"[156] as a response to questioning about documents he reviewed concerning the designation of two IIRO offices.[157] This statement was actually made in response to the question, "Did any of those subsequent clearances have anything to do with events that are the subject of this case?"[158] This was part of a broader discussion regarding Levitt's maintenance, or lack thereof, of a security clearance and was asked as a follow up to his response about being granting temporary clearance in relation to certain unspecified matters after leaving Treasury's employ. In any event, activities Levitt has no recollection of are irrelevant to the inquiry of whether or not the Defendants were provided the documents and testimony they are entitled to regarding Levitt's opinion in this case. Defendants have received all such documents, have had the opportunity to depose Levitt regarding the designation process, and will not be unduly prejudiced by Levitt's testimony regarding the rigor of the Treasury Department's designation program.

---

have been designated); 153:10-159:24 (obtaining documents and factual evidence and assessing credibility and relevance); 164:9-168:11(characterization of the part of the process during which an ultimate decision is made regarding designation); 169:4-181:6 (process for appealing a designation, government's standard for overturning a designation, and litigation risk assessment); 457:2-462:21 (Levitt's training for and role in the designation process); 463:9-467:9, 468:4-469:16 (the purpose of a designation); 535:2-541:6 (reasons why designations might be lifted by the Treasury Department; 541:7-547:4 (Levitt's expertise on the designation process); and 547:8-554:16 (evaluation and verification of sources).

[154] *Id.* at 153:8-9 ("I am not going to ask you about specific investigations.")

[155] *See e.g., id.* at 205:10-14, 206:4-23, and 367:5-23.

[156] Ex. 5 (Levitt Rpt.) 34.

[157] Defs. Br. 34.

[158] Ex. 13 (Levitt Tr.) 43:20-25.

### iv. Levitt's testimony regarding the Treasury Department designations will assist the trier of fact

Levitt specifically stated that he relied on publicly available material for his report and *not* the Memo to the Acting Director of the Office of Foreign Assets Control regarding the designations of Dr. Abd Al Hamid Sulaiman Al-Mujil and the IIRO branches in the Philippines and Indonesia.[159] Frankly, Defendants' concern about the affect Levitt's work on the designation of IIRO's branch offices will have on the jury is misplaced. It is not even necessary for the jury to be informed that Levitt was the individual who signed the Memo to the OFAC on IIRO. Given the size of the U.S. government, Levitt's work on the IIRO designations could not even be deduced from time period in which he worked at the Department of Treasury and the date upon which the designation occurred. In any case, Levitt's testimony regarding these designations, which relies upon publicly available facts and evidence, does not require him to speak to his role in the investigation. Moreover, the cases Defendants cite to argue Levitt's testimony about the designations would confuse and mislead the jury, are inapposite. As discussed more fully *supra*, at 38-40, *In re Mirena*, 169 F. Supp. 3d 396 is not applicable because Levitt did rely on any non-public government activity. Similarly, unlike the expert in *In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, Levitt does not rely on confidential information.

Levitt's experience in having participated in the designation process multiple times throughout his tenure with the Treasury Department is the very experience that supports his expertise.[160] This expertise, gained partially through first-hand experience, does not make him a fact witness because his testimony is not confined to his experience of the facts that touch only this case. That possibility was foreclosed by the U.S. Government's denial of the 2019 *Touhy* request.[161] However, this denial does not preclude Levitt from

---

[159] Ex. 13 (Levitt Tr.)  363:21-365:22 ("I did not use it in my report…I relied on the other material, I think I included the press release and the IIRO designation.")

[160] Ex. 13 (Levitt Tr.) 73:11-; *See* 89:12-90:12; *see also Id.* at 541:7-547:4.

[161] Levitt is not able to testify to the circumstances surrounding the designation of IIRO's branch offices and declined to do so on multiple occasions during his deposition. *See Id.* at 149:2-; 178:1-20; 205:15-22.

testifying as an expert with respect to the designation process and how that process is carried out within the Treasury Department and through interagency cooperation. In this capacity, it is not only his experience that is relevant but his training, education, and knowledge as well.[162] It also does not preclude him from relying on publicly available documents and applying his training and knowledge to analyze documents to offer opinions about facts gleaned from sources.

Jimmy Gurulé's testimony on the designation process is distinguishable from the testimony Levitt offered and would not function as a substitute. Gurulé's report sets forth a high-level overview of the designation process while Levitt's rebuttal report provides a granular examination of the considerations at each phase.[163] Importantly, the potential for experts to offer cumulative evidence is not a *Daubert* issue and need not be decided pretrial.[164] Even if the testimony of Gurulé and Levitt were considered duplicative, Plaintiffs should retain the election to offer either expert.

### v. Levitt's conclusions are appropriately developed following analysis under his accepted methodology

The term "material support," as employed by Levitt, is a term of art and not, as Defendants claim, merely a legal conclusion. Levitt's analysis precedes his conclusion in each instance in which he opines that material support was provided. To begin with, experts in terrorism cases often rely upon this terminology. In addition, experts are not estopped from reaching this conclusion where supported by evidence.[165] This is true even when the conclusion directly implicates the liability of an organization.[166] In addition, Levitt has

---

[162] Ex. 5 (Levitt Rpt.) 2 (Levitt's qualifications "as a noted expert in international terrorism, with a focus on Middle East terrorist groups and particular expertise in their logistical and financial support networks, are based on a multidisciplinary combination of [his] academic education, professional training and experience[.]"; *See* Ex. 13 (Levitt Tr.) 24:2-26:21.

[163] Ex. 8 (Gurulé Rpt.) 6-8; Ex. 6 (Levitt Rebuttal Rpt.) 5-7.

[164] *US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 986232, at * 1 (S.D.N.Y. Apr. 1, 2022) ("Duplicative expert opinions are not allowed. Counsel may elect which expert will provide which opinions."); *see also Cooper Crouse-Hinds, LLC v. City of Syracuse*, 568 F. Supp. 3d 205, 222 (N.D.N.Y. 2021) ("[R]egardless of whether Plaintiffs' experts' reports are unnecessarily duplicative, it is premature to limit their testimony before the issues a factfinder will be required to decide are determined…[t]he Court will evaluate whether expert testimony should be excluded…at the time of trial.")

[165] *Owens v. Republic of Sudan*, 864 F.3d at 790–91 ("In this case, the plaintiffs' experts relied upon their own extensive research into terrorist organizations to conclude that Sudan provided material support that caused the embassy bombings.")

[166] *Id.* at 784 ("From this evidence, all three experts concluded Sudan provided material support to al Qaeda.")

previously provided testimony in terrorism cases incorporating this term of art. For instance, in *Estate of Hirshfeld v. Islamic Republic of Iran*, Levitt testified, "[S]tarting in 1993, Iran provided material support to Hamas[.]"[167] Levitt's conclusions regarding material support are the result of analysis and a research methodology the Sixth Circuit described as "the gold standard."[168] Where Levitt's report incorporates the term "material support," the conclusion is substantiated with examples of types of support supplied, the source of the information, and qualification of the source. For instance, Levitt credits David E. Kaplan, an investigative journalist, with reporting the MWL's cash contributions to Islamic guerillas in the Philippines.[169] In concluding that IIRO provided material support to al Qaeda, Levitt relies upon six items evaluated under his gold standard methodology, including evidence produced in a Canadian court, a declassified CIA report, and information publicly released by the Treasury Department.[170] The ability of an expert in terrorism funding to be of any use to the jury is grounded in his or her ability to evaluate the credibility of such information and arrive at a conclusion regarding its validity.

### vi. An expert may rely on inadmissible evidence so long as experts in the field reasonably rely on such evidence in forming their opinions

Levitt's report demonstrates analysis in the collection of highly relevant, credible, and reliable sources, juxtaposed in a manner that, in and of itself, constitutes and proves the analysis of the author. "Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable."[171] It is perfectly permissible for an expert to rely on inadmissible evidence so long as experts in the

---

[167] 330 F. Supp. 3d 107, 136 (D.D.C. 2018) (In explaining the term "material support," Levitt said, "What we mean by material support [provided by Iran to Hamas] is the provision of the multiple types of support to ... a foreign terrorist organization [which] would include funds, actual money, in-kind services, and other things like weapons or their services or benefits.")

