# EXHIBIT 6

## EXPERT REBUTTAL REPORT OF DR. MATTHEW LEVITT

In re Terrorist Attacks on September 11, 2001, 03-md-1570 (GDB) (SN)
Senior Fellow and Director of the Program on Counterterrorism & Intelligence at the
Washington Institute for Near East Policy, and Adjunct Professor at Georgetown University


I.  <u>Scope of Work</u>

I have been asked to review expert reports submitted by defendants' counsel and to comment on a select few topics.

I previously submitted an expert report in this matter dated March 9, 2020 (the "First Report").  I will not repeat my First Report here, but incorporate it herein by reference in full.  My First Report, along with my curriculum vitae attached as Exhibit 1 to that Report, discusses my prior publications, prior testimony, and relevant experience.  I continue to be compensated for my time at a rate of $550.00 per hour.

To be clear, the following critique of defense expert reports should not be interpreted as a suggestion that different professionals examining issues germane to counter-terrorism, the history of al Qaeda, the September 11 attacks, terrorist financing, or organizational characteristics of terrorist organizations might construct different hypotheses and arrive at varying conclusions.  However, in my view, some of defense experts' statements and conclusions include mistaken assumptions, methodological error, and factual inaccuracies worthy of correction.  Nothing here should be mistaken for personal animus of any kind—I know several defense experts personally, several more by reputation.  Rather, I respectfully offer comment on several key points of professional disagreement.

I reserve the right to respond further to additional comments about my report, opinions, methodology, qualifications, and findings.

II.  <u>Reliability of U.S. Government Reports</u>

Defense experts call into question the reliability and probative value of various types of U.S. government reports.  In fact, both because the authors of those reports have access to information that is not available to the wider public (along with the open source information available to academics and scholars), and because their written products go through such robust editing processes (and, depending on the type of product, legal review), U.S. government reports are uniquely reliable and authoritative.

U.S. government documents are generally regarded as authoritative, a category that is not limited to scholarly publications.  One way to determine if a source is authoritative, for example, is to look at the publisher or sponsor of the publication.  "For websites," one academic source recommends, "look for the domain; .gov or .edu sites are more likely to contain unbiased

information."[1]  While there is variability among different types of government agencies and their various types of reports, "government documents and government websites are generally considered authoritative, credible sources of information."[2]  In other words, while the contents of a government report are open to discussion and debate, it should be noted that due to the layers of review, editing and approval, the reports issued by the State Department, Treasury Department, or U.S. intelligence agencies, for example, should not be written off just because they do not include scholarly citations.  To the contrary, the reports of agencies such as these are the product of rigorous review and typically provide information that is not otherwise available to the public.

As Dr. Martha Crenshaw notes in her expert report:

> I find government documents helpful, especially those issued by intelligence agencies and subsequently declassified (these include analytical reports as well as interviews). However, I also recognize that the information thus released is not comprehensive and that much remains classified (declassified documents are often extensively redacted).[3]

I concur with Dr. Crenshaw, and add that writing off government reports as having "no probative value" as some defense experts have (see, e.g., Report of Vahid Brown, pp. 5, 92, 99) is overly simplistic, facetious at face value, and academically shortsighted.  To the contrary, U.S. government reports add fact, insight, context and depth to issues of interest to academics and scholars by adding details and information to which they might not otherwise have access or insight. Such information should be contextualized within the larger rubric of publicly available information, and information from government sources can certainly be challenged on the facts in the spirit of open debate, especially as additional information comes to light, but it should not be disregarded out of hand.

Moreover, scholars risk sliding down a slippery slope when they disregard information in government or other authoritative reports simply because the scholars in question have not come across corroborating information. Consider, for example John Sidel's report, where he takes issue with a segment of my First Report, on page 35, where I cite a 1996 CIA report (to be discussed in more detail below) regarding the IIRO office in the Philippines:

> "Another high-ranking [IIRO] official in the Philippines leads Hamas meetings," the report stated, adding that "the majority of Hamas members in the Philippines are employed by the organization."[4]

In his report, Sidel responds, at page 30 of his report:

> Finally, the expert report authored by Matthew Levitt oddly seems to suggest (on page 35) that there was an active organizational presence of the Palestinian group Hamas (the Harakat al-Muqawama al-Islamiyya or Islamic Resistance Movement) in the IIRO Philippines offices in the

---

[1] https://libguides.mines.edu/govinfo/evaluate.
[2] https://apus.libanswers.com/faq/139271.
[3] Martha Crenshaw expert report, p. 7.
[4] Unclassified 1996 CIA document, marked FED-PEC0214474.  See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.

mid-1990s, on the basis of a single CIA document and a related article in the Wall Street Journal. This suggestion seems rather implausible or at least inexplicable, given the lack of any obvious rationale for this Palestinian organization to establish a base in the Philippines, whether in terms of diplomatic outreach, media activism, fund-raising, or logistical support for the organization's activities and members in the Gaza Strip and the West Bank.  It is possible that the IIRO's office in Manila in the 1990s had Palestinians on its staff who were – theologically and politically – aligned with Hamas.  But it is difficult to see what, if anything, could or should be concluded from the rather obscure, seemingly unimportant, and unverified – but suggestively sensationalized – claim of a foothold for the Palestinian Islamist group Hamas in the far-flung Philippines.

It should be first noted that Sidel mischaracterizes what I wrote in my report.  I did not write that "there was an active organizational presence."  Those are Sidel's words, neither mine nor the CIA's.  Sidel himself concedes that the IIRO offices in question may have included staff "aligned with Hamas," appearing to draw an obscure line at membership and apparently ignorant of the historical precedent of Hamas dispatching operatives to Southeast Asia.  Sidel presupposes that the suggestion of Hamas activity in the region "seems rather implausible or at least inexplicable."  And yet, though he may not be aware of them, there are plenty of examples of Hamas operatives active in the region.  Consider these, for example:

> (1) In 2014, Israeli authorities detained a Hamas commander who revealed that he and several other Hamas operatives received terrorist training in Malaysia.[5]

> (2) In January 2018, Philippine authorities deported a Hamas rocket scientist.  "He admitted being a member of Hamas," Philippine National Police Chief Ronald Dela Rosa explained. "He's a chemist and he has been responsible for improving the rocket technology of Hamas in firing their missiles from their area towards the other side, for Israel."[6]

> (3) In April 2018, gunmen killed another Hamas rocket scientist who was living in Malaysia.[7]

Sidel specifically states that he finds it "rather implausible or at least inexplicable" that Hamas would engage in diplomatic or media activities in the region, even though it is widely documented that one of Hamas' main websites, www.palestine-info.com, featured Hamas propaganda in several languages, including Malay.[8]  As for diplomatic activities, Hamas has long invested time and effort building up ties to Muslim communities in Southeast Asia.  In 2019, *Middle East Monitor* noted, "In recent months, Malaysia has witnessed a series of successive

---

[5] "Hamas Terror Cell Received Advanced Training in Malaysia," Israel Defense Forces, July 31, 2014, https://www.idf.il/en/articles/hamas/hamas-terror-cell-received-advanced-training-in-malaysia/.

