# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 03-MDL-1570 (GBD) (SN)

------------------------------------x.

IN RE: TERRORIST ATTACKS ON

SEPTEMBER 11, 2001

------------------------------------x

April 7, 2021

2:25 p.m.

Videotaped Deposition via Zoom
of MATTHEW A. LEVITT, pursuant to Notice,
before Jineen Pavesi, a Registered
Professional Reporter, Registered Merit
Reporter, Certified Realtime Reporter and
Notary Public of the State of New York.

Page 24

```
 1                    LEVITT
 2      Q.        I would like to understand your
 3  career progression.
 4                You were a student, you
 5  graduated from Yeshiva and then you did
 6  your graduate work at Fletcher School, is
 7  that correct?
 8      A.        Yes, I worked for a year in
 9  between in a fund-raising and consulting
10  firm in Manhattan just to pay my way while
11  my wife was in graduate school and then
12  went to the Fletcher School of Law and
13  Diplomacy for my graduate studies.
14      Q.        What firm was that that you
15  worked for in New York?
16      A.        I would have to look it up, it
17  was a one-year thing between two parts of
18  my life.
19      Q.        Right.
20                And then after you did your
21  masters and completed it and your orals in
22  May of 2005, what did you do then?
23      A.        So I continued on as a Ph.D.
24  student, I think now one can apply from
25  the outset to pursue a Ph.D. in advance of
```

Page 25

                    LEVITT

1
2   the masters, but at the time you had to do
3   the two-year masters, maintain a certain
4   GPA, get accepted, nominated, by the
5   faculty to be able to continue on for the
6   Ph.D.
7               So I did that and the following
8   year was spent in one more semester of
9   course work and then a semester of intense
10  study for the Ph.D. exams, which at least
11  at the time for me included three
12  three-hour written exams in each of my
13  three areas of concentration and one-hour
14  oral exam with representatives from each
15  of those concentrations.
16      Q.      And then you finished that
17  academic exercise in or around 1997, is
18  that correct?
19      A.      That's right.
20              If you look at the bottom of
21  page 1 of the CV, you'll see Program on
22  Negotiation at Harvard Law School, so it
23  was at that point that I was awarded a
24  graduate research fellowship at Harvard
25  Law School.

```
                                      Page 26
 1                    LEVITT
 2            There is a consortium called
 3    the Program on Negotiation that involves
 4    various schools at Harvard, MIT and the
 5    Fletcher School, I had already published a
 6    couple of papers with them and was
 7    fortunate to get --  to be awarded the
 8    graduate research fellowship, so that gave
 9    me an office in Harvard Law and a research
10    budget and I spent the 1997-1998 academic
11    year there, including doing my field
12    research for the Ph.D., writing the first
13    couple of chapters --  well, researching,
14    preparing for the fieldwork took months,
15    doing the fieldwork, you know, writing up
16    all the notes from the fieldwork and then
17    actually writing up the first two
18    chapters, the kind of foundational
19    methodology chapter and then the first of
20    my three case studies was the second
21    chapter.
22        Q.      And you were a Soref fellow
23    during the summer of 1998 at The
24    Washington Institute for Near East Policy?
25        A.       Well, what happened was I was
```

```
                                              Page 37
 1                    LEVITT
 2   Washington Institute.
 3        Q.        When were you offered the job?
 4        A.        So it must have been --  it was
 5   sometime that November, I went to meet
 6   with them, with someone, to ask advice
 7   about a different job, someone in Congress
 8   was looking for a senior staffer, and they
 9   said, look, if you want I'm happy to put
10   in a good word for you, but why wouldn't
11   you come here, the Institute covered
12   terrorism before but never had a dedicated
13   program, why don't you come and found the
14   program and be a senior fellow.
15                  It was offered like that on the
16   spot, I said I need to speak to my better
17   half, but accepted pretty quickly, and
18   that was that.
19        Q.        Director of terrorism studies,
20   correct?
21        A.        Correct.
22        Q.        Subsequent to that you became a
23   part-time consultant to the 9/11
24   Commission, is that right?
25        A.        That's correct.
```

```
                                        Page 38

 1                      LEVITT
 2      Q.          When did you start in that
 3   position?
 4      A.          Don't remember the date, but
 5   the person who was leading the commission
 6   on the professional staff reached out to
 7   me, Zelikow, and I don't remember if it
 8   was lunch or coffee, but asked me to meet
 9   with him and I did and asked me to join
10   the 9/11 Commission full-time.
11                  I thought about it and decided
12   I didn't want to do that full-time, I
13   wanted to be able to stay at The
14   Washington Institute, and so they said how
15   about doing this as a part-time capacity.
16                  As it happened, it was located
17   not far from my office in Washington and
18   so I said yes.
19                  I didn't end up staying very
20   long, it was a little bit frustrating to
21   be in a part-time capacity and things were
22   so fast-moving and I was part-time that
23   renewing my clearances logically was not
24   the priority and so after a few weeks,
25   probably two, maybe three months, of me
```

```
                                        Page 39
 1                  LEVITT
 2   going in, I forget, a few hours a week, I
 3   said, you know what, I think it would be
 4   best if you get only full-time people and
 5   they agreed.
 6        Q.        Did you not have a clearance
 7   while you were working for the 9/11
 8   Commission, had the clearance not come
 9   through?
10        A.        That's true, that's correct.
11                  I only ended up staying there
12   for a small number of weeks.
13                  There is also the issue that
14   they wanted to interview me and they did
15   ultimately interview me and if I had
16   stayed that would have been difficult, so
17   this kind of addressed both issues.
18        Q.        I see you don't list that on
19   the CV; is that because of the brevity of
20   time that you were there?
21        A.        Yes, it was a very part-time
22   short thing.
23                  I feel like, you know, you put
24   that on your CV and people aren't going to
25   pay attention to the time and it's going
```

Page 40

```
 1                    LEVITT
 2  to look like you're padding the CV.
 3             So I don't shy from telling
 4  people about it when it's appropriate, but
 5  it only was what it was.
 6     Q.       Did you have any further
 7  contact with the 9/11 Commission after you
 8  left as a part-time consultant?
 9     A.       I don't recall, it's certainly
10  possible.
11             There were a lot of people who
12  were working there who I knew well.
13             I don't recall if we had any
14  contact, but I did not have contact with
15  them in kind of a professional capacity, I
16  didn't go in for meetings or things like
17  that.
18     Q.       In 2005 you then went back into
19  the government; did you go in as deputy
20  assistant secretary for Intelligence and
21  Analysis or were you promoted to that
22  position?
23     A.       No, I went into that position,
24  so it was my first time in senior
25  executive service, so I had to apply both
```

```
                                    Page 42

 1                      LEVITT
 2   Intelligence, ODNI, meeting I had to go
 3   to; ODNI at the time was located at a base
 4   at the edge of Washington, so without
 5   public transportation it was just
 6   tremendously difficult, so to go to all of
 7   these meetings and then to be able to do
 8   the substantive work I needed to do meant
 9   that I was putting in, you know, lawyers
10   hours without the compensation and I
11   wasn't able to do the stuff that I love
12   most.
13                  So once a series of things that
14   I wanted to see through were done and I
15   felt that I had put this new office, this
16   congressionally-mandated center of
17   excellence, on its feet and helped
18   identify a successor, I could move on and
19   I did.
20       Q.        In your capacity, you had a
21   security clearance, did you not, when you
22   started there?
23       A.        Yes.
24       Q.        And you had it throughout the
25   time that you were there?
```

Page 43

1              LEVITT
2      A.      I did and then when I left, I
3  didn't have to, but I chose to terminate
4  it.
5      Q.      And have you had a security
6  clearance since?
7      A.      I have not had a regular
8  security, an ongoing security clearance
9  since, and in very rare instances, where
10  the intelligence community wanted to
11  consult me on something, they either, if
12  it's a secret collateral clearance
13  information, they just grant that to you
14  for the moment, and then for more
15  sophisticated stuff, they can basically
16  read you in, you sign a bunch of papers,
17  do your consultancy, they read you out,
18  you sign a bunch of papers and you're done
19  and can't talk about it.
20      Q.      Did any of those subsequent
21  clearances have anything to do with events
22  that are the subject of this case?
23      A.      The good news is I can't
24  remember because the bad news is if I did
25  I wouldn't be able to tell.

```
                                            Page 44
 1                      LEVITT
 2              It is the same type of thing,
 3    you have to sign all kinds of things to do
 4    this, to be, quote/unquote, read out, and
 5    that most basic thing is you can't talk
 6    about what you did here.
 7         Q.      Let me ask you this question
 8    then.
 9              You saw a lot of classified
10    material while you were at Treasury,
11    correct?
12         A.      Correct.
13         Q.      And you reviewed intelligence
14    product concerning terrorism, correct?
15         A.      Correct.
16         Q.      And you reviewed intelligence
17    product regarding OFAC designations of
18    SDGTs, correct?
19         A.      Correct.
20         Q.      And you reviewed intelligence
21    product concerning designations of
22    defendants in this case, correct?
23         A.      At least some; certainly not
24    all of the defendants in this case.
25         Q.      Did you review intelligence
```

Page 56

```
 1                    LEVITT
 2    WINEP, I've only read the acronym?
 3        A.        Yeah, we call it The Washington
 4    Institute, but I'll respond however you
 5    would like to call it.
 6                  To be clear, I never worked at
 7    OFAC, Office of Foreign Assets Control, I
 8    was in the Office of Intelligence and
 9    Analysis, which along with OFAC is within
10    Treasury's Department of Terrorism and
11    Financial Intelligence.
12        Q.        Was OFAC an office within your
13    reporting structure or was it separate?
14        A.        It was parallel.
15        Q.        So you had no supervisory
16    authority in what you were doing, is that
17    correct?
18        A.        So the way --  it's not
19    structured this way anymore, but the way
20    it was structured at the time, the Office
21    of Intelligence and Analysis did a lot of
22    work with OFAC, OFAC would ultimately
23    implement sanctions, but the process of
24    researching, drafting, working on
25    designations was part of what Office of
```

Page 57

```
 1                    LEVITT
 2   Intelligence and Analysis, for which I was
 3   the deputy assistant secretary, worked on
 4   together with OFAC.
 5        Q.       Whose decision was it to
 6   implement or not implement sanctions
 7   recommendation?
 8        A.       Oh, a whole lot of different
 9   people and a whole lot of different
10   offices in and well beyond Treasury.
11        Q.       Ultimately who was the
12   decision-maker?
13        A.       Ultimately the secretary of the
14   Treasury.
15        Q.       Would your office have input
16   into that decision?
17        A.       My office and many others in
18   and out of Treasury.
19        Q.       And your office wrote up the
20   recommendation package and dossier, is
21   that right?
22        A.       The specifics of how it works,
23   I can only get into so much detail, but,
24   yes; analysts would write up the various
25   drafts, it would have to go up through
```

