# EXHIBIT 21

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Stephen A. Cozen, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA Electronic Mail**

October 12, 2021

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)
               Yasin al Kadi

Dear Peter:

      We write in response to your September 14, 2021 letter regarding follow-up questions you had about the PECs' expert Victor Comras' additional considered material that may have been indicated in his work product notes. The notes themselves are privileged, working drafts of his report, and are therefore not discoverable. Material he may have relied on for an opinion in his reports is discoverable.

 In several instances however, Defense counsel asked Mr. Comras for his opinion on matters that were not expressed in his report. Aside from relevancy objections, Mr. Comras, indeed any expert, can answer those questions to the best of his ability but the federal rules do not require the production of materials untethered to expressed opinions (see Fed. R. Civ. P. 26) and he was not then required to perform a new investigation to support the new opinions Defense counsel elicited.

Plaintiffs have already provided the expert discovery materials required by the federal rules. We have already provided you with two Comras reports that are heavily footnoted with reliance material (248 footnotes to be exact), identified volumes of materials considered by Mr. Comras in forming his opinions, produced Mr. Comras for a 9-hour deposition, and provided the August 30, 2021 letter to respond to your questions. During our last meet & confer, Plaintiffs agreed to discuss with Mr. Comras whether his notes reflected additional material considered in forming his opinions that may not have already been identified.

**Below is a point by point response to your specific requests:**

      **Kadi's association with members of the Muslim Brotherhood**

1

The Muslim Brotherhood is not central to Mr. Comras' opinion on Kadi's support for al Qaeda, but provides historical background for his support of jihad and Islamic terror groups in general. The full sentence Mr. Salerno referenced reads "Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau." That opinion is one that Mr. Comras has held for many years, and one he reached from disparate sources used for earlier work. He made a similar observation in his book, Flawed Diplomacy (dated 2010), page 98. This was based on Kadi's time in Chicago and Pakistan, his reported involvement with the Makhtab in Pakistan and associations with Julaidan, Abdullah Azzam, Shiekh Abdul Majeed al-Zindani and others known to have ties to the Muslim Brotherhood. In Chicago Kadi also befriended Ahmad Zaki Hammad, a noted Muslim Brotherhood scholar who later served as a substantial financial link between Kadi and Hamas. (*see Boim v Quranic Literacy Institute*, 340 F. Supp. 2d 885 (N.D. Ill. 2004)). These sources indicate, for example, that Kadi was a substantial contributor to Mohammed Saleh, the Quaranic Literacy Institute and the Revival of Islamic Heritage Society. (*Boim* Case). Another example is his close association with Soliman Biheiri, who federal prosecutors described as "the U.S. banker for the Muslim Brotherhood. (*See* Simpson, Glen, The U.S. Provides Details Of Terror-Financing Web, WSJ, 9/15/2003).

There are also several references to Kadi's involvement and investments with PTECH Inc., an American Software company, several of whose directors had close ties with the Muslim Brotherhood. These references included an FBI press release related to the unsealed indictment, originally returned on March 1, 2007, charging PTECH executives Buford George Peterson and Oussama Abdul Ziade, both believed to be associated with the Muslim brotherhood, with concealing Kadi's investment in PTECH. According to the indictment, Kadi was a concealed shareholder through Sarmany Limited, a company Kadi owned and controlled. Kadi had invested approximately $10 million dollars in PTECH. Other material shows Kadi's links to BMI and the SAAR foundation, both with close ties to the Muslim Brotherhood. The leadership of the SAAR foundation was largely the same as that of the International Institute of Islamic Thought (IIIT), an important part of the U.S. Muslim Brotherhood.

Another example was Kadi's close association with BMI, SAAR and Soliman Biheiri, again, described as "the U.S. banker for the Muslim Brotherhood." (*See* Simpson, Glen, The U.S. Provides Details Of Terror-Financing Web, WSJ,9/15/2003). In a prepared statement before the Senate Banking Committee on Counter-terror Initiatives in the Terror Finance Program, dated October 22, 2003, Richard A. Clarke, Former National Counterterrorism Coordinator, National Security Council stated: "Yasin al Qadi is allegedly the financier behind several U.S. organizations which have been tied to terrorist support. Qadi has been identified in court papers as the banker behind a convoluted real estate transaction in Illinois where proceeds where siphoned off to Hamas operatives. Qadi has also been reported to be a lead investor in BMI, a New Jersey-based Islamic investment bank catering to ranking members of the Muslim Brotherhood, including Hamas and al Qaeda backers." The leadership of the SAAR foundation was largely the same as that of the International Institute of Islamic Thought (IIIT), an important part of the U.S. Muslim Brotherhood. (Steven Merley, "The Muslim Brotherhood in the United States," Research Monographs on the Muslim World, Paper 3" Hudson Institute, April 2009).

