UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

*In re* Terrorist Attacks on September 11, 2001

03 MDL 1570 (GBD) (SN)

ECF Case

*This document relates to:*

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No. 02 Civ. 6977*
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 03 Civ. 9849*
*Federal Insurance Co., et al. v. Al Qaida, et al., No. 03 Civ. 6978*
*Continental Casualty Co., et al. v. Al Qaeda, et al., No. 04 Civ. 5970*
*Euro Brokers Inc., et al., v. Al Baraka, et al., No. 04 Civ. 7279*
*Estate of John P. O'Neill et. al., v. Al Baraka et. al., No. 04 Civ. 1923*

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT YASSIN KADI'S MOTION TO EXCLUDE THE TESTIMONY OF VICTOR COMRAS**

**TABLE OF CONTENTS**

Introduction....1

I. Plaintiffs Fail to Address Egregious Defects in Comras's Reports....2

A. Comras's Intellectual Dishonesty....2

B. Comras's Cherry-Picking....3

C. Comras's Illogical and Unsupported Conclusions....4

D. Comras's Inability to Explain How He Calculated Unaccounted-for Funds....4

II. Plaintiffs' Failed Attempts to Justify Other Comras Flaws....5

A. Plaintiffs Argue Evidentiary Issues and Falsely Accuse Mr. Kadi of Doing So....5

B. Plaintiffs' Embellishments....6

C. The Significance of FATF Red Flags....8

D Plaintiffs' Other Attempts to Address Comras's Dishonesty....8

E. Hearsay, Guilt by Association, and State-Of-Mind Evidence....9

Conclusion....10

**TABLE OF AUTHORITIES**

**Page**

9/11 Commission Staff Report, *Monograph on Terrorist Financing* ..........................................10

Introduction

Plaintiffs' opposition to Yassin Kadi's Motion to Exclude the Testimony of Victor Comras (Opp. at 51-70)[1] fails to respond to key points in Mr. Kadi's argument, including points relating to intellectual dishonesty that alone justify the exclusion of Comras's entire testimony. (*See* bellwether *Daubert* decision (ECF 9060) at 32). A major portion of Plaintiffs' opposition is simply a repetition of Comras's reports, sometimes word-for-word and sometimes with embellishments. (Opp. at 55-62, 64, 66-69). Thus Plaintiffs argue their version of the facts, and the alleged absence of contrary evidence in a manner suited to opposition to a motion to dismiss, not to a *Daubert* motion. Plaintiffs' extensive discussion of the alleged merits of their claims is perhaps intended to obscure their inability to rebut the serious flaws that riddle Comras's reports and deposition testimony.

Plaintiffs mischaracterize many of Mr. Kadi's arguments, and then attempt to rebut these straw men. They restate at length Comras's qualifications (Opp. at 52-55), ignoring the limited nature of Mr. Kadi's comment about them. (Mem. at 3).[2] Even assuming that Comras has qualifications on the subject of terrorist financing, those qualifications mean nothing if not properly deployed. Comras, who apparently has never served before as an expert witness, evidenced a gross misunderstanding of his proper role. As Mr. Kadi discussed in his moving memorandum, Comras consistently rejected, without examination, evidence that undermined the thesis he had long embraced. (*See infra* at 3-4).

---

[1] "Opp." refers to ECF 9344, "Plaintiffs' Opposition to Defendants' Joint Motion to Exclude the Expert Testimony of Evan Kohlmann and Matthew Levitt [ECF No. 9246], and to Defendant Yassin Abdullah Kadi's Motion to Exclude the Testimony of Victor Comras [ECF No. 9248]." (Brackets in original).

[2] "Mem." refers to Mr. Kadi's "Memorandum of Law in Support of [his] Motion to Exclude the Testimony of Victor Comras." (ECF 9249, filed July 31, 2023).

In sum, contrary to Plaintiffs' assertion that Defendants have failed to adhere to the guidance of the Court's bellwether opinion (Opp. at 1), it is Plaintiffs who have disregarded the Court's directives, as well as those of *Daubert* and its progeny.

