UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-1570 (GBD) (SN)

This document relates to:

*Federal Insurance Co. v. Al Qaida*, No. 1:03-cv-6978
*Ashton v. Al Qaeda*, No. 1:02-cv-6977
*Salvo v. Al Qaeda*, No. 1:03-cv-5071
*Barrera v. Al Qaeda*, No. 1:03-cv-7036
*Continental Casualty Co. v. Al Qaeda*, No. 1:04-cv-5970
*Estate of Maher v. Al Rajhi Bank*, No. 1:23-cv-2845
Any other case naming Dallah Avco as a defendant

**DEFENDANT DALLAH AVCO TRANS ARABIA COMPANY'S MEMORANDUM
OF LAW IN SUPPORT OF ITS RENEWED MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

October 6, 2023
New York, New York

Robert K. Kry
Eric R. Nitz (*pro hac vice*)
MOLO LAMKEN LLP
600 New Hampshire Ave., Suite 500
Washington, D.C.  20037
(202) 556-2000
rkry@mololamken.com

*Attorneys for Defendant
Dallah Avco Trans Arabia Co.*

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

I.     Factual Background .......................................................................................... 3

     A.     Saudization, Secondment, and Educational Leave ................................ 3

     B.     Dallah Avco's Role Under the ANSS Contracts .................................... 4

           1.     Manpower Procurement ............................................................ 5

           2.     Payroll Processing .................................................................... 6

           3.     No Direction or Supervision .................................................... 6

           4.     Logistics .................................................................................... 8

     C.     Omar Al Bayoumi's History with the PCA ............................................ 8

     D.     Al Bayoumi's Role on the ANSS Project ........................................... 10

           1.     Al Bayoumi's Secondment ..................................................... 10

           2.     Al Bayoumi's Educational Leave ........................................... 12

     E.     Al Bayoumi's Interactions with the Hijackers ................................... 14

II.     Procedural History ........................................................................................ 15

     A.     Plaintiffs' Claims Against Dallah Avco ............................................. 15

     B.     The District Court's Dismissal Order .................................................. 16

     C.     The Second Circuit's Remand Order ................................................... 17

     D.     The Proceedings on Remand ............................................................... 17

ARGUMENT ........................................................................................................... 18

I.     The Court Lacks Personal Jurisdiction over Dallah Avco ............................. 19

     A.     Dallah Avco Did Not Knowingly Provide Cover Employment for
           Illegal Activities ................................................................................. 20

B.      Dallah Avco's Non-Tortious Administrative Activities Are Irrelevant to Personal Jurisdiction ............................................................................ 24

II.     Alternatively, the Court Should Grant Summary Judgment in Dallah Avco's Favor ................................................................................................................ 26

A.      Dallah Avco's Summary Judgment Motion Is Properly Before the Court .......... 26

B.      There Is No Evidence that Dallah Avco Knowingly Assisted the 9/11 Attacks .................................................................................................... 28

C.      Dallah Avco Did Not Proximately Cause the 9/11 Attacks ................................ 33

D.      Dallah Avco Is Not Vicariously Liable for the 9/11 Attacks .............................. 38

CONCLUSION ............................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*In re 650 Fifth Ave.*,
830 F.3d 66 (2d Cir. 2016)........................................................................................26

*Al Thani v. Hanke*,
No. 20-cv-4765, 2022 WL 489052 (S.D.N.Y. Feb. 17, 2022) ................................19

*Alix v. McKinsey & Co.*,
23 F.4th 196 (2d Cir. 2022) ....................................................................................36

*Bank of Am. Corp. v. City of Miami*,
581 U.S. 189 (2017)................................................................................................33

*Bender v. City of New York*,
78 F.3d 787 (2d Cir. 1996)......................................................................................33

*Corcoran v. N.Y. Power Auth.*,
202 F.3d 530 (2d Cir. 1999)....................................................................................38

*Corl v. Kenan Advantage Grp. Inc.*,
No. 3:20-CV-00503, 2022 WL 2232195 (M.D. Tenn. June 21, 2022) ...................27

*CutCo Indus., Inc. v. Naughton*,
806 F.2d 361 (2d Cir. 1986)....................................................................................20

*Dennis v. JPMorgan Chase & Co.*,
343 F. Supp. 3d 122 (S.D.N.Y. 2018)....................................................................25

*Doe v. Alsaud*,
224 F. Supp. 3d 286 (S.D.N.Y. 2016)....................................................................37

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) ......................................................................................32

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.*,
No. 03-2527, 2004 WL 303209 (D. Kan. Jan. 28, 2004)........................................27

*Girl Scouts of U.S. v. Steir*,
102 F. App'x 217 (2d Cir. 2004) ............................................................................25

*Hain v. Jamison*,
28 N.Y.3d 524 (2016) ..............................................................................................37

*Havlish v. 650 Fifth Ave. Co.*,
934 F.3d 174 (2d Cir. 2019)....................................................................................21

*Hilao v. Est. of Marcos*,
    103 F.3d 767 (9th Cir. 1996) ........................................................................36

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ........................................................................36

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ........................................................28, 29, 31

*Kaplan v. Lebanese Can. Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ........................................................................29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................................33

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ........................................................................20

*Marion v. TDI Inc.*,
    591 F.3d 137 (3d Cir. 2010) ........................................................................36

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012) ........................................................................36

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ........................................................................32

*Nat'l Petrochem. Co. v. The M/T Stolt Sheaf*,
    930 F.2d 240 (2d Cir. 1991) ........................................................................38

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ........................................................34, 36

*Rubens v. Mason*,
    387 F.3d 183 (2d Cir. 2004) ........................................................................26

*Russell v. Citigroup*,
    No. 22-cv-2057, 2023 WL 2969823 (E.D.N.Y. Feb. 24, 2023) ........................37

*Salsedo v. Palmer*,
    278 F. 92 (2d Cir. 1921) ........................................................................37

*Scribner v. Summers*,
    84 F.3d 554 (2d Cir. 1996) ........................................................32, 37

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ........................................................................30

*Swift Transp. Co. of Ariz., LLC v. RTL Enters., LLC,*
 No. 14-cv-902, 2015 WL 457641 (N.D.N.Y. Feb. 3, 2015)...................................................25

*Tardif v. City of New York,*
 991 F.3d 394 (2d Cir. 2021)............................................................................................33

*In re Terrorist Attacks on Sept. 11, 2001,*
 714 F.3d 118 (2d Cir. 2013)....................................................................................34, 35, 37

*In re Terrorist Attacks on Sept. 11, 2001,*
 714 F.3d 659 (2d Cir. 2013)...................................................................................... *passim*

*Twitter, Inc. v. Taamneh,*
 598 U.S. 471 (2023)........................................................................................................30

*United States v. Moseley,*
 980 F.3d 9 (2d Cir. 2020) ..............................................................................................32

*United States v. Quintieri,*
 306 F.3d 1217 (2d Cir. 2002)..........................................................................................39

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.,*
 477 F. Supp. 3d 241 (S.D.N.Y. 2020)..............................................................................19

*Waldman v. Palestine Liberation Org.,*
 835 F.3d 317 (2d Cir. 2016)......................................................................................20, 25

*Weiss v. Nat'l Westminster Bank, PLC,*
 993 F.3d 144 (2d Cir. 2021)......................................................................................29, 30

## STATUTES AND RULES

18 U.S.C. § 1964 ................................................................................................................16

18 U.S.C. § 2331(1)(B) .......................................................................................................32

18 U.S.C. § 2331(5)(B) .......................................................................................................32

18 U.S.C. § 2333 ................................................................................................................16

Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) ............................16, 32

N.Y. Est. Powers & Trusts Law § 11-3.2(b) ........................................................................38

Fed. R. Civ. P. 12(b) ...................................................................................................26, 27

Fed. R. Civ. P. 56................................................................................................................27

Fed. R. Civ. P. 56(a) ............................................................................................................26

Fed. R. Civ. P. 56(c)(2) .......................................................................................................26

### OTHER AUTHORITIES

*Restatement (Second) of Conflict of Laws* § 174 & cmts. a, c (1971) ...........................................38

5B Charles A. Wright et al., *Federal Practice & Procedure* § 1351
    (3d ed. rev. 2023) ................................................................................................................27

Defendant Dallah Avco Trans Arabia Company (now known as Dallah Trans Arabia Company) ("Dallah Avco") respectfully submits this memorandum of law in support of its renewed motion to dismiss for lack of personal jurisdiction or, in the alternative, for summary judgment.

## INTRODUCTION

Dallah Avco is a Saudi government contractor that performed outsourced human resources functions for the Kingdom of Saudi Arabia's civil aviation agency, the Presidency of Civil Aviation ("PCA").  Dallah Avco provided manpower procurement, payroll processing, and related administrative support for approximately 1,400 employees on the PCA's Air Navigation System Support ("ANSS") project.  One of those employees was Omar Al Bayoumi.

While most ANSS employees worked in Saudi Arabia, Omar Al Bayoumi was pursuing educational studies in the United States.  The PCA fully supported those studies because it planned for Al Bayoumi to take over the job of his supervisor, a Turkish national named Alp Karli, once he had the necessary qualifications.  That plan was part of the Saudi government's longstanding policy of Saudization – training Saudi nationals so they can take over skilled positions currently held by foreigners.

In February 2000, having already been in the United States for more than five years, Al Bayoumi briefly interacted with two of the future hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar.  Al Bayoumi helped them rent an apartment by filling out an application and listing himself as a reference and guarantor.  He also helped them obtain a check for the security deposit by allowing them to deposit cash into his account and then drawing a check for the same amount.

Nineteen months later, Al Hazmi and Al Mihdhar participated in the 9/11 attacks. Plaintiffs now seek to hold Dallah Avco liable for the hundreds of billions of dollars in losses that resulted on the ground that Dallah Avco aided and abetted, conspired, or directly caused the

attacks.   Plaintiffs accuse Dallah Avco of providing "cover employment" and financially supporting Al Bayoumi so he could remain in the United States and assist terrorists.

