UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-1570 (GBD) (SN)

**DEFENDANT DALLAH AVCO TRANS ARABIA COMPANY'S**
**RULE 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, Defendant Dallah Avco Trans Arabia Company (now known as Dallah Trans Arabia Company) ("Dallah Avco") respectfully submits the following statement of material facts as to which it contends there is no genuine issue to be tried.[1]

I.      **SAUDIZATION, SECONDMENT, AND EDUCATIONAL LEAVE**

A.      **Saudization**

1.      Saudization is the policy of increasing the participation of Saudi nationals in the Saudi Arabian workforce.  Ex. 1 ¶42 (Hammad Rep.).

2.      For over 50 years, Saudization has been an important and explicit policy of the Saudi government.  Ex. 1 ¶¶42-45 (Hammad Rep.).

3.      During the rapid development of Saudi Arabia's oil industry, too few Saudis possessed the technical training and skills to meet the demand for skilled labor.  Ex. 1 ¶41 (Hammad Rep.).

4.      Companies generally brought in foreign laborers, leaving Saudi nationals either unemployed or serving in low-level, unskilled positions. Ex. 1 ¶41 (Hammad Rep.).

---

[1] Cited exhibits are attached to the accompanying declaration of Eric R. Nitz.

5.      The Saudi public sector has had similar difficulties meeting its need for skilled and technical employees from Saudi nationals alone.  Ex. 1 ¶46 (Hammad Rep.).

6.      Saudi agencies have often contracted with private companies to recruit skilled foreign laborers, who then work alongside their Saudi counterparts.  Ex. 1 ¶46 (Hammad Rep.).

7.      Consistent with the policy of Saudization, the Saudi government has adopted mechanisms for Saudi public employees to improve their education and training so they can take over jobs currently held by foreigners.  Ex. 1 ¶48 (Hammad Rep.).

**B.      Secondment**

8.      Saudi law permits government agencies to second employees to other ministries or to the private sector.  Ex. 1 ¶¶49-50 (Hammad Rep.).

9.      Secondment is a common and unremarkable practice in Saudi Arabia.  Ex. 1 ¶53 (Hammad Rep.).

10.     One of the most common reasons for secondment is to improve an employee's job skills by temporarily placing the employee in a new position where he can obtain additional knowledge and experience.  Ex. 1 ¶49 (Hammad Rep.); Ex. 5 at 365:16-366:7 (Angari Tr.).

11.     Under Saudi law during the relevant period, an agency could second an employee for up to one year and could renew the secondment for additional one-year terms up to a maximum of five years.  Ex. 1 ¶50 (Hammad Rep.); Ex. 71 art. 29/4 n.* (KSA0000000937).

12.     Under Saudi law, prior to the commencement of a secondment, the authorized minister of the employee's agency must issue a decision approving the secondment.  Ex. 1 ¶51 (Hammad Rep.); Ex. 71 art. 29/1 (KSA0000000937).

13.     Under Saudi law, secondment is not considered an interruption of a civil servant's public sector employment, and the agency cannot terminate the employee or offer his position to someone else.  Ex. 1 ¶52 (Hammad Rep.); Ex. 71 art. 29/3 (KSA0000000937).

14.     Under Saudi law, a civil servant that is seconded to a private company continues to participate in the retirement system for public employees rather than the separate social security system for private employees.  Ex. 1 ¶¶171-172 (Hammad Rep.); Ex. 71 art. 29/6 (KSA0000000937).

C.     **Educational Leave**

15.     Saudi law permits public employees to take up to 30 days of "ordinary leave" each year, and to combine those periods for up to 90 days in any one year.  Ex. 1 ¶55 (Hammad Rep.); Ex. 91 arts. 28/1, 28/4 (Angari Ex. 396).

16.     Saudi law permits public employees to request "exceptional leave," and permits agencies to grant such leave on any reasonable basis, provided that the total leave does not exceed six months in any three-year period.  Ex. 1 ¶56 (Hammad Rep.); Ex. 91 art. 28/22 (Angari Ex. 396).

17.     Saudi law permits public employees to request "educational leave" to pursue educational studies.  Ex. 1 ¶¶54, 57 (Hammad Rep.); Ex. 91 art. 28/19 (Angari Ex. 396).

18.     Educational leave is a common and unremarkable practice in Saudi Arabia, and many government employees are allowed to take such leave.  Ex. 1 ¶57 (Hammad Rep.).

19.     An agency may grant educational leave if (1) the employee holds a high school diploma or its equivalent, (2) the employee has spent three years in service with a job rating of at least "good," and (3) the proposed course of study is relevant to the work of the agency where the employee works.  Ex. 1 ¶58 (Hammad Rep.); Ex. 91 art. 28/19 (Angari Ex. 396).

20.     One of the main reasons for allowing educational leave is to improve the employee's job skills and prospects for advancement once the employee returns to the agency. Ex. 1 ¶60 (Hammad Rep.); Ex. 5 at 375:24-376:6 (Angari Tr.).

21.    Under Saudi law, educational leave is not considered an interruption in the employee's public sector employment, and the period is therefore included for purposes of pension accumulation.  Ex. 1 ¶ 58 (Hammad Rep.).

22.    Under Saudi law, the agency that employs a civil servant on educational leave is responsible for monitoring the progress of the employee's studies, and if the employee does not fulfill the purpose of the educational leave, the period is not considered for hiring or promotion purposes.  Ex. 1 ¶ 59 (Hammad Rep.); Ex. 91 arts. 28/20-28/21 (Angari Ex. 396).

## II.    DALLAH AVCO'S ROLE UNDER THE ANSS CONTRACTS

### A.    Background

23.    The Air Navigation System Support ("ANSS") project was a project to provide support for the installation and maintenance of air traffic control, air navigation, and aeronautical communications facilities in Saudi airports.  Ex. 10 Contract art. 1 (KSA0000002074); Ex. 10 General Conditions art. 1(f) (KSA0000002083-84).

24.    The ANSS project was administered and overseen by the Presidency of Civil Aviation ("PCA"), a Saudi government agency that, during the relevant time period, was part of the Saudi Ministry of Defense and Aviation.  Ex. 10 General Conditions arts. 1(a), 1(d), 2 (KSA0000002082, 2085-86); Ex. 1 ¶ 67 (Hammad Rep.).

25.    To support the ANSS project, the PCA awarded a series of government contracts to private contractors, numbered ANSS I, ANSS II, ANSS III, and so on, with each contract typically covering a three-year term.  Ex. 2 at 40:23-41:18 (Kamel Tr.).

26.    Dallah Avco was first awarded the ANSS contract in the 1980s, and it continued to hold the ANSS contract until 2005.  Ex. 2 at 40:23-41:18 (Kamel Tr.).

27.    Dallah Avco began work under the ANSS IV contract on September 6, 1995; it began work under the ANSS V contract on September 6, 1998; and it began work under the

ANSS VI contract on September 6, 2001.  Ex. 10 Contract art. 3.1 (KSA0000002075); Ex. 11 Contract art. 3.1 (KSA0000002973); Ex. 12 Contract art. 3.1 (DA001363).

28.     Dallah Avco's responsibilities under the ANSS contracts included manpower procurement, payroll processing, and related administrative support.  Ex. 10 General Conditions art. 5 (KSA0000002086-87); Ex. 1 ¶69 (Hammad Rep.).

