REDACTED FOR PUBLIC FILING

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
)
IN RE:  TERRORIST ATTACKS ON          )      Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                    )      ECF Case
_____)

This document relates to:  *All Actions*

**DEFENDANT KINGDOM OF SAUDI ARABIA'S
<u>MOTION TO EXCLUDE EXPERT TESTIMONY</u>**

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

**REDACTED FOR PUBLIC FILING**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................v

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................3

I.      Bassem Youssef ...................................................................................................3

      A.    Youssef's Professional Background..........................................................3

      B.    Youssef's Opinions ..................................................................................4

      C.    Youssef's Methodology............................................................................6

II.     Emile Nakhleh .....................................................................................................7

      A.    Nakhleh's Professional Background.........................................................7

      B.    Nakhleh's Opinions ..................................................................................8

      C.    Nakhleh's Methodology..........................................................................10

III.    Alexander Meleagrou-Hitchens ........................................................................11

      A.    Meleagrou-Hitchens' Professional Background....................................11

      B.    Meleagrou-Hitchens' Opinions ..............................................................12

      C.    Meleagrou-Hitchens' Methodology........................................................13

IV.    Barry Schiff........................................................................................................13

      A.    Schiff's Professional Background ...........................................................13

      B.    Schiff's Opinions ....................................................................................14

      C.    Schiff's Methodology..............................................................................15

LEGAL STANDARD.......................................................................................................16

ARGUMENT ...................................................................................................................18

I.      The Challenged Experts Are Unqualified To Offer Key Opinions In
      Their Reports ......................................................................................................18

      A.    Youssef's Lack of Qualifications............................................................18

**REDACTED FOR PUBLIC FILING**

B.      Nakhleh's Lack of Qualifications ...........................................................19

C.      Meleagrou-Hitchens' Lack of Qualifications .......................................21

D.      Schiff's Lack of Qualifications ..............................................................22

II.     The Challenged Experts Offer Opinions That Are Not The Products Of
        Reliable Methodologies Or Reliable Data ...........................................................22

A.      Youssef and Nakhleh Purportedly Utilized Classified
        Methodologies and Materials in Forming Their Opinions .....................23

        1.      Youssef's Purported Use of Classified Methodologies
                and Materials...........................................................................23

        2.      Nakhleh's Purported Use of Classified Methodologies
                and Materials...........................................................................24

B.      The Challenged Experts Fail To Disclose or Apply Reliable
        Methodologies and Use Unreliable Data ...............................................26

        1.      Youssef's Failures To Disclose or Apply a Reliable
                Methodology and His Use of Unreliable Data.........................26

                a.      Unexplained reliance on experience ...............................26

                b.      Selective adoption of FBI theories..................................27

                c.      Crediting hearsay from unknown sources.......................29

                d.      Speculation and conjecture .............................................30

                e.      Use of unreliable telephone data.....................................31

                f.      Guilt by association.........................................................33

        2.      Nakhleh's Failures To Disclose or Apply a
                Reliable Methodology...............................................................34

                a.      Unexplained reliance on experience ...............................34

                b.      Lack of scholarly support................................................35

                c.      Selective adoption of FBI theories..................................39

                d.      Speculation and conjecture .............................................41

        3.      Meleagrou-Hitchens' Failures To Disclose or Apply a
                Reliable Methodology...............................................................42

**REDACTED FOR PUBLIC FILING**

|   |   |   | a. | Incomplete disclosure of methodologies | 42 |

a.     Incomplete disclosure of methodologies ...................................... 42

b.     About-face from previous published work ..................................... 43

c.     Selective adoption of FBI theories............................................. 44

d.     Speculation and conjecture about Al Awlaki................................ 45

e.     Speculation and conjecture about Al Bayoumi and Al Thumairy ........................................................... 47

4.     Schiff's Failures To Disclose or Apply a Reliable Methodology................................................................ 49

a.     Unexplained reliance on experience ............................................ 49

b.     Analytical gaps.......................................................................... 50

c.     Speculation and conjecture ....................................................... 52

d.     Obvious alternative explanations................................................. 52

C.     Youssef, Nakhleh, and Meleagrou-Hitchens Act as Conduits for Hearsay .......................................................................................... 53

III.     The Challenged Experts Opine On Improper Subjects.................................... 57

A.     Youssef Opines on Improper Subjects............................................... 57

1.     Youssef Constructs a Factual Narrative Based on Record Evidence ...................................................................... 57

2.     Youssef Opines on Witness Credibility.................................... 58

3.     Youssef Opines on States of Mind........................................... 59

B.     Nakhleh Opines on Improper Subjects ............................................. 61

1.     Nakhleh Opines on Witness Credibility ................................... 61

2.     Nakhleh Opines on States of Mind ......................................... 63

C.     Meleagrou-Hitchens Opines on Improper Subjects............................ 65

1.     Meleagrou-Hitchens Opines on Witness Credibility ................ 65

2.     Meleagrou-Hitchens Opines on States of Mind........................ 66

D.     Schiff Opines on Improper Subjects................................................. 67

**REDACTED FOR PUBLIC FILING**

1.  Schiff Opines on Witness Credibility ........................................................67

2.  Schiff Opines on States of Mind ...............................................................67

CONCLUSION....................................................................................................................67

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

CASES

*24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 514 F. Supp. 2d 571 (S.D.N.Y. 2007)....................26, 35

*Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009) ..............................54

*AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019),
    *objections overruled*, 2019 WL 2992016 (S.D.N.Y. July 8, 2019)..................54, 57, 59, 63

*Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011) ......................................................................27

*Daniels-Feasel v. Forest Pharm., Inc.*, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021),
    *appeal pending*, No. 22-146 (2d Cir.)..................................................................................41

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .........................................................16

*Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011)............................17, 52

*Disabled in Action v. City of New York*, 360 F. Supp. 3d 240 (S.D.N.Y. 2019) ...........................22

*Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, 575 F. Supp. 3d 242 (D. Mass. 2021)....................27

*Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229
    (S.D.N.Y. Feb. 19, 2020) .......................................................................................................18

*Fosamax Prods. Liab. Litig., In re*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009);......................59, 63, 67

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).................................................................16, 50

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012)...................................................23

*Gray v. Cottrell, Inc.*, 2007 WL 4864393 (E.D. Mo. Jan. 11, 2007)............................................23

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................57, 58

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001) ................................................65

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551 (S.D.N.Y. July 16, 2002)...................................58

*Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.
    (No II) MDL 2502, In re*, 892 F.3d 624 (4th Cir. 2018) ....................................................41

*Loyd v. United State*s, 2011 WL 1327043 (S.D.N.Y. Mar. 31, 2011)...........................................18

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612
    (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017)................................19, 22, 26, 43

*Macaluso v. Herman Miller, Inc.*, 2005 WL 563169 (S.D.N.Y. Mar. 10, 2005) ..........................22

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ...............17, 30

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ......................17, 54, 58, 59, 65, 67

*Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II), In re*,
       341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) .....................52

*MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289
       (S.D.N.Y. 2001) ..........................................................................................................................22

*National Prescription Opiate Litig., In re*, 2019 WL 3934490 (N.D. Ohio
       Aug. 20, 2019) ..........................................................................................................................23

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...............................17, 31, 48, 58, 65, 67

*Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y.), *amended on
       recon. in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001).................................................. 26-27

*R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010) .......................................................18

*Rezulin Prods. Liab. Litig., In re*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................58, 59

*Sanchez v. Boston Sci. Corp.*, 2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014)..........................23

*Scarpati v. United States*, 1994 WL 256691 (S.D.N.Y. June 7, 1994), *aff'd mem.*,
       50 F.3d 4 (2d Cir. 1995)..........................................................................................................56

*SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019), *recon. granted in
       part*, 2019 WL 2114067 (S.D.N.Y. May 8, 2019).....................................................18, 19

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)..............................................................58

*United States v. DeLucia*, 1997 WL 616006 (2d Cir. Oct. 7, 1997)...............................................56

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ................................................................62

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)........................................................17, 29, 54

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...................................................................59

*United States v. Ray*, 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022)........................................27, 49

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022)...............................................................33, 64

*Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, 2016 WL 865299
       (N.D.N.Y. Mar. 2, 2016).....................................................................................................56

*Youssef v. FBI*, 541 F. Supp. 2d 121 (D.D.C. 2008), *aff'd in part, rev'd in part*,
687 F.3d 397 (D.C. Cir. 2012), *on remand sub nom. Youssef v. Holder*,
75 F. Supp. 3d 148 (D.D.C. 2014) ........................................................................3, 4, 19


RULES

Fed. R. Evid.:

    Rule 702 .................................................................................................................16

    Rule 702(a).......................................................................................................18, 21

    Rule 703 .................................................................................................................17


OTHER MATERIALS

Natana J. Delong-Bas, *Wahhabi Islam:  From Revival and Reform to Global
Jihad* (2004) ...........................................................................................................37

Peter Mandaville, *Islam and Politics* (2d ed. 2014).......................................................37

Alexander Meleagrou-Hitchens:

    *As American as Apple Pie:  How Anwar al-Awlaki Became the Face of
Western Jihad* (2011) .......................................................................................12, 13

    *Incitement:  Anwar al-Awlaki's Western Jihad* (2020)...........................11, 13, 37, 39, 43

*Princeton Readings in Islamist Thought:  Texts and Contexts from Al-Banna to
Bin Laden* (Roxanne L. Euben & Muhammed Qasim Zaman eds., 2009) .......................37

REDACTED FOR PUBLIC FILING

## INTRODUCTION

Whether this Court has jurisdiction over Saudi Arabia depends on the answer to the question framed in the Court's March 28, 2018 order:  "[W]hether and to what extent [Fahad Al] Thumairy, [Omar Al] Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to [Nawaf Al] Hazmi, [Khalid Al] Mihdhar, and other 9/11 hijackers."  ECF No. 3946, at 23.  That question is best answered through the testimony of fact witnesses and the review of contemporaneous documents.  The Court, as finder of fact, can then assess the evidence on both sides and – if it finds that Plaintiffs have met their burden to come forward with evidence to support their allegations – resolve any material disputes by assessing witness credibility and drawing the inferences it finds persuasive.

Plaintiffs' proffered experts are massive detours from that straightforward route.  Bassem Youssef, a retired FBI agent whom the FBI kept off the 9/11 investigation, offers purported expertise as an investigator (the FBI has said he was really a translator) and communications analyst to suggest what narrative the Court should adopt and which witnesses it should find credible, along with reams of conjecture about Saudi officials' knowledge and intentions.  Emile Nakhleh, a retired CIA officer, offers a vituperative critique of Saudi religious beliefs, his views about witnesses' credibility and states of mind, and uninformed speculation about the Ministry of Islamic Affairs ("MOIA").  Alexander Meleagrou-Hitchens, a lecturer and author who specializes in "Social Movement Theory," recants his previously published conclusions to play investigator and summarize deposition testimony about which he has no expertise.  Barry Schiff, a pilot and flight instructor, opines that an equation and calculations found in Al Bayoumi's notebooks were used to assist the hijackers, based not on the equation and calculations themselves (which he admits on their face have no apparent connection to 9/11), but on his views about Al Bayoumi's associations and credibility.

**REDACTED FOR PUBLIC FILING**

All four (collectively, the "Challenged Experts") fail to meet basic standards that ensure the reliability of expert testimony and break settled rules that set limits on the testimony of qualified experts. Each is wholly unqualified or gives opinions that exceed the bounds of any qualifications. Youssef and Nakhleh disclose no reliable methodologies at all, while Meleagrou-Hitchens and Schiff give opinions that have nothing to do with Social Movement Theory or aviation. The Challenged Experts speculate, pick and choose their favorite documents from the massive FBI productions, and copy-and-paste hearsay and rejected investigative theories into their opinions. They intrude on the Court's domain as factfinder by assessing witness credibility and by purporting to opine on matters of knowledge, intent, motive, and purpose. Their opinions are unreliable and inadmissible from their introductions to their conclusions.

This case concerns a historic crime and has drawn great public scrutiny. Experts who offer their assistance to the Court in resolving a matter of such significance should be careful, precise, and aware of the limits on their role. But the Challenged Experts' reports and depositions show no signs of care, precision, or even self-awareness. Whether it be Youssef's assertion that his report uses classified techniques too secret for him to discuss, or Nakhleh's stereotyping of an entire country's religion as terrorist, or Meleagrou-Hitchens' bland about-face from his own publications to support Plaintiffs' theories, or Schiff's claim that Al Bayoumi could not plausibly have forgotten a set of 20-year-old notes, each falls short of the familiar standards required for an expert witness to present testimony to a federal court. This Court should say so, and it should exclude their testimony.[1]

---

[1] In addition to the Challenged Experts, Plaintiffs have submitted expert reports from Evan Kohlmann, Lawrence Dunham, and Steven Simon. As Saudi Arabia informed the Court in a March 22, 2023 letter, *see* ECF No. 8946, Saudi Arabia reserves the right to challenge the opinions offered by these experts on any grounds at other stages in the litigation, including in Saudi Arabia's renewed motion to dismiss. Saudi Arabia also reserves all relevance objections.

**REDACTED FOR PUBLIC FILING**

## BACKGROUND

### I.      Bassem Youssef

### A.      Youssef's Professional Background

Bassem Youssef is a retired FBI agent.  Youssef Tr. 208:2-4.[2]  He worked for the

FBI from 1986 until 2014.  Youssef Rep. 1.  He claims to have participated in important

counterterrorism investigations.  For example, Youssef states that while stationed in St. Louis he

served as "the case agent" on an investigation in which "the FBI discovered the presence of the

first covert cell of the Abu Nidal terrorist group in the United States"; that in Los Angeles he

"led" an investigation into the terrorist group "Al Gama'a" and "coordinated the FBI's strategy"

against that group; and that in Riyadh he served as "Legal Attaché" with "oversight

responsibility" for "all Gulf States . . . includ[ing] Saudi Arabia."  *Id.* at 1-3.

The FBI has disagreed with Youssef's description of his role as an FBI employee.  In

2003, Youssef filed an employment-discrimination case against the agency, alleging that the

FBI had wrongfully assigned him mere document-processing work when he was qualified for a

substantive counterterrorism role and had not permitted him to play any role in the investigation

of the 9/11 attacks.[3]  In response, the FBI presented testimony that, in St. Louis, Los Angeles,

and Riyadh, Youssef worked wholly or primarily as a "translator" and never led an investigation.

*See Youssef*, 541 F. Supp. 2d at 128-30.  When asked about that testimony, Youssef testified that

he did not recall it and that it was untrue.  Youssef Tr. 174:16-175:4, 177:11-17, 180:16-182:11.

---

[2] Unless otherwise specified, "Youssef Rep." refers to the version of the report served by
Plaintiffs on May 3, 2023, which is Exhibit 1.  An errata sheet served by Plaintiffs on May 3,
2023 is appended to Exhibit 1.  "Youssef Tr." refers to the transcript of his deposition on June
29, 2022, excerpts from which are Exhibit 2.

[3] *See Youssef v. FBI*, 541 F. Supp. 2d 121, 132-33 (D.D.C. 2008), *aff'd in part, rev'd in
part*, 687 F.3d 397 (D.C. Cir. 2012), *on remand sub nom. Youssef v. Holder*, 75 F. Supp. 3d 148
(D.D.C. 2014).

**REDACTED FOR PUBLIC FILING**

Later, in 2002, Youssef became the Unit Chief of the FBI's Digital Media Exploitation Unit, supervising the document work of which he had complained. Youssef Rep. 4; *Youssef*, 541 F. Supp. 2d at 133. In 2004, he transferred to become the Unit Chief of the FBI's Communications Analysis Unit, a role he held until his retirement in 2014. Youssef Rep. 4; *Youssef*, 541 F. Supp. 2d at 133. Neither role was investigatory. *See* Youssef Tr. 188:7-188:15 (testifying as to the "Document Exploitation Unit" that he did not "supervise any case investigations from top to bottom" because "that is not the role of a unit chief of . . . any unit that works in that capacity"); *id.* at 188:20-189:4 (same for Communications Analysis Unit).

Youssef has never published anything about the 9/11 attacks. *Id.* at 192:5-8. He has not published anything at all in the last 10 years. *Id.* at 93:7-94:2. He testified that he has written "numerous reports" about Al Qaeda but that they are all "classified." *Id.* at 92:11-21.

**B.    Youssef's Opinions**

Youssef offers two primary opinions: (1) that "the Kingdom of Saudi Arabia through its officials knowingly provided critical support and cover for Sunni Islamic extremists, including Al Qaeda, to safely and covertly operate a terror network inside California"; and (2) that "[t]he network provided substantial assistance to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar upon their arrival in the U.S., understanding that the two were Al Qaeda operatives." Youssef Rep. 9; *see id.* at 239-44. When asked about his opinions, Youssef conceded that he was "opining on the mental state that . . . individuals had when they undertook certain actions," Youssef Tr. 199:6-13; and that he was "opining on" those individuals' "particular knowledge when they undertook [those] activities," *id.* at 199:14-21.

In identifying the asserted "officials" who he opines had "knowledge of [a] California Al Qaeda support network prior to the 9/11 Attacks," Youssef Rep. 10, Youssef casts a broad net. He attributes that knowledge to 18 individuals, including two former Ministers of Islamic

**REDACTED FOR PUBLIC FILING**

Affairs, two former Deputy Ministers of Islamic Affairs, and the former Director-General of Airways Engineering in the Presidency of Civil Aviation, as well as 13 others he labels as "Saudi Government officials." *Id.*; *see id.* at 239-40.  He opines that nine of them – Fahad Al Thumairy, Omar Al Bayoumi, Musaed Al Jarrah, Khalid Al Sowailem, Smail Mana, Adel Al Sadhan, Mutaeb Al Sudairy, Abdullah Al Jaithen, and Majed Al Mersal – "participated" in a "support plot" for the 9/11 attacks and "had to have known" about Al Hazmi's and Al Mihdhar's Al Qaeda affiliations and violent intentions.  *Id.* at 15; *see* Youssef Tr. 13:21-14:13, 198:18-199:21.

As purported support for his primary opinions, Youssef's report lays out a lengthy factual narrative discussing purported events from the early 1990s through the 9/11 attacks.  Numerous subsidiary opinions are scattered throughout that narrative.  For example, Youssef discusses Al Qaeda's "tradecraft" or "modus operandi" in planning the 9/11 attacks.  *See*, *e.g.*, Youssef Rep. 15, 169; Youssef Tr. 310:13-18.  He asserts that Al Jarrah was "'heavily connected/linked to Saudi Sunni extremists operating inside the U.S., specifically with the Southern California based network of Muhammad Al-Muhanna[] and Fahad Al-Thumairy,'" and that Al Jarrah was "'a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California and has been directing, controlling and funding Al-Muhanna and Al-Thumairy since their arrival in the U.S.'"  Youssef Rep. 32 (quoting Ex. 3 (Youssef Ex. 5)).

