# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) <br> ECF Case |

This document relates to: *All Actions*

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE AND/OR LIMIT PROPOSED TESTIMONY OF DEFENDANT SAUDI ARABIA'S PROPOSED EXPERTS, MARC SAGEMAN, DAVID RUNDELL, AND DOUGLASS MOSS

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephan A. Cozen
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

Steven R. Pounian
James Gavin Simpson
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

May 12, 2022

## Table of Contents

PRELIMINARY STATEMENT ........................................................................................................1

I.    LEGAL STANDARD GOVERNING EXPERT TESTIMONY ........................................2

II.   CLAIMED EXPERTISE OF PROFFERED EXPERTS .................................................6

    A.  Marc Sageman .........................................................................................................6

    B.  David Henry Rundell ..............................................................................................8

    C.  Douglass M. Moss ..................................................................................................9

III.  THE COURT SHOULD EXCLUDE SAGEMAN'S OPINIONS IN AREAS IN WHICH HE IS NOTQUALIFIED ...................................................................................9

    A.  Pre-9/11 Saudi Arabia and Saudi history, the Saudi government, including its MOIA and Intelligence Services, and the Saudi government's relationships with Al Qaeda and other terrorist entities. ...............................................................................................9

    B.  Islam and the Muslim community .........................................................................10

    C.  The presence of terror groups, including Al Qaeda and Al Gama'a Al Islamiya (Al Gama'a) in California before the 9/11 Attacks. ....................................................11

    D.  Law enforcement investigations, the FBI, and FBI operations ............................15

    E.  Communications analysis .....................................................................................15

    F.  Arabic language ....................................................................................................20

IV.  THE COURT SHOULD PRECLUDE SAGEMAN'S OPINIONS BECAUSE THEY ARE UNRELIABLE ...............................................................................................20

    A.  Sageman's opinions about Saudi Arabia and its MOIA should be stricken as unreliable because they are not grounded in sufficient facts, lack intellectual rigor, do not account for alternative explanations, are premised on *ipse dixit*, were concocted for the purpose of this litigation, and are not generally accepted in the relevant expert community. ................................................................................................................20

    B.  Sageman's opinions about Saudi Arabia's day-to-day oversight and control over Thumairy and the King Fahad Mosque should be stricken as unreliable because they are not grounded in sufficient facts, lack intellectual rigor, do not account for alternative explanations, are premised on ipse dixit, were concocted for the purpose of this litigation, and are based on his deficient methodology of cherry-picking evidence. .....25

    C.  Sageman's opinion that there was no Sunni extremist cell at the King Fahad Mosque should be stricken as reliable because it is not grounded in sufficient facts, lacks intellectual rigor, does not account for alternative explanations, is premised on ipse dixit, was concocted for the purpose of this litigation, is not generally accepted in the relevant expert community, and is based on his deficient methodology of cherry-picking evidence. ...............................................................................................28

    D.  Sageman does not properly investigate the evidence that Bayoumi worked for Saudi Arabia to support Saudi extremism in San Diego and reaches unreliable conclusions. ........34

i

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

    E.    Sageman fails to use a reliable methodology by citing to uncorroborated statements from the terrorists themselves rather than carefully evaluating the evidence and renders one-off opinions contrary to those generally accepted by experts in the field........38

      1.    Sageman improperly renders opinions based on alleged statements of Khalid Sheikh Mohamed in detention that are uncorroborated, unfounded and unreliable...................39

      2.    Sageman's decision to simultaneously discard KSM's statements in favor of the uncorroborated statement of Osama Bin Laden to support self-serving conclusions further demonstrates how Sageman failed to properly investigate or apply any consistent methodology as required for reliability.............................................................43

    F.    Sageman does not follow accepted methodology and grossly misconstrues key evidence about the Saudi government support network used to support the hijackers. .....45

V.    THE COURT SHOULD PRECLUDE SAGEMAN'S REPORT BECAUSE IT IS REPLETE WITH *IPSE DIXIT* AND HIS ATTEMPTS TO USURP THE ROLE OF THE TRIER OF FACT ............................................................................................58

VI.    THE COURT SHOULD PRECLUDE SAGEMAN'S PROPOSED TESTIMONY OF LEGAL CONCLUSIONS, OR SPECULATIVE, CONJECTURAL, AND CONCLUSORY OPINIONS. ........................................................................................60

VII.    THE COURT SHOULD PRECLUDE OPINIONS OF MOSS ...........................62

    A.    Moss's Opinions About the Distance from Which a Pilot Can Identify a Target Are *Ipse Dixit* Unmoored from Any Reliable Basis or Method. .........................................63

    B.    Moss's Undisclosed Basis..............................................................................................63

    C.    Moss Speculates as to the Document in Bayoumi's Apartment. ...............................65

VIII.    THE COURT SHOULD PRECLUDE RUNDELL'S TESTIMONY BECAUSE IT IS UNHELPFUL, LACKS SPECIALIZED KNOWLEDGE, TELLS THE FACTFINDER WHAT RESULT TO REACH, AND IMPROPERLY (AND IN CONCLUSORY FASHION) ARGUES THE QUALIFICATIONS OF OTHER EXPERTS.........................................................................................................................66

CONCLUSION...............................................................................................................................69

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

## Table of Authorities

**Cases**

*Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A.*, 2005 WL 159592 (S.D.N.Y. Jan. 25, 2005) .................................................................................................................1

*American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226 (S.D.N.Y., Sept. 30, 2003) ....................3

*Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002)*.................................................. 3, 4, 5

*Bourjaily v. United States*, 483 U.S. 171 (1987) .............................................................................3

*Chitayat v. Vanderbilt Assocs.*, 2007 WL 2890248 (E.D.N.Y. Sept. 27, 2007)..............................................1

*Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)*.........................................................passim

*Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420 (E.D. N.Y. 2011) ..............................................6

*E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451 (S.D.N.Y. 2004) .................................................3

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235 (S.D.N.Y. 1999) ....................3

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)...........................................................................5, 6

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ...............................................................................4

*In re M/V MSC FLAMINIA*, 2017 WL 3208598 at *2 (S.D.N.Y. July 28, 2017)..............................................3

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................4

*In re Silicone Gel Breast Impl. Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004)....................6

*Joseph S. v. Hogan*, 2011 WL 2848330 (E.D.N.Y. July 15, 2011) ...........................................................2

*Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.*, 14 F.Supp.2d 391 (S.D.N.Y1998)..........................................................................................................64, 67

*Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)* .............................................................3, 4, 5, 28

*Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011) (*Linde* I) ................................................4

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 328 (E.D.N.Y. 2013) (*Linde* II) ......................................4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..........................1

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008)..........................4, 27, 65, 66

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ...........................................4, 27, 60

*New York v. UPS, 2016 WL 4735368 (S.D.N.Y. Sep. 10, 2016)*............................................................1, 2

*Nimely v. New York City,* 414 F.3d 381 (2d Cir. 2005) ...................................................................3, 67, 68

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) .............................................................21

*Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, 2011 WL 3874878 (S.D.N.Y. Aug. 31, 2011) .......................................................................................................1

*Tchatat v. City of New York*, 315 F.R.D. 441 (S.D.N.Y. 2016)..............................................................66

*Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643 (S.D.N.Y. July 14, 2022) ........................................................................................................1, 2

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

*U.S. v. Ceasar*, 10 F. 4th 66 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2841 (2022)...........................7

*U.S. v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019) ...........................................................6

*United States v Elshinawy*, 2018 WL 1521876 (D. Md. Mar. 28, 2018), aff'd, 781 Fed. Appx.
168 (4th Cir. 2019) ........................................................................................................6

*United States v Tounisi*, 900 F.3d 982 (7th Cir. 2018) ...........................................................6

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ...........................................................4

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .............................................15, 37, 41

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...........................................4, 12, 14

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ...........................................................3

*Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547 (2d Cir. 1977)...........................................1

*Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775
(S.D.N.Y. Apr. 8, 2009) ................................................................................................1

*Zaremba v. Gen. Motors Corp.*, 360 F.3d 355 (2d Cir. 2004)...........................................3, 5

**Statutes**

18 U.S.C. § 951 ..............................................................................................................28

**Other Authorities**

4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[2] (2d
ed. 1997)......................................................................................................................1

Senate Select Committee on Intelligence Committee Study of the Central Intelligence
Agency's Detention and Interrogation Program, S-Report 113-288, Dec. 9, 2014 ...................39, 40

SSCI Committee Study - Staff Summary, "Fact Check: Inaccurate and Misleading
Assertions Related to the CIA Detention and Interrogation Program in The Great War
of Our Time: The CIA's Fight Against Terrorism – From al Qa'ida to ISIS" by Michael
Morell and William Harlow, May 12, 2015 ...........................................................................43

The 9/11 Commission Report: Final Report of the National Commission on Terrorist
Attacks Upon the United States. Norton, 2004 ...........................................................passim

**Rules**

Federal Rules of Evidence 401 ...........................................................................................2, 3

Federal Rules of Evidence 403 ...........................................................................................2, 4

Federal Rules of Evidence 402 ...........................................................................................1

Federal Rules of Evidence 702 ...........................................................................................passim

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

**Key to Exhibit Citations**

Exhibits cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele, filed with the Memorandum.

| | |
|---|---|
| Ex. 1 (Sageman Saudi Report) (May 16, 2022) | "Rebuttal Expert Report of Marc Sageman" on behalf of the Kingdom of Saudi Arabia, dated May 16, 2022. |
| Ex. 2 (Rundell Report) (May 16, 2022) | "Rebuttal Expert Report of David Henry Rundell" on behalf of the Kingdom of Saudi Arabia, dated May 16, 2022. |
| Ex. 3 (Moss Report) (May 16, 2022) | "Rebuttal Expert Report," by Douglas M. Moss, on behalf of the Kingdom of Saudi Arabia, dated May 16, 2022. |
| Ex. 4 (Sageman Dep.) (June 27, 2022) | Transcript of Deposition of Marc Sageman (June 27, 2022) |
| Ex. 5 (Rundell Dep.) (June 10, 2021) | Transcript of Deposition of David Henry Rundell (June 10, 2021). |
| Ex. 6 (Moss Dep.) (June 10, 2021) | Transcript of Deposition of Douglas M. Moss (June 10, 2021). |
| Ex. 7 (Youssef Report) (April 1, 2022) | "Expert Report of Bassem Youssef," dated April 1, 2022. |
| Ex. 8 (Nakhleh Report) (April 1, 2022) | "Dr. Emile A. Nakhleh, Expert Report," dated April 1, 2022 |
| Ex. 9 (Dunham Report) (April 1, 2022) | "Expert Report of Lawrence Dunham," dated April 1, 2022 |
| Ex. 10 (Meleagrou-Hitchens Report) (April 1, 2022) | "Dr. Alexander Meleagrou-Hitchens, Expert Report, dated April 1, 2022. |
| Ex. 11 (Kohlmann Report) (April 1, 2022) | "Expert Report of Evan Francois Kohlmann," dated April 1, 2022 |
| Ex. 12 (Schiff Report) | "Disclosure of Expert Testimony by Capt. Barry Schiff" |
| Ex. 13 (Simon Report) (April 8, 2022) | "Expert Report of Steven N. Simon," dated April 8, 2022. |
| Ex. 14 (Bayoumi Dep.) | Excerpt of Transcript of Deposition of Omar Al Bayoumi (June 9, 10, & 11, 2021) |
| Ex. 15 (Ash-Shaikh Dep.) | Excerpt of Transcript of Deposition of Saleh al Ash-Shaikh (March 23 & 24, 2021 |
| Ex. 16 (Khalil Dep.) | Excerpt of Transcript of Deposition of Khalil al Khalil (June 14, 2019) |
| Ex. 17 (Mana Dep.) | Excerpt of Transcript of Deposition of Smail Mana (April 21, 2021) |

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

| Ex. 18 (Awad Dep.) | Excerpt of Transcript of Deposition of Abdullah Al Awad (March 9, 2021) |
|---|---|
| Ex. 19 (Madha Dep.) | Excerpt of Transcript of Deposition of Usman Madha (June 25, 2021) |
| Ex. 20 (Alzamari Dep.) | Excerpt of Transcript of Deposition of Akram Al Zamari (March 11, 2020) |
| Ex. 21 (Thumairy Dep.) | Excerpt of Transcript of Deposition of Fahad Al Thumairy (June 28, 29, & 30, 2021) |
| Ex. 22 (Qattan Dep.) | Excerpt of Transcript of Deposition of Ahmed Al Qattan (February 10, 2021) |
| Ex. 23 (Shahri Dep.) | Excerpt of Transcript of Deposition of Abdurrahman Al Shahri (January 26 & 27, 2021) |
| Ex. 24 (Morgan Dep.) | Excerpt of Transcript of Deposition of Kaysan Morgan (June 21, 2021) |
| Ex. 25 (Snell Dec'l) | Declaration of Dietrich L. Snell (May 10, 2021) |
| Ex. 26 (Madha Dec'l) | Declaration of Usman Madha (May 28, 2021) |
| Ex. 27 (Vasquez Dec'l) | Declaration of Efrain Vasquez (May 26, 2021) |
| Ex. 28 (Gonzalez Dec'l) | Declaration of Daniel Gonzalez (May 26, 2021) |
| Ex. 29 (Morgan Dec'l) | Declaration of Kaysan Morgan (October 29, 2020) |
| Ex. 30 (Ratchford Dec'l) | Declaration of Holly Ratchford (May 29, 2021) |
| Ex. 31 | Al-Shahri Exhibit 403 (FBI1033-1041) |
| Ex. 32 | Al-Shahri Exhibit 404 ███████ |
| Ex. 33 | Qattan Exhibit 411 (DOJ 9-10) |
| Ex. 34 | Qattan Exhibit 413 (███████) |
| Ex. 35 | Qattan Exhibit 419 (███████) |
| Ex. 36 | Qattan Exhibit 423 (███████) |
| Ex. 37 | Qattan Exhibit 424 (███████) |
| Ex. 38 | Ash-Sheikh Exhibit 477 (Al Haramain Website 2003) |
| Ex. 39 | Ash-Sheikh Exhibit 478 (Al Haramain Website 2001) |

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

| Ex. 40 | Adel Al Sadhan Exhibit 493 (FBI 1338) |
|--------|----------------------------------------|
| Ex. 41 | Jaithen Exhibit 576 (FBI 4012-4013) |
| Ex. 42 | Mana Exhibit 608 (█████████) |
| Ex. 43 | Mana Exhibit 611 |
| Ex. 44 | Al Bayoumi Exhibit 697 (FBI 4139) |
| Ex. 45 | Exhibit 732 (DA 1104) |
| Ex. 46 | KSA 0734-0737 |
| Ex. 47 | ██████ |
| Ex. 48 | ██████ |
| Ex. 49 | ████████ |
| Ex. 50 | KSA Responses, Interrogatories 10, 13, 16 (June 12, 2018) |
| Ex. 51 | KSA Responses, Interrogatory 10 (Aug. 14, 2018) |
| Ex. 52 | FBI 000141 |
| Ex. 53 | FBI 001293-001302 |
| Ex. 54 | FBI 001338 |
| Ex. 55 | FBI 001370-001375 |
| Ex. 56 | FBI 004012 |
| Ex. 57 | FBI 004114 |
| Ex. 58 | FBI 004139-004145 |
| Ex. 59 | FBI 008057 |
| Ex. 60 | FBI 011752-011767 |
| Ex. 61 | EO 3414-3442 |
| Ex. 62 | EO 3478-3618 |
| Ex. 63 | EO 0001-0011 |

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

| Ex. 64 | EO 1268-1277 |
| --- | --- |
| Ex. 65 | EO 0692-0695 |
| Ex. 66 | EO 3465-3472 |
| Ex. 67 | EO 0343-0352 |
| Ex. 68 | EO 0228-0235 |
| Ex. 69 | EO 3461-3464 |
| Ex. 70 | EO 2722-2723 |
| Ex. 71 | EO 2687-2690 |
| Ex. 72 | EO 2691-2692 |
| Ex. 73 | EO 0656-0664 |
| Ex. 74 | EO 1620-1623 |
| Ex. 75 | EO 2572 |
| Ex. 76 | EO 0518-0523 |
| Ex. 77 | EO 0603-0615-UPDATED |
| Ex. 78 | CIA_0001-0016 |
| Ex. 79 | CIA_0018-0036 |
| Ex. 80 | CIA_0029 |
| Ex. 81 | CIA_0031 |
| Ex. 82 | MPS 732-449 |
| Ex. 83 | MPS 731-18 |
| Ex. 84 | MPS 713-352 |
| Ex. 85 | MPS 720-16 |
| Ex. 86 | USIU 54-55 |
| Ex. 87 | Feb. 19, Feb. 25, & May 30, 2000, E-mails produced by Al Haramain |

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

| Ex. 88 | "The Al Qaeda Manual", "Interrogation and Investigation" |
|--------|----------------------------------------------------------|
| Ex. 89 | SSCI Committee Study of the CIA Detention and Interrogation Program with Foreword by Chairman Feinstein and Additional Minority Views, December 9, 2014 |
| Ex. 90 | SSCI Committee Study Staff Summary, "Fact Check: Inaccurate and Misleading Assertions Related to the CIA Detention and Interrogation Program," May 2015. |
| Ex. 91 | CIA, Briefing Notes on the Value of Detainee Reporting, August 2005, at 1. Included as Appendix II to the Report of the Senate Select Committee on Intelligence, Committee Study of the CIA's Detention and Interrogation Program, as released (Executive Summary only) December 9, 2014. |
| Ex. 92 | Excerpts from Sageman, Marc, *Understanding Terror Networks* (2004) |
| Ex. 93 | FBI Hijackers' Timeline (February 1, 2007). |
| Ex. 94 | Charge Sheet, U.S. v. KSM et al., Referral dated April 4, 2012. |
| Ex. 95 | December 21, 2018, KSA Opposition to Motion to Compel Addendum 2. |
| Ex. 96 | EO 0584 |
| Ex. 97 | Kaldrim 179 |
| Ex. 98 | 2021 GWU Declaration and Exhibits |

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in support of their Motion to Exclude and/or Limit purported expert opinion testimony of Marc Sageman, David Henry Rundell, and Douglas M. Moss, three expert witnesses offered by Defendant Saudi Arabia.

These three experts are merely mouthpieces for Saudi Arabia's defense arguments. As set out below, Saudi Arabia's experts, in particular its purported omnibus "expert" Marc Sageman, lack qualifications to opine in the multiple disciplines addressed in their opinions; base their opinions on unreliable methodology that is not generally accepted within their relevant professional community— *e.g.,* in the law enforcement and counter-terrorism investigative community; fail to conduct independent investigations; do not review and research key evidence; make broad *ipse dixit* pronouncements; and focus solely on attacking Plaintiffs' expert reports. Moreover, they offer a variety of irrelevant, prejudicial, and otherwise improper opinions not directed to any asserted claims.

Even given the liberal standards applicable to bench trials,[1] the opinions offered by Saudi Arabia's experts contravene Federal Rules of Evidence 702, 402 and relevant case law so much so that

---

[1] "[T]he *Daubert* gatekeeping standard is applied more flexibly when, [as here,] the judge is the factfinder," *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007). where "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC,* 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009); *see Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A.,* 2005 WL 159592 at *1 (S.D.N.Y. Jan. 25, 2005) ("As this will be a bench trial, there is no concern with protecting a jury from 'being bamboozled by technical evidence of dubious merit.'"); *Chitayat v. Vanderbilt Assocs.,* 2007 WL 2890248 at *2 (E.D.N.Y. Sept. 27, 2007)("given the absence of the need to protect juries from dubious expert evidence."). Thus, in a bench trial, when the gatekeeper and the trier of fact are the same, a court may admit expert evidence subject to the ability later to exclude it or disregard it, if the evidence turns out not to meet the standard of reliability under Rule 702. *Town & Country Linen Corp. v. Ingenious Designs LLC,* 2022 WL 2757643, at *2-3 (S.D.N.Y. July 14, 2022) (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[2] (2d ed. 1997).

The purpose for applying the more liberal admission standard in bench trials is so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions. *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552 (2d Cir. 1977); *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.,* 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (internal quotation marks and citation omitted). A court's confidence in its ability to ultimately disregard evidence falling outside the strictures of the evidence rules does not mean that a bench trial becomes a "free for all" where expert witnesses are concerned. *New York v. UPS,* 2016 WL 4735368 at *2 (S.D.N.Y. Sep. 10, 2016). This presumes that, if the Court applies a liberal standard in performing its gatekeeping obligation at the early stage, opportunity for live testimony and cross examination will be afforded later to permit the Court to perform that its obligation. "Although a court has general discretion to hear expert testimony and reserve on a *Daubert* motion until the conclusion of a bench trial, it still must perform a Rule 702 and *Daubert* analysis before it relies upon expert testimony."

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

the Court's attention is warranted now to achieve the efficiency of precluding unreliable, plainly irrelevant, or misleading testimony that serves only as "waste of everyone's time." *New York v. UPS*, 2016 WL 4735368 at \*2-3.

Sageman, for example, authored a 730-page report for Saudi Arabia, rife with *ipse dixit* premises and conclusions, while purporting to be an expert in dozens of disciplines[2] and capable of offering rebuttal opinions in the specialist disciplines of five of Plaintiffs' six experts. Sageman is not qualified to testify as to a vast majority of the disciplines in which he opines.[3] His core opinions, mostly offered in areas as to which he has no expertise or specialized knowledge, are based on defective methodology that broadly relies on cherry-picking evidence favorable to his ad-hoc crafted narrative and ignoring unfavorable evidence. Further, many of his core opinions serve to confuse the record are not accepted in the relevant expert community but directly conflict with the scholarship and studied findings of the relevant United States government agencies that collect and assess counterterrorism information. Sageman is here simply to dissemble and impermissibly parrot defense talking points.

## I.   LEGAL STANDARD GOVERNING EXPERT TESTIMONY

The admissibility and limitation of proffered expert testimony are controlled by standards set by Rules 702, 401, and 403 of the Federal Rules of Evidence and by the Supreme Court in *Daubert*,[4]

---

*Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643, at \*6 (S.D.N.Y. July 14, 2022); *see Joseph S. v. Hogan*, 2011 WL 2848330, at \*3 (E.D.N.Y. July 15, 2011) (noting that "[t]he dynamic" for *Daubert* motions "is slightly altered in a bench trial," but that, nonetheless, reliability determinations still must be made in a bench trial and that courts should not "shirk [their] responsibility of performing a full *Daubert* analysis").

[2] In his 730-page report and in his deposition, Sageman avoids any clear statements about what his actual expertise is, though he offers his purported 'expert' opinions as, *e.g.*, a forensic psychologist, terrorism expert, forensic communications analyst, law enforcement investigator, and Saudi society and religious movement expert. *See infra* II. A. Sageman, Saudi Arabia's jack-of-all trades expert, admitted that his expertise was at least limited in areas he opined on in his report. *Infra* nn. 26, 27.

