**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) ECF Case |
|---|---|

This document relates to: *All Actions*

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT KINGDOM OF SAUDI ARABIA'S MOTION (ECF No. 9088) TO EXCLUDE EXPERT TESTIMONY OF BASSEM YOUSSEF, DR. EMILE NAHKLEH, DR. ALEXANDER MELEAGROU-HITCHENS AND CAPTAIN BARRY SCHIFF

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

*For Plaintiffs' Executive Committee for Commercial Claims on behalf of the Plaintiffs*

June 26, 2023

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD ............................................................................................................... 2

ARGUMENT ........................................................................................................................... 3

I.   PLAINTIFFS' EXPERTS HAVE SUBSTANTIAL RELEVANT
     QUALIFICATIONS AND WELL REASONED OPINIONS THAT SAUDI
     ARABIA MISCHARACTERIZES ................................................................................. 3

     A. Bassem Youssef ("Youssef") .................................................................................... 3

     B. Dr. Emile Nakhleh ("Nakhleh") ............................................................................... 9

     C. Dr. Alexander Meleagrou-Hitchens ("Hitchens") ................................................. 12

     D. Captain Barry Schiff ("Schiff") ............................................................................. 13

II.  THE PLAINTIFFS' EXPERTS HAVE THE REQUISITE QUALIFICATIONS
     TO OPINE ON THE RELEVANT MATTERS OUTLINED IN THEIR
     REPORTS ................................................................................................................... 15

     A. Youssef is qualified to opine as to the Sunni extremist networks Saudi Arabia
        established before the 9/11 attacks and on Saudi government officials' use of those
        networks to aid 9/11 hijackers Hazmi and Mihdhar. ............................................. 15

     B. Nakhleh is qualified to offer opinions on the ideological and operational aspects of
        Saudi Arabia's support for extremism through its Ministry of Islamic Affairs. ....... 17

        1.  Nakhleh's background and professional experience qualify him to offer opinions
            on the tenets of Wahhabism and Wahhabis' engagement with the wider world in
            the context of jihad. ...................................................................................... 17

        2.  Nakhleh is qualified to opine on governance in Saudi Arabia in the 1990s, the
            Islamic Awakening, the creation of the Ministry of Islamic Affairs (MOIA) and
            MOIA's pursuit of da'wa overseas. ................................................................. 19

        3.  Nakhleh is qualified to opine on the roles of Saudi officials in the support
            network for the 9/11 terrorist attacks. ............................................................ 21

        4.  Nakhleh's specialized knowledge of religious doctrine and practice qualifies him
            to opine on the testimony of Saudi Arabia's propagator Fahad al-Thumairy and
            other witnesses. ........................................................................................... 22

     C. Hitchens is qualified to offer the opinions offered. ............................................... 23

     D. Schiff is qualified to offer the opinions offered. .................................................... 24

III. THE PLAINTIFFS' EXPERTS' OPINIONS ARE THE PRODUCT OF
     RELIABLE DATA AND METHODOLOGIES. ............................................................ 24

     A. Youssef and Nakhleh Did Not Rely on Classified Materials or Methodologies. ...... 24

i

**FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

1. Youssef did not rely on classified materials or methodology. ..................................24

2. Nakhleh, likewise, did not form his opinions based on classified materials or confidential information. ...............................................................26

B. Youssef Applied Reliable Methodology to Form his Opinions. .................................28

1. Youssef's used thorough FBI investigation techniques. ......................................28

2. Youssef does not selectively adopt FBI theories but applies his expertise and experience to bring human reason to bear upon disputed facts. ...........................29

3. Youssef credits hearsay to the extent that it is supported by other evidence. ...................30

4. Youssef does not engage in speculation and conjecture. ......................................32

5. Youssef properly applied his expertise to the phone data. ....................................33

6. Youssef used careful analysis, not "guilt by association." ....................................36

C. Nakhleh Applied Reliable Methodology to Form his Opinions. ...............................37

1. Nakhleh thoroughly explained his reliance on experience ...................................37

2. Nakhleh's opinions on Wahhabism and jihad reflect robust support in authoritative scholarship, based on facts and data that experts in analogous fields frequently rely on. ...............................................................41

3. Nakhleh carefully analyzed the materials produced in this litigation and formed his opinions on the totality of the evidence. ................................................47

4. Nakhleh's opinions are based on expert analysis of the weight of the evidence, not on speculation and conjecture. ...........................................................48

D. Hitchens Applied Reliable Methodology to Form his Opinions. ...............................49

1. Hitchens used his peer-reviewed methodology. ..................................................49

2. Hitchens made detailed findings about Awlaki's pre-9/11 extremism. .................50

3. Hitchens does not selectively adopt FBI theories. ..............................................51

4. Hitchens does not speculate about Awlaki, Bayoumi, and Thumairy. .................52

E. Schiff Applied Reliable Methodology to Form his Opinions. ..................................53

1. Schiff's experience directly supports his opinions. .............................................53

2. Schiff's opinions have no "analytical gaps." ......................................................54

3. Captain Schiff's Opinions Are Not Speculative or Conjectural. .........................56

4. Captain Schiff properly considered "obvious alternative explanations." ............56

F. The Plaintiffs' Experts Youssef, Nakhleh, and Hitchens Do Not Improperly Rely on Hearsay as Mere Conduits. ................................................................57

1. Youssef did not improperly rely on hearsay. .....................................................57

2. Nakhleh did not improperly rely on hearsay. .....................................................58

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

3.   Hitchens did not improperly rely on hearsay.....................................................................60

IV.  THE PLAINTIFFS' EXPERTS DO NOT OPINE ON IMPROPER SUBJECTS...................60

A. Bassem Youssef..........................................................................................................60

1.   Youssef properly applies his expertise to the facts.....................................................60

2.   Youssef may testify as to reliability of evidence considered. ....................................61

3.   Youssef does not offer "State of Mind" testimony.....................................................62

B. Dr. Emile Nakhleh......................................................................................................64

1.   Nakhleh may testify as to reliability of evidence considered. ....................................64

2.   Nakhleh does not offer "State of Mind" testimony....................................................66

C. Dr. Meleagrou-Hitchens Does not Improperly Opine on Credibility or State of Mind .........67

D. Captain Schiff Does not Improperly Opine About Credibility or State of Mind....................69

**CONCLUSION**........................................................................................................................70

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

<u>Table of Authorities</u>

## Cases

*Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A.*, 2005 WL 159592 (S.D.N.Y. Jan. 25, 2005) .........3

*Amorgianos v. Nat'l Railroad Passenger Corp.*, 137 F. Supp. 2d 147 (E.D.N.Y. 2001)................................44

*Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ........................................2

*Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...............................2

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415
(S.D.N.Y. Dec. 15, 2011) ..............................................................................................................66

*Berman v. Mobil Shipping & Transportation Co.*, 2019 WL 1510941 (S.D.N.Y. Mar. 27, 2019) ................2

*Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F. 3d 179 (2d Cir. 2001)..............................................47

*Cates v. Trs. of Columbia Univ. in City of N.Y.,* 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019)
(adopted at 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020)........................................................................2

*Commodities Cotton Futures*, 2020 WL 5849142 ............................................................................63

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................................passim

*Discover Fin. Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501 (S.D.N.Y. 2008)................................57

*Estate of Steinberg v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 199344
(D.D.C. Nov. 18, 2019) ................................................................................................................15

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012)..................................................passim

*Gray v. Cottrell, Inc.*, 2007 WL 4864393 (E.D. Mo. Jan. 11, 2007) .................................................25

*Henkin v. Islamic Rep. of Iran*, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021) ...........................15

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804 (2d Cir. 1994).....................passim

*In re Mirena Ius Levonorgestrel-Related Products Liab. Litig. (No. II)*, 341 F. Supp. 3d 213
(S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Products Liab. Litig.*
*(No. II)*, 982 F.3d 113 (2d Cir. 2020) ............................................................................................57

*In re Nat'l. Prescription Opiate Litig.*, 2019 WL 3934490 (N.D. Ohio Aug. 20, 2019) ............................25

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2022
WL 14814183 (E.D.N.Y October 26, 2022)............................................................................. 62, 70

*In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020)...................62

*In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230................................................................2

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001) .............................................. 19, 67

*Joseph S. v. Hogan*, 2011 WL 2848330 (E.D.N.Y. July 15, 2011) ....................................................3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......................................... 27, 30, 38, 42

*Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302 (S.D.N.Y. 2022) ........................................2

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ........................................... 44, 45

*Marvel Characters, Inc. v Kirby*, 726 F.3d 119 (2d Cir. 2013) ...........................................24, 64, 68

*Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720 (S.D.N.Y. 2011)............................................64

*Matter of Manhattan by Sail, Inc.*, 436 F. Supp. 3d 803 (S.D.N.Y. 2020) ........................................3

*McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995).............................................2, 16, 53

*Nimley v. City of N.Y.*, 414 F.3d 381 (2d Cir. 2005).............................................61, 62, 68

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) ............................................................................................50

*Riegel v. Medtronic, Inc.*, 451 F.3d 104 (2d Cir. 2006)................................................................49

*Rizk v. City of New York*, 2022 WL 900784 (E.D.N.Y. Mar. 28, 2022)................................................45

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

*S.E.C. v. Tourre*, 950 F. Supp. 666 (S.D.N.Y. 2013) ...................................................................2
*Sanchez v. Boston Sci. Corp.*, 2014 WL 4851989 (S.D.W.Va. Sept. 29, 2014).......................25
*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016).....................................30
*Shulaya v. United States*, 141 S.Ct. 2689 (2021) .....................................................................17
*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107 (2d Cir. 2006) ............47
*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) ...........................................................2
*Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 CIV. 3040 KBF, 2014 WL 464769
    (S.D.N.Y. Jan. 28, 2014) ....................................................................................................18
*U.S. Commodities Futures Trading Comm'n v. Wilson*, 2016 WL 7229056
    (S.D.N.Y. Sept. 30, 2016) ..................................................................................................66
*U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) ...............................................................................57
*U.S. v. Duncan*, 42 F.3d 97 (2d Cir.1994).................................................................................61
*U.S. v. Joseph*, 542 F.3d 13 (2008) ...........................................................................................49
*U.S. v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ....................................................................36
*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) ...................................passim
*United States v. Arslanouk*, 853 F. App'x. 714 (2d Cir. 2021) ..................................................17
*United States v. Damrah*, 412 F.3d 618 (6th Cir. 2005).............................................................45
*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .............................................................59
*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000) ............................................................69
*United States v. Johnson*, 319 U.S. 503 (1943) .........................................................................23
*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993).........................................................36, 58
*United States v. Mohammad*, 3:15-cr-00358-JJH (N.D. Ohio) ...................................................50
*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) .................................................................2
*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ..........................38, 42, 47, 58
*United States v. Patel*, 2023 WL 2643815 (D. Conn. Mar. 27, 2023).......................................63
*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) ...........................................................19, 36
*Vazquez v. City of New York*, 2014 WL 4388497 (S.D.N.Y. Sep. 5, 2014)................................45
*Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775
    (S.D.N.Y. Apr. 8, 2009) ......................................................................................................3
*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015) ........................................15
*Washington v. Schriver*, 255 F.3d 45 (2d Cir. 2001)..................................................................61
*Youssef v. F.B.I.*, 541 F. Supp. 2d 121 (D.D.C. 2008), *rev'd in part*, 687 F.3d 397
    (D.C. Cir. 2012)..........................................................................................................15, 16
*Youssef v. F.B.I.*, 687 F.3d 397 (D.C. Cir. 2012) .....................................................................16
*Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217 (1996) ................................................61

## Other Authorities

Bonnefoy, "Book Review: Wahhabi Islam," *The Journal of Islamic Studies* 17 (2006)...............46
Bunzel, Wahhabism: The History of a Militant Islamic Movement
    (Princeton University Press, 2023) ................................................................................18, 46
Kearney, J., "The real Wahhab," *Boston Globe*, Aug. 8, 2004) .................................................46
The 9/11 Commission Report: Final Report of the National Commission on
    Terrorist Attacks Upon the United States. Norton, 2004 ..................................................7, 43

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

**Rules**

Fed. R. Evid. 402 ...................................................................................................................1

Fed. R. Evid. 702 ..........................................................................................................passim

Fed. R. Evid. 703 ..........................................................................................................passim

Fed. R. Evid. 704 ............................................................................................................62, 70

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

**Key to Exhibit Citations**

Exhibits cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele, filed with the Memorandum, cited herein as "Ex. __"

| | |
|---|---|
| Ex. 1 (Youssef Rpt.) | Expert Report of Bassem Youssef (April 1, 2022) – version served on May 3, 2023, incorporating corrections from Errata Sheets dated April 22, 2022, May 8, 2022, and May 3, 2023 (Contains FBI-protected material). |
| Ex. 1A (Youssef Rpt.) | Expert Report of Bassem Youssef (April 1, 2022) – version served on May 3, 2023, incorporating corrections from Errata Sheets dated April 22, 2022, May 8, 2022, and May 3, 2023 (FBI-protected material redacted from document). |
| Ex. 1B (Youssef CV) | CV of Plaintiffs' Expert Bassem Youssef. |
| Ex. 2 (Nakhleh Rpt.) | Expert Report of Dr. Emile A. Nakhleh (April 1, 2022) – version served on May 14, 2022, incorporating corrections from Errata Sheet dated May 14, 2022 (Contains FBI-protected material). |
| Ex. 2A (Nakhleh Rpt.) | Expert Report of Dr. Emile A. Nakhleh (April 1, 2022) – version served on May 14, 2022, incorporating corrections from Errata Sheet dated May 14, 2022 (FBI-protected material redacted from document). |
| Ex. 3 (Hitchens Rpt.) | Expert Report of Dr. Alexander Meleagrou-Hitchens (April 1, 2022) – version served on May 11, 2022, incorporating corrections from Errata Sheet dated May 11, 2022 (Contains FBI-protected material). |
| Ex. 3A (Hitchens Rpt.) | Expert Report of Dr. Alexander Meleagrou-Hitchens (April 1, 2022) – version served on May 11, 2022, incorporating corrections from Errata Sheet dated May 11, 2022 (FBI-protected material redacted from document). |
| Ex. 4 (Schiff Rpt.) | Expert Report of Captain Barry Schiff (April 1, 2022) (Contains FBI-protected material). |
| Ex. 4A (Schiff Rpt.) | Expert Report of Dr. Alexander Meleagrou-Hitchens (April 1, 2022) – version served on May 11, 2022, incorporating corrections from Errata Sheet dated May 11, 2022 (FBI-protected material redacted from document). |
| Ex. 4B (Schiff CV) | CV of Plaintiffs' Expert Captain Barry Schiff. |
| Ex. 5 (Youssef Tr.) | Transcript of the Deposition of Bassem Youssef (June 29, 2022) – excerpted pages. |
| Ex. 6 (Nakhleh Tr.) | Transcript of the Deposition of Dr. Emile A. Nakhleh (June 15, 2022) – excerpted pages. |
| Ex. 7 (Hitchens Tr.) | Transcript of the Deposition of Dr. Alexander Meleagrou-Hitchens (June 23, 2022) – excerpted pages. |
| Ex. 8 (Schiff Tr.) | Transcript of the Deposition of Captain Barry Schiff (July 11, 2022) – excerpted pages. |

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

| Ex. 9 (Bayoumi Tr.) | Transcript of the Deposition of Omar Al-Bayoumi (June 8-10, 2021) — excerpted pages. |
|---|---|
| Ex. 10 (Thumairy Tr.) | Transcript of the Deposition of Fahad Al-Thumairy (June 28-30, 2021) — excerpted pages. |
| Ex. 11 (Curran Tr.) | Transcript of the Deposition of Edward J. Curran (April 21, 2005) in *Youssef v. FBI*, 1:0 3CVO 1551, D.D.C., from Doc. No. 82-16 on the docket of Case 1:03-cv-01551-CKK (D.D.C.), filed Mar. 13, 2006 — excerpted pages. |
| Ex. 12 (Mana Tr.) | Transcript of the Deposition of Ismail Ammar Mohamed Mana (April 21, 2021) — excerpted pages. |
| Ex. 13 (Snell Decl.) | Declaration of Dietrich L. Snell, Esq. (May 10, 2021) including its Exhibits 1-6, memoranda prepared for the 9/11 Commission. |
| Ex. 14 (MPS 43-409, -408) | Cover sheet and excerpted bates-stamped pages 409, 408 from URN 43 (PSS/115) of the documents produced by the Metropolitan Police Service ("MPS"), showing an Agreement signed by Omar Al Bayoumi, dated August 4, 1998, for the installation of a Public Telephone at the Masjid Al-Madinah Al-Munawarah (agreement for public payphone). |
| Ex. 15 (MPS 713-7, 137) | Cover sheet and excerpted bates-stamped pages 7, 137 from URN 713 (PSS/57) of the documents produced by the Metropolitan Police Service ("MPS"), showing (among various other items) the business cards of two separate Personal Bankers from the Bank of America, Balboa-Genesee Branch, listing the branch's contact number for Customer Service as "858.452.8400" (in 2000, Olympic year) and "619/452-8400" (prior to change in dialing code) respectively. |
| Ex. 16 (EO14040-000001 to –14-MDL) | Excerpted pages 1-14 (bates stamped EO14040-000001 to -14-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, an FBI Electronic Communication (EC), titled "To administratively close case," dated May 27, 2021 (Subject to FBI Protective Order). |
| Ex. 16A (EO14040-000001 to -14) | Excerpted pages 1-14 (bates stamped EO14040-000001 to -14) from documents produced by the FBI pursuant to Executive Order 14040, an FBI Electronic Communication (EC), titled "To administratively close case," dated May 27, 2021. |
| Ex. 17 (EO14040-000518 to -523-MDL) | Excerpted pages 518-523 (bates stamped EO14040-000518 to -523-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, titled "To Report Information Garnered During A Debriefing" (Subject to FBI Protective Order). |
| Ex. 17A (EO14040-000518 to -523) | Excerpted pages 518-523 (bates stamped EO14040-000518 to -523) from documents produced by the FBI pursuant to Executive Order 14040, titled "To Report Information Garnered During A Debriefing." |
| Ex. 18 (EO000603 to -615-UPDATED MDL) | Excerpted pages 603-615 (bates stamped EO14040-000603 to -615-UPDATED-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, FBI document, dated Dec. 28, 2009, outlining Operation Encore investigation (Subject to FBI Protective Order). |

**FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

| | |
|---|---|
| Ex. 18A (EO14040-000603 to -615-UPDATED) | Excerpted pages 603-615 (bates stamped EO14040-000603 to -615-UPDATED) from documents produced by the FBI pursuant to Executive Order 14040, FBI document, dated Dec. 28, 2009, outlining Operation Encore investigation. |
| Ex. 19 (EO14040-002757-MDL) | Excerpted page 2757 (bates stamped EO14040-002757-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, FBI document, dated Sept. 29, 2005, providing details regarding telephone contacts (Subject to FBI Protective Order). |
| Ex. 19A (EO14040-002757) | Excerpted page 2757 (bates stamped EO14040-002757) from documents produced by the FBI pursuant to Executive Order 14040, FBI document, dated Sept. 29, 2005, providing details regarding telephone contacts. |
| Ex. 20 (EO14040-003414 to –3442-MDL) | Excerpted pages 3414-3442 (bates stamped EO14040-003414 to -3442-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, Joint Intelligence Report prepared by FBI and CIA, titled "Assessment of Saudi Arabian Support to Terrorism and Counterintelligence Threat to the United States, dated December 2004 (Subject to FBI Protective Order). |
| Ex. 20A (EO14040-003414 to -3442) | Excerpted pages 3414-3442 (bates stamped EO14040-003414 to -3442) from documents produced by the FBI pursuant to Executive Order 14040, Joint Intelligence Report prepared by FBI and CIA, titled "Assessment of Saudi Arabian Support to Terrorism and Counterintelligence Threat to the United States, dated December 2004. |
| Ex. 21 (EO14040-003465 to -3472-MDL) | Excerpted pages 3465-3472 (bates stamped EO14040-003465 to -3472-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, FBI document titled "FAHAD ALTHUMAIRY," DATED September 2, 2003 (Subject to FBI Protective Order). |
| Ex. 21A (EO14040-003465 to -3472) | Excerpted pages 3465-3472 (bates stamped EO14040-003465 to -3472) from documents produced by the FBI pursuant to Executive Order 14040, FBI document titled "FAHAD ALTHUMAIRY," DATED September 2, 2003. |
| Ex. 22 (EO14040-003478 to -3608-UPDATED MDL) | Excerpted pages 3478-3608 (bates stamped EO14040-003478 to -3608 UPDATED-MDL, FBI Protected version), FBI Electronic Communication, titled Connections to the Attacks of September 11, 2001, dated July 23, 2021 (Subject to FBI Protective Order). |
| Ex. 22A (EO14040-003478 to -3608-UPDATED) | Excerpted pages 3478-3608 (bates stamped EO14040-003478 to -3608 UPDATED), FBI Electronic Communication, titled Connections to the Attacks of September 11, 2001, dated July 23, 2021. |
| Ex. 23 (EO14040-003603 to -3606-MDL) | Excerpted pages 3603-3606 (bates stamped EO14040-003603 to -3606-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, noting significance of Saudi student population as a pool for al-Qa-ida (Subject to FBI Protective Order). |

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

| Ex. 23A (EO14040-003603 to –3606) | Excerpted pages 3603-3606 (bates stamped EO14040-003603 to -3606) from documents produced by the FBI pursuant to Executive Order 14040, noting significance of Saudi student population as a pool for al-Qa-ida. |
|---|---|
| Ex. 24 (EO14040-003612 to -3616-MDL) | Excerpted pages 3603-3606 (bates stamped EO14040-003612 to -3616-MDL, FBI protected version) from documents produced by the FBI pursuant to Executive Order 14040, FBI Confidential Human Source (CHS) Reporting Document, dated Jan. 30, 2008 <span style="color:red">(Subject to FBI Protective Order)</span>. |
| Ex. 24A (EO14040-003612 to -3616) | Excerpted pages 3603-3606 (bates stamped EO14040-003612 to -3616) from documents produced by the FBI pursuant to Executive Order 14040, FBI Confidential Human Source (CHS) Reporting Document, dated Jan. 30, 2008. |
| Ex. 25 (FBI 008057) | Bates-stamped page FBI008057 from documents produced by the FBI, with Bank of America Deposit Receipt, dated Feb. 4, 2000 <span style="color:red">(Subject to FBI Protective Order)</span>. |
| Ex. 26 ███████████) | Bates-stamped page ███████ from documents produced by Saudi Arabia, █████████████████████ |
| Ex. 27 (Bunzel, *Wahhabism*) | Excerpts from Bunzel, *Wahhabism: The History of a Militant Islamic Movement* (Princeton University Press, 2023), Introduction & Ch. 3, "The Key Components: Jihad." |
| Ex. 28 (Wahhabism Book Review) | Bonnefoy, L., "Book Review: Wahhabi Islam," *The Journal of Islamic Studies* 17 (2006)" 371-72. |
| Ex. 29 (Real Wahhab article) | Kearney, J., "The real Wahhab," *Boston Globe*, Aug. 8, 2004. |
| Ex 30 (DOJ expert disclosure) | (DOJ expert disclosure (Dec. 1, 2016), ECF 294 at 2, *United States v. Mohammad*, 3:15-cr-00358-JJH (N.D. Ohio)). |

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

# PRELIMINARY STATEMENT

The Plaintiffs' Executive Committees, for all Plaintiffs, respectfully submit this Memorandum of Law in opposition to Defendant Kingdom of Saudi Arabia's Motion to Exclude Expert Testimony (ECF No. 9088), filed May 12, 2023, seeking to exclude testimony of Plaintiffs' experts Bassem Youssef, Dr. Emile Nakhleh, Dr. Alexander Meleagrou-Hitchens, and Captain Barry Schiff (collectively "Plaintiffs' Experts"). As set out in more detail below, Plaintiffs' Experts' opinions and testimony are within the scope of Fed. R. Evid. 402 and 702 and should not be stricken.

