# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) <br> ECF Case |
|---|---|

**This document relates to:**

*All actions*

---

**PLAINTIFFS' REPLY MEMORANDUM OF LAW TO SAUDI ARABIA'S OPPOSITION [ECF No. 9164] AND IN FURTHER SUPPORT OF PLAINTIFFS' *DAUBERT* MOTION [ECF No. 9091] TO EXCLUDE AND/OR LIMIT PROPOSED TESTIMONY OF DEFENDANT SAUDI ARABIA'S PROPOSED EXPERTS, MARC SAGEMAN, DAVID RUNDELL, AND DOUGLAS MOSS**

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*


Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

August 4, 2023

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................................1

I.   SAUDI ARABIA FAILS TO ESTABLISH THAT SAGEMAN IS QUALIFIED OR
     OFFERS RELIABLE OPINIONS ..................................................................................3

     A.   SAGEMAN IS NOT A QUALIFIED EXPERT ON THE BROAD
          RANGE OF SUBJECT MATTERS AS TO WHICH HE IS PROFFERED. ............8

          1.   Sageman does not have expertise on Saudi Arabia and its history, including
               its MOIA and intelligence services, or the Saudi government's relationship
               with Al Qaeda and other terrorist groups........................................................8

          2.   Sageman is not an expert on Islam and the Muslim community. ...........................9

          3.   Sageman is not an expert on Al Gama'a or Al Qaeda in California before
               the 9/11 Attacks.............................................................................................9

          4.   Sageman has never been a law enforcement investigator and does not have
               specialized knowledge about the FBI and its investigations....................................12

          5.   Sageman is not a communications or phone calls expert...........................................13

          6.   Sageman has no expertise on the Arabic language..................................................15

          7.   Sageman is not a memory expert. ......................................................................16

     B.   SAGEMAN PRESENTS OPINIONS THAT ARE UNRELIABLE.........................16

          1.   The flawed central premise of Sageman's report—that there was no
               support network for the 9/11 hijackers inside the United States—is based
               upon false statements procured under torture from al Qaeda terrorist
               Khalid Sheikh Mohammed ("KSM").................................................................17

          2.   Sageman has no proper basis to review the testimony and prior statements
               of Bayoumi and Kaysan Morgan. .....................................................................21

     C.   Saudi Arabia fails to address numerous issues Plaintiffs presented.............................21

II.  DAVID RUNDELL'S OPINIONS ARE NOT RELIABLE...............................................23

     A.   Rundell should be excluded because his opinions are not based on any
          reliable data or methodology, and he grossly misrepresents the basis for his
          opinions in a manner that amounts to impermissible *ipse dixit* and intellectual
          dishonesty. ...........................................................................................................23

     B.   Rundell offers pre-disposed opinions advocating for the political agenda of
          Saudi Arabia, the party that engaged him, and bases those opinions on
          nothing more than his *ipse dixit.* ..............................................................................28

III. OPINIONS OF PILOT MOSS SHOULD BE EXCLUDED AS UNRELIABLE ..........29

     A.   The basis for Moss's opinion on visual identification was not disclosed and
          cannot be tested, and the opinion should be stricken as unreliable..............................30

     B.   Saudi Arabia cannot use Moss to offer a speculative excuse for Bayoumi's
          equation contrary to Bayoumi's own testimony. ........................................................31

CONCLUSION.........................................................................................................................32

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

# Table of Authorities

## Cases

*Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002)........................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...........................................................passim

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir.2005) .......................................................................................25

*El Ansari v. Graham*, 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) .............................................................29

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).............................................................................2, 24, 28

*In re Al-Nashiri*, 47 F.4th 820 (D.C. Cir. 2022)..........................................................................................20

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) .........................................................................2

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004)................29

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .......................................3, 32

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ..................................................................25

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) .......................................................................1, 8

*Tardif v. City of New York*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................................28

*U.S. v. Ceasar*, 388 F. Supp.3d 194 (E.D.N.Y. 2019), *vacated and remanded*, 10 F.4th 66 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 2841 (2022) ...........................................................................7, 8

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011)...................................................................10

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)..............................................................................12

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990).................................................................1

*United States v. Zubaydah*, 142 S.Ct. 959 (2022) ..................................................................................20

## Statutes

Fed. R. Evid. 702 .......................................................................................................................1, 2, 7, 28

## Articles

C. J. Chivers, "*Russia Excuses Itself in Final Report on Beslan*," N.Y. Times (Dec. 22, 2006), https://www.nytimes.com/2006/12/22/world/europe/22cnd-beslan.html ....................................5

Carol Rosenberg, "*Biden Administration Rejects Use of Testimony Obtained From Torture in Guantánamo Trial*," N.Y. Times, (Feb. 1, 2022) https://www.nytimes.com/2022/02/01/us/politics/torture-guantanamo-terrorism-biden.html ...............................................................................................................................20

Neil Vigdor, *Witness to the unthinkable: Greenwich Point onlookers recall the day the towers fell*, Greenwich Time (Sept. 12, 2011), https://www.greenwichtime.com/news/article/Witness-to-the-unthinkable-Greenwich-Point-2164396.php) ..........................................................................................................31

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

## Key to Exhibit Citations

Exhibits identified as Ex. 103 through Ex. ___, as cited in this Memorandum of Law, are exhibits to the Declaration of Robert T. Haefele, filed on August 4, 2023, with this Memorandum.

Exhibits identified as Ex. 1 through Ex. 102 are exhibits attached to the [Corrected] Declaration of Robert T. Haefele, filed on June 8, 2023, at ECF No. 9118 on the 03-md-1570 docket.

References to "Plaintiffs' Br. __" are to ECF No. 9092 on the 03-md-1570 docket.

References to "KSA's Opp'n __" are to ECF No. 9164 on the 03-md-1570 docket.

| | |
|---|---|
| Ex. 103<br>(*Misunderstanding Terrorism*) | Excerpts of Marc Sageman, *Misunderstanding Terrorism* (University of Pennsylvania Press, 2017) |
| Ex. 104<br>(Sageman 9/11 Commission Statement) | Statement of Marc Sageman to the National Commission on Terrorist Attacks Upon the United States (July 9, 2003) |
| Ex. 105<br>(*Confronting Al-Qaeda*) | Marc Sageman, *Confronting Al-Qaeda: Understanding the Threat in Afghanistan and Beyond, Statement to Senate Committee on Foreign Relations*, 111th Cong. (Oct. 7, 2009) |
| Ex. 106<br>(*Leaderless Jihad*) | Excerpts of Marc Sageman, *Leaderless Jihad: Terror Networks in the Twenty-First Century* (University of Pennsylvania Press, 2008) |
| Ex. 107<br>(*Understanding Terror Networks*) | Excerpts of Marc Sageman, *Understanding Terror Networks* (University of Pennsylvania Press, 2004) |
| Ex. 108<br>(Beslan Commission report) | Report of the Parliamentary Commission [of the Russian Federal Assembly] to investigate the causes and circumstances of the terrorist act committed in the city of Beslan, Republic of North Ossetia – Alania on September 1 - 3, 2004 (Moscow, 2006); machine-translated into English from the original Russian. |
| Ex. 109<br>(Nakhleh Tr.) | Transcript of the Deposition of Emile A. Nakhleh (June 15, 2022) – excerpted pages. |
| Ex. 110<br>(Sageman Tr. July 1, 2021) | Transcript of the Deposition of Marc Sageman (July 1, 2021) – excerpted pages. |
| Ex. 111<br>(Sageman CV) | CV of Defendant Kingdom of Saudi Arabia's expert Marc Sageman. |
| Ex. 112<br>(Sageman Tr. June 27, 2022) | Transcript of the Deposition of Marc Sageman (June 27, 2022) – excerpted pages. |

FILED UNDER SEAL<br>CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

| | |
|---|---|
| **Ex. 113**<br><br>(Exh. 863 to Sageman's July 1, 2021 Deposition) | Exhibit 863 to Marc Sageman's July 1, 2021 (Marc Sageman, How to Find, Select, and Evaluate a Mental Health Professional for Trial, 9 Prac. Litig. 27 (1998)). |
| **Ex. 114**<br><br>(Youssef Tr.) | Transcript of the Deposition of Bassem Youssef (June 29, 2022) – excerpted pages. |
| **Ex. 115**<br><br>(Youssef Rpt.) | Integrated single-document version of Expert Report of Bassem Youssef, *including Youssef's phone calls spreadsheets*, as previously served by Plaintiffs on May 3, 2023 (with revisions incorporated from an April 22, 2022 Errata Sheet, a May 8, 2022 Supplement to Call Spreadsheets, and a May 3, 2023 Errata Sheet). |
| **Ex. 116**<br><br>(Rundell Tr.) | Transcript of the Deposition of David H. Rundell (June 10, 2022) – excerpted pages. |
| **Ex. 117**<br><br>(Rundell Rpt. App'x A, Materials Considered) | Appendix A to the Expert Report of David H. Rundell, Materials Considered by David H. Rundell. |
| **Ex. 118**<br><br>███████████████<br>████ | ████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>███████████████████ |
| **Ex. 119**<br><br>(Publication Information and Table of Contents of MOIA book "Fatwas of the Imams regarding the Dark Tragedies," with English translation from which Rundell's excerpts were extracted) | English Translation of the Table of Contents of "Fatwas of the Imams regarding the Dark Tragedies," compiled and organized by Muhammad Hussein bin Saeed Al Safran Al-Qahtani. |
| **Ex. 120**<br><br>(Defendant Saudi Arabia's letter re: witnesses, Feb. 3, 2020) | February 3, 2020 letter from Kellogg Hansen firm on behalf of Defendant Saudi Arabia responding to Plaintiffs' December 6, 2019 Witness List [includes reference at page 4 to Tawfiq al-Sudairy]. |
| **Ex. 121**<br><br>(Rundell "Kingdom of Silence" quote) | Excerpt of transcript from the film *Kingdom of Silence: The Exile and Murder of Jamal Khashoggi*, 2020. |
| **Ex. 122**<br><br>(Newsweek article) | Michael Gfoeller and David H. Rundell, *Opinion: Saudi Arabia's True Role in 9/11*, Newsweek, June 28, 2023. |

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

| Ex. 123 (Moss Tr.) | Transcript of Deposition of Douglas M. Moss (June 10, 2021) – excerpted pages. |
| --- | --- |
| Ex. 124 (Heavey Dec'l) | Declaration of James H.M. Heavey of Greenwich, CT (August 1, 2023), with Exhibits 1 and 2. |
| Ex. 125 (Bayoumi Tr.) | Transcript of Deposition of Omar Al Bayoumi (June 10, 2021) – excerpted pages. |

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Reply to the Kingdom of Saudi Arabia's ("Saudi Arabia") Opposition (ECF No. 9164) and in further support of Plaintiffs' *Daubert* Motion (ECF No. 9091) to Exclude and/or Limit Proposed Testimony of Defendant Saudi Arabia's Proposed Experts, Marc Sageman ("Sageman"), David Henry Rundell ("Rundell"), and Douglas M. Moss ("Moss").

