REDACTED FOR PUBLIC FILING

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ———————————————— ) | |
| IN RE:  TERRORIST ATTACKS ON        ) | Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001                          ) | ECF Case |
| ———————————————— ) | |

This document relates to:  *All Actions*


## DEFENDANT KINGDOM OF SAUDI ARABIA'S OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE AND/OR LIMIT PROPOSED EXPERT TESTIMONY

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

REDACTED FOR PUBLIC FILING

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ iv

INTRODUCTION .........................................................................................................................1

BACKGROUND ............................................................................................................................3

I.      Marc Sageman ....................................................................................................................3

        A.      Sageman's Professional Background ........................................................................3

        B.      Sageman's Opinions ................................................................................................6

                1.      Rebuttal of Kohlmann .................................................................................7

                2.      Rebuttal of Meleagrou-Hitchens .................................................................8

                3.      Rebuttal of Nakhleh .....................................................................................8

                4.      Rebuttal of Youssef ...................................................................................10

                        a.      Youssef's opinions on "tradecraft" ...............................................11

                        b.      Youssef's opinions on phone contacts ..........................................11

                5.      Rebuttal of Simon .......................................................................................12

        C.      Sageman's Methodology ........................................................................................13

II.     David Rundell ...................................................................................................................16

        A.      Rundell's Professional Background ........................................................................16

        B.      Rundell's Opinions ................................................................................................18

                1.      Rebuttal of Dunham ...................................................................................19

                2.      Rebuttal of Simon .......................................................................................20

                3.      Rebuttal of Nakhleh ...................................................................................21

        C.      Rundell's Methodology ..........................................................................................21

III.    Douglas Moss....................................................................................................................22

        A.      Moss's Professional Background ............................................................................22

        B.      Moss's Opinions .....................................................................................................23

        C.      Moss's Methodology ...............................................................................................25

LEGAL STANDARD................................................................................................25

ARGUMENT .......................................................................................................26

I.      Sageman's Opinions Are Admissible ................................................................26

        A.      Sageman Is Qualified To Offer the Opinions in His Report.................................26

                1.      Al Qaeda and Saudi Arabia........................................................26

                2.      Islam in Saudi Arabia, MOIA, and Al Qaeda's Ideology..........................27

                3.      Other Terrorist Groups..........................................................28

                4.      Law Enforcement and Investigations...............................................30

                5.      Phone Records ...................................................................30

                6.      Arabic Culture and Language ....................................................33

        B.      Sageman's Opinions Are the Product of a Reliable Methodology ......................33

                1.      Sageman Discloses a Reliable Methodology.......................................33

                2.      Sageman Applies His Methodology Reliably.......................................34

                3.      Plaintiffs' Challenges to Sageman's Methodology Fail ..........................37

                        a.      Saudi Arabia and MOIA ................................................38

                        b.      Al Thumairy's role in Southern California................................40

                        c.      Al Jarrah's alleged supervision of MOIA employees....................42

                        d.      The King Fahad Mosque and Al Thumairy's
                                alleged "extremism"....................................................43

                        e.      Al Bayoumi's studies and alleged "covert" role.........................44

                        f.      Statements by known Al Qaeda members ...............................46

                        g.      Other methodological objections .......................................48

        C.      Plaintiffs' Other Challenges to Sageman's Opinions Fail ....................................56

**REDACTED FOR PUBLIC FILING**

II.    Rundell's Opinions Are Admissible ..................................................................58

    A.    Rundell Is Qualified To Offer the Opinions in His Report....................................58

    B.    Rundell's Opinions Are the Product of a Reliable Methodology .........................59

    C.    Plaintiffs' Other Challenges to Rundell's Opinions Fail ......................................61

III.    Moss's Opinions Are Admissible .......................................................................62

    A.    Moss's Opinion on the Visibility of the World Trade Center
       Is Reliable ...........................................................................................................62

    B.    Moss's Opinion on the Likely Uses of the Equation Is Reliable ..........................65

CONCLUSION....................................................................................................................66

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

CASES

*Aluminum Warehousing Antitrust Litig.*, *In re*, 336 F.R.D. 5 (S.D.N.Y. 2020),
    *appeal pending*, No. 21-954 (2d Cir.)................................................................31

*Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ............................48

*CFTC v. Wilson*, 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016)...................................................66

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................................................25, 26

*Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011)......................25, 32, 65

*Digital Music Antitrust Litig.*, *In re*, 321 F.R.D. 64 (S.D.N.Y. 2017)...........................................60

*Eastern Profit Corp. v. Strategic Vision US, LLC*, 2020 WL 7490107
    (S.D.N.Y. Dec. 18, 2020) ................................................................................63

*El Ansari v. Graham*, 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) ............................................61

*Fosamax Prods. Liab. Litig.*, *In re*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)..................................46

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).........................................................................25

*IBM v. BGC Partners, Inc.*, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013)............................28, 31

*Jacoby Airplane Crash Litig.*, *In re*, 2007 WL 5037683 (D.N.J. Aug. 27, 2007) ........................63

*Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543 (W.D.N.Y. 2005) .............................61

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................................46

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013)............................................26, 61

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558
    (S.D.N.Y. 2017)................................................................................................32

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010)..............................................................63

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016) ............................ 59-60, 62

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107 (2d Cir. 2006) ................38

*Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300 (S.D.N.Y. 2009) ................................................61

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008).............................................34

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)................................................25

*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006),
    *aff'd*, 313 F. App'x 347 (2d Cir. 2008) .........................................................26, 34

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...........................................29-30

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022)................................................44

*Zyprexa Prods. Liab. Litig.*, *In re*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ....................60


ADMINISTRATIVE DECISIONS

*Administration of the N. Am. Numbering Plan*, *In re*, 11 FCC Rcd 2588 (1995).........................56


RULES

Fed. R. Evid.:

    Rule 702 ........................................................................................................25

    Rule 703 ........................................................................................................47


LEGISLATIVE MATERIALS

*Confronting Al-Qaeda:  Understanding the Threat in Afghanistan and Beyond:
    Hearing Before the S. Comm. on Foreign Relations*, 111th Cong.
    (Oct. 7, 2009) ..................................................................................................5


ADMINISTRATIVE MATERIALS

Notice, Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650
    (Oct. 8, 1997) ................................................................................................29


OTHER MATERIALS

Mohamed-Ali Adraoui et al., *Between Salafism, Sectarianism and Violence:
    The New Faces of Radicalization*, in *International Panel on Exiting
    Violence – Final Report*, Ch. 3 (2021)............................................................ 27

Steve Coll, *Directorate S:  The C.I.A. and America's Secret Wars in Afghanistan and Pakistan* (Penguin Press 2018) ...................................................................5

Editorial Board:

    *Dynamics of Asymmetric Conflict*, https://www.tandfonline.com/action/journalInformation?show=editorialBoard&journalCode=rdac20 ......................................4

    *Terrorism and Political Violence*, https://www.tandfonline.com/action/journalInformation?show=editorialBoard&journalCode=ftpv20 ...........................................4

Amr Hamzawy & Sarah Grebowski, Carnegie Middle East Ctr., "From Violence to Moderation:  Al-Jama'a al-Islamiya and al-Jihad," Carnegie Paper No. 20 (Apr. 2010)..................................................................................................29

Stéphane Lacroix, *Awakening Islam:  The Politics of Religious Dissent in Contemporary Saudi Arabia* (Harv. Univ. Press 2011).....................................39

Nelly Lahoud, *The Bin Laden Papers:  How the Abbottabad Raid Revealed the Truth about Al-Qaeda, Its Leader and His Family* (Yale Univ. Press 2022) ...................46

Alexander Meleagrou-Hitchens, *Incitement:  Anwar al-Awlaki's Western Jihad* (Harv. Univ. Press 2020) ...............................................................................40

David Rundell, *Vision or Mirage:  Saudi Arabia at the Crossroads* (2020)................................17

Marc Sageman:

    "Confronting al-Qaeda:  Understanding the Threat in Afghanistan," 3 Perspectives on Terrorism 4 (Dec. 2009)  .......................................5, 27, 28, 30

    *Leaderless Jihad:  Terror Networks in the Twenty-First Century* (Univ. of Penn. Press 2008) ....................................................................4, 27, 30

    *Misunderstanding Terrorism* (Univ. of Penn. Press 2016)............................3, 4, 5, 30, 31

    *The London Bombings* (Univ. of Penn. Press 2019)....................................................4, 13

    *Turning to Political Violence:  The Emergence of Terrorism* (Univ. of Penn. Press 2017) ....................................................................4, 13

    *Understanding Terror Networks* (Univ. of Penn. Press 2004) .............4, 27, 28, 29, 30, 40

Neil Vigdor, *Witness to the unthinkable:  Greenwich Point onlookers recall the day the towers fell*, Greenwich Time (Sept. 12, 2011), *at* https://www.greenwichtime.com/news/article/Witness-to-the-unthinkable-Greenwich-Point-2164396.php......................................................................63, 64

## INTRODUCTION

Saudi Arabia proffers three experts to rebut Plaintiffs' seven.  The rebuttal reports demonstrate that Plaintiffs' experts' convoluted hypotheses about clandestine terror support networks and hidden terrorist sympathizers are flawed and unpersuasive.  Reliable expert analysis of the testimony of fact witnesses and the contemporaneous documents points to the same conclusion the FBI reached in closing its Operation Encore investigation:  neither Omar Al Bayoumi nor Fahad Al Thumairy knowingly assisted the 9/11 hijackers, and no one directed them to do so.  Similarly, reliable expert presentation of the historical, political, and religious context – including Saudi Arabia's longstanding security partnership with the United States, bitter enmity with Osama bin Laden and his followers, and firm opposition on Islamic grounds to terror attacks and suicide bombings – helps dispel the falsehoods about Saudi Arabia and Islam promoted by Plaintiffs and their experts.

Marc Sageman, a sociologist, psychiatrist, and former CIA officer, turned to the study of terrorism after the 9/11 attacks.  He has since published five peer-reviewed books and many shorter articles on the subject and has testified about Al Qaeda before the 9/11 Commission and Congress.  His combination of recognized scholarship and personal experience with clandestine operations supports his detailed dissection of Plaintiffs' experts' partisan narratives.  Plaintiffs' challenge to Sageman, which makes up almost all of their motion, consists largely of factual disputes and contentions that he failed to address certain pieces of evidence.  At most, such contentions would go to the weight of Sageman's testimony, not to its admissibility.  Any potential effect on weight, moreover, is undermined by Plaintiffs' pervasive errors and misstatements.  Again and again, they assert that Sageman ignores evidence that he in fact discusses, label as purported "*ipse dixit*" statements for which he in fact explains his reasoning, and mischaracterize or quote out of context sources they say contradict his opinion.

1

**REDACTED FOR PUBLIC FILING**

David Rundell was a U.S. diplomat for almost 30 years and was stationed in Saudi Arabia for 15 years, rising to the level of Charge d'Affaires at the U.S. Embassy in Riyadh. He received multiple decorations for his work.  Since retiring from service, he has written a peer-reviewed history of Saudi Arabia.  His deep knowledge of Saudi Arabia's politics, history, and religion supports his response to Plaintiffs' experts' false claims about Islam in Saudi Arabia and Saudi Arabia's security partnership with the United States.  He is also familiar with diplomatic norms and practices and can therefore speak on the propriety of Saudi Arabia's diplomatic and consular representatives promoting its religion.  Plaintiffs' cursory attempts to poke holes in Rundell's reasoning and charge him with bias are unpersuasive and do not come close to meeting the standards for excluding expert opinion.

Douglas Moss has more than 40 years of experience as a pilot, flight instructor, and consultant on aircraft accidents.  His report is narrow in scope, dealing only with the speculation of Plaintiffs' aviation expert Barry Schiff that an equation and calculations found in a notebook of Al Bayoumi's were part of the 9/11 plot.  Moss explains that the equation would not have been useful to the hijackers, the calculations do not match the hijackers' actual flight plan, and the notebook page is a better fit for high-school math homework than for aviation.  Plaintiffs fail to show that anything about his opinion is unreliable.

To the extent the Court excludes Plaintiffs' experts (as it should), Saudi Arabia's experts will not need to rebut them.  But if Plaintiffs' experts are allowed to testify in support of their speculative conspiracy theories, Saudi Arabia should be allowed to respond with a dose of reality.  Sageman, Rundell, and Moss are qualified to administer that needed remedy; their opinions fall well within the bounds of permissible expert opinion.  The Court should deny Plaintiffs' motion to exclude or limit their testimony.

## BACKGROUND

### I.    Marc Sageman

#### A.    Sageman's Professional Background

Marc Sageman is an expert on terrorism, political violence, and the Middle East, among other topics. He holds both an M.D., specializing in psychiatry, and a Ph.D. in sociology. Sageman CV 1.[1] He is currently a Senior Fellow with the Foreign Policy Research Institute's Center for the Study of Terrorism. *Id.* In the past, he has been a Senior Fellow with the George Washington University Homeland Security Policy Institute and a Senior Advisor with the Center for Strategic and International Studies. *Id.* He has taught semester-long courses on the social psychology of terrorism and on urban terrorism. *Id.* at 3. He has been invited to lecture on terrorism at Harvard University, the University of Chicago, the U.S. Naval Academy, and 18 other U.S. universities, as well as universities in 20 other countries. *Id.*

Sageman began his career practicing medicine and served in the Navy as a physician. *Id.* at 2. In 1984, he joined the CIA as a case officer, with assignments including Pakistan and India. *Id.* As a case officer, he operated in hostile territory and received training in and employed clandestine tradecraft. Sageman Tr. 308:7-309:4-5.[2] His role included supporting the efforts of the Afghan mujahedin against the Soviet invasion. Sageman Rep. 22-23; Ex. 59 (*Misunderstanding Terrorism*), at 2-3. In 1991, Sageman left the CIA and returned to medicine, including forensic psychiatry. Sageman CV 2. He also continued his studies in the social

---

[1] "Sageman Rep." refers to the Rebuttal Expert Report of Marc Sageman, served by Saudi Arabia on May 16, 2022, which is Plaintiffs' Exhibit 1. "Sageman CV" refers to the Curriculum Vitae served as Exhibit 1 to Sageman's report, which is Exhibit 57.

[2] "Sageman Tr." refers to the transcript of Sageman's deposition on June 27, 2022, excerpts from which are Exhibit 58.

sciences, joining the University of Pennsylvania's Solomon Asch Center for the Study of

Ethnopolitical Conflict.  *Id.*; Ex. 59 (*Misunderstanding Terrorism*), at 3-4.

After the 9/11 attacks, Sageman turned to the study of the social movement he refers to as

the "global neojihad," which includes the perpetrators of the 9/11 attacks, other attacks such as

the 1993 World Trade Center bombing, Al Qaeda more generally, and the more recent Islamic

State.  Sageman Rep. 23 & n.53; Ex. 59 (*Misunderstanding Terrorism*), at 4-5.[3]  He presented

his study of the causes of and motivations behind Al Qaeda's terrorist attacks to the National

Security Council and as an expert before the 9/11 Commission.  Ex. 60 (Sageman 9/11

Commission testimony), at 7-11; Ex. 59 (*Misunderstanding Terrorism*), at 6-7.  In 2004,

he published his first peer-reviewed book on terrorism:  *Understanding Terror Networks*.

Ex. 61 (*Understanding Terror Networks*), at vii-ix.  Since then, he has published four more

peer-reviewed books and three dozen shorter peer-reviewed works on terrorism, including

individually and jointly authored journal articles and book chapters.  Sageman CV 3-6.[4]  He

is a member of the editorial boards of the academic journals *Terrorism and Political Violence*

and *Dynamics of Asymmetrical Conflict*.[5]

---

[3] Sageman used the phrase "global Salafi jihad" in his early work, but later adopted the phrase "neojihad" as "a more accurate expression for the social movement that carried out the 9/11 attacks," recognizing that "the vast majority of Muslims worldwide reject the notion that it is a jihad."  Sageman Rep. 23 n.53 (cleaned up).

[4] His four books after *Understanding Terror Networks* are *Leaderless Jihad:  Terror Networks in the Twenty-First Century* (2008), Ex. 62 (*Leaderless Jihad*); *Misunderstanding Terrorism* (2016), Ex. 59 (*Misunderstanding Terrorism*); *Turning to Political Violence:  The Emergence of Terrorism* (2017); and *The London Bombings* (2019).  Sageman CV 4-5.

[5] *See* Editorial Board, *Terrorism and Political Violence*, https://www.tandfonline.com/action/journalInformation?show=editorialBoard&journalCode=ftpv20 (last visited June 19, 2023); Editorial Board, *Dynamics of Asymmetric Conflict*, https://www.tandfonline.com/action/journalInformation?show=editorialBoard&journalCode=rdac20 (last visited June 19, 2023).

**REDACTED FOR PUBLIC FILING**

Sageman has worked as a consultant or advisor on terrorism, and as an investigator of terrorist attacks, for U.S. and foreign law enforcement and intelligence agencies.  As examples, from 2006 to 2007 he consulted for the Secret Service, joining its National Threat Assessment Center; in 2007 he conducted field research on radicalization for the Air Force Research Laboratory; from 2008 to 2009 he was a scholar-in-residence for the New York Police Department; and from 2010 to 2013 he advised the Army on insider threats, including a role on the ground in Afghanistan as an adviser to the International Security Assistance Forces ("ISAF"). Sageman CV 2-3; *see* Sageman Rep. 546, 567 & n.2087, 713 (discussing Sageman's experience in these roles); Ex. 59 (*Misunderstanding Terrorism*), at 10-18 (same).[6]

In addition to his expert testimony before the 9/11 Commission, Sageman has previously been an expert witness on terrorism before the Beslan Commission, a Russian parliamentary body that investigated the terrorist seizure of a school; before the U.S. Senate Committee on Foreign Relations; and in 31 criminal, civil, and military cases.  Sageman CV 3; Ex. 64 (list of cases served with Sageman Report); Ex. 65 (*Confronting Al-Qaeda:  Understanding the Threat in Afghanistan and Beyond:  Hearing Before the S. Comm. on Foreign Relations*, 111th Cong. (Oct. 7, 2009)), at 9-23.  His Senate testimony described the results of a survey he conducted "of all the al-Qaeda plots in the West, all the al-Qaeda affiliate plots in the West and all the plots done 'in the name of al-Qaeda' in the West since the formation of al-Qaeda in August 1988," later discussed in his 2009 article, "Confronting al-Qaeda:  Understanding the Threat in Afghanistan."  *See* Ex. 66 (Sageman, "Confronting al-Qaeda"), at 5.

