REDACTED FOR PUBLIC FILING

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— | ) | |
| IN RE:  TERRORIST ATTACKS ON | ) | Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| ———————————————— | ) | |

This document relates to:  *All Actions*

## DEFENDANT KINGDOM OF SAUDI ARABIA'S
## REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

**REDACTED FOR PUBLIC FILING**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION .......................................................................................................1

ARGUMENT ...............................................................................................................2

I.     The Challenged Experts Are Unqualified To Offer Key Opinions In Their Reports .............................................................................................................2

     A.     Youssef's Lack of Qualifications ...........................................................2

     B.     Nakhleh's Lack of Qualifications ...........................................................3

     C.     Meleagrou-Hitchens' Lack of Qualifications .........................................6

     D.     Schiff's Lack of Qualifications ...............................................................6

II.     The Challenged Experts Offer Opinions That Are Not The Products Of Reliable Methodologies Or Reliable Data .......................................................7

     A.     Youssef and Nakhleh Purportedly Utilized Classified Methodologies and Materials in Forming Their Opinions ......................7

           1.     Youssef's Purported Use of Classified Methodologies and Materials ...............................................................................7

           2.     Nakhleh's Purported Use of Classified Methodologies and Materials ...............................................................................8

     B.     The Challenged Experts Fail To Disclose or Apply Reliable Methodologies and Use Unreliable Data .............................................10

           1.     Youssef's Failures To Disclose or Apply a Reliable Methodology and His Use of Unreliable Data...........................10

                 a.     Unexplained reliance on experience ...............................10

                 b.     Selective adoption of FBI theories.................................10

                 c.     Crediting hearsay from unknown sources......................11

                 d.     Speculation and conjecture ............................................12

                 e.     Use of unreliable telephone data....................................13

                 f.     Guilt by association.......................................................15

2.      Nakhleh's Failures To Disclose or Apply a Reliable
        Methodology ........................................................................17

        a.      Unexplained reliance on experience ...............................17

        b.      Lack of scholarly support.................................................18

        c.      Selective adoption of FBI theories.................................20

        d.      Speculation and conjecture .............................................21

3.      Meleagrou-Hitchens' Failures To Disclose or Apply a
        Reliable Methodology.........................................................21

        a.      Incomplete disclosure of methodologies ........................21

        b.      About-face from previous published work ......................21

        c.      Selective adoption of FBI theories.................................22

        d.      Speculation and conjecture about Al Awlaki.................23

        e.      Speculation and conjecture about Al Bayoumi and
                Al Thumairy ....................................................................24

4.      Schiff's Failures To Disclose or Apply a Reliable
        Methodology ........................................................................25

        a.      Unexplained reliance on experience ...............................25

        b.      Analytical gaps.................................................................26

        c.      Speculation and conjecture .............................................26

        d.      Obvious alternative explanations....................................27

C.   Youssef, Nakhleh, and Meleagrou-Hitchens Act as Conduits for
     Hearsay ............................................................................................28

III.   The Challenged Experts Opine On Improper Subjects.........................29

A.   Youssef Opines on Improper Subjects.............................................29

1.      Youssef Constructs a Factual Narrative Based on Record
        Evidence...............................................................................29

2.      Youssef Opines on Witness Credibility...............................30

3.      Youssef Opines on States of Mind.......................................31

**REDACTED FOR PUBLIC FILING**

|  |  |  |  |
|---|---|---|---|
| B. | | Nakhleh Opines on Improper Subjects | 32 |
| | 1. | Nakhleh Opines on Witness Credibility | 32 |
| | 2. | Nakhleh Opines on States of Mind | 33 |
| C. | | Meleagrou-Hitchens Opines on Improper Subjects | 34 |
| | 1. | Meleagrou-Hitchens Opines on Witness Credibility | 34 |
| | 2. | Meleagrou-Hitchens Opines on States of Mind | 34 |
| D. | | Schiff Opines on Improper Subjects | 35 |
| | 1. | Schiff Opines on Witness Credibility | 35 |
| | 2. | Schiff Opines on States of Mind | 35 |

CONCLUSION .................................................................................................................35

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

CASES

*Air Disaster at Lockerbie Scotland on December 21, 1988, In re*, 37 F.3d 804
(2d Cir. 1994) ................................................................................................29, 34

*AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763 (Mar. 19, 2019),
*objections overruled*, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) ..................................29

*Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368 (2014), *adhered to on recon.*,
2016 WL 981858 (W.D.N.Y. Mar. 15, 2016) ...................................................14

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
291 F.3d 1000 (7th Cir. 2002) ...........................................................................15

*CFTC v. Wilson*, 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ...................................33

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...........................................9

*ECD Inv'r Grp. v. Credit Suisse Int'l*, 2017 WL 3841872 (S.D.N.Y. Sept. 1,
2017). .................................................................................................................14

*Fosamax Prods. Liab. Litig., In re*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................31

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .........................................................21

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012) ......................................7

*Heparin Prod. Liab. Litig., In re*, 2011 WL 1059660 (N.D. Ohio Mar. 21, 2011) ......15

*Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223 (E.D.N.Y. 2014) .......................3

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (2001), *amended in part on
denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) ...........................................15, 34

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................................20

*Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861 (D. Vt. 2004) ................................26

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ...................6, 28, 30, 34

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ...........................................15

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ......................................30, 34

*R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010) .................................26-27

*Rezulin Prods. Liab. Litig., In re*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) .....................29

*Schulz v. Celotex Corp.*, 942 F.2d 204 (3d Cir. 1991) .................................................26

*Shelton v. Gure*, 2021 WL 2210989 (M.D. Pa. June 1, 2021) ......................................26

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107
    (2d Cir. 2006) ............................................................................................................20

*Term Commodities Cotton Futures Litig., In re*, 2020 WL 5849142
    (S.D.N.Y. Sept. 30, 2020) ........................................................................................31

*Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247 (S.D.N.Y. 1997) ...................................3

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) ............................10

*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000) ..............................................35

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ...................................................15

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ..............................................15, 29

*United States v. Patel*, 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ..........................31

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ..................................................35

*United States v. Ray*, 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ...............................17

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) .........................................15, 24, 34

*Youssef v. FBI*, 687 F.3d 397 (D.C. Cir. 2012) ...............................................................2

*Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996) ............................................29

RULES

Fed. R. Evid.:

    Rule 702(a) ................................................................................................................17

    Rule 702(b) ...............................................................................................................10

    Rule 702(c) ................................................................................................................10

    Rule 703 (1994) ........................................................................................................29

REDACTED FOR PUBLIC FILING

OTHER MATERIALS

Cole M. Bunzel, *Wahhabism:  The History of a Militant Islamic Movement*
        (Princeton Univ. Press 2023) ..............................................................................................19

2 *The Oxford Encyclopedia of the Modern Islamic World* (Oxford Univ. Press
        1995) ........................................................................................................................18

REDACTED FOR PUBLIC FILING

## INTRODUCTION

Plaintiffs' opposition fails to defend the testimony of the purported experts they have retained to tell the Court how to weigh the evidence in this case. Those experts lack qualifications for the opinions they proffer, and none applies any methodology that goes beyond speculation based on documents the Court can read for itself. Expert testimony with the manifest flaws present here is inappropriate for any case. The result should be no different because this case involves allegations of a terrorist conspiracy or has special historical significance. To the contrary, the case's complexity and significance only heighten the importance of ensuring that the record before the Court is made in compliance with settled law.

Plaintiffs' opposition relies on bromides about the care and diligence of their experts, including frequent protests that the experts "carefully considered" various pieces of evidence, employed "rigorous" analysis, and "cross-checked" or "weighed" evidence. The Court should not take those statements at face value. Examination of the experts' own reports instead shows failures to consider evidence that Plaintiffs contend was considered, mere assertions where Plaintiffs claim rigor, and no mention of cross-checking or other methodological steps. Plaintiffs have the burden to show the expert testimony they proffer is reliable. They cannot carry that burden by *ipse dixit*.

Each of the four challenged experts, moreover, gives inappropriate opinions on witness credibility and on states of mind that controlling precedent reserves for the finder of fact. Youssef and Nakhleh in particular rest key premises of their opinions not only on credibility and state-of-mind determinations, but on exercises in guilt-by-association and stereotyping. This Court has said, following both precedent and principle, that it will not permit such improper testimony in this case. Plaintiffs' experts' baseless attacks on Saudi Arabia, Saudi governmental institutions, and Saudi religious beliefs call for the Court to do so again.

1

**REDACTED FOR PUBLIC FILING**

## ARGUMENT

**I.     The Challenged Experts Are Unqualified To Offer Key Opinions In Their Reports**

**A.     Youssef's Lack of Qualifications**

Plaintiffs proffer Youssef as an investigator qualified to review the entire discovery record and advise the Court on which witnesses to credit and what inferences to draw.  Youssef's alleged qualifications for that task rest on assertions about his work experience.  Those assertions conflict with witness testimony the FBI submitted in an employment-discrimination case, where Youssef complained that his requests to work on the 9/11 investigation had been denied.  KSA Mot. 3-4.  Plaintiffs do not dispute that the FBI presented evidence that Youssef's pre-9/11 job responsibilities were only those of a translator, but dismiss the issue as "never adjudicated." Pls. Opp. 15-16 n.18.[1]  It should not instill confidence that the testimony of Youssef's former colleagues that he inflated his responsibilities never reached a jury.

Although Plaintiffs assert that the D.C. Circuit "concluded" that Youssef " 'worked on a variety of counterterrorism investigations and received high praise from his supervisors,' " *id.* at 16 (quoting *Youssef v. FBI*, 687 F.3d 397, 399 (D.C. Cir. 2012)), the language they quote is not a conclusion but comes from the background section of an opinion "viewing the evidence in the light most favorable to Youssef."  *Youssef*, 687 F.3d at 401.  The court of appeals did not weigh in on whether Youssef's pre-9/11 responsibilities involved substantive investigation.

