REDACTED FOR PUBLIC FILING

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| IN RE:  TERRORIST ATTACKS ON | ) | Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

This document relates to:  *All Actions*

## MEMORANDUM OF LAW IN SUPPORT OF KINGDOM OF SAUDI ARABIA'S RENEWED MOTION TO DISMISS

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

REDACTED FOR PUBLIC FILING

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iv

GLOSSARY ....................................................................................................................... vi

INTRODUCTION .................................................................................................................1

STATEMENT OF RELEVANT FACTS ...............................................................................3

    1.    Al Qaeda and the 9/11 Attacks .....................................................................3

    2.    Al Hazmi and Al Mihdhar Arrive in Los Angeles.......................................4

    3.    Al Bayoumi Meets Al Hazmi and Al Mihdhar ............................................5

    4.    Al Hazmi and Al Mihdhar Arrive in San Diego ..........................................6

    5.    Al Hazmi's and Al Mihdhar's Other Contacts in San Diego.......................7

    6.    Al Hazmi and Al Mihdhar Return to Los Angeles ......................................9

    7.    Other Saudi Government Officials or Employees ........................................9

        a.    Musaed Al Jarrah ...........................................................................10

        b.    Khalid Al Sowailem........................................................................10

        c.    Adel Al Sadhan and Mutaeb Al Sudairy........................................10

        d.    Abdullah Al Jaithen and Majed Al Mersal.....................................11

LEGAL STANDARDS ........................................................................................................12

ARGUMENT ......................................................................................................................13

I.    No One Directed Al Bayoumi or Al Thumairy To Assist the 9/11
    Hijackers ...................................................................................................................13

    A.    Unrebutted Evidence Shows That No One Directed Al Bayoumi or
        Al Thumairy To Assist the Hijackers ....................................................13

    B.    Discovery Has Revealed No Support for Any of Plaintiffs'
        Allegations That Anyone Directed Al Bayoumi or Al Thumairy
        To Assist the Hijackers ..........................................................................14

        1.    Al Jarrah..........................................................................................14

**REDACTED FOR PUBLIC FILING**

|  |  | 2. | Al Sowailem | 16 |
|  |  | 3. | Other Saudi Officials | 16 |

| II. | | | Al Bayoumi Did Not Knowingly Assist or Direct Anyone To Assist the Hijackers | 17 |
| | A. | | Unrebutted Evidence Shows That Al Bayoumi Neither Knowingly Assisted nor Directed Anyone Else To Assist the Hijackers | 17 |
| | B. | | Discovery Has Revealed No Support for Plaintiffs' Allegations That Al Bayoumi Knowingly Assisted or Directed Others To Assist the Hijackers | 19 |
| | | 1. | The Mediterranean Restaurant | 19 |
| | | 2. | The Parkwood Apartments | 20 |
| | | 3. | Alleged Introductions or Directions to Others | 21 |

| III. | | | Al Thumairy Did Not Assist or Direct Anyone To Assist the Hijackers | 22 |
| | A. | | Unrebutted Evidence Shows That Al Thumairy Neither Assisted nor Directed Anyone Else To Assist the Hijackers | 22 |
| | B. | | Discovery Has Revealed No Support for Plaintiffs' Allegations That Al Thumairy Assisted or Directed Others To Assist the Hijackers | 24 |
| | | 1. | Direct Contact with the Hijackers | 24 |
| | | 2. | Al Bayoumi | 24 |
| | | 3. | Johar | 25 |

| IV. | | | Plaintiffs' Other Attempts To Show Knowing Assistance for the Hijackers Fall Short | 25 |
| | A. | | There Was No "Advance Team" for Al Hazmi and Al Mihdhar | 25 |
| | B. | | There Were No Suspicious Patterns of Telephone Usage | 26 |
| | | 1. | Call Attribution | 26 |
| | | 2. | Call Duration | 28 |
| | | 3. | Reasons for Calls | 29 |

| V. | | | Nothing Al Bayoumi or Al Thumairy Did Caused the 9/11 Attacks | 30 |

**REDACTED FOR PUBLIC FILING**

CONCLUSION..................................................................................................................................30

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
  999 F.3d 808 (2d Cir. 2021) ................................................................................12

*Figueroa v. Ministry for Foreign Affs. of Sweden*, 222 F. Supp. 3d 304
  (S.D.N.Y. 2016) ...................................................................................................13

*Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42 (2d Cir. 2021) ..................................12

*Hijazi v. Permanent Mission of Saudi Arabia to United Nations*, 689 F. Supp. 2d 669
  (S.D.N.Y.), *aff'd*, 403 F. App'x 631 (2d Cir. 2010) ...........................................13

*Kamen v. AT&T Co.*, 791 F.2d 1006 (2d Cir. 1986) ......................................................13

*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y.),
  *aff'd*, 719 F. App'x 47 (2d Cir. 2017) ................................................................13

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated and
  remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ........30

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ...............................................................12

*SEC v. Gallison*, 588 F. Supp. 3d 509 (S.D.N.Y. 2022) ................................................13

*Terrorist Attacks on September 11, 2001, In re*, 714 F.3d 109 (2d Cir. 2013) ..............12

*Weiss v. National Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) ......................17

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247
  (2d Cir. 2000) .......................................................................................................13

## STATUTES AND RULES

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
  (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) .........................12

  28 U.S.C. § 1604.................................................................................................12

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
  130 Stat. 852 (2016).................................................................................12, 17, 30

  28 U.S.C. § 1605B(b) ................................................................................... 12-13

  28 U.S.C. § 1605B(b)(2) ....................................................................................17

**REDACTED FOR PUBLIC FILING**

Fed. R. Evid.:

Rule 602 ................................................................................................................................16

Rule 803(8) ...........................................................................................................................15

Rule 803(8)(A)(i) ..................................................................................................................15

Rule 803(8)(A)(ii) .................................................................................................................15

Rule 803(8)(A)(iii) ................................................................................................................15

Rule 803(8)(B) ...............................................................................................................15, 25

**REDACTED FOR PUBLIC FILING**

# GLOSSARY[*]

| | |
|---|---|
| 9/11 Rep. | National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf (excerpts at Ex. 78) |
| Afifi Tr. | Deposition Transcript of Zeinab Afifi (June 23, 2021) (excerpt at Ex. 62) |
| Alzamari Tr. | Deposition Transcript of Akram Alzamari (Mar. 11, 2020) (excerpts at Ex. 99) |
| Anqari Tr. | Deposition Transcript of Abdul Aziz Abdul Kareem Al Anqari (Jan. 13 & 14, 2021) (excerpts at Ex. 25) |
| *Ashton* Compl. | Consolidated Complaint, *Ashton v. Kingdom of Saudi Arabia*, No. 17-cv-2003 (GBD) (SN), ECF No. 1 (S.D.N.Y. Mar. 20, 2017) |
| Bayoumi Tr. | Deposition Transcript of Omar Al Bayoumi (June 9-11, 2021) (excerpts at Ex. 24) |
| CAC | Consolidated Amended Complaint, *In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (GBD) (SN), ECF No. 3463 (S.D.N.Y. Mar. 17, 2017) |
| Coombs Tr. | Deposition Transcript of Samuel G. Coombs (June 22, 2021) (excerpts at Ex. 26) |
| FBI May 2021 EC | FBI May 2021 Electronic Communication, EO14040-000001 – EO14040-000014 (Ex. 80) |
| FSIA | Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) |
| Jaithen Tr. | Deposition Transcript of Abdullah Al Jaithen (Apr. 7 & 9, 2021) (excerpt at Ex. 75) |

---

[*] The short-form references in this Glossary include both sources cited in this Memorandum and sources cited in the accompanying Averment of Jurisdictional Facts and Evidence.

**REDACTED FOR PUBLIC FILING**

| | |
|---|---|
| Jarrah Tr. | Deposition Transcript of Musaed Al Jarrah (June 17-18, 2021) (excerpt at Ex. 61) |
| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B) |
| Kaldirim Tr. | Deposition Transcript of Osman Kaldirim (June 12, 2019) (excerpt at Ex. 143) |
| Khalil Tr. | Deposition Transcript of Khalil Al Khalil (June 14, 2019) (excerpt at Ex. 54) |
| Khan Tr. | Deposition Transcript of Riaz M. Khan (Jan. 23, 2019) (excerpt at Ex. 21) |
| KSA Aver. | Saudi Arabia's Averment of Jurisdictional Facts and Evidence |
| M. Johar Tr. | Deposition Transcript of Mohamed Johar (May 21, 2021) (excerpts at Ex. 84) |
| Madha Decl. | Declaration of Usman Madha (May 28, 2021) (Ex. 144) (exhibits omitted) |
| Madha Tr. | Deposition Transcript of Usman Madha (June 25, 2021) (excerpts at Ex. 145) |
| Mana Decl. | Declaration of Smail Mana (Nov. 2, 2019) (Ex. 77) |
| Mana Tr. | Deposition Transcript of Ismail Ammar Mohamed Mana (Apr. 21, 2021) (excerpts at Ex. 87) |
| Meleagrou-Hitchens Tr. | Deposition Transcript of Alexander Meleagrou-Hitchens (June 23, 2022) (excerpts at Ex. 7) |
| Mersal Tr. | Deposition Transcript of Majed Al Mersal (May 27-28, 2021) (excerpt at Ex. 76) |
| MOIA | Ministry of Islamic Affairs |
| Morgan Decl. | Declaration of Kaysan Morgan (Oct. 29, 2020) (Ex. 86) |
| Morgan Tr. | Deposition Transcript of Kaysan Morgan (June 21, 2021) (excerpts at Ex. 88) |
| Moss Rep. | Rebuttal Expert Report of Douglas M. Moss (May 16, 2022) (excerpt at Ex. 148) |

