# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | No. 03 MDL 1570 GBD FM<br><br>**CONFIDENTIAL – CONTAINS MATERIAL SUBJECT TO MDL PROTECTIVE ORDER** |

### EXPERT REPORT OF DR. ADLI A. HAMMAD

Dr. Adli A. Hammad states as follows:

1.     I, Dr. Adli A. Hammad, am the Managing Partner of Hammad & Al-Mehdar law firm, in alliance with Simmons & Simmons, 7524 King Abdulaziz Road - Alshatea Office 1209, Jeddah 23412-3675, Saudi Arabia. I attach a copy of my curriculum vitae as Appendix 1 to this Expert Report.

2.     I have been retained by Dallah Avco in *In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (S.D.N.Y.), to provide my independent expert opinion on certain issues of Saudi Arabian law and practice.

3.     I am instructed that the factual background to the dispute is or will be well known to the Court and other relevant parties to the dispute by the time this report is considered by the Court. Accordingly, I do not repeat such background in this report.

### BACKGROUND

**I.     My Background and Experience**

4.     I earned a Bachelor's Degree in Law (LLB) from the University of Cairo, Egypt, in 1978; a Master's Degree in International Business Law (LLM) from Southern Methodist

1

University, Dallas, Texas, in 1992; and a Doctorate Degree in Islamic Finance Law (PhD) from International Islamic University, Kuala Lumpur, Malaysia, in 2008.

5.     I am currently a Senior Partner in the law firm of Hammad & Al-Mehdar and have served in this capacity for the last 35 years. Hammad & Al-Mehdar is located in Jeddah, Saudi Arabia and is one of the leading local law firms with an international practice. The law firm of Hammad & Al-Mehdar has expanded to become one of the largest groups of Saudi Arabian lawyers working together in private practice. Hammad & Al-Mehdar provides legal advice on a full range of corporate, commercial, financial, and administrative matters to serve the needs of major local and international clients in the commercial, litigation, banking, and private sectors.

6.     My legal practice consists of representing local and foreign parties in a wide variety of disputes and transactional matters governed by Saudi law. I have been working for Saudi Aramco as labor law counsel. I have handled numerous disputes in the local courts in Saudi Arabia involving Saudi Arabian procedural and substantive law. I have acted as an arbitrator in local arbitrations in Saudi Arabia and international arbitration matters outside Saudi Arabia. I have also acted as counsel on behalf of several Saudi Arabian clients in legal disputes pending before courts and arbitral tribunals in the United States and the United Kingdom and have acted as an expert witness on Saudi law issues in court and arbitration proceedings in the United States and the United Kingdom.

7.     I have written several publications including the following books:

(a)     Islamic Investment Funds (2011) (comparison between Saudi and Malaysian laws);

(b)     Saudi Capital Markets Laws (2012) (commentary);

(c)     Right of Knowledge (2013) (articles on Saudi laws); and

(d)      Encyclopedia of Saudi Laws (2010) (with joint authors).

8.      My qualifications, training, and experience are further detailed in my curriculum vitae, attached as Appendix 1. My curriculum vitae includes a list of all publications I have authored within the past ten years and a list of all other cases in which I have testified as an expert at trial or by deposition within the past four years.

9.      Hammad & Al-Mehdar is being compensated at the rate of SR 2700 per hour for my time spent in connection with this matter.

## II.    Expert Declaration

10.      I make the following declaration in relation to my testimony:

(a)      I understand that my duty in giving testimony in this proceeding is to assist the Court in deciding the issues regarding which expert evidence is adduced. I have complied with, and will continue to comply with, that duty.

(b)      I confirm that this is my own, impartial, objective, unbiased opinion.

(c)      I confirm that all matters upon which I have expressed an opinion are within my area of expertise.

(d)      I confirm that, at the time of providing this written opinion, I consider it to be complete and accurate and constitute my true, professional opinion.

(e)      I reserve the right to modify or amend this opinion if additional information becomes known to me that is relevant to my analysis.

## III.    Scope of My Opinion

11.      I have been asked to give my expert opinion on the following issues under Saudi law:

(a)      Laying out the main principles of the Saudi Labor Law regime with regards to public and private employees;

(b)      Rendering my opinion regarding the policy of Saudization of the Saudi workforce under Saudi law, and the role of and requirements for secondment and educational leave under Saudi law; and

(c) Determining Omar Al Bayoumi's employment status under said Labor Law regime in relation to Dallah Avco.

## IV.    Documents Reviewed

12.    In preparing my expert opinion, I have been provided with and have reviewed various documents including:

(a) Air Navigation System Support ("**ANSS**") contracts, which were the master contracts signed between Dallah Avco and the Saudi Presidency of Civil Aviation ("**PCA**");

(b) Recorded correspondence between the PCA and Dallah Avco;

(c) Omar Al Bayoumi's personnel file with the ANSS project;

(d) Documents from the personnel files of other employees of the ANSS project;

(e) Internal correspondence within the ANSS project; and

(f) Declarations and deposition testimony of witnesses with relevant information.

13.    A full list of documents that I have reviewed in connection with preparing this report is attached as Appendix 2 to this report.

## PRINCIPLES OF SAUDI ARABIAN LAW

## I.    Saudi Labor Law Principles

### A.    History of the Saudi Labor Law

14.    The Saudi Labor Law ("**Labor Law**") is a group of legal rules that governs the relation arising out of one person working for another and under his management and supervision in exchange for a wage.[1] The Labor Law is considered a balanced law that regulates

---

[1] Dr. Al Sayied Eid Naiel, *Al-Waseet – Explanation to the Labor Law and Social Insurance in the Kingdom of Saudi Arabia* 5 (1415H).

4

the relations between employees and their employers.[2] The goal behind the Labor Law is to govern the labor relation without any sort of discrimination, whether it is gender, nationality, age, or the like.

15. In Saudi Arabia, the Labor Law was not introduced as a written law until the 20th Century. Before then, work relations had less importance in the country.[3] Labor contracts used to be governed by the rules of lease agreements, named "Ijarah," subject to Islamic jurisprudence, or "Fiqih."[4] In the mid-20th Century, labor relations became more important and common, due to the discovery of petroleum and rapidly growing industry.[5]

16. When Aramco Company started operating in Saudi Arabia, the number of workers promptly increased and regulation was deemed necessary to regulate the increasingly common labor relations at that time.[6] Due to the country's rapidly changing labor market and economic prosperity in that period, the King of Saudi Arabia introduced the *Compensation for Workers in the Industrial and Technical Projects Law* dated 18/07/1356H (corresponding to 23/09/1937G),[7] as a first effort to regulate the labor relations.[8] This law applied only to workers in the jobs of exploration and extraction of petroleum and minerals and was limited to obligating the employer to pay compensation to the employee in case of injury.

---

[2] Ministry of Labor, *Guidebook for Expatriates Recruited for Work in the Kingdom of Saudi Arabia* (2d ed. 2006).

[3] Dr. Al Sayied Eid Naiel, *supra*, at 13.

[4] *Ibid.*

[5] *Id.* at 14.

[6] *Ibid.*

[7] This law was issued by Royal Decree No. 44 dated 18/07/1356H (corresponding to 23/09/1937G).

[8] Dr. Al Sayied Eid Naiel, *supra*, at 15.

17.     In 1361H (corresponding to 1942G), as a supplement to the *Compensation for Workers in the Industrial and Technical Projects Law*,[9] legislation with 17 articles was announced to regulate workers in the petroleum and mineral fields. This legislation specified working hours, work conditions, inspections, and inspectors' authority.[10] Back then, the inspectors were controlled by the Ministry of Finance,[11] not the Ministry of Labor.

18.     After World War II, in 25/11/1366H (corresponding to 10/10/1947G), a Labor Law was passed with 60 articles, the majority of which were adopted from the Egyptian labor law.[12] This law was comprehensive compared to previous laws.[13] This law was applicable to all workers in the industrial, commercial, and agricultural sectors. It completely altered the previous two laws, covering working hours, wage protection, age of workers, termination of contracts, and much more.[14]

19.     In 1389H (corresponding to 1970G), due to economic prosperity, the Ministry of Labor and Social Insurance cooperated with the International Labor Office with the goal of preparing more comprehensive labor legislation to comply with the modern Saudi market.[15] This Labor Law had 211 articles divided into 13 chapters.[16] It addressed the rules for women and

---

[9] Issued by Royal Decree No. 5323 dated 13/04/1360H (corresponding to 09/05/1941G).

[10] Dr. Al Sayied Eid Naiel, *supra*, at 16.

[11] *Ibid*.

[12] *Ibid*.

[13] *Ibid.*

[14] *Id*. at 17.

[15] *Ibid*.

[16] Issued by Royal Decree No. M/21 dated 06/09/1389H, effective on 19/09/1389H (corresponding to 28/11/1969G).

adolescents in the work force, labor contract rules, various leaves, the labor committee, penalties, and other matters.[17] Also, on the same day, Saudi Arabia adopted the Social Insurance law.

20.    In 1426H (corresponding to 2005G), the Ministry of Labor announced a new Labor Law[18] to address new market challenges, especially the high unemployment percentage in Saudi Arabia and an unbalanced relation between the rights of employers and employees. This new Labor Law addressed challenges of Saudization, a policy of the Kingdom of Saudi Arabia implemented by the Ministry of Labor in the 1970s whereby Saudi companies and enterprises are mandated to employ Saudi nationals at defined minimum thresholds. This Labor Law, dated 1426H (corresponding to 2005G), is the current one and effective up to this date, including the latest amendments announced in 2015.

21.    The Labor Law of 1969 was the governing law of all labor relations from 1995 to 2002, the period relevant to the events at issue here. I shall explain the major rules of the 1969 labor law within the context of this report and its application to the matters discussed herein.

### B.    Labor Law Characteristics

22.    Similar to any other law, the Saudi Labor Law contains special characteristics.[19]

### 1.    Practical Law

23.    The Labor Law is considered practical, which means it is based on socio-economic considerations; its provisions are far from generality and abstractions.[20] This means

---

[17] Dr. Al Sayied Eid Naiel, *supra*, at 17.

[18] Issued by Royal Decree No. M/51 dated 23/08/1426H (corresponding to 2005G). First amended by Royal Decree No. M/24 dated 12/05/1434H (corresponding to 24/03/2013G) and further amended after that by Royal Decree No. M/46 dated 05/06/1436H (corresponding to 25/05/2015G).

[19] Dr. Munieer Fareed Al Dukmi, *The New Labor Law in Light of the Islamic Jurisprudence (Fiqih)* 11 (2012).

[20] *Ibid*.

the rules of the Labor Law vary and differ according to an employee's special circumstances. For instance, certain considerations for workers in the agriculture and industrial fields differ from considerations for work in other fields.[21] The Labor Law takes into consideration the age, sex, nationality, and social status of the worker and reflects those special circumstances of each worker according to his/her unique work situation.[22]

### 2. Absolute Law

24.     The most important feature of the Labor Law is that its rules are absolute to protect the weak party in the labor relation, the employee.[23] Generally, the rules of law are considered public policy; hence, the parties cannot agree to violate the Labor Law's provisions or otherwise contradict it. If the parties agreed to contradict the law, their agreement would be null and void.[24] However, when it comes to the Labor Law, the legal concept of "absolute" is defined to adjust for an employee's special weak status. If the parties indeed happened to be in violation of the Labor Law rules, their agreement will be null and void unless it is more beneficial to the employee, in which case it will be enforceable in favor of the employee against the employer. The Saudi Labor Law in article 8 has emphasized this legal concept and protected the employee from the employer's arbitrary abuse by stating "*Any condition that contradicts the provisions of this Law shall be deemed null and void. The same applies to any release or*

---

[21] *Ibid.*

[22] Dr. Al Sayied Eid Naiel, *supra*, at 18.

[23] *Id*. at 13.

[24] *Ibid.*

*settlement of the worker's rights arising from this Law during the validity of the work contract, unless the same is more beneficial to the worker.*"[25]

### 3. Interpreted in Favor of Employee

25.     The interpretation of the Labor Law shall always be in the employee's favor. Thus, if a Labor Law provision happens to be ambiguous and could be interpreted to have different meanings, it is mandatory to interpret the legal provision in the best interest of the employee, not the employer.[26] The justification is that, because the Labor Law protects the employee as the weak party in the labor relationship, it is logical to interpret any ambiguity in his favor.[27]

### 4. Enforceability

26.     To assure the enforceability of the Saudi Labor Law, the King has made sure that the Labor Law contains a variety of criminal penalties in the case of any violation.[28] Certain penalties are increased for recurring violations as stated in chapter 15 of the Labor Law.[29]

**C.     The Scope of the Labor Law and the Civil Service Law**

27.     The Saudi Labor Law applies and is limited to the following:

    (a)     Any contract with a private party whereby a person commits himself to work for an employer and under his management or supervision for a wage;

    (b)     Some workers of the government and public organizations and institutions, including those who work in pastures or agriculture;

---

[25] Labor Law, art. 8 (Official English language copy issued by the Saudi Bureau of Experts, Official Translation Department, at the Council of Ministries Portal).

[26] Dr. Al Sayied Eid Naiel, *supra*, at 25.

[27] *Ibid*.

[28] Dr. Munieer Fareed Al Dukmi, *supra*, at 13.

[29] *Ibid*.

(c)  Workers of charitable institutions;

(d)  Qualification and training contracts with workers other than those working for the employer within the limits of the special provisions provided for in this Law; and

(e)  Part-time workers with respect to safety, occupational health, and work injuries, as well as other matters decided by the Minister.[30]

28.  The Labor Law generally governs only the private sector. The public sector, where a person works for the government or governmental entities, is governed instead by the Civil Service Law.[31] According to the Saudi Basic Law, the Saudi government consists of three branches: the executive, the legislative and the judiciary.[32] The executive consists of the various ministries that govern the country and is led by the council of ministers, which is headed by the King.[33] Any ministry or an entity that is a subsidiary of a ministry is to be considered part of the public sector.

29.  With regards to employees of the public sector in Saudi Arabia, the employment relationship is not contractual but statutory. Thus, public sector employees (with a few exceptions[34]) fall under the "Law of Civil Service," which determines the structure and

---

[30] Labor Law, art. 5 (Official English language copy issued by the Saudi Bureau of Experts, Official Translation Department, at the Council of Ministries Portal).

[31] *Ibid*.

[32] Article 44, "The Basic Law," Royal Decree A/90, 27/08/1412H (corresponding to 01/03/1992G).

[33] Article 56, "The Basic Law," Royal Decree A/90, 27/08/1412H (corresponding to 01/03/1992G).

[34] As per Article 1 of the Regulation for the Employment of Non-Saudis in the Public Sector, issued by a Resolution by the Civil Servant Council No. 45 dated 01/08/1398H (corresponding to 06/07/1978G), military employees and employees who are employed under the Labor Law, issued by Royal Decree No. M/21 dated 06/09/1389H (corresponding to 15/11/1969G), are not subject to the Law of Civil Service.

governance of the civil service.[35] Public sector employees are therefore considered civil servants, and their employment relationship is governed by the Law of Civil Service and its associated regulations,[36] as well as laws and regulations that may be specific to their employing governmental agency. In effect, this means that the employment relationship between civil servants and their employers consists of predetermined employment terms enshrined in law that are not subject to variation by negotiation.[37]

    **D.**    **Employment Agreement**

30.    The Labor Law defines the term "Employment Agreement" in article 50 as "A contract concluded between an <u>employer and a worker</u>, whereby the latter undertakes to <u>work</u> under the <u>management or supervision</u> of the former for a <u>wage</u>."[38] Under this definition, an employment contract is a bilateral contract whereby employer and worker agree on the contract's terms and conditions as mandated by law. The law defines an <u>employer</u> as "Any natural or corporate person employing one or more workers for a wage" and a <u>worker</u> as "Any natural person working for an employer and under his management or supervision for a wage, even if he

---

[35] Article 59, "The Basic Law," Royal Decree A/90, 27/08/1412H (corresponding to 01/03/1992G).

[36] "The Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G).

[37] Abdullah Bin Rashed Al Sunaidi, *Is the Relationship Between a Governmental Employee and His Employer Contractual or Statutory?*, Al-Jazira, 26/05/2011. Nonetheless, some public employees are expressly excluded from the Civil Service Law and are instead regulated pursuant to the Labor Law. Those employees fall into three categories: (1) regular workers such as janitors, guards, lifters, and the like; (2) craftsmen such as mechanics, electricians, drivers, and the like; and (3) technicians such as radiologists, and laboratory and hospital workers. Appointed Wage Workers Regulation, Resolution by the Civil Service Council No. 141 dated 27/05/1399H (corresponding to 24/04/1977G) and effective on 07/01/1399H (corresponding to 27/05/1977G); Dr. Al Sayied Eid Naiel, *supra*, at 37.

[38] Labor Law, art. 50 (Official English language copy issued by the Saudi Bureau of Experts, Official Translation Department, at the Council of Ministries Portal).

is not under his direct control." Here the term "worker" includes Saudi and non-Saudi workers as well as both genders.

31.     Thus, for the employment contract to exist, it must have three essential elements: work, wage, and a subordination relationship of management or supervision. The last requirement – subordination – is the most significant element to measure the existence of the employment relation under the Saudi Labor law.

### 1.  Work

32.     In article 2, the Labor Law defines the first element, work, as "the effort in all human activities in execution of a (written or unwritten) work contract regardless of their nature or kind, be they industrial, trade, agriculture, technical or otherwise, whether physical or mental."

### 2.  Wages

33.     The wage definition was well summarized in *Saudi Business and Labor Law* as follows:

> The wage is all that is given to the workman in consideration of his work under an employment contract, whether written or unwritten, regardless of the nature of the wage, whether it is in cash or in kind, and payable monthly, weekly, daily, or on a piece-work basis or on the basis of the number hours or the amount of production, regardless of whether all or any part of the such wage consists of allowances or benefits.[39]

### 3.  The Existence of the Subordination Relationship Between the Parties

34.     The law defines "subordination" as "the employee works under the management or supervision of the employer."[40] Subordination is the most essential element to distinguish

---

[39] Alison Lerrik and Q Javed Mian, *Saudi Business and Labor Law – Its Interpretation and Application* 260 (2d ed. 1987).

[40] Dr. Munair Aldakmi, *Explanation of the Comparative Labor and Workman Law* 36 (2002).

employment contracts from other types of contracts, such as independent contractors and service agreements.[41] The drafters of the Labor Law have historically considered the subordination relationship to consist of two elements, as follows:[42]

### a)  Economic Subordination

35.     Economic subordination exists when the employee needs and depends on his wage because the employee believes it is his/her main source of income. Correspondingly, the employer exclusively benefits from the employee's activity in that the employee is not allowed to work for others.[43]

### b)  Legal Subordination

36.     Legal subordination is the employer's authority to have control over the worker's acts in a manner that restricts the worker's independence.[44] The Supreme Commission for Labor Settlement Disputes defined legal subordination as "following up on employee's attendance, leaves, administrative procedures and acts."[45] The employer's right to management, control, or supervision covers all the worker's acts executed or to be executed in the performance of his work.[46] This means that the labor relation exists when the employer gives work instructions and where the employee will be subject to those instructions and will create an obligation upon the

---

[41] Dr. Yousef Abdulmajeed, *Explanation of Labor and Workman Law in Saudi Arabia* 53 (4th ed. 1997).

