# Exhibit 2

Highly Confidential- Subject to Futher Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST        )
ATTACKS ON SEPTEMBER    )  03-MDL-1570
11, 2001                )  (GBD)(SN)
_____  )


THURSDAY, JANUARY 24, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped 30(b)(6) deposition of
Ammar H. Kamel, held at the offices of DLA
Piper Spain, Paseo de la Castellana, 35 -2º
28046, Madrid, Spain, commencing at 9:32
a.m., on the above date, before Carrie A
Campbell, Registered Diplomate Reporter,
Certified Realtime Reporter, Illinois,
California & Texas Certified Shorthand
Reporter, Missouri & Kansas Certified Court
Reporter

- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

Highly Confidential- Subject to Futher Confidentiality Review

Page 22

1   A.   -- yes, this is my
2   understanding.
3   Q.   Yes?
4   A.   Uh-huh.
5   Q.   And was -- based on the
6   investigation that you performed to prepare
7   for your testimony today, was Mr. Bayoumi
8   seconded from the PCA to work on the ANSS
9   project?
10   A.   The documents clearly says
11   that, yes.
12   Q.   And before his secondment, was
13   Mr. Bayoumi an employee of the PCA?
14   A.   The documents show that he, on
15   his own statement, in his application to US
16   international university, he was saying --
17   which was at 1960 -- '96, he said that he was
18   an employee with the PCA since 1977, and he
19   progressed in a couple of positions until the
20   '80s.
21        And then my understanding from
22   another document, that he was at that -- in
23   the States in '94 doing some studies.  And
24   when he send this application, he was just
25   applying to another university.  So he's

Page 23

1   stating that he was an employee of the PCA
2   since 1977.
3   Q.   So he was an employee of the
4   PCA since 1977, you said?
5   A.   This is what the application
6   that he filled says.
7   Q.   And the PCA is the Kingdom of
8   Saudi Arabia's Presidency of Civil Aviation?
9   A.   Yes.
10   Q.   So it's a part of the Kingdom
11   of Saudi Arabia, the government, right?
12   A.   I cannot say legally what -- I
13   really don't know, but it is an entity that
14   is related to -- I mean, it's not a private
15   company.
16   Q.   It's a governmental entity?
17   A.   Yeah.  But how the legalities
18   of that, I do not know.
19   Q.   And during -- based on your
20   investigation, during his secondment, did
21   Mr. Bayoumi become a Dallah Avco employee?
22   MR. KRY:  Objection.
23   THE WITNESS:  All the
24   employees, if you read the contract,
25   it's -- they're with the team of the

Page 24

1   PCA for the ANS -- I will call it the
2   ANS.  I won't call it the ANSS, all
3   right?  I have difficulty saying the
4   second S.  So if I say ANS, it's the
5   ANSS.
6        So the scope of work says that
7   the person that joins for the ANS
8   project, they become one team, and
9   this is the team for PCA.  And they
10   work on -- under the guidance and
11   control of PCA.  So at all times
12   they're PCA subordinates, although to
13   facilitate and to do our part of the
14   contract, you will find the
15   letterheads and the paperwork, which
16   is my main responsibility as well as
17   the recruitment, it will hold Dallah's
18   name.
19        But there are plenty of
20   documents that says those people work
21   under the control of PCA.  PCA says
22   what are their positions.  PCA says
23   the job descriptions, their salaries,
24   who gets to leave, when do they leave,
25   who gets -- whatever administrative

Page 25

1   employee thinks -- how it comes from
2   the PCA.  So we only do administrative
3   work and paperwork on that.
4   QUESTIONS BY MR. HAEFELE:
5   Q.   So is there any context in
6   which --
7   A.   Is there any what?
8   Q.   Is there any context in which
9   Mr. Bayoumi was an employee of Dallah Avco?
10   MR. KRY:  Objection to form,
11   and also it's an ambiguous question.
12   QUESTIONS BY MR. HAEFELE:
13   Q.   Is there any way in which
14   Mr. Bayoumi would be considered an employee
15   of Dallah Avco?
16   MR. KRY:  Same objection.
17   THE WITNESS:  He came to -- he
18   was a PCA employee.  They instructed
19   us to second him under the project,
20   and that's -- so he was alongside with
21   all the other 1,400 people of the
22   project.
23        So he's always an ANS employee
24   under the contract which Dallah was
25   handling, and those people had a

Highly Confidential- Subject to Futher Confidentiality Review

Page 38

1    something -- something like that.  What is
2    it?  What's that, an inch?
3              MR. NITZ:  Probably a 3- or
4        4-inch binder.
5              THE WITNESS:  Okay.  3-inch?
6        4-inch?
7              MR. NITZ:  3 or 4.
8    QUESTIONS BY MR. HAEFELE:
9        Q.    All right.  So two 3- or 4-inch
10   binders?
11       A.    Yeah.
12       Q.    Two binders that are 3 or 4
13   inches long?
14       A.    And one small one.
15       Q.    All right.  Other than those
16   binders that you reviewed over the past two
17   or three days, did you review any other
18   information that is the basis of any
19   information you're here to testify about?
20       A.    No.
21       Q.    Did you ask to have access to
22   any information that you were unable to --
23   for some reason to access?
24       A.    No.
25       Q.    Do you feel that you've been

Page 39

1    given adequate access to sufficient
2    information to prepare yourself for the
3    deposition?
4        A.    I've given access to all these
5    documents.  I can't define what sufficient
6    means when you say "sufficient," but I think
7    it clearly shows content that is -- that
8    we're asking about or talking about.
9              So I can't say if there's
10   something out of that that is sufficient.  I
11   mean, I can't -- I see enough information in
12   regards of the person we're talking about,
13   but other than that, I don't -- I didn't feel
14   that there's something for me that is needed
15   or sufficient that was not there.
16       Q.    Based on your investigation,
17   what is the relationship that existed between
18   Omar Al-Bayoumi and Dallah Avco?
19       A.    Well, based on the -- what I've
20   told you and the doc -- which is all coming
21   from the documents, it's clear from the
22   documents that Omar Al-Bayoumi was an
23   employee with PCA since 1977, progressing
24   through a couple of positions, I mean, like a
25   regular guy would do.

Page 40

1              And at some point of time in
2    '94 he was in the States.  The documents
3    doesn't say why he went there, but first
4    document that appears is that coming from PCA
5    to Avco Overseas saying to pay his education
6    fees and invoice it to the ANS 3.
7              After that documents show that
8    he will come to the ANS -- I'm not sure which
9    number, is it -- was it 4 or 3, but -- and
10   the secondment through the employment that
11   Dallah was providing to the project, and then
12   he lasted there for, I think, 2000.
13             And in 2000 when he exceeded
14   the number of allowed secondments that were
15   allowed by their policies, we see
16   instructions telling us to keep his hire but
17   enter a status of education leave for two
18   years.  Afterwards, when it ended, he was
19   terminated.  And from my understanding, he
20   remained with PCA even afterwards.
21             So this is the Omar Bayoumi
22   history that I am aware of.
23       Q.    What's the difference between
24   ANSS 1, 2, 3, 4, et cetera?
25       A.    It's just the periods.  I mean,

Page 41

1    it's contract with -- on the three years
2    period.  So when Dallah start doing this --
3    from my understanding, it was already ongoing
4    before work to Dallah.  I'm not sure how many
5    years.
6              But when Dallah was awarded it
7    in -- sometime in the '80s, so -- and it
8    continued until 2005, and it was renewed --
9    not renewed.  It was awarded, let's say,
10   attended and awarded every three years.  And
11   after each three years, some companies, as
12   well as Dallah, will bid again and some
13   will -- in our case, Dallah got awarded.  And
14   at the end of each project, the project will
15   be closed and hand over.  And we again -- so
16   it's like a new project.
17             So -- so -- and they call it 1,
18   2, 3, 4, 5.  This is my understanding.
19             (Kamel Exhibit 106 marked for
20        identification.)
21   QUESTIONS BY MR. HAEFELE:
22       Q.    So I'm showing you a document
23   that's been labeled for purposes of this
24   deposition as Kamel 106.  This is a document
25   that was e-mailed to us by your -- Mr. Kry

11 (Pages 38 to 41)

Highly Confidential- Subject to Futher Confidentiality Review

Page 46

1    Underneath that is Dallah Trans Arabia?
2        A.   No.  Dallah Trans Arabia used
3    to be Dallah Avco.  In the '70s, there was a
4    joint venture or partnership between
5    Dallah -- it wasn't called Dallah Al
6    Baraka -- Dallah, and Prince Ahmed bin Hamman
7    {phonetic} and Avco.  So that created Dallah
8    Avco.
9        Q.   So what you are the executive
10   director now is --
11       A.   Of course.
12       Q.   The entity you are now the
13   executive director of is what formerly was
14   Dallah Avco?
15       A.   Exactly.
16       Q.   And you have also -- during
17   this same time period, generally since
18   September 2007 to the present, you have been
19   president -- system president of Dallah Al
20   Baraka?
21       A.   Yes.
22       Q.   During the time period that
23   Mr. Bayoumi was seconded to work on the ANSS
24   project, where were you in employment --
25       A.   And he was seconded since,

Page 47

1    what, '95 until 2002?  From '95 until 2000 I
2    was in Halawani Brothers, which also is a
3    company -- is a food processing company,
4    which Dallah Baraka at that point of time had
5    the share of 81 percent.  Now it's a public
6    company.
7        Q.   Is it fair to say that during
8    that time period you were general manager at
9    Halawani Brothers and then assistant to
10   chairman of the board at Al-Jazira Holding
11   Company?
12       A.   No, I was -- I became the
13   general manager of Halawani in '97.  So
14   before that, in '95, I was assistant general
15   manager.
16            End of 1999, I left Halawani
17   and went back to the group, and I stayed
18   there -- I mean, different positions, as it
19   shows here, and I had the position at general
20   manager of -- it was general manager --
21       Q.   Let me interrupt you just to
22   clarify something.
23            You were not at Dallah Avco at
24   all during the time period that Mr. Bayoumi
25   was seconded, right?

