# EXHIBIT "A"

## VICTIMS LIST

### World Trade Center

Gordon McCannel Aamoth, 32, New York, N.Y.
Maria Rose Abad, 49, Syosset, N.Y.
Edelmiro (Ed) Abad, 54, New York, N.Y.
Andrew Anthony Abate, 37, Melville, N.Y.
Vincent Abate, 40, New York, N.Y.
Laurence Christopher Abel, 37
William F. Abrahamson, 58, Cortland Manor, N.Y.
Richard Anthony Aceto, 42, Wantagh, N.Y.
Erica Van Acker, 62, New York, N.Y.
Heinrich B. Ackermann, 38, New York, N.Y.
Paul Andrew Acquaviva, 29, Glen Rock, N.J.
Donald L. Adams, 28, Chatham, N.J.
Shannon Lewis Adams, 25, New York, N.Y.
Stephen Adams, 51, New York, N.Y.
Patrick Adams, 60, New York, N.Y.
Ignatius Adanga, 62, New York, N.Y.
Christy A. Addamo, 28, New Hyde Park, N.Y.
Terence E. Adderley, 22, Bloomfield Hills, Mich.
Sophia B. Addo, 36, New York, N.Y.
Lee Adler, 48, Springfield, N.J.
Daniel Thomas Afflitto, 32, Manalapan, N.J.
Emmanuel Afuakwah, 37, New York, N.Y.
Alok Agarwal, 36, Jersey City, N.J.
Mukul Agarwala, 37, New York, N.Y.
Joseph Agnello, 35, New York, N.Y.
David Scott Agnes, 46, New York, N.Y.
Joao A. Aguiar Jr., 30, Red Bank, N.J.
Lt. Brian G. Ahearn, 43, Huntington, N.Y.
Jeremiah J. Ahern, 74, Cliffside Park, N.J.
Joanne Ahladiotis, 27, New York, N.Y.
Shabbir Ahmed, 47, New York, N.Y.
Terrance Andre Aiken, 30, New York, N.Y.
Godwin Ajala, 33, New York, N.Y.
Gertrude M. Alagero, 37, New York, N.Y.
Andrew Alameno, 37, Westfield, N.J.
Margaret Ann (Peggy) Jezycki Alario, 41, New York, N.Y.
Gary Albero, 39, Emerson, N.J.
Jon L. Albert, 46, Upper Nyack, N.Y.
Peter Craig Alderman, 25, New York, N.Y.

Jacquelyn Delaine Aldridge, 46, New York, N.Y.
Grace Alegre-Cua, 40, Glen Rock, N.J.
David D. Alger, 57, New York, N.Y.
Ernest Alikakos, 43, New York, N.Y.
Edward L. Allegretto, 51, Colonia, N.J.
Eric Allen, 44, New York, N.Y.
Joseph Ryan Allen, 39, New York, N.Y.
Richard Lanard Allen, 30, New York, N.Y.
Richard Dennis Allen, 31, New York, N.Y.
Christopher Edward Allingham, 36, River Edge, N.J.
Janet M. Alonso, 41, Stony Point, N.Y.
Anthony Alvarado, 31, New York, N.Y.
Antonio Javier Alvarez, 23, New York, N.Y.
Telmo Alvear, 25, New York, N.Y.
Cesar A. Alviar, 60, Bloomfield, N.J.
Tariq Amanullah, 40, Metuchen, N.J.
Angelo Amaranto, 60, New York, N.Y.
James Amato, 43, Ronkonkoma, N.Y.
Joseph Amatuccio, 41, New York, N.Y.
Christopher Charles Amoroso, 29, New York, N.Y.
Kazuhiro Anai, 42, Scarsdale, N.Y.
Calixto Anaya, 35, Suffern, N.Y.
Jorge Octavio Santos Anaya, 25, Aguascalientes, Aguascalientes, Mexico
Joseph Peter Anchundia, 26, New York, N.Y.
Kermit Charles Anderson, 57, Green Brook, N.J.
Yvette Anderson, 53, New York, N.Y.
John Andreacchio, 52, New York, N.Y.
Michael Rourke Andrews, 34, Belle Harbor, N.Y.
Jean A. Andrucki, 42, Hoboken, N.J.
Siew-Nya Ang, 37, East Brunswick, N.J.
Joseph Angelini, 38, Lindenhurst, N.Y.
Joseph Angelini, 63, Lindenhurst, N.Y.
Laura Angilletta, 23, New York, N.Y.
Doreen J. Angrisani, 44, New York, N.Y.
Lorraine D. Antigua, 32, Middletown, N.J.
Peter Paul Apollo, 26, Hoboken, N.J.
Faustino Apostol, 55, New York, N.Y.
Frank Thomas Aquilino, 26, New York, N.Y.
Patrick Michael Aranyos, 26, New York, N.Y.
David Gregory Arce, 36, New York, N.Y.
Michael G. Arczynski, 45, Little Silver, N.J.
Louis Arena, 32, New York, N.Y.
Adam Arias, 37, Staten Island, N.Y.
Michael J. Armstrong, 34, New York, N.Y.
Jack Charles Aron, 52, Bergenfield, N.J.
Joshua Aron, 29, New York, N.Y.

Richard Avery Aronow, 48, Mahwah, N.J.
Japhet J. Aryee, 49, Spring Valley, N.Y.
Carl Asaro, 39, Middletown, N.Y.
Michael A. Asciak, 47, Ridgefield, N.J.
Michael Edward Asher, 53, Monroe, N.Y.
Janice Ashley, 25, Rockville Centre, N.Y.
Thomas J. Ashton, 21, New York, N.Y.
Manuel O. Asitimbay, 36, New York, N.Y.
Lt. Gregg Arthur Atlas, 45, Howells, N.Y.
Gerald Atwood, 38, New York, N.Y.
James Audiffred, 38, New York, N.Y.
Kenneth W. Van Auken, 47, East Brunswick, N.J.
Louis F. Aversano, Jr, 58, Manalapan, N.J.
Ezra Aviles, 41, Commack, N.Y.
Ayodeji Awe, 42, New York, N.Y
Samuel (Sandy) Ayala, 36, New York, N.Y.
Arlene T. Babakitis, 47, Secaucus, N.J.
Eustace (Rudy) Bacchus, 48, Metuchen, N.J.
John James Badagliacca, 35, New York, N.Y.
Jane Ellen Baeszler, 43, New York, N.Y.
Robert J. Baierwalter, 44, Albertson, N.Y.
Andrew J. Bailey, 29, New York, N.Y.
Brett T. Bailey, 28, Bricktown, N.Y.
Tatyana Bakalinskaya, 43, New York, N.Y.
Michael S. Baksh, 36, Englewood, N.J.
Sharon Balkcom, 43, White Plains, N.Y.
Michael Andrew Bane, 33, Yardley, Pa.
Kathy Bantis, 44, Chicago, Ill.
Gerard Jean Baptiste, 35, New York, N.Y.
Walter Baran, 42, New York, N.Y.
Gerard A. Barbara, 53, New York, N.Y.
Paul V. Barbaro, 35, Holmdel, N.J.
James W. Barbella, 53, Oceanside, N.Y.
Ivan Kyrillos Fairbanks Barbosa, 30, Jersey City, N.J.
Victor Daniel Barbosa, 23, New York, N.Y.
Colleen Ann Barkow, 26, East Windsor, N.J.
David Michael Barkway, 34, Toronto, Ontario, Canada
Matthew Barnes, 37, Monroe, N.Y.
Sheila Patricia Barnes, 55, Bay Shore, N.Y.
Evan J. Baron, 38, Bridgewater, N.J.
Renee Barrett-Arjune, 41, Irvington, N.J.
Arthur T. Barry, 35, New York, N.Y.
Diane G. Barry, 60, New York, N.Y.
Maurice Vincent Barry, 49, Rutherford, N.J.
Scott D. Bart, 28, Malverne, N.Y.
Carlton W. Bartels, 44, New York, N.Y.

3

Guy Barzvi, 29, New York, N.Y.
Inna Basina, 43, New York, N.Y.
Alysia Basmajian, 23, Bayonne, N.J.
Kenneth William Basnicki, 48, Etobicoke, Ontario, Canada
Lt. Steven J. Bates, 42, New York, N.Y.
Paul James Battaglia, 22, New York, N.Y.
W. David Bauer, 45, Rumson, N.J.
Ivhan Luis Carpio Bautista, 24, New York, N.Y.
Marlyn C. Bautista, 46, Iselin, N.J.
Jasper Baxter, 45, Philadelphia, Pa.
Michele (Du Berry) Beale, 37, Essex, Britain
Paul F. Beatini, 40, Park Ridge, N.J.
Jane S. Beatty, 53, Belford, N.J.
Larry I. Beck, 38, Baldwin, N.Y.
Manette Marie Beckles, 43, Rahway, N.J.
Carl John Bedigian, 35, New York, N.Y.
Michael Beekman, 39, New York, N.Y.
Maria Behr, 41, Milford, N.J.
Yelena Belilovsky, 38, Mamaroneck, N.Y.
Nina Patrice Bell, 39, New York, N.Y.
Andrea Della Bella, 59, Jersey City, N.J.
Debbie S. Bellows, 30, East Windsor, N.J.
Stephen Elliot Belson, 51, New York, N.Y.
Paul Michael Benedetti, 32, New York, N.Y.
Denise Lenore Benedetto, 40, New York, N.Y.
Bryan Craig Bennett, 25, New York, N.Y.
Oliver Duncan Bennett, 29, London, England
Eric L. Bennett, 29, New York, N.Y.
Margaret L. Benson, 52, Rockaway, N.J.
Dominick J. Berardi, 25, New York, N.Y.
James Patrick Berger, 44, Lower Makefield, Pa.
Steven Howard Berger, 45, Manalapan, N.J.
John P. Bergin, 39, New York, N.Y.
Alvin Bergsohn, 48, Baldwin Harbor, N.Y.
Daniel D. Bergstein, 38, Teaneck, N.J.
Michael J. Berkeley, 38, New York, N.Y.
Donna Bernaerts-Kearns, 44, Hoboken, N.J.
David W. Bernard, 57, Chelmsford, Mass.
William Bernstein, 44, New York, N.Y.
David M. Berray, 39, New York, N.Y.
David S. Berry, 43, New York, N.Y.
Joseph J. Berry, 55, Saddle River, N.J.
William Reed Bethke, 36, Hamilton, N.J.
Timothy D. Betterly, 42, Little Silver, N.J.
Edward F. Beyea, 42, New York, N.Y.
Paul Michael Beyer, 37, New York, N.Y.

Anil T. Bharvaney, 41, East Windsor, N.J.
Bella Bhukhan, 24, Union, N.J.
Shimmy D. Biegeleisen, 42, New York, N.Y.
Peter Alexander Bielfeld, 44, New York, N.Y.
William Biggart, 54, New York, N.Y.
Brian Bilcher, 36, New York, N.Y.
Carl Vincent Bini, 44, New York, N.Y.
Gary Bird, 51, Tempe, Ariz.
Joshua David Birnbaum, 24, New York, N.Y.
George Bishop, 52, Granite Springs, N.Y.
Jeffrey D. Bittner, 27, New York, N.Y.
Balewa Albert Blackman, 26, New York, N.Y.
Christopher Joseph Blackwell, 42, Patterson, N.Y.
Susan L. Blair, 35, East Brunswick, N.J.
Harry Blanding, 38, Blakeslee, Pa.
Janice L. Blaney, 55, Williston Park, N.Y.
Craig Michael Blass, 27, Greenlawn, N.Y.
Rita Blau, 52, New York, N.Y.
Richard M. Blood, 38, Ridgewood, N.J.
Michael A. Boccardi, 30, Bronxville, N.Y.
John Paul Bocchi, 38, New Vernon, N.J.
Michael L. Bocchino, 45, New York, N.Y.
Susan Mary Bochino, 36, New York, N.Y.
Bruce Douglas (Chappy) Boehm, 49, West Hempstead, N.Y.
Mary Katherine Boffa, 45, New York, N.Y.
Nicholas A. Bogdan, 34, Browns Mills, N.J.
Darren C. Bohan, 34, New York, N.Y.
Lawrence Francis Boisseau, 36, Freehold, N.J.
Vincent M. Boland, 25, Ringwood, N.J.
Alan Bondarenko, 53, Flemington, N.J.
Andre Bonheur, 40, New York, N.Y.
Colin Arthur Bonnett, 39, New York, N.Y.
Frank Bonomo, 42, Port Jefferson, N.Y.
Yvonne L. Bonomo, 30, New York, N.Y.
Sean Booker, 35, Irvington, N.J.
Sherry Ann Bordeaux, 38, Jersey City, N.J.
Krystine C. Bordenabe, 33, Old Bridge, N.J.
Martin Boryczewski, 29, Parsippany, N.J.
Richard E. Bosco, 34, Suffern, N.Y.
John Howard Boulton, 29, New York, N.Y.
Francisco Bourdier, 41, New York, N.Y.
Thomas H. Bowden, 36, Wyckoff, N.J.
Kimberly S. Bowers, 31, Islip, N.Y.
Veronique (Bonnie) Nicole Bowers, 28, New York, N.Y.
Larry Bowman, 46, New York, N.Y.
Shawn Edward Bowman, 28, New York, N.Y.

Kevin L. Bowser, 45, Philadelphia, Pa.
Gary R. Box, 37, North Bellmore, N.Y.
Gennady Boyarsky, 34, New York, N.Y.
Pamela Boyce, 43, New York, N.Y.
Michael Boyle, 37, Westbury, N.Y.
Alfred Braca, 54, Leonardo, N.J.
Sandra Conaty Brace, 60, New York, N.Y.
Kevin H. Bracken, 37, New York, N.Y.
David Brian Brady, 41, Summit, N.J.
Alexander Braginsky, 38, Stamford, Conn.
Nicholas W. Brandemarti, 21, Mantua, N.J.
Michelle Renee Bratton, 23, Yonkers, N.Y.
Patrice Braut, 31, New York, N.Y.
Lydia Estelle Bravo, 50, Dunellen, N.J.
Ronald Michael Breitweiser, 39, Middletown Township, N.J.
Edward A. Brennan, 37, New York, N.Y.
Frank H. Brennan, 50, New York, N.Y.
Michael Emmett Brennan, 27, New York, N.Y.
Peter Brennan, 30, Ronkonkoma, N.Y.
Thomas M. Brennan, 32, Scarsdale, N.Y.
Capt. Daniel Brethel, 43, Farmingdale, N.Y.
Gary L. Bright, 36, Union City, N.J.
Jonathan Eric Briley, 43, Mount Vernon, N.Y.
Mark A. Brisman, 34, Armonk, N.Y.
Paul Gary Bristow, 27, New York, N.Y.
Victoria Alvarez Brito, 38, New York, N.Y.
Mark Francis Broderick, 42, Old Bridge, N.J.
Herman C. Broghammer, 58, North Merrick, N.Y.
Keith Broomfield, 49, New York, N.Y.
Janice J. Brown, 35, New York, N.Y.
Lloyd Brown, 28, Bronxville, N.Y.
Capt. Patrick J. Brown, 48, New York, N.Y.
Bettina Browne, 49, Atlantic Beach, N.Y.
Mark Bruce, 40, Summit, N.J.
Richard Bruehert, 38, Westbury, N.Y.
Andrew Brunn, 28
Capt. Vincent Brunton, 43, New York, N.Y.
Ronald Paul Bucca, 47, Tuckahoe, N.Y.
Brandon J. Buchanan, 24, New York, N.Y.
Greg Joseph Buck, 37, New York, N.Y.
Dennis Buckley, 38, Chatham, N.J.
Nancy Bueche, 43, Hicksville, N.Y.
Patrick Joseph Buhse, 36, Lincroft, N.J.
John E. Bulaga, 35, Paterson, N.J.
Stephen Bunin, 45, New York, N.Y.
Thomas Daniel Burke, 38, Bedford Hills, N.Y.

Capt. William F. Burke, 46, New York, N.Y.
Matthew J. Burke, 28, New York, N.Y.
Donald James Burns, 61, Nissequogue, N.Y.
Kathleen A. Burns, 49, New York, N.Y.
Keith James Burns, 39, East Rutherford, N.J.
John Patrick Burnside, 36, New York, N.Y.
Irina Buslo, 32, New York, N.Y.
Milton Bustillo, 37, New York, N.Y.
Thomas M. Butler, 37, Kings Park, N.Y.
Patrick Byrne, 39, New York, N.Y.
Timothy G. Byrne, 36, Manhattan, N.Y.
Jesus Cabezas, 66, New York, N.Y.
Lillian Caceres, 48, New York, N.Y.
Brian Joseph Cachia, 26, New York, N.Y.
Steven Cafiero, 31, New York, N.Y.
Richard M. Caggiano, 25, New York, N.Y.
Cecile M. Caguicla, 55, Boonton, N.J.
Michael John Cahill, 37, East Williston, N.Y.
Scott W. Cahill, 30, West Caldwell, N.J.
Thomas J. Cahill, 36, Franklin Lakes, N.J.
George Cain, 35, Massapequa, N.Y.
Salvatore B. Calabro, 38, New York, N.Y.
Joseph Calandrillo, 49, Hawley, Pa.
Philip V. Calcagno, 57, New York, N.Y.
Edward Calderon, 44, Jersey City, N.J.
Kenneth Marcus Caldwell, 30, New York, N.Y.
Dominick E. Calia, 40, Manalapan, N.J.
Felix (Bobby) Calixte, 38, New York, N.Y.
Capt. Frank Callahan, 51, New York, N.Y.
Liam Callahan, 44, Rockaway, N.J.
Luigi Calvi, 34, East Rutherford, N.J.
Roko Camaj, 60, Manhasset, N.Y.
Michael Cammarata, 22, Huguenot, N.Y.
David Otey Campbell, 51, Basking Ridge, N.J.
Geoffrey Thomas Campbell, 31, New York, N.Y.
Sandra Patricia Campbell, 45, New York, N.Y.
Jill Marie Campbell, 31, New York, N.Y.
Robert Arthur Campbell, 25, New York, N.Y.
Juan Ortega Campos, 32, New York, N.Y.
Sean Canavan, 39, New York, N.Y.
John A. Candela, 42, Glen Ridge, N.J.
Vincent Cangelosi, 30, New York, N.Y.
Stephen J. Cangialosi, 40, Middletown, N.J.
Lisa B. Cannava, 30, New York, N.Y.
Brian Cannizzaro, 30, New York, N.Y.
Michael R. Canty, 30, Schenectady, N.Y.

Louis A. Caporicci, 35, New York, N.Y.
Jonathan N. Cappello, 23, Garden City, N.Y.
James Christopher Cappers, 33, Wading River, N.Y.
Richard M. Caproni, 34, Lynbrook, N.Y.
Jose Cardona, 32, New York, N.Y.
Dennis M Carey, 51, Wantagh, N.Y.
Edward Carlino, 46, New York, N.Y.
Michael Scott Carlo, 34, New York, N.Y.
David G. Carlone, 46, Randolph, N.J.
Rosemarie C. Carlson, 40, New York, N.Y.
Mark Stephen Carney, 41, Rahway, N.J.
Joyce Ann Carpeneto, 40, New York, N.Y.
Alicia Acevedo Carranza, Teziutlan, Puebla, Mexico
Jeremy M. Carrington, 34, New York, N.Y.
Michael T. Carroll, 39, New York, N.Y.
Peter Carroll, 42, New York, N.Y.
James J. Carson, 32, Massapequa, N.Y.
James Marcel Cartier, 26, New York, N.Y.
Vivian Casalduc, 45, New York, N.Y.
John F. Casazza, 38, Colts Neck, N.J.
Paul Cascio, 23, Manhasset, N.Y.
Kathleen Hunt Casey, 43, Middletown, N.J.
Margarito Casillas, 54, Guadalajara, Jalisco, Mexico
Thomas Anthony Casoria, 29, New York, N.Y.
William Otto Caspar, 57, Eatontown, N.J.
Alejandro Castano, 35, Englewood, N.J.
Arcelia Castillo, 49, Elizabeth, N.J.
Leonard M. Castrianno, 30, New York, N.Y.
Jose Ramon Castro, 37, New York, N.Y.
Richard G. Catarelli, 47, New York, N.Y.
Christopher Sean Caton, 34, New York, N.Y.
Robert J. Caufield, 48, Valley Stream, N.Y.
Mary Teresa Caulfield, 58, New York, N.Y.
Judson Cavalier, 26, Huntington, N.Y.
Michael Joseph Cawley, 32, Bellmore, N.Y.
Jason D. Cayne, 32, Morganville, N.J.
Juan Armando Ceballos, 47, New York, N.Y.
Marcia G. Cecil-Carter, 34, New York, N.Y.
Jason Cefalu, 30, West Hempstead, N.Y.
Thomas J. Celic, 43, New York, N.Y.
Ana M. Centeno, 38, Bayonne, N.J.
Joni Cesta, 37, Bellmore, N.Y.
Jeffrey M. Chairnoff, 35, West Windsor, N.J.
Swarna Chalasani, 33, Jersey City, N.J.
William Chalcoff, 41, Roslyn, N.Y.
Eli Chalouh, 23, New York, N.Y.

Charles Lawrence (Chip) Chan, 23, New York, N.Y.
Mandy Chang, 40, New York, N.Y.
Mark L. Charette, 38, Millburn, N.J.
Gregorio Manuel Chavez, 48, New York, N.Y.
Jayceryll M. de Chavez, 24, Carteret, N.J.
Pedro Francisco Checo, 35, New York, N.Y.
Douglas MacMillan Cherry, 38, Maplewood, N.J.
Stephen Patrick Cherry, 41, Stamford, Conn.
Vernon Paul Cherry, 49, New York, N.Y.
Nestor Chevalier, 30, New York, N.Y.
Swede Joseph Chevalier, 26, Locust, N.J.
Alexander H. Chiang, 51, New City, N.Y.
Dorothy J. Chiarchiaro, 61, Glenwood, N.J.
Luis Alfonso Chimbo, 39, New York, N.Y.
Robert Chin, 33, New York, N.Y.
Wing Wai (Eddie) Ching, 29, Union, N.J.
Nicholas P. Chiofalo, 39, Selden, N.Y.
John Chipura, 39, New York, N.Y.
Peter A. Chirchirillo, 47, Langhorne, Pa.
Catherine E. Chirls, 47, Princeton, N.J.
Kyung (Kaccy) Cho, 30, Clifton, N.J.
Abul K. Chowdhury, 30, New York, N.Y.
Mohammed Salahuddin Chowdhury, 38, New York, N.Y.
Kirsten L. Christophe, 39, Maplewood, N.J.
Pamela Chu, 31, New York, N.Y.
Steven Paul Chucknick, 44, Cliffwood Beach, N.J.
Wai-ching Chung, 36, New York, N.Y.
Christopher Ciafardini, 30, New York, N.Y.
Alex F. Ciccone, 38, New Rochelle, N.Y.
Frances Ann Cilente, 26, New York, N.Y.
Elaine Cillo, 40, New York, N.Y.
Edna Cintron, 46, New York, N.Y.
Nestor Andre Cintron, 26, New York, N.Y.
Lt. Robert Dominick Cirri, 39, Nutley, N.J.
Juan Pablo Alvarez Cisneros, 23, Weehawken, N.J.
Gregory Alan Clark, 40, Teaneck, N.J.
Mannie Leroy Clark, 54, New York, N.Y.
Thomas R. Clark, 37, Summit, N.J.
Eugene Clark, 47, New York, N.Y.
Benjamin Keefe Clark, 39, New York, N.Y.
Christopher Robert Clarke, 34, Philadelphia, Pa.
Donna Clarke, 39, New York, N.Y.
Michael Clarke, 27, Prince's Bay, N.Y.
Suria R.E. Clarke, 30, New York, N.Y.
Kevin Francis Cleary, 38, New York, N.Y.
James D. Cleere, 55, Newton, Iowa

Geoffrey W. Cloud, 36, Stamford, Conn.
Susan M. Clyne, 42, Lindenhurst, N.Y.
Steven Coakley, 36, Deer Park, N.Y.
Jeffrey Coale, 31, Souderton, Pa.
Patricia A. Cody, 46, Brigantine, N.J.
Daniel Michael Coffey, 54, Newburgh, N.Y.
Jason Matthew Coffey, 25, Newburgh, N.Y.
Florence Cohen, 62, New York, N.Y.
Kevin Sanford Cohen, 28, Edison, N.J.
Anthony Joseph Coladonato, 47, New York, N.Y.
Mark J. Colaio, 34, New York, N.Y.
Stephen J. Colaio, 32, Montauk, N.Y.
Christopher M. Colasanti, 33, Hoboken, N.J.
Michel Paris Colbert, 39, West New York, N.J.
Kevin Nathaniel Colbert, 25, New York, N.Y.
Keith Eugene Coleman, 34, Warren, N.J.
Scott Thomas Coleman, 31, New York, N.Y.
Tarel Coleman, 32
Liam Joseph Colhoun, 34, Flushing,, N.Y.
Robert D. Colin, 49, West Babylon, N.Y.
Robert J. Coll, 35, Glen Ridge, N.J.
Jean Marie Collin, 42, New York, N.Y.
John Michael Collins, 42, New York, N.Y.
Michael L. Collins, 38, Montclair, N.J.
Thomas J. Collins, 36, New York, N.Y.
Joseph Collison, 50, New York, N.Y.
Patricia Malia Colodner, 39, New York, N.Y.
Linda M. Colon, 46, Perrineville, N.J.
Soledi Colon, 39, New York, N.Y.
Ronald Comer, 56, Northport, N.Y.
Jaime Concepcion, 46, New York, N.Y.
Albert Conde, 62, Englishtown, N.J.
Denease Conley, 44, New York, N.Y.
Susan Clancy Conlon, 41, New York, N.Y.
Margaret Mary Conner, 57, New York, N.Y.
John E. Connolly, 46, Allenwood, N.J.
Cynthia L. Connolly, 40, Metuchen, N.J.
James Lee Connor, 38, Summit, N.J.
Jonathan (J.C.) Connors, 55, Old Brookville, N.Y.
Kevin P. Connors, 55, Greenwich, Conn.
Kevin Francis Conroy, 47, New York, N.Y.
Brenda E. Conway, 40, New York, N.Y.
Dennis Michael Cook, 33, Colts Neck, N.J.
Helen D. Cook, 24, New York, N.Y.
John A. Cooper, 40, Bayonne, N.J.
Joseph J. Coppo, 47, New Canaan, Conn.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

Gerard J. Coppola, 46, New Providence, N.J.
Joseph Albert Corbett, 28, Islip, N.Y.
Alejandro Cordero, 23, New York, N.Y.
Robert Cordice, 28, New York, N.Y.
Ruben D. Correa, 44, New York, N.Y.
Danny A. Correa-Gutierrez, 25, Fairview, N.J.
James Corrigan, 60, New York, N.Y.
Carlos Cortes, 57, New York, N.Y.
Kevin M. Cosgrove, 46, West Islip, N.Y.
Dolores Marie Costa, 53, Middletown, N.J.
Digna Alexandra Rivera Costanza, 25, New York, N.Y.
Charles Gregory Costello, 46, Old Bridge, N.J.
Michael S. Costello, 27, Hoboken, N.J.
Conrod K.H. Cottoy, 51, New York, N.Y.
Martin Coughlan, 54, New York, N.Y.
Sgt. John Gerard Coughlin, 43, Pomona, N.Y.
Timothy John Coughlin, 42, New York, N.Y.
James E. Cove, 48, Rockville Centre, N.Y.
Andre Cox, 29, New York, N.Y.
Frederick John Cox, 27, New York, N.Y.
James Raymond Coyle, 26, New York, N.Y.
Michelle Coyle-Eulau, 38, Garden City, N.Y.
Anne M. Cramer, 47, New York, N.Y.
Christopher Seton Cramer, 34, Manahawkin, N.J.
Denise Crant, 46, Hackensack, N.J.
Robert James Crawford, 62, New York, N.Y.
James L. Crawford, 33, Madison, N.J.
Joanne Mary Cregan, 32, New York, N.Y.
Lucia Crifasi, 51, Glendale, N.Y.
Lt. John Crisci, 48, Holbrook, N.Y.
Daniel Hal Crisman, 25, New York, N.Y.
Dennis A. Cross, 60, Islip Terrace, N.Y.
Helen Crossin-Kittle, 34, Larchmont, N.Y.
 Thomas G. Crotty, 42, Rockville Centre, N.Y.
John Crowe, 57, Rutherford, N.J.
Welles Remy Crowther, 24, Upper Nyack, N.Y.
Robert L. Cruikshank, 64, New York, N.Y.
Francisco Cruz, 47, New York, N.Y.
John Robert Cruz, 32, Jersey City, N.J.
Kenneth John Cubas, 48, Woodstock, N.Y.
Richard Joseph Cudina, 46, Glen Gardner, N.J.
Neil James Cudmore, 38, Port Washington, N.Y.
Thomas Patrick Cullen, 31, New York, N.Y.
Joan McConnell Cullinan, 47, Scarsdale, N.Y.
Joyce Cummings, 65
Brian Thomas Cummins, 38, Manasquan, N.J.

Nilton Albuquerque Fernao Cunha, 41
Michael Joseph Cunningham, 39, Princeton Junction, N.J.
Robert Curatolo, 31, New York, N.Y.
Laurence Curia, 41, Garden City, N.Y.
Paul Dario Curioli, 53, Norwalk, Conn.
Beverly Curry, 41, New York, N.Y.
Sgt. Michael Curtin, 45, Medford, N.Y.
Gavin Cushny, 47, Hoboken, N.J.
Caleb Arron Dack, 39, Montclair, N.J.
Carlos S. DaCosta, 41, Elizabeth, N.J.
John D'Allara, 47, Pearl River, N.Y.
Vincent D'Amadeo, 36, East Patchoque, N.Y.
Thomas A. Damaskinos, 33, Matawan, N.J.
Jack L. D'Ambrosi, 45, Woodcliff Lake, N.J.
Jeannine Marie Damiani-Jones, 28, New York, N.Y.
Patrick W. Danahy, 35, Yorktown Heights, N.Y.
Nana Kwuku Danso, 47, New York, N.Y.
Mary D'Antonio, 55, New York, N.Y.
Vincent G. Danz, 38, Farmingdale, N.Y.
Dwight Donald Darcy, 55, Bronxville, N.Y.
Elizabeth Ann Darling, 28, Newark, N.J.
Annette Andrea Dataram, 25, New York, N.Y.
Lt. Edward Alexander D'Atri, 38, New York, N.Y.
Michael D. D'Auria, 25, New York, N.Y.
Lawrence Davidson, 51, New York, N.Y.
Michael Allen Davidson, 27, Westfield, N.J.
Scott Matthew Davidson, 33, New York, N.Y.
Titus Davidson, 55, New York, N.Y.
Niurka Davila, 47, New York, N.Y.
Clinton Davis, 38, New York, N.Y.
Wayne Terrial Davis, 29, Fort Meade, Md.
Calvin Dawson, 46, New York, N.Y.
Anthony Richard Dawson, 32, Southampton, Hampshire, England
Edward James Day, 45, New York, N.Y.
Emerita (Emy) De La Pena, 32, New York, N.Y.
Melanie Louise De Vere, 30, London, England
William T. Dean, 35, Floral Park, N.Y.
Robert J. DeAngelis, 48, West Hempstead, N.Y.
Thomas P. Deangelis, 51, Westbury, N.Y.
Tara Debek, 35, Babylon, N.Y.
Anna Debin, 30, East Farmingdale, N.Y.
James V. DeBlase, 45, Manalapan, N.J.
Paul DeCola, 39, Ridgewood, N.Y.
Simon Dedvukaj, 26, Mohegan Lake, N.Y.
Jason Christopher DeFazio, 29, New York, N.Y.

David A. Defeo, 37, New York, N.Y.
Jennifer DeJesus, 23, New York, N.Y.
 Monique E. DeJesus, 28, New York, N.Y.
Nereida DeJesus, 30, New York, N.Y.
Donald A. Delapenha, 37, Allendale, N.J.
Vito Joseph Deleo, 41, New York, N.Y.
Danielle Delie, 47, New York, N.Y.
Colleen Ann Deloughery, 41, Bayonne, N.J.
Francis (Frank) Albert DeMartini, 49, New York, N.Y.
Anthony Demas, 61, New York, N.Y.
Martin DeMeo, 47, Farmingville, N.Y.
Francis X. Deming, 47, Franklin Lakes, N.J.
Carol K. Demitz, 49, New York, N.Y.
Kevin Dennis, 43, Peapack, N.J.
Thomas F. Dennis, 43, Setauket, N.Y.
Jean C. DePalma, 42, Newfoundland, N.J.
Jose Nicolas Depena, 42, New York, N.Y.
Robert J. Deraney, 43, New York, N.Y.
Michael DeRienzo, 37, Hoboken, N.J.
David Paul Derubbio, 38, New York, N.Y.
Jemal Legesse DeSantis, 28, Jersey City, N.J.
Christian L. DeSimone, 23, Ringwood, N.J.
Edward DeSimone, 36, Atlantic Highlands, N.J.
Lt. Andrew Desperito, 44, Patchogue, N.Y.
Michael Jude D'Esposito, 32, Morganville, N.J.
Cindy Ann Deuel, 28, New York, N.Y.
Jerry DeVito, 66, New York, N.Y.
Robert P. Devitt, 36, Plainsboro, N.J.
Dennis Lawrence Devlin, 51, Washingtonville, N.Y.
Gerard Dewan, 35, New York, N.Y.
Simon Suleman Ali Kassamali Dhanani, 62, Hartsdale, N.Y.
Michael L. DiAgostino, 41, Garden City, N.Y.
Matthew Diaz, 33, New York, N.Y.
Nancy Diaz, 28, New York, N.Y.
Obdulio Ruiz Diaz, 44, New York, N.Y.
Lourdes Galletti Diaz, 32, New York, N.Y.
Michael Diaz-Piedra, 49
Judith Belguese Diaz-Sierra, 32, Bay Shore, N.Y.
Patricia F. DiChiaro, 63, New York, N.Y.
Joseph Dermot Dickey, 50, Manhasset, N.Y.
Lawrence Patrick Dickinson, 35, Morganville, N.J.
Michael David Diehl, 48, Brick, N.J.
John DiFato, 39, New York, N.Y.
Vincent F. DiFazio, 43, Hampton, N.J.
Carl DiFranco, 27, New York, N.Y.
Donald J. DiFranco, 43, New York, N.Y.

Debra Ann DiMartino, 36, New York, N.Y.
Stephen P. Dimino, 48, Basking Ridge, N.J.
William J. Dimmling, 47, Garden City, N.Y.
Christopher Dincuff, 31, Jersey City, N.J.
Jeffrey M. Dingle, 32, New York, N.Y.
Anthony DiOnisio, 38, Glen Rock, N.J.
George DiPasquale, 33, New York, N.Y.
Joseph DiPilato, 57, New York, N.Y.
Douglas Frank DiStefano, 24, Hoboken, N.J.
Ramzi A. Doany, 35, Bayonne, N.J., Jordanian
John J. Doherty, 58, Hartsdale, N.Y.
Melissa C. Doi, 32, New York, N.Y.
Brendan Dolan, 37, Glen Rock, N.J.
Neil Dollard, 28, Hoboken, N.J.
James Joseph Domanico, 56, New York, N.Y.
Benilda Pascua Domingo, 37, New York, N.Y.
Charles (Carlos) Dominguez, 34, East Meadow, N.Y.
Geronimo (Jerome) Mark Patrick Dominguez, 37, Holtsville, N.Y.
Lt. Kevin W. Donnelly, 43, New York, N.Y.
Jacqueline Donovan, 34, New York, N.Y.
Stephen Dorf, 39, New Milford, N.J.
Thomas Dowd, 37, Monroe, N.Y.
Lt. Kevin Christopher Dowdell, 46, New York, N.Y.
Mary Yolanda Dowling, 46, New York, N.Y.
Raymond M. Downey, 63, Deer Park, N.Y.
Joseph M. Doyle, 25, New York, N.Y.
Frank Joseph Doyle, 39, Englewood, N.J.
Randy Drake, 37, Lee's Summit, Mo.
Stephen Patrick Driscoll, 38, Lake Carmel, N.Y.
Mirna A. Duarte, 31, New York, N.Y.
Luke A. Dudek, 50, Livingston, N.J.
Christopher Michael Duffy, 23, New York, N.Y.
Gerard Duffy, 53, Manorville, N.Y.
Michael Joseph Duffy, 29, Northport, N.Y.
Thomas W. Duffy, 52, Pittsford, N.Y.
Antoinette Duger, 44, Belleville, N.J.
Jackie Sayegh Duggan, 34
Sareve Dukat, 53, New York, N.Y.
Christopher Joseph Dunne, 28, Mineola, N.Y.
Richard A. Dunstan, 54, New Providence, N.J.
Patrick Thomas Dwyer, 37, Nissequogue, N.Y.
Joseph Anthony Eacobacci, 26, New York, N.Y.
John Bruce Eagleson, 53, Middlefield, Conn.
Robert D. Eaton, 37, Manhasset, N.Y.
Dean P. Eberling, 44, Cranford, N.J.
Margaret Ruth Echtermann, 33, Hoboken, N.J.

Paul Robert Eckna, 28, West New York, N.J.
Constantine (Gus) Economos, 41, New York, N.Y.
Dennis Michael Edwards, 35, Huntington, N.Y.
Michael Hardy Edwards, 33, New York, N.Y.
Lisa Egan, 31, Cliffside Park, N.J.
Capt. Martin Egan, 36, New York, N.Y.
Michael Egan, 51, Middletown, N.J.
Christine Egan, 55, Winnipeg, Manitoba, Canada
Samantha Egan, 24, Jersey City, N.J.
Carole Eggert, 60, New York, N.Y.
Lisa Caren Weinstein Ehrlich, 36, New York, N.Y.
John Ernst (Jack) Eichler, 69, Cedar Grove, N.J.
Eric Adam Eisenberg, 32, Commack, N.Y.
Daphne F. Elder, 36, Newark, N.J.
Michael J. Elferis, 27, College Point, N.Y.
Mark J. Ellis, 26, South Huntington, N.Y.
Valerie Silver Ellis, 46, New York, N.Y.
Albert Alfy William Elmarry, 30, North Brunswick, N.J.
Edgar H. Emery, 45, Clifton, N.J.
Doris Suk-Yuen Eng, 30, New York, N.Y.
Christopher S. Epps, 29, New York, N.Y.
Ulf Ramm Ericson, 79, Greenwich, Conn.
Erwin L. Erker, 41, Farmingdale, N.Y.
William J. Erwin, 30, Verona, N.J.
Sarah (Ali) Escarcega, 35, New York, N.Y.
Jose Espinal, 31
Fanny M. Espinoza, 29, Teaneck, N.J.
Francis Esposito, 32, New York, N.Y.
Lt. Michael Esposito, 41, New York, N.Y.
William Esposito, 51, Bellmore, N.Y.
Brigette Ann Esposito, 34, New York, N.Y.
Ruben Esquilin, 35, New York, N.Y.
Sadie Ette, 36, New York, N.Y.
Barbara G. Etzold, 43, Jersey City, N.J.
Eric Brian Evans, 31, Weehawken, N.J.
Robert Edward Evans, 36, Franklin Square, N.Y.
Meredith Emily June Ewart, 29, Hoboken, N.J.
Catherine K. Fagan, 58, New York, N.Y.
Patricia M. Fagan, 55, Toms River, N.J.
Keith G. Fairben, 24, Floral Park, N.Y.
William Fallon, 38, Coram, N.Y.
William F. Fallon, 53, Rocky Hill, N.J.
Anthony J. Fallone, 39, New York, N.Y.
Dolores B. Fanelli, 38, Farmingville, N.Y.
John Joseph Fanning, 54, West Hempstead, N.Y.
Kathleen (Kit) Faragher, 33, Denver, Colo.

Capt. Thomas Farino, 37, Bohemia, N.Y.
Nancy Carole Farley, 45, Jersey City, N.J.
Elizabeth Ann (Betty) Farmer, 62, New York, N.Y.
Douglas Farnum, 33, New York, N.Y.
John W. Farrell, 41, Basking Ridge, N.J.
Terrence Patrick Farrell, 45, Huntington, N.Y.
John G. Farrell, 32, New York, N.Y.
Capt. Joseph Farrelly, 47, New York, N.Y.
Thomas P. Farrelly, 54, East Northport, N.Y.
Syed Abdul Fatha, 54, Newark, N.J.
Christopher Faughnan, 37, South Orange, N.J.
Wendy R. Faulkner, 47, Mason, Ohio
Shannon M. Fava, 30, New York, N.Y.
Bernard D. Favuzza, 52, Suffern, N.Y.
Robert Fazio, 41, Freeport, N.Y.
Ronald C. Fazio, 57, Closter, N.J.
William Feehan, 72, New York, N.Y.
Francis J. (Frank) Feely, 41, Middletown, N.Y.
Garth E. Feeney, 28, New York, N.Y.
Sean B. Fegan, 34, New York, N.Y.
Lee S. Fehling, 28, Wantagh, N.Y.
Peter Feidelberg, 34, Hoboken, N.J.
Alan D. Feinberg, 48, New York, N.Y.
Rosa Maria Feliciano, 30, New York, N.Y.
Edward T. Fergus, 40, Wilton, Conn.
George Ferguson, 54, Teaneck, N.J.
Henry Fernandez, 23, New York, N.Y.
Judy H. Fernandez, 27, Parlin, N.J.
Jose Manuel Contreras Fernandez, El Aguacate, Jalisco, Mexico
Elisa Giselle Ferraina, 27, London, England
Anne Marie Sallerin Ferreira, 29, Jersey City, N.J.
Robert John Ferris, 63, Garden City, N.Y.
David Francis Ferrugio, 46, Middletown, N.J.
Louis V. Fersini, 38, Basking Ridge, N.J.
Michael David Ferugio, 37, New York, N.Y.
Bradley James Fetchet, 24, New York, N.Y.
Jennifer Louise Fialko, 29, Teaneck, N.J.
Kristen Fiedel, 27, New York, N.Y.
Samuel Fields, 36, New York, N.Y.
Michael Bradley Finnegan, 37, Basking Ridge, N.J.
Timothy J. Finnerty, 33, Glen Rock, N.J.
Michael Curtis Fiore, 46, New York, N.Y.
Stephen J. Fiorelli, 43, Aberdeen, N.J.
Paul M. Fiori, 31, Yorktown Heights, N.Y.
John Fiorito, 40, Stamford, Conn.
Lt. John R. Fischer, 46, New York, N.Y.

16

Andrew Fisher, 42, New York, N.Y.
Thomas J. Fisher, 36, Union, N.J.
Bennett Lawson Fisher, 58, Stamford, Conn.
John Roger Fisher, 46, Bayonne, N.J.
Lucy Fishman, 37, New York, N.Y.
Ryan D. Fitzgerald, 26, New York, N.Y.
Thomas Fitzpatrick, 35, Tuckahoe, N.Y.
Richard P. Fitzsimons, 57, Lynbrook, N.Y.
Salvatore A. Fiumefreddo, 47, Manalapan, N.J.
Christina Donovan Flannery, 26, New York, N.Y.
Eileen Flecha, 33, New York, N.Y.
Andre G. Fletcher, 37, North Babylon, N.Y.
Carl Flickinger, 38, Conyers, N.Y.
John Joseph Florio, 33, Oceanside, N.Y.
Joseph W. Flounders, 46, East Stroudsburg, Pa.
David Fodor, 38, Garrison, N.Y.
Lt. Michael N. Fodor, 53, Warwick, N.Y.
Steven Mark Fogel, 40, Westfield, N.Y.
Thomas Foley, 32, West Nyack, N.Y.
David Fontana, 37, New York, N.Y.
Chih Min (Dennis) Foo, 40, Holmdel, N.J.
Del Rose Forbes-Cheatham, 48, New York, N.Y.
Godwin Forde, 39, New York, N.Y.
Donald A. Foreman, 53, New York, N.Y.
Christopher Hugh Forsythe, 44, Basking Ridge, N.J.
Claudia Alicia Martinez Foster, 26, New York, N.Y.
Noel J. Foster, 40, Bridgewater, N.J.
Ana Fosteris, 58, Coram, N.Y.
Robert J. Foti, 42, Albertson, N.Y.
Jeffrey L. Fox, 40, Cranbury, N.J.
Virginia Fox, 58, New York, N.Y.
Virgin (Lucy) Francis, 62, New York, N.Y.
Pauline Francis, 57, New York, N.Y.
Joan Francis
Gary J. Frank, 35, South Amboy, N.J.
Morton Frank, 31, New York, N.Y.
Peter Christopher Frank, 29, New York, N.Y.
Richard K. Fraser, 32, New York, N.Y.
Kevin Joseph Frawley, 34, Bronxville, N.Y.
Clyde Frazier, 41, New York, N.Y.
Lillian I. Frederick, 46, Teaneck, N.J.
Andrew Fredericks, 40, Suffern, N.Y.
Tamitha Freemen, 35, New York, N.Y.
Brett O. Freiman, 29, Roslyn, N.Y.
Lt. Peter L. Freund, 45, Westtown, N.Y.
Arlene E. Fried, 49, Roslyn Heights, N.Y.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

Alan Wayne Friedlander, 52, Yorktown Heights, N.Y.
Andrew K. Friedman, 44, Woodbury, N.Y.
Gregg J. Froehner, 46, Chester, N.J.
Peter Christian Fry, 36, Wilton, Conn.
Clement Fumando, 59, New York, N.Y.
Steven Elliot Furman, 40, Wesley Hills, N.Y.
Paul James Furmato, 37, Colts Neck, N.J.
Fredric Gabler, 30, New York, N.Y.
Richard S. Gabrielle, 50, West Haven, Conn.
James Andrew Gadiel, 23, New York, N.Y.
Pamela Gaff, 51, Robinsville, N.J.
Ervin Vincent Gailliard, 42, New York, N.Y.
Deanna L. Galante, 32, New York, N.Y.
Grace Galante, 29, New York, N.Y.
Anthony Edward Gallagher, 41, New York, N.Y.
Daniel James Gallagher, 23, Red Bank, N.J.
John Patrick Gallagher, 31, Yonkers, N.Y.
Cono E. Gallo, 30, New York, N.Y.
Vincenzo Gallucci, 36, Monroe Township, N.J.
Thomas Edward Galvin, 32, New York, N.Y.
Giovanna (Genni) Gambale, 27, New York, N.Y.
Thomas Gambino, 48, Babylon, N.Y.
Giann F. Gamboa, 26, New York, N.Y.
Peter J. Ganci, 55, North Massapequa, N.Y.
Claude Michael Gann, 41, Roswell, Ga.
Lt. Charles William Garbarini, 44, Pleasantville, N.Y.
Cesar Garcia, 36, New York, N.Y.
David Garcia, 40, Freeport, N.Y.
Jorge Luis Morron Garcia, 38, New York, N.Y.
Juan Garcia, 50, New York, N.Y.
Marlyn C. Garcia, 21, New York, N.Y.
Christopher Gardner, 36, Darien, Conn.
Douglas B. Gardner, 39, New York, N.Y.
Harvey J. Gardner, 35, Lakewood, N.J.
Thomas A. Gardner, 39, Oceanside, N.Y.
Jeffrey B. Gardner, 36, Hoboken, N.J.
William Arthur Gardner, 45, Lynbrook, N.Y.
Francesco Garfi, 29, New York, N.Y.
Rocco Gargano, 28, Bayside, N.Y.
James M. Gartenberg, 36, New York, N.Y.
Matthew David Garvey, 37
Bruce Gary, 51, Bellmore, N.Y.
Palmina Delli Gatti, 33, New York, N.Y.
Boyd A. Gatton, 38, Jersey City, N.J.
Donald Richard Gavagan, 35, New York, N.Y.
Terence D. Gazzani, 24, New York, N.Y.

Gary Geidel, 44, New York, N.Y.
Paul Hamilton Geier, 36, Farmingdale, N.Y.
Julie M. Geis, 44, Lees Summit, Mo.
Peter Gelinas, 34, New York, N.Y.
Steven Paul Geller, 52, New York, N.Y.
Howard G. Gelling, 28, New York, N.Y.
Peter Victor Genco, 36, Rockville Centre, N.Y.
Steven Gregory Genovese, 37, Basking Ridge, N.J.
Alayne F. Gentul, 44, Mountain Lakes, N.J.
Edward F. Geraghty, 45, Rockville Centre, N.Y.
Suzanne Geraty, 30, New York, N.Y.
Ralph Gerhardt, 33, New York, N.Y.
Robert J. Gerlich, 56, Monroe, Conn.
Denis P. Germain, 33, Tuxedo Park, N.Y.
Marina R. Gertsberg, 25, New York, N.Y.
Susan M. Getzendanner, 57, New York, N.Y.
James Gerard Geyer, 41, Rockville Centre, N.Y.
Joseph M. Giaccone, 43, Monroe, N.J.
Lt. Vincent Francis Giammona, 40, Valley Stream, N.Y.
Debra L. Gibbon, 43, Hackettstown, N.J.
James A. Giberson, 43, New York, N.Y.
Craig Neil Gibson, 37, New York, N.Y.
Ronnie Gies, 43, Merrick, N.Y.
Laura A. Giglio, 35, Oceanside, N.Y.
Andrew Clive Gilbert, 39, Califon, N.J.
Timothy Paul Gilbert, 35, Lebanon, N.J.
Paul Stuart Gilbey, 39, Chatham, N.J.
Paul John Gill, 34, New York, N.Y.
Mark Y. Gilles, 33, New York, N.Y.
Evan H. Gillette, 40, New York, N.Y.
Ronald Gilligan, 43, Norwalk, Conn.
Sgt. Rodney C. Gillis, 34, New York, N.Y.
Laura Gilly, 32, New York, N.Y.
Lt. John F. Ginley, 37, Warwick, N.Y.
Jeffrey Giordano, 46, New York, N.Y.
John Giordano, 46, Newburgh, N.Y.
Donna Marie Giordano, 44, Parlin, N.J.
Steven A. Giorgetti, 43, Manhasset, N.Y.
Martin Giovinazzo, 34, New York, N.Y.
Kum-Kum Girolamo, 41, New York, N.Y.
Salvatore Gitto, 44, Manalapan, N.J.
Cynthia Giugliano, 46, Nesconset, N.Y.
Mon Gjonbalaj, 65, New York, N.Y.
Dianne Gladstone, 55, New York, N.Y.
Keith Alexander Glascoe, 38, New York, N.Y.
Thomas I. Glasser, 40, Summit, N.J.

Harry Glenn, 38, Piscataway, N.J.
Barry H. Glick, 55, Wayne, N.J.
Steven Lawrence Glick, 42, Greenwich, Conn.
John T. Gnazzo, 32, New York, N.Y.
William (Bill) Robert Godshalk, 35, New York, N.Y.
Michael Gogliormella, 43, New Providence, N.J.
Brian Fredric Goldberg, 26, Union, N.J.
Jeffrey Grant Goldflam, 48, Melville, N.Y.
Michelle Herman Goldstein, 31, New York, N.Y.
Monica Goldstein, 25, New York, N.Y.
Steven Goldstein, 35, Princeton, N.J.
Andrew H. Golkin, 30, New York, N.Y.
Dennis James Gomes, 40, New York, N.Y.
Enrique Antonio Gomez, 42, New York, N.Y.
Jose Bienvenido Gomez, 45, New York, N.Y.
Manuel Gomez, 42, New York, N.Y.
Wilder Gomez, 38, New York, N.Y.
Jenine Gonzalez, 27, New York, N.Y.
Joel Guevara Gonzalez, 23, Aguascalientes, Aguascalientes, Mexico
Rosa J. Gonzalez, 32, Jersey City, N.J.
Mauricio Gonzalez, 27, New York, N.Y.
Calvin J. Gooding, 38, Riverside, N.Y.
Harry Goody, 50, New York, N.Y.
Kiran Reddy Gopu, 24, Bridgeport, Conn.
Catherine Carmen Gorayeb, 41, New York, N.Y.
Kerene Gordon, 43, New York, N.Y.
Sebastian Gorki, 27, New York, N.Y.
Thomas E. Gorman, 41, Middlesex, N.J.
Kieran Gorman, 35, Yonkers, N.Y.
Michael Edward Gould, 29, Hoboken, N.J.
Yugi Goya, 42, Rye, N.Y.
Jon Richard Grabowski, 33, New York, N.Y.
Christopher Michael Grady, 39, Cranford, N.J.
Edwin John Graf, 48, Rowayton, Conn.
David M. Graifman, 40, New York, N.Y.
Gilbert Granados, 51, Hicksville, N.Y.
Elvira Granitto, 43, New York, N.Y.
Winston Arthur Grant, 59, West Hempstead, N.Y.
Christopher Stewart Gray, 32, Weehawken, N.J.
James Michael Gray, 34, New York, N.Y.
Linda Mair Grayling, 44, New York, N.Y.
John Michael Grazioso, 41, Middletown, N.J.
Timothy Grazioso, 42, Gulf Stream, Fla.
Derrick Arthur Green, 44, New York, N.Y.
Wade Brian Green, 42, Westbury, N.Y.
Elaine Myra Greenberg, 56, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

Gayle R. Greene, 51, Montville, N.J.
James Arthur Greenleaf, 32, New York, N.Y.
Eileen Marsha Greenstein, 52, Morris Plains, N.J.
Elizabeth (Lisa) Martin Gregg, 52, New York, N.Y.
Donald H. Gregory, 62, Ramsey, N.J.
Florence M. Gregory, 38, New York, N.Y.
Denise Gregory, 39, New York, N.Y.
Pedro (David) Grehan, 35, Hoboken, N.J.
John M. Griffin, 38, Waldwick, N.J.
Tawanna Griffin, 30, New York, N.Y.
Joan D. Griffith, 39, Willingboro, N.J.
Warren Grifka, 54, New York, N.Y.
Ramon Grijalvo, 58
Joseph F. Grillo, 46, New York, N.Y.
David Grimner, 51, Merrick, N.Y.
Kenneth Grouzalis, 56, Lyndhurst, N.J.
Joseph Grzelak, 52, New York, N.Y.
Matthew J. Grzymalski, 34, New Hyde Park, N.Y.
Robert Joseph Gschaar, 55, Spring Valley, N.Y.
Liming (Michael) Gu, 34, Piscataway, N.J.
Jose A. Guadalupe, 37, New York, N.Y.
Yan Zhu (Cindy) Guan, 25, New York, N.Y.
Geoffrey E. Guja, 47, Lindenhurst, N.Y.
Lt. Joseph Gullickson, 37, New York, N.Y.
Babita Guman, 33, New York, N.Y.
Douglas B. Gurian, 38, Tenafly, N.J.
Philip T. Guza, 54, Sea Bright, N.J.
Barbara Guzzardo, 49, Glendale, N.Y.
Peter Gyulavary, 44, Warwick, N.Y.
Gary Robert Haag, 36, Ossining, N.Y.
Andrea Lyn Haberman, 25, Chicago, Ill.
Barbara M. Habib, 49, New York, N.Y.
Philip Haentzler, 49, New York, N.Y.
Nizam A. Hafiz, 32, New York, N.Y.
Karen Hagerty, 34, New York, N.Y.
Steven Hagis, 31, New York, N.Y.
Mary Lou Hague, 26, New York, N.Y.
David Halderman, 40, New York, N.Y.
Maile Rachel Hale, 26, Cambridge, Mass.
Richard Hall, 49, Purchase, N.Y.
Vaswald George Hall, 50, New York, N.Y.
Robert John Halligan, 59, Basking Ridge, N.J.
Lt. Vincent Gerard Halloran, 43, North Salem, N.Y.
James D. Halvorson, 56, Greenwich, Conn.
Mohammad Salman Hamdani, 23, New York, N.Y.
Felicia Hamilton, 62, New York, N.Y.

Robert Hamilton, 43, Washingtonville, N.Y.
Frederic Kim Han, 45, Marlboro, N.J.
Christopher James Hanley, 34, New York, N.Y.
Sean Hanley, 35, New York, N.Y.
Valerie Joan Hanna, 57, Freeville, N.Y.
Thomas Hannafin, 36, New York, N.Y.
Kevin James Hannaford, 32, Basking Ridge, N.J.
Michael L. Hannan, 34, Lynbrook, N.Y.
Dana Hannon, 29, Suffern, N.Y.
Vassilios G. Haramis, 56, New York, N.Y.
James A. Haran, 41, Malverne, N.Y.
Jeffrey P. Hardy, 46, New York, N.Y.
Timothy John Hargrave, 38, Readington, N.J.
Daniel Harlin, 41, Kent, N.Y.
Frances Haros, 76, New York, N.Y.
Lt. Harvey L. Harrell, 49, New York, N.Y.
Lt. Stephen Gary Harrell, 44, Warwick, N.Y.
Stewart D. Harris, 52, Marlboro, N.J.
Aisha Harris, 22, New York, N.Y.
John Patrick Hart, 38, Danville, Calif.
John Clinton Hartz, 64, Basking Ridge, N.J.
Emeric J. Harvey, 56, Montclair, N.J.
Capt. Thomas Theodore Haskell, 37, Massapequa, N.Y.
Timothy Haskell, 34, Seaford, N.Y.
Joseph John Hasson, 34, New York, N.Y.
Capt. Terence S. Hatton, 41, New York, N.Y.
Leonard William Hatton, 45, Ridgefield Park, N.J.
Michael Helmut Haub, 34, Roslyn Heights, N.Y.
Timothy Aaron Haviland, 41, Oceanside, N.Y.
Donald G. Havlish, 53, Yardley, Pa.
Anthony Hawkins, 30, New York, N.Y.
Nobuhiro Hayatsu, 36, Scarsdale, N.Y.
Philip Hayes, 67, Northport, N.Y.
William Ward Haynes, 35, Rye, N.Y.
Scott Hazelcorn, 29, Hoboken, N.J.
Lt. Michael K. Healey, 42, East Patchogue, N.Y.
Roberta Bernstein Heber, 60, New York, N.Y.
Charles Francis Xavier Heeran, 23, Belle Harbor, N.Y.
John Heffernan, 37, New York, N.Y.
Howard Joseph Heller, 37, Ridgefield, Conn.
JoAnn L. Heltibridle, 46, Springfield, N.J.
Mark F. Hemschoot, 45, Red Bank, N.J.
Ronnie Lee Henderson, 52, Newburgh, N.Y.
Janet Hendricks, 48, New York, N.Y.
Brian Hennessey, 35, Ringoes, N.J.
Michelle Marie Henrique, 27, New York, N.Y.

Joseph P. Henry, 25, New York, N.Y.
William Henry, 49, New York, N.Y.
John Henwood, 35, New York, N.Y.
Robert Allan Hepburn, 39, Union, N.J.
Mary (Molly) Herencia, 47, New York, N.Y.
Lindsay Coates Herkness, 58, New York, N.Y.
Harvey Robert Hermer, 59, New York, N.Y.
Claribel Hernandez, 31, New York, N.Y.
Norberto Hernandez, 42, New York, N.Y.
Raul Hernandez, 51, New York, N.Y.
Gary Herold, 44, Farmingdale, N.Y.
Jeffrey A. Hersch, 53, New York, N.Y.
Thomas Hetzel, 33, Elmont, N.Y.
Capt. Brian Hickey, 47, New York, N.Y.
Ysidro Hidalgo-Tejada, 47, New York, N.Y., Dominican Republic
Lt. Timothy Higgins, 43, Farmingville, N.Y.
Robert D. Higley, 29, New Fairfield, Conn.
Todd Russell Hill, 34, Boston, Mass.
Clara Victorine Hinds, 52, New York, N.Y.
Neal Hinds, 28, New York, N.Y.
Mark D. Hindy, 28, New York, N.Y.
Richard Bruce Van Hine, 48, Greenwood Lake, N.Y.
Katsuyuki Hirai, 32, Hartsdale, N.Y.
Heather Malia Ho, 32, New York, N.Y.
Tara Yvette Hobbs, 31, New York, N.Y.
Thomas A. Hobbs, 41, Baldwin, N.Y.
James L. Hobin, 47, Marlborough, Conn.
Robert Wayne Hobson, 36, New Providence, N.J.
DaJuan Hodges, 29, New York, N.Y.
Ronald George Hoerner, 58, Massapequa Park, N.Y.
Patrick Aloysius Hoey, 53, Middletown, N.J.
Stephen G. Hoffman, 36, Long Beach, N.Y.
Marcia Hoffman, 52, New York, N.Y.
Frederick J. Hoffmann, 53, Freehold, N.J.
Michele L. Hoffmann, 27, Freehold, N.J.
Judith Florence Hofmiller, 53, Brookfield, Conn.
Thomas Warren Hohlweck, 57, Harrison, N.Y.
Jonathan R. Hohmann, 48, New York, N.Y.
Joseph Francis Holland, 32, Glen Rock, N.J.
John Holland, 30
Elizabeth Holmes, 42, New York, N.Y.
Thomas P. Holohan, 36, Chester, N.Y.
Bradley Hoorn, 22, New York, N.Y.
James P. Hopper, 51, Farmingdale, N.Y.
Montgomery McCullough Hord, 46, Pelham, N.Y.
Michael Horn, 27, Lynbrook, N.Y.

Matthew D. Horning, 26, Hoboken, N.J.
Robert L. Horohoe, 31, New York, N.Y.
Aaron Horwitz, 24, New York, N.Y.
Charles J. Houston, 42, New York, N.Y.
Uhuru G. Houston, 32, Englewood, N.J.
George Howard, 45, Hicksville, N.Y.
Steven L. Howell, 36, New York, N.Y.
Michael C. Howell, 60, New York, N.Y.
Jennifer L. Howley, 34, New Hyde Park, N.Y.
Milagros "Millie" Hromada, 35, New York, N.Y.
Marian Hrycak, 56, New York, N.Y.
Stephen Huczko, 44, Bethlehem, N.J.
Kris R. Hughes, 30, Nesconset, N.Y.
Melissa Harrington Hughes, 31, San Francisco, Calif.
Thomas F. Hughes, 46, Spring Lake Heights, N.J.
Timothy Robert Hughes, 43, Madison, N.J.
Paul R. Hughes, 38, Stamford, Conn.
Robert T. "Bobby" Hughes, 23, Sayreville, N.J.
Susan Huie, 43, Fair Lawn, N.J.
Mychal Lamar Hulse, 30, New York, N.Y.
William C. Hunt, 32, Norwalk, Conn.
Joseph G. Hunter, 31, South Hempstead, N.Y.
Robert Hussa, 51, Roslyn, N.Y.
Capt. Walter Hynes, 46, Belle Harbor, N.Y.
Thomas E. Hynes, 28, Norwalk, Conn.
Joseph Anthony Ianelli, 28, Hoboken, N.J.
Zuhtu Ibis, 25, Clifton, N.J.
Jonathan Lee Ielpi, 29, Great Neck, N.Y.
Michael Patrick Iken, 37, New York, N.Y.
Daniel Ilkanayev, 36, New York, N.Y.
Capt. Frederick Ill, 49, Pearl River, N.Y.
Abraham Nethanel Ilowitz, 51, New York, N.Y.
Anthony P. Infante, 47, Chatham, N.J.
Louis S. Inghilterra, 45, New Castle, N.Y.
Christopher N. Ingrassia, 28, Watchung, N.J.
Paul Innella, 33, East Brunswick, N.J.
Stephanie V. Irby, 38, New York, N.Y.
Douglas Irgang, 32, New York, N.Y.
Todd A. Isaac, 29, New York, N.Y.
Erik Hans Isbrandtsen, 30, New York, N.Y.
Taizo Ishikawa, 50
Aram Iskenderian, 41, Merrick, N.Y.
John Iskyan, 41, Wilton, Conn.
Kazushige Ito, 35, New York, N.Y.
Aleksandr Valeryerich Ivantsov, 23, New York, N.Y.
Virginia Jablonski, 49, Matawan, N.J.

Brooke Alexandra Jackman, 23, New York, N.Y.
Aaron Jacobs, 27, New York, N.Y.
Jason Kyle Jacobs, 32, Mendham, N.J.
Michael Grady Jacobs, 54, Danbury, Conn.
Ariel Louis Jacobs, 29, Briarcliff Manor, N.Y.
Steven A. Jacobson, 53, New York, N.Y.
Ricknauth Jaggernauth, 58, New York, N.Y.
Jake Denis Jagoda, 24, Huntington, N.Y.
Yudh V.S. Jain, 54, New City, N.Y.
Maria Jakubiak, 41, Ridgewood, N.Y.
Gricelda E. James, 44, Willingboro, N.J.
Ernest James, 40, New York, N.Y.
Mark Jardim, 39, New York, N.Y.
Mohammed Jawara, 30, New York, N.Y.
Francois Jean-Pierre, 58, New York, N.Y.
Maxima Jean-Pierre, 40, Bellport, N.Y.
Paul E. Jeffers, 39, New York, N.Y.
Joseph Jenkins, 47, New York, N.Y.
Alan K. Jensen, 49, Wyckoff, N.J.
Prem N. Jerath, 57, Edison, N.J.
Farah Jeudy, 32, Spring Valley, N.Y.
Hweidar Jian, 42, East Brunswick, N.J.
Eliezer Jimenez, 38, New York, N.Y.
Luis Jimenez, 25, New York, N.Y.
Charles Gregory John, 44, New York, N.Y.
Nicholas John, 42, New York, N.Y.
Scott M. Johnson, 26, New York, N.Y.
LaShawana Johnson, 27, New York, N.Y.
William Johnston, 31, North Babylon, N.Y.
Arthur Joseph Jones, 37, Ossining, N.Y.
Allison Horstmann Jones, 31, New York, N.Y.
Brian L. Jones, 44, New York, N.Y.
Christopher D. Jones, 53, Huntington, N.Y.
Donald T. Jones, 39, Livingston, N.J.
Donald W. Jones, 43, Fairless Hills, Pa.
Linda Jones, 50, New York, N.Y.
Mary S. Jones, 72, New York, N.Y.
Andrew Jordan, 35, Remsenburg, N.Y.
Robert Thomas Jordan, 34, Williston, N.Y.
Ingeborg Joseph, 60, Germany
Karl Henri Joseph, 25, New York, N.Y.
Stephen Joseph, 39, Franklin Park, N.J.
Albert Joseph, 79
Jane Eileen Josiah, 47, Bellmore, N.Y.
Lt. Anthony Jovic, 39, Massapequa, N.Y.
Angel Luis Juarbe, 35, New York, N.Y.

Karen Susan Juday, 52, New York, N.Y.
The Rev. Mychal Judge, 68, New York, N.Y.
Paul W. Jurgens, 47, Levittown, N.Y.
Thomas Edward Jurgens, 26, Lawrence, N.Y.
Kacinga Kabeya, 63, McKinney, Texas
Shashi Kiran Lakshmikantha Kadaba, 25, Hackensack, N.J.
Gavkharoy Mukhometovna Kamardinova, 26, New York, N.Y.
Shari Kandell, 27, Wyckoff, N.J.
Howard Lee Kane, 40, Hazlet, N.J.
Jennifer Lynn Kane, 26, Fair Lawn, N.J.
Vincent D. Kane, 37, New York, N.Y.
Joon Koo Kang, 34, Riverdale, N.J.
Sheldon R. Kanter, 53, Edison, N.J.
Deborah H. Kaplan, 45, Paramus, N.J.
Alvin Peter Kappelmann, 57, Green Brook, N.J.
Charles Karczewski, 34, Union, N.J.
William A. Karnes, 37, New York, N.Y.
Douglas G. Karpiloff, 53, Mamaroneck, N.Y.
Charles L. Kasper, 54, New York, N.Y.
Andrew Kates, 37, New York, N.Y.
John Katsimatides, 31, East Marion, N.Y.
Sgt. Robert Kaulfers, 49, Kenilworth, N.J.
Don Jerome Kauth, 51, Saratoga Springs, N.Y.
Hideya Kawauchi, 36, Fort Lee, N.J.
Edward T. Keane, 66, West Caldwell, N.J.
Richard M. Keane, 54, Wethersfield, Conn.
Lisa Kearney-Griffin, 35, Jamaica, N.Y.
Karol Ann Keasler, 42, New York, N.Y.
Paul Hanlon Keating, 38, New York, N.Y.
Leo Russell Keene, 33, Westfield, N.J.
Joseph J. Keller, 31, Park Ridge, N.J.
Peter Rodney Kellerman, 35, New York, N.Y.
Joseph P. Kellett, 37, Riverdale, N.Y.
Frederick H. Kelley, 57, Huntington, N.Y.
James Joseph Kelly, 39, Oceanside, N.Y.
Joseph A. Kelly, 40, Oyster Bay, N.Y.
Maurice Patrick Kelly, 41, New York, N.Y.
Richard John Kelly, 50, New York, N.Y.
Thomas Michael Kelly, 41, Wyckoff, N.J.
Thomas Richard Kelly, 38, Riverhead, N.Y.
Thomas W. Kelly, 51, New York, N.Y.
Timothy C. Kelly, 37, Port Washington, N.Y.
William Hill Kelly, 30, New York, N.Y.
Robert C. Kennedy, 55, Toms River, N.J.
Thomas J. Kennedy, 36, Islip Terrace, N.Y.
John Keohane, 41, Jersey City, N.J.

Lt. Ronald T. Kerwin, 42, Levittown, N.Y.
Howard L. Kestenbaum, 56, Montclair, N.J.
Douglas D. Ketcham, 27, New York, N.Y.
Ruth E. Ketler, 42, New York, N.Y.
Boris Khalif, 30, New York, N.Y.
Sarah Khan, 32, New York, N.Y.
Taimour Firaz Khan, 29, New York, N.Y.
Rajesh Khandelwal, 33, South Plainfield, N.J.
SeiLai Khoo, 38, Jersey City, N.J.
Michael Kiefer, 25, Hempstead, N.Y.
Satoshi Kikuchihara, 43, Scarsdale, N.Y.
Andrew Jay-Hoon Kim, 26, Leonia, N.J.
Lawrence Don Kim, 31, Blue Bell, Pa.
Mary Jo Kimelman, 34, New York, N.Y.
Andrew Marshall King, 42, Princeton, N.J.
Lucille T. King, 59, Ridgewood, N.J.
Robert King, 36, Bellerose Terrace, N.Y.
Lisa M. King-Johnson, 34, New York, N.Y.
Takashi Kinoshita, 46, Rye, N.Y.
Chris Michael Kirby, 21, New York, N.Y.
Howard (Barry) Kirschbaum, 53, New York, N.Y.
Glenn Davis Kirwin, 40, Scarsdale, N.Y.
Richard J. Klares, 59, Somers, N.Y.
Peter A. Klein, 35, Weehawken, N.J.
Alan D. Kleinberg, 39, East Brunswick, N.J.
Karen J. Klitzman, 38, New York, N.Y.
Ronald Philip Kloepfer, 39, Franklin Square, N.Y.
Yevgeny Kniazev, 46, New York, N.Y.
Thomas Patrick Knox, 31, Hoboken, N.J.
Andrew Knox, 30, Adelaide, Australia
Rebecca Lee Koborie, 48, Guttenberg, N.J.
Deborah Kobus, 36, New York, N.Y.
Gary Edward Koecheler, 57, Harrison, N.Y.
Frank J. Koestner, 48, New York, N.Y.
Ryan Kohart, 26, New York, N.Y.
Vanessa Lynn Kolpak, 21, New York, N.Y.
Irina Kolpakova, 37, New York, N.Y.
Suzanne Kondratenko, 27, Chicago, Ill.
Abdoulaye Kone, 37, New York, N.Y.
Bon-seok Koo, 42, River Edge, N.J.
Dorota Kopiczko, 26, Nutley, N.J.
Scott Kopytko, 32, New York, N.Y.
Bojan Kostic, 34, New York, N.Y.
Danielle Kousoulis, 29, New York, N.Y.
John J. Kren, 52
William Krukowski, 36, New York, N.Y.

Lyudmila Ksido, 46, New York, N.Y.
Shekhar Kumar, 30, New York, N.Y.
Kenneth Kumpel, 42, Cornwall, N.Y.
Frederick Kuo, 53, Great Neck, N.Y.
Patricia Kuras, 42, New York, N.Y.
Nauka Kushitani, 44, New York, N.Y.
Thomas Joseph Kuveikis, 48, Carmel, N.Y.
Victor Kwarkye, 35, New York, N.Y.
Kui Fai Kwok, 31, New York, N.Y.
Angela R. Kyte, 49, Boonton, N.J.
Amarnauth Lachhman, 42, Valley Stream, N.Y.
Andrew LaCorte, 61, Jersey City, N.J.
Ganesh Ladkat, 27, Somerset, N.J.
James P. Ladley, 41, Colts Neck, N.J.
Daniel M. Van Laere, 46, Glen Rock, N.J.
Joseph A. Lafalce, 54, New York, N.Y.
Jeanette LaFond-Menichino, 49, New York, N.Y.
David LaForge, 50, Port Richmond, N.Y.
Michael Patrick LaForte, 39, Holmdel, N.J.
Alan Lafrance, 43
Juan Lafuente, 61, Poughkeepsie, N.Y.
Neil K. Lai, 59, East Windsor, N.J.
Vincent A. Laieta, 31, Edison, N.J.
William David Lake, 44, New York, N.Y.
Franco Lalama, 45, Nutley, N.J.
Chow Kwan Lam, 48, Maywood, N.J.
Stephen LaMantia, 38, Darien, Conn.
Amy Hope Lamonsoff, 29, New York, N.Y.
Robert T. Lane, 28, New York, N.Y.
Brendan M. Lang, 30, Red Bank, N.J.
Rosanne P. Lang, 42, Middletown, N.J.
Vanessa Langer, 29, Yonkers, N.Y.
Mary Lou Langley, 53, New York, N.Y.
Peter J. Langone, 41, Roslyn Heights, N.Y.
Thomas Langone, 39, Williston Park, N.Y.
Michele B. Lanza, 36, New York, N.Y.
Ruth Sheila Lapin, 53, East Windsor, N.J.
Carol Ann LaPlante, 59, New York, N.Y.
Ingeborg Astrid Desiree Lariby, 42, New York, N.Y.
Robin Larkey, 48, Chatham, N.J.
Christopher Randall Larrabee, 26, New York, N.Y.
Hamidou S. Larry, 37, New York, N.Y.
Scott Larsen, 35, New York, N.Y.
John Adam Larson, 37, Colonia, N.J.
Gary E. Lasko, 49, Memphis, Tenn.
Nicholas C. Lassman, 28, Cliffside Park, N.J.

Paul Laszczynski, 49, Paramus, N.J.
Jeffrey Latouche, 49, New York, N.Y.
Cristina de Laura
Oscar de Laura
Charles Laurencin, 61, New York, N.Y.
Stephen James Lauria, 39, New York, N.Y.
Maria Lavache, 60, New York, N.Y.
Denis F. Lavelle, 42, Yonkers, N.Y.
Jeannine M. LaVerde, 36, New York, N.Y.
Anna A. Laverty, 52, Middletown, N.J.
Steven Lawn, 28, West Windsor, N.J.
Robert A. Lawrence, 41, Summit, N.J.
Nathaniel Lawson, 61, New York, N.Y.
Eugen Lazar, 27, New York, N.Y.
James Patrick Leahy, 38, New York, N.Y.
Lt. Joseph Gerard Leavey, 45, Pelham, N.Y.
Neil Leavy, 34, New York, N.Y.
Leon Lebor, 51, Jersey City, N.J.
Kenneth Charles Ledee, 38, Monmouth, N.J.
Alan J. Lederman, 43, New York, N.Y.
Elena Ledesma, 36, New York, N.Y.
Alexis Leduc, 45, New York, N.Y.
Myung-woo Lee, 41, Lyndhurst, N.J.
David S. Lee, 37, West Orange, N.J.
Gary H. Lee, 62, Lindenhurst, N.Y.
Hyun-joon (Paul) Lee, 32, New York, N.Y.
Jong-min Lee, 24, New York, N.Y.
Juanita Lee, 44, New York, N.Y.
Lorraine Lee, 37, New York, N.Y.
Richard Y.C. Lee, 34, Great Neck, N.Y.
Yang Der Lee, 63, New York, N.Y.
Kathryn Blair Lee, 55, New York, N.Y.
Stuart (Soo-Jin) Lee, 30, New York, N.Y.
Linda C. Lee, 34, New York, N.Y.
Stephen Lefkowitz, 50, Belle Harbor, N.Y.
Adriana Legro, 32, New York, N.Y.
Edward J. Lehman, 41, Glen Cove, N.Y.
Eric Andrew Lehrfeld, 32, New York, N.Y.
David Ralph Leistman, 43, Garden City, N.Y.
David Prudencio LeMagne, 27, North Bergen, N.J.
Joseph A. Lenihan, 41, Greenwich, Conn.
John J. Lennon, 44, Howell, N.J.
John Robinson Lenoir, 38, Locust Valley, N.Y.
Jorge Luis Leon, 43, Union City, N.J.
Matthew Gerard Leonard, 38, New York, N.Y.
Michael Lepore, 39, New York, N.Y.

Charles Antoine Lesperance, 55
Jeffrey Earle LeVeen, 55, Manhasset, N.Y.
John D. Levi, 50, New York, N.Y.
Alisha Caren Levin, 33, New York, N.Y.
Neil D. Levin, 47, New York, N.Y.
Robert Levine, 56, West Babylon, N.Y.
Robert M. Levine, 66, Edgewater, N.J.
Shai Levinhar, 29, New York, N.Y.
Adam J. Lewis, 36, Fairfield, Conn.
Margaret Susan Lewis, 49, Elizabeth, N.J.
Ye Wei Liang, 27, New York, N.Y.
Orasri Liangthanasarn, 26, Bayonne, N.J.
Daniel F. Libretti, 43, New York, N.Y.
Ralph M. Licciardi, 30, West Hempstead, N.Y.
Edward Lichtschein, 35, New York, N.Y.
Steven B. Lillianthal, 38, Millburn, N.J.
Carlos R. Lillo, 37, Babylon, N.Y.
Craig Damian Lilore, 30, Lyndhurst, N.J.
Arnold A. Lim, 28, New York, N.Y.
Darya Lin, 32, Chicago, Ill.
Wei Rong Lin, 31, Jersey City, N.J.
Nickie L. Lindo, 31, New York, N.Y.
Thomas V. Linehan, 39, Montville, N.J.
Robert Thomas Linnane, 33, West Hempstead, N.Y.
Alan Linton, 26, Jersey City, N.J.
Diane Theresa Lipari, 42, New York, N.Y.
Kenneth P. Lira, 28, Paterson, N.J.
Francisco Alberto Liriano, 33, New York, N.Y.
Lorraine Lisi, 44, New York, N.Y.
Paul Lisson, 45, New York, N.Y.
Vincent Litto, 52, New York, N.Y.
Ming-Hao Liu, 41, Livingston, N.J.
Nancy Liz, 39, New York, N.Y.
Harold Lizcano, 31, East Elmhurst, N.Y.
Martin Lizzul, 31, New York, N.Y.
George A. Llanes, 33, New York, N.Y.
Elizabeth Claire Logler, 31, Rockville Centre, N.Y.
Catherine Lisa Loguidice, 30, New York, N.Y.
Jerome Robert Lohez, 30, Jersey City, N.J.
Michael W. Lomax, 37, New York, N.Y.
Laura M. Longing, 35, Pearl River, N.Y.
Salvatore P. Lopes, 40, Franklin Square, N.Y.
Daniel Lopez, 39, New York, N.Y.
Luis Lopez, 38, New York, N.Y.
Manuel L. Lopez, 54, Jersey City, N.J.
George Lopez, 40, Stroudsburg, Pa.

Joseph Lostrangio, 48, Langhorne, Pa.
Chet Louie, 45, New York, N.Y.
Stuart Seid Louis, 43, East Brunswick, N.J.
Joseph Lovero, 60, Jersey City, N.J.
Michael W. Lowe, 48, New York, N.Y.
Garry Lozier, 47, Darien, Conn.
John Peter Lozowsky, 45, New York, N.Y.
Charles Peter Lucania, 34, East Atlantic Beach, N.Y.
Edward (Ted) H. Luckett, 40, Fair Haven, N.J.
Mark G. Ludvigsen, 32, New York, N.Y.
Lee Charles Ludwig, 49, New York, N.Y.
Sean Thomas Lugano, 28, New York, N.Y.
Daniel Lugo, 45, New York, N.Y.
Marie Lukas, 32, New York, N.Y.
William Lum, 45, New York, N.Y.
Michael P. Lunden, 37, New York, N.Y.
Christopher Lunder, 34, Wall, N.J.
Anthony Luparello, 62, New York, N.Y.
Gary Lutnick, 36, New York, N.Y.
Linda Luzzicone, 33, New York, N.Y.
Alexander Lygin, 28, New York, N.Y.
Farrell Peter Lynch, 39, Centerport, N.Y.
James Francis Lynch, 47, Woodbridge, N.J.
Louise A. Lynch, 58, Amityville, N.Y.
Michael Lynch, 34, New York, N.Y.
Michael F. Lynch, 33, New Hyde Park, N.Y.
Michael Francis Lynch, 30, New York, N.Y.
Richard Dennis Lynch, 30, Bedford Hills, N.Y.
Robert H. Lynch, 44, Cranford, N.J.
Sean Patrick Lynch, 36, Morristown, N.J.
Sean Lynch, 34, New York, N.Y.
Michael J. Lyons, 32, Hawthorne, N.Y.
Patrick Lyons, 34, South Setauket, N.Y.
Monica Lyons, 53, New York, N.Y.
Robert Francis Mace, 43, New York, N.Y.
Jan Maciejewski, 37, New York, N.Y.
Catherine Fairfax MacRae, 23, New York, N.Y.
Richard B. Madden, 35, Westfield, N.J.
Simon Maddison, 40, Florham Park, N.J.
Noell Maerz, 29, Long Beach, N.Y.
Jeannieann Maffeo, 40, New York, N.Y.
Joseph Maffeo, 30, New York, N.Y.
Jay Robert Magazine, 48, New York, N.Y.
Charles Wilson Magee, 51, Wantagh, N.Y.
Brian Magee, 52, Floral Park, N.Y.
Joseph Maggitti, 47, Abingdon, Md.

Ronald E. Magnuson, 57, Park Ridge, N.J.
Daniel L. Maher, 50, Hamilton, N.J.
Thomas Anthony Mahon, 37, East Norwich, N.Y.
William Mahoney, 38, Bohemia, N.Y.
Joseph Maio, 32, Roslyn Harbor, N.Y.
Takashi Makimoto, 49, New York, N.Y.
Abdu Malahi, 37, New York, N.Y.
Debora Maldonado, 47, New York, N.Y.
Myrna T. Maldonado-Agosto, 49, New York, N.Y.
Alfred R. Maler, 39, Convent Station, N.J.
Gregory James Malone, 42, Hoboken, N.J.
Edward Francis (Teddy) Maloney, 32, Darien, Conn.
Joseph E. Maloney, 46, Farmingville, N.Y.
Gene E. Maloy, 41, New York, N.Y.
Christian Maltby, 37, Chatham, N.J.
Francisco Miguel (Frank) Mancini, 26, New York, N.Y.
Joseph Mangano, 53, Jackson, N.J.
Sara Elizabeth Manley, 31, New York, N.Y.
Debra M. Mannetta, 31, Islip, N.Y.
Terence J. Manning, 36, Rockville Centre, N.Y.
Marion Victoria (vickie) Manning, 27, Rochdale, N.Y.
James Maounis, 42, New York, N.Y.
Joseph Ross Marchbanks, 47, Nanuet, N.Y.
Peter Edward Mardikian, 29, New York, N.Y.
Edward Joseph Mardovich, 42, Lloyd Harbor, N.Y.
Lt. Charles Joseph Margiotta, 44, New York, N.Y.
Kenneth Joseph Marino, 40, Monroe, N.Y.
Lester Vincent Marino, 57, Massapequa, N.Y.
Vita Marino, 49, New York, N.Y.
Kevin D. Marlo, 28, New York, N.Y.
Jose J. Marrero, 32, Old Bridge, N.J.
John Marshall, 35, Congers, N.Y.
James Martello, 41, Rumson, N.J.
Michael A. Marti, 26, Glendale, N.Y.
Lt. Peter Martin, 43, Miller Place, N.Y.
William J. Martin, 35, Rockaway, N.J.
Brian E. Martineau, 37, Edison, N.J.
Betsy Martinez, 33, New York, N.Y.
Edward J. Martinez, 60, New York, N.Y.
Jose Angel Martinez, 49, Hauppauge, N.Y.
Robert Gabriel Martinez, 24, New York, N.Y.
Lizie Martinez-Calderon, 32, New York, N.Y.
Lt. Paul Richard Martini, 37, New York, N.Y.
Joseph A. Mascali, 44, New York, N.Y.
Bernard Mascarenhas, 54, Newmarket, Ontario, Canada
Stephen F. Masi, 55, New York, N.Y.

Nicholas G. Massa, 65, New York, N.Y.
Patricia A. Massari, 25, Glendale, N.Y.
Michael Massaroli, 38, New York, N.Y.
Philip W. Mastrandrea, 42, Chatham, N.J.
Rudolph Mastrocinque, 43, Kings Park, N.Y.
Joseph Mathai, 49, Arlington, Mass.
Charles William Mathers, 61, Sea Girt, N.J.
William A. Mathesen, 40, Morristown, N.J.
Marcello Matricciano, 31, New York, N.Y.
Margaret Elaine Mattic, 51, New York, N.Y.
Robert D. Mattson, 54, Green Pond, N.J.
Walter Matuza, 39, New York, N.Y.
Charles A. (Chuck) Mauro, 65, New York, N.Y.
Charles J. Mauro, 38, New York, N.Y.
Dorothy Mauro, 55, New York, N.Y.
Nancy T. Mauro, 51, New York, N.Y.
Tyrone May, 44, Rahway, N.J.
Keithroy Maynard, 30, New York, N.Y.
Robert J. Mayo, 46, Morganville, N.J.
Kathy Nancy Mazza-Delosh, 46, Farmingdale, N.Y.
Edward Mazzella, 62, Monroe, N.Y.
Jennifer Mazzotta, 23, New York, N.Y.
Kaaria Mbaya, 39, Edison, N.J.
James J. McAlary, 42, Spring Lake Heights, N.J.
Brian McAleese, 36, Baldwin, N.Y.
Patricia A. McAneney, 50, Pomona, N.Y.
Colin Richard McArthur, 52, Howell, N.J.
John McAvoy, 47, New York, N.Y.
Kenneth M. McBrayer, 49, New York, N.Y.
Brendan McCabe, 40, Sayville, N.Y.
Michael J. McCabe, 42, Rumson, N.J.
Thomas McCann, 46, Manalapan, N.J.
Justin McCarthy, 30, Port Washington, N.Y.
Kevin M. McCarthy, 42, Fairfield, Conn.
Michael Desmond McCarthy, 33, Huntington, N.Y.
Robert Garvin McCarthy, 33, Stony Point, N.Y.
Stanley McCaskill, 47, New York, N.Y.
Katie Marie McCloskey, 25, Mount Vernon, N.Y.
Tara McCloud-Gray, 30, New York, N.Y.
Charles Austin McCrann, 55, New York, N.Y.
Tonyell McDay, 25, Colonia, N.J.
Matthew T. McDermott, 34, Basking Ridge, N.J.
Joseph P. McDonald, 43, Livingston, N.J.
Brian G. McDonnell, 38, Wantagh, N.Y.
Michael McDonnell, 34, Red Bank, N.J.
John F. McDowell, 33, New York, N.Y.

Eamon J. McEneaney, 46, New Canaan, Conn.
John Thomas McErlean, 39, Larchmont, N.Y.
Daniel F. McGinley, 40, Ridgewood, N.J.
Mark Ryan McGinly, 26, New York, N.Y.
Lt. William E. McGinn, 43, New York, N.Y.
Thomas H. McGinnis, 41, Oakland, N.J.
Michael Gregory McGinty, 42, Foxboro, Mass.
Ann McGovern, 68, East Meadow, N.Y.
Scott Martin McGovern, 35, Wyckoff, N.J.
William J. McGovern, 49, Smithtown, N.Y.
Stacey S. McGowan, 38, Basking Ridge, N.J.
Francis Noel McGuinn, 48, Rye, N.Y.
Patrick J. McGuire, 40, Madison, N.J.
Thomas M. McHale, 33, Huntington, N.Y.
Keith McHeffey, 31, Monmouth Beach, N.J.
Denis J. McHugh, 36, New York, N.Y.
Dennis P. McHugh, 34, Sparkill, N.Y.
Michael Edward McHugh, 35, Tuckahoe, N.Y.
Ann M. McHugh, 35, New York, N.Y.
Robert G. McIlvaine, 26, New York, N.Y.
Donald James McIntyre, 38, New City, N.Y.
Stephanie McKenna, 45, New York, N.Y.
Barry J. McKeon, 47, Yorktown Heights, N.Y.
Evelyn C. McKinnedy, 60, New York, N.Y.
Darryl Leron McKinney, 26, New York, N.Y.
Robert C. McLaughlin, 29, Westchester, N.Y.
George Patrick McLaughlin, 36, Hoboken, N.J.
Gavin McMahon, 35, Bayonne, N.J.
Robert Dismas McMahon, 35, New York, N.Y.
Edmund M. McNally, 41, Fair Haven, N.J.
Daniel McNeal, 29, Towson, Md.
Walter Arthur McNeil, 53, Stroudsburg, Pa.
Sean Peter McNulty, 30, New York, N.Y.
Christine Sheila McNulty, 42, Peterborough, England
Robert William McPadden, 30, Pearl River, N.Y.
Terence A. McShane, 37, West Islip, N.Y.
Timothy Patrick McSweeney, 37, New York, N.Y.
Martin E. McWilliams, 35, Kings Park, N.Y.
Rocco A. Medaglia, 49, Melville, N.Y.
Abigail Cales Medina, 46, New York, N.Y.
Ana Iris Medina, 39, New York, N.Y.
Deborah Medwig, 46, Dedham, Mass.
William J. Meehan, 49, Darien, Conn.
Damian Meehan, 32, Glen Rock, N.J.
Alok Kumar Mehta, 23, Hempstead, N.Y.
Raymond Meisenheimer, 46, West Babylon, N.Y.

Manuel Emilio Mejia, 54, New York, N.Y.
Eskedar Melaku, 31, New York, N.Y.
Antonio Melendez, 30, New York, N.Y.
Mary Melendez, 44, Stroudsburg, Pa.
Yelena Melnichenko, 28, Brooklyn, N.Y.
Stuart Todd Meltzer, 32, Syosset, N.Y.
Diarelia Jovannah Mena, 30, New York, N.Y.
Charles Mendez, 38, Floral Park, N.Y.
Lizette Mendoza, 33, North Bergen, N.J.
Shevonne Mentis, 25, New York, N.Y.
Steve Mercado, 38, New York, N.Y.
Wesley Mercer, 70, New York, N.Y.
Ralph Joseph Mercurio, 47, Rockville Centre, N.Y.
Alan H. Merdinger, 47, Allentown, Pa.
George C. Merino, 39, New York, N.Y.
Yamel Merino, 24, Yonkers, N.Y.
George Merkouris, 35, Levittown, N.Y.
Deborah Merrick, 45
Raymond J. Metz, 37, Trumbull, Conn.
Jill A. Metzler, 32, Franklin Square, N.Y.
David Robert Meyer, 57, Glen Rock, N.J.
Nurul Huq Miah, 35, New York, N.Y.
William Edward Micciulli, 30, Matawan, N.J.
Martin Paul Michelstein, 57, Morristown, N.J.
Luis Clodoaldo Revilla Mier, 54
Peter T. Milano, 43, Middletown, N.J.
Gregory Milanowycz, 25, Cranford, N.J.
Lukasz T. Milewski, 21, New York, N.Y.
Craig James Miller, 29, Va.
Corey Peter Miller, 34, New York, N.Y.
Douglas C. Miller, 34, Port Jervis, N.Y.
Henry Miller, 52, Massapequa, N.Y.
Michael Matthew Miller, 39, Englewood, N.J.
Phillip D. Miller, 53, New York, N.Y.
Robert C. Miller, 55, Hasbrouck Heights, N.J.
Robert Alan Miller, 46, Matawan, N.J.
Joel Miller, 55, Baldwin, N.Y.
Benjamin Millman, 40, New York, N.Y.
Charles M. Mills, 61, Brentwood, N.Y.
Ronald Keith Milstein, 54, New York, N.Y.
Robert Minara, 54, Carmel, N.Y.
William G. Minardi, 46, Bedford, N.Y.
Louis Joseph Minervino, 54, Middletown, N.J.
Thomas Mingione, 34, West Islip, N.Y.
Wilbert Miraille, 29, New York, N.Y.
Domenick Mircovich, 40, Closter, N.J.

Rajesh A. Mirpuri, 30, Englewood Cliffs, N.J.
Joseph Mistrulli, 47, Wantagh, N.Y.
Susan Miszkowicz, 37, New York, N.Y.
Lt. Paul Thomas Mitchell, 46, New York, N.Y.
Richard Miuccio, 55, New York, N.Y.
Frank V. Moccia, 57, Hauppauge, N.Y.
Capt. Louis Joseph Modafferi, 45, New York, N.Y.
Boyie Mohammed, 50, New York, N.Y.
Lt. Dennis Mojica, 50, New York, N.Y.
Manuel Mojica, 37, Bellmore, N.Y.
Manuel Dejesus Molina, 31, New York, N.Y.
Kleber Rolando Molina, 44, New York, N.Y.
Fernando Jimenez Molinar, 21, Oaxaca, Mexico
Carl Molinaro, 32, New York, N.Y.
Justin J. Molisani, 42, Middletown Township, N.J.
Brian Patrick Monaghan, 21, New York, N.Y.
Franklin Monahan, 45, Roxbury, N.Y.
John Gerard Monahan, 47, Wanamassa, N.J.
Kristen Montanaro, 34, New York, N.Y.
Craig D. Montano, 38, Glen Ridge, N.J.
Michael Montesi, 39, Highland Mills, N.Y.
Cheryl Ann Monyak, 43, Greenwich, Conn.
Capt. Thomas Moody, 45, Stony Brook, N.Y.
Sharon Moore, 37, New York, N.Y.
Krishna Moorthy, 59, Briarcliff Manor, N.Y.
Abner Morales, 37, New York, N.Y.
Carlos Morales, 29, New York, N.Y.
Paula Morales, 42, New York, N.Y.
Luis Morales, 46, New York, N.Y.
John Moran, 43, Rockaway, N.Y.
John Christopher Moran, 38, Haslemere, Surrey, England
Kathleen Moran, 42, New York, N.Y.
Lindsay S. Morehouse, 24, New York, N.Y.
George Morell, 47, Mount. Kisco, N.Y.
Steven P. Morello, 52, Bayonne, N.J.
Vincent S. Morello, 34, New York, N.Y.
Arturo Alva Moreno, 47, Mexico City, Mexico
Yvette Nicole Moreno, 25, New York, N.Y.
Dorothy Morgan, 47, Hempstead, N.Y.
Richard Morgan, 66, Glen Rock, N.J.
Nancy Morgenstern, 32, New York, N.Y.
Sanae Mori, 27, Tokyo, Japan
Blanca Morocho, 26, New York, N.Y.
Leonel Morocho, 36, New York, N.Y.
Dennis G. Moroney, 39, Eastchester, N.Y.
Lynne Irene Morris, 22, Monroe, N.Y.

Seth A. Morris, 35, Kinnelon, N.J.
Stephen Philip Morris, 31, Ormond Beach, Fla.
Christopher M. Morrison, 34, Charlestown, Mass.
Ferdinand V. Morrone, 63, Lakewood, N.J.
William David Moskal, 50, Brecksville, Ohio
Manuel Da Mota, 43, Valley Stream, N.Y.
Marco Motroni, 57, Fort Lee, N.J.
Iouri A. Mouchinski, 55, New York, N.Y.
Jude J. Moussa, 35, New York, N.Y.
Peter C. Moutos, 44, Chatham, N.J.
Damion Mowatt, 21, New York, N.Y.
Christopher Mozzillo, 27, New York, N.Y.
Stephen V. Mulderry, 33, New York, N.Y.
Richard Muldowney, 40, Babylon, N.Y.
Michael D. Mullan, 34, New York, N.Y.
Dennis Michael Mulligan, 32, New York, N.Y.
Peter James Mulligan, 28, New York, N.Y.
Michael Joseph Mullin, 27, Hoboken, N.J.
James Donald Munhall, 45, Ridgewood, N.J.
Nancy Muniz, 45, New York, N.Y.
Carlos Mario Munoz, 43
Francisco Munoz, 29, New York, N.Y.
Theresa (Terry) Munson, 54, New York, N.Y.
Robert M. Murach, 45, Montclair, N.J.
Cesar Augusto Murillo, 32, New York, N.Y.
Marc A. Murolo, 28, Maywood, N.J.
Robert Eddie Murphy, 56, New York, N.Y.
Brian Joseph Murphy, 41, New York, N.Y.
Christopher W. Murphy, 35, Easton, Md.
Edward C. Murphy, 42, Clifton, N.J.
James F. Murphy, 30, Garden City, N.Y.
James Thomas Murphy, 35, Middletown, N.J.
Kevin James Murphy, 40, Northport, N.Y.
Patrick Sean Murphy, 36, Millburn, N.J.
Lt. Raymond E. Murphy, 46, New York, N.Y.
Charles Murphy, 38, New York, N.Y.
John Joseph Murray, 32, Hoboken, N.J.
John Joseph Murray, 52, Colts Neck, N.J.
Susan D. Murray, 54, Summit, N.J.
Valerie Victoria Murray, 65, New York, N.Y.
Richard Todd Myhre, 37, New York, N.Y.
Lt. Robert B. Nagel, 55, New York, N.Y.
Takuya Nakamura, 30, Tuckahoe, N.Y.
Alexander J.R. Napier, 38, Morris Township, N.J.
Frank Joseph Naples, 29, Cliffside Park, N.J.
John Napolitano, 33, Ronkonkoma, N.Y.

Catherine A. Nardella, 40, Bloomfield, N.J.
Mario Nardone, 32, New York, N.Y.
Manika Narula, 22, Kings Park, N.Y.
Narender Nath, 33, Colonia, N.J.
Karen S. Navarro, 30, New York, N.Y.
Joseph M. Navas, 44, Paramus, N.J.
Francis J. Nazario, 28, Jersey City, N.J.
Glenroy Neblett, 42, New York, N.Y.
Marcus R. Neblett, 31, Roslyn Heights, N.Y.
Jerome O. Nedd, 39, New York, N.Y.
Laurence Nedell, 51, Lindenhurst, N.Y.
Luke G. Nee, 44, Stony Point, N.Y.
Pete Negron, 34, Bergenfield, N.J.
Ann Nicole Nelson, 30, New York, N.Y.
David William Nelson, 50, New York, N.Y.
James Nelson, 40, Clark, N.J.
Michele Ann Nelson, 27, Valley Stream, N.Y.
Peter Allen Nelson, 42, Huntington Station, N.Y.
Oscar Nesbitt, 58, New York, N.Y.
Gerard Terence Nevins, 46, Campbell Hall, N.Y.
Christopher Newton-Carter, 51, Middletown, N.J.
Kapinga Ngalula, 58, McKinney, Texas
Nancy Yuen Ngo, 36, Harrington Park, N.J.
Jody Tepedino Nichilo, 39, New York, N.Y.
Martin Niederer, 23, Hoboken, N.J.
Alfonse J. Niedermeyer, 40, Manasquan, N.J.
Frank John Niestadt, 55, Ronkonkoma, N.Y.
Gloria Nieves, 48, New York, N.Y.
Juan Nieves, 56, New York, N.Y.
Troy Edward Nilsen, 33, New York, N.Y.
Paul R. Nimbley, 42, Middletown, N.J.
John Ballantine Niven, 44, Oyster Bay, N.Y.
Katherine (Katie) McGarry Noack, 30, Hoboken, N.J.
Curtis Terrence Noel, 22, Poughkeepsie, N.Y.
Daniel R. Nolan, 44, Hopatcong, N.J.
Robert Walter Noonan, 36, Norwalk, Conn.
Daniela R. Notaro, 25, New York, N.Y.
Brian Novotny, 33, Hoboken, N.J.
Soichi Numata, 45, Irvington, N.Y.
Brian Felix Nunez, 29, New York, N.Y.
Jose R. Nunez, 42, New York, N.Y.
Jeffrey Nussbaum, 37, Oceanside, N.Y.
James A. Oakley, 52, Cortlandt Manor, N.Y.
Dennis O'Berg, 28, Babylon, N.Y.
James P. O'Brien, 33, New York, N.Y.
Scott J. O'Brien, 40, New York, N.Y.

Timothy Michael O'Brien, 40, Brookville, N.Y.
Michael O'Brien, 42, Cedar Knolls, N.J.
Captain Daniel O'Callaghan, 42, Smithtown, N.Y.
Richard J. O'Connor, 49, Poughkeepsie, N.Y.
Dennis J. O'Connor, 34, New York, N.Y.
Diana J. O'Connor, 38, Eastchester, N.Y.
Keith K. O'Connor, 28, Hoboken, N.J.
Amy O'Doherty, 23, New York, N.Y.
Marni Pont O'Doherty, 31, Armonk, N.Y.
Douglas Oelschlager, 36, New York, N.Y.
Takashi Ogawa, 37, Tokyo, Japan
Albert Ogletree, 49, New York, N.Y.
Philip Paul Ognibene, 39, New York, N.Y.
James Andrew O'Grady, 32, Harrington Park, N.J.
Joseph J. Ogren, 30, New York, N.Y.
Lt. Thomas O'Hagan, 43, New York, N.Y.
Samuel Oitice, 45, Peekskill, N.Y.
Patrick O'Keefe, 44, Oakdale, N.Y.
Capt. William O'Keefe, 49, New York, N.Y.
Gerald Michael Olcott, 55, New Hyde Park, N.Y.
Gerald O'Leary, 34, Stony Point, N.Y.
Christine Anne Olender, 39, New York, N.Y.
Elsy Carolina Osorio Oliva, 27, New York, N.Y.
Linda Mary Oliva, 44, New York, N.Y.
Edward K. Oliver, 31, Jackson, N.J.
Leah E. Oliver, 24, New York, N.Y.
Eric T. Olsen, 41, New York, N.Y.
Jeffrey James Olsen, 31, New York, N.Y.
Maureen L. Olson, 50, Rockville Centre, N.Y.
Steven John Olson, 38, New York, N.Y.
Matthew Timothy O'Mahony, 39, New York, N.Y.
Toshihiro Onda, 39, New York, N.Y.
Seamus L. Oneal, 52, New York, N.Y.
John P. O'Neill, 49, New York, N.Y.
Sean Gordon Corbett O'Neill, 34, Rye, N.Y.
Peter J. O'Neill, 21, Amityville, N.Y.
Michael C. Opperman, 45, Selden, N.Y.
Christopher Orgielewicz, 35, Larchmont, N.Y.
Margaret Orloske, 50, Windsor, Conn.
Virginia A. Ormiston, 42, New York, N.Y.
Kevin O'Rourke, 44, Hewlett, N.Y.
Juan Romero Orozco, Acatlan de Osorio, Puebla, Mexico
Ronald Orsini, 59, Hillsdale, N.J.
Peter K. Ortale, 37, New York, N.Y.
Emilio (Peter) Ortiz, 38, New York, N.Y.
David Ortiz, 37, Nanuet, N.Y.

Paul Ortiz, 21, New York, N.Y.
Sonia Ortiz, 58, New York, N.Y.
Alexander Ortiz, 36, Ridgewood, N.Y.
Pablo Ortiz, 49, New York, N.Y.
Masaru Ose, 36, Fort Lee, N.J.
Robert W. O'Shea, 47, Wall, N.J.
Patrick J. O'Shea, 45, Farmingdale, N.Y.
James Robert Ostrowski, 37, Garden City, N.Y.
Timothy O'Sullivan, 68, Albrightsville, Pa.
Jason Douglas Oswald, 28, New York, N.Y.
Michael Otten, 42, East Islip, N.Y.
Isidro Ottenwalder, 35, New York, N.Y.
Michael Chung Ou, 53, New York, N.Y.
Todd Joseph Ouida, 25, River Edge, N.J.
Jesus Ovalles, 60, New York, N.Y.
Peter J. Owens, 42, Williston Park, N.Y.
Adianes Oyola, 23, New York, N.Y.
Angel M. Pabon, 54, New York, N.Y.
Israel Pabon, 31, New York, N.Y.
Roland Pacheco, 25, New York, N.Y.
Michael Benjamin Packer, 45, New York, N.Y.
Deepa K. Pakkala, 31, Stewartsville, N.J.
Jeffrey Matthew Palazzo, 33, New York, N.Y.
Thomas Anthony Palazzo, 44, Armonk, N.Y.
Richard (Rico) Palazzolo, 39, New York, N.Y.
Orio Joseph Palmer, 45, Valley Stream, N.Y.
Frank A. Palombo, 46, New York, N.Y.
Alan N. Palumbo, 42, New York, N.Y.
Christopher M. Panatier, 36, Rockville Centre, N.Y.
Dominique Pandolfo, 27, Hoboken, N.J.
Paul Pansini, 34, New York, N.Y.
John M. Paolillo, 51, Glen Head, N.Y.
Edward J. Papa, 47, Oyster Bay, N.Y.
Salvatore Papasso, 34, New York, N.Y.
James N. Pappageorge, 29, Yonkers, N.Y.
Vinod K. Parakat, 34, Sayreville, N.J.
Vijayashanker Paramsothy, 23, New York, N.Y.
Nitin Ramesh Parandkar, 28, Waltham, Mass.
Hardai (Casey) Parbhu, 42, New York, N.Y.
James Wendell Parham, 32, New York, N.Y.
Debra (Debbie) Paris, 48, New York, N.Y.
George Paris, 33, New York, N.Y.
Gye-Hyong Park, 28, New York, N.Y.
Philip L. Parker, 53, Skillman, N.J.
Michael A. Parkes, 27, New York, N.Y.
Robert Emmett Parks, 47, Middletown, N.J.

Hasmukhrai Chuckulal Parmar, 48, Warren, N.J.
Robert Parro, 35, Levittown, N.Y.
Diane Marie Moore Parsons, 58, Malta, N.Y.
Leobardo Lopez Pascual, 41, New York, N.Y.
Michael J. Pascuma, 50, Massapequa Park, N.Y.
Jerrold H. Paskins, 56, Anaheim Hills, Calif.
Horace Robert Passananti, 55, New York, N.Y.
Suzanne H. Passaro, 38, East Brunswick, N.J.
Victor Antonio Martinez Pastrana, 38, Tlachichuca, Puebla, Mexico
Manish K. Patel, 29, Edison, N.J.
Avnish Ramanbhai Patel, 28, New York, N.Y.
Dipti Patel, 38, New Hyde Park, N.Y.
Steven B. Paterson, 40, Ridgewood, N.J.
James Matthew Patrick, 30, Norwalk, Conn.
Manuel Patrocino, 34
Bernard E. Patterson, 46, Upper Brookville, N.Y.
Cira Marie Patti, 40, New York, N.Y.
Robert Edward Pattison, 40, New York, N.Y.
James R. Paul, 58, New York, N.Y.
Sharon Cristina Millan Paz, 31, New York, N.Y.
Patrice Paz, 52, New York, N.Y.
Victor Paz-Gutierrez, 43, New York, N.Y.
Stacey L. Peak, 36, New York, N.Y.
Richard Allen Pearlman, 18, New York, N.Y.
Durrell Pearsall, 34, Hempstead, N.Y.
Thomas E. Pedicini, 30, Hicksville, N.Y.
Todd D. Pelino, 34, Fair Haven, N.J.
Michel Adrian Pelletier, 36, Greenwich, Conn.
Anthony Peluso, 46, New York, N.Y.
Angel Ramon Pena, 45, River Vale, N.J.
Richard Al Penny, 53, New York, N.Y.
Salvatore F. Pepe, 45, New York, N.Y.
Carl Allen Peralta, 37, New York, N.Y.
Robert David Peraza, 30, New York, N.Y.
Jon A. Perconti, 32, Brick, N.J.
Alejo Perez, 66, Union City, N.J.
Angel Perez, 43, Jersey City, N.J.
Angela Susan Perez, 35, New York, N.Y.
Ivan Perez, 37, New York, N.Y.
Nancy E. Perez, 36, Secaucus, N.J.
Anthony Perez, 33, Locust Valley, N.Y.
Joseph John Perroncino, 33, Smithtown, N.Y.
Edward J. Perrotta, 43, Mount Sinai, N.Y.
Lt. Glenn C. Perry, 41, Monroe, N.Y.
Emelda Perry, 52, Elmont, N.Y.
John William Perry, 38, New York, N.Y.

Franklin Allan Pershep, 59, New York, N.Y.
Daniel Pesce, 34, New York, N.Y.
Michael J. Pescherine, 32, New York, N.Y.
Davin Peterson, 25, New York, N.Y.
William Russel Peterson, 46, New York, N.Y.
Mark Petrocelli, 28, New York, N.Y.
Lt. Philip S. Petti, 43, New York, N.Y.
Glen Kerrin Pettit, 30, Oakdale, N.Y.
Dominick Pezzulo, 36, New York, N.Y.
Kaleen E. Pezzuti, 28, Fair Haven, N.J.
Lt. Kevin Pfeifer, 42, New York, N.Y.
Tu-Anh Pham, 42, Princeton, N.J.
Lt. Kenneth John Phelan, 41, New York, N.Y.
Michael V. San Phillip, 55, Ridgewood, N.J.
Eugenia Piantieri, 55, New York, N.Y.
Ludwig John Picarro, 44, Basking Ridge, N.J.
Matthew Picerno, 44, Holmdel, N.J.
Joseph O. Pick, 40, Hoboken, N.J.
Christopher Pickford, 32, New York, N.Y.
Dennis J. Pierce, 54, New York, N.Y.
Joseph A. Della Pietra, 24, New York, N.Y.
Bernard T. Pietronico, 39, Matawan, N.J.
Nicholas P. Pietrunti, 38, Belford, N.J.
Theodoros Pigis, 60, New York, N.Y.
Susan Elizabeth Ancona Pinto, 44, New York, N.Y.
Joseph Piskadlo, 48, North Arlington, N.J.
Christopher Todd Pitman, 30, New York, N.Y.
Josh Michael Piver, 23, New York, N.Y.
Joseph Plumitallo, 45, Manalapan, N.J.
John M. Pocher, 36, Middletown, N.J.
William Howard Pohlmann, 56, Ardsley, N.Y.
Laurence M. Polatsch, 32, New York, N.Y.
Thomas H. Polhemus, 39, Morris Plains, N.J.
Steve Pollicino, 48, Plainview, N.Y.
Susan M. Pollio, 45, Long Beach Township, N.J.
Joshua Poptean, 37, New York, N.Y.
Giovanna Porras, 24, New York, N.Y.
Anthony Portillo, 48, New York, N.Y.
James Edward Potorti, 52, Princeton, N.J.
Daphne Pouletsos, 47, Westwood, N.J.
Richard Poulos, 55, Levittown, N.Y.
Stephen E. Poulos, 45, Basking Ridge, N.J.
Brandon Jerome Powell, 26, New York, N.Y.
Shawn Edward Powell, 32, New York, N.Y.
Tony Pratt, 43, New York, N.Y.
Gregory M. Preziose, 34, Holmdel, N.J.

Wanda Ivelisse Prince, 30, New York, N.Y.
Vincent Princiotta, 39, Orangeburg, N.Y.
Kevin Prior, 28, Bellmore, N.Y.
Everett Martin (Marty) Proctor, 44, New York, N.Y.
Carrie B. Progen, 25, New York, N.Y.
David Lee Pruim, 53, Upper Montclair, N.J.
Richard Prunty, 57, Sayville, N.Y.
John F. Puckett, 47, Glen Cove, N.Y.
Robert D. Pugliese, 47, East Fishkill, N.Y.
Edward F. Pullis, 34, Hazlet, N.J.
Patricia Ann Puma, 33, New York, N.Y.
Hemanth Kumar Puttur, 26, White Plains, N.Y.
Edward R. Pykon, 33, Princeton, N.J.
Christopher Quackenbush, 44, Manhasset, N.Y.
Lars Peter Qualben, 49, New York, N.Y.
Lincoln Quappe, 38, Sayville, N.Y.
Beth Ann Quigley, 25, New York, N.Y.
Lt. Michael Quilty, 42, New York, N.Y.
Ricardo Quinn, 40, New York, N.Y.
James Francis Quinn, 23, New York, N.Y.
Carol Rabalais, 38, New York, N.Y.
Christopher Peter A. Racaniello, 30, New York, N.Y.
Leonard Ragaglia, 36, New York, N.Y.
Eugene J. Raggio, 55, New York, N.Y.
Laura Marie Ragonese-Snik, 41, Bangor, Pa.
Michael Ragusa, 29, New York, N.Y.
Peter F. Raimondi, 46, New York, N.Y.
Harry A. Raines, 37, New York, N.Y.
Ehtesham U. Raja, 28, Clifton, N.J.
Valsa Raju, 39, Yonkers, N.Y.
Edward Rall, 44, Holbrook, N.Y.
Lukas (Luke) Rambousek, 27, New York, N.Y.
Julio Fernandez Ramirez, 51, New York, N.Y.
Maria Isabel Ramirez, 25, New York, N.Y.
Harry Ramos, 41, Newark, N.J.
Vishnoo Ramsaroop, 44, New York, N.Y.
Lorenzo Ramzey, 48, East Northport, N.Y.
A. Todd Rancke, 42, Summit, N.J.
Adam David Rand, 30, Bellmore, N.Y.
Jonathan C. Randall, 42, New York, N.Y.
Srinivasa Shreyas Ranganath, 26, Hackensack, N.J.
Anne Rose T. Ransom, 45, Edgewater, N.J.
Faina Rapoport, 45, New York, N.Y.
Robert Arthur Rasmussen, 42, Hinsdale, Ill.
Amenia Rasool, 33, New York, N.Y.
Roger Mark Rasweiler, 53, Flemington, N.J.

David Alan James Rathkey, 47, Mountain Lakes, N.J.
William Ralph Raub, 38, Saddle River, N.J.
Gerard Rauzi, 42, New York, N.Y.
Alexey Razuvaev, 40, New York, N.Y.
Gregory Reda, 33, New Hyde Park, N.Y.
Sarah Prothero Redheffer, 35, London, England
Michele Reed, 26, Ringoes, N.J.
Judith A. Reese, 56, Kearny, N.J.
Donald J. Regan, 47, Wallkill, N.Y.
Lt. Robert M. Regan, 48, Floral Park, N.Y.
Thomas M. Regan, 43, Cranford, N.J.
Christian Michael Otto Regenhard, 28, New York, N.Y.
Howard Reich, 59, New York, N.Y.
Gregg Reidy, 26, Holmdel, N.J.
Kevin O. Reilly, 28, New York, N.Y.
James Brian Reilly, 25, New York, N.Y.
Timothy E. Reilly, 40, New York, N.Y.
Joseph Reina, 32, New York, N.Y.
Thomas Barnes Reinig, 48, Bernardsville, N.J.
Frank B. Reisman, 41, Princeton, N.J.
Joshua Scott Reiss, 23, New York, N.Y.
Karen Renda, 52, New York, N.Y.
John Armand Reo, 28, Larchmont, N.Y.
Richard Rescorla, 62, Morristown, N.J.
John Thomas Resta, 40, New York, N.Y.
Sylvia San Pio Resta, 26, New York, N.Y.
Eduvigis (Eddie) Reyes, 37, New York, N.Y.
Bruce A. Reynolds, 41, Columbia, N.J.
John Frederick Rhodes, 57, Howell, N.J.
Francis S. Riccardelli, 40, Westwood, N.J.
Rudolph N. Riccio, 50, New York, N.Y.
AnnMarie (Davi) Riccoboni, 58, New York, N.Y.
Eileen Mary Rice, 57, New York, N.Y.
David Rice, 31, New York, N.Y.
Kenneth F. Rice, 34, Hicksville, N.Y.
Lt. Vernon Allan Richard, 53, Nanuet, N.Y.
Claude D. Richards, 46, New York, N.Y.
Gregory Richards, 30, New York, N.Y.
Michael Richards, 38, New York, N.Y.
Venesha O. Richards, 26, North Brunswick, N.J.
James C. Riches, 29, New York, N.Y.
Alan Jay Richman, 44, New York, N.Y.
John M. Rigo, 48, New York, N.Y.
Theresa (Ginger) Risco, 48, New York, N.Y.
Rose Mary Riso, 55, New York, N.Y.
Moises N. Rivas, 29, New York, N.Y.

Joseph Rivelli, 43, New York, N.Y.
Isaias Rivera, 51, Perth Amboy, N.J.
Linda Rivera, 26, New York, N.Y.
Juan William Rivera, 27, New York, N.Y.
Carmen A. Rivera, 33, Westtown, N.Y.
David E. Rivers, 40, New York, N.Y.
Joseph R. Riverso, 34, White Plains, N.Y.
Paul Rizza, 34, Park Ridge, N.J.
John Frank Rizzo, 50, New York, N.Y.
Stephen Louis Roach, 36, Verona, N.J.
Joseph Roberto, 37, Midland Park, N.J.
Leo A. Roberts, 44, Wayne, N.J.
Michael Roberts, 30, New York, N.Y.
Michael Edward Roberts, 31, New York, N.Y.
Donald Walter Robertson, 35, Rumson, N.J.
Catherina Robinson, 45, New York, N.Y.
Jeffrey Robinson, 38, Monmouth Junction, N.J.
Michell Lee Robotham, 32, Kearny, N.J.
Donald Robson, 52, Manhasset, N.Y.
Antonio Augusto Tome Rocha, 34, East Hanover, N.J.
Raymond J. Rocha, 29, Malden, Mass.
Laura Rockefeller, 41, New York, N.Y.
John M. Rodak, 39, Mantua, N.J.
Antonio Jose Carrusca Rodrigues, 35, Port Washington, N.Y.
Anthony Rodriguez, 36, New York, N.Y.
Carmen Milagros Rodriguez, 46, Freehold, N.J.
Marsha A. Rodriguez, 41, West Paterson, N.J.
Richard Rodriguez, 31, Cliffwood, N.J.
Gregory E. Rodriguez, 31, White Plains, N.Y.
David B. Rodriguez-Vargas, 44, New York, N.Y.
Matthew Rogan, 37, West Islip, N.Y.
Karlie Barbara Rogers, 25, London, England
Scott Rohner, 22, Hoboken, N.J.
Keith Roma, 27, New York, N.Y.
Joseph M. Romagnolo, 37, Coram, N.Y.
Elvin Santiago Romero, 34, Matawan, N.J.
Efrain Franco Romero, 57, Hazleton, Pa.
James A. Romito, 51, Westwood, N.J.
Sean Rooney, 50, Stamford, Conn.
Eric Thomas Ropiteau, 24, New York, N.Y.
Aida Rosario, 42, Jersey City, N.J.
Angela Rosario, 27, New York, N.Y.
Fitzroy St. Rose, 40, New York, N.Y.
Mark H. Rosen, 45, West Islip, N.Y.
Linda Rosenbaum, 41, Little Falls, N.J.
Brooke David Rosenbaum, 31, Franklin Square, N.Y.

Sheryl Lynn Rosenbaum, 33, Warren, N.J.
Lloyd D. Rosenberg, 31, Morganville, N.J.
Mark Louis Rosenberg, 26, Teaneck, N.J.
Andrew I. Rosenblum, 45, Rockville Centre, N.Y.
Joshua M. Rosenblum, 28, Hoboken, N.J.
Joshua A. Rosenthal, 44, New York, N.Y.
Richard David Rosenthal, 50, Fair Lawn, N.J.
Daniel Rossetti, 32, Bloomfield, N.J.
Norman Rossinow, 39, Cedar Grove, N.J.
Nicholas P. Rossomando, 35, New York, N.Y.
Michael Craig Rothberg, 39, Greenwich, Conn.
Donna Marie Rothenberg, 53, New York, N.Y.
Nick Rowe, 29, Hoboken, N.J.
Timothy A. Roy, 36, Massapequa Park, N.Y.
Paul G. Ruback, 50, Newburgh, N.Y.
Ronald J. Ruben, 36, Hoboken, N.J.
Joanne Rubino, 45, New York, N.Y.
David Michael Ruddle, 31, New York, N.Y.
Bart Joseph Ruggiere, 32, New York, N.Y.
Susan Ann Ruggiero, 30, Plainview, N.Y.
Adam K. Ruhalter, 40, Plainview, N.Y.
Gilbert Ruiz, 57, New York, N.Y.
Stephen P. Russell, 40, Rockaway Beach, N.Y.
Steven Harris Russin, 32, Mendham, N.J.
Lt. Michael Thomas Russo, 44, Nesconset, N.Y.
Wayne Alan Russo, 37, Union, N.J.
John J. Ryan, 45, West Windsor, N.J.
Edward Ryan, 42, Scarsdale, N.Y.
Jonathan Stephan Ryan, 32, Bayville, N.Y.
Matthew Lancelot Ryan, 54, Seaford, N.Y.
Kristin A. Irvine Ryan, 30, New York, N.Y.
Tatiana Ryjova, 36, South Salem, N.Y.
Christina Sunga Ryook, 25, New York, N.Y.
Thierry Saada, 27, New York, N.Y.
Jason E. Sabbag, 26, New York, N.Y.
Thomas E. Sabella, 44, New York, N.Y.
Scott Saber, 36, New York, N.Y.
Joseph Sacerdote, 48, Freehold, N.J.
Mohammad Ali Sadeque, 62, New York, N.Y.
Francis J. Sadocha, 41, Huntington, N.Y.
Jude Elias Safi, 24, New York, N.Y.
Brock Joel Safronoff, 26, New York, N.Y.
Edward Saiya, 49, New York, N.Y.
John Patrick Salamone, 37, North Caldwell, N.J.
Hernando R. Salas, 71, New York, N.Y.
Juan Salas, 35, New York, N.Y.

Esmerlin Salcedo, 36, New York, N.Y.
John Salvatore Salerno, 31, Westfield, N.J.
Richard L. Salinardi, 32, Hoboken, N.J.
Wayne John Saloman, 43, Seaford, N.Y.
Nolbert Salomon, 33, New York, N.Y.
Catherine Patricia Salter, 37, New York, N.Y.
Frank Salvaterra, 41, Manhasset, N.Y.
Paul R. Salvio, 27, New York, N.Y.
Samuel R. Salvo, 59, Yonkers, N.Y.
Carlos Samaniego, 29, New York, N.Y.
Rena Sam-Dinnoo, 28, New York, N.Y.
James Kenneth Samuel, 29, Hoboken, N.J.
Hugo Sanay-Perafiel, 41, New York, N.Y.
Alva Jeffries Sanchez, 41, Hempstead, N.Y.
Jacquelyn P. Sanchez, 23, New York, N.Y.
Erick Sanchez, 43, New York, N.Y.
Eric Sand, 36, Westchester, N.Y.
Stacey Leigh Sanders, 25, New York, N.Y.
Herman Sandler, 57, New York, N.Y.
James Sands, 39, Bricktown, N.J.
Ayleen J. Santiago, 40, New York, N.Y.
Kirsten Santiago, 26, New York, N.Y.
Maria Theresa Santillan, 27, Morris Plains, N.J.
Susan G. Santo, 24, New York, N.Y.
Christopher Santora, 23, New York, N.Y.
John Santore, 49, New York, N.Y.
Mario L. Santoro, 28, New York, N.Y.
Rafael Humberto Santos, 42, New York, N.Y.
Rufino Conrado F. (Roy) Santos, 37, New York, N.Y.
Kalyan K. Sarkar, 53, Westwood, N.J.
Chapelle Sarker, 37, New York, N.Y.
Paul F. Sarle, 38, Babylon, N.Y.
Deepika Kumar Sattaluri, 33, Edison, N.J.
Gregory Thomas Saucedo, 31, New York, N.Y.
Susan Sauer, 48, Chicago, Ill.
Anthony Savas, 72, New York, N.Y.
Vladimir Savinkin, 21, New York, N.Y.
John Sbarbaro, 45, New York, N.Y.
Robert L. Scandole, 36, Pelham Manor, N.Y.
Michelle Scarpitta, 26, New York, N.Y.
Dennis Scauso, 46, Dix Hills, N.Y.
John A. Schardt, 34, New York, N.Y.
John G. Scharf, 29, Manorville, N.Y.
Fred Claude Scheffold, 57, Piermont, N.Y.
Angela Susan Scheinberg, 46, New York, N.Y.
Scott M. Schertzer, 28, Edison, N.J.

Sean Schielke, 27, New York, N.Y.
Steven Francis Schlag, 41, Franklin Lakes, N.J.
Jon S. Schlissel, 51, Jersey City, N.J.
Karen Helene Schmidt, 42, Bellmore, N.Y.
Ian Schneider, 45, Short Hills, N.J.
Thomas G. Schoales, 27, Stony Point, N.Y.
Marisa Di Nardo Schorpp, 38, White Plains, N.Y.
Frank G. Schott, 39, Massapequa Park, N.Y.
Gerard P. Schrang, 45, Holbrook, N.Y.
Jeffrey Schreier, 48, New York, N.Y.
John T. Schroeder, 31, Hoboken, N.J.
Susan Lee Kennedy Schuler, 55, Allentown, N.J.
Edward W. Schunk, 54, Baldwin, N.Y.
Mark E. Schurmeier, 44, McLean, Va.
Clarin Shellie Schwartz, 51, New York, N.Y.
John Schwartz, 49, Goshen, Conn.
Mark Schwartz, 50, West Hempstead, N.Y.
Adriane Victoria Scibetta, 31, New York, N.Y.
Raphael Scorca, 61, Beachwood, N.J.
Randolph Scott, 48, Stamford, Conn.
Christopher J. Scudder, 34, Monsey, N.Y.
Arthur Warren Scullin, 57, New York, N.Y.
Michael Seaman, 41, Manhasset, N.Y.
Margaret Seeliger, 34, New York, N.Y.
Carlos Segarra, 54, New York, N.Y.
Anthony Segarra, 52, New York, N.Y.
Jason Sekzer, 31, New York, N.Y.
Matthew Carmen Sellitto, 23, Morristown, N.J.
Howard Selwyn, 47, Hewlett, N.Y.
Larry John Senko, 34, Yardley, Pa.
Arturo Angelo Sereno, 29, New York, N.Y.
Frankie Serrano, 23, Elizabeth, N.J.
Alena Sesinova, 57, New York, N.Y.
Adele Sessa, 36, New York, N.Y.
Sita Nermalla Sewnarine, 37, New York, N.Y.
Karen Lynn Seymour-Dietrich, 40, Millington, N.J.
Davis (Deeg) Sezna, 22, New York, N.Y.
Thomas Joseph Sgroi, 45, New York, N.Y.
Jayesh Shah, 38, Edgewater, N.J.
Khalid M. Shahid, 25, Union, N.J.
Mohammed Shajahan, 41, Spring Valley, N.Y.
Gary Shamay, 23, New York, N.Y.
Earl Richard Shanahan, 50, New York, N.Y.
Shiv Shankar, New York, N.Y.
Neil G. Shastri, 25, New York, N.Y.
Kathryn Anne Shatzoff, 37, New York, N.Y.

48

Barbara A. Shaw, 57, Morris Township, N.J.
Jeffrey J. Shaw, 42, Levittown, N.Y.
Robert J. Shay, 27, New York, N.Y.
Daniel James Shea, 37, Pelham Manor, N.Y.
Joseph Patrick Shea, 47, Pelham, N.Y.
Linda Sheehan, 40, New York, N.Y.
Hagay Shefi, 34, Tenafly, N.J.
John Anthony Sherry, 34, Rockville Centre, N.Y.
Atsushi Shiratori, 36, New York, N.Y.
Thomas Shubert, 43, New York, N.Y.
Mark Shulman, 47, Old Bridge, N.J.
See-Wong Shum, 44, Westfield, N.J.
Allan Shwartzstein, 37, Chappaqua, N.Y.
Johanna Sigmund, 25, Wyndmoor, Pa.
Dianne T. Signer, 32, New York, N.Y.
Gregory Sikorsky, 34, Spring Valley, N.Y.
Stephen Gerard Siller, 34, West Brighton, N.Y.
David Silver, 35, New Rochelle, N.Y.
Craig A. Silverstein, 41, Wyckoff, N.J.
Nasima H. Simjee, 38, New York, N.Y.
Bruce Edward Simmons, 41, Ridgewood, N.J.
Arthur Simon, 57, Thiells, N.Y.
Kenneth Alan Simon, 34, Secaucus, N.J.
Michael John Simon, 40, Harrington Park, N.J.
Paul Joseph Simon, 54, New York, N.Y.
Marianne Simone, 62, New York, N.Y.
Barry Simowitz, 64, New York, N.Y.
Jeff Simpson, 38, Lake Ridge, Va.
Roshan R. (Sean) Singh, 21, New York, N.Y.
Khamladai K. (Khami) Singh, 25, New York, N.Y.
Thomas E. Sinton, 44, Croton-on-hudson, N.Y.
Peter A. Siracuse, 29, New York, N.Y.
Muriel F. Siskopoulos, 60, New York, N.Y.
Joseph M. Sisolak, 35, New York, N.Y.
John P. Skala, 31, Clifton, N.J.
Francis J. Skidmore, 58, Mendham, N.J.
Toyena Corliss Skinner, 27, Kingston, N.J.
Paul A. Skrzypek, 37, New York, N.Y.
Christopher Paul Slattery, 31, New York, N.Y.
Vincent R. Slavin, 41, Belle Harbor, N.Y.
Robert Sliwak, 42, Wantagh, N.Y.
Paul K. Sloan, 26, New York, N.Y.
Stanley S. Smagala, 36, Holbrook, N.Y.
Wendy L. Small, 26, New York, N.Y.
Catherine T. Smith, 44, West Haverstraw, N.Y.
Daniel Laurence Smith, 47, Northport, N.Y.

George Eric Smith, 38, West Chester, Pa.
James G. Smith, 43, Garden City, N.Y.
Joyce Smith, 55, New York, N.Y.
Karl Trumbull Smith, 44, Little Silver, N.J.
Kevin Smith, 47, Mastic, N.Y.
Leon Smith, 48, New York, N.Y.
Moira Smith, 38, New York, N.Y.
Rosemary A. Smith, 61, New York, N.Y.
Sandra Fajardo Smith, 37, New York, N.Y.
Jeffrey Randall Smith, 36, New York, N.Y.
Bonnie S. Smithwick, 54, Quogue, N.Y.
Rochelle Monique Snell, 24, Mount Vernon, N.Y.
Leonard J. Snyder, 35, Cranford, N.J.
Astrid Elizabeth Sohan, 32, Freehold, N.J.
Sushil Solanki, 35, New York, N.Y.
Ruben Solares, 51, New York, N.Y.
Naomi Leah Solomon, 52, New York, N.Y.
Daniel W. Song, 34, New York, N.Y.
Michael C. Sorresse, 34, Morris Plains, N.J.
Fabian Soto, 31, Harrison, N.J.
Timothy P. Soulas, 35, Basking Ridge, N.J.
Gregory T. Spagnoletti, 32, New York, N.Y.
Donald F. Spampinato, 39, Manhasset, N.Y.
Thomas Sparacio, 35, New York, N.Y.
John Anthony Spataro, 32, Mineola, N.Y.
Robert W. Spear, 30, Valley Cottage, N.Y.
Maynard S. Spence, 42, Douglasville, Ga.
George E. Spencer, 50, West Norwalk, Conn.
Robert Andrew Spencer, 35, Red Bank, N.J.
Mary Rubina Sperando, 39, New York, N.Y.
Frank J. Spinelli, 44, Short Hills, N.J.
William E. Spitz, 49, Oceanside, N.Y.
Joseph P. Spor, 35, Yorktown Heights, N.Y.
Klaus Johannes Sprockamp, 42, Muhltal, Germany
Saranya Srinuan, 23, New York, N.Y.
Michael F. Stabile, 50, New York, N.Y.
Lawrence T. Stack, 58, Lake Ronkonkoma, N.Y.
Capt. Timothy Stackpole, 42, New York, N.Y.
Richard James Stadelberger, 55, Middletown, N.J.
Eric A. Stahlman, 43, Holmdel Township, N.J.
Gregory M. Stajk, 46, Long Beach, N.Y.
Corina Stan, 31, Middle Village, N.Y.
Alexandru Liviu Stan, 34, New York, N.Y.
Mary D. Stanley, 53, New York, N.Y.
Joyce Stanton
Patricia Stanton

Anthony M. Starita, 35, Westfield, N.J.
Jeffrey Stark, 30, New York, N.Y.
Derek James Statkevicus, 30, Norwalk, Conn.
Craig William Staub, 30, Basking Ridge, N.J.
William V. Steckman, 56, West Hempstead, N.Y.
Eric Thomas Steen, 32, New York, N.Y.
William R. Steiner, 56, New Hope, Pa.
Alexander Robbins Steinman, 32, Hoboken, N.J.
Andrew Stergiopoulos, 23, New York, N.Y.
Andrew Stern, 41, Bellmore, N.Y.
Martha Jane Stevens, 55, New York, N.Y.
Richard H. Stewart, 35, New York, N.Y.
Michael James Stewart, 42, New York, N.Y.
Sanford M. Stoller, 54, New York, N.Y.
Lonny J. Stone, 43, Bellmore, N.Y.
Jimmy Nevill Storey, 58, Katy, Texas
Timothy Stout, 42, Dobbs Ferry, N.Y.
Thomas S. Strada, 41, Chatham, N.J.
James J. Straine, 36, Oceanport, N.J.
Edward W. Straub, 48, Morris Township, N.J.
George Strauch, 53, Avon-by-the-Sea, N.J.
Edward T. Strauss, 44, Edison, N.J.
Steven R. Strauss, 51, Fresh Meadows, N.Y.
Steven F. Strobert, 33, Ridgewood, N.J.
Walwyn W. Stuart, 28, Valley Stream, N.Y.
Benjamin Suarez, 36, New York, N.Y.
David S. Suarez, 24, Princeton, N.J.
Ramon Suarez, 45, New York, N.Y.
Yoichi Sugiyama, 34, Fort Lee, N.J.
William Christopher Sugra, 30, New York, N.Y.
Daniel Suhr, 37, Nesconset, N.Y.
David Marc Sullins, 30, New York, N.Y.
Lt. Christopher P. Sullivan, 38, Massapequa, N.Y.
Patrick Sullivan, 32, New York, N.Y.
Thomas Sullivan, 38, Kearney, N.J.
Hilario Soriano (Larry) Sumaya, 42, New York, N.Y.
James Joseph Suozzo, 47, Hauppauge, N.Y.
Colleen Supinski, 27, New York, N.Y.
Robert Sutcliffe, 39, Huntington, N.Y.
Selina Sutter, 63, New York, N.Y.
Claudia Suzette Sutton, 34, New York, N.Y.
John F. Swaine, 36, Larchmont, N.Y.
Kristine M. Swearson, 34, New York, N.Y.
Brian Edward Sweeney, 29, Merrick, N.Y.
Kenneth J. Swensen, 40, Chatham, N.J.
Thomas F. Swift, 30, Jersey City, N.J.

Derek O. Sword, 29, New York, N.Y.
Kevin T. Szocik, 27, Garden City, N.Y.
Gina Sztejnberg, 52, Ridgewood, N.J.
Norbert P. Szurkowski, 31, New York, N.Y.
Harry Taback, 56, New York, N.Y.
Joann Tabeek, 41, New York, N.Y.
Norma C. Taddei, 64, New York, N.Y.
Michael Taddonio, 39, Huntington, N.Y.
Keiji Takahashi, 42, Tenafly, N.J.
Keiichiro Takahashi, 53, Port Washington, N.Y.
Phyllis Gail Talbot, 53, New York, N.Y.
Robert R. Talhami, 40, Shrewsbury, N.J.
Sean Patrick Tallon, 26, Yonkers, N.Y.
Paul Talty, 40, Wantagh, N.Y.
Maurita Tam, 22, New York, N.Y.
Rachel Tamares, 30, New York, N.Y.
Hector Tamayo, 51, New York, N.Y.
Michael Andrew Tamuccio, 37, Pelham Manor, N.Y.
Kenichiro Tanaka, 52, Rye Brook, N.Y.
Rhondelle Cherie Tankard, 31, Devonshire, Bermuda
Michael Anthony Tanner, 44, Secaucus, N.J.
Dennis Gerard Taormina, 36, Montville, N.J.
Kenneth Joseph Tarantino, 39, Bayonne, N.J.
Allan Tarasiewicz, 45, New York, N.Y.
Ronald Tartaro, 39, Bridgewater, N.J.
Darryl Taylor, 52, New York, N.Y.
Donnie Brooks Taylor, 40, New York, N.Y.
Lorisa Ceylon Taylor, 31, New York, N.Y.
Michael M. Taylor, 42, New York, N.Y.
Paul A. Tegtmeier, 41, Hyde Park, N.Y.
Yeshavant Moreshwar Tembe, 59, Piscataway, N.J.
Anthony Tempesta, 38, Elizabeth, N.J.
Dorothy Temple, 52, New York, N.Y.
Stanley L. Temple, 77, New York, N.Y.
David Tengelin, 25, New York, N.Y.
Brian J. Terrenzi, 29, Hicksville, N.Y.
Lisa Marie Terry, 42, Rochester, Mich.
Goumatie T. Thackurdeen, 35, New York, N.Y.
Harshad Sham Thatte, 30, Norcross, Ga.
Thomas F. Theurkauf, 44, Stamford, Conn.
Lesley Anne Thomas, 40, Hoboken, N.J.
Brian T. Thompson, 49, Dix Hills, N.Y.
Clive Thompson, 43, Summit, N.J.
Glenn Thompson, 44, New York, N.Y.
Perry Anthony Thompson, 36, Mount Laurel, N.J.
Vanavah Alexi Thompson, 26, New York, N.Y.

Capt. William Harry Thompson, 51, New York, N.Y.
Nigel Bruce Thompson, 33, New York, N.Y.
Eric Raymond Thorpe, 35, New York, N.Y.
Nichola A. Thorpe, 22, New York, N.Y.
Sal Tieri, 40, Shrewsbury, N.J.
John Patrick Tierney, 27, New York, N.Y.
Mary Ellen Tiesi, 38, Jersey City, N.J.
William R. Tieste, 54, Basking Ridge, N.J.
Kenneth F. Tietjen, 31, Matawan, N.J.
Stephen Edward Tighe, 41, Rockville Centre, N.Y.
Scott C. Timmes, 28, Ridgewood, N.Y.
Michael E. Tinley, 56, Dallas, Texas
Jennifer M. Tino, 29, Livingston, N.J.
Robert Frank Tipaldi, 25, New York, N.Y.
John J. Tipping, 33, Port Jefferson, N.Y.
David Tirado, 26, New York, N.Y.
Hector Luis Tirado, 30, New York, N.Y.
Michelle Titolo, 34, Copiague, N.Y.
John J. Tobin, 47, Kenilworth, N.J.
Richard J. Todisco, 61, Wyckoff, N.J.
Vladimir Tomasevic, 36, Etobicoke, Ontario, Canada
Stephen K. Tompsett, 39, Garden City, N.Y.
Thomas Tong, 31, New York, N.Y.
Azucena de la Torre, 50, New York, N.Y.
Doris Torres, 32, New York, N.Y.
Luis Eduardo Torres, 31, New York, N.Y.
Amy E. Toyen, 24, Newton, Mass.
Christopher M. Traina, 25, Bricktown, N.J.
Daniel Patrick Trant, 40, Northport, N.Y.
Abdoul Karim Traore, 41, New York, N.Y.
Glenn J. Travers, 53, Tenafly, N.J.
Walter (Wally) P. Travers, 44, Upper Saddle River, N.J.
Felicia Traylor-Bass, 38, New York, N.Y.
Lisa L. Trerotola, 38, Hazlet, N.J.
Karamo Trerra, 40, New York, N.Y.
Michael Trinidad, 33, New York, N.Y.
Francis Joseph Trombino, 68, Clifton, N.J.
Gregory J. Trost, 26, New York, N.Y.
William Tselepis, 33, New Providence, N.J.
Zhanetta Tsoy, 32, Jersey City, N.J.
Michael Patrick Tucker, 40, Rumson, N.J.
Lance Richard Tumulty, 32, Bridgewater, N.J.
Ching Ping Tung, 44, New York, N.Y.
Simon James Turner, 39, London, England
Donald Joseph Tuzio, 51, Goshen, N.Y.
Robert T. Twomey, 48, New York, N.Y.

Jennifer Tzemis, 26, New York, N.Y.
John G. Ueltzhoeffer, 36, Roselle Park, N.J.
Tyler V. Ugolyn, 23, New York, N.Y.
Michael A. Uliano, 42, Aberdeen, N.J.
Jonathan J. Uman, 33, Westport, Conn.
Anil Shivhari Umarkar, 34, Hackensack, N.J.
Allen V. Upton, 44, New York, N.Y.
Diane Maria Urban, 50, Malverne, N.Y.
John Damien Vaccacio, 30, New York, N.Y.
Bradley H. Vadas, 37, Westport, Conn.
William Valcarcel, 54, New York, N.Y.
Mayra Valdes-Rodriguez, 39, New York, N.Y.
Felix Antonio Vale, 29, New York, N.Y.
Ivan Vale, 27, New York, N.Y.
Santos Valentin, 39, New York, N.Y.
Benito Valentin, 33, New York, N.Y.
Manuel Del Valle, 32, New York, N.Y.
Carlton Francis Valvo, 38, New York, N.Y.
Edward Raymond Vanacore, 29, Jersey City, N.J.
Jon C. Vandevander, 44, Ridgewood, N.J.
Frederick T. Varacchi, 35, Greenwich, Conn.
Gopalakrishnan Varadhan, 32, New York, N.Y.
David Vargas, 46, New York, N.Y.
Scott C. Vasel, 32, Park Ridge, N.J.
Santos Vasquez, 55, New York, N.Y.
Azael Ismael Vasquez, 21, New York, N.Y.
Arcangel Vazquez, 47, New York, N.Y.
Peter Anthony Vega, 36, New York, N.Y.
Sankara S. Velamuri, 63, Avenel, N.J.
Jorge Velazquez, 47, Passaic, N.J.
Lawrence Veling, 44, New York, N.Y.
Anthony M. Ventura, 41, Middletown, N.J.
David Vera, 41, New York, N.Y.
Loretta A, Vero, 51, Nanuet, N.Y.
Christopher Vialonga, 30, Demarest, N.J.
Matthew Gilbert Vianna, 23, Manhasset, N.Y.
Robert A. Vicario, 40, Weehawken, N.J.
Celeste Torres Victoria, 41, New York, N.Y.
Joanna Vidal, 26, Yonkers, N.Y.
John T. Vigiano, 36, West Islip, N.Y.
Joseph Vincent Vigiano, 34, Medford, N.Y.
Frank J. Vignola, 44, Merrick, N.Y.
Joseph B. Vilardo, 44, Stanhope, N.J.
Sergio Villanueva, 33, New York, N.Y.
Chantal Vincelli, 38, New York, N.Y.
Melissa Vincent, 28, Hoboken, N.J.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

Francine A. Virgilio, 48, New York, N.Y.
Lawrence Virgilio, 38
Joseph G. Visciano, 22, New York, N.Y.
Joshua S. Vitale, 28, Great Neck, N.Y.
Maria Percoco Vola, 37, New York, N.Y.
Lynette D. Vosges, 48, New York, N.Y.
Garo H. Voskerijian, 43, Valley Stream, N.Y.
Alfred Vukosa, 37, New York, N.Y.
Gregory Wachtler, 25, Ramsey, N.J.
Gabriela Waisman, 33, New York, N.Y.
Wendy Alice Rosario Wakeford, 40, Freehold, N.J.
Courtney Wainsworth Walcott, 37, New York, N.Y.
Victor Wald, 49, New York, N.Y.
Benjamin Walker, 41, Suffern, N.Y.
Glen J. Wall, 38, Rumson, N.J.
Mitchel Scott Wallace, 34, Mineola, N.Y.
Lt. Robert F. Wallace, 43, New York, N.Y.
Roy Michael Wallace, 42, Wyckoff, N.J.
Peter G. Wallace, 66, Lincoln Park, N.J.
Jean Marie Wallendorf, 23, New York, N.Y.
Matthew Blake Wallens, 31, New York, N.Y.
John Wallice, 43, Huntington, N.Y.
Barbara P. Walsh, 59, New York, N.Y.
James Walsh, 37, Scotch Plains, N.J.
Jeffrey Patrick Walz, 37, Tuckahoe, N.Y.
Ching H. Wang, 59, New York, N.Y.
Weibin Wang, 41, Orangeburg, N.Y.
Lt. Michael Warchola, 51, Middle Village, N.Y.
Stephen Gordon Ward, 33, Gorham, Maine
James A. Waring, 49, New York, N.Y.
Brian G. Warner, 32, Morganville, N.J.
Derrick Washington, 33, Calverton, N.Y.
Charles Waters, 44, New York, N.Y.
James Thomas (Muddy) Waters, 39, New York, N.Y.
Capt. Patrick J. Waters, 44, New York, N.Y.
Kenneth Watson, 39, Smithtown, N.Y.
Michael H. Waye, 38, Morganville, N.J.
Walter E. Weaver, 30, Centereach, N.Y.
Todd C. Weaver, 30, New York, N.Y.
Nathaniel Webb, 56, Jersey City, N.J.
Dinah Webster, 50, Port Washington, N.Y.
Joanne Flora Weil, 39, New York, N.Y.
Michael Weinberg, 34, New York, N.Y.
Steven Weinberg, 41, New City, N.Y.
Scott Jeffrey Weingard, 29, New York, N.Y.
Steven Weinstein, 50, New York, N.Y.

Simon Weiser, 65, New York, N.Y.
David T. Weiss, 50, New York, N.Y.
David M. Weiss, 41, Maybrook, N.Y.
Vincent Michael Wells, 22, Redbridge, England
Timothy Matthew Welty, 34, Yonkers, N.Y.
Christian Hans Rudolf Wemmers, 43, San Francisco, Calif.
Ssu-Hui (Vanessa) Wen, 23, New York, N.Y.
Oleh D. Wengerchuk, 56, Centerport, N.Y.
Peter M. West, 54, Pottersville, N.J.
Whitfield West, 41, New York, N.Y.
Meredith Lynn Whalen, 23, Hoboken, N.J.
Eugene Whelan, 31, Rockaway Beach, N.Y.
John S. White, 48, New York, N.Y.
Edward James White, 30, New York, N.Y.
James Patrick White, 34, Hoboken, N.J.
Kenneth W. White, 50, New York, N.Y.
Leonard Anthony White, 57, New York, N.Y.
Malissa White, 37, New York, N.Y.
Wayne White, 38, New York, N.Y.
Adam S. White, 26, New York, N.Y.
Leanne Marie Whiteside, 31, New York, N.Y.
Mark Whitford, 31, Salisbury Mills, N.Y.
Michael T. Wholey, 34, Westwood, N.J.
Mary Lenz Wieman, 43, Rockville Centre, N.Y.
Jeffrey David Wiener, 33, New York, N.Y.
William J. Wik, 44, Crestwood, N.Y.
Alison Marie Wildman, 30, New York, N.Y.
Lt. Glenn Wilkinson, 46, Bayport, N.Y.
John C. Willett, 29, Jersey City, N.J.
Brian Patrick Williams, 29, New York, N.Y.
Crossley Williams, 28, Uniondale, N.Y.
David Williams, 34, New York, N.Y.
Deborah Lynn Williams, 35, Hoboken, N.J.
Kevin Michael Williams, 24, New York, N.Y.
Louis Calvin Williams, 53, Mandeville, La.
Louie Anthony Williams, 44, New York, N.Y.
Lt. John Williamson, 46, Warwick, N.Y.
Donna Wilson, 48, Williston Park, N.Y.
William E. Wilson, 58, New York, N.Y.
Cynthia Wilson, 52, New York, N.Y.
David H. Winton, 29, New York, N.Y.
Glenn J. Winuk, 40, New York, N.Y.
Thomas Francis Wise, 43, New York, N.Y.
Alan L. Wisniewski, 47, Howell, N.J.
Frank T. Wisniewski, 54, Basking Ridge, N.J.
David Wiswall, 54, North Massapequa, N.Y.

Sigrid Charlotte Wiswe, 41, New York, N.Y.
Michael R. Wittenstein, 34, Hoboken, N.J.
Christopher W. Wodenshek, 35, Ridgewood, N.J.
Martin P. Wohlforth, 47, Greenwich, Conn.
Katherine S. Wolf, 40, New York, N.Y.
Jenny Seu Kueng Low Wong, 25, New York, N.Y.
Jennifer Y. Wong, 26, New York, N.Y.
Siu Cheung Wong, 34, Jersey City, N.J.
Yin Ping (Steven) Wong, 34, New York, N.Y.
Yuk Ping Wong, 47, New York, N.Y.
Brent James Woodall, 31, Oradell, N.J.
James J. Woods, 26, New York, N.Y.
Patrick Woods, 36, New York, N.Y.
Richard Herron Woodwell, 44, Ho-Ho-Kus, N.J.
Capt. David Terence Wooley, 54, Nanuet, N.Y.
John Bentley Works, 36, Darien, Conn.
Martin Michael Wortley, 29, Park Ridge, N.J.
Rodney James Wotton, 36, Middletown, N.J.
William Wren, 61, Lynbrook, N.Y.
John Wright, 33, Rockville Centre, N.Y.
Neil R. Wright, 30, Asbury, N.J.
Sandra Wright, 57, Langhorne, Pa.
Jupiter Yambem, 41, Beacon, N.Y.
Suresh Yanamadala, 33, Plainsboro, N.J.
Matthew David Yarnell, 26, Jersey City, N.J.
Myrna Yaskulka, 59, New York, N.Y.
Shakila Yasmin, 26, New York, N.Y.
Olabisi L. Yee, 38, New York, N.Y.
Edward P. York, 45, Wilton, Conn.
Kevin Patrick York, 41, Princeton, N.J.
Raymond York, 45, Valley Stream, N.Y.
Suzanne Youmans, 60, New York, N.Y.
Jacqueline (Jakki) Young, 37, New York, N.Y.
Barrington L. Young, 35, New York, N.Y.
Elkin Yuen, 32, New York, N.Y.
Joseph Zaccoli, 39, Valley Stream, N.Y.
Adel Agayby Zakhary, 50, North Arlington, N.J.
Arkady Zaltsman, 45, New York, N.Y.
Edwin J. Zambrana, 24, New York, N.Y.
Robert Alan Zampieri, 30, Saddle River, N.J.
Mark Zangrilli, 36, Pompton Plains, N.J.
Ira Zaslow, 55, North Woodmere, N.Y.
Kenneth Albert Zelman, 37, Succasunna, N.J.
Abraham J. Zelmanowitz, 55, New York, N.Y.
Martin Morales Zempoaltecatl, 22, New York, N.Y.
Zhe (Zack) Zeng, 28, New York, N.Y.

Marc Scott Zeplin, 33, Harrison, N.Y.
Jie Yao Justin Zhao, 27, New York, N.Y.
Ivelin Ziminski, 40, Tarrytown, N.Y.
Michael Joseph Zinzi, 37, Newfoundland, N.J.
Charles A. Zion, 54, Greenwich, Conn.
Julie Lynne Zipper, 44, Paramus, N.J.
Salvatore J. Zisa, 45, Hawthorne, N.J.
Prokopios Paul Zois, 46, Lynbrook, N.Y.
Joseph J. Zuccala, 54, Croton-on-Hudson, N.Y.
Andrew Steven Zucker, 27, New York, N.Y.
Igor Zukelman, 29, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

## AMERICAN AIRLINES FLIGHT 11

### Crew

Barbara Arestegui, 38, Marstons Mills, Massachusetts
Jeffrey Collman, 41, Novato, Calif.
Sara Low, 28, Batesville, Arkansas
Karen A. Martin, 40, Danvers, Mass.
First Officer Thomas McGuinness, 42, Portsmouth, New Hampshire
Kathleen Nicosia, 54, Winthrop, Mass.
John Ogonowski, 52, Dracut, Massachusetts
Betty Ong, 45, Andover, Massachusetts
Jean Roger, 24, Longmeadow, Massachusetts
Dianne Snyder, 42, Westport, Massachusetts
Madeline Sweeney, 35, Acton, Massachusetts

### Passengers

Anna Williams Allison, 48, Stoneham, Massachusetts
David Angell, 54, Pasadena, California
Lynn Angell, 45, Pasadena, California
Seima Aoyama, 48, Culver City, Calif.
Myra Aronson, 52, Charlestown, Massachusetts
Christine Barbuto, 32, Brookline, Massachusetts
Carolyn Beug, 48, Los Angeles, California
Kelly Ann Booms, 24, Brookline, Mass.
Carol Bouchard, 43, Warwick, Rhode Island
Neilie Anne Heffernan Casey, 32, Wellesley, Massachusetts
Jeffrey Coombs, 42, Abington, Massachusetts
Tara Creamer, 30, Worcester, Massachusetts
Thelma Cuccinello, 71, Wilmot, New Hampshire
Patrick Currivan, 52, Winchester, Mass.
Brian Dale, 43, Warren, New Jersey
David DiMeglio, 22, Wakefield, Mass.
Donald Americo DiTullio, 49, Peabody, Mass.
Albert Dominguez, 66, Sydney, Australia
Paige Farley-Hackel, 46, Newton, Mass.
Alex Filipov, 70, Concord, Massachusetts
Carol Flyzik, 40, Plaistow, N.H.
Paul Friedman, 45, Belmont, Massachusetts
Karleton D.B. Fyfe, 31, Brookline, Massachusetts
Peter Gay, 54, Tewksbury, Massachusetts
Linda George, 27, Westboro, Massachusetts
Edmund Glazer, 41, Los Angeles, California
Lisa Fenn Gordenstein, 41, Needham, Massachusetts
Andrew Peter Charles Curry Green, 34, Santa Monica, Calif.

Peter Hashem, 40, Tewksbury, Massachusetts
Robert Hayes, 37, from Amesbury, Massachusetts
Edward (Ted) R. Hennessy, 35, Belmont, Mass.
John A. Hofer, 45, Los Angeles, Calif.
Cora Hidalgo Holland, 52, of Sudbury, Massachusetts
Nicholas Humber, 60, of Newton, Massachusetts,
Waleed Iskandar, 34, London, England
John Charles Jenkins, 45, Cambridge, Mass.
Charles Edward Jones, 48, Bedford, Mass.
Robin Kaplan, 33, Westboro, Massachusetts
Barbara Keating, 72, Palm Springs, Calif.
David P. Kovalcin, 42, Hudson, New Hampshire
Judy Larocque, 50, Framingham, Mass.
Natalie Janis Lasden, 46, Peabody, Mass.
Daniel John Lee, 34, Van Nuys, Calif.
Daniel C. Lewin, 31, Charlestown, Mass.
Susan A. MacKay, 44, Westford, Massachusetts
Christopher D. Mello, 25, Boston, Mass.
Jeff Mladenik, 43, Hinsdale, Illinois
Antonio Jesus Montoya Valdes, 46, East Boston, Mass.
Carlos Alberto Montoya, 36, Bellmont, Mass.
Laura Lee Morabito, 34, Framingham, Massachusetts
Mildred Rose Naiman, 81, Andover, Mass.
Laurie Ann Neira, 48, Los Angeles, Calif.
Renee Newell, 37, of Cranston, Rhode Island
Jacqueline J. Norton, 61, Lubec, Maine
Robert Grant Norton, 85, Lubec, Maine
Jane M. Orth, 49, Haverhill, Mass.
Thomas Pecorelli, 31, of Los Angeles, California
Berinthia Berenson Perkins, 53, Los Angeles, Calif.
Sonia Morales Puopolo, 58, of Dover, Massachusetts
David E. Retik, 33, Needham, Mass.
Philip M. Rosenzweig, 47, Acton, Mass.
Richard Ross, 58, Newton, Massachusetts
Jessica Sachs, 22, Billerica, Massachusetts
Rahma Salie, 28, Boston, Mass.
Heather Lee Smith, 30, Boston, Mass.
Douglas J. Stone, 54, Dover, N.H
Xavier Suarez, 41, Chino Hills, Calif.
Michael Theodoridis, 32, Boston, Mass.
James Trentini, 65, Everett, Massachusetts
Mary Trentini, 67, Everett, Massachusetts
Pendyala Vamsikrishna, 30, Los Angeles, Calif.
Mary Wahlstrom, 78, Kaysville, Utah
Kenneth Waldie, 46, Methuen, Massachusetts
John Wenckus, 46, Torrance, Calif.

Candace Lee Williams, 20, Danbury, Conn.
Christopher Zarba, 47, Hopkinton, Massachusetts

## AMERICAN AIRLINES FLIGHT 77

### Crew

Charles Burlingame, 51, Herndon, Va.
David M. Charlebois, 39, Washington, D.C
Michele Heidenberger, 57, Chevy Chase, Md.
Jennifer Lewis, 38, Culpeper, Virginia
Kenneth Lewis, 49, Culpeper, Virginia
Renee A. May, 39, Baltimore, Md

### Passengers

Paul Ambrose, 32, Washington, D.C.
Yeneneh Betru, 35, Burbank, Calif
Mary Jane (MJ) Booth, 64, Falls Church, Va.
Bernard Curtis Brown, 11, Washington, D.C.
Suzanne Calley, 42, San Martin, Calif.
William Caswell, 54, Silver Spring, Md.
Sarah Clark, 65, Columbia, Md.
Zandra Cooper, Annandale, Va.
Asia Cottom, 11, Washington, D.C.
James Debeuneure, 58, Upper Marlboro, Md.
Rodney Dickens, 11, Washington, D.C.
Eddie Dillard, Alexandria, Va.
Charles Droz, 52, Springfield, Va.
Barbara G. Edwards, 58, Las Vegas, Nev.
Charles S. Falkenberg, 45, University Park, Md.
Zoe Falkenberg, 8, University Park, Md.
Dana Falkenberg, 3, of University Park, Md.
James Joe Ferguson, 39, Washington, D.C.
Wilson "Bud" Flagg, 63, Millwood, Va.
Darlene Flagg, 63, Millwood, Va.
Richard Gabriel, 54, Great Falls, Va.
Ian J. Gray, 55, Columbia, Md.
Stanley Hall, 68, Rancho Palos Verdes, Calif.
Bryan Jack, 48, Alexandria, Va.
Steven D. Jacoby, 43, Alexandria, Va.
Ann Judge, 49, Great Falls, Va.
Chandler Keller, 29, El Segundo, Calif.
Yvonne Kennedy, 62, Sydney, New South Wales, Australia
Norma Khan, 45, Reston, Va.
Karen A. Kincaid, 40, Washington, D.C.
Dong Lee, 48, Leesburg, Va.
Dora Menchaca, 45, of Santa Monica, Calif.
Christopher Newton, 38, Anaheim, Calif.

Barbara Olson, 45, Great Falls, Va
Ruben Ornedo, 39, Los Angeles, Calif.
Robert Penniger, 63, of Poway, Calif.
Robert R. Ploger, 59, Annandale, Va.
Lisa J. Raines, 42, Great Falls, Va.
Todd Reuben, 40, Potomac, Maryland
John Sammartino, 37, Annandale, Va.
Diane Simmons, Great Falls, Va.
George Simmons, Great Falls, Va.
Mari-Rae Sopper, 35, Santa Barbara, Calif.
Robert Speisman, 47, Irvington, N.Y
Norma Lang Steuerle, 54, Alexandria, Va.
Hilda E. Taylor, 62, Forestville, Md
Leonard Taylor, 44, Reston, Va.
Sandra Teague, 31, Fairfax, Va.
Leslie A. Whittington, 45, University Park, Maryland.
John D. Yamnicky, 71, Waldorf, Md.
Vicki Yancey, 43, Springfield, Va.
Shuyin Yang, 61, Beijing, China
Yuguag Zheng, 65, Beijing, China

## UNITED AIRLINES FLIGHT 175

### Crew

Robert Fangman, 33, Claymont, Del.
Michael R. Horrocks, 38, Glen Mills, Pa.
Amy N. Jarret, 28, North Smithfield, R.I.
Amy R. King, 29, Stafford Springs, Conn.
Kathryn L. LaBorie, 44, Providence, R.I.
Alfred Gilles Padre Joseph Marchand, 44, Alamogordo, N.M.
Capt. Victor Saracini, 51, Lower Makefield Township, Pa.
Michael C. Tarrou, 38, Stafford Springs, Conn.
Alicia Nicole Titus, 28, San Francisco, Calif.

### Passengers

Alona Avraham, 30, Asdod, Israel.
Garnet Edward (Ace) Bailey, 54, Lynnfield, Mass.
Mark Bavis, 31, West Newton, Mass.
Graham Andrew Berkeley, 37, Boston, Mass.
Touri Bolourchi, 69, Beverly Hills, Calif.
Klaus Bothe, 31, Linkenheim, Baden-Wurttemberg, Germany
Daniel R. Brandhorst, 41, Los Angeles, Calif
David Reed Gamboa Brandhorst, 3, Los Angeles, Calif.
John Brett Cahill, 56, Wellesley, Mass.
Christoffer Carstanjen, 33, Turner Falls, Mass.
John (Jay) J. Corcoran, 43, Norwell, Mass
Dorothy Alma DeAraujo, 80, Long Beach, Calif.
Ana Gloria Pocasangre de Barrera, 49, San Salvador, El Salvador
Lisa Frost, 22, Rancho Santa Margarita, Calif.
Ronald Gamboa, 33, Los Angeles, Calif.
Lynn Catherine Goodchild, 25, Attleboro, Mass.
Peter Morgan Goodrich, 33, Sudbury, Mass.
Douglas A. Gowell, 52, Methuen, Mass.
The Rev. Francis E. Grogan, 76, of Easton, Mass.
Carl Max Hammond, 37, Derry, N.H.
Peter Hanson, 32, Groton, Mass.
Sue Kim Hanson, 35, Groton, Mass.
Christine Lee Hanson, 2, Groton, Mass.
Gerald F. Hardacre, 61, Carlsbad, Calif.
Eric Samadikan Hartono, 20, Boston, Mass.
James E. Hayden, 47, Westford, Mass.
Herbert W. Homer, 48, Milford, Mass.
Robert Adrien Jalbert, 61, Swampscott, Mass.
Ralph Francis Kershaw, 52, Manchester-by-the-Sea, Mass.
Heinrich Kimmig, 43, Willstaett, Germany

Brian Kinney, 29, Lowell, Mass.
Robert George LeBlanc, 70, Lee, N.H.
Maclovio Lopez, Jr., 41, Norwalk, Calif.
Marianne MacFarlane, MacFarlane, 34, Revere, Mass.
Louis Neil Mariani, 59, Derry, N.H.
Juliana Valentine McCourt, 4, New London, Conn.
Ruth Magdaline McCourt, 45, New London, Conn.
Wolfgang Peter Menzel, 59, Wilhelmshaven, Germany
Shawn M. Nassaney, 25, Pawtucket, R.I.
Marie Pappalardo, 53, Paramount, Calif.
Patrick Quigley, 40, of Wellesley, Mass.
Frederick Charles Rimmele, 32, Marblehead, Mass.
James M. Roux, 43, Portland, Maine
Jesus Sanchez, 45, Hudson, Mass.
Mary Kathleen Shearer, 61, Dover, N.H.
Robert Michael Shearer, 63, Dover, N.H.
Jane Louise Simpkin, 36, Wayland, Mass.
Brian D. Sweeney, 38, Barnstable, Mass.
Timothy Ward, 38, San Diego, Calif.
William M. Weems, 46, Marblehead, Mass.

## UNITED AIRLINES FLIGHT 93

### Crew

Lorraine G. Bay, 58, East Windsor, N.J.
Sandra W. Bradshaw, 38, Greensboro, N.C.
Jason Dahl, 43, Denver, Colo.
Wanda Anita Green, 49, Linden, N.J.
Leroy Homer, 36, Marlton, N.J.
CeeCee Lyles, 33, Fort Myers, Fla.
Deborah Welsh, 49, New York, N.Y.

### Passengers

Christian Adams, 37, Biebelsheim, Germany
Todd Beamer, 32, Cranbury, N.J.
Alan Beaven, 48, Oakland, CA
Mark K. Bingham, 31, San Francisco, Calif.
Deora Frances Bodley, 20, San Diego, Calif.
Marion Britton, 53, New York, N.Y.
Thomas E. Burnett Jr., 38, San Ramon, Calif.
William Cashman, 57, North Bergen, N.J.
Georgine Rose Corrigan, 56, Honolulu, Hawaii
Patricia Cushing, 69, Bayonne, N.J.
Joseph Deluca, 52, Ledgewood, N.J.
Patrick Joseph Driscoll, 70, Manalapan, N.J.
Edward P. Felt, 41, Matawan, N.J.
Jane C. Folger, 73, Bayonne, N.J.
Colleen Laura Fraser, 51, Elizabeth, N.J.
Andrew Garcia, 62, Portola Valley, Calif.
Jeremy Glick, 31, Hewlett, N.J.
Lauren Grandcolas, 38, San Rafael, Calif.
Donald F. Greene, 52, Greenwich, Conn.
Linda Gronlund, 46, Warwick, N.Y.
Richard Guadagno, 38, of Eureka, Calif.
Toshiya Kuge, 20, Nishimidoriguoska, Japan
Hilda Marcin, 79, Budd Lake, N.J.
Nicole Miller, 21, San Jose, Calif.
Louis J. Nacke, 42, New Hope, Pa.
Donald Arthur Peterson, 66, Spring Lake, N.J.
Jean Hoadley Peterson, 55, Spring Lake, N.J.
Waleska Martinez Rivera, 37, Jersey City, N.J.
Mark Rothenberg, 52, Scotch Plains, N.J.
Christine Snyder, 32, Kailua, Hawaii
John Talignani, 72, New York, N.Y.

Honor Elizabeth Wainio, 27, Watchung, N.J.
Olga Kristin Gould White, 65, New York, N.Y.

## THE PENTAGON

Spc. Craig Amundson, 28, Fort Belvoir, Va.
Melissa Rose Barnes, 27, Redlands, Calif.
(Retired) Master Sgt. Max Beilke, 69, Laurel, Md.
Kris Romeo Bishundat, 23, Waldorf, Md.
Carrie Blagburn, 48, Temple Hills, Md.
Lt. Col. Canfield D. Boone, 54, Clifton, Va.
Donna Bowen, 42, Waldorf, Md.
Allen Boyle, 30, Fredericksburg, Va.
Christopher Lee Burford, 23, Hubert, N.C.
Daniel Martin Caballero, 21, Houston, Texas
Sgt. 1st Class Jose Orlando Calderon-Olmedo, 44, Annandale, Va.
Angelene C. Carter, 51, Forrestville, Md.
Sharon Carver, 38, Waldorf, Md.
John J. Chada, 55, Manassas, Va.
Rosa Maria (Rosemary) Chapa, 64, Springfield, Va.
Julian Cooper, 39, Springdale, Md.
Lt. Cmdr. Eric Allen Cranford, 32, Drexel, N.C.
Ada M. Davis, 57, Camp Springs, Md.
Capt. Gerald Francis Deconto, 44, Sandwich, Mass.
Lt. Col. Jerry Don Dickerson, 41, Durant, Miss.
Johnnie Doctor, 32, Jacksonville, Fla.
Capt. Robert Edward Dolan, 43, Alexandria, Va.
Cmdr. William Howard Donovan, 37, Nunda, N.Y.
Cmdr. Patrick S. Dunn, 39, Springfield, Va.
Edward Thomas Earhart, 26, Salt Lick, Ky.
Lt. Cmdr. Robert Randolph Elseth, 37, Vestal, N.Y.
Jamie Lynn Fallon, 23, Woodbridge, Va.
Amelia V. Fields, 36, Dumfries, Va.
Gerald P. Fisher, 57, Potomac, Md.
Matthew Michael Flocco, 21, Newark, Del.
Sandra N. Foster, 41, Clinton, Md.
Capt. Lawrence Daniel Getzfred, 57, Elgin, Neb.
Cortz Ghee, 54, Reisterstown, Md.
Brenda C. Gibson, 59, Falls Church, Va.
Ron Golinski, 60, Columbia, Md.
Diane M. Hale-McKinzy, 38, Alexandria, Va.
Carolyn B. Halmon, 49, Washington, D.C.
Sheila Hein, 51, University Park, Md.
Ronald John Hemenway, 37, Shawnee, Kan.
Maj. Wallace Cole Hogan, 40, Fla.
Jimmie Ira Holley, 54, Lanham, Md.
Angela Houtz, 27, La Plata, Md.
Brady K. Howell, 26, Arlington, Va.
Peggie Hurt, 36, Crewe, Va.

Lt. Col. Stephen Neil Hyland, 45, Burke, Va.
Robert J. Hymel, 55, Woodbridge, Va.
Sgt. Maj. Lacey B. Ivory, 43, Woodbridge, Va.
Lt. Col. Dennis M. Johnson, 48, Port Edwards, Wis.
Judith Jones, 53, Woodbridge, Va.
Brenda Kegler, 49, Washington, D.C.
Lt. Michael Scott Lamana, 31, Baton Rouge, La.
David W. Laychak, 40, Manassas, Va.
Samantha Lightbourn-Allen, 36, Hillside, Md.
Maj. Steve Long, 39, Ga.
James Lynch, 55, Manassas, Va.
Terence M. Lynch, 49, Alexandria, Va.
Nehamon Lyons, 30, Mobile, Ala.
Shelley A. Marshall, 37, Marbury, Md.
Teresa Martin, 45, Stafford, Va.
Ada L. Mason, 50, Springfield, Va.
Lt. Col. Dean E. Mattson, 57, Calif.
Lt. Gen. Timothy J. Maude, 53, Fort Myer, Va.
Robert J. Maxwell, 53, Manassas, Va.
Molly McKenzie, 38, Dale City, Va.
Patricia E. (Patti) Mickley, 41, Springfield, Va.
Maj. Ronald D. Milam, 33, Washington, D.C.
Gerard (Jerry) P. Moran, 39, Upper Marlboro, Md.
Odessa V. Morris, 54, Upper Marlboro, Md.
Brian Anthony Moss, 34, Sperry, Okla.
Ted Moy, 48, Silver Spring, Md.
Lt. Cmdr. Patrick Jude Murphy, 38, Flossmoor, Ill.
Khang Nguyen, 41, Fairfax, Va.
Michael Allen Noeth, 30, New York, N.Y.
Diana Borrero de Padro, 55, Woodbridge, Va.
Spc. Chin Sun Pak, 25, Lawton, Okla.
Lt. Jonas Martin Panik, 26, Mingoville, Pa.
Maj. Clifford L. Patterson, 33, Alexandria, Va.
Lt. J.G. Darin Howard Pontell, 26, Columbia, Md.
Scott Powell, 35, Silver Spring, Md.
(Retired) Capt. Jack Punches, 51, Clifton, Va.
Joseph John Pycior, 39, Carlstadt, N.J.
Deborah Ramsaur, 45, Annandale, Va.
Rhonda Rasmussen, 44, Woodbridge, Va.
Marsha Dianah Ratchford, 34, Prichard, Ala.
Martha Reszke, 36, Stafford, Va.
Cecelia E. Richard, 41, Fort Washington, Md.
Edward V. Rowenhorst, 32, Lake Ridge, Va.
Judy Rowlett, 44, Woodbridge, Va.
Robert E. Russell, 52, Oxon Hill, Md.
William R. Ruth, 57, Mount Airy, Md.

Charles E. Sabin, 54, Burke, Va.
Marjorie C. Salamone, 53, Springfield, Va.
Lt. Col. David M. Scales, 44, Cleveland, Ohio
Cmdr. Robert Allan Schlegel, 38, Alexandria, Va.
Janice Scott, 46, Springfield, Va.
Michael L. Selves, 53, Fairfax, Va.
Marian Serva, 47, Stafford, Va.
Cmdr. Dan Frederic Shanower, 40, Naperville, Ill.
Antoinette Sherman, 35, Forest Heights, Md.
Don Simmons, 58, Dumfries, Va.
Cheryle D. Sincock, 53, Dale City, Va.
Gregg Harold Smallwood, 44, Overland Park, Kan.
(Retired) Lt. Col. Gary F. Smith, 55, Alexandria, Va.
Patricia J. Statz, 41, Takoma Park, Md.
Edna L. Stephens, 53, Washington, D.C.
Sgt. Maj. Larry Strickland, 52, Woodbridge, Va.
Maj. Kip P. Taylor, 38, McLean, Va.
Sandra C. Taylor, 50, Alexandria, Va.
Karl W. Teepe, 57, Centreville, Va.
Sgt. Tamara Thurman, 25, Brewton, Ala.
Lt. Cmdr. Otis Vincent Tolbert, 38, Lemoore, Calif.
Willie Q. Troy, 51, Aberdeen, Md.
Lt. Cmdr. Ronald James Vauk, 37, Nampa, Idaho
Lt. Col. Karen Wagner, 40, Houston, Texas
Meta L. Waller, 60, Alexandria, Va.
Staff Sgt. Maudlyn A. White, 38, St. Croix, Virgin Islands
Sandra L. White, 44, Dumfries, Va.
Ernest M. Willcher, 62, North Potomac, Md.
Lt. Cmdr. David Lucian Williams, 32, Newport, Ore.
Maj. Dwayne Williams, 40, Jacksonville, Ala.
Marvin R. Woods, 57, Great Mills, Md.
Kevin Wayne Yokum, 27, Lake Charles, La.
Donald McArthur Young, 41, Roanoke, Va.
Lisa L. Young, 36, Germantown, Md.
Edmond Young, 22, Owings, Md.

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Exhibit A - victims list 9.29.05.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,
AS THAT TERM IS DEFINED HEREIN

1.  The name of the defendant to whom this Statement pertains is the International
    Islamic Relief Organization, including:

    a. International Islamic Relief Organization (Saudi Arabia)

    b. International Islamic Relief Organization branch offices in Africa, Asia,
       Europe, Canada, the United States of America, Latin America, and the
       Caribbean.

    These defendants are hereinafter collectively referred to as International Islamic
    Relief Organization ("IIRO").  The alleged misconduct and basis for liability is
    set forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of certain
    of the other defendants.  Given the vastly complicated nature of the conspiracy
    and other wrongdoing that led to the events of September 11, 2001, however,
    much information is unavailable to plaintiffs, and the identities of other
    wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore
    reserve the right to amend this Statement as information is learned and verified
    and after discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in

PLAINTIFF'S EXHIBIT

B

regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

  a. The predicate acts and statutes in question include:

  - Conspiracy to commit murder - NY  Penal § 105.15; NY  Penal § 125.25 (xi)

  - Conspiracy to commit arson - NY  Penal § 105.15; NY  Penal § 150.15

  - Fraud with Identification - 18 U.S.C. § 1028

  - Mail Fraud - 18 U.S.C. § 1341

  - Wire Fraud - 18 U.S.C. § 1343

  - Financial Institution Fraud - 18 U.S.C. §1344

  - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

  - Money Laundering - 18 U.S.C. § 1957

  - Defrauding the United States Government - 18 U.S.C. § 371

  - Travel Act - 18 U.S.C. § 1952

  - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

  - Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

  - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

  b. In the Mid 1990's to September 11, 2002, IIRO conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself.  IIRO conspired to conduct or participate, directly

or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, IIRO conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including IIRO, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. IIRO fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including IIRO, and illegal activity to generate material support to continue its terrorist operations.

    c. IIRO was not an employee, officer or director of the Enterprise, based upon present information available. IIRO is associated with the alleged Enterprise. IIRO is a member of the Enterprise, and is separate and distinct from the Enterprise. IIRO intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by IIRO is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by IIRO funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by IIRO, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. IIRO acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders,

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\B_IIRO - More Definite Statement - AL BAraka_92805.doc

is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including IIRO, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including IIRO, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of IIRO, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\B_IIRO - More Definite Statement - AL BAraka_92805.doc

trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like IIRO. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including IIRO. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by IIRO. IIRO, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. IIRO conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. IIRO conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. IIRO also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\B_IIRO - More Definite Statement - AL BAraka_92805.doc

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against IIRO are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. IIRO has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. IIRO conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  IIRO conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. IIRO has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

22. IIRO is a subsidiary body of Muslim World League ("MWL"), with over ninety (90) offices throughout the world.  According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO.  MWL uses IIRO as an operational arm to perform many of its charitable activities.[1]  In

---

[1] Given the control that defendant, MWL, had over IIRO, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Muslim World League, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et*

Page 8

reality, the IIRO is one of the charities operating within al Qaida's support infrastructure.

23. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which al Qaida planned, approved, and coordinated the Attack, and at which some or all of the September 11th hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir.

24. The U.S. intelligence report states that the IIRO, a Saudi humanitarian organization, has funded "militant training camps," shipped weapons to Afghanistan and had ties to Osama bin Laden. The IIRO is named in the 1996 intelligence report as one of 15 organizations that "employ members or otherwise facilitate the activities of terrorist groups in Bosnia." The document ties the group to the Palestinian terrorist organization Hamas, a man convicted in the 1993 World Trade Center bombing and plots to kill the Pope and attack U.S. airliners." The majority of Hamas members in the Philippines are employed by the organization," it says, adding, "the IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source."

25. The document was identified as a "CIA report" by special agent David Kane, an official in the U.S. Department of Homeland Security, in a court affidavit. Special Agent Kane said the IIRO also operates under the name Muslim World League (MWL). The IIRO and MWL are funded by the Saudi government. The CIA report cited by Special Agent Kane claims about one-third of the 50 international Islamic non-profit organizations were supporting terrorism or employing terrorist suspects. "While Muslim charities help the needy, they were also fostering violence." "Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package." Among other things, the report claims the head of the Muslim World League branch in Peshawar, Pakistan, "was illicitly supplying League documentation and arms to militants in Afghanistan and Tajikistan."

26. The CIA report, lists the IIRO as having "extremist connections," including to the Palestinian group Hamas, Algerian radicals, and the Egyptian precursor to al Qaida, Al-Gamaat Al-Islamiya. Kane stated in an affidavit, "The IIRO is affiliated with the Muslim World League, a major international organization largely financed by the government of Saudi Arabia," connecting the IIRO to al Qaida leader Osama bin Laden and convicted terrorist Ramzi Yousef.

27. The report also states that, "[t]he former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, has been linked to Manila-based plots to

*al.*, 04-CV-1923 (RCC).

Page 9

target the pope and U.S. airlines." Muhammad Jamel Khalifa is the brother-in-law to Osama bin Laden."

28. Kane stated in his affidavit, "I know that terrorists who have attacked or tried to attack the United States around the world have been associated with MWL/IIRO."

29. The perpetrators of the first attack on the World Trade Center in 1993 were given al Qaida funding and support through Mohamed Khalifa and IIRO.  Mohammed Khalifa, as the head of the IIRO, used the organization to fund terrorist groups within the Enterprise.

30. IIRO built its office in Khartoum, Sudan, in the same residential neighborhood as Osama Bin Laden's personal offices were located.  This IIRO office was also near Benevolence International Foundation, another alleged al Qaida front.

31. The IIRO was implicated in the bombing of the United States embassies in Kenya-Tanzania.  In September 1998, IIRO was deregistered and banned in Kenya following the bombings.  It was suspected that IIRO was involved in these bombings.

32. IIRO became al-Qaida's charity of choice to funnel money and weapons as described in the book *The Arab Volunteers of Afghanistan*, published by Adil abdul Galil Batargy.  According to the Washington Post, the US arm of the IIRO received $10 million from Saudi Arabia which was used to set up a company called Sana-Bell (an organization which is part of the SAAR network), that gave $3.7 million to BMI, a private Islamic investment company that may have passed the money to terrorist groups.

33. According to the Arabic periodical publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with Osama bin Laden's al-Qaida organization.

34. In March 2002, IIRO's offices in Herndon, Virginia were raided by the FBI, at an address which was the same address for numerous charities, organizations and businesses which have assisted by funding and or supporting al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

35. In January, 2004, the Senate Finance Committee asked the Internal Revenue Service ("IRS") for its records on more than twenty-five (25) Muslim charities and organizations as part of an investigation into possible links between nongovernmental organizations and terrorist financing networks.  Including in this list of charities was MWL and IIRO.

36. As the foregoing demonstrates, IIRO thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical

Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of IIRO's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

37. As the foregoing demonstrates, IIRO thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of IIRO's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

38. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\B_IIRO - More Definite Statement - AL BAraka_92805.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT MUSLIM WORLD LEAGUE, AS THAT TERM IS DEFINED
HEREIN

1.  The name of the defendants to whom this Statement pertains are the
defendant Muslim World League, including:

a. Muslim World League (Buenos Aires, Argentina)

b. Muslim World League (Preston, Australia)

c. Muslim World League (Vienna, Austria)

d. Muslim World League (Dhaka, Bangladesh)

e. Muslim World League (Bujumbura, Burundi)

f. Muslim World League (Etobicoke, Canada)

g. Muslim World League (Moroni, Comores)

h. Muslim World League (Brazzaville, Congo)

i. Muslim World League (Kobenhaven, Denmark)

j. Muslim World League (Mantes la Joile, France)

k. Muslim World League (Libreville, Gabon)

l. Muslim World League (Jakarta, Indonesia)

m. Muslim World League (Rome, Italy)

n. Muslim World League (Amman, Jordan)

o. Muslim World League (Nairobi, Kenya)

p. Muslim World League (Kuala Lumpur, Malaysia)

q. Muslim World League (Nouakchott, Mauritania)

r. Muslim World League (Mauritius, Mauritius)

**PLAINTIFF'S EXHIBIT**

**C**

      s. Muslim World League (Maputo, Mozambique)

      t. Muslim World League (Wuse Abuja, Nigeria)

      u. Muslim World League (Islamabad, Pakistan)

      v. Muslim World League (Makati City, Philippines)

      w. Muslim World League (Male, Republic of Maldives)

      x. Muslim World League (Moscow, Russia)

      y. Muslim World League (Makkah, Saudi Arabia)

      z. Muslim World League (Dakar, Senegal)

      aa. Muslim World League (Djibouti, Somalia)

      bb. Muslim World League (Gauteng, South Africa)

      cc. Muslim World League (Khartoum, Sudan)

      dd. Muslim World League (Dar Es Salaam, Tanzania)

      ee. Muslim World League (Bangkok, Thailand)

      ff. Muslim World League (Lome, Togo)

      gg. Muslim World League (Port of Spain, Trinidad)

      hh. Muslim World League (London, U.K.)

      ii. Muslim World League (Kampala, Uganda)

      jj. Muslim World League (New York, U.S.A.)

      kk. Muslim World League (Falls Church, U.S.A.)

These defendants are hereinafter collectively referred to as Muslim World League ("MWL"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re*

Page 2

*Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

b.        In the Mid 1990's to September 11, 2002, MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself.  MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, MWL conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.        The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.        The predicate act is not based upon a criminal conviction.

e.        Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.        The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.      The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including MWL, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

a.      The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.      The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a

hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. MWL fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including MWL, and illegal activity to generate material support to continue its terrorist operations.

c.       MWL was not an employee, officer or director of the Enterprise, based upon present information available. MWL is associated with the alleged Enterprise. MWL is a member of the Enterprise, and is separate and distinct from the Enterprise. MWL intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by MWL is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by MWL funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by MWL, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the

Page 6

United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. MWL acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a.    Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b.    The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al. (SDNY 04-CV-1922 (RCC)) and Estate of John P. O'Neill, et al. v. Iraq, et al. (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.    The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including MWL, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the Zakat, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including MWL, were used by the

Enterprise to accomplish its goals, with the knowledge and awareness of MWL, of both those goals and the uses to which the Funds were put.

b.      The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.      The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.      The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like MWL.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including MWL.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by MWL.  MWL, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. _MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

MWL also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against MWL are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. MWL has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. MWL has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

22. MWL was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." The MWL is the parent organization of the al Qaida charity International Islamic Relief Organization ("IIRO") and uses the IIRO as an operational arm to perform many of its charitable activities.[1]

23. The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities commonly referred to as bodies or members of the League, including IIRO, the World Assembly of Muslim Youth ("WAMY"),[2] Benevolence International Foundation ("BIF") and Rabita Trust.[3] The MWL has long operated as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

---

[1] Given the control this defendant, MWL, had over IIRO, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to the International Islamic Relief Organization., relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[2] Given the control this defendant, MWL, had over WAMY, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to the WAMY, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[3] Given the control this defendant, MWL, had over Rabita Trust, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to the Rabita Trust., relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

24. MWL is an organization funded, supported, financed and controlled by Saudi Arabia.   According to the testimony of Arafat al-Asahi, a MWL representative and head of IIRO's Canada branch IIRO and MWL were intimately connected to and funded by Saudi Arabia:

Q:  During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government had any concern whatsoever with respect to your office?

A:  Let me tell you one thing.  The Muslim World League, which it the mother of IIRO, is a fully government funded organization.  In other words, I work for the Government of Saudi Arabia.  I am an employee of that government.  Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia…

Q: …When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A:  I am paid by my organization which is funded by the government.  Let me tell you one little thing.  Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us.  They ask us about the people who are doing this project.

25. MWL has two offices in the United States.  One is in Herndon, Virginia – an office which many other alleged charities shared the same address.  The other is in New York City.  The Herndon office was the target of federal raids in early March, 2002.  The president of MWL was Abdulaziz Al Al-Sheikh, the Grand Mufti of the Kingdom of Saudi Arabia.  The officers for the Virginia office were Abdullah Bin Saleh al Obaid, as president; Hassan A.A. Bahafzallah, as vice president; and Yaqub M. Mirza, as secretary/treasurer.

26. Abdullah Bin Salej al Obaid, president of the MWL in the US, runs one of the Al Rajhi family's largest corporations, al-Watania Poultry.  The Al Rajhi family is the primary funder of the entire SAAR Foundation network, a network of charities alleged to assist the funding and support of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Obaid also served as secretary general of the Rabita Trust, an alleged charity which had its assets frozen as a Specially Designated Global Terrorist Entity.

27. Yaqub Mirza, the secretary and treasurer of the MWL in the United States the financial mastermind of the SAAR Network.  Yaqub Mirza's house was raided in March, 2002 by federal authorities for his alleged connections to al Qaida and September 11, 2001.

28. WML also is tied to Abdullah Omar Naseef of Saudi Arabia. Naseef is associated with the SAAR Foundation and Al Rajhi, a banking institution which assisted the funding and support of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Naseef served as secretary-general of the MWL during the time he created Rabita Trust and has attempted to spread MWL offices around the world. Part of his global efforts are found in his involvement in the SAAR Network charity. Naseef is an officer at the Makkah al-Mukarramah, Inc., at the same Herndon, Va. address as the SAAR network, Muslim World League, IIRO, al-Wantania Poultry, and numerous other known organizations which supported the Enterprise.

29. MWL has numerous connections with al-Qaida operatives. Osama Bin Laden's brother-in-law, Mohammed Jamal Khalifa, opened a Muslim World League office in Pakistan for the use of the al-Qaida founders.

30. Wa'el Jalaidan, identified by the U.S. Treasury Department as "one of the founders of al-Qaida," headed the MWL in Peshawar, Pakistan and served as secretary general of the Rabita Trust. Jalaidan spread Muslim World League offices around the world. These offices served in the early days of al-Qaida to attract and train warriors for the war in Afghanistan.

31. Wadih el-Hage, convicted for his role in the 1998 U.S. embassy bombings in Africa, stated at his trial that he worked at the Muslim World League in Peshawar, Pakistan in the 1980s. It was while working at MWL that el-Hage met Abdullah Azzam, the mentor of Osama Bin Laden and co-founder of al-Qaida.

32. In January, 2004, the Senate Finance Committee asked the Internal Revenue Service ("IRS") for its records on more than twenty-five (25) Muslim charities and organizations as part of an investigation into possible links between nongovernmental organizations and terrorist financing networks. Including in this list of charities was MWL and IIRO.

33. As the foregoing demonstrates, MWL thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of MWL's participation in the jihadist campaign of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

34. As the foregoing demonstrates, MWL thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product

of MWL's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

35. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
   GINA M. MAC NEILL, ESQUIRE (GM 0581)
   JERRY S. GOLDMAN, ESQUIRE (JG 8445)
   FREDERICK J. SALEK, ESQUIRE (FS 8565)
   Attorneys for the Plaintiffs
   111 Broadway, 13th Floor
   New York, N.Y. 10006
   212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT **SALEH ABDULLAH KAMEL**

1.  The name of the defendant to whom this Statement pertains is Saleh Abdullah
    Kamel ("Kamel").  The alleged misconduct and basis for liability is set forth
    below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**D**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Saleh Abdullah Kamel conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 2

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Saleh Abdullah Kamel, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure

of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.      Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Saleh Abdullah Kamel fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Saleh Abdullah Kamel, and illegal activity to generate material support to continue its terrorist operations.

c.   Saleh Abdullah Kamel was not an employee, officer or director of the Enterprise, based upon present information available.   Saleh Abdullah Kamel is associated with the alleged Enterprise.  Saleh Abdullah Kamel is a member of the Enterprise, and is separate and distinct from the Enterprise.  Saleh Abdullah Kamel intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Saleh Abdullah Kamel is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Saleh Abdullah Kamel funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Saleh Abdullah Kamel, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.   Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Saleh Abdullah Kamel acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Saleh Abdullah Kamel, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Saleh Abdullah Kamel, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Saleh Abdullah Kamel, of both those goals and the uses to which the Funds were put.

    b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and

helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Saleh Abdullah Kamel. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Saleh Abdullah Kamel. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Saleh Abdullah Kamel. Saleh Abdullah Kamel, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Saleh Abdullah Kamel are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaints, as amended.

20. Saleh Abdullah Kamel has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Kamel has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Kamel conducted or participated, directly or indirectly, in the conducted of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Saleh Abdulah Kamel is one of the wealthiest businessmen in Saudi Arabia.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

23. In 1969, Kamel founded Dallah Al Baraka Goup.  He is the majority owner, the CEO and the chairman of Dallah al Baraka Group.[1]  The Dallah al Baraka Group provides banking, investment, insurance and lending services to businesses located throughout the Muslim world.  It is the third largest Saudi company.

24. Kamel is Chairman of al Baraka Financial Institution, which is deeply involved in providing financial services and other forms of material support to Al Qaida.

25. Kamel was one of Al Shamal Bank's three founding members.  The other two founding members were Al Shamal for Investment and Development (a Sudanese company) and the Government of the Northern State.  Kamel is also a large shareholder of Al Shamal Bank.

26. Kamel also co-founded the U.S. branch of Sana-Bell, Inc., and enterprise established to provide revenues to sustain the US operations of the International Islamic Relief Organization ("IIRO)).[2]  In founding Sana-Bell, Inc., Kamel knew and intended that it would be used as a vehicle for funding terrorist organizations, including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, through the IIRO and the SAAR network.

27. Kamel has been identified as a principal financier of the Al Qaida and has made substantial contributions to many of the alleged charities operating within Al Qaida's infrastructure, with full knowledge that those funds would be used to support the operations of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. For example, Kamel is listed on the "Golden Chain" as a donor.  The "Golden Chain" is a list of the top wealthy financial supporters of the Al Qaida.  This document was seized by the Bosnian police during searches in the offices of the Benevolence International Foundation in Sarajevo in March 2002.  This document was presented by the United States Government as Exhibit 5 in the Department of

---

[1] Specific misconduct regarding Dallah Al Baraka Group, a co-defendant herein, is provided via More Definite Statement Applicable to Al Baraka Investment and Development Corp. a/k/a Al Baraka Bank a/k/a Dallah Al Baraka Group, LLC.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Baraka Investment and Development Corp. a/k/a Al Baraka Bank a/k/a Dallah Al Baraka Group, LLC, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

[2] Specific misconduct regarding IIRO, a co-defendant herein, is provided via the More Definite Statement Applicable to International Islamic Relief Organization.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to International Islamic Relief Organization, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

Justice "Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirators Statements" in the case of United States v. Arnaout filed on January 29, 2003. Additionally, this list was mentioned in the indictment of Enaam Arnaout (02 CR 892), a co-defendant. According to the United States government, this document is a "list of people referred to within Al Qaida as the "Golden Chain", wealthy donors to mujahadeen efforts."

28. Saleh Abdullah Kamel, son of Abdullah Kamel and Fatma NagroAbdullah Kamel, son of Abdullah Kamel and Fatma Nagro, was born in Makkah, Saudi Arabia, in 1941. After serving as an adviser to the Saudi Minister of Finance, he founded Dallah Al Baraka Group, LLC in 1969, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

29. Beginning in the late 1970s, Saleh Kamel financed and developed Dallah Al Baraka and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

30. In 1982, Saleh Kamel and Dallah Al Baraka began directing tens of millions of dollars in funds to at least 20 non-governmental organizations – including Osama Bin Laden's Mekhtab al Khidmat—the predecessor to al Qaida⎯ which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

31. Dallah Al Baraka, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. Dallah Al Baraka posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third in Saudi company in sales.

32. The Dallah Al Baraka financial arm is Al Baraka Investment & Development (ABID)[3], a wholly owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al Barakaat Bank".

33. These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank, Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American, Yemen Islamic Bank for Finance & Investment.

---

[3] Specific misconduct regarding Al Baraka Investment and Development ("Al Baraka"), a co-defendant herein, is provided via the More Definite Statement Applicable to Al Baraka. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Baraka, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 10

34. ABID assets, including funds under management, are valued at $4.4 billion. US assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

35. Dallah Al Baraka's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah.  Dallah Al Baraka has also facilitated Jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

36. ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, a co-defendant in this action, Faisal Islamic Bank,[4] Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

37. Saleh Kamel and Al Baraka materially supported Osama Bin Laden and his al Qaida network of front companies, farms, and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

38. Saleh Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaida first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal*, the official International Islamic Relief Organization publication, illustrates how Saleh Kamel has carried out his ongoing jihad. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of … Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

39. The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir … Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

40. Saleh Kamel and ABID are also major shareholders of the Arab Albanian Bank and Faisal Islamic Bank-Egypt.  Kamel's conglomerate Dallah al Baraka has large investments in Islamic banks, including al Tawqa bank, a co-defendant in this action, based in the Bahamas, among other financial institutions.  Kamel is chairman of the Bahrain-based General Council of Islamic Banks and Financial Institutions (IBFI).

41. Saleh Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaida. In fact, the United States Government has been investigating Saleh Abdullah Kamel for his material support of Al Qaida along with numerous other

---

[4] Specific misconduct regarding Faisal Islamic Bank ("FIB"), a co-defendant herein, is provided via the More Definite Statement Applicable to FIB.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to FIB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 11

*Burnett* defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaida, and the assets of other material sponsors have already been frozen by the Department of Treasury.

42. In March 2002, the Bosnian police found several documents and items regarding the history of Al-Qaida during searches in the offices of Benevolence International Foundation (BIF) in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that according to the US government is "a list of people referred to within Al Qaida as the "Golden Chain" or wealthy donors to mujahideen efforts". Among them was Saleh Abdullah Kamel.

43. The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the Indictment of Enaam Arnaout, a co-defendant in this action, on October 9, 2002 (02 CR 892).

44. The "Golden Chain" list was introduced and relied on in *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL255226, at *1-2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaida sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists (SDGT), a decision not lightly taken by the executive branch of the government.

45. A former member of al Qaida, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified Saleh Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaida. Al Fadl is a former al Qaida leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaida terrorist trials.

46. In 1992, Saleh Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Saleh Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

47. As part of his ongoing material support for Al Qaida and other Islamic militants groups in the Balkans, Saleh Kamel visited Bulgaria "prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles."

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

48. In 1998, Saleh Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain[5] account at Al Baraka account in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from Al Haramain accounts.

49. The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

50. Both brothers have, at various times, served on the Shariah Compliance Board of Saleh Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

51. The Darul Ulum Madrassa "backs jehadi organizations and both the Usmani brothers have provided practical help in setting jehadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa."

52. Darul Ulum provides support to Al Qaida affiliates and SDGT entities Harkatul Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen. Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and Al Qaida in their war against the United States.

53. Saleh Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in Houston, Texas. As early as 1984, Saleh Kamel held "sizeable investments in the United States…" via his financial interests in the Dallah Al Baraka Group.

54. In 1996, Dallah Al Baraka owned more than $230 million in assets in the United States and Europe. Saleh Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

55. In 2004, as chairman of the General Council of Islamic Banks, Saleh Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

56. In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials. Saleh Kamel is part owner of London-based Middle East Broadcasting Centre (MEBC). In 1992, Saleh Kamel purchased the U.S. media company, United Press International (UPI), for $3.9 million through his company MEBC. Saleh Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended

---

[5] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via the More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

to invest more than $10 million between 1993-1995 to revive the struggling media company. Saleh Kamel owned UPI until 2002 when it was sold to the Unification Church.

57. In 1999, it was announced that Saleh Kamel and Dallah Al Baraka were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

58. Saleh Kamel and Al Baraka sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

59. Al Baraka's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

60. In July 2003, Saleh Kamel and Dallah Al Baraka announced that it would sue four unnamed Western banks as third party defendants if Kamel and Al Baraka were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, "…the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

61. Saleh Kamel and Dallah Al Baraka are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.*, (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

62. Sanabel al Khair, the North American financial arm of IIRO, was established to receive, invest, and generate funds for the operations of International Relief Organization (IRO)—the 'United States arm' of IIRO.  Beginning in about 1991, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali.

63. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain Al Qaida fundraiser.  Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas provided account numbers to facilitate the contribution of funds.  These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of Dallah al Baraka, owned and controlled by Saleh Kamel.

64. A December 1993 advertisement from the official publication of the International Islamic Relief Organization, *Al Igatha Journal*, which was distributed across the United States, illustrates how Saleh Kamel carried out his jihad by establishing Al

Page 14

Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaida first started carrying out attacks against the United States. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of … Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir … Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

65. Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Saleh Kamel contributed at least $100,000 to the organization through his Dallah al Baraka Group branch in the U.S. in 1992.

66. Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993. Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

67. In 1992, regarding Saleh Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

68. A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier*, describes the likely economic collaboration of Saleh Kamel and Al Baraka with Bin Laden:

> "Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

69. In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Saleh Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden.

70. Saleh Kamel and Al Baraka were provided with numerous public notices regarding the Sudanese government's support and harboring of international terrorists.

71. When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

> Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed

terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

72. Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaida network with military and logistical support through the government of Sudan.

73. During 1991, Saleh Kamel, Yassin Al Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

74. Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

75. "There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

76. Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad … the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

77. In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, Al Qaida's second in command, was in attendance. At the conference Turabi accused the West of

trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States—the 'Great Satan.'"

78. Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

79. In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught...To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

80. The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Saleh Kamel and Al Baraka:

> In 1992 and 1993 Mohamed Atef [AlQaida's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

> In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaida, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

> On October 3 and 4, 1993 operatives of Al Qaida participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

> From 1993 members of Al Qaida began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaida, including Atef and Abu Ubaidah al Banshiri.

> Beginning in the latter part of 1993, members of Al Qaida in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, A US citizen and admitted member of Al Qaida, surveyed the US Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

81. An Al Baraka annual report from the period describes how Saleh Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads …." During this time, Osama Bin Laden was

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country.

82. In January 1992, U.S. diplomats warned the government of Sudan to stop harboring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice. They [terrorists] can come and go as they please. They operate here with impunity."

83. The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

84. In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

85. In August 1993, it was widely reported in the English, Arabic, and Sudanese press that the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic fundamentalist terrorist entities.

86. A portion of Saleh Kamel's investment revenues in Sudan were annually required to be committed to zakat – the Islamic almsgiving. However, in Sudan, Saleh Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

87. In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defense forces; and providing for martyrs' families."

88. The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Saleh Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

89. Osama bin Laden warned the West, in the 1999 August edition of *Sudanow* two months before Al Qaida coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops. The attack was

Page 18

carried out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

90. Osama Bin Laden was using diverted zakat funds, provided by Saleh Kamel and other major investors in the Sudanese economy, to recruit and train Al Qaida recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

91. In November 1993, the Arab Albanian Islamic Bank (AAIB) was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), Saudi Dallah Al Baraka Group (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

92. The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, "…a secrecy that cannot be maintained in an institution that pretends to be serious". The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

93. On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi[6] in the Arab Albanian Islamic Bank. The Arab-Albanian Bank was subsequently renamed United Albanian Bank. It is believed that Saleh Kamel and Al Baraka remain shareholders in the successor entity of the Arab-Albanian Bank.

94. Saleh Abdullah Kamel's Who's Who biography states that he has been a "founding member of Faisal Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Saleh Kamel in *The Saudi Gazette* on January 7, 2003.

95. According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions on its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

96. The Muslim World League[7] Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan".

---

[6] Specific misconduct regarding Yassin Al Qadi ("al Qadi"), a co-defendant herein, is provided via the More Definite Statement Applicable to al Qadi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via the More Definite Statement Applicable to MWL. Plaintiffs herein incorporate by

Page 19

97. Faisal Islamic Bank of the Sudan is an associated company of the DMI Trust.[8] The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

98. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, a co-defendant in this action, stated:

> "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

99. The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

100.   Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, Al Qaida, and other extremist groups.

101. Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

102. Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed

---

reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[8] Specific misconduct regarding DMI Trust, a co-defendant herein, is provided via the More Definite Statement Applicable to DMI Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to DMI Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic State.  Together they encouraged Osama bin Laden to travel to Sudan and to develop his Al Qaida terrorist network to train soldiers for jihad.

103. In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

104. The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Saleh Abdullah Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

105. The Saudi American Bank serves as the bank for the Dallah al Baraka Group. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

106. Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaida terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaida's and Osama bin Laden's tenure there.

107. Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaida terrorist operations as detailed herein. The Saudi American Bank[9] is also the main correspondent in

---

[9] Specific misconduct regarding Saudi American Bank ("SAB"), a co-defendant herein, is provided via the More Definite Statement Applicable to SAB.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to SAB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaida.

108. In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of Muslim Youth,[10] International Islamic Relief Organization and al Haramain Foundation.

109. Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co., Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

110. Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale, is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there.

111. Saleh Abdullah Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

112. In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and Al Baraka Investment and Development. According to newly obtained information on al Shamal Islamic Bank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

113. Osama Bin Laden was close to the new regime of Hassan Al-Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

114. One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department:

---

[10] Specific misconduct regarding World Assembly of Muslim Youth ("WAMY"), a co-defendant herein, is provided via the More Definite Statement Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

"Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

115. The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

116. Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Saleh Abdullah Kamel and ABID. Saleh Abdullah Kamel holds 15% of the bank shares.

117. Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

118. A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaida operatives held bank accounts in al Shamal Islamic Bank under their real names:

Q: While you were in the Sudan, did you handle money for Osama Bin Laden?
A: Could you repeat the question.
Q: Did you work on the finances for al Qaida while you were in the Sudan?
A: Yes.
Q: Did you know where the bank accounts of Osama Bin Laden and al Qaida were?
A: Yes.
Q: Do you know whose names they were in?
A: The bank account under Usama Bin Laden in Bank Shaml [Al Shamal Islamic Bank], Khartoum.
Q: That was under Osama Bin Laden's true name?
A: Yes.
Q: Were there accounts in other names?
A: Yes. Afad Makkee got account also.
Q: Afad Makkee, the account that he had under his name, do you know what name that is?
A: I remember Madani Sidi al Tayyib.
Q: Do you know of any other persons who had al Qaida money in their accounts?
A: Abu Rida al Suri.

Page 23

Q: Do you know his true name?
A: Nidal.
Q: Anyone else that you knew had al Qaida money in bank accounts in their name?
A: Abu Hajer al Iraqi.
Q: Do you know his true name?
A: Mamdouh Salim.
Q: Did you have any accounts in your name?
A: Shared with Abu Fadhl.
Q: So you had accounts in your name that were shared with Abu Fadhl?
A: Yes.
Q: Do you recall anyone else that had bank accounts in their name for al Qaida?
A: Abdouh al Mukhlafi.

119. Jamal Ahmed Al-Fadl also testified that Al-Qaida operatives received monthly checks of several hundred dollars from al Shamal Islamic Bank accounts:

Q: When you worked for Osama Bin Laden, in the Sudan, how much were you paid?
A: $1,200 (…) per month.
Q: For how long did you work for him?
A: Almost two years.
Q: What banks did he keep his money at?
A: Bank el Shamar [Al Shamal Islamic Bank].
Q: Any other banks?
A: I think he had accounts in different banks, but I only recall Bank Shamar [Al Shamal Islamic Bank].

120. Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al Shamal Islamic Bank to an Al-Qaida representative in Jordan:

Q: How did you carry the $100,000?
A: In my bag with my clothes.
Q: Do you recall what kind of bills the $100,000 was in?
A: I remember they all hundred bill.
Q: Sorry?
A: They all hundred bill.
Q: They were all hundred dollar bills?
A: Yes.
Q: Who gave you the money?

> A: Abu Fadhl, he bring it from Shamal Bank [Al Shamal Islamic Bank] and he bring it to me.
> Q: Abu Fadhl brought it from the Shamal Bank [Al Shamal Islamic Bank]?
> A: Yes.

121. During the course of the same trial, another associate of Bin Laden, Essam Al Ridi, testified that the bank was used for operational purposes in stating that "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

122. Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation (BIF), was subject to a complaint from the FBI on April 29, 2002. The assets of the Benevolence International Foundation have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding Al Qaida.

123. Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

124. Saleh Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely known that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

125. Osama Bin Laden was allowed to maintain accounts as an investor in al Shamal Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y Februrary 1994 bin Laden had already been stripped of his Saudi nationality and was a well known supporter of Islamic terrorist causes."

126. When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Saleh Kamel's Al Baraka Bank. This fact indicates that Saleh Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaida by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

127. Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency (TWRA), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

128. TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

129. During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaida network and operating terrorist training camps for al Qaida and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

130. In a 1994 interview with the Islamist magazine *Gazi Husrev Beg*, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

131. In 1977, Saleh Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the *Financial Strategy of the Muslim Brothers*, illustrates that Saleh Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

132. The document describes how Saleh Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

> No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

133. The document states the Saleh Kamel and Al Baraka is the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

134. With the investment support of Saleh Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank …"

Page 26

135. Swiss authorities have seized a copy of the *Financial Strategy of the Muslim Brotherhood* containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada. The same document mentions Saleh Abdullah Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

136. The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

137. By becoming majority owners in the International Islamic Bank in Luxemburg, Saleh Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics … is a good instrument to implement many projects which are necessary for the Gamaat and its members … [and] it is a good instrument to train higher level economic, financial and technical staff, within the framework of the Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

138. Saleh Abdullah Kamel and Al Baraka Bank, appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

139. On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaida by President George W. Bush. In announcing the designation of Al-Taqwa as a global terrorist entity, President Bush stated:

> "Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaida shift money around the world. Al Taqwa raises money for Al Qaida. They manage, invest, and distribute those funds…They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

140. In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

> "As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada [director of the bank]."

141. The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal

Page 27

financier of Al Qaida, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

142. Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q: A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that…?

> A: Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

143. Saleh Abdullah Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's, a co-defendant in this action, house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

144. In 1995, it was reported that Saleh Kamel and Al Baraka Bank had "major investments" in Bank Al-Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

145. In 1997, while Saleh Kamel maintained investments at Bank Al-Taqwa, Agence France Presse and the U.S. Department of Treasury reported that terrorist fundraisers were annually transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts. Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

146. Thus, as early as 1995, Saleh Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

147. As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its "own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

148. Bank Al Taqwa diverted funds from investors' accounts to terrorist entities– but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

149. Thus, Saleh Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

150. Along with SDGT Yassin Al Qadi, Saleh Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. (ALINTID) which was established during the early 1990s. The financial institution was reportedly

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

151. Multiple private and government sources have confirmed that Saleh Kamel and Yassin Al Qadi turned over the ownership and financial assets of the bank to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

152. A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

> "Through one of its branch offices, the Al-Haramain transferred large amounts of money to the local Wahhabi center in Dagestan, known as the Islamic center "Kavkaz," in the capital of the republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-Barakaat Bank."

153. A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists,* states the following regarding the international financial structures, involved in funding of Chechen rebels:

> In Saudi Arabia – (…) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al- Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

154. The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman, Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in Saudi Arabia.

155. The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

156. A memo from the FSB details the bank's role in funding Al Haramain:

> "Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the

Page 29

fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

157. FSB had intercepted from Saudi- based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

"The load is ready for sending – grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles. One thousand rounds of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet- proof) vests have been bought."

158. Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview:

"The Saudi Arabian Al-Haramain (…) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

159. The US State Department reported the connections between Al-Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

"The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries. According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (…).One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden. In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

160. The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets have been blocked pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

161. Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of

the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

162. In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

163. Saleh Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Saleh Kamel and Al Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

164. Saleh Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaida was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets – including Americans.

165. The involvement of Saleh Abdullah Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

166. According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, *US v. Soliman Biheiri*, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

167. In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank. The investigation report of his interview with agent David Kane states the following:

> "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 … Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

168. In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were Dallah Al Baraka and the Jordan Islamic Bank.

169. Jordan Islamic Bank, a Dallah Al-Baraka subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

statement, Saleh Abdullah Kamel acknowledged that Dallah Al-Baraka owns another 12 percent.

170. Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

171. According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the US government in December 2001.

172. Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

173. According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

174. Assets of Beit El-Mal, a 20% shareholder, were frozen. The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

175. Saudi national Omar Al Bayoumi, who lived in the United States from the late 1990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of Dallah al Baraka.

176. Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

177. Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, a subsidiary company of Dallah Avco Aviation, a Saudi government contractor owned by Saleh Kamel.

178. During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"---made it clear that the government wanted al-Bayoumi's contract renewed "as quickly as possible."

179. The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaida.

180. Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaida sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

181. In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

182. The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

183. Al Baraka Bank provided material support to the Spanish Al-Qaida cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

184. Saleh Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaida cell which directly funded and helped coordinate the September 11th hijacker cell. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi.

185. Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaida network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turk Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

186. Saleh Kamel provided material support to the Hamburg Al Qaida cell which planned, organized, and carried out the September 11th attacks.

187. Saleh Abdullah Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public relations & Marketing.

188. The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

189. Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

190. According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

191. Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable

Page 34

organization founded in 1983 by Saleh Abdullah Kamel and managed by Mohammed Abed al-Yamani.

192. Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

193. Iqra International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

194. Iqraa International has a branch in the US registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa international announced, in 2002, annual sales in an amount of $1,200,000.

195. IRS form 990 of the US branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

196. Iqraa International is currently under investigation by Russian Federal Security Services (FSB) for terrorism financing and logistic support.

197. The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

198. Servakh Abid Saad, Director of the Russian office of Iqraa international charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

199. Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Saleh Kamel partners. He began his career as manager of the board of Dallah Al Baraka.

200. Mohammed Abed al-Yamani became executive board member of Dallah Al Baraka. Mohammed Abed al-Yamani is currently deputy President of Dallah Al Baraka.

201. Mohamed Abed al-Yamani, as director of Iqra International, and Saleh Abdullah Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

202. Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

203. In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina, received $4,266,723 from Bakr Bin Laden and Saleh Abdullah Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

204. Muhammad Abed Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

205. Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

206. Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by the Saudi-based Dallah Al Baraka and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with Dallah Al Baraka. Iqraa also maintains operations through a local branch of the organization based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-400016.

207. Saleh Kamel is the owner of the Iqraa satellite television network. According to Iqra TV's director, Abdul-Qader Tash, the channel is the "brain child" of Saleh Kamel.

208. Saleh Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by Al Qaida and other transnational terror groups worldwide via the powerful medium of television programming. A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

> The issue is not one person, two, 10 or 100 going out with their guns to support their brothers. Defeating the infidels requires a much greater effort. It requires the mobilization of the nation. How can the nation be mobilized? I believe that the stupid acts of these Jews and Crusaders mobilize the nation. The big explosion will come!

209. Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Saleh Kamel's ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

210. Another Kamel-sponsored program on Iqraa TV, *Muslim Woman Magazine*, explicitly extols the virtues of child violence and hatred against Jews and Christians:

"Anchor Doaa Amer: Our report today will be a little different because our guest is a girl, a Muslim girl, but a true Muslim. Allah willing, may our God give us the strength to educate our children the same way, so that the next generation will turn out to be true Muslims who understand that they are Muslims and know who their enemies are. This girl will introduce herself immediately. She is the daughter of my sister in faith and of the artist Wagdi al-Arabia. Her name is Basmallah.

3 ½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

'Amer: Basmallah, how old are you?'

Child: Three-and-a-half.

'Amer: Are you a Muslim?

Child: Yes.

'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because ...

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child: In the Koran.

Amer: Right, he said that about them in the Koran.. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. ...May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate them now while they are still children so that they will be true Muslims.

211. Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

Page 37

"Only our culture understands sacrifice, loyalty and honour. No one in the [western] world sacrifices his life for his homeland. If his homeland is drowning he is the first to jump ship. But in our culture it is different because when a martyr dies, he reaches the height of bliss. When the martyr explodes, he knows that he is not dead. He is simply in transition to another, more beautiful world, because he knows very well that within seconds he will see the light of the Creator."

212. Saleh Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

213. In January 2003, Saleh Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S.-based public relations firm … designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam."

214. In October 2001, Saleh Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were "seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

215. As the foregoing demonstrates, Saleh Abdullah Kamel thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Saleh Abdullah Kamel's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

216. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\D_Kamel, Saleh - FINAL!!! More Definite Statement.doc

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
     GINA M. MAC NEILL, ESQUIRE (GM 0581)
     JERRY S. GOLDMAN, ESQUIRE (JG 8445)
     FREDERICK J. SALEK, ESQUIRE (FS 8565)
     Attorneys for the Plaintiffs
     111 Broadway, 13th Floor
     New York, N.Y. 10006
     212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT ASAT TRUST REG.

1.  The name of the defendant to whom this Statement pertains is Asat Trust Reg
    ("Asat").  The alleged misconduct and basis for liability is set forth below as well
    as elsewhere in the Complaint, as amended.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**E**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Asat conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Asat, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating

Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.   Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Asat fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Asat, and illegal activity to generate material support to continue its terrorist operations.

c.  Asat was not an employee, officer or director of the Enterprise, based upon present information available.  Asat is associated with the alleged Enterprise.  Asat is a member of the Enterprise, and is separate and distinct from the Enterprise.  Asat intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Asat is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Asat funds that activity, which activity culminated in the Attack.

The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Asat, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Asat acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida

established itself in Afghanistan, and relied on well-placed financial facilitators, including Asat, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Asat, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Asat, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Asat. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Asat. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Asat. Asat, with knowledge and intent, agreed to the overall

objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Asat also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Asat are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*;

Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Asat has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Asat Trust was designated by the United States and the United Nations as a terrorist-related entity.  The Office of Foreign Assets Control, of the United States Treasury, froze their assets due to their links to Al Taqwa, their individual activities to support terrorism and their financial support of the Al Qaida.

22. Asat Trust has been involved with the Al Taqwa network during the last thirty (30) years, registering changes in company names, personnel and financial structure, along with many other duties.  Al Tawqa is a co-defendant in the above-referenced cases.  In fact, many of the transactions of Al Taqwa and the Himmat Establishment were undertaken in care of Asat Trade Regulation.

23. Al Taqwa has also been designated as a terrorist-related entity and has been linked to significant support of the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. At the time of the Bank's designation President George Bush declared, "Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world.  Al Taqwa raises funds for Al Qaeda."

24. Asat Trust is owned by Youssef M. Nada, a co-defendant in the above-referenced cases.  Youssef M. Nada has been designated as a person who supports terrorism by the Department of the Treasury, Office of Foreign Assets Control.  He was sanctioned as a sponsor of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\E_Asat - More Definite Statement - AL BAraka.doc

25. Asat Trust, based in Liechtenstein, is headed and directed by Martin Wachter[1] and Erwin Wachter[2] (collectively referred to as the "Wachters"). Additionally, available information reveals a pattern of activity over a period of many years of the Wachters working at the same address registered to Asat Trust.

26. Both Wachters, Erwin and Martin, also own Sercor Treuhand Anstalt, a co-defendant in this action. As owners and heads of Asat Trust and Sercor Treuhand Annstalt, the Wachters oversaw the activities and had knowledge of the activities that supported the al Qaida.

27. Bothe Wachters have long known that accounts, under the control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

28. Despite this knowledge, the Wachters continued to permit, make available, assist and maintain those accounts.

29. There is additional information which links the Wachters and Asat Trust to Al Taqwa and its executives Youssef M. Nada, Ahmed Idris Nasreddin, Albert Friedrich Armand Huber, and Ali Ghaleb Himma, co-defendants who have been linked to funding al Qaida.

30. Via Galp International Trading Establishment, which Asat Trust also represented, the Wachters and Asat Trust have also been linked in news reports to laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa Enterprise.

31. As the foregoing demonstrates, Asat thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Asat's

---

[1] Specific misconduct regarding Martin Wachter, a co-defendant herein, is provided via More Definite Statement Applicable to Martin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Martin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Erwin Wachter, a co-defendant herein, is provided via More Definite Statement Applicable to Erwin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Erwin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

32. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\E_Asat - More Definite Statement - AL BAraka.doc

## PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT ARAB BANK, PLC

1. The name of the defendant to whom this Statement pertains is Arab Bank, PLC. The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**F**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, Arab Bank, PLC conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself. Arab Bank, PLC conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Arab Bank, PLC conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Arab Bank, PLC, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\F_Arab Bank PLC More Definite Statement - AL BAraka_.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Arab Bank, PLC fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Arab Bank, PLC, and illegal activity to generate material support to continue its terrorist operations.

c. Arab Bank, PLC was not an employee, officer or director of the Enterprise, based upon present information available. Arab Bank, PLC is associated with the alleged Enterprise. Arab Bank, PLC is a member of the Enterprise, and is separate and distinct from the Enterprise. Arab Bank, PLC intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Arab Bank, PLC is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Arab Bank, PLC funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Arab Bank, PLC, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Arab Bank, PLC acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.    The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Arab Bank, PLC, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Arab Bank, PLC, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Arab Bank, PLC, of both those goals and the uses to which the Funds were put.

    b.    The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.    The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Arab Bank, PLC.  Indeed, the Enterprise would not have

been successful without enthusiastic participation of all of the conspirators, including Arab Bank, PLC. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Arab Bank, PLC. Arab Bank, PLC, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Arab Bank, PLC conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Arab Bank, PLC conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Arab Bank, PLC also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\F_Arab Bank PLC More Definite Statement - AL BAraka_.doc

The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Arab Bank, PLC are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. Arab Bank, PLC has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Arab Bank, PLC conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Arab Bank, PLC conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Arab Bank is a private banking institution with head offices in Jordan. It is one of the largest financial institutions in the Arab world. It has one-hundred, ninety (190) branches in twenty-eight (28) countries. Arab Bank is controlled by the Shuman family, which holds 40% of the stock.

22. Arab Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

23. Spanish investigators have confirmed that al Qaida transferred money to their Spanish logistical cell that funded the September 11th Attack through Arab Bank.

24. Arab Bank accounts have also been used to distribute funds to al Qaida cells in other parts of the world. Arab Bank also maintains accounts for many of the so-called charity defendants that operate within al Qaida's infrastructure. The Kingdom of Saudi Arabia, directly by the 'Saudi Committee for the Support of the Intifada', uses these accounts to fund al Qaida operations, and as the principal

vehicle for supporting Palestinian suicide attacks. Arab Bank is the preferred channel of many Palestinian terrorist organizations for the transfer of money from external sources into the Palestinian Authority administered territories. There have been documents captured by the Israeli army which clearly illustrates the bank's important role as the Palestinian terrorist organization conduit for the transfer of funds to the infrastructure supporting their activities. The United States Intelligence and Terrorism Information Center at the Center for Special Studies (C.S.S.) issued a Special Information Bulletin on July,2004, named "Palestinian Terrorist Organizations Use the Arab Bank to Channel Money into Terrorism," stating Arab Banks connection to Palestinian terrorist organizations.

25. On February 9, 2005, Arab Bank announced that it intended to withdraw from the United States. A statement from Jordan's Central Bank said: "The climate of operating in the United Stated at present is not expedient with the bank's strategy."

26. At this time, Arab Bank is under federal regulatory investigation reportedly for failing to abide by U.S. anti-money laundering laws.

27. Arab Bank has long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Arab Bank has continued to maintain those accounts.

28. As the foregoing demonstrates, Arab Bank thereby has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Arab Bank's participation in al Qaida's jihadist campaign.

29. As the foregoing demonstrates, Arab Bank, PLC thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Arab Bank, PLC's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

30. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
      GINA M. MAC NEILL, ESQUIRE (GM 0581)
      JERRY S. GOLDMAN, ESQUIRE (JG 8445)
      FREDERICK J. SALEK, ESQUIRE (FS 8565)
      Attorneys for the Plaintiffs
      111 Broadway, 13th Floor
      New York, N.Y. 10006
      212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT NATIONAL COMMERCIAL BANK ("NCB") AND NCB'S
ENTITIES NCB AND NCB ENTITIES

1.  The name of the defendant to whom this Statement pertains is defendants:

    a.  National Commercial Bank ("NCB")

    b.  SNCB Corporate Finance Ltd ("SNCB Corporate")

    c.  SNCB Securities Limited ("SNCB Securities") (with SNCB Corporate and
        SCNBC Securities collectively referred to as the "NCB Entities").

    The alleged misconduct and basis for liability is set forth below as well as
    elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of certain
    of the other defendants.  Given the vastly complicated nature of the conspiracy
    and other wrongdoing that led to the events of September 11, 2001, however,
    much information is unavailable to plaintiffs, and the identities of other
    wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore
    reserve the right to amend this Statement as information is learned and verified
    and after discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\G_NCB - More Definite Statement - AL
BAraka_92805b.doc

**PLAINTIFF'S EXHIBIT**

**G**

category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, NCB and NCB Entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. NCB and NCB Entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the

operation or management of the operation of the Enterprise itself. Throughout this period, NCB and NCB Entities conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including NCB and NCB Entities, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. NCB and NCB Entities fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including NCB and NCB Entities, and illegal activity to generate material support to continue its terrorist operations.

Page 4

    c. NCB and NCB Entities was not an employee, officer or director of the Enterprise, based upon present information available. NCB and NCB Entities is associated with the alleged Enterprise. NCB and NCB Entities is a member of the Enterprise, and is separate and distinct from the Enterprise. NCB and NCB Entities intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by NCB and NCB Entities is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by NCB and NCB Entities funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by NCB and NCB Entities, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. NCB and NCB Entities acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\G_NCB - More Definite Statement - AL BAraka_92805b.doc

b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including NCB and NCB Entities, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including NCB and NCB Entities, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of NCB and NCB Entities, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous

recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like NCB and NCB Entities. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including NCB and NCB Entities. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by NCB and NCB Entities. NCB and NCB Entities, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. NCB and NCB Entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. NCB and NCB Entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. NCB and NCB Entities also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14.   The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15.   Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\G_NCB - More Definite Statement - AL BAraka_92805b.doc

named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against NCB and NCB Entities are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Ten, RICO, 18 U.S.C. § 1962(b), 1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. NCB and NCB Entities has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. NCB and NCB Entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. NCB and NCB Entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\G_NCB - More Definite Statement - AL BAraka_92805b.doc

Terrorism, preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, infrastructure, including the International Islamic Relief Organization (the "IIRO")[1], the Muslim World League (the "MWL"),[2] the World Association of Muslim Youth ("WAMY"),[3] the Benevolence International Foundation ("BIF"), Blessed Relief (Muwafaq) Foundation and al Haramain,[4] among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi,[5] NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.

22. NCB knowingly facilitates al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, fundraising by advertising the existence and numerical designations of the accounts it maintains for al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, cooperating charities throughout the Muslim world, so that the supporters can deposit funds directly into those accounts for the benefit of al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, and their cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through the IIRO, and also transferred significant funding to al Qaida, and/ or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through Blessed Relief

23. SNCB Corporate participated in the activities outlined above.

24. SNCB Corporate participated in the activities outlined above.

---

[1] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to the IIRO, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[2] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Muslim World League, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[3] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[4] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to al Haramain, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[5] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Suleiman Abdul Aziz al-Rajhi, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\G_NCB - More Definite Statement - AL BAraka_92805b.doc

25. As the foregoing demonstrates, NCB and NCB Entities thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of NCB and NCB Entities's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

26. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

**PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT COUNCIL ON AMERICAN-ISLAMIC**
**RELATIONS (CAIR) AND CAIR-CANADA**

1. The name of the defendants to whom this Statement pertains are defendants Council for American-Islamic Affairs (CAIR) and CAIR-Canada (collectively referred to as "CAIR"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement - Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**H**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, CAIR conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

   c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including CAIR, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating

Page 3

Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. CAIR fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including CAIR, and illegal activity to generate material support to continue its terrorist operations.

   c. CAIR was not an employee, officer or director of the Enterprise, based upon present information available. CAIR is associated with the alleged Enterprise. CAIR is a member of the Enterprise, and is separate and distinct from the Enterprise. CAIR intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by CAIR is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by CAIR funds that activity, which activity culminated in the Attack.

The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by CAIR, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. CAIR acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is

Page 5

offered.   After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including CAIR, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.   The money raised from these various sources (the "Funds"), including CAIR, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of CAIR, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.   All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like CAIR.   Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including CAIR.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the

assistance provided by CAIR. CAIR, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. CAIR also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against CAIR are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*;

Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. CAIR has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. CAIR has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. CAIR is a non-governmental organization whose mission statement is to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims and build coalitions that promote justice and understanding.

23. However, the true purpose for CAIR is to legitimize the activities of Islamic militants and to neutralize opposition to Islamic extremism. They serve as perception management in support of Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Their purpose is to create propaganda, misinformation, misdirection, marginalize opposition, silence critics and deceive governments. In February 2000, expert Sheihk Professor Abdul Hadi Palazzi, addressing the International Conference on Countering Suicide Terrorism sponsored by the Institute for Counter-terrorism of the Interdisciplinary Center in Herzlyia, Israel:

> "The Council for American–Islamic Relations is a Muslim Brotherhood front organization. It works in the United

States as a lobby against radio, television and print media journalists who dare to produce anything about Islam that is at variance with their fundamental agenda. CAIR opposes diversity in Islam: They are aggressive and closed-minded. Notwithstanding CAIR's evident connection to Hamas, they are regarded by the US. Administration as legitimate representatives of the Muslim American community."

24. CAIR has links to both Hamas and the Muslim Brotherhood.[1] Terrorism expert, Steve Emerson has stated before Congress that CAIR is a front for Hamas. CAIR was founded in 1994 as an offshoot of the Islamic Association for Palestine ("IAP"). It was founded by two former leaders of the IAP, Hamas supporters, Omar Ihmad and Nihad Amad. Additionally, a founding director of CAIR is Rafeeq Jabur, the president of IAP. IAP is a front for the Palestinian terrorist organization, Hamas. In 2002, Judge Gladys Kessler declared, "[t]here is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP") has acted in support of the HAMAS." Holy Land Foundation for Relief & Development v. Ashcroft, 219 F.Supp.2d 57, 70 (D.C. Dist. 2002). Also, founder Omar Ihmad was previously a key leader of the Palestinian Muslim Brotherhood.

25. CAIR was founded by donations from the Holy Land Foundation ("HLF"), which is a Specially Designated Global Terrorist Organization, World Assembly of Muslim Youth ("WAMY"),[2] and International Islamic Relief Organization ("IIRO").[3]

26. CAIR is funded by terrorists. The International Institute of Islamic Thought, an organization linked to the Muslim Brotherhood, donated money in 2003, according to its tax filings. Additionally, the Saudi-based Islamic Development Bank ("IDB") gave CAIR $250,000 in August 1999. The IDB also manages funds for the Al-Quds which finance suicide bombings against Israeli civilians by providing funds to the families of Palestinian "martyrs."

27. CAIR has proven links to Islamic Terrorists.

---

[1] These groups are both co-defendants in the above-referenced action.

[2] Specific misconduct regarding WAMY, a co-defendant herein, is provided via More Definite Statement Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

[3] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\H_CAIR - More Definite Statement - AL BAraka.doc

**Ghassin Elashi**

    a.    Elashi was the founder of CAIR's Texas chapter.  He was convicted in July 2004 of shipping computers to Libya and Syria, two designated state sponsors of terrorism.  In April 2005, he was also convicted of *knowingly* doing business with Mousa Abu Marzook, a senior Hamas leader and Specially Designated Terrorist.  On July 27, 2004, he was indicted for providing material support to Hamas, engaging in prohibited financial transactions with a Specially Designated Global Terrorist, money laundering, conspiracy and filing false tax returns.[4]

**Randall (Ismail) Royer**

    b.    In 1997, Royer began working as CAIR's "Communications Specialist" and continues to work there through October 2001.  He also served as "Civil Rights Coordinator."  He was indicted on charges of conspiring to help Al Qaida and the Taliban to battle American troops in Afghanistan.  On January 16, 2004, he plead guilty to lesser offenses and was convicted of weapons and explosives charges in connection to a terrorist related offense.[5]

**Bassam Khafasi**

    c.    As late as November 1, 2002, Khafagi served as CAIR's Director of Community Relations.  In January 2003, he was arrested and indicted in January 2003 on bank fraud charges.[6]  In September 2003, Kahfagi pleaded guilty to visa fraud and bank fraud,[7] for passing bad checks for substantial amounts in early 2001, and he was deported.[8]

    d.    Khafagi also served as founding member and President of the Islamic Assembly of North America ("IANA").  IANA is under investigation un the U.S. for money laundering and recruiting terrorists over the Internet.[9]  The FBI raided their offices in February 2003.

---

[4] U.S. v. Holy Land Foundation, (N.D. Texas), indictment filed July 27, 2004.

[5] "Two Defendants in Virginia Jihad Case Plead Guilty to Weapons Charges, Will Cooperate with Ongoing Investigations,"  U.S. Department of Justice News Release, January 16, 2004.

[6] U.S. v. Khafagi, Case No. 03-CR-80087 (E.D. Mich.), indictment filed February 13, 2003.

[7] "Ex-Head of Islamic Charity Pleads Guilty," Associated Press, September 10, 2003.

[8] "Former Head of Islamic Charity Sentenced in Fraud Case," Associated Press, November 13, 2003.

[9] "Saudi National Charged with Conspiracy to Provide Material Support to Hamas and Other Violent Jihadists,"  U.S. Department of Justice News Release, March 4, 2004.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\H_CAIR - More Definite Statement - AL BAraka.doc

**Rabih Hadid**

    e. Haddad served as a CAIR fundraiser. Haddad was co-founder of the Global Relief Foundation ("GRF"). GRF was designated by the US Treasury Department for financing the Al Qaida and other terrorist organizations and its assets were frozen by the US Government on December 14, 2001.[10]

    f. On this same date, Haddad was taken into custody based upon terrorism related charges.

    g. According to the Treasury Department, Haddad was a member of Makhtab Al-Khidamat, the precursor to Al Qaida.[11]

    h. In July 2003, Haddad was deported to Lebanon.[12]

**Mohammad Nimer**

    i. Nimer was the director of CAIR's Research Center. He also served as a member of the Board of Directors of the United Association for Studies and Research ("UASR"). The UASR is the strategic arm of Hamas in the United States.

**Imam Siraji Wahaj**

    j. Wahaji is a member of CAIR's Board of Advisors. Named in 1995 by U.S. Attorney Mary Jo White as a possible unindicted co-conspirator in the World Trade Center bombing case. He serves as the spiritual leader of the al-Taqwa Mosque in Brooklyn, and provided a forum for Sheik Omar Abdel Rahman, who was convicted as the master-mind of the conspiracy.

    k. He is also the Vice President of the Islamic Society of North America, a group which embraces the elements of the Muslim Brotherhood.

**Holy Land Foundation and Global Relief Foundation**

    l. Both HLF and GRF were listed on the US Treasury Specially Designated Global Terrorist list and their assets were frozen.

    m. Prior to this designation, CAIR actually solicited money for these organizations. Immediately after the attacks on September 11, 2001, on

---

[10] OFAC Designations of BIF and GRF, December 14, 2001.

[11] "Treasury Department Facts Sheet on the Global Relief Foundation."

[12] Sarah Freemean, "Haddad Deported, Family Remains in the U.S." Associated Press, July 16, 2003.

the home page of the CAIR website, it featured a section telling readers "what you can do for the victims of the WTC and Pentagon attacks." CAIR advised: "Donate through Global Relief Foundation" and "Donate through the Holy Land Foundation," providing the links to the groups' websites.

n. Additionally, in December 2001, the FBI raided several offices of the HLF, under the order of the President of the United States, as suspects of the main North American fundraiser for Palestinian Islamic terrorist organization Hamas. CAIR issued a public statement, along with the Islamic Association for Palestine ("IAP") and the Muslim Student Association ("MSA"), denouncing the President's order and insisting that these actions were taken without any evidence.

28. CAIR has consistently opposed the US Government action against individuals suspected of involvement in terrorism:

**Sami Al-Arian**

a. CAIR vehemently defended the alleged Plaestinian Islamic Jihad mastermind Sami Al-Arian and alleged that his arrest was based on "political considerations." On February 20, 2003, a South Florida professor Sami al-Arian was indicted for allegedly serving as North American leader of Palestinian Islamic Jihad ("PIJ"),[13] a government-designated terrorist organization that was labeled by Attorney General Joh Ashcroft as "one of the most violent organizations in the world," and which is allegedly responsible for the deaths of two Americans and over 100 Israelis.

b. Despite Al-Arian's documented history of extremism, CAIR officials have consistently defended him since his arrest.

**Fawaz Damra**

c. Damra was convicted for concealing his involvement in groups that advocated "violent terrorist attacks against Jews and others" on his citizenship application.

d. CAIR-Ohio's Executive Director defended Damra as a "great interfaith leader." CAIR Spokesman Ibrahim Hooper stated, "we're concerned that all of his due process is maintained and evidence be free of religious or ethnic stereotyping… We're always concerned when prominent leaders of the American Islamic community are charged, or detained, or harassed."

---

[13] U.S. v. Al-Arian, (M.D. Fl. 03-CR-77), indictment filed February 20, 2003.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\H_CAIR - More Definite Statement - AL BAraka.doc

**Musa Abu Marzook**

e. On August 7, 1995, the Deputy US Attorney for the SDNY requested the arrest and extradition to Israel of IAP founder Marzook (who was formerly the chief and is currently deputy chief of the Hamas Political Bureau.) Marzook was arrested at Kennedy airport.

f. CAIR came out in support of Marzook by stating, "[t]he arrest, detention and extradition is politically motivated…[and] this campaign has been orchestrated to serve as a wedge between America and Islamic countries."[14]

g. In June 1996, CAIR signed an open letter to then Secretary of State Warren Christopher that railed against "the injustice that has prevailed against Dr. Marzook" and alleged that "our judicial system has been kidnapped by Israeli interests." The letter additionally stated, "Dr. Abu Marzook is a political leader; no more, no less than any other political leader in the world.[15] CAIR also labeled Marzook's incarceration a hate crime in a 1996 report.[16]

**Jamil Al-Amim**

h. CAIR responded to the arrest and conviction of Jamil Al-Amim by praising him, by raising funds for him and then denying his guilt after his conviction for the murder of an Atlanta policeman.

**Imam Wagdy Ghoneim**

i. Ghoneim is a radical Egyptian cleric who has been videotaped calling for suicide bombings at radical Islamic conferences. He has been denied entrance to Canada after immigration officials determined he was a member of Hamas and the Muslim Brotherhood.[17]

j. In May 1998, he led an audience in a song with lyrics, "No to the Jews, descendants of the apes," at the CAIR co-sponsored rally at Brooklyn college.

---

[14] Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[15] Open letter of Mr. Christopher Warren, Secretary of State, Signed by CAIR, Reprinted in Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[16] The Price of Ignorance, American Muslim Research Center, 1996 and Laurie Goodstein, "Harassment of Muslims," The Washington Post, April 20, 1996.

[17] Ellen Van Wageningen, "Egyptian Religious Leader Denied Canadian VISA," The Ottawa Citizen January 10, 1999.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\H_CAIR - More Definite Statement - AL BAraka.doc

    k. After Ghoneim was arrested, CAIR's Southern California Executive Director Hussam Ayloush defended him: "[t]he whole Muslim community today is under a microscope of scrutiny. Committing a mistake that would invite a slap on the wrist for anyone else could lead to prison or deportation fro a Muslim."[18]

**Sheik Yusuf Al Qaradawi**

    l. Qaradawi is a leader of the Muslim Brotherhood, who has issued fatwas calling for attacks on American forces and killing Jews and mandating Jihad. In 2000, Qaradawi was banned from visiting the United States. However, CAIR has repeatedly championed Qaradawi, for example, CAIR's legal director Arsalan Iftikhar said: "if you look at Sheikh Yusuf Al-Qaradawi, the ---one of the most famous Muslim scholars in Cairo, Egypt, he has said unequivocally that people who commit suicide bombings and --- and acts of terror are completely outside the bounds of Islam."[19]

    m. However, the following are fatwas and pronouncements of Qaradawi:

    n. Only July 13, 2004, on his weekly program on the Arab satellite channel Al-Jazeera Qaradawi accused "the Jews" of permitting the spilling o f Arab blood and of being oppressors, and he concluded by stating, "There is no dialogue between us except by the sword and the rifle…"[20]

    o. In August, 2004, Qaradawi signed a statement calling for the support of the terrorist "resistance" in Iraq to the American and Coalition forces.[21]

    p. In March 2002, Qaradawi issued a fatwa on the "liberation" of "Muslim lands" from "disbelievers."[22]

29. As the foregoing demonstrates, CAIR thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad

---

[18] Ben Fox, "Arrest of Orange County Mosque Leader a 'Mistake,' Supporters Say," Associated Press, November 9, 2004.

[19] July 26, 2005 interview of CAIR's legal director Arsalan Iftikhar on MSNBC.

[20] MEMRI Special Dispatch Series No. 753, Sheikh Yousef Al-Qaradhawi: 'There is No Dialogue between Us and the Jews Except by the Sword and the Rifle,' July 27, 2004.

[21] ABC News Online, "Senior Muslim Figures Back Iraqi Insurgents," August 23, 2004.

[22] IslamOnline, Fatwa mandating Jihad against Christians, Jews and pagans to "liberate Muslim lands from the grips of disbelievers," March 20, 2002.

Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders

30. As the foregoing demonstrates, CAIR  thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

31. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

Page 15

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT AL-HARAMAIN ISLAMIC FOUNDATION, INC. A/K/A AL-HARAMAIN ISLAMIC FOUNDATION A/K/A ISLAMIC AL-HARAMAIN ("AHIF") AND AL HARAMAIN ISLAMIC FOUNDATION (SAUDI ARABIA), AL HARAMAIN ISLAMIC FOUNDATION (AFGANISTAN), AL HARAMAIN ISLAMIC FOUNDATION (ALBANIA), AL HARAMAIN ISLAMIC FOUNDATION (BANGLADESH), AL HARAMAIN ISLAMIC FOUNDATION (BOSNIA-HERZEGOVINA), AL HARAMAIN ISLAMIC FOUNDATION (ETHOPIA), AL HARAMAIN ISLAMIC FOUNDATION(INDONESIA), AL HARAMAIN ISLAMIC FOUNDATION (KENYA), AL HARAMAIN ISLAMIC FOUNDATION (NETHERLANDS), AL HARAMAIN ISLAMIC FOUNDATION (PAKISTAN), AL HARAMAIN ISLAMIC FOUNDATION (SOMALIA), AL HARAMAIN ISLAMIC FOUNDATION (TANZANIA), AL HARAMAIN ISLAMIC FOUNDATION A/K/A AL HARAMAIN ISLAMIC FOUNDATION, INC. (UNITED STATES)

1. The name of the defendant to whom this Statement pertains is Al-Haramain Islamic Foundation, Inc. a/k/a Al-Haramain Islamic Foundation a/k/a Islamic Al-Haramain ("AHIF") and Al Haramain Islamic Foundation (Saudi Arabia), Al Haramain Islamic Foundation (Afghanistan), Al Haramain Islamic Foundation (Albania), Al Haramain Islamic Foundation (Bangladesh), Al Haramain Islamic Foundation (Bosnia-Herzegovina), Al Haramain Islamic Foundation (Ethiopia), Al Haramain Islamic Foundation (Indonesia), Al Haramain Islamic Foundation (Kenya), Al Haramain Islamic Foundation (Netherlands), Al Haramain Islamic Foundation (Pakistan), Al Haramain Islamic Foundation (Somalia), Al Haramain Islamic Foundation (Tanzania), Al Haramain Islamic Foundation, Inc. (United States) (collectively as "AHIF entities"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York,

**PLAINTIFF'S EXHIBIT**

**I**

NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\I_Al Har- More Definite Statement - AL BAraka_b.doc

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332b(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

b.  In the Mid 1990's to September 11, 2002, AHIF and AHIF entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  AHIF and AHIF entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, AHIF and AHIF entities conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including AHIF and AHIF entities, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\I_Al Har- More Definite Statement - AL BAraka_b.doc

6.  A description of the Enterprise is as follows:

    a.  The Enterprise ('Radical Muslim Terrorism' or "al Qaida" or 'International Islamic Front for the Jihad Against Jews and Crusaders') ('Enterprise') is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ('Bin Ladin') formed an organization called 'The Foundation' or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.   Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. AHIF and AHIF entities fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and

Page 4

weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including AHIF and AHIF entities, and illegal activity to generate material support to continue its terrorist operations.

   c. AHIF and AHIF entities was not an employee, officer or director of the Enterprise, based upon present information available. AHIF and AHIF entities is associated with the alleged Enterprise. AHIF and AHIF entities is a member of the Enterprise, and is separate and distinct from the Enterprise. AHIF and AHIF entities intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by AHIF and AHIF entities is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by AHIF and AHIF entities funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by AHIF and AHIF entities, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. AHIF and AHIF entities acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including AHIF and AHIF entities, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including AHIF and AHIF entities, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of AHIF and AHIF entities, of both those goals and the uses to which the Funds were put.

   b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and

train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the 'Operatives') and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like AHIF and AHIF entities. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including AHIF and AHIF entities. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by AHIF and AHIF entities. AHIF and AHIF entities, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. AHIF and AHIF entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. AHIF and AHIF entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. AHIF and AHIF entities also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiffs resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\I_Al Har- More Definite Statement - AL BAraka_b.doc

property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the 'reasonably foreseeable victims of a RICO violation' and the 'intended victims of the racketeering enterprise,' (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against AHIF and AHIF entities are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. AHIF and AHIF entities has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. AHIF entities conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. AHIF entities conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and

conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiffs Complaint, as amended.

21. AHIF and the AHIF Entities are private charitable organizations that are supposed to provide a variety of humanitarian services to Muslims worldwide. It has a vast network of offices and representatives spanning fifty nations. AHIF and the AHIF Entities are a charity front for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and Osama bin Laden and provides direct material support to al Qaida. AHIF and the AHIF Entities use their humanitarian mission to disguise its financing of terrorist operations.

22. AHIF and the AHIF Entities have long provided financial services and other forms of material support to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Indeed, AHIF and the AHIF Entities have long acted as a fully integrated component of Al Qaida's world wide logistical and financial support infrastructure, and provided material support and resources to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and other affiliated foreign terrorist organizations.

23. AHIF and the AHIF Entities have offices all over the world from which it coordinates its support for the Enterprise, Radical Muslim terrorism, and/or the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and an interlocking management by which it effectuates that support. For example, Aqeel Adbulaziz Al-Aqil, a Saudi, is Secretary General of the Saudi AHIF located in Riyadh and president of the Oregon AHIF. Mansour Al-Kadi, a Saudi, is deputy director of the Oregon AHIF.

24. AHIF and the AHIF Entities have advertised their connection to al Qaida. AHIFs website used to have a direct link to the al Qaida site about the Chechnyian operations (qoqaz.com). The website is part of the al Qaida propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others).

25. Numerous branches of AHIF, including Afganistan, Albania, Bangladesh, Bosnia, Ethiopia, Herzegovina, Indonesia, Kenya, the Netherlands, Tanzania and Pakistan, have been designated as sponsors and supporters of al Qaida and affiliated Foreign Terrorist Organizations ("FTOs"). The United States government has designated two al-Haramain branches, in Bosnia and Somalia, as terrorist entities and has frozen the assets of both because they are clearly linked to

terrorist financing.  Both branches are controlled, including their funding, management, and direction, by the central Al-Haramain headquarters in Riyadh, Saudi Arabia.  Additionally, AHIF was banned from Kenya after the 1998 U.S. Embassy bombings.

26. When viewed as single entity, AHIF is on of the principle Islamic organizations providing support for the al Qaida network, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and promoting militant Islamic doctrine worldwide.  Under the leadership of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of AHIF field offices and AHIF representatives operating throughout Africa, Asia, Europe and North America provided financial and material support to the al Qaida network.

27. Also under Aqeel Abdulaziz Al Aqil's leadership, AHIF and the AHIF Entities implemented their tasks through their offices and representatives, which span more than fifty countries around the world.  AHIF maintained nine general committees and several other "active Committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

28. In Southeast Asia, AHIF served as primary source of al Qaida funding.

29. In Africa, AHIF was heavily involved in plotting terrorist attacks against Americans, including but not limited to the suicide bomber attacks against the U.S. Embassies in the Nairobi and Dar es Salaam in which 224 people were killed.

30. AHIF's Pakistan office provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons to al Qaida and al Qaida affiliated militants.

31. In Europe, AHIF sponsored al Qaida activity through the al Nur Mosque which served as a meeting place, recruitment center and base of operations for al Qaida within Germany.  At the direction of the Kingdom of Saudi Arabia, AHIF contributed in excess of $1 million to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

32. AHIF also sponsored al Qaida operations in Chechnya and Kosovo through it participation in the Saudi Joint Relief Committee (the "SJRC").  The SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives.  Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus.

33. In the United States, AHIF's Ashland, Oregon office committed violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act which funneled money to al Qaida.

34. AHIF and the AHIF Entities thereby have, for a period of many years, provided critical financial and logistical support to al Qaida to support that terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of AHIF's and the AHIF Entities' participation in al Qaida's jihadist campaign.

35. As the foregoing demonstrates, AHIF entities thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of AHIF entities's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

36. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

Page 11

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT DUBAI
ISLAMIC BANK

1. The name of the defendant to whom this Statement pertains is Dubai Islamic
   Bank. The alleged misconduct and basis for liability is set forth below as well as
   elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the
   defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
   al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
   (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
   Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
   Plaintiffs will separately file Statements with respect to the misconduct of certain
   of the other defendants. Given the vastly complicated nature of the conspiracy
   and other wrongdoing that led to the events of September 11, 2001, however,
   much information is unavailable to plaintiffs, and the identities of other
   wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore
   reserve the right to amend this Statement as information is learned and verified
   and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims
   List ("Victims List"). The victims consist of (1) all spouses, children, parents,
   siblings, or heirs of any individual who died at the World Trade Center in New York,
   NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
   Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
   (with the events at the World Trade Center in New York, N.Y., the Pentagon
   Building in Arlington County, Virginia, and the airliner crash in Shanksville,
   Pennsylvania, on September 11, 2001, and activities related thereto, collectively
   referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
   (including executors, estate administrators and trustees) entitled to bring legal action
   on behalf of any individual who died as the result of terrorist attacks on September
   11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
   and legal representative of individuals identified by the Attorney General of the
   United States or otherwise shown to have perpetrated, aided and abetted, conspired in
   regard to, or otherwise supported the terrorist attacks of September 11, 2001. The
   Victims List sets forth the names of the decedents killed by the attackers, with the
   category of "victims" further including their spouses, children, parents, siblings or
   heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by
   death, and all economic damages resulting from such deaths, and actions of the
   defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**J**

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\J_DIB - More Definite Statement - AL BAraka_b.doc

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Dubai Islamic Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Dubai Islamic Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Dubai Islamic Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\J_DIB - More Definite Statement - AL BAraka_b.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Dubai Islamic Bank, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

Page 3

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Dubai Islamic Bank fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including D_Name, and illegal activity to generate material support to continue its terrorist operations.

c. Dubai Islamic Bank was not an employee, officer or director of the Enterprise, based upon present information available. Dubai Islamic Bank is associated with the alleged Enterprise. Dubai Islamic Bank is a member of the Enterprise, and is separate and distinct from the Enterprise. Dubai Islamic Bank intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Dubai Islamic Bank is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Dubai Islamic Bank funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Dubai Islamic Bank, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Dubai Islamic Bank acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

     a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

     b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including D_Name, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Dubai Islamic Bank, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Dubai Islamic Bank, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Dubai Islamic Bank. Indeed, the Enterprise would not

have been successful without enthusiastic participation of all of the conspirators, including Dubai Islamic Bank. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Dubai Islamic Bank. Dubai Islamic Bank, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Dubai Islamic Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Dubai Islamic Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Dubai Islamic Bank also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and

loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Dubai Islamic Bank are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b), 1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Dubai Islamic Bank has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Dubai Islamic Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Dubai Islamic Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Dubai Islamic Bank is headquartered in Dubai which is one of the United Arab Emirates. The Chairman of Dubai Islamic Bank is Dr. Mohammad Khalfan Kharbash who also is the Minister of Finance of the United Arab Emirates. Dubai Islamic Bank has a history of laundering money on behalf of Osama Bin Ladin and the Al Qaida, as well as other illicit activities.

22. Dubai Islamic Bank is a shareholder in other banks which have laundered money and conducted other activities in support of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Dubai Islamic Bank is a shareholder of Baraka Islamic Bank EC, and affiliate of Al Baraka Bank.[1] Dubai Islamic Bank is also a shareholder of

---

[1] Specific misconduct regarding Al Baraka Investment & Development Corp. ("Al Baraka"), a co-defendant herein, is set forth in a More Definite Statement Applicable to Al Baraka. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Baraka, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\J_DIB - More Definite Statement - AL BAraka_b.doc

Tadamon Islamic Bank in Sudan, which is a shareholder of Al Shamal Islamic Bank.[2]

23. Dubai Islamic Bank has displayed a pattern of conduct that demonstrates the aiding, abetting and material support of international terrorism.

24. According to a NY Times article, on or about July 8, 1999, the United States government "quietly sent senior officials [in July 1999] to one of the countries, the United Arab Emirates, to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama Bin Ladin." The Unites States State Department announced that Dubai Islamic Bank had laundered money for Osama Bin Ladin. In July 1999, the U.S. State Department stated that the government of the United Arab Emirates reported that it had taken steps to clean up the Dubai Islamic Bank and to restore its reputation.

25. The U.S. State Department also confirmed that a United States delegation had traveled to the United Arab Emirates with evidence that Osama Bin Ladin was channeling funds through Dubai Islamic Bank. The Central Intelligence ("CIA") had obtained evidence that Osama Bin Laden had been permitted to funnel money through the Dubai Islamic Bank, which is backed by the government of the United Arab Emirates.

26. In a draft report on April 22, 2002, the North Atlantic Treaty Organization ("NATO") stated: "It is now apparent that institutions located in the United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the September 11th attacks. There has subsequently been much discussion about a traditional trust based means of transferring value; the al Hawala transaction system, which allows clients to move funds internationally without leaving any traces of the operation. The Al Barakaat Hawala operating out of Somalia and the UAE apparently helped to move funds to the terrorists who carried out the New York and Washington attacks. *Al Qaida had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania.*" (emphasis added).

27. A Saudi national, Mustafa Ahmed Al-Hisawi a/k/a Sheikh Saeed, held accounts at Dubai Islamic Bank and its affiliate and correspondent, Standard Chartered Bank.

---

[2] Al Shamal Bank is the bank which Osama Bin Ladin helped to establish in 1991 by providing capital in the amount of $50 million. Other defendants, named in the above-referenced actions, such as Faisal Islamic Bank, Youssef M. Nada, Mohammed Al Faisal Al Saud and others, additionally assisted in the establishment of Al Shamal Bank. Other specific misconduct regarding Al Shamal Bank is set forth in the RICO statement applicable to Mohammed Al Faisal Al Saud. Thereby, Plaintiffs hereby incorporate by reference the factual averments and arguments contained in the RICO Statement Applicable to Mohammed al Faisal al Saud which relate to Al Shamal Bank, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Al-Hisawi was Osama Bin Ladin's chief financial officer. Al-Hisawi lived in the UAE from June 2001 until September 11, 2001 when he fled to Karachi, Pakistan. The US authorities have identified at least $500,000 that flowed from Al-Hisawi's accounts to the nineteen (19) hijackers, including hundreds of thousands of dollars in money transfers from Dubai Islamic Bank to two (2) of the hijackers, Marwan al-Shehhi and Mohammed Atta, since at least June 2000, to pay for their flight training and expenses. These transactions were carried out in violation of international standards adopted to prevent money laundering, including the 40 Recommendations on Money Laundering adopted in 1990 by the International Financial Action Task Force, of which the UAE is a member.

28. Two days before the terrorist attacks on September 11, 2001, al-Hisawi received transfers back of "surplus" funds of $15,000 from three of the hijackers, Mohammed Atta, Walid al-Sheri and Marwan al-Shehhi.

29. On September 27, 2001, the Central Bank of the UAE, at the demand of the United States, announced an order to freeze the assets and investments of twenty-six (26) people or organizations suspected of maintaining contact with Al Qaida and Osama Bin Laden, in particular Dubai Islamic Bank.

30. In addition, on September 25, 2001, Luxemburg's commission for supervising financial institutions, the Commission de Surveillance du Secteur Financier, issued a regulatory alert naming Dubai Islamic Bank as having links with Osama Bin Ladin and terrorism.

31. Despite all these warnings, Dubai Islamic Bank continued to maintain the accounts and DIB knowingly provided financial services and other forms of material support to Al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networked like the Enterprise through anti-terrorist and money laundering safeguards and "know your customer" regulations.

32. As the foregoing demonstrates, Dubai Islamic Bank thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Dubai Islamic Bank' participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

33. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

Page 11

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT ERWIN WACHTER

1.  The name of the defendant to whom this Statement pertains is Erwin Wachter.
    The alleged misconduct and basis for liability is set forth below as well as
    described elsewhere in the Complaint, as amended.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v.
    Republic of Iraq, et al., Civil Action No. 04- CV- 1076 (RCC)*, other cases
    brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-
    MDL-1570(RCC)), and others.  Plaintiffs will separately file Statements with
    respect to the misconduct of certain of the other defendants.  Given the vastly
    complicated nature of the conspiracy and other wrongdoing that led to the events
    of September 11, 2001, however, much information is unavailable to plaintiffs,
    and the identities of other wrongdoers may be revealed through discovery or
    otherwise.  Plaintiffs therefore reserve the right to amend this Statement as
    information is learned and verified and after discovery or other information is
    obtained.

3.  The name of each victim is indicated on the attached hereto as  can be found on
    the More Definite Statement, Victims List ("Victims List").  The victims consist
    of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the
    World Trade Center in New York, NY, the Pentagon Building in Arlington County,
    Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist
    attacks on September 11, 2001 (with the events at the World Trade Center in New
    York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner
    crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related
    thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal
    representatives (including executors, estate administrators and trustees) entitled to
    bring legal action on behalf of any individual who died as the result of terrorist
    attacks on September 11, 2001; but excluding (3) all individuals, and all spouses,
    children, parents, siblings, and legal representative of individuals identified by the
    Attorney General of the United States or otherwise shown to have perpetrated, aided
    and abetted, conspired in regard to, or otherwise supported the terrorist attacks of
    September 11, 2001.  Victims List sets forth the names of the decedents killed by the
    attackers, with the category of "victims" further including their spouses, children,
    parents, siblings or heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**K**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Erwin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Erwin Wachter conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\K_EWachter- More Definite Statement - ABjsg.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Erwin Wachter, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al., Civil Action No. 04- CV- 1076 (RCC)*, and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."   Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of

racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Erwin Wachter fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Erwin Wachter, and illegal activity to generate material support to continue its terrorist operations.

c. Erwin Wachter was not an employee, officer or director of the Enterprise, based upon present information available. Erwin Wachter is associated with the alleged Enterprise. Erwin Wachter is a member of the Enterprise, and is separate and distinct from the Enterprise. Erwin Wachter intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Erwin Wachter is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Erwin Wachter funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Erwin Wachter, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Erwin Wachter acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

　　a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

　　b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

　　a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic

Page 5

Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Erwin Wachter, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Erwin Wachter, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Erwin Wachter, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Erwin Wachter. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Erwin Wachter. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic

Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Erwin Wachter. Erwin Wachter, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Erwin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Erwin Wachter also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Erwin Wachter are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. Erwin Wachter has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Erwin Wachter _conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Erwin Wachter is the head of Asat Trust, a co-defendant in the above-referenced cases.[1]  Additionally, available information reveals a pattern of activity over a period of many years of the Wachters, including both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust.

22. He is also an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases.[2]

---

[1] Specific misconduct regarding Asat Trust, a co-defendant herein, is provided via More Definite Statement Applicable to Asat Trust.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Asat Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Sercor Treuhand Anstalt, a co-defendant herein, is provided via More Definite Statement Applicable to Sercor Truehand Anstalt.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sercor Truehand Anstalt, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

Page 8

23. As owner and head of Asat Trust and Secor Treuhand Anstalt, Erwin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

24. Erwin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Erwin Wachter continued to permit, make available, assist, and maintain those accounts.

25. Available information demonstrates that there has been activities between the Wachters and Al Taqwa Bank, a co-defendant in the above- referenced cases who has been significantly linked to activities and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order  #13224.  Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

26. There is also information which links the Wachters to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Nasreddin, and Albert Friedrich Armand Huber, co-defendants in the above-referenced cases which have been linked to funding and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

27. Based upon information and belief, the Wachters were involved in laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa.

28. As the foregoing demonstrates, Erwin Wachter thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Erwin Wachter's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\K_EWachter- More Definite Statement - ABjsg.doc

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT MARTIN WACHTER

1. The name of the defendant to whom this Statement pertains is Martin Wachter. The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**L**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Martin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Martin Wachter conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d. The predicate act is not based upon a criminal conviction.

    e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Martin Wachter, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

    a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\L_WWachter - More Definite Statement - AL BAraka_b.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Martin Wachter fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).   These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.   The Enterprise relies upon a global network of banks and financial institutions, including Martin Wachter, and illegal activity to generate material support to continue its terrorist operations.

c.   Martin Wachter was not an employee, officer or director of the Enterprise, based upon present information available.  Martin Wachter is associated with the alleged Enterprise.   Martin Wachter is a member of the Enterprise, and is separate and distinct from the Enterprise.   Martin Wachter intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by Martin Wachter is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Martin Wachter funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Martin Wachter, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Martin Wachter acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

Page 5

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.   After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Martin Wachter, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.   They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.   Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.   The money raised from these various sources (the "Funds"), including Martin Wachter, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Martin Wachter, of both those goals and the uses to which the Funds were put.

   b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.   The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

   c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.   The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.   The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.   All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

   d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.   From the ranks of these recruits the nineteen perpetrators of the Attack were selected.   None of this would have been possible without the funds supplied by participants and conspirators like Martin Wachter.   Indeed, the Enterprise would not have

Page 6

been successful without enthusiastic participation of all of the conspirators, including Martin Wachter. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Martin Wachter. Martin Wachter, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Martin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Martin Wachter also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Martin Wachter are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Martin Wachter has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Martin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Martin Wachter is the director of Asat Trust, a co-defendant in the above-referenced cases.[1]  Additionally, available information reveals a pattern of activity over a period of many years of the Wachters, both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust.

22. Martin Wachter is an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases.[2]

---

[1] Specific misconduct regarding Asat Trust, a co-defendant herein, is provided via a More Definite Statement Applicable to Asat Trust.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Asat Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Sercor Treuhand Anstalt ("Sercor"), a co-defendant herein, is provided via More Definite Statement Applicable to Sercor Treuhand Anstalt.  Plaintiffs herein

Page 8

23. As a director and owner of Asat Trust and Secor Treuhand Anstalt, Martin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

24. Martin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Martin Wachter continued to permit, make available, assist, and maintain those accounts.

25. Available information demonstrates that there has been activities between the Wachters and Al Taqwa Bank, a co-defendant in the above- referenced cases who has been significantly linked to activities and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order  #13224.  Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

26. There is also information which links the Wachters to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Nasreddin, and Albert Friedrich Armand Huber, co-defendants in the above-referenced cases which have been linked to funding and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

27. Based upon information and belief, the Wachters were involved in laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa.

28. As the foregoing demonstrates, Martin Wachter thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Martin Wachter's participation in the jihadist campaign for al Qaida,

---

incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sercor, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\L_WWachter - More Definite Statement - AL BAraka_b.doc

and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Dated September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\L_WWachter - More Definite Statement - AL BAraka_b.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANTS SCHREIBER AND ZINDEL, FRANK ZINDEL, ENGELBERT
SCHREIBER, AND ENGELBERT SCHREIBER, JR.

*1.* The name of the defendant to whom this Statement pertains is Schreiber and
Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr..  The
alleged misconduct and basis for liability is set forth below as well as described
elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v.
Republic of Iraq, et al., Civil Action No. 04- CV- 1076 (RCC)*, other cases brought
by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-
1570(RCC)), and others.  Plaintiffs will separately file Statements with respect to
the misconduct of certain of the other defendants.  Given the vastly complicated
nature of the conspiracy and other wrongdoing that led to the events of September
11, 2001, however, much information is unavailable to plaintiffs, and the
identities of other wrongdoers may be revealed through discovery or otherwise.
Plaintiffs therefore reserve the right to amend this Statement as information is
learned and verified and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as  can be found on
the More Definite Statement, Victims List ("Victims List").  The victims consist
of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the
World Trade Center in New York, NY, the Pentagon Building in Arlington County,
Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist
attacks on September 11, 2001 (with the events at the World Trade Center in New
York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner
crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related
thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal
representatives (including executors, estate administrators and trustees) entitled to
bring legal action on behalf of any individual who died as the result of terrorist
attacks on September 11, 2001; but excluding (3) all individuals, and all spouses,
children, parents, siblings, and legal representative of individuals identified by the
Attorney General of the United States or otherwise shown to have perpetrated, aided
and abetted, conspired in regard to, or otherwise supported the terrorist attacks of
September 11, 2001.  Victims List sets forth the names of the decedents killed by the
attackers, with the category of "victims" further including their spouses, children,
parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**M**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.  conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\M_S&Z - More Definite Statement - ABjsg.doc

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al., Civil Action No. 04- CV- 1076 (RCC)*, and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\M_S&Z - More Definite Statement - ABjsg.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., and illegal activity to generate material support to continue its terrorist operations.

c. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. was not an employee, officer or director of the Enterprise, based upon present information available. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. is associated with the alleged Enterprise. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. is a member of the Enterprise, and is separate and distinct from the Enterprise. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. intended to

Page 4

further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First

Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous

recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The

World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b), 1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. For many years, the firm of Schreiber and Zindel has been used to launder money for Abdullah Omar Naseef, an individual associated with the SAAR Foundation and Rabita Trust[1], both of which are co-defendants in the above-referenced actions. Laundering the money occurred through the Al Taqwa Bank, also a co-defendant in the above-referenced cases. All three entities, SAAR, Rabita Trust and Al Taqwa Bank have been sanctioned by the U.S. Government.

23. Documents from the Government of Liechtenstein reveal that Schreiber and Zindel were "gatekeepers" for laundering funds through Al Taqwa for terrorist recipients, for many years. Some sources in Liechtenstein say that Schreiber and Zindel were instrumental in establishing Al Taqwa Bank as a shell for this purpose.

24. Schreiber and Zindel is run by Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.

25. Liechtenstein officials and separate documentation from a variety of sources also claim that Schreiber and Zindel were involved in laundering money from the Iraqi Oil-For-Food Program, along with the Al Qaida.

26. According to a published report, Engelbert Schreiber and Engelbert Schreiber, Jr. are listed on corporate documents for Nasreddin International Group Ltd. Holding, a co-defendant in this case, and a company which was also sanctioned by the United States Government. This company is owned by Ahmed Idris Nasreddin, the principal owner of Al Taqwa Bank, is an individual who has also been sanctioned United States Government. Since 1993, Engelbert Schreiber,

---

[1] Specific misconduct regarding Rabita Trust, a co-defendant herein, is provided via More Definite Statement. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\M_S&Z - More Definite Statement - ABjsg.doc

who was later replaced by his son, Engelbert Schreiber, Jr., have been trustees of Nasreddin Group International Limited Holdings, also known as Nasreddin International Group Ltd.

27. In April 1999, the German intelligence service (BND) reported that Engelbert Schreiber was arrested in August 1997 for money laundering. The 1999 BND report identified Engelbert Schreiber as a significant money launderer, who has had a close relationship with the Caracas/Venezuela mafia families Cuntrera-Caruana-Caldarella.

28. As owners and directors of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long known that accounts, under their control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. continued to permit, make available, assist, and maintain those accounts.

30. As the foregoing demonstrates, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.'s participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

31. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT SERCOR TREUHAND ANSTALT SERCOR TREUHAND ANSTALT

1. The name of the defendant to whom this Statement pertains is SERCOR TREUHAND ANSTALT. The alleged misconduct and basis for liability is set forth below as well as described elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.* (SDNY04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**N**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, SERCOR TREUHAND ANSTALT conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. SERCOR TREUHAND ANSTALT conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, SERCOR TREUHAND ANSTALT conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\N_Sercor - More Definite Statement - ABjsg.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including SERCOR TREUHAND ANSTALT, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.* (SDNY 04-CV-1570 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. SERCOR TREUHAND ANSTALT fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including SERCOR TREUHAND ANSTALT, and illegal activity to generate material support to continue its terrorist operations.

c. SERCOR TREUHAND ANSTALT was not an employee, officer or director of the Enterprise, based upon present information available. SERCOR TREUHAND ANSTALT is associated with the alleged Enterprise. SERCOR TREUHAND ANSTALT is a member of the Enterprise, and is separate and distinct from the Enterprise. SERCOR TREUHAND ANSTALT intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by SERCOR TREUHAND ANSTALT is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by SERCOR TREUHAND ANSTALT funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by SERCOR TREUHAND ANSTALT, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. SERCOR TREUHAND ANSTALT acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.* (SDNY 04-CV-1570 (RCC)), among others, and is a collection of the

Page 5

persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including SERCOR TREUHAND ANSTALT, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including SERCOR TREUHAND ANSTALT, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of SERCOR TREUHAND ANSTALT, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and

helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like SERCOR TREUHAND ANSTALT. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including SERCOR TREUHAND ANSTALT. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by SERCOR TREUHAND ANSTALT. SERCOR TREUHAND ANSTALT, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. SERCOR TREUHAND ANSTALT conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SERCOR TREUHAND ANSTALT conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. SERCOR TREUHAND ANSTALT also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against SERCOR TREUHAND ANSTALT are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. SERCOR TREUHAND ANSTALT has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  SERCOR TREUHAND ANSTALT conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  SERCOR TREUHAND ANSTALT conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Sercor Treuhand Anstalt has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Sercor Treuhand Anstalt is owned and managed by Martin Wachter[1] and Erwin Wachter,[2] co-defendants in the above-referenced cases.

23. As the foregoing demonstrates, Sercor Treuhand Anstalt thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Sercor Treuhand Anstalt's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

24. As the foregoing demonstrates, SERCOR TREUHAND ANSTALT thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of SERCOR TREUHAND ANSTALT's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

25. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

---

[1] Specific misconduct regarding Martin Wachter, a co-defendant herein, is provided via RICO Statement Applicable to Martin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statements Applicable to Martin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Erwin Wachter, a co-defendant herein, is provided via RICO Statement Applicable to Erwin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statements Applicable to Erwin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

Page 9

Dated:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____

GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT BANCA DEL GOTTARDO A/K/A BANCA DEL'GOTTARDO

1. The name of the defendant to whom this Statement pertains is Banca Del Gottardo a/k/a Banca Del'Gottardo ("Banca Del Gottardo"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**O**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Banca Del Gottardo conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Banca Del Gottardo conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Banca Del Gottardo conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.  The predicate act is not based upon a criminal conviction.

    e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Banca Del Gottardo, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

    a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure

Page 3

of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Banca Del Gottardo fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Banca Del Gottardo, and illegal activity to generate material support to continue its terrorist operations.

c. Banca Del Gottardo was not an employee, officer or director of the Enterprise, based upon present information available. Banca Del Gottardo is associated with the alleged Enterprise. Banca Del Gottardo is a member of the Enterprise, and is separate and distinct from the Enterprise. Banca Del Gottardo intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

Page 4

7. The pattern of racketeering activity conducted by Banca Del Gottardo is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Banca Del Gottardo funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Banca Del Gottardo, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Banca Del Gottardo acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Banca Del Gottardo, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Banca Del Gottardo, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Banca Del Gottardo, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these

recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Banca Del Gottardo.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Banca Del Gottardo.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Banca Del Gottardo.  Banca Del Gottardo, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  Banca Del Gottardo   conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Banca Del Gottardo conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Banca Del Gottardo also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary

losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Banca Del Gottardo are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Banca Del Gottardo has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Banca Del Gottardo conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Banca Del Gottardo conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Banca Del Gottardo in Lugano, Switzerland, moved al-Qaida money via the Al Taqwa bank, a shell that operated through correspondent accounts at the Gottardo branch in Nassau," as stated by the Washington Times stated on June 2, 2004. Al Taqwa Bank, a co-defendant in this case, has been sanctioned by the United States and the United Nations for funding al-Qaida and other terrorist activities. Banca Del Gottardo also handled payments for the Saddam money network.

22. For over two decades, Saddam Hussein, a co-defendant in the O'Neill cases, and former leader of Iraq and Radical Muslim Terrorism, caused money to be laundered to support Radical Muslim Terrorism. Sadam Husssein appointed his half-brother, Barzan e-Tikriti, a co-defendant in this case, to be his finance chief and control this laundering 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) operation.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\O_Banco del G- More Definite Statement - AL BAraka_b.doc

Barzan e-Tikriti made use of many Swiss Banks, such as the defendant Banca Del Gottardo, along with banks in Liechtenstein, Panama, and the Bahamas.

23. In fact, Iraqi networks financial activities were anchored in Lugano, Switzerland at Banca Del Gottardo, in conjunction with one of its component firms, Mediterranean Enterprises Development Projects (MEDP) moved $5 billion annually. At Banca Del Gottardo, Saddam had an account in the name of "Satan account."

24. There have been links to support Saddam's funding of the Al Qaida.

25. Banca Del Gottardo has a colorful history: It is the bank that moved the bribe and kickback money paid by a Swiss construction company to former Russian President Boris Yeltsin and his cronies in exchange for contracts to refurbish Kremlim buildings.

26. In the late 1970s, Banca Del Gottardo was the Swiss subsidiary of Banco Ambrosiano, "the Vatican Bank," which collapsed in 1982 in a $1 billion fraud that involved money siphoned off to offshore shell companies and accounts. Ambrosiano had laundered drug and arms trafficking money for the Italian and American mafias.

27. As the foregoing demonstrates, Banca Del Gottardo thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Banca Del Gottardo's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

28. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____

GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\O_Banco del G- More Definite Statement - AL BAraka_b.doc

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT DAR AL MAAL AL ISLAMI A/K/A DAR-AL-MALL AL ISLAMI A/K/A DAR AL-MAAL AL-ISLAMI (DMI) REFERRING TO AND INCLUDING DAR AL MAAL ADMINISTRATIVE SERVICES, SA A/K/A DMI ADMINISTRATIVE SERVICES SA AND DAR AL MAAL AL ISLAMI TRUST

1. The name of the defendant to whom this Statement pertains is Dar Al Maal Al Islami a/k/a Dar-Al-Maal Al Islami a/k/a Dar Al-Maal Al-Islami (DMI) referring to and including Dar al Maal Administrative Services, SA a/k/a DMI Administrative Services SA ("DMI SA") and Dar Al Maal Al Islami Trust ("DMI Trust") (herein after collectively known as "DMI"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

**PLAINTIFF'S EXHIBIT**

**P**

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, DMI conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* , affairs and participated in the operation or management of the operation of the Enterprise itself. DMI conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, DMI conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.   The predicate act is not based upon a criminal conviction.

e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including DMI , to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of

Page 3

which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. DMI fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including DMI, and illegal activity to generate material support to continue its terrorist operations.

c. DMI was not an employee, officer or director of the Enterprise, based upon present information available. DMI is associated with the alleged Enterprise. DMI is a member of the Enterprise, and is separate and distinct from the Enterprise. DMI intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by DMI is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by DMI funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by DMI , relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. DMI acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including DMI, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including DMI, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of DMI, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like DMI. Indeed, the Enterprise would not have been

successful without enthusiastic participation of all of the conspirators, including DMI.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by DMI.  DMI, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. DMI   conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  DMI conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. DMI also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are

in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against DMI are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. DMI has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. DMI conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. DMI conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended. [1]

21. Dar Al Maal Al Islami Trust ("DMI Trust") and DMI Administrative Services, S.A. ("DMI S.A.") are part of a network of related and intertwined financial institutions, collectively known as Dar Al Maal Al Islami ("DMI"), also known as the "House of Islamic Money" – created on July 29, 1981 and headquartered at avenue Louis-Casai 84, in Cointrin, Geneva, Switzerland.

**Organizational Structure and Purpose of Dar Al  Maal Al Islami, DMI Administrative Services S.A. and Daar Al-Maal Al-Islami Trust**

22. DMI is the predecessor-in-interest to DMI Trust and DMI S.A. DMI S.A. is located in Geneva, Switzerland. The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions."[2] These continents include North America, Europe, Africa and Asia.  DMI S.A. provides assistance to the

---

[1] Plaintiffs further incorporate herein More Definite Statements filed in connection with the O'Neill cases as to any defendant referenced in the following paragraphs.

[2] Annual Report DMI Trust 2002, p. 3.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology."[3]   Therefore, DMI Trust and DMI S.A. directly participate in the oversight and management of DMI Trust's subsidiary and associate entities. DMI Trust owns 100% of DMI S.A. DMI S.A. is both a wholly owned subsidiary and an agent of DMI Trust. DMI S.A. and DMI Trust are referred to collectively herein as "DMI." The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money").

23. DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank, as described herein. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

24. DMI Trust is an Islamic Financial Institution founded in 1981.[4] "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."[5] Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. Asset management, however, is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board. The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."[6] DMI S.A. is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust. DMI S.A. acts as one of DMI Trust's operational arms.

25. Since its establishment, DMI has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modern era. DMI was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."[7] DMI is one important element

---

[3] Id.

[4] Annual Report DMI Trust 1994, p. 2.

[5] Id.

[6] Id.

[7] Dr. Ali Hassan Abdel Kader, member of the Sharia Control Authority of DMI, "Report on the Islamic Economy and Contemporary Transactions," published by DMI, (1981). Preface

Page 9

of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."[8] "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim. The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."[9]

26. Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen. As Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

27. In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to financial jihad: "May Allah bless your Jihad and all your efforts. May He aid you and affirm your faith."[9]

28. Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

**DMI Liability**

29. DMI has, over a period of many years, directly and through its subsidiaries and affiliates, knowingly provided material support and resources to al Qaeda and/or affiliated individuals and entities. DMI's misconduct includes laundering money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. In addition, DMI's *Zakat* accounts have been used to support al Qaeda. In addition, DMI companies have facilitated financial transactions for, and advertised, maintained and serviced accounts on behalf of, several of al Qaeda's known charity fronts, including al Haramain Islamic Foundation, International Islamic Relief Organization and the Muslim World League. Both the United States and the Kingdom of Saudi Arabia have

---

authored by Dr. Ibrahim Moustapha Kamel, Executive Vice President to the President of the Administrative Council of DMI.

[8] Id.

[9] Id.

designated as al Qaeda terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for the financial, material and logistical support they provided to al Qaeda. DMI S.A. has handled the accounts of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaeda goals.

30. DMI Trust is a major shareholder in Al Shamal Bank, which Osama Bin Laden helped to establish in 1991 by providing capital of $50 million. Additionally, Faisal Islamic Bank (Sudan), another major shareholder of Al Shamal Bank is a subsidiary of defendant Islamic Investment Company of the Gulf (Bahrain) EC, which is in turn a wholly-owned subsidiary of DMI Trust. Moreover, another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan). Al Shamal Bank regularly provided financial and account services to al Qaeda operatives – six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

31. Islamic Investment Company of the gulf is based in Bahrain. It recently merged with Faisal Islamic Bank, and the new entity is called Al-Shamil Islamic Bank. Al-Shamil Islamic Bank is a subsidiary of DMI Trust. One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

32. DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

33. DMI is a primary vehicle for Saudi financing of the international Islamic fundamentalist movement. For example, Faisal Islamic Bank was implicated during the 2001 U.S. trial on the 1998 embassy bombings in Africa as holding bank accounts for al Qaeda operatives.

34. Functioning on an Islamic method, DMI adheres to the Zakat system. After the transaction is made, the funds earmarked as Zakat disappear and are off the books. Later, under no financial regulation, the money may be used to fund radical Islamic groups. Islamic banking institutions operate by participating in investments, sharing profits on projects, and earning fees for services performed.

35. Al Qaeda raises money from a variety of individuals, charities and businesses, including banks and financial institutions. Once raised, finances are transferred through banks and financial institutions, through individual accounts and accounts maintained by charities and other businesses. Money is also transferred through alternative remittance systems such as hawala, travelers' checks and directly by transporting and delivering cash. The simplest, safest and most efficient

mechanism to transfer money, however, "is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy."

36. Al Qaeda has infiltrated and abused the Islamic financial system, a typically legitimate form of investment and finance that abides by Sharia, or Islamic law, which prohibits the earning or payment of interest. "Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations. Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement. Moreover, al Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system."

37. A number of businesses and financial institutions which provide material support to al Qaeda do so through a complex web of inter-related corporations, charities, and financial service companies. These entities purposefully create subsidiaries with inter-locking directors and business ventures, in part, to conceal the distribution of funds for terrorist purposes. Such institutions maintain several associations, joint ventures and subsidiary banks which are used to finance and facilitate Osama bin Laden and the al Qaeda network.

38. The United Nations Security Council has created a committee to actively address the issue of the use of shell companies and offshore trusts as shields to obscure the identities of those groups or persons active in the financing of terrorism. In a December 2003 report, the Council declared that "such arrangements serve to mask potential terrorist-financing activities, and make it difficult to locate and deal with terrorist-related financial assets...." The Group of Eight (G8) Counter-Terrorism Action Group has "concluded that shell companies, offshore trusts and other beneficial ownership arrangements have allowed [businesses and individuals] to circumvent the full application of the measures set out in the [UN Security Council's anti-terrorism] resolutions."

39. Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world by perverting and taking advantage of every Muslim's religious duty - - payment of Zakat.

40. One of the so-called "five pillars" of Islam is Zakat, or almsgiving. The Quran requires every Muslim, both as individuals and corporations, to give Zakat for

specific charitable purposes as identified in the Quran. The standard rate for Zakat is 2.5% of current assets and other items of income.

41. Each year, every able Muslim citizen and company is obligated to donate 2.5% of his or its assets, in money or kind, to the poor and indigent as specified in the Quran. This legal and religious duty is generally satisfied by yearly donations to charities. Many of these charities have financed and continue to finance international terrorism under the cover of supporting Islamic schools, mosques, or orphanages.

42. It is estimated that hundreds of Saudi-based charitable organizations distribute as much as four billion U.S. dollars ($4,000,000,000.00) each year. Zakat funds are often provided in cash to prominent, trusted community leaders, or to institutions such as banks, which then commingle and disperse donated monies to persons or charities that they deem worthy. These practices have allowed unscrupulous front groups or charities to fund violent, extremist Islamic groups, including al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror which occurred on September 11, 2001.

43. Islamic businesses and financial organizations are major donors to Islamic charities as a result both of their own corporate Zakat obligations as well as their guidance and involvement in the distribution of the Zakat payments of their individual investors. Most Islamic financial institutions maintain a Zakat Department. This department selects the recipients for the business' own Zakat donations and is charged with ensuring that the Zakat is in fact distributed to worthy and appropriate recipients so that the donation satisfies the business' religious obligation as set forth in the Quran and under Sharia law. As a result, Islamic religious charities have tremendous influence and power in the Middle East and throughout the world.

44. Islamic financial institutions, through their Zakat Departments, also typically provide services to individual investors to assist them in selecting recipients for their Zakat funds and also to facilitate the actual donations. Investors make use of these services and do so in reliance on the financial institution to ensure that the donation is made to worthy recipients so that the donation complies with Sharia law and satisfies the investor's Zakat obligation. DMI engages in the Zakat services described above.

45. Islamic financial institutions that adhere to Sharia principles must also calculate the percentage of unlawful or unacceptable income that is collected but is considered unacceptable according to Sharia principles. This income is referred to as "Haraam," or forbidden. Examples of Haraam income include, among other things, any interest that is earned as a result of an account holder's credit balance and any income derived by a corporation from impure activities such as gambling or the sale of liquor. The donation of Haraam income that must be given away cannot count as a virtuous or charitable act. As such, it cannot fulfill a Muslim's

Page 13

Zakat obligation. Donations of Haraam income, then, are made in addition to the donations made to satisfy the Zakat requirement.

46. In addition to the actual monetary donations to charities, Islamic businesses like DMI also provide a broad range of facilities, material support, and services to charities and individuals and in some cases directly to al Qaeda through their various subsidiaries and investments. These activities include assistance in the actual distribution of both individual and corporate Haraam and Zakat obligations.

47. As partners, the financial institution and its associates, conspirators or agents have a close and collaborative relationship that requires that the bank be aware of the project or business involved in the transactions, the source of its funding, and its goals, successes and failures. In other words, the Islamic financial institution's relationship to its investment "customer" is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.

48. Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from both Zakat and Haraam donations made by and/or passed through Islamic businesses on behalf of themselves and/or their investors, and they rely on financial institutions, including DMI and its subsidiaries, to facilitate the illicit transfer of funds.

49. Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate through the Zakat system to his terrorist organization. In December 1998, during an interview with ABC News, Osama bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God."

50. On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including al Qaeda, as international terrorist entities. Osama bin Laden and his sponsors and followers were known to openly promote hatred and violence against innocents long before this time. On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other assistance in support of terrorism. The list of these "Specially Designated Global Terrorists" or terrorist organizations ("SDGT") included Osama bin Laden and al Qaeda.

51. In full recognition of Islamic principles, Osama bin Laden and his al Qaeda organization, in partnership with several Saudi and Gulf Islamic banks, founded banking institutes in the Republic of Sudan that provided funding and support for international terrorist operations and organizations and Osama Bin Laden.

52. DMI has also entered into business partnerships with prominent al Qaeda supporters, such as the National Islamic Front, the fundamentalist regime which has ruled Sudan since 1989 and provided safe haven to Osama bin Laden and al Qaeda from 1991 through 1996.

53. Through these actions, DMI has knowingly conspired to support al Qaeda's global jihad, and aided and abetted that terrorist organization.

54. DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

**DMI Trust Supervising Board Member Hassan Abdallah Al Turabi**

55. Consistent with this founding principle of invoking and organizing a financial jihad, DMI Trust appointed a supervising board of directors who embrace an ideology of violence. Hassan Abdallah Al Turabi served as one of the initial Supervising Board members of DMI Trust. Hassan Abdallah Al Turabi was the Secretary General of the Muslim Brotherhood in the Sudan in the early 1960's, and in 1986 he founded the National Islamic Front in the Sudan. Al Turabi promotes violent jihad as a means to achieve an Islamic state. In 1989, Al Turabi seized power in Sudan by coup and an Islamic state was created. Al Turabi encouraged radical Islamic terrorist groups such as al Qaeda to immigrate to Sudan.

56. In 1991, Osama bin Laden moved to the Sudan where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the al Qaeda network with military and logistical support through the government of Sudan.

57. In 1991 the U.S. State Department reported that:

> Terrorist and militant Muslim groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations.... The National Islamic Front, under the leadership of Hassan Al Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

58. Turabi also provided these groups with business and investment opportunities and in some cases political positions within the Sudanese government. Even before

Page 15

arriving in the Sudan, bin Laden began to invest in the region. He quickly developed a number of joint ventures with prominent National Islamic Front leaders such as Al Turabi. The United States State Department created a fact sheet on Osama Bin Laden which described his activities as follows:

59. Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front leader Hassan Al Turabi.... He embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

60. One of these business ventures was the creation of an Islamic bank in the Sudan called Al Shamal Islamic Bank. "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank." DMI conducted its financial support of jihad by also investing in the Al Shamal bank through the Faisal Islamic Bank of Sudan and the Tadamon Islamic Bank.

61. In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces; and providing for martyrs' families.

62. The ISSF jihad fund's largest public or private contributors were Prince Mohammed Al Faisal Al Saud's Faisal Islamic Bank, which gave 7 million Sudanese Pounds, along with Faisal Islamic Bank subsidiaries Shamal Islamic Bank, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

63. In June of 1991, during the period in which Osama bin Laden was transferring his center of operations to the Sudan, there were 26 Faisal Islamic Bank branches, 13 Tadamon Islamic Bank branches, and two Al Shamal Islamic Bank branches operating in the Sudan.

64. Another personal friend of Hassan Al Turabi is Sheik Omar Abdel Rahman (a/k/a the "Blind Sheik"), who was convicted for the 1993 bombing of the World Trade Center. The Blind Sheik provided religious inspiration to Hassan Al Turabi and Osama bin Laden, issuing a notorious fatwa permitting Afghan-Arab mujahideen

to assassinate Muslims who violated the Sharia and authorizing the killing of President Sadat of Egypt and tourists in Muslim lands. The Blind Sheik was also given refuge in Sudan by Hassan Al Turabi.

65. The government of Sudan and the Blind Sheik assisted Osama bin Laden and his al Qaeda network in the 1993 bombing of the World Trade Center. Sudan sent two intelligence agents to New York who posed as officials of the Sudan UN Mission to the United States. These agents attempted to assist the bombing co-conspirators to leave the country after the attack. One of the agents, Siddiq Ali, served as a bodyguard for Turabi when he visited the United States. Ali was arrested for attempting to blow up New York City landmarks, along with the Blind Sheik and five other Sudanese recruits and members of bin Laden's al Qaeda network.

66. On November 3, 1997, President Bill Clinton imposed a trade embargo against Sudan and a total asset freeze against the Government of Sudan. This was done after learning that the Government of Sudan's policies and actions such as support for international terrorism, efforts to destabilize neighboring governments, and the prevalence of human rights violations constituted an unusual and extraordinary threat to national security and foreign policy of the USA.

67. Turabi endorsed DMI's mission of worldwide jihad through his activities in the Sudan. In 1991, Turabi organized the Popular Arab and Islamic Congress (*Al-Mutamar al-Arabi al'Shabi al-Islami*, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Co-Defendant Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

68. Khalifa provided material support to Ramzi Youssef, convicted of the World Trade Center bombing in 1993, who was preparing to assassinate Pope John Paul II during a trip to the Philippines in 1995. Youssef was also planning Bojinka -- a plot to simultaneously explode twelve US flagship airplanes over the Pacific Ocean.

69. "There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

70. Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the

Page 17

PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic.

71. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without *jihad* … the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

72. In October 1994 Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States—the 'Great Satan.'"

73. Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

74. In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught....To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

75. In selecting Turabi, DMI Trust chose as one of its Supervising Board members an Islamic scholar who provided refuge, business opportunities, ideological support and logistical support to Osama bin Laden and the al Qaeda network. Turabi promoted and encouraged international Islamic movements to engage in jihad – the principle espoused by the DMI Trust. Founding DMI board members and spiritual advisors Hassan Al Turabi and Youssef al-Karadawi belong to the Muslim Brotherhood. Considered to be the first Islamic fundamentalist jihadi organization, the Muslim Brotherhood was the model for numerous militant groups, including al Qaeda. The Brotherhood's homepage states the group's basic credo:

> Allah is our objective.
> The messenger is our leader.
> Quran is our law.
> Jihad is our way.
> Dying in the way of Allah is our highest
> hope.

76. During the first meeting of the PAIC, Al-Turabi led the attendees with chants "Down with the USA." In October 1994, Hassan al-Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. At the conference

Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the "Great Satan." Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques" which calls for jihad against Americans.

**Faisal Islamic Bank of the Sudan**

77. An associated company of the DMI Trust is the Faisal Islamic Bank of the Sudan.[10] The Faisal Islamic Bank of the Sudan has served on the Board of Supervisors of the DMI Trust.[11] Statements by officials of DMI Trust confirm DMI's direct involvement in Faisal Islamic Bank's operations. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."[12]

78. Prince Mohammed founded Faisal Islamic Bank of Sudan in 1977 in partnership with the National Islamic Front (NIF), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989. Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of the Faisal Islamic Bank. In addition, the NIF has granted Faisal Islamic Bank privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization. Moreover, the bank has supplied loans to the NIF and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the NIF to operate, at least as late as 1992, from the penthouse of the bank's headquarters.[13] Through this association, "Turabi's party became the best financed in the Sudan."[14]

79. Al Qaeda has materially benefited from the business relationship among DMI, Faisal Islamic Bank and the NIF. In 1989, Hassan al Turabi, the ideological and political leader of the NIF, invited Osama bin Laden to move the entire al Qaeda

---

[10] Annual Report DMI Trust 1996, p. 28.

[11] Annual Report DMI Trust 1989, p. 5.

[12] Id.

[13] Judith Miller, "The Islamic Wave," the New York Times Magazine, p.22 (May 31, 1992); *See also,* Jonathan Randal, "Sudan Party Puts New Face on Fundamentalism," Washington Post, A30, Col. 4. (April 7, 1988).

[14] Id.

Page 19

organization to Sudan. Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991. Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan. During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF, and enjoyed the NIF's complete protection. The protection, support and safe haven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire. In addition, while in Sudan, al Qaeda established several businesses in partnership with the NIF, to fund al Qaeda's campaign to attack America.

80. Absent the support and safe haven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

81. The benefits al Qaeda derived from its relationship with the NIF were made possible, at least in part, by the partnership between the NIF and Faisal Islamic Bank, which partnership helped the NIF retain power in Sudan during the relevant time period. As a corollary, it is reasonable to infer that DMI and Faisal Islamic Bank hoped to reap financial benefit from the NIF's relationships with bin Laden. As Islamic banking institutions, DMI and Faisal Islamic Bank are forbidden to charge interest. Instead, the banks enter into partnerships with their depositors and borrowers, and share in the financial success of those partnerships. As Prince Mohammad al Faisal al Saud has explained: "We make money when our borrowers make money. If they don't we don't collect anything." By virtue of this system, DMI and Faisal Islamic Bank were partners with the NIF in the NIF's endeavors, including those involving Osama bin Laden.

82. Given Faisal Islamic Bank's close relationship with the NIF, and the NIF's direct role in managing the bank's operations, DMI and Faisal Islamic Bank were necessarily aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan. Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized. In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan. News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of *mujihadeen* were traveling to Sudan to receive terrorist training. By virtue of these reports, and their close relationship with the NIF, DMI and Faisal Islamic Bank necessarily were aware of al Qaeda's relationship with the NIF during this time.

83. Al Qaeda was so confident in the absolute protection of the NIF that it openly maintained accounts at Faisal Islaimc Bank. Former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum had held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

Q. Where were the accounts [of al Qaeda] held? In what
Page 20

countries?

A. (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].

Q. Is that also in Khartoum?

A. Yes.[15]

## Connections To The Al Shamal Islamic Bank of Sudan

84. The Faisal Islamic Bank of the Sudan was a founding member of the Al Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.[16] The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development. Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, Al Baraka for Investment and Development, and Sheik Saleh Abdullah Kamel.

85. The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank which was a founding shareholder of the Al Shamal Islamic Bank. The Tadamon Islamic Bank was formed in the Sudan on November 28, 1981.

86. A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps.... Jihad has now become an obligation that comes before any other duty."[17]

87. DMI Trust is a major investor in Al Shamal Bank. Another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan).

88. The Al Shamal Islamic Bank was capitalized by Osama bin Laden in the amount of fifty million U.S. dollars ($50,000,000.00). "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal."[18] Osama bin Laden continued to use this bank to finance his terrorist training activities in Sudan and to support his world wide terrorist network. In addition, Al Shamal Bank regularly provided financial and

---

[15] Testimony of Jamal Ahmed Al-Fadl, *United States v. Osama bin Laden*, *et al.* (S.D.N.Y. February 6, 2001).

[16] Statement by Al Shamal Islamic Bank (October 1, 2001).

[17] "Sudanese students enroll for controversial military service," AP News (June 6, 1998); AP News (August 4, 1998).

[18] Congressional Research Service, "Terrorism: Near Eastern Groups and State Sponsors," p. 16 (February 13, 2002).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts.  Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

89. Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank.[19] Osama bin Laden also financed the al Qaeda network in part through the Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
>
> $1,200 a month.
>
> For how long did you work for him [Osama bin Laden]?
>
> Almost two years.
>
> What Banks did he keep his money at?
>
> Bank Al Shamar.[20]
>
> [In responding "Bank Al Shamar," Al-Fadl   as referring to Al Shamal Islamic Bank.]

90. Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaeda representative in Jordan.[21] In the same trial, another former al Qaeda operative stated that the Al Shamal Islamic Bank was used for operational purposes. The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) *via* the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden.[22]

91. The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank. The accounts were opened on March 30, 1992 for the company Al-Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a

---

[19] Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 6, 2001).

[20] Id.

[21] Id.

[22] Testimony of Essam Al Riddi, U.S.A. v. Osama bin Laden (February 14, 2001).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

company registered in Saudi Arabia.[23]  This company, according to the U.S. State Department, was founded by prominent National Islamic Front members and exercises a monopoly over major agricultural exports from the Sudan.[24]

92. Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that Al Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.[25]

93. The Chairman of the Al Shamal Islamic Bank was Adel Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaeda network. In 1993, the government of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaeda. Adel Batterjee is a United States specially designated global terrorist.

## Tadamon Islamic Bank

94. The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank, which was a founding shareholder of the Al Shamal Islamic Bank. Jamal Al-Fadl testified in the criminal trial concerning the 1998 Embassy bombings that the Tadamon Islamic Bank was used by members of al Qaeda to fund the terrorist attacks and to generally support the network.[26]

## Faisal Islamic Bank of Egypt

95. Designated terrorist and Co-Defendant Youssef Nada[27] co-founded Faisal Islamic Bank of Egypt with former DMI Trust chairman Prince Mohammed Al Faisal Al Saud. Youssef Nada is the director of Al Taqwa Bank (a Specially Designated Global Terrorist entity) and a member of the Egyptian Muslim Brotherhood and Gama'a al-Islamiya, which is directly allied with al Qaeda through Dr. Ayman al Zawahiri. In 1970 Nada moved to Saudi Arabia and established contact with

---

[23] Statement of Mohamed S. Mohammed, Al Shamal Islamic Bank (September 2001).

[24] U.S. State Department Fact Sheet on Osama bin Laden (August 14, 1996).

[25] Statement of Senator Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (September 26, 2001).

[26] Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 20, 2001).

[27] The United States Department of the Treasury designated Youssef Nada as a Global Terrorist on November 6, 2001 for his role in funding al Qaeda *via* his Al Taqwa bank. (*Source: OFAC bulletin, November 7, 2001.*)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

members of the Saudi Royal family, and in 1977 he and Mohammed Al Faisal Al Saud established the Faisal Islamic Bank in Egypt.[28]

96. Faisal Islamic Bank of Egypt was heavily involved in the Bank of Credit and Commerce International (BCCI) banking fraud scandal of the 1970s and 1980s. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA)[29] rapidly spread to become a vast fraudulent empire. BCCI head Khalid bin Mahfouz was indicted in the United States on July 1, 1992 on criminal fraud charges and ultimately paid two hundred twenty-five million U.S. dollars ($225,000,000.00) in a settlement with U.S. prosecutors. The 1992 Senate Investigative Report on BCCI detailed the bank's role in supporting terrorism via massive diversions of laundered money.[30] Faisal Islamic Bank of Egypt moved approximately five hundred fifteen million five hundred thousand U.S. dollars ($515,500,000.00) of its deposits into overseas BCCI accounts.[31] A "major creditor of BCCI,"[32] Faisal Islamic Bank of Egypt was the main source of unrecorded deposits used by BCCI to conceal losses.

97. DMI Trust board members continue to participate in the regulation of Faisal Islamic Bank of Egypt. Through the conduct described above, DMI has knowingly and intentionally conspired to channel material support to al Qaeda, and aided and abetted al Qaeda in its ongoing campaign to attack America.

**Faisal Finance S.A. (Switzerland)**

98. One of DMI's Trust subsidiary institutions is Geneva- based Faisal Finance S.A. DMI Trust and its subsidiary Shamil Bank own the majority of Faisal Finance S.A. capital. Yassin al-Qadi, who has been indicated as a top financial sponsor of HAMAS, was designated on October 12, 2001 as a terrorist by the United States government under the criteria established in Executive Order 13224 for his financial support of al Qaeda. Yassin al-Qadi heads the Muwafaq Foundation. An SDGT entity, Muwafaq was created by Qadi and Khalid bin Mahfouz as an al Qaeda front company, and has been used to transfer millions of dollars to bin Laden. In 1995, bin Laden himself described Muwafaq as a central element to his financial network.

---

[28] Paul W. Rasche, "The Politics of Three - Pakistan, Saudi Arabia, Israel," *Studien von Zeitfragen* 35, Jahrgang InternetAusgabe 2001, p. 6 (December, 2001). Also published under the name F. William Engdahl.

[29] John Aloysius Farrell, "With Probes, Making His Mark," the Boston Globe (June 20, 2003)

[30] Senate Foreign Relations Committee Investigative Report on the BCCI Affair (December, 1992).

[31] William E. Schmidt, "Egypt Takes Control of BCCI Affiliate," Wall Street Journal.

[32] http://www.icclaw.com/1500/formex/pps/ukp51973.htm.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

## Islamic Principles and *Zakat*

99. DMI and its affiliated and subsidiary companies have also channeled support to al Qaeda through the distribution of *Zakat* and *haraam* funds. DMI and its affiliates operate under Islamic principles of finance, paying no interest on investments, and performing financial transactions inline with *Sharia* (Islamic law).

100.      To ensure that the investments and activities of DMI and its subsidiaries and affiliates comply with *Sharia* principles, DMI, like virtually every Islamic bank, maintains a Religious Board to oversee operations and ensure compliance with Islamic law.

101.      One important recommendation from the Religious Board is the amount of Zakat which should be distributed and the manner in which those funds should be disbursed. Each year the Religious Board has advised that over two million two hundred thousand U.S. dollars ($2,200,000.00) should be designated from the DMI for Zakat appropriation.   Subsumed within this amount is also the Zakat distributed on behalf of DMI's equity participants.

102.      The Religious Board plays a crucial role in determining the amount, manner and purposes for which *Zakat* is distributed.  *Zakat*, or almsgiving, is one of the five pillars of Islam. The Quran requires every Muslim, both as individuals and corporations, to give *Zakat* for specific charitable purposes as identified in the Quran.

103.      One previous member of the Religious Board of DMI Trust was Youssef al-Karadawi. Karadawi is the spiritual leader of the Muslim Brotherhood who promotes the DMI philosophy of jihad. On May 12, 2001, Karadawi stated that:

104.      The suicide mission is the loftiest form of jihad. We are talking about a heroic act of sacrifice and sanctification. The person who redeems his soul for Allah, sacrifices himself as a sacrifice for his religion and people, and fights the enemies of Allah, with new weapons that fate awarded to the downtrodden, in order to fight with these means against the tyranny of the arrogant.

105.      Youssef al-Karadawi was also a shareholder of Bank Al Taqwa in the Bahamas, which has been identified by the United States government as a financial supporter of al Qaeda. At the time of the Bank's designation President George Bush declared that:

106.      Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world. Al Taqwa raises funds for Al Qaeda.

107.      Karadawi has been barred from entering the US since November 1999 for his alleged support of terrorism and affiliations with al-Qaeda associates. He

Page 25

teaches at Qatar University in Doha, and serves as Chairman of Qatar Bank's Sharia board.

108.     In another interview in Palestine Times, Karadawi stated:

   The foreign military presence in the Arab world is in fact a new imperialist invasion.

   The Islamic resistance in Lebanon and Palestine represents the glorious face of the Muslim Umma and serves as an example to that effect. As for the martyrs, I have issued a religious edict blessing the martyrdom operations in which a given Muslim fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy.

   These heroes are carrying out the duty of Jihad on behalf of the entire Umma. Jihad and Resistance is our fate and destiny; it is a duty upon us.

109.     Karadawi has also endorsed the killing of American military personnel stationed in the Middle East. In an al-Quds Press Agency interview Karadawi stated: "Those killed fighting the American forces are martyrs given their good intentions since they consider these invading troops an enemy within their territories but without their will."

110.     Fatwas issued by Youssef al-Karadawi have long  appeared on numerous Islamic websites with broad readerships.  One such site is www.islam-online.net. Though based in Qatar, the site considers itself to be "global" and "multilingual," with content appearing in both Arabic and English and boasting a "global presentation" to reach out to "all people, Muslim and non-Muslim, without regard to geographic boundaries, religion, language, background, culture or gender." Karadawi heads up the Sharia advisory created by the website's owners to ensure the site's content remains in accordance with Islamic standards.

111.     On this webpage, Karadawi has referred to "the marvelous fighting carried out by our brothers in Chechnya" as "one of the best kinds of Jihad in the Cause of Allah:"

   There is a scholarly consensus (Ijma`) that whoever fights in defense of his religion, land and household, and is killed in that fighting, is considered a Martyr (Shahid). ...we are sure that Allah the Almighty will help [the Chechen fighters] put their enemy to rout, grant them victory and help them gain supremacy in their lands. ...The recent days augurs (sic) victory for Chechnya, and the Promise of Allah will for sure come true soon.

Page 26

112.    Other fatwas authored by Karadawi urging jihad can be seen on www.islam-online.net. In one, he encourages Muslims to wage jihad on all non-Muslims, declaring:

> Disbelievers are all alike. Capitalists, Communists, Westerners, Easterners, People of the Book [Christians and Jews] and pagans are by no means different from one other. They should all be fiercely fought if they attempt to occupy any part of the Muslim land.

113.    Waging war on the unbelievers, Karadawi states in his fatwas, is an ideology that must be embraced by all Muslims, and must be supported by their financial means. "Declaring Jihad to save our land is an Islamic obligation," he states; it is "incumbent on all Muslims to take part in Jihad." Karadawi endorses the use of the Zakat payments to support jihad efforts:

> If war is waged anywhere to achieve [the liberation of Muslims from] the tyranny of disbelievers, it is undoubtedly a case of Jihad for the sake of Allah. It thus needs to be financed from the money of Zakah....

114.    Prince Mohammed Al Faisal Al Saud, former Chairman of DMI Trust and Faisal Islamic Bank of Sudan, stated: "We make money when our borrowers make money. If they don't we don't collect anything." He said there was well over twelve billion U.S. dollars ($12,000,000,000.00) kept in cash in Saudi hands "because these religious people do not believe that they should put them in banks that collect or give interest." He said he hoped his Islamic banks would attract these funds, and said that over the brief period they had been in business—one year—they were already doing so.

115.    Prince Mohammed Al Faisal and DMI Trust sought the investment and distribution business of the Saudi religious elite that collect millions of dollars for the purpose of promoting Islam and funding religious works. These religious leaders also promote the same jihadist ideals as espoused by DMI. DMI supports radical and violent jihad by facilitating the transfer of funds from the religious Saudi elite to jihad groups, including al Qaeda.

116.    One cause that DMI S.A. has supported is the Islamic Center of Geneva. Established in Geneva in 1961 by the son-in-law of Hassan al-Banna, founder of the Egyptian Muslim Brotherhood and of co-defendant Muslim World League, the Islamic Center has received financial support from DMI S.A. The Center has also received financial support from Bank Al Taqwa, designated a terrorist entity by the United States government. Al Taqwa is headed by Specially Designated Global Terrorists Youssef Nada and Ahmed Idris Nasreddin. Youssef Al-Karadawi, a former member of the Religious Board of DMI Trust, also was a shareholder of Bank Al-Taqwa. On January 4, 2002, the Deputy General Counsel

Page 27

of the United States Department of the Treasury wrote to prosecutors in Switzerland stating that:

> [b]ased on information available to the United States Government, we have a reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist-related organizations....Bank Al Taqwa was founded in the Bahamas and is a close affiliate of Al Taqwa Management Organization....The Malta and Lugano, Switzerland branch offices of Al Taqwa Management Organization receive money that 'pours in' from Kuwait and the United Arab Emirates for Osama bin Ladin....As of late September 2001, bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada and Ali bin Mussalim. Nada has a controlling interest in, and is chairman of, Bank Al Taqwa, and Mussalim is involved in Bank Al Taqwa operations. Since the 1980s, following the pullout of the Soviet army from Afghanistan, Mussalim, assisted by Nada, has been providing indirect investment services for Al Qaida, investing funds for bin Laden, and making cash deliveries on request to the Al Qaida organization.

117. The Islamic Center of Geneva provided a support network for al Qaeda's terrorist activities. In 1991, the son of the Islamic Center's founder organized a conference at which Ayman al-Zawahiri and the "Blind Sheik" Omar Abdel Rahman, indicted for his role in the 1993 World Trade Center bombing, were present. As further evidence of the Islamic Center of Geneva's association with al Qaeda, Islamic convert Albert Huber (a board member at Youssef Nada's company) acknowledged that he used his connections to the Center to meet with members of Osama bin Laden's al Qaeda network in Lebanon.

118. DMI Trust satisfies its Zakat obligations by directly funding the al Qaeda network and by financially supporting charities and other groups which it knows support al Qaeda. DMI Administrative Services has directly funded an al Qaeda operative whom the United States Treasury has specially designated as a Global Terrorist. In addition, Islamic financial institutions identify and calculate Haraam income for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute Haraam income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with Sharia law. As a result of those obligations and services, Islamic financial institutions were and are directly involved in the selection of beneficiaries and the donation of billions of their own and their depositors' dollars to charities that sponsor terrorism.

119.     In addition, Islamic financial institutions like the DMI companies identify and calculate *Haraam* income - income that is collected but is considered unacceptable according to *Sharia* principles – for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute *Haraam* income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with *Sharia* law. In addition, DMI Trust and its affiliates and subsidiaries have their own *Haraam* obligation that must be calculated and subsequently donated to charity.

120.     Rather than provide charity directly to the needy, DMI and its affiliates disburse *Zakat* and *Haraam* funds under their control to charities of their own choosing. The charities, in theory, are to disburse the money to the needy. As a result, Islamic financial institutions like DMI are directly involved in the selection of charities to receive donations of their own and their depositors' dollars.

121.     The charities selected by DMI Trust or its agents materially supported, aided and abetted al Qaeda, international terrorists and their activities. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

122.     For a period of many years, DMI and its affiliated and subsidiary companies have known that many of the ostensible charities to which they channeled *Zakat* and *Haraam* funds were, in fact, fronts for al Qaeda. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

123.     In addition, DMI Trust's subsidiary Faisal Islamic Bank and the Islamic Investment Company of the Gulf actively participated in the collection of funds for certain of al Qaeda's "charitable" front organizations. For example, co-defendant IIRO solicited donations through full-page advertisements run in leading Islamic journals.  These advertisements, which called for *Zakat* donations to assist the needy in Chechnya, Bosnia, and other such areas, often provided account numbers to facilitate the contribution of funds. In many of these advertisements, which ran throughout the 1990s to the present in such publications as the English-language Muslim World League Journal (an Islamic periodical distributed widely throughout the United States), account numbers appeared for Faisal Islamic Bank and the Islamic Investment Company of the Gulf.

124.     During the time period that Faisal Islamic Bank provided the foregoing support and services to MWL and IIRO, the involvement of those ostensible charities in the sponsorship of al Qaeda was well known in the Arab and Muslim communities. Indeed, between 1992 and 2001, numerous media reports and statements by government officials implicated the MWL and IIRO in al Qaeda

Page 29

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\P_DMI- More Definite Statement - AL BAraka_b.doc

activities, plots and attacks in Pakistan, Afghanistan, Egypt, India, Kenya, Tanzania, the Philippines and elsewhere.

125.    DMI and its affiliated and subsidiary companies were necessarily aware of the reports and investigations implicating prominent Islamic charities, including IIRO and MWL, in the sponsorship of al Qaeda. In fact, in order to comply with its obligations under *Sharia*, DMI's Religious Board was required to carefully investigate and screen the "charities" selected to receive *Zakat* and *Haraam* contributions from the DMI companies, to ensure that those "charities" were using donated funds for purposes authorized by the Quran. As a result, DMI Trust knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

126.    Despite the actual knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of *Zakat* and *Haraam* contributions on their own behalf and on behalf of their investors, depositors and account holders. Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

127.    For instance, as early as 1992, DMI, its affiliates, agents or predecessors in interest knew or had to know that Osama Bin Laden and al Qaeda were directly collaborating with the International Islamic Relief Organization as part of the Bin Laden Organization's recruitment and training efforts which were crucial to the expansion of al Qaeda. In late 1992, a major Egyptian daily, *Rose Al Yusuf*, reported that the IIRO and Bin Laden Organization in Egypt recruited and sponsored more than 700 Arab operatives to travel to Afghanistan to train as jihadist terrorists. It was also widely reported in the international media that the Cairo office of the IIRO was managed by the Bin Laden family and Mohamad Showki Al Istanbul, who was sentenced to death in Egypt for his Islamic extremist activities. The IIRO was shut down by Egyptian authorities later in 1993 or early 1994 as a result of the charity's links to Osama Bin Laden.

128.    With operations in Egypt, DMI knew or had to know that the Muslim World League office in Cairo was also managed by Osama Bin Laden. Along with the IIRO Cairo offices, the MWL served as a direct recruitment and transit facility for jihadists on their way to Afghanistan. As a May 1993 *Rose Al Yusuf* article describes:

> Working with Palestinian Islamist Shaykh Abdallah Azzam, Bin-Ladin set up the 'Jihad and Relief" guesthouse in Peshawar to receive volunteers who would arrive after a short stop in the al-Ansar guesthouse in Jeddah. The route of this process passed through the unlicensed Cairo office

Page 30

of the Islamic World League [MWL], directed by Dr. Abdallah Umar Nasif.

129.     DMI knew or had to know that the Muslim World League was directly funding and materially supporting al Qaeda. Plaintiffs' Third Amended Complaint describes the pre-September 11th testimony of a high level al Qaeda operative, Mohammed Bayazid, who described how Osama Bin Laden's brother-in-law, convicted terrorist and IIRO employee, Jamal Khalifa, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda to recruit, train and equip al Qaeda terrorists.

130.     DMI knew or had to know that al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. DMI also knew or had to know that al Qaeda was and is the manager and recipient of millions of dollars from charities which DMI supported financially. As such, DMI aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists and international terrorist activities.

131.     Despite the actual and/or implied knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of Zakat and Haraam contributions on their own behalf and on behalf of their investors, depositors and account holders. Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

132.     As a result of its obligation to inquire and its access to information about its investors and depositors, DMI knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and account holders, to certain charities, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

**United States Contacts and Jurisdiction**

133.     DMI sought and seeks depositors from the general public throughout the world. It also sought and seeks capital from its shareholders. DMI makes its money from investing its depositors' money and from investing its own and others' capital. DMI, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

134.     In its quest to seek world wide participation, DMI advertises in the United States. A full page advertisement was published in the Wall Street Journal in 1981 announcing the "Foundation of Dar Al Maal Al Islami With a Capital of 1000 Million Dollars." In its 'Covenant and Call to Ummat Al Islam,' DMI executed a declaration that included the following statement:

Page 31

> The Founders observe with dismay the pernicious temptation Afforded to Muslims by the all pervasive influence of the Riba-dominated financial structure established in Ummat Al-Islam in imitation of institutions alien to it, and the Founders will join in a Holy Struggle for the sake of Allah, exalted be his Name, to eliminate Riba from Ummat Al-Islam since Riba as defined by the Glorious *Sharia* is banned by Allah.[33]

135. By advertising in a major United States publication with nationwide circulation and soliciting business from American consumers in support of a "holy struggle" in the slightly veiled language of jihad, DMI illustrates that it has purposefully directed its material support for Islamic extremist activities at the United States for more than two decades.

136. On November 27, 1984, Faisal Islamic Bank (Egypt), Faisal Islamic Bank (Sudan) and Dar Al-Maal Al Islami (DMI) ran an ad in the *New York Times* stating that they would be unable to attend a Conference on Islamic Banking and Finance at the Westbury Hotel, New York on December 12, 1984 "due to conflict with DMI's Annual General Meeting in Istanbul. It is therefore evident that the Conference will not have the necessary expertise to represent practices in Islamic Banking."[34]

137. When DMI was established in mid-1981, bank officials told the *Wall Street Journal* that it would be active in:

> Islamic investment, Islamic solidarity, and Islamic banking activities…" in Moslem nations and *in the U.S.* and Europe. It added that "Islamic banks capitalized by an organization of the standing of DMI will have a greater capacity to attract deposits from the public and governments." DMI said it is fixing its capitalization at $1 billion because it "will compete with well established and well-capitalized" Western financial institutions."[35] (emphasis added).

138. In addition, DMI has published various advertisements in U.S. magazines and journals distributed by various Saudi-based charities. In one such advertisement in the Journal of the Muslim World League, there is a picture of the DMI building in Switzerland with a notation which reads "the group benefits from an extensive network with a strong foothold with the major international Islamic centers. Its subsidiaries -- banks, insurance and investment companies -- are

---

[33] Dar Al-Maal Al-Islami, Advertisement, *Wall Street Journal*, June 12, 1981, p. 28.

[34] Dar Al-Maal Al-Islami and Faisal Bank Advertisement, New York Times, November 27, 1984, p. D21.

[35] "Islamic-Style Bank and Investment Group Is Formed with Capital Set at $1 Billion," *Wall Street Journal*, June 11, 1981, p. 31.

rooted regionally to respond more rapidly and effectively to client needs. The synergetic relationship between the subsidiaries gives DMI the leading edge."

139.     DMI also has significant business operations in the United States.  DMI's wholly-owned subsidiary, Crescent International Ltd., is a Bermuda registered company owned by Greenlight SA of Switzerland. Both entities are DMI Trust subsidiaries. A 2003 SEC 'Registration Statement' for shareholders of Acclaim Entertainment Inc., states:

> Mel Craw, Manager of DMI Trust, has voting and dispositive
> control over securities held by Crescent International, Ltd.[36]

140.     DMI Trust's 2001 Annual Report states that Greenlight (Switzerland) S.A. and Crescent International Ltd are 100 percent DMI Trust-owned "principal subsidiaries."[37]

141.     DMI, Crescent International, Ltd., and Greenlight SA have overlapping business managers and addresses. In Crescent International Ltd.'s SEC filings, Crescent International, Greenlight (Switzerland) SA, and DMI SA Services use the same business address in Geneva Switzerland:

> *Crescent International Ltd. January 2, 1999 SEC Filing*
> Melvyn Craw
> Crescent International Limited
> c/o Greenlight (Switzerland) SA
> 84, Av Louis-Casai, P.O. Box 42
> 1216 Geneva, Cointrin, Switzerland[38]
>
> *Crescent International Ltd. February 10, 2004 SEC Filing*
>
> c/o Greenlight (Switzerland) SA
> 84 AVE LOUIS CASAI, 1216
> COINTRIN/GENEVA Switzerland[39]

142.     DMI Trust uses the same business address as DMI Administrative Services S.A., Greenlight (Switzerland) SA, and Crescent International, Ltd.:

---

[36] Securities and Exchange Commission, Amendment No. 1 to Form S-3 Registration Statement Under the Securities Act of 1933, Acclaim Entertainment, Inc. August 22, 2003, p. 21.

[37] Dar Al-Maal Al-Islami Trust, Annual Report 2001, p. 35.

[38] Crescent International Ltd SEC Filing, Acquisition of Infocure Corp. Stock, Schedule 13D, Amdt. No.1, January 2, 1999.

[39] Crescent International Ltd SEC Filing, Acquisition of Franklin Wireless Corp. Stock, February 10, 2004.

Page 33

*www.dmitrust.com has the following under contact information:*
Daar Al-Maal Al-Islami Trust
Contact:
c/o DMI Administrative Services S.A.
84, Avenue Louis-Casai, P.O. Box 161
1216 Cointrin-Geneva Switzerland

143.     The 1999 SEC report lists a U.S. contact for Crescent International/DMI as:

COPY TO:
Sara P. Hanks, Esq.
Rogers & Wells
200 Park Avenue
New York, NY 10166
Tel: 212-878-8000

144.     In June 2003, Crescent International Ltd. owned 1.2%, or 1.4 million shares of Acclaim Entertainment Inc. prior to Acclaim's stock offering.[40] An April 1, 2004 stock sale Prospectus for Sun Healthcare Group, Inc., lists Crescent International Ltd. as owner of 35,000 shares of Sun Healthcare Group being offered for sale on the NASDAQ exchange. The report states:

Mel Craw and Maxi Brezzi, in their capacity as managers of Green Light (Switzerland) SA, the investment adviser to Crescent International Ltd., have voting control and investment discretion over the shares owned by Crescent International Ltd. Messrs. Craw and Brezzi disclaim beneficial ownership of such shares.[41]

145.     Since 2000, International FiberCom, Inc., (IFC) a Phoenix-based telecommunications service provider has borrowed at least $14 million from Crescent International. Crescent owns more than 2 million FiberCore shares. On June 22, 2001, IFC announced:

The completion of the private placement of $10 million in Series D Convertible Preferred Stock to Crescent International Ltd., an investment company managed by GreenLight (Switzerland) SA, and warrants exercisable to purchase 509, 554 shares of common

---

[40] Dar Al-Maal Al-Islami Trust, Annual Report 2001.

[41] Sun Healthcare Group, Inc., Form 424B3, Prospectus, File No. 333-113710, Securities and Exchange

Commission, April 1, 2004.

Page 34

stock at a price of $5.89 for a five year term…Crescent also agreed to purchase up to $10 million of common stock of the company in increments of between $200,000 and $2.5 million at the discretion of the company during the 18-month commitment period.[42]

146.    In June 2002, Dauphin Technology announced that 6.6 million shares of common stock: "may be acquired by Crescent International Ltd." In September 2001, Dauphin entered into a $10 million securities purchase agreement that "allows Dauphin to sell Crescent Crescent up to $7.5 mission in stock until September 27, 2003."[43]

147.    As of October 2001, DMI Trust had invested at least $200 million in the International Development Bank Infrastructure Fund L.P.[44]  DMI committed "$100 million for equity and an additional $100 million for complementary finance facility purposes."[45] The fund "seeks to work with governments, international project sponsors and local companies in investing in infrastructure projects in Islamic Development Bank member countries."[46]

148.    The fund was launched and is "managed" by Washington, DC based Emerging Markets Partnership (EMP). The private equity firm expects to raise $1 billion for the initiative. It is believed to be the first private investment vehicle for private-sector infrastructure projects in the Islamic world. EMP set up offices for the fund in Bahrain to "handle fund-raising efforts." [47]

149.    In addition, DMI became a 35% partner in Boston Capital, a Massachusetts based real estate financing firm with "holdings in 48 states and the U.S. Virgin Islands."[48]

150.    The CEO of DMI stated in an interview with the Gulf Daily news that the DMI group has "substantially increased" its investments in the United States after September 11, 2001.[49]

---

[42] "International FiberCom Amends Credit Facility," *The Phoenix Business Journal,* June 22, 2001.

[43] "Dauphin Technology Registers Stock," Tampa Bay Business Journal, June 26, 2002.

[44] Otis Bilodeau, "Private Equity True Believers," *The Daily Deal*, October 23, 2001.

[45] Asia Private Equity Review, August 1, 2003.

[46] Emerging Market Partnership Web site: http://www.empwdc.com/EMPIDBFund.htm.

[47] *Daily Deal*, October 23, 2001; "Jeddah-Based IDB Launches a Fund," *Wall Street Journal Europe*, October 8, 1998.

[48] Boston Capital Web site: https://www.bostoncapital.com/aboutIndex.html.

[49] Islamic Banks Victimized by Western Media," Gulf Daily News, (November 12, 2001).

Page 35

151.     DMI has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts.  Moreover, DMI has purposefully availed itself of the jurisdiction of the United States because it has directed its activities at the United States. DMI has financially and materially supported al Qaeda, Wael Jelaidan, Yassin Al Kadi and other al Qaeda members that call for holy war or jihad against the United States. Moreover, DMI's supervising board members and religious board members have publicly called for jihad against the United States.

152.     As the foregoing demonstrates, DMI thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of DMI 's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

153.     Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.


Date:  September 30, 2005



LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.



BY:_____
        GINA M. MAC NEILL, ESQUIRE (GM 0581)
        JERRY S. GOLDMAN, ESQUIRE (JG 8445)
        FREDERICK J. SALEK, ESQUIRE (FS 8565)
        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

## PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT SHAHIR ABDULARAOOF BATTERJEE

1.  The name of the defendant to whom this Statement pertains is Shahir Abdularaoof Batterjee.  The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**Q**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Shahir Abdularaoof Batterjee conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself.  Shahir Abdularaoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Shahir Abdularaoof Batterjee conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Shahir Abdularaoof Batterjee, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Shahir Abdularaoof Batterjee fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Shahir Abdularaoof Batterjee, and illegal activity to generate material support to continue its terrorist operations.

c. Shahir Abdularaoof Batterjee was not an employee, officer or director of the Enterprise, based upon present information available. Shahir Abdularaoof Batterjee is associated with the alleged Enterprise. Shahir Abdularaoof Batterjee is a member of the Enterprise, and is separate and distinct from the Enterprise. Shahir Abdularaoof Batterjee intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Shahir Abdularaoof Batterjee is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Shahir Abdularaoof Batterjee funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Shahir Abdularaoof Batterjee, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Shahir Abdularaoof Batterjee acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Shahir Abdularaoof Batterjee, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Shahir Abdularaoof Batterjee, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Shahir Abdularaoof Batterjee, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and

helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Shahir Abdularaoof Batterjee. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Shahir Abdularaoof Batterjee. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Shahir Abdularaoof Batterjee. Shahir Abdularaoof Batterjee, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Shahir Abdularaoof Batterjee conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Shahir Abdularaoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Shahir Abdularaoof Batterjee also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Shahir Abdularoof Batterjee are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Shahir Abdularoof Batterjee has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Shahir Abdularoof Batterjee conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Shahir Abdularoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

**Batterjee and Triple-B Trading**

21. Defendant Triple-B Trading GmbH,[1] of Rethwisch, Germany ("Triple-B"), is owned by Defendant Abdul-Matin Tatari, who also owns the Hamburg, Germany,

---

[1] Specific misconduct regarding Triple-B Trading GmbH ("Triple-B"), a co-defendant herein, is provided via More Definite Statement Applicable to Triple-B Trading GmbH. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Triple-B, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

firm Tatex Trading GmbH, together with other major shareholders Defendants Mazin M.H. Bahareth and Batterjee, and Hassan Bahtzallah. All of these wealthy Saudis are linked to Defendant Enaam Mahmoud Arnaout, a co-defendant in this action.

22. Shahir Batterjee is listed also as an owner of Triple-B.

23. Defendant Arnaout, a co-defendant in this case, the Chief Executive Officer of Defendant Benevolence International Foundation ("BIF"), a co-defendant in this case, was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds.

24. The two other owners of Triple-B Trading are Mazin Mohammed Bahareth, a co-defendant in this action, listed as Benevolence International Foundation's, a co-defendant in this case, treasurer, and a top executive of the Bahareth Organization, a Saudi construction conglomerate and Hassan Bahfzallah, a co-defendant in this action, who oversaw BIF's Saudi Arabia operations in the early 1990's and is listed as an official in three northern Virginia charities that were raided in March 2002 by federal agents probing alleged ties to al Qaida.

25. Abdul Matin Tatari[2] is listed as Triple-B's managing director.

26. Corporate records show that Batterjee family's holdings in the Middle East and Europe are vast and highly diversified, reporting annual sales well into the hundreds of millions of dollars from real estate, computers, supermarkets, hospitals, health-care products, pharmaceuticals, medical equipment, hotels and even an ice cream factory.  By contrast, the family's German outpost, Triple-B Trading, consists of one employee (Adbul Matin Tatari) and about $25,000 in capital, according to records on file in the neighboring state of Schleswig_Holstein, where Triple-B was incorporated in 1995 as an exporter of food, clothing and industrial equipment.

**Batterjee and Tatari**

27.  Abdul Matin Tatari told the *Chicago Tribune*  in November 2002 that he has known Shahir Batterjee for 15 to 16 years.

28. Defendant Triple-B has hired a number of persons associated with the September 11th hijackers. Hijacker Mohammed Atta was employed by Defendant Tatari for a period of time. Defendant Tatari is a member of the Syrian Brotherhood.

---

[2] Specific misconduct regarding Abdul Matin Tatari ("Tatari"), a co-defendant herein, is provided via More Definite Statement Applicable to Abdul Matin Tatari.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatari, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 9

29. Tatari said that he met Batterjee through Batterjee's father, Abdularaouf Ibrahim Batterjee, who heads a large Saudi company that imports medical equipment, and his uncle, Mohammed Ibrahim Batterjee, whose enterprises include Jeddah's Jumbo Ice Cream Factory.  He has known both elder Batterjee's since 1983.

30. Tatari acknowledged numerous business transactions between Tatex,[3] a co-defendant in this case, and the Batterjee family, including the sale to Mohammed Ibrahim Batterjee of a summer home near Rethwisch and 17 trucks to be used as "ice cream cars."

31. Batterjee visits Tatari three or four times a year on buying trips for German textiles that are exported to Saudi Arabia and used to make women's underwear for sale in the family's garment shops.

32. Tatari also told the *Tribune* that he buys textiles through Tatex and then sells them to Batterjee for a 10% commission, instead of using Triple-B partnership for mutual purchase/sale.

**Batterjee and Benevolence International Foundation ("BIF")**

33. Shahir Batterjee is the scion of a wealthy Saudi family who was an officer and director of Benevolence International Foundation ("BIF"), a co-defendant in this action, when it was established in Palos Hills, Illinois,  office nearly a decade ago.

34. According to the Illinois Secretary of State, Batterjee and Adel Batterjee and Mazen Bahareth were listed as the foundation's incorporators and directors.

35. The Benevolence International Foundation (a/k/a Al Bir al DaWalia) (or "BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes.

36. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992.  BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingushetia.

37. It was originally founded in the 1980's by a wealthy Saudi Arabian national named Adel Abdul Jalil Batterjee, who was an associate of Osama bin Laden.  Adel Abdul Jalil Batterjee later transferred control of the organization to the

---

[3]  Specific misconduct regarding Tatex Trading GmbH ("Tatex"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatex Trading GmbH.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatex,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 10

current Chief Executive Officer Enaam M. Arnaout (or "Arnaout"), a co-defendant in this case.

38. Within the United States, BIF's operations within the United States were headquartered in Illinois and run by senior al Qaida lieutenants Enaam Arnaout and Mohammed Laoy Bayazid, both founding members of the al Qaida movement. In the New York area, BIF was represented by Saffet Abid Catovich, a prominent leader of radical Islamic elements in Bosnia-Herzegovina.

39. Defendant Enaam Arnaout has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring al Qaida through diversion of charitable funds to sponsor al Qaida.

40. Additionally, Al Qaida members have held positions with BIF and this charity is one of the organizations utilized by al Qaida.

41. On December 16, 1994, Mohamad Jamal Khalifa, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Mohamad Jamal Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation (or "BIC") and the International Islamic Relief Organization (or "IIRO").[4] At the time of his travel, Mohamad Jamal Khalifa had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with Mohamad Jamal Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Mohamad Jamal Khalifa was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Mohamad Jamal Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money.

42. Mohamad Jamal Khalifa, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa.

43. Financial records obtained from Citibank indicate that in the four month period

---

[4] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

44. A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements: "Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands - Steeds of war projects."

45. The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

46. On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country.

47. BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

48. Defendant BIF has been deeply involved in financing, supporting, and facilitating al Qaeda terror operations through provision of money, equipment, and information, and by concealing and fabricating information and evidence concerning same.

49. Defendant BIF's involvement in support and financing for al Qaeda terrorist operations has been disguised as charitable activities.

50. BIF has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

51. BIF is an organization that al Qaida has used for logistical support, including the movement of money to fund international terrorist operations.

52. Enaam Arnaout has a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents.

53. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda have had

contacts with Benevolence International Foundation offices and personnel.

54. Benevolence International Foundation has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. Benevolence International Foundation made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

55. On December 14, 2001, searches were conducted of the offices of Benevolence International Foundation in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, Enaam M. Arnaout, removing materials from each place. According to a government witness, Enaam M. Arnaout was planning in March 2002, to leave for Jeddah, Saudi Arabia.

56. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking Benevolence International Foundation's assets and records, pending further investigation into BIF's ties to terrorists.

57. The Benevolence International Foundation is used by al Qaida for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaida have contacts with the Benevolence International Foundation and its office personnel; and, Benevolence International Foundation has had direct dealings with al Qaida operatives, providing them with military and financial support.

58. In the mid to late 1980s, Defendant Enaam Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

59. Within that same time frame, Defendant Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden. Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

60. Defendant Arnaout and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

61. BIF and Arnaout and co-conspirators used BIF's status as a charity and a tax-

exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

62. Arnaout and BIF co-conspirators kept secret from governments and the general public material facts about Defendant Arnaout's relationship with organizations engaging in violence, including al Qaeda and Osama Bin Laden.

63. BIF and Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities.

64. BIF and Arnaout and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

65. BIF and Arnaout and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaida, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

66. BIF and Arnaout and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

67. BIF and Arnaout engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

68. In or about 1992, Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami.

69. On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

70. In or about November 1995, Arnaout and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen.

71. Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

72. In or about May 1998, BIF and Arnaout facilitated the travel of an influential founding member of the al Qaida network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

73. In the latter part of the 1990's, with Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaida's majlis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

74. Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

75. In or about October 2001, Defendant Arnaout relayed to the BIF founder Adel Batterjee in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government and in particular the fact that Defendant Arnaout had been searched at the airport upon his return to the United States.

76. In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant Arnaout spoke via telephone to Adel Batterjee in Saudi Arabia, and Batterjee requested Defendant Arnaout to relocate with his family to Saudi Arabia.

77. On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country.

78. The documents recovered included documents established direct communication between Enaam Arnaout and Osama bin Laden and others in the late 1980's and

early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

79. Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaida, including:

    a. a chart of an organization involved in military activity headed by Osama Bin Laden;

    b. notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

    c. notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

    d. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

    e. a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

    f. various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

    g. various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

    h. various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

    i. a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons; and,

    j. In or about late 2001 and early 2002, while the BIF Enterprise continued

to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant Arnaout falsely and publicly stated that he did not know Osama Bin Laden personally, that Defendant Arnaout never fought against the Soviet Union, that Defendant Arnaout was never at the al Masada camp.

80. The federal raid of BIF's Illinois office uncovered the following additional documents confirming the scope and extent of BIF's sponsorship of al Qaida's efforts in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade for 300 blankets and 200 pairs of boots obtained from BIF; a receipt from the BiH Army dated June 3, 1994, for 2000 uniforms, 2000 pairs of shoes, and 10 "mass communication stations" donated by BIF to "this military unit;" a request dated December 31, 1994, from the Bosnian military for a combat ambulance, later delivered as promised in January 1995; and, a memorandum to BIF director Enaam Arnaout, dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army.

81. In March 2002, Bosnian police raided BIF's Sarajevo offices.  During the raid, investigators recovered extensive documentation relating to al Qaida's operations from BIF's computer system, including internal al Qaida documents detailing the contributions of various individuals and purported charities to the terrorist organization's development and expansion.  As is discussed in greater detail in the U.S. government's Santiago proffer in the Arnaout prosecution, the computer system housed a file labeled "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  BIF also maintained scanned documents in a voluminous "Tareekh al Musadat" file, detailing the history of al Qaida's Al Masada training camp, as well as an "Al Jabal" file containing daily reports of activities at the Al Jabal camp, operated by the al Qaida affiliated Hizb e Islami. Federal Insurance 99.

82. The documents contained within the aforementioned files confirm the long term and global participation of BIF, MWL, Rabita Trust, and other purported charities in al Qaida's support infrastructure.

83. Within the Tareekh Osama file, investigators also uncovered a document called the "Golden Chain." According to officials of the U.S. government, this document is "a list of people referred to within al Qaida" as wealthy donors to the al Qaida movement.  Among the individuals identified in the Golden Chain as al Qaida's principal sponsors are defendants Suleiman al-Rashid, Abdulkader al Bakri a/k/a Abdel Qader Bakri, Bakr Bin Laden, Youseff Jameel, Ibrahim Muhammad Afandi, Saleh Abdullah Kamel, Suleiman Abdulaziz al Rajhi, Mohammad bin Abdullah al-Jomaih, Abulrahman Hassan Sharbalty, Ahmed Mohamed Naghi, Khalid Bin Mahfouz Adel Faqih a.k.a Abdel Qader Faqeeh, Salahuddin Abduljawad a/k/a Salah al-Din Abdel Jawad, Ahmad Turki Yamani a/k/a Ahmed Zaki Yamani, Abdul Hadi Taher, Ahmad al Harbi Mohammed al-Issai, Hamad al

Hussaini, Mohamed Omar and al Kuwait.

84. On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

85. On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

86. Enaam M. Arnaout conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the mail fraud and wire fraud; in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

87. Enaam M. Arnaout for the purpose of executing a scheme to defraud knowingly caused an envelope containing a donation check in the amount of $1,620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465.

88. Enaam M. Arnaout for the purpose of executing a scheme to defraud, knowingly caused an envelope, containing a donation check in the amount of $1,000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465.

89. Enaam M. Arnaout for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey; in violation of Title 18, United States Code, Sections 1343 and 2..

90. Co-conspirators, aiders and abettors of the Benevolence International Foundation (a/k/a al-Birr al-Dawalia), include Defendants: Benevolence International Foundation – U.S.A. (Main Office), Benevolence International Foundation – U.S.A. (East Coast Office), Benevolence International Foundation – Canada,

Syed Suleman Ahmer, Enaam Mahmoud Arnaout (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Adel Baterjee, Zahir H. Kazmi, Muzaffar Khan, Soliman J. Khudeira, and Jamal Nyrabeh, all located, doing business or registered to do business in the United States.

91. On January 6, 2003, federal prosecutors filed a Santiago proffer in the criminal prosecution of Enaam Arnaout. The evidentiary proffer details at length the pervasive involvement of BIF, and of its executives and employees, in sponsoring al Qaida's global operations, describing the provision of material support and sponsorship to al Qaida as BIF's "core mission."

92. As set forth in greater detail in the Santiago proffer, BIF materially supported al Qaida and al Qaida affiliated militants in Afghanistan, Sudan, Bosnia-Herzegovina, Chechnya and other areas. For a period of more than 15 years, BIF representatives used the cover of their employment with BIF to shield their direct involvement in providing material support to Osama bin Laden, al Qaida, Gulbuddin Hekmatyar and Hezb e Islami. The support provided by BIF included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to al Qaida fighters, and sponsoring al Qaida camps throughout the World.

93. BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor al Qaida's activities.

94. Defendant BIF is tightly connected with WAMY,[5] a co-defendant in this action, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaida network.

95. In 1991, Osama bin Laden decided to relocate al Qaida's leadership structure and principal training camps to the Sudan, under the protection of the ruling National Islamic Front regime. Al Qaida remained in Sudan for a period of five (5) years, during which it worked closely with the National Islamic Front, the Sudanese Intelligence Service, and the Popular Defense Force.

---

[5] Specific misconduct regarding World Assembly of Muslim Youth, ("WAMY"), a co-defendant herein, is provided via More Definite Statement Applicable to World Assembly of Muslim Youth. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

96. When the al Qaida leadership structure relocated to Sudan in 1991, BIF immediately opened an office in the Sudan, to support al Qaida in its new location. BIF's sponsorship of al Qaida in the Sudan mirrored how it had worked with al Qaida in Afghanistan prior to 1991.

97. In 1992 the al Qaida leadership, including Osama bin Laden, made a strategic decision to become deeply involved in the ongoing ethnic conflict in the Balkan region, in order to establish relationships and a base of operations to support future al Qaida attacks in Europe. Towards that objective, al Qaida sent its mujihadeen fighters to Bosnia, to train and fight alongside members of the Bosnian Muslim Army.

98. From the outset, BIF played a pivotal role in al Qaida's efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to al Qaida affiliated fighters in Bosnia. BIF facilitated the movement of hundreds of al Qaida mujihadeen fighters into the region, by falsely representing to authorities that those terrorists would be working as BIF relief workers.

99. Within the Muslim world, BIF made little effort to conceal its support for al Qaida's operations in Bosnia. In its Arabic language fundraising appeals, BIF advertised itself as a "trustworthy hand for the support of [both] the Mujahideen and refugees" in Bosnia. Similarly, documents recovered during a federal raid of BIF's Illinois office in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations in support of Jihad in Bosnia/Herzegovina…contribute with your Mujahideen brothers to repel the Crusader/Zionist attack on Muslim lands."

100.    In conjunction with the March raid of BIF's regional headquarters in Sarajevo, discussed above, Bosnian police detained its manager, Munib Zahiragic, a former intelligence officer affiliated with the Bosnian Foreign Ministry.

101. Zahiragic turned over secret documents regarding al Qaida activities in Bosnia, including transcripts of communications between BIF management and senior commanders of al Qaida based in Afghanistan. The Bosnian officials also discovered firearms, ski masks, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Osama bin Laden during the raid.

102. BIF played an equally important role in the infrastructure supporting al Qaida's activities in Chechnya. Recognizing that the best way to transfer supplies into Chechnya was through Azerbaijan, BIF established a branch office in Baku, Azerbaijan to serve as a conduit for military supplies to al Qaida militants in Chechnya. Al Qaida lieutenant Saif ul Islam al Masri (a/k/a Abu Islam al Masri) served as BIF's charge d'affaires in the Chechen capital of Grazni, at the end of the supply chain. Saif ul Islam was a member of al Qaida's military committee

Page 20

and had graduated from an expert training course in explosives conducted by the Iranian backed Hezbollah terrorist group in Southern Lebanon. Saif also trained Somali Muslim militiamen to shoot down U.S. helicopters during the United Nations' humanitarian mission in the Horn of Africa in the early 1990s. His passport photograph was recovered during a search in 1997 of Kenyan residents suspected of belonging to a local al Qaida cell. During this time period, Saif was in direct contact via telephone from Baku with the Kenyan terrorist cell led by Wadih el Hage, who was responsible for relaying messages between Saif ul Islam in the Caucuses and the military committee of al Qaida in Afghanistan, which included Muhammed Atef and Osama bin Laden.

103. Within Chechnya, BIF provided material support to al Qaida fighters supporting the Chechen mujihadeen in the form of anti-mine boots, an x-ray machine, military uniforms and cash, in direct contravention of governing United Nations resolutions.

104. BIF engaged in extensive efforts to cover the nature of its operations within the United States from the public, going so far as to draft separate mission statements for internal and external purposes. While the external drafts portray BIF as a pure relief agency, the internal documents make clear that BIF's primary mission was the support of jihad and al Qaida mujihadeen.

105. Enaam Arnaout spoke with Munib Zahiragic while he was in the custody of Bosnian officials. During the conversation, Zahiragic advised Arnaout that the Bosnian officials had recovered various documents relating to al Qaida activities in Bosnia. Upon learning of the nature of the materials recovered in the raid, Arnaout ordered Zahiragic to conceal from authorities the involvement of other BIF representatives in the sponsorship of al Qaida activities, including Arnaout's own involvement.

106. BIF's U.S. arm used the U.S. financial system extensively to launder money for al Qaida and support its terrorist operations throughout the world. Between June 2000 and September 2001, members of the al Qaida movement transferred in excess of $1,000,000 via wire from an account at Union Bank at Switzerland to BIF's checking account in the United States. Those funds were co-mingled in BIF's checking account with donations the BIF Enterprise received from other sources and dispersed in large part to BIF offices overseas.

107. BIF substantially understated the amount of funds it received from the Swiss bank account it its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source.

108. Between January 4, 2000 and April 11, 2000, BIF sent 19 wire transfers from its checking account with Citibank to the bank accounts of Jordan Relief Association, MADLEE in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Lavia, to support al Qaida mujihadeen

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

fighters in Chechnya.

109. As the forgoing demonstrates, BIF has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

110. The September 11th Attack was a direct, intended and foreseeable product of BIF's participation in al Qaida's jihadist campaign.

111.      As the foregoing demonstrates, Shahir Abdularaoof Batterjee thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Shahir Abdularaoof Batterjee's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

112.      Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
        GINA M. MAC NEILL, ESQUIRE (GM 0581)
        JERRY S. GOLDMAN, ESQUIRE (JG 8445)
        FREDERICK J. SALEK, ESQUIRE (FS 8565)
        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT ABDUL MATIN TATARI

1. The name of the defendant to whom this Statement pertains is Abdul Matin Tatari ("Tatari"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**R**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.  The predicate acts and statutory authority relating to them include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Tatari conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself. Tatari conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Tatari conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\R_Tatari, Abdul Matin - More Definite Statement - AL BAraka.doc

International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Tatari, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which

Page 3

was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Tatari fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Tatari, and illegal activity to generate material support to continue its terrorist operations.

c. Tatari was not an employee, officer or director of the Enterprise, based upon present information available. Tatari is associated with the alleged Enterprise. Tatari is a member of the Enterprise, and is separate and distinct from the Enterprise. Tatari intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

Page 4

7. The pattern of racketeering activity conducted by Tatari is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Tatari funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Tatari, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Tatari acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

Page 5

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Tatari, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the 'Funds'), including Tatari, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Tatari, of both those goals and the uses to which the Funds were put.

    b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the 'Operatives') and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\R_Tatari, Abdul Matin - More Definite Statement - AL BAraka.doc

would have been possible without the funds supplied by participants and conspirators like Tatari. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Tatari. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Tatari. Tatari, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Tatari conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tatari conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Tatari also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiffs resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the 'reasonably foreseeable victims of a RICO violation' and the 'intended victims of the racketeering enterprise,' (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and

Page 7

loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Tatari are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Tatari has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Tatari conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tatari conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Abdul Matin Tatari is a 60 year old Syrian-born German citizen who is the owner and principal investor in Tatex Trading GmbH,[1] a co-defendant in this case, and Tatari Design ---German textile firms with sales of several million dollars per year.

22. Corporate records show that the registered owner of Tatex is Mohamad Majed Said, a co-defendant in this action, the former head of Syria's General Intelligence Directorate.

---

[1] Specific misconduct regarding Tatex Trading GmbH ("Tatex"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatex Trading GmbH. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatex, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 8

23. German intelligence officials told the *Chicago Tribune* in November 2002 that the Syrian government has identified Tatari as a member of the Muslim Brotherhood.

24. On Tuesday September 10, 2002, German authorities seized documents and financial information from Tatari's two homes and three company warehouses. German intelligence officials has been investigating Tatari, his wife, and two sons since July 2002 on suspicion that the family is using its companies as a front to launder money for terrorist organizations and smuggle Islamic militants into Western Europe.  The Tatari's were briefly detained in September 2002 and are currently living freely in Germany while the government continues its investigation of Tatex and affiliated companies.

25. Investigators are also examining 111 commercial visa requests filed by Tatex from 2000-2002 for "prospective buyers." Investigators suspect that some of the applicants were actually al Qaida operatives or other militants from Syria, Egypt, and Jordan.

26. According to German authorities, several member of the Hamburg cell worked at Tatex during the 1990's.  These individuals include: Mohammed Atta, Zammar (three different stints), and Mamoun Darkanzali, who worked at Tatex briefly around 13 years ago.

27. Tatari's son, Mohammed Hadi Tatari, has admitted to personally knowing several members of the Hamburg cell including Mounir el Motassadeq, Mohammed Atta, and Mohammed Haydar Zammar, the man who investigators believe recruited Atta, Al-Shehhi, Jarrah and others from Hamburg to visit training camps in Afghanistan in November 1999.  He has told authorities that he knew the cell members but had no prior knowledge of their plans or activities.

28. In fact, Mohammed Hadi Tatari, acknowledged knowing Zammar since meeting him in 1971 at the age of 11.

29. Tatari told the *Chicago Tribune* that his son stood as a witness at Motassadeq's wedding and the pair traveled to Denmark in March 2000 for and undisclosed purpose, at a time when hijacking plans were being made in Hamburg.

30. A search of internal German documents revealed that Mohammed Hadi Tatari was a signatory on an application to establish a Muslim prayer room for the 'Islam AG' Muslim student group at the Technical University Hamburg of which several members were also active in the Hamburg cell.

31. Related materials seized from el Motassadeq's apartment include a printed piece of paper with contact information for Tatex, a personal pocket calendar with the phone numbers of Mohammed Hadi Tatari and Tatari's with, Karen Tatari.  It was discovered that el Motassadeq called the Tatari's home phone line (#04822-6812)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\R_Tatari, Abdul Matin - More Definite Statement - AL BAraka.doc

in October 2002.  Also, the documents show that M.H. Zammer called Tatex on October 7, 2001 at 1:18 p.m.

32. As the foregoing demonstrates, Tatari thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Tatari's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

33. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.


Date:  September 29, 2005




LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.



BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT  TRIPLE-B TRADING COMPANY GmbH

1.  The name of the defendant to whom this Statement pertains is Triple-B Trading
Company GmbH ("Triple-B").  The alleged misconduct and basis for liability is
set forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
(SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others.
Plaintiffs will separately file Statements with respect to the misconduct of the
other defendants.  Given the vastly complicated nature of the conspiracy and other
wrongdoing that led to the events of September 11, 2001, however, much
information is unavailable to plaintiffs, and the identities of other wrongdoers
may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
right to amend this Statement as information is learned and verified and after
discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
List ("Victims List").  The victims consist of (1) all spouses, children, parents,
siblings, or heirs of any individual who died at the World Trade Center in New York,
NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
(with the events at the World Trade Center in New York, N.Y., the Pentagon
Building in Arlington County, Virginia, and the airliner crash in Shanksville,
Pennsylvania, on September 11, 2001, and activities related thereto, collectively
referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
(including executors, estate administrators and trustees) entitled to bring legal action
on behalf of any individual who died as the result of terrorist attacks on September
11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
and legal representative of individuals identified by the Attorney General of the
United States or otherwise shown to have perpetrated, aided and abetted, conspired in
regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
Victims List sets forth the names of the decedents killed by the attackers, with the
category of "victims" further including their spouses, children, parents, siblings or
heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**S**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and related statutory authority include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Triple-B conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Triple-B conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Triple-B conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including   Triple-B, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."   Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of

racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Triple-B fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Triple-B, and illegal activity to generate material support to continue its terrorist operations.

c. Triple-B was not an employee, officer or director of the Enterprise, based upon present information available. Triple-B is associated with the alleged Enterprise. Triple-B is a member of the Enterprise, and is separate and distinct from the Enterprise. Triple-B intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Triple-B is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\S_Triple-B - More Definite Statement - Al Baraka.doc

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Triple-B funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Triple-B, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Triple-B acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic

Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Triple-B, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Triple-B, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Triple-B, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Triple-B. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Triple-B. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against

Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Triple-B. Triple-B, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Triple-B conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Triple-B conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Triple-B also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Triple-B are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b), 1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Triple-B has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Triple-B conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Triple-B conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Defendant Triple-B Trading GmbH of Rethwisch, Germany ("Triple-B"), is owned by Defendant Abdul Matin Tatari,[1] who also owns the Hamburg, Germany, firm Tatex Trading GmbH,[2] together with other major shareholders Defendants Mazin M.H. Bahareth, a co-defendant in this action, and Shahir Abdulraoof Batterjee, and Hassan Bahtzallah, a co-defendant in this action. All of these wealthy Saudis are linked to Defendant Enaam Mahmoud Arnaout, a co-defendant in this action.

---

[1] Specific misconduct regarding Abdul Matin Tatari ("Tatari"), a co-defendant herein, is provided via More Definite Statement Applicable to Abdul Matin Tatari.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatari,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Tatex Trading GmbH ("Tatex"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatex Trading GmbH.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatex,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 8

22. Defendant Arnaout, the current Chief Executive Officer of Defendant Benevolence International Foundation ("BIF"), was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds.

23. Defendant Triple-B has hired a number of persons associated with the September 11th hijackers. Hijacker Mohammed Atta was employed by Defendant Tatari for a period of time. Defendant Tatari is a member of the Syrian Brotherhood.

24. Shahir Batterjee[3] is listed also as an owner of Triple-B.

25. The two other owners of Triple-B Trading are Mazin Mohammed Bahareth, listed as Benevolence International Foundation's, a co-defendant in this case, treasurer and a top executive of the Bahareth Organization, a Saudi construction conglomerate and Hassan Bahfzallah, who oversaw BIF's Saudi Arabia operations in the early 1990's and is listed as an official in three northern Virginia charities that were raided in March 2002 by federal agents probing alleged ties to al Qaida.

26. Corporate records show that Batterjee family's holdings in the Middle East and Europe are vast and highly diversified, reporting annual sales wellinto the hundreds of millions of dollars from real estate, computers, supermarkets, hospitals, health-care products, pharmaceuticals, medical equipment, hotels and even an ice cream factory. By contrast, the family's German outpost, Triple-B Trading, consists of one employee (Adbul Matin Tatari) and about $25,000 in capital, according to records on file in the neighboring state of Schleswig_Holstein, where Triple-B was incorporated in 1995 as an exporter of food, clothing and industrial equipment.

27. Defendant Triple-B and its principal shareholders and associates have materially supported, aided, abetted, and financed al Qaida.

28. As the foregoing demonstrates, Triple-B thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Triple-B's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently

---

[3] Specific misconduct regarding Shahir Abdularaouf Batterjee ("Batterjee"), a co-defendant herein, is provided via More Definite Statement Applicable to Batterjee. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Batterjee, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 9

unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 29, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
        GINA M. MAC NEILL, ESQUIRE (GM 0581)
        JERRY S. GOLDMAN, ESQUIRE (JG 8445)
        FREDERICK J. SALEK, ESQUIRE (FS 8565)
        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT AL BARAKA INVESTMENT & DEVELOPMENT CORP. A/K/A AL BARAKA BANK A/K/A DALLAH AL BARAKA GROUP, LLC

1. The name of the defendant to whom this Statement pertains is AL Baraka Investment & Development Corp. a/k/a Al Baraka Bank a/k/a Dallah Al Baraka Group, LLC ("Al Baraka"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**T**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Al Baraka conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Al Baraka conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Al Baraka conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.    The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.    The predicate act is not based upon a criminal conviction.

    e.    Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.    The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.    The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Al Baraka, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.    The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of

racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al Baraka fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Al Baraka, and illegal activity to generate material support to continue its terrorist operations.

   c. Al Baraka was not an employee, officer or director of the Enterprise, based upon present information available. Al Baraka is associated with the alleged Enterprise. Al Baraka is a member of the Enterprise, and is separate and distinct from the Enterprise. Al Baraka intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Al Baraka is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Baraka funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al Baraka, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Al Baraka acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many

books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Al Baraka, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Al Baraka, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Al Baraka, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Al Baraka. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Al Baraka. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits

and trainees, which pool would not have been available to it without the assistance provided by Al Baraka. Al Baraka, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Al Baraka conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al Baraka conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al Baraka also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Al Baraka are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Al Baraka has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al Baraka conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al Baraka conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Al Baraka is a wholly owned subsidiary of Dallah Al Baraka Group ("DABG"), which is based in Jeddah, Saudi Arabia. Al Baraka is the financial arm of DABG Its investments include forty-three (43) subsidiaries which are mainly banks in Arab and Islamic countries. The Chairman of Al Baraka is Saleh Abdullah Kamel ("Kamel"), a co-defendant in this case.[1]

22. Al Baraka has knowingly maintained accounts for many of the alleged charities which operate within the Al Qaida infrastructure. A memo from the Russia Federations Securtiy Service details the role of Al Baraka in funding Al Haramain, another co-defendant in this case.[2] Aqueel al-Aqueel, Al Haramain's

---

[1] Specific misconduct regarding Saleh Abdullah Kamel, a co-defendant herein, was provided via More Definite Statement Applicable to Saleh Abdullah Kamel. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Saleh Abdullah Kamel, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Al Haramain, a co-defendant herein, was provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its via More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 8

chairman, confirmed the use of Al Baraka by Al Haramain by stating that Al Haramain maintained accounts at Al Baraka in Saudi Arabia.

23. Al Baraka facilitates the fundraising efforts by the Enterprise. Al Baraka has advertised and does advertise the existence of and the numerical designations of the accounts it maintains for the alleged charities throughout the Muslim world and provides a mechanism for Al Qaida supporters to deposit funds directly into those accounts. These accounts that are maintained by Al Baraka have been used to transfer funds to support the cells of the Enterprise. For example, it was reported by the Bosnian Intelligence Agency that Al Baraka provided support to Al Haramain. This memorandum was titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina: Records available for 1998 show a flow of money into the so-called operating account of the Humanitarian Organizations at the Deposti Bank, Sarajevo, from the main account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million]."

24. Al Baraka had knowledge that the accounts it maintained were used to fund terrorism and the Enterprise. However, despite this knowledge, Al Baraka continued to maintain the accounts and thereby knowingly provided financial services and other forms of material support to the Enterprise.

25. Al Baraka has provided substantial support to the Enterprise through its subsidiaries and affiliates, which include Tadamon Islamic Bank, Al Shamal Bank and Aqsa Bank.

26. Al Baraka, along with Kamel, is a shareholder of Tadamon Islamic Bank ("Tadamon"). Tadamon is a bank which has long provided financial services and other forms of material support to the Al Qaida.

27. Al Baraka is also an investor in Al Shamal Bank.[3]

28. Saleh Abdullah Kamel ("Kamel") founded Dallah Al Baraka Group ("DABG") in 1969 as a privately held business conglomerate.

---

[3] Al Shamal Bank is the bank which Osama Bin Ladin helped to establish by providing capital in the amount of $50 million. Other defendants, named in the above-referenced actions, such as Faisal Islamic Bank, Youssef M. Nada, Mohammed Al Faisal Al Saud and others, additionally assisted in the establishment of Al Shamal Bank. Other specific misconduct regarding Al Shamal Bank is set forth in the RICO statement applicable to Mohammed Al Faisal Al Saud. Thereby, Plaintiffs hereby incorporate by reference the factual averments and arguments contained in the RICO Statement Applicable to Mohammed al Faisal al Saud which relate to Al Shamal Bank, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

29. Beginning in the late 1970s, Kamel financed and developed DABG and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

30. In 1982, Kamel and DABG began directing tens of millions of dollars in funds to at least 20 non-governmental organizations, including Osama Bin Laden's Mekhtab al Khidmat, the predecessor to al Qaida, which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

31. DABG, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. DABG posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third among Saudi companies in sales.

32. The DABG financial arm is Al Baraka Investment & Development ("ABID"), a wholly owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al Barakaat Bank".

33. These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank and Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, including Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American and Yemen Islamic Bank for Finance & Investment.

34. ABID assets, including funds under management, are valued at $4.4 billion. U.S. assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

35. DABG's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah.

36. DABG has also facilitated jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

37. ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

38. Kamel and DABG materially supported Osama Bin Laden and his al Qaida network of front companies, farms and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

39. Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaida first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal,* the official International Islamic Relief Organization ("IIRO") publication, illustrates how Kamel has carried out his ongoing jihad. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of... Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

40. The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

41. Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaida. In fact, the United States Government has been investigating Kamel for his material support of Al Qaida along with numerous other defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaida, and the assets of other material sponsors have already been frozen by the Department of Treasury.

42. In March 2002, the Bosnian police found several documents and items regarding the history of Al Qaida during searches in the offices of Benevolence International Foundation ("BIF") in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that according to the U.S. government is "a list of people referred to within Al Qaida as the "Golden Chain" or wealthy donors to mujahideen efforts". Among them was Kamel.

43. The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the indictment of Enaam Arnaout, a co-defendant in this action, on October 9, 2002 (02 CR 892).

44. The "Golden Chain" list was introduced and relied on in *United States v. Arnaout,* No. 02 Cr. 892, 2003 WL255226, at *l.2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaida sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists ("SDGT"), a decision not lightly taken by the executive branch of the government.

45. A former member of al Qaida, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaida. Al Fadl is a former al Qaida leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaida terrorist trials.

46. In 1992, Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

47. As part of his ongoing material support for al Qaida and other Islamic militant groups in the Balkans, Kamel visited Bulgaria prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles.

48. In 1998, Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain account at Al Baraka Bank in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from the Al Haramain accounts.

49. The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

50.  Both brothers have, at various times, served on the Shariah Compliance Board of Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

51. The Darul Ulum Madrassa backs jihadi organizations and both the Usmani brothers have provided practical help in setting up jihadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa.

52. Darul Ulum provides support to al Qaida affiliates and SDGT entities Harkatul Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen.

53. Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and al Qaida in their war against the United States.

54. Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in

Houston, Texas. As early as 1984, Kamel held sizeable investments in the United States via his financial interests in DABG.

55. In 1996, DABG owned more than $230 million in assets in the United States and Europe. Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

56. In 2004, as chairman of the General Council of Islamic Banks, Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

57. In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials.

58. Kamel is part owner of London-based Middle East Broadcasting Centre ("MEBC"). In 1992, Saleh Kamel purchased the U.S. media company, United Press International ("UPI"), for $3.9 million through his company MEBC. Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended to invest more than $10 million between 1993-1995 to revive the struggling media company. Kamel owned UPI until 2002 when it was sold to the Unification Church.

59. In 1999, it was announced that Kamel and DABG were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

60. Kamel and DABG sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

61. DABG's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

62. In July 2003, Kamel and DABG announced that they would sue four unnamed Western banks as third party defendants if Kamel and DABG were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, ". . .the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

63. Kamel and DABG are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.,* (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

64. Sanabel al Khair, the North American financial arm of IIRO, was established to receive, invest, and generate funds for the operations of International Relief

Page 13

Organization ("IRO")—the "United States arm" of IIRO.[4] Beginning in about 1991, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain al Qaida fundraiser.

65. Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas provided account numbers to facilitate the contribution of funds. These advertisements ran throughout the 1190s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of DABG.

66. A December 1993 advertisement from the official publication of the IIRO, *Al Igatha Journal,* which was distributed across the United States, illustrates how Kamel carried out his jihad by establishing Al Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaida first started carrying out attacks against the United States. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of ... Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

67. Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Kamel contributed at least $100,000 to the organization through his DABG branch in the U.S. in 1992.

68. Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993, Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

---

[4] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, was provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its via More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

69. In 1992, regarding Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

70. A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier,* describes the likely economic collaboration of Kamel and Al Baraka with Bin Laden:

> "Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

71. In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden,

72. Kamel and Al Baraka were provided with numerous public notices regarding the Sudanese government's support and harboring of international terrorists.

73. When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

> Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

74. Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaida network with military and logistical support through the government of Sudan.

75. During 1991, Kamel, Yassin Al Qadi[5] and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

76. Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

77. "There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

78. Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad ... the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

79. In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaida's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the 'Great Satan.'"

80. Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

---

[5] Specific misconduct regarding Yassin Al Kadi ("Al Kadi"), a co-defendant herein, was provided via More Definite Statement Applicable to Al Kadi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its via More Definite Statement Applicable to Al Kadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

81. In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught... To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

82. The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Kamel and Al Baraka:

> In 1992 and 1993 Mohamed Atef [al Qaida's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

> In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaida, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

> On October 3 and 4, 1993 operatives of Al Qaida participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

> From 1993 members of Al Qaida began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaida, including Atef and Abu Ubaidah al Banshiri.

> Beginning in the latter part of 1993, members of al Qaida in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, a U.S. citizen and admitted member of Al Qaida, surveyed the U.S. Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

83. An Al Baraka annual report from the period describes how Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads....During this time, Osama Bin Laden was overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country.

84. In January 1992, U.S. diplomats warned the government of Sudan to stop harboring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice. They [terrorists] can come and go as they please. They operate here with impunity."

85. The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

86. In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

87. In August 1993, it was widely reported in the English, Arabic, and Sudanese press that the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic fundamentalist terrorist entities.

88. A portion of Kamel's investment revenues in Sudan were annually required to be committed to zakat — the Islamic almsgiving. However, in Sudan, Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

89. In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). . .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.. .mobilization and training of the popular defense forces; and providing for martyrs' families."

90. The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing *5* million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

91. Osama bin Laden warned the West, in the 1993 August edition of *Sudanow* two months before Al Qaida coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops. The attack was carried

out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

92. Osama Bin Laden was using diverted zakat funds, provided by Kamel and other major investors in the Sudanese economy, to recruit and train al Qaida recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

93. In November 1993, the Arab Albanian Islamic Bank ("AAIB") was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), Saudi Dallah Al Baraka Group (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

94. The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, ". . . a secrecy that cannot be maintained in an institution that pretends to be serious."

95. The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

96. On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi in the Arab Albanian Islamic Bank.

97. The Arab Albanian Islamic Bank was subsequently renamed United Albanian Bank. It is believed that Kamel and Al Baraka remain shareholders in the successor entity AAIB.

98. Kamel's Who's Who biography states that he has been a "founding member of Faisal Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Kamel in *The Saudi Gazette* on January 7, 2003.

99. According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions in its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

100.    The Muslim World League[6] Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan."

---

[6] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, was provided via More Definite Statement Applicable to Muslim World League.  Plaintiffs herein
Page 19

101. Faisal Islamic Bank of the Sudan is an associated company of the DM1 Trust. The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DM1 and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

102. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud,[7] stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

103. The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

104. Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaida, and other extremist groups.

105. Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

---

incorporate by reference throughout this document the factual averments and arguments which will be contained within its via More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Specific misconduct regarding Mohammed Al Faisal Al Saud, a co-defendant herein, was provided via a previously filed RICO Statement Applicable to Mohammed Al Faisal Al Saud. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its via previously filed RICO Statement Applicable to Mohammed Al Faisal Al Saud, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC). Plaintiffs note that at the present time the case against Prince Mohammed is dismissed and the factual allegations and averments contained therein do not apply as to Prince Mohammed, at the present time.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

106.  Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic state. Together they encouraged Osama bin Laden to travel to Sudan and to develop his al Qaida terrorist network to train soldiers for jihad.

107.  In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

108.  The Saudi American Bank[8] is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

109.  The Saudi American Bank serves as the bank for DABG. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

110.  Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaida terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaida's and Osama bin Laden's tenure there.

111. Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaida terrorist operations

---

[8]  Specific misconduct regarding Saudi American Bank ("SAB"), a co-defendant herein, was provided via More Definite Statement Applicable to SAB.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its via More Definite Statement Applicable to SAB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaida.

112. In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of Muslim Youth, IIR and al Haramain Foundation.

113. Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co. and Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

114. Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there.

115. Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

116. In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and ABID. According to newly obtained information on al Shamal Islamic Dank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

117. Osama Bin Laden was close to the new regime of Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

118. One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department: "Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

119. The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

120. Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Kamel and ABID. Kamel holds 15% of the bank shares.

121. Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

122. A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaida operatives held bank accounts in al Shamal Islamic Bank under their real names:

> Q: While you were in the Sudan, did you handle money for Osama Bin Laden?
>
> A: Could you repeat the question.
>
> Q: Did you work on the finances for al Qaida while you were in the Sudan?
>
> A: Yes.
>
> Q: Did you know where the bank accounts of Osama Bin Laden and al Qaida were?
>
> A: Yes.
>
> Q: Do you know whose names they were in?
>
> A: The bank account under Usama Bin Laden in Bank Shaml [Al Shamal Islamic Bank], Khartoum.
>
> Q: That was under Osama Bin Laden's true name?
>
> A: Yes.
>
> Q: Were there accounts in other names?
>
> A: Yes. Afad Makkee got account also.
>
> Q: Afad Makkee, the account that he had under his name, do you know what name that is?
>
> A: I remember Madani Sidi al Tayyib.

Page 23

Q: Do you know of any other persons who had al Qaida money in their accounts?

A: Abu Rida al Sun.

Q: Do you know his true name?

A: Nidal.

Q: Anyone else that you knew had al Qaida money in bank accounts in their name?

A: Abu Hajer al Iraqi.

Q: Do you know his true name?

A: Mamdouh Salim.

Q: Did you have any accounts in your name?

A: Shared with Abu Fadhl.

Q: So you had accounts in your name that were shared with Abu Fadhl?

A: Yes.

Q: Do you recall anyone else that had bank accounts in their name for al Qaida?

A: Abdouh al Mukhlafi.

123. Jamal Ahmed Al-Fadl also testified that al Qaida operatives received monthly checks of several hundred dollars from al Shamal Islamic Bank accounts:

Q: When you worked for Osama Bin Laden, in the Sudan, how much were you paid?

A: $1,200 (...) per month.

Q: For how long did you work for him?

A: Almost two years.

Q: What banks did he keep his money at?

A: Bank el Shamar [Al Shamal Islamic Bank].

Q: Any other banks?

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

A: I think he had accounts in different banks, but I only recall Bank Shamar [Al Shamal Islamic Bank].

124. Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al Shamal Islamic Bank to an al Qaida representative in Jordan:

> Q: How did you carry the $100,000?
>
> A: In my bag with my clothes.
>
> Q: Do you recall what kind of bills the $100,000 was in?
>
> A: I remember they all hundred bill.
>
> Q: Sorry?
>
> A: They all hundred bill.
>
> Q: They were all hundred dollar bills?
>
> A: Yes.
>
> Q: Who gave you the money?
>
> A: Abu Fadhl, he bring it from Shamal Bank [Al Shamal Islamic Bank] and he bring it to me.
>
> Q: Abu Fadhl brought it from the Shamal Bank [Al Shamal Islamic Bank]?
>
> A: Yes.

125. During the course of the same trial, another associate of Bin Laden, Essam Al Ridi, testified that the bank was used for operational purposes in stating that "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

126. Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation ("BIF"), was subject to a complaint from the FBI on April 29, 2002. The assets of BIF have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaida.

127. Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

128. Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely know that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

129. Osama Bin Laden was allowed to maintain accounts as an investor in al Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y Februrary 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes."

130. When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Kamel's Al Baraka Bank. This fact indicates that Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaida by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

131. Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency ("TWRA"), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

132. TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

133. During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaida network and operating terrorist training camps for al Qaida and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

134. In a 1994 interview with the Islamist magazine Gazi Husrev Beg, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

135.  In 1977, Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the Financial Strategy of the Muslim Brothers, illustrates that Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

136.  The document describes how Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

> No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

137.  The document states that Kamel and Al Baraka is the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

138.  With the investment support of Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank…"

139.  Swiss authorities have seized a copy of the Financial Strategy of the Muslim Brotherhood containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada, a co-defendant in this action. The same document mentions Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

140.  The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

141.  By becoming majority owners in the International Islamic Bank in Luxemburg, Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics ... is a good instrument to implement many projects which are necessary for the Gamaat and its members ... [and] it is a good instrument to train higher level economic, financial and technical staff, within the framework of the Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

142. Kamel and Al Baraka Bank appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

143. On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaida by President George W. Bush. In announcing the designation of Al-Taqwa as a global terrorist entity, President Bush stated:

> "Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaida shift money around the world. Al Taqwa raises money for Al Qaida. They manage, invest, and distribute those funds. . . They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

144. In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

> "As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada [director of the bank]."

145. The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaida, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

146. Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q: A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that...?
>
> A: Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

147. Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

148. In 1995, it was reported that Kamel and Al Baraka Bank had "major investments" in Bank Al Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

149. In 1997, while Kamel maintained investments at Bank Al-Taqwa, Agence France Presse and the U.S. Department of Treasury reported that terrorist fundraisers were annually transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts. Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

150. Thus, as early as 1995, Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

151. As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

152. Bank Al Taqwa diverted funds from investors' accounts to terrorist entities— but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

153. Thus, Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

154. Along with SDGT Yassin Al Qadi, Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. ("ALINTID") which was established during the early 1990s. The financial institution was reportedly designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

155. Multiple private and government sources have confirmed that Kamel and Yassin Al Qadi turned over the ownership and financial assets of ALINTID to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

156. A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

"Through one of its branch offices, the Al-Haramain transferred large amounts of money to the local Wahhabi center in Dagestan, known as the Islamic center "Kavkaz," in the capital of the

Page 29

republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-Barakaat Bank."

157. A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists*, states the following regarding the international financial structures, involved in funding of Chechen rebels:

> In Saudi Arabia — (...) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al-Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

158. The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman, Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in Saudi Arabia.

159. The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

160. A memo from the FSB details the bank's role in funding Al Haramain:

> "Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

161. FSB had intercepted messages from Saudi-based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

> "The load is ready for sending -- grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles. One thousand rounds of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet-proof) vests have been bought."

162. Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview: "The Saudi Arabian Al-Haramain (...) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

163. The U.S. State Department reported the connections between al Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

> "The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries. According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (...). One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden. In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

164. The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets have been blocked pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

165. Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

166. In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

Page 31

167. Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Kamel and Al Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

168. Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaida was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets — including Americans.

169. The involvement of Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

170. According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, U.S. v. Soliman Biheiri, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

171. In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank.

172. The investigation report of his interview with agent David Kane states the following: "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 ... Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

173. In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were DABG and the Jordan Islamic Bank.

174. Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a statement, Kamel acknowledged that DABG owns another 12 percent.

175. Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

176. According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the U.S. government in December 2001.

177. Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

178. According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

179. Assets of Beit El-Mal, a 20% shareholder, were frozen. The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

180. Saudi national Omar Al Bayoumi, who lived in the United States from the late 1 990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of DAGB.

181. Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their

house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

182. Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, a subsidiary company of Dallah Avco Aviation.

183. During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"-- made it clear that the government wanted al-Bayoumi's contract renewed "as quickly as possible."

184. The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaida.

185. Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaida sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

186. In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

187. The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

188. Al Baraka Bank provided material support to the Spanish al Qaida cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

189. Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaida cell which directly funded and helped coordinate the September 11th hijacker cell. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi.

190. Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaida network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turkish Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

191. Kamel provided material support to the Hamburg al Qaida cell which planned, organized, and carried out the September 11th attacks.

192. Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing.

193. The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

194. Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

195. According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

196. Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable organization founded in 1983 by Kamel and managed by Mohammed Abed al-Yamani.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\T_AL Baraka and Dallah More Definite Statement.doc

197. Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

198. Iqraa International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

199. Iqraa International has a branch in the U.S. registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa international announced, in 2002. annual sales in an amount of $1,200,000.

200. IRS form 990 of the U.S.branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

201. Iqraa International is currently under investigation by Russian Federal Security Services (FSB) for terrorism financing and logistic support.

202. The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

203. Servakh Abid Saad, Director of the Russian office of Iqraa International charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

204. Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Kamel partners. He began his career as manager of the board of DABG. Mohammed Abed al-Yamani became executive board member of DABG and is currently deputy President of DABG.

205. Mohamed Abed al-Yamani, as director of Iqra International, and Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

206. Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

207. In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina,

Page 36

received $4,266,723 from Bakr Bin Laden and Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

208. Muhammad Abed al-Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

209. Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

210. Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by DABG and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with DABG. Iqraa also maintains operations through a local branch of the organization based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-400016.

211. Kamel is the owner of the Iqraa satellite television network. According to Iqraa TV's director, Abdul-Qader Tash, the channel is the "brain child" of Kamel.

212. Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by al Qaida and other transnational terror groups worldwide via the powerful medium of television programming.

213. A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

> The issue is not one person, two, 10 or 100 going out with their guns to support their brothers. Defeating the infidels requires a much greater effort. It requires the mobilization of the nation. How can the nation be mobilized? I believe that the stupid acts of these Jews and Crusaders mobilize the nation. The big explosion will come!

214. Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Kamel's ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

215. Another Kamel-sponsored program on Iqraa TV, Muslim Woman Magazine, explicitly extols the virtues of child violence and hatred against Jews and Christians:

Page 37

"Anchor Doaa Amer: Our report today will be a little different because our guest is a girl, a Muslim girl, but a true Muslim. Allah willing, may our God give us the strength to educate our children the same way, so that the next generation will turn out to be true Muslims who understand that they are Muslims and know who their enemies are. This girl will introduce herself immediately. She is the daughter of my sister in faith and of the artist Wagdi alArabia. Her name is Basmallah.

3½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

'Amer: Basmallah, how old are you?'

Child: Three-and-a-half.

'Amer: Are you a Muslim?

Child: Yes.

'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because…

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child: In the Koran.

Amer: Right, he said that about them in the Koran. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate

Page 38

them now while they are still children so that they will be true Muslims.

216. Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

> "Only our culture understands sacrifice, loyalty and honour. No one in the [western] world sacrifices his life for his homeland. If his homeland is drowning he is the first to jump ship. But in our culture it is different because when a martyr dies, he reaches the height of bliss. When the martyr explodes, he knows that he is not dead. He is simply in transition to another, more beautiful world, because he knows very well that within seconds he will see the light of the Creator."

217. Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

218. In January 2003, Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S. based public relations firm ... designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam."

219. In October 2001, Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were "seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

220. As the foregoing demonstrates, Al Baraka thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Baraka's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

221. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____

     GINA M. MAC NEILL, ESQUIRE (GM 0581)
     JERRY S. GOLDMAN, ESQUIRE (JG 8445)
     FREDERICK J. SALEK, ESQUIRE (FS 8565)
     Attorneys for the Plaintiffs
     111 Broadway, 13th Floor
     New York, N.Y. 10006
     212.242.2232

## PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT RABITA TRUST

1. The name of the defendant to whom this Statement pertains is Rabita Trust. The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**U**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Rabita Trust conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Rabita Trust, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

Page 3

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Rabita Trust fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Rabita Trust, and illegal activity to generate material support to continue its terrorist operations.

c. Rabita Trust was not an employee, officer or director of the Enterprise, based upon present information available. Rabita Trust is associated with the alleged Enterprise. Rabita Trust is a member of the Enterprise, and is separate and distinct from the Enterprise. Rabita Trust intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Rabita Trust is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Rabita Trust funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Rabita Trust, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Rabita Trust acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Rabita Trust, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Rabita Trust, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Rabita Trust, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Rabita Trust. Indeed, the Enterprise would not have been

successful without enthusiastic participation of all of the conspirators, including Rabita Trust. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Rabita Trust. Rabita Trust, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Rabita Trust also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Rabita Trust are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in Plaintiff's Complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Rabita Trust has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. In 1998, Rabita Trust was created, as a charitable organization, in order to organize the repatriation and rehabilitation of stranded Pakistanis (known as Biharis) from Bangladesh.  It was based in Peshawar, Pakistan.  A trust fund was started jointly by the Pakistani government and the Saudi-based charity, Muslim World League ("MWL").[1]  Rabita Trust was mainly funded by MWL, a world-wide Islamic organization heavily funded by the Saudis, which has also been involved with terrorism.

22. Rabita Trust was initially granted 250 million Riyals from the Pakistani government as well as 50 million Riyals from the Muslim World League to help

---

[1] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via More Definite Statement Applicable to MWL.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis.

23. Rabita Trust is a subsidiary body of Muslim World League ("MWL") and a sister organization of International Islamic Relief Organization ("IIRO").[2] Rabita Trust is one of the charities operating within al Qaida's support infrastructure.

24. The Rabita Trust should not be examined in a vacuum but rather as part of a large network of organizations that provide a financial base for Osama Bin Laden and al Qaida. Rabita is a "sister organization" of the International Islamic Relief Organization (or "IIRO"); both are subsidiaries of the Muslim World League (or "MWL"). MWL has numerous connections to al Qaida operatives; indeed, Osama bin Laden's brother-in-law, Jamal Khalifa, opened a Muslim World League office in Pakistan and an IIRO office in the Philippines for the use of al Qaida. The IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

25. Therefore, it is through the actions not only of the Rabita Trust and its employees, but also those of both the MWL and the IIRO, that one can fully ascertain the extent to which the Rabita Trust is one cog in larger Al Qaida financing machine that funds Bin Laden's radical and intolerant agenda under the guise of humanitarian aid.

26. Rabita Trust is an al Qaida front. On October 21, 2001, President George W. Bush designated Rabita Trust as a Specially Designated Global Terrorist Entity by Executive Order #13224. This order effectively froze the assets of Rabita Trust. In October, 2001, the United Kingdom took steps against Rabita Trust to freeze their assets due to their terrorist ties and due to a belief that they committed or posed a significant risk of committing or providing material support for terrorism.

27. On July 8, 2002, United Nations Resolution 1390 banned Rabita Trust by the United Nations ("UN") based upon its ties to terrorism. In fact, the UN ordered that all members of the UN: 1) Freeze any funds and other financial assets or economic resources; 2) Prevent the entry into or the transit through their

---

[2] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

territories; and 3) Prevent the direct or indirect supply, sale and transfer of all arms and related material, spare parts and technical advice, assistance, or training related to military activities.

28. In October 2002, New Zealand named Rabita Trust as a designated terrorist. Rabita Trust has been banned by the UN, the United States, by Canada and by others, based upon their terrorist ties and due to a belief that they committed or posed a significant risk of committing or providing material support for terrorism.

29. In January 2004, the Senate Finance Committee asked the Internal Revenue Service ("IRS") for records on Rabita Trust, along with over two dozen other Muslim charities and organizations, in order to investigate possible links between non-governmental organizations ("NGO") and terrorist financing networks.

30. When one considers the number of top Rabita Trust executives that are actively involved in financing Al Qaida, such as Wael Julaidan, Abdullah al Obaid and Abdullah Omar Naseef,; as well the well established body of evidence against the IIRO and MWL, it is clear that the Rabita Trust's ties to Al Qaida are too widespread and intimate to be coincidental or unintentional.

31. Rabita Trust is headed by Wa'el Hamza Jalaidan who serves on the Board of Trustees on Rabita Trust, who serves as the Director General of Rabita Trust, and who headed MWL in Pakistan.

32. Wa'el Hamza Jalaidan was identified by the United States Treasury as "an associate of Osama bin Laden and several of bin Laden's top lieutenants," and was designated "as a person who supports terror" under Executive Order 13224. The United States and Saudi Arabia jointly took action to freeze his assets.

33. In a Treasury Department Statement press release, it was stated:

> "Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Usama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980's. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Laden lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.
>
> Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts

Page 10

with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar.

In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."

34. According to an authoritative biography of bin Laden and the original members of al Qaida, the head of Rabita Trust, Wa'el Jalaidan, fought alongside Osama bin Laden and championed his cause. Detailing how al Qaida's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s, this account is noted for its accuracy and clarity. The biography, written by a fellow compatriot of bin Laden, noted: One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Jalaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan. These three: Osama bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Jalaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.

35. Wa'el Hamza Jalaidan is often referred to as a co-founder of the al Qaida. In the above statement by bin Laden, he strongly suggests that Jalaidan is a co-founder of the al Qaida.

36. Authorities claim that it was during his time in Peshawar that Jalaidan became involved with the individuals that would eventual evolve into al Qaida, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

37. Accordingly, Jalaidan was labeled as a SDGT on September 6, 2002, by President Bush and his assets were frozen.

38. Julaidan also has extensive links to al Qaida activity in Bosnia Herzogovinia. A BBC report in April 2000 cited a confidential memo sent to UN police forces in

Kosovo titled "Secret: US office only-Release to UNMIK." The document named Rabita Trust/ MWL representative Wa'el Julaidan as an associate of Osama bin Laden and stated that Julaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

39. U.S counterterrorism investigators have discovered a letter under the MWL/IIRO letterhead among numerous al Qaida documents recovered in Bosnia-Herzegovina. The letter, dating from the late 1980's, summarized a meeting held between al Qaida leaders and representatives of Muslim charitable organizations in which the attendees ultimately agreed to launch "attacks" from MWL offices in Pakistan.

40. Rabita Trust is also connected to the SAAR network through two officers: 1) Dr. Abdullah Omar Naseef, and 2) Abdullah al-Obaid. Naseef founded Rabita Trust and currently is the chairman. During the time that Rabita Trust was created, Naseef also served as Secretary General of the Muslim World League. Naseef is an officer at the Makkah al-Mukarramah, Inc. at 555 Grove Street, Herndon, Virginia a non-profit organization.

41. The offices of the SAAR Network were raided by the FBI in March of 2002 because of their extensive ties to Osama Bin Laden and the al Qaida terrorist network.

42. Abdullah al-Obaid. Obaid is president of the MWL, and an officer at Sanabel al-Kheer. He is also the Deputy General Manager at al-Watania Poultry, the largest business of the Al Rajhi family.[3] The Al Rajhi family is known as a large funder of the SAAR network and other NGO's which assisted and aided terrorism.

43. Al-Rajhi and his family have played a central role in financing Osama Bin Laden's terrorist network. They have provided substantial aid to al Qaida through the Co-Defendant Al-Rajhi Banking & Investment Corporation as well the above mentioned SAAR Foundation.

44. Abdullah Omar Naseef (or "Naseef") served as Secretary-General of the Muslim World League during the time he created Defendant Rabita Trust and has attempted to spread Muslim World League offices around the world. Part of his global efforts are found in his involvement in a SAAR Network charity. Naseef is

---

[3] Specific misconduct regarding Sulaiman Abdul Aziz Al Rajhi ("Sulaiman"), the head of the Al Rajhi family and the Al Rajhi businesses, a co-defendant herein, is provided via More Definite Statement Applicable to Sulaiman Abdul Aziz Al Rajhi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sulaiman, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 12

an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization that is under investigation for its ties to al Qaida

45. Rabita Trust is also closely linked to Osama Bin Laden through Mohammed Jamal Khalifa, brother in law of Osama bin Laden and MWL/IIRO employee. As with Julaidan, Khalifa emerged as a facilitator of terrorism during the Soviet/Afghan war. After the Soviet withdrawal, Khalifa used the MWL and the IIRO to aid Al Qaida in its transition from a local insurgency into a global terrorist operation.

46. Khalifa set up an IIRO chapter in the Philippines in Zamboanga City through which al Qaida was able to instigate and fund militant Muslims in the region. More specifically, IIRO helped facilitate the growth of the Moro Islamic Liberation Front (MORO) as well as the Abu Sayyaf Group (ASG), a co-defendant in this action. According to a former ASG member, less than 30% of IIRO's funds went towards legitimate endeavors while the rest was used to buy weapons and equipment for ASG.

47. While in the Philippines, the IIRO provided material assistance to al Qaida's efforts to plan and implement attacks in and against the United States, including the 1993 WTC bombing as well as plots to destroy the Brooklyn Bridge, the Lincoln Tunnels, assassinate the Pope, and blow up 12 American airlines over the Pacific Ocean.

48. Upon his arrest in San Francisco in December 1994, Khalifa was in possession of several incriminating items that link him to WTC bombers Ramzi Yousef and Wali Khan Amin Shah:

> *"he* (Khalifa) *had Wali Khan's beeper number in his phonebook as well as in his electronic organizer. Khalifa also had: (i) an entry for a number in Pakistan which Yousef had called from Manila; (ii) an entry from the cellular telephone of an associate of Wali Khan and Yousef (which Yousef also had in his phonebook) and (iii) an entry for Usama Bin Laden. Khalifa also possessed documents referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that Wali Khan and others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year."*

49. Ramzi Yousef, the al Qaida operative who was the mastermind behind the WTC bombing in 1993, was also in possession of several items indicating that he was in contact with Khalifa:

> "his (Ramzi) phonebook had a listing for Khalifa...Kahn had
> provided him with the business card of Khalifa in case he needed
> help...Yousef had a listing for 'Khalifah' in both his encrypted
> computer file and in his telephone/address book.  The encrypted
> log also contained a Post Office box for Mohammed Khalifah in
> Lebanon. Yousef's encrypted phone book listed the telephone
> number of Khalifa's charity."

50. In addition, Walker states that Omar Abdel Rahman, the leader of an al Qaida
linked terrorist organization named Al Gamaa al Islamia, had in his possession
upon his arrest a "business card for Mohammad Jamal Khalifa."  Rahman was
eventually convicted for conspiring to destroy the Brooklyn Bridge and the
Lincoln Tunnel.

51. The IIRO was also implicated in the 1998 Embassy bombings in Kenyan and
Tanzania. Wadih El-Hage, a former personal secretary to bin Laden , had several
IIRO business cards in his domicile at the time of his arrest in Kenya. The cards
are labeled "Kingdom of Saudi Arabia" below the IIRO's name. Among those
listed on the IIRO business cards are:

- Hussian Ali Al-Ghanam, labeled "the Jubail Area Manager & Africa
Consultant."

- Abdulnassir S. Osman, the "Orgn. Office Executive Manager—Kenya."

- Abdullah Mohammed Al Sagheer, on the "External Projects
Committee."Sagheer's card also displays "Muslim World League above
IIRO's name.

52. El-Hage's IIRO business cards were in distinguished company, as El-Hage's
domicile also contained business cards for several other charities that have strong
ties with al Qaida. El-Hage had contact information and business cards for the
Benevolence International Foundation, a Saudi charity that the U.S. government
believes to have direct ties to al Qaida. Also in his possession were business cards
from Al-Haramain,[4] a Saudi charity of which the U.S. designated two of its
branches terrorist entities. In addition, El- Hage had business cards for Help
African People and the above mentioned Mercy International—both of whom
were directly involved in financing the bombings in East Africa. Shortly after the
bombings, the Kenyan government cancelled the registration of Mercy

---

[4] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via More
Definite Statement Applicable to Al Haramain.  Plaintiffs herein incorporate by reference
throughout this document the factual averments and arguments which are contained within its
More Definite Statement Applicable to Al Haramain,  relating to *Estate of John P. O'Neill, et al.
v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL
BAraka.doc

International, Al-Haramain, Help African People, the Muslim World League (IIRO) and the Abdul Aziz Al Ibrahim Foundation.

53. On January 7, 1999, a Bangladeshi national by the name of Sayed Abu Nasir, a member of the U.S. designated terrorist group Lashker-e-Taiba. Lashker-e-Taiba that is closely associated with al Qaida, was arrested in India with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S. Plot in India is Foiled in the January 21, 1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO/IRO in Asia.

54. Although it can not be proven that Nasir received orders directly from Al-Gamdin, it is clear that Nasir worked for the IIRO in India and that he attended an IIRO meeting at which Al-Gamdin was also present.

55. One of the most explicit condemnations of the IIRO occurred during a deportation hearing for Mahmoud Jaballah in Canada in 2002.

56. Jaballah worked for the IIRO in Pakistan for three years prior to working as the principal of the Um Al Quara Islamic School in Toronto.

57. In December 2001, Jaballah was deported from Canada as a result of his involvement with al-Jihad, a terrorist outfit that was led by Ayman al-Zawhiri, al Qaida's second in command. More specifically, the Canadian government proved that Jaballah's fingerprints matched those of Mahmoud Said, "an Egyptian member of Al Jihad wanted for document forging, bomb making and other terrorist activities."

58. A French Intelligence report released shortly after 9/11 lists the IIRO as an al Qaida financer and makes specific mention of the IIRO's UK office and its affiliations with Islamic radicals:

> "*The last category of backers that Al Qaeda can count upon for support are welfare organizations. The financial report pointed a finger chiefly at the International Islamic Relief Organization (IIRO), which was also mentioned in the Jordanian intelligence memo.... "IIRO works out of 3 Worchester Street in Oxford in the U.K. It collects money and distributes the funds it raises to Rabita Alam Islami, the Saudi Islamic League [Muslim World League] that operates in 90 countries, including Chechnya and Bosnia, with a 5 billion budget.*"

59. 3 Worchester Street is the same address as the International Development Foundation (IDF), a charity heavily affiliated with Defendant Khaled bin

Page 15

Mahfouz. Mahfouz has ties to al Qaida through the National Commercial Bank,[5] the Pathfinder Group and the Muwafaq Foundation.

60. The IIRO office is in Britain was shut down in 1997 and British authorities concluded that the IIRO did perform legitimate humanitarian operations in England; however, given the connection to Mahfouz and the IDF, IIRO's financial activities in the UK were most likely associated with al Qaida.

61. The Benevolence International Foundation (BIF), a co-defendant in this action, was classified as a Specifically Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002 and its assets were frozen the following winter. The IIRO is tied to BIF's illegal activities through both Khalifa's personal contacts as well as its branch in Canada.

62. BIF's Executive Director in the United States, Enaam Arnaout, a co-defendant in this action, was implicated in 2002 in an FBI affidavit as having "a relationship with Usama bin Laden and many of his key associates dating back more than a decade." The affidavit also maintains that "BIF is an organization that al Qaida has used for logistical support, including the movement of money to fund its operations." Arnaout has been arrested and BIF's assets have been frozen.

63. In his affidavit, Special Agent Walker notes the close connection Khalifa had with senior BIF leadership. Upon his arrival in the United States in 1994, Khalifa was traveling with BIF employee and former Arab-Afghan fighter Mohammad Bayazid. Bayazid is an associate of al Qaida operative Jalaiden. In the East Africa bombing trial, a former member of al Qaida recalled how he once went with Bayazid to receive a cylinder of purported uranium.

64. The Canadian Branch of IIRO retains its own ties to al Qaida. Mohammed Khatib is the Director of IIRO in Canada. The Canadian chapter of BIF was co-founded by Khatib and the above mentioned Arnaout. Khatib became the Executive Director of BIF-Canada while continuing to work as an employee of IIRO and the Muslim World League. After BIF-USA's assets were frozen, BIF-Canada claimed its affiliation with BIF's US branch did not extend beyond their shared name. BIF-Canada, however, solicited donations for BIF-USA, as its website provided a direct link to a pledge form on the site run by BIF's U.S. office. In addition, BIF-USA's website listed BIF-Canada as its sister organization.

65. Therefore, the IIRO was officially linked to BIF's-USA office through its head officer in Canada as well as through Khalifa's own personal contacts.

---

[5] Specific misconduct regarding National Commercial Bank ("NCB"), a co-defendant herein, is provided via More Definite Statement Applicable to NCB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

66. No one element, no one accusation of funding is taken as being determinative of the assessment that the Rabita Trust has been providing support to terrorists through its actions. Rather, when considering the number of sources, number activities and length of time, the totality of evidence provides reason to believe that Rabita Trust, in cooperation with the IIRO, the MWL, and the SAAR Foundation, has knowingly funded an Al Qaida.

67. As the foregoing demonstrates, Rabita Trust thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Rabita Trust's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

68. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT SAUDI AMERICAN BANK

1. The name of the defendant to whom this Statement pertains is Saudi American Bank ("SAB"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**V**

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

   a. The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, SAB conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including SAB, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. SAB fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including SAB, and illegal activity to generate material support to continue its terrorist operations.

c. SAB was not an employee, officer or director of the Enterprise, based upon present information available. SAB is associated with the alleged Enterprise. SAB is a member of the Enterprise, and is separate and distinct from the Enterprise. SAB intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by SAB is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by SAB funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by SAB, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. SAB acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

Page 5

a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including SAB, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including SAB, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of SAB, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like SAB.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including SAB.  In order to identify nineteen individuals willing, able and

Page 6

competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by SAB.  SAB, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. SAB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

Page 7

17. The Federal Causes of Action Against SAB are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. SAB has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. SAB is a financial institution headquartered in Riyadh, Saudi Arabia, with offices in New York. The Saudi American Bank was established by royal decree on February 12, 1980, to assume the banking functions of Citibank's branches in the Kingdom of Saudi Arabia.

22. In the new formation 44.5% of the equity was sold for cash to 60 founders, including the original Saudi members of the Board of Directors. The remaining 40% of the equity was acquired by Citibank in exchange for their assets in the Kingdom.

23. Simultaneously Citibank entered into Technical Management Agreement (TMA) under which it agreed to manage the new bank for 8 years. This agreement provided that Citibank would second staff to the new bank and would provide technical support to the new bank. The TMA was renewed and it finally expired on Oct. 31, 2003.

24. In July 1999 SAMBA merged with United Saudi Bank (the "USB") to create one of the largest and the most profitable banks in the Middle East. USB itself was the product of a merger in 1997 between United Saudi Commercial Bank (USCB) and Saudi Cairo Bank (SCB). The USCB was founded in 1982 after a merge of 3

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

branches of foreign banks (United Bank of Pakistan, Bank Melli Iran and Banque du Liban d'Outre Mer).

25. According to the SAB Annual Report 2003, on Oct. 31, 2003, when the TMA expired, SAB moved to full local management, culminating a transition plan previously agreed with Citibank. From the following day Citibank ceased to be involved in the management of SAB.  The report describes that "the most critical transition issue was retaining the selected Citibank seconded staff... that we successfully achieved ..."

26. Prior to the expiration of the TMA, Citibank's stake in SAB was gradually reduced. Once in late 1991 they sold a 10% stake to two Saudi national agencies for social welfare and then sold additional shares in 1999 following the merger with Saudi United Bank. In 1999 Citibank holdings in the merged SAB remained 22.83%.

27. According to a Reuter's newswire, in October 2002 Citibank sold 2.83% of SAB to a Saudi Pension Fund for US$230 million.

28. Citigroup announced (May 27, 2004) that it planned to sell its remaining 20% stake in SAB Financial Group, ending its presence in the country after nearly 50 years. Citigroup said it was selling the stake to a Saudi state entity, the Public Investment Fund, and would record an aftertax gain of $760 million when it released second quarter earnings.

29. In addition to operating under the guidance of a corporation based in the United States, SAB had a U.S. office in 1996:

> Saudi American Bank
> 666 Fifth Avenue, 7th Floor
> New York, NY 10103(212) 307-8274
> (212) 307-8310 [fax]

30. SAB has been a member of the U.S. – Saudi Arabian Business Council, a coalition of corporations developed to promote business relations between the two countries, since 1997.  The headquarters of this group is located in Washington, D.C.

31. SAB is the main banker of the Arab Cement Company which is owned by the Al Rajhi Group and the Saudi Bin Ladin Group, two groups which have had ties to supporting Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Arab Cement Company

is managed by such Saudis as Khalid bin Salim Bin Mahfouz[1] and Mohammed Bin Laden.

32. Additionally, Khalid bin Salim bin Mahfouz maintained a bank account at SAB. This fact was realized when the United States Treasury Department sent a team of investigators to Saudi Arabia to track down prominent individuals allegedly associated with terrorist funding. Around September, 2003, SAB closed the account and returned his money.

33. It has been widely reported that Khalid bin Salim bin Mahfouz, a co-defendant herein, provided material support to Osama bin Laden and Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by providing millions of dollars to them.

34. Specifically, Khalid bin Salim bin Mahfouz, as the Chief Operating Officer of the Bank of Credit and Commerce International (BCCI), was implicated in supporting terrorism and fraud. Also, in Spain, he provided money through his bank. The National Commercial Bank ("NCB")[2] to Al Qaida operators. He is also the brother-in-law of Osama Bin Laden. He has been known to set up various charities organizations around the world since 1991, which have been linked to the Al Qaida and involved in the financing of Osama Bin Laden.

35. The 1992 US Senate Report on the BCCI Affair linked the bank to financial funding of the Afghan war.

> "(…) BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (…).This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%."

---

[1] Specific misconduct regarding Khalid Bin Mahfouz. ("Mahfouz"), a co-defendant herein, will be provided via More Definite Statement Applicable to Mahfouz. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Mahfouz, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

[2] Specific misconduct regarding National Commercial Bank. ("NCB"), a co-defendant herein, will be provided via More Definite Statement Applicable to NCB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

36. Under Khalid Bin Mahfouz, the BCCI was also implicated in supporting terrorism, as reported by the US Senate.

> *"In the course of targeting BCCI for laundering drug money, the CIA learned ofBCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization."*

37. The Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

> *"BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.*

38. In 1986, KBM became President and CEO of Defendant National Commercial Bank (NCB) and its principal shareholder with control over more than 50% of the bank's capital.

39. According to several testimonies, the NCB was operating during those years as a "financial conduit" for Osama Bin Laden operations as recalled by former CIA Chief of Counter-terrorism Vincent Cannistraro during a Congress Hearing in October 2001.

> *"How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism."*

40. A bank audit conducted in 1998 revealed that over a 10 year period $74 million was funneled by NCB's Zakat Committee to the International Islamic Relief Organization (IIRO),[3] headed by Osama Bin Laden's brother-in-law. The charity happened to be a major contributor to Osama Bin Laden's operations:

> *"Bin Laden used his personal fortune and continuing contributions from wealthy Islamic businessmen in Saudi and the Gulf to organize training camps in the Sudan for Islamic activists from every major Islamic country. These contributions, plus revenues from Islamic Charity fronts, such as the International Islamic Relief Organization, headed by Bin Laden's brother-in-law, as well as numerous other charitable fronts, continue to fuel his group today."*

41. The NCB audit report also stated that direct donations were "received through those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief Organization and Muwafaq Foundation".

42. In or about 1998, the NCB opened two "shared accounts" with Al-Rajhi Banking & Investment Corp[4] (Special Joint account #22 and #33) for IIRO as a member of the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), which was founded in 1998 by the Kingdom of Saudi Arabia to funnel donations to Islamic fighters in Kosovo and Chechnya.

43. The bank's audit report shows that:

> *NCB established special relations with the SJRC and maintained two shared accounts with Al-Rajhi Banking & Investment Corp for IIRO and SJRC donations in Kosovo and Chechnya. These special accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998.*

44. In June 1991 the Bin Mahfouz family founded Muwafaq Ltd in the Isle of Man, a tax haven. Its backers were named as a group of Saudi investors from Jeddah. The

---

[3] Specific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, will be provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

[4] Specific misconduct regarding Al Rajhi Bank, a co-defendant herein, will be provided via More Definite Statement Applicable to Sulaiman Abdul Aziz Al Rajhi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to AL Rajhi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

same year, Muwafak Foundation (Blessed Relief) was established in Sudan with Yasin Al-Qadi acting as chairperson.

45. Abdulrahman Bin Khalid Bin Mahfouz, son of KBM, became trustee of the Muwafaq Foundation (Blessed Relief) while serving as member of the board and Vice Chairman of the Executive Management Committee of NCB.

46. Abdulrahman Bin Khalid Bin Mahfouz acknowledged in a recent interview with Forbes Magazine that Muwafaq Foundation was the "brainchild" of his father, "who funded it with as much as $30 million."

47. The assets of Muwaffaq Foundation and those of its Chairman, Yasin Al-Qadi,[5] were frozen on October 12, 2001 by the US Treasury Department pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism. The governments of the United Kingdom, Turkey, Kazakhstan, Albania, Slovenia and Switzerland have also followed suit.

48. The US authorities described Yasin Al-Qadi as a "terrorist" and Muwaffaq Foundation as an organization that "financially supports terrorism" and "funnels money to the al Qaeda terrorist network". A Treasury Department statement added that:

> *Muwafaq is an Al-Qaida front that receives funding from wealthy Saudi businessmen" (…) "Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief.*

49. In an interview with the magazine *al-Watan al-Arabi* in 1996, Osama bin Laden stated that Muwaffaq in Zagreb is one of the humanitarian organizations that he is actively supporting.

50. SAB's Islamic Banking unit was created at the end of 1996. Regarding the body's activities, the SAMBA Web site states:

> *Every product introduced by SAMBA's Islamic Banking Group is carefully evaluated and monitored by our Shariah Supervisory Board. Products originated outside of SAMBA by other institutions undergo the same rigorous evaluation for compliance either by an appropriate Shariah authority or by SAMBA's own Shariah Board.*

---

[5] Specific misconduct regarding Yassin Al Qadi ("Al Qadi"), a co-defendant herein, will be provided via More Definite Statement Applicable to Al Qadi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

> SAMBA's Shariah Supervisory Board issues fatwas for each financing and investment product that belongs to the Islamic Banking Group. Fatwas establish guidelines that must be followed to ensure compliance with Shariah principles. Semi-annual reviews are made to confirm that guidelines are being implemented.

51. The SAMBA Shariah Board is chaired by Justice Mohammed Taqi Usmani, a prominent Pakistani Islamic scholar and Mufti with powerful positions on Shariah Boards and Accounting Standard bodies across the Arab world.

52. Justice Usmani has been a member of the Supreme Court of Pakistan since 1982. Presently, he is Chairman, Shariah Board, Citi Islamic Investment Bank, Bahrain; Chairman, Shariah Board, Amana Investments Ltd, Sri Lanka; Vice-Chairman, Shariah Board, Abu Dhabi Islamic Bank, Abu Dhabi; Member, Shariah Board, Dow Jones Islamic Market Index; Chairman, Shariah Board, Al-Meezan Commercial Bank Ltd; Vice President, Darul-Uloom Karachi; Deputy Chairman/ Permanent Member of Islamic Fiqh Academy, Jeddah; Chairman, Centre for Islamic Economics, Pakistan, since 1991; Chairman, Shariah Council AAOIFI; Chairman, Shariah Board, IslamiQ.com; Chairman, Shariah Board, Saudi American Bank, Jeddah; Chairman, Shariah Board, HSBC, Global Islamic Finance, London; Chairman, Shariah Board, Robert Fleming Oasis Fund, Luxembourg. He was also a member of Shariah Board, Faisal Bank, till recently.

53. Usmani made pro-Taliban mujahideen statements to a gathering of worshippers in Pakistan, we believe in late 2001 or early 2002. English language excerpts and a reporter's description of the speech, from the Pakistani magazine, *Jang*, follows:

> *Mufti Taqi Usmani Sahi urged the Muslim Ummah to help and assist their Afghan Muslim brethren instead of performing Umrah, because the Afghan Mujahideen are defending the existence and identity of the entire Muslim Ummah at large, hence assisting them is an Islamic obligation. Addressing a gathering on Friday, he said that Muslims should daily perform two rakaats Salaatul Haajah and make duaa for the victory of the Talibaan.*
>
> *Justice Mufti Taqi Uthmani has said that at this point in time, helping our Afghan brothers is the most excellent meritorious deed, citing the noble Hadith narrated by Hazrat Abu Hurairah (radiallahu anhu) who reports "When famine and drought becomes widespread amongst Muslims and they are suffering, then assisting them is the most virtuous good deed." Our Afghan brethren are facing a catastrophe. Despite the bombardment and severe winter, they are facing the enemy with great courage. Under the present circumstances, if we cannot participate in the battlefield and fight shoulder to shoulder with the Mujahideen then surely we could*

Page 14

*assist them financially and also participate in this Jihaad.
Therefore, this year, over and above routine donations, we should
assist our Afghan brethren with the monies normally spent on
Umrah trips and other such noble acts. We hope this way that their
good deeds will be accepted.*

*The Imaams should recite Qunoote Naazilah and pray especially
for the success of the Afghan Mujaahideen after every Salaah.
According to the fataawa of the Ulama, the Jihaad of the Taliban
is a true Jihad and it is the duty of every Muslim to participate in it
according to one's means and capacity.*

*Muslims are urged to fulfill this obligation.*

54. Saudi American was one the two banks used by the Spanish al Qaeda cell to
finance its own operations. Mohammed Galeb Zouaydi, an al Qaeda member
prosecuted in Spain for terrorist ties, owned numerous accounts at SAMBA that
showed various suspicious cash deposits.

55. On a letter seized Zouaydi's office in Spain, he described his personal bank status
in Jeddah while he was financing the September 11 attacks from his various
companies. On this document, Zouaydi noted that he had a personal bank account
on the Saudi American Bank, "Jeddah Al Medina Road Branch" with the account
number # 1014452201, to finance his activities in Europe. According to the
Spanish Court, Zouaydi used this account to materially support the terrorism.

56. The Saudi American Bank is the official correspondent of the Al Baraka Bank[6] of
Lebanon, which is based in Beirut and chaired by Saleh Abdullah Kamel.[7]  Saleh
Abdullah Kamel was one of the three founding members of Al Shamal Islamic
Bank.  The Saudi American Bank has maintained a partnership with the Al
Baraka financial system since its inception.

57. The Saudi American Bank serves as the bank for the Dallah al Baraka Group,
LLC ("Dallah Al Baraka") which is chaired by Saleh Abdullah Kamel.  Dallah Al

---

[6] Specific misconduct regarding Al Baraka Investment & Development Corp. ("Al Baraka"), a
co-defendant herein, will be provided via More Definite Statement Applicable to Al Baraka.
Plaintiffs herein incorporate by reference throughout this document the factual averments and
arguments which are contained within its More Definite Statement Applicable to Al Baraka,
relating to *Estate of John P. O'Neill, Sr. et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Specific misconduct regarding Saleh Abdullah Kamel, a co-defendant herein, will be provided
via More Definite Statement Applicable to Saleh Abdullah Kamel.  Plaintiffs herein incorporate
by reference throughout this document the factual averments and arguments which are contained
within its More Definite Statement Applicable to Saleh Abdullah Kamel, relating to *Estate of
John P. O'Neill, Sr. et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Baraka is a diversified conglomerate based in Jeddah, Saudi Arabia. It is involved in various industries, services and financial activities. The group includes twenty-three (23) banks located mostly in Arab and Islamic countries, in addition to several investment and financial companies. Dallah Al Baraka's financial arm if Al Baraka, as a wholly owned subsidiary. Saudi American Bank undertook financial transactions through the United States sanctioned Al Taqwa Bank.

58. SAB is the Riyadh correspondent to Faisal Islaimic Bank.[8] Faisal Islamic Bank is managed by Mohammed Al Faisal Al Saud. Faisal Islamic Bank, along with Mohamed Al Faisal Al Saud, has facilitated Al Qaida terrorist operations.

59. SAB is also the main correspondent in Riyadh for a branch of Al Shamal Bank, a branch of Dar al Mal al Islamic Trust[9] is Nassau, which have been involved in the financing and support of the Al Qaida.

60. In 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia to collect donations to the "heroes of the Al Quds Uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including defendants World Assembly of Muslim Youth ("WAMY"), International Islamic Relief Organization ("IIRO") and Al Haramain Foundation.[10]

61. The effort was managed by the Saudi Committee for the Support of the Intifada Al Quds, says a U.S. government official. The committee is run by Prince Naif Bin Abdul Aziz, the interior minister, an official in the Israel Defense Forces says.

---

[8] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Faisal Islamic Bank, a co-defendant herein, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[9] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Dar al Maal Al Islami Trust, , a co-defendant herein, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[10] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to World Association of Muslim Youth (WAMY), a co-defendant herein, within its More Definite Statement applicable to International Islamic Relief Organization (IIRO), a co-defendant herein, and within its More Definite Statement applicable to Al Haramain, a co-defendant herein, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), filed previously at the United States District Court of the Southern District of the United States, as part of the instant multi-district litigation.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

In October 2000 another royal, Prince Salman Bin Abdul Aziz, governor of Riyadh, encouraged citizens to deposit money in Account 98.

62. By participating in this effort, SAMBA directly and materially supported Hamas, Palestinian Islamic Jihad, and other terrorist groups in that region.

63. For over twenty (20) years, Citigroup has had a 20 percent stake in SAB. It has run the operation under a management contract since 1980. "Forbes" reports the United States bank used SAB to nurture its ties with the Saudi elite and that the relationship runs deep and sometimes loose. Prince Alwaleed bin Alsud, a Saudi prince, is purportedly the fourth-richest man in the world and he owns approximately $9.4 billion in Citigroup stock and a 7% interest in SAB. There are other Saudi royal family members who have significant holdings in both banks.

64. As has been recently reported, much money which was received by Arab Bank was transferred through SAB.

65. In 2000, the Saudi government issued an edict requiring all banks operating in the Kingdom to have charitable accounts to handle donations to the "martyrs" in the Palestinian uprising. Money from the funds, known as Account 98, was paid to the beneficiaries of suicide bombers and to the Hamas to help with the recruitment. SAB was a major conduit for this money. The Saudis refused to cooperate when Citigroup expressed concerns about the cash going to terrorist groups.

66. Some of the Saudi checks to the terrorists were routed through Saudi American Bank.

67. SAB financed many of the projects undertaken by Osama Bin Laden and the Al Qaida in Sudan during the years that the Al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. SAB was the main banker of the Saudi Bin Laden Group and the Mohamed Bin Laden Organization which provided technical assistance on these projects.

68. As the foregoing demonstrates, SAB thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of SAB's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

69. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232


Page 18

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\V_Saudi American Bank - More Definite Statement - AL BAraka.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT  TATEX TRADING GMBHT A/K/A TATEX TRADING GmbH

1.  The name of the defendant to whom this Statement pertains is Tatex Trading
GMBHT a/k/a Tatex Trading GmbH ("Tatex").  The alleged misconduct and
basis for liability is set forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
(SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
Plaintiffs will separately file Statements with respect to the misconduct of the
other defendants.  Given the vastly complicated nature of the conspiracy and other
wrongdoing that led to the events of September 11, 2001, however, much
information is unavailable to plaintiffs, and the identities of other wrongdoers
may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
right to amend this Statement as information is learned and verified and after
discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
List ("Victims List").  The victims consist of (1) all spouses, children, parents,
siblings, or heirs of any individual who died at the World Trade Center in New York,
NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
(with the events at the World Trade Center in New York, N.Y., the Pentagon
Building in Arlington County, Virginia, and the airliner crash in Shanksville,
Pennsylvania, on September 11, 2001, and activities related thereto, collectively
referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
(including executors, estate administrators and trustees) entitled to bring legal action
on behalf of any individual who died as the result of terrorist attacks on September
11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
and legal representative of individuals identified by the Attorney General of the
United States or otherwise shown to have perpetrated, aided and abetted, conspired in
regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
Victims List sets forth the names of the decedents killed by the attackers, with the
category of "victims" further including their spouses, children, parents, siblings or
heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**W**

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\W_Tatex - More Definite Statement - AL BAraka.doc

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a. The predicate acts and related statutes include:

   - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, Tatex conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Tatex conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Tatex conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\W_Tatex - More Definite Statement - AL BAraka.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including  Tatex, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."   Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\W_Tatex - More Definite Statement - AL BAraka.doc

racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Tatex fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Tatex, and illegal activity to generate material support to continue its terrorist operations.

c.   Tatex was not an employee, officer or director of the Enterprise, based upon present information available. Tatex is associated with the alleged Enterprise. Tatex is a member of the Enterprise, and is separate and distinct from the Enterprise. Tatex intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by Tatex is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Tatex funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Tatex, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Tatex acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic

Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Tatex, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Tatex, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Tatex, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Tatex. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Tatex. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews

and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Tatex. Tatex, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Tatex conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tatex conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Tatex also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Tatex are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Tatex has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Tatex conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tatex conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.,* 04-CV-1923(RCC), including all of the allegations and claims contained therein.

21. Defendant Tatex Trading Gmbh, a Hamburg, Germany company, also is owned by Defendant Abdul-Matin Tatari.[1]

22. Among Tatex Trading's principal shareholders are Mohammed Majed Said, a member of the Syrian National Security Council and a former Director of the Syrian intelligence service, and Hamed al Barakati[2] of Mecca, Saudi Arabia.

23. Defendant Tatex Trading and its principal shareholders and associates have materially supported, aided, abetted, and financed al Qaida.

---

[1] Specific misconduct regarding Abdul Matin Tatari ("Tatari"), a co-defendant herein, is provided via More Definite Statement Applicable to Abdul Matin Tatari. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatari, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Hamed al Barakati ("Barakati"), a co-defendant herein, is provided via More Definite Statement Applicable to Barakati. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Barakati, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 8

24. German investigators suspect Tatex of laundering money for Al Qaida and obtaining visas for Al Qaida operatives.

25. Investigators are examining 111 commercial visa requests filed by Tatex from 2000-2002 for "prospective buyers." Investigators suspect that some of the applicants were actually al Qaida operatives or other militants from Syria, Egypt, and Jordan.

26. In the late nineties, Mohammed Atta and other al Qaida members, including Mohammed Haydar Zammar, who is believed to have been one of the organization's top recruiters, worked on occasion at a German firm called Tatex Trading. "THE SYRIAN BET" by Seymour M. Hersh, The New Yorker, July 28, 2003.

27. According to German authorities, several member of the Hamburg cell worked at Tatex during the 1990's. These individuals include: Mohammed Atta, Zammar (three different stints), and Mamoun Darkanzali, who worked at Tatex briefly around 13 years ago.

28. As the foregoing demonstrates, Tatex thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Tatex's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 29, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

Page 9

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT AKIDA INVESTMENT COMPANY LIMITED

1.  The name of the defendant to whom this Statement pertains is Akida Investment Company Limited ("Akida Investment"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**X**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and applicable statutes include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Akida Investment conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Investment conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Akida Investment conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim

Terrorism, and/or al Qaida and/or the International Islamic Front for the
Jihad Against Jews and Crusaders, which conspiracy culminated in the
Attack.

c.   The individual times, places, and contents of the alleged misconduct are
not all particularly known at this time.

d.   The predicate act is not based upon a criminal conviction.

e.   Civil litigation has not yet resulted in a judgment regarding the predicate
acts.

f.   The predicate acts form a pattern of racketeering in that they are repeated,
ongoing, continuous, and are a part of the Enterprise's regular way of
doing business. Other of the defendants consistently, evenly constantly,
laundered money, filed false tax returns, and otherwise impeded and
impaired the administration of the tax laws as part of their scheme to
conduit money to terrorists, and yet obfuscate their support of Radical
Muslim Terrorism and/or al Qaida and/or the International Islamic Front
for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a
common plan because each act of knowing and intentionally providing
financial services and money laundering and tax evasion allowed certain
of the defendants, specifically including    Akida Investment, to
surreptiously provide funds to terrorist organizations, including al Qaida,
Radical Muslim Terrorism and/or the International Islamic Front for the
Jihad Against Jews and Crusaders, which conspiracy culminated in the
Attacks.

6.   A description of the Enterprise is as follows:

a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or
"International Islamic Front for the Jihad Against Jews and Crusaders")
("Enterprise") is comprised of the defendants named in the Original
Complaint and any additional complaints filed in this action as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi
Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill,
et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a
collection of the persons, organizations, businesses, and nations associated
in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in
the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an
organization called "The Foundation" or "al Qaida." Al Qaida was
intended to serve as a foundation upon which to build a global Islamic

Page 3

army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Akida Investment fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Akida Investment, and illegal activity to generate material support to continue its terrorist operations.

c.  Akida Investment was not an employee, officer or director of the Enterprise, based upon present information available.  Akida Investment is associated with the alleged Enterprise.  Akida Investment is a member of the Enterprise, and is separate and distinct from the Enterprise.  Akida Investment intended to further the Attack and adopted the goal of

furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Akida Investment is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Akida Investment funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Akida Investment, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Akida Investment acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-

1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Akida Investment, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Akida Investment, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Akida Investment, of both those goals and the uses to which the Funds were put.

    b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\X_Akida Investment - More Definite Statement - AL BAraka.doc

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Akida Investment. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Akida Investment. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Akida Investment. Akida Investment, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Akida Investment conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Investment conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Akida Investment also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

Page 7

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Akida Investment are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Akida Investment has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Akida Investment conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Investment conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. According to the United States Treasury Department, Akida Investment Co. Ltd is part of a worldwide network of financial institutions controlled by Defendants Youssef Nada and Ahmed Idris Nasreddin, and utilized for the purpose of covert funding of Islamic terrorist activities, including Osama bin Laden and his Al Qaida organization. Specifically, the Treasury Department has said:

> "Based on information available to Italy and the United States, Youssef Nada ("Nada") and Ahmed Idris Nasreddin ("Nasreddin"), through commercial holdings, operate an extensive financial

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\X_Akida Investment - More Definite Statement - AL BAraka.doc

network providing support for terrorist related activities. In the case of Nada and Nasreddin, this involves an extensive conglomeration of businesses from which they derive their income or through which they conduct transactions. Based on evidence of their support of terrorism, Nada and Nasreddin were previously designated by the international community as financiers of terror. Nada was designated by the United States on November 7, 2001, and by the United Nations on November 9, 2001. Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002. Nasreddin's corporate holdings and financial network provide direct support for Nada and Bank Al Taqwa, which was also previously designated by the United States on November 7, 2001, and the United Nations on November 9, 2001. This designation of fourteen additional entities owned or controlled by either Nada or Nasreddin will further restrict their assets and their network by precluding these companies from being used to provide funding or support for terrorism."

See Treasury Dept Release PO-3380, "The United States and Italy Designate Twenty-Five New Financiers of Terror" August 29, 2002.

22. The United Nations Security Council added Akida Bank Private Limited and Akida Investment Co. Ltd. to its list of organizations designated as aiding Al Qaeda. Security Council Press Release SC/7494, 4 September, 2002.

23. Nasreddin and Nada, who have worked closely together for many years, are both directors of Bank Al Taqwa, a co-defendant in this action, and Akida Bank. Nada holds a controlling interest in Bank Al Taqwa and Nasreddin holds a controlling interest in Akida Bank. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense. They are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.

24. Bank Al Taqwa, for which Nasreddin is a director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tunisia's An-Nahda, and Usama bin Laden and his Al Qaida organization. Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. In 1997, it was reported that the $60 million collected annually for Hamas was moved to Bank Al Taqwa accounts. As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Usama bin Laden and as of late September 2001, Usama bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\X_Akida Investment - More Definite Statement - AL BAraka.doc

25. Nada and Nasreddin own or control a number of business entities through direct ownership, control, or in cooperation with each other. Fourteen of these entities are being designated in furtherance of the prior designations of these two individuals to disrupt their use of assets under their ownership or control that could be used to finance terrorist activities:

> **Akida Bank Private Limited**
> Nasreddin, who serves as Akida Bank's president, also serves on the board of directors of Akida Bank along with Youssef Nada. According to corporate documents, the Nasreddin Foundation, an entity proposed for designation, owns an overwhelming majority of shares of Akida Bank, affording Ahmed Idris Nasreddin and the Nasreddin Foundation ownership and control of Akida Bank.

> **Akida Investment Co. Ltd.**
> Akida Investment Co. Ltd. was incorporated in the Bahamas in March 2001. Corporate documents indicate that as of April 2001, all of the assets and liabilities of Akida Bank Private Limited have been transferred to Akida Investment Company.

> Treasury Dept Release PO-3380, "The United States and Italy Designate Twenty-Five New Financiers of Terror" August 29, 2002.; *See* Office of Foreign Assets Control, Additional Designations of Terrorism-Related Blocked Persons, FR Doc. 02-27814 Filed 10-31-02

26. As the foregoing demonstrates, Akida Investment thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Akida Investment's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

27. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 29, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\X_Akida Investment - More Definite Statement - AL BAraka.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY")

1. The name of the defendant to whom this Statement pertains is World Assembly of Muslim Youth ("WAMY"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement
BAraka.doc

**PLAINTIFF'S EXHIBIT**

**Y**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, WAMY conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including WAMY, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. WAMY fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including WAMY, and illegal activity to generate material support to continue its terrorist operations.

c. WAMY was not an employee, officer or director of the Enterprise, based upon present information available. WAMY is associated with the alleged Enterprise. WAMY is a member of the Enterprise, and is separate and distinct from the Enterprise. WAMY intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by WAMY is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by WAMY funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by WAMY, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. WAMY acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

Page 5

a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including WAMY, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including WAMY, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of WAMY, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like WAMY. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including WAMY. In order to identify nineteen individuals willing, able

Page 6

and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by WAMY. WAMY, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. WAMY also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

Page 7

17. The federal causes of action against WAMY are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. WAMY has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. World Assembly of Muslim Youth (WAMY) is a multi-national organization which hasbeen at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

22. In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and

supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

## II. WAMY'S ORGANIZATIONAL STRUCTURE

23. Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League (MWL).[1] Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization (IIRO),[2] and Rabita Trust.[3] Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC).

24. Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia.

---

[1] Specific misconduct regarding Muslim World League. ("MWL"), a co-defendant herein, has been provided via More Definite Statement Applicable to MWL. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] pecific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, has been provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[3] Specific misconduct regarding Rabita Trust, a co-defendant herein, has been provided via More Definite Statement Applicable to Rabita Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.[4]

25. The Kingdom extensively supervises and controls WAMY's activities. On the macrolevel, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.

26. Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

> If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within – there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

---

[4] Specific misconduct regarding Al Haramain Islamic Foundation. ("Al Haramain"), a co-defendant herein, has been provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

27. The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

## III. THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

28. Osama bin Laden's al Qaida organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaida's terrorist activities garner the most attention, terrorist attacks represent but one of many vehicles through which al Qaida seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaida views the confrontation with the West to have two distinct, but equally important fronts:(1) cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

> The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

Page 11

*From Dawa to Jihad – The Various Threats From Radical Islam to the Democratic LegalOrder,* General Intelligence and Security Service of the Netherlands, December 2004.

29. As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaida engages in militant and violent operations throughout the World. Al Qaida's military activities are by no means limited to terrorist attacks. In fact, in establishing al Qaida, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaida's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaida has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaida's participation in these regional conflicts takes many forms. Al Qaida provides funding and logistical assistance to local extremist organizations, in support of their military and terrorist activities. In addition, al Qaida deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.

30. Through its military activities in these "regional" conflicts, al Qaida aims to establish and support radical Islamic regimes, a critical component of al Qaida's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaida's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:[al Qaida] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination. The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic(predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

*Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report").

31. Al Qaida also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the

Page 12

organization's image among local Muslim communities, and represent an integral component of al Qaida's ongoing recruiting and fundraising efforts. Al Qaida's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West. In fact, several of the September 11 hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaida's growth and development cannot be overstated. Perhaps more than any other factor, al Qaida's participation in these "regional" conflicts has enabled al Qaida to extend its sphere of influence throughout the globe.

## IV. WAMY'S ROLE IN ADVANCING THE AL QAIDA MOVEMENT

32. For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

33. Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

34. The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians

Page 13

Worldwide, February 15, 1996. The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!

35. Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaida movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaida's cultural assault on the United States and democratic institutions throughout the world.

36. Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere. WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups. Through these criminal activities, WAMY has further helped al Qaida to expand its sphere of influence throughout the globe.

37. WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….

The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

"Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times*, December 5, 1992.

38. Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11,2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

39. In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….

Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service(FSB)].

According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…

Page 15

Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS*, May 19, 2000.

40. Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

> 1998 Defense Department Report.

41. By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" *U.S. Links bin Laden to Chechnya, MSNBC.com*, August 15,1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control. *Id.*

42. Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY

Page 16

has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1. The question that must be asked is: What do the Chechen Muslims need from us today?

2. ***The need money to buy arms and ammunition. (emphasis supplied)***

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory. *The Chechen Tragedy –*

*The Reality and the Required Role*, Dr. Maneh al Jahari, *al Jazeera*, January 15, 2000.

43. Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

44. Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19,1999 article in the *Australian General News*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News*, January 15,1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism – 1999*, United States Department of State, April 2000.

45. Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida

activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips*, December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizbul Mujahideen, three violent jihadist groups operating under the broader al Qaida umbrella. *See SIMI: Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q: In your conferences, you have openly eulogized Osama bin Laden.
>
> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World. *SIMI: Nursery of Hate, India Today*, April 2, 2001.

46. In March of 2003, al Qaida military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safe house in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

47. WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online*, December 9, 2002.

48. That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The*

Page 18

*Tyrants*," was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

49. Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida.

50. Despite the increased scrutiny of WAMY's operations following the September 11thAttack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad.

51. In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar*, June 11, 2002.

52. In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire*, September 5, 2003.

53. Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist

organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.[5] *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury*, Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005.

## V. WAMY'S KNOWLEDGE

54. For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11,2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

55. In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

56. Given the close ties between WAMY's senior leadership and high level officials of the Kingdom, it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the

---

[5] Under Congressional procedures, the full transcript of this hearing will not be available for approximately five months. Plaintiffs believe that the full transcript may contain further details regarding WAMY's involvement in the sponsorship of al Qaida and other fundamentalist organizations, and reserve their right to supplement the record with a copy of that transcript as soon as it is available.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th. During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from1997 forward.

57. The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well.

58. A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, *whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals*…." (emphasis supplied). The *International Convention for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack.

59. In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and

ideological support to al Qaida and affiliated groups, for a period of many years leading up to the September 11th Attack.

60. As the foregoing demonstrates, WAMY thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

61. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
        GINA M. MAC NEILL, ESQUIRE (GM 0581)
        JERRY S. GOLDMAN, ESQUIRE (JG 8445)
        FREDERICK J. SALEK, ESQUIRE (FS 8565)
        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT  HAMED AL BARAKATI

1.  The name of the defendant to whom this Statement pertains is Hamed Al Barakati
    ("Barakati").  The alleged misconduct and basis for liability is set forth below as
    well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**Z**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.   The predicate acts and relevant statutory authority include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Barakati conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Barakati conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Barakati conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Z_Al Barakati - More Definite Statement - AL BAraka.doc

Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Barakati, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Barakati fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Barakati, and illegal activity to generate material support to continue its terrorist operations.

c. Barakati was not an employee, officer or director of the Enterprise, based upon present information available. Barakati is associated with the alleged Enterprise. Barakati is a member of the Enterprise, and is separate and distinct from the Enterprise. Barakati intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Z_Al Barakati - More Definite Statement - AL BAraka.doc

7. The pattern of racketeering activity conducted by Barakati is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Barakati funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Barakati, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Barakati acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

Page 5

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Barakati, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Barakati, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Barakati, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Z_Al Barakati - More Definite Statement - AL BAraka.doc

recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Barakati. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Barakati. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Barakati. Barakati, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Barakati conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Barakati conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Barakati also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency,

loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Barakati are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Barakati has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Barakati conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Barakati conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Barakati is a wealthy Saudi who is known as a real estate and construction magnate.

22. He is also a principle shareholder of Tatex Trading,[1] along with Abdul Matin Tatari.[2]

---

[1] Specific misconduct regarding Tatex Trading GmbH ("Tatex"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatex.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatex,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Abdul Matin Tatari ("Tatari"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatari.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its

Page 8

23. Defendant Tatex Trading and its principal shareholders and associates have materially supported, aided, abetted, and financed al Qaida. Barakati had knowledge of Tatex's support of the Al Qaida and assisted in this support.

24. As the foregoing demonstrates, Barakati thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Barakati's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

25. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

More Definite Statement Applicable to Tatari, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Z_Al Barakati - More Definite Statement - AL BAraka.doc

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT AKIDA
PRIVATE BANK LIMITED

1.  The name of the defendant to whom this Statement pertains is Akida Bank Private
Limited ("Akida Bank").  The alleged misconduct and basis for liability is set
forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
(SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others.
Plaintiffs will separately file Statements with respect to the misconduct of the
other defendants.  Given the vastly complicated nature of the conspiracy and other
wrongdoing that led to the events of September 11, 2001, however, much
information is unavailable to plaintiffs, and the identities of other wrongdoers
may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
right to amend this Statement as information is learned and verified and after
discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
List ("Victims List").  The victims consist of (1) all spouses, children, parents,
siblings, or heirs of any individual who died at the World Trade Center in New York,
NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
(with the events at the World Trade Center in New York, N.Y., the Pentagon
Building in Arlington County, Virginia, and the airliner crash in Shanksville,
Pennsylvania, on September 11, 2001, and activities related thereto, collectively
referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
(including executors, estate administrators and trustees) entitled to bring legal action
on behalf of any individual who died as the result of terrorist attacks on September
11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
and legal representative of individuals identified by the Attorney General of the
United States or otherwise shown to have perpetrated, aided and abetted, conspired in
regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
Victims List sets forth the names of the decedents killed by the attackers, with the
category of "victims" further including their spouses, children, parents, siblings or
heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**AA**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and applicable statutory authority include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Akida Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Akida Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al

Page 2

Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including  Akida Bank, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Akida Bank fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Akida Bank, and illegal activity to generate material support to continue its terrorist operations.

c. Akida Bank was not an employee, officer or director of the Enterprise, based upon present information available. Akida Bank is associated with the alleged Enterprise. Akida Bank is a member of the Enterprise, and is separate and distinct from the Enterprise. Akida Bank intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

Page 4

7. The pattern of racketeering activity conducted by Akida Bank is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Akida Bank funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Akida Bank, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Akida Bank acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AA_Akida Bank - More Definite Statement - AL BAraka.doc

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Akida Bank, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Akida Bank, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Akida Bank, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these

recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Akida Bank. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Akida Bank. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Akida Bank. Akida Bank, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Akida Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Akida Bank also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AA_Akida Bank - More Definite Statement - AL BAraka.doc

of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Akida Bank are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Akida Bank has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Akida Bank conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Akida Bank conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. According to the United States Treasury Department, Akida Bank is part of a worldwide network of financial institutions controlled by Defendants Youssef Nada and Ahmed Idris Nasreddin, and utilized for the purpose of covert funding of Islamic terrorist activities, including Osama bin Laden and his Al Qaida organization. Specifically, the Treasury Department has said:

> "Based on information available to Italy and the United States, Youssef Nada ("Nada") and Ahmed Idris Nasreddin ("Nasreddin"), through commercial holdings, operate an extensive financial network providing support for terrorist related activities. In the case of Nada and Nasreddin, this involves an extensive conglomeration of businesses from which they derive their income or through which they conduct transactions. Based on evidence of their support of terrorism, Nada and Nasreddin were previously

designated by the international community as financiers of terror. Nada was designated by the United States on November 7, 2001, and by the United Nations on November 9, 2001. Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002. Nasreddin's corporate holdings and financial network provide direct support for Nada and Bank Al Taqwa, which was also previously designated by the United States on November 7, 2001, and the United Nations on November 9, 2001. This designation of fourteen additional entities owned or controlled by either Nada or Nasreddin will further restrict their assets and their network by precluding these companies from being used to provide funding or support for terrorism."

See Treasury Dept Release PO-3380, "The United States and Italy Designate Twenty-Five New Financiers of Terror" August 29, 2002.

22. The United Nations Security Council added Akida Bank Private Limited and Akida Investment Co. Ltd. to its list of organizations designated as aiding Al Qaeda. Security Council Press Release SC/7494, 4 September, 2002.

23. Nasreddin and Nada, who have worked closely together for many years, are both directors of Bank Al Taqwa, a co-defendant in this action, and Akida Bank. Nada holds a controlling interest in Bank Al Taqwa and Nasreddin holds a controlling interest in Akida Bank. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense. They are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.

24. Bank Al Taqwa, for which Nasreddin is a director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tunisia's An-Nahda, and Usama bin Laden and his Al Qaida organization. Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. In 1997, it was reported that the $60 million collected annually for Hamas was moved to Bank Al Taqwa accounts. As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Usama bin Laden and as of late September 2001, Usama bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada.

25. Nada and Nasreddin own or control a number of business entities through direct ownership, control, or in cooperation with each other. Fourteen of these entities were designated by the US Treasury to disrupt their use of assets under their ownership or control that could be used to finance terrorist activities:

**Akida Bank Private Limited**

Page 9

Nasreddin, who serves as Akida Bank's president, also serves on the board of directors of Akida Bank along with Youssef Nada. According to corporate documents, the Nasreddin Foundation, an entity proposed for designation, owns an overwhelming majority of shares of Akida Bank, affording Ahmed Idris Nasreddin and the Nasreddin Foundation ownership and control of Akida Bank.

**Akida Investment Co. Ltd.**
Akida Investment Co. Ltd. was incorporated in the Bahamas in March 2001. Corporate documents indicate that as of April 2001, all of the assets and liabilities of Akida Bank Private Limited have been transferred to Akida Investment Company.

Treasury Dept Release PO-3380, "The United States and Italy Designate Twenty-Five New Financiers of Terror" August 29, 2002.; *See* Office of Foreign Assets Control, Additional Designations of Terrorism-Related Blocked Persons, FR Doc. 02-27814 Filed 10-31-02

26. As the foregoing demonstrates, Akida Bank thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Akida Bank's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

27. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 29, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY: _____
   GINA M. MAC NEILL, ESQUIRE (GM 0581)
   JERRY S. GOLDMAN, ESQUIRE (JG 8445)
   FREDERICK J. SALEK, ESQUIRE (FS 8565)

Page 10

Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT SULAIMAN ABDUL AZIZ AL RAJHI

1.  The name of the defendant to whom this Statement pertains is Sulaiman Abdul
    Aziz Al Rajhi ("Sulaiman").  The alleged misconduct and basis for liability is set
    forth below as well as elsewhere in the Complaint.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement -
AL BAraka.doc

**PLAINTIFF'S EXHIBIT**

**AB**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Sulaiman conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al

Page 2

Qaida and/or the International Islamic Front for the Jihad Against Jews
and Crusaders, which conspiracy culminated in the Attack.

c.  The individual times, places, and contents of the alleged misconduct are
not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate
acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated,
ongoing, continuous, and are a part of the Enterprise's regular way of
doing business.  Other of the defendants consistently, evenly constantly,
laundered money, filed false tax returns, and otherwise impeded and
impaired the administration of the tax laws as part of their scheme to
conduit money to terrorists, and yet obfuscate their support of Radical
Muslim Terrorism and/or al Qaida and/or the International Islamic Front
for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a
common plan because each act of knowing and intentionally providing
financial services and money laundering and tax evasion allowed certain
of the defendants, specifically including Sulaiman, to surreptiously
provide funds to terrorist organizations, including al Qaida, Radical
Muslim Terrorism and/or the International Islamic Front for the Jihad
Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or
"International Islamic Front for the Jihad Against Jews and Crusaders")
("Enterprise") is comprised of the defendants named in the Original
Complaint and any additional complaints filed in this action as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi
Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill,
et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a
collection of the persons, organizations, businesses, and nations associated
in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in
the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an
organization called "The Foundation" or "al Qaida."  Al Qaida was
intended to serve as a foundation upon which to build a global Islamic
army.  In February, 1998, a declaration was issued, following the holding
of a terrorist summit, announcing the formation of the International

Page 3

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sulaiman fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Sulaiman, and illegal activity to generate material support to continue its terrorist operations.

c. Sulaiman was not an employee, officer or director of the Enterprise, based upon present information available. Sulaiman is associated with the alleged Enterprise. Sulaiman is a member of the Enterprise, and is separate and distinct from the Enterprise. Sulaiman intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

Page 4

7. The pattern of racketeering activity conducted by Sulaiman is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sulaiman funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sulaiman, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Sulaiman acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Sulaiman, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Sulaiman, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Sulaiman, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these

recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Sulaiman. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Sulaiman. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sulaiman. Sulaiman, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Sulaiman also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss

of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Sulaiman are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Sulaiman has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. "Sulaiman is a wealthy Saudi figure and reputed financier of terrorism" according to the testimony of Dr. Michael Waller, Annenberg Professor of International Communications, at the United States Senate Committee on the Judiciary, <u>Terrorist Recruitment and Infiltration in the United States: Prisons and Military as an Operational Base</u>, *October 14, 2003*. Sulaiman Al Rajhi is also the head of one of Saudi Arabia's wealthiest families, the Al Rajhi family, which, based upon information and belief, is the primary financier of the SAAR Foundation, an organization that provided funding to the Enterprise.

## <u>Connection to Al Rajhi Bank</u>

22. Sulaiman is the chairman of the Board of Directors and the Managing Director of Al Rajhi Banking and Investment Corporation ("Al Rajhi"). Sulaiman is also the largest shareholder of Al Rajhi. Al Rajhi, a co-defendant in this action, has long

provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

23. Al Rajhi is the primary and/or preferred bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation,[1] the Muslim World League,[2] and the International Islamic Relief Organization.[3]

24. Al Rajhi Bank has served as one of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders preferred and/or primary banks for many years. Al Rajhi is the primary bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation ("Al-Haramain"), the Muslim World League ("MWL"), the World Association of Muslim Youth ("WAMY"),[4] the Benevolence International Foundation ("BIF"), and the International Islamic Relief Organization ("IIRO").

25. In cooperation with these charitable organizations, Al Rajhi Bank advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for there charitable organizations, thereby providing a mechanism, Al Rajhi facilitated Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, fundraising events.

26. The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for Al Haramain and the

---

[1] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via More Definite Statement Applicable to MWL. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[3] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[4] Specific misconduct regarding World Assembly of Muslim Youth ("WAMY"), a co-defendant herein, is provided via More Definite Statement Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

IIRO, have been used to transfer funds to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaida's, and/or Radical Muslim Terrorism's, and/or the International Islamic Front for the Jihad Against Jews and Crusaders', charity fronts, via *zakat* and *haram* contributions, including MWL, WAMY, IIRO Al Haramain and the Saudi Joint Relief Committee.

27. Al Rajhi Bank has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and that the funds it contributed directly to the charities were being funneled to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

28. Nevertheless, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders

29. The IIRO has accounts in Al Rajhi Bank, where donors deposit their donations. One of the IIRO Bank Account Numbers at Al Rahji Bank is 77700. The IIRO places advertisements for donations in their own publications, and Al Rajhi Bank collects and deposits these charitable donations into joint accounts according to the account numbers.

30. The IIRO is one of the chief Saudi charities definitively linked to financing a variety of international terrorist groups.

31. Al Rajhi Bank assisted the terrorist group al Qaeda knowing that the assistance would lead to wrongful and harmful acts. Specifically, Al-Rajhi Bank collected so-called "charitable" donations on behalf of Sanabil Al Kheer (Translation: "Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabil's Al Rajhi Bank account no. 77707. Sanabel Al-Kheer, which the IIRO "owns or controls," was established as a separate branch of the IIRO in 1987 to make investments designed to support the IIRO's charitable operations. Al Rajhi Bank collects Sanabel's donations, while organizations like Sanabel/IIRO and the Jeddah Al-Birr Society ensure their donors a reward of religious fulfillment.

32. Under the guise of IIRO funds labeled and designated for purposes such as "war and disaster" (Account number for Immigrants, Refugees, and Victims of Disasters: 77702) or "sponsor a child" (IIRO Account Number of Deprived

Children: 77704) charitable organizations such as the IIRO use banks like Al Rajhi Bank to gather donations that fund terrorism and terrorist activities.

33. Al Rajhi Bank also handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha Journal advertisements toward humanitarian needs in Somalia, Sri Lanka, India, and the Philippines under IIRO Account number 77709 for "the action most loved by Allah."

34. Al Rajhi Bank aided and abetted al Qaeda as the handler of donations for the donee, the IIRO, because Al Rajhi Bank knew about their terrorist organization's illegal operations and provided aid to al Qaeda with the intent to facilitate those their illegal activities. While serving as the collector of donations for these "charitable" organizations, professing "sublime noble values and deep-rooted traditions," Al Rajhi Bank's pattern is also to make direct donations to terrorist organizations.

35. This financial support managed by Al Rajhi Bank, although intended to aid an organization's peaceful activities, is a de facto mechanism for freeing up resources that can be used for terrorist acts.

36. Al Rajhi Bank knowingly and intentionally supplied the funds to the persons who committed the violent terrorist acts. Money was funneled to the Hamburg, Germany al Qaida cell through the Saudi Al Rajhi Bank to businessmen Mahmoud Darkazanli Abdul Fattah Zammar who provided the al Qaida cell of September 11 hijackers with financial and logistical support.

37. Through Al Rajhi Bank, September 11 hijacker Abdulaziz Al Omari received funds into his Al Rajhi Bank Account Number: 162608010366080, 39800061, and Visa Debit Card No. 4909-8016-2002-5747. Al-Omari frequently utilized a credit card drawn on a Saudi Arabian Bank [al-Rajhi bank] in the planning of the attacks.

38. On September 7, 2001, four days before the 9/11 attacks, Al-Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia on SunTrust bank account 265D-NY-280350.

39. On February 17, 1994, Al Rajhi Banking and Investment Company did a $533,333 donation for the Saudi High Commission in charge of collecting donations for Bosnia and Somalia.

40. On August 1995, Al Rajhi Banking and Investment Company contributed for $400,000 to the Saudi High Commission in charge of collecting donations for Bosnia during a 12 hour telethon. The donation has been released by Arabic newspaper Asharq Al-Awsat.

Page 11

41. Transfers to the Al-Rajhi Bank account of Wa'el Hamza Julaidan (account #314608010016294, Haye Al-Salamah, Jeddah, Saudi Arabia) on December 5, 2000. Wa'el Hamza Julaidan has been publicly described in 1999 as "the logistics chief of Bin Ladin's organization who has fought on Bin Ladin's side in Afghanistan". Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV.

42. Al Rajhi Banking & Investment materially supported terrorism of the type that implies the element of knowing or intentional support. The liability that arises out of [this kind of] Al Rajhi Bank's knowing and intentional support extends to all points along the causal chain of terrorism. Al Rajhi Bank therefore aided and abetted acts of international terrorism, namely (including but not limited to) the September 11, 2001 attacks on the United States.

43. Al Rajhi Bank provided material support or resources and aided and abetted al Qaida terrorists, and they did so knowingly and intentionally resulting in a [the] causal chain of violence.

44. Al Rajhi Bank has aided in the commission of the modern day equivalent of piracy, and Al Rajhi has violated present day international law.

45. Al Rajhi Bank has participated in the operation or management of [the] an "Enterprise" – alternatively defined as al Qaida, the al Qaida Movement or Radical Muslim Terrorism.

46. Al Rajhi Bank conspired with al Qaeda to attack the United States. As a conspirator, Al Rajhi Bank not only adopted the goal of furthering or facilitating the criminal endeavor, but intended to engage in conduct in furtherance of the enterprise. This endeavor, when [if] completed, would satisfy all the elements of the substantive criminal offense.

47. Abdullah al Rajhi, the head of Al Rajhi Bank, established a network of ostensible charities, known as the Sulaiman Abdul Aziz al-Rajhi ("SAAR") network, to serve as a complex fundraising and money laundering mechanism for al Qaeda. Abdullah al Rajhi used his authority as head of Al Rajhi Bank and as a Director of IIRO and MWL to facilitate the sponsorship of al Qaeda's operations throughout the world.

48. On January 1996, Sulaiman Al-Rajhi donated personally $80,000 for the Saudi High Commission in charge of collecting donations for Bosnia.

49. Al Rajhi Bank played a direct and active role in the management and operation of al Qaida's financial network, and Al Rajhi Bank knowingly conspired to further the objectives of the al Qaida movement during the years leading up to the September 11th attacks.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

### U.S. Contacts of Al Rajhi Bank

50. Al Rajhi Bank has adequate contacts with United States. Al Rajhi Bank purposely directed their actions at residents of the United States when Al Rajhi Bank financed al Qaida, whose stated purpose was targeting Americans.

51. September 11 hijacker Abdulaziz Al Omari financial transfers with Al Rajhi Bank (supra) [support the FBI's assertion that] demonstrates that al-Omari used his Al Rajhi credit card while in the U.S. In one financial transfer from the account of two of the other hijackers, Marwan al-Shehhi and Mohamed Atta, $200.00 was transferred into al-Omari's Al Rajhi Bank account via the Chase Manhattan Bank in New York, NY, to aid al-Omari's efforts in their planning of the attacks.

52. Al Rajhi Bank has many business interests which include extensive dealings with American corporations, or corporations which do extensive business in the United States.

53. The following organizations are Al Rajhi's U.S. investments: Aradi, Inc., and the Sulaiman Abdul Aziz al-Rajhi ("SAAR") Foundation. Sulaiman is also the Chairman and Managing Director of Al Rajhi Bank. Abdullah Sulaiman Al Rajhi, the General Manager of Al Rajhi Bank, is the President of Aradi Inc. Both of these U.S. Investments are located at 555 Grove Street, Herndon, Virginia, United States.

54. Al Rajhi Bank also has a direct involvement – through a position on the board of directors – in the following organizations:

> Piedmont Poultry Processing, Inc.,
> Address 1: 555 Grove Street
> Herndon, Virginia, United States 20170
>
> Address 2: Post Office Box 129 Lumber
> Bridge, North Carolina United States 28357
>
> Techno-Chemicals International, Inc.
> 1635 North Ironwood
> South Bend, Indiana, United States 46635
> Incorporated by Khaled Abdullah al-Rajhi InfoCom Corporation
> 630 International Parkway Post Office Box 850415
> Richardson, Texas, United States 75081

55. Many of the Al Rajhi businesses used InfoCom to host their websites. InfoCom, incorporated on March 16, 1992 and based in Richardson, Texas, hosts five hundred websites for Muslim organizations, many of which have ties to terrorism. Two of those organizations are Benevolence International Foundation (BIF) and Global Relief Foundation (GRF), both of whom were declared Specially

Designated Global Terrorists (SDGT) by the United States Treasury Department for their financial support to al Qaida. These two charities laundered money and defrauded investors in order to fund bin Laden and al Qaida. WAMY, under US investigation for its ties to al Qaida, also has its website registered care of InfoCom.

56. SDGT Holy Land Foundation for Relief and Development (HLF) shares employees with and has offices right across the street from InfoCom. The FBI had InfoCom's assets frozen by the Treasury Department six days before the World Trade Center and Pentagon attacks and the plane crash in Pennsylvania. Like the HLF, InfoCom received much of its early money from Mousa Abu Marzook, a top Hamas official who, the U.S. courts have determined, was directly involved in terrorism.

57. InfoCom began hosting the website for Al Rajhi Banking and Investment Corporation in 1997. InfoCom also used Al Rajhi Banking and Investment to receive money from their numerous Saudi investors. InfoCom received considerable money from an Al Rajhi Bank located in Saudi Arabia, and it was reasonable to assume that the money was used in furtherance of InfoCom's trade activity. SDGT Mousa Abu Marzook and one of his agents made 11 wire transfers totaling $2,003,659.00 into an unknown Al Rajhi Bank account from January 1989 through September 1992. InfoCom [and ICC, InfoCom's precursor] bank records show 48 wire transfers, totaling $1,542,804.00, from an unknown Al Rajhi Bank account between January 31, 1991 and July 2, 1997.

58. The Al Rajhi family is the SAAR Foundation's biggest donor. The SAAR Foundation is the hub of an enormous U.S. business enterprise. The Foundation dissolved in December 2000, but the hundreds of organizations that it created continue on as its legacy.

59. The Al Rajhi funded SAAR Foundation spawned a complex network of organizations that share officers, addresses, and funding. As of 2003, the Virginia Secretary of State Corporate Records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses at the 555 Grove Street location. Through this business enterprise, the Al Rajhi family maintains a strong presence with hundreds of U.S. businesses.

60. In addition to collecting donations on behalf of so-called "charities," Al Rajhi Bank has made numerous donations directly to charities headquartered or with offices in the United States. Al Rajhi Bank also conducts business in the United States through several corporate holdings.

61. Al Rajhi Bank and others, "purposefully directed" activities at the United States by funding those whose "activities" included killing innocent people for no reason other than that they were Americans.

62. Sulaiman Al Rajhi conducted or participated in, directly or indirectly, the affairs of Al Rajhi through a pattern of racketeering activity by, inter alia authorizing, ratifying, supervising, controlling, overseeing and/or directing Al Rajhi in its knowing and intentional provision of financial services to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and in servicing al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders bank accounts, and other accounts used to fund and support al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to National Commercial Bank**

63. Sulaiman Al Rajhi managed the National Commercial Bank (NCB)[5] budget for the Saudi Joint Relief Committee.

64. NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization.

65. Moreover, NCB has served as one of al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, infrastructure, including the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), the Benevolence International Foundation ("BIF"), Blessed Relief (Muwafaq) Foundation and al Haramain, among others.

66. Under the supervision of Sulaiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.

67. NCB knowingly facilitates al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, fundraising by advertising the existence and numerical designations of the accounts it maintains for al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, cooperating charities

---

[5] Specific misconduct regarding National Commercial Bank ("NCB"), a co-defendant herein, is provided via More Definite Statement Applicable to NCB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 15

throughout the Muslim world, so that the supporters can deposit funds directly into those accounts for the benefit of al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, and their cells throughout the world.

68. During the 1990s, NCB channeled in excess of $74 million to al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through the IIRO, and also transferred significant funding to al Qaida, and/ or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through Blessed Relief.

## Connection to International Islamic Relief Organization ("IIRO")

69. Sulaiman Al Rajhi also serves on the board of directors of the IIRO, a purported "charitable" organization which has long acted as fully integrated components of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorists.

## Connection to SAAR

70. Sulaiman Al Rajhi established the SAAR Foundation and Network ("SAAR"). SAAR was named after Sulaiman Abdul Aziz Al Rajhi. The Al Rajhi family has been the foundation's biggest donor, and Sulaiman Al Rajhi is the head of the family.

71. SAAR was formed in the 1970's by a group of Muslim scholars and scientists from the Middle East and Asia. SAAR incorporated in 555 Grove Street, Herndon Virginia as a 501(c)(3) non-profit organization on July 29, 1983. It was dissolved as of December 28, 2000.

72. SAAR was a long-time financial supporter of terrorism. According to the Virginia Secretary of State Corporate Records, there are more than one hundred affiliated organizations registered or doing business at just one address in Herndon, Virginia – 555 Grove Street. Most of these organizations do not maintain a physical presence there, or anywhere. The SAAR network is a sophisticated arrangement of front groups for fundamentalist Islamic terrorist organizations. The SAAR network includes but is not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc. Sterling Charitable Gift Fund, Sterling Management Group, Inc. and York Foundation. Many of the directors/managers of one organization, company or charity also serve as directors/managers for may other organizations, companies, or charities within the network. For example, at the Herndon address, Abdullah

Omar al-Obaid was an officer of two of the SAAR network entities – Muslim World League and Sana-Bell Al-Kheer, which received rent from the Muslim World League and the International Islamic Relief Organization.

73. In March 2002, SAAR was raided under a search warrant, for the Grove Street in Herndon, Virginia location, by the U.S. Treasury Department's Operation Greenquest looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as ... al Qaeda as well as individual terrorists . . . (including) Osama bin Laden."  It was said by authorities that the probe of Herndon groups is the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon has sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to …provide material support to foreign terrorist organizations."

74. The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of terror.  This network has been used to funnel money, billions of dollars, to al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism.  Additionally, the SAAR network provided logistical assistance to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through this web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

## Connection to Al Taqwa Bank and Youssef M. Nada

75. Sulaiman Al Rajhi was employed by Youssef M. Nada, the founder of Al Taqwa Bank.  On November 1, 2001, Al Taqwa Bank, by President Bush's executive Order, was denoted as a Specially Designated Global Terrorist Entity.  Its assets were frozen by the US Department of Treasury.

## Connection to al-Watania Poultry, Mar-Jac Investments, Inc. and Piedmont Poultry

76. Sulaiman Al Rajhi owns Saudi Arabia's largest poultry farm, al-Watania.  Mar-Jac Investments, Inc., Piedmont Poultry, al-Watania is controlled by the Safa Group, a known entity within the SAAR network.  These three companies have a significant business presence in the United States.  SAAR, (as described above) had an indirect financial interest in Safa Trust.

77. Safa Trust is considered to be SAAR's successor.

## Connection with Golden Chain

78. Sulaiman Al Rajhi is identified on the Golden Chain as one of al Qaida's principal financiers.  The "Golden Chain" document was discovered during a raid of the

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror officials of the US government concluded that the document id "a list of people referred to within al Qaida" as wealthy donors to the movement.  See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. Filed Jan. 6, 2003).  The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See Final Report of the 9/11 Commission, Note 21 to Chapter 2.  The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designation him as a terrorist sponsor under Executive Order 13224.  See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee.

79. As the foregoing demonstrates, Sulaiman thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Sulaiman's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

80. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

{BALANCE OF PAGE INTENTIONALLY LEFT BLANK}

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____

GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AB_Al Rajhi, Sulaiman - More Definite Statement -
AL BAraka.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT     YASSIN ABDULLAH AL-QADI A/K/A YASSIN AL-QADI
A/K/A YASSIN   AL-KADI A/K/A YASIN AL-QADI

1. The name of the defendant to whom this Statement pertains is Yassin Abdullah
   Al-Qadi a/k/a Yassin Al-Qadi a/k/a Yassin Al-Kadi a/k/a Yasin Al-Qadi ('Al-
   Qadi')  The alleged misconduct and basis for liability is set forth below as well as
   elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the
   defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
   al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
   (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
   Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
   Plaintiffs will separately file Statements with respect to the misconduct of the
   other defendants.  Given the vastly complicated nature of the conspiracy and other
   wrongdoing that led to the events of September 11, 2001, however, much
   information is unavailable to plaintiffs, and the identities of other wrongdoers
   may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
   right to amend this Statement as information is learned and verified and after
   discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims
   List ('Victims List').  The victims consist of (1) all spouses, children, parents,
   siblings, or heirs of any individual who died at the World Trade Center in New York,
   NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
   Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
   (with the events at the World Trade Center in New York, N.Y., the Pentagon
   Building in Arlington County, Virginia, and the airliner crash in Shanksville,
   Pennsylvania, on September 11, 2001, and activities related thereto, collectively
   referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including
   executors, estate administrators and trustees) entitled to bring legal action on behalf of
   any individual who died as the result of terrorist attacks on September 11, 2001; but
   excluding (3) all individuals, and all spouses, children, parents, siblings, and legal
   representative of individuals identified by the Attorney General of the United States or
   otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or
   otherwise supported the terrorist attacks of September 11, 2001.  The Victims List
   sets forth the names of the decedents killed by the attackers, with the category of
   'victims' further including their spouses, children, parents, siblings or heirs as set forth
   above.

4. The manner in which the victims were injured consists of death, suffering caused by
   death, and all economic damages resulting from such deaths, and actions of the
   defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**AC**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and relevant statutes include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Al-Qadi conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Al-Qadi conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Al-Qadi conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Al-Qadi, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which

Page 3

was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al-Qadi fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Al-Qadi, and illegal activity to generate material support to continue its terrorist operations.

c.  Al-Qadi was not an employee, officer or director of the Enterprise, based upon present information available.  Al-Qadi is associated with the alleged Enterprise.  Al-Qadi is a member of the Enterprise, and is separate and distinct from the Enterprise.  Al-Qadi intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Al-Qadi is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al-Qadi funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al-Qadi, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Al-Qadi acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Al-Qadi, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Al-Qadi, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Al-Qadi, of both those goals and the uses to which the Funds were put.

    b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this

would have been possible without the funds supplied by participants and conspirators like Al-Qadi. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Al-Qadi. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al-Qadi. Al-Qadi, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Al-Qadi conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al-Qadi conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al-Qadi also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiffs resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiffs jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the 'reasonably foreseeable victims of a RICO violation' and the 'intended victims of the racketeering enterprise,' (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and

Page 7

loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Al-Qadi are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Al-Qadi has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al-Qadi conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al-Qadi conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations and counts contained in the Second Amended Complaint in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.,* 04-CV-1923(RCC), including all of the allegations and claims contained therein.

21. Al-Qadi is one of Saudi Arabia's most prominent businessmen. He is involved in a multitude of global business investments in a variety of fields including real estate, financial services, trading, manufacturing, healthcare, animation productions and the services sector.

22. On October 12, 2001 according to Executive Order #13224, President George W. Bush designated Yassin Al-Qadi as a terrorist entity for financially supporting al-Qaida. Al-Qadi's assets were frozen in the United States, Europe, Albania and Turkey.

23. Al-Qadi has spent his entire career intentionally surrounding himself with individuals who either participate in or financially support Islamic terrorism. He is firmly embedded in the Islamic terrorist financing community through his business investments as well as his professional and personal relationships.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

24. Indeed, Al-Qadi openly admits that he knows Osama Bin Laden and has met with him on several occasions. According to a 2004 report by the Office of Foreign Assets Control (OFAC) a letter found in 2002 that was addressed to Osama bin Laden referenced Al-Qadi's managing money for Bin Laden in Sudan. The letter also referred to Al-Qadi as one of Bin Laden's former managers.

25. On September 21, 2005, The European Union and Commission of the European Communities refused to hear Yassin Al-Qadi's appeal against the freezing of his assets; holding that the European Community is obligated to adhere to the U.N. Security Council—which is outside EU jurisdiction and which supersedes the right of an individual (Al-Qadi) to have his case heard tried before the courts.

26. Although the Court's decision initially appears to be based on the issue of jurisdiction, the EU justifies its ruling as an international security measure "The applicants' interest in having a court hear their case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council."

27. This decision is an implicit acknowledgement of Al-Qadi's guilt.

28. Al-Qadi has knowingly provided material assistance to Islamic terrorist groups such as al-Qaida, Hamas and terrorist outfits in Bosnia- Herzegovina and Albania through his involvement with the charities and corporations detailed below.

**Maram and Al Iman**

29. Bank records show that between January 1998 and August 1998 Al-Qadi transferred $1.25 million dollars to Maram, a Turkish travel and trading firm that has significant ties to al-Qaida.

30. Maram was founded in December of 1996 as an Istanbul travel agency by Mamduh Salim—a former al-Qaida financial officer who is now serving time in a U.S. prison for his involvement in the bombing the U.S. Embassies in Kenya and Tanzania in August 1998.

31. In 1997, all of Salim's shares in Maram were transferred to Wael Jalaidan, a longtime friend of Al-Qadi, and his partner Mohamed Bayazid.

32. Al-Qadi claims that his donation to Maram was used solely to aid in the construction of Al Iman, a religious school in Yemen. Bank records confirm that Al-Qadi's claim is true but this in and of itself does not exonerate Al-Qadi, as Al Iman has extensive ties to Islamic militancy.

33. Al Iman was founded by Sheikh Abdul Mejid Al Zindani. Zindani fought alongside Bin Laden in Afghanistan, leads the Yemen chapter of the Muslim Brotherhood and has been designated by the U.S. as an active supporter of

Page 9

terrorism. According the U.S. Treasury Department, all Al Iman students are 'suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries.' John Walker Lindh, the American Taliban, is a former student of Al Iman.

## Wael Jalaidan

34. Al-Qadi's close friend, Wael Jalaidan, is an associate of Osama bin Laden and a high ranking member of International Islamic Relief Organization ("IIRO")[1] and the Muslim World League ("MWL")[2], both of which are front organizations for al Qaida.

35. On September 6, 2002, the U.S. government designated Jalaidan as a supporter of international terrorism and his assets were frozen. The U.S. Treasury Department asserts that Jalaidan is "one of the founders of al-Qaida."

36. Wael Jalaidan publicly embraced the notion of jihad in forums for militant Islamic thinking. Wael Jalaidan's photograph appears in the pages of *Al-Jihad Magazine*, a publication edited by Azzam, in a section discussing the reconstruction of Afghanistan. *Al-Jihad* was a publication of Mekhtab al Khidemat, a pre-Al-Qaida group formed by Osama Bin Laden and Abdullah Azzam to support jihadi fighters in Afghanistan.

37. Additionally, Bin Laden himself acknowledged his close ties to Jalaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qaida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wael Jalaidan."

38. According to U.S. officials, Jalaidan's role in alQaida is best described as a logistics chief, charged with the responsibility of moving people, ammunition and supplies from one place to another. Edward Turzanski, a national security analyst and political scientist at LaSalle University, states that capturing Jalaidan would

---

[1] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, is provided via More Definite Statement Applicable to International Islamic Relief Organization. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via More Definite Statement Applicable to Muslim World League. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

be "like getting a hold of Al Capone's bookkeeper. He knows where all the accounts are, he knows where he spends his money, he knows who gets it."

39. Jalaidan served as the head of the Islamic Center of Tucson (ICT), Arizona in 1983 while he was a graduate student at the School of Agriculture. Jalaidan withdrew from the University of Arizona on March 20, 1985 and soon surfaced in Peshawar, Pakistan. Authorities claim that it was during his time in Peshawar that Jalaidan became involved with the individuals that would eventual evolve into al Qaida, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

40. Wael Jalaidan headed the MWL in Peshawar and also served as the Secretary-General of the Rabita Trust, an operating division of MWL. The Rabita Trust[3] had its assets frozen after it was labeled a Specially Designated Global Terrorist Entity by President Bush on October 12, 2001.

41. U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah. Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Osama bin Laden and former al Qaida military chief Mohammed Atef (a.k.a. Abu Hafs Al-Masri).

42. Jalaidan also has extensive links to terrorist activity in Bosnia Herzogovina. A BBC report in April 2000 cited a confidential memo sent to UN police forces in Kosovo titled "Secret: US office only-Release to UNMIK." The document named MWL representative Wa'el Jalaidan as an associate of Osama bin Laden and stated that Jalaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

43. Seik Ajadi, former director of the Saudi humanitarian organization Muwafaq's, a co-defendant in this action, offices in Croatia and Bosnia Herzogovina, who also has been -- since October of last year -- on the list of those suspected of supporting terrorism, first registered Euroinvest--a construction, trade, import, and

---

[3] Specific misconduct regarding Rabita Trust, a co-defendant herein, is provided via More Definite Statement Applicable to Rabita Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

export company--as an individually owned company, and then as a corporation under the ownership of Sefik Ajadi and Yasin Al-Qadi.

44. In October 1997, Jalaidan also became of a co-owner of this company with 10 percent of its capital. Local sources claim that Jalaidan was authorized to withdraw money from the account of the Al Haramain[4] humanitarian organization and that he was the supervisor of Saudi humanitarian aid in Bosnia Herzogovina. Therefore, it is very likely that most of the money Al Haramain invested into Euroinvest ended up in the hands of Islamic terrorists in Bosnia Herzogovina.

45. Jalaidan also has ties to the Benevolence International Foundation (BIF),[5] a co-defendant in this action, which was classified as a Specially Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002.

46. Al-Qadi has had a close relationship with Jalaidan since the early 1980's and has not only employed Jalaidan but he has also provided him with personal and professional financial assistance. Despite the above information regarding Jalaidan, Al-Qadi still maintains that Jalaidan has not been in contact with Bin Laden since 1994.

47. Al-Qadi's main Albanian firm was Karavan Construction and Development. In 1996, Al-Qadi promoted Karavan's Egyptian engineer, Amr Abd' al-Wahab Selem al-Zaini to be the director of Karavan and Al-Qadi's financial representative in Albania. Al-Qadi had al-Zaini provide unlimited support to Jalaidan during his visit to Albania for the Laprake hospital construction project in the late 1990's.

48. In another instance, Karavan provided aid to the Saudi NGO Saudi Joint Relief Committee (SJRC) for Kosovo. SJRC's Chief at the time was Jalaidan. Jalaidan was provided an office in the Karavan corporate building.

49. Al-Qadi and Jalaidan were "involved in a small-scale travel company named Abrar of Saudi Arabia. The focus of this business was to provide services to Muslim pilgrims especially during the pilgrimage season (Hajj) and throughout the year, for minor pilgrimages."

---

[4] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[5] Specific misconduct regarding Benevolence International Foundation ("BIF"), a co-defendant herein, is provided via More Definite Statement Applicable to Shahir Abdularaouf Batterjee ("Batterjee"). Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Batterjee, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

50. Al-Qadi gave shares of a business he owned, KA Stan, to Jalaidan as a "reward for the assistance he provide to [Al-Qadi's] charitable activities in Bosnia."

51. By his account, Al-Qadi helped fund housing units for the Al Eman University in Sanaa, Yemen, transferring $1.25 million between February 24, 1998, and August 3, 1998. He accomplished this transfer by sending money from the account of his company Karavan Development Group directly to Jalaidan.

52. Al-Qadi claims that Jalaidan was entrusted with the implementation of "the University Housing Project" and executed the Project through Jalaidan's company, Maram. Maram was responsible for executing a contract with another company, Vefa, which constructed the housing.

53. Moreover, the founder of Al Eman University, Sheikh Abdel Majid Zindani, was labeled as a SDGT by President Bush on February 24, 2004.

## Mohamed Bayazid

54. Jalaidan's partner in Maram, Mohamed Bayazid, is also a member of al Qaida. The Justice Department believes that Bayazid is one of al-Qaida's top leaders. In the East Africa bombing trial, a former member of al Qaida recalled how he once went with Bayazid and Mamdouh Mahmud Salim (who was convicted in the East Africa bombing trial) to receive a cylinder of purported uranium.

55. Bayazid has publicly issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

56. On September 9, 2001, Bayazid carried out a plan (along with Bin Laden, other al Qaida members, and other members of the Taliban) to assassinate Ahmed Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years. Al Qaida terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmed Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

## Qadi International

57. Al-Qadi owns a company named Al-Qadi International that has provided material assistance to Hamas.

58. According the affidavit of Immigration and Customs Enforcement Special Agent David Kane, the Vice President of Qadi International is Dr. Tareq Al-Swaiden. Al-Swaiden is a Kuwaiti businessman and lecturer who has several times publicly encouraged jihad against the U.S. and Israel and praised Palestinian suicide bombers.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

59. Al-Qadi was mentioned in a civil asset forfeiture proceeding in Chicago in 1998 as a result of a donation he made to an Islamic organization that was funding Hamas. In 1991, Qadi International donated $820,000 dollars to the Quranic Literacy Institute (QLI). The FBI claims that the Chairman of QLI, Ahmed Zaki, is a conduit for terror money.

60. QLI used the money to purchase several acres in Woodridge, a small town southwest of Chicago. In 1994 QLI sold the institute for more than the price of the initial purchase but never repaid Al-Qadi the $820,000 dollars. In 1998 QLI's assets were frozen by the government on the grounds that it was using the income generated by the Woodridge investment to finance a member of Hamas.

61. The Hamas operative in question is Mohammad Salah, an employee of QLI. According to an affidavit by FBI Agent Robert Wright, Salah received almost all of the $110,000 that the Woodridge property generated. Salah was arrested in 1993 and charged with being a member and financer of Hamas. Salah pled guilty in an Israeli court in 1995 and was sentenced to seven years in prison.

62. In addition to the $820,000 donation to QLI, Al-Qadi also used Qadi International to transfer money directly to Mohammed Salah. Bank records show that Al-Qadi sent $27,000 directly to Salah in March 1992. Qadi International also executed transfers of $107,000 and $60,000 to bank account number # 8060700 of First National Bank of Chicago, which was held by Salah.

63. During the time period that Al-Qadi was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for Hamas. In August and September of 1992, Salah flew to the Middle East on a sixteen day trip to Israel and the Occupied Territories. During this trip, Salah funneled approximately $100,000 in funds to Hamas leader Mousa Abu Marzook. According to Salah, these funds were intended for and used for to purchase weapons to carry out specified terrorist actions against Israel.

64. FBI Agent Robert Wright was ordered to discontinue his investigation into QLI, Salah and Al-Qadi. Wright has since written a book that discusses the relationship between Al-Qadi, QLI, Salah and Hamas; however, he is under orders from the U.S. government to remain silent and is prevented from distributing or discussing his manuscript.

65. Despite Al-Qadi's knowledge of Saleh's involvement with Hamas and the ultimate forfeiture case brought by the United States against QLI and Salah, Al-Qadi never attempted to reclaim the $820,000 provided to QLI for the land deal. Nor did he stop further payments to QLI. Indeed, he states that "following Mohammed Salah's arrest I had agreed to with Dr. Zaki to provide additional support directly to QLI." Al-Qadi further admits that "at the express request of Dr. Zaki, I transferred between 1991 and 1997, sums totaling $210,000 to Dr. Zaki for charitable

purposes of QLI and for his own personal account." Al-Qadi's involvement with QLI continued through at least 2002.

**BMI**

66. In the 1980's Soliman Biheiri established BMI Investments Services, Inc., which was the holding company for three occupational companies all located at the same address: BMI Real Estate Development, BMI Leasing and BMI Trade and Investment. Biheiri's intention was to use BMI Real Estate Development to "purchase residential lots, construct houses on those lots, and sell the newly constructed houses."

67. Until 1996, Al-Qadi was an investor in an Islamic Bank named Arabic Beit ul Mal (BMI) which shared offices with Al-Qadi's Qadi International in Secaucus, N.J. BMI's other investors included a Syrian Hamas leader named Mousa Abu Marzouk and Tarek Swaiden, an alleged member of the Muslim Brotherhood.

68. BMI also has ties to the Bin Laden family. Defendant Abdullah Bin Laden invested a total of $500,000 with BMI Real Estate Development Limited Partnership and BMI Construction Fund Limited Partnership. Abdullah Bin Laden was also the incorporator and head of the United States branch of the Defendant World Assembly of Muslim Youth (WAMY)[6] in northern Virginia. WAMY has extensive ties to Islamic terrorism and openly recruits and indoctrinates Muslim youth. According to the article "The Roots of Terror" dated December 5, 2002 and published on National Review online (www.nationalreviewonline.com), the WAMY book entitled *Islamic View* states:

> "Teach our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."

69. BMI has ties to Islamic terrorism not only through its personal but also through its financial relations with the northern Virginia charity named International Relief Organization (IRO), the U.S. arm of the known al Qaida financer International Islamic Relief Organization (IIRO).

70. The IIRO/IRO has extensive ties to Islamic terrorism. According to a CIA report that was released in the summer of 2003, IIRO/IRO has connections to Hamas,

---

[6] Specific misconduct regarding World Assembly of Muslim Youth ("WAMY"), a co-defendant herein, is provided via More Definite Statement Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 15

Algerian radicals and the Egyptian precursor to al Qaida—Al Gamaat Al-Islamiya, a co-defendant in this action. The report states that the IIRO/IRO is connected to Osama bin Laden and convicted terrorist Ramzi Yousef through its ties to the Muslim World League. Finally, the reports documents that the IIRO/IRO "helps fund six militant training camps in Afghanistan."

71. On January 7, 1999, a Bangladeshi national by the name of Sayed Abu Nasir was arrested in India with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S. Plot in India is Foiled in the January 21, 1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO/IRO in Asia.

72. According to Richard Chesnoff's story, "It's More Than Just Who Plants the Explosives," in the July 31, 1996 edition of the New York Daily News, western intelligence sources traced IIRO money transfers to bank accounts in London and Amman, Jordan, at which point the funds were transferred to Hamas in Gaza and the West Bank. In a Declaration of Support for Pre-Trial Detention in the case of *United States of America v. Soliman S. Biheiri*, Senior Special Agent of the Bureau of Immigration and Customs Enforcement David Kane testified that he had evidence confirming that IIRO/IRO had transferred money to Hamas through the Holy Land Foundation for Relief and Development. According to the testimony of an IIRO/IRO official in federal court in Greenbelt, MD, IIRO/IRO received an infusion of $10 million from Saudi businessmen in the spring of 1992. Additionally, FBI court filings show that the charity received $400,000 from the Saudi Embassy in Washington.

73. In the summer of 1985, Soliman Biheiri first met Sulaiman Al-Ali, the eventual executive officer of IIRO/IRO's U.S. branch. Sulaiman Al-Ali was very familiar to Biheiri because he had given lectures in Muslim conventions and conferences in the United States. They developed both a personal and business relationship. Al-Ali frequently acted as a consultant to BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia. During this time, Biheiri paid "tens of thousands" of dollars to Al-Ali for "assistance he gave me on occasions, introducing BMI Finance and Investment Group to important institutions, important personalities. And when that resulting in any business for BMI Finance and Investment Group, we have paid him a fee. You can call it a commission or a fee, but that is how it is."

74. At the beginning of 1989, during a visit to the U.S., Al-Ali told Biheiri of his plans to move permanently to the United States and establish IRO, a non-profit organization, which would be headquartered in Virginia. He further told him that he was also involved in forming a D.C. nonprofit corporation to be named **"The Sana-Bell, Inc."** which "would act as a funding source for IRO**."** According to Dr.

Al-Ali, he was or would be a founding member of the Board of Directors of Sana-Bell, Inc.

75. In the summer of 1991, Sulaiman Al-Ali moved to the U.S. and established IRO. He told Soliman Biheiri that he, through Sana-Bell, was in the midst of receiving a $10,000,000 donation from an entity named the International Islamic Relief Organization (IIRO) located in Jeddah, Saudi Arabia. According to Al-Ali, he was to invest that money, through Sana-Bell, and then use the return of the income generated from these investments to cover the costs of IRO's operations.

76. As of February 2000, Sana-Bell, Inc. had made a total of four investments. Significantly, there was never a meeting of either Sana-Bell's Investment Committee or the Board of Trustees to discuss or formally approve any of these investments. The four were as follows:

   • Property at 360 S. Washington St. in Falls Church, Virginia where Al-Ali established IRO's office. For a number of years, Sulaiman Al-Ali and IRO managed the office building on the property at 360 S. Washington St. Al-Ali signed leases on behalf of Sana-Bell, Inc. and collected the rent. IRO and Al-Ali occupied the third floor of the building for only "nominal rent," resulting in Sana-Bell's inability to cover the building's carrying costs from the building's rental income. The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sana-Bell paid cash for the building and, therefore, had no mortgage expenses associated with the building. Its only carrying costs were real estate taxes, utilities, and maintenance. The decision to charge IRO only a nominal rent, insufficient to permit Sana-Bell to cover its costs through the building's rental income, was never the subject of a Trustee meeting, an Investment Committee meeting.

   • Residential real estate building lots in Prince Georges County, Maryland for which BMI Real Estate and Development, Inc. (BMI REDI) acted as a general agent and a general contractor of houses. In mid-1993, Sana-Bell purchased 15 developed residential building lots in Prince Georges County, Maryland. At Al-Ali's suggestion, Sana-Bell entered into a management agreement with BMI REDI to build, market, and sell those houses for Sana-Bell's account. Al-Ali was Sana-Bell's only point of contact with BMI with respect to all matters relating to Sana-Bell's role in the project.

   • 200 limited partnership units, valued at $1 million, in BMI Leasing Limited Partnership (BMI Leasing).

   • 20 limited partnership units, valued at $1.1 million, in BMI Construction Fund Limited Partnership (BMI Construction).

77. All of BMI's dealings with respect to Sana-Bell were through Sulaiman Al-Ali at the IRO office at 360 S. Washington St. At Al-Ali's direction, all the tax matters

Page 17

were sent to Yaqub Mirza at his office at 555 Grove St. in Herndon, Virginia. Al-Ali located, negotiated, and decided what investments Sana-Bell would make "because the benefit of those investments were designed to go to IRO, and not to [Sana-Bell]. The building purchase was designed to benefit IRO, not Sana-Bell, D.C. [Sana-Bell] operated as a mere conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia."

78. In 1992, IIRO/IRO invested $2 million in BMI through Sana Bell, Inc. By a subscription agreement executed on December 1, 1992, The Sana-Bell, Inc. purchased 20 units of limited partnership interests in BMI Construction Fund Limited Partnership of New Jersey (valued at $1.1 million). The declared purpose of the formation of the limited partnership with BMI Construction Fund was "acquiring and developing land and constructing dwellings for sale to the public at a profit."

79. By another subscription agreement executed by The Sana-Bell, Inc. on December 12, 1992, The Sana-Bell, Inc. purchased 200 units of limited partnership interests in BMI Leasing Limited Partnership, a New Jersey limited partnership. The declared purpose for the formation of the limited partnership with BMI Leasing was "purchasing and leasing capital equipment, instruments, machinery, vehicles, computers, office systems and related software to the public at a profit."

80. The $2 million from Sana Bell soon disappeared from BMI's books. A month after the al Qaida embassy bombing in North Africa in August of 1998, Sana Bell filed suit against BMI in a federal court in Maryland. Sana Bell claimed that it had uncovered several accounting irregularities in BMI's financial records—including the disappearance of the $2 million. More specifically, Sana Bell alleged that BMI illegally disbursed Sana Bell's investment in BMI at the direction of IIRO/IRO officer Suliman Al Ali. Since Sana Bell was an operating subsidiary of IIRO/IRO, the plaintiff and the defendant in the case were essentially part of the same corporate entity. Sana Bell obtained a judgment of $2.3 million in the lawsuit but it never collected on its judgment. Federal investigators believe that IIRO/IRO's law suit was intended to create an explanation for the disappearance of the funds and conceal any financial ties between BMI and Islamic extremists.

81. Although the final destination of the $2 million is not clear, authorities believe that the end result of the transaction was Biheiri and Al-Ali liquidating and splitting the $2.1 million cash investment by Sana-Bell, Inc. at an indeterminate time between 1996 and 1998 and never giving any form of compensation to Sana-Bell. Biheiri never attempted to contact anyone else affiliated with Sana-Bell to authorize or verify the changes authorized by Sulaiman Al-Ali.

82. According to FBI agent Robert Wright, a former BMI accountant contacted the FBI in 1999 and expressed concerns that his employer transferred money overseas to finance the "embassy bombings in Africa." Moreover, the 1996 IRS 990 form for IRO revealed that it donated $153, 768 to Mercy International, Canada. It came to

light during the prosecution of the al Qaida operatives involved in the embassy bombings that Mercy International's Nairobi branch provided assistance in the attack.

83. Additionally, a German intelligence report states that Mercy International is a front for the Muslim Brotherhood. Omar Al-Qadi, a member of Yassin Al-Qadi's family, is the director of Mercy International's U.S. branch.

84. IIRO/IRO, along with a dozen other northern Virginian Islamic charities, was raided by federal agents in March of 2002. The investigation into IIRO/IRO and, subsequently BMI, is still pending.

**Abrar Group International**

85. Al-Qadi is Vice Chairman of Abrar Group International. Abrar is headquartered in Stamford, Connecticut, has a strong presence in Malaysia and deals mainly in the financial service sector. The Abrar Group has been implicated in providing material assistance to Hamas through its financial dealings with IIRO/IRO and the Chicago, Illinois based Global Chemicals Inc.

86. According to FBI agent Valerie Donahue's 1997 affidavit, Abrar and IIRO/IRO jointly invested $2 million in Global Chemical Corp., which allegedly produced household and pool cleaning supplies. Abrar invested $250,000 by itself and $345,000 on behalf of one of its top clients. IIRO/IRO fronted the remaining amount of money, as two of its top officials owned 20% of Global Chemicals.

87. The president of Global Chemicals was Mohammed Mabrook, a Libyan immigrant who had worked for a pro-Palestinian group headed by Marzouk—the Syrian Hamas leader who invested in BMI with Al-Qadi. Although Global Chemicals had a warehouse full of toxic chemicals, it did not have any customers. In 1997 the FBI asked Dennis J. Reutter, a government employed chemical weapons expert, to investigate the chemical purchases of Global Chemicals. Reutter issued a report stating that the company's purchases "do not appear to be consistent with R&D for formulation of commercial cleaning products or for quality control of commercial cleaning products. The purchases appear to be more consistent with support" of a laboratory performing biochemistry or "organic synthesis." Organic synthesis is a term used to describe the process for manufacturing some explosives.

88. Although U.S. law enforcement officials did not find any direct evidence of bomb making materials at Global Chemicals facilities, in January of 1997 the Chicago fire department confiscated the company's chemicals and Marbrook left the U.S. for Saudi Arabia. At roughly the same time, Abrar vacated its Connecticut office. In response to pressure from the U.S., Saudi Arabia returned Marbrook to the U.S. in June of 1999. Many FBI officials believed that he had ties to Hamas; however, he was ultimately convicted on fraud charges for taking money from IIRO/IRO

Page 19

under false pretenses. In August 2001 he was sentenced to 51 months in jail. The U.S. government is still trying to determine the final destination of the money that Abrar and IIRO/IRO invested in Global Chemicals.

## Muwafaq Ltd

89. Muwafaq Ltd is an Islamic charity that transferred millions of dollars from wealthy Saudi businessmen to al-Qaida. Muwafaq Ltd. was founded in 1991 as a private company in the Isle of Man but its primary headquarters was located in Jeddah, Saudi Arabia. In 1992, the charity registered as a trust in the Isle of Jersey, a Great Britain tax haven. The corporation was endowed by Khalid bin Mahfouz, a known al-Qaida financer. Muwafaq quickly started relief work in Bosnia, Somalia, Sudan, Pakistan, Ethiopia, Albania and Afghanistan and opened branches in Germany and Austria; however, the charity also functioned as a financing tool for al-Qaida as well as the general Islamic fundamentalist movement.

90. Al-Qadi was the director and one of four shareholders for Muwafaq. In cooperation with Talal M.M. Bradkook and Dr. Mohaman Ali Elgari, Al-Qadi incorporated Muwafaq in Delaware in 1992 and operated the charity until 1997. During that time Al-Qadi spent roughly 15-20 million dollars of his own money on the day to day operations of Muwafaq.

91. Al-Qadi states that he selected the managers responsible for the various countries, and that he then delegated his authority to the various country managers, who in turn took day-to-day responsibility for running Muwafaq. Al-Qadi took an active role in the activities of each regional branch of the Muwafaq foundation and admits that he would visit each project country three to four times a year.

92. Al-Qadi states that there was little auditing performed by the foundation and that in several of the countries that Muwafaq had a presence, there "are no meaningful financial records available." Even in countries where there was a requirement that audits be filed, e.g. Pakistan, Al-Qadi can not confirm that the results of the audits were filed as required.

93. Muwafaq's ties to Islamic terrorism, specifically Osama bin Laden and al Qaida, are widespread and pervasive.

94. Al-Qadi hired Chafiq Ayadi, an SDGT since October 12, 2001, to head Muwafaq's European operation upon the recommendation of Jalaidan in late 1992. According to a 2004 report from the Office of Foreign Assets Control (OFAC), the U.S. government has information that demonstrates this hiring occurred shortly after Ayadi's expulsion from Tunisia for belonging to an Islamic extremist group.

95. During the mid-1990's, Ayadi also headed the Muwafaq branch in Bosnia.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

96. Ayadi was employed as director in charge of Muwafaq's European activities from 1992 to 1995 or 1996, and during that time Al-Qadi transferred substantial sums to Ayadi's personal account. Al-Qadi states that these transfers were for the sole purpose of the charitable objectives of the Muwafaq.

97. At the time of his appointment by Al-Qadi to be Muwafaq's European director, evidence indicates that Ayadi was operating under agreements to help Osama bin Laden.  According to information available to the U.S. Government, Ayadi was one of the principal leaders of the Tunisian Islamic Gront, the military wing of the extremist Al-Nadha movement. Ayadi reportedly went to Afghanistan in the early 1990's to receive paramilitary training, and went to Sudan along with suspected Tunisian terrorist Muhammad Harrath and Abdallah Jajji in order to meet with Osama bin Laden. Later, according to information available to the U.S. Government, they met bin Laden a second time, in the presence of Hassan Turabi, where they secured Bin Laden's agreement for Bin Laden collaborators in Bosnia to receive Tunisian Al-Nadha mujaheddin from Italy.

98. A considerable number of foreign and U.S. intelligence reports list Muwafaq as a primary source of funding for Islamic terrorist groups in several theatres of the globe.

99. A U.S. intelligence report states Muwafaq has ties to the extremist group al Gama'at Al Islamiyya and that it funds Egyptian terrorists in Bosnia. Similarly, an internal memorandum by Spanish External Intelligence also found that Muwafaq maintained contacts with the Egyptian Gamaa Islamiya.

100.     According to information available to the U.S. Government, in 1995, the then-leader of Al- Gamaa Islamiya, Talad Fuad Kassem, said that Muwafaq had provided logistical support and financial support for a mujahadin battalion in Bosnia.

101. Russia has also documented Muwafaq's terrorist activities. In a classified document that was released in 2003, the Counter-Terrorism Center for the Commonwealth and the Independent States, a unit of the Russian Ministry of Defense, states that "the Muwafaq Foundation was set up to give assistance to the families of Islamic terrorists...The headquarters are located in Jeddah, KSA."

102. A European intelligence source found that Khamir Amer Ballayth, an associate of Osama bin Laden, transferred between $200,000 to $250,000 to the Muwafaq foundation through the account of the Bin Jaad establishment at the Faysal Bank[7], a co-defendant in this case, in Peshawar.

---

[7] Specific misconduct regarding Faisal Islamic Bank  a/k/a Faysal Islamic Bank ("FIB"), a co-defendant herein, is provided via More Definite Statement Applicable to FIB.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which

Page 21

103. According to a foreign intelligence document, the Muwafaq foundation provided capital Osama bin Laden's personally owned Animal Resources Bank of Sudan.

104. Together Al-Qadi and Khalid bin Mahfouz[8] formed two offshoot subsidiaries, the National Management Consultancy Center (NMCC) and the National Commercial Bank (NCB),[9] to help conceal Muwafaq's financial ties to Osama bin Laden and al-Qaida.

105. In similar fashion to Muwafaq, NMCC was registered in Isle of Man but managed from Jeddah, Saudi Arabia. Al-Qadi delegated managerial power over NMCC to Sharia scholar Mohammed Ali Al Gari and appointed himself as co-executive director and primary share holder. Additionally, Al Gari was also appointed NCB Sharia Board Advisor giving him authority over the use and attribution of the Zakat (money to be given to charity) funds. Ali Gari was also a member of Muwafaq Foundation Council. Essentially, Al-Qadi and his associates were able to maintain control over NCB and NMCC and use them to consolidate and transfer money to Muwafaq and other charities that served as front organizations for al Qaida.

106. For instance, an audit of NCB revealed that over a ten year period the bank's Zakat Committee gave $74 million dollars to the International Islamic Relief Organization('IIRO'), which at the time was operated by Osama bin Laden's brother in law and documented as a primary source of funding for Osama bin Laden. During a Congressional Hearing in October of 2001, former CIA Chief of Counter-terrorism Vincent Cannistraro stated that NCB operated as a "financial conduit" for Osama bin Laden and helped him fund training camps in Sudan.

---

are contained within its More Definite Statement Applicable to FIB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[8] Specific misconduct regarding Khalid Bin Mahfouz ("Bin Mahfouz"), a co-defendant herein, is provided via More Definite Statement Applicable to Bin Mahfouz. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Bin Mahfouz, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[9] Specific misconduct regarding National Commercial Bank ("NCB"), a co-defendant herein, is provided via More Definite Statement Applicable to NCB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AC_Al Qadi, Yassin - More Definite Statement - AL BAraka.doc

107. Similarly, another audit of the National Commercial Bank of Saudi Arabia revealed that $3 million was pulled from the accounts of several wealthy Saudi businessmen and placed in Muwafaq's account for Osama bin Laden.

108. Many of Muwafaq's employees are either members of or associated with Islamic terrorist groups. For instance, a European intelligence source found that al-Qaida operative Mahmond Mehdi was once a member of Muwafaq, as was an Afghan fighter and suspected Hamas member named Husam Tayeh. The same source alleged that Muwafaq opened a branch in Manila in 1994 in cooperation with Muhammad Jamal Khalifa, who is involved in the Abu Sayyaf Group, a co-defendant in this action, and the Moro Islamic Liberation Front. Additionally, Jamal Khalifa is Osama Bin Laden's brother in law.

109. Along the same lines, in 1995 Muwafaq's Islamabad office in Pakistan was raided by the police and its local director, Amir Mehdi, arrested due to suspicions of connections with Ramzi Yousef, the man behind the bombing of the WTC in 1993. Although the director was released three months later and no charges were brought against the charity, its operations in Pakistan were terminated.

110. Upon his arrest, Mehdi was informed that telephone numbers, including a telephone number installed at his residence, had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.

111. In 1993, Abdel Latif Saleh became partner of Yassin Al-Qadi in Loks-Holl company, Medicare Sh.P.K and Karavan company. In 1994, he founded the Albanian branch of the Muwafaq Foundation. According to a Turkish intelligence report, Saleh was previously a member of the International Islamic Relief Organization a know al Qaida front organization. In the 1998 "Returnees from Albania" Egyptian military trials, many of the Albanian extremists who testified identified Abdul Latif Saleh as a primary supporter of the extremist movement in Albania. In 1999, in cooperation with the U.S. government, he was arrested and deported by Albanian officials based on suspicion of his involvement with the Egyptian Islamic Jihad and al Qaida.

112. According to information available to the U.S. Government, Saleh founded and organized the Albanian Islamic Jihad (AIJ). As early as 1999, Al-Qadi was known to be an active supporter of, and fund raiser for, the AIJ. Muwafaq operated an Islamic school in Kukes until 1997, and several of the most radical students from the school were selected for membership in AIJ.

113. OFAC found numerous documents and correspondence between Al-Qadi and Saleh. Saleh was named as an official signatory for Karavan bank accounts. Saleh was the general manager of all Al-Qadi businesses in Albania. Saleh was the only person who had authorization to withdraw money directly from Al-Qadi's bank account and transfer the funds whenever the situation required it.

114.   Large wire transfers were seen through these documents coming into and out of Al-Qadi's personal accounts in Albania. As well, large cash withdrawals were paid to Saleh.

115.   Similarly, the April/May 1998 edition of Defense and Foreign Affairs' Strategy Policy states that Muwafaq is mainly used to "recruit and train Albanian Mujahedin."

116.   Muwafaq employees also have ties to terrorist activity in Sarajevo, Bosnia-Herzegovina.  Karim Merjri is listed at the Head Officer of Muwafaq's division in Kosevsko, Sarajevo.   The Bosnian Financial Police have tied Mejri to al-Haramian Al-Aqsa, another Arab foundation that has financial ties to Islamic terrorism.

117.   Moreover, foreign Muslim volunteers en route to Bosnia to join the resistance often stayed at Muwafaq safe houses in Croatia. Croatian authorities conducted several raids on these houses and seized illegal arms.

118.   According to information available to the U.S. Government, Muwafaq transferred $500,000 to terrorist organizations in the Balkens.

119.   According to information available to the U.S. Government, Al-Qadi continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996. The primary recipients of Al-Qadi's support in the Balkans were Defendant Al-Haramain, the Revival of Islamic Heritage Society, Alwaqf al-Islamiya and Defendant the World Association of Islamic Youth. The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices were designated as SDGTs on January 9, 2002. The Bosnia-Herzegovina branch of the Al-Haramain Foundation was designated as an SDGT on March 11, 2002.

120.   In 2001, according to information available to the U.S. Government, Al-Qadi acknowledged that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkens.

121.   Finally, a German intelligence report states that Al-Qadi uses the following companies to transfer money on behalf of the Muwafaq Brigade militia in Bosnia and Kosovo: Abrar International of Kula Lumpur, Malaysia, BMI of Istanbul, Turkey, Loxall of Tirana, Albania, and Medicare of Tirana, Albania.

122.   According to a press report, Al-Qadi asserted at the time of his designation as a global terrorist that Muwafaq had terminated operations in 1996 or 1997. However, according to one of Al-Qadi's submission, as of late 2002, Muwafaq continued to be registered in Holland and Belgium.

**Vakufska Banka D.D. and Depozitna Banka D.D**

123. Vakufska Banka and Depozitna Banka have supported, facilitated and participated in terrorism financing on the territory of Bosnia Herzegovina. Moreover, the banks have provided financial support to several organizations acting as fronts for al Qaida, including Muwafaq, Al Haramian Islamic Foundation and the Saudi High Commission for Releif in Bosnia Herzegovina.

124. Al-Qadi has played a central role in the ownership and management of Vakufska and Depozitna. Depozitna was based in Sarajevo and owned by Al-Qadi, Chafiq Ayadi and Mahmal Investment Company—an Isle of Man based corporation that is currently under Bosnian investigation by the Financial Police and Federal Banking Agency. While he was a co-owner of the bank, Chafiq Ayadi used the bank to transfer $2.5 million to the account of the Muwafaq Foundation. Ayadi sold his shares of the bank to Al-Qadi in September of 2000.

125. In August 2002 Vakufska merged with Depozitna Banka, as the Banking Agency had rescinded Depozitna's banking permit on March 30, 2001. At the time, Vakufska was already partially owned by both Al-Qadi and Mahmal Investment Company, the same two groups that owned Vakufska.

126. Aside from Al-Qadi and Mahmal, several of Vakufska's past shareholders have financial ties to Islamic terrorist organizations. For instance, El Tarik Oil D.O.O., an oil company based in Sarajevo, was a shareholder with 8% bank capital in 2000. A Bosnian Financial Police report from 2002 documents that El Tarik regularly provides financial assistance to the Saudi High Commission and al Haramian al Aqsa foundation in Sarajevo, both of whom consistently offer logistical support to al Qaida.

127. The involvement of Al-Qadi in both Depozitna Banka and Vakufska Banka with the financial backing of Mahmal Investment Co. Limited has provided a financial arm to Islamic charities and terrorist organizations operating in Bosnia Herzegovina. A 2002 Bosnian Intelligence report describes Vakufska Banka as a financial base for Al Haramian Islamic Foundation and, subsequently, al Qaida:

> *"The al Haramian Islamic Foundation spent around 13 KM ($7, 647,000) between its foundation in 1997 and the end of last year (2000). Financial transactions were through accounts at the Depozitna Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering."*

128. The Bosnian intelligence report then establishes the link between Al Haramian Islamic Foundation and Osama bin Laden:

> *"Al Haramain…has acted as a channel for financing the activities ofterrorist organizations…According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al*

Page 25

*Islamija, while members of Bin Laden's El Itihad al Islamija terrorist groups were employed at the Somalia offices, which also financed their operations."*

129. The Bosnian Financial Police have documented that Vakufska Banka is involved in terrorist financing through financial transactions between the Saudi High Commission for Relief and a company named Engra. From 1998 to 2000, Engra conducted financial transactions of behalf of an organization linked to Osama bin Laden through the following bank accounts: account number 1604205500000502 at the Vakufska Banka in Sarajevo, Zenica Branch and account number 1602000000869046, which was opened at the Depozitna Banka.

130. According to information available to the U.S. Government, planning sessions for an attack against a U.S. facility in Saudi Arabia during the mid 1990's may have taken place at Depozitna Bank.

131. Chafiq Ayadi held Al-Qadi's shares in Depozitna Bank as the nominee for Al-Qadi from 1996 to 1998, and had a position with the bank until the end of 1998.

**Ptech**

132. In 1998 Yassin Al-Qadi invested 14 million in Ptech, a privately owned Massachusetts based technology company. By 2001, Al-Qadi was one of the company's top investors and managers.

133. Ptech was re-incorporated in Delaware in 2001 and is used primarily to develop enterprise blueprints at the highest level of US government and corporate infrastructure. These blueprints hold every important functional, operational, and technical detail of the enterprise. A secondary use of this powerful tool is to build other smart tools in a short period of time. Ptech's clients in 2001 included the Department of Justice, the Department of Energy, Customs, Air Force, the White House, the FAA, IBM, Sysco, Aetna, and Motorola.

134. Along with Al-Qadi, Ptech has several other disconcerting ties to Islamic terrorism. Defendant Yaqub Mirza is on Ptech's Board of Directors. Mirza shares links with several individuals and groups under investigation for terrorist funding or activity.

135. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. The SAAR Foundation is the organizational epicenter of a network of terrorist financing charities that were raided by the FBI in March of 2002. Mirza is the director of Sterling Advisory, a SAAR organization which controlled Ptech Fund LLC.

136. Mirza is listed as the President and CEO of Mar Jac Investments, Inc. Mar Jac Poultry, a Georgia based operating division of Mar Jac Investments is under investigation by U.S. authorities for its role in terrorist financing.

137. In August of 2000, Mirza registered the defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Islamic terrorists. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to the 1998 Embassy bombings.

138. Lastly, Mirza is involved with the Wahabbi Lobby, an influential Saudi based organization that promotes Islamic extremism through the World Association of Muslim Youth.

139. Soliman Biheiri is also a founding member of Ptech. Biheiri ran BMI Real Estate Development, a Virginia based group that is affiliated with the IIRO and suspected of financing the 1998 Embassy bombings.

140. Two of Ptech's employees, Suheil Laher and Muhamed Mubayyid, are affiliated with Care International, an organization that is co-located in Boston and Sudan and is under investigation due to its financial ties to bin Laden. Both of the two above mentioned employees subscribe to al Qaida's radical interpretation of Islam. Indeed, a Muslim Cleric at Harvard University described Laher as "over the top" with regards to his religious beliefs.

141. Husssein Ibrahim, a co-founder and chief scientist at Ptech is also an officer of the above mentioned BMI Real Estate.

142. Ptech's Middle Eastern branch, Horizons, is also neck deep in the Islamic fundamentalist movement, as there client list includes the Saudi bin Laden Company and the Afghan based BTC Bin Laden Telecom.

143. In December of 2002 the FBI raided Ptech and the investigation is still pending.

**Additional Business Assets and ties to Islamic Terrorism**

144. Al-Qadi is an executive with a Saudi company, MM Badkook, that supplied 15,000 meals a day to Kuwaiti and U.S. troops during the Gulf war. Talal Badkook , the company's founder, is also a member of the Al-Mustaqbal group along with Saleh Mohammed bin Laden, son of Mohammed bin Laden, and Abdullah Saleh Kamel,[10] son of Saleh Kamel who is the chairman of the Dallah al-Baraka.

---

[10] Specific misconduct regarding Saleh Abdullah Kamel ("Kamel"), a co-defendant herein, is provided via More Definite Statement Applicable to Kamel. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained

145. Al-Qadi is Vice President of Jamjoon, a Saudi Arabian company that has investments in a number of different industries. The company's owner, Shaykh Ahmad Salah Jamjoom, is related to the deputy chairman of Faysal Islamic Bank—Ahmed Shah Jamjoom.

146. Al-Qadi is the Director of Global Diamond Resources (GDR), a Nevada based company that manages three mines in South Africa. More specifically, Al-Qadi sits on GDR's board as a representative of New Diamond Holdings—a firm which has a controlling interest in GDR. Initially, Al-Qadi invested initially invested $3 million into GDR but as of October 2001 his investment had diminished to roughly $750,000.

147. GDR has strong ties with the Islamic fundamentalist movement. Several representatives of the bid Laden family invested heavily in GDR and serve on the board of directors with Al-Qadi. Al-Qadi was introduced and recommended to GDR through an executive of the Saudi bin Laden Group.

148. Al-Qadi serves on the Board of Directors of Shifa International Hospitals in Pakistan along with M. Saleem Khanani. Saleem Khanani is on the Board of Directors with Barakat Corporation and Barakat International in Florida. Although they were not targeted, these two businesses are part of the Barakaat Hawala Network that had its assets frozen on November 7th for funneling money to al Qaida.

149. Investors in the Al-Qadi investment Alintid Holding Company included major Al Haramain contributors, and a major contributor to al-Waqf and al-Haramain NGO's, according to information available to the U.S. Government. Albanian law enforcement officials seized Alintid documents during an October 2001 raid of the Tirana, Albania headquarters of al-Waqf al-Islami—an NGO that has personal linked to terrorist and extremist groups.

150. Yassin Al-Qadi knew or had to know that he was providing financial assistance to al-Qaida.

151. As the foregoing demonstrates, Al-Qadi thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al-Qadi's participation in the jihadist campaign for al Qaida, and/or Radical Muslim

---

within its More Definite Statement Applicable to Kamel, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

152. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT  FAISAL ISLAMIC BANK

1. The name of the defendant to whom this Statement pertains is Faisal Islamic Bank ("FIB").  The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**AD**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

   a.   The predicate acts and statutes in question include:

   - Conspiracy to commit murder - NY  Penal § 105.15; NY  Penal § 125.25 (xi)

   - Conspiracy to commit arson - NY  Penal § 105.15; NY  Penal § 150.15

   - Fraud with Identification - 18 U.S.C. § 1028

   - Mail Fraud - 18 U.S.C. § 1341

   - Wire Fraud - 18 U.S.C. § 1343

   - Financial Institution Fraud - 18 U.S.C. §1344

   - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

   - Money Laundering - 18 U.S.C. § 1957

   - Defrauding the United States Government - 18 U.S.C. § 371

   - Travel Act - 18 U.S.C. § 1952

   - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

   - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

   - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b.   In the Mid 1990's to September 11, 2002, FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, FIB conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

c.  The individual times, places, and contents of the alleged misconduct are
    not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate
    acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated,
    ongoing, continuous, and are a part of the Enterprise's regular way of
    doing business.  Other of the defendants consistently, evenly constantly,
    laundered money, filed false tax returns, and otherwise impeded and
    impaired the administration of the tax laws as part of their scheme to
    conduit money to terrorists, and yet obfuscate their support of Radical
    Muslim Terrorism and/or al Qaida and/or the International Islamic Front
    for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a
    common plan because each act of knowing and intentionally providing
    financial services and money laundering and tax evasion allowed certain
    of the defendants, specifically including FIB, to surreptiously provide
    funds to terrorist organizations, including al Qaida, Radical Muslim
    Terrorism and/or the International Islamic Front for the Jihad Against
    Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or
    "International Islamic Front for the Jihad Against Jews and Crusaders")
    ("Enterprise") is comprised of the defendants named in the Original
    Complaint and any additional complaints filed in this action as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi
    Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill,
    et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a
    collection of the persons, organizations, businesses, and nations associated
    in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in
    the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an
    organization called "The Foundation" or "al Qaida."  Al Qaida was
    intended to serve as a foundation upon which to build a global Islamic
    army.  In February, 1998, a declaration was issued, following the holding
    of a terrorist summit, announcing the formation of the International
    Islamic Front for the Jihad Against Jews and Crusaders, the precursor of
    which was the Muslim Brotherhood and the Islamic Jihad.  The structure
    of the Enterprise is an association in fact with common and complex goals

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. FIB fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including FIB, and illegal activity to generate material support to continue its terrorist operations.

c.  FIB was not an employee, officer or director of the Enterprise, based upon present information available. FIB is associated with the alleged Enterprise. FIB is a member of the Enterprise, and is separate and distinct from the Enterprise. FIB intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by FIB is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by FIB funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by FIB, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. FIB acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including FIB, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including FIB, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of FIB, of both those goals and the uses to which the Funds were put.

    b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

conspirators like FIB. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including FIB. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by FIB. FIB, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. FIB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and

loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against FIB are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. FIB has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. FIB is a subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC, whose holding company is Defendant Dar-al-Maal al Islami (DMI),[1] based in Switzerland. All three entities are chaired by Defendant Mohammed al Faisal al Saud.[2]

---

[1] Specific misconduct regarding DMI, a co-defendant herein, is provided via More Definite Statement Applicable to DMI. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to DMI, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] [2]Specific misconduct regarding Mohammed al Faisal al Saud ("Prince Mohammed"), a co-defendant herein, is provided via More Definite Statement, previously filed, Applicable to Prince Mohammed. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its RICO Statement, previously filed, Applicable to Prince Mohammed, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC). Such allegations shall only apply to defendants who are not presently dismissed in this action, without further leave of the Court.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

22. FIB was founded in 1970 by Yousef M. Nada ("Nada"), a co-defendant in this action.  Nada is a member of the Egyptian Muslim Brotherhood and the Jamaa al-Islamiya, which is directly allied with al Qaida.  When he came to Saudi Arabia, he became friendly with the Royal Family, though his membership in the Muslim Brotherhood, a co-defendant in this action, opened a construction company, and thereafter, founded the FIB.  Nada has been implicated as a supporter of the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and has been connected to the Al Taqwa Bank, as their president, in supporting Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

23. Fib enjoyed privileges denied other commercial banks (full tax pensions), as well as guarantees against confiscation or nationalization.  Moreover, these privileges came under official government protection from 1983 onward as the ruling regime became committed to all aspects of Sudanese life.

24. FIB is a subsidiary of Islamic Investment Company of the Gulf.

25. There are a number of FIB's across the Islamic world from Egypt to Pakistan to the Emirates and Malaysia.  The head of the FIB is Prince Mohammed Al Faisal Al Saud ("Prince Mohammed").

26.  During Prince Mohammed's tenure, FIB was involved with running accounts for bin Laden and his associates.

27. FIB was one of the main founders of the al Shamal Islamic Bank, the bank which Osama Bin Laden helped to establish in 1991 by providing capital in the amount of $50 million.

28. At this time, it is believed that FIB remains a major shareholder of al Shamal Bank.

29. At the time Faisal Islamic Bank provided financial services to Osama bin Laden, it was well known in the Muslim World that he was building a terrorist organization to wage jihad against the United States and the perceived enemies of Islam.

30. Indeed, at the conclusion of the Afghan was against the Soviets in 1989, Osama bin Laden had returned to Saudi Arabia as a "hero" of the *jihad* against the Soviets.

31. When the United States intervened against Iraq on behalf of Kuwait in 1990, bin Laden rallied radical Islamic elements to reject any U.S. support or intervention in the region.  As a result of his efforts to incite radical Islamic elements, bin Laden

Page 9

was publicly expelled from Saudi Arabia and moved immediately to the Sudan, where a radical Islamic group, openly welcomed him and his top lieutenants.

32. Once situated in Sudan, bin Laden began bringing veterans of the Afghan jihad to the country, where they received terrorist training and became the first members of what is known today as al Qaida.

33. These early al Qaida members fought alongside NIF troops in the ongoing conflict against Christians in the South, in return for which al Qaida received land for training camps, weapons and other forms of support from the Sudanese government. Bin Laden also established numerous front companies to support the new organization in Sudan. All of these activities were well publicized at the time and, as a result, bin Laden's terrorist intentions were well known to people and organizations within the Sudan, including FIB.

34. Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal.

35. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

36. FIB was also implicated during the 2001 United States trial relating to the 1998 embassy bombings in Africa. A former finance manager for al Qaida in Khartoum, Jamal al-Fadl, testified that FIB held bank accounts for al Qaida operatives by stating:

> Q: "Where were the accounts [of the al Qaida] held? In what countries?
>
> A: …we got account in Bank Faisal Islami.
>
> Q: Is that also in Khartoum?
>
> A: Yes."

37. The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by FIB. The events of 9/11 were a direct and intended and foreseeable result of FIB's participation.

38. FIB continued to maintain accounts for these entities long after al Qaida's murderous intent was made clear though the terrorist activities in the complaint, as amended. In doing so, FIB knowingly provided financial services and other forms

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

of material support to al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the Enterprise through anti-terrorist and money laundering safeguards.

39. FIB misconduct includes laundering money for Al Qaida (including maintaining and servicing AL Qaida bank accounts and accounts used to fund and support Al Qaida), and/or facilitating money transfers and weapons and military equipment purchases for Al Qaida.

40. FIB knowingly facilitated Al Qaida's fundraising efforts by advertising the existence and numerical designations of the accounts it maintained for Al Qaida's cooperating charities throughout the Muslim world.

41. FIB has channeled millions of dollars to al Qaida through its baking and financial operations, and knowingly and intentionally provided repeated material support and substantial assistance to al Qaida through the use of interstate and international faxes, telephones, wire transfers and transmissions and mailing in violation of numerous federal statutes.

42.  FIB controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States, and did nothing to stop them.

43. As the foregoing demonstrates, FIB thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of FIB's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

44. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AD_Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT KHALID BIN MAHFOUZ
A/K/A KHALED BIN MAHFOUZ

1.  The name of the defendant to whom this Statement pertains is Khalid Bin
    Mahfouz ("Mahfouz").  The alleged misconduct and basis for liability is set forth
    below as well as elsewhere in the Complaint, as amended.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**AE**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Mahfouz conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 2

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Mahfouz, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Mahfouz fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Mahfouz, and illegal activity to generate material support to continue its terrorist operations.

c. Mahfouz was not an employee, officer or director of the Enterprise, based upon present information available. Mahfouz is associated with the alleged Enterprise. Mahfouz is a member of the Enterprise, and is separate and distinct from the Enterprise. Mahfouz intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Mahfouz is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

Page 4

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Mahfouz funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Mahfouz, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Mahfouz acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Mahfouz, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Mahfouz, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Mahfouz, of both those goals and the uses to which the Funds were put.

    b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

conspirators like Mahfouz. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Mahfouz. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Mahfouz. Mahfouz, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Mahfouz also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency,

loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Mahfouz are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Mahfouz has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Khalid Bin Mahfouz is one of the wealthiest businessmen in Saudi Arabia.

22. National Commercial Bank ("NCB") was founded in 1950 by Salim bin Mahfouz, Khalid's father.  After Salim's death in 1986, Khalid became President and CEO.

23. From 1986 to 1999, Mahfouz was the President and CEO of the National Commercial Bank ("NCB").[1]  During that time, Mahfouz was also the principal shareholder, with over fifty percent (50%) interest and control over NCB.

---

[1] Specific misconduct regarding NCB, a co-defendant herein, is provided via More Definite Statement Applicable to National Commercial Bank ("NCB") and NCB's Entities.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to NCB and NCB's entities, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

24. NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City.

25. NCB was directly involved in the fraudulent schemes and practices of BCCI between 1986 and 1990.

26. While under Mahfouz's control, NCB served as a primary vehicle for channeling financial support to Osama bin Laden and al Qaida. In this regard, former CIA Chief of Counter-terrorism Vincent Cannistraro testified as follows during a congressional hearing in October 2001:

> How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Guld contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to bin Laden was handled until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism.

27. A bank audit of NCB was conducted in 1998. This audit revealed that over a ten (10) year period of time, the period in which Mahfouz was President and CEO, that about $74 million was funneled by its *Zakat* Committee to the International Islamic Relief Organization (IIRO).[2] The audit also found irregularities due to "unreported expenses and loans." It stated that "without knowledge to the Zakat Committee, NCB Directors established over the years credit and loan facilities that were not reviewed by the Committee." Direct donations were sent through NCB to the Red Crescent Saudi Committee, the International Relief Organization and Muwaffaq Foundation." These money transfers were discovered in April 1999, after the royal family ordered an audit of NCB and its founder and former chairman, Mahfouz.

---

[2] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement Applicable to International Islamic Relief Organization ("IIRO"). Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 9

28. In or about 1998, the NCB opened a two "shared account" with Al Rajhi Banking and Investment Corp.[3] (Special Joint account #22 and 33) for IIRO as a member of the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC). The SJRC served as a vehicle for funneling donations to al Qaida fighters in Kosovo and Chechnya. These accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998, indicating that they were established to launder funds in support of al Qaida activities in Kosovo and Chechnya.

29. According to a November 22, 1999 British intelligence report, the Saudi Arabian Royal family used NCB to channel funds to Osama bin Laden. In the fall of 1999, Reuters and USA Today quoted US intelligence sources stating an NCB audit conducted that $3 million was diverted to al Qaida through the bank from five of Saudi Araia's prominent business leaders' accounts. The transactions were laundered through accounts at NCB in the name of Blessed Relief Foundation (A/k/a Muwafaq Foundation ) and al Qaida charity front founded by bin Mahfouz and E.O. 13224 designee Yassin al Kadi.

30. NCB also provided facilities for a fundraiser to finance families of the "heroes of the "Palestinian uprising" sponsored by the IIRO in 2000.

31. Mahfouz founded the Muwaffaq Foundation a/k/a Blessed Relief Foundation, an alleged charity organization, a co-defendant in this action and a supporter of Osama Bin Ladin.

32. Bin Mahfouz was dismissed from NCB in 1999, soon after the audit revealed the bank's extensive involvement in sponsoring al Qaida. This audit report pointed to a $3 million transfer to the Muwaffaq Foundation, or "Blessed Relief."

33. Mahfouz remains a shareholder in NCB (10%), along with his wife, Maila Abdulaziz Kaaki (10%) and their sons (16% for both Abdulrahman and Sultan).

34. In October 13, 2001, the United States Government declared the Muwaffaq Foundation as a front for the al Qaida.

35. In 1991, Muwaffaq Ltd.was founded and financed by the Mahfouz family in the isle of Man, a tax haven. Its backers were named as a group of Saudi investors

---

[3] Specific misconduct regarding Al Rajhi, a co-defendant herein, is provided via More Definite Statement Applicable to Al Rajhi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Al Rajhi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

from Jeddah. The same year, Muwafaq Foundation was established in Sudan, with Yasin al Qadi.[4]

36. Abdulrahman Bin Khalid Bin Mahfouz, son of Mahfouz, was named Director of the Muwafaq Foundation, while simultaneously serving as a member of the board and Vice Chairman of the Executive Management Committee of NCB. Abdulrahman Bin Khalid bin Mahfouz acknowledged in an interview with Forbes Magazine that Muwafaq Foundation was the "brainchild" of his father "who funded it with as much as $30 million."

37. At the time they established Muwafaq Foundation, Yasin al Qadi and Mahfouz intended for it to serve as a vehicle for funding and otherwise supporting terrorist organizations, including al Qaida.

38. The assets of Muwafaq Foundation and those of its chairman Yasin al Qadi were frozen on October 12, 2001 by the US Treasury Department pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

39. The governments of the United Kingdom, Turkey, Kazakhstan, Albania, Slovenia, and Switzerland have also followed suit.

40. The US authorities described Yasin Al Qadi as a "terrorist" and Muwafaq Foundation as an organization that "financially supports terrorism" and "funnels money to the al Qaeda terrorist network."

41. Additionally, members of the board of the Muwaffaq Foundation are listed in the United States Treasury Department Office of Foreign Assets Control, "Specially Designated Nationals and Blocked Persons" list.

42. In an November 29, 2001 letter to Swiss authorities requesting that the Swiss government block al Qadi's assets by the Treasury Department General Counsel David Aufhauser summarized the Muwaffaq Foundation's pervasive sponsorship of al Qaida as follows:

> The leader of the terrorist organization Al Gama'at Al Islamiya, Talad Fuad Kassem, has said that the Muwaffaq Foundation provided logistical and financial support for a mujahidin battalion in Bosnia. The foundation also operated in Sudan, Somalia and Pakistan, among other places.

---

[4] Specific misconduct regarding Al Qadi, a co-defendant herein, is provided via More Definite Statement Applicable to Al Qadi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

A number of individuals employed by or otherwise associated with the Muwaffaq Foundation have connections to various terrorist organizations.

Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TFI) in the United Kingdom, was associated with the Muwaffaq Foundation personnel in Bosnia and other TIF members worked at the Muwaffaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwaffaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al Faran terrorist group responsible for the kidnapping of Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwaffaq Foundation offices and held its local director in custody for several months. The Muwaffaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.

They also employed or served s cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK), which has been partially financed by the Muwaffaq Foundation. Muwaffaq Foundation supplied identity cards and employment as cover for some Arabs to allow them to obtain visas to remain in Pakistan. The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the dissolution of MK in early June 2001 and its absorption into Al Qaida, a number of NGOs formerly associated with MK, including Muwaffaq Foundation also merged with Al Qaida.

Mr. Kadi has asserted in various press interviews that the Muwaffaq Foundation ceased operations at a range of different times in 1995, 1996, or 1997. However, the United Nations reported that Muwaffaq Foundation was active in Sudan as late as 1997. Moreover, far from ceasing operations, the U/N/ report stated that the" Muwaffaq Foundation plans to continue to expand its humanitarian activities in the coming year…" US Department of Humanitarian Affairs, Consolidated Inter-Agency, Appeal for Sudan January-December 1997 (Feb. 18, 1997)

From 1993, the head of the European offices of the Muwaffaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate. Ayadi Chaliq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mahammas

Page 12

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Depositna Banka in Sarajevo Bosnia, which was owned by Mr. Kadi. Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United Stated in the months preceding the attack.

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qadi and other terrorist organizations. Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and training terrorist cells. Their provision of humanitarian aid and educational services is done in concert with the terrorist to win the hearts and minds of the local people to whatever causes the terrorists espouse. When a region becomes more settled, such as Bosnia or Albania today, seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist organizational activity. Mr. Kadi's actions and those of his Muwaffaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.

43. On October 29, 1999, USA Today quoted a senior United States intelligence official who stated that wealthy business men, among them Mahfouz, were paying Osama Bin Ladin 'protection money' to stave off attacks on their businesses in Saudi Arabia. Intelligence officials said that, during that time, Mahfouz was placed under "house arrest" at a military hospital in the Saudi city of Taif.

44. Mahfouz has been identified as a principal financier of the Al Qaida and has made substantial contributions to many of the alleged charities operating within Al Qaida's infrastructure, with full knowledge that those funds would be used to support the operations of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. For example, Mahfouz is listed on the "Golden Chain" as a donor. The "Golden Chain" is a list of the top wealthy financial supporters of the Al Qaida. This document was seized by the Bosnian police during searches in the offices of the Benevolence International Foundation in Sarajevo in March 2002. This document was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirators Statements" in the case of United States v. Arnaout filed on January 29, 2003. Additionally, this list was mentioned in the indictment of Enaam Arnaout (02 CR 892), a co-defendant in this action. According to the United

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

States government, this document is a "list of people referred to within Al Qaida as the "Golden Chain", wealthy donors to mujahadeen efforts."

45. The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report f the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, an din fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee available at:

> http://www.treas.gov/press/releases/js2164.htm

46. Between 1986 and1990, bin Mahfouz was Chief Operating Officer of Bank of Credit and Commerce International (BCCI), and one of that bank's principal shareholders. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA) rapidly spread to become a vast fraudulent empire.

47. Under Mahfouz, BCCI actively participated in a variety of criminal endeavors, including the sponsorship of terrorism, as reported by the United States Senate. In particular, investigations by the CIA and US Senate directly implicated BCCI in the laundering of drug money, manipulation of financial markets, arms trafficking, and in handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

48. The 1992 US Senate Report on the BCCI Affair also linked the bank to financial funding of the Afgan war.

> BCCI may have been moving money through the National Bank of Oman to fund the was in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying "It was Arab money that was pouring through BCCI. The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Omam, where BCCI owned 29%.

49. According to the Senate Report, BCCI's support of terrorism and arms trafficking developed out of several factors.

> First, as a principal financial institution for a number of Gulf sheikdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and

then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

50. On July 1, 1992 Mahfouz was indicted in New York for his role in BCCI's criminal activities. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct by Mahfouz. Mahfouz paid over $200 million in fines to avoid further prosecution.

51. As the foregoing demonstrates, Mahfouz thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Mahfouz's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

52. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

Page 15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to Al-Rajhi Banking and Investment Corporation a/k/a Al Rajhi Bank** |

*This document relates to:*   Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

## RICO STATEMENT APPLICABLE TO AL RAJHI BANKING AND INVESTMENT CORPORATION A/K/A AL RAJHI BANK

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for defendant Al Rajhi Banking and Investment Corporation a/k/a Al Rajhi Banking ("Al Rajhi").

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

1. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2. The names of the defendants, to whom this RICO statement pertains is Al Rajhi Banking and Investment Corporation a/k/a Al Rajhi Banking ("Al Rajhi"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

3. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)). Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

**PLAINTIFF'S EXHIBIT**

**AF**

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

4. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, as described herein.

5.

    a. <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15;<br>NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15;<br>NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

| Defrauding the United States Government | 18 U.S.C. § 371 |
|---|---|
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |

  b. <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | Al Rajhi | Throughout this period, Al Rajhi conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | Al Rajhi | Al Rajhi undertook the above named actions as part of a conspiracy to commit murder and |

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

|  |  |  |
|---|---|---|
|  |  | arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Al Rajhi. |
| Mid-1990s to 9/11/2001 | Al Rajhi | Al Rajhi agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

c.  Not applicable.

d.  No.

e.  No.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders,.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Al Rajhi, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.

    a.    The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al . v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature

Page 5 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al Rajhi fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

c.  No.

d.  Al Rajhi is associated with the alleged enterprise.

e.  Al Rajhi is a member of the Enterprise, and is separate and distinct from the Enterprise.

f.  Al Rajhi intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Al Rajhi is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Rajhi funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al Rajhi, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Not applicable.

12. Not applicable to this defendant.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

13.

    a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b.   The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Al Rajhi, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Al Rajhi. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Al Rajhi. In order to identify nineteen

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Rajhi. Al Rajhi, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Al Rajhi also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of personal property, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of personal property, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| Count One | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| Count Two | Alien Tort Claims Act 28 U.S.C. §1350 |
| Count Nine | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

| | |
|---|---|
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| | |
|---|---|
| **Count Three** | Wrongful Death |
| **Count Four** | Survival |
| **Count Five** | Negligent and Intentional Infliction or Emotional Distress |
| **Count Six** | Conspiracy |
| **Count Seven** | Aiding and Abetting |
| **Count Eight** | Negligence |
| **Count Eleven** | Punitive Damages |

20.  Not applicable

Date: December 17, 2004

LAW OFFICES OF JERRY S. GOLDMAN
    & ASSOCIATES, P.C.

BY:_____

    GINA M. MAC NEILL, ESQUIRE
    (GM 0581)

BY: _____

    JERRY S. GOLDMAN,  ESQUIRE
    (JG 8445)

    Attorneys for the Plaintiffs

    111 Broadway, 13th Floor

    Page 10 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

New York, N.Y. 10006
212.242.2232

## EXHIBIT "A"

## RICO STATEMENT

## QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Rajhi | AAl Rajhi Banking & Investment Corporation has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>Al Rajhi is the primary and/or preferred bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation, the Muslim World League, and the International Islamic Relief Organization.<br><br>Al Rajhi Bank has served as one of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders preferred and/or primary banks for many years. Al Rajhi is the primary bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation ("Al- Haramain"), the Muslim World League ("MWL"), the World Association of Muslim Youth ("WAMY"), the Benevolent International Foundation ("BIF"), and the International Islamic Relief Organization ("IIRO").<br><br>In cooperation with these charitable | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

Page 11 of 85

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

organizations, Al Rajhi Bank advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for there charitable organizations, thereby providing a mechanism, Al Rajhi facilitated Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, fundraising events.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for Al Haramain and the IIRO, have been used to transfer funds to al Qaida cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaida's, and/or Radical Muslim Terrorism's, and/or the International Islamic Front for the Jihad Against Jews and Crusaders', charity fronts, via *zakat* and *haram* contributions, including MWL, WAMY, IIRO Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi Bank has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and that the funds it contributed directly to the charities were being funneled to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Nevertheless, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

|  | Crusaders. Al Rajhi Bank thereby has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign. |  |
|---|---|---|

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

**EXHIBIT "B"**

**RICO STATEMENT**

**QUESTION #4 and 17**

(See also http://www.september11victims.com/september11victims/victims_list.htm)

The Following is a list of the decedents as a result of the Attacks:

<u>World Trade Center</u>

Gordon McCannel Aamoth, 32, New York, N.Y.
Maria Rose Abad, 49, Syosset, N.Y.
Edelmiro (Ed) Abad, 54, New York, N.Y.
Andrew Anthony Abate, 37, Melville, N.Y.
Vincent Abate, 40, New York, N.Y.
Laurence Christopher Abel, 37
William F. Abrahamson, 58, Cortland Manor, N.Y.
Richard Anthony Aceto, 42, Wantagh, N.Y.
Erica Van Acker, 62, New York, N.Y.
Heinrich B. Ackermann, 38, New York, N.Y.
Paul Andrew Acquaviva, 29, Glen Rock, N.J.
Donald L. Adams, 28, Chatham, N.J.
Shannon Lewis Adams, 25, New York, N.Y.
Stephen Adams, 51, New York, N.Y.
Patrick Adams, 60, New York, N.Y.
Ignatius Adanga, 62, New York, N.Y.
Christy A. Addamo, 28, New Hyde Park, N.Y.
Terence E. Adderley, 22, Bloomfield Hills, Mich.
Sophia B. Addo, 36, New York, N.Y.
Lee Adler, 48, Springfield, N.J.
Daniel Thomas Afflitto, 32, Manalapan, N.J.
Emmanuel Afuakwah, 37, New York, N.Y.
Alok Agarwal, 36, Jersey City, N.J.
Mukul Agarwala, 37, New York, N.Y.
Joseph Agnello, 35, New York, N.Y.
David Scott Agnes, 46, New York, N.Y.
Joao A. Aguiar Jr., 30, Red Bank, N.J.
Lt. Brian G. Ahearn, 43, Huntington, N.Y.
Jeremiah J. Ahern, 74, Cliffside Park, N.J.
Joanne Ahladiotis, 27, New York, N.Y.
Shabbir Ahmed, 47, New York, N.Y.
Terrance Andre Aiken, 30, New York, N.Y.
Godwin Ajala, 33, New York, N.Y.
Gertrude M. Alagero, 37, New York, N.Y.

Page 14 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Andrew Alameno, 37, Westfield, N.J.
Margaret Ann (Peggy) Jezycki Alario, 41, New York, N.Y.
Gary Albero, 39, Emerson, N.J.
Jon L. Albert, 46, Upper Nyack, N.Y.
Peter Craig Alderman, 25, New York, N.Y.
Jacquelyn Delaine Aldridge, 46, New York, N.Y.
Grace Alegre-Cua, 40, Glen Rock, N.J.
David D. Alger, 57, New York, N.Y.
Ernest Alikakos, 43, New York, N.Y.
Edward L. Allegretto, 51, Colonia, N.J.
Eric Allen, 44, New York, N.Y.
Joseph Ryan Allen, 39, New York, N.Y.
Richard Lanard Allen, 30, New York, N.Y.
Richard Dennis Allen, 31, New York, N.Y.
Christopher Edward Allingham, 36, River Edge, N.J.
Janet M. Alonso, 41, Stony Point, N.Y.
Anthony Alvarado, 31, New York, N.Y.
Antonio Javier Alvarez, 23, New York, N.Y.
Telmo Alvear, 25, New York, N.Y.
Cesar A. Alviar, 60, Bloomfield, N.J.
Tariq Amanullah, 40, Metuchen, N.J.
Angelo Amaranto, 60, New York, N.Y.
James Amato, 43, Ronkonkoma, N.Y.
Joseph Amatuccio, 41, New York, N.Y.
Christopher Charles Amoroso, 29, New York, N.Y.
Kazuhiro Anai, 42, Scarsdale, N.Y.
Calixto Anaya, 35, Suffern, N.Y.
Jorge Octavio Santos Anaya, 25, Aguascalientes, Aguascalientes, Mexico
Joseph Peter Anchundia, 26, New York, N.Y.
Kermit Charles Anderson, 57, Green Brook, N.J.
Yvette Anderson, 53, New York, N.Y.
John Andreacchio, 52, New York, N.Y.
Michael Rourke Andrews, 34, Belle Harbor, N.Y.
Jean A. Andrucki, 42, Hoboken, N.J.
Siew-Nya Ang, 37, East Brunswick, N.J.
Joseph Angelini, 38, Lindenhurst, N.Y.
Joseph Angelini, 63, Lindenhurst, N.Y.
Laura Angilletta, 23, New York, N.Y.
Doreen J. Angrisani, 44, New York, N.Y.
Lorraine D. Antigua, 32, Middletown, N.J.
Peter Paul Apollo, 26, Hoboken, N.J.
Faustino Apostol, 55, New York, N.Y.
Frank Thomas Aquilino, 26, New York, N.Y.
Patrick Michael Aranyos, 26, New York, N.Y.
David Gregory Arce, 36, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Michael G. Arczynski, 45, Little Silver, N.J.
Louis Arena, 32, New York, N.Y.
Adam Arias, 37, Staten Island, N.Y.
Michael J. Armstrong, 34, New York, N.Y.
Jack Charles Aron, 52, Bergenfield, N.J.
Joshua Aron, 29, New York, N.Y.
Richard Avery Aronow, 48, Mahwah, N.J.
Japhet J. Aryee, 49, Spring Valley, N.Y.
Carl Asaro, 39, Middletown, N.Y.
Michael A. Asciak, 47, Ridgefield, N.J.
Michael Edward Asher, 53, Monroe, N.Y.
Janice Ashley, 25, Rockville Centre, N.Y.
Thomas J. Ashton, 21, New York, N.Y.
Manuel O. Asitimbay, 36, New York, N.Y.
Lt. Gregg Arthur Atlas, 45, Howells, N.Y.
Gerald Atwood, 38, New York, N.Y.
James Audiffred, 38, New York, N.Y.
Kenneth W. Van Auken, 47, East Brunswick, N.J.
Louis F. Aversano, Jr, 58, Manalapan, N.J.
Ezra Aviles, 41, Commack, N.Y.
Ayodeji Awe, 42, New York, N.Y
Samuel (Sandy) Ayala, 36, New York, N.Y.
Arlene T. Babakitis, 47, Secaucus, N.J.
Eustace (Rudy) Bacchus, 48, Metuchen, N.J.
John James Badagliacca, 35, New York, N.Y.
Jane Ellen Baeszler, 43, New York, N.Y.
Robert J. Baierwalter, 44, Albertson, N.Y.
Andrew J. Bailey, 29, New York, N.Y.
Brett T. Bailey, 28, Bricktown, N.J.
Tatyana Bakalinskaya, 43, New York, N.Y.
Michael S. Baksh, 36, Englewood, N.J.
Sharon Balkcom, 43, White Plains, N.Y.
Michael Andrew Bane, 33, Yardley, Pa.
Kathy Bantis, 44, Chicago, Ill.
Gerard Jean Baptiste, 35, New York, N.Y.
Walter Baran, 42, New York, N.Y.
Gerard A. Barbara, 53, New York, N.Y.
Paul V. Barbaro, 35, Holmdel, N.J.
James W. Barbella, 53, Oceanside, N.Y.
Ivan Kyrillos Fairbanks Barbosa, 30, Jersey City, N.J.
Victor Daniel Barbosa, 23, New York, N.Y.
Colleen Ann Barkow, 26, East Windsor, N.J.
David Michael Barkway, 34, Toronto, Ontario, Canada
Matthew Barnes, 37, Monroe, N.Y.
Sheila Patricia Barnes, 55, Bay Shore, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Evan J. Baron, 38, Bridgewater, N.J.
Renee Barrett-Arjune, 41, Irvington, N.J.
Arthur T. Barry, 35, New York, N.Y.
Diane G. Barry, 60, New York, N.Y.
Maurice Vincent Barry, 49, Rutherford, N.J.
Scott D. Bart, 28, Malverne, N.Y.
Carlton W. Bartels, 44, New York, N.Y.
Guy Barzvi, 29, New York, N.Y.
Inna Basina, 43, New York, N.Y.
Alysia Basmajian, 23, Bayonne, N.J.
Kenneth William Basnicki, 48, Etobicoke, Ontario, Canada
Lt. Steven J. Bates, 42, New York, N.Y.
Paul James Battaglia, 22, New York, N.Y.
W. David Bauer, 45, Rumson, N.J.
Ivhan Luis Carpio Bautista, 24, New York, N.Y.
Marlyn C. Bautista, 46, Iselin, N.J.
Jasper Baxter, 45, Philadelphia, Pa.
Michele (Du Berry) Beale, 37, Essex, Britain
Paul F. Beatini, 40, Park Ridge, N.J.
Jane S. Beatty, 53, Belford, N.J.
Larry I. Beck, 38, Baldwin, N.Y.
Manette Marie Beckles, 43, Rahway, N.J.
Carl John Bedigian, 35, New York, N.Y.
Michael Beekman, 39, New York, N.Y.
Maria Behr, 41, Milford, N.J.
Yelena Belilovsky, 38, Mamaroneck, N.Y.
Nina Patrice Bell, 39, New York, N.Y.
Andrea Della Bella, 59, Jersey City, N.J.
Debbie S. Bellows, 30, East Windsor, N.J.
Stephen Elliot Belson, 51, New York, N.Y.
Paul Michael Benedetti, 32, New York, N.Y.
Denise Lenore Benedetto, 40, New York, N.Y.
Bryan Craig Bennett, 25, New York, N.Y.
Oliver Duncan Bennett, 29, London, England
Eric L. Bennett, 29, New York, N.Y.
Margaret L. Benson, 52, Rockaway, N.Y.
Dominick J. Berardi, 25, New York, N.Y.
James Patrick Berger, 44, Lower Makefield, Pa.
Steven Howard Berger, 45, Manalapan, N.J.
John P. Bergin, 39, New York, N.Y.
Alvin Bergsohn, 48, Baldwin Harbor, N.Y.
Daniel D. Bergstein, 38, Teaneck, N.J.
Michael J. Berkeley, 38, New York, N.Y.
Donna Bernaerts-Kearns, 44, Hoboken, N.J.
David W. Bernard, 57, Chelmsford, Mass.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

William Bernstein, 44, New York, N.Y.
David M. Berray, 39, New York, N.Y.
David S. Berry, 43, New York, N.Y.
Joseph J. Berry, 55, Saddle River, N.J.
William Reed Bethke, 36, Hamilton, N.J.
Timothy D. Betterly, 42, Little Silver, N.J.
Edward F. Beyea, 42, New York, N.Y.
Paul Michael Beyer, 37, New York, N.Y.
Anil T. Bharvaney, 41, East Windsor, N.J.
Bella Bhukhan, 24, Union, N.J.
Shimmy D. Biegeleisen, 42, New York, N.Y.
Peter Alexander Bielfeld, 44, New York, N.Y.
William Biggart, 54, New York, N.Y.
Brian Bilcher, 36, New York, N.Y.
Carl Vincent Bini, 44, New York, N.Y.
Gary Bird, 51, Tempe, Ariz.
Joshua David Birnbaum, 24, New York, N.Y.
George Bishop, 52, Granite Springs, N.Y.
Jeffrey D. Bittner, 27, New York, N.Y.
Balewa Albert Blackman, 26, New York, N.Y.
Christopher Joseph Blackwell, 42, Patterson, N.Y.
Susan L. Blair, 35, East Brunswick, N.J.
Harry Blanding, 38, Blakeslee, Pa.
Janice L. Blaney, 55, Williston Park, N.Y.
Craig Michael Blass, 27, Greenlawn, N.Y.
Rita Blau, 52, New York, N.Y.
Richard M. Blood, 38, Ridgewood, N.J.
Michael A. Boccardi, 30, Bronxville, N.Y.
John Paul Bocchi, 38, New Vernon, N.J.
Michael L. Bocchino, 45, New York, N.Y.
Susan Mary Bochino, 36, New York, N.Y.
Bruce Douglas (Chappy) Boehm, 49, West Hempstead, N.Y.
Mary Katherine Boffa, 45, New York, N.Y.
Nicholas A. Bogdan, 34, Browns Mills, N.J.
Darren C. Bohan, 34, New York, N.Y.
Lawrence Francis Boisseau, 36, Freehold, N.J.
Vincent M. Boland, 25, Ringwood, N.J.
Alan Bondarenko, 53, Flemington, N.J.
Andre Bonheur, 40, New York, N.Y.
Colin Arthur Bonnett, 39, New York, N.Y.
Frank Bonomo, 42, Port Jefferson, N.Y.
Yvonne L. Bonomo, 30, New York, N.Y.
Sean Booker, 35, Irvington, N.J.
Sherry Ann Bordeaux, 38, Jersey City, N.J.
Krystine C. Bordenabe, 33, Old Bridge, N.J.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Martin Boryczewski, 29, Parsippany, N.J.
Richard E. Bosco, 34, Suffern, N.Y.
John Howard Boulton, 29, New York, N.Y.
Francisco Bourdier, 41, New York, N.Y.
Thomas H. Bowden, 36, Wyckoff, N.J.
Kimberly S. Bowers, 31, Islip, N.Y.
Veronique (Bonnie) Nicole Bowers, 28, New York, N.Y.
Larry Bowman, 46, New York, N.Y.
Shawn Edward Bowman, 28, New York, N.Y.
Kevin L. Bowser, 45, Philadelphia, Pa.
Gary R. Box, 37, North Bellmore, N.Y.
Gennady Boyarsky, 34, New York, N.Y.
Pamela Boyce, 43, New York, N.Y.
Michael Boyle, 37, Westbury, N.Y.
Alfred Braca, 54, Leonardo, N.J.
Sandra Conaty Brace, 60, New York, N.Y.
Kevin H. Bracken, 37, New York, N.Y.
David Brian Brady, 41, Summit, N.J.
Alexander Braginsky, 38, Stamford, Conn.
Nicholas W. Brandemarti, 21, Mantua, N.J.
Michelle Renee Bratton, 23, Yonkers, N.Y.
Patrice Braut, 31, New York, N.Y.
Lydia Estelle Bravo, 50, Dunellen, N.J.
Ronald Michael Breitweiser, 39, Middletown Township, N.J.
Edward A. Brennan, 37, New York, N.Y.
Frank H. Brennan, 50, New York, N.Y.
Michael Emmett Brennan, 27, New York, N.Y.
Peter Brennan, 30, Ronkonkoma, N.Y.
Thomas M. Brennan, 32, Scarsdale, N.Y.
Capt. Daniel Brethel, 43, Farmingdale, N.Y.
Gary L. Bright, 36, Union City, N.J.
Jonathan Eric Briley, 43, Mount Vernon, N.Y.
Mark A. Brisman, 34, Armonk, N.Y.
Paul Gary Bristow, 27, New York, N.Y.
Victoria Alvarez Brito, 38, New York, N.Y.
Mark Francis Broderick, 42, Old Bridge, N.J.
Herman C. Broghammer, 58, North Merrick, N.Y.
Keith Broomfield, 49, New York, N.Y.
Janice J. Brown, 35, New York, N.Y.
Lloyd Brown, 28, Bronxville, N.Y.
Capt. Patrick J. Brown, 48, New York, N.Y.
Bettina Browne, 49, Atlantic Beach, N.Y.
Mark Bruce, 40, Summit, N.J.
Richard Bruehert, 38, Westbury, N.Y.
Andrew Brunn, 28

Page 19 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Capt. Vincent Brunton, 43, New York, N.Y.
Ronald Paul Bucca, 47, Tuckahoe, N.Y.
Brandon J. Buchanan, 24, New York, N.Y.
Greg Joseph Buck, 37, New York, N.Y.
Dennis Buckley, 38, Chatham, N.J.
Nancy Bueche, 43, Hicksville, N.Y.
Patrick Joseph Buhse, 36, Lincroft, N.J.
John E. Bulaga, 35, Paterson, N.J.
Stephen Bunin, 45, New York, N.Y.
Thomas Daniel Burke, 38, Bedford Hills, N.Y.
Capt. William F. Burke, 46, New York, N.Y.
Matthew J. Burke, 28, New York, N.Y.
Donald James Burns, 61, Nissequogue, N.Y.
Kathleen A. Burns, 49, New York, N.Y.
Keith James Burns, 39, East Rutherford, N.J.
John Patrick Burnside, 36, New York, N.Y.
Irina Buslo, 32, New York, N.Y.
Milton Bustillo, 37, New York, N.Y.
Thomas M. Butler, 37, Kings Park, N.Y.
Patrick Byrne, 39, New York, N.Y.
Timothy G. Byrne, 36, Manhattan, N.Y.
Jesus Cabezas, 66, New York, N.Y.
Lillian Caceres, 48, New York, N.Y.
Brian Joseph Cachia, 26, New York, N.Y.
Steven Cafiero, 31, New York, N.Y.
Richard M. Caggiano, 25, New York, N.Y.
Cecile M. Caguicla, 55, Boonton, N.J.
Michael John Cahill, 37, East Williston, N.Y.
Scott W. Cahill, 30, West Caldwell, N.J.
Thomas J. Cahill, 36, Franklin Lakes, N.J.
George Cain, 35, Massapequa, N.Y.
Salvatore B. Calabro, 38, New York, N.Y.
Joseph Calandrillo, 49, Hawley, Pa.
Philip V. Calcagno, 57, New York, N.Y.
Edward Calderon, 44, Jersey City, N.J.
Kenneth Marcus Caldwell, 30, New York, N.Y.
Dominick E. Calia, 40, Manalapan, N.J.
Felix (Bobby) Calixte, 38, New York, N.Y.
Capt. Frank Callahan, 51, New York, N.Y.
Liam Callahan, 44, Rockaway, N.J.
Luigi Calvi, 34, East Rutherford, N.J.
Roko Camaj, 60, Manhasset, N.Y.
Michael Cammarata, 22, Huguenot, N.Y.
David Otey Campbell, 51, Basking Ridge, N.J.
Geoffrey Thomas Campbell, 31, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Sandra Patricia Campbell, 45, New York, N.Y.

Jill Marie Campbell, 31, New York, N.Y.

Robert Arthur Campbell, 25, New York, N.Y.

Juan Ortega Campos, 32, New York, N.Y.

Sean Canavan, 39, New York, N.Y.

John A. Candela, 42, Glen Ridge, N.J.

Vincent Cangelosi, 30, New York, N.Y.

Stephen J. Cangialosi, 40, Middletown, N.J.

Lisa B. Cannava, 30, New York, N.Y.

Brian Cannizzaro, 30, New York, N.Y.

Michael R. Canty, 30, Schenectady, N.Y.

Louis A. Caporicci, 35, New York, N.Y.

Jonathan N. Cappello, 23, Garden City, N.Y.

James Christopher Cappers, 33, Wading River, N.Y.

Richard M. Caproni, 34, Lynbrook, N.Y.

Jose Cardona, 32, New York, N.Y.

Dennis M Carey, 51, Wantagh, N.Y.

Edward Carlino, 46, New York, N.Y.

Michael Scott Carlo, 34, New York, N.Y.

David G. Carlone, 46, Randolph, N.J.

Rosemarie C. Carlson, 40, New York, N.Y.

Mark Stephen Carney, 41, Rahway, N.J.

Joyce Ann Carpeneto, 40, New York, N.Y.

Alicia Acevedo Carranza, Teziutlan, Puebla, Mexico

Jeremy M. Carrington, 34, New York, N.Y.

Michael T. Carroll, 39, New York, N.Y.

Peter Carroll, 42, New York, N.Y.

James J. Carson, 32, Massapequa, N.Y.

James Marcel Cartier, 26, New York, N.Y.

Vivian Casalduc, 45, New York, N.Y.

John F. Casazza, 38, Colts Neck, N.J.

Paul Cascio, 23, Manhasset, N.Y.

Kathleen Hunt Casey, 43, Middletown, N.J.

Margarito Casillas, 54, Guadalajara, Jalisco, Mexico

Thomas Anthony Casoria, 29, New York, N.Y.

William Otto Caspar, 57, Eatontown, N.J.

Alejandro Castano, 35, Englewood, N.J.

Arcelia Castillo, 49, Elizabeth, N.J.

Leonard M. Castrianno, 30, New York, N.Y.

Jose Ramon Castro, 37, New York, N.Y.

Richard G. Catarelli, 47, New York, N.Y.

Christopher Sean Caton, 34, New York, N.Y.

Robert J. Caufield, 48, Valley Stream, N.Y.

Mary Teresa Caulfield, 58, New York, N.Y.

Judson Cavalier, 26, Huntington, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Michael Joseph Cawley, 32, Bellmore, N.Y.
Jason D. Cayne, 32, Morganville, N.J.
Juan Armando Ceballos, 47, New York, N.Y.
Marcia G. Cecil-Carter, 34, New York, N.Y.
Jason Cefalu, 30, West Hempstead, N.Y.
Thomas J. Celic, 43, New York, N.Y.
Ana M. Centeno, 38, Bayonne, N.J.
Joni Cesta, 37, Bellmore, N.Y.
Jeffrey M. Chairnoff, 35, West Windsor, N.J.
Swarna Chalasani, 33, Jersey City, N.J.
William Chalcoff, 41, Roslyn, N.Y.
Eli Chalouh, 23, New York, N.Y.
Charles Lawrence (Chip) Chan, 23, New York, N.Y.
Mandy Chang, 40, New York, N.Y.
Mark L. Charette, 38, Millburn, N.J.
Gregorio Manuel Chavez, 48, New York, N.Y.
Jayceryll M. de Chavez, 24, Carteret, N.J.
Pedro Francisco Checo, 35, New York, N.Y.
Douglas MacMillan Cherry, 38, Maplewood, N.J.
Stephen Patrick Cherry, 41, Stamford, Conn.
Vernon Paul Cherry, 49, New York, N.Y.
Nestor Chevalier, 30, New York, N.Y.
Swede Joseph Chevalier, 26, Locust, N.J.
Alexander H. Chiang, 51, New City, N.Y.
Dorothy J. Chiarchiaro, 61, Glenwood, N.J.
Luis Alfonso Chimbo, 39, New York, N.Y.
Robert Chin, 33, New York, N.Y.
Wing Wai (Eddie) Ching, 29, Union, N.J.
Nicholas P. Chiofalo, 39, Selden, N.Y.
John Chipura, 39, New York, N.Y.
Peter A. Chirchirillo, 47, Langhorne, Pa.
Catherine E. Chirls, 47, Princeton, N.J.
Kyung (Kaccy) Cho, 30, Clifton, N.J.
Abul K. Chowdhury, 30, New York, N.Y.
Mohammed Salahuddin Chowdhury, 38, New York, N.Y.
Kirsten L. Christophe, 39, Maplewood, N.J.
Pamela Chu, 31, New York, N.Y.
Steven Paul Chucknick, 44, Cliffwood Beach, N.J.
Wai-ching Chung, 36, New York, N.Y.
Christopher Ciafardini, 30, New York, N.Y.
Alex F. Ciccone, 38, New Rochelle, N.Y.
Frances Ann Cilente, 26, New York, N.Y.
Elaine Cillo, 40, New York, N.Y.
Edna Cintron, 46, New York, N.Y.
Nestor Andre Cintron, 26, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Lt. Robert Dominick Cirri, 39, Nutley, N.J.
Juan Pablo Alvarez Cisneros, 23, Weehawken, N.J.
Gregory Alan Clark, 40, Teaneck, N.J.
Mannie Leroy Clark, 54, New York, N.Y.
Thomas R. Clark, 37, Summit, N.J.
Eugene Clark, 47, New York, N.Y.
Benjamin Keefe Clark, 39, New York, N.Y.
Christopher Robert Clarke, 34, Philadelphia, Pa.
Donna Clarke, 39, New York, N.Y.
Michael Clarke, 27, Prince's Bay, N.Y.
Suria R.E. Clarke, 30, New York, N.Y.
Kevin Francis Cleary, 38, New York, N.Y.
James D. Cleere, 55, Newton, Iowa
Geoffrey W. Cloud, 36, Stamford, Conn.
Susan M. Clyne, 42, Lindenhurst, N.Y.
Steven Coakley, 36, Deer Park, N.Y.
Jeffrey Coale, 31, Souderton, Pa.
Patricia A. Cody, 46, Brigantine, N.J.
Daniel Michael Coffey, 54, Newburgh, N.Y.
Jason Matthew Coffey, 25, Newburgh, N.Y.
Florence Cohen, 62, New York, N.Y.
Kevin Sanford Cohen, 28, Edison, N.J.
Anthony Joseph Coladonato, 47, New York, N.Y.
Mark J. Colaio, 34, New York, N.Y.
Stephen J. Colaio, 32, Montauk, N.Y.
Christopher M. Colasanti, 33, Hoboken, N.J.
Michel Paris Colbert, 39, West New York, N.J.
Kevin Nathaniel Colbert, 25, New York, N.Y.
Keith Eugene Coleman, 34, Warren, N.J.
Scott Thomas Coleman, 31, New York, N.Y.
Tarel Coleman, 32
Liam Joseph Colhoun, 34, Flushing,, N.Y.
Robert D. Colin, 49, West Babylon, N.Y.
Robert J. Coll, 35, Glen Ridge, N.J.
Jean Marie Collin, 42, New York, N.Y.
John Michael Collins, 42, New York, N.Y.
Michael L. Collins, 38, Montclair, N.J.
Thomas J. Collins, 36, New York, N.Y.
Joseph Collison, 50, New York, N.Y.
Patricia Malia Colodner, 39, New York, N.Y.
Linda M. Colon, 46, Perrineville, N.J.
Soledi Colon, 39, New York, N.Y.
Ronald Comer, 56, Northport, N.Y.
Jaime Concepcion, 46, New York, N.Y.
Albert Conde, 62, Englishtown, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Denease Conley, 44, New York, N.Y.
Susan Clancy Conlon, 41, New York, N.Y.
Margaret Mary Conner, 57, New York, N.Y.
John E. Connolly, 46, Allenwood, N.J.
Cynthia L. Connolly, 40, Metuchen, N.J.
James Lee Connor, 38, Summit, N.J.
Jonathan (J.C.) Connors, 55, Old Brookville, N.Y.
Kevin P. Connors, 55, Greenwich, Conn.
Kevin Francis Conroy, 47, New York, N.Y.
Brenda E. Conway, 40, New York, N.Y.
Dennis Michael Cook, 33, Colts Neck, N.J.
Helen D. Cook, 24, New York, N.Y.
John A. Cooper, 40, Bayonne, N.J.
Joseph J. Coppo, 47, New Canaan, Conn.
Gerard J. Coppola, 46, New Providence, N.J.
Joseph Albert Corbett, 28, Islip, N.Y.
Alejandro Cordero, 23, New York, N.Y.
Robert Cordice, 28, New York, N.Y.
Ruben D. Correa, 44, New York, N.Y.
Danny A. Correa-Gutierrez, 25, Fairview, N.J.
James Corrigan, 60, New York, N.Y.
Carlos Cortes, 57, New York, N.Y.
Kevin M. Cosgrove, 46, West Islip, N.Y.
Dolores Marie Costa, 53, Middletown, N.J.
Digna Alexandra Rivera Costanza, 25, New York, N.Y.
Charles Gregory Costello, 46, Old Bridge, N.J.
Michael S. Costello, 27, Hoboken, N.J.
Conrod K.H. Cottoy, 51, New York, N.Y.
Martin Coughlan, 54, New York, N.Y.
Sgt. John Gerard Coughlin, 43, Pomona, N.Y.
Timothy John Coughlin, 42, New York, N.Y.
James E. Cove, 48, Rockville Centre, N.Y.
Andre Cox, 29, New York, N.Y.
Frederick John Cox, 27, New York, N.Y.
James Raymond Coyle, 26, New York, N.Y.
Michelle Coyle-Eulau, 38, Garden City, N.Y.
Anne M. Cramer, 47, New York, N.Y.
Christopher Seton Cramer, 34, Manahawkin, N.J.
Denise Crant, 46, Hackensack, N.J.
Robert James Crawford, 62, New York, N.Y.
James L. Crawford, 33, Madison, N.J.
Joanne Mary Cregan, 32, New York, N.Y.
Lucia Crifasi, 51, Glendale, N.Y.
Lt. John Crisci, 48, Holbrook, N.Y.
Daniel Hal Crisman, 25, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Dennis A. Cross, 60, Islip Terrace, N.Y.
Helen Crossin-Kittle, 34, Larchmont, N.Y.
 Thomas G. Crotty, 42, Rockville Centre, N.Y.
John Crowe, 57, Rutherford, N.J.
Welles Remy Crowther, 24, Upper Nyack, N.Y.
Robert L. Cruikshank, 64, New York, N.Y.
Francisco Cruz, 47, New York, N.Y.
John Robert Cruz, 32, Jersey City, N.J.
Kenneth John Cubas, 48, Woodstock, N.Y.
Richard Joseph Cudina, 46, Glen Gardner, N.J.
Neil James Cudmore, 38, Port Washington, N.Y.
Thomas Patrick Cullen, 31, New York, N.Y.
Joan McConnell Cullinan, 47, Scarsdale, N.Y.
Joyce Cummings, 65
Brian Thomas Cummins, 38, Manasquan, N.J.
Nilton Albuquerque Fernao Cunha, 41
Michael Joseph Cunningham, 39, Princeton Junction, N.J.
Robert Curatolo, 31, New York, N.Y.
Laurence Curia, 41, Garden City, N.Y.
Paul Dario Curioli, 53, Norwalk, Conn.
Beverly Curry, 41, New York, N.Y.
Sgt. Michael Curtin, 45, Medford, N.Y.
Gavin Cushny, 47, Hoboken, N.J.
Caleb Arron Dack, 39, Montclair, N.J.
Carlos S. DaCosta, 41, Elizabeth, N.J.
John D'Allara, 47, Pearl River, N.Y.
Vincent D'Amadeo, 36, East Patchoque, N.Y.
Thomas A. Damaskinos, 33, Matawan, N.J.
Jack L. D'Ambrosi, 45, Woodcliff Lake, N.J.
Jeannine Marie Damiani-Jones, 28, New York, N.Y.
Patrick W. Danahy, 35, Yorktown Heights, N.Y.
Nana Kwuku Danso, 47, New York, N.Y.
Mary D'Antonio, 55, New York, N.Y.
Vincent G. Danz, 38, Farmingdale, N.Y.
Dwight Donald Darcy, 55, Bronxville, N.Y.
Elizabeth Ann Darling, 28, Newark, N.J.
Annette Andrea Dataram, 25, New York, N.Y.
Lt. Edward Alexander D'Atri, 38, New York, N.Y.
Michael D. D'Auria, 25, New York, N.Y.
Lawrence Davidson, 51, New York, N.Y.
Michael Allen Davidson, 27, Westfield, N.J.
Scott Matthew Davidson, 33, New York, N.Y.
Titus Davidson, 55, New York, N.Y.
Niurka Davila, 47, New York, N.Y.
Clinton Davis, 38, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Wayne Terrial Davis, 29, Fort Meade, Md.

Calvin Dawson, 46, New York, N.Y.

Anthony Richard Dawson, 32, Southampton, Hampshire, England

Edward James Day, 45, New York, N.Y.

Emerita (Emy) De La Pena, 32, New York, N.Y.

Melanie Louise De Vere, 30, London, England

William T. Dean, 35, Floral Park, N.Y.

Robert J. DeAngelis, 48, West Hempstead, N.Y.

Thomas P. Deangelis, 51, Westbury, N.Y.

Tara Debek, 35, Babylon, N.Y.

Anna Debin, 30, East Farmingdale, N.Y.

James V. DeBlase, 45, Manalapan, N.J.

Paul DeCola, 39, Ridgewood, N.Y.

Simon Dedvukaj, 26, Mohegan Lake, N.Y.

Jason Christopher DeFazio, 29, New York, N.Y.

David A. Defeo, 37, New York, N.Y.

Jennifer DeJesus, 23, New York, N.Y.

 Monique E. DeJesus, 28, New York, N.Y.

Nereida DeJesus, 30, New York, N.Y.

Donald A. Delapenha, 37, Allendale, N.J.

Vito Joseph Deleo, 41, New York, N.Y.

Danielle Delie, 47, New York, N.Y.

Colleen Ann Deloughery, 41, Bayonne, N.J.

Francis (Frank) Albert DeMartini, 49, New York, N.Y.

Anthony Demas, 61, New York, N.Y.

Martin DeMeo, 47, Farmingville, N.Y.

Francis X. Deming, 47, Franklin Lakes, N.J.

Carol K. Demitz, 49, New York, N.Y.

Kevin Dennis, 43, Peapack, N.J.

Thomas F. Dennis, 43, Setauket, N.Y.

Jean C. DePalma, 42, Newfoundland, N.J.

Jose Nicolas Depena, 42, New York, N.Y.

Robert J. Deraney, 43, New York, N.Y.

Michael DeRienzo, 37, Hoboken, N.J.

David Paul Derubbio, 38, New York, N.Y.

Jemal Legesse DeSantis, 28, Jersey City, N.J.

Christian L. DeSimone, 23, Ringwood, N.J.

Edward DeSimone, 36, Atlantic Highlands, N.J.

Lt. Andrew Desperito, 44, Patchogue, N.Y.

Michael Jude D'Esposito, 32, Morganville, N.J.

Cindy Ann Deuel, 28, New York, N.Y.

Jerry DeVito, 66, New York, N.Y.

Robert P. Devitt, 36, Plainsboro, N.J.

Dennis Lawrence Devlin, 51, Washingtonville, N.Y.

Gerard Dewan, 35, New York, N.Y.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Simon Suleman Ali Kassamali Dhanani, 62, Hartsdale, N.Y.
Michael L. DiAgostino, 41, Garden City, N.Y.
Matthew Diaz, 33, New York, N.Y.
Nancy Diaz, 28, New York, N.Y.
Obdulio Ruiz Diaz, 44, New York, N.Y.
Lourdes Galletti Diaz, 32, New York, N.Y.
Michael Diaz-Piedra, 49
Judith Belguese Diaz-Sierra, 32, Bay Shore, N.Y.
Patricia F. DiChiaro, 63, New York, N.Y.
Joseph Dermot Dickey, 50, Manhasset, N.Y.
Lawrence Patrick Dickinson, 35, Morganville, N.J.
Michael David Diehl, 48, Brick, N.J.
John DiFato, 39, New York, N.Y.
Vincent F. DiFazio, 43, Hampton, N.J.
Carl DiFranco, 27, New York, N.Y.
Donald J. DiFranco, 43, New York, N.Y.
Debra Ann DiMartino, 36, New York, N.Y.
Stephen P. Dimino, 48, Basking Ridge, N.J.
William J. Dimmling, 47, Garden City, N.Y.
Christopher Dincuff, 31, Jersey City, N.J.
Jeffrey M. Dingle, 32, New York, N.Y.
Anthony DiOnisio, 38, Glen Rock, N.J.
George DiPasquale, 33, New York, N.Y.
Joseph DiPilato, 57, New York, N.Y.
Douglas Frank DiStefano, 24, Hoboken, N.J.
Ramzi A. Doany, 35, Bayonne, N.J., Jordanian
John J. Doherty, 58, Hartsdale, N.Y.
Melissa C. Doi, 32, New York, N.Y.
Brendan Dolan, 37, Glen Rock, N.J.
Neil Dollard, 28, Hoboken, N.J.
James Joseph Domanico, 56, New York, N.Y.
Benilda Pascua Domingo, 37, New York, N.Y.
Charles (Carlos) Dominguez, 34, East Meadow, N.Y.
Geronimo (Jerome) Mark Patrick Dominguez, 37, Holtsville, N.Y.
Lt. Kevin W. Donnelly, 43, New York, N.Y.
Jacqueline Donovan, 34, New York, N.Y.
Stephen Dorf, 39, New Milford, N.J.
Thomas Dowd, 37, Monroe, N.Y.
Lt. Kevin Christopher Dowdell, 46, New York, N.Y.
Mary Yolanda Dowling, 46, New York, N.Y.
Raymond M. Downey, 63, Deer Park, N.Y.
Joseph M. Doyle, 25, New York, N.Y.
Frank Joseph Doyle, 39, Englewood, N.J.
Randy Drake, 37, Lee's Summit, Mo.
Stephen Patrick Driscoll, 38, Lake Carmel, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Mirna A. Duarte, 31, New York, N.Y.
Luke A. Dudek, 50, Livingston, N.J.
Christopher Michael Duffy, 23, New York, N.Y.
Gerard Duffy, 53, Manorville, N.Y.
Michael Joseph Duffy, 29, Northport, N.Y.
Thomas W. Duffy, 52, Pittsford, N.Y.
Antoinette Duger, 44, Belleville, N.J.
Jackie Sayegh Duggan, 34
Sareve Dukat, 53, New York, N.Y.
Christopher Joseph Dunne, 28, Mineola, N.Y.
Richard A. Dunstan, 54, New Providence, N.J.
Patrick Thomas Dwyer, 37, Nissequogue, N.Y.
Joseph Anthony Eacobacci, 26, New York, N.Y.
John Bruce Eagleson, 53, Middlefield, Conn.
Robert D. Eaton, 37, Manhasset, N.Y.
Dean P. Eberling, 44, Cranford, N.J.
Margaret Ruth Echtermann, 33, Hoboken, N.J.
Paul Robert Eckna, 28, West New York, N.J.
Constantine (Gus) Economos, 41, New York, N.Y.
Dennis Michael Edwards, 35, Huntington, N.Y.
Michael Hardy Edwards, 33, New York, N.Y.
Lisa Egan, 31, Cliffside Park, N.J.
Capt. Martin Egan, 36, New York, N.Y.
Michael Egan, 51, Middletown, N.J.
Christine Egan, 55, Winnipeg, Manitoba, Canada
Samantha Egan, 24, Jersey City, N.J.
Carole Eggert, 60, New York, N.Y.
Lisa Caren Weinstein Ehrlich, 36, New York, N.Y.
John Ernst (Jack) Eichler, 69, Cedar Grove, N.J.
Eric Adam Eisenberg, 32, Commack, N.Y.
Daphne F. Elder, 36, Newark, N.J.
Michael J. Elferis, 27, College Point, N.Y.
Mark J. Ellis, 26, South Huntington, N.Y.
Valerie Silver Ellis, 46, New York, N.Y.
Albert Alfy William Elmarry, 30, North Brunswick, N.J.
Edgar H. Emery, 45, Clifton, N.J.
Doris Suk-Yuen Eng, 30, New York, N.Y.
Christopher S. Epps, 29, New York, N.Y.
Ulf Ramm Ericson, 79, Greenwich, Conn.
Erwin L. Erker, 41, Farmingdale, N.Y.
William J. Erwin, 30, Verona, N.J.
Sarah (Ali) Escarcega, 35, New York, N.Y.
Jose Espinal, 31
Fanny M. Espinoza, 29, Teaneck, N.J.
Francis Esposito, 32, New York, N.Y.

Page 28 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Lt. Michael Esposito, 41, New York, N.Y.
William Esposito, 51, Bellmore, N.Y.
Brigette Ann Esposito, 34, New York, N.Y.
Ruben Esquilin, 35, New York, N.Y.
Sadie Ette, 36, New York, N.Y.
Barbara G. Etzold, 43, Jersey City, N.J.
Eric Brian Evans, 31, Weehawken, N.J.
Robert Edward Evans, 36, Franklin Square, N.Y.
Meredith Emily June Ewart, 29, Hoboken, N.J.
Catherine K. Fagan, 58, New York, N.Y.
Patricia M. Fagan, 55, Toms River, N.J.
Keith G. Fairben, 24, Floral Park, N.Y.
William Fallon, 38, Coram, N.Y.
William F. Fallon, 53, Rocky Hill, N.J.
Anthony J. Fallone, 39, New York, N.Y.
Dolores B. Fanelli, 38, Farmingville, N.Y.
John Joseph Fanning, 54, West Hempstead, N.Y.
Kathleen (Kit) Faragher, 33, Denver, Colo.
Capt. Thomas Farino, 37, Bohemia, N.Y.
Nancy Carole Farley, 45, Jersey City, N.J.
Elizabeth Ann (Betty) Farmer, 62, New York, N.Y.
Douglas Farnum, 33, New York, N.Y.
John W. Farrell, 41, Basking Ridge, N.J.
Terrence Patrick Farrell, 45, Huntington, N.Y.
John G. Farrell, 32, New York, N.Y.
Capt. Joseph Farrelly, 47, New York, N.Y.
Thomas P. Farrelly, 54, East Northport, N.Y.
Syed Abdul Fatha, 54, Newark, N.J.
Christopher Faughnan, 37, South Orange, N.J.
Wendy R. Faulkner, 47, Mason, Ohio
Shannon M. Fava, 30, New York, N.Y.
Bernard D. Favuzza, 52, Suffern, N.Y.
Robert Fazio, 41, Freeport, N.Y.
Ronald C. Fazio, 57, Closter, N.J.
William Feehan, 72, New York, N.Y.
Francis J. (Frank) Feely, 41, Middletown, N.Y.
Garth E. Feeney, 28, New York, N.Y.
Sean B. Fegan, 34, New York, N.Y.
Lee S. Fehling, 28, Wantagh, N.Y.
Peter Feidelberg, 34, Hoboken, N.J.
Alan D. Feinberg, 48, New York, N.Y.
Rosa Maria Feliciano, 30, New York, N.Y.
Edward T. Fergus, 40, Wilton, Conn.
George Ferguson, 54, Teaneck, N.J.
Henry Fernandez, 23, New York, N.Y.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Judy H. Fernandez, 27, Parlin, N.J.
Jose Manuel Contreras Fernandez, El Aguacate, Jalisco, Mexico
Elisa Giselle Ferraina, 27, London, England
Anne Marie Sallerin Ferreira, 29, Jersey City, N.J.
Robert John Ferris, 63, Garden City, N.Y.
David Francis Ferrugio, 46, Middletown, N.J.
Louis V. Fersini, 38, Basking Ridge, N.J.
Michael David Ferugio, 37, New York, N.Y.
Bradley James Fetchet, 24, New York, N.Y.
Jennifer Louise Fialko, 29, Teaneck, N.J.
Kristen Fiedel, 27, New York, N.Y.
Samuel Fields, 36, New York, N.Y.
Michael Bradley Finnegan, 37, Basking Ridge, N.J.
Timothy J. Finnerty, 33, Glen Rock, N.J.
Michael Curtis Fiore, 46, New York, N.Y.
Stephen J. Fiorelli, 43, Aberdeen, N.J.
Paul M. Fiori, 31, Yorktown Heights, N.Y.
John Fiorito, 40, Stamford, Conn.
Lt. John R. Fischer, 46, New York, N.Y.
Andrew Fisher, 42, New York, N.Y.
Thomas J. Fisher, 36, Union, N.J.
Bennett Lawson Fisher, 58, Stamford, Conn.
John Roger Fisher, 46, Bayonne, N.J.
Lucy Fishman, 37, New York, N.Y.
Ryan D. Fitzgerald, 26, New York, N.Y.
Thomas Fitzpatrick, 35, Tuckahoe, N.Y.
Richard P. Fitzsimons, 57, Lynbrook, N.Y.
Salvatore A. Fiumefreddo, 47, Manalapan, N.J.
Christina Donovan Flannery, 26, New York, N.Y.
Eileen Flecha, 33, New York, N.Y.
Andre G. Fletcher, 37, North Babylon, N.Y.
Carl Flickinger, 38, Conyers, N.Y.
John Joseph Florio, 33, Oceanside, N.Y.
Joseph W. Flounders, 46, East Stroudsburg, Pa.
David Fodor, 38, Garrison, N.Y.
Lt. Michael N. Fodor, 53, Warwick, N.Y.
Steven Mark Fogel, 40, Westfield, N.Y.
Thomas Foley, 32, West Nyack, N.Y.
David Fontana, 37, New York, N.Y.
Chih Min (Dennis) Foo, 40, Holmdel, N.J.
Del Rose Forbes-Cheatham, 48, New York, N.Y.
Godwin Forde, 39, New York, N.Y.
Donald A. Foreman, 53, New York, N.Y.
Christopher Hugh Forsythe, 44, Basking Ridge, N.J.
Claudia Alicia Martinez Foster, 26, New York, N.Y.

Page 30 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Noel J. Foster, 40, Bridgewater, N.J.
Ana Fosteris, 58, Coram, N.Y.
Robert J. Foti, 42, Albertson, N.Y.
Jeffrey L. Fox, 40, Cranbury, N.J.
Virginia Fox, 58, New York, N.Y.
Virgin (Lucy) Francis, 62, New York, N.Y.
Pauline Francis, 57, New York, N.Y.
Joan Francis
Gary J. Frank, 35, South Amboy, N.J.
Morton Frank, 31, New York, N.Y.
Peter Christopher Frank, 29, New York, N.Y.
Richard K. Fraser, 32, New York, N.Y.
Kevin Joseph Frawley, 34, Bronxville, N.Y.
Clyde Frazier, 41, New York, N.Y.
Lillian I. Frederick, 46, Teaneck, N.J.
Andrew Fredericks, 40, Suffern, N.Y.
Tamitha Freemen, 35, New York, N.Y.
Brett O. Freiman, 29, Roslyn, N.Y.
Lt. Peter L. Freund, 45, Westtown, N.Y.
Arlene E. Fried, 49, Roslyn Heights, N.Y.
Alan Wayne Friedlander, 52, Yorktown Heights, N.Y.
Andrew K. Friedman, 44, Woodbury, N.Y.
Gregg J. Froehner, 46, Chester, N.J.
Peter Christian Fry, 36, Wilton, Conn.
Clement Fumando, 59, New York, N.Y.
Steven Elliot Furman, 40, Wesley Hills, N.Y.
Paul James Furmato, 37, Colts Neck, N.J.
Fredric Gabler, 30, New York, N.Y.
Richard S. Gabrielle, 50, West Haven, Conn.
James Andrew Gadiel, 23, New York, N.Y.
Pamela Gaff, 51, Robinsville, N.J.
Ervin Vincent Gailliard, 42, New York, N.Y.
Deanna L. Galante, 32, New York, N.Y.
Grace Galante, 29, New York, N.Y.
Anthony Edward Gallagher, 41, New York, N.Y.
Daniel James Gallagher, 23, Red Bank, N.J.
John Patrick Gallagher, 31, Yonkers, N.Y.
Cono E. Gallo, 30, New York, N.Y.
Vincenzo Gallucci, 36, Monroe Township, N.J.
Thomas Edward Galvin, 32, New York, N.Y.
Giovanna (Genni) Gambale, 27, New York, N.Y.
Thomas Gambino, 48, Babylon, N.Y.
Giann F. Gamboa, 26, New York, N.Y.
Peter J. Ganci, 55, North Massapequa, N.Y.
Claude Michael Gann, 41, Roswell, Ga.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Lt. Charles William Garbarini, 44, Pleasantville, N.Y.
Cesar Garcia, 36, New York, N.Y.
David Garcia, 40, Freeport, N.Y.
Jorge Luis Morron Garcia, 38, New York, N.Y.
Juan Garcia, 50, New York, N.Y.
Marlyn C. Garcia, 21, New York, N.Y.
Christopher Gardner, 36, Darien, Conn.
Douglas B. Gardner, 39, New York, N.Y.
Harvey J. Gardner, 35, Lakewood, N.J.
Thomas A. Gardner, 39, Oceanside, N.Y.
Jeffrey B. Gardner, 36, Hoboken, N.J.
William Arthur Gardner, 45, Lynbrook, N.Y.
Francesco Garfi, 29, New York, N.Y.
Rocco Gargano, 28, Bayside, N.Y.
James M. Gartenberg, 36, New York, N.Y.
Matthew David Garvey, 37
Bruce Gary, 51, Bellmore, N.Y.
Palmina Delli Gatti, 33, New York, N.Y.
Boyd A. Gatton, 38, Jersey City, N.J.
Donald Richard Gavagan, 35, New York, N.Y.
Terence D. Gazzani, 24, New York, N.Y.
Gary Geidel, 44, New York, N.Y.
Paul Hamilton Geier, 36, Farmingdale, N.Y.
Julie M. Geis, 44, Lees Summit, Mo.
Peter Gelinas, 34, New York, N.Y.
Steven Paul Geller, 52, New York, N.Y.
Howard G. Gelling, 28, New York, N.Y.
Peter Victor Genco, 36, Rockville Centre, N.Y.
Steven Gregory Genovese, 37, Basking Ridge, N.J.
Alayne F. Gentul, 44, Mountain Lakes, N.J.
Edward F. Geraghty, 45, Rockville Centre, N.Y.
Suzanne Geraty, 30, New York, N.Y.
Ralph Gerhardt, 33, New York, N.Y.
Robert J. Gerlich, 56, Monroe, Conn.
Denis P. Germain, 33, Tuxedo Park, N.Y.
Marina R. Gertsberg, 25, New York, N.Y.
Susan M. Getzendanner, 57, New York, N.Y.
James Gerard Geyer, 41, Rockville Centre, N.Y.
Joseph M. Giaccone, 43, Monroe, N.J.
Lt. Vincent Francis Giammona, 40, Valley Stream, N.Y.
Debra L. Gibbon, 43, Hackettstown, N.J.
James A. Giberson, 43, New York, N.Y.
Craig Neil Gibson, 37, New York, N.Y.
Ronnie Gies, 43, Merrick, N.Y.
Laura A. Giglio, 35, Oceanside, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Andrew Clive Gilbert, 39, Califon, N.J.
Timothy Paul Gilbert, 35, Lebanon, N.J.
Paul Stuart Gilbey, 39, Chatham, N.J.
Paul John Gill, 34, New York, N.Y.
Mark Y. Gilles, 33, New York, N.Y.
Evan H. Gillette, 40, New York, N.Y.
Ronald Gilligan, 43, Norwalk, Conn.
Sgt. Rodney C. Gillis, 34, New York, N.Y.
Laura Gilly, 32, New York, N.Y.
Lt. John F. Ginley, 37, Warwick, N.Y.
Jeffrey Giordano, 46, New York, N.Y.
John Giordano, 46, Newburgh, N.Y.
Donna Marie Giordano, 44, Parlin, N.J.
Steven A. Giorgetti, 43, Manhasset, N.Y.
Martin Giovinazzo, 34, New York, N.Y.
Kum-Kum Girolamo, 41, New York, N.Y.
Salvatore Gitto, 44, Manalapan, N.J.
Cynthia Giugliano, 46, Nesconset, N.Y.
Mon Gjonbalaj, 65, New York, N.Y.
Dianne Gladstone, 55, New York, N.Y.
Keith Alexander Glascoe, 38, New York, N.Y.
Thomas I. Glasser, 40, Summit, N.J.
Harry Glenn, 38, Piscataway, N.J.
Barry H. Glick, 55, Wayne, N.J.
Steven Lawrence Glick, 42, Greenwich, Conn.
John T. Gnazzo, 32, New York, N.Y.
William (Bill) Robert Godshalk, 35, New York, N.Y.
Michael Gogliormella, 43, New Providence, N.J.
Brian Fredric Goldberg, 26, Union, N.J.
Jeffrey Grant Goldflam, 48, Melville, N.Y.
Michelle Herman Goldstein, 31, New York, N.Y.
Monica Goldstein, 25, New York, N.Y.
Steven Goldstein, 35, Princeton, N.J.
Andrew H. Golkin, 30, New York, N.Y.
Dennis James Gomes, 40, New York, N.Y.
Enrique Antonio Gomez, 42, New York, N.Y.
Jose Bienvenido Gomez, 45, New York, N.Y.
Manuel Gomez, 42, New York, N.Y.
Wilder Gomez, 38, New York, N.Y.
Jenine Gonzalez, 27, New York, N.Y.
Joel Guevara Gonzalez, 23, Aguascalientes, Aguascalientes, Mexico
Rosa J. Gonzalez, 32, Jersey City, N.J.
Mauricio Gonzalez, 27, New York, N.Y.
Calvin J. Gooding, 38, Riverside, N.Y.
Harry Goody, 50, New York, N.Y.

Page 33 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Kiran Reddy Gopu, 24, Bridgeport, Conn.
Catherine Carmen Gorayeb, 41, New York, N.Y.
Kerene Gordon, 43, New York, N.Y.
Sebastian Gorki, 27, New York, N.Y.
Thomas E. Gorman, 41, Middlesex, N.J.
Kieran Gorman, 35, Yonkers, N.Y.
Michael Edward Gould, 29, Hoboken, N.J.
Yugi Goya, 42, Rye, N.Y.
Jon Richard Grabowski, 33, New York, N.Y.
Christopher Michael Grady, 39, Cranford, N.J.
Edwin John Graf, 48, Rowayton, Conn.
David M. Graifman, 40, New York, N.Y.
Gilbert Granados, 51, Hicksville, N.Y.
Elvira Granitto, 43, New York, N.Y.
Winston Arthur Grant, 59, West Hempstead, N.Y.
Christopher Stewart Gray, 32, Weehawken, N.J.
James Michael Gray, 34, New York, N.Y.
Linda Mair Grayling, 44, New York, N.Y.
John Michael Grazioso, 41, Middletown, N.J.
Timothy Grazioso, 42, Gulf Stream, Fla.
Derrick Arthur Green, 44, New York, N.Y.
Wade Brian Green, 42, Westbury, N.Y.
Elaine Myra Greenberg, 56, New York, N.Y.
Gayle R. Greene, 51, Montville, N.J.
James Arthur Greenleaf, 32, New York, N.Y.
Eileen Marsha Greenstein, 52, Morris Plains, N.J.
Elizabeth (Lisa) Martin Gregg, 52, New York, N.Y.
Donald H. Gregory, 62, Ramsey, N.J.
Florence M. Gregory, 38, New York, N.Y.
Denise Gregory, 39, New York, N.Y.
Pedro (David) Grehan, 35, Hoboken, N.J.
John M. Griffin, 38, Waldwick, N.J.
Tawanna Griffin, 30, New York, N.Y.
Joan D. Griffith, 39, Willingboro, N.J.
Warren Grifka, 54, New York, N.Y.
Ramon Grijalvo, 58
Joseph F. Grillo, 46, New York, N.Y.
David Grimner, 51, Merrick, N.Y.
Kenneth Grouzalis, 56, Lyndhurst, N.J.
Joseph Grzelak, 52, New York, N.Y.
Matthew J. Grzymalski, 34, New Hyde Park, N.Y.
Robert Joseph Gschaar, 55, Spring Valley, N.Y.
Liming (Michael) Gu, 34, Piscataway, N.J.
Jose A. Guadalupe, 37, New York, N.Y.
Yan Zhu (Cindy) Guan, 25, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Geoffrey E. Guja, 47, Lindenhurst, N.Y.
Lt. Joseph Gullickson, 37, New York, N.Y.
Babita Guman, 33, New York, N.Y.
Douglas B. Gurian, 38, Tenafly, N.J.
Philip T. Guza, 54, Sea Bright, N.J.
Barbara Guzzardo, 49, Glendale, N.Y.
Peter Gyulavary, 44, Warwick, N.Y.
Gary Robert Haag, 36, Ossining, N.Y.
Andrea Lyn Haberman, 25, Chicago, Ill.
Barbara M. Habib, 49, New York, N.Y.
Philip Haentzler, 49, New York, N.Y.
Nizam A. Hafiz, 32, New York, N.Y.
Karen Hagerty, 34, New York, N.Y.
Steven Hagis, 31, New York, N.Y.
Mary Lou Hague, 26, New York, N.Y.
David Halderman, 40, New York, N.Y.
Maile Rachel Hale, 26, Cambridge, Mass.
Richard Hall, 49, Purchase, N.Y.
Vaswald George Hall, 50, New York, N.Y.
Robert John Halligan, 59, Basking Ridge, N.J.
Lt. Vincent Gerard Halloran, 43, North Salem, N.Y.
James D. Halvorson, 56, Greenwich, Conn.
Mohammad Salman Hamdani, 23, New York, N.Y.
Felicia Hamilton, 62, New York, N.Y.
Robert Hamilton, 43, Washingtonville, N.Y.
Frederic Kim Han, 45, Marlboro, N.J.
Christopher James Hanley, 34, New York, N.Y.
Sean Hanley, 35, New York, N.Y.
Valerie Joan Hanna, 57, Freeville, N.Y.
Thomas Hannafin, 36, New York, N.Y.
Kevin James Hannaford, 32, Basking Ridge, N.J.
Michael L. Hannan, 34, Lynbrook, N.Y.
Dana Hannon, 29, Suffern, N.Y.
Vassilios G. Haramis, 56, New York, N.Y.
James A. Haran, 41, Malverne, N.Y.
Jeffrey P. Hardy, 46, New York, N.Y.
Timothy John Hargrave, 38, Readington, N.J.
Daniel Harlin, 41, Kent, N.Y.
Frances Haros, 76, New York, N.Y.
Lt. Harvey L. Harrell, 49, New York, N.Y.
Lt. Stephen Gary Harrell, 44, Warwick, N.Y.
Stewart D. Harris, 52, Marlboro, N.J.
Aisha Harris, 22, New York, N.Y.
John Patrick Hart, 38, Danville, Calif.
John Clinton Hartz, 64, Basking Ridge, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Emeric J. Harvey, 56, Montclair, N.J.
Capt. Thomas Theodore Haskell, 37, Massapequa, N.Y.
Timothy Haskell, 34, Seaford, N.Y.
Joseph John Hasson, 34, New York, N.Y.
Capt. Terence S. Hatton, 41, New York, N.Y.
Leonard William Hatton, 45, Ridgefield Park, N.J.
Michael Helmut Haub, 34, Roslyn Heights, N.Y.
Timothy Aaron Haviland, 41, Oceanside, N.Y.
Donald G. Havlish, 53, Yardley, Pa.
Anthony Hawkins, 30, New York, N.Y.
Nobuhiro Hayatsu, 36, Scarsdale, N.Y.
Philip Hayes, 67, Northport, N.Y.
William Ward Haynes, 35, Rye, N.Y.
Scott Hazelcorn, 29, Hoboken, N.J.
Lt. Michael K. Healey, 42, East Patchogue, N.Y.
Roberta Bernstein Heber, 60, New York, N.Y.
Charles Francis Xavier Heeran, 23, Belle Harbor, N.Y.
John Heffernan, 37, New York, N.Y.
Howard Joseph Heller, 37, Ridgefield, Conn.
JoAnn L. Heltibridle, 46, Springfield, N.J.
Mark F. Hemschoot, 45, Red Bank, N.J.
Ronnie Lee Henderson, 52, Newburgh, N.Y.
Janet Hendricks, 48, New York, N.Y.
Brian Hennessey, 35, Ringoes, N.J.
Michelle Marie Henrique, 27, New York, N.Y.
Joseph P. Henry, 25, New York, N.Y.
William Henry, 49, New York, N.Y.
John Henwood, 35, New York, N.Y.
Robert Allan Hepburn, 39, Union, N.J.
Mary (Molly) Herencia, 47, New York, N.Y.
Lindsay Coates Herkness, 58, New York, N.Y.
Harvey Robert Hermer, 59, New York, N.Y.
Claribel Hernandez, 31, New York, N.Y.
Norberto Hernandez, 42, New York, N.Y.
Raul Hernandez, 51, New York, N.Y.
Gary Herold, 44, Farmingdale, N.Y.
Jeffrey A. Hersch, 53, New York, N.Y.
Thomas Hetzel, 33, Elmont, N.Y.
Capt. Brian Hickey, 47, New York, N.Y.
Ysidro Hidalgo-Tejada, 47, New York, N.Y., Dominican Republic
Lt. Timothy Higgins, 43, Farmingville, N.Y.
Robert D. Higley, 29, New Fairfield, Conn.
Todd Russell Hill, 34, Boston, Mass.
Clara Victorine Hinds, 52, New York, N.Y.
Neal Hinds, 28, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Mark D. Hindy, 28, New York, N.Y.
Richard Bruce Van Hine, 48, Greenwood Lake, N.Y.
Katsuyuki Hirai, 32, Hartsdale, N.Y.
Heather Malia Ho, 32, New York, N.Y.
Tara Yvette Hobbs, 31, New York, N.Y.
Thomas A. Hobbs, 41, Baldwin, N.Y.
James L. Hobin, 47, Marlborough, Conn.
Robert Wayne Hobson, 36, New Providence, N.J.
DaJuan Hodges, 29, New York, N.Y.
Ronald George Hoerner, 58, Massapequa Park, N.Y.
Patrick Aloysius Hoey, 53, Middletown, N.J.
Stephen G. Hoffman, 36, Long Beach, N.Y.
Marcia Hoffman, 52, New York, N.Y.
Frederick J. Hoffmann, 53, Freehold, N.J.
Michele L. Hoffmann, 27, Freehold, N.J.
Judith Florence Hofmiller, 53, Brookfield, Conn.
Thomas Warren Hohlweck, 57, Harrison, N.Y.
Jonathan R. Hohmann, 48, New York, N.Y.
Joseph Francis Holland, 32, Glen Rock, N.J.
John Holland, 30
Elizabeth Holmes, 42, New York, N.Y.
Thomas P. Holohan, 36, Chester, N.Y.
Bradley Hoorn, 22, New York, N.Y.
James P. Hopper, 51, Farmingdale, N.Y.
Montgomery McCullough Hord, 46, Pelham, N.Y.
Michael Horn, 27, Lynbrook, N.Y.
Matthew D. Horning, 26, Hoboken, N.J.
Robert L. Horohoe, 31, New York, N.Y.
Aaron Horwitz, 24, New York, N.Y.
Charles J. Houston, 42, New York, N.Y.
Uhuru G. Houston, 32, Englewood, N.J.
George Howard, 45, Hicksville, N.Y.
Steven L. Howell, 36, New York, N.Y.
Michael C. Howell, 60, New York, N.Y.
Jennifer L. Howley, 34, New Hyde Park, N.Y.
Milagros "Millie" Hromada, 35, New York, N.Y.
Marian Hrycak, 56, New York, N.Y.
Stephen Huczko, 44, Bethlehem, N.J.
Kris R. Hughes, 30, Nesconset, N.Y.
Melissa Harrington Hughes, 31, San Francisco, Calif.
Thomas F. Hughes, 46, Spring Lake Heights, N.J.
Timothy Robert Hughes, 43, Madison, N.J.
Paul R. Hughes, 38, Stamford, Conn.
Robert T. "Bobby" Hughes, 23, Sayreville, N.J.
Susan Huie, 43, Fair Lawn, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Mychal Lamar Hulse, 30, New York, N.Y.
William C. Hunt, 32, Norwalk, Conn.
Joseph G. Hunter, 31, South Hempstead, N.Y.
Robert Hussa, 51, Roslyn, N.Y.
Capt. Walter Hynes, 46, Belle Harbor, N.Y.
Thomas E. Hynes, 28, Norwalk, Conn.
Joseph Anthony Ianelli, 28, Hoboken, N.J.
Zuhtu Ibis, 25, Clifton, N.J.
Jonathan Lee Ielpi, 29, Great Neck, N.Y.
Michael Patrick Iken, 37, New York, N.Y.
Daniel Ilkanayev, 36, New York, N.Y.
Capt. Frederick Ill, 49, Pearl River, N.Y.
Abraham Nethanel Ilowitz, 51, New York, N.Y.
Anthony P. Infante, 47, Chatham, N.J.
Louis S. Inghilterra, 45, New Castle, N.Y.
Christopher N. Ingrassia, 28, Watchung, N.J.
Paul Innella, 33, East Brunswick, N.J.
Stephanie V. Irby, 38, New York, N.Y.
Douglas Irgang, 32, New York, N.Y.
Todd A. Isaac, 29, New York, N.Y.
Erik Hans Isbrandtsen, 30, New York, N.Y.
Taizo Ishikawa, 50
Aram Iskenderian, 41, Merrick, N.Y.
John Iskyan, 41, Wilton, Conn.
Kazushige Ito, 35, New York, N.Y.
Aleksandr Valeryerich Ivantsov, 23, New York, N.Y.
Virginia Jablonski, 49, Matawan, N.J.
Brooke Alexandra Jackman, 23, New York, N.Y.
Aaron Jacobs, 27, New York, N.Y.
Jason Kyle Jacobs, 32, Mendham, N.J.
Michael Grady Jacobs, 54, Danbury, Conn.
Ariel Louis Jacobs, 29, Briarcliff Manor, N.Y.
Steven A. Jacobson, 53, New York, N.Y.
Ricknauth Jaggernauth, 58, New York, N.Y.
Jake Denis Jagoda, 24, Huntington, N.Y.
Yudh V.S. Jain, 54, New City, N.Y.
Maria Jakubiak, 41, Ridgewood, N.Y.
Gricelda E. James, 44, Willingboro, N.J.
Ernest James, 40, New York, N.Y.
Mark Jardim, 39, New York, N.Y.
Mohammed Jawara, 30, New York, N.Y.
Francois Jean-Pierre, 58, New York, N.Y.
Maxima Jean-Pierre, 40, Bellport, N.Y.
Paul E. Jeffers, 39, New York, N.Y.
Joseph Jenkins, 47, New York, N.Y.

# LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Alan K. Jensen, 49, Wyckoff, N.J.
Prem N. Jerath, 57, Edison, N.J.
Farah Jeudy, 32, Spring Valley, N.Y.
Hweidar Jian, 42, East Brunswick, N.J.
Eliezer Jimenez, 38, New York, N.Y.
Luis Jimenez, 25, New York, N.Y.
Charles Gregory John, 44, New York, N.Y.
Nicholas John, 42, New York, N.Y.
Scott M. Johnson, 26, New York, N.Y.
LaShawana Johnson, 27, New York, N.Y.
William Johnston, 31, North Babylon, N.Y.
Arthur Joseph Jones, 37, Ossining, N.Y.
Allison Horstmann Jones, 31, New York, N.Y.
Brian L. Jones, 44, New York, N.Y.
Christopher D. Jones, 53, Huntington, N.Y.
Donald T. Jones, 39, Livingston, N.J.
Donald W. Jones, 43, Fairless Hills, Pa.
Linda Jones, 50, New York, N.Y.
Mary S. Jones, 72, New York, N.Y.
Andrew Jordan, 35, Remsenburg, N.Y.
Robert Thomas Jordan, 34, Williston, N.Y.
Ingeborg Joseph, 60, Germany
Karl Henri Joseph, 25, New York, N.Y.
Stephen Joseph, 39, Franklin Park, N.J.
Albert Joseph, 79
Jane Eileen Josiah, 47, Bellmore, N.Y.
Lt. Anthony Jovic, 39, Massapequa, N.Y.
Angel Luis Juarbe, 35, New York, N.Y.
Karen Susan Juday, 52, New York, N.Y.
The Rev. Mychal Judge, 68, New York, N.Y.
Paul W. Jurgens, 47, Levittown, N.Y.
Thomas Edward Jurgens, 26, Lawrence, N.Y.
Kacinga Kabeya, 63, McKinney, Texas
Shashi Kiran Lakshmikantha Kadaba, 25, Hackensack, N.J.
Gavkharoy Mukhometovna Kamardinova, 26, New York, N.Y.
Shari Kandell, 27, Wyckoff, N.J.
Howard Lee Kane, 40, Hazlet, N.J.
Jennifer Lynn Kane, 26, Fair Lawn, N.J.
Vincent D. Kane, 37, New York, N.Y.
Joon Koo Kang, 34, Riverdale, N.J.
Sheldon R. Kanter, 53, Edison, N.J.
Deborah H. Kaplan, 45, Paramus, N.J.
Alvin Peter Kappelmann, 57, Green Brook, N.J.
Charles Karczewski, 34, Union, N.J.
William A. Karnes, 37, New York, N.Y.

Page 39 of 85

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Douglas G. Karpiloff, 53, Mamaroneck, N.Y.
Charles L. Kasper, 54, New York, N.Y.
Andrew Kates, 37, New York, N.Y.
John Katsimatides, 31, East Marion, N.Y.
Sgt. Robert Kaulfers, 49, Kenilworth, N.J.
Don Jerome Kauth, 51, Saratoga Springs, N.Y.
Hideya Kawauchi, 36, Fort Lee, N.J.
Edward T. Keane, 66, West Caldwell, N.J.
Richard M. Keane, 54, Wethersfield, Conn.
Lisa Kearney-Griffin, 35, Jamaica, N.Y.
Karol Ann Keasler, 42, New York, N.Y.
Paul Hanlon Keating, 38, New York, N.Y.
Leo Russell Keene, 33, Westfield, N.J.
Joseph J. Keller, 31, Park Ridge, N.J.
Peter Rodney Kellerman, 35, New York, N.Y.
Joseph P. Kellett, 37, Riverdale, N.Y.
Frederick H. Kelley, 57, Huntington, N.Y.
James Joseph Kelly, 39, Oceanside, N.Y.
Joseph A. Kelly, 40, Oyster Bay, N.Y.
Maurice Patrick Kelly, 41, New York, N.Y.
Richard John Kelly, 50, New York, N.Y.
Thomas Michael Kelly, 41, Wyckoff, N.J.
Thomas Richard Kelly, 38, Riverhead, N.Y.
Thomas W. Kelly, 51, New York, N.Y.
Timothy C. Kelly, 37, Port Washington, N.Y.
William Hill Kelly, 30, New York, N.Y.
Robert C. Kennedy, 55, Toms River, N.J.
Thomas J. Kennedy, 36, Islip Terrace, N.Y.
John Keohane, 41, Jersey City, N.J.
Lt. Ronald T. Kerwin, 42, Levittown, N.Y.
Howard L. Kestenbaum, 56, Montclair, N.J.
Douglas D. Ketcham, 27, New York, N.Y.
Ruth E. Ketler, 42, New York, N.Y.
Boris Khalif, 30, New York, N.Y.
Sarah Khan, 32, New York, N.Y.
Taimour Firaz Khan, 29, New York, N.Y.
Rajesh Khandelwal, 33, South Plainfield, N.J.
SeiLai Khoo, 38, Jersey City, N.J.
Michael Kiefer, 25, Hempstead, N.Y.
Satoshi Kikuchihara, 43, Scarsdale, N.Y.
Andrew Jay-Hoon Kim, 26, Leonia, N.J.
Lawrence Don Kim, 31, Blue Bell, Pa.
Mary Jo Kimelman, 34, New York, N.Y.
Andrew Marshall King, 42, Princeton, N.J.
Lucille T. King, 59, Ridgewood, N.J.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Robert King, 36, Bellerose Terrace, N.Y.
Lisa M. King-Johnson, 34, New York, N.Y.
Takashi Kinoshita, 46, Rye, N.Y.
Chris Michael Kirby, 21, New York, N.Y.
Howard (Barry) Kirschbaum, 53, New York, N.Y.
Glenn Davis Kirwin, 40, Scarsdale, N.Y.
Richard J. Klares, 59, Somers, N.Y.
Peter A. Klein, 35, Weehawken, N.J.
Alan D. Kleinberg, 39, East Brunswick, N.J.
Karen J. Klitzman, 38, New York, N.Y.
Ronald Philip Kloepfer, 39, Franklin Square, N.Y.
Yevgeny Kniazev, 46, New York, N.Y.
Thomas Patrick Knox, 31, Hoboken, N.J.
Andrew Knox, 30, Adelaide, Australia
Rebecca Lee Koborie, 48, Guttenberg, N.J.
Deborah Kobus, 36, New York, N.Y.
Gary Edward Koecheler, 57, Harrison, N.Y.
Frank J. Koestner, 48, New York, N.Y.
Ryan Kohart, 26, New York, N.Y.
Vanessa Lynn Kolpak, 21, New York, N.Y.
Irina Kolpakova, 37, New York, N.Y.
Suzanne Kondratenko, 27, Chicago, Ill.
Abdoulaye Kone, 37, New York, N.Y.
Bon-seok Koo, 42, River Edge, N.J.
Dorota Kopiczko, 26, Nutley, N.J.
Scott Kopytko, 32, New York, N.Y.
Bojan Kostic, 34, New York, N.Y.
Danielle Kousoulis, 29, New York, N.Y.
John J. Kren, 52
William Krukowski, 36, New York, N.Y.
Lyudmila Ksido, 46, New York, N.Y.
Shekhar Kumar, 30, New York, N.Y.
Kenneth Kumpel, 42, Cornwall, N.Y.
Frederick Kuo, 53, Great Neck, N.Y.
Patricia Kuras, 42, New York, N.Y.
Nauka Kushitani, 44, New York, N.Y.
Thomas Joseph Kuveikis, 48, Carmel, N.Y.
Victor Kwarkye, 35, New York, N.Y.
Kui Fai Kwok, 31, New York, N.Y.
Angela R. Kyte, 49, Boonton, N.J.
Amarnauth Lachhman, 42, Valley Stream, N.Y.
Andrew LaCorte, 61, Jersey City, N.J.
Ganesh Ladkat, 27, Somerset, N.J.
James P. Ladley, 41, Colts Neck, N.J.
Daniel M. Van Laere, 46, Glen Rock, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Joseph A. Lafalce, 54, New York, N.Y.
Jeanette LaFond-Menichino, 49, New York, N.Y.
David LaForge, 50, Port Richmond, N.Y.
Michael Patrick LaForte, 39, Holmdel, N.J.
Alan Lafrance, 43
Juan Lafuente, 61, Poughkeepsie, N.Y.
Neil K. Lai, 59, East Windsor, N.J.
Vincent A. Laieta, 31, Edison, N.J.
William David Lake, 44, New York, N.Y.
Franco Lalama, 45, Nutley, N.J.
Chow Kwan Lam, 48, Maywood, N.J.
Stephen LaMantia, 38, Darien, Conn.
Amy Hope Lamonsoff, 29, New York, N.Y.
Robert T. Lane, 28, New York, N.Y.
Brendan M. Lang, 30, Red Bank, N.J.
Rosanne P. Lang, 42, Middletown, N.J.
Vanessa Langer, 29, Yonkers, N.Y.
Mary Lou Langley, 53, New York, N.Y.
Peter J. Langone, 41, Roslyn Heights, N.Y.
Thomas Langone, 39, Williston Park, N.Y.
Michele B. Lanza, 36, New York, N.Y.
Ruth Sheila Lapin, 53, East Windsor, N.J.
Carol Ann LaPlante, 59, New York, N.Y.
Ingeborg Astrid Desiree Lariby, 42, New York, N.Y.
Robin Larkey, 48, Chatham, N.J.
Christopher Randall Larrabee, 26, New York, N.Y.
Hamidou S. Larry, 37, New York, N.Y.
Scott Larsen, 35, New York, N.Y.
John Adam Larson, 37, Colonia, N.J.
Gary E. Lasko, 49, Memphis, Tenn.
Nicholas C. Lassman, 28, Cliffside Park, N.J.
Paul Laszczynski, 49, Paramus, N.J.
Jeffrey Latouche, 49, New York, N.Y.
Cristina de Laura
Oscar de Laura
Charles Laurencin, 61, New York, N.Y.
Stephen James Lauria, 39, New York, N.Y.
Maria Lavache, 60, New York, N.Y.
Denis F. Lavelle, 42, Yonkers, N.Y.
Jeannine M. LaVerde, 36, New York, N.Y.
Anna A. Laverty, 52, Middletown, N.J.
Steven Lawn, 28, West Windsor, N.J.
Robert A. Lawrence, 41, Summit, N.J.
Nathaniel Lawson, 61, New York, N.Y.
Eugen Lazar, 27, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

### LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

James Patrick Leahy, 38, New York, N.Y.
Lt. Joseph Gerard Leavey, 45, Pelham, N.Y.
Neil Leavy, 34, New York, N.Y.
Leon Lebor, 51, Jersey City, N.J.
Kenneth Charles Ledee, 38, Monmouth, N.J.
Alan J. Lederman, 43, New York, N.Y.
Elena Ledesma, 36, New York, N.Y.
Alexis Leduc, 45, New York, N.Y.
Myung-woo Lee, 41, Lyndhurst, N.J.
David S. Lee, 37, West Orange, N.Y.
Gary H. Lee, 62, Lindenhurst, N.Y.
Hyun-joon (Paul) Lee, 32, New York, N.Y.
Jong-min Lee, 24, New York, N.Y.
Juanita Lee, 44, New York, N.Y.
Lorraine Lee, 37, New York, N.Y.
Richard Y.C. Lee, 34, Great Neck, N.Y.
Yang Der Lee, 63, New York, N.Y.
Kathryn Blair Lee, 55, New York, N.Y.
Stuart (Soo-Jin) Lee, 30, New York, N.Y.
Linda C. Lee, 34, New York, N.Y.
Stephen Lefkowitz, 50, Belle Harbor, N.Y.
Adriana Legro, 32, New York, N.Y.
Edward J. Lehman, 41, Glen Cove, N.Y.
Eric Andrew Lehrfeld, 32, New York, N.Y.
David Ralph Leistman, 43, Garden City, N.Y.
David Prudencio LeMagne, 27, North Bergen, N.J.
Joseph A. Lenihan, 41, Greenwich, Conn.
John J. Lennon, 44, Howell, N.J.
John Robinson Lenoir, 38, Locust Valley, N.Y.
Jorge Luis Leon, 43, Union City, N.J.
Matthew Gerard Leonard, 38, New York, N.Y.
Michael Lepore, 39, New York, N.Y.
Charles Antoine Lesperance, 55
Jeffrey Earle LeVeen, 55, Manhasset, N.Y.
John D. Levi, 50, New York, N.Y.
Alisha Caren Levin, 33, New York, N.Y.
Neil D. Levin, 47, New York, N.Y.
Robert Levine, 56, West Babylon, N.Y.
Robert M. Levine, 66, Edgewater, N.J.
Shai Levinhar, 29, New York, N.Y.
Adam J. Lewis, 36, Fairfield, Conn.
Margaret Susan Lewis, 49, Elizabeth, N.J.
Ye Wei Liang, 27, New York, N.Y.
Orasri Liangthanasarn, 26, Bayonne, N.J.
Daniel F. Libretti, 43, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Ralph M. Licciardi, 30, West Hempstead, N.Y.
Edward Lichtschein, 35, New York, N.Y.
Steven B. Lillianthal, 38, Millburn, N.J.
Carlos R. Lillo, 37, Babylon, N.Y.
Craig Damian Lilore, 30, Lyndhurst, N.J.
Arnold A. Lim, 28, New York, N.Y.
Darya Lin, 32, Chicago, Ill.
Wei Rong Lin, 31, Jersey City, N.J.
Nickie L. Lindo, 31, New York, N.Y.
Thomas V. Linehan, 39, Montville, N.J.
Robert Thomas Linnane, 33, West Hempstead, N.Y.
Alan Linton, 26, Jersey City, N.J.
Diane Theresa Lipari, 42, New York, N.Y.
Kenneth P. Lira, 28, Paterson, N.J.
Francisco Alberto Liriano, 33, New York, N.Y.
Lorraine Lisi, 44, New York, N.Y.
Paul Lisson, 45, New York, N.Y.
Vincent Litto, 52, New York, N.Y.
Ming-Hao Liu, 41, Livingston, N.J.
Nancy Liz, 39, New York, N.Y.
Harold Lizcano, 31, East Elmhurst, N.Y.
Martin Lizzul, 31, New York, N.Y.
George A. Llanes, 33, New York, N.Y.
Elizabeth Claire Logler, 31, Rockville Centre, N.Y.
Catherine Lisa Loguidice, 30, New York, N.Y.
Jerome Robert Lohez, 30, Jersey City, N.J.
Michael W. Lomax, 37, New York, N.Y.
Laura M. Longing, 35, Pearl River, N.Y.
Salvatore P. Lopes, 40, Franklin Square, N.Y.
Daniel Lopez, 39, New York, N.Y.
Luis Lopez, 38, New York, N.Y.
Manuel L. Lopez, 54, Jersey City, N.J.
George Lopez, 40, Stroudsburg, Pa.
Joseph Lostrangio, 48, Langhorne, Pa.
Chet Louie, 45, New York, N.Y.
Stuart Seid Louis, 43, East Brunswick, N.J.
Joseph Lovero, 60, Jersey City, N.J.
Michael W. Lowe, 48, New York, N.Y.
Garry Lozier, 47, Darien, Conn.
John Peter Lozowsky, 45, New York, N.Y.
Charles Peter Lucania, 34, East Atlantic Beach, N.Y.
Edward (Ted) H. Luckett, 40, Fair Haven, N.J.
Mark G. Ludvigsen, 32, New York, N.Y.
Lee Charles Ludwig, 49, New York, N.Y.

Page 44 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Sean Thomas Lugano, 28, New York, N.Y.
Daniel Lugo, 45, New York, N.Y.
Marie Lukas, 32, New York, N.Y.
William Lum, 45, New York, N.Y.
Michael P. Lunden, 37, New York, N.Y.
Christopher Lunder, 34, Wall, N.J.
Anthony Luparello, 62, New York, N.Y.
Gary Lutnick, 36, New York, N.Y.
Linda Luzzicone, 33, New York, N.Y.
Alexander Lygin, 28, New York, N.Y.
Farrell Peter Lynch, 39, Centerport, N.Y.
James Francis Lynch, 47, Woodbridge, N.J.
Louise A. Lynch, 58, Amityville, N.Y.
Michael Lynch, 34, New York, N.Y.
Michael F. Lynch, 33, New Hyde Park, N.Y.
Michael Francis Lynch, 30, New York, N.Y.
Richard Dennis Lynch, 30, Bedford Hills, N.Y.
Robert H. Lynch, 44, Cranford, N.J.
Sean Patrick Lynch, 36, Morristown, N.J.
Sean Lynch, 34, New York, N.Y.
Michael J. Lyons, 32, Hawthorne, N.Y.
Patrick Lyons, 34, South Setauket, N.Y.
Monica Lyons, 53, New York, N.Y.
Robert Francis Mace, 43, New York, N.Y.
Jan Maciejewski, 37, New York, N.Y.
Catherine Fairfax MacRae, 23, New York, N.Y.
Richard B. Madden, 35, Westfield, N.J.
Simon Maddison, 40, Florham Park, N.J.
Noell Maerz, 29, Long Beach, N.Y.
Jeannieann Maffeo, 40, New York, N.Y.
Joseph Maffeo, 30, New York, N.Y.
Jay Robert Magazine, 48, New York, N.Y.
Charles Wilson Magee, 51, Wantagh, N.Y.
Brian Magee, 52, Floral Park, N.Y.
Joseph Maggitti, 47, Abingdon, Md.
Ronald E. Magnuson, 57, Park Ridge, N.J.
Daniel L. Maher, 50, Hamilton, N.J.
Thomas Anthony Mahon, 37, East Norwich, N.Y.
William Mahoney, 38, Bohemia, N.Y.
Joseph Maio, 32, Roslyn Harbor, N.Y.
Takashi Makimoto, 49, New York, N.Y.
Abdu Malahi, 37, New York, N.Y.
Debora Maldonado, 47, New York, N.Y.
Myrna T. Maldonado-Agosto, 49, New York, N.Y.
Alfred R. Maler, 39, Convent Station, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Gregory James Malone, 42, Hoboken, N.J.
Edward Francis (Teddy) Maloney, 32, Darien, Conn.
Joseph E. Maloney, 46, Farmingville, N.Y.
Gene E. Maloy, 41, New York, N.Y.
Christian Maltby, 37, Chatham, N.J.
Francisco Miguel (Frank) Mancini, 26, New York, N.Y.
Joseph Mangano, 53, Jackson, N.J.
Sara Elizabeth Manley, 31, New York, N.Y.
Debra M. Mannetta, 31, Islip, N.Y.
Terence J. Manning, 36, Rockville Centre, N.Y.
Marion Victoria (vickie) Manning, 27, Rochdale, N.Y.
James Maounis, 42, New York, N.Y.
Joseph Ross Marchbanks, 47, Nanuet, N.Y.
Peter Edward Mardikian, 29, New York, N.Y.
Edward Joseph Mardovich, 42, Lloyd Harbor, N.Y.
Lt. Charles Joseph Margiotta, 44, New York, N.Y.
Kenneth Joseph Marino, 40, Monroe, N.Y.
Lester Vincent Marino, 57, Massapequa, N.Y.
Vita Marino, 49, New York, N.Y.
Kevin D. Marlo, 28, New York, N.Y.
Jose J. Marrero, 32, Old Bridge, N.J.
John Marshall, 35, Congers, N.Y.
James Martello, 41, Rumson, N.J.
Michael A. Marti, 26, Glendale, N.Y.
Lt. Peter Martin, 43, Miller Place, N.Y.
William J. Martin, 35, Rockaway, N.J.
Brian E. Martineau, 37, Edison, N.J.
Betsy Martinez, 33, New York, N.Y.
Edward J. Martinez, 60, New York, N.Y.
Jose Angel Martinez, 49, Hauppauge, N.Y.
Robert Gabriel Martinez, 24, New York, N.Y.
Lizie Martinez-Calderon, 32, New York, N.Y.
Lt. Paul Richard Martini, 37, New York, N.Y.
Joseph A. Mascali, 44, New York, N.Y.
Bernard Mascarenhas, 54, Newmarket, Ontario, Canada
Stephen F. Masi, 55, New York, N.Y.
Nicholas G. Massa, 65, New York, N.Y.
Patricia A. Massari, 25, Glendale, N.Y.
Michael Massaroli, 38, New York, N.Y.
Philip W. Mastrandrea, 42, Chatham, N.J.
Rudolph Mastrocinque, 43, Kings Park, N.Y.
Joseph Mathai, 49, Arlington, Mass.
Charles William Mathers, 61, Sea Girt, N.J.
William A. Mathesen, 40, Morristown, N.J.
Marcello Matricciano, 31, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Margaret Elaine Mattic, 51, New York, N.Y.
Robert D. Mattson, 54, Green Pond, N.J.
Walter Matuza, 39, New York, N.Y.
Charles A. (Chuck) Mauro, 65, New York, N.Y.
Charles J. Mauro, 38, New York, N.Y.
Dorothy Mauro, 55, New York, N.Y.
Nancy T. Mauro, 51, New York, N.Y.
Tyrone May, 44, Rahway, N.J.
Keithroy Maynard, 30, New York, N.Y.
Robert J. Mayo, 46, Morganville, N.J.
Kathy Nancy Mazza-Delosh, 46, Farmingdale, N.Y.
Edward Mazzella, 62, Monroe, N.Y.
Jennifer Mazzotta, 23, New York, N.Y.
Kaaria Mbaya, 39, Edison, N.J.
James J. McAlary, 42, Spring Lake Heights, N.J.
Brian McAleese, 36, Baldwin, N.Y.
Patricia A. McAneney, 50, Pomona, N.Y.
Colin Richard McArthur, 52, Howell, N.J.
John McAvoy, 47, New York, N.Y.
Kenneth M. McBrayer, 49, New York, N.Y.
Brendan McCabe, 40, Sayville, N.Y.
Michael J. McCabe, 42, Rumson, N.J.
Thomas McCann, 46, Manalapan, N.J.
Justin McCarthy, 30, Port Washington, N.Y.
Kevin M. McCarthy, 42, Fairfield, Conn.
Michael Desmond McCarthy, 33, Huntington, N.Y.
Robert Garvin McCarthy, 33, Stony Point, N.Y.
Stanley McCaskill, 47, New York, N.Y.
Katie Marie McCloskey, 25, Mount Vernon, N.Y.
Tara McCloud-Gray, 30, New York, N.Y.
Charles Austin McCrann, 55, New York, N.Y.
Tonyell McDay, 25, Colonia, N.J.
Matthew T. McDermott, 34, Basking Ridge, N.J.
Joseph P. McDonald, 43, Livingston, N.J.
Brian G. McDonnell, 38, Wantagh, N.Y.
Michael McDonnell, 34, Red Bank, N.J.
John F. McDowell, 33, New York, N.Y.
Eamon J. McEneaney, 46, New Canaan, Conn.
John Thomas McErlean, 39, Larchmont, N.Y.
Daniel F. McGinley, 40, Ridgewood, N.J.
Mark Ryan McGinly, 26, New York, N.Y.
Lt. William E. McGinn, 43, New York, N.Y.
Thomas H. McGinnis, 41, Oakland, N.J.
Michael Gregory McGinty, 42, Foxboro, Mass.
Ann McGovern, 68, East Meadow, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Scott Martin McGovern, 35, Wyckoff, N.J.
William J. McGovern, 49, Smithtown, N.Y.
Stacey S. McGowan, 38, Basking Ridge, N.J.
Francis Noel McGuinn, 48, Rye, N.Y.
Patrick J. McGuire, 40, Madison, N.J.
Thomas M. McHale, 33, Huntington, N.Y.
Keith McHeffey, 31, Monmouth Beach, N.J.
Denis J. McHugh, 36, New York, N.Y.
Dennis P. McHugh, 34, Sparkill, N.Y.
Michael Edward McHugh, 35, Tuckahoe, N.Y.
Ann M. McHugh, 35, New York, N.Y.
Robert G. McIlvaine, 26, New York, N.Y.
Donald James McIntyre, 38, New City, N.Y.
Stephanie McKenna, 45, New York, N.Y.
Barry J. McKeon, 47, Yorktown Heights, N.Y.
Evelyn C. McKinnedy, 60, New York, N.Y.
Darryl Leron McKinney, 26, New York, N.Y.
Robert C. McLaughlin, 29, Westchester, N.Y.
George Patrick McLaughlin, 36, Hoboken, N.J.
Gavin McMahon, 35, Bayonne, N.J.
Robert Dismas McMahon, 35, New York, N.Y.
Edmund M. McNally, 41, Fair Haven, N.J.
Daniel McNeal, 29, Towson, Md.
Walter Arthur McNeil, 53, Stroudsburg, Pa.
Sean Peter McNulty, 30, New York, N.Y.
Christine Sheila McNulty, 42, Peterborough, England
Robert William McPadden, 30, Pearl River, N.Y.
Terence A. McShane, 37, West Islip, N.Y.
Timothy Patrick McSweeney, 37, New York, N.Y.
Martin E. McWilliams, 35, Kings Park, N.Y.
Rocco A. Medaglia, 49, Melville, N.Y.
Abigail Cales Medina, 46, New York, N.Y.
Ana Iris Medina, 39, New York, N.Y.
Deborah Medwig, 46, Dedham, Mass.
William J. Meehan, 49, Darien, Conn.
Damian Meehan, 32, Glen Rock, N.J.
Alok Kumar Mehta, 23, Hempstead, N.Y.
Raymond Meisenheimer, 46, West Babylon, N.Y.
Manuel Emilio Mejia, 54, New York, N.Y.
Eskedar Melaku, 31, New York, N.Y.
Antonio Melendez, 30, New York, N.Y.
Mary Melendez, 44, Stroudsburg, Pa.
Yelena Melnichenko, 28, Brooklyn, N.Y.
Stuart Todd Meltzer, 32, Syosset, N.Y.
Diarelia Jovannah Mena, 30, New York, N.Y.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Charles Mendez, 38, Floral Park, N.Y.
Lizette Mendoza, 33, North Bergen, N.J.
Shevonne Mentis, 25, New York, N.Y.
Steve Mercado, 38, New York, N.Y.
Wesley Mercer, 70, New York, N.Y.
Ralph Joseph Mercurio, 47, Rockville Centre, N.Y.
Alan H. Merdinger, 47, Allentown, Pa.
George C. Merino, 39, New York, N.Y.
Yamel Merino, 24, Yonkers, N.Y.
George Merkouris, 35, Levittown, N.Y.
Deborah Merrick, 45
Raymond J. Metz, 37, Trumbull, Conn.
Jill A. Metzler, 32, Franklin Square, N.Y.
David Robert Meyer, 57, Glen Rock, N.J.
Nurul Huq Miah, 35, New York, N.Y.
William Edward Micciulli, 30, Matawan, N.J.
Martin Paul Michelstein, 57, Morristown, N.J.
Luis Clodoaldo Revilla Mier, 54
Peter T. Milano, 43, Middletown, N.J.
Gregory Milanowycz, 25, Cranford, N.J.
Lukasz T. Milewski, 21, New York, N.Y.
Craig James Miller, 29, Va.
Corey Peter Miller, 34, New York, N.Y.
Douglas C. Miller, 34, Port Jervis, N.Y.
Henry Miller, 52, Massapequa, N.Y.
Michael Matthew Miller, 39, Englewood, N.J.
Phillip D. Miller, 53, New York, N.Y.
Robert C. Miller, 55, Hasbrouck Heights, N.J.
Robert Alan Miller, 46, Matawan, N.J.
Joel Miller, 55, Baldwin, N.Y.
Benjamin Millman, 40, New York, N.Y.
Charles M. Mills, 61, Brentwood, N.Y.
Ronald Keith Milstein, 54, New York, N.Y.
Robert Minara, 54, Carmel, N.Y.
William G. Minardi, 46, Bedford, N.Y.
Louis Joseph Minervino, 54, Middletown, N.J.
Thomas Mingione, 34, West Islip, N.Y.
Wilbert Miraille, 29, New York, N.Y.
Domenick Mircovich, 40, Closter, N.J.
Rajesh A. Mirpuri, 30, Englewood Cliffs, N.J.
Joseph Mistrulli, 47, Wantagh, N.Y.
Susan Miszkowicz, 37, New York, N.Y.
Lt. Paul Thomas Mitchell, 46, New York, N.Y.
Richard Miuccio, 55, New York, N.Y.
Frank V. Moccia, 57, Hauppauge, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Capt. Louis Joseph Modafferi, 45, New York, N.Y.
Boyie Mohammed, 50, New York, N.Y.
Lt. Dennis Mojica, 50, New York, N.Y.
Manuel Mojica, 37, Bellmore, N.Y.
Manuel Dejesus Molina, 31, New York, N.Y.
Kleber Rolando Molina, 44, New York, N.Y.
Fernando Jimenez Molinar, 21, Oaxaca, Mexico
Carl Molinaro, 32, New York, N.Y.
Justin J. Molisani, 42, Middletown Township, N.J.
Brian Patrick Monaghan, 21, New York, N.Y.
Franklin Monahan, 45, Roxbury, N.Y.
John Gerard Monahan, 47, Wanamassa, N.J.
Kristen Montanaro, 34, New York, N.Y.
Craig D. Montano, 38, Glen Ridge, N.J.
Michael Montesi, 39, Highland Mills, N.Y.
Cheryl Ann Monyak, 43, Greenwich, Conn.
Capt. Thomas Moody, 45, Stony Brook, N.Y.
Sharon Moore, 37, New York, N.Y.
Krishna Moorthy, 59, Briarcliff Manor, N.Y.
Abner Morales, 37, New York, N.Y.
Carlos Morales, 29, New York, N.Y.
Paula Morales, 42, New York, N.Y.
Luis Morales, 46, New York, N.Y.
John Moran, 43, Rockaway, N.Y.
John Christopher Moran, 38, Haslemere, Surrey, England
Kathleen Moran, 42, New York, N.Y.
Lindsay S. Morehouse, 24, New York, N.Y.
George Morell, 47, Mount. Kisco, N.Y.
Steven P. Morello, 52, Bayonne, N.J.
Vincent S. Morello, 34, New York, N.Y.
Arturo Alva Moreno, 47, Mexico City, Mexico
Yvette Nicole Moreno, 25, New York, N.Y.
Dorothy Morgan, 47, Hempstead, N.Y.
Richard Morgan, 66, Glen Rock, N.J.
Nancy Morgenstern, 32, New York, N.Y.
Sanae Mori, 27, Tokyo, Japan
Blanca Morocho, 26, New York, N.Y.
Leonel Morocho, 36, New York, N.Y.
Dennis G. Moroney, 39, Eastchester, N.Y.
Lynne Irene Morris, 22, Monroe, N.Y.
Seth A. Morris, 35, Kinnelon, N.J.
Stephen Philip Morris, 31, Ormond Beach, Fla.
Christopher M. Morrison, 34, Charlestown, Mass.
Ferdinand V. Morrone, 63, Lakewood, N.J.
William David Moskal, 50, Brecksville, Ohio

Page 50 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Manuel Da Mota, 43, Valley Stream, N.Y.
Marco Motroni, 57, Fort Lee, N.J.
Iouri A. Mouchinski, 55, New York, N.Y.
Jude J. Moussa, 35, New York, N.Y.
Peter C. Moutos, 44, Chatham, N.J.
Damion Mowatt, 21, New York, N.Y.
Christopher Mozzillo, 27, New York, N.Y.
Stephen V. Mulderry, 33, New York, N.Y.
Richard Muldowney, 40, Babylon, N.Y.
Michael D. Mullan, 34, New York, N.Y.
Dennis Michael Mulligan, 32, New York, N.Y.
Peter James Mulligan, 28, New York, N.Y.
Michael Joseph Mullin, 27, Hoboken, N.J.
James Donald Munhall, 45, Ridgewood, N.J.
Nancy Muniz, 45, New York, N.Y.
Carlos Mario Munoz, 43
Francisco Munoz, 29, New York, N.Y.
Theresa (Terry) Munson, 54, New York, N.Y.
Robert M. Murach, 45, Montclair, N.J.
Cesar Augusto Murillo, 32, New York, N.Y.
Marc A. Murolo, 28, Maywood, N.J.
Robert Eddie Murphy, 56, New York, N.Y.
Brian Joseph Murphy, 41, New York, N.Y.
Christopher W. Murphy, 35, Easton, Md.
Edward C. Murphy, 42, Clifton, N.J.
James F. Murphy, 30, Garden City, N.Y.
James Thomas Murphy, 35, Middletown, N.J.
Kevin James Murphy, 40, Northport, N.Y.
Patrick Sean Murphy, 36, Millburn, N.J.
Lt. Raymond E. Murphy, 46, New York, N.Y.
Charles Murphy, 38, New York, N.Y.
John Joseph Murray, 32, Hoboken, N.J.
John Joseph Murray, 52, Colts Neck, N.J.
Susan D. Murray, 54, Summit, N.J.
Valerie Victoria Murray, 65, New York, N.Y.
Richard Todd Myhre, 37, New York, N.Y.
Lt. Robert B. Nagel, 55, New York, N.Y.
Takuya Nakamura, 30, Tuckahoe, N.Y.
Alexander J.R. Napier, 38, Morris Township, N.J.
Frank Joseph Naples, 29, Cliffside Park, N.J.
John Napolitano, 33, Ronkonkoma, N.Y.
Catherine A. Nardella, 40, Bloomfield, N.J.
Mario Nardone, 32, New York, N.Y.
Manika Narula, 22, Kings Park, N.Y.
Narender Nath, 33, Colonia, N.J.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Karen S. Navarro, 30, New York, N.Y.
Joseph M. Navas, 44, Paramus, N.J.
Francis J. Nazario, 28, Jersey City, N.J.
Glenroy Neblett, 42, New York, N.Y.
Marcus R. Neblett, 31, Roslyn Heights, N.Y.
Jerome O. Nedd, 39, New York, N.Y.
Laurence Nedell, 51, Lindenhurst, N.Y.
Luke G. Nee, 44, Stony Point, N.Y.
Pete Negron, 34, Bergenfield, N.J.
Ann Nicole Nelson, 30, New York, N.Y.
David William Nelson, 50, New York, N.Y.
James Nelson, 40, Clark, N.J.
Michele Ann Nelson, 27, Valley Stream, N.Y.
Peter Allen Nelson, 42, Huntington Station, N.Y.
Oscar Nesbitt, 58, New York, N.Y.
Gerard Terence Nevins, 46, Campbell Hall, N.Y.
Christopher Newton-Carter, 51, Middletown, N.J.
Kapinga Ngalula, 58, McKinney, Texas
Nancy Yuen Ngo, 36, Harrington Park, N.J.
Jody Tepedino Nichilo, 39, New York, N.Y.
Martin Niederer, 23, Hoboken, N.J.
Alfonse J. Niedermeyer, 40, Manasquan, N.J.
Frank John Niestadt, 55, Ronkonkoma, N.Y.
Gloria Nieves, 48, New York, N.Y.
Juan Nieves, 56, New York, N.Y.
Troy Edward Nilsen, 33, New York, N.Y.
Paul R. Nimbley, 42, Middletown, N.J.
John Ballantine Niven, 44, Oyster Bay, N.Y.
Katherine (Katie) McGarry Noack, 30, Hoboken, N.J.
Curtis Terrence Noel, 22, Poughkeepsie, N.Y.
Daniel R. Nolan, 44, Hopatcong, N.J.
Robert Walter Noonan, 36, Norwalk, Conn.
Daniela R. Notaro, 25, New York, N.Y.
Brian Novotny, 33, Hoboken, N.J.
Soichi Numata, 45, Irvington, N.Y.
Brian Felix Nunez, 29, New York, N.Y.
Jose R. Nunez, 42, New York, N.Y.
Jeffrey Nussbaum, 37, Oceanside, N.Y.
James A. Oakley, 52, Cortlandt Manor, N.Y.
Dennis O'Berg, 28, Babylon, N.Y.
James P. O'Brien, 33, New York, N.Y.
Scott J. O'Brien, 40, New York, N.Y.
Timothy Michael O'Brien, 40, Brookville, N.Y.
Michael O'Brien, 42, Cedar Knolls, N.J.
Captain Daniel O'Callaghan, 42, Smithtown, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Richard J. O'Connor, 49, Poughkeepsie, N.Y.
Dennis J. O'Connor, 34, New York, N.Y.
Diana J. O'Connor, 38, Eastchester, N.Y.
Keith K. O'Connor, 28, Hoboken, N.J.
Amy O'Doherty, 23, New York, N.Y.
Marni Pont O'Doherty, 31, Armonk, N.Y.
Douglas Oelschlager, 36, New York, N.Y.
Takashi Ogawa, 37, Tokyo, Japan
Albert Ogletree, 49, New York, N.Y.
Philip Paul Ognibene, 39, New York, N.Y.
James Andrew O'Grady, 32, Harrington Park, N.J.
Joseph J. Ogren, 30, New York, N.Y.
Lt. Thomas O'Hagan, 43, New York, N.Y.
Samuel Oitice, 45, Peekskill, N.Y.
Patrick O'Keefe, 44, Oakdale, N.Y.
Capt. William O'Keefe, 49, New York, N.Y.
Gerald Michael Olcott, 55, New Hyde Park, N.Y.
Gerald O'Leary, 34, Stony Point, N.Y.
Christine Anne Olender, 39, New York, N.Y.
Elsy Carolina Osorio Oliva, 27, New York, N.Y.
Linda Mary Oliva, 44, New York, N.Y.
Edward K. Oliver, 31, Jackson, N.J.
Leah E. Oliver, 24, New York, N.Y.
Eric T. Olsen, 41, New York, N.Y.
Jeffrey James Olsen, 31, New York, N.Y.
Maureen L. Olson, 50, Rockville Centre, N.Y.
Steven John Olson, 38, New York, N.Y.
Matthew Timothy O'Mahony, 39, New York, N.Y.
Toshihiro Onda, 39, New York, N.Y.
Seamus L. Oneal, 52, New York, N.Y.
John P. O'Neill, 49, New York, N.Y.
Sean Gordon Corbett O'Neill, 34, Rye, N.Y.
Peter J. O'Neill, 21, Amityville, N.Y.
Michael C. Opperman, 45, Selden, N.Y.
Christopher Orgielewicz, 35, Larchmont, N.Y.
Margaret Orloske, 50, Windsor, Conn.
Virginia A. Ormiston, 42, New York, N.Y.
Kevin O'Rourke, 44, Hewlett, N.Y.
Juan Romero Orozco, Acatlan de Osorio, Puebla, Mexico
Ronald Orsini, 59, Hillsdale, N.J.
Peter K. Ortale, 37, New York, N.Y.
Emilio (Peter) Ortiz, 38, New York, N.Y.
David Ortiz, 37, Nanuet, N.Y.
Paul Ortiz, 21, New York, N.Y.
Sonia Ortiz, 58, New York, N.Y.

Page 53 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Alexander Ortiz, 36, Ridgewood, N.Y.
Pablo Ortiz, 49, New York, N.Y.
Masaru Ose, 36, Fort Lee, N.J.
Robert W. O'Shea, 47, Wall, N.J.
Patrick J. O'Shea, 45, Farmingdale, N.Y.
James Robert Ostrowski, 37, Garden City, N.Y.
Timothy O'Sullivan, 68, Albrightsville, Pa.
Jason Douglas Oswald, 28, New York, N.Y.
Michael Otten, 42, East Islip, N.Y.
Isidro Ottenwalder, 35, New York, N.Y.
Michael Chung Ou, 53, New York, N.Y.
Todd Joseph Ouida, 25, River Edge, N.J.
Jesus Ovalles, 60, New York, N.Y.
Peter J. Owens, 42, Williston Park, N.Y.
Adianes Oyola, 23, New York, N.Y.
Angel M. Pabon, 54, New York, N.Y.
Israel Pabon, 31, New York, N.Y.
Roland Pacheco, 25, New York, N.Y.
Michael Benjamin Packer, 45, New York, N.Y.
Deepa K. Pakkala, 31, Stewartsville, N.J.
Jeffrey Matthew Palazzo, 33, New York, N.Y.
Thomas Anthony Palazzo, 44, Armonk, N.Y.
Richard (Rico) Palazzolo, 39, New York, N.Y.
Orio Joseph Palmer, 45, Valley Stream, N.Y.
Frank A. Palombo, 46, New York, N.Y.
Alan N. Palumbo, 42, New York, N.Y.
Christopher M. Panatier, 36, Rockville Centre, N.Y.
Dominique Pandolfo, 27, Hoboken, N.J.
Paul Pansini, 34, New York, N.Y.
John M. Paolillo, 51, Glen Head, N.Y.
Edward J. Papa, 47, Oyster Bay, N.Y.
Salvatore Papasso, 34, New York, N.Y.
James N. Pappageorge, 29, Yonkers, N.Y.
Vinod K. Parakat, 34, Sayreville, N.J.
Vijayashanker Paramsothy, 23, New York, N.Y.
Nitin Ramesh Parandkar, 28, Waltham, Mass.
Hardai (Casey) Parbhu, 42, New York, N.Y.
James Wendell Parham, 32, New York, N.Y.
Debra (Debbie) Paris, 48, New York, N.Y.
George Paris, 33, New York, N.Y.
Gye-Hyong Park, 28, New York, N.Y.
Philip L. Parker, 53, Skillman, N.J.
Michael A. Parkes, 27, New York, N.Y.
Robert Emmett Parks, 47, Middletown, N.J.
Hasmukhrai Chuckulal Parmar, 48, Warren, N.J.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Robert Parro, 35, Levittown, N.Y.
Diane Marie Moore Parsons, 58, Malta, N.Y.
Leobardo Lopez Pascual, 41, New York, N.Y.
Michael J. Pascuma, 50, Massapequa Park, N.Y.
Jerrold H. Paskins, 56, Anaheim Hills, Calif.
Horace Robert Passananti, 55, New York, N.Y.
Suzanne H. Passaro, 38, East Brunswick, N.J.
Victor Antonio Martinez Pastrana, 38, Tlachichuca, Puebla, Mexico
Manish K. Patel, 29, Edison, N.J.
Avnish Ramanbhai Patel, 28, New York, N.Y.
Dipti Patel, 38, New Hyde Park, N.Y.
Steven B. Paterson, 40, Ridgewood, N.J.
James Matthew Patrick, 30, Norwalk, Conn.
Manuel Patrocino, 34
Bernard E. Patterson, 46, Upper Brookville, N.Y.
Cira Marie Patti, 40, New York, N.Y.
Robert Edward Pattison, 40, New York, N.Y.
James R. Paul, 58, New York, N.Y.
Sharon Cristina Millan Paz, 31, New York, N.Y.
Patrice Paz, 52, New York, N.Y.
Victor Paz-Gutierrez, 43, New York, N.Y.
Stacey L. Peak, 36, New York, N.Y.
Richard Allen Pearlman, 18, New York, N.Y.
Durrell Pearsall, 34, Hempstead, N.Y.
Thomas E. Pedicini, 30, Hicksville, N.Y.
Todd D. Pelino, 34, Fair Haven, N.J.
Michel Adrian Pelletier, 36, Greenwich, Conn.
Anthony Peluso, 46, New York, N.Y.
Angel Ramon Pena, 45, River Vale, N.J.
Richard Al Penny, 53, New York, N.Y.
Salvatore F. Pepe, 45, New York, N.Y.
Carl Allen Peralta, 37, New York, N.Y.
Robert David Peraza, 30, New York, N.Y.
Jon A. Perconti, 32, Brick, N.J.
Alejo Perez, 66, Union City, N.J.
Angel Perez, 43, Jersey City, N.J.
Angela Susan Perez, 35, New York, N.Y.
Ivan Perez, 37, New York, N.Y.
Nancy E. Perez, 36, Secaucus, N.J.
Anthony Perez, 33, Locust Valley, N.Y.
Joseph John Perroncino, 33, Smithtown, N.Y.
Edward J. Perrotta, 43, Mount Sinai, N.Y.
Lt. Glenn C. Perry, 41, Monroe, N.Y.
Emelda Perry, 52, Elmont, N.Y.
John William Perry, 38, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Franklin Allan Pershep, 59, New York, N.Y.
Daniel Pesce, 34, New York, N.Y.
Michael J. Pescherine, 32, New York, N.Y.
Davin Peterson, 25, New York, N.Y.
William Russel Peterson, 46, New York, N.Y.
Mark Petrocelli, 28, New York, N.Y.
Lt. Philip S. Petti, 43, New York, N.Y.
Glen Kerrin Pettit, 30, Oakdale, N.Y.
Dominick Pezzulo, 36, New York, N.Y.
Kaleen E. Pezzuti, 28, Fair Haven, N.J.
Lt. Kevin Pfeifer, 42, New York, N.Y.
Tu-Anh Pham, 42, Princeton, N.J.
Lt. Kenneth John Phelan, 41, New York, N.Y.
Michael V. San Phillip, 55, Ridgewood, N.J.
Eugenia Piantieri, 55, New York, N.Y.
Ludwig John Picarro, 44, Basking Ridge, N.J.
Matthew Picerno, 44, Holmdel, N.J.
Joseph O. Pick, 40, Hoboken, N.J.
Christopher Pickford, 32, New York, N.Y.
Dennis J. Pierce, 54, New York, N.Y.
Joseph A. Della Pietra, 24, New York, N.Y.
Bernard T. Pietronico, 39, Matawan, N.J.
Nicholas P. Pietrunti, 38, Belford, N.J.
Theodoros Pigis, 60, New York, N.Y.
Susan Elizabeth Ancona Pinto, 44, New York, N.Y.
Joseph Piskadlo, 48, North Arlington, N.J.
Christopher Todd Pitman, 30, New York, N.Y.
Josh Michael Piver, 23, New York, N.Y.
Joseph Plumitallo, 45, Manalapan, N.J.
John M. Pocher, 36, Middletown, N.J.
William Howard Pohlmann, 56, Ardsley, N.Y.
Laurence M. Polatsch, 32, New York, N.Y.
Thomas H. Polhemus, 39, Morris Plains, N.J.
Steve Pollicino, 48, Plainview, N.Y.
Susan M. Pollio, 45, Long Beach Township, N.J.
Joshua Poptean, 37, New York, N.Y.
Giovanna Porras, 24, New York, N.Y.
Anthony Portillo, 48, New York, N.Y.
James Edward Potorti, 52, Princeton, N.J.
Daphne Pouletsos, 47, Westwood, N.J.
Richard Poulos, 55, Levittown, N.Y.
Stephen E. Poulos, 45, Basking Ridge, N.J.
Brandon Jerome Powell, 26, New York, N.Y.
Shawn Edward Powell, 32, New York, N.Y.
Tony Pratt, 43, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Gregory M. Preziose, 34, Holmdel, N.J.
Wanda Ivelisse Prince, 30, New York, N.Y.
Vincent Princiotta, 39, Orangeburg, N.Y.
Kevin Prior, 28, Bellmore, N.Y.
Everett Martin (Marty) Proctor, 44, New York, N.Y.
Carrie B. Progen, 25, New York, N.Y.
David Lee Pruim, 53, Upper Montclair, N.J.
Richard Prunty, 57, Sayville, N.Y.
John F. Puckett, 47, Glen Cove, N.Y.
Robert D. Pugliese, 47, East Fishkill, N.Y.
Edward F. Pullis, 34, Hazlet, N.J.
Patricia Ann Puma, 33, New York, N.Y.
Hemanth Kumar Puttur, 26, White Plains, N.Y.
Edward R. Pykon, 33, Princeton, N.J.
Christopher Quackenbush, 44, Manhasset, N.Y.
Lars Peter Qualben, 49, New York, N.Y.
Lincoln Quappe, 38, Sayville, N.Y.
Beth Ann Quigley, 25, New York, N.Y.
Lt. Michael Quilty, 42, New York, N.Y.
Ricardo Quinn, 40, New York, N.Y.
James Francis Quinn, 23, New York, N.Y.
Carol Rabalais, 38, New York, N.Y.
Christopher Peter A. Racaniello, 30, New York, N.Y.
Leonard Ragaglia, 36, New York, N.Y.
Eugene J. Raggio, 55, New York, N.Y.
Laura Marie Ragonese-Snik, 41, Bangor, Pa.
Michael Ragusa, 29, New York, N.Y.
Peter F. Raimondi, 46, New York, N.Y.
Harry A. Raines, 37, New York, N.Y.
Ehtesham U. Raja, 28, Clifton, N.J.
Valsa Raju, 39, Yonkers, N.Y.
Edward Rall, 44, Holbrook, N.Y.
Lukas (Luke) Rambousek, 27, New York, N.Y.
Julio Fernandez Ramirez, 51, New York, N.Y.
Maria Isabel Ramirez, 25, New York, N.Y.
Harry Ramos, 41, Newark, N.J.
Vishnoo Ramsaroop, 44, New York, N.Y.
Lorenzo Ramzey, 48, East Northport, N.Y.
A. Todd Rancke, 42, Summit, N.J.
Adam David Rand, 30, Bellmore, N.Y.
Jonathan C. Randall, 42, New York, N.Y.
Srinivasa Shreyas Ranganath, 26, Hackensack, N.J.
Anne Rose T. Ransom, 45, Edgewater, N.J.
Faina Rapoport, 45, New York, N.Y.
Robert Arthur Rasmussen, 42, Hinsdale, Ill.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Amenia Rasool, 33, New York, N.Y.
Roger Mark Rasweiler, 53, Flemington, N.J.
David Alan James Rathkey, 47, Mountain Lakes, N.J.
William Ralph Raub, 38, Saddle River, N.J.
Gerard Rauzi, 42, New York, N.Y.
Alexey Razuvaev, 40, New York, N.Y.
Gregory Reda, 33, New Hyde Park, N.Y.
Sarah Prothero Redheffer, 35, London, England
Michele Reed, 26, Ringoes, N.J.
Judith A. Reese, 56, Kearny, N.J.
Donald J. Regan, 47, Wallkill, N.Y.
Lt. Robert M. Regan, 48, Floral Park, N.Y.
Thomas M. Regan, 43, Cranford, N.J.
Christian Michael Otto Regenhard, 28, New York, N.Y.
Howard Reich, 59, New York, N.Y.
Gregg Reidy, 26, Holmdel, N.J.
Kevin O. Reilly, 28, New York, N.Y.
James Brian Reilly, 25, New York, N.Y.
Timothy E. Reilly, 40, New York, N.Y.
Joseph Reina, 32, New York, N.Y.
Thomas Barnes Reinig, 48, Bernardsville, N.J.
Frank B. Reisman, 41, Princeton, N.J.
Joshua Scott Reiss, 23, New York, N.Y.
Karen Renda, 52, New York, N.Y.
John Armand Reo, 28, Larchmont, N.Y.
Richard Rescorla, 62, Morristown, N.J.
John Thomas Resta, 40, New York, N.Y.
Sylvia San Pio Resta, 26, New York, N.Y.
Eduvigis (Eddie) Reyes, 37, New York, N.Y.
Bruce A. Reynolds, 41, Columbia, N.J.
John Frederick Rhodes, 57, Howell, N.J.
Francis S. Riccardelli, 40, Westwood, N.J.
Rudolph N. Riccio, 50, New York, N.Y.
AnnMarie (Davi) Riccoboni, 58, New York, N.Y.
Eileen Mary Rice, 57, New York, N.Y.
David Rice, 31, New York, N.Y.
Kenneth F. Rice, 34, Hicksville, N.Y.
Lt. Vernon Allan Richard, 53, Nanuet, N.Y.
Claude D. Richards, 46, New York, N.Y.
Gregory Richards, 30, New York, N.Y.
Michael Richards, 38, New York, N.Y.
Venesha O. Richards, 26, North Brunswick, N.J.
James C. Riches, 29, New York, N.Y.
Alan Jay Richman, 44, New York, N.Y.
John M. Rigo, 48, New York, N.Y.

Page 58 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Theresa (Ginger) Risco, 48, New York, N.Y.
Rose Mary Riso, 55, New York, N.Y.
Moises N. Rivas, 29, New York, N.Y.
Joseph Rivelli, 43, New York, N.Y.
Isaias Rivera, 51, Perth Amboy, N.J.
Linda Rivera, 26, New York, N.Y.
Juan William Rivera, 27, New York, N.Y.
Carmen A. Rivera, 33, Westtown, N.Y.
David E. Rivers, 40, New York, N.Y.
Joseph R. Riverso, 34, White Plains, N.Y.
Paul Rizza, 34, Park Ridge, N.J.
John Frank Rizzo, 50, New York, N.Y.
Stephen Louis Roach, 36, Verona, N.J.
Joseph Roberto, 37, Midland Park, N.J.
Leo A. Roberts, 44, Wayne, N.J.
Michael Roberts, 30, New York, N.Y.
Michael Edward Roberts, 31, New York, N.Y.
Donald Walter Robertson, 35, Rumson, N.J.
Catherina Robinson, 45, New York, N.Y.
Jeffrey Robinson, 38, Monmouth Junction, N.J.
Michell Lee Robotham, 32, Kearny, N.J.
Donald Robson, 52, Manhasset, N.Y.
Antonio Augusto Tome Rocha, 34, East Hanover, N.J.
Raymond J. Rocha, 29, Malden, Mass.
Laura Rockefeller, 41, New York, N.Y.
John M. Rodak, 39, Mantua, N.J.
Antonio Jose Carrusca Rodrigues, 35, Port Washington, N.Y.
Anthony Rodriguez, 36, New York, N.Y.
Carmen Milagros Rodriguez, 46, Freehold, N.J.
Marsha A. Rodriguez, 41, West Paterson, N.J.
Richard Rodriguez, 31, Cliffwood, N.J.
Gregory E. Rodriguez, 31, White Plains, N.Y.
David B. Rodriguez-Vargas, 44, New York, N.Y.
Matthew Rogan, 37, West Islip, N.Y.
Karlie Barbara Rogers, 25, London, England
Scott Rohner, 22, Hoboken, N.J.
Keith Roma, 27, New York, N.Y.
Joseph M. Romagnolo, 37, Coram, N.Y.
Elvin Santiago Romero, 34, Matawan, N.J.
Efrain Franco Romero, 57, Hazleton, Pa.
James A. Romito, 51, Westwood, N.J.
Sean Rooney, 50, Stamford, Conn.
Eric Thomas Ropiteau, 24, New York, N.Y.
Aida Rosario, 42, Jersey City, N.J.
Angela Rosario, 27, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Fitzroy St. Rose, 40, New York, N.Y.
Mark H. Rosen, 45, West Islip, N.Y.
Linda Rosenbaum, 41, Little Falls, N.J.
Brooke David Rosenbaum, 31, Franklin Square, N.Y.
Sheryl Lynn Rosenbaum, 33, Warren, N.J.
Lloyd D. Rosenberg, 31, Morganville, N.J.
Mark Louis Rosenberg, 26, Teaneck, N.J.
Andrew I. Rosenblum, 45, Rockville Centre, N.Y.
Joshua M. Rosenblum, 28, Hoboken, N.J.
Joshua A. Rosenthal, 44, New York, N.Y.
Richard David Rosenthal, 50, Fair Lawn, N.J.
Daniel Rossetti, 32, Bloomfield, N.J.
Norman Rossinow, 39, Cedar Grove, N.J.
Nicholas P. Rossomando, 35, New York, N.Y.
Michael Craig Rothberg, 39, Greenwich, Conn.
Donna Marie Rothenberg, 53, New York, N.Y.
Nick Rowe, 29, Hoboken, N.J.
Timothy A. Roy, 36, Massapequa Park, N.Y.
Paul G. Ruback, 50, Newburgh, N.Y.
Ronald J. Ruben, 36, Hoboken, N.J.
Joanne Rubino, 45, New York, N.Y.
David Michael Ruddle, 31, New York, N.Y.
Bart Joseph Ruggiere, 32, New York, N.Y.
Susan Ann Ruggiero, 30, Plainview, N.Y.
Adam K. Ruhalter, 40, Plainview, N.Y.
Gilbert Ruiz, 57, New York, N.Y.
Stephen P. Russell, 40, Rockaway Beach, N.Y.
Steven Harris Russin, 32, Mendham, N.J.
Lt. Michael Thomas Russo, 44, Nesconset, N.Y.
Wayne Alan Russo, 37, Union, N.J.
John J. Ryan, 45, West Windsor, N.J.
Edward Ryan, 42, Scarsdale, N.Y.
Jonathan Stephan Ryan, 32, Bayville, N.Y.
Matthew Lancelot Ryan, 54, Seaford, N.Y.
Kristin A. Irvine Ryan, 30, New York, N.Y.
Tatiana Ryjova, 36, South Salem, N.Y.
Christina Sunga Ryook, 25, New York, N.Y.
Thierry Saada, 27, New York, N.Y.
Jason E. Sabbag, 26, New York, N.Y.
Thomas E. Sabella, 44, New York, N.Y.
Scott Saber, 36, New York, N.Y.
Joseph Sacerdote, 48, Freehold, N.J.
Mohammad Ali Sadeque, 62, New York, N.Y.
Francis J. Sadocha, 41, Huntington, N.Y.
Jude Elias Safi, 24, New York, N.Y.

Page 60 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Brock Joel Safronoff, 26, New York, N.Y.
Edward Saiya, 49, New York, N.Y.
John Patrick Salamone, 37, North Caldwell, N.J.
Hernando R. Salas, 71, New York, N.Y.
Juan Salas, 35, New York, N.Y.
Esmerlin Salcedo, 36, New York, N.Y.
John Salvatore Salerno, 31, Westfield, N.J.
Richard L. Salinardi, 32, Hoboken, N.J.
Wayne John Saloman, 43, Seaford, N.Y.
Nolbert Salomon, 33, New York, N.Y.
Catherine Patricia Salter, 37, New York, N.Y.
Frank Salvaterra, 41, Manhasset, N.Y.
Paul R. Salvio, 27, New York, N.Y.
Samuel R. Salvo, 59, Yonkers, N.Y.
Carlos Samaniego, 29, New York, N.Y.
Rena Sam-Dinnoo, 28, New York, N.Y.
James Kenneth Samuel, 29, Hoboken, N.J.
Hugo Sanay-Perafiel, 41, New York, N.Y.
Alva Jeffries Sanchez, 41, Hempstead, N.Y.
Jacquelyn P. Sanchez, 23, New York, N.Y.
Erick Sanchez, 43, New York, N.Y.
Eric Sand, 36, Westchester, N.Y.
Stacey Leigh Sanders, 25, New York, N.Y.
Herman Sandler, 57, New York, N.Y.
James Sands, 39, Bricktown, N.J.
Ayleen J. Santiago, 40, New York, N.Y.
Kirsten Santiago, 26, New York, N.Y.
Maria Theresa Santillan, 27, Morris Plains, N.J.
Susan G. Santo, 24, New York, N.Y.
Christopher Santora, 23, New York, N.Y.
John Santore, 49, New York, N.Y.
Mario L. Santoro, 28, New York, N.Y.
Rafael Humberto Santos, 42, New York, N.Y.
Rufino Conrado F. (Roy) Santos, 37, New York, N.Y.
Kalyan K. Sarkar, 53, Westwood, N.J.
Chapelle Sarker, 37, New York, N.Y.
Paul F. Sarle, 38, Babylon, N.Y.
Deepika Kumar Sattaluri, 33, Edison, N.J.
Gregory Thomas Saucedo, 31, New York, N.Y.
Susan Sauer, 48, Chicago, Ill.
Anthony Savas, 72, New York, N.Y.
Vladimir Savinkin, 21, New York, N.Y.
John Sbarbaro, 45, New York, N.Y.
Robert L. Scandole, 36, Pelham Manor, N.Y.
Michelle Scarpitta, 26, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Dennis Scauso, 46, Dix Hills, N.Y.
John A. Schardt, 34, New York, N.Y.
John G. Scharf, 29, Manorville, N.Y.
Fred Claude Scheffold, 57, Piermont, N.Y.
Angela Susan Scheinberg, 46, New York, N.Y.
Scott M. Schertzer, 28, Edison, N.J.
Sean Schielke, 27, New York, N.Y.
Steven Francis Schlag, 41, Franklin Lakes, N.J.
Jon S. Schlissel, 51, Jersey City, N.J.
Karen Helene Schmidt, 42, Bellmore, N.Y.
Ian Schneider, 45, Short Hills, N.J.
Thomas G. Schoales, 27, Stony Point, N.Y.
Marisa Di Nardo Schorpp, 38, White Plains, N.Y.
Frank G. Schott, 39, Massapequa Park, N.Y.
Gerard P. Schrang, 45, Holbrook, N.Y.
Jeffrey Schreier, 48, New York, N.Y.
John T. Schroeder, 31, Hoboken, N.J.
Susan Lee Kennedy Schuler, 55, Allentown, N.J.
Edward W. Schunk, 54, Baldwin, N.Y.
Mark E. Schurmeier, 44, McLean, Va.
Clarin Shellie Schwartz, 51, New York, N.Y.
John Schwartz, 49, Goshen, Conn.
Mark Schwartz, 50, West Hempstead, N.Y.
Adriane Victoria Scibetta, 31, New York, N.Y.
Raphael Scorca, 61, Beachwood, N.J.
Randolph Scott, 48, Stamford, Conn.
Christopher J. Scudder, 34, Monsey, N.Y.
Arthur Warren Scullin, 57, New York, N.Y.
Michael Seaman, 41, Manhasset, N.Y.
Margaret Seeliger, 34, New York, N.Y.
Carlos Segarra, 54, New York, N.Y.
Anthony Segarra, 52, New York, N.Y.
Jason Sekzer, 31, New York, N.Y.
Matthew Carmen Sellitto, 23, Morristown, N.J.
Howard Selwyn, 47, Hewlett, N.Y.
Larry John Senko, 34, Yardley, Pa.
Arturo Angelo Sereno, 29, New York, N.Y.
Frankie Serrano, 23, Elizabeth, N.J.
Alena Sesinova, 57, New York, N.Y.
Adele Sessa, 36, New York, N.Y.
Sita Nermalla Sewnarine, 37, New York, N.Y.
Karen Lynn Seymour-Dietrich, 40, Millington, N.J.
Davis (Deeg) Sezna, 22, New York, N.Y.
Thomas Joseph Sgroi, 45, New York, N.Y.
Jayesh Shah, 38, Edgewater, N.J.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Khalid M. Shahid, 25, Union, N.J.
Mohammed Shajahan, 41, Spring Valley, N.Y.
Gary Shamay, 23, New York, N.Y.
Earl Richard Shanahan, 50, New York, N.Y.
Shiv Shankar, New York, N.Y.
Neil G. Shastri, 25, New York, N.Y.
Kathryn Anne Shatzoff, 37, New York, N.Y.
Barbara A. Shaw, 57, Morris Township, N.J.
Jeffrey J. Shaw, 42, Levittown, N.Y.
Robert J. Shay, 27, New York, N.Y.
Daniel James Shea, 37, Pelham Manor, N.Y.
Joseph Patrick Shea, 47, Pelham, N.Y.
Linda Sheehan, 40, New York, N.Y.
Hagay Shefi, 34, Tenafly, N.J.
John Anthony Sherry, 34, Rockville Centre, N.Y.
Atsushi Shiratori, 36, New York, N.Y.
Thomas Shubert, 43, New York, N.Y.
Mark Shulman, 47, Old Bridge, N.J.
See-Wong Shum, 44, Westfield, N.J.
Allan Shwartzstein, 37, Chappaqua, N.Y.
Johanna Sigmund, 25, Wyndmoor, Pa.
Dianne T. Signer, 32, New York, N.Y.
Gregory Sikorsky, 34, Spring Valley, N.Y.
Stephen Gerard Siller, 34, West Brighton, N.Y.
David Silver, 35, New Rochelle, N.Y.
Craig A. Silverstein, 41, Wyckoff, N.J.
Nasima H. Simjee, 38, New York, N.Y.
Bruce Edward Simmons, 41, Ridgewood, N.J.
Arthur Simon, 57, Thiells, N.Y.
Kenneth Alan Simon, 34, Secaucus, N.J.
Michael John Simon, 40, Harrington Park, N.J.
Paul Joseph Simon, 54, New York, N.Y.
Marianne Simone, 62, New York, N.Y.
Barry Simowitz, 64, New York, N.Y.
Jeff Simpson, 38, Lake Ridge, Va.
Roshan R. (Sean) Singh, 21, New York, N.Y.
Khamladai K. (Khami) Singh, 25, New York, N.Y.
Thomas E. Sinton, 44, Croton-on-hudson, N.Y.
Peter A. Siracuse, 29, New York, N.Y.
Muriel F. Siskopoulos, 60, New York, N.Y.
Joseph M. Sisolak, 35, New York, N.Y.
John P. Skala, 31, Clifton, N.J.
Francis J. Skidmore, 58, Mendham, N.J.
Toyena Corliss Skinner, 27, Kingston, N.J.
Paul A. Skrzypek, 37, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Christopher Paul Slattery, 31, New York, N.Y.
Vincent R. Slavin, 41, Belle Harbor, N.Y.
Robert Sliwak, 42, Wantagh, N.Y.
Paul K. Sloan, 26, New York, N.Y.
Stanley S. Smagala, 36, Holbrook, N.Y.
Wendy L. Small, 26, New York, N.Y.
Catherine T. Smith, 44, West Haverstraw, N.Y.
Daniel Laurence Smith, 47, Northport, N.Y.
George Eric Smith, 38, West Chester, Pa.
James G. Smith, 43, Garden City, N.Y.
Joyce Smith, 55, New York, N.Y.
Karl Trumbull Smith, 44, Little Silver, N.J.
Kevin Smith, 47, Mastic, N.Y.
Leon Smith, 48, New York, N.Y.
Moira Smith, 38, New York, N.Y.
Rosemary A. Smith, 61, New York, N.Y.
Sandra Fajardo Smith, 37, New York, N.Y.
Jeffrey Randall Smith, 36, New York, N.Y.
Bonnie S. Smithwick, 54, Quogue, N.Y.
Rochelle Monique Snell, 24, Mount Vernon, N.Y.
Leonard J. Snyder, 35, Cranford, N.J.
Astrid Elizabeth Sohan, 32, Freehold, N.J.
Sushil Solanki, 35, New York, N.Y.
Ruben Solares, 51, New York, N.Y.
Naomi Leah Solomon, 52, New York, N.Y.
Daniel W. Song, 34, New York, N.Y.
Michael C. Sorresse, 34, Morris Plains, N.J.
Fabian Soto, 31, Harrison, N.J.
Timothy P. Soulas, 35, Basking Ridge, N.J.
Gregory T. Spagnoletti, 32, New York, N.Y.
Donald F. Spampinato, 39, Manhasset, N.Y.
Thomas Sparacio, 35, New York, N.Y.
John Anthony Spataro, 32, Mineola, N.Y.
Robert W. Spear, 30, Valley Cottage, N.Y.
Maynard S. Spence, 42, Douglasville, Ga.
George E. Spencer, 50, West Norwalk, Conn.
Robert Andrew Spencer, 35, Red Bank, N.J.
Mary Rubina Sperando, 39, New York, N.Y.
Frank J. Spinelli, 44, Short Hills, N.J.
William E. Spitz, 49, Oceanside, N.Y.
Joseph P. Spor, 35, Yorktown Heights, N.Y.
Klaus Johannes Sprockamp, 42, Muhltal, Germany
Saranya Srinuan, 23, New York, N.Y.
Michael F. Stabile, 50, New York, N.Y.
Lawrence T. Stack, 58, Lake Ronkonkoma, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Capt. Timothy Stackpole, 42, New York, N.Y.
Richard James Stadelberger, 55, Middletown, N.J.
Eric A. Stahlman, 43, Holmdel Township, N.J.
Gregory M. Stajk, 46, Long Beach, N.Y.
Corina Stan, 31, Middle Village, N.Y.
Alexandru Liviu Stan, 34, New York, N.Y.
Mary D. Stanley, 53, New York, N.Y.
Joyce Stanton
Patricia Stanton
Anthony M. Starita, 35, Westfield, N.J.
Jeffrey Stark, 30, New York, N.Y.
Derek James Statkevicus, 30, Norwalk, Conn.
Craig William Staub, 30, Basking Ridge, N.J.
William V. Steckman, 56, West Hempstead, N.Y.
Eric Thomas Steen, 32, New York, N.Y.
William R. Steiner, 56, New Hope, Pa.
Alexander Robbins Steinman, 32, Hoboken, N.J.
Andrew Stergiopoulos, 23, New York, N.Y.
Andrew Stern, 41, Bellmore, N.Y.
Martha Jane Stevens, 55, New York, N.Y.
Richard H. Stewart, 35, New York, N.Y.
Michael James Stewart, 42, New York, N.Y.
Sanford M. Stoller, 54, New York, N.Y.
Lonny J. Stone, 43, Bellmore, N.Y.
Jimmy Nevill Storey, 58, Katy, Texas
Timothy Stout, 42, Dobbs Ferry, N.Y.
Thomas S. Strada, 41, Chatham, N.J.
James J. Straine, 36, Oceanport, N.J.
Edward W. Straub, 48, Morris Township, N.J.
George Strauch, 53, Avon-by-the-Sea, N.J.
Edward T. Strauss, 44, Edison, N.J.
Steven R. Strauss, 51, Fresh Meadows, N.Y.
Steven F. Strobert, 33, Ridgewood, N.J.
Walwyn W. Stuart, 28, Valley Stream, N.Y.
Benjamin Suarez, 36, New York, N.Y.
David S. Suarez, 24, Princeton, N.J.
Ramon Suarez, 45, New York, N.Y.
Yoichi Sugiyama, 34, Fort Lee, N.J.
William Christopher Sugra, 30, New York, N.Y.
Daniel Suhr, 37, Nesconset, N.Y.
David Marc Sullins, 30, New York, N.Y.
Lt. Christopher P. Sullivan, 38, Massapequa, N.Y.
Patrick Sullivan, 32, New York, N.Y.
Thomas Sullivan, 38, Kearney, N.J.
Hilario Soriano (Larry) Sumaya, 42, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

James Joseph Suozzo, 47, Hauppauge, N.Y.
Colleen Supinski, 27, New York, N.Y.
Robert Sutcliffe, 39, Huntington, N.Y.
Selina Sutter, 63, New York, N.Y.
Claudia Suzette Sutton, 34, New York, N.Y.
John F. Swaine, 36, Larchmont, N.Y.
Kristine M. Swearson, 34, New York, N.Y.
Brian Edward Sweeney, 29, Merrick, N.Y.
Kenneth J. Swensen, 40, Chatham, N.J.
Thomas F. Swift, 30, Jersey City, N.J.
Derek O. Sword, 29, New York, N.Y.
Kevin T. Szocik, 27, Garden City, N.Y.
Gina Sztejnberg, 52, Ridgewood, N.J.
Norbert P. Szurkowski, 31, New York, N.Y.
Harry Taback, 56, New York, N.Y.
Joann Tabeek, 41, New York, N.Y.
Norma C. Taddei, 64, New York, N.Y.
Michael Taddonio, 39, Huntington, N.Y.
Keiji Takahashi, 42, Tenafly, N.J.
Keiichiro Takahashi, 53, Port Washington, N.Y.
Phyllis Gail Talbot, 53, New York, N.Y.
Robert R. Talhami, 40, Shrewsbury, N.J.
Sean Patrick Tallon, 26, Yonkers, N.Y.
Paul Talty, 40, Wantagh, N.Y.
Maurita Tam, 22, New York, N.Y.
Rachel Tamares, 30, New York, N.Y.
Hector Tamayo, 51, New York, N.Y.
Michael Andrew Tamuccio, 37, Pelham Manor, N.Y.
Kenichiro Tanaka, 52, Rye Brook, N.Y.
Rhondelle Cherie Tankard, 31, Devonshire, Bermuda
Michael Anthony Tanner, 44, Secaucus, N.J.
Dennis Gerard Taormina, 36, Montville, N.J.
Kenneth Joseph Tarantino, 39, Bayonne, N.J.
Allan Tarasiewicz, 45, New York, N.Y.
Ronald Tartaro, 39, Bridgewater, N.J.
Darryl Taylor, 52, New York, N.Y.
Donnie Brooks Taylor, 40, New York, N.Y.
Lorisa Ceylon Taylor, 31, New York, N.Y.
Michael M. Taylor, 42, New York, N.Y.
Paul A. Tegtmeier, 41, Hyde Park, N.Y.
Yeshavant Moreshwar Tembe, 59, Piscataway, N.J.
Anthony Tempesta, 38, Elizabeth, N.J.
Dorothy Temple, 52, New York, N.Y.
Stanley L. Temple, 77, New York, N.Y.
David Tengelin, 25, New York, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Brian J. Terrenzi, 29, Hicksville, N.Y.
Lisa Marie Terry, 42, Rochester, Mich.
Goumatie T. Thackurdeen, 35, New York, N.Y.
Harshad Sham Thatte, 30, Norcross, Ga.
Thomas F. Theurkauf, 44, Stamford, Conn.
Lesley Anne Thomas, 40, Hoboken, N.J.
Brian T. Thompson, 49, Dix Hills, N.Y.
Clive Thompson, 43, Summit, N.J.
Glenn Thompson, 44, New York, N.Y.
Perry Anthony Thompson, 36, Mount Laurel, N.J.
Vanavah Alexi Thompson, 26, New York, N.Y.
Capt. William Harry Thompson, 51, New York, N.Y.
Nigel Bruce Thompson, 33, New York, N.Y.
Eric Raymond Thorpe, 35, New York, N.Y.
Nichola A. Thorpe, 22, New York, N.Y.
Sal Tieri, 40, Shrewsbury, N.J.
John Patrick Tierney, 27, New York, N.Y.
Mary Ellen Tiesi, 38, Jersey City, N.J.
William R. Tieste, 54, Basking Ridge, N.J.
Kenneth F. Tietjen, 31, Matawan, N.J.
Stephen Edward Tighe, 41, Rockville Centre, N.Y.
Scott C. Timmes, 28, Ridgewood, N.Y.
Michael E. Tinley, 56, Dallas, Texas
Jennifer M. Tino, 29, Livingston, N.J.
Robert Frank Tipaldi, 25, New York, N.Y.
John J. Tipping, 33, Port Jefferson, N.Y.
David Tirado, 26, New York, N.Y.
Hector Luis Tirado, 30, New York, N.Y.
Michelle Titolo, 34, Copiague, N.Y.
John J. Tobin, 47, Kenilworth, N.J.
Richard J. Todisco, 61, Wyckoff, N.J.
Vladimir Tomasevic, 36, Etobicoke, Ontario, Canada
Stephen K. Tompsett, 39, Garden City, N.Y.
Thomas Tong, 31, New York, N.Y.
Azucena de la Torre, 50, New York, N.Y.
Doris Torres, 32, New York, N.Y.
Luis Eduardo Torres, 31, New York, N.Y.
Amy E. Toyen, 24, Newton, Mass.
Christopher M. Traina, 25, Bricktown, N.J.
Daniel Patrick Trant, 40, Northport, N.Y.
Abdoul Karim Traore, 41, New York, N.Y.
Glenn J. Travers, 53, Tenafly, N.J.
Walter (Wally) P. Travers, 44, Upper Saddle River, N.J.
Felicia Traylor-Bass, 38, New York, N.Y.
Lisa L. Trerotola, 38, Hazlet, N.J.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Karamo Trerra, 40, New York, N.Y.
Michael Trinidad, 33, New York, N.Y.
Francis Joseph Trombino, 68, Clifton, N.J.
Gregory J. Trost, 26, New York, N.Y.
William Tselepis, 33, New Providence, N.J.
Zhanetta Tsoy, 32, Jersey City, N.J.
Michael Patrick Tucker, 40, Rumson, N.J.
Lance Richard Tumulty, 32, Bridgewater, N.J.
Ching Ping Tung, 44, New York, N.Y.
Simon James Turner, 39, London, England
Donald Joseph Tuzio, 51, Goshen, N.Y.
Robert T. Twomey, 48, New York, N.Y.
Jennifer Tzemis, 26, New York, N.Y.
John G. Ueltzhoeffer, 36, Roselle Park, N.J.
Tyler V. Ugolyn, 23, New York, N.Y.
Michael A. Uliano, 42, Aberdeen, N.J.
Jonathan J. Uman, 33, Westport, Conn.
Anil Shivhari Umarkar, 34, Hackensack, N.J.
Allen V. Upton, 44, New York, N.Y.
Diane Maria Urban, 50, Malverne, N.Y.
John Damien Vaccacio, 30, New York, N.Y.
Bradley H. Vadas, 37, Westport, Conn.
William Valcarcel, 54, New York, N.Y.
Mayra Valdes-Rodriguez, 39, New York, N.Y.
Felix Antonio Vale, 29, New York, N.Y.
Ivan Vale, 27, New York, N.Y.
Santos Valentin, 39, New York, N.Y.
Benito Valentin, 33, New York, N.Y.
Manuel Del Valle, 32, New York, N.Y.
Carlton Francis Valvo, 38, New York, N.Y.
Edward Raymond Vanacore, 29, Jersey City, N.J.
Jon C. Vandevander, 44, Ridgewood, N.J.
Frederick T. Varacchi, 35, Greenwich, Conn.
Gopalakrishnan Varadhan, 32, New York, N.Y.
David Vargas, 46, New York, N.Y.
Scott C. Vasel, 32, Park Ridge, N.J.
Santos Vasquez, 55, New York, N.Y.
Azael Ismael Vasquez, 21, New York, N.Y.
Arcangel Vazquez, 47, New York, N.Y.
Peter Anthony Vega, 36, New York, N.Y.
Sankara S. Velamuri, 63, Avenel, N.J.
Jorge Velazquez, 47, Passaic, N.J.
Lawrence Veling, 44, New York, N.Y.
Anthony M. Ventura, 41, Middletown, N.J.
David Vera, 41, New York, N.Y.

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Loretta A, Vero, 51, Nanuet, N.Y.
Christopher Vialonga, 30, Demarest, N.J.
Matthew Gilbert Vianna, 23, Manhasset, N.Y.
Robert A. Vicario, 40, Weehawken, N.J.
Celeste Torres Victoria, 41, New York, N.Y.
Joanna Vidal, 26, Yonkers, N.Y.
John T. Vigiano, 36, West Islip, N.Y.
Joseph Vincent Vigiano, 34, Medford, N.Y.
Frank J. Vignola, 44, Merrick, N.Y.
Joseph B. Vilardo, 44, Stanhope, N.J.
Sergio Villanueva, 33, New York, N.Y.
Chantal Vincelli, 38, New York, N.Y.
Melissa Vincent, 28, Hoboken, N.J.
Francine A. Virgilio, 48, New York, N.Y.
Lawrence Virgilio, 38
Joseph G. Visciano, 22, New York, N.Y.
Joshua S. Vitale, 28, Great Neck, N.Y.
Maria Percoco Vola, 37, New York, N.Y.
Lynette D. Vosges, 48, New York, N.Y.
Garo H. Voskerijian, 43, Valley Stream, N.Y.
Alfred Vukosa, 37, New York, N.Y.
Gregory Wachtler, 25, Ramsey, N.J.
Gabriela Waisman, 33, New York, N.Y.
Wendy Alice Rosario Wakeford, 40, Freehold, N.J.
Courtney Wainsworth Walcott, 37, New York, N.Y.
Victor Wald, 49, New York, N.Y.
Benjamin Walker, 41, Suffern, N.Y.
Glen J. Wall, 38, Rumson, N.J.
Mitchel Scott Wallace, 34, Mineola, N.Y.
Lt. Robert F. Wallace, 43, New York, N.Y.
Roy Michael Wallace, 42, Wyckoff, N.J.
Peter G. Wallace, 66, Lincoln Park, N.J.
Jean Marie Wallendorf, 23, New York, N.Y.
Matthew Blake Wallens, 31, New York, N.Y.
John Wallice, 43, Huntington, N.Y.
Barbara P. Walsh, 59, New York, N.Y.
James Walsh, 37, Scotch Plains, N.J.
Jeffrey Patrick Walz, 37, Tuckahoe, N.Y.
Ching H. Wang, 59, New York, N.Y.
Weibin Wang, 41, Orangeburg, N.Y.
Lt. Michael Warchola, 51, Middle Village, N.Y.
Stephen Gordon Ward, 33, Gorham, Maine
James A. Waring, 49, New York, N.Y.
Brian G. Warner, 32, Morganville, N.J.
Derrick Washington, 33, Calverton, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Charles Waters, 44, New York, N.Y.
James Thomas (Muddy) Waters, 39, New York, N.Y.
Capt. Patrick J. Waters, 44, New York, N.Y.
Kenneth Watson, 39, Smithtown, N.Y.
Michael H. Waye, 38, Morganville, N.J.
Walter E. Weaver, 30, Centereach, N.Y.
Todd C. Weaver, 30, New York, N.Y.
Nathaniel Webb, 56, Jersey City, N.J.
Dinah Webster, 50, Port Washington, N.Y.
Joanne Flora Weil, 39, New York, N.Y.
Michael Weinberg, 34, New York, N.Y.
Steven Weinberg, 41, New City, N.Y.
Scott Jeffrey Weingard, 29, New York, N.Y.
Steven Weinstein, 50, New York, N.Y.
Simon Weiser, 65, New York, N.Y.
David T. Weiss, 50, New York, N.Y.
David M. Weiss, 41, Maybrook, N.Y.
Vincent Michael Wells, 22, Redbridge, England
Timothy Matthew Welty, 34, Yonkers, N.Y.
Christian Hans Rudolf Wemmers, 43, San Francisco, Calif.
Ssu-Hui (Vanessa) Wen, 23, New York, N.Y.
Oleh D. Wengerchuk, 56, Centerport, N.Y.
Peter M. West, 54, Pottersville, N.J.
Whitfield West, 41, New York, N.Y.
Meredith Lynn Whalen, 23, Hoboken, N.J.
Eugene Whelan, 31, Rockaway Beach, N.Y.
John S. White, 48, New York, N.Y.
Edward James White, 30, New York, N.Y.
James Patrick White, 34, Hoboken, N.J.
Kenneth W. White, 50, New York, N.Y.
Leonard Anthony White, 57, New York, N.Y.
Malissa White, 37, New York, N.Y.
Wayne White, 38, New York, N.Y.
Adam S. White, 26, New York, N.Y.
Leanne Marie Whiteside, 31, New York, N.Y.
Mark Whitford, 31, Salisbury Mills, N.Y.
Michael T. Wholey, 34, Westwood, N.J.
Mary Lenz Wieman, 43, Rockville Centre, N.Y.
Jeffrey David Wiener, 33, New York, N.Y.
William J. Wik, 44, Crestwood, N.Y.
Alison Marie Wildman, 30, New York, N.Y.
Lt. Glenn Wilkinson, 46, Bayport, N.Y.
John C. Willett, 29, Jersey City, N.J.
Brian Patrick Williams, 29, New York, N.Y.
Crossley Williams, 28, Uniondale, N.Y.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

David Williams, 34, New York, N.Y.
Deborah Lynn Williams, 35, Hoboken, N.J.
Kevin Michael Williams, 24, New York, N.Y.
Louis Calvin Williams, 53, Mandeville, La.
Louie Anthony Williams, 44, New York, N.Y.
Lt. John Williamson, 46, Warwick, N.Y.
Donna Wilson, 48, Williston Park, N.Y.
William E. Wilson, 58, New York, N.Y.
Cynthia Wilson, 52, New York, N.Y.
David H. Winton, 29, New York, N.Y.
Glenn J. Winuk, 40, New York, N.Y.
Thomas Francis Wise, 43, New York, N.Y.
Alan L. Wisniewski, 47, Howell, N.J.
Frank T. Wisniewski, 54, Basking Ridge, N.J.
David Wiswall, 54, North Massapequa, N.Y.
Sigrid Charlotte Wiswe, 41, New York, N.Y.
Michael R. Wittenstein, 34, Hoboken, N.J.
Christopher W. Wodenshek, 35, Ridgewood, N.J.
Martin P. Wohlforth, 47, Greenwich, Conn.
Katherine S. Wolf, 40, New York, N.Y.
Jenny Seu Kueng Low Wong, 25, New York, N.Y.
Jennifer Y. Wong, 26, New York, N.Y.
Siu Cheung Wong, 34, Jersey City, N.J.
Yin Ping (Steven) Wong, 34, New York, N.Y.
Yuk Ping Wong, 47, New York, N.Y.
Brent James Woodall, 31, Oradell, N.J.
James J. Woods, 26, New York, N.Y.
Patrick Woods, 36, New York, N.Y.
Richard Herron Woodwell, 44, Ho-Ho-Kus, N.J.
Capt. David Terence Wooley, 54, Nanuet, N.Y.
John Bentley Works, 36, Darien, Conn.
Martin Michael Wortley, 29, Park Ridge, N.J.
Rodney James Wotton, 36, Middletown, N.J.
William Wren, 61, Lynbrook, N.Y.
John Wright, 33, Rockville Centre, N.Y.
Neil R. Wright, 30, Asbury, N.J.
Sandra Wright, 57, Langhorne, Pa.
Jupiter Yambem, 41, Beacon, N.Y.
Suresh Yanamadala, 33, Plainsboro, N.J.
Matthew David Yarnell, 26, Jersey City, N.J.
Myrna Yaskulka, 59, New York, N.Y.
Shakila Yasmin, 26, New York, N.Y.
Olabisi L. Yee, 38, New York, N.Y.
Edward P. York, 45, Wilton, Conn.
Kevin Patrick York, 41, Princeton, N.J.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Raymond York, 45, Valley Stream, N.Y.
Suzanne Youmans, 60, New York, N.Y.
Jacqueline (Jakki) Young, 37, New York, N.Y.
Barrington L. Young, 35, New York, N.Y.
Elkin Yuen, 32, New York, N.Y.
Joseph Zaccoli, 39, Valley Stream, N.Y.
Adel Agayby Zakhary, 50, North Arlington, N.J.
Arkady Zaltsman, 45, New York, N.Y.
Edwin J. Zambrana, 24, New York, N.Y.
Robert Alan Zampieri, 30, Saddle River, N.J.
Mark Zangrilli, 36, Pompton Plains, N.J.
Ira Zaslow, 55, North Woodmere, N.Y.
Kenneth Albert Zelman, 37, Succasunna, N.J.
Abraham J. Zelmanowitz, 55, New York, N.Y.
Martin Morales Zempoaltecatl, 22, New York, N.Y.
Zhe (Zack) Zeng, 28, New York, N.Y.
Marc Scott Zeplin, 33, Harrison, N.Y.
Jie Yao Justin Zhao, 27, New York, N.Y.
Ivelin Ziminski, 40, Tarrytown, N.Y.
Michael Joseph Zinzi, 37, Newfoundland, N.J.
Charles A. Zion, 54, Greenwich, Conn.
Julie Lynne Zipper, 44, Paramus, N.J.
Salvatore J. Zisa, 45, Hawthorne, N.J.
Prokopios Paul Zois, 46, Lynbrook, N.Y.
Joseph J. Zuccala, 54, Croton-on-Hudson, N.Y.
Andrew Steven Zucker, 27, New York, N.Y.
Igor Zukelman, 29, New York, N.Y.

Page 72 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

### AMERICAN AIRLINES FLIGHT 11

### Crew

Barbara Arestegui, 38, Marstons Mills, Massachusetts
Jeffrey Collman, 41, Novato, Calif.
Sara Low, 28, Batesville, Arkansas
Karen A. Martin, 40, Danvers, Mass.
First Officer Thomas McGuinness, 42, Portsmouth, New Hampshire
Kathleen Nicosia, 54, Winthrop, Mass.
John Ogonowski, 52, Dracut, Massachusetts
Betty Ong, 45, Andover, Massachusetts
Jean Roger, 24, Longmeadow, Massachusetts
Dianne Snyder, 42, Westport, Massachusetts
Madeline Sweeney, 35, Acton, Massachusetts

### Passengers

Anna Williams Allison, 48, Stoneham, Massachusetts
David Angell, 54, Pasadena, California
Lynn Angell, 45, Pasadena, California
Seima Aoyama, 48, Culver City, Calif.
Myra Aronson, 52, Charlestown, Massachusetts
Christine Barbuto, 32, Brookline, Massachusetts
Carolyn Beug, 48, Los Angeles, California
Kelly Ann Booms, 24, Brookline, Mass.
Carol Bouchard, 43, Warwick, Rhode Island
Neilie Anne Heffernan Casey, 32, Wellesley, Massachusetts
Jeffrey Coombs, 42, Abington, Massachusetts
Tara Creamer, 30, Worcester, Massachusetts
Thelma Cuccinello, 71, Wilmot, New Hampshire
Patrick Currivan, 52, Winchester, Mass.
Brian Dale, 43, Warren, New Jersey
David DiMeglio, 22, Wakefield, Mass.
Donald Americo DiTullio, 49, Peabody, Mass.
Albert Dominguez, 66, Sydney, Australia
Paige Farley-Hackel, 46, Newton, Mass.
Alex Filipov, 70, Concord, Massachusetts
Carol Flyzik, 40, Plaistow, N.H.
Paul Friedman, 45, Belmont, Massachusetts
Karleton D.B. Fyfe, 31, Brookline, Massachusetts
Peter Gay, 54, Tewksbury, Massachusetts
Linda George, 27, Westboro, Massachusetts
Edmund Glazer, 41, Los Angeles, California
Lisa Fenn Gordenstein, 41, Needham, Massachusetts

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Andrew Peter Charles Curry Green, 34, Santa Monica, Calif.
Peter Hashem, 40, Tewksbury, Massachusetts
Robert Hayes, 37, from Amesbury, Massachusetts
Edward (Ted) R. Hennessy, 35, Belmont, Mass.
John A. Hofer, 45, Los Angeles, Calif.
Cora Hidalgo Holland, 52, of Sudbury, Massachusetts
Nicholas Humber, 60, of Newton, Massachusetts,
Waleed Iskandar, 34, London, England
John Charles Jenkins, 45, Cambridge, Mass.
Charles Edward Jones, 48, Bedford, Mass.
Robin Kaplan, 33, Westboro, Massachusetts
Barbara Keating, 72, Palm Springs, Calif.
David P. Kovalcin, 42, Hudson, New Hampshire
Judy Larocque, 50, Framingham, Mass.
Natalie Janis Lasden, 46, Peabody, Mass.
Daniel John Lee, 34, Van Nuys, Calif.
Daniel C. Lewin, 31, Charlestown, Mass.
Susan A. MacKay, 44, Westford, Massachusetts
Christopher D. Mello, 25, Boston, Mass.
Jeff Mladenik, 43, Hinsdale, Illinois
Antonio Jesus Montoya Valdes, 46, East Boston, Mass.
Carlos Alberto Montoya, 36, Bellmont, Mass.
Laura Lee Morabito, 34, Framingham, Massachusetts
Mildred Rose Naiman, 81, Andover, Mass.
Laurie Ann Neira, 48, Los Angeles, Calif.
Renee Newell, 37, of Cranston, Rhode Island
Jacqueline J. Norton, 61, Lubec, Maine
Robert Grant Norton, 85, Lubec, Maine
Jane M. Orth, 49, Haverhill, Mass.
Thomas Pecorelli, 31, of Los Angeles, California
Berinthia Berenson Perkins, 53, Los Angeles, Calif.
Sonia Morales Puopolo, 58, of Dover, Massachusetts
David E. Retik, 33, Needham, Mass.
Philip M. Rosenzweig, 47, Acton, Mass.
Richard Ross, 58, Newton, Massachusetts
Jessica Sachs, 22, Billerica, Massachusetts
Rahma Salie, 28, Boston, Mass.
Heather Lee Smith, 30, Boston, Mass.
Douglas J. Stone, 54, Dover, N.H
Xavier Suarez, 41, Chino Hills, Calif.
Michael Theodoridis, 32, Boston, Mass.
James Trentini, 65, Everett, Massachusetts
Mary Trentini, 67, Everett, Massachusetts
Pendyala Vamsikrishna, 30, Los Angeles, Calif.
Mary Wahlstrom, 78, Kaysville, Utah

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Kenneth Waldie, 46, Methuen, Massachusetts
John Wenckus, 46, Torrance, Calif.
Candace Lee Williams, 20, Danbury, Conn.
Christopher Zarba, 47, Hopkinton, Massachusetts

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

### AMERICAN AIRLINES FLIGHT 77

### Crew

Charles Burlingame, 51, Herndon, Va.
David M. Charlebois, 39, Washington, D.C
Michele Heidenberger, 57, Chevy Chase, Md.
Jennifer Lewis, 38, Culpeper, Virginia
Kenneth Lewis, 49, Culpeper, Virginia
Renee A. May, 39, Baltimore, Md

### Passengers

Paul Ambrose, 32, Washington, D.C.
Yeneneh Betru, 35, Burbank, Calif
Mary Jane (MJ) Booth, 64, Falls Church, Va.
Bernard Curtis Brown, 11, Washington, D.C.
Suzanne Calley, 42, San Martin, Calif.
William Caswell, 54, Silver Spring, Md.
Sarah Clark, 65, Columbia, Md.
Zandra Cooper, Annandale, Va.
Asia Cottom, 11, Washington, D.C.
James Debeuneure, 58, Upper Marlboro, Md.
Rodney Dickens, 11, Washington, D.C.
Eddie Dillard, Alexandria, Va.
Charles Droz, 52, Springfield, Va.
Barbara G. Edwards, 58, Las Vegas, Nev.
Charles S. Falkenberg, 45, University Park, Md.
Zoe Falkenberg, 8, University Park, Md.
Dana Falkenberg, 3, of University Park, Md.
James Joe Ferguson, 39, Washington, D.C.
Wilson "Bud" Flagg, 63, Millwood, Va.
Darlene Flagg, 63, Millwood, Va.
Richard Gabriel, 54, Great Falls, Va.
Ian J. Gray, 55, Columbia, Md.
Stanley Hall, 68, Rancho Palos Verdes, Calif.
Bryan Jack, 48, Alexandria, Va.
Steven D. Jacoby, 43, Alexandria, Va.
Ann Judge, 49, Great Falls, Va.
Chandler Keller, 29, El Segundo, Calif.
Yvonne Kennedy, 62, Sydney, New South Wales, Australia
Norma Khan, 45, Reston, Va.
Karen A. Kincaid, 40, Washington, D.C.
Dong Lee, 48, Leesburg, Va.
Dora Menchaca, 45, of Santa Monica, Calif.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Christopher Newton, 38, Anaheim, Calif.
Barbara Olson, 45, Great Falls, Va
Ruben Ornedo, 39, Los Angeles, Calif.
Robert Penniger, 63, of Poway, Calif.
Robert R. Ploger, 59, Annandale, Va.
Lisa J. Raines, 42, Great Falls, Va.
Todd Reuben, 40, Potomac, Maryland
John Sammartino, 37, Annandale, Va.
Diane Simmons, Great Falls, Va.
George Simmons, Great Falls, Va.
Mari-Rae Sopper, 35, Santa Barbara, Calif.
Robert Speisman, 47, Irvington, N.Y
Norma Lang Steuerle, 54, Alexandria, Va.
Hilda E. Taylor, 62, Forestville, Md
Leonard Taylor, 44, Reston, Va.
Sandra Teague, 31, Fairfax, Va.
Leslie A. Whittington, 45, University Park, Maryland.
John D. Yamnicky, 71, Waldorf, Md.
Vicki Yancey, 43, Springfield, Va.
Shuyin Yang, 61, Beijing, China
Yuguag Zheng, 65, Beijing, China

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

### <u>UNITED AIRLINES FLIGHT 175</u>

### <u>Crew</u>

Robert Fangman, 33, Claymont, Del.
Michael R. Horrocks, 38, Glen Mills, Pa.
Amy N. Jarret, 28, North Smithfield, R.I.
Amy R. King, 29, Stafford Springs, Conn.
Kathryn L. LaBorie, 44, Providence, R.I.
Alfred Gilles Padre Joseph Marchand, 44, Alamogordo, N.M.
Capt. Victor Saracini, 51, Lower Makefield Township, Pa.
Michael C. Tarrou, 38, Stafford Springs, Conn.
Alicia Nicole Titus, 28, San Francisco, Calif.

### <u>Passengers</u>

Alona Avraham, 30, Asdod, Israel.
Garnet Edward (Ace) Bailey, 54, Lynnfield, Mass.
Mark Bavis, 31, West Newton, Mass.
Graham Andrew Berkeley, 37, Boston, Mass.
Touri Bolourchi, 69, Beverly Hills, Calif.
Klaus Bothe, 31, Linkenheim, Baden-Wurttemberg, Germany
Daniel R. Brandhorst, 41, Los Angeles, Calif
David Reed Gamboa Brandhorst, 3, Los Angeles, Calif.
John Brett Cahill, 56, Wellesley, Mass.
Christoffer Carstanjen, 33, Turner Falls, Mass.
John (Jay) J. Corcoran, 43, Norwell, Mass
Dorothy Alma DeAraujo, 80, Long Beach, Calif.
Ana Gloria Pocasangre de Barrera, 49, San Salvador, El Salvador
Lisa Frost, 22, Rancho Santa Margarita, Calif.
Ronald Gamboa, 33, Los Angeles, Calif.
Lynn Catherine Goodchild, 25, Attleboro, Mass.
Peter Morgan Goodrich, 33, Sudbury, Mass.
Douglas A. Gowell, 52, Methuen, Mass.
The Rev. Francis E. Grogan, 76, of Easton, Mass.
Carl Max Hammond, 37, Derry, N.H.
Peter Hanson, 32, Groton, Mass.
Sue Kim Hanson, 35, Groton, Mass.
Christine Lee Hanson, 2, Groton, Mass.
Gerald F. Hardacre, 61, Carlsbad, Calif.
Eric Samadikan Hartono, 20, Boston, Mass.
James E. Hayden, 47, Westford, Mass.
Herbert W. Homer, 48, Milford, Mass.
Robert Adrien Jalbert, 61, Swampscott, Mass.
Ralph Francis Kershaw, 52, Manchester-by-the-Sea, Mass.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Heinrich Kimmig, 43, Willstaett, Germany
Brian Kinney, 29, Lowell, Mass.
Robert George LeBlanc, 70, Lee, N.H.
Maclovio Lopez, Jr., 41, Norwalk, Calif.
Marianne MacFarlane, MacFarlane, 34, Revere, Mass.
Louis Neil Mariani, 59, Derry, N.H.
Juliana Valentine McCourt, 4, New London, Conn.
Ruth Magdaline McCourt, 45, New London, Conn.
Wolfgang Peter Menzel, 59, Wilhelmshaven, Germany
Shawn M. Nassaney, 25, Pawtucket, R.I.
Marie Pappalardo, 53, Paramount, Calif.
Patrick Quigley, 40, of Wellesley, Mass.
Frederick Charles Rimmele, 32, Marblehead, Mass.
James M. Roux, 43, Portland, Maine
Jesus Sanchez, 45, Hudson, Mass.
Mary Kathleen Shearer, 61, Dover, N.H.
Robert Michael Shearer, 63, Dover, N.H.
Jane Louise Simpkin, 36, Wayland, Mass.
Brian D. Sweeney, 38, Barnstable, Mass.
Timothy Ward, 38, San Diego, Calif.
William M. Weems, 46, Marblehead, Mass.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

### UNITED AIRLINES FLIGHT 93

### Crew

Lorraine G. Bay, 58, East Windsor, N.J.
Sandra W. Bradshaw, 38, Greensboro, N.C.
Jason Dahl, 43, Denver, Colo.
Wanda Anita Green, 49, Linden, N.J.
Leroy Homer, 36, Marlton, N.J.
CeeCee Lyles, 33, Fort Myers, Fla.
Deborah Welsh, 49, New York, N.Y.

### Passengers

Christian Adams, 37, Biebelsheim, Germany
Todd Beamer, 32, Cranbury, N.J.
Alan Beaven, 48, Oakland, CA
Mark K. Bingham, 31, San Francisco, Calif.
Deora Frances Bodley, 20, San Diego, Calif.
Marion Britton, 53, New York, N.Y.
Thomas E. Burnett Jr., 38, San Ramon, Calif.
William Cashman, 57, North Bergen, N.J.
Georgine Rose Corrigan, 56, Honolulu, Hawaii
Patricia Cushing, 69, Bayonne, N.J.
Joseph Deluca, 52, Ledgewood, N.J.
Patrick Joseph Driscoll, 70, Manalapan, N.J.
Edward P. Felt, 41, Matawan, N.J.
Jane C. Folger, 73, Bayonne, N.J.
Colleen Laura Fraser, 51, Elizabeth, N.J.
Andrew Garcia, 62, Portola Valley, Calif.
Jeremy Glick, 31, Hewlett, N.J.
Lauren Grandcolas, 38, San Rafael, Calif.
Donald F. Greene, 52, Greenwich, Conn.
Linda Gronlund, 46, Warwick, N.Y.
Richard Guadagno, 38, of Eureka, Calif.
Toshiya Kuge, 20, Nishimidoriguoska, Japan
Hilda Marcin, 79, Budd Lake, N.J.
Nicole Miller, 21, San Jose, Calif.
Louis J. Nacke, 42, New Hope, Pa.
Donald Arthur Peterson, 66, Spring Lake, N.J.
Jean Hoadley Peterson, 55, Spring Lake, N.J.
Waleska Martinez Rivera, 37, Jersey City, N.J.
Mark Rothenberg, 52, Scotch Plains, N.J.
Christine Snyder, 32, Kailua, Hawaii
John Talignani, 72, New York, N.Y.

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

Honor Elizabeth Wainio, 27, Watchung, N.J.
Olga Kristin Gould White, 65, New York, N.Y.

Page 81 of 85

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

### THE PENTAGON

Spc. Craig Amundson, 28, Fort Belvoir, Va.
Melissa Rose Barnes, 27, Redlands, Calif.
(Retired) Master Sgt. Max Beilke, 69, Laurel, Md.
Kris Romeo Bishundat, 23, Waldorf, Md.
Carrie Blagburn, 48, Temple Hills, Md.
Lt. Col. Canfield D. Boone, 54, Clifton, Va.
Donna Bowen, 42, Waldorf, Md.
Allen Boyle, 30, Fredericksburg, Va.
Christopher Lee Burford, 23, Hubert, N.C.
Daniel Martin Caballero, 21, Houston, Texas
Sgt. 1st Class Jose Orlando Calderon-Olmedo, 44, Annandale, Va.
Angelene C. Carter, 51, Forrestville, Md.
Sharon Carver, 38, Waldorf, Md.
John J. Chada, 55, Manassas, Va.
Rosa Maria (Rosemary) Chapa, 64, Springfield, Va.
Julian Cooper, 39, Springdale, Md.
Lt. Cmdr. Eric Allen Cranford, 32, Drexel, N.C.
Ada M. Davis, 57, Camp Springs, Md.
Capt. Gerald Francis Deconto, 44, Sandwich, Mass.
Lt. Col. Jerry Don Dickerson, 41, Durant, Miss.
Johnnie Doctor, 32, Jacksonville, Fla.
Capt. Robert Edward Dolan, 43, Alexandria, Va.
Cmdr. William Howard Donovan, 37, Nunda, N.Y.
Cmdr. Patrick S. Dunn, 39, Springfield, Va.
Edward Thomas Earhart, 26, Salt Lick, Ky.
Lt. Cmdr. Robert Randolph Elseth, 37, Vestal, N.Y.
Jamie Lynn Fallon, 23, Woodbridge, Va.
Amelia V. Fields, 36, Dumfries, Va.
Gerald P. Fisher, 57, Potomac, Md.
Matthew Michael Flocco, 21, Newark, Del.
Sandra N. Foster, 41, Clinton, Md.
Capt. Lawrence Daniel Getzfred, 57, Elgin, Neb.
Cortz Ghee, 54, Reisterstown, Md.
Brenda C. Gibson, 59, Falls Church, Va.
Ron Golinski, 60, Columbia, Md.
Diane M. Hale-McKinzy, 38, Alexandria, Va.
Carolyn B. Halmon, 49, Washington, D.C.
Sheila Hein, 51, University Park, Md.
Ronald John Hemenway, 37, Shawnee, Kan.
Maj. Wallace Cole Hogan, 40, Fla.
Jimmie Ira Holley, 54, Lanham, Md.
Angela Houtz, 27, La Plata, Md.
Brady K. Howell, 26, Arlington, Va.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Peggie Hurt, 36, Crewe, Va.
Lt. Col. Stephen Neil Hyland, 45, Burke, Va.
Robert J. Hymel, 55, Woodbridge, Va.
Sgt. Maj. Lacey B. Ivory, 43, Woodbridge, Va.
Lt. Col. Dennis M. Johnson, 48, Port Edwards, Wis.
Judith Jones, 53, Woodbridge, Va.
Brenda Kegler, 49, Washington, D.C.
Lt. Michael Scott Lamana, 31, Baton Rouge, La.
David W. Laychak, 40, Manassas, Va.
Samantha Lightbourn-Allen, 36, Hillside, Md.
Maj. Steve Long, 39, Ga.
James Lynch, 55, Manassas, Va.
Terence M. Lynch, 49, Alexandria, Va.
Nehamon Lyons, 30, Mobile, Ala.
Shelley A. Marshall, 37, Marbury, Md.
Teresa Martin, 45, Stafford, Va.
Ada L. Mason, 50, Springfield, Va.
Lt. Col. Dean E. Mattson, 57, Calif.
Lt. Gen. Timothy J. Maude, 53, Fort Myer, Va.
Robert J. Maxwell, 53, Manassas, Va.
Molly McKenzie, 38, Dale City, Va.
Patricia E. (Patti) Mickley, 41, Springfield, Va.
Maj. Ronald D. Milam, 33, Washington, D.C.
Gerard (Jerry) P. Moran, 39, Upper Marlboro, Md.
Odessa V. Morris, 54, Upper Marlboro, Md.
Brian Anthony Moss, 34, Sperry, Okla.
Ted Moy, 48, Silver Spring, Md.
Lt. Cmdr. Patrick Jude Murphy, 38, Flossmoor, Ill.
Khang Nguyen, 41, Fairfax, Va.
Michael Allen Noeth, 30, New York, N.Y.
Diana Borrero de Padro, 55, Woodbridge, Va.
Spc. Chin Sun Pak, 25, Lawton, Okla.
Lt. Jonas Martin Panik, 26, Mingoville, Pa.
Maj. Clifford L. Patterson, 33, Alexandria, Va.
Lt. J.G. Darin Howard Pontell, 26, Columbia, Md.
Scott Powell, 35, Silver Spring, Md.
(Retired) Capt. Jack Punches, 51, Clifton, Va.
Joseph John Pycior, 39, Carlstadt, N.J.
Deborah Ramsaur, 45, Annandale, Va.
Rhonda Rasmussen, 44, Woodbridge, Va.
Marsha Dianah Ratchford, 34, Prichard, Ala.
Martha Reszke, 36, Stafford, Va.
Cecelia E. Richard, 41, Fort Washington, Md.
Edward V. Rowenhorst, 32, Lake Ridge, Va.
Judy Rowlett, 44, Woodbridge, Va.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC

Robert E. Russell, 52, Oxon Hill, Md.
William R. Ruth, 57, Mount Airy, Md.
Charles E. Sabin, 54, Burke, Va.
Marjorie C. Salamone, 53, Springfield, Va.
Lt. Col. David M. Scales, 44, Cleveland, Ohio
Cmdr. Robert Allan Schlegel, 38, Alexandria, Va.
Janice Scott, 46, Springfield, Va.
Michael L. Selves, 53, Fairfax, Va.
Marian Serva, 47, Stafford, Va.
Cmdr. Dan Frederic Shanower, 40, Naperville, Ill.
Antoinette Sherman, 35, Forest Heights, Md.
Don Simmons, 58, Dumfries, Va.
Cheryle D. Sincock, 53, Dale City, Va.
Gregg Harold Smallwood, 44, Overland Park, Kan.
(Retired) Lt. Col. Gary F. Smith, 55, Alexandria, Va.
Patricia J. Statz, 41, Takoma Park, Md.
Edna L. Stephens, 53, Washington, D.C.
Sgt. Maj. Larry Strickland, 52, Woodbridge, Va.
Maj. Kip P. Taylor, 38, McLean, Va.
Sandra C. Taylor, 50, Alexandria, Va.
Karl W. Teepe, 57, Centreville, Va.
Sgt. Tamara Thurman, 25, Brewton, Ala.
Lt. Cmdr. Otis Vincent Tolbert, 38, Lemoore, Calif.
Willie Q. Troy, 51, Aberdeen, Md.
Lt. Cmdr. Ronald James Vauk, 37, Nampa, Idaho
Lt. Col. Karen Wagner, 40, Houston, Texas
Meta L. Waller, 60, Alexandria, Va.
Staff Sgt. Maudlyn A. White, 38, St. Croix, Virgin Islands
Sandra L. White, 44, Dumfries, Va.
Ernest M. Willcher, 62, North Potomac, Md.
Lt. Cmdr. David Lucian Williams, 32, Newport, Ore.
Maj. Dwayne Williams, 40, Jacksonville, Ala.
Marvin R. Woods, 57, Great Mills, Md.
Kevin Wayne Yokum, 27, Lake Charles, La.
Donald McArthur Young, 41, Roanoke, Va.
Lisa L. Young, 36, Germantown, Md.
Edmond Young, 22, Owings, Md.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO Statement - FINAL.doc

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, PC**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the attached RICO statement Applicable to Al-Rajhi Banking and Investment Corporation a/k/a Al Rajhi Bank was served on all parties by way of electronic filing in the Southern District of New York on December 17, 2004.

Dated: December 17, 2004

BY:_____
        JERRY S. GOLDMAN, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AF_Al Rajhi RICO
Statement - FINAL.doc

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to Mohammed Al**<br>**Faisal Al Saud** |

*This document relates to:*    Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

## RICO STATEMENT
## APPLICABLE TO MOHAMMED AL FAISAL AL SAUD

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendant Mohammed Al Faisal al Saud.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(b), (c) and/or (d).

2.      The name of the defendant to whom this RICO statement pertains is Mohammed Al Faisal Al Saud ("Prince Mohammed"). The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4.      The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any

**PLAINTIFF'S EXHIBIT**

**AG**

individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5.       (a) <u>List of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15; <br> NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15; <br> NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States | 18 U.S.C. § 371 |

2

| Government | |
|---|---|
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |

(b) <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| <u>DATES</u> | <u>PARTICIPANTS</u> | <u>FACTS</u> |
|---|---|---|
| mid-1990s to 9/11/2001 | Prince Mohammed | Throughout this period, Prince Mohammed conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | Prince Mohammed | Prince Mohammed undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was |

3

| | | participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Prince Mohammed. |
|---|---|---|
| Mid-1990s to 9/11/2001 | Prince Mohammed | Prince Mohammed agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) Not applicable.

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically Prince Mohammed, to surreptitiously provide funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or International Islamic Front for the Jihad Against the Jews and Crusaders, which conspiracy culminated in the Attack.

4

6.

    a.  The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)) and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Prince Mohammed fit neatly into this framework by raising funds for and

5

providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Prince Mohammed and illegal activity to generate material support to continue its terrorist operations.

c.  No.

d.  Prince Mohammed is associated with the Enterprise.

e.  Prince Mohammed is a member of the Enterprise, and is separate and distinct from the Enterprise.

f.  Prince Mohammed intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Prince Mohammed is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Prince Mohammed funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.  The Enterprise, and the racketeering activities conducted by Prince Mohammed, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and

6

in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center- and as such, affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.     Not applicable.

12.     Not applicable.

13.

   a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b.  The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Second Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

14.     The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Prince Mohammed, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Prince Mohammed, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Prince Mohammed, of both those goals and the uses to which the Funds were put.

7

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Prince Mohammed. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Prince Mohammed. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Prince Mohammed. Prince Mohammed, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Prince Mohammed also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.    The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, business, and livelihood.

8

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| | |
|---|---|
| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Two** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Nine** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| | |
|---|---|
| **Count Three** | Wrongful Death |
| **Count Four** | Survival |
| **Count Five** | Negligent and Intentional Infliction or |

9

| | |
|---|---|
| | Emotional Distress |
| **Count Six** | Conspiracy |
| **Count Seven** | Aiding and Abetting |
| **Count Eight** | Negligence |
| **Count Eleven** | Punitive Damages |

20.  Not applicable

Date: March 10, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
          GINA M. MAC NEILL, ESQUIRE
          (GM 0581)

BY: _____/s/_____
          JERRY S. GOLDMAN, ESQUIRE
          (JG 8445)

          Attorneys for the Plaintiffs
          111 Broadway, 13th Floor
          New York, N.Y. 10006
          212.242.2232

10

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Prince Mohammed | Mohammed al Faisal al Saud ("Prince Mohammed") is the son of the late King Faisal and the cousin of King Fahd. Prince Mohammed is brother to Prince Turki al Faisal who headed the Saudi Secret Service. Prince Mohammed is part of the royal family and a well known business man in the Islamic Business World.<br><br>**Connection to DMI :**<br><br>Prince Mohammed is a founder of Dar al Maal al Islami. For almost twenty years, Dar al Maal al Islami Trust and Dar al Maal Administrative Services, SA (collectively {"DMI") were operated under the chairmanship of Prince Mohammed.<br><br>DMI has an investment banking arm known as the Islamic Investment Company of the Gulf ("IICG"), which is based in Bahrain. IICG is a wholly-owned subsidiary of DMI. Faisal Islamic Bank is a subsidiary of IICG. Both DMI and Faisal Islamic Bank are major shareholders in Al Shamal Bank.<br><br>A director of the Al Shamal Bank is Haydar Bin Laden, the half brother of Osama Bin Laden. Haydar Bin Laden is also on the Board of Directors for DMI. **The United Nations has acknowledged that DMI funds terrorist activities.** DMI has been directly linked to holding funds for Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through several of its subsidiary banks, including Al Shamal Bank. Based upon information and belief, Al Shamal Bank reportedly held upwards | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

11

of $50 million of investments of Osama Bin Laden, according to state department and United Nations documents.

DMI has also been linked to Al Taqwa Bank. The United States and the United Nations sanctioned Al Taqwa for funding al-Qaida and other terrorist activities.

DMI is viewed in the Muslim world as one of the primary vehicles for Saudi financing of the International Islamic Fundamentalist Movement. During the 2001 trial, relating to the 1998 United States embassy bombings in Kenya and Tanzania, Faisal Islamic Bank, which is a subsidary of DMI, was implicated as holding bank accounts for operatives of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

DMI adheres to the *Zakat* system of donating 2.5% of a company's annual income to Islamic leaders and institutions. DMI's *Zakat* accounts have been used to support Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

As chairman of DMI, Prince Mohammed oversaw the funding and had knowledge of the distribution of funds through DMI to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to Faisal Islamic Bank:**

Prince Mohammed is the major shareholder of Faisal Islamic Bank ("FIB"). He serves as the Chairman of the board of directors. As Chairman of FIB, Prince Mohammed "implements the decisions of the board, administers all activities [of the bank]and is directly responsible for all these activities before the Board," as stated on the website of the Faisal Islamic Bank of Egypt website.

12

FIB was founded in 1970 by Yousef M. Nada ("Nada"). Nada is a member of the Egyptian Muslim Brotherhood and the Jamaa al-Islamiya, which is directly allied with al Qaida. When he came to Saudi Arabia, he became friendly with the Royal Family, though his membership in the Muslim Brotherhood, opened a construction company, and thereafter, founded the FIB. Nada has been implicated as a supporter of the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and has been connected to the Al Taqwa Bank, as their president, in supporting Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

FIB is a subsidiary of Islamic Investment Company of the Gulf. Islamic Investment Company of the Gulf is a subsidiary of DMI.

FIB was one of the main founders of the al Shamal Islamic Bank, the bank which Osama Bin Laden helped to establish in 1991 by providing capital in the amount of $50 million. At this time, it is believed that FIB remains a major shareholder of al Shamal Bank. Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

FIB was also implicated during the 2001 United States trial relating to the 1998 embassy bombings in Africa. A former finance manager for al Qaida in Khartoum, Jamal al-Fadl, testified that FIB held bank accounts for al Qaida operatives by stating:

Q: "Where were the accounts [of the al Qaida] held? In what countries?

A: …we got account in Bank Faisal

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AG_Mohammed al Faisal al Saud - RICO statement - v1.doc

Islami.

Q: Is that also in Khartoum?

A: Yes."

The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by FIB.

The events of 9/11 were a direct and intended and foreseeable result of FIB's participation. FIB controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States, and did nothing to stop them.

As chairman of FIB, Prince Mohammed oversaw the funding and had knowledge of the distribution of funds through FIB to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**<u>Connection to al Shamal Bank:</u>**

Prince Mohammed is also Chairman of Al Shamal Bank. As stated prior, Al Shamal Bank was funded by Osama bin Laden in the amount of $50 million to assist the founding of the bank. Prince Mohammed joined bin Laden in founding the Al Shamal Bank in Sudan, according to a report prepared for the French intelligence service.

Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy

14

military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

A director of the Al Shamal Bank is Haydar Bin Laden, the half brother of Osama Bin Laden. Haydar Bin Laden is also on the Board of Directors for DMI.

As chairman of Al Shamal, Prince Mohammed oversaw the business activities and had knowledge of the distribution of funds through Al Shamal to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

## **Connection to Mohammed Galed Kalaje Zouaydi:**

Based upon information and belief, Prince Mohammed had close relations with Mohammed Galed Kalaje Zouaydi ("Zouaydi"). It has been reported that Prince Mohammed used Zouaydi as an accountant.

Zouaydi, of Syrian origin, is considered to be a "big financier" behind the European terrorist networks of al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. He was arrested in Spain in April 2002. Allegedly, Zouaydi was at the center of a money laundering ring that funded al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, in Europe. He set up private companies where he received donations in Saudi Arabia from 1996 to 2001. These funds were distributed to the al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, members in Europe.

Zouaydi had direct contact with the hijackers of Hamburg. He is a member of the Syrian Muslim Brotherhood whose other members in Hamburg were tied into the Hamburg terrorists, particularly Mohammed Atta.

Prior to September 11, 2001 Prince Mohammed was on notice that al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders: (a) was soliciting and raising funds in and from Saudi Arabia through purportedly legitimate businesses and financial entities; and (b) intended to use the material support and substantial assistance it acquired to kill Americans and attack American interests around the world. Despite the known and foreseeable risks posed to the United States citizens and property by al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Mohammed acted with the knowledge and intent that the flow of funds through and use of DMI, FIB, and al Shamal Bank would continue unabated. To that end, Prince Mohammed conducted and/or participated, directly or indirectly, in the affairs of the RICO Enterprises FIB and/or DMI and/or Al Shamal Bank and/or al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders through a pattern of racketeering activity that among other things, facilitated, materially supported and substantially assisted al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Prince Mohammed has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Prince Mohammed continued to permit, make available, assist, and maintain those accounts.

As the foregoing demonstrates, Prince Mohammed thereby knowingly has, for a period of many years, provided critical financial and

|  | logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Prince Mohammed's participation in al Qaida's jihadist campaign. |  |

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AG_Mohammed al Faisal al Saud - RICO statement - v1.doc

## CERTIFICATE OF SERVICE

I hereby certify that the attached RICO statement Applicable to Arab Bank was served on all counsel of record by way of electronic filing in the Southern District of New York on March 10, 2005.

Dated: March 10, 2005

BY:_____
        GINA M. MAC NEILL, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AG_Mohammed al Faisal al Saud - RICO statement - v1.doc