UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) Civil Action No. 03 MDL 1570 (GBD) (SN) <br> ) ECF Case <br> ) |

This document relates to: *All Actions*

# REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION AND RULE 72 OBJECTIONS TO THE JANUARY 26, 2024 ORDER [ECF NO. 9562] WHICH GRANTED IN PART DEFENDANTS' MOTION TO STRIKE EVIDENCE

Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Steven R. Pounian
James Gavin Simpson
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

March 1, 2024

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER

**TABLE OF CONTENTS**

A.  The Order erroneously found that Saudi Arabia suffered prejudice but overlooked Saudi Arabia's false and deficient discovery responses, which harmed the Plaintiffs and delayed this litigation. ...................................................................................................1

B.  Saudi Arabia does not justify the exclusion of Youssef's opinions concerning the Bayoumi "Washington trip" videotape. ................................................................................5

C.  Saudi Arabia does not justify the exclusion of Youssef's opinions on Bayoumi's work together with Saudi "advance team" agents Sadhan and Sudairy, including Bayoumi's correspondence with them. ....................................................................................................8

D.  Saudi Arabia does not justify excluding Youssef's opinions or the demonstrative exhibits Adams prepared of Bayoumi's February 2000 party video. ........................................8

E.  Usman Madha was already disclosed as a fact witness and his Declaration remains firmly within the scope of his prior testimony. .........................................................................10

CONCLUSION ................................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Brodeur v. Champion*, 2019 WL 3854302 (D. Conn. Aug. 16, 2019) ..........................................................9
*Outley v. City of New* York, 837 F.2d 587 (2d Cir. 1987) ....................................................... 1, 4, 5
*Preuss v. Kolmar Labs., Inc.*, 970 F. Supp 2d 171 (S.D.N.Y. 2013)................................................4
*Rodriguez v. Vil. of Port Chester*, 535 F Supp. 3d 202 (S.D.N.Y. 2021)........................................ 4, 9
*S.E.C. v. Rajaratnam*, 622 F.3d 159 (2d Cir. 2010) ...............................................................4

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................................9
Fed. R. Civ. P. 26(e).............................................................................................................6

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER

Saudi Arabia's Opposition offers no defense of the January 26 Order ("the Order") barring Plaintiffs from presenting expert testimony and demonstrative exhibits based on two never-before-seen videotapes of Saudi government agent Omar Al Bayoumi: (1) Bayoumi's video and report on his June-July 1999 trip to Washington, D.C.[1]; and (2) the uncut video footage of Bayoumi's February 2000 welcome party for the hijackers in San Diego.[2] Notwithstanding the smokescreens Saudi Arabia raises in its Opposition, it is an inescapable fact that copies of these videos, seized from Bayoumi by the Metropolitan Police Service (MPS) in September 2001, were produced only 12 days before Plaintiffs' filing deadline. The Court's finding of a "21-month delay" in producing Plaintiffs' expert Youssef's Declaration, Order at 13, is clearly erroneous and Saudi Arabia does not (and cannot) show otherwise.

Indeed, Saudi Arabia sidesteps altogether the Order's errors on timeliness and prejudice. In its Opposition, Saudi Arabia does not address, let alone justify, the Order's disregard of the evidence that Saudi Arabia is itself responsible for the relevant discovery delays: it provided deceitful answers to interrogatories about Bayoumi's June 1999 Saudi Embassy trip; its witnesses gave untruthful deposition testimony about Bayoumi's work and even about whether and how well they knew Bayoumi; and despite having the Bayoumi materials, it failed to produce any of the Bayoumi videotapes or Bayoumi's key Saudi government correspondence in response to Plaintiffs' April 2018 discovery requests. The Order's disregard of these facts in finding that *Plaintiffs* caused undue delay is clearly erroneous, and Saudi Arabia's Opposition offers nothing to show otherwise.

**A. The Order erroneously found that Saudi Arabia suffered prejudice but overlooked Saudi Arabia's false and deficient discovery responses, which harmed the Plaintiffs and delayed this litigation.**

The Order clearly erred in striking material evidence without the showing of genuine prejudice required by *Outley v. City of New* York, 837 F.2d 587, 589 (2d Cir. 1987). The record shows that Saudi

---

[1] Bayoumi's Washington trip video is ECF No. 9543, Ex. 10F. References herein to times on Bayoumi's Washington trip video are to Ex. 10F. Plaintiffs are serving an errata version of the transcript (Ex. 10F-TR) with this brief.
[2] Bayoumi's February 2000 welcome party video is ECF Nos. 9543, Ex. 10K ("Ex. 10K").

