PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT SHAHIR
ABDULARAOOF BATTERJEE

1. The name of the defendant to whom this Statement pertains is Shahir Abdularaoof Batterjee. The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**Q**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Shahir Abdularaoof Batterjee conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself. Shahir Abdularaoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Shahir Abdularaoof Batterjee conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Shahir Abdularaoof Batterjee, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Shahir Abdularaoof Batterjee fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Shahir Abdularaoof Batterjee, and illegal activity to generate material support to continue its terrorist operations.

c. Shahir Abdularaoof Batterjee was not an employee, officer or director of the Enterprise, based upon present information available. Shahir Abdularaoof Batterjee is associated with the alleged Enterprise. Shahir Abdularaoof Batterjee is a member of the Enterprise, and is separate and distinct from the Enterprise. Shahir Abdularaoof Batterjee intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

Page 4

7. The pattern of racketeering activity conducted by Shahir Abdularoof Batterjee is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Shahir Abdularoof Batterjee funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Shahir Abdularoof Batterjee, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.  Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Shahir Abdularoof Batterjee acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

Page 5

organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Shahir Abdularaoof Batterjee, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Shahir Abdularaoof Batterjee, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Shahir Abdularaoof Batterjee, of both those goals and the uses to which the Funds were put.

    b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and

helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Shahir Abdularaoof Batterjee.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Shahir Abdularaoof Batterjee.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Shahir Abdularaoof Batterjee.    Shahir Abdularaoof Batterjee, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Shahir Abdularaoof Batterjee  conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Shahir Abdularaoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Shahir Abdularaoof Batterjee also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Shahir Abdularaoof Batterjee are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Shahir Abdularaoof Batterjee has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Shahir Abdularaoof Batterjee conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Shahir Abdularaoof Batterjee conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

## Batterjee and Triple-B Trading

21. Defendant Triple-B Trading GmbH,[1] of Rethwisch, Germany ("Triple-B"), is owned by Defendant Abdul-Matin Tatari, who also owns the Hamburg, Germany,

---

[1] Specific misconduct regarding Triple-B Trading GmbH ("Triple-B"), a co-defendant herein, is provided via More Definite Statement Applicable to Triple-B Trading GmbH.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Triple-B,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

firm Tatex Trading GmbH, together with other major shareholders Defendants Mazin M.H. Bahareth and Batterjee, and Hassan Bahtzallah. All of these wealthy Saudis are linked to Defendant Enaam Mahmoud Arnaout, a co-defendant in this action.

22. Shahir Batterjee is listed also as an owner of Triple-B.

23. Defendant Arnaout, a co-defendant in this case, the Chief Executive Officer of Defendant Benevolence International Foundation ("BIF"), a co-defendant in this case, was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds.

24. The two other owners of Triple-B Trading are Mazin Mohammed Bahareth, a co-defendant in this action, listed as Benevolence International Foundation's, a co-defendant in this case, treasurer, and a top executive of the Bahareth Organization, a Saudi construction conglomerate and Hassan Bahfzallah, a co-defendant in this action, who oversaw BIF's Saudi Arabia operations in the early 1990's and is listed as an official in three northern Virginia charities that were raided in March 2002 by federal agents probing alleged ties to al Qaida.

25. Abdul Matin Tatari[2] is listed as Triple-B's managing director.

26. Corporate records show that Batterjee family's holdings in the Middle East and Europe are vast and highly diversified, reporting annual sales well into the hundreds of millions of dollars from real estate, computers, supermarkets, hospitals, health-care products, pharmaceuticals, medical equipment, hotels and even an ice cream factory.  By contrast, the family's German outpost, Triple-B Trading, consists of one employee (Adbul Matin Tatari) and about $25,000 in capital, according to records on file in the neighboring state of Schleswig_Holstein, where Triple-B was incorporated in 1995 as an exporter of food, clothing and industrial equipment.

**Batterjee and Tatari**

27.  Abdul Matin Tatari told the *Chicago Tribune*  in November 2002 that he has known Shahir Batterjee for 15 to 16 years.

28. Defendant Triple-B has hired a number of persons associated with the September 11th hijackers. Hijacker Mohammed Atta was employed by Defendant Tatari for a period of time. Defendant Tatari is a member of the Syrian Brotherhood.

