PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT RABITA TRUST

1. The name of the defendant to whom this Statement pertains is Rabita Trust. The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT U**

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

   a. The predicate acts and statutes in question include:

      - Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
      - Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
      - Fraud with Identification - 18 U.S.C. § 1028
      - Mail Fraud - 18 U.S.C. § 1341
      - Wire Fraud - 18 U.S.C. § 1343
      - Financial Institution Fraud - 18 U.S.C. §1344
      - Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
      - Money Laundering - 18 U.S.C. § 1957
      - Defrauding the United States Government - 18 U.S.C. § 371
      - Travel Act - 18 U.S.C. § 1952
      - Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
      - Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
      - Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

   b. In the Mid 1990's to September 11, 2002, Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Rabita Trust conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 2

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

    c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.  The predicate act is not based upon a criminal conviction.

    e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Rabita Trust, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

    a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

Page 3

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Rabita Trust fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Rabita Trust, and illegal activity to generate material support to continue its terrorist operations.

   c. Rabita Trust was not an employee, officer or director of the Enterprise, based upon present information available. Rabita Trust is associated with the alleged Enterprise. Rabita Trust is a member of the Enterprise, and is separate and distinct from the Enterprise. Rabita Trust intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Rabita Trust is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Rabita Trust funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Rabita Trust, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Rabita Trust acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Rabita Trust, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Rabita Trust, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Rabita Trust, of both those goals and the uses to which the Funds were put.

   b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

   c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

   d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Rabita Trust. Indeed, the Enterprise would not have been

Page 6

successful without enthusiastic participation of all of the conspirators, including Rabita Trust. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Rabita Trust. Rabita Trust, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Rabita Trust also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Rabita Trust are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in Plaintiff's Complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Rabita Trust has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Rabita Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Rabita Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. In 1998, Rabita Trust was created, as a charitable organization, in order to organize the repatriation and rehabilitation of stranded Pakistanis (known as Biharis) from Bangladesh.  It was based in Peshawar, Pakistan.  A trust fund was started jointly by the Pakistani government and the Saudi-based charity, Muslim World League ("MWL").[1]  Rabita Trust was mainly funded by MWL, a world-wide Islamic organization heavily funded by the Saudis, which has also been involved with terrorism.

22. Rabita Trust was initially granted 250 million Riyals from the Pakistani government as well as 50 million Riyals from the Muslim World League to help

---

[1] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via More Definite Statement Applicable to MWL.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis.

23. Rabita Trust is a subsidiary body of Muslim World League ("MWL") and a sister organization of International Islamic Relief Organization ("IIRO").[2] Rabita Trust is one of the charities operating within al Qaida's support infrastructure.

24. The Rabita Trust should not be examined in a vacuum but rather as part of a large network of organizations that provide a financial base for Osama Bin Laden and al Qaida. Rabita is a "sister organization" of the International Islamic Relief Organization (or "IIRO"); both are subsidiaries of the Muslim World League (or "MWL"). MWL has numerous connections to al Qaida operatives; indeed, Osama bin Laden's brother-in-law, Jamal Khalifa, opened a Muslim World League office in Pakistan and an IIRO office in the Philippines for the use of al Qaida. The IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

25. Therefore, it is through the actions not only of the Rabita Trust and its employees, but also those of both the MWL and the IIRO, that one can fully ascertain the extent to which the Rabita Trust is one cog in larger Al Qaida financing machine that funds Bin Laden's radical and intolerant agenda under the guise of humanitarian aid.

26. Rabita Trust is an al Qaida front. On October 21, 2001, President George W. Bush designated Rabita Trust as a Specially Designated Global Terrorist Entity by Executive Order #13224. This order effectively froze the assets of Rabita Trust. In October, 2001, the United Kingdom took steps against Rabita Trust to freeze their assets due to their terrorist ties and due to a belief that they committed or posed a significant risk of committing or providing material support for terrorism.

27. On July 8, 2002, United Nations Resolution 1390 banned Rabita Trust by the United Nations ("UN") based upon its ties to terrorism. In fact, the UN ordered that all members of the UN: 1) Freeze any funds and other financial assets or economic resources; 2) Prevent the entry into or the transit through their

---

[2] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, is provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 9

territories; and 3) Prevent the direct or indirect supply, sale and transfer of all arms and related material, spare parts and technical advice, assistance, or training related to military activities.

28. In October 2002, New Zealand named Rabita Trust as a designated terrorist. Rabita Trust has been banned by the UN, the United States, by Canada and by others, based upon their terrorist ties and due to a belief that they committed or posed a significant risk of committing or providing material support for terrorism.

