PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY")

1.  The name of the defendant to whom this Statement pertains is World Assembly of
    Muslim Youth ("WAMY").  The alleged misconduct and basis for liability is set
    forth below as well as elsewhere in the Complaint, as amended.

2.  All known wrongdoers are named as defendants in this action, as well as the
    defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
    al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
    (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
    Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
    Plaintiffs will separately file Statements with respect to the misconduct of the
    other defendants.  Given the vastly complicated nature of the conspiracy and other
    wrongdoing that led to the events of September 11, 2001, however, much
    information is unavailable to plaintiffs, and the identities of other wrongdoers
    may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the
    right to amend this Statement as information is learned and verified and after
    discovery or other information is obtained.

3.  The name of each victim can be found on the More Definite Statement, Victims
    List ("Victims List").  The victims consist of (1) all spouses, children, parents,
    siblings, or heirs of any individual who died at the World Trade Center in New York,
    NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
    Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
    (with the events at the World Trade Center in New York, N.Y., the Pentagon
    Building in Arlington County, Virginia, and the airliner crash in Shanksville,
    Pennsylvania, on September 11, 2001, and activities related thereto, collectively
    referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
    (including executors, estate administrators and trustees) entitled to bring legal action
    on behalf of any individual who died as the result of terrorist attacks on September
    11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
    and legal representative of individuals identified by the Attorney General of the
    United States or otherwise shown to have perpetrated, aided and abetted, conspired in
    regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The
    Victims List sets forth the names of the decedents killed by the attackers, with the
    category of "victims" further including their spouses, children, parents, siblings or
    heirs as set forth above.

4.  The manner in which the victims were injured consists of death, suffering caused by
    death, and all economic damages resulting from such deaths, and actions of the
    defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**Y**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, WAMY conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 2

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including WAMY, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

Page 3

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. WAMY fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including WAMY, and illegal activity to generate material support to continue its terrorist operations.

c.  WAMY was not an employee, officer or director of the Enterprise, based upon present information available. WAMY is associated with the alleged Enterprise. WAMY is a member of the Enterprise, and is separate and distinct from the Enterprise. WAMY intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by WAMY is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by WAMY funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by WAMY, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. WAMY acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

Page 5

a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including WAMY, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including WAMY, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of WAMY, of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like WAMY.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including WAMY.  In order to identify nineteen individuals willing, able

Page 6

and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by WAMY.  WAMY, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. WAMY also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

17. The federal causes of action against WAMY are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. WAMY has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. World Assembly of Muslim Youth (WAMY) is a multi-national organization which hasbeen at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

22. In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

## II. WAMY'S ORGANIZATIONAL STRUCTURE

23. Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League (MWL).[1] Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization (IIRO),[2] and Rabita Trust.[3] Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC).

24. Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia.

---

[1] Specific misconduct regarding Muslim World League. ("MWL"), a co-defendant herein, has been provided via More Definite Statement Applicable to MWL. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] pecific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, has been provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[3] Specific misconduct regarding Rabita Trust, a co-defendant herein, has been provided via More Definite Statement Applicable to Rabita Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.[4]

25. The Kingdom extensively supervises and controls WAMY's activities. On the macrolevel, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.

26. Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

> If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within – there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

---

[4] Specific misconduct regarding Al Haramain Islamic Foundation. ("Al Haramain"), a co-defendant herein, has been provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

27. The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

## III. THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

28. Osama bin Laden's al Qaida organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaida's terrorist activities garner the most attention, terrorist attacks represent but one of many vehicles through which al Qaida seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaida views the confrontation with the West to have two distinct, but equally important fronts:(1) cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

> The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad – The Various Threats From Radical Islam to the Democratic Legal Order,* General Intelligence and Security Service of the Netherlands, December 2004.

29. As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaida engages in militant and violent operations throughout the World. Al Qaida's military activities are by no means limited to terrorist attacks.  In fact, in establishing al Qaida, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaida's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaida has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaida's participation in these regional conflicts takes many forms. Al Qaida provides funding and logistical assistance to local extremist organizations, in support of their military and terrorist activities. In addition, al Qaida deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.

30. Through its military activities in these "regional" conflicts, al Qaida aims to establish and support radical Islamic regimes, a critical component of al Qaida's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaida's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:[al Qaida] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.  The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic(predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

*Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report").

31. Al Qaida also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the

organization's image among local Muslim communities, and represent an integral component of al Qaida's ongoing recruiting and fundraising efforts. Al Qaida's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West. In fact, several of the September11 hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaida's growth and development cannot be overstated. Perhaps more than any other factor, al Qaida's participation in these "regional" conflicts has enabled al Qaida to extend its sphere of influence throughout the globe.

## IV. WAMY'S ROLE IN ADVANCING THE AL QAIDA MOVEMENT

32. For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

33. Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

34. The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians

Worldwide, February 15, 1996.  The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!

35. Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaida movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaida's cultural assault on the United States and democratic institutions throughout the world.

36. Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere. WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups. Through these criminal activities, WAMY has further helped al Qaida to expand its sphere of influence throughout the globe.

37. WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….

The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

"Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times*, December 5, 1992.

38. Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11,2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

39. In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….

Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service(FSB)].

According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…

Page 15

Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS*, May 19, 2000.

40. Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

> 1998 Defense Department Report.

41. By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" *U.S. Links bin Laden to Chechnya, MSNBC.com*, August 15,1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control. *Id.*

42. Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY

Page 16

has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1. The question that must be asked is: What do the Chechen Muslims need from us today?

2. *The need money to buy arms and ammunition. (emphasis supplied)*

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory. *The Chechen Tragedy –*

*The Reality and the Required Role*, Dr. Maneh al Jahari, *al Jazeera*, January 15, 2000.

43. Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

44. Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19,1999 article in the *Australian General News*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News*, January 15,1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism – 1999*, United States Department of State, April 2000.

45. Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida

activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips*, December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizbul Mujahideen, three violent jihadist groups operating under the broader al Qaida umbrella. *See SIMI: Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q: In your conferences, you have openly eulogized Osama bin Laden.
>
> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World. *SIMI: Nursery of Hate, India Today*, April 2, 2001.

46. In March of 2003, al Qaida military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safe house in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

47. WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online*, December 9, 2002.

48. That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The*

*Tyrants*," was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

49. Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida.

50. Despite the increased scrutiny of WAMY's operations following the September 11thAttack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad.

51. In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar*, June 11, 2002.

52. In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire*, September 5, 2003.

53. Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist

organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.[5] *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury*, Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005.

## V. WAMY'S KNOWLEDGE

54. For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11, 2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

55. In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

56. Given the close ties between WAMY's senior leadership and high level officials of the Kingdom, it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the

---

[5] Under Congressional procedures, the full transcript of this hearing will not be available for approximately five months. Plaintiffs believe that the full transcript may contain further details regarding WAMY's involvement in the sponsorship of al Qaida and other fundamentalist organizations, and reserve their right to supplement the record with a copy of that transcript as soon as it is available.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\Y_WAMY - More Definite Statement - AL BAraka.doc

Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th. During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from1997 forward.

57. The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well.

58. A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, *whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals*…." (emphasis supplied). The *International Convention for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack.

59. In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and

ideological support to al Qaida and affiliated groups, for a period of many years leading up to the September 11thAttack.

60. As the foregoing demonstrates, WAMY thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

61. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

Page 22