PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT KHALID BIN MAHFOUZ
A/K/A KHALED BIN MAHFOUZ

1. The name of the defendant to whom this Statement pertains is Khalid Bin
Mahfouz ("Mahfouz"). The alleged misconduct and basis for liability is set forth
below as well as elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*
(SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re
Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
Plaintiffs will separately file Statements with respect to the misconduct of the
other defendants. Given the vastly complicated nature of the conspiracy and other
wrongdoing that led to the events of September 11, 2001, however, much
information is unavailable to plaintiffs, and the identities of other wrongdoers
may be revealed through discovery or otherwise. Plaintiffs therefore reserve the
right to amend this Statement as information is learned and verified and after
discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims
List ("Victims List"). The victims consist of (1) all spouses, children, parents,
siblings, or heirs of any individual who died at the World Trade Center in New York,
NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
(with the events at the World Trade Center in New York, N.Y., the Pentagon
Building in Arlington County, Virginia, and the airliner crash in Shanksville,
Pennsylvania, on September 11, 2001, and activities related thereto, collectively
referred to herein as "Attack" or "Attacks"); and (2) all legal representatives
(including executors, estate administrators and trustees) entitled to bring legal action
on behalf of any individual who died as the result of terrorist attacks on September
11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings,
and legal representative of individuals identified by the Attorney General of the
United States or otherwise shown to have perpetrated, aided and abetted, conspired in
regard to, or otherwise supported the terrorist attacks of September 11, 2001. The
Victims List sets forth the names of the decedents killed by the attackers, with the
category of "victims" further including their spouses, children, parents, siblings or
heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**PLAINTIFF'S EXHIBIT**

**AE**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Mahfouz conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 2

    c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d. The predicate act is not based upon a criminal conviction.

    e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Mahfouz, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

    a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Mahfouz fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Mahfouz, and illegal activity to generate material support to continue its terrorist operations.

c. Mahfouz was not an employee, officer or director of the Enterprise, based upon present information available. Mahfouz is associated with the alleged Enterprise. Mahfouz is a member of the Enterprise, and is separate and distinct from the Enterprise. Mahfouz intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Mahfouz is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Mahfouz funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Mahfouz, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Mahfouz acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.   The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Mahfouz, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Mahfouz, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Mahfouz, of both those goals and the uses to which the Funds were put.

    b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and

conspirators like Mahfouz.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Mahfouz.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Mahfouz.  Mahfouz, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Mahfouz also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency,

loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Mahfouz are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Mahfouz has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Mahfouz conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Mahfouz conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Khalid Bin Mahfouz is one of the wealthiest businessmen in Saudi Arabia.

22. National Commercial Bank ("NCB") was founded in 1950 by Salim bin Mahfouz, Khalid's father.  After Salim's death in 1986, Khalid became President and CEO.

23. From 1986 to 1999, Mahfouz was the President and CEO of the National Commercial Bank ("NCB").[1]  During that time, Mahfouz was also the principal shareholder, with over fifty percent (50%) interest and control over NCB.

---

[1] Specific misconduct regarding NCB, a co-defendant herein, is provided via More Definite Statement Applicable to National Commercial Bank ("NCB") and NCB's Entities.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to NCB and NCB's entities, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

24. NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City.

25. NCB was directly involved in the fraudulent schemes and practices of BCCI between 1986 and 1990.

26. While under Mahfouz's control, NCB served as a primary vehicle for channeling financial support to Osama bin Laden and al Qaida.  In this regard, former CIA Chief of Counter-terrorism Vincent Cannistraro testified as follows during a congressional hearing in October 2001:

> How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups?  Several businessmen in Saudi Arabia and in the Guld contribute monies.  Many of these contributions are given out of a sense of Islamic solidarity.  But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked.  There is little doubt that a financial conduit to bin Laden was handled until the Saudi government finally arrested a number of persons and closed down the channel.  It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism.

27. A bank audit of NCB was conducted in 1998.  This audit revealed that over a ten (10) year period of time, the period in which Mahfouz was President and CEO, that about $74 million was funneled by its *Zakat* Committee to the International Islamic Relief Organization (IIRO).[2]  The audit also found irregularities due to "unreported expenses and loans."  It stated that "without knowledge to the Zakat Committee, NCB Directors established over the years credit and loan facilities that were not reviewed by the Committee."  Direct donations were sent through NCB to the Red Crescent Saudi Committee, the International Relief Organization and Muwaffaq Foundation."  These money transfers were discovered in April 1999, after the royal family ordered an audit of NCB and its founder and former chairman, Mahfouz.

