# EXHIBIT U

# Estate of Robert M. Roth

# VCF Documentation



September 11th
Victim Compensation Fund

July 9, 2018

TRESA PETTIJOHN
C/O ANDREW CARBOY
LAW OFFICES OF ANDREW J. CARBOY LLC
ONE LIBERTY PLAZA 23RD FLOOR
NEW YORK NY 10006

Dear TRESA PETTIJOHN:

The September 11th Victim Compensation Fund ("VCF") has reviewed your Eligibility Form. You submitted an Eligibility Form on behalf of ROBERT ROTH. Your claim number is VCF0077658. Your Eligibility Form was determined to be substantially complete on July 06, 2018. As stated in the Regulations and on the claim form, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit on behalf of the decedent and his or her survivors.

**The Decision on your Claim**

The VCF has determined that the decedent has met the eligibility criteria established in the statute and regulations. Based on the information you submitted and information the VCF has received from the World Trade Center ("WTC") Health Program, the decedent has been found eligible for the following injuries:

- MALIGNANT NEOPLASM - MULTIPLE MYELOMA

Please note that there are several reasons why an injury that you think should be eligible is not listed above. For non-traumatic injuries, the name of the injury is based on the information provided by the WTC Health Program and there may be different names for the same injury. Additionally, your injury may not be listed if it was only recently certified for treatment by the WTC Health Program.

If in the future the WTC Health Program should notify you that a condition previously found eligible is no longer certified, you must inform the VCF as this may affect your eligibility status and/or the amount of your award.

**What Happens Next**

**If the decedent was certified for treatment by the WTC Health Program for a condition not listed above**, you should amend your claim. Please see the VCF website for details on how to amend your claim. The VCF will review the new information and determine if it provides the basis for a revised decision.

**If you believe the decedent had eligible injuries not treated by the WTC Health Program** and you would like the VCF to consider those injuries before calculating the amount of any compensation, you should amend your claim. If you choose to amend your claim, you will need



September 11th
Victim Compensation Fund

to use the VCF Private Physician process. The Private Physician process is a way for the VCF to gather the required information about the decedent's treatment in order to process your claim. All forms are available on the VCF website under "Forms and Resources." The website also includes detailed information and instructions on the Private Physician process.

**If the decedent did not have injuries other than those listed above,** you should submit your Compensation Form and required supporting materials. If you have already submitted your Compensation Form, you do not need to take any action at this time unless you receive a request from the VCF for missing information. The VCF will calculate the amount of any compensation based on the conditions listed above after all compensation-related documents are submitted.

If you have questions about the information in this letter or the claims process in general, please call our toll-free Helpline at 1-855-885-1555. For the hearing impaired, please call 1-855-885-1558 (TDD). If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: TRESA PETTIJOHN



September 11th
Victim Compensation Fund

March 20, 2019

TRESA ROTH
C/O ANDREW CARBOY
ANDREW J. CARBOY LAW OFFICES
ONE LIBERTY PLAZA 35TH FLOOR
NEW YORK NY  10006

Dear TRESA ROTH:

The September 11th Victim Compensation Fund ("VCF") has reviewed your claim for compensation.  Your claim number is VCF0077658.  Your Compensation Form was determined to be substantially complete on February 21, 2019.  This means your claim was deemed "filed" for purposes of section 405(b)(3) of the Statute on that date.

Based on the information you submitted, the VCF has calculated the amount of your eligible loss as **$1,214,887.38**.  This determination is in accordance with the requirements of the Reauthorized Zadroga Act.  The enclosed "Award Detail" includes a detailed explanation of the calculation and a list of the eligible conditions included in this determination.

**Please note:** The VCF completed the substantive review of your claim prior to February 25, 2019, and the amount of your award was **not** impacted by the Special Master's determination that the VCF's funding is insufficient to compensate all pending and projected claims.  Additional information about the determination of funding insufficiency and the changes that became effective on February 25, 2019, can be found at https://www.vcf.gov/fundinginsufficiency.html.

The VCF policy regarding compensation for past out-of-pocket medical expenses requires that the claim for medical expenses must be submitted as a compensation amendment to your claim after you have received your initial award determination.  As a result, the VCF did not consider your claim for medical expense loss at this time.  You may still seek compensation for medical expenses you have paid out-of-pocket by filing an amendment if your claimed, documented out-of-pocket expenses exceed the $5,000.00 minimum threshold established by the VCF.  The policy regarding medical expense loss can be found in the "Policies and Procedures" document under "Forms and Resources" on the www.vcf.gov website.  The website also includes detailed instructions on how to amend your claim, and the specific documentation that is needed when claiming out-of-pocket medical expenses.

According to the Department of Labor's Office of Workers' Compensation Programs, benefits are payable to Mr. Roth's children under the Federal Employee Compensation Act. Mrs. Roth's eligibility for benefits under FECA was terminated by her remarriage. This award calculation offsets the amount by which the Roth children's FECA benefits exceed the vested pension Mr. Roth had earned as of March 2008.

The Federal Employee Retirement System pension Mr. Roth would have received had he continued in federal employment to the FBI's mandatory retirement age would have been



September 11th
Victim Compensation Fund

greater than the vested pension he had earned at the time of his death. This pension loss is compensated as part of the award. The lost earnings and benefits calculation also accounts for the Thrift Savings Plan contribution and healthcare benefits Mr. Roth would have continued to receive through federal employment.

In light of the evidence regarding Mr. Roth's devotion to his children, the standard number of hours VCF uses to calculate replacement services for child care and guidance have been tripled.

No non-routine legal service expenses are approved for reimbursement for this claim.

As the Personal Representative, you are required to distribute any payment received from the VCF on behalf of the victim to the eligible survivors or other recipients in accordance with the applicable state law or any applicable ruling made by a court of competent jurisdiction or as provided by the Special Master.

**What Happens Next**

The VCF will deem this award to be final and will begin processing the payment on your claim unless you complete and return the enclosed Compensation Appeal Request Form within **30 days from the date of this letter** as explained below.  If you do not appeal, the Special Master will authorize the payment on your claim within 20 days of the end of the 30-day appeal period.  Once the Special Master has authorized the payment, it may take up to three weeks for the United States Treasury to disburse the money into the bank account designated on the VCF ACH Payment Information Form or other payment authorization document you submitted to the VCF.

