# EXHIBIT W

# Estate of Roger C. Steinert

# VCF Documentation



September 11th
Victim Compensation Fund

April 12, 2018

MELISSA LAWSON
1904 WOODED RIDGE COURT
FOGELSVILLE PA  18051

Dear MELISSA LAWSON:

The September 11th Victim Compensation Fund ("VCF") has reviewed your Eligibility Form. You submitted an Eligibility Form on behalf of ROGER STEINERT.  Your claim number is VCF0108180.  Your Eligibility Form was determined to be substantially complete on April 11, 2018.  As stated in the Regulations and on the claim form, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit on behalf of the decedent and his or her survivors.

**The Decision on your Claim**

The VCF has determined that the decedent has met the eligibility criteria established in the statute and regulations.  Based on the information you submitted and information the VCF has received from the World Trade Center ("WTC") Health Program, the decedent has been found eligible for the following injuries:

- BASAL CELL CARCINOMA OF SKIN, UNSPECIFIED
- VARIANTS OF LYMPHOSARCOMA AND RETICULOSARCOMA

Please note that there are several reasons why an injury that you think should be eligible is not listed above.  For non-traumatic injuries, the name of the injury is based on the information provided by the WTC Health Program and there may be different names for the same injury.  Additionally, your injury may not be listed if it was only recently certified for treatment by the WTC Health Program.

If in the future the WTC Health Program should notify you that a condition previously found eligible is no longer certified, you must inform the VCF as this may affect your eligibility status and/or the amount of your award.

**What Happens Next**

**If the decedent was certified for treatment by the WTC Health Program for a condition not listed above**, you should amend your claim.  Please see the VCF website for details on how to amend your claim.  The VCF will review the new information and determine if it provides the basis for a revised decision.

**If you believe the decedent had eligible injuries not treated by the WTC Health Program** and you would like the VCF to consider those injuries before calculating the amount of any compensation, you should amend your claim.  If you choose to amend your claim, you will need to use the VCF Private Physician process.  The Private Physician process is a way for the VCF



September 11th
Victim Compensation Fund

to gather the required information about the decedent's treatment in order to process your claim. All forms are available on the VCF website under "Forms and Resources." The website also includes detailed information and instructions on the Private Physician process.

**If the decedent did not have injuries other than those listed above,** you should submit your Compensation Form and required supporting materials. If you have already submitted your Compensation Form, you do not need to take any action at this time unless you receive a request from the VCF for missing information. The VCF will calculate the amount of any compensation based on the conditions listed above after all compensation-related documents are submitted.

If you have questions about the information in this letter or the claims process in general, please call our toll-free Helpline at 1-855-885-1555. For the hearing impaired, please call 1-855-885-1558 (TDD). If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: WENDELL TONG



September 11th
Victim Compensation Fund

February 8, 2019

MELISSA LAWSON
C/O WENDELL TONG
SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, PC
120 BROADWAY 18TH FLOOR
NEW YORK NY  10271


Dear MELISSA LAWSON:

The September 11th Victim Compensation Fund ("VCF") has reviewed your claim for
compensation.  Your claim number is VCF0108180.  Your Compensation Form was
determined to be substantially complete on January 08, 2019.  This means your claim was
deemed "filed" for purposes of section 405(b)(3) of the Statute on that date.

Based on the information you submitted, the VCF has calculated the amount of your eligible
loss as **$599,513.53**.  This determination is in accordance with the requirements of the
Reauthorized Zadroga Act.  The enclosed "Award Detail" includes a detailed explanation of
the calculation and a list of the eligible conditions included in this determination.

The VCF has determined that the loss of your father's FDNY pension benefits, which
terminated at his death, is not a loss compensable by the VCF.  That said, the Special Master
recognizes the fairness disparity in a process whereby former first responders, such as your
father, who responded to the WTC site in the wake of the attacks, do not qualify for Line of
Duty death designations from their former employers because they were not officially deployed
to the response effort.  Based on the circumstances presented in your claim, and in the
discretion of the Special Master, your compensation award includes an additional $250,000 in
economic loss.

No non-routine legal service expenses are approved for reimbursement for this claim.

As the Personal Representative, you are required to distribute any payment received from the
VCF on behalf of the victim to the eligible survivors or other recipients in accordance with the
applicable state law or any applicable ruling made by a court of competent jurisdiction or as
provided by the Special Master.

