**REDACTED FOR PUBLIC FILING**

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
IN RE:  TERRORIST ATTACKS ON     )     Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001          )     ECF Case
_____)

This document relates to:  *All Actions*

# REPLY MEMORANDUM OF LAW IN SUPPORT OF KINGDOM OF SAUDI ARABIA'S RENEWED MOTION TO DISMISS

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

GLOSSARY ............................................................................................................... viii

INTRODUCTION ..........................................................................................................1

ARGUMENT .................................................................................................................4

I.    The Court Should Resolve Jurisdictional Fact Disputes Using Admissible
      Evidence .............................................................................................................4

      A.    Whether Al Bayoumi's and Al Thumairy's Conduct Was Tortious
            or Within the Scope of an Agency Relationship Is a Jurisdictional
            Question .....................................................................................................4

      B.    The Court Should Disregard Inadmissible Materials................................6

            1.    Plaintiffs Cannot Rely on FBI Preliminary Materials and
                  Investigative Theories .....................................................................7

            2.    Plaintiffs Cannot Rely on Second-Hand Interview Reports .........9

            3.    Plaintiffs Cannot Rely on Fact Witnesses Without Personal
                  Knowledge .....................................................................................11

      C.    The Court Has Discretion To Determine Whether To Hold an
            Evidentiary Hearing................................................................................11

      D.    The Court Should Not Consider Facts Not Set Out in Plaintiffs'
            Brief ........................................................................................................13

II.   Any Assistance to Al Hazmi and Al Mihdhar Was Not Within the Scope
      of Al Thumairy's or Al Bayoumi's Office, Employment, or Agency ..............14

      A.    Plaintiffs Have No Evidence of Any Direction To Assist the
            Hijackers .................................................................................................15

      B.    Assistance to the Hijackers Would Not Have Been Within the
            Scope of Any Official, Employment, or Agency Relationship
            with the Saudi Government .....................................................................18

            1.    New York Law Governs Employment and Agency Issues .........18

            2.    Under New York Law, a Principal Is Not Liable for
                  Actions of an Official, Employee, or Agent Outside the
                  Scope of Office, Employment, or Agency....................................19

|  |  | 3. | Al Bayoumi's Work Had Nothing To Do with Helping Terrorists | 20 |

|  |  | 4. | Al Thumairy's Work Had Nothing To Do with Helping Terrorists | 25 |

III. Neither Al Bayoumi nor Al Thumairy Knowingly Assisted the Hijackers ...... 30

    A. The Court Should Resolve Jurisdictional Fact Disputes on the Record Developed in Jurisdictional Discovery ...... 30

    B. Al Bayoumi Did Not Knowingly Assist the Hijackers ...... 31

        1. Al Bayoumi Had No Connection to Al Qaeda ...... 33

        2. Al Bayoumi Did Not Knowingly Assist the Hijackers in Los Angeles ...... 35

        3. Al Bayoumi Did Not Knowingly Assist the Hijackers in San Diego ...... 36

    C. Al Thumairy Did Not Knowingly Assist the Hijackers ...... 41

IV. There Is No Evidence That Saudi Arabia Operated an "Extremist MOIA Enterprise" ...... 42

    A. Plaintiffs Mischaracterize Saudi Arabia's Religion ...... 42

    B. Plaintiffs' Contentions That Saudi Arabia Supported Terrorists Are Baseless ...... 45

        1. No Evidence Supports Plaintiffs' Claim That Saudi Officials or Agents Were Part of an "Extremist MOIA Enterprise" ...... 45

        2. No Evidence Supports Plaintiffs' Claim That Saudi Officials, Employees, or Agents "Hosted" Terrorists ...... 53

        3. The Individuals Who Assisted Al Hazmi and Al Mihdhar Were Not Part of Any Support Network ...... 55

V. Nothing Al Bayoumi or Al Thumairy Did Caused the 9/11 Attacks ...... 57

VI. The Dismissed Charity Allegations Are No Longer Before the Court ...... 58

CONCLUSION ...... 60

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**CASES**

*Anderson v. City of New York*, 657 F. Supp. 1571 (S.D.N.Y. 1987) ................................8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................13

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003) ......................................12

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016)...................................12

*AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992) .......................................19

*Bichler v. Eli Lilly & Co.*, 436 N.E.2d 182 (N.Y. 1982) ................................32

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
 581 U.S. 170 (2017)...........................................................................................4, 5

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ......................................8, 9

*City of New York v. Pullman Inc.*, 662 F.2d 910 (2d Cir. 1981) ................................7, 8, 9

*Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela*,
 556 F. Supp. 2d 272 (S.D.N.Y. 2008), *aff'd*, 341 F. App'x 722
 (2d Cir. 2009)................................................................................................31

*Corrigan v. Town of Brookhaven*, 2023 WL 7003936 (E.D.N.Y. Oct. 24, 2023)...................32

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ................................13

*Farmers Ins. Grp. v. Cnty. of Santa Clara*, 906 P.2d 44 (Cal. 1995) ...........................19

*Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180 (2d Cir. 2002)...........................12

*First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172 (2d Cir. 1998)...........................6

*Gentile v. Nulty*, 769 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................59

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012)...........................53

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377
 (2d Cir. 2006)................................................................................................18, 19

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221
 (S.D.N.Y. 2018)................................................................................................32

*Ierardi v. Sisco*, 119 F.3d 183 (2d Cir. 1997) ................................20

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257
(2d Cir. 2005) ..................................................................................... 13

*John St. Leasehold, LLC v. Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527
(S.D.N.Y. 2001), *aff'd*, 283 F.3d 73 (2d Cir. 2002) ............................ 19

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 2018 WL 8996333
(S.D.N.Y. Mar. 5, 2018) ....................................................................... 16

*Kamen v. AT&T Co.*, 791 F.2d 1006 (2d Cir. 1986) ......................................... 6

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
(D.C. Cir. 2004) ..................................................................................... 6

*Licci ex rel. Licci v. Lebanese Canadian Bank*, 672 F.3d 155 (2d Cir. 2012) .............. 20

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) .................................... 32

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358 (Cal. 1995) ................... 20

*Mamani v. Berzaín*, 309 F. Supp. 3d 1274 (S.D. Fla. 2018) ................................. 7

*Mascarella v. Brown*, 813 F. Supp. 1015 (S.D.N.Y. 1993) ................................. 18

*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y.),
*aff'd*, 719 F. App'x 47 (2d Cir. 2017) .................................................... 6

*New York City Dist. Council of Carpenters Pension Fund v. Forde*, 2018 WL
2455437 (S.D.N.Y. June 1, 2018), *adopted as modified*, 341 F. Supp. 3d
334 (S.D.N.Y. 2018) .......................................................................... 16-17

*Owens v. Republic of Sudan*, 531 F.3d 844 (D.C. Cir. 2008) .............................. 6

*Parmalat Sec. Litig., In re*, 477 F. Supp. 2d 637 (S.D.N.Y. 2007) ........................ 8

*Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2d Cir. 1991) ................................. 10

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *cert. granted,
vacated & remanded sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813
(2020) ................................................................................................ 12

*Pittman ex rel. Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998) ........................ 32

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ......................... 13

*Rivera v. State*, 142 N.E.3d 641 (N.Y. 2019) ...................................... 20, 21, 26

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979) ................................... 20, 21

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001)......................................................5, 6

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) ................................................................6

*Scarpati v. United States*, 1994 WL 256691 (S.D.N.Y. June 7, 1994), *aff'd*,
    50 F.3d 4 (2d Cir. 1995)................................................................................................10

*Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679 (N.Y. 1985) ...........................................18, 19

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010)......................................................................18

*Terrorist Attacks on September 11, 2001, In re*, 714 F.3d 109 (2d Cir. 2013)..............................4

*Toole v. McClintock*, 999 F.2d 1430 (11th Cir. 1993) ...................................................................7

*Trayvilla v. Japan Airlines*, 111 N.Y.S.3d 224 (App. Div. 2019) .................................................32

*United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737 (2d Cir. 1989) ..................................7

*United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992) ..................................................................10

*United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016) ..........................................................13

*United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980)..........................................................10, 11

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698
    (S.D.N.Y. 2011)................................................................................................................11

*Upstate Shredding, LLC v. Ne. Ferrous, Inc.*, 2016 WL 865299
    (N.D.N.Y. Mar. 2, 2016)................................................................................................10

*Usoyan v. Republic of Turkey*:

    438 F. Supp. 3d 1 (D.D.C. 2020), *aff'd*, 6 F.4th 31 (D.C. Cir. 2021),
    *cert. denied*, 143 S. Ct. 395 (2022) .........................................................................5

    6 F.4th 31 (D.C. Cir. 2021), *cert. denied*, 143 S. Ct. 395 (2022) ........................5

*Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 992 F. Supp. 2d 102
    (N.D.N.Y. 2014) ..............................................................................................................59

*Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586 (N.D. Fla. May 11, 2023)...................32

*Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021), *cert. denied*,
    142 S. Ct. 2866 (2022)...............................................................................................31, 32

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247
    (2d Cir. 2000)................................................................................................................12

**STATUTES AND RULES**

Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521 (1992) ................................................................................................................31, 32

    18 U.S.C. § 2331(1) ................................................................................................31

    18 U.S.C. § 2333(a) ...............................................................................................31

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ......................................4, 12

    28 U.S.C. § 1605(a)(3) ............................................................................................4

    28 U.S.C. § 1605(a)(5) ............................................................................................5

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ..................................................................................................................4, 6, 59

    28 U.S.C. § 1605B(b)(2) .........................................................................................4

Fed. R. Civ. P.:

    Rule 8 ......................................................................................................................6

    Rule 12(b)(1) ...........................................................................................................5

    Rule 56 ..................................................................................................................11

    Rule 56(c)(2) ...........................................................................................................6

Fed. R. Evid.:

    Rule 602 ................................................................................................................11

    Rule 801(d)(1)(A) .................................................................................................10

    Rule 801(d)(1)(B) .................................................................................................26

    Rule 803(3) ...........................................................................................................26

    Rule 803(6) .............................................................................................................9

    Rule 803(6)(E) ........................................................................................................9

    Rule 803(8) .............................................................................................................9

    Rule 803(8)(A)(iii) .................................................................................................7

    Rule 803(8)(B) ....................................................................................................8, 9

LEGISLATIVE MATERIALS

162 Cong. Rec. S2845 (May 17, 2016) ............................................................6


OTHER MATERIALS

2 *McCormick on Evidence* (8th ed.) .............................................................7

Alexander Meleagrou-Hitchens, *Incitement:  Anwar al-Awlaki's Western Jihad*
(Harv. Univ. Press 2020) ...................................................................38

Restatement (Third) of Agency (2006).........................................................19

Vienna Convention on Diplomatic Relations of 1961, Apr. 18, 1961,
23 U.S.T. 3227, 500 U.N.T.S. 95...................................................27

## GLOSSARY*

| | |
|---|---|
| 9/11 Rep. | National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf (excerpts at KSA Ex. 163) |
| 9/11 Rep., Executive Summary | National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States – Executive Summary* (July 2004), https://govinfo.library.unt.edu/911/report/911Report_Exec.pdf (KSA Ex. 291) |
| A. Johar Tr. | Deposition Transcript of Afrah Johar (May 18, 2021) (excerpt at KSA Ex. 249) |
| Afifi Tr. | Deposition Transcript of Zeinab Afifi (June 23, 2021) (Pls. Ex. 129) |
| Alzamari Tr. | Deposition Transcript of Akram Alzamari (Mar. 11, 2020) (Pls. Ex. 101) |
| Anqari Tr. | Deposition Transcript of Abdul Aziz Abdul Kareem Al Anqari (Jan. 13 & 14, 2021) (Pls. Ex. 94) |
| ANSS | Air Navigation System Support |
| Ash-Sheikh Tr. | Deposition Transcript of Saleh bin Abdulaziz Al Ash-Sheikh (Mar. 23, 2021) (Pls. Ex. 123) |
| *Ashton* Compl. | Consolidated Complaint, *Ashton v. Kingdom of Saudi Arabia*, No. 17-cv-2003 (GBD) (SN), ECF No. 1 (S.D.N.Y. Mar. 20, 2017) |
| ATA | Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521 (1992) |
| Awad Tr. | Deposition Transcript of Abdullah Al Awad (Mar. 9, 2021) (Pls. Ex. 95) |

---

* The short-form references in this Glossary include both sources cited in this Reply Memorandum and sources cited in the accompanying Response to Plaintiffs' Corrected Averment of Facts and Evidence.

| | |
|---|---|
| Bayoumi Tr. | Deposition Transcript of Omar Al Bayoumi (June 9-11, 2021) (Pls. Ex. 120) |
| CAC | Consolidated Amended Complaint, *In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (GBD) (SN), ECF No. 3463 (S.D.N.Y. Mar. 17, 2017) |
| Coombs Tr. | Deposition Transcript of Samuel G. Coombs (June 22, 2021) (Pls. Ex. 125) |
| Dunham Rep. | Expert Report of Lawrence Dunham (Apr. 1, 2022) (Pls. Ex. 152) |
| FBI May 2021 EC | FBI May 2021 Electronic Communication, EO14040-000001 – EO14040-000014 (KSA Ex. 80) |
| FBI July 2021 EC | FBI July 2021 Electronic Communication, EO14040-003478-MDL – EO14040-003608-MDL (Pls. Ex. 2CC) |
| FSIA | Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) |
| Gonzalez Decl. | Declaration of Daniel Gonzalez (May 26, 2021) (Pls. Ex. 89) |
| Heavey Decl. | Declaration of James H.M. Heavey (Aug. 1, 2023) (Pls. Ex. 163) |
| I. Johar Tr. | Deposition Transcript of Ibrahim Johar (May 20, 2021) (Pls. Ex. 109) |
| ICSD | Islamic Center of San Diego |
| *Incitement* | Alexander Meleagrou-Hitchens, *Incitement: Anwar al-Awlaki's Western Jihad* (2020) |
| Jaithen Tr. | Deposition Transcript of Abdullah Al Jaithen (Apr. 7 & 9, 2021) (Pls. Ex. 96) |
| Jarrah Tr. | Deposition Transcript of Musaed Al Jarrah (June 17-18, 2021) (Pls. Ex. 118) |
| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B) |

| | |
|---|---|
| Jenkins Rep. | Expert Report of Brian Michael Jenkins (Mar. 10, 2020) (excerpt at KSA Ex. 222) |
| Kaldirim Tr. | Deposition Transcript of Osman Kaldirim (June 12, 2019) (Pls. Ex. 121) |
| Khalil Tr. | Deposition Transcript of Khalil Al Khalil (June 14, 2019) (Pls. Ex. 113) |
| Kohlmann Rep. | Expert Report of Evan Francois Kohlmann (Apr. 1, 2022) (Pls. Ex. 150A) |
| KSA Aver. | Kingdom of Saudi Arabia's Averment of Jurisdictional Facts and Evidence in Support of Its Renewed Motion To Dismiss (KSA Ex. 1) |
| KSA Mem. | Memorandum of Law in Support of Kingdom of Saudi Arabia's Renewed Motion To Dismiss, ECF No. 9369 (S.D.N.Y. Oct. 6, 2023) |
| KSA Resp. to Pls. Aver. | Kingdom of Saudi Arabia's Response to Plaintiffs' Corrected Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco (KSA Ex. 160) |
| KSM | Khalid Sheikh Mohammed |
| KSM Statement | Substitution for the Testimony of Khalid Sheikh Mohammed (Pls. Ex. 31) |
| M. Johar Tr. | Deposition Transcript of Mohamed Johar (May 21, 2021) (Pls. Ex. 116) |
| Madha Decl. | Declaration of Usman Madha (May 28, 2021) (Pls. Ex. 72) |
| Madha Supp. Decl. | Supplemental Declaration of Usman Madha (Nov. 14, 2023) (Pls. Ex. 27) |
| Madha Tr. | Deposition Transcript of Usman Madha (June 25, 2021) (Pls. Ex. 128) |
| Mana Decl. | Declaration of Smail Mana (Nov. 2, 2019) (Pls. Ex. 168) |
| Mana Tr. | Deposition Transcript of Ismail Ammar Mohamed Mana (Apr. 21, 2021) (Pls. Ex. 110A) |

McGarrity Decl. — Public Declaration of Michael C. McGarrity, FBI (Sept. 12, 2019) (KSA Ex. 245)

Meleagrou-Hitchens Tr. — Deposition Transcript of Alexander Meleagrou-Hitchens (June 23, 2022) (Pls. Ex. 102)

Mersal Tr. — Deposition Transcript of Majed Al Mersal (May 27-28, 2021) (Pls. Ex. 115)

MOIA — Ministry of Islamic Affairs

Morgan Decl. — Declaration of Kaysan Morgan (Oct. 29, 2020) (Pls. Ex. 92)

Morgan Tr. — Deposition Transcript of Kaysan Morgan (June 21, 2021) (Pls. Ex. 112)

Moss Rep. — Rebuttal Expert Report of Douglas M. Moss (May 16, 2022) (KSA Ex. 148)

Moss Tr. — Deposition Transcript of Douglas Moss (June 10, 2022) (Pls. Ex. 106)

Muhanna Tr. — Deposition Transcript of Faisal Al Muhanna (June 3, 2021) (Pls. Ex. 108)

Nakhleh Rep. — Expert Report of Emile A. Nakhleh (May 14, 2022) (Pls. Ex. 149)

Nakhleh Tr. — Deposition Transcript of Emile A. Nakhleh (June 15, 2022) (excerpts at KSA Ex. 165)

OIG Rep. — Off. of Inspector Gen., U.S. Dep't of Justice, *A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (November 2004)* (June 2016), https://oig.justice.gov/sites/default/files/legacy/special/s0606/final.pdf (excerpts at KSA Ex. 96)

Pls. Aver. — Plaintiffs' Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco [Corrected], ECF No. 9541-1 (S.D.N.Y. Jan. 18, 2024)

Pls. Counterstatement to KSA Aver. of Facts — Plaintiffs' Counterstatement to the Kingdom of Saudi Arabia's Averment of Jurisdictional Facts [Corrected], ECF No. 9542 (S.D.N.Y. Jan. 18, 2024)

Pls. Opp. — Plaintiffs' Memorandum of Law in Opposition to the Renewed Motion To Dismiss of the Kingdom of Saudi Arabia [Corrected], ECF No. 9539 (S.D.N.Y. Jan. 17, 2024)

Qattan Tr. — Deposition Transcript of Ahmed Al-Qattan (Feb. 10, 2021) (Pls. Ex. 100)

Ratchford Decl. — Declaration of Holly Ratchford (May 29, 2021) (KSA Ex. 90)

Rundell Rep. — Rebuttal Expert Report of David Henry Rundell (May 16, 2022) (KSA Ex. 166)

Sadhan Tr. — Deposition Transcript of Adel Al Sadhan (Mar. 30-31, 2021) (Pls. Ex. 99)

