**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | ) 03 MDL 1570 (GBD)(SN) <br> ECF Case <br> ) <br> ) <br> ) **CONFIDENTIAL –** <br> ) **CONTAINS MATERIAL** <br> ) **SUBJECT TO FBI & MDL** <br> **PROTECTIVE ORDERS** |

**This document relates to:**

*Ashton v. Al Qaeda*, No. 1:02-cv-6977
*Federal Insurance Co. v. Al Qaida*, No. 1:03-cv-6978
*Salvo v. Al Qaeda*, No. 1:03-cv-5071
*Barrera v. Al Qaeda*, No. 1:03-cv-7036
*Continental Casualty Co. v. Al Qaeda*, No. 1:04-cv-5970
*Estate of Maher v. Al Rajhi Bank*, No. 1:23-cv-2845
*Any other case naming Dallah Avco as a defendant*

**PLAINTIFFS' OPPOSITION TO DEFENDANT DALLAH AVCO TRANS ARABIA**
**COMPANY'S RENEWED MOTION TO DISMISS OR IN THE ALTERNATIVE FOR**
**SUMMARY JUDGMENT**
**[CORRECTED]**

ANDERSON KILL, P.C.
Jerry S. Goldman
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 278-1000
Email: jgoldman@andersonkill.com
*For the Plaintiffs' Exec. Committees*

KREINDLER & KREINDLER
Steven R. Pounian
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel.: (212) 687-8181
Email: spounian@kreindler.com
*For the Ashton Plaintiffs*

Dated:  December 20, 2023 - Affirmed as to
corrections on January 17, 2024

MOTLEY RICE LLC
Robert T. Haefele
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*For the Plaintiffs' Exec. Committees*

COZEN O'CONNOR
Sean P. Carter
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
*For the Plaintiffs' Exec. Committees*

REDACTED FOR PUBLIC FILING

<u>**TABLE OF CONTENTS**</u>

**Page**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................4

    Bayoumi's Sham Coursework and Cover Employment in the United States ...........5

    Bayoumi's Access to "Seemingly Unlimited" Funds ..............................................15

    Bayoumi's Known Ties to Islamic Extremism ........................................................17

    Bayoumi Provided Extensive Aid to the Hijackers .................................................18

PROCEDURAL HISTORY ................................................................................................19

STANDARD OF REVIEW ................................................................................................20

ARGUMENT ....................................................................................................................22

POINT I.     THE COURT HAS PERSONAL JURISDICTION OVER DALLAH AVCO ......22

    (A)    This Court Has Personal Jurisdiction Over Dallah Avco Under the Licci Test ........22

    (B)    This Court Has Personal Jurisdiction Over Dallah Avco Under a Concerted
          Action Jurisdictional Test ........................................................................................26

    (C)    This Court Has Personal Jurisdiction Over Dallah Under the "Effects Test" ..........27

POINT II.    DALLAH CANNOT MEET ITS HEAVY BURDEN ON THE ISSUE OF
          ATA AND STATE LAW LIABILITY ON SUMMARY JUDGMENT .................32

    (A)    Material Disputed Facts Preclude Summary Judgment for Dallah Avco on ATA
          Liability and State and Federal Claims that Include an Intent or Knowledge
          Element ....................................................................................................................32

    (B)    Material Facts Preclude Summary Judgment for Dallah Avco on the Issue of
          Proximate Cause. .....................................................................................................37

          1.    "Substantial Factor"...................................................................................37

          2.    "Foreseeability" .........................................................................................39

CONCLUSION ..................................................................................................................40

i

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................21

*Asahi Metal Indus. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987) .........................................22

*Atchley v. Astra Zeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022) ................................ 33, 36

*Averbach v. Cairo Amman Bank*, 19-cv-0004, 2023 WL 5016884
    (S.D.N.Y. June 30, 2023) (Parker, J.)....................................................21, 28, 37

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194 (2d Cir. 1990) ......................20

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................21

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) ...............20, 22, 26, 27

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013)...................21, 28, 37

*Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017) ..............................................32

*First Horizon Bank v. Moriarty-Gentile*, 10-cv-289, 2015 WL 8490982
    (E.D.N.Y. Dec. 10, 2015) .............................................................................25

*Fowler v. Scores Holding Co. Inc.,* 677 F. Supp. 2d 673 (S.D.N.Y. 2009) .......................40

*Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ...................................29

*Gregory v. Burnett*, 577 Fed. Appx. 512 (6th Cir. 2014) ..............................................32

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014)...........................................22

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................*passim*

*Honickman v. Blom Bank SAL*, 6 F.4th 487 (2d Cir. 2021)....................................... 33, 34

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)......................................................22

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021).....................33, 35, 36

*Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261 (E.D.N.Y. 2019) ....................38

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)..........*passim*

REDACTED FOR PUBLIC FILING

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Linde v Arab Bank*, 882 F 3d 314 (2d Cir. 2018) ..................................................36

*Miller v. Arab Bank*, PLC, 372 F. Supp. 3d 33 (E.D.N.Y. 2019)................................38

*S. Oil of Louisiana Inc. v. Saberioon*, 19-cv-9622, 2021 WL 5180056
    (S.D.N.Y. Nov. 8, 2021)....................................................................... 21, 37

*S.E.C. v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013).......................................23

*Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405 (S.D.N.Y. 2021) ...........................25

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103
    (2d Cir. 2021) ................................................................................26

*Sokolow v. Palestine Liberation Org.*, 04-cv-00397 GBD, 2011 WL 1345086
    (S.D.N.Y. Mar. 30, 2011) (Daniels, J.)..................................................20

*Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016)....................... 22, 25

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013).......................40

*In re Terrorist Attacks on Sept. 11, 2001*, 03-cv-06978, 2023 WL 2430381
    (S.D.N.Y. Mar. 9, 2023) ....................................................................22

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ..................20, 22, 27, 28

*Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246 (E.D.N.Y. 2014)......................25

*Tiffany (NJ) v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .........................................29

*United States v. Adeniji*, 31 F.3d 58 (2d Cir. 1994)............................................29

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011)........................................29

*United States v. Fofanah*, 765 F.3d 141 (2d Cir. 2014) ........................................29

*United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021) ......................................32

*United States v. Nektalov*, 461 F.3d 309 (2d Cir. 2006).........................................29

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003).........................................29

*Viacom Int'l v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)......................................29

*In re Vitamin C Antitrust Litig.*, 05-cv-453, 2012 WL 12355046 (E.D.N.Y. Aug. 8,
    2012)...........................................................................................28

REDACTED FOR PUBLIC FILING

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Water Res. Grp., LLC v. Powers*, 12-cv-3779, 2013 WL 5202679 (E.D.N.Y. Sept. 13, 2013)................................................................................................................................28

*Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006)...........................39

**Statutes**

18 U.S.C. § 792......................................................................................................................30

18 U.S.C. §§ 792-794............................................................................................................4, 5

18 U.S.C. § 951.........................................................................................................................4

18 U.S.C. § 1546.................................................................................................................17, 18

18 U.S.C. § 2333(d)(2).......................................................................................................33, 35

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016).....................32, 33

Plaintiffs respectfully submit this memorandum of law in opposition to the renewed motion to dismiss for lack of personal jurisdiction, or in the alternative, for summary judgment filed by a private corporate entity Dallah Avco Trans Arabia Company ("Dallah Avco" or "Dallah").

## INTRODUCTION

Plaintiffs need only proffer factual allegations that constitute a *prima facie* showing of jurisdiction that is "factually supported". The Court in turn must construe the pleadings and evidence in the light most favorable to Plaintiffs and resolve all doubts and factual disputes in Plaintiffs' favor. Plaintiffs plainly satisfy this modest standard.

Overwhelming evidence now confirms that Saudi Arabia established and maintained an extensive clandestine network in the United States to promote extremism and support the radical agenda of Wahhabi religious officials and ministries. The CIA and FBI have confirmed both the existence of this Saudi government network and that it was engaged in sponsoring and supporting the 9/11 al Qaeda hijackers inside the United States. Dallah Avco served a critical role in that U.S. network by providing cover employment for and regular, substantial, and ongoing payments to entrenched Saudi intelligence agent Omar al Bayoumi. Shielded from U.S. authorities, Bayoumi would receive extensive resources from Saudi Arabia through Dallah Avco in the United States *for nearly 7 years*. Dallah's (and Saudi Arabia's) own former employee confirmed this relationship was "way outside the box" and "out of line".

Bayoumi in turn used his perch in Southern California and "seemingly unlimited" resources to connect at least two 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar, with an extensive Saudi-funded extremist network to prepare for their horrific mission. The 9/11 Commission Report in 2004 confirmed that Hazmi and Mihdhar were ill-prepared for a mission in the United States and that neither "would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." Averment ("Av.") ¶ 1446; Exhibit ("Ex.")

1

6, 9/11 Commission Report.[1] Extensive evidence Plaintiffs have painstakingly gathered and distilled since the 2004 Commission's Report confirm this. Bayoumi, behind the safe-harbor the Dallah cover employment provided, worked with other Saudi government officials to establish and operate the support mechanism, and assisted the hijackers with transportation, housing, leasing support, financial guarantees, leads for employment, food, English language advice, flight school enrollment, and introductions to other people in the United States willing to support their terrorist activities.

Dallah Avco nevertheless claims that U.S. courts lack jurisdiction to adjudicate its role in the largest ever terror attack on U.S. soil. Dallah is mistaken. At least three tests support jurisdiction: the *Licci* test, the concerted action test, and the effects test. Under the *Licci* test, the Court simply asks whether the claim arises out of contacts with the forum where the defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013). Here, Dallah used a U.S. bank to facilitate hundreds of thousands of dollars in ongoing payments to Bayoumi while he was living in the United States, provided cover employment to Bayoumi in the United States, and profited handsomely from this arrangement with Saudi Arabia, realizing at least 5-10% of Bayoumi's 7-year sham payments as "profit" and strengthening an ongoing business relationship with its primary customer, Saudi Arabia. Nor was this arrangement a one-off occurrence. Dallah harbored an estimated 50 additional ghost employees on its books, including Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay, who co-leased an apartment with Bayoumi in Southern California, no doubt in exchange for similar considerations from Saudi Arabia.

Dallah is also subject to jurisdiction under the concerted action test. That test looks at the acts of any alleged co-conspirators and imputes those in-forum contacts to other defendants. That

---

[1] References to the "Averment" are to Plaintiffs' Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco, and references to Exhibits refer to the exhibits appended to the Declaration of Robert T. Haefele, Esq., both being filed contemporaneously with the Court.

REDACTED FOR PUBLIC FILING

includes the extensive conduct of Saudi Arabia, Bayoumi, Fahad al Thumairy and the hijackers who are obviously subject to jurisdiction in the United States.

