UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:
*Alexander Jimenez, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11875 (GBD) (SN)

### MOVING PLAINTIFFS' MEMORANDUM OF LAW IN
### <u>SUPPORT OF MOTION FOR PARTIAL FINAL DAMAGES JUDGMENTS</u>

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        agreene@andersonkill.com
*Attorneys for Plaintiffs*

Dated:   New York, New York
         May 24, 2024

<u>**TABLE OF CONTENTS**</u>

**Page**

INTRODUCTION ...................................................................................................... 1

I.     Procedural Background.................................................................................... 2

       A.     Applicable Orders ................................................................................ 2

       B.     Related Cases ....................................................................................... 4

       C.     Moving Plaintiffs Herein – Service and Liability................................. 6

II.    Damages – Governing Law ............................................................................. 6

       A.     Background ........................................................................................... 6

       B.     Solatium Damages ............................................................................... 7

              1.     Functional Equivalents of Immediate Family Members.......................... 10

       C.     Punitive Damages ................................................................................ 19

       D.     Prejudgment Interest ........................................................................... 20

III.   Conclusion ...................................................................................................... 21

docs-100696086.1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashton v. al Qaeda Islamic Army*,
    02-CV-6977 (GBD)(SN) ................................................................................. *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya*,
    775 F. Supp. 2d 48 (D.D.C. 2011) ..........................................................................20

*Bauer v. Al Qaeda Islamic Army*,
    02-CV-7236 (GBD)(SN) ................................................................................. *passim*

*Belkin v. Islamic Republic of Iran*,
    667 F. Supp. 2d 8 (D.D.C. 2009) ...............................................................................7

*Dammarell v. Islamic Republic of Iran*,
    281 F. Supp. 2d 105 (D.D.C. 2003),
    vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005)..................................7

*Est. of Bland v. Islamic Republic of Iran*,
    831 F. Supp. 2d 150 (D.D.C. 2011) ..........................................................................8

*Est. of Heiser v. Islamic Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) ......................................................................4, 8

*In re Sept. 11 Litig.*,
    802 F.3d 314 (2d Cir. 2015)....................................................................................20

*Surette v. Islamic Republic of Iran*,
    231 F. Supp. 2d 260 (D.D.C. 2002) ..........................................................................8

*In re Terrorist Attacks on September 11, 2001*,
    03-md-1570.........................................................................................................4, 19

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ..........................................................................8

STATUTES

28 U.S.C. § 1605A(a)(1)...................................................................................4, 6, 19

Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115
    Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101) ...............................20

**INTRODUCTION**

For the reasons set forth below, the statements contained in the Declaration of Jerry S. Goldman, Esq. ("Goldman Declaration"), with exhibits appended thereto, which is being filed contemporaneously with this Memorandum of Law, as well as those set forth in prior motions for damages made on behalf of other *O'Neill* plaintiffs, certain plaintiffs in the above-captioned matter who are identified in annexed Exhibit A to the Goldman Declaration (the Plaintiffs identified in annexed Exhibit A are collectively referred to herein as the "Moving Plaintiffs") (which is Exhibit B to the Proposed Order) by and through their counsel, Anderson Kill P.C., respectfully move this Court for an Order:

1.      awarding the Moving Plaintiffs damages judgments against Defendant Islamic Republic of Iran ("Iran") in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill*, *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; AND,

2.      determining that:

(a)      Jaimenys Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

(b)      Jaimercedes Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

(c)      Jaimelin Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

3.       awarding solatium damages to the Moving Plaintiffs in the amount of $8,500,000 per child, as set forth in annexed Exhibit A; AND**,**

4.      awarding the Moving Plaintiffs prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

5.      granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

6.      granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

7.      granting to the Moving Plaintiffs such other and further relief as this Honorable Court deems just and proper.

This motion is made only on behalf of the Moving Plaintiffs, each of whom, it is respectively submitted, is the functional equivalent of a child of Manuel De Jesus Molina, who was killed in the September 11, 2001 terrorist attacks.

