UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-1570 (GBD) (SN)

**PUBLIC REDACTED VERSION**

This document relates to:

*Federal Insurance Co. v. Al Qaida*, No. 1:03-cv-6978
*Ashton v. Al Qaeda*, No. 1:02-cv-6977
*Salvo v. Al Qaeda*, No. 1:03-cv-5071
*Barrera v. Al Qaeda*, No. 1:03-cv-7036
*Continental Casualty Co. v. Al Qaeda*, No. 1:04-cv-5970
*Estate of Maher v. Al Rajhi Bank*, No. 1:23-cv-2845
Any other case naming Dallah Avco as a defendant

### DEFENDANT DALLAH AVCO TRANS ARABIA COMPANY'S REPLY IN SUPPORT OF ITS RENEWED MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

March 4, 2024
New York, New York

Robert K. Kry
Eric R. Nitz (*pro hac vice*)
MOLO LAMKEN LLP
600 New Hampshire Ave., Suite 500
Washington, D.C.  20037
(202) 556-2000
rkry@mololamken.com

*Attorneys for Defendant*
*Dallah Avco Trans Arabia Co.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    There Is No Evidence that Dallah Avco Knew Omar Al Bayoumi Was Engaging in Illegal Activities ................................................................................................. 2

    A.    Plaintiffs Must Establish Dallah Avco's Knowledge of Illegal Activities ............ 2

    B.    There Is No Evidence that Dallah Avco Knew About Any Deficiencies in Al Bayoumi's Educational Studies ........................................................................ 4

    C.    The Payments to Al Bayoumi Do Not Establish Dallah Avco's Knowledge of Illegal Activities ........................................................................................... 6

        1.    The Amount of the Payments Does Not Show Knowledge ....................... 7

        2.    The PCA's Avoidance of Saudi Civil Service Regulations Is Irrelevant .......................................................................................... 9

    D.    Dallah Avco's Secondment Correspondence Does Not Show Knowledge of Illegal Activities ......................................................................................... 12

    E.    The FBI and CIA Materials Are Inadmissible and Irrelevant ............................. 13

        1.    The Osama Bin Laden Reference ........................................................... 14

        2.    Soliman Al Ali's Lease Application ........................................................ 15

        3.    ████████████████'s FBI Interview .................................................. 15

        4.    The CIA Reports on Other Dallah Al Baraka Subsidiaries ..................... 17

    F.    The Court Should Hold an Evidentiary Hearing Only If Necessary ................... 18

II.    Dallah Avco Did Not Proximately Cause the 9/11 Attacks ............................................. 18

    A.    Plaintiffs Apply the Wrong Standard ................................................................. 18

    B.    There Is No Evidence of Proximate Cause ......................................................... 19

CONCLUSION ................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Ariza v. City of New York,*
  139 F.3d 132 (2d Cir. 1998)..................................................................................14

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
  902 F.2d 194 (2d Cir. 1990)..................................................................................18

*In re Bernard L. Madoff Inv. Sec. LLC,*
  12 F.4th 171 (2d Cir. 2021) ....................................................................................3

*City of New York v. Pullman Inc.,*
  662 F.2d 910 (2d Cir. 1981)..................................................................................14

*Crawford v. United States,*
  796 F.2d 924 (7th Cir. 1986) ................................................................................18

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
  563 U.S. 754 (2011)..................................................................................................3

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983)................................................................................2

*Honickman v. BLOM Bank SAL,*
  6 F.4th 487 (2d Cir. 2021) ...........................................................................2, 3, 11

*Norton v. Sam's Club,*
  145 F.3d 114 (2d Cir. 1998)....................................................................................4

*Owens v. Republic of Sudan,*
  864 F.3d 751 (D.C. Cir. 2017)..............................................................................19

*Parsons v. Honeywell, Inc.,*
  929 F.2d 901 (2d Cir. 1991)..................................................................................13

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013)....................................................................................19

*In re Terrorist Attacks on Sept. 11, 2001,*
  714 F.3d 118 (2d Cir. 2013)..................................................................................19

*In re Terrorist Attacks on Sept. 11, 2001,*
  714 F.3d 659 (2d Cir. 2013)....................................................................................2

*Twitter, Inc. v. Taamneh,*
  598 U.S. 471 (2023)..................................................................................................3

*United States v. Wassner*,
    141 F.R.D. 399 (S.D.N.Y. 1992) .......................................................................18

## RULES

Fed. R. Civ. P. 43(c) ......................................................................................................18

Fed. R. Evid. 403 ...........................................................................................................18

Fed. R. Evid. 803(8) ...........................................................................................14, 16, 17

Fed. R. Evid. 803(8)(A) .................................................................................................13

Fed. R. Evid. 803(8)(B) .......................................................................................13, 14, 15, 17

Fed. R. Evid. 805 ...............................................................................................13, 15, 16

## OTHER AUTHORITIES

U.S. Off. of Personnel Mgmt., *2001 General Schedule Locality Rates of Pay
    for San Diego, CA* (Jan. 2001) .....................................................................7

U.S. Off. of Personnel Mgmt., *Salary Table 2024-SD* (Jan. 2024) .................................7

## **TABLE OF RECORD ABBREVIATIONS**

| Abbreviation | Document | Docket Entry |
|---|---|---|
| DA Mem. | Dallah Avco's Memorandum of Law in Support of Its Renewed Motion To Dismiss or in the Alternative for Summary Judgment | Dkt. 9392 |
| DA SMF | Dallah Avco's Rule 56.1 Statement of Material Facts | Dkt. 9393 |
| DA Ex. # | Dallah Avco's Exhibits attached to the Declaration of Eric R. Nitz | Dkt. 9477 |
| DA Reply Ex. # | Dallah Avco's Further Exhibits attached to the Reply Declaration of Eric R. Nitz | Submitted Herewith (sealed) |
| PECs Opp. | Plaintiffs' Opposition to Dallah Avco's Renewed Motion To Dismiss or in the Alternative for Summary Judgment (Corrected) | Dkt. 9537 (sealed) |
| PECs SMF Resp. | Plaintiffs' Response to Dallah Avco's Rule 56.1 Statement of Material Facts | Dkt. 9485 (sealed) |
| Aver. | Plaintiffs' Averment of Facts (Corrected) | Dkt. 9541-1 (sealed) |
| PECs Ex. # | Plaintiffs' Exhibits (Corrected) | Hard Drive (sealed) |

## INTRODUCTION

Plaintiffs' sprawling 565-page averment is rife with speculation about a secret Saudi support network for terrorists.  Noticeably absent is any evidence that Dallah Avco ever ***knew*** about any of that.  There is simply no evidence that Dallah Avco ***knew*** Omar Al Bayoumi was in the United States to assist terrorists or engage in other illegal conduct.

