**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) <br><br> ECF Case |

**This document relates to:**
    *Burnett, et al. v. Islamic Rep. of Iran, et al.*, No. 15-cv-9903 (GBD)(SN)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF NON-NATIONAL 9/11 PERSONAL-INJURY PLAINTIFFS

### (*BURNETT* NON-NATIONALS 3)

### INTRODUCTION

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), Plaintiffs in the *Burnett* action pending before the Court seek partial final default judgment awarding them compensatory damages for pain and suffering they sustained as a result of their injuries on September 11, 2001. The Plaintiffs also seek (1) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (2) permission to seek economic-loss, punitive, or other damages at a later date; and (3) for all other personal-injury plaintiffs in *Burnett* who were not U.S. nationals on September 11, 2001 to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed. Plaintiffs seek this default judgment against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, the "Iran Defendants").

## PROCEDURAL BACKGROUND

Plaintiffs sued the Iran Defendants in connection with the injuries they sustained in the terrorist attacks on September 11, 2001.  On December 1, 2016, plaintiffs in the action *Burnett, et al. v. Islamic Rep. of Iran, et al.*, Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), whose claims arose pursuant to the private right of action codified at 28 U.S.C. 1605A(c) moved for judgment as to liability only. 15-cv-9903, ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69. On January 31, 2017, the Court entered judgment as to liability only against the Iran Defendants.  *See* 15-cv-9903, ECF No. 85.

Since the entry of liability under 28 U.S.C. § 1605A(c), this Court has awarded damages to scores of United States-national Plaintiffs who sustained physical injuries in the terrorist attacks on September 11, 2001. Now, those Plaintiffs who do not qualify for judgments under the exception to sovereign immunity found at 28 U.S.C. § 1605A—because they were not United States nationals on September 11, 2001—seek entry of partial final judgments against the Iran Defendants pursuant to the exception to sovereign immunity found at 28 U.S.C. § 1605B(b) and the "pass through" of 28 U.S.C. § 1606 to claims for assault and battery under New York state law. These Plaintiffs submit that the Court possesses subject-matter jurisdiction and personal jurisdiction over the Iran Defendants.

## ARGUMENT

### I.   This Court Possesses Subject-Matter Jurisdiction Over the Iran Defendants.

This Court recently addressed liability for a non-U.S.-national plaintiff in the *King* case within this MDL who sustained personal injuries in the attacks on September 11, 2001 and awarded damages to this plaintiff. *See* ECF No. 9666. The claims of non-U.S. national victims and their non-U.S. national family members cannot be brought pursuant to 28 U.S.C. § 1605A(c)—the statute upon which the Court has granted relief in its prior decisions—because to bring such an

action requires that the plaintiff be "(1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or (4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury of death…." *See* 28 U.S.C. §§ 1605A(c)(1)-(4). The plaintiffs in this motion do not fall within the parameters required to pursue a cause of action based upon the terrorism exception.

Therefore, these plaintiffs look to 28 U.S.C. § 1605B(b) to provide jurisdiction over their claims. This section provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b). Conspicuously absent from this exception to sovereign immunity is the requirement that the victim or their family members be U.S. nationals to pursue their claims. This differentiation between the terrorism exception found at Section 1605A and the Justice Against Sponsors of Terrorism Act found at Section 1605B derives from the location of the act of terrorism as "occurring in the United States."

The Supreme Court has held that "a foreign state is immune from the jurisdiction of courts in this country unless one of several enumerated exceptions to immunity applies.  28 U.S.C. §§ 1604, 1605-1607. If a suit falls within one of these exceptions, the FSIA provides subject-matter jurisdiction in federal district courts." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1053 (2019).

