**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br><br>ECF Case |

**This document relates to:**
   *Burnett, et al. v. Islamic Rep. of Iran, et al.*, No. 15-cv-9903 (GBD)(SN)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF NON-NATIONAL IMMEDIATE FAMILY MEMBERS (OR THEIR FUNCTIONAL EQUIVALENTS) OF NON-NATIONAL 9/11 DECEDENTS

### (*BURNETT* NON-NATIONALS 4)

### INTRODUCTION

For the reasons set forth below and in the accompanying Declaration of John M. Eubanks ("Eubanks Declaration"), with exhibits, and the accompanying memorandum of law, Plaintiffs in the *Burnett* action pending before the Court seek partial default judgment awarding the Plaintiffs included in the exhibits to the Eubanks Declaration (the "Moving Plaintiffs"):

(1) damages for intentional infliction of emotional distress/solatium under state law for immediate family members who were not U.S. nationals on September 11, 2001 (in this instance spouses, parents, children, and siblings, or the estate of a spouse, parent, child, or sibling, or the functional equivalents of such immediate family members) of non-U.S.-national 9/11 decedents in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs;

(2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment;

(3) permission for the Moving Plaintiffs to seek punitive damages or other damages at a later date; and

(4) for all other *Burnett* Plaintiffs whose claims are subject to the jurisdiction of this Court against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively the "Iran Defendants") solely under the exception to sovereign immunity found at 28 U.S.C. § 1605B(b), to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed. Plaintiffs seek this default judgment against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, the "Iran Defendants").

Plaintiffs' request is made in connection with the pending motion for default judgment as to liability sought against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in the *Burnett* case for non-national claimants that was filed on April 30, 2024. *See* ECF No. 9733.[1]

## PROCEDURAL BACKGROUND

Moving Plaintiffs sued the Iran Defendants in connection with the losses they sustained in the terrorist attacks on September 11, 2001. On December 1, 2016, plaintiffs in the action *Burnett, et al. v. Islamic Rep. of Iran, et al.*, Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), whose claims arose pursuant to the private right of action codified at 28 U.S.C. 1605A(c) moved for judgment as to liability only. 15-cv-9903, ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69. On January 31, 2017, the Court entered judgment as to liability only against the Iran Defendants. *See* 15-cv-9903, ECF No. 85.

Since the entry of liability under 28 U.S.C. § 1605A(c), this Court has awarded solatium damages to thousands of United States-national immediate family members of 9/11 decedents or

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

non-U.S.-national immediate family members of U.S.-national 9/11 decedents pursuant to Section 1605A(c).  Now, the Moving Plaintiffs who do not qualify for judgments under the exception to sovereign immunity found at 28 U.S.C. § 1605A—because they were not United States nationals on September 11, 2001 and neither was their loved one who was killed in the terrorist attacks— seek entry of partial final judgments against the Iran Defendants pursuant to the exception to sovereign immunity found at 28 U.S.C. § 1605B(b) and the "pass through" of 28 U.S.C. § 1606 to claims for intentional infliction of emotional distress under New York state law and Virginia state law[2]. These Plaintiffs submit that the Court possesses subject-matter jurisdiction and personal jurisdiction over the Iran Defendants.

## ARGUMENT

### I.   This Court Possesses Subject-Matter Jurisdiction Over the Iran Defendants.

This Court recently addressed liability for a non-U.S.-national plaintiff in the *King* case within this MDL who sustained personal injuries in the attacks on September 11, 2001 and awarded damages to this plaintiff.  *See* ECF No. 9666. The claims of non-U.S. national victims and their non-U.S. national family members cannot be brought pursuant to 28 U.S.C. § 1605A(c)—the statute upon which the Court has granted relief in its prior decisions—because to bring such an action requires that the plaintiff be "(1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or (4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury of death…."  *See* 28 U.S.C. §§ 1605A(c)(1)-(4).  The plaintiffs in this motion do

---

[2] As detailed in Exhibit A, two of the Moving Plaintiffs are family members of non-U.S.-national 9/11 decedents who perished in the terror attacks at the Pentagon in Virginia. The remaining Moving Plaintiffs are family members of non-U.S.-national 9/11 decedents who perished in the terror attacks in New York at the Twin Towers.

not fall within the parameters required to pursue a cause of action based upon the terrorism exception.

Therefore, these plaintiffs look to 28 U.S.C. § 1605B(b) to provide jurisdiction over their claims. This section provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b). Conspicuously absent from this exception to sovereign immunity is the requirement that the victim or their family members be U.S. nationals to pursue their claims. This differentiation between the terrorism exception found at Section 1605A and the Justice Against Sponsors of Terrorism Act found at Section 1605B derives from the location of the act of terrorism as "occurring in the United States."

