UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-1570 (GBD) (SN)

**PUBLIC REDACTED VERSION**

**DEFENDANT DALLAH AVCO TRANS ARABIA COMPANY'S
RESPONSE TO PLAINTIFFS' AVERMENT OF FACTS**

March 4, 2024
New York, New York

Robert K. Kry
Eric R. Nitz (*pro hac vice*)
MOLO LAMKEN LLP
600 New Hampshire Ave., Suite 500
Washington, D.C.  20037
(202) 556-2000
rkry@mololamken.com

*Attorneys for Defendant
Dallah Avco Trans Arabia Co.*

Defendant Dallah Avco Trans Arabia Co. ("Dallah Avco") respectfully submits the following response to Plaintiffs' Corrected Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco (Dkt. 9541-1).

Dallah Avco responds below only to those paragraphs that specifically relate to Dallah Avco, i.e. ¶¶ 627-723, 874-875, and 1189-1190. Dallah Avco incorporates the Kingdom of Saudi Arabia's responses to all paragraphs to the extent those responses support Dallah Avco's position. Citations to "DA SMF ¶__" are to paragraphs of Dallah Avco's Rule 56.1 Statement of Material Facts (Dkt. 9393) and incorporate by cross-reference all exhibits cited in the paragraphs listed.

Dallah Avco responds only to instances where plaintiffs' statements are not supported by the evidence cited. To the extent plaintiffs' statements may be supported by the evidence cited but contradicted by other evidence, Dallah Avco has not attempted to marshal all contradictory evidence in light of the posture of the case, and does not concede that no such evidence exists.

Certain responses state that there is no evidence that Dallah Avco knew about a particular fact. Those responses are for emphasis only and are not a concession that Dallah Avco knew about facts in other statements.

References to the inadmissibility of evidence are for emphasis only. Dallah Avco's evidentiary objections are set forth in Exhibit 102 to the Reply Declaration of Eric R. Nitz.

## RESPONSES TO AVERMENTS OF FACT

627.    Omar al-Bayoumi began working in the Jeddah office of the Presidency of Civil Aviation (PCA), a branch of the Saudi Ministry of Defense, in 1977 and remained on the books as an employee until his retirement in April 2014. Ex. 195, KSA 0629.

**Response:** Undisputed for purposes of this motion.

628.    In August-September 1993, Bayoumi took his first trip to the U.S.  Bayoumi claimed this was a solo, personal vacation in Florida for two months to study English.  Ex. 120, Bayoumi Dep. 35:4-37:14.  On August 25, 1993, while Bayoumi was in Florida, Mohamed al Salmi, the Director General of the PCA's Airways Engineering Department, requested Bayoumi be transferred from the Finance Department to the Airways Engineering Department.  According to Salmi, Bayoumi was needed to help "implement the financial procedures and financial contracts."  Ex 201, KSA 1054; Ex. 120, Bayoumi Dep. 38:15-43:11; Ex. 94, Anqari Dep. 24:18-27:17.

**Response:**  Undisputed for purposes of this motion.

629.    That was clearly not the actual reason for Bayoumi's transfer, however, because within four months after Bayoumi returned to Saudi Arabia from his Florida trip, Director Salmi began making arrangements for Bayoumi's move to San Diego.  Ex. 87, DA 2267.  From the outset, Bayoumi's Saudi Government work in California was handled surreptitiously and outside normal channels.  In January 1994, the PCA prepared and Director Salmi signed a "Purchase Requisition" for a "factory acceptance test" for an "air navigation project" with a PCA subcontractor; however, the funds were actually earmarked to pay for Bayoumi's travel to California, a weekly living allowance, and English training in San Diego starting in August 1994.  Ex. 88, DA 2268; Ex. 87, DA 2267; Ex. 94, Anqari Dep. 30:9-31:13; 156:3-23.  Saudi Arabia gave Bayoumi special treatment and permission to live and stay in California under unusual circumstances.  According to Abdul Aziz Abdul Kreem Al Anqari, the PCA's Assistant to the President of Civil Aviation, a Saudi Government employee such as Bayoumi could take only 30 days of leave per year.  Alternatively, the 30 days could be saved each year and then combined for a single leave of absence, but under no circumstances could an employee take

more than 90 days of leave in one year.  Any further leave would require an "exceptional leave" that if granted, would be unpaid.  Ex. 94, Anqari Dep. 238:21-240:16.

**Response:**  The cited evidence does not support the claim that "[t]hat was clearly not the actual reason for Bayoumi's transfer."  The cited evidence does not support the claim that Al Bayoumi's activities in California were "handled surreptitiously and outside normal channels." Al Salmi funded "between 45 and 50" other PCA students through the logistics budget by directing ANSS subcontractors to pay the expenses and reimbursing them.  PECs Ex. 125 at 48:6-49:4.  The cited evidence does not support the claim that "Saudi Arabia gave Bayoumi special treatment and permission to live and stay in California under unusual circumstances." The PCA granted Al Bayoumi 90 days of ordinary leave and then six months of extraordinary leave, consistent with Saudi regulations.  DA SMF ¶¶ 15-16, 92-96.

630.    The Saudi Government granted Bayoumi three times as much leave as the maximum permitted under its own regulations.  In August - September 1993, Bayoumi took a 51 day leave from the PCA Finance Dept., and from August 1994 to May 1995, Bayoumi was granted a 90-day leave and then two more 90-day exceptional leaves.  Ex. 283, KSA 4503, Ex. 207, KSA 4499; Ex. 208, KSA 4500; Ex 209, KSA 4501; Ex. 94, Anqari Dep. 253:4-254:25.  No explanation was provided by Saudi Arabia for this unusual accommodation for Bayoumi.  PCA Assistant President Anqari and head of human resources testified that Bayoumi was "an ordinary, low-level employee" and Bayoumi's job "was not of any special attention."  Ex. 94, Anqari Dep. 166:21-25, 196:5-11, 248:1-21, 319:3-320:19, 322:11-323:12, 327:18-329:25.

**Response:**  The cited evidence does not support the claim that the "Saudi Government granted Bayoumi three times as much leave as the maximum permitted under its own regulations" or that there was any "unusual accommodation for Bayoumi."  The PCA granted Al Bayoumi 90 days of ordinary leave and six months of extraordinary leave, consistent with Saudi

regulations.  DA SMF ¶¶15-16, 92-96.  The 51 days of ordinary leave that Al Bayoumi took in 1993 is irrelevant because, although Saudi law limits ordinary leave to a maximum of 90 days in any one year, it does not prohibit an employee from saving up more than 90 days and using them across multiple years.  DA Ex. 91 art. 28/4; PECs Ex. 94 at 238:21-239:18 (noting that some employees had saved up 150 days of ordinary leave but could only take 90 days per year).

631.    Bayoumi moved to California in August 1994.  Five months earlier in March 1994, Saudi Arabia specifically directed Avco Overseas, a Saleh Kamel affiliated company, to pay Bayoumi's tuition for a 27-week English language course plus a weekly living allowance for 30 weeks.  Ex. 87, DA 2267.  From the time of Bayoumi's arrival in August 1994, Saudi Arabia provided him with substantial funding through its longstanding agent in Newport Beach, California, a company called Ercan (aka Ercan Engineering, Inc. or Ercan, Inc.), which was owned by Magdi Hanna.  Ex. 86, Coombs Decl. 3-4.  The EO production revealed that in December 1992 Hanna, through Ercan, attempted to purchase military equipment for shipment to Saudi Arabia without obtaining the necessary U.S. export licenses.  Ex. 2, EO 2565.

**Response:**  The cited evidence does not support the claim that Avco Overseas was a "Saleh Kamel affiliated company."  Avco Overseas was an ANSS project subcontractor that had no corporate affiliation with Dallah Avco during the relevant period.  DA SMF ¶99.  The cited evidence does not support the claim that Ercan was an "agent" of Saudi Arabia, as opposed to a project subcontractor.   The cited evidence does not support the claim that Saudi Arabia funded Al Bayoumi through Ercan "[f]rom the time of Bayoumi's arrival in August 1994."  The PCA funded Al Bayoumi through Avco Overseas in 1994 and then funded Al Bayoumi through Ercan in 1995.  DA SMF ¶¶98, 102.  The FBI report is inadmissible, and in any case, does not affirmatively conclude that Hanna was purchasing military equipment without licenses, only that he was "reportedly" attempting to do so.  PECs Ex. 2V, EO 2565.

632.    Saudi Arabia was known to funnel kickbacks through Ercan and another Saudi contractor Dallah Avco Trans Arabia Company ("Dallah Avco" or "Dallah") to conceal the origin of funds and improperly pay Saudi officials.  Ex. 544, FBI 7995-REV2021 at 96.  For example, ████████████████████, a supervisor under the PCA's Air Navigation System Support ("ANSS") project reported money "regularly siphoned from PCA and diverted to upper management of PCA by manipulating invoices from subcontractors like Dallah Avco."  Ex. 544, FBI 007995-REV2021 at 96.  He further stated that "[t]hese invoices would be covered or marked on the books as local procurement."  Ex. 544, FBI 7995-REV2021 at 96.  He detailed a process where the President of the PCA may call Mohamed al-Salmi, Director General of Airways Engineering at the PCA and request cash.  Al-Salmi would approach ████ to create a fictitious purchase order which was then approved by Salmi.  ████ described this practice as "common at PCA, Dallah, and AVCO."  Ex. 544, FBI 7995-REV2021 at 96.  ████ also described "other allowances" at PCA that was basically providing a bonus or raise outside of the payroll system.  Ex. 544, FBI 7995-REV2021 at 96.

**Response:**  The FBI's interview memo for ████████████████ is inadmissible.  Ex. 544, FBI 7995-REV2021.  The interview memo does not show that Dallah Avco knew that Airways Engineering was using fictitious invoices to pay kickbacks to senior PCA officials.  ████████ does not say that he told Dallah Avco that the invoices were fictitious.  Dallah Avco had no responsibility for reviewing or auditing the invoices it processed; its job was simply to pay the invoices according to the terms the PCA had approved.  DA SMF ¶ 76.

