# Exhibit 101

H1i1tera

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     In Re: Terrorist Attacks on
 3   September 11, 2001
                                              03 MD 1570 (GBD)(SN)
 4
                                              Oral Argument
 5   ------------------------------x
                                              New York, N.Y.
 6                                            January 18, 2017
                                              11:39 a.m.
 7
     Before:
 8
                         HON. SARAH NETBURN,
 9
                                              Magistrate Judge
10
                              APPEARANCES
11
     COZEN O'CONNOR
12        Attorneys for Plaintiffs' Executive Committee
     BY:  SEAN P. CARTER, ESQ.
13        J. SCOTT TARBUTTON, ESQ.

14   KREINDLER & KREINDLER LLP
          Attorneys for Plaintiffs' Executive Committee
15   BY:  JAMES P. KREINDLER, ESQ.

16   ANDERSON KILL
          Attorneys for Plaintiffs' Executive Committee
17   BY:  JERRY S. GOLDMAN, ESQ.

18   BAUMEISTER & SAMUELS, P.C.
          Attorneys for Plaintiffs' Executive Committee
19   BY:  MICHEL F. BAUMEISTER, ESQ.

20   THOMAS E. MELLON, III, ESQ.
          Attorney for Plaintiffs Havlish and Hoglan
21
     MoloLAMKEN LLP
22        Attorneys for Defendant Dallah Avco
     BY:  ROBERT K. KRY, ESQ.
23        ERIC R. NITZ, ESQ.

