**REDACTED FOR PUBLIC FILING**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
IN RE:  TERRORIST ATTACKS ON      )    Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001           )    ECF Case
_____)

This document relates to:  *All Actions*

# KINGDOM OF SAUDI ARABIA'S AVERMENT
## OF JURISDICTIONAL FACTS AND EVIDENCE IN SUPPORT OF
## ITS RENEWED MOTION TO DISMISS

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**REDACTED FOR PUBLIC FILING**

**TABLE OF CONTENTS**

Page

I.    Background Concerning Saudi Arabia ....................................................................1

    A.    Saudi Arabia and Its Religion ....................................................................1

    B.    Saudi Arabia's Relationship with the United States ..................................4

    C.    Relevant Saudi Arabian Officials and Employees ....................................5

        1.    Omar Al Bayoumi ..........................................................................5

        2.    Fahad Al Thumairy ........................................................................8

        3.    Musaed Al Jarrah ...........................................................................9

        4.    Khalid Al Sowailem......................................................................10

        5.    Adel Al Sadhan ............................................................................11

        6.    Mutaeb Al Sudairy.......................................................................11

        7.    Abdullah Al Jaithen .....................................................................11

        8.    Majed Al Mersal ..........................................................................12

        9.    Smail Mana ..................................................................................12

II.   Background Concerning Al Qaeda and the 9/11 Attacks ....................................12

    A.    Al Qaeda, Its Leaders and Members, and the 9/11 Plot.........................12

    B.    Al Qaeda's Hostility Towards the United States and Saudi Arabia .......14

III.  Relevant Events in California ..............................................................................17

    A.    Al Hazmi's and Al Mihdhar's Arrival in Los Angeles..........................17

    B.    Al Bayoumi's and Morgan's Visit to the Consulate..............................21

    C.    Al Bayoumi's and Morgan's Encounter with Al Hazmi and Al Mihdhar..............................................................................................23

    D.    Al Hazmi and Al Mihdhar in San Diego ................................................25

        1.    The Parkwood Apartments ..........................................................25

        2.    Al Hazmi's and Al Mihdhar's Other Contacts in San Diego......28

**REDACTED FOR PUBLIC FILING**

|       |       | a. | Al-Mohdar Mohammed Abdullah Zeid | 28 |

a.      Al-Mohdar Mohammed Abdullah Zeid ........................................28

b.      Anwar Al Awlaki ........................................................30

c.      Abdussattar Shaikh ....................................................32

d.      Other Contacts ........................................................33

E.    Al Hazmi's and Al Mihdhar's Return to Los Angeles and Al Mihdhar's Departure ....................................................34

F.    Al Hazmi's Remaining Time in San Diego ........................................36

IV.   Al Bayoumi's and Al Thumairy's Interactions with Other Saudi Government Officials or Employees ........................................37

A.    Musaed Al Jarrah ........................................................37

B.    Khalid Al Sowailem........................................................39

C.    The Ramadan Imamate Visits ........................................40

1.    Ramadan 1419:  Al Sadhan, Al Sudairy, Al Mersal ................................40

2.    Ramadan 1420:  Al Jaithen and Al Mersal ................................43

V.    Al Bayoumi's and Al Thumairy's Phone Records During the Relevant Period ....................................................46

VI.   Additional Responses to Plaintiffs' Allegations ........................................48

A.    Alleged Knowledge by Saudi Officials ........................................48

B.    Al Thumairy's Diplomatic Status and Religious Opinions ................................48

C.    Al Bayoumi's Notebook ........................................50

**REDACTED FOR PUBLIC FILING**

Defendant Kingdom of Saudi Arabia ("Saudi Arabia") respectfully submits this Averment of Jurisdictional Facts and Evidence ("Averment") in support of its renewed Motion To Dismiss ("Motion").

All factual contentions on which Saudi Arabia will rely in support of its Motion are set forth in Saudi Arabia's Memorandum of Law in support of its Motion or will be set forth in a reply memorandum. All exhibits on which Saudi Arabia will rely in support of its Motion are attached to the declaration of counsel filed with the Motion or will be attached to a declaration of counsel filed with Saudi Arabia's reply. This Averment provides citations to record evidence to support Saudi Arabia's factual contentions. Saudi Arabia reserves the right to supplement this Averment on reply and to file a response to any Averment or declaration of counsel that Plaintiffs file in support of their oppositions to Saudi Arabia's Motion.

Saudi Arabia is filing its Motion in advance of the Court's ruling on the parties' cross-motions to exclude or limit expert evidence. This Averment includes citations to the reports and deposition testimony of experts whose testimony may be excluded by later order of the Court.

## I.    Background Concerning Saudi Arabia

### A.    Saudi Arabia and Its Religion

1.    The Kingdom of Saudi Arabia is a sovereign state. Its state religion is Islam, and its constitution is the Quran and the Sunna (the sayings, practices, and views of the Prophet Mohammed). Its form of government is monarchy. Ex. 2 (Embassy of the Kingdom of Saudi Arabia, *Basic Law of Governance*, https://www.saudiembassy.net/basic-law-governance).

2.    The modern Kingdom of Saudi Arabia was founded by King Abdulaziz bin Abuldrahman bin Faisal Al Saud in 1932. Since King Abdulaziz's death in 1953, each succeeding King has been one of his sons. Ex. 3 (Embassy of the Kingdom of Saudi Arabia, *History*, https://www.saudiembassy.net/history).

**REDACTED FOR PUBLIC FILING**

3.      Saudi Arabia has unique significance in the Islamic world because its territory includes Makkah (also transliterated Mecca) and Madina (also transliterated Medina), the two holiest sites in Islam.  Saudi Arabia's Kings use "Custodian of the Two Holy Mosques" as their official title.  Ex. 3 (*History*).

4.      Saudi Arabia's religious establishment follows the Hanbali school of jurisprudence and the tradition of Salafism, which gives particular weight to the words of the Quran, the Sunna, and the practices of the first three generations of Muslims who followed the Prophet Mohammed.  Rundell Rep. 4-7; Nakhleh Tr. 131:1-133:17.[1]

5.      Western scholars who study the interaction of Islam and politics often divide Salafis into three categories:

a.      "Quietists" (or "purists") believe in peaceful missionary work (in Arabic, *da'wah*) to spread Salafi Islamic beliefs; do not engage in political activism or calls for violence; and advocate obedience to the legitimate rulers of Muslim countries.  Rundell Rep. 4, 20, 41-42; Sageman Rep. 267, 526; Nakhleh Tr. 134:4-136:13, 137:18-138:4; Meleagrou-Hitchens Tr. 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West").

b.      "Activists" (or "politicos") believe in political activism to spread Salafi Islamic beliefs and to make governments more Islamic, including advocating for changes

---

[1] Some sources refer to Hanbali Salafi beliefs as "Wahhabism" and to Hanbali Salafis as "Wahhabis."  The term refers to the teachings of Mohammed Ibn Abd Al Wahhab, an important historical scholar and teacher who supported Imam Mohammed Al Saud at the time of the founding of the first Saudi state in the eighteenth century.  Saudi Arabia itself does not use the terms "Wahhabism" or "Wahhabi" and considers them misleading and derogatory.

in government, but do not necessarily advocate violence.  Sageman Rep. 267-68, 526;

Nakhleh Tr. 136:15-137:8; Meleagrou-Hitchens Tr. 72:17-75:8.

       c.     "Jihadists" (or "global jihadists" or "neojihadists") advocate the use of

violence against those they perceive to be the enemies of Islam.  Sageman Rep. 23-24,

267-69; Rundell Rep. 19-21, 42; Nakhleh Tr. 138:5-139:11; Meleagrou-Hitchens Tr.

78:10-79:12, 87:6-91:7.[2]

      6.     Saudi Arabia's religious establishment, including official bodies such as its

Council of Senior Scholars and its Ministry of Islamic Affairs ("MOIA"), is quietist:  it defers to

the King and his government in political matters and advocates for the spread of Islam through

peaceful *da'wah*.  Rundell Rep. 41, 48; Nakhleh Tr. 250:18-251:4 (agreeing that "the head of

the [religious] council . . . would not disagree with state policy as represented by the king");

Meleagrou-Hitchens Tr. 99:10-2l (agreeing that "the Saudi government and the religious

establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

      7.     Consistent with those beliefs, Saudi Arabia's religious establishment has

repeatedly declared terrorism – specifically including attacks on civilians and suicide attacks – to

be forbidden by Islam.  Rundell Rep. 43 (quoting an August 1988 ruling of the Council of Senior

Scholars making punishable by death acts of "sabotage and depravity" that include "assaulting or

destroying private or public property" and "blowing up or hijacking planes") and pre-9/11

statements by current and former Grand Muftis of Saudi Arabia that suicide bombings are

---

    [2] Some sources use the terms "global jihad" or "neojihad" to avoid confusion because the term "jihad" is used in Islamic theology to refer to (1) a spiritual struggle for self-improvement or (2) legitimate collective use of force authorized by governing political authorities.  *See, e.g.*, Sageman Rep. 23 & n.53.

3

**REDACTED FOR PUBLIC FILING**

prohibited); *see also* Meleagrou-Hitchens Tr. 92:9-93:3 ("Recognized Saudi religious

establishment figures do not call for terrorist attacks against the United States.").

      **B.**    **Saudi Arabia's Relationship with the United States**

      8.    Saudi Arabia and the United States are longstanding allies and strategic partners.

*See* Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet

(May 11, 2022)) (describing the "longstanding security" and "strong economic relationship"

between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism

efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and

educational ties [between the countries] with tens of thousands of Saudi students studying in U.S.

colleges and universities and scores of educational and cultural exchange visitors each year"), *at*

https://www.state.gov/u-s-relations-with-saudi-arabia/; Ex. 9 (U.S. Gov't Accountability Office,

*Combatting Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing*

*in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed*,

GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of

Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy

priorities"), *at* https://www.gao.gov/assets/gao-09-883.pdf; Rundell Rep. 34-40.

      9.    Several individuals who Plaintiffs have proffered as experts described Saudi

Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See*

Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls,"

*in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed.,

2009) at 74 (describing Saudi Arabia as "pro-Western"); Ex. 11 (Emile Nakhleh, *Iran and the*

*Middle East Amid Shifting Alliances*, at 2 (describing the United States and Saudi Arabia as

"allies"); Ex. 12 (Simon Ex. 4) (describing Saudi Arabia as a "staunch" ally of the United

REDACTED FOR PUBLIC FILING

States); *see also* Nakhleh Tr. 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States").

10.    During the 1980s and 1990s, Saudi Arabia's security partnership with the United States included joint efforts to support the Afghan resistance to the Soviet invasion of Afghanistan.  Rundell Rep. 37 (explaining that Saudi Arabia was one of the few Arab states that remained fully committed to the United States during the Cold War); Nakhleh Tr. 53:22-54:22.

11.    During the 1990s and 2000s, Saudi Arabia's security partnership with the United States included hosting hundreds of thousands of U.S. troops during the first and second Gulf Wars.  Rundell Rep. 37-38.

12.    Saudi Arabia has also, for generations, sent hundreds of thousands of Saudis to study in the United States at the Saudi government's expense.  Rundell Rep. 37-38 (explaining that there are more Saudis studying in the United States than students from any other country in the world); *id.* (explaining that more than half of Saudi Arabia's appointed parliament have university degrees from the United States, and an even higher proportion of the members of the Council of Ministers).

