# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

Civil Action No. 03-MD-1570

**REBUTTAL EXPERT REPORT OF DAVID HENRY RUNDELL**

**MAY 16, 2022**

**SUBJECT TO MDL PROTECTIVE ORDER**

experience includes many years of study, working and residing in Saudi Arabia and extensive interactions with the government of Saudi Arabia.

## II.    Summary of Opinions

Opinion 1:  Lawrence Dunham's opinions concerning Saudi Arabia's diplomatic and religious activities in the United States suggest impropriety and nefarious intention in activities that are from a diplomatic perspective no different in character from the United States' own promotion of its values and political views in other countries.

Opinion 2:  Steven Simon's opinions concerning Saudi Arabia's relationship with the United States are unbalanced.  They present an inflammatory, misleading and in some instances factually inaccurate characterization of the Saudi-American relationship.

Opinion 3:  Emile Nakhleh's opinions concerning Saud Arabia's history, politics and religion during the 1990s are fundamentally flawed.  His report does not provide the Court with a reliable understanding of Islam in Saudi Arabia, the role of the Ministry of Islamic Affairs or the relationship between Saudi Arabia and al-Qaeda.

Opinion 4:  It is implausible that the Saudi government funded or supported one of its most dangerous enemies in an attack on one of its most important strategic allies.

## III.    Background

From an American vantage point, the world may appear increasingly post-religious; a place where church and state are clearly divided and religion is a purely private mater.  This was not always the case in the West.  An Elizabethan Englishman clearly understood that heresy and treason could be one in the same.  Today, Islam remains the central condition of life for millions of Muslims who cherish their living faith in an ideology that is at once both sacred and secular, religious and political, and through which they hope to obtain God's posthumous mercy by living a pious life.

The matter at hand cannot be assessed without an accurate understanding of Islam in Saudi Arabia and the role religion has played in the county's stability and foreign policy.  One fundamental disagreement I have with Plaintiffs' experts is their apparent lack of appreciation for this relationship, both historically and at present.  Specifically, Islam as practiced in Saudi Arabia for the past 250 years is not a monolithic tradition.  It has evolved over time and often been subject to internal disagreement and division.  Nevertheless, religion remains the paramount focus of identity for the Saudi people.  It is the core social value and political ideology of the nation; one the Saudi state promotes as much as the United States promotes human rights and democracy.[1]

### A.    The Influence of Traditional Islamic Thought in Saudi Arabia

---

[1] Saudi Basic Law of Governance, Articles 23, 23, 26.

Saudi Arabia is a new nation, established only in 1932 after a thirty-year struggle that unified most of the Arabian Peninsula for the first time in centuries. The Wars of Unification, as they are known in Saudi Arabia, were waged by King Abdulaziz Bin Abd al-Rahman Al Saud, commonly referred to as "Ibn Saud," who ruled in Riyadh from 1902-1953. This was the third attempt by the Al Saud dynasty to dominate the Arabian Peninsula and, like his predecessors, Ibn Saud used religion as the motivating ideology for his political movement.

The Al Saud dynasty was founded by Imam Mohammad Al Saud (d.1788) who initially ruled only a small village in central Arabia. He would doubtless have remained an obscure figure had he not formed a highly effective and enduring alliance with a local religious reformer, Mohammad Ibn Abd al-Wahhab. Abd al-Wahhab was something of an Arabian Martin Luther who sought to reform religious practices by removing innovations and restoring what he considered to be the original, pure form of Islam practiced by the Prophet Mohammed and his earliest followers.[2]

Abd al-Wahhab was not an original theologian, but rather a charismatic preacher who possessed significant political skills. Today, he would be called an activist. After finding a patron, he mobilized the symbols and ideology of Islam to help legitimize the First Saudi State (1744-1818). Mohammad Al Saud, in turn, provided him with resources to spread his message as well as direct control over some social and financial issues.

The political order Abd al-Wahhab sought to enforce in Arabia was grounded in the Hanbali school of Islamic jurisprudence, and his movement cannot be understood without reference to these roots. The founder of the Hanbali school, Ahmed Ibn Hanbal (780-850), preached that the defining feature of an Islamic community is following Islamic law or *sharia*. This system is defined by the Quran, which is regarded as the word of God, the *sunna* or sayings, practices and views of the Prophet Mohammed and the practices of the first three generations of Muslims who are collectively known as the Salaf.[3] In his emphasis on this last point, Ibn Hanbal differed from the other three Sunni schools of Islamic law, and many of his followers are referred to as Salafis.[4] Today, most Saudis are Salafis, but not all Salafis are Saudi.

In Ibn Hanbal's view, salvation could be obtained only by living in a cohesive Islamic community where Islamic law was enforced. Moreover, maintaining such a community required strong, stable leadership. Thus, to obtain salvation, one must live in a pious community, obey its leader in nearly all circumstances and use only peaceful means to resist recognized authority. By emphasizing the religious requirement for political stability, Hanbali Islam produced a submissive, quietist society and not a confrontational attitude towards temporal power. It heavily emphasized the Quran's commandment: "O ye who believe! Obey Allah, and obey his

---

[2] Alexei Vassiliev. The History of Saudi Arabia (New York: New York University Press, 2000), pp. 34, 36.

[3] Fitzroy Morrissey. A Short History of Islamic Thought (Oxford: Oxford University Press, 2021), pp. 61-67, 136.

[4] 'Abd Allah Salih al-'Uthaymin. Muhammad Ibn 'Abd al-Wahhab: The Man and His Works (London: I.B. Tauris, 2009), pp. 114, 129, 136-39.

Messenger, and obey those charged with authority among you.  If ye differ in anything among yourselves, refer it to Allah and His Messenger"[5]

Hanbali jurisprudence was further developed by the noted Hanbali jurist Taqi al-Din Ibn Taymiyyah (1263-1328) who again emphasized that Islamic law was the glue holding a true Muslim community together.  Thus, he made application of *sharia* law the foremost responsibility of any Muslim ruler.  In his view, it was the application of *sharia* law, not geographic borders or political systems, that defined the boundaries of Islam.[6]

Ibn Taymiyyah also developed the view that religious scholars were responsible for interpreting the law which political leaders enforced.[7]  This model required only judicial and executive branches of government as all laws had already been given by God.  These laws where clearly stated in the Quran or found in the actions of the Prophet Mohammed and his early disciples.  These laws could be implemented by regulations, but never challenged, much less overturned.

Like Ibn Hanbal, Ibn Taymiyyah emphasized that the primary role of government was not to promote individual liberty or the pursuit of happiness, but to impose the legal order which a community required to achieve salvation for its members.[8]  In addition to the Quran, Ibn Taymiyyah also looked to the Salaf – that is, the first four Caliphs and earliest Muslim communities of the seventh century – for guidance on how to achieve this goal.  He repeatedly emphasized that the example of these pious ancestors is the highest religious authority.  Like Ibn Hanbal, Ibn Taymiyyah condemned as a sin any act of violence intended to overthrow established authority.  Most notably, he believed that a century of tyranny is better than a day of chaos.

Ibn Taymiyyah's political thinking was greatly influenced by the Mongol destruction of the Abassid Caliphate in 1258.  Ten years later, his own hometown in Turkey was sacked, and in 1300, he helped organize the defense of Damascus against the Mongols.  This was a period of widespread political upheaval and civil unrest, precisely the sort of chaos (in Arabic, *fitna*) both Ibn Hanbal and Ibn Taymiyyah sought to avoid.  This confusion was exacerbated by the Mongols' recent conversion to Islam and the thirteenth-century Islamic view that fighting fellow Muslims was an act of apostasy.  The Mongols claimed that as fellow Muslims they should not be opposed.  Ibn Taymiyyah did not agree and sought religious justification for resistance to the Mongols' invasion.[9]

He developed the view that anyone who did not scrupulously adhere to *sharia* law and perform Islamic rituals properly was not a true Muslim.[10]  In other words, he placed emphasis on both orthodoxy and orthopraxy.  The Mongols, failing on both counts, could not be considered true

---

[5] Quran, Chapter 4, Verse 59.

[6] Christine Moss Helms. The Cohesion of Saudi Arabia (London: Croom Helm, 1981), pp. 103-05.

[7] Noah Feldman. The Fall and Rise of the Islamic State (Princeton: Princeton University Press, 2008), p. 2.

[8] Nabil Mouline. The Clerics of Islam: Religious Authority and Political Power in Saudi Arabia, Ethan S. Rundell, trans. (New Haven: Yale University Press, 2014), pp. 25-26.

[9] Ibid., pp. 35-40.

[10] Feldman, p. 34.

Muslims.  While Ibn Taymiyyah emphasized that only respected religious scholars could declare someone a nonbeliever or kaffir, he was equally clear that everyone claiming to be a Muslim was not one.  Those who follow this view that non-observant Muslims should be excommunicated are known as Takffiris.

As in many other religions, Islamic scriptures have been interpreted, reinterpreted and misinterpreted many times to justify crusades, liberation struggles and terrorism.  The term jihad clearly illustrates this possibility and how it can be used by Muslims:  ideologues, their apologists and their opponents.  This Arabic word has become familiar to the educated public in the West and is capable of stirring a considerable emotional reaction among them.  Literally jihad means effort or striving for a praiseworthy goal.  In a religious setting, it refers to an effort "to do what is right and prevent what is wrong"; a phrase used frequently in the Quran and as the motto of Saudi Arabia's religious police force.  Jihad is often translated as "holy war", which can be accurate, but the precise meaning depends upon the context in which the word is used.

Muslim scholars refer to two types of jihad; an internal spiritual struggle known as jihad of the self (jihad al-nafs) and jihad of the sword (jihad al-sayf).  These are also referred to as the Greater and Lesser Jihad respectively.  There is a well-known Hadith or saying of the Prophet Mohammed recorded by his disciples that states the order in which jihad should be conducted: by the heart, the tongue, the hand short of violence and finally by armed combat.

Ibn Taymiyyah argued that jihad was obligatory against those who practiced corrupted forms of Islam.  His writings provide the standard Muslim commentary on the treatment of property, prisoners and non-combatants during jihad.  His originality is found in the passages legitimizing jihad against those Muslims who revolt against the established political authorities, fail to follow *sharia* law or do not perform rituals such as prayer, fasting or pilgrimage correctly; that is to say, the Mongols.  He went so far as to promote jihad against these false Muslims as even more worthwhile than making the pilgrimage, fasting or prayer.

Classic Islamic scholars including Ibn Hanbal and Ibn Taymiyyah discuss in some detail what is permissible in armed combat with non-Muslims and apostates.  In general, they forbade attacks on civilians and destruction of property.  Some have argued that their regulations on the treatment of prisoners and private property were the first code of international law that anticipated the Geneva Convention by a thousand years.

For our purposes, it should be made clear that Mohammad Ibn Abd al-Wahhab followed earlier Hanbali jurists and made no original contribution to the discussion of jihad.  As we will see, the Indian-Pakistani ideologue Abu Ala Mawdudi first promoted jihad as an anti-colonial political movement configured as liberation theology.  Mawdudi also reinterpreted the term jahiliyah to support his concept of anti-colonial jihad.  Jahiliyah had traditionally referred to the era of spiritual ignorance in pre-Islamic Arabia.  For Mawdudi it came to mean any contemporary society where purely Islamic government had not been adopted.  Other significant figures we shall encounter in this discussion such as Hassan al-Banna, Sayyid Qutb, Abdullah Azzam and ultimately Osama bin Ladin would build upon Mawdudi's new interpretation of jahiliyah and jihad as well as his emphasis on reestablishing a unified Islamic State.