[168] *Damrah,* 412 F.3d at 625.

[169] Ex. 5 (Levitt Rpt) 31.

[170] *Id.* at 35-36.

[171] *In re Mirena,* 169 F. Supp. 3d 396, 412.

field reasonably rely on such evidence in forming their opinions.[172] In addition to his synthesis of material from multiple sources, Levitt provides extensive analysis. While Defendants have cherry picked but a few passages in an effort to support their argument, in fact, even these portions of Levitt's report consist of probative analysis. It is absurdist in the extreme to assume that a layperson could bring the same level of curation to these sources and set forth these same paragraphs, made up of material inherently being cross-checked against other material in the same paragraph or on the same page, with the same level of precision of understanding and ability as an individual of Levitt's recognized expertise. Synthesis of material by terrorism experts is a recognized advantage of such experts in assisting the laypersons understanding of facts and events.[173] Levitt's report does not rely on block quotes as pillars of his opinions. Instead, he combines material from several sources to reach his own conclusions based upon his analysis accomplished through his knowledge, education, training, and experience. Just as Defendants can select a handful of paragraphs with multiple quotations—a practice in synthesis that Plaintiffs maintain *does* require expertise—so can Plaintiffs select a number of pages showing further analysis with fewer quotations.[174] Dividing Levitt's report into paragraphs including (1) quotations from multiple sources, (2) longer quotes, and (3) those including sentences with no citations intermingled with material not quoted but cited to a third-party source is ultimately not a helpful exercise. Levitt's report must be examined as a whole and as an analytical work, comprised of material that is generally accepted in the field in which Levitt operates. Levitt's synthesis of text and analysis of those materials is appropriate under Rule 702 and relevant case law. Moreover, Levitt is not required to "offer [a]…unique perspective."[175] This would simply auger in favor of experts' opinions being completely unmoored to any data points, premised on *ipse dixit*, and *sui generis*.

In *Damrah*, the defendant made a similar objection to Levitt's testimony, complaining to the court

---

[172] Fed. R. Evid. 703.

[173] April 27, 2023 Opinion & Order (ECF No. 9060), pp. 5-6 citing *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013).

[174] Ex. 5 (Levitt Rpt.) 10, 30, 32-33, 38, 43.

[175] Defs. Br. at 39.

that it relied heavily on inadmissible hearsay in violation of Rule 703.[176] In that case, the appellate court determined the material Levitt relied upon met the Rule 702 requirements.[177] Furthermore, the district court concluded, "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."[178] Rule 703 allows experts to rely on facts or data, even if hearsay, if it is of the type experts in the same field rely on for similar opinions. The evidence need not be admissible, but the evidence found to be inadmissible may be disclosed to the jury only if their probative value in helping the jury evaluate the opinion substantially outweigh the prejudicial effect.[179] The decision about whether that evidence may be revealed to the jury does not speak to the validity of Levitt's opinions. Even if the facts and data upon which he relied cannot be revealed to the jury, his opinions can still be stated, provided he follows the instructions of the court about what can be shown to the jury.[180] A decision regarding what evidence the jury may be shown is properly adjudicated when the court can make a better assessment of what prejudice might come about. Moreover, whether or not certain evidence is admissible is not a foregone conclusion but rather an inquiry to be taken up by the Court at the appropriate time.[181]

### vii. Levitt's Report Provides Necessary Background and Information Useful to the Trier of Fact in Evaluating His Opinions

The Court should reject Defendants' broad argument that Levitt should be prevented from presenting what amounts to a laundry list of issues Defendants extracted from his report. Divorced from

---

[176] *Damrah* 412 F.3d at 625 and n. 4 ("Damrah bases this objection on Levitt's testimony that he relied in part on certain books on the PIJ, press releases and newspaper articles, and the U.S. government publication, 'Patterns of Global Terrorism.' The only one of these sources revealed to the jury was "Patterns of Global Terrorism," which the court determined was "not inadmissible."

[177] *Id.* (quoting Federal Rule of Evidence 702, "(1) the testimony is based upon sufficient facts of data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.")

[178] *Damrah* 412 F.3d at 625.

[179] Fed.R.Evid. 703.

[180] *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022 WL 1042273, at *1 (S.D.N.Y. Apr. 5, 2022) (An expert also may rely on statements that are not admitted in evidence under Rule 703).

[181] For instance, this Court's March 6, 2023 Order (ECF No. 8905), striking Jonathan Winer's report, referred to a CIA document Winer quoted as "mostly hearsay." But afterward, Judge Daniels issued a decision, at ECF No. 8911, that admitted the same CIA documents for purposes of deciding a motion to dismiss. *Id.* at 12-13.

the background and substance of the report, and presented only by date, location, and topic, the true context of their presentation is obscured. For example the 2011 operation regarding Bin Laden's demise is presented by Levitt within a discussion Al Qaeda's background and organizational structure. The information about Hamas terrorist operatives holding day jobs within the group's network of charities and social service organizations is offered to contextualize how non-profit organizations are susceptible to abuse by terrorist and their supporters. The alleged Hamas support Levitt discusses bolsters the conclusion that IIRO donated to terrorist-linked organizations other than Al Qaeda. That is, this support of terrorism was a feature, not a bug—not one or two bad actors but a known pattern. The 2006 and 2008 UK government concerns similarly show the significance of charities' links to the terrorist threat and that, as late as 2008, "terrorist continue to use charities as sources of both financial and logistical support." These are certainly issues that received more illumination following 9/11 and many of the sources discussing these issues will, naturally, be dated post-September 2001. Nonetheless, they are also helpful in assisting the trier of fact with background and context, both permissible areas of testimony. ECF No. 9060 at 5-6.

> ### viii. Levitt's Education, Training, and Experience Qualify Him as an Expert on Terrorism and Terrorism Financing, and Levitt is not offered as an expert on religion, Islam, or Shariah

Levitt is not offered as an expert on religion, Islam, or Shariah. His brief discussion of the Islamic tradition of *dawa* is offered for background to his explanation of how this tradition has been incorporated into radical Islamic ideological principles. In offering this explanation, Levitt relies upon the definition of *dawa* by Defendants' expert, Olivier Roy, an Islam scholar writing about political Islam, as "militant preaching." In addition, he references Muslim Brotherhood founder Hassan al-Banna's tract *Da'watuna* (Our Militant Preaching) in defining the practice within radical Islam. These are exactly the type of texts experts in the field of terrorism may reasonably rely on in forming their opinions. Levitt's explanation of "Economic Jihad," which Defendants claim is "a novel issue that is unheard of in Islamic doctrine,"[182] is, within the first

---

[182] Defs. Br. 41 n. 236.

sentence of its mention, described as a phrase used and concept defined by radical Islamist leaders. Levitt does not opine that this is a practice in traditional Islam nor suggest that this practice has anything to do with the mainline religion. Instead, he describes it as a bastardization of traditional practice premised in a twisted reading of a sacred text.

### ix. Levitt is offered as an expert on accounting, finance, and audits only as those subjects relate to the financing of terrorism

Certainly, Levitt has the experience and educational tools to assess whether or not facts, data, and other information and evidence is reliable.[183] In any case, to be qualified to offer an opinion, it is not necessary that an expert has particular expertise in a specialized area of a subject matter as long as the expert has "educational and experiential qualifications in a general field closely related to the subject matter in question." *In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d 230, 282 (E.D.N.Y.2007) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir.1997). Levitt clearly has the training and experience to address issues of terrorist funding. His experience with the FBI was as a counterterrorism intelligence analyst during which time, he provided tactical and strategic analysis in support of counterterrorism operations. In this role, he focused on fundraising and logistical support networks for Middle Eastern terrorist groups. His time at the Treasury Department further strengthened his skills in this area.