[6] "Philippines to Deport Hamas 'Rocket Scientist,'" AFP, January 22, 2018, https://english.alarabiya.net/en/News/world/2018/01/22/Philippines-to-deport-Hamas-rocket-scientist-.

[7] Stuart Winer, "Malaysian Police Release Photo of Suspect in Killing of Hamas Rocket Expert," *Times of Israel*, April 25, 2018, https://www.timesofisrael.com/malaysian-police-release-photo-of-suspect-in-killing-of-hamas-rocket-expert/.

[8] Gabriel Weimann, *Terror on the Internet: The New Arena, The New Challenges* (Washington, D.C.: United States Institute of Peace, 2006), p. 82.

visits by high-ranking delegations from Hamas, indicating the growing ties between these two parties at a time when the movement is facing a tight political siege by many Arab countries."[9]

    *a.   Reliability of U.S. Treasury Department Designations*

Mr. Vahid Brown asserts in his expert report that "OFAC designations hold no probative value as to whether a given individual or entity was actually involved in association with a terrorist organization" (p. 5). Such designations, he claims, merely document "the fact of a US government suspicion of such an association" (p. 5). The OFAC designation process, he says, "is governed by a lower evidentiary standard designed to cast a wide net to stop flows of funds based on suspicion, rather than to adjudicate guilt or innocence based on actual evidence."  This is not a question of "guilt or innocence," since this is an administrative not a judicial matter.  It is not clear to what other standards Brown is comparing Treasury designations when he argues that they are governed by a "lower evidentiary standard"—lower than what?[10]  Nor is it clear why Mr. Brown opines that a determination of terrorism involvement, even if based on what he mistakenly perceives to be some lower standard, holds no probative value.  Regardless, as a former U.S. Treasury Deputy Assistant Secretary for Intelligence and Analysis, I can categorically state that Mr. Brown mistakes the facts regarding the designation process and the basis of fact for such actions, which is by no means based on suspicion alone, but rather factual, evidentiary materials.

In practice, the standard for designations is that there must be "reason to believe" which is "based on credible information."[11]  This legal threshold for designations is based on the legal threshold for civil penalty imposition for sanctions violations.[12] This falls short of a criminal case, where the standard is "beyond a reasonable doubt," but is arguably even more robust than the civil case standard of "a preponderance of the evidence."

Treasury designations are not judicial rulings, they are administrative actions, but that does not mean they are not authoritative findings.  Designations are not based on simple suspicion.  In fact, Treasury designations are based on long, robust, and heavily documented evidentiary packages that include copies of every cited source and go through multiple rounds of careful review by experts and lawyers both within the Treasury Department and in other agencies and departments.

---

[9] Adnan Abu Amer, "Hamas Considers Malaysia its Gateway to Asia," *Middle East Monitor*, June 25, 2019, https://www.middleeastmonitor.com/20190625-hamas-considers-malaysia-its-gateway-to-asia/.

[10] It should be noted, that MDL 1570 is a civil, not criminal, case, and that the evidentiary standard here is proof by a preponderance of the evidence.

[11] See, for example, in the context of Global Magnitsky designations as explained by Human Rights First, p. 8, https://www.humanrightsfirst.org/sites/default/files/hrf-global-magnitsky-faq.pdf.  This is also the standard for other Treasury standards such as standards for filing Suspicious Activity Reports (see https://www.fincen.gov/resources/statutes-regulations/guidance/interpretation-suspicious-activity-reporting-requirements) and for compliance with the Anti-Terrorism Certification (see https://www.opm.gov/combined-federal-campaign/reference-materials/memos/2004-cfc-memos/guidance-on-compliance-with-the-anti-terrorism-certification/).

[12] For example, for IEEPA violations see 31 CFR Appendix A to Part 501 – Economic Sanctions Enforcement Guidelines, https://www.law.cornell.edu/cfr/text/31/appendix-A_to_part_501

What the public sees, and what Mr. Brown appears to base his assessment upon, is only the brief, declassified press statement regarding a designation, not the evidentiary package itself. These evidentiary packages typically run into the dozens of pages, with the underlying reporting evidence—including classified reports, court documents, and a wide array of unclassified open source reporting—typically filling several thick binders and going into the hundreds of pages. The full evidentiary package is a classified document, but an unclassified press release, typically including a few pieces of declassified intelligence and providing identifying information to enable banks and other institutions to fully comply with the designation, is prepared and shared with the public.

Second, these designations are the final product of a long, arduous, careful and considered process at the end of which more entities proposed and considered for designation are not designated than those that are. The process is complex, and is not limited to the Treasury Department. Indeed, Treasury designations are the product of a full-fledged interagency process which, when finalized, represent the consensus of the U.S. Government interagency—the collection of agencies and departments involved in such national security efforts including intelligence agencies, law enforcement agencies, policy departments including the Departments of State, Justice, Defense, and Homeland Security and the White House National Security Council.

Allow me to describe the designation process, at least as it existed during my tenure at the Treasury Department from late 2005 to early 2007. While an analyst may do some preliminary work on his or her own, before a proposed designation evidentiary package is drafted, a short brief is presented to an interagency committee. The committee then determines if reasonable grounds exist to move forward and prepare a draft evidentiary package. If approved, a draft evidentiary package is prepared over a period of weeks or months. This process includes interagency collaboration between the Treasury officials drafting the evidentiary and colleagues at other agencies and departments. Many proposed designation targets do not move forward as a result of this process of careful research, writing, and consultation. Those that do are next subject to multiple levels of subject matter expert review and often many rounds of edits and revisions, before the draft evidentiary is shared with the NSC-led interagency body focused on countering illicit finance under the rubric of the Counterterrorism Security Group (CSG).

At this point the NSC leads an interagency discussion of the proposed designation, which is carefully reviewed by a long list of U.S. government agencies (in most cases, several offices and departments within each of these agencies review the draft evidentiary package and the collected feedback is provided as to that agency's response). Agencies are looking at two primary issues in their reviews: (1) analytical concurrence, and (2) policy review and competing equities.