Page 58

```
 1                      LEVITT
 2   various chains, I described the process as
 3   best I could in my report.
 4                 Part of that review went across
 5   my desk.
 6       Q.      You said that you met with Gulf
 7   charities.
 8                 Was that, I apologize for using
 9   the term OFAC, was that when you were at
10   Treasury or when you were at The
11   Washington Institute?
12       A.      I can't answer the question
13   about Treasury because that was in my
14   capacity as an intelligence official.
15                 But it's certainly been as an
16   academic outside of government.
17       Q.      You've met with the directors
18   of Gulf charities?
19       A.      I believe it was with
20   directors; I don't remember titles and
21   names right now, it certainly was with
22   senior officials.
23       Q.      Which ones?
24       A.      Again, I'd have to look that
25   up, but I travel significantly --  well,
```

```
 1                    LEVITT
 2      A.       I was about to say it's a very,
 3   very broad question and I certainly don't
 4   consider myself an expert in all things
 5   legal.
 6                I do have a masters in law and
 7   diplomacy, I consider myself someone who
 8   has an understanding of certain issues in
 9   the law, but I do not consider myself a
10   legal expert as such.
11      Q.       Do you consider yourself having
12   an expertise in the statutory framework
13   set forth by the U.S. government with
14   respect to terrorist designations?
15      A.       Yes, I have experience in that
16   and with other countries' regulatory
17   systems.
18      Q.       Do you consider yourself an
19   expert in evaluating audit reports?
20      A.       I really don't enjoy doing
21   that, so I suppose the answer is no, but
22   it has been --
23      Q.       No one does.
24      A.       -- for my sins, something
25   I've had to do from time to time.
```

```
 1              LEVITT
 2   Asia.
 3      Q.       You don't speak any of the
 4   languages of Southeast Asia?
 5      A.       No.
 6      Q.       You don't speak Arabic either,
 7   do you?
 8      A.       No, I have very limited
 9   understanding and limited vocabulary, but
10   I don't speak Arabic.
11      Q.       You do consider yourself an
12   expert, though, on the OFAC designation
13   process, is that correct?
14      A.       I lived it, so, yes.
15      Q.       You've worked in your capacity,
16   you've worked on evaluating and managing
17   the intelligence that supported
18   designation process, is that correct?
19      A.       That's one way to put it,
20   that's fine, I don't know if I would put
21   it that way, but that works.
22      Q.       I presume your expert opinion
23   is that you did a good job at it?
24      A.       I tried, I got awards; there
25   were no complaints.
```

```
                                            Page 85
 1                        LEVITT
 2       A.       I remember it happened, I don't
 3   remember doing it, but, yeah, for purposes
 4   of your question, yeah.
 5       Q.       I'm still a little bit unclear
 6   on your relationship to the Office of
 7   Foreign Assets Control.
 8                Was it your responsibility as
 9   deputy assistant secretary for the Office
10   of Intelligence and Analysis to prepare
11   this type of memo with respect to
12   designations under Executive Order 13224?
13       A.       Intelligence analysts in my
14   office would do the research and prepare
15   the evidentiary, which would go through
16   all the stages I discussed in my report,
17   within the Department of Treasury and
18   within and across the larger general
19   agency.
20                Once it went through the vast
21   majority of those hurdles, the process was
22   that it would go in the form of a memo
23   like this from the Office of Intelligence
24   and Analysis to the Office of Foreign
25   Assets Control.
```

1                    LEVITT

2              Again, OFAC and OIA were both,

3    you could think of it as sister components

4    within the larger TFI, Terrorism and

5    Financial Intelligence branch of the

6    Treasury Department.

7       Q.       Once you prepared this memo,

8    your office would have already gone

9    through the interagency process in

10   compiling of information that's contained

11   therein, is that correct?

12      A.       Yes, it is possible that there

13   can still be other steps, but generally,

14   yes.

15              At this point it has gone

16   through these various hoops, with the

17   exception, I believe, of the two stages of

18   legal review.

19              The intelligence office would

20   be doing kind of the substantive

21   information based on all the various

22   sources and then it goes to OFAC and OFAC

23   doesn't just, you know, say sure, OFAC

24   then does its piece of this, which is the

25   legal review for sufficiency by OFAC

```
                                              Page 87
 1                        LEVITT
 2    Treasury Department lawyers and the
 3    simultaneous but very separate legal
 4    review by lawyers at the Department of
 5    Justice for litigation risk.
 6         Q.        At the time that you prepared
 7    this memorandum, had there been a dialogue
 8    between your office and the office of the
 9    secretary with respect to whether this
10    designation was approved or would be
11    approved?
12         A.        I am not going to get into the
13    internal conversations I had with Treasury
14    leadership.
15              But these are not rogue, you
16    know, operations, this is part of the
17    department.
18              So the department, it goes
19    through all the checks and all the
20    balances, no one's surprised, and so
21    authorities would be aware that this is in
22    process, that it had even been considered,
23    that it was approved at various levels, et
24    cetera and so the appropriate offices
25    would know.
```

```
 1                    LEVITT
 2      Q.         Approximately how long did the
 3   process take from your office being
 4   charged with investigating and considering
 5   this designation to the preparation of
 6   this memo which has been marked as 2003?
 7      A.         These can be extensive
 8   processes; more than that I can't say.
 9      Q.         When you came to the Treasury
10   Department, was it already in process?
11      A.         That's very possible, I don't
12   remember.
13      Q.         Did you personally review the
14   evidentiary package before you signed the
15   agreement?
16      A.         Of course.
17      Q.         Did you review --
18      A.         I, like many, many others,
19   there are all these different levels that
20   have to be gone through.
21      Q.         Did you review the exhibits?
22      A.         Yes.
23      Q.         I assume there was a tremendous
24   amount of classified information that went
25   into this given that it's 754 pages and we
```

```
 1                    LEVITT
 2   can read about eight of them, is that a
 3   fair assumption?
 4        A.        You can see that the document
 5   that you put in front of me was at one
 6   point classified top secret and more,
 7   which has been redacted.
 8        Q.        The current redactions continue
 9   to remain, because it continues to remain
10   classified, is that right?
11        A.        As far as I know.
12        Q.        How many classification
13   designations did you work on during your
14   15 months at the Department of Treasury?
15        A.        Many.
16        Q.        More than ten, fewer than ten?
17        A.        More than ten.
18        Q.        How many memos like this one,
19   which then went to OFAC for final review,
20   would you have signed off on?
21        A.        Each of them.
22                  Well, yeah, each of the ones
23   that I was involved in.
24                  There is many different types
25   of sanction regimes and many different
```

Page 90

```
 1                    LEVITT
 2   types of designations and I did not -- I
 3   was not the from signatories that you see
 4   here on all of them.
 5                But for the ones that were
 6   related to terrorism and a variety of
 7   other sanction regimes, that would have
 8   been me at the time.
 9       Q.      Can I then deduce that you
10   signed off on more than ten of these while
11   you were there?
12       A.      Yes.
13       Q.      Now, you refer in your report
14   to the preparation of an evidentiary
15   package.
16                Is the evidentiary package what
17   appears here as the memorandum which
18   contains it looks like 13 pages or, yes,
19   it is numbered 13 on the bottom, is that
20   what you were referring to as the
21   evidentiary package, and then following
22   from that is an exhibit list and footnotes
23   and exhibits, is that correct?
24                MR. HAEFELE:  Object to the
25   form.
```

Page 91

```
1                    LEVITT

2              THE WITNESS:  Sorry?

3              MR. HAEFELE:  I said objection

4    to form, but you can answer it.

5        A.        Evidentiary package is the

6    whole kit and caboodle to include this

7    memo of the kind of narrative, if you

8    will; it would include all of the

9    underlying information.

10       Q.        I think that you spoke in your

11   report about an evidentiary package

12   supported by an --  an evidence package

13   supported by exhibits, but maybe it is

14   just terminological.

15              I just want to make sure that

16   we're on the same page as to how it's

17   done; maybe when we come back to the

18   substance on this, I can find that

19   reference in your report.

20              There are exhibits and is that

21   a standard feature of this kind of

22   memorandum, that there is a list of

23   exhibits and then exhibits and then a list

24   of notes that cite the exhibits, is that

25   correct?
```

Page 92

```
 1                    LEVITT
 2      A.        I believe so --
 3                MR. HAEFELE:  Object to form.
 4      A.        You seem to be looking at
 5   something and I don't see what that is.
 6      Q.        I'm looking, I can give you a
 7   page number, exhibit list which has a U, I
 8   assume U means unclassified?
 9      A.        Correct, for those documents
10   that are unclassified, it will still have
11   a classification marking letting you know
12   that it is unclassified.
13                Anything else will have
14   markings S or TS and whatever other
15   appropriate markings, there can be quite a
16   few, to denote what the classification is
17   for that particular report, or in this
18   case exhibit.
19      Q.        Okay, we'll come back to that
20   document on the substance.
21                Now, we talked a little bit
22   about languages.
23                I presume you have translators
24   available to you for documents in various
25   languages, correct?
```

Page 109

```
 1                    LEVITT
 2   answer that question, please.
 3        A.         I would do terrible on Jeopardy
 4   for that reason.
 5                   I did include, so I did rely
 6   on, some number, but I don't think it was
 7   all that many, of declassified
 8   intelligence reports, because I thought
 9   that would be useful.
10        Q.         There were reports that you
11   relied on, you were relying on the
12   unredacted material, not the redacted
13   material, correct?
14        A.         Clearly.
15        Q.         Obviously the Hammerle memo,
16   you saw the classified material, but now
17   it's redacted, correct?
18        A.         That's correct, and the nature
19   of the human brain is such that there is
20   no way I'd remember those details now,
21   anyway.
22        Q.         You've forgotten every single
23   bit of it, if you looked at the exhibits
24   you would have no idea what you looked at,
25   is that your testimony, sir?
```

```
 1                    LEVITT
 2      A.       I think you're twisting my
 3  words, so, no.
 4      Q.       No, I'm asking you a question,
 5  I am not twisting anything, I'm asking you
 6  a question.
 7      A.       If I were to look at the
 8  report, would I remember other things,
 9  maybe, maybe not.
10              If I were to then look at the
11  exhibits, would that trigger something,
12  maybe, maybe not.
13              You know, I don't know how good
14  your memory is, maybe mine is just
15  particularly poor, but I am not going to
16  remember every sentence or term or phrase
17  from a document that I reviewed quite a
18  few years ago.
19      Q.       You looked at classified
20  information; you can't say sitting here
21  today whether you recall some of that
22  classified information or you don't?
23      A.       I can definitely tell you
24  that I have forgotten a vast majority of
25  classified information I've ever seen,
```