Mr. Comras found similar references in his files on hearings on "The Muslim Brotherhood's Global Threat," before the Subcommittee on National Security of the House of Representatives Committee on Oversight and Government Reform, July 11, 2018, Serial No. 115–90: Included in this material is a submission by Dr M Zuhdi Jasser, President of American Islamic Forum for Democracy, describing Kadi's relations with Soliman Biheiri, who ran BMI, who federal prosecutors said *"came here as the Muslim Brotherhood's financial toehold in the U.S.* According to federal prosecutors, other shareholders of BMI included top HAMAS leader Mousa Abu Marzook and Tarek Swaidan, a Kuwaiti Muslim Brotherhood leader.

While these documents may have helped inform the background for his opinion, he did consider them in forming the opinions expressed in his Expert Report.

**Kadi espoused views of the Muslim Brotherhood**

Mr. Comras made this general observation in partial response to Mr. Salerno's deposition questionings concerning Mr. Comras' assertion that "Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood." The Oxford Dictionary defines "espouse" as adopting or supporting a cause, belief, or way of life. In this regard, he referenced the work Kadi carried out through his charities, establishment of mosques and school based on Salafist and Wahhabi principles. He also indicated he would have to refer to his notes for specific examples. He found some of the examples below.

**Sharia Compliant Banking:** Yasin Kadi devoted much of his professional career to furthering Sharia compliant banking, a key Muslim Brotherhood objective. (Kadi Deposition) The Muslim Brotherhood states on its website (dated 1/04/2003) that it is a Salafi movement. The Muslim Brotherhood's English-language website describes its principles as including the introduction of the Islamic Sharia as "the basis for controlling the affairs of state and society" and second, working to unify "Islamic countries and states, mainly among the Arab states, and liberate them from foreign imperialism." Hasan al-Banna, considered the founder of the Muslim Brotherhood, placed particular importance on reforming the banking system to comply with Sharia law. The Muslim Brotherhood embraced Sharia banking as a primary vehicle for advancing their vision of political Islam. (*See* Terrell, Ronald, Islamic Banking: Financing Terrorism or Meeting Economic Demand? Navy Post Graduate School Paper, December 2007)

**Assisting Muslim Brotherhood organizations**: Kadi was also very active, according to OFAC and court filings, in assisting and providing support to several organizations tied to the Muslim Brotherhood including the Revival of Islamic Heritage Society, Hamas, and Makhtab al Khidamat (*Kadi v Geithner*). He has several files indicating that Kadi's Muwafaq Charity also worked very closely with Sudan's National Islamic Front's Muslim Brotherhood leadership in carrying out its proselytizing activities and its promotion of its radical, anti-Western version of Islam. "[S]preading the Islamic Agenda are Sudanese Islamic Non-Governmental Organizations which include …Muwafaq…." (Wikileaks downloaded cable, Sudanese Mischief-making, 94 KHARTOUM 6366, Dec 14, 1994).

**Salafist Education**   Kadi and his Muwafaq Foundation frequently cite their assistance and funding for Islamic schools, centers, and mosques. Several of these institutions, such as Al Emam University in Sanaa, have served to proselytize toward Wahhabi and Salafist beliefs.

**Kadi's use of Shell or Front Companies to funnel money to al Qaeda**

With regard to shell companies, Mr. Salerno appears to refer to the statement in the Comras report that "Kadi also interwove a series of distinct business ventures, shell companies, and investments with the activities of his Muwafaq charities. He would use complex transactions through multiple banks and shell companies to engage with local commerce and fund Muwafaq's activities."  Contrary to Mr. Salerno's assertion in his letter, the report did not opine that "Mr. Kadi routinely conducted transactions through Shell Companies."

"Shell Company" is a term which has no precise definition. It is used in the report in a generic and descriptive sense. A shell company is generally considered as a company having no significant assets, ongoing business activities, or employees.  It is also often used synonymously with "shelf company," or "front company," whose definitions are slightly more precise.  Mr. Comras advised that he used the term "shell companies" in this generic sense as including both shelf companies and front companies. Making any distinctions between these terms would have been irrelevant as the issue being addressed is Kadi's use or abuse of his companies to disguise or obscure his involvement in the financial activity actually being conducted.