I. Plaintiffs Fail to Address Egregious Defects in Comras's Reports

A. Comras's Intellectual Dishonesty

Mr. Kadi cited specific examples of Comras eliding key information from quotations and other cited sources, and violating other rules of scholarship such as the requirement that verbatim quotes have quotation marks. (Mem. at 21-22).[3] Comras dropped the word "believes" from an otherwise verbatim quote, without quotation marks and without indication of an elision, from a report of U.S. Attorney Patrick Fitzgerald's statements about the reliability of a witness, and omitted other qualifying information that Fitzgerald offered regarding that witness, claiming that he "did not find it to be useful." (Mem. at 21-22)**.**

Comras elided, among other things, the qualifying words "may have" from a 9/11 Commission Report statement, so that Comras's quote read "entire charities … wittingly participated in funneling money to Al Qaeda." (Mem. at 21; ellipsis in Comras Report). In addition, the next sentence in Comras's Report (ECF 9251-1 at 13) said, "This included the Muwafaq Foundation," giving the clear – and false – impression that the 9/11 Commission included Mr. Kadi's Muwafaq Foundation ("Muwafaq"), and that the Commission definitively said that Muwafaq and other charities "wittingly" aided Al Qaeda, when in fact the Commission hedged its statement about charities' intentions and *never* mentioned Muwafaq. (Mem. at 21).

Another example of Comras's intellectual dishonesty, though not involving an error in citation (except perhaps to himself), is his failure to mention, in the "Sample List of Recent

[3] "Word-for-word inclusion of any part of someone else's written or oral sentence … requires citation in quotation marks and use of the appropriate conventions for attribution." ECF 9060 at 32 n.4 (cleaned up; ellipsis in original).

Publications …" attached to his Report, his own blog post from 2005, *It's Time to Put Yasin Al Kadi Out of Business!*, even though his list of 28 publications included four from 2005 and three pre-dating 2005. (Mem. at 2 & n.5). Comras thereby attempted to conceal a fact highly relevant to the reliability of his reports and potential testimony against Mr. Kadi.

Plaintiffs do not try to justify Comras's misleading description of a visit made to a Sudanese refugee camp in which eight NGOs, at least one of which was Christian, operated. Comras wrote about this camp in such a way as to create the incorrect impression that the camp – where the visitor was not permitted to speak to or take photos of refugees – was run by Muwafaq. (*See* Mem. at 20). Plaintiffs repeat the misleading assertion that this was a Muwafaq camp. (Opp. at 69).

B. <u>Comras's Cherry-Picking</u>

Plaintiffs have no argument to justify Comras's persistent refusal to consider evidence contrary to his thesis. Yet his inability or unwillingness to look at any information that "had nothing to do with what I was writing" (Mem. at 20) infected his entire Report and deposition testimony. *(Id.* at 7 n.14, 9-12 & nn.18-20, 15-16 & nn.26, 28, 17 &nn.30-31, 20, 21-22). It is disqualifying.

Plaintiffs simply ignore Mr. Kadi's discussion of Comras's disregard of OFAC's Albania report in which OFAC noted (1) interviews with a former Kadi employee who told them that Mr. Kadi had instructed him to keep Muwafaq assets out of the hands of the radical Al Haramain Islamic Foundation (Mem. at 10), and (2) the actual business activities engaged in by almost every Kadi company that Comras identified as a "shell" company (*Id.* at 11).

Similarly, Plaintiffs do not address the fact that Comras conceded at his deposition that Al Shamal Bank, which he criticized Mr. Kadi for doing business with, was probably one of only two commercial banks in Sudan in the 1990s with Islamic investment products. (*Id.* at 15 n.26). And there was no comment from Plaintiffs on Comras's failure to note that Amir Mehdi, whose arrest

in Pakistan Comras discussed, was released without charges. (*Id.* at 16 n.28). Nor do Plaintiffs attempt to justify Comras's failure, while criticizing Mr. Kadi's hiring of Mehdi, citing the Swiss Police Report, to note that report's mention of the reason Mr. Kadi gave for hiring Mehdi: his experience as a teacher and his knowledge of the geographical area that Muwafaq served. (*Id.* at 9, n.18).