Ten years of jurisdictional discovery have failed to produce any evidence supporting plaintiffs' theories.   Two basic facts foreclose their claims, either by precluding personal jurisdiction over Dallah Avco or by refuting their claims on the merits.

***First***, there is no evidence that Dallah Avco ever ***knew*** that Al Bayoumi was in the United States to help terrorists or engage in other illicit conduct.   The documents in Dallah Avco's files showed that Al Bayoumi was in the United States to pursue educational studies. Witnesses uniformly testified that they understood that Al Bayoumi was in the United States for that purpose, and they never told Dallah Avco otherwise.

Nor is there any circumstantial evidence from which a jury could infer that Dallah Avco ***must*** have known that Al Bayoumi was engaging in illicit activities.   Dallah Avco's relationship with Al Bayoumi was limited.   Dallah Avco did not direct or supervise the work of ANSS employees; it simply paid their salaries and benefits pursuant to the PCA's instructions and subject to the PCA's reimbursement.   Nor was the rationale for Al Bayoumi's lengthy stay in the United States so obviously pretextual that Dallah Avco must have know it was a sham. Saudization is a longstanding, explicit policy of the Saudi government.   Educating Saudi civil servants to improve their job skills so they can take over jobs held by foreigners is one of the basic means by which the Saudi government pursues that policy.

***Second***, even aside from the lack of knowledge, Dallah Avco did not ***proximately cause*** the 9/11 attacks.   Any connection between Dallah Avco and the 9/11 attacks was extremely remote.   Dallah Avco did not participate in the 9/11 attacks and did not pay Al Qaeda or any other terrorist organization to commit those attacks.   Instead, Dallah Avco administered Al

Bayoumi's salary and benefits, along with the payroll for 1,400 other ANSS employees. Al Bayoumi then briefly interacted with two future hijackers in circumstances that had nothing to do with his job on the ANSS project or his educational studies. Those two future hijackers then went on, ***nineteen months later***, to participate in the 9/11 attacks. That lengthy and attenuated chain of events does not come close to satisfying the requirements for proximate cause.

Dallah Avco has now been a defendant in these proceedings for over twenty years. Plaintiffs' claims against Dallah Avco were baseless at the outset, and they have not improved with time, despite ten years of jurisdictional discovery. The Court should either dismiss the claims against Dallah Avco for lack of personal jurisdiction or, in the alternative, grant summary judgment in Dallah Avco's favor.[1]

## BACKGROUND

I.   FACTUAL BACKGROUND

### A.   Saudization, Secondment, and Educational Leave

When the discovery of oil reserves led to the rapid industrialization of Saudi Arabia's economy, too few Saudi nationals possessed the technical training and expertise necessary to meet the demand for skilled labor. SMF ¶3. As a result, companies generally brought in foreign workers, leaving Saudi nationals either unemployed or serving in low-level positions. SMF ¶4. The Saudi public sector faced similar challenges. SMF ¶5. To reduce the country's dependence on foreign labor, the Saudi government has long pursued a policy of "Saudization" that aims to increase the participation of Saudi nationals in the workforce. SMF ¶1. For over fifty years, Saudization has been an important and explicit policy of the Saudi government. SMF ¶2; Ex. 1 ¶¶42-45 (cataloguing examples).

---

[1] Throughout, citations to "SMF" are to Dallah Avco's Local Rule 56.1 statement submitted herewith. Cited exhibits are attached to the accompanying declaration of Eric R. Nitz.

To promote Saudization, the Saudi government has adopted a variety of mechanisms to enable public employees to improve their education and training so they can take over jobs held by foreigners.  SMF ¶7.  One of those mechanisms is secondment.  Secondment permits a government agency to temporarily assign an employee to another ministry or to a private-sector company, where the employee can obtain additional knowledge and experience.  SMF ¶¶8, 10.

Saudi law also permits public employees to request "educational leave" to pursue educational studies.  SMF ¶17.  The proposed course of study must be relevant to the employee's work at the agency, and the agency is responsible for monitoring the progress of the employee's studies.  SMF ¶¶19, 22.  Educational leave is another mechanism by which the Saudi government endeavors to improve public employees' job skills and prospects for advancement once they return to the agency.  SMF ¶20.

### B.    Dallah Avco's Role Under the ANSS Contracts

The Presidency of Civil Aviation ("PCA") is a Saudi government agency that, during the relevant period, was part of the Saudi Ministry of Defense and Aviation.  SMF ¶24.  One of the projects the PCA administered was the Air Navigation System Support ("ANSS") project, which concerned the installation and maintenance of air traffic control, air navigation, and aeronautical communications facilities in Saudi airports.  SMF ¶¶23-24.  To support the ANSS project, the PCA awarded a series of contracts to private contractors, who procured manpower for the project, processed payroll, and provided related administrative support.  SMF ¶¶25, 28.

Dallah Avco was the contractor for the ANSS project from the 1980s through 2005.  SMF ¶¶26-27.  During that period, Dallah Avco provided support for approximately 1,400 ANSS project employees.  SMF ¶29.

4

1.      *Manpower Procurement*

One of Dallah Avco's responsibilities under the ANSS contracts was to recruit manpower for the project.  SMF ¶30.  The ANSS contracts included a "Manning Schedule" that listed a variety of positions and the number of employees to be recruited to each position.  SMF ¶31. The contracts attached position descriptions that specified the responsibilities for each position and the necessary qualifications.  SMF ¶35.  The contracts assigned a "level" to each position, ranging from Level A to Level N.  SMF ¶32.  Levels A through E were "Married Status" positions that entitled employees to additional benefits for their families.  SMF ¶¶33-34.

To carry out its recruiting functions, Dallah Avco would solicit resumes from workers, verify their qualifications against the ANSS contract requirements, and forward suitable applicants to the PCA for consideration.  SMF ¶36.  The ANSS contracts required Dallah Avco to obtain the PCA's approval before hiring any candidate onto the ANSS project.  SMF ¶37. The PCA retained authority to waive the experience, qualification, and nationality requirements set forth in the contracts.  SMF ¶38.

Although the ANSS contracts contemplated that Dallah Avco would generally recruit candidates for the PCA's consideration, they also authorized the PCA to direct Dallah Avco to hire specific employees onto the project.  Specifically, they state:  "[T]he Government may, at its discretion, at any time, direct the Contractor to hire any individual or individuals whom the Government deems suitable for employment under the Contract."  SMF ¶39 (quoting Ex. 10 at KSA0000002189 art. 4-2-1-2).  The contracts also contain an explicit Saudization provision. Under that provision, Dallah Avco was required to "give first priority to qualified Saudi Arabian nationals," and "[i]f at any time the Government shall notify the Contractor in writing of the availability of a Saudi Arabian National qualified for employment, the Contractor shall offer him employment forthwith."  SMF ¶40 (quoting Ex. 10 at KSA0000002207 art. 4-4-3-2-1).

Upon approving a candidate, the PCA would send Dallah Avco a form directing Dallah Avco to hire the employee onto the project.  SMF ¶41.  That form set forth the employee's name, job title, position number, and position level, among other information.  SMF ¶42.

### 2.    *Payroll Processing*

Dallah Avco was responsible for handling payroll for employees hired onto the ANSS project.  SMF ¶43.  Each ANSS employee received a base salary, a housing allowance, and a transportation allowance.  SMF ¶44.  An ANSS employee's base salary was determined by the employee's position level.  The ANSS contracts set forth the rates at which the PCA would reimburse Dallah Avco for payroll expenses, with Level A positions having the highest rates and Level N the lowest.  SMF ¶¶45-46.  Dallah Avco therefore relied on the PCA's position and level assignments to determine each employee's pay.  SMF ¶¶47-48.

The housing and transportation allowances were tied to the employee's base salary:  Each employee received 16.7% of base salary as a housing allowance and 10% as a transportation allowance.  SMF ¶44.  ANSS employees also sometimes received "other allowances" to cover additional expenses.  SMF ¶¶49-50.  The PCA determined the amount of any "other allowance" and reimbursed Dallah Avco for the amounts paid.  SMF ¶¶51-52.

### 3.    *No Direction or Supervision*

Dallah Avco did ***not*** direct or supervise ANSS employees once they were hired onto the project.  Instead, ANSS employees worked under the direction and supervision of the PCA.  The ANSS contracts expressly state that "Contractor-furnished personnel shall work for and in conjunction with the Presidency of Civil Aviation (PCA), as one integrated team."  SMF ¶53 (quoting Ex. 10 at KSA0000002188 art. 4-1).

Organizational charts included in the ANSS contracts show that ANSS employees reported to PCA officials.  For example, Contracts & Finance Control Manager Alp Karli and

Logistics Manager Samuel Coombs both reported to the PCA's Director-General of Airways Engineering, Mohammed Al Salmi.  SMF ¶ 54.  Job descriptions in the ANSS contracts confirm that ANSS employees reported to PCA officials.  SMF ¶ 55.

The witnesses who testified in this case – including two former Dallah Avco employees, a former PCA official, and a former ANSS employee – all uniformly agreed that the PCA, not Dallah Avco, directed and supervised ANSS employees.  SMF ¶¶ 56-61.  For example, former ANSS employee Samuel Coombs – who appeared as a cooperating witness for plaintiffs – testified that "[m]y boss was Mohamed Al-Salmi," that "Al-Salmi approved all of my vacation and personal leave as well as anything else that related to my job duties and administrative procedures," and that apart from receiving paychecks from Dallah Avco, "I had no other substantial contact with Dallah Avco."  SMF ¶¶ 60-61 (quoting Ex. 8 at 1).