29.     In connection with the ANSS project, Dallah Avco provided services for approximately 1,400 ANSS project employees.  Ex. 2 at 60:4-12 & errata (Kamel Tr.); Ex. 9 ¶6 (Yamani Decl.).

**B.     Manpower Procurement**

30.     The ANSS contracts required Dallah Avco to procure "engineering, technical, management, training, logistics, and support personnel" for the ANSS project in accordance with a "Manning Schedule" and "Position Descriptions" attached to the contract.  Ex. 10 General Conditions art. 5 (KSA0000002086); Ex. 10 Scope of Services art. 4-2-1-4 (KSA0000002190-91); Ex. 10 Manning Schedule (KSA0000002309-27).

31.     The Manning Schedule lists the job title, position number, and number of employees that must be recruited for each position.   Ex. 10 Manning Schedule (KSA0000002309-27).

32.     The Manning Schedule assigns a "Level" to each position ranging from Level A through Level N.  Ex. 10 Manning Schedule (KSA0000002309-27).

33.     According to the ANSS contracts, positions in Levels A through E were designated "Married Status" positions, while positions in Levels F through N were designated "Single Status" positions.  Ex. 10 Scope of Services art. 4-2-1-5 (KSA0000002191); Ex. 10 Manning Schedule (KSA0000002310).

34.     The ANSS contracts justify the different treatment between Married Status and Single Status positions on the ground that, "[f]rom past experience, it has become clear to the Government that certain skills required under the Contract are difficult to obtain on the international labor market, and that personnel possessing such skills can only be induced to relocate if the benefit package offered to them includes the right to be accompanied by their families."  Ex. 10 Scope of Services art. 4-2-1-5 (KSA0000002191).

35.     The position descriptions in the ANSS contracts specify the responsibilities of each position and set forth the necessary qualifications.  Ex. 10 Scope of Services art. 4-2-1-4 (KSA0000002190-91); *see, e.g.*, Ex. 54 (DA009292); Ex. 55 (DA009294).

36.     To fulfill its manpower procurement responsibilities, Dallah Avco would solicit resumes from workers, verify them against the PCA's job requirements, and send candidates to the PCA for consideration.  Ex. 3 at 92:12-94:8 (Khalifa Tr.).

37.     The ANSS contracts provide that "[t]he Contractor [*i.e.*, Dallah Avco] shall obtain Government approval for all candidates for employment or termination under the Contract prior to the candidates' employment or termination."   Ex. 10 Scope of Services art. 4-2-1-2 (KSA0000002189); *see also* Ex. 3 at 59:14-61:6 (Khalifa Tr.) (testifying that "Dallah Avco cannot hire or cannot place a person or a candidate if it's not been approved by PCA"); Ex. 5 at 346:16-21 (Angari Tr.) (confirming that "this provision required the PCA to approve all candidates that were recruited by Dallah Avco").

38.     Under the ANSS contracts, the PCA retained authority to "waive the experience, qualification, or nationality requirements" set forth in the Manning Schedule and position descriptions.  Ex. 10 Scope of Services art. 4-2-1-2 (KSA0000002189).

39.     Notwithstanding Dallah Avco's general responsibility for identifying candidates, the ANSS contracts provide that "the Government may, at its discretion, at any time, direct the

Contractor to hire any individual or individuals whom the Government deems suitable for employment under the Contract." Ex. 10 Scope of Services art. 4-2-1-2 (KSA0000002189).

40.     The ANSS contracts required Dallah Avco to maintain a "Saudization Program" that gave priority to Saudi nationals, stating:  "The Contractor shall, in providing personnel to perform the Services, give first priority to qualified Saudi Arabian nationals.  If at any time the Government shall notify the Contractor in writing of the availability of a Saudi Arabian National qualified for employment, the Contractor shall offer to employ him forthwith."  Ex. 10 Scope of Services art. 4-4-3-2-1 (KSA0000002207); *see* Ex. 5 at 351:23-352:23 (Angari Tr.) ("[I]f a Saudi national was available, he would have priority.").

41.     Once the PCA approved a candidate, the PCA would send Dallah Avco a form directing Dallah Avco to hire that employee onto the ANSS project.  Ex. 4 at 32:2-33:3, 48:19-49:9, 52:7-11, 126:14-128:13 (Khan Tr.); Ex. 1 ¶81 & n.122 (Hammad Rep.); *e.g.*, Ex. 51 (DA002312).

42.     Among other information, the PCA's form would list the name of the employee, the job title, the position number, and the position level to which the employee was to be hired.  *See, e.g.*, Ex. 51 (DA002312) ("You are authorized to hire ALEX MENCHION III, for the position of VORTAC TECHNICIAN, PD# 0804-02, (Level 'H'), Abha Sector"); Ex. 3 at 37:1-23 (Khalifa Tr.) (explaining that the "Presidency of Civil Aviation . . . decides . . . where to assign [the employee] and which position to give him"); Ex. 4 at 48:19-49:13 (Khan Tr.).

### C.     Payroll Processing

43.     Dallah Avco was responsible for handling payroll for all ANSS project employees.  Ex. 2 at 48:18-49:10 (Kamel Tr.) ("[T]hey process the paperwork and play a role, let's say, of a paymaster."); Ex. 10 Financial Conditions arts. 3-1, 3-1-1 (KSA0000002131) (listing "Man-month Funding" as "funds authorized for anticipated expenditures under this

Contract"); *cf.* Ex. 12 Management and Operations Plans art. 1-2-3-7 (DA001460) (requiring a "Salary/Merit Increase Plan"); *e.g.*, Ex. 20 (DA000491) (sample pay slip).

44.      In addition to a base salary, Dallah Avco paid ANSS employees a monthly housing allowance (calculated as two months per year, or 16.7%, of the base salary) and a monthly transportation allowance (calculated as 10% of the base salary).  Ex. 11 Management & Operations Plans art. 1-2-3-8 (KSA0000003078); Ex. 1 ¶¶ 156-157 (Hammad Rep.); *e.g.*, Ex. 29 (DA001063).

45.      Under the ANSS contracts, the PCA reimbursed Dallah Avco for payroll expenses according to pre-established rates that varied based on the employee's position level.  Ex. 10 Financial Conditions art. 3-2-1-1 (KSA0000002132) ("The Contractor shall be entitled each month to be paid for the Technical and Support Man-months provided during the preceding month at the man-month billing rates prescribed in Attachment D . . . ."); Ex. 10 Financial Conditions art. 3-7-1 (KSA0000002169-72) (chart of reimbursement rates); Ex. 7 at 83:2-19 (Coombs Tr.) ("[Q.] [D]o you know one way or the other whether the PCA reimbursed Dallah Avco for those salary payments?  A. It's a part of the contract.  I'm sure they did.").

46.      Level A positions had the highest reimbursement rate while Level N positions had the lowest rate.  Ex. 10 Financial Conditions art. 3-7-1 (KSA0000002169-72).

47.      Because the PCA's position level assignments determined how much the PCA would reimburse Dallah Avco for employee compensation, Dallah Avco relied on those assignments when setting ANSS employee salaries.   Ex. 2 at 284:19-285:17 (Kamel Tr.) ("[Q.] [W]hen Dallah Avco receives an instruction like this from the PCA, was that level assignment used as the basis for Dallah Avco's determination of things like the salary and the benefits that would be paid to the employee?  A. Yes.").