Youssef also opines on the recipients, contents, and significance of phone calls based on call records.  Although the records say nothing about the substance of the calls, Youssef opines with a "high degree of confidence" that "phone discussions among [certain] individuals revolved around . . . 9/11 hijackers Hazmi and Mihdhar, their arrival in Los Angeles, and the arrangements that were being made for them in Los Angeles and San Diego."  *Id.* at 125-26.  The individuals purportedly involved in such phone discussions included Al Bayoumi, Al Thumairy, █████, Al Sudairy, and "officials of the Saudi Embassy ([Al] Sowailem and/or [Al] Jarrah)."  *Id.* at 126;

*see also id.* at 127-32 (similar opinion focusing on Al Bayoumi and Al Thumairy).  Those individuals (except Al Sowailem, who is deceased) and others were deposed and denied such discussions or any foreknowledge of the 9/11 attacks.  Youssef opines that their "testimony . . . includes incredible claims" and was given with a "common . . . purpose . . . to hide their activities."  *Id.* at 126-27.

### C.    Youssef's Methodology

Youssef's report does not describe the methodology that he relies on to reach his conclusions.  It states generally that his opinions are "based on [his] own personal background, recollections, experience and knowledge, as well as the investigative methodology [he] learned throughout [his] years of service as a Special Agent with the FBI."  Youssef Rep. 5; *see also* Youssef Tr. 368:20-369:10, 374:22-375:10, 377:5-10 (answering questions about his methodology by referring back to his experience).  When asked about the "methodology that [he] applied for purposes of [his] report," Youssef testified that it is "classified."  Youssef Tr. 260:2-7; *see also id.* at 258:3-11, 259:4-21 (similar answers).

Some observations about Youssef's methods can be made from his report and testimony.  Many parts of his report summarize record materials, such as documents produced in party or third-party discovery and deposition testimony; opine on which witnesses should and should not be credited; and argue that inferences should be drawn to support Plaintiffs' theory that various individuals conspired to support the hijackers.  *See, e.g.*, Youssef Rep. 100-16 (discussing Al Sadhan's and Al Sudairy's visit to San Diego in December 1998 and January 1999); *id.* at 177-85 (discussing Al Bayoumi's and Kaysan Morgan's visit to the Saudi consulate in Los Angeles).

Other parts of Youssef's report describe phone calls.  He testified that he examined "phone records" and "compared them to [a] spreadsheet" of phone calls prepared by a staff member who "works at the Kreindler firm."  Youssef Tr. 270:6-271:1.  He then "filtered out that

spreadsheet to identify calls between particular individuals." *Id.* at 271:7-272:2.  His report then

argues that inferences should be drawn from the timing and frequency of those calls about who

discussed what with whom and what knowledge or purposes the callers had.  *See*, *e.g.*, Youssef

Rep. 125-26 (opining that calls "revolved around matters related to 9/11 hijackers Hazmi and

Mihdhar"); *id.* at 152-54 (opining that calls relate to an "important matter/project" that "must be

. . . to handle the arrival of Hazmi and Mihdhar").  Youssef testified that his methodology for

evaluating call records is also "classified."  Youssef Tr. 257:20-260:7.

## II.      Emile Nakhleh

### A.       Nakhleh's Professional Background

Emile Nakhleh is a research professor at the University of New Mexico and was the

director of its Global & National Security Policy Institute when he submitted his report.  Nakhleh

Rep., Annex A.[4]  He previously worked at Mount St. Mary's University (from 1967 to 1993) and

at the CIA (from 1993 to 2006).  *Id.*  At the CIA, Nakhleh was an intelligence service officer and

directed the Political Islam Strategic Analysis Program in the Directorate of Intelligence.  *Id.*

He received a PhD in international relations from American University in 1968.  *Id.*

Nakhleh has no degree in Saudi Arabian history, Nakhleh Tr. 36:10-12, and since 1975

has not written any peer-reviewed studies on Saudi Arabian history, *id.* at 34:9-12.  Nakhleh also

lacks degrees in Islamic studies, *id.* at 42:8-18, and comparative Islam, *id.* at 43:13-21.  He has

never published any peer-reviewed work on comparative Islam, *id.* at 43:22-44:2, on Islam as

practiced in Saudi Arabia, *id.* at 44:3-6, or on MOIA, *id.* at 23:1-4.

---

[4] Unless otherwise specified, "Nakhleh Rep." refers to the version of the report served by Plaintiffs on May 14, 2022, which is Exhibit 4.  An errata sheet served by Plaintiffs on May 14, 2022 is appended to Exhibit 4.  "Nakhleh Tr." refers to the transcript of his deposition on June 15, 2022, excerpts from which are Exhibit 5.  An errata sheet served by Plaintiffs on August 26, 2022 is appended to Exhibit 5.

Likewise, Nakhleh has no peer-reviewed publications on Al Qaeda's terrorist attacks in Western countries, *id.* at 44:7-10, on the development of Al Qaeda's Islamic thought, *id.* at 48:8-50:13, or on the 9/11 attacks, *id.* at 50:14-16.  He has never before been proffered as an expert witness in any case involving an Al Qaeda attack in a Western country, *id.* at 44:11-14, or in any case relating to the 9/11 attacks, *id.* at 50:17-21.

Nakhleh was not part of the CIA's core investigation into the 9/11 attacks, *id.* at 51:11-17, and did not participate in the FBI's investigation of the 9/11 attacks, *id.* at 113:21-114:2.  During his time at the CIA, he did not conduct any criminal investigations.  *Id.* at 363:6-8.  Moreover, Nakhleh has never overseen a criminal investigation from top to bottom, *id.* at 363:19-22, and has never attempted to review all of the materials gathered in a criminal investigation, *id.* at 364:1-4.  He is also not an expert at truth detection, *id.* at 338:1-339:6, nor in psychology or psychiatry, *id*. at 336:21-337:1.

### B.      Nakhleh's Opinions

In his report, Nakhleh opines on three subjects:  (1) the history and beliefs of the Hanbali Salafist school of Islamic jurisprudence in Saudi Arabia (for which he uses the pejorative term "Wahhabism"),[5] including the alleged interplay between the Saudi government's promotion of Hanbali Salafism and Osama bin Laden's terrorist objectives, *see*, *e.g.*, Nakhleh Rep. ¶¶ 25-145, 168-234; (2) the alleged support provided to the 9/11 hijackers by a purported network of Saudi government officials and employees, *see*, *e.g.*, *id.* ¶¶ 190-192, 205, 215-218, 233-259; and (3) the credibility of witnesses, *see*, *e.g.*, *id.* ¶¶ 146-167, 192, 218.  Nakhleh also opines that

---

[5] *See* Nakhleh Tr. 152:6-12 (acknowledging that the term "Wahhabism" is "considered pejorative" in Saudi Arabia, but denying that he personally considers the term pejorative); *id.* at 153:14-154:4 (confirming that his use of the term is intended to capture all categories of Hanbali Salafism).  Saudi Arabia objects to the use of the term "Wahhabism" to describe its religion.  We acknowledge as an unfortunate fact that some U.S. government sources and some English-speaking experts have adopted the term.

Saudi Arabia is a "state sponsor[] of terror," *id.* ¶ 144, and "precipitated the 9/11 attacks through its ideological and operational support for violent jihad" in the name of "Wahhabism," *id.* ¶ 258.

The parts of Nakhleh's report that describe "Wahhabism" as "the state religion of Saudi Arabia" make sweeping, derogatory characterizations. *Id.* ¶ 28. For example, he states that its adherents view "citizens of the United States and its allies" as "the 'enemies' of Islam" and "support acts of violent jihad" against them. *Id.* ¶¶ 29, 34. He also describes MOIA as a "Saudi state vehicle that . . . len[t] support to" Osama bin Laden's "ambitions . . . to wage jihad globally," *id.* ¶ 92; and that "supported and promoted" bin Laden's "violent *jihad*," *id.* ¶ 169. The report sums up his opinions on Saudi religion by stating that "Wahhabism is fundamental to the very being, the very essence of the Saudi state" and that "[t]he . . . attacks of 9/11 were inexorably an impulse *from within* the Saudi state, *of* the Saudi state." *Id.* ¶¶ 144-145.

At his deposition, Nakhleh retreated from the opinions about Saudi religion set out in his report. He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. Nakhleh Tr. 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.

Nakhleh opines that "several propagators and higher officials employed by the Kingdom of Saudi Arabia were among the officials who provided material support to the 9/11 plot," including by "making practical arrangements to host and harbor" Al Hazmi and Al Mihdhar, and providing them with "spiritual support and kinship." Nakhleh Rep. ¶ 237. He identifies as part of this purported support network Al Thumairy and Al Bayoumi; "propagators such as" Omar Abdi Mohamed, Al Jaithen, Al Mersal, Al Sadhan, and Al Sudairy, who he claims "carried out

advance planning, intelligence gathering and networking"; and "senior Saudi officials, among them" Al Sowailem and Al Jarrah.  *Id.* ¶ 258; *see id.* ¶ 245.

Nakhleh opines that "most of the Saudi government witnesses and other Saudi nationals" who were deposed in this case "view such proceedings as a charade" and so "lie[d], den[ied], obfuscate[d], dissimulate[d], [and] feign[ed] ignorance or memory lapses."  *Id.* ¶ 154; *see id.* ¶¶ 146-167, 192, 218.  He focuses particular attention on Al Thumairy, who he describes as a "[c]ase study."  *Id.*, Part E.i.  Nakhleh asserts that Al Thumairy's testimony on his interpretation of "Wahhabi religious doctrine" was "dishonest and misleading," *id.* ¶¶ 157-158; "not credible," *id.* ¶ 159; "transparently disingenuous," *id.* ¶ 162; "implausible" and "pathetic," *id.* ¶ 164; and "deceitful," *id.* ¶ 167.  He describes Al Thumairy's testimony on his life in Southern California as "the height of dishonesty, deception, and dissimulation."  *Id.* ¶ 218.

### C.    Nakhleh's Methodology

In forming the opinions in his report, Nakhleh claims to "have drawn upon" his "expertise" and "authority in political Islam," his "analysis of global trends . . . in the past three decades," his "knowledge of Arab and Muslim cultures," and his "engagement and discussions with Muslim interlocutors around the world."  Nakhleh Rep. ¶ 19.  He also claims to have "received and reviewed many documents extracted from the ongoing FBI document productions" and to have "scrutinized the indexes for other large productions in this case" and then "analy[zed] . . . portions of those productions."  *Id.* ¶ 17.  In addition, Nakhleh testified that many of his opinions, especially those about MOIA, are based on "classified" CIA "briefings" or "reports."  Nakhleh Tr. 49:3-50:13, 85:5-17, 217:13-218:5, 233:10-235:18, 242:14-22.

III.     **Alexander Meleagrou-Hitchens**

A.       **Meleagrou-Hitchens' Professional Background**

Alexander Meleagrou-Hitchens is a lecturer and researcher at King's College London,

where he teaches on "Terrorism and Radicalization." Meleagrou-Hitchens Rep., Annex A.[6]

He is a research fellow in the "Program on Extremism" at George Washington University. *Id.*

He received his PhD in "War Studies" from King's College London in 2015. *Id.* The subject

of his PhD was "the ideology and impact of the American jihadist preacher Anwar al-Awlaki."

Meleagrou-Hitchens Rep. ¶ 1 (emphasis omitted).[7]

In 2020, Meleagrou-Hitchens published a book about Al Awlaki titled *Incitement:*

*Anwar al-Awlaki's Western Jihad. See* Ex. 8 (Meleagrou-Hitchens Ex. 3). The book "was

peer-reviewed by Harvard University Press." Meleagrou-Hitchens Tr. 128:22-129:15. It charts

Al Awlaki's "ideological evolution," Ex. 8 (Meleagrou-Hitchens Ex. 3), at 15, from "a revered

mainstream Islamic preacher in America," *id.* at 1, who publicly and privately condemned the

9/11 attacks, *see id.* at 25-27, into someone who "eventually join[ed] al-Qaeda," *id.* at 1-2, and

embraced "Salafi-jihadism," *id.* at 15. In it, Meleagrou-Hitchens concluded that Al Awlaki's

interactions with the 9/11 hijackers were innocent:

> That Awlaki, even after openly associating with al-Qaeda for around eight years
> after 9/11, never made any claims about this suggests that he had no direct
> knowledge or involvement. Otherwise it would be hard to believe that, during a
> phase when he was attempting to build up his jihadist credentials, he would not
> have taken credit for the biggest success the global jihad movement has ever
> achieved against its archenemy.

---

[6] Unless otherwise specified, "Meleagrou-Hitchens Rep." refers to the version of the
report served by Plaintiffs on April 1, 2022, which is Exhibit 6. An errata sheet served by
Plaintiffs on May 11, 2022 is appended to Exhibit 6. "Meleagrou-Hitchens Tr." refers to
the transcript of his deposition on June 23, 2022, excerpts from which are Exhibit 7.

[7] In the 9/11 report and some other materials, "Awlaki" is transliterated as "Aulaqi."
This memorandum uses "Awlaki" to match Meleagrou-Hitchens.

*Id.* at 24-25.  Meleagrou-Hitchens also published an academic article in 2011 that similarly covers Al Awlaki's ideological transformation and reaches similar conclusions.[8]

Meleagrou-Hitchens testified at his deposition that he has no expertise in law enforcement, in criminal investigations, or in FBI and CIA operations.  Meleagrou-Hitchens Tr. 12:19-13:2, 13:6-17.  He has no expertise in reviewing telephone records and acknowledged his lack of familiarity with any peer-reviewed studies on the subject.  *Id.* at 201:15-202:6.  He has never evaluated investigative material as part of a criminal investigation.  *Id.* at 14:8-14.

### B.    Meleagrou-Hitchens' Opinions

Meleagrou-Hitchens offers two primary opinions.  *First*, he opines that Al Awlaki was "a committed Salafi extremist and a proponent of violent jihad" even before the 9/11 attacks, Meleagrou-Hitchens Rep. ¶ 22, and that he chose in 2005 to "public[ly] manifest[ ]" those "views he had long held" when he "announced himself as an al-Qaeda supporter," *id.* ¶ 123.  *Second*, he opines that Al Awlaki assisted the 9/11 hijackers on both the East and West Coasts "at the request of individuals linked to Saudi Arabia's Embassy and Consulate."  *Id.* ¶ 22.

Meleagrou-Hitchens also opines on the credibility of Al Bayoumi's and Al Thumairy's deposition testimony, describing the testimony as "a pattern of denials which later turned out to be false," *id.* ¶ 37 (Al Thumairy), and as "implausible," "dishonest[ ]," and "disingenuous," *id.* ¶ 67 (Al Bayoumi).  Further, he opines on the mental states and intentions of numerous individuals, including Al Awlaki, Al Bayoumi, Al Thumairy, and the hijackers.  *See, e.g., id.* ¶ 10 (Al Awlaki's purported intent); *id.* ¶ 22 (Al Awlaki's alleged knowledge); *id.* ¶ 72 (motivations of "the hijackers and their [purported] facilitators in the United States").

---

[8] *See* Ex. 9 (*As American as Apple Pie*).

### C.    Meleagrou-Hitchens' Methodology

To reach his opinion that Al Awlaki supported violent jihad before the 9/11 attacks, Meleagrou-Hitchens purportedly applied a "research methodology" he calls "Social Movement Theory."  *See* Meleagrou-Hitchens Rep. ¶¶ 8-20.  He applied the same methodology in his 2020 peer-reviewed book, *see* Ex. 8 (Meleagrou-Hitchens Ex. 3), at 7-10, and in his 2011 academic article, *see* Ex. 9 (*As American as Apple Pie*), at 13-14.[9]  Employing that methodology and his "many years of research" into Al Awlaki's oral and written works, Meleagrou-Hitchens purports in his report "to accurately identify Awlaki's ideology."  Meleagrou-Hitchens Rep. ¶ 6.  Yet that same methodology led Meleagrou-Hitchens to reach the opposite conclusions in his peer-reviewed 2020 book and his 2011 academic article.  *See*, *e.g.*, Ex. 8 (Meleagrou-Hitchens Ex. 3), at 15 (stating that an "analysis of Awlaki's ideological influences" can "provide insight" into "why and how he gravitated toward Salafi-jihadism later on in his career").

Meleagrou-Hitchens' report does not identify any methodology that he applies to reach his opinion that Al Awlaki helped the hijackers.  His opinions on this subject are unrelated to Social Movement Theory.

## IV.    Barry Schiff

### A.    Schiff's Professional Background

Barry Schiff is a retired pilot and flight instructor.  *See* Schiff Rep. 1; *id.*, App'x 4, at 3.[10] He has no other relevant experience.  At his deposition, he disclaimed any experience with

---

[9] As Meleagrou-Hitchens describes it in his report, "Social Movement Theory" involves examining a social movement through the lens of a series of "collective action frames":  (1) the "diagnostic," which asks "who or what is to blame?" for a perceived wrong; (2) the "prognostic," which focuses on "identify[ing] a range of solutions to the problem," and (3) the "motivational," which seeks to mobilize followers "to take part in action."  Meleagrou-Hitchens Rep. ¶ 14.

[10] Unless otherwise specified, "Schiff Rep." refers to the report served by Plaintiffs on April 1, 2022, which is Exhibit 10.  "Schiff Tr." refers to the transcript of his deposition on July 11, 2022, excerpts from which are Exhibit 11.

terrorism investigations and any "professional expertise in evaluating context between people to determine whether they may indicate some type of conspiracy or criminality." Schiff Tr. 52:2-11.

### B.   Schiff's Opinions

In his report, Schiff opines on "the aviation and piloting significance, if any," of a single page from a notebook found in a search of Al Bayoumi's apartment in Birmingham, England in September 2001. Schiff Rep. 2. That page is reproduced below.[11]



The top half of the page contains an equation based on the Pythagorean Theorem that can be used to calculate the distance to the horizon (d) from a specified height (h). *See id.* at 2-3

---

[11] Schiff used a black-and-white image of the notebook in his report. *See* Schiff Rep. 2 (citing UK MPS 999x_X0417). The image included here is a higher-quality color photograph. A copy of the color photograph is included in Exhibit 12. *See* Ex. 12 (Schiff Ex. 3), at 6.

(discussing the equation); *see also* Schiff Tr. 17:8-18:5 (same).  On the bottom half of the page, below the equation, are calculations organized into three columns.  In the left column, numbers are being subtracted, while in the center and right columns, numbers are being added.

In his report, Schiff opines that the notes "are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks."  Schiff Rep. 2; *see id.* at 11 (Al Bayoumi "likely . . . assist[ed] the 9/11 hijackers during the planning of the 9/11 Attacks by calculating and providing approximate aircraft altitudes and distances from which ground objects (or targets) could be identified by a pilot").

Schiff's report addresses only the left-most column of calculations:  "52-8=44."  *Id.* at 8-9.  He opines that the calculation "matches" the distance between the Robbinsville VOR and the LaGuardia VOR ("52 statute miles") and the "backtrack distance" from LaGuardia to the World Trade Center ("approximately 8 miles"), with the difference being the distance from the Robbinsville VOR to the World Trade Center ("44 statute miles").[12]  *Id.* at 9.  He further opines that it would have been "handy" for the hijackers to know that distance.  *Id.*

Schiff also opines that Al Bayoumi's deposition testimony concerning the notes, in which Al Bayoumi stated that he "could not remember" the equation but that it was " '[p]erhaps' " one " 'we studied before in high school,' " was "simply incredulous."  *Id.* at 10-11.