[3] Dr. Sageman also usurps the role of the Court with his *ipse dixit* in repeatedly stating how *he* qualifies an expert. *See* Ex. 1 at 6 "any expert…must rely extensively on FBI summaries of interviews with various people suspected to have been involved in the 9/11 plot;" at 20 stating "An expert cannot simply accept uncritically third-party assertions without checking them out" and "experts must adhere to basic archival methodology." Sageman also states, *id.* at 21, that "An expert with integrity cannot simply omit evidence he does not like" and "an expert must resist the temptation to prematurely select a given account that happens to confirm a favorite hypothesis." Sageman's opinions, though, repeatedly violate his own requirements.

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

*Kumho Tires*,[5] and their progeny, which require a two-part inquiry of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. A party introducing expert testimony has the burden to establish factors bearing on the admissibility of the expert's opinion by a preponderance of the evidence.[6]

**Threshold Question of Qualification.** Even before addressing issues of relevance and reliability, the Court must first address whether the expert is qualified to testify as to the opinion proffered. Even where "a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that [the expert] is qualified to express expert opinions as to other fields."[7] The witness must have specialized knowledge helpful to the factfinder and related to the opinion offered.[8]

**Relevance**. Courts look to Rule 401 standards in analyzing whether proffered expert testimony is relevant.[9] Expert testimony on topics with no relevance to the actual claims at issue may be precluded.[10] Under FRE 702, expert testimony must likewise "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Even where an expert's methodology rests on sound principles and results in potentially reliable conclusions or opinions, if that testimony

---

[5] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

[6] Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments; *Daubert*, 509 U.S. at 592, n. 10; *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Williams*, 506 F.3d 151, 160-61 (2d Cir. 2007); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357-58 (2d Cir. 2004). Rule 702 permits an expert witness to testify if: (a) The witness "is qualified as an expert by knowledge, skill, experience, training, or education;" (b) The witness's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (c) the testimony is based upon sufficient facts or data; (d) the testimony is the product of reliable principles and methods, and (e) the witness has applied the principles and methods reliably to the facts of the case.

[7] *See Nimely v. New York City*, 414 F.3d 381, 399 n.13 (2d Cir. 2005).

[8] *In re M/V MSC FLAMINIA*, 2017 WL 3208598 at *2 (S.D.N.Y. July 28, 2017) (requiring experts to confine opinions to the subjects on which they are qualified and precluding opinions outside the witness's area of expertise).

[9] *Amorgianos*, 303 F.3d at 265.

[10] *See, e.g., American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226, at *2 (S.D.N.Y., Sept. 30, 2003) (precluding expert who attempted to connect unrelated facts, finding the expert's testimony irrelevant); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 464 (S.D.N.Y. 2004) (same); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 241-42 (S.D.N.Y. 1999) (same).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

is unhelpful to a jury, it cannot be admitted.[11] Proffered expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[12]

Though qualified expert witnesses are "permitted wide latitude to offer opinions" on relevant subjects,[13] limits apply. For example, as this Court has held, experts cannot testify to legal conclusions, offer "speculative," "conjectural," or "conclusory" opinions, or opine "as to the motivations and intentions" of individuals or entities.[14]

To be admissible, expert testimony must also satisfy Rule 403, which allows courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**Reliability**. The test for reliability is "flexible,"[15] and tailored to the needs of the case and the discipline of the expert.[16] In assessing the reliability of testimony, the district court should be guided by "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"[17] A trial

---

[11] *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful").

[12] *Id.* at 591.

[13] ECF No. 9060 at 5-6, citing *Daubert*, 509 U.S. at 592; *see id.*, citing *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) (noting leeway for experts in terrorism cases to "synthesize dense or voluminous . . . texts," "offer background knowledge or context that illuminates . . . past events," or "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson.").

[14] ECF No. 9060 at 6 (citing *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (precluding expert opinions of "legal conclusion[s]"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (precluding "speculative," "conjectural," or "conclusory" opinions), and *Marvel Characters*, 726 F.3d at 135–36 (precluding opinions "as to the motivations and intentions" of individuals or entities)); *see also United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (improper to "tell the jury the defendant's intentions through the mouths of witnesses other than [itself]."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (defendant's expert's opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, not contain relevant expert evidence); *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) (*Linde* I) (same); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 328 (E.D.N.Y. 2013) (*Linde* II) (ruling on limits to expert's testimony, stating "an opinion as to the state of mind of an organization is inadmissible. *See Linde* I, 920 F. Supp. 2d at 285-87.").

[15] *Kumho Tire*, 526 U.S. at 141.

[16] *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (quoting *Daubert*, 509 U.S. at 594).

[17] *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

judge may (but need not) consider these non-exclusive factors identified in *Daubert*: (a) whether a theory or technique can be and has been tested; (b) whether it has been subjected to peer review and publication; (c) whether it has a high known or potential rate of error; and (d) whether it is generally accepted in the relevant scientific community.[18] But the district court should apply those factors only "where they are reasonable measures of the reliability of expert testimony," *id.* at 152; the list of factors "neither necessarily nor exclusively applies to all experts or in every case," *id.* at 141.

In *Kumho Tire*, the Supreme Court clarified that the trial judge's gatekeeping obligation applies not only to opinions based on "scientific" knowledge, as in *Daubert*, but also to opinions based on "other specialized" knowledge. 526 U.S. at 141. Often "expert testimony will not rely on anything like a scientific method …." Fed. R. Evid. 702 Advisory Committee Note. The reliability determination in such a case should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

This Court recognized that the four non-exclusive factors cited in *Daubert* are not squarely suited to experts testifying in terrorism cases. ECF No. 9060, a 4-5 (citing *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004)). "To ensure that [the experts'] opinions are connected to the facts by more than "'the *ipse dixit* of the expert,'"[19] courts may look to other factors to analyze an expert's reliability, such as: (1) whether the expert will testify about matters growing from the experts own independent research or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as the expert would be in the expert's regular professional work;

---

[18] *Kumho Tire, 526 U.S.* at 149-50 (citing *Daubert*, 509 U.S. at 592-94).
[19] ECF No. 9060 (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) [hereinafter *Joiner*])).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered.[20]

Although the Supreme Court has instructed courts to focus "on principles and methodology" the expert employed, and "not on the conclusions that they generate," *see Daubert*, 509 U.S. at 595, it has also recognized that "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. Accordingly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

## II.   CLAIMED EXPERTISE OF PROFFERED EXPERTS

### A.   Marc Sageman

Sageman has been a professional expert for over 25 years. He began as an medical expert in psychiatry in the 1990s, and since 2005 the predominant focus of his reported work has been to provide opinions concerning the sentencing of criminal defendants found guilty of terrorist acts. In those terrorism-related cases, Sageman met and evaluated defendants as a forensic psychiatrist expert, and presented his own unique thesis, that individuals involved in terrorism are dangerous only for the limited window of time that they are engaged in carrying out the act.[21] In the one identified instance where a court cited Sageman's testimony as grounds to reduce a sentence,[22] the Second Circuit vacated

---

[20] ECF No. 9060 (citing *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D. N.Y. 2011) (citing *In re Silicone Gel Breast Impl. Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing Fed. R. Evid. 702 Advisory Committee's Notes))).

[21] Sageman's alleged expertise has evolved from his earlier testimony, limited to medical and psychiatric issues, to testifying as a psychiatric expert in terrorism-related cases, to more recently bootstrapping his earlier expert testimony experiences to assert expertise to terrorism generally. For exemplars of his expertise in other cases where he relied on his novel thesis, see, *e.g., United States v Tounisi*, 900 F.3d 982, 985 (7th Cir. 2018) (Sageman opines that an individual who pled guilty to providing material support to a Foreign Terrorist Organization associated with Al Qaeda was "at no greater risk than the normal population of being a danger to the public"; Seventh Circuit affirms maximum 15 year sentence imposed by district court); *United States v Elshinawy*, 2018 WL 1521876, at *19 (D. Md. Mar. 28, 2018), aff'd, 781 Fed. Appx. 168 (4th Cir. 2019) (Sageman opined that "for two-and-a-half months, [the defendant] was very dedicated to carrying out an attack here in the United States…" but after that period the defendant was not dangerous; Fourth Circuit affirms 20-year sentence with terrorism enhancement).

[22] *U.S. v. Ceasar*, 388 F. Supp. 3d 194, 214 (E.D.N.Y. 2019)(Sageman opined that "[t]here is no risk of violence" by the defendant).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

and remanded the case, finding, contrary to Sageman's opinions, that the defendant had "recidivist tendencies" and made "attempts to cover up her conduct by deleting incriminating material and lying to law enforcement authorities…."[23] Sageman's novel go-to thesis—that terrorist actors are of limited danger and present no threat in the aftermath of a terrorist attack—although not explicitly stated in his report, is embedded throughout his opinions and methodology in this case.[24]

Sageman premises his opinions[25] on purported expertise in a seemingly unending number of subject areas, including: psychiatry and psychology; interviews and evaluations of convicted terrorists; the Saudi government, its ministries and policies; terror group in California before the 9/11 Attacks; the Arabic language and its use; the Muslim faith and community practices; communication analyses, and in general, "terrorism research and various terrorism organizations."[26] Sageman falls back on this refrain for a number of issues in an attempt to expand the scope of his testimony.[27] Sageman frequently stretches his qualifications unreasonably until forced to admit he has no expertise to justify his opinions. To give but *one* example, Sageman opines on Bayoumi's aviation equation, which is the subject of reports from both Plaintiffs' and Defendant's pilot experts, Barry Schiff and Douglas Moss.

---

[23] *U.S. v. Ceasar,* 10 F. 4th 66, 74-75 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 2841 (2022).

[24] Sageman's methods and views are not generally accepted within the relevant community of other terror experts and have been roundly criticized. A review of one of Sageman's books written by a member of the 2015 9/11 Review Commission observed that Sageman made a "fundamental misreading of the al Qaeda threat" that "flies in the face" of "the two most recent authoritative analyses of terrorist threats to the United States" made by U.S. intelligence. Bruce Hoffman, The Myth of Grass-Roots Terrorism 134, Foreign Affairs Vol 87 No. 3 (May/June 2008). The review faulted Sageman for using "historically groundless parallels" and "unidentified or vaguely identified data sources" that resulted in his "brusque dismissal of much of the existing academic literature on terrorism in general and terrorist networks in particular." *Id.* at 134, 135, 137. The article also found that "Sageman's one-size-fits-all claim that jihadists are 'essentially romantic men and women chasing a dream' and his sweeping assertion that 'there are no [al Qaeda] sleeper cells in the United States' are devoid of evidence." *Id.* at 138. As detailed below, Sageman's opinions here suffer from the same shortcomings and should be excluded.

[25] Sageman's opinions for Saudi Arabia are included in Ex. 1 and summarized in Ex. 1 (Sageman Report) at 726-729.

[26] *See, e.g.,* Ex. 4 (Sageman Dep.) at 280:1-14 (psychiatry); *id.* at 32:23 – 33:5 (stating that he is an expert in the Ministry of Islamic Affairs "[o]nly to the extent that it relates to [his] expertise on terrorism and various terrorist organizations." *See also id.* at 58:5 – 59:22 where, despite not speaking Arabic, Sageman opines on Plaintiffs' expert Nakhleh's translation regarding Fahad al-Thumairy's position in California. Regarding his telephone analysis, Dr. Sageman stated, *id.* at 208:3-10, "…I'm not really sure what you mean by 'expert.' In terms of my experience and skills, I've used it." But when asked, he could not identify a single instance when he had. *Id.* at 208:12-15.

[27] When asked, Ex. 4 (Sageman Dep.) at 295:2-6, if he was an expert on "questions of political Islam in the Kingdom of Saudi Arabia" Sageman replied "only as they relate to terrorist organizations."

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

When directly asked if he was an expert on aeronautical calculations, Sageman's response, Ex. 4 at 292:20-21, "I **started** as a physics major at Harvard, and I fly" (emphasis added), underscores he has no specialized knowledge on which to premise his opinion, and typifies the strident overreach he invokes to claim "expertise" on numerous other topics.

Indeed, the areas in which Sageman suggests he has expertise are often supported only by his *ipse dixit*. Examples include his purported expertise about memory,[28] Saudi Arabia's use of spies and co-optees,[29] telephonic forensic analysis,[30] support for jihadist causes in Saudi Arabia,[31] opening an FBI investigation,[32] *gas consumption*,[33] and linguistics.[34] Sageman is not a pilot; not a former diplomat; not an expert on diplomatic protocols, law enforcement investigations, foreign affairs, Islam, Wahhabism, or Salafism; and he is not an expert on the Saudi Ministry of Islamic Affairs ("MOIA"), Saudi Intelligence, Saudi propagation of Salafi Islam, or the relationship between Saudi Arabia and Al Qaeda.[35] Accordingly, Sageman's opinions in all of these areas should be stricken as offering the factfinder no help.

### B.     David Henry Rundell

---

[28] Sageman supports findings of memory lapses with his uncited and unsupported conclusion that "[t]his is how memory works," urging the Court to just trust him because "[t]his is normal, something I am familiar with as a trained psychologist." But he cites nothing more than himself to support the assertion. Ex. 1 (Sageman Report.) at 537.

[29] Ex. 1 (Sageman Report) at 271-273, 297, 300-304.

[30] *Id.* at 460-502; 629-631.

[31] *Id.* at 527-537.

[32] *Id.* at 540 ("The document cited is not evidentiary support for Dr. Nakhleh's accusation that the MoIA supported and promoted bin Laden's jihad. **To open a counterterrorism FI on a person, the FBI must demonstrate a possible nexus to a foreign power.**") (Emphasis added).

[33] *Id.* at 668-669. When confronted with the fact that he didn't have milage records for Omar Al-Bayoumi's vehicles, and that he had not considered that Bayoumi could have paid for gasoline with cash, Sageman could only offer that "his habit was to pay by credit card, so I took that. Most people have habits, and they continue their habits. Am I certain? No. But it seems that the evidence points to just one trip." Ex. 4 (Sageman Dep.) at 147:5-18.

[34] Ex. 1 (Sageman Report) at 12.

[35] Despite his lack of expertise in these areas, Sageman opines as if he were an aviation expert (Ex. 1 (Sageman Report) at 291-293), an expert on diplomatic protocols (*id.* at 240-243), an expert on foreign affairs (*id. at* 25-133), an expert on law enforcement investigations (*e.g., id.* at 321, 422-460), an expert on Islamic culture and customs (*e.g., id.* at 9, 421), an expert in Wahhabism (*id.* at 330), an expert in Salafism (*e.g., id.* at 26), an expert on MOIA (*e.g., id.* at 163-166), an expert on Saudi Intelligence practices (*id.* at 296), an expert on Salafi propagation (*id.* at 527-532), and an expert on the relationship between Saudi Arabia and Al Qaeda (at 93-120, characterizing it solely in the banal and simplistic terms of "hostility").

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

For the opinions Rundell offers,[36] he testified that his expertise is in the history, politics and religion of Saudi Arabia, with a particular focus on its relationship with the United States.[37] He claims to have expertise on Saudi Arabia's relationship with Osama bin Laden and al-Qaeda as an issue in Saudi-American relations in the 1990s and early 2000s.[38] He also claims to have expertise on diplomatic norms and practices during the 1990s and early 2000s, especially as they related to the Saudi-American relationship.[39]

## C.   Douglass M. Moss

Moss's "education, experience, and training" are as "a professional pilot."[40] He professes to offer opinions based on his background as an engineer and a pilot. *Id.* at 2.

## III.   THE COURT SHOULD EXCLUDE SAGEMAN'S OPINIONS IN AREAS IN WHICH HE IS NOT QUALIFIED

Throughout his 730-page report, Sageman purports to have expertise and specialized knowledge necessary to offer expert rebuttal opinions to five of Plaintiffs' experts[41] who have each worked for years in distinct disciplines.[42] But Sageman is unqualified to offer opinions on the following subject areas that lie outside the realm of his prior work, understanding, and experience.

## A.   Pre-9/11 Saudi Arabia and Saudi history, the Saudi government, including its MOIA and Intelligence Services, and the Saudi government's relationships with Al Qaeda and other terrorist entities.

Sageman offers various opinions about Pre-9/11 Saudi Arabia and Saudi history, the Saudi government, including its MOIA and Intelligence Services, and the Saudi governments' relationship

---

[36] Rundell opinions on behalf of Saudi Arabia are summarized in Ex. 2 (Rundell Report.) at 3.
[37] *Id.* at 2.
[38] *Id.*
[39] *Id.*
[40] Ex. 3 (Moss Report) at 1.
[41] Sageman purports to have sufficient specialized knowledge to rebut opinions of the following five of Plaintiffs' six experts: Dr. Emile Nakhleh, Bassem Youssef, Evan Kohlmann, Dr. Alexander Meleagrou-Hitchens, and Steven Simon. Ex. 1 (Sageman Report), at 1.
[42] Plaintiffs' five experts have expertise in a wide range of disciplines, including, for example, in the following areas: Saudi Arabia, al Qaeda, Osama bin Laden, complex criminal investigation, counter-terrorism investigations and complex conspiracy investigations, Anwar al Awlaki, international diplomacy, embassy protocol, political Islam, U.S. State Department protocols, and aviation.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

with Al Qaeda and other terror entities,[43] but has no specialized knowledge regarding these subjects. For example, Sageman offers opinions about the Saudi MOIA being "quietist"[44] and not extremist during the years leading up to the 9/11 Attacks. But Sageman is not recognized as an expert in these areas, specifically as they relate to Saudi Arabia before 9/11. Neither his academic nor his practical experience concern these areas at all. He does not understand spoken or written Arabic and made only three brief visits to Saudi Arabia starting in 2006, long after the relevant period on which he opines.[45] He is not an expert on Wahhabi Islam or Saudi Arabia's da'awah activities, which lie at the heart of the MOIA's mission, and he has never studied MOIA itself. Before the report he wrote for Saudi Arabia, he never wrote on these areas, and has never published peer reviewed opinions in any of these areas.[46] His opinions about Saudi Arabia, written for Saudi Arabia, are offered for the first time in his reports here, untested by anyone with knowledge or familiarity (aside from interested parties or counsel). Indeed, his report merely parrots the talking points long used by Saudi Arabia coupled with Sageman's *ipse dixit* commentary and resulting opinions. Nothing in his qualifications points to any specialized knowledge regarding the Saudi Arabia government before 9/11, its MOIA or the Saudi Intelligence apparatus, Saudi history, or the pre-9/11 relationships among these varied actors and Al Qaeda.[47]

### B.     Islam and the Muslim community

---

[43] *See, e.g.,* Ex. 1 (Sageman Report) at 59-101.

[44] Ex. 1 (Sageman Report) at 267.

[45] Ex. 4 (Sageman Dep.) at 83:16-84:7; *id.* at 53:12-55:10.

[46] *See, e.g.,* Ex 4 (Sageman Dep.) at 373:8-13 ("Q: Have you ever written any peer-reviewed literature regarding the creation, existence, responsibilities of the Saudi Ministry of Islamic Affairs, what you've referred to as the MoIA? A: It **might** be referred in my first two books. I did not talk about it in the last three books, no.") (Emphasis added).

[47] For example, Sageman offers a blanket defense of the Saudi government (including defenses of the General Intelligence Department, Ministry of the Interior, Ministry of Foreign Affairs, Ministry of Islamic Affairs, the Crown Prince, and the King) and offers his opinion as to why they *couldn't* assist Al Qaeda in the United States. Ex. 1 (Sageman Report) at 262-269.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman offers opinions regarding Islamic doctrine, the history of the faith, the differences between its sects, and other aspects of Islam,[48] but has no special education, skill, experience, or training regarding numerous details he purports to address about Islam in his opinions.[49] Accordingly, he should be precluded from opining on the subject.

### C. The presence of terror groups, including Al Qaeda and Al Gama'a Al Islamiya (Al Gama'a) in California before the 9/11 Attacks.

Sageman has no specialized knowledge about the presence before the 9/11 Attacks of terrorist groups in California, specifically Al Qaeda or Al Gama'a. Sageman's opinions in this regard are premised on *ipse dixit* and conflict with the generally accepted opinions of the relevant community— in this case, U.S. government determinations and decisions of the Second Circuit and other Courts. Accordingly, his opinions on the issue[50] should be precluded.

Plaintiffs' expert Youssef relies on his firsthand observations as an FBI Special Agent on the ground in Los Angeles in the mid-1990s to describe how Al Gama'a, through its leader Omar Abdul Rahman aka the "Blind Sheikh," nurtured and operated two Sunni extremist cells in California with direct ties to Osama Bin Laden and Al Qaeda, and the relationship between those cells and the 9/11 hijacker support network. Al Gama'a's operational hub was in Los Angeles at the Ibn Taymiyyah

---

[48] *See, e.g.,* Ex. 1 (Sageman Report) at 530 (stating "Muslims, even those with strong neojihadi inclinations, were confused by bin Laden's arguments and were going to fight in the far more popular Bosnian and then Chechen jihads. Furthermore, following Sheikh Abdullah Azzam's doctrine, this jihad was just defense of Muslim lands, as the title of one of his most popular books argues." and "the doctrines of Ibn Taymiyya or Muhammad ibn Abd al-Wahhab did not preach the global neojihadi" and "The Saudis who worked for the MoIA did not believe in this peculiar doctrine of global neojihadi."

[49] *See, e.g.,* Ex. 1 (Sageman Report) at 267-269 (stating, among other things, "The notion that the MoIA was supportive of AQ is based on ignorance of the subtleties of religious beliefs in Saudi Arabia. It lumps all Saudi Salafis in the same, mutually supportive, and extremist basket, which is apparently how some of the plaintiffs' experts contrast alleged Muslim 'moderates' against Saudi 'extremists.'").