As demonstrated below, Plaintiffs' experts have highly specialized knowledge and experience in the fields and issues they address through their testimony, and have reliably applied their unique expertise in reviewing the relevant evidence and arriving at their opinions. Their opinions will assist the Court as the factfinder and are manifestly proper under the standards applicable to this terrorism litigation. Saudi Arabia's misguided attacks on Plaintiffs' experts distort the applicable legal standards and deeply conflict with the "flexible" nature of this Court's inquiry into the reliability of the expert testimony, as required by the Federal Rules' "'general approach of relaxing the traditional barriers to 'opinion' testimony.'"[1] Contrary to this framework, the Kingdom largely hangs its arguments on its own one-sided view of sharply disputed facts, without acknowledging other conflicting and more credible evidence, or the full scope of the proofs underlying Plaintiffs' experts' opinions. On numerous occasions, Saudi Arabia essentially argues that Plaintiffs' experts should not be permitted to disagree with implausible testimony of the Kingdom's own fact witnesses or to explain how that testimony is inconsistent with other evidence and matters in the experts' field of expertise. None of these lines of argument support the exclusion of Plaintiffs' experts' opinion testimony, in whole or in part, and they

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

fall especially short in the context of the present proceeding, where the Court will sit as factfinder.

## LEGAL STANDARD

Plaintiffs previously set out the legal standards governing expert testimony, *see* ECF No. 9092, at 2-6, which are to be "construed with an eye towards the liberal thrust of the federal rules of evidence and their general approach of relaxing the traditional barriers to opinion testimony." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Daubert*, 509 U.S. at 588–89). Consistent with this principle, courts in the Second Circuit take a liberal view of the qualification requirements. ECF No. 9060 at 8 (citing *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020). If the expert has "educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).[2] The inquiry "is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 580. "[O]nly serious flaws in reasoning or methodology will warrant exclusion." *Cates v. Trs. of Columbia Univ. in City of N.Y.,* 2019 WL 8955333, at *11 (S.D.N.Y. Oct. 25, 2019) (adopted at 2020 WL 1528124, *7 (S.D.N.Y. Mar. 30, 2020) (Judge Daniels)); *see Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock*, 61 F.3d

---

[2] *See also Berman v. Mobil Shipping & Transportation Co.*, 2019 WL 1510941, at *8 (S.D.N.Y. Mar. 27, 2019) ("Assertions that the witness lacks particular educational or other experiential background[ ] 'go to the weight, not the admissibility, of [the] testimony.'") (citing *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 282 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)) (alteration in original)); *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) (approving expert opinion where testimony involved "broad economic principles" notwithstanding "lack of economics expertise" or training) (citations omitted).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

at 1044.

When, as here, "the Court serves as the factfinder, expert testimony should [generally] be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." *Matter of Manhattan by Sail, Inc.*, 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020) (citation omitted); *see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009) (explaining that, in a non-jury case, "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis."); *Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A.*, 2005 WL 159592 at *1 (S.D.N.Y. Jan. 25, 2005) ("[In] a bench trial, there is no concern with protecting a jury from 'being bamboozled by technical evidence of dubious merit.'"). The most appropriate course here is for the Court to address the disputed fact and evidentiary issues raised in Saudi Arabia's motion either at a hearing or during trial. *Joseph S. v. Hogan*, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011).

## **ARGUMENT**

I.  **PLAINTIFFS' EXPERTS HAVE SUBSTANTIAL RELEVANT QUALIFICATIONS AND WELL REASONED OPINIONS THAT SAUDI ARABIA MISCHARACTERIZES**

### A.   **Bassem Youssef ("Youssef")**

Bassem Youssef has an extensive and distinguished background and career with the FBI. Youssef grew up in Egypt, emigrated to the U.S. as a teenager, and became the FBI's first native Egyptian Arabic speaking special agent in 1988. He was immediately assigned to work on major Islamic counterterrorism cases, which became the focal point of his 26-year FBI career. Youssef's FBI assignments and investigatory skills, together with his Arabic language ability and native cultural knowledge, gave him extraordinary access to information about how Al Qaeda and related Islamic

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

extremist groups operated networks worldwide, inside the U.S., and specifically in Southern California in the decade before the 9/11 Attacks.

From 1992 to 1996, Youssef served as a special agent in counterterrorism investigations at the FBI's Los Angeles Field Office. Youssef led a major investigation of active Sunni extremist cells in Los Angeles and San Diego associated with the Al Gama'a Islamiyah (Al Gama'a) group led by the "Blind Sheikh" Omar Abdul Rahman, who was closely allied with Osama Bin Laden and Al Qaeda. Ex. 1 (Youssef Rpt.) 1-2, 19-21. Youssef was named as the FBI's nationwide coordinator of counterterrorism efforts against Al Gama'a and interacted with FBI headquarters on almost a daily basis on counterterrorism strategy against Islamic radical groups, including Al Qaeda and Al Gama'a. *Id.* at 2; Ex. 5 (Youssef Tr.) 50:6-9, 102:4-103:3. Youssef conducted training, seminars, and briefings for FBI special agents and CIA case officers on major case management of Islamic terror investigations and the recruitment and development of sources. Ex. 1 (Youssef Rpt.) 3. Youssef received a prestigious Director of Central Intelligence award for his work. Ex. 1B (Youssef CV).

After the June 1996 Khobar Towers terrorist bombing in Saudi Arabia, FBI Director Louis Freeh selected Youssef for a major promotion, naming him as the FBI's first Legal Attaché (LEGAT) to Saudi Arabia. He worked as LEGAT at the U.S. Embassy in Riyadh, Saudi Arabia from 1996 to 2000. Youssef regularly interacted with numerous high level Saudi officials in law enforcement, intelligence, and diplomatic circles on counterterrorism and other matters; attended meetings with the King, Crown Prince, and Minister of the Interior; spoke with the head of the Saudi Mabahith "once every two days"; had frequent dealings with the head of Saudi intelligence, Prince Turki, as well as officials at the Ministry of Foreign Affairs. Ex. 1 (Youssef Rpt.) 3, 36, 70; Ex. 5 (Youssef Tr.) 79:17 – 80:4. From 2000-2002, the FBI detailed Youssef to the CIA's National Counterintelligence Center as Group Chief of Executive Secretariat Office, where he coordinated the activities of several multi-

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

agency groups supporting the counterintelligence community, and as Chief of the Damage Assessment Branch, where he coordinated multi-agency efforts to assess the handling of high-profile intelligence leaks. Ex. 1 (Youssef Rpt.) 3; Ex. 1B (Youssef CV).

From 2002-2004, Youssef moved into a new role as the first Chief of the FBI's Digital Media Exploitation Unit, which was formed to provide vital know-how to counterterrorism investigations to analyze seized documents and computer hard drives of virtually every high-profile terrorism subject. Ex. 1 (Youssef Rpt.) 4. Youssef's investigatory skills were successful in opening the hard drive of Al Qaeda operative Dhiren Barot, giving investigators access to a trove of information about the terror group. Ex. 5 (Youssef Tr.) 372:3-373:22.

Youssef was named the Unit Chief of the Communications Analysis Unit of FBI's Counterterrorism Division, a position he held from 2004 until 2014. Youssef oversaw the FBI's analysis of telephone and email communications in support of counterterrorism investigations in all Field and LEGAT offices. Youssef's work to use communications analysis to "connect the dots" and identify terror networks was highly successful and led to the identification of numerous terror subjects and networks, including the two brothers responsible for the Boston Marathon bombing, and the Libyan militia leader associated with Al Qaeda who was responsible for the attack on the U.S. Consulate in Benghazi, Libya. Ex. 1 (Youssef Rpt.) 4-5. Throughout his FBI career, Youssef was given assignments on a variety of highly sensitive operations dealing with sources and undercover work involving radical Islamic groups. *Id.* at 3, 5, 22; Ex. 5 (Youssef Tr.) 369:18 - 370:8, 376:17-22.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Youssef applied knowledge and skills developed from his nearly 30-year FBI career to his analysis of the complete evidentiary record in this litigation to reach the opinions offered in this case.[3] Applying his experience, training, and in-depth knowledge of Sunni extremist groups (including Al Qaeda in particular) to assess the available evidence, Youssef reached four principal (but not exclusive) conclusions.

*First*, Youssef concluded that Saudi Arabia, and especially its Ministry of Islamic Affairs ("MOIA"), established a longstanding network of Saudi government officials to support Sunni extremism inside the U.S., including in Southern California, and that both Fahad al Thumairy ("Thumairy") and Omar al Bayoumi ("Bayoumi") were part of this network. *E.g.*, Ex. 1 (Youssef Rpt.) 9-12, 21, 49-53, 73, 85, 100. Youssef based his opinions on his own experience (including personal observations) as an FBI agent investigating Sunni extremist cells in Los Angeles and San Diego and application of that experience to an expansive range of evidence (as documented in his report).[4]

---

[3] Youssef's review and analysis included, for example, thousands of pages of evidence from FBI's PENTTBOM and Operation Encore investigations; government reports concerning the September 11th attacks (including the 9/11 Commission Report, CIA reports concerning the 9/11 operation, the 9/11 Review Commission Report, the Congressional Joint Inquiry); thousands of pages of evidence seized by Greater London's Metropolitan Police Service ("MPS") in a raid of Bayoumi's flat immediately after 9/11, bank and phone records; telephone records of key parties, to identify contacts and call patterns at key moments; and deposition testimony of all of the witnesses relevant to the claims against Saudi Arabia who testified in the litigation.

[4] Evidence toward his conclusion includes, *inter alia*, the extremist group Thumairy led at the King Fahad Mosque, *id.* at 49-60; that Bayoumi became a prominent member of the extremist group at the Islamic Center of San Diego, *id.* at 85-90; the direct links between those groups to the extremist cells that Youssef observed firsthand, *id.* at 35, 85; the Saudi government's funding and operation of the Ibn Taymiyyah and King Fahad Mosques, and the direct supervision in the running of those Mosques by senior Saudi government officials at MOIA's headquarters, the Saudi Embassy, and Saudi Consulate *id.* at 12, 42-49, 61-63; the visits of numerous Saudi government officials to Thumairy and Bayoumi in California, *id.* at 47, 106-8, 111, 147-9; the involvement of Thumairy and Bayoumi with Sunni extremists, including those tied to Al Qaeda, *id.* at 53, 63-5, 88, 103, 137-8, 201; MOIA's official appointment of Thumairy in January 1998 to lead Saudi government propagators in California, and work that his propagators did for Sunni extremist groups, *id.* at 44, 57-8, 63-65, 88; Youssef's analysis of the phone contacts of Thumairy and Bayoumi with Embassy and MOIA officials and each other, *id.* at 125-39; Saudi Arabia's operation of the Al Haramain organization, which was led by the Minister of Islamic Affairs, *id.* at 93-4, as well as the involvement of Al Haramain with Bayoumi, Thumairy, and visiting Saudi propagators, *id.* at 91-100, 105-6; and Al Haramain's direct support for Al Qaeda prior to the 9/11 Attacks, as admitted by Saudi Arabia, *id.* at 94-5.

6

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

*Second*, Youssef concluded that Al Qaeda would have sent 9/11 hijackers Nawaf al Hazmi Hazmi and Khalid al Mihdhar to Southern California, to commence the preparations in the United States for Al Qaeda's most important and ambitious plot, only after conducting detailed research and planning. Ex. 1 (Youssef Rpt.) 100-101, 160-62. Consistent with the findings of the 9/11 Commission, he opined that Al Qaeda would not deploy its operatives unless a support network was in place to help them accomplish their mission. Ex. 1 (Youssef Rpt.) 15, 100-101, 160-61, 169; Ex. 5 (Youssef Tr.) 298:9-18 ("[T]here is no way that al-Mihdhar and al-Hazmi would have been thrown into Los Angeles or Southern California on their own when they don't speak any English, they don't understand the culture" because the two men were like "fish out of water"). Instead, the two operatives on a mission inside a hostile country would necessarily rely only on the vetted, trusted members of their support network. Ex. 1 (Youssef Rpt.) 15, 164. Youssef explained that Al Qaeda's practice was for its operatives to be picked up by a trusted individual at the airport upon arrival in an unfamiliar foreign country and to stay at safe houses, not hotels, to reduce the chance for detection. Ex. 1 (Youssef Rpt.) 160 ("I know from other investigations that Al Qaeda operatives arriving in a new location for the first time would be trained to trust and work only with a person who was part of an established network with bona fides already verified by the organization.").[5]

*Third*, Youssef opined that Thumairy was the main designated contact person for Al Qaeda and its two operatives in Los Angeles and that Thumairy used members of his extremist cell at the King Fahad Mosque, including Saudi Consulate employee ███████████████████ ███████ to assist Hazmi and Mihdhar during their time in Los Angeles. Ex. 1 (Youssef Rpt.) 162. Youssef concluded based on his experience that the two trained Al Qaeda operatives would not risk

---

[5] *See also* The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States. Norton, 2004, at 215.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

getting help from strangers and would not have spent time or maintained a close relationship with ▮▮ unless he was a vetted, trusted member of their support network. Ex. 1 (Youssef Rpt.) 164, 242. Youssef's opinions are amply supported by the facts (unknown to the 9/11 Commission) demonstrating that the hijackers went directly to the King Fahad Mosque after being picked up by ▮▮. Ex. 1 (Youssef Rpt.) 160-170. These opinions are further supported by the evidence that Thumairy regularly served as a host and point of contact for extremists traveling to Los Angeles, and Thumairy's leadership of a jihadist faction in Los Angeles and connections to Al Qaeda. *Id.* at 50-53.

*Fourth*, Youssef opined that Bayoumi was the designated "handler" for Hazmi and Mihdhar assigned to relocate Hazmi and Mihdhar to San Diego and support them during their time there. Ex. 1 (Youssef Rpt.) 13. Youssef based this opinion on numerous facts, including, *inter alia*, Bayoumi's staged encounter with the hijackers at a Los Angeles restaurant, followed immediately by his meetings with Mana and Thumairy at the King Fahad Mosque; Bayoumi's efforts to find an apartment for the hijackers days before they arrived in San Diego; Bayoumi's hosting of the hijackers for several days at his own apartment upon their arrival and his co-signing of their apartment lease as a guarantor; helping them open a bank account and fronting the security deposit for their apartment rental in Bayoumi's complex; Bayoumi's coordination with Thumairy and collaboration with Anwar al-Awlaki ("Awlaki") to make arrangements for the hijackers, including financial help and getting them assimilated into the local community; phone call analysis; and Bayoumi's introductions of the two hijackers to various individuals in San Diego who provided them with important assistance. *Id.* at 170-202. These opinions are reinforced by evidence that other extremists associated with Al Qaeda were similarly hosted by Thumairy on their arrival in Los Angeles and proceeded directly from there to San Diego, to be hosted by Bayoumi. *Id.* at 103-104, 106. Youssef again used his FBI investigative technique of viewing the events from the perspective of Hazmi and Mihdhar. Ex. 1 (Youssef Rpt.) 177-202. Youssef concluded

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

that the known and established discipline of the Al Qaeda operatives made it highly implausible that they would risk associating themselves with Bayoumi to the extent that they did unless he was a vetted, trusted member of their support network. Ex. 1 (Youssef Rpt.) 199-200.

### B.      Dr. Emile Nakhleh ("Nakhleh")

Dr. Nakhleh is a retired senior intelligence analyst and research professor who forged an extraordinary career in the CIA as its "pre-eminent expert" on matters of political Islam, with a notable focus on the Arab states of the Middle East, including Saudi Arabia. Ex. 2 (Nakhleh Rpt.) ¶ 19. Nakhleh joined the CIA in 1990 and served in the Directorate of Intelligence for 16 years. *Id.*, Annex A, 1-2. Nakhleh founded and led the CIA's Political Islam Strategic Analysis Program, which acted as "the repository of expertise on political Islam for the U.S. Government." *Id.* ¶ 12. Nakhleh was the first ever Senior Analyst in the history of the CIA to be promoted to the ranks of the Senior Intelligence Service (SIS-1, 2 and 3), in recognition of his "valuable contribution[s] to the national intelligence effort."[6] Nakhleh received numerous CIA awards[7] culminating in the Distinguished Career Intelligence Medal in 2006,[8] having been "cited throughout his career for his expertise on Islamic and Middle Eastern issues." Ex. 2 (Nakhleh Rpt.) ¶ 13.

---

[6] On July 6, 1997, Nakhleh was designated at SIS-1. On July 5, 1998, he was promoted to SIS-2, and on January 13, 2002, he was promoted to SIS-3. The citation to his "valuable contribution" was repeated in both promotions. In addition, in March 2000, Nakhleh helped induct a CIA "Senior Analytic Service," and was its only representative delegated to attend the prestigious leadership seminars held at Harvard's Kennedy School (April 1-10, 1998) and Northwestern's Kellogg School (January 29-February 3, 2006).

[7] For example, Nakhleh received the Intelligence Commendation Medal in 1996 (as a "scholar of international renown" who established "an academic outreach program that is without peer in the US government"), Ex. 2 (Nakhleh Rpt.) ¶ 14; and the CIA Director's Award in 2004 (recognizing Nakhleh's "extraordinary fidelity and essential service").

[8] Nakhleh was recognized for his "exceptional achievement and meritorious service in positions of increasing responsibility" in the CIA.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Nakhleh was heavily relied on for authoritative briefings and strategic analysis by the highest-ranking U.S. intelligence and national security officials, including the President of the United States.[9] Ex. 2 (Nakhleh Rpt.) ¶ 2. Nakhleh is acknowledged to have briefed U.S. leadership in the immediate aftermath of the 9/11 Attacks on "the ideological impact of [Al Qaeda] in the Muslim world."[10]

Born in Palestine, Nakhleh's native fluency in Arabic[11] has proved a major asset in conducting fieldwork and building relationships of trust with interlocutors from across a broad spectrum. Nakhleh has "interviewed over 500 Islamic activists and scores of Imams, as well as dozens of Islamic political party leaders, prominent thinkers, and purveyors of emergent political ideologies." Ex. 2 (Nakhleh Rpt.) ¶ 20. He has "visited dozens of mosques, Islamic Centers, madrassas and other educational establishments across the Muslim world, and acquired copious amounts of their literature, including textbooks on language, culture, history, and Islamic and Qur'anic studies." *Id.* ¶ 23. He has developed especially rich insights into Qur'anic teachings and the "beliefs and perceptions of jihadists, including radical Salafis from Saudi Arabia and elsewhere." Ex. 2 (Nakhleh Rpt.) ¶¶ 20-21.

Nakhleh's education includes a Ph.D. at American University in International Relations, concentrating on the Middle East. Accounting for both professional and academic activities, Nakhleh has spent over 60 years focusing on Islamic studies, comparative Islam, and the influence of religion in state formation, with Saudi Arabia a prominent case study. Ex. 6 (Nakhleh Tr.) 36:1-8, 42:8-18,

---

[9] President George W. Bush's familiarity with and respect for Nakhleh was affirmed in his personal commendation letter of June 19, 2006 recognizing Nakhleh's "commitment to high standards" at the CIA. Ex. 2 (Nakhleh Rpt.) ¶ 14.

[10] Crumpton, Henry A., "The Art of Intelligence: Lessons from a Life in the CIA's Clandestine Service" (Penguin Press, 2012), at 183-4. Dr. Nakhleh was the substantive briefer who accompanied Director Tenet and Crumpton, the CIA's newly-appointed Chief of Counterterrorism Center / Special Operations (CTC/SO), to Camp David to brief President Bush, Vice President Cheney, and National Security Advisor Rice on September 22, 2001. Crumpton described Dr. Nakhleh as "one of the CIA's best analysts" and "one of the foremost authorities on political Islam." Crumpton wrote: "I always listened carefully to his [Nakhleh's] briefings. So did the president."

[11] At the CIA, Nakhleh tested 5,5,5 in Arabic (the highest professional level in the US Government) and during that time was the only 5,5,5 Arabic speaker in the entire Agency. Ex. 2 (Nakhleh Rpt.), Annex A, 2.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

43:13-21. In addition to his extensive "peer-review[ed]" writings on these topics in government,[12] Nakhleh published a 1975 book titled *The United States and Saudi Arabia*, which examines the Kingdom's religious history, state formation, politics, and foreign policy, Ex. 6 (Nakhleh Tr.) 33:5-34:7, as well as a 2008 book, *A Necessary Engagement*, which updates and reaffirms Nakhleh's expertise on comparative Islam, including the radical Islamic activism of Saudi Arabia. Ex. 2 (Nakhleh Rpt.), Annex B, 1.

Since leaving the CIA, Nakhleh has served as an expert consultant to the U.S. government on national security issues related to "Islamic radicalization, terrorism, and the Arab states of the Middle East." Ex. 2 (Nakhleh Rpt.), Annex A, 1. His roles have included advising the government for several years regarding Al Qaeda's attacks on Western countries. Ex. 6 (Nakhleh Tr.) 44:11-13, 44:22-45:1. Nakhleh is the founding Director of the Global & National Security Policy Institute at the University of New Mexico, and a life member of the Council on Foreign Relations. Ex. 2 (Nakhleh Rpt.), Annex A, at 2-3.

Nakhleh offers opinions in this case, through his lens as an expert on political Islam, regarding Saudi Arabia's "Wahhabi polity," the means by which it was implemented and advanced by officials of the MOIA prior to the 9/11 attacks, particularly through *da'wa* overseas, and the connections between "Wahhabi polity" and violent jihadist attacks. In particular, Nakhleh offers detailed specialized knowledge on the "ideological and operational approaches to jihad within Wahhabism," the "particularization" of which he examines through the works of successive leading authorities, including Ibn Taymiyya and Ibn Abd al-Wahhab. Nakhleh's report charts the creation of the Saudi

---

[12] Nakhleh's writings while at the CIA were "subject to peer review, [by his] peers at the agency who are experts in that area or who focus on that;" but "you do not have a peer review of a classified piece outside the Agency by someone who did not have security clearance." Ex. 6 (Nakhleh Tr.) 48:18-50:13; *see also Id.* 216:9-217:2, no CIA briefing to the President or other senior officials would be made "without having it be[ ] reviewed internally."

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Ministry of Islamic Affairs, its *da'wa* operations and the paths of certain MOIA propagators deployed to the United States, and the roles of Saudi officials in the support network for the 9/11 attacks. Ex. 2 (Nakhleh Rpt) ¶¶ 25, 50, 237. As set forth in detail below, Nakhleh is qualified to opine on these issues and applies sufficient facts and reliable methodology to arrive at his conclusions.