**I.**     Saudi Arabia improperly argues that its proposed expert Sageman, a researcher from the realm of academia, may provide opinions on a wide variety of other matters as to which Sageman has minimal or no work experience or history of research, and certainly has no basis to claim *expert* experience or specialized knowledge. Saudi Arabia is required to demonstrate that Sageman satisfies the basic competence threshold of Rule 702 through a showing of specialized knowledge, skill, or experience as to *each* subject matter regarding which he is offered as a witness; Saudi Arabia cannot extrapolate qualifications from one field to position Sageman as an "expert" to offer opinions in other, completely distinct fields. *Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields"); *see also United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) (expert in criminal drug cases was not entitled to testify regarding recordkeeping procedures of law enforcement agencies because "[a] witness may be qualified as an expert on certain matters and not others.")

Saudi Arabia attempts to paper over Sageman's fundamental lack of qualifications by making outrageous claims that he is needed to present rebuttal opinions to correct so-called "falsehoods" and "misstatements" in Plaintiffs' experts' reports. KSA's Opp'n 1. Yet as detailed below, Saudi Arabia repeatedly fails to answer Plaintiffs' key arguments in their motion highlighting Sageman's lack of

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

qualifications and the unreliability of his opinions. Saudi Arabia's silence regarding those arguments is a concession that it has no answer to them.

**II.**     Saudi Arabia cannot salvage its proposed expert Rundell in light of his stout refusal to review the underlying facts and data Plaintiffs' experts cited in their reports, and his repeated insistence that he can provide his rebuttal opinions based solely on his own personal experience. Rundell's opinions are a case study on the *ipse dixit* principle, eschewing the requirement to apply any expertise reliably to the facts in favor of predetermined opinions based on his say-so. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rundell's flawed methodology caught up with him when he asked a former MOIA Deputy Minister to find a "fatwa" document to back up his opinions, rather than research the issue himself. Rundell is incapable of conveying accurately to the court what the provided document (in Arabic) contains. Rundell grossly misrepresents the basis for his opinions in a manner that amounts to intellectual dishonesty. *See* ECF No. 9060 at 32 (precluding expert's testimony where his intellectual dishonesty undermines the Court's confidence that the expert "reliably applied" "reliable principles and methods" "to the facts of the case," citing Fed. R. Evid. 702); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (requiring the court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

**III.**     Saudi Arabia improperly attempts to present pilot Moss to address Bayoumi's airplane drawing and aviation equation by having Moss fashion a speculative excuse for Bayoumi's document that is contrary to Bayoumi's own testimony. Moreover, Moss's aviation opinions are based on unscientific tests that were not set forth in his report, cannot be repeated, and are unreliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993) ("A trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is simply based on "subjective belief or

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

unsupported speculation."); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (admission of "speculative or conjectural" expert testimony is an abuse of discretion).

## I.   SAUDI ARABIA FAILS TO ESTABLISH THAT SAGEMAN IS QUALIFIED OR OFFERS RELIABLE OPINIONS

Saudi Arabia fails to show that Sageman is qualified to opine outside the limited scope of his "expertise" as a psychiatrist-cum-terrorism researcher who attempts to predict the risks terrorist actors pose in the post-9/11 world. Sageman's trademark has been to generate surveys that downplay those risks, provide "counterintuitive insights" and "refute…conventional wisdom."[1] Nevertheless, Saudi Arabia attempts to reinvent Sageman as a jack-of-all-trades, presenting him as "an expert on terrorism, political violence, and the Middle East, *among other topics*", based on his experience as "a sociologist, psychiatrist, and former CIA officer," who "turned to the study of terrorism after the 9/11 attacks." KSA's Opp'n 1 (emphasis added).

Saudi Arabia grossly misrepresents Sageman's experience and scholarship. Most of its claims are based on Sageman's own self-promotional narrative, without any demonstrated work or achievement. Though Saudi Arabia asserts that Sageman "presented his study of the causes of and motivations behind Al Qaeda's terrorist attacks to the National Security Council ["NSC"]," ***that assertion is bogus***. KSA's Opp'n 4. Sageman wrote in a book that he presented a study to a meeting sponsored by the "National *Research* Council"—completely unrelated to the NSC. Ex. 103 (*Misunderstanding Terrorism*) at 6.[2] Moreover, Saudi Arabia has not produced a copy of Sageman's

---

[1] *E.g.,* Ex. 103 (*Misunderstanding Terrorism*) at 5-6. In his 2017 book, Sageman demonstrated his readiness to assert contrarian views even when he lacks a "clear understanding" of the subject matter; for example, Sageman states that: "[s]trongly influenced by the works of historians and sociologists applying social movement theory to Islamic movements, I used my 9/11 data to refute our conventional wisdom about terrorists, but the research still left me without a clear understanding of them." Ex. 103 (*Misunderstanding Terrorism*) at 5. This sentence typifies much of what Sageman holds up as his methodology: making use of self-designed, esoteric data sets that he regards as "his" to "refute" what the collective efforts of other, more established commentators and recognized authorities have found (in Sageman's pejorative usage, "conventional wisdom").

[2] Plaintiffs' expert Steven Simon served on the NSC in the 1990s and was its Senior Director of Counterterrorism. Ex. 13 (Simon Rpt.) 1. The notion of an academic like Sageman presenting a "study" to the NSC is unfeasible on its face, as any such external input into the deliberations of the Council was made to and through the National Security Advisor.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

supposed "study," and Plaintiffs have been unable to find any trace of it. Sageman's 2017 book described it as a "social network analysis" prepared in 2003, containing his "preliminary findings" from a small statistical survey based on "news articles" about terrorist subjects. Sageman later admitted that his "study" was riddled with errors. Ex. 103 (*Misunderstanding Terrorism*) at 6-7, 9.

Before the flawed premises of Sageman's survey methodology were exposed, Sageman was invited to appear before the 9/11 Commission and present his "analysis" of terrorist motivations. Ex. 104 (Sageman 9/11 Commission Statement) at 5, 7. Although Saudi Arabia now cites that appearance as a mark of Sageman's expertise, Sageman himself concedes that the foundations of his statistical analysis were "inaccurate" and "thin and unreliable," incorporating and compounding the errors of Sageman's prior 2003 "study."[3] Sageman's paper was not deemed worthy of citation in the 9/11 Commission Report and his deficient statistical analyses have no bearing on the issues in this case.

Saudi Arabia also cites Sageman's testimony before a U.S. Senate Committee in 2009, Ex. 105 (*Confronting Al-Qaeda*) at 9-23, wherein he assessed the then current al-Qaeda threat based on yet another superficial "survey" and further dabblings in "statistical analysis." Sageman used the platform to bolster and promote his hypothesis *du jour*, that post-9/11 terrorism appeared to be "degenerating into a 'leaderless jihad.'" Ex. 105 (*Confronting Al-Qaeda*) at 16. Sageman's evaluation of the post-9/11 terror threat was limited by his artificially contrived variable of plots "in the West," which conspicuously excluded the category of attacks being carried out *on the West* in different parts of the world. His evaluation and did not even consider al-Qaeda's pre-9/11 attacks against the United States in East Africa (the 1998 Embassy Bombings) and Yemen (the 2000 assault on the USS Cole).

---

[3] In 2017, Sageman reviewed the statistical work he presented to the 9/11 Commission — which also provided the basis for his 2004 book Understanding Terror Networks (Ex. 107 (*Understanding Terror Networks*)) — and found that "my own original database was inaccurate because its basis of news articles was later refuted by other, more reliable information" and that his work was based on "thin and unreliable" data. Ex. 103 (*Misunderstanding Terrorism*) at 6-7, 9.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Sageman's selective surveys exhibit no relevance or expert basis to his proposed far-reaching testimony on the subject of al Qaeda in this case.

Saudi Arabia states that Sageman testified before the Beslan Commission in Russia but presents no evidence or details of such testimony (not even the subject matter on which Sageman purportedly testified) and relies solely on Sageman's diaristic account. Ex. 103 (*Misunderstanding Terrorism*) at 8. Sageman is not mentioned in available public records of the Beslan Commission's activities or its final report. Ex. 108 (Beslan Commission report).[4]

Saudi Arabia repeatedly touts Sageman's "peer-reviewed books" and articles, KSA's Opp'n 4, but Saudi Arabia points to *nothing* in those publications to demonstrate that Sageman has any specialized knowledge about Saudi Arabia, MOIA, Saudi intelligence, the history of Saudi Arabia and Al Qaeda, Islam in Saudi Arabia, or the activities of terror groups, including Al Qaeda and Al Gama'a, in California during the decade prior to the 9/11 Attacks. Moreover, the mere writing of an academically "peer-reviewed" book is not a benchmark of expertise, and "publication (or lack thereof)" is "not dispositive" to the assessment of an expert's testimony but is rather one factor among many that courts can consider. *Daubert*, 509 U.S. at 579, 594. It is especially spurious in the case of Sageman, whose works have been found to contain significant errors and are on subject matters only notionally related to this litigation. Moreover, the process of publishing a book is not equivalent to the counterterrorism investigations and strategic national security analysis that Plaintiffs' experts carried out during their careers.[5]

---

[4] Note that this English-language version of the report is machine-translated, as the Final Report and records of the Beslan Commission are available only in Russian. For an appraisal of the report and the Commission's work, *see e.g.* C. J. Chivers, "*Russia Excuses Itself in Final Report on Beslan*," N.Y. Times, (Dec. 22, 2006), https://www.nytimes.com/2006/12/22/world/europe/22cnd-beslan.html.

[5] For example, at the FBI, Youssef routinely prepared investigative reports that were subject to scrutiny and approval by supervisors, as well as submitting affidavits for review by federal courts to justify issuance of criminal warrants and subpoenas. Similarly, as a CIA senior analyst, Nakhleh briefed the President, Vice President and other U.S. government principals on life-and-death matters of national security, requiring multiple layers of internal peer review as a matter of course before anything left his desk. Ex. 109 (Nakhleh Tr.) 48:21-49:22.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Sageman's 2004 book, which launched his career as a psychiatrist-cum-terror expert, was based on a statistical analysis (of no relevance here) ultimately found to be unreliable.[6] The focus of Sageman's books is his attempt to predict the behavior of terrorist actors in the *post-9/11* world.[7] In doing so, Sageman cites the work of others to present al Qaeda's history, but his research does not address Saudi Arabia or its MOIA, other than to note that Saudi Arabia "has not allowed independent investigation [of 9/11] on its soil" and "tolerated violent sermons from Salafi preachers in support of the jihad." Ex. 107 (*Understanding Terror Networks*) at 53, 66.