---

[6] *See also* Ex. 63 (Coll, *Directorate S*), at 607-24 (describing Sageman's work investigating "insider killings" for ISAF in Afghanistan, including reviewing the records of dozens of homicide investigations, review of "communication intercept evidence," and ultimately helping ISAF to "rewrite [its] standard operating procedures" to reduce threats).

## B.    Sageman's Opinions

Sageman rebuts opinions offered by five of Plaintiffs' expert witnesses:  Evan Kohlmann, Alexander Meleagrou-Hitchens, Emile Nakhleh, Bassem Youssef, and Steven Simon.  After describing his methodology, *see infra* pp. 13-16, Sageman gives a historical overview of the "mutual hostility" that grew into "outright belligerence," Sageman Rep. 26, between Saudi Arabia and Al Qaeda in the years leading up to the 9/11 attacks.  *Id.* at 26-133.  He summarizes the "complex and sometimes contradictory" record developed in jurisdictional discovery about events in Southern California in 1999 and 2000, seeking "to understand each piece of evidence in context of the totality of the evidence."  *Id.* at 133-34; *see id.* at 134-245.  Where different witnesses give different actual or alleged statements about the same events, or the same witness has given different actual or alleged statements, Sageman describes the different versions and factors that bear on the weight that might be given one as opposed to another.[7]

Applying his own knowledge of terrorism and terrorist organizations to that body of evidence, Sageman next reviews Plaintiffs' allegations and theories.  *Id.* at 245-422.  He also reviews the progress, investigative hypotheses, and conclusions of "Operation Encore," the FBI's recently closed investigation into Al Thumairy, Al Bayoumi, and Musaed Al Jarrah.  *Id.* at 422-501.  That investigation sought to prove the same allegations and theories that Plaintiffs advance in this case, but was closed when the FBI concluded that the three individuals "'did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack.'"  *Id.* at

---

[7] For example, when discussing Al Bayoumi's first meeting with Al Hazmi and Al Mihdhar in Los Angeles, Sageman sets out the "four versions of events" that Al Bayoumi gave at various times, which he finds "generally mutually consistent," Sageman Rep. 177-83; the "8 versions" given at various times by Kaysan Morgan, "which change[] significantly with each recounting," *id.* at 183-99; and the testimony of Smail Mana, *id.* at 199-200, who observed some but not all of the relevant events; *see also id.* 372-75, 377-78, 380-81, ██████, 392-93 (further analysis of statements by Al Bayoumi, Morgan, and Mana about the meeting, including ████████████████████████████████████████████████████.

6

454 (quoting Ex. 13 (Youssef Ex. 10), at 9-10).  Sageman further considers the conclusions of

other government investigations into the 9/11 attacks.  *Id*. at 501-03.  Relying on all of that

material, he then evaluates the opinions of Plaintiffs' experts.

1.       **Rebuttal of Kohlmann.**  Kohlmann opines on the purported "significance of

certain individuals, organizations, and movements" who Plaintiffs allege were "linked to key

subjects of the Operation Encore investigation."  Kohlmann Rep. ¶ 20.[8]  Most of Kohlmann's

report focuses on alleged terrorist connections or sympathies of individuals who are not alleged

to have been Saudi government officials, employees, or agents, and most of whom are not

alleged to have had any contact with the 9/11 hijackers.[9]  He attempts to show that Al Bayoumi,

Al Thumairy, and others associated with these individuals in one way or another, *see*, *e.g.*, *id.*

¶¶ 34, 59, 69, and opines that these associations support Plaintiffs' allegations that "forces within

the Saudi government genuinely identified with the ideals of violent jihad," *id.* ¶ 82.  Sageman

identifies flaws in Kohlmann's methodology and reasoning such as overreliance on "Operation

Encore material," to the exclusion of "the rest of the discovery material"; failure to "address . . .

significant contradictions between Operation Encore summaries of . . . previous interviews with

deponents and the testimonies of those deponents"; and characterizations of individuals as

"extremists and jihadists" without "defining what" those labels "mean[]."  Sageman Rep. 504;

*see id.* at 504-14 (further discussing Kohlmann's report).

---

[8] "Kohlmann Rep." refers to Kohlmann's report served by Plaintiffs on April 1, 2022, which is Plaintiffs' Exhibit 11.

[9] *See* Kohlmann Rep. ¶¶ 25-34 (Omar Hamerman); *id.* ¶¶ 35-42 (Ziyad Khaleel); *id.* ¶¶ 48-52 (Ali Al Khudayr and Ahmad Al Khalidi); *id.* ¶¶ 59-60 (Salman Al Awdah); *id.* ¶¶ 61-63 (Abdelaziz Al Khalidi and Sulayman Al Khalidi); *id.* ¶¶ 64-68 (███████████; *id.* ¶¶ 69-71 (Osama Basnan); *id.* ¶¶ 72-74 (Abdolrahman Barzanjee); *id.* ¶¶ 75-78 (Mustafa Mohammed Krer).

**REDACTED FOR PUBLIC FILING**

2.      **Rebuttal of Meleagrou-Hitchens.**  Meleagrou-Hitchens opines that Anwar

Al Awlaki assisted the 9/11 hijackers on the West Coast "at the request of individuals linked to

Saudi Arabia's Embassy and Consulate."  Meleagrou-Hitchens Rep. ¶ 22.[10]  Sageman points to

assumptions that Meleagrou-Hitchens makes without supporting evidence, such as his assertions

that Al Bayoumi had "some sort of nefarious or clandestine status" in San Diego; and that the

individuals who allegedly assisted the hijackers "were somehow organized into a support

network."  Sageman Rep. 515, 522.  Sageman shows that Meleagrou-Hitchens relies for key

propositions on unreliable sources, such as unsupported statements attributed to confidential

human sources and by Plaintiffs' retained investigators, *id.* at 516, and makes errors about Al

Bayoumi's education and employment, misidentifying him as "a Saudi Wahhabi propagator or

preacher," *id.* at 519.  Analyzing the proffered bases for Meleagrou-Hitchens' opinions, Sageman

concludes that Meleagrou-Hitchens has pointed to "no evidence that officials in the KSA

government instructed or directed [Al Awlaki] to assist the future hijackers."  *Id.* at 523.

3.      **Rebuttal of Nakhleh.**  Nakhleh opines that "the state religion of Saudi Arabia,"

for which he uses the term "Wahhabism," supports "acts of violent jihad . . . which the rest of the

world labels unambiguously 'terrorism,'" including attacks against "citizens of the United States

and its allies."  Nakhleh Rep. ¶¶ 28, 29, 34.[11]  As Saudi Arabia has explained in moving to

exclude Nakhleh's testimony, the term "Wahhabism" is derogatory; a more reasonable term

(beyond simply "Islam") is "Hanbali Salafism," a phrase that includes a spectrum of beliefs.  *See*

KSA Mot. 8-9 & n.5, 36-37.  After commenting that Nakhleh's report displays "blatant prejudice

_____

[10] "Meleagrou-Hitchens Rep." refers to the version of the report served by Plaintiffs
on April 1, 2022, which (together with a May 11, 2022 errata sheet) is Exhibit 6.

[11] "Nakhleh Rep." refers to the version of Nakhleh's report served by Plaintiffs on
May 14, 2022, which is Exhibit 4.

REDACTED FOR PUBLIC FILING

against Saudis," Sageman Rep. 525-26, Sageman explains its methodological and analytical errors:  Nakhleh "confuses Saudi Salafi doctrines with neojihadi doctrines," when the two are in fact "opposed," *id.* at 526; "lump[s] all Saudi Salafis into the same group," *id.*; *see also id.* at 534; and commits "an anachronism by projecting back into [historical] Hanbali scholars" Ibn Taymiyyah and Ibn Abd Al Wahhab "the concept of the global neojihadi," *id.* at 530.[12]  Sageman rebuts Nakhleh's description of the Ministry of Islamic Affairs ("MOIA") as "'serving al-Qa'ida's and other jihadists' agenda,'" *id.* at 526-27 (quoting Nakhleh Rep. ¶ 99), by pointing to bin Laden's opposition to MOIA's creation and to the views of "prominent scholars of Saudi Salafism and [of] the period of the Sahwa insurrection," who interpreted MOIA's creation as a way to "spread a quietist version of Salafism loyal to the royal family," *id.*; *see also id.* at 80-83, 267-69 (background on MOIA).

Nakhleh further opines that the 9/11 hijackers received assistance from a purported "Saudi 9/11 support network," including Al Bayoumi and Al Thumairy.  Nakhleh Rep. ¶ 233. Sageman examines Nakhleh's proffered support for this opinion and shows that it is based not on evidence but instead on Nakhleh's own "assumption[s]," "beliefs," and "speculation," combined with non-authoritative FBI documents that present investigative hypotheses and rely on hearsay statements attributed to unknown individuals.  Sageman Rep. 534-36, 542-43, 546-58.  Sageman also points to statements by Nakhleh that imply that he "has not reviewed" or is not "familiar

---

[12] Sageman points out that, in identifying Al Qaeda's beliefs with historical Salafi thinkers, Nakhleh himself is "adopting the rationale [of] global neojihadis like bin Laden," Sageman Rep. 530, which Saudi Arabia has long rejected as a grotesque distortion of its faith.

with . . . discovery material" that contradicts or fails to support his assertions, *id.* at 546, 548; and to Nakhleh's lack of any "methodology except for appeal to his alleged expertise," *id.* at 558.[13]

Nakhleh opines that "most of the Saudi government witnesses and other Saudi nationals appearing in the present proceedings" were "case[s] in point" of "jihadists" who "lie . . . without any remorse or compunction," accusing Al Thumairy specifically of "conscious[ly] . . . dishonest and misleading" testimony based on purported experience in observing the "demeanor" of witnesses being "interrogated by hostile captors."  Nakhleh Rep. ¶¶ 154, 157, 165.  Sageman explains that Nakhleh has no evidentiary basis to call Saudi Arabia's witnesses "jihadists" and no scientific basis for his purported ability to act as a "lie detector."  Sageman Rep. 536-39; *see id.* at 537 ("As a board certified forensic psychiatrist, I've reviewed the scientific literature on such claims of being able to detect the truth, and these claims always fall short.  There is no substitute for confronting what people say with empirical evidence for each and every claim.").

**4.    Rebuttal of Youssef.**  Youssef primarily opines that "the Kingdom of Saudi Arabia through its officials knowingly provided critical support and cover for Sunni Islamic extremists, including Al Qaeda, to safely and covertly operate a terror network inside California"; and that "[t]he network provided substantial assistance to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar upon their arrival in the U.S., understanding that the two were Al Qaeda operatives."  Youssef Rep. 9; *see id.* at 239-44.[14]  Sageman describes "many methodological problems" with Youssef's approach, including his "very selective" and

---

[13] *See* Sageman Rep. 548, 550-51, 555, 557-58 (examples of Nakhleh's failure to consider discovery material contrary to his conclusions); *id.* at 523, 525, 531-32, 542 (examples of Nakhleh's lack of methodology).

[14] "Youssef Rep." refers to the version of Youssef's report served by Plaintiffs on May 3, 2023, which is Exhibit 1.

"one-sided" "use of evidence" and his "adopt[ion of] Operation Encore's speculations and investigative hypotheses from its internal documents as facts." Sageman Rep. 724.[15]

> a.    **Youssef's opinions on "tradecraft."**  To support his conclusions, Youssef opines about Al Qaeda's purported "tradecraft" and about "tradecraft" supposedly used by individuals such as Al Bayoumi.  *E.g.*, Youssef Rep. 85, 160-61, 182, 192, 234, 242.  Sageman responds that Youssef's report shows a lack of familiarity with "clandestine tradecraft" generally or "AQ" – that is, Al Qaeda – "tradecraft, tactics, and modus operandi" specifically.  Sageman Rep. 602, 609; *see also id.* at 652 (criticizing Youssef's description of Al Qaeda as leaving "'[n]othing . . . to chance,'" Youssef Rep. 160, as closer to "Hollywood" than to "reality").  For example, Sageman explains that Al Bayoumi's communication "pattern" with the Embassy "is not compatible with an agent or asset reporting to his case officer 'on a day-to-day basis,'" Sageman Rep. 602-03 (quoting Youssef Rep. 84); that Youssef's opinions about Al Qaeda "advance team[s]" are inconsistent with Al Qaeda's other actions in connection with the 9/11 attacks and other terrorist attacks, *id.* at 611-14, 624-25; and that Youssef fails to account for Al Qaeda's practice of keeping information in discrete "compartment[s]," *id.* at 651, 697, 708.[16]

> b.    **Youssef's opinions on phone contacts.**  Youssef also purports to draw conclusions by analyzing telephone calls allegedly involving Al Bayoumi, Al Thumairy,

---

[15] *See* Sageman Rep. 575-77, 583, 589, 598-99, 604, 618, 665-66, 680 (examples of Youssef's selective reliance on discovery material); *id.* at 596-97, 599, 614-15, 635, 711 (examples of Youssef's misidentification of Operation Encore investigative hypotheses either as conclusions of the FBI or as facts).

[16] Sageman's discussion of Al Qaeda's practices and modus operandi is supported by earlier parts of his report that discuss how Al Qaeda scouted targets and how it kept information about attacks (including the 9/11 attacks) in tight organizational compartments.  *See* Sageman Rep. 129-30 (statements by bin Laden and Khalid Sheikh Mohammed); *id.* at 249-51 (Al Qaeda manual found in Manchester, England); *id.* at 251-59 (examples of other Al Qaeda operations); *id.* at 260-61 (discussion of Al Qaeda's actual support personnel for the 9/11 attacks in Dubai).

and others.  *E.g.*, Youssef Rep. 125-40, 145-47, 150-54.  Sageman points out ways in which

Youssef's telephone analyses are unreliable and unpersuasive.  Those include Youssef's

implausible hypotheses that Al Thumairy used a "'front man'" to "hide his relationship with

al-Bayoumi" by making calls using a cell phone for which Al Thumairy was not the subscriber

during the same period when Al Bayoumi's and Al Thumairy's personal cell and residential

phone records show calls, Sageman Rep. 627-29; and that Al Bayoumi "wrote down . . . alleged

clandestine contacts in [a] phone book" that he then "made . . . available to volunteers at the

Al Madina Mosque," *id.* at 629.

Sageman also discusses innocent explanations for actual or alleged phone contacts that

Youssef opines must have been about alleged support for the 9/11 hijackers.  As one example,

when Al Bayoumi and Al Thumairy had contacts during Ramadan – a time when imams were

visiting Southern California – Sageman explains that it "seems far more reasonable that [the

calls] were about [the] visiting Islamic scholars" than that they "'related to providing assistance

to Hazmi and Mihdhar in California.'"  *Id.* at 631-32 (quoting Youssef Rep. 128).  As another

example, when Al Bayoumi "dramatically increased the number of his calls to the [E]mbassy,"

Sageman explains that the calls likely related to "administrative" matters such as "authenticating

. . . multiple school records to be able to continue [Al Bayoumi's] education[] . . . before the end

of March 2000."  *Id.* at 676-77 & n.2290 ("The administrative nature of [the] calls is supported

by the numerous documents about [Al Bayoumi's] education bearing a KSA [E]mbassy stamp

from March 2000.").

     **5.**    **Rebuttal of Simon.**  Simon opines that Saudi Arabia "is not an 'ally' of the

United States" and that the relationship between the two countries, "while close and long-lasting,

should be understood as transactional," Simon Rep. ¶¶ 11-12;[17] that Saudi Arabia prior to the 9/11

attacks "systematically evaded and denied [U.S.] requests" for cooperation, *id.* ¶ 14; and that the

United States warned Saudi Arabia prior to the 9/11 attacks that "it was stoking the fires of

extremism," *id.* ¶ 20.  Sageman responds that Simon's description of the U.S.-Saudi relationship

"is true of the relationship among all countries" because all "[c]ountries pursue their self-

interest," Sageman Rep. 725; that some U.S. demands for cooperation "infringed on Saudi

sovereignty," *id.* at 725-26; and that, in describing Saudi religious "doctrine," Simon, like

Nakhleh and Youssef, erroneously fails to "distinguish between . . . the political rejectionist

doctrine that resonated with [Al Qaeda's] followers[ ] and the quietist non-political doctrine

promoted by [Saudi Arabia]," *id.* at 726.

C.      **Sageman's Methodology**

Sageman applies the same methodology for analyzing terrorist attacks that he used in

*Turning to Political Violence* and *The London Bombings*, two of his peer-reviewed books

published by the University of Pennsylvania Press.  Sageman Rep. 2 & n.1.  That methodology

entails "carefully analyz[ing]" allegations "by weighing them against the totality of the

information available in the discovery material and in the larger set of evidence about terrorism

and specifically [Al Qaeda] terrorism and the 9/11 attacks," and then "conclud[ing] with an

opinion that fits most closely this full, nuanced, and complex set of evidence."  *Id.* at 22.

Sageman "privilege[s] primary sources" over other types of sources.  *Id.* at 2.  "A primary

source is an artifact, such as a document, image, or recording or any source of information that

was created at the time of the event under study"; "is the original source of information about a

---

[17] "Simon Rep." refers to the (Corrected) Expert Report of Steven N. Simon, served by
Plaintiffs on April 8, 2022, which is Plaintiffs' Exhibit 13.

specific topic"; and is "distinguished from secondary sources, which cite, comment on, or build upon primary sources." *Id.* at 2-3.[18]  For example, a document is a primary source on its own contents, and a "videotape or sound recording" of an event would be a primary source on what happened during that event. *Id.* at 3-4.  Although eyewitnesses are sometimes called primary sources on events they witnessed, Sageman considers even eyewitness testimony to be a secondary source because it "can be given years after the event and [is] therefore vulnerable to distortions of hindsight or degrading memory." *Id.* at 3.  Accordingly, Sageman considers each secondary source's "distance from the event or topic under study." *Id.*

Many of the sources at issue here are not even secondary but "tertiary," "quaternary," or even further removed. *Id.* at 3-4.  For example, FBI memoranda summarizing interviews are "at best tertiary accounts" because they are "subject to possible distortion, misunderstanding, and inaccuracies between the [witness] . . . and the FBI agent who wrote the summary." *Id.* at 4.  In considering such sources, Sageman explains that it is necessary to consider "many factors, including the conduct of the interview, the mode of memorializing it at the time of the interview, and the transcription from the notes to the summary." *Id.* at 6.  "[P]roducts that are generated from these summaries of interviews," such as "analyses[,] . . . summaries, or updates," are "further removed . . . and must be considered quaternary sources." *Id.* at 4.