Plaintiffs fail to show that the lack of support for Youssef's qualifications goes only to the weight of his opinions.  Courts exclude testimony where an expert "strays too far afield from his expertise."  ECF No. 9060, at 10.  Youssef does so when he departs from phone records to

---

[1] Plaintiffs misquote Saudi Arabia as stating that " 'the lawsuit shows' " that Youssef was a translator.  Pls. Opp. 15 (emphasis omitted).  Saudi Arabia stated that "the *testimony of FBI representatives from* his employment-discrimination lawsuit shows that his role at that time was that of a translator."  KSA Mot. 19 (emphasis added).

opine on clandestine tradecraft, *e.g.*, KSA Mot. 5 (discussing Youssef Rep. 15, 32, 169; Youssef Tr. 310:13-18);[2] on the reliability of confidential sources, *e.g.*, *id.* at 29-30 (discussing Youssef Rep. 32 & n.64, 61 & n.202, 155 & n.629); and on the purported involvement of senior Saudi officials in the 9/11 plot based on alleged supervision of charitable organizations, *e.g.*, *id.* at 33-34 & n.24 (discussing Youssef Tr. 36:22-37:16, 40:3-18, 50:10-18, 51:3-54:15, 56:15-57:8, 62:9-20, 64:7-17).  Further, a court may consider "lack of qualifications . . . and the inadequacies of [the expert's] methodology . . . separately or in combination" when resolving a *Daubert* challenge.  *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 253 (S.D.N.Y. 1997).[3]  A combined approach is appropriate here because Youssef's opinions rest so heavily on his exaggerated experience in investigating crimes.

### B.       Nakhleh's Lack of Qualifications

Plaintiffs proffer Nakhleh's testimony on several topics where he goes well beyond any relevant expertise.  *First*, Plaintiffs fail to defend Nakhleh's qualifications to opine on the history and beliefs of Saudi religion.  Nakhleh has no training on Saudi religion, has published no work on it, and discloses no relevant experience other than assertions about classified reports and briefings that he claims he cannot discuss.  KSA Mot. 7-8, 10, 19-21, 24-25.  Plaintiffs respond with an unsupported claim that Nakhleh "has spent decades deepening his scholarship . . . on the specific characteristics of Wahhabism."  Pls. Opp. 17.  They cite generally to paragraphs 19 to 28 of his report, of which only paragraphs 19 to 24 state his qualifications.  Those paragraphs do not

---

[2] "Youssef Tr." refers to his June 29, 2022 deposition, excerpts from which are Exhibit 94.

[3] *See also Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 228-29 (E.D.N.Y. 2014) (taking into account expert's "patently inflated" credentials in excluding his testimony).

mention "Wahhabism"[4] and discuss "political Islam" only generally, not Islam in Saudi Arabia.[5]

*Second*, Plaintiffs fail to defend Nakhleh's qualifications to opine on the history, creation, and goals of the Ministry of Islamic Affairs ("MOIA").  Neither his academic credentials nor his published work touch on this subject.  KSA Mot. 7, 19.  At his deposition, Nakhleh showed unfamiliarity with basic facts about MOIA.  *Id.* at 20 (collecting examples).  Contrary to Plaintiffs' characterization of that colloquy as a mere "memory test," Pls. Opp. 20, the questions Nakhleh could not answer go to the substance of his opinions.  For example, Nakhleh could not name the first Minister of Islamic Affairs.  Nakhleh Tr. 17:15-18:4.  That was Abdullah Al Turki, who after his retirement as minister personally joined in Saudi Arabia's 1998 attempt to extradite Osama bin Laden from Afghanistan.  Sageman Rep. 108-09.  Someone purporting to have expertise to say that MOIA "supported and promoted" "the violent *jihad* of bin Ladin," Nakhleh Rep. ¶ 169; *see also id.* ¶ 92 (similar), should be aware that MOIA's founding minister personally worked to bring bin Laden to justice.

*Third*, Plaintiffs fail to defend Nakhleh's qualifications to opine on MOIA's process for selecting propagators.  *See* KSA Mot. 20.  They cite his assertion in his report that he "came

---

[4] The only arguable reference to "Wahhabism" in those paragraphs is in paragraph 21, which claims that "Islamic activists" he encountered were "proud" and "honored" to speak with him in Arabic, referencing the "18th century" view of "Ibn Abd al-Wahhab" that "the Angel Jibril delivered to the Prophet Muhammad" the Qur'an "in the Arabic language."  Nakhleh Rep. ¶ 21.  That passing reference does not show "decades" of "scholarship . . . on the specific characteristics of Wahhabism."  Pls. Opp. 17.

[5] For example, when Nakhleh lists his "contacts" abroad, he mentions Egypt, Turkey, Jordan, Malaysia, Uzbekistan, Indonesia, Kenya, Palestine, Israel, and Tunisia – but not Saudi Arabia.  Nakhleh Rep. ¶ 20 n.1.  Plaintiffs also assert that Nakhleh made a "prominent case study" of Saudi Arabia, Pls. Opp. 10, but his report contains no statement supporting that claim, and neither does the deposition testimony Plaintiffs cite.  *See* Nakhleh Tr. 36:1-8, 42:8-18, 43:13-21.  ("Nakhleh Tr." refers to his June 15, 2022 deposition, excerpts from which are Exhibit 95.)  Rather, he testified that he published "a small book about U.S.[-]Saudi relations" in "1975," *id.* at 33:5-18; that other books he published in the 1980s "touched on" Saudi Arabia, *id.* at 35:15-22; and that his work on "comparative Islam" included "some . . . research and writing focused on Islam in Saudi Arabia, Islam in Indonesia, Islam in Egypt," *id.* at 43:17-19.

across" and "spoke to some" MOIA "propagators" during his "travels," Nakhleh Rep. ¶ 208,

*cited in* Pls. Opp. 20, which is insufficient on its face.[6]  They also point to his "analysis of

relevant documents" from discovery.  Pls. Opp. 20.  Reviewing such documents does not

establish expertise.  The Court as factfinder can equally well review the same documents.

Plaintiffs also do not address Nakhleh's concessions that he does "[n]ot necessarily" know

"what was typical in terms of experience for propagators" and is "not an expert" on MOIA's

"promotion process."  Nakhleh Tr. 318:16-18, 319:5-10, *cited in* KSA Mot. 20.

   *Fourth*, Plaintiffs fail to defend Nakhleh's qualifications to endorse their theory that

Saudi Arabian officials knowingly provided "material support" for the 9/11 attacks.  KSA Mot.

20-21.  They concede he is not a "criminal investigator," but describe him as a "thematic expert"

on "ideological and operational aspects of support for violent jihad."  Pls. Opp. 21.  That

description blurs an important distinction.  Nakhleh's studies may relate to terrorist *ideology*,

though not to Islam as it is practiced in Saudi Arabia.  But Plaintiffs have made no showing that

he is an expert on terrorist *operations*.[7]  Yet much of his report speculates on that topic.

   *Fifth*, Plaintiffs concede (as they must) that Nakhleh is "not an expert in truth detection."

*Id.* at 22.  They nevertheless defend his opinions that Fahad Al Thumairy and others gave

untruthful testimony, asserting that he is merely opining on "'matters of religion.'"  *Id.* (quoting

Nakhleh Rep. ¶ 218).  To the contrary, Nakhleh's report proffers unambiguous opinions on

whether Saudi Arabia's witnesses told the truth.  *See* KSA Mot. 10 (summarizing Nakhleh Rep.

---

[6] Nakhleh first admitted that "the first time [he] met with anyone from [MOIA] was well after the September 11 attacks," then later amended this to say that "before 2001" he had met "[j]ust a couple" of "people at [MOIA]," whose names and positions he could not recall. Nakhleh Tr. 17:4-11, 25:6-26:1.

[7] Plaintiffs cite Nakhleh's descriptions of visiting Saudi Arabia and of conducting and monitoring hostile interrogations, Pls. Opp. 21 (citing Nakhleh Rep. ¶¶ 139, 156), but Nakhleh never claims that he conducted or oversaw any operational investigation.  His (unsupported) assertion of "thematic" expertise is about "religious doctrine."  Nakhleh Rep. ¶¶ 156, 158.

¶¶ 157-159, 162, 164, 167, 218); *id.* at 61-62; *infra* p. 32.  No expert can properly give such opinions, and Nakhleh in particular admittedly lacks the expertise to do so.

### C.      Meleagrou-Hitchens' Lack of Qualifications

Plaintiffs proffer Meleagrou-Hitchens to opine not merely on the application of "Social Movement Theory" to the ideology of Al Qaeda, but on the existence of a support network for the 9/11 attacks in Southern California, as to which he has no relevant expertise.  KSA Mot. 12, 21.  Plaintiffs mischaracterize that point as an argument that "an expert in social sciences or history can never be deemed qualified."  Pls. Opp. 23.  A social scientist or historian can give opinions to which expertise in social science or history is relevant.  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013); ECF No. 9060, at 5-6.  But social-science credentials do not allow an expert to amass "hearsay statements" in order to "speculate as to the motivations and intentions of certain parties" or to "opine on the credibility of other witnesses' accounts," *Marvel Characters*, 726 F.3d at 136, as Meleagrou-Hitchens does here.

### D.      Schiff's Lack of Qualifications

Plaintiffs proffer Schiff to opine not merely on the relevance of an equation and calculations from an aviation perspective, but on whether Omar Al Bayoumi used that equation and calculations to help the hijackers.  KSA Mot. 14-15.  Yet their defense of Schiff's qualifications focuses solely on aviation.  Pls. Opp. 13-14, 24.  They do not address his concession at his deposition that his opinions about Al Bayoumi were based on information from Plaintiffs' counsel about "Bayoumi's contacts with the hijackers" and on an assessment of Al Bayoumi's credibility.  KSA Mot. 49 (discussing Schiff Rep. 11; Schiff Tr. 51:15-21).[8] Nor do they explain how Schiff's aviation experience qualifies him to evaluate such matters.

---

[8] "Schiff Tr." refers to his July 11, 2022 deposition, excerpts from which are Exhibit 11.

## II.     The Challenged Experts Offer Opinions That Are Not The Products Of Reliable Methodologies Or Reliable Data

### A.     Youssef and Nakhleh Purportedly Utilized Classified Methodologies and Materials in Forming Their Opinions

Experts may not testify based on classified methodologies or information that they refuse to disclose.  *See* KSA Mot. 23 & n.14 (citing *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42 (E.D.N.Y. 2012), among other cases).  Plaintiffs point to no case allowing such testimony.  Instead, they contend that their experts do not rely on classified methodologies or materials.  Pls. Opp. 24-27.  The record shows otherwise.

### 1.     Youssef's Purported Use of Classified Methodologies and Materials

Youssef testified at his deposition that the phone-record analysis in his report, including the so-called "calling circle" and "calling chain," uses a classified methodology.  KSA Mot. 24 (quoting testimony).  Plaintiffs take out of context Youssef's statement that he "would be happy to explain the process," Youssef Tr. 258:16-19, asserting that Saudi Arabia's counsel did not follow up, Pls. Opp. 25.  To the contrary, counsel asked follow-up questions such as whether there was any "public version" of the methodology.  Youssef Tr. 259:12-14.  Youssef answered that he "c[ould]n't be the one to expound on it in detail," showing that his offer to explain was illusory.  *Id.* at 259:15-21; *see id.* at 260:2-7 (reaffirming that "the detailed process would be classified").