**REDACTED FOR PUBLIC FILING**

| | |
|---|---|
| Muhanna Tr. | Deposition Transcript of Faisal Al Muhanna (June 3, 2021) (excerpt at Ex. 155) |
| Nakhleh Rep. | Expert Report of Emile A. Nakhleh (May 14, 2022) (excerpt at Ex. 153) |
| Nakhleh Tr. | Deposition Transcript of Emile A. Nakhleh (June 15, 2022) (excerpts at Ex. 5) |
| OIG Rep. | Off. of Inspector Gen., U.S. Dep't of Justice, *A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (November 2004)* (June 2016), https://oig.justice.gov/sites/default/files/legacy/special/s0606/final.pdf (excerpts at Ex. 96) |
| Qattan Tr. | Deposition Transcript of Ahmed Al-Qattan (Feb. 10, 2021) (excerpts at Ex. 138) |
| Ratchford Decl. | Declaration of Holly Ratchford (May 29, 2021) (Ex. 90) |
| Rundell Rep. | Rebuttal Expert Report of David Henry Rundell (May 16, 2022) (excerpts at Ex. 4) |
| Sadhan Tr. | Deposition Transcript of Adel Al Sadhan (Mar. 30-31, 2021) (excerpt at Ex. 65) |
| Sageman Rep. | Rebuttal Expert Report of Marc Sageman (May 16, 2022) (excerpts at Ex. 6) |
| Schiff Tr. | Deposition Transcript of Barry Schiff (July 11, 2022) (excerpt at Ex. 147) |
| Sudairy Tr. | Deposition Transcript of Mutaeb Al Sudairy (Apr. 1-2, 2021) (excerpt at Ex. 74) |
| *Terrorist Financing Monograph* | John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing:  Staff Report to the Commission* (2004), https://www.9-11commission.gov/ staff_statements/911_TerrFin_Monograph.pdf (Ex. 83) |
| Thumairy Tr. | Deposition Transcript of Fahad Al Thumairy (June 28-30, 2021) (excerpts at Ex. 53) |

Youssef Rep.                    Expert Report of Bassem Youssef – with Errata
                                (May 3, 2023) (excerpts at Ex. 118)

Zeid Tr.                        Deposition Transcript of Al-Mohdar Mohamed
                                Abdullah Zeid (May 7 & 10, 2021) (excerpts at
                                Ex. 93)

## INTRODUCTION

The Kingdom of Saudi Arabia did not support the horrific terrorist attacks that struck its longstanding ally the United States of America on September 11, 2001.  Those attacks were carried out by the terrorist group Al Qaeda, whose leader Osama bin Laden had years earlier declared Al Qaeda an enemy of both the United States and Saudi Arabia.  Long before the 9/11 attacks, Saudi Arabia's most senior political leaders revoked bin Laden's citizenship, froze his assets, and worked to bring him to justice.  Its most senior religious leaders denounced terrorist attacks as contrary to Islam.  Allegations that Saudi Arabia has been anything but a friend to the United States – or anything but a foe to Al Qaeda – lack any basis in fact.

The present motion turns on a question this Court posed in 2018:  "whether and to what extent [Fahad Al] Thumairy, [Omar Al] Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to [Nawaf Al] Hazmi, [Khalid Al] Mihdhar, and other 9/11 hijackers."  ECF No. 3946, at 23.  The answer is now clear.  No one – senior Saudi official or otherwise – directed Al Thumairy or Al Bayoumi to assist Al Hazmi and Al Mihdhar or any other hijackers.  Al Thumairy provided no assistance and directed no one else to do so.  Al Bayoumi helped Al Hazmi and Al Mihdhar find an apartment and get a certified check.  He did not know they were planning an attack, and he directed no one else to help them.

Plaintiffs' allegation that Musaed Al Jarrah "tasked" Al Thumairy and Al Bayoumi to assist the hijackers rests on a speculative investigative theory that the FBI has since rejected.  Plaintiffs' allegation that Al Thumairy and Al Bayoumi met at the Saudi Consulate to discuss the hijackers has been debunked both as to the participants in the conversation (Al Thumairy was not there) and as to its substance.  Discovery has also revealed no support for allegations that Al Bayoumi planned to meet the hijackers ahead of time or paid their rent.  It has revealed none for allegations that Al Thumairy gave the hijackers money, found them lodgings, or helped them

**REDACTED FOR PUBLIC FILING**

find flight schools or obtain drivers' licenses.  And it has revealed none for allegations that other Saudi employees served as an "advance team" for the hijackers or helped them in any way.

The record is fully developed.  During jurisdictional discovery, Saudi Arabia produced 5,785 documents (9,582 pages) to Plaintiffs, including voluntary productions of documents subject to the Vienna Conventions on Diplomatic and Consular Relations.  The FBI produced more than 2,500 documents (more than 13,500 pages) in discovery.  At Plaintiffs' request, the President then ordered a second FBI review that yielded more than 930 more documents (more than 4,000 pages).  Other third parties have produced thousands more documents.  Plaintiffs have taken testimony from 18 current or former officials or employees of Saudi Arabia, including current and former Ministers and Ambassadors.  They have taken the testimony of eight third-party witnesses and obtained declarations from 11 more.  Despite all that, no fact witness and no contemporary document supports Plaintiffs' assertion that there was a hidden support network for the 9/11 attacks in Southern California – much less a Saudi government one.

Throughout discovery, Plaintiffs have argued that their position is supported by theories that the FBI examined during its lengthy investigation of the 9/11 attacks – most prominently, the theory that Al Jarrah gave directions to help the hijackers – but others as well.  The Court can and should draw its own conclusions.  But if the Court considers the FBI's views, it now has the agency's May 2021 Electronic Communication ("EC") closing its investigation into Al Jarrah, Al Thumairy, and Al Bayoumi.  The agency found that information from Al Qaeda detainees "corroborated that Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack"; "determined[ ] that insufficient evidence existed to prosecute Thumairy, Bayoumi, and Al-Jarrah for wittingly conspiring to assist the . . . hijackers"; and concluded that "the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  FBI May 2021 EC at 9-10, 11.

**REDACTED FOR PUBLIC FILING**

The tools of criminal investigation and civil discovery have been deployed in an unprecedented manner to unearth the facts about Al Hazmi and Al Mihdhar in Southern California.  Plaintiffs' attempts to assign some form of complicity to Al Jarrah, Al Thumairy, and Al Bayoumi – among dozens of others pulled into the matter – have been tenacious and prolonged.  Saudi Arabia has cooperated with that process.  The time has now come for the Court to assess the evidence and find the jurisdictional facts.  It should determine that no evidence supports Plaintiffs' jurisdictional allegations against Saudi Arabia and that their claims should accordingly be dismissed for lack of subject-matter jurisdiction.

## STATEMENT OF RELEVANT FACTS

1.      **Al Qaeda and the 9/11 Attacks.**  On September 11, 2001, the terrorist organization Al Qaeda committed a horrific attack on the United States using hijacked airplanes, resulting in thousands of deaths and massive destruction.  For years before that, Al Qaeda was a recognized enemy of the United States and of Saudi Arabia.  KSA Aver. ¶ 62.[1]  Saudi Arabia made efforts to stop Al Qaeda and bring its leader, Osama bin Laden, to justice.  Those efforts included, in 1994, stripping bin Laden of his Saudi citizenship and freezing his assets, *id.* ¶ 63; in 1996, seeking his extradition from Sudan, *id.* ¶ 65; and, in 1998, seeking his extradition from Afghanistan, *id.* ¶¶ 70-71.  Bin Laden and those around him also believed that Saudi Arabia had made attempts on his life.  *Id.* ¶ 72.

The 9/11 attacks were planned by bin Laden and Al Qaeda member Khalid Sheikh Mohammed ("KSM").  *Id.* ¶¶ 52-53.  According to the 9/11 Report, bin Laden approved in

---

[1] "KSA Aver." refers to Saudi Arabia's Averment of Jurisdictional Facts and Evidence, submitted with this motion.  As directed by Judge Netburn, ECF No. 9026, at 4, all factual contentions on which Saudi Arabia relies are or will be set forth in this motion or on reply.  The Averment provides citations to record evidence for Saudi Arabia's factual contentions.  Saudi Arabia reserves the right to supplement its Averment at the time of its reply.  Other abbreviations and short forms used in this Memorandum are set forth in the Glossary.

March or April 1999 the proposal that became the 9/11 attacks.  *Id.* ¶ 54.  According to bin Laden's handwritten papers found after his 2011 death, he conceived of crashing airplanes into financial towers after hearing about the October 31, 1999 crash of EgyptAir 990.  *Id.* ¶¶ 55-56. Information about the plot was compartmentalized within Al Qaeda to avoid discovery.  *Id.* ¶ 57. Even most hijackers did not know the nature of the attacks until shortly before they occurred.  *Id.*

Two 9/11 hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar, came to the United States in January 2000 and stayed in Southern California.  *Id.* ¶¶ 58, 73-159.  Al Mihdhar left in June and Al Hazmi left in December.  *Id.* ¶¶ 150, 157.  While in California, they tried to learn English and to get flight training.  *Id.* ¶¶ 73, 128.  Both attempts failed; they participated in the 9/11 attacks as "muscle," not pilots.  *Id.* ¶¶ 155, 159.  There is no evidence that any Al Qaeda member communicated with any Saudi government official or employee about Al Hazmi or Al Mihdhar before their arrival.  *Id.* ¶¶ 74-75.

**2.    Al Hazmi and Al Mihdhar Arrive in Los Angeles.**  On January 15, 2000, Al Hazmi and Al Mihdhar arrived in Los Angeles on a flight from Bangkok.  *Id.* ¶ 73.  Soon after, they visited the King Fahad Mosque in Culver City.  *Id.* ¶ 77.  They met a congregant named Mohammed Johar and asked him for help finding a place to stay.  *Id.* ¶¶ 77, 81.  Johar showed them to some motels, a restaurant, a bus station, and a grocery store.  *Id.* ¶¶ 82-85.  No one asked him to help them.  *Id.* ¶ 87.  He did so because it was customary to help newcomers to an Islamic community; he had received similar help from others when he came to the United States from Eritrea.  *Id.* ¶ 88.  He had no idea they were planning an attack on the United States.  *Id.* ¶ 154.