[42] *Id.* at 37.

[43] *Id*. at 53, 54.

[44] Alison Lerrik and Q Javed Mian, *supra*, at 247.

[45] Supreme Commission for Labor Settlement Disputes, Resolution No. 1201 dated 03/08/1424H (corresponding to 09/05/2003G).

[46] Alison Lerrik and Q Javed Mian, *supra*, at 247.

employee. The employee will be subject to penalties in case of violation.[47] The subordination relationship embodied in the management, control, or supervision by the employer over the worker may be exercised in a direct or indirect manner. Nonetheless, in all cases, the exercise must be apparent during the entire period of the employment contract.[48]

37.     Legal subordination is present when the law gives the employer the right to determine the work assigned to the employee; the place of work; the working hours, attendance, and leave requirements; and the right to impose penalties on an employee in case of violation.[49] Correspondingly, the law imposes a duty on the worker to obey his employer. This duty requires the worker to follow and obey his employer's orders and instructions, to follow his directions, and to refrain from committing acts that are prohibited by him under the law.[50] This duty of obedience requires the worker's obedience to the employer's instructions without arguments from the worker.[51] This duty shall be performed by the worker to the extent acceptable within his employment agreement, but shall never extend to violate cultural morals or religious beliefs.[52] The law permits the employer to enforce certain disciplinary measures against any employee who is proven to violate his instructions as per the law.[53]

38.     Legal subordination can take two forms, as follows:

- Technical Subordination, where the employee is subject to the employer's control, supervision, and management, either partially or completely, in all details and

---

[47] Dr. Hassan Keira, *The Principles of Labor Law – Employment Contract* 150 (3d ed. 1979).

[48] Alison Lerrik and Q Javed Mian, *supra*, at 247.

[49] Dr. Munair Aldakmi, *supra*, at 37.

[50] *Id.* at 40.

[51] *Ibid.*

[52] *Ibid.*

[53] *Id.* at 36.

14

aspects of the work. The employer must be aware of all details of the employee's work.

- Managerial Subordination, where the employee is left with his technical knowledge to do the work himself without the direct control of the employer knowing all details and technical aspects of his work. Nonetheless, the employee remains subordinate to the employer with respect to circumstances such as workplace rules, working hours, relocation, leaves, and the like.[54]

c)    Legal Subordination Doctrine over Economic Subordination

39.    Saudi Labor Law today focuses primarily on the legal subordination element and less on economic subordination.[55] The Saudi Labor Law focuses especially on the managerial or organizational form of legal subordination, not the technical. Because it is hard for the employer to be technically aware of all the details and aspects of workers' techniques at work, the Labor Law primarily relies on managerial subordination – where the worker is under the employer's instructions, and those instructions relate to workplace rules and similar aspects – to define the employment relationship.[56]

**E.    An Employer's Liability for Acts of an Employee**

40.    A basic principle of Saudi law is that every person is liable for his own actions, and no one can bear the consequences of actions that are done by another.[57] However, the law recognizes a narrow exception in the employer-employee relationship. Under that exception, the employer may be liable for the consequence of his employee's wrongful act committed under the instruction of the employer and within the scope of employment. The employee's wrongful act must happen within the limits of the course of employment taking into consideration the subject

---

[54] Dr. Hassan Keira, *supra*, at 151.

[55] Dr. Munair Aldakmi, *supra*, at 38.

[56] *Id*. at 38-40.

[57] Dr. Mustafa Al-Zarqa, *The Responsibility of the Superior Over His Subordinates*, Islamic Fiqh Academy Journal 151, 10 (2005).

15

matter of the action, the <u>tool</u> used to commit the action, and the <u>manner</u> by which the action is done.[58] The subject matter refers to the work agreed upon to be done by the employee under the employment contract.[59] In other words, the wrongful act must be done within the scope of employment.[60] If the wrongful act is done whilst doing something other than working on the subject matter of the employment contract, the act is excluded from the liability of the employer.[61]

## II.     Saudization and the Education and Training of Saudi Employees

### A.     The Policy of Saudization

41.     For many years, foreigners comprised a large percentage of the skilled workforce in Saudi Arabia, particularly in managerial and technical positions. This situation resulted largely from the rapid development of Saudi Arabia's petroleum industry and the role of foreign companies like Saudi Aramco in that process. When the Arabian-American Oil Company (Aramco) first came to Saudi Arabia, not enough Saudis possessed the technical training and skills to meet the demand for skilled labor. As a result, foreign companies generally brought in their own workforce to manage the operations, or recruited workers from other foreign countries, which left a large number of Saudi nationals either unemployed or serving in low-level, unskilled positions.

42.     The Saudi government concluded that it was not consistent with the Saudi national interest that Saudi citizens should serve only in subordinate positions in the workforce.

---

[58] Dr. Hasan Al-Thannon, *Al-Mabsoot in Civil liability: Liability for the Acts of Others* 454 (1st ed. 2006).

[59] *Ibid.*

[60] Dr. Mustafa Al-Zarqa, *supra*, at 156.

[61] *Ibid*.

Because limited budgetary resources made it impossible for the Saudi government to provide all its citizens with greater employment opportunities in the public sector, the government introduced a Saudi nationalization scheme known as "Saudization" to increase the number of Saudi workers in the private sector.  For many years, Saudization has been an important and explicit policy of the Saudi government.

43.      The Saudi government's attempts to increase the number of Saudi nationals in the private sector have been ongoing for over half a century. Since 1970, the Saudi government has adopted a comprehensive "Development Plan" every five years to promote economic and social progress. Each Development Plan has prominently discussed Saudization. The First Five-Year Development Plan (1970-1975) recognized the importance of implementing robust educational and training programs for Saudi nationals. Those programs were designed to provide Saudis with the necessary skills and training to fill vacant positions, thereby increasing the participation of Saudis in the national workforce and diminishing the need for expatriate workers.[62] The Second Development Plan (1975-1980) set a goal of increasing the number of Saudi nationals in the workforce.  Like the First Development Plan, it also recognized the importance of providing Saudis with the education and training needed for occupations requiring higher productivity.[63]

44.      The Third Development Plan (1980-1985) leveraged government contracting to increase Saudi participation in the Saudi workforce. It provided: "Priority in awarding contracts for projects will be given to Saudi contractors. When contracts are awarded to foreign contractors, they will have the stipulation that some of the work must be sub-contracted to Saudi

---

[62] First Development Plan issued by the Ministry of Economy and Planning, Ch. 4, Manpower Resources and Development, p. 86.

[63] Second Development Plan issued by Ministry of Economy and Planning, Ch. 5, Human Resource Development, p. 216.

companies."[64]   The Fifth Development Plan (1990-1995) created educational programs to prepare Saudis to meet the workforce demand. It also prescribed a minimum target for the growth of the Saudi labor force that should be met by companies in the private sector.[65] Development plans in subsequent years have continued to focus on Saudization.[66]

45.     The Saudi government has adopted a variety of strategies to promote Saudization. Those strategies have included incentives and other programs to encourage the hiring of Saudi nationals to skilled positions, as well as initiatives to encourage Saudi nationals to obtain the education and job skills they need to replace foreign labor. For instance, in the mid-1990s, the government instructed private companies with 20 or more employees to increase the number of their Saudi employees by 5% annually.[67] The government also imposed a prohibition on the employment of non-Saudis in several professions.[68] More recently, the Saudi Ministry of Human Resources and Social Development launched an initiative to raise recruitment fees for foreign workers in order to discourage Saudi companies from employing such workers.[69]

46.     The lack of Saudi representation in the workforce was particularly problematic for the public sector, which is responsible for administering the country's laws and regulations.

---

[64] Third Development Plan issued by Ministry of Economy and Planning, Ch. 3, The Strategy for the Third Plan, p. 86.

[65] Fifth Development Plan issued by Ministry of Economy and Planning, Ch. 6, Labor Market, p. 119.

[66] Sixth Development Plan issued by Ministry of Economy and Planning, Ch. 6, p. 173; Eighth Development Plan issued by Ministry of Economy and Planning, Ch. 6, The Private Sector, p. 137.

[67] Council of Ministers Decision No. 50 of 1994, Article 2.

[68] Council of Ministers Decision No. 50 of 1994, Article 5.

[69] Ministry of Human Resources and Social Development, Reduction of Cost Discrepancy Between Saudi Labor[er]s & Expatriates, https://hrsd.gov.sa/en/initiatives/reduction-cost-discrepancy-between-saudi-labors-expatriates (updated 25/07/2017G).

Generally, only Saudi citizens may hold positions within the Saudi civil service.[70] For many years, however, the Saudi civil service has had difficulty meeting its need for skilled and technical employees from Saudi nationals alone. For that reason, Saudi government agencies have frequently contracted with private companies to recruit and provide skilled foreign employees, who then work alongside their civil service counterparts under the agency's direction and supervision. Those foreign contract workers perform work that could otherwise be performed by Saudi nationals if sufficient skilled labor were available.

47.     The Saudi government has taken various steps to reduce that public-sector reliance on foreign labor. For example, the Fifth Development Plan called for active Saudization programs to increase the number of Saudi nationals performing public-sector work.[71]

48.     The Saudi government has also adopted mechanisms by which Saudi public employees can improve their education and training, allowing them to obtain the necessary qualifications to perform jobs currently held by foreigners. I discuss some of these mechanisms below.

### B.     Secondment

49.     It is common practice for government ministries and agencies to second employees to other ministries or to the private sector. One of the most common reasons for such secondments is to improve the employee's job skills. By temporarily placing the employee in a new position where he can obtain additional knowledge and experience, the agency can benefit from the employee's improved skills once the secondment ends and the employee returns. Those new skills can advance the employee's career prospects and qualify him for more senior

---

[70] Article 4/a, "Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G).

[71] Fifth Development Plan issued by the Ministry of Economy and Planning, Ch. 6, p. 119.

positions at the agency. The current version of Article 59 of the Implementing Regulation for Human Resources in the Civil Service explicitly explains this rationale: "The processes of transfer, assignment, secondment and borrowing aim at developing the governmental human resources and ensuring the good conduct of business."[72]

50.     Secondment of public employees is governed by Articles 29/1 – 29/7 of the Implementing Regulation of the Civil Service Law issued by the Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 1977G),[73] amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 1983G), No. 1/198 dated 12/06/1410H (corresponding to 1990G), and No. 459/1 dated 09/11/1417H (corresponding to 1997G). Under the version of those regulations in effect starting 12/06/1410H (corresponding to 1990G), an agency may second an employee for a one-year term and may extend the secondment in one-year increments, but the total period of secondment may not exceed five years.[74]

51.     The secondment regulations do not expressly stipulate whether the secondment should commence by a decision of the government agency or by a request of the private entity. The employee may request the secondment or he may be assigned by his superior. The superior may choose to second the employee for his professional development, or alternatively, the entity to which the employee will be seconded may make the request in light of the employee's skillset

---

[72] Article 59, "The Implementing Regulation for Human Resources in the Civil Service," Council of Ministers Decision No. 1550 dated 09/06/1440H (corresponding to 11/05/2019G). A Saudi government witness who testified in this case, former Assistant to the President of Civil Aviation Abdul Aziz Al Angari, confirmed this rationale at his deposition. He explained that, during a secondment, an employee could "acquire . . . expertise which would benefit him and benefit us when he returns to his job." Angari Tr. 365:16-366:7.

[73] "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G).

[74] "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G).

or a shortage of labor. The regulation requires that, prior to the commencement of the secondment of any public employee, the authorized minister must issue a decision approving the secondment.[75]

52.     During the secondment period, if the employee receives a salary from the private employer that is lower than his original salary, the government agency would pay the difference. In some cases, the private employer may even pay the employee a salary greater than his original salary. This will usually be the case if the employee is seconded overseas.[76] As a practice, secondment is not considered an interruption in public sector employment. The seconded employee's original public sector employer cannot offer his position to another candidate and is prohibited from terminating his position.

53.     Secondment is a common and unremarkable practice in Saudi Arabia, where a great number of government employees (*e.g.*, professors at public universities, public officers, and prosecutors) are seconded to other public and private entities.  Secondment can take place even if such entities have no contractual relationship with the government agency.

### C.     Educational Leave

54.     Article 28 of the Civil Service Law lists various types of leave that public employees may take. Those leaves include ordinary leave, exceptional leave, and – most important here – educational leave to enable the employee to pursue educational studies.

---

[75] Article 29/1, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 1/198 dated 12/06/1410H (corresponding to 09/01/1990G).

[76] Article 29/7, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

55.     Article 28/1 of the Civil Service Law permits public employees to take 30 days of "ordinary leave" each year.[77] An employee can combine periods of ordinary leave, provided that the total ordinary leave does not exceed 90 days in any one year.[78]

56.     Article 28/22 of the Civil Service Law permits public employees to request "exceptional leave."[79] The agency may permit exceptional leave for any reasonable basis, but the total exceptional leave may not exceed six months within any three-year period.[80]

57.     Finally, Article 28/19 of the Implementing Regulation of the Civil Service Law permits public employees to request "educational leave."[81] Educational leave is another common and unremarkable practice in Saudi Arabia. A great number of government employees are allowed to take educational leave from their employment in order to pursue studies.

58.     Under Article 28/19, a Saudi civil servant may be granted educational leave if (1) the employee holds a high school diploma or the equivalent, (2) the employee has spent three years in service with a job evaluation of at least "good," and (3) the course of study is relevant to the work of the agency where the civil servant works.[82] The period of educational leave is not

---

[77] Article 28/1, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[78] Article 28/4, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[79] Article 28/22, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/05/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[80] *Ibid.*

[81] Article 28/19, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/05/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[82] *Ibid.*

considered an interruption of the employee's public sector employment and is therefore included for purposes of pension accumulation.[83]

59.     Article 28/20 provides that the agency that employs the civil servant is responsible for monitoring the progress of the employee's studies during the educational leave.[84] Article 28/21 adds that, if the employee does not fulfill the purpose for which the educational leave was granted, the leave period will not be considered for hiring or promotion purposes.[85]

60.     From those provisions, it is apparent that one of the main reasons for allowing educational leave is to improve the employee's jobs skills and prospects for advancement once the employee returns to the agency. That is why the Civil Service Law requires that the course of study be relevant to the employee's work at the agency, why the law makes the agency responsible for monitoring the employee's education, and why the leave period is not counted for hiring or promotion if the employee does not complete the studies. Educational leave thus advances the policy of Saudization by providing a way for civil servants to improve their qualifications and to advance to more senior positions at the agency.[86]

---

[83] *Ibid.*

[84] Article 28/20, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/05/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[85] Article 28/21, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/05/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[86] Abdul Aziz Al Angari confirmed at his deposition that the reason the Civil Service Law requires that the course of study be relevant to the employee's position is "so that he can benefit from his studies when he returns to work, if the government permits him the leave to study." Angari Tr. 375:24-376:6.

61.     Prior to commencing educational leave, the employee must receive an acceptance from the institution of learning in which he seeks to enroll. The employing ministry or agency typically sets the duration of the educational leave but may extend that period as it sees fit.[87]

62.     A public employee on educational leave typically does not receive a salary from the agency that granted him the educational leave.[88] However, the employee may work for any private or public entity during his educational leave, as nothing in the Civil Service Law prohibits the employee from receiving a salary from any other source during the period of educational leave.

### D.     Government Scholarship

63.     One final mechanism by which public sector employees can increase their education and job training is government scholarship. Governmental scholarship is regulated by the Employee Scholarship Regulation that was issued in 1391H (corresponding to 1971G).[89]

64.     Government scholarship differs from educational leave in that the employee generally receives half of his salary in addition to financial allocations given to regular students under scholarship.[90] A public sector employee under scholarship generally is not allowed to

---

[87] Article 9, "The Employee Assignment Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

[88] Article 28/19, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/05/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[89] "The Employee Scholarship Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

[90] Article 15, "The Employee Scholarship Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

work, unless the work is approved by the Saudi Cultural Mission and does not affect the employee's educational performance.[91]

65.      As with educational leave, the scholarship period is not considered an interruption of the employee's public sector employment and is therefore included for purposes of pension accumulation.[92]  Unlike with educational leave, however, a public employee on scholarship is obliged to continue in the civil service upon his return to Saudi Arabia for a period equal to the time spent on the scholarship.[93]

66.      Government scholarship is another mechanism by which the Saudi government promotes Saudization by increasing the job skills of the Saudi workforce.

### OPINIONS REGARDING THE EMPLOYMENT STATUS OF OMAR AL BAYOUMI AND OTHER ANSS EMPLOYEES

**I.      Dallah Avco's Role in the ANSS Project**

67.      The Air Navigation System Support project ("**ANSS**") was a project that aimed to provide support for the installation and maintenance of air traffic control, air navigation and aeronautical communications facilities in all airports in the Kingdom of Saudi Arabia, and to maintain and augment existing facilities.[94] It was undertaken by the Presidency of Civil Aviation ("**PCA**"), which was an ancillary body to the Ministry of Defence and Aviation at the time of the

---

[91] Article 14, "The Employee Scholarship Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

[92] Article 26, "The Employee Scholarship Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

[93] Article 25, "The Employee Scholarship Regulation," Council of Civil Service Decision No. D/3/17752 dated 20/07/1391H (corresponding to 09/09/1971G).

[94] Article 1(f), Air Navigation System Support Contract, Volume I, Exhibit B, "General Conditions" (DA000110).

contract and for the period relevant to this case. In 2005, the PCA was separated from the Ministry of Defence and was renamed the General Authority of Civil Aviation ("**GACA**").[95]

68.     To carry out the ANSS project, the PCA awarded a series of contracts to private contractors to provide manpower procurement, payroll processing, and related administrative support for project employees. The contracts were generally tendered for three-year terms and were numbered ANSS I, ANSS II, and so on. Dallah Avco was awarded several ANSS contracts starting in the 1980s and ending in 2005, when the PCA awarded the project to a different contractor, Safari.[96]

### A.      Dallah Avco's Responsibilities Under the ANSS Contracts

69.     Dallah Avco's responsibilities were governed by the terms of the ANSS contracts. Dallah Avco was tasked with manpower procurement, payroll processing, training, and the provision of technical support.[97]

70.     With regards to manpower procurement, the contract required Dallah Avco to procure "engineering, technical, management, training, logistics, and support personnel in accordance with . . . the provisions enumerated herein," which included a "manning schedule" and "position description[s]" attached to the contract.[98] Although Dallah Avco was responsible for the recruitment process, it selected the candidates based on criteria provided by the PCA and

---

[95] "Civil Aviation Law," Royal Decree No. M/44 dated 18/07/1426H (corresponding to 23/08/2005G).

[96] Kamel Tr. 41:6-10; Yamani Decl. ¶ 6.

[97] Article 5, Air Navigation System Support Contract, Volume I, Exhibit B, "General Conditions" (DA000115).