Page 48

1        A.   Correct.
2        Q.   What is the business, or what
3    was the business, of Dallah Avco during the
4    time period that Mr. Bayoumi was seconded to
5    Dallah Avco?
6            MR. KRY:  Objection.  Beyond
7    the scope, I think.
8            THE WITNESS:  I don't know.  I
9    wasn't there.  But from my
10   understanding now, that one of the
11   things that they were doing is the ANS
12   project.  I'm sure that maybe they
13   were doing -- my general knowledge of
14   this, that they were doing operation
15   and maintenance.  But that's it, it's
16   just general information.
17   QUESTIONS BY MR. HAEFELE:
18       Q.   What was Dallah Avco's business
19   with regard to the ANSS project?
20       A.   As stated in the contract,
21   they -- their -- the contract -- they provide
22   ground services, this is what the contract
23   says, and they recruit personnel for the
24   project, depending on criterias and job
25   descriptions that are coming from the PCA,

Page 49

1    and they carry on the logistics of getting
2    those people.
3            And then they -- after that,
4    they process the paperwork and play a role,
5    let's say, of a paymaster.  They make sure
6    that the -- the employees are being paid,
7    take care of the paperwork of leaves,
8    vacations, loans, whatever things of that
9    nature.
10            So this is the purpose of that.
11       Q.   I want to break that down.  I
12   want to make sure I got everything.
13       A.   Okay.
14       Q.   One of the -- I think you
15   indicated that Dallah Avco, under the ANSS
16   contract, provided operation and maintenance?
17       A.   Not --
18            MR. KRY:  Misstates testimony.
19            THE WITNESS:  Not --
20   QUESTIONS BY MR. HAEFELE:
21       Q.   I'm asking.  I'm asking it for
22   correction.
23       A.   I'll rephrase it.
24            I think they do three main
25   things: First of all, the finance,

13  (Pages 46 to 49)

Highly Confidential- Subject to Futher Confidentiality Review

Page 50

1   because -- not -- this comes -- last thing,
2   they do the recruitment.  I mean, the PCA
3   needed specialized personnel, so we -- Dallah
4   Avco will do the recruitment of those people
5   based on criteria that is given them from the
6   PCA.
7            The PCA will have the final
8   say, acceptance or no.  Then those people,
9   some of them will be local, some of them will
10  be foreigners.  You will process the
11  logistical part of bringing the foreigners
12  and where will they house or stuff like that,
13  and then you proceed with the paperwork for
14  these employees.
15           So this is the main three
16  categories that Dallah Avco was doing.
17       Q.   All right.  So the three things
18  are finance, recruitment and paperwork?
19       A.   Yes.
20           And the contract says that all
21  the personnel that are furnished in the scope
22  of contract, all the personnel that are
23  furnished by the contractor, which is Dallah
24  Avco, work under the guidance and control of
25  the PCA.  It says that explicitly, and it

Page 51

1   says the -- for one team, which is the team
2   of the project of the PCA, and work with
3   those people.
4            And it even goes to the extent
5   that says that Dallah's project people, who
6   are taking project -- care of the project
7   from Dallah's side, cannot go visit the sites
8   until scheduled and given approvals to visit
9   those sites.
10           And it says that those people
11  are working with air navigation systems and
12  equipment, and these things are confidential,
13  and Dallah should not try to get any
14  information or anything.
15           I mean, once the employee is
16  given to the project -- and even there's a
17  letter stating that -- we are not supposed to
18  communicate with them.  There's a letter
19  coming from the director of the engineering
20  to the chairman of Dallah Avco, Abdullah
21  Kamel, says that all of Dallah's people who
22  are original Dallah people should not
23  communicate, and no circulations of, you
24  know, papers or anything, and absolutely have
25  no communication with PCA personnel except

Page 52

1   through the engineering department.
2            So there's letter of that
3   saying it explicitly.
4        Q.   And have you seen that letter
5   in the documents that --
6        A.   Yes, I have.
7        Q.   -- that you looked at?
8        A.   Yes.
9            MR. HAEFELE:  Has that been
10  produced?
11           MR. KRY:  We can.  We'll have
12  to check with the witness which one,
13  but we can do that at the break.
14           MR. HAEFELE:  Thank you.
15  QUESTIONS BY MR. HAEFELE:
16       Q.   The contract that Dallah had
17  with the PCA -- first off, the contract
18  you're talking about is a contract with the
19  PCA, correct?
20       A.   Yes.
21       Q.   Between Dallah and the PCA?
22       A.   Yes.
23       Q.   Or Dallah Avco and the PCA?
24       A.   Yes.
25       Q.   And the performance of that

Page 53

1   contract, was it for tasks to be done in the
2   Kingdom of Saudi Arabia?
3        A.   You'd understand that, yes, but
4   it doesn't -- it doesn't limit that to this.
5   It says anything that is requested as to work
6   with the sites of the project, but then I
7   think there are parts to do with training
8   because there is a letter coming from -- how
9   do you call alhukumii {phonetic}?  What is
10  alhukumii?
11           MR. HASHIM:  The government
12  control department.
13           THE WITNESS:  This is a very
14  high-ranking office which controls all
15  the spending of the government, so
16  there's a letter coming from this
17  government control.  It's like an
18  auditor, I think --
19           MR. HASHIM:  Yeah, auditor.
20           THE WITNESS:  Auditor, yeah?
21           -- auditor who audits
22  ministries and send to the PCA talking
23  about some students -- it says
24  students -- that were supposed to get
25  some training and that the project,

14 (Pages 50 to 53)

Highly Confidential- Subject to Futher Confidentiality Review

Page 58

```
 1        A.    Yes.  Yeah, of course.
 2        Q.    And you had indicated that one
 3   of the other aspects of the ANSS contract
 4   with Dallah Avco, or the contract for the
 5   ANSS project, was to perform recruitment,
 6   right?
 7        A.    It's a major part.
 8        Q.    Pardon me?
 9        A.    It's a major part, yes.
10        Q.    It is a major part.
11              And how would Dallah Avco go
12   about recruiting individuals, personnel, for
13   the ANSS project?
14        A.    It's -- it states in the
15   contract -- I mean, there's a part where it
16   states recruitment plan, and it states -- it
17   has four categories, and it states that you
18   will take the specifications or the criteria
19   or the job descriptions of people who need to
20   be recruited, and you go to recruitment --
21   and go over to recruit them.  I mean, this is
22   what it says.
23              But in the last one also it
24   says process urgent requests.  So sometimes
25   the requests will be coming from the PCA
```

Page 59

```
 1   maybe on a time basis urgency or maybe on a
 2   specific need urgency.  So it clearly states
 3   that some of the recruitment will be urgently
 4   requested and need to be attended.
 5        Q.    During the period that
 6   Mr. Bayoumi was seconded to the ANSS project,
 7   what was Dallah Avco's revenue under the ANSS
 8   project?
 9        MR. KRY:  Objection.  Beyond
10   scope.
11        THE WITNESS:  I don't know.  I
12   have no idea.
13   QUESTIONS BY MR. HAEFELE:
14        Q.    Was it a significant amount or
15   insignificant amount?  Was it large?
16        MR. KRY:  Same objection, and
17   also objection to form.
18        THE WITNESS:  I really don't
19   know.
20   QUESTIONS BY MR. HAEFELE:
21        Q.    During the period that
22   Mr. Bayoumi was seconded to the ANSS project,
23   how many people worked for Dallah Avco?
24        MR. KRY:  Objection.  Beyond
25   scope.
```

Page 60

```
 1        THE WITNESS:  I don't know.  I
 2   don't know.
 3   QUESTIONS BY MR. HAEFELE:
 4        Q.    How many people worked on the
 5   ANSS project?
 6        A.    I understand 1,400.
 7        Q.    And is that 1,400 throughout
 8   the whole time or 1,400 at any given time?
 9        A.    I don't know if that was each
10   period or this was the overall.  My
11   understanding that it was at any given time,
12   but I might be wrong.
13        Q.    And of those 1,400, how many
14   Dallah Avco -- or strike that.
15              Of those 1,400, how many of the
16   ANSS personnel worked in the United States?
17        A.    I don't know.
18        Q.    Were there any?
19        A.    I'm not aware of anybody -- in
20   the documents, I don't know of anybody
21   working in the States except Bayoumi.
22        Q.    All right.  So as far as you
23   know, from the information you have based on
24   your investigation, Mr. Bayoumi was the only
25   ANSS personnel who was working from the
```

Page 61

```
 1   United States?
 2        A.    This is the information in
 3   documents, yes.
 4        Q.    Within Dallah Avco, do you
 5   understand or can you tell me what the
 6   meaning of the word "department" is?
 7        MR. KRY:  Objection to form.
 8        THE WITNESS:  Department?
 9   QUESTIONS BY MR. HAEFELE:
10        Q.    Yeah.  If I'm looking at one of
11   the Dallah Avco forms, and I see the term
12   "department" --
13        MR. KRY:  Objection to form.
14   Sorry.
15              Maybe it'd be helpful to tell
16   him which document you're looking at.
17        MR. HAEFELE:  It's throughout
18   the documents there's the term.
19   QUESTIONS BY MR. HAEFELE:
20        Q.    Is there a term -- is there use
21   of the term "department" within Dallah Avco?
22        A.    In general, I mean, it's an
23   organizational unit which will be taking care
24   of -- you have finance department, you have a
25   engineering department, you have IT
```

16 (Pages 58 to 61)

Highly Confidential- Subject to Futher Confidentiality Review

Page 86

1    Wednesday.
2        Q.    I sort of got that.
3        A.    Okay.  Just to be clear.
4        Q.    Thank you.  All right.
5            When we left off, we were
6    talking about the position that had been
7    assigned to Mr. -- or the title that had been
8    assigned to Mr. Bayoumi of a senior data
9    processing technician.  And I believe that
10   you had said, though, there is some job
11   description that applied to that position for
12   the ANSS project.
13           It didn't matter to Dallah Avco
14   whether or not Mr. Bayoumi met the
15   qualifications for that job description,
16   right?
17           MR. SHEN:  Objection to form.
18           THE WITNESS:  I don't think
19   that it is Dallah's Avco to check that
20   the title will match the job
21   description.  Maybe it's our role to
22   check that this guy job description --
23   the job description fits this guy.
24   But are both of these matching
25   allegedly the title, I don't think

Page 87

1    it's our job.
2        So if they say this job title
3    is equal to this job description,
4    well, it might logically be, yes,
5    equal to it, or, no, it's not our job
6    to check this thing, which, of
7    course -- I mean, what we're relying
8    on is the job description, not the job
9    title.
10   QUESTIONS BY MR. HAEFELE:
11       Q.    Ordinarily when you --
12       A.    However, for Mr. Bayoumi, this
13   does not apply at all.
14       Q.    But ordinarily you would look
15   to the job description that the PCA gave you
16   to determine whether or not potential
17   recruits had the qualifications to meet the
18   job description, wouldn't you?
19       A.    Of course.
20       Q.    But that didn't apply in the
21   case of Mr. Bayoumi?
22       A.    It didn't apply from the
23   context that he was assigned to the project
24   on the direct request of the PCA.  So he was
25   not under the normal recruitment procedures

Page 88

1    that would normally take place throughout
2    Dallah Avco employees who are assigned to do
3    the recruitment.
4        Q.    Why is that?
5            MR. KRY:  Objection.  Lack of
6    foundation.
7            THE WITNESS:  What do you mean
8    "why is that?"
9    QUESTIONS BY MR. HAEFELE:
10       Q.    Well, you said it didn't apply
11   from the context that he was assigned to the
12   project on the direct request of the PCA, so
13   he was not under the normal recruitment
14   procedures that would normally take place
15   throughout Dallah Avco employees.
16           Why is it that he didn't fall
17   under the normal recruitment procedures?
18           MR. KRY:  Objection.  Lack of
19   foundation.
20           THE WITNESS:  He proceed to the
21   final stage of hiring.  You won't -- I
22   mean, you have a letter, formal
23   letter, with the guy's name, with the
24   position, with the salary, and it says
25   hire this guy.  So that's it.