1

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER

Arabia did not suffer prejudice, but rather *caused* severe prejudice to Plaintiffs through its serial discovery misconduct.

1. **Saudi Arabia ignores Plaintiffs' showing that the Order overlooked that Saudi Arabia hid relevant discovery and provided false answers**. While the videotape of Bayoumi's Washington trip (produced by the MPS in December 2023, but never by Saudi Arabia) shows that Bayoumi visited the Saudi Embassy in June 1999 and had a close working relationship with MOIA-Embassy officials Adel Al Sadhan and Mutaeb Al Sudairy, Saudi Arabia's June 2018 Answers to Interrogatories falsely stated that Bayoumi *never visited the Saudi Embassy* and made only a single trip to Washington, D.C. in March 2000. ECF No. 9571 at 12 & n. 6.[3] Moreover, though the video shows Sadhan and Sudairy together with Bayoumi in D.C. in June 1999, the two Saudi officials falsely testified that they did not know Bayoumi (Sadhan) or saw him only at San Diego's Al Madinah Mosque (Sudairy). *Id.* at 12.

2. **The Court clearly erred in striking expert opinions as untimely when Saudi Arabia has failed—without any explanation—to produce *any* of the Bayoumi videotapes in response to specific discovery requests for such videos in 2018**. ECF No. 9571 at 16. Saudi Arabia seeks to prop up Bayoumi's testimony that the "last time" he saw the February 2000 party video was when he "handed it to the British police." ECF No. 9595 at 17 n. 14. This submission is false and misleading in two respects: (1) Bayoumi did not "hand" any video evidence to the police—rather, the MPS seized the Bayoumi videotapes from Bayoumi's garage in Birmingham, England;[4] and (2) MPS

---

[3] Bayoumi himself has repeatedly lied about going to Washington in February and March 2000 in an effort to establish an alibi for time he actually spent in San Diego providing crucial support to the hijackers. *Compare* Bayoumi's claims in ECF No. 9541, Ex. 120, Bayoumi Dep. 474:21-476:16, and ECF No. 9541, Ex. 90, Snell Dec, Ex. 2 at 5; *with* ECF No. 9541-1, ¶ 681, citing documents in the MPS production confirming that Bayoumi was in San Diego at the time.

[4] ECF No. 9543, Ex. 678DD, at 2. "Selection of Video Cassettes" seized on 09/22/2001 given MPS Exhibit Ref. PSS/100. Video footage of the February 2000 party was on at least two separate VHS videotapes (Bayoumi said he "downloaded" the footage from his camcorder), which were "split away" from PSS/100 and given individual Exhibit Refs. DSC/12 and DSC/13. *Id.*, at 2, 14. *See also* ECF No. 9541, Ex. 450, 325:12-327:21 (describing PSS/100 videos), 328:19-329:6. Copies of DSC/12 and DSC/13 were produced by the MPS in December 2023.

chain-of-custody records (produced in December 2023) show that MPS returned the party videotapes, with other seized materials, on May 2, 2002, at which time Bayoumi checked off each item individually to acknowledge receipt.[5] The record establishes a clear inference that Saudi Arabia had Bayoumi's videotapes: Bayoumi worked as a Saudi government agent; the Saudi Embassy in London was immediately engaged when Bayoumi was arrested on a terrorism warrant; and Saudi Arabia was closely involved in monitoring and following up on the U.K. authorities' detention, investigation and repatriation of Bayoumi.[6] Saudi Arabia's refusal to address the questions around its possession of the Bayoumi materials is conspicuous and telling.