---

[2] Specific misconduct regarding Abdul Matin Tatari ("Tatari"), a co-defendant herein, is provided via More Definite Statement Applicable to Abdul Matin Tatari.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatari, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

29. Tatari said that he met Batterjee through Batterjee's father, Abdularaouf Ibrahim Batterjee, who heads a large Saudi company that imports medical equipment, and his uncle, Mohammed Ibrahim Batterjee, whose enterprises include Jeddah's Jumbo Ice Cream Factory.  He has known both elder Batterjee's since 1983.

30. Tatari acknowledged numerous business transactions between Tatex,[3] a co-defendant in this case, and the Batterjee family, including the sale to Mohammed Ibrahim Batterjee of a summer home near Rethwisch and 17 trucks to be used as "ice cream cars."

31. Batterjee visits Tatari three or four times a year on buying trips for German textiles that are exported to Saudi Arabia and used to make women's underwear for sale in the family's garment shops.

32. Tatari also told the *Tribune* that he buys textiles through Tatex and then sells them to Batterjee for a 10% commission, instead of using Triple-B partnership for mutual purchase/sale.

## Batterjee and Benevolence International Foundation ("BIF")

33. Shahir Batterjee is the scion of a wealthy Saudi family who was an officer and director of Benevolence International Foundation ("BIF"), a co-defendant in this action, when it was established in Palos Hills, Illinois,  office nearly a decade ago.

34. According to the Illinois Secretary of State, Batterjee and Adel Batterjee and Mazen Bahareth were listed as the foundation's incorporators and directors.

35. The Benevolence International Foundation (a/k/a Al Bir al DaWalia) (or "BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes.

36. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992.  BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingushetia.

37. It was originally founded in the 1980's by a wealthy Saudi Arabian national named Adel Abdul Jalil Batterjee, who was an associate of Osama bin Laden. Adel Abdul Jalil Batterjee later transferred control of the organization to the

---

[3] Specific misconduct regarding Tatex Trading GmbH ("Tatex"), a co-defendant herein, is provided via More Definite Statement Applicable to Tatex Trading GmbH.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Tatex,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 10

current Chief Executive Officer Enaam M. Arnaout (or "Arnaout"), a co-defendant in this case.

38. Within the United States, BIF's operations within the United States were headquartered in Illinois and run by senior al Qaida lieutenants Enaam Arnaout and Mohammed Laoy Bayazid, both founding members of the al Qaida movement. In the New York area, BIF was represented by Saffet Abid Catovich, a prominent leader of radical Islamic elements in Bosnia-Herzegovina.

39. Defendant Enaam Arnaout has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring al Qaida through diversion of charitable funds to sponsor al Qaida.

40. Additionally, Al Qaida members have held positions with BIF and this charity is one of the organizations utilized by al Qaida.

41. On December 16, 1994, Mohamad Jamal Khalifa, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Mohamad Jamal Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation (or "BIC") and the International Islamic Relief Organization (or "IIRO").[4] At the time of his travel, Mohamad Jamal Khalifa had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with Mohamad Jamal Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Mohamad Jamal Khalifa was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Mohamad Jamal Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money.

42. Mohamad Jamal Khalifa, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa.

43. Financial records obtained from Citibank indicate that in the four month period

---

[4] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

44. A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements: "Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands - Steeds of war projects."

45. The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

46. On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country.

47. BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

48. Defendant BIF has been deeply involved in financing, supporting, and facilitating al Qaeda terror operations through provision of money, equipment, and information, and by concealing and fabricating information and evidence concerning same.

49. Defendant BIF's involvement in support and financing for al Qaeda terrorist operations has been disguised as charitable activities.

50. BIF has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

51. BIF is an organization that al Qaida has used for logistical support, including the movement of money to fund international terrorist operations.

52. Enaam Arnaout has a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents.

53. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda have had

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

contacts with Benevolence International Foundation offices and personnel.

54. Benevolence International Foundation has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. Benevolence International Foundation made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

55. On December 14, 2001, searches were conducted of the offices of Benevolence International Foundation in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, Enaam M. Arnaout, removing materials from each place. According to a government witness, Enaam M. Arnaout was planning in March 2002, to leave for Jeddah, Saudi Arabia.

56. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking Benevolence International Foundation's assets and records, pending further investigation into BIF's ties to terrorists.

57. The Benevolence International Foundation is used by al Qaida for logistical support:  terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaida have contacts with the Benevolence International Foundation and its office personnel; and, Benevolence International Foundation has had direct dealings with al Qaida operatives, providing them with military and financial support.

58. In the mid to late 1980s, Defendant Enaam Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri,"  "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

59. Within that same time frame, Defendant Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden.  Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

60. Defendant Arnaout and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

61. BIF and Arnaout and co-conspirators used BIF's status as a charity and a tax-

exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

62. Arnaout and BIF co-conspirators kept secret from governments and the general public material facts about Defendant Arnaout's relationship with organizations engaging in violence, including al Qaeda and Osama Bin Laden.

63. BIF and Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities.

64. BIF and Arnaout and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

65. BIF and Arnaout and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaida, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

66. BIF and Arnaout and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

67. BIF and Arnaout engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

68. In or about 1992, Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami.

69. On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

70. In or about November 1995, Arnaout and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen.

71. Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

72. In or about May 1998, BIF and Arnaout facilitated the travel of an influential founding member of the al Qaida network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

73. In the latter part of the 1990's, with Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaida's majlis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

74. Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

75. In or about October 2001, Defendant Arnaout relayed to the BIF founder Adel Batterjee in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government and in particular the fact that Defendant Arnaout had been searched at the airport upon his return to the United States.

76. In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant Arnaout spoke via telephone to Adel Batterjee in Saudi Arabia, and Batterjee requested Defendant Arnaout to relocate with his family to Saudi Arabia.

77. On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country.

78. The documents recovered included documents established direct communication between Enaam Arnaout and Osama bin Laden and others in the late 1980's and

early 1990's.  The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

79. Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaida, including:

a. a chart of an organization involved in military activity headed by Osama Bin Laden;

b. notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

c. notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

d. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

e. a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

f. various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

g. various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

h. various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

i. a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons; and,

j. In or about late 2001 and early 2002, while the BIF Enterprise continued

Page 16

to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant Arnaout falsely and publicly stated that he did not know Osama Bin Laden personally, that Defendant Arnaout never fought against the Soviet Union, that Defendant Arnaout was never at the al Masada camp.

80. The federal raid of BIF's Illinois office uncovered the following additional documents confirming the scope and extent of BIF's sponsorship of al Qaida's efforts in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade for 300 blankets and 200 pairs of boots obtained from BIF; a receipt from the BiH Army dated June 3, 1994, for 2000 uniforms, 2000 pairs of shoes, and 10 "mass communication stations" donated by BIF to "this military unit;" a request dated December 31, 1994, from the Bosnian military for a combat ambulance, later delivered as promised in January 1995; and, a memorandum to BIF director Enaam Arnaout, dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army.

81. In March 2002, Bosnian police raided BIF's Sarajevo offices.  During the raid, investigators recovered extensive documentation relating to al Qaida's operations from BIF's computer system, including internal al Qaida documents detailing the contributions of various individuals and purported charities to the terrorist organization's development and expansion.  As is discussed in greater detail in the U.S. government's Santiago proffer in the Arnaout prosecution, the computer system housed a file labeled "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  BIF also maintained scanned documents in a voluminous "Tareekh al Musadat" file, detailing the history of al Qaida's Al Masada training camp, as well as an "Al Jabal" file containing daily reports of activities at the Al Jabal camp, operated by the al Qaida affiliated Hizb e Islami. Federal Insurance 99.

82. The documents contained within the aforementioned files confirm the long term and global participation of BIF, MWL, Rabita Trust, and other purported charities in al Qaida's support infrastructure.