29. In January 2004, the Senate Finance Committee asked the Internal Revenue Service ("IRS") for records on Rabita Trust, along with over two dozen other Muslim charities and organizations, in order to investigate possible links between non-governmental organizations ("NGO") and terrorist financing networks.

30. When one considers the number of top Rabita Trust executives that are actively involved in financing Al Qaida, such as Wael Julaidan, Abdullah al Obaid and Abdullah Omar Naseef,; as well the well established body of evidence against the IIRO and MWL, it is clear that the Rabita Trust's ties to Al Qaida are too widespread and intimate to be coincidental or unintentional.

31. Rabita Trust is headed by Wa'el Hamza Jalaidan who serves on the Board of Trustees on Rabita Trust, who serves as the Director General of Rabita Trust, and who headed MWL in Pakistan.

32. Wa'el Hamza Jalaidan was identified by the United States Treasury as "an associate of Osama bin Laden and several of bin Laden's top lieutenants," and was designated "as a person who supports terror" under Executive Order 13224. The United States and Saudi Arabia jointly took action to freeze his assets.

33. In a Treasury Department Statement press release, it was stated:

> "Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Usama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980's. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Laden lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.
>
> Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts

Page 10

> with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar.
>
> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."

34. According to an authoritative biography of bin Laden and the original members of al Qaida, the head of Rabita Trust, Wa'el Jalaidan, fought alongside Osama bin Laden and championed his cause. Detailing how al Qaida's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s, this account is noted for its accuracy and clarity. The biography, written by a fellow compatriot of bin Laden, noted: One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Jalaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan. These three: Osama bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Jalaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.

35. Wa'el Hamza Jalaidan is often referred to as a co-founder of the al Qaida. In the above statement by bin Laden, he strongly suggests that Jalaidan is a co-founder of the al Qaida.

36. Authorities claim that it was during his time in Peshawar that Jalaidan became involved with the individuals that would eventual evolve into al Qaida, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

37. Accordingly, Jalaidan was labeled as a SDGT on September 6, 2002, by President Bush and his assets were frozen.

38. Julaidan also has extensive links to al Qaida activity in Bosnia Herzogovinia. A BBC report in April 2000 cited a confidential memo sent to UN police forces in

Page 11

Kosovo titled "Secret: US office only-Release to UNMIK." The document named Rabita Trust/ MWL representative Wa'el Julaidan as an associate of Osama bin Laden and stated that Julaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

39. U.S counterterrorism investigators have discovered a letter under the MWL/IIRO letterhead among numerous al Qaida documents recovered in Bosnia-Herzegovina. The letter, dating from the late 1980's, summarized a meeting held between al Qaida leaders and representatives of Muslim charitable organizations in which the attendees ultimately agreed to launch "attacks" from MWL offices in Pakistan.

40. Rabita Trust is also connected to the SAAR network through two officers: 1) Dr. Abdullah Omar Naseef, and 2) Abdullah al-Obaid. Naseef founded Rabita Trust and currently is the chairman. During the time that Rabita Trust was created, Naseef also served as Secretary General of the Muslim World League. Naseef is an officer at the Makkah al-Mukarramah, Inc. at 555 Grove Street, Herndon, Virginia a non-profit organization.

41. The offices of the SAAR Network were raided by the FBI in March of 2002 because of their extensive ties to Osama Bin Laden and the al Qaida terrorist network.

42. Abdullah al-Obaid. Obaid is president of the MWL, and an officer at Sanabel al-Kheer. He is also the Deputy General Manager at al-Watania Poultry, the largest business of the Al Rajhi family.[3] The Al Rajhi family is known as a large funder of the SAAR network and other NGO's which assisted and aided terrorism.

43. Al-Rajhi and his family have played a central role in financing Osama Bin Laden's terrorist network. They have provided substantial aid to al Qaida through the Co-Defendant Al-Rajhi Banking & Investment Corporation as well the above mentioned SAAR Foundation.