---

[2] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement Applicable to International Islamic Relief Organization ("IIRO").  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

28. In or about 1998, the NCB opened a two "shared account" with Al Rajhi Banking and Investment Corp.[3] (Special Joint account #22 and 33) for IIRO as a member of the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC). The SJRC served as a vehicle for funneling donations to al Qaida fighters in Kosovo and Chechnya.  These accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998, indicating that they were established to launder funds in support of al Qaida activities in Kosovo and Chechnya.

29. According to a November 22, 1999 British intelligence report, the Saudi Arabian Royal family used NCB to channel funds to Osama bin Laden.  In the fall of 1999, Reuters and USA Today quoted US intelligence sources stating an NCB audit conducted that $3 million was diverted to al Qaida through the bank from five of Saudi Araia's prominent business leaders' accounts.  The transactions were laundered through accounts at NCB in the name of Blessed Relief Foundation (A/k/a Muwafaq Foundation ) and al Qaida charity front founded by bin Mahfouz and E.O. 13224 designee Yassin al Kadi.

30. NCB also provided facilities for a fundraiser to finance families of the "heroes of the "Palestinian uprising" sponsored by the IIRO in 2000.

31. Mahfouz founded the Muwaffaq Foundation a/k/a Blessed Relief Foundation, an alleged charity organization, a co-defendant in this action and a supporter of Osama Bin Ladin.

32. Bin Mahfouz was dismissed from NCB in 1999, soon after the audit revealed the bank's extensive involvement in sponsoring al Qaida.  This audit report pointed to a $3 million transfer to the Muwaffaq Foundation, or "Blessed Relief."

33. Mahfouz remains a shareholder in NCB (10%), along with his wife, Maila Abdulaziz Kaaki (10%) and their sons (16% for both Abdulrahman and Sultan).

34. In October 13, 2001, the United States Government declared the Muwaffaq Foundation as a front for the al Qaida.

35. In 1991, Muwaffaq Ltd.was founded and financed by the Mahfouz family in the isle of Man, a tax haven.  Its backers were named as a group of Saudi investors

---

[3] Specific misconduct regarding Al Rajhi, a co-defendant herein, is provided via More Definite Statement Applicable to Al Rajhi.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Al Rajhi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

from Jeddah.  The same year, Muwafaq Foundation was established in Sudan, with Yasin al Qadi.[4]

36. Abdulrahman Bin Khalid Bin Mahfouz, son of Mahfouz, was named Director of the Muwafaq Foundation, while simultaneously serving as a member of the board and Vice Chairman of the Executive Management Committee of  NCB. Abdulrahman Bin Khalid bin Mahfouz acknowledged in an interview with Forbes Magazine that Muwafaq Foundation was the "brainchild" of his father "who funded it with as much as $30 million."

37. At the time they established Muwafaq Foundation, Yasin al Qadi and Mahfouz intended for it to serve as a vehicle for funding and otherwise supporting terrorist organizations, including al Qaida.

38. The assets of Muwafaq Foundation and those of its chairman Yasin al Qadi were frozen on October 12, 2001 by the US Treasury Department pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

39. The governments of the United Kingdom, Turkey, Kazakhstan, Albania, Slovenia, and Switzerland have also followed suit.

40. The US authorities described Yasin Al Qadi as a "terrorist" and Muwafaq Foundation as an organization that "financially supports terrorism" and "funnels money to the al Qaeda terrorist network."

41. Additionally, members of the board of the Muwaffaq Foundation are listed in the United States Treasury Department Office of Foreign Assets Control, "Specially Designated Nationals and Blocked Persons" list.

42. In an November 29, 2001 letter to Swiss authorities requesting that the Swiss government block al Qadi's assets by the Treasury Department General Counsel David Aufhauser summarized the Muwaffaq Foundation's pervasive sponsorship of al Qaida as follows:

> The leader of the terrorist organization Al Gama'at Al Islamiya, Talad Fuad Kassem, has said that the Muwaffaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia.  The foundation also operated in Sudan, Somalia and Pakistan, among other places.

---

[4] Specific misconduct regarding Al Qadi, a co-defendant herein, is provided via More Definite Statement Applicable to Al Qadi.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

A number of individuals employed by or otherwise associated with the Muwaffaq Foundation have connections to various terrorist organizations.

Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TFI) in the United Kingdom, was associated with the Muwaffaq Foundation personnel in Bosnia and other TIF members worked at the Muwaffaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwaffaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al Faran terrorist group responsible for the kidnapping of Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwaffaq Foundation offices and held its local director in custody for several months. The Muwaffaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.

They also employed or served s cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK), which has been partially financed by the Muwaffaq Foundation. Muwaffaq Foundation supplied identity cards and employment as cover for some Arabs to allow them to obtain visas to remain in Pakistan. The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the dissolution of MK in early June 2001 and its absorption into Al Qaida, a number of NGOs formerly associated with MK, including Muwaffaq Foundation also merged with Al Qaida.

Mr. Kadi has asserted in various press interviews that the Muwaffaq Foundation ceased operations at a range of different times in 1995, 1996, or 1997. However, the United Nations reported that Muwaffaq Foundation was active in Sudan as late as 1997. Moreover, far from ceasing operations, the U/N/ report stated that the" Muwaffaq Foundation plans to continue to expand its humanitarian activities in the coming year…" US Department of Humanitarian Affairs, Consolidated Inter-Agency, Appeal for Sudan January-December 1997 (Feb. 18, 1997)

From 1993, the head of the European offices of the Muwaffaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate. Ayadi Chaliq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mahammas

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Depositna Banka in Sarajevo Bosnia, which was owned by Mr. Kadi. Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United Stated in the months preceding the attack.

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qadi and other terrorist organizations. Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and training terrorist cells. Their provision of humanitarian aid and educational services is done in concert with the terrorist to win the hearts and minds of the local people to whatever causes the terrorists espouse. When a region becomes more settled, such as Bosnia or Albania today, seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist organizational activity. Mr. Kadi's actions and those of his Muwaffaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.

43. On October 29, 1999, USA Today quoted a senior United States intelligence official who stated that wealthy business men, among them Mahfouz, were paying Osama Bin Ladin 'protection money' to stave off attacks on their businesses in Saudi Arabia. Intelligence officials said that, during that time, Mahfouz was placed under "house arrest" at a military hospital in the Saudi city of Taif.

44. Mahfouz has been identified as a principal financier of the Al Qaida and has made substantial contributions to many of the alleged charities operating within Al Qaida's infrastructure, with full knowledge that those funds would be used to support the operations of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. For example, Mahfouz is listed on the "Golden Chain" as a donor. The "Golden Chain" is a list of the top wealthy financial supporters of the Al Qaida. This document was seized by the Bosnian police during searches in the offices of the Benevolence International Foundation in Sarajevo in March 2002. This document was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirators Statements" in the case of United States v. Arnaout filed on January 29, 2003. Additionally, this list was mentioned in the indictment of Enaam Arnaout (02 CR 892), a co-defendant in this action. According to the United

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

States government, this document is a "list of people referred to within Al Qaida as the "Golden Chain", wealthy donors to mujahadeen efforts."

45. The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See <u>Final Report f the 9/11 Commission</u>, Note 21 to Chapter 2.  The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, an din fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224.  See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee available at:

> http://www.treas.gov/press/releases/js2164.htm

46. Between 1986 and1990, bin Mahfouz was Chief Operating Officer of Bank of Credit and Commerce International (BCCI), and one of that bank's principal shareholders.  Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA) rapidly spread to become a vast fraudulent empire.

47. Under Mahfouz, BCCI actively participated in a variety of criminal endeavors, including the sponsorship of terrorism, as reported by the United States Senate.  In particular, investigations by the CIA and US Senate directly implicated BCCI in the laundering of drug money, manipulation of financial markets, arms trafficking, and in handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

48. The 1992 US Senate Report on the BCCI Affair also linked the bank to financial funding of the Afgan war.

> BCCI may have been moving money through the National Bank of Oman to fund the was in Afghanistan.  The bank's role began to surface in the mid-1980's (…).  This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying "It was Arab money that was pouring through BCCI.  The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Omam, where BCCI owned 29%.

49. According to the Senate Report, BCCI's support of terrorism and arms trafficking developed out of several factors.

> First, as a principal financial institution for a number of Gulf sheikdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\AE_bin Mahfouz, Khalid - More Definite Statement - AL BAraka.doc

then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

50. On July 1, 1992 Mahfouz was indicted in New York for his role in BCCI's criminal activities. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct by Mahfouz. Mahfouz paid over $200 million in fines to avoid further prosecution.

51. As the foregoing demonstrates, Mahfouz thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Mahfouz's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

52. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.



BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232


Page 15