- **Appealing the Award**:  You may request a hearing before the Special Master or her designee if you believe the amount of your award was erroneously calculated or if you believe you can demonstrate extraordinary circumstances indicating that the award does not adequately address your claim.  **If you choose to appeal, your payment will not be processed until your appeal has been decided**.

To request a hearing, you must complete and return the enclosed Compensation Appeal Request Form **and** Pre-Hearing Questionnaire no later than **30 calendar days** from the date of this letter.  The VCF will notify you in writing of your scheduled hearing date and time and will provide additional instructions to prepare for your hearing.  If both forms are not submitted with complete information within 30 days, you have waived your right to appeal and we will begin processing your payment.

- **Amending your Claim**: You may amend your claim in the future if your circumstances change and you have new information to provide to the VCF.  For example, you may amend if the WTC Health Program certifies additional physical conditions for treatment, if you have information in support of your claim that was not submitted to the VCF when your award was determined and that you believe would affect the amount of your award, or if you have incurred additional economic loss due to an eligible condition.  The VCF will review the new information and determine if it provides the basis for a revised decision.  Please see the VCF website for additional details on how to amend your claim and the specific



September 11th
Victim Compensation Fund

circumstances that may be appropriate to request an amendment.

- **Notifying the VCF of new Collateral Source Payments**: You must inform the VCF of any new collateral source payments you receive, or become entitled to receive, such as a change to your disability or survivor benefits, as this may change the amount of your award. If you notify the VCF within 90 days of learning of the new collateral source payment, your award will not be adjusted to reflect the new entitlement or payment. If you notify the VCF more than 90 days after learning of the new or revised entitlement or payment, the VCF may adjust your award to reflect the new payment as an offset, which may result in a lower award. If you need to notify the VCF of a new collateral source payment, please complete the "Collateral Offset Update Form" found under "Forms and Resources" on the www.vcf.gov website.

Your award was calculated using our published regulations, and I believe it is fair and reasonable under the requirements of the Reauthorized Zadroga Act. As always, I emphasize that no amount of money can alleviate the losses suffered on September 11, 2001.

If you have any questions, please call our toll-free Helpline at 1-855-885-1555. For the hearing impaired, please call 1-855-885-1558 (TDD). If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: TRESA ROTH


September 11th
Victim Compensation Fund

## Award Detail

Claim Number:     VCF0077658
Decedent Name:    ROBERT ROTH

| PERSONAL INJURY CLAIM (Losses up to Date of Death) | |
|---|---|
| **Lost Earnings and Benefits** | |
| Loss of Earnings including Benefits and Pension | $0.00 |
| Mitigating or Residual Earnings | $0.00 |
| **Total Lost Earnings and Benefits** | **$0.00** |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Disability Pension | $0.00 |
| Social Security Disability Benefits | $0.00 |
| Workers Compensation Disability Benefits | $0.00 |
| Disability Insurance | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Lost Earnings** | **$0.00** |
| | |
| **Total Lost Earnings and Benefits Awarded** | **$0.00** |
| | |
| **Other Economic Losses** | |
| Medical Expense Loss | $0.00 |
| Replacement Services | $0.00 |
| **Total Other Economic Losses** | **$0.00** |
| | |
| **Total Economic Loss** | **$0.00** |
| | |
| **Total Non-Economic Loss** | **$250,000.00** |
| | |
| **Subtotal Award for Personal Injury Claim** | **$250,000.00** |



September 11th
Victim Compensation Fund

| DECEASED CLAIM (Losses from Date of Death) | |
|---|---|
| Loss of Earnings including Benefits and Pension | $2,433,594.00 |
| | |
| Offsets Applicable to Lost Earnings and Benefits | |
| Survivor Pension | ($768,508.48) |
| SSA Survivor Benefits | ($631,674.00) |
| Worker's Compensation Death Benefits | $0.00 |
| Other Offsets related to Earnings | ($1,000.00) |
| Total Offsets Applicable to Loss of Earnings and Benefits | ($1,401,182.48) |
| | |
| Total Lost Earnings and Benefits Awarded | $1,032,411.52 |
| | |
| Other Economic Losses | |
| Replacement Services | $214,325.00 |
| Burial Costs | $12,045.55 |
| Total Other Economic Losses | $226,370.55 |
| | |
| Total Economic Loss | $1,258,782.07 |
| | |
| Non-Economic Loss | |
| Non-Economic Loss - Decedent | $250,000.00 |
| Non-Economic Loss - Spouse/Dependent(s) | $600,000.00 |
| Total Non-Economic Loss | $850,000.00 |
| | |
| Additional Offsets | |
| Social Security Death Benefits | ($255.00) |
| Life Insurance | ($643,075.69) |
| Other Offsets | ($197,500.00) |
| Total Additional Offsets | ($840,830.69) |
| | |
| Subtotal Award for Deceased Claim | $1,267,951.38 |



September 11th
Victim Compensation Fund

| Subtotal of Personal Injury and Deceased Claims | $1,517,951.38 |
|---|---|
| PSOB Offset | ($303,064.00) |
| Prior Lawsuit Settlement Offset | $0.00 |
| Previously Paid Personal Injury Award | $0.00 |
| TOTAL AWARD | $1,214,887.38 |
| | |
| Factors Underlying Economic Loss Calculation | |
| Annual Earnings Basis (without benefits) | $120,907.00 |
| Percentage of Disability attributed to Eligible Conditions - applicable to Personal Injury losses | |
| Start Date of Loss of Earnings Due to Disability - applicable to Personal Injury losses | |

| Eligible Conditions Considered in Award |
|---|
| Malignant Neoplasm - Multiple Myeloma |

# Family Member Affidavits

Alexa A. Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X      **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                                 **ALEXA A. ROTH**


                                           Plaintiffs,               21-CV-01394 (GBD)(SN)


                       V.


ISLAMIC REPUBLIC OF IRAN,

                                           Defendant.
-------------------------------------------------------------- X

STATE OF TEXAS              )
                           : SS
COUNTY OF HARRIS            )


        ALEXA A. ROTH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
2030 Chantilly Lane, Houston, Texas 77018.