**What Happens Next**

The VCF will deem this award to be final and will begin processing the payment on your
claim unless you complete and return the enclosed Compensation Appeal Request Form
within **30 days from the date of this letter** as explained below.  If you do not appeal, the
Special Master will authorize the payment on your claim within 20 days of the end of the 30-
day appeal period.  Once the Special Master has authorized the payment, it may take up to
three weeks for the United States Treasury to disburse the money into the bank account
designated on the VCF ACH Payment Information Form or other payment authorization
document you submitted to the VCF.



September 11th
Victim Compensation Fund

- **Appealing the Award**:  You may request a hearing before the Special Master or her designee if you believe the amount of your award was erroneously calculated or if you believe you can demonstrate extraordinary circumstances indicating that the award does not adequately address your claim.  **If you choose to appeal, your payment will not be processed until your appeal has been decided**.

To request a hearing, you must complete and return the enclosed Compensation Appeal Request Form **and** Pre-Hearing Questionnaire no later than **30 calendar days** from the date of this letter.  The VCF will notify you in writing of your scheduled hearing date and time and will provide additional instructions to prepare for your hearing.  If both forms are not submitted with complete information within 30 days, you have waived your right to appeal and we will begin processing your payment.

- **Amending your Claim**: You may amend your claim in the future if your circumstances change and you have new information to provide to the VCF.  For example, you may amend if the WTC Health Program certifies additional physical conditions for treatment, if you have information in support of your claim that was not submitted to the VCF when your award was determined and that you believe would affect the amount of your award, or if you have incurred additional economic loss due to an eligible condition.  The VCF will review the new information and determine if it provides the basis for a revised decision.  Please see the VCF website for additional details on how to amend your claim and the specific circumstances that may be appropriate to request an amendment.

- **Notifying the VCF of new Collateral Source Payments**: You must inform the VCF of any new collateral source payments you receive, or become entitled to receive, such as a change to your disability or survivor benefits, as this may change the amount of your award.  If you notify the VCF within 90 days of learning of the new collateral source payment, your award will not be adjusted to reflect the new entitlement or payment.  If you notify the VCF more than 90 days after learning of the new or revised entitlement or payment, the VCF may adjust your award to reflect the new payment as an offset, which may result in a lower award.  If you need to notify the VCF of a new collateral source payment, please complete the "Collateral Offset Update Form" found under "Forms and Resources" on the www.vcf.gov website.

Your award was calculated using our published regulations, and I believe it is fair and reasonable under the requirements of the Reauthorized Zadroga Act.  As always, I emphasize that no amount of money can alleviate the losses suffered on September 11, 2001.

If you have any questions, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund



September 11th
Victim Compensation Fund

# Award Detail

Claim Number:      VCF0108180
Decedent Name:     ROGER STEINERT

| PERSONAL INJURY CLAIM (Losses up to Date of Death) | |
|---|---|
| **Lost Earnings and Benefits** | |
| Loss of Earnings including Benefits and Pension | $0.00 |
| Mitigating or Residual Earnings | $0.00 |
| **Total Lost Earnings and Benefits** | $0.00 |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Disability Pension | $0.00 |
| Social Security Disability Benefits | $0.00 |
| Workers Compensation Disability Benefits | $0.00 |
| Disability Insurance | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Lost Earnings** | $0.00 |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Medical Expense Loss | $0.00 |
| Replacement Services | $0.00 |
| **Total Other Economic Losses** | $0.00 |
| | |
| **Total Economic Loss** | $0.00 |
| | |
| **Total Non-Economic Loss** | $300,000.00 |
| | |
| **Subtotal Award for Personal Injury Claim** | $300,000.00 |



September 11th
Victim Compensation Fund

| DECEASED CLAIM (Losses from Date of Death) | |
|---|---|
| **Loss of Earnings including Benefits and Pension** | |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Survivor Pension | |
| SSA Survivor Benefits | |
| Worker's Compensation Death Benefits | |
| Other Offsets related to Earnings | |
| **Total Offsets Applicable to Loss of Earnings and Benefits** | |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Replacement Services | $88,610.00 |
| Burial Costs | $5,555.00 |
| **Total Other Economic Losses** | $344,165.00 |
| | |
| **Total Economic Loss** | $344,165.00 |
| | |
| **Non-Economic Loss** | |
| Non-Economic Loss - Decedent | $250,000.00 |
| Non-Economic Loss - Spouse/Dependent(s) | $100,000.00 |
| **Total Non-Economic Loss** | $350,000.00 |
| | |
| **Additional Offsets** | |
| Social Security Death Benefits | ($255.00) |
| Life Insurance | ($108,502.47) |
| Other Offsets | $0.00 |
| **Total Additional Offsets** | ($108,757.47) |
| | |
| **Subtotal Award for Deceased Claim** | $585,407.53 |