Sageman Rep. — Rebuttal Expert Report of Marc Sageman (May 16, 2022) (KSA Ex. 167)

Sageman WAMY Rep. — Expert Report of Marc Sageman (Aug. 6, 2020) (excerpts at KSA Ex. 178)

Schiff Tr. — Deposition Transcript of Barry Schiff (July 11, 2022) (Pls. Ex. 104)

Simon Rep. — Expert Report of Steven N. Simon (Apr. 8, 2022) (Pls. Ex. 153)

Simon Tr. — Deposition Transcript of Steven Simon (June 9, 2022) (Pls. Ex. 127)

Snell Decl. — Declaration of Dietrich L. Snell (May 10, 2021) (Pls. Ex. 99)

Sudairy Tr. — Deposition Transcript of Mutaeb Al Sudairy (Apr. 1-2, 2021) (Pls. Ex. 119)

Sultan Tr. — Deposition Transcript of Mahmood Sultan (Apr. 1-2, 2021) (Pls. Ex. 114)

*Terrorist Financing Monograph* — John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing: Staff Report to the Commission* (2004), https://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf (Pls. Ex. 7)

| | |
|---|---|
| *The Black Banners* | Ali Soufan, *The Black Banners (Declassified)* (2011) (KSA Ex. 238) |
| Thumairy Tr. | Deposition Transcript of Fahad Al Thumairy (June 28-30, 2021) (Pls. Ex. 107) |
| Turki Tr. | Deposition Transcript of Abdullah Al Turki (Sept. 14, 2018) (Pls. Ex. 97) |
| Vasquez Decl. | Declaration of Efrain Vasquez (May 26, 2021) (Pls. Ex. 345) |
| VCDR | Vienna Convention on Diplomatic Relations of 1961, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 |
| Weidner Decl. | Declaration of Brian Weidner (Nov. 16, 2023) (Pls. Ex. 13) |
| Youssef Decl. | Declaration of Bassem Youssef (Dec. 20, 2023) (Pls. Ex. 694) |
| Youssef Rep. | Expert Report of Bassem Youssef – with Errata (May 3, 2023) (Pls. Ex. 5) |
| Youssef Tr. | Deposition Transcript of Bassem Youssef (June 29, 2022) (Pls. Ex. 105) |
| Zeid Tr. | Deposition Transcript of Al-Mohdar Mohamed Abdullah Zeid (May 7 & 10, 2021) (Pls. Ex. 117) |

## INTRODUCTION

The factual questions into which this Court ordered discovery in 2018 have straightforward answers.  No "Saudi official[ ]" – "senior" or otherwise – gave any "direction" to Omar Al Bayoumi or Fahad Al Thumairy to "assist[ ] . . . [the] 9/11 hijackers."  ECF No. 3946, at 23.  Al Bayoumi's assistance to Nawaf Al Hazmi and Khalid Al Mihdhar was minimal in "extent," *id.*, and had innocent motives:  to help fellow Saudis who were new to the San Diego Muslim community and to get a referral fee from his apartment manager.  Al Thumairy did not assist the hijackers at all.  Neither Al Bayoumi nor Al Thumairy directed any "agents," *id.*, to do anything for Al Hazmi or Al Mihdhar.  All this is shown by admissible evidence:  the testimony of percipient witnesses, including not only Saudi Arabia's former employees but also third parties; and contemporaneous documents such as bank records corroborating Al Bayoumi's testimony that he never paid the hijackers' rent or gave them money.

Plaintiffs' opposition brief largely abandons any theory of jurisdiction based on a direction to help the hijackers.  To the extent they address direction, they rely on purported circumstantial evidence such as error-laden phone call analyses that support no inference in their favor.  Mostly, they now press (at 54) a different theory that Al Bayoumi and Al Thumairy were part of an amorphous "pro-jihadist enterprise and support network" that created "foreseeable terrorist risks."  Not one of those conclusory labels is grounded in fact.  There is no evidence of an "enterprise," of a "support network," or of "jihadist" or "terrorist" associations by Al Bayoumi or Al Thumairy.  Nor is there reason to believe that Saudi officials – representatives of a foreign sovereign that was and is an ally of the United States, a sworn enemy of Al Qaeda, and an advocate for the peaceful spread of a quietist tradition of Islam – knew of or authorized any such thing.  Nor is there any basis for Plaintiffs to claim that the 9/11 attacks were a "foreseeable risk" of Saudi Arabia's conduct, even if that were the correct legal standard, which it is not.

Tightening the focus to specifics reveals how far Plaintiffs have strayed from reality. They contend that Al Bayoumi was a covert agent of the Ministry of Islamic Affairs ("MOIA") who was trained in clandestine "tradecraft," paid surreptitiously through a contractor for a separate agency, and privy to Al Qaeda's carefully kept secrets such as the methods and targets of the 9/11 attacks. Yet Plaintiffs also contend that Al Bayoumi planned to meet men he supposedly knew to be terrorists in a public restaurant with an innocent witness present, lent them a phone registered in his wife's name, had the same innocent witness videotape a gathering they attended with two dozen others, arranged for them to stay in the home of a longstanding FBI informant, left the meeting videotape to be found among his personal effects after the attacks triggered a worldwide manhunt, and voluntarily told police of his encounter with the hijackers.

Plaintiffs' increasingly wild theories even include assertions that Al Bayoumi prepared a flight plan and a "casing" report for the attacks, based on a document that appears to be a high-school math assignment and a tourist video that includes footage of artwork, flowerbeds, and a squirrel on the White House lawn. The record developed in discovery confirms that Al Bayoumi was no more than he appeared to be: an accountant for Saudi Arabia's civil aviation agency studying English and business abroad, who was part of the local Muslim community and a volunteer at a local mosque, and who became entangled in the 9/11 investigation because he had helped two fellow Saudis he had no reason to suspect of wrongdoing.

Similarly, Plaintiffs contend that Al Thumairy was another covert agent for whom Saudi Arabia created an elaborate cover and whom Saudi Arabia provided two separate mobile phones through "front men." Yet Plaintiffs also contend that he used those supposedly secret phones interchangeably with his personal mobile and residential phones to make and receive calls about covert activities; and then, after the 9/11 attacks, registered one of the secret phones in his own

name.  Plaintiffs also rely on an erroneous date translation generated by a program from a Bangladeshi hobbyist's website to contest Saudi Arabia's official calendar and to contend that Al Thumairy met the hijackers on a date where contemporaneous documents show him traveling to Riyadh by way of Washington, D.C.  And they accuse not only Al Thumairy, but also at least eight other MOIA officials (it is hard to tell exactly), of being aware of the hijackers' arrival and their malign intent.  The debunked theories, character assassination, and sheer fantasy that Plaintiffs present to the Court do not prove anything.

This Court is the factfinder for jurisdictional issues.  By statutory mandate, both subject-matter and personal jurisdiction depend on a determination that an official, employee, or agent of a foreign state, acting within the scope of their duties, committed a tortious act that caused Plaintiffs' injuries.  In this case, that means a determination that Al Bayoumi or Al Thumairy, as part of their work for Saudi Arabia, knowingly or with deliberate indifference provided the hijackers with assistance that had a reasonable connection to the 9/11 attacks.  Plaintiffs have had ample time and unprecedented discovery from the Saudi and the U.S. governments to meet their burden of coming forward with evidence to show that those jurisdictional elements are present. They have not come close.  And even if the Court finds that Plaintiffs have met their initial burden, Saudi Arabia's contrary evidence more than tips the scales in favor of immunity.  The cases against Saudi Arabia should end with a determination – in accord with the previous findings of the 9/11 Commission, the 9/11 Review Commission, the FBI, and the CIA – that there is no evidence to show that Saudi Arabia was complicit in the 9/11 attacks.

## ARGUMENT

I.    **The Court Should Resolve Jurisdictional Fact Disputes Using Admissible Evidence**

The standard for a motion to dismiss under the FSIA is well-settled.  Saudi Arabia is indisputably a foreign sovereign.  KSA Mem. 12.  Plaintiffs accordingly have the burden of "'going forward with evidence'" to show that "'immunity should not be granted.'"  *Id.* (quoting ECF No. 3946, at 5-6, quoting in turn *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013)).  If the Court finds Plaintiffs have carried that burden, it should then determine jurisdictional facts by a preponderance of the evidence, with Saudi Arabia bearing the ultimate burden of persuasion.  *Id.*  Plaintiffs mischaracterize this framework in several ways.

A.    **Whether Al Bayoumi's and Al Thumairy's Conduct Was Tortious or Within the Scope of an Agency Relationship Is a Jurisdictional Question**

Plaintiffs err in contending (at 6) that they need only "show that their factual allegations bring their claim within the parameters of an actionable tort."  For Plaintiffs to overcome Saudi Arabia's sovereign immunity, JASTA requires that any "damages" Plaintiffs seek must be "caused by . . . a tortious act or acts of [a] foreign state, or of an[ ] official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605B(b)(2).  Accordingly, whether there was a relevant "tortious act," whether it was "within the scope of . . . office, employment, or agency," and whether it "caused" Plaintiffs' damages are jurisdictional questions that the Court should answer by looking at evidence.

*Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 581 U.S. 170 (2017), confirms the point.  That case dealt with the FSIA's expropriation exception, which covers certain disputes over "rights in property taken in violation of international law." 28 U.S.C. § 1605(a)(3).  The Supreme Court held that plaintiffs must "show (and not just arguably show) a taking of property in violation of international law" to establish jurisdiction.

581 U.S. at 187.  It explained that "resolution of factual disputes" relevant to jurisdiction should occur "as near to the outset of the case as is reasonably possible."  *Id.*; *see id.* at 178 (emphasizing that this approach applies even where "answer[ing] the jurisdictional question" requires a court "inevitably [to] decide some, or all, of the merits issues").  Plaintiffs cannot forestall that jurisdictional inquiry by arguing that it calls for findings that would also go to the merits.

*Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021), *cert. denied*, 143 S. Ct. 395 (2022), on which Plaintiffs rely (at 8-9), does not help them.  *Usoyan* involved an assault by the President of Turkey's security detail on protesters.  The protesters invoked the non-commercial-tort exception, 28 U.S.C. § 1605(a)(5), and Turkey did not contest at the jurisdictional stage that the alleged assault was tortious.  *See Usoyan v. Republic of Turkey*, 438 F. Supp. 3d 1, 12 (D.D.C. 2020), *aff'd*, 6 F.4th 31.  Turkey instead argued that its immunity was preserved by § 1605(a)(5)'s discretionary-function exception.  In rejecting that argument, the D.C. Circuit stated that "whether Turkey's acts were justifiable" was "a merits question, not a jurisdictional one."  *Usoyan*, 6 F.4th at 47.  That passing remark does not show that here, where Saudi Arabia vigorously contends that no relevant tortious act occurred, the issue is not jurisdictional.

In any event, it has been clear in the Second Circuit since at least *Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001), that whether conduct was "tortious" under § 1605(a)(5) should be resolved on a motion to dismiss under Rule 12(b)(1) – including, if necessary, factfinding by the Court.  *Robinson*, which affirmed the dismissal of a slip-and-fall claim against Malaysia, explained that the plaintiff was required not only to "alleg[e]," but also to "proffer . . . evidence to support," his contention "that the Malaysian government committed a 'tortious act or omission.'"  *Id.* at 142.  It further stated that the district court was "required" "to determine" both "what the relevant activities of the Malaysian government were" and "whether

those acts were tortious under [applicable] law." *Id.* That forecloses Plaintiffs' argument that the question whether a tortious act occurred is not jurisdictional.

Plaintiffs misplace reliance (at 6) on general language in JASTA's preamble and legislative history. Nothing in JASTA (whether in its preamble or its operative text) addresses the procedure for finding jurisdictional facts; nor does the floor statement, 162 Cong. Rec. S2845 (May 17, 2016), that Plaintiffs cite. None of the cases cited in the floor statement, on which Plaintiffs also rely (at 6), involved factfinding after the plaintiffs received jurisdictional discovery.[1] The Court should now resolve the factual disputes on which it ordered discovery in 2018.[2]

## B.    The Court Should Disregard Inadmissible Materials

As Saudi Arabia showed in its opening brief (at 13 n.11), the Court should apply "the familiar standards of admissibility found in . . . Rule 56." *E.g.*, *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 499 (S.D.N.Y.), *aff'd*, 719 F. App'x 47 (2d Cir. 2017). That includes disregarding "material cited to support or dispute a fact [that] cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). A full list of Plaintiffs' exhibits to which Saudi Arabia objects is set forth in Exhibits 161 (for exhibits cited in Plaintiffs'

---

[1] *See Owens v. Republic of Sudan*, 531 F.3d 844, 894-95 (D.C. Cir. 2008) (applying Rule 8 to determine facial sufficiency of pleadings); *Rux v. Republic of Sudan*, 461 F.3d 461, 467-68 (4th Cir. 2006) ("Sudan's motion to dismiss here was based solely on the legal sufficiency of the pleadings."); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131-32 (D.C. Cir. 2004) (holding plaintiff had "more than . . . satisf[ied] any possible burden of production" because "the only discovery to date ha[d] been that which the plaintiff has voluntarily accorded the defendants" and "the plaintiff ha[d] not yet had an opportunity to conduct any").

[2] In a footnote (at 11 n.5), Plaintiffs assert that they "retain the benefit of their factual allegations and evidence" on "issues as to which [they] have not been afforded discovery." The only authority they cite, *Kamen v. AT&T Co.*, 791 F.2d 1006, 1010 (2d Cir. 1986), says nothing of the kind. Plaintiffs had ample opportunity in 2018 and during four years of discovery to show the Court why they needed discovery "'to verify allegations of specific facts crucial to an immunity determination.'" ECF No. 3946, at 7 (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)). They cannot meet their burden to come forward with evidence by criticizing the Court's discovery rulings.

brief or Averment) and 162 (for those not cited).  Evidentiary objections are also set out in

Exhibit 160 as part of Saudi Arabia's response to each Averment paragraph.

### 1. Plaintiffs Cannot Rely on FBI Preliminary Materials and Investigative Theories

**a.** Plaintiffs cannot rely on conclusory statements that set forth what FBI agents

suspected or hoped to prove.  Plaintiffs erroneously contend (at 21 n.12) that such documents

are "factual findings from a legally authorized investigation" under Federal Rule of Evidence

803(8)(A)(iii).  But "[a]n interim report subject to revision and review . . . d[oes] not satisfy the

express requirement of the Rule" for "the 'findings' of an agency or official."  *City of New York*

*v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981); *see also United Air Lines, Inc. v. Austin Travel*

*Corp.*, 867 F.2d 737, 743 (2d Cir. 1989) (affirming exclusion of reports in part because of their

"interim and inconclusive nature"); 2 *McCormick on Evidence* § 296 (8th ed.) ("[T]he statement

must constitute the conclusion of a governmental agency as opposed to a mere accumulation of

information, and it must not be an interim or preliminary document.") (footnote omitted).[3]

One preliminary document that Plaintiffs have mischaracterized as an agency finding,

as discussed in Saudi Arabia's opening brief (at 15), is a statement in FBI internal reports that Al

Jarrah "tasked al-Thumairy and al-Bayoumi with assisting the hijackers," *e.g.*, ECF No. 3463-4,

at 5, which the FBI later described as an "investigative theory," ECF No. 5142, ¶ 22.  Another

example is an FBI July 2021 electronic communication (the "FBI July 2021 EC"), prepared after

the FBI closed Operation Encore.  Pls. Ex. 2CC (3478-MDL to 3608-MDL).[4]  The FBI July 2021

---

[3] Plaintiffs mischaracterize (at 21 n.12) *Mamani v. Berzaín*, 309 F. Supp. 3d 1274 (S.D. Fla. 2018), which acknowledged that "Rule 803 'makes no exception for tentative or interim reports subject to revision and review'" before admitting particular reports that it found to be final.  *Id.* at 1295 (quoting *Toole v. McClintock*, 999 F.2d 1430, 1434-35 (11th Cir. 1993)).

[4] Plaintiffs have submitted a declaration from former FBI agent Brian Weidner purporting to authenticate the FBI July 2021 EC (which was created long after Weidner retired) and make

EC "consolidate[s]" earlier preliminary materials that the writer "located . . . and copied," while cautioning that it "should not be considered an intelligence assessment" and that the writer was "not investigating or re-investigating the 9/11 investigation" because of "a lack of resources and analytical assistance." *Id.* (3479-MDL, 3481-MDL).

     **b.**     In addition, the Court should disregard Plaintiffs' preliminary FBI materials because "the source of the information [and] other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B).  In assessing trustworthiness, courts consider "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).[5]

     As to timeliness, many preliminary FBI materials at issue were created years after the 9/11 attacks as part of "Operation Encore," which began in 2007.  As to skill, there is no record evidence of the skill of the investigators who created preliminary materials, but also no reason to ascribe to them greater skill than the authors of the 9/11 Report, the joint 2004 FBI-CIA report, the 9/11 Review Report, and the FBI's May 2021 EC, all of which constitute final findings of government investigations and all of which rejected the theory that senior Saudi officials directed Al Bayoumi and Al Thumairy to help Al Hazmi and Al Mihdhar or that the Saudi government otherwise assisted the hijackers.  *See Pullman*, 662 F.2d at 915 (describing it as "significant"

---

other factual statements.  The Court struck the Weidner declaration for violating a court order, but stated that it "m[ight] consider" the declaration "solely to authenticate" the FBI July 2021 EC.  ECF No. 9562, at 8.  There is no dispute that the FBI produced the July 2021 EC; but whether it is an authentic FBI document does not affect its failure to meet any hearsay exception.

    [5] *See also*, *e.g.*, *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 640-41 (S.D.N.Y. 2007) (excluding report where author "operated under . . . informational constraints," "did not hear both sides of the story," and "performed all of her work . . . for the express purpose of assisting [a] prosecutor in making his case"); *Anderson v. City of New York*, 657 F. Supp. 1571, 1579 (S.D.N.Y. 1987) (excluding report from congressional committee).

that an agency head "did not accept the recommendation of [a] staff report").  Operation Encore

also conducted no hearings, and its preliminary materials were not meant for public review.  *See*

*Bridgeway*, 201 F.3d at 143 (observing that Rule 803(8) "assum[es] . . . that public inspection to

which many such records are subject will disclose inaccuracies").

As for "motivation problems," *id.*, Operation Encore was no neutral factfinding exercise.