Finally, even under the "effects test," Dallah Avco must answer for its conduct in a U.S. court. Dallah cannot turn a blind eye to its 7-year role in an ongoing tortious effort to imbed a Saudi spy with extremist ties to terrorism inside the United States. Dallah provided the cover for Bayoumi that was obviously pretextual for illicit activity inside the U.S. Bayoumi received "seemingly unlimited" funds through Dallah—improperly "double-dipping" to realize his own Dallah salary in addition to payments through Dallah to pursue sham coursework, on top of regular monthly $15,000 cash payments funneled through various Saudi subcontractors—based on employment documentation on Dallah letterhead. Dallah processed payments to Bayoumi as if he were a Dallah employee, even though he provided no services to the company and his educational pursuits were essentially non-existent. He also was an employee of the Saudi government's Presidency of Civil Aviation ("PCA") and seconded to Dallah to be listed as working on a project that was underway in Saudi Arabia. Oddly, Bayoumi was stationed in the United States even though (according to Dallah) it had no office or projects based here. The purported reason for his educational pursuits in the United States at age 36 was to improve Bayoumi's English-speaking skills, but almost none of his multi-year coursework was to develop English proficiency and he failed to attend or meaningfully pursue the courses he enrolled in. Dallah must have realized its role involved creating a fake paper trail to allow Bayoumi to remain in the United States.

In fact, Dallah did realize that its employment of Bayoumi was a sham, requesting (unsuccessfully) that Saudi Arabia terminate the purported secondment. But this request to terminate an otherwise profitable relationship for Dallah suggests knowledge of wrongdoing, not innocence. Indeed, this arrangement was business as usual for Dallah. CIA documents confirm that Saleh Kamel, founder of Dallah Al Baraka Group LLC ("DABG"), parent company of Dallah Avco

3

regularly used DABG subsidiaries to funnel money to terrorist organizations, including al Qaeda. FBI records also confirm that money was "regularly siphoned from PCA and diverted to upper management of PCA by manipulating invoices from subcontractors like Dallah Avco" or by creating "fictitious purchase orders".

Dallah claims that even if this Court exercises jurisdiction, Dallah should be dismissed on summary judgment because it did not "knowingly" support Bayoumi's illicit activities and even if it did, its support was too remote from the 9/11 attacks. ECF 9363 at 3. But Dallah *did know* it was providing recurring "way outside the box" payments and sham cover employment to a Saudi operative in the United States for *years* to fund his activities and conceal his real work from U.S. authorities. That alone is a felony under the Foreign Agents Registration Act and the Espionage Act. *See, e.g.*, 18 U.S.C. § 951 (foreign government official living and working inside the U.S. required to file a notification with the U.S. Attorney General or "shall be . . . imprisoned not more than ten years"); 18 U.S.C. §§ 792-794 ("Whoever harbors or conceals any person who he knows, or has reasonable grounds to believe or suspect, has committed, or is about to commit, an offense under sections 793 or 794 of this title, shall be . . . imprisoned not more than ten years."). In this case, the FBI confirmed what most who had contact with Bayoumi had come to suspect, that Bayoumi was working for Saudi intelligence. Av. ¶¶ 112, 868-69. Bayoumi's support role for the hijackers is detailed in the factual averment filed by Plaintiffs in both this submission and their opposition to the Saudi Motion to Dismiss. Dallah's direct support for Bayoumi during the lead up to the 9/11 attacks is not at all attenuated, but a necessary and substantial factor in allowing the conspiracy to succeed.

## FACTUAL BACKGROUND

Dallah Avco, a subsidiary of DABG, is a Saudi government contractor specializing in providing services to Saudi Arabia's civil aviation agency, the PCA. Av. ¶ 662. DABG was founded by Saleh Kamel, who the CIA has identified as a key figure in the al Qaeda support network that

provided widespread funding to al Qaeda, National Islamic Front, Hamas and various mujahidin groups. Av. ¶ 663. Indeed, immediately following the 9/11 attacks, the FBI received information that Dallah Avco and DABG were "linked to UBL." Av. ¶ 703.

Dallah generally filled vacancies, payroll processing, and administrative support for the PCA's Air Navigation System Support ("ANSS") project in Saudi Arabia. Av. ¶ 664. Saudi Arabia was known to funnel kickbacks through Dallah Avco and other ANSS contractors to conceal the origin of funds and improperly pay Saudi officials. Av. ¶ 632. For example, ███████████████ ████ a supervisor under the ANSS project reported money "regularly siphoned from PCA and diverted to upper management of PCA by manipulating invoices from subcontractors like Dallah Avco." *Id.* He further stated that "[t]hese invoices would be covered or marked on the books as local procurement." *Id.*  He detailed a process where the President of the PCA may call Mohamed al-Salmi, Director General of Airways Engineering at the PCA and request cash. Al-Salmi would approach ████ to create a fictitious purchase order which was then approved by Salmi. ████ described this practice as "common at PCA, Dallah, and AVCO." *Id.* ████ also described "other allowances" at PCA that basically provided a bonus or raise outside of the payroll system. *Id.*

**Bayoumi's Sham Coursework and Cover Employment in the United States**

In 1977, at age 19, Bayoumi began working for Saudi Arabia, purportedly within the PCA. While Bayoumi states he worked for the PCA, wide-ranging evidence confirms Bayoumi was a Saudi intelligence officer, at least by the time he was deployed to the U.S. in the mid-1990s. Av. ¶¶ 112, 627, 868-73. Bayoumi's purported role changes within the PCA, his eventual sham secondment to Dallah, and his prolonged stay in the United States, all authorized at the highest levels of the PCA and Saudi Arabia's Ministry of Defense, were part of an ongoing effort to imbed Bayoumi within the United States and shield him from detection by U.S. authorities. Av. ¶¶ 627-723, 802, 811, 874-75, 1189-90.

REDACTED FOR PUBLIC FILING

From the outset, Bayoumi's Saudi government work in California was handled surreptitiously and outside normal channels. This included transferring Bayoumi to the PCA Airways Engineering Department from the Finance Department to "implement" financial procedures and contracts in August 1993 but then arranging for Bayoumi to *study* in the United States within four months, and concealing Bayoumi's travel here through a "Purchase Requisition" with a PCA subcontractor. Av. ¶¶ 628-29.

In August 1994, at age 36, Bayoumi entered the United States on a student visa. Av. ¶ 631. Saudi Arabia instructed Avco Overseas, a U.S.-based Dallah affiliate and ANSS subcontractor Ercan (aka Ercan Engineering, Inc. or Ercan, Inc.), owned by Magdi Hanna, to pay Bayoumi $4,000.00 per month and advised the INS that Bayoumi was pursuing his education in San Diego. Av. ¶ 708. Bayoumi registered with San Diego State University ("SDSU") to enroll in an English as a Second Language program, and further requested that it pay Bayoumi's weekly living allowance to be reimbursed through Dallah Avco. Av. ¶¶ 629, 631, 678, 709; ECF 9364 ¶ 100.

For the next 7 years, a consistent pattern emerged. Bayoumi failed to meaningfully attend classes, he failed to show up for work, his purported reason for staying in the United States would regularly change, and yet he would receive ongoing, regular, substantial sums through Dallah Avco, Ercan and other sources. Av. ¶¶ 709-722.

For example, SDSU records confirm that Bayoumi missed the first few weeks of both the fall and winter sessions and missed 333 hours of coursework out of a total of 480 possible "base" hours while he was enrolled. Av. ¶¶ 709-710. Following his enrollment at SDSU in February 1995, Bayoumi would enroll in English courses at ELS Language Centers in San Diego until mid-August 1995, but Bayoumi failed to attend classes at all between March 25, 1995 and April 23, 1995 and received "failure" or "poor" grades in about a third of his classes. Av. ¶ 709.

REDACTED FOR PUBLIC FILING

Around this time, Saudi Arabia realized it could not continue to maintain an operative in the United States without long-term cover. A Saudi official identified ongoing "exceptional leave" requests as a potential option, but exceptional leave, as the name implies, is exceptional and has strict limitations. Av. ¶¶ 629-630; ECF 9365-92, Ex. 89. A Saudi government employee such as Bayoumi could take only 30 days of leave per year. Alternatively, the 30 days could be saved each year and then combined for a single leave of absence, but under no circumstances could an employee take more than 90 days of leave in one year. Any further leave would be "exceptional leave" that if granted, would be unpaid. Av. ¶¶ 629-630.

But from 1993 through 1995, the Saudi government granted Bayoumi three times as much leave as the maximum permitted under its own regulations. In August through September 1993, Bayoumi took a 51 day leave from the PCA Finance Department, and from August 1994 to May 1995, Bayoumi was granted a 90-day leave and then *two* more 90-day exceptional leaves. Av. ¶ 630. And Bayoumi was *paid* during his time on exceptional leave, contrary to Saudi regulations. Av. ¶¶ 112, 631-660, 708, 868-69. No explanation was provided for this unusual accommodation for Bayoumi. PCA Assistant President Anqari and head of human resources testified that Bayoumi was "an ordinary, low-level employee" and Bayoumi's job "was not of any special attention." Av. ¶ 630.

A sham secondment was therefore Saudi Arabia's more viable long-term solution to maintain its operative in the United States. Saudi Arabia initially used Ercan, with a branch in Southern California, to sustain Bayoumi in the United States, but determined that it could not second Bayoumi to an American company under Saudi law. Av. ¶ 665.[2] Both Ercan and Dallah funded Bayoumi in San Diego, and Bayoumi listed both of them on various forms as his employer.

---

[2] As discussed *infra* at 8, the May 11, 1995 letter from Ercan owner Magdi Hanna requesting that Bayoumi be seconded to Ercan should be understood as originating from the PCA. That is Saudi Arabia's general practice with respect to its contractors. This is further supported here because Hanna "was very frustrated" by Bayoumi, "that he didn't want to take orders from him. He didn't want to do what he wanted him to do." Av. ¶ 665 n.1.

REDACTED FOR PUBLIC FILING

On May 24, 1995, Alawi Mohamed Saeed Kamel (Managing Director of Dallah Avco and nephew of Saleh Kamel) sent a letter to the President of Civil Aviation, informing that Dallah Avco currently has an "urgent need of the services of employee Mr. Omar Ahmed Mustafa al Bayoumi as an accountant." Av. ¶ 668. Dallah's 30(b)(6) witness, Ammar Kamel believes that despite the letter seemingly coming from Dallah "the PCA must have initiated the secondment" and "understands the reference in the letter to an 'urgent need' for Al-Bayoumi to refer to the PCA's urgent need to have Al-Bayoumi placed on the ANSS Project." Av. ¶ 669. But to an outside observer, the letter would appear to come from Dallah and would not have shown the request as emanating from the Saudi government.