As the awards set forth in the Proposed Order represent the only direct recovery against Iran on behalf of the Moving Plaintiffs for the claims herein, any award issued to the Moving Plaintiffs will constitute final awards and judgments against Iran for the Moving Plaintiffs.

## I.      PROCEDURAL BACKGROUND

### A.      Applicable Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

(a)      The Court's January 24, 2017 Order, ECF No. 3435,[1] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."  For compliance with the required sworn declaration, please see paragraph 11 below.

(b)      The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

(c)      The Court's October 14, 2016 Order, ECF No. 3362, related to the cases captioned as *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

(d)      The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

(e)      The Court's October 28, 2019 Order, ECF No. 5338, setting forth the scheduling order.

(f)      The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

(g)      The Court's September 22, 2023 Order, ECF No. 9355, setting forth procedures for default judgment motions.

---

[1] All ECF numbers are to the MDL docket unless stated otherwise.

docs-100696086.1

B.     **Related Cases**

Relying on evidence and arguments[2] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th attacks, this Court, on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *O'Neill*, *Havlish*, *Ashton*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran (*See*, e.g., ECF Nos. 2516, 3014, 3016, 3020-23).  Subsequently, other liability findings were made for additional *O'Neill* plaintiffs.  After granting *Havlish* plaintiffs' Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents.  Upon the *Havlish* plaintiffs' submissions, on October 3, 2012 this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium…in an action under Section 1605A.  28 U.S.C. § 1605A(c)(4).  In such an action, …family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |

---

[2] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

| Child | $8,500,000 |
|---|---|
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See*, e.g., ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the Foreign Sovereign Immunities Act ("FSIA") in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate

judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest.  ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.  However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims.  ECF Nos. 3358 at 17-20; 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually.  ECF Nos. 3383 at 2, 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to other plaintiffs' awards in *Burnett*.

### C.    Moving Plaintiffs Herein – Service and Liability

As set forth in Exhibit A to the Proposed Order, Moving Plaintiffs herein filed suit and duly served Iran. The Clerk's Office, upon Plaintiffs' applications, issued a Clerk's Certificate of Default, and a liability judgment has been entered in the above-referenced matter.

## II.    DAMAGES – GOVERNING LAW

### A.    Background

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members [or the functional equivalents of such family members] can recover solatium for their emotional injury; and all

plaintiffs can recover punitive damages." ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83).

Moving Plaintiffs are each the functional equivalent of a child of 9/11 decedent Manuel De Jesus Molina, as demonstrated by documentary evidence of their familial relationship, as discussed herein.[3] *See* Goldman Declaration at ¶¶ 4-13, 17-21.

As liability has been established in this matter, each Moving Plaintiff is now entitled to damages in the amounts set forth in annexed Exhibit A to the Goldman Declaration, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the September 11, 2001 terrorist attacks (the "9/11 Attacks"). In accordance with the terms of the FSIA, the Moving Plaintiffs are entitled to compensation under Section 1605A for solatium damages and are also entitled to prejudgment interest.

## B.    Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional

---

[3] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

distress.  *See*, e.g., *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id.*  This formula, however, may be adjusted upward or downward when circumstances warrant.  *See*, e.g., *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, …are faced with frequent reminders of the events of that day."  ECF No. 2618 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ."  *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in *Bauer*, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in *Hoglan*, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* plaintiffs, ECF No. 3977 at 6–7.  The same amounts were adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "*Burnett/Iran II*," No. 15-cv-09903, ECF No. 101.[4]

The solatium losses suffered by the Moving Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in *O'Neill*, *Havlish*, *Ashton*, *Bauer*, *Hoglan*, and *Burnett*.  As such, Moving Plaintiffs respectfully request that the Court award them solatium damages in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan*, *O'Neill*, and *Burnett* cases.

---

[4] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's July 31, 2017 Order, ECF No. 3666, are in later filings of the *Burnett*, *Ashton*, and *O'Neill* plaintiffs.