Plaintiffs certainly have no direct evidence of Dallah Avco's knowledge.  The Court will search plaintiffs' averment in vain for any document or witness testimony showing that Dallah Avco ever learned anything about Al Bayoumi's alleged illegal activities.  Despite the central role of "calling circles" and "call chains" in plaintiffs' submissions, plaintiffs identify only a ***single telephone call*** between Al Bayoumi and Dallah Avco during the ***eight years*** he spent abroad.  *See* Aver. ¶874 ("That early morning call to Dallah Avco was the only call in Bayoumi's records to Dallah Avco.").  Plaintiffs' telephone call analysis – the linchpin of their claims against the Kingdom – thus refutes rather than confirms Dallah Avco's complicity.

Nor is there any circumstantial evidence of Dallah Avco's knowledge.  Plaintiffs finally admit – after two decades of litigation – that it "appears to be true" that Al Bayoumi was not a Dallah Avco employee.  PECs Opp. 25.  But plaintiffs resist the obvious corollary:  Because Dallah Avco did not direct or supervise Al Bayoumi's activities, it had no reason to know what, if anything, Al Bayoumi was doing.  Dallah Avco simply processed salaries and subcontractor payments pursuant to the PCA's instructions, just as the ANSS contracts required.

Dallah Avco's lack of knowledge is fatal to both personal jurisdiction and liability on the merits.  Plaintiffs also fail to show proximate cause, invoking the wrong legal standard and distorting Dallah Avco's highly attenuated connection to the 9/11 attacks.  The Court should dismiss or, in the alternative, grant summary judgment to Dallah Avco.

## ARGUMENT

I. **THERE IS NO EVIDENCE THAT DALLAH AVCO KNEW OMAR AL BAYOUMI WAS ENGAGING IN ILLEGAL ACTIVITIES**

Plaintiffs' incessant refrain is that "Dallah Avco knew or should have known that it was providing sham employment" because Al Bayoumi "failed to . . . meaningfully pursue educational coursework" and "received substantial ongoing payments through Dallah Avco." *See, e.g.*, PECs SMF Resp. ¶¶ 53-70.  That theory misstates both the law and the evidence.

### A. **Plaintiffs Must Establish Dallah Avco's Knowledge of Illegal Activities**

For both jurisdiction and the merits, plaintiffs must show Dallah Avco's ***knowledge*** – not mere suspicions, unanswered questions, or failures to investigate, but ***knowledge*** – that Al Bayoumi was engaging in illegal conduct.  The Second Circuit remanded for jurisdictional discovery into "Dallah Avco's ***knowledge*** regarding al Bayoumi's activities."  *In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks VII")*, 714 F.3d 659, 679 (2d Cir. 2013) (emphasis added).  Plaintiffs over-complicate that remand order by spinning out three different theories of jurisdiction.  PECs Opp. 22-31.  But they do not deny that ***each*** theory requires a showing – through evidence or factually supported allegations – that Dallah Avco ***knew*** Al Bayoumi was engaging in illegal conduct in the United States.  Conspiracy jurisdiction, for example, requires that a defendant ***agreed*** to "participate in an unlawful act, or a lawful act in an unlawful manner." *Id.* at 26 n.7 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Plaintiffs' three theories are not novel, and if the Second Circuit thought they permitted jurisdiction without knowledge, it would not have remanded for discovery into that topic.  714 F.3d at 679.

Similarly, on the merits, plaintiffs must show that Dallah Avco was "generally aware of [its] role as part of an overall illegal or tortious activity."  *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021).  Plaintiffs' "should have known" theory defies that standard.

Aiding and abetting is not negligence.  The defendant must have "consciously and culpably" participated in a wrongful act.  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023).  To be sure, the defendant need not have been aware of the "specific act that caused the plaintiff's injury." *Honickman*, 6 F.4th at 496.  But it must have been "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was **foreseeable**."  *Id.*  The "general" nature of the awareness thus refers only to **what** illegal conduct the defendant knew about, not **whether** the defendant was aware of any illegal conduct at all.  Even on that issue, the requirement is fatal to plaintiffs' claims:  It is not enough for plaintiffs to assert that Dallah Avco was aware of violations of Saudi civil service regulations or (even more fancifully) the Foreign Agents Registration Act.  Plaintiffs must show Dallah Avco's knowledge of illegal conduct **from which the 9/11 attacks were reasonably foreseeable**.

Plaintiffs urge the Court to adopt a "willful blindness" standard.  PECs Opp. 29.  But they ignore the limited scope of that concept.  Willful blindness has "two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  Willful blindness thus requires **more** than "deliberate indifference" – it requires "**active efforts** . . . to avoid knowing." *Id.* at 770 (emphasis added); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 185 (2d Cir. 2021).