In addressing the application of the exception to sovereign immunity codified at 28 U.S.C. § 1605B(b) to the terrorist attacks on September 11, 2001, Magistrate Judge Netburn provided the following analysis (subsequently adopted by Judge Daniels)—adjusted to address the circumstances at issue in this motion—in recommending that the exception applies here to provide the Court with subject-matter jurisdiction:

> [The victims'] claims plainly satisfy many of 28 U.S.C. § 1605B(b)'s requirements. [They are] seeking "money damages" from Iran. [28 U.S.C. § 1605B(b)"; *see* No. 15-cv-09903, ECF No. 53 at 1082-88 (*Burnett* complaint [at issue in this motion]). Those damages are for "physical injur[ies]" [they] sustained "in the United States." 28 U.S.C. § 1605B(b); *see* ECF No. 9154-7 at ¶¶ 5-33; No. 15-cv-09903, ECF No. 53 at 1081. [Their] injuries were "caused" by the 9/11 Attacks. 28 U.S.C. § 1605B(b); *see* ECF No. 9154-7 at ¶¶ 5-33; No. 15-cv-09903, ECF No. 53 at 1081. And the 9/11 Attacks were "act[s] of international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); *see* No. 15-cv-09903, ECF No. 53 at 1081.
>
> One element of 28 U.S.C. § 1605B(b) merits closer attention: the requirement that "a tortious act or acts of the foreign state" "caused" the injury. For FSIA purposes, "a tortious act" includes the "knowing or deliberately indifferent provision of material support to terrorists," and "cause" incorporates "the traditional test for proximate causation[:] . . . 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 643, 645 (S.D.N.Y. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). In simple terms, there must be a link between a state's support for terrorism and the plaintiff's injuries.
>
> The Court heard evidence linking Iran to the 9/11 Attacks in a 2011 hearing. Based on that record, it found that Iran was 'aware[] of[] and involve[d] in[]" al Qaeda's plans and provided "material support" to the terrorist group. *In re 9/11*, 2011 WL 13244047, at *26, 41. It concluded that Iran's "material support" proximately "caused" the 9/11 Attacks and, by extension, the resulting injuries. *Id.* at *41; *see* ECF No. 9154-7; *cf.* ECF No. 9274 at 3 (concluding that Iran proximately caused latent injuries). The evidence supporting those findings establishes the last element of 28 U.S.C. § 1605B(b)—that Iran's "tortious act[s]" "caused" [plaintiffs'] injuries. *See* ECF Nos. 2431, 2432, 2433, 2473.

*See* ECF No. 9506 at 6-7. Magistrate Judge Netburn correctly concluded that these cases meet the jurisdictional threshold for establishing subject-matter jurisdiction over the Iran Defendants under 28 U.S.C. § 1605B(b), and the Court is free to exercise subject-matter jurisdiction here. This

conclusion was subsequently adopted by the Court.  *See* ECF No. 9666 at 2-4. Therefore, as in the *King* case, this Court has subject-matter jurisdiction over these Plaintiffs' claims under 28 U.S.C. § 1330(a). *See* ECF No. 9506 at 7.

## II.   This Court Possesses Personal Jurisdiction Over the Iran Defendants.

With subject-matter jurisdiction satisfied through the application of the exception found at 28 U.S.C. § 1605B(b), the Court must assess whether it has personal jurisdiction over the Defendants.  In *Harrison*, the Supreme Court held, "[t]he FSIA also provides personal jurisdiction 'where service has been made under [28 U.S.C. §] 1608." 139 S. Ct. at 1054. Here, the Amended Complaint in this case was filed on February 8, 2016. *See* 15-cv-9903, ECF No. 53. Service of process on a foreign state or a political subdivision of a foreign state is governed by 28 U.S.C. § 1608(a) which "sets out in hierarchical order the . . . four methods by which '[s]ervice . . . shall be made.'" *Harrison*, 139 S. Ct. at 1054 (quoting 28 U.S.C. § 1608(a)). There is no special arrangement for service of process between the Plaintiffs here and the Iran Defendants, so service on the Islamic Republic of Iran and its political subdivision the Islamic Revolutionary Guard Corps was not possible under 28 U.S.C. § 1608(a)(1). Further, there is no applicable international convention on service of judicial documents to which both the United States and the Islamic Republic of Iran are parties such that service under 28 U.S.C. § 1608(a)(2) was also not possible. On March 1, 2016, Plaintiffs requested service of process on the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps pursuant to 28 U.S.C. § 1608(a)(3) by requesting that the requisite documents and Farsi translations be sent "by any form of mail requiring a signed receipt." The Clerk Certificate of Mailing on the Islamic Republic of Iran under 28 U.S.C. § 1608(a)(3) was docketed on March 7, 2016. *See* 15-cv-9903, ECF No. 55. The Clerk Certificate of Mailing on the

Islamic Revolutionary Guard Corps was also docketed on March 7, 2016. *See* 15-cv-9903, ECF No. 57.