The Supreme Court has held that "a foreign state is immune from the jurisdiction of courts in this country unless one of several enumerated exceptions to immunity applies. 28 U.S.C. §§ 1604, 1605-1607. If a suit falls within one of these exceptions, the FSIA provides subject-matter jurisdiction in federal district courts." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1053 (2019). In addressing the application of the exception to sovereign immunity codified at 28 U.S.C. § 1605B(b) to the terrorist attacks on September 11, 2001, Magistrate Judge Netburn provided the following analysis (subsequently adopted by Judge Daniels)—adjusted to address the circumstances at issue in this motion—in recommending that the exception applies here to provide the Court with subject-matter jurisdiction:

[The victims'] claims plainly satisfy many of 28 U.S.C. § 1605B(b)'s requirements. [They are] seeking "money damages" from Iran. [28 U.S.C. § 1605B(b)"; *see* No. 15-cv-09903, ECF No. 53 at 1082-88 (*Burnett* complaint [at issue in this motion]). Those damages are for "physical injur[ies]" [they] sustained "in the United States." 28 U.S.C. § 1605B(b); *see* ECF No. 9154-7 at ¶¶ 5-33; No. 15-cv-09903, ECF No. 53 at 1081. [Their] injuries were "caused" by the 9/11 Attacks. 28 U.S.C. § 1605B(b); *see* ECF No. 9154-7 at ¶¶ 5-33; No. 15-cv-09903, ECF No. 53 at 1081. And the 9/11 Attacks were "act[s] of international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); *see* No. 15-cv-09903, ECF No. 53 at 1081.

One element of 28 U.S.C. § 1605B(b) merits closer attention: the requirement that "a tortious act or acts of the foreign state" "caused" the injury. For FSIA purposes, "a tortious act" includes the "knowing or deliberately indifferent provision of material support to terrorists," and "cause" incorporates "the traditional test for proximate causation[:] . . . 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 643, 645 (S.D.N.Y. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). In simple terms, there must be a link between a state's support for terrorism and the plaintiff's injuries.

The Court heard evidence linking Iran to the 9/11 Attacks in a 2011 hearing. Based on that record, it found that Iran was 'aware[] of[] and involve[d] in[]" al Qaeda's plans and provided "material support" to the terrorist group. *In re 9/11*, 2011 WL 13244047, at *26, 41. It concluded that Iran's "material support" proximately "caused" the 9/11 Attacks and, by extension, the resulting injuries. *Id.* at *41; *see* ECF No. 9154-7; *cf.* ECF No. 9274 at 3 (concluding that Iran proximately caused latent injuries). The evidence supporting those findings establishes the last element of 28 U.S.C. § 1605B(b)—that Iran's "tortious act[s]" "caused" [plaintiffs'] injuries. *See* ECF Nos. 2431, 2432, 2433, 2473.

*See* ECF No. 9506 at 6-7. Magistrate Judge Netburn correctly concluded that these cases meet the jurisdictional threshold for establishing subject-matter jurisdiction over the Iran Defendants under 28 U.S.C. § 1605B(b), and the Court is free to exercise subject-matter jurisdiction here. This conclusion was subsequently adopted by the Court. *See* ECF No. 9666 at 2-4. Therefore, as in the *King* case, this Court has subject-matter jurisdiction over these Plaintiffs' claims under 28 U.S.C. § 1330(a). *See* ECF No. 9506 at 7.

II.     **This Court Possesses Personal Jurisdiction Over the Iran Defendants.**

With subject-matter jurisdiction satisfied through the application of the exception found at

28 U.S.C. § 1605B(b), the Court must assess whether it has personal jurisdiction over the

Defendants.  In *Harrison*, the Supreme Court held, "[t]he FSIA also provides personal jurisdiction

'where service has been made under [28 U.S.C. §] 1608."  139 S. Ct. at 1054.  Here, the Amended

Complaint in this case was filed on February 8, 2016.  *See* 15-cv-9903, ECF No. 53.  Service of

process on a foreign state or a political subdivision of a foreign state is governed by 28 U.S.C. §

1608(a) which "sets out in hierarchical order the . . . four methods by which '[s]ervice . . . shall be

made.'"  *Harrison*, 139 S. Ct. at 1054 (quoting 28 U.S.C. § 1608(a)).  There is no special

arrangement for service of process between the Plaintiffs here and the Iran Defendants, so service

on the Islamic Republic of Iran and its political subdivision the Islamic Revolutionary Guard Corps

was not possible under 28 U.S.C. § 1608(a)(1).  Further, there is no applicable international

convention on service of judicial documents to which both the United States and the Islamic

Republic of Iran are parties such that service under 28 U.S.C. § 1608(a)(2) was also not possible.

On March 1, 2016, Plaintiffs requested service of process on the Islamic Republic of Iran and the

Islamic Revolutionary Guard Corps pursuant to 28 U.S.C. § 1608(a)(3) by requesting that the

requisite documents and Farsi translations be sent "by any form of mail requiring a signed receipt."

The Clerk Certificate of Mailing on the Islamic Republic of Iran under 28 U.S.C. § 1608(a)(3) was

docketed on March 7, 2016.  *See* 15-cv-9903, ECF No. 55.  The Clerk Certificate of Mailing on

the Islamic Revolutionary Guard Corps was also docketed on March 7, 2016.  *See* 15-cv-9903,

ECF No. 57.

On May 2, 2016, after more than 30 days had passed since the Clerk's March 7, 2016

Certificates of Mailing without any response from the Islamic Republic of Iran or the Islamic

Revolutionary Guard Corps, Plaintiffs sought service of process on these defendants pursuant to 28 U.S.C. § 1608(a)(4) via diplomatic channels through the U.S. Department of State.  On October 28, 2016, the Clerk of the Court received proof of service from the U.S. Department of State for service on both the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps stating that "the documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note numbers 1069-IE and 1070-IE dated and delivered on September 14, 2016." *See* 15-cv-9903, docket entry from October 28, 2016.