633.    The Metropolitan Police Service recovered files belonging to Bayoumi including a May 1998 letter of recommendation Bayoumi obtained from Hanna stating that Hanna had known Bayoumi since August 1994, the same month that Bayoumi arrived in California.  Ex. 678U, MPS 732_21.  In November 1994, during his nine-day trip to Ercan's Newport Beach

Offices, PCA Logistics Manager Samuel Coombs, a former U.S. Army Logistics Major hired by the Saudi PCA, held meetings with Hanna and Bayoumi.  Ex. 86, Coombs Decl. 1 and 3.

**Response:**  Undisputed for purposes of this motion.

634.    When Coombs arrived at Ercan's office, he was met by Ercan's owner Magdi Hanna who took Coombs to an Ercan conference room where Hanna introduced Coombs to Bayoumi.  Ex. 86, Coombs Decl. 4.

**Response:**  Undisputed for purposes of this motion.

635.    Coombs reached out to greet Bayoumi, but Bayoumi refused to shake Coombs's hand, instead, condescendingly asking Coombs if he was Jewish.  Coombs said that Bayoumi was "pleased" to learn that Coombs was not Jewish.  Ex. 86, Coombs Decl. 4.

**Response:**  Undisputed for purposes of this motion.

636.    Coombs testified that "Bayoumi asked me about a request that he had placed for one new car for himself."  Coombs was unaware of Bayoumi's request and told Bayoumi that he would need to contact Director Salmi about the car.  Ex. 86, Coombs Decl. 4.

**Response:**  Undisputed for purposes of this motion.

637.    Hanna and Bayoumi had already been working together for some time.  Hanna told Coombs that Bayoumi was at Ercan that day because Bayoumi and his wife "wanted some additional furniture…"  Ex. 125, Coombs Dep. 171:14-21.  Hanna complained to Coombs that Bayoumi had been ordering Hanna around.  Ex. 86, Coombs Decl. 4.  Coombs testified that Hanna showed him an apartment complex in Costa Mesa, CA where Bayoumi had an apartment, and that Bayoumi "was nagging Mr. Hanna to get the apartment furnished with some nice furniture."  Ex. 86, Coombs Decl. 4.

**Response:**  Undisputed for purposes of this motion.

638.    Bayoumi's name was always the first name in the list of students contained in the logistics budget because his expenses were significantly higher than the rest of the students, Bayoumi claimed unusual additional expenses, and he was considerably older in age than the other students and a married man with children.  Ex. 86, Coombs Decl. 2; Ex. 125, Coombs Dep. 58:1-24 (stating that Bayoumi and his wife and kids were living with him in Southern California when he drove past their apartment years before Bayoumi's fake promotion to a "married status" position).

**Response:**  The cited evidence does not support the claim that Al Bayoumi's promotion to a married status position was "fake."   Under the ANSS contracts, all positions Levels A through E are "Married Status" positions that entitle employees to additional benefits for their families, while positions Levels F through N are "Single Status" positions that do not entitle employees to those additional benefits, regardless of whether they are in fact married.  DA SMF ¶¶33-34.  Al Salmi did in fact promote Al Bayoumi to a Level C married status position in May 2000.  DA SMF ¶¶159-160.

639.    Saudi Government supervisor PCA Director Salmi and another PCA officer both instructed Coombs to pay Bayoumi with funds from the PCA Logistics Department expense budget through Dallah Avco and Ercan in California.  Under this arrangement Saudi Arabia paid Bayoumi $60,000 per year through Ercan and Dallah Avco in 1996, when the annual amount paid to Bayoumi was raised to $90,000.  Ex. 86, Coombs Decl. 3; Ex. 125, Coombs Dep. 59:12-60:12.

**Response:**  The cited evidence does not show that Dallah Avco knew that these amounts were being paid to Al Bayoumi. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████. PECs Ex. 125 at 148:8-21.  Coombs never told Dallah Avco that Ercan had marked up

the goods on its invoices to account for the financial support it was providing to Al-Bayoumi. *Id.* at 148:22-149:2. Dallah Avco searched its files but found no payments to Ercan that mentioned Al Bayoumi. DA Ex. 9 ¶¶47-52; DA Reply Ex. 101 at 30:17-33:15 (1/18/17 Hr'g Tr.).

640. Coombs remembered the specific amount of Bayoumi's pay because Coombs's own salary at the time was $60,000 and Bayoumi was being paid the same amount for "expenses." Ex. 125, Coombs Dep. 59:12-21.

**Response:** Undisputed for purposes of this motion.

641. The amounts that Saudi Arabia was paying Bayoumi "amazed" Coombs and made him think "I … wish I had [Bayoumi's] job." Ex. 125, Coombs Dep. 59:22-60:12.

**Response:** Undisputed for purposes of this motion.

642. Bayoumi was paid "significantly higher" amounts than actual students being funded by the PCA. Ex. 86, Coombs Decl. 2.

**Response:** The cited evidence does not support the implication that Al Bayoumi was not an "actual" student. There is plenty of evidence that Al Bayoumi was an actual student. DA SMF ¶¶90-91, 121-126.

643. Bayoumi also sought reimbursement of unusual additional expenses, including payments for his wife to travel back and forth to Saudi Arabia, and cars for him and his wife. Ex. 86, Coombs Decl. 3.

**Response:** Coombs testified that Al Bayoumi requested one new car, so that his wife could have his existing car. PECs Ex. 86 at 3.

644. When Coombs complained to PCA Director Mohamed al-Salmi that Bayoumi's expenses were unusual and exorbitant, Coombs immediately "got corrected" by Salmi. Salmi told Coombs that Salmi wanted Bayoumi to stay in America, and instructed Coombs not to raise

questions, because: "that's not for you to worry about."   Ex. 125, Coombs Dep. 131:14-20, 139:17-20.

**Response:**  Undisputed for purposes of this motion.

645.    In April 1995, PCA Director Salmi issued a letter to Hanna of Ercan outlining the financial support to be provided to Bayoumi by Ercan.  Ex. 125, Coombs Dep. 147:13-23.

**Response:**  Undisputed for purposes of this motion, although Coombs might be referring to Al Salmi's February 1995 letters at DA Ex. 90.

646.    Saudi Arabia told Hanna that his deal with Saudi Arabia was premised on Hanna's agreement to support Bayoumi inside the U.S.  At Saudi Arabia's suggestion, Hanna and Saudi Arabia agreed that Hanna would mark up the cost of goods Ercan sold to Saudi Arabia to cover the added expenses for supporting Bayoumi.  Ex. 125, Coombs Dep. 148:13-21.

**Response:**  Undisputed for purposes of this motion, but there is no evidence that Dallah Avco knew about this exchange.  Coombs testified that he never told Dallah Avco that Ercan had marked up the goods on its invoices to account for the financial support it was providing to Al Bayoumi.  PECs Ex. 125 at 148:22-149:2.

647.    Saudi Arabia also arranged for Hanna to pay Bayoumi personally and directly in cash, rather than by check through Ercan.  Ex. 544, FBI 7995-REV2021 (PCA supervisor ████████████ describes how Hanna paid Ercan funds via cash payments).

**Response:**  The FBI's interview memo for ████████████ is inadmissible.  There is no evidence that Dallah Avco knew about this exchange.

648.    In March 1996, PCA Director Salmi instructed that all checks payable by the PCA to Ercan should be issued instead to Ercan's principal, Magdi Hanna.  On that occasion, Salmi redirected a total of nearly $800,000 in funding for Ercan to Hanna personally.  Ex. 440, DA 10582; Ex. 544, FBI 7995-REV2021.

**Response:** Undisputed for purposes of this motion.  The FBI's interview memo for ███████████████ is inadmissible.

649.    ███████████████████████████, a PCA supervisor who worked under ████████, admitted to the FBI that PCA Director Salmi instructed Ercan to pay Bayoumi $10,000 per month in cash.  ████████ was personally aware that Hanna provided Bayoumi approximately $10,000 in cash each month at the request of PCA Director Salmi during the period Hanna had the contract with the Saudi PCA.  According to ████████, Hanna laundered money through businesses in California to "funnel … payments" to Bayoumi.  ████████ also told the FBI that PCA Director Salmi provided Bayoumi a "stipend" of $5,000 per month but was unsure whether that stipend was paid simultaneously with the other monthly amounts.  Ex. 544, FBI 7995- REV2021.

**Response:**  The FBI's interview memo for ███████████████ is inadmissible.  There is no evidence that Dallah Avco knew about the payments through Ercan.

650.    Coombs testified based on his personal observations that it was "clear … that Mr. Bayoumi knew Mr. Hanna" and explained that the two men "knew each other because Al-Salmi had hooked them up because that's where he [Bayoumi] was getting his money, was through them, and his apartment and stuff like that that was all being paid through Ercan."  Ex. 125, Coombs Dep. 171:22-172:4.

**Response:**  Undisputed for purposes of this motion.

651.    Bayoumi's handwritten address book, and Bayoumi's typed January 2000 and October 2000 phone lists, each contain Ercan's office and fax numbers and Magdi Hanna's home and cell numbers.  Ex. 12AA, MPS738_26; Ex. 12BB, MPS 688_7 (January 2000 typed list); Ex. 421, FBI 000345-49 at 0347 (Omar's Phone Book October 4, 2000).

**Response:**  Undisputed for purposes of this motion.

652.    Within his typed January and October 2000 phone number lists, Bayoumi also included driving instructions to the office of Ercan and Hanna in Newport Beach, California.  Ex. 421, FBI 000345-49 at 347 (October 2000 typed list).

**Response:**  Undisputed for purposes of this motion.

653.    The available phone records show that Bayoumi made 21 calls to Hanna's cell and home phone and Ercan's office numbers in 1999-2000.  Bayoumi, Hanna, and Ercan likely exchanged numerous additional calls as the production did not include calls placed by Ercan or Magdi Hanna and included only a fraction of the time that Bayoumi worked with Magdi Hanna between 1994 and 2001.  Ex. 12R (Bayoumi calls to ERCAN and Magdi Hanna).