24   LAW FIRM OF OMAR T. MOHAMMEDI, LLC
          Attorneys for Defendants Wamy International,
25                              World Assembly of Muslim Youth
     BY:  OMAR T. MOHAMMEDI, ESQ.
```

1  documents that were put back in Dallah City. When the Dallah
2  City search was conducted, one of the things we located was the
3  set of Mr. Kamel's documents, and those were among the hard
4  copy documents that were searched.
5         THE COURT: And were they produced?
6         MR. KRY: Anything related to al-Bayoumi, yes.
7         THE COURT: What if there was a notation in a calendar
8  entry, you know, two weeks before the letter to the PCA asking
9  for his secondment, if there was a calendar entry that said,
10 meeting with PCA minister, or whoever you would be meeting
11 with?
12        MR. KRY: I'm not aware of a document like that
13 existing, but I do know those files were retrieved, they were
14 searched for anything related to al-Bayoumi, whether or not
15 they expressly referred to al-Bayoumi, and any responsive
16 documents located as a result of that process were produced.
17        THE COURT: Okay.
18        MR. KRY: Turning back to another issue you mentioned,
19 and this is the issue of the disarray in the warehouse, because
20 I think those two are different issues that are being combined
21 here. When the project ended in 2005, the boxes with the ANSS
22 files were put in the warehouse, and then over the intervening
23 I guess 12 years now, you know, it's undeniable that other
24 affiliated companies within the Dallah Avco group put
25 additional stuff there and the warehouse fell into a bit of

1  disarray.  But there's no evidence and there's no reason to
2  think that that disarray in the warehouse somehow meant that
3  the files themselves became disorganized or lost, because the
4  files are in boxes, and those boxes had to be dug out, but they
5  were.  Two searches of the warehouse were done.  The ANSS boxes
6  were retrieved.  And that was a lot of work because of the
7  disarray in the warehouse.  But there's no reason to think that
8  once those boxes were taken out, that the files within those
9  boxes somehow became incomplete or documents got lost.  And so
10 I'm not arguing that the state of disarray in the warehouse is
11 an excuse for Dallah Avco not having to comply with its
12 discovery demands.  Obviously the litigation has been pending
13 since then.  What creates the undue burden is the fact that the
14 files within those boxes are very voluminous, and for some of
15 the things they're asking for, it's very difficult to identify
16 responsive documents.
17         And I want to turn to the Ercan and Avco Overseas
18 documents, because those are important.
19         THE COURT:  Right.  Can you tell me how large the
20 Ercan file is.
21         MR. KRY:  Right.  So there's no single Ercan file.
22 Unlike With Avco Overseas, Ercan was actually in their document
23 requests, so when we were going through the Dallah City boxes,
24 and that's like, you know, 2 or 3 million-some pages of hard
25 copy documents that were gone through manually, because we were

H1i1tera

1  aware that that request was outstanding, we did segregate files
2  relating to Ercan, whether or not they related to al-Bayoumi.
3  Our search did not identify any documents that related to Ercan
4  and al-Bayoumi.  There is a reference in one FBI document that
5  says that -- where an anonymous source who's not even
6  identified claims that someone at PCA told Ercan to put
7  al-Bayoumi on Ercan's payroll and said their contract would be
8  jeopardized if that didn't happen.  Our files didn't find
9  anything, anything whatsoever to do with that.  Now Ercan is
10 another ANSS contract vendor and so there are documents
11 relating to Ercan that are totally unrelated from Omar
12 al-Bayoumi.  And to give you an example, there's a bunch of
13 documents where, for example, Ercan supplies a piece of
14 electronics equipment, a piece of hardware to the ANSS project,
15 and then the PCA wants to bill that back to the project and so
16 they say, you know, Dallah Avco, pay Ercan for the expense it
17 incurred, and then we'll pay you to the ANSS project contract.
18 So there are a bunch of documents like that, but that has
19 nothing whatsoever to do with this case.  That said, we were
20 mindful this request was out, so we went through Dallah City,
21 we set this aside, so we have in total, going through those
22 3 million pages, we came across about 900 pages of documents
23 relating to Ercan.  That's what Mr. Carter's referring to when
24 he says it would be no burden to produce those if that's what
25 the Court orders, and in fact, during the course of this, we

1   had offered to produce that as part of our larger compromise.

2   The situation With Avco Overseas is different in a
3   very important way.  Their document request, despite the fact
4   that they have I think 56 different requests covering
5   everything under the sun, never once requested Avco Overseas,
6   and that's despite the fact that they knew it was a potentially
7   relevant entity.  And in fact, if you look at Exhibit J,
8   page 30 of the motion in this case, this is the FBI report.  It
9   says at the end -- there's a redaction, but I think everyone
10  agrees that at least plaintiffs contend that refers to
11  Mr. Bayoumi.

12          THE COURT:  Where are you?  Sorry.

13          MR. KRY:  This is page 31 of 32 on the ECF header at
14  the top, but it's page 30 on the bottom of the document.

15          THE COURT:  Yes.

16          MR. KRY:  So it says, redacted, "identified" redacted
17  "as a ghost employee Of Avco Overseas.  Estimated that there
18  were approximately 50 individuals carried on the books and PCA
19  or Dallah and being paid for doing nothing."  So this is not a
20  company that came out of nowhere.  It's just not true that the
21  first time they found out about this was from our papers.  Avco
22  Overseas was absolutely referenced in the 9/11 report -- I'm
23  sorry, not the 9/11 report, this FBI document.  Had they made
24  that request, we could have done the same thing for Avco
25  Overseas that we did with Ercan.  We could have set aside the

H1i1tera

1   stuff we came across so that we could resolve it now without
2   having to redo the entire search.  But because they never had
3   an Avco Overseas document request, we had no reason to do that.
4   We had no reason to expect that they would want those
5   documents.  The documents we did find for Avco Overseas, and
6   these are the ones from 1994, where there was a period, a brief
7   period before Mr. al-Bayoumi was seconded to the ANSS project.
8   Those documents we came across, and that was the proverbial
9   needle in the haystack.  I mean, that we came up with at the
10  very end of this manual, laborious review of 2 or 3 million
11  documents.  If we had found that at the beginning of that
12  review, then maybe we would have said, well, maybe this is
13  relevant after all and we could have started to set aside
14  documents relating to it.  But this came at the very end, your
15  Honor.
16          So the result of all this is that there's simply no
17  way to find documents relating to Avco Overseas unrelated to
18  al-Bayoumi other than repeating this incredibly laborious,
19  time-consuming, expensive, resource-intensive process that
20  Mr. Yamani describes in his declaration.
21          One of the basic requirements for a motion to compel
22  is that if you're compelling production, it has to be documents
23  you've actually asked for.  They didn't ask for these
24  documents.  We've suffered enormous prejudice as a result of
25  the fact that they didn't ask for the documents because now the

H1i1tera

only way to find them would be to redo a process that's been incredibly laborious and time-consuming. And so for that reason, I just think there's a fundamental distinction between the Ercan documents on the one hand and the Avco Overseas documents on the other hand, because the Avco Overseas documents have just this enormous undue burden issue.

THE COURT: Okay. I have a couple of targeted questions for you. The first has to do with the bank wire transfers or checks. It sounds like there's evidence of I guess maybe paystubs, some type of payment evidence of Dallah Avco to al-Bayoumi, but there's not evidence of the actual transfer of funds.

MR. KRY: No, there is. I don't think there's evidence -- I mean, I believe the complaint was just, it's not a complete record of everything. But there's certainly plenty of documents we've produced along those lines reflecting that those amounts were paid.

THE COURT: I thought Mr. Carter said that there was no bank transfer information.

MR. KRY: We produced wire transfer applications, among other documents. There's plenty of that. Dallah Avco's function was payroll processing, and so they asked for a million things that we wouldn't be expected to have. That's certainly something we would be expected to have, and we've produced whatever we have. It's definitely not a hundred