### C.    Relevant Saudi Arabian Officials and Employees

#### 1.    Omar Al Bayoumi

13.    Omar Al Bayoumi began working at the Saudi Arabian Presidency of Civil Aviation ("PCA") in December 1977 as an auditor (Grade 5) in the Finance Department, located in Jeddah, Saudi Arabia.  As of 1991, he had reached the position of accountant (Grade 8) in the PCA's Finance Department.  Ex. 13 (KSA0000001137); Ex. 14 (KSA0000001139); Ex. 15

**REDACTED FOR PUBLIC FILING**

(KSA0000001110); Ex. 16 (KSA0000001106-08); Ex. 17 (KSA0000001091-92); Ex. 18 (KSA0000001072-73).[3]

14.     In 1993, the PCA transferred Al Bayoumi from its Finance Department to its Airways Engineering Directorate, which (among other duties) oversaw the Air Navigation System Support ("ANSS") project to develop and support Saudi Arabia's civil air navigation system.  Ex. 19 (Anqari Ex. 364); Ex. 20 (KSA0000001052); Khan Tr. 144:13-145:1.

15.     Dallah Avco Trans Arabia Company ("Dallah Avco") contracted with the PCA to provide "materials, equipment, labor," and related services for the ANSS project.  Ex. 22 (KSA0000002072) at 2074; *see also*, *e.g.*, Ex. 23 (Anqari Ex. 392) (setting forth Dallah Avco's scope of services to PCA under ANSS contract).

16.     Al Bayoumi was transferred from PCA to Airways Engineering in 1993 and was selected to eventually replace Alp Karli, a Turkish national, as the head of the Contracts and Finance Control division of the Airways Engineering Directorate.  Bayoumi Tr. 43:8-44:7; Ex. 19 (Anqari Ex. 364).

17.     Al Bayoumi's selection to replace Karli was part of Saudi Arabia's "Saudization" initiative, an effort to recruit Saudis to replace non-Saudis within the Saudi economy.  Anqari Tr. 349:15-350:19; Bayoumi Tr. 43:8-44:7, 621:21-622:2, 762:8-763:8; Coombs Tr. 49:7-13.

18.     As part of the "Saudization" initiative, Saudi Arabia funded education and training for Saudi nationals.  Bayoumi Tr. 621:21-622:2, 653:8-22, 762:8-763:8; Coombs Tr. 49:5-55:18 (testifying that, at PCA, "anywhere from 45 to 50 individuals who were part of the Saudization program . . . had their educational expenses paid for them").

---

[3] The agency known as the PCA throughout the relevant period was renamed the General Authority of Civil Aviation ("GACA") in 2006.

**REDACTED FOR PUBLIC FILING**

19.    In 1994 and 1995, Al Bayoumi applied for and was granted a leave of absence from the PCA to pursue his education in the United States.  Bayoumi Tr. 636:4-16, 637:18-638:1, 638:19-639:7; Ex. 27 (Bayoumi Ex. 722); Ex. 28 (Bayoumi Ex. 723); Ex. 29 (Bayoumi Ex. 724); Ex. 30 (KSA0000008778).

20.    From June 1995 to April 2000, the PCA seconded (that is, loaned) Al Bayoumi to Dallah Avco.  Ex. 31 (KSA0000001029) (request in 1995); Ex. 32 (KSA0000000712) (approval in 1995); Ex. 33 (KSA0000000710) (renewal in 1996); Ex. 34 (KSA0000000711) (renewal in 1997); Ex. 35 (KSA0000000709) (renewal in 1998); Ex. 36 (KSA0000000813) (renewal in 1999).

21.    During this time, Al Bayoumi continued to pursue his education in the United States, with his salary and allowances paid by Dallah Avco.  Ex. 32 (KSA0000000712); Bayoumi Tr. 666:1-12 (testifying that he used the "salary and benefits that [he] received as an ANSS employee over the course of [his] five-year secondment . . . to pay [his] education and living expenses in the United States," and not "to fund any illegal activities").

22.    In April 2000, Al Bayoumi's compensation for "[o]ther [a]llowance[s]" increased from 1,742 riyals per month to 14,271 riyals per month.  Ex. 37 (Khan Ex. 103).

23.    Al Bayoumi recalls that this increase occurred because his salary at that time was not commensurate with his educational experience and previous work experience and because at the time he was paying for his educational expenses from his salary.  Bayoumi Tr. 699:21-704:14 (confirming that the "other allowances" were used to fund his education and living expenses and were never used for any illegal activities).

24.    Contemporaneous documents show that, on April 12, 2000, Al Bayoumi's secondment to Dallah Avco ended; on April 15, he resumed his position at the PCA; on May 1,

Dallah Avco rehired him on the ANSS project; and on May 23, the PCA granted him a two-year

academic leave to pursue a doctoral degree. Ex. 38 (DA001058-59); Ex. 39 (KSA0000000989);

Ex. 40 (KSA0000000902); Ex. 41 (KSA0000000872).

25.     On October 9, 2000, Al Bayoumi moved to the United Kingdom to begin a

Ph.D. program at Aston University. Ex. 42 (Bayoumi Ex. 739) at 8000 (Al Bayoumi passport)

(showing entry to United Kingdom on October 9, 2000); Ex. 43 (KSA0000006692) (letter

from Aston University confirming Al Bayoumi "joined the Research Degrees Programme

in October 2000").

26.     Although Al Bayoumi's studies at Aston were cut short, in May 2002, he earned a

master's degree in management from Aston University. Ex. 44 (KSA0000000840).

27.     In July 2002, Al Bayoumi returned to Jeddah and resumed his work on the ANSS

project. Ex. 42 (Bayoumi Ex. 739) at 8000 (Al Bayoumi passport).

28.     Contrary to Plaintiffs' allegations, Al Bayoumi testified that he has never been a

Saudi intelligence officer or "an agent for any Saudi law enforcement agency," or had "any

assignment for any Saudi intelligence or law enforcement agency." Bayoumi Tr. 724:18-725:13.

29.     While he was in San Diego, Al Bayoumi helped to found the Masjid Al Madina

Al Munawarah (the "Al Madina Mosque") and worked as a volunteer there, sometimes using

the title "general supervisor." Bayoumi Tr. 145:24-147:4, 148:4-9, 151:2-18, 152:15-21.

### 2.     Fahad Al Thumairy

30.     In 1995, Fahad Al Thumairy graduated from Mohammed Bin Saud Islamic

University in Riyadh, Saudi Arabia, at MOIA. Ex. 45 (KSA0000002829) (diploma); Ex. 46

(Ghudaian Ex. 450) (Employment Application dated February 16, 1996).

31.     The Saudi Embassy in the United States applied for Al Thumairy to be registered

as an Administrative Officer in the Los Angeles Consulate; the State Department approved this

application.  Ex. 47 (Awad Ex. 459) (letter from State approving request); Ex. 48 (KSA0000006882)

("Special Passport" and visa identifying Al Thumairy as an "Official" in the "Saudi Embassy").

32.     Al Thumairy was approved to work in MOIA's Da'wah Office in the United

States and was sent to the Ibn Taymiyyah Mosque in Los Angeles.  Ex. 49 (KSA0000002684);

Ex. 50 (Ghudaian Ex. 452); Ex. 51 (Ghudaian Ex. 433).

33.     In 1998, the King Fahad Mosque in Los Angeles opened, and Al Thumairy

became a full-time imam there.  Ex. 52 (KSA0000001260); Thumairy Tr. 90:4-20; *see id.* at

125:22-126:6 (testifying that his appointment as an imam for the mosque was spontaneous and

he does not recall a written decision); *cf.* Khalil Tr. 99:23-100:11 (testifying that the mosque's

leadership did not consider Al Thumairy to be an imam at the mosque, but others did because

he led prayers at the mosque and was qualified in Islamic studies).

34.     In April 2001, Al Thumairy's initial five-year deployment to the United States,

which was set to expire on March 29, 2001, was extended for two years, to March 6, 2003.

Ex. 55 (KSA0000001739) (April 3, 2001 administrative decision).

### 3.     Musaed Al Jarrah

35.     During the relevant period, Musaed Al Jarrah was the assistant head of the Islamic

Affairs Department at the Embassy of Saudi Arabia in Washington, D.C.  Ex. 56 (Jarrah Ex.

782) (resume translating title as "Assistant President"); *see also* Ex. 57 (KSA0000008651)

(July 20, 1998 administrative decision); Ex. 58 (KSA0000008652) (August 18, 1999

administrative decision); Ex. 59 (KSA0000008653) (June 28, 2000 administrative decision);

Ex. 60 (KSA0000008654) (July 28, 2001 administrative decision).

36.     The Islamic Affairs Department (or Division), in which Al Jarrah worked, was

(despite its name) part of the Ministry of Foreign Affairs rather than part of MOIA.  Jarrah Tr.

309:6-310:21 (the people Al Jarrah worked with in the "Islamic Affairs division" did not

"include the Ministry of Islamic Affairs"); *see also* Khalil Tr. 20:4-21:5, 34:6-35:15; Afifi Tr. 16:4-17:7; Sageman Rep. 163-64.

37.     The Islamic Affairs Department dealt with cultural and public relations outreach to Muslims and U.S. mosques, as well as assisting with religious pilgrimages to Saudi Arabia (*hajj* or *umrah*).  Khalil Tr. 18:20-19:3, 20:4-24, 24:10-25:15, 26:12-27:2 (testifying that the Islamic Affairs Department at the Embassy was established in 1987 and that it conducted public relations "to create good relation between the embassy and other Muslims around groups, regardless of nationality or color").

### 4.     Khalid Al Sowailem

38.     During the relevant period, Khalid Al Sowailem was the head of the Da'wah Office (also referred to as the "IFTA Office") located in the Embassy of Saudi Arabia in Washington, D.C.  Ex. 63 (KSA0000002612) (August 27, 1995 administrative decision directing deployment); Ex. 64 (KSA000002572) (May 13, 2000 administrative decision extending deployment); *see also* Sadhan Tr. 33:5-12.

39.     The Da'wah Office, although located in the Embassy, was part of MOIA, and Al Sowailem was a MOIA employee.  Ex. 63 (KSA0000002612); Ex. 64 (KSA000002572); Jarrah Tr. 40:3-7, 136:14-137:7; Thumairy Tr. 51:6-19; Sageman Rep. 163-64.

40.     The Da'wah Office dealt with MOIA employees working in the United States, such as Al Thumairy, as well as other MOIA employees who traveled to the United States during Ramadan.  *See*, *e.g.*, Ex. 66 (KSA0000001234) (letter appointing Al Thumairy as a preacher to work in Los Angeles); Ex. 67 (KSA0000001247) (dealing with Ramadan preachers); Ex. 68 (KSA0000007584) (stating that MOIA had sent 14 preachers during Ramadan 1419 and had

organized the distribution of 35 tons of dates, which are traditionally eaten when breaking the Ramadan fast).[4]

### 5.     Adel Al Sadhan

41.     During the relevant period, Adel Al Sadhan was an employee in the Da'wah Abroad office in the Ministry of Islamic Affairs in Riyadh, where he was responsible for editing letters dealing with the needs of Islamic communities inside and outside the Kingdom. Sadhan Tr. 20:17-22:16, 28:17-21.

### 6.     Mutaeb Al Sudairy

42.     During the relevant period, Mutaeb Al Sudairy was a MOIA employee working in a department he referred to as the "Da'wah center" in Riyadh, where he made "observations about the content [and] nature of . . . religious discourse." Sudairy Tr. 49:18-52:17.