Thus, jihad has a variety of potential and historical meanings, but it is the one developed by contemporary, violent jihadists that has come to dominate Western understanding of the word. It is essential for our purposes to recognize that these recent, revolutionary and anti-imperialist interpretations of jihad are grafted onto traditional Sunni scholarship, but not part of the standard Hanbali catechism promoted by Saudi clerics.

Mohammad Ibn Abd al-Wahhab was an evangelist, not a theologian. For thirty years, he taught a simplified version of Hanbali Islam to the people of central Arabia or as it is known locally, the Najd. As a fundamentalist, he looked to original sources such as the Quran and acts of the Prophet for guidance rather than to subsequent legal interpretations and exegesis. He was what we would call an originalist. Thus his preaching emphasized a narrow interpretation of monotheism and the need to avoid any practices not condoned by Islam's founding generations.[11]

Abd al-Wahhab established a community of preachers led by his sons and sent these missionaries to the villages and nomadic bedouin tribes of Arabia. The founder of the Al Saud dynasty Mohammed Al Saud married one of Abd al-Wahhab's daughters. Nearly 300 years later, the movement Abd al-Wahhab founded remains the dominant cultural feature of Saudi Arabia, and his family continues to lead the Saudi religious establishment.

Outside of Saudi Arabia, Mohammad Ibn Abd al-Wahhab has long been a controversial figure. For some Muslims he remains a great scholar and reformer; the man who ended centuries of corruption and misguided innovation by restoring the true teachings of the Prophet Mohammed.[12] His followers regard themselves as the true Muslims who have a duty to reform their misguided brothers. However, for others, Abd al-Wahhab was an ignorant eccentric who joined forces with an ambitions local politician to create a nonconformist sect and divide Islam with attacks on the practices of Shia and Sufi Muslims.[13]

To summarize, Mohammad Ibn Abd al-Wahhab was a disciple of Ibn Hanbal and Ibn Taymiyyah. From them he acquired his devotion to orthodoxy, orthopraxy and political order. In particular, he adopted their willingness to declare other Muslims nonbelievers as well as a religiously based loyalty to any existing political order which promoted Islam. He had nothing to say about reestablishing the Caliphate, which existed during his lifetime, or attacking non-Muslims, whom he seldom if ever met. His ideas remain central to the thinking of the Saudi religious establishment today and have been part of Saudi Arabia's school curriculum for decades.

Until 1918, the Ottoman Empire ruled most of the modern Middle East as a Caliphate whose legitimacy depended, as we have noted, upon upholding *sharia* law. In theory, *sharia* law and the scholars who interpreted it placed a check on the Sultan's absolute executive authority. The formal abolition of the Caliphate in 1924 led to the end of this political system that had governed

---

[11] Frank Vogel. Islamic Law and Legal System: Studies of Saudi Arabia (Leiden: Brill, 2000), p. 76.

[12] Abdullah al-Uthayman, pp. 131, 144.

[13] Hamid Algar. Wahhabism: A Critical Essay (Oneonta, New York: Islamic Press International, 2002), pp. 31-36, 51, 69.

the Arab world for well over a thousand years. This event greatly influenced the thinking of ideologues such as Abu Ala Mawdudi and Hasan al-Banna who lived through the loss of the Caliphate and were committed to reestablishing the unity of the Islamic world.

After the First World War, new colonial governments and then independent republican Arab regimes replaced Islamic institutions with foreign concepts such as elected legislatures, positive law and secular courts. Nearly everywhere in the Arab world, the *ulema* were marginalized, becoming minor officials with no real political authority.

Everywhere, that is, except Saudi Arabia – where there never was a colonial government or secular Arab nationalist regime, and where the classical Islamic constitutional order in which executive power is counterbalanced by the scholars is preserved to this day in a recognizable form.[14] An appreciation of this fundamental difference between Saudi Arabia and all other Arab states is completely missing from Plaintiffs' expert reports.

This history fostered Saudi Arabia's unique political structure, one where there is no separation between church and state and where public administration is regarded as a religious act. Government agencies administer religious services, and many clerics are civil servants working in government offices or state-funded mosques. There is a secular police force and a religious police force. There are secular universities and religious universities as well as secular and religious courts. All of this is most unusual in the twenty-first century, but equally an important factor in Saudi Arabia's surprising stability in a region characterized by coups and revolutions.

The Quran is the Saudi constitution, and the Council of Senior Scholars functions as something of a Supreme Court issuing decisions on public matters such as organ transplants, abortion and girls' education. The Council has at various times declared al-Qaeda terrorists to be heretics, condemned suicide attacks as un-Islamic and forbad Saudis from fighting in Iraq during the American occupation of that country.

The independence of the Saudi religious scholars or *ulema* has certainly been compromised by the King's control of great oil wealth and the emergence of new sources of regime legitimacy such as economic development. Nevertheless, the *ulema* remain semi-independent junior partners in the political establishment and cannot be ignored with impunity. They defend the established political order in Saudi Arabia because, unlike in most Muslim nations, they are an important part of it. There are numerous historic examples of the mutually self-reinforcing relationship between the religious and political leadership of Saudi Arabia. Three will suffice to illustrate the point.

As a first example, part of the military force Ibn Saud used to conquer Arabia in the first decades of the twentieth century came from nomadic tribes he united under the banner of religious reform. Known as the Ikhwan, this religiously motivated military force defeated numerous opponents who based their strength on loyalty to a single tribe. Furthermore, Ibn Saud's use of religion as a unifying political theme instead of a secular nationalism sharply distinguished him from other modern nation builders such as Turkey's Kemal Ataturk, Egypt's Gamal Abdul Nasser and the Shah of Iran. Likewise, his avoidance of tribally based political alignments

---

[14] Feldman, p. 92.

government was *jahiliyya*, a term traditionally used to describe the period of ignorance before Islam, but which was now transformed by Mawdudi to apply to any period or person who failed to accept the sovereignty of God over all things. It was Mawdudi's new definition of *jahiliyya* that Sayyid Qutb used to justify the assassination of Anwar Sadat.

Mawdudi published a journal The Quranic Interpreter (*Tarjuman al-Quran*), which promoted his vision for a new society where charging interest would be banned, gender segregation would be enforced, women would be barred from public life, religious and political freedom for non-Muslims would be restricted and apostates would be executed.[42] Mawdudi attacked Shia and Sufi Muslims while endorsing an aggressive jihad against non-Muslims. He claimed that "Islam wishes to destroy all states and governments anywhere on the face of the earth which are opposed to its ideology and program." To justify this effort he noted: "How can the loss of some lives – even if the number runs into thousands – be compared to the calamity that will befall mankind if evil triumphs over good and atheism over the religion of God."[43]

### 4.    Late Twentieth-Century Political Events in Iran and Pakistan

The radicalization of the Muslim world during the 1980s grew not only from religious ideologies, but also from political events. In 1979, Ayatollah Ruhollah Khomeini successfully overthrew Iran's secular government and energized Islamic radicals everywhere. Two years later, Iran's well-orchestrated effort to transform the Hajj in Mecca into an anti-Al Saud, anti-American demonstration further politicized Islam. The Camp David Accords were signed in 1981, ending the conflict between Egypt and Israel, but not resolving the issue of Jerusalem. This left many Muslims feeling once again humiliated and abandoned. Their anger over the Camp David Accords was driven home to me when Anwar Sadat was assassinated in 1981; while the American Embassy lowered its flag to half mast, none of the Arab embassies did. However, no event had a more radicalizing impact on Islam and al-Qaeda's evolution than the growing influence of religion in the politics of Pakistan.

The father of modern Pakistan, Mohammad Ali Jinnah (1876-1948), was a secular Shia who promoted religious toleration throughout his career. Very regrettably, he died of lung cancer eight months after Pakistan achieved independence, and the country's long slide towards Islamic fundamentalism began shortly thereafter. In 1977, that slide accelerated rapidly following a military coup led by General Zia al Haq (1924-1988). In his first televised speech to the nation, President Zia sought to increase his legitimacy by quoting Mawdudi and calling for the introduction of an Islamic system of government and society.

Despite his military training, Zia came from a conservative clerical family and was determined to Islamize his country. To do this he turned to Mawdudi's Islamic Society Party or the J.I.P., which for the eleven years of Zia's rule enjoyed unprecedented political influence. It provided the ideological force that allowed Zia to transform Pakistan.[44] Zia systematically coopted the

---

[42] Morrissey, p. 199.

[43] Abul Ala Mawdudi. Towards Understanding Islam, Khurshid Ahmad, trans. (Islamic Publications, 1979), p. 105; Vol. 2, No. 1 of The Faithful Struggle in the section entitled "Permanent Jihad," pp. 256, 257, 269.

[44] Allen, p. 272.

party, giving jobs to thousands of party members in his newly Islamized courts and schools. In 1979, when J.I.P.'s virulently anti-American student wing attacked the American Embassy in Islamabad, Zia did nothing and left embassy staff trapped in the burning building for over four hours.

Zia modified the predominantly secular legal system inherited from the British with Islamic law. In 1980, adultery, fornication and blasphemy became criminal offenses. Although much of the prosecution system remained Anglo-Saxon, new punishments such as whipping, amputation and stoning to death were created. Zia ordered women to cover their heads in schools, universities and on state television. He banned girls' sports and enforced Ramadan fasting all while continuing to receive massive amounts of American development and military assistance.[45]

Most significantly, Zia imposed the Islamic *zakat* tax and used the revenues to fund religious schools. This was the first time public funds were used for religious education in Pakistan, and the majority of these schools taught the conservative Deobandi doctrines which Zia favored. The schools provided free religious training, room and board to thousands of impoverished Pakistanis. Many of these Deobandi-trained graduates joined Pakistan's army and civil service where General Zia's patronage ensured rapid promotion. A significant number were subsequently recruited into Pakistan's rapidly expanding Directorate of Inter-Service Intelligence or ISI.[46] Hundreds of schools were built along the Afghan frontier specifically to educate Afghan refugees and enroll them in the anti-Soviet jihad.[47] By the time Zia died in 1988, there were over 9,000 madrassas in Pakistan. These schools were all built by the government of Pakistan, staffed by local teachers and administrated by Pakistanis.

### 5.    Influences on al-Qaeda and Other Radical Groups

The radicalization of political Islam – in the Middle East, in South Asia or in other parts of the world – cannot be traced to one person, one idea, one event, or one funding source. It was a social trend that emerged from anti-colonial struggles and evolved over time into the dominant vehicle for political dissent. On various occasions, religion was used to shore up the legitimacy of military regimes or provide comfort to demoralized populations after military defeats by Israel and India. On other occasions, Islam became the language of calls for income equality and social justice. In both Pakistan and Egypt, political Islam grew from long-established local intellectual traditions and through locally established political parties. Abu'l A'la Mawdudi, President Zia al Haq and al-Qaeda's Taliban protectors all evolved primarily from the South Asian, fundamentalist Deobandi movement. Hassan al-Banna and Sayyid Qutb very clearly had more influence on al-Qaida than Mohammad Ibn Abd al-Wahhab. As one scholar put it, "all the major contemporary radicalist movements, particularly the Tunisian Islamic Tendency, . . . the

---

[45] Kim Ghattas. Black Wave: Saudi Arabia, Iran, and the Forty-Year Rivalry That Unraveled Culture, Religion, and Collective Memory in the Middle East (London: Wildfire, 2020), pp. 110-30.

[46] Allen, p. 272.

[47] Zahid Hussain. Frontline Pakistan: The Struggle with Militant Islam (New York: Columbia University Press, 2008), p. 78.