### x. Levitt is qualified to offer opinions on Al Qaeda and Saudi Charities

Levitt's expertise is more generalized than to be confined to analysis of only those groups on which he has the most experience. Al Qaeda and Saudi Charities were so recognized as a part of Levitt's professional experience with the Middle East, Gulf charities, and terrorism that he was invited to participate as a consultant to the 9/11 Commission's "al Qaeda and other transnational threats" team.[184] He also participated in crisis situations including the terrorist threat that existed around 2000 and the 9/11 attacks.[185]

---

[183] Ex. 13 (Levitt Tr.) 37:3-40:17.
[184] Ex. 5 (Levitt Rpt.) 3.
[185] *Id.* at 2.

As a U.S. government intelligence analysist, he researched and analyzed trends and patterns of international terrorist groups.[186]

What Defendants appear to argue here is that, notwithstanding his expertise, Levitt's opinions must be confined to specific geographic areas and particular terrorist groups. Rule 702 contains no sufficiency requirement regarding the number of times an expert must have previously testified or dealt with a particular issue. And according to case law, general qualifications in a subject matter can qualify an expert to testify regarding a more specialized area within the subject. So any sufficiency requirement should apply to Levitt's education and experience as opposed to the specific groups or geographic areas of his prior investigations. Experts need not conduct studies of their own in order to opine on a topic and may instead review other studies and literature to reach a reliable opinion.[187]

### xi.   Levitt's Treatment of WAMY is in Accord with the Standards Set Forth by the Court

Levitt's report describes the relationship of WAMY to the Saudi Government vis-à-vis a report by the Dutch General Intelligence and Security Service (AIVD) which he selected because it "offers a good summary explanation of how these charities functioned as part of Saudi government policy and as an extension of branches of the Saudi government[.]"[188] The 9/11 Commission Report, which Levitt also cites, offers a similar view regarding Saudi control of WAMY. Levitt also references the CRA's decision revoking WAMY's registration for providing thousands of dollars to a U.N. sanctioned entity, Benevolence International Foundation (BIF). *See also supra*, at 27-28. The Court's standard for allowing experts to testify is whether the expert describes a methodology in detail, whether the expert analyzed information in ways analogous in social science and provided citations to respected sources. ECF No. 9060 at 40. Levitt testified

---

[186] *Id.*

[187] *In re Mirena* at 412; *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042–43 (2d Cir.1995) (rejecting argument that because expert had "no experience performing or interpreting air quality studies" he was not qualified to testify); *see also Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F. Supp. 2d 269, 284 (S.D.N.Y.2011) ("Experts need not have actually collected the data on which they base their conclusions in order to be credible.")

[188] Ex. 5 (Levitt Rpt.) 29.

extensively to his methodology.[189] He has also selected reputed sources regarding his statements on WAMY, at least some with which he has personal familiarity,[190] and he analyzed these sources consistent with the articulated standard. There is no credible argument to be made for excluding Levitt's testimony regarding WAMY.

      **c.    Comras Has Substantial Relevant Qualifications, And His Opinions Are The Product Of Reliable Data And Methodologies.**

Comras has highly specialized knowledge and experience in the field of terrorist-related financing, money laundering, and the development, implementation, and enforcement of economic and financial sanctions. Ex. 11 (Comras CV). His report and testimony reliably applied his unique expertise in reviewing the relevant evidence and reaching his opinions.

Comras's opinions will assist the Court and the factfinder and are manifestly proper under the standards applicable to this terrorism litigation. Comras offered opinions on two Saudi nationals, Yassin Kadi ("Kadi") and Wa'el Julaidan ("Julaidan"), concluding that they provided financing and other material support to OBL and Al Qaeda knowing that the support would be used to finance terror attacks against Americans, including the September 11, 2001 attacks. OFAC designated both men as "Specially Designated Global Terrorist" ("SDGT"),[191] Kadi on October 12, 2001, and Julaidan on September 6, 2002.[192]

Kadi's attacks on Comras conflict with the "flexible" nature of this inquiry into the reliability of expert testimony under the Federal Rules.[193]  Kadi largely hangs his arguments on his own one-sided view of sharply disputed facts, failing to acknowledge the full scope of proofs underlying Comras's opinions.

---

[189] Ex. 13 (Levitt Tr.) 472:3-481, 550:23-554:16, and 572:6-9.

[190] *Id.* at 136:12-17.

[191] The SDGT designation is governed by the International Emergency Economic Powers Act, 50 U.S.C. 1701 et seq, (IEEPA) and Executive Orders issued pursuant thereto which have delegated the authority to designate to the Secretary of the Treasury. The Secretary of the Treasury is authorized to designate when the Secretary finds that such persons are associated with, or act for or on behalf or are owned or controlled by designated terrorists, or that assist them, sponsor, or provide support for (including financial) to them. Persons so designated are referred to as specially designated global terrorists, or SDGTs.

[192] Ex. 9 (Comras Rpt.) 50-51.

[193] *Daubert*, 509 U.S. at 588 (recognizing a "general approach of relaxing the traditional barriers to 'opinion' testimony.").

Kadi does not and cannot attack Comras's considerable expert qualifications and his experience in uncovering the roots of terrorism financing. Comras held several senior U.S. State Department positions, where he dealt with export controls, international economic and financial issues, notably serving as Director of the Office of Sanctions and Export Controls. He was appointed as the International Monitor for the U.N. to administer the U.N. Security Council's sanctions against Al Qaeda and the Taliban. He led the U.N.'s efforts to ferret out individuals and organizations that provided financing to Al Qaeda and other terror groups.

Kadi makes only a halfhearted challenge to Comras's methodology, but acknowledges that Comras applied the same well-accepted methodology governmental authorities routinely apply to uncover terror financing. At base, Kadi's argument rests on arguments strung together to posit that Comras should have accepted wholesale Kadi's testimony and his view of the evidence and come up with alternative possibilities to explain Kadi's incriminating financial transactions and business operations. This argument, which goes to the weight rather than the admissibility of Comras's opinions, in not a proper *Daubert* challenge. The jury is entitled to hear Comras's opinions and resolve the averred factual conflicts.

In sum, Kadi repeats here the same arguments offered and rejected when he challenged the sanctions OFAC and other authorities imposed on him. For example, Kadi claims Comras "has not identified one cent that has traveled from Mr. Kadi… to Al Qaeda." Kadi Br. 2. To the contrary, Comras identified the funding trail of entities Kadi created to camouflage his terror funding. OFAC rejected Kadi's similar claims, finding his arguments "strain[] credulity." In essence, Kadi asks this Court to endorse the evasive methods he used to fund Al Qaeda and ignore the reliable techniques of governmental authorities that Comras applied to identify such financing.

### i. Comras Has Substantial Relevant Qualifications Identifying And Combating Terror Financing.

Comras earned his B.S. degree at Georgetown University School of Foreign Service; his J.D. from the University of Florida with honors, where he was on the Law Review; and an LLM in International Legal

Studies from Harvard University.[194] He was appointed a Foreign Service Officer in 1966 and became a senior officer in 1990. Comras then served as Director of the Department's Office of Sanctions and Export Controls from 1991 to 1994. He was the chief architect of the international and economic sanctions against Serbia during the Bosnia and Kosovo wars. He was directly involved in designing, implementing, and monitoring the international regulatory and other measures to identify, prevent, stop and/or punish the use of illicit financial transactions and other means to circumvent financial sanctions. In 1994, President Clinton appointed Comras to serve as the first U.S. Envoy and Chief of Mission to the Republic of Northern Macedonia. He served in diplomatic assignments in Africa, Europe, and Canada, as well as the U.N., the Council of Europe, European Union, and as the U.S. delegate to COCOM. He is the recipient of numerous accolades, including ten Superior and Meritorious Honor Awards from the State Department.