Agencies will first review the draft designation looking to see if they agree with the information cited and the analytical conclusions drawn from that information. They will consider such issues as the timeliness of the information (an action would not be taken today based only on information from several years ago) and source reliability (how reliable is the source of the information, how strong a reporting record does an intelligence source have, and when he or she

was last vetted).  Finally, they will consider whether the totality of the information supports the conclusion that the entity in question is financing or otherwise supporting terrorism.

Next, agencies will consider whether a designation is the best policy option for this particular target.  Even once it is determined that the information is timely, the sources are strong, and the conclusions are accurate, there is no automaticity to the designation process.  Perhaps another policy option would be more effective or have fewer unintended consequences.  Or perhaps the potential unintended second or third order consequences outweigh the potential benefit of the designation.  They will also consider whether there are any diplomatic, financial, intelligence or other equities that the designation might undermine and weigh those considerations.  Would the proposed designation undermine diplomatic efforts such as a peace negotiation, for example?  Might it undermine an ongoing intelligence or law enforcement operation?  Again, a great many proposed designations are not pursued as a result of these considerations.

Lawyers also carry out not one but two rounds of legal review.  Treasury lawyers, in consultation with interagency counterparts, conduct a legal review to determine if the proposed designation meets the standard of the executive order, in this case E.O. 13224.  This legal sufficiency review determines, among other things, if the substance, timeliness, sourcing and facts in the evidentiary package meet the legal standard under the executive order.  Meanwhile, lawyers at the Department of Justice carry out their own legal review focused on litigation risk.  Since individuals and entities designated by the U.S. government can sue the government to get off the list, the Department of Justice (which would have to defend the action) reviews the evidentiary package to be confident that if sued the U.S. government has confidence it could successfully defend its actions.  This, parenthetically, explains why the U.S. government successfully defends most such lawsuits—it sets out from the outset to make sure the full evidentiaries are so airtight that they are fully defensible in court.  This sets an even higher de facto standard for designations to move forward than that laid out by the letter of the law and typically goes well beyond the reviews for analytical consensus and legal sufficiency.

If a proposed designation package survives all these various reviews, each of which can send the process back to start at or near the beginning, then a diplomatic outreach plan is developed to work with partner nations around world, both bilaterally and where appropriate through multilateral organizations like the United Nations.  When possible, the United States will invite partner nations to participate in a joint designation.

Cognizant of the problem of terrorist abuse of charities, for example, the Kingdom of Saudi Arabia joined the United States to designate Wael Juleidan (where the two governments referred to Juleidan as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror"[13]) and branches of the al Haramain Foundation.  While there are many reasons why a country might

---

[13] See https://www.treasury.gov/press-center/press-releases/Pages/po3397.aspx.  Vahid Brown takes issue with this characterization (Brown expert report, p. 87) but it should be noted the Saudi government participated in this action and clearly supported the characterization since texts are negotiated with participating countries when designations are done jointly.  Also, the fact that Brown found no corroborating information does not mean that the intelligence underpinning the findings of the joint U.S.-Saudi action are wrong, it just underscores the need to be able to use classified information when dealing with terrorist financing which typically involves significant effort to hide and obfuscate any terrorist or illicit finance activities.

choose not to join in such a designation even if they agree with it, when they do participate in such joint action it is a bold statement of concurrence with a designation's findings.  Since 2002, the Kingdom of Saudi Arabia and the United States have issued several joint designations and actions, including:

- March 2002: Designation of Somalia and Bosnia-Herzegovina branches of al-Haramain Islamic Foundation.[14]
- September 2002: Designation of Wa'el Hamza Julidan.[15]
- December 2003: U.S. and Saudi jointly call on UN to list Vazir, an NGO in Bosnia, as an AKA for al-Haramain-Bosnia.[16]
- January 2004: Designation of al-Haramain branches in Indonesia, Kenya, Tanzania, and Pakistan.[17]
- June 2004: Designation of al-Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia and The Netherlands.[18]
- April 2015: Designation of al-Furqan Foundation Welfare Trust.[19]
- March 2016: Designation of al-Rahmah Welfare Organization and Jamia Asariya Madrassa.[20]
- May 2018: Terrorist Financing Targeting Center (TFTC), co-chaired by the U.S. and Saudi Arabia and including GCC states, designates Hezbollah senior leadership.[21]

Finally, in an effort to be transparent and provide some information about these actions to the public and the private sector, at this point in the designation process a press statement is drafted to include bits of classified material that are sanitized (to protect sources and methods) and declassified so they can be included in the press statement.  The statement also includes identifying information for the entities being designated.

   b.  *Provenance and reliability of 1996 CIA Report*

In his expert report for the defense, Vahid Brown claims that the 1996 CIA document I and other plaintiff experts cite is of "unknown provenance" and "lacks probative value."  Both assertions are wrong.

As to the document's provenance, that is clear from several sources.  First, the original May 2003 reporting on the CIA report in the *Wall Street Journal* cites various U.S. officials who attest to the document's existence.  Second, a December 2003 United Nations report cited to the document and identified its provenance.  Third, in a March 2004 CIA letter related to this case the CIA acknowledged that the document is a classified CIA report.

---

[14] https://fas.org/irp/news/2002/03/dot031102fact.html.
[15] https://www.treasury.gov/press-center/press-releases/Pages/po3397.aspx.
[16] https://www.treasury.gov/press-center/press-releases/Pages/js1063.aspx.
[17] https://www.treasury.gov/press-center/press-releases/Pages/js1108.aspx.
[18] https://www.treasury.gov/press-center/press-releases/Pages/js1703.aspx.
[19] https://www.treasury.gov/press-center/press-releases/Pages/jl10019.aspx.
[20] https://www.treasury.gov/press-center/press-releases/Pages/jl0400.aspx.
[21] https://home.treasury.gov/news/press-releases/sm0387.

Glenn Simpson's May 9, 2003, article in the *Wall Street Journal* not only quotes from the CIA report in question, it quotes several former U.S. officials in a position to know about such issues about the report and its contents as well.  The author notes that six former U.S. intelligence officials he interviewed said, "the document is typical of the reports CIA was reporting at the time."[22]  Simpson quoted two from National Security Council counterterrorism officials on the record—William Wechler[23] and Daniel Benjamin[24]—both of whom have stellar reputations.