Page 111

1                    LEVITT
2   that's the way the brain works and I
3   wanted it that way, that's why I turned in
4   my clearances, because I knew I'd be going
5   out into the open source world and I would
6   want to be able to go to conferences and
7   do media appearances or, not like what I
8   was thinking about at the time, but it
9   also enables me to do something like this,
10  serve as an expert witness, without having
11  to worry where do I know something from.
12              And so I left government, each
13  time I had a several-month period where I
14  didn't speak publicly and I did not do
15  media and you kind of just let that kind
16  of settle and I don't think it is
17  surprising that if you don't review it, if
18  you're not exposed to it on a regular
19  basis, the brain is only so big and it is
20  filled by other current things.
21      Q.      And also there are things that
22  you remember from a long time ago and you
23  don't remember how you remember them,
24  isn't that a fair thing to say?
25      A.      Sure, mostly about, you know,

```
 1                   LEVITT
 2   intelligence product is put on a secure
 3   system and you have the clearances to
 4   access that system and to access this
 5   document, right, you will almost certainly
 6   not also have access to the underlying
 7   source information, but because that's
 8   part of the process, right, if it gets to
 9   the point where it's published, you know,
10   classified within the system, not
11   published to the world, you can have a
12   level of confidence that there's been a
13   very careful scrub of the sources and
14   their reliability, et cetera.
15        Q.        Obviously the standard of proof
16   that an intelligence agent might apply is
17   not the same standard that a court would
18   apply on admitting evidence, is it?
19        A.        No, there are many different
20   standards out there for information within
21   government.
22                  There are different standards
23   in criminal cases and in civil cases,
24   standards for evidentiaries, designations,
25   and all of that.
```

Page 130

                    LEVITT

1
2          But you can have a sense of
3   confidence in the reliability in
4   intelligence community information and the
5   reason for that is because the system is
6   so robust.
7      Q.      With respect to the finished
8   intelligence products that you were
9   referring to?
10     A.      No, I was --  I was explaining
11  in all cases.
12          I'll review again; certainly in
13  the finished intelligence products, but
14  even in more raw intelligence it will be
15  necessary, if I'm the person writing this
16  cable, for me to provide some information,
17  maybe not to you, but to whosever job it
18  is to oversee sources, and there is
19  specialization for that, so that people in
20  a position to supervise this, to make
21  independent assessments in case I get too
22  close to my source, can verify the
23  credibility or can rank the confidence
24  that we have in a particular source of
25  information.

Page 131

```
1                     LEVITT
2              And so that would even come at
3   some level within the raw intelligence,
4   because otherwise how are you going to
5   have access to that to make those
6   decisions whether or not to include it in
7   the finished product or not.
8       Q.      Presumably different levels
9   applied as you go up through the process,
10  is that fair?
11      A.      It's not really how it works,
12  but in a nutshell, there are different
13  ways to assess source and there are very,
14  very strict and set methodological systems
15  in place for determining, you know, high
16  confidence, medium confidence, low
17  confidence, et cetera.
18              It is not this kind of simple
19  subjective, well, I trust the guy --  my
20  screen is just jumping everywhere, I don't
21  know about you.
22      Q.      Not mine.
23      A.      All right.
24      Q.      In practical terms, did you
25  ever find that intelligence agencies ever
```

Page 132

```
 1                    LEVITT
 2   altered their standards in view of the
 3   urgency of the issue that was presented,
 4   for example, terrorism?
 5               MR. HAEFELE:  Object to the
 6   form.
 7               THE WITNESS: Answer?
 8               MR. HAEFELE:  Yes.
 9      Q.      Yes.
10               THE WITNESS: I apologize, I
11   think that's you, Mr. Haefele, I just hear
12   that you said something, I can't hear what
13   you have said in those circumstances, I
14   don't know if you're too close to your mic
15   or not.
16      A.      So I have not had that
17   experience myself, I'm fortunate to say.
18               Though you're trained to look
19   for it and to question and to doubt and to
20   double-check.
21               But there have been instances
22   --  let me rephrase.
23               There has been reporting,
24   because I haven't been personally involved
25   in these reviews or cases, where there is
```

Page 133

```
 1                    LEVITT
 2  pressure to move quickly or something like
 3  that and somehow the process is rushed.
 4                That has not been my
 5  experience.
 6       Q.      But you have heard that it has
 7  happened in the government, correct?
 8       A.      I have read reports, like
 9  everybody else has read reports in the
10  press, that this has happened.
11                I can't speak to what exactly
12  did or didn't happen and the reason it's
13  so surprising when it is reported is
14  because the systems really are so kind of
15  set in stone and therefore it's shocking
16  when you hear reports that the system
17  didn't work, to me they're the exceptions
18  that prove the rule.
19                But I also have no firsthand
20  experience or knowledge of situations like
21  that, I'm very happy to report.
22       Q.      Are you familiar with the
23  extensive academic literature on selection
24  bias in intelligence reporting?
25       A.      I am familiar.
```

Page 134

                              LEVITT

1

2      Q.        Pressure being brought on

3   analysts to produce intelligence that

4   their political superiors are seeking to

5   have?

6      A.        Well, that's another matter.

7                Selection bias is not something

8   that is unique to the intelligence

9   community, selection bias is a problem for

10  anybody working in a research field

11  potentially.

12               The second question that you

13  asked of political pressures is the

14  conversation we just had; I never

15  experienced it, period, but I have read

16  press reports of instances like that, but

17  I have no firsthand knowledge, I can't say

18  how it happened, if it really happened

19  that way, what part of the system was

20  bucked, if it was one last review or --  I

21  can't, I don't know.

22     Q.        Presumably over time some

23  intelligence turns out to be right and

24  some turns out to be wrong and the

25  community is updating and correcting all

```
 1                    LEVITT
 2   the time, am I correct?
 3       A.        I wouldn't put it that way --
 4                 MR. HAEFELE:   Objection to
 5   form.
 6       A.        The vast majority of
 7   intelligence turns out to be on the ball.
 8                 We're dealing with human beings
 9   and we're dealing with information,
10   information can change, events can shed
11   new light that you didn't have before, and
12   so you can have circumstances of course
13   where over time you find out that some
14   information continues to prove to be just
15   as right as it was and some information
16   you find there's new stuff out there.
17                 In the intelligence community
18   there is a process for correction.
19       Q.        You don't, presumably once you
20   give up your clearances, you don't know
21   whether earlier intelligence that you've
22   looked at have been updated and corrected
23   or not, correct?
24       A.        Correct, I don't have access to
25   that, full stop.
```

Page 136

```
 1                    LEVITT
 2      Q.        You also referenced certain
 3  foreign intelligence agencies.
 4                In your experience, are foreign
 5  intelligence sources more reliable, less
 6  reliable, or about the same as U.S.
 7  intelligence reporting?
 8      A.        So what specifically are you
 9  referring to --
10                MR. HAEFELE:  Objection to
11  form.
12      Q.        You cite the Dutch Intelligence
13  Service twice.
14                Do you have experience with the
15  Dutch Intelligence Service?
16      A.        Yeah, I do, including out of
17  government.
18                And this is an unclassified
19  report, so there is no redacted portion.
20                Many intelligence agencies,
21  including U.S. intelligence agencies, do
22  sometimes produce fully unclassified
23  reports.
24                In the United States we have
25  the Global Trends Report by the director
```

Page 149

LEVITT

1

2      Q.      I'm right that with respect to

3   the designations in this case, you did not

4   talk to anybody from IIRO at all, correct?

5      A.      Who I spoke to when I was in

6   government is not something I can talk to.

7      Q.      But it is --  let's talk about

8   generally you do not talk to potential

9   designees, correct?

10              MR. HAEFELE:  Objection to

11   form.

12      A.      OFAC talks to all kinds of

13   people, including people who have been

14   designated.

15              There is no requirement to talk

16   to people before they're designated and

17   the main reason is that you're dealing

18   with people who are being accused of

19   engaging in illicit conduct and you don't

20   expect when you go up to the bank robber,

21   excuse me, did you rob the bank, for them

22   to say something particularly useful in

23   the circumstance.

24      Q.      Well, that comes back to your

25   Al Capone comment.

```
                                     Page 150
 1                    LEVITT
 2               Sometimes you can ask the bank
 3    robber and they can explain why they
 4    didn't do it, right, and you can listen to
 5    that.
 6       A.      Did I make an Al Capone
 7    statement?
 8       Q.      You've done it many times, not
 9    today yet, do you recall that, you say you
10    don't go talk to Al Capone and ask him
11    whether he is in organized crime.
12               We don't need to talk about Al
13    Capone, we can talk about a bank robber.
14       A.      I'm sorry, you've confused me
15    thoroughly, I'm sorry.
16               Is there an Al Capone reference
17    that you would like to raise, I am not
18    sure where this went.
19       Q.      You've testified to it multiple
20    times, but I don't want to waste time
21    talking about Al Capone.
22               You've used an analogy, you
23    don't go up to the bank robber and ask him
24    whether he robbed a bank, but presumably
25    you're assuming your conclusion in making
```

```
 1                   LEVITT
 2  that statement, are you not?
 3     A.      You're not assuming any
 4  conclusion, you're doing your
 5  investigation that gets you to your
 6  conclusion and you don't necessarily go
 7  and ask someone about whom there is
 8  sufficient evidence for whatever the
 9  action is at hand, in this case a
10  designation and the bank robbery and
11  arrest, whether they did it and expect to
12  get useful information back.
13     Q.      Well, they could tell you they
14  were in Poughkeepsie that day and not in
15  Brooklyn, right?
16     A.      And if that turned out to be
17  the case, you would think that would come
18  up in the investigation and, as you well
19  know, in the case of designations, there
20  are ways of appealing and suing and if
21  that type of information is there, that
22  will come out.
23     Q.      We'll come on to that --
24     A.      I should note also short of
25  that, OFAC does typically in certain
```

```
 1                    LEVITT
 2   circumstances, people are designated and
 3   they ask to meet with OFAC to clarify that
 4   type of information if there is something
 5   quite that simple and that can just
 6   resolve it just like that without having
 7   to go to court.
 8       Q.      You never had any such meetings
 9   with respect to the designation that we've
10   been discussing, did you?
11       A.      Well --
12               MR. HAEFELE:  Objection to
13   form.
14       A.      Again, I can't tell you what
15   meetings I had, but also you're asking
16   about OFAC and I was not OFAC.
17       Q.      But --  okay.
18               You made a statement about
19   OFAC; you said OFAC has meetings, do you
20   have knowledge of their having meetings
21   with targets before designations?
22       A.      I do not have knowledge of OFAC
23   meeting with targets before designations.
24               What I was saying just now is I
25   have knowledge, and actually not from my
```

Page 153

```
 1                    LEVITT
 2    time at Treasury, of OFAC meeting with
 3    entities, persons or entities, that had
 4    been designated, saying, hey, you made a
 5    mistake, can we meet and I can clear it up
 6    for you; if it's really that simple, it's
 7    that simple.
 8       Q.     I am not going to ask you about
 9    specific investigations.
10               In the course of your preparing
11    documents like the memo that we have seen
12    and marked, do you subpoena documents from
13    targets before you make a designation
14    decision?
15               MR. HAEFELE:  Objection to
16    form.
17       A.     Again, I was in the Office of
18    Intelligence and Analysis, so that would
19    not be what OIA would do.
20               There are other parts of
21    Treasury that can do other things.
22       Q.     Do you know whether any
23    documents were subpoenaed in connection
24    with this designation?
25       A.     I do not.
```