Mr. Comras' files indicate that Yassin Kadi owned or controlled, directly or indirectly, several dozen different companies. Many of these companies were registered in the Channel Islands, which required nothing more than a registration, director, and nameplate (Mark Halstead, "Shell Corporations: Everything You Need to Know," Red Flag Alert). Others were established in Saudi Arabia, Pakistan, Turkey, Sudan, Albania, Bosnia, Delaware, United States and elsewhere. They included such company names as Caravan Development Groups Ltd ("Karavan"), Sarmay Ltd, Loxhall Limited, Melidan Limited, NMCC Limited, Twenty First Century Media Limited, Abrar Development Limited, Arkday Limited, Cavallo Limited, and Nash Development Limited. Several of these companies, such as Sarmay (Sarmany) mentioned above and Loxhall, cited in the report, were used to obscure Kadi's holdings in companies allegedly engaged in controversial activities. In Albania, they included "Medicare," "Loxhall," "Karavan," "Alintid Beton," "Albanian Snacks," "Loks Holl," "Cavallo," "Waleed for general Trade," "Emane," and "Kambel." According to an article by Eduart Bala, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," in MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, December 2013, discussed during the deposition, they were closed not only because they were connected with Kadi and al-Qaeda, but also because they were fictitious companies with limited commercial activity. (This article was cited in the report for other purposes in footnote 108 on page 29, and listed in Annex 2 as Military Review)

### Muwafaq continued activities in Pakistan until 2003

The Newcomb Memorandum.  Mr. Comras searched his files and could not find any information showing that Muwafaq Pakistan continued in operation as such after the 2001 terror attacks. The

reference to 2003 may have been a typo.  The extensive 2800 page OFAC submission referred to in the *Kadi v Geithner* case indicates that Muwafaq "continued to operate until mid–2001 under the umbrella of Makhtab al-Khidamat.

> "IIRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time. The source was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan." 92 (PEC-KSA 2133-2134).

**The IIRO and WML**

See an article by Abdul Wahab Bashir, Arab News Staff lauding the IIRO in Pakistan, titled "Islamic charity pushes to help Afghan people," dated 2001-01-10. *See also* Observatoire de L'Action Humanitaire, "International Islamic Relief Organisation of Saudi Arabia (al-Ighata al-Islamiya al-'alamiya) – History" at http://www.observatoire-humanitaire.org/en/index.php?page=fiche-ong.php&part=historique&chapitre=337&id=81:

> "From 1982 on, Pakistan: the IIRO helps Afghans who fled from their country after the invasion of the Red Army. Among them are mujaheddin who fight against the Soviet occupying troops and call for a holy war (*jihad*) against the communist regime set up by Moscow in Kabul. Based in Peshawar, the IIRO's operations are directed by Talaat Fouad Abdul Qasim, a terrorist of the Egyptian Jihad (*Jama'at al-Islamiyya*) who was sentenced to death in abstentia in his country of origin, and who will eventually be captured the Americans in Croatia and executed in Cairo on 1998."

While Mr. Comras has extensive notes and files dealing with the IIRO and WML, he did not refer to these files except as they related directly to the activities of Yasin Kadi and Wael Julaidan - the focus of his own expert report. He was aware that the IIRO and WML are the subject of other separate expert reports filed between the relevant parties.  This may explain the disconnect that occurred in at his deposition with responses to inquiries concerning these organizations.

Mr. Comras did make reference in his expert report to the UNSC Al Qaeda and Taliban Monitoring Group Reports filed in 2002 and 2003. He also referenced the 1996 CIA report on the abuse of charities.

The Monitoring Group report publicly issued December 2, 2003 as UN Document S/2003/1070, paragraphs 40-44 dealt specifically with the IIRO.  It indicated, in part that

> "Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam and Nairobi. A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in

5

> Afghanistan prior to 11 September 2001. After that date, Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan".

The Monitoring Group report also noted that:

> "The [IIRO] charity also works in close association with the Muslim World League. Many prominent Middle East figures and financiers have associated themselves with this mainstream Islamic charity."

Other reports in his files included

1. *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, docket Des-6-99, 2 November 1999.
2. CIA report can be found on the Internet at http://www.centreforsecuritypolicy.org/cia96charities.pdf.
3. Associated Press, "Pakistan deporting 89 Arab aid workers", 6 October 2001 Matthew A. Levitt, United States Senate Judiciary Committee, Subcommittee on Terrorism, 10 September 2003.
4. Matthew Levitt, "The Political Economy of Middle East Terrorism," Middle East Review of International Affairs, Volume 6, Issue 4, (December 2002)
5. Zachary Abusa, "Tentacles of terror: Al Qaeda's Southeast Asian network", in *Contemporary Southeast Asia*, December 2002, pp. 427-465.
6. The Testimony of Matthew Epstein with Evan Kohlmann Before the House Committee on Financial Services Subcommittee on Oversight on "Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts," March 11, 2003.