Plaintiffs also fail to address the fact that Comras, though citing Bergen's *The Osama bin Laden I Know* to support the fact that Wa'el Julaidan had a relationship with OBL in Afghanistan during the Afghan-Soviet War, omitted Bergen's coverage of Julaidan's ultimate rejection of OBL's extreme views. (Mem. at 17 n.31). In a similar failure to provide a complete picture of a relationship, Comras condemned Mr. Kadi's support for a dormitory construction project in Yemen and his retention of Julaidan to manage it, but made no mention of Mr. Kadi's reasons for doing either. (*Id.* at 17 & nn.30-31).

C. Comras's Illogical and Unsupported Conclusions

Similarly, Plaintiffs found no way to explain the bizarre logical leaps Comras engaged in to justify some of his outlandish *ipse dixit* pronouncements about Mr. Kadi's supposed support of terrorism. (*See* Mem. at 14, 16, 18-19, 21, 22- 23). Plaintiffs are thus left with a hopelessly unreliable expert whose opinions violate the *Daubert* standards and, indeed, rational thought.

D. Comras's Inability to Explain How He Calculated Unaccounted-for Funds

One of the strangest findings in Comras's Report was in his discussion of funds allegedly unaccounted for when Mr. Kadi helped to finance the Al Eman dormitory construction project in Yemen. On page 33 of his Report, Comras says that $300,000 was unaccounted for, but on page 50, he puts that number in the range of $936,000 and $1.28 million. (Mem. at 18). When deposed, not only did Comras deny that this constituted a discrepancy (it was simply "two different

accountings by two different groups for two different purposes"), but, despite his vaunted expertise in forensic accounting (Opp. at 54 & n.197; Report at 4), he could not explain how he came up with the latter number range, other than to explain that his "methodology is, again, the fungibility of money." (Mem. at 19). Wisely, Plaintiffs make no attempt to explain this. (*See* Opp. at 68).

## II. Plaintiffs' Failed Attempts to Justify Other Comras Flaws

### A. Plaintiffs Argue Evidentiary Issues and Falsely Accuse Mr. Kadi of Doing So

Plaintiffs recite numerous factual allegations in support of their substantive case against Mr. Kadi (Opp. at 55-69), in effect restating much of the discussion in Comras's reports, while (falsely) accusing Mr. Kadi of doing the same (Opp. at 51, 61), *and also* faulting Mr. Kadi for *not* rebutting Comras's factual conclusions, with variations of "Kadi does not deny." (*E.g.*, Opp. at 63, 65, 66). These inappropriate arguments deflect attention from the issue at hand: Comras's dishonest and otherwise unreliable work as a would-be expert.

For example: Plaintiffs assert that "Kadi argues that he had nothing to do with Al Haramain Islamic Foundation …." (Opp. at 64 n.215). This was not Mr. Kadi's argument. His argument was that Comras ignored evidence in OFAC's report that Mr. Kadi had instructed an employee in Albania to keep Muwafaq assets out of the hands of AHIF. (Mem. at 10). Mr. Kadi thus made a pointed attack on Comras's refusal to discuss evidence that undercut his allegations about Mr. Kadi. It was an example of evidence favorable to Mr. Kadi uncovered by OFAC in its lengthy on-the-ground investigation in Albania, evidence that Comras ignored. *(Id.* at 9-12). Plaintiffs skirt the fact that Comras ignored exculpatory facts; they focus instead on *other* evidence relating to Albania. (Opp. at 64 n.215).

Similarly, Plaintiffs accuse Mr. Kadi of "seek[ing] to reargue the findings of OFAC, which designated him as an SDGT." (Opp. at 61). Again, this mischaracterizes Mr. Kadi's argument, which was that Comras (and Plaintiffs themselves) uncritically assert various OFAC statements as evidence and "findings" supposedly pointing to Mr. Kadi's liability (*Id.* at 61-65, 67), whereas OFAC identifies risks, and does not make definitive conclusions of guilt. (Mem. at 8). Furthermore, Comras mostly repeated OFAC's "findings" without analyzing them, and ignored exonerating evidence uncovered by OFAC itself. (Mem. at 8-12).

To be clear: Mr. Kadi is well aware that this motion is not the place to argue evidence, but rather, whether Comras ignored evidence that undermined his foregone conclusions. Plaintiffs' attempt to obscure the issue fails. (Mem. at 12). An expert need not consider every alternative scenario or piece of evidence. But Comras consistently disregarded without analysis every alternative inconsistent with Plaintiffs' claims, and engaged in *ipse dixit* pronouncements. He wrote as an advocate, not an expert witness.