Documents show that Al Salmi retained sole authority over ANSS employee worksite assignments, out-of-Kingdom travel, hiring, termination, and other matters.  SMF ¶ 62.  In correspondence, Al Salmi instructed Dallah Avco to "always coordinate with this office" before communicating with ANSS employees because the employees were "valued assets of this Directorate."  SMF ¶ 63 (quoting Ex. 47).  The PCA, not Dallah Avco, approved ANSS employee vacation or leave, business travel, and worksite transfers.  SMF ¶¶ 64-66.  ANSS employees worked in PCA buildings and carried PCA identification cards.  SMF ¶¶ 67-68.  ANSS employees received confidential PCA information to which Dallah Avco had no right of access.  SMF ¶ 69.  The PCA held out ANSS employees as its own representatives in correspondence.  SMF ¶ 70.  And ANSS employees carried business cards that bore the PCA logo and identified them as PCA employees.  SMF ¶ 71 (citing Ex. 60).

#### 4.   *Logistics*

In addition to manpower procurement and payroll processing, the ANSS contracts also assigned Dallah Avco responsibility for "logistics" relating to procurement of spare parts and other equipment or services.   SMF ¶ 72.   When PCA employees needed such equipment or services, they would submit purchase requests.   SMF ¶ 73.   Those requests would be reviewed by the ANSS Logistics Manager and the PCA Director-General of Airways Engineering before being sent to a vendor for fulfillment.   *Id.*

Once the PCA approved a purchase request, the Logistics Manager would also send a payment request to Dallah Avco, instructing it to pay the vendor.   SMF ¶ 74.   The ANSS contracts provide that the PCA would reimburse Dallah Avco for all logistics payments made. SMF ¶ 75.   When processing logistics payments, Dallah Avco had no responsibility for reviewing or auditing the prices on the invoices, whether the PCA actually needed the goods or services, or the PCA's selection of a vendor.   SMF ¶ 76.   Dallah Avco's job was simply to pay the invoices according to the terms the PCA had approved.   *Id.*

Al Salmi sometimes used the logistics budget to pay educational expenses for PCA employees.   SMF ¶¶ 77-78.   Dallah Avco had no role in those decisions.   SMF ¶ 78.   Plaintiffs' cooperating witness Samuel Coombs testified that Al Salmi used the logistics budget to pay educational expenses, rather than having the PCA pay the expenses directly, because the approval process for direct payments was very long and could take months, whereas paying the expenses through a subcontractor was quicker.   SMF ¶ 79.

### C.   **Omar Al Bayoumi's History with the PCA**

In 1977, Omar Al Bayoumi began work as an auditor in the PCA's Financial Administration Department.   SMF ¶ 80.   In 1993, Al Salmi transferred Al Bayoumi to the PCA's

Airways Engineering Directorate.  SMF ¶81.  Al Bayoumi worked as an accountant at Airways Engineering and reported to Contracts & Finance Control Manager Alp Karli.  SMF ¶¶81-83.

When Al Bayoumi began work at Airways Engineering, Karli told him that he would ultimately take over Karli's job as the head of Contracts & Finance Control.  SMF ¶84.  That plan reflected the Saudi government policy of Saudization:   Karli is Turkish, whereas Al Bayoumi is Saudi.  SMF ¶¶85-86.  Karli told Al Bayoumi that he needed to improve his English skills before taking over the position.  SMF ¶87.

Accordingly, in August 1994, while still employed as a civil servant at the PCA, Al Bayoumi began pursuing English as a Second Language studies at San Diego State University.  SMF ¶88.  Alp Karli approved Al Bayoumi's course of study.  SMF ¶89.  Al Bayoumi took several classes during the Fall 1994 and Spring 1995 semesters; he received passing grades and favorable comments from his instructors.  SMF ¶¶90-91.  To enable those studies, Al Bayoumi requested and obtained multiple leaves of absence from the PCA.  SMF ¶¶92-95.  Each of those leave requests was approved by Al Salmi.  SMF ¶96.

Al Salmi used the PCA's logistics budget to pay for Al Bayoumi's tuition and living expenses.  SMF ¶¶98-103.  Al Salmi directed two ANSS project subcontractors, Avco Overseas Services and Ercan Engineering & Contracting, to pay the tuition and living expenses, and then had the expenditures reimbursed as logistics expenses.  SMF ¶¶98-99, 102.[2]

Dallah Avco had no role in preparing those directives or deciding to use the logistics budget to pay educational expenses.  SMF ¶¶101, 103.  Instead, Dallah Avco simply processed the payments under the ANSS contract procedures, just like it did for other logistics payments.  SMF

---

[2] Despite the similarity in names, Avco Overseas was not affiliated with Dallah Avco during the relevant period.  SMF ¶99.

¶ 100.  The documentation for those payments reflects that the PCA was funding "educational expenses" for "Mr. Omar Al-Bayoumi at San Diego State University." *Id.* (quoting Ex. 49).

### D.   Al Bayoumi's Role on the ANSS Project

#### 1.   *Al Bayoumi's Secondment*

By May 1995, Al Bayoumi had exhausted the leave to which he was entitled under Saudi law.  SMF ¶¶ 15-16, 105.  But Al Bayoumi still wanted to pursue more educational studies.  SMF ¶ 104.  Al Bayoumi needed another legal mechanism to extend his stay in the United States if he was to continue his studies there.  SMF ¶ 105.

Initially, Al Bayoumi tried to arrange a secondment to Ercan, one of the subcontractors that had paid his tuition and living expenses over the prior months.  SMF ¶¶ 106-107.  That arrangement fell through after Al Bayoumi learned that Saudi law did not allow secondments to an American company like Ercan.  SMF ¶ 108.

Instead, Al Bayoumi was seconded to the ANSS project.  That secondment was arranged by the PCA's Airways Engineering Directorate, although Dallah Avco sent a letter formally requesting the secondment.  SMF ¶¶ 109-112.  The PCA approved the secondment on June 25, 1995.  SMF ¶ 113.  Al Salmi directed Dallah Avco to hire Al Bayoumi onto the ANSS project by a notice effective June 6, 1995.  SMF ¶ 114.  Over the following years, the PCA extended the secondment four times, bringing the total secondment period to five years.  SMF ¶ 115.

During the secondment, the PCA assigned Al Bayoumi to specific job positions on the ANSS project.  SMF ¶¶ 117-118.  For example, the PCA's initial June 6, 1995 notice directed Dallah Avco to hire Al Bayoumi as a Senior Data Processing Technician with pay level "G." SMF ¶ 117 (citing Ex. 27).  Dallah Avco paid Al Bayoumi a monthly salary and allowances that corresponded to the positions and pay grades to which the PCA assigned him, just like it did for other ANSS employees.  SMF ¶¶ 119-120.

Al Bayoumi, however, did not perform the job tasks typically associated with the positions he held.  SMF ¶121.  Instead, he continued to pursue educational studies in the United States.  *Id.*  From 1995 to 2000, Al Bayoumi took English language and business courses from several different schools, including ELS Language Centers, West Coast University, Alliant International University, the Keller Graduate School of Management, and George Washington University.  SMF ¶¶121-126.  Al Bayoumi ultimately earned a Master of International Business Administration degree from Alliant and a Master's Certificate in Project Management from George Washington University.  SMF ¶¶124, 126.

In March 1997, the PCA's Director of Personnel wrote to Al Salmi to inquire about the reasons for Al Bayoumi's secondment, the nature of his studies, and his future plans.  SMF ¶127.  Al Salmi responded that (1) the secondment reflected the policy of "developing the national competencies and cadres to replace the non-Saudi workforce" – *i.e.*, the policy of Saudization; (2) the PCA wanted to extend the secondment so it could "take advantage of [Al Bayoumi] after completing his study as he will effectively take [the] place [of] a government employee in the Air Navigation System Support Program"; (3) Al Bayoumi was pursuing "preparatory study for obtaining a master's degree in business administration and studies in financial management"; and (4) Al Bayoumi had "a firm desire to continue in his office after the expiration of the secondment."  SMF ¶128 (quoting Ex. 13).

The PCA took steps to ensure that Al Bayoumi completed his studies.  In April 1999, Dallah Avco wrote to the PCA stating that it did not want to renew Al Bayoumi's secondment for a fifth year.  SMF ¶129.  Days later, Al Salmi responded that the PCA wanted to renew the secondment so Al Bayoumi could "complete the task under which the Presidency approved of his Secondment" and asked Dallah Avco to submit a renewal request "in order to complete the

Secondment Procedures Arrangements, as per Law." SMF ¶¶ 130-131 (quoting Ex. 32). Dallah Avco complied, and the PCA extended the secondment for a fifth year. SMF ¶ 132.

Al Bayoumi testified that his coursework in the United States was relevant to his job at Airways Engineering and was intended to improve his job skills. SMF ¶ 133. He hoped that, by pursuing those studies, he would eventually take over Alp Karli's job as the head of Contracts & Finance Control. SMF ¶ 135. PCA official Abdulaziz Al Angari testified that Al Bayoumi's coursework suited his position in the agency's financial department. SMF ¶ 134.

Al Bayoumi never told anyone at Dallah Avco that he was in the United States for some purpose other than pursuing educational studies, and to his knowledge, no one at the PCA ever told Dallah Avco that either. SMF ¶¶ 136-137. Al Angari never told anyone at Dallah Avco that Al Bayoumi's educational studies were a sham. SMF ¶ 138. And plaintiffs' cooperating witness Samuel Coombs understood that Al Bayoumi was in the United States to pursue educational studies. SMF ¶ 139. According to Coombs, four or five other people at Airways Engineering told him that Al Bayoumi was pursuing educational studies. SMF ¶ 140. And Coombs never told Dallah Avco that Al Bayoumi was doing anything different. SMF ¶ 141.

### 2. *Al Bayoumi's Educational Leave*

In March 2000, Al Bayoumi was nearing the end of his fifth year of secondment – the maximum allowed by Saudi law – and he returned briefly to Saudi Arabia, where he resumed his old job at the PCA. SMF ¶¶ 11, 144-145. Al Bayoumi still wanted to pursue more educational studies, so he wrote to Al Salmi to request an educational leave. SMF ¶¶ 146-147. In May 2000, the PCA granted Al Bayoumi a two-year educational leave "to pursue his Post Graduate Study in the United States of America." SMF ¶ 149.