48.     In practice, Dallah Avco's ANSS employee compensation payments were approximately 5% to 10% less than the PCA's reimbursement payments, with the difference representing Dallah Avco's overhead, other expenses, and profit margin as a government contractor.  Ex. 1 ¶ 152 (Hammad Rep.).

49.     In addition to housing and transportation allowances, Dallah Avco also sometimes paid  an "other allowance" to ANSS employees.  Ex. 2 at 217:11-218:15 (Kamel Tr.).

50.     An "other allowance" was "any other thing that is not housing allowance or transportation allowance."  Ex. 2 at 217:20-218:15 (Kamel Tr.); *see also id.* (citing as examples "traveling from here to there, eating, moving, lodging, maybe sending somebody to get some experts, guests," or "overtime").

51.     The PCA, not Dallah Avco, determined the amount of any "other allowance" paid to an ANSS employee.  Ex. 4 at 163:3-164:1 (Khan Tr.) ("Q. Who determined how much of an other allowance to pay?  A. PCA . . . ."); Ex. 2 at 217:4-19 (Kamel Tr.).

52.     The PCA reimbursed Dallah Avco for "other allowances" as it did for other payroll expenses.  Ex. 2 at 253:17-254:6 (Kamel Tr.); Ex. 1 ¶ 158 (Hammad Rep.).

**D.     Direction and Supervision over ANSS Employees**

53.     Dallah Avco did not direct or supervise the work of ANSS employees once they were hired onto the project.  Instead, the ANSS contracts provide that "Contractor-furnished personnel shall work for and in conjunction with the Presidency of Civil Aviation (PCA), as one integrated team."  Ex. 10 Scope of Services art. 4-1 (KSA0000002188); *see also* Ex. 10 Scope of Services art. 4-4-1 (KSA0000002205) ("The personnel furnished by the Contractor shall work in Saudi Arabia as an integrated element of PCA.").

54.     Organizational charts in the ANSS contracts show that ANSS employees such as Contracts & Finance Control Manager Alp Karli and Logistics Manager Samuel Coombs

reported to the PCA's Director-General of Airways Engineering, Mohammed Al Salmi.  Ex. 77 (KSA0000003168); Ex. 40 (DA001477); Ex. 7 at 86:14-87:20 (Coombs Tr.); Ex. 6 at 608:12-610:24 (Al Bayoumi Tr.).

55.    Job descriptions in the ANSS contracts refer to ANSS employees reporting directly to PCA officials.  *See, e.g.*, Ex. 53 (DA009230-31) (Contracts & Finance Control Manager was "[r]esponsible to the General Manager of Airways Engineering").

56.    Dallah Avco's recruitment manager Jaber Khalifa testified that ANSS employees were directed and supervised by the PCA, not by Dallah Avco.  Ex. 3 at 33:22-34:14 (Khalifa Tr.) ("Once we recruit them, we give them to the ANSS project.  And the PCA is the one who knows where they work, what they work and what – they evaluate them.  They are under the full authority of the Presidency of Civil Aviation."); *id.* at 50:16-51:5 ("Dallah Avco only process[es] their documentation, their salaries, their benefits.  But they are under the policy and procedures set by the Presidency of Civil Aviation."); *id.* at 56:16-24 ("Q. Who was supervising the work of the people that were working on the ANSS project?  A. . . . The PCA."); *id.* at 73:24-74:15 ("Dallah Avco did not provide supervision over those employees," and "[t]hey can't give any directions").

57.    Dallah Avco's Director of Manpower Services Riaz Khan testified that ANSS employees were directed and supervised by the PCA, not by Dallah Avco.  Ex. 4 at 59:7-20 (Khan Tr.) ("[T]he employees going to the PCA they're reporting there and what they are doing, we don't know about that.  They are working for them, and they're supervising about that.  They're the responsible for them, PCA."); *id.* at 48:2-49:9 (PCA determined site assignments); *id.* at 102:18-103:12 (PCA determined vacation time); *id.* at 103:16-105:1 (PCA determined job tasks).

58.    Dallah Avco's corporate representative testified that ANSS employees were directed and supervised by the PCA, not by Dallah Avco.  Ex. 2 at 23:19-25:3 (Kamel Tr.)

("[T]hey work . . . under the guidance and control of PCA.  So at all times they're PCA subordinates . . . .  [T]here are plenty of documents that says those people work under the control of PCA.  PCA says what are their positions.  PCA says the job descriptions, their salaries, who gets to leave, when do they leave . . . .  [W]e only do administrative work and paperwork on that."); *id.* at 50:17-52:3 ("[T]he contract says that all the personnel that are furnished in the scope of contract, all the personnel that are furnished by the contractor, which is Dallah Avco, work under the guidance and control of the PCA."); *id.* at 251:17-25 ("[A]ll of the ANSS employees, including people like Alp Karli, would have been directed and supervised by the PCA").

59.      The PCA's Assistant to the President Abdulaziz Al Angari testified that ANSS personnel would "report to the Presidency of Civil Aviation" and "perform [their] jobs side by side with the counterpart Saudi national employees."  Ex. 5 at 104:13-105:5 & errata, 347:10-349:7 (Angari Tr.).

60.      ANSS employee Samuel Coombs, a cooperating witness for plaintiffs, testified that "[m]y boss was Mohamed Al-Salmi, AED's Director General," and that "Al-Salmi approved all of my vacation and personal leave as well as anything else that related to my job duties and administrative procedures."  Ex. 8 at 1 (Coombs Decl.); *see also* Ex. 7 at 83:20-85:1 (Coombs Tr.) ("[Al Salmi] directed me — basically he would call me in and talk to me about what he wanted done . . . .").

61.      By contrast, no one from Dallah Avco directed or supervised Samuel Coombs's work, and apart from receiving his paycheck from Dallah Avco, Mr. Coombs had no substantial contact with Dallah Avco at all.  Ex. 7 at 82:7-83:1 (Coombs Tr.) ("Q. Did anyone from Dallah Avco direct or supervise your day-to-day work at Airways Engineering?  A. No way.  No."); Ex. 8 at 1 (Coombs Decl.) ("I had no other substantial contact with Dallah Avco . . . .").

62. According to a PCA memorandum addressed to Dallah Avco, PCA Airways Engineering Director-General Mohammed Al Salmi retained sole authority over ANSS employee worksite assignments, out-of-Kingdom travel, hiring, termination, and other matters, while delegating certain other functions to his subordinates. Ex. 46 (DA002001-03).

63. In other correspondence, Al Salmi "instructed [Dallah Avco] to always coordinate with this office prior to sending any distribution letter to PCA/AE employees on any contract matter," warning that ANSS employees were "valued assets of this Directorate" and that "PCA will not tolerate losing these employees." Ex. 47 (DA002075).

64. The PCA, not Dallah Avco, approved or denied ANSS employee vacation or leave requests. *See, e.g.*, Ex. 41 (DA001916); Ex. 45 (DA001990).

65. The PCA, not Dallah Avco, approved or denied ANSS employee business travel. *See, e.g.*, Ex. 52 (DA008623-25).

66. The PCA, not Dallah Avco, transferred ANSS employees from one worksite to another. *See, e.g.*, Ex. 42 (DA001918); Ex. 43 (DA001919); Ex. 44 (DA001930).