## C.    Schiff's Methodology

Schiff's report states that his "qualifications include 69 years of piloting experience (including [a] 34-year career as a TWA captain and 65-year career as a certified flight

---

[12] "VOR" stands for "very high frequency omni-directional range."  Schiff Rep. 6. VOR stations are located throughout the country to provide navigational signals to aircraft, namely, the distance and direction between the aircraft and VOR station.  Schiff Tr. 90:3-91:22. The Robbinsville VOR is a station located in the vicinity of New York City.  *See* Schiff Rep. 8-9.

instructor)."  Schiff Rep. 1.  Other than his experience, his report does not disclose a methodology used to reach his conclusions.

At his deposition, Schiff testified that he would not have any reason to believe the equation, standing alone, had anything to do with the 9/11 attacks.  Schiff Tr. 48:9-17; *see also id.* at 50:11-51:5 ("If I saw that in and by itself, I would have no reason to believe it had anything to do with anything.").  He also admitted that he did not know that the distance between the Robbinsville VOR and the World Trade Center (purportedly, the "52-8=44" calculation in the left column) "would have been important at all" to the hijackers.  *Id.* at 180:4-17.  He further testified that he "attempted to find a connection between the numbers" in the center and right columns "and the paths taken by the hijackers" but was unable to do so.  *Id.* at 116:15-118:1, 173:14-176:20 (testifying, *inter alia*, that he "look[ed] for that relationship on multiple maps").

## LEGAL STANDARD

An expert witness in federal court must be "qualified . . . by knowledge, skill, experience, training, or education," must have "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue," must rely on "sufficient facts or data," must use "reliable principles and methods," and must "reliably appl[y] the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In applying Rule 702, the Court determines whether an "expert's testimony . . . rests on a reliable foundation," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and ensures that there is not "too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

This Court has recently set out and applied the criteria that it will use in this matter to assess the reliability and helpfulness of expert evidence.  *See* ECF No. 9060, at 3-9.  As relevant here, key factors include whether an opinion is based on "'independent research'" or "'was developed expressly for purposes of testifying'"; whether an expert "'unjustifiably extrapolate[s]

. . . to an unfounded conclusion'"; whether an expert "'adequately account[s] for obvious alternative explanations'"; the degree of "'care[]'" used, especially compared to the expert's "'regular professional work'"; and whether a "'field of expertise . . . is known to reach reliable results.'" *Id.* at 5 (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011)).

Expert testimony is also subject to other requirements and limitations. To be "helpful to the trier of fact," that testimony must "'concern[] matters that the average juror'" – here, the Court as factfinder – is not independently "'capable of understanding.'" *Id.* (quoting *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008)). Experts may not give "'speculative,' 'conjectural,' or 'conclusory' opinions." *Id.* at 6 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)). They may rely on hearsay evidence of a kind that "experts in the particular field would reasonably rely on," Fed. R. Evid. 703, but may not be mere "'conduit[s] for introducing hearsay,'" ECF No. 9060, at 7 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)).

To protect the exclusive role of the finder of fact, important areas are wholly off-limits for experts. They may not give "opinions that constitute evaluations of witness credibility," even if the expert has (or claims to have) relevant "scientific or technical expertise." *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005). Experts also may not "opine 'as to the motivations and intentions' of individuals or entities." ECF No. 9060, at 6 (quoting *Marvel Characters*, 726 F.3d at 135-36). As this Court has recently observed, this latter prohibition bars not only testimony about "the state of mind of an individual or a corporation," but also – and perhaps with even greater force – testimony about the state of mind "of a whole region." *Id.* at 21.

REDACTED FOR PUBLIC FILING

# ARGUMENT

## I.   The Challenged Experts Are Unqualified To Offer Key Opinions In Their Reports

"Even vast experience as an expert cannot substitute for knowledge about the particular field at issue."  *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 408 (S.D.N.Y. 2019), *recon. granted in part on other grounds*, 2019 WL 2114067 (S.D.N.Y. May 8, 2019); *see id.* at 407 (concluding that "[n]othing in [a proffered expert's] educational background, his work experience, or even his prior work as an expert gives him the necessary expertise to opine on the[] matters [on which he opines] or to critique other experts' opinions on th[o]se topics").[13]  Throughout their reports, the Challenged Experts opine on topics as to which they lack the necessary "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  Even if the topics at issue were appropriate for expert opinion (which many are not, *infra* pp. 57-67), the Challenged Experts would not be the experts to address them.

### A.   Youssef's Lack of Qualifications

Youssef is not qualified to review documents and testimony and opine on the alleged existence of "Sunni extremist networks established by Saudi Arabia prior to the 9/11 Attacks in Southern California" and on the alleged "utiliz[ation]" of "those networks" by "Saudi Government officials" purportedly "to facilitate 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar."  Youssef Rep. 11; *see generally id.* at 9-244.  Despite Youssef's self-aggrandizing

---

[13] *See also Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, at *7 (S.D.N.Y. Feb. 19, 2020) ("That O'Driscoll worked in an industry that was a part of the financial crisis does not make him an expert qualified to speak to the causes of such a crisis."); *Loyd v. United State*s, 2011 WL 1327043, at *5 (S.D.N.Y. Mar. 31, 2011) (excluding "an internist and infectious disease specialist" from testifying about "the causes of neurological disorders," because that specialty "does not translate to an understanding" of those causes); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 282 (S.D.N.Y. 2010) ("Although both [experts] are qualified to opine on the value and quality of precious stones, and [one] is an expert in the design of estate jewelry, they both lack the comprehensive design background necessary to opine that plaintiff's jewelry line is 'distinctive' or 'unique' in the history of jewelry.").

claims about his pre-9/11 experience as an investigator and case agent, *see id.* at 1-3, the testimony of FBI representatives from his employment-discrimination lawsuit shows that his role at that time was that of a translator.  *See Youssef*, 541 F. Supp. 2d at 128-29; *supra* p. 3.

Youssef's later roles as the Unit Chief of the Document Exploitation Unit and then later of the Communications Analysis Unit did not involve "supervis[ing] any case investigations," Youssef Tr. 188:7-189:4, and "cannot substitute for knowledge about the particular field at issue," *Lek Sec.*, 370 F. Supp. 3d at 408.  Those positions might qualify him for the phone-call part of his analysis, which is inadmissible for other reasons.  *Infra* pp. 23-24, 31-33.  But the "central . . . issue addressed in his report," *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017), is whether Saudi government employees provided support to the 9/11 hijackers in the United States while knowing they were Al Qaeda operatives preparing to commit terrorist attacks.  About that, Youssef is qualified to say nothing that Plaintiffs' counsel cannot say for themselves.

### B.    Nakhleh's Lack of Qualifications

Nakhleh is not qualified to opine on the history or beliefs of the Hanbali Salafist school of Islamic jurisprudence in Saudi Arabia (which he calls "Wahhabism").  His degree is in international relations, and he is currently a professor of national security policy.  Nakhleh Report, Annex A at 1, 3.  He published "a small book about U.S. Saudi relations" in 1975 and other books "on the Gulf" in the 1980s that "touched on Saudi Arabia."  Nakhleh Tr. 33:5-16, 35:17-22.  Neither qualifies him to give an opinion about the purportedly shared religious beliefs of an entire country.  Nakhleh also testified that he wrote reports and analyses about Saudi Arabia while an intelligence officer at the CIA, but those materials are not listed in Annex A to his expert report, and he refused to discuss their substance at his deposition, claiming they were classified.  *Infra* pp. 24-25 (discussing Nakhleh's claims of reliance on classified material).

Neither Saudi Arabia nor the Court can examine them to determine whether they support his claim to expertise.

Nakhleh is also not qualified to opine on the purported history and activities of MOIA and the roles of its employees. *See, e.g.*, Nakhleh Rep. ¶¶ 49-53, 88-99, 168-234. Nakhleh admitted at his deposition that he is not an expert on MOIA as an institution. Nakhleh Tr. 24:3-6. He could not answer basic questions about the Ministry. He misidentified the first Minister of Islamic Affairs, *id.* at 17:15-18:4; could not identify the current Minister of Islamic Affairs at all, *id.* at 19:7-9; did not know the names of MOIA's deputy ministers prior to the 9/11 attacks, or how many there were, *id.* at 18:5-15; and did not know MOIA's budget in the late 1990s, or what the budget was for da'wah inside Saudi Arabia and abroad, *id.* at 18:16-19:5.

When confronted with his lack of basic knowledge about MOIA, Nakhleh responded that his "focus was . . . in [MOIA's] international [d]a'wah," *id.* at 19:13-20, and that he is "an expert on what they do, especially overseas," *id.* at 24:3-6. But he did not know the name of the individual who was in charge of *da'wah* overseas prior to 2001, *id.* at 21:4-8, nor of any deputy minister to whom that individual reported, *id.* at 21:9-11. When asked about employees sent overseas for *da'wah* (Nakhleh uses the term "propagators"), he had no knowledge about their typical experience, *id.* at 317:18-318:20; about their typical promotion path or about MOIA's promotion process, *id.* at 318:21-321:7; or about their average age, *id.* at 316:19-21. Accordingly, he is not qualified to opine that it is "incredulous" that Al Jaithen's assignment to Minneapolis was "innocent," Nakhleh Rep. ¶ 192, or that it is "implausib[le]" that Al Thumairy "selected Los Angeles as his destination on his own," *id.* ¶ 206.

Nakhleh is also not qualified to review documents and testimony and opine that "propagators and higher officials employed by the Kingdom of Saudi Arabia were among the officials who provided material support to the 9/11 plot" or "knew that they were assisting

terrorist operatives of the al-Qai'da organization who were preparing to commit acts of violent jihad inside the United States." *Id.* ¶ 237; *see also id.* ¶¶ 146-167, 190-192, 205, 215-218, 233-259.  He has never overseen a criminal investigation or drawn conclusions from materials gathered in such an investigation.  *Supra* pp. 7-8.  Nor is he qualified to opine whether Saudi Arabia's witnesses told the truth at their depositions.  Nakhleh Rep. ¶¶ 141-167.  He is not an expert in truth detection, in psychology, or in any other relevant subject.  *Supra* p. 8.

C.     **Meleagrou-Hitchens' Lack of Qualifications**

Meleagrou-Hitchens is not qualified to review documents and testimony and opine that Al Awlaki conspired with Saudi government officials to support the 9/11 hijackers.  He has no experience in law enforcement, in supervising or participating in criminal investigations, or in FBI or CIA operations.  *Supra* p. 12; *see also* Meleagrou-Hitchens Rep., Annex A (no law enforcement or intelligence credentials or experience).  He also has no experience in analyzing phone records.  *Supra* p. 12.  He has never evaluated investigative material as part of a criminal investigation, *id.*, interrogated a criminal suspect as part of a criminal investigation, Meleagrou-Hitchens Tr. 13:3-5, or prepared memoranda documenting interrogations conducted in such an investigation, *id.* at 49:4-7.

Meleagrou-Hitchens points to his "experience," *id.* at 266:21-267:14, as a "researcher and analyst," *id.* at 14:15-17.  He purports to be "very familiar with court records" and "FBI productions," because he co-wrote a book about "ISIS in America."  *Id.* at 14:18-15:18.  But he never identifies those "court records" or "FBI productions" – other than admitting that they are "unrelated" to Al Awlaki and the 9/11 attacks, *id.* – how he analyzed them, or how that experience informs his purported analysis in this case.  General research experience on an unrelated issue is not "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

### D.      Schiff's Lack of Qualifications

Schiff is not qualified to opine that Al Bayoumi aided the 9/11 hijackers in carrying out the 9/11 attacks.  At his deposition, he acknowledged lacking any experience with terrorism investigations or identifying criminal conspiracies.  *Supra* pp. 13-14.  Schiff's aviation background may qualify him to speak with expertise about some issues.  He could fairly testify that the equation in Al Bayoumi's notebook standing alone appears to have nothing to do with the 9/11 attacks and that the hijackers would likely have navigated to their target visually rather than using the notebook calculations.  *Supra* p. 16; *infra* pp. 50-52.  But those (of course) are not the opinions Plaintiffs proffer.  They want Schiff to testify the notes were made to assist the hijackers based on his understanding about the alleged "relationships between Mr. al-Bayoumi and the two Al-Qaeda terrorists."  Schiff Tr. 51:7-21.  On that topic, his opinion "strays too far afield from his expertise," ECF No. 9060, at 10, and should be excluded.

## II.      The Challenged Experts Offer Opinions That Are Not The Products Of Reliable Methodologies Or Reliable Data

An expert must disclose and apply a reliable methodology.  *See Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 244 (S.D.N.Y. 2019) (excluding an expert whose opinions were riddled with "glaring methodological errors"); *LVL XIII Brands*, 209 F. Supp. 3d at 648 (excluding an expert for the "independent reason[ ]" that he "did not use a reliable methodology").  An expert must also use reliable data.  *See MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 293 (S.D.N.Y. 2001) (concluding that expert testimony was "unreliable," because "a major ingredient . . . is itself lacking in sufficient indicia of reliability"); *see also Macaluso v. Herman Miller, Inc.*, 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (ruling that expert testimony was "not sufficiently reliable to be admissible," because it was "based on incorrect

factual assumptions that render all of his subsequent conclusions purely speculative"). The Challenged Experts fall short of these requirements.

### A.   Youssef and Nakhleh Purportedly Utilized Classified Methodologies and Materials in Forming Their Opinions

The Court should exclude the opinions offered by Youssef and Nakhleh purportedly based on application of confidential or classified "investigatory methods" or purportedly "based on facts developed through confidential . . . investigations." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42 (E.D.N.Y. 2012) (excluding an expert who relied on facts derived from classified investigations and methodologies).[14]  Saudi Arabia "will be unable to effectively cross-examine" those experts about those opinions and their bases, and so "[a]ny weight" given to those opinions "would be excessive." *Id.*

### 1.   Youssef's Purported Use of Classified Methodologies and Materials

Youssef's analysis of phone records showing calling and receiving numbers – but not the substance of any call – is the only part of his opinion that relates to his substantive expertise at the FBI. *Supra* pp. 18-19.  Discussion of phone calls makes up much of his report, and he refers to phone calls as support for many of his assertions.[15]  So far as the record shows, Youssef's

---

[14] *See also*, *e.g.*, *In re National Prescription Opiate Litig.*, 2019 WL 3934490, at *3 (N.D. Ohio Aug. 20, 2019) (excluding expert opinions based in part on confidential information that expert refused to disclose); *Sanchez v. Boston Sci. Corp.*, 2014 WL 4851989, at *12 (S.D.W. Va. Sept. 29, 2014) (same); *Gray v. Cottrell, Inc.*, 2007 WL 4864393, at *2 (E.D. Mo. Jan. 11, 2007) (striking an expert who "assert[ed] that she is prohibited from testifying about one of the bases for her opinions by virtue of statutory law and the terms of [a] contractual agreement"; noting that the expert's "inability to fully testify about relevant matters impermissibly infringes upon defendant's ability to . . . [conduct a] complete and rigorous cross-examination").

[15] *See* Youssef Rep. 5-6, 14-15, 42-43, 45 & n.114, 46 n.117, 52 & n.150, 59-60, 77 & n.295, 84, 97-98 & n.401, 100, 102 & n.413, 103 & n.417, 115, 121-22 & nn.505-08, 123-24, 126, 127-29 & nn.524-25, 130 & n.531, 132-40 & nn.542, 556, 560, 145-47 & n.591, 150-51 & n.614, 152-59 & nn.623, 627, 636, 641-53, 162-63, 165, 169-72, 173-75 & n.708, 176, 184-85, 186, 193 & n.787, 196, 197-98 & nn.811-12, 200, 207-08 & nn.850-51, 853, 210-11, 216, 218-19 & n.913, 221-22, 225, 243.  Some references are to statements in FBI documents about phone calls rather than to Youssef's own spreadsheets.

23

method is reviewing a spreadsheet of calls from one number to another and drawing circumstantial inferences from call timing and frequency. *See* Youssef Rep. 6-7, 14; Youssef Tr. 270:6-272:2. No expertise is needed for such inferences. Plaintiffs' counsel can argue them, Saudi Arabia's counsel can rebut them, and the Court can accept or reject them.

Youssef claims that his inferences are more authoritative than a layperson's because he applies certain "investigative techniques used to analyze communications," including one called a "Calling Circle" (he also refers to a "calling chain") that U.S. government agencies use to investigate terrorists. Youssef Rep. 5, 14, 146. But at his deposition, when asked about these techniques, he testified that those methodologies are "classified" and that he "can't be the one to expound on" them. Youssef Tr. 258:12-260:7. Reliance on classified techniques prevents Saudi Arabia from testing, and the Court from evaluating, the reliability of Youssef's methodology.

Youssef also relies on an investigation that he says the FBI conducted in Southern California between 1992 and 1996, which serves as part of the basis for his opinion that there was a support network for terrorism there. *See*, *e.g.*, Youssef Rep. 1-2, 12, 16-24, 53-54. Youssef testified at his deposition that material related to that investigation remains classified, and he refused to say even its code name. Youssef Tr. 43:17-45:2, 46:19-47:20.[16] He also claimed to have authored "numerous reports" on Al Qaeda at the FBI – the core topic of his report – but testified that the reports are "classified." *Id.* at 92:11-21. The Court should exclude all of Youssef's opinions allegedly based on those classified methodologies and materials.

### 2. Nakhleh's Purported Use of Classified Methodologies and Materials

Nakhleh claims that his entire report is "informed by [his] experience" at the CIA. Nakhleh Rep. ¶ 2. He testified that his opinions on "Al-Qaeda's Islamic thought" were presented

---

[16] At another point, Youssef testified that he did not know whether the FBI has declassified such material. Youssef Tr. 49:18-50:4, 393:4-10.

**REDACTED FOR PUBLIC FILING**

in "high-level briefings . . . to senior policymakers," Nakhleh Tr. 48:8-17; and that "there were reports and briefings that we did from CIA that . . . highlighted the role of the [MOIA] . . . in support of terrorism," *id.* at 75:12-20.  He similarly claimed that his opinion that Saudi witnesses could not be "credit[ed]" was "shared by others" and were "the type of briefings that we presented to the president of the United States and every other high official below him."  *Id.* at 335:12-336:3.[17]

When asked about the CIA reports and briefings that purportedly provide the basis for his expertise and support his opinions, Nakhleh testified that they were classified and he could not discuss them.  When asked about support for his opinion that "the Ministry of Islamic Affairs' charge was to . . . wage jihad globally," for example, Nakhleh answered:

> When I was in the government, we looked at that very closely and, in fact, we did some briefings exactly on this point.  So I could not possibly have cited a source here from the CIA, either briefings or papers on this very topic.

*Id.* at 232:21-233:9; *see also id.* at 84:21-85:17 ("classified" CIA "reports" that purportedly supported "our conclusion" about Saudi "support of the two hijackers"); *id.* at 238:3-21 ("many years of work" on the "topic" of MOIA that he could not "share" in his testimony); *id.* at 244:10-245:18 ("confidential and classified information" purportedly showing that the Saudi government and other Gulf governments were "aware" of terrorist funding).  Nakhleh thus asks the Court to accept his word that an entire ministry of the Saudi government (or, after he backtracked, "elements" within it, *infra* p. 38) promoted global jihad based on unverifiable assertions that, at the CIA, he worked on secret briefings reaching that conclusion.