[50] *See, e.g.,* Ex. 1 (Sageman Report) at 560-565 (Sageman rebuts Youssef's findings as to Al Gama'a in Southern California).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Mosque (which was succeeded in 1999 by the King Fahad Mosque) and there was a satellite cell in San Diego at the Islamic Center of San Diego Mosque (ICSD). [51]

Sageman's vain attempts to explain away this evidence demonstrate that he is unqualified to address it; indeed, he admitted in 2003 that he was "out of the loop" on Al Qaeda and the evolution of what he called the "Global Salafi Jihad" in the 1990s.[52] Alternatively, his opinions are unfounded and unreliable, since they run contrary not only to definitive U.S. intelligence findings, but also to several court decisions, including the ruling of the Second Circuit affirming Rahman's conviction and prison sentence for leading a conspiracy to carry out major terrorist attacks inside the U.S., including the February 1993 bombing of the World Trade Center, a precursor to the 9/11 Attacks.[53] Sageman offers the opinions that Al Gama'a "rejected violence in 1997" and that by 2000 Al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other."[54] The first opinion is directly contradicted by the fact that on October 8, 1997, the U.S. Department of State designated Al Gama'a as a Foreign Terrorist Organization (FTO) and Al Gama'a remained on the FTO list for the next 25 years.[55] Sageman himself describes what an FTO designation means: that members of the designated

---

[51] Ex. 7 (Youssef Report) at 19-22. The circumstances show that Saudi Arabia had to know about the existence of these extremist cells: the Kingdom funded, controlled, and operated the Ibn Taymiyyah Mosque through its Saudi government Imam Ibrahim al Hiber, who openly hosted and actively supported Rahman, and the Mosque's Chairman Khalil al Khalil, who led the Islamic Affairs department at the Saudi Embassy (later run by Musaed al Jarrah). *Id.* at 21. The Los Angeles Mosque and its governing Foundation (which also ran the King Fahad Mosque) were named for the medieval Sheikh Ibn Taymiyyah, infamous for his radical doctrine and fatwas to do violent jihad against the enemies of Islam. Sageman once wrote that Wahhab (the spiritual force behind Salafism—also known as Wahhabism—the dominant religious movement in the Kingdom) "based many of his Quranic interpretations on the fatwas of… ibn Taymiyya…. The question was put to ibn Taymiyya whether it was legitimate for Muslims to declare a jihad against other Muslims…. (he answered) [t]hey were not real Muslims, but apostates who should be punished with death according to the Sharia. It was the right, indeed the duty, of Muslims to wage jihad against them." Sageman, *Understanding Terror Networks* (2004), at 9. Sageman quotes Osama bin Laden citing an Ibn Taymiyya fatwa as basis for his 1996 declaration of war against the US. *Id.* at 19.

[52] Sageman statement to 9/11 Commission, July 9, 2003. Sageman worked as a medical doctor throughout the time during which the events most critical to this litigation occurred.

[53] *United States v. Rahman*, 189 F.3d 88, 107, 124 (2d Cir. 1999).

[54] Ex. 1 (Sageman Report) at 561.

[55] Al Gama'a was among the first groups listed by the State Department as an FTO. Al Gama'a was delisted as an FTO in May 2022. https://www.state.gov/revocation-of-five-foreign-terrorist-organizations-designations-and-the-delisting-of-six-deceased-individuals-as-specially-designated-global-terrorists/

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

group are "terrorists" in the eyes of the United States.[56] Sageman failed to address the FTO finding

and opines, without citing any authority, that Al Gama'a "rejected violence in 1997."[57]

Sageman's second opinion is directly contradicted by the considerable weight of U.S.

intelligence findings, most notably set forth in a December 1998 briefing to President Clinton, which

warned that Bin Laden and his allies were planning attacks including an aircraft hijacking to obtain

Rahman's release from prison.[58] A January 1999 CIA Report further concluded that Bin Laden was

using worldwide alliances with other Islamic extremist organizations, including Al Gama'a, to provide

the variety of support needed to carry out Al Qaeda's terror operations.[59]

Sageman also ignores evidence from the years leading up to the 9/11 Attacks that Rahman,

despite being imprisoned, continued to support terrorism in the U.S. and forge his alliance with Bin

Laden. Indeed, Rahman issued a fatwa from prison encouraging attacks against the U.S., made public

by Rahman's sons in a joint May 1998 press conference with Osama Bin Laden.[60] Two days after that

event, Bin Laden lauded Rahman as "one of the most prominent Islamic scholars whom God gave

the courage to speak."[61] Peter Bergen's history of Bin Laden cited by Sageman himself[62] and Youssef[63]

summarizes Rahman's ties to Al Qaeda and the 9/11 Attacks. Bergen's account directly contradicts

Sageman's opinions:

> Sheikh Rahman's fatwa to attack the U.S. economy and American aviation was an important
> factor in the 9/11 attacks. Al Qaeda's Egyptian leaders wanted to exact revenge on the United
> States for the imprisonment and "ill treatment" of their spiritual guide. At the same time Sheikh

---

[56] Ex. 1 (Sageman Report) at 117.

[57] *Id.* at 561.

[58] The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States. Norton, 2004, at 128-29.

[59] Ex.78 (CIA_0002-0008), CIA Report, *How Bin Laden Commands a Global Terrorist Network* at 3 (Jan. 27, 1999). The report described how Bin Ladin discussed his terror targets in meetings with "allied extremist groups," *id.* at CIA 0004; that Al Qaeda's "Military Committee," which was "responsible for implementing terrorist plans" had been chaired by a member or former member of Al Gama'a, *id.* at CIA 0005; and that Bin Laden had control over and was "increasingly" a "linchpin for the operations" of Al Gama'a "hardliners," *id.* at CIA 0003.

[60] Peter L. Bergen, *The Osama Bin Laden I Know: An Oral History of al Qaeda's Leader* (Free Press 2006), 204-5.

[61] https://www.meforum.org/435/usama-bin-ladin-american-soldiers-are-paper-tigers (last accessed May 11, 2023).

[62] Ex. 1 (Sageman Report) at 42.

[63] Ex. 7 (Youssef Report) at 24.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Rahman gave his followers his spiritual sanction for terrorist attacks. Sheikh Rahman's fatwas are the nearest equivalent that al Qaeda has to an ex cathedra statement by the Pope… Rahman was able for the first time in al Qaeda's history to rule that it was legally permissible, and even desirable, to carry out attacks against American planes and corporations, exactly the type of attacks that took place on 9/11.[64]

Sageman makes the incredible claim that at the times when Rahman made multiple visits to the Ibn Taymiyyah Mosque, including his highly publicized final visit in April 1993, he was a "legitimate Islamic scholar" and a mere "*political* advocate of violent jihad".[65] Sageman mentions Rahman's criminal conviction in passing[66] but fails to consider the evidence upon which that conviction was based, as set forth by the Second Circuit in its affirmance, that, *inter alia*, in January 1993 Rahman publicly announced his support of "violent jihad"; that Rahman sponsored the February 1993 bombing of the World Trade Center; and that Rahman led a group of co-conspirators planning a "Spring 1993 bombing campaign" throughout New York City.[67]

Before being retained by Saudi Arabia, Sageman himself made statements that he now contradicts in his report: he identified Rahman as a terrorist on the "Central Staff of al Qaeda" and described how Al Gama'a and Al Qaeda worked to pursue their shared goals in pursuit of global jihad and an Islamic caliphate.[68]

Sageman has no actual experience or expertise to provide opinions concerning the operations of terror groups in California prior to the 9/11 Attacks, and the opinions he offers are at odds with the studied findings of the U.S. government, authoritative scholarship in the area, and the evidence

---

[64] Bergen, *supra*, at 208.

[65] Ex. 1 (Sageman Report) at 563 (emphasis added).

[66] *Id.* at 564.

[67] *United States v. Rahman*, 189 F.3d 88, 107, 124 (2d Cir. 1999).

[68] Sageman, *Understanding Terror Networks* (2004), at 185. Sageman described Rahman and Bin Laden as sharing "a relationship of fellow travelers…who believe in similar ideology and goals but who do not belong to the same organization…" and that they were "not isolated" but brought together "a larger community of sympathizers that might feed the formal ranks of the organization." Sageman, *Leaderless Jihad* (2008), at 30.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

itself. His *ipse dixit* opinions merely reflect his own lack of knowledge of the facts.[69] As Sageman himself previously acknowledged, law enforcement personnel routinely have specialized knowledge that is unavailable to an academic researcher like Sageman.[70]

In contrast to Sageman's *ipse dixit*, Youssef offers insights drawn from his own extensive investigatory work in California, which led to his assignment as the FBI's nationwide coordinator on Al Gama'a.[71]

### D.   Law enforcement investigations, the FBI, and FBI operations

Sageman offers opinions regarding law enforcement investigations, the FBI and FBI operations[72] but has no relevant background, training, practical experience, or other specialized knowledge to offer such opinions.[73]

### E.   Communications analysis

---

[69] For example, Sageman states that: "I am skeptical that al Gama'a…was running operations in California;" "I am not aware of any Islamic terrorist being prosecuted in California;" and there is "no evidence" of "collaboration" between Al Gama'a and Al Qaeda "or even the presence of these organizations in Southern California." Ex. 1 (Sageman Report) at 563-4.

[70] Sageman wrote that:
> Although the government funds academics trained in social science methodology to analyze data, it does not share any information on terrorist operations with them. On the other hand, in-house government analysts, who have the access to the most classified information, lack the sophisticated methodological background to fully and accurately analyze their data… I concluded, drawing on the flaws of this situation to their extreme, that academics understand everything but know nothing, while government analysts know everything but understand nothing.

Sageman, *Misunderstanding Terrorism* (2017), at preface.

[71] Ex. 7 (Youssef Report) at 2. In 1993 Youssef recruited a source with direct access to Osama Bin Laden, who provided information that Rahman approved an attack on a Masonic Temple in Los Angeles and instructed his operatives to contact Bin Laden to obtain funding. *Id.* at 2, 22). The FBI's penetrative investigations of Al Gama'a in California formed part of the same complex case that led to the prosecutions of Rahman and others in this Court. The extremist activities of Al Gama'a and Al Qaeda in California in the 1990s were also the subject of a major, successful DOJ prosecution in Florida and the FBI's TERRSTOP investigation, spawning substantial FBI counterterrorism work that continued for over two decades. *United States v. Jayyousi*, 657 F.3d 1085, 1092-95 (11th Cir. 2011) (affirming conviction of Jayyousi and others for material support to Al Qaeda and Al Gama'a based on, *inter alia*, evidence of relevant meetings and events at the ICSD mosque in San Diego); FBI 011752-011767, at 11764; Ex. 7 (Youssef Report) at 22-23. The proof in that case included court-ordered electronic intercepts of a meeting in San Diego where individuals discussed providing support to groups planning a "slaughtering" and their plans to publish a booklet about the duty to conduct terrorism. *Id.* at 23, n.14.

[72] *See, e.g.*, Ex. 1(Sageman Report) at 525 ("This might be especially true if they were subject to an FBI investigation as such an investigation has the potential to turn people against the U.S. government." *See also id.* at 540 ("To open a counterterrorism FI on a person, the FBI must demonstrate a possible nexus to a foreign power.").

[73] Sageman engages in "whataboutism" to discredit *all* FBI investigative methodologies by discussing the 2001 anthrax attacks and goes on to say, with *no citation or support*, "I found that [FBI special agents and law enforcement officers] could not tell the difference between traditional Saudi Salafi preaching and neojihadi ideology." Ex. 1 (Sageman Report) at 19.

15

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman offers extensive communication analyses[74] but has no expertise, background, training, or specialized knowledge in that field. Indeed, Sageman could not identify a single case where he had ever used communications analysis,[75] and testified that his "opinions" rely largely on the work plaintiffs provided, not his own "expertise"[76] Accordingly, he should not be allowed to present ad hoc "analysis" as an expert for the first time in this litigation.

Sageman is unfamiliar with both the methodology and the terminology used by law enforcement to investigate communications among participants in complex crimes, including terrorist plots. Law enforcement professionals with the requisite expertise, notably including specialists in the Communications Analysis Unit of the FBI's Counterterrorism Division,[77] are experienced in handling and interpreting the available records of phone data; generating an analysis by applying uniform methodologies such as "call circles" and "call chaining"; and identifying patterns of activity, if any.[78] Not only has Sageman never performed any of this work, but he also repudiates the rubric that experts in this field routinely and successfully employ.[79] Sageman did not compile his own "matrix" by which to analyze the thousands of call records, nor did he use any other accepted methodology to analyze the phone records and consider their significance.[80]

Communications experts in law enforcement operations routinely carefully process and chart out all the evidence to determine whether they can discern a credible assessment of the identity of the

---

[74] *See id.* at 460-502 and 629-631.
[75] Ex. 4 (Sageman Dep.) at 208:12-15.
[76] Sageman admitted in his deposition that he studied the Plaintiffs' spreadsheets (which he referred to as "matrices") to form his "expert" opinion. Ex. 4 (Sageman Dep.) at 208:16 – 209:18.
[77] Plaintiffs' expert Youssef served for a decade as the Chief of the FBI's Communications Analysis Unit of the Counterterrorism Division, amassing extensive experience applying communications analysis to investigate cases in the U.S. and overseas. In the present case, Youssef carefully charted all the available call records and applied traditional law enforcement methodologies to analyze the calls and identify significant call patterns.
[78] Ex. 7 (Youssef Report) at 3-5, 14-15.
[79] "This is a normal pattern of calling when a colleague comes to town and local colleagues call him. There is no need to call it a special name like calling chain, which seem to assume that the callers know one another well. This is not necessary." Ex. 1 (Sageman Report) at 643.
[80] Ex. 4 (Sageman Dep.) at 209:4-14-210.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

callers, as well as the nature and purpose of the calls — evidence that is regularly admitted into evidence in criminal conspiracy trials. Sageman, by contrast, dissembles on the fly in a transparent effort to confuse the record concerning the call detail records, an improper exercise that is unhelpful to this Court's factual inquiry. For instance, Sageman repeats Bayoumi's testimony that "[a]nyone who has access to a telephone line can make a call,"[81] and it "could have been anybody calling" on the phone in Bayoumi's Mosque office[82]; and that Bayoumi's cell phone was "available to anyone who needed to make a phone call"[83]. But Sageman does not (and cannot) provide genuine expert analysis to evaluate Bayoumi's testimony based on the call detail records. Similarly, Sageman labels a cell phone number listed in Bayoumi's phone book as belonging to Thumairy as a "contested number" at which Thumairy "could sometimes be reached."[84] These statements are not the fruit of any specialized experience on Sageman's part, nor the product of any comparative analysis. They are, rather, a partisan attempt to manufacture "expert" support for the Saudi witnesses' unbelievable claims. He parrots Saudi talking points instead of using the basic investigation tools of a communications expert by reviewing the actual phone data and usage patterns.

Sageman opines that the Ramadan holiday is a "confounding variable" when considering call detail records[85], but the only "analysis" he performs is to show that call volume generally increases during the holiday.[86] He did not conduct an examination of the historical pattern of calls involving the Saudi government officials at issue in this case over both Ramadan and non-Ramadan periods. Sageman speculates that the January 5, 2000 calls among ███, Bayoumi, and Thumairy may have

---

[81] Ex. 1 (Sageman Report) at 461.
[82] *Id.* at 628.
[83] Ex. 1 (Sageman Report) at 299.
[84] Ex. 1 (Sageman Report) at 480. Sageman similarly falls back on layman's terms in opining that "the fact that two telephone lines were in contact does not necessarily mean that the calls can be attributed to their respective subscribers" Ex. 1 (Sageman Report) at 461 – particularly, it would seem, when the subscribers in question are Saudi government officials and their associates are providing support to the hijackers.
[85] Ex. 1 (Sageman Report) at 724-25.
[86] Ex. 1 (Sageman Report) at 463.

17

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

been a social exchange of "Ramadan wishes"[87] without placing those calls in context of all the other calls among the same individuals (ignoring, inter alia, the call that Thumairy placed to ███ at 1:59pm on January 15, 2000, a half hour after the hijackers arrived in Los Angeles) and the absence of other calls even during the Ramadan holiday. [88]

Sageman similarly describes as exchanges of "courtesy calls and Ramadan wishes"[89] the group of calls in late December 1999 involving Saudi officials Thumairy, Bayoumi, terrorist preacher Aulaqi, and senior Saudi Embassy official Khalid al-Sowailem. Yet again, Sageman is unqualified to do an expert analysis to review the entire historical pattern of calls among those same individuals. The FBI, however, did precisely such work and concluded, with the benefit of its law enforcement expertise, that "[a]nalysis of al-Bayoumi and al-Thumairy's call activity indicates that the assistance provided to the hijackers likely involved a network of people including al-Bayoumi, al-Thumairy, Anwar Aulaqi and an individual at the EKSA [Saudi Embassy] in Washington D.C."[90]

Another example is the series of phone calls by Bayoumi (again involving Thumairy and Aulaqi) on February 4, 2000. On that day, the hijackers were getting settled in San Diego after leaving Los Angeles and were staying with Bayoumi; As this Court already has recognized Bayoumi helped them open a bank account, co-signed their apartment lease as guarantor, and provided a certified check for their security deposit, all immediately upon their arrival in San Diego. Ramadan had ended more than three weeks earlier, so, no longer able to avail himself of his meretricious the holiday-call justification, now Sageman conjectures that "[t]he calls to Sheikh Anwar and then to Sheikh Fahad

---

[87] Ex. 1 (Sageman Report) at 450.
[88] Sageman states that the January 5 records "cannot be accurate" because the times of the calls among the men overlap. Ex. 1 (Sageman Report) at 449 n. 1780. Here again, Sageman exhibits his lack of expertise in these matters: he fails to consider that ███ and Thumairy spoke for several minutes first (███ called at 12:12:53 for 8 minutes to Thumairy's cell phone) and then conferenced in Bayoumi to join them (███ called at 12:17:32 for 2 minutes to Bayoumi's cell phone). Ex. 77 (EO 0609-UPDATED); Ex. 53 (FBI █████████████).
[89] Ex. 1 (Sageman Report) at 645.
[90] Ex. 96 (EO 000584).

18

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

may suggest that al-Bayoumi might have had a religious question."[91] ) Again, this is not expert work resulting from any call analysis conducted pursuant to an accepted methodology, but sheer (implausible) conjecture.

Sageman again fails the reliability test in his consideration of a distinct group of five calls by Bayoumi to MOIA propagator and advance team member Sudairy in late January and early February 2000 — when the hijackers were moving from Los Angeles to San Diego. In opining that these calls were not significant, Sageman states that "I strongly suspect" that Bayoumi's prior cell phone bills from before January 2000 "might include more calls to al-Sudairy, whom al-Bayoumi seemed to have kept in touch."[92] Sageman's unsupported suspicion, however, was contradicted by Bayoumi, who tried to deny calling Sudairy at all.[93]

Indeed, despite Sageman's unfounded speculation that Bayoumi and Sudairy "kept in touch," Bayoumi's next recorded call to MOIA propagator Sudairy was made on March 31, 2001, over a year later, when Sudairy was living in Columbia, Missouri with a key Al Qaeda operative. Sageman does not consider that call in his report, nor does he consider that at the time that Bayoumi called Sudairy, hijackers Hazmi and Hanjour were driving across the U.S. heartland. Sageman also took no account of the traffic ticket that Hazmi got the day after Bayoumi's call, on April 1, 2001, in Oklahoma driving eastbound on Interstate 40.[94] That location placed Hazmi and Hanjour on a route that would take them through Missouri, near to where Sudairy was located.[95] ) Sageman neglects his duty as an expert

---

[91] Ex. 1 (Sageman Report) at 482.
[92] Ex. 1 (Sageman Report) at 493.
[93] Ex. 14 (Bayoumi Dep.) at 585:21-4 – 586:1-2 (Bayoumi himself claimed that "[i]t could have been another person who called" Sudairy using Bayoumi's phone).
[94] Ex. 93 (FBI Hijackers' Timeline) at 131.
[95] Ex. 7 (Youssef Report) at 222.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

and fails to investigate the objective evidence about all the relevant events, whether they occurred in 2000 or in 2001.[96] Sageman's house of cards cannot withstand the weight of all the coincidences.

### F.    Arabic language

Sageman offers opinions regarding the Arabic language but has no specialized knowledge regarding Arabic. Sageman does not understand written or spoken Arabic, has no training, academic or practical experience,[97] and cannot offer expert opinions about the meaning of Arabic words translated by someone else.[98]

### IV.    THE COURT SHOULD PRECLUDE SAGEMAN'S OPINIONS BECAUSE THEY ARE UNRELIABLE

Sageman's opinions on the issues addressed below should be precluded as unreliable. Sageman did not conduct a genuine investigation or use commonly accepted law enforcement practices; acts merely as a mouthpiece for Saudi Arabia; and ignores the evidence of the longstanding Saudi government support network in Southern California for Sunni extremists, including Al Qaeda

### A.    Sageman's opinions about Saudi Arabia and its MOIA should be stricken as unreliable because they are not grounded in sufficient facts, lack intellectual rigor, do not account for alternative explanations, are premised on *ipse dixit*,

---

[96] Similarly, Sageman does not consider the June 14, 2001, phone call that ████ received from the Virginia phone of two men who provided substantial assistance to hijackers Hazmi and Hanjour after meeting them "by chance" at the Dar Al Hijrah Mosque in Virginia, where Anwar Aulaqi moved to be the Imam shortly after Hazmi left California. Ex. 60 (FBI 011756). Sageman claims that this "falls outside the relevant scope of this litigation" Ex. 1 (Sageman Report) at 709, the same defense the Kingdom has repeatedly deployed to avoid producing discovery.

[97] Ex. 4 (Sageman Dep.) at 58:20-59:2.

[98] See, e.g., Ex. 1 (Sageman Report) at 602 where Sageman claims the term "Sheikh" is used in Arabic as a greeting akin to the word "dear" (*see also, infra*, IV. G.) and Ex. 4 (Sageman Dep.) at 198:6-202:20, wherein he disagrees with the 9/11 Commission Reports conclusions based on "the totality of the record." In another example, Sageman offers his *ipse dixit* conjecture about a letter Omar al-Bayoumi wrote in Arabic to Saad al Habib in February 1999 regarding Sadhan and Sudairy. Ex. 1 (Sageman Report) at 621. Former FBI supervisory special agent Youssef, a native Arabic speaker, analyzed the Arabic words and determined that Bayoumi's testimony about the letter (claiming that it addressed a translating issue at the Mosque) made no sense, but rather that the letter contained a coded message for Habib to contact the two MOIA propagators for information about their recent visit to Southern California as a 9/11 advance team. Ex. 7 (Youssef Report) at 112-13. Sageman's opinion was based on his review of translations by others, including the "British translator" who made incomplete, quick, summary translations for the (British) Metropolitan Police Services (Ex. 1 (Sageman Report) at 621), rather than his own actual study of the Arabic document, which he could not understand. Sageman does not mention Bayoumi's reference in the letter to ████ role as extremist cell "Emir" or leader, and incorrectly concludes that the letter did not make an "urgent" request (as Youssef determined from the Arabic). Ex. 1 (Sageman Report at 621-622). In sum, Sageman cannot use his analysis of the Arabic words to offer opinions about Bayoumi's letter, particularly when those opinions are different from Bayoumi's own far-fetched testimony.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

**were concocted for the purpose of this litigation, and are not generally accepted in the relevant expert community.**

Sageman's opinions about the MOIA are factually unfounded and fall well short of the standards for proper expert testimony.[99] Sageman ignores evidence that contradicts his favored result, resulting in opinions contrary to the consensus and weight of studied assessments of U.S. law enforcement and intelligence agencies concerning KSA's support for Sunni extremism, including Al Qaeda; as well as KSA's own admissions concerning counterterrorism initiatives directed at the MOIA. Sageman's opinions are incompatible with his own prior statements and are starkly contradicted by the evidence concerning the ideological orientation and extremist activities of the very MOIA employees implicated in the hijackers' support network.