### C.     Dr. Alexander Meleagrou-Hitchens ("Hitchens")

Dr. Meleagrou-Hitchens is a lecturer and research analyst on Terrorism and Radicalisation at King's College London and a Research Fellow of the Program on Extremism at George Washington University. Ex. 3 (Hitchens Rpt.) Ann'x A, 1. Hitchens was asked to apply his expertise on the ideology and impact of the American jihadist preacher Anwar al-Awlaki ("Awlaki") and the significance of his contacts with the hijackers and Saudi government officials. Ex. 3 (Hitchens Rpt.) ¶ 2. Hitchens received his Ph.D. from King's College in 2014 for his thesis on Awlaki and has dedicated 14 years of original research to Awlaki. Hitchens has written extensively on armed conflict, radicalization, and terrorism, and is the author of peer-reviewed publications, including *Incitement: Anwar al-Awlaki's Western Jihad*, reviewed and published in 2020 by Harvard University Press. *Id.* ¶ 7, Ann'x A.

Hitchens began to study Awlaki in 2009, before Awlaki was targeted and killed by U.S. forces in Yemen in 2011. Ex. 3 (Hitchens Rpt.) ¶ 5. Hitchens mapped Awlaki's connections to Islamist networks in the United States and the United Kingdom and systematically evaluated Awlaki's preaching, lectures, publications, and other public statements. *Id.* He has compiled and maintained a digital library of all known Awlaki books, publications, lectures, speeches, sermons, internet activity,

12

and other available material in what is believed to be one of the world's most comprehensive repositories on Awlaki's life and works. *Id.*[13]

Hitchens concluded that by the year 2000, when Awlaki was in contact with Bayoumi and the hijackers, he had adopted anti-American jihadist views that were "directly in line with how al-Qaeda . . . presented the world prior to 9/11," *id.* ¶ 79, and that Awlaki likely knew the hijackers were associated with Al Qaeda and worked to help the hijackers together with Saudi officials, who trusted Awlaki as both an "ideological mentor and an operational facilitator." *Id.* ¶ 124.

### D.    Captain Barry Schiff ("Schiff")

Captain Schiff's qualifications include almost seven decades of piloting experience, including thirty-four years as a TWA airline captain. Ex. 4 (Schiff Rpt.) 1. He has accrued more than 28,000 flight hours, spent in hundreds of different aircraft types, including as an FAA designated check captain on the Boeing 757 and 767, the aircraft involved in the 9/11 Attacks. *Id.* He taught flight planning throughout his long career and has "extensive experience instructing and reviewing the performance of professional airline pilots." *Id.* He has been called "America's Flight Instructor" and is the author of over 1,900 aviation related articles and books *Id.* at 1; Ex. 4B (Schiff CV) 6-7.

Captain Schiff applied his extensive aviation experience to the discrete task of "explain[ing] and opin[ing] to a reasonable degree of aviation and piloting certainty the aviation and piloting significance . . . of [hand-written] notes," Ex. 4 (Schiff Rpt.) 1, that Bayoumi admits he wrote. Ex. 9 (Bayoumi Tr.) 289:16-290:9. The notes include an equation; a drawing of an airplane; a description of variables for "h" the "hight" [sic] the plane from the earth in mile" and "d" as "distance from the

---

[13] Hitchens reached his opinions by using the same well-accepted and rigorous methodology as he did in his peer-reviewed publications. He conducted a focused review of Awlaki's contemporaneous statements from his library together with the materials produced in this case.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

plane to "hurrizen" [sic]; and numbers and calculations. *Id.* Schiff was well familiar with the equation, which "is used in aviation to determine the line-of-sight distance to the horizon from an airplane at a given altitude." Ex. 4 (Schiff Rpt.) 2. Schiff used the equation as a pilot "to know at what altitude he would be able to see [an] airport" from a certain distance, Ex. 8 (Schiff Tr.) 36:6-19, and had taught the equation and its use to student pilots. *Id.* 38:9-19.

Applying his experience to the facts presented, Schiff offered his core opinion, namely: "that the airplane sketch, equation, and calculations made by Mr. Bayoumi on X0417 (Figure 1) are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks." Ex. 4 (Schiff Rpt.) 2. The basis for Schiff's opinion was his detailed aviation analysis of the numbers that Bayoumi input into the equation and calculations, as well as the results he obtained.[14] Schiff's analysis shows that Bayoumi's notes are hardly random scribbles but have a direct relationship to the planning of the 9/11 Attacks.

---

[14] Schiff cited various factors, including: (1) Bayoumi wrote two "distance variables" into his equation to calculate the minimum altitudes at which an aircraft would have to be flown to see a target on the ground from 50 and 70 miles away. Ex. 4 (Schiff Rpt.) 4. Schiff opined that Bayoumi's variables based on 50 and 70 miles are significant from a piloting perspective as they constitute a "reasonable…range of distances to consider for the 9/11 attacks" that would "provide them [the 9/11 hijackers] with the visual cues needed to fly the hijacked jetliners into their targets." *Id.* at 5-6. (2) Schiff confirmed from the available flight data and radar of the hijacked planes that the actions of the 9/11 hijackers were consistent with the 50–70-mile range input by Bayoumi in his equation. *Id.* at 6. (3) Schiff observed flight data that the hijackers of UAL flight 93 (which ultimately crashed in Shanksville, Pennsylvania) selected "an altitude of 5,000 feet for the final portion of the flight before flying visually," *id.* at 8, which he determined "comports well with the minimum altitude of 3,300 feet" required to see a ground target at 70 miles, as Bayoumi input into the equation. (4) Schiff also determined that the calculation of "52-8=44" made by Bayoumi next to the line-of-sight equation "matches up with the final portion of UAL Flight 175 that navigated abeam the Robbinsville VOR and then toward the LaGuardia VOR." *Id.* at 8-9. Schiff concluded that "it is evident that the 9/11 hijackers navigated the jetliners towards their targets using radio navigation aids (on the ground) and then making visual sightings of landmarks (such as rivers) followed by visual acquisition of the targets themselves." *Id.* at 4. Schiff determined that one of those ground radio navigation aids was the Robbinsville VOR, which the 9/11 hijackers of UAL Flight 175 tuned to as they made their approach toward the World Trade Center. *Id.* at 8-9; Ex. 8 (Schiff Tr.) 149:21-150:3. Schiff found that the numbers in Bayoumi's calculation are mileage figures taken from an aeronautical chart to calculate the distance of 44 miles from the Robbinsville VOR to the World Trade Center. Ex. 4 (Schiff Rpt.) 8-9; Ex. 8 (Schiff Tr.) 118:2-119:4, 149:21-150:3, 175:1-4. Schiff determined that this distance, together with the results of Bayoumi's line-of-sight equation, was a "handy" flight planning tool for the 9/11 hijackers to know where and how a plane heading towards New York City from the southeast would "visually acquire the World Trade Center" to carry out the attacks. Ex. 4 (Schiff Rpt.) 9; Ex. 8 (Schiff Tr.) 182:9-21.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

## II.   THE PLAINTIFFS' EXPERTS HAVE THE REQUISITE QUALIFICATIONS TO OPINE ON THE RELEVANT MATTERS OUTLINED IN THEIR REPORTS

Courts must examine the "totality of the witness's background" to determine whether the proffered expert meets "one or more of the qualifications listed in Rule 702." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). In terrorism cases, courts generally recognize the interdisciplinary nature of the study of terrorism and qualify experts to testify based on their relevant experience in the implicated disciplines. ECF No. 9060 at 40.[15]

### A.   Youssef is qualified to opine as to the Sunni extremist networks Saudi Arabia established before the 9/11 attacks and on Saudi government officials' use of those networks to aid 9/11 hijackers Hazmi and Mihdhar.

Saudi Arabia argues that Youssef is not qualified to opine on the existence in Southern California of Sunni extremist networks established by Saudi Arabia before the 9/11 Attacks or on the use of those networks by Saudi government officials to facilitate Hazmi and Mihdhar. KSA's Br. 26-27.[16] Ignoring Youssef's clear qualifications, Saudi Arabia wrongly denigrates his outstanding record with the FBI, citing a spurious defense the government raised in opposing an employment discrimination lawsuit Youssef filed[17] and egregiously claiming "the lawsuit *shows*" that Youssef was merely a "translator" (when he was a Special Agent and LEGAT). KSA's Br. 27 (emphasis added). In fact, the cited decision makes no such finding but tracks precisely with Youssef's own accounting of his professional experience in his report and testimony.[18] Youssef's supervisor in Los Angeles testified

---

[15] *See, e.g., Estate of Steinberg v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 199344 (D.D.C. Nov. 18, 2019 (noting an expert provided expert testimony regarding "international terrorism and terrorist financing"); *Henkin v. Islamic Rep. of Iran*, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021) (recognizing the same expert has testified "as an expert on international terrorism, U.S. policy toward the Middle East, countering violent extremism, and terrorist financing and sanctions policy").

[16] *See supra* § I.A. for a summary of Youssef's opinions.

[17] *Youssef v. F.B.I.*, 541 F. Supp. 2d 121, 129 (D.D.C. 2008), *rev'd in part*, 687 F.3d 397 (D.C. Cir. 2012). Youssef filed the suit based on his belief that the FBI refused to give him key assignments because of his ethnic background.

[18] *Youssef*, 541 F. Supp. 2d at 129 (describing Youssef as "a case agent on one or more counterterrorism investigations" who coordinated one or more FBI "Islamic Group cases," which were part of a counterterrorism program that investigated

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

that Youssef did exemplary work as an FBI Special Agent counterterrorism investigator and received

a Director of Central Intelligence award.[19] Then-FBI Director Louis Freeh commended Youssef as an

"essential player" who was held in "high regard" by Saudi Arabia and the U.S. Ambassador to Saudi

Arabia, Wyche Fowler, described Youssef as "just the right man" for the LEGAT position.[20] The D.C.

Court of Appeals concluded in its 2012 decision:

> In the first eight years of his career, Youssef worked on a variety of counterterrorism
> investigations and received high praise from his supervisors. In 1996, he was promoted
> to the position of Legal Attaché in Riyadh, Saudi Arabia, where he served as a liaison
> to local law enforcement authorities and helped improve relations between the FBI
> and its Saudi counterpart, the Mabahith. As he had before, Youssef once again received
> excellent performance reviews.

*Youssef v. F.B.I.*, 687 F.3d 397, 399 (D.C. Cir. 2012). In any event, a dispute over an expert's credentials

goes to the weight, not to the admissibility, of the testimony. *McCullock*, 61 F.3d at 1043-44.

Saudi Arabia is incorrect where it suggests, at KSA's Br. 4, that Youssef's investigation work

ended after he left Los Angeles and was promoted to senior management positions.[21] The second half

of his career continued to address critical aspects of major FBI counterterrorism investigations,

including coordinating the Khobar Towers investigation and other counterterrorism work inside Saudi

---

certain crimes and collected criminal intelligence). The decision does cite allegations of the government in the context of an adversarial proceeding, but those allegations were hotly disputed and never adjudicated.

[19] Youssef's supervisor in Los Angeles testified that:

> Basically Bassem [Youssef] was the counterterrorism program. He was the entire program. Because of
> the knowledge he brought with him as to how these terrorist groups work, how to talk to these people,
> the direction of investigations, how they should go, the language ability that they did have, the daily
> traditions of these various groups, remember, you had many different kinds of group, the customs, it is
> absolutely essential that an agent know that when he's looking at a target.... We had no one in the office
> or bureau that I know that could bring these issues to the table that Bassem brought through based on
> the knowledge of the group, the demeanor, his attitude and judgment, and his ability to get along with
> people. It was just invaluable.

Ex. 11 (Curran Tr.) 24-26 (3-5 of the ECF).

[20] *Youssef*, 541 F. Supp. 2d at 129-30. Saudi Arabia of course has direct knowledge of Youssef's work as LEGAT.

[21] Saudi Arabia ignores Youssef's work as a Special Agent, which included his work in Los Angeles investigating Al Gama'a and Al Qaeda and in St. Louis as a case agent on major case 94, codenamed "Desert War" where the FBI discovered the presence of the first covert cell of the Abu Nidal terrorist group in the United States. Ex. 1 (Youssef Rpt.) 1.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Arabia as LEGAT; inspecting the computer hard drives recovered from Al Qaeda and other terrorists as head of FBI's Digital Media Exploitation Unit; analyzing phone communications of Al Qaeda operatives as Unit Chief; and undertaking various special counterterrorism operation assignments. Ex. 1 (Youssef Rpt.) 1-5.[22]

Lastly, Youssef is undisputedly qualified to testify as to phone call analysis based on his 10 years as **Chief** of the Communications Analysis Unit at the FBI's Counterterrorism Division where he routinely used the same type of phone analysis techniques set out in his Report. Ex. 1 (Youssef Rpt.) 5, 8, 14.

> **B.**    **Nakhleh is qualified to offer opinions on the ideological and operational aspects of Saudi Arabia's support for extremism through its Ministry of Islamic Affairs.**

**1.    Nakhleh's background and professional experience qualify him to offer opinions on the tenets of Wahhabism and Wahhabis' engagement with the wider world in the context of jihad.** Nakhleh has spent decades deepening his scholarship on political Islam,[23] on the different belief systems and historical influences that have shaped the four Schools of Jurisprudence in Sunni Islam, and on the specific characteristics of Wahhabism, the state religion of Saudi Arabia. Ex. 2 (Nakhleh Rpt.) ¶¶ 19-28.

Nakhleh's vast experience as a Senior Analyst and his leadership of the highly respected Political Islam Strategic Analysis Program (PISAP) in the CIA are sufficient to establish that he

---

[22] Saudi Arabia claims that Youssef has not published and has "never published anything about the 9/11 attacks," KSA's Br. 4, but Youssef is not an academic expert – he gained his expertise in the field. The Second Circuit has rejected similar arguments. *See United States v. Arslanouk*, 853 F. App'x. 714, 718-19 (2d Cir. 2021) (rejecting arguments that the expert in Eurasian crime case "had never testified in a Eurasian organized crime trial, had authored no publications and had never been previously qualified as an expert in any field"), *cert. denied sub nom.*, *Shulaya v. United States*, 141 S.Ct. 2689 (2021).

[23] According to Nakhleh's definition, political Islam covers "the actions of individuals and groups, lawful and unlawful, to change the political, legal, economic, educational, and judicial nature of public policy"—whether locally or on an international scale—"according to the activists' interpretations of their faith." Nakhleh, E., *A Necessary Engagement*, Introduction, xv; and, generally, Ch. 1 "Political Islam and Islamization."

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

possesses "specialized knowledge." *See, e.g., Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 533 (E.D.N.Y. 2012) (finding that a former FBI investigator's "background and professional experience qualify as 'specialized knowledge'").[24] Nakhleh's 60-year accumulation of unique, first-hand insights and perspectives on the Middle East, on the role of Islam in state formation, including in Saudi Arabia, and on the complexities of support for violent jihad, Ex. 6 (Nakhleh Tr.) 36:1-8; *supra* § I.B., will be especially helpful to the Court as it pertains to topics "beyond the knowledge" of the trier of fact. *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 124 (D. Conn. 2008).

Nakhleh has carefully parsed through and compared the doctrinal characteristics of the different Schools, explaining the distinguishing features of Wahhabism.[25] Ex. 6 (Nakhleh Tr.) 125:11-129:3; Ex. 2 (Nakhleh Rpt.) ¶¶ 25-35. Wahhabis' ideological support for violent jihad against the perceived "enemies" of Islam is a key original doctrinal tenet, acknowledged by genuine experts,[26] and shown by Nakhleh to have been subject to significant "particularization" prior to 9/11. Ex. 2 (Nakhleh Rpt.) ¶¶ 29-48, 122-137. Nakhleh does not trade in "sweeping derogatory characterizations" or "caricatures," KSA's Br. 9, 64, but rather accurately relies on authoritative scholarly sources citing to a "duty" that "lies at the heart of Wahhabism." Ex. 2 (Nakhleh Rpt.) ¶ 30, fn. 11.

Saudi Arabia's reference to what it calls "stereotyping of an entire country's religion as terrorist," KSA's Br. 2, is wide of the mark and deeply disrespectful to Nakhleh, who as a scholar, as

---

[24] *See also, e.g., Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 CIV. 3040 KBF, 2014 WL 464769, at *2 (S.D.N.Y. Jan. 28, 2014) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience.").

[25] Ex. 2 (Nakhleh Rpt.) ¶ 26, fn 6, explaining that the commonly used Western term "Wahhabi" is "a form of shorthand to denote followers of the doctrine espoused by Ibn Abd al-Wahhab."

[26] *See, e.g.*, Ex. 27 (Bunzel, *Wahhabism*), Ch. 3 "The Key Components: Jihad," at 182-183 (citing Wahhab's writings on the duties "incumbent" on followers, not only in rejecting and condemning unbelievers, but "showing them hatred and enmity, and waging *jihad* against them until the religion becomes God's entirely.").

18

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

an expert, and not least in his long-term government career, has espoused and successfully fostered engagement with the Muslim world through "a more sophisticated and nuanced approach based on expertise, understanding, dialogue, and a mutuality of interests."[27] Use of vernacular that is lazy and plainly wrong, whether in the "stereotypes" of Korean businesses found improper by this Court, ECF No. 9060, at 21 (quoting *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1007 (9th Cir. 2001)),[28] or in Saudi Arabia's unsupportable claim that Nakhleh used the adjectives "dangerous and untrustworthy" to describe Wahhabis, KSA's Br. 35, 64, serves to diminish understanding. By contrast, Nakhleh conducts a conscientious analysis of Wahhabism and is fit to elucidate this complex doctrine for the Court.

**2.      Nakhleh is qualified to opine on governance in Saudi Arabia in the 1990s, the Islamic Awakening, the creation of the Ministry of Islamic Affairs (MOIA) and MOIA's pursuit of da'wa overseas.** Nakhleh travelled to Saudi Arabia multiple times both before and after 9/11 and met with senior government officials from various agencies, including MOIA. Ex. 6 (Nakhleh Tr.) 14:10-16:11, 24:7-12;[29] *see also* Ex. 2 (Nakhleh Rpt.) ¶ 19.

Based on fieldwork, study, and dedicated analysis, Nakhleh became intimately, expertly familiar with MOIA's history in the context of Saudi governance in the 1990s, Ex. 2 (Nakhleh Rpt.) ¶¶ 67-88, including MOIA's creation as the Saudi King's principal response to the more radical

---

[27] *See, e.g.*, Nakhleh, E., *A Necessary Engagement*, Introduction, xv-xviii.

[28] The types of expert testimony excluded in the cases cited in ECF No. 9060, at 21 (*i.e.*, *Jinro*, 266 F.3d at 1007, and *United States v. Zhong*, 26 F.4th 536, 557 (2d Cir. 2022), excluding "trafficking in stereotypes") are starkly distinguishable from Nakhleh's analysis of Saudi religion, since it is Saudi Arabia itself that has imposed on its citizens the unitary, "narrow, exclusivist" pursuit of Wahhabism, "intolerant of any deviation from orthodoxy." Ex. 2 (Nakhleh Rpt.) ¶ 26. Nakhleh's opinions offer important additional context to the scholarly works he has considered, assisting the Court in charting the historical and ideological influences on followers of Wahhabism.

[29] Although the record of Nakhleh's answers at deposition was blemished by numerous interruptions by Saudi Arabia's counsel, Nakhleh testified that he travelled to Saudi Arabia at least three times prior to 9/11, *id.* 16:12-17:3, and four times after 9/11. *Id.* 14:7-16:11.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

demands of the Islamic Awakening (*al-Sahwa*), *Id.* ¶¶ 89-93; MOIA's operations, notably propagation of the central tenets of Wahhabism through *da'wa* overseas, Ex. 6 (Nakhleh Tr.) 15:20-16:6, 19:13-20, 23:5-11, 24:3-6; and how *da'wa* was carried out "with a Saudi state imprimatur"[30] and "managed by representatives of the [MOIA] operating, mostly under diplomatic cover, out of Saudi embassies and consulates across the globe." Ex. 2 (Nakhleh Rpt.) ¶¶ 93-96.

Saudi Arabia claims that Nakhleh is not qualified to opine on the "history and activities of MOIA and the roles of its employees," KSA's Br. 20, based on a quickfire memory test on structural, budgetary and personnel aspects of MOIA. Meanwhile, MOIA employees themselves are similarly unclear on such aspects. *E.g.*, Ex. 10 (Thumairy Tr.) 44:1-23 (Thumairy unable to remember the Director of da'wa overseas, Dr. al-Ghudaian, or anyone who worked with him when he joined the MOIA in Riyadh); 46:1-21 (unable to remember appointment procedures).

Nakhleh's opinions regarding the MOIA processes of selecting, appointing, and deploying propagators draw on both his own considerable professional experience, including speaking with MOIA propagators in the field, Ex. 2 (Nakhleh Rpt.) ¶¶ 207-213, and his analysis of relevant documents (notably from KSA production, which Nakhleh reviewed in Arabic), including letters regarding recommendation, posting and ████████, and deposition testimony. Ex. 2 (Nakhleh Rpt.) ¶¶ 182-205. The careful manner in which Nakhleh applied his qualifications to his expert analysis will

---

[30] Nakhleh's relevant professional experience also encompasses in-depth, strategic analysis of the Saudi religious education system, based on extensive "explorations" and interviews in Saudi Arabia, Ex. 2 (Nakhleh Rpt.) ¶¶ 54-59. Nakhleh "acquired and studied close to 300 Saudi Arabian textbooks," *Id.* ¶ 55, and identified MOIA's endorsement of the "official state imprimatur" on extremist texts, with even "entry-level" educational materials found to have been "infus[ed]" with "Wahhabi jihadi doctrine." *Id.* ¶¶ 56-57.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

assist the Court in understanding the roles of MOIA propagators in the United States and the "ideological and operational ties" between them. Ex. 2 (Nakhleh Rpt.) ¶ 235.[31]

    **3.**    **Nakhleh is qualified to opine on the roles of Saudi officials in the support network for the 9/11 terrorist attacks.** Nakhleh's unique qualifications to offer opinions in this case are rooted in a career record as a senior analyst whose review of text and speech was heavily relied on by principals across the U.S. national security apparatus, and a briefer whose opinions on vital issues related to 9/11 were solicited and valued by the President and other leaders, *supra* § I.B. Saudi Arabia's challenge to Nakhleh's standing to opine on its officials' roles in the 9/11 support network is misplaced. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

    Nakhleh approached the evidence in this case not as a criminal investigator, but as a seasoned thematic expert trained to identify and assess the ideological and operational aspects of support for violent jihad through "detailed review," Ex. 2 (Nakhleh Rpt.) ¶¶ 235-237, for which he considered wide-ranging documentary production, *id.* ¶ 17. Nakhleh's CIA experience also included analytical oversight functions in respect of investigations carried out by other U.S. agencies (*e.g.*, "monitored, reviewed, reported, and followed up on testimonial product," *id.* ¶ 156), as well as by foreign law enforcement and intelligence counterparts, including Saudi Arabian services (*e.g.*, "visited Saudi Arabia in the immediate wake of [the Khobar Towers] attacks, surveyed the site of the bombings and held discussions with… government officials," *id.* ¶¶ 138-143), directly relevant to 9/11.