Saudi Arabia cites various short-term consulting positions Sageman held on and off between 2006 to 2013 (including with the Secret Service, the New York City Police Department, and the U.S. Army) but the record is devoid of information about what expertise Sageman purportedly developed as a result of those positions.[8] Sageman and Saudi Arabia present his consultant positions in purely conclusory fashion. KSA's Opp'n 5. No essential details are offered to show the amount and type of work that Sageman conducted; the nature of the terror groups involved in his work, if any; or any concrete outcomes to which Sageman contributed. Saudi Arabia offers nothing to show how any of

---

[6] In his 2017 book, Sageman observed that his "collaboration with scientists and engineers" had convinced him that he could no longer use what he called "sophisticated analysis" from "basically my own original matrix of 172 al-Qaeda terrorists" to reach any conclusions, because his "matrix" was based on "thin and unreliable data…." Ex. 103 (*Misunderstanding Terrorism*) at 9. It was that analysis of 172 terrorists that Sageman used as the basis for his 2004 book. *Id.* at 7. Sageman further wrote that the "cutting-edge mathematicians" he worked with had made "calculations…based on flawed databases" and he too had learned the "[r]ubbish in, rubbish out" principle, conceding: "I…realized that my own original database was inaccurate because its basis of news articles was later refuted by other, more reliable information. It is very hard to categorize the complexity of human relationships and capture their dynamics in a static graph even with excellent data." *Id.* at 6.

[7] *E.g.,* Ex. 103 (*Misunderstanding Terrorism*, 2017) at 22 ("Trying to prevent a repeat of 9/11, [the U.S. government] has again and again let its imagination run wild and responds to worst-case scenarios without objectively assessing the real threat. […] This book tries to break this cycle by bringing realistic numbers into the assessment of the threat facing the West."); Ex. 107 (*Understanding Terror Networks*, 2004) at vii ("Only a thorough understanding of these new [i.e., post-9/11] terror networks and their social movement will enable the world to mount an effective defense….").

[8] Saudi Arabia also cites to Sageman's "field research on radicalization for the Air Force Research Laboratory" but provides no description of that work, and nothing to show that his purported study was ever used or relied upon by the Air Force (or anyone else) in any fashion, let alone how it may relate to any of the subject matters as to which Saudi Arabia offers Sageman as an expert. In 2017, Sageman stated that "[t]he… study still has not been released by the Air Force."). Ex. 103 (*Misunderstanding Terrorism*) at 178 n. 15.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

these consultant roles might have equipped Sageman with skills or knowledge relevant to the particular issues at stake here.[9]

Indeed, Saudi Arabia admits that Sageman has no specialized knowledge from his own direct experiences or observations. Rather, Sageman's knowledge comes from his retrospective research; Saudi Arabia concedes that "*Sageman's report reflects the information known today*, not the information known as of one point in the past." KSA's Opp'n 30 (emphasis added). As a researcher allegedly using "information known today," Sageman must, in the words of the Supreme Court, cite "good grounds" —specific evidence and research—to back up his statements. *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known."). But Sageman repeatedly fails this test and makes bald fact pronouncements based on nothing other than his own *ipse dixit*, contrary to Rule 702. *E.g.,* Plaintiffs' Br. (ECF No. 9092) 8, 11, 14-5, 27, 58-60.

Saudi Arabia's discussion of Sageman's "professional background" conspicuously omits all of Sageman's substantial litigation expert witness work. Ex. 110 (Sageman Tr. July 1, 2021) 248:21-250:3 (testifying that his expert witness work furnishes 95% of his income). That omission is telling, because courts have routinely rejected Sageman's expert testimony, with only one exception (that was overturned on appeal). Plaintiffs' Br. 6-7 & n. 21-24. Indeed, Saudi Arabia fails to answer Plaintiffs' arguments about that one exception: the recent Second Circuit decision that vacated a district court's sentencing decision based on Sageman's opinion that the defendant presented "no risk of violence." *U.S. v. Ceasar*, 388 F. Supp.3d 194, 214 (E.D.N.Y. 2019), *vacated and remanded*, 10 F.4th 66 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 2841 (2022). ECF No. 9092 at 6-7. The Second Circuit found that

---

[9] For example, when asked "what does a scholar in residence at a police department do?", Sageman replied "Whatever I did." Ex. 110 (Sageman Tr. July 1, 2021) 145:13-16. When counsel attempted to follow up by asking "did you produce reports or was there a resulting finding or something that you did that was put in writing that changed the procedures that the police department did?" Sageman replied: "No. There were a lot of discussions and recommendations, oral." *Id.* at 147:17-23.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Sageman's opinion (based on his personal examination of the defendant) was contrary to evidence that the defendant had made attempts to "cover up her conduct" and lied to law enforcement authorities. 10 F.4th at 74-75. Despite Sageman's opinions within the limited realm of his "expertise" on post-9/11 terror subjects having been uniformly rejected by courts, Saudi Arabia now proffers Sageman to opine on a broad range of novel areas in which he is completely unqualified.

### A. SAGEMAN IS NOT A QUALIFIED EXPERT ON THE BROAD RANGE OF SUBJECT MATTERS AS TO WHICH HE IS PROFFERED.

#### 1. Sageman does not have expertise on Saudi Arabia and its history, including its MOIA and intelligence services, or the Saudi government's relationship with Al Qaeda and other terrorist groups.

Saudi Arabia does not challenge Plaintiffs' arguments that Sageman has *no* relevant work history dealing with Saudi Arabia and has *never* done any research on Saudi Arabia and its agencies, including its Ministry of Islamic Affairs ("MOIA") and Saudi intelligence, or on the relationship between Saudi Arabia and Al Qaeda. Plaintiffs' Br. 9-10. There is simply no basis to suggest that Sageman is an expert on any aspect of Saudi Arabia prior to the 9/11 Attacks. Instead, Saudi Arabia claims that Sageman's superficial knowledge about Al Qaeda should somehow give him license to offer wide-ranging opinions on Saudi Arabia. KSA's Opp'n 26-7. This is plainly wrong. *E.g.*, *Nimely*, 414 F.3d at 399 n. 13.

Sageman has no expertise to present the opinions scattered throughout his report on Saudi Arabia and its agencies. For example, Saudi Arabia insists that Sageman should be able to opine that Thumairy's continued "good standing" with MOIA means that it is "unlikely… Thumairy had actually given sermons supporting violent jihad." KSA's Opp'n 43-44. But Sageman himself has no expert knowledge of MOIA to render this or other assessment of MOIA, its policies, or Thumairy's standing within MOIA. Moreover, Saudi Arabia offers no response to Plaintiffs' arguments that Sageman wrongly stated that Thumairy had been "investigated" by Saudi authorities about his relationship with the 9/11 hijackers. Saudi Arabia produced no evidence of any such investigation. Plaintiffs' Br. 33-34.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

### 2. Sageman is not an expert on Islam and the Muslim community.

Saudi Arabia does not demonstrate that Sageman has done any research on Wahhabi doctrine, the history of the Muslim faith, the differences between the sects and the practices followed in different countries, nor that he has studied other aspects of Islam. Contrary to Saudi Arabia's arguments, Sageman's 9/11 Commission statement contains no expert analysis of Islam. KSA's Opp'n 27, citing KSA Ex. 60. Instead of showing expertise, Saudi Arabia makes conclusory claims that Sageman's "scholarship has covered the Salafi school of Islam," *id.*, but there is no such thing as the "Salafi school" of Islam. As Plaintiffs' expert Emile Nakhleh explains, there are four schools of Sunni Islam, among them the Hanbali school that is followed in Saudi Arabia. Ex. 8 (Nakhleh Rpt.) ¶25.

Saudi Arabia asserts that Sageman's knowledge of Islam somehow relates to MOIA's relationship with Al Qaeda and other terror groups. KSA's Opp'n 27-8. But there is nothing in the record to suggest that Sageman ever did any prior work or studies involving MOIA to qualify him as an expert. Saudi Arabia also inserts a claim that Sageman was an "investigator" for law enforcement, *id.* at 28, but (as discussed further below) there is nothing to show that Sageman ever worked as an investigator on any case, nor has Saudi Arabia or Sageman identified *any* terror or other investigation that Sageman himself allegedly conducted, or in which he played any meaningful role.

### 3. Sageman is not an expert on Al Gama'a or Al Qaeda in California before the 9/11 Attacks.

Saudi Arabia fails to establish that Sageman has specialized knowledge about the terror groups operating in California *prior to the 9/11 Attacks* and attempts to gloss over the issue. Saudi Arabia completely avoids addressing Plaintiffs' arguments that Sageman's opinions merely showcase his personal speculation and lack of knowledge. Plaintiffs' Br. 14-15 & n. 69. Sageman states in his report that "*I am skeptical* that Al Gama'a Islamiyah was running operations in California" and "*I am not aware* of any Islamic terrorist being prosecuted in California for terrorist activities…." Ex. 1 (Sageman Rpt.)

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

563. But Sageman's "skepticism" or lack of awareness provides no basis for a reliable expert opinion and are his *ipse dixit*. Sageman has cited to no substantive evidence to support his opinions. *Id.*

Sageman never worked in California (or even visited there in this case), and no showing has been made that he did any research of Al Qaeda and Al Gama'a in California. Saudi Arabia does not answer Plaintiffs' arguments that if Sageman did such research he would have learned that the terror groups operated inside California for years before 9/11. Plaintiffs' Br. 14-15 & n. 71. The Eleventh Circuit affirmed convictions of terror subjects based on evidence that Al Gama'a and Al Qaeda were working together on terror plots inside California in the 1990s. *United States v. Jayyousi*, 657 F.3d 1085, 1092-5 (11ᵗʰ Cir. 2011). Saudi Arabia's failure to address *Jayyousi*, as well as the FBI's TERRSTOP investigation of Al Gama'a and Al Qaeda agents in California, concedes that Sageman simply does not know what he is talking about.