To illustrate an appropriate analysis, Sageman gives the example of Al Bayoumi's interview with the London Metropolitan Police Service ("MPS"), which, unlike most other contemporaneous statements, was recorded and transcribed. *Id.* at 6-11.  Sageman uses the

---

[18] Sageman's reason for privileging primary sources turns on reliability.  As he explains, "[t]he more links there are in a chain of information from the original source, the greater the likelihood of distortion in the last source in relation to the original source," and "[t]he more removed a source is from the referred event, the lesser the reliability of the source."  Sageman Rep. 3.

REDACTED FOR PUBLIC FILING

transcript to show how Al Bayoumi "remembered new details" as the interview progressed, *id.* at 7; how some "crucial detail[s]" were left unclear by the use of "ambigu[ous]" terms like "there," *id.* at 8; and how "cultural distance" introduced confusion on issues such as recognizing last names or interactions between male and female relatives and acquaintances, *id.* at 9-11, and the degree of closeness implied by the word "friend," *id.* at 12.

Sageman then further explains how summaries of interviews that are not recorded or transcribed introduce additional factors:  failures to note how the interviewer "guides" or gives "hints" to the witness, *id.* at 12-13; "handwritten notes" that do not and cannot capture all of an interview, *id.* at 13; delay between the preparation of the notes and the preparation of the summary, including delays in this case of "week[s]" or even "month[s]," *id.*; and, sometimes, a lack of information about the witness's sources of knowledge, *id.* at 13-14.  Sageman also observes that the witnesses in this case were never given "an opportunity to review, fact check, correct, or clarify the records written by FBI agents" and that depositions revealed "many significant discrepancies between the facts as stated by the deponents and the contents of various FBI summaries."  *Id.* at 15.[19]

To deal with such uncertainties, Sageman "compare[s] a specific source's information with other sources' information and evaluate[s] . . . respective reliability in terms of access to the events referred to in the information and compatibility with the rest of the evidence in the totality of the discovery material, especially evidence with more robust reliability."  *Id.* at 14-15.  In some instances, "where it [i]s difficult to evaluate the reliability of one version of a given event,"

---

[19] Sageman notes particular instances in which FBI interview summaries are "not consistent with the totality of the rest of the discovery material"; in which "some FBI agents persistently and extensively 'cut and pasted' . . . from previous summaries"; and in which there are multiple "FD 302s of the same interview, with the same person, at the same place and the same time, but with widely different topics of discussion."  Sageman Rep. 16-17.

he instead "list[s] . . . various accounts given by different people over the years about the same event," attempting "to allow the reader to appreciate the complexity of the discovery material and help approximate what might have happened." *Id.* at 15.  He also stresses the importance of "cross-check[ing]" all sources, including both depositions and FBI summaries, and "compar[ing]" them "for consistency with other information found reliable." *Id.* at 16.

In applying his method to this case, Sageman "sifted through as much evidence from the discovery material" as he "could," including but not limited to "all relevant FBI documents and witness depositions." *Id.* at 22.  He "specifically searched for evidence incriminating [Saudi Arabia] as supporting the future hijackers who came to Southern California in early 2000," including the evidence highlighted "by the plaintiffs' relevant complaints and experts." *Id.*; *see id.* at 21 ("Experts . . . cannot just select documents that only support their side of an argument.").  Sageman then considered Plaintiffs' "allegations . . . against the totality of the information available in the discovery material," as well as "the larger set of evidence about terrorism and specifically [Al Qaeda] and the 9/11 attacks." *Id.* at 22.

## II.   David Rundell

### A.   Rundell's Professional Background

David Rundell is an expert on Saudi Arabia, on U.S.-Saudi relations, on Saudi Arabia's relationship with bin Laden and Al Qaeda in the 1990s and early 2000s, and on diplomatic norms and practices during the 1990s and early 2000s.  Rundell Rep. 1-2.[20]  He holds a master's degree in Modern Middle East Studies from Oxford University and received advanced economic training at the Foreign Service Institute.  Rundell CV 3.  He developed his expertise during

---

[20] "Rundell Rep." refers to the Rebuttal Expert Report of David Henry Rundell, served by Saudi Arabia on May 16, 2022, which is Plaintiffs' Exhibit 2.  "Rundell CV" refers to the Curriculum Vitae served as Exhibit 1 to Rundell's report, which is Exhibit 67.

nearly three decades of service with the U.S. State Department, including 15 years in Saudi Arabia.  *See* Rundell Rep. 1; Rundell CV 1-3.  He has also published a peer-reviewed book on Saudi Arabia:  *Vision or Mirage:  Saudi Arabia at the Crossroads* (2020), *see* Ex. 68 (*Vision or Mirage*), which one scholarly reviewer called "'a deeply learned and nuanced account of the Kingdom's history, politics and economics,'" Rundell Rep. 2 (quoting Bernard Haykel, Professor of Near Eastern Studies at Princeton University).

From 1980 to 2002, Rundell served as a Foreign Service Officer.  Rundell CV 3. He spent seven years stationed in Saudi Arabia in political, economic, and commercial roles, including in Riyadh "as a political officer . . . during the early years of Saudi-American cooperation in Afghanistan"; and in Jeddah as "the principal reporting officer on the *Sahwah*, a Muslim-Brotherhood-inspired protest movement which emerged in Saudi Arabia following Operation Desert Storm."  Rundell Rep. 1.  He also "worked on the Saudi account in the State Department's Office of Congressional Relations" and "in the Regional Affairs Office of the State Department's Near East Bureau," with "specific responsibility for following Political Islam and other pan-Islamic movements," including "the anti-Soviet jihad in Afghanistan."  *Id.*

Beginning in 2002, Rundell moved into senior positions in the American Mission in Saudi Arabia.  Rundell CV 1-2.[21]  From 2002 to 2004, he served as Commercial Counselor, with responsibility for "help[ing] American firms identify emerging business opportunities, structure strategic partnerships and resolve trade disputes."  *Id.* at 2.  The State Department awarded him the Charles Cox Award, its "highest award for commercial work."  *Id.*  From 2004 to 2006, he served as Economic Counselor, "[w]ork[ing] closely with the Ministry of Finance and [the Saudi

---

[21] *See* Rundell CV 1 ("The American Mission in Saudi Arabia consists of an Embassy and two consulates with over 800 employees and an annual budget of 52 million dollars.").

**REDACTED FOR PUBLIC FILING**

Arabian Monetary Authority] to eliminate funding to terrorist organizations." *Id.* From 2006 to 2008, he served as Political Counselor, with "primary responsibility" for the Embassy's relationships with Saudi Arabia's Ministry of Foreign Affairs and Ministry of Interior. *Id.* at 1-2. From 2008 until his retirement from the State Department in 2009, Rundell served as the Charge d'Affaires and Deputy Chief of Mission. *Id.* at 1.

For his work in Saudi Arabia during his State Department career, Rundell received three "Superior Honor Awards" – "an unequalled record of single-country specialization, not only in Saudi Arabia, but in any country." Rundell Rep. 1. For example, during his time as the Political Counselor, he received one for his "'outstanding political reporting and policy recommendations designed to promote both American interests and Saudi security.'" Rundell CV 2.

Since retiring from the State Department in 2010, Rundell has provided consulting services related to Saudi Arabia in various capacities, including individually, as an employee at a Boston-based consulting firm called Monitor, and as a Partner at Arabia Analytica. *Id.* at 1; Rundell Tr. 38:11-39:9, 40:12-41:3, 62:14-63:23.[22]

**B.      Rundell's Opinions**

Rundell rebuts opinions offered by three of Plaintiffs' experts – Lawrence Dunham, Steven Simon, and Emile Nakhleh. As background for those rebuttals, his report initially provides a historical summary of Islam as it relates to politics in Saudi Arabia. He begins by discussing the roots of Saudi religious thought in the teachings of Mohammad Ibn Abd Al Wahhab, Rundell Rep. 3-7, whose "ideas remain central to the thinking of the Saudi religious establishment today," *id.* at 7. He explains the role of Islam in the founding of Saudi Arabia and the role of the religious establishment in promoting "the principle of obedience to the King" and

---

[22] "Rundell Tr." refers to the transcript of Rundell's deposition on June 10, 2022, excerpts from which are Exhibit 69.

"strong stable government" as well as repeatedly condemning "al-Qaeda," "terrorism," and "suicide bombing." *Id.* at 9-10.

Rundell contrasts that history to that of the non-Saudi "theologians and ideologues" who "al-Qaeda[ ] . . . terrorists actually followed," *id.* at 10, such as Hassan al-Banna, the "found[er] of the Society of Muslim Brothers," *id.* at 13; Sayyid Qutb, a "harsh critic of Western imperialism, Zionism, and the Egyptian government" who "reinterpreted traditional Islamic concepts to legitimize revolution," *id.* at 14-15; and Abu'l A'la Mawdudi, an Indian "political activist" who founded the "Islamic Society (*Jam'at Islami*)," with the "ultimate goal [of] recreat[ing] a caliphate," *id.* at 17.  Rundell explains that, as early as "the 1970s," "the form of political and militant Islam that most influenced al-Qaeda had already diverged entirely from the Hanbali Salafism" of "the political and religious leadership of Saudi Arabia." *Id.* at 21.

Rundell describes the more recent events that led to the founding of Al Qaeda, including "the radicalization of political Islam" in connection with "the anti-Soviet jihad in Afghanistan" in the 1980s and early 1990s, *id.* at 21-22; bin Laden's break with the Saudi government, including King Fahd's 1994 "decree stripping Osama bin Ladin of his Saudi citizenship," *id.* at 26; bin Laden's 1996 "Declaration of War" against "Americans" and his "harsh condemnation of the Saudi government" for supporting the United States, *id.* at 26-27 (italics omitted); and the unsuccessful 1998 and 1999 efforts of the United States and Saudi Arabia to extradite bin Laden from Afghanistan, *id.* at 27-30.  He also discusses Al Qaeda's post-2001 attacks in Saudi Arabia and efforts to "topple" Saudi Arabia's government, *id.* at 30, and the support that the Saudi religious establishment provided for the Saudi government, *id.* at 30-32.

      **1.**     **Rebuttal of Dunham.**  Dunham opines that the Saudi government's "practice of posting religious personnel in diplomatic status in the U.S." was "contrary to established

diplomatic law and U.S. guidelines." Dunham Rep. 12.[23] Rundell, himself an experienced U.S. diplomat, responds that "diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population." Rundell Rep. 32. For Saudi diplomats, that includes Islam, which is "the core ideology of Saudi Arabia." *Id.* at 33. Rundell also explains that "[t]he United States has itself, at various times, promoted religion both directly and indirectly," and currently "has thousands of State Department employees promoting American cultural values abroad," including "in cities where [the United States] maintain[s] no embassy or consulate." *Id.*

**2.      Rebuttal of Simon.**  Rundell responds to Simon's opinions on the U.S.-Saudi relationship, *see supra* pp. 12-13, which he rejects as "unbalanced," "inflammatory," "misleading," and "factually inaccurate."  Rundell Rep. 3.  Rundell explains that Saudi Arabia's "own security depends" on its "longstanding strategic relationship with the United States, . . . which the government of Saudi Arabia would not readily jeopardize," *id.* at 34, and that "[t]he Saudis have in fact often supported U.S. policies which they believed undermined their own interests," *id.* at 38.  As for Simon's claims concerning the Saudi government's alleged lack of cooperation with the United States on terrorism prior to the 9/11 attacks, *see supra* p. 13, Rundell notes that "[t]he Saudis often complained that the United States was asking them to place financial sanctions on Saudi citizens based on very limited information, or at least very limited information that [the United States] w[as] willing to share with them," Rundell Rep. 38.  Further, Rundell criticizes Simon for his "complete lack of any mention of Saudi cooperation in [U.S.] efforts to neutralize Osama bin Ladin before September 11, 2001."  *Id.* at 39.

---

[23] "Dunham Rep." refers to the Expert Report of Lawrence Dunham, served by Plaintiffs on April 1, 2022, which is Plaintiffs' Exhibit 9.

3.     **Rebuttal of Nakhleh.**  Rundell responds to Nakhleh's opinions, *see supra* pp. 8-9, on "Saudi Arabia's history, politics and religion during the 1990s," describing Nakhleh's views as "fundamentally flawed."  Rundell Rep. 3.  Rundell opines that Nakhleh's discussion of Islam in Saudi Arabia "conflate[s] a very diverse range of opinions," *id.* at 40, and gives "a very inaccurate depiction of the views held by the leading Saudi religious scholars, the Saudi government and the vast majority of the Saudi population," *id.* at 42; and that "the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and very specifically those that involve suicide," *id.*

Further, Rundell explains that "the Ministry of Islamic Affairs was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family," and that Nakhleh's mischaracterization of the history leading to its creation "reveals a complete lack of understanding about events in Saudi Arabia."  *Id.* at 45. Further, responding to Nakhleh's claims that Al Thumairy made implausible statements about his religious knowledge and beliefs at his deposition, Rundell discusses the "inherent difficulties in discussing nuanced religious doctrines through a translator in an adversarial setting," *id.* at 46, and opines that Al Thumairy's answers can be read to reflect "disagreement" with the use of Islam as a "justification for attacks" rather than lack of understanding of Islam, *id.* at 46-47.

C.     **Rundell's Methodology**

To conduct his analysis, Rundell reviewed the reports for the experts he sought to rebut, "as well as the relevant primary and secondary sources."  Rundell Rep. 2.  He then "appl[ied]" his wide-ranging "personal experience," including "many years of study, working and residing in Saudi Arabia and extensive interactions with the government of Saudi Arabia."  *Id.* at 2-3.

III.     **Douglas Moss**

A.     **Moss's Professional Background**

Douglas Moss is a professional pilot and flight instructor with experience in accident

reconstruction.  Moss Rep. 2-3; *see* Moss CV.[24]  He holds engineering-related bachelor's and

master's degrees from the Georgia Institute of Technology, and an Aviation Safety and Security

Certificate from the University of Southern California.  Moss CV 3.[25]  He is a graduate of the

U.S. Air Force Test Pilot School.  *Id.*

From 1977 to 1990, Moss served in the U.S. Air Force.  *Id.* at 2-3.  He was a fighter pilot,

a test pilot, and a project manager at the U.S. Air Force Flight Test Center, and an instructor

at the U.S. Air Force Test Pilot School.  *Id.*  As an instructor, he was "[r]esponsible for the

development and instruction of the Flying Qualities syllabus for both flight and academic

instruction," among other roles.  *Id.* at 2.  After leaving active duty in 1990, he continued to

serve in the Air Force Reserves as an instructor at the Test Pilot School.  *Id.*

From 1990 to 1997, Moss worked at the Douglas Aircraft Company, a division of the

McDonnell Douglas Corporation.  Moss Rep. 2; Moss CV 2.  There, he "conducted flight

testing of new and modified commercial aircraft designs" and "assisted with the design of new

equipment and aircraft and instructed customer airline pilots."  Moss Rep. 2; Moss CV 2.

In 1997, Moss joined United Airlines, ultimately reaching the rank of Captain.  Moss CV

1.  As a Captain on Boeing 757 and 767 aircraft, he was "responsible for the operation of the

airplane and the safety of its passengers and crew."  Moss Rep. 2.  At United, Moss also served

---

[24] "Moss Rep." refers to the Rebuttal Expert Report of Douglas M. Moss, served by Saudi
Arabia on May 16, 2022, which is Plaintiffs' Exhibit 3.  "Moss CV" refers to Moss's Curriculum
Vitae, which is appended to the report and included in Plaintiffs' Exhibit 3.

[25] Moss also has a J.D. and an M.B.A.  Moss CV 3.

as a flight engineer on a variety of aircraft, *id.*, and provided instruction to pilots assigned to

United's Airbus A320 and Boeing 777 fleets, Moss CV 1.  He retired from United in 2018.  *Id.*

Since 2005, Moss has been the Managing Member of AeroPacific Consulting LLC

("AeroPacific"), "[p]rovid[ing] technical assistance and consulting services to various

organizations regarding aviation, such as aircraft accident analysis, airport land-use issues,

and operational factors."  *Id.*; *see* Moss Rep. 2 (AeroPacific "provides aviation-related accident

investigation . . . services"); *id.* at 3 ("I have been in the business of conducting airplane accident

analysis since 2005.").  Since 2009, he has taught in the Aviation Safety and Security Program at

the University of Southern California's Viterbi School of Engineering.  Moss CV 1.

### B.      Moss's Opinions

Moss rebuts opinions offered by Plaintiffs' expert Barry Schiff.  Schiff opines that the

equation and calculations on a single page from a notebook found in a search of Al Bayoumi's

apartment in Birmingham, England in September 2001 "are consistent with preparations made

as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying

out those attacks."  Schiff Rep. 2.[26]  Moss responds that the equation is "commonly used in . . .

algebra and geometry classes" but "is *not* commonly used in the aviation industry"; that pilots

have "no need . . . to calculate line-of-sight distances based on altitudes"; and that no "mention

of using the [e]quation" appears in any of "the foundational publications and handbooks used by

pilots."  Moss Rep. 8-9.  Moss explains that – instead of the equation – the 9/11 hijackers likely

used Very High Frequency Omni Range ("VOR") navigation to fly to the general area of their

targets.  *Id.* at 16-17.  Once there, they likely used landmarks (such as the Hudson River,

Manhattan Island, New York skyline, and Twin Towers) to "visually navigate[ ]."  *Id.* at 19;

---

[26] "Schiff Rep." refers to the report served by Plaintiffs on April 1, 2022, which is
Exhibit 10.

*see id.* at 14.  Moss also explains that the flight paths taken by the hijackers do not match use

of the equation or the other numbers in Al Bayoumi's notebook, *id.* at 7, 18-19; that "there is

nothing written" showing that Al Bayoumi even "calculated the solution to the equation," *id.* at

7; and that the hijackers' actual flight path shows that they flew at altitudes far exceeding the

altitude that the equation implies they should be at to see their targets, *id.* at 13-14, 16.