Youssef's purported reliance on a classified methodology requires exclusion of his analysis because it prevents "adequate[] cross-examin[ation]" to test the reliability of his opinions.  *Gill*, 893 F. Supp. 2d at 541-42; *see id.* at 541 (excluding testimony "based on facts developed through confidential [intelligence] investigations and investigatory methods").  Saudi Arabia cannot cross-examine Youssef to determine whether he was "as careful as [he] would be in h[is] regular professional work," ECF No. 9060, at 5, because the methodology he used in his prior professional work is not public and was not disclosed.  Nor can Saudi Arabia cross-examine

Youssef on whether his purported techniques "reach reliable results for the type of opinion offered." *Id.* That is a real concern because the FBI concluded in May 2021 – after reviewing investigative materials including the same phone evidence on which Youssef relies – that the investigative theories he endorses were not supported by evidence. KSA Mot. 27.

Youssef's reliance on classified materials about an FBI investigation that took place between 1992 and 1996 in Southern California also supports exclusion of his opinions about a supposed support network for terrorism there. *Id.* at 24. Plaintiffs point to testimony in which Youssef offered to discuss "'the players and the operatives that [he] looked at who were involved with the Ibn Taymiyyah Mosque,'" Pls. Opp. 25-26 (quoting Youssef Tr. 47:16-18) – that is, his conclusions. But when asked about the *bases* for those conclusions – the "investigative materials," as well as "what [he] did" in the investigation – Youssef answered either that the information was "classified" or that he did not know whether it was still classified (and so could not reveal it). Youssef Tr. 43:17-45:2, 47:22-50:4, 393:4-10; *see id.* at 49:9-11 ("I can share with you whatever I know has been made public, and that's all I can answer here.").

Youssef also has no publicly available work on Al Qaeda. Although he purports to be able to opine on Al Qaeda's "tradecraft" or "modus operandi," *e.g.*, Youssef Rep. 15, 160, 169, his only purported experience with that organization consisted of "classified" reports that he refused to discuss. KSA Mot. 24. Plaintiffs have no response to this point.

## 2. Nakhleh's Purported Use of Classified Methodologies and Materials

Nakhleh testified at his deposition that his opinions on Al Qaeda's Islamic thought, on MOIA, and on Saudi Arabia's purported support for terrorism were supported by CIA reports and briefings whose contents he could not disclose. KSA Mot. 24-25. Plaintiffs inaccurately state that the classified reports and briefings were not Nakhleh's "basis for opining," but were "evidence of [his] . . . expertise." Pls. Opp. 26-27. But Nakhleh answered questions directly

seeking the bases for his opinions about alleged support for violent jihad by referring to classified material.  *See* Nakhleh Tr. 232:21-233:9 (when asked about his failure to "cite anything" to support his opinion about MOIA's purported "charge . . . to . . . wage jihad globally," responding that, "[w]hen . . . in the government," he had "d[one] some briefings exactly on this point" and "briefings or papers on this very topic," but "could not possibly . . . cite[]" them).[9]

Further, Nakhleh's reliance on classified materials to support his alleged expertise is also inappropriate.  Saudi Arabia is challenging Nakhleh's qualifications to opine on Saudi Arabia's state religion, on the history and creation of MOIA, on MOIA's process for selecting propagators, and on the truthfulness of witnesses.  KSA Mot. 19-21; *see supra* pp. 3-6.  Where an expert has published relevant work, testing the expert's qualifications includes a review of that work to see whether it really establishes expertise and whether it squares with the expert's proffered opinions.  Where an expert has published nothing relevant, that is a factor to be weighed by the court as gatekeeper and (if the testimony is admitted) by the factfinder.  *See* ECF No. 9060, at 8-9 (citing authorities stating that lack of "academic training," among other "weaknesses," can be addressed by "cross-examination").  Here, Nakhleh asserts he has written reports that show his expertise, but Saudi Arabia and the Court cannot see them or ask him about them.[10]  That prevents the "[v]igorous cross-examination" *Daubert* prescribes as a safeguard against "shaky" testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

---

[9] *See also, e.g.*, Nakhleh Tr. 244:18-245:18 (when asked about his failure to "cite anything" to support his opinion about "'Saudi . . . government[] . . . aware[ness]'" of donations to bin Laden, referring to "data we acquired through our economic and banking analyst at the CIA," which data he stated were "confidential and classified"); *id.* at 335:12-336:11 (when asked whether his "belief that [he] can't credit [Saudi witness] accounts . . . affects [his] opinions," answering that "this type of opinion I expressed here and similar opinions that . . . I expressed at the agency were shared by others" in "briefings" that were "accepted" and "respected").

[10] Plaintiffs even argue that Nakhleh's work has been subject to "'peer review,'" Pls. Opp. 11 (quoting Nakhleh Tr. 48:18-50:13), based on his testimony that it was reviewed solely

### B. The Challenged Experts Fail To Disclose or Apply Reliable Methodologies and Use Unreliable Data

#### 1. Youssef's Failures To Disclose or Apply a Reliable Methodology and His Use of Unreliable Data

a. **Unexplained reliance on experience.**  Other than his purportedly classified phone-record analysis techniques, Youssef's report does not disclose a methodology, but relies on his FBI experience without explaining how that experience leads to his conclusions.  KSA Mot. 26-27.  Plaintiffs attribute to Youssef methodological steps that he never mentions, such as "cross-check[ing]" evidence and "assess[ing] the reliability of each source."  Pls. Opp. 28 (citing *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 126 (D. Conn. 2008)).[11]  It is one thing for a court to accept an expert's testimony based on "social science methodologies" that have received "peer review."  *Abu-Jihaad*, 553 F. Supp. 2d at 125-26.  But if counsel's mere after-the-fact assertion that a former FBI agent with no social-science credentials performed such steps were enough, the requirement that expert testimony be "the product of reliable principles and methods," Fed. R. Evid. 702(c), would mean nothing.[12]

b. **Selective adoption of FBI theories.**  Youssef treats FBI investigative theories that align with Plaintiffs' allegations as authoritative "findings" or "conclusions," while rejecting as "political" FBI conclusions that do not help Plaintiffs.  KSA Mot. 27-29 (giving examples).

---

by his "peers at the agency," Nakhleh Tr. 49:5-7.  They cite no case accepting as "peer review" an expert's mere say-so that work was reviewed secretly by other agency employees.

[11] Plaintiffs also quote Youssef's statements that his conclusions are supported by "all the available evidence," Youssef Rep. 10; that he "look[ed] at every angle" and "look[ed] at every single possible vantage point" to "see . . . what would be the next lead," Youssef Tr. 373:11-15; and that he attempted to find a "nexus to terrorism," Youssef Rep. 5.  *See* Pls. Opp. 28.  Those statements do not disclose a reliable methodology.  They only confirm that Youssef's approach was a result-oriented search for support (or purported support) for Plaintiffs' allegations.

[12] Plaintiffs cannot satisfy Rule 702(c) by pointing to Youssef's description of documents he reviewed.  *See* Pls. Opp. 26-27.  The documents are the "facts [and] data" on which he relies; their "sufficien[cy]," Fed. R. Evid. 702(b), is separate from the reliability of his methods.

Plaintiffs assert that Youssef "assesses the evidence, applies his experience and expertise, and forms an opinion as to each document." Pls. Opp. 29-30. They point to nowhere in Youssef's report or testimony where he does those things for the 2012 or 2014 investigative updates or the July 2021 compilation of old investigative material. *Compare* KSA Mot. 28-29 (citing Youssef Rep. 10-11, 57-58, 132 & n.538, 161, 231, 234, 241) *with* Pls. Opp. 29-30 (no response).

Plaintiffs do address Youssef's rejection of the FBI's conclusions in the May 2021 electronic communication that closed Operation Encore, but their arguments miss the point. They cite Youssef's criticisms in his report, Youssef Rep. 233-39; quote his characterization of the FBI's "national security and foreign relations" reasons for closing Operation Encore, Pls. Opp. 29 n.40; and quote his assertions at his deposition that he "disagree[s]" with it, *id.* at 29, and that "all the documents and all the analysis . . . speak to the contrary," Youssef Tr. 343:9-12. To call those assertions "rigorous," Pls. Opp. 29, is an insult to rigor. More fundamentally, what shows the unreliability of Youssef's methods is not that he criticizes the FBI's May 2021 conclusions. It is that he criticizes those conclusions while adopting rejected theories such as those in the 2012, 2014, and July 2021 documents without any analysis.

      **c.**    **Crediting hearsay from unknown sources.** Youssef also adopts as fact the alleged statements of confidential sources despite not knowing their names, the bases for their asserted knowledge, or their relationships with the FBI. KSA Mot. 29-30 (giving examples). Plaintiffs repeat Youssef's errors, describing a confidential source's statements about Musaed Al Jarrah's purported role in "direct[ing]" a "'network' of 'Saudi Sunni extremists'" as "findings" of the FBI, and stating incorrectly that the FBI made those "findings" in the May 2021 closing memorandum. Pls. Opp. 30-31.[13] They then go on to assert that Youssef cites other evidence

---

[13] As Saudi Arabia explained in its motion (at 29), the May 2021 communication repeats the confidential source's statements, then states that "[n]o additional information was revealed

about Al Jarrah as well.  Plaintiffs make similar arguments that Youssef "came to his own conclusions" about confidential source statements that Al Thumairy supposedly received a suspicious call from Malaysia or sent "extremist materials" to Mana.  *Id.* at 31-32.

Even if other evidence supported Youssef's conclusions (which it does not), that would still not address his methodological error of treating confidential source statements as factual merely because an FBI document purports to summarize those statements.  Youssef does not have the information necessary to assess the sources' credibility, and credibility is for the factfinder anyway.  The Court should make clear that Youssef may not testify that confidential source statements are credible or true.  Further, it should take his baseless insistence that the unnamed sources' statements are "findings" or "conclusions" of, or were found "credible" by, the FBI itself, Youssef Rep. 57 & n.179, 61, 155 n.629, as reason to doubt the reliability of his opinions.  *Cf.* ECF No. 9060, at 32 (observing that an expert's "whitewash[ing]" of an "anonymous internet source" "undermine[d] the Court's confidence" in his reliability).