At the King Fahad Mosque, Johar introduced Al Hazmi and Al Mihdhar to Fahad Al Thumairy.  *Id.* ¶ 78.  Al Thumairy was employed by the Ministry of Islamic Affairs ("MOIA"),

**REDACTED FOR PUBLIC FILING**

which had assigned him to serve as the imam of the King Fahad Mosque. *Id.* ¶¶ 32-33.[2] Johar's reason for the introduction was that the two men were Saudis and he thought Al Thumairy would like to meet them. *Id.* ¶ 78(b). Johar recalls that the two men spoke with Al Thumairy for a short period. *Id.* ¶ 78(c). Al Thumairy does not recall meeting them. *Id.* ¶ 79. As an imam, he met many visitors, and it is not unusual that he cannot recall such visitors. *Id.* ¶ 80. Al Thumairy did nothing to help Al Hazmi or Al Mihdhar, then or later. *Id.* ¶¶ 79, 87. He received no direction from anyone to do so and directed no one else to do so. *Id.* ¶¶ 153-154, 162-164.[3]

3. **Al Bayoumi Meets Al Hazmi and Al Mihdhar.** On or around January 31, 2000, Omar Al Bayoumi visited Los Angeles. *Id.* ¶ 90. Al Bayoumi was an accountant for Saudi Arabia's Presidency of Civil Aviation ("PCA"), seconded to Saudi government contractor Dallah Avco. *Id.* ¶¶ 13, 20. From 1994 to 2000, he lived in the United States to learn English and study management and accounting. *Id.* ¶¶ 19-21. His secondment was part of a "Saudization" initiative to train Saudi employees for positions of responsibility. *Id.* ¶¶ 16-18. One former Dallah Avco employee recalls "anywhere from 45 to 50 individuals who . . . had their educational expenses paid for them" by Dallah Avco as "part of the 'Saudization' initiative." *Id.* ¶ 18.

Al Bayoumi came to Los Angeles to renew his and his family's passports at the Saudi Consulate. *Id.* ¶ 90. He invited Kaysan Morgan (also called "Isamu Dyson" and "Cayson Bin

---

[2] Al Thumairy's visa ███████████████████████ inaccurately describe him as an administrative officer stationed at the Saudi Consulate in Los Angeles. KSA Aver. ¶ 31. Documents produced by the State Department show that the United States was aware that Al Thumairy was in fact working as an imam at a mosque in October 2000, ███████████████ ███████████████████████████. *Id.* ¶¶ 234-235.

[3] Akram Alzamari, a friend of Johar's who met Al Hazmi and Al Mihdhar in June, recalls Johar telling him that the two men "came through" Al Thumairy. Alzamari Tr. 132:2-10. Johar denies saying this. M. Johar Tr. 89:23-90:17. Alzamari and Johar agree, however, that Johar never said Al Thumairy had told him to help the hijackers, and Johar is adamant that Al Thumairy never did so. KSA Aver. ¶ 87; Alzamari Tr. 50:3-6.

Don"), an American acquaintance, to come with him. *Id.* While at the Consulate, Al Bayoumi filled out the paperwork for the passport renewals. *Id.* ¶ 91. He recalls praying with Morgan at a prayer room and picking up some religious materials for the Al Madina Mosque in San Diego, which he had helped found and where he volunteered. *Id.* ¶¶ 29, 92-93. Al Bayoumi received the materials from Smail Mana, an Algerian national who worked at the Consulate. *Id.* ¶¶ 47-48, 93. When Mana gave Al Bayoumi the materials, the two men briefly exchanged greetings. *Id.* ¶ 94. They had never met before, have never met since, and have no relationship. *Id.* ¶ 96.

After leaving the Consulate, Al Bayoumi and Morgan looked for a restaurant that served halal food so that they could get lunch. *Id.* ¶¶ 97, 99. After a first unsuccessful stop at a place that was either closed or did not serve meals, they found a suitable Mediterranean restaurant. *Id.* ¶¶ 98-99. At the restaurant, Al Bayoumi overheard Al Hazmi and Al Mihdhar speaking in Arabic, and he approached them and introduced himself. *Id.* ¶ 100. Al Bayoumi was not expecting to meet Al Hazmi and Al Mihdhar. *Id.* ¶ 105. He had no idea, then or at any time before the 9/11 attacks, that they were planning to attack the United States. *Id.* ¶ 108. He made small talk and, among other topics, mentioned that he lived in San Diego, a beautiful city with nice weather. *Id.* ¶ 101. He did not offer to help them or suggest they come to San Diego. *Id.* ¶¶ 103-104. They did not tell him they were planning to come there. *Id.* ¶ 110.[4]

**4.    Al Hazmi and Al Mihdhar Arrive in San Diego.**  Several days later, Al Hazmi and Al Mihdhar took a bus to San Diego. *Id.* ¶¶ 86, 109. After they arrived, they went to the

---

[4] Morgan was present at the meeting, but does not speak Arabic or know what was said. KSA Aver. ¶ 102. Based on his contemporaneous observations, he believed the meeting to be "'purely a coincidence.'" Morgan Decl. ¶ 19. He later met with Plaintiffs' counsel and signed a declaration stating that he "now believe[s] . . . that preparations had been made for al-Hazmi and al-Mihdhar's arrival in California outside of my knowledge." *Id.* ¶ 30. At his deposition, he testified that Plaintiffs' counsel had drafted this statement, but that he had added "outside of my knowledge" in order "[t]o clarify that, to the extent that there were preparations made for 9/11 hijackers, [he] do[es]n't know anything about that." Morgan Tr. 77:16-21, 80:6-14.

Islamic Center of San Diego, where they again met Al Bayoumi.  *Id.* ¶ 109.  Al Bayoumi had not

expected to see them again.  *Id.* ¶ 110.  When Al Bayoumi learned they were looking for a place

to live in San Diego, he referred them to the Parkwood Apartments, where he and his family

lived.  *Id.* ¶ 111.  Al Bayoumi did this because (like Johar) he considered it customary to help

newcomers to an Islamic community and also because Parkwood's manager had previously paid

him for referring new tenants.  *Id.* ¶ 117(a)-(b).

On February 4, 2000, Al Hazmi and Al Mihdhar signed a lease at Parkwood.  *Id.* ¶ 112.

Al Bayoumi co-signed their lease as a guarantor and helped them open a bank account and obtain

a certified check from a nearby bank for their first month's rent and deposit.  *Id.* ¶¶ 112-113.

The check was in Al Bayoumi's name because the bank would not permit Al Hazmi or Al

Mihdhar to issue a certified check from their new account, but he did not give them the money.

*Id.* ¶¶ 114-116.  Instead, Al Hazmi immediately reimbursed him.  *Id.* ¶ 115.

Al Bayoumi interacted with Al Hazmi and Al Mihdhar a few times after they moved in,

including at a gathering to thank those who had volunteered and led prayers during Ramadan at

the Al Madina Mosque.  *Id.* ¶¶ 118-120.[5]  He did not socialize with them much because they

engaged in inappropriate physical humor in front of his children.  *Id.*  ¶ 121.  He spent much of

the rest of 2000 outside the United States, in Saudi Arabia or the United Kingdom, and had no

contact with Al Hazmi or Al Mihdhar.  *Id.* ¶ 122.  The last time he recalls seeing them was in

February or March 2000.  *Id.*  He never directed anyone to help them.  *Id.* ¶ 123.

**5.     Al Hazmi's and Al Mihdhar's Other Contacts in San Diego.**  Al Hazmi and Al

Mihdhar met others in San Diego.  *First*, they met Al-Mohdar Mohamed Abdullah Zeid (also

---

[5] Because some guests brought their families, unmarried male guests could not attend in the same space.  KSA Aver. ¶ 119.  Al Bayoumi and some of the attendees asked Al Hazmi and Al Mihdhar if unmarried male guests could gather in their apartment, and they agreed.  *Id.*

called "Mohdar Abdullah"), a college student from Yemen.  *Id.* ¶ 124.  Zeid recalls meeting Al

Hazmi and Al Mihdhar at a mosque in El Cajon, California, likely the Al Madina Mosque.  *Id.*

¶ 125.  He became their friend, introduced them to others, and helped them obtain drivers'

licenses and apply to language and flight schools.  *Id.* ¶¶ 127-128.  No one, including Al

Bayoumi, introduced Zeid to Al Hazmi and Al Mihdhar or directed him to help them.  *Id.* ¶¶ 126,

131-132.  He had no idea they were planning an attack on the United States.  *Id.* ¶ 133.  Al

Bayoumi knew Zeid from the mosque and recalls him as someone that "liked to help anybody"

and would "offer help . . . [to] make some money on the side."  *Id.* ¶ 130.

  *Second*, Al Hazmi and Al Mihdhar met Anwar Al Awlaki (sometimes spelled "Aulaqi"),

the imam of the Al Ribat Mosque.  *Id.* ¶ 134.  Al Awlaki may have accompanied them to

Parkwood during one of their attempts to obtain an apartment.  *Id.* ¶ 138.  At the time of the 9/11

attacks, Al Awlaki was known as a politically moderate Islamic preacher.  *Id.* ¶ 135.  Later, he

became a recruiter for Al Qaeda and in 2011 was killed by a U.S. drone attack.  *Id.* ¶ 136.  Al

Bayoumi knew Al Awlaki as an imam and occasionally asked him religious questions.  *Id.* ¶ 139.

Al Bayoumi did not direct Al Awlaki to help Al Hazmi and Al Mihdhar.  *Id.* ¶ 140.

  *Third*, Al Hazmi and Al Mihdhar met Abdussattar Shaikh, who rented them a room in his

home beginning in late May 2000.  *Id.* ¶ 142.  Shaikh was a longstanding paid FBI informant.

*Id.* ¶ 141.  He did not observe anything suspicious about Al Hazmi and Al Mihdhar.  *Id.* ¶ 144.

Al Bayoumi did not introduce Shaikh to Al Hazmi and Al Mihdhar, and there is no evidence that

he had anything to do with them moving into Shaikh's home.   *Id.* ¶ 145.

  The 9/11 Report discussed others who provided the hijackers with employment,

translation, transportation, banking, and other assistance.  *Id.* ¶ 146(a)-(f) (discussing, *e.g.*,

Osama Mustafa, Osama Aswadallah, Omar Bakarbashat).  There is no evidence they received

instructions from Al Bayoumi, Al Thumairy, or any other Saudi official or employee.  *Id.* ¶ 147.