[98] *See, e.g.*, KSA0000002986; KSA0000003352-68.

subject to PCA approval of the selected candidates.[99] Dallah Avco was obligated to "[o]btain Government approval for all candidates for employment or termination under the Contract prior to the candidate's employment or termination."[100] Dallah Avco was required to recruit "for Government review and approval, only technical personnel meeting the requirements as defined in Volume IV."[101] The Government reserved the right to review resumes, interview candidates, and approve all personnel selected for employment by the contractor.[102]

71.    Although the contract contemplated that Dallah Avco would generally identify suitable candidates for the PCA's consideration based on the requirements set by the PCA, the contract also authorized the PCA to instruct Dallah Avco to put specific individuals on the project. Specifically, the Government was entitled to, "at its discretion, at any time, direct the Contractor to hire any individual or individuals whom the Government deems suitable for employment under the Contract."[103] Conversely, the Government also retained the right to terminate ANSS personnel. The contract reserved to the "Contracting Officer" – a PCA

---

[99] Article 2-1-2, Air Navigation System Support Contract, Volume III, Exhibit H, "Scope of Services" (DA001580).

[100] *Ibid.*

[101] Article 1-2-2, Air Navigation System Support Contract, Volume II, Exhibit F, "Personnel Proficiency" (DA001493).

[102] Article 2-1-8, Air Navigation System Support Contract, Volume III, Exhibit H, "Recruitment Review and Assessment" (DA001583-85).  Abdul Aziz Al Angari, the Assistant to the President of Civil Aviation, confirmed at his deposition that the PCA was required to approve all candidates recruited by Dallah Avco. Angari Tr. 346:16-21. Dallah Avco's recruitment manager, Jaber Khalifa, testified that the PCA had "final authority" over whom to hire as well as salary, promotion, firing, benefits, and evaluations. Khalifa Tr. 59:14-61:6; *see also id.* at 37:10-23, 88:4-89:2. Dallah Avco's director of manpower services, Riaz Khan, confirmed that all decisions regarding whom to hire and how much to pay were made by the PCA. Khan Tr. 32:4-33:3, 48:19-22, 51:1-11, 51:21-24, 52:7-11, 68:20-69:2, 75:19-23, 85:22-24, 86:14-15, 121:6-24, 163:18-164:1.

[103] Article 4-2-1-2, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002189).

employee – the authority to "investigate" ANSS personnel who "are found to be performing their duties in an unsatisfactory manner."[104] Dallah Avco could then be "directed to terminate [the ANSS employee] on the date to be decided by the contracting Officer or his designee."[105]

72.     The ANSS contract expressly required Dallah Avco to adhere to the policy of Saudization. Dallah Avco was obliged to give first priority to Saudi nationals, and the Government reserved the right to directly intervene in the hiring process in this respect: "If at any time the Government shall notify the Contractor in writing of the availability of a Saudi Arabian national qualified for employment, the Contractor shall offer to employ him forthwith. . . . Saudi Arabian Nationals employed to meet the requirements of the Saudization program shall not be employed without the prior written approval of the Government."[106]

73.     Dallah Avco did not direct or supervise the work of ANSS employees after they were recruited to the project. Instead, once recruited, employees were to join the existing PCA workforce and work under the auspices of the PCA managers and supervisors. The contract states that the "[c]ontractor-furnished personnel shall work for and in conjunction with the Presidency of Civil Aviation (PCA), as one integrated team, to train, augment, assist and actively support the existing workforce in the operation, maintenance and certification of the

---

[104] Article 4-2-6-2, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002197).

[105] *Ibid.*

[106] Article 1, Air Navigation System Support Contract, Volume III, Exhibit K, "Saudization Plan" (DA001647). Angari confirmed at his deposition that "if a Saudi national was available, he would have priority." Angari Tr. 352:22-23. Samuel Coombs, the logistics manager on the ANSS project, testified that Saudization was a "program where non-Saudi workers would be replaced by Saudi workers" and that a "component of the Saudization program was to pay for the education of the potential replacement Saudi employees." Coombs Tr. 49:10-18. Al Bayoumi described Saudization as the process of "bringing Saudi nationals into the [ANSS] program." Al Bayoumi Tr. 612:11-15; *see also id.* at 613:7-9 (describing "Saudization" as "bringing Saudi nationals instead of foreign nationals").

government's Air Navigation System facilities, systems, and equipment."[107] ANSS employees could be "assigned to work directly under the supervision of Government employees, advisors or consultants."[108] As just one example, the Contracts and Finance Control Manager for the ANSS project was "responsible to the General Manager of Airways Engineering" at the PCA.[109] Organizational charts for the PCA's Airways Engineering Division, which were included in some ANSS contracts, show that ANSS personnel worked alongside civil servants and ultimately reported to PCA managers and supervisors.[110]

74.     Consistent with Dallah Avco's limited role, the contract restricted the information that Dallah Avco employees (as opposed to ANSS personnel) could receive. The contract states that ANSS "personnel working directly under Government supervision may in the course of their duties be in receipt of information to which [Dallah Avco] will have no right of access."[111]

---

[107] Article 4-1, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002188); *see also* Article 4-4-1, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002205) ("The personnel furnished by the Contractor shall work in Saudi Arabia as an integrated element of PCA."). Al Bayoumi testified that ANSS employees did in fact work side-by-side with other Airways Engineering personnel as part of one integrated team. Al Bayoumi Tr. 614:23-615:3; *see also id.* at 616:4-7 (explaining there were "government employees and there were foreign employees that were working on the same project").

[108] Article 1-1-2-1-1, Air Navigation System Support Contract, Volume II, Exhibit F, "Maintenance and Operations." (DA001491-579); *see also* Article 4-4-1, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002205) (noting that the Contractor's "Program Management" must "direct, control, and administer the activities of Contractor personnel within the requirements of the contract, and according to the management direction, orders, rules and regulations of PCA").

[109] DA009230-31.

[110] KSA0000003168.

[111] Article 3, Air Navigation System Support Contract, Volume I, Exhibit B, "Relinquishment to other parties confidentiality and non-disclosure" (DA000114).

Dallah Avco employees also needed special permission to access ANSS project sites.[112]

75.     In addition to recruitment, Dallah Avco was responsible for processing the payment of salaries and other benefits to ANSS employees.[113] For this function too, Dallah Avco merely carried out the PCA's instructions. In the contract, the PCA gave Dallah Avco a schedule of wage reimbursement rates setting different rates for different classes of employees.[114] Further, the PCA set the amount of total funding authorized for the project and allocated specific budgets to each sector, including wages.[115]

76.     The PCA reimbursed Dallah Avco on a monthly basis for the expenses it incurred under the contract.[116] The ANSS contract provides that "[t]he Contractor shall be entitled each month to be paid for the Technical and Support Man-Months provided during the preceding month at the man-month billing rates" specified in the contract.[117] The PCA's orders of credit reference payment of "labor costs" for "employment (man/month)," confirming that the PCA reimbursed those amounts.[118]

---

[112] Article 19, Air Navigation System Support Contract, Volume I, Exhibit B, "Accessing the Site" (DA001384) ("The Government shall grant the Contractor access to the sites and facilities, to enable the Contractor to perform its obligations under the Contract. The Government will issue the necessary passes for authorized Contractor personnel after applications and fees, if required, have been received . . . .").

[113] Kamel Tr. 48:20-49:10; *see also* Article 1-2-3-7, Air Navigation System Support Contract, Volume I, Exhibit D, "Salary/Merit Increase Plan" (DA001460).

[114] Air Navigation System Support Contract, Volume I, Exhibit C, "Financial Conditions," Attachment D (DA001450-53).

[115] Article 1, Air Navigation System Support Contract, Volume I, Exhibit C, "Financial Conditions" (DA001411-12).

[116] Article 2-1-1, Air Navigation System Support Contract, Volume I, Exhibit C, "Financial Conditions" (DA001412-13).

[117] *Ibid.*

[118] KSA0000006631. Dallah Avco's former director of finance, Ahmed Niazi, confirmed that all compensation paid to ANSS employees was reimbursed by the PCA. Kamel Tr. 252:1-254:6 &

77.     Finally, Dallah Avco was responsible for certain administrative tasks related to the foregoing functions. For example, Dallah Avco provided training to technicians and engineers during the on-boarding process using PCA-provided material,[119] and it handled certain employee-relations matters.[120] Dallah Avco also dealt with day-to-day queries on behalf of the PCA such as petty expenses and vacation and leave requests.[121]

78.     Thus, it is clear from the contract between the PCA and Dallah Avco that Dallah Avco had no authority to control, supervise, or direct the work of ANSS employees.

**B.     Other Evidence Confirming Dallah Avco's Role**

79.     The documents and correspondence generated in the course of Dallah Avco's performance of the ANSS contracts make clear that Dallah Avco performed only administrative functions and did not exercise supervision and control over ANSS employees. That fact is also confirmed by the testimony of Dallah Avco employees, PCA officials, and ANSS project employees.

*1.  Personnel Records*

80.     As part of its administrative responsibilities, Dallah Avco maintained a personnel file for each worker on the ANSS project. The personnel records demonstrate that Dallah Avco did not exercise control over ANSS employees.

---

Kamel Ex. 129. Angari agreed that the PCA reimbursed Dallah Avco for ANSS employee salaries. Angari Tr. 355:20-357:17.

[119] Article 1-3, Air Navigation System Support Contract, Volume III, Exhibit H, "Technical and Operation Support" (DA001579).

[120] Article 13, Air Navigation System Support Contract, Volume I, Exhibit B, "General Conditions" (DA000121-22).

[121] Article 2-1-2, Air Navigation System Support Contract, Volume I, Exhibit C, "Financial Conditions" (DA001413).

81.     This fact is evident from the notices in which the PCA set the positions and pay grades for ANSS employees. The PCA issued these notices to Dallah Avco ordering it whom to hire or fire on the ANSS project, the position to which to assign each employee, and the pay grade that determined each employee's compensation.[122]

82.     Personnel records also show that the PCA transferred employees from one region to another based on the needs of a particular branch of the ANSS project.[123] In some cases, an employee was transferred to an area of the project that Dallah Avco was not operating. In one example, a Mr. Errol Realce was sent from one ANSS project location where Dallah Avco was operating to Yemen Sector,[124] which was outside of Dallah Avco's scope and was a location Dallah Avco had no involvement in.[125]

83.     Additionally, any employee that was to embark on a business trip had to obtain the prior written approval of the PCA, and Dallah Avco then received instructions to arrange his travel logistics.[126] When employees submitted requests for vacation or leave to Dallah Avco, that

---

[122] *See, e.g.*, Authorization to hire Alex Menchion III for the position of Vortac Technician, Level "H" (DA002312); Authorization to Hire Harry C. Morehouse (DA001994); Letter from PCA/AE Logistics Manager informing Dallah Avco it was "essential" to retain services of specific employee (DA002039); Authorization to Promote Alberto Trinidad (DA002055); PCA letter directing Dallah Avco to terminate employee (DA001923); PCA memorandum giving notice that certain contracts had been extended (DA002089).

[123] Authorisation to transfer "Charles Jansch" to Riyadh (DA001930).

[124] Letter from sector manager of the PCA operations in the Southern Region to PCA director in Jeddah requesting a clerk (DA001919), and the Jeddah director to the Yemen Sector responding to the request sending "Errol Realce" (DA001918).

[125] Article 2-14, Air Navigation System Support Contract, Volume III, Exhibit H, Scope of Services (DA001592).

[126] *See, e.g.*, Request for business travel and airline ticket purchased by Dallah Avco (DA008623-25); *see also* DA002085.

request would be passed on to the PCA for approval or rejection.[127]

84.      The PCA confirmed Dallah Avco's lack of direction or supervision when it declined to renew Dallah Avco's contract for the ANSS project and awarded the contract to a new contractor in 2005.[128] All ANSS employees were then transferred to the new contractor.[129]

### 2.   Correspondence Between the PCA and Dallah Avco

85.      The PCA's correspondence with Dallah Avco confirms the nature of the relationship among the PCA, Dallah Avco, and ANSS employees.

86.      For example, in a letter to Dallah Avco, the PCA's Director-General of Airways Engineering, Mohammed Al Salmi, described ANSS employees as "valued assets of this Directorate."[130] The letter emphasized that the PCA would "not tolerate losing these employees."[131] Al Salmi therefore "instructed [Dallah Avco] to always coordinate with [PCA/AE] prior to sending any distribution letter to PCA/AE employees on any contract matter."[132] That requirement that Dallah Avco obtain the PCA's permission before even communicating with ANSS employees confirms the PCA's control.

---

[127] Dallah Avco informed the PCA of the request of an employee, Harry Moorehouse, to cancel a scheduled leave (DA001990). The PCA also had control over the employee's vacations (DA001916).

[128] Non-award contract to "Errol Realce" (DA001913).

[129] The PCA instructed Dallah Avco to transfer all the employees to the new contractor, Safari, and Dallah Avco complied. DA002122-35.

[130] DA002075.

[131] *Ibid.*

[132] *Ibid.*; *see also* Kamel Tr. 51:18-52:3, 75:10-14.

87.     All ANSS personnel received PCA ID cards which allowed them to access ANSS sites, while Dallah Avco senior executives did not have such access.[133] Dallah Avco employees were required to apply to the PCA for passes to access ANSS sites.[134]

88.     A memorandum from Al Salmi to Dallah Avco's project director at the time, Samir Magboul, specifies the approvals that were required for even administrative actions within the ANSS project.[135] Certain activities, such as site assignments, out-of-Kingdom travel, direction to hire, employee termination, purchase requisition, purchase orders, and letters of instruction required the approval of the Director-General himself.[136] Other approvals – such as time reports, applications for leave and holidays, overtime, performance evaluations, and authorized absences – were delegated to Airways Engineering Division or Department heads, such as the Contracts and Finance Control ("CFC") Manager.[137]

89.     Alp Karli, the CFC Manager, would inform Dallah Avco's project manager that certain ANSS employees' contracts had been extended.[138] In one example, Karli writes, "As per the Director General's instructions, we are pleased to inform you that the Employment Agreement of the following employees have been extended for a further period of one

---

[133] *See* DA001070 (format of an application that should be filled out in order to obtain the approval of the PCA to access ANSS site).

[134] Article 19, Air Navigation System Support Contract, Volume 1, Exhibit B, "General Conditions" (DA001384).

[135] *See* DA002001-03.

[136] DA002003.

[137] *Ibid.*

[138] *See, e.g.*, DA002089.

year . . . ."[139] Karli proceeds to list the affected employees, identifying them by ID number, name, department, position, and the date their contract would expire.[140]

90.     The PCA would also direct Dallah Avco to make certain payments to ANSS employees. On March 11, 1996, Al Salmi directed Dallah Avco project director Fareed Bogary to "pay in advance the following staff TDY expenses" for a 15-day trip to Paris to attend a "Critical Design Review."[141]

### 3. Witness Testimony

91.     Witness testimony in this case confirms that ANSS employees were directed and supervised by the PCA, not by Dallah Avco. Dallah Avco's recruitment manager, Jaber Khalifa, testified that ANSS employees were "under the full authority of the Presidency of Civil Aviation."[142] They operated "under the policy and procedures set by the Presidency of Civil Aviation," and "their time schedule, and their mobilization, their work schedule has been set by ANSS."[143] "Dallah Avco did not provide supervision over those employees . . . ."[144] Instead, "[t]he PCA" was "supervising the work of the people that were working on the ANSS project."[145] Dallah Avco "didn't provide direction to those employees either."[146]

---

[139] *Ibid.*

[140] *Ibid.* Notably, when individuals within the PCA sought a pay raise for ANSS employees, they made the request to Airways Engineering Director General Al Salmi, not to Dallah Avco. *See* Letter from Director of Administrative Development to Al Salmi (DA002317).

[141] DA002085.

[142] Khalifa Tr. 34:7-9; *see also id.* at 37:18-23 (noting that ANSS employees "are under the full responsibility of Presidency of Civil Aviation, which is ANSS project," so the "ANSS project decides which – where to assign [the employee] and which position to give him")

[143] *Id.* at 50:23-24, 51:20-23; *see also id.* at 56:4-6 ("we tell [the ANSS employees] that [they] will be strictly working for the ANSS program under the PCA").

[144] *Id.* at 74:2-9.

[145] *Id.* at 56:16-24.

92.     Dallah Avco's Director of Manpower Services, Riaz Khan, similarly testified that Dallah Avco did not direct or supervise ANSS employees. The PCA, not Dallah Avco, determined the "assigned site" of ANSS employees.[147] Dallah Avco did not know "what [ANSS employees] are doing."[148] ANSS employees were "working for" and "supervis[ed]" by the PCA.[149] For example, the PCA, not Dallah Avco, tracked and approved an ANSS employee's vacation time.[150] And the tasks of individual employees were "defined by the PCA."[151]

93.     Dallah Avco's corporate representative, Ammar Kamel, testified that ANSS employees worked "under the guidance and control of PCA," and "at all times they're PCA subordinates."[152] "[T]hose people work under the control of PCA. PCA says what are their positions. PCA says the job descriptions, their salaries, who gets to leave, when do they leave . . . [I]t comes from the PCA."[153]

94.     A senior PCA official confirmed that ANSS personnel were directed and supervised by the PCA. Former Assistant to the President of Civil Aviation Abdul Aziz Al Angari testified that ANSS personnel "would report to the Presidency of Civil Aviation, air

---

[146] *Id.* at 74:10-15.

[147] Khan Tr. 48:2-22.

[148] *Id.* at 59:12-20.

[149] *Id.* at 59:19-20.

[150] *Id.* at 102:18-103:4.

[151] *Id.* at 104:21-105:1.

[152] Kamel Tr. 23:19-24:18.

[153] *Id.* at 24:19-24:3; *see also id.* at 50:17-52:3 ("[T]he contract says that all the personnel that are furnished in the scope of contract, all the personnel that are furnished by the contractor, which is Dallah Avco, work under the guidance and control of the PCA."); *id.* at 70:7-10 ("[T]he actual guidance and control and oversight over the personnel was done by the PCA . . . ."); *id.* at 251:17-25.

navigation, who [was] in charge of the contract."[154] ANSS employees recruited by Dallah Avco would "perform [their] jobs side by side with the counterpart Saudi national employees" in the PCA's Airways Engineering Directorate.[155]

95.     Finally, ANSS employees themselves confirmed that the PCA directed and supervised ANSS personnel. ANSS Logistics Manager Samuel Coombs stated in a declaration that "[his] boss was Mohamed Al-Salmi, AED's Director General," and that "Al-Salmi approved all of [his] vacation and personal leave as well as anything else that related to [his] job duties and administrative procedures."[156] By contrast, apart from receiving his payroll, Coombs had "no other substantial contact with Dallah Avco."[157] No one from Dallah Avco "direct[ed] or supervise[d] [his] day-to-day work at Airways Engineering."[158] Al Bayoumi similarly testified that Al Salmi was the "manager" of ANSS employee Alp Karli.[159]

### C.     Status of Specific ANSS Employees

96.     Apart from Omar Al Bayoumi himself, two other ANSS employees, in particular, were the subject of substantial evidence in this case: Contracts and Finance Control manager Alp Karli and Logistics Manager Samuel Coombs. The evidence clearly shows that both individuals were directed and supervised by the PCA, not by Dallah Avco.

---

[154] Angari Tr. 104:15-105:5 & Errata Sheet.

[155] *Id.* at 348:25-349:5.

[156] Coombs Decl. 1; *see also* Coombs Tr. 83:20-85:1.

[157] Coombs Decl. 1.