Page 89

1            So you don't go through
2    checking -- you will put on record
3    whatever paperwork he has, but you
4    won't go and check and see candidates
5    and assess which candidate is better
6    and whatever normal recruitment
7    procedure -- this is what I mean --
8    and test them on it and check whatever
9    that thing is to make sure that they
10   really do -- what they say is true or
11   something like that.
12           So he'll go to the hiring, to
13   the final stage.  He's been hired.
14   You only plug his information and put
15   him on your system.
16   QUESTIONS BY MR. HAEFELE:
17       Q.    So in the normal circumstances,
18   Dallah Avco would look to see whether a
19   recruit candidate met the job description
20   that PCA provided, correct?
21       A.    Logically, yes.
22       Q.    And --
23       A.    I can't say that they did it or
24   no, but logically, yes.
25       Q.    And in Mr. Bayoumi's

23 (Pages 86 to 89)

Highly Confidential- Subject to Futher Confidentiality Review

Page 90

1    circumstance, Dallah Avco -- I'll put quotes
2    around "recruited Mr. Bayoumi." Well, he --
3    Dallah Avco assigned Mr. Bayoumi a title
4    within the ANSS project because the Kingdom
5    of Saudi Arabia, the PCA, directed them to do
6    so?
7         A.    The PCA send a letter asking or
8    requesting or instructing Dallah Avco to
9    assign this person this position starting at
10   this date with this salary.
11        Q.    And Mr. Bayoumi, throughout his
12   secondment, had positions other than senior
13   data processing technician, correct?
14        A.    Correct.
15        Q.    And he held the position of
16   PCA/AE budget coordinator at one point.
17            Do you remember that?
18        A.    I could remember that, yeah.
19        Q.    And he held a position of
20   senior DSS programmer at one point, correct?
21        A.    Yes.
22        Q.    And he held a position of
23   assistant configuration specialist, or at
24   least the title he was assigned at some
25   point?

Page 91

1         A.    Yes.  Yes.
2         Q.    And he was assigned the title
3    of a senior contract specialist at some
4    point, correct?
5         A.    Correct.
6         Q.    Now, are they each similar to
7    what you said about the senior data
8    processing technician?
9             Are they each circumstances
10   where the PCA directed Dallah Avco to assign
11   Mr. Bayoumi those titles?
12        A.    Yes.
13        Q.    And so for each of those, it
14   didn't matter so much for Mr. Bayoumi's
15   purposes for -- or in the instance of
16   Mr. Bayoumi, it didn't matter whether
17   Mr. Bayoumi met the job qualifications for
18   those positions; it just mattered that the
19   PCA said give this guy this title?
20        A.    The instruction was there --
21        MR. SHEN: Objection to form.
22        THE WITNESS:  -- and Dallah
23   Avco complied with this instruction,
24   yes.
25

Page 92

1    QUESTIONS BY MR. HAEFELE:
2         Q.    So Dallah Avco was instructed
3    by the PCA to assign Mr. Bayoumi a given
4    title, and Dallah Avco complied?
5         A.    Correct.
6         Q.    Do you have an understanding
7    from your investigation as to why Mr. Bayoumi
8    was treated differently?
9         MR. KRY:  Objection.
10        THE WITNESS:  We -- we can't --
11   I haven't seen any documents that I
12   could compare that he was treated
13   differently.  I don't have anything to
14   show any comparison with anybody else.
15   QUESTIONS BY MR. HAEFELE:
16        Q.    Well, you yourself have
17   testified that the ordinary process was that
18   Dallah Avco would go out and make -- and
19   recruit people for a position.
20            In this instance Dallah Avco
21   was told this is the person that's going to
22   be given this title.
23        A.    This is the --
24        Q.    Do you know why that was -- do
25   you know why that circumstance was -- was

Page 93

1    so -- that it was different from the normal
2    process?
3         A.    It's --
4         MR. SHEN:  Objection to form.
5    Misstates the witness' testimony.
6         MR. KRY:  Objection.
7         THE WITNESS:  It's not
8    different in particular.  Like I told
9    you, the contract allowed explicitly
10   for -- in the recruiting man clause to
11   process urgent requests.  So the
12   contract would say this is not
13   different.  This is a normal
14   procedure.
15            If it were 100 percent came on
16   request, it would be normal.  If
17   100 percent would come through the
18   recruitment, this is what I meant
19   normal.
20            Most of them -- I can't say
21   that most of them, but the normal
22   recruitment procedure that everyone
23   understand is you go and look for
24   candidates.  But within the context
25   and the wording of the contract,

Highly Confidential- Subject to Futher Confidentiality Review

Page 98

1    QUESTIONS BY MR. HAEFELE:
2        Q.   I'm not asking you about that.
3    I'm asking whether or not there was an
4    awareness that there's a job description and
5    that there's no possible way that Mr. Bayoumi
6    could perform any part of the job description
7    while located in the United States.
8            MR. KRY:  Objection to form.
9            MR. SHEN:  Objection to form.
10           MR. KRY:  Objection.  Calls for
11       speculation.  Also, that's a compound
12       and very confusing question.
13           MR. SHEN:  I'm not even sure
14       what the question is.
15   QUESTIONS BY MR. HAEFELE:
16       Q.   Is there any part of this job
17   description that Mr. Bayoumi could have
18   performed from the United States?
19           MR. KRY:  Objection.  Calls for
20       speculation.  Lack of foundation.
21   QUESTIONS BY MR. HAEFELE:
22       Q.   You can answer.
23       A.   If you look at the job
24   description, I -- looking at the job
25   description as a piece of paper, maybe you

Page 99

1    would get to that conclusion.  But did -- was
2    it Dallah's Avco role or responsibility at
3    any time to check each employee against his
4    job description, I don't think so.
5            And we were aware, to our
6    knowledge, that he's continuing his studies.
7    This is what PCA explicitly said that -- as a
8    reason of his being in the United States.
9            And even in his job offer,
10   which is part of the process and procedure of
11   hiring him, the employee should sign the job
12   offer as acceptance.  And you have
13   handwriting of Alp Karli saying that this guy
14   is in the United States, so we will be
15   signing on his behalf.
16           So this will -- this is the end
17   of the process from our side.
18       Q.   I had referenced a series of
19   jobs that Mr. Bayoumi had.
20           Did Mr. Bayoumi perform any of
21   the tasks of any of the jobs?
22           MR. KRY:  Objection.  Lack of
23       foundation.
24           THE WITNESS:  We don't know.
25

Page 100

1    QUESTIONS BY MR. HAEFELE:
2        Q.   Was it Dallah Avco's
3    understanding that the purpose of Mr. Bayoumi
4    being in the United States was for studies?
5        A.   This is what we have in the
6    documents, yes.
7        Q.   And so for the duration of the
8    time that he was in the United States, the
9    purpose that he was in the United States was
10   to perform or to engage in studies?
11       A.   This is what PCA document says.
12       Q.   And if the PCA document says
13   that the purpose of him being in the United
14   States was for studies --
15           And he was in the United States
16   for his studies for the duration of the time
17   he was seconded, correct?
18       A.   Correct.
19       Q.   -- why was he given job titles
20   for jobs that he was in the United States for
21   the time period he was given those job
22   titles?
23           MR. KRY:  Objection.  Lack of
24       foundation and calls for speculation.
25           THE WITNESS:  Ask the PCA.

Page 101

1    QUESTIONS BY MR. HAEFELE:
2        Q.   Who at the PCA would have that
3    information?
4            MR. KRY:  Objection.
5            THE WITNESS:  Excuse me?
6    QUESTIONS BY MR. HAEFELE:
7        Q.   Who at the PCA would have that
8    information?
9            MR. KRY:  Objection.  Lack of
10       foundation.
11           THE WITNESS:  I don't know.
12   QUESTIONS BY MR. HAEFELE:
13       Q.   Why were his job titles changed
14   throughout the time period he was seconded in
15   the various extensions if the only thing he
16   was doing was his studies?
17           MR. KRY:  Objection.  Lack of
18       foundation.
19           MR. SHEN:  Objection to the
20       form.
21           THE WITNESS:  Also ask the PCA.
22   QUESTIONS BY MR. HAEFELE:
23       Q.   All right.  But just to
24   clarify, the role that he had throughout the
25   time period he was seconded was as a student

26 (Pages 98 to 101)

Highly Confidential- Subject to Futher Confidentiality Review

Page 102

1    in the US?
2         A.    The role?  What do you mean by
3    "role"?
4         Q.    Well, the task that he
5    performed was as a student, correct?
6         A.    The documents of the PCA
7    indicates that he was continuing his studies,
8    of course.  This is what -- this is the
9    knowledge that we have on documents.
10        Q.    During the break, next break,
11   can you identify what documents you're
12   relying upon for that information?
13        A.    Of course.
14        Q.    In the records there are a
15   series of timesheets.
16              Have you seen timesheets for
17   Mr. Bayoumi?
18        A.    I have.
19        Q.    All right.  And those
20   timesheets bear the logo of Dallah Avco on
21   them, right?
22              MR. KRY:  Objection.
23   Misstatement and it's compound because
24   there's many different timesheets.
25              THE WITNESS:  I need to check

Page 103

1         the documents, but I've seen documents
2    that were coming from PCA -- this is
3    what I remember -- regarding
4    Mr. Bayoumi.  I don't remember they
5    were under Dallah's letterhead.
6              I've seen letters in Dallah's
7    letterhead of the hiring and the
8    changing of position, but I don't
9    remember the timesheets were Dallah's
10   papers.
11   QUESTIONS BY MR. HAEFELE:
12        Q.    I'm going to ask you to pull
13   up -- from the stack from yesterday's
14   deposition, there's an item marked Khan 104.
15        A.    104?
16        Q.    Yes.  It looks like this.
17   Yeah, it's right there.  Right there.
18              All right.  Do you see
19   Dallah --
20        A.    Yes.
21        Q.    -- Dallah Avco's letterhead at
22   the top --
23        A.    Yes.
24        Q.    -- or logo of Dallah Avco at
25   the top?

Page 104

1         A.    Yes.
2         Q.    All right.  So is this a Dallah
3    Avco document?
4              MR. KRY:  Objection to form.
5              THE WITNESS:  It appears to
6    have Dallah Avco letterhead.
7    QUESTIONS BY MR. HAEFELE:
8         Q.    All right.  And I note that
9    Mr. Karli is the signature at the bottom.
10             And Mr. Karli's a PCA employee,
11   correct?
12        A.    Yes.
13        Q.    All right.  Do you know why
14   Mr. Karli would be signing a document on
15   Dallah Avco's letterhead?
16        A.    I don't know for certainty, but
17   what I expect is that these were given to
18   them because they're working on their sites,
19   so -- to designate the ANS project employees
20   who are recruited by Dallah and who were in
21   Dallah's payrolls and paperwork cycle.
22             So they would fill it there and
23   send it back to us so we -- I mean, for both
24   of them to know that these are Dallah's,
25   let's say, workforce under the ANS since we

Page 105

1    are dealing with the -- the processes -- part
2    of it, their side, which we're not allowed to
3    go, and they have to do the paperwork, and
4    then it comes to us.
5         Q.    So Mr. Karli would work out the
6    time entries for Mr. Bayoumi with
7    Mr. Bayoumi, presumably?
8         A.    Excuse me?
9              MR. KRY:  Objection.  Calls for
10   speculation.
11             MR. SHEN:  Objection to form.
12   QUESTIONS BY MR. HAEFELE:
13        Q.    All right.  Would Dallah Avco
14   communicate with Mr. Bayoumi to determine
15   what time he had worked on a given day?
16        A.    No.
17        Q.    How would that come about?
18             MR. KRY:  Objection.  Calls for
19   speculation.
20             MR. SHEN:  Objection to form.
21             THE WITNESS:  We wouldn't --
22   QUESTIONS BY MR. HAEFELE:
23        Q.    Pardon me?
24        A.    You asked would we communicate?
25        Q.    All right.  How are the time

27 (Pages 102 to 105)

Highly Confidential- Subject to Futher Confidentiality Review

Page 130

1    Consulting Engineers."
2        Did they move forward to
3    contract with Ercan?
4        MR. SHEN:  Objection to form.
5        THE WITNESS:  We don't know if
6    this refers to the ANS -- if I'm
7    reading it, I think it's something
8    else, so I don't know if they
9    proceeded with those or no.
10       But what was reflected in our
11   side that Ercan was -- took after Avco
12   Overseas some of the recruitment tasks
13   that Avco Overseas were doing.
14   QUESTIONS BY MR. HAEFELE:
15       Q.    And what --
16       A.    But I cannot say that the first
17   paragraph refers to something that I know of.
18       Q.    Was Dallah Avco doing any
19   recruitment in the US?
20       A.    I'm not aware of something like
21   that.  I'm not -- I mean, I can't remember
22   reading something like that.
23       Q.    Okay.  And the letter makes
24   reference to Avco Overseas, and you mentioned
25   Avco Overseas.