3.  **The Order overlooked and Saudi Arabia ignores the newly discovered video evidence that Bayoumi introduced Saudi government official Sheikh Muhammad Al Qahtani to the hijackers at the welcome party**. ECF No. 9571 at 16. The video shows that Qahtani worked together with Bayoumi for Saudi Arabia in San Diego in 2000. Saudi Arabia's Opposition ignores the importance of Qahtani's presence at the party and offers no explanation for its failures to produce documents or information about Qahtani, even though Qahtani (and his work with Bayoumi in support of the hijackers) fell squarely within Saudi Arabia's discovery obligations.[7]

---

[5] ECF No. 9543, Ex. 678DD, at 20-22 (MPS Forensic Management Team Property Receipt 69/2002). Check marks appear next to each item received, including the PSS/100 "Selection of Video Cassettes" (item 64), the PSS/115 (later MPS43) Bayoumi correspondence with Saudi government officials (item 75, listed as "Financial papers"), and the individual DSC/12 and DSC/13 videotapes containing footage of the February 2000 party (items 93 and 94). Bayoumi wrote "not recieved [sic]" next to one item. In failing to acknowledge the proof that the MPS returned the Bayoumi files and videotapes to Bayoumi in 2002, Saudi Arabia wrongfully tries to disparage the MPS chain-of-custody documentation as a "slide presentation," ECF No. 9595 at 17 n. 14. In reality the official MPS/FMT Property Receipt was executed by a government investigatory agency in the regular course of its business, checked and signed by Bayoumi (who wrote "Omar" next to his signature, which was witnessed by an MPS officer), and produced to aid this Court in response to its June 2021 Hague Convention Request.

[6] Bayoumi was arrested on September 21, 2001 as a suspect under U.K. law in the preparation, instigation, and commission of acts of terrorism in the United States, under Section 41(b) of the U.K. Terrorism Act 2000. He was detained for one week and his passport held for a further seven months. Bayoumi confirmed to the MPS that he conferred with Saudi government officials at the Saudi Embassy in London upon his arrest; that the "procedures" of his interviews were coordinated with the Saudi Embassy; and that his further participation in U.S. and U.K. investigations, including the restoration of his materials and his repatriation to Saudi Arabia, would be guided by "ask[ing] the Embassy first." ECF No. 9541, Ex. 450 (MPS interviews of Bayoumi), at 6:4-9, 4:24-5:14, and 899:8-900:12.

[7] For example, in July 2019, this Court ordered Saudi Arabia to produce documents concerning an "Imam Muhammed" in San Diego between November 1999 and January 2000, July 22, 2019 Opinion & Order on PECs' Motion to Compel (sealed) at 50-51, but Saudi Arabia claimed it could not find any documents. ECF No. 5200 at App. 5 ¶ 15.

3

**4. Saudi Arabia disregards its promise to this Court to "dig deep" in its searches of MOIA, the Embassy, and the Consulate for Bayoumi communications.** ECF No. 9572 at 19. The *only* defense Saudi Arabia offers for failing to produce highly relevant Bayoumi documents is counsel's argument (relegated to a footnote) that Bayoumi's correspondence to MOIA, Embassy, and Consulate officials was "decades-old" and Saudi Arabia may have lost the documents or somehow overlooked them in its searches. ECF No. 9595 at 18 n. 15. Yet again, Saudi Arabia ignores that the MPS returned Bayoumi's work correspondence files in 2002 and offers no explanation for its failure to produce relevant documents from Bayoumi's files.[8]

The Order overlooked each of these circumstances. Saudi Arabia's discovery violations and misdirection tactics denied Plaintiffs their basic right to question Saudi Arabia's officials regarding Bayoumi's contemporaneous documents, videos, and information about his Saudi government work. *S.E.C. v. Rajaratnam*, 622 F.3d 159, 180-82 (2d Cir. 2010) (the goal of discovery is to provide "a level playing field…."). After Saudi Arabia withheld the Bayoumi materials from Plaintiffs during discovery, the Order compounded that prejudice by preventing Plaintiffs from having their expert and fact witnesses comment upon and explain those materials when Plaintiffs eventually uncovered them.

The three cases Saudi Arabia cites are distinguishable and do not support the Order's striking of testimony based on newly discovered evidence.[9] Saudi Arabia ignores that it obtained an extension of time for its motion papers but made no timely effort to cure any claimed prejudice, such as by

---

[8] It is only because the MPS seized, preserved, and produced Bayoumi's files that Plaintiffs have Bayoumi's substantial, continuous work correspondence with MOIA's Minister, Sowailem, Fahad Al Thumairy, Sadhan, Sudairy, and various other Saudi government, Embassy, MOIA, and Al Haramain officials. *e.g.* ECF No. 9541-1, Pl. Av. § IX.