83. Within the Tareekh Osama file, investigators also uncovered a document called the "Golden Chain." According to officials of the U.S. government, this document is "a list of people referred to within al Qaida" as wealthy donors to the al Qaida movement.  Among the individuals identified in the Golden Chain as al Qaida's principal sponsors are defendants Suleiman al-Rashid, Abdulkader al Bakri a/k/a Abdel Qader Bakri, Bakr Bin Laden, Youseff Jameel, Ibrahim Muhammad Afandi, Saleh Abdullah Kamel, Suleiman Abdulaziz al Rajhi, Mohammad bin Abdullah al-Jomaih, Abulrahman Hassan Sharbalty, Ahmed Mohamed Naghi, Khalid Bin Mahfouz Adel Faqih a.k.a Abdel Qader Faqeeh, Salahuddin Abduljawad a/k/a Salah al-Din Abdel Jawad, Ahmad Turki Yamani a/k/a Ahmed Zaki Yamani, Abdul Hadi Taher, Ahmad al Harbi Mohammed al-Issai, Hamad al

Hussaini, Mohamed Omar and al Kuwait.

84. On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

85. On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

86. Enaam M. Arnaout conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the mail fraud and wire fraud; in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

87. Enaam M. Arnaout for the purpose of executing a scheme to defraud knowingly caused an envelope containing a donation check in the amount of $1,620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465.

88. Enaam M. Arnaout for the purpose of executing a scheme to defraud, knowingly caused an envelope, containing a donation check in the amount of $1,000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465.

89. Enaam M. Arnaout for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey; in violation of Title 18, United States Code, Sections 1343 and 2..

90. Co-conspirators, aiders and abettors of the Benevolence International Foundation (a/k/a al-Birr al-Dawalia), include Defendants: Benevolence International Foundation – U.S.A. (Main Office), Benevolence International Foundation – U.S.A. (East Coast Office), Benevolence International Foundation – Canada,

Syed Suleman Ahmer, Enaam Mahmoud Arnaout (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Adel Baterjee, Zahir H. Kazmi, Muzaffar Khan, Soliman J. Khudeira, and Jamal Nyrabeh, all located, doing business or registered to do business in the United States.

91. On January 6, 2003, federal prosecutors filed a Santiago proffer in the criminal prosecution of Enaam Arnaout.  The evidentiary proffer details at length the pervasive involvement of BIF, and of its executives and employees, in sponsoring al Qaida's global operations, describing the provision of material support and sponsorship to al Qaida as BIF's "core mission."

92. As set forth in greater detail in the Santiago proffer, BIF materially supported al Qaida and al Qaida affiliated militants in Afghanistan, Sudan, Bosnia-Herzegovina, Chechnya and other areas. For a period of more than 15 years, BIF representatives used the cover of their employment with BIF to shield their direct involvement in providing material support to Osama bin Laden, al Qaida, Gulbuddin Hekmatyar and Hezb e Islami.  The support provided by BIF included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to al Qaida fighters, and sponsoring al Qaida camps throughout the World.

93. BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor al Qaida's activities.

94. Defendant BIF is tightly connected with WAMY,[5] a co-defendant in this action, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaida network.

95. In 1991, Osama bin Laden decided to relocate al Qaida's leadership structure and principal training camps to the Sudan, under the protection of the ruling National Islamic Front regime.  Al Qaida remained in Sudan for a period of five (5) years, during which it worked closely with the National Islamic Front, the Sudanese Intelligence Service, and the Popular Defense Force.

---

[5] Specific misconduct regarding World Assembly of Muslim Youth, ("WAMY"), a co-defendant herein, is provided via More Definite Statement Applicable to World Assembly of Muslim Youth.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

96. When the al Qaida leadership structure relocated to Sudan in 1991, BIF immediately opened an office in the Sudan, to support al Qaida in its new location. BIF's sponsorship of al Qaida in the Sudan mirrored how it had worked with al Qaida in Afghanistan prior to 1991.

97. In 1992 the al Qaida leadership, including Osama bin Laden, made a strategic decision to become deeply involved in the ongoing ethnic conflict in the Balkan region, in order to establish relationships and a base of operations to support future al Qaida attacks in Europe. Towards that objective, al Qaida sent its mujihadeen fighters to Bosnia, to train and fight alongside members of the Bosnian Muslim Army.

98. From the outset, BIF played a pivotal role in al Qaida's efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to al Qaida affiliated fighters in Bosnia. BIF facilitated the movement of hundreds of al Qaida mujihadeen fighters into the region, by falsely representing to authorities that those terrorists would be working as BIF relief workers.