44. Abdullah Omar Naseef (or "Naseef") served as Secretary-General of the Muslim World League during the time he created Defendant Rabita Trust and has attempted to spread Muslim World League offices around the world. Part of his global efforts are found in his involvement in a SAAR Network charity. Naseef is

---

[3] Specific misconduct regarding Sulaiman Abdul Aziz Al Rajhi ("Sulaiman"), the head of the Al Rajhi family and the Al Rajhi businesses, a co-defendant herein, is provided via More Definite Statement Applicable to Sulaiman Abdul Aziz Al Rajhi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sulaiman, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 12

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\U_Rabita Trust - More Definite Statement - AL BAraka.doc

an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization that is under investigation for its ties to al Qaida

45. Rabita Trust is also closely linked to Osama Bin Laden through Mohammed Jamal Khalifa, brother in law of Osama bin Laden and MWL/IIRO employee. As with Julaidan, Khalifa emerged as a facilitator of terrorism during the Soviet/Afghan war. After the Soviet withdrawal, Khalifa used the MWL and the IIRO to aid Al Qaida in its transition from a local insurgency into a global terrorist operation.

46. Khalifa set up an IIRO chapter in the Philippines in Zamboanga City through which al Qaida was able to instigate and fund militant Muslims in the region. More specifically, IIRO helped facilitate the growth of the Moro Islamic Liberation Front (MORO) as well as the Abu Sayyaf Group (ASG), a co-defendant in this action. According to a former ASG member, less than 30% of IIRO's funds went towards legitimate endeavors while the rest was used to buy weapons and equipment for ASG.

47. While in the Philippines, the IIRO provided material assistance to al Qaida's efforts to plan and implement attacks in and against the United States, including the 1993 WTC bombing as well as plots to destroy the Brooklyn Bridge, the Lincoln Tunnels, assassinate the Pope, and blow up 12 American airlines over the Pacific Ocean.

48. Upon his arrest in San Francisco in December 1994, Khalifa was in possession of several incriminating items that link him to WTC bombers Ramzi Yousef and Wali Khan Amin Shah:

> *"he (Khalifa) had Wali Khan's beeper number in his phonebook as well as in his electronic organizer. Khalifa also had: (i) an entry for a number in Pakistan which Yousef had called from Manila; (ii) an entry from the cellular telephone of an associate of Wali Khan and Yousef (which Yousef also had in his phonebook) and (iii) an entry for Usama Bin Laden. Khalifa also possessed documents referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that Wali Khan and others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year."*

49. Ramzi Yousef, the al Qaida operative who was the mastermind behind the WTC bombing in 1993, was also in possession of several items indicating that he was in contact with Khalifa:

Page 13

> *"his (Ramzi) phonebook had a listing for Khalifa...Kahn had provided him with the business card of Khalifa in case he needed help...Yousef had a listing for 'Khalifah' in both his encrypted computer file and in his telephone/address book. The encrypted log also contained a Post Office box for Mohammed Khalifah in Lebanon. Yousef's encrypted phone book listed the telephone number of Khalifa's charity."*

50. In addition, Walker states that Omar Abdel Rahman, the leader of an al Qaida linked terrorist organization named Al Gamaa al Islamia, had in his possession upon his arrest a "business card for Mohammad Jamal Khalifa." Rahman was eventually convicted for conspiring to destroy the Brooklyn Bridge and the Lincoln Tunnel.

51. The IIRO was also implicated in the 1998 Embassy bombings in Kenyan and Tanzania. Wadih El-Hage, a former personal secretary to bin Laden, had several IIRO business cards in his domicile at the time of his arrest in Kenya. The cards are labeled "Kingdom of Saudi Arabia" below the IIRO's name. Among those listed on the IIRO business cards are:

- Hussian Ali Al-Ghanam, labeled "the Jubail Area Manager & Africa Consultant."

- Abdulnassir S. Osman, the "Orgn. Office Executive Manager—Kenya."

- Abdullah Mohammed Al Sagheer, on the "External Projects Committee."Sagheer's card also displays "Muslim World League above IIRO's name.

52. El-Hage's IIRO business cards were in distinguished company, as El-Hage's domicile also contained business cards for several other charities that have strong ties with al Qaida. El-Hage had contact information and business cards for the Benevolence International Foundation, a Saudi charity that the U.S. government believes to have direct ties to al Qaida. Also in his possession were business cards from Al-Haramain,[4] a Saudi charity of which the U.S. designated two of its branches terrorist entities. In addition, El- Hage had business cards for Help African People and the above mentioned Mercy International—both of whom were directly involved in financing the bombings in East Africa. Shortly after the bombings, the Kenyan government cancelled the registration of Mercy

---

[4] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 14

International, Al-Haramain, Help African People, the Muslim World League (IIRO) and the Abdul Aziz Al Ibrahim Foundation.

53. On January 7, 1999, a Bangladeshi national by the name of Sayed Abu Nasir, a member of the U.S. designated terrorist group Lashker-e-Taiba. Lashker-e-Taiba that is closely associated with al Qaida, was arrested in India with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S. Plot in India is Foiled in the January 21, 1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO/IRO in Asia.