        2.      I am currently 28 years old, having been born on September 25, 1994.

        3.      I am the daughter of Decedent, Robert Roth, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My father passed away from multiple myeloma on March 16, 2008, at the age of
44. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.    FBI Special Agent Robert M. Roth was my father. He was my biggest cheerleader, role model, and confidant. He and I spent countless hours working on home renovation projects, finishing basements, joining family friends in deck remodels, ensuring we had the best grass on the block, etc. We often spent time practicing soccer to enhance my game, landing me with some of the most elite teams in the northern Virginia area for years. We always joked and laughed. We studied long division, read the Bible every night, tracked the stock market in the Washington Post, jammed out to every genre of music under the sun, and cheered on the Redskins and the University of Virginia football team every weekend we could. The ways he impacted me in the 13 years I had with him are more than I can put into an affidavit. I have now renovated my own home, watch my own stock market portfolio, continue to be involved in my church, listen to all kinds of music - but mostly his, am still involved in a soccer organization, watch college football every weekend I can, and volunteer with the homeless - all because he taught me how. There are few things that I do now that are not a direct reflection of who my father was and how he taught me to be.

6.    On September 11, 2001, my dad was a special agent for the FBI stationed at Washington Field Office in Washington, D.C. He was working on the Evidence Response Team (ERT). He was at the Pentagon from 9/11-9/28. I recall him coming home days into the investigation, coming round to the back door, immediately taking his clothes off at the back door and coming in to shower. I remember him saying it was so dirty and it smelled terrible, and he didn't want to bring it into the house. I was 6, almost 7.

7.    After a family run/bike ride, my dad thought he pulled his hip flexor. After no improvement, my dad went to the doctor for the pain. The doctors made him sit down because he

had no hip socket left and he was a walking miracle. His femur should have punctured through his dissolving hip socket, and he should have died. He was diagnosed with cancer on my birthday, September 25th, 2006. We talked about it that night as a family at the foot of my parents' bed. They went in for a hip replacement shortly after finding out. Not too long after, they discovered that this cancer was more serious than initially thought. He had stage 4 multiple myeloma. John's Hopkins didn't give him long to live. It was discovered that the University of Arkansas for Medical Sciences had a better life expectancy. We went there for treatment. Because we were homeschooled, we often traveled together as a family. There were several times that one of my siblings would get sick and my mom would have to leave. Often going to stay with her mom in Missouri, a few hours away. I stayed with dad and went to doctors' appointments and treatments, becoming the primary caregiver if needed. The vomiting, pain, and overall state of his condition were hard to watch as a 12-year-old. I now know that I only knew and understood half of it. My dad went into remission at some point in the summer of 2007 before relapsing in late 2007. He was flown to the hospital in Arkansas with north of 150 bone lesions. He remained in the hospital from mid-December to late January 2007. He went on hospice in March of 2008 and died shortly after.

8.    I can't think of many times where the void isn't felt from missing my dad. In high school, I often went to my games alone because my mom couldn't be everywhere all at once. I was missing my biggest cheerleader and coach. I drove my dad's truck, teaching myself how to drive a stick shift, practicing and practicing so I didn't mess it up in front of kids at school. I sobbed and sobbed in the pouring down rain when I couldn't figure out how to change my wiper blades but couldn't see to drive to my next destination and didn't feel like I had anyone to call. Post-grad moved me, knowing my dad would have been there and my mom couldn't split her time. I could

have saved thousands of dollars if my dad was still alive with in-home renovations. I continually

sobbed and walked around in a dark fog knowing he could have been my biggest help and he wasn't

here. I'm getting married in September 2023. I have completely changed the configuration of my

wedding knowing and dreading the continual void I'll feel all day. I had some of the darkest blues

I've had in years for about a month after getting engaged. I never dreamed of a wedding day like

my friends did, knowing mine would feel so different. Outside of the bride and groom, the bride's

dad is one of the most important people on a wedding day. It makes my eyes get teary and my throat

close knowing he isn't here and my fiancé, and future kids will never know the best human I've

ever had the pleasure of knowing. The hole left in my heart will never be the same and it impacts

me in every aspect of life.

ALEXA A. ROTH

Sworn before me this

20 day of Sept, 2023

Notary public

DANA LYNN CARDWELL
Notary ID #126050841
My Commission Expires
April 27, 2027

Camryn B. Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X     **AFFIDAVIT OF**
EVELYN BETSO, et al.,                          **CAMRYN B. ROTH**


                                Plaintiffs,    21-CV-01394 (GBD)(SN)

            V.

ISLAMIC REPUBLIC OF IRAN,

                                Defendant.
------------------------------------------------------------- X

STATE OF VIRGINIA        )
                         : SS
COUNTY OF PRINCE

WILLIAM                  )


        CAMRYN B. ROTH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
12244 Sherborne Street, Bristow, Virginia 20136.

        2.      I am currently 24 years old, having been born on March 11, 1999.

        3.      I am the daughter of Decedent, Robert Roth, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My father passed away from multiple myeloma on March 16, 2008, at the age of
44. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.      My dad was an FBI agent throughout my childhood before he died the week I turned nine years old. I vividly remember how much he strove to be fully present on my birthday from his hospital bed, even though he passed away only five days later. I also have many memories of him taking my siblings and neighbor kids on bike rides to get ice cream the summer before he died when in remission.

6.      I was two and a half years old on 9/11. I have no recollection of it but know that my dad was at the Pentagon from September 11th to the 28th in 2001. He helped recover the airplane's black box, rummaged through the debris, and protected as many civilians as he could. This is my extent of knowledge of what occurred during that time because I was so young.

7.      My father was diagnosed with multiple myeloma in September of 2006 and underwent remission in 2007. I cannot say there was an onset because we had no idea what was happening; we just watched his body deteriorate rapidly. The illness attacked him quickly and changed everything for us. He would travel to Arkansas with my mother to undergo treatment for weeks on end. Sometimes my four siblings and I would tag along for the trip, and sometimes the five of us would stay with my aunt in Virginia. He declined so swiftly, but one would have never guessed it from his demeanor. It is horrible to watch a parent wither before you, especially one with so much life for him. My dad was a healthy man. He often went on daily runs and helped mow our neighbor's lawn. It was exceedingly difficult to watch life drain from his eyes.