September 11th
Victim Compensation Fund

| Subtotal of Personal Injury and Deceased Claims | $885,407.53 |
|---|---|
| PSOB Offset | $0.00 |
| Prior Lawsuit Settlement Offset | $0.00 |
| Previously Paid Personal Injury Award | ($285,894.00) |
| TOTAL AWARD | $599,513.53 |
| | |
| Factors Underlying Economic Loss Calculation | |
| Annual Earnings Basis (without benefits) | |
| Percentage of Disability attributed to Eligible Conditions - applicable to Personal Injury losses | |
| Start Date of Loss of Earnings Due to Disability - applicable to Personal Injury losses | |

| Eligible Conditions Considered in Award |
|---|
| Basal Cell Carcinoma of Skin, Unspecified |
| Variants of Lymphosarcoma and Reticulosarcoma |

# Family Member Affidavits

Amanda C. Francfort

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X      **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                  **AMANDA C. FRANCFORT**


                                        Plaintiffs,        21-CV-01394 (GBD)(SN)


                        V.

ISLAMIC REPUBLIC OF IRAN,

                                        Defendant.
------------------------------------------------------------- X

STATE OF NORTH
CAROLINA                    )
                                         : SS
COUNTY OF WAKE           )


        AMANDA C. FRANCFORT, being duly sworn, deposes and says:

        1.        I am a plaintiff in the within action, am over 18 years of age, and reside at
3537 Sienna Hill Place, Cary, North Carolina 27519.

        2.        I am currently 52 years old, having been born on July 24, 1971.

        3.        I am the daughter of Decedent, Roger Steinert, upon whose death my claim
is based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.        My father passed away from non-Hodgkin lymphoma on June 2, 2017, at the age
of 71. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.     My father, Roger Steinert, was a New York firefighter and was loved and respected by all the people that he worked with. He worked very hard in his life and enjoyed everything that he did, and became involved in. His love for life, and other people was respected by so many. He loved to work in his yard, and in his home to make it the best it could be. He lived a modest life but woke up each morning with a smile on his face, knowing that he was alive and doing the best that he could do. He would call almost every day to check in and ask how the family was doing and always remembered little interesting facts about each of my children, or myself, to ask questions about, and always showed his concern when needed. He was a wonderful listener, and extremely generous with his time. He loved visiting my family in North Carolina, and in Massachusetts, where he would travel up on his own and stay with us for a week at a time getting involved in anything that we were doing. He loved his grandchildren very much and they just adored him also. He was constantly helping in any way that he could to make our lives better or more interesting. He especially loves coming up with unique places to go and visit and asked us all to come along with him on a day trip to a small town or on a hike.

6.     From what I recall, Roger was volunteering a day or two after the 9/11 tragic attack on the twin towers. He spent several days at the WTC Exposure Zone helping with clean-up, search and rescue and other responsibilities as needed. He worked alongside my brother, Evan Steinert, and several other firefighters from the firehouse he retired from. He just wanted to do his part and help the city he loved.

7.     We received the news of my father's illness Christmas of 2012. He told us that he was very sick and that he had testicular cancer. This came to a huge shock to us because this is a man who does not drink any alcohol or smoke cigarettes and lives on a very strict gluten-free diet

and eats only organic food mostly from his garden. He has lived a very natural life, and this was then a shock to hear news that a man who was so healthy and fit could become sick. After he had had his testicular surgery, the doctors informed us that he had stage four cancer, and the cancer was throughout his whole entire body. We knew at that moment that we would lose our dad. He decided to do chemotherapy to possibly save his life. Still true to himself. He stayed to his healthy diet and exercised most days when he could. He went into remission about a year after he started chemotherapy, and we thought it was possible that he was cured. However, the cancer came back in his extremities, especially his legs, and we knew that he most likely had no chance of ever recovering. Soon after that, neuropathy was a huge part of his pain, and really slowed him down from his very active life that he spent with his family and his grandchildren. He was diagnosed with non-Hodgkin's lymphoma, which destroyed his body, which was heartbreaking and terminal. His quality of life was shot after a while when he could no longer sleep with the pain of neuropathy and lymphedema in his legs. He had to spend so much time in and out of doctors' offices that he spent less and less time with the people he loved. The loss of his hair, loss of his weight, mouth, sores, all were horrific to watch and see him in so much pain. He was only looking forward to spending time with his family and grandchildren. He was only looking forward to taking the time to enjoy life in his retirement that he never got to do.