Some of the very interim reports Plaintiffs seek to admit describe Operation Encore as "*seek[ing]*

*to prove*" that Al Thumairy, Al Bayoumi, and Al Jarrah "provided . . . assistance with the

knowledge that al-Hazmi and al-Mihdhar were here to commit an act of terrorism."  Pls. Ex. 2F

(226-MDL) (emphasis added); Pls. Ex. 2H (276-MDL).  Several Operation Encore agents now

work for Plaintiffs.  *See* Gonzalez Decl. ¶ 10; Vasquez Decl. ¶ 16.  Treating their work product

as evidence rather than advocacy would depart from the "commonsense manner" in which Rule

803(8) should be applied.  *Pullman*, 662 F.2d at 914.[6]

## 2.      Plaintiffs Cannot Rely on Second-Hand Interview Reports

A separate subset of documents consists of reports of interviews conducted by FBI agents

(recorded on "FD-302" forms) or other investigators.  Although such reports are potentially

admissible under Rule 803(6) or 803(8) if properly certified as business or public records,

Plaintiffs have (as set out in Exhibits 161 and 162) submitted no such certifications for most of

the ones in the record.  Discovery also revealed substantial reasons to doubt the trustworthiness

of certain reports under Rule 803(6)(E) and Rule 803(8)(B).  Several third-party witnesses,

represented by their own independent counsel, have testified that reports prepared during

---

[6] *See also* KSA Resp. to Pls. Aver. ¶ 1495 (showing unreliable reporting by Gonzalez and
Vasquez); Sageman Rep. 423 (explaining that "participation" in Operation Encore was "limit[ed]
. . . to a few" agents, "allow[ing] for the self-selection of the most dedicated and zealous agents
who were convinced of Saudi complicity to egg each other [on], to become homogeneous in their
beliefs and sense of mission, and . . . to become victims of groupthink").

Operation Encore did not accurately represent their interviews.  KSA Resp. to Pls. Aver. ¶¶ 1721,

1726, 1731 (Zeid); *id.* ¶¶ 1495, 1570 (█████); *id.* ¶¶ 1473-1474, 1482-1483 (█████; *id.*

¶ 830 (████).  Some reports were prepared weeks or months after the interviews.  *Id.* ¶¶ 1482,

1495.  Some contained identical language for different interviews, suggesting cutting-and-

pasting.  *Id.*  In one instance, two very different reports were prepared for the same interview;

one relied on contemporaneous notes so cursory they are hard to make out.  *Id.*

 Even where interview reports may be admissible, underlying witness statements are a

second level of hearsay and cannot be used for their truth.  *See Parsons v. Honeywell, Inc.*, 929

F.2d 901, 907 (2d Cir. 1991) ("[E]ntries in a police report which result from the officer's own

observations and knowledge may be admitted but . . . statements made by third persons under no

business duty to report may not.") (emphasis omitted); *Upstate Shredding, LLC v. Ne. Ferrous,*

*Inc.*, 2016 WL 865299, at *13 (N.D.N.Y. Mar. 2, 2016) (applying double-hearsay analysis to

conclude that statements in FD-302 report were inadmissible); *Scarpati v. United States*, 1994

WL 256691, at *3 (S.D.N.Y. June 7, 1994) (same), *aff'd*, 50 F.3d 4 (2d Cir. 1995) (table).  The

reports in this case show the dangers of hearsay:  some witnesses are reported as giving very

different accounts of the same events.  *E.g.*, KSA Resp. to Pls. Aver. ¶ 1567 (discussing conflicts

among Morgan's eight different versions of his trip to Los Angeles with Al Bayoumi).

 Nor do statements in interview reports qualify as prior inconsistent statements under

Rule 801(d)(1)(A) or permissible extrinsic impeachment material.  Rule 801(d)(1)(A) applies

only to statements "given under penalty of perjury at a trial, hearing, or other proceeding or in

a deposition," Fed. R. Evid. 801(d)(1)(A), which these were not.  In addition, "a 'third party's

characterization' of a witness's statement does not constitute a prior statement of that witness

unless the witness has subscribed to that characterization."  *United States v. Almonte*, 956 F.2d

27, 29-30 (2d Cir. 1992) (quoting *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980));

*see Leonardi*, 623 F.2d at 756-57 (affirming exclusion of "FBI agent's memorandum" that witness "had never seen" before "his cross-examination"). The reports here were never "endorsed" by the witnesses and are nothing like "verbatim transcript[s]." *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 710 (S.D.N.Y. 2011).

### 3.    Plaintiffs Cannot Rely on Fact Witnesses Without Personal Knowledge

The Court should disregard the testimony of purported fact witnesses who lack "personal knowledge of the matter[s]" to which they testify. Fed. R. Evid. 602. Examples include Kaysan Morgan's statement that he believes Al Bayoumi's encounter with Al Hazmi and Al Mihdhar was not a coincidence and his account of the Arabic discussion that occurred in that encounter, KSA Resp. to Pls. Aver. ¶¶ 1575-1577, 1605; Usman Madha's statement that Al Thumairy was part of an extremist group or held extremist beliefs, *id.* ¶¶ 148, 412; Samuel Coombs's statement that the amount or manner in which Al Bayoumi was paid while seconded to Dallah Avco was unusual, *id.* ¶ 672; and Akram Alzamari's statement that Mohammed Johar told him that Al Hazmi and Al Mihdhar "came through" Al Thumairy, *id.* ¶ 1474. The Court should also disregard documents that rely on statements from witnesses whose identities and bases for knowledge (if any) are not disclosed. *E.g.*, *id.* ¶¶ 112, 868 (statement in Pls. Ex. 2W (2638-39) that an unidentified source "reported" that Al Bayoumi was a Saudi intelligence "cooptee"); *id.* ¶ 538 (statement in Pls. Ex. 288 (██████) that ████████████████████████████████ ████████████████████████) (██████████████████).

### C.    The Court Has Discretion To Determine Whether To Hold an Evidentiary Hearing

Although Rule 56 provides guidance on evidentiary standards, Plaintiffs err in contending (at 10) that the Court's "review of the parties' written submissions is governed by the Rule 56 'material issue of fact' standard" so that the Court may not resolve factual disputes without an

evidentiary hearing.  There is ample basis for the Court to determine there are no factual disputes because Plaintiffs have not met their burden of production.  Even if the Court finds that Plaintiffs have met that burden, it still has discretion to decide whether an evidentiary hearing would help resolve any such disputes.  A "district court's decision not to hold an evidentiary hearing" in an FSIA case is "reviewed for abuse of discretion."  *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)); *see also id.* at 208 (quoting statement in *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003), that a "[a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction").  That is different from summary judgment, where factual disputes require a trial as a matter of law.

In arguing to the contrary, Plaintiffs mischaracterize (at 10-11) *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *cert. granted, vacated & remanded on other grounds sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020).  *Peterson* considered and rejected an argument that an evidentiary hearing is always needed to resolve factual disputes:

> [I]t is within the district court's discretion to *decide disputed jurisdictional facts*, even at the motion to dismiss stage, *without holding an evidentiary hearing* where, as here, the court "considered all the submissions of the parties" and it "has not been shown that a hearing was necessary because the resolution of factual issues was not readily ascertainable from the declarations of witnesses or turned on questions of credibility."

*Id.* at 77 n.6 (quoting *Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (per curiam)) (emphases added; cleaned up).  *Filetech*, too, made clear that a hearing was discretionary and affirmed a decision not to hold one.  *See* 304 F.3d at 183.  This Court has ample leeway to decide whether an evidentiary hearing would actually assist in factfinding.

Plaintiffs also misstate the law in contending (at 12) that they can carry their burden of production (and so, they assert, demand a hearing) merely by urging the Court to "disbelie[ve]

. . . the Kingdom's fact witness testimony." Even on summary judgment, a plaintiff cannot get to a jury merely by making "'general attacks upon the defendant's credibility.'" *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261-62 (2d Cir. 2005) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) ("discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion") (cleaned up).[7]

Every current or former Saudi official or employee asked has denied giving or knowing of any direction to anyone to provide any assistance to Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. KSA Aver. ¶ 232 (collecting citations). Third-party witnesses accused of complicity have testified that they had no knowledge of the hijackers' intentions and were not asked to assist them. *Id.* ¶ 87 (M. Johar); *id.* ¶¶ 131-132 (Zeid); *see also* KSA Resp. to Pls. Aver. ¶¶ 1114, 1119 (discussing FBI finding that Abdussatar Shaikh, who died before discovery began, was also not complicit). Plaintiffs cannot carry their burden just by asserting that every percipient witness has lied. Nor do those baseless assertions compel this Court to hold a hearing on Plaintiffs' claims.

### D.     The Court Should Not Consider Facts Not Set Out in Plaintiffs' Brief

Before briefing began, the Court ordered the parties to "set forth all pertinent facts" in their briefs and stated: "This may not be accomplished by incorporating by reference other documents such as declarations or averments of facts." ECF No. 9026, at 4. The Court further warned that it would "consider only averments cited in the briefs." *Id.* Plaintiffs' opposition brief is accompanied by an Averment containing 2,118 paragraphs. Most of those paragraphs

---

[7] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), on which Plaintiffs rely (at 12), is not to the contrary. That case addressed a plaintiff who had both made out a *prima facie* case of employment discrimination and also proved the employer's nondiscriminatory explanation false. 530 U.S. at 147. Similarly, *United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016), held that the "totality of the evidence," of which "false testimony" was only one piece, supported a jury's verdict. *Id.* at 132.

(73%) either are not cited at all in Plaintiffs' brief or are cited only in overbroad ranges that Plaintiffs proffer to support conclusory statements.  ECF No. 9560-1 (version of Plaintiffs' brief highlighting such statements); ECF No. 9560-3 (table setting forth 1,565 such paragraphs).

The Court denied Saudi Arabia's and Dallah Avco's motion to strike the offending parts of Plaintiffs' brief and Averment.  ECF No. 9562.  It acknowledged that there are "legitimate questions as to whether [Plaintiffs'] citations are proper" and that, "[a]t the very least, the Plaintiffs violated the spirit of" the Court's briefing order.  *Id.* at 5.  Nevertheless, the Court reasoned that the "procedural posture . . . and the importance of the issues raised . . . weigh[ed] against excluding marginal portions of the Plaintiffs' filings," as did the "substantial delay" if Plaintiffs had to rewrite and refile.  *Id.*  The Court did not, however, revisit its order requiring facts to be set forth in the briefs.  Accordingly, the Court can and should now disregard the parts of Plaintiffs' Averment that are improperly cited or not cited at all.

Because Plaintiffs' Averment remains in the record, Saudi Arabia is filing with this reply (as Exhibit 160) its own Response to Plaintiffs' Averment.  The Response is necessarily very long – because it must both repeat and respond to every Averment paragraph – and is not intended to be read front to back.  All paragraphs of the Response on which Saudi Arabia intends to rely are cited properly in this brief.  To the extent the Court considers other paragraphs of Plaintiffs' Averment, it should also consider Saudi Arabia's responses to those paragraphs.

## II.    Any Assistance to Al Hazmi and Al Mihdhar Was Not Within the Scope of Al Thumairy's or Al Bayoumi's Office, Employment, or Agency

The Court in March 2018 did not order discovery based on generalized theories of vicarious liability.  It reasoned that, although "Thumairy and Bayoumi may not have been acting within the scope of their employment, as imam and employee of Dallah Avco, respectively, Plaintiffs allege facts sufficient to show that they and their agents were following instructions

from more senior officials in the Saudi Embassy." ECF No. 3946, at 22. Four years of discovery then focused on Plaintiffs' baseless allegation that Al Thumairy and Al Bayoumi had received such "instructions." Plaintiffs now argue in their opposition brief (at 3, 57) that they need not come forward with "evidence that Saudi Arabia's officials and agents acted pursuant to an express directive" and that "express orders or instruction are not required for acts to be within the scope." Instead, they proffer (at 1) a new theory that Al Thumairy, Al Bayoumi, and others "act[ed] within the core of their functions . . . in coordinating an essential support network for pro-jihadist extremists." That theory is both a telling retreat from the allegations Plaintiffs used to obtain discovery and itself unsupported by the record.

### A.    Plaintiffs Have No Evidence of Any Direction To Assist the Hijackers

**1.**    Saudi Arabia showed in its opening brief (at 13-17) that no evidence supports Plaintiffs' allegation that Al Thumairy or Al Bayoumi received any "direction [from] more senior Saudi officials[] to provide assistance to Hazmi, Mihdhar, [or any of the] other 9/11 hijackers." ECF No. 3946, at 23. So far as they address direction at all, Plaintiffs rely (at 46) on "phone records," which they assert show "an intensive and unusual call circle among Thumairy, Bayoumi, ███, and MOIA Embassy Director Sowailem" at around the time of the hijackers' arrival in San Diego. Their brief sets forth no specific facts to support their general assertion that there was a "call circle," as opposed to a group of unrelated calls, or that any such "circle" was "intensive and unusual." The paragraphs they cite from their Averment are conclusory, speculative, and based on incorrect or unreliable information.[8]

---

[8] Plaintiffs' Averment relies on conclusory assertions, KSA Resp. to Pls. Aver. ¶ 1247, 1249; on Youssef's unreliable opinions, *id.* ¶¶ 1248-1250, 1253-1254; on inadmissible hearsay and conclusory statements from FBI preliminary investigative materials, *id.* ¶¶ 1251-1253, 1262; on misattribution to Al Thumairy of calls from numbers that were not his, *id.* ¶¶ 1254, 1259, 1265; on misattribution to Al Bayoumi of calls that were made on a shared mosque phone line, *id.* ¶¶ 1254, 1256, 1265; and on conjecture that more calls might exist, *id.* ¶¶ 1255, 1263.

**2.**     Plaintiffs have no persuasive response to Saudi Arabia's showing in its opening brief (at 26-28 & nn.27-29) that their purported expert Bassem Youssef's analysis makes significant errors that misattribute calls and inflate their numbers.  Instead, they bluster about Youssef's credentials (at 46 n.16) with no substantive defense of his work.  Plaintiffs also contend (at 21, item 10) that some calls they misattribute to Al Thumairy were really his because the subscribers (Faisal Al Muhanna and Saleh Al Hatlani) were "front m[e]n" who covered up Al Thumairy's involvement in those calls.  There is no evidence of any such thing.  KSA Resp. to Pls. Aver. ¶¶ 738-739, 746.  Al Thumairy also used his home phone to call the same purportedly suspicious numbers.  *E.g.*, *id.* ¶¶ 739, 746.  It makes no sense that he would use secret cell phones to conceal his calls to certain numbers but also call them with a phone registered in his own name, *id.*; Sageman Rep. 461, 628-29; or that after the 9/11 attacks he would link himself to one of the secret phones by registering it himself, KSA Resp. to Pls. Aver. ¶¶ 739, 746.

**3.**     Plaintiffs also attach 26 new charts (Pls. Ex. 12A through 12Z) not found in Youssef's report purporting to show phone calls.  The charts fix some of Youssef's errors, leave others as they were, and introduce new mistakes such as double-counting calls.  KSA Resp. to Pls. Aver. ¶¶ 444-446, 607, 735, 741-742, 749 (misattributed calls in Pls. Exs. 12A, 12B, 12E, 12J, 12K, 12L, 12M, 12U; double-counted calls in Pls. Ex. 12A); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 2018 WL 8996333, at *1 (S.D.N.Y. Mar. 5, 2018) (rejecting exhibit that was "not a neutral summary, but an argument unsupported by the underlying data").  The new exhibits also rely directly on inadmissible hearsay without even the fig-leaf of Youssef as a conduit.  KSA Resp. to Pls. Aver. ¶¶ 94, 444-446, 604, 607, 653, 735 (examples from Pls. Exs. 12A, 12B, 12C, 12J, 12R); *see New York City Dist. Council of Carpenters Pension Fund v. Forde*, 2018 WL 2455437, at *14 (S.D.N.Y. June 1, 2018) (rejecting summary exhibit for lack of a "basis for concluding that any of the underlying evidence is admissible"), *adopted as modified*,

341 F. Supp. 3d 334 (S.D.N.Y. 2018).  In sum, Plaintiffs' charts are not admissible or reliable at all, and certainly cannot support inferences from call frequencies at particular times.

4.        Plaintiffs fail to address the innocuous reasons for phone calls between and among various individuals, the Saudi Embassy, and the Saudi Consulate in Los Angeles set out in Saudi Arabia's opening brief (at 29-30).  In light of those reasons, there is no basis to infer that any of those calls concerned Al Hazmi and Al Mihdhar.

a.        Al Thumairy contacted the Embassy and his nominal supervisor Al Sowailem for administrative matters, such as leave requests.  KSA Aver. ¶¶ 182-183.  These calls occurred with the same frequency both before the hijackers arrived (indeed, even before Al Qaeda conceived the 9/11 plot) and afterwards.  KSA Resp. to Pls. Aver. ¶ 1259.

b.        Al Bayoumi contacted the Embassy and the Los Angeles Consulate as a volunteer for the Al Madina Mosque to request donations and Islamic material.  *Id.* ¶ 1257.  He also called the Embassy's Cultural Mission, which worked with Saudi students in the United States.  *Id.* His call volume to diplomatic facilities increased before his visit to the Consulate to renew his families' passports and pick up religious material.  *Id.* ¶¶ 1518-1522 (showing that Al Bayoumi made multiple calls to Keller Graduate School and more than a dozen to the Cultural Mission during this time period and that Al Bayoumi's application to renew his passport includes a letter from Keller confirming his enrollment); *id.* ¶ 1618 (showing that Al Bayoumi's calls do not, as Plaintiffs assert (at 47), cease when the hijackers "were safely settled in San Diego").

c.        Al Bayoumi explained that he called Al Thumairy about religious questions from mosque patrons.  KSA Resp. to Pls. Aver. ¶ 1254.  It is unsurprising that a number of these calls occurred during the holy month of Ramadan, when Al Thumairy received many more such calls.

Sageman Rep. 463 (showing that Al Thumairy made 226 total calls during Ramadan, compared to an overall monthly average of 128, and likely received even more).

    **d.**    No call record shows calls between ████ and Al Bayoumi.  KSA Resp. to Pls. Aver. ¶ 1262.[9] ████████████████████████; it is unsurprising that Al Thumairy called him about a dozen times from November 1999 to January 2000.  *Id.* ¶¶ 1261-1264.

    **B.**    **Assistance to the Hijackers Would Not Have Been Within the Scope of Any Official, Employment, or Agency Relationship with the Saudi Government**

    **1.**    **New York Law Governs Employment and Agency Issues**

The March 2018 Order "look[ed] to New York law to determine the relevant scope of vicarious liability under JASTA" because "the majority of Plaintiffs' injuries arising out of the 9/11 Attacks occurred in New York, and most of the Plaintiffs are domiciled there," rejecting Plaintiffs' "argu[ment] that California law should apply."  ECF No. 3946, at 10-12 (citing *Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010), and *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384-85 (2d Cir. 2006)).  Plaintiffs sought no reconsideration of that ruling.