Mr. Ammar Kamel's explanation appears to be accurate. The ANSS project is based in Saudi Arabia, and nearly all of those who worked on that project were PCA employees working in Saudi Arabia. Av. ¶ 670. There is no part of the ANSS project that would entail an employee performing work in the United States over a period of years. *Id.* Further, no Dallah Avco employees servicing the ANSS project would involve any work in the United States. *Id.* In fact, according to Dallah's chairman of the board, Dallah "has never been licensed or registered to do business in the United States," "never carried any activity at any time in the U.S.A.", "has never owned or leased property in the United States," "has never offered or advertised any activities or services within the United States," "has never had a branch office" in the United States, and has never had "a representative, an employee or an agent in the United States." *Id.*

In July 1995, PCA Director General Mohammed al Salmi directed Dallah Avco to add Bayoumi to its payroll as a full-time employee working as a "Senior Data Processing Technician" on an ANSS airport project located in "JED" - Jeddah, Saudi Arabia. Av. ¶¶ 674, 676. But as Dallah knew full well, Bayoumi performed no work for Dallah or the ANSS project. Av. ¶ 675.

Instead, he enrolled in West Coast University's ("WCU") MBA program from November 13, 1995 through January 18, 1997. Av. ¶ 711. Bayoumi enrolled and attended 15 classes during this time, but the classes were only two months long in duration, and he was taking only 1-3 courses at a time. Av. ¶ 712. Foreign intelligence officers often pose as students because they can easily obtain a student visa, pay tuition, enroll in classes with a light and flexible schedule but rarely attend classes (many of which do not take regular attendance) and have the freedom to conduct other activities without U.S. government officials noticing, as Bayoumi had already been doing for almost two years at this point. *Id.* Bayoumi continued to have ample time to perform his true function in the United States while nominally in school. And his business studies were unrelated to his original reason for being here—to pursue English language coursework. *Id.*

During this time, in April 1996, Dallah Avco requested to extend Bayoumi's purported secondment for another year, and the request is granted. Av. ¶ 714. The extension required coordination at the highest levels including the President of the PCA, the Deputy Minister of Defense and Aviation and the Assistant Minister of Defense and Aviation. *Id.* And again, even though Dallah purportedly made the request, the request truly originated from Saudi Arabia but was made on Dallah letterhead. *Id.*

In December 1996, Bayoumi wrote (in perfect English) to the United States International University (aka Alliant Int'l University) ("USIU") requesting a transfer to finish his degree because WCU had financial problems. Av. ¶ 711. He enrolled in USIU beginning in winter quarter 1997. *Id.*

In early 1997, Dallah again requested to extend Bayoumi's purported secondment for another year. Av. ¶ 715. Again, this request should be understood as coming from the Saudi government. *Id.* This time before extending the purported secondment, the PCA human resources department requested additional information. *Id.* Mohammed al Salmi responded that the further

secondment related to Saudization and that Bayoumi would pursue a master's degree in business administration that would be complete by the end of the secondment year (early 1998). *Id.*

On May 6, 1997, Anqari authorized the continued secondment for another year to complete a Master's in International Business Administration. *Id.* But an email recovered by the FBI years later shows that during this time Bayoumi paid a USIU professor to prepare his coursework for him. Av. ¶ 713. The academic record further shows that despite being on probation in July 1997, Bayoumi did not return to take classes but took an "independent study" course on marketing in the Arabian Gulf to obtain his USIU degree. Av. ¶ 716.

Following completion of his "degree," one would have expected the secondment to end since the new proffered reason Bayoumi was still in the United States was to obtain this "degree" by the end of that year's secondment. Not so. In April 1998, the President of the PCA asked the Assistant Minister of Defense and Civil Aviation to extend the purported secondment another year to May 1999. Av. ¶ 718. Again, the request came from the highest levels of the PCA in close coordination with the Saudi defense ministry. *Id.* On May 12, 1998, Anqari approved the purported secondment for another year. *Id.* At the same time, the Saudi Embassy actively vouched for Bayoumi's status as a student. For example, a May 20, 1998 letter from Dr. Jamil Shami, the "Director, Academic Affairs" at the "National Guard Office" of the Saudi Embassy in Washington, D.C. falsely represented that "Al-Bayoumi was a candidate for a full scholarship from the Government of Saudi Arabia" including a "monthly living allowance." Av. ¶ 719.

But there is a gap in Bayoumi's educational pursuits from December 1997 through November 1998. In November 1998, he enrolled in Keller Graduate School to take additional MBA courses, but it was actually to maintain his cover in the United States as his transcript shows he failed to complete a single class or earn a single credit at Keller. Av. ¶¶ 717, 720-21.

In April 1999, realizing that Bayoumi's continued secondment to Dallah Avco was a sham, Chairman of Dallah Avco, Alawi Mohammed Saeed Kamel, wrote to Mohammed al Salmi that Dallah did not want to renew the secondment. Av. ¶ 679. Salmi responded on April 7, 1999 and directed Dallah to take the steps necessary to keep Bayoumi on the payroll so he could "complete the task" assigned to him by Saudi Arabia and to draft a letter "with all due speed in order for the secondment arrangements to be completed." Av. ¶ 680. That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah. *Id.* On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. *Id.* On May 3, 1999, Anqari approved the purported secondment for another year. *Id.*

Around this same time, Saudi Arabia prepared a performance review of Bayoumi dated April 1999 (and again in March 2000) for his work with the PCA. Despite never showing up to work and being paid by Ercan and Dallah Avco during this time to take coursework he was not actually taking, Bayoumi was described by Saudi Arabia as "persistent and hard working" and "known for his continuous ambitions toward development and better efforts" and he received the highest possible ratings from Saudi Arabia for his work. Av. ¶¶ 675-78, 704-05. Dallah likely had these reports and would have known they were fraudulent given its apparent role as an outsourced human resources department for the PCA and because Bayoumi was seconded to Dallah at the time. Av. ¶¶ 664, 678.

From May 1999 through March 2000, Bayoumi attended seven continuing education short-courses run by ESI International (in association with George Washington University), amounting to a "Master's Certificate in Project Management.". Av. ¶ 681. However, Bayoumi never enrolled at George Washington University ("GWU"), nor did he obtain a Master's Degree as he tried to claim. Ex. 120, Bayoumi Dep. at 137:8-138:18. The seven ESI short-courses, each lasting two to five days,

comprised a maximum of 35 days of classes. Only two were held in Washington, D.C., both in late June 1999, whereas most were held in San Diego. Av. ¶¶ 681, 698. Av. ¶¶ 681, 698. Bayoumi completed his final short-course at a hotel in San Diego between February 28 and March 3, 2000. Documents in the Metropolitan Police Service production confirmed Bayoumi's daily attendance, contrary to Bayoumi's claimed alibi that he went to Washington, D.C. for several weeks in February and March 2000. Av. ¶ 681

In early 2000, Bayoumi enrolled in a second master's program at USIU on January 21, 2000, for the "Winter Quarter 2000," then withdrew on February 7, 2000, but nevertheless obtained a March 5, 2000 certification from USIU to support his student visa that he was a business administration student in a "full course of study." Av. ¶ 722.

Bayoumi returned to Saudi Arabia at the end of March 2000, as the funding arrangements that Saudi Arabia had made to pay Bayoumi through his five years at Dallah Avco were set to end in April 2000. Av. ¶ 682.  Bayoumi reported in to PCA Director Salmi, who reported that on April 15, 2000, Bayoumi was "back in service" at his job for Saudi Arabia. Av. ¶¶ 682-83.

But Bayoumi, Salmi, and PCA's President, were working on the Saudi government's plan for Bayoumi to return to the United States, and Bayoumi had his wife and children stay put in San Diego to await his return. Av. ¶ 684. On May 9, 2000, Bayoumi wrote to Salmi at the PCA asking to be placed on educational leave for two years effective June 4, 2000. Av. ¶¶ 684-85. Bayoumi's request to Salmi for an "unpaid study leave" was supported by a forged document purporting to be a May 8, 2000 letter from GWU accepting Bayoumi for its Ph.D. program.  Av. ¶¶ 686, 689. The forged letter was faxed on May 8, 2000 from a 703 area code number in Virginia to Bayoumi in Saudi Arabia. Av. ¶ 687. The circumstances show that it is likely that Bayoumi called someone he worked with at the Saudi Embassy in Washington, D.C. to ask them to prepare the forged letter that Bayoumi needed to apply for the study leave. *Id.*

The GWU Registrar testified that the address on the letter did not belong to GWU, but to a separate company that ran a "Certificate Program" under GWU's name. That Certificate Program included the 2–5-day lectures for which Bayoumi had previously received certificates. Av. ¶ 688. GWU confirmed that the company operating the Certificate Program did not run any Ph.D. program for GWU and that the letter did not come from GWU. Av. ¶¶ 681, 688-89.

On May 11, 2000, Salmi wrote to the PCA's Director of Personnel Affairs and Salaries stating that he had no objection to Bayoumi's 2-year educational leave request. Av. ¶ 690. Initially, Anqari recommended that Bayoumi's request be denied, because after all, Bayoumi had not actually worked on the ANSS project for nearly 7 years at that point. Av. ¶ 691. In rejecting the leave request, Anqari stated that Bayoumi had "enough leaves" and cited the money that PCA spent on Bayoumi's purported education as well as the job vacancy Bayoumi left open at the PCA in Saudi Arabia. Av. ¶ 692. But the highest-level officials at the PCA immediately intervened to provide Bayoumi with special treatment outside of PCA's normal practices. Anqari's denial of Bayoumi's study leave was overruled by the PCA's President Ali Al-Khalaf. Av. ¶ 693. On May 23, 2000, the PCA issued a decree granting Bayoumi a two-year educational leave. *Id.*

Al Bayoumi continued to be paid his salary through Dallah Avco and the ANSS project during his two years of educational leave, just like he had been during his 5-year purported secondment, ECF 9364 ¶ 152, even though the applicable rules required that Bayoumi could only request and obtain an "*unpaid* study leave," Av. ¶ 694. But on May 29, 2000, PCA Director Salmi ordered that Bayoumi receive a "promotion" and substantial pay increase for a new job as a "Senior DSS Programmer" with Dallah Avco backdated to an effective date of April 13, 2000.  Av. ¶ 695.

Although Bayoumi had no actual accounting or other work to show for it, and had not been attending school, Bayoumi's pay stubs show that his total pay from Dallah Avco more than doubled from March 2000 to April 2000, and for each month in July through December 2000. Av. ¶ 696.