### 1.       Functional Equivalents of Immediate Family Members

The *Hoglan II* October 14, 2016 Report and Recommendation, ECF No. 3363, *adopted by* Mem. Decision and Order dated October 31, 2017, ECF No. 3384, recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that they had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member.  *See Hoglan IV* Report and Recommendation, dated August 8, 2017, ECF No. 3676, *adopted by* Mem. Decision and Order dated November 17, 2017, ECF No. 3795. These categories of non-immediate family members included fiancées and domestic partners, step-relatives (including step-children), aunts, uncles, nieces, nephews and cousins.  *See* ECF No. 3363.

In the October, 2016 Report and Recommendation, ECF No. 3363, three (3) factors were identified by the Court as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e., did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member).  *Id.* at 10-12.  In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together.  *Id.*  With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as

10

being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id*. at 14-15.  In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*. at 17-28.

This motion for damages judgments is submitted on behalf of Jaimercedes Taveras ("Jaimercedes"), Jaimelin Taveras ("Jaimelin"), and Jaimenys Taveras ("Jaimenys"), the stepchildren of 9/11 decedent Manuel De Jesus Molina ("Manuel"). The declarations of Jaimercedes, Jaimelin, and Jaimenys, annexed as Exhibits B, C, and D to the Goldman Declaration, and the affidavit of their mother, Mercedes Molina ("Mercedes"), annexed as Exhibit E to the Goldman Declaration, demonstrate that each of them are the functional equivalent of Manuel's child, and as such the Moving Plaintiffs should each be awarded a $8.5 million judgment.[5]

> **(a)  Jaimercedes Taveras, Jaimelin Taveras, and Jaimenys Taveras, Child Equivalents of Manuel De Jesus Molina**
> Presumptive Award: $8.5 Million each
> Requested Award: $8.5 Million each

Jaimercedes, Jaimelin, and Jaimenys were the stepchildren of Manuel, and for the reasons set forth below, and in the accompanying declarations of Jaimercedes, Jaimelin, and Jaimenys, and the affidavit of Mercedes, annexed as Exhibits B, C, D, and E to the Goldman Declaration, respectively, Plaintiffs submit that Jaimercedes, Jaimelin, and Jaimenys should be deemed the functional equivalent of Manuel's children.

---

[5] While this Court has awarded $4.25 million solatium damages judgments to stepchildren who were 9 years old or older when the 9/11 decedent became part of their family, *see* ECF Nos. 3795 and 8286, the Moving Plaintiffs believe the strength of Manuel's relationship with Jamienys Taveras, as described herein, warrants a full solatium damages judgment of $8.5 million.

Manuel came into Jaimelin's and Jaimenys' lives in 1992 when he started dating their mother, Mercedes.[6] Goldman Declaration, Exhibit C ¶ 2; Exhibit D ¶ 2.  Jaimelin and Jaimenys were 1 year old and 9 years old, respectively, at the time. Goldman Declaration, Exhibit C ¶ 2; Exhibit D ¶ 2.  Manuel was always in Jaimercedes' life, since she was born in 1993, and while a Court did not enter a decree establishing paternity before Manuel died, Jaimercedes' mother believes that Manuel is Jaimercedes' biological father. Goldman Declaration, Exhibit B ¶ 2; Exhibit E ¶ 7.  Manuel lived in a 3-bedroom apartment in the Bronx with Mercedes, Jaimercedes, Jaimelin, and Jaimenys continuously from 1995 until his death on September 11, 2001. Goldman Declaration, Exhibit B ¶ 2; Exhibit C ¶ 2; Exhibit D ¶ 2. Additionally, Manuel's cousin lived with them from 1997 until 2002. Goldman Declaration, Exhibit B ¶ 2; Exhibit C ¶ 2; Exhibit D ¶ 2.