Plaintiffs fail at both steps.  They identify no evidence that Dallah Avco "subjectively believe[d]" there was a "high probability" that Al Bayoumi was assisting terrorists.  And they identify no **affirmative steps** that Dallah Avco took to avoid learning the truth.  Indeed, they never even explain how Dallah Avco could have discovered the truth at all.  Should Dallah Avco have sent someone to the United States to follow Al Bayoumi around and see who he was

consorting with in his spare time?  "Willful blindness" presupposes that there was something to see, and Dallah Avco was never in a position to see anything at all.[1]

### B.     There Is No Evidence that Dallah Avco Knew About Any Deficiencies in Al Bayoumi's Educational Studies

Plaintiffs do not dispute that the Saudi public policy of Saudization was a reasonable explanation for the PCA's support for its employees' educational studies.  Plaintiffs' own witness Samuel Coombs confirmed that the PCA funded studies for about 45 to 50 employees pursuant to that policy, and that this was a common practice at several Saudi companies where he had worked.  DA Reply Ex. 97 at 47:18-55:18, 141:3-19 (Coombs Dep.).  Nonetheless, plaintiffs urge that Dallah Avco must have known that *Al Bayoumi's* studies were a sham because Al Bayoumi did not "meaningfully pursue educational coursework."  PECs SMF Resp. ¶¶ 53-70.  There is no evidence that Dallah Avco *knew* about any of the alleged deficiencies in Al Bayoumi's studies.

For example, plaintiffs claim that Al Bayoumi's studies at San Deigo State University were a sham because, although the SDSU transcripts state that Al Bayoumi had attendance rates ranging from 88.5% to 92%, plaintiffs' own re-calculations produce lower numbers.  Aver. ¶ 710 (citing PECs Ex. 320 at 71-81).  Setting aside the absurdity of holding Dallah Avco liable for the 9/11 attacks because the *university itself* miscalculated Al Bayoumi's attendance, the more basic problem is that Dallah Avco *never received any of those records*.  Plaintiffs obtained them from the university through third-party discovery in 2018.  PECs Ex. 320 at 71.

Similarly, plaintiffs complain that, at ELS Language Centers, Al Bayoumi received "failure" or "poor" grades in about a third of his classes.  Aver. ¶ 709 (citing PECs Ex. 320 at 35-

---

[1] Plaintiffs' only claims that do not require knowledge are the state-law negligence-based claims. DA Mem. 28-33.  Those claims fail because Dallah Avco owed no duty of care to the victims of the 9/11 attacks.  *Id.* at 37.  Plaintiffs respond with a single sentence at the end of a footnote that cites no authority.  PECs Opp. 36 n.10.  That cursory reference does not preserve the argument. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

36).  But Al Bayoumi received "Good," "Very Good," or "Excellent" grades in about *half* his classes.  PECs Ex. 320 at 35-36.  Regardless, Dallah Avco never received those records either.

As for Al Bayoumi's two years at West Coast University and U.S. International University, plaintiffs do not dispute that Al Bayoumi earned a Master of International Business Administration degree in December 1997.  PECs Ex. 340 at 61.  They complain that he took only a few courses at a time, and that one was an "independent study" course on marketing in the Arabian Gulf.  Aver. ¶¶711-712, 716 (citing PECs Ex. 320 at 44-46; PECs Ex. 340 at 60-61).  Dallah Avco never received those records.

Dallah Avco never received records about Al Bayoumi's studies at Keller in 1998 and 1999 or his failure to sit for exams.  Aver. ¶¶720-721.  Dallah Avco never received records about Al Bayoumi's studies with George Washington University in 1999 and 2000, or the fact that they were continuing education courses offered through an affiliate, or that Al Bayoumi earned only a "Master's Certificate," not a master's degree.  Aver. ¶681.  Dallah Avco never learned about Al Bayoumi's registration and withdrawal at USIU in 2000 either.  Aver. ¶721.

Dallah Avco never knew that Al Bayoumi paid a USIU professor to help him with coursework.  Aver. ¶713.  Dallah Avco never knew that Al Bayoumi was briefly on academic probation.  Aver. ¶716.  Dallah Avco never knew that someone at the Saudi Embassy claimed that Al Bayoumi was a candidate for a scholarship.  Aver. ¶719.  And Dallah Avco never knew that Al Bayoumi submitted a forged acceptance letter from GWU when he requested educational leave from the PCA in May 2000.  Aver. ¶¶686-688.  The cover note shows that Al Bayoumi submitted that letter only to the PCA.  DA Reply Ex. 98 (KSA0000000904).  Al Bayoumi confirmed that he never sent it to Dallah Avco.  DA Ex. 6 at 685:19-686:9.

The few documents that Dallah Avco *did* receive gave no reason whatsoever to question the bona fides of Al Bayoumi's studies.  Dallah Avco processed the 1994 correspondence

showing that Avco Overseas was paying Al Bayoumi's tuition.  DA Exs. 49, 50.  Dallah Avco received a copy of SDSU's December 1994 letter to Al Salmi reporting that Al Bayoumi had "progressed steadily" and was "insisting on a specialized English course in Accounting / Finance / Contracts."   DA Ex. 33.  Dallah Avco received copies of the 1997 correspondence between Jestinaya and Al Salmi concerning Al Bayoumi's studies.  DA Ex. 16; DA Ex. 13.  And Dallah Avco received the May 2000 decree granting Al Bayoumi educational leave.  DA Ex. 21.  None of those documents suggested anything deficient about Al Bayoumi's studies.

Nor is it surprising that Dallah Avco would not receive more documentation.  The PCA, not Dallah Avco, directed and supervised ANSS employees like Al Bayoumi.  DA SMF ¶¶ 53-71.  And the PCA was responsible for monitoring Al Bayoumi's educational leave.  DA Ex. 91 art. 28/20.  Given Dallah Avco's limited role under the ANSS contracts as an outsourced human resources provider, Dallah Avco was never in a position to inquire into any of these matters.[2]

### C. The Payments to Al Bayoumi Do Not Establish Dallah Avco's Knowledge of Illegal Activities

Plaintiffs urge that Al Bayoumi received substantial payments through Dallah Avco. PECs SMF Resp. ¶¶ 53-70.  But they do not dispute that (1) the PCA directed Dallah Avco to make *all* those payments pursuant to Dallah Avco's payroll and logistics functions under the ANSS contracts; (2) Dallah Avco processed the payments as required by those contracts; and (3) the PCA then reimbursed Dallah Avco.  DA SMF ¶¶ 45-52, 72-78.  Nothing about those payments suggested that Al Bayoumi was using them for illegal activities.