On May 2, 2016, after more than 30 days had passed since the Clerk's March 7, 2016 Certificates of Mailing without any response from the Islamic Republic of Iran or the Islamic Revolutionary Guard Corps, Plaintiffs sought service of process on these defendants pursuant to 28 U.S.C. § 1608(a)(4) via diplomatic channels through the U.S. Department of State. On October 28, 2016, the Clerk of the Court received proof of service from the U.S. Department of State for service on both the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps stating that "the documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note numbers 1069-IE and 1070-IE dated and delivered on September 14, 2016." *See* 15-cv-9903, docket entry from October 28, 2016.

The Central Bank of the Islamic Republic of Iran is an "agency or instrumentality" of the Islamic Republic of Iran, and service of process on an agency or instrumentality of a foreign state is governed by 28 U.S.C. § 1608(b). Neither of the first two provisions in the hierarchical order of section 1608(b) applied in this instance, so on March 1, 2016, Plaintiffs requested service on the Central Bank of the Islamic Republic of Iran pursuant to 28 U.S.C. § 1608(b)(3). The Clerk's Certificate of Mailing on the Central Bank of the Islamic Republic of Iran was docketed on March 7, 2016. *See* 15-cv-9903, ECF No. 54. Plaintiffs received a return receipt indicating that service had been made on the Central Bank of the Islamic Republic of Iran on March 18, 2016. *See* 15-cv-9903, ECF No. 64.

Plaintiffs submitted their Affidavit of Service as to the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran pursuant to 28

U.S.C. § 1608 on November 10, 2016. Therefore, this Court possesses personal jurisdiction over the Iran Defendants in this case because service has been made pursuant to 28 U.S.C. § 1608.

## III.   The Iran Defendants Have Defaulted.

Under 28 U.S.C. § 1608(d), "a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty [60] days after service has been made under this section." On November 10, 2016, Plaintiffs filed a request for entry of a Clerk's Certificate of Default to be entered on or after November 15, 2016 which would have been the day after the expiration of the 60-day time period set forth in 28 U.S.C. § 1608(d).  *See* 15-cv-9903, ECF No. 63 at ¶13. On December 5, 2016, the Clerk's Certificate of Default was entered against the Iran Defendants.  *See* 15-cv-9903, ECF No. 67. The Iran Defendants have not appeared at any point in this litigation even after entry of the Clerk's Certificate of Default.

## IV.   The Iran Defendants are Liable for Assault and Battery Under New York Law.

In prior judgments entered on behalf of Plaintiffs in this case against Iran, the Court has looked to 28 U.S.C. § 1605A(c) that provides a cause of action for U.S. nationals injured or killed in terrorist attacks supported by designated state sponsors of terrorism. The Plaintiffs in this motion seek damages against the Iran Defendants despite their status as non-U.S.-nationals at the time they sustained their injuries. As set forth above, this Court possesses jurisdiction over these Plaintiffs' claims under 28 U.S.C. § 1605B(b), and the application of this exception to foreign sovereign immunity triggers the language in 28 U.S.C. § 1606 which provides that a foreign sovereign who is not entitled to immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." The D.C. Circuit has read this provision to ensure that "if an FSIA exception abrogates immunity, plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Rep. of Iran*,

573 F.3d 835, 841 (D.C. Cir. 2009). As in the *King* case, the Amended Complaint in this case—

which is the same pleading adopted by the *King* plaintiffs—does not explicitly include claims for

assault and battery under New York law. As the Court explained:

> The crux of default is a defendant's admission of the "factual allegations" laid out
> in the complaint. "[I]t remains for the court to consider whether the unchallenged
> facts constitute a legitimate cause of action . . . ."
>
> In the FSIA context, "[w]hile [plaintiffs] d[o] not have to identify the specific
> source of law in [their] complaint," they must "do so at an appropriate time in the
> litigation." Plaintiff has certainly asserted assault and battery claims in the instant
> motion.   This Court agrees with Magistrate Judge Netburn's conclusion that
> because (a) Plaintiff's complaint alleges facts which "cogently charge[] Iran with
> legal responsibility for his injuries," and (b) Plaintiff has clearly identified assault
> and batter causes of action in the instant motion, this Court may consider Plaintiff's
> assault and battery claims against Iran.

ECF No. 9666 at 6-7 (citations omitted).

The Plaintiffs here have precisely followed this precedent. These Plaintiffs pleaded factual

allegations that clearly asserted the Iran Defendants' legal responsibility for their personal injuries

on 9/11:

- "**Iran . . . entered into an alliance with al-Qaeda** . . . to work together to conduct
  terrorist operations against the United States." No. 15-cv-09903, ECF No. 53 at ¶
  4976.

- Through that partnership, "**Iran . . . had actual foreknowledge of[] . . . the 9/11
  [A]ttacks** . . . [,] which were carried out by members of al-Qaeda." *Id*. at ¶ 5006.

- In the lead up to 9/11, "**Iran . . . assist[ed] in, and contribut[ed] to, the
  preparation and execution of the plans" for the Attacks**, *id*. at ¶ 4951, including
  by providing "instruction, training, direction, financing, and support" to al Qaeda,
  *id*. at ¶ 5031.

- "**In furtherance of those plans, the al-Qaeda hijackers deliberately caused
  planes to crash into the World Trade Center Towers,** the Pentagon, and a field
  in Shanksville, Pennsylvania on September 11, 2001." *Id*. One of the hijacked
  planes, "American Airlines Flight 11[,] . . . crashed . . . into the North Tower of the
  World Trade Center in New York . . . , **causing** the collapse of the tower, the deaths
  of the 9/11 Decedents, and **injuries** to other plaintiffs," including the Non-U.S.
  National Plaintiffs. *Id*. at ¶ 5013.

And the Plaintiffs have identified assault and battery as appropriate causes of action in the instant motion for default judgment. Thus, this Court should rely upon these theories of liability in reviewing the evidence to determine that these plaintiffs are entitled to the relief sought.[1]

### A.    Choice-of-law Analysis

Where the Court has determined that an exception to immunity applies, and 28 U.S.C. § 1606 is implicated, then the choice-of-law rules applicable to any other actor within this forum would apply here—that is, New York's choice-of-law analysis applies here.  *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 124 S. Ct. 1502, 1508 (2022); *see also Barkanic v. Gen. Admin. of Civ. Aviation of People's Rep. of China*, 923 F.2d 957, 959-60 (2d Cir. 1991). Therefore, the Iran Defendants are subject to suit for assault and battery in the same manner that other private defendants would be.

Under New York choice-of-law principles, " 'controlling effect' must be given 'to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 196 (1985), *quoting Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963). "In determining the interests of a jurisdiction in a particular tort, New York courts assess whether the state laws in conflict are primarily 'conduct regulating' or 'loss allocating.' Conduct-regulating rules are those 'governing conduct to prevent injuries from occurring,' while loss allocating rules 'are those which prohibit, assign, or limit liability after the tort occurs…." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp.3d 385, 424 (S.D.N.Y. 2014) (citations omitted). For conduct-regulating rules, New York courts hold that "the law of the place of the tort 'will usually have a predominant, if not exclusive, concern'… because the locus jurisdiction's interests in protecting

---

[1] Further, in the *King* case in which this issue has already been adjudicated, the Court noted that the Amended Complaint in this case was adopted by the *King* plaintiffs.  *See* ECF No. 9666 at 6, n.3.

the reasonable expectations of the parties who relied on it govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction." *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 522 (1994), *quoting Schultz*, 65 N.Y.2d at 198.