The Central Bank of the Islamic Republic of Iran is an "agency or instrumentality" of the Islamic Republic of Iran, and service of process on an agency or instrumentality of a foreign state is governed by 28 U.S.C. § 1608(b).  Neither of the first two provisions in the hierarchical order of section 1608(b) applied in this instance, so on March 1, 2016, Plaintiffs requested service on the Central Bank of the Islamic Republic of Iran pursuant to 28 U.S.C. § 1608(b)(3).  The Clerk's Certificate of Mailing on the Central Bank of the Islamic Republic of Iran was docketed on March 7, 2016.  *See* 15-cv-9903, ECF No. 54. Plaintiffs received a return receipt indicating that service had been made on the Central Bank of the Islamic Republic of Iran on March 18, 2016.  *See* 15-cv-9903, ECF No. 64.

Plaintiffs submitted their Affidavit of Service as to the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran pursuant to 28 U.S.C. § 1608 on November 10, 2016.  Therefore, this Court possesses personal jurisdiction over the Iran Defendants in this case because service has been made pursuant to 28 U.S.C. § 1608.

## III.    The Iran Defendants Have Defaulted.

Under 28 U.S.C. § 1608(d), "a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the

complaint within sixty [60] days after service has been made under this section."  On November 10, 2016, Plaintiffs filed a request for entry of a Clerk's Certificate of Default to be entered on or after November 15, 2016 which would have been the day after the expiration of the 60-day time period set forth in 28 U.S.C. § 1608(d).  *See* 15-cv-9903, ECF No. 63 at ¶13.  On December 5, 2016, the Clerk's Certificate of Default was entered against the Iran Defendants.  *See* 15-cv-9903, ECF No. 67. The Iran Defendants have not appeared at any point in this litigation even after entry of the Clerk's Certificate of Default.

## IV.   The Iran Defendants are Liable for Intentional Infliction of Emotional Distress ("IIED") Under New York Law and Virginia Law.

In prior judgments entered on behalf of Plaintiffs in this case against Iran, the Court has looked to 28 U.S.C. § 1605A(c) that provides a cause of action for U.S. nationals injured or killed in terrorist attacks supported by designated state sponsors of terrorism. The Moving Plaintiffs in this motion seek damages against the Iran Defendants despite their status as non-U.S.-nationals at the time that their family members perished in the 9/11 attacks. As set forth above, this Court possesses jurisdiction over these Plaintiffs' claims under 28 U.S.C. § 1605B(b), and the application of this exception to foreign sovereign immunity triggers the language in 28 U.S.C. § 1606 which provides that a foreign sovereign who is not entitled to immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  The D.C. Circuit has read this provision to ensure that "if an FSIA exception abrogates immunity, plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). The Amended Complaint in this case does not explicitly include claims for IIED under New York or Virginia law. As the Court explained in the context of common law claims for assault and battery:

The crux of default is a defendant's admission of the "factual allegations" laid out in the complaint. "[I]t remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action . . . ."

In the FSIA context, "[w]hile [plaintiffs] d[o] not have to identify the specific source of law in [their] complaint," they must "do so at an appropriate time in the litigation." Plaintiff has certainly asserted assault and battery claims in the instant motion. This Court agrees with Magistrate Judge Netburn's conclusion that because (a) Plaintiff's complaint alleges facts which "cogently charge[] Iran with legal responsibility for his injuries," and (b) Plaintiff has clearly identified assault and battery causes of action in the instant motion, this Court may consider Plaintiff's assault and battery claims against Iran.

ECF No. 9666 at 6-7 (citations omitted).

The Moving Plaintiffs have precisely followed this precedent. These Plaintiffs pleaded factual allegations that clearly asserted the Iran Defendants' legal responsibility for the death of their family members on 9/11:

- "**Iran . . . entered into an alliance with al-Qaeda** . . . to work together to conduct terrorist operations against the United States." No. 15-cv-09903, ECF No. 53 at ¶ 4976.

- Through that partnership, "**Iran . . . had actual foreknowledge of[] . . . the 9/11 [A]ttacks** . . . [,] which were carried out by members of al-Qaeda." *Id*. at ¶ 5006.

- In the lead up to 9/11, "**Iran . . . assist[ed] in, and contribut[ed] to, the preparation and execution of the plans" for the Attacks**, *id*. at ¶ 4951, including by providing "instruction, training, direction, financing, and support" to al Qaeda, *id*. at ¶ 5031.

- "**In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into the World Trade Center Towers,** the Pentagon, and a field in Shanksville, Pennsylvania on September 11, 2001." *Id*. One of the hijacked planes, "American Airlines Flight 11[,] . . . crashed . . . into the North Tower of the World Trade Center in New York . . . , **causing** the collapse of the tower, the deaths of the 9/11 Decedents, and **injuries** to other plaintiffs," including the Non-U.S. National Plaintiffs. *Id*. at ¶ 5013.

Further, they have pleaded factual allegations that support their own claims to injuries sustained through their loss:

- "The support provided by Iran included assistance in, and contribution to, the preparation and execution of the plans that culminated in the hijacked flights, the

9

extrajudicial killings of the 9/11 Decedents, and the injuries to the surviving plaintiffs." No. 15-cv-09903, ECF No. 53 at ¶ 4951.

- "As a direct and proximate result of the intentional, willful, reckless, and careless actions of Defendants, all Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including … loss of consortium, solatium, and/or companionship…." *Id.* at ¶ 5032.

- "As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs will forever grieve the deaths of the 9/11 Decedents." *Id.* at ¶ 5043.