**Response:**  The cited evidence does not support the claim that "Bayoumi, Hanna, and Ercan likely exchanged numerous additional calls."

654.    At his deposition, Bayoumi claimed he did not know Magdi Hanna and could not recall meeting or speaking with him, collecting any money from Ercan, or having any contact with Ercan or employees of Ercan.  Ex. 120, Bayoumi Dep. 101:13-102:1, 102:21-103:7, 104:16-105:3.  Bayoumi also claimed that he could not recall driving to Ercan's offices and had never been to Newport Beach, CA — even though Bayoumi had written down the driving instructions to the Ercan office in both his January 2000 and October 2000 phone lists and Samuel Coombs met Bayoumi and Hanna at Ercan's Newport Beach office in 1994, during Coombs' only trip to Ercan in Southern California during his employment with PCA.  Ex. 120, Bayoumi Dep. 103:15-104:15; Ex. 86, Coombs Decl. 3-4.

**Response:**  Undisputed for purposes of this motion.

655.    In July 1997, Bayoumi signed his U.S. Department of Justice Immigration and Naturalization Service immigration form to maintain his student visa.  Bayoumi certified on that form that he had $27,858 for his costs to maintain himself as a student for nine months in the

U.S. and that he was receiving the "[f]unds from another source" specifically: "Sponsor: ERCAN". Ex. 311, MPS720_6.

**Response:** Undisputed for purposes of this motion.

656.    In May 1998, Hanna wrote Bayoumi a letter of recommendation on Ercan stationery stating that he had known him since August 1994. Ex. 678U, MPS 732_21.

**Response:** Undisputed for purposes of this motion.

657.    Coombs, who personally met Bayoumi and Hanna together and saw their interactions, testified that Bayoumi's claim that he did not know Magdi Hanna was a lie and that "[h]e [Bayoumi] knew him [Hanna]." Ex. 125, Coombs Dep. 171:11-172:16. In February and September 1997, Bayoumi submitted INS Form I-20, Certificate of Eligibility for Non-Immigrant (F-1) Student Status, confirming his enrollment at United States International University ("USIU") and claiming that he was receiving funding from Ercan for tuition and living expenses. Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 488, FBI 001370-73 (Bayoumi's INS Forms I-20 listing Ercan as his "means of support" in February and again in September 1997, indicating Ercan was providing support in the amount of $27,858).

**Response:** Undisputed for purposes of this motion.

658.    In March 2000, Bayoumi prepared an INS Form I-20 stating he would receive $29,535 in funding from Ercan for his tuition and living expenses, Ex. 211, KSA 6642-65 at 61, and shared that INS form with his work colleagues at the Saudi Consulate in Los Angeles. Ex. 211, KSA 6642-65 at 61.

**Response:** The cited evidence does not show that the employees at the consulate were Al Bayoumi's "work colleagues."

659.    The FBI recovered "numerous copies of communications between PCA and ERCAN dealing with purchase requests for procurement actions" including a letter from Saudi

Arabia to Hanna requesting that he pay for Bayoumi's expenses.  Ex. 523, FBI 003891 (noting the attachment of copies of these numerous communications).

**Response:**  The FBI report is inadmissible.

660.    After 9/11, a criminal complaint was filed in the Southern District of California charging Bayoumi with the felony of fraud and misuse of immigration documents.  18 U.S.C. § 1546.  Ex. 488, FBI 1370-73; Ex. 5, Youssef Rpt. pp. 74-75.  When it was learned that Bayoumi was no longer in the U.S. and not likely to be extradited on these charges, the Complaint was dropped.

**Response:**  Undisputed for purposes of this motion.

661.    While Saudi Arabia was providing Bayoumi with funding through Ercan and Dallah, the Saudi government also placed Bayoumi on Dallah Avco's payroll.  Ex. 2, EO 3326 ("Al-Bayoumi's rental application form listed his occupation as Assistant to the Director of Finance, DALLAH AVCO, Jeddah, Saudi Arabia.").

**Response:**  The FBI report is inadmissible.  The cited evidence does not support the claim that Al Bayoumi was ever "on Dallah Avco's payroll" or that he was an "Assistant to the Director of Finance, DALLAH AVCO."  Al Salmi assigned Al Bayoumi to various positions on the ANSS project, and Dallah Avco processed Al Bayoumi's payroll as an ANSS project employee, subject to reimbursement by the PCA.  SMF ¶¶114, 117-120, 150-152.  Plaintiffs admit in their memorandum that it "appears to be true" that Al Bayoumi was not a Dallah Avco employee.  PECs Opp. 25.

662.    Dallah Avco is a subsidiary of Dallah Al Baraka Group LLC ("DABG") and Saudi government contractor specializing in providing services to Saudi Arabia's civil aviation agency, the Presidency of Civil Aviation ("PCA").  *In re Terrorist Attacks on September 11,*

*2001*, 11-3294-cv(L), Appellee Dallah Avco Trans Arabia Co. Ltd.'s Brief with Respect to Personal Jurisdiction, ECF No. 479 at 1-2; Ex. 111, Khalifa Dep. 22:16-25:17.

**Response:**  Undisputed for purposes of this motion.

663.    DABG was founded by Saleh Kamel, who the CIA has identified as a key figure in the al-Qaeda support network that provided widespread funding to al-Qaeda, National Islamic Front, Hamas and various mujahidin groups.  Ex. 83, CIA-SUB_0020-30 at 0024; Ex. 78, CIA 720-804 at 741; Ex. 79, CIA 807-848 at 809, 823.

**Response:**  The cited CIA reports are inadmissible and unreliable and do not support the claim that Saleh Kamel was a "key figure in the al-Qaeda support network that provided widespread funding to al-Qaeda, National Islamic Front, Hamas and various mujahidin groups." Plaintiffs previously sued Dallah Al Baraka and Sheikh Saleh Kamel over allegations that they supported Al Qaeda, including allegations mentioned in the CIA reports.  This Court dismissed all claims against both defendants, and the Second Circuit affirmed.  Dkt. 632 at 59-60 & Dkt. 2312 at 33-34, *aff'd*, 714 F.3d 118 (2d Cir. 2013).

664.    Dallah generally filled vacancies, payroll processing, and administrative support for the PCA's ANSS project, in Saudi Arabia.  Ex. 111, Khalifa Dep. 30:3-34:14, 51:16-52:21. Dallah had no role in recruiting local (Saudi) recruits for the PCA, such as Omar Al Bayoumi, as the PCA would handle that themselves.  Ex. 111, Khalifa Dep. 39:4-20.

**Response:**  Undisputed for purposes of this motion.

665.    Saudi Arabia used Ercan and Dallah Avco to sustain Bayoumi in the United States.  Saudi Arabia purportedly could not second Bayoumi to an American company under Saudi law.  *See* Ex. 448, MPS 727_176; Ex. 678Q, MPS 727_178; Ex. 678P, MPS 727_145.[1]  So while Ercan would have attracted less attention as a cover for Bayoumi to carry out his true mission as a Saudi government agent, given its physical presence in the United States, Dallah

was chosen instead because of its ongoing relationship with a U.S. subcontractor through the ANSS project in the United States.  ECF No. 2927-2, para. 7-9; Ex. 5, Youssef Rpt. 73-75.

**Response:**  The cited portions of the Graham declaration (ECF No. 2927-2) and the Youssef Report (PECs Ex. 5) are inadmissible.  The cited evidence does not support the claims that "Ercan would have attracted less attention as a cover for Bayoumi to carry out his true mission as a Saudi government agent" or that "Dallah was chosen instead because of its ongoing relationship with a U.S. subcontractor through the ANSS project in the United States."

665 fn.1.  The May 11, 1995 letter from Ercan owner Magdi Hanna requesting that Bayoumi be seconded to Ercan should be understood as originating from the PCA.  That is Saudi Arabia's general practice with respect to its contractors.  Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13-207:23.  This is further supported here because Hanna "was very frustrated" by Bayoumi, "that he didn't want to take orders from him.  He didn't want to do what he wanted him to do.  And everything in – Omar would come to him and tell him things that he wanted, and ANSS [sic: Hanna] didn't want to do [it]."  Ex. 125, Coombs Dep. 168:21-169:6; Ex.86, Coombs Decl. 4.

**Response:**  Undisputed for purposes of this motion.

666.  Bayoumi was apparently not the only Saudi government official assigned to work in San Diego who was separately paid through Dallah Avco.  The EO production included an FBI report that in September 1998, Dr. Soliman Al-Ali aka Soliman Ali Elay, together with Bayoumi, submitted a joint lease application for an apartment in La Jolla, California where Al-Ali would live in 1998-1999.  On the joint lease application Al-Ali and Bayoumi listed Dallah Avco as their employer.  ("Elay listed his business occupation as a consultant for DALLA Co., Saudi Arabia.");  Ex. 2, EO 3553 ("During this time Albayoumi and Alali listed their employment with Dalla Company, Saudi Arabia");  Ex. 543, FBI 007968-REV2021 (realtor had

seen the name "Omar AL-BAYOUMI" on the rental application).  At this time, Al-Ali was also

an employee on the payroll of the Saudi Embassy in Washington, D.C.  Ex. 145, KSA 7506-

7522 at 7521 (showing Al-Ali receiving a 2000 bonus).  *See also* Ex. 2, EO 1609 (fraudulently

listing "Mana Life" as his employer).

**Response:**  The citation for the first quotation is missing, but the quotation appears to be

from PECs Ex. 2AA at EO 3326.  The cited FBI reports are inadmissible.  The claim that Al-Ali

identified himself as a "consultant" for "DALLA Co." on a lease application does not show that

Al-Ali was a "Saudi government official assigned to work in San Diego who was separately paid

through Dallah Avco."

667.    Bayoumi's arrangement with Dallah Avco began in June 1995 and was renewed

annually and approved each year by the Saudi Deputy Minister of Defense.  Ex. 277, KSA 4345

(PCA decides to extend in 1999), Ex. 278, KSA 4346 (no objection from Deputy Minister of

Defense), Ex. 279, KSA 4350 (1998 extension), Ex. 280, KSA 4353 (noting 1999 is the "fourth

extendable year").  FBI records describe the arrangement as "an informal agreement" between

Dallah and the PCA.  Ex. 469, FBI 000281 at 282.