### 7.     Abdullah Al Jaithen

43.     During the relevant period, Abdullah Al Jaithen was a MOIA employee who worked in MOIA's office in Qassim, Saudi Arabia. Jaithen Tr. 38:7-19.

44.     Al Jaithen described his work as follows: "My job was to spread awareness about pure Islam, about the ethics, the morals, the religious rules of Islam. And we also went through some difficult circumstances, like terrorism from ISIS and Al Qaeda. We explained to people that it was not permissible to join such terrorist organizations and that it was unlawful to shed blood, things of that nature." Jaithen Tr. 44:18-45:4; *see also id.* at 46:10-13 ("[I]f a bombing

---

[4] References to "Ramadan 1419" and similar dates are references to the Hijri calendar, which is an Islamic lunar calendar. For official purposes, Saudi Arabia uses the Umm Al-Qura version of the Hijri calendar, which is available at https://ummulqura.org.sa. For the convenience of the Court, Saudi Arabia is submitting (as Exhibits 69 to 73) copies of pages from the Umm Al-Qura calendar website, in English, showing date conversions from 1998, 1999, 2000, 2001, and 2002 to the Hijri calendar, which cover 1419, 1420, 1421, and 1422 AH.

REDACTED FOR PUBLIC FILING

takes place in a certain country, we were expected to condemn it and explain that shedding innocent blood was not permissible.").

### 8.    Majed Al Mersal

45.    During the relevant period, Majed Al Mersal was a MOIA employee who worked with Al Jaithen in MOIA's Qassim office.  Mersal Tr. 34:13-35:1, 37:8-15, 38:11-15.

46.    Al Mersal's duties were a combination of "administrative work" and "fieldwork," including "lessons and lectures at colleges, schools and mosques," or "appear[ances] in media" such as "radio and TV."  Mersal Tr. 40:19-41:6.

### 9.    Smail Mana

47.    During the relevant period, Smail Mana (referred to in some parts of the record as "Ismail Mana") was an employee of the Los Angeles Consulate.  Mana Decl. ¶ 3.

48.    Mana is a citizen of Algeria and a permanent resident of the United States. He has never been a citizen of Saudi Arabia.  Mana Decl. ¶ 2.

49.    While employed at the Consulate, Mana's responsibilities were primarily those of a translator.  He also distributed Islamic literature to visitors to the Consulate.  Mana Decl. ¶ 3.

## II.    Background Concerning Al Qaeda and the 9/11 Attacks

### A.    Al Qaeda, Its Leaders and Members, and the 9/11 Plot

50.    Al Qaeda is a foreign terrorist organization, designated as such by the United States in October 1999.  9/11 Rep. 185.

51.    During the 1990s and 2000s, the leader of Al Qaeda was Osama bin Laden. 9/11 Rep. 55-70 (describing bin Laden's founding of Al Qaeda).

52.    Bin Laden personally participated in planning the plot that culminated in the September 11, 2001 attacks on the United States.  9/11 Rep. 155 (discussing bin Laden's

REDACTED FOR PUBLIC FILING

"reported[ ]" role in "select[ing] . . . targets" during "a series of meetings in the spring of 1999 . . . near Kandahar," in Afghanistan).

53.     Khalid Sheikh Mohammed, often referred to as "KSM," was "the principal architect of the 9/11 attacks."  9/11 Rep. 145.

54.     According to the 9/11 Commission, KSM claimed that he came up with the idea for the attacks; that bin Laden told him "in March or April 1999 . . . that al Qaeda would support his proposal"; and that the nature and targets of the attacks became clear only after further discussions in the spring of 1999 among bin Laden, KSM, and a third Al Qaeda leader named Mohammed Atef.  9/11 Rep. 154-55; *see* Sageman Rep. 123-25.

55.     According to later-recovered documents from the Abbottabad compound where bin Laden was killed by U.S. forces in 2011, bin Laden himself wrote that "[t]he idea came to [him] when [he] heard about the plane piloted by al-Batouti."  Sageman Rep. 125-26 (quoting Ex. 79 (Nakhleh Ex. 12)).

56.     If true, bin Laden's statement dates the idea for the 9/11 attacks significantly later than the date in the 9/11 Report because the reference to "al-Batouti" appears to mean Gamal el-Batouti, the pilot of EgyptAir 990, who was widely reported to have intentionally crashed the plane into the ground.  The EgyptAir 990 crash occurred on October 31, 1999, and reports of it spread through the media in November 1999.  Sageman Rep. 125-26.

57.     Information about the 9/11 attacks was "compartmentalized" even within Al Qaeda to avoid "discover[y]," so that even the hijackers "did not know about the nature of the operation until shortly before the attack."  FBI May 2021 EC at 009; *see id.* (further stating that compartmentalization "is consistent with the FBI's assessment of the last two decades of large scale [Al Qaeda]-related attacks"); Sageman Rep. 129-30.

REDACTED FOR PUBLIC FILING

58.    Nawaf Al Hazmi and Khalid Al Mihdhar were two Al Qaeda members who helped carry out the 9/11 attacks.  9/11 Rep. 2-3, 155.

59.    Bin Laden selected Al Hazmi and Al Mihdhar as hijackers for the 9/11 attacks in the spring of 1999.  9/11 Rep. 155; Sageman Rep. 124-25.

60.    Al Hazmi and Al Mihdhar were first informed about the details of the 9/11 attacks during meetings in Qandahar during Ramadan 1420, which began in December 1999.  Sageman Rep. 126-28; Ex. 81 (CIA, *11 September:  The Plot and the Plotters* (CIA_000088-149)).

61.    There is no evidence that any Al Qaeda member informed any official or employee of the Kingdom of Saudi Arabia that it was planning the 9/11 attacks or discussed those attacks with any such official or employee.

### B.    Al Qaeda's Hostility Towards the United States and Saudi Arabia

62.    During the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia.  *See* 9/11 Rep. 47-48 (discussing Al Qaeda's calls for attacks on the United States); Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment:  "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Khalil Tr. 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); Sageman Rep. 65-117; Rundell Rep. 26-30; Nakhleh Tr. 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat).

63.    In April 1994, Saudi Arabia stripped Al Qaeda's leader, Osama bin Laden, of his Saudi citizenship and froze his assets.  9/11 Rep. 57, 170, 497 n.113; *Terrorist Financing Monograph* at 20; Sageman Rep. 76-77; Rundell Rep. 26; Nakhleh Tr. 60:3-11.

REDACTED FOR PUBLIC FILING

64.     In 1994 and 1995, bin Laden publicly accused King Fahd and Saudi Arabia's government of betraying and conspiring against Islam, including an August 1995 demand for the King's resignation.  Sageman Rep. 81-88; *see id.* at 88 ("Oh King, we have proven above that your regime has committed sins against Islam that negate its guardianship in the eyes of Allah. . . .  We ask that you tender your resignation.").

65.     In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia.  9/11 Rep. 62-63; Sageman Rep. 89-91; Rundell Rep. 26; Nakhleh Tr. 62:22-63:8.

66.     After leaving Sudan, bin Laden and other Al Qaeda members settled in Afghanistan.  9/11 Rep. 109; Sageman Rep. 92.

67.     In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam.  Sageman Rep. 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the Arabian Peninsula," and criticized the Saudi regime:  "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . .  While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy.  So, efforts should be pulled to kill him, fight him, destroy him."); *see* 9/11 Rep. 47-48; Rundell Rep. 27-28; *see also* Nakhleh Tr. 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified").

68.     In January 1998, Saudi security forces intercepted at the Yemeni-Saudi border several Islamist militants attempting "to smuggle four Russian-made antitank missiles into Saudi Arabia," an attempt that the 9/11 Commission linked to Al Qaeda.  9/11 Rep. 152; *see also id.* at 115 (describing what appears to be the same incident as "the Saudi government . . . quietly disrupt[ing] Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles"); Sageman Rep. 104-05 (discussing the smuggling attempt and a resulting "major crackdown" by "Saudi security forces").

69.     In February 1998, bin Laden joined in a so-called "fatwa" that "every Muslim in all countries" should "kill the American[s] and their allies – civilians and military – . . . in order to liberate the al-Aqsa Mosque and the Holy Mosque [*i.e.*, Mecca] from their grip."  Sageman Rep. 106 & n.388 (quoting a translation of the statement); *see* Rundell Rep. 28-29 (quoting a different translation and observing that bin Laden's call "to liberate Mecca was a direct attack on the legitimacy of the Saudi government and its stewardship of the Muslim Holy Land"); *see also* 9/11 Rep. 47-48 (discussing the same statement).

70.     In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution.  9/11 Rep. 115 (discussing Prince Turki's overture to the Taliban); Sageman Rep. 108-14 (more detailed discussion including Al Turki's participation); Nakhleh Tr. 63:15-64:14.

71.     The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course.  In response, Saudi Arabia terminated diplomatic relations with the Taliban. Sageman Rep. 113-14; Nakhleh Tr. 64:15-65:3.

REDACTED FOR PUBLIC FILING

72.    During the period from 1996 to 1998, there were assassination attempts against

bin Laden that he or those around him attributed to Saudi Arabia.  *See* 9/11 Rep. 63 (in 1996,

before leaving Sudan, bin Laden "had already escaped at least one assassination attempt that he

believed to have been the work of the Egyptian or Saudi regimes, or both"); Sageman Rep.

102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had

unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi

consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see

also* Nakhleh Tr. 65:4-11 (conceding that he had heard "statements about" an "assassination

attempt" on bin Laden that "Saudi Arabia was behind").

## III.    Relevant Events in California

### A.    Al Hazmi's and Al Mihdhar's Arrival in Los Angeles

73.    On January 15, 2000, Al Hazmi and Al Mihdhar arrived in Los Angeles,

California on a flight from Bangkok, Thailand, with the goal of learning English and getting

flight training.  9/11 Rep. 215, 221-22.

74.    There is no evidence that Al Hazmi or Al Mihdhar had communications with any

Saudi government official or employee prior to their arrival in the United States.

75.    There is no evidence that any other Al Qaeda member had communications with

any Saudi government official or employee about Al Hazmi or Al Mihdhar.

76.    There is no evidence as to what Al Hazmi or Al Mihdhar did immediately after

they landed in Los Angeles.  *See generally* 9/11 Rep. 216 ("After the pair cleared Immigration

and Customs at Los Angeles International Airport, we do not know where they went."); *id.* at

514 n.8.

77.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

78.    ████████████████████████████████████████

██████████████████████

       a.    ███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

       b.    ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████

       c.    ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

**REDACTED FOR PUBLIC FILING**

d. ████████████████████████████████

████████████████████████████████

e. ████████████████████████████████

████████████████████████████████

████████████████

79.    Al Thumairy does not recall meeting Al Hazmi or Al Mihdhar at all, whether in January 2000 or later.  Thumairy Tr. 340:15-341:2, 346:1-19, 348:1-9, 491:4-6.

80.    Over the course of the approximately four years that Al Thumairy served as imam of the King Fahad Mosque, he interacted with perhaps "[m]illions" of visitors, making it "impossible" for him to "know the names of every person who came to" the Mosque even though a visitor might recognize his name as the imam.  Thumairy Tr. 565:7-566:16.