Egyptian Islamic Jihad organization and the Syrian Muslim Brotherhood, derive their ideological and political programs from the writings of al-Mawdudi and Sayyid Qutb."[48]

In seeking to understand al-Qaeda's beliefs, it is more informative to consider al-Qaeda's leadership, which was heavily Egyptian. In contrast to the quietist Salafism practiced and endorsed by the political and religious leadership of Saudi Arabia, al-Qaeda was and continues to be composed of political militants who are ready to use violence in pursuit of their political beliefs. For instance, Ayman Zawahiri, who joined al-Qaeda before the 9/11 attacks and later became the head of al-Qaeda, readily acknowledged Qutb's influence on his thinking. Like both al-Banna and Qutb, Zawahiri was an Egyptian (not a Saudi), and like many of his fellow countrymen, he was traumatized by Egypt's defeat in the 1967 war with Israel. He explicitly blamed this defeat on the Arab world's secular ideologies. Zawahiri saw Islam as the only solution and began his efforts to overthrow the Egyptian government by joining the jihadist movement when he was only fifteen years old. For the rest of his life in Egypt, Sudan and Afghanistan, he has promoted violent jihad initially against the government of Egypt and subsequently against the West in all its manifestations.

Zawahiri, like Qutb, believed that the only legitimate political authority on earth came from God and was transmitted solely through *sharia* law. He criticized the Muslim Brotherhood for becoming too moderate. He accused the Brotherhood of heresy for participating in elections, which he claimed only served the secular interests of the United States.[49] He even went so far as to formally condemn the Grand Mufti of Saudi Arabia, Abdulaziz bin Baz, for approving of the Kingdom's newly appointed parliament. In a vitriolic screed entitled "Advice to the Community to Reject the Ruling of Sheikh Bin Baz Authorizing Parliamentary Representation," Zawahiri stated explicitly the difference between al-Qaeda's ideology and that of Saudi Arabia's senior religious scholar: "Evil, my brothers, lies in the group that defends positive law, democracy, and elections. These rulers are unbelieving apostates who it is necessary to fight until the unbelief and corruption that pollute their country is eliminated . . . . What use is it if the sheikh (Bin Baz) spent his entire life preaching monotheism, rejecting idolatry and fighting paganism if now he authorizes participation in idolatrous democracy whether through the Consultative Assembly or through elections. This opinion by Sheikh Bin Baz will lead to the suspension of jihad against the tyrants who rule us without bothering to consult revealed law."[50]

Zawahiri was very clear about who his enemies were: "The Western forces hostile to Islam refer to us as Islamic fundamentalists. They have adopted a number of tools to fight Islam including the United Nations, the servile rulers of Muslim people, the multinational corporations, international media, relief agencies and nongovernmental organization all of which are used for their espionage and proselytizing."[51]

---

[48] Youssef M. Choueiri. Islamic Fundamentalism: The Story of Islamist Movements (3rd ed.) (London: Continuum Press, 2010), p. 100.

[49] Gilles Kepel. Al-Qaeda in its Own Words (Cambridge: Harvard University Press, 2008), p. 148.

[50] Ibid., p. 164.

[51] Ibid., pp. 183-84.

Like bin Ladin, Zawahiri opposed the use of American military forces to expel Iraq from Kuwait. He forcefully rejected the Saudi religious scholars' formal approval of the American presence and resented the fact that some American forces remained in Saudi Arabia after Operation Desert Storm was over: "This is not a matter of assistance, but of occupation, spoils of war, pillage, domination and crusader hegemony over the Muslims in our most sacred territory, the Arabian Peninsula. The local rulers are a thin veil for the American presence. The official *ulema* sign fatwas that are dictated to them authorizing this domination, this pillage, this crusader hegemony . . . ."[52]

Zawahiri's writings also illustrate the divergence between al-Qaeda's ideology and the classic Hanbali doctrines of Ibn Taymiyyah that were subsequently echoed by Abd al-Wahhab: "Be sure to inflict the maximum casualties on the enemy, kill the greatest number of people for this is the only language understood in the West . . . . It is always possible to track down an American or a Jew and kill them with a bullet or a knife." He also encouraged suicide: "[C]oncentrate on martyrdom operations as this is the most successful way to inflict damage on the opponent at the least cost to the mujahideen."[53] These teachings are irreconcilable with the traditional Hanbali views that attacks on civilians are impermissible in warfare and suicide is forbidden.

In summary, al-Qaeda's worldview drew from many different sources of Islamic thought. Some ideas went back centuries. Others were the result of recent events. Ibn Hanbal encouraged respect for the views and practices of the pious ancestors or Salafism. Ibn Taymiyyah endorsed excommunication of those who did not behave as proper Muslims or *takfirism*. Afghani, Abdu and Rida searched for ways to restore Islam and confront an overpowering West. Al-Banna politicized Islam and Qutb weaponized it. The defeat of Muslim armies by Israel in 1967 and by India in 1971 discredited the secular nationalists who had led independence movements. The American presence in Saudi Arabia and UN sanctions against Iraq fueled bitter resentment.

The teachings of Mohammad Ibn Abd al-Wahhab himself were irrelevant to this intellectual evolution. Until the 1970s, Abd al-Wahhab and even Ibn Taymiyyah were largely unknown or ignored outside of the Arabian Peninsula. It was not until Saudi Arabia's rise as an energy superpower that Hanbali Salafism with its austere emphasis on monotheism, ritual practice and political order began to spread throughout the Muslim world. By that time, the form of political and militant Islam that most influenced al-Qaeda had already diverged entirely from the Hanbali Salafism that was practiced and endorsed by the political and religious leadership of Saudi Arabia.

### C.    The Afghan Jihad, the Rise of bin Ladin and His Break with Saudi Arabia

As we have seen, the radicalization of political Islam was a process, not a single event. It was an evolution with multiple historic causes. Many of its apostles were figures of local or at most regional importance. Most of its organizational structures were focused primarily on local issues. What transformed radicalized political Islam into a truly international movement was the

---

[52] Ibid., p. 183.

[53] Ibid., pp. 197-205.

anti-Soviet jihad in Afghanistan, which was supported by the governments of both the United States and Saudi Arabia.

### 1.    The Soviet Invasion and U.S.-Saudi Support for the Afghan Resistance

In December 1979, the Fortieth Red Army crossed the Amu Darya River from Soviet Tajikistan to support the faltering communist regime of Barbak Karmal. They withdrew from Afghanistan ten years later having lost some 15,000 soldiers. This invasion of Afghanistan may appear a minor event in our post-Soviet world, but forty years ago it was seen by many as a highly destabilizing event. Pakistan feared that the Soviets might continue their advance through Pakistan to the warm waters of the Indian Ocean. President Jimmy Carter stated: "An attempt by any outside force to gain control of the Persian Gulf region will be regarded as an assault on the vital interests of the United States of America, and . . . will be repelled by all means necessary, including military force."[54] Already concerned about communist regimes in South Yemen and Somalia, Saudi Arabia did not want to see another domino to fall, especially if it threatened a key ally like Pakistan. For Saudi Arabia, the primary objectives were helping fellow Muslims defend themselves from invading atheists, containing the Iranian Revolution, preventing Soviet expansion towards the Persian Gulf and supporting strategic allies Pakistan and the United States.

Official Saudi funding grew along with that of the United States. These funds were administered by Prince Turki al-Faisal, who led Saudi Arabia's external intelligence agency, the General Intelligence Directorate, from 1977 to 2001. A son of King Faisal, brother of a Foreign Minister, and a Governor of Mecca, few Saudi royals were closer to security matters than Prince Turki. According to Prince Turki, the GID placed all of its contributions to the Afghan resistance into CIA-controlled Swiss bank accounts.[55] According to American Ambassador Peter Tomsen, the Saudi Embassy in Islamabad also made smaller contributions to various Afghan religious and political leaders associated with various resistance groups.[56]

The United States government welcomed Saudi support for the Afghan jihad against the Soviets, which matched American financial contributions dollar-for-dollar and provided effective support for American policy across the Muslim world. As Riyadh's ambassador to Washington Prince Bandar bin Sultan explained: "We did not use East-West argument or America's anti-communism rhetoric, we used religion. We said 'the Communists are atheist, they do not believe in God and we are fighting them for religious reasons.' We galvanized the Muslim World behind us, which fitted perfectly with a strategy for fighting the Soviet Union in places the United States could not influence as well as we could."[57]

---

[54] President James Carter. The State of the Union Address delivered before a Joint Session of Congress, Jan. 23, 1980.

[55] Turki al-Faisal. The Afghanistan File (Cowes, Isle of Wight: Arabian Publishing, 2021), p. 48.

[56] Peter Tomsen. The Wars of Afghanistan: Messianic Terrorism, Tribal Conflicts, and the Failures of Great Powers (New York: PublicAffairs, 2011), p. 197.

[57] William Simpson. The Prince: The Secret Story of the World's Most Intriguing Royal, Prince Bandar bin Sultan (New York: Regan Books, 2006), p. 112.

Turki al-Faisal had tried to encourage mujahideen unity ever since their first appearance at the Organization of Islamic Cooperation in 1981. At that meeting, the mujahideen had agreed to form an Islamic Union for the Liberation of Afghanistan. Although that agreement soon fell apart, Turki continued to promote Sunni cooperation and in 1986 tried to create a unified Afghan delegation to peace talks being held between the United States and the Soviet Union in Geneva. That, too, met with failure due to Afghan squabbling.[64]

In 1989, the Saudis supported an Afghan Loya Jirga or national assembly in Rawalpindi. Organized by Pakistan, the meeting was attended by three thousand Afghan notables who created the Afghan Interim Government or AIG to be led initially by Sibghatullah Mojadeddi. This, too, proved unsustainable. Once the Soviets had withdrawn from Afghanistan, the ethnic and ideological fissures among the mujahideen, compounded by raw personal ambition, led almost immediately to civil war.[65]

The ISI favored mujahideen leader Gulbuddin Hekmatyar, although he was a notably disruptive figure who began assassinating rival mujahideen, working with communist defectors and generally trying to monopolize power. Amidst growing disorder, the herald of the Afghan jihad Abdullah Azzam was assassinated in 1989. Osama bin Ladin eventually took over his Services Office and combined it with Ayman Zawahiri's Islamic Jihad organization into al-Qaeda.

### 3.    Bin Ladin's Return to Saudi Arabia

In 1989, bin Ladin returned to Saudi Arabia. Whether he had despaired of mujahideen infighting or considered his work in Afghanistan done is not clear. In any event, bin Ladin soon approached Prince Turki with a plan to launch a new jihad against the communist government of South Yemen. His offer was declined. When Iraq invaded Kuwait in August 1990, bin Ladin approached the Saudi Defense Minister Prince Sultan and offered to liberate Kuwait with his mujahideen.[66] Again his offer was declined, with Sultan reportedly saying: "But Osama, there are no caves in Kuwait."

I was in Jeddah at this time and do not recall bin Ladin's conversations with Saudi officials coming to the Embassy's attention. However, these interactions have been well documented since. He was no doubt offended by the rejection of his proposals and like many Saudis became strongly opposed to the garrisoning of Christian troops in the Muslim Holy Land during Operation Desert Storm.

This opposition crystalized into a non-violent protest movement in Saudi Arabia known as the Awakening or *Sahwah*. Led by Muslim Brotherhood sympathizers such as Safar al-Hawali and Salman al-Auda, it called for the expulsion of foreign troops and stricter enforcement of Islamic values. I reported extensively on the *Sahwah* from Jeddah at this time. While its leaders were eventually jailed, the government did adopt more conservative social policies. Moreover, the Saudi government became concerned about unregulated charitable funds, particularly those

---

[64] Ibid., pp. 6, 7.