Following the 9/11 Attacks, Comras was appointed by then U. N. Secretary General Kofi Annan, with the concurrence of the U.N Security Council, to serve as an International Monitor charged with overseeing the implementation of U.N. Security Council sanctions measures against Al Qaeda and the Taliban. Comras led the U.N.'s efforts to identify and act against individuals and organizations responsible for terror financing. He has testified as an expert before the U.S. Congress and the Canadian Parliament and has published numerous books and articles about the financing of Al Qaeda and other related terror groups.[195]

---

[194] Ex. 9 (Comras Rpt.) 1.

[195] *See* Ex. 11 (Comras CV). A partial list of his publications and presentations include "*Al Qaeda Finances and Funding for Affiliated Groups*" in Terrorism Financing and State Responses (Stanford University Press 2007); "*Current and Evolving Trends in Terrorism Financing,*" Testimony before House Subcommittee on Financial Services, September 28, 2010; "*Judge finds proper balance between due process and national security in Al-Haramain wiretapping case,*" in Jurist Legal News and Research, March 10, 2009; "*Reforming U.S. Counter-Terrorism Assistance Programs,*" Panel Presentation, U.S. House of Representatives Committee on Foreign Affairs, Washington DC; "*Deterring Terrorism By Providing A Civil Right Of Action Against Perpetrators And Sponsors of Terrorism,*" Testimony before the Canadian Parliament, Senate Committee on Legal and Constitutional Affairs, Ottawa, June 18, 2008; "*The International Response to Terrorism Financing,*" An Address Delivered at the International Conference on Terrorism, Herzilya, Israel, September 14, 2006; "*Winning the War Against Terrorism Financing, An Address to the First International Conference of Armed Forces Commanders,*" Atlanta, March 8, 2006; "*Funding for Al Qaeda,*" Strategic Insights, Center For Contemporary Conflict, January, 2005; "*Following Terrorists' Money,*" The Washington Post, June 5, 2005; "*Filling the Information Gaps on Al Qaeda,*" Washington Post, June 1, 2004; "*Al Qaeda and the War on Terrorism, An International Perspective,*" Naples Council of World Affairs, Naples, Florida, April 13, 2004; Special Reports for the United

While working for the U.N. Security Council, Comras spearheaded its evaluation of the sources and tactics Al Qaeda and the Taliban used to obtain the financing necessary to maintain their terror organizations and operations. Comras met with government and international officials, as well as other public and private counterterrorism experts, to help countries implement Security Council Resolutions that blocked terror financing. He also represented the Monitoring Group at the Financial Action Task Force ("FATF") Plenary (a subsidiary of the Organization for Economic Co-operation and Development ("OECD")) and G-20 ministerial meetings on fighting terrorism financing.[196]

Comras is recognized internationally as an expert on measures to combat terrorism by identifying and restricting terror financing and other illicit international transactions. Kadi does not challenge Comras's qualifications to render opinions on terror financing, but claims they are of "dubious relevance" or help to the factfinder regarding the roles of Kadi and Julaidan in providing financial support to Al Qaeda. Kadi incorrectly suggests that Comras's expertise is limited only to assessing perceived risks of future, not past, conduct. Comras in fact possesses highly specialized, substantial knowledge concerning Al Qaeda's modus operandi to secure its funding, as demonstrated by his extensive studies and writings, and his work on the U.N. Security Council's Panel of Expert's on Al Qaeda and the Taliban, which produced authoritative reports on Al Qaeda's funding sources.

### ii.   Comras's Opinions Are the Product Of Reliable Data And Methodologies

Reviewing the evidence, Comras applied his vast experience on the relevant issues: he used his forensic accounting[197], social science research and evaluation skills; secondary source analysis methodology; and, established anti-money laundering/terror financing methodology. Comras used his background and experience to evaluate the document productions and deposition testimony in the MDL and the relevance,

---

Nations Security Council Monitoring Group on the State of Implementation of Measures Against Al Qaeda and Taliban, Dec. 2, 2003; July 7, 2003; Dec. 17, 2002; and Sept. 20, 2002.

[196] Ex. 9 (Comras Rpt.) 3.

[197] Forensic accounting involves analysis of the transfer of financial assets, including the tracing of funds, asset identification, and evaluation of, or absence of, record keeping and due diligence reviews. *Id.* at 4.

reliability, and accuracy of secondary sources such as concurrent press reports, intelligence reports, testimony, and other publicly available source information. Comras's 57-page report, containing 230 footnotes, identifies sources, authors, and dates where relevant. *Id.* at 4. Comras also issued a 17-page Rebuttal Report (with 18 footnotes) to Kadi's expert anthropologist Jonathan Benthall,[198] and responded to additional post-deposition questions Kadi's counsel raised.[199] Comras used the accepted criteria to identify and evaluate terror financing: the "red flags" developed by FATF, EGMONT, the International Monetary Fund, the Wolfsberg Group, the Federal Financial Institutions Examination Council ("FFIEC") and other public and private institutions. *Id.* at 4-5. This Court previously recognized the FATF standards as global norms. ECF No. 9060 at 17. Comras identified the list of "red flags" experts in the field have traditionally evaluated to determine the likelihood of terrorist financing.[200]

Comras reviewed documents and Kadi's own testimony about Kadi's long-lasting relationship with OBL that began in the late 1970s. In the 1980s, OBL raised money through Kadi to support the Afghan jihad against the Soviets. *Id.* at 13. During that time Kadi became associated with several individuals who were later designated as terrorists, including Wael Julaidan, Amir Mehdi, Chafiq Ayadi, and Abdul Latif Saleh.[201] Kadi was seen on multiple occasions at Al Qaeda guest houses in Peshawar and the Dawa Organization guest house in Khartoum. Ex. 9 (Comras Rpt.) 14 n. 38.

---

[198] Ex. 9 (Comras Rebuttal Rpt.).

[199] Ex. 21 (PECs' Oct. 12, 2021 letter to Peter Salerno).

[200] Ex. 9 (Comras Rpt.) 7-8. The "red flags" he identified are: (1) The parties to the transaction (owner, beneficiary, etc.) are from countries known to support terrorist activities and organizations; (2) The funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from higher-risk countries; (3) The parties have channeled funds to false corporations and shell-companies; (4) A series of complicated transfers of funds take place from one person to another as a means to hide the source and intended use of the funds; (5) Transactions involving foreign currency exchanges are followed within a short time by funds transfers to higher-risk locations (6) Multiple accounts are used to collect and funnel funds to a small number of foreign beneficiaries, both persons and businesses, particularly in higher-risk locations; (7) The use of multiple, foreign bank accounts; (8) Inclusion in the transaction of an associated individual in the United Nations 1267 Sanctions list (9) Media reports that an account holder is linked to known terrorist organizations; (10) Improperly identified beneficial owner of the account; (11) Use of nominees, trusts, family member or third-party accounts; and (12) The transaction is not economically justified considering the account holder's business or profession.

[201] Ex. 19 (Kadi Tr.) 289:1-10.

In 1990 Kadi began a close working relationship with Saudi billionaire Khalid bin Mahfouz, the chairman of the National Commercial Bank in Saudi Arabia.[202] Mahfouz gave Kadi $5 million to establish and operate the Muwafaq Foundation, while Kadi himself contributed $2 million. Ex. 9 (Comras Rpt.) 15. Between 1991 and 1996, Mahfouz and Kadi used untraceable bearer checks[203] totaling more than $60 million to fund the Foundation. *Id.* 17. Comras detailed how Kadi routed these funds with little or no record keeping through his companies and charities, including the Muwafaq Foundation, to finance Al Qaeda. *Id.* 18 & n. 59.

Comras determined that Kadi used the Muwafaq Foundation to support Al Qaeda. Throughout the 1990s Kadi managed the projects and activities of that Foundation and handpicked its directors and managers. Those directors and managers—Julaidan, Ayadi Mehdi, and Abdul Latif Saleh—were each closely associated with Al Qaeda. *Id.* at 19.