Respected newspapers like the Wall Street Journal employ rigorous editorial standards, such that an article such as this would not have run had the paper's senior editors not been satisfied with the provenance of CIA report and the confirmation of the unnamed former intelligence community officials.  The article remains on the *Wall Street Journal*'s website without any editorial caveat, indicating that the *Journal* continues to stand by this reporting.

November 3, 2003, five months after the publication of the *Wall Street Journal* story based on the 1996 CIA report, the Chairman of the United Nation's al Qaeda and Taliban Monitoring Group provided the Chairman of the UN Security Council with the second in its series of reports regarding the status of al Qaeda and Taliban financing.[25]  This Chairman subsequently shared this report with the members of the UN Security Council and the public on December 2, 2002.[26]

Contrary to the statements of several defense experts, the UN Monitoring Group—which is staffed by experts from countries around the world and is held in very high regard—found that al Qaeda was indeed benefiting from abuse of charity as a means of financing its terrorist activities:

> Today, Al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds.  Activities range from collection boxes at mosques and Islamic centres to direct fund-raising and solicitations, the merging of funds for both legitimate relief purposes and terrorism, the misuse or embezzlement of legitimate charitable funds, and the creation of front charities to channel funds from community collections or deep-pocket supporters.  Al-Qaida has also benefited from, and relies heavily on, the activities of legitimate charities that support the propagation and teaching of more radical forms of Muslim fundamentalism.[27]

Along with other evidence tying the IIRO to al Qaeda financing, the November 2003 UN Monitoring Group report cited to the 1996 CIA report in question, including a link to the CIA report.[28]  The UN Monitoring Committee is careful to use only reliable sources out of an abundance of caution for its own and its reports' reputation.  Since the committee's expert staff is comprised of experts from multiple countries, its decision to include reference to a CIA report

---

[22] Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.
[23] https://www.atlanticcouncil.org/expert/william-f-wechsler/.
[24] https://www.americanacademy.de/staff-member/daniel-benjamin/.
[25] "Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them," *https://www.undocs.org/S/2003/1070*
[26] Ibid.
[27] Ibid., p. 14.
[28] The link for the CIA report provided in the footnote of the UN document is no longer active, but the link can still be accessed using *the Internet Archive 'Wayback Machine' https://web.archive.org/web/20061005073201/www.centerforsecuritypolicy.org/cia96charities.pdf*.

indicates the committee was confident of the document's provenance and reliable enough to be included in the committee's report.

Confirmation of the *Wall Street Journal*'s dating of the report to 1996 is inferable from the file name for the document, "cia96charities.pdf."  The UN Monitoring Committee identified the provenance of the 1996 CIA report:  "A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001."[29]  In a footnote, the UN Monitoring Committee again identifies this as a CIA report:  "The extracts from the text of this CIA report can be found on the Internet at http://www.centreforsecuritypolicy.org/cia96charities.pdf."[30]

As an aside, I note here Mr. Brown's criticism of my report for writing that the IIRO directly funded al Qaeda training camps, instead of writing militant training camps.  The 1996 CIA report states these were militant training camps, but the UN Monitoring Committee here also notes these were believed to be al Qaeda training camps.[31]

The UN Monitoring Committee's November 2003 report has been submitted for the court's consideration in this case, as noted in ECF No. 517 which also notes that the UN documented the CIA report's provenance as a "recently published report by the United States Central Intelligence Agency."[32]

Finally, the CIA itself explicitly confirmed provenance of its 1996 report on charities' ties to international terrorism.  Plaintiff's lawyers filed a Freedom of Information Act (FOIA) request dated November 24, 2003, requesting the CIA intelligence report on terrorist abuse of Islamic charities.  In a letter dated March 24, 2004, and written on CIA letterhead, the CIA's Information and Privacy Coordinator, Robert T. Herman, acknowledged that the report in question exists in CIA files, but declined to produce the report.  In other words, while denying the request to produce the document, the CIA explicitly confirmed that the requested document is a CIA document that exists in its files.  Mr. Herman wrote: "We have located a copy of the report you requested and have determined that it is properly classified and must be denied in its entirety on the basis of FOIA exemptions (b)(1) and (b)(3)."[33]

In an apparent recognition that his assertion regarding the document's provenance might be wrong, Mr. Brown added the following addendum to his rejection of the 1996 CIA report's provenance: "Even if it originated from the CIA, the document still offers nothing to substantiate any of the posited links between Islamic charities and extremists."[34]  Here I refer Mr. Brown to the report of Dr. Crenshaw, who noted in her expert report for the defense that she found government documents helpful, "especially those issued by intelligence agencies," even as she

---

[29] Ibid., p. 15.
[30] Ibid., p. 15, footnote d.  As noted above, The link for the CIA report provided in the footnote of the UN document is no longer active, but the link can still be accessed using *the Internet Archive 'Wayback Machine'* *https://web.archive.org/web/20061005073201/www.centerforsecuritypolicy.org/cia96charities.pdf*.
[31] Ibid., p. 15.
[32] ECF No. 517, In re Terrorist Attacks on September 11, 2001, 03-md-1570 (GDB) (SN) - MDL 1570
[33] CIA FOIA letter dated March 24, 2004 (PECFOIA0017505).
[34] Vahid Brown expert report, p. 96.

recognized "that the information thus released is not comprehensive and that much remains classified (declassified documents are often extensively redacted)."[35]

Aside from the fact that intelligence agencies gain access to information that may otherwise be unavailable to the public, the fact is that the U.S. intelligence community invests significant time and energy into analytical and methodological training for its analysts. It also invests significant resources into the editorial process for its products. I know this from firsthand experience, both as a desk analyst and a senior manager in the U.S. intelligence community. Even if the document in question offers no citations or other means of substantiating the information in the report, the fact that it was produced by the CIA should make it worthy of serious consideration. Moreover, scholars can and should seek to corroborate information in intelligence reports—if not specific details that might not be publicly available without access to intelligence sources and methods, then at least the larger picture. Here, both the macro issue of terrorist abuse of charity, and the narrower one of the involvement of specific charities in such activities, are widely available.