Page 154

```
 1                     LEVITT
 2      Q.        When Treasury receives
 3   classified information from confidential
 4   sources from other stakeholders, does it
 5   know who the confidential sources are?
 6                  MR. HAEFELE:  Objection to the
 7   form.
 8      A.        By stakeholders, you mean other
 9   parts of the U.S. intelligence community?
10      Q.        That's correct.
11      A.        Okay.
12                  So part of Treasury, the part
13   that I was in, is also part of the
14   intelligence community.
15                  So there are a couple of ways
16   to answer this question.
17                  One is, depending on the type
18   of document in question, that document may
19   already include information about the
20   reliability, the confidence level, in the
21   underlying source for any particular piece
22   of information.
23      Q.        You say it may include that
24   information?
25      A.        Correct.
```

Page 155

```
1                    LEVITT
2      Q.        Or it may not, correct?
3      A.        Depends on the type of document
4   or report.
5      Q.        Okay.
6      A.        If it does not, then within
7   intelligence community channels, there are
8   ways to be able to get that information so
9   that, you know, if one part of the
10  intelligence community is the collector
11  and they hold those kind of crown jewels
12  of the identity of the source and when it
13  was vetted and all that kind of stuff,
14  that's not going to be available to other
15  parts of the intelligence community that
16  may have access to the final report that
17  comes out of this, if that final report
18  does not include some information to give
19  that user a sense of, well, what kind of a
20  source, how credible, there are ways to go
21  back to that originating agency and
22  address that question.
23     Q.        Can you rely on hearsay
24  evidence in your process of preparing a
25  memorandum like the memorandum that we
```

Page 156

```
 1                    LEVITT
 2   have marked earlier?
 3        A.        Define hearsay for me, please.
 4                  MR. HAEFELE:  Objection to the
 5   form.
 6        Q.        Hearsay is evidence that is not
 7   -- that is not primary evidence in terms
 8   of a document or a statement of an
 9   individual, that's not a technical legal
10   definition, but you can use that.
11        A.        I am not sure that helps.
12                  Hearsay is a legal term, right,
13   so it doesn't apply in that sense to the
14   intelligence community.
15                  But if we're going to use it a
16   little more colloquially, which I think is
17   how you intended it --
18        Q.        Yes.
19        A.          --  then the simple answer is
20   no, you cannot just hear something from a
21   cab driver and throw it into a report
22   without any kind of explanation of where
23   and how you heard it, who you heard it
24   from and what their credibility or
25   reporting track record is, that's not how
```

Page 157

```
 1                    LEVITT
 2  the system works.
 3              So the system is built in such
 4  a way to avoid
 5  I-heard-in-the-elevator-going-up-to-my-
 6  apartment.
 7     Q.      Can you use a legal pleading
 8  that's submitted by a party as something
 9  to support a designation?
10              MR. HAEFELE:  Objection to
11  form.
12     A.      Can you use a legal pleading,
13  say it again, please.
14     Q.      A legal pleading submitted by a
15  party in litigation, where a party says
16  IRRO did X and it's a pleading, it's not
17  proven, would you rely on that in a
18  designation?
19              MR. HAEFELE:  Objection.
20     A.      I suppose we'd have to have a
21  particular instance in hand for me to
22  fully be able to answer, understand and
23  answer the question.
24              You can have --  you can
25  include classified information, you can
```

Page 158

```
 1                    LEVITT
 2   also include unclassified information.
 3                That unclassified information
 4   can include things like testimony in a
 5   trial.
 6       Q.      Could you use a proffer
 7   submitted by the prosecution that has
 8   never been presented at a trial?
 9                MR. HAEFELE:  Objection to the
10   form.
11       A.      I don't know.
12       Q.      Can you use newspaper articles
13   to support a designation?
14                MR. HAEFELE:  Form.
15       A.      So you can cite to newspaper
16   articles for some points in a designation,
17   that doesn't mean the designation is based
18   on newspaper articles.
19                Again, what are you using the
20   newspaper for, right; on a certain date
21   the president of the United States enacted
22   this executive order, cite to The New York
23   Times, no problem with that.
24                So you can use newspaper
25   articles where appropriate.
```

Page 159

```
 1                    LEVITT
 2        Q.        But of course designee doesn't
 3   know what you're using it for because it's
 4   classified, right?
 5        A.        A designee doesn't know what
 6   we're using --
 7        Q.        If you cite --  you just said
 8   it depends on what the newspaper article
 9   is used for.
10        A.        In other words, it depends on
11   what is included in that article that you
12   are using.
13                  So if you have an article that
14   states some fact that can't be verified
15   anywhere else in the world, that may not
16   be as strong as quoting a newspaper
17   article for a verifiable fact or a quote
18   or something like that.
19                  The designee is not privy to
20   the designation and does not know; that's
21   not particularly relevant as to whether or
22   not the citation to a media article is
23   something that can be relied on for the
24   particular point being referenced.
25        Q.        I know it is 5:30.
```

Page 164

```
 1                    LEVITT
 2   raw reporting, where it ends up or not,
 3   correct?
 4       A.        You do not necessarily know
 5   looking at a raw report where it
 6   ultimately gets referenced from the
 7   outside; in the intelligence community
 8   there are ways to do that.
 9       Q.        I want to come back to the OFAC
10   designation process in general.
11              There is no hearing conducted
12   within the Department of the Treasury
13   prior to the designation, is there?
14       A.        Not in the sense that you're
15   used to as a lawyer.
16              The issue gets an extended
17   hearing, if you will, at multiple
18   meetings, where it is raised and debated.
19              More entities that are raised
20   for potential designation, far more, are
21   ultimately not designated --
22       Q.        That's not my question --
23       A.        But it is, because your
24   question is does it get a hearing and this
25   is the --
```

```
 1              LEVITT
 2      Q.      No, I asked you whether there
 3  is a hearing conducted with a neutral
 4  decision-maker prior to designation.
 5      A.      No, that you didn't ask, but
 6  that's another question.
 7              So, no, there is no single
 8  hearing with, however you want to define a
 9  neutral decision-maker, I would argue that
10  the people doing this are neutral, I don't
11  get paid more as a Treasury official if we
12  do a designation or don't, I've got no
13  skin in that game.
14      Q.      A judge doesn't get paid more
15  either, but a judge is a judge and a judge
16  is different than having everybody working
17  for the government, right?
18              MR. HAEFELE:  Objection,
19  argumentative.
20      A.      If you are a defendant and you
21  have a U.S. government paid defense
22  counsel, that's worse, because they're all
23  paid by the government, I don't think so.
24      Q.      You --
25      A.      You have a lot of people --
```

```
 1                    LEVITT
 2              (Cross-talking.)
 3      Q.      You know the difference between
 4  having a unilateral process and adversary
 5  process; are you familiar with the
 6  difference between those two?
 7      A.      Certainly in the legal context,
 8  but I would argue --
 9      Q.      I am not asking you to argue, I
10  am just asking you to answer my question.
11      A.      I will appreciate you not
12  interrupting me like that, we have been
13  really good for three-and-a-half hours,
14  let's stop now.
15      Q.      I would appreciate you just
16  answering my questions.
17      A.      I'm trying hard.
18      Q.      Okay.
19      A.      My turn?
20      Q.      The question is, do you know
21  the difference between a unilateral and
22  adversarial process?
23      A.      Yes.
24      Q.      There is no one in the room
25  that represents the potential designee, is
```

Page 167

1                    LEVITT

2    there?

3        A.        There are people in the room

4    who are not there as the let's-do-this,

5    there is no one there saying my job is to

6    argue not to do this and yet there are

7    many, many people who do, because there is

8    no automaticity to this, you want to get

9    it right, there is multiple levels, both

10   in the legal review and in the substantive

11   review, leave aside the policy review,

12   whether or not it is good policy.

13                People who are arguing

14   vociferously against any given action,

15   it's not in the sense that you're thinking

16   about it may be in a courtroom, but it's

17   not the case that this is like a kumbaya,

18   bunch of people getting together and

19   saying, hey, let's do it, not like that at

20   all.

21       Q.        I wasn't suggesting it was a

22   kumbaya process.

23                You're familiar with an

24   administrative process where there is an

25   administrative law judge who hears

Page 168

1                      LEVITT

2    evidence; there is no process like that in

3    the designation, is there?

4        A.      Not like that.

5                MR. HAEFELE:  Objection to

6    form.

7        Q.      There is no opportunity for the

8    target to submit contrary evidence, is

9    there?

10       A.      Not in the process of the

11   designation.

12       Q.      On page 17 of your report,

13   which is Exhibit A, you talk, and you

14   referenced it earlier --  Exhibit 2001,

15   sorry --  you say, you state from

16   experience that those listed in the

17   process can and do appeal designations.

18                Do you recall that, that's

19   correct, isn't it?

20       A.      I'm sorry, one second.

21                MR. HAEFELE:  Objection to the

22   form.

23       A.      17?

24       Q.      I think it's --

25       A.      You have it up, someone has

1              LEVITT

2    magically put it up on the screen now, so

3    I don't need to search for it, thank you.

4         Q.       Designated entities can and do

5    appeal their designation, that's correct,

6    isn't it?

7         A.       Thank you very much, there you

8    go.

9                  (Witness perusing document.)

10        A.       I don't know about you, but

11   I've got progressive, so when that pops

12   up, that's really something for me.

13                 Yes, it says that here.

14        Q.       I think we're all progressives

15   here.

16                 And you say "in none of these

17   cases was U.S. government action

18   capricious."

19                 Now, capricious is a legal

20   term, correct?

21        A.       Not for me, I am not a lawyer,

22   you may use it as a legal term.