According to the Epstein and Kohlmann testimony before the House Committee on Financial Services Subcommittee on Oversight on "Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts," March 11, 2003:

> The supposedly "humanitarian" facade of IIRO hides a covert agenda of the group. Even since the early days of the Soviet-Afghan jihad, IIRO enabled Muslim World League to provide Arab-Afghan militants with a covert international military and financial infrastructure. U.S. counterterrorism investigators have discovered a letter under the MWL/IIRO letterhead among numerous Al-Qaida documents recovered in Bosnia-Herzegovina. The letter dating from the late 1980s, summarized a meeting held between Al-Qaida leaders and representatives of Muslim charitable organizations in which the attendees ultimately agreed to launch "attacks" from MWL offices in Pakistan.

In addition, Mr. Comras' files contained other material that may have directly or indirectly served to inform his opinions related to the IIRO and WML. These files were gathered in the 2002-2010 period in relations to his work on the al Qaeda and Taliban Sanctions Monitoring Group and/or his activities as a writer, speaker, and consultant on terrorism financing:

Abusa, Zachary, "Tentacles of terror: Al Qaeda's Southeast Asian network", in *Contemporary Southeast Asia*, December 2002, pp. 427-465.

Associated Press, "Pakistan deporting 89 Arab aid workers", 6 October 2001

BLA "9/11 Outline on International Islamic Relief Organization," (an HTM file downloaded on 8/5/2003 not otherwise identified in my files)

Brisard, Jean-Charles, Roots and Trends of Saudi Terrorism Financing, Dec 19, 2002

1996 CIA report on Abuse of Charities, as reported and replicated by the Center for Security Policy

CRS Report For Congress on The Role of Charities and NGO's in the Financing of Terrorist Activities, presented to the Senate Subcommittee on International Trade and Finance, Aug. 1, 2002

CRS Report: Saudi Arabia: Terrorist Financing Issues, October 4, 2004 –June 11, 2008

Dohnanyi, Johannes, Schmutzige Geshafte und Heiliger Krieg, (2002)  (English transaction excerpts by Kevin Coogan)

Ehrenfeld, Rachel, "Dollars of Terror," Front Page Magazine, April 18, 2005

Emerson, Steven, Testimony,  "The Effectiveness of U.S. Anti-Terrorism Financing Efforts, House Subcommittee on Oversight and Investigations hearings, March 11, 2003

Gold, Dore, "Saudi  Support For International Terrorism: Background and Current Developments, Testimony before Senate Committee on Government Affairs, July 31. 2003

Gunaratna, Rohan, Inside Al Qaeda, 2002

Johnson, Christopher, "Terrorism as Mass Tort: Responsibility for 9/11, Saudi American Forum Essay, January 14, 2003

Kupchinsky, Roman, "Bankrolling Terror: Special RFE/RL Report on Terrorism Financing, November 21, 2002

Levitt, Matthew, "The Political Economy of Middle East Terrorism," Middle East Review of International Affairs, Vol 6, issue 4, December 2002

Menelik, Girma Yohannes, "The Financial Sources of Islamic Terrorists" 2005 Research Paper

Rensselaer, Lee, "Terrorist Financing: The U.S. and International Response, CRS

December 6, 2002

Ruling in *Dept of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, docket Des-6-99, 2 November 1999.

Treasury Dept. Press Release, "Treasury Designated Director, Branches of Charity Bankrolling Al Qaeda Network," Aug. 3, 2006.

**Time frame when Al Qaeda became a terrorist organization**

According to the U.S. National Intelligence Center, the first al Qaeda terrorist attack directed at the United States took place in Aden in December 29, 1992, with the planting of bombs at two hotels housing U.S. Marines who were supporting U.S. military operations in Somalia. (*see also* Comras book, Flawed Diplomacy, page 44)." Bin Ladin was first put on the State Department's terrorism related TIPOFF watchlist in 1993. Al Qaeda was formally designated as a Foreign Terrorist Organization by the U.S. Secretary of State on October 8, 1999 (U.S. Government public records) but had already been a known Islamic terrorist organization.

Very truly yours,

| | |
|---|---|
| KREINDLER & KREINDLER LLP | MOTLEY RICE LLC |
| | |
| By: /s/ Andrew J. Maloney | By:  /s/ Robert T. Haefele |
| ANDREW J. MALONEY | ROBERT T. HAEFELE |
| KREINDLER & KREINDLER LLP | MOTLEY RICE LLC |
| 750 Third Avenue | 28 Bridgeside Boulevard |
| New York, New York 10017 | Mount Pleasant, SC 29465 |
| Tel.: 212-687-8181 | Tel.: (843) 216-9184 |
| Email: amaloney@kreindler.com | Email: rhaefele@motleyrice.com |
| For the Plaintiffs' Exec. Committees | For the Plaintiffs' Exec. Committees |

COZEN O'CONNOR

By:  /s/ Sean P. Carter
SEAN P. CARTER
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
For the Plaintiffs' Exec. Committees