B. Plaintiffs' Embellishments

Plaintiffs misstate and mischaracterize material in Comras's reports and deposition testimony, and invent facts not found there. Mr. Kadi presents this not to argue the facts, but to call attention to the unreliability of Plaintiffs' own briefing. Examples:

(1) Plaintiffs say, "… Comras made clear that Kadi had a long-standing relationship with the Muslim Brotherhood." (Opp. at 69, *citing* their Ex. 21 (ECF 9345-22)). The cited exhibit, a letter written by counsel, refers to Mr. Kadi's "association with *members of* the Muslim Brotherhood," not with the organization itself (ECF 9345-22 at 1-2 (emphasis added)), as does Comras's Report at 14, which also contains the qualifier "allegedly."

(2) Plaintiffs say, "… Kadi …*intentionally refused to keep transparent accounting records* (Kadi Br. 6) …." (Opp. at 63 n.211) (emphasis added). Nothing in Kadi's brief, at 6 or elsewhere, or in Comras's reports, supports this statement.

(3) Plaintiffs say, "… Comras found that [Muwafaq Limited, a Kadi company] was used by Kadi to finance terrorism …" (Opp. at 58, citing Report at 17-18), when the Report said only that "Kadi sent money [from a Limited account] to a Sudanese businessman, Mohamed Abdullah Gar-al-Nabi, an NIF member, close associate of Turabi, and affiliate of al Qaeda." (Report at 18).

(4) Plaintiffs say, "Comras detailed OBL's close working relationship with Muwafaq in the Sudan …." (Opp. at 57, citing Report at 34-40). This is a distortion of Comras's report. He said that Muwafaq worked with the NIF (Sudan's governing party); that the FBI had a source who claimed OBL had "mentioned Muwafaq many times" in relation to Muwafaq's supposed support of the Sudanese militia in southern Sudan (Report. at 36-37); and that Muwafaq and a company owned by OBL were co-shareholders in Sudanese agricultural export company. (*Id.* at 38).

(5) Plaintiffs claim that Comras was entitled to "consider Kadi's failure to explain financial irregularities," asserting, without citation, that "Kadi is well aware that OFAC and other investigators asked those very questions and Kadi could not provide verifiable innocent explanations." (Opp. at 66). Contrary to the impression that Plaintiffs seek to create with this undocumented assertion, Comras did not consider OFAC's dissatisfaction with any of Mr. Kadi's responses, and did not identify any person or body to whom answers to the questions in his mind should have been provided. (Mem. at 12-14 & n.24).

C. The Significance of FATF Red Flags

Plaintiffs use a straw man argument in asserting that Mr. Kadi challenged the "red flags" methodology of the FATF and other regulatory bodies in identifying possible terrorist financing. (Opp. at 62). Mr. Kadi did not argue that the red flags are an illegitimate means of detecting possible terrorist financing. His criticism was that Comras treated red flags as evidence of actual terrorist financing rather than as a warning that certain conduct indicates *the possibility* of terrorist financing (Mem. at 4-5), despite Comras's admission in testimony that FATF red flags are simply warnings, not findings. *(Id.* at 5).

Plaintiffs also attempt to justify Comras's other misuse of red flags: They claim that Comras's conflation of the FATF's two tiers of red flags (*see* Kadi Mem. at 5-6) is benign because the two tiers are part of a continuum. (Opp. at 62). While the two tiers may, in fact, be part of a continuum, Comras misleadingly fused the tiers in such a way as to obscure the fact of a continuum, using "my own list of red flags." (Mem. at 6). For instance, he characterized Mr. Kadi's cash infusions and loans to one of his Bosnian businesses, the business's sub-optimal accounting practices, and its presence in a conflict zone – all of which fall within the FATF's lower risk tier – simply as "a whole series of 'red flags'" *(Id.* at 5-6 & n.13).