During his educational leave, Al Bayoumi remained employed on the ANSS project, and Dallah Avco continued to pay his salary and benefits as an ANSS employee, subject to

reimbursement by the PCA.  SMF ¶¶150-152.  Al Bayoumi, however, believed that he had been paid less than he deserved and less than he needed to support his educational studies during his secondment, and he complained about his compensation to his superiors at the PCA while he was back in Saudi Arabia.  SMF ¶¶153-157.  In response, Al Salmi promoted Al Bayoumi to a Level C position – a married status position that entitled Al Bayoumi to additional benefits for his family – effective April 13, 2000.  SMF ¶¶158-160.

That same month, the PCA also increased the amount of "other allowances" that Al Bayoumi received as part of his ANSS paycheck.  SMF ¶¶161-162.  The PCA, not Dallah Avco, determined the amount of those other allowances.  SMF ¶164.  The PCA paid Al Bayoumi the other allowances to fund his education and living expenses, and Al Bayoumi understood that the PCA was paying the allowances for that purpose.  SMF ¶¶165-166.  Al Bayoumi in fact used the allowances to pay for his education, pursuing graduate studies at Aston University in the United Kingdom and ultimately earning a Master of Science in Management Research in May 2002. SMF ¶¶167-168.  Al Bayoumi never told anyone at Dallah Avco that he was using his other allowances for some different purpose.  SMF ¶169.

In August 2001, Al Salmi promoted Al Bayoumi to a Level B position, and his base salary increased accordingly, although his other allowances ceased.  SMF ¶170.  In November 2001, Alp Karli wrote to Dallah Avco to reduce Al Bayoumi's salary "[a]s per the instructions of Director General, PCA/AE" – *i.e.*, Al Salmi.  SMF ¶171 (quoting Ex. 25).

In April 2002, Al Bayoumi requested an additional two years of educational leave to pursue doctoral studies at Aston.  SMF ¶172.  Al Salmi, however, objected to the request on the ground that work conditions required that Al Bayoumi return to his old job and that Al Bayoumi had already earned a degree.  SMF ¶173.  Al Salmi directed Dallah Avco to terminate Al

Bayoumi from the ANSS project effective May 12, 2002.  SMF ¶ 174.  Al Bayoumi then returned to his old job as a civil servant at the PCA.  SMF ¶ 175.

####    E.    Al Bayoumi's Interactions with the Hijackers

While Al Bayoumi was in California, he briefly interacted with Nawaf Al Hazmi and Khalid Al Mihdhar, two individuals who would later go on to be hijackers in the 9/11 attacks.

On or around February 1, 2000, Al Bayoumi met Al Hazmi and Al Mihdhar at a restaurant in Los Angeles.  SMF ¶ 176.  Al Bayoumi had a conversation with them.  *Id.*

A few days later, Al Bayoumi helped Al Hazmi and Al Mihdhar rent an apartment in the Parkwood complex where Al Bayoumi lived in San Diego.  SMF ¶¶ 177-178.  Al Bayoumi helped fill out the application form, listed himself as a reference, and signed a guarantee for the lease.  SMF ¶ 177.  Al Bayoumi also helped Al Hazmi and Al Mihdhar obtain a check to pay the security deposit:  He allowed them to deposit $1,558 in cash into his own bank account and then drew a check from the account for the same amount.  SMF ¶ 178.

Shortly after, Al Bayoumi used Al Hazmi and Al Mihdhar's apartment for an event honoring volunteers from a mosque.  SMF ¶ 179.  Al Bayoumi used their apartment so the men would have somewhere to congregate separate from Al Bayoumi's own apartment, where the women were congregating.  *Id.*

Al Bayoumi's interactions with the two future hijackers were unrelated to his ANSS job duties, unrelated to his educational studies, and unrelated to any connection Al Bayoumi had to Dallah Avco.  SMF ¶¶ 180-183.  No one at Dallah Avco instructed Al Bayoumi to assist Al Hazmi and Al Mihdhar, and Al Bayoumi never informed anyone at Dallah Avco that he had ever met, much less assisted, those two individuals.  SMF ¶¶ 184-187.

Al Bayoumi never understood that his employment on the ANSS project was sham cover employment to enable him to assist terrorists.  SMF ¶ 188.  No one at Dallah Avco or the PCA

ever suggested as much to Al Bayoumi.  SMF ¶¶189-190.  Al Bayoumi never used any of his

ANSS salary or allowances to assist terrorists, never requested salary or allowances from Dallah

Avco for the purpose of assisting terrorists, and never understood that his salary or allowances

were some sort of reward for assisting terrorists.  SMF ¶¶191-194.

There is no evidence that anyone ever told Dallah Avco that Al Bayoumi had provided or

would provide assistance to terrorists.  SMF ¶195.  And Dallah Avco had no reason to anticipate

that Al Bayoumi would interact with the two future hijackers.  SMF ¶196.

## II.  Procedural History

### A.    Plaintiffs' Claims Against Dallah Avco

On March 6, 2003, the Ashton plaintiffs named Dallah Avco among hundreds of other

defendants in their Consolidated Master Complaint in *Ashton v. Al Qaeda*, No. 02-cv-6977,

Dkt. 11 (Mar. 6, 2003).  In the operative Sixth Amended Consolidated Master Complaint, the

Ashton plaintiffs allege that Dallah Avco provided cover employment to Al Bayoumi and

financially supported the 9/11 attacks by making payments to Al Bayoumi.  No. 02-cv-6977,

Dkt. 465 ¶¶452-454 (Sept. 30, 2005).

In September 2003, the Federal Insurance plaintiffs filed their own complaint naming

Dallah Avco among hundreds of other defendants.  *Fed. Ins. Co. v. Al Qaida*, No. 03-cv-06978,

Dkt. 1 (Sept. 10, 2003).  The operative First Amended Complaint in that action makes similar

allegations.  No. 03-cv-06978, Dkt. 772 ¶¶414-419 (Sept. 30, 2005).  A few other complaints

have included Dallah Avco as a defendant as well.  *See* Consol. First Am. Master Compl., *Salvo

v. Al Qaeda*, No. 03-cv-5071, Dkt. 3 (Sept. 5, 2003); Compl., *Barrera v. Al Qaeda*, No. 03-cv-

7036, Dkt. 1 (Sept. 5, 2003); Second Am. Compl., *Cont'l Cas. Co. v. Al Qaeda*, No. 04-cv-5970,

Dkt. 195 (Oct. 6, 2005); *see also Estate of Maher v. WAMY*, No. 23-cv-2845 (severed from

*Ashton* per MDL Dkt. 8984).

Collectively, plaintiffs' complaints assert a variety of causes of action, but they can be grouped into five categories: (1) direct liability claims under federal laws, namely the Antiterrorism Act, 18 U.S.C. § 2333; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964; and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (reproduced at 28 U.S.C. § 1350 note); (2) indirect liability claims, namely aiding and abetting and conspiracy; (3) intentional tort claims under state law, namely trespass, assault, battery, and intentional infliction of emotional distress; (4) negligence-based tort claims under state law, namely negligence, wrongful death, and negligent infliction of emotional distress; and (5) miscellaneous counts that depend on the validity of other underlying claims, namely survival, punitive damages, and property damage. *See* Ex. 96 (claim chart).

## B.     The District Court's Dismissal Order

On March 6, 2006, Dallah Avco moved to dismiss.   MDL Dkts. 1711-1712; *see also* MDL Dkts. 1820-1821.  On June 17, 2010, this Court granted the motion.  MDL Dkt. 2252.

This Court held that Dallah Avco lacked the "necessary continuous, permanent and substantial presence" in the United States to support general jurisdiction.  MDL Dkt. 2252  at 23. Al Bayoumi's actions could not support specific jurisdiction either, because "[t]he culpable acts of an employee cannot be the basis to exercise jurisdiction over a foreign corporation, absent a showing that the subject acts were authorized and performed in furtherance of the employer's business." *Id.* at 41-42.  Plaintiffs, the Court concluded, alleged no facts "from which it can be reasonably inferred that [Al Bayoumi] . . . committed the alleged wrongful acts in furtherance of Dallah Avco's business interests or at its direction." *Id.* at 42.  The Court thus dismissed all claims against Dallah Avco for lack of personal jurisdiction. *Id.* at 60.

### C.     The Second Circuit's Remand Order

On April 16, 2013, the Second Circuit vacated and remanded.  *In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks VII")*, 714 F.3d 659 (2d Cir. 2013).

The court of appeals "agree[d] with the District Court that the allegations against [Dallah Avco] fail to show that the acts of Omar al Bayoumi 'were authorized and performed in furtherance of [Dallah Avco's] business.' "  714 F.3d at 679.  But the court reasoned that plaintiffs' "jurisdictional theory against Dallah Avco is not limited solely to the acts of al Bayoumi."  *Id.*  In particular, "plaintiffs allege that Dallah Avco provided 'cover employment' for al Bayoumi while he was in the United States and allegedly supporting two September 11, 2001 hijackers."  *Id.*  The court concluded that "plaintiffs' allegations suggest that Dallah Avco may have directed its activities, related to Bayoumi's cover employment, toward the United States, although questions about Dallah Avco's knowledge regarding al Bayoumi's activities remain."  *Id.*

The court of appeals concluded that "the limited factual allegations regarding . . . Dallah Avco's knowledge of al Bayoumi's activities in San Diego[ ] counsel in favor of remand."  714 F.3d at 679.  The court vacated and remanded for jurisdictional discovery.  *Id.*

### D.     The Proceedings on Remand

Ten years of jurisdictional discovery followed.   In response to plaintiffs' sprawling document requests, Dallah Avco conducted an exhaustive search that included manually reviewing millions of pages of old ANSS project files excavated from a warehouse in the outskirts of Jeddah, Saudi Arabia.  Ex. 9 ¶¶2-55.  Dallah Avco ultimately produced over ten thousand pages of documents.  *Id.* ¶3.  Thousands more pages have been produced by the Kingdom of Saudi Arabia, the London Metropolitan Police Service, and plaintiffs themselves. The U.S. government has also publicly released thousands of pages from the FBI.