67. ANSS employees worked in PCA buildings, not in Dallah Avco's corporate offices. Ex. 7 at 85:15-86:13 (Coombs Tr.); Ex. 6 at 48:1-14 (Al Bayoumi Tr.) (Alp Karli).

68. ANSS employees received PCA identification cards that provided access to ANSS worksites. By contrast, Dallah Avco employees needed special PCA permission to access those worksites. Ex. 30 (DA001070); Ex. 10 General Conditions art. 29 (KSA0000002097).

69. The ANSS contracts provide that "[t]he Contractor understands and agrees that its personnel working directly under Government supervision may in the course of their duties be in receipt of information to which the Contractor will have no right of access," and state that "the Contractor agrees that it will make no attempt to obtain such information from the aforementioned personnel." Ex. 10 Special Specifications art. 2-83 (KSA0000002125-26).

70.     The PCA held out ANSS employees as its own employees in correspondence with other parties.  *See, e.g.*, Ex. 59 (DA010841) (identifying ANSS Contracts & Finance Control Manager Alp Karli as one of four "Airways Engineering personnel" who would "represent this office during the contract and change over from AVCO Overseas Services to ERCAN Consulting Engineers").

71.     ANSS employees carried business cards that bore the PCA logo and identified them as PCA employees.  *See, e.g.*, Ex. 60 (DA010915) (business card identifying Alp Karli as the "Director, Contracts & Finance" of the "Ministry of Defence and Aviation, Presidency of Civil Aviation, Airways Engineering").

### E.     Logistics

72.     In addition to manpower procurement and payroll processing, the ANSS contracts assigned Dallah Avco responsibility for "logistics" relating to procurement of spare parts and other equipment or services.   Ex. 10 Logistics Support System arts. 4-8-1, 4-8-1-1 (KSA0000002268) ("The Contractor shall, as may be requested by the Government, provide material and services in relation to the Air Navigation System Support (ANSS) Program, equipment and facilities and other systems indicated by the Government . . . .  The Contractor shall procure new spare parts and other new equipment . . . .").

73.     To procure equipment or services, PCA mechanics or other PCA employees would submit purchase requests, which would be reviewed and approved by the ANSS Logistics Manager and then PCA Airways Engineering Director-General Mohammed Al Salmi before being sent to a vendor for fulfillment.   Ex. 7 at 88:15-95:1 (Coombs Tr.); *e.g.*, Ex. 57 (DA010695-722) (sample purchase requests).

74.     Once Al Salmi approved a purchase request, the ANSS Logistics Manager would send a request for payment to Dallah Avco instructing Dallah Avco to pay the vendor.  Ex. 7 at 100:5-106:9 (Coombs Tr.); *e.g.*, Ex. 56 (DA010334-46) (sample request for payment).

75.     Under the ANSS contracts, the PCA agreed to reimburse Dallah Avco for all logistics purchase payments.  Ex. 10 Financial Conditions art. 3-3-1-1 (KSA0000002135) ("The Contractor shall be entitled each month to be paid for Logistics Support purchases made during previous months . . . ."); Ex. 7 at 107:21-108:22 (Coombs Tr.).

76.     When processing a logistics purchase payment request, Dallah Avco had no responsibility for reviewing or auditing the reasonableness of the prices reflected on the invoices, no responsibility for reviewing or auditing whether the PCA actually needed the goods or services reflected on the invoices, and no responsibility for reviewing or auditing the PCA's selection of a vendor to provide those goods and services; its job was simply to pay the invoices according to the terms the PCA had approved.  Ex. 7 at 106:23-107:20 (Coombs Tr.).

77.     The PCA sometimes used the ANSS logistics budget to pay educational expenses for PCA employees.  Ex. 8 at 2 (Coombs Decl.); Ex. 7 at 109:4-110:4, 112:4-113:14 (Coombs Tr.); *e.g.*, Ex. 58 (DA010731-33) (sample purchase request for "Defense Language Institute, English Language Center").

78.     The decision to use logistics funds to pay for PCA employee educational expenses was made by the PCA's Director-General of Airways Engineering, Mohammed Al Salmi, not by Dallah Avco.  Ex. 7 at 113:15-114:4, 116:14-117:2 (Coombs Tr.); *e.g.*, Ex. 50 (DA002267) (financial directive for payment of educational expenses signed by Al Salmi).

79.     According to ANSS Logistics Manager Samuel Coombs, Al Salmi used the logistics budget to pay educational expenses rather than having the PCA pay them directly

because the approval process for direct payments was very long and could take months, whereas paying the expenses through a subcontractor was quicker.  Ex. 7 at 125:21-126:18 (Coombs Tr.).

III.     **OMAR AL BAYOUMI'S HISTORY WITH THE PCA**

80.     In 1977, the PCA hired Omar Al Bayoumi to work as an auditor in its Financial Administration Department in Jeddah, Saudi Arabia.  Ex. 61 (KSA0000000629).

81.     In 1993, the PCA's Director-General of Airways Engineering, Mohammed Al Salmi, transferred Al Bayoumi to the PCA's Airways Engineering Directorate, where he worked as an accountant.  Ex. 78 (KSA0000004515).

82.     Al Bayoumi's direct supervisor in Airways Engineering was Contracts & Finance Control Manager Alp Karli.  Ex. 6 at 624:3-13 (Al Bayoumi Tr.).

83.     Al Bayoumi worked in a PCA Airways Engineering office building, next to Alp Karli's office.  Ex. 6 at 48:1-14 (Al Bayoumi Tr.).

84.     When Al Bayoumi began work at Airways Engineering in 1993, Alp Karli told Al Bayoumi that Al Bayoumi would ultimately take over Karli's job as the head of Contracts & Finance Control.  Ex. 6 at 51:2-52:22 (Al Bayoumi Tr.).

85.     Al Bayoumi understood that the PCA's plan to have him replace Alp Karli was part of the Saudi government policy of Saudization.  Ex. 6 at 621:21-622:2 (Al Bayoumi Tr.).

86.     Alp Karli is a Turkish national, whereas Al Bayoumi is a Saudi national.  Ex. 24 (DA000601-02).

87.     Alp Karli told Al Bayoumi that Al Bayoumi needed to improve his English language skills before he could take over Karli's job.  Ex. 6 at 51:2-52:22 (Al Bayoumi Tr.).

88.     In August 1994, while still employed as a civil servant at the PCA, Al Bayoumi began pursuing English as a Second Language studies at San Diego State University.  Ex. 6 at 625:6-627:3 (Al Bayoumi Tr.).

89.     Alp Karli approved Al Bayoumi's educational program at San Diego State University, and Al Bayoumi is not aware of anyone else involved in the approval of his educational program.  Ex. 6 at 628:13-18 (Al Bayoumi Tr.).

90.     Al Bayoumi took several classes at San Diego State University during the Fall 1994 and Spring 1995 semesters.  Ex. 86 (PEC-KSA1-000071-83).

91.     San Diego State University records show that Al Bayoumi had attendance rates ranging from 88.5% to 92%, achieved passing grades, and received generally favorable comments from his instructors.  Ex. 86 (PEC-KSA1-000071-83).

92.     To enable his studies, Al Bayoumi requested and received a series of leaves of absence from the PCA.  Ex. 6 at 635:24-636:16, 637:15-638:1, 638:19-639:7 (Al Bayoumi Tr.).