---

[17] *See also* Nakhleh Rep. ¶ 55 (referring to "classified" studies "of Saudi texbooks" to support his expertise); Nakhleh Tr. 216:9-218:5 (same for briefings on the Sahwa movement and the Memorandum of Advice).

**B.     The Challenged Experts Fail To Disclose or Apply Reliable Methodologies and Use Unreliable Data**

The reports of Youssef, Nakhleh, and Meleagrou-Hitchens provide "virtually no insight into the considerations that shaped [their] qualitative analys[e]s," and thus "[t]here is . . . no basis on which to hold that [their] opinions derive from . . . reliable methodolog[ies]." *LVL XIII Brands*, 209 F. Supp. 3d at 648; *see 24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007) (rejecting an expert's "unverifiable, inchoate" methodology).

**1.     Youssef's Failures To Disclose or Apply a Reliable Methodology and His Use of Unreliable Data**

**a.     Unexplained reliance on experience.**  Leaving aside his purportedly classified phone-record analysis techniques, *supra* pp. 23-24, Youssef claims to have applied an "investigative methodology [he] learned" at the FBI, as well as his "personal background, recollections, experience and knowledge."  Youssef Rep. 5; *see id.* at 8 (claiming to have used "the same expert analysis" as in his "work for the FBI").  The report never sets out his "investigative methodology" or explains how Youssef allegedly applied that methodology in reaching his opinions.  For example, his report does not explain how (or even whether) he weighed different kinds of source material or reconciled conflicting evidence.  Nor does it cite to any publication laying out the methodology he purportedly applied or evaluating its efficacy. *See 24/7 Recs.*, 514 F. Supp. 2d at 575-76 (observing, in rejecting an expert, that the proffering party "ha[d] not cited a single published authority" to support the expert's methodology).

When pressed about his methodology at his deposition, Youssef pointed to his "experience . . . set forth in the first few pages" of his report and "[his] explanation and [his] commentary of [his] opinions for every piece of evidence that correlates to another piece of evidence."  Youssef Tr. 377:5-18.  Conclusory references to experience – especially exaggerated experience, *supra* pp. 3-4 – are not a reliable methodology.  *See Primavera Familienstiftung v. Askin*, 130 F. Supp.

2d 450, 530 (S.D.N.Y.) (excluding testimony of expert who "aver[red] conclusorily that his experience led to his opinion"), *amended on recon. in part on other grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011).[18]

       **b.**      **Selective adoption of FBI theories.**  Although Youssef's report relies on FBI memoranda and other FBI materials, he applies no consistent or principled method to determine which of those documents should be given weight.  As one example, when the FBI closed its "Operation Encore" investigation into Al Bayoumi, Al Thumairy, and Al Jarrah, it issued a May 2021 electronic communication stating that the three men "did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack"; that there is "insufficient evidence . . . to prosecute" them "for wittingly conspiring to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack"; and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Ex. 13 (Youssef Ex. 10), at 9-11.  The document also includes a September 2021 addendum clarifying that the FBI found no "evidentiary support" for allegations that Al Jarrah had personal or telephone contacts with the hijackers and that its investigation included "approximately 60 interviews" between 2007 to 2016.  *Id.* at 12-14.  When asked about this document, Youssef disagreed with the FBI's conclusions and attributed them to "political reasons or diplomatic

---

[18] *See also United States v. Ray*, 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) ("Even '[i]f the witness is relying solely or primarily on experience, [he still] must explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts.'") (citation omitted, brackets in original, emphases added); *Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, 575 F. Supp. 3d 242, 246-49 (D. Mass. 2021) (excluding expert testimony with "no basis" other than "[g]eneric appeals to . . . experience").

reasons," Youssef Tr. 342:13; *see also id.* at 354:22 (similar), although the document says nothing of the kind.

But when FBI materials support Youssef's preferred results, he adopts them without scrutiny. In July 2021, several months after the investigation closed, an FBI agent wrote an electronic communication "consolidat[ing] information" about "entities that are part of or closely tied to the Saudi Arabian government." Ex. 14 (Nakhleh Ex. 4), at 479, 482. The communication is addressed "[t]o file," with disclaimers that it "should not be considered an intelligence assessment and is not intended as such"; and that the writer was "not investigating or re-investigating the 9/11 investigation." *Id.* at 479, 481-82. Youssef admitted that the July 2021 report "regurgitates" the contents of previous documents. Youssef Tr. 341:7-16. His report inaccurately describes the results of that regurgitation as "findings of the FBI" and repeats them uncritically. Youssef Rep. 10-11, 57-58, 161, 231, 234, 241.

As another example, Youssef quotes and inaccurately describes as the "FBI's conclusion" the statement in a 2012 investigative update, which is repeated in a 2014 update, that "'[t]here is evidence that al-Jarrah had possible links to al Qaeda and tasked al-Thumairy and al-Bayoumi with assisting the hijackers.'" *Id.* at 132 & n.538 (quoting the public version of Ex. 15 (Youssef Ex. 9), at 227); *see also* Ex. 16 (Youssef Ex. 7), at 276.[19] As the Court knows, when this statement was made public, the FBI filed a declaration by the Assistant Director of its Counterterrorism Division stating: "[I]t would have been more appropriate to phrase the last sentence in the 2012 Report and the statements about the individual at the top of [EO14040-000227] as an investigative theory being pursued by the FBI and not as objective statements of fact." ECF No. 5142, ¶ 22. When asked about the Assistant Director's statement, Youssef

---

[19] The statement also refers to "telephonic contact[s]" but does not give specifics. *See supra* pp. 23-24; *infra* pp. 31-33 (discussing Youssef's telephone analysis).

testified that he "d[id]n't think it was accurate" and that it was made "to protect the reputation of the FBI."  Youssef Tr. 321:17-323:2.

      **c.**    **Crediting hearsay from unknown sources.**  Similarly, Youssef's opinions rely in key respects on FBI documents setting out alleged statements from confidential sources, which he repackages as "conclusions" or "findings" of the FBI.  His report omits or obscures "information . . . need[ed] 'to factor into [the factfinder's] deliberations the reliability (or unreliability) of the particular source[s].' "  ECF No. 9060, at 7 (quoting *Mejia*, 545 F.3d at 198).

      As one example, to support his opinion about Al Jarrah's purported links to a "Southern California based network" of " 'Saudi Sunni extremists' " that he " 'controll[ed], guid[ed] and direct[ed],' " Youssef relies on a 2003 FBI report summarizing information from an unnamed FBI source.  Youssef Rep. 32 & n.64, 61 & n.202 (quoting the public version of Ex. 3 (Youssef Ex. 5), at 534).  Identical language was later copied-and-pasted into other FBI documents that Youssef also quotes.  *See id.* at 230-31 & n.974 (quoting Ex. 17 (EO14040-000556-68), at 562).  The same "network" language became part of the predicate for the 2007 initiation of an investigation into Al Bayoumi, Al Thumairy, and Al Jarrah.  *See* Ex. 18 (Youssef Ex. 6); Youssef Tr. 294:2-6 (acknowledging that the language is identical).

      Ultimately, the May 2021 electronic communication closing the investigation repeated the same confidential source information and then stated that "[n]o additional information was revealed outside of" that 2003 source reporting and "telephone information."  Ex. 13 (Youssef Ex. 10), at 4-5.  Youssef testified that he does not know the identity of the FBI's 2003 source, does not know that source's history with the FBI, and does not know the identities of the authors of the 2003 FBI report.  Youssef Tr. 281:17-283:11.  Yet Youssef gives the impression that the source's uncorroborated characterization of Al Jarrah was an institutional "conclu[sion]," Youssef Rep. 61, of the FBI itself.

As another example, to support his opinion that Al Thumairy had foreknowledge of and was involved in supporting the 9/11 attacks, Youssef relies on an FBI summary of a statement from a unnamed source that, "in late December 1999, 'the [King Fahad Mosque] received a phone call from an individual in Malaysia'" who "wanted to speak with Al-Thumairy about the imminent arrival" of "'two brothers . . . who needed their assistance.'" *Id.* at 155 (quoting the public version of Ex. 19 (Youssef Ex. 2), at 520) (capitalization omitted; ellipsis in original). The summary states that, "according to" the source, "[t]hose 'two brothers' were . . . Nawaf al Hazmi and Khalid al Mihdhar.'" *Id.* (same). Again, Youssef does not know the source's identity. Youssef Tr. 34:10-35:1; *see also id.* at 33:16-19 (same for Ex. 20 (Youssef Ex. 1)). Yet he purports to divine from the "manner" in which the FBI "present[ed]" the statement that the FBI "assessed the source information as credible." Youssef Rep. 155 n.629.

As a third example, Youssef states that, "[i]n September 2003, the FBI found that Thumairy, together with Mohamed al Muhanna, had 'recently [sent]' extremist materials from the MOIA to ███ at the Saudi Consulate for distribution to Mosques around Los Angeles." *Id.* at 57. The document Youssef quotes makes no such finding: It is an FBI memorandum documenting alleged statements from an unknown source. *See id.* at 57 n.179 (citing "EO14040-3470-3471-MDL," which is part of Ex. 21 (Nakhleh Ex. 8)); *see also id.* at 51 n.147, 57 n.182 (same use of the source reporting reflected in Ex. 21). Again, Youssef's report misinforms the reader by attributing to the agency findings that it did not make.

      **d.**    **Speculation and conjecture.** Youssef's opinions "are based on speculation or conjecture." *Major League Baseball*, 542 F.3d at 311. As one example, his discussion of Al Sadhan's and Al Sudairy's travel to San Diego, Youssef Rep. 101-16, states that various

communications or interactions "would have" happened with no evidence that they did happen.[20] Youssef then uses those invented interactions to support further conjecture that Al Sadhan and Al Sudairy were an "advance intelligence team" for the 9/11 hijackers.  *Id.* at 114.  As this Court recently explained, "[i]t is the role of an expert to apply his methodology to the facts of the case, not to imagine new ones."  ECF No. 9060, at 20.

As another example, Youssef's discussion of the alleged call to the King Fahad Mosque from Malaysia about "two brothers" is based on two FBI documents summarizing alleged statements from an unnamed source or sources about whom he knows nothing.  *Supra* p. 30. At his deposition, he opined further that the caller was Al Qaeda operative Walid Bin Attash, Youssef Tr. 19:12-22, 21:10-15, which neither document says.  *See* Exs. 19 (Youssef Ex. 2) & 20 (Youssef Ex. 1).  He then opined further still that Bin Attash spoke with Al Thumairy and "conveyed the message" that "there are two brothers coming in from Al-Qaeda who are going to be doing some kind of an attack in the U.S.," *id.* at 20:18-21:9, which, again, neither document says.[21]  Such conjectural "leap[s]" into "unverifiable subjectivity," *Nimely*, 414 F.3d at 399, undermine the reliability of his testimony and warrant its exclusion.

e.    **Use of unreliable telephone data.**  Youssef's phone analysis makes errors and unsupported assumptions about the owners or users of various phone and fax numbers.  For example, Youssef treats the phone number ((619) 579-3142) and fax number ((619) 401-2697)

---

[20] *See* Youssef Rep. 107 ("Thumairy would have been informed in advance" of the visit); *id.* at 108 ("Sadhan and Sudairy would have been sheparded [sic] . . . to . . . Bayoumi"); *id.* ("Thumairy and Bayoumi would have coordinated" about the visit); *see also id.* at 105 ("[i]t is likely" that Al Sadhan's and Al Sudairy's visit "was coordinated with Al Haramain").

[21] Youssef then went even further, asserting that Bin Attash was in the United States during the summer of 2000 and met with Al Thumairy.  Youssef Tr. 28:15-29:12.  Although he acknowledged that the 9/11 Commission found no evidence of Bin Attash being present in the United States before the 9/11 attack, Youssef testified that Bin Attash "could have easily secreted himself across the United States without us knowing."  *Id.* at 29:13-30:7.

for the Al Madinah Mosque as belonging to Al Bayoumi ("Bayoumi Kurdish" and "Bayoumi

Kurdish Mosque fax" in his spreadsheets). *See* Ex. 22 (Youssef call spreadsheet excerpt). Al

Bayoumi testified that "anyone" and "everyone" could use the phones in that mosque and that Al

Bayoumi was infrequently present there. *See* Ex. 23 (Bayoumi Tr.), at 297:3-20. Youssef

similarly treats phone numbers ((310) 204-1250 and (310) 202-0432) and fax number ((310)

204-1260) for the King Fahad Mosque as belonging to Al Thumairy ("KFM" in his

spreadsheets). *See* Ex. 22 (Youssef call spreadsheet excerpt). By treating every call to or from

the Al Madinah Mosque number as involving Al Bayoumi, and every call to or from the King

Fahad Mosque number as involving Al Thumairy, Youssef inflates the number of calls that

purportedly involve them.

Youssef also treats cell phone numbers as belonging to Al Thumairy based on speculation.

He assumes that the phone number ██████0777 was Al Thumairy's before the 9/11 attacks,

although bills for that number show a starting service date ("Start Srv.") for Al Thumairy of

"04/22/2002." Ex. 24 (FBI000365-67). Youssef acknowledges that the subscriber for the 0777

number in 2000 and 2001 was an Los Angeles Consulate employee named Saleh Al Hatlani, not

Al Thumairy, but conjectures that Al Hatlani was a "front man" or "logistics agent." Youssef

Rep. 124-25. Youssef then relies on December 2000 calls involving the 0777 number for his

opinion that Al Bayoumi and Al Thumairy were in phone contact. *Id.* at 122.[22]

Youssef also assumes that the phone number ██████3362 was Al Thumairy's. Al

Thumairy has testified that he does not recall that number. *See* Ex. 27 (Thumairy Tr.), at 497:14-

---

[22] Youssef points to two documents showing the 0777 number in conjunction with
Al Thumairy's name in or around June 2001, *see* Youssef Rep. 121 n.504 (citing Ex. 25
(FBI000508-09), at 508 (phone bill showing call forwarding to that number in June 2001), Ex.
26 (Muhanna Ex. 670), at 045 (FBI document summarizing lease application from July 2001)),
but neither is a reasonable basis for attributing all calls made in December 2000 to Al Thumairy.

498:11.  Subscriber information that Plaintiffs represent they obtained from AT&T shows the

subscriber as Faisal Al Muhanna, a Saudi student.  *See* Ex. 28 (Muhanna Ex. 671); *see also*

Ex. 29 (Muhanna Tr.), at 23:2-13, 34:3-11 (discussing his education in the United States); *id.* at

92:4-93:4 (discussing the subscriber information).  Youssef conjectures that Al Muhanna, like Al

Hatlani, was a "front man" or "logistics agent" for Al Thumairy.  Youssef Rep. 124-25.  He then

relies on late 1999 and early 2000 calls involving the 3362 number to show that Al Bayoumi and

Al Thumairy were in contact around the time of the hijackers' arrival.  *Id.* at 121.[23]  By building

speculative attributions into his phone analysis, Youssef makes camouflaged credibility and

evidentiary determinations about who used which numbers in the guise of purported expertise.

   **f.**  **Guilt by association.**  Experts may not opine that individuals are "guilty by

association."  *United States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022).  A lengthy section of

Youssef's report describes Al Thumairy as part of an "extremist group," "radical group," or

"radical faction," and as having "contacts" with individuals accused of wrongdoing in other

contexts.  Youssef Rep. 49-60.  Another section describes Al Bayoumi as having "a leadership

role of [a] Sunni extremist cell" at the Islamic Center of San Diego based largely on Al Bayoumi's

association with Omar Hamerman, who Youssef identifies (without support) as himself being an

"extremist."  *Id.* at 85-88.

   Youssef also suggests that senior Saudi officials must have been part of the terrorist plot

based on tenuous inferences from association (or alleged association), frequently disbelieving

their testimony in order to do so.  Thus, for former Minister of Islamic Affairs Abdullah Al

---

[23] To support his assumption that the 3362 number was Al Thumairy's, Youssef relies on a document titled "Omar's Phone Book January 26, 2000."  Youssef Rep. 120-21 (citing Ex. 30 (Sudairy Ex. 518), at 293).  When asked about that document, Al Bayoumi testified that it was a document generally available to anyone at the Al Madinah Mosque, that any number of people could have entered phone numbers into that document, and that he could not confirm the accuracy of the information it contains.  Ex. 23 (Bayoumi Tr.), at 506:2-20, 781:11-784:5.

Turki, Youssef relies on his alleged "appoint[ment] and approv[al] [of] the hiring of Mr. Thumairy" for a post in Los Angeles and his alleged position as the "head honcho . . . of Al Haramain." Youssef Tr. 36:22-37:16, 40:3-18.  Youssef's report does not address Minister Al Turki's testimony that he recalled no involvement in Al Haramain, that he has never known Al Thumairy, and that (as Minister) he would not necessarily "know . . . personally" an individual whose appointment he approved.  Ex. 31 (Turki Tr.), at 64:6-20, 124:10-125:1, 125:21-126:21.

Similarly, for former Minister Saleh Al Ash-Sheikh, Youssef relies on his alleged "very high-level" position "within Al Haramain," Youssef Tr. 50:10-18, ignoring Minister Al Ash-Sheikh's testimony that he was not involved in Al Haramain's activities, *see* Ex. 32 (Ash-Sheikh Tr.), at 137:14-138:10, 139:21-140:6, 186:16-187:3.  For Deputy Minister Al Ammar, Youssef relies on his alleged membership on the Ibn Taymiyyah Foundation board, which "had oversight responsibility" over, and purportedly "g[ot] reporting" about, the King Fahad Mosque and Al Thumairy.  Youssef Tr. 51:3-54:15, 56:15-57:8.  Youssef ignored or disbelieved testimony from two third-party witnesses that the Saudi officials appointed as Ibn Taymiyyah Foundation directors before the 9/11 attacks did not attend board meetings or act as active board members.  *See* Ex. 33 (Khalil Tr.), at 376:10-379:11; Ex. 34 (Kaldirim Tr.), at 264:21-268:5.[24]

## 2.   Nakhleh's Failures To Disclose or Apply a Reliable Methodology

a.   **Unexplained reliance on experience.**  Like Youssef's report, Nakhleh's report does not disclose the methodology Nakhleh applied in reaching his opinions.  At his deposition, Nakhleh insisted that he applied a "comprehensive interdisciplinary methodology, both qualitative and quantitative," that he "employed" at the CIA.  Nakhleh Tr. 278:6-279:11.  But the few

_____

[24] *See also*, *e.g.*, Youssef Tr. 62:9-20 (relying on former Deputy Minister Tawfiq Al Sudairy's alleged "appoint[ment] of propagators" who were "part" of a purported "advance team"); *id.* at 64:7-17 (pointing to his alleged membership on the board of Al Haramain).

references in Nakhleh's report to an "interdisciplinary approach" are mere high-level descriptions of parts of Nakhleh's graduate-school coursework and career. *See* Nakhleh Rep. ¶¶ 5, 7, 9, 12. He never says what disciplines make up his "interdisciplinary" approach, nor what in his report is "quantitative" other than the paragraph numbers. Nor does the report explain how Nakhleh allegedly applied his approach. Like Youssef's, it does not explain how (or whether) Nakhleh weighs different kinds of source material or reconciles conflicting evidence, and it cites to no publication laying out the methodology he purportedly applied or evaluating its efficacy. *See 24/7 Recs.*, 514 F. Supp. 2d at 575-76.