Sageman's opinions are contrary to the December 2004 Joint Assessment of the FBI and CIA, which presented the conclusions of U.S. intelligence that prior to 9/11 "official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations…, provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity."[100] The FBI-CIA Assessment also concluded that Saudi Arabia had provided "special consideration" to Al Qaeda, and that the Saudi government included members and sympathizers of the terror organization.[101] Over 15 years later, the FBI prepared a July 2021 Electronic Communication to provide summary and historical information from its 9/11 investigations for use by future FBI agents, focusing on the connections with Saudi Arabian

---

[99] Plaintiffs' jurisdictional discovery was strictly limited, and Saudi Arabia's experts should be precluded from offering opinions as to matters that were not the focus of the jurisdictional discovery the Court authorized. The Court previously found that Saudi Arabia raised no competent or relevant factual challenge to "Plaintiffs' well-pled allegations", ECF No. 3946 at 22-23, and authorized "limited and targeted jurisdictional discovery critical to answering" a specific issue the Court identified. *Id.* Plaintiffs remain entitled to have accepted as true all the well-pled allegations as to which there was no jurisdictional discovery, and no Saudi expert can be permitted to act as a trojan horse to challenge those facts. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (when "the defendant challenges the legal sufficiency of plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiffs."). Plaintiffs will address this point further in briefing the jurisdictional motions later in the year.
[100] Ex. 61 (EO 3414-3442, at 3416).
[101] *Id.*

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

government elements in the U.S. The FBI concluded that prior to the 9/11 Attacks a "Saudi (Wahhabi) / Salafi / militant network… was created, funded, directed and supported by the KSA [Saudi Arabia] and its affiliated organizations and diplomatic personnel within the U.S."[102]

Sageman also fails to address key findings of the FBI-CIA Joint Assessment based on evidence assembled by U.S. intelligence agencies regarding Saudi Arabia's control and supervision of the Al Haramain Islamic Foundation (Al Haramain), which "provided material support to the terrorist activities of al-Qa'ida around the world" and "aided the al-Qa'ida cells responsible for the 1998 US Embassy bombings."[103] U.S. intelligence determined that "[t]wo Saudi cabinet officials officially supervise [Al Haramain's] activities."[104] MOIA's Minister Shaikh Saleh al Shaikh was the Chairman of Al Haramain and acted as the "titular head and superintendent" of the organization.[105]

Saudi Arabia ultimately admitted in 2016 that, before 9/11, Al Haramain was "notoriously tied to Osama Bin Laden" and was "one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998."[106] Saudi Arabia's admission and the history of its role in Al Haramain are swept under the rug by Sageman.

Untenably, Sageman contends that Al Haramain "is too peripheral to the issues in this litigation to discuss it since al-Haramain was never implicated in the 9/11 attacks."[107] Sageman ignores

---

[102] Ex. 62 (EO EO 3478-3618) at 3555-3558.

[103] The U.S. Treasury Department formally designated the Al Haramain organization for its financial and material support for Al Qaeda and other terrorist and terrorist organizations. https://home.treasury.gov/news/press-releases/hp1043.

[104] *Id.*; Ex. 61 (EO 3414-3442, at 3435).

[105] Ex. 39 (Ash-Shaikh 478) at 2; Sageman did not address the false and self-serving testimony of Minister Shaikh that he had no relationship with Al Haramain. *See, e.g.,* Ex. 15 (Ash-Shaikh Dep.) at 137:14-144:21. Al Haramain was "part of the Saudi Joint Relief Committee, which is headed by the Saudi Minister of Interior, Prince Nayif bin Abdul-Aziz al-Sau'd, a member of the Saudi royal family and head of Mabahith." Ex. 61 (EO 3435). The Mabahith is the Saudi equivalent of the FBI. Al Haramain's website shows that another senior MOIA Deputy Minister served as an Al Haramain Board member. Ex. 38 (Ash-Shaikh 477) at 3-4 (Tawfiq al Sudairy).
U.S. intelligence determined that non-governmental organizations "receiving money from the GSA [Saudi Arabia] and supporting Islamic extremism pose a serious threat to US interests…" and that "[i]t is likely that the KSA [Saudi Arabia] ignored the organizations' activities because of their close association with the religious partners of the Al Sauds, the Al Shaykhs, who control the Ministry of Islamic Affairs…, and are committed to spreading Wahhabi Islam." Ex. 61 (EO 3414-3442, at EO 3418).

[106] Kingdom of Saudi Arabia and Counterterrorism, (Saudi government publication 2016) at 13, 86.

[107] Ex. 1 (Sageman Report) at 608.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

the evidence that MOIA's pre-9/11 leadership of Al Haramain established MOIA's direct ties to anti-U.S. extremism and support of Bin Laden and Al Qaeda, as well as the intimate connections between Al Haramain and what the FBI described as the "Southern California based network" of "Saudi Sunni extremists"[108] (including Bayoumi, Thumairy, and the visiting Saudi officials) who arranged and provided support for the hijackers).[109]

Sageman does not address the fact that beginning in 1996, President Clinton and his Administration repeatedly issued specific warnings to Saudi Arabia to stop empowering jihadists through the MOIA and Al Haramain. Nor does he address that Saudi Arabia rejected those warnings.[110]

In his report, Sageman does not acknowledge that Saudi Arabia refused to join with the U.S. to fight Al Qaeda terrorism until the Kingdom was itself attacked in May 2003.[111] Saudi Arabia admitted that it was not until long after the 9/11 Attacks that MOIA took action to curb the rampant extremists in its ranks by firing and suspending hundreds of Imams.[112] Sageman conceded the same point before he was retained by Saudi Arabia, writing in 2004 that:

> despite the fact that fifteen of nineteen perpetrators of the 9/11 operation were Saudi nationals, Saudi Arabia refused to acknowledge its citizens' involvement in the global Salafi jihad. The Saudis believed they were safe from terrorism on their own soil. They provided

---

[108] Ex. 63 (EO 0001-0011), at 0004.

[109] Ex. 7 (Youssef Report) at 91-100.

[110] Ex. 13 (Simon Report) at 4-5.

[111] Ex. 61 (EO 3414-3442), at 3416.

[112] The Saudi government reported that it instituted a program after 9/11 resulting in the expulsion and disciplining of numerous MOIA officials:

> Imams who preach intolerance or hate toward others are dismissed, punished, or retrained. On 27 May 2003, the Ministry of Islamic Affairs fired 353 Imams, 'khateeb,' and muezzin and placed on suspension 1,367 others, who were ordered to join a multi-year enlightenment program devoted to educating imams and monitoring religious preaching.

Kingdom of Saudi Arabia and Counterterrorism (Saudi government publication, 2016), at 32. Sageman says that the Imams fired by MOIA were only "domestic clerics" from inside Saudi Arabia but has no basis for his claim that the Imams were "private preachers." Ex. 1 (Sageman Report) at 512-513. The insinuation of Sageman's comments is that MOIA's international operations were unaffected by the clampdown, but he didn't investigate the matter. The facts show that Thumairy was barred from entering the U.S. in May 2003; MOIA's Embassy chief Sowailem left the U.S. and returned to Saudi Arabia in the summer of 2003; the propagators working under Thumairy who were associated with terror groups AIAI (Omar Abdi Mohamed) and HAMAS (███████ were let go in 2003; and MOIA shut down its entire U.S. operations in September 2003, all consistent with the Saudi government 2003 policy change to rein in extremism.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

refuge for fleeing mujahedin, allowed business contributions to the jihad, and tolerated violent sermons from Salafi preachers in support of the jihad and condemning the West. These conditions helped maintain a reservoir of potential future mujahedin. The May 12, 2003, Riyadh bombing shattered this complacency, and the kingdom started to crack down on locally bred terrorism and began an internal discussion about the contribution of its culture and finances to terrorism.[113]

Sageman further wrote that "[l]ittle is known about… the Saudis involved in the September 11 atrocities because the Saudi government has not allowed independent investigation on its soil."[114] But now, Sageman ignores that the Saudi government never investigated the conduct of its officials who provided support to the 9/11 hijackers, and Saudi Arabia is a completely closed society where information and ideas are carefully monitored and controlled by authorities.[115]

Sageman tries to bolster his "quietist" theme by citing prominent Saudi government religious officials Sheikh bin Baz and Shaykh bin al-Uthaymeen aka Uthaymin, overlooking that both men were prominent Al Haramain supporters.[116] Sageman says Uthaymeen was a "well-known leader of the quietist faction,"[117] but there is no citation for this claim and Sageman did not properly investigate the facts. Uthaymeen preached that non-Muslims should be put to death in a 1995 sermon that was found in the library of the King Fahd Mosque, which Saudi Arabia controlled and operated.[118]

Saudi Arabia (with its supreme access to, and control over the Saudi government's officials) could easily have produced an expert who had intimate knowledge of its own ministries and

---

[113] Sageman, *Understanding Terror Networks* (2004), at 53.

[114] *Id.* at 66.

[115] The State Department prepared a 2022 Country Report on Human Rights in Saudi Arabia which details the serious state-run monitoring and restrictions on all forms of information. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

[116] Ex. 39(Ash-Shaikh 478) at 4-5.

[117] Ex. 1 (Sageman Report) at 543. Sageman is transparently trying to exploit the fact that Plaintiffs were not afforded discovery on these issues, in an attempt to offer self-serving opinions that are not subject to examination based on evidence in the custody of the Kingdom. For instance, Plaintiffs have not been afforded discovery as to the Kingdom's post-9/11 counterterrorism efforts directed at extremism in the MOIA and Saudi government religious components. That is one of the every reasons such testimony cannot be credited over Plaintiffs' facts and evidence on such issues.

[118] Ex. 8 (Dr. Nakhleh Report) at 69-70. The FBI reported that 9/11 hijacker Nawaf al Hazmi was a follower of Uthaymeen. Ex. 64 (EO 1268-1277), at 1277.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

government and who would be qualified to provide opinions. Instead, it chose Sageman, who has no

specialized knowledge on the matter.

**B.    Sageman's opinions about Saudi Arabia's day-to-day oversight and control over Thumairy and the King Fahad Mosque should be stricken as unreliable because they are not grounded in sufficient facts, lack intellectual rigor, do not account for alternative explanations, are premised on ipse dixit, were concocted for the purpose of this litigation, and are based on his deficient methodology of cherry-picking evidence.**

Sageman concludes that Thumairy did not actually supervise anyone, claiming that he "was

just a MoIA preacher and nothing more"[119], and that Thumairy's supervisor at the Embassy Sowailem

was a mere "administrative conduit."[120] Yet the Kingdom's own documents show that ███████████

███████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████[121] Sageman adopts

Thumairy's self-serving testimony that his supervisory role was "only a suggestion"[122] but does not

consider the letter that Sowailem sent to MOIA propagators in California confirming Thumairy's

appointment and directing them to "cooperate with" and report to Thumairy.[123] Sageman ignores

other facts that contradict his opinion, such as █████████████████████████████████████

███████████████[124] and the FBI's findings that Thumairy oversaw a network of MOIA

propagators in California.[125]

Sageman made no effort to investigate the Saudi government propagators under Thumairy or

their work under Thumairy's supervision. Nor does Sageman address the substantial funds that

---

[119] Ex. 1 (Sageman Report) at 329.
[120] *Id.* at 164.
[121] Ex. 32(Al-Shahri 404).
[122] Ex. 1 (Sageman Report) at 583.
[123] Ex.33 (Al-Qattan 411). That letter was never produced by Saudi Arabia (but should have been) and was only obtained because the FBI seized the letter in a raid after 9/11 on the home of Saudi MOIA propagator Omar Abdi Mohamed.
[124] *E.g* ███████████████████.
[125] Plaintiffs have identified at least six MOIA propagators working under Thumairy in Southern California prior to the 9/11 Attacks, including: Mohamed al Muhanna and ████████████ in Los Angeles; and Omar Abdi Mohamed, ███████, Abdimagid M. Omar, and ████████ in San Diego. Ex. 65 (EO 0692-0695); Ex. 62 (EO 3478-3618), at 3555-58; *see also* Ex. 63 (EO 0001-0011), at 0004 (describing Thumairy's "network" in California).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Thumairy oversaw and regularly distributed to Saudi government propagators and other individuals and entities in the course of his job.[126] He ignores how Thumairy's duties as a Mosque Imam were part of a Saudi government operation that was closely monitored by Saudi Arabia. Sageman does not mention that in 1997, seven Saudi government officials were named as Directors of the Board overseeing the Ibn Taymiyyah Mosque and (as of 1999) the King Fahad Mosque, including Thumairy's MOIA supervisor Sowailem; the head of the Islamic Affairs department in Washington, run by Musaed al Jarrah; and Consul General Mohamed al Salloum.[127] Sageman is not a communications expert. Sageman does not mention how Khalil, another Saudi government official and longstanding Chairman of the Mosque's Board, communicated with MOIA's Deputy Minister Abdelaziz Ammar regarding Thumairy and gave instructions to Thumairy about the Mosque's operation; or that Shuaib, a Saudi government propagator and another Mosque Director, reported directly to Thumairy.[128]

Sageman fails to investigate the discrepancies in Thumairy's testimony. When questioned by the 9/11 Commission and the FBI in 2003 and 2004 about his work reporting chain, Thumairy did not mention Sowailem (despite being asked about his contacts at the Saudi Embassy) but stated that he reported to the Saudi Consul General and worked with other Saudi Consulate officials, including ███████. The Consulate had an Islamic Affairs department staffed by Mana, ████████████ ████████████████████████████████████████████[129] At his 2021 deposition, however,

---

[126] These funds include the $369,000 that Thumairy distributed in 1999-2001 to various recipients (including himself) and at least one other MOIA propagator who worked for him in California, (Ex. 31 (Al-Shahri. 403)), and ██████████ █████████. Plaintiffs sought Thumairy's banking records that were seized by the FBI. The DOJ stated that Thumairy's banking records were destroyed by the FBI in 2005. Plaintiffs are still seeking written confirmation of the destruction of those records and communications with Saudi Arabia about the destruction of those records.

[127] Ex. 97 (Kaldirim 179). Two additional Saudi government officials were also on the Board: the Board's Director Khalil, and Tajuddin Shuaib, who worked as a MOIA propagator under Thumairy. *Id.*

[128] Ex. 17(Khalil Dep.) at 78:6-24,85:8-86:12; EO 3478-3618, at 3555-58; ██████████████████); Ex. 49 (Al-Qattan 411).

[129] Ex. 18 (Mana Dep.) at 253:25-254:18; Ex. 18 (Awad Dep.) at 75:12-77:16.

26

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Thumairy testified he reported only to Sowailem (who was now dead and could not be questioned) and did not know Mana or anyone at the Saudi Consulate except the Consul General.[130]

9/11 Commission Staff Member Dietrich Snell testified about the Commission's findings, including that Thumairy was "deceptive" during his interview because "[h]is answers were either inconsistent or, at times, in direct conflict with information we have from other sources."[131] Sageman completely sidesteps the issue by speculating that Thumairy was in "physical discomfort" during that interview "probably because al-Thumairy was concerned about the issue of his diplomatic status."[132] ( But no evidence supports Sageman's claim, and Sageman never met or examined Thumairy. Sageman has no expert basis on which to recast the evidence to excuse Thumairy. Experts may not engage in such conjecture and mindreading.[133]

Sageman also improperly presents his *ipse dixit* claims that Jarrah had no role regarding Thumairy.[134] His opinion, however, contradicts FBI-CIA findings[135] as well as █████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████.[136]

Finally, Sageman does not address the key fact that ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.[137] Sageman failed to

---

[130] After the deposition, the EO production revealed that in 2003, after he was back in Saudi Arabia, Thumairy pulled strings with the Saudi government to keep ████████████████████ at the Consulate. Ex. 60 (FBI ████████).

[131] Ex. 25 (*See* Exhibit 6 of Snell Dec'l) at 2-3.

[132] Ex. 1 (Sageman Report) at 316.

[133] *Major League Baseball Props.*, 542 F.3d at 311 (experts may not engage in speculation and conjecture); *Marvel Characters*, 726 F.3d at 135–36 (state of mind testimony is outside an expert's purview).

[134] Sageman claims that "Jarrah was just the voice on the telephone dealing with his [Thumairy's] visas" Ex. 1 (Sageman Report) at 490, 584, 585.

[135] The FBI-CIA Assessment concluded that Al Jarrah's "responsibilities [were] to manage and control all assignments of Saudi Imams in the United States," and that Jarrah distributed funds to individuals who "have ties to terrorism," Ex. 61 (EO 3414-3442), at 3431.

[136] ████████████████████████.

[137] Ex. 9 (Dunham Report) at 13-19, 23-24. Nor did Sageman address the fact that ████████████████████ ████████████████████████████████████████████████████████████████████████████████

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

demonstrate the "intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152, by not conducting the basic inquiries routinely followed by experts in law enforcement or terrorism.

Particularly when viewed collectively, this overt cherry-picking of the evidentiary record, and pattern of failing to investigate or acknowledge myriad evidence in conflict with his preordained opinions, confirms that Sageman's opinions are unreliable.

**C.    Sageman's opinion that there was no Sunni extremist cell at the King Fahad Mosque should be stricken as reliable because it is not grounded in sufficient facts, lacks intellectual rigor, does not account for alternative explanations, is premised on ipse dixit, was concocted for the purpose of this litigation, is not generally accepted in the relevant expert community, and is based on his deficient methodology of cherry-picking evidence.**

Sageman systematically ignores or distorts the evidence that Thumairy was a "hard core extremist" who took the helm of the existing Los Angeles Sunni extremist cell under the supervision of Saudi Arabia officials in order to reach his conclusion that there was no Sunni extremist cell at the King Fahad Mosque led by Thumairy.

Sageman completely discounts the testimony of Usman Madha, an independent witness who was a manager at the King Fahad Mosque and daily Mosque attendee, that Thumairy was the leader of a group of extremists at the Mosque (that included Thumairy's MOIA assistant Mohamed al Muhanna and the Saudi Consulate's Islamic Affairs employee Mana) that held regular private meetings and espoused radical, anti-U.S. views.[138] Sageman ignores the fact that Thumairy's group was a

███████████████████████████████████████████████

---

███████████████████████████████████████████████. Any non-diplomat working for a foreign country inside the U.S. was required to file a notification with the Attorney General. 18 U.S.C. § 951.

[138] Ex. 26 (Madha Dec'l at ¶¶ 16, 19-29. Sageman discounts Madha's declaration as "plaintiffs' lawyers' declaration drafted for Madha" but Madha, represented by his own counsel, swore to the declaration and confirmed at his deposition that the declaration was his own.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

████.[139] Sageman claims that Madha's testimony can be disregarded because Madha did not speak Arabic or participate in the meetings of Thumairy's group[140] yet Sageman ignores that Madha frequently spoke to Thumairy and Mana in English;[141] regularly observed firsthand the activities and behavior of Thumairy's group as they met around the Mosque, including in the library; found jihadist materials in a Mosque office that he believed belonged to Thumairy;[142] and personally handled the serious disturbance that occurred after Thumairy's assistant Muhanna, together with other members of Thumairy's group (one of whom was wearing Osama Bin Laden's unique headdress), began a protest at the Mosque on the Friday after the 9/11 Attacks *to express their support for the 9/11 hijackers*.[143] Nor does Sageman address the Saudi Consulate meeting that Madha attended where Consul General Mohamed al Salloum ratified Muhanna's conduct by claiming that he "did not believe that Mr. Al Muhanna had done anything wrong" and that Muhanna should be allowed to return to the Mosque despite his open support for the 9/11 Attacks.[144] Sageman looks the other way at facts which show the Saudi government's control and approval of the extremist activities at the Mosque led by Thumairy and that undermine his opinions. Most critically, he ignores this evidence precisely because it is inconvenient to his preferred and preordained opinions.

---

[139] ████████████████████████████████████████████████████████████████████████ in the group led by Thumairy that Madha later observed at the King Fahad Mosque. Ex. 26 (Madha Dec'l) at ¶ 19.

[140] Ex. 1 (Sageman Report) at 139, 573.

[141] For example, Sageman overlooks that Madha spoke regularly to Mana and observed that Mana had "a fierce hatred of non-Muslims and held anti-America beliefs." Ex. 26 (Madha Dec'l) at ¶ 20.

[142] Ex. 26 (Madha Dec'l) at ¶¶ 16; Ex. 27 (Madha Dep.) at 79. Sageman ignores the related, corroborating fact that in 2003, after being denied entry to the U.S. and returning to Saudi Arabia, Thumairy together with Muhanna shipped 2000 boxes of extremist material to ████ at the Saudi Consulate. Ex. 66 (EO 3470). The FBI further reported that in 2004, when the Consulate wanted to fire ████ for storage and distribution of the material, Thumairy and Muhanna "used their influence with the Saudi Government to keep ████ in place…." Ex. 60 (FBI ████████████████████ Sageman says that the allegation is "unlikely" because "neither Thumairy nor Muhanna were still in the United States…." Ex. 1 (Sageman Report) at 371 but fails to recognize the significant facts that even after the 9/11 Attacks and while employed by Saudi Arabia that Thumairy, Muhanna, and ████ continued to promote extremism.

[143] The protest occurred on Friday, September 14, 2001, the same day that President George W. Bush proclaimed as a National Day of Prayer and Remembrance for the Victims of the Terrorist Attacks. https://georgewbush-whitehouse.archives.gov/news/releases/2001/09/20010913-7.html

[144] Ex. 26 (Madha Dec'l) at ¶29.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman ignored that Saudi government official, and Mosque Chairman Khalil confirmed Madha's account that, before the 9/11 Attacks, an extremist group held meetings in the Mosque's library.[145]

Sageman does, however, cite to Khalil's testimony to claim repeatedly—without investigating the facts—that the Culver City police were called before the 9/11 Attacks to remove the extremists from the Mosque.[146] Khalil stated that the police were contacted on August 12, 2001, but did not make the call himself and could not confirm when the call occurred.[147] Khalil did remember the name of one of the extremists that was involved: "Abu Saliman" aka Khalid Cherif.[148] Madha identified Cherif as a member of Thumairy's extremist group who participated in the protest in support of the 9/11 hijackers and who was expelled from the Mosque *after* 9/11.[149] Sageman did not consider Madha's testimony that he was personally responsible for contacting the police and that he did so days *after* the 9/11 Attacks because of the disturbance involving Thumairy's extremist group.[150]

Sageman does not mention Khalid Cherif in his report. Nor does he attempt to explain why Thumairy denied knowing Cherif—███████████████████████████████████████ ████████████████[151] Thumairy had every reason to try to deny a connection with a member of

---

[145] Ex. 16 (Khalil Dep.) 56:6-58:7; Ex. 26 (Madha Dec'l) at ¶18 ("Al Thumairy often held meetings with his group in the library").

[146] Ex. 1 (Sageman Report) at 573: "since the middle of the 1990s, he [Khalil] and Imam Shuaib kept extremists out of the King Fahad Mosque," citing Ex. 16 (Khalil Dep.) at 56-60; and Ex. 1 (Sageman Report) at 653: "As Dr. al-Khalil testified, there were some extremists who came and tried to influence the mosque, but they were expelled, and Sheikh Shuaib even called the Culver City police on one of them…."

[147] Ex. 16 (Khalil Dep.) at 60:22-61:9.