---

[31] Nakhleh "assessed correspondence and testimony about the career paths that propagators followed within the Ministry structures and on overseas official platforms as they existed at the time; and [] applied [his] analysis in particular to the ideological and operational ties revealed between these propagators, insofar as these can be shown to have created relationships of association and indicate unity of purpose."

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

4.      **Nakhleh's specialized knowledge of religious doctrine and practice qualifies him to opine on the testimony of Saudi Arabia's propagator Fahad al-Thumairy and other witnesses.** Nakhleh's knowledge, skill, and experience in conducting and analyzing interviews of subjects from a diverse range of backgrounds in political Islam, in Saudi Arabia and the wider Muslim world, *supra* § I.B., qualify him as an expert to opine based on the testimony of others. His opinions are relevant, and his unique qualifications will assist the trier of fact. It is immaterial that Nakhleh "is not an expert in truth detection, [or] in psychology." KSA's Br. 21.

Nakhleh makes plain in his report that his starting point for review of Thumairy's testimony is an assessment of what Thumairy said about "matters of religion." Ex. 2 (Nakhleh Rpt.) ¶ 218. Nakhleh's opinions regarding Thumairy's testimony emphasize the bespoke analytical framework that Nakhleh's specialized knowledge of political Islam provides him when assessing the statements made by an eminent Salafi-Wahhabi Imam and propagator. Ex. 6 (Nakhleh Tr.) 204:4-206:19; *see also* Ex. 2 (Nakhleh Rpt.) ¶ 158 ("a valid professional yardstick against which to assess whether a witness with al-Thumairy's education and pedigree would have familiarity with matters such as jihad, the Hadith" or other essential tenets of Wahhabism).

Nakhleh's learned assessment was that when Thumairy dissimulated upon being asked "about Ibn Taymiyya and Ibn Taymiyya's doctrine or about violent jihad doctrine against the enemies of Islam or about the hadith," then Nakhleh found it to be "most incredulous" based on "knowing what [Thumairy] studied and the curriculum at Imam Mohammad University." Ex. 6 (Nakhleh Tr.) 204:7-16. Nakhleh arrived at his expert opinion that he "could not really credit Thumairy's account" not

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

based on any legal or judicial determination, but rather to assist the Court "in light of all the facts I know." Ex. 6 (Nakhleh Tr.) 206:11-19.[32]

As a Senior Intelligence Service Officer in the CIA, Nakhleh not only interviewed and debriefed "jihadists, suspected terrorists, and other sensitive subjects," but also conducted reliability assessments based on "thousands of such interviews" done by others. Ex. 2 (Nakhleh Rpt.) ¶ 156. Here, Nakhleh undertook "thorough review and analysis," *id.* ¶ 156, of deposition transcripts and videos of current and former MOIA and other Saudi government officials. He weighed the witnesses' testimony against documents and multiple other sources of evidence in this case, as well as his lifelong study of relevant religious doctrine. Nakhleh's conclusions are not improper due to the reliance of this material. *See United States v. Johnson*, 319 U.S. 503, 519-20 (1943).

### C.        Hitchens is qualified to offer the opinions offered.

Saudi Arabia argues Hitchens is unqualified "to review documents and testimony" because his background is not in criminal prosecutions or law enforcement. KSA's Br. 21. It offers no reason, however, why the only experts who could testify in this case are those who have, for example, "interrogated a subject as part of a criminal investigation." *Id.* at 21. And, to suggest that Hitchens has only "general research experience on an unrelated issue," *id.*, is absurd. His background and expertise concern precisely the subject matter on which he opines. *See, e.g., supra* § I.C.; Ex. 3 (Hitchens Rpt.) Ann'x A. Not only does the subject matter overlap, but Saudi Arabia also admits he has studied the same types of sources, including court records and FBI documents. *See* KSA's Br. 21. Its argument is simply that an expert in social sciences or history can never be deemed qualified. That is, of course,

---

[32] *Id.* at 205:5-8 stating "I mean, judging against all the evidence, I did not think his testimony coincided with what he knew and what he learned and what he studied"; and 206:14-19  "I reviewed his background, I reviewed his knowledge… [including his "own specialty"] … [and] I concluded there must have been other reasons why he did not answer those questions."

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

untrue. *See Marvel Characters, Inc. v Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (stating that "[w]e have no doubt that a historian's 'specialized knowledge' could potentially aid a trier of fact in some cases" and that "[a] historian could, for example, help to identify, gauge the reliability of and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson"); *see also Gill*, 893 F. Supp. 2d at 537-8 (court permits expert testimony about "the history of events that help establish the [defendant's] state of mind in context").

      **D.    Schiff is qualified to offer the opinions offered.**

Although framed as an across-the board challenge, Saudi Arabia does not actually dispute that Schiff is qualified to offer most of the anticipated testimony. Contrary to Saudi Arabia's suggestions, KSA's Br. 14, 22, Schiff need not be a "terrorism expert" to provide his aviation-related opinions on whether Bayoumi's equation and calculation were related to the aviation planning of the 9/11 Attacks. Unsurprisingly, it cites no authority for this proposition, and ignores that Schiff's considerable experience relates directly to the narrow questions of whether and how Bayoumi's notes are related to the flight planning of the hijackers for their plot.

**III.    THE PLAINTIFFS' EXPERTS' OPINIONS ARE THE PRODUCT OF RELIABLE DATA AND METHODOLOGIES.**

      **A.    Youssef and Nakhleh Did Not Rely on Classified Materials or Methodologies.**

      **1.    Youssef did not rely on classified materials or methodology.** Youssef did not rely on classified materials to form his opinions, nor did he use classified methodology to apply his expertise to the phone calls and records cited in his expert report. Saudi Arabia plays loose with its assertions, KSA's Br. 31-32, that Youssef's method of reviewing and analyzing cell phone records is "classified." But Youssef clearly explained the basis for his opinions and took care not to base his

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

opinions on classified information, Ex. 1 (Youssef Rpt.) 5, unlike the cases cited by Saudi Arabia.[33] Youssef made clear that he is not basing his conclusions on classified material, saying "all my analysis is in my report." Ex. 5 (Youssef Tr.) 261:11.

Youssef explained two methods of telephone analysis in his report: calling circles and calling chains.[34] At his deposition, Youssef offered to further explain these methods, *id.* 258:16-19, but Saudi Arabia ignored these offers for explanation. Youssef took every opportunity to provide examples of how he applied these methods to identify Al Qaeda militants. *Id.* 374:1-16 ("[L]ooking at other contacts within the network that we know of[,] of those who are known to be terrorist operatives, we were able to highlight the one number that is unknown to us. And from that analysis we were able to identify him and then eventually apprehend him."). Saudi Arabia cannot meaningfully argue that Youssef said these methods of analysis are "classified" when he described them in his Report, provided examples, and counsel did not question him further.

That Youssef declined to disclose the "code name" for his southern California investigation is irrelevant. He stated "The code name I would not share with you. However, I can give you an idea

---

[33] Most of the other cases cited by Saudi Arabia involve clearly distinguishable circumstances where the expert flatly refused to testify about the basis of his or her opinion. *In re Nat'l. Prescription Opiate Litig.*, 2019 WL 3934490, at \*3-4 (N.D. Ohio Aug. 20, 2019)(opinions based on certain "legal guidance" that the expert refused to disclose because of *Touhy* regulations were excluded); *Sanchez v. Boston Sci. Corp.*, 2014 WL 4851989, at \*12 (S.D.W.Va. Sept. 29, 2014)(where expert refused to explain the basis for one of his opinions because of a confidentiality order and work product privilege, the opinion was excluded); *Gray v. Cottrell, Inc.*, 2007 WL 4864393, at \*2 (E.D. Mo. Jan. 11, 2007)(expert who asserted she was prohibited from testifying about the bases of her opinions was excluded). In *Gill*, 893 F. Supp. 2d 523, the court excluded the opinions of two experts, one a retired Israeli general and the other a retired Israeli colonel, as irrelevant and prejudicial, and stated that the opinions were likely based on information "obtained secretly" from their government positions.

[34] "In communications analysis jargon, this type of calling activity is known as "call chaining" where one call between two individuals is shortly followed by another call by one of the two individuals to a third individual. Call chaining generally indicates that all the participants of the calling activity know one another." Exhibit 1 (Youssef Rpt.) 146. "I have applied recognized investigative techniques used to analyze communications throughout this report. For example, in the communications analysis world, the "Calling Circle" is one of the best analytic tools available. "Calling Circles" are frequent calls of short duration between two or more individuals or entities and they indicate familiarity between those individuals beyond casual acquaintance. A pattern of calls between individuals or entities shortly before or following a significant event is indicative of familiarity with and discussion of such event." Exhibit 1 (Youssef Rpt.) 14.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

and speak *in detail* about the players and the operatives that I looked at who were involved with the Ibn Taymiyyah Mosque who eventually became the same people as part of the inner circle of Thumairy." *Id.* 47:14-20 (emphasis added). Saudi Arabia again did not follow-up on this invitation.

**2.    Nakhleh, likewise, did not form his opinions based on classified materials or confidential information.** To the extent that Nakhleh's report is "informed by [his] experience" at the CIA, Ex. 2 (Nakhleh Rpt.) ¶ 2, Nakhleh's experience in fact serves as an invaluable basis of Nakhleh's specialized knowledge, and not as any impediment to adequate cross-examination. Only a fraction of the work, knowledge and skill Nakhleh gained in his CIA career is protected by confidentiality, and this fraction does not provide the basis for Nakhleh's expert opinions. Saudi Arabia ignores Nakhleh's description of having "rendered [his] expert opinions and conclusions… upon the maximum amount of factual material and declassified investigative product made available to me for review in the 9/11 multi-district litigation." Ex. 2 (Nakhleh Rpt.) ¶ 24. Opinions in Nakhleh's report are further supported by his years of research and analysis of political Islam and Islamic radicalization. *E.g. Id.* ¶¶ 24, 53.

Saudi Arabia's wrongful allegation that Nakhleh based "his opinion" on confidential material, KSA's Br. 24, is a red herring. The portion of Nakhleh's deposition Saudi Arabia points to for its argument concerned whether Nakhleh had "published any peer-reviewed studies" regarding Al Qaeda's Islamic thought and 9/11, to which Nakhleh responded "not in public forum," and "not outside the Agency." Ex. 6 (Nakhleh Tr.) 48:8-17, 50:14-16. The "high-level briefings" to which Nakhleh referred, *id.* 48:8-50:13, were not relied upon by Nakhleh as a basis for opining, but were rather offered as alternative evidence of Nakhleh's acknowledged expertise, *supra* § I.B., since Nakhleh himself delivered the briefings "to senior policymakers from the White House down." Ex. 6 (Nakhleh Tr.) 48:8-17. As this Court considers Nakhleh's expertise, the "test of reliability is 'flexible,' and

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (*citing Daubert*, 509 U.S. 579).

Saudi Arabia makes similarly misleading arguments regarding the basis for Nakhleh's expertise on "the role of the [MOIA]… in support of terrorism," and Nakhleh's opinions on the reliability of Saudi Arabia's witnesses, KSA's Br. 25. Selective inclusion of excerpted quotes from Nakhleh's deposition grossly mischaracterize his testimony.[35] Viewed in full, Nakhleh's responses reiterate that none of his expert opinions rely for their basis on material that is classified or confidential. Indeed, with regard to FBI documents, Nakhleh stated that he had not read them contemporaneously "[when] those reports were classified," but had rather reviewed them during his expert engagement when "many of them came out as a result of the Executive Order as part of this investigation and this litigation." Ex. 6 (Nakhleh Tr.) 76:18-77:9.

Nakhleh consistently reiterated that he specifically steered clear of classified materials as the basis on which to form his opinions, since he was sensitive to his solemn lifelong obligation to observe secrecy and other protections of official documents, notably where liaison relationships were at issue. Ex. 2 (Nakhleh Rpt.) ¶ 55.[36] Nakhleh's opinions are based on sufficient facts and data, drawing upon his many decades of researching and analyzing the themes of his report, and relying on a reviewable record of publicly available material and documents provided in this litigation. *See* Ex. 2 (Nakhleh Rpt.) Annex C.

---

[35] For example, when asked whether the CIA had produced its own, later report separate from the 2004 Joint FBI-CIA Report regarding Saudi Arabia's role in 9/11, Nakhleh responded: "I cannot really answer this question definitively because there were reports and briefings that we did from CIA that basically highlighted the role of the [MOIA] in this -- in support of terrorism." Ex. 6 (Nakhleh Tr.) 75:12-76:4. Saudi Arabia excluded the first half of Nakhleh's testimony in wrongfully presenting it as "proof" that Nakhleh relied on confidential material.

[36] Nakhleh refers to – but does not rely on – two studies on Saudi textbooks he authored while in the CIA and explains that the classification was based on a "political rationale," because not all the subject countries (at least five other Muslim-majority countries in addition to Saudi Arabia) were informed of the project. Ex. 2 (Nakhleh Rpt.) ¶55, n.28.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

**B.    Youssef Applied Reliable Methodology to Form his Opinions.**

**1.    Youssef's used thorough FBI investigation techniques.** Contrary to Saudi Arabia's claims, KSA's Br. 34, Youssef described how he used the tools of an FBI investigator to reach his opinions. He carefully reviewed "all the available evidence"; looked "at every single possible vantage point"; cross-checked and correlated information; examined leads to determine whether they had a "nexus to terrorism"; and carefully assessed the reliability of each source. Ex. 1 (Youssef Rpt.) 5, 7, 10; Ex. 5 (Youssef Tr.) 373:11-15; *see Abu-Jihaad*, 553 F. Supp. 2d at 126 (court allows testimony of terror expert who "gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources."). Youssef used the same mode of analysis that he previously used to present his investigative conclusions in probable cause and reasonable suspicion reports submitted before federal district courts. Ex. 1 (Youssef Rpt.) 8.

Youssef's detailed explanations are not "conclusory" statements of his experience.[37] He stated plainly "[a]t the onset of [his] report, [he] basically explain[ed] that based on [his] personal background, [experience, knowledge, recollections], and the investigative methodology that [he's] learned throughout the years of service as a special agent in the FBI is what [he] base[d] all of [his opinions] on." Ex. 5 (Youssef Tr.) 369:18 – 370:8. Youssef also explained that he analyzed and reviewed many volumes of documents related to this case that were produced "up to the very eve of the service of [his] Report." Ex. 1 (Youssef Rpt.) 7. Youssef also "read and reviewed the entire depositions of the Saudi Government witnesses and the non-party witnesses…." *Id.* at 6. Throughout his report, Youssef compares the deposition testimony against the documents that defendants produced, and analyzes

---

[37] Youssef's methodology, gained from his years of experience at the FBI are "all over" his report. *See* Ex. 5 (Youssef Tr.) 365:13 – 368:18.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

them using his experience, to determine what conclusions he can reach.[38] Indeed, when pressed on

substantive questions in his deposition, Youssef was able to answer with specific facts and data that

he considered, without appealing solely to his own experience. *E.g.,* Ex. 5 (Youssef Tr.) 120:5-20

(responding to question regarding Bin Laden by applying his experience to the facts); *id.* 122:9-17.

      **2.**      **Youssef does not selectively adopt FBI theories but applies his expertise and**

**experience to bring human reason to bear upon disputed facts.** Saudi Arabia criticizes Youssef's

purported "selective adoption of FBI theories," KSA's Br. 27-29, arguing he does not apply a

consistent methodology to determine which FBI documents deserve weight. This argument is not an

appropriate *Daubert* challenge but a Trojan horse for Saudi Arabia to dispute factual evidence and

discuss its preferred narrative. Indeed, contrary to Saudi Arabia's assertion, Youssef does not

"uncritically" accept competing FBI reports. Rather, he assesses the evidence, applies his experience

and expertise, and forms an opinion as to each document. An example of this is Youssef's discussion

of the May 2021 EC[39] that Saudi Arabia suggests was not weighed. KSA's Br. 27-28. But Youssef

addressed the May 2021 EC extensively in his report. Ex. 1 (Youssef Rpt.) 233-39.[40] In his deposition,

Youssef offered to further explain his conclusions regarding the document, saying "I'm familiar with

the EC, and I can tell you that I disagree with the conclusion. And I can explain that, and I can also

explain the actual EC and how it's put together." Ex. 5, (Youssef Tr.) 205:9-13. Saudi Arabia, once

again, ignored this offer. *Id.* 205:15-20. Youssef further exemplifies the rigorous examination of the

---

[38] *See, e.g.,* Ex. 1 (Youssef Rpt.) 94 (comparing statements made by Minister al Ash-Sheikh to documentary evidence to the contrary).

[39] Ex. 16 (The FBI's May 2021 Electronic Communication closing Operation Encore, EO14040-000001 to -14 (Exh. 13 to KSA's Br.) ("May 2021 EC").

[40] Youssef assessed, "[b]ased on my experience and review of the documents produced by the FBI, the Subfile – Operation Encore investigation was closed because it had accomplished its intelligence goal to collect sufficient national security information about the support provided by Saudi Government officials to the 9/11 hijackers prior to the 9/11 Attacks, and the further continuation of the investigation possibly leading to criminal indictments was viewed as a potential harm to U.S. national security and foreign relations interests." Ex. 1 (Youssef Rpt.) 233.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

documents in this litigation, as opposed to just reading and taking one document at face value, stating, regarding the conclusions of the May 2021 EC, "I would answer based on all the documents and all the analysis that was conducted from 2001 until this period speak to the contrary." Ex. 5 (Youssef Tr.) 343:9-12.

Youssef considered the May 2021 EC, together with all of the other materials he reviewed, and applied his expertise to it before reaching his conclusions. Saudi Arabia is free to disagree. Its argument is nothing more than a factual dispute best suited for cross-examination, not a *Daubert* issue.[41]

### 3.     Youssef credits hearsay to the extent that it is supported by other evidence.

Saudi Arabia is mistaken when it asserts that Youssef relies on "alleged statements from confidential sources, which he repackages as 'conclusions' or 'findings' of the FBI." KSA's Br. 29. Again, Saudi Arabia disputes evidence which is more appropriately weighed by the factfinder and is inappropriate for a *Daubert* argument.

*First*, experts, like Youssef, can rely on hearsay that is used by experts in their field. ECF No. 9060 at 6-7. *Second*, Saudi Arabia repeatedly uses a self-serving and selective approach that reviews facts in isolation and refuses to consider how Youssef independently reached his conclusions based on application of his experience to assess the full body of evidence. For instance, after unfairly criticizing Youssef for not blindly relying on the politically charged May 2021 closing memo, Saudi

---

[41] When "testimony falls within the range where experts might reasonably differ, the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (citing *Kumho Tire, Co.*, 526 U.S. at 153) (internal quotations omitted). Saudi Arabia also questions Youssef's citation to FBI reports that Jarrah tasked Thumairy and Bayoumi with assisting the hijackers, KSA's Br. 28, but takes that citation out of context of the phone analysis that Youssef conducted. Ex. 1 (Youssef Rpt.) 132-35. Youssef specifically concluded based on his independent review of the calls, including his examination of the calls Thumairy and Bayoumi made to Saudi Embassy officials, that he would alter the FBI's findings to read that it was "Khalid al Sowailem and/or Musaed al Jarrah who tasked Thumairy and Bayoumi...." *Id.* at 132-3.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Arabia reverses course and attacks Youssef for citing the same memo's findings that a "Southern California based network" of "Saudi Sunni extremists" including Thumairy and Muhanna were directed by Jarrah. KSA's Br 29. But Saudi Arabia ignores how Youssef came to his opinions about the Saudi government's network in Southern California by using his FBI work expertise (including his time in California) to analyze the evidence. Ex. 1 (Youssef Rpt.) 19-73.[42]

Another example is the Confidential Human Source ("CHS") information that Thumairy received an advance call from Malaysia about the hijackers and assigned ███ to pick them up at the airport and bring them to the mosque. *Id.* at 155. Youssef came to his own conclusions based on all the evidence that Thumairy was the contact person for the hijackers upon their arrival, *id.* 162, and that he asked ███ to help, *id.* 165. Youssef separately reviewed the CHS information, observed that the FBI found the CHS information credible,[43] and found that the information was "consistent with other evidence."[44]

---

[42] Youssef not only considered various FBI findings that described Jarrah as a recruiter and supervisor of extremist Saudi propagators, but cited to the facts *inter alia* that Jarrah took over the Embassy Islamic Affairs job held by the King Fahad Mosque's Chairman Khalil; ████████████████████████████████████████ ████████████████████████████████████████████████████ who along with Muhanna, led the protest at the Mosque in support of the 9/11 hijackers; and his analysis of Thumairy and Bayoumi's calls to the Islamic Affairs department at the Saudi Embassy and to Jarrah's cell phone. Ex. 1 (Youssef Rpt.) 21, 31, 49 & n. 135, 58 & n. 188.

[43] Youssef properly stated in his report that based on his experience the FBI's presentation of the source information about Thumairy in an "investigative accomplishment report" form that would only be generated after the FBI rated the source information as credible. Ex. 1 (Youssef Rpt.) 236. Saudi Arabia's contrary suggestion, KSA's Br. 30, fails to reveal Youssef's explanation.

[44] Youssef's report detailed the consistent evidence corroborating the source information, including that the hijackers attended an Al Qaeda meeting in Malaysia immediately before traveling to California; ███ met the hijackers and brought them to meet with Thumairy at the King Fahad Mosque; the support, including lodging, that ███ provided for the hijackers after they left their meeting with Thumairy; Bayoumi and Awlaki's meetings with and support for the hijackers; and the relevant phone contacts among the various participants. Ex. 1 (Youssef Rpt.) 155, 160-70. When asked at his deposition, Youssef testified that senior Al Qaeda operative and current Guantanamo detainee Walid bin Attash was likely the individual who made the phone call to Thumairy because Attash was in Malaysia at the time to attend a meeting with Hazmi and Mihdhar; had trained with both of them; and because he was Bin Laden's communications person. Ex. 5 (Youssef Tr.) 123:15-22. Youssef also stated based on his FBI knowledge that at the time Attash had access to fraudulent passports and could have easily bypassed the normal legal systems to enter the U.S. *Id.* 30:1-7. Saudi Arabia's claims

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Finally, Saudi Arabia takes out of context Youssef's citation to the FBI's report  after returning to Saudi Arabia. KSA's Br. 30. Youssef referred to that report after citing a litany of proof that Thumairy had a close, long-lasting work and personal relationship with Mana ████████████████████████████████████ ) at odds with Thumairy's deposition claim that he did not know Mana. Ex. 1 (Youssef Rpt.) 55-7.[45]

**4.      Youssef does not engage in speculation and conjecture.** Contrary to Saudi Arabia's arguments, KSA's Br. 30-31, Youssef does not engage in "speculation or conjecture," but instead appropriately applies his expertise and methodology to the evidence. For example, ample evidence supports Youssef's conclusion that Adel al Sadhan and Mutaeb al Sudairy were an advance team for the hijackers, including his testimony about Al Qaeda's use of advance teams to plan other attacks. Ex. 5 (Youssef Tr.) 306:7 – 307:10; *see also id.* 367:6-14 ("In fact, my experience, working counterintelligence operations, whether it be with the FBI or with the FBI and in concert with the CIA, mandate that there would have to be an advance team and that there would have to be a support structure for an operation like this to go successfully."). Saudi Arabia again completely fails to address

---

regarding testimony that it elicited upon cross-examination, KSA's Br. 31, ignore the evidence and Youssef's specialized knowledge.