Sageman's lack of qualifications is further shown by his complete failure to address the U.S. government's 1997 designation of Al Gama'a as a Foreign Terrorist Organization, and his outlandish and unsupported claim that Al Gama'a became a "peaceful" organization that same year. Sageman was apparently unaware of the U.S. designation of Al Gama'a as an FTO, something that is basic knowledge to anyone who avows to be "expert" on the terror group. Saudi Arabia attempts to excuse Sageman's lack of knowledge, describing the FTO designation as only "a name on a list, giving no indication of the particular conduct that warranted designation or the timing of that conduct." KSA's Opp'n 29 n. 31. This claim is a remarkable avoidance of the truth, given the degree of scrutiny that goes into a designation, the severe consequences attached to the designation, and the active, grave danger that Al Gama'a, together with Al Qaeda, posed against the United States before the 9/11 Attacks. Saudi Arabia falsely states that the FTO designation is "presumably…based on…previous violent conduct," KSA's Opp'n 29, but such designations are only ever made where "the terrorist

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §1189(a)(1)(C).

Sageman's claim that Al Gama'a terrorists turned "peaceful" in 1997, Ex. 1 (Sageman Rpt.) 561, 563, is a red herring. It is based on the 1997 *domestic* ceasefire agreement *inside Egypt* arrived at as an accommodation between the Egyptian government and a group of Al Gama'a figureheads incarcerated in Egyptian prisons. The only source Sageman offered about the ceasefire is his own 2004 book, which confirms that "the leadership shura [of Al Gama'a] in prison" agreed to "a unilateral ceasefire *in Egypt*" because the group's "terrorism campaign in Egypt had been a failure…." Ex. 107 (*Understanding Terror Networks*) at 47 (emphasis added).[10] This ceasefire *in Egypt*, however, did not affect the ongoing international efforts of Al Gama'a, in partnership with Al Qaeda, to support violent jihad against the United States. Indeed, Saudi Arabia does not answer the proof cited in Plaintiffs' motion which shows how Al Gama'a was a terror threat to the United States in the years leading up to the 9/11 Attacks.[11]

Saudi Arabia and Sageman cite nothing to support Sageman's challenged claim that by 2000 Al Gama'a and Al Qaeda were "strong rivals who no longer collaborated with each other." KSA's Opp'n 29-30; Ex. 1 (Sageman Rpt.) 560-61. Instead, Saudi Arabia offers misleading citations to Sageman's own books. Saudi Arabia cites Sageman's 2004 description of Rahman as a member of the "Central Staff of al Qaeda," and claims that Sageman "revised that view" in his 2008 book, based on his so-called "evolving understanding," by recognizing that Rahman and Bin Laden "did not belong

---

[10] Saudi Arabia improperly attempts to add a new source to the record which Sageman did not cite or rely upon to reach his opinions. KSA's Opp'n 29 n. 30, KSA Ex. 72. In any event, that source confirms that the 1997 ceasefire discussions addressed attacks inside Egypt, not the global jihad against the U.S., and shows that even in Egypt, there was no "total renunciation of violence" by Al Gama'a until after the 9/11 Attacks, in 2002. KSA Ex. 72 at 3.

[11] This includes the May 1998 fatwa of the "Blind Sheikh" Omar Abdel Rahman against the U.S. and in support of Osama Bin Laden, cited as "an important factor in the 9/11 attacks;" the December 1998 Presidential briefing about the risk of an aircraft hijacking to obtain Rahman's release; the January 1999 CIA Report showing how Bin Laden was using worldwide alliances with organizations including Al Gama'a to provide support for Al Qaeda; and the FBI's TERRSTOP investigation. Plaintiffs' Br. 13 & n. 58, 59, 15 & n.71.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

to the same organization." KSA's Opp'n 30 n. 33. Yet the issue is not about the organizations to which the two men belonged, but how they collaborated with like-minded jihadists to plot and carry out terrorist acts against the United States. Saudi Arabia fails to answer the point Plaintiffs raised that, in 2008, Sageman wrote that Rahman and Bin Laden were "fellow travelers" who shared "similar ideology and goals," and that Rahman was uniquely positioned to "feed the formal ranks of the [al Qaeda] organization." Plaintiffs' Br. at 14 & n. 68 (citing Ex. 106 (*Leaderless Jihad*) at 30).[12]

### 4. Sageman has never been a law enforcement investigator and does not have specialized knowledge about the FBI and its investigations.

Saudi Arabia makes outrageous unsupported claims that "Sageman has worked… as an investigator of terrorist attacks, for U.S. and foreign law enforcement and intelligence agencies." KSA's Opp'n 5. There is no mention in Sageman's CV that he ever received training or worked as an "investigator," let alone that he is qualified as an expert to conduct or opine on an investigation. Ex. 111 (Sageman CV). Rather, Sageman's CV sets out his potted experiences as a researcher and academic, not as an investigator. None of the "examples" cited by Saudi Arabia that Sageman "consulted," "conducted field research," "was a scholar-in-residence" or "advised" others show that Sageman was ever assigned to work as a law enforcement investigator. The absence of Sageman's investigative credentials is confirmed by a review of each source Saudi Arabia cited.[13]

---

[12] Saudi Arabia wrongly attempts to defend Sageman's description of the Omar Abdul Rahman a/k/a the "Blind Sheikh" as a "legitimate Islamic scholar" in 1993, claiming that it was only "[y]ears later" that Rahman was convicted for his terror activities. KSA's Opp'n 29 n. 32. Saudi Arabia fails to demonstrate that Sageman is qualified to offer such an opinion and continues to ignore the Second Circuit's specific findings that *in January 1993* Rahman gave a public speech in Brooklyn at which he "voiced his beliefs in violent *jihad*" and "further stated that being called terrorists was fine, so long as they were terrorizing the enemies of Islam, the foremost of which was the United States and its allies." *United States v. Rahman*, 189 F.3d 88, 107 (2d Cir. 1999). Then, shortly after Rahman oversaw the February 1993 World Trade Center bombing and as he was planning a second Spring 1993 terror attack on New York, *id.* at 124, Rahman travelled to Los Angeles and San Diego and held meetings with members of Al Gama'a extremist cells hosted by the Ibn Taymiyah Mosque, which at the time was supported by Saudi Arabia and led by a Saudi government Imam, who was replaced several years later by Fahad al Thumairy.

[13] Saudi Arabia cites to pages 546, 567, and 713 in Sageman's report (Ex. 1) as proof of his "investigation" work. KSA's Opp'n 5. None of those sources support their claim. Page 546 contains nothing but a summary of Sageman's work as a "consultant on terrorism." Page 567 states that Sageman "reviewed the complete FBI…file on Ali Mohamed" which involves research of investigation work done by others. Similarly, Page 713 states that Sageman "had the opportunity to

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Sageman accordingly has no basis to opine about the FBI and its investigations. Saudi Arabia claims that Sageman is qualified because he had "personal discussions with FBI special agents and law enforcement officers," KSA's Opp'n 30, from which Sageman concluded "they could not tell the difference between traditional Saudi Salafi preaching and neojihadi ideology." Ex. 1 (Sageman Rpt.) 19.[14] But Sageman has never worked with the FBI, and Saudi Arabia provides no context to understand why, when, how, or for how long these "personal discussions" might have taken place, or whether they even involved counterterrorism officials. Even assuming these unidentified "personal discussions" occurred, a few random conversations with unspecified law enforcement officers does not give Sageman the standing or qualifications necessary to offer expert opinions regarding the FBI and its investigations.

### 5. Sageman is not a communications or phone calls expert.

Saudi Arabia fails to show that Sageman has expertise in communications (including phone) analysis. Sageman's CV confirms that he has never worked in the communications field in any capacity. Ex. 111 (Sageman CV). Nor does Sageman have training in communications analysis. Ex. 112 (Sageman Tr. June 27, 2022) 204:10-12. Saudi Arabia cites to Sageman's claim at his deposition that he used communications analysis in certain "investigations" but omits reference to the follow-up question, which asked Sageman "[c]an you be specific as to any investigations in which you've used communications analysis?", and he replied: "*I can't*". *Id.* at 208:12-14 (emphasis added). Sageman could

---

review GTMO intelligence reports" and made "field visits" which again shows that he simply reviewed investigation materials prepared by others. Saudi Arabia also cites a book excerpt based on an interview of Sageman which again involves his activities "reviewing…records" from investigations others conducted, not acting himself as an investigator. KSA's Opp'n 5 n. 6. If these citations demonstrate anything of relevance to the point, they further show that Sageman has acted merely as a professional contrarian, reviewing and criticizing others' work regardless of his expertise.

[14] The term "neojihadi" is a term Sageman made up himself to describe Islamic extremism as part of his methodology for studying post-9/11 terrorists. He cites his term throughout his report as if it is accepted vocabulary, and uses it to criticize others, *see, e.g.*, Ex. 1 (Sageman Rpt.) 559 ("the intelligence community's and academia's understanding of neojihadi terrorism" were "quaint" and "wrong"), but we have not found a single instance (except Saudi Arabia's brief) where the term has been used by anyone other than Sageman. Moreover, as stated above, Sageman has no expertise to offer opinions on "traditional Saudi Salafi preaching." Section I.A.2., *supra*.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

not offer any description of the instances in which he claims to have performed communications analysis or even the "kinds of records or . . . categories of records" that he analyzed, simply averring that everything was "classified." *Id.* at 203:10-17, 204:19-23. Saudi Arabia ignores the fact that Sageman, himself a professional expert,[15] declined at his deposition to call himself an expert on communications analysis, making the remarkable claim that "I'm not really sure what you mean by 'expert.'" *Id.* at 208:7-8.

Saudi Arabia improperly uses Sageman to repeat witness testimony and present counsel's arguments under the guise of communications analysis. Saudi Arabia does not even attempt to show that Sageman used any type of proper methodology to examine the phone records, which only further reemphasizes Sageman's lack of qualifications.[16] Contrary to Saudi Arabia's argument, Plaintiffs' disagreement is not *per se* over "Sageman's conclusions," KSA's Opp'n 31, but the fact that Sageman is unqualified and that he does not (and cannot) use communications analysis to reach his opinions.

None of Saudi Arabia's examples show that Sageman has expertise in communication analysis. KSA's Opp'n 31-32. *First,* Saudi Arabia does not dispute that Sageman did no analysis of the calls from Bayoumi's Mosque phone to determine whether or not the calls were made by Bayoumi. Instead, Saudi Arabia admits that all Sageman does is repeat Bayoumi's testimony. KSA's Opp'n 31. *Second,*

---

[15] Sageman wrote an article for a lawyer's magazine that addressed, in Sageman's words, "the factors to consider for selecting the most effective expert in terms of the expected audience" and included citations to legal authorities on expert testimony, including *Daubert.* Ex. 113 (Exh. 863 to Sageman's July 1, 2021 Deposition) at 27, 30.