Schiff opines that the equation provides "a reasonably accurate approximation of how far

a pilot can see an object on the ground from a given aircraft altitude."  Schiff Rep. 2.  Moss

responds that the equation provides only a geometric relationship between an observer in the sky

and the distance to the horizon.  *See* Moss Rep. 8-9; Moss Tr. 68:4-16 (testifying the equation

"would be inappropriate" to determine "what distance you would be able to first see a target").[27]

How far away a pilot can actually "see" an object is "more affected by the refraction, absorption,

and distortion in the atmosphere," and how far away a pilot can actually "recogniz[e]" an object

is determined by the relative size of the object and distance to the object.  Moss Rep. 8-11.  Moss

explains that, based on his own flight experience, he would not expect to see large landmarks

like the Pentagon or the World Trade Center until within 5 to 10 miles.  *Id.* at 11, 19.  But using

the equation would inaccurately suggest that, at 1,650 feet of altitude, a pilot would be able to

see an object 50 miles away; and, at 3,234 feet, an object 70 miles away.  *Id.* at 11.[28]

---

[27] "Moss Tr." refers to the transcript of Moss's deposition on June 10, 2022, excerpts from which are Exhibit 70.

[28] Moss also explained that the flight path of American Airlines Flight 77 (which crashed into the Pentagon) indicated the hijackers did not "recognize[ ]" the Pentagon until they were within 4.2 miles.  Moss Rep. 14-16.  By contrast, the equation implies the hijackers could have seen the Pentagon from 190 miles away.  *Id.* at 16.

C.      **Moss's Methodology**

Moss's rebuttal opinions are based on his "personal and professional experience as a

pilot," Moss Rep. 19, which he applied to the information in Al Bayoumi's notebook, as well as

other relevant "pieces of information," such as the flight-path studies for the 9/11 attacks, Moss

Tr. 31:23-32:17; *see* Moss Rep. 3-4 (listing "Materials Reviewed").

## LEGAL STANDARD

An expert witness in federal court must be "qualified . . . by knowledge, skill, experience,

training, or education," must have "specialized knowledge [that] will help the trier of fact to

understand the evidence or to determine a fact in issue," must rely on "sufficient facts or data,"

must use "reliable principles and methods," and must "reliably appl[y] the principles and methods

to the facts of the case." Fed. R. Evid. 702. In applying Rule 702, the Court determines whether

"an expert's testimony . . . rests on a reliable foundation," *Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579, 597 (1993), and ensures that there is not "too great an analytical gap between the

data and the opinion proffered," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

As this Court recently set out, "[c]ourts have a degree of ' " ' "flexib[ility]" ' " ' to tailor the

Rule 702 inquiry to the needs of the case and the discipline of the expert." ECF No. 9060, at 4

(quoting *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011)). For "terrorism experts,

who are often security officials, social scientists, accountants, or historians," courts consider,

among other factors, whether an expert " 'unjustifiably extrapolate[s] . . . to an unfounded

conclusion' "; " 'adequately account[s] for obvious alternative explanations' "; the degree of

" 'care[ ]' " used, especially compared to the expert's " 'regular professional work' "; and whether

a " 'field of expertise . . . is known to reach reliable results.' " *Id.* at 4-5 (quoting *Deutsch v.*

*Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011)) (ellipses in original).

"[Q]ualified expert witnesses are 'permitted wide latitude to offer opinions' on relevant subjects, 'including those that are not based on firsthand knowledge or observation.'" *Id.* at 5 (quoting *Daubert*, 509 U.S. at 592). "In particular, experts in terrorism cases may be well-positioned to 'synthesize dense or voluminous . . . texts,' 'offer background knowledge or context that illuminates . . . past events,' or 'identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson.'" *Id.* at 5-6 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013)) (ellipses in original); *see id.* at 6 (noting that terrorism experts may offer "insight[s]" into matters such as "'al Qaeda's origin, leadership, and operational structure," to "aid the [factfinder] in understanding' the group's history and operations") (quoting *United States v. Paracha*, 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008)).

## ARGUMENT

### I.    Sageman's Opinions Are Admissible

#### A.    Sageman Is Qualified To Offer the Opinions in His Report

Sageman's experience in counterterrorism and in clandestine tradecraft, together with his extensive body of relevant scholarship on terrorist organizations generally and Al Qaeda specifically, qualify him to opine on each topic featured in his rebuttal expert report. Plaintiffs' contentions that he lacks the requisite knowledge or experience fall short.

##### 1.    Al Qaeda and Saudi Arabia

Sageman is qualified to opine on the escalation of conflict and hostility between Al Qaeda and Saudi Arabia from the late 1980s through the 1990s. Sageman Rep. 59-101. Contrary to Plaintiffs' assertions, Pls. Mot. 9-10, Sageman's opinions relate directly to his expertise on terrorism and terrorist organizations, including Al Qaeda, whose historical development, activities, and relationships have been a major topic of his peer-reviewed scholarship. *See*, *e.g.*, Ex. 61

(*Understanding Terror Networks*), at 34-51; Ex. 62 (*Leaderless Jihad*), at 40-46.  Plaintiffs

quote out of context Sageman's statement that he was "'out of the loop'" on Al Qaeda "in the

1990s."  Pls. Mot. 12.  Sageman's expertise is based not on contemporaneous knowledge of

Al Qaeda during the 1990s, but on years of study after the 9/11 attacks.  *See* Sageman CV 3-6;

*supra* pp. 4-5.

**2.      Islam in Saudi Arabia, MOIA, and Al Qaeda's Ideology**

Sageman is qualified to opine on Islam in Saudi Arabia and on Saudi Arabia's Ministry

of Islamic Affairs as they relate to Al Qaeda and other terrorist organizations.  He has previously

studied and analyzed the religious and ideological beliefs of Al Qaeda terrorists.  *See*, *e.g.*,

Ex. 61 (*Understanding Terror Networks*), at 1-24; Ex. 62 (*Leaderless Jihad*), at 35-40.  His

peer-reviewed scholarship has covered the Salafi school of Islam, including the diversity of views

within the school.  *See*, *e.g.*, Ex. 61 (*Understanding Terror Networks*), at 1-24; Ex. 71 (Adraoui,

Amghar, Merone, Sageman & Thomas, "Between Salafism, Sectarianism and Violence"), at 58-

62.  His expert testimony before the 9/11 Commission discussed the relationship of Al Qaeda's

ideology to Salafi Islam.  Ex. 60 (Sageman 9/11 Commission testimony).  Contrary to Plaintiffs'

assertions, Pls. Mot. 11 & nn.48-49, Sageman can properly rebut Nakhleh's opinion that Saudi

Arabia and its citizens share Al Qaeda's beliefs.  Sageman Rep. 530.

Sageman has studied the support structures for terrorist attacks and the causes of terrorist

radicalization.  *See*, *e.g.*, Ex. 61 (*Understanding Terror Networks*), at 61-135; Ex. 62 (*Leaderless

Jihad*), at 47-108; Ex. 71 (Adraoui, Amghar, Merone, Sageman & Thomas, "Between Salafism,

Sectarianism and Violence"), at 62-70; Ex. 66 (Sageman, "Confronting al-Qaeda") (surveying

terrorist plots in the West).  Contrary to Plaintiffs' assertions, Pls. Mot. 9-10 & nn.43-44, 47,

he can thus properly rebut Youssef's and Nakhleh's assertions that MOIA provided support for

terrorist attacks generally and for the 9/11 attacks specifically.  Sageman Rep. 267-69, 526-27,

27

717-19.  Further, Sageman has ample experience in analyzing terrorist attacks as a historian,

consultant, advisor, and investigator for U.S. and foreign law enforcement and intelligence

agencies.  *See* Sageman CV; *supra* p. 5.  To the extent Youssef and Nakhleh purport to opine on

MOIA's activities based on discovery materials from this case, he is qualified to review those

materials and rebut their opinions.[29]

### 3.      Other Terrorist Groups

Sageman is qualified to rebut Youssef's opinions about the alleged activities of

Al Gama'a Islamiya in Southern California in the 1990s and their purported relationship to

Al Qaeda's alleged activities.  Sageman Rep. 560-65.  He has previously written about historical

development of Al Gama'a Islamiya and its relationship with Al Qaeda over time.  *See*, *e.g.*,

Ex. 61 (*Understanding Terror Networks*), at 34-51 (referring to Al Gama'a Islamiya as the

"Egyptian Islamic Group," or "EIG").  Sageman also has studied both pre- and post-9/11 terrorist

plots in the West by Al Qaeda and other global neo-jihadi groups.  *See*, *e.g.*, Ex. 66 (Sageman,

"Confronting al-Qaeda").  Contrary to Plaintiffs' assertions, Pls. Mot. 11 n.50, he is therefore

qualified to respond to Youssef.

Plaintiffs' contentions that Sageman is not qualified incorporate misplaced criticisms

about the substance of his opinions about Al Gama'a Islamiya.  Their mere "disagreement" with

Sageman's opinions "bears no relationship to [his] qualifications."  *IBM v. BGC Partners, Inc.*,

2013 WL 1775437, at \*15 (S.D.N.Y. Apr. 25, 2013).  In any event, Plaintiffs' criticisms lack

merit.  *First*, Plaintiffs incorrectly state that his opinion that "[t]he leadership of the al Gama'a

---

[29] Plaintiffs also err in challenging a section of Sageman's report that sets out reasons that employees of other Saudi ministries would have assisted Al Qaeda.  Pls. Mot. 10 n.47.  Those opinions similarly relate to Sageman's expertise on Al Qaeda because his analysis is grounded in historical evidence of bin Laden's goals and objectives, including opposition to those ministries and the royal family members who led them.  Sageman Rep. 262-67.

Islamiya had rejected violence in 1997," Sageman Rep. 561, is "contradicted" by the State

Department's 1997 "designat[ion]" of "Al Gama'a as a Foreign Terrorist Organization."  Pls.

Mot. 12.  Sageman documented the leadership of Al Gama'a Islamiya's July 1997 turn away

from violence in his first peer-reviewed book.  *See* Ex. 61 (*Understanding Terror Networks*),

at 46-47 (noting that the "leadership shura" of Al Gama'a Islamiya "announced a unilateral

ceasefire in Egypt in July 1997"); *see also id.* at 51, 63.  Other scholars have documented the

same shift.[30]  That is not inconsistent with a 1997 designation, which would presumably be based

on the group's previous violent conduct.[31]  And even if Sageman did disagree with the State

Department, that would not be a basis for excluding his opinion.

*Second*, Plaintiffs erroneously challenge Sageman's opinion that by "the first half of

2000" Al Gama'a Islamiya, Al Qaeda, and a third group (Egyptian Islamic Jihad) "were strong

rivals and no longer collaborated with each other," Sageman Rep. 560-61, by citing to "U.S.

intelligence findings" or events from January 1999 or earlier.  Pls. Mot. 13-14.  Nothing

Plaintiffs cite speaks to the dynamic that existed among the groups by 2000.[32]  Further, as

---

[30] *See, e.g.*, Ex. 72 (Hamzawy & Grebowski, "From Violence to Moderation"), at 4
(noting that "Al-Jama'a al-Islamiya has upheld its commitment to nonviolence since 1997");
*id.* at 3-4 (elaborating on the strategy adopted by Al Gama'a Islamiya's leadership in the late
1990s).  As Sageman explains in his report, a "splinter group" that "continued violence"
was "condemned by the al Gama'a leadership."  Sageman Rep. 563-64; *see also* Ex. 61
(*Understanding Terror Networks*), at 47, 63 (same).  Similarly, Sheikh Omar Abdel Rahman
initially "supported" the 1997 rejection of violence, Ex. 61 (*Understanding Terror Networks*),
at 47, but "withdrew his support for their initiative during the summer of 2000," *id.* at 51.

[31] The 1997 designation on which Plaintiffs rely merely includes "Gama'a al-Islamiyya"
as a name on a list, giving no indication of the particular conduct that warranted designation or
the timing of that conduct.  Notice, Designation of Foreign Terrorist Organizations, 62 Fed. Reg.
52,650, 52,650 (Oct. 8, 1997).

[32] Plaintiffs mischaracterize Sageman's discussion of Abdel Rahman.  Pls. Mot. 14.
Sageman acknowledges that in 1993 Abdel Rahman was "a political advocate of violent jihad,"
but explains that, at that time, he was also regarded as a "legitimate Islamic scholar."  Sageman
Rep. 563.  Years later, Abdel Rahman was convicted of criminal conspiracy, *see United States v.*

Sageman explains, real-time intelligence reports may later be found inaccurate as additional

information comes to light. *See*, *e.g.*, Sageman Rep. 255 (discussing "'the fog of war'" over

the U.S. intelligence community in the years after the 9/11 attacks).[33]  Sageman's report reflects

the information known today, not the information known as of one point in the past.

### 4.      Law Enforcement and Investigations

Sageman is qualified to rebut Plaintiffs' experts' opinions as they concern law

enforcement and law enforcement investigations.  He has worked as a consultant or advisor on

counterterrorism for law enforcement agencies including the Secret Service and the NYPD, and

investigated insider killings in Afghanistan for ISAF.  *See* Sageman CV 1-2; *supra* p. 5 & n.6.

His report describes his "personal discussions with FBI special agents and law enforcement

officers" in the years that followed 9/11, Sageman Rep. 19, and his peer-reviewed publications

describe the knowledge and experience he has gained through "consultations with foreign

and domestic intelligence and law enforcement agencies," Ex. 66 (Sageman, "Confronting

al-Qaeda"), at 5; *see* Ex. 59 (*Misunderstanding Terrorism*), at 10-18.  Plaintiffs make a

conclusory assertion that he lacks "background" in and "practical experience" with

investigations, Pls. Mot. 15, but fail to address his actual relevant experience.

### 5.      Phone Records

Sageman is qualified to rebut Youssef's phone-record analysis.  As he explained at his

deposition, communications analysis "has been the backbone of some of [his] investigations,"

---

*Rahman*, 189 F.3d 88 (2d Cir. 1999), but that is not evidence that anyone who met with him in
1993 was also a criminal.

[33] Sageman's own scholarship candidly acknowledges his own evolving understandings
based on new information.  In 2004, Sageman labeled Abdel Rahman as a member of the
"Central Staff of al Qaeda."  Ex. 61 (*Understanding Terror Networks*), at 185.  By 2008,
Sageman revised that view and recognized that Abdel Rahman and bin Laden "d[id] not belong
to the same organization."  Ex. 62 (*Leaderless Jihad* ), at 30.

Sageman Tr. 207:20-208:10, and he has "investigate[d] several cases that might have involved

clandestine use of telephone[s], what we call trade craft," *id.* at 309:1-4; *see also* Ex. 59

(*Misunderstanding Terrorism*), at 16-18 (describing Sageman's role in Afghanistan and his

previous use of "electronic evidence" gathered by ISAF's "counterintelligence unit"); *id.* at 19

(describing his previous analysis of "electronic communications" as an expert witness); *supra*

p. 5 & n.6.  In addition, during Sageman's service with the CIA, he worked as "a case officer

operating in a hostile country" and was "trained" in "the use of telephone[s] by clandestine

operators."  Sageman Tr. 308:7-19.  He can thus rebut Youssef's opinions that telephone records

show signs of tradecraft.  *See, e.g.*, Sageman Rep. 627-29, 635-36, 638-42.

Plaintiffs' challenge to Sageman's qualifications to rebut Youssef on phone records

does not address his past experience with communications analysis.  Instead, Plaintiffs largely

disagree with Sageman's conclusions.  Pls. Mot. 16-20.[34]  Those disagreements are irrelevant

to whether Sageman is qualified.  *See IBM*, 2013 WL 1775437, at *15.  They also lack merit.

*First*, Plaintiffs fault Sageman for relying on Al Bayoumi's first-hand witness testimony

that others beside Al Bayoumi himself had access to the Al Madinah Mosque phones and to

Al Bayoumi's cellphone, Pls. Mot. 17 (discussing Sageman Rep. 299, 461, 628), but point to no

---

[34] Plaintiffs also criticize Sageman (at 16) for "not compil[ing] his own 'matrix'" of
phone calls.  Sageman includes several tables and one chart of relevant phone calls in his report
where they help to illustrate his analysis.  Sageman Rep. 462-63, 467, 472, 478, 481, 492.
Further, as a rebuttal expert, Sageman had no obligation to compile a "matrix" – Plaintiffs'
dressed-up word for a spreadsheet, *see* KSA Ex. 22 – in order to identify problems with the
spreadsheets attached to Youssef's report and with the circumstantial inferences that Youssef
draws from them.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 33 (S.D.N.Y.
2020) ("A rebuttal expert need not identify alternative or better methodologies to identify
purported flaws in an opposing expert's approach.") (cleaned up), *appeal pending*, No. 21-954
(2d Cir.).  Further still, Youssef himself "did not compile" any spreadsheets (or "matri[ces]"),
Pls. Mot. 16 – a staff member who "works at the Kreindler firm" did the actual compiling, Ex. 2
(Youssef Tr.), at 270:6-271:1.

contrary evidence.  Even if there were such evidence, "the strength of [an expert's] factual premises . . . go to the weight, not the admissibility, of [that expert's] testimony."  *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 577 (S.D.N.Y. 2017).

*Second*, Plaintiffs contend that Sageman lacked a basis for labeling the phone number ███████-3362 a "contested" number for Al Thumairy.  Pls. Mot. 17 (discussing Sageman Rep. 480).[35]  As Saudi Arabia explained in its motion, the record is ambiguous as to the attribution of that number because contemporaneous cell phone bills show the subscriber as Faisal Al Muhanna.  *See* KSA Mot. 32-33.  Sageman properly recognized that ambiguity.