      **d.**      **Speculation and conjecture.**  Significant parts of Youssef's opinions are based on mere speculation, such as assertions that Adel Al Sadhan and Mutaeb Al Sudairy "would have" had various interactions with Al Thumairy and Al Bayoumi during their visit to San Diego; or that an alleged call to Al Thumairy from Malaysia was made by Walid Bin Attash, who purportedly "conveyed" a message about "an attack in the U.S."  KSA Mot. 30-31.  Plaintiffs' defenses of those parts of his opinion are cursory and unpersuasive.  Youssef's testimony that his "experience" tells him there "would have to be an advance team," Youssef Tr. 367:6-14, *quoted*

---

outside of the CHS [*i.e.*, confidential human source] reporting and telephone information."
Ex. 13 (Youssef Ex. 10), at 4-5.  That is not an FBI finding that the source's statements about Al Jarrah were true, no matter how many times Plaintiffs and their experts say it is.

*in* Pls. Opp. 32, doubles down on the *ipse dixit* of his report.[14]  Likewise, all Plaintiffs cite for

Youssef's conjecture about Bin Attash is Youssef's hand-waving at the "totality of . . .

circumstances," such as Bin Attash's mere presence in Malaysia and previous links to Al Hazmi

and Al Mihdhar.  Youssef Tr. 123:15-22, *quoted in* Pls. Opp. 33 n.47.

   **e.**  **Use of unreliable telephone data.**  In addition to Youssef's purported reliance

on classified methodologies for his phone-record analysis, *see supra* pp. 7-8, his speculative

attribution of phone calls renders that analysis even more unreliable.  Youssef has no basis to

attribute to Al Bayoumi every phone call and every fax from certain Al Madinah Mosque phone

and fax numbers.  KSA Mot. 31-32.  Plaintiffs point to some calls from one mosque phone

number that resemble calls Al Bayoumi made on his cell phone.  Pls. Opp. 34-35 & n.52.  At

most, that may suggest *some* calls from the mosque number were Al Bayoumi's; but Youssef

assumes *all* calls and faxes from the mosque were Al Bayoumi's.  *See* Ex. 22.[15]  Youssef's

attribution of every phone call and every fax from certain King Fahad Mosque phone numbers

to Al Thumairy is also speculative, KSA Mot. 32, and Plaintiffs make no attempt to justify it.

   Youssef's attribution of phone calls to and from cell phones registered to Faisal Al

Muhanna and Saleh Al Hatlani on the basis that the two were "front m[e]n" for Al Thumairy

---

[14] Plaintiffs' attempt to marshal relevant "facts," Pls. Opp. 33 n.46, fares no better.  As one example, Plaintiffs' assertion that Al Sadhan and Al Sudairy followed "the precise path that [the] hijackers would" appears to mean mostly that they visited some of the same Salafi mosques in Southern California.  *Id.* (citing Youssef Rep. 100-16).  As another, Youssef's assertion that Al Bayoumi's February 1999 letter to Saad Al Habib mentioning Al Sadhan's and Al Sudairy's visit was somehow linked to Nawaf Al Hazmi's and Khalid Al Mihdhar's April 1999 visa application, *id.*; *see* Youssef Rep. 112, is pure invention.  *See also* Sageman Rep. 621-22 (explaining the flaws in Youssef's interpretation of the letter to Al Habib).

[15] Plaintiffs cite Youssef's assertion that Al Bayoumi's office was "locked," Pls. Opp. 35, but his source for that assertion states only that the office was locked as of an FBI interview in September 2001, well after the relevant time.  *See* Ex. 96 (EO14040-001828 to EO14040-001830), at EO14040-001829, *cited in* Youssef Rep. 83 n.325.  Al Bayoumi also testified that two different telephones at the mosque – one in Al Bayoumi's office and one in another office – shared the same number.  Ex. 97 (Bayoumi Tr.), at 176:13-177:17, 784:9-785:11.

is likewise speculative.  *Id.* at 32-33 (quoting Youssef Rep. 124-25).  The attribution of the 0777

number to Al Thumairy rather than to Al Hatlani is based on documents dated in or around June

2001, well after the relevant time.  *Id.* at 32 & n.22; Pls. Opp. 33-34.  The attribution of the 3362

phone number to Al Thumairy rather than to Al Muhanna is based on an entry in a phone-book

document that Al Bayoumi testified contained entries made by Kurdish volunteers working from

a publicly available list.  KSA Mot. 33 & n.23; Pls. Opp. 33-34.[16]  Neither is reliable.  And

Youssef's scenario that Al Thumairy used two different secret phone numbers provided to him

by two different front men, while simultaneously abandoning secrecy to use a number registered

in his own name for calls with Al Bayoumi and others, is the kind of "wholly implausible

assumption" that makes an expert's opinion inadmissible.  *ECD Inv'r Grp. v. Credit Suisse Int'l*,

2017 WL 3841872, at *13 (S.D.N.Y. Sept. 1, 2017).

Plaintiffs argue that Youssef "cross-check[ed]" the cell phone numbers by determining

that the numbers made calls to individuals in Al Thumairy's "calling circle."  Pls. Opp. 34 (citing

Youssef Rep. 121-22).  But Youssef defines a "calling circle" as "two or more individuals or

entities" who make "frequent calls" to one another.  Youssef Rep. 14.  To determine whether

individuals call one another, Youssef first needs their numbers.  Relying on a "calling circle" to

verify the same numbers used to define the "calling circle" is (for want of a better word) circular.

*Cf. Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 378 (2014) (rejecting expert's "circular

reasoning" for lack of "a sufficiently rigorous analytical connection between . . . methodology

and . . . opinion"), *adhered to on recon.*, 2016 WL 981858 (W.D.N.Y. Mar. 15, 2016).

___

[16] Plaintiffs label this point about the phone-book "speculation," Pls. Opp. 34 n.49, but Al
Bayoumi has personal knowledge that it contains information from a "sheet" that was "outside" the
Al Madinah Mosque and that Kurdish "volunteers" who helped him would "add[ ] names and add[ ]
names" to it.  Ex. 97 (Bayoumi Tr.), at 505:19-506:20; *see also id.* at 782:18-783:9 ("I started the
Omar phone book, but I did not enter all the data. . . .  [I]t was at the mosque.  And then anybody
who would have names, there would be volunteers inputting the data in the phone book.").

Further, Plaintiffs themselves contend that the numbers' subscribers (Al Hatlani and Al Muhanna) had "direct ties" to Al Thumairy, through their work or socially.  Pls. Opp. 34. Assuming that Al Hatlani and Al Muhanna were indeed colleagues or acquaintances of Al Thumairy in the relatively small group of Saudi expatriates in Southern California in the late 1990s, there is no need to resort to clandestine conspiracies to explain why they sometimes called the same people as did Al Thumairy.  The "obvious alternative explanation[ ]," ECF No. 9060, at 5, is that they had other mutual colleagues or acquaintances.[17]

  **f.**  **Guilt by association.**  Youssef relies on improper guilt-by-association reasoning for his charges that Al Bayoumi and Al Thumairy were "extremist[s]."  KSA Mot. 33-34 (citing *United States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022)).[18]  Plaintiffs concede that Youssef relies on "association," but argue that such testimony is permissible in terrorism cases by analogy to testimony about "'the operation, structure, membership, and terminology of organized crime families.'"  Pls. Opp. 36 (quoting *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993)); *but see United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008) (distinguishing *Locascio* and rejecting the testimony of an expert who, rather than offering "sociological knowledge," served as "a chronicler of the recent past" giving "pronouncements on elements of the charged

---

[17] *See* Sageman Rep. 451-52 & n.1787 (discussing the "Small World phenomenon" in "social network analysis" and observing that, in a community like the "largely alien or immigrant Gulf Arabic speaking Saudi-Yemeni pious Salafi community in Southern California, . . . almost anyone is no more than two degrees of separation from anyone else").

[18] Plaintiffs attempt to distinguish *Zhong* as a criminal case, Pls. Opp. 36 n.56, but courts apply the rule against inferring guilt from mere association in civil cases, including cases involving allegations of material support for terrorism.  *See, e.g.*, *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1022 (7th Cir. 2002) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982)); *see also Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1008 (2001) (rejecting expert opinion based on stereotypes about Korean businesses in part as an "appeal[ ] to . . . guilt by association"), *amended in part on other grounds on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001); *In re Heparin Prod. Liab. Litig.*, 2011 WL 1059660, at *11 (N.D. Ohio Mar. 21, 2011) (following *Jinro*).

offense"). Here, Youssef does not opine about the operation, structure, or terminology of the so-called "extremist cells" he purports to have detected, and he opines about their membership only in conclusory form. *See*, *e.g.*, Youssef Rep. 52 (asserting that Al Bayoumi led a "Sunni extremist cell in San Diego" and that Al Thumairy led an "extremist group at the King Fahad Mosque"). He instead opines that Al Bayoumi and Al Thumairy knew people (or people who knew people) who held bad views or committed bad acts unrelated to the 9/11 attacks.[19] That is not a reliable basis for inferences about Al Bayoumi's or Al Thumairy's own actions.

Nor do Plaintiffs persuasively defend Youssef's association-based opinions about Saudi officials such as former Ministers Abdullah Al Turki and Saleh Al Ash-Sheikh. As to Al Turki, even if Al Turki appeared familiar with Al Thumairy and addressed him by his first name, Pls. Opp. 37, that is no basis to infer support for the 9/11 plot, and there is no evidence at all that Al Turki "pulled strings," *id.*, to appoint Al Thumairy.[20] As to Al Ash-Sheikh, Plaintiffs point again to his nominal supervisory role over Al Haramain, *id.* at 36, but not to any relevant action he took in that role. As to the officials who served on the King Fahad Mosque's board, Plaintiffs have nothing to support their assertion of "direct involvement in Mosque activities," *id.* at 36-37, nor to any reason that any such involvement would plausibly support Youssef's inferences.[21]

---

[19] *See*, *e.g.*, Youssef Rep. 53-54 (Al Thumairy allegedly knew Abdo Ghanem); *id.* at 58-60 (Al Thumairy allegedly knew Khalid Al Cherif and Sheikh Muqbil Al Wadi); *id.* at 85 (Al Bayoumi knew Omar Hamerman, ██████████████████.

[20] To support his string-pulling assertion, Youssef asserts that Al Thumairy was exempted from a civil-service requirement and that Al Thumairy's English was not good enough for the job. Youssef Rep. 38. Even if Youssef were somehow qualified to opine that Al Thumairy's hiring was unusual as a matter of Saudi civil-service practice in the 1900s, he cites no evidence that Al Turki was personally involved in any exemptions or waivers.

[21] Plaintiffs contend that former Deputy Minister Abdulaziz Al Ammar received "reports" about Al Thumairy in August 2001 and after the 9/11 attacks, Pls. Opp. 36-37 & n.57, but none of the alleged reports suggested that Al Thumairy had foreknowledge of or supported the attacks – much less that Al Ammar did.