6.      **Al Hazmi and Al Mihdhar Return to Los Angeles.**  On June 9, 2000, Al Hazmi and Al Mihdhar returned to Los Angeles, accompanied by Zeid.  *Id.* ¶ 148.  They stayed in a motel overnight.  *Id.* ¶ 149.  The following day, Al Mihdhar flew out of Los Angeles, returning to Yemen.  *Id.* ¶ 150.  Some witnesses recall seeing Al Thumairy with Al Hazmi or with both Al Hazmi and Al Mihdhar at the King Fahad Mosque during this visit.  *Id.* ¶ 151(a), (c).[6]  Al Thumairy does not recall any such encounter.  *Id.* ¶ 151(d).  Contemporaneous documents show that he was not in Los Angeles at the relevant time.  *Id.* ¶ 152(a)-(b).[7]  Even if Al Thumairy met Al Hazmi and Al Mihdhar during their second visit, he never received any instructions from anyone to assist, instructed anyone to assist, or did anything himself to assist them.  *Id.* ¶ 153.

After Al Mihdhar left for Yemen, Al Hazmi returned to San Diego.  *Id.* ¶ 156.  There is no evidence Al Hazmi had any contact with Al Bayoumi, Al Thumairy, or any other Saudi official or employee after his return.  *Id.* ¶ 158.  In December 2000, Al Hazmi left San Diego for Arizona, together with Hani Hanjour, another Al Qaeda member and 9/11 hijacker.  *Id.* ¶ 157.

7.      **Other Saudi Government Officials or Employees.**  Al Bayoumi and Al Thumairy interacted with various other Saudi government officials or employees.  Some of those officials or employees became subjects of jurisdictional discovery, witnesses, or both.

---

[6] Zeid recalls seeing Al Thumairy, Al Hazmi, Al Mihdhar, Johar, and Alzamari in the mosque's parking lot, having dinner with the hijackers (but not with Al Thumairy), and at some separate time (he could not recall when) seeing Al Thumairy, Al Hazmi, and Al Mihdhar in a library that was not in the mosque, KSA Aver. ¶ 151(a); Johar recalls the dinner, but does not recall any meeting involving Al Thumairy, *id.* ¶ 151(b); and Akram Alzamari, a friend of Johar's, recalls seeing Al Thumairy and Al Hazmi (but not Al Mihdhar or Zeid) emerging from the mosque's library in the evening, after which Zeid, Al Hazmi, and Al Mihdhar went to dinner, *id.* ¶ 151(c).

[7] ███████████████████████████████████████████████████ KSA Aver. ¶ 152(a); and Al Thumairy's passport shows that he arrived in Riyadh, Saudi Arabia on June 10, which (given flight times) would not be possible if he had been in Los Angeles on the evening of June 9, *id.* ¶ 152(b).

a.     **Musaed Al Jarrah.**  During the relevant period, Al Jarrah was the assistant head of the Islamic Affairs Department at the Saudi Embassy in Washington, D.C.  *Id.* ¶ 165.  Al Jarrah does not recall knowing who Al Bayoumi was before the 9/11 attacks and never had more than minimal contact with him, such as receiving a request for funding for the Al Madina Mosque.  *Id.* ¶¶ 169-170.  Al Jarrah does not know Al Thumairy personally, but interacted with him professionally, such as by assisting in the renewal of Al Thumairy's assignment to the United States.  *Id.* ¶¶ 166-167.  Al Jarrah never heard of Al Hazmi or Al Mihdhar before the 9/11 attacks, and directed, or was directed by, anyone to help Al Hazmi, Al Mihdhar, or any other 9/11 hijackers.  *Id.* ¶¶ 173, 175-176.

b.     **Khalid Al Sowailem.**  During the relevant period, Al Sowailem was the head of the Da'wah Office at the Saudi Embassy in Washington, D.C.  *Id.* ¶ 178.[8]  He was nominally Al Thumairy's supervisor and performed tasks such as approving vacation requests and filling out performance evaluations.  *Id.* ¶ 182.  Al Thumairy communicated with him primarily about administrative matters.  *Id.* ¶ 183.  Al Bayoumi did not know Al Sowailem.  *Id.* ¶ 181.  Al Sowailem (who died in 2018) was not deposed.  There is no evidence that he ever heard of or interacted with Al Hazmi, Al Mihdhar, or any other 9/11 hijackers, or that he took any direct or indirect action to help them.  *Id.* ¶¶ 184-185.

c.     **Adel Al Sadhan and Mutaeb Al Sudairy.**  During the relevant period, Al Sadhan and Al Sudairy were employed by MOIA.  *Id.* ¶¶ 41-42.  In Ramadan 1419 (December 1998 and January 1999), MOIA sent them to San Diego to preach at the Al Madina Mosque.  *Id.* ¶¶ 187, 194.  Their assignments were part of MOIA's "Ramadan imamate" program, which sent

---

[8] The Da'wah Office, also referred to ████████ as the "IFTA Office," was separate from the Department of Islamic Affairs.  The Da'wah Office (although located in the Embassy) was part of MOIA; while the Department of Islamic Affairs was (despite its name) part of the Ministry of Foreign Affairs.  KSA Aver. ¶¶ 36, 39.

preachers to mosques worldwide during the holy month of Ramadan. *Id.* ¶ 186. While in Southern California, Al Sadhan and Al Sudairy met Al Thumairy and Al Bayoumi. *Id.* ¶¶ 190, 197. Neither Al Sadhan nor Al Sudairy ever instructed Al Thumairy or Al Bayoumi to do anything or received instructions from them to do anything. *Id.* ¶¶ 193, 198. Moreover, neither ever met nor spoke with Al Hazmi, Al Mihdhar, or any of the 9/11 hijackers. *Id.* ¶ 199.

  **d. Abdullah Al Jaithen and Majed Al Mersal.** During the relevant period, Al Jaithen was employed by MOIA. *Id.* ¶¶ 43-44. In Ramadan 1420 (December 1999 and January 2000), MOIA sent him to the United States as part of its Ramadan imamate program. *Id.* ¶ 202. Al Jaithen traveled to Los Angeles for five to six days so that he could obtain medical treatment for chronic headaches, to San Diego for a night, and then to Columbus, Ohio where he spent the rest of Ramadan. *Id.* ¶¶ 205-206, 212-213. He does not recall Al Bayoumi, who recalls hearing him lecture. *Id.* ¶¶ 214-215.[9] Al Jaithen recalls a friendly conversation with Al Thumairy, who does not recall Al Jaithen. *Id.* ¶¶ 208, 210.[10]

  During the relevant period, Al Mersal was employed by MOIA. *Id.* ¶¶ 45-46. In Ramadan 1419, he traveled to Los Angeles as part of MOIA's imamate program and preached at the King Fahad Mosque. *Id.* ¶ 200. In Ramadan 1420, he traveled to San Diego as part of the same program and preached at the Al Madina Mosque. *Id.* ¶¶ 202-203, 220. For part of the second trip, Al Mersal traveled with Al Jaithen. *Id.* ¶ 202. Al Mersal recalls interacting with Al

---

  [9] A record from a Travelodge motel in Los Angeles shows Al Bayoumi and Al Jaithen checking in together on December 20, 1999. KSA Aver. ¶ 216. Neither Al Bayoumi nor Al Jaithen recalls this hotel stay. *Id.* ¶¶ 217-218. Al Bayoumi testified that he does not believe he stayed with Al Jaithen, but might have made a reservation for Al Jaithen because Al Jaithen did not speak English. *Id.* ¶ 218.

  [10] An internal MOIA memorandum shows Al Jaithen as being scheduled to visit "Kismayo, Kenya" and then "Minneapolis." KSA Aver. ¶ 203. He does not recall being assigned to visit either of those places. *Id.* ¶ 204.

Thumairy in Los Angeles, although Al Thumairy does not recall Al Mersal.  *Id.* ¶¶ 208, 210.  Al Bayoumi recalls meeting Al Mersal in San Diego, although Al Mersal does not recall Al Bayoumi except from later mentions in the media.  *Id.* ¶ 214.

Neither Al Jaithen nor Al Mersal ever met any of the 9/11 hijackers; and, before the 9/11 attacks, neither ever heard of Al Mihdhar or Al Hazmi or ever discussed any of the 9/11 hijackers with anyone.  *Id.* ¶ 222.  No one gave them instructions to assist the 9/11 hijackers, and they did not give such instructions to anyone else.  *Id.*

## LEGAL STANDARDS

A "foreign state" is presumptively "immune from the jurisdiction of the courts of the United States" under the Foreign Sovereign Immunities Act of 1976 ("FSIA").  28 U.S.C. § 1604; *see Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Where, as here, it is established that "'the defendant . . . is a foreign sovereign . . . , the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted.'"  ECF No. 3946, at 5-6 (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013)); *see also Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816-17 (2d Cir. 2021) (plaintiff has the "initial burden of production").  If the plaintiff meets that burden, the foreign sovereign bears "the ultimate burden of persuasion," ECF No. 3946, at 5-6, "by a preponderance of the evidence."  *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 52 & n.3 (2d Cir. 2021).

Plaintiffs seek to establish an exception to Saudi Arabia's immunity under the Justice Against Sponsors of Terrorism Act ("JASTA"), which authorizes certain actions for

> damages . . . caused by – (1) an act of international terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605B(b).  This Court previously ruled that, "in the absence of contrary evidence from Saudi Arabia," Plaintiffs' "allegations . . . articulate[d]" a "reasonable basis" for jurisdiction in one (but only one) respect:  their allegations that "Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers."  ECF No. 3946, at 23.  Saudi Arabia now moves to dismiss with the benefit of the record developed in jurisdictional discovery.

In determining whether Plaintiffs have met their burden of production, and (if necessary) whether Saudi Arabia has met its burden of persuasion, this Court should look to "the body of decisional law that has developed under Rule 56."  *Figueroa v. Ministry for Foreign Affs. of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (citing *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). [11]  It should disregard factual contentions that "are not based on personal knowledge, contain inadmissible hearsay, [or] are conclusory or argumentative."  *SEC v. Gallison*, 588 F. Supp. 3d 509, 514 n.1 (S.D.N.Y. 2022) (Daniels, J.).  The Court has discretion to determine whether an evidentiary hearing is necessary.  *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

## ARGUMENT

### I.      No One Directed Al Bayoumi or Al Thumairy To Assist the 9/11 Hijackers

#### A.      Unrebutted Evidence Shows That No One Directed Al Bayoumi or Al Thumairy To Assist the Hijackers

There is no evidence that "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar."  ECF No. 3946, at 21 (citing

---

[11] *See also Hijazi v. Permanent Mission of Saudi Arabia to United Nations*, 689 F. Supp. 2d 669, 670 (S.D.N.Y.), *aff'd*, 403 F. App'x 631 (2d Cir. 2010); *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 499 (S.D.N.Y.) ("[E]vidence may include affidavits, exhibits and declarations, all subject to the familiar standards of admissibility found in . . . Rule 56."), *aff'd*, 719 F. App'x 47 (2d Cir. 2017).