[158] Coombs Tr. 82:23-83:1 ("Q. Did anyone from Dallah Avco direct or supervise your day-to-day work at Airways Engineering? A. No way. No.").

[159] Al Bayoumi Tr. 610:19-24.

1. *Alp Karli*

97.     Alp Karli was the manager of the Contracts and Finance Control ("CFC") unit within the PCA's Airways Engineering Directorate.[160] He was a longtime ANSS project employee; his name appears on a list of ANSS employees that indicates his ANSS position and pay grade.[161] Al Salmi authorized Dallah Avco to hire Karli to that position.[162]

98.     The PCA's organization chart for its Airways Engineering Directorate shows that, as the head of "Contracts & Finance Control," Alp Karli reported to the "Director-General Airways Engineering," Mohammed Al Salmi.[163]   The job description for Karli's position in the ANSS contract likewise stated that he was "[r]esponsible to the General Manager of Airways Engineering."[164]

99.     Samuel Coombs confirmed in his testimony that "Alp Karli, as the head of the CFC, reported to Al Salmi."[165] Ammar Kamel testified that "as an ANSS employee, . . . Alp Karli's work [was] directed and supervised by the PCA," and that "all of the ANSS employees, including people like Alp Karli, would have been directed and supervised by the PCA."[166] Al Bayoumi testified that Al Salmi was Karli's "manager."[167] Al Bayoumi never saw anyone from

---

[160] DA000601-02; Coombs Tr. 87:7-12; Kamel Tr. 250:14-251:2.

[161] DA000601-02; Al Bayoumi Tr. 708:8-709:2.

[162] DA000601-02.

[163] KSA000003168; *see* Coombs Tr. 87:7-20.

[164] DA009230-31.

[165] Coombs Tr. 87:17-20.

[166] Kamel Tr. 251:3-22.

[167] Al Bayoumi Tr. 610:19-24; *see also id.* at 45:13-467, 619:16-620:6 ("Mr. Karli would manage the work at ANSS. However, there were some transactions that he would refer to Salmi for these transactions."). Al Bayoumi also claimed at one point that Alp Karli reported to Dallah Avco. *Id.* at 44:23-45:21. But he later acknowledged that his only basis for that understanding

Dallah Avco direct Karli on how to do his work.[168] As an ANSS employee, Karli "work[ed] side by side with other Airways Engineering personnel as part of one integrated team."[169]

100.    Alp Karli's office was located in a PCA Airways Engineering building, where he worked alongside other Airways Engineering personnel like Al Salmi and Al Bayoumi.[170] Karli did not work in Dallah Avco's offices.[171]

101.    The PCA held out Alp Karli as one of its representatives. In a November 10, 1994 letter to Dallah Avco, Al Salmi listed Karli as one of four "Airways Engineering personnel" who would "represent this office" in a meeting between the PCA's Airways Engineering Directorate and Ercan Consulting Engineers.[172] Karli himself sent correspondence on Airways Engineering letterhead purporting to act on behalf of the agency.[173]  And Karli's business card identified him as an employee of "Presidency of Civil Aviation Airways Engineering" and bore the PCA logo.[174]

102.    In light of the foregoing, it is clear that Alp Karli's work was directed and supervised by the PCA, not by Dallah Avco. Hence, an employment relationship between Dallah Avco and Alp Karli did not exist.

---

was that Alp Karli sometimes attended meetings at Dallah Avco's headquarters, and that he knew nothing about what happened at those meetings. *Id.* at 619:16-621:10.

[168] *Id.* at 620:7-19.

[169] *Id.* at 614:11-615:3.

[170] *Id.* at 48:1-14.

[171] *Id.* at 615:22-617:7.

[172] DA010841.

[173] DA000603 (November 13, 2001 memorandum from Alp Karli on PCA Airways Engineering letterhead instructing Dallah Avco to lower Al Bayoumi's salary at the direction of Al Salmi).

[174] DA010915.

## 2. Samuel Coombs

103.     Samuel Coombs was an ANSS employee from 1994 until 1997 who served as the Assistant Logistics Manager and then Logistics Manager in the PCA's Airways Engineering Directorate.[175] Coombs was recruited to the position by Dallah Avco.[176]

104.     The PCA's organization chart for its Airways Engineering Directorate shows that, as Logistics Manager, Coombs reported to the "Director-General Airways Engineering," Mohammed Al Salmi.[177]

105.     As noted above, Coombs stated in his declaration that "[his] boss was Mohamed Al-Salmi, AED's Director General," and "Al-Salmi approved all of [his] vacation and personal leave as well as anything else that related to [his] job duties and administrative procedures."[178] Coombs testified that Al Salmi directed his work at Airways Engineering: "He directed me – basically he would call me in and talk to me about what he wanted done."[179]

106.     By contrast, apart from his payroll, Coombs had "no other substantial contact with Dallah Avco."[180] When asked whether "anyone from Dallah Avco direct[ed] or supervise[d] [his] day-to-day work at Airways Engineering," Coombs responded: "No way. No."[181]

---

[175] Coombs Decl. 1; Coombs Tr. 79:19-81:10.

[176] Coombs Tr. 79:18-80:3.

[177] KSA000003168; *see also* Coombs Tr. 86:14-87:16.

[178] Coombs Decl. 1; *see also* Coombs Tr. 83:20-84:5.

[179] Coombs Tr. 84:6-15.

[180] Coombs Decl. 1; *see also* Coombs Tr. 82:7-22.

[181] Coombs Tr. 82:23-83:1.

107.    As Logistics Manager, Coombs worked in a PCA office building.[182] He never did any of his day-to-day work from Dallah Avco's corporate offices, which were located in a separate building.[183]

108.    Dallah Avco issued paychecks to Coombs pursuant to the ANSS contract.[184] The PCA, however, determined Coombs's salary.[185] The PCA also reimbursed Dallah Avco for the salary payments Dallah Avco made pursuant to the contract.[186]

109.    In light of the foregoing, it is clear that Samuel Coombs's work was directed and supervised by the PCA, not by Dallah Avco. Hence, there was no employment relationship between Dallah Avco and Samuel Coombs either.

### D.    Conclusion

110.    Based on my analysis of the ANSS contracts and the other documents and testimony set forth above, I conclude that ANSS project employees were not employees of Dallah Avco. Under Saudi law, the defining characteristic of an employment relationship is the employer's direction and supervision of the employee's work. That is the major principle under Saudi law to establish the legal subordination element of the employment relationship. The contracts and other evidence reviewed above make clear that Dallah Avco had no role whatsoever in directing or supervising the work of ANSS project employees. Dallah Avco therefore was not the employer of ANSS employees as a matter of Saudi labor law.

---

[182] *Id.* at 85:15-86:4.

[183] *Id.* at 86:5-13.

[184] Coombs Decl. 1; Coombs Tr. 82:7-16.

[185] Coombs Tr. 84:19-23 ("Q. Did Al-Salmi play a role in setting your salary and benefits at Airways Engineering? A. I'm sure he did . . . .").

[186] *Id.* at 83:15-19.

## II.      Omar Al Bayoumi's Role in the ANSS Project

111.    I have also been asked to opine specifically on the employment status of Omar Al Bayoumi, who worked on the ANSS project from 1995 to 2002. In many respects, Al Bayoumi was similar to other ANSS employees. He was hired onto the project and assigned job titles using the same forms and processes as other ANSS employees. Dallah Avco processed his salary and benefits just like it did for other ANSS employees. And as with other ANSS employees, Dallah Avco had no role in directing or supervising Al Bayoumi's work.

112.    Al Bayoumi differed from most ANSS employees in that he was a government civil servant who was "loaned" to the ANSS project, first by secondment and then by educational leave. And while other ANSS employees worked in the Kingdom, Al Bayoumi pursued educational studies in the United States to improve his job skills.

113.    Although Al Bayoumi was different in these respects, nothing about his particular circumstances affects my opinion that there was no employment relationship between Al Bayoumi and Dallah Avco. Nothing in the materials I reviewed, moreover, suggests that Al Bayoumi's arrangements with the PCA were contrary to the ANSS contracts or to Saudi law. Those arrangements were consistent with the legal requirements for secondment and educational leave, two of the mechanisms frequently used to improve the job skills of Saudi public employees in order to carry out the Saudi public policy of Saudization.

### A.      Omar Al Bayoumi's Hiring and Termination on the ANSS Project

114.    Prior to his association with the ANSS project, Al Bayoumi was a longtime civil servant at the PCA. Documents show that the PCA hired Al Bayoumi in 1977.[187] In November

---

[187] KSA0000000629; KSA0000004515.

1993, he was transferred to the PCA's Airways Engineering Directorate.[188] When he arrived in Airways Engineering, he was told he would ultimately replace Alp Karli as the head of the Contracts and Finance Control unit, but that he needed to improve his English skills before assuming that role.[189]

115.    About a year later, on August 30, 1994, the PCA granted Al Bayoumi a 90-day regular leave.[190] Subsequently, the PCA granted Al Bayoumi two 90-day exceptional leaves, commencing on November 27, 1994 and then February 23, 1995.[191] Al Bayoumi requested and received those leaves, while still employed by the PCA, so he could pursue educational studies at San Diego State University.[192] According to Al Bayoumi, Alp Karli approved his educational program.[193]

116.    The PCA funded Al Bayoumi's tuition and expenses by arranging for an ANSS subcontractor, Avco Overseas, to pay the expenses, and then reimbursing Avco Overseas through the ANSS project.[194] On March 30, 1994, Al Salmi wrote Avco Overseas to request that it "pay the tuition for Mr. Omar Al-Bayoumi" of US $4,430.[195] Al Salmi stated that the PCA would guarantee reimbursement through the "ANSS III Project Account."[196] In addition to

---

[188] KSA0000000629; KSA0000004515; Al Bayoumi Tr. 621:21-622:2.

[189] Al Bayoumi Tr. 43:10-24, 51:3-19.

[190] KSA00000004501.

[191] *Ibid.*

[192] DA002160; Al Bayoumi Tr. 625:10-18, 636:13-16, 637:22-638:1, 639:4-7; *see also id.* at 53:19-24 (explaining that he came to San Diego while "on vacation").

[193] Al Bayoumi Tr. 628:13-15.

[194] DA002267; *see also* Al Bayoumi Tr. 59:7-9 (stating that "airways engineering" paid for language school).

[195] DA002267.

[196] *Ibid.*

tuition, Al Salmi asked Avco Overseas to pay a "weekly living allowance (up to 30 weeks) of US $600."[197] Logistics Manager Samuel Coombs testified that Al Salmi would often pay expenses like these through subcontractors, rather than having the PCA pay them directly, because the approval process for having the PCA pay the expenses itself was "very long" and "could take as much as two months."[198]

117.   Avco Overseas complied with those requests and paid Al Bayoumi's tuition and living allowance.[199] Avco Overseas then submitted its own invoice to Dallah Avco, which administered the ANSS III contract.[200] Dallah Avco, in turn, paid Avco Overseas and then invoiced the PCA under the ANSS III contract.[201]

118.   Initially, Al Bayoumi intended to remain in the United States for only a year.[202] At the end of his spring 1995 semester at San Diego State University, however, Bayoumi decided he wanted to pursue additional educational studies.[203] At that point, however, Al Bayoumi had already taken three months of ordinary leave and six months of exceptional leave. As explained above, the Saudi Civil Service Law permits only 90 days of ordinary leave in a single year and only six months of exceptional leave in any three-year period. Al Bayoumi had therefore exhausted all of his available ordinary and exceptional leave by May 1995 and needed to find an alternative mechanism if he was to stay in the United States pursuing his studies.

---

[197] *Ibid.* In September 1994, Al Salmi directed Avco Overseas to pay Al Bayoumi's living allowance in a lump sum rather than installments. DA002281-82. Al Salmi instructed Avco Overseas to invoice the ANSS III Project Account. *Ibid.*; *see* Coombs Tr. 114:16-118:16.

[198] Coombs Tr. 125:21-126:18.

[199] *See* DA002261-66; DA002268-70; DA002274-80; *see also* Al Bayoumi Tr. 640:14-17.

[200] DA002274.

[201] Kamel Tr. 167:12-168:5.

[202] Al Bayoumi Tr. 64:23-65:2.

[203] *Id.* at 649:5-14.

119.     It is at this point that Al Bayoumi first officially became affiliated with the ANSS project. In late May 1995, Dallah Group chairman Alawi Kamel sent a letter to the PCA stating that "Dallah Avco's air navigation system support project is currently in urgent need" of Al Bayoumi's services and requesting that he be seconded.[204] Although this letter in isolation might be misunderstood to suggest that Dallah Avco was the party who wanted Al Bayoumi seconded to the ANSS project, for a number of reasons, I conclude that in fact this was not the case, and that the request was clearly sent at the behest of either the PCA or the ANSS project staff working under the PCA's direction and supervision.

120.     First, Al Bayoumi himself testified that the request originated with the PCA's Airways Engineering Directorate, not with Dallah Avco. Al Bayoumi testified that "[t]he finance division of airways engineering" "arranged the secondment."[205] He explained that the secondment was intended to enable him to pursue educational studies in the United States so he could take over Alp Karli's job as the head of the Contracts and Finance Control unit.[206]

121.     Al Bayoumi's testimony is consistent with the understanding of Dallah Avco's own officers. Dallah Group Chairman Alawi Kamel stated that Dallah Avco sent the May 1995 letter at the PCA's request. He explained that, "[a]lthough the letter involves a request from Dallah Avco to the PCA for the secondment of Al-Bayoumi, . . . PCA must have initiated the

---

[204] DA001132.

[205] Al Bayoumi Tr. 66:19-24; *see also id.* at 651:8-21 ("Airways Engineering were the ones who made those arrangements [to be seconded to the ANSS project] so that [he] could pursue those studies"). The Kingdom's counsel has confirmed to the Court that the PCA asked Dallah Avco to send the secondment request: "[T]here's no question [Al Bayoumi] was only working for Dallah Avco because civil aviation asked Dallah Avco to employ him as part of Dallah Avco's contract with civil aviation." July 30, 2015 Hr'g Tr. 13:21-24.

[206] Al Bayoumi Tr. 653:8-22.

secondment because no one at Dallah Avco in 1995 knew who Al-Bayoumi was."[207] Kamel understood "the reference in the letter to an 'urgent need' for Al Bayoumi to refer to the PCA's urgent need to have Al-Bayoumi placed on the ANSS Project."[208]

122.    The ANSS contract explicitly contemplates such requests. Although Dallah Avco was generally responsible for recruiting ANSS employees, the contract states that the PCA could, "at its discretion, at any time, direct the Contractor to hire any individual or individuals whom the Government deems suitable for employment under the Contract."[209] The contract's Saudization provision contemplates that the PCA would use this authority for Saudi candidates like Al Bayoumi: "If at any time the Government shall notify the Contractor in writing of the availability of a Saudi Arabian national qualified for employment, the Contractor shall offer to employ him forthwith."[210] That was evidently what happened in the case of Al Bayoumi. Dallah Avco's recruitment manager, Jaber Khalifa, confirmed that he did not know Al Bayoumi and did not recruit him to the project.[211]

123.    Al Bayoumi's employment history and circumstances confirm that conclusion. Before joining the ANSS project, Al Bayoumi was a long-time employee of the PCA.[212] Before he was hired to the ANSS project, Al Bayoumi was studying in the United States at the PCA's

---

[207] Kamel Ex. 127; Kamel Tr. 240:10-241:2.

[208] Kamel Ex. 127; Kamel Tr. 241:3-14.

[209] Article 4-2-1-2, Air Navigation System Support Contract, Volume I, Section 4, "Scope of Services" (KSA0000002189); Kamel Tr. 232:15-233:25.

[210] Article 4-4-3-2-1, Air Navigation System Support Contract, Volume I, "Saudization Plan" (KSA0000002207).

[211] Khalifa Tr. 17:22-18:9; 38:14-39:20.

[212] KSA0000000629; KSA0000004515.

expense, pursuing a course of study that related to his work for the PCA.[213] After Al Bayoumi's ANSS employment ended, he returned to the Airways Engineering Directorate.[214] By contrast, I have seen no indication that Dallah Avco had any similar relationship with Al Bayoumi before or after his connection to the ANSS project. This history strongly suggests that Al Bayoumi was seconded to the ANSS project so he could continue his educational studies for the benefit of the PCA, once he had exhausted his ordinary and exceptional leave and needed a new legal mechanism to enable him to continue his educational studies abroad without giving up his job as a PCA employee.

124.    Even the May 1995 letter that Alawi Kamel sent to the PCA requesting Al Bayoumi's secondment indicates that the request originated from the PCA or from ANSS staff working under its supervision. That letter states that "Dallah Avco's *air navigation system support project* is currently in urgent need" of Al Bayoumi's services – not that *Dallah Avco itself* was in need of his services.[215] ANSS project employees worked under the direction and supervision of the PCA, not Dallah Avco.

125.    From the foregoing materials, I conclude that the initial decision to hire Al Bayoumi onto the ANSS project in 1995 was made by the PCA or by ANSS staff working under its supervision – not by Dallah Avco. I further conclude that the PCA or ANSS employees initiated the secondment of Al Bayoumi to the ANSS project so that Bayoumi could continue pursuing his educational studies without resigning from the Saudi civil service.

---

[213] *See* ¶¶ 114-117, *supra*; Angari Tr. 386:12-18.

[214] KSA0000000629; KSA0000000704.

[215] DA001132 (emphasis added).

126. Based on the documents above, it is evident that the recommendation and request to hire Al Bayoumi came from the PCA, and that Dallah Avco's involvement was limited to merely carrying out the PCA's instructions. Those facts support my opinion that Al Bayoumi was not an employee of Dallah Avco.

127. The documents similarly indicate that the PCA rather than Dallah Avco made the decision to terminate Al Bayoumi's employment from the ANSS project in May 2002. Around that time, Al Bayoumi applied for an extension of his educational leave.[216] On May 5, 2002, however, Al Salmi refused the request, explaining that "work conditions" at Airways Engineering "require the presence of [Al Bayoumi] in his position."[217] Al Salmi also noted that Al Bayoumi had "already got his academic degree."[218] The next day, the PCA issued a notice directing Dallah Avco to terminate Al Bayoumi from the project effective May 12, 2002.[219] Al Bayoumi then returned to work at the PCA.[220] That sequence of events confirms my conclusion that Al Bayoumi's association with the ANSS project was directed by the PCA or Airways Engineering for the purpose of allowing Al Bayoumi to pursue educational studies.

128. The documents thus make clear that the decision to terminate Al Bayoumi's employment was made by the PCA. The fact that the PCA rather than Dallah Avco was in charge

---

[216] KSA0000000895.

[217] KSA0000000894.

[218] *Ibid.*

[219] DA001239.