Page 131

1        What's Avco Overseas?
2        A.    Yeah, my understanding is Avco
3    Overseas is a -- some sort of an engineering
4    company that entered into partnership with
5    Dallah in the '70s to do some -- or handle
6    some operation and maintenance projects, and
7    they had a 50 percent share in the Dallah
8    Avco Trans Arabia.
9        So they were partners, and this
10   partnership lasted until the '80s.  I'm not
11   sure what year where they sold their share
12   back again to the group.
13       And Dallah kept the name for a
14   couple of years just under Dallah Avco, but
15   then subsequently they just dropped the name.
16       Q.    What is the relationship
17   between Avco Overseas or Dallah Avco, or what
18   was the relationship between them?
19       A.    I think -- my understanding is
20   that they provided engineering -- engineering
21   services.  Might that be equipment or
22   consultancies or personnel.  This is my
23   general understanding.
24       Q.    And just for clarification, the
25   individuals that are referenced in the 1, 2,

Page 132

1    3 and 4 on that letter are identified as
2    Airways Engineering personnel, so they're PCA
3    individuals?
4        MR. SHEN:  Objection to form.
5        THE WITNESS:  I'm not sure I --
6    this one?
7    QUESTIONS BY MR. HAEFELE:
8        Q.    Yeah.
9        A.    Yeah.  Yes, they're PCA
10   individuals.
11       Q.    And one of them we know is --
12   Mr. Karli was a PCA individual?
13       A.    Yes.
14       MR. KRY:  Time for a break
15   maybe?
16       MR. HAEFELE:  A few more
17   minutes.
18       MR. KRY:  Okay.
19       (Kamel Exhibit 111 marked for
20   identification.)
21   QUESTIONS BY MR. HAEFELE:
22       Q.    Showing you what's been marked
23   as Kamel 11 -- or 111, I'm sorry.
24       MR. KRY:  We just have an
25   objection to the form of the document.

Page 133

1        The notation on the bottom has been
2    truncated on this copy.
3        MR. NITZ:  Actually, there's
4    two different copies of it.  You see
5    there's a start of a handwritten
6    notation.  The one that's
7    Bates-numbered DA001016 has the
8    complete notation.
9        MR. HAEFELE:  I'm not sure --
10   let me see, because I thought I had
11   the same document.
12       MR. NITZ:  Right down there.
13   It's cut off a little bit.
14       MR. HAEFELE:  That may be what
15   he's looking at, too, though.
16       MR. KRY:  It is.  Our point is
17   just there's another -- the same
18   document appears as per our own
19   production but does not have that
20   writing truncated, and so we'd suggest
21   using the complete document.
22       MR. HAEFELE:  Oh.  I think it's
23   your document, not mine.
24       MR. NITZ:  It is.  We produced
25   two different versions.

34 (Pages 130 to 133)

Highly Confidential- Subject to Futher Confidentiality Review

Page 154

1   back to Kamel 113 --
2       A.   13.
3       Q.   -- and you look at -- and you
4   look at the second line down, you're going to
5   see a number that's PR, purchase requisition,
6   74598 A.
7           Do you see that?
8       A.   I'm locating it.  Second line
9   in the body or in the --
10      Q.   Sorry, right here.
11      A.   Okay.  Okay.  Here?  This one?
12          PR 7, something, something
13  5988?
14      Q.   74598 A.
15      A.   Okay.
16      Q.   Do you see that?
17      A.   I see that, but I can't make
18  the numbers in the middle.  I see PR, but
19  something, something, 5988.  Okay.
20      Q.   All right.  And then if you
21  look at Kamel 114, special instructions, it
22  says, "charge to PR 74598 A."
23      A.   Okay.
24      Q.   All right.  Can we be clear now
25  that this Exhibit Kamel 13 {sic} is the

Page 155

1   purchase requisition referenced in Kamel 114?
2       A.   Okay.
3           MR. SHEN:  Objection.
4   Foundation.
5           MR. KRY:  Objection to form and
6   foundation.
7           THE WITNESS:  Okay.
8   QUESTIONS BY MR. HAEFELE:
9       Q.   Is it?
10          MR. SHEN:  Objection.
11  Foundation.
12          THE WITNESS:  This is what it
13  seems.
14  QUESTIONS BY MR. HAEFELE:
15      Q.   All right.
16      A.   Okay.
17      Q.   And Kamel 113 is dated
18  2 February '94, correct?
19      A.   Yes.
20      Q.   And Kamel 114 is dated
21  03/04/94 --
22      A.   Yes.
23      Q.   -- correct?
24          And the reference in the
25  description is to factory acceptance test for

Page 156

1   KAIA air navigation project plus five economy
2   class tickets, right?
3       A.   Right.
4       Q.   And the purchase requisition in
5   Kamel 113 describes in the description area
6   factory acceptance test for KAIA air
7   navigation project, correct?
8       A.   Okay.
9       Q.   And underneath that, down here
10  at the bottom it says, "Please provide five
11  economy class roundtrip tickets," correct?
12      A.   This is the last one?  This one
13  here?
14      Q.   Yeah.
15      A.   Please provide five economy
16  class trip tickets -- roundtrip tickets.
17  Okay.
18      Q.   Yes?
19      A.   Okay.
20      Q.   Is that a yes?
21      A.   That is a yes.
22      Q.   All right.  And in that same
23  purchase requisition, there is a reference to
24  American Language Institute.
25          Do you know what that's for?

Page 157

1       A.   American Language, no.
2       Q.   All right.  But Avco is
3   facilitating getting that paid, correct?
4           MR. SHEN:  Objection.
5   Foundation.
6           THE WITNESS:  Could you repeat
7   the question?
8   QUESTIONS BY MR. HAEFELE:
9       Q.   Sure.
10          But Dallah Avco is performing a
11  task --
12      A.   Right.
13      Q.   -- to get that purchase
14  requisition paid, correct?
15      A.   Correct.
16          MR. SHEN:  Objection.
17  Foundation.
18  QUESTIONS BY MR. HAEFELE:
19      Q.   Is that right?
20      A.   Yes.
21          (Kamel Exhibit 115 marked for
22  identification.)
23  QUESTIONS BY MR. HAEFELE:
24      Q.   Showing you what's been marked
25  as 2267.

Highly Confidential- Subject to Futher Confidentiality Review

Page 158

1          2267 is -- I'm sorry, what's
2    the exhibit number on that?
3          MR. KRY: 115.
4          THE WITNESS: 115.
5    QUESTIONS BY MR. HAEFELE:
6          Q.    Okay.  Kamel 115 is a document
7    produced in litigation by Dallah Avco as
8    DA002267, and it is a letter from the PCA to
9    Avco Overseas Services/Textron, right?  Yes?
10         A.    Yes.
11         Q.    And it's dated 30 March 1994,
12   correct?
13         A.    Right.
14         Q.    And does this document refer to
15   the same transaction that we just looked at a
16   moment ago?
17         MR. KRY:  Objection.
18   Foundation.
19         MR. SHEN:  Objection.
20   Foundation.
21         THE WITNESS:  I don't see the
22   number.  It has the American Language
23   Institute, but it doesn't have any
24   number to indicate that it is related
25   to those two.

Page 159

1          Okay.  It's in close vicinity
2    of time.
3    QUESTIONS BY MR. HAEFELE:
4          Q.    Is this a direction for --
5          A.    Avco.
6          Q.    -- Avco Overseas to make
7    payment for Mr. Al-Bayoumi's moneys for the
8    American Language Institute?
9          A.    It does.
10         MR. SHEN:  Object to form.
11         THE WITNESS:  Yes.
12   QUESTIONS BY MR. HAEFELE:
13         Q.    And does it indicate that the
14   PCA guarantees payment of that amount to Avco
15   Overseas using the ANSS 3 project account?
16         A.    It does.
17         Q.    And it also directs them to pay
18   living allowance up to 30 weeks for
19   Mr. Bayoumi's living expenses and invoice it
20   to the ANSS project account?
21         A.    This is what it says, yeah.
22         Q.    And do you have any reason to
23   believe that the reference to the American
24   Language Institute in Kamel 115 is unrelated
25   to the reference to the American Language

Page 160

1    Institute in the purchase requisition?
2          MR. SHEN:  Objection to form.
3          MR. KRY:  Objection to form.
4          MR. SHEN:  Objection.
5    Foundation.
6          THE WITNESS:  I can't say, I
7    mean, looking at this that they're
8    related.  It's the same name, but we
9    can't say for sure.  If they have the
10   same number, then we could be certain.
11   QUESTIONS BY MR. HAEFELE:
12         Q.    Well, it's the same name and
13   the same time period related to the same Avco
14   Overseas and the Presidency of Civil
15   Aviation, right?
16         MR. KRY:  Objection to form.
17   Foundation.
18         MR. SHEN:  Objection to form.
19         MR. KRY:  And it's
20   argumentative.
21         THE WITNESS:  It doesn't has
22   the -- what do you call it -- the
23   purchase order number, and it doesn't
24   refer to the KAIA project test
25   factory, so you can't say that these

Page 161

1    two are the same.
2          It only has -- shares the
3    American Language Institute, and,
4    therefore, you cannot say for sure
5    that it is the same.  Okay.
6    QUESTIONS BY MR. HAEFELE:
7          Q.    Are you aware of any other
8    individual that Dallah Avco facilitated
9    payments for the American Language Institute
10   other than Mr. Bayoumi?
11         MR. KRY:  Objection to scope.
12         MR. SHEN:  Objection to scope.
13         THE WITNESS:  Dallah Avco did
14   not facilitate this.  Avco Overseas
15   who facilitated.  Avco Overseas then
16   reimbursed the invoice.
17         This is not Dallah Avco.  This
18   is Avco Overseas.
19   QUESTIONS BY MR. HAEFELE:
20         Q.    Well, didn't we just determine
21   that Kamel 13 {sic} was the purchase
22   requisition that was referenced in Kamel 114?
23         A.    Yes.
24         MR. SHEN:  Objection to form.
25

41 (Pages 158 to 161)

Highly Confidential- Subject to Futher Confidentiality Review

Page 162

```
1    QUESTIONS BY MR. HAEFELE:
2        Q.   And Kamel 113 includes the
3    purchase requisition for payment of American
4    Language Institute, correct?
5        A.   Yes.
6        Q.   Thank you.
7            MR. SHEN:  Objection to form.
8            (Kamel Exhibit 116 marked for
9    identification.)
10   QUESTIONS BY MR. HAEFELE:
11       Q.   So I'm showing you what's been
12   marked as Kamel 116.  Kamel 116 is a document
13   produced by Dallah Avco in the litigation as
14   DA002261.
15       A.   Okay.
16       Q.   Would you agree with me that
17   this is a Dallah Avco document?
18           MR. KRY:  Objection.  Form.
19   QUESTIONS BY MR. HAEFELE:
20       Q.   Is this a Dallah Avco document?
21       A.   Yes.
22       Q.   And is it dated August 8 of
23   1994?
24       A.   Yes.
25       Q.   And it has the Dallah Avco
```