[9] In *Outley,* the Second Circuit *reversed* the district court's exclusion at trial of testimony from two eyewitnesses where the plaintiff failed to serve the defendant with their address and phone contact information and first interviewed the eyewitnesses "approximately 10 days" before trial. *Id.* at 588. The other cited cases do not consider testimony based on newly discovered evidence (let alone evidence that the opposing party withheld from discovery). *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp 2d 171, 177-180 (S.D.N.Y. 2013) (defendant could not call two of its own employees as witnesses since they were never disclosed during two-and-a-half-year discovery period and their testimony was "largely…irrelevant" or "not…of particular importance"); *Rodriguez v. Vil. of Port Chester*, 535 F Supp. 3d 202, 212 (S.D.N.Y. 2021) (expert could not submit supplemental report since it did not address "previously unknown" information and was "clearly an attempt to bolster and correct deficiencies in … original Report").

requesting depositions. Instead, it did nothing. The Second Circuit in *Outley* criticized such gamesmanship, holding that "Courts… look[] with disfavor upon parties who claim surprise and prejudice but who do not ask for a recess…." 837 F.2d at 590 (citation omitted).

### B. Saudi Arabia does not justify the exclusion of Youssef's opinions concerning the Bayoumi "Washington trip" videotape.

Saudi Arabia does not dispute that Plaintiffs first received the Bayoumi "Washington trip" videotape just 12 days before the briefing deadline. Saudi Arabia says (at 14) that the Court could consider Youssef's declaration only "as a whole" and that "parties cannot generate new expert opinions at will." Those arguments evade the point: Plaintiffs (unlike Saudi Arabia) obtained this evidence for the first time in December 2023. Youssef necessarily reviewed the newly produced video evidence together with, and in the context of, the existing proof. The Court committed clear and reversible error by denying Plaintiffs the right to have their counterterrorism expert provide opinions on such important, previously unavailable contemporaneous evidence.

Youssef's opinions on the Bayoumi "Washington trip" videotape also are not "outside the scope" of his original expert report, as Saudi Arabia claims (at 14-15). A core conclusion of Youssef's report was that Bayoumi worked with Thumairy and other Saudi government officials (including MOIA-Embassy diplomats Sadhan, Sudairy, and Sowailem) to knowingly assist Al Qaeda carry out a terror mission inside the U.S. ECF No. 9543, Ex. 694 ("Youssef Decl.") ¶ 36; *e.g.,* ECF No. 9541, Ex. 5 ("Youssef Rpt.") 10, 15, 101, 239-44. Youssef found that the Bayoumi "Washington trip" videotape footage of Sadhan, Sudairy, and the Saudi Embassy—followed by 30 minutes during which the sole or principal focus of Bayoumi's footage and narration was the U.S. Capitol—offers additional (previously unavailable) support for his findings that Saudi government officials knowingly supported

5

Al Qaeda. *Id.*[10] In addition, contrary to Saudi Arabia's claims (at 15) concerning Fed. R. Civ. P. 26(e), Youssef's report would be "incomplete" without his review of this newly discovered additional evidence in the record of the Saudi government's complicity with Al Qaeda.

The bulk of Saudi Arabia's Opposition improperly raises an attack on the "merits of Youssef's opinion," KSA Opp. 15, which only serves to highlight the sharply disputed issues of fact at issue. Saudi Arabia offers its own misleading explanation of the visual images on the video, yet ignores *Bayoumi's narration* of his footage, which Youssef studied using his native knowledge of Arabic and his FBI counterterrorism background. As Youssef describes, the video was prepared for a specific audience that Bayoumi repeatedly describes as his "esteemed brothers." Youssef Decl. ¶¶ 16, 23, 28. Youssef finds that Bayoumi's words showed that he was given a specific assignment to report on the U.S. Capitol; Bayoumi undertakes to provide more "results soon" and refers to "the plan." *Id.* ¶¶ 19, 22. Bayoumi also films and discusses specific features of what he calls this "most important" building, including its structure, supporting columns, security personnel, staff, entrances, and surroundings. *Id.* ¶¶ 11, 15, 20-22, 24, 27. Bayoumi also makes defiant religious statements that demonstrate his deep religious motivation to usurp the symbols of American power. *Id.* ¶¶ 17, 18.[11] Youssef concludes that the video is not that of a tourist, but rather bears the hallmarks of planning or preparing for acts of terrorism, and resembles operational videos prepared by Al Qaeda and other terror groups to prepare for attacks. *Id.* ¶ 8-9, 14, 16, 28.