99. Within the Muslim world, BIF made little effort to conceal its support for al Qaida's operations in Bosnia. In its Arabic language fundraising appeals, BIF advertised itself as a "trustworthy hand for the support of [both] the Mujahideen and refugees" in Bosnia. Similarly, documents recovered during a federal raid of BIF's Illinois office in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations in support of Jihad in Bosnia/Herzegovina…contribute with your Mujahideen brothers to repel the Crusader/Zionist attack on Muslim lands."

100.    In conjunction with the March raid of BIF's regional headquarters in Sarajevo, discussed above, Bosnian police detained its manager, Munib Zahiragic, a former intelligence officer affiliated with the Bosnian Foreign Ministry.

101. Zahiragic turned over secret documents regarding al Qaida activities in Bosnia, including transcripts of communications between BIF management and senior commanders of al Qaida based in Afghanistan. The Bosnian officials also discovered firearms, ski masks, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Osama bin Laden during the raid.

102. BIF played an equally important role in the infrastructure supporting al Qaida's activities in Chechnya. Recognizing that the best way to transfer supplies into Chechnya was through Azerbaijan, BIF established a branch office in Baku, Azerbaijan to serve as a conduit for military supplies to al Qaida militants in Chechnya. Al Qaida lieutenant Saif ul Islam al Masri (a/k/a Abu Islam al Masri) served as BIF's charge d'affaires in the Chechen capital of Grazni, at the end of the supply chain. Saif ul Islam was a member of al Qaida's military committee

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc

and had graduated from an expert training course in explosives conducted by the Iranian backed Hezbollah terrorist group in Southern Lebanon. Saif also trained Somali Muslim militiamen to shoot down U.S. helicopters during the United Nations' humanitarian mission in the Horn of Africa in the early 1990s. His passport photograph was recovered during a search in 1997 of Kenyan residents suspected of belonging to a local al Qaida cell. During this time period, Saif was in direct contact via telephone from Baku with the Kenyan terrorist cell led by Wadih el Hage, who was responsible for relaying messages between Saif ul Islam in the Caucuses and the military committee of al Qaida in Afghanistan, which included Muhammed Atef and Osama bin Laden.

103. Within Chechnya, BIF provided material support to al Qaida fighters supporting the Chechen mujihadeen in the form of anti-mine boots, an x-ray machine, military uniforms and cash, in direct contravention of governing United Nations resolutions.

104. BIF engaged in extensive efforts to cover the nature of its operations within the United States from the public, going so far as to draft separate mission statements for internal and external purposes. While the external drafts portray BIF as a pure relief agency, the internal documents make clear that BIF's primary mission was the support of jihad and al Qaida mujihadeen.

105. Enaam Arnaout spoke with Munib Zahiragic while he was in the custody of Bosnian officials. During the conversation, Zahiragic advised Arnaout that the Bosnian officials had recovered various documents relating to al Qaida activities in Bosnia. Upon learning of the nature of the materials recovered in the raid, Arnaout ordered Zahiragic to conceal from authorities the involvement of other BIF representatives in the sponsorship of al Qaida activities, including Arnaout's own involvement.

106. BIF's U.S. arm used the U.S. financial system extensively to launder money for al Qaida and support its terrorist operations throughout the world. Between June 2000 and September 2001, members of the al Qaida movement transferred in excess of $1,000,000 via wire from an account at Union Bank at Switzerland to BIF's checking account in the United States. Those funds were co-mingled in BIF's checking account with donations the BIF Enterprise received from other sources and dispersed in large part to BIF offices overseas.

107. BIF substantially understated the amount of funds it received from the Swiss bank account it its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source.

108. Between January 4, 2000 and April 11, 2000, BIF sent 19 wire transfers from its checking account with Citibank to the bank accounts of Jordan Relief Association, MADLEE in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Lavia, to support al Qaida mujihadeen

fighters in Chechnya.

109. As the forgoing demonstrates, BIF has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

110. The September 11th Attack was a direct, intended and foreseeable product of BIF's participation in al Qaida's jihadist campaign.

111.      As the foregoing demonstrates, Shahir Abdularaoof Batterjee thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Shahir Abdularaoof Batterjee's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

112.      Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Q_SBatterjee - More Definite Statement - AL BAraka_b.doc