54. Although it can not be proven that Nasir received orders directly from Al-Gamdin, it is clear that Nasir worked for the IIRO in India and that he attended an IIRO meeting at which Al-Gamdin was also present.

55. One of the most explicit condemnations of the IIRO occurred during a deportation hearing for Mahmoud Jaballah in Canada in 2002.

56. Jaballah worked for the IIRO in Pakistan for three years prior to working as the principal of the Um Al Quara Islamic School in Toronto.

57. In December 2001, Jaballah was deported from Canada as a result of his involvement with al-Jihad, a terrorist outfit that was led by Ayman al-Zawhiri, al Qaida's second in command. More specifically, the Canadian government proved that Jaballah's fingerprints matched those of Mahmoud Said, "an Egyptian member of Al Jihad wanted for document forging, bomb making and other terrorist activities."

58. A French Intelligence report released shortly after 9/11 lists the IIRO as an al Qaida financer and makes specific mention of the IIRO's UK office and its affiliations with Islamic radicals:

> *"The last category of backers that Al Qaeda can count upon for support are welfare organizations. The financial report pointed a finger chiefly at the International Islamic Relief Organization (IIRO), which was also mentioned in the Jordanian intelligence memo.... "IIRO works out of 3 Worchester Street in Oxford in the U.K. It collects money and distributes the funds it raises to Rabita Alam Islami, the Saudi Islamic League [Muslim World League] that operates in 90 countries, including Chechnya and Bosnia, with a 5 billion budget."*

59. 3 Worchester Street is the same address as the International Development Foundation (IDF), a charity heavily affiliated with Defendant Khaled bin

Page 15

Mahfouz. Mahfouz has ties to al Qaida through the National Commercial Bank,[5] the Pathfinder Group and the Muwafaq Foundation.

60. The IIRO office is in Britain was shut down in 1997 and British authorities concluded that the IIRO did perform legitimate humanitarian operations in England; however, given the connection to Mahfouz and the IDF, IIRO's financial activities in the UK were most likely associated with al Qaida.

61. The Benevolence International Foundation (BIF), a co-defendant in this action, was classified as a Specifically Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002 and its assets were frozen the following winter. The IIRO is tied to BIF's illegal activities through both Khalifa's personal contacts as well as its branch in Canada.

62. BIF's Executive Director in the United States, Enaam Arnaout, a co-defendant in this action, was implicated in 2002 in an FBI affidavit as having "a relationship with Usama bin Laden and many of his key associates dating back more than a decade." The affidavit also maintains that "BIF is an organization that al Qaida has used for logistical support, including the movement of money to fund its operations." Arnaout has been arrested and BIF's assets have been frozen.

63. In his affidavit, Special Agent Walker notes the close connection Khalifa had with senior BIF leadership. Upon his arrival in the United States in 1994, Khalifa was traveling with BIF employee and former Arab-Afghan fighter Mohammad Bayazid. Bayazid is an associate of al Qaida operative Jalaiden. In the East Africa bombing trial, a former member of al Qaida recalled how he once went with Bayazid to receive a cylinder of purported uranium.

64. The Canadian Branch of IIRO retains its own ties to al Qaida. Mohammed Khatib is the Director of IIRO in Canada. The Canadian chapter of BIF was co-founded by Khatib and the above mentioned Arnaout. Khatib became the Executive Director of BIF-Canada while continuing to work as an employee of IIRO and the Muslim World League. After BIF-USA's assets were frozen, BIF-Canada claimed its affiliation with BIF's US branch did not extend beyond their shared name. BIF-Canada, however, solicited donations for BIF-USA, as its website provided a direct link to a pledge form on the site run by BIF's U.S. office. In addition, BIF-USA's website listed BIF-Canada as its sister organization.

65. Therefore, the IIRO was officially linked to BIF's-USA office through its head officer in Canada as well as through Khalifa's own personal contacts.

---

[5] Specific misconduct regarding National Commercial Bank ("NCB"), a co-defendant herein, is provided via More Definite Statement Applicable to NCB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 16

66. No one element, no one accusation of funding is taken as being determinative of the assessment that the Rabita Trust has been providing support to terrorists through its actions. Rather, when considering the number of sources, number activities and length of time, the totality of evidence provides reason to believe that Rabita Trust, in cooperation with the IIRO, the MWL, and the SAAR Foundation, has knowingly funded an Al Qaida.

67. As the foregoing demonstrates, Rabita Trust thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Rabita Trust's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

68. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

Page 17