8.      My father's death changed the trajectory of our lives. He and I planned to vacation in Israel for my sixteenth birthday and often talked about what I wanted to do when I grew up. I loved going on bike rides with him for ice cream, especially because of the philosophical discussions we shared during these bike rides. I have much to be grateful for because of the incredible father I had. I cannot help but feel that he died in his prime because he lived life to the

fullest and still had so much to look forward to.

9.      We never went to Israel. He will not walk me down the aisle. He missed all five high school graduations for his children. He never got to see me grow up. He never even saw me complete the third grade.

_____
CAMRYN B. ROTH

Sworn before me this

3 day of October 2023

Notary public

MAURICE PRINGLE
Notary Public · State of Florida
Commission # HH 175002
My Comm. Expires Sep 12, 2025
Bonded through National Notary Assn.

Haley R. Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X     **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                **HALEY R. ROTH**


                                    Plaintiffs,       21-CV-01394 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------- X
STATE OF TENNESSEE        )
                          : SS
COUNTY OF
WILLIAMSON                )

      HALEY R. ROTH, being duly sworn, deposes and says:

      1.    I am a plaintiff in the within action, am over 18 years of age, and reside at 5782 Stone Brook Drive, Brentwood, Tennessee 37067.

      2.    I am currently 26 years old, having been born on January 30, 1997.

      3.    I am the daughter of Decedent, Robert Roth, upon whose death my claim is based, and submit this Affidavit in connection with the present motion for a default judgment and in support of my solatium claim.

      4.    My father passed away from multiple myeloma on March 16, 2008, at the age of 44. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.     The decedent is my dad. He was a special agent in the FBI and a first responder to the Pentagon. We found out he had a month to live on my eleventh birthday. My birthday is on January 30th; he passed a month and a half later, on March 16th. That year he had been in Little Rock, Arkansas, seeking treatment. He knew that would be the last birthday we would spend together. He did everything he could to come home and spend that day with me despite how weak and sick he felt. Before he was diagnosed with cancer, he was very active. He would often go on runs and we would bike behind him. We spent a lot of time outside together. We made habitats for our animals and the turtles I would catch. He once created a huge zip line for us and all the neighbors. He was involved in anything and everything he could be and was always our biggest supporter.

6.     On September 11th, I was four years old. I remember being in the basement of our house watching an educational show when my mom ran downstairs in distress and changed the channel. I thought she was upset with me. She gathered my siblings and I together and said something awful had happened. Later that day, a woman from our church dropped by the house to tell us our dad was okay. He asked a person leaving the Pentagon site to stop by our church and have someone get word to our family that he was safe. He stayed on-site at the Pentagon from September 11th to September 28th.

7.     My dad was very active before he got sick. One day he was out running when his hip started to hurt. When the pain continued and he visited a doctor to find out the cause of his pain, we discovered that cancer had eaten his entire hip ball. From then on, he fought for mental clarity and time with his family. There was a point in treatments when he could not clearly remember who everyone was. His sickness drastically changed our whole family. My aunt, who also has five children, helped watch my siblings and me while my parents traveled to treatment centers across the country.

8.      My dad was the sole provider for our family, but he was so much more than that. He was a handyman, a man of God, a man always ready for an adventure. There are many things I do now that I know my dad would be doing with me or helping me with, like building a headboard, fixing a leak in my ceiling, and resolving problems with the car. He never saw me graduate. He will never meet my future husband. He will never meet my children or share the same adventures with them that he had with me. It is impossible to describe what he has missed out on in life and what I have had to figure out on my own not having him around.

HALEY R. ROTH

Sworn before me this

3ᵈ day of October, 2023

Notary public

Jonathan Alexander Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                              03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X   **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                              **JONATHAN ALEXANDER**
                                                                   **ROTH**

                                  Plaintiffs,      21-CV-01394 (GBD)(SN)

                    V.

ISLAMIC REPUBLIC OF IRAN,

                                  Defendant.
-------------------------------------------------------------- X

STATE OF NORTH CAROLINA)

                           : SS
COUNTY OF WAKE)

        JONATHAN ALEXANDER ROTH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
8809 Barleymoor Drive, Raleigh, North Carolina 27615.

        2.      I am currently 51 years old, having been born on September 1, 1972.

        3.      I am the brother of Decedent, Robert Roth, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My brother passed away from multiple myeloma on March 16, 2008, at the age of
44. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.      Bobby was my oldest brother. He was, and continues to be, a role model. I remember him daily. He was selfless in his chosen career in law enforcement. More importantly, he was a good father and husband. I looked up to him my entire youth. He exhibited a true role model of what I wanted to become as a father, particularly on his deathbed as he professed his faith in Christ to his children. The faith he had in the Lord was outstanding. His utmost wish in life was for the children to see Christ the way he himself saw Christ. Despite the trials and tribulations of his severe condition, he was at peace with it and encouraged his family to be at peace too.

6.      Bobby was on site at the Pentagon building from September 11, 2001, through September 28, 2001, collecting evidence from a very dirty event. He was in the impact area with limited protection, even though the air quality in the area was evidently dangerous and unhealthy.

7.      We were shocked to discover that Bobby became ill rapidly at such a young age. It was unheard of. His life drastically changed because he could not spend time with his wife and five children the way he used to before the onset of the illness. He sought treatment out of state at the Multiple Myeloma Institute in Little Rock, Arkansas, and was often on the road with his wife. I travelled with Bobby to Arkansas for treatments so his wife could remain with their five young children in Virginia. I made sure he was safe, secure, and isolated from people for fear of infection.

8.      My brother's death was a devastating event for all of us, particularly for me because I lost the man I strove to be like. It has made me try to be deliberate when interacting with his children. I can never replace Bobby, but I can act as an authority figure and an occasional surrogate father to his children. I know he wished he was given more time with his children. The loss of a father impacted the children, particularly Alexa because she was his eldest daughter and shared a close bond with him. Her recent wedding day was beautiful but a difficult occasion nonetheless

because Bobby was not there to walk her down the aisle. His sons replaced him, and while it was lovely to see them accompany her, it was not the same. My brother should have been the one to walk Alexa down the aisle. The implications of the results of September 11th continue to last to the present day.