8.     My dad and I were always extremely close. He would call almost every day to check in and see how we were doing to make sure that he knew how we all were and if he could help in any way. He spent a lot of time with my three boys, who all miss him very much, but they still keep the strong memories of him close in their heart. They learned a lot from him in a few years they got to spend, watching him build things and teaching them to be wonderful men. He taught me to be a strong, independent woman, and I will forever be grateful to have a dad that encouraged me to be

myself, and to be a wonderful mother and businessperson. To watch what he did during 9/11 to help others and to give back to our country, and then to have him taken away from us is truly heartbreaking. He was a healthy, strong human being that turned to skin and bones because of his illness. I try each day to remember him before his illness took over his body. I will also be forever grateful for the time that I had with him and what an impact he made on my life and my family.

AMANDA C. FRANCFORT

Sworn before me this

1 day of Aug , 2023

Notary public

Melissa Lawson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

In Re:

TERRORIST ATTACKS ON                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------------ X    **AFFIDAVIT OF**
EVELYN BETSO, et al.,                        **MELISSA LAWSON**


                              Plaintiffs,        21-CV-01394 (GBD)(SN)


                V.

ISLAMIC REPUBLIC OF IRAN,

                              Defendant.
------------------------------------------------------------------ X

STATE OF
PENNSYLVANIA            )
                        : SS
COUNTY OF LEHIGH        )


        MELISSA LAWSON, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
1904 Wooded Ridge Court, Fogelsville, Pennsylvania 18051.

        2.      I am currently 55 years old, having been born on February 5, 1968.

        3.      I am the daughter of Decedent, Roger Steinert, upon whose death my
claims are based. I submit this Affidavit in support of the present motion for a default
money judgment for the claim made on behalf of my father's estate and for my solatium
claim. On June 14, 2017, I was issued Letters Testamentary as Executor of my father's
estate by the Somerset County Surrogate's Court.

        4.      My father passed away from non-Hodgkin lymphoma on June 2, 2017, at the age
of 71. It was medically determined that this illness was causally connected to his exposure to the
toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      Vocationally, Roger was a FDNY firefighter for approximately 25 years.  He was a hard-working, reliable, dedicated, responsible, highly skilled, well respected, and passionate firefighter, who loved his job, helping people and saving lives.  He was well liked and respected by everyone with whom he worked and was viewed as a positive role model.   He loved his job as a firefighter.  He always said it was the best job in the world.   Later in his career, he became a senior chauffeur because of his great sense of direction, ability to drive the trucks safely and properly and ability to find the most efficient route to get to fires quickly.  He loved having the responsibility of driving the fire trucks.

6.      My father worked very hard all his life, even taking on side jobs to make extra money to support our family.  He was frugal, saved his money and lived a modest lifestyle.  His number one priority was ensuring the needs of his wife/children/family were being met.  He saved money by doing most things himself (taking care of the vehicle maintenance/repairs; mowing his own lawn; chopping wood; fixing things around the house; handling his own plumbing and electrical work; making renovations and building additions; cleaning the chimney; building furniture, staircases, bathrooms, etc.; and taking care of all the bills, taxes, insurance, and utilities).  He hated to rely on other people.  He always strived to learn how to do things for himself.  He strived to always do better, learn more and increase his skills and knowledge.

7.      My father enjoyed life to the fullest.  He appreciated every day, even the bad days.   He always looked for the positives, rarely the negatives.  He appreciated the simple things in life and the little things most people took for granted.  He saw the beauty in everything and would remind others of just how lucky they were to live in America, to have the freedoms we have and the beauty of nature that surrounds us.