Even if this Court were to revisit choice of law (and there is no reason it should), its previous analysis was correct.  As Plaintiffs concede (at 54-55), New York choice-of-law rules govern.  In tort cases, New York's choice-of-law analysis depends on whether a dispute involves a rule that sets "'standards of conduct'" or one that "'allocat[es] losses.'"  *GlobalNet*, 449 F.3d at 384 (quoting *Mascarella v. Brown*, 813 F. Supp. 1015, 1019 (S.D.N.Y. 1993), in turn quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684-85 (N.Y. 1985)).  For loss-allocating

---

[9] Plaintiffs cite to a hearsay document, Pls. Ex. 2JJ (603-15-UPDATED), stating that ████ called Al Bayoumi in the morning of January 5, 2000.  No such call is shown in any phone records.  The same document states that ████ was on another call at the same time and questions whether the call information is accurate.  KSA Resp. to Pls. Aver. ¶ 1262.

rules, New York courts look primarily to "the parties' domiciles."  *Id.*; *see AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) ("[W]hen the law in conflict is loss allocating, the law of the state where at least one of the parties is domiciled generally applies.").[10]  New York classifies "vicarious liability" rules as loss-allocating.  *See GlobalNet*, 449 F.3d at 384; *Schultz*, 480 N.E.2d at 685.[11]  Plaintiffs do not dispute that most of them are domiciled in New York.  Saudi Arabia has not pressed for its own law.  It follows that New York agency law applies.

> ### 2.  Under New York Law, a Principal Is Not Liable for Actions of an Official, Employee, or Agent Outside the Scope of Office, Employment, or Agency

Under New York law, a principal is liable for its agents' torts performed "within the scope of their agency" but not for acts "'motivated solely by personal motives unrelated to the furtherance of the principal's business.'"  ECF No. 3946, at 12 (quoting *John St. Leasehold, LLC v. Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527, 543 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 73 (2d Cir. 2002) (per curiam)).  A principal may also be held liable for "'authoriz[ing] [an] agent's commission of a crime or an intentional tort.'"  *Id.* (quoting Restatement (Third) of Agency § 2.02 cmt. h (2006)).  As already shown, Plaintiffs have no evidence that Saudi Arabia directed Al Thumairy or Al Bayoumi to assist the 9/11 hijackers.

---

[10] Plaintiffs assert without support (at 55) that "New York courts also look for guidance to the factors listed in *Restatement (Second) Conflict of Laws*" and invoke its multi-factor test.  They cite no case applying New York law that has resorted to a general § 145 inquiry rather than the analysis set out in *GlobalNet*.  In any event, the Restatement factors would favor New York as the domicile of most Plaintiffs and as the place where the most injuries occurred.

[11] Plaintiffs incorrectly state (at 56) that California considers vicarious-liability rules to be "*both* conduct-regulating and loss-allocating."  Because New York choice-of-law rules apply, New York's classification controls.  In any event, Plaintiffs mischaracterize California law.  *See Farmers Ins. Grp. v. Cnty. of Santa Clara*, 906 P.2d 440, 448 (Cal. 1995) (describing "the central justification for respondeat superior" as being that "*losses* fairly attributable to an enterprise . . . should be *allocated* to the enterprise") (emphases added).

Plaintiffs err in contending (at 58) that New York law permits liability for the acts of an employee or agent whenever that employee's or agent's acts were "general[ly] . . . foreseeab[le]." *Riviello v. Waldron*, 391 N.E.2d 1278, 1282 (N.Y. 1979). The Second Circuit has cautioned against "inordinate emphasis on the concept of general foreseeability" when applying New York employment law. *Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997). Instead, courts consider

> "the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated."

*Rivera v. State*, 142 N.E.3d 641, 645 (N.Y. 2019) (quoting *Riviello*, 391 N.E.2d at 1281); *see* ECF No. 3946, at 11-12. In any event, Plaintiffs cannot show foreseeability of any kind.

Because Plaintiffs do not contend that New York and California law are different, there is no need to examine California law. *See Licci ex rel. Licci v. Lebanese Canadian Bank*, 672 F.3d 155, 157 (2d Cir. 2012) (per curiam) ("If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."); *see* ECF No. 3946, at 11 n.7. In any event, California holds employers liable for intentional employee torts only where "the tort [is] engendered by or arise[s] from the work," so that "[t]he employment . . . predictably . . . create[s] the risk employees will commit intentional torts of the type for which liability is sought." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 362 (Cal. 1995). Despite their rhetoric, Plaintiffs fail to show that it was predictable that Al Bayoumi or Al Thumairy would assist terrorists seeking to harm the United States.

### 3.      Al Bayoumi's Work Had Nothing To Do with Helping Terrorists

**a.**      Al Bayoumi's testimony and contemporaneous documents show that he was an accountant sent to the United States to learn English and pursue an education. KSA Aver. ¶¶ 19, 21. His employer, the PCA, seconded him to its contractor Dallah Avco, which paid his education

and living expenses. *Id.* ¶¶ 20-21. He helped to found and volunteered at a local mosque near

San Diego. *Id.* ¶ 29. As a result, he attended mosque events, *e.g.*, *id.* ¶ 118 (reception to thank

Ramadan volunteers), and met visiting preachers or religious scholars, *id.* ¶ 180 (████████████

████████████████████████████████); *id.* ¶ 197 (meeting with Al Sudairy); *id.*

¶ 215 (meeting with Al Mersal and attendance at lectures by Al Jaithen). There is no evidence

that his volunteer work had anything to do either with extremism or with his employment (or any

agency) relationship with Saudi Arabia.

Even if Plaintiffs had evidence that Al Bayoumi helped Al Hazmi and Al Mihdhar because

he was a secret terrorist sympathizer (which they do not, *see infra* pp. 33-41), they could not

show that he "further[ed]" the PCA's "business" by doing so. ECF No. 3946, at 12. Applying

the *Rivera* and *Riviello* factors reinforces that conclusion. There is no connection of "time, place

[or] occasion" between Al Bayoumi's studies at educational institutions in the United States and

his encounters with Al Hazmi and Al Mihdhar. *Rivera*, 142 N.E.3d at 645. Despite Plaintiffs'

attempts to tar Al Bayoumi as an extremist, there is no evidence that he had any "history"

or "actual practice" of helping terrorists, or that it was something he "commonly d[id]" as a

PCA employee. *Id.* Such acts would be an extreme "departure from [the] normal methods" of

accountancy or graduate studies. *Id.* And Plaintiffs fail to show any reason that the PCA could

reasonably have anticipated that Al Bayoumi would help attack the United States. *Id.*

**b.** Plaintiffs have no evidence to support their assertion (at 23) that Al Bayoumi was

a "'cooptee' of Saudi intelligence." The FBI memorandum they cite attributes this information

to an unnamed "[r]ecent source," Pls. Ex. 2AA (3283-MDL), and so is double hearsay subject to

no exception. Al Bayoumi testified that he neither has been a Saudi intelligence officer or agent

nor had "'any assignment for any Saudi intelligence . . . agency.'" KSA Aver. ¶ 28 (quoting

Bayoumi Tr. 724:18-725:13). In addition, because Saudi intelligence was working to stop

Al Qaeda, not to help it, an intelligence "cooptee" would have had no motive to help terrorists.[12]

Also, Plaintiffs do not explain how any alleged assignment for Saudi intelligence would support

their allegation that Al Bayoumi played a covert role for MOIA.

    **c.**    Nor, as Plaintiffs contend (at 23-24), does the PCA's direction to Dallah Avco to

pay for Al Bayoumi's salary and benefits while he was in the United States equate to "awareness

[of] and support for his covert work." Al Bayoumi's studies were part of a "Saudization program"

that trained Saudi nationals to replace expatriate employees of government contractors. KSA

Aver. ¶¶ 17-18. Dozens of other PCA employees ("45 to 50," *id.* ¶ 18 (quoting Coombs Tr.

49:25-50:11)) had similar arrangements. KSA Resp. to Pls. Aver. ¶ 629. Plaintiffs assert (at 24)

that Al Bayoumi's job was a "sham" because paperwork described him as a "data processing

technician," but that does not show he was a covert operative. A more reasonable explanation is

that PCA, Dallah Avco, or both decided to pay Al Bayoumi's salary and educational expenses

with an open position on the ANSS project payroll regardless of the job title. There is also

nothing to show that the secondment was related to MOIA. KSA Resp. to Pls. Aver. ¶ 674.

    **d.**    Plaintiffs also assert (at 59-60) that Adel Al Sadhan, Mutaeb Al Sudairy, Majed

Al Mersal, and Abdullah Al Jaithen were "extremists" and that Al Bayoumi "support[ed]" them

when they visited Southern California, supposedly to show that supporting extremists was part of

his job. Notably, Plaintiffs downplay (at 60 n.23) their previous theory, rebutted in Saudi Arabia's

opening brief (at 25-26), that the visitors were "advance team[s]." In any event, there is no

evidence that Al Sadhan, Al Sudairy, Al Mersal, or Al Jaithen supported terrorism, *infra* pp. 46,

---

[12] KSA Aver. ¶ 70 (discussing the efforts of Prince Turki Al Faisal, who then headed Saudi intelligence, to extradite bin Laden for prosecution); *id.* ¶ 72 (discussing bin Laden's belief that Saudi Arabia had attempted to kill him); *see also id.* ¶ 590; Sageman Rep. 296-97 (discussing "poorly sourced and vague" cooptee allegation and explaining that, even "[i]f al-Bayoumi was a cooptee of the GID," "he would have been opposed to the hijackers").

49-50; that Al Bayoumi gave them substantial support (he may have booked Al Jaithen a hotel room), *infra* pp. 46-47, 50-51; or that his interactions with any of the four were part of his work for Saudi Arabia, as opposed to his volunteer work at the Al Madina Mosque, *infra* pp. 47-48.

    **e.**    Plaintiffs' jumbled list (at 25-27) of other contentions does not withstand scrutiny. Many list items are not properly before the Court because they are conclusory statements for which Plaintiffs' brief has no supporting facts. Regardless, it does not suggest status as a "key operative" that Al Bayoumi had an extensive "phone book" (item 1) or "host[ed] Saudi religious officials" at the Al Madina Mosque (item 2), nor that in 1998 he may have been paid to help type up and edit a report that someone else sent to the Ambassador (items 3-4). Assertions that he interacted with "extremists" or "radicals" (items 5, 10), or that he had "ties" with Anwar Al Awlaki (item 11), are mere guilt by association and unrelated to any employment or agency relationship with Saudi Arabia; and Plaintiffs have no evidence to show that Al Bayoumi associated with anyone whom he knew supported terrorism.[13] Nor is there anything beyond Plaintiffs' say-so to suggest that Al Bayoumi's phone calls with Al Thumairy (item 6), the number of which Plaintiffs exaggerate, *supra* p. 16, had anything to do with work for Saudi Arabia.

    Some of Plaintiffs' items cut against their own theory that Al Bayoumi was a covert agent. Their assertion that Al Bayoumi worked towards "MOIA religious and operational control" of the Al Madina Mosque (item 7) involves Al Bayoumi's volunteer work with the

---

[13] For Al Sadhan, Al Sudairy, Al Jaithen, and Al Mersal, see *infra* pp. 46, 49-50. For ▒▒▒▒▒▒▒▒ and Omar Abdi Mohamed, see *infra* pp. 52-53; for Al Awlaki, see *infra* p. 38. For Osama Bassnan, Plaintiffs cite only inadmissible hearsay that he supported terrorism or that Al Bayoumi associated with him. KSA Resp. to Pls. Aver. ¶¶ 936-940 (Bassnan). For Saad Al Habib and ▒▒▒▒▒▒▒▒, Plaintiffs cite only inadmissible hearsay and unreliable expert testimony that they supported terrorism. *Id.* ¶ 1159-1169 (Al Habib); *id.* ¶¶ ▒▒▒▒ (▒▒▒▒▒▒).

mosque, which was out in the open and unrelated to Al Bayoumi's work for Saudi Arabia.[14]

Al Bayoumi's "visits to the Saudi Embassy and Consulate" (item 8) weigh against any covert status, because a "competent intelligence officer . . . tr[ying] to keep his relationship with [Saudi Arabia] clandestine" would not "frequent[ly]" visit an "official Saudi establishment."  Sageman Rep. 301.  █████ alleged statements to Operation Encore (which ████ denies making) that Al Bayoumi was, for example, "considered higher in rank than the Consul General" are inadmissible hearsay.  KSA Resp. to Pls. Aver. ¶ 830.  Even if admissible, those statements would suggest that Al Bayoumi's secret role was generally known in the Consulate, including by non-Saudi staff like ████ .  That is hardly consistent with him being a clandestine operative.

The rest of Plaintiffs' list is similarly unpersuasive.  There is no reason to think that Al Bayoumi's inability to recall in 2021 an individual named Magdi Hanna (item 13), whom he allegedly met more than 20 years earlier, *e.g.*, *id.* ¶ 654, was a deliberate lie rather than a failure of recollection.  Assertions in a preliminary FBI document that Al Bayoumi had job duties he did not perform, or did not attend classes (item 15), are not evidence.  *Id.* ¶ 717.  Indeed, contrary to Plaintiffs' assertions (item 17), both Al Bayoumi's testimony and contemporaneous documents show that he did attend classes.  *Id.* ¶¶ 681, 709-710, 712, 720; *see also* KSA Aver. ¶ 26 (showing that Al Bayoumi ultimately earned a master's degree in management).  Al Bayoumi's alleged purchase and use of calling cards (item 16) was not plausibly "tradecraft" in view of Plaintiffs' simultaneous allegation that he was also, at the same time, making calls to supposedly secret contacts using numbers to which he subscribed in his own name.  Sageman Rep. 302

---

[14] *E.g.*, *id.* ¶ 942 (addressing Plaintiffs' mischaracterization of Al Bayoumi's hearsay letters about the Al Madina Mosque); *id.* ¶ 956 (addressing Plaintiffs' mischaracterization of Al Bayoumi's hearsay statements to UK law enforcement authorities); *id.* ¶ 989 (addressing Youssef's unsupported assertion that Al Haramain funded the mosque); *see also* Bayoumi Tr. 297:11-20 (discussing Al Bayoumi's office at the mosque).

("A competent intelligence officer would not leave a trail of communication with his official contact from his personal phone."). Finally, Plaintiffs' accusation that Al Bayoumi sought "to conceal and downplay his [various] contacts" (item 18) is a mere general attack on credibility – and, given the passage of time, an insubstantial one.[15]

### 4. Al Thumairy's Work Had Nothing To Do with Helping Terrorists

**a.** Al Thumairy worked for MOIA, which assigned him to its Da'wah Office in the United States, which in turn assigned him to Los Angeles, where he became the imam of the King Fahad Mosque. KSA Aver. ¶¶ 32-33; Thumairy Tr. 90:4-13. As imam, Al Thumairy led prayers, gave lessons and speeches, and answered religious questions. KSA Aver. ¶¶ 33, 237-238; Thumairy Tr. 241:18-242:15. MOIA promotes a quietist form of Hanbali Salafist Islam that defers to the King in matters of governance; it opposes political advocacy, violent jihad, and terrorism, especially suicide attacks. KSA Aver. ¶¶ 5(a), 6-7. Al Thumairy agreed with those views. He testified that he opposed "aggressions against anyone" in the name of Islam; witnesses who heard him speak at the mosque agreed. *Id.* ¶¶ 237-238.

In light of MOIA's quietist and politically deferential theology, if Al Thumairy had supported extremists who were actively hostile to Saudi Arabia (and there is no evidence that he did, *infra* pp. 41-42), he would have been doing the opposite of his job, and certainly not "further[ing]" MOIA's "business." ECF No. 3946, at 12. Because there is no evidence of Al Thumairy encountering the hijackers more than once, Plaintiffs can show no connection of "time, place [or] occasion" between his work for Saudi Arabia and any such encounters.

---

[15] Plaintiffs mischaracterize (at 62) Saudi Arabia's interrogatory response concerning Al Bayoumi's supervisor during his secondment and leave, which they baselessly attack as false. Saudi Arabia initially suggested, and later confirmed, that Alp Karli was Al Bayoumi's nominal supervisor during this period. Saudi Arabia further stated that Al Bayoumi's responsibility in the United States was to pursue his education and that Karli did not substantively supervise Al Bayoumi in doing so. Pls. Ex. 24, at 16; Pls. Ex. 25, at 3. Those responses were and are correct.

*Rivera*, 142 N.E.3d at 645.  Nor is there evidence that Al Thumairy had any "history" or "actual practice" of helping terrorists; that it was something he "commonly d[id]"; or that it related to his "normal methods" of leading prayers, answering religious questions, and giving sermons.  *Id.* Finally, MOIA, which works peacefully to spread quietist Islam, had no reason to anticipate that Al Thumairy would allegedly turn from that path.  *Id.*

    **b.**    Plaintiffs have no evidence to support their assertion (at 19-20) that Al Thumairy's "true work for Saudi Arabia . . . involved cultivating and leading jihadist extremists" and "fund[ing] . . . a network of jihadist agents." ██████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ KSA Resp. to Pls. Aver. ¶ 521.[16] ██████████████████████████████████████████████ ████████████████████████████████████ *Id.* (quoting KSA Ex. 201 (████████)). ████████████████████████████████ ██████████████████████ *Id.* (citing KSA Ex. 207 (████████), KSA Ex. 208 (████████), KSA Ex. 209 (████████)).[17] ████████████████████████████████████████████ ████████████████████████████████████████████

---

    [16] *See* KSA Ex. 198 ██████████████████████████████; KSA Ex. 290 ██████████████████████████████████████████████████.

    [17] Exhibits 201 and 207 through 209 are proffered to establish their authors' contemporaneous states of mind, not for the truth of the matters asserted.  Fed. R. Evid. 803(3). Exhibit 201 is also admissible to rebut accusations of dishonesty.  Fed. R. Evid. 801(d)(1)(B).

██████████████████████████████████████████████████████

████████████████████████████████████████████.[18]

    **c.**    Al Thumairy's diplomatic credentials do not suggest, as Plaintiffs contend

(at 19-20), that his work for Saudi Arabia involved helping terrorists.  It is consistent with the

Vienna Convention on Diplomatic Relations for a country that has religious officials to request

diplomatic status for them.  KSA Resp. to Pls. Aver. ¶ 119; *see* VCDR ¶ 3(1)(e) (including

"developing . . . cultural . . . relations" among the "functions of a diplomatic mission").  From an

international perspective, Saudi diplomats promoting Islam in the United States is no different

from U.S. diplomats promoting gay rights in Saudi Arabia.  Rundell Rep. 33.  It is true that State

Department regulations require diplomatic officials to work out of an embassy or consulate.

Al Thumairy did not.[19]  But Plaintiffs' leap (at 19-20) from the premise that Al Thumairy's

possession of diplomatic credentials may have violated regulations to the conclusion that Saudi

Arabia gave him a secret mission to support terrorists is not reasonable.