Over a nearly 7-year period, Dallah Avco processed payments for Bayoumi in the United States through a U.S. bank, and for 5 of those years, provided sham employment for Bayoumi in the United States at the direction of Saudi Arabia. Av. ¶¶ 627-723. But over this 7-year period, Bayoumi performed no work for Dallah or the ANSS project he was assigned to. Av. ¶¶ 670, 672, 675.

Meanwhile, Bayoumi's job positions and pay constantly changed. Av. ¶¶ 674-76. Dallah Avco had none of these positions and Bayoumi's role within the ANSS project did not change. Av. ¶ 676. And there would be no need to second a PCA employee to Dallah Avco to work in the United States. Av. ¶¶ 670, 676. Rather, Bayoumi and another PCA official Alp Karli, routinely prepared false time records to show that Bayoumi was working in Jeddah, Saudi Arabia when he was actually working as a Saudi agent in San Diego. Av. ¶ 677. Bayoumi received huge sums of money for his ghost employment in the United States with significant pay increases corresponding to the hijackers' arrival. Av. ¶¶ 632, 639-644, 649, 671-72, 696-97, 700, 704, 799-813, 840-41, 942-997. Saudi Arabia determined the job titles that Bayoumi would receive, and all the amounts paid to Bayoumi through Dallah Avco, including Bayoumi's salary, housing allowance, other allowance, and transportation. Av. ¶ 678.

At the same time he received substantial payments through Dallah Avco, Bayoumi failed to meaningfully pursue his English coursework, he then failed to meaningfully pursue his Masters or any tangible coursework thereafter. The few classes he did attend after the initial English courses had nothing to do with Saudization or replacing his Turkish superior Alp Karli, and Karli confirmed Bayoumi was *overqualified* for Karli's job and would only need six months training to take over. Av. ¶¶ 681, 709-710, 712, 715-17, 722. In fact, Bayoumi never took over Karli's position despite his multiple years of "education" that were supposedly to facilitate this promotion. Av. ¶ 717. Dallah knew Bayoumi's employment was a sham and eventually requested that the secondment cease despite realizing substantial profit from the arrangement. Av. ¶ 679.

**Bayoumi's Access to "Seemingly Unlimited" Funds**

As discussed above, Saudi Arabia was known to funnel kickbacks through Dallah Avco and other ANSS contractors to conceal the origin of funds and improperly pay Saudi officials. This was not just a general practice disconnected from Bayoumi. ████, a supervisor on the ANSS project, admitted to the FBI that PCA Director Salmi instructed Ercan to pay Bayoumi $10,000 per month in cash. Av. ¶ 649. ████ admitted that Ercan's owner laundered money through businesses in California to funnel payments to Bayoumi. ████ also told the FBI that Salmi provided Bayoumi an additional "stipend" of $5,000 per month. *Id.* Magdi Hanna confirmed in a letter that payments were ongoing through at least 2000. Av. ¶¶ 655-59, 700. These payments were on top of Bayoumi's ANSS salary (paid through Dallah), and on top of Bayoumi's educational leave stipend also paid through the PCA Logistics budget and funneled through Dallah Avco. Av. ¶ 700. If Ercan or Dallah failed to comply, their Saudi contracts would be jeopardized. Av. ¶ 701.

Bayoumi received funds from the PCA Logistics Department expense budget through Dallah Avco on top of his ANSS salary through Dallah Avco. Under this arrangement Saudi Arabia was paying Bayoumi $60,000 per year through Dallah Avco to cover his expenses and billed against the PCA's logistics budget until 1996, when the annual amount paid to Bayoumi was raised to $90,000. Av. ¶¶ 638-43. Bayoumi was being paid significantly higher amounts than actual students being funded by PCA. Av. ¶ 638. In addition, Bayoumi sought reimbursement of unusual additional expenses, including payments for his wife to travel back and forth to Saudi Arabia, and cars for him and his wife. Av. ¶ 643. Bayoumi's name was always the first name in the list of students contained in the Logistics budget because his expenses were significantly higher than the rest of the students, Bayoumi claimed unusual additional expenses, and he was considerably older in age than the other students and a married man with children. Av. ¶ 638.

REDACTED FOR PUBLIC FILING

When PCA Logistics Manager Coombs complained to Salmi that Bayoumi's expenses were unusual and exorbitant, Salmi immediately corrected him. Salmi wanted Bayoumi to stay in America, and instructed Coombs not to raise questions because "that's not for you to worry about." Av. ¶ 644. When shown records that Saudi Arabia paid both an educational stipend and an ANSS salary to Bayoumi through Dallah, Coombs described the arrangement as "way outside of the box" and "double-dipping." Av. ¶ 672. Coombs had never heard of such an arrangement being made for a PCA official. *Id.* Coombs also testified before the 9/11 Commission and FBI about his time at the PCA that "something didn't seem right to me. It was out of line." *Id.* In sum, Bayoumi received at least three separate streams of funding from the Saudi government through Saudi contractors: his ANSS salary through Dallah Avco payroll, his $90,000 per year education stipend through Dallah Avco and ultimately paid out of the PCA logistics budget to cover expenses, and at least $15,000 a month in cash through Ercan. Av. ¶ 700. This is of course, in addition to other amounts Bayoumi received directly from al Qaeda sympathizers while in the United States, including hundreds of thousands of dollars from a wealthy Saudi businessman to build a mosque in San Diego, and from the International Islamic Relief Organization and Sanabel. Av. ¶¶ 942-997, 799-813, 840-41.

Dallah Avco would process payments to Bayoumi and transfer them to a U.S. bank. Av. ¶ 672. Dallah Avco profited from this arrangement, receiving 5-10% on top of the payments it sent to Bayoumi "to cover Dallah Avco's overhead, other expenses, and profit margins as a government contractor". ECF 9365-1, Hammad Report ("Rpt.") ¶ 152. FBI documents further confirm that Dallah had at least 50 "ghost employees" on its books to conceal their mission in foreign countries, including Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay, who co-leased an apartment with Bayoumi in Southern California, no doubt in exchange for a similar considerations. Av. ¶¶ 666, 675, 802-03.

REDACTED FOR PUBLIC FILING

The arrangement to secretly pay and provide cover employment to Bayoumi ultimately succeeded. It was not until after the 9/11 attacks that the facts became known and ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ And on October 13, 2001, the FBI did a trace of companies Bayoumi claimed to work for and "established" a "connection between Bin Laden and Dallah Avco" that warranted further investigation. Av. ¶ 703.

Even long after 9/11, Saudi Arabia continued to maintain the charade that Bayoumi was not a Saudi government official to hide its complicity in the attacks. For example, in January 2002, United States government officials met with PCA representatives in Saudi Arabia. A report prepared by the PCA concerning the meeting shows that the PCA misled the U.S. government by claiming that "Bayoumi worked under contract for Dallah Avco." Av. ¶ 702. Dallah complained and asked Saudi Arabia to correct this misrepresentation. *Id.*

## Bayoumi's Known Ties to Islamic Extremism

Bayoumi has documented ties to extremism. *E.g.*, Av. ¶¶ 876-997. For example, when Bayoumi first arrived in San Diego, he immediately went to the Islamic Center of San Diego (ICSD) Mosque, which was a mosque with a covert Sunni extremist cell with ties to the extremist cell at the Ibn Taymiyah Mosque. Av. ¶¶ 131-174, 876. Shortly after his arrival in San Diego, Bayoumi met Forge aka Omar Hamerman at the ICSD, and Hamerman helped Bayoumi find an apartment near the ICSD. Av. ¶¶ 876-77. █████████████████████████████████████████████████ █████████████████████████████████████████████████. Bayoumi associated with Hamerman ███████████████████████████████████████████████████████

---

[3] ███████████████████████████████████████████████████████████ ████████████████████.

Bayoumi's name had first surfaced at the FBI in 1995 during its investigation of Sunni extremism that undoubtedly included Bayoumi. Av. ¶ 889. The FBI raid on Bayoumi's San Diego office found extremist materials including a "Book of Jihad" published by the Islamic Guidance Center of Saudi Arabia. Av. ¶ 890. A witness told the FBI a month after the 9/11 Attacks that Bayoumi was "always talking about how the Islamic community needs to take action" and that on several occasions Bayoumi told her that "they were 'at Jihad.'" Av. ¶ 891.

Bayoumi also had documented ties to Sunni Islamic extremist Anwar al Aulaqi, attending the Al Ribat Mosque, where Aulaqi was the Imam on a regular basis. Av. ¶¶ 843, 853-54, 894, 912, 915-16, 922-24, 929. Phone records show regular contact between Bayoumi, Thumairy and Aulaqi. *Id.* Bayoumi called Aulaqi before and on the day of the hijackers' arrival in San Diego and introduced the hijackers to Aulaqi. Av. ¶¶ 607, 1639.

Bayoumi also had extensive documented ties to Specially Designated Global Terrorist al Haramain Islamic Foundation Group in close proximity to the August 7, 1998 embassy bombings. Av. ¶¶ 3-7, 958-997. These are all in addition to the ongoing extremist connections Bayoumi used to aid the hijackers when they arrived in Southern California. Not coincidentally, Bayoumi became part of a second FBI counterterrorism investigation in September 1998, and was in close contact with several others who were being investigated for terrorist support. Av. ¶¶ 958-997. Ultimately, the investigation was terminated for unknown reasons. Av. ¶ 990.

**Bayoumi Provided Extensive Aid to the Hijackers**

Bayoumi's extensive aid to the hijackers is set forth in the accompanying Averment. Av. ¶¶ 627-1924. Saudi officials Bayoumi, Thumairy, and their subagents provided transportation, housing, leasing support, financial guarantees, leads for employment, food, and English language advice and assistance, to the hijackers, and worked with Saudi government officials who were part of an advance team to evaluate the support network prior to the hijackers' arrival. Bayoumi, Thumairy,

and their subagents also signed the hijackers up for flight lessons and hosted a welcome party to honor them and bring them into the like-minded community of support in Southern California.

## PROCEDURAL HISTORY

Since 2003, various plaintiff groups have alleged that Dallah Avco is liable for providing cover employment and substantial ongoing payments to Omar al Bayoumi in the United States to assist the hijackers. *E.g.*, *Ashton v. Al Qaeda*, 02-cv-6977, ECF 11; *id.* at ECF 465 ¶¶ 452-454; *Fed. Ins. Co. v. Al Qaida*, 03-cv-06978, ECF 1; *id.* at ECF 772 ¶¶ 414-419; *see also* MDL ECF 1699. Plaintiffs have asserted various causes of action against Dallah Avco and seek various forms of damages.