Manuel was the primary supporter of the family in every way. Goldman Declaration, Exhibit B ¶ 3; Exhibit C ¶ 3; Exhibit D ¶ 3; Exhibit E ¶¶ 10, 14, 30-31, 34. In addition to being the sole wage earner in the family since Mercedes was disabled, Manuel took the lead role in the family's home life and in raising Jaimercedes, Jaimelin, and Jaimenys. Goldman Declaration, Exhibit B ¶ 3; Exhibit C ¶ 3; Exhibit D ¶ 3; Exhibit E ¶¶ 10, 14, 30-31, 34. Manuel did the household chores, grocery shopping, and cleaning. Goldman Declaration, Exhibit B ¶ 3; Exhibit D ¶ 3; Exhibit E ¶ 30. Manuel helped Jaimercedes, Jaimelin, and Jaimenys with their math homework, he attended their school events and medical appointments, he cooked meals for them, played with them at home, bought them birthday and Christmas presents (Christmas Eve was Manuel's birthday so this was always an especially festive time of year), and helped Jaimercedes and Jaimelin get dressed. Goldman Declaration, Exhibit B ¶ 3; Exhibit C ¶ 3; Exhibit D ¶ 3;

---

[6] Manuel and Mercedes got married on April 9, 2000 in the Dominican Republic. Goldman Declaration, Exhibit C ¶ 2; Exhibit D ¶ 2 n.1; Exhibit E ¶ 10.

Exhibit E ¶ 38. Manuel took them to the park, on regular weekend trips to Manhattan to visit their grandmother (his mother) and aunt (his sister), and on vacations to his hometown in the Dominican Republic to visit his side of the family and their collection of roosters. Goldman Declaration, Exhibit B ¶ 3; Exhibit C ¶ 3; Exhibit D ¶ 3. Manuel did everything a father would be expected to do for his children, as well as most things a mother would do (since their mother was disabled). Goldman Declaration, Exhibit B ¶ 3; Exhibit E ¶ 38.

Jaimercedes, Jaimelin, and Jaimenys each have special memories of their time with Manuel. Jaimercedes remembers when Manuel tried to keep a rooster and two other birds in their small Bronx apartment, and when Manuel took pictures of Jaimercedes with the birds. Goldman Declaration, Exhibit B ¶ 4. Unfortunately, the family had to get rid of the birds because the bird food attracted cockroaches. Goldman Declaration, Exhibit B ¶ 4. Jaimercedes also remembers when Manuel and her mom helped her with her math homework by drawing little apples, and it turned into a competition between Manuel and her mom about who could draw the best apple, and how much they loved each other. Goldman Declaration, Exhibit B ¶ 5. Jaimercedes remembers how Manuel would hug her goodnight every night and say a traditional Dominican blessing to her. Goldman Declaration, Exhibit B ¶ 6. Jaimercedes remembers waiting for Manuel to come home from work every day. Goldman Declaration, Exhibit B ¶ 6.  Manuel was a true family man who wanted to spend as much time as possible with his three daughters. Goldman Declaration, Exhibit B ¶ 6. Jaimercedes remembers sitting on Manuel's back while he would do push-ups in their living room, listening together to romantic Bachata music, learning how to play dominoes, or watching the Aristocats in Spanish, or Oscar de la Hoya, one of Manuel's favorite boxers. Goldman Declaration, Exhibit B ¶ 6. To this day, Jaimercedes has certain Bachata songs memorized because she and Manuel listened to the music together so frequently. Goldman

13

Declaration, Exhibit B ¶ 6. Jaimercedes remembers how passionate Manuel was about playing dominoes and how Manuel made sure his daughters knew how to play. Goldman Declaration, Exhibit B ¶ 6. Because of Manuel, Jaimercedes considers herself one of the best dominoes players around. Goldman Declaration, Exhibit B ¶ 6.