---

[2] Plaintiffs belabor Samuel Coombs's statement to the FBI that Al Bayoumi was one of 50 "ghost employees" on Dallah Avco's books.  PECs Opp. 16-17.  But Coombs clarified at his deposition that those "ghost employees" were all students, that he used the terms "ghost employee" and "student" interchangeably, that he had no first-hand knowledge of what the students were doing, and that he called them "ghost employees" only because several of them did not return to the PCA after finishing their studies.   DA Reply Ex. 97 at 134:18-137:10.

### 1.    *The Amount of the Payments Does Not Show Knowledge*

Nothing about the amount of the payments suggested illegal activities.  Documents show that Al Bayoumi received (1) around $3,000 to $4,000 per month in tuition and living expenses through the PCA's logistics department in 1994 and early 1995; (2) $2,500 to $4,500 per month through his ANSS salary from mid-1995 to 2002; and (3) $3,400 to $3,800 per month in "other allowances" in 2000 and 2001.  DA Exs. 20, 50, 90; DA Ex. 1 ¶ 145.  In addition, Samuel Coombs recalled (without documentary corroboration) that Al Bayoumi received $5,000 to $7,500 per month through the PCA's logistics department in 1996 and 1997.  DA Ex. 8 at 3.

Nothing about those amounts would have alerted Dallah Avco that Al Bayoumi might be bankrolling criminal activities.  While ample, the amounts were not so exorbitant that they could only be explained as financing for some criminal enterprise.  Even including Coombs's uncorroborated figures for 1996 and 1997, Al Bayoumi never received more than around $10,000 per month – and most months, he received far less.  Those amounts, even at their highest, were similar to what some U.S. government employees made during that era, and much less than what they make today.  *See* U.S. Off. of Personnel Mgmt., *Salary Table 2024-SD* (Jan. 2024) (San Diego GS-15 salaries ranging from $163,706 to $191,900) (DA Reply Ex. 99); U.S. Off. of Personnel Mgmt., *2001 General Schedule Locality Rates of Pay for San Diego, CA* (Jan. 2001) ($88,725 to $115,343) (DA Reply Ex. 100).

That the PCA paid Al Bayoumi more than other students proves nothing.  Al Bayoumi was differently situated.  The other students were much younger, were mostly unmarried, and lived together in dormitories in groups of two to four.  DA Ex. 8 at 2; DA Reply Ex. 97 at 55:19-56:17.  Al Bayoumi, by contrast, had 17 years of seniority at the PCA and had a wife and three children to support.  DA Ex. 8 at 2; DA Ex. 61; PECs Ex. 320 at 30 (listing dependents).  Moreover, Al Bayoumi was pursuing graduate-level education in the United States and thus had

unusually high expenses.  DA Ex. 1 ¶ 163.  Because the PCA had obvious reasons to pay Al Bayoumi a lot more than other students, that difference could not have alerted Dallah Avco that Al Bayoumi was using the funds to finance terrorism or other criminal conduct.

Tellingly, plaintiffs' own witness Samuel Coombs never suspected that the payments had anything to do with criminal activity.  Coombs testified that the reason he objected to the payments was "favoritism" – they "gave Al-Bayoumi a higher standard of living than the other Saudi students that were being funded through logistics."  DA Reply Ex. 97 at 118:20-119:1, 130:15-21.  Al Bayoumi lived in a nice apartment in a nice part of town; Al Bayoumi's wife took frequent trips to Saudi Arabia; and on one occasion Al Bayoumi asked to purchase a new car so his wife could use his old one.  DA Ex. 8 at 3-5; DA Reply Ex. 97 at 57:16-58:12, 129:19-131:13.  Coombs "[n]ever learn[ed] that Al-Bayoumi was using his educational funding to plan terrorist attacks or engage in other criminal activity" and never "even suspect[ed] that Al-Bayoumi was using his educational funding to plan terrorist attacks or engage in other criminal activity."  DA Reply Ex. 97 at 132:11-22, 150:16-151:19.

To be sure, when Coombs worked at the PCA, he only knew about the logistics payments, not the ANSS salary.  DA Ex. 8 at 3.  But the logistics payments were the lion's share of Al Bayoumi's funding during that period: $90,000 per year vs. an ANSS salary of only $2,900 per month.  DA Ex. 8 at 3; DA Ex. 1 ¶ 145; DA Ex. 20.  Coombs never claimed that he would have suspected terrorism or other criminal conduct if only he had known about those additional $2,900 payments.  Besides, there is no evidence that **Dallah Avco** knew about all the payments to Al Bayoumi either – particularly the logistics payments in 1996 and 1997.[3]

_____

[3] When the PCA paid educational expenses through the logistics budget, it did so by directing subcontractors like Avco Overseas and Ercan to pay the expenses and then having Dallah Avco reimburse them.  *See* DA Exs. 50, 90 (financial directives to Avco Overseas and Ercan); DA Reply Ex. 97 at 116:14-23, 124:4-13 (explaining that these directives were examples of the

If there was anything improper about the payments to Al Bayoumi, Coombs was in a far better position to know than Dallah Avco. Coombs and Al Salmi personally approved all of the logistics payments, including the educational funding. DA Reply Ex. 97 at 92:8-21, 109:4-13; DA Exs. 56-58. By contrast, Dallah Avco did not review or audit any of those expenses – its role was simply to process the payments the PCA had approved. DA Reply Ex. 97 at 106:23-107:20. Coombs kept a spreadsheet where he tracked the amounts paid to each student. *Id.* at 160:25-163:15. But he never shared that spreadsheet with Dallah Avco. *Id.* at 178:5-12. Dallah Avco processed thousands of invoices from vendors around the world. *See* DA Ex. 8 at 2 (annual logistics budget of $196 million); DA Ex. 9 ¶¶47-52 (three million pages of files). Dallah Avco had no reason to comb through those invoices in an effort to aggregate and analyze the payments to Al Bayoumi. The standard for aiding and abetting is ***knowledge***, not failure to conduct a forensic financial investigation.

### 2.    *The PCA's Avoidance of Saudi Civil Service Regulations Is Irrelevant*

Plaintiffs urge that the PCA was avoiding Saudi civil service regulations by effectively granting Al Bayoumi a paid educational leave when the regulations permitted only unpaid leave. PECs Opp. 13; Aver. ¶674. That may well be true – but it is irrelevant.