Loss-allocating rules apply the framework established in *Neumeier v. Kuehner*, 31 N.Y.2d 121 (1972) which established three rules: (1) where the parties are domiciliaries of the same jurisdiction, "the law of that state should control and determine the standard of care" (31 N.Y.2d at 128); (2) where the parties are domiciliaries of different states, and the local law of one state is more favorable than the local law of the other state, then the "place of injury" would apply (*id.*); or (3) the law of the place of the tort would apply where the alleged victim and the alleged tortfeasor are domiciliaries of different states unless "it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants" (*id.*). As this Court has held, "here, despite the number of Movants and diversity of domiciles, that task [of considering each plaintiff vis-à-vis each defendant] is easier than one might predict. The first rule does not apply because no Movant is domiciled in Iran. And under either the second or the third rule, the law of the 'place [of the tort]' governs." ECF No. 9287 at 4.

### B.   Plaintiffs Have Properly Pleaded Claims Under New York Assault-and-Battery Law.

The Plaintiffs included on Exhibit A to the Eubanks Declaration all sustained injuries on September 11, 2001 in New York. Since the law of the place of injury governs in these cases, New York law would apply to all of the claims in this motion. This Court has found as follows:

> Under New York law, "[b]attery is the unjustified touching of another person, without that person's consent, with the intent to cause a bodily contact that a reasonable person would find offensive," while "[a]ssault involves putting a person in fear of a battery." *Rivera v. State*, 34 N.Y.3d 383, 389 (2019) (internal citation

omitted). Such contact can occur "by means of an instrumentality." *See Aberbach v. Biomedical Tissue Servs., Ltd.*, 48 A.D.3d 716, 718 (2d Dep't 2008). "Aiding-[and-]abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 397 (N.Y. Sup. Ct. 1994) (applying the *Halberstam* factors in an assault case).

This Court has little trouble finding that the al Qaeda hijackers committed assault and battery against Plaintiff[s]. (*See* Report at 12-13.) And, based on the evidence that Plaintiff[s have] proffered—which Iran has admitted is true by virtue of its default—this Court agrees with Magistrate Judge Netburn's conclusion that Iran both knew of and substantially assisted al Qaeda's attacks on the United States. (*See id.* at 13.) This Court adjudges Iran liable to Plaintiff[s].

ECF No. 9666 at 8.

## V.   Damages Should be Awarded to the Plaintiffs Identified in Exhibit A.

Plaintiffs identified in Exhibit A now respectfully request that this Court grant them partial default judgment as to damages against the Iran Defendants. Plaintiffs respectfully submit that the Court should adopt and apply the same damages procedures here that the Court has applied in this case to actions maintained under § 1605A. Equity dictates that non-U.S. national Plaintiffs be entitled to the same damages regime as had been applied to § 1605A claims throughout this case. *See* ECF No. 2618 at 14 (awarding *Havlish* plaintiffs common law damages against non-sovereign defendants in same amounts as § 1605A claims against Iran "under traditional tort principles" even though *Havlish* plaintiffs did not maintain Anti-Terrorism Act claims against these defendants and Section 1605A claims were inapplicable as to these defendants).

Accordingly, while § 1605B(b) confers jurisdiction, the appropriate damages framework for Plaintiffs' common-law claims should be the same framework that has been applied to claims maintained under § 1605A, as set forth below. This is also true given the determination by this Court and others that there exists an "interest in promoting uniformity of determinations with

11

respect to [state sponsored terrorist acts]." *See* ECF No. 3363 at 2. This is further underscored by the determination in the *King* case that "considerations of fairness dictate that the preexisting personal injury damages framework applies to non-U.S. nationals as well." ECF No. 9666 at 9. Magistrate Judge Netburn's Report and Recommendation (adopted by the Court) provided a salient rationale that "doing so will promote the efficient adjudication of this litigation and, more importantly, restore a measure of parity to plaintiffs of different nationalities…. [T]he 9/11 Attacks did not just devastate U.S. nationals and their families; they killed 372 people from over 90 countries and injured many more. And yet, non-U.S. nationals have no shared in the default judgments entered against Iran in this litigation—largely due to legal hurdles unique to their claims. As we parse these issues and grant judgments in favor of non-U.S. national plaintiffs, justice demands that we honor their losses as we do those of U.S. nationals." ECF No. 9506 a 14.[2]