- "…the estates, survivors and family members of the 9/11 Decedents … are entitled to recover damages against Defendants for injury, wrongful death, survival, intentional infliction of emotional distress, and solatium." *Id.* at ¶ 5053.

- "As a direct and proximate result of the Defendants' acts …, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries." *Id.* at ¶ 5065.

Therefore, by implication, the Moving Plaintiffs have identified IIED as an appropriate cause of action in the Amended Complaint and also in the instant motion for default judgment. Thus, this Court should rely upon this theory of liability in reviewing the evidence to determine that these plaintiffs are entitled to the relief sought.

### A.    Choice-of-law Analysis

Where the Court has determined that an exception to immunity applies, and 28 U.S.C. § 1606 is implicated, then the choice-of-law rules applicable to any other actor within this forum would apply here—that is, New York's choice-of-law analysis applies here. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 124 S. Ct. 1502, 1508 (2022); *see also Barkanic v. Gen. Admin. of Civ. Aviation of People's Rep. of China*, 923 F.2d 957, 959-60 (2d Cir. 1991).  Therefore, the Iran Defendants are subject to suit for IIED in the same manner that other private defendants would be.

New York has different choice-of-law rules for different types of claims. IIED claims are considered "conduct-regulating," so the law of the " 'place of the tort' " controls. *Padula v. Lilarn Prop. Corp.*, 84 N.Y.2d 519, 522 (1994) (quoting *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 196 (1985)). For current purposes, that "place" is the jurisdiction "where the last event necessary to make the [defendant liable occurred," even if "the defendant's [mis]conduct … occurred … in another [jurisdiction]." *Schultz*, 65 N.Y.2d at 195 (1985). As this Court explained in a prior Order on the choice of law issue in the instant context for non-U.S. national family members, the relevant events occurred when al Qaeda terrorists crashed hijacked passenger jets into "the Twin Towers, a field near Shanksville, and the Pentagon." *See* ECF No. 9287 at 4. Accordingly, the claims brought by the family members of people killed in the attacks at the Twin Towers and the Pentagon are respectively governed by New York and Virginia law. New York law requires courts to analyze choice-of-law on a party-versus-party or tort-by-tort basis, not by looking at the case as a whole. *See Edwards v. Erie Coach Lines Co.*, 17 N.Y.3d 306, 329 (2011). Thus, the Court must analyze the IIED claims of the respective Moving Plaintiffs under New York and Virginia law.

**B.    Plaintiffs Have Properly Pleaded IIED Claims Under New York and Virginia Law.**

Under New York law, the following are the elements of an IIED claim: (1) extreme and outrageous conduct, (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress, (3) a causal connection between the conduct and injury, and (4) severe emotional distress. *Petkewicz v. Dutchess Cty. Dep't of Cmty. & Fam. Servs.*, 137 A.D.3d 990, 27 N.Y.S.3d 264 (2016). Similarly, under Virginia law, a successful IIED claim includes the following elements: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Kreutzer*, 271 Va.

188, 203, 624 S.E.2d 24 (2006). As this Court has previously recognized, an IIED claim under either New York or Virginia law also generally requires that the plaintiff witness or be present for the outrageous conduct. *See* ECF No. 9287 at 6. However, as discussed *infra*, courts have concluded that the presence element of an IIED claim is not required in the special context of family members suing state sponsors of terrorism (like Iran) under Section 1605A. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 42 (D.D.C. 2007) (collecting cases and discussing the exception to the presence element for an IIED claim under various state laws); *Republic of Sudan v. Owens*, 194 A.3d 38, 40 (D.C. 2018) (answering certified question from United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit")); and *Kumar v. Republic of Sudan*, 2019 WL 13251350, at 12-13 (E.D. Va. July 31, 2019) (finding that "presence" is not required in the "special context" of a civil suit against a state sponsor of terror).

With regard to the first four elements of an IIED claim under either New York or Virginia law, Moving Plaintiffs submit that an act of terrorism is by definition extreme and outrageous and is intended to cause the highest degree of emotional distress. *Stethem v. Islamic Republic of Iran*, 201 F.Supp. 78, 89 (D.D.C. 2002). The Moving Plaintiffs with family members who perished at the Twin Towers and the Pentagon have clearly met the first four requisite elements of an IIED claim under both New York and Virgina state law. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011) (conclusions of law ¶¶ 18-35) (ECF No. 2515). This Court has previously found that "[t]he 9/11 terrorist attacks are contrary to the guarantees 'recognized as indispensable by civilized peoples.'" ECF No. 2515 at 50. Further, this Court also found that "plaintiffs have established that the 9/11 attacks were caused by Defendants' [including Iran's] provision of material support to al Qaeda," *id*. at 52, and met the solatium requirements under 1605A(c). *Id*. at 53.

12

This Court specifically found Iran liable for providing wide-ranging material support for al Qaeda in connection with the 9/11 Attacks. Under the above-referenced black letter law, this conduct clearly is "outrageous" and "extreme," clearly disregarded "a substantial probability of causing, severe emotional distress" and caused resulting emotional distress. While this Court previously found Iran liable under Section 1605A and therefore "an analysis of liability under state law [wa]s unnecessary", *id*. at n.9, this Court then cited *Owens v. Republic of Sudan*, 826 F.Supp.2d 128 (D.D.C. 2011), a case which found Sudan liable under state common law for similar facilitating conduct. In a subsequent decision less than a year later, this Court then entered judgments against non-sovereign defendants under state law traditional tort principles, for similarly facilitating conduct Iran was found to have committed. *See* ECF No. 2618 at 14. The Court should similarly conclude that under New York and Virginia state law, the Moving Plaintiffs have met the first four elements of an IIED claim based upon Iran's actions in support of the 9/11 Attacks.