**Response:**  Undisputed for purposes of this motion.

668.    On May 24, 1995, Alawi Mohamed Saeed Kamel (Managing Director of Dallah

Avco and nephew of Saleh Kamel) sent a letter to the President of Civil Aviation, informing that

Dallah Avco is currently in an "urgent need of the services of employee Mr. Omar Ahmed

Mustafa al Bayoumi as an accountant."  Ex. 181, Kamel Exhibit 121 (KSA 1029).

**Response:**  The cited document does not state that "Dallah Avco" was in "urgent need of

the services of employee Mr. Omar Ahmed Mustafa al Bayoumi."  The letter states that "Dallah

Avco's ***air navigation system support project*** is currently in urgent need of the services of the

16

Presidency's employee, Mr. Omar Ahmed Mustafa Al-Bayoumi."  DA Ex. 37 (emphasis added);
PECs Ex. 181; *see also* PECs Ex. 103 (Kamel Dep.) at 198:20-199:12 (objection to translation).

669.    Dallah's 30(b)(6) witness, Ammar Kamel believes that despite the letter
seemingly coming from Dallah "the PCA must have initiated the secondment" and "understands
the reference in the letter to an 'urgent need' for Al-Bayoumi to refer to the PCA's urgent need
to have Al-Bayoumi placed on the ANSS Project."  Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel
Dep. 171:17-23; 196:13-207:23.

**Response:**  Undisputed for purposes of this motion.

670.    The ANSS project is based in Saudi Arabia, and nearly all of those who worked
on that project were PCA employees working in Saudi Arabia.  Ex. 111, Khalifa Dep. 30:14-
34:21, 55:11-23, 76:3-21.  There is no part of the ANSS project that would entail an employee
performing work in the United States over a period of years.  Ex. 111, Khalifa Dep. 76:23-77:5.
Further, no Dallah Avco employees servicing the ANSS project would involve any work in the
United States.  Ex. 111, Khalifa Dep. 90:16-24.  In fact, according to Dallah's chairman of the
board, Dallah "has never been licensed or registered to do business in the United States," "never
carried any activity at any time in the U.S.A.," "has never owned or leased property in the United
States," "has never offered or advertised any activities or services within the United States," "has
never had a branch office" in the United States, and has never had "a representative, an employee
or an agent in the United States."  ECF No. 1712-2.

**Response:**  Undisputed for purposes of this motion.

671.    PCA Director Salmi never informed PCA Logistics Manager Coombs that
Bayoumi was also on Dallah Avco's payroll and thus receiving a salary and benefits on top of
the other funds that he received from Ercan and Dallah Avco.

**Response:**  Undisputed for purposes of this motion.

672.    When shown the records of Bayoumi's arrangement, Coombs described it as "outside of the box" and "double-dipping."  Ex. 125, Coombs Dep. 39:21-40:22; 45:16-22, 159:17-160:14.  Coombs had never heard of such an arrangement being made for a PCA official.  Ex. 86, Coombs Decl. 3.  Coombs testified that these payments were made through a U.S. bank to Bayoumi.  Ex. 125, Coombs Dep. 36:8-37:25.  Coombs also testified before the 9/11 Commission and FBI about his time at the PCA that "something didn't seem right to me.  It was out of line."  Ex. 125, Coombs Dep. 67:24-68:10.

**Response:**  The cited evidence does not support the claim that "Coombs testified that these payments were made through a U.S. bank to Bayoumi."  The cited portion of Coombs's testimony discusses the 1994 payment that Al Salmi directed ***Avco Overseas*** to make to Al Bayoumi.  PECs Ex. 125 at 35:5-37:24.  That payment was made by Avco Overseas, not Dallah Avco (although Dallah Avco reimbursed Avco Overseas and then invoiced the PCA pursuant to the ANSS logistics process).  DA SMF ¶¶ 72-76, 98-100; DA Exs. 49-50.  Coombs initially testified that the payment was made "through the American side of Dallah Avco," PECs Ex. 125 at 36:12-37:1, but he later clarified that he meant Avco Overseas, not Dallah Avco, *id.* at 117:3-117:17 ("I'm sorry I said it that way, but it was Avco Overseas Services, yes.").  The reference to Coombs's testimony that "something didn't seem right to me.  It was out of line," refers to the spreadsheets that Coombs kept in which he tracked the amounts of logistics funds spent on educational expenses for PCA students.  PECs Ex. 125 at 67:7-68:6.  Coombs admitted that he never shared those spreadsheets with Dallah Avco.  *Id.* at 178:5-12.

673.    Saudi Arabia claims that Bayoumi's arrangement with Dallah Avco was a "secondment," KSA Aver. ¶¶ 20, 21, 24, but Bayoumi's arrangement was atypical and barred by Saudi Arabia's own procedures.

**Response:** The paragraph cites no evidence for the claim that "Bayoumi's arrangement was atypical and barred by Saudi Arabia's own procedures."

674.    Saudi Arabia's policy was to forbid Saudi Government officials (such as Bayoumi) to be "seconded" to pursue their education if that education was paid for by the Saudi government.  Ex. 94, Anqari Dep. 245:3-8, 269:1-270:22, 387:9-388:1.  Saudi Arabia paid for Bayoumi's education, not Dallah Avco; therefore, secondment would not normally have been allowed.  Ex. 103, Kamel Dep. 114:3-14; Ex. 427, DA 0092 ("the cost of [Bayoumi's] studies were not charged to Dallah Avco but to the [PCA]").  PCA Director Salmi issued his first direction to Dallah Avco in July 1995 (effective June 6, 1995), for Dallah Avco to add Bayoumi to its payroll as a full-time employee working as a "Senior Data Processing Technician" on an Air Navigation System Support (ANSS) airport project located in "JED" - Jeddah, Saudi Arabia. Ex. 433, DA 1016; Ex. 94, Anqari Dep. 88:20-89:14.

**Response:** There is no evidence that Dallah Avco was aware of any Saudi government policy that seconded employees could not pursue educational studies if those studies were ultimately funded by the government.  The Saudi secondment regulations contain no such requirement.  DA Ex. 71 at KSA0000000937.  The educational leave regulations state that such leave is "without pay," but that limitation means only that the employee's civil service salary must be suspended, not that the employee cannot receive funding through other sources.  DA Ex. 91 art. 28/19; DA Ex. 1 ¶194.  The cited evidence does not support the claim that Al Salmi directed Dallah Avco "to add Bayoumi to its payroll" as opposed to the ANSS project payroll.

675.    However, as Dallah itself knew, Bayoumi performed no work for Dallah Avco. *See* 9/11 Commission Rpt. at 515 n. 18; Ex. 429, DA 0329; Ex. 125, Coombs Dep. 155:16-157:9; Ex. 120, Bayoumi Dep. 73:7-75:11.  FBI documents further confirm that Dallah had at least 50 "ghost employees" on its books to conceal their mission in foreign countries, including

Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay.  Ex. 319, PEC-KSA 000441 at 43; Ex. 125, Coombs Dep. 48:6-49:4; Ex. 2, EO 3326; Ex. 293, KSA 7791.

**Response:**  The cited evidence does not support the claim that "Dallah had at least 50 'ghost employees' on its books to conceal their mission in foreign countries."  When questioned about that claim at his deposition, Coombs (the source of the "ghost employees" remark) clarified that those "ghost employees" were all students, that he used the terms "ghost employee" and "student" interchangeably, that he had no first-hand knowledge of what the students were doing, and that he called them "ghost employees" only because several of them did not return to the PCA after finishing their studies.  PECs Ex. 125 at 134:18-137:10.  The cited evidence also does not support the claim that Dallah Avco had those employees on its books "to conceal their mission in foreign countries."  The cited evidence does not support the claim that "Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay" was one of those students or "ghost employees," that he was a "Saudi embassy officer," or that he had any connection to the PCA, the ANSS project, or Dallah Avco at all.  The cited FBI reports and the cited reference in the 9/11 report are inadmissible.

676.    Director Salmi entered similar orders to Dallah Avco to pay Bayoumi for ANSS jobs in the Kingdom in each year that Bayoumi continued to work for Saudi Arabia in the U.S. These jobs included not only Senior Data Processing Technician, but also "PCA/AE Budget Coordinator" and "DSS Programmer."  Dallah Avco had none of these positions, and Bayoumi's role within the ANSS project did not change.  Ex. 111, Khalifa Dep. 89:3-91:23.  And there would be no need to second a PCA employee to Dallah Avco to work in the United States.  Ex. 111, Khalifa Dep. 98:10-99:20.

**Response:**  The cited evidence does not support the claim that "Dallah Avco had none of these positions" to the extent that statement is meant to suggest that those were not ANSS project

positions.  The ANSS contracts show that those were in fact ANSS project positions.  *See, e.g.,* DA Ex. 10 at KSA0000002315-16 (ANSS IV manning chart listing various "DSS/Programmer" positions); DA Ex. 11 at KSA0000003361 (ANSS V manning chart listing "PCA/AE Budget Coordinator" position).  The cited testimony addresses only whether those were positions at Dallah Avco itself, as opposed to ANSS project positions.  The cited testimony also does not support the claim that "there would be no need to second a PCA employee to Dallah Avco to work in the United States."  The testimony discusses only secondment of an employee to work at Dallah Avco itself, not secondment of an employee to work on the ANSS project.

677.    Bayoumi, together with another PCA official Alp Karli, routinely prepared false time records to show that Bayoumi was working in Jeddah, Saudi Arabia on these jobs when in fact he was working as a clandestine agent for the Saudi Government in San Diego.  Bayoumi signed these false records but never held any of these jobs.  Ex. 429, DA 0329, Ex. 125, Coombs Dep. 155:16-157:9; Ex. 120, Bayoumi Dep. 73:7-75:11.