81.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

82.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

83.    ████████████████████████████████

████████████████████████████████████

████████████████████████

84. ███████████████████████████████████████████

████████████████████████████████████

85. ████████████████████████████████████████████████████

████████████████████████████████

86. ████████████████████████████████████████████████████

████████████████████████████████████████████

87. ███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ Thumairy Tr. 516:24-

517:15 (Al Thumairy never "provide[d] any instructions to . . . Johar to do anything").

88. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

89.     There is no evidence that anyone other than ▮▮▮▮ assisted Al Hazmi or Al Mihdhar when they first arrived in Los Angeles.

**B.    Al Bayoumi's and Morgan's Visit to the Consulate**

90.     On January 31, 2000 or February 1, 2000, Al Bayoumi traveled from San Diego to Los Angeles with an American, Kayson Morgan (also referred to as "Isamu Dyson" and "Cayson Bin Don"), to renew his and his family's passports at the Saudi Consulate in Los Angeles.  9/11 Rep. 217 (dating trip to February 1, 2000); Ex. 85 (Awad Ex. 463), at 643 (later Consulate report about visit), 648 (application for passport dated January 31, 2000, with issuance date of February 1, 2000); Ex. 42 (Bayoumi Ex. 739) (passport showing issuance date of February 1, 2000); Bayoumi Tr. 357:17-358:15 (identifying Morgan as "Osama"); Morgan Decl. ¶¶ 5, 8 (describing invitation from Al Bayoumi to travel to Los Angeles "during January 2000"); Sageman Rep. 176-77, 668-69 (discussing likely date of visit).

91.     At the Consulate, Al Bayoumi filled out the paperwork necessary to renew his and his family's passports and gave it to a female receptionist.  Bayoumi Tr. 381:11-382:13.

92.     Al Bayoumi and Morgan then prayed in a prayer room at the Consulate.  Bayoumi Tr. 375:11-376:23 (describing the prayer room); *id.* at 382:23-383:3, 384:9-18, 386:14-20 (describing the sequence of events).

93.     Before leaving the Consulate, Al Bayoumi also picked up copies of the Quran for the Al Madina Mosque from Mana.  Bayoumi Tr. 383:13-384:5, 388:11-389:3 (describing Mana as a "person from . . . Islamic Affairs" who was a "non-Saudi" and who Al Bayoumi "didn't know"); Mana Decl. ¶¶ 10-12, 14 (describing the interaction and explaining that he learned only later that the Saudi citizen whom he had met may have been Al Bayoumi); Mana Tr. 134:8-135:3 (describing the interaction); Morgan Decl. ¶¶ 12-15 (describing the interaction and stating that he identified Mana from a photograph provided by the FBI); *see also* Bayoumi Tr. 302:1-303:19

REDACTED FOR PUBLIC FILING

(testifying that "Saad Al Shabreen" and "Ismail Mana" were names he received from the Consulate in connection with a request for religious materials).

94.     Al Bayoumi exchanged greetings with Mana when he picked up these materials. Bayoumi Tr. 379:16-22, 384:19-24 (stating that the person from Islamic Affairs "introduced himself to us" and "said that he was the one who was going to give us the mushaffs"; a "mushaff" is "a book containing the Quran"); Mana Decl. ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi).

95.     Although the witnesses' recollections differ on the sequence of events, the length of Al Bayoumi's interaction with Mana was measured in minutes or even less than a minute.

    a.     Mana recalls his "entire interaction" with the Saudi citizen he later learned was Al Bayoumi "last[ing] no more than one minute." Mana Decl. ¶ 12.

    b.     Al Bayoumi recalls his interaction with the person who gave him the copies of the Quran also involving that person escorting himself and Morgan to the Consulate's prayer room (but not staying with them afterwards), but did not give a duration for the entire interaction. Bayoumi Tr. 384:6-385:22.

    c.     Morgan recalls Al Bayoumi speaking "briefly" with the person later identified as Mana, and then recalls leaving the reception area with the person later identified as Mana and then waiting "for at least 20 – 30 minutes," but did not observe whether they spoke further outside his presence. Morgan Decl. ¶¶ 12, 15.

96.     Both Al Bayoumi and Mana recall that Al Bayoumi's and Morgan's visit to the Consulate was the only time that Al Bayoumi ever met Mana. The two have no relationship. Mana Decl. ¶ 16 ("Other than the interactions described above, I have never interacted with,

**REDACTED FOR PUBLIC FILING**

spoken to, or seen Mr. Al Bayoumi anywhere else, including at the King Fahad Mosque.");
Bayoumi Tr. 302:15-17 ("Q. And Ismail Mana, do you know Ismail Mana? A. No.").

      **C.    Al Bayoumi's and Morgan's Encounter with Al Hazmi and Al Mihdhar**

    97.    Al Bayoumi recalls going with Morgan directly from the Consulate to get lunch
(having first prayed at the Consulate, *supra* ¶ 92); Morgan recalls going to the King Fahad
Mosque to pray and then going to get lunch. Bayoumi Tr. 390:17-392:5; Morgan Decl. ¶ 16; *see*
9/11 Rep. 217-18 (noting this difference in recollection).

    98.    The first place they tried was not serving meals. Bayoumi Tr. 393:12-394:7 ("We
were looking for another restaurant that me and my family had eaten at before, but it was closed,
I believe."); Morgan Decl. ¶ 16 (recalling that the first place they tried "was not a restaurant but a
halal meat market," and the "proprietor of the market told Mr. al-Bayoumi that there was a halal
restaurant a short walk from the market").

    99.    After that first try, Al Bayoumi and Morgan found a restaurant that served halal
food. Al Bayoumi does not recall the name or exact location; Morgan recalls it as the
"Mediterranean Café." Bayoumi Tr. 393:8-395:8; Morgan Decl. ¶ 16.

    100.    Al Hazmi and Al Mihdhar were also at the restaurant. Al Bayoumi "heard them
speaking Arabic" and introduced himself. Bayoumi Tr. 396:8-23; Morgan Decl. ¶ 17 ("They
were speaking Arabic and ordering coffee. Mr. al-Bayoumi overheard them.").

    101.    Al Bayoumi, Al Hazmi, and Al Mihdhar had a short conversation in Arabic.
Bayoumi Tr. 399:11-400:1 ("Ordinary conversation. Where do you live? I said, we live in San
Diego. And I told them that we were on our – we were going back home to San Diego now and
that San Diego was a beautiful city with nice weather. . . . [T]hey said they were from Saudi
Arabia."); *id.* at 402:7-9 ("I told them that we lived close to the Islamic Center in San Diego.");

REDACTED FOR PUBLIC FILING

*id.* at 404:20-23 ("It was not that long of a time.  Just Salaam-Alaikum ['peace be upon you'], we live in San Diego, we are leaving now.").

102.    Morgan does not speak or understand Arabic and did not participate in the conversation at the restaurant.  Morgan Decl. ¶¶ 17-18; Morgan Tr. 82:4-7.

103.    At no time during his conversation at the restaurant with Al Hazmi and Al Mihdhar did Al Bayoumi offer to help them in any way.  Bayoumi Tr. 726:23-727:2.

104.    At no time during his conversation at the restaurant with Al Hazmi and Al Mihdhar did Al Bayoumi invite them to San Diego or suggest that they come there.  Bayoumi Tr. 796:9-13 ("[Y]ou're saying that I advised them.  I did not advise them.  I only told them that the weather is nice in San Diego and it's a beautiful city.  Did I guide them?  No.").

105.    Al Bayoumi did not plan to meet Al Hazmi and Al Mihdhar at the restaurant, nor did anyone direct him there.  The meeting was a "coincidence."  Bayoumi Tr. 725:14-726:8; *see* Morgan Tr. 28:22-29:6 (admission that Morgan "ha[s] no personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence"); *id.* at 80:10-14 (admission that he "do[es]n't know anything about" any alleged "preparations made for 9/11 hijackers").

106.    After leaving the restaurant, Al Bayoumi and Morgan returned to San Diego.  Morgan recalls that they first visited the King Fahad Mosque, but Al Bayoumi recalls that they tried to find the mosque, but could not find it, and went home.  *Compare* Bayoumi Tr. 403:23-405:2 *with* Morgan Decl. ¶¶ 20-23.

107.    The encounter at the restaurant came to the 9/11 Commission's attention only because Al Bayoumi disclosed it during interviews with law enforcement.  9/11 Rep. 218 ("We know about [the encounter] because Bayoumi told law enforcement that it happened.").

24

REDACTED FOR PUBLIC FILING

108.    Neither during the encounter at the restaurant, nor at any later time, did Al

Bayoumi know or suspect that Al Hazmi and Al Mihdhar were planning to commit terrorist

attacks against the United States.  Bayoumi Tr. 724:7-17; *see* FBI May 2021 EC at 009-010

(discussing "information corroborat[ing] that . . . Bayoumi[] . . . did not knowingly conspire

to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack"); 9/11 Rep. 218 ("[W]e

have seen no credible evidence that [Al Bayoumi] believed in violent extremism or

knowingly aided extremist groups.  Our investigators who have dealt directly with him and

studied his background find him to be an unlikely candidate for clandestine involvement with

Islamist extremists.") (footnote omitted).

### D.    Al Hazmi and Al Mihdhar in San Diego

#### 1.    The Parkwood Apartments

109.    Several days later, Al Hazmi and Al Mihdhar came to the Islamic Center of San

Diego ("ICSD"), where they met Al Bayoumi again.  Bayoumi Tr. 421:5-422:23.

110.    Al Bayoumi had not planned to meet Al Hazmi and Al Mihdhar again, and neither

they nor anyone else had told him they would be coming to San Diego.  Bayoumi Tr. 422:20-23,

729:9-730:4.

111.    Upon learning that Al Hazmi and Al Mihdhar were looking for a place to live in

San Diego, Al Bayoumi referred them to the Parkwood Apartments, where he and his family had

an apartment.  Bayoumi Tr. 439:24-440:13, 733:20-24.

112.    On February 4, 2000, Al Bayoumi helped Al Hazmi and Al Mihdhar fill out a

lease application; he later co-signed their lease as a guarantor.  Bayoumi Tr. 432:12-435:22,

437:10-439:23, 736:5-23; Ex. 89 (Bayoumi Ex. 704); Ratchford Decl. ¶¶ 11-13, 15; *see* 9/11

Rep. 219.

113.    Al Bayoumi also went with Al Hazmi and Al Mihdhar to a nearby bank to get a certified check for their first month's rent and security deposit; they opened an account using cash they already had.  Bayoumi Tr. 440:14-442:9, 443:10-13; *see* Ratchford Decl. ¶ 14.

114.    Because the bank would not issue a certified check from a new account the same day that account was opened, Al Bayoumi, at a bank employee's suggestion, obtained a certified check from his own account.  Bayoumi Tr. 442:13-443:9 ("[T]he employee said, let them deposit the money in your account and issue the check from your account."); *id.* at 737:3-17 ("[T]he bank teller told us you can't issue a check unless you open an account.  And if you open an account, it's going to require 24 hours for it to be active.  And after that said, of course there's another way, that since you have an account with us, you can pay with a check from your account . . . and they will make a deposit."); *see* 9/11 Rep. 219; Ratchford Decl. ¶ 14.

115.    Al Bayoumi received reimbursement from Al Hazmi and Al Mihdhar at the same time that he obtained the certified check.  Ex. 91 (Bayoumi Ex. 737) (bank account statement showing same-day deposit and check for $1,558 each); Bayoumi Tr. 442:22-443:13, 735:21-736:11 (reviewing Ex. 91 (Bayoumi Ex. 737)); *id.* at 737:12-17 (testifying that "they made a deposit first, then the check went out," and that this happened "at the same time"); *see* 9/11 Rep. 219; *see also* Ratchford Decl. ¶ 14 (confirming that the check Al Bayoumi provided was for $1,558).