[65] Ibid., pp. 99-106.

[66] Ibid., pp. 107, 111.

going to the most militant fundamentalist groups in Afghanistan. As a result, it established a committee under Prince Salman, the Governor of Riyadh, to collect and distribute private funds for Afghanistan. This was the first official effort to control private charitable funds going to Afghanistan. The Governor's involvement reflects both support for the fundraising and a desire to have better control over it.

### 4.     Bin Ladin's Turn Against the Saudi Government

By 1991, the Saudi government had given up trying to persuade Osama bin Ladin to stop his harsh public criticism of the royal family for Saudi Arabia's cooperation with the United States and in particular the presence of American forces in the Kingdom. Bin Ladin continued to speak out and eventually left the country.[67] Whether he left of his own accord, escaped from house arrest or was asked to leave depends on whom you ask. Whatever the circumstances, bin Ladin left Saudi Arabia for Peshawar and eventually settled in Khartoum where he was welcomed by President Omar Bashir and the leader of Sudan's branch of the Muslim Brotherhood, Hassan Turabi. Bin Ladin purchased or started several businesses and farms in Sudan, which he used to provide jobs for the now unemployed Arab veterans of the Afghan jihad.

In 1993, several members of bin Ladin's family as well as the journalist Jamal Khashoggi traveled to Khartoum in further attempts to convince Osama bin Ladin to stop issuing anti-Saudi statements. They were not successful, and in 1994 King Fahd issued a royal decree stripping Osama bin Ladin of his Saudi citizenship.[68] This was a very public, very serious and very unusual step that made it clear to all Saudi citizens that Osama bin Ladin was an enemy of the State. At the same time, the bin Ladin family published statements in newspapers stating that Osama was disowned and disavowed. How his share of the family firm was handled is unclear, although Prince Turki states that it was placed in a trust.

During the early 1990s, the United States, Egypt and Saudi Arabia put mounting pressure on Sudan to expel bin Ladin, though where he was to go remained unclear. According to Prince Turki, Sudan's President Omar Bashir offered to hand bin Ladin over to Saudi Arabia in March of 1996 under the condition that he not be prosecuted. Saudi Crown Prince Abdullah refused to make that commitment, noting that bin Ladin had already financed and encouraged terrorism and was not above the law.[69]

Former CIA Director George Tenet stated that Sudan never offered to extradite bin Ladin to the United States. Former National Security Director for Counterterrorism Richard Clarke notes that no request was ever made to Sudan by the United States because at that time there was inadequate evidence to indict bin Ladin in an American court. Whether he was expelled or left on his own accord, bin Ladin moved from Khartoum to Jalalabad, Afghanistan in May 1996.[70]

---

[67] Turki al-Faisal, p. 118; Richard A. Clarke. Against All Enemies: Inside America's War on Terror (New York: Free Press, 2004), p. 135.

[68] Tomsen, p. 455.

[69] Turki al-Faisal, pp. 161, 162.

[70] George Tenet. At the Center of the Storm: My Years at the CIA (New York: Harper Collins, 2007), p. 103; Clarke, p. 140.

### 5.    Bin Ladin's Declaration of War

On August 23, 1996, shortly after his move to Afghanistan, bin Ladin issued his *Declaration of War Against the Americans Occupying the Land of the Two Holy Sanctuaries*. This 8,000-word document presents the clearest expression of the influences that motivated bin Ladin and shaped his objectives. It was sent from Afghanistan by fax to several Arab newspapers and signed "A message from Osama bin Ladin to his Muslim brothers worldwide and in the Arabian Peninsula in particular." With ample quotes from the Quran, it expresses very contemporary grievances in religious terms. Bin Ladin complains about unemployed university graduates, underpaid civil servants, late payments to contractors, servile religious scholars and inadequate sewer systems. Much of the declaration is a harsh condemnation of the Saudi government and the House of Saud, which bin Ladin condemns for issuing "pagan laws", cooperating with the "Crusader-Zionist alliance" and imprisoning the *Sahwah* leaders Safar al-Hawali and Salman al-Auda.

After his criticism of the Al Saud, bin Ladin details suffering of Muslims around the world at the hands of Israel, the United States and the Saudi government: "Each of you knows the injustice, oppression and aggression the Muslims are suffering from the Zionist-Crusader alliance and its lackeys. . . . The blood of Muslims is flowing in Palestine, Iraq and Lebanon as well as Tajikistan, Burma, Kashmir, Assam, the Philippines, southern Thailand, Ogaden, Somalia, Eritrea, Chechnya and Bosnia where Muslims have been victims of appalling acts of butchery. These things took place in full view of the entire world because of the conspiracy between the Americans and their allies. . . . All of their false propaganda about human rights faded away behind the blows dealt to the Muslims and the massacres perpetrated upon them in every part of the world."[71]

The call for political violence could easily have been written by Sayyid Qutb, Abdullah Azzam or Ayman Zawahiri. Bin Ladin repeats the claims that, with the help of "apostate governments," the West has occupied Muslim lands and oppressed the Muslim people. Their humiliation and suffering can be ended only by violent jihad, which is now the duty of every Muslim. The time for gradualism and the jihad for education are over. In the entire document, there is not a single reference to Mohammad Ibn Abd al-Wahhab.

Bin Ladin also shifts the primary target of jihad firmly to the United States. While dozens of militant Salafi writers had made similar claims about corrupt governments and their foreign allies, they had largely focussed on overthrowing their own Muslim governments. The Islamic Jihad movement, for example, had previously assassinated Egyptian President Anwar Sadat, massacred tourists at Luxor and in 1995 blown up the Egyptian Embassy in Pakistan all in hopes of bringing an Islamist government to Cairo.

In bin Ladin's view, this parochialism divided and weakened the Muslims every bit as much as secular nationalism. It could be overcome by uniting all jihadists against their one common enemy, the United States of America. Thus, bin Ladin explicitly called for a change of targets stating that it was necessary to start with the Americans, who were the most important enemy. Bin Ladin re-stated and amplified some of Zawahiri's views, but no other Muslim ideologue

---

[71] Kepel, p. 47.

prior to bin Ladin sought so clearly to unite Arab, Asian and African Muslims behind the exclusive cause of attacking America.

### 6.     Bin Ladin, the Taliban and the Saudi Extradition Effort

A month after bin Ladin issued his declaration of war on the United States, Jalalabad fell to the Taliban. Kabul fell a few weeks later. The United States closed its embassy in Kabul and did not recognize the new Taliban government. Saudi Arabia kept its embassy open, but withdrew its ambassador. Despite numerous Saudi protests, bin Ladin continued to issue anti-Saudi statements. In 1997, he moved from Jalalabad to the Taliban headquarters in Kandahar along with those Arab mujahideen who had accompanied him to Afghanistan. If this was an effort on the part of the Taliban to control or silence him, it failed.

In March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular.[72] It is evident that, by this time, both Riyadh and Washington were well aware of bin Ladin's anti-American and anti-Saudi statements.

In January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against police stations. The United States was concerned that they might be used against high-level visitors.[73]

Then, in February 1998, bin Ladin issued a new manifesto: *The World Islamic Front Statement Urging War Against Jews and Crusaders.* Much to the Saudis' annoyance, it was broadcast across the Arab world on Qatar's Al Jazeera television station, which repeatedly provided a wide audience for bin Ladin, al-Qaeda and Muslim Brotherhood views. Bin Ladin's 1998 statement announced the formation of the World Islamic Front. It stressed the dangers all Muslims faced and called for unity and jihad. In a staged demonstration of unity, the document was signed by the leaders of several Egyptian, Pakistani and Bangladeshi Islamic groups. To justify jihad outside of the Muslim world, bin Ladin selectively quoted part of the so-called Sword Verse in the Quran "Kill the polytheists wherever you find them."[74]

He again drew specific attention to the greater enemy the United States: "For over seven years the United States has been occupying the most sacred of the Islamic lands, the Arabian Peninsula, plundering its riches, dictating to its rulers, humiliating its people . . . and continuing aggression against the people of Iraq. . . . The crimes and sins of the Americans are a clear declaration of war on God, his messenger and all Muslims. Throughout Islamic history the scholars have unanimously agreed that jihad is a duty when Muslims are attacked."

He goes on to say: "Killing the Americans and their allies – civilians and military – is an individual duty for every Muslim who can carry it out in any country where it is possible in order

---

[72] Turki al-Faisal, p. 165.

[73] Ibid., p. 166; Tenet, p. 105.

[74] The Quran, Chapter 9, Verse 5.

to liberate Jerusalem and Mecca."[75]  His mention of the need to liberate Mecca was a direct attack on the legitimacy of the Saudi government and its stewardship of the Muslim Holy Land.

Bin Ladin's statement led to renewed American and Saudi efforts to have him extradited from Afghanistan.  In March 1998, American ambassador to the United Nations Bill Richardson traveled to Kandahar to meet the Taliban leadership.  He was blithely told not to worry because bin Ladin was not a qualified religious scholar and thus his pronouncements were of little consequence.  Nonetheless, he could not be handed over to the Americans.[76]  In June 1998, Saudi intelligence director Prince Turki al-Faisal accompanied by the Secretary General of the Muslim World League (who was also the recently retired Minister of Islamic Affairs) traveled to Kandahar to make a similar request.  They, too, were ultimately refused, though the Taliban agreed to set up a joint committee to judge bin Ladin's activities and subsequently sent a delegation to Riyadh to discuss the committee's composition.[77]

On August 7, 1998, al-Qaeda terrorists bombed the American embassies in Kenya and Tanzania. Two weeks later, American cruise missiles destroyed al-Qaeda training camps in Afghanistan as well as a chemical factory in Sudan.  The American attack appears to have antagonized the Taliban leadership, for when Prince Turki made a second trip to Kandahar in September 1998 to follow up on his efforts to extradite bin Ladin, he received a very hostile reception.

The only published accounts of this meeting come from Prince Turki himself.  He has stated on numerous occasions that he was subjected to a tirade from Taliban leader Mullah Omar for persecuting bin Ladin and allowing Americans to occupy the Muslim Holy Land.  Mullah Omar denied there had ever been any agreement about a joint committee to judge bin Ladin, even though a Taliban delegation had come to Riyadh to discuss its details.[78]

Prince Turki reportedly ended the meeting with a warning to Mullah Omar that the Taliban's cooperation with bin Ladin would have very negative effects on Afghanistan and its relations with Saudi Arabia.  Shortly thereafter, Saudi Arabia withdrew its Charge d'Affaires from Kabul, asked Saudi charities to stop working with the Taliban, sponsored an Organization of the Islamic Conference resolution condemning Afghanistan's use as a terrorist sanctuary and increased contact with Afghan parties opposed to the Taliban.[79]

### 7.    Bin Ladin's Indictment and Other U.S. Efforts

On November 4 1998, bin Ladin was indicted on 238 charges in the United States District Court for the Southern District of New York.  Four days later, the United States offered a five million dollar reward for his arrest.  On December 18, 1998, the United Nations passed a motion censuring Afghanistan for harboring terrorists.  Pakistan was the only dissenting vote.  At the same time, both the American Ambassador to Pakistan and the Assistant Secretary of State for

---

[75] Kepel, p. 55.

[76] Coll, pp. 284-87.

[77] Turki al-Faisal, p. 168.

[78] Ibid., p. 178.

[79] Ibid., p. 179.

South Asian Affairs made it clear to the Taliban that if they did not hand over bin Ladin they would be held responsible for his actions.[80]  In 1999, the United State imposed unilateral sanctions on the Taliban for refusing to extradite bin Ladin.