This Court is familiar with Julaidan. On September 6, 2002, the U.S. and Saudi Arabian governments announced they were jointly listing Julaidan, an SDGT, stating in part:

> Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

Ex. 9 (Comras Rpt.) 29. Comras took account of numerous details concerning Kadi and Julaidan's close personal and professional relationship and the substantial sums of money that Kadi provided to Julaidan through various front companies. *E.g., id.* at 30-33. During the MDL litigation, Plaintiffs attempted to collect discovery materials from Julaidan, including his deposition, that likely contained incriminating information as to both Julaidan and Kadi. Julaidan refused to cooperate, and this Court entered a default judgment

---

[202] Mahfouz's name was found on the so-called "Golden Chain" list of Al Qaeda's principal financiers. *Id.* at 16 & 44.

[203] A bearer check is a check payable to the person in physical possession of the check. It can be transferred to the holder by delivery without having to be endorsed. Pay-to-bearer instruments are not registered in the name of a specific owner and are difficult to trace through their value transfer circuit, until they are ultimately deposited. It is a method used to insulate the issuer of the check from those who hold, transfer or cash the check since he may not have actual knowledge of its interim or final disposition at the time of issue. Ex. 9 (Comras Rpt.) 17 n. 50.

against him.[204]

Comras further exposed Kadi's scheme by detailing Muwafaq's unusual activities that Kadi could not, or would not, explain. Kadi admitted that he put the various branch managers in place; was principally responsible for raising money for the activities of the local offices; and visited them three or four times a year. Kadi further admitted that there was little to no auditing and that no meaningful financial records were available. He described Muwafaq as a highly decentralized operation with no reporting structure, systemwide accounting or main bank accounts. Ex. 9 (Comras Rpt.) 34.

Muwafaq's first operation was in Sudan under Hassan Turabi and the NIF. *See* ECF No. 7942 at 9-10 (describing the role of Turabi and the NIF in sponsoring Al Qaeda in the Sudan). The Sudanese NIF throughout the 1990s actively promoted a radical anti-West version of Islam and openly supported Islamic terrorism. Sudan was listed as a State Sponsor of Terrorism by the U.S. in 1993.[205] Comras detailed OBL's close working relationship with Muwafaq in the Sudan, as well as Kadi's other businesses and investments in Sudan while it was widely known to be a designated State Sponsor of Terrorism. Sudan not only hosted OBL and Al Qaeda but also provided continued support to Al Qaeda even after OBL left Sudan in 1996. Sudan has been adjudged liable in U.S. Courts for conspiring with Al Qaeda to attack two U.S. Embassies in East Africa in 1998 and the U.S.S. Cole in Yemen in 2000. Ex. 9 (Comras Rpt.) 34-40.

Kadi ignores a large section of Comras' report on Sudan in the 1990s that not only described Kadi's Muwafaq Foundation and its relationship with the NIF and OBL,[206] but also profiled several of Kadi's

---

[204] Earlier this year this Court held:

> Given the willfulness of Jelaidan's noncompliance, the demonstrated inefficacy of lesser sanctions, the decades-long duration of Jelaidan's disregard, and the series of warnings issued by multiple judges regarding the consequences of additional obstructive behavior, this Court now renders default judgment against Defendant Wael Jelaidan.

ECF No. 9241 at 2

[205] https://www.state.gov/u-s-relations-with-sudan.

[206] The U.S. Embassy in Khartoum stated that the NIF was using Muwafaq to promote its radical, anti-Western versions of Islam. Ex. 9 (Comras Rpt.) 35; Ex. 10 (Comras Rebuttal Rpt.) 7.

businesses that were operating in the Sudan during that period. *Id.* at 34-40. No business or charity could thrive in Sudan in the 1990s without explicit support from the Turabi-Bashir Islamic government that was openly hostile to the West. Comras properly considers Kadi's extensive operations and investments in a terrorist State – Sudan – together with other evidence of Kadi's terror financing. Kadi claimed that the Muwafaq Foundation ceased its Sudan operations in 1996, coincidently at the time OBL left Sudan. But the U.N. found that the Foundation was still active in 1997 with plans to expand the following year. Ex. 9 (Comras Rpt.) 37. The Foundation's director Siraq al-din Abdel Bari simply moved over to a newly named entity called Sub-Saharan International Development Organization.

Comras further detailed Kadi's financing of Al Qaeda through the Muwafaq Foundation elsewhere, including in the Balkans, *id.* at 42-48, and in Pakistan, where Kadi sent money to Amir Mehdi, who was arrested in 1995 on terrorism related charges associated with Ramzi Yousef and the 1993 World Trade Center bombing.

Comras also addressed how at roughly the same time that he created the Muwafaq Foundation, Kadi established a company called "Muwafaq Limited." Kadi claimed that Muwafaq Limited was formed solely to hold his shares in a Pakistan hospital company, but Comras found that the company was used by Kadi to finance terrorism. Like the Muwafaq Foundation, the Muwafaq Limited's accounts were funded by millions of dollars in Mahfouz's bearer checks, and Kadi sent the money from those checks to a leading member of Sudan's National Islamic Front (NIF) who was providing direct assistance to Al Qaeda. *Id.* at 17-8.

Comras found that "Kadi also provided $5 million via his Leemount company to TWRA [the Third World Relief Agency]", which was "a Sudanese NGO" that "American and German counter-terrorism investigators…concluded…provided a primary pipeline for arms shipments to Al Qaeda." Ex. 9 (Comras

Rpt.) 26.[207]

Kadi also provided $10 million to the Islamic Investment Company of the Gulf ("IICG") that was the subject of multiple investigations concerning its possible links to terrorism. OBL's brother Haydar Mohammed bin Laden was the director of IICG at that time and OBL allegedly had $10M in family funds frozen by the Saudi government at that time, raising suspicion that this was a secret transfer of OBL's money to the IICG which was also a shareholder in the Faisal Islamic Bank in Sudan. OBL moved to the Sudan at the same time and had accounts in the Shamal Bank under the protection of the Sudanese government. IICG was also a wholly owned subsidiary of Dar al-Maal al-Islami Trust ("DMI") with a portfolio of Islamic banks including Faisal Islamic Bank that maintained accounts for charities and businesses that were later designated as financial conduits for Al Qaeda, including the IIRO and MWL.

Shortly after the September 11 Attacks, on October 12, 2001, Kadi was designated as a SDGT by OFAC at the U.S. Treasury for his past assistance, sponsoring and providing financial, material or technological support to Al Qaeda, OBL, Wa'el Julaidan, and other entities and individuals associated with terrorism. *Id.* at 51.[208]

The year after Kadi was designated as an SDGT, he petitioned OFAC for reconsideration. OFAC rejected his petition and issued the following statement:

> It strains credulity that Al-Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al-Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. …. OFAC concludes that when considering the number of sources, the number of activities and length

---

[207] Comras found that Julaidan, who was being separately funded by Kadi, "transferred some $6 million to the TWRA and received from the TWRA over $7 million, for suspected arms purchases." *Id.*

[208] The United Nations said "The individual Yasin Abdullah Ezzedine Qadi … satisfies the standard for listing by the [Sanctions Committee] because of his actions in (a) participating in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of; (b) supplying, selling, or transferring arms and related material to; (c) recruiting for; or (d) otherwise supporting acts or activities of; Al-Qaeda, Usama bin Laden or the Taliban, or any cell, affiliate, splinter group or derivative thereof (see United Nations Security Council Resolution 1822 (2008), paragraph 2)." European Union Court of Justice, Judgment July 18, 2013 p 7. United Nations Security Council Resolutions 1267 (1999) and 1333 (2000). United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi. *Id.* at 51 n. 224.

of time, the totality of the evidence, both classified and unclassified, provides a reason to believe Yassin Al-Qadi has funded terrorist and extremist individuals and operations.[209]

The designation resulted in the blocking of all Kadi's assets that were subject to the jurisdiction of the U.S. and the U.N. designation required all countries to freeze his assets, ban him from international travel, and prevent him from acquiring weapons or explosives. Kadi circumvented many of these restrictions and continued to operate several of his businesses and traveled. It is believed that Saudi Arabia did not freeze his assets and permitted him to have access to banks, finances, and property and did not limit his travel. *Id.* at 51.[210]

Comras considered multiple sources of information, including Kadi's own scant unverifiable and incredulous explanations, and weighed them against one another to conclude with a reasonable degree of certainty, that Kadi was engaged in terror financing for Al Qaeda throughout the 1990s and up to the 9/11 attacks. Nevertheless, Kadi quotes sections of Comras's report out of context to suggest that he had no basis for his opinions. For example, Kadi makes the remarkable claim that Comras "never articulated" the "substantive reasons for believing" that Kadi provided support to Al Qaeda. Kadi Memo. at 24. To the contrary, the section of Comras's report quoted by Kadi cites to "Kadi's transactions with Maram and Wael Julaidan" (which are described in detail elsewhere within his report); "Kadi's choice of business partners… all of whom had substantial links to al Qaeda" and "Kadi's transactions…[that] went undocumented, off-the-books, and/or lacked traceable accounting records." Ex. 9 (Comras Rpt.) 56.