Moreover, this is hardly the only report linking the IIRO to terrorist financing. Indeed, at the time of the U.S. Treasury and United Nations designation of two IIRO offices and the Executive Director of the IIRO office in the Eastern Province of Saudi Arabia, the reaction from Saudi officials was not to deny the IIRO's terrorist ties but rather to argue that the IIRO was not a Saudi institution. The Saudi government also announced it had opened an investigation into the activities of the head of the IIRO Eastern Province office and a frozen his assets.[36]

Indeed, in the course of the February 2019 deposition of IIRO Secretary-General Adnan Basha in this case, Mr. Basha himself acknowledged that there were "financial improprieties" in the IIRO Eastern Province office (p. 278). Mr. Basha testified that the Eastern Province branch, under the leadership of Prince Turki bin Jalawi al Saud, was sending large sums of money overseas without authorization from the IIRO General Secretariat, including to the IIRO-Pakistan branch. Specifically, Basha explained that:

> (1) The IIRO discovered that the Eastern Province was funding overseas projects without requesting and obtaining the required authorization from IIRO Headquarters;

> (2) The IIRO formed a committee to investigate and audit the "financial irregularities" at the Eastern Province;

> (3) The audit confirmed the Eastern Province was sending funds abroad without required receipts and vouchers, in violation of IIRO's financial regulations;

> (4) All of the violations were connected to Prince Turki;

---

[35] Martha Crenshaw expert report, p. 7.
[36] "Saudi Ambassador Remarks on U.S. Designation of IIRO Branches," The Embassy of the Kingdom of Saudi Arabia, Washington, D.C., August 4, 2006, https://www.saudiembassy.net/press-release/saudi-ambassador-remarks-us-designation-iiro-branches.

(5) Prince Turki ultimately resigned as head of the Eastern Province because he refused to change his behavior in light of the auditor's recommendations.[37]

### c. Limitations of Harmony Database and Similar Documents

I have used the Harmony database for my research, and find the Harmony Program and the primary source documents to be very useful. But one must be careful not to treat such documents as gospel, for several reasons. They are much better when used in corroboration with other sources of information. One reason is that even if the documents themselves are authentic, the information they contain represent what the authors believe to be true, which may not be accurate due to error, bias, or any other number of reasons. More importantly, document collections like the Harmony database come with their own credibility challenges.

The Harmony Program itself notes up front the limitations of its data set. These are primary documents, but they are not always contextualized and therefore "scholars and practitioners should be aware that analyzing such data is fraught with risk." Moreover, the Harmony program itself notes that the documents in its database "were collected on the battlefield unscientifically" and therefore "there is no way to know just how representative documents captured by U.S. forces are of the larger body of information produced by al-Qa'ida or other insurgents." The database in which the documents are stored, the program notes, "is imperfect and virtually impossible to search systematically," meaning "readers and researchers should therefore be wary of conclusions drawn from Harmony documents alone."[38] Dr. Martha Crenshaw notes some of these limitations in her own report.[39]

### III.   Methodology, Scholarly Debate, and Terminology

### a. Methodology

Defense expert Marc Sageman spends over three pages of his report trying to disparage my work and undermine my methodology by fixating on a few critical reviews of my 2006 book *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, a peer-reviewed academic book published by Yale University Press (publishers in Spain and Poland bought rights to the book and published it in Spanish and in Polish). One of the book's chapters was published as a stand-alone article, and reviewed yet again in the publication process for the peer-reviewed journal *Studies in Conflict & Terrorism*.[40] The book was a 2007 Top Seller in Politics and Law, as compiled by YBP Library Services, and was selected by the American Association of University Professors as a 2007 AAUP University Press Book for Public and Secondary School Libraries.[41]

[37] Deposition Testimony of Adnan Basha, Feb. 21, 2019, pp. 265-278.
[38] The Harmony Program, Counterterrorism Center, U.S. Military Academy, https://ctc.usma.edu/harmony-program/.
[39] Martha Crenshaw expert report, p. 7.
[40] Matthew Levitt, "Could Hamas Target the West?" *Studies in Conflict & Terrorism*, vol. 30, Issue 11, 2007, https://www.tandfonline.com/doi/full/10.1080/10576100701611270?scroll=top&needAccess=true.
[41] https://www.washingtoninstitute.org/policy-analysis/hamas-politics-charity-and-terrorism-service-jihad.

Sageman argues, without any evidence or further discussion, that "the critiques leveled at [my book on Hamas] in the past are still relevant in the present report."[42]  He does not bother to specify which critiques leveled at me in the past are relevant to my present report, or how.

As to my methodology, the United States Court of Appeals for the Sixth Circuit has described my research methodology as "the gold standard."[43]  And, in a watershed ruling upholding the constitutionality of the material support statute §2339B, the Supreme Court of the United States twice cited to my book on Hamas—the very book Sageman belittles—to support its position.[44]  I have published two other peer-reviewed books (one with Rowman-Littlefield, one with Georgetown University Press) and penned many peer-reviewed articles, none of which took issue with my methodology.  My academic achievements, publications, and awards speak for themselves.

Dr. Sageman, on the other hand, stands accused of serious methodological shortcomings.  First, Sageman stands accused of plagiarizing two passages, from two different authors, which he included in his book *Leaderless Jihad*.  As a result, the director of Penn Press, which published Sageman's book, committed to having future editions of the book include explicit attribution for these passages.[45]  Needless to say, plagiarism is a serious academic offense and a matter of academic integrity.

Sageman has also been accused of specific methodological shortcomings as well.  One academic journal review of Sageman's *Misunderstanding Terrorism* takes Sageman to task for grounding his work too heavily in social psychology, without taking other academic perspectives into account:

> Despite its thoroughness and consistency, Sageman's radicalization model fails to convince. Indeed, due to its theoretical grounding being exclusively in social psychology, his argument is made vulnerable to the criticisms that this discipline usually attracts.  For instance, accusations of failing to take cultural elements into account due to the use of rigid universal models seem particularly relevant here.  Moreover, in the context of Islamism, the model's quasi-exclusive focus on identity at the expense of ideology ("In the turn to political violence identity trumps ... ideology," p. 74) constitutes a highly contentious premise, which may cast doubts on the relevance of the book's policy recommendations.[46]

More broadly, Sageman stands accused of dismissing existing academic literature that contradicts his hypotheses.  Dr. Bruce Hoffman, one of the most highly regarded academic experts on terrorism and a professor at Georgetown University, had this to say about Sageman's book *Leaderless Jihad*:

---

[42] Marc Sageman expert report, p. 15.

[43] See Sixth Circuit Court of Appeals ruling in *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005), http://ftp.resource.org/courts/c/F3/412/412.F3d.618.04-4216.html.

[44] See SCOTUS opinion in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010), http://www.supremecourt.gov/opinions/09pdf/08-1498.pdf.

[45] Scott Jaschick, "Missing Attribution in Controversial Book," *Inside Higher Ed*, July 28, 2008, https://www.insidehighered.com/news/2008/07/28/missing-attribution-controversial-book.