23        Q.       Are you aware, sir, that the

24   standard for appealing a designation is

25   that the action taken was arbitrary and

```
1                    LEVITT
2   capricious or an abusive process, are you
3   aware of that standard?
4        A.       When you say it like that, that
5   rings a bell.
6                 But not  -- no, I haven't
7   memorized this, but it doesn't surprise.
8        Q.       Do you know how a designee
9   appeals a designation?
10       A.       Primarily --  well, the actual
11  appeal is primarily through a suit.
12       Q.       And that's brought in Federal
13  District Court, correct?
14       A.       Correct.
15       Q.       Were you ever involved in any
16  such lawsuits when you were in the
17  government?
18       A.       Again, I was in the Office of
19  Intelligence and Analysis, I was not
20  involved in anything like that.
21       Q.       And the standard --  so you
22  file a lawsuit in District Court, that's
23  how you appeal the designation, correct,
24  and presumably a designee has to pay to
25  litigate a lawsuit in Federal Court,
```

Page 171

```
  1                    LEVITT
  2   correct?
  3              MR. HAEFELE:  Objection.
  4      A.      Presumably, I don't know,
  5   sounds like you don't know either, I have
  6   never done it.
  7      Q.      Actually, I do know and I have
  8   done it and you do.
  9              Is the lawsuit filed under the
 10   Administrative Procedure Act, to your
 11   knowledge?
 12      A.      I don't know.
 13              MR. HAEFELE:  Objection, form.
 14      Q.      The standard that is applied in
 15   a designation is that the government has
 16   reason to believe there is a basis for the
 17   designation, correct?
 18      A.      Yes.
 19      Q.      And when you go to court to
 20   challenge a designation, you must prove
 21   that the government was arbitrary and
 22   capricious in stating that it had a reason
 23   to believe there was a basis for
 24   designation, correct?
 25      A.      If you say so.
```

Page 172

```
 1                    LEVITT
 2              MR. HAEFELE:  Objection.
 3       Q.     Well, you said earlier that you
 4   understood the legal parameters around the
 5   standard.
 6              You understand that if you
 7   appeal the designation, you have to prove
 8   that the government acted arbitrarily and
 9   capriciously in asserting a reason to
10   believe a basis, correct?
11              MR. HAEFELE:  Objection to
12   form, mischaracterizes earlier testimony.
13       Q.     And that's a pretty high
14   standard, isn't it, you have to prove that
15   the government was unreasonable and
16   arbitrary and capricious and had no
17   reasonable basis for the designation,
18   correct?
19              MR. HAEFELE:  Objection, form.
20       A.     I am not in a position to
21   judge, you know, how reasonable or
22   unreasonable a level of proof that is.
23              This is administrative action
24   and under the law, that's the threshold.
25       Q.     Let's take a look at your
```

Page 173

```
  1                    LEVITT
  2    expert rebuttal report, which we're going
  3    to mark as Exhibit 2005, and I would like
  4    to direct your attention to F4, the way we
  5    put it on the listing.
  6                    (Defendants' Exhibit 2005,
  7    Expert Rebuttal Report, was marked for
  8    identification, as of this date.)
  9        Q.        Page 6, please.
 10                    I would like to direct your
 11    attention to the second full paragraph on
 12    the page, and in particular your statement
 13    in the report that begins, the last two
 14    sentences, "this, parenthetically,
 15    explains."
 16                    (Witness perusing document.)
 17        Q.        You say, "This,
 18    parenthetically, explains why the U.S.
 19    government successfully defends most such
 20    lawsuits - it sets out from the outset to
 21    make sure the full evidentiaries are so
 22    airtight that they are fully defensible in
 23    court."
 24                    Do you see that?
 25        A.        I do.
```

```
 1                    LEVITT
 2      Q.         And yet the standard as we've
 3  been discussing is, in order to prevail in
 4  court, all the government needs to do is
 5  to show that its decision that it had
 6  reason to believe was not arbitrary and
 7  capricious or an abuse of discretion,
 8  correct?
 9               MR. HAEFELE:  Object to the
10  form.
11      A.         Sorry, what's the question?
12               MR. LEWIS:  Could you read back
13  the question, please.
14               (Record read.)
15      A.         The fact that that's the
16  standard doesn't mean that the government
17  lawyers nonetheless insist that the
18  factual information be beyond reproach and
19  that is my experience.
20               Specifically, you didn't ask
21  me, you didn't highlight this, but the
22  point that this is following for context
23  is about the fact that there are two
24  rounds of legal review.
25               Forget the Treasury/OFAC review
```

```
 1                    LEVITT
 2   for sufficiency; there is on top of that
 3   an entire separate set of review within
 4   the Department of Justice specifically for
 5   litigation risk which, you know, routinely
 6   comes back and says I know that you've hit
 7   the threshold here, we want you to hit it
 8   higher, and you may not agree with the
 9   Department of Justice's decision to do
10   that, you may not think it's necessary, it
11   may not actually be necessary based on
12   what you've explained on your expertise,
13   I'm just telling you from my experience,
14   this has been, this was the case.
15        Q.      The litigation risk that we're
16   talking about is the risk that a court
17   will find that you had no reason to
18   believe there was a basis for designation
19   and you say that explains why we always
20   win.
21              And I'm asking you whether you
22   have some basis for stating that the
23   Department of Justice's litigation risk
24   explains why the government wins as
25   opposed to the standard of arbitrary and
```

```
 1                    LEVITT
 2    capricious.
 3             So what I'm asking you is
 4    whether you have a basis to say that the
 5    Justice Department's litigation risk
 6    assessment is the reason why the
 7    government always wins, which is what you
 8    say here on page 6.
 9        A.      I don't know what's so
10    complicated here.
11             MR. HAEFELE:  Wait; Eric, can
12    you pick one of those questions so I know
13    which one I'm objecting to.
14        Q.      You say this explains why the
15    U.S. government successfully defends most
16    such lawsuits, do you see where you say
17    that, and I am saying to you, do you agree
18    that in order to successfully defend a
19    lawsuit, all the government needs to show
20    is that it was not arbitrary and
21    capricious to decide it had a reason to
22    believe?
23        A.      And my answer to you --
24             MR. HAEFELE:  Objection to
25    form.
```

```
 1                    LEVITT
 2     A.          -- again, is the fact whether
 3  or not they had to do it, whether or not
 4  they were going overboard, the Department
 5  of Justice lawyers reviewing these
 6  evidentiaries for litigation risk took the
 7  position regularly that these
 8  designations, these evidentiaries had to
 9  be airtight, that the quality of the
10  information had to be extremely strong,
11  because they did not want to be in a
12  position where they couldn't defend,
13  successfully defend, one of these actions.
14              You're telling me as a lawyer
15  they didn't need to do this; super
16  interesting.
17              I'm telling you from the
18  perspective of those who were doing it,
19  this was part of the process and this was
20  the reason there was litigation risk
21  review on the part of the Department of
22  Justice.
23     Q.     Did you participate in the
24  litigation risk review?
25     A.     I participated in the overall
```

LEVITT

1    process of this, part of which was handing

2    off a draft evidentiary at a certain point

3    to both OFAC lawyers and DOJ lawyers and I

4    would sometimes be in those meetings that

5    would follow after they did their review

6    where they would say this is not good

7    enough, that's not good enough, this you

8    got to take out, whatever it is.

9              I would hear this feedback all

10   the time.

11      Q.      Did you participate in that

12   process with respect to the designations

13   of the IIRO Philippines or Indonesia

14   office?

15      A.      If I knew I couldn't tell you,

16   but I don't remember which specific

17   incidents I did participate in those

18   meetings and didn't, I didn't have to

19   every time.

20              But if there was a meeting

21   where the lawyers from either OFAC or DOJ

22   came back and said they had tremendous

23   feedback and questions, sometimes they

24   would want to bring in a senior management

Page 179

1                         LEVITT
2    person like myself or somebody else to be
3    part of that meeting.
4         Q.        You say, "This sets an even
5    higher de facto standard for designations
6    to move forward than laid out by the
7    letter of the law and typically goes well
8    beyond" --  I'm sorry, I'm reading the
9    wrong thing, looking at my wrong notes, I
10   apologize, and it is 5:59.
11                  Can we take a look at page 4,
12   please.
13                  (Witness complying.)
14        Q.        I would like to direct your
15   attention to the penultimate paragraph.
16                  MR. HAEFELE:  Looking at the
17   one that starts "in practice"?
18                  MR. LEWIS:  Yes.
19        Q.        We've talked about the reason
20   to believe standards and you say at the
21   end of this, "This falls short of a
22   criminal case where the standard is beyond
23   a reasonable doubt, but is arguably even
24   more robust in the civil case standard of
25   a preponderance of the evidence."

```
                                        Page 180
 1                    LEVITT
 2              What is your basis for making
 3    that statement about burdens of proof?
 4        A.       It is experience; at the end of
 5    the day I cannot remember a single time
 6    where people said, well, not all the
 7    evidence points this way, but a
 8    preponderance of the evidence does.
 9              In my experience, it was always
10    the case that it was either extremely
11    strong or it wasn't going forward; never,
12    never, was I aware of any case, any
13    designation, where whatever the civil case
14    standard might have been, where in fact
15    the Treasury Department said, well, if the
16    preponderance of the evidence, so, okay.
17        Q.       But preponderance of the
18    evidence is a standard applied by neutral
19    decision-maker, right, that's the civil
20    standard, you understand that, right?
21        A.       Right, this is a civil case
22    standard where evidence or whatever
23    preponderance means is enough.
24              In our case that would never
25    fly.
```

Page 181

```
 1                    LEVITT
 2       Q.        An administrative law judge
 3   also applies a preponderance of the
 4   evidence based upon an adversarial
 5   proceeding, correct?
 6       A.        That's correct.
 7                 MR. HAEFELE:  Object to form.
 8       Q.        And here there is never any
 9   evidence submitted by the other side,
10   right?
11       A.        That's not what I'm stating
12   here.
13                 We can discuss that if you'd
14   like, but I'm saying here simply the
15   threshold is ultimately in the
16   designations more than, far more than, a
17   preponderance of the evidence.
18                 I hear your response, which is
19   a statement, not a question, for a very
20   interesting discussion about, yes, but
21   that preponderance of the evidence is
22   determined by an independent judge.
23       Q.        Fair enough; legal standard
24   that binds the determination under the
25   executive order is reason to believe,
```

Page 196

LEVITT

1
2  who have been involved in the process have
3  discussed it the same way I have.
4           The process as we have
5  discussed it is not itself a classified
6  matter, which is why I'm able to discuss
7  it.
8      Q.      You talked yesterday about
9  whether you had reviewed depositions that
10 had been taken in this case of fact
11 witnesses, do you recall that, sir?
12     A.      Yes.
13     Q.      And you said that you had been
14 given certain portions of depositions by
15 counsel, do you recall that?
16     A.      Yes.
17     Q.      Now, you don't refer to those
18 depositions in your report, but you do
19 refer to a portion of one deposition in
20 your rebuttal report.
21           Do you recall that, sir?
22     A.      Not offhand, but I take your
23 word for it.
24     Q.      Did you receive the portions of
25 the deposition that you referred to after

Page 205

```
 1                    LEVITT
 2   looked at none of them, correct?
 3       A.      I am not aware of what banking
 4   information was made available in this
 5   case, that's not the type of work that I
 6   do and it is not the type of financial
 7   tracing that I would have done in
 8   government, anyway, that's not my area of
 9   expertise, so I would not have done that.
10       Q.      So you didn't do any financial
11   tracing in connection with the
12   designations of IIRO Philippines or IIRO
13   Indonesia, correct?
14       A.      Did I personally, no.
15       Q.      Did you look at any financial
16   tracing or financial data that was
17   provided by your team in connection with
18   the designation?
19       A.      Beyond the sources that have
20   been left unredacted in the declassified
21   designation, I am not at liberty to tell
22   you anything I looked at.
23       Q.      I see --
24       A.      To be clear, I was not the one
25   who drafted it, I looked at it, but I
```