D. Plaintiffs' Other Attempts to Address Comras's Dishonesty

Plaintiffs try to justify Comras's truncation of OFAC's citation to a 1999 OBL quote referring to Wa'el Julaidan as being in the same boat with him by averring, without citation, that OBL's motive for the quote was to warn Julaidan "to stay the course with Al Qaeda" (Opp. at 69), something that even Comras did not suggest in his Reports or testimony. This appears to be nothing more than counsel's own speculation as to OBL's state of mind. Comras's omission of the fact that, as OFAC noted, the "boat" also included Abdullah Azzam (who was assassinated in 1989), allowed

him to create the mis-impression that Julaidan had a more recent association with OBL. (*See* Mem. 19-20). During his deposition, Comras was more candid about why he omitted Azzam from the boat: "[T]hat was not part of what I was trying to say." (*See id.* at 20).

Plaintiffs repeat and endorse Comras's statement that Mr. Kadi "used" bearer checks (Opp. at 56, 69-70), despite the fact that Mr. Kadi deposited bearer checks he received from his benefactor, but never issued them. While this is not the worst example of Comras's habit of misleading the reader, the most benign characterization of this usage is that it lacks the clarity and accuracy that one would expect of an intellectually honest expert witness.

Plaintiffs attempt to justify Comras's unsupported claim that Mr. Kadi "propagated radical Islamic theology" by citing to allegations that Mr. Kadi had a "long-standing relationship with the Muslim Brotherhood." (Opp. at 69). Even assuming that such a relationship had existed (*but see supra* at 6), it would not constitute evidence that Mr. Kadi propagated anything. (*See* Mem. at 23).

E. Hearsay, Guilt by Association, and State-of-Mind Evidence

Hearsay. Although expert witnesses may use hearsay evidence, simply repeating that type of evidence without synthesizing it with other sources renders it unhelpful and unnecessary for the factfinder. (ECF 9060 at 7; Mem. at 9). Comras's conclusions relied almost exclusively on hearsay(and double hearsay) evidence that he simply accepted at face value without subjecting it to thoughtful analysis. The fact that Comras disregarded any evidence that undercut the point he wanted to make – even if it was in the very document he was citing (*e.g.,* OFAC's Albanian Report and the Swiss Police Report (*see* Mem. at 9-10 & nn.18-19; *supra* at 3-4)) – makes it clear that he did not, as Plaintiffs assert, "utilize[] his discerning analysis of the available evidence to reach his conclusions." (Opp. at 65). Comras's "analysis" was not done with discernment; it was done with

blinders on – focused only on the goal he had dating back to at least 2005, when he lamented that Mr. Kadi had not been put out of business. (*supra* at 2-3).

Guilt by Association. A significant problem with attempts to infer guilt by association is not just that it is "unfair" (*see* Opp. at 66), but that it is weak evidence, reliant on assumptions from facts that do not logically lead to the conclusion sought. For example, the fact that a member of the "Al Muwafaq Brigade" (which might or might not have been associated with Mr. Kadi's Muwafaq Foundation) during the Bosnian War, was arrested for attempting to plant a bomb at the Los Angeles airport in 1999 (Report at 44 and n.186), is so attenuated as to be non-probative. (Mem. at 14). The 9/11 Commission Staff, frequently cited by Comras, recognized the "difference between troubling 'links' to terrorists and compelling evidence of supporting terrorists."[4]

State of Mind. In a footnote (Opp. at 70, n. 222), Plaintiffs attempt to justify Comras's attempt to characterize Mr. Kadi's state of mind (allegedly to support al Qaeda's plan to attack the United States) by citing cases to the effect that "[a]n expert can testify to whether a given state of mind is consistent with a given practice." (*Id.*, quoting case). But that is not what Comras did. He asserted conclusions about Mr. Kadi's state of mind based on a range of activities. These conclusions were "connected to the facts" only by "the *ipse dixit* of the expert." (ECF 9060 at 4 (cleaned up); *see* Mem. at 22, n.34, 24; ECF 9060 at 6, 12-13, 23, 35).

Conclusion

Victor Comras's proffered testimony should be excluded.

Dated: October 16, 2023

[4] 9/11 Commission Staff Report, *Monograph on Terrorist Financing* 110, https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf. See also *id.* at 9. Comras cited this document in his Report at 12, 13 n.31, 16.

Respectfully submitted,

/s/ *Peter C. Salerno*
Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
Attorneys for Defendant Kadi
221 Schultz Hill Road
Pine Plains, NY 12567
Tel. No. 518 771 3050
Email: peter.salerno.law@gmail.com