17

Dallah Avco presented for deposition its corporate representative as well as two former employees: its former recruitment manager Jaber Khalifa and its former Director of Manpower Services Riaz Khan.  Exs. 2-4.  The Kingdom presented for deposition a former senior PCA official, Assistant to the President Abdulaziz Al Angari, as well as Omar Al Bayoumi himself.  Exs. 5, 6.  Finally, plaintiffs presented for deposition a former ANSS employee,  ANSS Logistics Manager Samuel Coombs, who had cooperated with plaintiffs to submit a declaration.  Exs. 7, 8.  Dallah Avco submitted an expert report from Dr. Adli Hammad, an expert on Saudi employment law.  Ex. 1.  Plaintiffs never moved to exclude Dr. Hammad and never even took his deposition.

With jurisdictional discovery now complete, Dallah Avco renews its motion to dismiss for lack of personal jurisdiction.  In the alternative, Dallah Avco moves for summary judgment.

## ARGUMENT

The Second Circuit remanded plaintiffs' claims against Dallah Avco for jurisdictional discovery because "plaintiffs allege that Dallah Avco provided 'cover employment' for al Bayoumi while he was in the United States and allegedly supporting two September 11, 2001 hijackers."  *In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks VII")*, 714 F.3d 659, 679 (2d Cir. 2013).  The court cautioned, however, that "questions about Dallah Avco's knowledge regarding al Bayoumi's activities remain" and that "the limited factual allegations regarding . . . Dallah Avco's knowledge of al Bayoumi's activities in San Diego[] counsel in favor of remand."  *Id.*

After ten years of jurisdictional discovery, those "questions about Dallah Avco's knowledge" have been answered.  There is precisely *zero* evidence that Dallah Avco knew anything about Al Bayoumi's interactions with future hijackers in the United States or had any reason at all to think that Al Bayoumi's job on the ANSS project was some sort of sham "cover employment" designed to enable him to assist terrorists.  Dallah Avco processed Al Bayoumi's

salary and benefits at the PCA's direction, just like it did for the 1,400 other employees on the ANSS project payroll. But as far as Dallah Avco knew, Al Bayoumi was in the United States pursuing educational studies with the PCA's blessing to advance his career prospects – not to support future hijackers.

Those facts preclude holding Dallah Avco liable for the 9/11 attacks. Dallah Avco's lack of knowledge about Al Bayoumi's alleged illicit conduct in the United States precludes a finding of personal jurisdiction. Alternatively, the Court should grant summary judgment in Dallah Avco's favor. All of plaintiffs' claims require either knowledge, proximate cause, or both. Yet plaintiffs have no evidence of either.

## I.   THE COURT LACKS PERSONAL JURISDICTION OVER DALLAH AVCO

After ten years of jurisdictional discovery, plaintiffs are right where they began – with not even the slightest basis for asserting personal jurisdiction over Dallah Avco.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Terrorist Attacks VII*, 714 F.3d at 673. This showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* The Court "will not draw argumentative inferences in the plaintiff's favor" and will not "accept as true a legal conclusion couched as a factual allegation." *Id.*

"[A]fter jurisdictional discovery," moreover, the Court "may consider only *admissible* evidence." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 251 & n.6 (S.D.N.Y. 2020) (collecting cases); *see also Al Thani v. Hanke*, No. 20-cv-4765, 2022 WL 489052, at *5 (S.D.N.Y. Feb. 17, 2022) ("[A] court, in resolving a [personal jurisdiction] motion made after jurisdictional discovery, may consider only *admissible* evidence."). If the Court conducts an evidentiary hearing, the plaintiffs' burden is even higher: "[T]he plaintiff must

demonstrate personal jurisdiction by a preponderance of the evidence." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986).

To establish specific personal jurisdiction, a plaintiff must show that "the defendant has '***purposefully directed***' his activities at residents of the forum," and that "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (emphasis added). "Put another way, specific personal jurisdiction properly exists where the defendant took '***intentional, and allegedly tortious, actions . . . expressly aimed***' at the forum." *Id.* (emphasis added). The defendant must have "'***expressly aimed' intentional tortious acts*** at residents of the United States." *Id.* (emphasis added); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016) (defendant must "'expressly aim[]' his conduct at the United States"); *contrast Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (finding jurisdiction based on the "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs").

Plaintiffs have not made that showing. Dallah Avco could not have aimed "intentional tortious acts" at the United States because there is no evidence that Dallah Avco ever ***knew*** that Al Bayoumi's role on the ANSS project was a sham to conceal illegal activities. And while Dallah Avco performed administrative human resources functions for Al Bayoumi and 1,400 other ANSS employees, those ***non-tortious*** activities cannot support jurisdiction.

### A.    Dallah Avco Did Not Knowingly Provide Cover Employment for Illegal Activities

The Second Circuit remanded for jurisdictional discovery against Dallah Avco because "plaintiffs allege that Dallah Avco provided 'cover employment' for al Bayoumi while he was in the United States and allegedly supporting two September 11, 2001 hijackers." *Terrorist Attacks VII*, 714 F.3d at 679. The court reasoned that "plaintiffs' allegations suggest that Dallah Avco

may have directed its activities, related to Bayoumi's cover employment, toward the United States, ***although questions about Dallah Avco's knowledge regarding al Bayoumi's activities remain***." *Id.* (emphasis added).  The court concluded that "the limited factual allegations regarding . . . ***Dallah Avco's knowledge of al Bayoumi's activities in San Diego[]*** counsel in favor of remand." *Id.* (emphasis added).

That language makes clear that, in the Second Circuit's view, the key factor for jurisdiction was "Dallah Avco's knowledge of al Bayoumi's activities" in California.  If Dallah Avco did not ***know*** it was providing "cover employment" so Al Bayoumi could assist terrorists or commit other illegal acts, Dallah Avco could not have "'expressly aimed' ***intentional tortious acts***" here.  *Terrorist Attacks VII*, 714 F.3d at 674 (emphasis added).  "A district court must follow the mandate issued by an appellate court."  *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 181 (2d Cir. 2019).  Under the Second Circuit's mandate, this Court's jurisdiction turns on whether Dallah Avco ***knew*** it was providing cover employment for illegal activity.

After ten years of jurisdictional discovery, the answer to that question is unmistakable. Not one shred of evidence suggests that Dallah Avco ***knew*** Al Bayoumi was in the United States to help future hijackers or engage in any other illicit activities.  Rather, the evidence uniformly shows that Dallah Avco knew only what was apparent from the documents themselves: that Al Bayoumi was in the United States to pursue educational studies, with the PCA's blessing, to improve his job skills and advance his career at the agency.

There is certainly no ***direct*** evidence of Dallah Avco's knowledge of illicit activities. Dallah Avco received multiple documents showing that Al Bayoumi was in the United States to pursue educational studies.  Dallah Avco received and processed paperwork for Al Bayoumi's tuition at San Diego State University in 1994.  SMF ¶ 100.  Dallah Avco received copies of the

1997 PCA correspondence in which Mohammed Al Salmi explained that Al Bayoumi was in the United States to pursue educational studies to improve his job qualifications.  SMF ¶¶ 127-128. Dallah Avco received a copy of the PCA's 2000 decree authorizing Al Bayoumi's educational leave.  SMF ¶ 149.  By contrast, *not a single document shows that Dallah Avco knew Al Bayoumi was in the United States to support terrorists or engage in other illicit activity*.

The witness testimony is no different.  Al Bayoumi never told anyone at Dallah Avco that he was in the United States for some purpose other than pursuing educational studies.  SMF ¶ 136.  To the best of Al Bayoumi's knowledge, no one else at the PCA told Dallah Avco that either.  SMF ¶ 137.  The PCA's Assistant to the President Abdulaziz Al Angari never told anyone at Dallah Avco that Al Bayoumi's educational studies were a sham.  SMF ¶ 138.  And plaintiffs' own cooperating witness Samuel Coombs never told anyone at Dallah Avco that Al Bayoumi was doing something other than pursuing educational studies.  SMF ¶ 141.  Coombs himself understood that Al Bayoumi was in the United States to pursue educational studies, and four or five other employees at Airways Engineering told him the same thing.  SMF ¶¶ 139-140. By contrast, *not a single witness testified that anyone ever told Dallah Avco that Al Bayoumi was in the United States to engage in illegal activity*.

Nor is there any *circumstantial* evidence of Dallah Avco's knowledge of wrongdoing. For one thing, Dallah Avco's relationship with Al Bayoumi was not so close that a jury could reasonably infer that Dallah Avco *must* have known whether Al Bayoumi was engaging in illegal activities.  Dallah Avco's responsibilities under the ANSS contracts were limited.  Dallah Avco did not make hiring or firing decisions, did not assign job positions, and did not direct or supervise the work of ANSS employees.  SMF ¶¶ 23-71.  Instead, Dallah Avco performed manpower procurement and payroll processing – essentially acting as an outsourced human

resources department.  *Id.*  In Al Bayoumi's case, Dallah Avco did not even perform the first of those two functions:  Al Bayoumi was a longtime PCA employee who was hired onto the ANSS project at the explicit direction of the PCA.  SMF ¶¶ 110-114.  Because Dallah Avco had no role in directing or supervising the work of ANSS employees, Al Bayoumi's mere status as an ANSS employee does not imply that Dallah Avco must have known what he was doing.