93.     On August 28, 1994, Al Bayoumi began a 90-day period of regular leave.  Ex. 73 (KSA0000001032-33).

94.     On November 27, 1994, Al Bayoumi began a 90-day period of exceptional leave.  Ex. 74 (KSA0000001040-41).

95.     On February 27, 1995, Al Bayoumi began a second 90-day period of exceptional leave.  Ex. 75 (KSA0000001046).

96.     Each of Al Bayoumi's leave requests was directed to, and approved by, the PCA's Director-General of Airways Engineering, Mohammed Al Salmi.  Ex. 73 (KSA0000001032-33); Ex. 74 (KSA0000001040-41); Ex. 75 (KSA0000001046).

97.     In December 1994, San Diego State University Program Coordinator Linda Lawton corresponded with Al Salmi about Al Bayoumi's course of studies, and in particular his stated desire to pursue a specialized English course in Accounting / Finance / Contracts.  Ex. 33 (DA001105-06).

98.     Mohammed Al Salmi used the ANSS project's logistics budget to pay for Al Bayoumi's educational studies at San Diego State University.  Specifically, on March 30, 1994, Al Salmi issued a financial directive to Avco Overseas Services / Textron, instructing it to pay Al Bayoumi's tuition as well as a weekly living allowance, and guaranteeing payment through the ANSS project account.  Ex. 50 (DA002267).

99.     Avco Overseas was a Texas-based subcontractor for the ANSS project that formerly had a minority (approximately 15%) equity stake in Dallah Avco, but which had not been affiliated with Dallah Avco since the mid-1980s.  Ex. 2 at 130:23-131:23 & errata (Kamel Tr.); Ex. 3 at 130:16-132:23 (Khalifa Tr.); Ex. 9 ¶83 (Yamani Decl.).

100.    Pursuant to Al Salmi's March 1994 directive, Avco Overseas paid Al Bayoumi's tuition at San Diego State University and invoiced the ANSS Logistics Manager; Dallah Avco in turn paid Avco Overseas and invoiced the PCA pursuant to the ANSS contract's logistics procedures, identifying the payments as "educational expenses" for "Mr. Omar Al-Bayoumi at San Diego State University."  Ex. 49 (DA002261-63); Ex. 2 at 157:24-168:5 (Kamel Tr.).

101.    Dallah Avco had no role in preparing Al Salmi's March 1994 directive to Avco Overseas to pay Al Bayoumi's tuition and living expenses.  Ex. 7 at 114:15-117:2 (Coombs Tr.).

102.    On February 5 and 12, 1995, Al Salmi sent two financial directives to another ANSS project subcontractor, a California company named Ercan Engineering & Contracting, directing it to pay Al Bayoumi's tuition and living expenses.  Ex. 90 (MPS 732 D0883-X0361 at 320, 324).

103.    The two financial directives to Ercan were both signed by Al Salmi, and Dallah Avco had no role in deciding to use ANSS logistics funds to pay those educational expenses. Ex. 7 at 124:4-125:19, 129:13-18 (Coombs Tr.).

IV.     **AL BAYOUMI'S ROLE ON THE ANSS PROJECT**

      A.     **Al Bayoumi's Secondment**

      104.     After completing his coursework in Spring 1995, Al Bayoumi wanted to pursue further educational studies in the United States.  Ex. 6 at 649:5-14 (Al Bayoumi Tr.).

      105.     By May 1995, Al Bayoumi had already taken 90 days of ordinary leave and six months of exceptional leave, the maximum permitted by Saudi law, and therefore had to find another legal mechanism to extend his stay in the United States if he was to remain there.  Ex. 1 ¶ 118 (Hammad Rep.).

      106.     On May 11, 1995, ANSS subcontractor Ercan Consulting Engineers sent a letter to the PCA requesting "approval to have Mr. Omar Al-Bayoumi seconded to work in our financing department for a period of one year."  Ex. 88 (MPS 727 D0951-X0352 at 176).

      107.     On May 16, 1995, Al Bayoumi wrote to a contact in the Saudi government, Ahmed Al Hamdan, explaining that he was "in America spending an extraordinary leave," that "[a] company has offered me to work with it for a year," and that the company had written to the PCA seeking approval for the secondment.  Ex. 87 (MPS 727 D0951-X0352 at 178).

      108.     Hamdan responded to Al Bayoumi, stating that he had spoken to Abdulaziz Al Angari at the PCA and learned that Saudi law did not permit a civil servant like Al Bayoumi to be seconded to an American company like Ercan.  Ex. 89 (MPS 727 D0951-X0352 at 145).

      109.     On May 24, 1995, Dallah Avco's managing director Alawi Kamel wrote to the PCA, stating that "Dallah Avco's air navigation system support project is currently in urgent need of the services of the Presidency's employee, Mr. Omar Ahmed Mustafa Al-Bayoumi, for the job of accounts supervisor," and requesting that the PCA "approve seconding the aforementioned individual to work for us for one year."  Ex. 37 (DA001132).

110.     Dallah Avco's corporate representative testified that, "[a]lthough the [May 24, 1995] letter involves a request from Dallah Avco to the PCA for the secondment of Al-Bayoumi, . . . PCA must have initiated this secondment because no one at Dallah Avco in 1995 knew who Al-Bayoumi was."  Ex. 2 at 239:20-241:17 (Kamel Tr.); *see also* Ex. 1 ¶ 121 (Hammad Rep.); Ex. 3 at 17:22-18:9; 38:14-39:20 (Khalifa Tr.) (Dallah Avco's recruitment manager testifying that he did not know Al Bayoumi and did not recruit him to the project).

111.     Al Bayoumi testified that "[t]he finance division of airways engineering," not Dallah Avco, "arranged the secondment."  Ex. 6 at 66:19-24 (Al Bayoumi Tr.); *see also id.* at 651:8-21 (testifying that "Airways Engineering were the ones who made those arrangements").

112.     The Kingdom of Saudi Arabia has represented to the Court that "there's no question [Al Bayoumi] was only working for Dallah Avco because civil aviation asked Dallah Avco to employ him as part of Dallah Avco's contract with civil aviation."  Ex. 94 at 13:21-24 (July 30, 2015 Hr'g Tr.); *see also* Ex. 1 at ¶¶ 119-125 (Hammad Rep.) ("[T]he request was clearly sent at the behest of either the PCA or the ANSS project staff working under the PCA's direction and supervision.").

113.     On June 25, 1995, the President of Civil Aviation granted Al Bayoumi a secondment for a period of "one year renewable."  Ex. 38 (DA001134).

114.     PCA Airways Engineering Director-General Mohammed Al Salmi directed Dallah Avco to hire Al Bayoumi onto the ANSS project by a notice effective as of June 6, 1995. Ex. 27 (DA001016); Ex. 2 at 86:4-92:5 (Kamel Tr.); Ex. 4 at 126:14-128:13 (Khan Tr.).

115.     Over the following years, the PCA extended Al Bayoumi's secondment four times, bringing the total period of secondment to five years.  Ex. 28 (DA001062); Ex. 22 (DA000552); Ex. 36 (DA001120); Ex. 35 (DA001119).

116.     At one point, Saudi Arabia's social security agency notified Dallah Avco that the company was erroneously withholding social security payments from Al Bayoumi's paycheck, explaining that, because Al Bayoumi was a civil servant who was merely seconded to another position, he still fell under the government pension program.  Ex. 26 (DA000899); Ex. 1 ¶¶170-173 (Hammad Rep.); Ex. 2 at 254:25-256:14 (Kamel Tr.).