      **b.**    **Lack of scholarly support.** Nakhleh's report confirms that he applied no reliable methodology. His opinions on Saudi religion paint a distorted picture that equates the Islamic beliefs held by Saudi Arabia as an institution, by its leaders and religious authorities, and by its people with Al Qaeda's advocacy of mass murder. No reputable scholar would say such things. Nakhleh himself could not defend his statements when cross-examined.

      **i.**    Nakhleh's report describes "Wahhabis" as dangerous and untrustworthy. He attributes to "Wahhabis" the belief that the United States is an "enemy" of Islam, Nakhleh Rep. ¶¶ 29, 248; support for "violent jihad" against such enemies, *id.* ¶¶ 30, 34, 45, 66, 144, 229-230; and support for "terrorism" or "terror," *id.* ¶¶ 34-35, 144. He asserts that "Saudi Wahhabis are prepared to subordinate, even put at risk, other important relationships, for example with their international allies[] in their immutable allegiance to their religious brethren." *Id.* ¶ 45. He also claims that "most Salafi Wahhabis" regard "Western parliaments, ruling bodies, [and] the judiciary" as "illegitimate" and so are likely to lie under oath. *Id.* ¶¶ 146-147.

      Nakhleh attributes those purported "Wahhabi" beliefs to "Saudi Arabia" or the "Saudi state," which he describes as a "Wahhabi polity" and as "Wahhabi[]" in its "very essence." *E.g., id.* ¶¶ 44, 49, 62, 64, 142, 143, 144, 145, 237. He accuses Saudi Arabia of "embod[ying]

REDACTED FOR PUBLIC FILING

. . . extremist tendencies," *id.* ¶ 49, and compares it to "Dr. Jekyll and Mr. Hyde," *id.* ¶¶ 144-145.

He makes similar derogatory statements about "Saudi officials" or Saudi "religious authorities"

as groups:  that "Saudi officials have . . . led children to drink from a poisonous reservoir of

radical intolerant ideologies and violent jihadist tendencies," *id.* ¶¶ 61, 130; that "there was

a marked and unprecedented convergence of views between bin Ladin and Saudi religious

authorities . . . [on] jihad against the United States," *id.* ¶ 130; and that "Saudi officials" believed

in "the 'justness' of jihad against the United States," *id.* ¶ 134.[25]

Nakhleh likewise identifies MOIA as an institution as "Wahhabi" – and therefore, he

says, jihadist.  He opines that King Fahd's creation of MOIA in the early 1990s was a concession

to the "agenda" of "radical clerics," *id.* ¶ 88; that MOIA was a "Saudi state vehicle that . . . len[t]

support to" Osama bin Laden's "ambitions . . . to wage jihad globally," *id.* ¶ 92; that MOIA

"br[ought] to fruition th[e] demands" of "the religious classes . . . that . . . jihad should be

intensified," *id.* ¶ 168; that MOIA "supported and promoted" bin Laden's "violent *jihad*," *id.*

¶ 169; and that the "activities" of a "propagator" employed by "MOIA" would include providing

"assistance . . . to any visitor engaged or planning to engage in . . . fighting jihad," *id.* ¶ 213.

**ii.**     Real experts disagree with Nakhleh's statements about Saudi religion.  At his

deposition, Nakhleh acknowledged Natana Delong-Bas, Peter Mandaville, and Roxanne Euben

as experts on "Wahhabism," Nakhleh Tr. 29:2-30:4, and also acknowledged Delong-Bas and

Euben as experts on Saudi Arabia, *id.* at 37:1-39:8.  All three of those scholars take the view that

Saudi religious beliefs generally are "quietist" and should not be confused with the "jihadist"

---

[25] Nakhleh also attributes violent beliefs to Saudi citizens generally and to groups within
Saudi society.  *See* Nakhleh Rep. ¶ 132 ("the vast majority of faculty and graduate students at the
Imam Muhammad University and other educational establishments" agreed with "justifications
for attacking the United States and killing 'innocent' civilians"); *id.* ¶ 136 (at the time of the 9/11
attacks, "the view of the United States as an 'enemy' of Islam and the requirement to do jihad
against it was . . . widely accepted in Saudi Arabia").

beliefs held by Al Qaeda.[26]  So, for that matter, has Plaintiffs' own expert, Meleagrou-Hitchens.[27]

Indeed, Nakhleh himself acknowledged the distinction between "quietist," "activist," and

"jihadist" Salafi beliefs in a book written before Plaintiffs retained him as an expert.  Ex. 38

(Nakhleh Ex. 6), at 112-16.[28]

When confronted with the views of those experts (and with his own book) at his deposition,

Nakhleh acknowledged that quietist Salafis "do not engage [in] or support violent jihad."

Nakhleh Tr. 138:2-4; *see id.* at 135:22-136:14 (agreeing that his past writings describe quietists

as "not participat[ing] in violence or terrorism").  Rather, quietists "tend[] to read the scripture

literally without any deviation," in which they are similar to "fundamentalist[] Christians and

Jews."  *Id.* at 137:20-138:4.  He admitted that King Fahd and other senior Saudi leaders were

quietist, including Ibn Baz, the Grand Mufti.  *Id.* at 147:22-148:9, 150:3-9.  He also admitted that

"the religious council appointed by the king" would have supported "state policy" in the 1990s

and that this policy was "against waging jihad against the United States."  *Id.* at 250:6-251:4,

251:18-21.  Indeed, Nakhleh even admitted that the "prevalent view in . . . the four schools of

---

[26] In a book written just a few years after the 9/11 attacks, Delong-Bas explained that "[t]he militant Islam of Osama bin Laden . . . is *not* representative of Wahhabi Islam as it is practiced in contemporary Saudi Arabia."  Ex. 35 (Nakhleh Ex. 7), at 279 (emphasis added). Mandaville has written that "[m]ost Salafis today" are "Salafi quietists" and "deem it wholly inappropriate for religious scholars to become involved in activism, much less *jihad*," and that "most" members of "the Saudi religious establishment" are "firmly in the quietist camp."  Ex. 36 (*Islam and Politics*), at 49-50.  Euben similarly states that "Wahhabi religious scholars" in Saudi Arabia "have long affirmed a quietist political stance" and have "le[ft] matters of the state to the ruling family."  Ex. 37 (*Princeton Readings in Islamist Thought*), at 21.

[27] *See* Ex. 8 (Meleagrou-Hitchens Ex. 3), at 50-51 (identifying the "Saudi religious establishment line" with "quietists" who "reject political involvement or political frames" and "call for absolute obedience to the legitimate ruler . . . of any Muslim country they are based in," and that the "main practices they support" include "peaceful *dawah*").

[28] Saudi Arabia itself has many times denounced terrorism as un-Islamic, through both its political and religious authorities.  *See, e.g.*, ECF No. 3851, at 24 & nn.25-27.  This motion relies on experts who write on Saudi religion in English because Nakhleh concedes their expertise and because they are more accessible to the Court.

jurisprudence in Sunni Islam," including Hanbali Salafism, is that only the King can declare jihad, *id.* at 182:1-20; and that King Fahd certainly did not issue a fatwa of jihad against the United States, *id.* at 184:2-6.

Consistent with those concessions, Nakhleh did not defend his report's claim that Saudi Arabia or MOIA as a whole "support[ed] . . . jihad globally." Nakhleh Rep. ¶ 92. Instead, he testified not that "it was the mission of the whole ministry" to wage violent jihad globally, but that "elements within that ministry" held that belief. Nakhleh Tr. 235:4-18 (discussing Nakhleh Rep. ¶ 92); *see id.* at 239:7-241:8 (discussing Nakhleh Rep. ¶ 169); *id.* at 261:14-262:9. When asked to put names to those "elements," Nakhleh named Al Thumairy, Al Sowailem, Al Jaithen, Al Mersal, Al Sadhan, Al Sudairy, *id.* at 156:13-157:8, 158:13-20, 209:22-210:12; the deputy minister who "approved the appointment of Thumairy," *id.* at 157:9-19; and "[w]hoever . . . made the appointment" of Al Jaithen and others to come to the United States, *id.* at 288:5-289:1.

iii.     Nakhleh's report, as he has conceded, never mentions either quietist or activist Salafis in Saudi Arabia. *See* Nakhleh Tr. 154:11-155:5. When asked whether he "lumped together all Hanbali Salafists into one category of Wahhabists," he answered that he "did so because [he] was focusing on . . . those who support violent jihad and who see an enemy." *Id.* at 154:18-155:1. That omission supports exclusion of his testimony. *See* ECF No. 9060, at 4-5 ("whether [the expert] is as careful as [the expert] would be in [the expert's] regular professional work" is a factor in "analyz[ing] an expert's reliability") (cleaned up).

Nakhleh's error also renders unreliable his discussions of specific individuals. For example, Nakhleh opines that "extremist[s]" who support "'jihadist' cause[s]" would "feel comfortable [with] and trusting" towards Al Jaithen because he once received a letter of recommendation from "Shaykh Muhammad bin Saleh Al Uthaymeen," an "influential Wahhabi-Salafi theologian[ ]." Nakhleh Rep. ¶¶ 183-187 (emphasis omitted). But at his deposition,

he agreed with a published statement by Meleagrou-Hitchens identifying "Muhammad Ibn al-Uthaymeen" as an "influential Saudi-based scholar associated with the quietist movement." Nakhleh Tr. 150:10-19 (discussing Ex. 8 (Meleagrou-Hitchens Ex. 3), at 51) (emphasis added). So even if any inference about Al Jaithen's personal beliefs and associations could be drawn from the Al Uthaymeen letter, the logical inference would be that he was a quietist, not a jihadist.

       **c.**    **Selective adoption of FBI theories.**  Nakhleh's selective use of FBI and CIA materials to support his opinions about an alleged "support network" for the hijackers shows the unreliability of his methods.  He claims that his opinions are supported not only by "classified" CIA analysis, *supra* pp. 24-25, but also by a purportedly "careful[ ]" review of "the relevant documents in the FBI production."  Nakhleh Rep. ¶ 255.  His report appeals to "the FBI," to "documents released by the FBI," and to "FBI investigative documents" as "authoritative," and cites statements in FBI preliminary investigative materials without any discussion of their reliability.  *Id.* ¶¶ 181, 240, 256-257.  Yet, like Youssef, he credits only agency statements that support Plaintiffs' theories and disparages or mischaracterizes others.[29]

       As one example, Nakhleh's opinion that Al Bayoumi, Al Sadhan, and Al Sudairy formed an "advance team" for Al Hazmi and Al Mihdhar relies on Ex. 39 (EO14040-000582-87) and Ex. 40 (EO14040-000588-600), which are preliminary investigative materials prepared as part of Operation Encore.  *See* Nakhleh Rep. ¶¶ 238, 250.  Judge Daniels recently addressed those two documents in his February 7, 2023 order, ECF No. 8862, and rejected the *Ashton* Plaintiffs'

---

[29] Like Youssef, Nakhleh adopts as fact the statements of the unnamed source or sources whose statements about an alleged phone call to Al Thumairy from Malaysia are summarized in preliminary FBI materials.  Nakhleh Rep. ¶¶ 240, 251 (discussing Exs. 19 (Youssef Ex. 2) and 20 (Youssef Ex. 1)).  At his deposition, Nakhleh admitted that he does not know the identity of that "confidential human source," does not know the basis of that source's information, does not know the FBI's history with that source, is unaware of any follow-up from the FBI investigating the source's information, does not know who made the purported call, and does not know the contents of the purported call.  Nakhleh Tr. 94:7-98:17, 103:3-11.

similar reliance on them as purported new evidence that could warrant reopening discovery.[30]  In the same order, Judge Daniels observed that "[t]he FBI ultimately rejected [those] theories about Sadhan and Sudairy" in its May 2021 electronic communication "clos[ing] Operation Encore." *Id.* at 25 (citing Ex. 39).

As another example, Nakhleh, like Youssef, relies on the July 2021 communication "[t]o file" that was prepared after Operation Encore was closed to "consolidate" previous material without making any "intelligence assessment" and without "investigating or re-investigating the 9/11 investigation."  Ex. 14 (Nakhleh Ex. 4), at 479, 481-82; *see supra* p. 28.  His report inaccurately describes this document as the FBI's "authoritative 'last word' on . . . official Saudi support."  Nakhleh Rep. ¶ 257.  Nakhleh's report does not mention or discuss the May 2021 electronic communication closing Operation Encore.  When asked, he testified that the May 2021 communication "did not necessarily to me give me the impression that [it] is the conclusion of the continued investigation."  Nakhleh Tr. 111:10-13; *but see* Ex. 13 (Youssef Ex. 10), at 11 ("All leads have been completed.  The [New York field office] is closing captioned matter.").[31]

In addition, despite his purported reliance on classified CIA materials and conclusions, *supra* pp. 24-25, Nakhleh's report nowhere mentions that in December 2004 the CIA joined with the FBI in a report to Congress finding "no evidence that . . . the Saudi Government . . . knowingly provided support for the attacks of 11 September 2001 or . . . had foreknowledge

---

[30] *See* ECF No. 8862, at 24 (explaining that Ex. 39 "qualifies the 'advance intelligence team' theory merely as 'possibl[e]'" and reemphasizing the need for "caution when 'relying on unsupported "conclusions" in investigative documents'") (brackets in original); *id.* at 25 (explaining that Ex. 40 "convey[s] that the allegations against Sadhan and Sudairy consist of theories describing only what 'may' have happened").

[31] When asked about the July 2021 communication, Nakhleh also inaccurately testified that "it's not just [a] compilation."  Nakhleh Tr. 267:1-6; *but see* Ex. 14 (Nakhleh Ex. 4), at 481 ("[W]riter has located relevant serials and ha[s] copied that information directly within this communication.").

of terrorist operations in the Kingdom or elsewhere," and "no information to indicate that . . .

Omar al-Bayoumi . . . materially supported the hijackers wittingly . . . or provided material

support for the September 11 attacks." Ex. 41 (Nakhleh Ex. 1), at 416. When asked about

this report, Nakhleh stated that he was familiar with it but that its conclusions were "political"

and reflected "lack of knowledge of the role of the Ministry of Islamic Affairs." Nakhleh Tr.

75:12-76:4. He admitted, however, that the CIA has issued no public document changing the

conclusions of the December 2004 report. *Id.* at 76:14-17.

Nakhleh's method of selecting documents to support Plaintiffs' litigation theories was

cast in a sharp light when Plaintiffs served the original version of his report on April 1, 2022.

That version, like the one Plaintiffs served a month and a half later, included an opinion that

"[t]he persons designated to lead *da'wa*" at the King Fahad Mosque in Culver City, California

"included in their briefs . . . the support of violent jihadists," but supported it with a footnote

stating "INTELLIGENCE + SUPPORT FOR JIHAD – Citations still to be added from the FBI

documents." Ex. 42 (Nakhleh Rep. (Apr. 1, 2022)), ¶ 179 n.91. When asked about this footnote,

Nakhleh admitted that he "made [his] opinions, and then [he] tr[ied] to in a sense look for

documents that share, if you will, the same opinion." Nakhleh Tr. 280:6-281:13. That is

cherry-picking, a recognized ground for excluding expert opinions. *See Daniels-Feasel v. Forest

Pharm., Inc.*, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) ("Cherry-picking is a form of

'[r]esult-driven analysis,' which 'undermines principles of the scientific method' by 'applying

methodologies (valid or otherwise) in an unreliable fashion.'") (quoting *In re Lipitor (Atorvastatin

Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634

(4th Cir. 2018)) (brackets in original), *appeal pending*, No. 22-146 (2d Cir.).

        **d.**    **Speculation and conjecture.** Nakhleh's report, like Youssef's, *supra* pp. 30-31,

engages in speculation and conjecture on matters that go to the heart of his opinions. Examples

include his opinions that there is "no conceivable scenario" in which Al Thumairy and Al Bayoumi would have helped Al Hazmi and Al Mihdhar "on their own initiative," Nakhleh Rep. ¶ 239; that Al Thumairy or Al Bayoumi "would have received some form of advance notification" that Al Hazmi and Al Mihdhar "were coming," *id.*; that there is "no conceivable scenario" in which Al Thumairy and Al Bayoumi "would not have known" that Al Hazmi and Al Mihdhar "were embarking on some sort of violent jihadist action," *id.* ¶ 240; and that "Saudi government . . . officials . . . must have known in advance" that Al Hazmi and Al Mihdhar "were coming to the US on a mission that was not humanitarian, educational, or propagational," *id.* ¶ 246.[32] Statements of this kind do not aid the Court in understanding anything, but merely attempt to put a purportedly expert imprimatur on Plaintiffs' otherwise unsupported allegations.

### 3. Meleagrou-Hitchens' Failures To Disclose or Apply a Reliable Methodology

**a. Incomplete disclosure of methodologies.** Meleagrou-Hitchens discloses a methodology that applies to only some of his opinions. His report describes "Social Movement Theory," *see* Meleagrou-Hitchens Rep. ¶¶ 8-20, which social scientists use to "study[] Islamic activism by drawing on frameworks used to understand a range of social movements," *id.* ¶ 9. Meleagrou-Hitchens allegedly employed Social Movement Theory to determine that Al Awlaki was a secret "proponent of violent jihad" even before the 9/11 attacks. *Id.* ¶ 22; *see id.* ¶¶ 8-20.

Meleagrou-Hitchens does not purport to use Social Movement Theory for his conclusions that Al Awlaki assisted the 9/11 hijackers or did so at the request of Saudi officials. Nor could

---

[32] *See also* Nakhleh Rep. ¶ 191 (there "would have been no need" for Al Jaithen to meet Al Bayoumi if Al Jaithen's visit had been "innocent"); *id.* ¶ 241 (Al Hazmi's and Al Mihdhar's "purpose would manifest" in "characteristics [that] would have been evident to anyone who would encounter them"); *id.* ¶ 252 (Al Thumairy "must have known who 'the guys' were before they arrived in Los Angeles and therefore he must have organized the logistical team that provided the two hijackers with logistical support"); *id.* ¶ 253 (Al Thumairy "must have had a clear idea" that the hijackers "were embarking on an important jihadist mission").

he, because Social Movement Theory has nothing to do with synthesizing and evaluating investigative materials to determine whether a group of individuals conspired to support a specific terrorist attack.  But Meleagrou-Hitchens does not lay out any other methodology.  Because his report offers "no insight into the considerations that shaped" his opinions about assistance to the hijackers, they should be excluded.  *LVL XIII Brands*, 209 F. Supp. 3d at 648.

At his deposition, Meleagrou-Hitchens referred to his "past experience in reading similar types of documents" as the ones in this case and "writing about them."  Meleagrou-Hitchens Tr. 266:16-267:14.  Conclusory appeals to experience are not enough.  *Supra* pp. 26-27.