[148] *Id.* at. 61:10-15; Ex. 26 (Madha Dec'l) at ¶ 19 (confirming that Khaled Al Cherif was also known as Khaled Abu Suleiman)███████████████████████████████████.

[149] Ex. 26 (Madha Dec'l) at ¶26-28.████████████████████████████████████

[150] Ex. 26 (Madha Dec'l) at ¶28.

[151] Another reason why Thumairy should have remembered Cherif was that ████████████████████ ████████████████████████████████████████.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

his extremist group that led the Mosque protest. Instead of grappling with Thumairy's implausible denials, Sageman simply ignores the evidence.[152]

Sageman does not mention the findings of U.S. law enforcement based on their investigations that Thumairy was a "hard core extremist." EO 0004.[153] Sageman repeatedly ignores or discounts the evidence of the extremist cell at the Mosque led by Thumairy as well as Thumairy's direct links with Sunni extremist groups including Al Qaeda and Al Gama'a. For example, Sageman ignores eyewitness and other proof that Thumairy hosted and held private meetings with a radical religious figure from Yemen associated with Al Qaeda, Shaikh Muqbil al Wadi, in 2000 at the King Fahad Mosque.[154]

Sageman admits that the FBI's information about the repeated contacts of Thumairy with individuals at a company called ██████████ (who provided support for major terror operations involving Al Qaeda and Al Gama'a) "seems alarming,"[155] yet Sageman concludes that it is of no concern because he did "[a] check" (presumably an internet search) to determine that ████ ████ was "still in business."[156]. Sageman shows no understanding of how the FBI's counterterrorism efforts operate in the real world. Sageman dismisses Thumairy's involvement with Ghanem under the guise of the "Small World phenomenon"[157] — ████████████████████████████████████

████████████████████████████████████████████████████████

---

[152] Sageman also ignores Khalil's testimony that in August 2001, Thumairy hosted three Saudi extremists at the Mosque, one of whom was a Saudi MOIA official. Khalil testified that he had dinner with Thumairy and the three men, and that he instructed Thumairy on August 19, 2001, not to host any more Saudis at the Mosque without his express permission. Ex. 16 (Khalil Dep.) at 78:2-86:12. Sageman also tries to explain Khalil's testimony that Thumairy was a student and not the Imam of the Mosque but ignores the evidence that Thumairy was the Mosque's Imam and leader, including Khalil's own admission to the 9/11 Commission. *See* Ex. 26 (Exhibit 5 of Snell Dec'l) at 6.

[153] Ex. 63 (EO 0004). Sageman states that Thumairy was denied entry to the U.S. because of a general visa issue Ex. 1 at 309-310, but Sageman ignores that Thumairy "was refused entry, based on a determination by the State Department that he might be connected with terrorist activity." 9/11 Commission Report at 217.

[154] Ex. 20 (Alzamari Dep.) at 125:23-126:14, 126:23-127:5.

[155] Ex. 60 FBI ██████████ ) at ████████. One terror plot cited by the FBI was the thwarted "Millenium" bombing in Los Angeles.

[156] Ex. 1 (Sageman Report) at 451.

[157] Ex. 1 (Sageman Report) at 587.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

██████████████████[158]██████████████████████████████████████████

██████████████████;[159] and Madha identified Ghanem as a member of Thumairy's extremist

group.[160]

     Displaying his lack of experience in criminal investigations, Sageman also ignores that the

Saudi government propagators supervised by Thumairy had direct ties to Al Qaeda and other terror

organizations.[161] Muhanna actively expressed support and praise for the 9/11 Attacks. Sageman makes

no mention of Omar Abdi Mohamed, a propagator working for Thumairy in San Diego, who in 2000

was an active leader of a Somali terror group, AIAI, that was "closely associated" with Al Qaeda.[162]

Nor does Sageman mention ██████████████ another propagator working for Thumairy in San Diego

who received at least $66,000 from Thumairy, and who was identified by the FBI as providing

fundraising support for Islamic extremist groups, including the terror group HAMAS and its

associated organization, the Holy Land Foundation, and as a leader of Muslim Brotherhood cells

inside the U.S.[163]

     Sageman belittles Thumairy's August 1999 call to the Saudi home of three men linked to terror

attacks (including the beheading of a U.S. contractor)[164] as "just a call without more information."[165]He

---

[158] Ex. 7 (Youssef Report) at ████.

[159] Ex. 60 (FBI ██████████████████.

[160] Ex. 27 (Madha Dec'l) at ¶ 19.

[161] Sageman also states that he found "no evidence" to support the FBI's finding that Thumairy operated a bookstore in Culver City that was used to support Saudi propagators in California. Ex. 1 (Sageman Report) at 329. Yet Madha testified that Thumairy operated a bookstore a block away from the Mosque for at least one year. Ex. 27 (Madha Dec'l) at ¶23.

[162] Sageman fails to address the FBI documents that identify Saudi propagator Omar Abdi Mohamed as an Al Qaeda member. Ex. 67 (EO 0343-0352), at 345. Nor does Sageman consider that while he was working for Thumairy, Mohamed received over $350,000 from organizations associated with Al Qaeda, the Global Relief Foundation and Al Haramain, through a California charity that Mohamed established, the Western Somalia Relief Agency; and that Mohamed laundered the funds through the charity via a "hawala" transfer agent used by Al Qaeda. *United States v Mohamed*, 203 Fed. Appx. 879, 880 (9th Cir. 2006) ("Mohamed had received money from organizations that would later be designated Specially Designated Global Terrorists and…this money's destination was unknown"; "he had undisclosed employment with the government of Saudi Arabia"; and "he had extensive foreign travel despite no apparent income to support it.").

[163] Ex. 68 (EO 0228-0235), at 0229; Ex. 69 (EO 3461-3464), at 3463; and Ex. 62 (EO 3478-3618,) at 3555-58.

[164] Ex. 60 (FBI 011752-011767), at 11762.

[165] Ex. 1 (Sageman Report) at 450.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

looks at the call in isolation and fails to consider it in the context of Thumairy's other known extremist contacts and associations, which demonstrate its significance.

Instead of properly investigating the facts, Sageman says that Thumairy was not an extremist by citing carefully selected statements of other members of Thumairy's extremist group and Saudi government officials. For example, Sageman cites the *redacted* statement of a mosque employee who describes Thumairy as a "quiet" man);[166] the *unredacted* version of the same document, however, shows that the interviewee is █████████, a member of Thumairy's extremist group.[167] Sageman also relies on █████, another member of Thumairy's group, to describe Thumairy as "quiet and moderate"[168], and Saudi official Khalil to offer that Thumairy was "regular."[169] Sageman claims that "there is no evidence that Sheikh Fahad was ever expelled from the King Fahad Mosque"[170] yet offers no explanation for the evidence that Thumairy never returned to the King Fahad Mosque after the 9/11 Attacks.[171]

Sageman repeatedly claims that that ████████████████████████████████████

 █████████████████████████[172] but he did not scrutinize that statement. If he had, he would have

---

[166] Ex. 1 (Sageman Report) at 138, n.512.

[167] Ex. 70 (EO 2722-2723) at 2722. Ex. 26 (Madha Dec'l) at ¶¶ 19, 22. Sageman also selectively overlooks that MOIA propagator █████ told the FBI that █████ would know about Thumairy and the hijackers if anyone would, and that █████ remained in touch with Thumairy in Saudi Arabia. Ex. 71 (EO 2687-2690), at 2687; and Ex. 72 (EO 2691-2692), at 2691.

[168] Ex. 1 (Sageman Report) at 138.

[169] Ex. 1 (Sageman Report) at 330. Similarly, Sageman selectively quotes one section of a 2004 FBI report that Thumairy "was not considered to be radical or extremist" while ignoring other parts of the same report which state that Thumairy was "expelled" from the King Fahad Mosque and "joined with some extremists" to form another Mosque in Los Angeles where Thumairy "promulgated Islamic extremist views to the followers." Ex. 73 (EO 0656-0664), at 0659-0660. The FBI report cited that Thumairy "had contact" with Omar Abdi Mohamed, the leader of the AIAI group tied to Al Qaeda but did not mention that Thumairy was Mohamed's direct supervisor.

[170] Ex. 1 (Sageman Report) at 310.

[171] 9/11 Commission Report at 217 (Thumairy "apparently lost his position at the King Fahd mosque"). Sageman relies on Khalil's testimony that Thumairy was not expelled, Ex. 1 (Sageman Report) at 310, but fails to consider Khalil's admission that the last time he saw Thumairy in Los Angeles was before the 9/11 Attacks. Ex. 16 (Khalil Dep.) at 68:22-69:4. Sageman claims that Madha testified that Thumairy was not expelled from the Mosque but that is misleading; Madha said had no personal knowledge and "did not know what took place behind my back." Ex. 19 (Madha Dep.) at 77:19-21,79. All Madha knew was that Thumairy made a "sudden and unexpected" departure from the Mosque shortly before the 9/11 Attacks and was never seen there again. Ex. 26 (Madha Dec'l) at ¶ 24-25; Ex. 19 (Madha Dep.) at 78:3-10.

[172] Ex. 1 (Sageman Report) at 332.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders



learned that there is no proof that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sageman makes no effort to explore the reasons why ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The FBI-CIA

assessment, however, points to the complicity of high-level Saudi government officials, who shared

Thumairy's fervent anti-U.S. and anti-Semitic views, in protecting Thumairy and other Saudi

officials.[174]

### D.   Sageman does not properly investigate the evidence that Bayoumi worked for Saudi Arabia to support Saudi extremism in San Diego and reaches unreliable conclusions.

Sageman adopts as his opinion Saudi Arabia's litigation stance that Bayoumi was a "full-time

student" Ex. 1 (Sageman Report) at 145, 283) (in conflict with the FBI's contrary finding) and.

Sageman does not consider the fact that Bayoumi did not earn a single course credit after 1997.[175]

Sageman also turned a blind eye to Bayoumi's unusual pattern of fraudulent representations about his

educational status and affiliations.[176]

---

[173] Ex. 15 (Ash-Shaikh Dep.) at 212:8-214:7; Ex. 21 (Thumairy Dep.) at 20:5-17; Ex. 22 (Qattan Dep.) at 225:8-227:10; Ex. 23 (Shahri Dep.) at 98:1-5, 112:11-113:20; Ex. 16 (Khalil Dep.) at 69:5-72:5.

[174] The FBI-CIA assessed that Saudi Arabia's lead investigatory official, the Saudi Minister of Interior responsible for the Mabahith (akin to the FBI) "maintained for months after 11 September 2001 that no Saudis or Arabs had been involved in the [9/11] attacks, but rather that the attacks were plots by the CIA and Israel's Mossad." Ex. 61 (EO 3414-3442), at 3423, 3435. The FBI-CIA found that the same Saudi Minister of Interior, together with MOIA's Minister, administered the Al Haramain organization that provided material support to Al Qaeda.

[175] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nor does Sageman address the fact that Bayoumi's student visa required him to be a full-time student. Sageman claims that Bayoumi attended classes at Keller School of Management in 1998-1999, but Bayoumi never sat for exams or received any credit there. Ex. 743. Sageman misleadingly states that "[f]rom May 1999 to March 2000, he [Bayoumi]… took courses at the George Washington University…in Washington, D.C." (145) when the "courses" consisted of a 3-4 day continuing education programs held in Washington in June 1999 (during which time Bayoumi went to the Saudi Embassy to meet MOIA's Sowailem) and on two another occasions in May 1999 and March 2000 in Bayoumi's U.S. base of San Diego. Ex. 98 (GWU Registrar Dec'l) at ¶ 6-8; Ex. 46 (KSA 0734-0737).

[176] Sageman admitted that he was "suspicious" that Bayoumi had forged a May 2000 "letter of acceptance" for a Ph.D. program on George Washington University stationery but did nothing to investigate the facts because in his view it was

34

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman similarly refuses to investigate the evidence that Bayoumi was at work in San Diego as an undisclosed agent of Saudi Arabia. He does not account for the fact that in April 1999 (shortly after the hijackers obtained their visas to travel to Southern California), Saudi Arabia's contractor Dallah Avco objected to keeping Bayoumi on its payroll, but Saudi Arabia ordered Dallah to continue to pay him salary and benefits so that Bayoumi could "complete the task" assigned to him in the U.S. by the Kingdom.[177] Nor does Sageman mention the substantial additional money ($90,000 per year in 1996) Bayoumi was paid by another Saudi government contractor, Ercan, and its principal Magdi Hanna.

Sageman also discounts Bayoumi's substantial interactions with the Saudi Embassy and Consulate, including MOIA's Director Sowailem's admission to the FBI that he met and had regular phone calls with Bayoumi. Sageman simply repeats Sowailem's explanation that he spoke to Bayoumi "about his education"[178] but does not examine why such a senior MOIA official would have regular discussions with Bayoumi about "his education." Sageman simply discards the facts showing that Bayoumi worked with Consulate officials as well as ███████ admission to law enforcement agents that Bayoumi held a "special status" at the Consulate.[179] While Sageman claims that he saw Bayoumi's file of videotapes recovered by the Metropolitan Police Service (MPS), he did not study them with a

---

"not really all that relevant." Ex. 4 (Sageman Dep.) at 358-367; Ex. 99 (Anqari Ex. 384); Ex. 100 (Bayoumi Ex. 711). Sageman also failed to address the numerous other false statements made by or on behalf of Bayoumi regarding his status as a student, including: his fabricated student visa applications, Ex. 102 (Bayoumi Ex. 680); the Saudi Embassy's false representations about a "scholarship" awarded to Bayoumi, Ex. 82 (MPS 732-449); and ████████████ ████████████████████████████████████████████████ USIU production at 54-55; ████████████████████████. Sageman further ignores the fact that the actual school credits that Bayoumi did receive in 1997 are likely a fraud too, as there is evidence that Bayoumi ███████████████████ ██████████████████████.

[177] ████████████████████████████.

[178] Ex. 1 (Sageman Report) at 363.

[179] Ex. 27 (Vasquez Dec'l) at ¶20; Ex. 28 (Gonzalez Dec'l) at ¶20. Sageman's bias is revealed in his suggestion that two former law enforcement members, an FBI Special Agent and New York City detective and member of the Joint Terrorism Task Force, made up what ██████ told them about Bayoumi. Ex. 1 (Sageman Report) at 600(Sageman says that ██████ "version was far more consistent with the rest of the discovery material than the allegations of the two Operation Encore investigators.").

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

translator, which would have been an essential step for him to comprehend that evidence, given that the vast majority of the dialogue is in Arabic. Nor is it apparent that Sageman made any effort to investigate and identify the individuals depicted on Bayoumi's videotapes or photographs.

Sageman does not consider that within days of the 1998 U.S. Embassy bombings, carried out by Al Qaeda with the critical assistance of the MOIA-led Al Haramain organization, Bayoumi met with two high level Al Haramain officials in San Diego, Soliman al Buthe and Mansour al Kadi.[180] Nor does Sageman address the evidence about Bayoumi's efforts to install an Al Haramain Imam at the Al Medina Mosque in Southern California.[181] Sageman provides his off-the-cuff observations about the video of Bayoumi embracing Anwar Aulaqi at an Eid holiday celebration[182] yet did not question why Bayoumi falsely testified that he never met Aulaqi in person.[183] Sageman discounts Bayoumi's close ties to Aulaqi by asserting that Aulaqi was "not yet radicalized"[184], but Sageman did not investigate the relationship that Aulaqi maintained with Hazmi, Mihdhar, Hanjour and other hijackers, or Aulaqi's move to Northern Virginia to lead the very mosque that several of the hijackers would visit when they lived on the East Coast.[185] Sageman further disregarded the antisemitic venom that Aulaqi espoused, in close parallel to Bin Laden's rhetoric.[186]

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[180] Ex. 7 (Youssef Report) at 95-96.
[181] Ex. 7 (Youssef Report) at 99.
[182] Ex. 1 (Sageman Report) at 519.
[183] Ex. 4 (Bayoumi Dep.) at 482:12-24.
[184] Ex. 1 (Sageman Report) at 605.
[185] Ex. 11 (Meleagrou-Hitchens Report) at 22-25. In Sageman's view, Aulaqi became a terrorist "partly because of the harassment he experienced from the FBI" Ex. 1 (Sageman Report) at 637.
[186] Ex. 10 (Meleagrou-Hitchens Report) at 28-31.
[187] ████████████████████████

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████[193]

     Sageman does not mention that at the relevant times Hamerman was an operative and active member of the "USA Dawah Group" of Al Haramain, the MOIA-led organization designated by the U.S. because of its material support to Al Qaeda for terror attacks.[194]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[188] Sageman also says nothing about the extremist "Book of Jihad" published by Saudi Arabia and found in Bayoumi's office by the FBI or the statement of a witness that Bayoumi "was always talking about how the Islamic community needs to take action" and that "they were 'at Jihad'." Ex. 44 (Al Bayoumi 697); Ex. 60 (FBI 011752-011767), at 011759.

[189] Ex. 7 (Youssef Report) ████.

[190] Ex. 1 (Sageman Report) ████.

[191] Ex. 11 (Kohlmann Report) ███. The Eleventh Circuit described Zaky's extremist ties as well as the organization that Zaky ran together with Hamerman, and that █████████ took over after Zaky's death. *Jayyousi*, 657 F.3d at 1094-95.

[192] █████████████████████████████.

[193] ████████████████████████████████████████████████████ Nor does Sageman consider why Bayoumi's files (seized by the MPS) contained various personal documents of Hamerman, including Hamerman's passport and 1992 oath, confirming his conversion to Islam. Ex. 83 (MPS 731-18).

[194] Ex. 87 (Feb. 19, Feb. 25, & May 30, 2000, e-mails produced by Al Haramain).

[195] ██████████████████████████████

[196] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

CONFIDENTIAL: Subject to FBI and MDL Protective Orders



**E.** **Sageman fails to use a reliable methodology by citing to uncorroborated statements from the terrorists themselves rather than carefully evaluating the evidence and renders one-off opinions contrary to those generally accepted by experts in the field.**

A profound, pervasive error renders Sageman's entire report unreliable: he uncritically adopts excerpts from statements attributed to Al Qaeda terrorists. Specifically, he relies heavily on a statement attributed to the detained Khalid Sheikh Mohamed ("KSM"),[198] and on his interpretation of a note he says was written by the deceased Osama Bin Laden. Sageman's wholesale adoption of statements attributed to the terrorists runs afoul of the accepted methodology and determinations of law enforcement professionals and genuine experts, and places Sageman at odds with specific findings of the FBI, CIA, and the 9/11 Commission. Sageman's opinions based on the "statements" of KSM and Bin Laden should be excluded.

---



[197]

[198] Ex. 1 (Sageman Report) at 124 n.447; *U.S. v. Moussaoui*, Cr. No. 01-455-A, Defendant's Exhibit 941, Substitution for the Testimony of Khalid Sheikh Mohammed. The document appeared in 2006, three years into KSM's ongoing detention, and purports to summarize answers educed from KSM under interrogation by the CIA.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

1.   **Sageman improperly renders opinions based on alleged statements of Khalid Sheikh Mohamed in detention that are uncorroborated, unfounded and unreliable.**

Sageman cites what he calls KSM's "statement"[199] over 200 times in his expert report and relies on this document for his bedrock opinions that:

- Al Qaeda's only advance planning, before sending Hazmi and Mihdhar into the U.S. to commence the terror group's most important operation, was to hope that strangers who attended local mosques would offer them help;[200] and

- the key events, relationships, and interactions involving the hijackers all occurred because of "happenstance" and "by chance".[201]

But Sageman is again pronouncing *ipse dixit* opinions contrary to the overwhelming consensus of the U.S. intelligence establishment. Sageman's error is exposed by his reference to the product of KSM's interrogations (procured by torture during years of secret detention) as "testimony."[202] Nothing could be further from the truth.

The CIA, which ran KSM's detention and interrogation, made damning assessments of the value of KSM's statements. The CIA found that "a significant amount of the disseminated intelligence reporting from KSM that the CIA identified as important threat reporting was later identified as fabricated."[203] The CIA also determined "that protecting operatives in the United States appeared to

---

[199] Sageman also misleadingly refers to "KSM's report" and to multiple "KSM statements." Ex. 1 (Sageman Report) at 379.

[200] *E.g.*, Ex. 1 (Sageman Report) at 356 ("it appears that al-Hazmi and al-Mihdhar followed KSM's advice of seeking help at the local mosque….They went to the King Fahad Mosque, because it was a Salafi mosque with a Saudi imam."); *id* at 694 (hijackers "met him [Bayoumi] at the restaurant by chance and learned he was…exactly what they were looking for, per KSM's orders"); *id.* at 720 ("KSM directed al-Hazmi and al-Mihdhar to rely on pious mosque worshippers for help. This means that Youssef gets it completely backward. Al-Hazmi and al-Mihdhar met al-Bayoumi by chance.").

[201] *E.g.*, *id.* at 383 ("▮▮▮▮ met al-Hazmi and al-Mihdhar by chance"); ("▮▮▮▮ had shown al-Hazmi and al-Mihdhar the Mediterranean Gourmet Restaurant by chance"); *id.* at 393 ("hijackers met al-Bayoumi by chance and decided to exploit his obliging nature").

[202] Ex. 1 (Sageman Report) at 691.

[203] Ex. 89 ("Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program" ("SSCI Committee Study"), S-Report 113-288, Dec. 9, 2014 at 96 n. 556 citing the Committee's still-classified KSM detainee review).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

be a 'major part' of KSM's resistance efforts" during his interrogation,[204] and that KSM carefully guarded his most important secrets by "withholding or lying about terrorist plots and operatives targeting the United States."[205] KSM repeatedly gave contradictory answers at various stages of his interrogation and ultimately claimed that because of the harsh interrogation techniques (including waterboarding) he "simply told his interrogators what he thought they wanted to hear."[206] The CIA found that KSM's statements did not assist law enforcement to understand or account for the 9/11 support network.[207]

The 9/11 Commission carefully evaluated KSM's "interrogation reports" and specifically found that his claim that Al Qaeda did not make advance preparations for the hijackers in California should not be credited.[208] Sageman ignores the testimony of 9/11 Commission Staff Member Dietrich Snell that "[w]e determined that because Hazmi and Mihdhar were unfamiliar with the West and unable to speak and understand English, it was likely that arrangements had been made in advance for them to receive assistance upon their arrival in California."[209]

Sageman suggests that KSM's statements are reliable because Al Qaeda did not partner with other terror groups to carry out terror attacks. But Sageman's claim is false: U.S. intelligence and law enforcement found that Al Qaeda worked routinely with other like-minded groups[210] such as Al

---

[204] 9/11 Commission Report at 514 n. 4, citing CIA report, Intelligence Community Terrorist Threat Assessment (IICT), "Khalid Shaykh Muhammed's Threat Reporting – Precious Truths, Surrounded by a Bodyguard of Lies," Apr. 3, 2003, 4 – 5.