[45] Thumairy's deposition testimony was also contradicted by Mana, who testified that he regularly attended the King Fahd Mosque (Ex. 12, (Mana Tr.) 84), knew Thumairy as the Imam at both the Ibn Taymiyyah and King Fahd Mosques (*Id.* at 66, 84), translated for Thumairy (*Id.* 73), lived on the same street (*Id.* 99), was invited by Thumairy to give the Friday prayer himself on occasion (*Id.* 85), and was responsible for distributing Saudi government funding from the Consulate to the Mosque ███████████████████ (*Id.* 121-22).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

the evidence supporting Youssef's opinions.[46] At every turn, Youssef specified the detailed analysis that went into his determinations.[47]

     **5.**     **Youssef properly applied his expertise to the phone data.** Youssef is unquestionably a communications expert, as Saudi Arabia partially concedes, as it relates to counterterrorism investigations.[48] His conclusions regarding phone records are reliable and based on his extensive experience as well as the evidence, not speculation or conjecture. Saudi Arabia disputes two of Youssef's conclusions: that the phone number ██████-3142 ("-3142") and fax number ██████ ████2697 belong to Bayoumi, and that the phone numbers ██████-3362 ("-3362") and (██████ 0777 ("-0777") belong to Thumairy. Saudi Arabia uses terms like "assumes" and "conjectures" and asserts that these conclusions are based on "speculation" to try and bolster its argument, but the fact is that Youssef did not speculate to reach his conclusions: he relied on *evidence*.

     For instance, Youssef found that Bayoumi listed the -3362 number in his phone books as Thumairy's cell number, and that Thumairy listed the -0777 number on a July 2001 apartment lease

---

[46] Youssef cited numerous facts, including that Sadhan and Sudairy followed the precise path that hijackers Hazmi and Mihdhar would follow almost exactly a year later; the coordination between Bayoumi and Thumairy ahead of the Sadhan/Sudairy visit; Sadhan's immigration form, which listed Thumairy's phone number as his contact in the U.S.; Bayoumi's photographs and videos of Sadhan and Sudairy with Bayoumi and ████████ during their visit; ████████ ████████████████████████████████████████████████████ and the timing and patterns of phone calls; the "extremely urgent" February 1999 letter that Bayoumi sent about the visit with contact information, followed by the hijackers' April 1999 visa applications to travel to Los Angeles. Ex. 1 (Youssef Rpt.) 100-16, 170-75, 221, 238.

[47] Evidence supporting the conclusion that Walid bin Attash made that phone call is detailed in Youssef's report and deposition. *Id.* 123:15-22 ("Based on looking at that document and other information that Mr. bin Attash was in Malaysia at the time and the fact that he was the one that trained with al-Hazmi and Mihdhar, looking at that in **totality of the circumstances here** would tell me that he's the man because he is the communications man for bin Ladin.") (emphasis added).

[48] KSA's Br. 19 (saying of Youssef's roles as Unit Chief of the Document Exploitation Unit and then later of the Communications Analysis Unit, "Those positions might qualify him for the phone-call part of his analysis which is inadmissible for other reasons."). As discussed at *supra* § III. A.1., Saudi Arabia is wrong that Youssef's opinions based on his communications analysis are excludable for other reasons.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

application. Ex. 1 (Youssef Rpt.) 121.[49] Youssef analyzed all the phone records, including from Thumairy's landline, to cross-check that the -3362 and -0777 numbers were used by Thumairy to make and receive calls. Ex. 1 (Youssef Rpt.) n. 504. For example, Youssef determined that the calls made on the -0777 number from December 10, 2000 to August 15, 2001 match those of locations and individuals that were part of Thumairy's calling circle. Ex. 1 (Youssef Rpt.) 121-22. Youssef separately investigated the subscriber information for the -3362 and -0777 numbers and determined that both numbers used the same Long Beach, California apartment address but were under the names of two different individuals who worked for (or claimed to work for) the Saudi government and had direct ties to Thumairy. Ex. 1 (Youssef Rpt.) 121-25.[50] The FBI produced the records of those numbers to the Plaintiffs in this litigation in response to their subpoena for Thumairy's phone calls, and the FBI's own independent analysis itself confirmed Youssef's methodology by finding that the -3362 and -0777 numbers were being used by Thumairy at the relevant times.[51]

Regarding Bayoumi's -3142 number, Youssef specifically reviewed Bayoumi's claims that "anyone" could use the phones in his office by using the basic tools of a communications expert to compare the actual call usage patterns on Bayoumi's office phone to the call usage on Bayoumi's cell

---

[49] While Saudi Arabia wrongfully accuses Youssef of "speculation," KSA's Br. 32, it engages in speculation by making the claim that "any number of people could have entered phone numbers" into Bayoumi's phone book, KSA's Br. 33 n. 23, when the -3362 number was entered in both of Bayoumi's typed phone books dated January and October 2000. Ex. 1 (Youssef Rpt.) 131 n. 532.

[50] As set forth in Youssef's report, Faisal al Muhanna, the subscriber for the -3362 number, represented that he was a "trainer" for the Saudi Embassy in a July 2001 joint lease agreement he entered for two apartments near the King Fahad Mosque with Thumairy. Ex. 1 (Youssef Rpt.) 121. Hatlani, the subscriber for the -0777 number, was a Saudi Consulate "Vice Consul" ███████████████████ *Id.* at 122. Youssef opined that Muhanna and Hatlani were classic examples of a "front man" technique that Youssef had seen foreign governments use to support their operatives working abroad on covert matters. *Id.* at 124-25.

[51] A 2005 FBI report described the -3362 number as "used by Al-Thumairy but subscribed to Faisal Al-Muhana [sic]" and that the -0777 number was "subscribed to Salah Al-Hatlani, but used by Al-Thumairy…." Ex. 19 (EO14040-002757-MDL); Ex. 1 (Youssef Rpt.) 102 n. 413. Youssef and the FBI independently found a total of 67 calls between Thumairy and Bayoumi. *Id.*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

phone, to Bayoumi's own phone book, and relevant events.[52] In his review of the phone records, Youssef cited the Arabic notation that Bayoumi wrote on his office phone bill next to calls made by visiting Al Haramain operatives in August 1998.[53] Youssef also referenced an FBI report that Bayoumi's office phone was separate from the Mosque's own number and was locked and not used by others.[54] Saudi Arabia does not point to any specific call Youssef misattributed to Bayoumi on his office phone.

Further, regarding Youssef's communications analysis expertise, Youssef described in his report how he used various techniques he learned at the FBI to analyze the calls, including studying the "spikes" and "clusters" in call activity between two individuals, *id.* at 125, 243; the patterns of calls among groups of individuals, such as "calling circles" or "call chaining"; the length of calls; and the time and day of the week of the calls. *Id.* at 14, 125, 243. Youssef regularly used those methods as an FBI Communications Unit Chief to submit probable cause and other opinions before federal courts.

Saudi Arabia's disagreement with Youssef's conclusions that he bases on evidence does not render them unreliable, speculative, or conjectural.

---

[52] Ex. 1 (Youssef Rpt.) 83 n.325 (in reviewing calls made to the Saudi Embassy, Youssef determined that "Bayoumi interchangeably used his Mosque office phone and cell phone to call the same Saudi Government numbers."); *id.* at 102-3 n. 416-7 (reviewing calls by Bayoumi from his Mosque office to various Saudi government officials in advance of the trip of MOIA propagators Sadhan and Sudairy to California); *id.* at 172 (while Bayoumi testified that "it could have been another person who called" Sudairy in January-February 2000, Youssef determined that "[t]he calls to Sudairy were placed from Bayoumi's Mosque phone and Bayoumi's cell phone" and that "[i]t would be a strange and unlikely coincidence for 'another person' as described by Bayoumi to be calling Sudairy from both of those phones over this discrete two-week period."); Ex. 1 (Youssef Rpt.) 77 n. 295 (noting the calls were made from Bayoumi's cell phone and office phone to ███████████, who ran one of the Saudi government contractors that were funding Bayoumi's work for Saudi Arabia in San Diego).

[53] Ex. 1 (Youssef Rpt.) 98 n. 401. Youssef's detailed analysis is shown by the fact that he noted that calls made to ███████'s parents on from Bayoumi's Mosque office phone in August 1998 may have been made by ███████ when he returned to San Diego as a member of the Al Haramain delegation visiting Bayoumi and cross-referenced the calls to the phone bills of Bayoumi's cell phone and Al Haramain. *Id.*; *see also id.* 157 n. 642 (noting that a January 2000 call from Bayoumi's Mosque phone may have been made by someone other than Bayoumi). The fact that Bayoumi made notations of the calls made by Al Haramain on his office phone bill is evidence that he carefully regulated the use of his office phone.

[54] Ex. 1 (Youssef Rpt.) 83 n. 325. The documents produced by the MPS) also show that Bayoumi specifically arranged for a payphone outside the mosque for the use of the congregants. Ex. 14 (MPS43-953) (agreement for public payphone).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

6.    **Youssef used careful analysis, not "guilt by association."** Again, Saudi Arabia masquerades factual disputes as a *Daubert* issue. KSA's Br. 33. Terrorism experts *must* analyze the relationships among the fact witnesses and other relevant individuals. Like an organized crime expert, Youssef can apply his unique knowledge about the operation of Sunni extremist cells and terror groups, including Al Qaeda. The Second Circuit has long "approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). A number of the fact witnesses in this case have close, if not direct, associations to extremist cells in Southern California and Al Qaeda.[55] Analyzing those associations is necessary for an expert to determine whether it was more or less likely that certain individuals supported Al Qaeda.[56]

Contrary to Saudi Arabia's arguments, KSA's Br. 34, Youssef identified Minister Saleh Al Ash-Sheikh as the leader of Al Haramain based on U.S. government findings and Al Haramain's own contemporaneous website posts. Ex. 1 (Youssef Rpt.) 93-94. Further, Saudi Arabia's suggestion that MOIA Deputy Minister Ammar and other Saudi government Board members of the Mosque did not actually play any role there is contrary to the evidence of their direct involvement in Mosque activities,

---

[55] *See, e.g.,* Ex. 1 (Youssef Rpt.) 49-60. For example, Omar Hamerman was an associate of radical extremist Mohammed Zaky and took over leadership of the extremist cell in San Diego after Zaky's death. Ex. 1 (Youssef Rpt.) ▮, 23▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Mutaeb al Sudairy lived in Columbia, Missouri, with Al Qaeda member Ziyad Khaleel, who had also shared ties with Bayoumi's close associate and infamous extremist Awlaki. *Id.* at 109. A full accounting of witness associations to extremists is too lengthy to present here, but all are accounted for in Youssef's Report.

[56] *U.S. v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) ("Expert testimony is similarly appropriate in the context of a case — such as this one — which implicates the activities of terrorist organizations **and their supporters**.) (emphasis added). The sole case Saudi Arabia cited for its "guilty by association" argument is a *criminal* case. *Zhong*, 26 F.4th at 558. The experts in *Zhong* were forbidden from testifying to the *legal* guilt of defendant's associations. Thus, in essence, the prohibition on "guilt" precludes a legal conclusion, which is irrelevant here where Youssef does not offer a legal conclusion on criminal liability, nor has Saudi Arabia argued as much. It would be a misapplication of the law to forbid the experts in this instance from opining on relationships between fact witnesses based on criminal law standards meant to be applied in a criminal context.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

including *inter alia* that Ammar received reports from the Mosque Foundation's Chairman Khalil al Khalil about Thumairy,[57] ███████████████████████████████████████ and was the direct supervisor of Sowailem, Thumairy, Muhanna, and the other propagators working for Thumairy. Ex. 1 (Youssef Rpt.) 29, 47 n. 121.[58]

Saudi Arabia also overlooks the basis for Youssef's opinions on MOIA Minister Abdullah al Turki, KSA's Br. 33-34, including eyewitness testimony that Turki had a close first name relationship with Thumairy, Ex. 1 (Youssef Rpt.) 36-37; that Turki appointed Thumairy and pulled strings for him to get the high-profile assignment to Los Angeles, *id.* at 37-38; and that under the Saudi government appointment process, based on Youssef's knowledge, a recommendation from a senior official such as Turki was a requirement for Thumairy to get his job. *Id.* at 36-7 & n. 79.

All these facts make it *more likely* that high level Saudi officials aided Al Qaeda and are all based on evidence Youssef analyzed.

### C.  Nakhleh Applied Reliable Methodology to Form his Opinions.

**1.  Nakhleh thoroughly explained his reliance on experience and analytical methodology consistently applied throughout his career.** Nakhleh has disclosed and

---

[57] Ammar received reports from Khalil about the Mosque, including the August 2001 report about Thumairy hosting several extremists at the King Fahad Mosque including another MOIA official, as well as the report shortly after the 9/11 Attacks from MOIA propagator Shuaib that the FBI showed him photographs of Thumairy with the hijackers at the Mosque. Ex. 1 (Youssef Rpt.) 29, 47 n. 121, 61-3, 67.

[58] Saudi Arabia's claim that Youssef "ignored or disbelieved testimony from third-party witnesses" about the role of Saudi government officials on the Mosque Board, KSA's Br. 34, is highly misleading. First, one of those witnesses, the Mosque Board's Chairman Khalil, worked for the Saudi government at the Saudi Embassy (he was Jarrah's immediate predecessor as Islamic Affairs deputy), its Imam University, and its Shura Council. Ex. 1 (Youssef Rpt.) 10, 25-26. Second, both Khalil and the second witness, Osman Kaldirim, gave incredible testimony that Thumairy was not the King Fahad Mosque's Imam but merely a student, and that they had no idea Saudi Arabia employed and appointed Thumairy (or Muhanna) to work at the Mosque. *Id.* at 71. Evidently Saudi witnesses had trouble keeping their story straight, beginning with Saudi Arabia's representation that Thumairy was employed as a diplomat at their consulate. Third, the roles of the Saudi government officials who served on the Board in overseeing the Mosque were confirmed through independent evidence, such as Mana's appointment by the Saudi Consul General (who served on the Board) to assist Thumairy in the operation of the Mosque. *Id.* at 29, 49.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

demonstrated a methodology that is reliable and has been reliably applied in formulating his opinions. Nakhleh testified that he applied a "comprehensive interdisciplinary methodology" that was both "qualitative and quantitative" in nature. Ex. 6 (Nakhleh Tr.) 278:6-20. In honing his methodology while at the CIA, Nakhleh drew upon expertise from specialists in disciplines including "empirical scien[ce]" and the social sciences—*i.e.*, "scientists who focus on issues other than quantifiable data." *Id.*

Nakhleh also sought out and absorbed expertise from other disciplines throughout his career, including in "economic, educational, judicial and other aspects of public policy in numerous Muslim countries as well as the religious/sectarian conflicts within the Muslim world." Ex. 2 (Nakhleh Rpt.) ¶ 10. In his expert report, Nakhleh describes how his "well-structured interdisciplinary approach" was "imported with [him] into the US Government when [he] joined the CIA," *id.* ¶¶ 5-12, helping build Nakhleh's Program into "the most respected center of Islamic expertise in the U.S. government." Ex. 6 (Nakhleh Tr.) 279:1-11. "It's the same methodology [he] used then and the same methodology [he] used in writing [his] report." *Id.* 279:7-8.

In terrorism cases, where "expert testimony is not of a technical nature, but rather falls within the ambit of social science, this Court is guided by the objective of the *Daubert* factors, and not a mechanical application of each one." *United States v. Paracha*, 2006 WL 12768, 19 (S.D.N.Y. Jan. 3, 2006) (*citing Kumho Tire Co.*, 526 U.S. at 152). A methodology that "consists of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information" is deemed sufficient. *Paracha*, 2006 WL 12768, at *20.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Nakhleh's methodology entails, foremost, "a thorough reading" of all the available documents, Ex. 2 (Nakhleh Rpt.) ¶ 9, including "books and journal articles,"[59] *id.* ¶ 9, and "many primary and secondary reports and publications"[60] (in both English and Arabic), *id.* ¶ 7. Nakhleh stated that "read[ing] a lot" over the years, including "the books I cited in my report in [Annex C]" was fundamental to "how I form an expert opinion on issues relating to political Islam and Islamization." Ex. 6 (Nakhleh Tr.) 238:21-239:5. Nakhleh's extensive study of texts is then supplemented by Nakhleh's first-hand knowledge and experience, gained from decades of exploratory field trips, interviews and engagement with Qur'anic teachings, *supra* § I.B., "on extended research visits to Muslim majority and Muslim minority countries across the globe." Ex. 2 (Nakhleh Rpt.) ¶ 10. Recognizing the scope of information analyzed, Nakhleh states that his methodology prioritizes an "understanding of the intermingling of religion (in this case, Islam) and society, and of religion and nationalism." *Id.* ¶ 5.

In the current case, Nakhleh's methodology encompassed a "dedicated analysis" of a broad range of relevant documents from the vast documentary productions in this litigation, the principal categories of which Nakhleh sets forth in his report. *Id.* ¶¶ 17, 236.[61] Nakhleh similarly undertook a

---

[59] *See also Id.* ¶ 5 (specifying "books and journal articles on Islam as a religion, a community of faith, and a driver of social policy"); Ex. 6 (Nakhleh Tr.) 233:15-22 (reflecting opinions based on "overall research and analysis and documentations and books and articles that I have read over time"); *id.* 238:21-239:2 (in particular, "the books I cited in my report in [Annex C]").

[60] *See also Id.* ¶ 5 (specifying that "[p]ublications on the different historical narratives, politics, and society helped [him] greatly understand the role of Islamization in the governing process of different countries and cultural drivers in Muslim majority and Muslim minority countries across the Muslim world").

[61] *Id.* ¶ 236 (specifying "original documents produced by the Kingdom of Saudi Arabia," reviewed in Arabic as well as their English translations, "documents produced by the FBI," especially those released "under Executive Order 14040," and "documents recovered in law enforcement searches" in locations in both the U.S., primarily "associated with persons of interest" in California, and in the U.K., as produced by the MPS.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

detailed, highly specialized review of relevant deposition transcripts and recordings. *Id.* ¶ 236.[62] Nakhleh applied his methodology to the "maximum amount of factual material and declassified investigative product made available to me for review." *Id.* ¶ 24*, see also Id.* Annex C.

Additionally, Nakhleh explains that he has "acquired and studied close to 300 Saudi Arabian textbooks," *id.* ¶ 55, and has "devoted special efforts to obtaining and conducting analysis of extremist publications, as well as materials related to sermons or lectures given by radical Muslim preachers," *id.* ¶ 23, which in turn has enabled him to read, in their original form, "numerous Arabic language pamphlets and publications written by Saudi jihadists and radical clerics," *id.* ¶ 23. All the above reiterated how Nakhleh's methodology is qualitatively enriched by the personal access and professional experience he has accumulated during his career.

The "quantitative" dimension of Nakhleh's methodology is exemplified by his use of an array of "official" figures[63] in his report's first "*da'wa* case study." Ex. 2 (Nakhleh Rpt) ¶¶ 171-181. Nakhleh set forth numbers to quantify scale and ambition,[64] extent and range of U.S. locations targeted by MOIA,[65] and even funding structure,[66] cumulatively to depict "how Saudi Arabia's Wahhabi polity was implemented" by MOIA officials in the U.S. prior to 9/11. *Id.* ¶ 172.

Further examples of "quantitative" aspects of Nakhleh's analysis include: Nakhleh's illustration of the stature of the Imamate at the King Fahad Mosque by juxtaposing numbers

---

[62] *Id.* ¶ 155 (offering an example of how he applied his methodology to form his expert opinions, Nakhleh "carried out a thorough review and analysis of the audio-video recording provided to me by counsel of the deposition of Thumairy in these proceedings").

[63] Nakhleh's numbers here are quoted from a July 1998 issue of Al-Daawah Magazine, an "official monthly publication" of the Saudi MOIA, recovered from Omar al-Bayoumi by the FBI. Ex. 2 (Nakhleh Rpt) ¶ 171.

[64] Ex. 2 (Nakhleh Rpt.) ¶ 172a (MOIA's "projects in 100 countries," including "1500 mosques, 1000 academic institutions and schools, 210 Islamic Centers"—all established "within five years of [MOIA's] creation").

[65] *Id.* ¶ 172c (enumerating donations in at least eight major cities, including New York, Washington DC and Los Angeles).

[66] *Id.* ¶ 172d ("more than $30 million USD" through the Islamic Affairs Department of the Saudi Embassy "to support societies doing Islamic activism on the American continent").

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

(*e.g.*, "capacity for 2,000 worshippers," "principal mosque" among "a total of 26" in greater L.A., "fourth-largest" in any U.S. city) with contemporaneous policy statements made by Dr. al-Turki, MOIA's first Minister ("one of the most important means by which to spread the Islamic da'wa"), *id.* ¶¶ 174-181; and Nakhleh's reference at deposition, relying on KSA documentary production,[67] to the ██████████████████████████████████████████, Ex. 6 (Nakhleh Tr.) 316:11-18.

As evidence of his methodology in practice, Nakhleh relates how he presided over a "vibrant academic outreach program" in the CIA, bringing together leading experts in the field to ensure that the grounds for his analysis were peer-reviewed and enriched by the broad contributions of other knowledgeable authorities. Ex. 2 (Nakhleh Rpt.) ¶ 11-14. The aim there, to generate "evidence-based, knowledgeable briefings that utilized all-source intelligence," *id.* ¶ 11, correlates closely with Nakhleh's reliance on his interdisciplinary methodology to arrive at well-founded opinions in the present case.

Finally, at deposition Nakhleh explained expansively how he applies his methodology for assessing the reliability of sources, and weighing up or reconciling the evidence each source provides, against the wider totality of the evidence. *E.g.*, Ex. 6 (Nakhleh Tr.) 97:4-100:13, and 202:17-203:9.

2.    **Nakhleh's opinions on Wahhabism and jihad reflect robust support in authoritative scholarship, based on facts and data that experts in analogous fields frequently rely on.** As much as Saudi Arabia might wish that Wahhabism and its central tenet of jihad be taboo in this litigation, *see, e.g.* KSA's Br. 8,[68] this Court should find: *first*, that Nakhleh's expert opinions on

_____

[67] ████████████████████████████████████████████████████████████████████
██████████████

[68] Saudi Arabia's blunt gripe that Nakhleh "uses the pejorative term 'Wahhabism'," KSA's Br. 8, ignores the insightful, contextual explanation Nakhleh provided in his report, Ex. 2 (Nakhleh Rpt) 11, n.7, noting that "outsiders, especially those in the West, use the term ['Wahhabism'] as a form of shorthand to denote followers of the doctrine espoused by Ibn Abd al-Wahhab." Nakhleh foresaw Saudi Arabia's position and offered the Court assistance in interpreting its background, *id.* 11, n.7 ("The Saudis regard the term as pejorative because it appears to characterize 'their' Islam as merely one branch or version of Islam, as opposed to the Saudi belief that Wahhabism is the only Islam and represents Islam in its entirety. One

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

these central subjects of the litigation are built upon Nakhleh's application of sound methodology; and *second*, that the facts and data (including the terminology) Nakhleh relies upon, whether Saudi Arabia mischaracterizes them or grudgingly acknowledges them as "unfortunate," *id.,* n.5,[69] are facts and data that have long been heeded among scholars of Islam—including, in their finer points, through healthy debate. Nakhleh's facts and data are squarely of the kinds that other experts in terrorism cases routinely rely on in reaching their conclusions.