[16] Saudi Arabia argues in a footnote that "Sageman had no obligation to compile a 'matrix', which it derides as "Plaintiffs' dressed-up word for a spreadsheet," KSA's Opp'n 31 n. 34, which misses the point that Plaintiffs were quoting *Sageman himself*, who used the term "matrix" at his deposition. Ex. 112 (Sageman Tr. June 27, 2022) 208:16-21, 209:4-7. Saudi Arabia also makes the misleading claim that Youssef "'did not compile' any spreadsheets," KSA's Opp'n 31 n. 34, but Youssef did in fact compile nine of his own spreadsheets, drawing upon a repository of calls in a master data set (Youssef was assisted by a staff member of one of Plaintiffs' law firms, who did the time-consuming rote work of inputting the data (phone numbers, call participants, dates, times, etc.) into rows corresponding to each of more than 14,000 individual phone calls. Youssef reviewed and compared his spreadsheets against "the actual phone records." Ex. 114 (Youssef Tr.) 270:10-271:1. Exhibit 115 to the declaration accompanying this brief (Ex. 115 Youssef Rpt.) is the integrated single-document version of Youssef's report *including his phone calls spreadsheets*, as previously served by Plaintiffs on May 3, 2023 (with revisions incorporated from an April 22, 2022 Errata Sheet, a May 8, 2022 Supplement to Call Spreadsheets, and a May 3, 2023 Errata Sheet).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Saudi Arabia suggests that Sageman can repeat counsel's claims that "the record is ambiguous" because the phone number ███████-3362 was subscribed to by Faisal Al Muhanna, not Thumairy, *id.* at 32, but Sageman failed to examine the phone calls made from that number for their consistency with calls known to have been made by Thumairy from other phone numbers. Nor did Sageman study the various other phone numbers subscribed to by Muhanna. *Third*, Saudi Arabia offers a string cite to various occasions (at pages 450, 463, 482, 493, 645, and 745-25 of Sageman's report) where Sageman offers his purely contrarian views, infusing speculation and conjecture that tracks Saudi Arabia's alternative narrative, again without doing *any* communications analysis of the complete call pattern among the relevant individuals. *Id.*

For one example, Saudi Arabia cites to Sageman's suggestion that various calls made by Bayoumi to Thumairy and Aulaqi on February 4, 2000, as Bayoumi was busy finalizing the arrangements for the hijackers' apartment, "may suggest that al-Bayoumi *might have had* a religious question." *Id.* at 32 n. 36 (emphasis added). This is a classic illustration of speculative *ipse dixit*. Sageman does no analysis of the unique pattern of calls among Bayoumi, Thumairy, and Aulaqi to reach this conclusion. Instead, Sageman simply inserts an unfounded contrarian speculative possibility. Indeed, Sageman contradicts himself on the immediately preceding page of his report by acknowledging that Aulaqi was involved with Bayoumi in getting the hijackers their apartment and that Bayoumi may have either called Aulaqi himself to tell him that the hijackers had got their apartment or lent his phone to the hijackers to call Aulaqi. Ex. 1 (Sageman Rpt.) 481.

### 6. Sageman has no expertise on the Arabic language.

Saudi Arabia concedes that Sageman has no basis to offer opinions about usage of the Arabic language. KSA's Opp'n 33. This Court should make clear that Sageman may not offer opinions about how Arabic speakers use Arabic. Saudi Arabia should not be permitted to leave a foot in the door by claiming that Sageman's "experience" gives him "familiarity." KSA's Opp'n 33. Thus, for example,

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Sageman is not qualified to provide an expert opinion on the Arabic words in correspondence written by Bayoumi: neither on the use of, or meaning conveyed by, the Arabic honorifics such as "Sheikh" or "Emir"; nor on the urgency or implicit messages of a letter marked "extremely urgent" in Arabic. Plaintiffs' Br. 20 & n. 98.

### 7. Sageman is not a memory expert.

Saudi Arabia does not answer Plaintiffs' motion to strike Sageman's opinions regarding the memory functions of Thumairy and other witnesses. Plaintiffs' Br. 8 & n. 28, 47 & n. 250. Instead, Saudi Arabia merely repeats Sageman's flawed opinions on memory, including the assertion that "Thumairy's failures of recollection are consistent with the ordinary workings of human memory" in defense of Thumairy's statements before the 9/11 Commission and at his deposition. KSA's Opp'n 42. Saudi Arabia fails to respond to Plaintiffs' arguments that the 9/11 Commission found Thumairy "deceptive." Plaintiffs' Br.27 & n. 131. Sageman's attempt to explain Thumairy's answers is *ipse dixit*, and outside the ambit of Sageman's purported expertise; he never examined Thumairy or Thumairy's alleged memory issues. Sageman's unsupported opinions on human memory are a classic example of "junk science." *Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("the courtroom door remains closed to junk science").

### B. SAGEMAN PRESENTS OPINIONS THAT ARE UNRELIABLE

Saudi Arabia's representations that across-the-board Sageman applies the "same methodology" that he previously used in his "peer-reviewed" books, KSA's Opp'n 13, acknowledges that he is presented *solely* as an expert from the realm of research/academia. The representation should be taken as Saudi Arabia's concession that Sageman has no expert basis upon which to offer opinions as a law enforcement investigator or communications analyst, because Sageman does not (and cannot) use the methodologies of those fields, nor are such methodologies applied in his "peer reviewed" books.

16

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

The numerous methodological and other deficiencies in Sageman's opinions are in large part due to the fact that he wrongly feigns expertise in investigator and analyst roles as to which he is unqualified and offers wide ranging opinions on a variety of different subjects (including Saudi Arabia, Islam, terror groups in California, Arabic language, etc.) that are outside the scope of his limited specialized knowledge.

> 1. **The flawed central premise of Sageman's report—that there was no support network for the 9/11 hijackers inside the United States—is based upon false statements procured under torture from al Qaeda terrorist Khalid Sheikh Mohammed ("KSM").**

Saudi Arabia's papers confirm that Sageman relied on *nothing other than KSM's narrative* for his central conclusion that no support network existed inside the United States. Saudi Arabia claims that Sageman used a proper methodology because he "evaluates" KSM's statement "against other sources," KSA's Opp'n 46. *None* of the sources Saudi Arabia cited—a "2002 interview with an Egyptian journalist"; papers found at the Abbottabad raid; and three FBI interview reports of other subjects—support KSM's statement concerning the absence of a support network. KSA's Opp'n 46 & n. 50.[17] It is clear that Sageman allowed the poisoned fruit of a terrorist's statement to infect his entire report. As Saudi Arabia now acknowledges, the KSM statement is cited throughout Sageman's report in 58 separate footnotes, KSA's Opp'n 46 n. 48. Even that number, however, downplays the numerous instances where Sageman bases opinions on the KSM statement without citing it.[18]

---

[17] The sources Saudi Arabia cited show that Sageman had no basis for his support network opinion other than KSM's statement. The 2002 interview of KSM with an "Egyptian journalist" is cited by Sageman for the proposition that KSM purportedly stated that the decision was made to proceed with the 9/11 Attacks "[a]bout two and a half years prior to the holy raids….", Ex. 1 (Sageman Rpt.) 124 & n. 448. Sageman also cites Abbottabad documents on the timing of decisions regarding the attack and the issue of compartmentation. *Id.* at 125, 130. Sageman also cites the FBI interview reports of three witnesses to address issues concerning Mihdhar leaving the United States and to address various issues about Mihdhar leaving the United States. *Id.* at 705-6; KSA's Opp'n 46 n. 50 (referencing "FBI interview reports of ███████, ███████, and Mohdar Abdullah (Zeid)").

[18] *See, e.g.*, Ex. 1 (Sageman Rpt.) 260 n. 1111 (citation to KSM statement followed by two additional opinions based on KSM with no basis or footnotes of their own); *id.* at 356-357 (several paragraphs of opinions citing to "KSM's advice" and what "KSM had advised [the hijackers] to do" without footnotes).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Sageman's reliance on KSM's statement as the basis for his opinions represents the kind of "intellectual dishonesty" which this Court has condemned, ECF No. 9060 at 32, and justifies striking all Sageman's opinions. KSM had every motive to dissemble and misdirect his interrogators and was specifically found by U.S. government officials to have been lying on his support network statements. Plaintiffs' Br. at 38-43. That Sageman places unquestioned reliance on an unsworn statement of a terrorist found to be untruthful on the very subject matter at hand, without addressing key trustworthiness concerns raised by the very law enforcement authorities who questioned KSM to obtain that statement, underscores his failures as an expert.

Saudi Arabia provides *no* answer to Plaintiffs' arguments, including that the CIA found (directly relevant to Sageman's key opinions here) that KSM provided "fabricated" statements with the goal of "protecting operatives in the United States" and "withholding or lying about terrorist plots and operatives targeting the United States." KSA's Opp'n 47 (responding to Plaintiffs' Br. 38-40). Nor does Saudi Arabia offer a response to the finding of the 9/11 Commission that KSM lied about Al Qaeda's support network inside California. *Id.* Instead, Saudi Arabia tries to divert the Court from the truth: it states that "[p]laintiffs contend that the 9/11 Commission and the CIA found some of KSM's statements were not credible, . . . but fail to point out that the FBI's communication closing Operation Encore in May 2021 relied on similar material." KSA's Opp'n 47.

Not only is Saudi Arabia's argument a ploy to avoid dealing honestly with the clear CIA and 9/11 Commission findings, but the FBI's May 2021 communication Saudi Arabia cited is completely distinguishable from Sageman's wholesale adoption of KSM's narrative. The FBI's communication stated that Al Qaeda "compartmentalized" its operations based on *six* separate, independent, and

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

consistent statements of Al Qaeda members (including KSM), as well as the common knowledge and judgment of law enforcement professionals. Ex. 63 (EO14040-000001 to -11) at -000009.[19]

Likewise, Saudi Arabia's claim that Plaintiffs' own experts "rely on the same or similar sources," KSA's Opp'n 47, is clearly distinguishable. Youssef cited a statement of KSM on a particular, narrow issue where the circumstances showed that it matched what another individual had said on the same issue, in a statement obtained during a separate interrogation conducted on U.S. soil by the FBI. Ex. 115 (Youssef Rpt.) 18 n. 11.[20] Sageman, however, is not an expert in law enforcement and used none of these basic, critical safeguards against basing his report on a terrorist's deceit.