*Third*, Plaintiffs take issue with Sageman offering explanations for specific phone calls, or patterns of phone calls, that do not comport with Plaintiffs' theory of the case.  *See* Pls. Mot. 17-20 (discussing Sageman Rep. 450, 463, 482, 493, 645, 724-25).  As this Court has explained, an expert must "'adequately account[] for obvious alternative explanations.'"  ECF No. 9060, at 5 (quoting *Deutsch*, 768 F. Supp. 2d at 426).  Unlike Plaintiffs' experts, who leap to conclusions that ambiguous call records show conspiracies, *see* KSA Mot. 31-33, Sageman properly considers reasonable alternative explanations, drawing on other evidence in the record and his knowledge of customs among Muslims.[36]

_____

[35] Although Plaintiffs do not specify which number is the subject of their complaint, Sageman's citations show that the ███████-3362 number is the one he labels "contested."  *See* Sageman Rep. 480 & n.1888 (citing Ex. 73 (EO14040-002748-UPDATED-MDL to EO14040-002765-UPDATED-MDL)); *see also* Ex. 73 (EO14040-002748-UPDATED-MDL to EO14040-002765-UPDATED-MDL), at 757-58.

[36] *See, e.g.*, Sageman Rep. 450 (explaining that a possible phone call "might have been to say that [religious] material was ready to be picked up or to return Ramadan wishes to someone who had sent him wishes during the last few days of Ramadan"), 463 (explaining that, "during the Holy Month of Ramadan, Muslims call each other to offer their greetings and good wishes as well"), 482 (noting that certain "calls to Sheikh Anwar and then to Sheikh Fahad may suggest that al-Bayoumi might have had a religious question," relying on Al Bayoumi's uncontroverted deposition testimony), 493 (pointing to evidence that "Al-Bayoumi kept in touch with prominent

REDACTED FOR PUBLIC FILING

6.        **Arabic Culture and Language**

Plaintiffs incorrectly assert that Sageman offers expert opinions on the Arabic language.

Pls. Mot. 20.  He does not.  The statements challenged by Plaintiffs (at 20 n.98) are within the

scope of his experience, such as his familiarity with the use of the word "Sheikh" as a "courtesy"

in "Arabic culture," Sageman Rep. 602, and his opinion on an Arabic-language document is

based on translations of the document, *id.* at 621-22.

B.        **Sageman's Opinions Are the Product of a Reliable Methodology**

1.        **Sageman Discloses a Reliable Methodology**

The first part of Sageman's expert report describes in detail the methodology he

employed to reach his opinions in this case.  Sageman Rep. 2-22; *see also supra* pp. 13-16.

It is the same methodology that he uses in his own peer-reviewed scholarship.  Sageman Rep. 2

& n.1.  He undertakes a "careful[ ]" analysis of the allegations against "the totality of the

information available in the discovery material and in the larger set of evidence about terrorism

and specifically [Al Qaeda] terrorism and the 9/11 attacks."  *Id.* at 22.  He takes into account

the importance of "primary sources," *id.* at 2, and also draws distinctions among different types

of "secondary" and "tertiary" sources, accounting for distortions that can be introduced in

documents such as FBI witness summaries and analysis documents based on summaries, and

giving examples of summaries that appear unreliable, *id.* at 3-17.

Sageman thus "details the techniques he used to evaluate" the discovery material and

other sources, "account for 'competing explanations,' and reach studied conclusions."  ECF No.

9060, at 37 (rejecting a challenge to an expert's methodology).  This Court has approved similar

---

people he met and called them periodically"), 645 (explaining, *contra* Youssef, that certain calls
suggest "courtesy calls and Ramadan wishes," not a relationship to 9/11 hijackers Al Hazmi and
Al Mihdhar), 724-25 (pointing out that Youssef "fails to consider Ramadan as a confounding
variable in increased telephone traffic among pious Muslims").

methods that include "'gather[ing] information from multiple sources' and 'cross-check[ing] factual information' against other accounts." *Id.* at 14 (quoting *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 126 (D. Conn. 2008)); *see id.* at 18 (approving an "all source" methodology); *see also Paracha*, 2006 WL 12768, at *20 (approving a methodology "of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether . . . conclusions remain consonant with the most reliable sources").

### 2. Sageman Applies His Methodology Reliably

Sageman's expert report shows not only that he articulated a reliable methodology, but also that he "adhered to [that] methodology," ECF No. 9060, at 27 (similar finding for other Defendants' expert Jonathan Benthall), by considering a variety of record material and stressing the importance of cross-checking and comparison to arrive at a reliable result.

One example of Sageman's methodology is his analysis of the various versions of Al Bayoumi's visit to the Saudi Consulate and initial encounter with Al Hazmi and Al Mihdhar at the Mediterranean Gourmet restaurant in Los Angeles, which Al Bayoumi has testified was by chance but Plaintiffs allege was planned. Sageman discusses "four versions of events" given by or attributed to Al Bayoumi – a transcript of his MPS interview, a summary of his FBI interview, a Memorandum for the Record prepared by the 9/11 Commission staff, and the transcript of his deposition – finding them "generally mutually consistent." Sageman Rep. 177; *see id.* at 177-83. Sageman then walks through "8 versions" of the same events given by or attributed to Kaysan Morgan (also referred to as Caysan Bin Don and Isamu Dyson), who accompanied Al Bayoumi on that day. *Id.* at 184; *see id.* at 183-99. Morgan's versions, which Sageman labels "Morgan1" through "Morgan8," include six FBI interview summaries, one declaration that Plaintiffs'

counsel drafted and Morgan signed, and Morgan's deposition transcript. *Id.* Sageman observes that Morgan's "memory . . . changes significantly" from version to version. *Id.* at 184.[37]

Sageman also gives reasons for attaching greater or lesser significance to particular versions of Morgan's statements. For example, he observes that in Morgan6, which purports to summarize a May 2010 FBI interview, "most of the paragraphs dealing with the consular visit and meeting with the future hijackers . . . were identical cut and paste duplicates of those in Morgan5," which purports to summarize an August 2007 FBI interview; but that the writer of Morgan6 "eliminated the comments of the writers [of Morgan5] questioning Morgan as to the basis of his claims," so as to create "a more positive and definite recounting of Morgan's memory of that day's events." *Id.* at 196; *see also id.* at 386 (noting that the writer of Morgan6 also removed a "whole paragraph in which Morgan emphasized that the restaurant meeting was a chance meeting"). He further explains that Morgan7, the declaration that Plaintiffs' counsel drafted for Morgan, "selects features from Morgan4 and Morgan6, and is written in the style of Morgan6, in a strong and positive manner," *id.* at 197-98, and that Morgan later testified at his deposition (Morgan8) that Plaintiffs' counsel added statements that were "partial speculation and not based on firsthand knowledge," *id.* at 198; *see* Ex. 74 (Morgan Tr.), at 80:15-81:4.[38]

Another example is Sageman's analysis of the various versions of an alleged meeting between Al Thumairy and Al Hazmi and Al Mihdhar on June 9, 2000, just before Al Mihdhar

---

[37] Sageman also discusses Smail Mana's version of his encounter with Al Bayoumi and Morgan at the Saudi Consulate, although in less detail because Mana's statements are "mutually consistent" and because he played a "peripheral role." Sageman Rep. 199-200.

[38] Specifically, Plaintiffs' counsel added language in which Morgan stated that he "believe[d] . . . that preparations had been made for al-Hazmi and al-Mihdhar's arrival in California." Pls. Ex. 29 (Morgan Decl.), ¶ 30; *see* Ex. 74 (Morgan Tr.), at 77:2-78:8. Morgan added the phrase "outside of my knowledge" to that language and testified that he "wouldn't have firsthand knowledge of" any such preparations. *Id.* at 78:9-81:4.

left the United States for Yemen.  *See, e.g.*, Youssef Rep. 212-14 (describing Plaintiffs' version of the alleged meeting).  Al Thumairy has testified that he did not have such a meeting.  Ex. 75 (Thumairy Tr.), at 347:18-348:9.  Sageman compares that testimony with that of other witnesses (or alleged witnesses) – ███████████████████ and Al-Mohdar Mohamed Abdullah Zeid – observing that "[e]ach gives a different version" of events.  Sageman Rep. 232.  The witnesses' testimony shows differing recollections as to whether, when, and where any such meeting took place.[39]  Sageman also considers documentary evidence, including ████████ ███████████████████████████████████████████ ████████████████████ and a June 10 passport stamp showing Al Thumairy's arrival in Saudi Arabia (suggesting he flew there from D.C.).  *Id.* at 235-36 (discussing Ex. 75 (Thumairy Tr.), at 340:15-348:9; Ex. 79 (Al Shahri Ex. 405); and ████████████████.

Sageman's careful analysis lays the foundation for his rebuttal of Plaintiffs' experts.  For the first example set out above, he shows that Youssef's version of the encounter at the Mediterranean Gourmet relies "almost exclusively on the plaintiffs' lawyers' [Morgan] declaration" and on "a small portion of Morgan's deposition that revolves around his declaration."  *Id.* at 671; *see id.* at 677, 680-85.[40]  For the second example, he shows that Youssef's assumption that the June 9 meeting took place is not supported by "robust evidence,"

---

[39] According to their deposition testimonies, the only contact Johar recalled with the hijackers at the relevant time was a dinner at which Al Thumairy was not present, Sageman Rep. 233 (discussing Ex. 76 (M. Johar Tr.), at, *e.g.*, 293:15-294:9, 314:19-316:6); Alzamari recalled seeing Al Thumairy and Al Hazmi (but not Al Mihdhar) emerging from the mosque's library in the evening, *id.* at 233-34 (discussing Ex. 77 (Alzamari Tr.), at, *e.g.*, 62:11-63:8, 65:4-66:11); and Zeid recalled a meeting with Al Thumairy, Al Hazmi, and Al Mihdhar in the mosque's library, but did not recall what was discussed or when the meeting took place, *id.* at 234-35 (discussing Ex. 78 (Zeid Tr.), at, *e.g.*, 218:1-221:11, 226:5-23, 272:10-273:4, 278:22-279:17).

[40] To the extent Youssef relies on other sources, such as alleged statements in FBI interview summaries of ████ and ████████ that ████ and ████████ disavowed at their depositions, Sageman addresses those as well.  Sageman Rep. 677-78.

REDACTED FOR PUBLIC FILING

leaving the only "documented contact" between Al Thumairy and the hijackers as a brief, undated introduction in January 2000. *Id.* at 665-66. That showing undermines Youssef's assertion that Al Thumairy's "call pattern closely matches [his] actions . . . to arrange and provide assistance to Hazmi and Mihdhar," *id.* at 665 (quoting Youssef Rep. 174), because Youssef fails to establish either that Al Thumairy took any such actions or the dates of any purported actions that Al Thumairy took. To the extent the Court permits Youssef to opine on such matters (which it should not, *see* KSA Mot. 18-19, 23-24, 26-34), Sageman's rebuttal opinion will help the Court to understand how Youssef's conclusions rest on unsupported assumptions and unjustified inferences.

### 3. Plaintiffs' Challenges to Sageman's Methodology Fail

Nowhere in their motion do Plaintiffs dispute the reliability of Sageman's methodology as disclosed in his report. Indeed, nowhere in their motion do they even discuss his disclosed methodology. They instead say that he "cherry-pick[s] evidence," "ignor[es] unfavorable evidence," makes "*ipse dixit*" assertions, and "speculat[es]." *E.g.*, Pls. Mot. 2, 58, 61. With few exceptions, Plaintiffs' challenges to Sageman's methodology are mere assertions that he did not consider or address certain evidence in his report or that the weight of the evidence purportedly favors their view rather than his.[41]

---

[41] *See*, *e.g.*, Pls. Mot. 21 ("ignores evidence"), 22 ("fails to address," "swept under the rug"), 22-23 ("ignores the evidence"), 23 ("does not address," "does not acknowledge"), 24 ("ignores"), 25 ("does not consider," "ignores other facts," "made no effort to investigate"), 26 ("ignores," "fails to investigate"), 27 ("completely sidesteps," "does not address"), 28 ("ignores"), 29 ("ignores," "looks the other way"), 30 ("ignored," "did not consider," "does not mention"), 31 ("does not mention," "ignores"), 32 ("ignores"), 33 ("no explanation for the evidence"), 34 ("does not consider," "turned a blind eye"), 35 ("refuses to investigate the evidence"), 36 ("does not consider," "did not investigate," "fails to address"), 37 ("ignores," "disregards evidence," "does not mention," "does not investigate," "nor does he consider"), 47 ("ignores"), 48 ("ignores"), 49 ("ignores the evidence"), 50 ("ignoring the proof," "ignores

**REDACTED FOR PUBLIC FILING**

Even when the record shows that an expert overlooked evidence, that goes to weight, not

to admissibility.  *See* ECF No. 9060, at 18-19 (explaining that a mere argument that "additional

relevant documents . . . contradict [an expert's] opinions" does not warrant exclusion); *see also*,

*e.g.*, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006)

("[G]aps or inconsistencies in [expert] testimony . . . go to the weight of the evidence, not to its

admissibility.") (cleaned up).  Although extreme cherry-picking can warrant exclusion, *see* KSA

Mot. 27-29, 39-41, 44-45, Plaintiffs' showing falls far short of that level.  Indeed, many of their

assertions about Sageman's opinions or about evidence lack any support in the record.

> a.      **Saudi Arabia and MOIA.**  Plaintiffs fail to show that Sageman's opinions about

Saudi Arabia and should be excluded because they are "contrary" to U.S. government findings

such as a 2004 FBI and CIA joint report stating that MOIA had supported "some" individuals

"associated with terrorism-related activity" and that "[t]he Saudi government and many of its

agencies ha[d] been infiltrated or exploited by individuals associated with or sympathetic to

al-Qa'ida."  Pls. Ex. 61, at 416; *see* Pls. Mot. 21-23, 27, 34.  As an initial matter, Plaintiffs fail to

mention that the same report found "no evidence that . . . the Saudi Government . . . knowingly

provided support for the attacks of 11 September 2001 or . . . had foreknowledge of terrorist

operations in the Kingdom or elsewhere," and "no information to indicate that . . . Omar

al-Bayoumi . . . materially supported the hijackers wittingly, [was an] intelligence officer[] of

the Saudi Government or provided material support for the 11 September attacks."  Pls. Ex. 61,

---

the facts"), 51 ("failed to investigate," "somehow missed," "also missed"), 53 ("contrives to
ignore record evidence," "fails to account," "fails to address"), 56 ("disregards the evidence,"
"ignores," "refuses to acknowledge the evidence"), 57 ("ignores the equally important
evidence"), 58 ("failed to investigate and consider the record evidence," "repeatedly failed to
consider facts").

at 416.  As a whole, the document supports Sageman's conclusions (and Saudi Arabia's position) rather than Plaintiffs'.

Further, Sageman addresses the statements about MOIA in the 2004 report, observing that they are "quite vague, seem[ ] to lump all Salafis into one extremist basket, and ignore[ ] the major differences between traditional Salafi teachings and neojihadi doctrines."  Sageman Rep. 269.  He also explained that the agencies writing in 2004 lacked the benefit of later "work [by] Arabic speaking scholars, who published in the 2010s" and who had a greater "appreciation of internal Saudi politics" and of MOIA's role in "fight[ing] off th[e] neojihadi challenge."  *Id.*; *see id.* at 80 & n.282 (citing Stéphane Lacroix, *Awakening Islam:  The Politics of Religious Dissent in Contemporary Saudi Arabia* (Harv. Univ. Press 2011), a specific example of such post-2010 scholarship).  Plaintiffs' criticism at best reflects mere disagreement with Sageman's reasoning rather than a showing that it is unreliable.[42]

There is no merit to Plaintiffs' complaint that Sageman declined to address their allegations about "Saudi Arabia's control and supervision of the Al Haramain Islamic Foundation," deeming them " 'too peripheral to the issues in this litigation to discuss.' "  Pls. Mot. 22-23 (quoting Sageman Rep. 608).  Judge Daniels has dismissed Plaintiffs' allegations about Saudi Arabia's funding and alleged control of Islamic charities including Al Haramain for failure to plead a *prima facie* case of jurisdiction.  ECF No. 3946, at 31 & n.16.  He has recently rejected Plaintiffs' requests to reconsider that ruling, including as to their charity allegations.

---

[42] Plaintiffs also inaccurately contend that Sageman "does not acknowledge that Saudi Arabia refused to join with the U.S. to fight Al Qaeda terrorism until the Kingdom was itself attacked in May 2003."  Pls. Mot. 23 (citing Pls. Ex. 61, at 416).  Sageman addresses this issue in a balanced manner, citing specific examples of pre-9/11 cooperation, such as the attempt to extradite bin Laden from Afghanistan, *see* Sageman Rep. 108-11, but also acknowledging that there were times at which Saudi Arabia viewed certain U.S. demands to investigate its citizens as "infringe[ments] on its sovereignty," *id.* at 725-26.

ECF No. 8862, at 1-2, 4, 11-12.  Sageman's decision not to address a topic outside the scope of jurisdictional discovery in an already lengthy report is not a basis to exclude his testimony.

Plaintiffs also err in accusing Sageman of inconsistency with his past work.  They quote language from his 2004 book, *Understanding Terror Networks*, stating that until 2003 Saudi Arabia "'refused to acknowledge its citizens' involvement in the global Salafi jihad'" and was "'complacen[t]'" about terrorism.  Pls. Mot. 23-24 (quoting Ex. 61 (*Understanding Terror Networks*), at 53).  Although Saudi Arabia does not agree with those characterizations (and Sageman has made clear that his opinions are not Saudi Arabia's), there is no conflict between the opinions he expressed in his book and his opinions in his report.  *Understanding Terror Networks* is clear that the terrorists it studied regarded existing Islamic governments, including the Saudi government, as enemies like the United States.  Ex. 61 (*Understanding Terror Networks*), at 18-24.  And Plaintiffs quote nothing from the book (nor is there anything) to suggest that Saudi Arabia's government or any of its agencies ever viewed Al Qaeda as an ally or supported it – much less supported the 9/11 attacks.[43]

**b.**      **Al Thumairy's role in Southern California.**  Plaintiffs fail to show that Sageman's analysis of testimony and discovery materials concerning Al Thumairy's job responsibilities is unreliable.  *See* Pls. Mot. 25-28.  The key question is whether Al Thumairy was "just an MOIA preacher," as Sageman opines, or instead "some sort of undercover agent."  Sageman Rep. 329-30.  Sageman's opinion comes at the end of a long recounting of evidence

_____

[43] Plaintiffs also attempt to fault Sageman for not providing a "citation" for his statement that Sheikh Muhammad Al Uthaymeen was a "'leader of the quietist faction.'"  Pls. Mot. 24 (quoting Sageman Rep. 543).  An expert need not provide a citation for every statement in his report.  *See* ECF No. 9060, at 11.  Two of Plaintiffs' own experts agree that Al Uthaymeen was an "'influential . . . quietist.'"  KSA Mot. 38-39 (discussing Ex. 5 (Nakhleh Tr.), at 150:10-19, in turn discussing Ex. 8 (Meleagrou-Hitchens Ex. 3), at 51).  That Al Uthaymeen may have given sermons about Islamic theology that are inconsistent with American principles of religious tolerance, *see* Pls. Mot. 24, does not make him a supporter of Al Qaeda or of terrorism.