### 2.    Nakhleh's Failures To Disclose or Apply a Reliable Methodology

**a.    Unexplained reliance on experience.**  Nakhleh's report does not disclose a methodology.  At his deposition, he made only vague references to "interdisciplinary" methods and "qualitative and quantitative" techniques.  KSA Mot. 34 (quoting Nakhleh Tr. 278:6-279:11).  After reprising those vague references, Pls. Opp. 37-38, Plaintiffs point to Nakhleh's description of the materials he considered and his purported experience, *id.* at 39-40.  Nothing they cite meets the requirement that a "witness . . . relying solely or primarily on experience . . . must explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts."  *United States v. Ray*, 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) (cleaned up; emphases added).

Plaintiffs' defense of Nakhleh's claim that his methodology has a "'quantitative' dimension," Pls. Opp. 40, falls flat.  They point to paragraphs 172 and 174 to 181 of his report to show how he uses "figures."  *Id.* at 40-41 & nn.64-66.  Nakhleh did not compile the figures in those paragraphs himself.  Almost all are from a single issue of *Al-Daawah* magazine.[22]  No "specialized knowledge," Fed. R. Evid. 702(a), is required to list numbers already collected in a magazine.  Further, Plaintiffs cannot use Nakhleh's claims about "briefings" at the CIA, Pls. Opp. 41, as support for his methodology because he testified that those briefings were classified and refused to discuss them.  *See supra* pp. 8-9.[23]

---

[22] *See* Nakhleh Rep. ¶¶ 172(a) n.85, 172(c) n.86, 175 n.90; *see also id.* ¶ 176 (stating without citation that there were 26 mosques in Los Angeles at the time).

[23] Plaintiffs also incorrectly claim that Nakhleh at his deposition "explained expansively how he applies his methodology for assessing the reliability of sources" and "weighing up or reconciling the evidence each source provides."  Pls. Opp. 41.  If anything, Nakhleh further undermined himself by testifying that he "take[s] the FBI['s] word" (or purported word) about the reliability of confidential sources, Nakhleh Tr. 99:6-7, and by conceding that he should not be trying to "get in [people's] heads," *id.* at 202:17-203:4, as his report clearly does, *see* KSA Mot. 63-65.

   **b.    Lack of scholarly support.**  Nakhleh's report attributes to Saudi Arabia, to MOIA,

to its leaders and religious authorities, and to its people beliefs that they do not hold, such as

support for "terrorism" or "violent jihad"; the belief that the United States is an "enemy" of

Islam; and, to Saudi Arabia's witnesses, the belief it is acceptable to lie under oath.  *See* KSA

Mot. 35-36.  Plaintiffs' assertions that Nakhleh uses "authoritative sources" and that his opinions

have "a secure scholarly basis," Pls. Opp. 43, lack any support.[24]

   Nakhleh's sweeping derogatory statements about Saudi religion are also contrary to the

views of scholars Nakhleh recognized as experts at his deposition, including Natana Delong-Bas,

Peter Mandaville, and Roxanne Euben; as well as to the views of Plaintiffs' own proffered expert

Meleagrou-Hitchens.  All recognize that the Saudi religious establishment and Saudis generally

are quietists who reject Al Qaeda's calls for violent jihad.  *See* KSA Mot. 36-37 & nn.26-27.

Plaintiffs attack Delong-Bas with some unfavorable reviews, Pls. Opp. 45-46 & n.75; but

Nakhleh himself cited her as an authority, *see* Nakhleh Tr. 29:2-14; *see also* Nakhleh Rep.,

Annex C at 1 (citing her work).  Plaintiffs ignore Mandaville's and Meleagrou-Hitchens'

statements entirely, *see* Pls. Opp. 45-47, and address Euben in an unpersuasive footnote.[25]

_____

   [24] To identify the sources they say provide "authoritative" support, Plaintiffs direct the reader to § II.B.1 of their opposition, concerning Nakhleh's purported qualifications.  *See* Pls. Opp. 43.  That section cites only footnote 11 of Nakhleh's report, which in turn cites (1) an entire volume of the works of the fourteenth-century jurist Ibn Taymiyyah, long before Saudi Arabia was founded, and (2) an entry on "Jihad" from an encyclopedia that does not mention Saudi Arabia or Mohammed Ibn Abd Al Wahhab.  Nakhleh Rep. ¶ 30 n.11; *see* Ex. 98 (2 *The Oxford Encyclopedia of the Modern Islamic World* 369-73 (Oxford Univ. Press 1995)).

   [25] That footnote erroneously suggests that Euben "agree[s]" with Nakhleh because he refers to "quietis[m]" as a "'political stance.'"  Pls. Opp. 45 n.74 (emphasis omitted).  But Euben explains that "quietis[m,] . . . in the case of . . . Saudi Salafis, means affirming allegiance to the Saudi royal family," contrasting it to the views of "Bin Laden" and others "who broke with the royal family" in the early 1990s "and who called for the overthrow of the royal family and for jihad against Western powers."  Ex. 37, at 22.

**REDACTED FOR PUBLIC FILING**

Plaintiffs also err in citing a new book by Cole Bunzel, *id.* at 18 n.26, 46 nn.75-76 (citing Pls. Ex. 27), as purported support for Nakhleh.  Like other scholars, Bunzel acknowledges that "Wahhabism" in modern Saudi Arabia is a "quietest [sic] form of Islam that t[eaches] proper worship, police[s] Saudi society, and emphasize[s] obedience to the ruler."  Ex. 99 (*Wahhabism: The History of a Militant Islamic Movement* (2023)), at 9.  Plaintiffs misleadingly omit from their excerpt of Bunzel that acknowledgement, along with other statements contrary to Nakhleh's baseless accusations that the state religion of Saudi Arabia supports terrorism.[26]

Plaintiffs also lack any persuasive response to Nakhleh's own unwillingness to defend his report.  Although they deny that he "opined that a Saudi Wahhabi could be a 'quietist' *as opposed to* a jihadist," Pls. Opp. 46, his concession is clear, *see* Nakhleh Tr. 137:18-138:4 ("Q. . . .  [Y]ou describe that group of quietists as essentially the same as fundamentalists, Christians and Jews, who do not engage [in] or support violent jihad; correct?  A.  That is correct.").[27]  Plaintiffs also fail to address Nakhleh's retreat from his statements that Saudi Arabia or MOIA "support[ed] . . . jihad globally" and his fall-back to the position that only "elements" – conveniently consisting of individuals relevant here – did so.  KSA Mot. 38 (comparing Nakhleh Rep. ¶¶ 92, 169, with Nakhleh Tr. 235:4-18, 239:7-241:8, 261:14-262:9).

Plaintiffs err in dismissing the conflicts between Nakhleh's report, the work of recognized scholars in the relevant field, and his own admissions at his deposition as mere "gaps or

---

[26] *See* Ex. 99 (*Wahhabism*), at 28 (discussing the "decline of militant Wahhabism in Saudi Arabia" after 1932 and the conflict between Saudi establishment religious views and "the ideologues of Jihadi Salafism"); *id.* at 334 (acknowledging the deference of "Wahhabi scholars of the twentieth century . . . ['to the wishes of the king [on] . . . important political issue[s]'").

[27] *See also* Nakhleh Tr. 147:3-7 (discussing a "movement by so many jihadists from the quietist ideology to a more activist ideology and looking at doing jihad against a perceived enemy of Islam"); *id.* at 343:21-344:3 (agreeing with reference to "distinctions in Hanbali Salafism between the quietists, the politicos, and the jihadis").

inconsistencies." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006), *cited in* Pls. Opp. 47.  Those conflicts go to the heart of his opinions because they show that his testimony that the religious beliefs and duties of Saudi Arabia's witnesses included support for violent jihad lacks the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

  c.    **Selective adoption of FBI theories.**  Nakhleh's treatment of FBI materials depends on whether they support Plaintiffs' allegations.  Where a document that recycles investigative theories seems to help Plaintiffs, he inaccurately describes it as an "authoritative 'last word.'"  KSA Mot. 40 (discussing the July 2021 electronic communication, Ex. 14 (Nakhleh Ex. 4)).  Where a document that contains actual FBI conclusions does not help Plaintiffs, he disregards it.  *Id.* (discussing the May 2021 electronic communication, Ex. 13 (Youssef Ex. 10)).  Plaintiffs fail to show that Nakhleh made any "considered comparison," Pls. Opp. 47, of the two documents.  His report does not mention the May 2021 communication; at his deposition, he inaccurately stated that it was not the "conclusion" of Operation Encore. KSA Mot. 40 (comparing Nakhleh Tr. 111:10-13 with Ex. 13 (Youssef Ex. 10), at 11).

  Further, Plaintiffs offer no response to Saudi Arabia's showing that Nakhleh wrote his conclusions first and then looked for documents to find them.  That showing is amply supported by Plaintiffs' initial service of his report with a capitalized footnote seeking support for already-formed conclusions about "SUPPORT FOR JIHAD . . . from the FBI documents" and by his admission at his deposition that he "tr[ied] to in a sense look for documents that share . . . the same opinion" he had already "made."  *Id.* at 41 (quoting Ex. 42 (Nakhleh Rep. (Apr. 1, 2022)), ¶ 179 n.91, and Nakhleh Tr. 280:6-281:13).  Plaintiffs may now wish that telling footnote and testimony did not exist, but cannot erase them by ignoring them.

**d.**     **Speculation and conjecture.**  The Court should exclude as speculative Nakhleh's

statements that there is "no conceivable scenario" in which Al Bayoumi and Al Thumairy would

have acted "on their own initiative" or "would not have known" that Al Hazmi and Al Mihdhar

"were embarking on some sort of violent jihadist action."  KSA Mot. 41-42 (quoting, *e.g.*,

Nakhleh Rep. ¶¶ 239-240).  Plaintiffs' formulaic assertion that Nakhleh "cross-check[ed] . . .

sufficient facts from multiple sources," Pls. Opp. 48, is insufficient to supply the "connect[ion]

to existing data," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), that his report lacks.