CAC ¶¶ 244-245; *Ashton* Compl. ¶ 44(b)).  Al Bayoumi testified that he never received any such

direction.  KSA Aver. ¶¶ 108, 160-161 (citing Bayoumi Tr. 722:14-723:15, 724:7-17).  Al

Thumairy testified the same.  *Id.* ¶¶ 153, 162-163 (citing Thumairy Tr. 491:7-21, 491:23-492:4).

Plaintiffs deposed 18 party witnesses and eight third-party witnesses during jurisdictional fact

discovery and have received extensive document discovery.  None of that discovery has revealed

any direction to assist the hijackers.

No Saudi official (senior or otherwise) had a motive to help Al Qaeda attack the United

States.  During the relevant period, Al Qaeda had declared itself an enemy of Saudi Arabia, and

Saudi Arabia was working at the highest levels of its government to bring bin Laden to justice.

*Id.* ¶¶ 62-71.  Saudi Arabia's religious establishment (including MOIA's leadership) supported

its staunch alliance with the United States and denounced suicide attacks and killing civilians as

perversions of the Islamic faith.  *Id.* ¶¶ 5-7.  A Saudi official aiding Al Qaeda would have been

betraying his country and exposing himself to arrest and prosecution by his own government.

Nor did Al Qaeda have a motive to share its plans with a Saudi official.  As the FBI

explained in closing its investigation into the 9/11 attacks, Al Qaeda "compartmentalized . . .

attack groups and roles" and "did not make the attack plans known in advance to others for fear

the nature of the attack would be discovered," which "corroborated that Thumairy, Bayoumi, and

Al-Jarrah did not knowingly conspire to assist the [9/11] hijackers."  FBI May 2021 EC at 9-10.

It is not plausible (and there is no evidence) that Al Qaeda nevertheless revealed its operatives to

a senior Saudi official, so that the official could reveal them to Al Bayoumi and Al Thumairy.

**B.   Discovery Has Revealed No Support for Any of Plaintiffs' Allegations That Anyone Directed Al Bayoumi or Al Thumairy To Assist the Hijackers**

**1.   Al Jarrah.**  Al Jarrah testified that he never told either Al Bayoumi or Al

Thumairy to help Al Hazmi or Al Mihdhar and that he had never heard of the hijackers prior to

the 9/11 attacks.  KSA Aver. ¶ 173 (citing Jarrah Tr. 595:22-596:10).  His testimony is

corroborated by Al Bayoumi's and Al Thumairy's.  *Id.* ¶¶ 160-163.  There is no evidence to

contradict it.  There is also no evidence that Al Jarrah has ever had any connection to Al Qaeda.

When they sought jurisdictional discovery, Plaintiffs relied on an assertion in a 2012

internal FBI report that a then-unnamed individual had "tasked al-Thumairy and al-Bayoumi

with assisting the hijackers."  ECF No. 3463-4, at 5. [12]  The FBI has since revealed that the

individual was Al Jarrah, ECF No. 6292, at 1; that the 2012 statement about him was an

"investigative theory[,] . . . not [an] objective statement[] of fact," *id.* (citing ECF No. 5142,

¶ 22); and that the investigative theory relied on statements by a "CHS" (confidential human

source) whose basis (if any) for knowledge about Al Jarrah is unknown, FBI May 2021 EC at

4-5; *see also id.* at 12-13 (clarifying that no "source documentation" or "evidentiary support"

shows that Al Jarrah had any "'personal contact with the hijackers'").

The investigative theory and related source statements are inadmissible hearsay.  The

2012 and 2014 reports may be "record[s] . . . of a public office," Fed. R. Evid. 803(8), but do not

fall within the public-record exception to hearsay. [13]  The FBI's later clarification that the

statement was a mere theory and rejection of that theory "indicat[e] a lack of trustworthiness."

Fed. R. Evid. 803(8)(B); *see* ECF No. 6579, at 13-14 n.5 (Netburn, J.) (observing that the

situation "cautions against relying on unsupported 'conclusions' in investigative documents").

---

[12] The FBI has produced a confidential version of the 2012 report with some redactions
lifted.  *See* Ex. 150 (EO14040-000273-UPDATED-MDL) at 276.  A similar statement appears in
a 2014 report.  *See* Ex. 151 (EO14040-000222-UPDATED-MDL) at 226.

[13] The statement that Al Jarrah "tasked" Al Bayoumi and Al Thumairy is not the FBI's
own "activit[y]," Fed. R. Evid. 803(8)(A)(i), nor was it "observed" by the FBI, Fed. R. Evid.
803(8)(A)(ii), nor, as a later-rejected theory, is it a "factual finding[]," Fed. R. Evid. 803(8)(A)(iii).

The source statements are hearsay-within-hearsay subject to no exception, and there is no showing "the [source] has personal knowledge of the matter."  Fed. R. Evid. 602.[14]

Nor is there any evidence of any contact between Al Jarrah and either Al Thumairy or Al Bayoumi during the period surrounding the hijackers' arrival in Southern California, from December 1999 to March 2000.  There is no evidence that Al Jarrah was then in Southern California or spoke by phone with Al Thumairy or Al Bayoumi.  KSA Aver. ¶¶ 174, 175(a).

2.    **Al Sowailem.**  Although Al Sowailem is deceased and could not testify, Al Bayoumi and Al Thumairy testified that he never directed either one to help the hijackers.  *Id.* ¶¶ 160-163.  There is no evidence to contradict that testimony and no evidence that Al Sowailem ever interacted with Al Hazmi, Al Mihdhar, or other 9/11 hijackers, or even knew who they were.  *Id.* ¶ 184.  As for contacts between Al Sowailem and Al Thumairy, Al Thumairy at least nominally reported to Al Sowailem and recalled contacting him about administrative matters such as vacation requests.  *Id.* ¶¶ 182-183.  For his part, Al Bayoumi had little recollection of Al Sowailem, ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████  *Id.* ¶ 180.

3.    **Other Saudi Officials.**  No other Saudi official directed Al Bayoumi, Al Thumairy, or anyone else to help the hijackers.  Every current or former Saudi official or employee who has testified has denied giving or knowing of any such direction.  *Id.* ¶ 232 (collecting citations).  No fact witness has testified to, and no contemporaneous document shows, any such direction.  Plaintiffs' experts have baselessly accused not only Al Thumairy, Al Bayoumi, Al Jarrah, and Al

---

[14] The source statement also used broad conclusory language that Al Jarrah had "manage[d] and control[led] all assignments of Saudi Imams in the United States" and was a "controlling, guiding, and directing influence on all aspects of Sunni extremist activity in Southern California."  FBI May 2021 EC at 4; *see also* Ex. 152 (EO14040-000533-MDL) (apparent original version).

Sowailem, but at least 14 others whom they identify as "Saudi Government officials" – including two former Ministers of Islamic Affairs – of knowing about purported support for Al Qaeda in Southern California.[15]  Those experts' opinions should be excluded, *see* ECF No. 9088, and in any event lack credibility.  It is not plausible that more than a dozen Saudi officials supported Al Qaeda while it was advocating the overthrow and even the death of King Fahd or that Al Qaeda trusted those Saudi officials with knowledge of its secret attack plans.

## II.  Al Bayoumi Did Not Knowingly Assist or Direct Anyone To Assist the Hijackers

### A.  Unrebutted Evidence Shows That Al Bayoumi Neither Knowingly Assisted nor Directed Anyone Else To Assist the Hijackers

Al Bayoumi helped Al Hazmi and Al Mihdhar find an apartment, set up a bank account, and obtain a certified check for their deposit and first month's rent.  KSA Aver. ¶¶ 111-114. Jurisdiction under JASTA requires a "tortious act or acts," 28 U.S.C. § 1605B(b)(2), which here requires "know[ledge]" of or "deliberate[] indifferen[ce]" to the hijackers' plans.  ECF No. 3946, at 9-10; *see Weiss v. National Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) (explaining that "deliberate indifference" means "know[ledge]" of "a substantial probability" that the recipient of support "engages in terrorism").  Al Bayoumi had no such mental state.

Four fact witnesses observed Al Bayoumi's interactions with the hijackers:  Al Bayoumi, Morgan, Zeid, and Holly Ratchford, the manager of the Parkwood Apartments.  Al Bayoumi denied any awareness of the hijackers' plans.  KSA Aver. ¶ 108 (citing Bayoumi Tr. 724:7-17).[16]

---

[15] *See*, *e.g.*, Youssef Rep. 239-40 (attributing knowledge to Abdullah Al Turki, Saleh Al Sheikh, Abdulaziz Al Ammar, Tawfiq Al Sudairy, Mohammed Al Salmi, Khalil Al Khalil, Mana, Mutaeb Al Sudairy, Adel Al Sadhan, Al Mersal, Al Jaithen, Mohamed Al Muhanna, ████████, and Omar Abdi Mohamed); Nakhleh Rep. ¶¶ 246-247 (asserting that "Saudi government (MOIA) officials from Riyadh to Washington, DC[] and Los Angeles must have known in advance that . . . al-Hamzi [sic] and al-Mihdhar[] were coming to the US on a mission" that "involved a terrorist operation against the United States").

[16] Through an expert, Plaintiffs have contended that a page allegedly found in Al Bayoumi's notebook with a picture of an airplane and some equations reflects "flight planning

Morgan has "no personal knowledge of any facts indicating that Mr. Bayoumi knew, before September 11th, 2001, of Hazmi and Mihdhar's plans to commit terrorism." Morgan Tr. 29:8-13. Although Plaintiffs allege that Al Bayoumi directed Zeid to assist the hijackers, Zeid denied any relationship with Al Bayoumi or knowledge of the hijackers' plans. KSA Aver ¶ 133 (citing Zeid Tr. 445:4-446:12); *see also* Zeid Tr. 452:21-455:12, 466:1-470:20. Ratchford, who signed a declaration about the hijackers' apartment application, did not testify that Al Bayoumi knew anything about their intent. *See generally* Ratchford Decl.