[220] Al Bayoumi Tr. 713:20-714:4; *see* KSA0000000629.

of deciding Al Bayoumi's employment status confirms that Al Bayoumi was not an employee of Dallah Avco.[221]

### B.    Omar Al Bayoumi's Positions on the ANSS Project

129.    Shortly after the PCA seconded Al Bayoumi to the ANSS project, Al Salmi sent Dallah Avco a notice dated June 6, 1995 directing Dallah Avco to hire him onto the project and specifying important information about his job title, position number, task and department, and compensation level.[222] Specifically, Al Salmi directed Dallah Avco to assign Al Bayoumi the job title "Snr Data Proc Tech," position number "0704.04," task and department "JED" (or "Jeddah Sector"), and compensation level "G."[223]

130.    This information was important because it corresponded to provisions in the ANSS contracts and enabled Dallah Avco to determine what to pay the employee. Each ANSS contract contained charts listing the various positions the PCA needed and the number of employees to be hired for each.[224] The charts also listed the amount Dallah Avco would be reimbursed for compensation paid to employees assigned to each level, from Level A to Level

---

[221] The documents also show other instances where Al Bayoumi was "hired" or "terminated." In April 2000, the PCA sent Dallah Avco a notice directing it to terminate Al Bayoumi effective April 12, 2000. DA001059. The PCA also sent a separate instruction to hire Al Bayoumi back onto the project effective April 13, 2000. DA001057. Those notices coincided with when Al Bayoumi went from secondment to educational leave status after reaching the five-year limit on secondments, as described further below. Kamel Tr. 247:18-248:12. The PCA's instructions were therefore likely due to the fact that Al Bayoumi had reached the maximum time for secondments permitted under Saudi law, requiring the PCA to change Al Bayoumi's status. The PCA's termination and rehiring of Al Bayoumi in connection with that change confirms my opinion that Dallah Avco was not Al Bayoumi's employer.

[222] DA001016.

[223] *Ibid.*

[224] *See, e.g.*, KSA0000002311-27 (Manning Schedule).

N.[225] By directing Dallah Avco to hire an employee to a particular position, the PCA effectively determined the employee's compensation.

131.    Omar Al Bayoumi held various positions and corresponding pay grades during his seven years on the ANSS project. The following table summarizes his positions:

| Table 1 – Al Bayoumi ANSS Project Positions[226] | | | | |
|---|---|---|---|---|
| **Effective Date** | **ANSS Contract** | **Position** | **Level** | **Reimbursement Rate (SR/month) (3.75 SR = 1 USD)** |
| June 6, 1995 | III/IV | Snr. Data Proc. Tech. | G | 12,189-12,972 |
| Sept. 6, 1998 | V | PCA/AE Budget Coord. | G | 10,533-10,928 |
| *Apr. 13, 2000\** | *V* | *Asst. Config. Spec.* | *F* | *11, 777-12,604* |
| Apr. 13, 2000 | V | Snr. DSS Prog. | C | 13,560 |
| Sept. 6, 2001 | VI | Snr. Contract Specialist | B | 20,550 |

\* superseded by following instruction

132.    The documentation relating to those position changes shows that the PCA decided what positions Al Bayoumi would have. For the initial 1995 assignment and the two modification requests in 2000, the PCA sent Dallah Avco a "Request for Modification and/or Authorization of Contract/Agreement" signed by Al Salmi specifying the position to which Al Bayoumi should be assigned and the associated compensation level.[227] For the 2001

---

[225] *See, e.g.*, KSA0000002168-74.

[226]   DA000082; DA000600; DA000605; DA001016; DA001061; KSA0000002170; KSA0000002319; KSA0000003067; KSA0000003358; KSA0000003361; KSA0000003599; KSA0000003933. As indicated, the reimbursement rates in the chart are stated in Saudi riyals ("SR"), which have a fixed exchange rate of 3.75 Saudi riyals to one U.S. dollar.

[227] DA000598; DA000600; DA001057. Dallah Avco's files include two different modification requests for April 2000. DA000600; DA001057. Although those requests had the same effective date, the requests were sent a month apart, and Dallah Avco's representative testified that the

modification, Al Salmi sent Dallah Avco an instruction letter with a chart containing the same information – positions and compensation levels – for several employees.[228] I understand that Dallah Avco has not been able to locate the PCA instruction letter for the 1998 modification. But that change was reflected in a "Notice of Employment,"[229] and Dallah Avco's Director of Manpower Services, Riaz Khan, testified that the information in those notices was provided by the PCA.[230] That notice thus implies that the 1998 change was prompted by a modification request from the PCA, similar to the other changes.

133.    I therefore conclude that the PCA, rather than Dallah Avco, determined the positions to which Al Bayoumi would be assigned and the compensation levels associated with those positions. Dallah Avco merely complied with those instructions.

134.    Each position Al Bayoumi held was listed in the corresponding ANSS contract.[231] Al Bayoumi's position changes in 1998 and 2001 corresponded with the dates when Dallah Avco completed one three-year ANSS contract and began work on the next one (for example, the transition from ANSS IV to ANSS V in 1998).[232] Because each ANSS contract had its own

---

company understood the later request as superseding the earlier one. Kamel Tr. 246:9-247:16. Nothing in the ANSS contracts or Saudi law prohibited the PCA from superseding an earlier instruction in that manner.

[228] DA000601-02.

[229] DA000098.

[230] Khan Tr. 48:19-22.

[231] *See* KSA0000002319 ("Snr. Data Processing Technician"); KSA0000003361 ("PCA/AE Budget Coordinator," "Asst. Configuration Specialist"); KSA0000003358 ("Snr. DSS Programmer"); DA001615 ("Snr Contract Specialist").

[232] Al Bayoumi's position changed to PCA/AE Budget Coordinator on September 6, 1998, the same day that the ANSS IV contract ended and the ANSS V contract began. DA000098; DA00106; KSA0000002973; Kamel Tr. 243:12-244:19. Similarly, Al Bayoumi's position changed to Senior Contract Specialist in September 2001, when the ANSS V contract ended and the ANSS VI contract began. DA001363; DA000095; DA000601-02.

manpower chart, it would not be surprising for the PCA to reassign Al Bayoumi to a new position when the contract changed.[233] For example, the ANSS VI contract did not include the "PCA/AE Budget Coordinator" position that Al Bayoumi held under ANSS V, so the PCA necessarily had to reassign him to a new position.[234] Similarly, the April 2000 position change corresponded with when Al Bayoumi went from secondment status to educational leave status, as explained below.[235] There was nothing about those position changes that was contrary to the contracts, contrary to Saudi law, or otherwise inappropriate or unusual.

135.    Although Al Bayoumi was assigned to various positions during his seven years on the ANSS project, the materials I reviewed indicate that Al Bayoumi was not in fact performing the job functions typically associated with those positions. Instead, he was pursuing educational studies in the United States (and later the United Kingdom). I reviewed numerous academic transcripts and other documents confirming Al Bayoumi's academic studies.[236] Al Bayoumi himself testified that these documents accurately reflect his coursework.[237]

136.    As described above, Al Bayoumi explained that he pursued educational studies in the United States so he could replace Alp Karli as the CFC manager at Airways Engineering.

---

[233] Kamel Tr. 243:12-244:19, 248:14-249:12.

[234] *Compare* DA001606-609 (ANSS VI), *with* KSA0000003361 (ANSS V).

[235] DA000548; Kamel Tr. 246:9-248:12

[236] *See, e.g.*, DA001105-06; DA002275-76 (letter and invoices regarding San Diego State University); PEC-KSA1-000007-16 (application to United States International University); PEC-KSA1-000075-76; PEC-KSA1-000082 (1994 and 1995 transcripts from SDSU showing 92% and 89% attendance); PEC-KSA1-000044-47 (1995-1996 transcript from West Coast University); PEC-KSA1-000061 (1997 transcript from Alliant International University); PEC-KSA1-000079, -83 (certificates of completion from SDSU); KSA0000000725 (1997 Master of International Business Administration certificate from United States International University); KSA0000000726 (2000 Master's Certificate in Project Management from George Washington University); KSA0000000724 (2002 Master of Science certificate from Aston).

[237] Al Bayoumi Tr. 656:6-659:22.

That rationale is described in internal PCA correspondence from 1997, of which Dallah Avco received a copy. The PCA's Director of Personnel, Abdelrahim Nuri Jestiniya, wrote to Al Salmi asking, among other things, "What are the reasons for [Al Bayoumi's] stay in the USA? For completing study or other reasons?," and "What is the type of study, major, and qualification which he wants to obtain, and when will he be done?"[238] Al Salmi responded that Al Bayoumi was taking "preparation study to get the master's degree in business administration and studies in financial management" and that he sought "to complete study and later utilize it actively participating as a government employee in the airspace system support program."[239] Angari confirmed at his deposition that Al Bayoumi's course of study "suit[ed]" his position in "the financial department."[240] The 1997 exchange of letters between Al Salmi and Jestiniya shows that the PCA understood that Al Bayoumi was pursuing studies in the United States to improve his job skills as a PCA or ANSS employee.

137.    Other documents confirm that the PCA supported and encouraged Al Bayoumi's studies. As explained above, in 1994, while Al Bayoumi was a civil servant at the PCA and before he became associated with the ANSS project, Al Bayoumi was taking classes at San Diego State University.[241] The PCA supported those studies by directing a U.S.-based contractor to pay Al Bayoumi's expenses and reimbursing the expenses via the ANSS III project.[242] San

---

[238] KSA0000004466.

[239] DA000044.

[240] Angari Tr. 386:12-18; *see also id.* at 375:24-376:6 (noting that the educational leave regulations require the subject of an employee's studies to relate to his work).

[241] DA002160.

[242] DA002267.

Diego State University corresponded directly with the PCA about Al Bayoumi's studies.[243]

138.     The PCA also confirmed its approval of Al Bayoumi's studies in May 2000, when it formally placed him on educational leave. Citing a request from Al Salmi to grant Al Bayoumi an "Educational Leave . . . to pursue his Post Graduate Study in the United States of America," the PCA "grant[ed] [Al Bayoumi] Educational Leave for a Period of (Two Years)."[244]

139.     Al Bayoumi's superiors on the ANSS project were aware of his studies in the United States. Al Bayoumi's direct supervisor was Alp Karli, the ANSS project's Contracts and Finance Control manager, who reported directly to Al Salmi at the PCA.[245] According to Al Bayoumi, Alp Karli reviewed and approved his course of study.[246] The PCA's June 1995 instruction to hire Al Bayoumi includes the handwritten notation, "Send Offer to CFC Because Employee Out of Kingdom. CFC Will Sign Offer & Return."[247] Karli certified that Al Bayoumi reported for work in August 1995.[248] He signed Al Bayoumi's time sheets.[249] And he signed Al Bayoumi's performance evaluations.[250] Karli thus clearly knew that Al Bayoumi was overseas and was aware of his educational studies there.

140.     The documents make clear that the PCA was well aware of, and affirmatively encouraged, Al Bayoumi's pursuit of educational studies in the United States to improve his job

---

[243] DA001105-06.

[244] DA000548.

[245] *See* DA002161; DA001477; KSA0000003168; Kamel Tr. 66:17-67:5; Angari Tr. 126:24-127:6.

[246] Al Bayoumi Tr. 628:13-15.

[247] DA001016.

[248] DA001073.

[249] *See* DA000328-412; DA000446.

[250] *See, e.g.*, KSA0000000882.

skills, both before and during his time on the ANSS project. The PCA's involvement in and approval of Al Bayoumi's educational studies confirms Dallah Avco's limited role.

141.    It is also worth highlighting that nothing in the ANSS contracts or Saudi law prohibited the PCA from supporting Al Bayoumi's pursuit of educational studies to improve his job skills. In fact, the PCA's support for Al Bayoumi's educational studies was consistent with the Saudi policies of Saudization and promoting education of the Saudi workforce.

142.    The ANSS contracts expressly refer to one particular educational program for employees, a "Basic Training Program Center Life Support Services."[251] Although Al Bayoumi's studies had nothing to do with that program, the fact that the contracts expressly mention the program confirms that training and education of ANSS employees was an important PCA objective. Dallah Avco's role was simply to comply with the PCA's directives by paying the employee's salary and benefits as the PCA might direct.

143.    The fact that Al Bayoumi was assigned job titles that may have had little relation to his status as a student does not change my opinions. The ANSS contracts contain detailed charts of positions and the compensation levels for each.[252] If the PCA wanted to put Al Bayoumi on the project, it had to assign him to one of those positions so Dallah Avco could process his salary and benefits under the contract. Because there was no position for "overseas student," the PCA had to assign him some other position at whatever pay level the PCA considered appropriate. Whether Al Bayoumi's actual work corresponded with the typical duties of the position was a matter for the PCA, the entity that directed and supervised ANSS employees. Dallah Avco's role was simply to comply with the PCA's instructions.

---

[251] KSA002175.

[252] *See* KSA0000002311-27.

C.    Omar Al Bayoumi's Salary and Benefits

144.    Omar Al Bayoumi received a variety of payments during his time on the ANSS project. He received regular monthly payments for base salary, housing and transportation allowances, and "other allowances." He also received occasional one-time payments for service awards, a bonus, and a social insurance refund. Although Dallah Avco issued all of those payments to Al Bayoumi pursuant to its payroll processing responsibilities for the ANSS project, the materials I reviewed show that Dallah Avco made those payments at the PCA's direction and that it was reimbursed for the payments by the PCA.

145.    The following table summarizes Al Bayoumi's monthly payments from Dallah Avco:

| Table 2 – Al Bayoumi Monthly Salary & Benefits[253] All Figures in SR (3.75 SR = 1 USD) | | | | | |
|---|---|---|---|---|---|
| **Starting Date** | **Base Salary** | **Housing Allowance** | **Transp. Allowance** | **Other Allowance** | **Total** |
| Aug. 1995 | 8,600 | 1,433 | 860 | | 10,893 |
| Oct. 1998 | 7,740 | 1,290 | 774 | 1,742 | 11,546 |
| Apr. 2000 | 7,740 | 1,290 | 774 | 14,271 | 24,075 |
| July 2000 | 9,500 | 1,583 | 950 | 14,271 | 26,304 |
| Jan. 2001 | 9,500 | 1,583 | 950 | 12,852 | 24,685 |
| Sept. 2001 | 13,000 | 2,167 | 1,300 | | 16,467 |
| Nov. 2001 | 10,000 | 1,667 | 1,000 | | 12,667 |

---

[253] DA000457-517; DA001022. The figures in the chart are approximate. Because deductions varied over time, Al Bayoumi's net compensation differed from month to month. Al Bayoumi's pay also varied slightly within the date ranges identified. For a few periods, there are also differences between the electronic pay slips and hard copy pay slips.

146.     The following table summarizes Al Bayoumi's one-time payments from Dallah Avco:

| Table 3 – Al Bayoumi One-Time Payments[254] All Figures in SR (3.75 SR = 1 USD) | | |
|---|---|---|
| **Date** | **Amount** | **Description** |
| Sept. 5, 1998 | 17,701 | Service Award |
| Sept. 5, 1999 | 7,740 | Bonus |
| Apr. 12, 2000 | 7,815 | Service Award |
| Sept. 5, 2001 | 25,570 | Service Award |
| Nov. 5, 2001 | 2,745 | Service Award |
| May 12, 2002 | 6,578 | Service Award |
| June 3, 2003 | 24,096 | Social Insurance Refund |

147.     In addition to the payments Al Bayoumi received through Dallah Avco, Al Bayoumi also received occasional payments from ANSS subcontractors to defray his educational expenses, similar to the payments he received from Avco Overseas before he was seconded to the ANSS project in May 1995.[255]

148.     I now discuss each category of monthly and one-time payment in more detail.

   *1. Base Salary*

149.     As reflected in Table 2 above, Al Bayoumi's base salary ranged from SR 7,740 to SR 13,000 per month over his seven years on the ANSS project. The documents show that nearly

---

[254] DA000293-95; DA000434; DA000439; DA000444-45.

[255] *See* Coombs Dep. 124:4-125:19 (two payments from Ercan).

every change in salary resulted from a position assignment made by the PCA. The sole exception was the November 2001 reduction, which resulted from an explicit PCA instruction.

150.    As already explained, each ANSS contract listed the employee positions to be filled and specified a "level" – from A through N – for each position.[256] The contract then specified the reimbursement rate the PCA would pay Dallah Avco for each employee at a particular level.[257] For example, under the ANSS IV contract, the PCA paid Dallah Avco SR 22,229 per month for each Level A employee.[258] Dallah Avco therefore relied on the PCA's position assignments in setting each employee's salary, because the position level would determine how much the PCA would reimburse Dallah Avco for that employee.[259]

151.    As can be seen by comparing Table 1 and Table 2 above, nearly all of Al Bayoumi's salary changes corresponded with changes in his position on the ANSS project. The PCA initially hired Al Bayoumi in 1995 as a Level G Senior Data Processing Technician with a reimbursement rate of SR 12,189-12,972, and he received a base salary of SR 8,600. In September 1998, when Dallah Avco went from the ANSS IV to the ANSS V contract, the PCA changed Al Bayoumi's position to a Level G PCA/AE Budget Coordinator, which had a lower reimbursement rate under the ANSS V contract of SR 10,533-10,928, and Al Bayoumi received a correspondingly lower salary of 7,740. In April 2000, around the time Al Bayoumi went from secondment to educational leave status, the PCA promoted him to a Level C Senior DSS Programmer with a reimbursement rate of SR 13,560, and he began receiving a higher salary of SR 9,500 soon after. Finally, in September 2001, when Dallah Avco went from the ANSS V to

[256] *See, e.g.*, KSA0000002311-27.

[257] *See, e.g.*, KSA0000002168-74.

[258] KSA0000002169.

[259] Kamel Tr. 252:6-8, 253:2-16, 284:19-285:17.

the ANSS VI contract, the PCA promoted Al Bayoumi to a Level B Senior Contract Specialist with a reimbursement rate of SR 20,550, and he received a higher salary of SR 13,000.

152.    As the figures above show, there was a relatively consistent relationship between the base salary Dallah Avco paid Al Bayoumi and the reimbursement rate the PCA paid Dallah Avco: The base salary was approximately 30% to 35% less than the reimbursement rate. Most of that difference corresponded to the housing and transportation allowances Dallah Avco also paid, which added an additional 16.7% and 10% of base salary respectively, as described below. The remaining difference of 5% to 10% would represent the amount available to cover Dallah Avco's overhead, other expenses, and profit margins as a government contractor.[260]

153.    The only salary change for Al Bayoumi that did not result from a change in his position was the November 2001 reduction from SR 13,000 to SR 10,000. The documents show that that reduction resulted from an explicit instruction from the PCA. Specifically, on November 1, 2001, Alp Karli wrote to Dallah Avco on PCA letterhead stating, "As per the instructions of Director General, PCA/AE [*i.e.*, Al Salmi], [Al Bayoumi's] new Salary Scale will be as follows: Basic Salary SR 10,000.00."[261]

154.    Notably, when Al Bayoumi made inquiries about his compensation, he corresponded directly with the PCA. For example, when Al Bayoumi inquired about certain pay

---

[260] Dallah Avco's corporate representative testified that Dallah Avco relied on the PCA's "level" assignments to determine what salary and benefits to pay an ANSS employee. *See* Kamel Tr. 285:11-17 ("Q. And so when Dallah Avco receives an instruction like this from the PCA, was that level assignment used as the basis for Dallah Avco's determination of things like the salary and the benefits that would be paid to the employee? A. Yes."). That approach explains why there is a relatively consistent relationship between the salary that Dallah Avco paid an employee and the reimbursement Dallah Avco received from the PCA for an employee with that pay level.