Page 163

```
1    letterhead on it?
2        A.   Yes.
3        Q.   And it is a document addressed
4    to the Kingdom of Saudi Arabia from Dallah
5    Avco, correct?
6        A.   Excuse me?
7        Q.   It's a document addressed from
8    Dallah Avco to the Kingdom of Saudi Arabia,
9    right?
10       A.   For the PCA.
11           MR. SHEN:  Objection to form.
12   QUESTIONS BY MR. HAEFELE:
13       Q.   It's addressed to the Kingdom
14   of Saudi Arabia, Presidency of Civil
15   Aviation, correct?
16       A.   Correct.
17       Q.   And is this a document
18   describing charges for purchase requisition
19   74598 A?
20       A.   Yes, correct.
21       Q.   And that is the same document
22   that we looked at as Kamel 13 {sic}, correct?
23       A.   Yes.
24       Q.   And the reference in the
25   description of charges are for the factory
```

Page 164

```
1    acceptance test for KAIA air navigation
2    project, American Language Institute?
3            MR. KRY:  Misstates the
4    document.
5            THE WITNESS:  Correct.
6    QUESTIONS BY MR. HAEFELE:
7        Q.   What does the description
8    indicate the charges are for?
9        A.   Afterwards it says being
10   education expenses met by Avco Overseas
11   Services Textron for Mr. Omar Al-Bayoumi at
12   San Diego State University per documentation
13   attached.
14       Q.   And why is it that Dallah Avco
15   is describing these charges to the Kingdom
16   and identifying an amount of $4,775?
17       A.   Well, Dallah is not describing
18   anything to the Kingdom.  Dallah is
19   describing to the PCA that it had a letter
20   from Avco Overseas with that same
21   description, with that amount of money, that
22   was paid for that person doing that thing
23   that's there, which is educational.  And we
24   are reimbursing -- reimbursing Avco according
25   to that purchase order under those contract
```

Page 165

```
1    name.
2            So it's only stating the facts
3    that were in the papers that were received,
4    so --
5        Q.   Well, this is a -- this is a
6    document dated an invoice -- I'm sorry,
7    indicated to be an invoice dated August 8,
8    1994, correct?
9        A.   Yes.
10       Q.   All right.  And why is Dallah
11   Avco invoicing the Kingdom of Saudi Arabia
12   Presidency of Civil Aviation for that charge?
13       A.   Because at the end of the day,
14   the contract, whatever payments that Dallah
15   is -- Dallah Avco is, what, doing the
16   contracts, executing the contract, in this
17   case, I think, ANSS 33.  So whatever expenses
18   that would occur under that contract.
19           And some of them within the
20   contract wording are logistical services or
21   whatever that are instructed, initiated by
22   the PCA, so we would have to reimburse --
23   invoice them so they could pay us.  So they
24   would have to pay us whatever we paid.
25           And in this case it's a cycle
```

42 (Pages 162 to 165)

Highly Confidential- Subject to Futher Confidentiality Review

Page 166

1  that started with the PCA going to Avco and
2  asking them to pay to a third party, and then
3  Avco, at the request of PCA, invoicing Dallah
4  under such and such contract, which was
5  ANS 3. This is where the money will come
6  from. We will pay Avco, and then it will go
7  back again to the PCA telling them to pay us
8  this money.
9      Q.   So on the one end of the
10  transaction, there's the Kingdom's PCA that
11  is trying to get Mr. Bayoumi into the
12  American Language Institute in San Diego,
13  correct?
14      A.   Correct.
15          MR. SHEN:  Objection.
16  Foundation.
17  QUESTIONS BY MR. HAEFELE:
18      Q.   And on the other end there is
19  Avco that is making payments in the United
20  States to allow Mr. Bayoumi to participate in
21  this American Language Institute, correct?
22          MR. KRY:  Objection.  Form.
23          When you say "Avco," do you
24      mean Avco Overseas?
25          MR. HAEFELE:  Avco Overseas,

Page 167

1  yes.
2  QUESTIONS BY MR. HAEFELE:
3      Q.   Correct?
4      A.   Yes, correct.
5      Q.   And then the necessary
6  connection between those two to get this
7  process completed is Dallah Avco to make that
8  transaction happen through the ANSS project?
9          MR. KRY:  Objection to form and
10  foundation.
11          MR. SHEN:  Objection.
12          THE WITNESS:  Not -- it was PCA
13  asking Avco to pay money for
14  Mr. Bayoumi's education.
15          So Avco will say, "Why should
16  we pay him money, and where will we
17  get our money back?"
18          So PCA is saying beforehand,
19  "You should invoice the project."
20          Okay.  So they do that.  They
21  pay the money to the university, and
22  they invoice the project.
23          The project, which is under
24  Dallah Avco, gets the invoice, pays
25  back Avco Overseas.  Okay.

Page 168

1          Then who should give us our
2      money?
3          We send this to the PCA again,
4      completing the cycle, asking for our
5      money to be paid.
6  QUESTIONS BY MR. HAEFELE:
7      Q.   Okay.  Is the process of
8  secondment something that is a typical or an
9  irregular process that happens at Dallah
10  Avco?
11          MR. KRY:  Objection.
12          THE WITNESS:  It happens all
13      over.
14  QUESTIONS BY MR. HAEFELE:
15      Q.   It happens all over, meaning
16  it's a commonality, it's a common thing that
17  happens?
18      A.   It's a common practice, yeah,
19  in the business world, in the education world
20  and...
21      Q.   And it's not something that's
22  unusual for Dallah Avco to address in looking
23  for personnel to fill positions or candidates
24  for recruitment?
25          MR. KRY:  Objection.

Page 169

1          THE WITNESS:  Excuse me?
2  QUESTIONS BY MR. HAEFELE:
3      Q.   It's not something that's
4  unusual for Dallah Avco to address in looking
5  for candidates to fill positions, correct?
6          MR. KRY:  Objection to the
7      double negative.
8          THE WITNESS:  It is unusual or
9      usual?
10  QUESTIONS BY MR. HAEFELE:
11      Q.   Well, is it unusual or is it
12  not unusual?
13          MR. KRY:  To --
14  QUESTIONS BY MR. HAEFELE:
15      Q.   I took you to be saying it's
16  not unusual.
17      A.   It's -- no, it's not unusual.
18          Ask me the question.  Are we
19  doing it, or are we not doing it?  I'm
20  confused when you say "unusual" or "usual."
21          Rephrase it.
22      Q.   You frequently use secondment
23  in the process of filling positions or
24  recruitments for Dallah Avco's ANSS project?
25      A.   Not in particular, but it is a

43 (Pages 166 to 169)

Highly Confidential- Subject to Futher Confidentiality Review

Page 214

```
 1  right?
 2      MR. KRY: Objection.
 3  Foundation.
 4      MR. SHEN: Objection.
 5  Foundation.
 6      THE WITNESS: Correct.
 7  QUESTIONS BY MR. HAEFELE:
 8      Q.   Is that correct?
 9      A.   Yes.
10      Q.   And one of the ways for Bayoumi
11  to be seconded to the ANSS project was to
12  demonstrate a need for him on the project,
13  right?
14      MR. KRY: Objection.
15  Foundation.
16      THE WITNESS: To mention a
17  need.
18  QUESTIONS BY MR. HAEFELE:
19      Q.   To mention a need?
20      A.   Yes.
21      Q.   And the letter at Kamel 121
22  does that, right?
23      A.   121? Yes, it does.
24      Q.   But Dallah Avco had no need,
25  correct?
```

Page 215

```
 1      A.   Dallah Avco never had any need
 2  to anybody of this.
 3      Q.   And if there was a need, the
 4  need was the PCA's need, correct?
 5      MR. SHEN: Objection.
 6  Foundation.
 7      THE WITNESS: Of course. It
 8  was the project need, which is a PCA
 9  need.
10      MR. HAEFELE: Okay. At this
11  point I'm going to turn the
12  questioning over to Mr. Carter.
13      DIRECT EXAMINATION
14  QUESTIONS BY MR. CARTER:
15      Q.   Good afternoon, Mr. Kamel.
16      A.   Good afternoon.
17      Q.   I hope to be very brief.
18      You were here yesterday for
19  Mr. Khan's deposition, correct?
20      A.   Exactly.
21      Q.   And during his deposition, the
22  plaintiffs marked as Khan 103 what appear to
23  be a series of computer printouts, and I've
24  just handed that to you.
25      Do you see those?
```

Page 216

```
 1      A.   Okay. Okay.
 2      Q.   Based on the preparations you
 3  did for the deposition today, do you know
 4  what those are?
 5      A.   They're pay advices for an
 6  employee to get paid.
 7      Q.   Do you know where they were
 8  pulled from?
 9      A.   I think they're an output of
10  our system, Dallah's system, upon receiving
11  of the paperwork that comes from the PCA's,
12  let's say, supervisors or -- it's paperwork
13  that comes to us, and it enters -- is
14  inputted in our system, and the outcome is a
15  pay advice because we were responsible to
16  process the payments.
17      Q.   And did the documents that have
18  been marked as Khan 103 relate to Omar
19  Al-Bayoumi?
20      A.   They have his name.
21      Q.   Okay. And do you see -- do you
22  see there are categories of payments on each
23  of the pages?
24      A.   Yes.
25      Q.   And there's a category
```

Page 217

```
 1  identified as basic salary.
 2      Do you see that?
 3      A.   Yes, I do.
 4      Q.   During the period of Omar
 5  Al-Bayoumi's secondment, do you know who was
 6  responsible for determining what his basic
 7  salary would be?
 8      A.   PCA would send the job title
 9  and the salary as well as the other
10  allowances, and we turn it in.
11      Q.   Now, were all of the allowances
12  determined by the PCA?
13      A.   Yes.
14      Q.   So that would be true for the
15  housing allowance?
16      A.   Yes.
17      Q.   And would that also be true for
18  the category identified as other allowance?
19      A.   Of course.
20      Q.   We had a discussion with
21  Mr. Khan yesterday about what the "other
22  allowance" category encompassed.
23      Do you know what falls within
24  the other allowance category?
25      A.   In general, it would be any
```

55 (Pages 214 to 217)

Highly Confidential- Subject to Futher Confidentiality Review

Page 218

1   other thing that is not housing allowance or
2   transportation allowance. Because, for
3   instance -- I'm not saying this about Bayoumi
4   or anybody else, but the project had 13
5   airports, so you would be having people
6   traveling from here to there, eating, moving,
7   lodging, maybe sending somebody to get some
8   experts, guests.
9          So any other thing that is not
10  categorized as a housing allowance or, let's
11  say, a specifically mentioned allowance would
12  be under "other allowance." So it would be
13  many things. And like Mr. Khan said
14  yesterday, overtime would be another
15  allowance.
16      Q.   Did Dallah Avco itself have any
17  role in determining adjustments to
18  Mr. Bayoumi's salary or allowances?
19      A.   Not at all.
20      Q.   In its role as the paymaster,
21  did Dallah Avco issue the payments to the
22  ANSS employees for their compensation and
23  allowances?
24      A.   You mean as to pay them
25  directly, transfer it to them?