While Saudi Arabia claims there is "no similarity to actual Al Qaeda casing reports" such as that of convicted terrorist operative Dhiren Barot, the Court need only examine Bayoumi's video to

---

[10] Youssef concludes that Bayoumi's video was a casing report of the U.S. Capitol prepared for Al Qaeda but does not state that Bayoumi and the other Saudi government officials involved in the plot had specific knowledge of Al Qaeda's plan to crash aircraft into U.S. targets.
[11] Bayoumi describes people climbing up scaffolding on the National Mall as "demons of the White House" and then turns the camera to the Capitol, stating that he is "[i]n front of the Congress" and that "[t]here is no Power nor Strength except through Allah!" *Id.*

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER

see that it covers the same casing criteria that Saudi Arabia's own expert cited. KSA Opp. 16 n. 12 (*e.g.* "supporting columns," security arrangements, the building surroundings, and means of egress). Moreover, Youssef based his opinion on his experience as the FBI Chief responsible for assessing terrorist videos such as the one in the Dhiren Barot case. Youssef Decl. ¶¶ 16, 23, 28.

Nor does Saudi Arabia address the *timing* of Bayoumi's U.S. Capitol video—which Youssef found was highly significant because the video was prepared as Al Qaeda was meeting to discuss targets for the "planes operation," including the U.S. Capitol. *Id.* ¶ 25.

Saudi Arabia claims that "[t]his is nothing more than a tourist video" because Bayoumi "introduces himself to other tourists," KSA Opp. at 16 & n. 11, yet the only persons that Bayoumi actually addresses in his narration are the "esteemed brothers" for whom his video report is being prepared.[12] Saudi Arabia suggests that Bayoumi simply filmed innocuous artwork, water fountains, and flower beds, but its appraisal of that footage is taken out of context from Bayoumi's accompanying narration and his focus on the Capitol's security, structural features, surroundings, and access.[13] Saudi Arabia misleadingly counts minutes of footage inside and outside of the Capitol, but does not question that the Capitol and its surroundings were Bayoumi's main focus for nearly 30 minutes.[14] Saudi Arabia complains that it could not be a casing video because Bayoumi "kept [it] in his apartment for months after the 9/11 attacks, mixed in with his personal effects," KSA Opp. at 16, but Bayoumi was arrested

---

[12] Saudi Arabia's support for its "tourist" claim includes Bayoumi's Arabic utterances to the camera while English-speaking tourists can be heard talking to one another in the background (17:49-17:55); Bayoumi's scripted commentary in Arabic as he films the surroundings of the White House and the National Mall (21:19-21:27; and 29:58-30:11); and one instance where Bayoumi got someone else to film him, so that Bayoumi could demonstrate his presence inside the Capitol (50:17-50:27); after which Bayoumi turned the camera back onto that person, an unsuspecting visitor from Idaho (50:47-50:55).
[13] The supposedly innocuous "B-roll" footage of flowerbeds and lampposts effectively acts as punctuation for Bayoumi's casing report. Saudi Arabia's suggestion that Bayoumi shows an "interest" in water fountains is particularly disingenuous. It cites a sequence of video footage, at 1:00:16-1:01:45, that warrants the Court's closer inspection because it betrays the actual purpose and methodology of Bayoumi's filming, namely that he is following a "plan" (he repeats the same phrase verbatim, once before and once after changing his vantage point), and that he is primarily positioning himself to film lines of approach and security arrangements at the Capitol building.
[14] Youssef Decl. ¶10 (providing accurate time-stamps from 33:12 through 1:01:35). Saudi Arabia also observes that Bayoumi's video was all "taken at ground level," KSA Opp. at 15, but ignores how Bayoumi films in detail a scale-model of the Capitol building "capturing its features as if from the sky above." Youssef Decl. ¶ 20; 45:29-45:59 (Bayoumi states that the model allows a "different perspective.")

7

on September 21, 2001 and the videotape was seized from his garage the next day. Saudi Arabia's reliance on the fact that it could not find mention of the videotape in the 9/11 investigation materials produced in this case, *id.*, is of no weight; if Saudi Arabia has a question in that regard, it would be better addressed to the FBI or its own equivalent, the Mabahith.