9.      The loss of my brother at such a young age must be noted. It feels like a waste of a life that had gone really well up to that time. I continue, however, to keep my faith in Christ the way Bobby used to and remind myself that we must make peace with whatever comes to us. I try my best, but it is truly difficult to do so.

_JONATHAN ALEXANDER ROTH_

Sworn before me this

_13_ day of _October_, 2023

Notary public

Comm. Exp.
09-26-2027

ALEXANDRIA NGUYEN
NOTARY
PUBLIC
WAKE COUNTY, N.C.

Jonathan R. Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                      03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X      **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                              **JONATHAN R. ROTH**


                                  Plaintiffs,          21-CV-01394 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                  Defendant.
------------------------------------------------------------- X

STATE OF VIRGINIA)
                         : SS
COUNTY OF PRINCE

WILLIAM)


        JONATHAN R. ROTH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
12244 Sherborne Street, Bristow, Virginia 20136.

        2.      I am currently 21 years old, having been born on October 27, 2001.

        3.      I am the son of Decedent, Robert Roth, upon whose death my claim is based,
and submit this Affidavit in connection with the present motion for a default judgment
and in support of my solatium claim.

        4.      My father passed away from multiple myeloma on March 16, 2008, at the age of
44. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.      My father, Robert Martin (Bob) Roth, was my father, FBI agent, best friend, and the person with whom I have shared the fondest memories of my life. On a typical weekday, he would come home to see me sitting in the front yard waiting for him. We ate dinner as a family every night and played a fun game or watched a movie, and then he would read us a Bible story before bedtime. My dad often had tasks around the house during most weekends, so I was always up early to assist with the yard work or completion of the basement. He often took all of us kids on bike rides, hikes, and any other activity that allowed him to spend time with us.

6.      On September 11th, my father was employed as an FBI Agent serving on the Evidence Response Team. That morning, he was in Quantico, Virginia, completing qualification shooting at an FBI training facility. He rushed to the Pentagon to respond as soon as he received a phone call stating it was attacked. He remained there for the following eighteen days to work and respond accordingly.

7.      I vividly remember waiting at the top of the stairs in the foyer for my father to come home from his doctor's appointment. When he walked through the door, he looked at me with the utmost concern as he called for my mother to tell her about the news regarding his cancer diagnosis. My siblings and I spent a lot of time driving back and forth from Little Rock, Arkansas, where he went to receive the best treatment he possibly could. After his hip replacement, he was unable to complete the basement, take us on bike rides, go hiking, or plan out activities with us that he used to do prior to his illness.

8.      The pain and sadness I felt following my father's death was significant. However, I can now see in hindsight that the years I spent growing up without a father in my life was what made the larger impact. I realized that my years in middle school and high school affected me

because I lacked a certain type of discipline that I probably should have developed during that time or at a younger age. This would not have been an issue had my father not passed. I am sure there are many other ways I have been impacted by the lack of a father for many years growing up and the pain and lasting consequences that his passing left on me. I often find myself looking back at the time I spent sitting next to my dad in the hospital, and I wonder what life would have been like had he not died.

JONATHAN R. ROTH

Sworn before me this

13 day of October, 2023

Notary public



Joseph Robert Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                           03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X    **AFFIDAVIT OF <u>JOSEPH</u>**
EVELYN BETSO, et al.,                                           **<u>ROBERT ROTH</u>**


                                    Plaintiffs,        21-CV-01394 (GBD)(SN)


                        V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------- X

STATE OF TENNESSEE        )
                          : SS
COUNTY OF SHELBY          )

          JOSEPH ROBERT ROTH, being duly sworn, deposes and says:

          1.    I am a plaintiff in the within action, am over 18 years of age, and reside at
2584 Horsham Drive, Germantown, Tennessee 38139.

          2.    I am currently 54 years old, having been born on March 10, 1969.

          3.    I am the brother of Decedent, Robert Roth, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

          4.    My brother passed away from multiple myeloma on March 16, 2008, at the age of
44. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

          5.    Robert M. Roth was my older brother and closest confidante. He was also

the best man at my wedding. During the ten years I spent overseas in the Air Force, my family and I travelled home in the summers and spent days or weeks with Rob and his family. Their house in Virginia was a sanctuary for our family. We *always* had a place to go and *always* looked forward to getting there. My four children are similarly aged to his five; all the cousins formed lifelong attachments during these times. If I travelled to D.C. for work, he would offer to drive in to the city, take me to the house for dinner, and then drive me back if required. After working a full day, he would spend up to four hours in the car – one hour each way – to make that happen.

6.　　We would watch football together, go to the shooting range, or help our dad on his farm, and we always looked for ways to involve the kids as much as possible. He was so much more than just my older brother. His life was and is the standard to which I compare mine. His example of a life of service is one we all would do well to emulate. As sick as he was near the end, he was able to drive me to the airport. That was the last time I saw him. We listened to the radio and made small talk. He died two weeks later.

7.　　My brother was an FBI agent at the Washington Field Office. He was at the firing range in Quantico when 9/11 unfolded. He responded from there to the Pentagon after it was struck. Over the next couple of weeks, he recovered evidence from the crash site of AA Flight 77. He worked the site almost continuously, only going home occasionally for fresh clothes, a homecooked meal, and a nap. Afterward, we talked about the conditions of the site, the damaged rings of the Pentagon, the pulverized remains of the airplane intermixed with the contents and debris of the building, body parts, the smell of the extinguished fire and jet fuel and rotting flesh of the victims. He – and many others – meticulously processed that scene for over two weeks.

8.　　I first heard of my brother's diagnosis for multiple myeloma after he visited the

doctor for a nagging hip injury. There was initially much to be optimistic about because he was in great shape. I remember the discussions about insurance and what treatments were available. After Johns Hopkins gave him eighteen months to live, he went to Little Rock in Arkansas for treatment. To my knowledge, Sam Walton, the founder of WalMart, died of multiple myeloma, and his family established the Multiple Myeloma Institute there. I made three trips to Little Rock during his treatment. One was a road trip with him from Virginia to Arkansas so that he would have his truck in Little Rock to go to and from the hospital. I sat with him during his chemo treatments and helped him at the house where he stayed. During another trip, I drove all five of his kids from Virginia to Arkansas because he and his wife could not leave Little Rock, and they had missed Christmas together. I only had enough time to briefly witness their reunion before I had to get back on the road and drive his truck back to Virginia. As soon as he could travel, he went back to Virginia and never returned to Little Rock.