8.      My father lived a very healthy lifestyle.  He did not smoke, rarely drank, adhered to a strict diet and remained very active.  He ate primarily organic foods and strived to eat foods high in antioxidants, vitamins and good nutrients.  He would rarely eat out at restaurants but would rather prepare his own meals using raw, healthy, natural ingredients at home and at the firehouse whenever possible.  In the 25 years he worked at the firehouse, he rarely called in sick.  Daily exercise was very important to him.  He was tall, lean and strong.  He had great stamina and lots of energy.

9.      During his time off from work, he enjoyed traveling with our family around the U.S. by car or camper to see the beauty of our country.  He enjoyed finding fun and interesting points of interest, doing the research and planning the routes to take to get there.   He mostly chose the roads less traveled as he was always seeking an adventure.   He loved family trips, big or small, and took us to see and experience new places every chance he could, including to national parks, museums, lakes, rivers, historic homes, tourist attractions, etc.

10.     One of his favorite hobbies and activities was boating.  He enjoyed taking us on his boat to various lakes and rivers.  He especially loved canoeing on the Delaware River and taking his motorboat on Lake George. I have many special memories with him, from the time I was a child until a young adult (and then later with my own family and children), traveling to lakes or rivers (big and small), exploring, seeing the sights, appreciating the beauty, and just enjoying being on the water.  Later, he took us boating every summer on Lake George, which he loved the most.

11.     My father was a kind and caring person who always seemed to put others first.  He always offered his help and services, lending a hand whenever needed.   He was a great listener and made everyone feel special by making the effort to remember something specific or unique about them.  He enjoyed asking questions and showing a true, genuine interest in others.  He would always ask how they were doing and about a few specific things that he knew were important to them (specific events that were going on in their lives at the time).

12.     Mostly, my father loved his wife and children more than life itself.  He made them his number one priority and wanted only the best for us.  He provided deep and unconditional love, care, concern for his children and consistent involvement in their lives, whether in person or simply via daily phone calls.  He always remembered birthdays, holidays, and special events so he could ensure to show his kids and grandkids he was thinking of them.  He was always so generous and thoughtful, making sure he put a lot of thought and effort into gifts or gestures.  He always made the time to spend with each of his children, never favoring one over the other.  He especially loved spending time with his grandchildren and doing fun and creative activities.   Roger also enjoyed spending time outdoors, gardening/landscaping, building things, using tools repairing things, tinkering on his cars, doing masonry work, and doing general handyman-type tasks.  He and my mother worked collaboratively for years to renovate their

home and grounds.

13.     Being a firefighter for 25 years, my father often worked several days in a row, including many evenings, but he would almost always use his free time to spend with his family. My father and I were always extremely close. Growing up, he was actively involved in my life and my siblings' lives. My father was an amazing role model. He taught me many things since I was a little girl, including how to be kind, caring, humble, responsible, punctual, studious, to find a job I would love and excel at, learn new skills, work hard, earn my own way, use my money wisely and frugally, and to save for a rainy day. He taught me how to be good at math, geography, and history. He exposed me to the beautiful country within which we live, by taking us on many family trips across the US, as well as how to be resourceful and use tools to build and fix/repair things.

14.     Roger was very loving, caring and always concerned about my well-being. He was always available to listen, provide sound advice, suggestions or to help me solve problems. There wasn't anything I could not talk to him about and vice versa.  My father made sure we had a wonderful childhood, always finding ways to ensure we had fun, whether it be via playing games, spending summers at the lake (boating/swimming), traveling, hiking, sleigh-riding in the winter, toasting marshmallows by the fire or just staying home to watch movies.

15.     When I started my own family, my father and I continued to remain very close. He was involved with almost all aspects of my life--he helped me with finding new/used vehicles to buy, helped us move to every one of our new homes (physically helping to pack, move/transfer furniture on his trailer, carry boxes & furniture into the house, etc.),  he attended the births of both my children and provided many hours of babysitting and care when I needed it, and he attended all birthday parties, holidays, and many of my children's school functions, plays and graduations. He also had a very special bond with my son who has a severe intellectual disability (autism) by always making time to take him to places he enjoys, volunteering to babysit, providing care, preparing meals, attending medical appointments, or just spending quality time together whether it be hiking, boating, visiting the zoo or going to a park. In the summers, my father would join us on our vacations and would help plan fun things to see and do.