    **d.**    As with Al Bayoumi, Plaintiffs attempt to support their arguments about

Al Thumairy's "role and status within the MOIA enterprise" with a hodge-podge (at 20-23) of

irrelevant, unsupported claims.  Plaintiffs begin by asserting (item 1) that a 2004 joint FBI-CIA

report supports their theory of a "MOIA operation."  That report found "no evidence that . . . the

Saudi Government . . . knowingly provided support for the attacks of 11 September 2001" and "no

---

[18] To the extent Plaintiffs rely (at 28-29, 60) on Al Thumairy's contacts with Al Sadhan, Al Sudairy, Al Jaithen, and Al Mersal, there is no evidence that those individuals were extremists or supported terror.  *Infra* pp. 46, 49-50.  Nor is it surprising or incriminating that, although Al Sadhan appears to have listed Al Thumairy as his U.S. point of contact, Al Thumairy did not remember him 20 years later.  KSA Resp. to Pls. Aver. ¶¶ 1073, 1077.

[19] The State Department was aware as of 2000 that Al Thumairy was an imam at "the Mosque in Culver City," rather than an administrative officer in the Embassy or the Consulate. Ex. 140 (Dunham Ex. 12) at 39.  ████████████████████████████████████
████████.  KSA Ex. 141 (████████) (████████████); *see* KSA Resp. to Pls. Aver. ¶ 239.

information to indicate that Omar al-Bayoumi . . . materially supported the hijackers wittingly."

Pls. Ex. 2BB (3416-MDL).  Although it criticizes Saudi Arabia for giving "stipends" to "Sunni

Muslim preachers" who were "subjects of or tied to counterterrorism investigations," it makes

no finding that Saudi Arabia knew of or endorsed those individuals' alleged connections.[20]

It also nowhere mentions Al Thumairy or suggests wrongdoing on his part.

Some contemporaneous documents (items 2-3) suggest that



. KSA Resp. to

Pls. Aver. ¶¶ 352-353.  Regardless, this Court has already distinguished "supervis[ion]" of

"missionary activities" from support for terrorism, rejecting Plaintiffs' efforts to blur the line.

ECF No. 3946, at 30.  Plaintiffs' contention that Al Thumairy was underqualified to be an imam

(item 4) is contrary to record evidence that he held a graduate degree in Islamic studies, KSA

Resp. to Pls. Aver. ¶¶ 204, 211-213, 222-223, and in any event would not support a reasonable

inference that he was part of a secret terror network.  To the extent Al Thumairy played a role in

distributing private charitable donations, Plaintiffs assert that the recipients were "extremist[s]"

or "Al Qaeda fronts" (items 5, 9) but cite only conclusory statements and hearsay.[21]

Any regulatory-compliance issues concerning Al Thumairy's diplomatic status, place of

work, or car registration (items 6, 11) have nothing to do with support for terror.  *Supra* p. 27.

---

[20] The report states that "Saudi officials in Washington, DC, apparently were either
unaware of or were turning a blind eye to the radical connections of the US-based individuals
on their payroll."  Pls. Ex. 2BB (3431-MDL).  That is not a finding of knowledge.

[21] The paragraphs Plaintiffs cite concerning distribution of donations show no link
between those donations and any extremists or terrorists.  KSA Resp. to Pls. Aver. ¶¶ 267,
348-350, 378.  Plaintiffs' allegation that funds went to "associate[s]" of Al Ittihad Al Islamia is
supported only by hearsay.  *Id.* ¶ 340.  There is also no evidence (as opposed to mere allegations)
linking ▮▮▮▮▮▮▮ to terrorism.  *Id.* ¶¶ 383-385; *infra* note 52 & n.45.  Nor is there evidence
that Prince Abdulaziz bin Fahad intended any private charitable donations to support terrorism.

Even if relevant, Plaintiffs' assertion that he worked in a "highly centralized structure" (item 7) relies on generalized hearsay statements; and, even if credited, allegations that Al Thumairy "reported" to no fewer than six people suggests the opposite of centralization.[22]  Plaintiffs also falsely label as an "FBI-CIA[] joint finding" statements that Al Thumairy reported to Al Jarrah and that Al Jarrah "direct[ed] . . . Sunni extremist activity" (item 8).[23]  The allegation that Al Thumairy used a wireless phone obtained by a "front man" (item 10) is unsupported and implausible.  *Supra* p. 16.  Nor is there evidentiary support for Plaintiffs' claim that the King Fahad Mosque (items 12-13) had anything to do with terrorism.  *Infra* pp. 53-54 & n.47.

The Court should also reject Plaintiffs' attempt to prove Saudi Arabia's guilt by charging Al Thumairy with alleged associations with "extremists," "radicals," and "members of" a so-called "MOIA enterprise" (items 14-17) based on hearsay or unreliable expert testimony. *Infra* pp. 45-53 (addressing "MOIA enterprise" allegations).  There is no evidence from any percipient witness that Al Thumairy ever possessed, distributed, or shipped "extremist literature."  KSA Resp. to Pls. Aver. ¶¶ 438-440.

Plaintiffs sum up by calling the King Fahad Mosque a "center[] for jihadist indoctrination and planning" (item 23) and accusing Al Thumairy of "implausible and false

---

[22] The evidence shows that Al Thumairy nominally reported to Al Sowailem, although there is little evidence that Al Sowailem actually did much supervision.  KSA Resp. to Pls. Aver. ¶¶ 257, 285.  There is evidence that Al Thumairy interacted with Abdulaziz Al Ammar on several occasions.  *Id.* ¶ 301.  Plaintiffs assert based on hearsay that Al Thumairy also reported to Al Jarrah, *id.* ¶¶ 104, 279, 303; to Majid Al Ghesheyan, *id.* ¶¶ 253, 303; and to Mohammed Al Salloum, *id.* ¶ 327; *see also id.* ¶ 270 (addressing conclusory assertions by Youssef).

[23] The 2004 joint FBI-CIA report says that Al Jarrah "manage[d] and control[led] [the] assignments of Saudi Imams."  Pls. Ex. 2BB (3431-MDL).  That statement is admissible, but incorrect; it appears to be an error from a confidential source who confused Al Jarrah with Al Sowailem.  Sageman Rep. 337-38, 342-43.  The joint report does not contain the language Plaintiffs quote about Al Jarrah directing "extremist activity."  That language is from the FBI July 2021 EC (Pls. Ex. 2CC (3496-97-MDL)), which is inadmissible hearsay.  *Supra* pp. 7-8.

testimony" (item 24).  Plaintiffs have made no evidentiary showing on either point.  *Id.* ¶ 139 (Al Khalil, the director of the King Fahad Mosque, testifying that there were no violent individuals or terrorists at the mosque); *id.* ¶¶ 210, 217-218; 220-221, 223-234 (addressing Plaintiffs' claims of false testimony).  They cannot meet their burden with labels and rhetoric.

## III.   Neither Al Bayoumi nor Al Thumairy Knowingly Assisted the Hijackers

### A.   The Court Should Resolve Jurisdictional Fact Disputes on the Record Developed in Jurisdictional Discovery

Jurisdictional discovery has disproven the key allegations Plaintiffs relied on to obtain that discovery.  Key examples from Saudi Arabia's opening brief (at 15, 19-22, 25) include Plaintiffs' allegations that an individual (later named as Al Jarrah) "tasked" Al Bayoumi and Al Thumairy to help the hijackers; that, the day the hijackers arrived, Al Thumairy met with Al Bayoumi for an hour inside Al Thumairy's office at the Saudi Consulate in Los Angeles; that Al Bayoumi paid the hijackers' rent; that Al Bayoumi assigned Al-Mohdar Mohamed Abdullah Zeid to help them in San Diego; that Al Thumairy gave the hijackers money or lodgings or helped them with flight school; and that Al Thumairy assigned an individual (later named as Johar) to help the hijackers in Los Angeles.  Plaintiffs have not met their burden to come forward with evidence supporting any of those allegations, and they retreat from several of them.[24]

Plaintiffs inaccurately contend (at 2, 4, 41 & n.15, 63, 68) that the March 2018 Order has already decided for jurisdictional purposes that Saudi Arabia's officials and agents committed tortious acts that "caused" Plaintiffs' injuries.  That Order did no such thing, but merely

---

[24] For example, Plaintiffs do not dispute that Al Bayoumi met Mana rather than Al Thumairy at the Consulate, Pls. Opp. 65; or that Al Hazmi and Al Mihdhar immediately reimbursed Al Bayoumi for the certified check he helped them obtain, Pls. Counterstatement to KSA Aver. of Facts ¶ 115; and their baseless assertion that Al Jarrah tasked Al Bayoumi and Al Thumairy with aiding the hijackers has given way to an argument (at 57) that "express orders or instruction are not required for acts to be within the scope" of agency.  *Supra* p. 15.

REDACTED FOR PUBLIC FILING

"[a]ccept[ed] Plaintiffs' well-pled allegations as true for purposes of resolving the *instant* motion"

– that is, Saudi Arabia's motion to dismiss at ECF No. 3667 – "in the absence of contrary

evidence from Saudi Arabia."  ECF No. 3946, at 4, 23, 41 (emphasis added); *see id.* at 4-5

("Plaintiffs' allegations . . . narrowly articulate a reasonable basis for this Court to assume

jurisdiction").  The March 2018 Order neither suggested nor implied that mere allegations would

suffice in a post-discovery motion.  *See Compania del Bajo Caroni (Caromin) v. Bolivarian*

*Republic of Venezuela*, 556 F. Supp. 2d 272, 282 (S.D.N.Y. 2008) (stating after jurisdictional

discovery that the court would "resolve disputed issues of jurisdictional fact by looking beyond

the bare pleadings to the record evidence"), *aff'd*, 341 F. App'x 722 (2d Cir. 2009).

## B.    Al Bayoumi Did Not Knowingly Assist the Hijackers

The March 2018 Order observed that "the parties agree" that jurisdiction would be

supported by a "tortious" act in the form of "knowing or deliberately indifferent provision of

material support to terrorists."  ECF No. 3946, at 9-10.  Since then, the Court has further ruled

that a foreign state such as Saudi Arabia is not subject to secondary-liability claims under the

ATA.  ECF No. 8862, at 12-19.  In light of that ruling, to establish an ATA "tortious" act,

Plaintiffs must plead and prove both the mental state of knowledge or deliberate indifference and

the other elements of ATA primary liability:  "violent acts or acts dangerous to human life" that

"appear to be intended" "(i) to intimidate or coerce a civilian population; (ii) to influence the

policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government

by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1) (defining an act of

"international terrorism"); *see id.* § 2333(a) (authorizing a person "injured . . . by reason of an

act of international terrorism . . . [to] sue therefor"); *Weiss v. Nat'l Westminster Bank, PLC*,

993 F.3d 144, 161-62 (2d Cir. 2021) (explaining the interaction of § 2331(1) and § 2333(a)), *cert.*

*denied*, 142 S. Ct. 2866 (2022); ECF No. 7942, at 38, *adopted in relevant part*, ECF No. 9278.

The state-of-mind elements for Plaintiffs' New York secondary-liability claims are even more demanding. *See Pittman ex rel. Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998) ("Concerted-action liability . . . is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him.'") (quoting *Bichler v. Eli Lilly & Co.*, 436 N.E.2d 182, 186 (N.Y. 1982)) (brackets in *Bichler*; second ellipsis in *Pittman*); *id.* at 122-23 ("Conspiracy and aiding and abetting are varieties of concerted-action liability . . . . [T]o be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct."); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 246 (S.D.N.Y. 2018) (applying *Pittman*). Contrary to Plaintiffs' assertion (at 63 & n.25), New York does not recognize claims for negligence (even gross negligence) in aiding an intentional tort.[25]

As shown in Saudi Arabia's opening brief (at 17-22), the evidence shows that Al Bayoumi had no actual knowledge of, and displayed no deliberate indifference to, the hijackers' intentions when he assisted them. He thought he was extending a welcoming hand to newcomers to the local Muslim community, as he had done for others in the past and as others had done for him; he had no idea these two newcomers were terrorists. Plaintiffs' ATA claims also fail under *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), and *Weiss* because the assistance Al Bayoumi provided (helping Al Hazmi and Al Mihdhar find an apartment and a get a certified check) was

_____

[25] *See Corrigan v. Town of Brookhaven*, 2023 WL 7003936, at *2 (E.D.N.Y. Oct. 24, 2023) ("New York courts have routinely held that allegations of intentional conduct cannot form the basis of a cause of action sounding in negligence.") (cleaned up); *Trayvilla v. Japan Airlines*, 111 N.Y.S.3d 224, 225 (App. Div. 2019) (dismissing negligence causes of action as "premised only on allegations of intentional conduct" such as assault). Plaintiffs cite no contrary authority. *Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586 (N.D. Fla. May 11, 2023), did not decide "whether [those] Plaintiffs ha[d] plausibly alleged a gross negligence claim under Florida law," much less New York law; it ruled only that the court lacked jurisdiction. *Id.* at *8 n.10.

innocuous.  It was neither violent, dangerous, nor apparently intended to intimidate, coerce,

or cause mass destruction.  In addition, Plaintiffs' New York claims fail for lack of any actual

knowledge of the hijackers' intentions and of any common plan or design to commit a tort.

### 1.    Al Bayoumi Had No Connection to Al Qaeda

No evidence supports Plaintiffs' assertion (at 64-65) that Al Bayoumi was a "trusted

person[ ]" with whom Al Qaeda made "arrang[ements] in advance" to prepare for Al Hazmi's

and Al Mihdhar's arrival into the United States.  There is no evidence that any Al Qaeda member

contacted Al Bayoumi before the hijackers' U.S. arrival or that he knew the hijackers' intentions.

Plaintiffs recite (at 41) the 9/11 Report's conjecture that it was "unlikely that Hazmi and

Mihdhar . . . would have come to the United States without arranging to receive assistance from

one or more individuals informed in advance" – while ignoring the same Report's finding of "no

credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist

groups."  9/11 Rep. 215, 218.  In any event, investigation has since shown that information about

the 9/11 plot was compartmentalized within Al Qaeda to keep it secret.  KSA Resp. to Pls. Aver.

¶ 1372 (citing FBI May 2021 EC at 9); *see* Pls. Ex. 31, ¶ 12 (statement of Khalid Sheikh

Mohammed that there "was no al Qaeda operative or facilitator in the United States to help

al-Midhdar [sic] and al-Hazmi settle in the United States"); Sageman Rep. 129-30.  Plaintiffs'

increasingly strained theories that Al Bayoumi knew the identities of the hijackers, the nature

of the plot, and even its specific targets cannot be squared with such compartmentalization.

Discovery has also revealed further support for the 9/11 Report's finding that Al Bayoumi

was "an unlikely candidate for clandestine involvement with Islamist extremists."  9/11 Rep.

218.  If Al Bayoumi were a terrorist operative, he would not have taken an innocent witness

(Morgan) to meet with terrorist contacts.  KSA Resp. to Pls. Aver. ¶ 1553.  Nor would he have

voluntarily disclosed that meeting to law enforcement.  *Id*.  Nor would he have used his personal

phone to contact supposed co-conspirators, including those at the Saudi Embassy and the Los Angeles Consulate. *Id.* ¶ 1564; *supra* p. 17 (explaining the innocent reasons Al Bayoumi had for such calls). Nor would he have invited the same innocent witness to videotape interactions of terrorists with supposed co-conspirators. KSA Resp. to Pls. Aver. ¶¶ 1656-1657, 1716. Nor, if somehow he did make incriminating videotapes, would he have kept them (and supposedly incriminating notes) in his apartment after the attack. *Id.* ¶ 1658; *see also* Sageman Rep. 697 (discussing things Al Bayoumi did that would have been "terrible tradecraft").

As set forth above, there is no merit to Plaintiffs' assertion (at 53, 66) that Al Bayoumi's videotape of his vacation to Washington, D.C. in June 1999 was "casing" the U.S. Capitol for an attack. *Infra* pp. 48-49. Nor is there merit to Plaintiffs' argument (at 52-53, 66) that an undated math equation scribbled on a notepad found with Al Bayoumi's possessions in September 2001, and common in high-school algebra and geometry texts, *see* Moss Rep. 7 & Exhibits, proves that Al Bayoumi had advance knowledge of the 9/11 attacks. Plaintiffs' own aviation expert admitted that the 9/11 hijackers did not use the equation during the attacks, KSA Resp. to Pls. Aver. ¶ 1905 (citing Schiff Tr. 75:6-10); that they could not have used the equation to commit the attacks, *id.* ¶¶ 1905-1907 (citing Schiff Tr. 75:6-10); and that, because they were novice pilots, they could not have used the equation at all, *id.* ¶ 1900 (citing Schiff Tr. 32:8-33:1, 35:2-36:1, 36:2-9, 39:13-42:1). Schiff conceded that, if he "saw [the sketch page] in and by itself," he "would have no reason to believe it had anything to do with anything"; only because Plaintiffs' counsel had colored his views with allegations about "relationships between Mr. al-Bayoumi and the two Al-Qaeda terrorists" did he conclude the equation related to the 9/11 attacks. *Id.* ¶ 1898

(quoting Schiff Tr. 50:11-51:22); *see also* Moss. Rep. 12-16 (explaining the absence of any

meaningful relationship between the equation and the hijackers' flight paths).[26]

## 2. Al Bayoumi Did Not Knowingly Assist the Hijackers in Los Angeles

No evidence supports Plaintiffs' allegations (at 43-46, 65) that Al Bayoumi provided

any assistance to the hijackers in Los Angeles, let alone witting and substantial assistance.  The

evidence shows only that Al Bayoumi and Morgan coincidentally met the hijackers at a halal

restaurant in San Diego on a day trip from Los Angeles to renew Al Bayoumi's family's

passports at the Saudi Consulate.  KSA Aver. ¶¶ 90, 105; KSA Resp. to Pls. Aver. § XX.I

header; *id.* ¶ 1567.  Plaintiffs fail to support their theory (at 44) that Al Bayoumi manufactured

that trip to create an "alibi" for meeting with the hijackers at the restaurant.  In particular, there

is no record support for Plaintiffs' contentions (at 44) that Al Bayoumi did not need to go to the

Consulate on the day he encountered the hijackers because he had already renewed his passport

the day before or that he pretended to get an unnecessary passport photo.  Record evidence

shows that he made only one trip to the Consulate and that the stop for a photo was genuine.

KSA Resp. to Pls. Aver. ¶¶ 1532, 1558.[27]

---

[26] Plaintiffs claim (at 53) that Al Bayoumi "dissembled" when asked about the equation because he testified inaccurately that he could have used it to measure the distance of the road between two cities.  Al Bayoumi testified he did not remember when he made the sketch, could not recall what the equation was for, and did not know what the accompanying numbers meant. *See* KSA Resp. to Pls. Aver. ¶ 1909 (citing Bayoumi Tr. 290:7-292:9).  His speculation about its purpose may have been off-base, but that does not show deception.

[27] Plaintiffs emphasize (at 44-45) ambiguity about whether Al Bayoumi and Morgan went to the King Fahad Mosque the day they met the hijackers, and if so how many times.  KSA Resp. to Pls. Aver. ¶ 1583 (comparing Morgan's testimony that he and Al Bayoumi went to the mosque after lunch with Al Bayoumi's testimony that he did not); *id.* ¶ 1602 (rebutting Plaintiffs' misstatement that Mana testified he saw Al Bayoumi and Morgan at the mosque).  In any event, there is no reason to think any such visits had anything to do with the hijackers.