In Spring 2006, Dallah Avco moved to dismiss for lack of personal jurisdiction and failure to state a claim. ECF 1711-12, 1820-21. Plaintiffs opposed. ECF 1809, 1841. On June 17, 2010, the Court granted Dallah Avco's motion to dismiss for lack of personal jurisdiction, along with 37 other defendants. ECF 2252. The Court based its dismissal on the grounds that Bayoumi did not "commit[] the alleged wrongful acts in furtherance of Dallah Avco's business interests or at its direction." *Id.* at 42. The Court did not address Dallah's failure to state a claim argument and did not consider that Dallah committed a separate tort from the ones committed by Bayoumi.

Plaintiffs appealed. *See In re Terrorist Attacks on September 11, 2001*, 11-3294(L). In April 2013, following extensive briefing, *see* 11-3294(L), ECF 298, 417, 581, the Second Circuit affirmed the dismissal of most of the 37 defendants but vacated and remanded the Court's decision as to Dallah Avco. The Second Circuit held that "plaintiffs' jurisdictional theory against Dallah Avco is not limited solely to the acts of al Bayoumi. Rather, plaintiffs allege that Dallah Avco provided 'cover employment' for al Bayoumi while he was in the United States and allegedly supporting two September 11, 2001 hijackers. . . . [P]laintiffs' allegations against [ ] Dallah Avco suggest a closer nexus between their alleged support of al Qaeda and the September 11, 2001 attacks." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 679 (2d Cir. 2013) ("*Terrorist Attacks VII*"). The Second

19

Circuit then remanded Dallah Avco for jurisdictional discovery. Six months following that decision, the Second Circuit decided *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) and subsequently decided *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018). These decisions codified additional personal jurisdiction tests not discussed in *Terrorist Attacks VII*.

Following remand, the parties engaged in jurisdictional discovery. Almost immediately, Plaintiffs encountered issues with Dallah Avco's production as detailed in several letters to the Court. *See, e.g.*, ECF 2883, 3211, 3314. Plaintiffs subsequently deposed the following witnesses:

(1) Dallah's corporate representative Ammar Hassan Kamel; (2) Jaber Khalifa—former Dallah recruitment manager; (3) Riaz Khan—former Dallah Avco director of manpower; (4) former Assistant to the President of the PCA Abdulaziz al Anqari; (5) Omar al Bayoumi; and (6) Samuel Coombs – former ANSS Logistics manager (and former Saudi and Dallah employee).

Subsequently, Plaintiffs received thousands of additional documents from the London Metropolitan Police Service (Scotland Yard), the FBI, and the CIA, and Dallah Avco submitted an expert report on Saudi employment law from Dr. Adli Hammad.

## STANDARD OF REVIEW

Dallah Avco has moved to dismiss or, in the alternative, for summary judgment. Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction. After jurisdictional discovery, Plaintiffs' *prima facie* showing must include an averment of facts. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 198 (2d Cir. 1990); *Sokolow v. Palestine Liberation Org.*, 04-cv-00397 GBD, 2011 WL 1345086, *1 (S.D.N.Y. Mar. 30, 2011) (Daniels, J.) (court accepts all averments of jurisdictional facts as true). "The plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction" that is "factually supported". *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722

REDACTED FOR PUBLIC FILING

F.3d 81, 84 (2d Cir. 2013); *Averbach v. Cairo Amman Bank*, 19-cv-0004, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (Parker, J.).

In response to a post-jurisdictional discovery Rule 56 motion, the plaintiff need only show that there are not undisputed facts demonstrating the absence of jurisdiction. *Dorchester*, 722 F.3d at 84; *Averbach*, 2023 WL 5016884, at *4. For either motion, the court must "construe the pleadings and affidavits in the light most favorable to plaintiffs," and resolve all doubts, including factual disputes, in the plaintiff's favor. *Dorchester*, 722 F.3d at 84; *Averbach*, 2023 WL 5016884, at *4; *S. Oil of Louisiana Inc. v. Saberioon*, 19-cv-9622, 2021 WL 5180056, at *3 (S.D.N.Y. Nov. 8, 2021). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986). If the court conducts an evidentiary hearing, or if the defendant challenges personal jurisdiction at trial, then—and only then—must the plaintiff prove jurisdiction by a preponderance of the evidence. *Dorchester*, 722 F.3d at 85; *Averbach*, 2023 WL 5016884, at *4. Where the merits of the case are relevant to the jurisdictional issue and are in dispute, it is appropriate to deny a motion to dismiss and defer the question until after merits discovery. *Dorchester*, 722 F.3d at 87; *Averbach*, 2023 WL 5016884, at *4.

When moving for summary judgment, the movant bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that disputed material fact remains. *Id.* at 314.[4]

---

[4] The documents cited in the Averment are admissible because they are relevant, not hearsay, used for non-hearsay purposes, or they fall within a hearsay exception. *See also* Plaintiffs Opp. to Saudi Arabia's Motion to Dismiss, nn. 12, 14.

## ARGUMENT

**POINT I.    THE COURT HAS PERSONAL JURISDICTION OVER DALLAH AVCO**

To establish personal jurisdiction, due process requires that Dallah Avco have "certain minimum contacts with [the United States] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Terrorist Attacks VII*, 714 F.3d 659, 273 (2d Cir. 2013). The relevant inquiry is simply whether "[Dallah Avco's] conduct and connection with the forum … are such that [it] should reasonably anticipate being haled into court there.'" *Id.* This assessment of notice and fair play is based in part on the strength of the forum's interests at issue. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317-320 (1945); *Asahi Metal Indus. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987). The Second Circuit has established three relevant jurisdictional tests: the purposeful availment test as clarified in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), the concerted action test discussed in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) and the "effects test," also discussed in *Licci*.[5] Plaintiffs meet the modest jurisdictional threshold under all three.

### (A)    This Court Has Personal Jurisdiction Over Dallah Avco Under the *Licci* Test

So long as "in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013); *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 27 (E.D.N.Y. 2016). Dallah Avco's connection to this case involves *7 years* of in-forum activity that directly relates to its business activities here, *i.e.,* continued sham employment of and substantial

---

[5] *Licci* and *Schwab* were decided after *Terrorist Attacks VII*, so the Second Circuit (and this Court) have never applied them to Dallah Avco's personal jurisdiction defense. These cases are the law in the Second Circuit and apply here. *See In re Terrorist Attacks on Sept. 11, 2001*, 03-cv-06978, 2023 WL 2430381, at *10 (S.D.N.Y. Mar. 9, 2023) (applying concerted action test to Dubai Islamic Bank's renewed motion to dismiss for lack of personal jurisdiction on remand from *Terrorist Attacks VII*); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135–36 (2d Cir. 2014) (litigant could raise jurisdictional defense following intervening change in law).

REDACTED FOR PUBLIC FILING

payments to Omar al Bayoumi using a U.S. bank while Dallah's purported employee resided in Southern California[6] in exchange for continued business from Saudi Arabia and the receipt of 5-10% of Bayoumi's salary as compensation from Saudi Arabia. And of course, the resulting terrorist attacks took place here on American soil.

Beginning in 1994, Saudi Arabia used Dallah as a conduit to funnel hundreds of thousands of dollars to its agent in the United States, initially here on a student visa, then through a series of purported 1-year secondments to Dallah, and then to pursue "unpaid" educational leave that was in fact paid through Dallah. Av. ¶¶ 631-660, 709. FBI documents confirm that Saudi Arabia induced its subcontractors, including Dallah Avco, to maintain Bayoumi in the United States so as not to jeopardize ongoing business relationships with Saudi Arabia. Av. ¶ 701. Witnesses and CIA and FBI reports all document this "way outside the box" relationship, resulting in Bayoumi receiving significant streams of money in the United States through Dallah and its U.S.-based subcontractor Ercan. Av. ¶ 671-72. This included $15,000 a month in cash, Bayoumi's ANSS salary paid through Dallah, and Bayoumi's education stipend also processed through Dallah Avco. Av. ¶ 700.

The multi-year sham secondment, renewed annually, reflected Saudi Arabia's "urgent need" to station and funnel substantial funds to its operative in the United States without detection. Av. ¶¶ 667-69. Dallah was chosen because of its ongoing relationship with a U.S. subcontractor through the ANSS project. Av. ¶ 665.

This purported secondment relationship between Dallah and Bayoumi was no isolated event. FBI documents confirm that Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay, who co-leased an apartment with Bayoumi in Southern California, had a similar relationship. Av. ¶ 666.

---

[6] Dallah's contacts throughout the United States, including California, are relevant for purposes of establishing personal jurisdiction in this multi-district litigation. *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013).

REDACTED FOR PUBLIC FILING

Indeed, Saudi Arabia was known to regularly funnel kickbacks through Dallah Avco and other ANSS contractors to conceal the origin of funds and improperly pay Saudi officials. Av. ¶ 632.

Importantly, almost all of the key raises to Bayoumi's compensation corresponded to significant events *related to supporting the 9/11 hijackers in San Diego* and unrelated to Bayoumi's ANSS employment (non) activities. For example, after 1997, Bayoumi no longer meaningfully attended classes, still failed to show up to his ghost job, and the FBI began its *second* counterterrorism investigation into Bayoumi, yet this period corresponds to a substantial *increase* in his salary. *E.g.*, ECF 9365-1, Hammad Rpt. ¶ 145. Similarly, when hijackers Hazmi and Mihdhar arrived in the United States in January 2000, his pay again increased substantially, only to decrease after he is no longer assisting the hijackers. *Id.*; Av. ¶ 696.

Dallah's expert explains that the changes in pay correspond to changes in Bayoumi's job title following Dallah's completion of one 3-year ANSS contract and the beginning of a subsequent ANSS contract, but this explanation fails to explain (1) why Bayoumi received an increased salary at particular times, (2) why he received pay raises unrelated to the completion of the ANSS contracts (for example between April and July 2000), (3) why Bayoumi continued to receive his substantial ANSS salary through Dallah Avco when he performed no work and his purported secondment ended and he went on educational leave, and (4) why Bayoumi received hundreds of thousands of dollars through at least three sources. The more plausible explanation is that Saudi Arabia paid Bayoumi through Dallah Avco, not to perform any work for the ANSS project or to pursue coursework, but to provide Bayoumi with the resources he needed to complete his true mission in the United States—supporting Saudi Arabia's radical extremist agenda, culminating in 9/11.

Dr. Hammad even concedes that "Bayoumi was not in fact performing the job functions typically associated with those positions." ECF 9365-1, Hammad Rpt. ¶ 135. Further, the one Saudization program Hammad identifies that is associated with the ANSS project "had nothing to

do with" the educational program that Bayoumi pursued and that his job titles "had little relation to his status as a student." *Id.* ¶ 143. Hammad attempts to explain Bayoumi's substantial salary and allowances increase in April 2000 (corresponding closely with the arrival of the hijackers) by saying he was promoted to a "married status" position. But Bayoumi was 42 years old at the time and already had a wife and children. Av. ¶ 638. It also fails to explain the further pay increase Bayoumi received in July 2000.