Jaimelin remembers that Manuel was very supportive of her education. Goldman Declaration, Exhibit C ¶ 4.  Manuel helped her with her homework almost every night. Goldman Declaration, Exhibit C ¶ 4.  One of Jaimelin's fondest memories of Manuel relates to her fifth grade "senior trip." Goldman Declaration, Exhibit C ¶ 5.  The trip cost $40 and Jaimelin's mom said that they did not have the funds, so Jaimelin would be unable to go. Goldman Declaration, Exhibit C ¶ 5.  Jaimelin was devastated since all her school friends were going. Goldman Declaration, Exhibit C ¶ 5.  On the morning of the trip, Manuel surprised Jaimelin and told her that he came up with the funds for the trip plus a little extra for lunch. Goldman Declaration, Exhibit C ¶ 5.  Together Manuel and Jaimelin raced to school, so Jaimelin was on time for the trip. Goldman Declaration, Exhibit C ¶ 5.  Jaimelin was so excited to go on the trip to Connecticut. Goldman Declaration, Exhibit C ¶ 5.  Jaimelin remembers coming home and telling her parents about the fantastic trip, which would not have happened without Manuel. Goldman Declaration, Exhibit C ¶ 5.  Additionally, Jaimelin remembers when Manuel taught her how to ride a bike in the summer of 2001, when they were on a family trip in the Dominican Republic. Goldman Declaration, Exhibit C ¶ 6.  Jaimelin remembers that Manuel was always there to pick her up when she fell, and how Manuel encouraged her to keep trying. Goldman Declaration, Exhibit C ¶ 6.  By the end of the summer, Manuel successfully taught Jaimelin how to ride a bike. Goldman Declaration, Exhibit C ¶ 6.  This was their last family trip before Manuel was killed on 9/11. Goldman Declaration, Exhibit C ¶ 6.

14

Jaimenys remembers how supportive, funny, and attentive Manuel was with her. Goldman Declaration, Exhibit D ¶ 4.  Manuel was her family's protector, and he brought stability and a loving presence to their home. Goldman Declaration, Exhibit D ¶ 4. Jaimenys remembers that Manuel was the first person to give her $20, which was significant because her biological father never supported her and her family and he was an alcoholic and physically and emotionally abusive. Goldman Declaration, Exhibit D ¶ 4.  Manuel also took Jaimenys to her first movie—the Lion King. Goldman Declaration, Exhibit D ¶ 4.  Jaimenys remembers how Manuel regularly took her out to dinner at McDonalds (her favorite) and told her she could order whatever she wanted. Goldman Declaration, Exhibit D ¶ 4.  When Jaimenys was older, she and Manuel would regularly commute home together from their jobs in Manhattan. Goldman Declaration, Exhibit D ¶ 4.  Jaimenys remembers how Manuel loved boxing, Bachata music, fitness, playing dominoes, and his bird collection. Goldman Declaration, Exhibit D ¶ 4. Jaimenys still has Manuel's hat that he gave to her. Goldman Declaration, Exhibit D ¶ 4. Jaimenys never would have guessed that would be the last memento she would have of Manuel. Goldman Declaration, Exhibit D ¶ 4.

There is no doubt that Manuel was Jaimercedes', Jaimelin's, and Jaimenys' father. Goldman Declaration, Exhibit B ¶ 10; Exhibit C ¶ 8; Exhibit D ¶ 5.  They had a very close relationship akin to a father and daughter and they each considered each other to be father and daughter in every way. Goldman Declaration, Exhibit B ¶ 15; Exhibit C ¶¶ 3, 11; Exhibit D ¶¶ 5, 9; Exhibit E ¶¶ 7-9, 38.  Manuel was supportive, funny, attentive, and always tried to hide the ugly parts of the world from his daughters. Goldman Declaration, Exhibit B ¶ 7; Exhibit D ¶ 4. Manuel made sure to raise his daughters with strong values and provide them with discipline. Goldman Declaration, Exhibit B ¶ 7; Exhibit D ¶ 5.  Jaimercedes remembers when Manuel

15

grounded her for using a curse word and insisted that she spend quality time with the family instead of using electronics. Goldman Declaration, Exhibit B ¶ 7.  Jaimenys remembers that when she would skip school, Manuel would explain to her the importance of getting an education. Goldman Declaration, Exhibit D ¶ 5.  It meant so much to Jaimenys that Manuel was always present and made sure she felt important. Goldman Declaration, Exhibit D ¶ 5.