---

payments that Coombs described in his declaration); *id.* at 171:22-172:4 ("[T]hat's where [Al Bayoumi] was getting his money . . . that was ***all being paid through Ercan***." (emphasis added)); *id.* at 88:15-114:4 & DA Exs. 56-58 (describing process generally). Even if Dallah Avco processed a reimbursement, it would not have seen any connection to Al Bayoumi unless the reimbursement request identified the connection. While Avco Overseas was transparent (DA Ex. 49), Ercan handled things differently: ██████████████████████████████ DA Reply Ex. 97 at 148:8-21. Coombs confirmed that he "[n]ever t[old] anyone at Dallah Avco that Ercan had marked up the goods on its invoices to account for the financial support it was providing to Al-Bayoumi." *Id.* at 148:22-149:2. Dallah Avco searched its files but found no payments to Ercan that mentioned Al Bayoumi – only the one Avco Overseas payment from 1994. DA Ex. 9 ¶¶47-52; DA Exs. 49, 50; DA Reply Ex. 101 at 30:17-33:15 (1/18/17 Hr'g Tr.).

Article 28/19 of the Saudi civil service regulations states that educational leave is "without pay" and thus prohibits an agency from paying an employee a civil service salary while the employee is on educational leave.  DA Ex. 91 art. 28/19; DA Ex. 1 ¶194.  A jury could reasonably find that Al Salmi's various arrangements for paying Al Bayoumi and other PCA students were efforts to avoid that regulation.  Airways Engineering could not pay the students directly, so instead, Al Salmi directed logistics subcontractors to pay them, knowing that the amounts would be reimbursed through the PCA's logistics budget.  Similarly, Al Salmi put Al Bayoumi on the ANSS payroll, knowing that his salary would be reimbursed by the PCA.  Both arrangements were efforts to do indirectly what Airways Engineering could not do directly: grant PCA employees *paid* rather than *unpaid* educational leave.

Even so, Al Salmi's arrangements cannot justify holding Dallah Avco liable for the 9/11 attacks.  First, while Al Salmi may have been *avoiding* Article 28/19's prohibition on paid educational leave, that does not mean he was *violating* the provision.  Dr. Hammad opines that Article 28/19 applies only to an employee's *civil service* salary and thus permitted the PCA to pay Al Bayoumi an ANSS salary.  DA Ex. 1 ¶194.  Second, even if Al Salmi's arrangements crossed the line into impermissible circumvention, Dallah Avco had no reason to know.  A private contractor like Dallah Avco cannot reasonably be expected to monitor, much less enforce, a government agency's own compliance with civil service regulations.  Even Samuel Coombs did not appreciate what Al Salmi was doing:  He thought Al Salmi was paying students through the logistics budget because it was "quicker."  DA Reply Ex. 97 at 125:21-126:18.[4]

---

[4] The PCA's own leadership seems not to have understood what Al Salmi was doing.  Dallah Avco's secondment request states that "Dallah Avco's *air navigation system support project*" needed Al Bayoumi's services, DA Ex. 37 (emphasis added), but the PCA's secondment decree states that Al Bayoumi was being seconded to "Dallah AVCO Company," DA Ex. 38, seemingly oblivious to the fact that the whole point of the secondment was to put Al Bayoumi on the ANSS

In any event, aiding and abetting requires more than knowledge of just *any* illegal activity. The defendant must have been "generally aware of its role in an overall illegal activity *from which the act that caused the plaintiff's injury was foreseeable*." *Honickman*, 6 F.4th at 496 (emphasis altered). Even if Dallah Avco knew that Al Salmi was evading Saudi civil service regulations, Dallah Avco could not have foreseen that those administrative infractions would *result in the 9/11 attacks*. Al Salmi's skirting of civil service regulations cannot justify holding Dallah Avco liable for the hundreds of billions of dollars of losses that ultimately resulted.

Coombs complained that Al Bayoumi was "double-dipping" by receiving both an ANSS salary and logistics payments. DA Ex. 8 at 3; DA Reply Ex. 97 at 159:4-160:14. But there is no law against "double-dipping." The civil service regulations state that educational leave is "without pay," and the logistics payments and ANSS salary were both mechanisms to avoid that provision, but the fact that Al Salmi paid Al Bayoumi partly through one budget and partly through another does not make the payments any more or less appropriate. That Al Salmi paid Al Bayoumi through two budgets while paying other students through only one is unremarkable: Al Salmi was paying Al Bayoumi a lot more and had good reasons for doing so.[5]

A jury could reasonably find that Al Salmi was skirting civil service regulations by paying PCA students during their studies, and that Al Salmi paid Al Bayoumi more than other students and thus gave him a higher standard of living. What a jury could *not* reasonably find is that Dallah Avco must therefore have known that Al Bayoumi was in the United States to assist terrorists or engage in other criminal conduct. That leap would require sheer speculation.

---

payroll so Airways Engineering could pay him during his studies. Al Salmi's 1997 exchange with Jestinaya similarly omits any reference to this issue. DA Exs. 13, 16.

[5] Moreover, there is no evidence that Dallah Avco *knew* about the "double-dipping." Apart from the one *pre-secondment* payment through Avco Overseas in 1994, there is no evidence that Dallah Avco knew about any of the logistics payments to Al Bayoumi. *See* pp. 8-9 & n.3, *supra*.

### D.   Dallah Avco's Secondment Correspondence Does Not Show Knowledge of Illegal Activities

Plaintiffs admit that it "appears to be accurate" that, although Dallah Avco sent the letter requesting Al Bayoumi's secondment in May 1995 (DA Ex. 37), the PCA's Airways Engineering Directorate asked Dallah Avco to send that letter.  PECs Opp. 8; *see also* Aver. ¶665 n.1.  Plaintiffs insist that the letter shows Dallah Avco's complicity because the only reason to send such a letter would be to generate a false paper trail.  PECs Opp. 8.  That is incorrect.