A.      **Personal-Injury Damages Under the Court's Previously Adopted Framework.**

The Plaintiffs identified in Exhibit A are non-U.S.-nationals who were on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); or who were among those who entered the premises in the vicinity of the World Trade Center and were injured on September 11, 2001. The injuries of individuals who were injured on September 11, 2001 range from smoke inhalation and broken bones to devastating burns and loss of limbs. One injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the horror of the attacks on September 11, 2001. Under the framework previously adopted by this Court, these injuries are all compensable, and given that these injuries occurred either as a direct result of the

---

[2] The *Burnett* non-national Plaintiffs appreciate the Court's desire to achieve parity here under the law, but they would be remiss not to highlight that the Court—knowingly or unknowingly—has entered default judgments for numerous non-national plaintiffs within this MDL prior to entry of the *King* decision earlier this year.

attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of attempting

to assist or render aid to the injured or endangered or to flee from the scene, the proximate causation

of these injuries is not in question.

In the first Report and Recommendation issued by Magistrate Judge Netburn addressing

personal-injury damages in this context (which was affirmed by Judge Daniels without objection),

the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where

"personal injury plaintiffs cannot escape the memory of 9/11." *See* ECF No. 5879 at 5. This

accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief"

resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering

the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible

impact on the lives of the victims' families, I find that it is appropriate to grant the upward

departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively

requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30,

2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-

*82 (S.D.N.Y. Oct. 3, 2012)).

This Court then established "a baseline award of $7 million, an upward deviation of $10

million, and a downward deviation of $5 million for personal-injury damages for pain and

suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its

discretion to award further upward departures in exceptional cases." *Id.* at 6. The Court divided

the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken
bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in
dust or debris; significant respiratory ailments including nasal irritations, chest pain,
and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant
orthopedic injuries such as strains, sprains, or fractures that cause continuing
intermittent pain and may require surgery.  This category will also include short term

or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id.* at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma.  Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

The Court issued upward or downward departures based on the facts of each case presented. For example, in the case of Plaintiff Lauren Manning, this Court granted an upward departure and found that Manning was entitled to a $25,000,000 judgment, noting that Manning's injuries were "beyond devastating." *See* ECF No. 5955 at 3-4. Based on the Court's decision in *King*, Plaintiffs here request that the personal-injury damages framework set forth above be applied in equal manner to the injuries asserted by the Plaintiffs here who were not U.S. nationals on September 11, 2001 (though some of them have since obtained their U.S. citizenship).

**B.      The Court Should Defer Determination on Punitive Damages.**

While the Moving Plaintiffs assert that they are entitled to punitive damages for the egregious nature of the actions of the Iran Defendants in providing support to Al Qaeda leading to the terrorist attacks on September 11, 2001, they will—like their co-plaintiffs with claims under 28 U.S.C. § 1605A(c)—submit to the Court's practice in this litigation and defer determination of punitive-damage issues until a later stage of the litigation. Therefore, the Moving Plaintiffs herein explicitly request permission to address the issue of punitive damages at a later date. *See, e.g.*, ECF

No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C. Plaintiffs are Entitled to Prejudgment Interest at the Rate of 4.96% from September 11, 2001 Through the Date of Judgment.

Under New York law, the New York Court of Appeals has "long held that prejudgment interest in a wrongful death action is 'part of the damages,' and that such interest should run from the date of death to the date of verdict." *Toledo v. Iglesia Ni Christo*, 18 N.Y. 363, 367-68 (2012) (citations omitted). The New York Court of Appeals then determined that "the proper method for calculating preverdict interest in a wrongful death action is to discount the verdict to the date of liability, i.e., the date of death, and award interest on that amount from the date of death to the date of judgment." *Id.* at 368. New York law provides that interest be calculated at nine percent per annum. *See* N.Y. C.P.L.R. § 5004(a).