## C.  The "Presence" requirement in IIED cases is overruled in situations involving state-sponsored terrorism.

As referenced above, courts in the District of Columbia, relying upon the Second Restatement of Torts[3], have specifically concluded that the "presence" element is not required to sustain an IIED claim in the unique context of a family member's civil suit against a state sponsor of terror like Iran for the death of a loved one. The District of Columbia's highest state court has confirmed that the IIED elements established in the Second Restatement of Torts provide the

---

[3] Like the District of Columbia, New York and Virginia have also adopted the Second Restatement's formulation of the cause of action for IIED. *See Taggart v. Costabile*, 131 A.D.3d 243, 249, 14 N.Y.S.3d 388, 393 (2015) (noting that the New York Court of Appeals first adopted the Second Restatement's formulation of intentional infliction of emotional distress in *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978)); and *Russo v. White*, 241 Va. 23, 26–27, 400 S.E.2d 160, 162–63 (1991) (noting that Virginia's approach to IIED claims, as established in *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974), was "patterned after the [Second] Restatement definition.")

proper standard to apply. *Republic of Sudan v. Owens (Owens III)*, 194 A.3d 38, 41 (D.C. 2018).

As the *Owens III* court explained, the "elements of an IIED claim arising from injury to a member

of the plaintiff's immediate family" are established by § 46 of the Restatement, which sets out the

following elements of IIED liability:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes
> severe emotional distress to another is subject to liability for such emotional
> distress, and if bodily harm to the other results from it, for such bodily harm.
> (2) Where such conduct is directed at a third person, the actor is subject to liability
> if he intentionally or recklessly causes severe emotional distress
>> (a) to a member of such person's immediate family who is present at the
>> time, whether or not such distress results in bodily harm, or
>> (b) to any other person who is present at the time, if such distress results in
>> bodily harm.

*Id.* (*quoting* the Second Restatement of Torts § 46 (1968)).

Importantly, the *Owens III* court went on to clarify that a claimant who alleges emotional

distress arising from a terrorist attack that injured or killed a family member need not have been

present at the scene of the attack to state a cognizable IIED claim for relief. *Id.* at 42–45. In other

words, the court "held that when emotional distress is caused by conduct directed at a member of

a plaintiff's family, the plaintiff must," as a general rule, be "present at the time" of the conduct in

order to make out an IIED claim[,]" but also "carved out" what it called 'the FSIA Terrorism

Exception' to the presence requirement" in the limited context of "cases brought under § 1605A,"

*Owens v. Republic of Sudan (Owens IV)*, 924 F.3d 1256, 1259 (D.C. Cir. 2019) (*quoting Owens

III*, 194 A.3d at 41, 42). The Court specifically found this exception to be permitted by the

comments to the Restatement itself. *See Owens III*, 194 A.3d at 42 (*citing* the Second Restatement

of Torts § 46 (1968) Caveat & cmt. i).

Thus, *Owens III* confirmed that the same general principles of tort law that govern the

claims brought by directly injured plaintiffs within one of 1605A's enumerated categories also

14

govern claims brought by immediate family members who pursued claims via District of Columbia law. Indeed, several other courts have reached the same conclusion with regard to the FSIA terrorism exception to the "presence" requirement for a successful IIED claim. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 43–44 (D.D.C. 2007) (collecting cases and specifically finding that New York and Virginia law would allow IIED claims to be brought by family members in the terrorism context without having to establish a presence requirement); *Barry v. Islamic Republic of Iran*, 437 F.Supp.3d 15, 51 (D.D.C. 2020) (relying on *Owens III* in finding that the presence element is not required in the unique context of IIED claims brought by family members against a state sponsor of terror); *Kumar v. Republic of Sudan*, 2019 WL 13251350, at *12-13 (E.D. Va. July 31, 2019) (finding that "presence" is not required in the "special context" of a civil suit against a state sponsor of terror); and *Maxwell v. Islamic Republic of Iran*, No. 22-cv-173 (RC), 2024 WL 1342775, at *25 (D.D.C. Mar. 29, 2024) (same).

Similarly, the Moving Plaintiffs submit that under New York and Virginia law, they were not required to be present during the terror attacks at the Twin Towers and the Pentagon in order to sustain their IIED claims in this unique context of a civil suit against a state sponsor of terror.[4] As District of Columbia law demonstrates, courts (like New York and Virginia) that apply the Second Restatement have found that the Restatement's exception to the presence requirement for "conduct ... directed at a third person," *see* Second Restatement of Torts, § 46, comment 1, applies in FSIA cases because "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 43–44 (D.D.C. 2007) (citation and quotation omitted) (collecting cases and concluding that New York and

---

[4] Alternatively, the Moving Plaintiffs argue that they have otherwise met the presence requirement for IIED claims as the tragic events of September 11, 2001, were broadcast live around the world in real time. These family members watched as the Twin Towers collapsed on their loved ones and the Pentagon burned following these terror attacks.

Virginia would not apply a presence requirement given the severe nature of terrorist attacks). Thus, the Moving Plaintiffs submit that both New York and Virginia law would recognize this exception to the presence requirement. To hold otherwise would "do little more than shield culpable defendants (like Iran) from liability and deny relief to deserving plaintiffs." *Owens III*, 194 A.3d at 44.