**Response:**  The cited evidence does not support the claim that the timesheets were "false" or that they "show[ed] that Bayoumi was working in Jeddah, Saudi Arabia."  The timesheets state only that the "ANSS Program" was based in "Jeddah, Saudi Arabia," not that Al Bayoumi was located there.  PECs Ex. 429 at DA000371 *et seq.*  The cited evidence does not show that Al Bayoumi "was working as a clandestine agent for the Saudi Government in San Diego."  The cited evidence also does not show that Al Bayoumi "never held any of these jobs," although concededly, he was pursuing educational studies in the United States rather than performing the job functions typically associated with those positions.  DA SMF ¶ 121.

678.    The PCA determined the job titles that Bayoumi would receive, and all the amounts paid to Bayoumi by Dallah Avco, including Bayoumi's salary, housing allowance, other allowance, and transportation.  The PCA directed Dallah Avco to pay those amounts to

Bayoumi. Ex. 122, Khan Dep. 51:21-52:6, 152:3-154:9, 163:7-164:1; Ex. 428, DA 0099 (Khan Dep. Ex. 86).

**Response:** Undisputed for purposes of this motion.

679. In April 1999, however, the Chairman of the Board of Dallah Avco wrote to Saudi Arabia to terminate the secret arrangement and informed Saudi Arabia that it would no longer pay Bayoumi. Ex. 435, DA 1101; Ex. 436, DA 1102.

**Response:** The cited evidence does not support the claim that Al Bayoumi's secondment to the ANSS project was a "secret" arrangement. Alawi Kamel did inform the PCA in April 1999 that Dallah Avco did not want to renew Al Bayoumi's secondment for another year. PECs Ex. 435.

680. Saudi Arabia, via PCA Director General Salmi, immediately issued an order to Dallah Avco to take the steps necessary to keep Bayoumi on the payroll so that Bayoumi could "complete the task" assigned to him by the Kingdom. Ex. 437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 103, Kamel Dep. 180:10-182:3, 183:10-23. That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah. Ex. 182, Kamel Ex. 119 (DA 1110). On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 439, DA 1357.

**Response:** The cited evidence does not support the claim that Al Bayoumi's secondment was a "purported" secondment rather than an actual secondment.

681. From May 1999 through March 2000, Bayoumi attended seven continuing education short-courses run by ESI International (in association with George Washington

University).  Ex. 678AA, MPS732_821.  Paperwork submitted to the Saudi Embassy indicated that these seven short-courses, each lasting two to five days, amounted cumulatively to a "Master's Certificate in Project Management."  Ex. 680C, KSA 906-907.  Bayoumi's certificates show that only two of the short-courses were held in Washington, D.C., both in late June 1999, Ex. 680A, KSA 734, 736 (Bayoumi Washington, D.C. certificates), whereas most of them were held in San Diego, Ex. 680B, KSA 735, 737, 1835 (Bayoumi San Diego certificates).  Bayoumi completed his final short-course in San Diego between February 28 and March 3, 2000.  *Id.* at KSA 735.  Documents in the MPS production confirm that Bayoumi attended daily at a hotel in San Diego, Ex. 678Y, MPS732_361-368 (Bayoumi course paperwork, 02/28/00-03/03/00 in San Diego, CA), contrary to Bayoumi's claimed alibi that he went to Washington, D.C. for several weeks in February and March 2000.  Ex. 120, Bayoumi Dep. 474:21-476:16; Ex. 90, Snell Dec., Ex. 2 at 5.

**Response:**  There is no evidence that Dallah Avco ever received any records concerning Al Bayoumi's continuing education courses through ESI International in association with George Washington University from 1999 to 2000.

682.    Bayoumi returned to Saudi Arabia at the end of March 2000, as the funding arrangements that Saudi Arabia had made to pay Bayoumi through Dallah Avco were set to end, and reported in to PCA Director Salmi.  Ex. 94, Anqari Dep. 104:15-105:20.

**Response:**  Al Bayoumi's passport stamp shows that he returned to Saudi Arabia on March 11, 2000.  DA Ex. 79 at KSA0000008000.

683.    PCA Director Salmi reported that on April 15, 2000, Bayoumi was "back in service" at his job for the Kingdom in Saudi Arabia. Ex. 233, KSA 0989.

**Response:**  Undisputed for purposes of this motion.

684.    Bayoumi, Director Salmi, and the PCA's President, continued to work on the Saudi Government's plan for Bayoumi to return to the U.S. and on May 9, 2000, Bayoumi submitted a formal request to PCA Airways Engineering Director Mohamed al Salmi requesting an "unpaid study leave" to "complete my postgraduate study, PhD, in the United States of America." Ex. 228, KSA 0902.

**Response:**  Undisputed for purposes of this motion.

685.    Simultaneously, Bayoumi was filing documents with the PCA to attend a PhD program in the U.S. and filing visa paperwork with the U.S. Consulate in Jeddah.  Bayoumi did not reapply for a student visa but for a "B1/B2" business/tourist visa.  That visa was issued by the U.S. Consulate to Bayoumi on May 10, 2000.  Ex. 276, KSA 4337 (secondment); Ex. 66, KSA 0901 (Ex. 384); Ex. 452, KSA 8001.

**Response:**  Undisputed for purposes of this motion.

686.    Bayoumi's request to PCA Director Salmi for an "unpaid study leave" was supported by a forged document purporting to be a May 8, 2000, letter from George Washington University (GWU) accepting Bayoumi for its Ph.D. program.  Ex. 229, KSA 0903.

**Response:**  Undisputed for purposes of this motion, but there is no evidence that Dallah Avco ever received a copy of the purported acceptance letter.  DA Reply Ex. 98 (KSA0000000904) (cover note showing that letter was sent to PCA staff); PECs Ex. 120 at 685:19-686:9 (Al Bayoumi confirming that he never sent the letter to Dallah Avco).

687.    The forged letter was faxed on May 8, 2000 from a 703 area code number in Virginia to Bayoumi in Saudi Arabia.  The circumstances show that it is likely that Bayoumi called someone he worked with at the Saudi Embassy in Washington, D.C. to ask them to prepare the forged letter that Bayoumi needed to apply for the study leave.

**Response:** The cited evidence does not support the claim that "it is likely that Bayoumi called someone he worked with at the Saudi Embassy in Washington, D.C. to ask them to prepare the forged letter that Bayoumi needed to apply for the study leave."

688.    The GWU Registrar testified that the address on the letter did not belong to GWU, but to a separate company that ran a "Certificate Program" under GWU's name.  That Certificate Program included the 2–3-day lectures for which Bayoumi had previously received certificates.  Ex. 196, KSA 0734-7.  The GWU Registrar confirmed that the company operating the Certificate Program did not run any Ph.D. program for GWU and that the letter did not come from GWU.  Ex. 162, GWU Registrar Decl. ¶ 7-11.

**Response:** Undisputed for purposes of this motion.

689.    Bayoumi had other forged documents purporting to be from GWU that were recovered by the MPS.  Ex. 678X, MPS 732_307 (the MPS found in Bayoumi's possession an August 1999 letter on GWU "Law School" stationery signed by someone claiming to be the "Coarse [sic] Counselor" stating that Bayoumi "is enrolled in ESI International's Project Management Program and will be attending classes starting in September.").

**Response:** Undisputed for purposes of this motion, but there is no evidence that Dallah Avco ever received that letter either.

690.    On May 11, 2000, Salmi wrote to the PCA's Director of Personnel Affairs and Salaries stating that he had no objection to Bayoumi's 2-year educational leave request.  Ex. 66, KSA 0901 (Ex. 384).

**Response:** Undisputed for purposes of this motion.

691.    Bayoumi's atypical activities in the U.S. is demonstrated by the fact that his unpaid study leave request was promptly denied by PCA's Assistant President Anqari and

Human Resources department on May 16, 2000.  Ex. 94, Anqari Dep. 145:25-149:10; Ex. 200, KSA 0889, Ex. 199, KSA 0888.

**Response:**  The cited evidence does not support the claim that Al Bayoumi's activities in the United States were "atypical" or that this is the reason why the PCA's Assistant President Al Angari recommended denying Al Bayoumi's May 2000 request for an educational leave.  Al Angari testified that he recommended denial "possibly because of the budget and possibly because that position cannot remain vacant."  PECs Ex. 94 at 146:3-147:22.

692.    In rejecting the leave request, Anqari stated that Bayoumi had "enough leaves" and cited the money that PCA spent on Bayoumi's purported education as well as the job vacancy Bayoumi left open at the PCA in Saudi Arabia.  Ex. 94, Anqari Dep. 149:21-150:23, 153:15-23, 162:20-23.

**Response:**  Undisputed for purposes of this motion.

693.    But the highest-level officials at the PCA immediately intervened to provide Bayoumi with special treatment outside of PCA's normal practices.   Anqari's denial of Bayoumi's study leave "was overruled" by the PCA's President Ali Al-Khalaf, the "head of Civil Aviation."  Ex. 94, Anqari Dep. 163:19-164:2.  On May 23, 2000, the PCA issued a decree granting Bayoumi a two-year educational leave.  Ex. 431, DA 0548.

**Response:**  The cited evidence does not support the claim that the PCA gave Al Bayoumi "special treatment outside of PCA's normal practices."   Al Angari testified that his recommendation on the leave request was subject to review by the PCA's President and that the President overruled his recommendation.  PECs Ex. 94 at 146:14-23, 163:19-164:7.

694.    PCA Director Salmi also approved Bayoumi's study leave.  The applicable rules required that Bayoumi could only request and obtain an "*unpaid* study leave."  Ex. 228, KSA 0902 (emphasis added); Ex. 94, Anqari Dep. 238:21-240:16.

**Response:** The educational leave regulations state that leave is "without pay," but that limitation means only that the employee's civil service salary must be suspended, not that the employee cannot receive funding through other sources. DA Ex. 91 art. 28/19; DA Ex. 1 ¶194.

695.    But on May 29, 2000, PCA Director Salmi ordered that Bayoumi receive a "promotion" and substantial pay increase for a new job as a "Senior DSS Programmer" with Dallah Avco backdated to an effective date of April 13, 2000. Ex. 425, DA 0082.