116.    At no time did Al Bayoumi give Al Hazmi or Al Mihdhar money or pay for their expenses.  Bayoumi Tr. 737:18-23; *see* 9/11 Rep. 219 ("Neither then nor later did Bayoumi give money to either Hazmi or Mihdhar, who had received money from KSM.").

117.    Al Bayoumi had two reasons for helping Al Hazmi and Al Mihdhar to obtain an apartment at the Parkwood Apartments.

     a.     *First*, like ▮▮▮, he considered it customary to help newcomers to an Islamic community and had received similar help himself when he had first arrived in the United States.  Bayoumi Tr. 737:24-739:24; *see id.* at 738:16-23 ("An American person came with me from the mosque.  So we went and rented an apartment.  I didn't know him, he didn't know me.  We met at the mosque, I told them I need an apartment, so we looked for . . . apartment complexes until we found this apartment, and I lived there."); *id.* at 739:5-11 ("[I]f you go to the community, for example, and ask for someone to cosign with you or something, to rent an apartment, at least ten people would help you without hesitation."); *see also supra* ¶ 88.

     b.     *Second*, he had received a referral fee ($100 to $200) from the manager of the Parkwood Apartments in the past and expected to (and did) receive a similar fee for referring Al Hazmi and Al Mihdhar.  Bayoumi Tr. 734:1-17.

118.     Shortly after Al Hazmi and Al Mihdhar moved into the Parkwood Apartments, Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madina Mosque during Ramadan.  Bayoumi Tr. 460:12-461:7; *see also* Ex. 92 (FBI 4014-4018) at 4017 (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000").

119.     Some guests to the reception brought their families, and the attendants adhered to an Islamic tradition requiring families and unmarried men to be separated in group settings. Accordingly, Al Bayoumi and others who had brought their families asked Al Hazmi and Al Mihdhar if male guests could gather in their apartment, and Al Hazmi and Al Mihdhar agreed. Bayoumi Tr. 460:12-463:23; *see id.* at 461:12-20 ("The people that brought their families with

them, they went and they asked them, we need the apartment because we have people, the families with us.  At the beginning they said no.  But when they saw the people coming, eventually they said okay, fine, no problem.").

120.    Following this party, Al Hazmi and Al Mihdhar had minimal contact with Al Bayoumi.  He would exchange greetings when he saw them.  Bayoumi Tr. 742:18-743:4.

121.    Al Hazmi and Al Mihdhar avoided Al Bayoumi after he criticized them for inappropriate behavior in front of his children.  *See* Bayoumi Tr. 755:2-11 ("Khalid and Nawaf tended to avoid me.  Why?  Because they tended to joke with one another physically, using hands, in the presence of my children.  And I warned my children not to mix with them because of that bad behavior.  From that day on, they took the position of avoiding me.  Even if they see me, they wouldn't approach me.").

122.    Al Bayoumi spent much of the remainder of 2000 outside of San Diego, in Saudi Arabia and the United Kingdom, and did not interact with Al Hazmi or Al Mihdhar when he was traveling away from San Diego.  The last time he recalled interacting with Al Hazmi or Al Mihdhar was in February or March 2000.  Bayoumi Tr. 744:3-757:1.

123.    At no time, while in San Diego or otherwise, did Al Bayoumi instruct anyone to help Al Hazmi, Al Mihdhar, or any other 9/11 hijacker.  Bayoumi Tr. 724:2-6.

### 2.    Al Hazmi's and Al Mihdhar's Other Contacts in San Diego

#### a.    Al-Mohdar Mohammed Abdullah Zeid

124.    █████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████;

*see* 9/11 Rep. 216, 218-19 (Zeid's interactions with the hijackers).

125. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████; *cf. supra* ¶ 29 (describing Al

Bayoumi's volunteer work at the Al Madina Mosque in El Cajon).

126. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

127. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████.

128. According to the 9/11 Report, Zeid introduced the hijackers to his friends and

helped them obtain drivers' licenses and apply to language and flight schools.  9/11 Rep. 220;

*cf.* ████████████████████████████████████████████████████████████

████████████████

129. Al Bayoumi does not recall seeing Zeid with Al Hazmi and Al Mihdhar at all.

Bayoumi Tr. 486:19-487:15, 490:8-18.

130. Al Bayoumi recalls knowing Zeid from his work at the Al Madina Mosque and

recalls him as someone who "liked to help anybody" and would "offer help . . . [to] make some

money on the side."  Bayoumi Tr. 589:17-590:7; *see id.* at 797:4-5 ("[Zeid] provides services for

anybody.").

131. 

132. ; *see* Bayoumi Tr. 724:2-6; *id.*

at 797:2-8 (Al Bayoumi never "assign[ed]" or "instruct[ed]" Zeid "to take care of" or "to assist

the hijackers").

133.

### b.    Anwar Al Awlaki

134.    Anwar Al Awlaki (also transliterated "Aulaqi") was a United States citizen and, at

the time that Al Hazmi and Al Mihdhar were in San Diego, the imam of the Al Ribat (also

transliterated "Rribat") Mosque in San Diego.  9/11 Rep. 221.

135.    Before and for some time after the 9/11 attacks, Al Awlaki was known as a

politically moderate Islamic preacher who opposed terrorism.  *See* Sageman Rep. 521

(describing Awlaki's condemnation of the 9/11 attacks, leading a prayer at the U.S. Capitol in

July 2001, and speaking at the Pentagon in February 2002); Ex. 94 (Meleagrou-Hitchens Ex. 3)

at 1 (book by Plaintiffs' proffered expert describing "Awlaki [as] initially a revered

mainstream Islamic preacher in America who was considered to be a legitimate authority on the

religion by a large swathe of Western Muslims"); *id.* at 28 (describing Al Awlaki's invitation to

speak at the Pentagon).

REDACTED FOR PUBLIC FILING

136.    Later, Al Awlaki became a recruiter for and leader of Al Qaeda.  In 2011, he was killed by a U.S. drone attack in Afghanistan.  Sageman Rep. 521 (discussing Al Awlaki's trajectory after 9/11); *see* Ex. 95 (Remarks by the President at the National Defense University (May 23, 2013)) (acknowledging the strike that killed Al Awlaki as an "instance when we targeted an American citizen"), *at* https://obamawhitehouse.archives.gov/the-press-office/2013/05/23/remarks-president-national-defense-university.

137.    According to the 9/11 Report, "Hazmi and Mihdhar reportedly respected Aulaqi as a religious figure and developed a close relationship with him."  9/11 Rep. 221.

138.    Al Awlaki may have accompanied Al Hazmi and Al Mihdhar to the Parkwood Apartments during one of their attempts to obtain an apartment there.  Ratchford Decl. ¶ 8 (testimony of apartment manager stating that, before moving into the apartment, the hijackers were "accompanied by another man who helped translate for them" who looked like Anwar Al Awlaki and that she recognizes the person in a picture attached to the declaration (showing a picture of Awlaki) as "an Imam and translator who most likely accompanied al-Hazmi and al-Mihdhar," although she "did not know his name").

139.    Al Bayoumi knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so.  Bayoumi Tr. 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him); *id.* at 589:9-16 (Al Bayoumi "reached out to Al Awlaki "on occasion").

**REDACTED FOR PUBLIC FILING**

140.    Al Bayoumi did not ask or direct Al Awlaki to help Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers.  Bayoumi Tr. 724:2-6 (testifying that he never instructed anybody to assist any of the 9/11 hijackers).

### c.    Abdussattar Shaikh

141.    Abdussattar Shaikh was an U.S. citizen and long-time FBI "asset" or "informant." 9/11 Rep. 223 (describing a "housemate who rented [a] room to Hazmi and Mihdhar" who was "an apparently law-abiding citizen with long-standing, friendly contacts among local police and FBI personnel"); OIG Rep. 256 & n.185 (referring to Shaikh as an "asset" or "informant"); *id.* at 260 & n.197 (stating that Shaikh had been an asset since 1994 and that in July 2003 was "given a $100,000 payment").

142.    In late May 2000, Shaikh rented a room to the hijackers in his home.  OIG Rep. 256 (dating the rental to "late May 2000"); Ratchford Decl. ¶ 19 (Parkwood Apartments lease ended on May 31, 2000); ███████████████████████████████████████ ███████████████████████████████ ; *see* 9/11 Rep. 220, 223.

143.    Shaikh is deceased and did not testify in this litigation.  Ex. 97 (LexisNexis copy of California death record).

144.    According to the 9/11 Commission, Shaikh "did not see anything unusual enough in the behavior of Hazmi or Mihdhar to prompt him to report to his law enforcement contacts." 9/11 Rep. 223; *see also* OIG Rep. 261, 336 (reporting that Shaikh described them as "quiet tenants who paid their rent" and "good Muslims who often went to the mosque and prayed," and "insisted that he noted no indicators of [their] nefarious activity").

145.    Al Bayoumi knew Shaikh but did not introduce the hijackers to Shaikh or assist the hijackers in renting a room in Shaikh's house, or even know that they were doing so.

*Bayoumi* Tr. 228:1-230:15, 510:2-8; *see also* OIG Rep. 260 (stating that "Hazmi and Mihdhar met the asset at the mosque they attended").

### d.    Other Contacts

146.    According to the 9/11 Report, a number of other individuals provided Al Hazmi or Al Mihdhar with assistance while they were in San Diego:

a.    Osama Mustafa hired Al Hazmi to work at a Texaco gas station that he owned.  9/11 Rep. 518 n.42.

b.    Osama Awadallah, whose number was found in Al Hazmi's car that was abandoned at Washington Dulles airport prior to the 9/11 attacks, and who also worked at the Texaco gas station, befriended the hijackers, translated, and helped them adjust to life in San Diego.  9/11 Rep. 220.

c.    Omar Bakarbashat, who also worked at the Texaco station, helped Al Hazmi learn English, and took over Al Hazmi and Al Mihdhar's first apartment in San Diego after they moved out.  9/11 Rep. 221.

d.    An individual who lived across the street from the ICSD sold the hijackers a Toyota Carolla and allowed them to use his address in registering the vehicle "to help a fellow Muslim brother."  9/11 Rep. 220.

e.    In April 2000, an administrator at the ICSD allowed Hazmi to use his bank account to receive a $5,000 wire transfer, which was made by Khalid Sheikh Mohammed's nephew.  9/11 Rep. 220.

f.    Yazeed Al Salmi moved into Shaikh's house with Al Hazmi after Al Mihdhar left California for Yemen.  9/11 Rep. 222.  According to the 9/11 Report, Al Salmi purchased traveler's checks at a bank in Riyadh in July 2000.  On September 5, 2000, Al Hazmi deposited $1,900 of the traveler's checks into his bank account, after

**REDACTED FOR PUBLIC FILING**

withdrawing the same amount in cash. *Id.* ("It is possible that Hazmi was simply cashing the traveler's checks for a friend. We do not know . . . .").

147.    There is no evidence that any of these individuals received any instructions from Al Bayoumi, Al Thumairy, or any Saudi official to assist the hijackers.