A year later, the United Nations acted against the Taliban, passing resolution 1333, which demanded the extradition of bin Ladin.  The UN imposed a ban on all arms sales to Afghanistan, authorized the seizure of Taliban assets held abroad and banned international travel by some Afghan officials.  These sanctions deterred neither bin Ladin nor the Taliban.  In October 2000, al-Qaeda attacked the USS Cole refueling in Yemen.  That same year, the Taliban destroyed ancient Buddhas in the Bamiyan Valley and declared that all Hindus in Afghanistan must wear a yellow badge.

By this point, Saudi Arabia, like the rest of the world, had clearly identified Osama bin Ladin as a threat.  The King had stripped him of his citizenship and rejected Sudan's request for a pardon.  The Saudi Minister of Defense had raised the need to coordinate efforts against bin Ladin with the President of the United States.  The policies of both the United States and Saudi Arabia concerning the need to stop him were both clear and in alignment.

### D.    Al-Qaeda in Saudi Arabia 2001-2007

I understand that this case is about the September 11, 2001 attacks.  I am not addressing the history of those attacks in this report or attempting to weigh the evidence concerning them.  To do so would be outside my assignment and indeed beyond the scope of my expertise.  I am, however, familiar with the post-2001 history of al-Qaeda in Saudi Arabia.  A brief discussion of that history is relevant to the issues discussed in this report.

In May 2003, on the night before Secretary of State Colin Powell was due to arrive in Riyadh, al-Qaeda launched simultaneous attacks on three Western expatriate residential compounds.  Thirty-six people died in those attacks and more than 100 were badly injured.  The American Embassy evacuated dependents and did not bring them back for six years.  These events initiated a campaign of terror inside Saudi Arabia that was emphatically intended to topple the Western-aligned monarchy and establish a more conservative Islamic state.

For the next four years, Saudi Arabia faced its most serious internal security threat since the Ikhwan Revolt of 1929.  Dozens of people and over 100 Saudi police officers were killed in a seemingly endless series of terror attacks and shoot-outs.  The Ministry of Interior headquarters in Riyadh and Aramco's vital gas processing facility at Abqaiq were bombed.  Foreigners were murdered in their offices and homes or as they went to work.  Some were beheaded.  Western journalists were injured or killed.

On December 6, 2004, al-Qaeda terrorists crashed a car through the gate of the American Consulate in Jeddah, shot the Saudi National Guardsmen on duty and took control of the large consulate compound for nearly eight hours.  Six U.S. government employees were killed before

---

[80] Clarke, p. 185; Jason Burke. Al-Qaeda: Casting a Shadow of Terror (London: I.B.Tauris & Co., 2003), p. 173.

Saudi National Guard units stormed the compound, killing or capturing all of the terrorists – including one who tried to escape by climbing into a palm tree.

Because they rejected the legitimacy of Saudi Arabia as a nation, the terrorists called themselves "al-Qaeda in the Arabian Peninsula" (AQAP). A great deal of original research went into finding out what motivated them, and the results gathered from scores of interviews made interesting reading. These Saudi terrorists were, for the most part, urban high-school graduates in their twenties from lower middle-class backgrounds. Most were unmarried and had jobs with steady, but modest, incomes. Most had been to Afghanistan or had relatives who had been on jihad abroad.

Importantly, they were motivated largely by *events outside of Saudi Arabia* and by what the sociologists called "humiliation rage." Fueled by religious zeal, this boiled down to a three-part agenda: defend foreign Muslims who were being abused by non-Muslims, get the foreigners and their non-Islamic values out of Saudi Arabia and overthrow the Al Saud monarchy, which was clearly aligned with the non-Muslim foreigners.

Unlike the governments of Syria, Egypt and Algeria, the Al Saud never turn the army on their own people. They treated the insurrection not as a war, but as a crime wave to be handled by the police, rather than the military. The Saudi effort was led by then-Deputy Minister of Interior Prince Mohammad bin Naif whom I met with regularly and who was himself wounded in an assassination attempt in 2009.

Because religion is the language that resonates most forcefully with the population, the Saudi government was careful to condemn al-Qaeda in theological, rather than political, terms. Instead of using the standard Arabic word for terrorist, Saudi officials referred to al-Qaeda members as "religious deviants" or "misguided corrupters on earth." King Abdullah announced that "We specifically warn anyone who tries to justify his crimes in the name of religion. We say that anyone who tries to do this will be considered a full partner with the terrorists and will suffer their fate."[81]

Official internet chat rooms staffed by moderate clerics sought to refute subversive online preaching. Religious rulings by prominent clerics directly countered al-Qaeda propaganda. The Kingdom's most senior religious scholars, including the Grand Mufti of Saudi Arabia and the Imam of the Great Mosque in Mecca, repeatedly denounced terrorisms in their sermons. Prominent religious scholars who had given ideological support to the terrorists were quickly arrested and remain in prison to this day.

In 2004, two of Saudi Arabia's most controversial religious leaders came out strongly against al-Qaeda. As mentioned previously, Saffar al-Hawali and Salman al-Auda were serious scholars with large followings who in the early 1990s had led the non-violent, anti-government protest movement known as the *Sahwah*; they had been specifically praised by Osama bin Ladin in his

---

[81] "Address to the Nation by Crown Prince Abdullah," May 13, 2003, in Public Statements by Senior Saudi Officials Condemning Extremism and Promoting Moderation, Washington, DC, Saudi Embassy, Sept. 2004, pp. 19, 20.

1998 "Declaration of War."  Now, al-Hawali and al-Auda undermined al-Qaeda's legitimacy with theologically articulate assaults on terrorism.

Condemning al-Qaeda's agenda was not difficult for the Saudi religious scholars.  As we have seen, many of the terrorists' tenets such as resisting Western influence or using political violence to overthrow an established government came not from Mohammad Ibn Abd al-Wahhab, but from Hassan al-Banna and Sayyid Qutb.  Much more significantly, although Abd al-Wahhab had nothing to say about confronting secular Western values, he had a great deal to say about the importance of avoiding civil unrest (*fitna)*.  Many Wahhabi texts are direct attacks on anything that disrupts the social order or political stability.  These arguments are fundamental elements of Hanbali Salafism.  The Saudi *ulema* used them against al-Qaeda, which they understood posed a serious threat to public order.

Thus, throughout this difficult period, the most respected Saudi religious scholars denounced al-Qaeda, supported the monarchy and brought with them most of their constituents:  pious citizens, religious policemen, mosque preachers and religious studies school teachers.  The theological offensive that they supported helped to prevent al-Qaeda from ever becoming a broadly based popular movement in Saudi Arabia.

The beginning of the end for al-Qaeda in the Arabian Peninsula came in April 2005 when the government's massive public awareness program and policy of paying large rewards for information paid off.  In Al-Rass, a rural community 150 miles northwest of Riyadh, residents notified the police of suspicious activity at a local farm.  What followed was a three-day gun battle in which dozens of police officers were wounded and the leadership of AQAP died.  The organization never recovered from this blow; leaderless, finding new recruits scarce and clearly lacking broad public support, the remnants of AQAP began fleeing to Yemen where many still remain.

The significance of these events should not be overlooked by the Court.  More than any other population in the world, the Saudis have been exposed to and educated in the ideas of Mohammad Ibn Abd al-Wahhab and the Hanbali-Salafi tradition he represented.  Yet Saudi Arabia was one of the few countries to defeat al-Qaeda within its borders and did so with a far less brutal anti-terror campaign than those used in Egypt, Algeria or Syria.  The simple fact is that the religious components of the Saudi education system encouraged stability, not revolution.  This is one reason most Saudis across the political spectrum rejected not only the ideas of al-Qaeda in 2003, but also the 2011 Arab Spring, which was a non-event in Saudi Arabia.  I know this because I was in Riyadh on both occasions.

In summation, Saudi Arabia did not provide the majority of al-Qaeda's leadership or membership.  Moreover, those Saudis who joined al-Qaeda were primarily motivated by events outside of the Kingdom as well as opposition to the Saudi monarchy, which the Saudi religious establishment firmly supported.  Finally, those Muslims who joined al-Qaeda were motivated by a wide range of ideas derived more from nineteenth- and twentieth-century political ideologues such as Mohammad Abdu, Hassan al-Banna, Sayyid Qutb and Abu Al'a Mawdudi than from the eighteenth-century evangelist Mohammad Ibn Abd al-Wahhab.  Al-Qaeda's growth cannot fairly be attributed to the Saudi state or the religion that state promotes.

## IV.    Opinions

### A.    Rebuttal of the Expert Report of Lawrence Dunham

I have been asked to address Mr. Dunham's opinion that there is something fundamentally improper about "posting religious personnel in diplomatic status."[82]  On the contrary, in my view and based on my Foreign Service experience, diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. This does not preclude maintaining diplomatic relations with countries that hold widely differing political and religious ideologies.  As we have seen, Islam is the core ideology of Saudi Arabia. Promoting it is enshrined in the Kingdom's Basic Law of Governance.  For Saudis, the truth of Islam is as self evident as the American belief that all men are created equal.  In both instances, advancing that belief is not only acceptable, but expected.

At times, the ideas promoted by a foreign embassy are at odds with the values of its host nation. This does not delegitimize the embassy's right to present its views.  Most Americans did not accept the Marxism promoted by the Soviet and Chinese embassies.  Some Americans found Soviet atheism truly offensive.  Most Saudis do not accept the American Embassy's support for same-sex marriage.  In fact, many Saudis find this idea highly offensive, but their government has never challenged the right of American Cultural Affairs Officers to advocate for gay rights. That many secular Americans do not share the Saudis' regard for religion, and many religious Americans practice very different faiths, does not make Saudi Arabia's promotion of its value system improper or out of line with standard diplomatic practice.

The United States has itself, at various times, promoted religion both directly and indirectly.  In the nineteenth century, the federal government funded missionaries to "civilize" Native Americans, with different denominations being assigned to convert different tribes to Christianity.  The U.S. government's support for missionaries in Asia is well documented.  Even today, "faith based" grants are available to churches and provide funding for community-based activities such as after-school programs and early reading programs.

I have no opinion as to whether Saudi Arabia obtained the proper diplomatic or consular credentials for individuals working outside of the Embassy or Consulate or if the Saudi government violated State Department regulations in place at the time.  But in terms of practice, the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate.  For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation.[83]  The U.S. government has also supported Binational Cultural Centers, which are private, autonomous, foreign associations that support diverse programs involving the teaching of English, cultural exhibits, concerts, seminars and a library.[84]

---

[82] Expert Report of Lawrence Dunham, p. 12 (Apr. 1, 2022).

[83] General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26.

[84] Ibid., pp. 26-30.

Mr. Dunham's report reflects a significant lack of appreciation for both the role of religion in Saudi political culture and the American government's own practices. Consequently, his assertions of Saudi impropriety are flawed.