In terrorism cases, where "expert testimony is not of a technical nature, but rather falls within the ambit of social science, this Court is guided by the objective of the *Daubert* factors, and not a mechanical

---

[209] Ex. 9 (Comras Rpt) 48.

[210] Kadi used his considerable resources to repeatedly petition for delisting of his SDGT designation. Eventually, by 2014, the U.S. determined Kadi was no longer a current threat to fund or assist a mostly defunct Al Qaeda and delisted Kadi, but warned that "OFAC may consider re-designating Mr. Kadi should it become aware of information indicating that he has resumed the activities that resulted in his designation as an SDGT or that he has otherwise engaged in activities that would make him subject to designation pursuant to Executive Order 13224 or other authorities administered by OFAC." *Id.* at 53. As Comras states in his report, the delisting "did not detract from findings by the U.S. Treasury Department, The European Union, or the United Nations that Yasin Kadi engaged in channeling funds to Osama bin Laden." Ex. 9 (Comras Rpt.) 52-3.

application of each one." *United States v. Paracha*, 2006 WL 12768, 19 (S.D.N.Y. Jan. 3, 2006) (*citing Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)). A methodology that "consists of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information" is deemed sufficient. *Paracha*, 2006 WL 12768, at *20.

The Federal Rules of Evidence provide that "an expert may base an opinion on facts or data in the case . . . [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. The court is tasked with ensuring that an expert is "basing testimony upon professional studies or personal experience, employ[ed] in the courtroom [with] the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Paracha*, 2006 WL 12768, at *19 (citing *Kumho Tire Co.*, 526 U.S. at 152).

### iii.   Kadi Argues His View Of The Facts In A Challenge That Goes To The Weight Of Comras's Opinions Rather Than Their Admissibility.

Kadi's arguments simply restate his view of the disputed facts and seek to reargue the findings of the OFAC, which designated him as an SDGT.

1. <u>Red Flags.</u> Red Flags are warning signs to banks, financial institutions, businesses, accountants, and government investigators when looking for money laundering and terror financing. Comras cited many of these FATF and financial community standards used to signal the likelihood of terrorist financing. However, creative terror financiers continue to find ways to circumvent these safeguards to get the money and resources to the terrorists.

Terror organizations need large sums of money to operate, feed, clothe, house, train, travel, purchase weapons/explosives for their operatives long before money is required to move terrorists into position for a terror attack. In terrorism investigations, as Comras noted, it is important to "follow the money." But following the money is easier said than done. Terror financiers will usually take efforts to hide the money trail from donors to the terrorists. And, money is fungible and ostensibly directed at one purpose, such as a business transaction or humanitarian cause, it can also be laundered, siphoned off, or used to free

up other funds for terrorism related purposes. One of many examples cited in Comras's report was the business dealings of Kadi's Muwafaq Foundation with Wadi al Aqiq, a Sudanese company in which bin Laden and Al Qaeda had significant financial interests. Ex. 9 (Comras Rpt.) 9 & n. 17, 37-8.

Kadi challenges the validity of Comras's "red flag" factors, suggesting that they lack FAFT's imprimatur, and disregarding their general acceptance by the financial regulatory agencies. Yet, Kadi fails to name even one of these risk factors that is irrelevant or objectionable. Kadi strains to argue that some of the individual red flag criteria are speculative and only show a "potential" for terror financing. Comras however, reviewed all the evidence and found that Kadi's conduct raised, not merely one or two red flags, but *numerous* red flags over the course of many years. Kadi's transactions often went forward without explanation or accounting as to how the money was used.

It is the significant number of risk factors, or "red flags," associated with so many financial transactions and activities of Kadi and the entities under his control which, Comras concluded, demonstrates probable terrorist financing. Ex. 9 (Comras Rpt.) 54-56.

Kadi claims that while the FATF uses a two-tier analysis of "risk indicators" and "terrorist abuse indicators" Comras did not. But Kadi miscomprehends the tiers, believing that they are separate, rather than a continuum. The sliding scale of evidence moves from the analysis of a single red flag "risk indicator" to a pattern of multiple red flags which indicate the likelihood of "terrorist abuse indicators," including financing. As OFAC found, the accumulation of such activities demonstrates terror financing abuse. Ex. 9 (Comras Rpt.) 7-8. This is precisely what OFAC found when it imposed imposing sanctions on Kadi.

While Kadi argues that there may be "possible innocent explanations," he has not readily volunteered them. To the extent Kadi offers any alternative explanations, Comras considered them — as did OFAC — and rejected them as being unsupported, contrary to accepted business norms, or difficult to

believe. Alternative explanations that an expert considers and rejects are clearly a question for the jury.[211]

Comras need not consider every excuse Kadi can conceive. *See U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 238–39 (S.D.N.Y. 2004) ("An expert is not required . . . to categorically exclude each and every possible alternative cause."); *Discover Fin. Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 n.7 (S.D.N.Y. 2008) (expert testimony is not rendered unreliable because all possible causes are not eliminated and parties are free to argue at trial that other explanations are "equally or more likely.").[212]

2. OFAC's Designation. Kadi claims that because many of his business associates and investments were not designated as SDGTs until *after* 9/11, that the designation should not be used against him now to impute knowledge in the 1990s. Kadi, however, does not actually deny that he knew or suspected them to be involved in terrorism. Nor does he deny that they worked together in prior years to fund the Islamic fighters against the Soviets in Afghanistan. Kadi's close relationship with these same individuals during the 1990s, including partnering with them, employing them, and funding them supposedly without knowing or asking how they were spending his money, defies belief. Their designation as SDGT after the 9/11 investigation began was no surprise. In addition, Kadi transacted with several entities designated *before* 9/11. Kadi claims that he did not know the Farmer's Bank in Sudan was designated a supporter of terrorism before the 9/11 attacks. He also admits that he had contacts with OBL over many years and was in the Sudan at the same time OBL was openly conducting fund raising and operating Al Qaeda training camps. According to the National Intelligence Center, Al Qaeda's first terror attack directed at the United States took place on December 29, 1992, when bombs were planted in Aden, Yemen at two hotels housing U.S.

---

[211] See e.g., Kadi made cash infusions to his business KA Stan that operated in a conflict zone near known Islamic terror groups and intentionally refused to keep transparent accounting records (Kadi Br. 6); Euroinvest "sold" goods on credit to customers who never paid but did not produce records of same; employed and/or loaned money to terrorists who were later designated as SDGTs. According to Kadi, this was ordinary conduct.

[212] When "testimony falls within the range where experts might reasonably differ, the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (citing *Kumho Tire, Co.*, 526 U.S. at 153) (internal quotations omitted).