[46] Nathanaël Chouraqui, "Book Review: Misunderstanding Terrorism by Marc Sageman," *St Antony's International Review* , Vol. 13, No. 1, The Politics of Uncertainty (May 2017), pp. 164-166, https://www.jstor.org/stable/26229127?seq=1.

> Although these informal local terrorist groups are certainly a critical part of the global terrorist network, *Leaderless Jihad*'s salient weakness is its insistence that this dimension represents the entire threat facing the United States today. This shortcoming can largely be explained by Sageman's brusque dismissal of much of the existing academic literature on terrorism in general and terrorist networks in particular.[47]

Hoffman specifically takes issue with Sageman's methodological approach:

> *Leaderless Jihad* employs a methodology that the author calls "middle-range analysis." His approach claims to examine "the terrorists themselves, fully embedded in their environment"; it does this "from the bottom up to see exactly what is happening on the ground in the hope of explaining the larger phenomenon of terrorism." Given that Sageman was trained as a psychiatrist, it is not surprising that he favors analyzing terrorism from an individual perspective rather than taking an organizational or collective approach. But the benefits of bottom-up versus top-down approaches to the study of terrorism have been debated by scholars for years. Indeed, one of the finest books in the field focuses on precisely this question. *Origins of Terrorism: Psychologies, Ideologies, Theologies, States of Mind*, edited by Walter Reich (a psychiatrist, too) and published nearly 20 years ago, is still in print, yet it is conspicuously absent from Sageman's bibliography.[48]

Hoffman continues, further critiquing Sageman's methodology:

> *Leaderless Jihad* founders precisely on what Sageman claims are its strengths: the empirical data on which his analysis is based and his technique of examining terrorism as a social movement. For a book that extols scientific methods and the importance of facts, *Leaderless Jihad* has a surprisingly curt discussion of methodology and only a brief elucidation of the data to be tested…. From a social science perspective, however, these types of unidentified or vaguely identified data sources and unclear collection procedures pose serious problems. Furthermore, Sageman does not explain how his collection of data conforms to the scientific standards of academic inquiry that he finds so lacking in the work of most terrorism scholars.[49]

In a later article, in which Sageman and Hoffman continue the debate, Hoffman again highlights deep flaws in Sageman's methodology:

> As for methodology, Sageman writes in these pages that "in science, the strength of the evidence should trump loyalty to authority." But he seems not to understand that science is cumulative. Sageman publicly shared his data on the "bunches of guys" he studied for his last book, Understanding Terror Networks, but he has not done the same with his data for Leaderless Jihad. The type of appendix that appeared in the first book, with the names of his subjects and brief biographies, is absent from the second. It is therefore impossible for a reader to determine if

---

[47] Bruce Hoffman, "Review Essay: The Myth of Grass-Roots Terrorism, Why Osama bin Laden Still Matters," Foreign Affairs, May/June 2008, https://www.foreignaffairs.com/reviews/review-essay/2008-05-03/myth-grass-roots-terrorism.
[48] Bruce Hoffman, "Review Essay: The Myth of Grass-Roots Terrorism, Why Osama bin Laden Still Matters," Foreign Affairs, May/June 2008, https://www.foreignaffairs.com/reviews/review-essay/2008-05-03/myth-grass-roots-terrorism.
[49] Bruce Hoffman, "Review Essay: The Myth of Grass-Roots Terrorism, Why Osama bin Laden Still Matters," Foreign Affairs, May/June 2008, https://www.foreignaffairs.com/reviews/review-essay/2008-05-03/myth-grass-roots-terrorism.

> Sageman's new evidence really is superior to other existing data. It is also curious that an author who rails in his book against scholars who supposedly rely on information from "mysterious sources -- anonymous tips from the 'intelligence community' -- that cannot be verified" defends himself by citing "what I have heard from law enforcement agencies around the world during my extensive consultations with them."[50]

The methodological flaws in Dr. Sageman's work run deep and are well documented.

   *b. Scholarly Debate and my Book on Hamas*

Sageman cites to a handful of negative reviews of my book on Hamas, suggesting such criticism is rare and neglecting to note that the book received excellent reviews as well.  It should not surprise that when writing on sensitive topics it is more than likely that someone is going to take issue with whatever one writes, and that is perhaps most true when writing about something like the Israeli-Palestinian conflict.  I take it as a matter of pride that my book was taken so seriously that other scholars felt the need to respond to it in reviews and by writing entire books of their own, and I welcome the opportunity to have those discussions and debates in a mutually respectful way.

Not everyone feels that way, and so some reviews of my book conveyed the reviewer's own bias. That was the case with Sara Roy's review of my book, which Sageman cites extensively.  The fact that a journal solicited a review from Roy and then ultimately decided, after weeks of back and forth, that her review of my book lacked "objectivity," adding that among the journals board members who reviewed her submission, "all reviewers found the piece one-sided," reflects poorly on Roy, not on my book.[51]  Others would refer to her review of my book as "controversial and polemic."[52]  Indeed, Roy's rejected review of my book, and her bias approach, became the topic of articles of their own.[53]  Sageman presents the saga of Roy's rejected review as a point against me and my work, but the episode is actually a blemish on her resume and a commentary on her bias, not mine.

For the record, I have never been asked to write an article only to have the outlet's review committee rescind the offer.  That *The Fletcher Forum of World Affairs* rejected Roy's review due to her lack of objectivity and one-sidedness speaks volumes of the caliber of her commentary on my book.

Sageman himself displays a lack of careful objectivity when he notes that Roy suggested readers read other books on Hamas instead of mine, citing two in particular.  "She recommended the

---

[50] Marc Sageman and Bruce Hoffman, "Does Osama Still Call the Shots? Debating the Containment of al Qaeda's Leadership," *Foreign Affairs*, July/August 2008, https://www.foreignaffairs.com/articles/2008-06-01/does-osama-still-call-shots.
[51] Cinnamon Stillwell, "Sara Roy: The Harvard Professor who Cried Censorship," Middle East Forum, July 10, 2007, https://www.meforum.org/campus-watch/15379/sara-roy-the-harvard-professor-who.
[52] https://css.ethz.ch/en/services/digital-library/articles/article.html/94918.
[53] Cinnamon Stillwell, "Sara Roy: The Harvard Professor who Cried Censorship," Middle East Forum, July 10, 2007, https://www.meforum.org/campus-watch/15379/sara-roy-the-harvard-professor-who.

reader to read instead two available classical books on Hamas that Levitt ignored," Sageman writes.[54]  In fact, far from ignoring these books I reference both in my own book on Hamas.