Page 206

```
                         LEVITT
 1
 2    can't go into anything that remains
 3    classified.
 4        Q.       Did you ever look at any
 5    financial tracing records given to you by
 6    your staff in connection with the
 7    designation process?
 8        A.       You can ask the question
 9    multiple ways, but unfortunately I'm still
10    limited by a legal requirement not to
11    reveal anything that remains classified.
12        Q.       I understand that, but I can
13    ask the questions and if you can't answer
14    it, then we have a record that you can't
15    answer it and then we can confront the
16    court about the consequences of that, but
17    I am going to ask you the questions, sir.
18        A.       With pleasure.
19        Q.       Okay.
20                 Have you ever reviewed any
21    Hawali records?
22        A.       Not out of government and I
23    can't speak to what I did in government.
24        Q.       Are you aware, sir, that the
25    9/11 Commission concluded that it could
```

Page 363

```
 1                    LEVITT
 2      A.        Yes.
 3      Q.        None of those refer to IIRO or
 4   MWL, do they?
 5      A.        Correct.
 6                MR. HAEFELE:  Objection to
 7   form.
 8      Q.        Let's move on.
 9                We've talked about what we've
10   called the Hammerle report, do you know
11   what I'm referring to, is that clear, sir?
12      A.        By Hammerle report, do you mean
13   the IIRO designation?
14      Q.        I mean the report that you
15   wrote to Barbara Hammerle, yes, I think
16   we're talking about the same thing and I
17   spilled some water, but hopefully I can
18   find a dry copy.
19                Oh, here it is and it's dry.
20                (Pause.)
21      Q.        You did not cite this report in
22   your report.
23                Were you aware at the time that
24   you prepared the report that the
25   Hammerle --  that this document, which is
```

Page 364

```
1                    LEVITT
2    marked as 2003, had been produced in
3    redacted form in this litigation?
4         A.      Hold on, 2003, let me cull it
5    up.
6         Q.      That's your memo to Barbara
7    Hammerle.
8         A.      This is what we referred to as
9    the IIRO designation or the evidentiary,
10   the report itself.
11               To be clear, this is not a memo
12   that I personally drafted; it goes out
13   from the Office of Intelligence and
14   Analysis and the way it's done is from the
15   head of that office, which was me in my
16   capacity as deputy assistant secretary, to
17   OFAC, meaning the director in this case,
18   there was an acting director, Barbara
19   Hammerle.
20               So this was actually drafted by
21   others, reviewed by many, ultimately
22   including myself.
23               I want to be clear for you,
24   because you referred to it as my memo,
25   this is just the way the department does
```

Page 365

1                    LEVITT

2    its internal workings of formally passing

3    it over to OFAC.

4        Q.      You reviewed and approved it

5    before you initialed it, correct?

6        A.      Yes.

7        Q.      Were you aware at the time that

8    you prepared your report that this

9    document had been produced in the

10   litigation?

11       A.      Yes.

12       Q.      And you reviewed it and relied

13   on it but did not cite it in your report,

14   is that correct?

15              MR. HAEFELE:  Object to form.

16       A.      I did not use it in my report

17   because it seemed kind of inappropriate

18   for the document that had my name on it.

19              So I just, you know, I relied

20   on the other material, I think I included

21   the press release and the IIRO

22   designation.

23              It just seemed a little --

24   like it would be a little strange.

25       Q.      I'd like to direct your

Page 367

```
 1                    LEVITT
 2   be included to be able to serve as source
 3   for a unique fact, in this case the fact
 4   that IIRO was a defendant in this case.
 5        Q.        That exhibit was included in
 6   the 754-page overall package as an exhibit
 7   that was sent around to the various
 8   agencies and participants in the process,
 9   correct?
10        A.        No.
11                  First of all, all of the
12   underlying documents don't necessarily
13   kind of travel all over the place.
14                  For the review, it depends who
15   needs or wants them and I don't know how
16   many pages Exhibit 67 was.
17                  For the purpose of just being
18   able to say, hey, they were listed in
19   defendants, you probably didn't need to
20   include very much other than maybe just
21   even the cover page, but I don't know what
22   Exhibit 67 included, it doesn't include
23   page numbers.
24        Q.        I'm kind of confused here,
25   because there is no unredacted reference
```

Page 457

```
 1                    LEVITT

 2      Q.        Your entire period of time with

 3  Treasury, the 15 months, what part of that

 4  were you involved in actually --  actually

 5  involved in the designation process in any

 6  capacity?

 7                  MR. HAEFELE:  Objection, form.

 8      A.        Sorry, at what point in those

 9  15 months or in what way was I involved?

10      Q.        In what period of time, I'm

11  just wondering when you started your job

12  on day 1 did you start --  were you

13  involved in the designation process, did

14  you have to go through a training period.

15                  Of those 15 months, when did

16  you actually start becoming involved in

17  the designation process to any extent?

18      A.        I don't know a date, probably I

19  was allowed to get my feet wet a little

20  bit and kind of learn the ropes.

21                  To be clear, I was not ever

22  drafting the designations, I was within

23  that kind of senior management overseeing

24  the process.

25                  And then as we discussed
```

Page 458

```
 1                    LEVITT
 2   earlier, at some point, for those
 3   designations that ultimately went forward,
 4   which was fewer than those that didn't
 5   make it through the process because of the
 6   nature of how robust it was, at one point
 7   the package in its current form would be
 8   put into a memo and the way it would be
 9   delivered within Treasury's offices, from
10   Treasury's Office of Intelligence and
11   Analysis to OFAC, would be from the DAS,
12   for intel, intelligence, which was me
13   during those periods, to the director, and
14   at one point there was an acting director
15   at the Office of Assets Control, OFAC.
16             So I don't remember exactly
17   what the first date was that I played some
18   type of role in this whole process.
19             I typically was representing
20   Treasury in meetings.
21             The way government works is one
22   of the ways you kind of get up to speed is
23   briefing memos, so, you know, probably
24   within a week or two, wherever we were on
25   our work on different projects, and of
```

Page 459

1                    LEVITT

2    course we didn't only do designations, we

3    did lots of other things, I'd get kind of

4    read-up and read-in and play my role.

5         Q.        To drill down on that a little

6    bit.

7                    When you say it took some time

8    to get your feet wet, how long?

9         A.        I've told you I have no idea if

10   it was, you know, day 2 or week 2.

11                   Treasury's Office of

12   Intelligence and Analysis --

13        Q.        Let me just stop you there,

14   because I appreciate your answer, but my

15   time is tight.

16                   You're not sure if it was day

17   2, week 2; was it month 2?

18        A.        I'm sure --  I don't remember

19   exactly.

20                   I assume it was quicker than

21   that; again, because I wasn't the one

22   drafting, I didn't have to be the subject

23   matter expert, I was the one who was

24   reviewing as part of that process and so I

25   imagine I was able to start up in that

Page 460

```
 1                    LEVITT
 2  role fairly quickly.
 3       Q.      So a couple of weeks, a few
 4  weeks?
 5       A.      Maybe even earlier.
 6               I can't say it enough times, I
 7  don't know.
 8       Q.      Got it.
 9       A.      But it was quick.
10       Q.      Then you talked about a
11  percentage of your work at Treasury was in
12  the designation process when you were
13  actively working as the deputy assistant
14  secretary.
15               What percentage of your time as
16  deputy assistant secretary was spent on
17  designations?
18       A.      I have no idea and it probably
19  varied based on work flow.
20               Like I said, I had lots of
21  different responsibilities, lots of
22  management responsibilities, that were not
23  part of the --  what I would call the
24  substance of the work, you know, HR,
25  budget, all that kind of stuff.
```

```
 1                    LEVITT
 2              There was always more than one
 3    designation happening at a time, in
 4    different stages of the process, and you
 5    work on one for a long time and ultimately
 6    some don't go through.
 7              And then there is --  the
 8    Office of Intelligence and Analysis is
 9    part of the intelligence community, so our
10    office was also just producing finished
11    intelligence reports of all different
12    kinds all the time as well.
13              So we had a lot going on, I
14    wouldn't even know where to start, how to
15    answer that question.
16       Q.     10 percent of your work, 15
17    percent of your work?
18       A.      I'm sorry, you can guess every
19    number from one to a hundred, I still
20    won't be able to answer you if the answer
21    is I don't know.
22       Q.      I understand we can't quantify
23    it, but my sense is that while you were at
24    DAS or while you were at Treasury as a
25    DAS, you were extremely busy with many
```

Page 462

```
 1                    LEVITT
 2   tasks, one of which was being involved in
 3   the designation process from a review
 4   standpoint, not an authoring report
 5   standpoint, is that accurate?
 6       A.       Correct, reviewing it.
 7                Part of my role was shepherding
 8   it through the various processes of the
 9   inner agency once it got to a certain
10   level.
11                So I had to go to lots and lots
12   and lots of meetings, some of which were
13   not only about designations but would
14   include designations, so there were
15   certain times illicit finance meetings
16   more broadly and part of that would be,
17   okay, Treasury, where are we on certain
18   designations, that type of a thing.
19                So I had kind of multiple ways
20   that I was involved, but I was not the
21   drafter, you're right.
22       Q.       Got it.
23                So out of those tens of
24   charities that were designated with ties
25   to Al Qaeda and Hamas, among other
```

Page 463

1                    LEVITT

2    terrorist groups, WAMY was not amongst

3    those designated, correct?

4        A.        That's correct.

5        Q.        WAMY International or sometimes

6    referred to as WAMY USA, was not amongst

7    those designated, correct?

8        A.        Correct.

9        Q.        Would you agree that the

10   designation is a sanction in and of

11   itself, it is a sanction against the

12   entity sanctioned --  sorry, that was

13   confusing.

14                 Designation is a sanction

15   against the entity designated?

16                 MR. HAEFELE:  Objection to the

17   form.

18       A.        Yes, I think it is accurate to

19   say designations are a form of sanctions.

20                 There are many forms of

21   sanctions, but this has financial

22   consequences.

23       Q.        Would you agree that the

24   sanctions associated with designation give

25   the U.S. leverage over foreign nations

Page 464

```
 1                    LEVITT
 2   when it comes with respect to a charity
 3   that might be based in that foreign
 4   nation?
 5                MR. HAEFELE:  Objection to
 6   form.
 7      A.        So these types of actions are
 8   meant to prevent bad actors from being
 9   able to carry out their bad actions.
10                If the primary goal here is to
11   have leverage vis-a-vis the host country,
12   that alone would not be insufficiency --
13   I mean, it wouldn't even be in the
14   ballpark for taking such an action.
15                In fact, it's frequently the
16   opposite effect; that because of
17   sensitivities about diplomatic equities
18   and diplomatic relations, entities,
19   including entities that might have been
20   nominated for designation, might not
21   ultimately be designated.
22                Is it the case, however --  I'm
23   sorry.
24      Q.        Let me just be more specific.
25                Let's pull up 2021 again,
```

```
 1                    LEVITT
 2   please, page 13.
 3       A.       This is my report, the first
 4   report?
 5       Q.       No, no, this is the CFR Task
 6   Force Report.
 7       A.       Okay.
 8                MR. HAEFELE:  What page are you
 9   pulling up?
10                MR. GOETZ:  Page 13, please.
11       Q.       Just the first paragraph, I ask
12   that we blow that up, please.
13                Just in the interest of time, I
14   just ask that you read that to yourself
15   and tell me whether you agree with it or
16   disagree with it.
17                (Witness perusing document.)
18       A.       Okay, I've read it.
19       Q.       Do you agree or disagree with
20   that portion of the CFR report?
21       A.       It is not how I would describe
22   it.
23       Q.       So you disagree with it?
24                MR. HAEFELE:  Objection to
25   form.
```

Page 466

                    LEVITT

1

2      A.      I -- let me put my answer in

3   my own words.