Nor was the PCA's stated reason for Al Bayoumi's lengthy stay in the United States so implausible that Dallah Avco must have known it was a sham.  Saudization is an important public policy of the Saudi government, and training Saudi citizens to take over skilled positions currently held by foreigners is a critical way the Saudi government advances that policy.  SMF ¶¶ 1-22.  The ANSS project contracts explicitly address Saudization.  SMF ¶ 40.  And the PCA's desire to improve Al Bayoumi's job qualifications so he could take over the position of his supervisor, a Turkish national, is consistent with that policy.  SMF ¶¶ 84-87.  Viewed against that cultural backdrop, Dallah Avco had no reason to question the PCA's decision to grant Al Bayoumi a lengthy secondment and educational leave to pursue studies abroad, much less conclude that Al Bayoumi must have been involved in some sort of illegal activity.

Because there is no evidence that Dallah Avco ***knew*** Al Bayoumi was engaged in any illegal activities, Dallah Avco could not have directed "intentional tortious acts" at the United States.  *Terrorist Attacks VII*, 714 F.3d at 674.  The Second Circuit remanded this case for discovery into "Dallah Avco's ***knowledge*** of al Bayoumi's activities."  *Id.* at 679 (emphasis added).  Discovery has now shown that Dallah Avco had no knowledge of any illegal activities whatsoever.  Under the plain terms of the Second Circuit's mandate, the claims against Dallah Avco should be dismissed for lack of personal jurisdiction.

23

### B.   Dallah Avco's Non-Tortious Administrative Activities Are Irrelevant to Personal Jurisdiction

Plaintiffs cannot establish jurisdiction based on Dallah Avco's routine administrative support for the ANSS project.  The Second Circuit held that, to support jurisdiction, the defendants must have "'expressly aimed' *intentional tortious acts*" at the United States. *Terrorist Attacks VII*, 714 F.3d at 674 (emphasis added).  Routine human resources functions such as payroll processing and related administrative support are *non-tortious activities* and therefore not relevant to jurisdiction.  If those functions alone established jurisdiction over Dallah Avco, the Second Circuit would never have remanded for discovery into "Dallah Avco's *knowledge* of al Bayoumi's activities" in the United States.  *Id.* at 679 (emphasis added).  The Second Circuit's mandate plainly contemplated an inquiry into whether Dallah Avco had "knowledge" of Al Bayoumi's activities beyond the undisputed fact that Al Bayoumi was receiving his paycheck as an ANSS employee.

Even if Dallah Avco's non-tortious activities were somehow relevant despite the Second Circuit's mandate, they do not support jurisdiction.  A plaintiff must show that the defendant "'purposefully directed' his activities at residents of the forum." *Terrorist Attacks VII*, 714 F.3d at 674.  Dallah Avco did not purposefully direct *any* activities toward the United States here.

Dallah Avco had no role in deciding to send Al Bayoumi to the United States.  Al Bayoumi had already been studying in San Diego for nearly a year, with the PCA's blessing, when the PCA first seconded him to the ANSS project in 1995.  SMF ¶¶ 80-103.  The PCA approved Al Bayoumi's course of study so he could take over his supervisor's job at the agency. SMF ¶¶ 84-89.  The PCA then arranged Al Bayoumi's secondment to the ANSS project after Al Bayoumi exhausted his available leave quota, his secondment to Ercan fell through, and he

needed some other mechanism to extend his stay if he was going to continue his studies.  SMF ¶¶ 104-114.  Dallah Avco did not purposefully direct any of those United States activities.

Dallah Avco's mere administration of Al Bayoumi's salary and benefits does not show that Dallah Avco purposefully directed activities at the United States.  Dallah Avco was contractually obligated to process salary and benefits for approximately 1,400 ANSS employees pursuant to the PCA's instructions and subject to the PCA's reimbursement, regardless of where the PCA decided to send those employees.  SMF ¶¶ 29, 43-52.  That one of the 1,400 employees happened to be studying in the United States was wholly incidental and fortuitous from Dallah Avco's perspective and does not constitute "purposeful" direction.

In *Waldman*, for example, the Second Circuit rejected a claim of personal jurisdiction where an organization committed "random" terror attacks that "indiscriminately" harmed Americans among many other victims.  835 F.3d at 337-38.  Other cases reach similar results. *See, e.g.*, *Girl Scouts of U.S. v. Steir*, 102 F. App'x 217, 219 (2d Cir. 2004) (no jurisdiction under state long-arm statute where defendants "directed [their website] at the entire United States" and "manifested no intent specifically to target New York"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 207-08 (S.D.N.Y. 2018) (no jurisdiction where defendants "aimed their conduct at counterparties . . . around the world, some of whom happened to be in the United States"); *Swift Transp. Co. of Ariz., LLC v. RTL Enters., LLC*, No. 14-cv-902, 2015 WL 457641, at *4 (N.D.N.Y. Feb. 3, 2015) (similar).  Plaintiffs' claims fail for the same reason here.  Dallah Avco processed payroll for 1,400 ANSS employees, one of whom happened to be in the United States as a result of decisions in which Dallah Avco had no role whatsoever.  Those circumstances do not show that Dallah Avco ***purposefully*** directed any activities at the United States.

25

Under the Second Circuit's mandate, this Court should limit its analysis to whether Dallah Avco *knew* it was providing cover employment for illegal activities. But even if the Court were to disregard the Second Circuit's mandate and evaluate Dallah Avco's activities more broadly, Dallah Avco's provision of routine human resources services for the ANSS project cannot establish jurisdiction, because Dallah Avco did not ***purposefully direct*** those activities at the United States.

## II. ALTERNATIVELY, THE COURT SHOULD GRANT SUMMARY JUDGMENT IN DALLAH AVCO'S FAVOR

If the Court nonetheless finds personal jurisdiction, it should grant summary judgment in Dallah Avco's favor. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party." *In re 650 Fifth Ave.*, 830 F.3d 66, 86 (2d Cir. 2016). To avoid summary judgment, plaintiffs must produce ***admissible*** evidence supporting their claims (or at least evidence that can be reduced to admissible form). Fed. R. Civ. P. 56(c)(2); *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) ("On a motion for summary judgment, a district court may rely only on material that would be admissible at trial.").

Plaintiffs cannot avoid summary judgment here. All of plaintiffs' claims require either knowledge, proximate cause, or both. And plaintiffs have no evidence of either.

### A. Dallah Avco's Summary Judgment Motion Is Properly Before the Court

As an initial matter, Dallah Avco properly seeks summary judgment at this stage, even though it also moves to dismiss for lack of personal jurisdiction. Under the Federal Rules, "[n]o defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion." Fed. R. Civ. P. 12(b). A defendant therefore does not

"waive[] [its] right to contest personal jurisdiction" by moving, "in the alternative, for summary judgment pursuant to Rule 56." *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, No. 03-2527, 2004 WL 303209, at *1 n.1 (D. Kan. Jan. 28, 2004) (citing Fed. R. Civ. P. 12(b)); *see also* 5B Charles A. Wright et al., *Federal Practice & Procedure* § 1351 (3d ed. rev. 2023) (noting that "a defendant may join objections to jurisdiction under Rule 12(b)(2) with . . . any other defenses that are assertable by motion without waiving the jurisdictional defense"); *Corl v. Kenan Advantage Grp. Inc.*, No. 3:20-CV-00503, 2022 WL 2232195, at *5 (M.D. Tenn. June 21, 2022) (no waiver so long as defendant "made clear that [it] was asking the Court to rule in [its] favor on the merits under Rule [56] only if the Court found that it did have jurisdiction over [it]").

There are compelling reasons for this Court to consider Dallah Avco's summary judgment motion at this time. Dallah Avco has already endured lengthy and burdensome discovery far more extensive than what most merits defendants undergo. Dallah Avco conducted wide-ranging document searches that included manually reviewing millions of pages of old ANSS project files excavated from a warehouse in the outskirts of Jeddah. Ex. 9 ¶¶ 2-55. Dallah Avco presented for depositions both its corporate representative and two former employees – it has no witnesses left to produce. Exs. 2-4. Plaintiffs have never identified what additional evidence they might seek if this litigation proceeded through yet another round of discovery before Dallah Avco could move for summary judgment. As the Court is aware, plaintiffs in this MDL have been proceeding against both "jurisdictional" and "merits" defendants with no real difference over the scope of discovery permitted. In those circumstances, delaying summary judgment would serve no useful purpose.

Dallah Avco, meanwhile, has a powerful interest in the prompt resolution of the claims against it. Dallah Avco was first named as a defendant in this litigation **twenty years ago** in

2003.  *See Ashton v. Al Qaeda*, No. 02-cv-6977, Dkt. 11 (S.D.N.Y. Mar. 6, 2003).  The Second

Circuit remanded Dallah Avco for jurisdictional discovery **ten years ago** in April 2013.  *See*

*Terrorist Attacks VII*, 714 F.3d at 679.  Since then, plaintiffs have been endlessly pursuing their

theory that Dallah Avco knowingly provided cover employment to Al Bayoumi so he could

assist future hijackers when they arrived in the United States.  None of the evidence plaintiffs

have uncovered has come anywhere close to showing Dallah Avco's knowledge of illegal

activity.  Yet Dallah Avco has remained mired in this MDL for decades, continuing to incur legal

fees year after year while these baseless allegations of wrongdoing hang overhead.  It is time for

the Court to put an end to plaintiffs' meritless claims against Dallah Avco by whatever

procedural mechanism will most expeditiously accomplish that result.

###   B.   There Is No Evidence that Dallah Avco Knowingly Assisted the 9/11 Attacks

Summary judgment is clearly warranted on this record.  The gravamen of plaintiffs'

claims against Dallah Avco is that the company aided and abetted the 9/11 attacks by providing

"cover employment" to Omar Al Bayoumi.  *Terrorist Attacks VII*, 714 F.3d at 679.  Aiding and

abetting, however, requires ***knowledge***.  And there is no evidence that Dallah Avco ***knew*** Al

Bayoumi was in the United States for some reason other than pursuing educational studies to

advance his career at the PCA.  That lack of knowledge is fatal to plaintiffs' aiding and abetting

claims, their conspiracy claims, and all of their other intentional tort claims.