### B.     Al Bayoumi's Educational Studies

117.     During Al Bayoumi's secondment, the PCA formally assigned Al Bayoumi to specific job positions on the ANSS project.  For example, the PCA's initial June 6, 1995 notice directed Dallah Avco to hire Al Bayoumi as a Senior Data Processing Technician with pay level "G."  Ex. 27 (DA001016); Ex. 2 at 86:4-92:5 (Kamel Tr.).

118.     On September 6, 1998, at the PCA's direction, Dallah Avco changed Al Bayoumi's position to PCA/AE Budget Coordinator.  Ex. 19 (DA000098) (notice of employment); Ex. 4 at 38:19-39:14, 48:19-49:13 (Khan Tr.) (testifying that "all of the information" on notice of employment forms "is provided to Dallah Avco from the PCA"); Ex. 1 ¶132 (Hammad Rep.).

119.     Throughout Al Bayoumi's secondment, Dallah Avco paid Al Bayoumi a monthly salary, housing allowance, and transportation allowance that corresponded to the positions and pay grades to which the PCA assigned him, just like it did for other ANSS employees.  Ex. 1 ¶¶144-157 (Hammad Rep.); *see* Ex. 20 (DA000457-517, 1022).

120.     The PCA reimbursed Dallah Avco for the salary and benefits it paid to Al Bayoumi, just like it did for other ANSS employees.  Ex. 10 Financial Conditions art. 3-2-1-1 (KSA0000002132); Ex. 5 at 355:20-357:17 (Angari Tr.).

121.     Despite Al Bayoumi's formal job positions on the ANSS project, Al Bayoumi did not perform the tasks typically associated with those positions.  Instead, he pursued educational studies in the United States.  Ex. 6 at 655:22-659:22 (Al Bayoumi Tr.); *see also id.* at 652:22-

653:1 (testifying that "the reason for the secondment was so [he] could pursue educational studies in the United States").

122.    From February 1995 through August 1995, Al Bayoumi took English language classes at ELS Language Centers in San Diego.  Ex. 82 (PEC-KSA1-000035-36).

123.    From November 1995 through January 1997, Al Bayoumi took courses toward a Master of International Business Administration at West Coast University.  Ex. 83 (PEC-KSA1-000044-47).

124.    From Winter Quarter to Fall Quarter 1997, Al Bayoumi took courses toward a Master of International Business Administration at Alliant International University in San Diego, and was awarded that degree in 1997.  Ex. 84 (PEC-KSA1-000061); Ex. 63 (KSA0000000725).

125.    In 1998 and 1999, Al Bayoumi enrolled in courses at the Keller Graduate School of Management, although he did not complete the exam requirements for the courses or earn any credits for them.  Ex. 85 (PEC-KSA1-000067-70); Ex. 6 at 771:5-772:11 (Al Bayoumi Tr.).

126.    During 1999 and 2000, Al Bayoumi took several continuing education courses at George Washington University and was awarded a Master's Certificate in Project Management in March 2000.  Ex. 70 (KSA0000000907); Ex. 64 (KSA0000000726); Ex. 65 (KSA0000000734-37); Ex. 76 (KSA0000001835).

127.    In a March 12, 1997 letter of which Dallah Avco received a copy, PCA Director of Personnel Abdelrahim Nuri Jestinaya wrote to PCA Airways Engineering Director-General Al Salmi to inquire about Al Bayoumi's status, asking:

"1)  What are the reasons for the secondment renewal for the third time?

2)  What are the reasons for his stay in the US?  Is it to continue his education there or for other reasons?

3)  What is the type of study, specialization, and qualification to be obtained and when will he complete his study?

4) Does he have the desire to continue in the office after his return?  Or will he leave the work?"

Ex. 16 (DA000091).

128.    In a March 19, 1997, letter of which Dallah Avco received a copy, Al Salmi responded to Jestinaya's questions as follows:

"1.  The reasons for renewal of the secondment: it is made based on the Company's request in the framework of the cooperation existing between the governmental and private sectors to developing the national competencies and cadres to replace the non-Saudi workforce.

2.  The reasons for extending his secondment period: to continue his study and to take advantage of him after completing his study as he will effectively take place as a government employee in the Air Navigation System Support Program carried out by the Company (Contractor).

3.  The type of study currently carried out by the said employee is the preparatory study for obtaining a master's degree in business administration and studies in financial management.  His study will end at the end of the required secondment year.

4. The said person has a firm desire to continue in his office after the expiration of the secondment."

Ex. 13 (DA000044).

129.    On April 4, 1999, Dallah Avco wrote to the PCA stating that it did not wish to renew Al Bayoumi's secondment for a fifth year.  Ex. 31 (DA001102).

130.    On April 7, 1999, Al Salmi responded:  "We would like to inform you that the Presidency wants to grant [Al Bayoumi] a Secondment for a period of one year only, to complete the task under which the Presidency approved of his Secondment.  Hence, please renew the Secondment . . . to another period of one year . . . . provided that, a letter to be issued by the Company directed to the Presidency in this respect in the required expedition in order to complete the Secondment Procedures Arrangements, as per Law . . . ."  Ex. 32 (DA001104).

131.    Al Bayoumi testified in reference to that exchange that the "task" for which the PCA had seconded him was "further educational studies," and that as of April 1999, he had not completed the studies he intended to pursue.  Ex. 6 at 680:1-20 (Al Bayoumi Tr.).

132.    Following the PCA's instructions, on April 7, 1999, Dallah Avco sent the PCA a letter requesting another extension of Al Bayoumi's secondment, which the PCA granted. Ex. 34 (DA001110); Ex. 35 (DA001119).

133.    Al Bayoumi testified that "the coursework [he was] pursuing in the United States [was] relevant to [his] job at Airways Engineering" and that "this coursework [was] intended to improve [his] job skills at Airways Engineering."  Ex. 6 at 660:4-11 (Al Bayoumi Tr.).

134.    PCA Assistant to the President Abdulaziz Al Angari testified that Al Bayoumi's course of study "suit[ed]" his position in "the financial department."  Ex. 5 at 385:25-386:18 (Angari Tr.).

135.    Al Bayoumi "hope[d] that by pursuing this coursework [he] would eventually take over Alp Karli's job as the head of the contracts, finance and controls unit in Airways Engineering." Ex. 6 at 660:12-17 (Al Bayoumi Tr.).

136.    Al Bayoumi never told anyone at Dallah Avco that he was in the United States for some purpose other than pursuing educational studies.  Ex. 6 at 659:23-660:3, 680:21-681:1 (Al Bayoumi Tr.).

137.    To Al Bayoumi's knowledge, no one at the PCA ever told anyone at Dallah Avco that Al Bayoumi was in the United States for some purpose other than pursuing educational studies. Ex. 6 at 681:2-7 (Al Bayoumi Tr.).

138.    Abdulaziz Al Angari never told anyone at Dallah Avco that Al Bayoumi's educational studies were a sham.  Ex. 5 at 390:2-10 (Angari Tr.).

139.    Plaintiffs' cooperating witness ANSS Logistics Manager Samuel Coombs understood that Al Bayoumi was in the United States to pursue educational studies.  Ex. 7 at 150:16-20 (Coombs Tr.); *id.* at 127:23-128:14, 129:4-7.