**b.      About-face from previous published work.**  Where Meleagrou-Hitchens applies Social Movement Theory in his report, he fails to apply it reliably.  His opinion that Al Awlaki supported violent jihad before the 9/11 attacks is contrary to his earlier published work, which describes Al Awlaki as a "mainstream Islamic preacher in America," which rejects as "hard to believe" the theory that Al Awlaki was involved in the 9/11 attacks but kept silent about it after he embraced Al Qaeda, and which discusses Al Awlaki's "ideological evolution" towards violence.  Ex. 8 (Meleagrou-Hitchens Ex. 3), at 1, 15, 24-25; *see supra* pp. 11-12.  *See also* ECF No. 9060, at 4-5 (noting the relevance to an "expert's reliability" that the expert's opinion in the litigation "was developed expressly for purposes of testifying").

In his report, Meleagrou-Hitchens claims to see "clear signs of extremism" in Al Awlaki's pre-9/11 lectures and writings.  Meleagrou-Hitchens Rep. ¶¶ 75, 123.  At his deposition, Meleagrou-Hitchens acknowledged that he copied verbatim large portions of his peer-reviewed 2020 book and his 2011 academic article directly into his expert report, Meleagrou-Hitchens Tr. 128:22-131:5, 311:12-312:8, but chose not to copy, or even acknowledge, his earlier conclusion that Al Awlaki's jihadist transformation occurred after 9/11 – a conclusion based on the same lectures and writings that Meleagrou-Hitchens now claims show the opposite.  It is one thing to

change one's mind.  But not even to acknowledge the change shows the kind of "intellectual dishonesty [that] undermines . . . confidence" in an expert's reliability.  ECF No. 9060, at 32.

When questioned, Meleagrou-Hitchens testified that he changed his mind about Al Awlaki's pre-9/11 ideology when "re-listening" to Al Awlaki's lectures for his report. Meleagrou-Hitchens Tr. 327:15-328:16.  He claimed to have "come across things [he] had actually missed when [he] did the book, particularly [Al Awlaki's] views on his presentation of the Jewish threat" to Islam.  *Id.*  Meleagrou-Hitchens did not elaborate on what supposedly overlooked material he had newly discovered.  He admitted at his deposition that he still is "not aware of anything [Al Awlaki] said privately or publicly supporting global jihad prior to 9/11." *Id.* at 325:18-22.  His explanation does not restore confidence in his opinions.

      **c.**      **Selective adoption of FBI theories.**  Meleagrou-Hitchens opines that Al Awlaki's alleged interactions with Al Hazmi, Al Mihdhar, and a third hijacker – Hani Hanjour – in Virginia constituted "Saudi government sponsored[ ] operational support."  Meleagrou-Hitchens Rep. ¶ 68.  Under cross-examination, he was unable to identify any Saudi government official who interacted with the 9/11 hijackers in Virginia, Meleagrou-Hitchens Tr. 288:1-289:12, or to point to any evidence that "any Saudi Arabian official offered any assistance to the hijackers . . . in Virginia," *id.* at 292:22-293:15 (admitting that "the current discovery materials" include "no actual evidence" to show that such assistance was offered).  Instead, he testified that "[i]t is the FBI's opinion" that Saudi government officials "instructed" individuals in Virginia to assist the hijackers.  *Id.* at 299:5-12.  He acknowledged that no document produced by the FBI expressed that opinion, but claimed that it is "implicit" in a 2016 Operation Encore communication setting out investigative theories about ████, Al Sadhan's, and Al Sudairy's possible involvement with the hijackers.  *Id.* at 301:5-302:16 (discussing Ex. 43 (FBI011752-67)).

Despite relying on that implicit theory, Meleagrou-Hitchens' report never mentions the FBI's May 2021 communication closing Operation Encore and stating that "the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Ex. 13 (Youssef Ex. 10), at 11. At his deposition, he stated that he was not "challeng[ing]" the FBI's "final conclusions." Meleagrou-Hitchens Tr. 49:10-22 ("I don't believe I have challenged th[e] final conclusions. . . . I don't challenge the conclusion of the FBI."). When pressed on the May 2021 communication's statement that "the FBI has not identified additional groups or individuals responsible for the attack," he conceded that it was a "conclusion" of the FBI, although he described it as "narrow" and inaccurately asserted that "the July [2021] connections document" contains "further evidence" beyond what the FBI "relied on in May." *Id.* at 310:4-311:2; *but see supra* p. 28 (discussing the July 2021 communication to file). None of this tells the Court more than it could learn from reading the FBI documents itself.

      **d.**    **Speculation and conjecture about Al Awlaki.** Meleagrou-Hitchens engages in speculation, conjecture, and unjustified factual assumptions that further undermine his opinions. As one example, he opines that Al Awlaki helped Al Hazmi and Al Mihdhar open an account by calling a Bank of America phone number on the same day that the hijackers opened an account. Meleagrou-Hitchens Rep. ¶ 42.[33] At deposition, Meleagrou-Hitchens admitted that the phone number he attributed to Al Awlaki was the "general" number for Al Ribat Mosque and that he simply assumed Al Awlaki (rather than anyone else with access to the mosque's phone) made the phone call to the Bank of America phone number. Meleagrou-Hitchens Tr. 207:3-208:14.

---

[33] Meleagrou-Hitchens also claims that Al Awlaki may have translated for Al Hazmi as part of a car-rental process. Meleagrou-Hitchens Rep. ¶ 48; *see also* Meleagrou-Hitchens Tr. 246:16-247:4. He acknowledged at his deposition that there is no evidence placing Al Awlaki and Al Hazmi in the same rental car agency at the same time other than a statement purportedly made by an employee of such an agency that he saw Al Awlaki with someone who "was a close resemblance" to Al Hazmi. *Id.* at 246:20-247:11; *see* Meleagrou-Hitchens Rep. ¶ 48.

**REDACTED FOR PUBLIC FILING**

Meleagrou-Hitchens also assumed that the Bank of America phone number was assigned to the same Bank of America branch where the hijackers opened an account, Meleagrou-Hitchens Rep. ¶ 42, although the FBI's preliminary investigative materials on which he relied attribute the number to a different Bank of America branch in San Diego.[34]  Thus, both endpoints of the call are uncertain at best.

As a second example, Meleagrou-Hitchens opines that Al Awlaki translated for Al Hazmi and Al Mihdhar when they were securing an apartment at the Parkwood Apartments in San Diego.  Meleagrou-Hitchens Rep. ¶ 41.  His identification of the translation relies on the declaration of Holly Ratchford, the property manager at the Parkwood Apartments.  The declaration gives a description ("a man in his 30s or 40s, 5'9" to 5'11" tall with small square glasses and a skull cap") that Meleagrou-Hitchens states "closely matches Awlaki's at the time." *Id.*  Ratchford's declaration, signed in 2021, also purports to identify pictures of Al Awlaki as the translator who accompanied Al Hazmi and Al Mihdhar in 2000.  But the declaration also states that the translator Ratchford met "worked for Alliant University in San Diego in its International Studies Department as an aide or counselor of some sort."  Ex. 46 (Ratchford Decl.), ¶ 8.  Meleagrou-Hitchens admitted at his deposition that he did not know of Al Awlaki ever working for Alliant University and then conceded that he "c[ould]n't make a full conclusion" on whether Ratchford met Al Awlaki.  Meleagrou-Hitchens Tr. 245:15-246:14.

As a third example, Meleagrou-Hitchens opines that Al Awlaki was "a spiritual bulwark" for the 9/11 hijackers.  Meleagrou-Hitchens Rep. ¶ 93.  For support, he points to hearsay

---

[34] *See* Ex. 44 (Meleagrou-Hitchens Ex. 4), at 612 (stating the number was assigned to the "Villa La Jolla Drive" branch); Ex. 45 (Meleagrou-Hitchens Ex. 5) (receipt showing that the hijackers visited the "Balboa-Genesee Branch").  At his deposition, Meleagrou-Hitchens claimed for the first time that the Bank of America phone number allegedly called by Al Awlaki was a "standard customer service number" at the relevant time, but was unable to offer any basis for that claim.  Meleagrou-Hitchens Tr. 209:7-212:15.

statements in the Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001.

*See id.* ¶ 46; Meleagrou-Hitchens Tr. 229:18-231:16.  He acknowledged not knowing who made

those statements and not knowing their basis.  Meleagrou-Hitchens Tr. 231:18-233:13.  He also

acknowledged not knowing what Al Awlaki and the hijackers discussed, when they had

conversations, or how many conversations they had.  *Id.* at 146:19-149:14.

As a fourth example, Meleagrou-Hitchens opines that Al Awlaki helped the hijackers

"acclimate" to the United States.  Meleagrou-Hitchens Rep. ¶ 124.  When asked about the basis

for this opinion, he testified that "one can reasonably deduce" that Al Awlaki helped "acclimatize"

the hijackers because Al Awlaki was an American who "would have known the culture" and

"didn't have an accent."  Meleagrou-Hitchens Tr. 249:12-14, 338:4-15, 341:4-5.  He gave no

further basis for that conclusion.

e.    **Speculation and conjecture about Al Bayoumi and Al Thumairy.**  Meleagrou-

Hitchens has no basis to opine that Al Thumairy "personally asked Awlaki to assist Hazmi and

Mihdhar during their time in San Diego."  Meleagrou-Hitchens Rep. ¶ 37.  His only support for

this statement was what "one confidential witness" allegedly "reported to the FBI."  *Id.* (citing

Ex. 19 (Youssef Ex. 2)).  At his deposition, Meleagrou-Hitchens acknowledged that he does not

know the identity of the unnamed source.  Meleagrou-Hitchens Tr. 140:12-22.  When asked "the

basis for th[e] [source's] knowledge," Meleagrou-Hitchens answered:  "I do not recall the exact

basis of the knowledge.  I think it was their relationship with Thumairy."  *Id.* at 141:1-10.  The

document does not describe any such relationship.  *See* Ex. 19 (Youssef Ex. 2).

Nor does Meleagrou-Hitchens have any basis to opine that Al Bayoumi asked Al Awlaki

to "act[ ] as a facilitator for the hijackers."  Meleagrou-Hitchens Rep. ¶ 40.  His report cites no

evidence that Al Bayoumi made such a request.  When asked for such evidence, he answered:

"[W]e can assume that." Meleagrou-Hitchens Tr. 220:11-16. He also stated that such a request was "a pretty realistic assumption," explaining that assumption as follows:

> Well, we have, again, evidence around all of this, which makes it a reasonable conclusion, in my expert opinion, that given the calls around it, given the fact that Bayoumi lived at the same apartment, and that Bayoumi had been looking for an apartment for the individuals to live near him, have been trying to help them -- sorry, the hijackers, have been trying to help them and then Awlaki, it appears, very likely, after a number of meetings between Bayoumi and the hijackers and Holly Ratchford, the manager there, Awlaki's attendance, again taken alongside the Bank of America stuff we just discussed, makes it, I think, a pretty realistic assumption that this was another example of assisting them in this case as the translator . . . .

*Id.* at 219:15-220:7.[35] A "district court has the duty to exclude under Rule 702" such "*ipse dixit*" testimony. *Nimely*, 414 F.3d at 399.

Meleagrou-Hitchens also opines that Al Bayoumi was "the most likely source of [the hijackers'] introduction to Awlaki's [Al Ribat] mosque," Meleagrou-Hitchens Rep. ¶ 64, and that Al Bayoumi made that introduction to "cater[]" to "the hijackers' spiritual affairs," *id.* ¶ 66. His reasoning that Al Bayoumi likely led the hijackers to that mosque in particular is based on the assertion that the Al Ribat Mosque was "not the most obvious mosque you would attend if you had just arrived in San Diego as a complete stranger in the pre-Internet era." Meleagrou-Hitchens Rep. ¶ 64. When cross-examined, Meleagrou-Hitchens admitted that he had only "passed through" San Diego on one occasion, has no knowledge of "where Muslims go to worship in San Diego," does not know the size of Al Ribat's congregation or that of other San Diego mosques (either now or in the 1990s), and could only guess as to the number of Salafist

---

[35] As to the assertion about phone calls, Meleagrou-Hitchens admitted that he does not know the contents of any such calls and that the phone number he attributed to Al Awlaki was not Al Awlaki's personal number. Meleagrou-Hitchens Tr. 202:15-203:4, 207:3-208:14.

mosques in San Diego in the 1990s.  Meleagrou-Hitchens Tr. 254:4-258:10.  Those admissions further show the lack of reliability in his assumptions and reasoning.[36]

### 4.       Schiff's Failures To Disclose or Apply a Reliable Methodology

**a.       Unexplained reliance on experience.**  Schiff's report does not disclose a methodology, but relies on his experience as a pilot, flight instructor, and check captain. Schiff Rep. 1.  Like other experts who rely on experience, he accordingly "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Ray*, 2022 WL 101911, at \*2. Schiff fails that requirement.  From his perspective as a professional aviator, he has conceded that he would have no reason to believe the equation in Al Bayoumi's notebook, standing alone, had anything to do with the 9/11 attacks, or how or why the hijackers would have used any of the calculations.  Schiff Tr. 48:9-17, 116:15-117:6, 180:4-17.

Schiff's opinion that Al Bayoumi "prepared" the equation and calculations "to assist the 9/11 hijackers" is thus based not on his aviation experience but on information he was given about "Bayoumi's contacts with the hijackers" and his assessment of Al Bayoumi's credibility. Schiff Rep. 11; *see* Schiff Tr. 51:15-21.  Nothing in Schiff's report or testimony explains how or why his experience as a pilot and flight instructor helped him understand those matters or why his views on those matters are helpful to the Court.

---

[36] Meleagrou-Hitchens also relies on a video allegedly showing Al Bayoumi hugging Al Awlaki as one of roughly 40 people.  *See* Meleagrou-Hitchens Rep. ¶ 65; *infra* p. 63 n.56 (Nakhleh's reliance on same video).  Meleagrou-Hitchens describes it as showing Al Bayoumi and Al Awlaki "warm[ly] embrac[ing]" and exchanging "words of mutual recognition." Meleagrou-Hitchens Rep. ¶ 65.  He admitted at his deposition that "[i]t is not possible to determine what they said to each other in that video" and that he has no knowledge of "what was said" in Al Bayoumi's "conversations" with the other 39 or so individuals who he also embraced in the video.  Meleagrou-Hitchens Tr. 183:4-184:12.

   **b.    Analytical gaps.**  To the extent Schiff purports to rely on his aviation experience,

his testimony shows that the "analytical gap[s] between the data and the opinion proffered" are

"too great" for that opinion to be admissible.  *Joiner*, 522 U.S. at 146.

   **i.**    Schiff's report states that the notebook equation can be "used in aviation to

determine the line-of-sight distance to the horizon from an airplane at a given altitude."  Schiff

Rep. 2.  But he testified that he personally had never used the equation to navigate an airplane in

28,000 hours of flight time over six decades.  Schiff Tr. 36:2-9.  The equation is not used in any

of the six "foundational aviation publications regarding navigation," *id.* at 31:17-22,[37] or in any

of the dozen books – including the three-volume book "The Proficient Pilot" – that Schiff

himself has written on aviation, *id.* at 39:13-42:1.  Schiff has never tested any of his "few hundred"

students on use of the equation during 14 years as a pilot examiner.  *Id.* at 32:8-33:1; *see id.* at 38:9-

19 (testifying that he "taught [the equation] on the side," but that it "was not something that was

a required part of the course").  And in his dozen years as a check airman ("a captain designated

by his airline to fly with other pilots to ensure . . . their continuing operation is normal"), Schiff

never checked whether the pilots he reviewed knew of the equation.  *Id.* at 35:2-36:1.

   Schiff testified that he taught the equation to a "few" of his students, *id.* at 32:16-33:7,

and has used the equation personally "to know at what altitude I'd be able to see [an] airport," *id.*

at 36:6-19, but called it "an advanced technique in aviation," *id.* at 37:3-5.  Use of the equation

---

   [37] Those six publications are (1) the Airman Certification Standard ("a guide for pilots
who are applying to become licensed pilots" with "standards by which they have to abide"),
Schiff Tr. 19:4-16; (2) the Airplane Flying Handbook ("a book used by student pilots who are
learning to fly"), *id.* at 21:7-17; (3) the Pilot's Handbook of Aeronautical Knowledge
("information required of a pilot to become a licensed pilot"), *id.* at 22:16-23:1, 24:16-21, 27:4-
22; (4) the Instrument Flying Handbook ("a handbook published by the FAA intended for those
learning to fly instruments"), *id.* at 28:20-29:5, 29:15-17; (5) the Instrument Procedures
Handbook ("procedures that pilots use when flying under instrument conditions"), *id.* at 30:4-14;
and (6) the Aeronautical Information Manual ("a compendium of everything pilots need to know
to fly airplanes within the United States"), *id.* at 30:21-31:13.

would go "above and beyond" what he would "expect others to do," especially novices – a category that would include the 9/11 hijackers. *Id.* at 36:10-37:9; *see id.* at 168:20-169:4 (opining that the 9/11 attacks was "probably the first time" that the 9/11 hijackers "ha[d] ever flown a high performance jet aircraft").

Schiff also acknowledged that the solution to the equation does not match the hijackers' flight data. *Id.* at 75:6-10. The equation implies that the minimum altitudes for the hijackers to have a line of sight on their target from 50 or 70 miles away would have been 1,650 feet and 3,234 feet, respectively. *Id.* at 55:5-56:22. But the hijackers flew the planes "far above" those altitudes. *Id.* at 70:5-20; *see id.* at 71:16-74:13 (altitude of 29,000 feet when 67 miles from target); *id.* at 75:21-88:16 (altitude of 28,500 altitude when 57 miles from target).

**ii.** Schiff opines that the left column of calculations "matches" the distance between the Robbinsville VOR and the LaGuardia VOR ("52 statute miles") and the "backtrack distance" from LaGuardia to the World Trade Center ("approximately 8 miles"), with the difference being the distance from the Robbinsville VOR to the World Trade Center ("44 statute miles").[38] Schiff Rep. 9. He further opines that it would have been "handy" for the hijackers to know that distance. *Id.*

But Schiff testified at his deposition that the hijackers would not have used that distance in navigating the plane. Once the hijackers were near the Robbinsville VOR, they would have been able to see the World Trade Center and fly directly into it. *See* Schiff Tr. 177:5-17 (agreeing that "what you would do if you were a hijacker is you would get a visual on your

---

[38] "VOR" stands for "very high frequency omni-directional range." Schiff Rep. 6. VOR stations are located throughout the country to provide navigational signals to aircraft, namely, the distance and direction between the aircraft and VOR station. Schiff Tr. 90:3-91:22. The Robbinsville VOR is a station located in the vicinity of New York City. *See* Schiff Rep. 8-9.

target, and you would just navigate into the target"); *id.* at 177:22-178:4 (testifying that the World Trade Center is visible from the vicinity of the Robbinsville VOR).

Schiff offers no opinion that the center and right-most columns had any relation to the 9/11 attacks; his report discusses neither. He testified that he "attempted to find a connection between the numbers" in those columns "and the paths taken by the hijackers" but was unable to do so. *Id.* at 116:15-118:1, 173:14-176:20 (testifying, *inter alia*, that he "look[ed] for that relationship on multiple maps").