[205] *Ibid.*, SSCI Committee Study at 93, under the heading "*After the Use of the CIA's Enhanced Interrogation Techniques Against KSM Ends, the CIA Continues to Assess That KSM is Withholding and Fabricating Information.*"

[206] Ex. 89 (SSCI Committee Study at 92 n.522 citing CIA cable of June 22, 2003). The 9/11 Commission cited to one example of a "less than satisfactory explanation" that KSM provided under questioning. 9/11 Commission report at 514 n.4.

[207] While the CIA briefed on "five key areas in which detainee reporting has played a key role," gaining deeper understanding of and accounting for the 9/11 support network was conspicuous by its absence. Ex. 90 (CIA, *Briefing Notes on the Value of Detainee Reporting*, August 2005, at 1. Included as Appendix II to the Report of the Senate Select Committee on Intelligence, Committee Study of the CIA's Detention and Interrogation Program, as released (Executive Summary only) December 9, 2014, pp. 662-671, at 663.

[208] 9/11 Commission Report at 147, 215.

[209] Ex. 25 (Snell Decl) at ¶ 8. Saudi Arabia chose not to cross-examine Snell.

[210] Ex. 78 (CIA_0001-0016) (CIA EO Production Doc. 1), CIA Analytic Report, "How Bin Ladin Commands a Global Terrorist Network," January 27, 1999, at CIA_0002.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Gama'a, AIAI, and Jemaah Islamiah, essentially cutting its cloth according to the specific geographical, logistical, and tactical imperatives of each operation.[211] Examples of the consensus and weight of intelligence and law enforcement assessments of Al Qaeda's planning and partnerships include:

- A CIA report of November 2000 finding that Al Qaeda was highly adaptable to the requirements of each specific mission, depicting it as a "a highly skilled, resilient network with a wide range of methods of attack at its disposal." The Agency found that Al Qaeda observed "sound operational practices, making use of meticulous contingency planning completed far in advance of an operation;"[212]

- When Hazmi and Mihdhar travelled to Malaysia in January 2000, just prior to their arrival in California, they received lodging at an apartment and other support from members of an extremist network associated with the Jemaah Islamiah group;[213]

- The CIA found that Al Qaeda carried out the 1998 Embassy bombings using "the resources of a potent local network in place for almost a decade."[214]

- The CIA found that separate plots in Canada and Jordan that "attest to Bin Ladin's success in enlisting the aid of more loosely organized Sunni extremist networks."[215]

Al Qaeda forged partnerships with other terror groups, including AIAI, Al Gama and Jemaah Islamiah, to carry out terror attacks. In November 1997 it provided funding and tactical planning support to Al Gama to carry out the Luxor Attacks.[216] The mid-1990s Masonic Temple terror plot in Los Angeles was a joint Al Gama – Al Qaeda operation successfully thwarted by the FBI.[217]

---

[211] *Ibid*, Ex. 78 at CIA 0002-0003, referring to "Al Qa'ida's wide network in some 60 countries," "relationships with sympathetic groups and individuals," and "exploitation of contacts in certain Islamic relief organizations." *Jayyousi*, 657 F.3d at 1092-95 (affirming convictions of defendants who "supported an international network of radical Islamists, including al–Qaeda and other terrorist groups such as Maktab al–Khidamat…, the precursor to al–Qaeda founded by Palestinian Abdullah Azzam, and The Islamic Group of Egypt founded by an Egyptian cleric, Sheikh Omar Abdel Rahman ("the Blind Sheikh")").

[212] Ex. 79 (CIA_0018-0036) (CIA Analytic Report, "Bin Laden's Terrorist Operations: Meticulous and Adaptable," Nov. 2, 2000, at CIA_0019).

[213] 9/11 Commission Report at 514 n. 5, citing to "lodging and travel assistance" arrangements in Malaysia "precisely" analogous to the kind of support Hazmi and Mihdhar would likely have received in California.

[214] Ex. 81 (Meticulous and Adaptable, at CIA_0031).

[215] Ex. 80 (Meticulous and Adaptable, at CIA_0029).

[216] Lawrence Wright, The Looming Tower – Al Qaeda's Road to 9/11 (Penguin 2007), 291-3, citing to the March 2000 report of the Swiss Federal Police on Bin Laden's funding of Al-Gama'a's Luxor Attack of November 17, 1997.

[217] Ex. 7 (Youssef Report) at 2, 22.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman cannot be used to place the KSM statement into evidence under these circumstances. Sageman uncritically accepts KSM's preposterous statement that his preparations consisted merely of buying a "San Diego Yellow and White Pages at a market in Karachi" from which he "saw…that San Diego had many local flight schools and English language schools."[218]

His opinions are contrary to the conclusions of the FBI, CIA, and the 9/11 Commission that KSM concealed and manipulated information, and that Al Qaeda would have ensured in advance that there was a support network in place for the hijackers.

Sageman suggests that the KSM statement can be deemed reliable because KSM divulged information to CIA interrogators about additional Al Qaeda operatives tied to the U.S. ("it seems that KSM did not try to protect any potential AQ infrastructure in the U.S.").[219] Yet this is a transparent attempt to select an isolated data point to justify an opinion; Sageman does not have the necessary background or knowledge, nor has he done the work necessary to provide a proper expert evaluation of KSM's statements together with other evidence. Instead, Sageman effectively serves as a dupe for Al Qaeda. Sageman cites an Al Qaeda operations manual[220] which shows that Al Qaeda operatives were trained that if captured they would tell law enforcement a prearranged false story, which included giving up the names of other actual Al Qaeda operatives not involved in the plot to sidetrack investigators and protect the actual support network.[221]

The CIA's analysis of KSM's interrogations confirms that KSM followed the Al Qaeda playbook and "fabricated" his responses accordingly. KSM only divulged information about other operatives when he figured that it was safe for him to do so, principally once he knew they had already

---

[218] Ex. 1 (Sageman Report) at 169. KSM Statement, at 17: "Those directories were also useful for locating commercial institutions, mosques, apartment complexes, and fellow Muslims to whom the hijackers might contact for help (for example, about where to rent an apartment or find halal restaurants or grocery stores)." These examples of types of "help" the hijackers would require appears to "cover all the bases" of support actually provided by Saudi officials and their proxies.
[219] Ex. 1 (Sageman Report) at 256.
[220] Id. at 249.
[221] Ex. 88 "The Al Qaeda Manual", "Interrogation and Investigation" section at PDF page 67-68.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

been captured. None of the other persons on the list of names Sageman cites was an important AQ "operative" of the kind KSM so keenly protected, rather, they were insignificant actors, several only fleeting acquaintances of KSM's, whose names KSM was quite prepared to give up to create the impression of cooperating with his CIA interrogators[222]

Nearly two decades ago before he was retained by Saudi Arabia, Sageman wrote that the prison interviews of individuals involved in a terror plot "must be viewed with skepticism…."[223] Sageman has failed to heed his own advice.

**2.    Sageman's decision to simultaneously discard KSM's statements in favor of the uncorroborated statement of Osama Bin Laden to support self-serving conclusions further demonstrates how Sageman failed to properly investigate or apply any consistent methodology as required for reliability.**

Sageman offers two opinions – one based on a statement attributed to KSM and the other based on a note allegedly written by Bin Laden – which expose how he improperly cherry-picks facts to promote a false narrative and the intellectual dishonesty of his methods.

The first opinion is that Hazmi and Mihdhar got their U.S. visas in April 1999 "*before* they knew anything about the 9/11 plot" and did so "on their own in order to make themselves attractive to bin Laden for any possible operations on U.S. soil."[224] (emphasis in original). Here, Sageman again relies solely on a statement attributed to KSM.[225]

Sageman's opinion is contrary to all the evidence, and what the hijackers wrote on their U.S. visa applications filed on April 3 (Hazmi) and April 7 (Mihdhar), 1999.[226] Sageman did not investigate or account for the key fact that Hazmi and Mihdhar – applying simultaneously with another Al Qaeda

---

[222] Ex. 90 SSCI Committee Study - Staff Summary, "Fact Check: Inaccurate and Misleading Assertions Related to the CIA Detention and Interrogation Program in The Great War of Our Time: The CIA's Fight Against Terrorism – From al Qa'ida to ISIS" by Michael Morell and William Harlow, May 12, 2015.
[223] Ex. 92 (Sageman, Understanding Terror Networks (2004), at 65).
[224] Ex. 1 (Sageman Report) at 625.
[225] *Id.* at 124, 125, 128.
[226] Ex. 93 (FBI Hijackers' Timeline) at 40.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

operative, upon bin Laden's instructions[227] – specifically listed *Los Angeles* in their applications as their destination.[228] The hijackers' visa applications unequivocally show that Al Qaeda had already arranged for the operatives to settle in California *more than nine months before they arrived in the U.S.*, just after the MOIA advance team, along with Thumairy and Bayoumi, had confirmed that the Southern California network was ready and available to host the two Al Qaeda operatives.

The second opinion is that Bin Laden first "conceived" the 9/11 plot in November 1999, and therefore Sageman opines that it is "implausible" that the MOIA propagators who visited California in December 1998-January 1999 could be an Al Qaeda advance team.[229] Sageman's sole basis for this opinion is a note he says was handwritten by Bin Laden in 2003.[230]

Sageman uses the Bin Laden note without making any effort to evaluate or corroborate its content, solely because it appears to support a conclusion he wants to reach.[231] Sageman makes no effort to evaluate the direct contradictions between the Bin Laden note and KSM's statement, which indicates that the plot was devised by KSM and discussed with Bin Laden for years in advance.[232]

---

[227] Charge Sheet, U.S. v. KSM et al., Referral dated April 4, 2012, at 2. "In early 1999" bin Laden instructed Khallad bin Attash "to obtain a United States visa so that he could travel to the United States and obtain pilot training in order to participate in what Khallad bin Attash termed 'The Planes Operation'." Khallad applied for his own U.S. visa in Sana'a, Yemen on the same day, April 3, 1999, that Hazmi applied in Jeddah, Saudi Arabia. The close coordination indicates that Hazmi and Mihdhar were similarly acting on bin Laden's instructions.

[228] Ex. 1 (Sageman Report) at 625.

[229] Ex. 1 (Sageman Report) at (354 (the propagators visited "almost a year before bin Laden conceived of crashing commercial airliners into commercial buildings").

[230] Ex. 1 (Sageman Report) at 125-126 n.458. Contrary to what he writes in his report, Sageman concedes in his footnote that "the piece paper [sic] is undated." The provenance, attribution, date, and essential character of the note are uncertain.

[231] The 9/11 Commission stated that assessing the statements of sworn enemies of the United States can be challenging and that the statements must be carefully evaluated and compared to other statements and evidence. 9/11 Commission Report at 146. Sageman simply accepted the alleged Bin Laden note without making such a careful review, and the note is directly contradicted by evidence as well as KSM's statements.

[232] Sageman states elsewhere in his report that KSM (not Bin Laden) was the "originator" of the "planes operation" Ex. 1 (Sageman Report) at 120; that the plot to hijack planes and crash them into buildings had been discussed by KSM and Bin Laden since December 1996 *id. at* 123; and that the timing of when Bin Laden gave final approval to the operation was "hard to pin down precisely" but "[a]ll indications point to March or April 1999." *id. See* 9/11 Commission Report at 492 n. 38. "KSM has provided inconsistent information about whether Bin Ladin first approved his proposal for what became the 9/11 attacks in late 1998 or in early 1999."

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Nor does Sageman consider in reaching his opinions U.S. intelligence obtained information about the credible threat of an Al Qaeda aircraft hijacking operation inside the U.S., which was included in a briefing to President Clinton *in December 1998*.[233]

In sum, Sageman did not use a consistent methodology: he simply cited whatever scrap of information he could find to prop up his client's desired conclusory opinions. There is no rigor to his methods, as he fails to engage with, or actively ignores, all the information that undermines his opinions. Ultimately Sageman's reliance on words attributed to terrorists is proven to be both fallacious and fickle: he mostly aligned himself with the KSM statement; but where the KSM statement gave the wrong answer, he reverted to the purported writings of Osama Bin Laden.

### F.   Sageman does not follow accepted methodology and grossly misconstrues key evidence about the Saudi government support network used to support the hijackers.

Sageman opines that the hijackers arrived in the U.S. with no plan beyond the fanciful notion of KSM's instructions to seek out fellow Muslims. Sageman offers his *ipse dixit*, citing KSM as his only authority, that Hazmi and Mihdhar arrived in Los Angeles and went to the King Fahad Mosque "because it was a Salafi mosque with a Saudi imam…."[234] Yet Sageman Sageman did no genuine expert investigation to determine why upon their arrival in Los Angeles, the hijackers went directly to the King Fahad Mosque and met Thumairy.[235] Sageman observes that Los Angeles has one of the largest Muslim communities in the United States,[236] yet he has no familiarity with the mosques in Los Angeles at that time and failed to examine why—from among all the available options—the hijackers should have chosen the King Fahad Mosque. Sageman does not explain how or when the hijackers got

---

[233] 9/11 Commission Report at 129.

[234] Ex. 1 (Sageman Report) at 356.

[235] The 9/11 Commission concluded that "[t]he circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar." 9/11 Report at 217. At that time, however, the Commission was unable to find evidence of Thumairy's links to the hijackers, stating that "we do not pick up their trail until February 1, 2000, when they [Hazmi and Mihdhar] encountered Omar al Bayoumi…." In Los Angeles. *Id.*

[236] Ex. 1 (Sageman Report) at 135.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

information about the King Fahad Mosque, and he contradicts himself. He repeatedly claims that Al Qaeda and Saudi Arabia were "very hostile" and "declared enemies".[237] If that was indeed true, it would make no sense for the Al Qaeda operatives to commence a major terror operation inside the U.S. by going to a Mosque named after the then current Saudi King, operated by Saudi Arabia, and led by the Saudi government's diplomat-Imam Thumairy.

Sageman does not credit the evidence that Thumairy arranged for the hijackers to stay in Los Angeles through ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮ "best friend" ▮▮▮▮ testified that ▮▮▮ told him in 2000 that "[t]hey [Hazmi and Mihdhar] came through Sheikh Fahad [al Thumairy]" and that: "I want to introduce you to two people."[238] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮."[239]

Sageman speculates that ▮▮▮▮ used the term "came through" to mean "'passing through' or visiting."[240] As this Court's own previous review of ▮▮▮▮ testimony shows, Sageman misrepresents the testimony and reads it out of context from the questions posed to ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[241] After misrepresenting ▮▮▮▮ testimony, Sageman makes an "assumption" that the hijackers stayed at an unidentified hotel during their time in Los Angeles rather than with ▮▮▮. When asked "[w]hat's the basis for your opinion that they [Hazmi and Mihdhar] stayed in a hotel?", Sageman responded: "I

---

[237] *Id.* at 26, 727.
[238] ▮▮▮▮▮▮▮▮
[239] Ex. 28 (Gonzalez Dec'l) at ¶¶12-19; Ex. 52 (FBI 000141).
[240] Ex. 1 (Sageman Report) ▮▮▮.
[241] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

assumed that they probably did not sleep on the street. And I grant, it's an assumption on my part."[242] Sageman conceded that "Youssef is right that the FBI canvassed all nearby hotels but found no trace of the hijackers."[243] Yet Sageman speculates the hijackers may have paid cash "off the books."[244]

Sageman repeatedly makes the unequivocal but false claim "there is *no evidence* that they [Hazmi and Mihdhar] stayed at ███████████ apartment."[245] But there clearly is evidence that the two hijackers stayed at █████ apartment during their time in Los Angeles in January 2000. █████████ testified that █████ told him that Hazmi and Mihdhar were staying at his apartment.[246] ████ recounted that: "████, he told me that they stayed in his house. They spend the night in his house."[247] █████████ testified that "█████ did not specify how long. He told me they spend the night. To the best of my recollection, that is the wording he used…."[248] During the time that the hijackers stayed with him, █████ younger sister who lived with him "went to spend the night with her other [older] sister" in her nearby apartment.[249] Sageman declares that "█████████ memory appears unclear"[250] so he decides that █████ must have been talking to █████ about Hazmi's later June 2000 visit on his own to Los Angeles after Mihdhar had left, when Hazmi stayed at the apartment of █████ older sister while she was on vacation.[251] Yet Sageman ignores that █████████ testified that he spoke with █████ about the stay of both Hazmi and Mihdhar at █████ apartment and that the conversation occurred

---

[242] Ex. 4 (Sageman Dep.) at 231:24-232:8.

[243] Ex. 1 (Sageman Report) at 680; The FBI's canvas of hotels successfully found the subsequent stay of the hijackers with Mohdar Abdullah at a Los Angeles motel on June 9, 2000 as well as stays of Omar al Bayoumi on December 20, 1999 (together with MOIA propagator Jaithen) and January 9, 2000.

[244] Ex. 1 (Sageman Report) at 680; Sageman does not consider that hotel operators are required to keep proper registration records.

[245] *E.g.,* Ex. 1 (Sageman Report) at 662 ("there is no evidence that █████ hosted the hijackers"); Ex. 1 (Sageman Report) at 678, stating "[t]he hijackers never lived in █████ apartment in January 2000."

[246] ████████████████████████.

[247] █████████████.

[248] ████████████.

[249] ███████████.

[250] Ex. 1 (Sageman Report) at 398.

[251] *Id.*

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

when the hijackers were staying with ████ in January 2000. Moreover, Hazmi stayed at ████ sister's apartment, not ████ apartment, on his *later* June 2000 solo visit.[252]

Sageman discounts the testimony of a former FBI special agent and a former New York City Police Detective and member of the Joint Terrorism Task Force to whom ████ admitted that Hazmi and Mihdhar were staying at ████ apartment when he walked with them to the Mediterranean Restaurant on Venice Boulevard in Los Angeles to meet with Omar al Bayoumi.[253] This testimony confirmed ████ account of what ████ told him about the hijackers staying with ████ when they first arrived in Los Angeles.

Sageman also ignores Kaysan Morgan's testimony that he was at the restaurant with Bayoumi when Hazmi and Mihdhar stated that "they were living in an apartment nearby" that was "around the corner" from the restaurant.[25]████ apartment meets that description: it was located at ████ Avenue, Los Angeles, half a block away and around the corner from the restaurant. Sageman admitted that he did not actually identify the location of ████ apartment in relation to the restaurant.[255] This failure to examine critical evidence demonstrates Sageman's lack of basic investigatory experience and abandonment of any credible and reliable methodology.

Sageman ultimately concedes that there is evidence that the hijackers stayed with ████, because he performs a convoluted statistical analysis to resolve ████ inconsistent statements. Sageman concludes that the hijackers did not stay at ████ apartment because ████ repeated that

---

[252] Sageman ignores that the later visit of Hazmi on his own in June 2000 did not include Mihdhar, nor did it require ████ younger sister to stay in her older sister's apartment; to the contrary, Hazmi stayed in the older sister's apartment while she was away on vacation. Sageman himself admits elsewhere that ████ and ████ spoke about the two hijackers staying at ████ apartment *before* ████ first met the hijackers and saw them with Thumairy (which we know was on June 9, 2000) and *before* Hazmi returned to visit Los Angeles later that same month after Mihdhar left California to return to the Middle East. Ex. 1 (Sageman Report) at 233.
[253] Ex. 28 (Gonzalez Dec'l) at ¶21; Ex. 27 (Vasquez Dec'l). at ¶19. Saudi Arabia chose not to cross-examine the two former law enforcement agents.
[254] Ex. 24 (Morgan Dec'l) at ¶18-19; 9/11 Commission Report at 217 ("They [Hazmi and Mihdhar] said they were living in an apartment near the restaurant but did not specify the address.").
[255] Ex. 4 (Sageman Dep.) at 234:21-24.

48

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

story to the FBI six times.[256] Sageman's analysis is an example of the smoke and mirrors method of his report and his unique, unreliable methodology.

Sageman adopts ████ testimony that he dropped Hazmi and Mihdhar off at the "bus station in Santa Monica" where Sageman says they took "a bus that went straight for San Diego" but Sageman "did not check" to see if there was a bus service from Santa Monica to San Diego in 2000.[257] An internet search shows that the Santa Monica bus station closed in 1994.[258]

Sageman also ignores the evidence of ████ role in overseeing the help provided by ████ for the hijackers. The FBI found that ████ and ████ exchanged phone calls ████████ ████████████████████████████████████████████████████████████████[259] Sageman presents his own conjecture that these calls were between other family members but fails to explain why the calls occurred at the precise times that the hijackers were being assisted by ████. Perhaps it is another coincidence.

Finally, Sageman opines that the evidence does not support the source information in a 2017 FBI Report which describes that Thumairy received a call from Malaysia around the end of 1999 about the imminent arrival of two brothers who needed their assistance; that Thumairy instructed ████ to pick up the hijackers at the airport and bring them to Thumairy; and that Thumairy assigned ████ to take care of the hijackers during their time in Los Angeles.[260] But Sageman only reaches his conclusion

---

[256] Ex. 1 (Sageman Report) at 661; Sageman absurdly calculates that the chance that the hijackers stayed at ████ apartment is less than 14%, which in his estimation "makes it clearly and convincingly unlikely to be true." Ex. 1 (Sageman Report) at 661. ████ deposition testimony confirms that he spent substantial time with and had a close relationship with the hijackers from their arrival and brought them to meet Thumairy; took them to do grocery shopping and to the Mediterranean restaurant; held a bag for them as they went to San Diego; stayed in contact with them over the phone; hosted a dinner at his home for them upon their return to Los Angeles in June; and again hosted Hazmi when he returned on his own. Ex. 7 (Youssef Report) at 164 n. 670.

[257] Ex. 4 (Sageman Dep.) at 236:8-18.

[258] Robert Wynne, The Bus Stopped Here: Santa Monica's Greyhound Station Closes After 48 Years, L.A. TIMES, Oct. 1, 1994, https://www.latimes.com/archives/la-xpm-1994-10-01-me-45234-story.html.

[259] Ex. 60 (FBI ████████████████). Sageman also does not address the evidence that Thumairy, Mana, and ████ father knew each other very well. ████████████████████.

[260] Ex. 76 (EO518-523, at 520).

49

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

by ignoring the proof that the hijackers went to Malaysia ono their way to Los Angeles to meet with other Al Qaeda operatives; ████ was the first person known to meet the hijackers in Los Angeles; that ████ brought the hijackers into the King Fahad Mosque to meet Thumairy; and ████ helped the hijackers get settled in the neighborhood and hosted the hijackers at his apartment.

According to Sageman, KSM instructed Hazmi and Mihdhar to live in San Diego but they were stuck in an unidentified hotel in Los Angeles, without a plan or any of the support Al Qaeda normally arranged for its operatives, when they happened to walk into a restaurant and out of the blue they were approached by Bayoumi, "a San Diego resident and pious Muslim."[261] Sageman opines that Bayoumi was "exactly what they were looking for, per KSM's orders."[262] Sageman's fantastical vision of events ignores the facts of what happened before and after Bayoumi's restaurant meeting with the hijackers. Sageman blindly adopts – indeed, actively promotes – Bayoumi's false cover story. It is a tale that relies not on any evidence, but on coincidence after coincidence.[263] Bayoumi's meeting with the two Al Qaeda operatives in Los Angeles was consistent with carefully planned tradecraft of Saudi officials Bayoumi, Thumairy, and Mana. Bayoumi groomed a young, non-Arabic speaking American convert, Kaysan Morgan,[264] to accompany him in order to provide a cover story of having only met Hazmi and Mihdhar "by chance."