Rule 703 of the Federal Rules of Evidence provides that "an expert may base an opinion on facts or data in the case . . . [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. The court is tasked with ensuring that an expert is "basing testimony upon professional studies or personal experience, employ[ed] in the courtroom [with] the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Paracha*, 2006 WL 12768, at *19 (citing *Kumho Tire Co.*, 526 U.S. at 152). Nakhleh shows that he has employed his methodology with characteristically great care and intellectual rigor, *see, e.g.,* Ex. 6 (Nakhleh Tr.) 125:16-130:21,[70] providing nuanced expert opinions and

---

can often hear it said among scholars of Islam, in relation to such designations: every Wahhabi is a Salafi, but not every Salafi is a Wahhabi").

[69] KSA's Br. 8, n.5, where Saudi Arabia offers in a footnote, contrary to the strident tone of its position on "Wahhabism," the following: "We acknowledge as an unfortunate fact that some U.S. government sources and some English-speaking experts have adopted the term."

[70] Nakhleh's answers at deposition exhibited attention to detail that was frequently missing from Saudi Arabia's questions, *see, e.g.,* Ex. 6 (Nakhleh Tr.) 129:11-20 ("I've studied these schools over time thoroughly, there are more spectrums in the other schools of jurisprudence in Sunni Islam and less so in the Hanbali school."). As further expressions of his rigor, Nakhleh insisted upon clarity of definition (*e.g., id.* 125:16-19 ("you have to define really what you mean by Salafism"); *id.* 155:20-156:11 ("you have to [] define for me what do you mean by the government")) and inserted caveats and qualifications (*e.g., id.* 129:4-10 ("[Tawhid] is the doctrine, the Wahhabi doctrine, the Wahhabi Salafi doctrine, of the oneness of God"); *id.* 154:5-10 (any distinction between Hanbali Salafist beliefs "depends on what context you are talking about")). Saudi Arabia omitted vital pages of foundational context, *e.g., id.* 125:16-130:21, from its exhibit containing "excerpts" of the Nakhleh deposition transcript, Saudi Arabia seeks to rely only on Nakhleh's answers (or parts of his answers) to a series of quickfire questions, *see, e.g.,* KSA's Br. 8, 37, devoid of the necessary context, clarity, and caveats.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

illuminating complex areas that the Court might otherwise consider "beyond [its] knowledge]." *Abu-Jihaad*, 553 F. Supp. 2d at 124.

This Court must not be misled by Saudi Arabia's ruse to erase the nuance, precision, and richness of insight from Nakhleh's discussion and opinions regarding Saudi religious ideology. As already discussed, *supra* § II.B.1, Nakhleh draws upon authoritative sources for his opinions on the key original doctrinal tenets of Wahhabism, and rests upon a secure scholarly basis in analyzing Wahhabis' ideological support for violent jihad against the perceived "enemies" of Islam. Further, Nakhleh's review of the "operational approaches to jihad within Wahhabism," Ex. 2 (Nakhleh Rpt.) § A.ii., ¶¶ 36-43 and § C ¶¶ 122-137,[71] lends vital context to understand why MOIA propagators and other Saudi officials provided support to the 9/11 hijackers in Southern California. Nakhleh presents a detailed historical analysis as foundation for his opinion that "the prevailing view of the 'justness' of jihad against the United States also offered the most viable rationale upon which Saudi officials, most of them operating under the [MOIA], … willingly provided support to the 9/11 hijackers," Ex. 2 (Nakhleh Rpt.) ¶ 134. Nakhleh's expert report and testimony offer unique insights and assistance to the Court in addressing the questions at the heart of this case.

Rule 703 "controls the *bases* upon which an expert may rest testimony." *Gill*, 893 F. Supp. 2d at 530 (emphasis added). Saudi Arabia's challenge to Nakhleh's opinions on Saudi religion makes clear that what it objects to are Nakhleh's *opinions* themselves, rather than the *bases* upon which Nakhleh has opined. KSA's Br. 35-39. This is evidenced by its irrelevant and misleading claim that "[r]eal

---

[71] Nakhleh's explanation of the "particularization" of both ideological and operational approaches to jihad within Wahhabism relies upon sufficient facts from a plethora of sources, including the publications of Sayyid Qutb and Muhammad Surur, the 9/11 Commission Report, and documents produced by the FBI and Saudi Arabia, and original writings of radical jihadists including Yusuf al-'Uyayri. *See also* Ex. 2 (Nakhleh Rpt.) ¶ 145, describing Saudi Arabia's furnishing of facilities, resources, and cover to a network of avowed jihadists in the United States "to create and sustain new operational cells."

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

experts disagree with Nakhleh's *statements* about Saudi religion," *Id.* at 36, which says nothing about the rigorous *methodology and process* by which Nakhleh arrived at those statements. Saudi Arabia's claim is misdirected. "The district court must focus 'not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology.'" *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 320 (E.D.N.Y. 2013) (citing *Amorgianos v. Nat'l Railroad Passenger Corp.*, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001)).

In the detailed review of Nakhleh's methodology in this case, *supra* § III.C.1, it is evident that Nakhleh relies on, *inter alia*, his thorough reading of books, journal articles, pamphlets, reports, and other publications in formulating his opinions. Nakhleh specifies more than 40 different books as "materials considered" in the preparation of his report, notably under the categories of "Wahhabi Salafi Islam in Saudi Arabia and Violent Jihadist (terrorist) Outcomes" and "Political Islam (Beyond Violent Jihadist Literature)." Ex. 2 (Nakhleh Rpt.) Annex C, 1-4. The books reflect proper diversity of scholarly perspectives, including texts containing opinions with which Nakhleh disagrees, in whole or in part, and those that he has distinguished by his reliable methodology, *supra* § III.C.1, as he explained at deposition. *See, e.g.,* Ex. 6 (Nakhleh Tr.) 175:20-178:14.[72]

Nakhleh also analyzed thousands of pages of documents produced in the 9/11 litigation, including relevant contemporaneous material and investigatory reporting, *inter alia* from the FBI, CIA, Saudi Arabia, MPS and EO productions. *Id.* ¶¶ 16-17, Annex C. Such reliance materials are widely accepted for cases in the orbit of the social sciences. "Given the secretive nature of terrorists, the

---

[72] *See, e.g.,* Ex. 6 (Nakhleh Tr.) 176:14-22 (regarding Delong-Bas' view of the dissonance between bin Laden's "militant Islam" and the "Wahhabi Islam" practiced in Saudi Arabia, Nakhleh explained that he "reviewed the book as part of the full range of books and articles [he] reviewed" and stated "It is their opinion -- it is his opinion -- which is fine, he's entitled to his opinion. And my opinion would agree with some, would disagree with other. In the context of the whole thing, I was talking about the practice, not necessarily what Ibn Abd al-Wahhab wrote, but how that evolved in contemporary Saudi Arabia.")

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Court can think of few other materials [other than books, press releases, newspaper articles, and government publications] that experts in the field of terrorism would rely upon." *Linde*, 922 F. Supp. 2d at 323-24 (citing *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005)).

Similarly, Nakhleh's opinions in this case rely upon his vast first-hand knowledge and experience from his fieldwork analyzing Wahhabism in ideology and practice, including his research visits, interviews, and engagement with Qur'anic teachings, *supra* § I.B. Even where an expert's "opinions may not rest on statistical studies or traditional scientific methods, they are, nevertheless, based on data—including personal experience, interviews, review of [ ] manuals and other primary sources, and review of academic literature—of a type reasonably relied upon by experts in various disciplines of social science." *Rizk v. City of New York*, 2022 WL 900784, at *3 (E.D.N.Y. Mar. 28, 2022) (citing *Vazquez v. City of New York*, 2014 WL 4388497, at *12 (S.D.N.Y. Sep. 5, 2014)).

Saudi Arabia adopts the term "quietist" as part of a false-flag gambit to inject confusion into Nakhleh's discussion of religious ideology. KSA's Br. 36-37. Nakhleh has not used "quietist" in the manner alleged.[73] Further Saudi Arabia's presentation of a "lack of scholarly support" for Nakhleh is disingenuous.[74] Saudi Arabia builds its arguments upon a book by Natana Delong-Bas, its favorite

---

[73] Nakhleh, *A Necessary Engagement*, at 112-16. Nakhleh did not use the word "quietist" in this passage and did not attribute "quietist" characteristics to Saudi religious beliefs. Any "distinction" Nakhleh identified among three groups of Salafis lay only in their receptiveness to political discourse, whereas "all three groups… who are called Wahhabis by others… shun the "infidels"… and believe that these "infidels" (including citizens of the United States and its allies, Israelis, and pro-American Arab and Muslim leaders) have waged a war on Islam and are therefore the 'far' and 'near' enemy of Islam. It is the duty of all Muslims to do jihad against this enemy." *Id.* at 113.

[74] To the extent that "quietism" features in the relevant discourse, it is as a *political* doctrine, not a mark of any kind of moderation of the *religious* doctrine Wahhabis embrace in respect of jihad. Scholars cited by Saudi Arabia actually agree with Nakhleh in using "quietist" to denote disengagement from (domestic) affairs of governing and loyalty to *political* rulers. Compare Euben's observation that certain Saudi religious figures have affirmed "a quietist *political* stance" (emphasis added), which amounts to "leaving matters of the state to the ruling family," KSA's Br. 37 (citing Euben, at 21), with Nakhleh's responses regarding whether MOIA's al-Turki and Ibn Baz were "quietist," Ex. 6 (Nakhleh Tr.) 148:20-150: 9 (asked if al-Turki was a "quietist… loyal to the royal family," Nakhleh differentiated between political loyalty and religious belief: "I don't know what was in his head and his own belief about what was jihad and permissible jihad and what was not;" and as to Ibn Baz, "[w]ell, he toed the line, that's for sure. And [if] he did not -- if he were not loyal to the ruling family, he would not have stayed in his position").

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

academic from the "philo-Wahhabi" category, "apologetic" to Wahhabism, whose portrayal of Wahhab "as a protofeminist averse to jihad" has been fiercely criticized,[75] and is starkly refuted by reference to Wahhab's own original doctrinal writings.[76] Such was Delong-Bas' unbalanced narrative and her parroting of Saudi "official" lines that "[c]ertain paragraphs [in her book] might have been published by the Saudi Ministry of Islamic Affairs."[77]

Nakhleh has never opined that a Saudi Wahhabi could be a "quietist" *as opposed to* a jihadist. KSA's Br. 37. It is specious to imply that Nakhleh, in deposition testimony marred by Saudi Arabia's counsel's railroading and belligerent interruptions,[78] might have "retreated from the opinions about Saudi religion set out in his report." *Id.* at 9. Saudi Arabia could have presented "quietism" through the testimony of a qualified expert in the field, but it opted not to—no doubt because any qualified expert would have corroborated Nakhleh's opinions.

Saudi Arabia's motion should be denied because it builds a straw man out of Nakhleh's evidence, quoting selective citations to Nakhleh's testimony out of context,[79] and pointedly setting up misleading references to what Nakhleh "accuses Saudi Arabia of," "makes … derogatory statements

---

[75] *See, e.g.,* Ex. 27 (Bunzel, *Wahhabism*), Introduction, at 19 (citing Ex. 29 (Kearney, "The real Wahhab," *Boston Globe*, Aug. 8, 2004) and Ex. 28 (Bonnefoy, "Book Review: Wahhabi Islam," *The Journal of Islamic Studies* 17 (2006)" 371-72)).

[76] *Supra* § II.B.1, n.26, Bunzel, *Id.* at 182-183 (Wahhab "present[ed] jihad as a fundamental duty," "preach[ed] the necessity of… fighting [polytheists] in jihad," and "wrote frequently about jihad").

[77] Bonnefoy, *supra* n.75, at 371 ("The author seeks to rescue [Wahhab] from association with [bin Laden] and terrorism;" and "does not distance herself enough from a certain kind of official and hagiographic discourse.")

[78] Saudi Arabia's counsel used scorched earth tactics to question Nakhleh. *e.g.,* Ex. 6 (Nakhleh Tr.) 41:3-11, 42:22-43:7, and 349:1-8 ("Well, sometimes it happens that a witness doesn't answer a question. We've seen that today, correct?"). Saudi counsel regularly interrupted and cut Nakhleh off mid-answer. *e.g., Id.* 21:20-22:11; 26:2-11, 31:18-32:3; 155:13-156:11, 169:14-170:4; 187:2-9; 208:2-18, 258:3-19; 265:21-266:1-22; 290:8-291:1; 345:1-21.

[79] KSA's Br. 38, iii. alleges that Nakhleh "lumped together" all Salafists and made an "omission" of certain groups, but this ignores Nakhleh's repeated efforts to complete his sentences and instill caveats. *See supra* § III.C.2., n.70; *see also id.* n.78 (examples of Saudi Arabia's counsel's interruptions of Nakhleh's testimony). Nakhleh consistently accounts for and distinguishes quietism and activism, as well as nuances in Wahhabi theological practices and the "strains" of religious doctrine. *See, e.g.,* Ex. 2 (Nakhleh Rpt.) § A.ii. ¶42; Ex. 6 (Nakhleh Tr.) 152:6-156:11.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

about," or "never mentions." KSA's Br. 35-36, 38. Saudi Arabia then asks the Court to exclude Nakhleh's opinions on what it presents as contradictory views among scholars. KSA's Br. 36-37. This Court should find that these arguments "go to the weight of the evidence, not to its admissibility." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (citing *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F. 3d 179, 186 (2d Cir. 2001)). The proper avenue to address such factual concerns is cross examination. *Daubert*, 509 U.S. at 596; *SR Int'l Bus. Ins. Co.*, 467 F.3d at 134.

3.      **Nakhleh carefully analyzed the materials produced in this litigation and formed his opinions on the totality of the evidence.** Nakhleh's review of materials in forming his opinions was thorough; he did not base his opinions on classified materials, *supra* § III.A.2., and he included the review of contradictory documents. Nakhleh's considered comparison between the FBI "closing document" of May 2021 and the FBI "connections memo" of July 2021 is illustrative of his methodology: he weighed up both, considered their respective approaches and the different items of evidence they contained, and appraised the July 2021 memo as "much more comprehensive." Ex. 6 (Nakhleh Tr.) 108:9-109:15, 110:8-113:20. The conclusions reached in Nakhleh's report are "based on extensive research and expertise" as well as a careful review of volumes of documents. Ex. 6 (Nakhleh Tr.) 282:6-20; Ex. 2 (Nakhleh Rpt.) ¶ 255. Thus, Nakhleh's methodology "is more reliable than a simple cherry-picking of information." *Paracha*, 2006 WL 12768, at *20.

Nakhleh's opinions regarding Bayoumi, Sadhan, and Sudairy working together as an "advance team" are similarly based on his "careful[] review[] [of] the depositions," multiple relevant documents, and his own specialized knowledge of MOIA operational structures. Ex. 2 (Nakhleh Rpt.) ¶ 205; *see also* ¶¶ 207-213.

The density of publications and documents produced in this litigation make it impractical for Nakhleh to review every source of information. *See* ECF No. 9060 at 18-19 ("No witness, expert or

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

otherwise, could readily review all the discovery in this case plus all publications relevant to the issues it presents."). Nevertheless, Nakhleh accessed the entire production and reviewed the "maximum amount of factual material and declassified investigative product," Ex. 2 (Nakhleh Rpt.) ¶¶ 16-24, sufficient to meet the standard of what other experts in the field would rely on.

4.     **Nakhleh's opinions are based on expert analysis of the weight of the evidence, not on speculation and conjecture.** Saudi Arabia alleges an infirm basis for Nakhleh's opinions regarding the assistance Saudi Arabia's agents Thumairy and Bayoumi provided to Hazmi and Mihdhar. KSA's Br. 41-42. On the contrary, Nakhleh's methodology and cross-checking of sufficient facts from multiple sources comports with the applicable standard. *Abu-Jihaad*, 553 F. Supp. 2d at 126.

By way of example, Nakhleh dedicated extensive, specific focus to the path followed, Ex. 2 (Nakhleh Rpt.) § F.iii., ¶¶ 206-234, and actions performed by Saudi MOIA official Thumairy, whom he opined provided not only operational support, but also "a religious justification for the al-Qa'ida terrorist attacks of which [Hazmi and Mihdhar] were part." Ex. 2 (Nakhleh Rpt.) ¶ 234.[80]

Nakhleh's opinions on the support network comprising "several propagators and higher officials employed by the Kingdom of Saudi Arabia," *Id.* ¶ 234, were similarly rested on his detailed analysis of the documents in production. Nakhleh not only specified the names of Saudi officials he had identified through his review,[81] but also detailed the different forms of operational support he recognized, including "in the plot's advance planning, making practical arrangements to host and

---

[80] Nakhleh applied to Thumairy the description of "enabler" and relied on the analytical basis he had already elaborated in his previous peer-reviewed book, *A Necessary Engagement*, at p.117.

[81] In addition to Thumairy and Bayoumi, Nakhleh identified from documents certain "MOIA propagators" including Omar Abdi Mohamed, Jaithen, Mersal, Sadhan, and Sudairy as having "carried out advance planning, intelligence gathering and networking," and "senior Saudi officials," including Sowailem and Jarrah, "at whose direction the plot was carried out, and to whom – indeed through whom – an official line of reporting was maintained." *Id.* ¶258; *see also id.* ¶245.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

harbor the two hijackers… and in providing all-important spiritual support and kinship as a means of reinforcing their extremist religious beliefs." *Id.* ¶ 234.

Saudi Arabia can raise all its points during its cross-examination of Nakhleh.

**D.    Hitchens Applied Reliable Methodology to Form his Opinions.**

**1.    Hitchens used his peer-reviewed methodology.** Hitchens' report uses the same well-accepted, rigorous methodology as he did in his peer-reviewed publications and applied Social Movement Theory, as he did in his book *Incitement* and other articles. Ex. 3 (Hitchens Rpt.). Saudi Arabia argues that Hitchens makes "[c]onclusory appeals to experience," KSA's Br. 43, but cites his testimony wholly out of context. Hitchens teaches at a world leading research institution and explained that in preparing his report he used his expertise and experience from having his "writing peer reviewed and approved, again, by top university presses and publishers," Ex. 7 (Hitchens Tr.) 267:3-4, and he compared the peer review process to the "very same type of analyses" he performed here in reviewing "official records, FBI documents, investigative documents" to reach his opinions. *Id.* 267:9-11. In fact, Hitchens incorporated portions of his peer reviewed book *Incitement* into the report where it "was the strongest presentation of the material," such that he "couldn't really improve it." *Id.* 129:4-15; 130:12-17. Hitchens painstakingly reviewed contemporaneous recordings of Awlaki lectures from his library and detailed how Awlaki's statements compared to Al Qaeda's messaging at the time. Ex. 3 (Hitchens Rpt.) ¶¶ 75-93. As this Court previously explained, one "cannot require much more from" experts such as historians who are not using "'hard science methodologies.'" ECF No. 9060 at 11 (quoting *U.S. v. Joseph*, 542 F.3d 13, 21 (2008)). Where the expert has offered "some explanation as to how [he] came to his conclusion[s] and what methodologies or evidence substantiate" them, that "is enough to admit his testimony." *Id.* (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 464–

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

65 (S.D.N.Y. 2010) (concluding that "the reliability of [the expert]'s testimony largely depends on whether he has drawn the proffered industry standards from an adequate source—in this case, his experience").[82]

2. **Hitchens made detailed findings about Awlaki's pre-9/11 extremism.** Saudi Arabia makes the false and misleading argument that Hitchens does an "[a]bout face" and previously concluded in his book *Incitement* "that Awlaki's jihadist transformation occurred after 9/11…." KSA's Br. 43. But Hitchens wrote in that book that the issue remained an open question,[83] and his opinions were based not only on his prior work but on substantial additional research, including "re-listening to…many, many hours of [Awlaki's] lectures," together with evidence from this MDL that he reviewed applying his same methodology. Ex. 7 (Hitchens Tr.) 328:8-9; Ex. 3 (Hitchens Rpt.) ¶¶ 75-80.[84]

---

[82] In 2016, the U.S. Justice Department retained Hitchens as an "expert on international terrorism, the global jihad movement, with a focus on Awlaki's personal biography, including his time in the United States, United Kingdom and Yemen; his ideology; his published works; and his role and influence on the movement" to assist the trier of fact in a prosecution of four defendants who were convicted of funding and providing material support to Awlaki who would use the money to support terror attacks. *see* Ex. 30 (DOJ expert disclosure (Dec. 1, 2016), ECF 294 at 2, *United States v. Mohammad*, 3:15-cr-00358-JJH (N.D. Ohio)). The defendants plead guilty before the court made any rulings.

[83] Ex. 7 (Hitchens Tr.) 316:17-317:15. In his book, Hitchens indicated that Awlaki's relationship with the hijackers involved "unsolved mysteries" and that Awlaki had not claimed credit for his involvement with the 9/11 hijackers; but in his work in this case he learned for the first time that Awlaki not only made statements in line with Al Qaeda's dogma before 9/11, but also that Awlaki had a motive to keep his association with the hijackers quiet to protect others who were also involved, including Bayoumi. *Id.* 135:9-20.

[84] Hitchens also cited to numerous additional facts from his research about Awlaki's extremist connections before 9/11 including that Awlaki became enamored with the conflict in Afghanistan and traveled there in 1992 and thereafter began "to adopt a worldview partly shaped by the doctrine of Afghan jihadis…," Ex. 3 (Hitchens Rpt.) ¶23; Awlaki met Ziyad Khalil (who provided logistical support to Osama bin Laden and Al Qaeda used in the 1998 Embassy bombing attacks) and the two men maintained a relationship over the years including during the time that Awlaki provided assistance to Hazmi and Mihdhar, *id.* ¶25; in 1996 Awlaki, encouraged a Saudi student in Denver to travel to Chechnya to join in jihad against the Russians and espoused the legitimacy of violence against the enemies of Islam, *id.* ¶31; Awlaki then had a confrontation with a Mosque elder who warned Awlaki not to preach violent jihad, *id*; within two weeks of that confrontation, Awlaki moved to San Diego and was recruited to become the Imam of the Al Ribat Mosque in San Diego, *id.* ¶ 27; Awlaki's lecture series CDs were produced and distributed by a Saudi businessman who attended* Imam University with Thumairy and had phone contacts with Thumairy in 1999-2000, *id.* ¶¶ 28, 29; in 1998-99; records show that Awlaki was Vice President of the Charitable Society for Social Welfare, a Yemeni organization cited in a federal court indictment as a front for Al Qaeda and led by an individual blacklisted by the Treasury Department after 9/11 as a Specially Designated Global Terrorist and described as a loyalist to Bin Laden, *id.* ¶ 32; in 2000, the FBI further investigated Awlaki for ties to Omar Abdul Rahman a/k/a the "Blind Sheik." *Id.* ¶ 34.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Hitchens discovered "new material" including "crucial and shocking" claims made by Awlaki in a 2000 lecture that "the enemies of Muslims today are the modern-day Pharaohs; and that Jewish people are orchestrating a war on Islam and Muslims." Ex. 7 (Hitchens Tr.) 322:11-15; Ex. 3 (Hitchens Rpt.) ¶76. Awlaki's views were "directly in line with how al-Qaeda…presented the world prior to 9/11." *Id.* ¶ 79. Hitchens concluded that this constituted "a fringe and extreme interpretation of the faith which Awlaki was helping to bolster and disseminate in America at the same time he was in direct contact with three of the hijackers and agents of the Saudi government." *Id.* ¶ 80.