Saudi Arabia makes the remarkable claim that there is "no evidence" that KSM's narrative was "procured under torture," KSA's Opp'n 47 n. 51, when (a) Plaintiffs' motion submitted the Senate Committee "SSCI" report, setting forth KSM's torture in excruciating detail, including scores of applications of waterboarding, ECF No. 9118-89, *e.g.* at 115-118; and (b) Sageman himself admitted this fact, albeit in passing, Ex. 1 (Sageman Rpt.) 256 (acknowledging that KSM made his statements "under torture").[21] Last year, the U.S. Supreme Court, ruling on a case concerning another CIA

---

[19] Plaintiffs' expert Youssef agreed that "[a] terror organization, like an intelligence agency, is known to share information about a planned operation on a 'need to know' basis." Ex. 115 (Youssef Rpt.) 237.

[20] The concordant information came from the FBI interrogation of Ramzi Yousef, the "mastermind" of the 1993 World Trade Center bombing. In another section of his report, Plaintiffs' expert Youssef approached the KSM statement as a law enforcement expert – with caution, correctly describing it as "the information that the FBI prepared about the questioning of [KSM]," Ex. 115 (Youssef Rpt.) 237, whereas Sageman referred to the document variously as "KSM's report," "KSM statements," and KSM's "testimony." Plaintiffs' Br. 39-40, citing Ex. 1 (Sageman Rpt.) 379, 691. Saudi Arabia draws a false equivalence when it suggests that Plaintiffs' expert Nakhleh "rel[ied]" on other documents found in the Abbottabad raid"—the footnote cited contains only Nakhleh's observation that a copy of a Sayyid Qutb publication had been "found among the documents recovered from [bin Laden's] compound," Ex. 8 (Nakhleh Rpt.) 15, n.16. Meleagrou-Hitchens' only cite to a document "recovered from bin Laden's hideout in Abbottabad" is to a 2010 letter signed and dated by bin Laden, which Meleagrou-Hitchens analyzes in the context of Awlaki's rising prominence in AQAP. Ex. 10 (Meleagrou-Hitchens Rpt.) 46, n.185. None of Plaintiffs' experts relied on the unattributed note Sageman used, nor on any other Abbottabad document, in any remotely analogous way.

[21] Saudi Arabia cites to the fact that the KSM statement was used at the *Moussaoui* trial of another Al Qaeda terrorist, KSA's Opp'n 47 n. 51, but ignores that facts that it was the terrorist *defendant* in that case who introduced the statement, and that the government provided the statement as an accommodation to that defendant because it refused to allow KSM to testify.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

detainee in the same category as KSM,[22] cited that SSCI report regarding that torture. *United States v. Zubaydah*, 142 S.Ct. 959, 964 (2022) (citing Ex. 89 (Senate Committee Report) at 40-41). Last year, the U.S. government made a definitive, final decision to stop using all detainee statements identified as having been made under torture and provided assurances that "it will not offer any statements obtained by the torture of anyone at any stage of the proceedings."[23] Saudi Arabia cannot use Sageman to resurrect the fraudulent statement of a terrorist.

Saudi Arabia provides *no* response to Plaintiffs' arguments that the documentary evidence shows that the 9/11 plot was well underway in April 1999, when Hazmi and Mihdhar—applying simultaneously with a third Al Qaeda operative upon bin Laden's instructions—got their U.S. visas listing *Los Angeles* as their destination. Plaintiffs' Br. 43-44; KSA's Opp'n 46-8. By ignoring that evidence, Saudi Arabia concedes the point that Sageman has no proper basis for his opinions that the terrorists decided to get their visas "on their own" or that the 9/11 attacks were not "conceived" until November 1999. Indeed, Sageman's attempt to use, as basis for the latter opinion, a single unattributed handwritten note[24] found in the Abbottabad raid in 2011 fails as a matter of law to establish the

---

[22] Both Abu Zubaydah and KSM were categorized among the CIA's "high-value detainees," and both were subjected to years of "enhanced interrogation techniques" while held in the Rendition, Detention and Interrogation (RDI) Program that have been acknowledged as torture. Zubaydah was waterboarded 83 times, KSM 183 times. *E.g.*, Ex. 89 (Senate Committee Report) at 40, 85.

[23] *In re Al-Nashiri*, 47 F.4th 820, 825 (D.C. Cir. 2022). In written briefing to the court opposing al-Nashiri's writ of mandamus, dated January 31, 2022, the Department of Justice stated: ""The government recognizes that torture is abhorrent and unlawful, and unequivocally adheres to humane treatment standards for all detainees. … [T]he government will not seek admission, at any stage of the proceedings, of any of petitioner's statements while he was in CIA custody." *See* Carol Rosenberg, "*Biden Administration Rejects Use of Testimony Obtained From Torture in Guantánamo Trial*," N.Y. Times, (Feb. 1, 2022), https://www.nytimes.com/2022/02/01/us/politics/torture-guantanamo-terrorism-biden.html ("the Nashiri challenge was seen as a test of how civilian courts viewed the limits on the use of evidence derived through torture at the military commissions").

[24] Ex. 1 (Sageman Rpt.) 125-126 n.458. Contrary to what he writes in his report, Sageman concedes in his footnote that "the piece paper [sic] is undated." The provenance, attribution, date, and essential character of the note are uncertain.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

necessary "good grounds" for his opinion under *Daubert*. *None* of the other "sources" Saudi Arabia cited provides any support for Sageman's flawed analysis.[25]

### 2. Sageman has no proper basis to review the testimony and prior statements of Bayoumi and Kaysan Morgan.

Sageman offers his critique of the events surrounding the trip of Bayoumi and Morgan to Los Angeles where they met the hijackers. KSA's Opp'n 34-35. But Sageman offers no relevant specialized knowledge to provide insights about those events, nor does he bring the skills of a trained law enforcement investigator to the task. Sageman simply parrots the talking points of Saudi counsel and adds his own contrarian views premised improperly on naked supposition and sophistry. Saudi Arabia fails to address the specific errors and omissions Plaintiffs raised concerning Sageman's statements about Bayoumi and Morgan. Plaintiffs' Br. 50-55. Instead, Saudi Arabia doubles down on Sageman's errors. For example, Saudi Arabia's Opposition simply ignores the proof from its own answers to interrogatories—which Sageman never reviewed, Ex. 112 (Sageman Tr. June 27, 2022) 162:5-13—and that directly conflicts with Sageman's version of events and shows that Bayoumi made a second trip to the Consulate with Kaysan Morgan to "pick up" his completed passport. Plaintiffs' Br. at 52.

### C. Saudi Arabia fails to address numerous issues Plaintiffs presented.

Saudi Arabia repeatedly fails to address the facts Plaintiffs presented on numerous issues in their motion. For one example, Saudi Arabia ignores that Sageman did not consider key evidence of Thumairy's extremism and his extremist group at the King Fahad Mosque. Sageman: (a) did not consider the protest Thumairy's extremist group held at the King Fahad Mosque, with Thumairy's MOIA assistant Mohamed al Muhanna among those who rallied in favor of the 9/11 hijackers on the Friday after the 9/11 Attacks, or the Saudi Consulate's support of that protest, Plaintiffs' Br. 29; (b)

---

[25] Saudi Arabia cites to Sageman's references to so-called "statements that bin Laden made publicly during his lifetime"—none of which provide support for his opinion—and KSM's statement, which is contrary to Sageman's opinion. KSA's Opp'n 46 & n. 50.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

based his opinions on Khalil's testimony that police were called to the Mosque before the 9/11 Attacks, when Khalil had lacked personal knowledge on that issue, and the call was actually made by Mosque's business manager after 9/11, *id.* at 30; (c) does not mention ██████████, a member of Thumairy's group who participated in the Mosque 9/11 protest, who was Thumairy called over 350 times and who met privately with Embassy official Jarrah, *id.* at 30-1; (d) does not mention the eyewitness proof that Thumairy hosted a radical religious figure from Yemen at the King Fahad Mosque in 2000, *id.* at 31; (e) did not study the direct ties of the propagators working for Thumairy to Al Qaeda and terror organizations, *id.* at 32; and (f) had no evidence to support his claim that ████ ████████████████████████████████████████████

For another example, Saudi Arabia is silent about how Sageman disregards evidence that ████ ████████ was the leader of the San Diego extremist cell, as shown by various facts, including Bayoumi's letter describing ████████ as "Al Emir." Plaintiffs' Br. 37. Nor does Saudi Arabia mention, let alone seek to explain, the substantial funding and support that Bayoumi arranged for ████████. *Id.* Instead, Saudi Arabia cherry-picks isolated facts to support its "guilt by association" narrative to justify Bayoumi's in-depth collaboration with a known extremist. KSA Opp'n at 45 & n. 47.

Again and again Saudi Arabia ignores facts at odds with its arguments. Saudi Arabia is silent about Sageman's failure to consider Bayoumi's relationship in California with Saudi contractor Ercan, and Ercan's payments of tens of thousands of dollars to Bayoumi. Plaintiffs' Br. 35. Sageman also inexplicably omitted the fact that Dallah Avco tried in April 1999 to end its arrangement to pay Bayoumi, but was instructed by Saudi Arabia to continue paying him because Bayoumi had to "complete the task" that the Kingdom had assigned to him in the U.S. *Id.* Nor does Saudi Arabia attempt to provide an explanation for why its senior MOIA official Khalid al Sowailem held regular phone calls with Bayoumi. *Id.*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

## II.    DAVID RUNDELL'S OPINIONS ARE NOT RELIABLE

David Rundell's opinions are, by his own admission, based not on the case record but rather on his *ipse dixit*, his own self-made pronouncements. Saudi Arabia's Opposition tries to excuse and distract from the fact that Rundell offers opinions based purely on his personal experiences and relationships; makes no attempt to apply any reliable methodology to the facts of the case; and dissembles as to the nature and provenance of the sources of information he draws upon for his analysis.[26]

### A.  Rundell should be excluded because his opinions are not based on any reliable data or methodology, and he grossly misrepresents the basis for his opinions in a manner that amounts to impermissible *ipse dixit* and intellectual dishonesty.

Saudi Arabia's characterization of its expert David Rundell's methodology comprises just two short sentences, KSA's Opp'n 21, which serve to reinforce the principal pillars of Plaintiffs' motion to exclude his testimony. The first sentence encapsulates the misrepresentation and intellectual dishonesty that plague the Kingdom's presentation of Rundell, repeating the false claim that he "reviewed the reports for the experts he sought to rebut"—*i.e.*, Plaintiffs' experts Dunham, Simon, and Nakhleh—"*as well as the relevant primary and secondary sources.*" *Id.* (quoting Ex. 2 (Rundell Rpt.) 2) (emphasis added). Yet Rundell admitted at his deposition that he formed his opinions "*without having reviewed all of these categories of discovery material produced in this case*" because he decided that the discovery material was "irrelevant" and "unnecessary." Ex. 116 (Rundell Tr.) 263:17-264:10 (emphasis added).