**REDACTED FOR PUBLIC FILING**

and investigative history, including various investigative hypotheses implicating Al Thumairy that the 9/11 Commission and the FBI raised and ultimately rejected. *Id.* at 304-29. Consistent with his methodology, Sageman considers evidence against his opinion, such as an early hypothesis that Al Thumairy had told a taxi driver to pick up the hijackers at the airport, *id.* at 304-05, and FBI summaries of purported confidential source statements that Al Thumairy received a suspicious call from Malaysia before Al Hazmi and Al Mihdhar arrived, *id.* at 319-21, 325-27, and gives his reasons for not accepting that evidence.

Plaintiffs' challenges to Sageman's reasoning fall short. They incorrectly assert that Sageman "does not consider" a letter sent by Khalid Al Sowailem regarding Al Thumairy's alleged "appoint[ment] . . . as the supervisor of all MOIA propagators in California," Pls. Mot. 25; to the contrary, Sageman's report mentions ███████████████████████████ █████ and discusses Al Thumairy's testimony about them, Sageman Rep. 583 & n.2136 (discussing ██████████████████████████████████); and Ex. 75 (Thumairy Tr.), at 157:10-158:15).[44] Plaintiffs also criticize Sageman for purportedly disregarding "discrepancies in Thumairy's testimony." Pls. Mot. 25-26. To the contrary, although Sageman (unlike Youssef, Nakhleh, and Meleagrou-Hitchens, *see* KSA Mot. 58-59, 61-63, 65-66) does not give an opinion on Al Thumairy's credibility, he acknowledges conflicts between earlier and later statements attributed to Al Thumairy, as well as conflicts with the testimony of other witnesses where they exist. *E.g.*, Sageman Rep. 309, 312, 316 (discussing Al Thumairy's 2003 and 2004 alleged overstatements of time he spent at the Consulate, later addressed at his deposition).

---

[44] If by "does not consider" Plaintiffs mean merely that Sageman does not cite ███ ██████████████ the letter that they cite, *see* Pls. Ex. 33, their statement is technically correct but misleading and irrelevant, because █████████████████████████████████████ ████████ *Compare id. with* ██████████████████████████████████████

**REDACTED FOR PUBLIC FILING**

Sageman also points out that those alleged overstatements, and Al Thumairy's alleged "discomfort" when questioning by 9/11 Commission staff became "confrontational," *id.* at 312, can be explained as a response to the United States' then-recent cancellation of Al Thumairy's visa, *id.* at 316, 634; *see also id.* at 583-84 (explaining that Al Thumairy's failures of recollection are consistent with the ordinary workings of human memory).  Plaintiffs object to this as "mindreading," Pls. Mot. 27, but it is a reasonable response to Youssef's opinion that Al Thumairy made "'a deliberate effort to obfuscate and obstruct,'" Sageman Rep. 583 (quoting Youssef Rep. 44-45).  If Plaintiffs' experts' opinions about Al Thumairy's credibility and state of mind are admitted (which they should not be, *see* KSA Mot. 57-67), then Sageman should be allowed to give "alternative explanations," ECF No. 9060, at 5, for Al Thumairy's testimony.[45]

     **c.**     **Al Jarrah's alleged supervision of MOIA employees.**  Plaintiffs mischaracterize Sageman's opinions about Al Jarrah as "*ipse dixit* claims."  Pls. Mot. 27. Sageman reasonably addresses the discovery material concerning Al Jarrah's alleged supervisory role over MOIA employees, including Al Thumairy.  Among other things, he explains that the FBI's identification of Al Jarrah as such a supervisor appears to be based on a single confidential source whose basis of knowledge is never stated and who appears to have mistakenly confused Al Jarrah with Al Sowailem, Sageman Rep. 336-39 – but whose statements about Al Jarrah were then repeated (often verbatim or near-verbatim) multiple times in investigative material, *id.* at

---

[45] Plaintiffs also object that Sageman does not address their hobbyhorses about the funding and board membership of the King Fahad Mosque ("KFM"), Al Thumairy's receipt and distribution of various donations, and other propagators such as Omar Abdi Mohamed.  Pls. Mot. 25-26.  The Court has already ruled such matters outside the scope of jurisdictional discovery because of their lack of a connection to any alleged assistance to the hijackers.  *See* ECF No. 3946, at 28-31 (ruling that Plaintiffs failed to plead a *prima facie* basis for jurisdiction as to Abdi Mohamed); ECF No. 8862, at 26-28 (denying further discovery concerning Abdi Mohamed); Nov. 25, 2019 Order (under seal), at 7-8 (denying further discovery into Saudi Arabia's funding of the KFM as beyond the scope of jurisdictional discovery), *objections overruled*, ECF No. 6612.  Those irrelevant matters are not a serious challenge to Sageman's methodology.

342-51.  Sageman also addresses the timing of phone calls between Al Jarrah and Al Thumairy

and explains that they are consistent with Al Jarrah helping Al Thumairy with his visa.  *Id.* at

490-91, 584-85.  Plaintiffs object that Sageman fails to consider relevant ████████████

████████  Pls. Mot. 27 & n.136, but ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

    **d.**    **The King Fahad Mosque and Al Thumairy's alleged "extremism."**  Plaintiffs

fail to show any lack of reliability in Sageman's rebuttal of Youssef's opinion that Al Thumairy

led an "extremist cell" at the King Fahad Mosque or held "extremist" or "radical" views.  Pls.

Mot. 28-34.[46]  Sageman discusses direct testimony about Al Thumairy's conservative but quietist

beliefs from Mana and Alzamari, as well as an account attributed to mosque director Khalil

Al Khalil, Sageman Rep. 138, and compares it to the hearsay testimony of Madha, who signed a

declaration calling Al Thumairy a "radical" but admitted at his deposition that he was relying on

what others had told him because he did not speak Arabic and could not understand Al Thumairy's

sermons, *id.* at 139; *see* Ex. 83 (Madha Tr.), at 37:3-38:17.  Sageman also discusses FBI and

other U.S. government statements about Al Thumairy's beliefs and associations:  some describe

Al Thumairy as "radical" or "extremist," but others reject that description.  Sageman Rep. 138,

████, 307-08, ████.  And he considers Al Thumairy's continued good standing with MOIA

---

[46] As Sageman points out, the terms "extremist" and "radical" are often misused to
describe Salafi beliefs that have nothing to do with terrorism.  Sageman Rep. 330-31, 562-63,
568.  For example, Usman Madha testified that Al Thumairy and alleged "followers" of his
were extremist in part because one or more of them allegedly told Madha not to celebrate
Thanksgiving.  *Id.* at 139 (discussing Ex. 83 (Madha Tr.), at, *e.g.*, 60:18-61:18).  Many Salafis
believe that Muslims should not celebrate non-Muslim holidays and that Thanksgiving is such
a holiday.  That is a religious belief, not an indication of support for terrorism.

after his return to Saudi Arabia, which would be unlikely if Al Thumairy had actually given sermons supporting violent jihad. *Id.* at 330-33.  If Plaintiffs' experts' opinions about Al Thumairy's purported beliefs and associations are admitted (which they should not be, *see* KSA Mot. 33-34, 58-66), then Sageman should be able to point out countervailing factors.

Plaintiffs' bid to exclude Sageman's opinion on this topic relies on Madha's testimony, Pls. Mot. 28-29; FBI and CIA statements, *id.* at 31-32; and assertions that Al Thumairy associated or spoke with other individuals whom Plaintiffs label extremists, *id.* at 30-33.  As set out above, Sageman addresses most of the materials that Plaintiffs cite and meets the requirement that an expert "analyze a range of evidence before arriving at a conclusion."  ECF No. 9060, at 18. Further, Plaintiffs' repeated contentions that Al Thumairy must be an extremist because he met or spoke with alleged extremists is an effort to show that he is "guilty by association."  *United States v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022).  Because an expert's testimony should be excluded for engaging in such reasoning, *see id.*, Sageman's testimony surely should not be excluded for refusing to do so.

      **e.**     **Al Bayoumi's studies and alleged "covert" role.**  Plaintiffs fail to establish any grounds for excluding Sageman's rebuttal of their experts' opinions that Al Bayoumi had some sort of covert assignment to "support Saudi extremism."  Pls. Mot. 34-38.  Sageman examines both testimonial and documentary evidence of Al Bayoumi's time in San Diego as a student. Sageman Rep. 145-46 & nn.550-558.  He acknowledges that Al Bayoumi's academic record was not "stellar," *id.* at 559, and that Al Bayoumi failed to earn credit for some courses because he missed final exams, *id.* at 145 n.553.  Sageman also collects testimony and discovery material showing that the arrangement through which Dallah Avco, a Saudi government contractor, paid for Al Bayoumi's education was consistent with other efforts at "Saudization" – that is, the Saudi

**REDACTED FOR PUBLIC FILING**

government policy of training Saudi nationals to take on government contracting work being done by non-Saudi nationals. *Id.* at 144 & nn.540-41, 282-84, 598.

Further, Sageman explains his reasons for rejecting Plaintiffs' allegation (which Plaintiffs' experts adopt) that Al Bayoumi's studies were mere "cover" for a "clandestine" role. *Id.* at 300-02. Those reasons include the "consistent administrative paper trail" showing Al Bayoumi's employment with the Presidency of Civil Aviation ("PCA") even after his return to Saudi Arabia, *id.* at 300, 302; Al Bayoumi's voluntary admissions during interviews of purported "clandestine" contacts, use of his personal phone, and other basic failures to keep his actions and contacts confidential, *id.* at 301-02; his continued presence in the United Kingdom for more than a year after the 9/11 attacks, *id.* at 302; and his links to a Ministry (the Ministry of Defense, through the PCA) that was "deeply hostile" to Al Qaeda, *id.* at 303.

Plaintiffs argue that Sageman failed to consider or did not give sufficient weight to evidence they call suspicious, such as documents showing that Dallah Avco wished to drop Al Bayoumi from its payroll in April 1999 but the PCA insisted he remain, Pls. Mot. 35, or Al Bayoumi's communications with the Embassy and Consulate, *id.*, which Sageman opines can reasonably be explained as relating to administrative matters, Sageman Rep. 483-86, 635-36. They also press more guilt-by-association reasoning, claiming that ███████████████ ████████████████████████████████████████████████████████████████████████ ██████████████ Pls. Mot. 36-37.[47] Sageman was not bound to follow Plaintiffs to their implausible conclusion that the PCA was providing poorly designed cover for a clandestine, rogue MOIA agent who was aiding enemies of Saudi Arabia. At the least his opinions are well

---

[47] Plaintiffs also remarkably assert that ███████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████

"within 'the range where experts might reasonably differ,'" *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)), and should be evaluated by the finder of fact.

  **f.**   **Statements by known Al Qaeda members.**  Among many other sources cited in his report, Sageman considers statements made by Khalid Sheikh Mohammed (often referred to as "KSM"), one of the architects of the 9/11 plot, and bin Laden. For KSM, Sageman considers several statements including a 2002 interview with an Egyptian journalist (published in 2003) and a 2006 statement that was submitted in lieu of KSM's testimony at the trial of Zaccarias Moussaoui. *E.g.*, Sageman Rep. 124-25, 128-30, 134.[48] For bin Laden, Sageman considers both statements that bin Laden made publicly during his lifetime, *e.g.*, *id.* at 85-88, 95-96, and recently released papers found after his death in the 2011 raid on his compound in Abbottabad, Pakistan, *e.g.*, *id.* at 125-28.[49] As with all the sources he cites, Sageman evaluates the KSM and bin Laden statements against other sources, including each other, and including documents produced by the FBI, to determine the best-supported version of events.[50]

---

[48] Plaintiffs inaccurately assert without citation that Sageman cites KSM's 2006 statement "over 200 times." Pls. Mot. 39. The statement is cited in 58 of Sageman's 2388 footnotes (approximately 2.5%). *See* Sageman Rep. nn.447, 450, 452, 454, 457, 469, 470, 473, 475, 476, 478, 488, 491, 679, 681, 683, 684, 685, 686, 689, 689, 690, 692, 951, 961, 965, 979, 1073, 1086, 1088, 1089, 1090, 1099, 1111, 1116, 1173, 2054, 2185, 2211, 2212, 2249, 2251, 2254, 2256, 2264, 2314, 2333, 2334, 2335, 2344, 2367, 2368, 2371, 2375, 2382, 2383, 2384, 2386. It makes up an even lower percentage of his total citations because many of his footnotes contain more than one source.

[49] Peer-reviewed scholarship cited by Sageman attributes the papers to bin Laden. *See* Sageman Rep. 125 n.458 (citing Ex. 84 (Lahoud, *The Bin Laden Papers*), at 16).

[50] *See, e.g.*, Sageman Rep. 125 (noting that bin Laden's Abbottabad papers "give a different story" of the origins of the 9/11 attacks than the account reflected in KSM's 2006 statement), 130 (noting points of agreement and disagreement between KSM's accounts and the Abbottabad papers), 705-06 (noting consistency between KSM's 2006 statement and FBI interview reports for ▬▬▬▬▬, Ahmad Mohammed Mustafa, and Mohdar Abdullah (Zeid)).

Plaintiffs err in asserting that Sageman's use of KSM's and bin Laden's statements renders his opinions unreliable.  Pls. Mot. 38-45.  Experts on terrorism may rely on statements by terrorists because other "experts in th[at] particular field would reasonably rely on those kinds of facts or data."  Fed. R. Evid. 703.  Plaintiffs do not claim that KSM's or bin Laden's statements do not meet that criterion.  Nor could they, because their own experts rely on the same or similar sources.  *See* Youssef Rep. 237-38 (relying on KSM's 2006 statement); Nakhleh Rep. ¶ 38 n.16 (relying on other documents found in the Abbottabad raid); *id.* ¶¶ 99, 117, 151 (discussing public statements by bin Laden); Meleagrou-Hitchens Rep. ¶¶ 121-122 & n.185 (quoting a letter by bin Laden found in the Abbottabad raid).[51]  Plaintiffs cannot coherently object to Sageman rebutting their experts using (in part) documents on which those experts themselves rely.[52]

Plaintiffs contend that the 9/11 Commission and the CIA found some of KSM's statements were not credible, Pls. 39-40, 42-43, but fail to point out that the FBI's communication closing Operation Encore in May 2021 relied on similar material.  For example, the FBI relied on "[c]onsent statements from various [Al Qaeda] members, including KSM" and five named others, to make its finding that Al Qaeda "compartmentalized the attack groups and roles within the operation" and "did not make the attack plans known in advance to others," which "corroborated that Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack."  Ex. 13 (Youssef Ex. 10), at 9-10.

---

[51] Plaintiffs also assert that KSM's 2006 statement was "procured by torture."  Pls. Mot. 39.  They cite no evidence that supports this claim.  The statement was presented to the jury in the *Moussaoui* case with a judicial instruction to "approach th[o]se statements with the understanding that they were made under circumstances designed to elicit truthful statements from the witness."  Ex. 85 (KSM Substitution), at 2.

[52] To be clear, Saudi Arabia does not concede that Plaintiffs' experts are actually qualified to give the opinions set out in their reports.  *See* KSA Mot. 18-22.

Plaintiffs also mischaracterize Sageman's use of a handwritten bin Laden document from the Abottabad raid that, if accurate, would put the conception of the idea behind the 9/11 attacks in November 1999.  They inaccurately state that Sageman "accept[s]" the bin Laden document "without making any effort to evaluate or corroborate its content" and does not "evaluate the direct contradictions between the Bin Laden note and KSM's statement," which arguably puts the conception of the attacks in March or April 1999.  Pls. Mot. 44 & n.231.  To the contrary, Sageman notes this conflict and considers both March or April 1999 and November 1999 as potentially relevant dates.  Sageman Rep. 123-28.  Either starting point supports his rebuttal, because either date would contradict Youssef's and Nakhleh's hypotheses that Adel Al Sadhan and Mutaeb Al Sudairy were acting as an "advance team" when they visited San Diego in Ramadan AH 1419 (December 1998 and January 1999).  *Id.* at 359, 553, 625-26.

**g.    Other methodological objections.**  Plaintiffs' remaining methodological objections are a hodge-podge of criticisms of Sageman's treatment of particular pieces of evidence.  Pls. Mot. 45-58.  Even if accurate (which they are not), those criticisms would point only to "minor flaw[s]" in Sageman's "reasoning" and would not detract from his "grounds for his . . . conclusions."  *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cleaned up).  Saudi Arabia nevertheless responds for the sake of completeness.

**i.**    Plaintiffs err in describing as "*ipse dixit*" Sageman's statement that the hijackers went to the King Fahad Mosque "'because it was a Salafi mosque with a Saudi imam.'"  Pls. Mot. 45 (quoting Sageman Rep. 356).  That inference is supported not only by KSM's statement, on which Sageman reasonably relied, but also by the statements of "most of the Muslims that the FBI interviewed," as well as "all the devout Muslims deposed in this litigation," that "Muslim[s] traveling abroad" can expect "hospitality and assistance" from their "fellow Muslims."  Sageman

Rep. 421 (citing as an example the statement attributed to Khalid Al Yafai recorded in a 9/11 Commission memorandum for the record).