### 3.    Meleagrou-Hitchens' Failures To Disclose or Apply a Reliable Methodology

**a.**     **Incomplete disclosure of methodologies.**  Meleagrou-Hitchens fails to explain

how "Social Movement Theory" helps him to opine on the existence of an alleged support

network for the 9/11 hijackers in Southern California.  KSA Mot. 42-43.  Plaintiffs, like

Meleagrou-Hitchens, point solely to his previous work as to Anwar Al Awlaki's ideological

evolution, coupled with his claim to have previously reviewed " 'official records, FBI documents,

[and] investigative documents' " when writing a different book.  Pls. Opp. 49-50 (quoting

Meleagrou-Hitchens Tr. 267:6-11).[28]  But the Court will search in vain for any account of how

his social-science methodology gives him an understanding of investigative materials that is

"beyond the ken of the average juror," ECF No. 9060, at 5, or of the Court as factfinder.

**b.**     **About-face from previous published work.**  Meleagrou-Hitchens also fails to

explain how "Social Movement Theory" led him to conclude in 2020, in his published peer-

reviewed book, that Al Awlaki was a "mainstream Islamic preacher" before 9/11 and that it was

"hard to believe" that Al Awlaki had any "direct knowledge or involvement" in the 9/11 attacks,

---

[28] "Meleagrou-Hitchens Tr." refers to his June 23, 2022 deposition, excerpts from which
are Exhibit 100.

yet also led him to conclude the opposite after Plaintiffs retained him.  KSA Mot. 11, 43 (quoting

Ex. 8 (Meleagrou-Hitchens Ex. 3), at 1, 24-25).  Plaintiffs assert that Meleagrou-Hitchens "wrote

in [his] book that the issue remained an open question," but do not cite the book, instead relying

on his characterization from his deposition testimony.  Pls. Opp. 50 & n.83.  If the book contained

anything to support that characterization, Plaintiffs would have quoted it.[29]

Plaintiffs also cite Meleagrou-Hitchens' claim that he changed his mind after Plaintiffs

retained him, while "re-listening" to Al Awlaki's lectures "for the purpose of [his] report."

Meleagrou-Hitchens Tr. 328:4-9.  Saudi Arabia pointed out in its motion that Meleagrou-

Hitchens' "'develop[ment]'" of his "'opinion . . . for the purposes of testifying,'" KSA Mot. 43

(quoting ECF No. 9060, at 5), undercuts its reliability; Plaintiffs have no response.[30]

      **c.**      **Selective adoption of FBI theories.**  At his deposition, Meleagrou-Hitchens

made a baseless claim that "the FBI's opinion" that "Saudi government officials instructed

individuals on the East Coast to assist the hijackers" had "informed [his] own expert opinion."

Meleagrou-Hitchens Tr. 299:5-12, *quoted in part in* KSA Mot. 44.  Plaintiffs cannot point to any

such FBI opinion, just as Meleagrou-Hitchens could not.  Instead, they claim he said that the

"Mosque" the hijackers attended in Virginia "had '(Saudi government sponsored) operational

support'" – that is, funding.  Pls. Opp. 51 (quoting Meleagrou-Hitchens Rep. ¶ 68).  That is not

_____

[29] Even Plaintiffs' quotation of the testimony is misleading.  Meleagrou-Hitchens did not claim to have said that the issue of Al Awlaki's involvement in the 9/11 attacks was an open question, but only that "there continued to be unexplained or open questions about what [Al Awlaki] was expressing privately."  Meleagrou-Hitchens Tr. 317:2-5.

[30] Plaintiffs assert without citation that Meleagrou-Hitchens changed his views based on "evidence from this MDL."  Pls. Opp. 50.  Meleagrou-Hitchens himself did not say that.  If he had, it would only confirm that the crux of his opinion involves the review of investigative materials about which he lacks any expertise.

a fair reading of his report.[31]  Even if it were, his deposition testimony, which Plaintiffs fail to address, clearly makes the indefensible claim that his own opinion rests on an FBI opinion that does not exist.  *Cf.* ECF No. 9060, at 32 (observing that an expert's "stubborn defense" of a misleading citation showed a lack of "intellectual rigor").

Meleagrou-Hitchens also fails even to cite the May 2021 electronic communication closing Operation Encore (which contains the FBI's actual conclusions), but inaccurately testified that he is not "challeng[ing]" the FBI's "final conclusions."  KSA Mot. 45 (citing Meleagrou-Hitchens Tr. 49:10-22).  Plaintiffs err in contending that Meleagrou-Hitchens did not need to consider the May 2021 communication because it "does not mention Awlaki."  Pls. Opp. 52.  As Meleagrou-Hitchens conceded, that communication states a "conclusion" that "the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged," Meleagrou-Hitchens Tr. 310:4-9, 310:18-19; *see* Ex. 13 (Youssef Ex. 10), at 11.  That would include Al Awlaki.  Meleagrou-Hitchens also opines that the purported support network for the hijackers included Al Bayoumi and Al Thumairy, *see* Meleagrou-Hitchens Rep. ¶¶ 35, 39-40, 66-67, who are at the center of the May 2021 communication.

> **d.    Speculation and conjecture about Al Awlaki.**  Meleagrou-Hitchens' opinions

that Al Awlaki assisted the hijackers contain unwarranted leaps.  KSA Mot. 45-47.  Plaintiffs' defense of his conjecture that Al Awlaki called the Bank of America branch where Al Bayoumi went with the hijackers largely overlaps with their challenges to Sageman's rebuttal on the subject, which Saudi Arabia addresses in its opposition.  *See* KSA Opp. 55-56 & n.64.  Further, Meleagrou-Hitchens himself does not rely on (or even include in his list of materials considered)

---

[31] The relevant paragraph opines that the hijackers "gravitated towards the place where both the *(Saudi government sponsored) operational support* and the consonant (Awlaki) ideological fellowship would be provided *to them*."  Meleagrou-Hitchens Rep. ¶ 68 (emphases added).  That is an (unsupported) claim that Saudi government support went "to" the hijackers.

the ambiguous business cards that Plaintiffs assert support the inference that the call went to the right bank branch. *Compare* Pls. Opp. 52 & n.86 *with* Meleagrou-Hitchens Rep., Annex B. Plaintiffs' argument thus only confirms that his opinions are not reliable, because he did not consider the evidence they now (erroneously) say is key.

Plaintiffs also fail to address Meleagrou-Hitchens' concessions at his deposition that conflicts in the evidence prevented him from drawing the "full conclusion" that the man who met Holly Ratchford was Al Awlaki, KSA Mot. 46 (citing Meleagrou-Hitchens Tr. 246:8-14); that he did not know what conversations, if any, Al Awlaki had with the hijackers about spiritual matters, or the basis for the Joint Inquiry's related statements about them, *id.* at 47 (citing Meleagrou-Hitchens Tr. 146:19-149:14); and that his opinion that Al Awlaki helped the hijackers "acclimatize" was based solely on Al Awlaki's familiarity with America and lack of an accent, *id.* (citing Meleagrou-Hitchens Tr. 249:12-14, 338:4-15, 341:4-5). Instead, Plaintiffs assert generally that Meleagrou-Hitchens' inferences are reasonable from the whole of the evidence. Pls. Opp. 52-53. Such arguments confirm his improper attempt to "'usurp[] the [factfinder's] function' to weigh the facts and reach an ultimate decision on an issue." ECF No. 9060, at 6 (quoting *Zhong*, 26 F.4th at 556).

e. **Speculation and conjecture about Al Bayoumi and Al Thumairy.** Meleagrou-Hitchens' opinions about Al Bayoumi and Al Thumairy fare no better. As for Al Bayoumi, Plaintiffs recount facts listed in Meleagrou-Hitchens' opinion, Pls. Opp. 53, but disregard his testimony that he "assum[ed]" that Al Bayoumi asked Al Awlaki to help the hijackers based on a series of alleged contacts, KSA Mot. 48 (discussing Meleagrou-Hitchens Tr. 219:15-220:16). None of those contacts involved Al Bayoumi asking Al Awlaki to do anything. As for Al Thumairy, Plaintiffs state that Meleagrou-Hitchens "d[oes] not 'opine' that Thumairy asked

Awlaki to assist Hazmi and Mihdhar."  Pls. Opp. 53 n.88.  At his deposition, Meleagrou-Hitchens

seemed to believe he was giving such an opinion.  Meleagrou-Hitchens Tr. 143:9-15.  But in

view of Plaintiffs' concession, the Court should deem any such opinion withdrawn.

### 4.    Schiff's Failures To Disclose or Apply a Reliable Methodology

a.    **Unexplained reliance on experience.**  Schiff's report presents a situation where

the basis for his expertise (experience as a pilot, flight instructor, and check captain) diverges

from the basis for his opinion (that the purpose of the equation and calculations found in Al

Bayoumi's notebook was to help the hijackers).  KSA Mot. 49.  That divergence is shown by

three concessions Schiff made at his deposition:  that his experience gave him " 'no reason to

believe' " that the equation " 'in and by itself . . . had anything to do with anything,' " *id.* at 16

(quoting, *e.g.*, Schiff Tr. 50:11-51:5); that he did not know whether the figures in the left column

" 'would have been important at all' " to the hijackers, *id.* (quoting Schiff Tr. 180:4-17); and that,

despite searching, he had failed " 'to find a connection between' " the center and right columns

" 'and the paths taken by the hijackers,' " *id.* (quoting Schiff Tr. 116:15-118:1).

Plaintiffs respond by mischaracterizing Schiff's testimony, asserting that he testified

about the "routine use" of the equation for flight planning.  Pls. Opp. 54.  Nowhere in his report

or testimony does Schiff say the use was routine.  He testified the opposite:  although he, an

experienced pilot, had used the equation, its use would go " 'above and beyond' " what he would

" 'expect others,' " especially novices like the 9/11 hijackers, to do.  KSA Mot. 50-51 (quoting,

*e.g.*, Schiff Tr. 36:10-37:9).  Similarly, Plaintiffs quote Schiff's statement in his report that the

equation and calculations were " 'consistent with the [hijackers'] flight paths,' " Pls. Opp. 54

(quoting Schiff Rep. 3), but ignore his contrary testimony at his deposition.[32]

---

[32] *See* Schiff Tr. 70:5-11 (agreeing that, "at the actual altitude the hijackers were flying,
for the three planes that crashed in the World Trade Center and the Pentagon . . . there would

    **b.**    **Analytical gaps.**  Plaintiffs fail to explain away Schiff's concessions that the use

of the equation was an advanced technique that novices would not use and that he rarely taught,

that the left column of calculations gave a distance that the hijackers would not have used, and

that the center and right columns were wholly unrelated to the flight paths.  KSA Mot. 50-52.

Plaintiffs argue that the equation and calculations could have been used as a "flight planning

tool," but Schiff admitted that he did not know whether they would have been of any use for

planning.  *See* Schiff Tr. 180:8-12 ("[I]n the beginning, when they were planning this event,

. . . different pieces of information could have come in handy.  Who knows how and when they

would, I don't know."), *quoted in* KSA Mot. 52.