Al Bayoumi also had no motive to provide knowing assistance to the hijackers. There is no evidence that he supported terrorism or Al Qaeda. He testified that he and others at the Al Madina Mosque did "not support" attempts to link Islam to "violence[ ] . . . [or] guns" and that he and the mosque's imam would remove documents supporting violence that were posted on the mosque's public message board and "keep [them] in a file to be destroyed later on," if not "destroy [them] right there and then." Bayoumi Tr. 307:1-309:13. [17] The 9/11 Commission found "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups." 9/11 Rep. 218. Jurisdictional discovery has also revealed none.

---

preparations for the 9/11 Attacks." ECF No. 9163, at 54. As Saudi Arabia's rebuttal expert explains, the equation "is <u>not</u> commonly used in the field of aviation" and is not "consistent with the actual 9/11 jetliner tracks," but is "a typical exercise for geometry, algebra, and astronomy students," a group likely including Al Bayoumi's teenage son. KSA Aver. ¶¶ 243(a) & (d), 245 (quoting Moss Rep. 7-8, 13). Also, Al Qaeda's compartmentalization of information about the 9/11 attacks, *id.* ¶ 57, makes it unlikely that Al Hazmi and Al Mihdhar themselves would have had the target information necessary for flight planning in early 2000, much less have shared it.

[17] Some documents fitting this description were found in Al Bayoumi's office at the mosque. Bayoumi Tr. 306:4-8, 308:19-23. Al Bayoumi testified that any such documents that had not been "destroyed yet" were from "a file [meant] to be destroyed later on." *Id.* at 307:1-309:13.

**B.   Discovery Has Revealed No Support for Plaintiffs' Allegations That Al Bayoumi Knowingly Assisted or Directed Others To Assist the Hijackers**

**1.   The Mediterranean Restaurant.**   When Plaintiffs sought jurisdictional discovery, they relied on allegations that the meeting between Al Bayoumi and the hijackers at the Mediterranean restaurant was pre-planned.  They claimed Al Bayoumi and Al Thumairy "met . . . for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles," that Al Thumairy "tasked" Al Bayoumi to assist the hijackers, and that Al Bayoumi then "traveled to a Middle Eastern restaurant in the Los Angeles area where he met with [the hijackers] and offered to help them settle in San Diego."  ECF No. 3946, at 19-20, 23 (citing CAC ¶¶ 170, 172).

Discovery has shown that, instead of meeting Al Thumairy at the Consulate, Al Bayoumi met Mana.  KSA Aver. ¶ 93 (citing Bayoumi Tr. 383:13-384:5, 388:11-389:3; Mana Decl. ¶¶ 10-12, 14; Morgan Decl. ¶¶ 12-15).  The meeting lasted minutes at most, not an hour.  *Id.* ¶¶ 95(a)-(c) (citing Bayoumi Tr. 384:6-385:22; Mana Decl. ¶ 12; Morgan Decl. ¶¶ 12, 15).  The conversation had nothing to do with the hijackers, but consisted of brief greetings.  *Id.* ¶ 94 (citing Bayoumi Tr. 379:16-22, 384:19-24; Mana Decl. ¶ 12).

Discovery has also shown that Al Bayoumi had no advance plans to go to the Mediterranean restaurant.  *Id.* ¶¶ 97-99.  Al Bayoumi recalls "looking for another restaurant that me and my family had eaten at before, but it was closed."  *Id.* ¶ 98 (citing Bayoumi Tr. 393:12-394:7).  Morgan recalls that Al Bayoumi initially stopped at a halal meat market that did not serve food and the market's owner then directed Al Bayoumi to the Mediterranean restaurant.  *Id.* (citing Morgan Decl. ¶ 16); *see also* Morgan Tr. 70:3-76:8.  Morgan has "no personal knowledge of any facts indicating that [the] encounter . . . was anything other than a coincidence."  KSA Aver. ¶ 105 (citing Morgan Tr. 28:22-29:6); *see supra* p. 6 & n.4.

Discovery has also shown that, during the encounter at the Mediterranean restaurant, Al Bayoumi did not offer to help the hijackers at all and did not know that they were planning to come to San Diego.  KSA Aver. ¶¶ 103, 110 (citing Bayoumi Tr. 422:20-23, 726:23-727:2, 729:9-730:4).  He merely told them that he and Morgan lived in San Diego and that San Diego was "a beautiful city with nice weather."  *Id.* ¶ 101 (citing Bayoumi Tr. 399:11-400:1). [18]

**2.**     **The Parkwood Apartments.**  When Plaintiffs sought jurisdictional discovery, they relied on allegations that Al Bayoumi "pa[id] . . . rent" for Al Hazmi and Al Mihdhar and received "a sharp increase in the stipend he received from Saudi Arabia," which "Plaintiffs attribute[d] to the assistance [he] was providing to the hijackers."  ECF No. 3946, at 20-21 (citing, among other sources, CAC ¶ 173 and *Ashton* Compl. ¶¶ 39(k), 44(d)).

Discovery has shown that Al Bayoumi never paid the hijackers' rent.  His testimony and contemporaneous documents confirm that he merely helped Al Hazmi get a certified check and that Al Hazmi gave him the money for the check immediately.  KSA Aver. ¶¶ 114-115.  Al Bayoumi did this only because the bank would not permit Al Hazmi to obtain a certified check the same day he opened his account.  *Id.* ¶ 114.  Al Bayoumi did not give Al Hazmi or Al Mihdhar money at any time, *see id.* ¶ 116, and so there is no basis to infer that any money Al Bayoumi received was support for the hijackers.  In addition, Al Bayoumi explained that an increase in the funds he received in April 2000, *id.* ¶ 22, related to compensation he should have been receiving based on his educational attainment and prior work experience, and based on his payment of educational expenses out of his salary, *id.* ¶ 23 (citing Bayoumi Tr. 699:21-704:14).

_____

[18] Morgan's declaration states that Al Bayoumi "invited" Al Hazmi and Al Mihdhar to San Diego, but not that he offered to help them settle there.  Morgan Decl. ¶ 18.  Morgan does not speak Arabic and lacks personal knowledge of what was said.  Morgan Tr. 81:5-84:5.

Discovery has also shown that Al Bayoumi had innocent motives to help Al Hazmi and Al Mihdhar to find an apartment and complete the application process. *First*, it was customary in the local Muslim community to help newcomers; Al Bayoumi had benefitted from similar assistance when he was new to San Diego. *Id.* ¶ 117(a) (citing Bayoumi Tr. 737:24-739:24); *cf. id.* ¶ 88 (similar testimony from Johar). That custom extended to co-signing leases as a guarantor – it was not uncommon for new arrivals to need someone to co-sign, and many were willing to do so. *Id.* ¶ 117(a) (citing Bayoumi Tr. 737:24-739:24). *Second*, Al Bayoumi expected to, and did, receive a referral fee for bringing in new tenants. *Id.* ¶ 117(b) (citing Bayoumi Tr. 734:1-17). He had received similar fees in the past. *Id.*

**3.    Alleged Introductions or Directions to Others.** When Plaintiffs sought jurisdictional discovery, they relied on allegations that Al Bayoumi "put" Al Hazmi and Al Mihdhar "in contact" with Al Awlaki, "introduced" them to Zeid, and "enlisted" Zeid to assist them. ECF No. 3946, at 21. Discovery has shown that Al Bayoumi did none of those things. *First*, there is no evidence that Al Bayoumi introduced the hijackers to Al Awlaki. He knew Al Awlaki only as an imam and might have asked him or directed others to him for answers to religious questions. KSA Aver. ¶ 139 (citing Bayoumi Tr. 482:12-21, 483:9-13, 589:9-16).[19]

*Second*, there is no evidence that Al Bayoumi introduced the hijackers to Zeid or directed Zeid to assist them. Al Bayoumi testified that he never asked, assigned, or instructed Zeid

---

[19] At his deposition, Plaintiffs asked Al Bayoumi about phone records showing that, on February 4, 2000, his cell phone made successive one-minute calls to Al Awlaki's home number, the Al Ribat Mosque where Al Awlaki preached, and the Al Ribat Mosque fax number. Al Bayoumi did not remember these calls, but suggested he might have been asking Al Awlaki a religious question. Bayoumi Tr. 587:12-588:7. The length of the calls suggests that Al Bayoumi did not succeed in reaching Al Awlaki. It is also possible that Al Bayoumi let Al Hazmi or Al Mihdhar use his phone for those calls. He testified that he did not recall letting the two men use his phone, but considered it "normal" to allow "anyone who wants to make a phone call" to use his phone. *Id.* at 467:5-19.

(referred to as "Mohdar Abdullah") to assist the hijackers.  *Id.* ¶ 132 (citing Bayoumi Tr. 724:2-6, 797:2-8); *see also* Bayoumi Tr. 589:17-590:7, 796:14-797:8, 824:11-21.  Zeid testified that Al Bayoumi "was never in a position of authority over" him, "was never in a position to direct, task or instruct [him] to do anything," and "never instructed [him] to do anything."  KSA Aver. ¶ 131 (citing Zeid Tr. 465:21-467:15).  Zeid did not recall speaking with Al Bayoumi about the hijackers and did not know of Al Bayoumi instructing anyone to assist them.  Zeid Tr. 468:23-470:5.[20]

## III.  Al Thumairy Did Not Assist or Direct Anyone To Assist the Hijackers

### A.  Unrebutted Evidence Shows That Al Thumairy Neither Assisted nor Directed Anyone Else To Assist the Hijackers

Al Thumairy did nothing to assist Al Hazmi and Al Mihdhar.  KSA Aver. ¶ 153 (citing Thumairy Tr. 492:11-493:2); *see also* Thumairy Tr. 518:13-520:7.  He does not recall meeting them at all.  KSA Aver. ¶ 79 (citing Thumairy Tr. 340:15-341:2, 346:1-19, 348:1-9, 491:4-6).  Other witnesses suggest that he met them once or twice.  *See supra* p. 9 & n.6.  Contrary to Plaintiffs' allegations, Al Thumairy never gave Al Hazmi or Al Mihdhar money or lodgings, or helped them find flight schools or get drivers' licenses.  Thumairy Tr. 520:11-521:21.  He also did not direct others to help them.  KSA Aver. ¶ 153 (citing Thumairy Tr. 491:7-21).  No fact witness knew of any such directions.  *Id.* ¶ 232 (collecting citations).  Nor did Al Thumairy know of the hijackers' plans.  *Id.* ¶ 154 (citing Thumairy Tr. 493:4-11).