[261] DA000603.

he had not received, he wrote to Al Salmi at the PCA rather than to Dallah Avco.[262] When Al Bayoumi believed he was entitled to higher compensation commensurate with his level of education, he complained to Airways Engineering, not Dallah Avco.[263] And when Al Bayoumi submitted his banking information, he sent it to Azhari Al Awad in the ANSS project's Contracts and Finance Control unit, not to Dallah Avco.[264]

155.    Based on the foregoing documents, it is clear that Al Bayoumi's salary during the entire time he was on the ANSS project resulted from decisions made by the PCA. In most cases, the PCA determined Al Bayoumi's salary by assigning him to a position with a particular compensation level, which Dallah Avco relied on to determine his salary. In November 2001, by contrast, the PCA simply intervened and adjusted Al Bayoumi's salary directly. The fact that the salary rates of Al Bayoumi were controlled by the PCA and merely implemented by Dallah Avco confirms my opinion that Dallah Avco was not the employer of Al Bayoumi.

*2.   Housing and Transportation Allowances*

156.    In addition to his base salary, Al Bayoumi received monthly housing and transportation allowances as an ANSS employee. The ANSS contracts required Dallah Avco to pay those allowances in amounts specified in each employee's employment offer.[265] The PCA instructed Dallah Avco what amounts to pay.[266]

157.    Al Bayoumi's employment offers stated that he would receive a housing allowance of 16.7% of base salary (*i.e.*, two months per year) and a transportation allowance of

---

[262] DA000298.

[263] Al Bayoumi Tr. 705:16-706:8.

[264] DA000309; *see also* DA000602.

[265] *See* KSA0000003078; KSA0000003340; KSA0000003349.

[266] Khan Tr. 154:5-9; Kamel Tr. 217:11-16.

10% of base salary.[267] Those rates were the same as what other ANSS employees received.[268] As Table 2 shows, Al Bayoumi was in fact paid those precise amounts throughout his entire seven-year tenure on the project.

### 3.  Other Allowances

158.    Al Bayoumi's monthly pay also sometimes included an amount described as "other allowance."[269] "Other allowance" was a broad term used to describe any allowance that did not qualify as either a housing allowance or a transportation allowance.[270] The amount of any "other allowance" was determined by the PCA.[271] The PCA reimbursed Dallah Avco for any "other allowance" paid.[272]

159.    As reflected in Table 2, Al Bayoumi began receiving modest other allowances in October 1998 in the amount of SR 1,742 per month (*i.e.*, $465). In April 2000, his other allowances increased significantly to SR 14,271 (*i.e.*, $3,806) and remained at that level until January 2001, when they fell to SR 12,852 (*i.e.*, $3,427). The other allowances ceased entirely in September 2001.

160.    Al Bayoumi testified that the PCA provided those other allowances to defray his educational and living expenses, and that he did in fact use the other allowances for that

---

[267] DA000608 (1995 offer); DA001063 (1996 offer); DA001061 (1998 offer); DA000097 (2000 offer); DA000605 (2001 offer).

[268] *See, e.g.*, DA002357; DA002688; DA003546.

[269] *See* DA000457-83; DA001022.

[270] Kamel Tr. 217:20-218:15; *see also* EO14040-000939 (explaining that "other allowances" could include "a bonus or raise through the payment of monies to someone" or "reimbursement for temporary travel or a business trip").

[271] Khan Tr. 163:7-164:1; Kamel Tr. 217:11-19.

[272] Kamel Tr. 252:1-254:6 & Ex. 129.

purpose.[273] Al Bayoumi provided the same explanation during his interview with the FBI in 2003.[274]

161.    Alp Karli provided the same explanation too. In January 2002, Alp Karli and two PCA officials met with U.S. officials to provide information about Al Bayoumi. Karli and the PCA officials explained that Al Bayoumi's compensation consisted of "basic salary, in addition to his accommodation and transportation allowances [that] were paid to him monthly," and that "[i]n addition, other allowances were paid to him from time to time to support his education and family expenses."[275] The reference to support for "educational and family expenses" must refer to the other allowances – no other element of Al Bayoumi's compensation fits that description.

162.    The April 2000 timing of the sharp increase in Al Bayoumi's other allowances is consistent with another important change in Al Bayoumi's employment status. That month, the PCA promoted Al Bayoumi to Senior DSS Programmer, a Level C position.[276] Unlike Al Bayoumi's previous positions, a Level C position was a "Married Status" position that entitled Al Bayoumi to additional benefits for his family, including "a reasonable stipend toward the school costs" of his dependents.[277] Al Bayoumi's April 2000 employment offer stated that he

---

[273] Al Bayoumi Tr. 702:20-703:2 ("Q. Was this other allowance intended to fund your education and living expenses while you were on your educational leave in the United States? . . . A. Yes, yes."); *id.* at 705:1-15 (confirming that he spent the funds on "education and living expenses").

[274] EO14040-000249 ("At other times, Al-Bayoumi received additional funds, separate from his salary, to pay for his tuition and/or housing. During these periods of time, his additional stipend would be increased.").

[275] DA000090.

[276] DA001057.

[277] KSA0000003328; KDA0000003078. The ANSS contract explains that "[f]rom past experience . . . certain skills required under the Contract are difficult to obtain on the international labor market" and that candidates "possessing such skills can only be induced to relocate if the benefit package offered to them includes the right to be accompanied by their families." KSA0000003328. The ANSS contract thus identifies all positions Levels A through E

could receive, for two children, a maximum of 80% of Saudi tuition or $3,000 for tuition abroad.[278] The substantial increase in Al Bayoumi's other allowances occurred around the same time he became entitled to those additional benefits under his married status contract.[279]

163.    As I explained above, Saudi Arabia has a strong public policy of educating its Saudi workforce. Nothing in the ANSS contracts or Saudi law prohibited the PCA from supporting Al Bayoumi's studies in the United States by paying additional stipends to cover his tuition and living expenses. The cost of living is much higher in the United States than in Saudi Arabia, and the cost of post-secondary education even more so. It would not be at all surprising if the PCA concluded that a Saudi civil service salary, or even a Saudi private-sector salary designed for workers in the Kingdom, would be inadequate to cover Al Bayoumi's educational and living expenses in the United States.

164.    In any case, the important point is that the amount of the allowance was determined by the PCA.[280] The PCA also reimbursed Dallah Avco for the amount paid.[281] Accordingly, Dallah Avco's lack of control over Al Bayoumi's educational stipends confirms that Dallah Avco was not his employer.

### 4.  Service Awards

165.    Turning to Al Bayoumi's one-time payments, Table 3 shows that Al Bayoumi received service awards ranging from SR 6,578 to SR 25,570 on five dates: September 5, 1998;

---

as "Married Status" positions that entitle the ANSS employee to be accompanied by his family. *Ibid.*

[278] DA000097.

[279] *See* Al Bayoumi Tr. 693:10-694:4 (describing these "wonderful, wonderful benefits that I'm seeing for the first time" upon his promotion to a married status position).

[280] Khan Tr. 163:7-164:1; Kamel Tr. 217:11-19.

[281] Kamel Tr. 252:1-254:6 & Ex. 129; Angari Tr. 357:14-17; *see also* Angari Tr. 277:23-278:15, 356:18-20.

April 12, 2000; September 5, 2001; November 5, 2001; and May 12, 2002. The first four dates correspond to when Al Bayoumi's position or salary on the ANSS project changed, and the last date corresponds to when Al Bayoumi was terminated from the project.

166.    Under the Saudi Labor and Workmen Law, employees are entitled to an end-of-service award. Article 87 of that Law specifies the mechanism used to calculate the end-of-service award. It provides that: "Where the term of a labor contract for a specified period comes to an end or where the employer cancels a contract of unspecified period, the employer shall pay to the workman an award for the period of his service to be computed on the basis of half a month's pay for each of the first five years and one month's pay for each of the subsequent years. The last rate of pay shall be taken as basis for the computation of the award. For fractions of a year, the workman shall be entitled to an award which is proportionate to his service period during that year . . . ."[282]

167.    Al Bayoumi's employment records show that, whenever he changed position or salary level or finished work on the project, he received a service award calculated according to the requirements of Article 87 of the Saudi labor law. Al Bayoumi's service award consisted of 50% of one month's pay for each year of service up to five years, and 100% of one month's pay for each year of service after the first five years. For example, on September 5, 1998, when Al Bayoumi completed his position on the ANSS IV contract, he had worked 3 years and 3 months in that position at a salary of SR 10,893, so he received a service award of SR 17,701 (*i.e.*, 10,893 × 50% × 3.25).[283] The method for calculating those awards was specified in Al

---

[282]  Article 87, "Labor and Workmen Law," Royal Decree No. M/21 dated 06/09/1389H (corresponding to 15/11/1969G), effective on 19/09/1389H (corresponding to 28/11/1969G).

[283]  DA000294; *see also* DA000295; DA000439; DA000444; DA000445. All but one of the service awards coincided with either Al Bayoumi's end of service on a particular ANSS contract,

Bayoumi's employment documents.[284] The service awards for other ANSS employees were computed the same way.[285] Those formulas are prescribed by Article 87 of the Saudi Labor law, as explained above.

168.    Al Bayoumi's service awards were thus received in the ordinary course of his ANSS employment, and the amounts were fixed by Saudi law according to his salary and tenure on the project, both of which were determined by the PCA.

### 5.   *Bonus*

169.    Al Bayoumi received one modest bonus payment of SR 7,740 (*i.e.*, $2,064) on September 5, 1999.[286] Al Bayoumi's earlier employment offer for the position he held at the time expressly provided that he would receive a bonus of one month's salary, and the bonus he received was consistent with that amount.[287]

### 6.   *Social Insurance Refund*

170.    On June 3, 2003, a year after leaving the ANSS project, Al Bayoumi received a payment of SR 24,096 (*i.e.*, $6,426).[288] Dallah Avco's corporate representative testified that this payment represented a refund of social security payments that Dallah Avco had erroneously withheld on Al Bayoumi's behalf.[289]

---

the end of his secondment, or his termination from the ANSS project entirely in 2002. The only exception is the November 5, 2001 service award, which coincided with Al Bayoumi's salary reduction that month.  DA000445; DA000601.  That salary reduction appears to have been treated as equivalent to an end of contract for purposes of the service award.

[284] DA001087.

[285] *See, e.g.*, DA002348; DA002688-89; DA003546-47.

[286] DA000293.

[287] DA001061.

[288] DA000434.

[289] Kamel Tr. 256:9-14.

171.    Under Saudi law, private employers are required to withhold and remit a portion of each employee's compensation to GOSI, the Saudi social security system.[290] Government civil servants, by contrast, do not participate in GOSI and instead have their own separate retirement system.

172.    The documents show that, in September 1999, GOSI notified Dallah Avco that the company had been erroneously withholding GOSI payments on Al Bayoumi's behalf.[291] GOSI explained that, because Al Bayoumi was a civil servant who had merely been seconded to another position, he still fell under the government pension program.[292] GOSI therefore refunded the payments to Dallah Avco, and Dallah Avco refunded them to Al Bayoumi.[293]

173.    The fact that Al Bayoumi was still subject to the Saudi government pension program during his secondment confirms that he was not an employee of Dallah Avco during that period.

### 7.   Payments from ANSS Subcontractors

174.    In addition to the payments from Dallah Avco, Al Bayoumi also received occasional payments from subcontractors on the ANSS project that were arranged through the ANSS project's Logistics Department and intended to defray his educational and living expenses. Logistics Manager Samuel Coombs testified, for example, that Al Bayoumi received two payments from subcontractor Ercan Engineering in the 1995 timeframe.[294] Those payments

---

[290]  Article 7/1, "Social Insurance Law," Council of Ministers Decision No. 199 dated 17/08/1421H (corresponding to 13/11/2000G), Royal Decree No. M/33 dated 03/09/1421H (corresponding to 29/11/2000G).

[291] DA000899.

[292] *Ibid.*

[293] *Ibid.*; Kamel Tr. 256:9-14.

[294] *See* Coombs Tr. 124:4-125:19 (two payments from Ercan).

were similar to the payments Al Bayoumi received from Avco Overseas in 1994 and 1995, before his secondment to the ANSS project.[295]

175.    All of those Logistics Department payments were made at the direction of the PCA, not Dallah Avco. Al Salmi issued "financial directives" that instructed subcontractors to pay Al Bayoumi's educational and living expenses.[296] Dallah Avco had no role in deciding to use logistics funds to pay those expenses or in preparing those financial directives.[297]

176.    Al Salmi intended those payments to defray Al Bayoumi's tuition and living expenses, and Al Bayoumi used them for that purpose.[298] Coombs testified that Al Salmi paid the expenses through subcontractors, rather than having the PCA pay them directly, because the approval process for having the PCA pay the expenses was "very long" and "could take as much as two months."[299]

177.    Once the subcontractor paid those expenses, Dallah Avco would pay the subcontractor pursuant to the ANSS contract, as with other expenditures for parts or supplies under the contract.[300] Dallah Avco's role was only to pay the amounts Airways Engineering

---

[295] DA002267.

[296] Coombs Decl. 2 ("These Financial Directives were periodically sent to me by Mr. Al-Salmi."); Coombs Tr. 116:14-23, 124:4-12; *see also* DA002267.

[297] Coombs Tr. 116:24-117:1 ("Q. And to your knowledge, did Dallah Avco have any role in preparing financial directives like this one? A. No."); *id.* at 129:13-18 ("Q. To your knowledge, did anyone at Dallah Avco have any role in deciding to use logistics funds to fund the educational payments for Saudi students that you referred to in your declaration? A. No. No.").

[298] Coombs Decl. 2 ("The budget was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA."); Coombs Tr. 116:14-23, 126:19-127:22; Al Bayoumi Tr. 674:12-15.

[299] Coombs Tr. 125:21-126:18.

[300] *Id.* at 105:21-106:9.

approved; it had no role in reviewing the amounts or vendors selected.[301] The PCA then reimbursed Dallah Avco pursuant to the ANSS contracts.[302]

178.    The fact that all payments to Al Bayoumi, including these Logistics Department payments, were made at the direction of the PCA, not Dallah Avco, confirms that Al Bayoumi was not an employee of Dallah Avco. Dallah Avco did not have the authority to make any decisions related to the payments made to Al Bayoumi.

### D.    Omar Al Bayoumi's Secondment and Educational Leave Status

179.    Over his seven-year employment on the ANSS project, Al Bayoumi held two different legal statuses in relation to his civil service position at the PCA. For the first five years, he was on secondment. For the last two, he was on educational leave. In my opinion, the reason Al Bayoumi went from secondment to educational leave is that he reached the five-year limit for secondments under Saudi law. Whether Al Bayoumi was on secondment or educational leave did not fundamentally affect his relationship to the ANSS project: Throughout the entire seven-year period, Al Bayoumi held a variety of positions on the project and continued to receive a salary and benefits as an ANSS employee while pursuing educational studies abroad. Secondment and educational leave were simply two different legal mechanisms for temporarily releasing Al Bayoumi from his civil service position at the PCA.

---

[301] *Id.* at 106:23-107:20, 132:1-9.

[302] *Id.* at 107:21-108:22; KSA00002135 (ANSS IV Contract § 3-3-1-1) (providing that "[t]he Contractor shall be entitled each month to be paid for Logistics Support purchases made during previous months").

180.    The following chart summarizes the key dates for Al Bayoumi's secondments and educational leave:

| Table 4 – Al Bayoumi Secondments and Educational Leave[303] | |
|---|---|
| **Date** | **Description** |
| May 24, 1995 | Secondment Request – Year 1 |
| June 25, 1995 | Secondment Decree – Year 1 |
| Apr. 3, 1996 | Extension Request – Year 2 |
| May 22, 1996 | Secondment Decree – Year 2 |
| Feb. 18, 1997 | Extension Request – Year 3 |
| May 6, 1997 | Secondment Decree – Year 3 |
| Mar. 28, 1998 | Extension Request – Year 4 |
| May 12, 1998 | Secondment Decree – Year 4 |
| Apr. 7, 1999 | Extension Request – Year 5 |
| May 3, 1999 | Secondment Decree – Year 5 |
| May 23, 2000 | Educational Leave Decree – Years 6 & 7 |

181.    As I explained above, secondment is a common mechanism in Saudi Arabia for temporarily assigning a government employee to a different position elsewhere in government or in the private sector. At the time of Al Bayoumi's employment on the ANSS project, Saudi law permitted secondments for a maximum of five years.[304]

---

[303]   DA001132-34;  DA001110-11;  DA001062;  DA001124;  DA000044;  DA001120-21; DA000900-01; DA001119; DA000548-49.

[304]   "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

182.    As Table 4 shows, the PCA initially seconded Al Bayoumi to the ANSS project for one year by a decree issued on June 25, 1995.[305] After that first year, the PCA extended Al Bayoumi's secondment four times, for a total of five years.

183.    The secondment process required multiple layers of review and approval within the PCA and Ministry of Defense and Aviation. The PCA's human resources department would first examine the legality of any secondment request.[306] The Assistant to the President of Civil Aviation would then write a memorandum to the President of Civil Aviation recommending approval or denial of the request.[307] The President would then write the Deputy Minister of Defense for approval.[308] After the Deputy Minister had approved the secondment,[309] the President of Civil Aviation would issue a decree effecting the secondment.[310]

184.    Although each of Al Bayoumi's secondment decrees was preceded by a letter from Dallah Avco requesting the secondment,[311] for reasons I explained above, it is clear from the record that the motivation for putting Al Bayoumi on the ANSS project originated from the PCA or from ANSS staff working under the PCA's supervision, not from Dallah Avco.[312] That remained true throughout Al Bayoumi's employment on the project.

185.    Correspondence surrounding the 1999 extension of Al Bayoumi's secondment for a fifth year confirms that the PCA was driving the process. On April 4, 1999, Dallah Group

---

[305] DA001134.

[306] Angari Tr. 241:5-13; *see also* KSA0000000942.

[307] *See, e.g.*, KSA0000001031.

[308] *See, e.g.*, KSA0000001030.

[309] *See, e.g.*, KSA0000001028.

[310] *See, e.g.*, DA001133.

[311] *See, e.g.*, DA001132.

[312] *See* ¶¶ 119-126, *supra*.

Chairman Alawi Kamel wrote to Al Salmi stating that Dallah Avco did not wish to renew Al Bayoumi's secondment for a fifth year.[313] The PCA's Airways Engineering Directorate received that letter on April 6, 1999, as indicated by a stamp on the document.[314]

186.    The PCA's copy of the letter includes a handwritten notation that states: "Do the necessary to extend the Secondment Period of the Employee for one year effective from 8/1/1420H."[315] The next day, April 7, 1999, Al Salmi responded to Dallah Avco's letter.[316] Under the heading "top urgent," Al Salmi stated that "the Presidency is desirous to grant [Al Bayoumi] a Secondment for a period of one year only, to complete the task under which the Presidency approved of his Secondment."[317] Al Bayoumi testified that, at the time of this letter, he had not yet completed all the education he intended to pursue in the United States.[318] The "task" to which Al Salmi referred was the further studies that Al Bayoumi intended to pursue.[319]

187.    Al Salmi thus directed Dallah Avco to "please renew the Secondment of the said [employee] to another period of one year" and requested "a letter to be issued by the Company directed to the Presidency in this respect in the required expedition in order to complete the Secondment Procedures Arrangements, as per Law, in point of the lack of time and the dawn of the New Hijri Year."[320] Dallah Avco sent that letter the same day, requesting renewal of Al

---

[313] DA000902.