Page 219

1       Q.   Correct.
2       A.   In any channel?
3            Yes.
4       Q.   With regard to Mr. Bayoumi
5   specifically, do you know how he was paid?
6       A.   I've seen many -- a couple of
7   ways. I've seen bank transfers, documents
8   showing that, and I've seen cash advices
9   where you -- somebody would come to take the
10  cash, and I've seen transfer of that same
11  amount going through Bayoumi's account.
12          And I've seen at his end of
13  service him giving a daily proxy to somebody
14  to come and -- we get to give him that cash.
15  So I've seen a couple of them.
16      Q.   Okay. When you referred to
17  bank transfers, were you referring to wire
18  transfers?
19      A.   Yes.
20      Q.   And who was the party
21  responsible for initiating those wire
22  transfers?
23          MR. KRY: Objection.
24          THE WITNESS: Initiating or
25  processing?

Page 220

1          QUESTIONS BY MR. CARTER:
2       Q.   Well, from whose account were
3   they sent?
4       A.   From Dallah's account.
5       Q.   And do I then understand that
6   Dallah would get reimbursed by the PCA?
7       A.   Correct.
8       Q.   But the wire transfer itself
9   would come from a Dallah account to Bayoumi's
10  account?
11          MR. KRY: Objection.
12          THE WITNESS: Of course.
13  QUESTIONS BY MR. CARTER:
14      Q.   Early this morning I believe
15  you testified, and correct me if I am wrong,
16  I believe you testified that the ANSS
17  contract contemplated financial support for
18  certain students receiving training; is that
19  correct?
20      A.   I've seen document that shows
21  that.
22      Q.   Okay. And I believe in regard
23  to that issue, you referenced documents
24  involving the General Auditing Authority of
25  the Kingdom?

Page 221

1       A.   Correct.
2       Q.   And your counsel was kind
3   enough to identify the documents to which you
4   were referring, and I am marking them as
5   Kamel Exhibit 123, and they are Bates-stamped
6   DA1964 through 1970.
7            (Kame Exhibit 123 marked for
8   identification.)
9   QUESTIONS BY MR. CARTER:
10      Q.   I've marked the Arabic
11  documents along with an unofficial
12  translation your counsel provided to us,
13  subject to reservation of all privileges and
14  with the understanding that the translation
15  is not binding on the company.
16          With those clarifications, I'd
17  like to ask you a few questions about this.
18      A.   Okay. Okay.
19      Q.   Are those the documents you
20  were referencing earlier when you were
21  discussing --
22      A.   Yes.
23      Q.   -- the provisions of the
24  contract that contemplated financial support
25  for certain students?

Highly Confidential- Subject to Futher Confidentiality Review

Page 230

1  does it appear that the support level that
2  was being provided by -- to Bayoumi was well
3  beyond the limit referred to in the auditor's
4  report?
5        MR. KRY:  Objection.
6  Misleading.
7        MR. SHEN:  Objection to form.
8        THE WITNESS:  If it was the
9  student program, then it was
10  exceeding, but here it says housing
11  allowance, transportation allowance
12  and other allowance.
13        So it doesn't say this is
14  training allowance or student basic
15  training program allowance, so you
16  cannot say that these are exceeding
17  because you cannot connect them with
18  the allowance.
19  QUESTIONS BY MR. CARTER:
20     Q.    Okay.  So it is not Dallah's
21  position that Omar Al-Bayoumi was a
22  student --
23     A.    No.
24     Q.    -- receiving training pursuant
25  to the provision of the contract we just

Page 231

1  discussed?
2     A.    Correct.
3     Q.    Mr. Kamel, are you aware of any
4  other provisions of the ANSS contract that
5  contemplated the provision of financial
6  support to students?
7        MR. KRY:  Objection.
8        MR. SHEN:  Objection to form.
9        THE WITNESS:  No.
10  QUESTIONS BY MR. CARTER:
11     Q.    Are you aware of any other
12  written arrangement between Dallah Avco and
13  the PCA to provide financial support through
14  Dallah Avco to any student?
15        MR. KRY:  Objection.
16        THE WITNESS:  No.
17        MR. CARTER:  That's all I have.
18  Thank you.
19        THE WITNESS:  Thank you.
20        MR. HAEFELE:  That's it for the
21  plaintiffs.  Thank you.  Thank you,
22  Mr. Kamel.
23        MR. KRY:  Great.  We'll have
24  some questions, if we can just take a
25  recess.

Page 232

1        VIDEOGRAPHER:  The time is now
2  3:24.  Going off the record.
3        (Off the record at 3:24 p.m.)
4        VIDEOGRAPHER:  Okay.  The time
5  is now 3:32.  Back on the record.
6        (Kamel Exhibit 125 marked for
7  identification.)
8        CROSS-EXAMINATION
9  QUESTIONS BY MR. KRY:
10     Q.    Good afternoon.
11     A.    Good afternoon.
12     Q.    Mr. Kamel, I'm going to mark as
13  Exhibit 125 an excerpt from the ANSS 4
14  contract, Bates-numbered KSA2185 to 89.
15        In particular -- and if I can
16  direct your attention to the excerpt on page
17  4-2, Section 4-2-1-2, Recruitment
18  Responsibilities and Approval.
19     A.    Okay.
20     Q.    The first sentence of that
21  paragraph says, "The contractor shall be
22  entirely responsible for all aspects of the
23  recruitment process, subject only to prior
24  government approval of contractor-selected
25  candidates, except that the government may,

Page 233

1  at its discretion, at any time, direct the
2  contractor to hire any individual or
3  individuals whom the government deems
4  suitable for employment under the contract."
5        Mr. Kamel, what's your
6  understanding of what that "except" clause
7  means in this provision?
8     A.    My understanding is it's our
9  main responsibility to carry over all the
10  recruitment processes.  However, it's always
11  under prior government approval of the
12  candidates.
13        So we will select the
14  candidates, normally, and they will go to the
15  government, who will approve them, and then
16  those will be passed to us.
17        However, sometimes there will
18  be certain cases where -- what is it? -- the
19  contractor to hire an individual or
20  individuals whom the government deems
21  suitable.
22        So if we get somebody directly
23  from our -- from the program with an explicit
24  instruction to hire him, we should comply
25  with that.

59  (Pages 230 to 233)

Highly Confidential- Subject to Futher Confidentiality Review

Page 234

1      Q.    So in light of this provision,
2   would there be anything suspicious or unusual
3   in the course of Dallah Avco's administration
4   of this contract with the PCA or the ANSS
5   project requesting that a particular
6   individual be put on the project without
7   regard to the recruitment process that Dallah
8   Avco followed for many of the candidates?
9           MR. HAEFELE:  Objection to
10   form.
11           THE WITNESS:  Not at all.
12   QUESTIONS BY MR. KRY:
13      Q.    And in light of this provision,
14   would there have been anything suspicious or
15   unusual from Dallah Avco's point of view with
16   the fact that the PCA or the ANSS project
17   directed that Omar Al-Bayoumi be hired as an
18   ANSS project employee?
19           MR. HAEFELE:  Objection.  Form.
20           THE WITNESS:  Not at all.
21           (Kamel Exhibit 126 marked for
22   identification.)
23   QUESTIONS BY MR. KRY:
24      Q.    I'm going to mark as this next
25   exhibit, number 126, another contract

Page 235

1   excerpt.  This one's Bates-numbered KSA2109
2   and 2119 to 2122.  This is also from the
3   ANSS 4 contract.  And I want to direct your
4   attention to page 2-38, section
5   number 2-81-2-3-1, which is titled
6   "Recruitment Plan."
7      A.    Uh-huh.
8      Q.    And this section states, "The
9   recruitment plan shall describe how the
10   contractor proposes to, A, solicit
11   applications from candidates for employment
12   under the contract; B, determine the
13   suitability of applicants in terms of
14   qualifications, experience, personality and
15   legal eligibility; C, provide orientation to
16   successful applicants; and D, process urgent
17   requests."
18           Mr. Kamel, what's your
19   understanding of the meaning of paragraph D
20   of this section?
21      A.    B or D?
22      Q.    D.
23      A.    D.  D's -- it's making way for
24   direct requests coming from the -- from the
25   PCA to Dallah to hire -- to process urgent

Page 236

1   requests of recruitment.
2      Q.    And does this subsection D
3   require the contractor, being Dallah Avco, to
4   have a recruitment plan specifically
5   addressing those sorts of urgent requests?
6      A.    No.
7      Q.    Does -- does sec --
8   Section 2-81-2-3-1 states that the
9   recruitment plan shall describe how the
10   contractor proposes to, and then subsection D
11   says, "process urgent requests"?
12      A.    No.
13      Q.    If I can direct your attention
14   to the wording of the provision.
15      A.    To where?
16      Q.    2-81-2-3-1.
17      A.    Okay.
18      Q.    The provision states, "The
19   recruitment plan shall describe how the
20   contractor proposes to, D, process urgent
21   requests."
22      A.    Okay.
23      Q.    In light of this provision, is
24   it your understanding that Dallah Avco from
25   time to time would receive urgent requests?

Page 237

1           MR. HAEFELE:  Objection to
2   form.
3   QUESTIONS BY MR. KRY:
4      Q.    To put particular people on a
5   project?
6      A.    This is what I understand, yes.
7      Q.    So in light of that provision,
8   would there be anything unusual or
9   questionable about receiving a request from
10   the PCA or the ANSS project on an urgent
11   basis?
12      A.    Not at all.
13           MR. HAEFELE:  Objection to
14   form.
15           MR. MALONEY:  Join.
16   QUESTIONS BY MR. KRY:
17      Q.    In light of this provision,
18   would there be anything unusual or
19   questionable about receiving a request from
20   the PCA or the ANSS project referring to an
21   urgent need to have Al-Bayoumi on the
22   project?
23           MR. HAEFELE:  Objection to
24   form.
25           THE WITNESS:  No.

60 (Pages 234 to 237)

Highly Confidential- Subject to Futher Confidentiality Review

Page 238

1       MR. KRY:  Could we go off the
2   record one second?
3       VIDEOGRAPHER:  The time is now
4   3:38.  Going off the record.
5       (Off the record at 3:38 p.m.)
6       VIDEOGRAPHER:  The time is now
7   3:40.  Back on the record.
8   QUESTIONS BY MR. KRY:
9       Q.    Mr. Kamel, do you remember
10  testifying earlier today about a letter that
11  was sent by Alawi Kamel to Al-Salmi at the
12  PCA requesting that Mr. Al-Bayoumi be
13  seconded to the ANSS project?
14      A.    You're referring to the first
15  joining?
16      Q.    Correct.
17      A.    Yes, I do.
18      Q.    And in the course of preparing
19  for your testimony today, were you given any
20  information about Alawi Kamel's understanding
21  at the time about who originated that
22  request?
23      A.    I think it was originated by
24  the head of the project from Dallah's side,
25  and this -- this is normal process that is --

Page 239

1   somebody at the specified department would
2   prepare the letter, and if it needed to be
3   addressed to a certain level of hierarchy in
4   the other party, then it will go to the equal
5   level from our side.
6       Q.    I'm sorry, I think maybe there
7   was a miscommunication on the question.
8       I wasn't referring to who
9   originated the process of composing the
10  letter.  I was referring to who originated
11  the idea of having Al-Bayoumi seconded to the
12  ANSS project.
13      A.    The first one, I haven't seen
14  any documents to show that -- where was it
15  originated, but it clearly shows in the
16  letter that the need was originated from the
17  ANS project.  It clearly states that.
18      (Kamel Exhibit 127 marked for
19  identification.)
20      MR. KRY:  Okay.  I'm going to
21  mark as an exhibit, number 127, a
22  document which I'll also provide to
23  counsel at this point.  This is one of
24  the things that I'd referred to
25  earlier.  It contains information that