### C. Saudi Arabia does not justify the exclusion of Youssef's opinions on Bayoumi's work together with Saudi "advance team" agents Sadhan and Sudairy, including Bayoumi's correspondence with them.

Saudi Arabia acknowledges that Bayoumi filmed Sadhan and Sudairy on his Washington trip, KSA Opp. at 5, n.7, but ignores the false testimony denying such trips, *see, e.g.*, ECF No. 9504 at 5, and omits key sections of the videotape where Sadhan and Sudairy are actually shown interacting with Bayoumi, including Bayoumi's statement that Sudairy will be his "leader" and "Emir" during this trip. Youssef Decl. ¶¶ 29-33.[15] Saudi Arabia fails to address the evidence of Sadhan and Sudairy's connections to Al Qaeda. Youssef's report presented his opinions that Sadhan and Sudairy served as an "advance team" for Al Qaeda, and the video evidence confirms that status. Youssef's analysis of coded messages in Arabic in Bayoumi's correspondence could only have been presented upon the aggregation of the evidence, including the Bayoumi videotapes received in December 2023.[16]

### D. Saudi Arabia does not justify excluding Youssef's opinions or the demonstrative exhibits Adams prepared of Bayoumi's February 2000 party video.

The Court need not indulge Saudi Arabia's incorrect claim (at 17) that an entire section of Youssef's Declaration (¶¶ 60-103) is based on Adams' demonstrative exhibits. This section contains

---

[15] Instead, Saudi Arabia cites to sections of the video footage when Bayoumi either narrates to camera (8:38-9:10), or speaks with two other men about the Islamic Center (9:30-15:12), one of whom appears to be another Saudi Embassy official who escorted Bayoumi there in his car (14:54-15:12). Bayoumi calls the man "Muhammad".

[16] Saudi Arabia claims (at 3) that because Youssef's original April 1, 2022 report cited some materials from the Bayoumi files the MPS produced only days earlier, in March 2022, that Youssef should have had ample time to include additional materials. This ignores the sheer amount and complexity of Bayoumi materials; the painstaking work done to translate and review them; and the need to review the complete body of evidence to place the materials in context and understand them. Youssef's report specifically warned that his report could not have been complete, explaining that the MPS materials (along with the documents the FBI and CIA produced shortly before his report was filed) "are voluminous and complex and take substantial time to review and analyze" and that "it has been impossible to consider all of these newly-produced materials before the deadline of this Report" and that "[a]ll of these materials must be studied together and considered with the existing evidence" and that "I expect that it will be necessary to supplement this Report." Youssef Rpt. at 7.

Youssef's findings on *Bayoumi's video footage itself*—including Youssef's use of Arabic skills to hear names and dialogue. In one paragraph (¶ 65), Youssef confirms the accuracy of Adams' exhibits based on the video evidence.

Saudi Arabia does not and cannot challenge Adams' demonstrative exhibits on grounds of foundation or accuracy. The Adams exhibits present true and objectively verifiable digital renderings of the video evidence of Bayoumi's February 2000 welcome party for the 9/11 hijackers which make that evidence "comprehensible in a single viewing." ECF No. 9543, Ex. 10K-Adams (Adams Decl.) ¶ 14. The Court can resolve the sole point of contention concerning Adams by correcting the error of elevating Adams' status to that of a Rule 26 expert. Adams' demonstrative exhibits are not akin to those that incorporate expert opinions. *See Brodeur v. Champion*, 2019 WL 3854302, at *1 (D. Conn. Aug. 16, 2019) (citing exhibits prepared by experts to demonstrate their findings on various topics, including the dynamics of a car crash or the trajectory of a bullet). Rather, the Adams exhibits "freeze-frame" Bayoumi's video evidence to allow the factfinder to perceive the presence and location of individuals at the event. While the task required technical knowledge—and Adams' Declaration demonstrates that he possesses the requisite levels of technical and procedural skill—the demonstrative exhibits themselves can be independently checked for accuracy against the time-stamped Bayoumi video and transcript, as Youssef confirms. Youssef Decl. ¶ 65. Saudi Arabia makes no claim to the contrary. Saudi Arabia's claim that Adams was subject to the April 1, 2021 expert deadline makes no sense, as Adams offers no expert opinions and his exhibits were not subject to the expert deadline. *Rodriguez*, 535 F. Supp. 3d at 217 (there is no deadline for demonstrative exhibits). Moreover, the complete copy of the Bayoumi party video upon which the exhibits were based was produced by the MPS in December 2023.[17]

---

[17] The March 2022 MPS production included incomplete video footage of the February 2000 welcome party, "cut" into separate DVD files, which Plaintiffs analyzed, transcribed, and translated. Adams initially worked from the March 2022

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER

### E. Usman Madha was already disclosed as a fact witness and his Declaration remains firmly within the scope of his prior testimony.