9.    There is a hole in my life where my brother should be. The time of his illness was a crucible. We wanted to be hopeful about his prognosis, but every success was followed by a setback. I used to joke with him about being older than me and the benefits of being younger. I vividly remember the day I became as old as he was when he died. From that day on, I was in unchartered waters. When I turned forty-five years old, I hit a melancholy milestone he never achieved. Even fifteen years after his death, his life still has an elemental effect on mine.

JOSEPH ROBERT ROTH

Sworn before me this

1st day of Nov, 2023

Notary public

Kyle J. Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X      **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                          **KYLE J. ROTH**


                                   Plaintiffs,     21-CV-01394 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                   Defendant.
------------------------------------------------------------- X

STATE OF VIRGINIA            )
                              : SS
COUNTY OF PRINCE

WILLIAM                       )


    KYLE J. ROTH, being duly sworn, deposes and says:

    1.    I am a plaintiff in the within action, am over 18 years of age, and reside at 12244 Sherborne Street, Bristow, Virginia 20136.

    2.    I am currently 18 years old, having been born on December 10, 2004.

    3.    I am the son of Decedent, Robert Roth, upon whose death my claim is based, and submit this Affidavit in connection with the present motion for a default judgment and in support of my solatium claim.

    4.    My father passed away from multiple myeloma on March 16, 2008, at the age of 44. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.     My dad passed away quite early in my life, so I was unable to truly get to know him and create lasting memories with him. Everything I could have learned from him had he survived his illness was delivered to me through a third-party individual, either my mother or a mutual friend. I wish I got the chance to know him. It is one thing to observe a person's characteristics; it is a completely different thing to be stripped of this observation. I fully believe my dad was the individual everyone tells me he was, but I wish I was granted the opportunity to see it for myself.

6.     I was not yet born when the attacks occurred on September 11, 2001, but I do know my dad responded to the Pentagon with the FBI on that day because my family told me. I learned that my dad was a true hero and would respond to the Pentagon every day, from September 11, 2001, through September 28, 2001. It was his job, and it was his character too. He wanted to help in any way he could.

7.     I do not have any memory of the onset of my dad's illness and passing. I was only a year and nine months old when he was diagnosed with cancer on September 25, 2006. He died on March 16, 2008, when I was three years and three months old. The only knowledge I have of his pain that I can share with others is from a video that was recorded a week before his passing. I otherwise don't have anything to compare him to because we barely have any photographs of us safe and healthy together. I do not have the slightest recollection of my dad's voice. I wish I could have known my father before the cancer took him away from us.

8.     The video mentioned above is of an interview my uncle conducted with my dad regarding his family life and identity. I watched just the first twenty minutes of it, but I was able to discern my father's funny and caring personality. He left a lasting impression on anyone who interacted with him, and he was extremely interpersonal. My uncle – my dad's brother-in-law –

was particularly enthralled by my dad; I could see from that video that they shared a close bond. My dad was the brother my uncle did not know he needed. I am sure that my uncle misses my dad terribly.

9.      Nothing fills me with a more profound sense of grief than the knowledge that my beloved mother lost her soulmate and will always miss him, or that my sisters miss their father and will not have someone to walk them down the aisle when their time comes. I wish he had been there for my eldest sister's wedding. His absence was felt when she walked down the aisle without him. My brother and I miss him terribly and wish he were still here so he could teach us how to become a true man, even on a day-to-day basis. I wish I did not have to watch tutorial videos on shaving or tying a tie. It is only right that a father teaches his son the values of becoming a true man in physical, emotional, and intellectual aspects, and I was deprived of this right.

10.     It has been fifteen years since my dad passed away, and the grief prevails when I think of him from time to time. I can feel that something is missing. I have several photographs of my father hung on the wall in my room; it is as if he is watching over me while I sleep. I feel more connected to him whenever I look at him, and I am proud of my father for the hero and person he was. I respect him for exemplifying his familial role first and foremost. Being a father was his main and most important priority. I wish he was able to be my father.

11.     I am filled with anger because I was robbed of a father. It was not a typical cancer that took my dad away, but one that he might not have ever dealt with had the attacks not occurred on September 11th. I live with the pain of not having had a fatherly figure in my life, and it is not fair. I am angry that I seem to be the only one in my life among my family to have been completely robbed of a father, and this has made me feel alienated from him. I am the youngest of my siblings, and I wish I was able to share just one precious moment with my dad that I can remember. My

brother, the fourth child in our family, does not seem to understand that I truly do not have any memory or recollection of my time with our father, and it has gotten exhausting trying to explain it to him. I am glad that my siblings got to have our dad, but I wish I got to have him too.

_Kyle J. Roth_
KYLE J. ROTH

Sworn before me this

_2_ day of _August_, 2023

_____
Notary public

City/County of Prince William
Commonwealth of Virginia
The foregoing instrument was acknowledged before me
This _7_ day of _August_, _2023_
by _Kyle Roth_
_____ Notary Public
Reg. # _6015116_   Com. Exp. _02/28/2026_

Robert Joseph Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                           03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

---------------------------------------------------------------- X     **AFFIDAVIT OF ROBERT**
EVELYN BETSO, et al.,                                                  **JOSEPH ROTH**


                                    Plaintiffs,        21-CV-01394 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
---------------------------------------------------------------- X

STATE OF VIRGINIA        )
                         : SS
COUNTY OF WAKE           )


        Robert Joseph Roth, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
11512 Midlavian Drive, Raleigh, North Carolina 27614.

        2.      I am currently 86 years old, having been born on November 16, 1936.

        3.      I am the father of Decedent, Robert Roth, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My son passed away from multiple myeloma on March 16, 2008, at the age of 44.
It was medically determined that this illness was causally connected to his exposure to the toxins
resulting from the September 11, 2001, terrorist attacks at the Pentagon.