16.     From what I recall, my father volunteered over the course of the first few days

immediately following the 9/11 attack on the twin towers and then an additional several days thereafter during the first month. The aftermath responsibilities were open to volunteers, off-duty firefighters as well as retired firefighters. Since he was retired, he felt he could offer his time and services to help in any way he could. Furthermore, because his son (my brother) was an active firefighter at the time and was also there that tragic day. My father was able to join my brother for a few days. Additionally, he was able to join a few of his former co-firefighter friends from his firehouse. He either took the bus into the city with groups of firefighters or would drive himself. He spent his time at the WTC Exposure Zone helping with search and rescue, recovery, sorting, digging, bucket brigade, clean-up, and other responsibilities as needed.

17.     In 2012, my father was diagnosed with Non-Hodgkin Lymphoma (NHL). His NHL was a rare and extremely aggressive type, called Diffuse Large B-Cell non-Hodgkin Lymphoma. He was also diagnosed with co-morbid cancers, including "Uns Malignant Neoplasm Skin/Site Uns" (Basal Cell Carcinoma of the skin, unspecified), Variants of Lymphosarcoma and Reticulosarcoma. We were completely shocked because he was always so healthy!  The cancer first appeared in his testicle (which had to be removed and radiated), but after further testing, it was determined he actually had NHL, stage 4.  He was given no more than 6 months to a year to live.

18.     He immediately started chemo treatments which lasted on and off over the course of five years, along with radiation treatments for cancerous growths on the surfaces of his legs, chest, neck, and other locations.  He tried several clinical trials as well, including a stem-cell transplant, in hopes they would help.  Going through the stem-cell transplant was especially difficult for him--not only because he had to remain in quarantine at the hospital for about a month and not see his family very often--but also because he was constantly sick, nauseous, tired, and unable to eat solids due to the sores in his mouth.  My father also had to endure many bone marrow

biopsies, which were extremely painful, many blood transfusions, not to mention having to take the many, many cancer medications and cancer-killing chemicals which wreaked havoc on his entire body.   After several years of chemo and radiation, he was in remission (for approximately 6 months to 1 year), but the cancerous growths returned in his legs.  Toward the end, my father was in tremendous pain 24/7.   His neuropathy/lymphedema was severe and eventually he required heavy prescription pain medicine.

19.   The diagnosis of having stage 4 NHL caused my father tremendous heartbreak and emotional turmoil.  It changed his life forever and took a physical toll on his body.  The cancer and the treatments negatively affected his quality of life.  He could no longer do all the things he once enjoyed doing.  Over time, the cancer and chemo treatments weakened his body, his strength, and endurance.   The need to sleep and rest became more and more frequent.  The pain from his neuropathy (under his feet) became worse and worse, which affected his ability to walk, eventually requiring him to use a cane.  Additionally, he developed severe lymph edema (swelling) in the legs which caused even more tremendous pain.   The chemo made his hair fall out and negatively affected his appetite, ability to eat and swallow (due to the severe mouth sores that developed), and ability to enjoy food/taste food.  He lost a lot of weight and needed to overcome that by taking high calorie/weight-gaining supplements.

20.   The constant doctor appointments, bloodwork, X-rays, CT-Scans, etc., became more and more regular, which also took away from his ability to spend time with his family or to go places.  The hardest part for him was not knowing whether he would get to enjoy the rest of his retirement or do the activities he loved to do. Not knowing if he would ever see his family again, if he would be around to take care of his wife (especially since his pension would stop upon death and my mother would not have income other than Social Security to survive) or get to spend quality time with his children was too much to bear!  Also, it was hard on him not knowing if he would

ever get to see his grandchildren grow up, graduate school, go to college and get married. He wrote a letter at the time describing how he felt.

21.    My father's illness and death had a tremendous impact on me. It was so hard for me to see him in such pain and to see him so worried about his future and the possibility of dying. His death took a big piece of me with him. It was one of the hardest things I have ever had to go through emotionally.

22.    I was actively involved in his life and his journey to cure his cancer. We would discuss treatment options, side-effects, doctor appointments, changes, symptoms, next steps, lab and test results, alternative and complimentary treatments, remedies, diets, etc. He spent many days at my home so I could care for him when he was too weak to do so himself and to give my mother a break.