Plaintiffs also fail to muster evidence showing that Al Bayoumi and Morgan's encounter with the hijackers was planned. Al Bayoumi testified that it was a "coincidence," and Morgan testified that he observed nothing to suggest that it was anything but a coincidence. KSA Aver. ¶ 105 (quoting Bayoumi Tr. 725:14-726:8; Morgan Tr. 28:22-29:6, 80:10-14). Both witnesses agreed that they went to the restaurant only because the meat market they tried first did not serve sit-down meals, and an employee at that market (whom neither knew) recommended that they try the nearby restaurant instead. KSA Resp. to Pls. Aver. § XX.I header; id. ¶ 1567.

Plaintiffs speculate (at 43, 45) that Al Bayoumi brought Morgan, who everyone agrees was an innocent third party, to meet the hijackers to conceal the meeting's true purpose, and fooled Morgan into believing the meeting occurred by chance in an exercise of expert Al Qaeda "tradecraft." That theory collapses under its own weight. If the meeting were clandestine, it would violate all principles of tradecraft for Al Bayoumi to bring an unwitting stranger as a witness, to visit the Consulate and then meet the hijackers at a public place, and to disclose the meeting voluntarily to investigators. KSA Resp. to Pls. Aver. ¶ 1553 (citing Sageman Rep. 683-84). A covert operative using real tradecraft would make contact in a non-public place such as a hotel room or a confederate's home, out of sight of any unwanted viewer. Id.

### 3. Al Bayoumi Did Not Knowingly Assist the Hijackers in San Diego

Likewise, no evidence supports Plaintiffs' allegations (at 46-51, 65) that Al Bayoumi knowingly provided substantial assistance to Al Hazmi or Al Mihdhar in San Diego.

a. The record shows that, after Al Bayoumi came across Al Hazmi and Al Mihdhar at the Islamic Center of San Diego ("ICSD"), he helped them rent an apartment in the complex where he lived – which, again, would make no sense as "tradecraft" if he was helping them covertly. KSA Aver. ¶¶ 109-117. No evidence supports Plaintiffs' contentions (at 46-48)

that Al Bayoumi arranged the hijackers' transport to San Diego, pre-arranged their San Diego apartment, or "coordinated" with Anwar Al Awlaki to make any such arrangements.

**i.**     Plaintiffs point to no record evidence that Al Bayoumi arranged the hijackers' travel to San Diego, instead averring (at 47) that "[t]he circumstances" support their assertion. Those "circumstances" consist solely of Youssef's speculation that Al Qaeda would have chosen "a mode of transportation that would not allow their operatives to make a mistake, get lost, or be exposed to scrutiny."  Pls. Aver. ¶ 1608 (quoting Youssef Rep. 193-94).[28]  Youssef cites no source for that conjecture.  Johar, the only eyewitness to the hijackers' trip, testified that he drove them to the bus station so that they could take a bus from Los Angeles to San Diego. KSA Resp. to Pls. Aver. ¶ 1609 (citing M. Johar Tr. 277:4-279:7).

**ii.**     Plaintiffs' claim (at 46-47) that Al Bayoumi planned to lease the hijackers an apartment before they came to San Diego is based on Youssef's unreliable phone call analysis and on hearsay statements in the Morgan declaration that Plaintiffs drafted.  KSA Resp. to Pls. Aver. ¶¶ 1606, 1607.  The only admissible evidence Plaintiffs cite – the declaration of the apartment complex's manager, Holly Ratchford – does not support their assertion.  *Id.* ¶ 1606. Ratchford stated that Al Bayoumi had visited her office to check for available apartments "'approximately 5-6 times'" before he brought the hijackers there, but there is no evidence that those earlier visits related to a search for an apartment for the hijackers.  *Id.* (quoting Ratchford Decl. ¶ 6).  To the contrary, Al Bayoumi frequently checked to see if apartments were available so that he could refer people to the complex and receive a referral fee.  *Id.*  Indeed, he did so

---

[28] Even Youssef merely speculated that someone "such as" Al Bayoumi (among other named individuals) "likely" drove the hijackers to San Diego.  Youssef Rep. 194.

soon after beginning to rent his apartment in June 1999, eight months before he met the hijackers

and six months before December 1999 when KSM sent the hijackers to San Diego.  *Id.*[29]

  **iii.**  Plaintiffs' claim (at 48) that Al Bayoumi "coordinated" with Al Awlaki to settle

the hijackers into San Diego is equally unsubstantiated, as Plaintiffs' own expert has concluded.

In 2020, before being retained by Plaintiffs, Meleagrou-Hitchens published a peer-reviewed

book about the ideology of Al Awlaki before and after the 9/11 attacks.  KSA Resp. to Pls.

Aver. ¶ 1755 (citing KSA Ex. 94, *Incitement*).  In that book, he charted Al Awlaki's ideological

transformation from peaceful preacher to jihadi in the years following the 9/11 attacks, opining

that his limited interactions with the 9/11 hijackers were innocent.[30]  Youssef's dubious phone

call analysis does not cast those conclusions into doubt.  *Id.* ¶ 1635 (Al Bayoumi and the hijackers

went to a different bank branch than the one that received a call from a phone at Al Awlaki's

mosque, and there is no evidence that Al Awlaki made the call).  Nor does Ratchford's statement

that she "likely" saw a man resembling Al Awlaki with Al Bayoumi; Ratchford also stated that

the man she saw worked for Alliant University, with which Al Awlaki had no affiliation.  *Id.*

¶ 1627 (quoting Ratchford Decl. ¶ 8).

  **b.**  Plaintiffs also fail to support their contention (at 49-50) that the "primary purpose"

of the gathering at Al Bayoumi's San Diego apartment was to "introduce" Al Hazmi and

Al Mihdhar to "a protective support network."  The video of the gathering shows that it started

---

[29] Plaintiffs' assertion (at 47) that the hijackers stayed at Al Bayoumi's own apartment is based on inadmissible hearsay.  KSA Resp. to Pls. Aver. ¶ 1625.  Also, it would have been a serious violation of cultural norms for Al Bayoumi to invite two unrelated adult men to stay at his home where his wife and daughter lived.  *Id.*; *see* Sageman Rep. 11.

[30] *See* KSA Ex. 94 (*Incitement*), at 24-25 (explaining reasons to believe that Al Awlaki had "no direct knowledge or involvement" in the 9/11 attacks); *id.* at 94 ("As events relating to Muslims changed after 9/11, so did Awlaki.").

with a round of introductions.[31]  Al Bayoumi opened by stating:  "everyone should state his name, and introduce himself to the brothers by name and so on, God willing, we'll get to know each other."  KSA Resp. to Pls. Aver. ¶¶ 1656, 1685 (quoting Video MPS2023-059, at 16:42-16:46).  The phrase "brothers" did not mean anyone in particular:  most guests introduced themselves as "brothers," as Muslims often do.  *Id.* (*e.g.*, "Your brother Abdulrahman al-Barzanjee," "Your brother in Allah, Sami Doski," "Your brother Muhammad Mawazini") (quoting Video MPS2023-059, at 16:52-19:13).  The guests did not know one another because they were from different congregations (Al Madina Mosque and the ICSD).  *Id.*  Al Bayoumi hosted the gathering in part so they could meet.  *Id.*

Two guests of honor – Sheikh Fouad Hamouda, the senior imam of the ICSD, and Sheikh Abdulrahman Barzanjee, a visiting imam from Norway to the Al Madina Mosque – sat next to each other and made remarks.  *Id.* ¶¶ 1656, 1673, 1675.[32]  After they finished, Al Bayoumi praised the two imams, saying:  "this gathering of ours today . . . is for us to see these great faces, these glowing faces," nodding in the direction of the two imams.  *Id.* ¶ 1675 (citing Video MPS2023-059, at 13:46-13:52). [33]  Al Bayoumi later presented a plaque to a third guest of honor,

---

[31] Plaintiffs emphasize (at 48-49) that the 9/11 Commission supposedly had a version of the videotape four minutes shorter than the one they have now.  *See* KSA Resp. to Pls. Aver. ¶ 1658.  But Plaintiffs identify nothing in those four minutes that would cast doubt on the Commission's statement that "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves . . . in a back room."  9/11 Rep. 219.

[32] Hamouda spoke for about three minutes, telling a story about a man who refused a meal in order to fast.  KSA Resp. to Pls. Aver. ¶ 1675 (citing Video MPS2023-059, at 1:18-4:02).  Barzanjee spoke for about eight minutes, telling two stories about the importance of good reputation, and advising listeners to preserve their reputations and uphold morals to serve as good representatives of Islam.  *Id.* (citing Video MPS2023-059, at 5:13-13:24).

[33] Plaintiffs baselessly attack as false (at 49-50) Al Bayoumi's testimony that one purpose of the gathering was to honor Barzanjee before his return to Norway.  Record evidence corroborates Al Bayoumi's recollection.  KSA Resp. to Pls. Aver. ¶ 1712 (in January 2001, Barzanjee identified himself as "Imam and orator of Masjid Bilal" and "Head of the Kurdish Islamic Association / Oslo"; Al Bayoumi wrote on January 10, 2001, stating that Barzanjee could

Khalid Al Yafai, to thank him for leading Ramadan prayers at the Al Madina Mosque.  *Id.* (citing Video MPS2023-059, at 14:05-19, 14:47-15:18).

Al Hazmi and Al Mihdhar neither had "special status" at this party nor "participated  in the party throughout," as Plaintiffs claim (at 49).  Al Mihdhar was never introduced and did not speak.  KSA Resp. to Pls. Aver. ¶ 1670.  The 29-minute video shows him for nine seconds, preparing food and moving from the bedroom to the kitchen.  *Id.* (citing Video MPS2023-059, at 15:05, 20:21, 26:29).  Al Hazmi's face is not shown at all.  *Id.* ¶ 1656.  Parts of his body may arguably be seen for 8.5 seconds.  *Id.*  During the introductions, he gave only his first name, muttering it in such a low voice that other guests asked him to speak up.  *Id.* ¶¶ 1668, 1686 (citing Video MPS2023-059, at 18:37-18:46).[34]

    **c.**    Record evidence also refutes Plaintiffs' other allegations (at 51) of Al Bayoumi's purported support to the hijackers.  Al Bayoumi did not arrange for Al Hazmi and Al Mihdhar to stay at long-time FBI informant Abdussattar Shaikh's boarding house.  He was not even in the United States when the hijackers made arrangements with Shaikh.  KSA Resp. to Pls. Aver. ¶¶ 1108, 1768.[35]  Nor did Al Bayoumi help Al Hazmi pass an English proficiency test to get

---

not return to the U.S. because he could not bring his children).  No admissible evidence supports Plaintiffs' claims (at 49-50) either that Barzanjee was "the permanent Imam at the Al Madinah Mosque" or that he "held a leadership role in . . . Ansar Al Islam."  KSA Resp. to Pls. Aver. ¶¶ 1133, 1712.

    [34] There is no evidence that Al Bayoumi instructed Morgan not to film the hijackers. Plaintiffs simply make that up (at 49).  KSA Resp. to Pls. Aver. ¶¶ 1676, 1688.

    [35] Al Bayoumi testified, based primarily on a hard-to-read stamp on his passport, that he believed he had returned to the United States on July 1, 2000.  *Id.* ¶¶ 1108, 1769 (citing Bayoumi Tr. 821:5-19 and KSA Ex. 42 (KSA 8001)).  Plaintiffs cite later-produced materials suggesting that he left the U.K. on May 31, 2000 and was scheduled to arrive that evening in San Diego.  *Id.* ¶ 1767 (citing, *e.g.*, Pls. Exs. 2V, 2GG, 678BB).  Even the evening of May 31 would be too late for Al Bayoumi to have made arrangements for the hijackers to stay with Shaikh – their move was in "late May."  KSA Aver. ¶ 142 (quoting OIG Rep. 256); *see also* OIG Rep. 260 ("[s]ometime in May"); KSA Resp. to Pls. Aver. ¶ 1108 (observing that Pls. Ex. 538 (FBI 7345), an FBI interview summary for Shaikh to which Saudi Arabia objects as

a student visa.  *Id.* ¶¶ 1735-1745.  Indeed, Al Hazmi never got a student visa; Shaikh helped

him extend his existing one, which had no English-proficiency requirement.  *Id.* ¶ 1744.  And

Plaintiffs have no support for their conjecture that Al Bayoumi lent the hijackers his wife's cell

phone or that they used that cell phone to make or receive calls; that lack of support undercuts

several of their contentions that Al Bayoumi was in contact with the hijackers.  *Id.* ¶¶ 1752-1754.

### C. Al Thumairy Did Not Knowingly Assist the Hijackers

No evidence supports Plaintiffs' allegations (at 41-42, 52 & n.19, 65) that Al Thumairy

knowingly assisted the hijackers or directed others to do so.  Saudi Arabia showed in its opening

brief (at 4-5, 22-23) that Al Thumairy has no memory of Al Hazmi or Al Mihdhar, did not assist

them at all, and had only one short interaction with them.  Plaintiffs' erroneous contention (at

41-42, 65) that Al Thumairy served as the hijackers' "point of contact" rests solely on Youssef's

inadmissible phone call analysis and the 9/11 Commission's early conjecture – later rejected

several times over – that it was "unlikely" that the non-English-speaking hijackers came to the

U.S. without pre-planned assistance from a U.S.-based operative.  *Supra* p. 33.

There is no support for Plaintiffs' contention (at 42-43) that Al Thumairy told ███ to

assist the hijackers.  Plaintiffs misplace reliance (at 42) on an FBI summary of an interview with

███ conducted two weeks before the summary was written.  Not only is that summary

hearsay, but ███ testified that it "contains many errors" and denied making the statements

the summary attributed to him – namely, that Al Thumairy asked him to "look after" two "very

significant people."  KSA Resp. to Pls. Aver. ¶ ███ (quoting ███).  To the

extent Plaintiffs rely (at 42-43) on ███ statement that ███ said the hijackers "came through"

Al Thumairy, it is inadmissible hearsay.  KSA Resp. to Pls. Aver. ¶ ███.  ███ testified that

---

hearsay but which Plaintiffs seek to introduce, states that Al Hazmi responded to a notice Shaikh
had put up at the ICSD).

Al Thumairy did not instruct him to help the hijackers and that he introduced Al Thumairy to the hijackers, not the other way around. *Id.* (citing ███████████████████).

Contemporaneous documentary evidence refutes Plaintiffs' contention (at 52 & n.19) that Al Thumairy met the hijackers in Los Angeles on the evening of June 9, 2000. At the time of the alleged meeting, Al Thumairy was flying to Saudi Arabia through Washington, D.C. KSA Resp. to Pls. Aver. ¶ 1793. ██████████████████████ and a June 10 Saudi entry stamp on his passport show he could not have been in Los Angeles on the evening of June 9. *Id.* Plaintiffs' claim (at 52 n.19) that Saudi Arabia uses an "inaccurate date conversion" from the Hijri to Gregorian calendars is both wrong and a telling example of the lack of seriousness behind Plaintiffs' factual representations. Saudi Arabia cited dates from its official Umm Al-Qura calendar, which the Saudi officials stamping Al Thumairy's passport would have used. KSA Resp. to Pls. Aver. ¶ 1795. Plaintiffs use a "procedurally generated" – that is, computer-made – calendar from a "personal website" ("Habib's Digital Garden") of a Bangladeshi software developer. *Id.* Even Plaintiffs' own certified translations agree with Saudi Arabia's date conversion. *Id.* (citing KSA Ex. 100 (████████)). When the correct dates are used, it is clear that Al Thumairy did not meet the hijackers on June 9. Even if he had, a brief second encounter, months after the first, would not be evidence of assistance, much less of knowing assistance.

## IV. There Is No Evidence That Saudi Arabia Operated an "Extremist MOIA Enterprise"

### A. Plaintiffs Mischaracterize Saudi Arabia's Religion

None of Plaintiffs' contentions refutes Saudi Arabia's showing in its opening brief (at 3, 14) that no Saudi official had any motive to help Al Qaeda, a longstanding enemy of Saudi Arabia and the United States. KSA Aver. ¶¶ 63, 65, 67, 70; KSA Resp. to Pls. Aver. ¶¶ 48,

50-51, 53, 72-74 (describing Saudi Arabia's adverse actions against bin Laden and Al Qaeda's denunciation of King Fahd as a purported "apostate"); Pls. Ex. 671 (U.S. Treasury press release announcing "the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror").  Plaintiffs' allegation (at 13) that the Saudi government promoted "jihadist causes" through MOIA is specious.  MOIA was created to strengthen the Saudi government's position against radical clerics who challenged the authority of the Saudi royal family.  KSA Resp. to Pls. Aver. ¶¶ 40-42, 52, 82 (citing Rundell Rep. 45; Sageman Rep. 80). It did not "spread the extremist Wahhabi/Salafi variant of Islam," as Plaintiffs contend (at 13), but promoted "quietism," a peaceful approach adhered to by the Saudi government and its religious establishment.  *E.g.*, KSA Resp. to Pls. Aver. ¶ 17; KSA Aver. ¶ 44 (testimony of Al Jaithen that MOIA "explained to people that it was not permissible to join terrorist organizations and that it was unlawful to shed blood") (quoting Jaithen Tr. 44:18-45:4).

At his deposition, Plaintiffs' expert Emile Nakhleh retreated from statements about Saudi religion in his report, conceding that in the 1990s the Saudi government's "inner circle" and its religious leaders were quietists and that quietists "do not . . . support violent jihad."  *E.g.*, KSA Resp. to Pls. Aver. ¶ 19 (quoting Nakhleh Tr. 137:18-138:4, 147:22-148:19, 150:3-9); *see also id.* ¶ 41 (citing Nakhleh's admission, Nakhleh Tr. 152:6-12, that "Wahhabism" is a pejorative term).  Plaintiffs' expert Alexander Meleagrou-Hitchens likewise agreed that "the Saudi government and the religious establishment" are "categorized most accurately" as being "quietist" and that the "defining method" of quietism is "peaceful Da'wah."  *Id.* (quoting Meleagrou-Hitchens Tr. 61:5-62:8, 99:10-21).[36]

---

[36] The conclusory statements of Plaintiffs' expert Steven Simon that Saudi Arabia "was empowering jihadists" and "played handmaiden to the 9/11 attacks" are not supported by any citation.  Simon contradicted those assertions at his deposition.  KSA Resp. to Pls. Aver.