Dallah Avco's defense of the case is that Bayoumi is not technically a Dallah Avco employee under Saudi law. That appears to be true but is also an admission to what Plaintiffs have long alleged, that Dallah knowingly participated in a scheme with the Saudi government to create the *appearance* that Bayoumi was a Dallah employee to hide the origin of his payments, his mission in the United States, and to funnel him hundreds of thousands of dollars without detection or suspicion.

Not surprisingly, there is ample case law that paying an employee's salary in the relevant jurisdiction subjects a company to jurisdiction there. *E.g.*, *Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 255-57 (E.D.N.Y. 2014) (finding personal jurisdiction over employer company where employer company paid plaintiff's salary for work in New York); *First Horizon Bank v. Moriarty-Gentile*, 10-cv-289, 2015 WL 8490982, at *5 (E.D.N.Y. Dec. 10, 2015) (finding personal jurisdiction over employer company in part because it was "the conduit through which payments for such [employee's] work and any distributions are channeled"). And the facts and allegations here are more compelling than in *Licci* and its progeny. In *Licci*, the Second Circuit found personal jurisdiction over a bank that used New York's banking system "dozens" of times to effect wire transfers to a financial arm of Hizballah. *Licci*, 732 F.3d at 166, 168–73. And even "dozens of transfers over an extended period" is not needed "to establish a course of dealing" for purposes of establishing jurisdiction. *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 414 (S.D.N.Y. 2021) (finding personal jurisdiction over banks that chose to operate correspondent accounts in New York); *see also Strauss v.*

25

*Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20-21, 28-32 (E.D.N.Y. 2016) (finding personal jurisdiction where bank routed a transfer through its New York Branch five times, for a total of $205,000).

Even more so than in *Licci* and related cases, where the terror attacks occurred *outside* the United States, the 9/11 attacks occurred inside the United States with the critical assistance of Bayoumi who Dallah helped provide a fictitious cover for in the U.S. Dallah had substantially more robust contact in the United States directly related to the attacks, including its substantial contributions to a U.S-based Saudi extremist network. Av. ¶¶ 627-1924.

### (B) This Court Has Personal Jurisdiction Over Dallah Avco Under a Concerted Action Jurisdictional Test

"To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018). Plaintiffs allege that Dallah conspired with, aided and abetted, and provided other material support to Saudi Arabia and Saudi agent Omar al Bayoumi in the United States, who then used his position to assist the 9/11 hijackers in the United States in preparation for their plan to hijack four U.S. airliners and crash them into civilian targets, killing thousands of U.S. citizens. No one can reasonably dispute that Saudi Arabia, Bayoumi, and the hijackers are subject to jurisdiction in the United States based on their significant contacts with the forum. The issue Dallah appears to dispute is whether a conspiracy existed and whether it participated. The record establishes that Dallah Avco conspired with Saudi Arabia to enable Bayoumi to live in the U.S.[7] FBI records

---

[7] To state a claim for conspiracy, a plaintiff needs to allege "an agreement between two or more persons" to "participate in an unlawful act, or a lawful act in an unlawful manner." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The

REDACTED FOR PUBLIC FILING

confirm "an informal *agreement* between DA [Dallah Avco] and the PCA in which Al Bayoumi has been, since June 1995, temporarily released from the PCA" and that from that point on, Dallah paid Bayoumi's salary. Av. ¶¶ 639, 667 (emphasis added). The FBI report then details Dallah's agreed upon role with respect to the secondment. But the true nature of the "informal agreement" between Saudi Arabia, Bayoumi, and Dallah can only reasonably be understood as one to provide cover employment and substantial ongoing payments to a Saudi operative in the United States so that Bayoumi could pursue his true mission on behalf of Saudi Arabia. Av. ¶¶ 627-1924. Even if Dallah knew only that it was agreeing to assist a Saudi operative in the United States, but did not know of Bayoumi's extremist ties, Dallah would still be part of the conspiracy, since the agreement need only relate to the broad object of the conspiracy—i.e. imbedding a Saudi intelligence officer in the United States in violation of several criminal statutes including the Espionage and Foreign Agents Registration Acts—not necessarily the 9/11 attacks. *Schwab*, 883 F.3d at 87-88. Accordingly, if Bayoumi or Saudi Arabia have sufficient contacts with the United States, so does Dallah Avco.

### (C)      This Court Has Personal Jurisdiction Over Dallah Under the "Effects Test"

The "effects test" is "typically invoked where the conduct that forms the basis for the controversy occurs *entirely* out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff (as was the case for the vast majority of the 37 defendants on appeal in *Terrorist Attacks VII*). In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Licci*, 732 F.3d at 173 (emphasis added). Here, Dallah provided cover employment and funneled hundreds of thousands of dollars to Bayoumi *in the United States*, and substantial and horrific loss of life and property damage occurred here too.

---

agreement need relate only to the broad object of the conspiracy (here, implanting a Saudi agent in the United States to advance Saudi Arabia's extremist agenda), not the particular attack resulting in harm. *Schwab*, 883 F.3d at 87-88.

REDACTED FOR PUBLIC FILING

Nevertheless, Plaintiffs readily satisfy this alternate test as well. The "fair warning requirement is satisfied [since Dallah Avco] purposefully directed [its] activities at residents of the forum, and th[is] litigation results from alleged injuries [sustained in the 9/11 attacks] that arise out of or relate to those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (substitution added). Dallah Avco "purposefully directed [its] activities at residents of [this] forum,'" since it "took 'intentional, and allegedly tortious actions … expressly aimed' at the forum" or its residents. *Id.* at 674.

Importantly, at this stage, Plaintiffs need not *prove* that Dallah Avco committed intentional tortious conduct. Rather, Plaintiffs need only *allege* a tort, and in this post-jurisdictional discovery posture provide "factual support" that Dallah committed a tort, with factual disputes that only resolve through an evidentiary hearing or at trial. *Dorchester*, 722 F.3d at 84-85, 87; *Averbach*, 2023 WL 5016884, at *4-7; *In re Vitamin C Antitrust Litig.*, 05-cv-453, 2012 WL 12355046, at *12 (E.D.N.Y. Aug. 8, 2012) (effects test satisfied after jurisdictional discovery but prior to an evidentiary hearing, where plaintiffs alleged a conspiracy and presented facts tending to show that a defendant contributed to a cartel with the express purpose of inflicting supercompetitive prices in the United States); *see also Water Res. Grp., LLC v. Powers*, 12-cv-3779, 2013 WL 5202679, at *5-6 (E.D.N.Y. Sept. 13, 2013) (effects test satisfied after jurisdictional discovery but prior to an evidentiary hearing, where allegations of tortious conduct and averment of facts detailed communications in, to and from the jurisdiction including in-person meetings and wire transfers from plaintiffs to defendant).

Here, by knowingly providing "cover employment" for Bayoumi, Dallah Avco enabled him to reside undetected in the United States and provide material assistance to the 9/11 hijackers. Av. ¶¶ 627-1924. Dallah Avco "purposefully directed" its activities toward this forum, and these actions directly resulted in the 9/11 attacks that "'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985).

REDACTED FOR PUBLIC FILING

Dallah Avco wrongly claims that specific personal jurisdiction is not proper because it did not know that Bayoumi's fake role on the ANSS project was a sham to conceal illicit activities nor was the employment "so obviously pretextual" that Dallah Avco must have known it was a sham. ECF 9363 at 2, 20.

While there are a many ways one can acquire knowledge (e.g., directly, indirectly, or through willful blindness/conscious avoidance), the law does not privilege one way over the other. *See United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011). Here, Dallah was not just a bystander, but an active participant in an illegal scheme, and committed overt acts in furtherance of a conspiracy to violate U.S. laws. Settled law considers a person to have "knowledge" when he or she has a strong suspicion that a fact exists, but intentionally avoids confirmation. *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Viacom Int'l v. YouTube, Inc.*, 676 F.3d 19, 34 (2d Cir. 2012); *Tiffany (NJ) v. eBay, Inc.*, 600 F.3d 93, 109–10 (2d Cir. 2010) ("[W]illful blindness is equivalent to actual knowledge[.]"). Thus, a willfully blind defendant takes deliberate actions to avoid confirming a high probability of wrongdoing and can almost be said to have actually known the critical facts. *Global–Tech*, 563 U.S. at 769. A defendant cannot escape "knowing" a fact if it deliberately shields itself from clear evidence of critical facts strongly suggested by the circumstances. *Id.*; *United States v. Fofanah*, 765 F.3d 141, 144 (2d Cir. 2014); *United States v. Svoboda*, 347 F.3d 471, 477–78 (2d Cir. 2003). "The rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil.'" *United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994). The Second Circuit has found that the presence of "red flags" can support a finding of actual knowledge and conscious avoidance. *Ferguson*, 676 F.3d at 278; *United States v. Nektalov*, 461 F.3d 309, 315, 317 (2d Cir. 2006).

Federal criminal law has codified the same principle if someone aids or conceals a foreign agent in the United States. It is a felony for Dallah to "harbor" or "conceal" any person who Dallah

"knows, *or has reasonable grounds to believe or suspect*" is a foreign agent. 18 U.S.C. § 792. Dallah had, at a minimum, grounds to suspect with high probability Bayoumi's true identity and illicit role in the United States, yet continued to support him for over 7 years.

Compounding Dallah's scienter element further is the CIA's assessment that from its founding, Dallah Avco and its founder Saleh Kamel were known to have ties to extremist causes and terrorism including widespread funding to al Qaeda, National Islamic Front, Hamas and various mujahidin groups. Av. ¶ 663. In this context, Bayoumi's 7-year placement in the United States, facilitated by Dallah Avco, is simply a continuation of this historical relationship to support an extremist jihadist network. Dallah cannot set Bayoumi loose, claim it never supervised him and think that it bore no responsibility for his actions that Dallah supplied the platform for. Dallah knew there was no "urgent need" in the United States for Bayoumi to work on the ANSS project, indeed once assigned, he never showed up to work. Av. ¶¶ 669-70, 675-77. Dallah knew Bayoumi's official positions listed on Dallah Avco letterhead were shams. Av. ¶¶ 675-77. It knew that continued secondment to pursue educational opportunities was not credible, since Bayoumi had already completed the coursework he supposedly was here to complete and rarely attended classes anyway. Av. ¶¶ 709-21. Dallah knew the continued secondment of Bayoumi in the United States made no sense since there was no reason to have a Dallah employee stationed long-term in the United States as Dallah had no offices or projects based in the United States. Av. ¶¶ 670, 676. Dallah knew it was the conduit for Bayoumi receiving multiple streams of money through the ANSS project that was "way outside the box" and "out of line". Av. ¶ 672. Dallah knew that Bayoumi was receiving substantially more than what a typical Saudi government employee would receive to pursue coursework. Av. ¶¶ 672-74. Dallah and the Assistant President of the PCA knew Bayoumi's continued stay in the United States for educational pursuits was a sham and requested it cease. Av. ¶¶ 679, 691-92. Indeed, while Bayoumi's educational pursuits for 7+ years were purportedly to allow

REDACTED FOR PUBLIC FILING

Bayoumi to take over for his Turkish superior, Alp Karli, Karli confirmed to the FBI that Bayoumi was *overqualified* for Karli's job, and that Karli would only need *six months* to fully integrate Bayoumi into his job. Av. ¶ 717. In fact, Bayoumi never took over Karli's position despite his multiple years of education that were supposedly to facilitate this promotion. Av. ¶ 717.