In contrast, Jaimercedes, Jaimelin, and Jaimenys had no real relationship with their biological father,[7] who did not play an important role in their lives. Goldman Declaration, Exhibit B ¶ 11; Exhibit C ¶ 9; Exhibit D ¶ 6.

Jaimercedes never had a relationship with the man listed on her birth certificate as her father. Goldman Declaration, Exhibit B ¶ 11.  To this day, he has never contacted or visited her. Goldman Declaration, Exhibit B ¶ 11.  Jaimercedes' son, Robert Manuel (who is named after Manuel), recognizes Manuel as his grandfather and his mother's father. Goldman Declaration, Exhibit B ¶¶ 10-11.  Jaimercedes tells her son every day what a great man his grandfather was and the significance of her son's namesake. Goldman Declaration, Exhibit B ¶ 11.

Jaimelin has no relationship with her biological father, who left the family for the Dominican Republic in approximately 1991. Goldman Declaration, Exhibit C ¶ 9.  Jaimelin has not spoken to him in decades. Goldman Declaration, Exhibit C ¶ 9.  Jaimelin considers Manuel to be the grandfather of her 3 young children. Goldman Declaration, Exhibit C ¶ 9.  Jaimelin's oldest son, Raynel Manuel Puello, is named after his grandfather who he never met. Goldman Declaration, Exhibit C ¶ 9.

Jaimenys also has no real relationship with her biological father, who was an alcoholic and physically and emotionally abusive. Goldman Declaration, Exhibit D ¶ 6.  He moved to the

---

[7] As previously stated, Jaimercedes' mother believes that Manuel is Jaimercedes' biological father. Goldman Declaration, Exhibit B ¶ 2; Exhibit E ¶ 7.

Dominican Republic when Jaimenys was approximately 12 years old and never came back to visit her. Goldman Declaration, Exhibit D ¶ 6. At most he would call Jaimenys 2-3 times a year when she was growing up and only for a 2-minute conversation. Goldman Declaration, Exhibit D ¶ 6. He did not emotionally or financially support Jaimenys and her younger sisters, or act at all like a father. Goldman Declaration, Exhibit D ¶ 6. Manuel filled that void and was the father figure in their lives.

Jaimercedes, Jaimelin, and Jaimenys were an integral part of Manuel's family. Manuel took them to visit his family in Manhattan and to his hometown in the Dominican Republic. Goldman Declaration, Exhibit B ¶ 3; Exhibit C ¶ 3; Exhibit D ¶ 3. Jaimelin remembers traveling with Manuel to the Dominican Republic almost every summer. Goldman Declaration, Exhibit C ¶ 6. They would visit his parents, brothers and sisters, and cousins and their dozens of roosters. Goldman Declaration, Exhibit C ¶ 6. Manuel's family knew how much his daughters meant to him, and they treated his daughters like family.

Unfortunately, 9/11 ripped their family apart. Goldman Declaration, Exhibit B ¶ 14; Exhibit C ¶ 10. The night before 9/11, Jaimenys told her parents that she was worried something would happen to them. Goldman Declaration, Exhibit D ¶ 7. Manuel made one of his usual jokes and reassured Jaimenys that everything would be fine. Goldman Declaration, Exhibit D ¶ 7. When Jaimenys woke up on September 11, 2001, she never imagined that she would never see Manuel again. Goldman Declaration, Exhibit D ¶ 7. After Manuel's tragic death on 9/11, Jaimercedes, Jaimelin, and Jaimenys had trouble dealing with his passing and sought grief counseling. Goldman Declaration, Exhibit B ¶ 8; Exhibit C ¶ 7; Exhibit D ¶ 7; Exhibit E ¶ 36. Jaimenys hoped that Manuel was a missing person, and that the family would be able to find him. Goldman Declaration, Exhibit D ¶ 7. Jaimenys visited several hospitals to ask if he was a