The ANSS contracts authorized Airways Engineering to "direct the Contractor to hire any individual or individuals whom the Government deems suitable for employment" on the ANSS project.  DA SMF ¶39.  By regulation, however, Airways Engineering could not itself second a PCA employee like Al Bayoumi to the ANSS project.  Instead, secondments had to be approved at a much higher level by the Assistant Minister of Defense.  DA Ex. 1 ¶51; DA Ex. 71 art. 29/1; PECs Ex. 94 at 240:25-241:4; DA Ex. 38.  Telling Dallah Avco to send a letter on behalf of the ANSS project asking the PCA's leadership to release Al Bayoumi from his civil service position so he could be put on the project was one reasonable way to accomplish that goal.  If nothing else, the Assistant Minister would presumably want to know that Dallah Avco agreed to the secondment, and having Dallah Avco send the letter was one way to communicate that fact.  Even if Airways Engineering could have arranged the secondment some other way, Dallah Avco had no reason to argue with Al Salmi over his chosen approach.  The whole situation would have seemed like a minor administrative detail, not a conspiracy to conceal assistance to terrorists.[6]

---

[6] On at least one occasion, Al Salmi implied that there was some legal requirement that the request come from Dallah Avco.  *See* DA Ex. 32 (directing "a letter to be issued by the Company . . . as per Law").  Dallah Avco had no reason to question that assertion.  Perhaps Al Salmi asked Dallah Avco to send the request because he thought the PCA would be more likely to grant the request if it came from Dallah Avco, avoiding any questions into whether Airways Engineering was seconding Al Bayoumi merely so it could keep paying him during his educational studies. If so, Al Salmi never shared that rationale with Dallah Avco.

Plaintiffs also point to Dallah Avco's 1999 letter informing the PCA that Dallah Avco did not want to renew Al Bayoumi's secondment (DA Ex. 31), suggesting that it shows Dallah Avco knew about Al Bayoumi's illegal activities and got "cold feet." PECs Opp. 31. That letter shows nothing of the sort. Dallah Avco had ample grounds to object to Al Bayoumi's continued secondment even based on the undisputed facts. By that point, Al Bayoumi had spent five years in the United States on his seemingly never-ending all-expenses-paid educational junket. He was drawing an ANSS salary and filling a slot on the project that otherwise could have been filled by someone doing actual airport work in the Kingdom. Dallah Avco had every reason to question that use of project resources – even though, as events show, Al Salmi would have the last word. DA Ex. 32. Dallah Avco's objection is not circumstantial evidence of knowledge of illegal activities because Dallah Avco had ample reasons to object regardless.[7]

### E.      The FBI and CIA Materials Are Inadmissible and Irrelevant

Plaintiffs rely on FBI and CIA reports. To be admissible as public records, however, those reports must meet three requirements: (1) they must reflect "factual findings from a legally authorized investigation" or "a matter observed while under a legal duty to report," Fed. R. Evid. 803(8)(A); (2) "the source of information . . . or other circumstances [must not] indicate a lack of trustworthiness," Fed. R. Evid. 803(8)(B); and (3) if a report recounts third-party statements, those statements themselves must satisfy a hearsay exception, Fed. R. Evid. 805; *see Parsons v.*

---

[7] Plaintiffs also rely on Al Bayoumi's timesheets. Aver. ¶ 677 (citing PECs Ex. 429); *see also* DA Reply Ex. 97 at 33:6-34:14 (noting that all ANSS employees had similar timesheets). Those timesheets were signed by Alp Karli at Airways Engineering, not by anyone at Dallah Avco. PECs Ex. 429. Plaintiffs do not explain why Dallah Avco would have audited Alp Karli's approvals or even how it could have done so. Moreover, the timesheets state that the ***ANSS project*** was based in Saudi Arabia, not that ***Al Bayoumi*** worked there. *Id.* Separately, plaintiffs point to PCA performance reviews for Al Bayoumi. Aver. ¶¶ 704-705 (citing PECs Exs. 197, 198). But no evidence supports plaintiffs' claim that "Dallah likely had these reports." PECs Opp. 11. They are internal PCA documents that were produced by the Kingdom, not ANSS employee records produced by Dallah Avco. PECs Exs. 197, 198.

*Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (public records exception does not extend to "statements made by third persons").  None of plaintiffs' reports survives those criteria.

### 1.     *The Osama Bin Laden Reference*

Plaintiffs point to two FBI reports from early October 2001 claiming that someone told **Osama Bin Laden himself** to contact Dallah Avco in 1998.  Aver. ¶ 703 (citing PECs Ex. 2V at EO2565, EO2549).  That wild allegation is plainly inadmissible.

The reports are not "factual findings" under Rule 803(8).  To qualify, a report must "embody the findings of an agency" and not merely "the tentative results of an incomplete staff investigation."  *City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981).  Mere "interim report[s] subject to revision and review" do not qualify.  *Id.* at 914; *see also Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998).  These reports fail that standard.  On their face, they emphasize the FBI's uncertainty and need for further investigation.  *See* PECs Ex. 2V at EO2565 (requesting "specific information . . . which would include type of reporting, location to location, identities of the parties involved, date(s), transcript, if it is a conversation and any additional pertinent information"); *id.* at EO2549 (similar).  One report emphasizes that "it is critical to be able to determine if this is an actual link . . . or not."  *Id.* at EO2566.  By any measure, these are "tentative" or "interim" assessments, not final agency findings.

The reports also lack trustworthiness under Rule 803(8)(B).  They make clear that the FBI had no idea whether this information was reliable or not.  PECs Ex. 2V at EO2565, EO2549; *contrast* Dkt. 8911 at 12 (admitting reports that had "sufficient additional information . . . to assess [their] reliability").  After October 2001, moreover, references to this allegation seemingly disappear from the FBI's reporting.  Evidently the FBI promptly dismissed the allegation for what it was: fantasy-grade rumor with no basis in reality.

14

The reports are also inadmissible because they rest on two more layers of hearsay:  They recount what some other government investigator reported about some unknown source's claim. Fed. R. Evid. 805.  And the reports are irrelevant because, even if – against all odds – someone actually told Osama Bin Laden to contact Dallah Avco in 1998, that would not show that Dallah Avco knew that Al Bayoumi was in the United States to assist terrorists.