The Second Circuit held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). *World Trade Farmers Market, Inc. v. American Airlines, Inc. (In Re: September 11th Litigation)*, 2015 U.S. App. LEXIS 16619, *66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id.* Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' 9/11 claims. *Id.*

However, this Court has adopted the 4.96 percent interest rate for prejudgment interest for all claims. *See* ECF No. 9435. In light of the Court's prior decisions within this MDL, the continued attempts to render uniformity to the damages applied herein, and notwithstanding the

higher statutory rate of interest applicable under New York state law, the Moving Plaintiffs identified in Exhibit A respectfully request that the Clerk of the Court be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## VI.    Individualized Case Assessments

This motion addresses two (2) personal injury claims for Plaintiffs who sustained injuries within close proximity to the World Trade Center during the terrorist attacks on 9/11. What follows is a summary of the attached proof.

### A.    Ivan Almendarez, Jr.
Injury Category[3]: Escape Injuries
Severity: Significant

At the time of the terrorist attacks on September 11, 2001, Ivan Almendarez, Jr., was a citizen of Nicaragua, but he later became a United States citizen in 2015. *See* Eubanks Dec., Ex. B, Declaration of Ivan Almendarez, Jr., at ¶ 2. At the time of the attacks, he worked as a janitor with American Building Maintenance (ABM) at the WTC's North Tower. *Id*. at ¶ 3. On the morning of

---

[3] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14.  Those categories include the following:
1)    IMPACT INJURY
Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);
2)    ESCAPE INJURY
Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e., during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC were under attack, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);
3)    BUILDING COLLAPSE INJURY
Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);
4)    FALLING DEBRIS INJURY
Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas);
5)    PULMONARY TRAUMA INJURY
Persons who breathed in large quantities of smoke, debris, chemicals, WTC Dust, jet fuel or related toxins at Ground Zero, Pentagon, or Shanksville, PA and whose lungs were burned, damaged and injured on 9/11; and
6)    LATENT INJURIES (CANCERS).

16

September 11th, Mr. Almendarez had been working in the basement area of the North Tower collecting cleaning supplies when the first passenger jet, American Airlines Flight 11, struck the upper section of the building. He felt the building shake and he heard several explosions. His supervisor told Mr. Almendarez to evacuate from the building, so he grabbed his radio and rushed out of the office. *Id*. at ¶¶ 4-5.

When he came out of ABM's basement office, Mr. Almendarez saw a man who worked in the building, and his arms and face had been severely burned due to a fireball which exploded out of the basement elevator. He grabbed the injured man and evacuated from the North Tower building through the loading dock. However, as he jumped from the loading dock to the ground level, Mr. Almendarez fell and injured his left knee. *Id*. at ¶ 5.

Despite his left knee injury, Mr. Almendarez continued to flee from the North Tower area while trying to help the burned gentleman get to safety and medical care. He received a radio call from ABM management to evacuate from the North Tower and meet by One Chase Plaza (which was located one block away from the WTC), so he walked to One Chase Plaza as instructed. Mr. Almendarez then saw a second passenger jet slam into the upper section of the South Tower. *Id*. at ¶¶ 6-7. After watching the carnage unfold in and around the South Tower, he heard a loud sound similar to thunder and watched as the building begin to collapse. The debris from the South Tower fell around Mr. Almendarez, and a thick cloud of building dust and debris struck him. *Id*. at ¶ 8.

Mr. Almendarez attempted to run away from the area, but he could not see in front of him due to the thickness of the debris cloud. While running away from the area, he tripped and fell to the pavement and people trampled over him as they fled the area. Mr. Almendarez suffered additional injuries to his back and right shoulder during these events. *Id*. at ¶ 9. Determined to escape from the area, Mr. Almendarez ran into the One Chase Plaza building entrance, and he felt the ground shake

as the South Tower completely collapsed. Following the collapse of the South Tower, Mr. Almendarez ran out of One Chase Plaza to locate a safer area. He took off his shirt to filter out the dust in the air as he had trouble breathing due to the thickness of the debris cloud. *Id.* at ¶¶ 10-11.