**V.    IIED Damages Should be Awarded to the Immediate-Family-Member Plaintiffs Here Under the Court's Previously Adopted Solatium Damages Framework.**

The Moving Plaintiffs identified in Exhibit A further request that this Court grant them partial default judgment as to damages against the Iran Defendants. Plaintiffs respectfully submit that the Court should adopt and apply the same damages procedures here that the Court has applied in this case to actions maintained under § 1605A. Equity dictates that non-U.S. national Plaintiffs be entitled to the same damages regime as had been applied to § 1605A claims throughout this case. *See* ECF No. 2618 at 14 (awarding *Havlish* plaintiffs common law damages against non-sovereign defendants in same amounts as § 1605A claims against Iran "under traditional tort principles" even though *Havlish* plaintiffs did not maintain Anti-Terrorism Act claims against these defendants and Section 1605A claims were inapplicable as to these defendants).

Accordingly, while § 1605B(b) confers jurisdiction, the appropriate damages framework for Plaintiffs' common-law claims should be the same framework that has been applied to claims maintained under § 1605A, as set forth below. This is also true given the determination by this Court and others that there exists an "interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts]." *See* ECF No. 3363 at 2.  This is further underscored by this Court's rationale as stated in the *King* case that "considerations of fairness dictate that the preexisting … damages framework applies to non-U.S. nationals as well."  ECF No. 9666 at 9. Magistrate Judge Netburn's Report and Recommendation (adopted by the Court) provided a

salient rationale that "doing so will promote the efficient adjudication of this litigation and, more importantly, restore a measure of parity to plaintiffs of different nationalities…. [T]he 9/11 Attacks did not just devastate U.S. nationals and their families; they killed 372 people from over 90 countries and injured many more.  And yet, non-U.S. nationals have not shared in the default judgments entered against Iran in this litigation—largely due to legal hurdles unique to their claims.  As we parse these issues and grant judgments in favor of non-U.S. national plaintiffs, justice demands that we honor their losses as we do those of U.S. nationals."  ECF No. 9506 a 14.

The Moving Plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) IIED damages for the losses they suffered as the immediate family members (in this instance, spouses, parents, children, and siblings, or the estate of a spouse, parent, child, or sibling) of their decedents in the same per plaintiff amounts previously awarded by this Court to U.S.-national solatium claimants under 28 U.S.C. § 1605A(c), namely, $12,500,000 to the spouse of a 9/11 decedent, $8,500,000 to the child of a 9/11 decedent, $8,500,000 to the parent of a 9/11 decedent, and $4,250,000 to the sibling of a 9/11 decedent; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) permission for the Moving Plaintiffs identified in Exhibit A to seek punitive damages or other damages at a later date; and (4) for all other similarly situated *Burnett* Plaintiffs to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

When previously awarding solatium damages in this case under 28 U.S.C. § 1605A(c), this Court has looked at the framework established by District Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent

in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id*.  This formula, however, may be adjusted upward or downward when circumstances warrant.  *See, e.g., Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 1 50, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate.  In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer, "profound agony and grief and, [w]orse yet, . . . are faced with frequent reminders of the events of that day."  *See* ECF No. 2619 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the 9/11 Attacks and their indelible impact on the lives of the victims' families."  *Id*. at 11.  In that Report, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2619 at 11.

The solatium IIED damages suffered by the Moving Plaintiffs identified in Exhibit A before the Court in this application are legally and factually comparable to those suffered by the other plaintiffs in *Burnett* and the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, and *Hoglan* cases. Therefore, the Moving Plaintiffs identified on Exhibit A respectfully request that the Court grant

them awards of IIED damages in the same amounts awarded to solatium claimants under the terrorism exception.

## VI. Damages Should be Awarded to the Non-Immediate-Family-Member Plaintiffs Here who are Functionally Equivalent to Immediate Family Members of 9/11 Decedents.

In this Court's October 14, 2016 Report and Recommendation, adopted in pertinent part by Judge Daniels (ECF No. 3384), the Court recognized that, in addition to awarding damages to individuals considered traditional "family members," the Court may also award damages to non-immediate family members who meet certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with a September 11, 2001 decedent. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews, and cousins. *See* ECF No. 3363.

In that Report, the Court identified factors the Court would consider as relevant for determining whether, for awarding damages, a domestic partner would be considered the "functional equivalent" of a spouse and whether a stepsibling would be considered the "functional equivalent" of a sibling. The factors that the Court identified as relevant in the context of domestic partnership are "the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement." *Id.* at 14-15. The framework that the Court adopted in the context of step-relations is this: "… stepsiblings who became part of the family when the decedent was in early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who

were in the same range when the decedent became part of their family shall be deemed

fully equivalent to biological children," ". . . stepsiblings who became part of the family

when the decedent had passed early childhood but was still living in the family home

and undergoing secondary education (roughly ages 9 through 17) may be entitled to

solatium damages reduced by one-half, and stepchildren who were in this age range

when the decedent who became part of the family shall receive half damages as well,"

and ". . . stepsiblings who became part of the decedent's family when the decedent had

nearly finished his secondary education (roughly age 18 and above) and/or did not

cohabit with the decedent for a significant period of time will likely not be deemed

functional equivalents of immediate family members and shall not be illegible for

solatium awards, with the same being true for stepchildren who were this age when the

decedent became part of their family. In all cases, the Court will recommend solatium

awards only for those step-relatives that cohabited with the decedent and establish that

they otherwise had a close and longstanding relationship." *Id*. at 15-16.