**Response:** The cited evidence does not support the claim that "Senior DSS Programmer" was a job "with Dallah Avco." It was a position on the ANSS project. PECs Ex. 425; DA Ex. 11 at KSA0000003358 (ANSS V manning chart listing position).

696.    Plaintiffs' expert Youssef determined "[a]though Bayoumi had no actual accounting or other work to show for it, and had not been attending school, yet his total pay from Dallah Avco more than doubled from SAR (Saudi Riyals) 11,546 per month (U.S. $3,078) in March 2000, to SAR 24,075 ($6,420) in April 2000, to SAR 26,304 ($7,014) for each month in July through December 2000." The exchange rate of Saudi Riyals to U.S. Dollars is 3.75 Riyals to a Dollar. Ex. 5, Youssef Rpt. 80; Ex. 430, DA 0457-83 at 61-70.

**Response:** The sources cited by Youssef do not support his claim that Al Bayoumi "had no actual accounting or other work to show for it" and "had not been attending school." The evidence shows that Bayoumi did attend school during his five years of secondment. DA SMF ¶¶121-126. Undisputed for purposes of this motion that Al Bayoumi's pay "more than doubled from SAR (Saudi Riyals) 11,546 per month (U.S. $3,078) in March 2000, to SAR 24,075 ($6,420) in April 2000, to SAR 26,304 ($7,014)" as a result of the significantly increased "other allowances" that Al Bayoumi began receiving that month at the PCA's direction. DA Ex. 1 ¶145; DA SMF ¶¶153-169.

697.    Saudi Arabia did not produce any documents concerning Bayoumi's work or pay while he was at PCA headquarters for two months in April-May 2000.  PCA's Logistics Manager Samuel Coombs testified that the PCA office led by Salmi handled and used large amounts of cash in ways that were not always transparent or free of suspicion.  Ex. 86, Coombs Decl. 2.

**Response:**  Undisputed for purposes of this motion, but there is no evidence that Dallah Avco knew about the Airways Engineering Directorate's use of "large amounts of cash in ways that were not always transparent or free of suspicion."

698.    Bayoumi was paid SAR 24,885 ($6,636) per month from January 2001 to August 2001, which covered the time Bayoumi still lived in San Diego.  Bayoumi and his family moved out of their San Diego apartment on June 23, 2001.  Ex. 91, Ratchford Decl. ¶ 20.

**Response:**  Undisputed for purposes of this motion.

699.    Bayoumi's pay from Dallah Avco sharply decreased, reflected in his pay stubs, after September 2001.  September 2001 (SAR 12,033 - $3,209) Ex. 430, DA 0457-83 at 79; October 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 80; November 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 81; December 2001 (SAR 13,300 - $3,547) Ex. 430, DA 0457-83 at 82; January 2002 (SAR 12,667 - $3,378) Ex. 430, DA 0457-83 at 83.

**Response:**  Undisputed for purposes of this motion.

700.    In sum, Bayoumi received at least three separate streams of regular funding from the Saudi government through Saudi contractors (in addition to other funding sources): his ANSS salary through Dallah Avco payroll, his $90,000 per year education stipend through Dallah Avco and Ercan and ultimately paid out of the PCA logistics budget to cover expenses, and at least $15,000 a month in cash through Ercan.  Ex. 86, Coombs Decl. 3; Ex. 125, Coombs

Dep. 23:7:14, 58:25-60:12; Ex. 35, FBI 007995-7998 (Bayoumi Dep. Ex. 679); Ex. 320, PEC-

KSA1-000001-98 at 31; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680).

      **Response:** The cited evidence does not support the claim that Al Bayoumi received "at

least $15,000 a month in cash through Ercan" ***in addition to*** the other amounts described in this

paragraph. The FBI's interview memo of ███████████ states that Al Bayoumi

received "approximately $10,000 in cash per month at the behest of Al-Salmi during the time

that [Ercan] had the contract with PCA" and that "Mohamed Al-Salmi at PCA similarly provided

a monthly stipend to Al-Bayoumi of approximately $5,000 per month," but that "██████ was not

sure whether those stipends were paid simultaneously or not." PECs Ex. 35 at FBI 007997. The

former amount corresponds to the $90,000 per year ($7,500 per month) in logistics funding that

Al Bayoumi allegedly received through Ercan in 1996 and 1997, DA Ex. 8 at 3, while the latter

amount corresponds to the $3,400 to $3,800 per month in "other allowance" stipends that Al

Bayoumi received in 2000 and 2001, DA Ex. 20; DA Ex. 1 ¶145. Plaintiffs are double-counting

by claiming that these are all separate payments. In any case, the FBI's interview memo of

████████ is inadmissible. There is no evidence that Dallah Avco knew about any of the logistics

payments through Ercan. ████████████████████████████████████

████████████████████████████████████████████████████

PECs Ex. 125 at 148:8-21. Coombs never told Dallah Avco that Ercan had marked up the goods

on its invoices to account for the financial support it was providing to Al-Bayoumi. *Id.* at

148:22-149:2. Dallah Avco searched its files but found no payments to Ercan that mentioned Al

Bayoumi. DA Ex. 9 ¶¶47-52; DA Reply Ex. 101 at 30:17-33:15 (1/18/17 Hr'g Tr.).

      701. Saudi Arabia pressured Ercan and Dallah to continue paying and maintaining

Bayoumi's cover in the United States or risk losing substantial lucrative contracts with the Saudi

government. Ex 319, PEC-KSA 000441-43 at 42; Ex. 84, Congressional Joint Inquiry Excerpt –

"The 28 Pages" at 423 (stating that Bayoumi was receiving money from Ercan, and that when he [Manna [sic]] refused to pay Bayoumi a monthly salary for doing nothing, he was told that Ercan would lose its contract if it did not pay Bayoumi); Ex. 435, DA 1101; Ex. 436, DA 1102; Ex. 437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 439, DA 1357; Ex. 125, Coombs Dep. 143:7-148:21.  Given Bayoumi's recurring access to substantial funds through Dallah Avco, sources confirm that Bayoumi had "seemingly unlimited" funds.  Ex. 9, Joint Inquiry at 174.

**Response:**  The cited evidence does not support the claim that "Saudi Arabia pressured . . . Dallah to continue paying and maintaining Bayoumi's cover in the United States or risk losing substantial lucrative contracts with the Saudi government."  The cited evidence does not support the claim that Al Bayoumi in fact had access to "seemingly unlimited" funds.  The statements in the Joint Inquiry are inadmissible.

702.    In January 2002, United States government officials from the Departments of Justice and Treasury met with PCA representatives in Saudi Arabia.  A report prepared by the PCA concerning the meeting shows that the PCA misled the U.S. government by claiming that "Bayoumi worked under contract for Dallah Avco."  Ex. 426, DA 0089-90.  In a letter to the PCA, Dallah Avco stated that Bayoumi was at all times a PCA employee.  Dallah Avco also stated that one of the participants in this meeting, Alp Karli, "signed the minutes of [the] meeting as a representative of Dallah Avco" but that this was "incorrect" because Karli was "a coordinator and supervisor over the contractor Dallah Avco on behalf of the [PCA]."  Ex. 426, DA 0089-90, Ex. 427, DA 0092-93.  According to Dallah Avco, "at all times they're PCA subordinates" and "PCA says what are their positions.  PCA says the job descriptions, their salaries, who gets to leave, when do they leave, who gets – whatever administrative thinks – how it comes from the PCA."  Ex. 103, Kamel Dep. 23:19-25:3.

**Response:**  Undisputed for purposes of this motion.

703.    After the 9/11 Attacks the FBI received information concerning a connection between Dallah Avco and Osama bin Laden.  On October 10, 2001 the FBI San Diego office received information that "[a]s of 1998, Dallah Avco Trans Arabia Ltd was reportedly a subsidiary of the Al Baraka Investment and Development Company in Jeddah. … [It was also known as] Avco Dallah Company aka Dallah Avco Company [and] was linked to UBL. [Redacted] UBL was instructed to contact the company in June of 1998."  Ex. 2, EO 2565.  On October 13, 2001, the Director of the FBI did a trace of companies Bayoumi claimed to work for and "established" a "connection between Bin Laden and Dallah Avco" that warranted further investigation and potential declassification of evidence by the U.S. counterintelligence community.  Ex. 2, EO 2549.

**Response:**  The cited FBI reports are inadmissible.  The October 13 report does not state that "the Director of the FBI did a trace of companies Bayoumi claimed to work for" that established a connection between Bin Laden and Dallah Avco.  Rather, both the October 10 and October 13 reports refer to information the FBI apparently received from another law enforcement or intelligence agency whose identity is redacted, which in turn obtained the information from some unknown source.  Both reports on their face reflect that the FBI was still evaluating the reliability of the information.  *See* PECs Ex. 2V at EO 2565 ("It is requested that [redacted] provide specific information pertaining to the above reference to DATA, which would include type of reporting, location to location, identities of the parties involved, date(s) transcript, if it is a conversation and any additional pertinent information."); PECs Ex. 2V at EO 2549 ("FBI San Diego is seeking additional details about . . . the source of this information . . . . Is the source of the intelligence available for further tasking specific to this case?").

704.    Bayoumi received job performance evaluations from Saudi Arabia, and an extraordinary salary increase in May 2000, that coincided with the time that he established the

Saudi government's extremist network inside Southern California that provided material support to 9/11 hijackers Hazmi and Mihdhar in San Diego. Ex. 434, DA 1054. Saudi Arabia prepared two performance reviews of Bayoumi dated April 1999 and March 2000, as an "accountant" for the "Contracts and Financial Control Division" of the "Airways Engineering" Division of Saudi Arabia's Presidency of Civil Aviation. These reviews covered the time when Bayoumi was supposedly "seconded" as a "student" and while he was being paid by both Ercan and Dallah Avco. Ex. 198, KSA 0882; Ex. 197, KSA 0879.