### E.    Al Hazmi's and Al Mihdhar's Return to Los Angeles and Al Mihdhar's Departure

148.    On June 9, 2000, Al Hazmi, Al Mihdhar, and Zeid drove from San Diego to Los Angeles. 9/11 Rep. 220, 222; ███████████████.

149.    ████████████████████████████████████████████████
███████████████████████; Ex. 98 (Zeid Ex. 3B) (motel registration card).

150.    On June 10, 2000, Al Mihdhar left California on a flight from Los Angeles to Yemen. 9/11 Rep. 220; ███████████████.

151.    Witnesses' recollections vary about what occurred during Al Hazmi's and Al Mihdhar's visit to Los Angeles on June 9 and 10, 2000.



██████████████████████████████████████████████████

████████████████████████████

      c.     Alzamari recalls seeing Al Thumairy and Al Hazmi, but not Al Mihdhar, emerging from the mosque's library in the evening, after which Zeid, Al Hazmi, and Al Mihdhar went to dinner at a restaurant, but Alzamari did not; he then recalls later visiting Al Hazmi, Al Mihdhar, and Zeid at a motel and speaking with them.  Alzamari Tr. 80:22-81:20, 81:24-82:9, 85:4-11, 86:18-25, 87:24-88:7, 88:24-89:5.

      d.     Al Thumairy, as noted above, does not recall meeting Al Hazmi or Al Mihdhar at all.  *Supra* ¶ 79.

152.    Contemporaneous documents show that Al Thumairy could not have been in Los Angeles during the evening of June 9, 2000 or at any time on June 10, 2000.

      a.     Al Thumairy signed a letter on  letterhead of the IFTA Office in Washington, D.C. dated 7 Rabi 'Al-awwal 1421, corresponding to June 9, 2000; he did not have this letterhead in his possession in Los Angeles and would have used it only in Washington, D.C.  Ex. 100 (Qattan Ex. 413) (Plaintiffs' certified translation showing date of June 9, 2000); Thumairy Tr. 510:21-512:23, 566:21-569:3 (discussing this document); *see* Ex. 71 (Calendar for the Year 2000) (date conversion).

      b.     Al Thumairy's passport shows an entry stamp for Saudi Arabia that is dated 8 Rabi 'Al-awwal 1421, corresponding to June 10, 2000; at the time, taking into account the transit time between Los Angeles and Riyadh, the lack of direct flights, and the 10-hour time difference, it would have been impossible for Al Thumairy to leave Los Angeles the evening of June 9 and arrive in Riyadh on June 10.  Ex. 48, at 893 (passport showing date stamp; translated at PDF page 40 of Ex. 48); Thumairy Tr. 505:4-510:20

REDACTED FOR PUBLIC FILING

(discussing this document and the time required for travel); *see* Ex. 71 (Calendar for the Year 2000) (date conversion).

153.    Whether or not Al Thumairy encountered the hijackers, he never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers.  Thumairy Tr. 491:7-21, 492:11-493:2.

154.    Further, at no time before the 9/11 attacks did Al Thumairy know or suspect that those attacks were being planned.  Thumairy Tr. 493:4-11; *see* FBI May 2021 EC at 009-010 (discussing "information corroborat[ing] that Thumairy[ ] . . . did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack").

155.    Al Mihdhar did not succeed in learning English or learning to fly an airplane before his return to Yemen.  9/11 Rep. 221-22; *see also id.* at 239 (showing Al Hazmi and Al Mihdhar as hijackers on Flight 77, for which Hani Hanjour was the pilot).

### F.    Al Hazmi's Remaining Time in San Diego

156.    After Al Mihdhar left the United States for Yemen, Al Hazmi returned to San Diego.  9/11 Rep. 222.

157.    In December 2000, Al Hazmi left San Diego for Arizona, together with Hani Hanjour, another Al Qaeda member who was one of the 9/11 hijackers.  9/11 Rep. 223.

158.    There is no evidence that Al Hazmi had any contacts with Al Bayoumi, Al Thumairy, or any other Saudi official or employee after his return to San Diego.

159.    Al Hazmi did not succeed in learning English or learning to fly an airplane before his departure for Arizona with Hanjour.  9/11 Rep. 221-22; *see id.* at 223 ("By the fall of 2000, Hazmi no longer even pretended to study English or take flying lessons."); *see also id.* at 239 (showing Al Hazmi and Al Mihdhar as hijackers on Flight 77, for which Hani Hanjour was the pilot).

IV.    **Al Bayoumi's and Al Thumairy's Interactions with Other Saudi Government Officials or Employees**

160.    No one in the Saudi government instructed Al Bayoumi to help Al Hazmi, Al Mihdhar, or any other 9/11 hijacker.  Bayoumi Tr. 722:14-23.

161.    Al Bayoumi never discussed Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers with anyone at the Saudi Embassy or Consulate.  Bayoumi Tr. 722:24-723:15.

162.    No one in the Saudi government instructed Al Thumairy to help Al Hazmi, Al Mihdhar, or any other 9/11 hijacker.  Thumairy Tr. 491:15-21.

163.    Al Thumairy never discussed Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers with anyone at the Saudi Embassy or Consulate.  Thumairy Tr. 491:23-492:4.

164.    Al Bayoumi and Al Thumairy never spoke with one another about Al Hazmi, Al Mihdhar, or the other 9/11 hijackers.  Bayoumi Tr. 791:17-21; Thumairy Tr. 494:6-8.

A.    **Musaed Al Jarrah**

165.    As set out above, during the relevant period, Musaed Al Jarrah was the assistant head of the Islamic Affairs Department at the Saudi Embassy in Washington, D.C.  *Supra* ¶ 35.

166.    Al Jarrah has no personal relationship with Al Thumairy.  Jarrah Tr. 605:5-20.

167.    Al Jarrah recalls having only one phone conversation with Al Thumairy, which took place in 2003.  Jarrah Tr. 166:24-167:15.

    a.    Al Thumairy was in Saudi Arabia at the time and wanted to return to his position in the United States.  Jarrah Tr. 167:16-19, 172:2-8.

    b.    Al Sowailem had told Al Thumairy to contact Al Jarrah and had informed Al Jarrah that Al Thumairy would be calling him.  Jarrah Tr. 167:23-168:5, 562:15-563:5.

     c.     On that call, Al Jarrah told Al Thumairy to contact MOIA about his difficulties returning to the United States.  Jarrah Tr. 172:2-8.

168.    Al Thumairy does not recall Al Jarrah.  Thumairy Tr. 417:5-418:9.

169.    In July 1998, Al Bayoumi and others associated with the Al Madina Mosque wrote letters to Al Jarrah requesting support for the new mosque, including books and furniture for its associated school.  Ex. 101 (FBI 1342); Ex. 102 (Bayoumi Ex. 685); Ex. 103 (Bayoumi Ex. 686).

170.    Al Jarrah does not recall correspondence from Al Bayoumi and does not recall, before the 9/11 attacks, knowing who Al Bayoumi was.  Jarrah Tr. 193:3-21 ("I don't know him. . . . I heard his name, after the September [11] events, from the media."); *id.* at 195:11-14, 219:19-220:2, 603:21-604:2; *see id.* at 229:9-232:8 (discussing Ex. 102 (Bayoumi Ex. 685)).

171.    Al Bayoumi recalls knowing that Al Jarrah was the person at the Embassy responsible for religious and Islamic Affairs, but has no personal relationship with him. Bayoumi Tr. 157:7-159:5, 797:22-798:1.

172.    Al Jarrah never provided instructions to Al Bayoumi or Al Thumairy to do anything.  Jarrah Tr. 604:4-18, 605:21-606:11.

173.    Before the 9/11 attacks, Al Jarrah had never heard the names of Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers, and had never discussed any of the hijackers with anyone.  Jarrah Tr. 595:22-596:10.

174.    Al Jarrah never provided any assistance to Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers.  Jarrah Tr. 598:15-599:3; *see* FBI May 2021 EC addendum at 013 (finding a "lack of evidentiary support" for a statement that Al Jarrah had "'personal contact with the hijackers'" and directing that it "should be removed from the closing EC").

175.    Al Jarrah never instructed anyone to provide assistance to Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers.  Jarrah Tr. 599:5-11.

a.    There is no evidence that Al Jarrah himself was in Southern California during the period surrounding the hijackers' arrival in Southern California, from December 1999 to March 2000.

176.    No one ever instructed Al Jarrah to provide assistance to Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers.  Jarrah Tr. 601:22-602:5.

177.    Al Jarrah has no knowledge of any assistance that anyone else provided to Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers.  Jarrah Tr. 602:7-13; *see* FBI May 2021 EC at 009-010 (discussing "information corroborat[ing] that . . . Al-Jarrah did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack").

**B.    Khalid Al Sowailem**

178.    As set out above, during the relevant period, Al Sowailem was the head of the Da'wah Office or IFTA Office at the Saudi Embassy in Washington, D.C.  *Supra* ¶ 38.

179.    Al Sowailem is deceased and did not testify in this litigation.  *See* ECF No. 9270-18, at 4.

180.    Contemporaneous documents show that Al Bayoumi sent a letter to the Minister of Islamic Affairs in which he thanked Al Sowailem, among others including Al Thumairy, for "cooperation and coordination" in connection with the visit of Al Sadhan and Al Sudairy to the Al Madina Mosque in Ramadan 1419.  Ex. 104 (Ghudaian Ex. 445).

181.    Al Bayoumi does not recall Al Sowailem's name; when asked about the letter, he commented that "when somebody comes to visit" he would "thank everybody who is involved," including people he might not have met.  Tr. 170:19-171:1, 271:24-272:15 ("[W]e call the

REDACTED FOR PUBLIC FILING

embassy and they would say, oh, it would be so-and-so Sheikh and they give the name.  Later on – we get the name and later on we thank those involved by the name.").

182.    Contemporaneous documents show that Al Sowailem was Al Thumairy's nominal supervisor.  *E.g.*, Ex. 66 (KSA0000001234) (June 1996 letter referring to Al Thumairy's deployment to Los Angeles); Ex. 105 (Thumairy Ex. 836) (performance evaluation); Ex. 106 (KSA0000000596) (approval of leave request).

183.    Al Thumairy does not recall Al Sowailem substantively overseeing Al Thumairy's work in Los Angeles, but instead recalls interacting with him primarily about administrative matters such as leave requests.  Thumairy Tr. 114:23-115:10 ("Al Sowailem . . . was the administrative director [with] whom I dealt regarding vacations").

184.    There is no evidence that Al Sowailem ever interacted with Al Hazmi, Al Mihdhar, or other 9/11 hijackers, or even knew who they were.

185.    There is no evidence that Al Sowailem assisted Al Hazmi, Al Mihdhar, or other 9/11 hijackers; gave instructions to anyone to assist Al Hazmi, Al Mihdhar, or other 9/11 hijackers; or received such instructions.

### C.    The Ramadan Imamate Visits

186.    In the late 1990s and early 2000s, MOIA conducted a "Ramadan imamate" program in which dozens of imams from the Ministry were sent to various mosques around the world to lead prayers during the holy month of Ramadan.  Ex. 107 (Qattan Ex. 417) (listing 51 MOIA delegates who were sent to cities around the world to lead prayer during Ramadan).

### 1.    Ramadan 1419:  Al Sadhan, Al Sudairy, Al Mersal

187.    In Ramadan 1419, corresponding to December 1998 and January 1999, Al Sadhan and Al Sudairy participated in the imamate program.  Sadhan Tr. 27:9-28:16 (discussing

REDACTED FOR PUBLIC FILING

participation but not recalling exact date); Sudairy Tr. 62:19-24 (identifying the date as Ramadan 1419); *see* Exs. 69-70 (date conversion).