## B.    Rebuttal of the Expert Report of Steven N. Simon

I have been asked to address Mr. Simon's opinion that Saudi Arabia is not an "ally" of the United States and is not regarded as such by the United States government. I consider his statements misleading for several reasons.[85] First, there are many nations generally regarded as allies of the United States with which we do not share "nuclear technology" or with which we do not have formal treaty "obligations."[86] Belgium would be an example of the former and Israel an example of the latter. Second, Mr. Simon's implication that alliances must be based on shared values such as the "sentiment that underpins the transatlantic alliance" is patently false.[87] Would he deny that the Soviet Union was an ally of the United States during the Second World War? Finally, and most problematically, Mr. Simon asserts that the U.S.-Saudi relationship is not an alliance because it is a "transactional" association based on "mutual dependency".[88]

To the contrary, many scholars of international relations would argue that this is precisely the definition of an alliance. In other words, alliances, whether formally codified or not, are always based on shared interests and not necessarily on shared values. This is certainly the view of the respected Council on Foreign Relations. The CFR Backgrounder on U.S.-Saudi Relations states: "The United States, first through its oil industry and then through government contacts, established a relationship with Saudi Arabia's founder, King Abdulaziz Ibn Saud, and his successors that evolved into a close alliance despite a stark clash in values."[89]

This assessment of the U.S.-Saudi relationship's significance is shared by the U.S. government. For example, the State Department has written: "The U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities, such as achieving security in Iraq, advancing the Israeli-Palestinian peace process, and ensuring stability in world oil markets."[90] The same Department's recent Bilateral Relations Fact Sheet is equally clear that Saudi Arabia plays an important role in working toward a peaceful and prosperous future for the region and is a strong partner in security and counter-terrorism efforts and in military, diplomatic, and financial cooperation. Its forces work closely with U.S. military and law enforcement to safeguard both countries' national security.[91]

---

[85] Expert Report of Steven N. Simon ¶ 11 (Apr. 8, 2022).

[86] Ibid.

[87] Ibid., ¶ 12.

[88] Ibid., ¶ 13.

[89] Council on Foreign Relations Editors, Dec. 7, 2018.

[90] U.S. Gov't Accountability Office, Combatting Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883 (Sept. 2009) *avaialable at* https://www.gao.gov/assets/gao-09-883.pdf.

[91] State Department Factsheets, Saudi Arabia, Policy Issues, Dec. 20, 2020.

My purpose here is not to arbitrate the usage of the word "ally" in either technical language or common parlance, but rather to give the Court an understanding of Saudi Arabia's longstanding strategic relationship with the United States, a relationship upon which the Kingdom's own security depends and which the government of Saudi Arabia would not readily jeopardize.

Like the United States, Saudi Arabia prefers the status quo.  It has a strong vested interest in the existing order and a great deal to lose politically and economically from economic instability.  Thus, for over seventy years, the Kingdom has been a valuable partner of the United States in maintaining stability in the Middle East specifically by opposing Soviet Marxism, Nasser's Arab Socialism, and Khomeini's Islamic Revolution.  On many occasions, Saudi diplomacy, oil production and financial resources have supported American policy behind the scenes.  As Henry Kissinger noted:  "Often I found through other channels a helpful Saudi footprint placed so unobtrusively that one gust of wind could erase its traces."[92]

American oil companies discovered and developed Saudi Arabia's oil fields.  Unlike in many other countries, the relationship between the oil companies and their Saudi hosts was largely cooperative and constructive.  The Arabian American Oil Company (ARAMCO) built schools, hospitals and roads.  It drained malarial swamps and drilled water wells for the population as well as producing ever-increasing amounts of oil.  In the 1970s, the Saudi government gradually bought out the firm's American owners in a consensual agreement.  This differed very dramatically from the outright expropriation of foreign oil assets that took place in Iran, Iraq or Venezuela.

The first time most Americans became aware of Saudi Arabia was during the 1973 Arab-Israeli War.  A month before the war broke out, King Faisal told NBC News that America's complete support for Zionism put Saudi Arabia in an untenable position within the Arab world and made it extremely difficult for the Kingdom to continue supplying the United States with oil.[93]  At the first OPEC meeting after the war began, Saudi Oil Minister Zaki Yamani argued successfully against an oil embargo and the immediate nationalization of all American oil assets in Arab countries.  However, after large numbers of American military aircraft began flying arms directly from Germany to Israeli front line troops, Libya and the United Arab Emirates announced an oil embargo.  King Faisal, who was being called an American stooge throughout the Arab world, felt compelled to joint them.

In his new biography "Master of the Game, Henry Kissinger and the Art of Middle East Diplomacy", former Assistant Secretary of State of Near Eastern Affairs Martin Indyk makes clear that Secretary of State Kissinger fully recognized that large, public arms shipments to Israel would put the Saudis in an indefensible position.  Kissinger argued that the arms shipments should be transported on commercial aircraft or at least be kept limited.  It was President Nixon who said we should "go big" and ultimately forced the Saudis' hand.[94]  Thus, it is historically

---

[92] Henry Kissinger. Years of Upheaval (Boston: Little Brown, 1982), p. 663.

[93] Jeffrey Robinson. Yamani: The Inside Story (London: Simon and Schuster, 1988), p. 91.

[94] Martin Indyk. Master of the Game: Henry Kissinger and the Art of Middle East Diplomacy (New York: Alfred Knopf, 2021), pp. 143, 144, 145.

inaccurate to say, as Mr. Simon does, that Saudi Arabia "led" the 1973 oil embargo against the United States.[95]

The Saudi oil embargo initially included American naval forces operating in the Persian Gulf and fighting in Vietnam.  Very secretly, these restrictions were lifted following an American request.  Surprisingly, the Arab oil embargo, which caused such economic havoc, did not permanently damage U.S.-Saudi relations.  Secretary of State Henry Kissinger and Secretary of the Treasury William Simon recognized the need to recycle petrodollars back into the U.S. economy and avoid this sort of economic disruption in the future.  They set out very deliberately to create incentives for Saudi Arabia to become a stakeholder in American prosperity, and to a large extent they succeeded.  Thus, I would disagree with Mr. Simon's  reasoning that a country cannot be an ally of the United States if there have been episodes of "tension" or even "extreme tension" between them.[96]  Dealing with bilateral tension is a common and essential function of international diplomacy.

Today, Saudi Aramco is the largest oil company in the world.  It produces roughly 10 percent of global oil production every day.  For comparison, Exxon/Mobil, the largest private oil company, produces about 4 percent.  Saudi Arabia controls some 20 percent of global oil reserves, and its oil is among the world's cleanest and least costly to produce.  The world's last commercially produced barrels of oil will probably come from Saudi Arabia.  Yet what makes the Kingdom so important to the global economy is not the amount or cost of the oil it produces, but the spare production capacity it maintains.

Unlike any other nation or oil company, Saudi Arabia spends many billions of dollars drilling and then shutting in oil wells that they can produce roughly 2 million barrels of oil a day.  This is a political decision, not a commercial one.  It makes Saudi Arabia the Central Bank of Energy.  It allows the Saudis to step in when there is a war, a hurricane or a strike that disrupts production elsewhere in the world, and they have done so many, many times.  It is also this spare capacity that has often allowed the United States to impose sanctions on other oil producers without creating an oil price shock.

Saudi Arabia would like oil to remain a major part of the global energy mix for a long time.  Towards that end, Saudi Aramco has for over forty years generally sought to maintain affordable and stable oil prices, not as a favor to the United States, but because it is in their own interest to do so.  Saudi Aramco does this by adjusting production levels of several different grades of oil and their prices for delivery to various locations on a monthly basis.  Over the past forty years, the Saudis have increased production as often as they have reduced it.

Mr. Simon characterizes the U.S.-Saudi relationship as "crude diplomacy," implying that is it strictly an oil-related arrangement.[97]  This too is inaccurate.  In her book "Thicker Than Oil", which was essentially her Columbia University doctoral dissertation, Dr. Rachel Bronson explicitly debunks this myth.  Located at the crossroads between Europe, Asia and Africa, Saudi

---

[95] Simon Report ¶ 13.

[96] Ibid.

[97] Ibid.

Arabia has long been geographically important. For many years, it was the Eastern flank of our Euro-centric world. The first American airbase in Saudi Arabia was built during World War II and then became a strategic bomber base on the southern flank of the Soviet Union. Today, Saudi Arabia is the western flank of the newly important Indo-Pacific theater. Our principal air base in the region moved to Qatar in the early 2000s, but even today the U.S. Army Corps of Engineers is busy building Saudi military facilities to American standards so that they will be ready for American use when needed, as they were in Operation Desert Storm.

Saudi Arabia was one of the very few Arab states that remained fully committed to the West during the Cold War. Egypt, Syria, Iraq and Yemen were all at one time Soviet allies. The Saudis, on the other hand, never bought Russian weapons or sent officers for training to Moscow. Riyadh's funding of the Afghan mujahideen was but one example of the significant financial support Saudi Arabia has provided to American allies. Lt. Col. Oliver North, a National Security Council staff member during the Reagan Administration, has written: "[The Saudis] knew what it meant to have a Communist presence in the neighborhood, which is why they were already supporting the Afghan resistance to the tune of hundreds of millions of dollars."[98]

Nicaragua was another very quiet example of Saudi-American Cold War cooperation. "The Contras would never have survived without the help of Saudi Arabia's King Fahd. President Reagan wanted the Contras kept alive body and soul. The King made it happen with his secret assistance."[99] Today, Saudi Arabia continues to provide significant financial aid to numerous Western-aligned states in the Middle East.

While Saudi arms sales have often been controversial, it is important to note that they have also created thousands of well-paid American manufacturing jobs, kept open defense production lines that were otherwise unprofitable and reduced the unit cost paid by NATO allies for everything from tanks to fight aircraft.

The Arab-Israeli conflict is a destabilizing factor in the Middle East and therefore something Saudi Arabia would like to see resolved. Because they are the guardians of Mecca, the Saudis will not get ahead of the Muslim consensus on this issue, but they have quietly and consistently supported American efforts to end the conflict. Even when they followed the Arab consensus and broke off diplomatic relations with Egypt following the Camp David Accords, they did not cut off all financial aid to Cairo. More recently, they did not object when Bahrain and the United Arab Emirates established diplomatic relations with Israel. For the first time in 70 years, Saudi Arabia has begun to grant overflight clearance for El Al flights, and there is now a Chief Rabbi of Saudi Arabia who quietly goes about his business in Riyadh.

Culturally, Saudi Arabia and the United States have little in common. One is a constitutional republic, and the other is a monarchy. Yet for three generations, hundreds of thousands of Saudis have studied in the United States at their government's expense. This has been a very deliberate policy to get young Saudis out of their hidebound surroundings and exposed to more

---

[98] Oliver North. Under Fire: An American Story (New York: Harper Collins, 1991), p. 243 (emphasis omitted).

[99] Ibid., p. 258.

open societies. I have personally heard King Abdullah state this intention on more than one occasion. Most years, as a percentage of the nation's total population, there are more young Saudis studying in the United States than students from any other country in the world. That in itself is a clear statement of the Saudi government's commitment to the Saudi-American relationship.

These American-educated Saudis now make up a large portion of the Saudi elite. Over half of Saudi Arabia's appointed parliament have American university degrees. The proportion is even higher in the Council of Ministers. There cannot be another government in the world outside of Washington where this is true.

Without citing any specific examples, Mr. Simon asserts that Saudi Arabia has periodically "disregarded U.S. interests to advance its own political goals."[100] In my experience, quite the opposite is true. The Saudis have in fact often supported U.S. policies which they believed undermined their own interests. For example, Saudi leaders made it very clear publicly and privately that they opposed the 2003 American invasion of Iraq, which they correctly believed would leave increased instability on their doorstep. Nevertheless, they allowed limited use of their airspace and facilities for Operation Iraqi Freedom, something our NATO ally Turkey refused to do. More recently, the Saudis have been very uncomfortable with the so-called Iran Nuclear Deal. Again, they believe the agreement will eventually lead to a nuclear armed, revolutionary Iran on their doorstep. Yet in this case they have kept their concerns private and approved the agreement in 2015.[101]

Based on forty years of following the Saudi-American relationship, I can state that it is always composed of both cooperation and conflict. For example, the 9/11 Report has stated: "Before 9/11, the Saudi and U.S. governments did not fully share intelligence information or develop an adequate joint effort to track and disrupt the finances of the al Qaeda organization." The report further noted that "a number of FBI and CIA officers complained to the Joint Inquiry (ie the 9/11 Commission) about a lack of cooperation in terrorism investigations both before and after the September 11 attacks."