Marines supporting operations in Somalia. OBL was first placed on the U.S. State Department's terrorism watch list in 1993. He was designated a terrorist on November 4, 1998 and listed on the FBI's Most Wanted List in 1999.[213] Sudan itself was designated as a State Sponsor of Terrorism by the United States in 1993 after the first World Trade Center bombing and New York Landmarks bombing plot was foiled.[214] Kadi does not suggest that he was ignorant of Sudan's designation but nonetheless continued to operate businesses and investments in Sudan throughout the 1990s. According to Millard Burr and Robert Collins' book: Revolutionary Sudan: Hasan Al-Turabi and the Islamist State, 1989- 2000, p. 89-90, Muwafaq opened an office in Mogadishu circa 1992 and was reportedly engaged in providing weapons and ammunition to Islamists there. Ex. 9 (Comras Rpt.) 36 n. 140.

Kadi admits that multiple government reports that included the U.S. State Department, Treasury Department, the CIA, U.S. Foreign Broadcast Information Service, the U.N. and the Swiss Police, contain evidence of Kadi's relationship with OBL and other terrorist supporters. Kadi Memo. at 8-9. Comras carefully analyzed and compared this information to other evidence contained in the document production, including Kadi's submissions to OFAC and deposition testimony, to reach his conclusion that Kadi was involved in terror financing for OBL and Al Qaeda.[215]

Kadi claims that Comras improperly relied on hearsay contained in those government reports. Comras is entitled to rely on facts or data, including hearsay, that are used by experts in his field. Fed. R.

---

[213] FBI.gov/history/famous-cases/osama-bin-laden.

[214] https://www.state.gov/u-s-relations-with-sudan.

[215] In another puzzling defense, Kadi argues that he had nothing to do with Al Haramain Islamic Foundation ("AHIF") a charity that even Saudi Arbia acknowledged was a conduit for terror support; rather, he was on the Board of Directors of Al Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA") a different charity that was *also designated* by OFAC as a supporter of terrorism. Kadi Br.10-11 n. 22. Kadi does not address the involvement of Muwafaq Albania director Abdul Latif Saleh with the Al Haramain Foundation. Saleh, together with the Al Haramain Foundation, recruited and financed the establishment of Albanian jihadist groups whose mission were to destabilize the internal situation in Albania. Saleh was investigated by local police for terrorism and deported. Kadi was a founding shareholder of the Arab Albania Islamic Bank and shortly after opening an account there, $600,000 was transferred into the account that was believed to be earmarked for OBL who then provided the money to Saleh to establish such extremist groups. U.S. Treasury Dept. Press Release JS-2727. According to the U.N, OBL provided working capital for five of Kadi's companies in Albania. Kadi's Loxhall company shared the same address in Albania as al Haramain. *See* Ex. 9 (Comras Rpt.) 45-47.

Evid. 703; ECF No. 9060 at 6-7.[216] Experts in terrorism cases frequently consider hearsay in reaching their opinions. *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 532 (E.D.N.Y. 2012); *Paracha*, 2006 WL 12768, at *20. In addressing reliance on hearsay, "the issue is whether the evidence on which the expert relies is '[o]f a type reasonably relied upon by experts in the particular field.'" *Abu-Jihaad*, 553 F. Supp. 2d at 126 (*citing United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993)). See also, ECF No. 9060 at 6-7. Here, Comas drew upon his expertise and considered multiple government reports about Kadi and additional reports concerning persons and entities that were also believed to be terror supporters, as well as documents produced by Kadi before OFAC and in the MDL litigation and Kadi's deposition in this case and then utilized his discerning analysis of the available evidence to reach his conclusions. *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003).

Kadi makes the specious claim that OFAC only undertook "one actual investigation" of him, Kadi Memo. at 9, but ignores the proof Comras cited that OFAC conducted an intensive, multi-faceted financial examination, including questioning Kadi and reviewing his submissions; confirming that Kadi was responsible for his managers; determining that Kadi did not conduct oversight of his financial transactions; and analyzing Kadi's wire transfers and cash withdrawals. *E.g.*, Ex. 9 (Comras Rpt.) 34, 38, 47 n. 202, 48.

Kadi does not deny that he utilized shell companies to move money from one business to another, or to charities or individuals. Instead, he merely criticized Comras at his deposition for his inability to identify each of Kadi's shell companies. Comras indicated that Kadi incorporated businesses in the Channel Islands (Jersey and the Isle of Man) which provided tax shelters and secrecy for a business' operations.[217] Using

---

[216] *Abu-Jihaad*, 553 F. Supp. 2d 121 ("While Mr. Kohlmann must, perforce, rely often on hearsay, he testified that he gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources").

[217] Ex. 14 (Comras Tr.) 93-94, referring to Kadi's shell companies that were closed not only because they were connected to Kadi and Al Qaeda, but also because they were fictitious companies with limited commercial activity. *See also* Ex. 9 (Comras Rpt.) 29 n. 108, Eduart Bala, Deputy Director of Defense Intelligence Agency, *Financing of Terrorism – Case Study, Albania* in Military Review, Security and Defense Review Training and Doctrine Command, 2d Ed. Dec. 2013, listed in Annex 2 as MILITARY REVIEW.

shell companies, or companies that may or may not actually have legitimate working functions is not the point; rather, operating businesses that maintain little to no accounting records about where they are sending money and why, is the point that Comras and government investigators were most interested in. Terror financiers know and plan for the eventuality that investigators may try to follow the money trail that funds terror activities, and they therefore take measures expressly to cover their tracks in opaque business transactions.

3. <u>Comras is Entitled to Consider Kadi's Failure to Explain Financial Irregularities</u>. Kadi argues that neither he nor his companies had to provide an explanation for suspicious transactions because no entity or person, including Kadi's own accountants, required them to provide such an explanation. But Kadi is well aware that OFAC and other investigators asked those very questions and Kadi could not provide verifiable innocent explanations. Nor does Kadi do so here. As Comras testified, Kadi's own companies and accountants "should know what it's doing, where the money is going, what's happening. But there is no record of any of that in these cases."[218]

4. <u>Comras Properly Considered Kadi's Co-conspirators and Business Associates</u>. Kadi argues that he is the unfair victim of "guilt by association." He claims that he did not know the people or entities he did business with were connected to terror funding – or alternatively defends them by attacking the evidence of their terror support. In a series of denials, Kadi implies that he did not know that a member of a brigade funded by his Muwafaq Foundation was arrested for attempting to plant a bomb in LAX Airport in 1999; that the IICG to which Kadi's Muwafaq Foundation transferred money to had been the subject of multiple terror investigations; that Kadi used Al Shamal Bank in Sudan for his business transactions not knowing that OBL was a partner or shareholder of the bank; that two of Kadi's entities signed a shareholder agreement with OBL for a Sudanese company called Wadi al Aqiq, a well-known Al Qaeda front company;

---

[218] Ex. 14 (Comras Tr.) 303:3-305:4; further, "I've seen enough to know there are blanks. And the companies where there were some recordings of accounting, such as in Pakistan, the accountants had to rely on the information that was simply relying on statements of the managers or the directors…. If there is an explanation, please provide it." *Id.*

that OBL dominated the sesame business in Sudan in an industry that Kadi did business with in Sudan; that Kadi gave money to Gari al Nabi, an associate of Hasan al-Turabi the head of the NIF party in Sudan and a known supporter of Islamic terrorism; that Kadi had a decades long relationship, employed and transferred large sums of money to Wael Julaidan, a known Al Qaeda fund raiser (described above) who the Court rendered a default judgment over for failing to cooperate; that Kadi hired Amir Medhi to run Muwafaq in Pakistan who was later arrested for his support of terrorism. See Kadi Memo. at 15-16.

Kadi does not mention the close relationship of his Muwafaq Foundation in Sudan with the Turabi government and the NIF throughout the 1990s and the financial support that then the NIF provided to Al Qaeda and its terror campaign against the U.S., including the 1998 U.S. Embassy bombings in East Africa and the 2000 attack on the USS Cole off the coast of Yemen. The U.S. Ambassador in Khartoum found that Kadi's Muwafaq Foundation was "an NIF instrument" used to promote its radical, anti-U.S. versions of Islam. Ex. 9 (Comras Rpt.) 35; Ex. 10 (Comras Rebuttal Rpt.) 7.