Sageman cites Roy's controversial review of my book, but neglects to note that there is no shortage of glowing reviews of my book as well, including the following jacket blurb on the book itself by defense expert Dennis Lormel:

> In a compelling and authoritative manner, Matthew Levitt masterfully demonstrates that the charitable and social components of Hamas cannot be separated from its true nature.[55]

In contrast to Roy's rejected review, the review of my book on the prestigious, peer-reviewed journal *Terrorism and Political Violence* noted that while other books (included those cited by Roy) focused on the group's ideological and political development, my "timely and well-documented book...makes an important contribution from a different perspective."  The review continues, "Levitt meticulously details the multiple roles that political, religious, and military leaders play, and he demonstrates how charitable social welfare organizations indirectly and directly support terrorism by funding Hamas."[56]

Similarly, in 2008 the peer-reviewed journal *Perspectives on Terrorism* included my book on Hamas in its list of the top 50 books on terrorism and counterterrorism adding, "The book is meticulously documented."[57]  Four years later, this same journal included the book in its expanded list of the top 150 books on terrorism and counterterrorism, writing:

> In one of the most comprehensive and meticulously documented accounts of the Palestinian terrorist group Hamas, the author explains how it succeeded in blending terrorism, extremist political activism, and social welfare services to become the dominant political force in the Palestinian territories.  Although this account is out-of-date, with important geo-political and military developments taking place since its publication, it still provides important background information on the organization.[58]

Aside from academic reviews, a long list of other outlets reviewed the book favorably and a still longer list of practitioners and experts praised the book, including a former CIA director, a former NSC counterterrorism director, and the former chief of the FBI's terror finance operations section.[59]

---

[54] Marc Sageman expert report, p. 15.
[55] Dennis Lormel jacket cover review of *Hamas*,  https://yalebooks.yale.edu/book/9780300122589/hamas.
[56] Lawrence Rubin, "A Review of: "Matthew Levitt. Hamas: Politics, Charity, and Terrorism in the Service of Jihad," *Terrorism and Political Violence*, Vol. 19, Issue 1, 2007, https://www.tandfonline.com/doi/abs/10.1080/09546550601141555?journalCode=ftpv20.
[57] Joshua Sinai, "Top 50 Books on Terrorism and Counterterrorism," *Perspectives on Terrorism*, Vol. 2, No. 11, 2008,  http://www.terrorismanalysts.com/pt/index.php/pot/article/view/57/html.
[58] Joshua Sinai, "Terrorism Bookshelf: Top 150 Books on Terrorism and Counterterrorism," *Perspectives on Terrorism*, Vol. 6, No. 2, 2012, http://www.terrorismanalysts.com/pt/index.php/pot/article/view/sinai-terrorism-bookshelf/html.
[59] https://yalebooks.yale.edu/book/9780300122589/hamas.

Sageman also notes that Yale University Press, The Washington Institute, and I were sued for libel in 2007 over a single sentence in book.  As I later explained in an article for *The New Republic*:

> Soon after the suit against me was filed, the Washington Institute and I filed a motion under California's anti-SLAPP (Strategic Lawsuits Against Public Participation) provisions, which provide a mechanism for quickly resolving lawsuits designed primarily to chill the valid exercise of constitutionally guaranteed rights, including free speech.  Our motion was supported by my declaration contesting the suit's allegations.  Yale also filed a motion under the anti-SLAPP statute. KinderUSA and Al-Marayati withdrew their lawsuit shortly thereafter.[60]

The libel suit was dismissed, with prejudice, and I was completely vindicated.  Sageman sites an attorney for those who sued me saying otherwise.  But as I have explained, "[w]e offered no monetary compensation; we were not obligated to make any changes to the book; and we are not limited in what we can write in the future.  The case was dismissed with prejudice."[61]  Sageman suggests that the fact that the charity in question still functions indicates I was in the wrong, but it could just as easily be the case that the charity was scared straight by the publicity brought on by my anti-SLAPP lawsuit.  It could also be the case that the FBI is carrying out a surveillance operation, much as it did with the Holy Land Foundation over many years, which would also explain why the charity remains open.

    *c.  Public Academic Criticism*

Dr. Sageman ends his critique of my work with the following statement:

> The fact that academics publicly (as opposed to privately) criticize Kohlmann and Levitt is quite rare in terrorism research.  Most of the time, my colleagues in the field simply adopt a polite silence when confronted with a colleague with little scholarly integrity.  That Kohlmann and Levitt are exceptions to this live and let live atmosphere in this field indicates that they have crossed a threshold of methodological mediocrity.[62]

In fact, public academic criticism is fairly common in terrorism research.  That is especially the case when it comes to hot-button topics like the Israeli-Palestinian conflict.  Dr. Sageman is well aware that such public debate and criticism takes places in the open from time to time, since he is the subject of the most publicized, well-known case of public criticism and debate in terrorism research, which played out on the pages of *Foreign Affairs*.[63]  Indeed, the *New York Times* story covering the debate between Dr. Sageman and Dr. Hoffman (discussed, in part, above) was

---

[60] Matthew Levitt, "Chilling Effect," *The New Republic*, October 12, 2007, https://newrepublic.com/article/63746/chilling-effect.
[61] Matthew Levitt, "Chilling Effect," *The New Republic*, October 12, 2007, https://newrepublic.com/article/63746/chilling-effect.
[62] Marc Sageman expert report, pp. 17-18.
[63] Marc Sageman and Bruce Hoffman, "Does Osama Still Call the Shots? Debating the Containment of al Qaeda's Leadership," *Foreign Affairs*, July/August 2008, https://www.foreignaffairs.com/articles/2008-06-01/does-osama-still-call-shots.

entitled "A Not Very Private Feud Over Terrorism."[64]  Dr. Sageman himself has written that "disagreements among experts are the driving force of the scientific enterprise."[65]

> d.   *Jihad, Zakat, and Economic Jihad*

Defense expert Dr. Sherman Jackson claims that my explanation of the phenomenon of "economic Jihad" (in Arabic, *Jihad bin Mal*) "is clearly grounded in anti-Muslim bias."[66]  Such an ad hominem attack is as unfortunate and uncalled for as it is inaccurate.  As I demonstrate in my First Report, this term is not one of my own making but rather one employed by Islamist extremists to raise funds for militant activities.  As I explain in my First Report, this is not something that occurs within mainstream Islamic practice, rather "the call to wage economic jihad is a staple of radical leaders of various stripes."[67]

Dr. Jackson concedes in his report that I explain that terrorist financing involving charitable giving through zakat "is an 'abuse' of the system," but goes on to state that "Levitt implies that this abuse is so regular and normalized as to constitute the system itself."[68]  In fact, I neither wrote nor implied any such thing.  The section of my First Report (pp. 23-24) to which Jackson refers discusses the findings of the 9/11 Commission and an academic who states that abuse of zakat is a primary means of terror financing used by those who seek to abuse religious rulings to violent ends.