4      Q.       All right.

5      A.       It is not how I would put it,

6   because this implies that one of the

7   purposes of the designation would be to

8   create leverage for them to do.

9            And I think the better way to

10  explain it is that the possibility that

11  the sanction might happen could be used in

12  diplomatic engagements before it happens,

13  as saying, look, here's the evidence, this

14  entity is within your borders, we can help

15  you with the evidentiary burden if you

16  need it, but if you don't take action, we

17  may have to do something like designate it

18  on our own.

19            That does create some leverage

20  sometimes; not always enough, not always,

21  and not always enough for there to be

22  action, especially if the entity is

23  closely tied to the government and its

24  rulers.

25            When a designation happens, it

Page 467

```
 1                     LEVITT
 2   is the case, especially if you're dealing
 3   with entities that have multiple branches
 4   and if only some of those branches have
 5   been designated, that that can create
 6   leverage, create willingness to have a
 7   more robust conversation, especially if
 8   there wasn't willingness to have one
 9   before.
10             And so my point here, for
11   example, to the Al Harmain example, where
12   there were a couple of branches designated
13   and a couple more and a couple more, I
14   think it was ultimately the fourth time
15   around, if memory serves, that all of them
16   were designated and ultimately the Saudis
17   joined in that designation, so there can
18   be leverage that can be created.
19             The idea in the diplomatic
20   roll-out is to leverage the potential for
21   this action, especially if its action
22   might also happen in the case of Al Qaeda
23   at the United Nations, to get that
24   leverage for either the host country's
25   action or joint action, but that's in
```

```
 1                    LEVITT
 2   advance of the sanction.
 3       Q.      Let me just stop you here.
 4               You would agree that this
 5   Council For Foreign Relations Task Force
 6   Report talks about the leverage resulting
 7   from the designation itself, correct,
 8   that's what this discusses?
 9       A.      They're saying that it can in
10   some cases create such leverage.
11       Q.      And that lengthy explanation
12   that you just gave me, that's based on
13   your experience at the Department of
14   Treasury, is that correct?
15               MR. HAEFELE:  Objection to
16   form.
17       A.      This is based on my experience
18   and understanding of how the system works.
19       Q.      While you were at the
20   Department of Treasury for 15 months doing
21   all the things that you were doing as
22   deputy assistant secretary, correct?
23       A.      Again, to be clear, not just
24   based on my 15 months there, but as
25   someone who follows combating of financing
```

Page 469

```
 1                LEVITT
 2  of transnational threats generally, but
 3  also based on my experience when I was in
 4  government, you know.
 5                This is meant to be a tool,
 6  it's not meant to be punishment, it's
 7  meant to achieve the goal of stopping
 8  illicit behavior.
 9                And so it is not the case that
10  you just want to do the designation no
11  matter what, you can use the possibility
12  of designation for other action.
13                Or, by the way, even if it
14  comes up in the course of the interagency
15  discussions that there is some other
16  action that can be taken --
17      Q.      Let's just not get too far
18  afield, I was just asking for your
19  experience just as a foundational
20  question.
21                Do you have any experience --
22  you've never worked at the State
23  Department, correct?
24      A.      I did work as a temporary
25  government employee for the State
```

Page 472

```
 1                  LEVITT
 2  assume it is.
 3      Q.      Yesterday in your testimony in
 4  response to Mr. Lewis's question, you were
 5  asked generally some questions about
 6  relying upon newspaper articles, do you
 7  recall those questions?
 8      A.      Correct.
 9      Q.      And you say as part of your
10  methodology you can do it, but you would
11  want to know something about the
12  publication, was it reliable, did it have
13  good vetting, and I am paraphrasing, and
14  you would also, if you could, want to know
15  something about the author of that
16  article, do you recall those answers
17  generally?
18              MR. HAEFELE:  Object to form.
19      A.      Generally, yes.
20      Q.      What do you know about the
21  person who wrote this article?
22      A.      We don't, but this seems to be
23  something we can rely on for the purposes
24  the Muslim World Publication is quoting a
25  Muslim World League event, someone at a
```

Page 535

```
 1                    LEVITT
 2      Q.       What are the reasons why the
 3  Treasury Department lifts designations
 4  when warranted?
 5      A.       Either because it is found that
 6  the court decides that it did not hit
 7  threshold or you could have a situation
 8  where designations are removed because the
 9  entity no longer exists or it is
10  established that the entity is no longer
11  engaged in the activity with which it was
12  accused of engaging in per the
13  designation.
14      Q.       Could it also be that Treasury
15  has decided that it erred in designating
16  the individual or entity in the first
17  place, regardless of whether a court finds
18  that it did?
19               MR. HAEFELE:  Objection to
20  form.
21      A.       I can't think of an instance
22  where Treasury came out and said that they
23  erred, I can't think of an instance where
24  that happened offhand.
25      Q.       You believe that the United
```

Page 536

```
 1              LEVITT
 2   States Treasury has never erred in
 3   designating an individual or entity?
 4              MR. HAEFELE:  Objection to
 5   form.
 6      A.     I don't know of a case where
 7   they have, but that's also not what I
 8   said.
 9              What I said, you asked me
10   originally if a Treasury error could be a
11   reason and I answered I can't think
12   offhand of a case where someone was
13   delisted and the reason was given Treasury
14   --  by Treasury saying Treasury made a
15   mistake, I can't think of such an example.
16      Q.     I'm just going to ask you
17   another question.
18              Could one reason be for the
19   lifting of a designation by the United
20   States Treasury Department that it erred
21   in making the designation in the first
22   instance?
23              MR. HAEFELE:  Objection to
24   form.
25      A.     I think it would be highly
```

Page 537

1              LEVITT
2    unlikely given the robust nature of that
3    process and I can't think of an instance
4    where that was the case.
5        Q.      So you believe it's not
6    possible that the reason for the lifting
7    of a designation is because Treasury
8    Department made an error?
9              MR. HAEFELE:  Objection to the
10   form.
11       A.      Yeah, you could state my
12   answers in a different way, but that's not
13   what I said.
14              I said I know of no such case
15   and I find it highly unlikely because of
16   the robust nature of the process.
17              In the world of hypotheticals,
18   you know, could pigs fly, could something
19   happen, I suppose in a hypothetical, but I
20   know of no such case.
21       Q.      And your knowledge comes from
22   the time that you were at the Department
23   of Treasury and any other public
24   information, is that correct?
25       A.      Yes, but not limited to my time

Page 538

1                    LEVITT
2   at Treasury.
3              If an entity is delisted, that
4   is a public event, public happening.
5       Q.    Does the U.S. Treasury
6   Department always give a reason for the
7   lifting of a designation?
8       A.    I don't know if the Treasury
9   Department gives a reason, I can't recall
10  a specific Treasury press statement as
11  such, I don't remember an example like
12  that.
13      Q.    So how would you know what the
14  reason is for the lifting of a designation
15  if the U.S. Treasury doesn't give a
16  reason?
17             MR. HAEFELE:   Form.
18      A.    Well, we'd need to look at
19  examples where it happened and to see, but
20  I'm just saying I don't recall an example
21  where the reason cited was Treasury made a
22  mistake.
23             This is an exceptionally robust
24  process which includes multiple levels of
25  reviewing, including litigation risk

Page 539

```
 1                    LEVITT
 2  review, which is taken well above the
 3  necessary legal threshold, not just for
 4  sufficiency.
 5            So it shouldn't surprise that
 6  at the end of the day the Treasury
 7  designations that ultimately do go forward
 8  and many more that are promoted or
 9  suggested don't go forward, that those are
10  very robust.
11      Q.        Maybe I can just ask you a more
12  simple question and I read the testimony
13  of yours in prior cases, Dr. Levitt, and I
14  know you have the ability to answer
15  straightforwardly.
16            I do think it would be helpful
17  to the court in this case as we're
18  presenting your testimony if we could try
19  to communicate in a straightforward
20  manner.
21            On your report, on page 17,
22  when you wrote "designated entities can
23  and do appeal their designations and the
24  U.S. Department" --  let me start again.
25            On your report on page 17, you
```

Page 540

```
 1                    LEVITT
 2   wrote, "Designated entities can and do
 3   appeal their designations and the U.S.
 4   Treasury Department has a record of
 5   lifting designations when warranted."
 6              What did you mean by that
 7   statement?
 8      A.     I am not sure I understand the
 9   question, I think it is very
10   straightforward.
11              An entity that is designated
12   can appeal its designation, like, this is
13   not a final issue, you can sue, you can
14   appeal the designation, and designations
15   can be lifted.
16              These do not have to be
17   permanent, there is a process.
18      Q.     And you say "the U.S. Treasury
19   Department has a record of lifting
20   designations when warranted."
21              What does that mean, "when
22   warranted"?
23              MR. HAEFELE:  Objection.
24      A.     When the determination is made,
25   it would typically be by the court because
```

Page 541

1                     LEVITT
2    that's the nature of how the process goes,
3    that the designation should not stand.
4              All I was trying to say here is
5    that there is a process, I didn't mean to
6    kind of comment on the process.
7       Q.      When did you become an expert
8    in the designation process by the U.S.
9    Treasury?
10             MR. HAEFELE:  Objection.
11      A.      I became familiar with it long
12   before my time at Treasury.
13             In fact, I was spotted for the
14   job at Treasury based on work I had done
15   on finance --  illicit finance and
16   combating illicit finance.
17             I think it's safe to say that
18   kind of more substantive expertise came
19   when I was someone who was involved in the
20   process and got to see how it worked
21   firsthand.
22      Q.      So you became an expert on the
23   U.S. Treasury Department's designation
24   process beginning sometime in late 2005?
25             MR. HAEFELE:  Objection, form.

Page 542

1                    LEVITT
2       A.        Again, I had some understanding
3    and expertise in this before then, but
4    certainly that expertise was solidified
5    once I had the opportunity to kind of be
6    inside the process.
7       Q.        Let me ask it this way.
8                 When did you first become an
9    expert?
10                MR. HAEFELE:  Objection, form.
11      Q.        In the U.S. Treasury
12   designation process?
13      A.        I don't know how to answer that
14   because, you know, I don't go around
15   referring to myself as an expert, I don't
16   remember when people first started
17   referring to me as an expert in these
18   things.
19                But I had developed knowledge
20   and expertise in this even prior to
21   Treasury, I had written articles about
22   these issues, but certainly became far
23   more expert in these issues when I was
24   selected to join the Treasury Department
25   in 2005.