To establish aiding and abetting – under the federal Antiterrorism Act or otherwise – a

plaintiff must show "three elements": "(1) the party whom the defendant aids must perform a

wrongful act that causes an injury"; "(2) the defendant must be ***generally aware of his role as***

***part of an overall illegal or tortious activity*** at the time that he provides the assistance"; and

"(3) the defendant must ***knowingly and substantially assist*** the principal violation."  *Honickman*

*v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (emphasis added).  For the second element,

"[t]he defendant need not be generally aware of its role in the ***specific act*** that caused the plaintiff's injury," but it must be "generally aware of its role in an ***overall illegal activity*** from which the act that caused the plaintiff's injury was foreseeable." *Id.* at 496 (emphasis altered). For the third element, courts consider six factors in assessing whether assistance was substantial: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id.* at 500.

In *Honickman*, for example, the Second Circuit dismissed an aiding and abetting claim against a bank that provided financial services to three customers connected to Hamas. 6 F.4th at 501-02. The court held that "the allegations do not support an inference that BLOM Bank was ***aware*** of the Three Customers' ties with Hamas prior to the relevant attacks, thereby undermining the second element of general awareness." *Id.* at 501 (emphasis added). The Treasury Department designated one customer as a terrorist supporter "only after the final attack at issue," and the fact that the customers "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood these organizations' true nature and activities." *Id.* at 502. The court contrasted the "limited public sources" implicating the customers at issue in that case with the "detailed, numerous sources that sufficed" in an earlier case, where "Hizbollah made public statements identifying the defendant-bank's customers as 'integral parts of Hizbollah' prior to the relevant attacks." *Id.* (quoting *Kaplan v. Lebanese Can. Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021)).

Similarly, in *Weiss v. National Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021), the Second Circuit rejected an aiding and abetting claim against a bank that transferred funds at the direction of a customer to charities that allegedly supported Hamas. "[T]he charities to which

NatWest transferred funds as instructed by Interpal performed charitable work and . . . Interpal did not indicate to NatWest that the transfers were for any terroristic purpose . . . ." *Id.* at 166. Plaintiffs thus "could not show . . . that NatWest was generally aware that it was playing a role in Hamas's acts of terrorism." *Id.* at 167; *see also Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223-25 (2d Cir. 2019) (rejecting aiding and abetting claim where "plaintiffs' allegations themselves suggest that in providing banking services to ARB, HSBC had little reason to suspect that it was assuming a role in [Al Qaeda's] terrorist activities").

Most recently, in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Cout held that social media platforms were not liable for aiding and abetting terrorism merely because terrorist groups used their platforms. The Court emphasized the "conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant ***consciously and culpably*** 'participate[d]' in a wrongful act so as to help 'make it succeed.' " *Id.* at 493 (emphasis added). That element of conscious wrongdoing was absent in that case: "[T]he only affirmative 'conduct' defendants allegedly undertook was creating their platforms and setting up their algorithms to display content relevant to user inputs and user history." *Id.* at 498. "The mere creation of those platforms . . . is not culpable," even if "bad actors like ISIS are able to use platforms like defendants' for illegal – and sometimes terrible – ends." *Id.* at 499.

Those precedents foreclose aiding and abetting liability here. There is no evidence that Dallah Avco ***knew*** Al Bayoumi was in the United States to assist terrorists or engage in any other unlawful activity. Rather, all evidence shows the opposite: So far as Dallah Avco knew, Al Bayoumi was in the United States to pursue educational studies with the PCA's blessing so he could advance his career at the agency. As already explained, no document shows that Dallah Avco ever learned that Al Bayoumi was in the United States to engage in illegal activities. No

one ever told Dallah Avco that Al Bayoumi was in the United States to engage in illegal activities.   And no circumstantial evidence shows that Dallah Avco must have known that Al Bayoumi was in the United States to engage in illegal activities.   Simply put, if Al Bayoumi was in the United States to participate in a secret welcoming committee for newly arrived terrorists, rather than to pursue educational studies to advance his career, no one ever told Dallah Avco that.   Dallah Avco never learned about it.   Dallah Avco never ***knew*** it.   *See* pp. 21-23, *supra*.

That absence of knowledge is fatal to plaintiffs' aiding and abetting claims.   Under the second element for aiding and abetting, the defendant must be "***generally aware*** of his role as part of an overall illegal or tortious activity."   *Honickman*, 6 F.4th at 494 (emphasis added). Dallah Avco was never "generally aware" of any illegal activities.   Under the third element, the defendant must "***knowingly*** and substantially assist the principal violation."   *Id.* (emphasis added).   Dallah Avco never "knowingly" assisted any unlawful conduct.

Dallah Avco's lack of knowledge also weighs decisively against a finding that any assistance was "substantial[ ]."   *Honickman*, 6 F.4th at 494.   The defendant's "state of mind" is one of the factors courts consider when evaluating whether assistance was substantial.   *Id.* at 500. Here, Dallah Avco's "state of mind" was that it didn't know anything.   The other factors point the same way:   Dallah Avco was not present at the 9/11 attacks.   Dallah Avco's connection to Al Hazmi and Al Mihdhar was highly attenuated.   And although Dallah Avco paid Al Bayoumi's salary and benefits over several years, Al Bayoumi's assistance to Al Hazmi and Al Mihdhar – through which Dallah Avco's assistance must also be filtered when evaluating an aiding and abetting claim – was isolated, insubstantial, and temporally remote from the 9/11 attacks.

Dallah Avco's lack of knowledge also forecloses plaintiffs' conspiracy claims.   To prove a conspiracy – under the Antiterrorism Act or otherwise – plaintiffs must show "an ***agreement***

between two or more persons . . . to participate in an unlawful act." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023).   Conspiracy requires "a ***conscious commitment*** to a common scheme designed to achieve an unlawful objective." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018) (emphasis added).   Because there is no evidence that Dallah Avco ***knew*** Al Bayoumi was in the United States to help terrorists, Dallah Avco cannot have made a "conscious commitment" to any unlawful common scheme. *See, e.g.*, *Freeman*, 57 F.4th at 80 (dismissing conspiracy claim against banks where complaint did not "allege that the Banks and the terrorist groups shared any 'common intent'" and plaintiffs did not "plead that the Banks intended to kill or injure U.S. service members in Iraq").

Dallah Avco's lack of knowledge likewise precludes all of plaintiffs' direct liability claims under federal law.   The Antiterrorism Act applies only to acts "***intended***" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping."   18 U.S.C. § 2331(1)(B), (5)(B) (emphasis added).   RICO requires "***knowledge*** of the unlawful nature of [the] actions," or at a minimum, the same "*mens rea* requirement . . . found in the predicate crimes."   *United States v. Moseley*, 980 F.3d 9, 17-19 (2d Cir. 2020) (emphasis added).   And the TVPA requires that the defendant "***intentionally*** inflict[]" torture or commit a "***deliberated*** killing not authorized by a previous judgment."   Pub. L. No. 102-256, §§ 3(a), (b)(1), 106 Stat. 73, 73 (1992) (reproduced at 28 U.S.C. § 1350 note) (emphasis added). All those claims require ***knowledge*** – something plaintiffs have not shown here.

Finally, Dallah Avco's lack of knowledge forecloses all of plaintiffs' state-law intentional tort claims, such as trespass, assault, battery, and intentional infliction of emotional distress. Those claims, by definition, require ***intentional*** conduct. *See Scribner v. Summers*, 84 F.3d 554,

557 (2d Cir. 1996) ("Under New York law, trespass is the intentional invasion of another's property."); *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) ("Under New York law, civil assault 'is an intentional placing of another person in fear of imminent harmful or offensive contact.'"); *id.* ("Civil battery 'is an intentional wrongful physical contact with another person without consent.'"); *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (intentional infliction of emotional distress requires "intent to cause severe emotional distress"). Because there is no evidence that Dallah Avco **knew** Al Bayoumi was in the United States to assist terrorists, Dallah Avco cannot have committed any of those ***intentional*** torts.

Dallah Avco's lack of knowledge thus forecloses **all** of plaintiffs' secondary liability claims, **all** of plaintiffs' federal direct liability claims, and **all** of plaintiffs' state-law intentional tort claims – in other words, all of plaintiffs' claims except for the state-law negligence-based claims, which fail for other reasons discussed below.

### C.    Dallah Avco Did Not Proximately Cause the 9/11 Attacks

Plaintiffs cannot show proximate cause either.  All of plaintiffs' direct liability claims – whether for intentional torts or mere negligence – require that Dallah Avco's **own** acts proximately caused plaintiffs' injuries.  Plaintiffs cannot make that showing.

Even where a statute is silent, plaintiffs must show "injuries . . . proximately caused by violations."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). "That venerable principle reflects the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.'"  *Id.*  Proximate cause requires that the "harm alleged has a ***sufficiently close connection*** to the conduct the statute prohibits" and "bars suits for alleged harm that is '***too remote***' from the defendant's unlawful conduct."  *Id.* at 133 (emphasis added).   "[F]oreseeability alone does not ensure the close connection that proximate cause requires."  *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202 (2017).

The Second Circuit applied that proximate cause requirement to the Antiterrorism Act in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) – a case decided before Congress amended the statute to permit aiding and abetting and conspiracy claims.  The plaintiffs sued UBS for transferring hundreds of millions of dollars to Iran, which in turn funded Hizbollah and Hamas. *Id.* at 93.  The court held that "the Complaint failed to allege proximate cause." *Id.* at 94.  "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs.  It does not allege that UBS provided money to Hizbollah or Hamas.  It does not allege that U.S. currency UBS transferred to Iran was given to Hizbollah or Hamas.  And it does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.* at 97.  "The fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism," but "the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

The Second Circuit reached a similar result in *In re Terrorist Attacks on September 11, 2001 ("Terrorist Attacks VI")*, 714 F.3d 118 (2d Cir. 2013).  The plaintiffs there alleged that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations." *Id.* at 124.  The court held:  "These allegations are insufficient for proximate causation purposes for the same reasons the allegations in *Rothstein* fell short.  Simply put, plaintiffs do not allege that the . . . defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the . . . defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." *Id.* (citation omitted).  The court also was "not persuaded that providing routine

banking services to organizations and individuals said to be affiliated with al Qaeda . . . proximately caused the September 11, 2001 attacks or plaintiffs' injuries." *Id.* That absence of proximate cause foreclosed not only the federal Antiterrorism Act claims but also state-law claims as well. *Id.* at 126-27.