140.    Approximately four to five people at Airways Engineering told Samuel Coombs that Al Bayoumi was in the United States pursuing educational studies.  Ex. 7 at 128:15-129:3 (Coombs Tr.).

141.    Samuel Coombs never told anyone at Dallah Avco that Al Bayoumi was doing something other than pursuing educational studies in the United States.  Ex. 7 at 150:21-25 (Coombs Tr.).

142.    Dallah Avco's understanding was that Al Bayoumi was in the United States to pursue educational studies.  Ex. 2 at 101:23-102:9 (Kamel Tr.).

143.    There is no evidence that anyone ever told Dallah Avco that Al Bayoumi was in the United States for some purpose other than pursuing educational studies.

### C.    Al Bayoumi's Educational Leave

144.    Al Bayoumi's fifth year of secondment, the maximum permitted by Saudi law, was scheduled to expire in April 2000.  Ex. 72 (KSA0000000989); Ex. 1 ¶ 50 (Hammad Rep.).

145.    As the expiration of his secondment neared, Al Bayoumi returned to Saudi Arabia in March 2000, and he resumed his old job at Airways Engineering a few weeks later.  Ex. 6 at 547:11-548:5 (Al Bayoumi Tr.); Ex. 79 (KSA0000008000) (passport stamp showing entry date of March 11, 2000); Ex. 72 (KSA0000000989) (reporting that Al Bayoumi was "back to service" as of April 15, 2000).

146.    Despite having completed his secondment, Al Bayoumi still wanted to pursue more educational studies.  Ex. 6 at 682:17-24 (Al Bayoumi Tr.).

147.     On May 9, 2000, Al Bayoumi wrote to Director-General Al Salmi requesting a two-year educational leave.  Ex. 69 (KSA0000000902).

148.     On May 11, 2000, Al Salmi submitted Al Bayoumi's request for educational leave to the PCA's Director of Personnel Affairs and Salaries, stating that he did not object.  Ex. 68 (KSA0000000901).

149.     On May 22, 2000, the PCA granted Al Bayoumi a two-year educational leave "to pursue his Post Graduate Study in the United States of America," in a decree of which Dallah Avco received a copy.  Ex. 21 (DA000548).

150.     While on educational leave, Al Bayoumi continued to be employed on the ANSS project so he could receive a salary to fund his studies.  Ex. 6 at 688:21-689:6 (Al Bayoumi Tr.).

151.     Saudi law permitted Al Bayoumi to receive an ANSS salary during his educational leave even though his civil service salary was suspended.  Ex. 1 ¶ 194 (Hammad Rep.).

152.     Dallah Avco continued to process Al Bayoumi's ANSS employee salary and benefits during his educational leave pursuant to the PCA's directions, just like it did during his secondment.  Ex. 1 ¶¶ 144-157 (Hammad Rep.); Ex. 20 (DA000457-83, 1022).

153.     Al Bayoumi believed that, during his secondment, he had been paid less than he deserved.  Ex. 6 at 661:5-8, 663:22-664:16 (Al Bayoumi Tr.).

154.     Al Bayoumi was upset that he was being paid much less than Alp Karli, even though he considered himself more qualified than Alp Karli.  Ex. 6 at 691:1-692:4 (Al Bayoumi Tr.).

155.     ANSS project employee salaries are designed for workers in Saudi Arabia and may not be sufficient to cover the expenses of someone pursuing post-secondary education in the United States.  Ex. 1 ¶ 163 (Hammad Rep.).

156.    When Al Bayoumi returned to Saudi Arabia between his secondment and educational leave, he complained to his superiors at the PCA's Airways Engineering Directorate that he was being paid too little based on his qualifications.  Ex. 6 at 690:9-691:20 (Al Bayoumi Tr.).

157.    Al Bayoumi complained to Airways Engineering that he faced significant education and living expenses and that his salary was too low to pay for those expenses.  Ex. 6 at 705:16-706:8 (Al Bayoumi Tr.).

158.    In April 2000, the PCA's Director-General of Airways Engineering Mohammed Al Salmi directed Dallah Avco to promote Al Bayoumi to Assistant Configuration Specialist, a Level F position, effective April 13, 2000.  Ex. 23 (DA000600).

159.    The following month, Al Salmi superseded that order and instructed Dallah Avco to promote Al Bayoumi to Senior DSS Programmer, a Level C position, also effective April 13, 2000.  Ex. 14 (DA000082); Ex. 2 at 246:9-247:17 (Kamel Tr.).

160.    Unlike Al Bayoumi's former positions, the Level C position was a "Married Status" position that entitled Al Bayoumi to additional benefits for his wife and children, including "a reasonable stipend toward the school costs" of his dependents.  Ex. 11 Scope of Services: Man-Month Personnel art. 2-1-5 (KSA0000003328); Ex. 11 Management and Operation Plans art. 1-2-3-8 (KSA0000003078); Ex. 18 (DA000097) (married status employment offer stating that Al Bayoumi would receive up to 80% of Saudi tuition or $3,000 for foreign tuition for up to two children); Ex. 6 at 693:10-694:4 (Al Bayoumi Tr.) (describing these "wonderful, wonderful benefits that I'm seeing for the first time").

161.    Around the same time the PCA promoted Al Bayoumi to a married status position, it increased his compensation by raising the amount of "other allowances" he received. Ex. 20 (DA000457-83); Ex. 1 ¶145 (Hammad Rep.).

162.    Al Bayoumi had been receiving modest "other allowances" of about $465 per month since October 1998, but the size of those other allowances increased significantly to about $3,800 per month in April 2000.  Ex. 20 (DA000457-83); Ex. 1 ¶ 145 (Hammad Rep.).

163.    Al Bayoumi understood that Airways Engineering increased his other allowances in response to the complaints he had expressed about his compensation.  Ex. 6 at 703:4-20, 706:9-14 (Al Bayoumi Tr.).

164.    The amount of Al Bayoumi's other allowances was determined by the PCA, not by Dallah Avco.  Ex. 4 at 163:3-164:1 (Khan Tr.); Ex. 2 at 217:4-19 (Kamel Tr.).

165.    The PCA directed the payment of other allowances to Al Bayoumi in order to fund his education and living expenses.  Ex. 15 (DA000089-90) (PCA/ANSS memo stating that Al Bayoumi "received other bonuses irregularly to support his educational and family expenses"); *see also* Ex. 17 (DA000092-93).

166.    Al Bayoumi understood that his other allowances were intended to fund his education and living expenses.  Ex. 6 at 702:20-703:2 (Al Bayoumi Tr.) ("Q. Was this other allowance intended to fund your education and living expenses while you were on your educational leave outside the Kingdom? . . . A. Yes, yes."); *id.* at 705:9-15 ("When you received these other allowances from Airways Engineering, was it your understanding that they expected you would use the funds to pay your education and living expenses?  A. Yes.").

167.    During his educational leave, Al Bayoumi pursued graduate studies at Aston University in the United Kingdom, earning a Master of Science in Management Research in May 2002.  Ex. 6 at 751:17-756:14 (Al Bayoumi Tr.); Ex. 62 (KSA0000000724).

168.    Al Bayoumi spent his other allowances on his education and living expenses.  Ex. 6 at 705:1-4 (Al Bayoumi Tr.).

169.    Al Bayoumi never told anyone at Dallah Avco that he was using his other allowances for anything other than paying his education and living expenses.  Ex. 6 at 706:15-707:2 (Al Bayoumi Tr.).