      **c.**    **Speculation and conjecture.** Schiff's admissions at his deposition also show that his testimony about the equation and calculations is speculative. When asked to explain the "utility of the distance between th[e] VOR stations [and] the World Trade Center towers . . . to the hijackers," Schiff Tr. 180:4-7, he answered:

> I don't know that they would have been important at all, but that doesn't mean that in the beginning, when they were planning this event, that different pieces of information could come in handy. Who knows how and when they would, I don't know. For example, this formula equation that Mr. Bayoumi worked with, it doesn't mean they used. It doesn't mean that they had to use it or even thought about using it. I think it was something in the planning stages that one looked at as a piece of information.

*Id.* at 180:8-17. The rhetorical query about "[w]ho knows how and when" the hijackers would have used the equation, alongside the admission that Schiff himself "do[es]n't know," further confirms that his opinion is too unreliable to assist the Court.

      **d.**    **Obvious alternative explanations.** Schiff's opinion is also unreliable because it fails to "'account[] for obvious alternative explanations'" for the equation and calculations. ECF No. 9060, at 5, 37 (quoting *Deutsch*, 768 F. Supp. 2d at 426); *see also In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 262 (S.D.N.Y. 2018) ("[A]n expert[] . . . must demonstrate that she has adequately accounted for obvious alternative explanations.") (cleaned up), *aff'd*, 982 F.3d 113 (2d Cir. 2020) (per curiam).

**REDACTED FOR PUBLIC FILING**

As Schiff conceded at his deposition, the equation in the notebook also appears in standard mathematics textbooks to teach students "how to calculate solutions to quadratic equations," which is "a standard problem in high school math courses."  Schiff Tr. 43:3-45:14, 46:10-47:14.  He conceded at his deposition that it "could be a possibility" that Al Bayoumi was helping his teenage son with homework.  *Id.* at 113:15-114:2.  He further testified that he was "not sure" whether he knew when he formed his opinions that Al Bayoumi had "a son that was in high school" when the equation was written and did not "consider th[e] possibility" that Al Bayoumi could have been helping his son with homework.  *Id.* at 112:22-113:4, 114:4-18.[39]

In opining on Al Bayoumi's testimony, Schiff similarly failed to consider an obvious alternative explanation for Al Bayoumi's inability to remember the notes.  *See* Ex. 23 (Bayoumi Tr.), at 290:7-291:15.  Schiff testified that he "belie[ved]" that Al Bayoumi "knew exact[ly] why he wrote the equation down, but . . . feigned ignorance" at his deposition.  Schiff Tr. 111:6-14.  In forming that opinion, Schiff did not consider that 20 years passed between the time that Al Bayoumi wrote down the equation and the time that Al Bayoumi was asked about it.  *See id.* at 103:11-104:17 (stating that he did not "recall" when Al Bayoumi was deposed and that he would have to "look at his deposition . . . [to] have a rough idea as to the time span"); *id.* at 105:6-13 (testifying that he "d[id]n't think" he "consider[ed] the passage [of] time" and "d[id]n't know that it was necessary to do that").

### C.   Youssef, Nakhleh, and Meleagrou-Hitchens Act as Conduits for Hearsay

The opinions of Youssef, Nakhleh, and Meleagrou-Hitchens also improperly repeat investigative theories and hearsay statements from the FBI's preliminary investigative material without adding any analysis of their own.  An expert cannot serve as a "Trojan Horse of hearsay."

---

[39] Al Bayoumi's son Emad was born on ▮▮▮/1406 AH, which is ▮▮▮▮▮, 1986 in the Gregorian calendar, and so was 14 years old in 2000.  *See* Ex. 47 (KSA0000000655).

**REDACTED FOR PUBLIC FILING**

*AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *12 (S.D.N.Y. Mar. 19, 2019)

(Netburn, J.), *objections overruled*, 2019 WL 2992016 (S.D.N.Y. July 8, 2019); *see* ECF No.

9060, at 7 (noting that " 'a party cannot call an expert simply as a conduit for introducing hearsay

under the guise that the testifying expert used the hearsay as the basis of his testimony' ")

(quoting *Marvel Characters*, 726 F.3d at 136) (alteration removed).[40]

Examples of Youssef serving as a conduit for hearsay include his incorporation of the

FBI July 2021 communication to file, Youssef Rep. 10-11, 161; of statements about Al Jarrah's

purported "connect[ions]" by an anonymous source, *id.* at 32; of similar statements about Al

Bayoumi's purported status as a "cooptee" of Saudi intelligence, *id.* at 84; of the investigative

theory that "al-Jarrah . . . tasked al-Thumairy and al-Bayoumi with assisting the hijackers," *id.*

at 132; of statements in a 2016 FBI report about phone calls between ▉▉▉ and ▉▉▉▉▉▉▉,

where Youssef concedes he has not himself reviewed the calls, *id.* at 169-70; and of further

statements in the same report about ▉▉▉ dropping off the hijackers at a bus station, *id.* at 194.

Youssef frequently recites the formula that he "agree[s] with" or "concur[s] with" the FBI, *e.g.*,

*id.* at 53, 114, 132, 154, 161, 194, even when quoting investigative theories that the FBI itself

has disavowed in its May 2021 communication or in this litigation.  *Supra* pp. 26-28.

Similarly, Nakhleh's report contains block quotations of anonymous source information

alleging phone calls to Al Thumairy, Nakhleh Rep. ¶¶ 240, 251, and the FBI's July 2021

communication to file consolidating previous information, *id.* ¶¶ 256-257.  Meleagrou-Hitchens

repeats without any added analysis the alleged statements of confidential witnesses to the FBI

---

[40] *See also Mejia*, 545 F.3d at 197 (rejecting testimony that "simply 'repeat[ed] hearsay evidence without applying any expertise whatsoever' ") (citation omitted); *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) ("An expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge.").

**REDACTED FOR PUBLIC FILING**

that Al Thumairy asked Al Awlaki to assist the hijackers, Meleagrou-Hitchens Rep. ¶ 37; the

9/11 Commission's statement that the hijackers "developed a close relationship" with Al Awlaki,

*id.* ¶ 46; and the Joint Inquiry's statement that Al Awlaki was the hijackers' "spiritual advisor

while they were in San Diego," *id.*

Plaintiffs' experts' heavy reliance on FBI preliminary investigative materials is a special

problem because the record made during discovery shows, as the Court has observed, the need

for "caution when 'relying on unsupported "conclusions" in investigative documents.'"  ECF

No. 8862, at 24 (quoting ECF No. 6579, at 13-14 n.5).  The record also shows that in many

instances the testimony that witnesses have given under oath and subject to cross-examination

has differed in material respects from FBI summaries of the same witnesses' unsworn statements

in documents that were never shown to or adopted by the witnesses themselves.[41]  The record

also contains examples of FBI memoranda reflecting interviews years apart that nonetheless

contain identical language,[42] examples of inconsistent FBI memoranda reflecting the same

interview,[43] and examples of cursory handwritten notes containing little information about the

---

[41] *See, e.g.*, Ex. 48 (Abdullah Tr.), at 425:24-444:23 (identifying "inaccuracies," "contradictions," and "false statement[s]" in FBI reports); ████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████  All of the preceding statements were made by third-party witnesses, not under Saudi Arabia's control, represented by independent counsel.

[42] *Compare* Ex. 52 (FBI000079-95) (August 8, 2007 report concerning an August 2, 2007 interview of Cayson, sometimes spelled "Kaysan," bin Don) *with* Ex. 53 (FBI000096-106) (June 20, 2010 report concerning a May 17, 2010 interview of bin Don).

[43] *Compare* Ex. 54 (FBI000046-49) (January 15, 2016 report concerning a November 13, 2015 interview of ████) *with* Ex. 55 (FBI000244-46) (December 1, 2015 reporting concerning the same interview of ████).

content of an interview,[44] suggesting that later-prepared summaries relied on an FBI agent's recollection rather than on any contemporaneous recording of what the witness said.[45]

Those problems of reliability are further underscored by the conflict between the investigative theories on which Youssef and Nakhleh rely and the FBI's final conclusion in closing Operation Encore that Al Bayoumi, Al Thumairy, and Al Jarrah "did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, [it] ha[d] not identified additional groups or individuals responsible for the attack other than those currently charged."  Ex. 13 (Youssef Ex. 10), at 9-11.  With that finding, the FBI reaffirmed the earlier findings of the 2004 final report of the 9/11 Commission, which found no evidence that Saudi Arabia or its senior officials funded al Qaeda, *see* ECF No. 3669-1, at 171, or that Al Thumairy or Al Bayoumi assisted the 9/11 attacks, *see* ECF No. 3669-2, at 216-19; as well as the 2005 joint report of the FBI and the CIA, and the 2015 report of the 9/11 Review Commission, all of which reached similar conclusions, *see* ECF No. 3669-6, at 2; ECF No. 3669-7, at 101-03.  Against that backdrop, endorsements of preliminary investigative theories and rejection of final conclusions can be of little assistance to the Court.

It would be premature now to determine the admissibility of any particular FBI documents, which Judge Daniels will address as part of the upcoming renewed motion to

---

[44] *See* Ex. 56 (FBI000350-60) (apparent notes of an interview of ███████; page 358 shows the date ████████████████, but it is unclear whether all the notes are from that date).

[45] For similar reasons, courts have rejected attempts to admit FBI interview summaries (referred to by the agency as "FD-302" documents) as evidence.  *See, e.g.*, *United States v. DeLucia*, 1997 WL 616006, at *1 (2d Cir. Oct. 7, 1997) (judgment noted at 125 F.3d 845 (table)) (upholding the district court's decision to reject an effort to admit statements in an FBI FD-302, because the movant "failed to establish that the statements in the report had the requisite circumstantial guarantees of trustworthiness"); *Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, 2016 WL 865299, at *13 (N.D.N.Y. Mar. 2, 2016) (concluding that hearsay statements contained in an FBI FD-302 were inadmissible); *Scarpati v. United States*, 1994 WL 256691, at *3-4 (S.D.N.Y. June 7, 1994) (same), *aff'd mem.*, 50 F.3d 4 (2d Cir. 1995) (table).

dismiss.  *See* ECF No. 9026, at 4-5 (order setting briefing schedule, including for evidentiary

objections).  But Plaintiffs' experts should not be permitted to short-circuit that process through

the device of quoting hearsay statements and investigative theories as their own opinions.

## III.   The Challenged Experts Opine On Improper Subjects

Youssef, Nakhleh, Meleagrou-Hitchens, and Schiff opine on subjects that exceed the role

even of a qualified and reliable expert.  Even if their opinions were otherwise reliable (which they

are not), they should be excluded because of their improper subject matter.

### A.   Youssef Opines on Improper Subjects

#### 1.   Youssef Constructs a Factual Narrative Based on Record Evidence

Expert testimony should be excluded when it "construct[s] a factual narrative based upon

record evidence," because the factfinder "is capable of understanding and deciding" such matters

"without the expert's help."  *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469

(S.D.N.Y. 2005); *see AU New Haven*, 2019 WL 1254763, at *24 (rejecting expert testimony that

was "nothing more than a narrative of the case which a [factfinder] is equally capable of

constructing") (internal quotation marks omitted).  Most of Youssef's report consists of such a

narrative, quoting testimony and documents that Plaintiffs should present directly to the Court

rather than filtering through an expert.[46]  He " 'do[es] no more than . . . propound a particular

---

[46] *See* Youssef Rep. 24-30 (founding and funding of King Fahad Mosque); *id.* at 30-33
(Embassy and MOIA operations); *id.* at 36-41, 60-63 (appointment of Al Thumairy as imam at
mosque); *id.* at 42-49 (Al Thumairy's interactions and contacts); *id.* at 49-60 (Al Thumairy's
role at the mosque); *id.* at 73-82 (Al Bayoumi's secondment to and activities in California);
*id.* at 82-84 (Al Bayoumi's contacts with the Embassy); *id.* at 85-90 (Al Bayoumi's contacts or
alleged contacts in California); *id.* at 91-100 (Al Bayoumi's work at a Kurdish mosque and
alleged contacts with Al Haramain); *id.* at 102-16 (Al Sadhan's and Al Sudairy's visit to San
Diego); *id.* at 139-54 (Al Jaithen's and Al Mersal's visit to San Diego); *id.* at 156-59, 162-70,
175-77 (events in January 2000 at the time of the hijackers' arrival); *id.* at 177-92 (Al Bayoumi's
visit to Los Angeles and encounter with the hijackers); *id.* at 192-200 (the hijackers' arrival in
San Diego); *id.* at 200-12 (alleged assistance to the hijackers in San Diego); *id.* at 212-14

interpretation of [certain individuals' alleged] conduct,'" *In re Rezulin Prods. Liab. Litig.*, 309
F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551,
at *2 (S.D.N.Y. July 16, 2002)), and then "'stat[es] ultimate legal conclusions based on th[e]
facts'" as he sees them, *Highland*, 379 F. Supp. 2d at 471 (quoting *United States v. Bilzerian*,
926 F.2d 1285, 1294 (2d Cir. 1991)).

### 2.     Youssef Opines on Witness Credibility

"[E]xpert opinions that constitute evaluations of witness credibility, even when such
evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."
*Nimely*, 414 F.3d at 398; *see Marvel Characters*, 726 F.3d at 136 (affirming exclusion of
proffered expert historians who "opine[d] on the credibility of other witnesses' accounts").

Youssef's report violates this settled rule many times.  He opines that he has detected
"a pattern of lying by . . . Saudi Government officials" and other witnesses.  Youssef Rep. 149.[47]
He opines that at least nine witnesses gave testimony that is "implausible," "unbelievable,"
"incredible," or "not credible."[48]  He accuses Al Thumairy of engaging in a "pattern of
deception" indicative of "a deliberate effort to obfuscate and obstruct."  *Id.* at 45.[49]  He accuses

---

(alleged meeting with Al Thumairy); *id.* at 214-17 (other alleged contacts with the hijackers); *id.*
at 222-25 (the hijackers' activities and contacts in Virginia).

   [47] *See also* Youssef Rep. 45 ("pattern of deception indicat[ing] . . . a deliberate effort to
obfuscate and obstruct"); *id.* at 113 (witness "tried . . . to conceal" information); *id.* at 130 &
n.531 ("answers [were] 'deceptive'" and showed a "pattern of lying"); *id.* at 140 n.561 ("pattern
of deceptive behavior"); *id.* at 154 ("persistent denials, lying, and diversion"); *id.* at 181 n.736
(witness "clearly . . . engaged in deception").

   [48] *See* Youssef Rep. 45, 59, 130 (Al Thumairy); *id.* at 69-70 (Al Ibrahim); *id.* at 70 (Al
Awad); *id.* (Mana); *id.* at 71 (Khalil Al Khalil and Osman Kaldirim); *id.* at 142 (Al Jaithen and
Al Mersal); *id.* at 188, 233 (Al Bayoumi); *see also id.* at 126 (statement that Al Bayoumi, Al
Thumairy, Al Jaithen, Al Mersal, Al Sudairy, and Mana as a group made "incredible claims").

   [49] *See also* Youssef Rep. 44 (opining that Al Thumairy employed a "method of evasion"
at his deposition); *id.* at 130 n.531 (opining that Al Thumairy "exhibited" a "pattern of lying").

Al Bayoumi of "l[ying] to the FBI," *id.* at 203 n.831, and of telling "casual lies . . . at his deposition," *id.* at 179 n.724.[50]  He even stated that he expected "any Saudi official" to testify untruthfully.  Youssef Tr. 57:17-20 ("I'm not expecting that any Saudi official would answer in a way that would implicate the Kingdom of Saudi Arabia in their statement.").

All of Youssef's credibility determinations should be excluded.  Further, throughout his report, Youssef's other opinions rely heavily on his credibility determinations as a basis for the inferences he draws.[51]  Accordingly, his inappropriate credibility determinations provide another basis for finding his opinions unreliable and excluding them as a whole.

### 3.      Youssef Opines on States of Mind

Experts may not opine on "'the motivations and intentions' of individuals or entities," ECF No. 9060, at 6 (quoting *Marvel Characters*, 726 F.3d at 135-36), on their "beliefs," *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (per curiam), or on their "knowledge" or "state of mind," *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see AU New Haven*, 2019 WL 1254763, at *13 (citing *Rezulin*, 309 F. Supp. 2d at 547, and observing that "science has not yet invented a way to read minds").  Youssef has admitted that he does so.  *See* Youssef Tr. 199:6-13 (mental state); *id.* at 199:14-21 (knowledge).

Nor could Youssef deny it.  The primary opinions in his report are that Saudi Arabia's officials, employees, and others had "actual knowledge" of "substantial support to radical Sunni

---

[50] *See* Youssef Rep. 190 n.777 (opining that Al Bayoumi "lied"); *id.* at 195 (describing Al Bayoumi's testimony as "unlikely"); *id.* at 203 (opining that Al Bayoumi "gave a false alibi"); *id.* at 219 (opining that Al Bayoumi gave "false[ ]" testimony).

[51] *See* Youssef Rep. 243 (relying on his opinion that the "testimony" of "Saudi Government witnesses" was purportedly "discredited" to support an inference of their "role in aiding an Al Qaeda attack"); *see also id.* at 115 (similarly relying on opinion about "denials" to support an inference of witness conduct); *id.* at 154 (same for opinion about "persistent denials, lying, and diversions"); *id.* at 167-68 (same for opinion about "persistent and categorical denials"); *id.* at 185 (same for opinion that "claims" were untrue).