Sageman's blinkered opinion "that there was only one trip to Los Angeles"[265]  shows he repudiated any proper investigation, instead patching together disparate pieces of information in an

---

[261] Ex. 1 (Sageman Report) at 694.
[262] Id.
[263] The first coincidence here is drawn from Bayoumi's deposition testimony that he unexpectedly spotted Morgan on the street and spontaneously invited him on the trip Ex. 1 (Sageman Report) at 182. Ex. 29 (Morgan Dec'l) at ¶8; Ex. 24 (Morgan dep.) at 95; sworn testimony that this was "not a true statement," because Bayoumi first told Morgan that he had to resolve an I-94 visa issue, and then invited Morgan 1-2 days ahead of the trip. Bayoumi told Morgan in advance that they would go to the Consulate, see the new King Fahad Mosque, and go to a halal restaurant in L.A. Ex. 29 (Morgan Dec'l) at ¶¶ 8-9.
[264] Kaysan Morgan was known at the time as Isamu Dyson, and later Cayson Bin Don. Morgan had converted to Islam in 1999 at the Mosque in Washington, D.C. that was under the control of the Saudi Embassy. Ex. 29 (Morgan Dec'l) at ¶6.
[265] Ex. 1 (Sageman Report) at 670.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

unreliable manner.  Sageman opines, for example, that the trip with Morgan to Los Angeles ███ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████[266]  Sageman claims that he alone is right about the date, and that the 9/11 Commission and the FBI *mistakenly* concluded that Bayoumi and Morgan went to Los Angeles on Tuesday, February 1, 2000.[267]

Sageman, however, failed to investigate sufficient facts, which reveal that Bayoumi travelled to Los Angeles on *both* January 31 and February 1, 2000.  Sageman insisted he did a "careful analysis" of Bayoumi's cell phone records on these dates[268] but he somehow missed the three calls from Bayoumi's cell phone to Morgan's cell phone at 10:47am, 11:51am, and 11:59am on January 31, the very day Sageman claims the two men travelled together in Bayoumi's car from San Diego to Los Angeles.[269] While Sageman cites Morgan's testimony that Bayoumi called his wife on the drive home from Los Angeles[270], Sageman also missed the phone call evidence on this issue: Bayoumi called his family home at 7:11pm *on February 1*, but there are no records of any call home on January 31.

The records of Bayoumi's phone calls discredit Sageman's "opinion" that Bayoumi and Morgan went to Los Angeles together on January 31.[271] Sageman discounted what the evidence demonstrates: that Bayoumi travelled to Los Angeles ████████████████████████████ ██████████████████████████████████████████████████████████████████████████████

February 1, 2000, on which they would meet the hijackers.

---

[266] Ex. 1 (Sageman Report) at 668, 670.
[267] *Id.* at 668.
[268] *Id.* at 673-4.
[269] The calls are listed on the Spreadsheet "Calls between November 1999 – February 2000" appended to Youssef's Report.
[270] Ex. 1 (Sageman Report) at 198.
[271] The records also show that on February 1, Bayoumi placed a call to Morgan's home at 9:50pm, after the men had returned from their trip that day.
[272] Sageman does not challenge the fact that Bayoumi filled his gas tank on both January 30 and February 1, which was consistent with Bayoumi making two trips to Los Angeles. Ex. 7 (Youssef Report) at 178. Nevertheless, Sageman offers an opinion that Bayoumi only used "about 12 gallons a week," based on his erroneous and irrelevant calculations of Bayoumi's fuel consumption over a six-week period. Even the transactions that Sageman presents – based solely on

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman admitted that he did not even review Saudi Arabia's 2018 answers to interrogatories, which stated that Bayoumi went with Morgan to "the Saudi Consulate in Los Angeles on or around February 1, 2000, to *pick up* a renewed passport…"[273]

Sageman also blindly accepts the claims of Bayoumi and Mana that they did not know each other but rather met – by chance – at the Consulate on the day that Bayoumi came in with Morgan. Sageman's opinion is contradicted by evidence including: (1) ███████████████████████ ████████████[274]; (2) t████████████████ Bayoumi, and Thumairy;[275] (3) the (fake) discussion in English that Bayoumi and Mana had in Morgan's presence about how Bayoumi had not been to the Consulate for three months,[276] when in fact Bayoumi had been at the Consulate the day before; and (4) Bayoumi's meetings later the same day with Mana and Thumairy at the King Fahad Mosque.[277]   All of that evidence fatally undermines the reliability of Sageman's opinion regarding the relationship between Bayoumi and Mana.

Sageman improperly assumes that Mana and Bayoumi gave credible testimony despite the numerous contradictions in their respective accounts of the events; despite Bayoumi's relationship with the Consulate; and despite both men's relationships with one another and with the King Fahad

---

Bayoumi's credit card gas purchases and excluding cash – add up to a total of 102.5 gallons, or at least 17 gallons per week. Ex. 1 (Sageman Report) at 669. Mathematical calculations are yet another area on which Sageman is clearly not an expert.

[273] KSA Responses, Interrogatories 10, 13, 16 (June 12, 2018); KSA Responses, Interrogatory 10 (Aug. 14, 2018) (emphasis added); Ex. 4 (Sageman dep.) at 162:5-13. The interrogatory answer caught Saudi Arabia in another lie, as it was prepared, and Bayoumi testified at his deposition, *before* the MPS produced the postmarked February 2, 2000, envelope (return receipt requested) showing that the Consulate mailed the passports for Bayoumi, his wife, and their children to Bayoumi's home address in San Diego.  Saudi Arabia told this Court that its interrogatory answers were prepared based on its meetings with the relevant Saudi officials, including Bayoumi. Ex 95 (December 21, 2018, KSA Opposition to Motion to Compel at Add.2).  Saudi Arabia's story does not match up with the evidence and Sageman once again is told to ignore it.

[274] ███████████████████████████████████████████.

[275] ██████████████████████████████████████████████████████.

[276] Ex. 29 (Morgan Dec'l) at ¶ 12.

[277] Ex. 29 (Morgan Dec'l) at ¶ 12.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Mosque.[278] Sageman is similarly unqualified to opine about the meaning of Bayoumi's December 2000 letter in Arabic to Mana, whom Bayoumi addressed using the honorific "Sheikh Ismail."[279] The December 2000 letter serves to confirm Bayoumi's close relationship with Mana and his specific knowledge of the religious role at the King Fahad Mosque that Thumairy assigned to Mana.[280]

Sageman contrives to ignore record evidence in setting forth his opinion that the location of Bayoumi's meeting with the hijackers was another "coincidence." The hijackers told Bayoumi they were staying at an "apartment" that was "around the corner," which fits the description of ████ apartment; ████ admitted to ████ that the hijackers stayed at his apartment; and ████ admitted to the FBI that he walked the hijackers from his apartment to the restaurant the day the hijackers met Bayoumi. Sageman fails to account for those statements, all of which undermine the reliability of his opinion about the nature of the meeting.

Sageman also fails to address, far less explain, Morgan's testimony that after the restaurant meeting, Morgan and Bayoumi went immediately to the nearby King Fahad Mosque, where Bayoumi met in private with both Mana and Thumairy.[281] Sageman fails to use a consistent methodology and presents opposing versions of the events. Sageman's first version is that Bayoumi knew the

---

[278] For instance, Sageman cites Mana's declaration that the "only reason I recall" the encounter with Morgan at the Consulate was "because this was the first time, I have met a Jewish convert to Islam,") (Ex. 1 at 199) but fails to acknowledge that it must have been Bayoumi who told Mana about Morgan's heritage. When confronted at his deposition, Mana initially contradicted himself, claiming he did not hear about Morgan being Jewish until a few years later, and then said: "I'll claim my Fifth Amendment for this." Ex. 17 (Mana dep.) at 153:12-16. Exercise of that Constitutional right is only appropriate when the answer may tend to incriminate the witness. Sageman also neglected to check Bayoumi's testimony that he and Morgan entered the front entrance of the Consulate and filled out passport application paperwork in its front reception area. Bayoumi may have done that when he visited the Consulate on January 31 along with his wife and children, but that is not what happened on February 1. Both Mana and Morgan testified that Bayoumi entered the Consulate from the private rear entrance reserved for Consulate employees, and had Morgan wait for him in a reception room while Bayoumi went inside the Consulate. Ex. 17 (Mana dep.) at 169:20-170:8; Ex. 43 (Mana 611); Ex. 29 (Morgan Dec'l) at ¶¶11-12. Sageman made no effort to account for those testimonies, nor to examine the floor plan of the Consulate to understand the relevant events.

[279] Ex. 1 (Sageman Report) at 602.

[280] See also *supra* III. F. on Sageman's lack of qualifications to provide opinions about Arabic meaning and usage. ████
████████████████████████████████████████████████████████████████████████████

[281] Ex. 29 (Morgan Dec'l) at ¶¶20-1.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

neighborhood around the Mosque and probably did not get lost after leaving the restaurant. [282] This confirms Morgan's testimony and conflicts with Bayoumi's account that after leaving the restaurant "we [Bayoumi and Morgan] wanted to go to King Fahad Mosque, but we got lost…so I just decided to head home."[283] Sageman's second version, however, parrots Bayoumi's self-serving testimony that he "got lost" trying to find the Mosque after leaving the restaurant and decided to head back to San Diego.[284] Sageman conjures a falsehood to add credence to the fiction of Bayoumi getting "lost"; based on Bayoumi's claim that he rarely visited the King Fahad Mosque, Sageman says he "calculated" that Bayoumi had only been there "once or twice" before.[285]) Photographs of Bayoumi's visits to the Mosque, as well as hotel and fuel records, place Bayoumi at or in the immediate vicinity of the King Fahad Mosque on at least six separate dates prior to going there with Morgan.[286][287] Khalil, who is himself pictured with Bayoumi at the Mosque, admitted to the 9/11 Commission that Bayoumi was there "frequently" to see Thumairy.[288]

Saudi Arabia's counsel chose not to cross-examine Morgan about various subjects, including his sworn testimony (and prior statements to the FBI) that Bayoumi went to the Mosque and met with Mana and Thumairy immediately after his meeting with the hijackers. Rather than confronting Morgan directly at his deposition (when Morgan could have explained his testimony), Saudi Arabia instead

---

[282] Sageman says that it "makes sense" that "they got lost from the consulate to the restaurant, not from the restaurant to the Mosque." Ex. 1 (Sageman Report) at 682.

[283] Ex. 14 (Bayoumi dep.) at 405:3-16.

[284] Ex. 1 (Sageman Report) at 183.

[285] Ex. 1 (Sageman Report) at 180.

[286] Additionally, a tape seized from Bayoumi's office is dated December 20, 1999, and shows that Bayoumi likely attended the prayers held at the King Fahad Mosque that day, as the names of the Sheikhs "Magid" and "Abdullah" on the tape match those of visiting propagators Majid Mersal and Abdullah al Jaithen, with whom Bayoumi co-registered at a Los Angeles hotel that same day. Ex. 57 (FBI 004114); Ex. 41 (Jaithen 576) (FBI 004012).

[287] Ex. 7 (Youssef Report) at 190-92. Additionally, a tape seized from Bayoumi's office is dated December 20, 1999, and shows that Bayoumi likely attended the prayers held at the King Fahad Mosque that day, as the names of the Sheikhs "Magid" and "Abdullah" on the tape match those of visiting propagators Majid Mersal and Abdullah al Jaithen, with whom Bayoumi co-registered at a Los Angeles hotel that same day. Ex. 57 (FBI 4114); Ex. 41 (Jaithen 576).

[288] Ex. 25 (Snell Dec'l,) Ex. 5 at 8. Bayoumi also maintained a regular practice of attending Mosque for obligatory prayers, making it likely that he went to the Mosque whenever he was in Los Angeles. Ex. 29 (Morgan Dec'l) at ¶23.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

improperly uses Sageman unfairly to impugn Morgan as "inconsistent"[289] and an "unreliable witness,"[290] and to attack his testimony as "plaintiffs' lawyers' declaration drafted for Morgan,"[291] a "one-sided document,"[292] and a "tainted source."[293] But it is Sageman who is inconsistent, and he mimics lawyerly arguments rather than provide expert reasoning.

Sageman invents a spurious statistical methodology to weigh up the aggregate number of prior statements made by Morgan and Bayoumi, and somehow concludes that Sageman's "chance theory" should prevail.[294]Sageman wrongly labels Morgan as inconsistent because Morgan did not mention certain facts on every single occasion he was interviewed, even though the interview themes and questions were determined by the FBI, and evolved from one interview to the next, as is typical during law enforcement investigations.[295] Even with his dismissive pejorative characterizations of Morgan, Sageman does not and cannot point to any instance of material, genuine inconsistency in Morgan's testimony.

---

[289] Ex. 1 (Sageman Report) at 379.

[290] *Id.* at 685.

[291] *Id.* at 667.

[292] *Id.* at 671

[293] *Id.* at 680. This Court established the procedure for witnesses to sign declarations to present their testimony and then be deposed. Morgan stated that declaration was based on his prior statements to the 9/11 Commission and the FBI, Ex. 29 (Morgan Dec'l) at ¶3, and is willing to testify before the Court if necessary. *Id.* at ¶ 2.

[294] Ex. 1 (Sageman Report) at 381.

[295] *Id.* at 198. For example, Sageman claims that Morgan's statement that Bayoumi called his wife on their way home from Los Angeles is "consistent with Morgan3, but not mentioned in Morgan4 or Morgan6." Ex. 1 (Sageman Report) at 198. However, there is nothing to suggest that Morgan was asked about that phone call in his "Morgan4" or "Morgan6" interviews, and Morgan's testimony about the call is consistent throughout his statements. Ex. 29 (Morgan Dec'l) at ¶22. Another example is the visit of Bayoumi and Morgan to the Mosque after meeting the hijackers. Morgan consistently told the FBI, whenever he was asked, that he and Bayoumi went to the Mosque after meeting with the hijackers. If Morgan were ever to have been asked and said there was not a visit, such a statement (a genuine example of inconsistency) surely would have been documented in the FBI's interview summaries. No such record of inconsistency in Morgan's statement exists.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Sageman claims that after having what Bayoumi described as a "two minute" meeting at the restaurant,[296] the hijackers a day or two later headed to San Diego to "exploit Bayoumi's kind offer."[297] Yet Bayoumi testified that he made no offer to help the hijackers in any way.[298] Sageman discounts, without explanation, the evidence that Bayoumi was already looking at various apartments for the hijackers before they arrived in San Diego.[299]

Sageman adopts Bayoumi's testimony that he once again ran into the hijackers completely by chance, this time at the ICSD in San Diego nearby Bayoumi's home. Sageman accepts this remarkable coincidence in stride and then speculates without basis that the hijackers must have stayed at an unidentified hotel for 2-3 days after their arrival in San Diego.[300] Sageman disregards the evidence showing that Bayoumi actually lodged the hijackers in his own apartment: Bayoumi admitted to Ratchford that Hazmi and Mihdhar "were staying with him," a fact which Bayoumi also wrote down on the application when he co-signed as a guarantor for the hijackers' apartment.[301] Sageman pontificates that it is "impossible for a Salafi Muslim like al-Bayoumi to host two male strangers at his small home when his wife and daughter are living with him"[302] yet ignores what Bayoumi himself said to the complex manager and wrote, and ignores the absence of proof that the hijackers stayed at a hotel or anywhere other than with Bayoumi. Sageman also refuses to acknowledge the evidence of

---

[296] Morgan testified that the meeting lasted about 30 minutes. Ex. 29 (Morgan Dec'l) at ¶ 19. In his analysis of the meeting, Sageman makes a misleading claim that Bayoumi volunteered information to the MPS about the hijackers, whereas in fact Bayoumi only spun his narrative about the meeting *after* the MPS asked him specific questions about the events of September 11th, and whether he could identify people he knew in San Diego who might be involved. It is a gross distortion to state that Bayoumi "volunteered" the information.

[297] Ex. 1 (Sageman Report) at 723.

[298] Ex. 14 (Bayoumi dep.) at 726:23-727:2.

[299] Parkwood apartments manager Holly Ratchford testified that Bayoumi went to her office about 5-6 times to check on available apartments before he brought in Hazmi and Mihdhar. Ex. 30 (Ratchford Dec'l) at ¶6. Morgan testified that Bayoumi "discussed setting up an apartment with his apartment complex manager prior to the arrival of al-Hazmi and al-Mihdhar in San Diego." Ex. 29 (Morgan Dec'l) at ¶25.

[300] Ex. 1 (Sageman Report) at 552.

[301] Ex. 30 (Ratchford Dec'l) at ¶7. The rental documents show that the hijackers signed documents for the apartment on February 3, showing that they arrived in San Diego on February 2 or 3. *Id.* at ¶8-10. They moved into their apartment on February 5, so they stayed with Bayoumi for 2-3 nights. *Id* at ¶ 16.

[302] Ex. 1 (Sageman Report) at 689.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

what had just happened when ███ hosted the two hijackers at his Los Angeles apartment: ███ sister moved out to stay elsewhere temporarily, a scenario Bayoumi was far more likely to have employed.[303]

As to Aulaqi, Sageman claims *ipse dixit* that "there is *no evidence* of Sheikh Anwar's involvement at all" besides several phone calls,[304] but this is plainly wrong. First, Sageman ignores the equally important evidence that the calls among "Sheikh Anwar," Bayoumi, Thumairy, and officials at the Saudi Embassy occurred on significant days at significant times, linked to specific arrangements being made for the hijackers, and were not taking place randomly.[305]

Second, Ratchford identified not only Bayoumi but also Aulaqi as having accompanied Hazmi and Mihdhar to the Parkwood Apartments office; her testimony is that Aulaqi translated for them.[306] Third, Aulaqi also worked in tandem with Bayoumi by calling ahead to the same Bank of America branch where Bayoumi brought the hijackers to open their bank account.[307] Sageman flatly asserts that Youssef's finding on this point is "false,"[308] because Aulaqi's call was not to the same bank where Bayoumi took the hijackers,[309] but to "another branch."[310] Sageman based his opinion on his own 2022 internet search for the bank branch[311] and failed to investigate the matter in any serious manner. He did not interrogate Bayoumi's files seized by the MPS in 2001 and produced in this litigation, which included the business cards of two Bank of America employees at its Balboa-Genessee branch.[312]

---

[303] ███████████████████████ Sageman ignores Ratchford's testimony that Bayoumi acted out of character – he was rushed and under pressure - when he came to the rental office with the hijackers, Ex. 30 (Ratchford Dec'l at ¶7), which is consistent with Bayoumi hosting the two hijackers at his apartment.
[304] Ex. 1 (Sageman Report) at 691.
[305] Ex. 7 (Youssef Report) at 137-39.
[306] Ex. 30 (Ratchford Dec'l) at ¶8 & Exhibit B to Ratchford Declaration.
[307] The call was made at 2:33pm. Ex. 77 (EO 0603-0615 UPDATED), at 0612.
[308] Ex. 1 (Sageman Report) at 295.
[309] *Id.* at 516.
[310] *Id.* at 595.
[311] *Id.* at 691.
[312] Ex. 84 (MPS 713-352). In addition to the business cards of the bank employees from the Balboa branch, Bayoumi also had a letter in his file bearing the signature of one of those Bank of America employees, which purports to confirm his relationship as a customer of that branch, Ex. 85 (MPS 720-16). Bayoumi accompanied the hijackers to that branch of the bank, and its records show that the hijackers opened their account at 3:40pm. Ex. 59 (FBI 008057).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Those business cards confirm that the number Aulaqi called at 2:33pm on February 4, 2000 (858-452-8400) is the very same customer service number of the very same branch where Bayoumi took the hijackers approximately one hour later. Sageman either simply dispensed with a fact inconvenient to his opinion or failed to investigate and consider the record evidence. Either way, having repeatedly failed to consider facts that contradict his theory of a string of "coincidences," Sageman undermined his qualifications as an expert and the reliability of his opinions concerning Bayoumi's meeting with the hijackers in Los Angeles, their subsequent arrival in San Diego, and the support Bayoumi provided to them to assimilate there.

## V. THE COURT SHOULD PRECLUDE SAGEMAN'S REPORT BECAUSE IT IS REPLETE WITH *IPSE DIXIT* AND HIS ATTEMPTS TO USURP THE ROLE OF THE TRIER OF FACT

Sageman acts as judge and trier of fact. He claims that he has "carefully weighed the evidence" and conducted his own "review of the totality of the evidence" in order to reach determinations as to what is "more consistent."[313] Sageman creates facts to suit his preordained conclusions, and embellishes details to promote Saudi Arabia's false narratives, with no foundation or attribution whatsoever in the record.[314] This methodology of creating facts or explanations is part and parcel of Sageman's frequent, arrogant appeal to his own authority, *i.e.* his *ipse dixit*.

Sageman's opinions are so rife with his *ipse dixit* that it is impossible to enumerate in this brief every single instance in which it manifests.[315] Throughout his report, whenever Sageman lacks knowledge of relevant facts—which happens frequently—rather than accept that he does not know something, Sageman instinctively declares *ipse dixit* that facts unfamiliar to him must not be true.[316]

---

[313] Ex. 1, e.g. at 600.

[314] *Supra* III E, on communications analysis, and in particular Sageman's fanciful explanations of subjects' contacts and connectivity, or lack thereof.

[315] Specific examples of Sageman's *ipse dixit* are set forth earlier in this brief, *inter alia supra,* Section IV B, on Saudi Arabia's control over the King Fahad Mosque and the extremist cell led by Thumairy, Section II A, on Saudi Arabia and its MOIA, and *supra*, Section III F, on Arabic language and usage.

[316] *Supra,* Section III C, on Al Gama'a and Al Qaeda presence and cooperation in California in the 1990s.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Notwithstanding Sageman's claims, true expert knowledge on the subjects Sageman opines about, as represented by the cumulative knowledge of Plaintiffs' experts, does not begin and end with what Sageman claims to know.  Plaintiffs' case is not bound by the limits of Sageman's knowledge.