Saudi Arabia cites Hitchens' deposition testimony that Awlaki did not say anything "*specifically*" about "supporting global jihad," KSA's Br. 44 (emphasis added) (citing Ex. 7 (Hitchens Tr.) 325:18-22), ignoring that Hitchens explained in detail the basis for his findings of Awlaki's pre-9/11 extremism, including Awlaki's 2000 lectures that he reviewed on this case. *Id.* 322:11-15, 328:9-15. Hitchens also explained how Awlaki would publicly say things to appeal to the media while he would say different things in online forums associated with extremists. *Id.* 317:6-10. This Court and other courts have allowed experts to present similar testimony in terror and other cases. ECF 9060 at 6, 25-30 (citing cases); *Gill*, 893 F. Supp. 2d at 532-33, 541 (expert testimony regarding Hamas and its agents responsible for a terror attack).

**3.     Hitchens does not selectively adopt FBI theories.** Saudi Arabia's main point has nothing to do with FBI findings. Saudi Arabia takes language from Hitchens' report out of context to attack him for stating that Awlaki's interactions with the hijackers in Virginia constituted "Saudi government sponsored[ ] operational support." KSA's Br. 44. What Hitchens stated in his report was that Awlaki and the hijackers all went to "the place"—the "Dar al Hijrah Mosque in Falls Church, VA"—that had "(Saudi government sponsored) operational support." Ex. 3 (Hitchens Rpt.) ¶ 68. Hitchens explained that Dar al Hijrah Mosque was founded through the joint efforts of the Saudi

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Embassy and a Muslim Brotherhood-influenced organization, and that a Saudi government funded charity was involved in the hiring Awlaki as the Mosque's Imam. *Id.* ¶¶ 51-3. He also observed that "it was unlikely to simply be a coincidence that the hijackers went straight to where Awlaki was based – not once, but twice." *Id.* ¶ 68.[85] Saudi Arabia also argues that Hitchens should have mentioned the May 2021 EC in his report, KSA's Br. 45, yet that document does not mention Awlaki.

#### 4. Hitchens does not speculate about Awlaki, Bayoumi, and Thumairy.

Saudi Arabia questions Hitchens' citation to evidence that Awlaki called ahead to a Bank of America branch immediately before Bayoumi took the hijackers there. KSA's Br. 45-6. Saudi Arabia incorrectly argues that the call was made to a different bank branch; but bank business cards from Bayoumi's seized files confirm that Awlaki called the same branch where Bayoumi took the hijackers.[86] Likewise, Saudi Arabia questions Hitchens' citation to apartment manager Holly Ratchford's testimony that Awlaki was with the hijackers and translated for them. KSA's Br. 46; Ex. 3 (Hitchens Rpt.) ¶ 41.[87] Saudi Arabia chose not to depose Ratchford regarding her testimony and seeks in effect to cross-examine her through Hitchens. Like any expert, Hitchens is entitled to rely on the evidence before the Court, and Saudi Arabia can make its arguments about that evidence at the jurisdictional hearing. Saudi Arabia

---

[85] Hitchens did cite to 2016 FBI Operation Encore report which found that "one of the more difficult to reconcile connections is between ███, a Saudi Consulate officer █████, and the hijackers' support network on the East Coast," specifically the May 2001 phone call from ██████████, a member of the hijackers' East Coast support network, to ███ in Los Angeles. Ex. 3 (Hitchens Rpt.) ¶ 70. Hitchens noted that ██████████ Eyad al-Rababah, like Bayoumi, claimed to have a "chance encounter" with the hijackers (at a 7/11 Store) but later confirmed the truth that he met them at Awlaki's Dar al Hijrah Mosque. Ex. 7 (Hitchens Tr.) 145:16-146:12, 234:14-235:8.

[86] The number called by Awlaki at 2:33 pm on February 4, 2000 was ███-8400. Ex. 22A, (EO000603 to -615-UPDATED), at -612-UPDATED). Bank of America business cards kept by Bayoumi in his files (that were seized by British police) show that the number Awlaki called is the same customer service number of the Balboa-Genesee branch where Bayoumi took the hijackers approximately one hour later. Ex. 15 (MPS 713-7, 137). The bank's records show that the hijackers opened their account there at 3:40pm. Ex. 25 (FBI 008057). Saudi Arabia tries to claim Awlaki did not make the call to the bank but ignores Bayoumi's calls to Awlaki that same day. Ex. 3 (Hitchens Rpt.) ¶ 42.

[87] Hitchens was also qualified based on his detailed knowledge of Awlaki to confirm that Ratchford's description of the man who accompanied the hijackers (apart from her identification of Awlaki's photograph) closely matches the appearance and physical characteristics of Awlaki at that time. Ex. 3 (Hitchens Rpt.) ¶ 41.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

wrongly suggests that Hitchens' conclusion that Awlaki was a "spiritual bulwark" for the hijackers was based merely on findings in U.S. government reports. KSA's Br. 46-7. This ignores Hitchens' expert analysis based on his review of many historical documents that Awlaki's preachings were "closely aligned with the basic religious training that al-Qaeda operatives received…." Ex. 3 (Hitchens Rpt.) ¶ 93. Similarly, Saudi Arabia takes Hitchens' conclusion that Awlaki helped the hijackers "acclimate" to the U.S. out of context from the evidence not only of their ideological alignment but of their relationship starting from when they first arrived in San Diego through their time together in Virginia.[88] Saudi Arabia questions the conclusions drawn by Hitchens regarding "Awlaki's apparent role in acting as a facilitator for the hijackers at Bayoumi's request" and that Bayoumi likely introduced the hijackers to Awlaki. KSA's Br. 47-48; Ex. 3 (Hitchens Rpt.) ¶¶ 40, 66. Saudi Arabia simply ignores the evidence underlying these conclusions, including inter alia the hijackers' ties to Bayoumi and Awlaki in San Diego immediately after their arrival in San Diego; how Awlaki participated in the assistance provided by Bayoumi to the hijackers; the phone calls among Awlaki, Bayoumi, and Thumairy surrounding the hijackers' arrival; the involvement of a longtime friend of Awlaki's family and associate of Bayoumi, Mohdar Abdullah, in providing help to the hijackers; and the party that Bayoumi held for the hijackers to introduce them to others in the Islamic community. Ex. 3 (Hitchens Rpt.) ¶¶ 38-49, 66. Saudi Arabia's claims are properly addressed to the weight, not the admissibility, of the testimony. *McCullock*, 61 F.3d at 1043-44.

### E.   Schiff Applied Reliable Methodology to Form his Opinions.

**1.   Schiff's experience directly supports his opinions.** Contrary to Saudi Arabia's arguments, Schiff clearly articulated his relevant flight planning and training experience; how he and

---

[88] Contrary to Saudi Arabia's argument, Hitchens did not "opine" that Thumairy asked Awlaki to assist Hazmi and Mihdhar, KSA's Br. 47, but he simply cited an FBI source report to that effect. Ex. 3 (Hitchens Rpt.) ¶ 37.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

other pilots used for flight planning the same equation Bayoumi used; and how the numbers Bayoumi input match up with key aspects of the 9/11 plot. *See generally* Ex. 4 (Schiff Rpt.). Schiff's routine use of the equation as a pilot for flight planning is fully consistent with his expert opinion concerning Bayoumi's notes, and Saudi Arabia makes no attempt to suggest otherwise. *Compare, e.g.*, Ex. 8 (Schiff Tr.) 36:6-21 *with* Ex. 4 (Schiff Rpt.) 8-9, 11.

Instead of offering legal argument, Saudi Arabia mischaracterizes Schiff's opinions. It contends that "standing alone" Bayoumi's equation has nothing to do with flight planning for the 9/11 Attacks, KSA's Br. 49, but ignores Schiff's testimony and the facts that the equation does not stand alone. Bayoumi's notes specifically referenced the height and distance variables for a "plane" and included "a little diagram of an airplane related to the formula." Ex. 8 (Schiff Tr.) 110:10-16. Schiff's detailed piloting analysis shows how the "distance variables" Bayoumi input into his equation (the "50" and "70" mile numbers); the figures Bayoumi used in his calculation (the "52" and "8" numbers); and the minimum altitude numbers obtained from the equation, were each independently consistent with flight planning preparations for the 9/11 Attacks. Ex. 4 (Schiff Rpt.) 4-6, 8-9; *see supra*, n.14. Saudi Arabia ignores the detailed facts about how Schiff determined from Bayoumi's equation and calculations that "the altitudes and distances used—and the results obtained—are consistent with the flight paths of the hijacked 9/11 jetliners." *Id.* at 2.

**2. Schiff's opinions have no "analytical gaps."** Despite Saudi Arabia's various arguments, it does not identify any gap in Schiff's analysis or opinions concerning the use or utility of the information set forth in Bayoumi's notes for flight planning. *See* KSA's Br. 50-52.

First, Saudi Arabia misleadingly argues that Schiff did not use the equation to "navigate an airplane" and that the hijackers similarly did not use it once they could visually acquire their targets.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

*See* KSA's Br. 51-52.[89] As Schiff explained, however, the equation is not used to do math in the air but is used on the ground as a *flight planning* tool, to learn in advance when during the flight a pilot should be able to see his or her destination. That is precisely how Bayoumi presented the equation in his notes with an airplane sketch, and how Schiff applied the equation in his report. Ex. 4 (Schiff Rpt.) 2, 5, 10, 11; Ex. 8 (Schiff Tr.) 118:7-17, 180:16-17, 181:20-182:4.

Second, Saudi Arabia argues that the equation "does not match the hijackers' flight data," because the hijackers flew the planes "far above" the minimum calculated altitude obtained from Bayoumi's equation and did not need to use the Robbinsville VOR to navigate, because on the actual day of the attacks they could see the World Trade Center and fly into it. KSA's Br. 51. Once again, this ignores Schiff's testimony that the purpose of Bayoumi's calculations was to provide the hijackers with basic flight planning information about how high they needed to be off the ground to see the target and from what distance. Ex. 8 (Schiff Tr.) 181:20-182:4. Saudi Arabia's argument that once the hijackers had "a visual on a target" they could beeline into that target only underscores the utility of knowing, as part of the planning process, approximately when one could expect to have such a visual. *See* KSA's Br. 51-52; *see also* Ex. 8 (Schiff Tr.) 156:9-12, 156:21-157:4, 160:6-15, 161:1-8, & 184:10-12.

Third, Saudi Arabia argues that Schiff acknowledged that use of the equation is not something he would expect pilots to do for every flight, but rather something that was "above and beyond" routine preparation. *See* KSA's Br. 51; 37:2; Ex. 8 (Schiff Tr.) 31:17-22. But Schiff testified as to how the equation is used in aviation, and Saudi Arabia's arguments in no way contradicts, much less identifies a gap, in his analysis. Saudi Arabia is free to argue that someone planning an unprecedented attack on our nation would do just the bare minimum in planning. There is no inherent reason,

---

[89] *See* KSA's Br. 51-52 (selectively quoting from Schiff's statement that he "ha[s] used" the equation, but "[n]ot to navigate" Ex. 8 (Schiff Tr.) 36:9, and similarly mischaracterizing testimony concerning hijacker's use of the equation).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

however, why the equation would be less pertinent to the flights on 9/11 than the example Mr. Schiff gave of flying from Kansas to a new airport in Illinois.[90]

**3.    Captain Schiff's Opinions Are Not Speculative or Conjectural.** Saudi Arabia argues that Schiff speculates because he cannot know how the hijackers used Bayoumi's calculations. KSA's Br. 52. This argument repeats Saudi Arabia's "analytical gap" argument and again ignores Schiff's opinions about how Bayoumi's calculations relate to flight *planning*. Saudi Arabia's argument is a distraction because planning calculations may not ultimately be used in undertaking the flight.[91]

**4.    Captain Schiff properly considered "obvious alternative explanations."** Saudi Arabia claims that Schiff should have considered its counsel's speculation that "Bayoumi could have been helping his son with his homework," KSA's Br. 53—even though there is no evidence of that and Bayoumi himself did not think of it when asked why he made the notes at this deposition. *See* Ex. 4 (Schiff Rpt.) 10 (quoting Bayoumi's explanation, or lack thereof). Saudi Arabia is simply trying to devise a better excuse than the author of the notes could when testifying under oath. Nor is there any indication in the notes themselves, including the specific numbers that Bayoumi used, to suggest that

---

[90] *Compare* Ex. 8 (Schiff Tr.) 36:6-21 (testifying as to how the information provided through the equation "comes in handy" in his experience) *with* KSA's Br. 51 (complaining about, but not disagreeing with, Schiff's opinion that Bayoumi's calculations likewise provided information that "would have been 'handy'" for the hijackers). Saudi Arabia also argues that Schiff does not offer an opinion about the meaning of the calculations in the center and right-most columns. KSA's Br. 52. It does not explain, however, how this has any bearing on the matters about which Schiff *does* opine. If anything, it shows an unwillingness to speculate or offer any opinion about which he lacked an adequate degree of certainty. As Schiff testified, he believed there were "too many possibilities" to offer an opinion about what appeared to be distances in those columns. Ex. 8 (Schiff Tr.) 116:17-118:1 (explaining that there were numerous potential distances or routes consistent with those numbers).

[91] Schiff explained how the calculations Bayoumi made would be useful for flight planning to determine an altitude for the flight, Ex. 8 (Schiff Tr.) 182:13-21, and also if working in a simulator (which there is evidence the hijackers used to practice), the calculations can be used to practice the height from which the hijackers needed to be to comfortably descend into an object on the ground from a given distance. *See* Ex. 8 (Schiff Tr.) 182:9-184:7 (offering this as one of multiple examples of the utility of the calculation made). Schiff also explained that Bayoumi was likely using an aeronautical chart, or "IFR" chart, in writing down the numbers he used in his calculations, and that "you can plan flights a whole lot better if you know where the VORs are." Ex. 8 (Schiff Tr.) 22:16-22. He further discussed that, for flight planning purposes, where you need to anticipate the weather and other variables that may occur during a flight, it would be helpful to know the distance from the VOR to the target. *See, e.g.*, Ex. 8 (Schiff Tr.) 124:4-11; 126:17-18.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

the notes involved "homework."[92] Saudi Arabia also mischaracterizes Schiff's testimony. He stated

that it was "possible," that the equation could be used for math education because "all math problems

can be used in high school math problems." *See* Ex. 8 (Schiff Tr.) 113:8-9. He explained, however, the

explanation Saudi Arabia suggested at his deposition is *not* a "realistic" one. Ex. 8 (Schiff Tr.) 115:11-

15. For one thing, "[i]f he were teaching his son how to do that problem, why didn't he complete it?"

*Id.* And, "[w]hy didn't he show his work? *Id.* Schiff, himself an educator who has taught this particular

equation, need not consider every excuse Saudi Arabia can conceive. *See U.S. Info. Sys., Inc. v. Int'l Broth.*

*of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 238–39 (S.D.N.Y. 2004) ("An expert

is not required . . . to categorically exclude each and every possible alternative cause."); *Discover Fin.*

*Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 n.7 (S.D.N.Y. 2008) (expert testimony is not

rendered unreliable because all possible causes are not eliminated and parties are free to argue at trial

that other explanations are "equally or more likely.").

### F.      The Plaintiffs' Experts Youssef, Nakhleh, and Hitchens Do Not Improperly Rely on Hearsay as Mere Conduits.

### 1.      **Youssef did not improperly rely on hearsay.** Youssef is entitled to rely on facts or

data, including hearsay, that are used by experts in his field. Fed. R. Evid. 703; ECF 9060 at 6-7. Saudi

Arabia complains about Youssef's citation of the FBI's July 2021 report on the Saudi government's

extremist network but ignores that the report falls squarely within Rule 703, because it was prepared

---

[92] Saudi Arabia also claims that Schiff failed to consider "that 20 years passed between the time that Al Bayoumi wrote down the equation and the time that Al Bayoumi was asked about it." *Id.* Saudi Arabia's arguments ignore Schiff's findings that Bayoumi's sketch, equation, and calculations were part of the preparations for the 9/11 Attacks and overlook Bayoumi's own incentive to feign a memory problem rather than admit the incriminating reason for his drawing. Ex. 4 (Schiff Rpt.) 11; Ex. 8 (Schiff Tr.) 109:21-111:5. Saudi Arabia cites cases from the context of experts in fields such as medicine or epidemiology opining on causation to argue that every expert in every context "must demonstrate that [she] has adequately accounted for obvious alternative explanations." *In re Mirena Ius Levonorgestrel-Related Products Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 262 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Products Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (alteration in original). Even assuming *arguendo* the case law Saudi Arabia cites were apposite, no obvious alternatives were ignored here.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

to provide FBI counterterrorism agents and officials (like Youssef) with "summary and historical information" about the "involvement of personnel and entities controlled by the Saudi Arabia government…with the attacks of September 11, 2001" that was deemed "essential" for them to understand in their work. Ex. 22A (EO14040-003478 to -3608-UPDATED) at -3479. Saudi Arabia's arguments about that July 2021 report also ignore that Youssef independently reached his expert opinions on the Saudi government network based on his own extensive experience in California and Saudi Arabia together with his analysis of the evidence in this case. Ex. 1 (Youssef Rpt.). Indeed, at different points throughout his Report, Youssef carefully considered and explained how he agreed or disagreed with conclusions reached by the 9/11 Commission and the FBI based on his specialized knowledge, experience, and the evidence revealed in the MDL discovery that may not have been reviewed by the Commission or the FBI early in the investigation. *E.g.*, Ex. 1 (Youssef Rpt.) 132, 232-3, 235-37.

Saudi Arabia's argument is another attempt to denigrate damaging evidence, and again highlight its preferred view. The key difference is that Youssef does not analyze the FBI documents in a vacuum, as Saudi Arabia does in its brief. *Abu-Jihaad*, 553 F. Supp. 2d 121 ("While Mr. Kohlmann must, perforce, rely often on hearsay, he testified that he gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources").

2.       **Nakhleh did not improperly rely on hearsay.** Nakhleh exercised due caution and a rigorous gauge of analytical value when deciding whether to credit source information, and particularly FBI reporting and findings, in his expert report. Experts in terrorism cases are frequently faced with hearsay. *See Gill*, 893 F. Supp. 2d at 532; *Paracha*, 2006 WL 12768, at *20. In addressing reliance on hearsay, "the issue is whether the evidence on which the expert relies is '[o]f a type reasonably relied upon by experts in the particular field.'" *Abu-Jihaad*, 553 F. Supp. 2d at 126 (*citing Locascio*, 6 F.3d at

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

936). Here, Nakhleh drew upon his expertise and proved himself to be discerning in his analysis of investigative theories and hearsay evidence. *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003).

Saudi Arabia challenges Nakhleh's citation to "anonymous source information alleging phone calls to Al Thumairy," KSA's Br. 54, but therein lies a pertinent example of Nakhleh setting forth how he analyzed each item of hearsay evidence he relied upon. The source information Nakhleh analyzed actually comprises two distinct sets of FBI reporting on two separate Confidential Human Sources (identities undisclosed[93]). Ex. 2 (Nakhleh Rpt.) ¶¶ 240-242,[94] and 251-254[95]. Nakhleh was accustomed throughout his CIA career to "accept[ing]" and analyzing source information where "not everyone necessarily was privy or had the security clearance to know the specific source." Ex. 6 (Nakhleh Tr.) 95:1-96:1. Nakhleh's approach accorded with his CIA methodology, by which he would always "weigh" the information, "reflect on it much more thoroughly," "analyze it," and account for factors such as the source's "history" and whether any "reporting has been credible over time." *Id.* 97:17-98:7; *see also* 98:18-99-19. Here, Nakhleh "weighed the information from th[e] confidential source, in the context of all other reporting about the activities . . . of al-Thumairy and other propagators on the West Coast," and "based on [his] experience and [his] expertise," Nakhleh found it to be "a credible type of reporting" to rely on for his opinions regarding Thumairy. *Id.* 96:7-14.

Thus, in no sense is Nakhleh a mere conduit. On the contrary, Nakhleh meets the test for reliance on hearsay by "[h]aving carefully gone through the relevant documents in the FBI production"

---

[93] As previously discussed, the anonymity of the sources does not in itself render the information unreliable.

[94] Ex. 17 (EO14040-000518 to 523-MDL), containing FBI reporting on its Confidential Human Source (CHS), which Nakhleh assessed as "credible."

[95] Ex. 24 (EO14040-003612 to -3616-MDL), reporting information from "a further CHS for the FBI," whom Nakhleh assessed as "clearly close to al-Thumayri," and "whose most reliable knowledge would appear to relate to the community around the King Fahad Mosque."

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

and "applied the analytical techniques upon which much of [his] career's work has been based." Ex. 2 (Nakhleh Rpt.) ¶ 255.

     **3.**     **Hitchens did not improperly rely on hearsay.** Hitchens properly reached his conclusions about the nature of the relationship between Awlaki and the hijackers by considering the 9/11 Commission and Joint Inquiry findings together with his detailed analysis of their ideological alignment and other facts as set out earlier in this brief, *see supra* § III.D.4.[96]

## IV.    THE PLAINTIFFS' EXPERTS DO NOT OPINE ON IMPROPER SUBJECTS

     **A.**     **Bassem Youssef**

     **1.**     **Youssef properly applies his expertise to the facts.** Saudi Arabia complains that Youssef presents a "factual narrative," KSA's Br. 57, but his report reliably applies his investigative expertise and relevant, specialized knowledge to the facts. Contrary to Saudi Arabia's arguments, Youssef's wealth of counterterrorism expertise helps the factfinder to understand and consider complex evidence of clandestine international terror support operations involving a foreign sovereign. Youssef's opinions are presented in his report's headings and throughout his report itself, including sections Saudi Arabia cites as a "narrative."[97] Youssef's methodology was to review "all of the available evidence" before reaching his opinions, Ex. 1 (Youssef Rpt.) 10, and his selection, organization,

---

[96] Contrary to Saudi Arabia's argument, Hitchens did not "opine" that Thumairy asked Awlaki to assist Hazmi and Mihdhar, KSA's Br. 47, but he simply cited an FBI source report to that effect. Ex. 3 (Hitchens Rpt.) ¶ 37.