The Kingdom's second sentence, affirming that what Rundell actually "appl[ied]" was his "wide-ranging 'personal experience,' including 'many years of study, working and residing in Saudi

---

[26] Rundell also admitted at his deposition that several aspects of the resume regarding his experience as a diplomat in Saudi Arabia were misleading. His "15 years in Saudi Arabia" were neither consecutive nor even focused on one particular specialization or concentration; they were rather scattered in a piecemeal across a lengthy bureaucratic career, speaking to Rundell's work as an "odd-job" or "stand-in" functionary who never attained substantive expertise in any professional realm. In addition, Rundell was not the "principal reporting officer on the *Sahwah*," but worked as a "mid-level person" for the State Department, *id.* at 102:7-9, and he was not included on the reporting and analysis of other U.S. government departments or agencies regarding these events.

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Arabia and extensive interactions with the government of Saudi Arabia,'" *Id.* (quoting Ex. 2 (Rundell Rpt.) 2-3), signifies that Rundell's opinions rely on nothing more than his *ipse dixit*, which is patently "not enough," ECF No. 9060 at 32 (quoting *Joiner*, 522 U.S. at 146). To this point, Rundell conceded that, given the "things which [he] understood from [his] long experience in Saudi Arabia," he "didn't need to read anything else to form [his] opinions," and that in the task of rebutting Plaintiffs' experts' reports, "any expert, anyone who knows anything about Saudi Arabia would have answered those questions the exact same way I did." Ex. 116 (Rundell Tr.) 161:1-8, 255:1 to 256:2, 267:13 to 268:24.

Rundell admitted that he read only one deposition transcript (Fahad al-Thumairy) and was only "vaguely aware" that there had been other depositions taken in the litigation, since he "never saw any of them or had any details." *Id.* at 161:1-8. Rundell testified that: "Basically I read what I was given to read, which was really the expert witnesses of Dunham, Simon, and Nakhleh, and that's pretty much what I read." *Id.* at 255:14-18.

Rundell did not bother to consult or cross-check any of the underlying documents that Plaintiffs' experts had relied upon to reach their conclusions. He failed to review relevant record evidence from Saudi Arabia's production, the FBI production, and the thousands of pages of documents released under Executive Order No. 14040 (encompassing documents from the FBI and CIA).

Saudi Arabia argues that Rundell was not required to "analyze [any] record evidence" to form his opinions, and that "not testifying about the actions of particular individuals based on discovery materials," should not on its own "make [Rundell's] opinions inadmissible," KSA's Opp'n 61. The Kingdom claims that Rundell should be allowed to "'offer background knowledge or context that illuminates… past events'," even while conceding that Rundell has not "attempt[ed] to weigh the evidence concerning [the 9/11 attacks]." *Id.*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

The Kingdom's argument fails on two counts. *First*, it downplays the extent of Rundell's limitations as an expert, which he himself has set forth candidly in his report. Plaintiffs' Br. 66, Ex. 2 (Rundell Rpt.) 30 ("To [address the history of the 9/11 attacks] would be outside my assignment and indeed beyond the scope of my expertise.") Rundell cannot apply himself to the evidence in a manner that "illuminates or places [it] in perspective" as Saudi Arabia argues because Rundell admits that he has not even seen that evidence. *Second*, since Rundell is proffered as an expert uninitiated in the relevant facts of the case, the litmus test for the admissibility of his testimony is whether it is "helpful in comprehending and deciding issues beyond the understanding of a layperson." *DiBella v. Hopkins,* 403 F.3d 102, 121 (2d Cir.2005); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)(expert are needed where the evidence "would otherwise elude, mislead, or remain opaque to a layperson."). Yet Rundell acknowledges that he cannot help to elevate the court's understanding because he has no knowledge beyond that of "the average person who reads the newspaper" on the core subjects of this litigation. Ex. 116 (Rundell Tr.) 202:16-17 ("I am not an expert on the nuances of the 9/11 attack..."); *id.* at 250:9-251:18 ("[o]n the details of who did what on the 9/11 hijacking, I know no more than the average person who reads the newspaper, so, no, I don't claim any expertise on that…"); *id.* at 251:9-18 ("… I have said before I don't have any real expertise on what the people of 9/11 were doing or not doing in the United States.")

Rundell placed such faith in his own personal experiences that he found "I certainly didn't need to review other reports or investigations in order to understand what were the mistakes in the [Plaintiffs' experts' reports] that I was asked to look at." *Id.* at 164:18-21. Rundell stated that Plaintiffs' experts' reports "were all based on things which I understood from my long experience in Saudi Arabia," and since he regarded his assignment to rebut Plaintiffs' experts as "really pretty

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

straightforward," he represented that he was able to form his opinions based on "the wide range of knowledge which [he] ha[d] available without reading those documents." *Id.* at 211:14-24.[27]

Rundell's absence of methodology is further demonstrated by one of the few sources he did claim to have relied upon for his expert opinions: a set of documents published by the Ministry of Islamic Affairs,[28] which he obtained from his "friends" in Saudi Arabia in a ham-fisted effort to prop up a preordained conclusion without doing any research on his own. *Id.* at 157:22 to 158:12. Specifically, Rundell said he obtained the documents from Tawfiq al-Sudairy, who was formerly MOIA's Deputy Minister and a Board member of Al Haramain, among other Saudi government functions he performed relevant to this case.[29]

Rundell testified as to his exchange with Tawfiq al-Sudairy: "I asked him specifically, I said, Look, you would know if there are fatwas that have condemned terrorism from the [Council of Senior Scholars], and if you know of any, would you send me a copy, and he did." *Id.* at 150:18 to 153:2. Rundell (who confirmed that he did not "read all of this Arabic" and is not qualified to interpret religious texts) claimed that he relied on English translations of the fatwas, *id.* at 168:18 to 169:5. However, the translations Rundell supposedly relied on were neither identified nor served as part of Rundell's reliance materials and have never been produced by Saudi Arabia despite Plaintiffs' specific request. *Id.* at 172:5-9.

---

[27] *See also id.* at 255:14-18: "I wasn't asked to read anything else, but I would say that I didn't need to read anything else to form my opinions."

[28] The documents in question, served exclusively in Arabic with Rundell's report, are represented as: "Excerpts of Muhammad Hussein bin Saeed Al Safran Al-Qahtani, ed., Fatwas of the Imams Regarding Dark Tragedies (attached to this Appendix)." Ex. 117 (Rundell Rpt. App'x A, Materials Considered) 1.

[29] *See, e.g,* Ex. 116 (Rundell Tr.) 149:7-13. In addition to his MOIA Deputy Minister position and role with Al Haramain, Tawfiq al-Sudairy ███████████████████████████████████████████████ Ex. 118 ██████████████████████████████████████ Tawfiq al-Sudairy was also responsible for the deployment of Saudi Arabia's "advance teams" of MOIA propagators to the United States, including his own brother Mutaeb al Sudairy in the period directly preceding the arrival of the hijackers in Southern California. Ex. 115 (Youssef Rpt.) 100-116; see in particular, at 105 n. 432 (citing Exh. 446, KSA 9538 (Tawfiq al Sudairy signed letter as the "supervisor" of the MOIA's Ramadan program)).

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Rundell's report cited the MOIA documents as the basis for opining that "Saudi religious leaders understood the threat of terrorism and condemned acts of terrorism, including suicide bombing, before the attacks of September 11, 2001." Ex. 2 (Rundell Rpt.) 43, 48. Yet Rundell was incapable of providing any insight or accurate information about the MOIA documents and stated that he "believe[s] they do" contain "fatwas from prior to 9/11," Ex. 116 (Rundell Tr.) 166:14-17.

Rundell demonstrably failed to apply any intellectual rigor and got wrong every guess he hazarded about the MOIA documents: they were extracted from a book published in 2003 (after the Riyadh bombings of May 2003), and none of the excerpts Rundell cited are actually "fatwas" (religious edicts), but rather formulaic statements responding to acts of violence that occurred exclusively on the territory of the Kingdom of Saudi Arabia itself. *See* Ex. 119 (Publication Information of MOIA book "Fatwas of the Imams regarding the Dark Tragedies," with English translation).[30] Rundell did not and could not – because he lacks the expertise and specialized knowledge to do so – provide any independent judgment as to the content but is merely taking Tawfiq al-Sudairy's word for it, and premising his testimony on what Tawfiq al-Sudairy told him. Those untenable circumstances are further aggravated by the fact that the same Tawfiq al-Sudairy was named by Plaintiffs as a witness but *declined to testify* himself.[31] Saudi Arabia is accordingly trying to use Rundell to introduce hearsay from Tawfiq al-Sudairy into the record without a proper foundation or opportunity for cross-examination. ECF No. 9060 at 7.

---

[30] The full MOIA publication "Fatwas of the Imams regarding the Dark Tragedies," compiled and organized by Muhammad Hussein bin Saeed Al Safran Al-Qahtani, is a book of 329 pages available exclusively in Arabic from the website www.moswarat.com. Saudi Arabia served an extract of 32 pages comprising pp. 1 (the front cover), 42-58, 171-175, 197-204, and 329 (the back cover). Ex. 117 (Rundell Rpt. App'x A, Materials Considered) at 7-38. Saudi Arabia omitted publication information including the date of the book—1424 AH, corresponding to 2003 (Ex. 119 at 4)—and any English translation showing that five of the six documents it extracted are "bayans" (declaratory statements), and the sixth document contains answers by bin Baz to a question from Al Madina newspaper, responsive to specific violent acts in Saudi Arabia. None of the extracted documents are "fatwas" (religious edicts).

[31] Ex. 120 (Defendant Saudi Arabia's letter re: witnesses, Feb. 3, 2020) at 4. This Court granted Saudi Arabia's motion for a protective order as to Tawfiq al-Sudairy because there was no "evidence suggesting that the Kingdom retains control" over him. ECF No. 6408 at 11. Plaintiffs were therefore denied the opportunity to take Tawfiq al-Sudairy's deposition.