  **ii.**  Plaintiffs fail to show that Alzamari's testimony required Sageman to accept their allegation that "Thumairy arranged for the hijackers to stay in Los Angeles through ████████ and ████████████" Pls. Mot. 46-47.  As Sageman explains, ██████ "rejected several times the claim that █████ had told him that [Al Thumairy] had tasked him to help the hijackers." Sageman Rep. 661 & n.2263 ████████████████████████████████ That claim was based on an FBI interview summary that ██████████ repeatedly testified was inaccurate. *Id.* at 322-23 ████████████████████████████ Plaintiffs seize on a separate part of ████████ deposition in which he testified that ██████ told him that the hijackers "came through" Al Thumairy ██████████████████████ but that language is ambiguous and does not indicate Al Thumairy asked █████ to do anything.  At his deposition, ██████ denied that Al Thumairy ever asked him to do anything for the hijackers and testified that he introduced Al Thumairy to the hijackers rather than vice versa.  Sageman Rep. 323 & n.1315, 402 & n.1615 ████████████████████████████████████████████████

Al Thumairy also denied asking anyone to do anything for the hijackers.  Ex. 75 (Thumairy Tr.), at 492:5-18.  The record does not support (much less compel) the conclusions Plaintiffs urge.

  **iii.**  Plaintiffs fail to show that Sageman errs in stating that there is "no evidence" that the hijackers stayed at ██████ apartment.  Pls. Mot. 47 (italics omitted); *see also id.* at 53 (repeating the same allegations about the apartment stay).  To be clear, the dispute concerns whether they stayed there in January 2000 (when the hijackers first arrived in Los Angeles), as Youssef opines.  Sageman agrees that there is evidence that ██████ "allowed al-Hazmi to stay for one night at his sister's empty apartment on 19-20 June 2000."  Sageman Rep. 395; *see id.* at 400 ██████████████████████████████ Sageman discusses ██████████ testimony

and explains that it is largely consistent with ▮▮▮▮ noting some inconsistencies such as

▮▮▮▮ use of the word "they." *Id.* at 397-98 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮[53] Sageman also discusses, and gives his reasoning for not accepting, the version of

events presented in an FBI summary of a 2015 interview summary for ▮▮▮. *See id.* at 390-92

(explaining that ▮▮▮ "explicitly repudiated" the summary at his deposition and that the FBI

agents who wrote it "appear[ ]" to have "substituted ▮▮▮▮ alleged 2010 account of what

▮▮▮ had supposedly told him for ▮▮▮ own account").[54]  His thorough analysis of the

evidence confirms the reliability of his methods.[55]

      **iv.**     Plaintiffs fail to show that Sageman erred in relying on ▮▮▮ and ▮▮▮

testimony that the two did not know each other and did not speak on the phone, but that ▮▮▮

wife and ▮▮▮ mother, who did know each other, may have done so.  Pls. Mot. 49; *see*

Sageman Rep. 369-70.  That is a reasonable alternative explanation for allegedly suspicious

contacts; considering alternative explanations is an expert's job.  *See* ECF No. 9060, at 5.

As Sageman points out, the point also illustrates the "weaknesses of relying on specific

---

    [53] Contrary to Plaintiffs' characterization of his testimony, Pls. Mot. 46-48, ▮▮▮ did not testify that ▮▮▮ told him about the stay in January 2000.  He testified that he does not "remember the exact time" when the stay at the apartment occurred and that ▮▮▮ told him about it only "after the fact, after it happened." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    [54] Nor, as Plaintiffs contend, Pls. Mot. 48, was Sageman required to accept the testimony of the former law enforcement agents who wrote the unreliable 2015 summary (and who now work for Plaintiffs as consultants) that ▮▮▮ said the things they wrote.

    [55] Plaintiffs assert that Sageman must have been wrong in accepting ▮▮▮ testimony because ▮▮▮ testified that he dropped Al Hazmi and Al Mihdhar at a Santa Monica "bus station," but "an internet search" shows that the Santa Monica Greyhound terminal "closed in 1994." Pls. Mot. 49 & n.258.  Such nitpicking does not rise to the level of a *Daubert* challenge.  Also, ▮▮▮ did not say he dropped the hijackers off at that particular terminal.  He said he dropped them off at a "stop station" where a bus would make a stop after leaving from a "main" station. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

telephone links," which taken alone do not "provide the identity of the caller."  Sageman Rep. 370.[56]

v.      Plaintiffs err in asserting that Sageman "ignor[es] . . . proof" supporting their allegation that Al Thumairy received a suspicious call from Malaysia before Al Hazmi and Al Mihdhar arrived in Los Angeles and then "assigned" ███ to support them.  Pls. Mot. 49-50. To the contrary, Sageman discusses at length those allegations, the unreliable FBI documents on which they are based, and the related opinions of Nakhleh and Youssef.  Sageman Rep. 320-21, 325-27, 554-57, 647, 657-59.  He does not "ignor[e]" anything; nor do Plaintiffs point to any competent evidence – much less "proof" – to support their version of events.

vi.      Plaintiffs criticize Sageman for purportedly "blindly adop[ting]" Al Bayoumi's purportedly "false cover story" about his encounter with Al Hazmi and Al Mihdhar, which they continue to insist was "carefully planned tradecraft."  Pls. Mot. 50-51.  Sageman explains in detail his reasons for rejecting the hypotheses that the meeting was planned as a matter of intelligence tradecraft or that a competent clandestine operator in Al Bayoumi's position would have brought along an innocent third party like Morgan as a "cover."[57]  Plaintiffs' assertions that

---

[56] Plaintiffs quote an FBI document asserting that ████████████████████████████ ████████████████████████████████████████████  Pls. Mot. 49 & n.259 (quoting Pls. Ex. 60) (capitalization omitted).  Sageman considers this document, but does not find it persuasive.  Sageman Rep. 369.  The assertion is conclusory, and the document does not state what the times or alleged "events of logistic assistance" were.

[57] *See* Sageman Rep. 250 (small restaurant would be a "terrible place to meet"), 250-51 (contact with Saudi government agents "would go against all principles of clandestine operations"), 301 (Al Bayoumi's voluntary disclosure of the meeting to MPS would violate the principle of "never admit[ting] one's relationship with clandestine assets"), 302 (a "competent intelligence officer would not bring an unwitting person like Morgan to a clandestine meeting"), 374 n.1511 (Morgan's presence "was not a cover story" because it did not give Al Bayoumi a "reason" to perform the allegedly "operational act[s]"), 683 ("bring[ing] a perfect stranger to a clandestine meeting . . . breaks the secrecy of the meeting").

things must have happened as they and their experts say are no basis for excluding contrary testimony from a qualified expert.

      **vii.**    Plaintiffs fail to undermine Sageman's reasoning that Al Bayoumi likely traveled to Los Angeles once (on January 31, 2000) rather than twice (on both January 31 and February 1). Pls. Mot. 50-52.  Sageman acknowledges that "most documents date [the trip] as 1 February 2000," which is the date of Al Bayoumi's renewed passport.  Sageman Rep. 176.  He reasons that the trip more likely occurred on January 31, with the passport being issued and mailed on February 1, because ████████████████████████████████████████████

████████████████████████████████.  *Id.* at 176-77.[58]  Youssef opines that there were two trips, Youssef Rep. 177-180, 184, but Sageman analyzes Al Bayoumi's fuel purchases and responds that they were "far more compatible with just one trip to Los Angeles than two," Sageman Rep. 669 (adding up Al Bayoumi's total gas purchases and consumption over six weeks).  Plaintiffs' quarrels with that analysis do not warrant exclusion.[59]

      **viii.**    Plaintiffs do not show that any evidence required Sageman to accept their allegation that "Bayoumi and Mana . . . kn[e]w each other" before meeting at the Consulate.  Pls. Mot. 52.  As Sageman explains, Mana testified that he did not know Al Bayoumi, Sageman Rep.

---

    [58] *See* ████████████████████████████████████████████
████████████; Ex. 87 (KSA0000007996-8020) (passport itself).

    [59] Plaintiffs assert that Al Bayoumi could not have been traveling with Morgan on January 31 because Al Bayoumi's cell phone called a cell phone number they attribute to Morgan that morning, Pls. Mot. 51, but it is hardly impossible that Al Bayoumi might have had a reason to call Morgan on a day they were traveling together.  Further, Morgan testified that he did not even have a cell phone during the relevant period, Ex. 74 (Morgan Tr.), at 95:20-96:12, making Plaintiffs' attribution of the calls to him questionable.  In addition, Plaintiffs quibble with Sageman's math as to the fuel calculations, Pls. Mot. 51-52 n.272, but appear not to understand that he treats the February 1 purchase as an "extra" filling that accounts for the Los Angeles trip, Sageman Rep. 669.  When the February 1 filling is thus excluded from the weekly average, Sageman's statement that Al Bayoumi averaged "about 12 gallon[s]" per week, *id.*, is correct.

**REDACTED FOR PUBLIC FILING**

199-200 (citing Ex. 51 (Mana Ex. 603), ¶¶ 10-12; and Ex. 88 (Mana Tr.), at, *e.g.*, 134:8-135:22,

███████████, while Al Bayoumi could identify Mana only as "a non-Saudi employee with a

beard," *id.* at 182 (summarizing Ex. 89 (Bayoumi Tr.), at 381:6-390:16); *see also* Ex. 89

(Bayoumi Tr.), at ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████.

     Plaintiffs' assertions that Al Bayoumi and Mana knew one another (and testified falsely

that they did not) do not establish any errors in Sageman's approach.  Pls. Mot. 52-53.  They

misplace reliance on ████████████████████████████████████████████

████████████████████████████████████ which Sageman addresses, Sageman Rep. 367-

69, and ████████████████████████████████████████████████████████

████████████████████.  They also assert that ███████████████████████████ but

Sageman addresses that point as well and explains that ███████████████ is shown not in ████████████

████████████████ but in ████████████████████████████████████████████████

████████████████████████████.[60]  And Plaintiffs rely on the declaration that their

counsel drafted for Morgan, Pls. Ex. 29, but that declaration does not state that Al Bayoumi and

---

[60] Specifically, Sageman observes that ███████████████████████████████████████
"cannot be accurate" because ████████████████████████████████████████████████
████████████████████████████████████████████.  Sageman Rep.
449 n.1780 (discussing documents including ███████████).  He also observes that ████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████████████████████.

Mana knew one another.[61]  Even if it did, the significant changes between the different versions

of events Morgan has related, *see* Sageman Rep. 183-99, suggest no particular reason to prefer

his recollection over Al Bayoumi's and Mana's.[62]

       **ix.**     Plaintiffs' assertion that Sageman "fails to address[ ] . . . Morgan's testimony"

about an alleged visit to the King Fahad Mosque after the restaurant encounter, Pls. Mot. 53-54,

mischaracterizes Sageman's report.  Sageman addresses in detail Morgan's different versions (or

the versions attributed to him by the FBI or drafted for him by Plaintiffs) of the events.  Sageman

Rep. 183-99, 373-75, 378, 380-81, 386, 392-93; *supra* pp. 34-36.

       **x.**     Plaintiffs incorrectly state that Sageman "discounts, without explanation, . . .

evidence that Bayoumi was already looking at various apartments for the hijackers before they

arrived in San Diego."  Pls. Mot. 56.  Sageman addresses that purported evidence, which is the

declaration of apartment manager Holly Ratchford that Al Bayoumi had repeatedly asked about

available apartments.  Sageman Rep. 207 & n.852 (citing Ex. 46 (Ratchford Decl.), ¶ 6); *see also*

Pls. Ex. 29 (Morgan Decl.), ¶ 25 (similar).  As Sageman explains, Al Bayoumi testified that he

asked Ratchford about available apartments because he was hoping to earn a referral fee (as he

---

[61] The declaration states that, when Al Bayoumi and Mana "spoke briefly" at the Consulate, it was "mentioned in [Morgan's] presence . . . that Mr. al-Bayoumi had not been at the consulate for at least three months" and that later at the King Fahad Mosque, after the "sunset prayer," Al Bayoumi "went into a conference room near the mosque entrance."  Pls. Ex. 29 (Morgan Decl.), ¶¶ 12, 20-21.  The second statement is qualified by a statement that it is made "[t]o the best of [Morgan's] recollection."  *Id.* ¶ 21.

[62] Sageman also addresses the December 2000 letter that Plaintiffs mischaracterize as "confirm[ing] Bayoumi's close relationship with Mana."  Pls. Mot. 53 (citing Sageman Rep. 602).  Plaintiffs incorrectly state the letter was "to . . . Mana" and was "addressed" to him, *id.*, but in fact it was a holiday greeting addressed to the consul general that included thanks to Mana (using the polite honorific "Sheikh") along with three other consular employees.  *See* Sageman Rep. 601-02 (discussing Ex. 90 (Ltr. from Al Bayoumi to Consul General (Dec. 29, 2000))).  Nothing in it suggests a "close relationship."

did for referring Al Hazmi and Al Mihdhar) and that he made similar referrals on other occasions and earned similar fees.  Sageman Rep. 207 (citing Ex. 89 (Bayoumi Tr.), at 734:1-17); *see also id.* at 666 (explaining that the information about referral fees, which Ratchford confirmed, puts Al Bayoumi's "inquiries . . . in a different light").  Plaintiffs, like their experts, omit this innocent explanation for Al Bayoumi's effort to connect Al Hazmi and Al Mihdhar with an apartment.[63]

  **xi.**  Finally, Sageman does not exceed the bounds of reasonable expert opinion in pointing to the lack of evidence supporting Plaintiffs' allegations that Anwar Al Awlaki was part of a supposed plot to support the 9/11 attacks.  The main dispute on this point is whether, on the day that Al Bayoumi helped Al Hazmi and Al Mihdhar with their security deposit, Al Awlaki called "the same bank where Bayoumi took the hijackers."  Pls. Mot. 57.  There are no phone records showing such a call; the only evidence that it occurred is an FBI analysis document that states that "Aulaqi" called the "Villa La Jolla Drive" branch that day.  Pls. Ex. 77, at 612-UPDATED.  As Sageman points out, Al Bayoumi did not take the hijackers to the Villa La Jolla Drive branch, but to the Balboa-Genesee Branch.  Sageman Rep. 495, 691.

  Relying on business cards found in the MPS production and comparing them to the phone numbers in the FBI analysis document, Plaintiffs appear to suggest that the FBI got the call *number* right, but attributed it to the wrong bank *branch*.  Pls. Mot. 57-58 & nn.307, 312 (citing Pls. Exs. 77, 84).  But if the FBI document is not reliable about the identities of the participants

---

[63] Plaintiffs also point (at 56) to Ratchford's testimony that Al Bayoumi told her that Al Hazmi and Al Mihdhar were "staying with him," Ex. 46 (Ratchford Decl.), ¶ 7, which Al Bayoumi denied in one of his MPS interviews.  *Compare* Sageman Rep. 11 (discussing Ex. 91 (Al Bayoumi MPS Tr. C (Sept. 23, 2001))), at 13 (explaining that in cultural context it would be improper for single men to stay at a family home with women present), *with* Ex. 46 (Ratchford Decl.), ¶ 7.  The inconsistency could easily be a misunderstanding or failure of recall, and does not show any problem with Sageman's methods.

in the call, then Plaintiffs have no basis to say that Al Awlaki himself was the caller.  As Sageman points out, the number given for Al Awlaki is the number for the mosque at which he preached, not his personal number, so the call could have been made by "anyone at Al-Ribat Mosque who had access to this telephone."  Sageman Rep. 691; *see also id.* at 495.  That is a reasonable basis to question whether the call was made as Youssef asserts.[64]

## C.   Plaintiffs' Other Challenges to Sageman's Opinions Fail

Plaintiffs' remaining three arguments lack merit.  *First*, Plaintiffs accuse Sageman of improperly "act[ing] as judge and trier of fact" by seeking to act as "arbiter of the truth" and "enter[ing] the minds of witnesses."  Pls. Mot. 58-60.  The audacity of this argument is remarkable.  As Saudi Arabia has shown in its motion, Plaintiffs have proffered experts to urge the Court to draw factual inferences and accept factual narratives based on conclusory assertions about their experience as investigators or researchers, KSA Mot. 6-7, 26-27, 34-35, 42-43, 57-58; the importance of various sources of evidence or non-evidentiary hearsay, *id.* at 27-30, 39-41, 44-45, 53-57; the credibility of witnesses, *id.* at 58-59, 61-63, 65-66, 67; and the states of mind of individuals, organizations, and, in Nakhleh's case, the entire religious tradition of Hanbali Salafism, *id.* at 59-61, 63-65, 66, 67.  The Court should exclude those opinions.  If it does, Sageman will not need to rebut them.  But if the Court allows Plaintiffs to present experts

---

[64] Further, the business cards are ambiguous.  *Compare* Pls. Ex. 77, at 612-UPDATED (FBI analysis document stating that the number called from the Al Ribat Mosque was "(858) 452-8400"), *with* Pls. Ex. 84 (business card listing "619/654-6720" directly under the Balboa Avenue address for the branch and "619/452-8400" next to the heading "Customer Service") *and* Ex. 92 (second business card listing "858.654.6720" under the Balboa Avenue address and "858.452.8400" as a "Customer Svc" number).  Leaving the area-code discrepancy aside, the description of the 452-8400 number as a "Customer Service" number does not show that it was associated only with the Balboa-Genesee branch; it could have been a general number used by more than one branch.  The different central-office codes (654 and 452) also indicate that the numbers on the cards were not served by the same telephone switch.  *See generally In re Administration of the N. Am. Numbering Plan*, 11 FCC Rcd 2588, 2592 & n.13 (1995).

**REDACTED FOR PUBLIC FILING**

who argue inferences from discovery material, conjecture about "support networks," and attribute terrorist ideology and deceptive intent to witnesses, Saudi Arabia should be permitted to present Sageman's careful rebuttal of those inferences, conjectures, and attributions.

*Second*, Plaintiffs accuse Sageman of drawing "legal conclusions" and weighing upon the "merits of [their] allegations." Pls. Mot. 60-62. They point to nothing in Sageman's report that fairly reads as a legal conclusion. Where he discusses the lack of "'evidence'" supporting the FBI's "'speculations'" about Al Jarrah, Pls. Mot. 60 (quoting Sageman Rep. 352), he is summarizing factual opinions in the previous section. Where he refers to Plaintiffs' attempt to "'open up the KSA to all sorts of liability,'" *id.* (quoting Sageman Rep. 276) (cleaned up), he is giving background and context for his opinions about Al Bayoumi's alleged role as an intelligence officer, which he addresses as a factual matter informed by his CIA experience. Sageman Rep. 300-04. Where he states that certain topics are not "'relevant'" or are "'peripheral,'" Pls. Mot. 60 & n.325 (quoting Sageman Rep. 523, 608, 709), he is explaining his reasons for not opining on those topics. None of those statements attempts to usurp the Court's role of declaring the law.