    **c.**    **Speculation and conjecture.**  Schiff's inability to testify with any confidence

whether or how the hijackers would have used the equation and calculations, *see* Schiff Tr.

180:8-12, warrants exclusion of his testimony.  An expert's use of "very speculative language"

can show that an opinion is unreliable.  *Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 870

(D. Vt. 2004) (excluding testimony that "it should have been foreseeable . . . the [defendants]

'might' have to remove excess surface water"); *see also Shelton v. Gure*, 2021 WL 2210989,

at *11 (M.D. Pa. June 1, 2021) (observing that " 'such language as "possibility" ' " can " 'result[ ]

in exclusion' " by showing that " 'testimony is speculative' ") (quoting *Schulz v. Celotex Corp.*,

942 F.2d 204, 208 (3d Cir. 1991)).

    Here, Schiff's report states that the equation and calculations were "consistent" with

flight planning.  Schiff Rep. 2.  An opinion that evidence is merely consistent with a possibility

is not a reliable basis for choosing that possibility over others.  *Cf. R.F.M.A.S., Inc. v. So*, 748 F.

---

have been no meaningful line-of-sight issues caused by the curvature of the earth"); *id.* at 70:17-
20 (agreeing that "[i]n most cases" the hijackers were "far above th[e] minimum altitude" where
curvature would come into play); KSA Mot. 51-52 (additional transcript citations).

Supp. 2d 244, 250-51, 285 (S.D.N.Y. 2010) (adopting recommendation to exclude trademark

infringement experts whose testimony did not "explain[ ]" why defendants' conduct was not

"equally consistent with . . . aesthetic" choices).  And Schiff's concessions at his deposition,

*see supra* p. 25 & n.32, further confirm that his aviation expertise does not give him a basis to

say whether the equation and calculations were used for flight planning for the 9/11 attacks.

      **d.**    **Obvious alternative explanations.**  Schiff did not consider any possible uses for

the equation and calculations other than the 9/11 attacks, such as high-school math homework.

KSA Mot. 52-53.[33]  He also did not consider whether Al Bayoumi's inability to remember the

equation and calculations, which his report labels "simply incredulous," Schiff Rep. 11, could

have resulted from the passage of time.  KSA Mot. 53.  Plaintiffs suggest that he rejected those

possibilities at his deposition, Pls. Opp. 56, but Schiff's testimony only confirms that his opinion

is not based on aviation expertise and is speculative.

      Thus, in addition to conceding that he did not consider that the equation could be a

homework problem, *see* Schiff Tr. 114:4-22, Schiff testified that he found this possibility

"[un]realistic" based on "the context of the events of the day and what happened with respect to"

Al Bayoumi's alleged "relationships with the hijackers," *id.* at 113:15-114:2.  Similarly, Schiff

testified he did not "recall" that he "consider[ed] the passage [of] time" in judging Al Bayoumi's

credibility.  *Id.* at 104:4-8.  When asked whether it would be "remarkable" for Al Bayoumi not to

remember helping his son with his homework, Schiff answered:  "I don't know.  I can't answer

that."  *Id.* at 115:1-12.  Only then did he ask why Al Bayoumi "didn't . . . complete" the equation

---

[33] Plaintiffs complain that Al Bayoumi did not recognize the equation and calculations
as math homework.  Pls. Opp. 56.  It means nothing that Al Bayoumi could not recall the notes
20 years after the fact.  Unrebutted evidence shows the equation's use in high-school math
textbooks, but not in aviation texts.  KSA Mot. 50, 53; *see also* Moss Rep. 7-8 & nn.12-15.

and "didn't . . . show his work." *Id.* at 115:12-15.  Together with Schiff's other testimony, those colloquies show that he cannot reliably opine on the equation's actual purpose or use.

### C.        Youssef, Nakhleh, and Meleagrou-Hitchens Act as Conduits for Hearsay

Youssef, Nakhleh, and Meleagrou-Hitchens each attempt in their reports to incorporate or adopt investigative theories and hearsay statements from the FBI's preliminary investigative material.  KSA Mot. 54-57.  As for Youssef, Plaintiffs err in contending that his use of hearsay is permissible because he "explain[s] how he agree[s] or disagree[s]" with the materials he cites. Pls. Opp. 58.  To the contrary, Youssef repeatedly provides either no explanation or only a conclusory one.[34]  The Court should repeat its refusal to give "the parties a blank check to slip hearsay statements into expert reports."  ECF No. 9060, at 41.

As for Nakhleh, Plaintiffs make a revealing error in relying on his deposition testimony that he used his purported CIA expertise to determine whether FBI documents purporting to summarize confidential source statements about calls to Al Thumairy were "'a credible type of reporting.'"  Pls. Opp. 59 (quoting Nakhleh Tr. 96:7-14).  That is just the point.  If those double-hearsay statements are ultimately admitted, it will be the Court's task as factfinder "to 'judg[e] . . . [the] credibility' of the evidence 'and draw[] inferences'" from it.  ECF No. 9060, at 7 (quoting *Marvel Characters*, 726 F.3d at 136) (alterations in ECF No. 9060).  Plaintiffs as much as admit that they proffer Nakhleh to bolster the credibility of absent, unknown declarants.

As for Meleagrou-Hitchens, Plaintiffs cross-reference their defense of his methodology. Pls. Opp. 60.  Even an expert with a reliable methodology (a category that does not include

---

[34] *See* KSA Mot. 54; Youssef Rep. 32 (block-quote of source statement about Al Jarrah with no added analysis); *id.* at 84-85 (block-quote of source statement about Prince Bandar, conclusory statements about expertise); *id.* at 132 (block-quote of investigative theories plus conclusory statements about phone evidence); *id.* at 169-70 (block-quote of characterization of call information to which Youssef admits he had no access); *id.* at 194 (block-quote of unfavorable characterization of witness testimony).

Meleagrou-Hitchens) cannot "merely 'repeat[]' information" from hearsay sources.  ECF No.

9060, at 14 (quoting *Mejia*, 545 F.3d at 197).  Meleagrou-Hitchens does just that, *see* KSA Mot.

54-55, and Plaintiffs do not contend otherwise.

## III.   The Challenged Experts Opine On Improper Subjects

### A.   Youssef Opines on Improper Subjects

#### 1.   Youssef Constructs a Factual Narrative Based on Record Evidence

Most of Youssef's report is an improper factual narrative.  KSA Mot. 57-58 & n.46.

Plaintiffs rely on *In re Air Disaster at Lockerbie Scotland on December 21, 1988*, 37 F.3d 804

(2d Cir. 1994), *abrogated on other grounds by Zicherman v. Korean Air Lines Co.*, 516 U.S. 217

(1996), which permitted experts, testifying at trial, to "summariz[e] the trial record" and "highlight

portions of the trial transcripts."  *Id.* at 826; *see* Pls. Opp. 61.  Although an expert may refer to

testimony to explain the "'bas[is]'" of "'an opinion or inference,'" 37 F.3d at 826 (quoting Fed.

R. Evid. 703 (1994)), courts in this District draw the line when an expert report in whole or in

significant part is "nothing more than a narrative of the case," *AU New Haven, LLC v. YKK*

*Corp.*, 2019 WL 1254763, at *24 (Mar. 19, 2019) (cleaned up), *objections overruled*, 2019 WL

2992016 (S.D.N.Y. July 8, 2019).

Plaintiffs also attempt to recharacterize parts of Youssef's narrative as opinion.  Pls. Opp.

60 n.97.  Much of that attempt rests on mere wordplay:  to say that Youssef gives "opinions" on

matters such as "members and practices of [alleged] Sunni extremist cells in Los Angeles and

San Diego mosques" and "Saudi government support of Los Angeles and San Diego Mosques

with [alleged] Sunni extremist cells," *id.*, is to say that he "propound[s] a particular

interpretation" of the "conduct" of the purported cell members, *In re Rezulin Prods. Liab. Litig.*,

309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).  Further, Plaintiffs' suggestion that Youssef is giving

"opinions" on "the Saudi government's . . . reporting structure, oversight, and customs" and

"Saudi Consulate and Embassy practices," Pls. Opp. 60 n.97, concern matters far outside his

purported expertise.  Except for his phone-record analysis and tradecraft opinions, which are

inadmissible for other reasons, Youssef's report merely argues the facts.

### 2.    Youssef Opines on Witness Credibility

Youssef improperly opines on witness credibility using unambiguous terms such as

"lying," "deception," "unbelievable," "incredible," and "not credible."  KSA Mot. 58-59 &

nn.47-51 (giving examples).  Expert opinion on the credibility of other witnesses is improper.

*See id.* (citing *Marvel Characters*, 726 F.3d at 136, and *Nimely v. City of New York*, 414 F.3d

381 (2d Cir. 2005)).  Plaintiffs do not dispute that legal rule.  Instead, they assert that Youssef's

opinion "is about the record evidence, not the credibility of the fact witnesses."  Pls. Opp. 61-62;

*but see id.* at 63 (admitting that Youssef's report "express[es] incredulity" about witness

testimony).  Accusing Saudi Arabia's witnesses of "a pattern of lying," Youssef Rep. 149,

like Youssef's other statements collected in Saudi Arabia's motion, cannot plausibly be called

anything but credibility opinions.  Plaintiffs' attempt to square their expert's opinion with

controlling law cannot itself be squared with the actual contents of his report.[35]

Plaintiffs mischaracterize Saudi Arabia's position as an argument that "expert witnesses

cannot disagree with . . . fact witnesses."  Pls. Opp. 62 n.100; *see also id.* at 68-69.  Conflicts

between fact and expert witness testimony frequently arise.  But an expert cannot "comment[]

directly, under the guise of expert opinion, on the credibility of trial testimony."  *Nimely*, 414

F.3d at 398.  Plaintiffs' attempts to deny or circumvent that settled rule do them no credit.

---

[35] Plaintiffs also point to deposition testimony in which Youssef avoided saying that
witnesses are lying.  Pls. Opp. 61-62 nn.98, 101.  Contrary to Plaintiffs' suggestion, an expert's
refusal to repeat the opinions in his report at deposition is not a reason for admitting his testimony
on those matters, but a further reason to exclude it.