---

[20] A footnote in the 9/11 Report states that Zeid "claimed Bayoumi specifically asked him" to assist the hijackers.  9/11 Rep. 516 n.20 (citing a summary of Zeid's July 23, 2002 FBI interview).  The 9/11 Commission did not find that Al Bayoumi did so; it contrasted Zeid's alleged statement to Al Bayoumi's denial.  *See id.*  The FBI summary states that Zeid "believes Omar Al-Bayoumi randomly chose him from the Mosque to be the individual to acclimate the hijackers to the United States, particularly San Diego, California," and "denied knowing any other reason why Al-Bayoumi introduced the hijackers to him."  Ex. 154 (Zeid Ex. 1E) at FBI 173.  When asked, Zeid declined to adopt the statement.  *See* Zeid Tr. 140:10-143:3.  He further testified that the FBI interview summaries he had been shown contained "inaccuracies," "contradictions," and "false accusations."  *Id.* at 426:12-444:23.  The statements in the summary are hearsay subject to no exception.

Al Thumairy also had no motive to give knowing aid to terrorists. Plaintiffs have alleged that he holds "extremist" views, but he rejects that label and does not know who has accused him of "extremis[m]." *Id.* ¶ 237 (quoting Thumairy Tr. 515:4-15).[21] Mana and Alzamari, who speak Arabic and heard Al Thumairy's sermons, described him as "'never express[ing] any extremist or violent views'" and denied ever hearing him "'express any violent or extremist opinions.'" *Id.* ¶ 238 (quoting Mana Decl. ¶ 8; Alzamari Tr. 134:15-135:12; citing also Zeid Tr. 475:15-24).

To the extent others have accused Al Thumairy of extremism or radicalism, those accusations lack any basis in personal knowledge. Usman Madha, a former mosque employee, signed a declaration describing Al Thumairy as "extreme" and as part of a "group [that] held extreme, radical, and anti-American views," but admitted under cross-examination that he "understand[s] very little Arabic," could not "understand [Al Thumairy's] sermons," and "never personally heard Thumairy express any support for terrorism in any of his sermons." *Id.* ¶ 240 (quoting Madha Decl. ¶¶ 18-19; Madha Tr. 38:3-39:17).[22] Other negative statements about Al Thumairy's beliefs are likewise second-hand.[23]

---

[21] When questioned about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified," Al Thumairy answered: "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone. And we criticized that act" – that is, the 9/11 attacks – "back then, at the time." KSA Aver. ¶ 237 (quoting Thumairy Tr. 478:14-479:8).

[22] *See also* Madha Tr. 48:22-51:10 (admitting that he had no personal knowledge of Al Thumairy bringing extremist materials into the mosque or distributing them). Madha also used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." *Id.* at 60:17-61:18.

[23] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ When the FBI closed its investigation into the 9/11 attacks, it stated that a

**B.    Discovery Has Revealed No Support for Plaintiffs' Allegations That Al Thumairy Assisted or Directed Others To Assist the Hijackers**

**1.    Direct Contact with the Hijackers.**  Plaintiffs' assertions that Al Thumairy gave the hijackers religious counsel, *e.g.*, ECF No. 9163, at 48, are unsupported by evidence.  Johar testified that, when he introduced them to Al Thumairy in January 2000, they spoke only briefly. KSA Aver. ¶ 78(c) (citing M. Johar Tr. 96:15-18, 97:22-98:4, 385:20-386:4).  Although Alzamari and Zeid recall seeing Al Thumairy on the evening of June 9 or the morning of June 10, 2000 with the two men when they returned to Los Angeles, the timing does not match up. Contemporaneous documents show that Al Thumairy was ████████████████████ and in Saudi Arabia by June 10.[24]  In any event, whether Al Thumairy encountered the hijackers once, twice, or not at all, there is no evidence that he knew of, much less supported, their plans.[25]

**2.    Al Bayoumi.**  When Plaintiffs sought jurisdictional discovery, they asserted that Al Thumairy had "tasked" Al Bayoumi to assist Al Hazmi and Al Mihdhar during the alleged Consulate meeting.  ECF No. 3946, at 19-20, 23.  As set out in Part II.B.1, that meeting did not occur.  Al Bayoumi and Al Thumairy deny discussing the hijackers at any time.  KSA Aver. ¶ 164 (citing Bayoumi Tr. 791:17-21; Thumairy Tr. 494:6-8).

---

redacted source "reported that [Thumairy] was a 'hard core extremist.'"  FBI May 2021 EC at 5. The statement about Al Thumairy is inadmissible hearsay-within-hearsay.

[24] *Compare* 9/11 Rep. 220, 222 (dating the hijackers' trip with Zeid to June 9, 2000) *and* Ex. 98 (Zeid Ex. 3B) (card showing Zeid's check-in at a Culver City motel on June 9) *with* Ex. 100 (Qattan Ex. 413) ███████████████████████████████████████████████ ██████████ Ex. 48 (KSA0000006882) (passport stamp showing arrival in Saudi Arabia on 8 Rabi 'Al-awwal 1421, corresponding to June 10), *and* Thumairy Tr. 505:4-510:20 (discussing the time required to fly from Los Angeles to Saudi Arabia in 2000); *see* KSA Aver. ¶¶ 148, 150, 152 (discussing same evidence).

[25] Plaintiffs have relied on FBI summaries of statements from a confidential source or sources purportedly stating that the King Fahad Mosque received a call for Al Thumairy about "two brothers" who would be arriving from "Malaysia."  *E.g.*, ECF No. 9092, at 49-50 (citing ECF No. 9093-76).  The summary does not disclose the source's identity or basis for (purported) knowledge, and the statements are hearsay-within-hearsay subject to no exception.

**3.**      **Johar.**  When Plaintiffs sought jurisdictional discovery, they alleged that Al Thumairy had "'assigned an individual to take care of'" Al Hazmi and Al Mihdhar.  *E.g.*, CAC ¶ 158(f) (quoting ECF No. 3463-4, at 5).  The "assign[ment]" allegation is another failed investigative theory like the allegations about Al Jarrah discussed in Part I.B.1.

Plaintiffs contend that the allegedly assigned individual was Johar.  *E.g.*, ECF No. 9092, at 49-50.  Al Thumairy and Johar deny that Al Thumairy gave Johar any such assignment.  KSA Aver. ¶ 87 (collecting citations).  Johar testified that he introduced Al Hazmi and Al Mihdhar to Al Thumairy, not vice versa.  *Id.* ¶ 78(a) (citing M. Johar Tr. 94:17-18, 213:14-15, 385:15-19, 391:24-392:7, 399:8-14).



, *id.* ¶ 87 (collecting citations); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* ▮▮▮▮ Tr. 49:12-19, 51:1-53:11, 116:15-22, 132:2-10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[26]

## IV.    Plaintiffs' Other Attempts To Show Knowing Assistance for the Hijackers Fall Short

### A.    There Was No "Advance Team" for Al Hazmi and Al Mihdhar

Plaintiffs (through their experts) contend that the four missionaries who visited Los Angeles as part of MOIA's Ramadan imamate program in AH 1419 and 1420 – Al Sadhan, Al Sudairy, Al Jaithen, and Al Mersal – were secret "advance team[s]" for the hijackers.  *See*, *e.g.*,

---

[26] For many FBI interview summaries – particularly those prepared during Operation Encore – the "circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B); *see* ECF No. 9088, at 55-56 (examples of testimony that summaries were inaccurate, cutting-and-pasting, different accounts of the same interview, and cursory handwritten notes).  Saudi Arabia will further address this issue once Plaintiffs make clear which summaries they seek to admit.

Youssef Rep. 100, 139.  As the Court observed in repeatedly rejecting requests for discovery targeting Al Sadhan and Al Sudairy, Plaintiffs have no "concrete allegations that either official assisted the hijackers."  ECF No. 8862, at 24; ECF No. 6614, at 3; ECF No. 6580, at 8 (Netburn, J.).  Nor are there such allegations as to Al Jaithen or Al Mersal.

Al Sadhan, Al Sudairy, Al Jaithen, and Al Mersal all deny ever meeting Al Hazmi or Al Mihdhar; or ever giving to or receiving from Al Thumairy or Al Bayoumi any instructions to help them – to the extent they recall Al Bayoumi at all.  KSA Aver. ¶¶ 193, 198-199, 222; *supra* pp. 10-12.  Al Thumairy and Al Bayoumi likewise deny giving to or receiving from the visitors any instructions.  KSA Aver. ¶¶ 193, 198, 211, 219.  Al Sadhan and Al Sudairy also visited California months before the 9/11 Report dates the conception of the 9/11 plot (March or April 1999), and even further before the date in the later-recovered bin Laden papers (November 1999).  *Supra* pp. 3-4.  The idea that any of the visiting Ramadan imams were there to assist Al Hazmi and Al Mihdhar is pure imagination.

### B.    There Were No Suspicious Patterns of Telephone Usage

When Plaintiffs sought discovery, they relied on allegations that Al Bayoumi made many phone calls to the Saudi Embassy and Consulate during the relevant period.  *See* ECF No. 3946, at 21-22 (citing CAC ¶ 226).  Through their expert, Plaintiffs contend "that there were unusual patterns of phone activity during the period from November 1999 – February 2000 among" Al Thumairy, Al Bayoumi, and others, which were allegedly discussions about "matters related to 9/11 hijackers Hazmi and Mihdhar."  Youssef Rep. 125-26.  Saudi Arabia has moved to exclude that phone analysis.  *See* ECF No. 9088, at 23-24, 31-33.  If admitted, it deserves no weight.