[314] *Ibid.*

[315] *Ibid.*

[316] DA000900.

[317] *Ibid.*

[318] Al Bayoumi Tr. 680:9-13.

[319] *Id.* at 680:14-20.

[320] DA000900.

Bayoumi's secondment for a fifth year.[321]

188.    The PCA's control over the secondment of Al Bayoumi clearly indicates that Al Bayoumi is not an employee of Dallah Avco, as all decisions related to his secondment were made by the PCA.

189.    Al Bayoumi was not the only PCA employee that the PCA seconded to the ANSS project. Employment records identify at least two other ANSS employees who were similarly seconded from the PCA.[322] There is no indication that those other employees were pursuing educational studies, and their files indicate that they worked in the Kingdom.[323] Nonetheless, those other examples of PCA secondments show that Al Bayoumi was not unique in that respect.

190.    In April 2000, Al Bayoumi completed his fifth year of secondment, and apparently returned briefly to the PCA.[324] Because Al Bayoumi had reached the five-year limit on secondments, the PCA had to adopt a different mechanism of suspending his civil service status if he was to continue his studies abroad.

191.    On May 9, 2000, Al Bayoumi wrote to Al Salmi at the PCA asking to be placed on educational leave for two years effective June 4, 2000.[325] On May 11, 2000, Al Salmi wrote to the PCA's Director of Personnel Affairs and Salaries stating that he had no objection to Al Bayoumi's request.[326] Initially, the Assistant to the President of Civil Aviation recommended

---

[321] DA001110.

[322] *See* DA008663 (PCA order authorizing secondment of Adnan Al Hindi); DA009200 (PCA order authorizing secondment of Tariq Mahmood Fairaq).

[323] *See generally* DA008581-698 (Al Hindi employment file); DA009120-224 (Fairaq employment file).

[324] KSA0000000704.

[325] KSA0000000902; *see also* KSA0000000904-908.

[326] KSA0000000901.

that Al Bayoumi's request be denied.[327] The President of Civil Aviation did not adopt that recommendation, however, and on May 17, 2000, Al Bayoumi's request was approved.[328]

192.     On May 23, 2000, the PCA issued a decree granting Al Bayoumi a two-year educational leave.[329] Expressly referencing Al Salmi's May 10, 2000 "request for approval of granting [Al Bayoumi] a (two-year) study leave . . . to continue his postgraduate studies in the U.S.," the PCA decreed its "[a]pprov[al] granting [Al Bayoumi] a [two-year] study leave without pay as from [June 3, 2000], under Article (28/19) of the Civil Service Law."[330]

193.      The decree's reference to "Article (28/19) of the Civil Service Law" refers to the educational leave provisions under Saudi law that I discussed above.[331] As I explained, educational leave is a common practice in Saudi Arabia. The PCA's decision to grant Al Bayoumi educational leave was an unremarkable way to permit a government employee to suspend his civil service employment while pursuing studies.[332]

194.     Al Bayoumi continued to be employed on the ANSS project during his two years of educational leave, just like he had been during his five years of secondment. Thus, while Al Bayoumi's educational leave was "without pay" in the sense that he did not receive his civil service salary, he did continue to receive his salary and benefits as an ANSS employee. Although

---

[327] KSA0000000889.

[328] KSA0000004335; *see* Angari Tr. 162:20-164:13, 303:4-17.

[329] DA000548.

[330] *Ibid.*

[331] *See* ¶¶ 57-62, *supra*.

[332] DA000548.

a government employee on educational leave typically does not receive his civil service salary,[333] he is allowed to work for any private or public entity during his leave and can receive compensation for that separate work. Al Bayoumi testified that Airways Engineering assigned him to the ANSS project during the educational leave period so he could use the ANSS salary and benefits to fund his education and living expenses.[334] Nothing in the Saudi regulations governing educational leave prohibited Al Bayoumi from receiving that separate compensation.

195.    The circumstances surrounding the educational leave confirm that the PCA, rather than Dallah Avco, was driving the process. As explained above, the educational leave was decreed by the PCA based on an internal request from Al Salmi at the PCA, which in turn stemmed from a request that Al Bayoumi had submitted to the PCA.

## E.    Al Bayoumi's Own Statements

196.    Finally, Al Bayoumi's own statements confirm that Al Bayoumi did not consider himself to be a Dallah Avco employee. When Al Bayoumi applied to United States International University in December 1996, he stated that he was "presently employed by the Civil Aviation Administration in the Kingdom of Saudi Arabia."[335] He went on to describe his career with the agency.[336] Al Bayoumi made similar representations when he later applied for a graduate

---

[333] Article 28/19, "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

[334] Al Bayoumi Tr. 688:23-689:12.

[335] PEC-KSA1-000015; *see also* Al Bayoumi Tr. 145:7-12 (confirming that employment facts described in letter are accurate).

[336] PEC-KSA1-000015; Al Bayoumi Tr. 145:7-12.

program at Case Western Reserve University, stating that he had been employed by the Saudi civil aviation administration for 20 years.[337]

197.   When investigators met with Al Bayoumi after 9/11, he confirmed that he was a PCA employee. In a 2003 interview with 9/11 Commission staff, Al Bayoumi explained that he was "selected to participate in further education by *his employer (PCA)* based on his knowledge of English and his ability to teach accounting."[338] Al Bayoumi identified his "boss" as "Alb Karli, who worked in Jiddah in a PCA unit responsible for finances and contracts in the field of aviation services within Saudi Arabia."[339]

198.   Likewise, when the FBI interviewed Al Bayoumi in 2003, he told investigators that he had "worked for the Saudi Arabian Presidency of Civil Aviation (PCA) for approximately twenty-seven years, and currently works in the finance/budget department."[340] Al Bayoumi began work at the PCA in 1977.[341] Al Bayoumi's statement to the FBI therefore confirms that he considered himself to be a PCA employee even during the seven-year period he was attached to the ANSS project.

199.   Al Bayoumi thus repeatedly identified himself as an employee of the Civil Aviation Administration. Those statements support my opinion that he was not an employee of Dallah Avco. If Al Bayoumi was an actual employee of Dallah Avco, he presumably would not have referred to himself as a PCA employee.

---

[337] PEC-KSA000442.

[338] DA002161 (emphasis added).

[339] *Ibid.*

[340] EO14040-000249.

[341] KSA0000000629.

F.      **Conclusions**

200.    I conclude from the foregoing facts that Omar Al Bayoumi was not at any time an employee of Dallah Avco. The PCA decided to hire Al Bayoumi onto the ANSS project. The PCA selected all the positions Al Bayoumi held on the project and approved and encouraged his pursuit of educational studies in the United States to improve his job skills as an ANSS employee. The PCA determined Al Bayoumi's compensation by directing that he be hired to positions that had specific compensation levels under the ANSS contract, and in one instance by directly intervening to modify Al Bayoumi's salary. The PCA also supplemented Al Bayoumi's salary with stipends to cover his educational and living expenses in the United States. At no point did Dallah Avco ever direct or supervise Al Bayoumi's work or exercise any control over how he carried out his activities. Al Bayoumi therefore had no employment relationship with Dallah Avco.

201.    I see nothing inappropriate, unlawful, or even remarkable about Al Bayoumi's arrangement. The PCA's willingness to encourage an ANSS employee's pursuit of educational studies is consistent with the longstanding public policy of Saudization and improving the job skills of the Saudi workforce. The PCA and Al Bayoumi used two different mechanisms, secondment and educational leave. Both mechanisms enabled Al Bayoumi to suspend his civil service position while pursuing educational studies through the ANSS project. I do not see anything remarkable about that relationship, nor do I believe Dallah Avco would have any reason to see anything remarkable about it. Instead, Dallah Avco's limited role was simply to process Al Bayoumi's salary and benefits as directed by the PCA, consistent with its limited role under the ANSS contracts.

### III.   Al Bayoumi's Alleged Activities in Southern California Did Not Fall Within the Scope of His Employment

202.    As discussed previously, to hold an employer liable for its employee's actions under Saudi Law, the wrongful act committed by the employee must occur within his capacity as an employee of the employer while taking into consideration the nature of the action, the means used to commit the wrongful action, and the way in which the action was committed.[342] Even if Al Bayoumi could somehow be considered an employee of Dallah Avco (contrary to my conclusions above), plaintiffs' allegations concerning Al Bayoumi's activities in Southern California would fall outside the scope of his employment and outside the purposes for which he was seconded to the ANSS project. I therefore conclude that Dallah Avco would not be vicariously liable for Al Bayoumi's actions under Saudi law, even if an employment relationship existed.

203.    I understand that plaintiffs contend that Al Bayoumi met the hijackers at a restaurant, took them to a bank when they were trying to obtain a check to pay for their apartment, and borrowed their apartment to host a gathering to honor volunteers.[343]

204.    It is evident that Al Bayoumi's actions were taken in his personal capacity and had no relation whatsoever to his work on the ANSS project, either as a secondee or as a civil servant on educational leave.

205.    The nature of the allegedly wrongful acts had nothing to do with the purposes for which Al Bayoumi was seconded to the ANSS project. The purpose of Al Bayoumi's secondment and educational leave was to pursue educational studies to improve his skills as an

---

[342] Dr. Hasan Al-Thannon, *supra*, at 454.

[343] Pls. Consol. Am. Compl. ¶¶ 172-173 (Mar. 7, 2017); Al Bayoumi Tr. 715:22-717:6.

ANSS project employee. The educational leave regulations permitted such leave only if the course of study was "relevant" to the work of the agency.[344]

206.    Al Bayoumi testified that his interactions with the hijackers were not in any way related to his job duties at Airways Engineering, his job duties on the ANSS project, or his relationship with Dallah Avco, to the extent he had one.[345] He stated that those interactions had nothing to do with his pursuit of educational studies in the United States, nor were they related in any way to the reasons Al Bayoumi came to the United States.[346] Rather, Al Bayoumi explained that he came to the United States to pursue educational studies so he could replace Alp Karli as the Contracts and Finance Control manager at Airways Engineering.

207.    Documents from Al Bayoumi's ANSS personnel file confirm that testimony. In response to inquiries from the PCA's Director of Personnel Abdelrahim Nuri Jestiniya,[347] Al Salmi explained that the "reasons for extending [Al Bayoumi's] secondment period" were "to continue his study and to take advantage of him after completing his study."[348] Al Salmi explained that Al Bayoumi was pursuing "preparatory study for obtaining a master's degree in business administration and studies in financial management."[349] When the PCA later placed Al Bayoumi on educational leave, it issued a decree stating that he was to "continue his

---

[344] Article 28/19 "Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), Royal Decree No. 49/M dated 10/07/1397H (corresponding to 14/06/1983G).

[345] Al Bayoumi Tr. 715:10-16.

[346] Al Bayoumi Tr. 717:7-18.

[347] DA000091.

[348] DA000044.

[349] *Ibid.*

postgraduate studies."[350] Documents make clear that Al Bayoumi was, in fact, pursuing educational studies.[351]

208.    Plaintiffs' allegations describe conduct that falls well outside those purposes. Al Bayoumi's alleged assistance to the hijackers did not relate to his status as an employee on the ANSS project or the educational activities he was pursuing to improve his skills as an ANSS employee. Plaintiffs allege that Al Bayoumi's "duties involved the advancement of the agenda of the Ministry of Islamic Affairs, under the direction of Thumairy and other more senior representatives of the Ministry's offices in the United States."[352] Those allegations have no relation to Al Bayoumi's role as an ANSS employee or his efforts to obtain an education in the United States to improve his skills for that project.

209.    The means used to commit the alleged wrongful action and the way in which the action was committed confirm that Al Bayoumi's alleged efforts to aid the hijackers fall outside the scope of his employment. Plaintiffs allege that Al Bayoumi met with two 9/11 hijackers, assisted them in procuring an apartment in San Diego, and "took steps to ensure that the hijackers received essential assistance from other members of the San Diego Muslim community."[353] Those allegations have no connection to Al Bayoumi's status as an ANSS employee or educational activities related to that status. His interaction with the hijackers did not arise from his educational studies, nor did those studies further his ability to assist the hijackers using the means plaintiffs allege.

---

[350] DA000548.

[351] *See* n.236, *supra*.

[352] Pls. Consol. Am. Compl. ¶171.

[353] *Id.* ¶¶172-174.

210.     Thus, taking into consideration the nature of the alleged action, the means used to commit the action, and the way in which the action was committed, I conclude that under Saudi law, Al Bayoumi's activities with respect to the hijackers do not fall within the scope of his employment on the ANSS project.

211.     Under the rules of vicarious liability under Saudi law, Dallah Avco could not be held vicariously liable for Al Bayoumi's actions in Southern California. The nature of the actions he allegedly committed do not relate to the scope of work he was obliged to perform as an ANSS employee. In other words, any wrongful acts were not within the scope of his employment.

## CONCLUSION

212.     Based on the foregoing analysis and the application of Saudi law, I am of the opinion that, for the duration of his involvement with the ANSS project, Al Bayoumi was not an employee of Dallah Avco.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 31st day of March, 2022.
Jeddah, Saudi Arabia

_____
   Dr. Adli A. Hammad

80

# Appendix 1



# Dr. Adli Ali Hammad

**PO Box 864, Jeddah-21421 Saudi Arabia**
**Tel:** +966 920004626
**Fax:** (02) +966 6069190
**Mobile:** +966 505594268
**Email:** adli.hammad@hmco.com.sa

**Lawyer under the license of the Ministry of Justice No. 107/24 dated 07/04/1424 AH.**

**Personal Information:**

- Nationality: **Saudi**
- Date of Birth: **03/06/1958**
- Marital status: **Married**

**Academic degrees:**

- Bachelor's degree in Law from Cairo University, 1978.
- Diploma in Islamic Studies from the Institute of Islamic Studies in Cairo, 1989 AD
- Master's degree in International Trade Law from Southern Methodist University in Dallas, Texas - USA 1992 AD.
- Doctorate degree in Islamic Finance Law, International Islamic University Malaysia 2008.

**Practical experiences:**

- November 1984 - until now: Partner and Director of Hammad Al-Mihdhar Law Firm and Legal Consultations.
- June 1979 - June 1980: Legal Adviser, Daelim Industrial Company
- June 1980 - October 1982: Labour issues representative, Aramco Company
- October 1982 - November 1984: Legal Adviser, Muhammad Omar Al-Amoudi Office
- December 1998 - May 2011 AD: General Legal Adviser to the Saudi Economic and Development Holding Company, a closed joint-stock company (SEDCO Holding - SEDCO Capital)

**Specialties:**

- Islamic banking
- Money market law
- Family businesses
- International commercial arbitration
- Banking issues.

**Special Activities:**

- Vice Chairman of the Board of Directors of the Makkah Commercial Arbitration Centre.
- A certified arbitrator at the Saudi Centre for Commercial Arbitration.
- A certified arbitrator at the Commercial Arbitration Centre for the Gulf Cooperation Council States. Fellowship of the Institute of International Arbitrators - London. (CIAL)
- Certified arbitrator at the Dubai International Financial Centre (DIFC) Court
- Assistant Professor of Commercial Law, Dar Al-Hekma University.

**Membership in:**

- Board of Directors of the International Organization for the Memorization of the Holy Qur'an.
- Board of Directors of the Law and Arbitration Centre (Jeddah Chamber of Commerce).
- Board of Directors of the Commercial and Industrial City Group.
- Board of Directors of the Middle East and North Africa Beverages Company.
- Advisory Board of the Islamic Development Bank IDB
- The Audit Committee of the General Authority for Endowments.
- The Lawyers Committee of the Jeddah Chamber of Commerce.
- Arab Lawyers Union.

- International Bar Association.
- Arab Union for the Protection of Industrial Property.
- Group of Arab Legal Services Offices.
- Board of Directors of the Centre for Conciliation in Family Companies (Jeddah Chamber of Commerce).
- Chairman of the Board of Directors of the Phoenix Al-Riyadh Investment Company (a French company affiliated with the French government owned Audas military company).
- Board of Directors of Saudi Venture Capital Company (a financial services company licensed by the Capital Market Authority).
- Audit Committee of Saudi Venture Capital Company (a financial services company).
- The Audit Committee of the General Authority for Endowments (an independent governmental body).
- Board of Directors of the Middle East and North Africa Refreshments Company (Pepsi Saudi Arabia).
- Board of Directors of Al-Madina Commercial Company.
- Chairman of the Investment Committee of the International Organization for the Book and the Sunnah.
- Board of Directors of the International Organization for the Quraan Holy Book and the Sunnah.
- The Council, Association of Neighbourhood Centres in Jeddah.
- Development Committee of Prince Majid Charitable Society.

## Publications and Research:

- Arbitration in Yemen: A detailed explanation of the new Yemeni arbitration for the year 1992.
- Research paper: Participation in the workshop of the UNCITRAL Committee on Yemeni Arbitration. - Contributor to an article published in International Banking and Financial Services entitled (Rental Under Saudi Law).
- Islamic Investment Funds Provisions Book (a comparative study between the laws of Saudi Arabia and Malaysia). 2010.
- Encyclopaedia of Saudi Systems (9 volumes) 2011.
- Encyclopaedia of Capital Market Laws (in press) 2012.
- You have the right to know (a collection of articles) (in press) 2012.
- Legal research and author of many research papers and articles in Al-Eqtisadiah newspaper and Okaz newspaper.

## Courses and conferences:

- Contract Drafting Course - Jeddah Chamber of Commerce.
- International Trade Contracts Course - Jeddah Chamber of Commerce.
- International Commercial Arbitration Symposium - Jeddah 2006.
- Family Business Symposium
- Jeddah 2008. Islamic Finance Conference - Dubai 2005.
- Islamic Banking Conference - Dubai 2007.
- Cooperative Insurance Conference - Jeddah 2008.
- Women's Rights in Family Business Seminar - Jeddah 2008.
- Assistant Professor in Commercial Law, Dar Al-Hekma University - Jeddah 2009.