Page 240

1   was communicated to the witness
2   concerning knowledge that Alawi Kamel
3   had concerning the circumstances of
4   the letter.
5   QUESTIONS BY MR. KRY:
6       Q.    And the document states,
7   "According to Mr. Kamel," being Alawi
8   Kamel --
9       A.    Okay.
10      Q.    -- "Samir Magboul, the ANSS
11  project director, prepared this letter to the
12  PCA requesting the PCA second Al-Bayoumi to
13  Dallah Avco.  He knows this because the
14  letter contains Mr. Magboul's initials near
15  his signature.  Mr. Kamel signed this letter
16  because it was directed at a high-level
17  minister, the President of Civil Aviation.
18  It would have been inappropriate to send a
19  high-level minister a letter signed by a
20  lower-level manager within Dallah Avco or the
21  ANSS project.
22      "Although the letter involves a
23  request from Dallah Avco to the PCA for the
24  secondment of Al-Bayoumi, Mr. Kamel explained
25  that PCA must have initiated this secondment

Page 241

1   because no one at Dallah Avco in 1995 knew
2   who Al-Bayoumi was.
3       "Finally, Mr. Kamel understands
4   the reference in the letter to an urgent need
5   for Al-Bayoumi to refer to the PCA's urgent
6   need to have Al-Bayoumi placed on the ANSS
7   project."
8       Mr. Kamel, is this information
9   concerning the company's knowledge of a
10  former employee that was provided to you in
11  connection with your preparation for this
12  deposition?
13      A.    It was.
14      Q.    And are you aware of any reason
15  to believe that this information is
16  incorrect?
17      A.    No.
18      (Kamel Exhibit 128 marked for
19  identification.)
20  QUESTIONS BY MR. KRY:
21      Q.    All right.  Next document I'm
22  going to show you, which I'll mark as
23  Exhibit 128, is another document which we are
24  also providing to opposing counsel now.
25      This was a document that was

61 (Pages 238 to 241)

Highly Confidential- Subject to Futher Confidentiality Review

Page 242

1  prepared by your counsel as a summary of
2  various other documents in Dallah Avco's and
3  the KSA's productions concerning a topic that
4  was the subject of the a fair amount of
5  testimony today regarding Al-Bayoumi's status
6  and positions on the ANSS project.
7        Do you recall reviewing this
8  document during the course of your
9  preparation to testify today?
10       A.   I do.
11       Q.   And so the chart has six
12  columns:  effective date, ANSS contract,
13  Al-Bayoumi status, position, level and
14  reimbursement rate.
15       And then it has various
16  effective dates down the left-hand side, and
17  then at the bottom it listed the source
18  documents that are referenced.
19       The first effective date listed
20  here is June 6, 1995, and that indicates that
21  the position Omar Al-Bayoumi was assigned to
22  initially was senior data proc tech, level G
23  position.
24       At the time of this initial
25  secondment, the ANSS contract in effect,

Page 243

1  according to this chart, was number 3,
2  although I think number 4 came in effect soon
3  after.
4        Is that information correct to
5  the best of your knowledge regarding
6  Al-Bayoumi's initial position?
7        A.   Yes.
8        Q.   And is it correct that at that
9  time Mr. Al-Bayoumi was on a secondment from
10 the PCA?
11       A.   Yes.
12       Q.   Now, this chart shows that
13 there was a change in Al-Bayoumi's status on
14 September 6, 1998, with a new position of
15 PCA/AE budget coordinator, a level G
16 position, and that that change also coincided
17 with the change from the ANSS 4 contract to
18 the ANSS 5 contract.
19       Is that information on this
20 chart correct, Mr. Kamel?
21       MR. HAEFELE:  Objection to
22 form.
23       THE WITNESS:  Yes.
24 QUESTIONS BY MR. KRY:
25       Q.   Mr. Kamel, is it your

Page 244

1  understanding that Mr. Al-Bayoumi's position
2  was changed from senior data proc tech to
3  PCA/AE budget coordinator on the same date
4  that Dallah Avco's ANSS contract rolled over
5  from ANSS 4 to ANSS 5?
6        MR. KRY:  Objection to form.
7        THE WITNESS:  The data -- the
8  documents show that this change
9  happened at the same time, yes.
10 QUESTIONS BY MR. KRY:
11       Q.   So would there have been
12 anything surprising or unusual from Dallah
13 Avco's point of view that the PCA would
14 change an employee's position when Dallah
15 Avco was going from one ANSS contract to a
16 different ANSS contract?
17       MR. HAEFELE:  Objection to
18 form.
19       THE WITNESS:  No.  No.
20 QUESTIONS BY MR. KRY:
21       Q.   Do you recall earlier today
22 that there was some letter exchanges between
23 Alawi Kamel and Al-Salmi regarding whether to
24 renew Al-Bayoumi's secondment for the fifth
25 year, and that letter refers to Al-Bayoumi as

Page 245

1  an accounts supervisor?
2        Do you recall that earlier
3  exhibit?
4        A.   Yes.
5        Q.   And then does this chart
6  correctly indicate that during this time
7  period the technical name of his position was
8  budget coordinator?
9        A.   Yes.
10       Q.   And that that reference --
11       MR. HAEFELE:  Objection to
12 form.
13 QUESTIONS BY MR. KRY:
14       Q.   -- to an account supervisor,
15 that that was actually a term that was in
16 Arabic that was then translated into English,
17 correct?
18       MR. HAEFELE:  Objection to
19 form.
20       THE WITNESS:  The Arabic had
21 account supervisor.  In English
22 translation was accountant only.
23 QUESTIONS BY MR. KRY:
24       Q.   Okay.  And at a general level,
25 would the position of accountant be something

62 (Pages 242 to 245)

Highly Confidential- Subject to Futher Confidentiality Review

Page 246

1 dramatically different from the position of a
2 budget coordinator?
3          MR. HAEFELE:  Objection to
4      form.
5          THE WITNESS:  Dallah really
6      doesn't have to do anything
7      regardless.
8 QUESTIONS BY MR. KRY:
9      Q.    This chart indicates that on
10 April 13, 2000, Al-Bayoumi's position was
11 changed to assistant config spec, a level F
12 position.
13          And then in addition, there's
14 another document that shows with the same
15 effective date, April 13, 2000, Al-Bayoumi's
16 position was changed to senior DSS
17 programmer.
18          And then there's an indication
19 on this chart that the first appointment was
20 superseded by the following one.
21          Mr. Kamel, do you know whether
22 those two appointment letters from the PCA,
23 although they have the same effective date,
24 whether they had the same date that they were
25 transmitted from the PCA?

Page 247

1          MR. HAEFELE: Objection.
2          THE WITNESS:  Do they have
3      what?
4 QUESTIONS BY MR. KRY:
5      Q.    Were they sent on the same
6 date, or were they sent on different dates?
7      A.    The dates on them are one month
8 apart.
9      Q.    Okay.  And so was it Dallah
10 Avco's understanding that according to those
11 two documents, the PCA originally wanted him
12 on one position but then sent a subsequent
13 notice that superseded that earlier one with
14 this other position?
15          MR. HAEFELE:  Form.
16          THE WITNESS:  Yes.
17 QUESTIONS BY MR. KRY:
18      Q.    All right.  This time period in
19 April and May of 2000, was that the same time
20 period in which Al-Bayoumi completed his
21 fifth-year secondment and then some weeks
22 later was put on educational leave by the --
23 by the PCA?
24          MR. HAEFELE:  Objection to
25      form.

Page 248

1          THE WITNESS:  As the document
2      show, yes.
3 QUESTIONS BY MR. KRY:
4      Q.    So would there have been
5 anything surprising or unusual about the fact
6 that the PCA changed Al-Bayoumi's position at
7 the same time he went from one status to
8 another status?
9          MR. HAEFELE:  Objection to
10      form.
11          THE WITNESS:  I agree it would
12      be the same for us.
13 QUESTIONS BY MR. KRY:
14      Q.    All right.  The final change
15 listed on this chart is September 6, 2001,
16 and in that one Al-Bayoumi is put on the
17 senior contract specialist position, which is
18 a level B position.
19          And the chart indicates that
20 that is also the same date that Dallah Avco
21 rolled over from the ANSS 5 to the ANSS 6
22 contract.
23          Is that correct, that this
24 change of position coincided with Dallah Avco
25 going from ANSS 5 to ANSS 6?

Page 249

1          MR. HAEFELE:  Objection to
2      form.
3          THE WITNESS:  It is.
4 QUESTIONS BY MR. KRY:
5      Q.    And would there have been
6 anything surprising or unusual about the PCA
7 changing Al-Bayoumi's position when Dallah
8 Avco went from one contract to a different
9 contract?
10          MR. HAEFELE:  Objection to
11      form.
12          THE WITNESS:  No.  No.
13 QUESTIONS BY MR. KRY:
14      Q.    There's a column in this chart
15 for the level associated with these positions
16 and then the reimbursement rate associated
17 with those levels.
18          Every time the PCA sent Dallah
19 Avco a letter directing Dallah Avco to put
20 Al-Bayoumi on a particular position, did
21 those letters indicate the level associated
22 with that position?
23      A.    It did.
24      Q.    And did ANSS contracts indicate
25 the reimbursement rates associated with those

Golkow Litigation Services - 1.877.370.DEPS

Highly Confidential- Subject to Futher Confidentiality Review

1    levels?
2        A.    Yes, it did.
3        Q.    So that was all information
4    dictated by the terms of these communications
5    from the PCA and from the terms of the
6    contracts themselves?
7        A.    Yes.
8        Q.    Okay.  We're done with that
9    document.
10            MR. HAEFELE:  Excuse me.
11            MR. KRY:  We're done with that
12    document.
13    QUESTIONS BY MR. KRY:
14        Q.    Mr. Kamel, have you heard of
15    the contracts finance and controls component?
16        A.    No.
17        Q.    CFC?
18        A.    CFC, yes.
19        Q.    And is that a component of the
20    ANSS project?
21        A.    It is.
22        Q.    And is Alp Karli the head of
23    that component?
24        A.    As the documents show, yes.
25        Q.    And so was Alp Karli an ANSS

1    employee?
2        A.    As the documents show, yes.
3        Q.    And as an ANSS employee, was
4    Alp Karli's work directed and supervised by
5    the PCA?
6        A.    Yes.
7        Q.    Are you a Saudi lawyer,
8    Mr. Kamel?
9        A.    Am I a what?
10        Q.    A lawyer?
11        A.    No.
12        Q.    So are you here to give us any
13    legal opinion about whether there was an
14    employment relationship between any
15    particular parties as a matter of Saudi law?
16        A.    No.
17        Q.    But is it your understanding
18    that all of the ANSS employees, including
19    people like Alp Karli, would have been
20    directed and supervised by the PCA?
21        A.    This is what the contract
22    explicitly says.
23        Q.    And so your understanding is
24    that that's true of ANSS employees generally?
25        A.    Yes.

1        Q.    In the course of preparing for
2    today's deposition, were you also given
3    information about the knowledge of another
4    former Dallah Avco employee, Ahmed Niazi?
5        A.    Yes.
6        Q.    Was Mr. Niazi formerly the
7    director of finance at Dallah Avco?
8        A.    This is what the document says.
9        Q.    And as the director of finance,
10    would Mr. Niazi have been familiar with the
11    financial transactions involving, among other
12    things, payment of payroll and reimbursement
13    that Dallah Avco obtained for those payments?
14        A.    He should have.
15        Q.    Okay.  I'm going to mark as --
16            (Kamel Exhibit 129 marked for
17    identification.)
18    QUESTIONS BY MR. KRY:
19        Q.    All right.  I've marked as
20    Exhibit 129 a document which I'm provided to
21    you now.
22            Mr. Kamel, do you recognize
23    this as information known to Ahmed Niazi that
24    was provided to you in connection with
25    preparing for this deposition?