Saudi Arabia claims that Plaintiffs did not argue that Madha was a "known witness" in their papers, KSA Opp. at 12, yet that fact was already established in Saudi Arabia's motion. ECF No. 9500 at 3. Madha was the sole available eyewitness who could identify persons and places on the Bayoumi videotapes and photographs. Saudi Arabia's failure to produce those materials denied Plaintiffs their right to question the four Saudi government officials featured in Bayoumi's April 1999 "Mana" event video and April-May 1999 photographs—Khalil, Bayoumi, Thumairy, and Soliman Al-Ali—about their meetings and the other attendees. ECF No. 9543, Ex. 11E. Saudi Arabia's claim that Madha's supplemental declaration went outside the scope of his initial declaration is unfounded.[18] The Court's striking of Madha's Declaration in these circumstances was clear and reversible error.

## CONCLUSION

Plaintiffs' motion for reconsideration should be granted and the stricken declarations allowed into the factual record. To the extent that reconsideration is denied, the District Court should consider and sustain Plaintiffs' objections.

---

version of the video footage to reconstruct the room and prepare his demonstrative exhibits. He then completed his work and finalized those exhibits upon receipt of the "uncut" version in the December 2023 MPS production. The December 2023 version comprises a single digital video file of 30 minutes, on which the footage runs in sequence, enabling 29 individuals to be identified through their introductions and other speech, and including ten sequences in which the hijackers Hazmi and/or Mihdhar are shown. By contrast, the March 2022 version comprised four separate DVD files, none longer than 15 minutes, on which the footage was "cut" at multiple points, duplicated, and produced out of sequence. The March 2022 version cannot accurately be described as "show[ing] substantially all of the gathering," KSA Opp. at 17, because it omitted vital footage including multiple introductions of individuals, a speech identifying Bayoumi ("Abu Emad") as the "General Supervisor," and the clearest view of hijacker Khalid Al Mihdhar walking through the main room, right in front of the camera. These images and more, cumulatively amounting to about one sixth of the total footage of the February 2000 party, were produced for the first time in December 2023. Ex. 10K at 18:57 *et seq*, 20:22, 27:18.

[18] *Compare* ECF No. 9541, Ex. 72 (Madha Decl.) with *id.*, Ex. 27 (Madha Supp. Decl.), both of which identify the scope of Madha's knowledge deriving from his work for the Islamic Foundation of Sheikh Ibn Taymiyah during the same 15-year period (1998-2013), his attendance and familiarity with the clergy and congregants at the same two mosques (Ibn Taymiyah Mosque in Los Angeles and King Fahad Mosque in Culver City), and his personal interactions with the same Saudi officials including Khalil and Thumairy.

Dated:  March 1, 2024                                  Respectfully submitted,

| MOTLEY RICE LLC | COZEN O'CONNOR |
|---|---|
| By: /s/ Robert T. Haefele<br>Robert T. Haefele<br>Jodi Westbrook Flowers<br>Donald A. Migliori<br>28 Bridgeside Boulevard<br>Mount Pleasant, South Carolina 29464<br>Tel.: (843) 216-9184<br>Email: rhaefele@motleyrice.com<br><br>*Liaison Counsel and Co-Chairs for the Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs* | By: /s/ Sean P. Carter<br>Sean P. Carter<br>Stephen A. Cozen<br>Scott Tarbutton<br>One Liberty Place<br>1650 Market Street, Suite 2800<br>Philadelphia, Pennsylvania 19103<br>Tel.: (215) 665-2105<br>Email: scarter@cozen.com<br><br>*Co-Chairs and Liaison Counsel of the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs* |

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
James Gavin Simpson
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

FILED UNDER SEAL SUBJECT TO MDL PROTECTIVE ORDER