        5.      The decedent was our oldest child. He was a very special and trustworthy

man. He was known for his involvement and dedication in our church community. He was one of the few people in our parish to take the teenagers on camping trips, and he was able to incorporate church life in his household. He would read the Bible to the children every night before bed. He adored his wife and loved his children. It was very difficult to lose him.

6.   My son was a lead FBI agent at the time. When the Pentagon was attacked, he was tasked to go down to the Pentagon and recover the bodies of deceased victims. It was very difficult for him to do this. I knew this was his job, but I did not know just how dangerous it was. He had to do this regardless of how dangerous it was, but he did complain about a metallic taste in his mouth. He worked at the Pentagon from September 11th through September 28th in 2001.

7.   Bob had some trouble with his hip. I remember him sitting on the floor trying to relieve the pain, and I advised him to go see the doctor about it. He was diagnosed with multiple myeloma after and began treatment on January 2, 2007. My son and daughter-in-law devoted their lives to his treatments. They sought treatment in Arkansas. His brothers accompanied him on these trips to Arkansas. When he returned home, he would visit me with his family, and we tended to avoid conversations regarding his illness because they were not ones we wanted to have.

8.   My son's passing was difficult to endure. My wife was dealing with Alzheimer's disease at the time, so she was not completely comprehending what was happening. I tried explaining it to her numerous times, but she never fully understood. She was aware that Bob was no longer with us because we now had to aid Bob's family in their financial needs and familial support. Helping the children manage without their father. We saw the children often and they grew closer to us, but it was not easy to help the children manage after their father's passing. I provided as much financial support for each of the children's college expenses as I could through the years.

But I could never, and will never, fill the role that their father had.

9.     I miss my son very much. Out of the three sons I have, his wife is the closest one to me. Robert will always be special.

_____

ROBERT JOSEPH ROTH

1st day of November 2023

_____

Notary public

ELIZABETH ESPINOSA
NOTARY PUBLIC
WAKE COUNTY
NORTH CAROLINA
MY COMMISSION EXPIRES JULY 06, 20

Tresa Roth

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------X     **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                              **TRESA ROTH**


                                    Plaintiffs,      21-CV-01394 (GBD)(SN)

                    V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
------------------------------------------------------------ X

STATE OF VIRGINIA          )
                            : SS
COUNTY OF PRINCE

WILLIAM                    )


TRESA ROTH, being duly sworn, deposes and says:

1.       I am a plaintiff in the within action, am over 18 years of age, and reside at 12244 Sherborne Street, Bristow, Virginia 20136.

2.       I am currently 58 years old, having been born on February 10, 1965.

3.       I am the wife of Decedent, Robert Roth, upon whose death my claim is based. I submit this Affidavit in support of the present motion for a default money judgment for the claim made on behalf of my husband's estate and for my solatium claim. On October 2, 2013, I was issued Letters Testamentary as Executor of my husband's estate by the Wake County's Surrogate Court.

4.     My husband passed away from multiple myeloma on March 16, 2008, at the age of 44. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks at the Pentagon.

5.     Bob was my husband and my best friend. We met during our college years in Missouri and got engaged the night before I graduated in May 1987. He had graduated in December 1986 and moved back to his parents' home in Virginia, but returned to Missouri during the summer of 1986 so we could date. I moved to Virginia in December 1987 and lived in a house with three other roommates Bob introduced me to at the church we attended. We got married in September 1988 and remained in marital bliss for nineteen and a half years until his passing, leaving me as a widow with our children, with our eldest at thirteen years of age and our youngest at three years.

6.     I have just finished raising our five children, and I have done everything to keep their father's memory alive in them, reminding them constantly of his love for our family, his honesty, his integrity and work ethic, his loyalty, his strong faith in God, his incredible wit and humor, his patriotism, and his love for his fellow neighbor. He exhibited an unquenchable desire to learn something new every day, repair the house and car as needed, and plan for our future. He exemplified empathy in the most benevolent manner, delivering criticism to someone in such a way that one could not be offended because he never sought to hurt anyone. He cared deeply for those around him and only wished for them to be better tomorrow than they were today. He was the complete package, and I will always have a hole his absence cannot fill in my heart.

7.     Bob was an FBI Special Agent for the Bureau's Evidence Response Team (ERT), stationed at the Washington Metropolitan Field Office in Washington, DC. On the morning of September 11, 2001, Bob was in Quantico, Virginia, to conduct routine pistol qualifications, as

required of him to fulfill. When he heard that the Pentagon was under attack, Bob instantly drove to the site and worked diligently there through September 28, 2001, to assist in rescue and recovery efforts. On that first day, ERT members and other responders wore whatever hazmat gear was provided until they were supplied with better and more efficient equipment. Regardless of the improved equipment, Bob often remarked on the metallic taste in his mouth and the stench in his sinuses from the air. I was eight months pregnant with our fourth child at the time, and our daughters were six, four, and two years old, respectively. I was worried for my husband as he returned to the Pentagon every day despite the unhealthy air that permeated there from the damaged aircraft.

8.      There was no gradual indication of an illness; it was just there in a catastrophic way. One evening in late August 2006, Bob went for a run with four of our children, who were either on their bikes or scooters, while I followed them with our 21-month-old in a stroller. I arrived home before Bob and the children did, and when they eventually arrived home, I noticed that Bob was limping. He presumed to have pulled his hip flexor, so he stopped running for a bit and took Motrin. A week or so passed, but the hip pain did not go away, so Bob contacted the doctor, who confirmed that the pain must be related to the hip flexor and would require the medication Bob decided on. Bob increased his dose of Motrin to the maximum dose allowed, but the pain only worsened to the point that he had to rely on spare crutches we kept at home for stability and minimal movement. On September 25, 2006, we celebrated our eldest daughter's twelfth birthday with a family pancake breakfast party. Bob took the day off from work and visited the doctor in the afternoon for an MRI appointment. Our children were homeschooled, so I remained in the house with them all day until I received a call from Bob at around 4:30, asking me to step into the garage so that the children would not hear the conversation. He shared the doctors' suspicions of cancer, as well as the absence of a hip ball. We were in a state of shock because Bob was only

forty-two years old at the time and maintained an excellent and healthy lifestyle, including consistent exercise. How could there be an indication of cancer? The older children were aware that something was not right, so we held our family prayer time that evening and shared our concerns regarding Daddy's hip and that we would be visiting the doctors more often to figure out what exactly it could be. Bob underwent a procedure to have a new titanium hip ball put in place. He was extremely worried about this because there was a fitness test he was required to pass for his occupation, and he was worried he wouldn't be able to. He was our main source of income by this point because I had stopped working so that I could raise our five children. During one of the initial appointments, we were told Bob had plasmacytoma that had been contained and was now gone. We were at ease but not for long. A follow-up appointment a few weeks later required Bob to undergo a bone marrow biopsy that diagnosed him with multiple myeloma. We visited Johns Hopkins University Hospital for a consultation and were told that Bob had approximately eighteen months left to live. We were devastated.