23.    Seeing my once strong, active, and healthy father dwindle down to just skin and bones was very hard to witness. In between chemo treatments, he would regain some strength and be able to enjoy some aspects of his hobbies, but at a much-reduced level. Regardless, his hobbies helped keep his mind off the cancer (even if it was just temporarily). Whenever he could, he would still strive to spend his "off time" between treatments visiting his children and grandchildren, visiting his firehouse friends, and his special-needs grandson. He tried to remain optimistic, but in the back of his mind he knew he had an uphill battle and the odds were against him. He used his "good" days to see the people he loved the most, knowing that it could potentially be the last time.

24.    The years following my father's death were most difficult. He left a huge void in our family and left my mother with the complete burden of taking care of the home, bills, and property herself. Because of his death, his pension completely stopped, leaving my mother without an additional source of income outside of her social security. As a result, her way of living and

lifestyle had to change drastically.  As the oldest, I stepped in to help my mother learn how to run the home, including teaching her how to use a computer to pay her bills, helping her with paying her taxes, setting up accounts in her name, finding ways to save money and investing what little she had, taking care of her vehicles (including renewing insurance, registrations and state inspections), obtaining help with lawn care and maintenance, and finding new health-care insurance (since she could no longer be on my father's).  The list goes on and on.  Currently, I am still assisting my mother with carrying out the numerous jobs and responsibilities my father once handled.

25.    The hardest part about losing my father is not being able to talk to him daily—not being able to tell him about my day, share stories, provide updates about the kids, and plan new adventures and trips.  I miss being able to spend summers together at the lake, go for walks, spend holidays and birthdays together and especially not being able to give him hugs and tell him I love him.

MELISSA LAWSON

Sworn before me this
18 day of September, 2023

Notary public

Commonwealth of Pennsylvania - Notary Seal
Debra K. Jack, Notary Public
Lehigh County
My commission expires August 17, 2025
Commission number 1273426

Evan K. Steinert

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X      **<u>AFFIDAVIT OF</u>**
EVELYN BETSO, et al.,                                                **<u>EVAN K. STEINERT</u>**


                                    Plaintiffs,        21-CV-01394 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------- X

STATE OF NEW JERSEY      )
                                          : SS
COUNTY OF BERGEN          )


        EVAN K. STEINERT, being duly sworn, deposes and says:

        1.       I am a plaintiff in the within action, am over 18 years of age, and reside at

100 Dimmig Road, Upper Saddle River, New Jersey 07458.

        2.       I am currently 49 years old, having been born on June 28, 1974.

        3.       I am the son of Decedent, Roger Steinert, upon whose death my claim is

based, and submit this Affidavit in connection with the present motion for a default

judgment and in support of my solatium claim.

        4.       My father passed away from non-Hodgkin lymphoma on June 2, 2017, at the age

of 71. It was medically determined that this illness was causally connected to his exposure to the

toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      My relationship with my father was as meaningful and nurturing as any son could ever hope for. The level of attention, love, and sharing of his time and knowledge, was above and beyond what most dads can do. He was a fireman for 27 years and included me in most every meaningful firehouse function. Outside of work, he supported my every interest, hobby, and adventure. My father took my family on many long trips, including across the US in a camper, which lasted over a month during the summer, and the memories still remain as the greatest trip I've ever taken. He was my role model, my hero and best friend. From building model cars with me as a child, to helping me buy my very first real car, an old, non-running classic, of which we rebuilt the engine together, and became my main transportation for several years after. We shared almost all the same interests, including outdoors, boats, cars, and motorcycles, and dreaming of and searching for our own large swath of private land with a pond someday in our future. My father taught me how to ski, swim, ride a bike, operate a motorcycle, navigate a canoe through windy strong current rivers, drive stick shift, cook delicious meals, and almost everything I know about carpentry, plumbing and auto mechanics. My relationship with my father remained as strong or stronger over the years, up until asking him to be my best man at my wedding, in 2018. He was absolutely thrilled to have the honor, but tragically passed away before my wife and I married.

6.      On the day of September 11, 2001, I did not see my father at all. My father was home, while I was at Ground Zero. My father was glued to the TV and radio stations, trying to make sense of what was happening and worrying himself sick as to whether I was safe, or even alive. By the late afternoon of the 11th, my dad made many phone calls to orchestrate his voluntary efforts to make his way into the city within the

next few days, for rescue and recovery operations. He was finally able to make it to Ground Zero on the 13th of September, by joining up with his former company, Ladder 86, out of Staten Island. He continued to assist with recovery operations, on and off for about 8 to 10 days total.