Nor is there evidence supporting Plaintiffs' contentions (at 1-2, 14-16) that the Saudi government had "extensive connections to Al Qaeda and terrorism" and "abuse[d]" diplomatic privileges to provide cover for its agents and officials.  In the 2004 FBI/CIA Joint Assessment, which Plaintiffs cite for those contentions, the FBI and the CIA found that the Saudi government did not provide "financial support to al-Qa'ida," was "neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida," and had "for years viewed the organization as a threat to the security and survival of the Al Saud."  KSA Resp. to Pls. Aver. ¶¶ 5, 1454 (quoting Pls. Ex. 2OO (EO 3417)).  The same report also found "no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  *Id.* (quoting Pls. Ex. 2OO (EO 3416)); *see also id.* ¶ 35 (citing U.S. government reports describing Saudi Arabia and the United States as longstanding allies and strategic partners, including in the fight against terrorism).

Saudi Arabia obtained diplomatic credentials for religious officials such as Al Thumairy for convenience, not to deceive anyone.  *Id.* ¶¶ 231-232.  The U.S. State Department was aware of Al Thumairy's role as an imam, ███████████████████████████████████████████ ███████████████; and there is nothing intrinsically improper about posting religious personnel in diplomatic positions.  *Supra* p. 27 & n.19.

¶¶ 72-74 (citing Simon's concessions that, before the 9/11 attacks, Saudi Arabia (with the United States) "put[ ] the most pressure on Sudan to expel or neutralize bin Laden"; Saudi Arabia urged the Taliban to "extradite" bin Laden or to "resolve the problem in a definitive way," meaning to "detain him or kill him"; and Saudi Arabia provided extraordinary cooperation in the investigation of the Khobar Tower bombings by allowing FBI agents to watch interrogations of Saudi citizens in Saudi Arabia and to submit questions to the interrogators).  Simon's admissions are consistent with other evidence that Saudi Arabia worked with the United States in the years before 9/11 to share intelligence regarding potential terrorist activity.  *Id.* ¶ 72 (discussing a "joint intelligence committee" and Saudi Arabia's alerting the United States to suspected Al Qaeda activity in January 1998) (citing Rundell Rep. 28); *see also* KSA Aver. ¶¶ 63, 65, 68, 70.

### B.   Plaintiffs' Contentions That Saudi Arabia Supported Terrorists Are Baseless

Plaintiffs' opposition brief has little to say about their theory that Saudi preachers were an "advance team" for the hijackers.  As Saudi Arabia showed in its opening brief (at 25-26), no evidence supports that theory.  Plaintiffs now shift emphasis to a more attenuated (but equally unsupported) theory, arguing (at 2, 28-39) that a purported Saudi "MOIA enterprise" hosted Al Qaeda-linked extremists other than Al Hazmi and Al Mihdhar on other occasions.

### 1.   No Evidence Supports Plaintiffs' Claim That Saudi Officials or Agents Were Part of an "Extremist MOIA Enterprise"

**a.**   Plaintiffs misplace reliance (at 16) on the FBI's July 2021 EC's reference to a purported "network" of Saudi militants.  That document does not contain agency findings or conclusions, but merely compiles previous preliminary materials without assessing them.  *Supra* pp. 7-8.  The FBI's actual conclusions in closing Operation Encore in its May 2021 EC were that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  Pls. Ex. 2A (EO 9-11).

Further, Al Qaeda did not use support networks of the type that Plaintiffs suggest (at 13-14, 42) either for the 9/11 attacks or more generally.  KSA Resp. to Pls. Aver. ¶¶ 1443, 1451, 1485; Sageman Rep. 249-57.  There is no evidence of a local support network either for the 9/11 pilot hijackers or for the non-pilot "muscle" hijackers.  Sageman Rep. 251; *see also* Pls. Ex. 31 (KSM Statement), ¶ 12 ("[T]here was no al Qaeda operative or facilitator in the United States to help al-Midhdar [sic] and al-Hazmi settle in the United States."); *id.* ¶ 29 ("Al Qaeda had no one in California to help the two.").  More generally, with one exception unrelated to the 9/11 attacks

that led to discovery by law enforcement, Al Qaeda did not use "local non-AQ network[s] or infrastructure."  Sageman Rep. 251-53 (discussing examples).

> **b.**     None of the four pre-9/11 Ramadan preachers Plaintiffs name (at 28-34) was a terrorist, nor did their visits resemble the hijackers' stay in California.  KSA Mem. 25-26.  Also, Plaintiffs have no evidence that any of them actually did anything relevant to the 9/11 attacks.

> **i.**     Al Sadhan and Al Sudairy went to San Diego in December 1998 and January 1999 as part of an established program that sent Ramadan preachers throughout the world. They also briefly met Al Thumairy while transiting through Los Angeles.  *See* KSA Resp. to Pls. Aver. ¶¶ 1073-1074, 1080, 1082.  No evidence supports Plaintiffs' assertion (at 28) that Al Sadhan or Al Sudairy had "a 'nexus to al-Qa'ida,'" much less that Al Bayoumi or Al Thumairy knew about any such nexus.[37]  Al Sadhan and Al Sudairy did not know and never interacted with the 9/11 hijackers.  KSA Aver. ¶ 199 (citing Sadhan Tr. 383:22-384:20; Sudairy Tr. 365:9-13). Nor is there any evidence that either did anything to assist the 9/11 plot.

Plaintiffs' allegations that Al Bayoumi provided "support" to Al Sadhan and Al Sudairy are conclusory and based on hearsay.  Among other things, there is no evidence that Al Bayoumi arranged for Al Sadhan and Al Sudairy to stay at the home of long-time FBI informant Shaikh in San Diego, KSA Resp. to Pls. Aver. ¶ 1103, or that he "took care" of them when he met them at

---

[37] Plaintiffs quote the vague phrase "nexus to al-Qa'ida" out of context from a preliminary FBI document that acknowledges the lack of "independent . . . information that [Al Sadhan and Al Sudairy] were working at the behest of a terrorist network."  KSA Resp. to Pls. Aver. ¶ 1063 (quoting Pls. Ex. 2M (585-MDL)).  The same document acknowledges that "the FBI has no information about the context" of Al Sudairy's alleged association with Ziyad Khaleel in the summer of 2000.  Pls. Ex. 2M (586-MDL); *see also* KSA Resp. to Pls. Aver. ¶¶ 1064-1066 (addressing other allegations against Khaleel).  And neither Plaintiffs nor the documents on which they rely cite any evidence to support an assertion that Al Sadhan was linked to Al Qaeda.

the Saudi Embassy.  During June 1999, when Al Bayoumi visited D.C., Al Sadhan and Al Sudairy were working at the Embassy and did not need a caretaker.  *Id.* ¶¶ 1227-1228.[38]

Plaintiffs also give no reason to believe that Al Bayoumi's interactions with Al Sadhan and Al Sudairy were part of his work for Saudi Arabia, as opposed to his volunteer work at the Al Madina Mosque.  There is no factual basis for Plaintiffs' argument (at 12-13, 29-30) that Al Bayoumi and Al Thumairy "coordinated" with senior Saudi officials to host Al Sadhan and Al Sudairy in advance of their arrival, much less as part of a purported "jihadist-supporting platform in Southern California."  Plaintiffs quote out of context (at 29) the word "coordination" in letters Al Bayoumi wrote to Al Thumairy, Al Sowailem, and Al Ghesheyan.  Those letters simply expressed thanks for the visiting imams' contributions during Ramadan.



Pls. Ex. 416; *see* KSA Resp. to Pls' Aver. ¶ 277.

Pls. Ex. 416.  That is a quietist sentiment, not a terrorist one.  The other letters have similar language and in no way suggest support for terrorism or violence.[39]  And Plaintiffs'

---

[38] Contrary to Plaintiffs' assertion (at 62), Al Sadhan did not testify that he never met Al Bayoumi, but only that he "didn't know him personally."  KSA Resp. to Pls. Aver. ¶ 1170.

[39] Pls. Ex. 411 (similar language to that quoted in text concerning "prayers, lessons, and reflections" and "worship, learning, and the rejection of disputes and division"), *cited in* KSA Resp. to Pls. Aver. ¶¶ 794, 1032; Pls. Ex. 413 (same), *cited in* KSA Resp. to Pls. Aver. ¶¶ 783, 1032, 1154; Pls. Ex. 414 (same), *cited in* KSA Resp. to Pls. Aver. ¶ 604; Pls. Ex. 678D (letter to Al Thumairy thanking him for "kind efforts" and "coordination," and expressing a desire to "excel in serving the Muslims in this country"), *cited in* KSA Resp. to Pls. Aver. ¶¶ 1032, 1153.

unreliable phone call analysis (at 29-30, 32-33) shows nothing meaningful about Al Bayoumi's

or Al Thumairy's contacts with Al Sadhan, Al Sudairy, Al Mersal, or Al Jaithen.[40]

Plaintiffs also mischaracterize (at 31-32) a fax message Al Bayoumi sent to his friend

Saad Al Habib.  *See* KSA Resp. to Pls. Aver. ¶¶ 1159-1162.  The message was intended to

re-establish communication between two friends – Bayoumi wrote "[p]lease reply urgently"

because he had recently lost telephone contact with Al Habib – and provide a brief account of the

first Ramadan at the Al Madina Mosque, which Al Habib had funded.  *Id.*  Plaintiffs' contention

(at 31) that the message was a cryptic communication reporting on Al Sadhan's and Al Sudairy's

purportedly "undisclosed work for the MOIA" is based on an erroneous translation of a Saudi

idiom ("take the loaf of bread from the baker," which is roughly equivalent to the U.S. idiom of

getting information "straight from the horse's mouth"), which Youssef conjectures is code for a

covert operation.  KSA Resp. to Pls. Aver. ¶¶ 1161-1162.

Finally, Plaintiffs' fanciful new theory (at 2) that Al Bayoumi, Al Sadhan, and Al Sudairy

"'cas[ed]' the U.S. Capitol for an attack" in June 1999 cannot be squared with the actual video

on which they rely.  That video shows a run-of-the-mill tourist visit to Washington, D.C.,

including footage of the Saudi Embassy, the Islamic Center of Washington, D.C., the White

House, the Mall, the Smithsonian Institute, and the U.S. Supreme Court.  KSA Resp. to Pls.

Aver. ¶ 1212 (discussing Pls. Ex. 10F).  It also includes footage showing interest in beautiful

flower beds, old-fashioned lamp posts, water fountains, and a squirrel running across the White

---

[40] *Supra* pp. 16-18.  In particular, Plaintiffs' allegations concerning phone calls
supposedly about Al Sadhan and Al Sudairy assume that Al Bayoumi made calls from a mosque
phone that was available to all mosque members, KSA Resp. to Pls. Aver. ¶¶ 1085, 1087, 1089,
1092; speculate that Al Bayoumi "would have spoken" to Al Jarrah or Al Sowailem in a call to a
general Islamic Affairs number, *id.* ¶ 1089; speculate that a call to Saad Al Habib related to Al
Sadhan and Al Sudairy, *id.* ¶ 1094; and incorporate Youssef's unreliable analysis, *id.* ¶ 1299.

House Lawn.  *Id.*  As for the Capitol, it focuses on interior footage (irrelevant to a planned air

attack) and contains only 7 minutes showing the outside.  *Id.*  It in no way resembles actual

Al Qaeda casing reports.  *Id.* (citing Sageman Rep. 257-59, which gives examples).

     **ii.**     Al Jaithen and Al Mersal were visiting Ramadan preachers in the imamate

program for the following year (December 1999 to January 2000).  Al Mersal was assigned

to San Diego, and Al Jaithen to Columbus, Ohio, after the location of his assignment changed.

KSA Aver. ¶¶ 212-213, 220; KSA Resp. to Pls. Aver. ¶¶ 1273, 1288.  While in the United States,

Al Jaithen briefly visited Los Angeles to receive treatment for his chronic headaches at a

specialized hospital.  KSA Resp. to Pls. Aver. ¶ 1288 (describing the assignment changes); *id.*

¶¶ 1290, 1312 (citing Jaithen Tr. 60:18-21, 69:23-70:8, 112:2-8, about the headache treatment).

     Neither Al Jaithen nor Al Mersal was an "extremist" or had ties to Al Qaeda.  Al Jaithen

studied under Sheikh Abdullah Uthaymeen, a Saudi religious scholar "most closely associated"

with peaceful, quietist Salafism, according to Meleagrou-Hitchens.  *Id.* ¶ 1277 (quoting

Meleagrou-Hitchens Tr. 61:12-62:8, 70:21-72:1); *see also id.* ¶ 1284 (no indication that Al

Jaithen had any relationship with Al Haramain).  Al Mersal studied under Al Jaithen.  Plaintiffs

misplace reliance (at 34) on allegations that Al Jaithen "worked for the MOIA in Qassim

Province" in Saudi Arabia.  It is not evidence of terrorism that someone worked in an allegedly

suspicious region of Saudi Arabia.  Nor is it evidence against Al Bayoumi that he merely

associated with someone from such a region.[41]  As for Al Mersal, he has spent his career at the

---

[41] Further, Al Jaithen's mentor was a quietist, not (as Plaintiffs assert) an extremist, KSA
Resp. to Pls. Aver. ¶¶ 1277-1279; and Plaintiffs' claims that Al Jaithen had anti-American views
and suspicious associations are based on inadmissible hearsay, *id.* ¶¶ 1282-1284. ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████ Pls. Ex. 227.  That is not evidence that he was an "extremist" in 1999.

forefront of Saudi Arabia's fight against Al Qaeda's ideology, including more than 16 years

working at a terrorist rehabilitation center.  KSA Resp. to Pls. Aver. ¶¶ 1274, 1286.  Neither

Al Jaithen nor Al Mersal met any of the 9/11 hijackers, or had even heard their names before the

9/11 attacks.  KSA Aver. ¶ 222 (citing Jaithen Tr. 306:21-308:18; Mersal Tr. 289:10-291:16).

There is no evidence that either did anything to assist the 9/11 plot.

Plaintiffs speculate (at 32) that Saudi Arabia "select[ed]" Al Jaithen "personal[ly]" for an

"unusual" assignment in Los Angeles.  What that assignment might have been, Plaintiffs do not

say.  Al Jaithen's testimony that he chose to spend a few days in Los Angeles for medical care is

unrebutted.  Plaintiffs also err in asserting (at 34) that Al Jaithen's "A-2 visa application" stated

that his "intended address" was a Los Angeles Holiday Inn.  The document Plaintiffs cite is not

a visa application; it was a form Al Jaithen filled out upon landing in the United States.  It makes

sense that by then he knew he was going to Los Angeles.  KSA Resp. to Pls. Aver. ¶ 1303.[42]

Plaintiffs' further assertion (at 33) that Al Bayoumi "carefully attended to" Al Jaithen and

Al Mersal while they were visiting Los Angeles and San Diego distorts the evidence.  There is

nothing extraordinary about Al Jaithen spending one night at a Travelodge near the King Fahad

Mosque before he flew to Columbus, even if Al Bayoumi may have helped him to reserve the

room.  KSA Mem. 11 n.9.  Contrary to Plaintiffs' contentions (at 33), Al Bayoumi did not stay

at the Travelodge with Al Jaithen, KSA Resp. to Pls. Aver. ¶¶ 1337-1338 (citing Bayoumi Tr.

339:2-20; Jaithen Tr. 135:8-137:11), and neither Al Jaithen nor Al Mersal met with Al Thumairy

during Al Jaithen's stay, *see id.* ¶ 1348.  Nor is there anything suspicious about Al Bayoumi

---

[42] Plaintiffs also have no evidence for their allegations (at 33) that Al Bayoumi arranged
for Fathi Aidarus or Khalid Al Yafai to "attend[ ] to" the visiting imams, much less that any
interactions they had related to a purported terrorist support network.  KSA Resp. to Pls. Aver.
¶¶ 1313-1318, 1334-1336.  Also, the video evidence on which Plaintiffs rely shows Al Bayoumi
asking Aidarus to confirm his name, which does not suggest familiarity.  *Id.* ¶ 1315.

taking Al Mersal and Al Jaithen with his young son to SeaWorld, where they admired exhibits and played "air hockey."  *Id.* ¶¶ 1330-1331.

     **c.**     There is no support for Plaintiffs' claims (at 36-39) that the other individuals they name in Southern California were part of a purported MOIA "extremist support network."

     **i.**     Smail Mana's only link to this case is that he gave Al Bayoumi some religious materials when Al Bayoumi renewed his passport at the Saudi Consulate, where Mana worked as a translator.  KSA Mem. 6.[43]  Al Bayoumi and Mana had no relationship and did not know each other.  KSA Aver. ¶ 96; KSA Resp. to Pls. Aver. ¶ 1413.  Mana and Johar also had no relationship and merely saw each other at the King Fahad Mosque.  KSA Resp. to Pls. Aver. ¶ ██ .

     Plaintiffs call Mana a radical (at 37-38), but cite only inadmissible statements by Usman Madha.  Madha admitted that he was not a member of the group of alleged radicals at the King Fahad Mosque, did not attend their meetings, and had no personal knowledge of their discussions (which were in Arabic, which he does not understand).  KSA Aver. ¶ 240; KSA Resp. to Pls. Aver. ¶ 400 (citing Madha Tr. 38:24-39:17).  He also used the word "extreme" vaguely to describe nonviolent beliefs such as declining to "celebrat[e] . . . Thanksgiving."  KSA Resp. to Pls. Aver. ¶ 432 (quoting Madha Tr. 60:18-61:18); *see also id.* ¶¶ 400-402 (addressing allegation that Mana had "anti-American beliefs").[44]  Mana has never been involved with terrorists and condemned the 9/11 attacks.  *Id.* ¶¶ 400-401.  He had never heard the hijackers' names before the attacks and did nothing to assist them.  *Id.* ¶ 1456 (citing Mana Decl. ¶ 6).

---

    [43] Plaintiffs incorrectly state (at 37) that it is "undisputed that Mana was a Saudi Consulate officer."  He was a contract employee whose primary task was translation.  KSA Resp. to Pls. Aver. ¶ 400 (quoting Mana Tr. 54:3-4).

    [44] Plaintiffs make a cursory attempt (at 37) to implicate ██ in ████████████ ████████████ .  There is no evidence that ████████████████ ████████████ .  KSA Resp. to Pls. Aver. ¶ ██ .

**ii.** Plaintiffs' evidence (at 38-39) as to Omar Abdi Mohamed is also lacking. There is no evidence that Al Thumairy actually supervised Abdi Mohamed. KSA Resp. to Pls. Aver. ¶¶ 351-354. 

*Id.*; *see also* ECF No. 3946, at 30 (even if Al Thumairy "supervised Mohamed's missionary activities," that would not "support [an] inference" that "Mohamed was part of [a] cell that Thumairy [allegedly] directed to provide support to the 9/11 hijackers"). There is no evidence that Abdi Mohamed knew who the hijackers were or that he assisted them in any way.

Plaintiffs fail to move the needle by asserting that Abdi Mohamed was affiliated with an organization in turn affiliated with Al Qaeda. KSA Resp. to Pls. Aver. ¶ 359 (addressing hearsay statement that a former leader of that organization was "rumored to know bin Laden"). Plaintiffs rely on an immigration-fraud prosecution charging Abdi Mohamed with concealing funding from entities such as Al Haramain, but leave out that Abdi Mohamed was acquitted on those counts. *Id.* ¶¶ 369-374. The March 2018 Order rejected Plaintiffs' allegations relating to Abdi Mohamed based on substantially the same material. ECF No. 3946, at 28-31.