Tellingly, at around the time that the FBI began investigating Bayoumi (again) for terrorist activity, Dallah voiced its concern over Bayoumi's sham employment to the PCA. Av. ¶¶ 679, 959-997. But Dallah having cold feet about the operation shows knowledge, not innocence, and its willingness to continue with the charade despite its cold feet is more analogous to a scared lookout helping criminals avoid apprehension rather than an innocent bystander.[8]

According to FBI reports, these facts led many in the Southern California community to conclude that Bayoumi was a Saudi intelligence officer operating in the United States. Av. ¶¶ 868-73. If bystanders were able to deduce this, how much more so should the company paying Bayoumi hundreds of thousands of dollars for 7 years to do a job he never showed up for and education he never really pursued, have realized the same thing?

And Bayoumi was not just a Saudi intelligence officer, he had clear ties to terrorism. Even before the hijackers arrived, the FBI had already investigated Bayoumi *twice* in connection with terrorist activity, including one beginning in September 1998, right after al Qaeda perpetrated the embassy bombings against the United States. Av. ¶¶ 959-997. Bayoumi also had documented ties to Specially Designated Global Terrorist al Haramain and others with ties to the embassy bombings, and had taken leadership roles within several U.S.-based Sunni extremist cells. Av. ¶¶ 3-7, 959-997.

At a minimum, Dallah Avco knew it was harboring a Saudi agent in the United States. That alone is an intentional tort, and a criminal felony. But the historical financial ties between the Dallah

---

[8] The Assistant President of the PCA also recommended denial of Bayoumi's educational leave request in May 2000, and ultimately was overruled by the PCA President. It is likely that only a few high-level Saudi officials knew of Bayoumi's true mission in the United States, such as the PCA President.

REDACTED FOR PUBLIC FILING

group, its founder, and al Qaeda, coupled with pay increases corresponding to the hijackers' arrival, Bayoumi's documented ties to terrorism and him constantly stating he was "at jihad," all lead to the undeniable inference that Dallah knew Bayoumi was a Saudi spy in the United States whose mission was to advance extremist terrorist ideologies, ultimately culminating in the 9/11 attacks.

While Dallah denies its knowledge and intent, that only admits that there are material facts in dispute that must be resolved by the trier of fact.[9] Since there is plausible evidence that Dallah took intentional and allegedly tortious actions aimed at the forum or its residents by knowingly providing cover employment and substantial payments to Bayoumi, specific jurisdiction is established.

## POINT II.    DALLAH CANNOT MEET ITS HEAVY BURDEN ON THE ISSUE OF ATA AND STATE LAW LIABILITY ON SUMMARY JUDGMENT

As described above, proving knowledge and intent are often the most disputed elements of a crime. That they are disputed means that they must be resolved by a jury at trial. According to Dallah, these disputed issues are material elements of the Anti-terrorism Act ("ATA") and other state and federal laws alleged. But these disputes cannot be resolved here.

### (A)    Material Disputed Facts Preclude Summary Judgment for Dallah Avco on ATA Liability and State and Federal Claims that Include an Intent or Knowledge Element

The Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA") created a cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed … an act of

---

[9] Circumstantial evidence is sufficient to prove a defendant's tortious intent, and such intent may be proved inferentially because it is a matter of defendant's subjective mental state and revolves around facts that "rarely [are] admitted" and usually within defendant's knowledge and control. *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017) (quoting *Celle v. Fillipino Reporter Enders, Inc.*, 209 F.3d 163, 183 (2d Cir. 2000)); *accord Gregory v. Burnett*, 577 Fed. Appx. 512, 518 (6th Cir. 2014) (claims involving proof of a defendant's intent seldom lend themselves to summary disposition, and circumstantial evidence may suffice to defeat summary judgment). The reason for this rule is readily apparent. Conspiracy is by its nature a secretive operation; accordingly, intent may be established *entirely* through circumstantial evidence, and even "seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general." *United States v. Landesman*, 17 F.4th 298, 320-22 (2d Cir. 2021) (quoting *United States v. Wexler*, 522 F.3d 194, 207-8 (2d Cir.2008)).

REDACTED FOR PUBLIC FILING

international terrorism." 18 U.S.C. § 2333(d)(2). The purpose in enacting JASTA was to "provide civil litigants with the broadest possible basis . . . to seek relief against persons, entities and foreign countries . . . that engage in terrorist activities against the United States." 130 Stat. at 855.

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) serves as the framework for analyzing ATA aiding and abetting claims. Under *Halberstam* there are three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury"; "(2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time he provides the assistance"; and "(3) the defendant must *knowingly and substantially* assist the principal violation". *Honickman v. Blom Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021).

Dallah asserts there is inadequate evidence of its knowledge of Bayoumi's true mission in the United States. Dallah's motion thus centers on the general awareness and knowing and substantial assistance elements of ATA aiding and abetting liability.

As both *Halberstam* and *Honickman* hold, "general awareness" does not require that the defendant be aware of its role "in the specific act that caused the plaintiff's injury"; rather it is sufficient for liability that the defendant be "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was 'foreseeable.'" *Honickman*, 6 F.4th at 496; *accord Atchley v. Astra Zeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022). The use of the word "general" in the phrase "general awareness" connotes less than full, or fully focused, recognition and is fact-intensive. *Id.* Further, "[t]he language and purpose of JASTA are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal even where the relevant substantial assistance was given through an intermediary". *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021).

The facts in *Halberstam* resemble the case against Dallah here. In *Halberstam*, the court found a woman named Linda Hamilton civilly liable for aiding and abetting the murder of Michael

33

Halberstam during a burglary. Hamilton did not commit the burglary or the murder herself; indeed, she was not even present during the burglary and murder. The burglary and murder were instead committed by Welch, Hamilton's long-term romantic partner. Hamilton was unaware that Welch planned to burglarize or kill Halberstam, and she claimed more broadly that she was unaware that Welch had committed burglaries throughout their 5-year relationship. Hamilton did, however, regularly perform "secretarial work" for Welch, such as typing up transmittal letters for sales of stolen goods and keeping inventories of stolen goods that were sold. *Halberstam*, 705 F.2d at 474-78.

Chiefly because (1) Hamilton and Welch experienced a "sudden influx of great wealth," (2) transactions were filtered through Hamilton *except* for payouts for the stolen goods sold, and because of (3) Hamilton's "collusive and unsubstantiated treatment and deductions on her tax forms," the *Halberstam* court found that these facts combined sufficiently supported the inference that Hamilton *knew* that her partner Welch was engaged in illegal activities. The *Halberstam* court noted, it would "defy credulity" that Hamilton did not know that something illegal was afoot. 705 F.2d at 486.

Importantly, the court in *Halberstam* held that it was sufficient to establish that Hamilton had aiding and abetting liability for the murder of Halberstam because Hamilton was "generally aware" of her role in Welch's criminal enterprise; it was *not* necessary that Hamilton knew that Welch was committing burglaries (or that Welch would kill Halberstam). *Halberstam*, 705 F.2d at 488, cited with approval in *Honickman*, 6 F.4th at 496-97.

The reasoning in *Halberstam* is easily analogized to the present case. While Dallah claims it had no knowledge of its role leading up to the attacks, Dallah knew—or was willfully blind to the fact—that it was providing cover employment to a Saudi intelligence officer in the United States with documented ties to terrorism. Av. ¶¶ 3-7, 627-723, 958-997. If bystanders in San Diego knew Bayoumi was a Saudi intelligence officer, how much more so should Dallah have known since they were funneling hundreds of thousands of dollars to him in the United States—way more than any

34

other ANSS employee—to do no work and attend basically no classes, in a manner that was "way outside the box" for 7 years? Dallah's request to end the purported secondment is further evidence of knowledge that it was illegal. If Dallah was realizing 5-10% profit on the arrangement with Bayoumi and purportedly had no required oversight over him, why would Dallah have sought to terminate the secondment so urgently unless Dallah knew it was doing something risky and improper? Indeed, testimony given to the FBI confirms that Saudi Arabia would regularly use contractors, including Dallah Avco, to create fraudulent invoices to improperly pay Saudi officials and mask the source of funds, and Saudi Arabia would threaten its contractors with loss of business to maintain this improper payment structure. Av. ¶¶ 632, 701. And here, the improper payments increased significantly right when the 9/11 hijackers arrived. Av. ¶¶ 704. Just like Hamilton could not credibly deny knowledge of her role in her partner's criminal enterprise, Dallah cannot avoid the obvious inference from the evidence. Dallah knew it was providing improper payments and cover employment to a Saudi operative with extremist ties in the United States. Av. ¶¶ 3-7, 627-723, 958-997. Even if Dallah did not know the resulting illicit activity would include facilitating the 9/11 attacks, as in *Halberstam*, as long as Dallah was generally aware of its role in an improper enterprise—in this case conduct that violated at least two criminal statutes, the Foreign Agents Registration Act and the Espionage Act— Dallah can be liable for the resulting injuries. And given Dallah's historical ties to al Qaeda and Bayoumi's ties to terrorism prior to 9/11, Av. ¶¶ 632, 663, 876-997, Dallah likely knew even more. Plainly, this evidence is more than sufficient to make out the "general awareness" element of ATA aiding and abetting liability.

Regarding the other challenged element, the "knowing" component requires that the defendant know "that it is providing assistance", 18 U.S.C. § 2333(d)(2), either directly to a foreign terrorist organization, or indirectly through an intermediary. *Kaplan*, 999 F.3d at 863-64. If the defendant knowingly—and not innocently or inadvertently—gives assistance, then the knowing

35

component of knowing and substantial assistance is satisfied.  *Id.*  Here, as in *Atchley*, 22 F.4th at 222, Dallah cannot argue that its assistance was "in any way accidental."  *Id.*  The same evidence outlined above, *supra* at 32-35, that established Dallah's general awareness of its role in Bayoumi's tortious activities satisfies the "knowing" component of the knowing and substantial assistance of ATA aiding and abetting liability.