17

patient there and searched lists of patients that had checked in from the attacks. Goldman Declaration, Exhibit D ¶ 7.  Jaimenys did not want to believe that Manuel left this world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that he was really gone. Goldman Declaration, Exhibit D ¶ 7.  Jaimercedes, Jaimelin, and Jaimenys lost a father figure and were forced to become more independent. Goldman Declaration, Exhibit B ¶ 8; Exhibit D ¶ 7.  Jaimercedes acted out after 9/11, especially towards her late teenage years. Goldman Declaration, Exhibit B ¶ 8.  Manuel's death created a large void that was never filled. Goldman Declaration, Exhibit B ¶ 3.  Jaimercedes, Jaimelyn, and Jaimenys feel Manuel's loss every day, have fond memories of him, and would do anything to spend more time with him. Goldman Declaration, Exhibit B ¶ 14; Exhibit C ¶ 10; Exhibit D ¶ 7.  Jaimelin even had Manuel's name tattooed on her back in his memory. *See* Goldman Declaration, Exhibit C, Exhibit 1. Every year around the anniversary of 9/11, Jaimercedes and her family donates money to their church and gathers there to share stories and blessings in Manuel's honor. Goldman Declaration, Exhibit B ¶ 13.  Manuel's name is included in the mass reading. Goldman Declaration, Exhibit B ¶ 13.

Jaimercedes, Jaimelin, and Jaimenys each received non-economic dependency awards from the original September 11th Victim Compensation Fund of 2001 on account of their status as the functional equivalents of Manuel's children. Goldman Declaration, Exhibit B ¶ 12; Exhibit D ¶ 8.  Additionally, Manuel claimed Jaimercedes, Jaimelin, and Jaimenys as his dependents on his 1997, 1998, 1999, and 2001 tax returns. Goldman Declaration, Exhibit B ¶ 12; Exhibit D ¶ 8; Exhibit E ¶ 11.

Based on Jaimercedes', Jaimelin's, and Jaimenys' traumatic experience in losing their stepfather, their protector and provider, Manuel De Jesus Molina, Jaimercedes, Jaimelin, and

Jaimenys should each be awarded the full solatium damages award of $8.5 million otherwise awarded to children of September 11, 2001 decedents.

C.  **Punitive Damages**

Plaintiffs are also entitled to punitive damages under the FSIA. 28 U.S.C. § 1605A(c)(4). In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." ECF No. 2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). ECF No. 2623 at 2. The Court has applied that ratio to awards for plaintiffs in other related cases. *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See*, e.g., ECF No. 3666 (Judge Daniels' Order in

19

*Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### D.      Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment.  ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the

20

Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks. *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6. Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## III.   CONCLUSION

For the reasons herein, the Goldman Declaration, in the papers previously submitted to this Court in support of damages against Iran in this MDL, and as previously decided by this Court, the Plaintiffs respectfully request that this Honorable Court enter an Order:

1.   awarding the Moving Plaintiffs damages judgments against Iran in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill*, *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; AND,

2.   Determining that:

   a.   Jaimenys Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

21

b.      Jaimercedes Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

c.      Jaimelin Taveras is the functional equivalent of a child of Manuel De Jesus Molina, who died in the Terrorist Attacks on September 11, 2001; AND,

3.      awarding solatium damages to the Moving Plaintiffs in the amount of $8,500,000 per child, as set forth in annexed Exhibit A; AND,

4.      awarding the Moving Plaintiffs prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

5.      granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

6.      granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

7.      granting to the Moving Plaintiffs such other and further relief as this Honorable Court deems just and proper.

22

Dated:   New York, New York          Respectfully submitted,
         May 24, 2024

/s/ Jerry S. Goldman

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        agreene@andersonkill.com

*Attorneys for Plaintiffs*

23