### 2. *Soliman Al Ali's Lease Application*

Plaintiffs cite FBI reports claiming that Soliman Al Ali (a.k.a. "Elay") listed himself as a "consultant" to "DALLA Co." on a joint lease application with Al Bayoumi. Aver. ¶666 (citing PECs Ex. 2AA at EO 3326 & Ex. 2CC at EO 3553).  Those reports are likewise inadmissible.

The reports fail Rule 803(8)(B) because there are obvious reasons to doubt the reliability of the statement they attribute to Elay.  No other evidence corroborates the claim that Elay had any connection to Dallah Avco or the PCA.  Plaintiffs describe Elay as the President of the IIRO and a Saudi Embassy employee. Aver. ¶¶109, 666.  Elay's realtor claimed that he was "working in the television/communication field."  PECs Ex. 2AA at EO 3326.  On other applications, Elay and Al Bayoumi listed their employer as "Mana Life," a claim plaintiffs describe as fraudulent. Aver. ¶666 (citing PECs Ex. 2R at EO 1609).  Those circumstances strongly suggest that Elay was simply making stuff up and was not actually a consultant for "DALLA Co."

The FBI reports are also inadmissible because Elay's statement on the lease application is itself hearsay. Fed. R. Evid. 805.  And they are irrelevant because, even if Elay miraculously did have some consulting arrangement with Dallah Avco, that would not show that Dallah Avco knew Al Bayoumi was in the United States to help terrorists.

### 3. ██████████████████ *'s FBI Interview*

Plaintiffs rely on the FBI interview memo for ███████████████████████, Samuel Coombs's assistant in the PCA's logistics department.  Aver. ¶¶632, 647-649 (citing

PECs Ex. 544).  ██████ claimed that the logistics department used fictitious invoices to pay kickbacks to senior PCA officials.  PECs Ex. 544 at ██████.  He also stated that Al Salmi paid Al Bayoumi through Ercan (i.e., the logistics payments) as well as a salary (i.e., the ANSS salary) and additional stipends (i.e., the other allowances).  *Id.* at ██████.  ████ explained, however, that "Al-Bayoumi was a student in San Diego" and that "Al-Salmi [was] tak[ing] care of Al-Bayoumi" because Al Bayoumi "was slated to take over an upper level management position held by Alp Karli, aka 'The Turk' at PCA."  *Id.* ████ thus confirms key elements of Dallah Avco's understanding.

The FBI's interview memo is not admissible.  The notes are not "findings" under Rule 803(8).  And ████'s statements themselves are hearsay.  Fed. R. Evid. 805.

In any event, ████'s statements are irrelevant.  That the PCA was allegedly using fictitious invoices to pay kickbacks to senior PCA officials is immaterial because there is no evidence that Dallah Avco knew about the kickbacks.  ████ never claims he ***told Dallah Avco*** the invoices were fictitious.  Dallah Avco did not review or audit the invoices it received from the PCA's logistics department – it simply processed them according to the PCA's directions. DA Reply Ex. 97 at 106:23-107:20.  Moreover, ████ never suggested that the kickbacks had anything to do with terrorism or other illegal activities in the United States.

████'s statements about payments to Al Bayoumi, meanwhile, are cumulative because ████ describes the same payments (in slightly different estimated amounts) that Coombs recalled or that other evidence shows.  *See* p. 7, *supra*.  And while ████ confirms that Al Salmi directed Ercan to support Al Bayoumi, he never claims that Dallah Avco ***knew*** about those payments through Ercan.  PECs Ex. 544 at ██████; *cf.* pp. 8-9 & n.3, *supra*.  ████'s account is thus entirely consistent with Dallah Avco's own understanding.

### 4.    *The CIA Reports on Other Dallah Al Baraka Subsidiaries*

Finally, plaintiffs rely on three CIA reports that allege misconduct at other entities in the broader Dallah Al Baraka group of companies founded by Sheikh Saleh Kamel.  Aver. ¶663 (citing PECs Exs. 78, 79, 83).   One report claims that Osama Bin Laden had accounts at Albaraka Bank in Sudan.  PECs Ex. 78 at 14.  Another claims that the Iqra Charitable Agency provided funds to an insurgent group in Somalia.  PECs Ex. 79 at 16-17; *see also* PECs Ex. 83 at 3 (alleging "widespread funding to Al-Qa'ida" without providing details).

Those reports are inadmissible under Rule 803(8).  They provide no details about when the transactions occurred, who was aware of them, how Saleh Kamel or other senior Dallah Al Baraka managers learned about the transactions, or whether they failed to take remedial actions. Plaintiffs previously sued Dallah Al Baraka and Saleh Kamel over these very allegations, including Osama Bin Laden's use of bank accounts in Sudan.  Dkt. 2312 at 33-34.  This Court dismissed those claims.  Dkt. 632 at 59-60 & Dkt. 2312 at 33-34, *aff'd*, 714 F.3d 118 (2d Cir. 2013).  The Court explained that the Sudan bank transactions occurred in the early 1990s, long before Al Qaeda targeted the United States.  Dkt. 2312 at 34.  And the Court saw no basis to hold Dallah Al Baraka or Saleh Kamel liable for actions of a foreign subsidiary.  *Id.*  Public records cannot be trustworthy under Rule 803(8)(B) when this Court has already rejected the inferences plaintiffs seek to draw from them.

Even if the reports were admissible against Dallah Al Baraka or Saleh Kamel, they would be irrelevant to Dallah Avco.  None of the reports even mentions Dallah Avco.  Plaintiffs point to no evidence that Saleh Kamel or anyone else at Dallah Al Baraka ever told Dallah Avco anything about the group's foreign operations in Sudan or Somalia.  Nor do plaintiffs advance any theory for piercing the corporate veil so as to impute Dallah Al Baraka's knowledge to Dallah Avco.  Dallah Al Baraka is a $4.5 billion global conglomerate.  PECs Ex. 78 at 14.  This

Court already rejected plaintiffs' effort to impute knowledge from Albaraka Bank to Dallah Al Baraka.  Dkt. 2312 at 34.  Plaintiffs' effort to impute that same knowledge *to Dallah Avco* is even more far-fetched.   Plaintiffs' arguments are improper and inflammatory "guilt by association" rhetoric – "just what Fed. R. Evid. 403 was intended to exclude."  *United States v. Wassner*, 141 F.R.D. 399, 405 (S.D.N.Y. 1992).