Mr. Almendarez then ran towards the Brooklyn Bridge as the North Tower collapsed. He went to Canal Street and walked into his union headquarters and cleaned off the dust and debris that had covered his body. He walked from Canal Street towards 141 Broadway Street and arrived home that afternoon. *Id.* at ¶¶ 12-13. In the days, weeks, months, and years after the events of September 11th, Mr. Almendarez sought medical treatment for his various injuries and conditions caused by the 9/11 Attacks, which included a cervical disc disorder, a sprained left knee, a sprained right shoulder joint, and post-traumatic stress disorder (PTSD). *Id.* at ¶¶ 14-16.

    **B.    Robert Ramos**
            **Injury Category: Pulmonary Trauma Injuries**
            **Severity: Significant**

At the time of the terrorist attacks on September 11, 2001, Robert Ramos was a citizen of the Dominican Republic, but he later became a United States citizen in 2005. *See* Eubanks Dec., Ex. B, Declaration of Robert Ramos, at ¶ 2. At the time of the attacks, he worked as a painter for DeFila Painting in the New York City Area. *Id.* at ¶ 3. On the morning of September 11th, Mr. Ramos had been painting on the fourth floor of the interior of a building at 88 Greenwich Street (next door to the WTC) when he witnessed the second passenger jet, United Airlines Flight 175, collide with the South Tower. He had been so close to the South Tower at the time of the collision that the impact knocked Mr. Ramos off of his feet. When he was able to stand up he saw what looked like a warzone in front of him. *Id.* at ¶ 4.

Paralyzed with fear, Mr. Ramos stood in awe of the carnage until he saw the South Tower begin to collapse. He began to run in an attempt to get away from the dust cloud and falling debris. Mr. Ramos ran into the Battery Tunnel for cover from the dust and debris, but he soon discovered

that he was trapped in an enclosed area that was quickly filling with smoke, dust, and debris. *Id.* at ¶ 5. Due to the large quantities of dust and debris that he had inhaled into his lungs and airways, Mr. Ramos struggled to breathe and felt as though he was about to suffocate. In an effort to escape from the debris cloud, he moved towards the Brooklyn end of the tunnel but he collapsed to the ground once he had escaped. An ambulance crew found Mr. Ramos and transported him to Long Island College Hospital, where he received initial treatment for his respiratory injuries. *Id.* at ¶¶ 6-7.

Following his release from the hospital, Mr. Ramos continued to experience shortness of breath and associated symptoms for the remainder of 2001. He became excessively fatigued doing simple physical tasks, such as walking up stairs. In the days, weeks, months, and years after the events of September 11th, Mr. Ramos continued to seek medical treatment for his various injuries and conditions caused by the 9/11 Attacks, which included asthma, chronic rhinosinusitis, reactive airway disease syndrome (RADS), upper airway hyperreactivity, gastroesophageal reflux disease (GERD), and PTSD. *Id.* at ¶¶ 8-11.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Declaration of John M. Eubanks, the Plaintiffs identified in Exhibit A respectfully request that this Court enter judgments on their behalf for compensatory damages in the form of pain-and-suffering damages in amounts consistent with the framework previously established by the Court. Furthermore, the *Burnett* plaintiffs identified at Exhibit A respectfully request that the Court: (1) award prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (2) grant permission for the *Burnett* plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other appropriate damages at a later date; and

(3) grant permission for all *Burnett* Plaintiffs not appearing on Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  June 12, 2024

Respectfully submitted,

MOTLEY RICE LLC

*/S/ John M. Eubanks*_____
John M. Eubanks, Esq.
Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
Jade Haileselassie, Esq.
John C. Duane, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
Email: jeubanks@motleyrice.com

*Attorneys for Plaintiffs*