The information in the accompanying declarations confirm that the Moving

Plaintiffs identified on Exhibit B meet the Court's prior standard for "functional

equivalence" entitling them to awards for IIED damages.

The losses claimed by the Moving Plaintiffs identified in Exhibit B are legally and factually

comparable to those suffered by other claimants previously awarded solatium damages in this

litigation under 28 U.S.C. § 1605A(c). The deaths here were sudden and unexpected and were the

result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose

deaths were intended to create an environment of fear and terror. The claimants here were not

attenuated victims — they had a familial relationship with the 9/11 decedent and were directly and irrevocably harmed by the terrorist acts and consequences. Accordingly, the presumptive values for solatium damages previously adopted by the Court for solatium damages under 28 U.S.C. § 1605A(c) should apply equally to claims for IIED for the Moving Plaintiffs on Exhibit B.

> **A.** **Solomon Gayle, Fiancé of 9/11 Decedent Seilai Khoo, Seeks a Determination that he is the Functional Equivalent of Seilai Khoo's Husband with a requested award of IIED damages of $12,500,000.**

As set forth in the Declaration of Solomon Gayle, attached as Exhibit C to the Eubanks Declaration, Mr. Gayle was the long-time domestic partner/fiancé of 9/11 decedent Seilai Khoo. Mr. Gayle and Ms. Khoo's backgrounds were diverse: Mr. Gayle was from Jamaica and was attending Columbia University playing soccer for the intercollegiate athletic team while Ms. Khoo was a Malaysian national who had been educated in the British system of education in Singapore prior to enrolling at Columbia University in New York. *See* Ex. C at ¶¶ 2, 3, 4, 6. Despite their differences, the similarities in their situations—being from tropical countries and educated in a similar secondary-school education while also both attending Columbia University in the Computer Science program—brought them together. *Id.* at ¶¶ 4-6. They became a couple in 1984, and they continued as a couple until Seilai Khoo's untimely death on September 11, 2001. *Id.* at ¶ 5.

While the two traveled extensively both locally and around the world together during their 17 years together, what truly made them a couple was how they supported each other in their careers and other life pursuits. For example, as Mr. Gayle began to know Ms. Khoo better while they were in college, he determined that the Computer Science program at Columbia University was not appropriately challenging her, and Mr. Gayle encouraged her to take classes in Economics because he believed that Seilai's intelligence and drive would translate well to working somewhere on Wall Street following graduation. *Id.* at ¶ 7. When Ms. Khoo was seeking her Chartered

Financial Analyst certification, Mr. Gayle was there to provide support and give her space to do the work needed to succeed. *Id.* at ¶ 13-14. And when Mr. Gayle sought to obtain more extensive professional knowledge about newer internet technologies, Ms. Khoo supported him spending a year in Silicon Valley gaining invaluable experience and then supporting him both emotionally and financially when he returned in 1997 and began to build an internet start-up company that required him to leave his full-time job. *Id.* at ¶¶ 18-23. And one of the reasons that Mr. Gayle returned to New York rather than relocating both of them to California was to allow Ms. Khoo to continue to build her career at Fred Alger Management where she rose to the rank of Executive Vice President and Portfolio Manager on the 93rd Floor of One World Trade Center at the time she was killed. *Id.* at ¶¶ 2, 19-20.

When it came to marriage, the couple discussed this frequently because they were completed committed to one another. *Id.* at ¶ 15. They often thought of simply going to the courthouse and making it "official" or getting married during some of their frequent international travels, but they had agreed to wait to get married until they had moved from their joint residence in Jersey City, New Jersey to a new home in New York such that they could return from the wedding to their selected New York home. *Id.* at ¶¶ 15-17. Before Mr. Gayle went to California in 1996, he presented Ms. Khoo with an engagement ring to cement what they knew to be true— that they were husband and wife. *Id.* at ¶ 18. Dr. Kingsley Chin, who was friends with both Mr. Gayle and Ms. Khoo dating to their time at Columbia, wrote, "I closely witnessed the relationship they developed and shared over seventeen years, and cannot imagine any other situation [other than the terrorist attacks] that could have disrupted their strong partnership. Prior to SeiLai's tragic death on September 11, 2001, they were engaged and living together in their condominium in

Jersey City, and close friends and family member [were very aware that] their marriage and family plans were only being delayed because of career commitments." *Id.* at ¶ 24.

The couple lived together in Jersey City, New Jersey from 1992 until Ms. Khoo's death on September 11, 2001, and as mentioned above, they planned to move to new location in New York City together in the near future. *Id.* at ¶¶ 14, 17.  While the two did not commingle their finances, this was more cultural than anything else as Mr. Gayle—because of the pay disparity between Ms. Khoo's successful work in finance and Mr. Gayle's work in the technology sector, Mr. Gayle did not want people to believe he was with Ms. Khoo solely for her money in addition to Mr. Gayle's Jamaican male bravado, he wanted to be able to stand on his own two feet while also supporting Ms. Khoo's provision of monetary support to her family members from her earnings. *Id.* at ¶ 25. This support for Ms. Khoo leaving a legacy for her family extended into Ms. Khoo's Last Will & Testament which did not include funds for Mr. Gayle while naming him as the Executor which was something to which he readily agreed and supported. *Id.* at ¶ 26.  Despite not commingling their finances, they remained of the mindset of "what's mine is yours, and what's yours is mine." *Id.* at ¶ 27.