**Response:** The cited evidence does not support the claim that the PCA's May 2000 promotion of Al Bayoumi to a married status position, and accompanying 23% salary increase from SR 7,740 to SR 9,500, was "extraordinary." PECs Ex. 434. The cited evidence does not support the claim that the promotion or performance evaluations "coincided with the time that [Al Bayoumi] established the Saudi government's extremist network inside Southern California that provided material support to 9/11 hijackers Hazmi and Mihdhar in San Diego." The cited evidence does not support the claim that Al Bayoumi was "being paid by both Ercan and Dallah Avco" during the periods covered by the reviews.

705. In these evaluations, Bayoumi was described by the Kingdom as "persistent and hard working" and "known for his continuous ambitions toward development and better efforts" and he received the highest possible ratings from Saudi Arabia for his work. Ex. 198, KSA 0882; Ex. 197, KSA 0879.

**Response:** Undisputed for purposes of this motion, but there is no evidence that Dallah Avco had any role in preparing these performance evaluations or ever received copies of them. These performance evaluations are internal PCA documents that were produced by the Kingdom, not ANSS employee files produced by Dallah Avco. PECs Exs. 197, 198.

706.    Foreign government officials living and working inside the U.S. are required to file a notification with the U.S. Attorney General.  18 U.S.C. § 951.  No such notification was filed for Bayoumi during the seven years he lived and worked in the U.S.

**Response:**  This paragraph misstates the requirements of the statute, which applies only to an "agent of a foreign government," specifically defines that term, and contains several exclusions.  18 U.S.C. § 951(a), (d).  The paragraph cites no evidence that Al Bayoumi was required to register under the statute.

707.    As cover, Saudi Arabia had Bayoumi obtain and use a full-time student visa to enter, reside, and work in the U.S. from 1994 through 2000 and a business/tourist visa to enter, reside, and work in the U.S. from May 2000 through June 2000.  Ex. 452, KSA 8001; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680).

**Response:**  The cited evidence does not support the claim that Al Bayoumi obtained his visas "[a]s cover" for any other activities.

708.    Ercan was used by Saudi Arabia to support Bayoumi's immigration status with the INS.  Bayoumi's immigration forms filed in February and September 1997 stated that Bayoumi was pursuing educational programs in San Diego and that Ercan would pay support to Bayoumi at the rate of $4,000 per month until the year 2000.  Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 211, KSA 6642-65 at 61; Ex. 340, USIU production at 31; Ex. 488, FBI 001370-73 at 373.

**Response:**  Undisputed for purposes of this motion.

709.    Bayoumi enrolled at San Diego State University ("SDSU").  Ex. 320, PEC-KSA1-000001-98 at 71.  Following his enrollment at SDSU, Bayoumi would enroll in English courses at ELS Language Centers in San Diego until mid-August 1995, but Bayoumi failed to

attend classes at all between March 25, 1995 and April 23, 1995 and received "failure" or "poor" grades in about a third of his classes. Ex. 320, PEC-KSA1-000001-98 at 35-36.

**Response:** The cited ELS Language Centers transcript shows that, although Al Bayoumi received "failure" or "poor" grades in about a third of his classes, he received "Good," "Very Good," or "Excellent" grades in about half his classes. PECs Ex. 320 at PEC-KSA1-000035. The transcript further shows that Al Bayoumi did not enroll in classes for the four weeks from March 25 to April 23, 1995, not that he failed to attend classes for which he had enrolled. *Id.* There is no evidence that Dallah Avco received these records.

710. While SDSU records appear to state that Bayoumi had attendance rates in his English coursework ranging from 88.5% to 92%, Ex. 320, PEC-KSA1-000001-98 at 71, that is misleading and grossly overestimates his actual attendance. Bayoumi missed the first few weeks of both the fall and winter sessions and attended just 147 hours of class in total while enrolled out of a possible 480 "base" hours of class. In other words, Bayoumi missed 333 hours of coursework out of a total of 480 possible "base" hours while he was enrolled. Ex. 320, PEC-KSA1-000001-98 at 74 (noting that fall session began on August 30, 1994 but no Bayoumi attendance records until September 12, 1994); Ex. 320, PEC-KSA1-000001-98 at 72-73 (noting enrollment date of August 30, 1994, but date Bayoumi began classes as September 22, 1994); Ex. 320, PEC-KSA1-000001-98 at 75 (comment noting that Bayoumi "[e]ntered the class late in the term"); Ex. 320, PEC-KSA1-000001-98 at 81 (no hours of attendance for first three weeks of spring 1995 session); Ex. 320, PEC-KSA1-000001-98 at 71 (noting that coursework was measured in hours, that there was a "base of 20 hours of instruction per week" divided into "general English" and "oral communication"); Ex. 320, PEC-KSA1-000001-98 at 74, Ex. 320, PEC-KSA1-000001-98 at 78, Ex. 320, PEC-KSA1-000001-98 at 81 (noting hours attended for "G" i.e. general English, "OC" i.e., oral communication, and "T" which is "Total" though at

times the subtotal of G and OC does not add to T, which was likely the result of short hand); *id.* (20 hours per week over the sessions and including the first two weeks of fall session classes Bayoumi missed equals 480 hours and adding up the "T" amounts yields 147 hours).

**Response:**  The cited SDSU transcripts state on their face that Al Bayoumi had 92% and 89% attendance rates, achieved passing grades, and received generally favorable comments from his instructors (e.g., "Put forth a lot of effort and made steady progress in the class"; "Very diligent and an asset to the class"; "An outstanding student in every respect"; "A positive and enthusiastic student").  PECs Ex. 320 at PEC-KSA1-000075; PECs Ex. 320 at PEC-KSA1-000082.  There is no evidence that Dallah Avco received these records.

711.    From November 1995 through mid-1997 Bayoumi enrolled in classes at West Coast University ("WCU") and United States International University in San Diego ("USIU"). In December 1996, Bayoumi wrote to USIU requesting a transfer to finish his degree because WCU had financial problems.  Ex. 38 (Bayoumi Dep. Ex. 683).  And he enrolled in USIU beginning in the Winter Quarter of 1997.  Ex. 320, PEC-KSA1-000001-98 at 29.

**Response:**  Undisputed for purposes of this motion, but there is no evidence that Dallah Avco received these records.

712.    Bayoumi enrolled and attended 15 classes during this time, but the classes were only two months long in duration, and he was taking only 1-2 courses at a time.  Ex. 320, PEC-KSA1-000001-98 at 44-46.  Foreign intelligence officers often pose as students because they can easily obtain a student visa, pay tuition, enroll in classes with a light and flexible schedule but rarely attend classes (many of which do not take regular attendance) and have the freedom to conduct other activities without U.S. government officials noticing, *see* 9/11 Commission Report at 272; Ex. 5, Youssef Rpt. 74, as Bayoumi had already been doing for almost two years at this point.  Bayoumi continued to have ample time to perform his true function in the United States

while in school.  And his business studies were unrelated to his original reason for being here—to pursue English language coursework.

**Response:**  The cited WCU transcript shows that Al Bayoumi took **three** courses at the same time on multiple occasions, not "only 1-2 courses at a time."  PECs Ex. 320 at PEC-KSA1-000044-46.  There is no evidence that Dallah Avco received these records.  The cited evidence does not support the claim that "[f]oreign intelligence officers often pose as students because they can easily obtain a student visa, pay tuition, enroll in classes with a light and flexible schedule but rarely attend classes (many of which do not take regular attendance) and have the freedom to conduct other activities without U.S. government officials noticing"; the cited pages of the 9/11 Report and the Youssef Report say nothing about these topics whatsoever.  The paragraph cites no evidence for the claim that Al Bayoumi's "true function" was something other than pursuing educational studies.  The paragraph cites no evidence for the claim that "[Al Bayoumi's] business studies were unrelated to his original reason for being here—to pursue English language coursework."  Al Bayoumi went to the United States to pursue educational studies to prepare him to take over the job of his supervisor, Alp Karli, the head of Contracts and Finance Control.  PECs Ex. 120 at 43:8-44:7, 50:12-51:24.  Business studies were therefore related to his reason for being in the United States.  *See* PECs Ex. 94 at 385:25-386:18 (Angari testifying that Al Bayoumi's coursework "suit[ed]" his position in "the financial department"); DA Ex. 13 (Al Salmi explaining that Al Bayoumi was pursuing "preparatory study for obtaining a master's degree in business administration and studies in financial management" so he could "effectively take [the] place [of] a government employee in the Air Navigation System Support Program"); PECs Ex. 120 at 660:4-17 (Al Bayoumi's coursework was "relevant to [his] job at Airways Engineering" and he "hope[d] that by pursuing this coursework [he] would eventually take over Alp Karli's job as the head of the contracts, finance and controls unit").

713.    An October 2000 email recovered by the FBI shows that during this time Bayoumi engaged in a pattern of fraud by paying a USIU professor named ███████████ to prepare his coursework for him.  Ex. 567, FBI 011777-011783 at 011782 (Bayoumi agrees to pay ████████ "what ever you suggest" to help him prepare "some assignments" and states to ████████ that he "helped me [Bayoumi] in the beginning…."); Ex. 340, USIU production at 50.

**Response:**  The cited email does not show that Al Bayoumi "engaged in a pattern of fraud" by paying a professor to "prepare his coursework for him," as opposed to merely helping him with the coursework.  There is no evidence that Dallah Avco knew about this email.

714.    During this time, in April 1996, Dallah Avco requested to extend Bayoumi's purported secondment for another year and the request is granted.  Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710.  The extension required coordination at the highest levels including the President of the PCA, the Deputy Minister of Defense and Aviation and the Assistant Minister of Defense and Aviation.  Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710; Ex. 94, Anqari Dep. 101:24-103:19.  And again, even though Dallah purportedly made the request, the request truly originated from Saudi Arabia but was made on Dallah letterhead.  Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23.

**Response:**  The cited evidence does not support the claim that Al Bayoumi's secondment was a "purported" secondment rather than an actual secondment.