188.    Their travel as part of the Ramadan 1419 imamate program was the only trip that either Al Sadhan or Al Sudairy took to California.  Sadhan Tr. 381:7-15; Sudairy Tr. 363:5-18.

189.    Al Sadhan and Al Sudairy flew together from Saudi Arabia to Los Angeles, where they first stayed for approximately two days in a hotel.  Sadhan Tr. 58:4-59:1, 60:12-15; Sudairy Tr. 93:3-5.

190.    While in Los Angeles, Al Sadhan and Al Sudairy prayed at the Ibn Tamiyyah Mosque, where they met Al Thumairy.  Sadhan Tr. 56:5-15; Sudairy Tr. 104:9-13, 111:8-23; *see also* Sadhan Tr. 64:9-23 (Al Sadhan "believe[s]" he "had a meal" with Al Thumairy, but does not "remember what or when").

191.    There was no arrangement ahead of time that Al Sadhan and Al Sudairy would meet Al Thumairy.  Sadhan Tr. 383:6-12; Sudairy Tr. 363:24-364:6.

192.    Neither Al Sadhan nor Al Sudairy had ever met Al Thumairy before, has ever met him since, or has ever worked with him.  Sadhan Tr. 129:21-130:4, 381:20-382:8, 384:21-385:3, 387:5-14; Sudairy Tr. 115:7-14, 186:10-23.

193.    Al Thumairy never instructed Al Sadhan or Al Sudairy to do anything, and they never instructed him to do anything.  Sadhan Tr. 383:14-21; Sudairy Tr. 364:7-16 (further testifying that Thumairy never discussed the 9/11 hijackers with him); *id.* at 368:1-9, 369:1-6; Thumairy Tr. 516:17-22.

194.    After two days in Los Angeles, Al Sadhan and Al Sudairy traveled to San Diego, where they led prayers at the Al Madina Mosque during Ramadan.  Sadhan Tr. 123:4-23; *see also id.* at 123:24-124:2 (recalling also leading prayer once at the Abu Bakr and Al Ribat

REDACTED FOR PUBLIC FILING

mosques); Sudairy Tr. 78:1-11; *see also id.* at 157:15-19 ("The majority of the time was at Al Madina Mosque. And occasionally one of us would go to another mosque, if invited.").

195.    When they first arrived in San Diego, Al Sadhan and Al Sudairy stayed at a hotel near the Al Madina Mosque; later, they stayed at the home of Abdussattar Shaikh, who they had met at the mosque. Sadhan Tr. 87:23-88:4, 104:14-23; Sudairy Tr. 132:3-5, 166:13-167:6.

196.    Al Sadhan does not recall meeting Al Bayoumi at all and does not recall Al Bayoumi assisting him while in San Diego. Sadhan Tr. 72:3-21, 90:18-91:8, 202:21-203:4; *see also id.* at 92:12-19 ("If it wasn't for the news, I wouldn't have known his name."); *id.* at 103:9-104:12 (no recollection of Al Bayoumi introducing him to Shaikh).

197.    Al Sudairy recalled meeting Al Bayoumi for the first time at the Al Madina Mosque in San Diego, and that Al Bayoumi introduced himself as a Saudi student. Sudairy Tr. 139:19-140:7, 142:17-143:7, 150:22-151:1; *see also id.* at 148:20-149:17 (recalling that he saw Al Bayoumi "frequently" at the mosque during Ramadan); *id.* at 170:5-23 (no recollection of Al Bayoumi introducing him to Shaikh).

198.    Al Bayoumi never gave any instructions to Al Sudairy to do anything, nor did Al Sudairy ever give instructions to Bayoumi to do anything. Sudairy Tr. 367:17-24, 364:17-365:8 (testifying that Al Bayoumi never discussed any of the 9/11 hijackers with him).

199.    Neither Al Sadhan nor Al Sudairy ever met or spoke with Al Hazmi, Al Mihdhar, or any of the 9/11 hijackers. Sadhan Tr. 383:22-384:20; Sudairy Tr. 365:9-13.

200.    Also in Ramadan 1419, Al Mersal participated in the imamate program at the King Fahad Mosque in Los Angeles, where he led prayers, gave lessons, and answered worshippers' questions. Mersal Tr. 79:5-80:22, 101:13-23.

REDACTED FOR PUBLIC FILING

201.    Al Mersal met Al Thumairy for the first time during this visit and had not previously known of Al Thumairy.  Mersal Tr. 91:12-17, 99:22-100:6, 102:18-21, 249:20-24.

### 2.    Ramadan 1420:  Al Jaithen and Al Mersal

202.    In Ramadan 1420, corresponding to December 1999 and January 2000, Al Jaithen and Al Mersal traveled together from Saudi Arabia to California to participate in the imamate program.  Jaithen Tr. 58:22-59:12, 73:21-23; Mersal Tr. 183:19-184:1.

203.    Contemporaneous MOIA documents show that Al Mersal was assigned to lead Ramadan prayer at the Al Madina Mosque in San Diego; and that Al Jaithen was assigned to visit "Kismayo" in "Kenya"; then, "Kismayo" was crossed out and replaced with "Minneapolis, USA" Minnesota.  Ex. 107 (Qattan Ex. 417) at 7807; Ex. 108 (Ghudaian Ex. 446) at 9538.

204.    Al Jaithen does not recall being assigned to visit either Kismayo or Minneapolis. Jaithen Tr. 64:17-65:4, 195:18-196:3.

205.    Al Jaithen recalls choosing to travel first to Los Angeles, partially to see doctors to treat his chronic headaches.  Jaithen Tr. 60:16-21; *see also* Mersal Tr. 217:6-19 (confirming that Al Jaithen then and to this day "suffer[s] from severe chronic headache[s]").

206.    Al Jaithen and Al Mersal first arrived in Los Angeles, where they stayed at a hotel near the King Fahad Mosque for five or six days.  Jaithen Tr. 83:21-23, 85:6-9.

207.    While in Los Angeles, Al Jaithen recalls providing lessons at the King Fahad Mosque about "fasting, charity, . . . ethics and morals," as well as seeing a doctor about his headaches and undergoing an MRI.  Jaithen Tr. 107:6-13, 108:3-109:7, 111:11-115:4.

208.    While in Los Angeles, Al Jaithen and Al Mersal recall seeing Al Thumairy. Jaithen Tr. 102:2-104:1 (mentioning "a friendly conversation and getting to know each other"); *id.* at 125:3-24 (discussing dinner at Al Thumairy's home); Mersal Tr. 197:14-20, 198:18-22 (recalling seeing Al Thumairy and praying with him at the King Fahad Mosque).

**REDACTED FOR PUBLIC FILING**

209.    Al Jaithen had not heard of Al Thumairy or spoken with him before meeting him for the first time at the King Fahad Mosque; never worked with him; and never spoke with him after leaving Los Angeles.  Jaithen Tr. 105:4-18, 131:4-11, 304:13-24.

210.    Al Thumairy does not recall meeting either Al Jaithen or Al Mersal.  Thumairy Tr. 287:8-16, 294:5-23.

211.    Al Thumairy never gave any instructions to Al Jaithen or Al Mersal to do anything; nor did Al Jaithen or Al Mersal ever give instructions to Al Thumairy to do anything. Jaithen Tr. 305:10-12; Mersal Tr. 290:9-291:16; Thumairy Tr. 516:17-22.

212.    From Los Angeles, Al Jaithen and Al Mersal traveled to San Diego.  Al Jaithen stayed for a night and recalls visiting a mosque, where he gave a lesson.  Jaithen Tr. 123:3-16, 158:14-159:4; Mersal Tr. 211:1-9.

213.    The next day, Al Jaithen returned to Los Angeles to catch a flight to Columbus, Ohio, where he spent the remainder of Ramadan giving "[l]essons in Islamic jurisprudence, Islamic creed, fasting, prayers, charity, [and] ethics" at the Omar El-Kattab Mosque.  Jaithen Tr. 85:18-86:19, 94:4-8, 161:5-10, 166:3-6.

214.    Neither Al Jaithen nor Al Mersal recalls meeting Bayoumi.  Jaithen Tr. 229:20-23; Mersal Tr. 231:19-24, 257:15-23 ("I heard about Omar al-Bayoumi from the media.  I don't know whether or not I met him in San Diego.  I don't know whether or not he's a Saudi citizen.").

215.    Al Bayoumi recalls meeting Al Mersal and recalls Al Jaithen lecturing at the mosque.  Bayoumi Tr. 330:7-17, 335:10-13.

REDACTED FOR PUBLIC FILING

216.    A contemporaneous document produced by the FBI shows "Abdullah A S Al Jraithen [sic]" and "Albayoumi.,Omar [sic]" as guests checking in to a Travelodge hotel in Los Angeles on December, 20, 1999, and checking out on December 21.  Ex. 109 (Jaithen Ex. 576).

217.    Al Jaithen does not recall checking into a hotel with Al Bayoumi and testified that the only person with whom he shared a room in California was Mersal.  Jaithen Tr. 131:16-132-19, 150:21-152:4, 153:9-21.

218.    Al Bayoumi did not stay in the hotel and does not recall going there, but believes it is "possible" that he made a reservation for Al Jaithen.  Bayoumi Tr. 339:2-340:1 ("It's possible when a guest arrives and they need a stay at the hotel, we can make a reservation for the hotel. . . .  If [the guest] does not know English.").

219.    Al Bayoumi never discussed the hijackers with Al Mersal or Al Jaithen, never gave any instructions to Al Mersal or Al Jaithen, and never received any instructions from Al Mersal or Al Jaithen.  Bayoumi Tr. 789:16-790:6.

220.    After Al Jaithen left for Columbus, Ohio, Al Mersal remained in San Diego for the rest of Ramadan 1420 to lead Ramadan prayers, give lessons, and answer questions.  Mersal Tr. 219:10-220:16, 234:23-235:13.

221.    At the end of Ramadan, both Al Mersal and Al Jaithen returned to Saudi Arabia.  Mersal Tr. 241:2-242:10.

222.    Neither Al Jaithen nor Al Mersal ever met any of the 9/11 hijackers; before the 9/11 attacks, neither had ever heard the names Khalid Al Mihdhar or Nawaf Al Hazmi; and neither discussed any of the 9/11 hijackers with anyone before the 9/11 attacks.  Moreover, no one gave Al Jaithen or Al Mersal instructions to assist the 9/11 hijackers, and they did not give such instructions to anyone else.  Jaithen Tr. 306:21-308:18; Mersal Tr. 289:10-291:16.

## V.    Al Bayoumi's and Al Thumairy's Phone Records During the Relevant Period

223.    During the period from December 1999 to March 2000, Al Bayoumi's home

phone number was ███████5941, and his mobile phone number was ███████-7623.  Copies

of available phone records for those numbers during that period, as produced by the FBI, are

Exhibits 110 through 117, including Bates ranges FBI 3154-3194 and FBI 3221-3263; but note

that counsel have been unable to locate in the FBI's document production any phone records for

the 7623 number showing calls before January 9, 2000.

224.    During the period from December 1999 to March 2000, Al Bayoumi's available

phone records show 1,182 calls, of which 702 lasted one minute or less.  *See* Exs. 110-117.