Based on my experience working on terrorist finance issues in Riyadh, I would agree with these statements. As the report indicates, neither side was willing to fully share information. The Saudis often complained that the United States was asking them to place financial sanctions on Saudi citizens based on very limited information, or at least very limited information that we were willing to share with them. It is also true that in some instances the United Nations found the evidence presented by the United States against Saudi citizens inadequate to justify financial sanctions.

In part, this was the natural result of all intelligence services' inclination to compartmentalize and protect information. By way of comparison, the 9/11 Report specifically cites the lack of cooperation within our own government as a contributing factor to 9/11: "The U.S. government must find a way of pooling intelligence and using it to guide the planning of and assignment of

---

[100] Simon Report ¶ 14.

[101] "Saudi Arabia Approves Iran Nuclear Deal," N.Y. Times, July 22, 2015.

responsibilities for *joint operations* involving entities as disparate as the CIA, the FBI, the State Department, the military, and the agencies involved in homeland security."[102]

Again based on my own experience, I would agree with the Commission's conclusion that there was inadequate cooperation between different agencies of the U.S. government and inadequate cooperation between agencies of the Saudi and American governments. Furthermore, I would add that there was inadequate cooperation between different agencies within the Saudi government. This was particularly true in regards to terrorist finance issues with the Saudi Ministry of Interior, Ministry of Finance and Ministry of Foreign Affairs. Nevertheless a "lack of cooperation in terrorism investigations" for whatever reason is significantly different from supporting terrorism.

During the decade after 9/11, I saw considerable improvement in cooperation among Saudi agencies regarding terrorist financing and between Saudi and U.S. government agencies on the same issue. For example, U.S. Assistant Secretary of the Treasury Juan Zurate stated, "[T]he targeting actions and systemic reforms undertaken by the Kingdom of Saudi Arabia clearly demonstrate its commitment to work with us and the international community to combat the global threat of terrorist financing."[103]

What I found most surprising in Mr. Simon's report was its complete lack of any mention of Saudi cooperation in our efforts to neutralize Osama bin Ladin before September 11, 2001. It is hard to attribute this oversight to a lack of knowledge of what is widely and publicly available information. Surely, Mr. Simon is aware that the Saudi government froze bin Ladin's assets and stripped him of his citizenship, sought assistance from the governments of Sudan and Afghanistan to control or expel the al-Qaeda leader, and, as the 9/11 Report states, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy."[104]

I would like to emphasize that the most senior levels of the Saudi government were well aware before 9/11 that the security of their own nation was threatened by al-Qaeda. They also recognized that the security of their own nation was dependent on the support it received from the United States. In discussions I attended with King Abdullah after the 9/11 attacks, the King emphasized the importance the Kingdom placed on preserving its relationship with the United States. He stated that the relationship could not survive another 9/11-type attack. This worried him greatly. Thus, I must reject Mr. Simon's characterizations of Saudi Arabia as "in effect play[ing] handmaiden to the 9/11 attacks"[105] or "pour[ing] gasoline into the inferno."[106] This is inflammatory rhetoric, not serious analysis. More significantly, it contradicts Mr. Simon's own

---

[102] 9/11 Commission Report, Executive Summary, p. 357.

[103] Testimony of Juan C. Zarate, Deputy Assistant Secretary Executive Office for Terrorist Financing & Financial Crimes U.S. Department of the Treasury JS-1257 (Mar. 24, 2004), available at https://home.treasury.gov/news/press-releases/js1257.

[104] 9/11 Commission Report, Executive Summary, p. 11.

[105] Simon Report ¶ 14.

[106] Ibid., ¶ 20.

statement that the U.S.-Saudi relationship was one of "mutual dependency."[107]  Why would the Saudi government seek to undermine a relationship upon which it was inherently dependent?

## C.    Rebuttal of the Expert Report of Dr. Emile A. Nakhleh

I have been asked to comment on the elements of Dr. Nakhleh's report relating to Political Islam in Saudi Arabia.  Another expert will be providing opinions on the "operational" parts of Dr. Nakhleh's opinion.  I would like to begin by acknowledging Dr. Nakhleh's many years of service to the U.S. government and his contribution to keeping the United States safe from al-Qaida terrorism.  Having spent many years pursuing the same objective and having had my own life threatened by Saudi terrorists, his contribution is something for which I am grateful.

I would also like to endorse Dr. Nakhleh's statement that he "accepted the basic assumption that political Islam . . . did not develop in a vacuum divorced from the social, cultural, historical, linguistic, economic, educational, and political environment of a particular country".[108]

Dr. Nakhleh was in charge of developing the CIA's expertise on Political Islam globally.  He traveled to and studied Political Islam in dozens of countries.  He developed longstanding contacts with political parties and popular movements including but not limited to the Muslim Brotherhood in Egypt, Refah and AKP in Turkey, the Islamic Action Front in Jordan, PAS in Malaysia, the Islamic Movement in Uzbekistan, PKS in Indonesia, the Islamic Party in Kenya, Hamas in Palestine, the Islamic Movement in Israel and al-Nahda in Tunisia.  He wrote books on Political Islam in Bahrain and Israel.  He visited nearly every town and large village in Palestine where he interviewed local officials, academics, corporate employees and political activists.

The scope of my own expertise is more limited.  I am an authority only on Political Islam in Saudi Arabia.  I visited nearly every town and large village only in Saudi Arabia.  I wrote only one book about Saudi Arabia.  No one covering Political Islam from Morocco to Indonesia could reasonably be expected to have a detailed understanding of the "social, cultural, historical, linguistic, economic, educational, and political environment" in Saudi Arabia.  I believe the errors in Dr. Nakhleh's report are the result of this dilution of effort.

Dr. Nakhleh's first error is his assertion that there is somehow a single body of religious and political beliefs called Wahhabism that is shared by (a) the leaders of the Saudi religious establishment, (b) critics of the establishment such as the *Sahwa* movement (which was not a terrorist movement), (c) Saudi Arabia's political leadership and (d) al-Qaeda and other terrorist groups.[109]  In fact, there are distinct and important religious and political disagreements among these disparate groups.

Dr. Nakhleh correctly notes that, while "every Wahhabi is a Salafi, not every Salafi is a Wahhabi."[110]  Despite that acknowledgment, he then repeatedly uses various undefined terms

---

[107] Ibid., ¶ 13.

[108] Expert Report of Dr. Emile A. Nakhleh ¶ 5 (Apr. 1, 2022).

[109] E.g., Nakhleh Report ¶¶ 25-27, 29-35, 44, 49, 98-99, 110-111, 118, 122, 130, 145.

[110] Ibid., ¶ 26 n.7.

such as Salafi-Wahhabi, Wahhabi-jihadi, Hanbali Wahhabi, Saudi-Salafi-Wahhabi and Sururi-Qutbi Wahhabi, which conflate a very diverse range of opinions.[111]  Dr Nakhleh also completely ignores the fact that there were highly respected quietist theologians active in Saudi Arabia during the same era as Surur who preached dramatically different messages, for example Nasir al-Din al-Albani (1914-1999).  To equate Qutb and Surur with all – or even a predominant part – of Saudi religious views is remarkable and unfounded.

Dr. Nakhleh furthermore implies that militant jihad is somehow exclusive to the Hanbali or Wahhabi tradition in Islam.  This is simply not the case.[112]  For example, the noted Andalusian scholar Averroes (1126-1198), who lived well before Ibn Taymiyyah or Abd al-Wahhab, considered that jhad is "always an armed struggle."  Yet like many classic Islamic scholars, including Ibn Hanbal and Ibn Taymiyyah, Averoes generally forbade attacks on noncombatants and the destruction of private property.[113]

A more balanced and insightful analysis would have noted that there is significant disagreement between the Saudi *ulema* and al-Qaeda regarding matters such as political quietism vs. political activism; defense of Islamic lands vs. offensive attacks on western nations; the legitimacy of the current Saudi government; suicide attacks; and Saudi Arabia's alliance with the United States.  Dr. Nakhleh's fundamental error is asserting that everyone he calls a "Wahhabi" shares the same political beliefs and moreover that everyone in this category supports "violent jihad".
Dr. Nakhleh states:  "In the course of the last century, Salafi Wahhabis have embraced further particularization of the concept of jihad, specifically through elaboration of the acceptable terms of engagement in violent jihad."[114]  This inaccurate view taints his entire analysis and is no more accurate than concluding that all Christians reject the theory of evolution.  Certainly some do – and some of those who do claim that the only correct interpretation of their religion supports it – but many do not.

The error becomes even more stark when one examines the historical figures in Dr. Nakhleh's analysis.[115]  Mohammad Ibn Abd al-Wahhab was primarily concerned with issues of doctrinal and ritual purity.  He was particularly focused on avoiding polytheism and ritualistic innovations, *shirk* and *bid'a*.  Politically, Abd al-Wahhab was a quietist who deferred to the Al Saud leadership, as his successors do today.

Both Sayyid Qutb and Mohammad Surur were senior members of the Muslim Brotherhood, which Dr. Nakhleh correctly describes as "anathema to Saudi-Wahhabi-Salafis."[116]  Thus,

---

[111] E.g., ibid., ¶¶ 33, 37, 42, 59.

[112] See Rudolph Peters. Jihad in Classical and Modern Islam (Princeton: Markus Wiener, 1996).

[113] Gilles Kepel. Jihad: The Trail of Political Islam, Anthony F. Roberts, trans. (Cambridge: Harvard University Press, 2002), pp. 110-20.

[114] Nakhleh Report ¶ 36.

[115] Ibid., ¶¶ 25-43.

[116] Ibid., ¶ 201.

Dr. Nakhleh's assertion of an ideology called "Sururi-Qutbi Wahhabism" is not only unsupported by any citation, but in fact internally inconsistent.[117]

Qutb and Surur were violent revolutionaries who focused much more on political activism than theology. Their political message was explicitly and emphatically hostile to established Muslim regimes, which they referred to as the "near enemy". As Dr. Nakhleh notes, Qutb began directing currents of fierce criticism towards the United States and its "'near enemy' allies in the Arab world."[118] "Qutb advocated that the 'near enemy' should be fought just as vigorously as the 'far enemy': such leaders should be removed from power by all means, including by force."[119] It is implausible that the Saudi government or the Saudi religious establishment, which legitimized and depended upon the Saudi state, would have provided a platform for someone calling for their removal by force. In fact, Surur was expelled from Saudi Arabia precisely because the Saudi *ulema* rejected his preaching; a fact that Dr. Nakhleh somehow overlooked.

Dr. Nakhleh notes correctly that Saudis never use the word "Wahhabi." The term is an imprecise Western invention which fails to recognize the numerous strands of Islamic thought that have existed and evolved in Saudi Arabia over the past two centuries. Using this term and combining varied views under one heading leads to Dr. Nakhleh's second error; his emphatic and repeated equation of Islam as practiced in Saudi Arabia with "violent jihad". He writes that violent jihad is part and parcel of Saudi religious belief and that "There is no disconnect, no break in the causal chain, between da'wa and violent jihad." This is a very inaccurate depiction of the views held by the leading Saudi religious scholars, the Saudi government and the vast majority of the Saudi population.