Information related to the OFAC and the U.N. designations is part of the factual presentation contained in the Comras Report. It is particularly relevant as it relates to Kadi's known associations, and business and financial relationships with others engaged in terrorist financing activities, including inter alia, Wael Julaidan, Abdul Latif Saleh, and Chafiq Ayadi. Such information has nothing to do with "guilt by association," but rather it exposes the web of business and financial relationships between these bad actors, which demonstrates their collaborative history of terrorist financing.

Terrorism experts *must* analyze the relationships among the fact witnesses and other relevant individuals. Comras used careful analysis of a variety of evidence from a range of sources, not limited to the designations, concerning these relationships. Comras applied his unique knowledge about the financing of Al Qaeda and other terror groups to the facts surrounding both Kadi and Julaidan's conduct. The Second Circuit has long "approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families." *Locascio*, 6 F.3d at 936. The

entities and individuals referred to by Comras had close associations to Al Qaeda. Analyzing those associations was proper and necessary for Comras to reach his opinions.[219]

     5. <u>The Maram Affair Represents but One Example of Kadi's Effort to Fund Terrorists.</u> Maram Travel was established by Mahmdou Salim[220] and 'sold' to Julaidan and Mohamed Bayazid who were active with OBL in Afghanistan.[221] Maram provided military equipment to an Al Qaeda charity, Benevolence International Foundation ("BIF"), which then passed the material onto Chechen jihadists. Ex 9 (Comras Rpt.) 48-49. Kadi went on to fund Maram on its project to build student housing for Sheikh Abdul Majeed al-Zindani who was in the process of creating Eman University in Yemen. Zindani had a long history of working with OBL and served as one of his spiritual leaders, recruited jihadists to Al Qaeda training camps and played a key role in Al Qaeda weapons purchases. Zindani was designated as an SDGT in 2004. *Id.* at 49. Dr. Fadl al Masri, head of Islamic Jihad and Al Qaeda's Fatwa committee, taught at Eman University. Anwar Al-Aulaqi lectured there, and American Taliban member John Walter Lindh studied there along with other members of Al Qaeda. *Id.* Between February and May 1998, Kadi transferred $1.25 million from his Karavan company to Julaidan for the student housing project. Julaidan transferred $300,000 of this money to his own personal account, where it disappeared. While a small percentage of the other Kadi money was spent on student housing, the ledgers showed that hundreds of thousands of dollars went missing.

     6. <u>Comras Properly Represented the Facts.</u> In another puzzling argument, Kadi claims that Comras intentionally misquoted the September 6, 2002 U.S. Treasury Press Release that designated Julaidan as a

---

[219] *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) ("Expert testimony is similarly appropriate in the context of a case — such as this one — which implicates the activities of terrorist organizations **and their supporters**.") (emphasis added). Comras does not offer a legal conclusion on criminal liability, nor has Kadi argued as much. It would be a misapplication of the law to forbid the experts in this instance from opining on relationships between individuals and entities based on criminal law standards meant to be applied in a criminal context.

[220] Salim was arrested and deported to the U.S. for his role in the 1998 Embassy bombings and stabbed a prison guard in the NY MCC. He is serving a life sentence in Supermax prison.

[221] A Swiss Police Report cited by Comras maintained that Kadi commissioned Julaidan and Abu Hasan al Madani with the building project. Kadi sent Julaidan several payments totaling $125,000 for this purpose. These sums originated exclusively from Switzerland. According to Swiss Police "Those who were involved in this operation all number amongst the trusted inner circle of [OBL] and his Al-Qaeda organization." (Ex. 9 (Comras Rpt.) 48 (citing KADI10758)).

SDGT by not including the reference to Abdullah Azzam who had been assassinated in 1989. Kadi Memo.

at 19. The full quote from the Treasury Dept. reads as follows:

> Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that We were all in one boat, as is known to you, including our brother, Wa'el Julaidan. Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar.

Comras did not claim to offer the entire quote; rather, he correctly cited it for the relevant context that as

late as 1999, OBL called Julaidan a "brother" and that the two men shared a close relationship from the

1980s when they fought in Afghanistan with Azzam. This was OBL's reminder to Julaidan to stay the course

with Al Qaeda. Kadi's attempt to show a material distortion is completely unfounded. Likewise, Kadi

maintains that Comras was mistaken when he cited Benthall's book, *The Charitable Crescent*, as indicating that

the Muwafaq Foundation's charitable aid was conditioned on adherence to political and religious criteria.

Comras' only mistake was to attribute that observation to Benthall himself, rather than to the book's *co-author*

(Dr. Jerome Bellion-Jourdan) who visited the Muwafaq Refugee camp. Kadi Memo. at 20. Kadi, however,

fails to address the material point made by both Comras and Benthall's co-author, that Kadi's Muwafaq

organization and the NIF shared the same extremist ideology and the NIF supervised Muwafaq's activities.

Kadi criticizes Comras' opinion that Kadi propagated radical Islamic ideology and claimed there

was no proof. Kadi Br. 23. But Comras made clear that Kadi had a long-standing relationship with the

Muslim Brotherhood. Ex. 21 (PECs' Oct. 12, 2021 Ltr to Salerno).

In Kadi's exhaustive argument over the facts, he criticizes any reliance on testimony of former

Sudanese government agent and Al Qaeda accountant, Jamal al Fadl. Kadi Br. 20-21. While Kadi can

criticize Fadl's sworn testimony and trials, the fact remains that U.S. prosecutors, judges and juries have found

Fadl to be credible and relied on him for criminal convictions under the higher 'beyond a reasonable doubt'

burden of proof. Ex 14 (Comras Tr.) 65, 156-57, 388. Lastly, knowing that the use of bearer checks is a red

flag for terror financing, Kadi claims that his benefactor and mentor Mahfouz, not Kadi, himself, had issued the checks. Kadi Br. 22. But this poor excuse hardly serves to exonerate Kadi, who was responsible for handling the distribution of the same bearer check funds.[222]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' applications in their entirety.

Dated:  September 15, 2023

Respectfully submitted,

MOTLEY RICE LLC

By: /s/ *Robert T. Haefele*
ROBERT T. HAEFELE
JODI WESTBROOK FLOWERS
DONALD A. MIGLIORI
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*Liaison Counsel for the Plaintiffs'*
*Executive Committee for Personal Injury and Death*
*Claims on behalf of the Plaintiffs*

COZEN O'CONNOR

By: /s/ *Sean P. Carter*
SEAN P. CARTER
STEPHEN A. COZEN
J. SCOTT TARBUTTON
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*Co-Chair of the Plaintiffs' Executive Committee for*
*Commercial Claims on behalf of Plaintiffs*

---

[222] Kadi, at 24, also claims that Comras improperly commented on Kadi's *intentional* and *knowing* conduct to siphon money off of transactions to help finance Al Qaeda in the time period leading up to 9/11. But Comras provided his expert assessment on the constructive knowledge of individuals by weighing multiple sources of evidence. "An expert can testify to whether a given state of mind is consistent with a given practice." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14.[222] That is exactly what Comras did. Indeed, "while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind." *Patel*, 2023 WL 2643815, at *39. For example, "defendant likely knows X if they do Y." *Commodities Cotton Futures*, 2020 WL 5849142, at *14. Expert testimony regarding the "actions that bear on a party's state of mind are permissible." *U.S. Commodities Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016).

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Plaintiffs' Opposition to Defendants' Joint Motion To Exclude The Expert Testimony Of Evan Kohlmann And Matthew Levitt [ECF No. 9246], And To Defendant Yassin Abdullah Kadi's Motion To Exclude The Testimony Of Victor Comras [ECF No. 9248] was electronically filed this 15th day of September, 2023. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which the parties may access.

_____

Robert T. Haefele