It is a fraud and a travesty that charities are abused to finance terrorism, especially when in the context of the laudable practice of charity given in fulfillment of a religious practice.  But, as I noted in my First Report, the 9/11 Commission concluded that "Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, zakat.  These financial facilitators also appeared to rely heavily on certain imams [preachers] at mosques who were willing to divert zakat donations to al Qaeda's cause."[69]  This abuse is a documented fact.

I should note here that the 9/11 Commission is well regarded and frequently cited by defendants' experts. [70]  As defense expert Dr. Martha Crenshaw explains:

> Like all other researchers studying the 9/11 attacks, I am indebted to the work of the official 9/11 Commission, whose 78 staff members reviewed two and a half million pages of documents and were able to access classified information.  The composition of the legislatively-mandated commission was bipartisan, and their vote approving the report was unanimous.[71]

---

[64] Elaine Sciolino and Eric Schmitt, "A Not Very Private Feud Over Terrorism," *New York Times*, June 8, 2008, https://www.nytimes.com/2008/06/08/weekinreview/08sciolino.html.

[65] Marc Sageman and Bruce Hoffman, "Does Osama Still Call the Shots? Debating the Containment of al Qaeda's Leadership," *Foreign Affairs*, July/August 2008, https://www.foreignaffairs.com/articles/2008-06-01/does-osama-still-call-shots.

[66] Sherman Jackson expert report, p. 25.

[67] Levitt First Report, p. 25.

[68] Sherman Jackson expert report, p. 23.

[69] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 170, http://www.9-11commission.gov/report/911Report.pdf.

[70] See, for example, extensive citations to the 9/11 Commission Report in the expert report of Dennis Lormel.

[71] Martha Crenshaw expert report, p. 7.

The fact that individuals would abuse the praiseworthy idea of giving charity for religious purposes—in the case of the Muslim faith, zakat, among Jewish extremists, zedaka, etc.—is loathsome.  The fact that some Jihadi violent extremists employ the concept of "economic Jihad" to raise funds for terrorist activities under the guise of religious practice is certainly disturbing, and yet it happens.  As I noted in my First Report, Al Kifah/CARE (a key part of the Makhtab al Kidmat network) specifically urged donors to include donations for jihad in order to fulfill their zakat obligations and warned that "the one who withholds the zakat will be severely tortured in Hell-fire unless Allah forgives him."[72]

Recognizing the extent of the problem, and seeking to protect charitable giving in the Kingdom from abuse, the government of Saudi Arabia eventually instituted reforms specifically geared toward addressing the problem of terrorist abuse of charity.  For example, a 2017 Saudi government report, "Saudi Arabia and Counterterrorism," notes a wide array of counterterrorism programs and policies the Kingdom had put in place after September 2001, including one targeting donations collected in mosques and the unregulated transfer of charity collected within the Kingdom.

> Donations in mosques and public places are prohibited, and Saudi charities are prohibited from transferring money outside the country to ensure that charitable funds do not find their way to violent extremists.[73]

The Saudi report also notes the Kingdom's use of intelligence and financial investigations to identify suspect transactions, much like those used by the U.S. Treasury Department.

> We have established a major intelligence department to monitor and investigate any suspected financial transactions.  This is usually done in coordination with the Saudi Monetary Agency and the banks.  This led to convicting more than 226 persons in terrorist financing activities, prosecuting more than 240 suspects, freezing and investigating more than 117 suspected accounts, closing all unlicensed charity collection locations.[74]

It seems difficult to argue such activity has not taken place within the Kingdom of Saudi Arabia when the Kingdom itself has acknowledged that it has.  Saudi Arabia has joined the United States to designate some of these activities, and ultimately began to take action of its own to identify and stop such activities from occurring in the future.

Finally, Dr. Jackson takes issue with plaintiff's experts' use of the term Jihad, arguing that plaintiff's experts, including myself, do not differentiate between the various meanings of the term.  In fact, we do, keeping our focus on militant, offensive Jihad as opposed to Jihad as personal improvement and religious observance.  Common sense helps distinguish between the two.  When the context is fighting, militancy, or demonization of the other the term typically

---

[72] "The Obligation of Zakat," *Al-Hussam* 5, no. 7 (January 1997), see *U.S. v. Mubayyid, et al.*, U.S. District Court, District of Massachusetts

[73] "Saudi Arabia and Counterterrorism," Saudi Ministry of Foreign Affairs, April 2017, p. 66, https://www.saudiembassy.net/sites/default/files/White%20Paper_Counterterrorism_April2017_1.pdf.

[74] "Saudi Arabia and Counterterrorism," Saudi Ministry of Foreign Affairs, April 2017, p. 35, https://www.saudiembassy.net/sites/default/files/White%20Paper_Counterterrorism_April2017_1.pdf.

refers to militant Jihad, and when the context is fasting, praying, religious observance or personal improvement the term typically refers to the "greater Jihad" of becoming a better person.

Mr. Brown takes issue with his reading of plaintiff's expert reports for failing to make accommodations for militant Jihad in the context of a "response to aggression, attempted genocide or invasion" (i.e., defensive Jihad).[75]  While such militant behavior may be "legally regulated" within Islamic law, as Jackson suggests, it may or may not be legal under international law and may well still fall under traditional definitions of terrorism.  Moreover, as the Syrian civil war has made painfully clear, engaging in fighting as part of a defensive Jihad can be a slippery slide into something more offensive, dangerous, and terrorist.  The sectarian nature of the Syrian civil war attracted people drawn to defending fellow Sunni Muslims facing the atrocities of the regime of Bashar al-Assad.  Many did not come as radical Islamists, but over the course of the fighting moved from one fighting group to another, sometimes ending up with terrorist groups.  So, to be clear, Jihad as a term can refer to many types of activities, only some of which are militant and/or terrorist.

_____

Dr. Matthew Levitt

Jan 18, 2021

Date

_____

[75] Sherman Jackson expert report, p. 16.