Page 543

1              LEVITT
2       Q.      When was the first time that
3   you wrote an article about the U.S.
4   Treasury designation process?
5       A.      Oh, I don't recall offhand.
6       Q.      Was it after 9/11?
7       A.      It would have to have been,
8   because in 9/11 I was with the F.B.I.
9   except for short stuff beforehand.
10      Q.      Were you involved in the U.S.
11  Treasury Department's designation process
12  when you were at the F.B.I.?
13      A.      No, not as such.
14              There were small number of
15  instances where as part of an interagency
16  process F.B.I. would engage with Treasury
17  on issues and it's possible that some of
18  those things were part of --  I wouldn't
19  have known it at the time --  part of
20  Treasury's, meaning F.B.I.'s, part of
21  their designation process and might have
22  been in support of something else.
23              I had very, very limited
24  contact with Treasury when I was with the
25  F.B.I. and, to my knowledge, did not work

Page 544

```
 1                    LEVITT
 2   on designation issues.
 3       Q.      I think you testified earlier
 4   in your testimony that you're not aware of
 5   any document that sets forth the
 6   designation process, that this is
 7   something that you learned about on the
 8   job at Treasury and maybe in writing some
 9   articles beforehand, is that correct?
10       A.      So what I was asked about at
11   the time was if there is an official
12   document, like a Treasury document, that
13   lays this out, and to my knowledge there
14   is not.
15       Q.      Is it fair to say you don't
16   know what the designation process was that
17   was used by the U.S. government in the
18   months following September 11, 2001?
19                 MR. HAEFELE:  Objection to
20   form.
21       A.      I would say I have insight into
22   that.
23                 I was not there at the time and
24   that makes a difference.
25       Q.      When you say you had insight
```

Page 545

```
 1                    LEVITT
 2   into that, what do you mean?
 3        A.      Well, I have read about it, I
 4   have learned about it.
 5                When you go and work at the
 6   Treasury, you hear and learn about kind of
 7   the history of the tools you're using, you
 8   know.
 9                I arrived at the Treasury
10   Department in 2005, this wasn't
11   terribly --  you know, it was years, but
12   these tools were still relatively new and
13   the executive order was basically the same
14   executive order, so you learn and you hear
15   about the past and how things were done.
16                So I would say I had some
17   understanding of it, but I was not there,
18   part of the actual process at the time, I
19   was not there.
20        Q.      Can you compare and contrast
21   the process that was used by the U.S.
22   government in November of 2001 compared to
23   what it was when you were at Department of
24   Treasury beginning in 2005?
25        A.      My understanding is that in the
```

```
 1                    LEVITT
 2    weeks after 9/11, and I can understand
 3    this from my own experience being at the
 4    F.B.I. at that time, everything was a
 5    million miles a minute, everybody was
 6    afraid that there were other plots, very,
 7    very tense time, things were moving very,
 8    very, very fast.
 9               Fast forward years later to
10    when I was at Treasury, there were very
11    clear, slow, deliberate systems in place
12    for how to go about a designation, for the
13    interagency process, for concurrence on
14    the information, on the policy, et cetera,
15    all of that, as we've discussed earlier.
16               Whereas right after 9/11, it
17    was right after 9/11, and it was a much
18    more kind of frenetic and, to be honest,
19    kind of a scary time.
20        Q.        When you say --  I think I was
21    asking you about the process; do you know
22    precisely what the process used by the
23    U.S. government to make designations in
24    November 2001 was?
25        A.        So it was the same executive
```

Page 547

```
 1                    LEVITT
 2  order, but I don't know, I can't speak
 3  to -- in the same kind of detail I can
 4  speak to how it was later.
 5              You know, what the order of the
 6  meetings were, at what point did the
 7  lawyers come in, that I don't know.
 8      Q.      Do you know who Jamal Fadl is?
 9      A.      Not personally, I know of him.
10      Q.      Have you ever met him?
11      A.      Sorry?
12      Q.      Have you ever met him?
13      A.      No.
14      Q.      Have you ever seen him speak or
15  testify in public?
16      A.      No.
17      Q.      Have you ever seen audio or
18  visual recordings of him?
19      A.      Definitely not video; I don't
20  recall if I've heard audio.
21              I've read a lot of transcripts
22  from his trial, not recently, years ago.
23      Q.      Is it hard to evaluate
24  credibility from a transcript?
25              MR. HAEFELE:  Object to form.
```

Page 548

1                    LEVITT
2      A.        Sometimes.
3                 If you have the patience to
4   kind of read carefully and read slowly and
5   if you don't only rely on the transcript
6   but on talking to others and reading other
7   material.
8                 But a court transcript,
9   especially in a criminal case, can be very
10  revealing.
11     Q.        Let me ask this question; when
12  Jamal Fadl was the sole source for
13  information, how do you evaluate whether
14  he is telling the truth?
15                MR. HAEFELE:   Objection to
16  form.
17     A.        Part of the answer is that this
18  is not  -- this is a court hearing, this
19  is not, you know, him speaking to the
20  media, this is the product of F.B.I.
21  interviews.
22                When the evidence is put
23  forward, that has some element of U.S.
24  government vetting to it and so that is
25  given more weight, say, than someone just

Page 549

```
 1                    LEVITT
 2   speaking publicly at some event or to a
 3   newspaper or something.
 4              By virtue of it being part of a
 5   trial, the trial coming to a conclusion,
 6   you can give that some more weight.
 7      Q.      And you mentioned an F.B.I.
 8   interview, so let me ask this way.
 9              If Jamal Fadl gives an F.B.I.
10   interview and you read the transcript of
11   that interview, how do you evaluate
12   whether Jamal Fadl is telling the F.B.I.
13   the truth during the interview?
14              MR. HAEFELE:  Objection to
15   form.
16      A.      So the F.B.I. has a variety of
17   investigative tools, they can use this
18   information as lead information, working
19   on their own, or with other agencies,
20   sometimes the country's agencies try and
21   verify that information and if they then
22   choose to move forward with it, you can
23   have some level of confidence that this is
24   accurate or if it is within the world of
25   knowledge that they know, that the F.B.I.
```

Page 550

1                    LEVITT

2    -- that the prosecutors at the Department

3    of Justice are not going forward with

4    information they believe to be untrue.

5        Q.      My apologies, I understand how

6    the F.B.I. might evaluate it, which was

7    your answer, but I was asking a slightly

8    different question, and so my apologies if

9    I wasn't clear, so let me try again.

10                When Jamal Fadl gives an

11   interview to the F.B.I. and you review as

12   a social scientist that transcript, how do

13   you evaluate whether Jamal Fadl is telling

14   the truth when he is the sole source of

15   information?

16                MR. HAEFELE:  Objection to

17   form.

18       A.      The F.B.I. interview isn't

19   taken in isolation, the F.B.I. interview

20   goes along with the trial, transcript,

21   conviction, and in totality that will

22   gives it more credibility.

23       Q.      You've made reference to your

24   methodology as the gold standard.

25                What was the methodology used

Page 551

1                    LEVITT

2    in connection with your two expert reports

3    in this case?

4        A.        To be clear, I have not

5    referred to myself as the gold standard,

6    that's others referring to me.

7                   I'm not so pompous as to, you

8    know, so let's be clear.

9                   My methodology here was to

10   review material, this is historical

11   material, and put together a report based

12   on reliable material that addresses the

13   issues at hand.

14                  So looking at things like the

15   9/11 Commission Report, the Muslim World

16   League's own documents, we have the

17   Treasury designations, of course, and

18   explaining a variety of issues, some of

19   them more general.

20                  The larger issue of

21   vulnerabilities, charities of all kinds

22   face to abuse and the types of abuse that

23   can be involved, you know, proactively

24   setting up a charity to be a front, which

25   is a form of abuse, infiltration of

Page 552

```
 1                    LEVITT
 2  charities is another form of abuse.
 3             And to put that information
 4  together using my expertise, having worked
 5  on these issues for years, to try and
 6  present it in a way that will be readily
 7  available to the parties that will be
 8  using the report.
 9      Q.      In evaluating a secondary
10  source, do you evaluate the materials on
11  which the secondary source relies?
12      A.      When possible you can.
13      Q.      Did you do that in connection
14  with this case?
15      A.      You would need to point to a
16  particular incidence of source or
17  something for me to answer that.
18             I did not go and try to
19  independently verify everything, say, in
20  the 9/11 Commission Report or Treasury
21  designation, so that can't be.
22             Certain documents, certain
23  sources like those are inherently more
24  valuable and I used them.
25      Q.      When do you doubt the contents
```

Page 553

```
                               LEVITT
 1
 2     of a newspaper article, say a New York
 3     Times article or Wall Street Journal
 4     article?
 5                    MR. HAEFELE:  Objection to
 6     form.
 7         A.         Sometimes you have to know
 8     enough about the subject matter to doubt
 9     it.
10                    But as I explained earlier, it
11     might have been today or it might have
12     been yesterday afternoon, for the purposes
13     of a report like this, there are certain
14     things for which it's really rather safe
15     to use a media source.
16                    You know, that an event took
17     place on a certain day, that an individual
18     was in a certain place at a certain time,
19     that an individual made a certain
20     statement, certain basic factual
21     information, that you just want to provide
22     a source to your reader that they can
23     check to demonstrate that there is
24     recorded sourcing for that fact.
25         Q.         Did you ever doubt the contents
```

Page 554

```
 1                    LEVITT
 2   of a Wall Street Journal or New York Times
 3   article?
 4                  MR. HAEFELE:  Object to the
 5   form.
 6      A.        I'm sure, I'm sure I have.
 7                  Again, depends on the context,
 8   depends on the author, depends on how well
 9   the author does things like quoting other
10   people who can verify it, depending on
11   whether or not others will verify the
12   issue at hand.
13                  There are other ways; you can
14   go and interview the author, interview
15   other people about it to give you greater
16   confidence.
17      Q.        I know, Dr. Levitt, you have
18   been careful with a lot of your language
19   today and yesterday and throughout your
20   reports and so I'm going to try to
21   understand that care a little bit.
22                  Maybe we can start here; do you
23   agree that a person in support of
24   terrorism doesn't necessarily mean that
25   the organization that employs that person
```

Page 572

```
1                    LEVITT
2      A.        I don't think so, no.
3      Q.        Has a court ever concluded that
4   you were unqualified to offer an opinion?
5      A.        No.
6      Q.        Has a court ever taken issue
7   with the methodology that you used in
8   offering an opinion?
9      A.        No.
10               MR. COTTREAU:  If we can go off
11   the record, I think I'm through, but let
12   me confirm that.
13               THE VIDEO TECHNICIAN: Time is
14   5:57, we're off the record.
15               (Recess taken.)
16               THE VIDEO TECHNICIAN: We are on
17   the record, the time is 6 p.m..
18               Please continue.
19               MR. COTTREAU:  Dr. Levitt, I
20   have nothing more, thank you very much,
21   and the defendants collectively reserve
22   the balance of any time they have to be
23   added in the event that they have
24   reexamination for you after plaintiffs'
25   counsel has a chance to examine you.
```