Plaintiffs' evidence falls short for similar reasons here. Plaintiffs assert that, starting in 1995, Dallah Avco provided "cover employment" to Al Bayoumi and paid his monthly salary and benefits as an ANSS employee. Then, in early February 2000, in a turn of events that had nothing to do with Al Bayoumi's position on the ANSS project, Al Bayoumi met two of the future hijackers at a Mediterranean restaurant in Los Angeles and helped them rent an apartment. Then, ***nineteen months*** later in September 2001, those two hijackers participated in the 9/11 attacks. Any connection between Dallah Avco's provision of routine human resources services for the PCA's 1,400 ANSS employees and Al Qaeda's 9/11 attacks was not "proximate" in any conceivable sense. It was very, very remote. No reasonable jury could find that Dallah Avco proximately caused the 9/11 attacks.

This is not a situation where a defendant "provided money directly to al Qaeda." *Terrorist Attacks VI*, 714 F.3d at 124. Dallah Avco paid Al Bayoumi's salary and benefits as an ANSS employee, just like it paid salaries and benefits to 1,400 other ANSS employees. SMF ¶¶ 29, 43-52, 119-120. But there is no evidence that Al Bayoumi ever gave any of those funds to Al Hazmi and Al Mihdhar or otherwise used them to fund the 9/11 attacks. SMF ¶¶ 168-169, 191-193. The only financial interaction that Al Bayoumi had with Al Hazmi and Al Mihdhar was the February 2000 incident when Al Bayoumi helped Al Hazmi and Al Mihdhar pay their security deposit by allowing them to deposit cash into his bank account and then writing a check

for the same amount.  SMF ¶178.  Those funds did not come from Dallah Avco – they came from Al Hazmi and Al Mihdhar themselves.  *Id.*

Even if Al Bayoumi had in fact used his ANSS salary and benefits to fund terrorism, that would not establish proximate cause.  So far as we have found, no court has ever held that an employer "proximately caused" a tort that an employee committed in his spare time, merely because the employee used his salary to commit the tort.  *Cf. Marion v. TDI Inc.*, 591 F.3d 137, 150-51 (3d Cir. 2010) (holding that bank did not proximately cause company's Ponzi scheme despite repeatedly lending funds to company which then used them to engage in scheme).  If a McDonald's employee uses his paycheck to purchase a gun and rob a bank, McDonald's does not thereby "proximately cause" the bank robbery.  That principle applies with even more force here, where (1) Dallah Avco was not Al Bayoumi's employer but merely an outsourced HR provider; and (2) Al Bayoumi did not himself commit any terrorist attack but merely helped two future hijackers rent an apartment nineteen months before 9/11.  Any connection between Dallah Avco's role on the ANSS project and the 9/11 attacks is remote in the extreme.  Finding proximate cause on these facts would drain the concept of all meaning.

That absence of proximate cause is fatal to all of plaintiffs' direct liability claims under federal law.  The Antiterrorism Act requires proximate cause.  *See Rothstein*, 708 F.3d at 94-97.  RICO requires proximate cause.  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265-68 (1992); *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022).  And the TVPA requires proximate cause.  *See Hilao v. Est. of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996).  (The TVPA claim is also facially deficient because that statute applies only to natural persons, not corporations like Dallah Avco.  *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012).)

The absence of proximate cause also forecloses all of plaintiffs' state-law claims.  The intentional tort claims require proximate cause.  *See Scribner*, 84 F.3d at 557 (trespass);  *Doe v. Alsaud*, 224 F. Supp. 3d 286, 294 (S.D.N.Y. 2016) (assault and battery);  *Russell v. Citigroup*, No. 22-cv-2057, 2023 WL 2969823, at *7 (E.D.N.Y. Feb. 24, 2023) (emotional distress); *see also Terrorist Attacks VI*, 714 F.3d at 126-27 (dismissing intentional tort claims for lack of proximate cause).  All of the negligence-based claims require proximate cause too.  *See Hain v. Jamison*, 28 N.Y.3d 524, 528 (2016) ("'[E]vidence of negligence is not enough by itself to establish liability,' for it also must be proved that the negligence was a proximate, or legal, cause of the event that produced the harm sustained by the plaintiff."); *Salsedo v. Palmer*, 278 F. 92, 94 (2d Cir. 1921) ("To sustain an action for [wrongful] death, the wrongful act, neglect, or default must have been the proximate cause of the death."); *Russell*, 2023 WL 2969823, at *7 (negligent infliction of emotional distress).

The attenuated nature of plaintiffs' injuries forecloses their negligence-based claims for another reason too.  Under New York law, a plaintiff claiming negligence "must show that the defendant owed the plaintiff a cognizable duty of care."  *Terrorist Attacks VI*, 714 F.3d at 126. "[B]anks [and other financial institutions] do not owe non-customers a duty to protect them from the intentional torts of their customers."  *Id.*  The same principle applies here:  An outsourced HR provider like Dallah Avco does not owe a duty of care to third parties injured by off-the-clock activities of the employees whose salaries and benefits they process.

In conclusion, the lack of proximate cause forecloses all of plaintiffs' direct liability claims, under both federal and state law.  Indeed, the Court would be justified in dismissing even the ***indirect*** claims (aiding and abetting and conspiracy) on this basis:  Even the relationship between ***Al Bayoumi*** and the 9/11 attacks is very attenuated.  But regardless, the relationship

37

between ***Dallah Avco*** and the 9/11 attacks is remote in the extreme.  The direct liability claims

thus fail.  Dallah Avco simply did not proximately cause the 9/11 attacks.[3]

### D.    Dallah Avco Is Not Vicariously Liable for the 9/11 Attacks

Finally, Dallah Avco cannot be held vicariously liable for the 9/11 attacks on the theory

that Al Bayoumi was a Dallah Avco employee.  Whether there was any employment relationship

between Dallah Avco and ANSS employees like Al Bayoumi is a question of Saudi law:  Saudi

Arabia is the jurisdiction where Dallah Avco performed its obligations under the ANSS contracts

and where any employment relationship was centered.  *See Restatement (Second) of Conflict of

Laws* § 174 & cmts. a, c (1971).  The unrebutted testimony of Dallah Avco's Saudi employment

law expert Dr. Adli Hammad establishes that no employment relationship existed between

Dallah Avco and ANSS employees like Al Bayoumi, because Dallah Avco did not direct or

supervise the work of those employees.  Ex. 1 ¶¶ 67-201; *cf. Nat'l Petrochem. Co. v. The M/T

Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir. 1991) ("The crucial element of an agency relationship . . .

'is that the agent acts subject to the principal's direction and control.' ").  Plaintiffs offer no

contrary expert testimony on Al Bayoumi's employment status; they never moved to exclude Dr.

Hammad's opinion; and they never even took his deposition.  The record thus stands unrefuted

that Al Bayoumi was not a Dallah Avco employee.

Even if there were some doubt, the Second Circuit already held in this case that Al

Bayoumi's interactions with the two future hijackers were beyond the scope of any employment

---

[3] The absence of any viable substantive claims forecloses plaintiffs' claims for survival, punitive
damages, and property damage.  A survival claim is not an independent tort claim but merely a
vehicle by which a personal representative can assert a claim that otherwise could have been
brought by the decedent.  *See* N.Y. Est. Powers & Trusts Law § 11-3.2(b); *Corcoran v. N.Y.
Power Auth.*, 202 F.3d 530, 541 (2d Cir. 1999) ("It is a condition precedent to . . . survival
actions that the decedent's claim must have been viable at the time of death.").  The claims for
punitive damages and property damage likewise are not freestanding tort claims but rather
categories of damages that presuppose the existence of some valid underlying claim.

relationship:  "With regard to Dallah Avco, we agree with the District Court that the allegations against the company fail to show that the acts of Omar al Bayoumi 'were authorized and performed in furtherance of the employer's business.' "  *Terrorist Attacks VII*, 714 F.3d at 679. That holding is binding here.  The "law of the case doctrine . . . requires a trial court to follow an appellate court's previous ruling on an issue in the same case."  *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  It "forecloses relitigation of all issues previously . . . decided by the appellate court."  *Id.*  The Second Circuit's mandate thus precludes vicarious liability.

In any event, discovery has only confirmed the Second Circuit's conclusion.  Al Bayoumi's fleeting interactions with the two future hijackers had no connection to his job duties on the ANSS project, his relationship to Dallah Avco (to the extent he had one), his educational studies, or his reasons for coming to the United States.  SMF ¶¶180-183.  Al Bayoumi's interactions were beyond the scope of his employment under Saudi law.  Ex. 1 ¶¶40, 202-211. Thus, even if there were some dispute over Al Bayoumi's employment status, plaintiffs cannot hold Dallah Avco vicariously liable for Al Bayoumi's actions.

39

## **CONCLUSION**

The Court should dismiss the claims against Dallah Avco for lack of personal jurisdiction.

In the alternative, the Court should grant summary judgment in Dallah Avco's favor.[4]


Dated:   October 6, 2023                          Respectfully submitted,
      New York, New York


     /s/ Robert K. Kry
Robert K. Kry
Eric R. Nitz (*pro hac vice*)
MOLO LAMKEN LLP
600 New Hampshire Ave., Suite 500
Washington, D.C.  20037
(202) 556-2000
rkry@mololamken.com

*Attorneys for Defendant*
*Dallah Avco Trans Arabia Co.*

---

[4] Dallah Avco adopts the Kingdom of Saudi Arabia's legal arguments solely to the extent those arguments justify rejection of the claims against Dallah Avco as well.