170.    In August 2001, Al Salmi directed Dallah Avco to promote Al Bayoumi to the position of Senior Contracts Specialist, a Level B position, and his base salary increased accordingly, although his other allowances ceased.   Ex. 24 (DA000601-02); Ex. 1 ¶145 (Hammad Rep.); Ex. 20 (DA000457-83).

171.    On November 13, 2001, Alp Karli wrote to Dallah Avco on PCA letterhead instructing it to reduce Al Bayoumi's base salary to SR 10,000 per month "[a]s per the instructions of Director General, PCA/AE."  Ex. 25 (DA000603).

172.    On April 29, 2002, Al Bayoumi wrote to the PCA to request an additional two years of educational leave, explaining that he was pursuing doctoral studies at Aston and planned to complete them by the end of December 2003.  Ex. 67 (KSA0000000895-98).

173.    On May 5, 2002, Al Salmi wrote to the PCA's Personnel Director to object to Al Bayoumi's request, explaining:  "Due to the work conditions that require the presence of the aforementioned employee in his position, the Department cannot approve his request at the present time especially that the applicant has already got his academic degree."   Ex. 66 (KSA0000000894).

174.    Al Salmi directed Dallah Avco to terminate Al Bayoumi from the ANSS project effective May 12, 2002.  Ex. 39 (DA001239).

175.    Following his termination from the ANSS project, Al Bayoumi returned to his position as a civil servant at the PCA.  Ex. 61 (KSA0000000629); Ex. 6 at 713:16-714:4 (Al Bayoumi Tr.).

## V.      AL BAYOUMI'S INTERACTIONS WITH THE HIJACKERS

176.      On or around February 1, 2000, Al Bayoumi met future 9/11 hijackers Nawaf Al Hazmi and Khalid Al Mihdhar at a halal restaurant in Los Angeles and had a conversation with them.   Ex. 6 at 390:17-405:2, 410:9-19 (Al Bayoumi Tr.) (redacted version); Ex. 92 at 3-4 (Al Bayoumi Ex. 708).

177.      On or around February 4, 2000, Al Bayoumi helped Al Hazmi and Al Mihdhar rent an apartment at the Parkwood complex in San Diego by helping them fill out the application form, listing himself as a reference, and signing a guarantee of the lease.   Ex. 80 (FED-PEC0306489-500, 504); Ex. 81 (FED-PEC0306527); Ex. 92 at 4 (Al Bayoumi Ex. 708).

178.      Also on February 4, 2000, Al Bayoumi helped Al Hazmi and Al Mihdhar obtain a check for their security deposit by allowing them to deposit cash into his Bank of America account and then drawing a check from his account for the same amount.   Ex. 92 at 5 (Al Bayoumi Ex. 708); Ex. 93 (BANA ALB 0004) (showing a deposit of $1,558 and a corresponding payment of $1,558); Ex. 80 (FED-PEC0306489-500, 504) (showing that Al Hazmi and Al Mihdhar owed a $30 application fee, a $775 security deposit, and $783 in first month's rent, for a total of $1,558).

179.      Shortly after, Al Bayoumi used Al Hazmi and Al Mihdhar's apartment to host an event honoring volunteers from a mosque, so that the men could congregate in a separate space from his own apartment, where the women were congregating.   Ex. 6 at 714:24-716:8 (Al Bayoumi Tr.); Ex. 92 at 5 (Al Bayoumi Ex. 708).

180.      Al Bayoumi's interactions with Al Hazmi and Al Mihdhar were unrelated to his job duties in connection with the ANSS project.   Ex. 6 at 716:18-24 (Al Bayoumi Tr.).

181.      Al Bayoumi's interactions with Al Hazmi and Al Mihdhar were unrelated to his relationship, to the extent he had one, with Dallah Avco.   Ex. 6 at 717:2-6 (Al Bayoumi Tr.).

182.   Al Bayoumi's interactions with Al Hazmi and Al Mihdhar were unrelated to his pursuit of educational studies in the United States.  Ex. 6 at 717:7-11 (Al Bayoumi Tr.).

183.   Al Bayoumi's interactions with Al Hazmi and Al Mihdhar were unrelated to the reasons that he came to the United States.  Ex. 6 at 717:12-18 (Al Bayoumi Tr.).

184.   No one at Dallah Avco ever instructed Al Bayoumi to assist Al Hazmi and Al Mihdhar.  Ex. 6 at 717:20-23 (Al Bayoumi Tr.).

185.   Al Bayoumi never told anyone at Dallah Avco that he had interacted with Al Hazmi and Al Mihdhar.  Ex. 6 at 717:24-718:3 (Al Bayoumi Tr.).

186.   No one at Dallah Avco instructed Al Bayoumi to provide assistance to terrorists of any sort.  Ex. 6 at 718:4-7 (Al Bayoumi Tr.).

187.   Al Bayoumi never told anyone at Dallah Avco that he had interacted or would interact with anyone who would go on to participate in the 9/11 attacks.  Ex. 6 at 718:8-19 (Al Bayoumi Tr.).

188.   Al Bayoumi did not believe that his employment on the ANSS project was sham cover employment to enable him to assist terrorists in the United States.  Ex. 6 at 718:21-719:1 (Al Bayoumi Tr.).

189.   No one at Dallah Avco ever told Al Bayoumi that his employment on the ANSS project was sham cover employment to enable him to provide assistance to terrorists in the United States.  Ex. 6 at 719:2-10 (Al Bayoumi Tr.).

190.   No one at the PCA ever told Al Bayoumi that his employment on the ANSS project was sham cover employment to enable him to provide assistance to terrorists in the United States.  Ex. 6 at 719:2-10 (Al Bayoumi Tr.).

191.   Al Bayoumi did not use the salary or allowances he received as an ANSS employee to assist terrorists.  Ex. 6 at 719:12-15 (Al Bayoumi Tr.).

192.    Al Bayoumi did not request any salary or allowances from Dallah Avco for the purpose of assisting terrorists.  Ex. 6 at 719:16-19 (Al Bayoumi Tr.).

193.    Al Bayoumi did not tell anyone at Dallah Avco that he planned to use his salary or allowances to assist terrorists.  Ex. 6 at 719:20-24 (Al Bayoumi Tr.).

194.    Al Bayoumi never understood that the salary and allowances he received as an ANSS employee were a reward for assisting terrorists in the United States.  Ex. 6 at 720:1-6 (Al Bayoumi Tr.).

195.    There is no evidence that anyone ever told Dallah Avco that Al Bayoumi had provided or would provide assistance to terrorists.

196.    Al Bayoumi cannot think of any reason why anyone at Dallah Avco should have anticipated that he would briefly interact with two Saudis who would go on, a year and a half later, to be 9/11 hijackers.  Ex. 6 at 720:12-21 (Al Bayoumi Tr.).

Dated:    October 6, 2023                                Respectfully submitted,
          New York, New York

                                                          /s/ Robert K. Kry
                                                         Robert K. Kry
                                                         Eric R. Nitz (*pro hac vice*)
                                                         MOLO LAMKEN LLP
                                                         600 New Hampshire Ave., Suite 500
                                                         Washington, D.C.  20037
                                                         (202) 556-2000
                                                         rkry@mololamken.com

                                                         *Attorneys for Defendant*
                                                         *Dallah Avco Trans Arabia Co.*

31