Islamic extremism" in Southern California, Youssef Rep. 239; had "knowledge" of Al Hazmi's and Al Mihdhar's affiliation with Al Qaeda and "plan[s]" for "an attack against the U.S.," *id.* at 239-40; and "were conscious of their role in aiding an Al Qaeda attack inside the U.S.," *id.* at 243; *see, e.g., id.* at 9-10, 15, 239-44.  From beginning to end, his report makes improper assertions about institutions' and individuals' allegedly "knowing[ ]" conduct, *id.* at 9; their "knowledge," *id.* at 10, 11, 239-43; what they "knew," "had to have known," "had to know," "would have known," "should have known," or "was known" to them, *id.* at 15, 60, 64, 72, 80-82, 89, 108, 125; their "purpose[s]," "true purpose[s]," "actual purpose[s]," or "express purpose[s]," *id.* at 113, 142, 145, 154, 218; their "intention[s]" or what they "intended," *id.* at 120, 192; and their "motive[s]," *id.* at 191-92, 213-14.[52]

Youssef also opines on motive using less direct language.  He describes Al Thumairy as "tr[ying] to hide his relationship" with Minister Al Turki, *id.* at 37 n.79, and as "willing[ ] to say anything . . . to protect his superiors," *id.* at 41.  He speculates that the testimony of multiple witnesses "is best understood as an acknowledgement by them of Thumairy's extremism and an effort, post 9/11, to avoid responsibility for Thumairy's acts," *id.* at 71; characterizes Minister Al Ash-Sheikh's deposition testimony as "an effort to conceal the support that Saudi Arabia's leadership provided to Al-Qaeda through Al Haramain[ ] before the 9/11 Attacks," *id.* at 94; and asserts that "the deposed participants" were "determined to protect the secret that they were

---

[52] *See also* Youssef Rep. 9, 15 ("sympath[ies]"); *id.* at 33 ("worldview"); *id.* at 39, 45 ("deliberate" acts and efforts); *id.* at 45, 77 (ability to "remember" facts or matters that "would have [been] remembered"); *id.* at 50, 54 ("views"); *id.* at 56, 59, 130-31, 146, 184-85, 206 ("know[ledge]" of others or who individuals "knew"); *id.* at 69-71 ("idea[s]" about facts); *id.* at 74, 94, 113, 120, 149, 168, 178 (intent "to conceal," to "cover up," or to "hide"); *id.* at 107 ("would have been informed"); *id.* at 112, 187 ("understanding[s]"); *id.* at 131, 149 (intent "to shut down" or "prevent . . . inquir[ies]"); *id.* at 242-43 ("conscious[ness]"); *id.* at 202 ("reason[s]").

engaged in illegal covert activities," *id.* at 154. Youssef also claims to know the motives and purposes of MOIA as an institution[53] and the motives of Al Qaeda.[54]

### B.   Nakhleh Opines on Improper Subjects

#### 1.   Nakhleh Opines on Witness Credibility

**a.**   Nakhleh opines on witness credibility at length. He devotes a section of his report (Part E) to the purported "deliberate non-cooperation and deceit of Saudi Arabia's witnesses," which focuses on the witnesses' religious belief and national origin. He begins with baseless assertions that "most Salafi Wahhabis," a category he conflates with "jihadists," would not respect the "Western . . . judiciary," Nakhleh Rep. ¶ 147; goes on to state that "Saudi jihadists appearing in the present proceedings would . . . lie, deny, obfuscate, dissimulate, feign ignorance or memory lapses, etc. without any remorse or compunction," *id.* ¶ 154; and, further, that "[t]he depositions of most of the Saudi government witnesses and other Saudi nationals appearing in the present proceedings . . . have proven to be a case in point," *id*.

When questioned, Nakhleh denied "say[ing] . . . in . . . paragraph [154]" that the Saudi witnesses were "jihadists." Nakhleh Tr. 331:13-14. (He did not explain how that denial could be squared with his description of their depositions collectively as "a case in point" of how "Saudi jihadists" would "lie.") He then continued:

> I based this paragraph on their belief that in hokum, divine rule, and that they were in a proceeding by an enemy of Islam, an infidel country in Dar al-Harb rather than in Dar al-Islam. That was the main point I was trying to make.

---

[53] *See*, *e.g.*, Youssef Rep. 33 ("It is my opinion that the MOIA selected Thumairy for the position in Los Angeles because he was a Sunni extremist who shared the same worldview as [Ibrahim Al Hiber] and other anti-U.S. radicals inside MOIA and the Saudi Government.").

[54] *See*, *e.g.*, Youssef Rep. 13 ("Al Qaeda sent Hazmi and Mihdhar to Los Angeles and to the King Fahad Mosque because it was a known safe and trusted location with an established radical support network, including its Saudi Government Imam Fahad al Thumairy, who was ready and willing to care for the two hijackers.").

**REDACTED FOR PUBLIC FILING**

*Id.* at 331:14-19.  That is, he adhered to his opinion that the testimony of Saudi officials and nationals should not be believed based on his attribution to them of the view that the United States is an "infidel country" and "an enemy of Islam."  *Id.*  Nakhleh also reaffirmed that he intended to give opinions that testifying witnesses were "deceitful," *id.* at 322:7-324:12; *see id.* at 333:1-335:11 (giving "examples" including "Thumairy," "Bayoumi," "Sudairy," "al-Jaythin," "Sadhan," "Mersal," and "Al-Jarrah").  He even said he would need to "refresh [his] memory" to give a "full list" of all the individuals he thought had lied.  *Id.* at 334:8-12.

   **b.**   Nakhleh's report singles out Al Thumairy as a "[c]ase study," Nakhleh Rep., Part E.i, claiming to have based his opinions on Al Thumairy's "answers, utterances, and body language" during his deposition.  *Id.* ¶ 155.  As the Second Circuit held in *United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999), however, expert testimony about a fact witness's "demeanor" is just as improper as other types of credibility testimony.  *Id.* at 289.  Evaluating demeanor is part of the "assessment of credibility" that is "[f]undamental to the role of . . . [the] trier of fact."  *Id.*

   Nakhleh also based his opinion that Al Thumairy was untruthful in part on assumptions that Al Thumairy could not have sincerely held certain religious beliefs.  As one example, Al Thumairy was asked about a *hadith* (a saying attributed to the Prophet) that "only one religion shall exist in the Arabian Peninsula."  Ex. 27 (Thumairy Tr.), at 480:9-13.[55]  Al Thumairy answered:  "I don't know if that attribution of Hadith is correct or incorrect."  *Id.* at 480:19-21.  Nakhleh himself has described the same *hadith* as "questionable" in previous writings and testified that he was "not at all sure of its attribution."  Nakhleh Tr. 356:13-357:3.  But when Al

---

   [55] According to Nakhleh, the attribution of the *hadith* is significant because critics of the alliance between the United States and Saudi Arabia have relied on it to support arguments that U.S. troops should not be stationed in Saudi Arabia.  Nakhleh Tr. 57:11-59:1.

Thumairy gave the same answer, Nakhleh considered it a lie because "most Saudis [Nakhleh] spoke with" while in Saudi Arabia "accept[ed] this hadith as a fact." *Id.* at 357:7-20.[56]

c.       Like Youssef, Nakhleh also draws inferences to support his other opinions based on his improper credibility determinations. Nakhleh Rep. ¶ 218 (relying on Al Thumairy's alleged "lies" to infer his knowing involvement in the 9/11 plot); Nakhleh Tr. 335:12-17 (agreeing that his "belief" that he could not "credit" the witness's "accounts certainly affects [his] opinions").[57] That further undermines the reliability of his opinion as a whole.

## 2.       Nakhleh Opines on States of Mind

Nakhleh opines on the "knowledge, motivations, intent, state of mind, [and] purposes," *Fosamax*, 645 F. Supp. 2d at 192, of Saudi Arabia and its Ministry of Islamic Affairs as an institution, Saudi officials, and other individuals and organizations. Knowledge and intent are at the core of his opinions that Saudi officials "knew that they were assisting terrorist operatives of the al-Qa'ida organization who were preparing to commit acts of violent jihad inside the United States," Nakhleh Rep. ¶ 237, and that the members of the purported "network" acted with "the knowledge or concurrence of the [Saudi] government," *id.* ¶ 257 (italics omitted). Few pages of his report do not show attempts to "read minds." *AU New Haven*, 2019 WL 1254763, at *13.[58]

---

[56] Nakhleh also claimed that Al Bayoumi lied in his deposition about his relationship with Al Awlaki, based entirely on a video showing Al Bayoumi hugging and greeting more than 40 people at a mosque, of whom Al Awlaki was one. Nakhleh Tr. 322:14-325:2. At his deposition, Nakhleh asserted that "the *way* [Al Bayoumi] hugged" Al Awlaki shows the two were close. *Id.* at 325:3-8 (emphasis added). He admitted that he is not an expert on hugs, but purported to have knowledge of the relevant "tradition." *Id.* at 326:3-327:1.

[57] *See also* Nakhleh Rep. ¶ 167 (stating that Al Thumairy's alleged "preparedness to lie" was a "miscalculation" that "shone a spotlight on his actual role"); *id.* ¶ 192 (relying on Al Jaithen's alleged "obfuscation" to infer that his conduct was not "innocent"); *id.* ¶ 205 (relying on his "review[] [of] the depositions" of Al Jaithen and Al Mersal to infer "deliberate planning"); *id.* ¶ 206 (relying on the alleged "implausibility" of Al Thumairy's claims).

[58] *See* Nakhleh Rep. ¶¶ 29, 34 (what "Wahhabis believe"); *id.* ¶¶ 32-33 (how "Wahhabis view the world" and "the Salafi-Wahhabi view"); *id.* ¶ 45 (what "Saudi Wahhabis are prepared"

**REDACTED FOR PUBLIC FILING**

Nakhleh's state-of-mind opinions are especially pernicious because he "traffick[s] in stereotypes," a category of testimony that the Second Circuit and this Court have rejected as "'self-evidently improper and prejudicial.'"  ECF No. 9060, at 21 (quoting *Zhong*, 26 F.4th at 557).  His descriptions of "Wahhabis" collectively as violent and untrustworthy, *supra* pp. 35-36, present caricatures of the religious beliefs accepted by Saudi Arabia, advanced by its Ministry of Islamic Affairs, and held by its citizens.  No expert should be permitted to give such testimony.

---

to do); *id.* ¶ 59 ("the inflexible Salafi-Tawhidi attachment to only the Hanbali Wahhabi school of thought"); *id.* ¶ 66 (what "[t]he Saudis recognized"); *id.* ¶ 72 (how "hardliners viewed" and "perceived" "Western educated Muslims"); *id.* ¶ 74 (matters of which Al Thumairy "would have had to be conversant . . . and supportive"); *id.* ¶ 76 (what "the Saudi government . . . wanted"); *id.* ¶ 89 (what King Fahd "accept[ed]" and "appear[ed] to feel"); *id.* ¶¶ 93-94 (King Fahd's "motiv[es]" and "hope[s]"); *id.* ¶ 95 (what "[t]he Al-Saud . . . must have known"); *id.* ¶ 98 (bin Laden's "purpose[ ]"); *id.* ¶ 111 (the "views" that "Saudis . . . held"); *id.* ¶ 119 (what "many Saudis who worked for the Ministry of Islamic Affairs and who were educated at Imam Muhammad University believed"); *id.* ¶¶ 125-126 (how "Bin Laden's pronouncements" "were perceived" and how he "was viewed"); *id.* ¶¶ 129-130 (the "views" of "many *'Ulama*" and "religious authorities"); *id.* ¶ 134 (the "prevailing view" among "Saudi officials" purported to have "willingly provided support to the 9/11 hijackers"); *id.* ¶ 139 (the "intent[s]" and "impulse[s]" of Saudi "officials"); *id.* ¶¶ 153-154 (the "view[s]" and "feeling[s]" of alleged "Saudi jihadists," and whether they would experience "remorse or compunction"); *id.* ¶ 157 (whether Al Thumairy acted "deliberately" or "conscious[ly]"); *id.* ¶¶ 161-167 (what "knowledge" Al Thumairy had, what he "would have known," his "fear," his "impulse"); *id.* ¶ 173 (how "the Saudi government regarded" the King Fahad Mosque); *id.* ¶ 179 (what Saudi Arabia "contemplated"); *id.* ¶¶ 184-186 (the "attitude" of the deceased Al Uthaymeen and how he "saw" Al Jaithen); *id.* ¶ 187 (how "[t]hose who expose extremist views . . . would feel"); *id.* ¶ 190 (what "someone within the MOIA had a reason" to do); *id.* ¶ 196 (the "state of mind of the signers" of a statement); *id.* ¶ 205 ("deliberate planning"); *id.* ¶ 210 (the Ministry's "focus[ ]"); *id.* ¶ 212 (the "prevailing view" among "many academics associated with Imam Muhammad University and many [Ministry] employees"); *id.* ¶¶ 213-214 (what the Ministry "expected"); *id.* ¶ 215 (of what Al Thumairy "would be notified"); *id.* ¶ 218 (what Al Thumairy did or "didn't know" and what he was "primed" to do); *id.* ¶ 225 (a "hardened belief"); *id.* ¶ 229 (whether "violent jihad" is "part and parcel" of "Saudis['] . . . religious belief"); *id.* ¶¶ 232-233 ("doctrinal" and "ideological" beliefs); *id.* ¶ 235 ("unity of purpose"); *id.* ¶¶ 239-240 (whether Al Thumairy and Al Bayoumi would have acted "on their own initiative," and what they "would . . . have known"); *id.* ¶ 241 (what "would have been evident"); *id.* ¶¶ 245-247 ("the knowledge or approval of Saudi government officials," what they "must have known," and what they "knew in advance"); *id.* ¶ 248 (that individuals were "sympathetic and supportive of . . . violent jihad[ ] against the United States"); *id.* ¶¶ 252-253 (what Al Thumairy "must have known" and of what he "must have had a clear idea"); *id.* ¶ 255 (that individuals were "like-minded").

It does not change this result that at his deposition Nakhleh conceded that Saudi Arabia institutionally and its senior officials are "quietist" rather than jihadist, Nakhleh Tr. 147:22-148:10, 150:3-9, and testified that only "elements" within MOIA support global jihad, *id.* at 235:4-18; *see supra* p. 38. His opinions still speak to states of mind based on inappropriate stereotypes. The Court recently gave the example of the testimony rejected in *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001), for "generaliz[ing] that most Korean businesses are corrupt" and "not to be trusted." *Id.* at 1007, *quoted in* ECF No. 9060, at 21. Just as Nakhleh has admitted that not all "Wahhabis" are jihadist, the expert in *Jinro* admitted that he would not "say all Korean business[es]" are "corrupt[]." *Id.* at 1003. Exclusion remained appropriate there and remains appropriate here.

### C.  Meleagrou-Hitchens Opines on Improper Subjects

#### 1.  Meleagrou-Hitchens Opines on Witness Credibility

Meleagrou-Hitchens describes Al Thumairy's testimony as demonstrating "a pattern of denials which later turned out to be false," Meleagrou-Hitchens Rep. ¶ 37, and Al Bayoumi's testimony as "implausible," "dishonest[]," and "disingenuous," *id.* ¶ 67. He testified at his deposition that Al Bayoumi's testimony cannot be taken "at face value," Meleagrou-Hitchens Tr. 193:9-194:4, and that he "wasn't being honest," *id.* at 198:4-15.[59] Those opinions should be excluded as improper evaluations of witness credibility under *Marvel Characters* and *Nimely*.

At his deposition, Meleagrou-Hitchens even admitted that it was "not [his] place to call someone a liar," *id.* at 193:13-14, but then testified that he believed that the testimony of a witness

---

[59] *See also* Meleagrou-Hitchens Rep. ¶ 110 (crediting the statements in an FBI report documenting an interview with Al Awlaki and claiming that Al Awlaki was "deceitful"); Meleagrou-Hitchens Tr. 238:1-239:10 (similarly claiming that Al Awlaki "lied" to the FBI). Although Al Awlaki, who is deceased, was not deposed, it would be the Court's role (not an expert's) to evaluate the credibility of any of his past statements that might be admitted.

should be given less weight if the witness has been accused of serious crimes, *id.* at 193:20-194:4 ("[Al Bayoumi is] someone who is, of course, giving a deposition to a trial in which he may well be implicated in mass murder."). Like Nakhleh, Meleagrou-Hitchens also opines that Al Bayoumi's testimony should not be trusted because of Al Bayoumi's alleged religious beliefs. Meleagrou-Hitchens Rep. ¶ 67 (stating that Al Bayoumi's testimony exhibits a "brand of dishonesty I have regularly encountered in my studies of religious extremists").[60]  Thus, his opinions not only would be improper in their subject matter, but are based on grounds that the Court should give no weight whatsoever.

### 2.    Meleagrou-Hitchens Opines on States of Mind

Meleagrou-Hitchens also opines on individuals' mental states and intentions. His core opinions are that before 9/11 Al Awlaki was "a committed Salafi extremist and a proponent of violent jihad," Meleagrou-Hitchens Rep. ¶ 22, an attempt to divine Al Awlaki's beliefs; and that it is "highly likely" that Al Awlaki "kn[ew] . . . that the hijackers . . . were al-Qaeda," *id.*, runs squarely afoul of settled law. He also gives opinions that the hijackers "deliberate[ly]" sought out Al Awlaki, *id.* ¶ 63; that they "were sent to seek" him out, *id.* ¶ 72; about the "views" Al Awlaki held and when he held them, *id.* ¶ 123; and that "Saudi officials and agents[] . . . trusted Awlaki," *id.* ¶ 124. At his deposition, he further speculated about what Al Bayoumi "was aware," "would have known," and "had planned." Meleagrou-Hitchens Tr. 226:20-228:17. All of those opinions are improper under settled law.

---

[60] Without conceding that Al Bayoumi's personal religious beliefs are legitimately at issue, we note that the 9/11 Commission found "no credible evidence that he believed in violent extremism or knowingly aided extremist groups," ECF No. 3669-2, at 218; *see also id.* ("Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists.").

### D.      Schiff Opines on Improper Subjects

#### 1.      Schiff Opines on Witness Credibility

Schiff's report states that Al Bayoumi gave "simply incredulous" testimony in stating that he could not recall an equation and calculations in a 20-year-old notebook. Schiff Rep. 10-11. That opinion is unreliable because Schiff admitted failing to "consider the passage [of] time" when assessing Al Bayoumi's lack of memory. Schiff Tr. 105:6-13; *supra* p. 53. Even if Schiff had a basis for his opinion, it would still be inadmissible under *Nimely* and *Marvel Characters*. Further, Schiff's report states that he reached his conclusion that Al Bayoumi "prepared" the calculations "to assist the 9/11 hijackers" in part based on Al Bayoumi's purported "inadequate, illogical explanation" for the notebook materials. Schiff Rep. 11. His intrusion on the factfinder's role therefore undermines that opinion as well.

#### 2.      Schiff Opines on States of Mind

Schiff opines that the "purpose of the calculations" was to assist the hijackers. Schiff Rep. 11. The calculations, being inanimate, have no purpose of their own. When Schiff speaks about their "purpose," he means Al Bayoumi's purpose in preparing them. As set forth above, that is improper state-of-mind testimony. *See Fosamax*, 645 F. Supp. 2d at 192 (excluding expert testimony about "purposes"). Schiff could perhaps testify to the general use (or lack of use) of the equation in aviation or even the degree to which the equation or calculations would have been useful (or not at all useful) to the hijackers, as facts the Court could consider when it makes its own determinations about Al Bayoumi's state of mind. But his testimony on those points does not help Plaintiffs. *Supra* pp. 16, 50-52.

## CONCLUSION

For the foregoing reasons, the Court should exclude the opinions of Bassem Youssef, Emile Nakhleh, Alexander Meleagrou-Hitchens, and Barry Schiff.

**REDACTED FOR PUBLIC FILING**

Dated:  May 12, 2023                                Respectfully submitted,

                                                    */s/ Michael K. Kellogg*
                                                    _____

                                                    Michael K. Kellogg
                                                    Mark C. Hansen
                                                    Gregory G. Rapawy
                                                    Andrew C. Shen
                                                    Christopher M. Young
                                                    KELLOGG, HANSEN, TODD, FIGEL
                                                       & FREDERICK, P.L.L.C.
                                                    Sumner Square
                                                    1615 M Street, N.W., Suite 400
                                                    Washington, D.C. 20036-3209
                                                    (202) 326-7900
                                                    (202) 326-7999 (fax)

                                                    *Attorneys for the Kingdom of Saudi Arabia*

**REDACTED FOR PUBLIC FILING**

## CERTIFICATE OF SERVICE

I hereby certify that, on May 12, 2023, I caused a copy of the foregoing Motion To

Exclude Expert Testimony to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*
_____

Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*