Sageman repeatedly implies that his uncertainty about a particular fact carries the same weight as an evidentiary finding.[317] Sageman also frequently appeals to his "beliefs" and his suspicions as if they are unassailable fact,[318] even where his stated belief is in nothing more than the terminology which he alone devised and uses and that has never been adopted or used by recognized experts.[319]  In certain instances, Sageman even credits his lack of imagination as fact.[320]

One of the more egregious examples of Sageman's near-constant *ipse dixit* arises when he implies that none of the FBI's reports can be trusted because "[p]ressure and veiled threats (*i.e.*, 'it is unlawful to lie to a federal agent' stated in a harsh tone of voice) against interviewees are usually ignored in the written records."[321]

Sageman even employs *ipse dixit* to enter the minds of witnesses of this case, observing that al-Bayoumi "seemed very genuine in his enjoyment of life in the United States,"[322] and "believed that it

---

[317] "I am not convinced that there was a formal meeting establishing al Qaeda" Ex. 1 (Sageman Report) at 42; "I am not sure whether Operation Encore had access to the wealth of documents from Saudi Arabia in the discovery material of this litigation." *id.* at 294; "It is difficult to comment on such poorly sourced and vague information, almost two decades after the events described in the allegation." *id.* at 296.

[318] "I believe the State Department found out that Sheikh Fahad was the imam of King Fahad Mosque;" "I do not believe that AQ or KSM are that stupid." *id.* at 432.

[319] Ex. 1 (Sageman Report) at 23 n. 53, "I believe global neojihad is a more accurate expression for the social movement that carried out the 9/11 attacks" (before citing to himself). Sageman admits that his phrase "neojihadi" appears nowhere else in scholarship, let alone in the rubric used by investigators, analysts and other recognized experts in U.S. intelligence and law enforcement, stating "As no one has yet come up with a better term, I compromise… and call it neo-jihadi, like jihad, but not precisely jihad."

[320] "I cannot imagine AQ or KSM ... to allow his field operators to try to recruit people in a hostile environment" Ex. 1 (Sageman Report) at 432; "It is hard for me to imagine that Sheikh Fahad [Thumairy]... would look upon Sheikh Anwar [Aulaqi] as an ideological mentor." Ex. 1 (Sageman Report) at 522-3.

[321] *Id.* at 13.

[322] *Id.* at 146.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

was natural for Muslims at a mosque to help other Muslims in need."[323] In addition to being only Sageman's *ipse dixit*, opinions such as these are excludable as testimony to motivations or intent.[324]

Sageman is not the arbiter of the truth, and his report is tainted in its entirety with an incredible number of opinions that he asks the Court to accept just because he says so. Sageman's *ipse dixit* so pollutes his entire report that it should be excluded.

## VI.   THE COURT SHOULD PRECLUDE SAGEMAN'S PROPOSED TESTIMONY OF LEGAL CONCLUSIONS, OR SPECULATIVE, CONJECTURAL, AND CONCLUSORY OPINIONS.

Sageman frequently comes to legal conclusions by applying facts to the law. Take the example discussed above, where Sageman states "[t]here is no evidence supporting the FBI's speculations about al-Jarrah's alleged role in the 9/11 attacks."  While dressed up to appear as though he is merely disagreeing with the FBI, this direct opinion is effectively Sageman's conclusion regarding the merits of the Plaintiffs' allegations. Sageman makes even bolder legal conclusions with respect to jurisdiction when he states  "I will not address the subsection, "Connections between California support cell and the East Coast network for the hijackers," as it again falls outside the relevant scope of this litigation."[325] Sageman speaks to one of the ultimate legal issues of this case - the liability of the Kingdom of Saudi Arabia, by observing that Plaintiffs assertions  "open[] up the KSA to all sorts of liability for the attacks" and that "this is a critical issue that [he] address[es] at the end of this section on al-Bayoumi."[326] In other words, Sageman drops all pretense of offering an expert opinion and

---

[323] *Id.* at 147.

[324] *See* ECF 9060 at 6 (citing *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013).

[325] Ex. 1 (Sageman Report) at 709. Similarly: at 521, "I put aside Hanjour and the alleged Northern Virginia network since it is beyond the scope of this litigation;" at 523, stating that Anwar Aulaqi's ideological and operational contributions in light of his post-9/11 positions as a terrorist leader are "too peripheral to the issues at hand in this litigation;" at 608, stating that the terror-supporting Saudi government organization Al Haramain is "too peripheral to the issues in this litigation to discuss it since al-Haramain was never implicated in the 9/11 attacks."

[326] *Id.* at 276.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

concedes that his report was drafted to address the issue of liability as to Saudi Arabia.[327] Legal conclusions, per ECF 9060 at 6, are "out of bounds" and should be excluded.

In addition to legal conclusions, Sageman tries to pass off his armchair speculations as fact. On scores of occasions, he begins his sentences with "I suspect". For example, "I suspect that [bin Laden] was trying to appropriate the Sahwa religious movement to recruit among its supporters;"[328] "I suspect that had he [Thumairy] had such [extremist] beliefs, he would have probably been purged from the ministry [MOIA];"[329] "I suspect that this is when bin Laden heard about the allegation that al-Batouti crashed the plane into the Atlantic Ocean;"[330] and, regarding the relationship between Bayoumi and Thumairy, "I supsect they met at some point but not frequently."[331] Sageman's speculations repeatedly fly in the face of evidence he has not deigned to consider.

Sageman's speculations also underpin his throwaway, inherently contradictory opinions about the hijackers being "inept"[332] and "complete failures in their mission"[333] yet still somehow skillful enough to have "exploited" and "manipulated"[334] the "kind"[335] Saudi officials and other "pious mosque worshippers"[336] who provided the hijackers with support. Sageman's conclusory statements should preclude the foundational opinion of his report, denying that the Saudi government officials, along with those who instructed and directed them, and their associates in southern California comprise a

---

[327] *See also* Sageman's conclusion that "It is therefore extraordinarily unlikely that a senior official from any of these KSA departments or ministries might have directed or instructed subordinates to assist sworn enemies of the royal family, especially against its most important international ally and protector, the United States." *Id.* at 273.

[328] *Id.* at 84.

[329] *Id.* at 330.

[330] *Id.* at 126.

[331] *Id.* at 633.

[332] *Id.* at 612, 720, 728. Sageman plays on their "ineptitude" to opine that KSM made exceptions for Hazmi and Mihdhar against the "robust AQ rule" that operatives should "avoid the [local] Muslim community which might be monitored by local security forces." Sageman's opinions on Al Qaeda planning are, as stated above, wholly unreliable.

[333] *Id.* at 612, 720, 728. Sageman plays on their "ineptitude" to opine that KSM made exceptions for Hazmi and Mihdhar against the "robust AQ rule" that operatives should "avoid the [local] Muslim community which might be monitored by local security forces." Sageman's opinions on Al Qaeda planning are, as stated above, wholly unreliable.

[334] *Id.* at 421, 695.

[335] *Id.* at 544, "Bayoumi was kind enough to help pious visitors in need…;" 331, Thumairy "kind, gentle," not extremist.

[336] *Id.* at 720, 728.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

"support network:" no, says Sageman, "[t]hey were simply victims of the hijackers' exploitation of their obliging nature."[337] Such speculation is "out of bounds" and all of Sageman's bare speculative assertions must be excluded accordingly.

## VII.    THE COURT SHOULD PRECLUDE OPINIONS OF MOSS

Defense Expert Douglas Moss was retained as rebuttal expert to critique the expert report of Captain Barry Schiff.[338] Captain Schiff's report discloses anticipated expert testimony "regarding aviation piloting and flight planning issues."[339] In particular, he applies his extensive expertise in aviation and flight planning to opine that the  handwritten notes and calculations found in Omar al Bayoumi's possession in England in September 2001, after the 9/11 attacks were used to support the hijackers in planning the 9/11 attacks.[340] The materials were found in Bayoumi's apartment and Bayoumi admits they are in his handwriting.[341] The notepad at issue shows an equation at the top, followed by a drawing of a plane at an unresolved distance from the horizon, notes referencing variables used in terms of the height and distance of a plane from the horizon, followed by numerical calculations.[342]

Specifically, Captain Schiff opined that "[t]he equation used by Bayoumi is based on the principles of geometry and is used in aviation to determine the line-of-sight distance to the horizon from an airplane at a given altitude" and given the context, i.e. numerous contacts between Bayoumi and the hijackers, as well as Bayoumi's illogical explanation of the formula, calculations and diagram, the equation would "enable a hijacker/pilot to determine from what distance he could expect to

---

[337] *Id.* at 720, 728.
[338] Ex. 6 (Moss Dep.) at 20:13-18).
[339] Ex. 12 (Schiff Report) at 1.
[340] *Id.* at 2.
[341] Ex. 14 (Bayoumi Dep.).
[342] *See* Ex. 3 (Moss Report) at 5.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

visually acquire a ground target from a given aircraft altitude so that he could then maneuver the aircraft to strike said target."

### A. Moss's Opinions About the Distance from Which a Pilot Can Identify a Target Are *Ipse Dixit* Unmoored from Any Reliable Basis or Method.

While Moss acknowledged that the equation Bayoumi wrote down "would give a limiting theoretical floor" for where one can see an object on the horizon at a certain flight altitude;[343] and that there is no formula *other* than the equation Bayoumi used that could be used to determine at what point a pilot could first see a target;[344] Moss nevertheless opines that Bayoumi's formula is "useless" for targeting a target such as the World Trade Center (WTC) because one must be within 5-10 miles to identify a building such as the WTC.[345]

Moss, however, applies no reliable method to reach his conclusion. The explanation he disclosed in his report consists of unsupported *ipse dixit* about his own personal abilities, not expert analysis satisfying *Daubert*. Moss testified that he would be "surprised if you could identify specifically the World Trade Center towers" from 24 miles away and said that he didn't even know if the WTC was the tallest structure in New York.

[346] Indeed, as most anyone familiar with the New York Tri-State area knows, the World Trade Center was visible from the ground from more than 30 miles away and even further when viewed from aircraft during flights. In fact, after the 9/11 Attacks, media sources captured images of the burning north tower just before its collapse from Greenwich, Connecticut, approximately 30 miles away.[347]

### B. Moss's Undisclosed Basis.

---

[343] *Id.* at 83:17-21.
[344] *Id.* at 68:4-8.
[345] Ex. 6 (Moss Dep.) at 50, 98, 103.
[346] Ex. 6 (Moss Dep.) at 94:25-95:15; 96:11-12.
[347] https://www.greenwichtime.com/news/article/Witness-to-the-unthinkable-Greenwich-Point-2164396.php (last accessed 5/11/2023).

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Moreover, Moss admitted at his deposition that he chose not to disclosed in his report that his opinions were based on testing he performed while sitting on his home porch in the Reno, Nevada foothills.[348]Moss testified that as an attempt to "somewhat verify" his theory, he performed a personal experiment.[349] Specifically, Moss sat with his iPad at his home in Reno and determined how far away he could identify specific buildings. To do this, he looked outside, and then looked for the building on an app called ForeFlight, which has a map feature like Google Earth or Google maps. Then, he would use a "yardstick" type feature on the app to calculate the distance to the different buildings or features he saw.[350]  Moss did not document the results of this exercise in his report or anywhere else, nor can could he remember or give an address for anything he identified using this technique.[351]  This, Moss testified, was actually "how [he] came up with those numbers, five to ten miles." [352]

Moreover, although Moss presented this alternative basis as something he used to "assess, in a fairly scientific manner, when [he] could identify certain objects,"[353] it is not testable, nor does it meet the requirements for a reliable methodology under *Daubert*. Even Moss himself could not be sure he could repeat it, as he cannot remember which objects he used for this assessment. Furthermore, Moss performed his exercise from the ground, while Bayoumi's equation calculated the distance necessary to see a target from the air. Moss looked at "structures" too small to have an address, yet the WTC was the tallest building in the largest city in the United States.[354] Moss's distance opinions

---

[348] Ex. 6 (Moss Dep.) at 104:22-106:16 (stating that "part of the basis" for his opinions was not disclosed in his report).
[349] Ex. 6 (Moss Dep.) at 106:21-109:16.
[350] *Id.* at 105:5-109:16. The app does not allow one to enter a specific building address for use or identify specific buildings but does have a feature to "identify where on the map a building would be based on upon the surrounding terrain and road structure." *Id* at 109:2-16.
[351] *See id.* at 107:25-108:6 & 110:21-111:20. Further, many of the "structures" he identified did not have addresses at all. *Id.* at 11:17-20.
[352] *See id.* at 105:2-3.
[353] *See id.* at 105:11-13.
[354] *Compare also Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.,* 14 F.Supp.2d 391, 404 (S.D.N.Y. 1998) (expert "could not testify as to facts that have no support in the evidence generated by witnesses with knowledge of the facts").

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

should be excluded as unreliable, unhelpful, and irrelevant, and also barred because they were not properly set forth in his report.

### C. Moss Speculates as to the Document in Bayoumi's Apartment.

When asked what he believed was the purpose behind the Bayoumi formula, calculations and diagram, Moss simply suggests that "there could be any number of reasons" to use the equation at the top of Bayoumi's notepad.[355] He then suggests that because this particular type of equation is, in his view, frequently used in academics, Bayoumi's equation and calculations "are more consistent" with efforts to assist a student, perhaps his son, "with school work."[356] But at his deposition, Moss admitted that Bayoumi's own testimony about the equation had nothing whatsoever to do with his son or purported But at his deposition, Moss admitted that Bayoumi's own testimony about the equation had nothing whatsoever to do with his son or purported "school work."[357] As Moss admitted, he "can't get into Bayoumi's head"[358] and was simply stating that "there could be any number of reasons" to write down such an equation.[359] His opinions are nothing more than unhelpful speculation, and should be excluded under *Daubert*.[360]

---

[355] Sections 8-10 of Moss's report offer Moss's inadmissible conjecture about the purpose of the handwritten notes found in Bayoumi's possession and whether they were prepared to assist the 9/11 hijackers. Ex. 3 (Moss Report) at 7.

[356] *Id.*

[357] Ex. 6 (Moss Dep.) at 23:16-24 ("I did not say that was why he wrote it.").

[358] *Id.* at 23:16-24.

[359] *Id.*

[360] *See, e.g.,* Doc. 9060 at 20 (Opinion and Order) (citing *Major League Baseball Props.*, 542 F.3d at 311 as "precluding speculation, conjecture, and conclusory opinions"). It bears noting the Moss's speculation also has a certain internal inconsistency to it. He suggests that Bayoumi did not solve the equation and may not have known how to do so. Ex. 3 (Moss Report) at 7-8. If that were the case, how could he help a student to do so? And why would he add another problem to the student's plate instead or aiding in the resolution of an already-existing textbook question?

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

## VIII.   THE COURT SHOULD PRECLUDE RUNDELL'S TESTIMONY BECAUSE IT IS UNHELPFUL, LACKS SPECIALIZED KNOWLEDGE, TELLS THE FACTFINDER WHAT RESULT TO REACH, AND IMPROPERLY (AND IN CONCLUSORY FASHION) ARGUES THE QUALIFICATIONS OF OTHER EXPERTS.

Rundell himself states that "I understand that this case is about the September 11, 2001, attacks. I am not addressing the history of those attacks in this report or attempting to weigh the evidence concerning them. To do so would be outside my assignment and indeed beyond the scope of my expertise."[361] Instead he styled his report to rebut opinions of three of Plaintiffs' experts: Lawrence Dunham, Steven Simon, and Dr. Emile Nakhleh. To that end, he sets forth three sets of opinions styled as rebuttal to each of those experts. Rundell then tacks on to these conclusions, however, an "Opinion 4," which he summarizes as his own belief that "[i]t is implausible that the Saudi government funded or supported one of its most dangerous enemies in an attack on one of its most important strategic allies."[362] In support of this conclusory statement, he offers two paragraphs styled as the "conclusion" section to his report. Rather than providing analysis, Rundell simply purports to "emphasize" certain "points" he drew as his own conclusions.

Such "conclusory" claims must be excluded. *See Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) (stating that opinions that are "conclusory" must be excluded) (citing *Major League Baseball Props.*, 542 F.3d at 311 (rejecting expert's conclusory statement where it was not accompanied by "any evidentiary citation" or any elaboration of the expert's reasoning)). This is particularly true where, as here, the claims are offered in rebuttal, but do not directly rebut any particular expert, except to the extent that Rundell claims, in ipse dixit fashion, that no "serious or informed" person could possibly disagree with him. Further, "the overwhelming weight of Second Circuit authority precludes expert testimony" on whether it would be objectively reasonable for a party to act in a certain manner,

---

[361] Ex. 2 (Rundell report) at 30.
[362] *Id.* at 3.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

as this is "a quintessential common law jury question." *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.,* 14 F. Supp. 2d 391, 404 (S.D.N.Y 1998). A related ground for the exclusion of the testimony is that it is unhelpful to the trier of fact because: it "undertakes to tell the jury what result to reach," and "attempts to substitute the expert's judgment for the jury's" in a manner that does not "'assist the trial of fact.'" *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (quoting Fed. R. Evid. 702).

Regarding Plaintiffs' expert, former State Department Chief of Diplomatic Protocol, Lawrence Dunham, Rundell concedes that "I have no opinion as to whether Saudi Arabia obtained the proper diplomatic or consular credentials for individuals working outside of the Embassy or Consulate or if the Saudi government violated State Department regulations in place at the time."[363] That should be the end of the discussion. Nonetheless Rundell cavalierly offers his personal belief that even if Saudi Arabia violated the law, it is excusable because the U.S. engages in an analogous practice by "promoting American cultural values abroad."[364] Rundell's opinion should be struck; his false 'apples and oranges' comparison of secret Saudi support for religious extremists inside the U.S. with the U.S. government's promotion for democracy and human rights is off the mark, irrelevant, and does not provide expert analysis that assists the finder of fact.

Mr. Rundell also makes conclusory statements regarding the qualifications of Plaintiffs' expert, Dr. Emile Nakhleh, and improperly argues Dr. Nakhleh's level of expertise as compared to his own. Specifically, Rundell opines that his own background includes extensive travel inside Saudi Arabia and touts himself as possessing "more limited," but impliedly specific expertise than Dr. Nakhleh, making him better suited to opine on the matters at issue in their respective reports. Alluding to Dr. Nakhleh's vast experience and impressive credentials, Rundell comments, "No one covering Political Islam from

---

[363] *Id.* at 33.
[364] *Id.* at 33-4.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Morocco to Indonesia could be expected to have a detailed understanding of the 'social, cultural, historical, linguistic, economic, educational, and political environment' in Saudi Arabia."[365]

Mr. Rundell's opinions as to Dr. Nakhleh's abilities are improper attack on an expert's credibility, *see Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005), and Rundell has no support for his opinion concerning what Dr. Nakhleh can do. His opinion is only his own *ipse dixit*. It is also, ultimately, a curious choice for Mr. Rundell to opine as to other expert's relative capacity to offer opinions of relevant detail, given the wide range of irrelevant issues Rundell addresses in his own report.[366]

When it comes to discussing the subject matter of *this* case, Rundell makes clear that he did not follow any methodology to analyze the relevant record evidence; indeed, he admits that he did not analyze the evidence at all: "Am I aware that the FBI produced things for this present litigation? I think I am. I think I've heard that somewhere. I don't think I've ever seen anything that they produced…."[367] Rundell never engaged with the FBI, EO, or MPS productions and he did not even review any of the discovery produced by Saudi Arabia to investigate the facts.[368] Rundell improperly claimed that his own personal knowledge was sufficient to offer his critique of other expert reports that did review the relevant evidence.[369]

Rundell finally admits his personal biases for Saudi Arabia when asked about his opinions regarding the murder of Jamal Khashoggi at the Saudi Embassy in Istanbul:

> Do I agree that the United States has a strategic relationship with Saudi Arabia that should not be destroyed by the death of one person? Yes. Q. Does the United States have a strategic relationship with Saudi Arabia that outweighs the death of 3,000 persons, sir? …. You're

---

[365] *Id.* at 40 ff. Rundell's statements regarding Dr. Nakhleh actually serve to underscore the latter's credentials, especially as at several points Rundell acknowledges and endorses Dr. Nakhleh's expertise and career achievements,

[366] Rundell's report contains his forays into topics as diverse as "Modern Islamic Thought and al-Qaeda," an Ottoman Sultan's attack on Vienna in the Nineteenth century, "establishment of British and French mandates in Egypt, Syria, Iraq, Lebanon and Palestine," a section related to the "Indian Subcontinent," and another concerning "Late Twentieth Century Political Events in Iran and Pakistan," among other topics.

[367] Ex. 5 (Rundell Dep.) at p. 162:7-17.

[368] Ex. 5 (Rundell Dep.) at 163:10-14.

[369] Ex. 5 (Rundell Dep.) at 163:19-164:21.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

getting --that's a hypothetical question, you know…. So I think, you know, you can stand on your soapbox all you want, but these are the realities of the world, that we have an important relationship with Saudi Arabia that the American people depend upon to a considerable extent for their security and their prosperity, and it needs to be maintained. And I do believe that, yes.[370]

While Rundell's many years of residence in Saudi Arabia may have positioned him to discuss certain aspects of the Kingdom from an insider's perspective, he is unqualified to address the issues in this case, and his opinions in this case rely almost entirely on his own say-so. His failure to cite support for his sweeping claims and rebuttals are, by his own admission, premised on his belief that the evidence produced in this litigation is irrelevant. Rundell exhibits such a pre-disposed bias in favor of Saudi Arabia where many of his friends reside, that he believes there is no need to follow any reliable methodology. His report of unsupported ipse dixit opinions and ultimate conclusions should be struck.

## **CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court bar, exclude, or otherwise limit the expert opinions and testimony offered by Marc Sageman, David Henry Rundell, and Douglas M. Moss, together with such further relief as the Court may deem appropriate.

---

[370] Ex. 5 (Rundell Dep.) at pp. 293:10-15, 294:15-24.

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

Dated:  May 12, 2023                         Respectfully submitted,

MOTLEY RICE LLC                              COZEN O'CONNOR

By:  /s/ Robert T. Haefele                   By:  /s/ Sean P. Carter
ROBERT T. HAEFELE                            SEAN P. CARTER
JODI WESTBROOK FLOWERS                       STEPHEN A. COZEN
DONALD A. MIGLIORI                           J. SCOTT TARBUTTON
C. ROSS HEYL                                 COZEN O'CONNOR
MOTLEY RICE LLC                              One Liberty Place
28 Bridgeside Boulevard                      1650 Market Street, Suite 2800
Mount Pleasant, SC 29465                     Philadelphia, Pennsylvania 19103
Tel.: (843) 216-9184                         Tel.: (215) 665-2105
Email: rhaefele@motleyrice.com               Email: scarter@cozen.com

*For Plaintiffs' Executive Committee for Personal Injury*   *For the Plaintiffs' Executive Committee for Commercial*
*and Death Claims on behalf of the Plaintiffs*             *Claims on behalf of Plaintiffs*

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian, Esq.
James Gavin Simpson, Esq.
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

CONFIDENTIAL: Subject to FBI and MDL Protective Orders

**Certificate of Service**

I hereby certify that, on May 12, 2023, I caused an electronic copy of Memorandum of Law in Support of Plaintiffs' *Daubert* Motion to Exclude and/or Limit Proposed Testimony of Defendant Saudi Arabia's Proposed Experts, Marc Sageman, David Henry Rundell, and Douglas M. Moss, and all accompanying papers to be served electronically by the Court's Electronic Case Filing (ECF) System. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

/s/ _____
       Robert T. Haefele