[97] For example, in reaching his conclusion that Saudi Arabia established and backed an extremist support network in Los Angeles and San Diego that provided substantial support to the 9/11 hijackers, Youssef sets out opinions on a variety of relevant subjects including, *inter alia*, the Saudi government's strict reporting structure, oversight, and customs, Ex. 1 (Youssef Rpt.) at 36, 62, 64-5, 108; elements of the Saudi government that supported Sunni extremism before 9/11, *id.* at 21, 33-4, 93-95; identification of members and practices of Sunni extremist cells in Los Angeles and San Diego mosques, *id.* at 2, 12, 19-21, 23, 35, 52-53, 85-6; Saudi government support of Los Angeles and San Diego Mosques with Sunni extremist cells, *id.* at 21, 88-9; Saudi Consulate and Embassy practices, *id.* at 70, 72; investigation techniques to identify a support network, *id.* at 162, 164; application of phone call analysis techniques, *id.* at 125, 128-9, 140, 145-46, 152-4, 171-2; use of tradecraft by Saudi Arabia and its officials, *id.* at 124, 182, 192; the meaning of Arabic language documents and terms, *id.* at 86, 113, 202; Al Qaeda's modus operandi to use "advance teams" and a trusted local support network, *id.* at 100-101, 193; assessment of specific terrorists such as Anwar Awlaki and Khalid Sheikh Mohammed, *id.* at 59, 101-102, 109, 137, 201; and the relationship between Al Qaeda and other terror groups, like Al Gama'a, *id.* at 18, 19, 22-4, 101-102.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

verification, and presentation of the facts demonstrate his methodology and embody his opinions. Youssef's phone call spreadsheets attached to his report further demonstrate his attention to detail. The Second Circuit has recognized that it is appropriate and helpful for an expert to organize a set of complex facts into a coherent, understandable structure to properly understand the expert's opinion and their basis. *U.S. v. Duncan,* 42 F.3d 97, 1010 (2d Cir.1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts."); *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994) (hereinafter "*Lockerbie*"), abrogated on other grounds by *Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217 (1996) (Second Circuit permits expert testimony using summaries of testimony in the record).

      **2.**      **Youssef may testify as to reliability of evidence considered.** Saudi Arabia asserts that Youssef's cataloguing of inconsistencies in the testimony and evidence Saudi Arabia proffered is equivalent to telling the factfinder which witnesses are credible. This is not the case. Here, as is often so, record evidence often conflicts with witness testimony.[98] Unlike in *Nimley v. City of N.Y.*, 414 F.3d 381 (2d Cir. 2005), where the expert "essentially instructed the jury as to an ultimate determination" on credibility, *id.* at 398, here Youssef's testimony is helpful to the factfinder to explain why he relies more on certain evidence and less on other evidence.[99] An expert's ability to distinguish for the fact finder the relative reliability ascribed to conflicting evidence is an essential part of the expert's ability to explain the supporting premises for the expert's opinions.[100]

---

[98] Despite multiple attempts to bait Youssef into telling the factfinder that the witnesses lied, he stated plainly that his conclusion was simply that "their testimony is not commensurate with the actual facts." Ex. 5 (Youssef Tr.) 211:2 – 21.

[99] There is a difference between the *reliability* of testimony and the *credibility* of testimony. *See Washington v. Schriver,* 255 F.3d 45, 59 (2d Cir. 2001) ("There is no question that under New York law, a witness can testify about factors affecting the reliability of another witness, as long as he or she avoids commenting directly on the credibility of the witness." (citations omitted)).

[100] As Youssef states in his report, "[i]n my experience it is not uncommon for interviewees to occasionally contradict themselves on specific details. It is then important for the investigators to assess all the facts, including the contradictions

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

In contrast to *Nimley*, Youssef's testimony about the relative reliability of conflicting evidence does "assist the trier of fact," (here, the Court) to make an ultimate determination, without making an ultimate decision himself. *Id.* The testimony aids the factfinder in assessing the weight to accord the expert's opinion. At base, Youssef's testimony is about the record evidence, not the credibility of the fact witnesses. In addition, shining a light on the stark differences between the fact witnesses' testimony and evidence allows the factfinder to reach informed conclusions. Youssef's testimony assessing the reliability of the witness evidence can be summarized by his statements that the testimony of Saudi officials was "inconsistent with the facts" and "their testimony is inconsistent…." Ex. 5 (Youssef Tr.) 59:12-16, 60:7-11. An expert such as Youssef has a duty to investigate inconsistent evidence. *See Lockerbie*, 37 F.3d at 826 (approving an expert's comments on witness testimony made "in a non-legal sense").[101]

**3.    Youssef does not offer "State of Mind" testimony.** Youssef does not assert that he can divine intent or motivation from witnesses, rather he provides his expert assessment on the constructive knowledge of individuals by weighing multiple sources of evidence. "An expert can testify to whether a given state of mind is consistent with a given practice." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020).[102] That is exactly what Youssef did. Indeed, "while experts are not permitted to testify to an actor's state of mind, an expert can testify to

---

and settle on the most likely scenario." Ex. 1 (Youssef Rpt.) 165 n. 677. Boiled down to its essence, Saudi Arabia's argument is that Plaintiffs' expert witnesses cannot disagree with its fact witnesses. This would be a "bizarre result" at odds with a central purpose of expert testimony under Rules 702-704. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2022 WL 14814183, at *57 (E.D.N.Y October 26, 2022).

[101] After another round of being asked whether he thought witnesses were being truthful, Youssef appropriately responded "Evidence shows otherwise." *Id.* 218:8-19.

[102] The court held that expert "testimony about Defendants' knowledge in light of their actions—*e.g.*, that Defendants knew the possibility that there may be diminishing warehouse delays; that Defendants knew the March exports were materially inflated; that Defendants knew of the logistical obstacles to increasing their positions at a late date—are admissible." *Id.*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

whether a given practice is consistent with a given state of mind." *United States v. Patel*, 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023). For example, "defendant likely knows X if they do Y." *Commodities Cotton Futures*, 2020 WL 5849142, at *14.

Many witnesses in this litigation outright denied knowing each other, despite prior admissions and documentary evidence proving their extensive and years-long associations. When Youssef opines as an investigator that a witness "had to know" something, it is based on substantial evidence, and Youssef is expressing incredulity based on the truly unbelievable denials offered in depositions. For instance, Thumairy's claim that he did not know Mana defies any reasonable logic. Indeed, the record evidence shows that ████████████████████████████████████ and the two men had an extensive work relationship and friendship as shown by numerous documents and testimony.[103] Given the evidence, it is clear Thumairy answered untruthfully in his deposition. Youssef's conclusions that Thumairy was deceptive were not legal conclusions or a credibility assessment, but reliability assessments of competing evidence based on Youssef's work as a counterterrorism investigator and necessary for his assessment of the evidence considered.[104] Denials contradicted by other evidence carry implications in law enforcement and investigatory contexts (*i.e.*, non-legal contexts). *Lockerbie*, 37 F.3d at 826 ("it was clear from the content of his direct and cross-examination" that the terms "fraud" and "deceit" were used by the expert "in a non-legal sense"). The 9/11 Commission made similar findings that Thumairy was "deceptive" during his interview because "[h]is answers were either

---

[103] Ex. 1 (Youssef Rpt.) 54-57.

[104] *See, e.g.,* Ex. 1 (Youssef Rpt.) 131 ("Bayoumi denied knowing that Thumairy worked for Saudi Arabia or the MOIA despite evidence that ████████████████████████████████████████████████████████ ████████████████████"); *Id.* at 59 ("Thumairy testified at his deposition that he did not know Khalid Cherif. This is incredible given, among other evidence, ████████████████████████████████████████████████████████ ████████████████████

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

inconsistent or, at times, in direct conflict with information we have from other sources." Ex. 13 (Snell Decl., Exh. 6) at 2-3.

Saudi Arabia relies on the Second Circuit's decision in *Marvel*, 726 F.3d at 135, but that case is distinguishable and supports Youssef's testimony. *Marvel* affirmed the exclusion of testimony from two "historical" experts concerning whether a comic book artist had retained rights in the drawings he made for a publisher. The Second Circuit confirmed that "[w]e have no doubt that a historian's "specialized knowledge" could potentially aid a trier of fact in some cases...." and that "[a] historian could, for example, help to identify, gauge the reliability of and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson." *Id.* at 135. *Marvel* concluded, however, that the historical experts "do not bring their expertise to bear in any such way." *Id.*[105] Here, by contrast, Youssef's opinions are rooted in his expertise and the facts, and he aids the factfinder to "gauge the reliability" and "interpret" the complex evidence. *Marvel*, 726 F.3d at 135.

### B. Dr. Emile Nakhleh

**1.   Nakhleh may testify as to reliability of evidence considered.** Saudi Arabia seeks to exclude Nakhleh's testimony by characterizing his expert conclusions as opining on witness credibility. KSA's Br. 63-65. But just with as Saudi Arabia's complaints as to Plaintiffs' other expert witnesses, many of Saudi Arabia's challenges on witness credibility are disputes about Nakhleh's conclusions. *See e.g.*, KSA's Br. 61, Ex. 2 (Nakhleh Rpt.) ¶¶ 59, 134, 239, 225, 257.[106] And just as with Youssef, *supra* § IV.A.2., Nakhleh must be permitted to explain his assessment of the relative reliability

---

[105] The district court in *Marvel* concluded that the report presented opinions about the motives and intent of witnesses "that are without factual basis and are based on speculation or conjecture...." *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 730 (S.D.N.Y. 2011).

[106] *See also supra* n.100. Preclusion of Nakhleh's testimony would yield the "bizarre result" that an expert is not permitted to rely on evidence to reach their conclusion.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

of conflicting evidence. Nakhleh analyzed the relevant documents including the depositions of most of Saudi Arabia's fact witnesses in forming the basis for his ultimate opinion; "that the Kingdom of Saudi Arabia precipitated the 9/11 attacks through its ideological and operational support for violent jihad in the name of Wahhabism." Ex. 2 (Nakhleh Rpt.) ¶ 258. An expert's opinion is "not improper simply because [it is] based on the testimony of others." *Lockerbie*, 37 F.3d at 826. Examination of the record evidence is acceptable. *Id.*

Saudi Arabia states that Nakhleh relies on "Al Thumairy's alleged 'lies' to infer his knowing involvement in the 9/11 plot." KSA's Br. 63. This is incorrect. Nakhleh based his opinions on his specialized knowledge of political Islam in Saudi Arabia, on his familiarity with key tenets of Wahhabi religious doctrine, including *hukm* (divine rule) and jihad, and on discovery materials in this litigation.

As part of the research on which his expertise is founded, Nakhleh visited Saudi Arabia's Imam Muhammad University in the 1990s and gained first-hand knowledge of its curriculum. Ex. 2 (Nakhleh Rpt.) ¶ 160. Nakhleh found that Thumairy's testimony about his university course-work, along with Thumairy's claims that he "d[id]n't know" and was "not interested" in core precepts of Wahhabi religious doctrine, were strikingly at odds with that curriculum and the requirements of the MOIA position that Thumairy went on to hold. Ex. 2 (Nakhleh Rpt.) ¶¶ 160-64, 166. For example, Thumairy denied knowing Ibn Taymiyyah's doctrine of jihad even though it was "central to university education at Imam Muhammad University" in the period, let alone the fact that Thumairy worked at Mosques in Los Angeles named after Ibn Taymiyyah and run by the Ibn Taymiyyah Foundation. Ex. 2 (Nakhleh Rpt.) ¶ 166; Ex. 6 (Nakhleh Tr.) 204:4-206:19.[107]

---

[107] Nakhleh testified that "I mean, judging against all the evidence, I did not think his testimony coincided with what he knew and what he learned and what he studied" Ex. 6 (Nakhleh Tr.) 205:5-8, and "I reviewed his background, I reviewed his knowledge… [including his "own specialty"] … [and] I concluded there must have been other reasons why he did not answer those questions." *Id.* 206:15-19.

65

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Based on Nakhleh's studies, experience, and analyses of key religious principles, he assessed that the testimony of Saudi Arabia's witnesses was inconsistent with other information in the record. Ex. 2 (Nakhleh Rpt.) ¶¶ 147, 154; Ex. 6 (Nakhleh Tr.) 323:9-19 (regarding Thumairy); and *Id.* 323:20-324:4 (regarding Bayoumi). Such assessments of the relative reliability of conflicting evidence are permissible. *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011). The Court should regard them as matters to be addressed on cross-examination.

      **2.**      **Nakhleh does not offer "State of Mind" testimony.** Testimony relating to "the history, structure, and goals" of an organization or movement is permissible. *Abu-Jihaad*, 553 F. Supp. 2d at 122. Similarly, expert testimony regarding the "actions that bear on a party's state of mind are permissible." *U.S. Commodities Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016). Several of Nakhleh's opinions that are challenged by Saudi Arabia are reached as a result of Nakhleh's personal experiences.[108] Other challenged conclusions are Nakhleh's descriptions of *actions* that bear on state of mind,[109] or his analyses of "the history, structure, and goals"[110] of Ministry of Islamic Affairs' propagators or Saudi Arabia's Wahhabi polity.[111] Nakhleh possesses the requisite qualifications to opine on radical Wahhabi ideology and the resultant pursuit of violent jihad.

      Saudi Arabia's allegation that Nakhleh's opinions are improper and prejudicial is misleading. To explain his opinions of political Islam in Saudi Arabia, Nakhleh provided the "history, structure,

---

[108] Ex. 2 (Nakhleh Rpt.) ¶¶ 74, 76, 89, 93-95, 98, 119, 139, 154, 157, 161-67, 186-187, 190, 196, 205, 218, 237, 239, 240-241, 246-247, 257.

[109] Ex. 2 (Nakhleh Rpt.) ¶¶ 66, 130, 173, 210, 225, 237, 248, 252-53.

[110] *Abu-Jihaad*, 553 F. Supp. 2d at 123.

[111] Ex. 2 (Nakhleh Rpt.) ¶¶ 29, 32-34, 45, 59, 72, 76, 111, 125-126, 129-130, 134, 153-154, 179, 184-85, 212-215, 229, 232-233, 235, 245, 255.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

and goals" of Wahhabi polity. *Abu-Jihaad*, 553 F. Supp. 2d at 123. Nakhleh's analysis encompasses the

creation of the Saudi state, ideological foundations, and practice of Wahhabism in Saudi Arabia. Ex.

2 (Nakhleh Rpt.) ¶¶ 25-66. Saudi Arabia challenges Nakhleh's *conclusions* about Wahhabism and cites

to *Jinro,* 266 F.3d 993, to support its position. That case is distinguishable here. The expert witness in

*Jinro* offers a baseless generalization of Korean businesses as corrupt after reading a newspaper article

that alleged the "prevalence of corruption in the Korean business community." *Id.* at 1003. That expert

"cited no research or study, nor any empirical declaration." *Id. at* 1004. In contrast, Nakhleh bases his

opinions on specialized knowledge through experience, text, and documents.[112] Saudi Arabia may

challenge the substance of Nakhleh's opinions on cross-examination, not here.

### C.      Dr. Meleagrou-Hitchens Does not Improperly Opine on Credibility or State of Mind

Saudi Arabia quotes text out of context and claims, without addressing the content of the

pertinent passages, that Hitchens offered credibility opinions. *See* KSA's Br. 65. The two paragraphs

Saudi Arabia cites from Hitchens' Report (¶ 37 and ¶ 67) reference Thumairy's statement that he never

heard of Awlaki (despite contradictory evidence, including of their multiple phone calls to one another

at key times related to the hijackers), and Bayoumi's claim that he never met Aulaqi (also despite

contradictory evidence, including video of them sharing a warm embrace, and other evidence). Ex. 3

(Hitchens Rpt.) ¶¶ 36-37, 41-42, 65-67. These paragraphs describe an irreconcilable conflict between

---

[112] Documents referring to Wahabism include, *e.g.,* Ex. 21 (EO14040-003465 to -3472-MDL); 2004 FBI-CIA Joint Assessment, Ex. 20 (EO14040-003414 to -3442-MDL); Ex. 23 (EO14040-003603 to -3606-MDL) at -3604; and see Ex. 2 (Nakhleh Rpt.) ¶¶ 34, fn. 13 *citing* Center for Religious Freedom ("Freedom House"), "Saudi Publications on Hate Ideology Invade American Mosques," published by Freedom House, Washington, DC, 2005; at p.40. The Wahhabi worldview on the "mission behind enemy lines" is elaborated as follows: "Either they are there to acquire new knowledge and make money that can later be employed in the jihad against the infidels, or they are there to proselytize the infidels to convert them to Islam. Any other reason for lingering among the unbelievers in their lands is illegitimate, and a true Muslim must exit as quickly as possible."

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

the objective evidence and witness testimony that led Hitchens to assess the reliability of the evidence and conclude that the testimony "turned out to be false" and was "implausible."

Saudi Arabia is wrong to contend that an expert must scrub from his or her report any information showing that a witness was untruthful or wrong. An expert must be able to explain the reasons why one source was credited and not another, or how conflicting accounts were resolved. *Lockerbie*, 37 F.3d at 825–27 (rejecting argument that experts could not comment on credibility of fact witness testimony in articulating their opinions).[113] Saudi Arabia cites *Marvel* and *Nimely*, but as discussed previously, those cases are distinguishable because the experts did not point to inconsistencies in the evidence but offered unfounded, bald credibility appraisals.[114]

Saudi Arabia's arguments that Hitchens opines on the "states of mind" of Awlaki and the hijackers, KSA's Br. 66, take his opinions out of context. For example, Hitchens presents his expert appraisal of the extremism preached by Awlaki before the 9/11 Attacks and explains how it directly relates to the extremism promoted by Al Qaeda and the hijackers. He concludes that Awlaki was "a committed Salafi extremist and a proponent of violent jihad." Ex. 3 (Hitchens Rpt.) 22. This was based on his highly specialized knowledge of Awlaki, including his research that pinpointed how Awlaki's

---

[113] The Report also describes witnesses who recanted statements after being confronted with conflicting, objective evidence of this sort. *Id.* ¶¶ 37, 60. And, if there were conflicting accounts, such as Mohdar Abdullah's conflicting descriptions of his contacts with Bayoumi, Hitchens presents both versions of events, noted whether there was any reason to give one version more weight than another, but does not discount either. *See* Ex. 2 (Hitchens Rpt.) ¶ 45; *see also id.* at ¶ 48 (acknowledging and identifying "conflicting" information about Awlaki's whereabouts in the second half of 2000).

[114] Saudi Arabia's argument that Hitchens commented on Bayoumi's "religious beliefs" is misleading. KSA's Br. 66. Hitchens cited Bayoumi's testimony that he did not meet Awlaki in person or discuss religious matters with him that was inconsistent with other evidence. Ex. 3 (Hitchens Rpt.) ¶¶ 65, 67. Hitchens then noted that Bayoumi's disclaimers were similar to those that Hitchens regularly encountered in his studies of "religious extremists" and "jihadists" in which those individuals would distance themselves from a fellow jihadist. *Id.* ¶ 67. Hitchens was not making a comment on religion but was describing a pattern of deceptive behavior among extremist individuals.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

views were aligned with those of Al Qaeda in 2000. *Id.* ¶¶ 75-80.[115] He also concludes that based on his experience, the nature of the relationship of the hijackers with Awlaki and their shared "extremist religious ideology and worldview" makes it highly likely that Awlaki was aware that the hijackers were Al Qaeda. Ex. 3 (Hitchens Rpt.) ¶¶ 22, 72. [116] Such opinions are within the proper scope of expert testimony. *See United States v. Feliciano*, 223 F.3d 102, 120-121 (2d Cir. 2000) (expert may affirm that, "based on [his] participation in the investigation" the defendants' gang had "been involved in narcotics trafficking").

### D.   Captain Schiff Does not Improperly Opine About Credibility or State of Mind.

Saudi Arabia suggests that Captain Schiff is testifying about Bayoumi's credibility or state of mind, KSA's Br. 67, but ignores how he uses his aviation expertise to explain the significance of the numbers Bayoumi input into his aviation equation and calculations. His testimony shows that the numbers were not randomly selected but that Bayoumi's notes reflect a direct relationship to the planning of the 9/11 Attacks. Captain Schiff testified that he was not offering "an opinion about whether Bayoumi was lying" but that "I'm just saying it was difficult to believe" Bayoumi's testimony, explaining that "these are not just some notations in a notebook" but "are more than that…." Ex. 8 (Schiff Tr.) 102:11-20, 112:18-20. Schiff's opinions are based on application of his experience to the objective record, not any claimed ability to mind-read. Boiled down to its essence, Saudi Arabia's

---

[115] Saudi Arabia similarly questions Hitchens for opining about "'views' Awlaki held and when he held them," and that "Saudi officials and agents[] . . . trusted Awlaki". KSA's Br. 66, *citing* Ex. 3 (Hitchens Rpt.) ¶¶ 123, 124. But the conclusion is a summary of the full report that precedes it, affording the factfinder an explanation of the bases for Hitchens' opinions. Even in ¶ 123, Hitchens writes "[a]s has been demonstrated," indicating that the summary of Hitchens' opinion about Awlaki's jihadist views have been explained throughout the report based on the evidence presented. *See, e.g.* Ex. 3 (Hitchens Rpt.) ¶¶ 25, 31-2, 34, 73, 75-80, 87-92.

[116] KSA mischaracterizes the excerpted text to suggest that Hitchens asserts the hijackers "deliberate[ly]" "sought out" Awlaki in Virginia. KSA's Br. 66 (citing Ex. 3 (Hitchens Rpt.) ¶ 63). But Hitchens actually wrote that the hijackers sought out Awlaki and that, in his report, he "expand[s] on [his] expert analysis that [the hijackers' attendance at Awlaki's mosques both in San Diego and in Virginia] were both deliberate destinations of worship…." Ex. 3 (Hitchens Rpt.) ¶ 63. In fact, he does so in ¶¶ 64-68.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

argument is that Plaintiffs' experts cannot disagree with its fact witnesses. This would be a "bizarre result" at odds with a central purpose of expert testimony under Rules 702-704. *In re Payment Card Interchange Fee*, 2022 WL 14814183, at *57.

## **CONCLUSION**

For the foregoing reasons, Saudi Arabia's Motion to exclude the expert testimony of the Plaintiffs' experts, Bassem Youssef, Dr. Emile Nakhleh, Dr. Alexander Meleagrou-Hitchens, and Captain Barry Schiff should be denied.

Dated:  June 26, 2023                              Respectfully submitted,

MOTLEY RICE LLC                              COZEN O'CONNOR

By:  /s/ Robert T. Haefele                        By:  /s/ Sean P. Carter
Robert T. Haefele                                Sean P. Carter
Jodi Westbrook Flowers                           Stephen A. Cozen
Donald A. Migliori                               Scott Tarbutton
C. Ross Heyl                                     One Liberty Place
28 Bridgeside Boulevard                          1650 Market Street, Suite 2800
Mount Pleasant, South Carolina 29464             Philadelphia, Pennsylvania 19103
Tel.: (843) 216-9184                             Tel.: (215) 665-2105
Email: rhaefele@motleyrice.com                   Email: scarter@cozen.com

*Liaison Counsel and Co-Chairs for the Plaintiffs'*     *Co-Chairs and Liaison Counsel of the Plaintiffs'*
*Executive Committee for Personal Injury and Death*     *Executive Committee for Commercial Claims on behalf*
*Claims on behalf of the Plaintiffs*                    *of Plaintiffs*

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

70

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

**<u>Certificate of Service</u>**

I hereby certify that, on June 26, 2023, I caused an electronic copy of the Plaintiffs' Memorandum of Law in Opposition to Defendant Saudi Arabia's Motion (ECF No. 9088) to Exclude Expert Testimony of Bassem Youssef, Dr. Emile Nakhleh, Dr. Alexander Meleagrou-Hitchens and Captain Barry Schiff, and all accompanying papers to be served electronically by the Court's Electronic Case Filing (ECF) System. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____
Robert T. Haefele

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**