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Rundell's own admissions demonstrate that he did not apply any proper methodology and that he falls back on his unfounded self-assurance that his *ipse dixit* opinions should be heard simply because he is presenting them. Ex. 116 (Rundell Tr.) 166:1-8 ("[T]o be honest, I didn't really even need those fatwas. . . . I knew what I was saying already was accurate, and they were put in there as an appendix to confirm that to people who might not be as well-informed about Saudi Arabia as I am.") It is well settled, however, that "[t]he expert feeling comfortable, without more, is not a sound methodology under *Daubert*." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) (internal quotation marks omitted). Rundell's opinions are not "based on sufficient facts or data" as required by Rule 702 but are "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Thus, "there is simply too great an analytical gap between the data and the opinion proffered" to satisfy the reliability requirement of Rule 702. *Id.*

Rundell simply has no basis to render opinions when he refused to look at the relevant evidence in the case**.** *See also* ECF No. 9060 (striking expert Freeman's report, finding it "lack[ed] adequate support," "include[ed] sparse citations," and included an "anemic" "reading list," resulting in the Court finding that "[w]hat remained [was] only Freeman's assertion that his opinions are accurate. But an expert's '*ipse dixit*' is not enough."). Rundell's report fares no better than that of his counterpart Freeman—the same person who recommended to Saudi Arabia that Rundell should be engaged as an expert in this case. Ex. 116 (Rundell Tr.) 20:20 to 21:4.

### B. Rundell offers pre-disposed opinions advocating for the political agenda of Saudi Arabia, the party that engaged him, and bases those opinions on nothing more than his *ipse dixit*.

Saudi Arabia does not address the facts that Rundell admitted that he is committed to the goal of advancing the U.S.-Saudi relationship despite "harmful outcomes of the actions of Saudi officials," Ex. 116 (Rundell Tr.) 287:1 to 288:5, as part of a personal strategy that Rundell has referred to as a "paid political commercial for [Saudi Arabia's Crown Prince] Mohammed bin Salman." *Id.* at 291:2 to

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

294:24; Ex. 121 (Rundell "Kingdom of Silence" quote) at 2. Rundell exhibits a blinkered, intimate affinity for Saudi Arabia that underpins his very public role as the Kingdom's advocate and demonstrates "bias of an extraordinary degree," which disqualifies him as an expert. *El Ansari v. Graham*, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019), (citing *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) (finding expert disqualified where expert is proffering party's attorney).

After his deposition, Rundell has further confirmed his role as the Kingdom's cheerleader in a June 2023 opinion article in *Newsweek,* where—without disclosing in the article his formal relationship with Saudi Arabia or his role as an expert in this litigation—Rundell purports to offer expert insight into the core subject matters of this litigation and reiterates his alignment with the Kingdom's stated views on topics including the 9/11 Attacks. Ex. 122 (Newsweek article).

Rundell's Newsweek article echoed parts of his deposition. Notwithstanding his admitted lack of any specialized knowledge concerning the events of 9/11, *id.* at 202:16-17; 250:9 to 251:18; 251:9-18, Rundell could not hold himself back from offering sweeping opinions about ultimate issues in the case, supported by nothing more than his own say-so. He was conditioned to recite, in rote form, his opinion on the "implausib[ility]" of Saudi Arabia's support for the 9/11 attacks,[32] and doubled down by pronouncing his own conclusion that "[t]he government of Saudi Arabia had no role in the terrorist attacks of 9/11." Ex. 116 (Rundell Tr.) 198:8-10.

## III.   OPINIONS OF PILOT MOSS SHOULD BE EXCLUDED AS UNRELIABLE

Saudi Arabia's makes a series of misleading arguments concerning the proposed testimony of pilot Moss concerning Bayoumi's notebook page with an airplane sketch, aviation drawing, and calculations.

---

[32] *See, e.g.*, Ex. 116 (Rundell Tr.) 198:16-24 ("it seems unlikely and indeed implausible that the government of Saudi Arabia would have enlisted one of its fiercest enemies to attack one of its most essential friends"), and 200:15 to 201:4 ("The premise that Saudi Arabia would participate in a terrorist attack against a close partner is implausible.").

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

### A. The basis for Moss's opinion on visual identification was not disclosed and cannot be tested, and the opinion should be stricken as unreliable.

Saudi Arabia's arguments do not squarely address that Moss failed to include in his report the basis for his opinion that "one would need to be within at least 5 to 10 miles to visually identify" the World Trade Center, Ex. 3 (Moss Rpt.) 19; that his opinion cannot be tested and is unreliable; and that his opinion is at odds with physical reality. Accordingly, the opinion should be stricken.

Saudi Arabia misleadingly claims that Moss based his opinion on his "personal experience" as a pilot, citing his "decades of aviation experience" including his flights into New York. KSA's Opp'n 62-63. But Moss testified that "I'm not talking from the experience of flying into the New York area…." Ex. 123 (Moss Tr.) 104:12-15. Instead, Moss stated that he reached his opinion by coming up with an "estimation" of 5-10 miles and then conducting "testing"—which *he did not mention in his report*—that he admitted "was part of the basis" for his opinion. *Id.* at 105:23 to 106:3. The "testing" involved Moss using an aviation app to measure distances from his home porch outside Reno, Nevada—not New York City—to certain "buildings, houses, structures, on the other side of the valley." *Id.* at 105:8-10. Moss said that he made "quantitative measurements" to reach his 5-10-mile finding, *id.* at 106:24-25, but Moss could not provide those "measurements" or identify any of the "buildings, houses, structures" that he used in his testing. *Id.* at 107:11 to 108:6. Saudi Arabia tries to turn the table upside down by arguing that "Plaintiffs fail to show the tests are unreliable." KSA's Opp'n 65, when it was Moss who (a) failed to include information about his testing in his report, as required by Fed. R. Civ. P. 26(a)(2)(B), and (b) is unable to provide the basic information necessary to check the reliability of his testing.

Acknowledging the central flaw in Moss's report, Saudi Arabia concedes that it "does not intend to proffer his [Moss's] testimony" about "testing". KSA's Opp'n 64. That concession only confirms that Moss cannot testify on the subject matter at all. If he does not explain his testing, Moss

**FILED UNDER SEAL**
**CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

cannot (as he must) provide the basis for his 5-10-mile opinion, and there is simply no way for Plaintiffs and the Court to confirm its reliability.

Saudi Arabia makes a last-ditch effort to prop up Moss with a new belated "expert opinion" from photographer Richard Quindry, citing KSA Ex. 93 (Quindry Dec'l), which attempts to question whether the World Trade Center towers could be seen from 30 miles away at ground level, as shown by the *Greenwich Time* article referenced in Plaintiffs' motion papers. Plaintiffs' Br. 63.[33]

Citing Quindry's "opinion," Saudi Arabia wrongly claims that Plaintiffs are "misleading" the Court about "visibility," KSA's Opp'n 64, but the opposite is true. Saudi Arabia ignores how the *Greenwich Time* article recounts that with "no binoculars required" stunned onlookers witnessed the unfolding 9/11 tragedy from a Connecticut park exactly 30 miles from the World Trade Center towers. Ex. 124 (Heavey Dec'l), Exh. 2. Instead, Saudi Arabia uses Quindry to craft an argument that defies reality. Quindry never visited Connecticut and offers no genuine visual identification opinions. To quell any doubt, Plaintiffs provide the declaration of James H.M. Heavey, a resident of Greenwich, Connecticut, who currently works at the same Grennwich Point Park featured in the *Greenwich Time* article, and who attests that from that park one can "readily identify" by "naked eye" the new World Trade Center from 30 miles away. Ex. 124 (Heavey Dec'l), at ¶¶ 1-8.

### B. Saudi Arabia cannot use Moss to offer a speculative excuse for Bayoumi's equation contrary to Bayoumi's own testimony.

Saudi Arabia seeks to use pilot Moss improperly to furnish a manufactured excuse unsupported by the evidence and that Bayoumi himself declined to provide during his deposition testimony. KSA's Opp'n 65. Bayoumi testified that he prepared the equation for himself, not anyone else. Ex. 124 (Bayoumi Tr.) 290:15-16 (Bayoumi stated that he prepared his document "[p]erhaps to remember, memorize the equation"). While Moss concedes that he has no basis to disagree with

---

[33] Neil Vigdor, *Witness to the unthinkable: Greenwich Point onlookers recall the day the towers fell*, Greenwich Time (Sept. 12, 2011), https://www.greenwichtime.com/news/article/Witness-to-the-unthinkable-Greenwich-Point-2164396.php).

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

Bayoumi, Ex. 123 (Moss Tr.) 23:16-24, Saudi Arabia suggests that Moss can provide an opinion that

Bayoumi's aviation writings are somehow "more consistent with Mr. Bayoumi assisting a student,

perhaps his own son." KSA's Opp'n 65. Moss has no grounds as an expert (or any basis whatsoever)

to present such conjecture before this Court. *Daubert*, 509 U.S. at 590 ("A trial court must decide

whether a qualified expert's testimony rests on a reliable foundation, or is simply based on "subjective

belief or unsupported speculation."); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d at 311

(experts cannot offer "speculative," "conjectural," or "conclusory" opinions).

## **CONCLUSION**

For the foregoing reasons, as well as the reasons articulated in Plaintiffs' Memorandum of Law

(ECF No. 9092) in Support of Plaintiffs' *Daubert* Motion to Exclude and/or Limit Proposed

Testimony of Defendant Saudi Arabia's Proposed Experts, Marc Sageman, David Rundell, and

Douglas Moss, Plaintiffs Motion (ECF No. 9091) should be granted.

Dated:  August 4, 2023                          Respectfully submitted,

MOTLEY RICE LLC                             COZEN O'CONNOR

By:  /s/ Robert T. Haefele                   By:  /s/ Sean P. Carter
Robert T. Haefele                            Sean P. Carter
Jodi Westbrook Flowers                       Stephen A. Cozen
Donald A. Migliori                           Scott Tarbutton
C. Ross Heyl                                 One Liberty Place
28 Bridgeside Boulevard                      1650 Market Street, Suite 2800
Mount Pleasant, South Carolina 29464         Philadelphia, Pennsylvania 19103
Tel.: (843) 216-9184                         Tel.: (215) 665-2105
Email: rhaefele@motleyrice.com               Email: scarter@cozen.com

*Liaison Counsel and Co-Chairs for the Plaintiffs'*     *Co-Chairs and Liaison Counsel of the Plaintiffs'*
*Executive Committee for Personal Injury and Death*     *Executive Committee for Commercial Claims on behalf*
*Claims on behalf of the Plaintiffs*                    *of Plaintiffs*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS

**<u>Certificate of Service</u>**

I hereby certify that, on August 4, 2023, I caused an electronic copy of the Plaintiffs' Reply Memorandum Of Law To Saudi Arabia's Opposition And In Further Support Of Plaintiffs' *Daubert* Motion To Exclude And/Or Limit Proposed Testimony Of Defendant Saudi Arabia's Proposed Experts, Marc Sageman, David Rundell, And Douglas Moss, and all accompanying papers, to be served electronically by the Court's Electronic Case Filing (ECF) System. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____

Robert T. Haefele

FILED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO FBI AND MDL PROTECTIVE ORDERS