Plaintiffs' complaint that Sageman opines on the "merits of their allegations" again disregards the nature of the opinions he is rebutting. Youssef, Nakhleh, and Meleagrou-Hitchens all proffer opinions that endorse Plaintiffs' core allegations in this case.[65] In rebutting those

---

[65] *See*, *e.g.*, Youssef Rep. 9 (opining that "Saudi Arabia through its officials knowingly provided critical support and cover for Sunni Islamic extremists, including Al Qaeda," by creating a "network [that] provided substantial assistance to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar upon their arrival in the U.S., understanding that the two were Al Qaeda operatives"); Nakhleh Rep. ¶ 237 (opining that "officials employed by the Kingdom of Saudi Arabia were among the officials who provided material support to the 9/11 plot" and "knew that they were assisting terrorist operatives of the al-Qa'ida organization who were preparing to commit acts of violent jihad inside the United States"); Meleagrou-Hitchens Rep. ¶ 124 (opining that Al Awlaki "had some knowledge of the al-Qaeda connections of" the hijackers, "help[ed] acclimate and settle the hijackers into their lives in America," and was part of a "U.S.-based support network . . . working through and in concert with Saudi officials and agents").

opinions, Sageman himself necessarily comments on those allegations and finds them unsupported. Plaintiffs cannot proffer expert opinions that embrace the merits and then move to preclude Saudi Arabia's expert from saying those opinions are wrong.

*Third*, as the preceding sections show, Plaintiffs' attempt to label Sageman's opinions as "conclusory" and "speculati[ve]," *id.* at 61-62, find no support in his work product, which gives an extraordinarily detailed account of his sources and reasoning. He might possibly be faulted for including too much detail, but not for failing to explain himself. He meets the criteria the Court has set out by "describ[ing] [his] methodolog[y] in detail; demonstrat[ing] that [he] analyze[s] information in ways analogous to accepted social science . . . [and] national security practices; and provid[ing] citations to respected sources." ECF No. 9060, at 40. The Court should rule his testimony admissible.

## II.     Rundell's Opinions Are Admissible

### A.     Rundell Is Qualified To Offer the Opinions in His Report

Rundell is qualified to offer rebuttal opinions on Saudi history, politics, and religion, as well as on Saudi Arabia's longstanding strategic relationship with the United States and its hostile relations with Al Qaeda in the years leading up to the 9/11 attacks. His qualifications to do so come from his years of experience on the ground in Saudi Arabia, from his time as a junior political officer visiting "nearly every town and large village" in the country, Rundell Rep. 40, to his senior roles that included meetings with King Abdullah and his ministers, *id.* at 1. After leaving government service, he continued to build on that expertise with both consulting and scholarly work, including his 2020 publication of a peer-reviewed book on Saudi Arabia's history, politics, and current role in world affairs. *See supra* pp. 17-18.

Plaintiffs concede that Rundell's "many years of residence in Saudi Arabia may have positioned him to discuss certain aspects of the Kingdom," but assert that he is "unqualified to

address the issues in this case." Pls. Mot. 69.  To the contrary, Rundell is qualified to rebut

Dunham's assertions that it was inconsistent with the "United States['] . . . expect[ations]" and

"international practice" to "post[ ] [Saudi] religious personnel in diplomatic status," Dunham Rep.

11-12, based on his experience with the United States' practices of promoting its own cultural

values through its own diplomatic personnel, Rundell Rep. 33-34.[66]  He is qualified to rebut

Nakhleh's assertions about "Wahhabi" beliefs and support of "violent jihad" against the United

States as well as Nakhleh's depiction of MOIA as a "Saudi state vehicle" that "support[ed] . . .

violent jihad," *e.g.*, Nakhleh Rep. ¶¶ 34, 92, 169, based on his studies of Saudi Arabia's history

and religion and on his experience with MOIA.  Rundell Rep. 1, 44-46.  He is qualified to rebut

Simon's claims that Saudi Arabia "played handmaiden to the 9/11 attacks" by "systematically

evad[ing] and den[ying]" U.S. requests for counterterrorism cooperation, Simon Rep. ¶ 14,

based on his studies of and experience with Saudi cooperation, Rundell Rep. 1, 37-40, including

on the attempted 1998 extradition of bin Laden from Afghanistan, *id.* at 28-29.  Finally, based

on his familiarity with Saudi Arabia's "goals [as] an organization," ECF No. 9060, at 29,

Rundell is qualified to opine that it is "implausible that the Saudi government funded or

supported one of its most dangerous enemies in an attack on one of its most important strategic

allies."  Rundell Rep. 3.

### B. Rundell's Opinions Are the Product of a Reliable Methodology

Because he is testifying as a rebuttal expert, Rundell is "under no obligation to create

models or methods of his own."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 51

---

[66] Recognizing the limits of his expertise, Rundell reasonably declines to opine on whether Saudi Arabia "obtained the proper . . . credentials" for all MOIA employees or "violated State Department regulations in place at the time," Rundell Rep. 33, limiting his opinion to broader diplomatic norms and the United States' own practices.  Plaintiffs incorrectly assert that makes Rundell's opinion "irrelevant," Pls. Mot. 67, but if Dunham's opinions themselves are relevant, it is also relevant that his assertions about norms and practices are inaccurate.

(S.D.N.Y. 2016).  His role is instead to "'attack'" the "'models or methods'" of Plaintiffs'

"'expert[s].'"  *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (quoting

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)).  He is rebutting

experts who testify about Saudi Arabia's politics, religion, relations with the United States, and

compliance with diplomatic norms based on their purported experience.  *See*, *e.g.*, Nakhleh Rep.

¶¶ 25-145; Simon Rep. ¶¶ 11-14, 20; Dunham Rep. 12.  To the extent their testimony is admitted,

Rundell can properly explain the flaws in that testimony based on his own experience and peer-

reviewed research.  *See* Rundell Rep. 33-48.

    Plaintiffs' attacks on Rundell's methodology and reasoning fall short.  *First*, they

inaccurately challenge as "conclusory," Pls. Mot. 66, Rundell's opinions that the United States

is "one of [Saudi Arabia's] most important strategic allies," that Al Qaeda is "one of [Saudi

Arabia's] most dangerous enemies," and that it is "implausible" that Saudi Arabia as an

institution would have supported an Al Qaeda attack on the United States, Rundell Rep. 3.  To

the contrary, Rundell describes in detail the importance of Saudi Arabia's strategic relationship

with the United States to both parties, citing sources including the State Department, the Council

on Foreign Relations, and several historians, as well as describing his own personal experience

as a U.S. diplomat in Saudi Arabia.  Rundell Rep. 34-40 & nn.89-94.  He also describes bitter

enmity between Saudi Arabia and Al Qaeda before and after the 9/11 attacks, including Saudi

Arabia's stripping of bin Laden's citizenship and attempts to extradite him, as well as Al Qaeda's

rhetorical and physical attacks against Saudi Arabia, citing sources such as bin Laden's own

statements and later memoirs and histories, again supported by Rundell's own experience.  *Id.* at

26-32 & nn.67-80.

    *Second*, Plaintiffs miss the mark in arguing that Rundell's testimony is unreliable because

he did not "analyze [allegedly] relevant record evidence."  Pls. Mot. 68.  Rundell's report is clear

that his "assignment" did not include "addressing the history of [the 9/11 attacks] or attempting to weigh the evidence concerning them."  Rundell Rep. 30.  Plaintiffs cite no authority that every expert must analyze record evidence.  To the contrary, an expert can properly "'offer background knowledge or context that illuminates . . . past events,'" ECF No. 9060, at 5-6 (quoting *Marvel Characters*, 726 F.3d at 136) (ellipsis in original), as Rundell does here.  That he is not testifying about the actions of particular individuals based on discovery materials does not make his opinions inadmissible.

### C.    Plaintiffs' Other Challenges to Rundell's Opinions Fail

Plaintiffs' other criticisms of Rundell either wholly lack merit or go to weight rather than admissibility.  *First*, they err in claiming that he is biased because he has stated that the United States' "'strategic relationship with Saudi Arabia . . . should not be destroyed by the death of one person,'" referring to the 2018 murder of Jamal Khashoggi.  Pls. Mot. 68-69 (quoting Rundell Tr. 293:10-15).  As Rundell pointed out, Rundell Tr. 293:16-296:4, the United States itself shares that view and has continued after Khashoggi's death to engage with Saudi Arabia at the highest levels during both the Trump and Biden Administrations.  Plaintiffs' assertion that Rundell is biased because he agrees with the United States on that matter of foreign policy is meritless and in any event goes to the "'appropriate weight . . . to be afforded his expert testimony.'"  *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (declining to exclude expert for alleged bias; quoting *Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005)); *see also El Ansari v. Graham*, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019) (only "bias of an extraordinary degree" warrants exclusion).[67]

---

[67] Although the issue is not relevant to the present litigation, Saudi Arabia considers Khashoggi's death to be murder under its own laws and has prosecuted and convicted his murderers in its own courts.

*Second*, Plaintiffs mischaracterize some of Rundell's criticisms of Nakhleh's opinions as opinions on Nakhleh's own credibility.  Pls. Mot. 68.  To the contrary, Rundell reasonably points out a conflict in Nakhleh's reasoning:  Nakhleh concedes that the relationship between politics and Islam varies depending on "the social, cultural, historical, linguistic, economic, educational, and political environment of a particular country," Nakhleh Rep. ¶ 5, but then claims to be able to testify about Islam in Saudi Arabia based on experience "in Europe, across the African continent, and in Australia," and more generally "across the Muslim world," *e.g.*, *id.* ¶¶ 20, 23. Rundell points out that this "dilution of effort," Rundell Rep. 40, undermines Nakhleh's own description of the basis for his claims, and then points to specific "error[s]," "inconsisten[cies]," "inaccuracies," and "exaggeration[s]" in Nakhleh's report, *id.* at 40-48.  That is appropriate "critiqu[e]" of an "opposing party's expert witness."  *Scott*, 315 F.R.D. at 44 (cleaned up). The Court should reject Plaintiffs' effort to paint it as a credibility opinion.

## III.    Moss's Opinions Are Admissible

Plaintiffs do not dispute that Moss is qualified to testify about matters of aviation based on his experience.  Nor do they challenge most of his opinions rebutting their expert Schiff. Instead, their challenge is limited to two narrow aspects of Moss's rebuttal opinions:  the distance from which the World Trade Center is visible, and the likely uses of the equation.

### A.    Moss's Opinion on the Visibility of the World Trade Center Is Reliable

Plaintiffs fail to show that Moss's opinion that "one must be within 5-10 miles to identify a building such as the [World Trade Center]" should be excluded as unreliable.  Pls. Mot. 63. Moss explains in his report that his opinions are based on his decades of aviation experience and his thousands of hours of flight time – including into New York and Washington, D.C.  Moss Rep. 11, 19; *see* Moss Tr. 94:18-24 (he is familiar with the approach to New York), 98:6-13 (he has flown into New York 50 to 100 times as a commercial pilot), 103:22-104:21 (his

**REDACTED FOR PUBLIC FILING**

opinions are an "extrapolation from [his] thousands of hours of experience looking at general terrain, general objects, skylines, buildings, and making a reasonable deduction and estimation of [his] visual acuity").  Based on that personal experience, Moss explains that numerous factors – including haze, smoke, moisture, and refraction – limit pilot visibility and that the limits of human eyesight make it impossible to distinguish objects that are relatively small compared to the distance to the object.  Moss Rep. 8-11, 19-20.

Moss's personal experience provides ample basis for his opinion regarding the distance at which the World Trade Center and the Pentagon are visually identifiable.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 & n.148 (S.D.N.Y. 2010); *In re Jacoby Airplane Crash Litig.*, 2007 WL 5037683, at *37 (D.N.J. Aug. 27, 2007) (allowing a pilot to testify based on experience, because "piloting is not a hard science" but instead "is based on the observations and experience of the pilot expert").

Plaintiffs' contention that the World Trade Center "was visible from the ground from more than 30 miles away," Pls. Mot. 63, is a "factual dispute[ ]," ECF No. 9060, at 19, not a ground for exclusion.  Further, Plaintiffs provide no reliable basis for their assertion, but cite an online newspaper article that is not admissible for its truth.  *See* Pls. Mot. 63 n.347 (citing Neil Vigdor, *Witness to the unthinkable:  Greenwich Point onlookers recall the day the towers fell*, Greenwich Time (Sept. 12, 2011) ("Greenwich Time article"), *at* https://www.greenwichtime. com/news/article/Witness-to-the-unthinkable-Greenwich-Point-2164396.php); *see also Eastern Profit Corp. v. Strategic Vision US, LLC*, 2020 WL 7490107, at *4 (S.D.N.Y. Dec. 18, 2020).[68]

---

[68] Counsel for Saudi Arabia has retrieved and saved a copy of the Greenwich Time article and all photographs and can provide them to the Court upon request.  Because of the number (21) and size (several megabytes each) of the photograph images attached to the article, filing the entire set by ECF would be cumbersome.  As set out below, certain images from the article are Exhibits A through D to the Quindry Declaration, which is Exhibit 93 to this opposition.

Further inquiry into the Greenwich Time article shows greater reasons to doubt its reliability. Plaintiffs did not introduce the article at Moss's deposition, instead citing it for the first time in their opposition as a "media source[ ]" that "captured images" of the World Trade Center "after the 9/11 Attacks" from "approximately 30 miles away." Pls. Mot. 63. After seeing this surprising representation, counsel for Saudi Arabia consulted an expert on digitally enhanced photography, who confirmed that the article pulled up by going to the website Plaintiffs cite shows some images produced with the use of a "telephoto lens" and that some images "appear tightly cropped, increasing the magnification already obtained by the lens." Ex. 93 (Quindry Decl.), ¶¶ 11-12. As a result, the images "are very misleading when it comes to determining the ability to make out the New York skyline . . . and in no way represent what someone there would experience with the naked eye." Id. ¶ 15 (describing Quindry Exs. A, B, and C, which are three of the images presented by the article).[69] The Court should disregard Plaintiffs' attempt to counter Moss's expert opinion by pointing to so-called "captured images," Pls. Mot. 63, that use special lenses and editing techniques to give a misleading impression of visibility.[70]

Plaintiffs also seek to exclude additional tests that Moss did to verify his opinion. Id. at 64-65. Those tests are not set forth in Moss's report; Saudi Arabia has not proffered and does not intend to proffer his testimony about them. Plaintiffs themselves elicited testimony regarding these tests when they asked Moss what he had done to "confirm" his opinion. Moss Tr. 104:22-

---

[69] A fourth image attached to the article presents "a realistic view of what a person would see with the naked eye from that location." Ex. 93 (Quindry Decl.), ¶ 15 (discussing Quindry Ex. D). In that image, "[t]he New York City skyline has all but disappeared." Id. ¶ 14.

[70] Some individuals quoted in the Greenwich Time article state that at the time of the September 11 attacks the "flash" or "fireball" from the planes striking the towers was visible to the naked eye from 30 miles away. Greenwich Time article; see also id. (referring to the post-attack "plume of smoke"). Those statements, in addition to being inadmissible, are irrelevant to whether the hijackers could see the towers from that distance during their flight approach.

105:2.  In any event, Plaintiffs fail to show the tests are unreliable.  Moss conducted the tests by measuring distances to objects that he could visually identify from the side of a mountain.  *Id.* at 104:22-105:22.  He used the application ForeFlight, *see id.* at 107:5-10, which pilots use for navigation – including Plaintiffs' own expert, Schiff, who vouched for its accuracy, *see* Schiff Tr. 82:20-83:7.[71]  Because the structures are shown on ForeFlight, *see* Moss Tr. 109:8-16, there was no need for Moss to know their mailing addresses, as Plaintiffs imply (at 64).

### B.  Moss's Opinion on the Likely Uses of the Equation Is Reliable

Plaintiffs also fail to show that Moss's rebuttal to Schiff's opinion about the likely use of the equation is speculative.  Pls. Mot. 65.  Moss explains that the equation is not commonly used in the aviation industry, would have been useless to determine how far away one could see a target, and could not have been used by the 9/11 hijackers based on the flight path they took.  *See supra* pp. 23-24.  Based on those premises, Moss disagrees with Schiff's opinion that the equation was related to the 9/11 attacks.  *See* Moss Tr. 50:11-19 ("the equation is completely useless" to the hijackers), 51:19-22 (denying "any relation" to 9/11 attacks).  At the same time, Moss notes that the equation is used in math education.  Moss Rep. 7-8, 23-39 (examples).  Moss thus observes that the equation in Al Bayoumi's notebook is "more consistent with Mr. Bayoumi assisting a student, perhaps his own son."  *Id.* at 7.

Unlike Schiff, who opines on Al Bayoumi's state of mind when writing down the equation, *see* KSA Mot. 67, Moss properly stays within his role as an expert in "'account[ing] for obvious alternative explanations'" for the equation and calculations, ECF No. 9060, at 5 (quoting *Deutsch*, 768 F. Supp. 2d at 426).  Indeed, he expressly refuses to try to "get into

---

[71] "Schiff Tr." refers to the transcript of Schiff's deposition on July 11, 2022, excerpts from which are Exhibit 11.

Mr. Bayoumi's head." Moss Tr. 23:16-24. Because Moss's testimony "d[oes] 'not directly opine' on intent," ECF No. 9060, at 39 (quoting *CFTC v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016)), it is appropriate.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude the opinions of rebuttal experts Marc Sageman, David Rundell, and Douglas Moss.

Dated: June 26, 2023                    Respectfully submitted,

                                        /s/ *Michael K. Kellogg*
                                        _____
                                        Michael K. Kellogg
                                        Mark C. Hansen
                                        Gregory G. Rapawy
                                        Andrew C. Shen
                                        Christopher M. Young
                                        KELLOGG, HANSEN, TODD, FIGEL
                                          & FREDERICK, P.L.L.C.
                                        Sumner Square
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036-3209
                                        (202) 326-7900
                                        (202) 326-7999 (fax)

                                        *Attorneys for the Kingdom of Saudi Arabia*

REDACTED FOR PUBLIC FILING

## CERTIFICATE OF SERVICE

I hereby certify that, on June 26, 2023, I caused a copy of the foregoing Opposition to Plaintiffs' *Daubert* Motion To Exclude and/or Limit Proposed Expert Testimony to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*

67