### 3.    Youssef Opines on States of Mind

Youssef improperly opines on the states of mind of people and organizations using unambiguous terms such as "knowledge," "purpose," and "intent," as well as less direct, but equally unambiguous, language.  KSA Mot. 59-60 & nn.52-54.  Expert opinion on states of mind is improper.  *See id.* at 59 (citing, *e.g.*, ECF No. 9060, at 6).  Plaintiffs argue that an expert may testify that "'a given practice is consistent with a given state of mind.'"  Pls. Opp. 62-63 (quoting *United States v. Patel*, 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023)).  The cases they cite involve experts testifying about economic effects or industry conditions from which a factfinder could infer knowledge or purpose.[36]  Those cases also affirmed the principle that the experts "may not opine about specific . . . state[s] of mind."  *Patel*, 2023 WL 2643815, at *39; *see Cotton Futures*, 2020 WL 5849142, at *14 (excluding expert's testimony where it spoke directly to "Defendants' motivation").  As the examples set out in Saudi Arabia's motion show, Youssef opines on specific states of mind.

Plaintiffs also misplace reliance on arguments that Youssef's state-of-mind opinions are purportedly supported by "substantial evidence" or by his inflated expertise "as a counterterrorism investigator."  Pls. Opp. 63; *see also id.* at 64 (attempting to distinguish *Marvel Characters* by insisting that Youssef's arguments are "rooted in . . . expertise and . . . facts").  Contentions that the evidence establishes an individual's or organization's "knowledge, motivations, intent, state of mind, or purposes" are "not . . . proper subject[s] for expert or even lay testimony."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).  It does not matter

---

[36] *See Patel*, 2023 WL 2643815, at *39 (economic testimony about whether an agreement would have had the economic effect of "suppressing wages" was relevant to allegations about its "purpose"); *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) (testimony about possibility of "sales cancellations" and "reasons to expect" market effects was relevant to allegations that defendants intended to create a price squeeze).

whether Youssef is right about the evidence or is a skilled investigator (though he is neither).

The opinions he seeks to give are outside any expert's competence.

### B.    Nakhleh Opines on Improper Subjects

#### 1.    Nakhleh Opines on Witness Credibility

Nakhleh improperly opines on witness credibility using language as unambiguous as

Youssef's: "deceit," "dishonest," "not credible," and other formulations.  KSA Mot. 10, 61-62

(collecting examples).  Plaintiffs do not even suggest that his credibility opinions can be justified

as "practice" opinions, as they (erroneously) do for Youssef.  Instead, they argue that experts are

permitted to "[e]xamin[e] . . . the record evidence."  Pls. Opp. 65.  That bland generality has

nothing to do with Nakhleh's report, which contains (among other things) an entire section

describing how his purported experience with "testimonial product" helped him to observe

Al Thumairy's "answers, utterances, and body language."  Nakhleh Rep. ¶¶ 155-156.

Plaintiffs also claim that Nakhleh was entitled to opine on Al Thumairy's credibility

because he visited the university Al Thumairy attended and was familiar with its "curriculum."

Pls. Opp. 65.  That argument asks the Court to accept a three-layer stack of inappropriate expert

testimony:  Nakhleh (1) asserts that Al Thumairy had certain personal knowledge and beliefs

about "religious principles," *id.* at 66, which is an improper state-of-mind opinion; (2) purports

to divine that, in giving testimony inconsistent with Nakhleh's assertions about his knowledge

and beliefs, Al Thumairy deliberately lied, which is an improper credibility opinion; and

(3) infers that Al Thumairy's motive for the purported lies was to conceal wrongdoing, which

is another improper state-of-mind opinion.  None of that is admissible.[37]

---

[37] Neither is Nakhleh's outrageous statement that the testimony of "Saudi Arabia government witnesses and other Saudi nationals" was "a case in point" of "jihadists" who would "lie . . . without any remorse or compunction," KSA Mot. 61 (quoting Nakhleh Rep. ¶ 154), which Plaintiffs make no perceptible attempt to defend.

**REDACTED FOR PUBLIC FILING**

2.        **Nakhleh Opines on States of Mind**

Nakhleh improperly opines throughout his report on the "knowledge," "motiv[es],"
"intent[s]," and "purpose[s]" of a host of individuals and organizations.  KSA Mot. 63-64 & n.58
(collecting examples).  Contrary to Plaintiffs' suggestion, there is no exception to the rule against
state-of-mind testimony for an expert who purports to have "personal experiences" on related
topics, Pls. Opp. 66 & n.108, and Plaintiffs cite no authority for any such exception.  Nor do
Plaintiffs cite any authority permitting an expert to testify to state of mind because the same
opinion discusses "actions."  *Id.* (citing *CFTC v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y.
Sept. 30, 2016)).  To the contrary, *Wilson* applies the rule that an expert may not "directly
opine on an actor's state of mind."  2016 WL 7229056, at *8 (excluding testimony about what
an individual "realized" and "acknowledged") (emphases omitted).  Nakhleh breaks that rule
throughout his report.

Further, although this Court has permitted expert testimony about "an organization['s]
. . . history, structure, or goals," it has also made clear that such testimony may not extend to
"intentions or beliefs."  ECF No. 9060, at 29-30 (cleaned up).  As Saudi Arabia's motion
documents, Nakhleh's opinions repeatedly cross into that prohibited territory.  To take one example,
paragraphs 29 and 32 to 34 of Nakhleh's report purport to state what "Wahhabis believe" and
how "Wahhabis view the world."  Plaintiffs' description of those paragraphs as organizational
history, structure, or goal testimony, Pls. Opp. 66 & n.110, is not accurate.  More generally,
Plaintiffs' generalized assertion that broad swathes of Nakhleh's opinions are organizational
history, structure, or goal testimony fails to overcome Saudi Arabia's showing based on the
actual words Nakhleh uses.  *Compare id. with* KSA Mot. 63-64 & n.58.

Nakhleh's derogatory statements about the beliefs and motives of "Wahhabis," a term he
uses for all adherents to "the state religion of Saudi Arabia," Nakhleh Rep. ¶ 28; *see* Nakhleh Tr.

153:14-154:4, also improperly "'traffick[] in stereotypes.'"  KSA Mot. 64 (quoting ECF No.

9060, at 21).  Plaintiffs fail to distinguish the Ninth Circuit's *Jinro* decision on the basis that

the opinion excluded there was also unreliable for other reasons.  Pls. Opp. 67.[38]  "[A]ppeal[s]

to bias, guilt by association, and even xenophobia," *Jinro*, 266 F.3d at 1008, are improper

regardless of expert qualifications or methodology.  Indeed, when this Court applied *Jinro*

(along with the Second Circuit's *Zhong* decision) to exclude the testimony of Plaintiffs' expert

Jonathan Winer about the "state of mind . . . of a whole region," it did so despite his "work . . .

concentrated on the Middle East, including Saudi Arabia."  ECF No. 9060, at 17, 21-22.

### C.    Meleagrou-Hitchens Opines on Improper Subjects

#### 1.    Meleagrou-Hitchens Opines on Witness Credibility

Meleagrou-Hitchens improperly opines that Al Thumairy's testimony included "a pattern

of . . . false" statements and that Al Bayoumi's testimony was "dishonest[]."  KSA Mot. 65

(quoting, *e.g.*, Meleagrou-Hitchens Rep. ¶¶ 37, 67).  Plaintiffs err in suggesting that *Lockerbie*

permits an expert to "comment on [the] credibility of fact witness testimony."  Pls. Opp. 68.

Nothing in *Lockerbie* authorizes an expert to testify that a fact witness has lied, and *Nimely*

and *Marvel Characters* make clear that experts may not do so.

#### 2.    Meleagrou-Hitchens Opines on States of Mind

Meleagrou-Hitchens improperly opines in his report about Al Awlaki's and the hijackers'

beliefs and knowledge; at his deposition, he added testimony about what Al Bayoumi "was aware,"

"would have known," and "had planned."  KSA Mot. 66 (collecting examples).  Plaintiffs admit that

Meleagrou-Hitchens reasons from premises about "ideology and worldview" to the conclusion

that Al Awlaki was "likely . . . aware" of the terrorist plans.  Pls. Opp. 69.  That is prohibited

---

[38] To be sure, Nakhleh's opinions about "Wahhabism" are *also* unreliable for lack of
qualifications and lack of a reliable methodology.  *See supra* pp. 3-6, 17-21.

mind reading.  *See* ECF No. 9060, at 12-13 (discussing exclusion of expert testimony that "a person '"subscribed . . . to the concept of *jihad*"'" in *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999)) (brackets omitted).[39]  And Plaintiffs offer no defense of Meleagrou-Hitchens' testimony that Al Bayoumi was dishonest at his deposition.  The Court should clarify that any such opinions are also barred.

###### D.    Schiff Opines on Improper Subjects

####### 1.    Schiff Opines on Witness Credibility

Schiff improperly opines that he finds Al Bayoumi's testimony about failing to recall the equation and calculations "'simply incredulous.'"  KSA Mot. 67 (quoting Schiff Rep. 10-11).  Plaintiffs do not address that language from his report, but rely on his deposition testimony stating that he was not offering "an opinion about whether Bayoumi was lying."  Pls. Opp. 69.  Neither Schiff nor Plaintiffs defend the credibility opinion that his report clearly gives.

####### 2.    Schiff Opines on States of Mind

Schiff improperly opines on the "'purpose of the calculations'" found in Al Bayoumi's notebook, meaning Al Bayoumi's purpose in preparing them.  KSA Mot. 67 (quoting Schiff Rep. 11).  Plaintiffs do not contest that Schiff's opinion refers to Al Bayoumi's state of mind.

### CONCLUSION

For the foregoing reasons, the Court should exclude the opinions of Bassem Youssef, Emile Nakhleh, Alexander Meleagrou-Hitchens, and Barry Schiff.

---

[39] Plaintiffs misplace reliance on *United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000), *cited in* Pls. Opp. 69, which involved expert testimony about the activities of an organization (a gang) and had nothing to do with ideology, worldview, or knowledge.  *See id.* at 120-22.

**REDACTED FOR PUBLIC FILING**

Dated:  August 4, 2023                    Respectfully submitted,

                                          /s/ *Michael K. Kellogg*
                                          _____
                                          Michael K. Kellogg
                                          Mark C. Hansen
                                          Gregory G. Rapawy
                                          Andrew C. Shen
                                          Christopher M. Young
                                          KELLOGG, HANSEN, TODD, FIGEL
                                            & FREDERICK, P.L.L.C.
                                          Sumner Square
                                          1615 M Street, N.W., Suite 400
                                          Washington, D.C. 20036-3209
                                          (202) 326-7900
                                          (202) 326-7999 (fax)

                                          *Attorneys for the Kingdom of Saudi Arabia*

**REDACTED FOR PUBLIC FILING**

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 4, 2023, I caused a copy of the foregoing Reply in Support of Motion To Exclude Expert Testimony to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*