### 1.    Call Attribution.

Plaintiffs overstate the number of relevant phone calls by attributing phone calls based on speculation.  *First*, they attribute to Al Bayoumi all calls to and from the phone and fax numbers for the Al Madina Mosque despite unrebutted testimony that

"anyone" could use the mosque phones and he was infrequently there.[27]  They likewise attribute

to Al Thumairy all calls to and from two phones and one fax for the King Fahad Mosque.[28]

*Second*, Plaintiffs attribute to Al Thumairy all calls to and from cell phone numbers that,

according to contemporaneous phone company records, were registered to two other individuals

(Saleh Al Hatlani and Faisal Al Muhanna) at the relevant time.[29]  Al Thumairy does not recall

either number.  Thumairy Tr. 316:3-17, 329:13-330:8.  In attempting to link Al Hatlani's number

to Al Thumairy, Plaintiffs have cited documents dated in 2001 or later, which do not provide a

reasonable basis for attributing calls in 2000 to Al Thumairy.[30]  In attempting to link Al

Muhanna's number to Al Thumairy, Plaintiffs have relied on a document labeled "Omar's Phone

Book."  The entries in that document are hearsay subject to no exception.[31]

---

[27] Aver. ¶ 225 (citing Youssef Rep. app'x ("Calls Between Bayoumi and Thumairy"), which labels (619) 579-3142 as "Bayoumi Kurdish" and (619) 401-2697 as "Bayoumi Kurdish Mosque fax"); Exs. 119-123 (FBI 1444-59) (records from November 1999 to March 2000 for 3142 number); Bayoumi Tr. 297:11-20 (phone availability)).  Because Al Bayoumi let others use his cell phone, *supra* n.19, even some calls from his personal numbers may not have been his.

[28] Aver. ¶ 228 (citing Youssef Rep. app'x ("Calls Between Bayoumi and Thumairy"), which labels (310) 204-1250, (310) 202-0432, and (310) 204-1260 as "KFM"); Exs. 130-133 (KFM 172-184, 285-296, 474-479, 480-489) (January and February 2000 records)).

[29] Aver ¶¶ 230-231 (citing Youssef Rep. app'x ("Calls Between Bayoumi and Thumairy") labeling ██████-0777 and ██████-3362 as "Fahad al Thumairy"); Ex. 135 (Awad Ex. 462) (phone company record showing Al Hatlani as subscriber for 0777 number in 2000); Ex. 134 (FBI 365-67) (showing Al Thumairy as subscriber for 0777 number with a "[s]tart" date of "04/22/2002," well after the relevant period); Ex. 136 (Muhanna Ex. 671) (showing Al Muhanna as subscriber for the 3362 number); Muhanna Tr. 92:4-93:4 (discussing subscriber information)).

[30] ECF No. 9163, at 33-34 & n.50 (citing "June 2001" and "July 2001" documents).

[31] The FBI produced two versions of the "Phone Book" document.  When asked about it, Al Bayoumi testified that it is based on information compiled from a "sheet" that was "outside" the Al Madina Mosque and that Kurdish "volunteers" who helped him would "add names" to it. Bayoumi Tr. 505:19-506:20; *see id.* at 782:18-783:9 ("I started the Omar phone book, . . . but I did not enter all the data. . . .  [I]t was at the mosque.  And then anybody who would have names, there would be volunteers inputting the data in the phone book.").

*Third*, Plaintiffs label as calls from "Bayoumi . . . to the Saudi Embassy" calls not only to actual Embassy numbers, but also calls to the Consulate in Los Angeles, calls to the Saudi Arabian Cultural Mission, which provides support to Saudi students in the United States, and calls to individuals who have never been alleged to have had any connection to this case.[32] Their list of calls from "Thumairy . . . to the Saudi Embassy" is similarly overinclusive.[33]

2.      **Call Duration.**  Plaintiffs also overstate the number of allegedly suspicious phone calls by treating each call as a separate, complete communication.  Phone records show that both Al Bayoumi and Al Thumairy often made or received calls of very short duration (one minute or less).  For example, from December 1999 to March 2000, Al Bayoumi's phone records show a total of 1,182 incoming or outgoing calls, of which 702 (59.4%) lasted one minute or less; Al Thumairy's show a total of 633 calls, of which 310 (48.9%) lasted one minute or less.  *See* KSA Aver. ¶ 227 (citing phone records).  Some, if not all, of those very short calls likely reflect failures to connect, consistent with Al Bayoumi's testimony that Al Thumairy "doesn't answer . . . phone calls" and "[i]t was hard to get him to answer the phone."  Bayoumi Tr. 451:15-23.

When attribution questions and likely failures to connect are taken into account, the number of allegedly suspicious phone calls decreases sharply.  For example, Plaintiffs (through Youssef) assert that there were 27 calls between Al Bayoumi and Al Thumairy from December 1999 to March 2000.  *See* Youssef Rep. app'x, "Calls Between Bayoumi and Thumairy" (entries 6 to 32).  If calls that cannot be reliably attributed are excluded (that is, calls to and from the Al

---

[32] Youssef Rep. app'x, "Bayoumi Calls to the Saudi Embassy" (including calls to, among others, the Consulate, the Cultural Mission, "Abdelaziz Nazer," an "Operator / Mail" number, an "Academic Advisor," a number for "Cultural and Social Affairs," the "Saudi Student Club," "Mohamed Abdelaziz," a "Follow Up Unit," "Doaa Elsayid," "Ghadda Trabulsi," "Yosef M. Al Sumairy," and "Tarig Eltayeb").

[33] Youssef Rep. app'x, "Thumairy Calls to Saudi Embassy" (including calls to, among others, the Cultural Mission, "Farid Aljan," and "Abdelaziz al Saleh").

**REDACTED FOR PUBLIC FILING**

Madina Mosque numbers and calls to and from the 3362 number for which Al Muhanna was the subscriber), 13 calls remain. *See id.* (entries 6-10, 12-14, 16-19, 26). If calls that lasted one minute or less are excluded, only 10 remain; only one of those 10 calls occurred after the hijackers arrived in Los Angeles on January 15, 2000. *See id.* (entries 7, 9-10, 12-14, 16-18, 26).

Similarly, Youssef asserts that there were 110 calls from "Bayoumi . . . to the Saudi Embassy" during the period from December 1999 to March 2000; but if calls to Cultural Mission numbers and calls that lasted one minute or less are excluded, the number is far smaller – only 32 calls to Embassy numbers and 9 calls to the Los Angeles Consulate.[34] And Youssef asserts that there were 59 calls from "Thumairy . . . to [the] Saudi Embassy" during the same period; but if calls to Cultural Mission numbers, calls to individuals never accused of involvement in any plot, and calls lasting less than one minute are excluded, the number drops to 19.[35]

**3.    Reasons for Calls.**  Unrebutted witness testimony establishes innocent reasons for phone contacts between Al Bayoumi and Al Thumairy that have nothing to do with Al Hazmi and Al Mihdhar. Al Bayoumi explained that he might reach out to Al Thumairy, among other imams, with requests for religious materials or with questions about religious matters. Bayoumi Tr. 379:14-22, 451:24-452:17. Al Thumairy confirmed that he frequently received questions "regarding family matters or worshipping matters or rituals," especially during the religiously significant "month of Ramadan." Thumairy Tr. 495:13-497:13.

As for calls with the Embassy and the Consulate, Al Bayoumi explained that he communicated with the Embassy about the certification of his education records and with the

---

[34] Youssef Rep. app'x, "Bayoumi Calls to the Saudi Embassy" (Embassy, entries 51-52, 57, 60-61, 65, 67, 72, 74, 82-83, 89-91, 94-95, 102-103, 106-107, 109, 116, 119, 121, 123, 128, 130, 133, 139, 142, 146, 155; Consulate, entries 53, 66, 69, 77-81, 93).

[35] Youssef Rep. app'x, "Thumairy Calls to Saudi Embassy" (entries 68, 78-79, 92, 94, 96, 100-102, 106-107, 109-111, 114-115, 118, 120-121).

**REDACTED FOR PUBLIC FILING**

Embassy and the Consulate about obtaining copies of the Quran for the Al Madina Mosque.

Bayoumi Tr. 301:13-303:19, 766:6-768:2, 776:17-778:8.  Al Thumairy explained that he

"communicate[d]" with Al Sowailem at the Embassy "regularly regarding time of vacations" and

other administrative matters, and that people "from the consulate" or "from the Islamic Affairs

[Department] would call and inquire about . . . pilgrimage or . . . family matters."  Thumairy Tr.

51:10-23, 223:9-224:1.  No evidence contradicts those explanations.

## V.      Nothing Al Bayoumi or Al Thumairy Did Caused the 9/11 Attacks

This Court has ruled that, to meet JASTA's jurisdictional causation requirement, Plaintiffs

must show a "'reasonable connection'" between Saudi Arabia's conduct and their injuries:  "the

. . . conduct 'must be a "substantial factor" in the sequence of events that led to the plaintiff's

injury'" and "the plaintiff's injury 'must have been reasonably foreseeable or anticipated as a

natural consequence.'"  ECF No. 3946, at 14 (quoting *Owens v. Republic of Sudan*, 864 F.3d

751, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic

of Sudan*, 140 S. Ct. 1601 (2020)).  The Court further ruled that Plaintiffs had adequately alleged

that element.  As set out above, their allegations included many purported acts that Plaintiffs

cannot prove with evidence, such as planning meetings to assist Al Hazmi and Al Mihdhar,

paying their rent, helping them find drivers' licenses and flight schools, and "tasking" others to

help them.  The smaller set of acts that remains – finding lodging at the Parkwood Apartments,

where they stayed a short time, and assisting with a certified check – do not to establish any form

of causation.  Alternatively, Saudi Arabia respectfully preserves for appeal its contention that

JASTA requires but-for causation, *see* ECF No. 3946, at 12-15, which Plaintiffs cannot establish.

## CONCLUSION

The Court should dismiss Plaintiffs' claims against Saudi Arabia for lack of jurisdiction.

**REDACTED FOR PUBLIC FILING**

Date: October 6, 2023                    Respectfully submitted,

                                         /s/ *Michael K. Kellogg*
                                         _____
                                         Michael K. Kellogg
                                         Mark C. Hansen
                                         Gregory G. Rapawy
                                         Andrew C. Shen
                                         Christopher M. Young
                                         KELLOGG, HANSEN, TODD, FIGEL
                                            & FREDERICK, P.L.L.C.
                                         1615 M Street, N.W., Suite 400
                                         Washington, D.C. 20036
                                         (202) 326-7900
                                         (202) 326-7999 (fax)

                                         *Attorneys for the Kingdom of Saudi Arabia*

31

**REDACTED FOR PUBLIC FILING**

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 6, 2023, I caused a copy of the foregoing document to be served electronically pursuant to the Court's ECF system.

/s/ *Michael K. Kellogg*

Michael K. Kellogg

*Attorney for the Kingdom of Saudi Arabia*