## Languages:

- Arabic
- English

**EXPERIENCE IN ARBITRATION**

In addition to Dr. Hammad significant experience in Arbitration having been appointed as arbitrator or umpire in several arbitrations as listed below

| Sr. | Claimant | Defendant | Matter | Dr. Hammad's Role | Court /Arbitration | City | Governing Law | Year |
|---|---|---|---|---|---|---|---|---|
| 1 | Al-Amoudi brothers Company | Heirs of Salahuldin Abdul-Jawad | Contracting | Arbitrator | Labor disputes Settlement Committee | Jeddah | Saudi law | 1998 |
| 2 | Al-Harameen Hospital | Irfan Medical Services Co. | Medical post | Chairman of Arbitration Panel | Sharia Court | Jeddah | Saudi law | 2001 |
| 3 | Mohammad Saeed Foundation | Galahar Company, Britain | Commercial agency | Chairman of Arbitration Panel | Board of Grievances | Jeddah | Saudi law | 2002 |
| 4 | Al-Wamatic Factory | Instalux Company, France | Trading company | Arbitrator | Gulf Arbitration Center | Jeddah | Saudi law | 2003 |
| 5 | Haitham Abdulgader Nusair | Al-Jazeera Bank | Islamic financing | Chairman of Arbitration Panel | Sharia Court | Jeddah | Saudi law | 2006 |
| 6 | The Islamic Company for trading in Bahrain | Halal Food Company | Islamic financing | Chairman of Arbitration Panel | Sharia Court | Jeddah | Saudi law | 2007 |
| 7 | Ahmed Mohammad Omar Baswedan | Al-Salam Gold and Silver Company | Labor | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2007 |
| 8 | Saleh Al-Attas | Osama Radi | Attorneys' fees | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2009 |
| 9 | Desar foundation for trade and suplly | Saraya Trading Est. | Trading company | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2009 |
| 10 | Arab Sat | Qasim Channel | Satellite transmission contract | Arbitrator | Sharia Court | Jeddah | Saudi law | 2009 |
| 11 | Khalied Al-braheem | Bader Al-Aiban | Trading company | Arbitrator | Sharia Court | Riyadh | Saudi law | 2009 |
| 12 | Salem Al-Hattmi | Hasan Aref | Renting contract | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2012 |
| 13 | The Saudi Company for trade and Construction (Satic) | Al-Aman Modern Power Company | Claim - hold post | Single Arbitrator | Sharia Court | Jeddah | Saudi law | 2012 |
| 14 | Mohammad Saleh Jamjom | Real Estate Commercial Markets Limited | Compensation claim for mismanagement of the company | Chairman of Arbitration Panel – Casting Arbitrator | Board of Grievances | Jeddah | Saudi law | 2012 |
| 15 | The Saudi Younbu Company for Petrochemicals | The National Company for Petrochemical Industries (Natpet) | Contract of sale - a difference in the interpretation of the contract | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2014 |
| 16 | Abdulrahman Mustafa Zaitoney | Al-Masarat Construction works Co. | Contracts of sale of housing units | Arbitrator | Sharia Court | Jeddah | Saudi law | 2014 |
| 17 | The Company of Emaar Kingdom for Real Estate Investment | The National Company for Medical Hospitals | Hospital Renting contract | Chairman of the Panel | Sharia Court | Jeddah | Saudi law | 2014 |

| 18 | SPC | IKEA | Transporation Contract | Arbitrator | Labor disputes Settlement Committee | Jeddah | Saudi law | 2015 |
|---|---|---|---|---|---|---|---|---|
| 19 | Sulaiman Fakeeh | Sulaiman Al-Khereji | Engeering Contract | Chariman of the Panel | Sharia Court | Jeddah | Saudi law | 2015 |
| 20 | Ibrahim Al Zamil | Ghassan Faraj | - | Arbitrator | Board of Grievances | Jeddah | Saudi law | 2015 |
| 21 | Al Jeel Company | Marat Company | Health Care | Chairman | Gulf Arbitration Center | Jeddah | Saudi law | 2016 |
| 22 | Zaki Farsi | M. Hamza | Real Estate | Chairman | Sharia Court | Jeddah | Saudi law | 2017 |
| 23 | Zaki Farsi | Y. Hamza | Real Estate | Chairman | Sharia Court | Jeddah | Saudi law | 2017 |
| 24 | Al-Amoudi brothers Company | Heirs of Salahuldin Abdul-Jawad | Contracting | Arbitrator | Board of Grievances | Jeddah | Saudi law | 1998 |
| 25 | Al-Harameen Hospital | Irfan Medical Services Co. | Medical post | Chairman of Arbitration Panel | Board of Grievances | Jeddah | Saudi law | 2001 |
| 26 | Rashed H. D. Al Otabi | Moteb S. O. Al Otaibi | Modaraba Contract | Arbitrator | General Court | Jeddah | Saudi Law | 2017 |
| 27 | Riyadh K. Makarem | Mazen S. Zaher | Partnership Contract | Chairman of the Panel | General Court | Jeddah | Saudi Law | 2016 |
| 28 | Sameer S. Magbool | Al Baraka Faculties & Exports Dev. Saudi Co. | Dispute about steel sales | Chairman of the Panel | General Court | Jeddah | Saudi Law | 2018 |
| 29 | Heirs of Yusuf Banan | Al Kamal Import Co. Ltd. | Dispute about the reevaluation of shares in a company | Arbitrator | Board of Grievances | Jeddah | Saudi Law | 2018 |
| 30 | Al Motabaggani medical Services Co. | Jaser Ali Al Hareesh Hospital | Dispute about a medical and non-medical management and operation contract | Chairman of the Panel | General Court | Jeddah | Saudi Law | 2018 |
| 31 | Adco Ad. & pub. Agency | Al Farouki Est. | Claim for ad. signs rent | Arbitrator | General Court | Jeddah | Saudi Law | 2018 |
| 32 | Samia Al Malamani | Noral Al Sherbinin | Partnership Co. | Arbitrator | General Court | Jeddah | Saudi Law | 2020 |
| 33 | Shuaibah Water and Electricity Company | - | Provide a legal opinion on the merits of a number of jurisdictional challenges raised in UNCITRAL arbitration proceedings commenced by the Client | Expert | General Court | Jeddah | Saudi Law | 2020 |
| 34 | Al Nozol Holdings | Urban Development Company | Rental Contract Housing units in Makkah Al Mukarramah | Arbitrator | Public Court | Jeddah | Saudi Law | 2020 |
| 35 | Jeddah chamber of commerce and Industry | Al Mnzel Company | Rental Contracts | Arbitrator | Public Court | Jeddah | Saudi Law | 2020 |
| 36 | Mohammed Sholaq | European Decoration Company | Contracting | Arbitrator | Public Court | Jeddah | Saudi Law | 2020 |

| 37 | Al Qemam Company | Mohammed Al Barak | Share Purchase Contract | Arbitrator | Royal Court | Jeddah | Saudi Law | 2020 |
| 38 | Nahdi Aviation Technology Company | Saudi ground Services Company | Engine Equipment | Arbitrator | Public Court | Jeddah | Saudi Law | 2020 |

**Statement of Expert Witness Report. Dr. Adli Hammad's Matters as Expert Witness:**

| Sr. | Client | Name of Matter | Dr. Adli's Role | Court/Arbitration | City | Governing LAW | Year |
|---|---|---|---|---|---|---|---|
| 1 | Fullbright | Halliburton Saudi Arabia | Respondent Expert Witness | Federal Court | Houston | Saudi law | 2010 |
| 2 | JP Morgan | A family inheritance dispute over $ 300 Million | Respondent Expert Witness | High Court | Jersey | Saudi law | 2010 |
| 3 | Fullbright | Halliburton Saudi Arabia | Respondent Expert Witness | American Arbitration Center | Houston | Saudi law | 2011 |
| 4 | ICDL | ICDL Saudi Arabia | Claimant Expert Witness | High Court | Dublin | Saudi law | 2012 |
| 5 | Sullivan & Cromwell | Tenaris Global Services S.A | Claimant Expert Witness | International Chamber of Commerce of International Court of Arbitration | New York | New York | 2014 |
| 6 | Dallah Avco | 9/11- Civil Cases | Respondent Expert Witness | Federal Court | New York | Saudi law | 2015 |
| 7 | Baker Botts | UNOPS | Respondent Expert Witness | International Chamber of Commerce of International Court of Arbitration | Dubai | Saudi law | 2015 |
| 8 | Clifford Chance | Bahrawi vs Henkel | Expert Witness | International Chamber of Commerce of International Court of Arbitration | Paris | France | 2015 |
| 9 | Harney | AHAB vs SIFQO | Respondent Expert Witness | Cayman Island Court | Cayman Island | Saudi law | 2016 |
| 10 | Morrison & Foerster (UK) LLP | SICL vs. SAMBA | Respondent Expert Witness | High Court of Justice | London | Saudi Law | 2019 |
| 11 | White & Case LLP | UAL SA and Hisham A. Al Ansari Trading vs Globe Marine Services Co. | Respondent Expert Witness | High Court of Justice | London | Saudi Law | 2019 |
| 12 | Weatherford Oil Tool Middle East Limited | Expert Witness in Arbitration | Expert Witness | General Court | Bahrain | Saudi Law | 2020 |

# Appendix 2

# EXPERT REPORT OF DR. ADLI A. HAMMAD

## DOCUMENTS CONSIDERED

**Produced Documents**

| | | |
|---|---|---|
| DA000044 | DA000328-412 | DA000598 |
| DA000045-49 | DA000434 | DA000599 |
| DA000050-51 | DA000435 | DA000600 |
| DA000052-77 | DA000436 | DA000601-02 |
| DA000080 | DA000437 | DA000603 |
| DA000081 | DA000438 | DA000604 |
| DA000082 | DA000439 | DA000605 |
| DA000083 | DA000440 | DA000607 |
| DA000085 | DA000441 | DA000608 |
| DA000089-90 | DA000443 | DA000612-13 |
| DA000091 | DA000444 | DA000618 |
| DA000095 | DA000445 | DA000676 |
| DA000096 | DA000446 | DA000679 |
| DA000097 | DA000447 | DA000687 |
| DA000098 | DA000449 | DA000688 |
| DA000099 | DA000453 | DA000799 |
| DA000100-06 | DA000455 | DA000887 |
| DA000107-38 | DA000456 | DA000892 |
| DA000139-44 | DA000457-83 | DA000893 |
| DA000145-48 | DA000484-517 | DA000895 |
| DA000149-73 | DA000526 | DA000899 |
| DA000174-80 | DA000528 | DA000900 |
| DA000181-212 | DA000531 | DA000901-02 |
| DA000213-19 | DA000532 | DA000996 |
| DA000220-24 | DA000533 | DA000997 |
| DA000225-50 | DA000534 | DA001015 |
| DA000251-55 | DA000536-37 | DA001016 |
| DA000256-85 | DA000544 | DA001018-22 |
| DA000292 | DA000548 | DA001030 |
| DA000293 | DA000549 | DA001039 |
| DA000294 | DA000558-59 | DA001046 |
| DA000295 | DA000560-61 | DA001047 |
| DA000296 | DA000562-63 | DA001052 |
| DA000298 | DA000564-65 | DA001053 |
| DA000309 | DA000566-67 | DA001057 |
| DA000310 | DA000568-69 | DA001058-59 |
| DA000312 | DA000570-71 | DA001060 |
| DA000322 | DA000572-73 | DA001061 |
| DA000324 | DA000574-75 | DA001062 |
| DA000326 | DA000576-77 | DA001063 |

DA001068
DA001069
DA001070
DA001073
DA001077-78
DA001079-90
DA001105-06
DA001107
DA001108
DA001110
DA001111
DA001115
DA001118
DA001119
DA001120
DA001121
DA001124
DA001127
DA001132-33
DA001134
DA001223
DA001239
DA001337-41
DA001358-66
DA001367-98
DA001399-408
DA001409-56
DA001457-73
DA001474-86
DA001487-547
DA001548-73
DA001574-602
DA001603-26
DA001627-44
DA001645-50
DA001651-58
DA001659-93
DA001694-730
DA001731-42
DA001743-55
DA001756-828
DA001829-31
DA001832-63
DA001864-89
DA001890-905
DA001906-12

DA001913-22
DA001923-29
DA001930-39
DA001940-43
DA001944-54
DA001955-58
DA001959-63
DA001964-70
DA001971-73
DA001974
DA001975-76
DA001977
DA001978-80
DA001981
DA001982-95
DA001996-98
DA001999-2000
DA002001-03
DA002004-57
DA002058-74
DA002075
DA002076-84
DA002085
DA002086
DA002087
DA002088
DA002089
DA002090-92
DA002093-110
DA002111-14
DA002115-18
DA002119-21
DA002122-35
DA002136-41
DA002142-46
DA002147-49
DA002150-53
DA002154-55
DA002156
DA002157-59
DA002160-68
DA002169-75
DA002176-86
DA002187-91
DA002192-203
DA002204-20

DA002221-47
DA002248-53
DA002261-69
DA002270-73
DA002274
DA002275
DA002276
DA002277
DA002278
DA002279
DA002280
DA002281-82
DA002283
DA002284
DA002289
DA002309-10
DA002311-16
DA002317-19
DA002317
DA002318
DA002327
DA002328
DA002329
DA002330
DA002331
DA002332
DA002333-682
DA002683-3045
DA003546-547
DA007970-97
DA008372-436
DA008581-698
DA009120-224
DA009225-532
DA010841
DA010908
DA010915
DA001105-06

EO14040-000249-57
EO14040-000938-41

FED-PEC0276052-54
FED-PEC0276327-56

| | | |
|---|---|---|
| KSA0000000629 | KSA0000000942 | KSA0000004515 |
| KSA0000000704 | KSA0000001028 | KSA0000006631 |
| KSA0000000724 | KSA0000001030 | |
| KSA0000000725 | KSA0000001031 | PEC-KSA000404-34 |
| KSA0000000726 | KSA0000001842-2328 | PEC-KSA000441-43 |
| KSA0000000882 | KSA0000002870-3381 | |
| KSA0000000879 | KSA0000003599 | PEC-KSA1-000007-16 |
| KSA0000000889 | KSA0000003933 | PEC-KSA1-000031 |
| KSA0000000894 | KSA0000004335 | PEC-KSA1-000044-47, 61 |
| KSA0000000895 | KSA0000004409 | PEC-KSA1-000075-76, |
| KSA0000000901-02 | KSA0000004466 | 79-83 |
| KSA0000000903-08 | KSA0000004500 | |
| KSA0000000936-37 | KSA0000004501 | |

**Deposition Transcripts**

Jaber Khalifa (Sept. 17, 2018)
Riaz M. Khan (Jan. 23, 2019)
Ammar H. Kamel (Jan. 24, 2019)
Abdul Aziz Abdul Kareem Al Angari (Jan. 13-14, 2021) (as redacted by the FBI)
Omar Al Bayoumi (June 9-11, 2021) (as redacted by the FBI)
Samuel Coombs (June 22, 2021) (as redacted by the FBI)

**Other Discovery Materials and Transcripts**

Declaration of Abdullah Yamani (May 22, 2016)
Declaration of Samuel Coombs (Jan. 25, 2021)
Kamel Dep. Ex. 127 – Summary of Alawi Kamel knowledge
Kamel Dep. Ex. 129 – Summary of Ahmed Niazi knowledge
Angari Dep. Ex. 396 – Article 28 of the Implementing Regulation for the Civil Service Law
Hearing transcript on Saudi Arabia's motion to dismiss (July 30, 2015)

**Saudi Legal Authorities**

Dr. Yousef Abdulmajeed, *Explanation of Labor and Workman Law in Saudi Arabia* (4th ed. 1997).

Appointed Wage Workers Regulation, Resolution by the Civil Service Council No. 141 dated 27/05/1399H (corresponding to 24/04/1977G) and effective on 07/01/1399H (corresponding to 27/05/1977G).

Dr. Munair Aldakmi, *Explanation of the Comparative Labor and Workman Law* (2002).

"The Basic Law," Royal Decree A/90, 27/08/1412H (corresponding to 01/03/1992G).

"Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G).

"Civil Aviation Law," Royal Decree No. M/44, 18 Rajab 1426H (corresponding to 23/08/2005G).

Council of Ministers Decision No. 50 of 1994.

Dr. Munieer Fareed Al Dukmi, *The New Labor Law in Light of the Islamic Jurisprudence (Fiqih)* (2012).

Eighth Development Plan issued by Ministry of Economy and Planning, Ch. 6, The Private Sector.

"The Employee Assignment Regulation," Council of Civil Service, Decision No. D/3/17752, 20/07/1391H (corresponding to 09/09/1971G).

"The Employee Scholarship Regulation," Council of Civil Service, Decision No. D/3/17752, 20/07/1391H (corresponding to 09/09/1971G).

Fifth Development Plan issued by Ministry of Economy and Planning, Ch. 6, Labor Market.

First Development Plan issued by the Ministry of Economy and Planning, Ch. 4, Manpower Resources and Development.

"The Implementing Regulation of the Civil Service Law," Council of Ministers Decision No. 951 dated 27/06/1397H (corresponding to 14/06/1977G), amended by the Civil Service Council Resolution No. 1/198 dated 12/06/1410H (corresponding to 09/01/1990G); Civil Service Council Resolution No. 742 dated 03/09/1403H (corresponding to 14/06/1983G).

"The Implementing Regulation for Human Resources in the Civil Service," Council of Ministers Decision No. 1550, 09/06/1440H (corresponding to 14/02/2019G).

Dr. Hassan Keira, *The Principles of Labor Law – Employment Contract* (3d ed. 1979).

"Labor and Workmen Law," Royal Decree No. M/21 dated 06/09/1389H, effective on 19/09/1389H (corresponding to 28/11/1969G).

Labor Law (Official English language copy issued by the Saudi Bureau of Experts, Official Translation Department, at the Council of Ministries Portal).

Alison Lerrik and Q Javed Mian, *Saudi Business and Labor Law – Its Interpretation and Application* (2d ed. 1987).

Ministry of Human Resources and Social Development, Reduction of Cost Discrepancy Between Saudi Labor[er]s & Expatriates, https://hrsd.gov.sa/en/initiatives/reduction-cost-discrepancy-between-saudi-labors-expatriates (updated 25/07/2017G).

Ministry of Labor, *Guidebook for Expatriates Recruited for Work in the Kingdom of Saudi Arabia* (2d ed. 2006).

Dr. Al Sayied Eid Naiel, *Al-Waseet – Explanation to the Labor Law and Social Insurance in the Kingdom of Saudi Arabia* (1415H).

"Regulation for the Employment of Non-Saudis in the Public Sector," Resolution of the Civil Servant Council No. 45 dated 01/08/1398H (corresponding to 06/07/1978G).

Royal Decree No. 44 dated 18/07/1356H (corresponding to 22/09/1937G).

Royal Decree No. 5323 dated 13/04/1360H (corresponding to 09/05/1941G).

Royal Decree No. M/24 dated 12/05/1434H (corresponding to 24/03/2013G).

Royal Decree No. M/46 dated 05/06/1436H (corresponding to 25/05/2015G).

Royal Decree No. M/51 dated 23/08/1426H (corresponding to 2005G).

Second Development Plan issued by Ministry of Economy and Planning, Ch. 5, Human Resource Development.

Sixth Development Plan issued by Ministry of Economy and Planning, Ch. 6.

"Social Insurance Law," Council of Ministers Decision No. 199 dated 17/08/1421H (corresponding to 13/11/2000G), Royal Decree No. M/33 dated 03/09/1421H (corresponding to 29/11/2000G).

Supreme Commission for Labor Settlement Disputes, Resolution No. 1201, dated 03/08/1424H (corresponding to 09/05/2003G).

Abdullah Bin Rashed Al Sunaidi, *Is the Relationship Between a Governmental Employee and His Employer Contractual or Statutory?*, Al-Jazira, 26/05/2011.

Dr. Hasan Al-Thannon, *Al-Mabsoot in Civil liability: Liability for the Acts of Others* (1st ed. 2006).

Third Development Plan issued by Ministry of Economy and Planning, Ch. 3, The Strategy for the Third Plan.

Dr. Mustafa Al-Zarqa, *The Responsibility of the Superior Over His Subordinates* – Islamic Fiqh Academy Journal 151 (2005).