1        A.    Yes.
2        Q.    And the second paragraph of
3    this document says, "Under this arrangement,
4    Dallah Avco was compensated for paying the
5    salaries of all ANSS employees.  All
6    man-month employees were reimbursable
7    employees for whom Dallah Avco received
8    compensation from the PCA, and Mr. Niazi does
9    not remember any instances where Dallah Avco
10    was not reimbursed."
11            Is that information that was
12    known to Mr. Niazi and that was provided to
13    you in connection with preparing for this
14    deposition as Dallah Avco's corporate
15    representative?
16        A.    Yes.
17        Q.    And is it true to the best of
18    your knowledge that the head of Dallah Avco's
19    finance department is not aware of any
20    instance where Dallah Avco paid compensation
21    to an ANSS employee that was not reimbursed
22    by the PCA?
23        A.    No.  Well, the documents
24    doesn't show any such instance.
25        Q.    Okay.  So just to be clear for

64 (Pages 250 to 253)

Highly Confidential- Subject to Futher Confidentiality Review

Page 254

1  the record, to the best of your knowledge,
2  including the information you obtained from
3  Mr. Niazi, there was no instance where Dallah
4  Avco paid compensation to an ANSS employee
5  that was not reimbursed by the PCA?
6      A.   Correct.
7          (Kamel Exhibit 130 marked for
8      identification.)
9  QUESTIONS BY MR. KRY:
10     Q.   All right.  One more document,
11 which I'm going to mark as 130.  This is a
12 document Bates-numbered DA000899.
13         MR. HAEFELE:  That's Kamel 130?
14         MR. KRY:  It is Exhibit Kamel
15     130.  Thank you.
16 QUESTIONS BY MR. KRY:
17     Q.   And then there's again a
18 translation on the back, subject to the same
19 stipulation we had earlier.
20         Take a moment to review this
21 letter, but it relates to Social Security
22 payments for -- in connection with
23 Al-Bayoumi.
24     A.   Okay.
25     Q.   During the ANSS project, was

Page 255

1  there a period during which Dallah Avco paid
2  Al-Bayoumi's Social Security payments?
3      A.   Throughout his employment, yes.
4      Q.   And did Dallah Avco
5  subsequently come to learn that those
6  payments were -- were not appropriate?
7      A.   They were -- they came to know
8  that he was considered under the civil
9  pension, which that would -- government
10 entities' employees, whereas the private
11 company employees will be handed to the -- is
12 social insurance.
13         So you were paying his social
14 insurance to that entity, and at the end of
15 the service -- this is coming from the civil
16 pension telling us that he is a seconded
17 employee, which he would be under our
18 subordination.
19         So they're calculating this
20 amount that we paid, and they say they will
21 credit our account with them so it doesn't
22 have to be like double payments.
23         So what they're telling us,
24 that he's not a private employee, he's a
25 government entity employee here, which is

Page 256

1  under the civil pension, not the social
2  insurance.
3      Q.   So is it your understanding
4  that even during the time he was seconded to
5  the ANSS project, Al-Bayoumi was considered a
6  public employee for purposes of his pension?
7      A.   This is what this letter
8  clearly says.
9      Q.   And as a result of this
10 communication, sometime later, and actually a
11 considerable time later, did Dallah Avco
12 eventually refund some of those withheld
13 pension payments to Mr. Al-Bayoumi?
14     A.   Yes, we did.
15         MR. KRY:  No further questions
16 for us.
17         MR. SHEN:  I have a few.
18         VIDEOGRAPHER:  The time is now
19     3:57.  Going off the record.
20     (Off the record at 3:57 p.m.)
21         VIDEOGRAPHER:  Okay.  The time
22 is now 4:02.  Back on the record.
23         CROSS-EXAMINATION
24 QUESTIONS BY MR. SHEN:
25     Q.   Mr. Kamel, my name is Andy

Page 257

1  Shen.  I'm a lawyer that represents the
2  Kingdom of Saudi Arabia.  I just have a few
3  questions for you today, sir.
4          When did you start at Dallah
5  Avco?
6      A.   I never was at Dallah Avco.
7  I'm a Dallah Trans Arabia employee.
8      Q.   And when did you start at
9  Dallah Trans Arabia?
10     A.   Dallah Trans Arabia was in
11 2007, end of 2007.
12     Q.   Sir, did you ever work on the
13 ANSS project?
14     A.   No.
15     Q.   And certainly you have no
16 personal knowledge of the ANSS project,
17 correct?
18     A.   No.
19     Q.   Anything that you've testified
20 today about the ANSS project comes from the
21 work that you've done to get educated for
22 purposes of this deposition, correct?
23     A.   Correct.
24     Q.   And, sir, you don't have any
25 personal knowledge as to Mr. Al-Bayoumi's

65 (Pages 254 to 257)

Highly Confidential- Subject to Futher Confidentiality Review

Page 282

1    Q.   Okay.  So does this refresh
2  your recollection as to whether you saw any
3  documents during your preparations in which
4  PCA officials provided direction to Dallah
5  Avco concerning Omar Al-Bayoumi's salary and
6  expense levels?
7         MR. SHEN:  Objection to form.
8         THE WITNESS:  It does, yes.
9  QUESTIONS BY MR. CARTER:
10    Q.   Mr. Kamel, I've just handed you
11  an exhibit we marked yesterday as Khan 99.
12         Do you see that document?
13    A.   Yes, I do.
14    Q.   Are you familiar with this form
15  of document based on your preparations for
16  today's deposition?
17    A.   Slightly.
18    Q.   What do you understand this
19  document to be?
20    A.   It says "personal status
21  change," so it shows that changed from this
22  thing to that thing.  And it shows basic
23  salary change; job title, same; contract
24  type, same; housing, same; transport, same.
25  So it's just instruction.

Page 283

1    Q.   Okay.  And is this a document
2  pertaining to Omar Al-Bayoumi?
3    A.   It does.
4    Q.   And does this document indicate
5  a change is being made relative to Bayoumi's
6  compensation?
7    A.   It does.
8    Q.   And does the document identify
9  the reason for this change?
10    A.   Job title reason.  I suppose
11  the instruction of the Director General PCA.
12    Q.   Okay.  The Director General of
13  the PCA, do you know who that was at this
14  time period?
15    A.   I would suspect Al-Salmi.
16    Q.   Okay.  And was he a PCA
17  employee?
18    A.   Yes, he is.
19    Q.   Mr. Kamel, are you aware of any
20  other information provided by former Dallah
21  employees pertaining to whether the PCA
22  initiated Omar Al-Bayoumi's secondment?
23    A.   No.
24    Q.   And are you aware of any other
25  summaries of interviews that address who

Page 284

1  initiated Omar Al-Bayoumi's secondment?
2    A.   No.
3    Q.   And are you aware of any other
4  information or summaries of interviews that
5  address who was responsible for extending or
6  directing the extension of Omar Al-Bayoumi's
7  secondment?
8    A.   No.
9         MR. CARTER:  That's all I have.
10         MR. KRY:  I just have a couple
11  questions.
12         VIDEOGRAPHER:  The time is now
13  4:29.  Going off the record.
14    (Off the record at 4:29 p.m.)
15         VIDEOGRAPHER:  Okay.  The time
16  is now 4:31.  Back on the record.
17         RECROSS-EXAMINATION
18  QUESTIONS BY MR. KRY:
19    Q.   Mr. Kamel, I'm going to show
20  you a document previously marked Exhibit 112.
21  This is the 1995 instruction from the PCA to
22  put Al-Bayoumi on the project.
23         And do you see where that
24  correspondence from the PCA identifies the
25  position as senior data proc tech and then

Page 285

1  identifies a level as G?
2    A.   Okay.  Okay.
3    Q.   Now, does that reference to
4  level G correspond to something in the ANSS
5  project?  I'm sorry, in the ANSS contract?
6    A.   Yes, it does.
7    Q.   Does the ANSS contract specify
8  a pay rate or at least a reimbursement rate
9  associated with that position level?
10    A.   As the documents show, yes.
11    Q.   And so when Dallah Avco
12  receives an instruction like this from the
13  PCA, was that level assignment used as the
14  basis for Dallah Avco's determination of
15  things like the salary and the benefits that
16  would be paid to the employee?
17    A.   Yes.
18         MR. KRY:  Okay.  No other
19  questions.  Off the record.
20         VIDEOGRAPHER:  The time is now
21  4:32.  Off the record.
22    (Off the record at 4:32 p.m.)
23         VIDEOGRAPHER:  Okay.  The time
24  is now 4:33.  Back on the record.
25         RECROSS-EXAMINATION

72 (Pages 282 to 285)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001<br><br>*This document relates to:*<br>All cases | No. 03 MDL 1570 GBD FM |

**ERRATA SHEET FOR THE
RULE 30(b)(6) DEPOSITION OF AMMAR H. KAMEL,
CORPORATE REPRESENTATIVE FOR DALLAH AVCO
(January 24, 2019)**

| Page and Line | Current Text | Revised Text | Reason |
|---|---|---|---|
| 21:13-14 | somebody who has special knowledge something | somebody who has special knowledge about something | Clarification |
| 41:10 | attended and awarded | tendered and awarded | Transcription error |
| 45:20-21 | Dallah Avco is the owner of Dallah Trans Arabia. | Dallah Al Baraka is the owner of Dallah Trans Arabia. | Correction |
| 46:6 | Prince Ahmed bin Hamman | Prince Khalid Bin Abdullah Bin Abdulrahman Al Saud | Correction/Transcription error |
| 60:9-12 | I don't know if that was each period or this was the overall.  My understanding that it was at any given time, but I might be wrong. | That was the total number overall. | Correction |
| 86:18-19 | I don't think that it is Dallah's Avco to check | I don't think that it is Dallah Avco's role to check | Clarification |
| 90:7 | The PCA send a letter | The PCA sent a letter | Clarification |
| 93:10 | the recruiting man clause | the recruitment plan clause | Clarification |
| 114:11 | What his abouts were | What his whereabouts were | Clarification |
| 130:12 | some of the recruitment tasks | some of the tasks | Clarification |
| 131:7 | 50 percent share | 15 percent share | Transcription error |



1

| Page and Line | Current Text | Revised Text | Reason |
|---|---|---|---|
| 143:22 | should had his signature | should have had his signature | Clarification |
| 145:25 | A job offer to CFC | Send job offer to CFC | Conform to document |
| 154:19 | something, something, 5988 | something, something, 598 A | Transcription error |
| 164:25 | under those contract | under that contract | Clarification |
| 165:17 | I think, ANSS 33 | I think, ANSS 3 | Clarification |
| 215:1-2 | Dallah Avco never had any need to anybody of this. | Dallah Avco never had any need for anybody on this project. | Clarification |
| 219:13 | giving a daily proxy | giving a proxy | Clarification |
| 255:17-18 | which he would be under our subordination. | which he would be under the civil service's subordination. | Clarification |
| 282:20 | personal status | personnel status | Transcription error |
| 287:13 | on the forms, and that is that are coming from PCA | on the forms, that are coming from PCA | Clarification |
| 292:5 | all datas are having signatures | all documents are having signatures | Clarification |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March _31_ , 2019

Ammar Kamel

2