9.    Bob commenced treatment at Johns Hopkins that included the TT1 protocol. He learned that a fellow coworker who had responded to the attacks on September 11th was also diagnosed with the same cancer and undergoing the same treatment. They both wondered if there could be a correlation between their cancers and their exposure to the dust and toxins in the air, but the thought was not entertained for long because they recalled being told "they were safe" while they responded to the tragedy. They were intent on recovery because they wanted to continue their work and support their families, especially their small children. After much research, Bob discovered the University of Arkansas for Medical Sciences in Little Rock to be renowned for their Multiple Myeloma Institute. We were fortunate to be seen by Dr. Bart Barlogie, the director of the program, in November that same year. We were worried that UAMS would not accept Bob given he had already begun the TT1 protocol, but Dr. Barlogie did accept Bob, and the TT2

protocol commenced on January 2, 2007. The treatment would consist of chemotherapy, two bone marrow transplants, and a lifetime of TTI maintenance protocol to keep the cancer in remission. It was not the most wonderful way to start the new year, but there yet remained hope for improvement and recovery. The trip to Arkansas lasted five weeks. Our entire family moved to Little Rock and lived in the basement of a home so I could continue homeschooling the children. When Bob was in a neutropenic state and could not be left alone, I was able to take him to his appointments and administer potassium through his IV the way the nurses at the hospital taught me to do. These trips were made multiple times through December 2007. Our daily lives were exceedingly disrupted, and we were thankful for the family members who were able to go in my place so that I could be with the children and give them as normal a home life as possible. We learned much about the program, and Bob was able to mail in weekly blood and urine samples as he carved his time in Little Rock according to the specifics of testing and the completion of the neutropenic phases.

10.     After his first bone marrow transplant, Bob was placed in remission by May 2007, only to totally relapse with more than one hundred forty bone lesions by December 10, 2007, the same day as our youngest child's third birthday. We returned to Little Rock, but my poor Bob was bedridden by this point and remained in the hospital, undergoing a third bone marrow transplant in that same year. I stayed in the hospital with him while the children remained in Virginia with my sister, who was willing to take care of them and homeschool them together with her own five children. I was not doing well. The stress was overbearing and taking a toll on all of us. I lost much weight and remained at one hundred twelve pounds for quite some time. Bob developed severe renal issues while in the hospital, resulting in new medications for his kidneys and mechanical compressions on his legs for a normal flow of blood. He needed insulin shots because his blood sugar levels remained at alarmingly high levels. He developed aphasia and was unable to either

recognize me or recall the names of our children. He could not deliver a single-word sentence. It was heartbreaking to watch him descend to this state. He experienced constant nausea, vomiting, and diarrhea for weeks, and lost weight to the point of skeletal appearance. Our poor daughter shrieked at the sight of her father's bony legs when the children were able to visit with their uncle. We endured an emotionally, physically, and financially draining rollercoaster.

11.    By January 30, 2008 (our second daughter's birthday), a family friend arranged for Bob to fly home, with Dr. Barlogie's approval, because Bob did not want to miss his little girl's birthday, knowing it would most likely be the last one. Our friends carried Bob onto our front porch and delivered him to his children on his daughter's birthday. To this day, I cannot hold back the tears of bittersweet emotion we felt that day. At the time of Bob's release from the hospital, the doctors told him he had remitted down to nine bone lesions that were healing. This was wonderful news to hear after everything Bob endured in the past seven weeks living in the hospital. There was still hope. We figured Bob would be back in remission with all lesions healed by the time we would return to UAMS for the follow-up appointment.

12.    The follow-up appointment at the end of February in 2008 revealed that the treatment did not work. Our hearts shattered at the news. Bob now had forty-odd new lesions. There was nothing else for us to do. He had just begun walking alone for about a week by then for a very short distance with the use of a cane or a pair of crutches. We were told he would most likely die within two weeks. Bob passed away two weeks and two days after that appointment. His battle with multiple myeloma ended on March 16, 2008, five days after he had watched our eleven-year-old daughter open her birthday presents from the view of his hospice bed in our family home. It was the most valiant fight our family ever fought.

13.    The effects of Bob's illness and passing have been profound on all of us. As his wife,

left to raise five children on her own, I have been under great strain and stress for the past fifteen years. I had to become the mother and father of my children, as well as their sole provider, educator, and protector. There has been a great void in our lives, and I know that my children feel the absence of their father and the hole it has caused. We were never able to live the same financial lifestyle we would have lived had Bob survived. His illness truly took a mental and physical toll on us all, and we continued to receive counseling all these years to cope and make peace with the pain that lingers despite how much time has passed since 2008. Bob was a leader in our church, a family man who cared deeply for his children and carved substantial time to do all sorts of things with them, including teaching them to play golf, ride a bike, repair fences, build a deck and basement, and conduct plumbing duties. He read the Bible to them, and we prayed together every night. He instilled his love for his fellow neighbor in our children, taking them to feed the homeless and help the less fortunate. He would often hold philosophical discussions with them, and even took our daughters on their first dates so they would know how an honorable man should treat them. I was fond of those nights when we would put the children to bed early so that he would arrive home in a suit and tie, and we would enjoy a quiet dinner date, all so that I – and our peeking children – would know I deserved the best. He modeled true excellency for us in every aspect possible. The impact of his absence has left an eternal rippling effect on our entire family.

TRESA ROTH

Sworn before me this

3 day of Aug., 2023

Notary public

KOURTNEE LEWIS
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES FEB. 28, 2025
COMMISSION # 7946068