7.    My father was first diagnosed with cancer in 2012. My father simply did not feel right and insisted on multiple doctors' visits before additional tests were authorized; in doing so, his doctors discovered testicular cancer. We were almost satisfied with the results, as it was said to be curable, and explained why he did not feel right. But after further screenings were recommended, it was discovered that the cancer was already spreading throughout his body and told he'd only have a year or two to live. He was diagnosed with Non-Hodgkin's B cell lymphoma. His quality of life instantly plummeted to severe anxiety and deep depression. He always tried to stay positive and was willing to try any treatment. But he was cooped up in a hospital bed, losing his hair, and staring out a window all day and it was killing him just as much as the cancer. He had so much living he needed and wanted to do. So many dreams to fulfill and so much of his retirement he had to accept that he couldn't enjoy. In the end, the treatments were so brutally harsh, he had to rely heavily on pain killers and lost his ability to walk without a cane. He lost a lot of weight, and his morale was rock bottom, before succumbing to his disease.

8.    Life has become far more challenging since my father's death. As the backbone of our family, everything has changed. As a firefighter of 21 years, and a WTC responder, I have developed anxiety, wondering if I'll be the next of the many thousands of victims who've succumbed to World Trade Center related illnesses. And

while still healthy, not having my father and best friend around, the void in my life is tremendous. My wife and our children also feel the absence of the great man who had such a huge impact and presence in our everyday lives. I'm often left feeling quite bitter, knowing this was a needless and premature death. Not a day goes by where I don't think of my father and miss him immensely.

EVAN K. STEINERT

Sworn before me this

9th day of August, 2023

Notary public

HYEKYUNG CARRERO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CA6075075
Certified in New York County
Commission Expires September 3, 2025

Leslie A. Steinert

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X          **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                               **LESLIE STEINERT**


                                      Plaintiffs,            21-CV-01394 (GBD)(SN)


              V.

ISLAMIC REPUBLIC OF IRAN,

                                      Defendant.
-------------------------------------------------------------- X

STATE OF NEW JERSEY    )
                                         : SS
COUNTY OF SOMERSET    )


        LESLIE STEINERT, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
13 Ferguson Road, Warren, New Jersey 07059.

        2.      I am currently 75 years old, having been born on December 10, 1947.

        3.      I am the spouse of Decedent, Roger Steinert, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My husband passed away from non-Hodgkin lymphoma on June 2, 2017, at the
age of 71. It was medically determined that this illness was causally connected to his exposure to
the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      I was 15 and my husband-to-be was 17.  We spent the three years before we married learning about each other and how our lives were alike in every way, making us compatible and comfortable as partners in a loving, compassionate marriage.  Our three children made us complete and added to the adventures in the traveling we enjoyed.   He was the center of our universe with our family orbiting around him. He followed his older brother, my father and uncle by becoming a fireman also for 25 years. When our son grew old enough to do so too, his joining the fire department made three generations of firefighters.

6.      My husband was involved with the survivor search in the twisted, hellish, bombed rubble of the parking garage under the first tower in 1973.  Years later in 2001, our son came close to losing his life in the twin towers attack.  Soon after he, with my husband and other firefighter friends, went on a search and rescue mission where they froze their time spent at the site with photos and video.

7.      In 2012, my husband began a different journey, one that would last five years, of fighting non-Hodgkin's lymphoma.  He was initially informed by doctors he had only 1.5 to 3 months to live.  I journeyed with him and treated him with natural remedies which granted him the extra years to reign in our family as a hero.   Our journeys ended June 2, 2017, when he died unexpectedly in my arms on our kitchen floor.  Our world stopped spinning.  We were lost in a vacuum where time stood still.  My first time in 55 years, I no longer had his guidance as to how to go on, to have his hand to hold, to talk with, or to love.

8.      Today, six years later, I continue putting back my shattered life.  One step at a time, I try to walk in his shoes, tackling his chores that he saw to with ease.  He could do anything – fix, build, operate machinery, use tools, and cook—but he cannot come back to be with me. I've learned how to cope with the obstacles of running my home and property, but missing his life around me is the most difficult one.

*Leslie Steinert*

LESLIE STEINERT

Sworn before me this
14th day of August, 2023

*Maureen Korman*

Notary public

MAUREEN KORMAN
NOTARY PUBLIC, STATE OF NEW JERSEY
COMMISSION # 2415641
MY COMMISSION EXPIRES 12/28/2026