**iii.** Plaintiffs' allegations as to ▮▮▮▮▮▮ and Mohamed Al Muhanna are baseless. Their blanket citations at pages 19 (214 Averment paragraphs) and 36 (four Averment sections) require no response. *Supra* pp. 13-14. The specific Averment paragraphs they cite (at 27, 37, 39, 61-62) have no admissible evidence that ▮▮▮▮ or Al Muhanna supported terrorism or Al Qaeda.[45] There is no evidence that ▮▮▮▮ interacted with the 9/11 hijackers or anyone

---

[45] As to ▮▮▮▮, Plaintiffs rely (at 19-20, 27, 37, 39) on inadmissible hearsay, KSA Resp. to Pls. Aver. ¶¶ ▮▮▮▮▮▮▮▮▮▮▮▮; a statement that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ▮▮▮▮; and documents naming him as an unindicted co-conspirator in a case about a charity (the Holy Land Foundation) allegedly connected to Hamas, not Al Qaeda, *id.* ▮▮▮▮ There is no showing that he was charged or convicted in that case. As to Al Muhanna,

who assisted them, KSA Resp. to Pls. Aver. ¶¶ 379-384; and Al Muhanna came to Southern

California in ▬▬▬▬▬, well after the hijackers left, *id.* ¶ 396.

### 2. No Evidence Supports Plaintiffs' Claim That Saudi Officials, Employees, or Agents "Hosted" Terrorists

**a.** Relying (at 18) on Youssef's supposed "investigative experience," Plaintiffs

assert that the Saudi government "funded" the Ibn Taymiyyah Mosque in the "early 1990s"

and "hosted" Sheikh Omar Abdel Rahman at the mosque. Youssef's statements about Abdel

Rahman purport to be based on knowledge of a nonpublic FBI investigation; when cross-

examined, he refused to disclose details because they were (or might be) "classified." KSA

Resp. to Pls. Aver. ¶ 879 (citing Youssef Tr. 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21,

393:4-10). Even if Youssef were qualified to testify about FBI investigations (which he is not,

*e.g.*, *id.* ¶ 1211), the Court should not accept testimony purportedly "based on facts developed

through confidential . . . investigations." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42

(E.D.N.Y. 2012). Further, Alzamari, who attended the Ibn Taymiyyah Mosque in the mid-to-late

1990s, and visited up to "[o]nce to twice a day," had never heard that Abdel Rahman came there.

KSA Resp. to Pls. Aver. ¶ 148 (citing Alzamari Tr. 17:16-18:3, 37:13-15, 38:14-17). Mana

"th[ought] [Abdel Rahman] stopped briefly [at the mosque] once," but "didn't return" because

the mosque "didn't agree with his opinions." *Id.* (citing Mana Tr. 71:3-9).

No evidence shows that the Ibn Taymiyyah Foundation or the King Fahad Mosque

was funded or controlled by Saudi Arabia. Witnesses with personal knowledge testified that

the "Ibn Taymiyyah Foundation" has "always been" "completely independent of the Saudi

---

Plaintiffs rely (at 22, 61-62) on more inadmissible hearsay, KSA Resp. to Pls. Aver. ¶¶ 393, 395, 397, 399, 440, 512, 538-540; testimony without personal knowledge, *id.* ¶¶ 394, 438-440, 512-513, 549; and a mischaracterization of the FBI's May 2021 EC, *id.* ¶ 398; *see also supra* p. 29 (addressing Plaintiffs' allegation about sending "extremist" materials).

Arabian government." *Id.* ¶ 950 (quoting Khalil Tr. 366:20-367:15; Kaldirim Tr. 263:13-21).[46]

Prince Abdulaziz bin Fahad donated to build a mosque in his father's name; for a time after that

donation, Saudi officials sat on the Foundation's board, but never attended meetings and were

ultimately removed. *Id.* ¶¶ 300-301. Also, ███████████████, the Saudi government

never provided operating funds for the new mosque. *Id.* ¶ 138.

     **b.**    Plaintiffs' contention (at 35) that Al Thumairy hosted three purported extremists

in July-August 2001 mischaracterizes Al Khalil's testimony. *See* KSA Resp. to Pls. Aver. ¶¶ 324,

468, 470. Al Khalil's statement that "it came to me that [Al Thumairy] was hosting them" is

hearsay, Khalil Tr. 80:16-17; he also later clarified that the word "hosting" was inaccurate,

KSA Resp. to Pls. Aver. ¶ 324 ("He was really meeting with them. Hosting them, I don't

know.") (quoting Khalil Tr. 107:11-23, 393:5-17).[47] Plaintiffs rely solely on inadmissible

hearsay for their claim that Al Thumairy rented an apartment for the three men. *Id.* ¶ 472.

     **c.**    Plaintiffs fail to show that Al Thumairy hosted Sheikh Muqbil Al Wadi in 2000.

There is no admissible evidence of Al Wadi's purportedly radical beliefs, *id.* ¶¶ 450-453, nor that

Al Thumairy made any arrangements for Al Wadi, *id.* ¶¶ 454-455. Contrary to Plaintiffs' claim

(at 35), Akram Alzamari did not testify that Al Thumairy hosted Al Wadi, but only that he was

---

[46] Al Khalil was asked only about the period from 1995 to the present. Khalil Tr. 367:3-5. At the time, Plaintiffs had not come forward with any allegations before 1995. Kaldirim was asked about the Foundation's entire existence. Kaldirim Tr. 263:20-21.

[47] Al Khalil's concern was that the visitors might oppose to the *Saudi* government, not the American government. KSA Resp. to Pls. Aver. ¶ 468 (citing Khalil Tr. 81:1-8). He also clarified that, when he used the word "extremists" in referring to a group at the mosque, he meant individuals who had "conservative" views but did not support violence. *E.g.*, *id.* ¶¶ 139, 418 (citing Khalil Tr. 388:3-390:4); *see* Khalil Tr. 391:7-11 ("Thinking that they are the only right Muslims, others are not right. That's what I mean by extremists."). Plaintiffs claim (at 35) one visitor was a MOIA official, but cite no evidence. KSA Resp. to Pls. Aver. ¶ 324.

"aware of . . . contact between" Al Thumairy and Al Wadi, including a few meetings and a lunch. KSA Resp. to Pls. Aver. ¶ 454 (quoting Alzamari Tr. 125:14-126:5, 126:23-127:5).

       **d.**      Plaintiffs' claim (at 36) that Al Bayoumi "supported" affiliates of Al Haramain is contrary to their own exhibits stating that Al Bayoumi opposed an attempt by Al Haramain to control the Al Madina Mosque. KSA Resp. to Pls. Aver. ¶ 983 (citing Pls. Ex. 487 (FBI 1349)). In any case, allegations against Al Haramain are not now before the Court. *Infra* pp. 58-60.

      **3.**      **The Individuals Who Assisted Al Hazmi and Al Mihdhar Were Not Part of Any Support Network**

      Plaintiffs' allegations of a government-run support network are further undermined because there is no evidence to show that the individuals in the Los Angeles and San Diego Muslim communities who interacted with and assisted Al Hazmi and Al Mihdhar had previously assisted any purported extremists or had any significant connections with the Saudi government.

      **a.**      Johar, who helped Al Hazmi and Al Mihdhar find a place to stay in San Diego, and who showed them where to find a grocery store and a bus station, KSA Aver. ¶¶ 82-83, 85, was merely a congregant at the King Fahad Mosque. There is no evidence that he interacted with or supported Al Sadhan, Al Sudairy, Al Jaithen, Al Mersal, or any other supposed beneficiaries of the purported support network; nor that Johar's relationship with Al Thumairy was anything but the normal acquaintance between a worshipper and an imam. KSA Resp. to Pls. Aver. ¶ 1493 (citing Johar's testimony that he knew Al Thumairy only as "Sheikh Fahad," the imam of the mosque, and did not know his last name); *supra* pp. 41-42 (discussing testimony that Al Thumairy never asked Johar to help the hijackers).[48] There is also no evidence that Johar

---

[48] Plaintiffs' assertion (at 42) that "Johar's family members were close to both Thumairy and Mana" is not evidence that Johar himself knew Al Thumairy. It is also unsupported by any testimony based on personal knowledge: Madha, who stated that Ibrahim Johar (Mohammed Johar's father) knew Al Thumairy and Mana, could not have understood their conversations in

had any contacts with Al Bayoumi.  KSA Resp. to Pls. Aver. ¶ 1495 (citing Johar's testimony

that he had never heard Al Bayoumi's name before 2015).  To the extent Plaintiffs assert (at 46)

███████████████████████████████████████████████████████

███ testimony that Mana's wife and Johar's mother knew each other from the mosque and may

have been friends, but Mana and Johar had no relationship.  KSA Resp. to Pls. Aver. ¶ 1498.

      **b.**      Zeid, who socialized with the hijackers while they were in San Diego and who,

according to the 9/11 Report, introduced them to his friends and helped them obtain drivers'

licenses and apply to language and flight schools, KSA Aver. ¶¶ 127-128, was a university

student who worked at a gas station and a member of the local Muslim community.  There is no

evidence that Zeid interacted with or supported Al Sadhan, Al Sudairy, Al Jaithen, Al Mersal,

or any other supposed beneficiaries of the purported support network.  There is no evidence that

Zeid had any relationship with Al Bayoumi apart from sometimes attending the mosque where

Al Bayoumi volunteered.  KSA Resp. to Pls. Aver. ¶ 1721 (discussing testimony that, contrary

to Plaintiffs' assertions, Al Bayoumi never asked Zeid to help the hijackers).  There is likewise

no evidence that Zeid ever had any relationship with Al Thumairy apart from recognizing him as

the imam of the King Fahad Mosque.  *Id.* ¶ 1733.

      **c.**      When Shaikh rented a room to Al Hazmi and Al Mihdhar, socialized with them,

and helped Al Hazmi with his visa, he had been an FBI "asset" or "informant" for more than five

years.  KSA Aver. ¶¶ 141-142 (citing OIG Rep. 256 & n.185); KSA Resp. to Pls. Aver. ¶ 1120.

The FBI considered him a "reliable source" who had "provided . . . significant information over

the years."  OIG Rep. 335.  The FBI agent who worked with Shaikh believed he had "good

judgment about which individuals might pose a threat."  *Id.* at 336.  After the 9/11 attacks,

---

Arabic.  KSA Resp. to Pls. Aver. ¶ 1493.  Ibrahim Johar denied knowing Al Thumairy beyond
exchanging greetings, and, like his son, did not remember Al Thumairy's last name.  *Id.*

"the San Diego FBI" conducted an "investigation . . . [and] concluded that [Shaikh] had not been complicit." KSA Resp. to Pls. Aver. § XV.E (citing OIG Rep. 261 n.198). Evidence that an FBI informant spent more time with the hijackers (especially Al Hazmi) and assisted them more than did anyone else is a strong reason to reject Plaintiffs' theory (at 49) that Al Bayoumi and Al Thumairy "introduce[d] the hijackers to a carefully curated group . . . who could be trusted to look after the hijackers and cocoon them in a protective support network."

Al Bayoumi knew Shaikh, but there is no evidence that Al Bayoumi was involved in deciding who would rent a room from Shaikh. *Supra* pp. 40-41 & n.35, 46 (addressing allegations that Al Bayoumi introduced Al Sadhan and Al Sudairy to Shaikh and arranged for Al Hazmi and Al Mihdhar to move into Shaikh's home). There is no evidence that Al Thumairy knew Shaikh.

## V.     Nothing Al Bayoumi or Al Thumairy Did Caused the 9/11 Attacks

No evidence supports Plaintiffs' allegations that any actions of Al Bayoumi or of Al Thumairy had a "reasonable connection" to the 9/11 attacks or were a "substantial factor" in causing those attacks; or that the attacks were "reasonably foreseeable or anticipated as a natural consequence" of Al Bayoumi's or Al Thumairy's conduct. ECF No. 3946, at 14, 22. The March 2018 Order determined only that, "[a]t this stage, Plaintiffs have also sufficiently *alleged* that the assistance Bayoumi provided to Hazmi and Mihdhar, including the individuals he put them in contact with, bear at least some reasonable connection to the 9/11 Attacks." *Id.* at 22 (emphasis added). But at the present stage, Plaintiffs need evidence, not allegations.[49]

---

[49] Plaintiffs cite the merits elements of their claims (at 68), but they successfully persuaded this Court to adopt a reasonable-connection standard for jurisdictional causation in the March 2018 Order. ECF No. 3946, at 12-14. Plaintiffs give no reason to revisit that ruling.

The whole of Al Bayoumi's assistance to Al Hazmi and Al Mihdhar was helping them apply for an apartment where they stayed for less than three months and, on the same day, taking them to the bank to set up an account. Others, including the FBI's long-time asset Shaikh, with whom Al Hazmi lived for more than six months, provided far more assistance and forged a far more intimate relationship with the hijackers. *Supra* pp. 40-41. Al Thumairy did nothing for the hijackers at all. *Supra* pp. 41-42. Plaintiffs have also failed to come forward with evidence that Al Bayoumi or Al Thumairy put the hijackers in contact with anyone. *Supra* pp. 38-42. Plaintiffs have accordingly made no showing that the mass destruction of the 9/11 attacks was reasonably foreseeable or a natural consequence of Al Bayoumi's innocuous actions.

Further, Al Bayoumi's actions were not a substantial factor in the 9/11 attacks because Al Hazmi and Al Mihdhar failed in their mission in Southern California – to learn English and fly planes. Al Mihdhar left without permission and returned to Yemen in June 2000, while Al Hazmi bided his time, doing nothing operational, until Hani Hanjour arrived in the United States in December 2000. KSA Resp. to Pls. Aver. ¶ 1267 (citing bin Laden's statement (KSA Ex. 79) that the hijackers spent the year of 2000 "without achieving success"); *id.* ¶ 1654 (citing KSM's statement (Pls. Ex. 31) that "the early mishap with Hazmi and Mihdhar was a mistake in judgment on his part"). Not until 2001 did Al Hazmi and Al Mihdhar undertake any concrete actions that led to the 9/11 attacks. Plaintiffs do not allege that Al Bayoumi or Al Thumairy provided or instructed anyone else to provide them support during that later time period.

## VI.   The Dismissed Charity Allegations Are No Longer Before the Court

The March 2018 Order ruled that Plaintiffs both had failed to "articulate a valid basis for holding Saudi Arabia vicariously liable for the acts of [Islamic] charity organizations" and also had "fail[ed] to adequately allege that those acts caused the 9/11 Attacks." ECF No. 3946, at 31-37. The Court's more recent order in February 2023 denied Plaintiffs' motion to "revise the

March 2018 Order," ECF No. 8862, at 28, which had focused heavily on the charity allegations, ECF No. 7432, at 13-18.  Plaintiffs now seek a third bite at the apple, contending (at 69) that the Court's previous rulings do not bar them from asserting jurisdiction based on their "state . . . law aiding and abetting and conspiracy claims."  That argument fails for three reasons.

*First*, the March 2018 Order dismissed the charity allegations in their entirety for failure to meet JASTA's jurisdictional requirements.  When Plaintiffs unsuccessfully sought reconsideration of that ruling, they mentioned their state-law theories only in a footnote.  ECF No. 7432, at 5 n.4; *see Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 992 F. Supp. 2d 102, 134 (N.D.N.Y. 2014) ("Federal courts routinely decline to consider issues raised only in a footnote and in a perfunctory manner.") (cleaned up).  The present motion is not an opportunity for them to argue that state-law versions of their charity claims should still be in the case after all.  *See*, *e.g.*, *Gentile v. Nulty*, 769 F. Supp. 2d 573, 582 n.17 (S.D.N.Y. 2011) (on motion for summary judgment, claims "already dismissed" were not "before the court").

*Second*, with only minor exceptions, Plaintiffs' brief does not set forth the facts on which they rely for their charity claims.  The charity section of their Averment (§ XXVIII) includes 194 paragraphs (¶¶ 1925-2118), of which their brief properly cites only 13.  The remainder of their factual assertions are not properly before the Court.  *Supra* pp. 13-14.

*Third*, the few charity-related facts that Plaintiffs set forth in their brief do not help them. They rely solely (at 70) on allegations as to Al Haramain, mentioning no other charities and citing documents showing only that the Minister of Islamic Affairs exercised supervisory authority over Al Haramain, such as providing high-level authorizations to conduct operations and open

bank accounts.[50]   None of that amounts to the "day-to-day control" this Court found wanting in

2018.  ECF No. 3946, at 33-34.  To the contrary, Plaintiffs state (at 36, 70) that Aqeel Al Aqil

controlled Al Haramain on a "day-to-day" basis.  Plaintiffs proffer no evidence that Al Aqil

was a Saudi government official.  Saudi Arabia worked jointly with the United States to impose

sanctions against Al Aqil.  KSA Resp. to Pls. Aver. ¶ 1962.  In addition, just as they did in 2018,

Plaintiffs fail to show any causal link between Al Haramain and the 9/11 attacks.  Their assertion

(at 70) that "charities like Al Haramain were part of the MOIA enterprise" does not come close.

## CONCLUSION

The Court should dismiss Plaintiffs' claims against Saudi Arabia for lack of jurisdiction.


Date:  March 4, 2024                              Respectfully submitted,

                                                  /s/ *Michael K. Kellogg*
                                                  Michael K. Kellogg
                                                  Mark C. Hansen
                                                  Gregory G. Rapawy
                                                  Andrew C. Shen
                                                  KELLOGG, HANSEN, TODD, FIGEL
                                                     & FREDERICK, P.L.L.C.
                                                  1615 M Street, N.W., Suite 400
                                                  Washington, D.C. 20036
                                                  (202) 326-7900
                                                  (202) 326-7999 (fax)

                                                  *Attorneys for the Kingdom of Saudi Arabia*

---

[50] KSA Resp. to Pls. Aver. ¶¶ 1936-1939 (addressing general allegations about MOIA's and Minister's supervisory role); *id.* ¶ 1940 (discussing MOIA authorizations for certain bank accounts); *id.* ¶ 1941 (responding to Plaintiffs' mischaracterization of documents concerning other bank accounts and other unsupported allegations); *id.* ¶ 1942 (objecting to Plaintiffs' reliance on hearsay and mischaracterization of sources).  Plaintiffs' reliance on hearsay statements about Saudi Arabia's knowledge of misconduct by Al Haramain officials likewise falls short of showing day-to-day control.  *Id.* ¶¶ 1980, 1982-1983, 1987.

**REDACTED FOR PUBLIC FILING**

## CERTIFICATE OF SERVICE

I hereby certify that, on March 4, 2024, I caused a copy of the foregoing document to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*
Michael K. Kellogg

*Attorney for the Kingdom of Saudi Arabia*