Turning to the "substantial" component of "knowing and substantial assistance" element, there are six factors to weigh, namely:  (1) the nature of the act assisted; (2) the amount and kind of assistance; (3) the defendant's presence at the time of the fact; (4) the defendant's relationship to the tortious actor; (5) the defendant's state of mind; and (6) the duration of the assistance. *See Halberstam*, 705 F.2d at 483-4; *Atchley*, 22 F.4th at 221.

Measured against these standards, the evidence that Dallah provided "substantial" assistance is not only sufficient, but overwhelming. After all, it was Dallah that imbedded Bayoumi in California and thus made it possible for him to welcome the hijackers to the United States, to provide them with a range of assistance and to introduce them to the network of other terrorist operatives who assisted them in obtaining flight training and in coordinating the September 11 attacks. By facilitating Bayoumi's undetected presence in the U.S. with access to "seemingly unlimited" funds, Dallah provided not only "substantial" assistance to al Qaeda and its terrorist activities in the United States, but assistance that was crucial and that led a straight line to the attacks of September 11, 2001.[10]

---

[10] For similar reasons, Dallah's challenges to other state a federal causes of action based on its alleged "lack of knowledge" fail, and for the reasons discussed in the concerted action personal jurisdiction section, Dallah cannot avoid conspiracy liability either. *See supra* at 26-27. Dallah's conduct also satisfies the elements of primary ATA liability. *See Linde v Arab Bank*, 882 F 3d 314, 326 (2d Cir. 2018). Dallah's conduct violated at least two criminal statutes, and supporting a Saudi spy with documented ties to terrorism in the United States endangers human life, influences government policy, affects government conduct, and transcends national boundaries. *E.g.*, Av. ¶ 869 n.2. Dallah also has a duty to protect third parties from an imbedded Saudi spy with documented ties to terrorism, especially when it facilitated Bayoumi's conduct and was in a unique position to know Bayoumi's true role in the United States.

**(B)    Material Facts Preclude Summary Judgment for Dallah Avco on the Issue of Proximate Cause.**

It is readily foreseeable that lending important financial and logistical support to an imbedded Saudi intelligence agent with ties to terrorist operatives in the United States will soon lead to terrorist activities actually taking place in the United States. Av. ¶¶ 876-997. This powerful—indeed, almost undeniable—statement at a minimum precludes summary judgment for Dallah.

In its August 10, 2023 Decision in the *Sudan* case (ECF 9278), this Court reviewed and elaborated upon the legal standard for causation that has been applied in this MDL proceeding. The Court explained in that Decision that proximate causation requires only "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  ECF 9278 at 9 (quoting *In Re Terrorist Attacks of September 11*, 298 F. Supp. 3d 631, 645 (S.D.N.Y. 2018)). In the present case, Dallah must demonstrate, drawing all inferences in Plaintiffs' favor, that no reasonable factfinder could conclude: (1) Dallah's activities were a "substantial factor" leading to the injuries suffered by the 9/11 plaintiffs; and (2) the injuries were a "reasonably foreseeable" consequence of those actions.  *Id.*; *Dorchester*, 722 F.3d at 84; *Averbach*, 2023 WL 5016884, at *4; *S. Oil of Louisiana Inc.*, 2021 WL 5180056, at *3. Dallah cannot meet its heavy burden.

**1.    "Substantial Factor"**

Fifteen of the 9/11 hijackers were Saudis who spoke little or no English, and who knew almost no one in the United States. Their mission required them to live in the United States unnoticed for an extended period, take flight training here, and to coordinate closely with an extended terrorist network in the U.S. in order to hijack multiple planes and crash them into several occupied buildings across the country virtually simultaneously on September 11.

This was a long-term mission, the first steps of which would necessarily include finding homes in the United States for the hijackers, supplying them with money and bank accounts, and putting them in touch with other terrorist operatives in the U.S., so that the hijackers could

REDACTED FOR PUBLIC FILING

accomplish all the many and varied tasks they were called upon to perform prior to September 11 itself. Stated differently, Hazmi and Mihdhar were ill-prepared for a mission in the United States and neither "would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." Av. ¶ 1446; Ex. 6, 9/11 Commission Report.

Those first steps were precisely what Bayoumi accomplished while posted in California when future September 11 hijackers Hazmi and Mihdhar first arrived in the United States and established al Qaeda's presence in the U.S. Had they failed, the entire operation would have been in jeopardy. Instead, Saudi Arabia established a secret support network that would assist the hijackers including providing transportation, housing, leasing support, financial guarantees, money, leads for employment, food, and English language advice and assistance. Further, Bayoumi, Thumairy, and their subagents welcomed at least two separate advance teams of extremist Imams from the Ministry of Islamic Affairs who traveled to Southern California from Saudi Arabia, to ensure that a similar network of support existed and was in place to receive the al Qaeda hijackers when they arrived. Bayoumi simply could not have aided the hijackers when they arrived in the United States without Dallah Avco. Av. ¶¶ 627-1924. This assistance plainly satisfies the substantial factor element. ECF 9278 at 10-13 (Sudan's extensive financial support and safe-haven to al Qaeda during the early 1990's was a proximate cause of the September 11 attacks); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261 (E.D.N.Y. 2019) (finding bank's monetary support to terrorist organization through routing of payments and maintaining of accounts proximate cause of plaintiffs' injury); *Miller v. Arab Bank*, PLC, 372 F. Supp. 3d 33, 46 (E.D.N.Y. 2019) (plaintiffs sufficiently alleged that bank's conduct was the proximate cause of plaintiffs' injuries where the payments the bank administered through a martyr payment scheme incentivized terrorists to commit acts of violence). Here, Dallah funneled money to Bayoumi right when the hijackers needed assistance in the United States and covered Bayoumi's tracks right when U.S. authorities were investigating Bayoumi for ties to

38

terrorism in advance of 9/11. There can be little question that Dallah's alleged conduct was a substantial factor in causing Plaintiffs' injuries.

### 2.  "Foreseeability"

Similarly, the September 11 attacks were a foreseeable consequence of Dallah's conduct. The "reasonably foreseeability" component of proximate causation does not require the support to be earmarked for a specific terrorist attack, only that the "defendant acts to support some future attack to be planned, reasonably anticipating that the brunt of the injuries will be felt there." ECF 9278 at 13 (quoting *In Re Terrorist Attacks of September 11, 2001*, 718 F. Supp. 2d 456, 481 (S.D.N.Y. 2010)).

Plainly, supporting a Saudi spy in the United States with documented ties to terrorism, and who was the subject of two FBI counterterrorism investigations prior to 9/11, has some reasonable connection to terrorist attacks taking place in the United States. Av. ¶¶ 876-997. While Dallah may not have known Bayoumi would aid the hijackers fly planes into buildings, proximate cause does not require Dallah's specific knowledge of the 9/11 attacks, only a reasonable connection to the resulting acts. ECF 9278 at 13. Indeed, spies are regularly used to support terrorists and assassination attempts in foreign countries, including those committed by Saudi Arabia itself. Av. ¶ 869 n.2. Bayoumi used the substantial assistance he received through Dallah Avco to provide hijackers al Hazmi and Mihdhar with homes, money and a network of critical contacts in the U.S. ultimately resulted in a devastating terrorist operation in the United States. Av. ¶¶ 627-1924.

Nevertheless, Dallah argues that proof of foreseeability is lacking in part because purportedly too much time—nineteen months—passed between the time Bayoumi welcomed the hijackers to the U.S. and the September 11th attacks. *See* ECF 9363 at 35. Yet in *Sudan* much more time had elapsed between the primary material support and the 1998 East African Embassy bombings, and the Court found that proximate cause had been established. At the very least, the passage of time is a disputed issue which cannot be settled as a matter of law. *See Weiss v. Nat'l Westminster Bank PLC*,

REDACTED FOR PUBLIC FILING

453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) (holding that "[w]hile the lapse of time may factor into the proximate cause inquiry, given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used" it "cannot conclude as a matter of law that NatWest's transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002"); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 434 (E.D.N.Y. 2013) (genuine issue of material fact as to whether sizable amount of money sent to Hamas-affiliated groups was a proximate cause of terrorist attacks at issue).

Dallah also ignores that Bayoumi coordinated a "dry run" of the reception the hijackers would receive before they arrived, that he connected the hijackers to a network of helpful subagents operating within the United States, and that both Bayoumi and this network continued to assist the hijackers throughout their time in the United States. Bayoumi and Thumairy were the first gatekeepers, opening the door when the hijackers arrived and secreting them undetected while they prepared to complete their mission. The line between Dallah's wrongful conduct and the September 11th attacks is far shorter and far more direct than in other cases where courts have either found proximate cause or submitted the question to a jury.[11]

## CONCLUSION

By reason of the forgoing, Plaintiffs respectfully request that the Court deny Dallah Avco's renewed motion to dismiss or, in the alternative, for summary judgment.

Date:   December 20, 2023 - Affirmed as to corrections on January 17, 2024

---

[11] Summary judgment for Dallah is also inappropriate here because merits discovery of Saudi Arabia and Dallah has not begun, Saudi Arabia has improperly failed to provide requested documents and evidence, and Plaintiffs are still receiving additional evidence from third parties. *See Fowler v. Scores Holding Co. Inc.*, 677 F. Supp. 2d 673 (S.D.N.Y. 2009) (before a court grants summary judgment, the non-movant must have opportunity to discover information essential to her opposition); ECF 4216 at n.2 (Dallah noting connection between discovery from Saudi Arabia and Dallah and requesting identical deadlines); Hearing Transcript, dated January 18, 2017, 15:9-10, 19:8-18; 44:7-8 (Court noting the "relatively narrow scope of discovery that the plaintiffs are entitled" against Dallah Avco in jurisdictional discovery and denying in part motion to compel on this ground). Since Plaintiffs have not had the opportunity to discover merits information, Dallah's motion must be denied.

REDACTED FOR PUBLIC FILING

ANDERSON KILL, P.C.

By: /s/ Jerry S. Goldman
JERRY S. GOLDMAN
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 278-1000
Email: jgoldman@andersonkill.com
*For the Plaintiffs' Exec. Committees*

KREINDLER & KREINDLER

By: /s/ Steven R. Pounian
STEVEN R. POUNIAN
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel.: (212) 687-8181
Email: spounian@kreindler.com
*For the Ashton Plaintiffs*

MOTLEY RICE LLC

By: /s/ Robert T. Haefele
ROBERT T. HAEFELE
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*For the Plaintiffs' Exec. Committees*

COZEN O'CONNOR

By: /s/ Sean P. Carter
SEAN P. CARTER
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
*For the Plaintiffs' Exec. Committees*

REDACTED FOR PUBLIC FILING