### F.     The Court Should Hold an Evidentiary Hearing Only If Necessary

For the foregoing reasons, plaintiffs have not made out even a prima facie case of Dallah Avco's knowledge that Al Bayoumi was engaging in illegal activities.  If the Court disagrees, however, it should hold an evidentiary hearing at which plaintiffs will have to prove personal jurisdiction by a preponderance of the evidence.  *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196-98 (2d Cir. 1990).  Moreover, because the witnesses are all outside the Court's jurisdiction and plaintiffs have already had ample opportunity to cross-examine them, the Court should conduct a paper hearing on the existing record.  *See* Fed. R. Civ. P. 43(c); *Crawford v. United States*, 796 F.2d 924, 928-29 (7th Cir. 1986) ("No format is specified by statute or rule for evidentiary hearings on jurisdiction; any rational mode of inquiry will do.").

## II.    DALLAH AVCO DID NOT PROXIMATELY CAUSE THE 9/11 ATTACKS

Plaintiffs' claims also fail because Dallah Avco did not proximately cause the 9/11 attacks.  Plaintiffs rely on the wrong legal standard, and their theories fail any conceivable test.

### A.     Plaintiffs Apply the Wrong Standard

Plaintiffs rely on the causation standard this Court applied in its August 10, 2023 ruling against Sudan.  PECs Opp. 37-40 (citing Dkt. 9278).  That is the wrong standard.

The Sudan case concerned "jurisdictional causation" under the Foreign Sovereign Immunities Act.  Dkt. 9278 at 9.  The Court relied on its March 28, 2018 decision on claims against Saudi Arabia.  *Id.* (citing Dkt. 3946 at 12-14).  That earlier case emphasized that a

different and stricter standard applies outside the jurisdictional context: "It is well settled . . . that jurisdictional causation under the FSIA is ***distinct from and more liberal than*** the substantive causation elements of any one claim." Dkt. 3946 at 14 n.8 (emphasis added). The Court distinguished the Second Circuit's decisions in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), and *In re Terrorist Attacks on September 11, 2001 ("Terrorist Attacks VI")*, 714 F.3d 118 (2d Cir. 2013), on the ground that those cases "address[ed] standards for proximate cause necessary to state claims under the ATA and RICO statutes." Dkt. 3946 at 13-14 n.8; *see also Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017) ("Establishing . . . causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits.").

Those stricter merits standards govern here. Dallah Avco seeks summary judgment because no reasonable jury could find ***on the merits*** that it proximately caused the 9/11 attacks. DA Mem. 33-38. Dallah Avco's memorandum relied squarely on *Rothstein* and *Terrorist Attacks VI* (DA Mem. 34-35) – the very cases this Court ***distinguished*** in its 2018 decision. Dkt. 3946 at 13-14 n.8. Plaintiffs do not analyze that stricter merits causation standard and do not even mention *Rothstein* or *Terrorist Attacks VI*. That is reason enough to reject their position.

### B.  There Is No Evidence of Proximate Cause

In any event, plaintiffs' theories fail any standard. Plaintiffs assert that Dallah Avco proximately caused the 9/11 attacks by providing cover employment and a salary and stipends to Al Bayoumi so he could live in the United States. Plaintiffs do ***not*** assert that Al Bayoumi used any of those funds to support terrorism – only that someone had to pay his living expenses and give him a reason to be in the country if he was going to remain here while helping terrorists. That theory is utterly boundless. No doubt, everyone needs food and shelter to survive, and someone who starves, dies on the street, or gets deported can no longer help terrorists or do anything else in the country. But that does not mean that an employer who sponsors an

employee's overseas studies and funds the employee's living expenses thereby proximately causes every crime the employee commits.  That principle applies even more strongly to Dallah Avco, which was not Al Bayoumi's employer but a mere outsourced human resources provider.

The attenuated connection between Dallah Avco and Al Bayoumi is then compounded by the similarly remote connection between Al Bayoumi and the 9/11 attacks.  Al Bayoumi did not plan the 9/11 attacks; he did not purchase plane tickets for the hijackers; and he did not drive anyone to the airport on 9/11.  Rather, he helped two of the hijackers rent an apartment *nineteen months* before the attacks.  Plaintiffs try to obscure that limited role by pointing to a broader "secret support network" that included a "network of helpful subagents."  PECs Opp. 38, 40. But there is no evidence that Dallah Avco knew anything about those "helpful subagents" or reasonably could have foreseen their involvement.  And regardless, plaintiffs' need to rely on "helpful subagents" simply underscores that plaintiffs' already long and convoluted chain of causation is not long enough without those additional links too.

This is not a legally complex issue.  Proximate cause requires some reasonable, common-sense limit on the chain of causation between a defendant's actions and the plaintiffs' injuries before holding a defendant liable for hundreds of billions of dollars in catastrophic losses. Plaintiffs are miles beyond any reasonable limit here.

## CONCLUSION

The Court should dismiss the claims against Dallah Avco for lack of personal jurisdiction. In the alternative, the Court should grant summary judgment in Dallah Avco's favor.

Dated:   March 4, 2024                           Respectfully submitted,
         New York, New York


                                                  /s/ Robert K. Kry
                                                 Robert K. Kry
                                                 Eric R. Nitz (*pro hac vice*)
                                                 MOLO LAMKEN LLP
                                                 600 New Hampshire Ave., Suite 500
                                                 Washington, D.C.  20037
                                                 (202) 556-2000
                                                 rkry@mololamken.com

                                                 *Attorneys for Defendant*
                                                 *Dallah Avco Trans Arabia Co.*