For Mr. Gayle, the "husband" title was less important than the relationship that he and Ms. Khoo shared—they lived as husband and wife in every meaningful way. *Id.* at ¶ 30.  They contemplated adopting so that the demands of pregnancy would not impact Seilai's work, but all of those dreams were shattered on September 11, 2001. *Id.*

For these reasons, Plaintiff Solomon Gayle meets all of the parameters set by the Court as the functional equivalent of a spouse to 9/11 decedent Seilai Khoo, and Plaintiffs submit that Mr. Gayle should be awarded solatium damages in the amount of $12,500,000.00.

**B.    Erica Zimmerman, Step-Daughter of 9/11 Decedent Kenneth William Basnicki, Seeks a Determination that she is the Functional Equivalent of Kenneth William Basnicki's Daughter with a requested award of IIED damages of $8,500,000.**

Erica Zimmerman is a Canadian citizen who lost her step-father, Kenneth William Basnicki, also a Canadian citizen who was the Financial Marketing Director for BEA Systems and was on a business trip to New York meeting with co-workers on the 106th Floor of the North Tower when it was struck by the first hijacked airlines on September 11, 2001. *See* Eubanks Dec., Ex. D (Declaration of Erica Zimmerman) at ¶¶ 1-2. At time, Erica Zimmerman was 21 years old, but she was approximately two years old when she was first introduced to man she refers to as "Dad" and four years old when her mother and Ken Basnicki were married. *Id.* at ¶¶ 3-4. As stated in her Declaration, "Kenneth was my father in every sense of the word. He sheltered me, fed me, clothed me and provided for me in every way a parent provides for their children. He provided emotional, moral and spiritual guidance to me until the day he died." *Id.* at ¶ 5. When Kenneth and her mother were married, Kenneth expressed his desire to adopt Erica; however, Canadian laws precluded such an adoption absent the permission of Erica's biological father. *Id.* at ¶ 9. Despite her biological father spending very little time with Erica while she was growing up and making no meaningful contribution to Erica's upbringing (including not providing financial support to Erica's mother after their divorce), Erica's biological father refused to grant the required permission for the adoption to proceed. *Id.* at ¶¶ 9-11. Kenneth, on the other hand, provided for Erica's every need, declared her as his dependent on his tax returns, identified her as his child in his Last Will & Testament, and filled every role in Erica's life that a father would fill. *Id.* at ¶¶ 5-6, 8, 12. As a testament to his role as Ms. Zimmerman's dad, an obituary for Mr. Basnicki ran in the Union Daily Times on November 8, 2001 entitled "Still and Inspiration" providing quoted insights into Ms. Zimmerman's view of her father. In the article, she is quoted (under the name

Erica Basnicki) as saying, "[i]t's pretty normal to not listen to what your father has to say.  Now it's funny how many times I say, 'Dad always said this.' I actually listen to him more now."[5] In addressing her hope of studying journalism in New York, she stated, "[t]he best way to honor my dad for me is to not be scared, and to live and go to school in New York….  I know my dad's fighting for me somehow.  He'll work his magic, and I'll work my magic over here."[6]  She remains "guided by the love, kindness, understanding and family values shown me by Kenneth, and I am the woman I am today because Kenneth was my father." Ex. D at ¶ 13.

For these reasons, Plaintiff Erica Zimmerman a/k/a Erica Zimmerman-Basnicki meets all of the parameters set by the Court as the functional equivalent of a child to 9/11 decedent Kenneth William Basnicki, and Plaintiffs submit that Ms. Zimmerman should be awarded solatium damages in the amount of $8,500,000.00.

**VII.    Plaintiffs will Seek Punitive Damages at a Later Date.**

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See, e.g*., ECF No. 3666 (Judge Daniels order in *Burnett*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

**VIII.   The Court Should Award Prejudgment Interest at 4.96 Percent Per Annum, Compounded Annually to all of the claims from September 11, 2001 Through the Date of Judgment.**

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries

---

[5] *See* "Kenneth Basnicki Obituary: Still an Inspiration," published by Union Daily Times on Nov. 8, 2001, accessed at  https://www.legacy.com/us/obituaries/uniondailytimes/name/kenneth-basnicki-obituary?pid=128867  (last visited June 19, 2024).

[6] *Id.*

caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14). This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). *World Trade Farmers Market, Inc. v. American Airlines, Inc*. (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619, *66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id.* Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' 9/11 claims. *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiffs identified in Exhibits A and B respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## CONCLUSION

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11-related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Moving Plaintiffs on Exhibit A respectfully request that this Court award them IIED damages of $12,500,000 per spouse, $8,500,000 per parent, $8,500,000 per child, and $4,250,000 per sibling. Furthermore, the Moving Plaintiffs on Exhibit B respectfully request that the Court recognize them as functional equivalents of immediate family members of their 9/11 decedents and award them IIED damages in the amounts requested. All of the Moving Plaintiffs also request that the Court: (1) award prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (2) grant permission for the Moving Plaintiffs to seek punitive damages or other appropriate damages at a later date; and (3) grant permission for all similarly situated *Burnett* Plaintiffs o submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  June 19, 2024

Respectfully submitted,

MOTLEY RICE LLC


*/S/ John M. Eubanks*
John M. Eubanks, Esq.
Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
John C. Duane, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
Email: jeubanks@motleyrice.com

*Attorneys for Plaintiffs*