715.    In early 1997, Dallah again requested to extend Bayoumi's purported secondment for another year.  Ex. 443, KSA 4462.  Again, this request should be understood as coming from the Saudi government.  Ex. 180, Kamel Exhibit 127, Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23.  This time before extending the purported secondment, the PCA human resources department requested additional information: The reasons for extending the secondment for a third time? The reasons for Bayoumi's stay in the USA? For completing studies or other

reasons? What type of study, major, or qualification does Bayoumi want to obtain, and when will he be done? Will Bayoumi continue in his position after returning, or will he leave his work? Ex. 281, KSA 4466. Mohammed al Salmi responded that the further secondment related to Saudization and that Bayoumi would pursue a master's degree in business administration that would be complete by the end of the secondment year (early 1998). Ex. 424, DA 0044. On May 6, 1997, Anqari authorizes the continued secondment for another year to complete a Master's in International Business Administration. Ex. 424, DA 0044.

**Response:** The cited evidence does not support the claim that Al Bayoumi's secondment was a "purported" secondment rather than an actual secondment.

716. In July 1997, Bayoumi was placed on academic probation at USIU for failing to maintain a minimum G.P.A. Ex. 2, EO 1762; Ex. 340, USIU production at 49. Bayoumi was nevertheless awarded a master's degree from USIU in December 1997. Ex. 340, USIU production at 60 (showing graduation fee). The academic record shows that despite being on probation in July 1997, Bayoumi did not return to take classes but took an "independent study" course on marketing in the Arabian Gulf to obtain his USIU degree. Ex. 340, USIU production at 61.

**Response:** Undisputed for purposes of this motion, but there is no evidence that Dallah Avco learned about Al Bayoumi's academic probation or the nature of his courses at USIU.

717. After the summer of 1997 Bayoumi did not complete any regular school courses. In its 2014 Operation Encore report, the FBI concluded that "Omar Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." Ex. 2, EO 0226. The few classes he did attend after the initial English courses had nothing to do with replacing Alp Karli, the purported reason for Bayoumi being in the U.S. in the first place, and Alp Karli confirmed Bayoumi was

overqualified for Karli's job and would only need six months training to take over.  Ex. 469, FBI 000281 at 283.  In fact, Bayoumi never took over Karli's position despite his multiple years of education that were supposedly to facilitate this promotion.  *Compare* Ex. 469, FBI 000281 (listing Alp Karli as "Director of Finance" at PCA) *with* Ex. 37, Bayoumi Ex. 682 (Resume of Bayoumi not listing Director of Finance of similar senior position).

**Response:**  The cited evidence does not support the claim that "Bayoumi did not complete any regular school courses" after summer 1997.  Al Bayoumi enrolled in courses at Keller Graduate School of Management, although he did not complete the exam requirements or earn any credits.  DA SMF ¶125.  During 1999 and 2000, Al Bayoumi took several continuing education courses through ESI International in association with George Washington University and was awarded a Master's Certificate in Project Management in March 2000.  DA SMF ¶126.  The FBI's Operation Encore report is inadmissible and cites no support for the claim that Al Bayoumi was "not attending classes."  The paragraph cites no support for the claim that Al Bayoumi's business courses "had nothing to do with replacing Alp Karli."  Alp Karli was the head of Contracts and Finance Control, so business courses were clearly relevant.  See sources cited in response to paragraph 712 above.  The FBI's interview memo of Alp Karli is inadmissible and does not support the claim that "Bayoumi was overqualified for Karli's job and would only need six months training to take over."  Alp Karli stated only that, ***after Al Bayoumi completed his doctoral studies in March 2002***, he would be overqualified for Karli's job and would require only six more months of training to take over.  PECs Ex. 469 at FBI000283.

718.     In April 1998, the President of the PCA asked the Assistant Minister of Defense and Civil Aviation to extend the purported secondment another year to May 1999.  Ex. 438, DA 1126.  Again, the request came from the highest levels of the PCA in close coordination with the

Saudi defense ministry.  On May 12, 1998, Anqari approved the purported secondment for another year.  Ex. 438, DA 1126.

**Response:**  The cited evidence does not support the claim that Al Bayoumi's secondment was a "purported" secondment rather than an actual secondment.

719.    A May 20, 1998, letter from Dr. Jamil Shami, the "Director, Academic Affairs" at the "National Guard Office" of the Saudi Embassy in Washington, DC falsely represented that "Al-Bayoumi was a candidate for a full scholarship from the Government of Saudi Arabia" including a "monthly living allowance."  Ex. 678Z, MPS 732_449.  Another letter dated September 21, 2000 from Jamil Al Shami of the Saudi Embassy was similarly drafted to support Bayoumi's cover.  Ex. 678I, MPS 82_19.

**Response:**  The cited evidence does not support the claim that these two Saudi embassy letters were "false[ ]" or "drafted to support Bayoumi's cover."  There is no evidence that Dallah Avco knew about either letter.

720.    To maintain his cover, Bayoumi enrolled for two semesters of classes at Keller School of Management in San Diego from November 1998 to June 1999.  The school's records show that Bayoumi earned no credit for any classes at Keller.  The November sessions indicate that he withdrew, and the June sessions are marked "unsatisfactory."  Ex. 320, PEC-KSA1-000001-98 at 67-70.

**Response:**  The cited evidence does not support the claim that Al Bayoumi enrolled at Keller "[t]o maintain his cover."  There is no evidence that Dallah Avco received these records.

721.    Bayoumi claimed at his deposition that he attended classes in the Fall at Keller but did not sit for his exams "because the subjects were dry" and then enrolled in the same courses again the following Spring, saying that he was "not too ashamed to try again," and once again did not sit for his exams.  Ex. 120, Bayoumi Dep. 772:1-7, 804:3-15.

**Response:**  Undisputed for purposes of this motion.

722.    In early 2000, Bayoumi enrolled in a second master's program at USIU on January 21, 2000, for the "Winter Quarter 2000," then withdrew on February 7, 2000, but nevertheless obtained a March 5, 2000 certification from USIU to support his student visa that he was a business administration student in a "full course of study."  Ex. 340, USIU production at 54-55; Ex. 211, KSA 6642-65 at 61.

**Response:**  Undisputed for purposes of this motion, but there is no evidence that Dallah Avco received these records.

723.    Omar Al-Bayoumi was not part of a "Saudization" program, as suggested at KSA Aver. ¶¶ 17, 18.  There is no evidence of other individuals working for Saudi Arabia who were given special treatment and funding similar to what was provided to Bayoumi or allowed to continue in that program for years without actually attending courses.

**Response:**  The paragraph cites no support for the claims that "Omar Al-Bayoumi was not part of a 'Saudization' program," that no other Saudi employees "were given special treatment and funding similar to what was provided to Bayoumi," or that Al Bayoumi was "allowed to continue in that program for years without actually attending courses."  Al Salmi funded "between 45 and 50" other PCA students through the logistics budget.  PECs Ex. 125 at 48:6-49:4.  Al Bayoumi did actually attend courses.  DA SMF ¶¶ 90-21, 122-126.

\*    \*    \*    \*    \*

874.    Bayoumi's Mosque phone records show that he made one call to Dallah Avco on January 10, 1999 at 5:06 am.  Ex 504, FBI 1542.  That early morning call to Dallah Avco was the only call in Bayoumi's records to Dallah Avco.  The call was immediately preceded by calls to the PCA Airways Engineering Department at 3:21 am and 4:59 am and followed by a call to PCA at 5:11am.  Ex 504, FBI 1542.  Bayoumi made a total of 13 calls to the PCA in July 1998,

November 1998, January 1999, April 1999, and for the final time in January 2000.  Ex. 12V (Bayoumi calls to Presidency Civil Aviation).

**Response:**  Undisputed for purposes of this motion.

875.    The timing of these calls show that they are related to ongoing events concerning to Bayoumi's work as a Saudi agent in San Diego.  For example, Bayoumi called the PCA days after Dallah balked at extending Bayoumi's 'ghost employment' term and the PCA directed Dallah to extend Bayoumi's "secondment" to complete his "task" in San Diego.  Ex. 435, DA 1101; Ex. 436, DA 1102; Ex. 215, KSA 705; Ex. 94, Anqari Dep. 114:5-124:25.

**Response:**  The cited evidence does not support the claim that the timing of Al Bayoumi's "one call to Dallah Avco on January 10, 1999 at 5:06 am" (¶874) was in any way "related to ongoing events concerning Bayoumi's work as a Saudi agent in San Diego."  The cited evidence also does not show that Al Bayoumi was "work[ing] as a Saudi agent in San Diego" or that Dallah Avco "balked at extending Bayoumi's 'ghost employment' term."

*    *    *    *    *

1189.  On the same day (April 7, 1999) that the second visa for the two hijackers was received, and Bayoumi wrote to Sadhan and Sudairy, PCA Director Salmi wrote a "Top Urgent" note to Dallah Avco, rejecting their request to end Bayoumi's "secondment" and instructing them to extend Bayoumi's term for another year because he needs "to complete the task under which the Presidency approved of his Secondment."  Ex. 432, DA 1004.  That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah.  Ex. 182, Kamel Ex. 119 (DA 1110).  On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for

a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 6, DA 1119.

**Response:** The cited evidence does not support the claim that the secondment was a "purported" secondment rather than an actual one. The cited evidence does not support the implication that the decision to extend Al Bayoumi's secondment for another year in April 1999 had anything to do with the two hijackers' receipt of their visas or Al Bayoumi's communications with Sadhan and Sudairy.

1190. Two days later, on April 9, 1999, Bayoumi placed four calls to Saudi government offices at the Presidency of Civil Aviation, presumably to ensure that payments would continue through Dallah Avco after the PCA had intervened to ensure his extension. Ex. 12V (Bayoumi calls to Presidency Civil Aviation).

**Response:** The cited evidence does not support the claim that these four calls were "presumably to ensure that payments would continue through Dallah Avco."


Dated:  March 4, 2024            Respectfully submitted,
        New York, New York


          /s/ Robert K. Kry
        Robert K. Kry
        Eric R. Nitz (*pro hac vice*)
        MOLO LAMKEN LLP
        600 New Hampshire Ave., Suite 500
        Washington, D.C.  20037
        (202) 556-2000
        rkry@mololamken.com

        *Attorneys for Defendant*
        *Dallah Avco Trans Arabia Co.*