225.    Plaintiffs' expert has asserted that calls to and from ███████-3142 and

███████-2697 were also calls to and from Al Bayoumi, Youssef Rep. app'x ("Calls Between

Bayoumi and Thumairy"), but:

        a.    Records for those phone numbers, as produced by the FBI, show that

Al Bayoumi registered them for the Al Madina Mosque, not for his personal use.  *See*

Exs. 119-123 (FBI 1444-1459) (records from November 1999 to February 2000).

        b.    The mosque's phone line was available for the entire congregation of the

mosque to use.  Bayoumi Tr. 297:11-20 ("[T]he phone in the masjid was open for all to

make phone calls.  There is one telephone in my office, and there is another telephone in

the other office, and that was open for anyone to call, at any time, anyone.  My presence

would be once a week, once every other week or once a month.  Otherwise, the telephone

is open for everyone."); *see also id.* at 176:13-177:20 (explaining that there was "only

one phone number for the mosque," to which both phones connected); *id.* at 784:9-

787:20 (similar testimony).

REDACTED FOR PUBLIC FILING

226.    During the period from December 1999 to March 2000, Al Thumairy's home phone number was ████████ 0638.  Copies of available phone records for that number during that period, as produced by the FBI, are Exhibits 124 through 129, including Bates ranges FBI 510-521 and FBI 548-590.

227.    During the period from December 1999 to March 2000, Al Thumairy's available phone records show 633 calls, of which 310 lasted one minute or less.  *See* Exs. 124-129.

228.    Plaintiffs' expert has asserted that calls to and from the numbers ████████-1250, ████████-0432, and ████████ 1260 were also calls to and from Al Thumairy, Youssef Rep. app'x ("Calls Between Bayoumi and Thumairy"), but:

   a.    Records for those phone numbers, as produced by the King Fahad Mosque, show that they were registered to that mosque, not to Al Thumairy.  *See* Exs. 130-133 (KFM 172-184, 285-296, 474-479, 480-489) (January and February 2000 records).

   b.    There is no evidence that Al Thumairy was the only or even the primary user of the King Fahad Mosque's phones or fax.

229.    There is no evidence that Al Thumairy had a mobile phone during the period from December 1999 to March 2000.

230.    Plaintiffs' expert has asserted that calls to and from the mobile phone number ████████ 0777 during 2000 were also calls to and from Al Thumairy, *e.g.*, Youssef Rep. app'x ("Calls Between Bayoumi and Thumairy"), but subscriber information for the 0777 number shows that Al Thumairy's start date for that number was "04/22/2002," well after the relevant period.  Ex. 134 (FBI 365-367); *see also* Ex. 135 (Awad Ex. 462) (showing "Salah Al Hatlani" as subscriber with a start date of "10/01/2000" and a cancellation date of "04/22/2002").

**REDACTED FOR PUBLIC FILING**

231.    Plaintiffs' expert has asserted that calls to and from the mobile phone number

████ 3362 during 1999 and 2000 were also calls to and from Al Thumairy, *e.g.*, Youssef

Rep. app'x ("Calls Between Bayoumi and Thumairy"), but:

      a.    Al Thumairy does not recall this number.  Thumairy Tr. 316:6-17.

      b.    Subscriber information for the 3362 number shows that it was registered

to Faisal Al Muhanna from July 31, 1997 to February 27, 2000, Ex. 136 (Muhanna Ex.

671), and registered to ████████ from June 10, 2000 to April 29, 2002, Ex. 137.

      c.    To the extent Plaintiffs rely on the listing of the 3362 number in a

document labeled "Omar's Phone Book," that document is inadmissible hearsay and is

not a reliable basis for expert opinion for the reasons given in Saudi Arabia's motion.

## VI.    Additional Responses to Plaintiffs' Allegations

### A.    Alleged Knowledge by Saudi Officials

232.    Every current or former Saudi official or employee who has been asked has

denied giving or knowing of any direction to anyone to provide any assistance to Al Hazmi, Al

Mihdhar, or any other 9/11 hijackers.  Bayoumi Tr. 721:22-724:17; Thumairy Tr. 490:6-494:20;

Jarrah Tr. 598:23-599:11, 601:22-607:4; Mana Decl. ¶¶ 3-16; Mana Tr. 211:9-220:13, 263:15-

264:2; Jaithen Tr. 304:9-305:12, 306:21-309:16; Mersal Tr. 289:10-291:16; Sadhan Tr. 383:14-

384:20, 386:13-391:15; Sudairy Tr. 363:5-365:20, 367:17-370:15; Khalil Tr. 362:7-365:9;

Anqari Tr. 335:9-341:15 (former Presidency of Civil Aviation official); Qattan Tr. 222:6-16,

259:13-21 (former Embassy official, current Minister of State).

### B.    Al Thumairy's Diplomatic Status and Religious Opinions

233.    From 1996 to 2003, Al Thumairy held diplomatic status as a Consular employee

and his visa listed him either as an Official at the Embassy or the Consulate.  Ex. 139

(STATE00139) (State Department Detail Lookup for Thumairy); Ex. 48 (Thumairy passport).

234.    From at least October 4, 2000, the State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate.  Ex. 140 (Dunham Ex. 12) at 039 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City.").

235.    On March 21, 2003, the State Department revoked Al Thumairy's visa because he was engaging in activities incompatible with his status, and Al Thumairy was then denied entry into the United States when he attempted to return from Saudi Arabia in May 2003.  Ex. 141 (KSA0000006810) (diplomatic note).

236.    When he was denied entry, Al Thumairy was told that it was because his visa did not permit him to work outside a diplomatic facility.  Thumairy Tr. 523:3-20 ("officials [at the] LA airport" told him that his "visa needed to change" because it required him to "work inside the diplomatic building," rather than "in the mosque"); *see also id.* at 524:4-12 (he was never told "entry was denied because of ties to terrorism" and he has no such ties).

237.    Contrary to Plaintiffs' allegations, there is no evidence that Al Thumairy holds or has ever held radical or extremist views, or supports or has ever supported terrorism.  When asked about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified," Thumairy answered:  "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone.  And we criticized that act back then, at the time.  In Islam you cannot even hurt an animal, let alone human beings.  So this justification is incorrect."  Thumairy Tr. 478:14-479:8; *see also id.* at 515:4-15 (testifying that, while he was in Los Angeles, he was not "aware of anyone ever accusing [him] of giving extremist teachings, lessons, or sermons" or "of being an extremist or of supporting terrorism").

238.    Witnesses who speak Arabic and heard Al Thumairy's sermons describe him as "never express[ing] any extremist or violent views" and state that they have never heard him "express any violent or extremist opinions."  Mana Decl. ¶ 8; Alzamari Tr. 134:15-135:12; *see also* ███████████████ .

239.    Saudi Arabia received from the United States and produced in this litigation an unsigned communication stating that Al Thumairy engaged in "extremist preaching," expressed "animosity toward the Saudi Royal Family," had "followers [who] praised and supported the terrorist attacks of 11 September 2001," and was believed "expelled from the King Fahd Mosque."  Ex. 142 (KSA0000006863-65) at 865.  The communication does not identify any source for its statements about Al Thumairy, and the Chairman of the foundation that operates the King Fahad Mosque, Khalil Al Khalil, testified that Al Thumairy was not expelled from the mosque.  Khalil Tr. 78:2-5, 395:20-397:17; *see also* Kaldirim Tr. 171:11-14.

240.    Although Usman Madha, a former mosque employee, signed a declaration describing Al Thumairy as "extreme" and as a member of a "group [that] held extreme, radical, and anti-American views," he later admitted that he could not understand Al Thumairy's sermons and had never personally heard Al Thumairy support terrorism.  *Compare* Madha Decl. ¶¶ 18-19 *with* Madha Tr. 38:3-39:17 (Al Thumairy gave sermons and lead prayers in "Arabic"; Madha "understand[s] very little Arabic"; Madha "never personally heard Thumairy express any support for terrorism in any of his sermons"; and Madha "do[es] not know what Thumairy ever discussed with members of th[e] group" described in Madha's declaration).

## C.    Al Bayoumi's Notebook

241.    Contrary to Plaintiffs' allegations, there is no evidence that Al Bayoumi ever assisted the 9/11 hijackers with flight planning.  To support such allegations, Plaintiffs have pointed to a diagram and calculation in a notebook seized from Al Bayoumi by authorities in the

**REDACTED FOR PUBLIC FILING**

United Kingdom, which appears to calculate the height of an airplane necessary to see an object on the horizon at 50 and 70 miles.  *See* Ex. 146, at 7 (Schiff Ex. 3).

242.     Plaintiffs' aviation expert, Barry Schiff, conceded that the equation, standing alone, has no apparent connection to the 9/11 attacks.  Schiff Tr. 48:9-17; *see also id.* at 50:11-51:5 ("If I saw that in and by itself, I would have no reason to believe it had anything to do with anything.").

243.     Saudi Arabia's rebuttal expert, Douglas Moss, gives reasons that the diagram cannot be related to flight planning for the 9/11 attacks:

   a.     The equation set forth is not an aeronautical equation that is commonly used by pilots.  Moss Rep. 8 ("Although th[e] equation is commonly used in academia, such as algebra and geometry classes, that equation is <u>not</u> commonly used in the aviation industry to calculate line-of-sight distances to the horizon from an airplane at a given altitude. . . .  No instance of the Equation, technique, or methodology is found in any of the foundational aviation publications regarding navigation . . . .").

   b.     A pilot's ability to see objects is "generally most limited by impediments to visibility, such as haze, smoke, and moisture," as well as by "terrestrial refraction," the "redirect[ion]" of "light . . . due to density differences in the air as it passes through layers in the atmosphere."  Moss Rep. 9; *see id.* at 19 (further discussion)

   c.     At distance of 50 miles, a pilot could not make out specific buildings. Moss Rep. 11 ("Using my own experience of years of flying into New York (LaGuardia) and Washington (Reagan National) and looking for landmarks, I would not expect to visually identify a large object, such as the World Trade Center or Pentagon until I was within at least 5 to 10 miles."); *see id.* at 19 (further discussion).

d.      "[I]f one were to calculate the altitude and range combinations predicted by the Equation, those combinations would not be consistent with the actual 9/11 jetliner tracks."  Moss Rep. 13; *see also id.* at 13-16 (explaining in detail).

244.    In addition, Al Qaeda's compartmentalization of information about the attacks, *supra* ¶ 57, renders it implausible that anyone other than the hijackers would have been given the details about the targets of the attacks necessary for flight planning.

245.    By contrast, the equation is "a typical exercise for geometry, algebra, and astronomy students," Moss Rep. 7-8 & appendix, and Al Bayoumi had a teenaged son during the relevant period, *see* Ex. 149 (KSA0000000655) (showing the birth of Al Bayoumi's son Emad as ▮▮/1406 AH, which is ▮▮▮▮▮ 1986, making him 14 years old in 2000).


Date:  October 6, 2023                          Respectfully submitted,

                                                 /s/ *Michael K. Kellogg*
                                                Michael K. Kellogg
                                                Mark C. Hansen
                                                Gregory G. Rapawy
                                                Andrew C. Shen
                                                Christopher M. Young
                                                KELLOGG, HANSEN, TODD, FIGEL
                                                    & FREDERICK, P.L.L.C.
                                                1615 M Street, N.W., Suite 400
                                                Washington, D.C. 20036
                                                (202) 326-7900
                                                (202) 326-7999 (fax)

                                                *Attorneys for the Kingdom of Saudi Arabia*