Where to begin? Dr. Nakhleh writes: "*Da'wa* literally translates as the 'call' to embrace Islam. However, as a manifestation of Wahhabi polity, and as a core mission in Saudi Arabia's foreign policy, *da'wa* is understood to mean the 'propagation', or proselytization, of Wahhabism throughout the world."[120] And just what is this message? Dr. Nakhleh himself provides an answer. "The Saudis have espoused Wahhabi Islam as the only true Islam, and have sought to overcome and eliminate local interpretations, and indeed local cultural practices in Muslim worship, such as veneration of saints, visits to supposedly holy places, praying differently including by incorporating local practices / variations on timings, etc., forgoing the fasting rituals. The Saudis have conversely insisted upon the adoption of strict adherence to true Islamic rituals, such as praying punctually five times a day. I observed the Wahhabi curtailment of local practices on my visits to villages in northern Nigeria, Turkmenistan, Indonesia, and other places."[121] There is nothing here about "violent jihad"; and for a good reason, because it is not part of the message. A firm belief in the correctness of their own interpretation of Islam and a

---

[117] Ibid., ¶ 42.

[118] Ibid., ¶ 38.

[119] Ibid., ¶ 37.

[120] Ibid., ¶ 45 n.23.

[121] Ibid., ¶ 64 n.33.

rejection of other interpretations of Islam, absolutely. But a call to physically attack other Muslims or non-Muslims? No.

To the contrary, the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and very specifically those that involve suicide. Many of their statements precede the attacks of September 11, 2001 and clearly refute the idea that the Saudi *ulama* would have encouraged or justified the 9/11 attacks. Some of these statements were official rulings or *fatwahs* made by the full Council of Senior Scholars. Others were statements by the Grand Mufti, who is the senior jurist in the Kingdom, which, while not official rulings, gave a clear indication of the Council's views.

For example, in August 1988, the full Council issued a ruling concerning acts of sabotage. The full text is listed in the appendices. The ruling includes the following statement: "First: the punishment of death will be against whoever is – by Sharia – proven to have committed an act of sabotage and depravity on land. Such acts include assaulting or destroying private or public property (such as blowing up houses, mosques, schools, hospitals, factories, bridges, weapons warehouses, water [plants]), and other public facilities (such as oil pipelines, blowing up or hijacking planes, and so on). The verses mentioned that such depravity on earth or killing others should be punished by death. The reason was that the danger and harm of those who carry out sabotage acts are more significant than the danger and harm of those who commit banditry (where they attack people on roads to steal their money or kill them)."

The Grand Mufti Abdulaziz Bin Baz (1912-1999) stated on more than one occasion that suicide attacks were never justified. During one interview he was asked:

> Question: What is the ruling of someone committing suicide by strapping explosives to himself in order kill a number of Jewish people?
>
> Answer: We have already given our opinion on this many times before that such an act is never correct because it's a form of killing oneself and Allāh says: [ وَلَا تَقْتُلُوا أَنفُسَكُمْ ] And do not kill yourselves.[122]

More recently on April 21, 2001, the current Grand Mufti of Saudi Arabia, Abdulaziz Al al-Shaykh, stated in interview with the London-based newspaper al-Sharq al-Awsat, "What you call suicide bombings are in my view illegitimate and have nothing to do with jihad in the cause of God. I am afraid it is another form of killing oneself."[123]

I can confirm that, during my years in Saudi Arabia, there were those who endorsed suicidal acts of terrorism, but I never encountered any such statement made by a senior cleric or in the school textbooks I reviewed. Parenthetically, Dr. Nakhleh claims to have reviewed over 300 publicly available Saudi school textbooks and concluded that they preach violent jihad. "The unclassified CIA report . . . noted that such texts 'teach hatred as part of the doctrine of disavowal,' and

---

[122] https://abdurrahmanorg.files.wordpress.com/2014/10/suicide-bombings-shaykh-ibn-baaz-authentic-translations-com.pdf

[123] https://www.washingtoninstitute.org/policy-analysis/saudi-fatwa-against-suicide-terrorism

'stress the theme of religious violence.'"[124]  Why has he offered this conclusion, but not a single substantiating quotation from any of the hundreds of publicly available books he read?

This is only one of Dr. Nakhleh's forceful but unsubstantiated claims about Saudis or groups of Saudis supporting terrorism.  For example, he states:  "[M]any Saudis who worked for the Ministry of Islamic Affairs and who were educated at Imam Mohammad University believed in the cause of jihad and in helping jihadists, especially those who were embarking on violent and 'spectacular' attacks against the American symbols of power."[125]  He further states:  "[M]any 'Ulama shared bin Ladin's views that the U.S. presence in Saudi Arabia . . . was an insult to the sanctity of the of the state and its religion, Islam, which warranted the waging of jihad in response."[126]

And he states that an al-Qaeda pamphlet published after the 9/11 attacks set out the "prevailing view shared and articulated by the vast majority of faculty and graduate students at the Imam Muhammed University and other educational establishments."[127]

None of these statements is supported by any evidence or recognizable methodology.  To the extent that Dr. Nakhleh relies on his own visits to Saudi Arabia and conversations with unspecified Saudis, it would have been helpful if he had provided at least a statement of when and for how long he was actually in Saudi Arabia.  It takes time, often a great deal of time, to develop contacts and personal relations in Saudi Arabia.  It is dangerous to extrapolate from a short visit with a few people that "many Saudis who worked for the Ministry of Islamic Affairs" or "many ulama" or "the vast majority of faculty and graduate students" held any particular view whatsoever.

I spent immeasurably more time in Saudi Arabia than Dr. Nakhleh and have decades-long close relationships with graduates of Imam Mohammad University and Saudi religious scholars.  I strongly disagree with Dr. Nakhleh's statements that most of these people supported al-Qaeda. I am not aware of any authority or recognized expert who makes this claim, and it is entirely inconsistent with my experience.  As for the ulema, a term which generally connotes the most senior religious scholars, they signed a formal fatwah justifying the presence of non-Muslim troops in Saudi Arabia when needed to protect the Kingdom.

There are also a number of historical inaccuracies in Dr. Nakhleh's report.  The most significant concern the Letter of Demands / Memorandum of Advice[128] and the Creation of the Ministry of Islamic Affairs.[129]  I was present in Saudi Arabia at the time and reported extensively on both events.  Allow me to explain.

---

[124] Nakhleh Report ¶ 55 n.30.

[125] Ibid., ¶ 119.

[126] Ibid., ¶ 129.

[127] Ibid., ¶ 132.

[128] Ibid., ¶¶ 67-88.

[129] Ibid., ¶ 88.

we criminalize aggressions against anyone.  And we criticized that act [9/11] back then, at the time.'"[136]

When al-Thumairy replied "I don't know about that thing. . . .  I don't know about that terminology".  What was he really saying?  What "thing" was he talking about?  Was he claiming that he did not know about the concept of *bilad al-harb*, which is most unlikely, or that he did not agree with using this concept as a justification for attacks?  The English phrase "I don't know about that" often implies disagreement.  Al-Thumairy then goes on to say very clearly that, while he does not know about (*i.e.*, understand) this terminology, any justification for the 9/11 attacks is wrong.

Again, when al-Thumairy was asked if he was aware of "the *Hadith* attributed to the Prophet Mohammad, . . . that only one religion shall exist in the [Arabian Peninsula],"[137] he replied that he did not "know if that attribution of Hadith is correct or incorrect".[138]  He did not say that he had never heard of this Hadith, which in my view would have indeed been implausible.  Instead, he gave the same answer that many scholars would give – *i.e.*, that the validity of this Hadith is open to reasonable debate, and he is not prepared to give an opinion on it.

Having just said that he does not know if the Prophet Mohammed ever really said any of this, al-Thumairy is asked if the Hadith whose validity he just questioned permits jihad against foreign forces.[139]  Al-Thumairy replies that he is unaware of any such justification.  Again, just what was he saying:  that no such justification exists, that he does not understand the basis for this justification or that he does not agree with this justification?  In my view, the questioning in these proceedings could have been and should have been conducted with more precision.

Al-Thumairy goes on to endorse "communication among countries," "treaties," "agreements," "peaceful coexistence among religions" and "dialogue among religions" as "the way it should be."  These statements are inconsistent with Dr. Nakhleh's characterization of him as a violent jihadist, so instead Dr. Nakhleh labels him as an unreliable witness.  These statements indicate however that Al-Thumairy, like the vast majority of Saudis, does not believe that the United States and Saudi Arabia are in a state of war, which is the premise of several of Plaintiffs' questions.

It is worth noting that, in his discussion of *Dar al-Harb* and *Dar al-Islam* (the abode of war and the abode of peace), Dr. Nakhleh acknowledges the third potential state of affairs between Muslim and non-Muslim states, *Dar al-Sulh* or *Dar al-ahd* (the abode of treaties).[140]  While the classic scholars disagree on the exact terms and duration of such truces, there is wide agreement that they are entirely permissible.  In other words, even "ardent Wahhabis" recognize that Muslims and non-Muslims must not always be at war.

---

[136] Ibid., ¶ 162 & nn.71-72 (alternation in original).

[137] Ibid., ¶ 163.

[138] Ibid.

[139] Ibid.

[140] Ibid., ¶ 32.

Finally, Dr. Nakhleh's statement about the roles and qualifications of Ministry of Islamic Affairs officials are without any basis in expertise, evidence or reasoning. He states that "support of violent jihadists" is within the "briefs" of "persons designated to lead *da'wa*."[141] He states that "commitment to and belief in the concept of jihad against the 'infidels' and the perceived enemies of Islam" is a "critical qualification" for an "appointment" such as al-Thumairy's.[142] He further states that a "designated propagator" for "MOIA" is "supposed to provide whatever assistance [is] needed to any visitor engaged in jihad or planning to engage in jihad," including "*jihad Qital* or fighting jihad".[143] These claims are outlandish and are inconsistent with my own experience with Ministry of Islamic Affairs officials, some of whom I know extremely well. Dr. Nakhleh's claims are also inconsistent with the very purpose for why the Ministry of Islamic Affairs was created – to control extremism.

## V.    Conclusion

In conclusion, I would like to emphasize four points that bear directly on any claim that the government of Saudi Arabia supported the attacks of September 11, 2001. First, Saudi Arabia has had a longstanding strategic relationship with the United States that began well before the September 11, 2001 attacks and upon which its own security depends. The Saudi government would not readily have jeopardized this relationship. Second, Saudi religious leaders understood the threat of terrorism and condemned acts of terrorism, including suicide bombing, before the attacks of September 11, 2001. Third, it is a mistake to conflate Saudi Arabia with al-Qaeda. Al-Qaeda was never, in terms of its leadership, membership or ideology, a primarily Saudi organization. Its ideology is entirely at odds with the quietist apolitical brand of Islam practiced and promoted in Saudi Arabia. Fourth, as accurately stated by the 9/11 Commission, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy."[144]

The attacks of 9/11 had many antecedents that include centuries-old conflict with the West, humiliation of defeats by Israel and India, the Iranian revolution, the Afghan jihad, the presence of American troops in Arabia and Qatar's Al Jazeera broadcasting bin Ladin's radical views including his call to kill Americans. To focus on Saudi religion as a cause is, in my view, mistaken. Even a superficial look at al-Qaeda reveals that the ideas of al-Banna, Qutb, Azzam and Zawahiri had far more influence than those of Mohammad Ibn Abd al-Wahhab. Above all, having looked at this issue from many angles over many years, there is no conceivable reason why the government of Saudi Arabia would enlist one of its fiercest enemies to attack one of its closest friends. I am not aware of any serious and informed Saudi Arabia or al-Qaeda experts who believe otherwise.

---

[141] Ibid., ¶ 179.

[142] Ibid., ¶ 212.

[143] Ibid., ¶ 213.

[144] 9/11 Commission Report, Executive Summary, p. 11.

Dated:  May 16, 2022

David Henry Rundell