# EXHIBIT 78

# THE 9/11 COMMISSION REPORT

# 1

# "WE HAVE
# SOME PLANES"

Tuesday, September 11, 2001, dawned temperate and nearly cloudless in the eastern United States. Millions of men and women readied themselves for work. Some made their way to the Twin Towers, the signature structures of the World Trade Center complex in New York City. Others went to Arlington, Virginia, to the Pentagon. Across the Potomac River, the United States Congress was back in session. At the other end of Pennsylvania Avenue, people began to line up for a White House tour. In Sarasota, Florida, President George W. Bush went for an early morning run.

For those heading to an airport, weather conditions could not have been better for a safe and pleasant journey. Among the travelers were Mohamed Atta and Abdul Aziz al Omari, who arrived at the airport in Portland, Maine.

## 1.1 INSIDE THE FOUR FLIGHTS

**Boarding the Flights**
**Boston: American 11 and United 175.** Atta and Omari boarded a 6:00 A.M. flight from Portland to Boston's Logan International Airport.[1]

When he checked in for his flight to Boston, Atta was selected by a computerized prescreening system known as CAPPS (Computer Assisted Passenger Prescreening System), created to identify passengers who should be subject to special security measures. Under security rules in place at the time, the only consequence of Atta's selection by CAPPS was that his checked bags were held off the plane until it was confirmed that he had boarded the aircraft. This did not hinder Atta's plans.[2]

Atta and Omari arrived in Boston at 6:45. Seven minutes later, Atta apparently took a call from Marwan al Shehhi, a longtime colleague who was at another terminal at Logan Airport. They spoke for three minutes.[3] It would be their final conversation.

Between 6:45 and 7:40, Atta and Omari, along with Satam al Suqami, Wail al Shehri, and Waleed al Shehri, checked in and boarded American Airlines Flight 11, bound for Los Angeles. The flight was scheduled to depart at 7:45.[4]

In another Logan terminal, Shehhi, joined by Fayez Banihammad, Mohand al Shehri, Ahmed al Ghamdi, and Hamza al Ghamdi, checked in for United Airlines Flight 175, also bound for Los Angeles. A couple of Shehhi's colleagues were obviously unused to travel; according to the United ticket agent, they had trouble understanding the standard security questions, and she had to go over them slowly until they gave the routine, reassuring answers.[5] Their flight was scheduled to depart at 8:00.

The security checkpoints through which passengers, including Atta and his colleagues, gained access to the American 11 gate were operated by Globe Security under a contract with American Airlines. In a different terminal, the single checkpoint through which passengers for United 175 passed was controlled by United Airlines, which had contracted with Huntleigh USA to perform the screening.[6]

In passing through these checkpoints, each of the hijackers would have been screened by a walk-through metal detector calibrated to detect items with at least the metal content of a .22-caliber handgun. Anyone who might have set off that detector would have been screened with a hand wand—a procedure requiring the screener to identify the metal item or items that caused the alarm. In addition, an X-ray machine would have screened the hijackers' carry-on belongings. The screening was in place to identify and confiscate weapons and other items prohibited from being carried onto a commercial flight.[7] None of the checkpoint supervisors recalled the hijackers or reported anything suspicious regarding their screening.[8]

While Atta had been selected by CAPPS in Portland, three members of his hijacking team—Suqami, Wail al Shehri, and Waleed al Shehri—were selected in Boston. Their selection affected only the handling of their checked bags, not their screening at the checkpoint. All five men cleared the checkpoint and made their way to the gate for American 11. Atta, Omari, and Suqami took their seats in business class (seats 8D, 8G, and 10B, respectively). The Shehri brothers had adjacent seats in row 2 (Wail in 2A, Waleed in 2B), in the first-class cabin. They boarded American 11 between 7:31 and 7:40. The aircraft pushed back from the gate at 7:40.[9]

Shehhi and his team, none of whom had been selected by CAPPS, boarded United 175 between 7:23 and 7:28 (Banihammad in 2A, Shehri in 2B, Shehhi in 6C, Hamza al Ghamdi in 9C, and Ahmed al Ghamdi in 9D). Their aircraft pushed back from the gate just before 8:00.[10]

**Washington Dulles: American 77.** Hundreds of miles southwest of Boston, at Dulles International Airport in the Virginia suburbs of Washington, D.C., five more men were preparing to take their early morning flight. At 7:15, a pair

of them, Khalid al Mihdhar and Majed Moqed, checked in at the American Airlines ticket counter for Flight 77, bound for Los Angeles. Within the next 20 minutes, they would be followed by Hani Hanjour and two brothers, Nawaf al Hazmi and Salem al Hazmi.[11]

Hani Hanjour, Khalid al Mihdhar, and Majed Moqed were flagged by CAPPS. The Hazmi brothers were also selected for extra scrutiny by the airline's customer service representative at the check-in counter. He did so because one of the brothers did not have photo identification nor could he understand English, and because the agent found both of the passengers to be suspicious. The only consequence of their selection was that their checked bags were held off the plane until it was confirmed that they had boarded the aircraft.[12]

All five hijackers passed through the Main Terminal's west security screening checkpoint; United Airlines, which was the responsible air carrier, had contracted out the work to Argenbright Security.[13] The checkpoint featured closed-circuit television that recorded all passengers, including the hijackers, as they were screened. At 7:18, Mihdhar and Moqed entered the security checkpoint.

Mihdhar and Moqed placed their carry-on bags on the belt of the X-ray machine and proceeded through the first metal detector. Both set off the alarm, and they were directed to a second metal detector. Mihdhar did not trigger the alarm and was permitted through the checkpoint. After Moqed set it off, a screener wanded him. He passed this inspection.[14]

About 20 minutes later, at 7:35, another passenger for Flight 77, Hani Hanjour, placed two carry-on bags on the X-ray belt in the Main Terminal's west checkpoint, and proceeded, without alarm, through the metal detector. A short time later, Nawaf and Salem al Hazmi entered the same checkpoint. Salem al Hazmi cleared the metal detector and was permitted through; Nawaf al Hazmi set off the alarms for both the first and second metal detectors and was then hand-wanded before being passed. In addition, his over-the-shoulder carry-on bag was swiped by an explosive trace detector and then passed. The video footage indicates that he was carrying an unidentified item in his back pocket, clipped to its rim.[15]

When the local civil aviation security office of the Federal Aviation Administration (FAA) later investigated these security screening operations, the screeners recalled nothing out of the ordinary. They could not recall that any of the passengers they screened were CAPPS selectees. We asked a screening expert to review the videotape of the hand-wanding, and he found the quality of the screener's work to have been "marginal at best." The screener should have "resolved" what set off the alarm; and in the case of both Moqed and Hazmi, it was clear that he did not.[16]

At 7:50, Majed Moqed and Khalid al Mihdhar boarded the flight and were seated in 12A and 12B in coach. Hani Hanjour, assigned to seat 1B (first class),

soon followed. The Hazmi brothers, sitting in 5E and 5F, joined Hanjour in the first-class cabin.[17]

**Newark: United 93.** Between 7:03 and 7:39, Saeed al Ghamdi, Ahmed al Nami, Ahmad al Haznawi, and Ziad Jarrah checked in at the United Airlines ticket counter for Flight 93, going to Los Angeles. Two checked bags; two did not. Haznawi was selected by CAPPS. His checked bag was screened for explosives and then loaded on the plane.[18]

The four men passed through the security checkpoint, owned by United Airlines and operated under contract by Argenbright Security. Like the checkpoints in Boston, it lacked closed-circuit television surveillance so there is no documentary evidence to indicate when the hijackers passed through the checkpoint, what alarms may have been triggered, or what security procedures were administered. The FAA interviewed the screeners later; none recalled anything unusual or suspicious.[19]

The four men boarded the plane between 7:39 and 7:48. All four had seats in the first-class cabin; their plane had no business-class section. Jarrah was in seat 1B, closest to the cockpit; Nami was in 3C, Ghamdi in 3D, and Haznawi in 6B.[20]

The 19 men were aboard four transcontinental flights.[21] They were planning to hijack these planes and turn them into large guided missiles, loaded with up to 11,400 gallons of jet fuel. By 8:00 A.M. on the morning of Tuesday, September 11, 2001, they had defeated all the security layers that America's civil aviation security system then had in place to prevent a hijacking.

### The Hijacking of American 11

American Airlines Flight 11 provided nonstop service from Boston to Los Angeles. On September 11, Captain John Ogonowski and First Officer Thomas McGuinness piloted the Boeing 767. It carried its full capacity of nine flight attendants. Eighty-one passengers boarded the flight with them (including the five terrorists).[22]

The plane took off at 7:59. Just before 8:14, it had climbed to 26,000 feet, not quite its initial assigned cruising altitude of 29,000 feet. All communications and flight profile data were normal. About this time the "Fasten Seatbelt" sign would usually have been turned off and the flight attendants would have begun preparing for cabin service.[23]

At that same time, American 11 had its last routine communication with the ground when it acknowledged navigational instructions from the FAA's air traffic control (ATC) center in Boston. Sixteen seconds after that transmission, ATC instructed the aircraft's pilots to climb to 35,000 feet. That message and all subsequent attempts to contact the flight were not acknowledged. From this and other evidence, we believe the hijacking began at 8:14 or shortly thereafter.[24]

with his colleagues on the floor of the command center. In a brief moment of reflection, he was recorded remarking that "This is a new type of war."[241]

He was, and is, right. But the conflict did not begin on 9/11. It had been publicly declared years earlier, most notably in a declaration faxed early in 1998 to an Arabic-language newspaper in London. Few Americans had noticed it. The fax had been sent from thousands of miles away by the followers of a Saudi exile gathered in one of the most remote and impoverished countries on earth.

2

# THE FOUNDATION OF
# THE NEW TERRORISM

## 2.1 A DECLARATION OF WAR

In February 1998, the 40-year-old Saudi exile Usama Bin Ladin and a fugitive
Egyptian physician, Ayman al Zawahiri, arranged from their Afghan headquar-
ters for an Arabic newspaper in London to publish what they termed a fatwa
issued in the name of a "World Islamic Front." A fatwa is normally an inter-
pretation of Islamic law by a respected Islamic authority, but neither Bin Ladin,
Zawahiri, nor the three others who signed this statement were scholars of
Islamic law. Claiming that America had declared war against God and his mes-
senger, they called for the murder of any American, anywhere on earth, as the
"individual duty for every Muslim who can do it in any country in which it
is possible to do it."[1]

Three months later, when interviewed in Afghanistan by ABC-TV, Bin
Ladin enlarged on these themes.[2] He claimed it was more important for Mus-
lims to kill Americans than to kill other infidels. "It is far better for anyone to
kill a single American soldier than to squander his efforts on other activities,"
he said. Asked whether he approved of terrorism and of attacks on civilians, he
replied: "We believe that the worst thieves in the world today and the worst
terrorists are the Americans. Nothing could stop you except perhaps retalia-
tion in kind. We do not have to differentiate between military or civilian. As
far as we are concerned, they are all targets."

*Note: Islamic names often do not follow the Western practice of the consistent use of surnames. Given the variety of names we
mention, we chose to refer to individuals by the last word in the names by which they are known: Nawaf al Hazmi as Hazmi,
for instance, omitting the article "al" that would be part of their name in their own societies. We generally make an exception for
the more familiar English usage of "Bin" as part of a last name, as in Bin Ladin. Further, there is no universally accepted way
to transliterate Arabic words and names into English. We have relied on a mix of common sense, the sound of the name in Ara-
bic, and common usage in source materials, the press, or government documents. When we quote from a source document, we use
its transliteration, e.g., "al Qida" instead of al Qaeda.*

Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.

In August 1996, Bin Ladin had issued his own self-styled fatwa calling on Muslims to drive American soldiers out of Saudi Arabia. The long, disjointed document condemned the Saudi monarchy for allowing the presence of an army of infidels in a land with the sites most sacred to Islam, and celebrated recent suicide bombings of American military facilities in the Kingdom. It praised the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 bombing in Aden, and especially the 1993 firefight in Somalia after which the United States "left the area carrying disappointment, humiliation, defeat and your dead with you."[3]

Bin Ladin said in his ABC interview that he and his followers had been preparing in Somalia for another long struggle, like that against the Soviets in Afghanistan, but "the United States rushed out of Somalia in shame and disgrace." Citing the Soviet army's withdrawal from Afghanistan as proof that a ragged army of dedicated Muslims could overcome a superpower, he told the interviewer: "We are certain that we shall—with the grace of Allah—prevail over the Americans." He went on to warn that "If the present injustice continues . . . , it will inevitably move the battle to American soil."[4]

Plans to attack the United States were developed with unwavering single-mindedness throughout the 1990s. Bin Ladin saw himself as called "to follow in the footsteps of the Messenger and to communicate his message to all nations,"[5] and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam.

## 2.2 BIN LADIN'S APPEAL IN THE ISLAMIC WORLD

It is the story of eccentric and violent ideas sprouting in the fertile ground of political and social turmoil. It is the story of an organization poised to seize its historical moment. How did Bin Ladin—with his call for the indiscriminate killing of Americans—win thousands of followers and some degree of approval from millions more?

The history, culture, and body of beliefs from which Bin Ladin has shaped and spread his message are largely unknown to many Americans. Seizing on symbols of Islam's past greatness, he promises to restore pride to people who consider themselves the victims of successive foreign masters. He uses cultural and religious allusions to the holy Qur'an and some of its interpreters. He appeals to people disoriented by cyclonic change as they confront modernity and globalization. His rhetoric selectively draws from multiple sources—Islam, history, and the region's political and economic malaise. He also stresses grievances against the United States widely shared in the Muslim world. He



*©Reuters 2004*

*Usama Bin Ladin at a news conference in Afghanistan in 1998*

inveighed against the presence of U.S. troops in Saudi Arabia, the home of Islam's holiest sites. He spoke of the suffering of the Iraqi people as a result of sanctions imposed after the Gulf War, and he protested U.S. support of Israel.

## Islam

Islam (a word that literally means "surrender to the will of God") arose in Arabia with what Muslims believe are a series of revelations to the Prophet Mohammed from the one and only God, the God of Abraham and of Jesus. These revelations, conveyed by the angel Gabriel, are recorded in the Qur'an. Muslims believe that these revelations, given to the greatest and last of a chain of prophets stretching from Abraham through Jesus, complete God's message to humanity. The Hadith, which recount Mohammed's sayings and deeds as recorded by his contemporaries, are another fundamental source. A third key element is the Sharia, the code of law derived from the Qur'an and the Hadith.

  Islam is divided into two main branches, Sunni and Shia. Soon after the

produced a common problem throughout the Muslim world: a large, steadily increasing population of young men without any reasonable expectation of suitable or steady employment—a sure prescription for social turbulence. Many of these young men, such as the enormous number trained only in religious schools, lacked the skills needed by their societies. Far more acquired valuable skills but lived in stagnant economies that could not generate satisfying jobs.

Millions, pursuing secular as well as religious studies, were products of educational systems that generally devoted little if any attention to the rest of the world's thought, history, and culture. The secular education reflected a strong cultural preference for technical fields over the humanities and social sciences. Many of these young men, even if able to study abroad, lacked the perspective and skills needed to understand a different culture.

Frustrated in their search for a decent living, unable to benefit from an education often obtained at the cost of great family sacrifice, and blocked from starting families of their own, some of these young men were easy targets for radicalization.

### Bin Ladin's Historical Opportunity

Most Muslims prefer a peaceful and inclusive vision of their faith, not the violent sectarianism of Bin Ladin. Among Arabs, Bin Ladin's followers are commonly nicknamed *takfiri*, or "those who define other Muslims as unbelievers," because of their readiness to demonize and murder those with whom they disagree. Beyond the theology lies the simple human fact that most Muslims, like most other human beings, are repelled by mass murder and barbarism whatever their justification.

"All Americans must recognize that the face of terror is not the true face of Islam," President Bush observed. "Islam is a faith that brings comfort to a billion people around the world. It's a faith that has made brothers and sisters of every race. It's a faith based upon love, not hate."[17] Yet as political, social, and economic problems created flammable societies, Bin Ladin used Islam's most extreme, fundamentalist traditions as his match. All these elements—including religion—combined in an explosive compound.

Other extremists had, and have, followings of their own. But in appealing to societies full of discontent, Bin Ladin remained credible as other leaders and symbols faded. He could stand as a symbol of resistance—above all, resistance to the West and to America. He could present himself and his allies as victorious warriors in the one great successful experience for Islamic militancy in the 1980s: the Afghan jihad against the Soviet occupation.

By 1998, Bin Ladin had a distinctive appeal, as he focused on attacking America. He argued that other extremists, who aimed at local rulers or Israel, did not go far enough. They had not taken on what he called "the head of the snake."[18]

Finally, Bin Ladin had another advantage: a substantial, worldwide organization. By the time he issued his February 1998 declaration of war, Bin Ladin had nurtured that organization for nearly ten years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

## 2.3 THE RISE OF BIN LADIN AND AL QAEDA (1988–1992)

A decade of conflict in Afghanistan, from 1979 to 1989, gave Islamist extremists a rallying point and training field. A Communist government in Afghanistan gained power in 1978 but was unable to establish enduring control. At the end of 1979, the Soviet government sent in military units to ensure that the country would remain securely under Moscow's influence. The response was an Afghan national resistance movement that defeated Soviet forces.[19]

Young Muslims from around the world flocked to Afghanistan to join as volunteers in what was seen as a "holy war"—*jihad*—against an invader. The largest numbers came from the Middle East. Some were Saudis, and among them was Usama Bin Ladin.

Twenty-three when he arrived in Afghanistan in 1980, Bin Ladin was the seventeenth of 57 children of a Saudi construction magnate. Six feet five and thin, Bin Ladin appeared to be ungainly but was in fact quite athletic, skilled as a horseman, runner, climber, and soccer player. He had attended Abdul Aziz University in Saudi Arabia. By some accounts, he had been interested there in religious studies, inspired by tape recordings of fiery sermons by Abdullah Azzam, a Palestinian and a disciple of Qutb. Bin Ladin was conspicuous among the volunteers not because he showed evidence of religious learning but because he had access to some of his family's huge fortune. Though he took part in at least one actual battle, he became known chiefly as a person who generously helped fund the anti–Soviet jihad.[20]

Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors."[21]

Mosques, schools, and boardinghouses served as recruiting stations in many parts of the world, including the United States. Some were set up by Islamic extremists or their financial backers. Bin Ladin had an important part in this

activity. He and the cleric Azzam had joined in creating a "Bureau of Services" (Mektab al Khidmat, or MAK), which channeled recruits into Afghanistan.[22]

The international environment for Bin Ladin's efforts was ideal. Saudi Arabia and the United States supplied billions of dollars worth of secret assistance to rebel groups in Afghanistan fighting the Soviet occupation. This assistance was funneled through Pakistan: the Pakistani military intelligence service (Inter-Services Intelligence Directorate, or ISID), helped train the rebels and distribute the arms. But Bin Ladin and his comrades had their own sources of support and training, and they received little or no assistance from the United States.[23]

April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaeda) as a potential general headquarters for future jihad.[24] Though Azzam had been considered number one in the MAK, by August 1988 Bin Ladin was clearly the leader (*emir*) of al Qaeda. This organization's structure included as its operating arms an intelligence component, a military committee, a financial committee, a political committee, and a committee in charge of media affairs and propaganda. It also had an Advisory Council (Shura) made up of Bin Ladin's inner circle.[25]

Bin Ladin's assumption of the helm of al Qaeda was evidence of his growing self-confidence and ambition. He soon made clear his desire for unchallenged control and for preparing the mujahideen to fight anywhere in the world. Azzam, by contrast, favored continuing to fight in Afghanistan until it had a true Islamist government. And, as a Palestinian, he saw Israel as the top priority for the next stage.[26]

Whether the dispute was about power, personal differences, or strategy, it ended on November 24, 1989, when a remotely controlled car bomb killed Azzam and both of his sons. The killers were assumed to be rival Egyptians. The outcome left Bin Ladin indisputably in charge of what remained of the MAK and al Qaeda.[27]

Through writers like Qutb, and the presence of Egyptian Islamist teachers in the Saudi educational system, Islamists already had a strong intellectual influence on Bin Ladin and his al Qaeda colleagues. By the late 1980s, the Egyptian Islamist movement—badly battered in the government crackdown following President Sadat's assassination—was centered in two major organizations: the Islamic Group and the Egyptian Islamic Jihad. A spiritual guide for both, but especially the Islamic Group, was the so-called Blind Sheikh, Omar Abdel Rahman. His preaching had inspired the assassination of Sadat. After being in and out of Egyptian prisons during the 1980s, Abdel Rahman found

refuge in the United States. From his headquarters in Jersey City, he distributed messages calling for the murder of unbelievers.[28]

The most important Egyptian in Bin Ladin's circle was a surgeon, Ayman al Zawahiri, who led a strong faction of the Egyptian Islamic Jihad. Many of his followers became important members in the new organization, and his own close ties with Bin Ladin led many to think of him as the deputy head of al Qaeda. He would in fact become Bin Ladin's deputy some years later, when they merged their organizations.[29]

### Bin Ladin Moves to Sudan

By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum.[30] Bin Ladin agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad.[31] While agents of Bin Ladin began to buy property in Sudan in 1990,[32] Bin Ladin himself moved from Afghanistan back to Saudi Arabia.

In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport. With help from a dissident member of the royal family, he managed to get out of the country under the pretext of attending an Islamic gathering in Pakistan in April 1991.[33] By 1994, the Saudi government would freeze his financial assets and revoke his citizenship.[34] He no longer had a country he could call his own.

Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tuc-

son, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus.[35]

Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)[36]

Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well.[37] The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders.[38] Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.[39]

This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid-1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK.[40] Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson.[41] Al Khifa recruited American Muslims to

fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

## 2.4 BUILDING AN ORGANIZATION, DECLARING WAR ON THE UNITED STATES (1992–1996)

Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an often-repeated lecture on the need to cut off "the head of the snake."[42]

By this time, Bin Ladin was well-known and a senior figure among Islamist extremists, especially those in Egypt, the Arabian Peninsula, and the Afghanistan-Pakistan border region. Still, he was just one among many diverse terrorist barons. Some of Bin Ladin's close comrades were more peers than subordinates. For example, Usama Asmurai, also known as Wali Khan, worked with Bin Ladin in the early 1980s and helped him in the Philippines and in Tajikistan. The Egyptian spiritual guide based in New Jersey, the Blind Sheikh, whom Bin Ladin admired, was also in the network. Among sympathetic peers in Afghanistan were a few of the warlords still fighting for power and Abu Zubaydah, who helped operate a popular terrorist training camp near the border with Pakistan. There were also rootless but experienced operatives, such as Ramzi Yousef and Khalid Sheikh Mohammed, who—though not necessarily formal members of someone else's organization—were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates.[43]

In now analyzing the terrorist programs carried out by members of this network, it would be misleading to apply the label "al Qaeda operations" too often in these early years. Yet it would also be misleading to ignore the significance of these connections. And in this network, Bin Ladin's agenda stood out. While his allied Islamist groups were focused on local battles, such as those in Egypt, Algeria, Bosnia, or Chechnya, Bin Ladin concentrated on attacking the "far enemy"—the United States.

### Attacks Known and Suspected

After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction. In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans. The perpetrators are reported to have belonged to a

group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.[44]

Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly supervised by al Qaeda's military leader.[45] Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shootdown of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.[46]

In November 1995, a car bomb exploded outside a Saudi–U.S. joint facility in Riyadh for training the Saudi National Guard. Five Americans and two officials from India were killed. The Saudi government arrested four perpetrators, who admitted being inspired by Bin Ladin. They were promptly executed. Though nothing proves that Bin Ladin ordered this attack, U.S. intelligence subsequently learned that al Qaeda leaders had decided a year earlier to attack a U.S. target in Saudi Arabia, and had shipped explosives to the peninsula for this purpose. Some of Bin Ladin's associates later took credit.[47]

In June 1996, an enormous truck bomb detonated in the Khobar Towers residential complex in Dhahran, Saudi Arabia, that housed U.S. Air Force personnel. Nineteen Americans were killed, and 372 were wounded. The operation was carried out principally, perhaps exclusively, by Saudi Hezbollah, an organization that had received support from the government of Iran. While the evidence of Iranian involvement is strong, there are also signs that al Qaeda played some role, as yet unknown.[48]

In this period, other prominent attacks in which Bin Ladin's involvement is at best cloudy are the 1993 bombing of the World Trade Center, a plot that same year to destroy landmarks in New York, and the 1995 Manila air plot to blow up a dozen U.S. airliners over the Pacific. Details on these plots appear in chapter 3.

Another scheme revealed that Bin Ladin sought the capability to kill on a mass scale. His business aides received word that a Sudanese military officer who had been a member of the previous government cabinet was offering to sell weapons-grade uranium. After a number of contacts were made through intermediaries, the officer set the price at $1.5 million, which did not deter Bin Ladin. Al Qaeda representatives asked to inspect the uranium and were shown a cylinder about 3 feet long, and one thought he could pronounce it genuine. Al Qaeda apparently purchased the cylinder, then discovered it to be bogus.[49] But while the effort failed, it shows what Bin Ladin and his associates hoped to do. One of the al Qaeda representatives explained his mission: "it's easy to kill more people with uranium."[50]

Bin Ladin seemed willing to include in the confederation terrorists from

almost every corner of the Muslim world. His vision mirrored that of Sudan's Islamist leader, Turabi, who convened a series of meetings under the label Popular Arab and Islamic Conference around the time of Bin Ladin's arrival in that country. Delegations of violent Islamist extremists came from all the groups represented in Bin Ladin's Islamic Army Shura. Representatives also came from organizations such as the Palestine Liberation Organization, Hamas, and Hezbollah.[51]

Turabi sought to persuade Shiites and Sunnis to put aside their divisions and join against the common enemy. In late 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States. Not long afterward, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security. Bin Ladin reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983. The relationship between al Qaeda and Iran demonstrated that Sunni–Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations. As will be described in chapter 7, al Qaeda contacts with Iran continued in ensuing years.[52]

Bin Ladin was also willing to explore possibilities for cooperation with Iraq, even though Iraq's dictator, Saddam Hussein, had never had an Islamist agenda—save for his opportunistic pose as a defender of the faithful against "Crusaders" during the Gulf War of 1991. Moreover, Bin Ladin had in fact been sponsoring anti-Saddam Islamists in Iraqi Kurdistan, and sought to attract them into his Islamic army.[53]

To protect his own ties with Iraq, Turabi reportedly brokered an agreement that Bin Ladin would stop supporting activities against Saddam. Bin Ladin apparently honored this pledge, at least for a time, although he continued to aid a group of Islamist extremists operating in part of Iraq (Kurdistan) outside of Baghdad's control. In the late 1990s, these extremist groups suffered major defeats by Kurdish forces. In 2001, with Bin Ladin's help they re-formed into an organization called Ansar al Islam. There are indications that by then the Iraqi regime tolerated and may even have helped Ansar al Islam against the common Kurdish enemy.[54]

With the Sudanese regime acting as intermediary, Bin Ladin himself met with a senior Iraqi intelligence officer in Khartoum in late 1994 or early 1995. Bin Ladin is said to have asked for space to establish training camps, as well as assistance in procuring weapons, but there is no evidence that Iraq responded to this request.[55] As described below, the ensuing years saw additional efforts to establish connections.

**Sudan Becomes a Doubtful Haven**

Not until 1998 did al Qaeda undertake a major terrorist operation of its own, in large part because Bin Ladin lost his base in Sudan. Ever since the Islamist regime came to power in Khartoum, the United States and other Western governments had pressed it to stop providing a haven for terrorist organizations. Other governments in the region, such as those of Egypt, Syria, Jordan, and even Libya, which were targets of some of these groups, added their own pressure. At the same time, the Sudanese regime began to change. Though Turabi had been its inspirational leader, General Omar al Bashir, president since 1989, had never been entirely under his thumb. Thus as outside pressures mounted, Bashir's supporters began to displace those of Turabi.

The attempted assassination in Ethiopia of Egyptian President Hosni Mubarak in June 1995 appears to have been a tipping point. The would-be killers, who came from the Egyptian Islamic Group, had been sheltered in Sudan and helped by Bin Ladin.[56] When the Sudanese refused to hand over three individuals identified as involved in the assassination plot, the UN Security Council passed a resolution criticizing their inaction and eventually sanctioned Khartoum in April 1996.[57]

A clear signal to Bin Ladin that his days in Sudan were numbered came when the government advised him that it intended to yield to Libya's demands to stop giving sanctuary to its enemies. Bin Ladin had to tell the Libyans who had been part of his Islamic army that he could no longer protect them and that they had to leave the country. Outraged, several Libyan members of al Qaeda and the Islamic Army Shura renounced all connections with him.[58]

Bin Ladin also began to have serious money problems. International pressure on Sudan, together with strains in the world economy, hurt Sudan's currency. Some of Bin Ladin's companies ran short of funds. As Sudanese authorities became less obliging, normal costs of doing business increased. Saudi pressures on the Bin Ladin family also probably took some toll. In any case, Bin Ladin found it necessary both to cut back his spending and to control his outlays more closely. He appointed a new financial manager, whom his followers saw as miserly.[59]

Money problems proved costly to Bin Ladin in other ways. Jamal Ahmed al Fadl, a Sudanese-born Arab, had spent time in the United States and had been recruited for the Afghan war through the Farouq mosque in Brooklyn. He had joined al Qaeda and taken the oath of fealty to Bin Ladin, serving as one of his business agents. Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States. Also testifying about al Qaeda in a U.S. court was L'Houssaine Kherchtou, who told of breaking with Bin Ladin because of Bin Ladin's professed inability to provide him with money when his wife needed a caesarian section.[60]

In February 1996, Sudanese officials began approaching officials from the

United States and other governments, asking what actions of theirs might ease foreign pressure. In secret meetings with Saudi officials, Sudan offered to expel Bin Ladin to Saudi Arabia and asked the Saudis to pardon him. U.S. officials became aware of these secret discussions, certainly by March. Saudi officials apparently wanted Bin Ladin expelled from Sudan. They had already revoked his citizenship, however, and would not tolerate his presence in their country. And Bin Ladin may have no longer felt safe in Sudan, where he had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both. In any case, on May 19, 1996, Bin Ladin left Sudan—significantly weakened, despite his ambitions and organizational skills. He returned to Afghanistan.[61]

## 2.5 AL QAEDA'S RENEWAL IN AFGHANISTAN (1996–1998)

Bin Ladin flew on a leased aircraft from Khartoum to Jalalabad, with a refueling stopover in the United Arab Emirates.[62] He was accompanied by family members and bodyguards, as well as by al Qaeda members who had been close associates since his organization's 1988 founding in Afghanistan. Dozens of additional militants arrived on later flights.[63]

Though Bin Ladin's destination was Afghanistan, Pakistan was the nation that held the key to his ability to use Afghanistan as a base from which to revive his ambitious enterprise for war against the United States.

For the first quarter century of its existence as a nation, Pakistan's identity had derived from Islam, but its politics had been decidedly secular. The army was—and remains—the country's strongest and most respected institution, and the army had been and continues to be preoccupied with its rivalry with India, especially over the disputed territory of Kashmir.

From the 1970s onward, religion had become an increasingly powerful force in Pakistani politics. After a coup in 1977, military leaders turned to Islamist groups for support, and fundamentalists became more prominent. South Asia had an indigenous form of Islamic fundamentalism, which had developed in the nineteenth century at a school in the Indian village of Deoband.[64] The influence of the Wahhabi school of Islam had also grown, nurtured by Saudi-funded institutions. Moreover, the fighting in Afghanistan made Pakistan home to an enormous—and generally unwelcome—population of Afghan refugees; and since the badly strained Pakistani education system could not accommodate the refugees, the government increasingly let privately funded religious schools serve as a cost-free alternative. Over time, these schools produced large numbers of half-educated young men with no marketable skills but with deeply held Islamic views.[65]

Pakistan's rulers found these multitudes of ardent young Afghans a source



of potential trouble at home but potentially useful abroad. Those who joined the Taliban movement, espousing a ruthless version of Islamic law, perhaps could bring order in chaotic Afghanistan and make it a cooperative ally. They thus might give Pakistan greater security on one of the several borders where Pakistani military officers hoped for what they called "strategic depth."[66]

It is unlikely that Bin Ladin could have returned to Afghanistan had Pakistan disapproved. The Pakistani military intelligence service probably had advance knowledge of his coming, and its officers may have facilitated his travel. During his entire time in Sudan, he had maintained guesthouses and training camps in Pakistan and Afghanistan. These were part of a larger network used by diverse organizations for recruiting and training fighters for Islamic insurgencies in such places as Tajikistan, Kashmir, and Chechnya. Pakistani intelligence officers reportedly introduced Bin Ladin to Taliban leaders in Kandahar, their main base of power, to aid his reassertion of control over camps near

Khowst, out of an apparent hope that he would now expand the camps and make them available for training Kashmiri militants.[67]

Yet Bin Ladin was in his weakest position since his early days in the war against the Soviet Union. The Sudanese government had canceled the registration of the main business enterprises he had set up there and then put some of them up for public sale. According to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there.[68]

He also lost the head of his military committee, Abu Ubaidah al Banshiri, one of the most capable and popular leaders of al Qaeda. While most of the group's key figures had accompanied Bin Ladin to Afghanistan, Banshiri had remained in Kenya to oversee the training and weapons shipments of the cell set up some four years earlier. He died in a ferryboat accident on Lake Victoria just a few days after Bin Ladin arrived in Jalalabad, leaving Bin Ladin with a need to replace him not only in the Shura but also as supervisor of the cells and prospective operations in East Africa.[69] He had to make other adjustments as well, for some al Qaeda members viewed Bin Ladin's return to Afghanistan as occasion to go off in their own directions. Some maintained collaborative relationships with al Qaeda, but many disengaged entirely.[70]

For a time, it may not have been clear to Bin Ladin that the Taliban would be his best bet as an ally. When he arrived in Afghanistan, they controlled much of the country, but key centers, including Kabul, were still held by rival warlords. Bin Ladin went initially to Jalalabad, probably because it was in an area controlled by a provincial council of Islamic leaders who were not major contenders for national power. He found lodgings with Younis Khalis, the head of one of the main mujahideen factions. Bin Ladin apparently kept his options open, maintaining contacts with Gulbuddin Hekmatyar, who, though an Islamic extremist, was also one of the Taliban's most militant opponents. But after September 1996, when first Jalalabad and then Kabul fell to the Taliban, Bin Ladin cemented his ties with them.[71]

That process did not always go smoothly. Bin Ladin, no longer constrained by the Sudanese, clearly thought that he had new freedom to publish his appeals for jihad. At about the time when the Taliban were making their final drive toward Jalalabad and Kabul, Bin Ladin issued his August 1996 fatwa, saying that "We . . . have been prevented from addressing the Muslims," but expressing relief that "by the grace of Allah, a safe base here is now available in the high Hindu Kush mountains in Khurasan." But the Taliban, like the Sudanese, would eventually hear warnings, including from the Saudi monarchy.[72]

Though Bin Ladin had promised Taliban leaders that he would be circumspect, he broke this promise almost immediately, giving an inflammatory interview to CNN in March 1997. The Taliban leader Mullah Omar promptly "invited" Bin Ladin to move to Kandahar, ostensibly in the interests of Bin Ladin's own security but more likely to situate him where he might be easier to control.[73]

There is also evidence that around this time Bin Ladin sent out a number of feelers to the Iraqi regime, offering some cooperation. None are reported to have received a significant response. According to one report, Saddam Hussein's efforts at this time to rebuild relations with the Saudis and other Middle Eastern regimes led him to stay clear of Bin Ladin.[74]

In mid-1998, the situation reversed; it was Iraq that reportedly took the initiative. In March 1998, after Bin Ladin's public fatwa against the United States, two al Qaeda members reportedly went to Iraq to meet with Iraqi intelligence. In July, an Iraqi delegation traveled to Afghanistan to meet first with the Taliban and then with Bin Ladin. Sources reported that one, or perhaps both, of these meetings was apparently arranged through Bin Ladin's Egyptian deputy, Zawahiri, who had ties of his own to the Iraqis. In 1998, Iraq was under intensifying U.S. pressure, which culminated in a series of large air attacks in December.[75]

Similar meetings between Iraqi officials and Bin Ladin or his aides may have occurred in 1999 during a period of some reported strains with the Taliban. According to the reporting, Iraqi officials offered Bin Ladin a safe haven in Iraq. Bin Ladin declined, apparently judging that his circumstances in Afghanistan remained more favorable than the Iraqi alternative. The reports describe friendly contacts and indicate some common themes in both sides' hatred of the United States. But to date we have seen no evidence that these or the earlier contacts ever developed into a collaborative operational relationship. Nor have we seen evidence indicating that Iraq cooperated with al Qaeda in developing or carrying out any attacks against the United States.[76]

Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain. Through his relationship with Mullah Omar—and the monetary and other benefits that it brought the Taliban—Bin Ladin was able to circumvent restrictions; Mullah Omar would stand by him even when other Taliban leaders raised objections. Bin Ladin appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan. Al Qaeda members could travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates. Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.[77]

The Taliban seemed to open the doors to all who wanted to come to Afghanistan to train in the camps. The alliance with the Taliban provided al Qaeda a sanctuary in which to train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes. While Bin Ladin maintained his own al Qaeda guesthouses and camps for vetting and training recruits, he also provided support to and bene-

fited from the broad infrastructure of such facilities in Afghanistan made available to the global network of Islamist movements. U.S. intelligence estimates put the total number of fighters who underwent instruction in Bin Ladin–supported camps in Afghanistan from 1996 through 9/11 at 10,000 to 20,000.[78]

In addition to training fighters and special operators, this larger network of guesthouses and camps provided a mechanism by which al Qaeda could screen and vet candidates for induction into its own organization. Thousands flowed through the camps, but no more than a few hundred seem to have become al Qaeda members. From the time of its founding, al Qaeda had employed training and indoctrination to identify "worthy" candidates.[79]

Al Qaeda continued meanwhile to collaborate closely with the many Middle Eastern groups—in Egypt, Algeria, Yemen, Lebanon, Morocco, Tunisia, Somalia, and elsewhere—with which it had been linked when Bin Ladin was in Sudan. It also reinforced its London base and its other offices around Europe, the Balkans, and the Caucasus. Bin Ladin bolstered his links to extremists in South and Southeast Asia, including the Malaysian-Indonesian JI and several Pakistani groups engaged in the Kashmir conflict.[80]

The February 1998 fatwa thus seems to have been a kind of public launch of a renewed and stronger al Qaeda, after a year and a half of work. Having rebuilt his fund-raising network, Bin Ladin had again become the rich man of the jihad movement. He had maintained or restored many of his links with terrorists elsewhere in the world. And he had strengthened the internal ties in his own organization.

The inner core of al Qaeda continued to be a hierarchical top-down group with defined positions, tasks, and salaries. Most but not all in this core swore fealty (or *bayat*) to Bin Ladin. Other operatives were committed to Bin Ladin or to his goals and would take assignments for him, but they did not swear bayat and maintained, or tried to maintain, some autonomy. A looser circle of adherents might give money to al Qaeda or train in its camps but remained essentially independent. Nevertheless, they constituted a potential resource for al Qaeda.[81]

Now effectively merged with Zawahiri's Egyptian Islamic Jihad,[82] al Qaeda promised to become the general headquarters for international terrorism, without the need for the Islamic Army Shura. Bin Ladin was prepared to pick up where he had left off in Sudan. He was ready to strike at "the head of the snake."

Al Qaeda's role in organizing terrorist operations had also changed. Before the move to Afghanistan, it had concentrated on providing funds, training, and weapons for actions carried out by members of allied groups. The attacks on the U.S. embassies in East Africa in the summer of 1998 would take a different form—planned, directed, and executed by al Qaeda, under the direct supervision of Bin Ladin and his chief aides.

### The Embassy Bombings

As early as December 1993, a team of al Qaeda operatives had begun casing targets in Nairobi for future attacks. It was led by Ali Mohamed, a former Egyptian army officer who had moved to the United States in the mid-1980s, enlisted in the U.S. Army, and became an instructor at Fort Bragg. He had provided guidance and training to extremists at the Farouq mosque in Brooklyn, including some who were subsequently convicted in the February 1993 attack on the World Trade Center. The casing team also included a computer expert whose write-ups were reviewed by al Qaeda leaders.[83]

The team set up a makeshift laboratory for developing their surveillance photographs in an apartment in Nairobi where the various al Qaeda operatives and leaders based in or traveling to the Kenya cell sometimes met. Banshiri, al Qaeda's military committee chief, continued to be the operational commander of the cell; but because he was constantly on the move, Bin Ladin had dispatched another operative, Khaled al Fawwaz, to serve as the on-site manager. The technical surveillance and communications equipment employed for these casing missions included state-of-the-art video cameras obtained from China and from dealers in Germany. The casing team also reconnoitered targets in Djibouti.[84]

As early as January 1994, Bin Ladin received the surveillance reports, complete with diagrams prepared by the team's computer specialist. He, his top military committee members—Banshiri and his deputy, Abu Hafs al Masri (also known as Mohammed Atef)—and a number of other al Qaeda leaders reviewed the reports. Agreeing that the U.S. embassy in Nairobi was an easy target because a car bomb could be parked close by, they began to form a plan. Al Qaeda had begun developing the tactical expertise for such attacks months earlier, when some of its operatives—top military committee members and several operatives who were involved with the Kenya cell among them—were sent to Hezbollah training camps in Lebanon.[85]

The cell in Kenya experienced a series of disruptions that may in part account for the relatively long delay before the attack was actually carried out. The difficulties Bin Ladin began to encounter in Sudan in 1995, his move to Afghanistan in 1996, and the months spent establishing ties with the Taliban may also have played a role, as did Banshiri's accidental drowning.

In August 1997, the Kenya cell panicked. The London *Daily Telegraph* reported that Madani al Tayyib, formerly head of al Qaeda's finance committee, had turned himself over to the Saudi government. The article said (incorrectly) that the Saudis were sharing Tayyib's information with the U.S. and British authorities.[86] At almost the same time, cell members learned that U.S. and Kenyan agents had searched the Kenya residence of Wadi al Hage, who had become the new on-site manager in Nairobi, and that Hage's telephone was being tapped. Hage was a U.S. citizen who had worked with Bin Ladin in Afgha-

nistan in the 1980s, and in 1992 he went to Sudan to become one of al Qaeda's major financial operatives. When Hage returned to the United States to appear before a grand jury investigating Bin Ladin, the job of cell manager was taken over by Harun Fazul, a Kenyan citizen who had been in Bin Ladin's advance team to Sudan back in 1990. Harun faxed a report on the "security situation" to several sites, warning that "the crew members in East Africa is [*sic*] in grave danger" in part because "America knows . . . that the followers of [Bin Ladin] . . . carried out the operations to hit Americans in Somalia." The report provided instructions for avoiding further exposure.[87]

On February 23, 1998, Bin Ladin issued his public fatwa. The language had been in negotiation for some time, as part of the merger under way between Bin Ladin's organization and Zawahiri's Egyptian Islamic Jihad. Less than a month after the publication of the fatwa, the teams that were to carry out the embassy attacks were being pulled together in Nairobi and Dar es Salaam. The timing and content of their instructions indicate that the decision to launch the attacks had been made by the time the fatwa was issued.[88]

The next four months were spent setting up the teams in Nairobi and Dar es Salaam. Members of the cells rented residences, and purchased bomb-making materials and transport vehicles. At least one additional explosives expert was brought in to assist in putting the weapons together. In Nairobi, a hotel room was rented to put up some of the operatives. The suicide trucks were purchased shortly before the attack date.[89]

While this was taking place, Bin Ladin continued to push his public message. On May 7, the deputy head of al Qaeda's military committee, Mohammed Atef, faxed to Bin Ladin's London office a new fatwa issued by a group of sheikhs located in Afghanistan. A week later, it appeared in *Al Quds al Arabi*, the same Arabic-language newspaper in London that had first published Bin Ladin's February fatwa, and it conveyed the same message—the duty of Muslims to carry out holy war against the enemies of Islam and to expel the Americans from the Gulf region. Two weeks after that, Bin Ladin gave a videotaped interview to ABC News with the same slogans, adding that "we do not differentiate between those dressed in military uniforms and civilians; they are all targets in this *fatwa*."[90]

By August 1, members of the cells not directly involved in the attacks had mostly departed from East Africa. The remaining operatives prepared and assembled the bombs, and acquired the delivery vehicles. On August 4, they made one last casing run at the embassy in Nairobi. By the evening of August 6, all but the delivery teams and one or two persons assigned to remove the evidence trail had left East Africa. Back in Afghanistan, Bin Ladin and the al Qaeda leadership had left Kandahar for the countryside, expecting U.S. retaliation. Declarations taking credit for the attacks had already been faxed to the joint al Qaeda–Egyptian Islamic Jihad office in Baku, with instructions to stand by

for orders to "instantly" transmit them to *Al Quds al Arabi*. One proclaimed "the formation of the Islamic Army for the Liberation of the Holy Places," and two others—one for each embassy—announced that the attack had been carried out by a "company" of a "battalion" of this "Islamic Army."[91]

On the morning of August 7, the bomb-laden trucks drove into the embassies roughly five minutes apart—about 10:35 A.M. in Nairobi and 10:39 A.M. in Dar es Salaam. Shortly afterward, a phone call was placed from Baku to London. The previously prepared messages were then faxed to London.[92]

The attack on the U.S. embassy in Nairobi destroyed the embassy and killed 12 Americans and 201 others, almost all Kenyans. About 5,000 people were injured. The attack on the U.S. embassy in Dar es Salaam killed 11 more people, none of them Americans. Interviewed later about the deaths of the Africans, Bin Ladin answered that "when it becomes apparent that it would be impossible to repel these Americans without assaulting them, even if this involved the killing of Muslims, this is permissible under Islam." Asked if he had indeed masterminded these bombings, Bin Ladin said that the World Islamic Front for jihad against "Jews and Crusaders" had issued a "crystal clear" fatwa. If the instigation for jihad against the Jews and the Americans to liberate the holy places "is considered a crime," he said, "let history be a witness that I am a criminal."[93]

# 3

# COUNTERTERRORISM
# EVOLVES

IN CHAPTER 2, we described the growth of a new kind of terrorism, and a new terrorist organization—especially from 1988 to 1998, when Usama Bin Ladin declared war and organized the bombing of two U.S. embassies. In this chapter, we trace the parallel evolution of government efforts to counter terrorism by Islamic extremists against the United States.

We mention many personalities in this report. As in any study of the U.S. government, some of the most important characters are institutions. We will introduce various agencies, and how they adapted to a new kind of terrorism.

## 3.1 FROM THE OLD TERRORISM TO THE NEW: THE FIRST WORLD TRADE CENTER BOMBING

At 18 minutes after noon on February 26, 1993, a huge bomb went off beneath the two towers of the World Trade Center. This was not a suicide attack. The terrorists parked a truck bomb with a timing device on Level B-2 of the underground garage, then departed. The ensuing explosion opened a hole seven stories up. Six people died. More than a thousand were injured. An FBI agent at the scene described the relatively low number of fatalities as a miracle.[1]

President Bill Clinton ordered his National Security Council to coordinate the response. Government agencies swung into action to find the culprits. The Counterterrorist Center located at the CIA combed its files and queried sources around the world. The National Security Agency (NSA), the huge Defense Department signals collection agency, ramped up its communications intercept network and searched its databases for clues.[2] The New York Field Office of the FBI took control of the local investigation and, in the end, set a pattern for future management of terrorist incidents.

Four features of this episode have significance for the story of 9/11.

# 4

# RESPONSES TO AL QAEDA'S INITIAL ASSAULTS

## 4.1 BEFORE THE BOMBINGS IN KENYA AND TANZANIA

Although the 1995 National Intelligence Estimate had warned of a new type of terrorism, many officials continued to think of terrorists as agents of states (Saudi Hezbollah acting for Iran against Khobar Towers) or as domestic criminals (Timothy McVeigh in Oklahoma City). As we pointed out in chapter 3, the White House is not a natural locus for program management. Hence, government efforts to cope with terrorism were essentially the work of individual agencies.

President Bill Clinton's counterterrorism Presidential Decision Directives in 1995 (no. 39) and May 1998 (no. 62) reiterated that terrorism was a national security problem, not just a law enforcement issue. They reinforced the authority of the National Security Council (NSC) to coordinate domestic as well as foreign counterterrorism efforts, through Richard Clarke and his interagency Counterterrorism Security Group (CSG). Spotlighting new concerns about unconventional attacks, these directives assigned tasks to lead agencies but did not differentiate types of terrorist threats. Thus, while Clarke might prod or push agencies to act, what actually happened was usually decided at the State Department, the Pentagon, the CIA, or the Justice Department. The efforts of these agencies were sometimes energetic and sometimes effective. Terrorist plots were disrupted and individual terrorists were captured. But the United States did not, before 9/11, adopt as a clear strategic objective the elimination of al Qaeda.

**Early Efforts against Bin Ladin**
Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism. In 1993, the CIA noted that he had paid for the training of some Egyptian terrorists in Sudan. The State Department detected his money in aid to the Yemeni terrorists who

set a bomb in an attempt to kill U.S. troops in Aden in 1992. State Department sources even saw suspicious links with Omar Abdel Rahman, the "Blind Sheikh" in the New York area, commenting that Bin Ladin seemed "committed to financing 'Jihads' against 'anti Islamic' regimes worldwide." After the department designated Sudan a state sponsor of terrorism in 1993, it put Bin Ladin on its TIPOFF watchlist, a move that might have prevented his getting a visa had he tried to enter the United States. As late as 1997, however, even the CIA's Counterterrorist Center continued to describe him as an "extremist financier."[1]

In 1996, the CIA set up a special unit of a dozen officers to analyze intelligence on and plan operations against Bin Ladin. David Cohen, the head of the CIA's Directorate of Operations, wanted to test the idea of having a "virtual station"—a station based at headquarters but collecting and operating against a subject much as stations in the field focus on a country. Taking his cue from National Security Advisor Anthony Lake, who expressed special interest in terrorist finance, Cohen formed his virtual station as a terrorist financial links unit. He had trouble getting any Directorate of Operations officer to run it; he finally recruited a former analyst who was then running the Islamic Extremist Branch of the Counterterrorist Center. This officer, who was especially knowledgeable about Afghanistan, had noticed a recent stream of reports about Bin Ladin and something called al Qaeda, and suggested to Cohen that the station focus on this one individual. Cohen agreed. Thus was born the Bin Ladin unit.[2]

In May 1996, Bin Ladin left Sudan for Afghanistan. A few months later, as the Bin Ladin unit was gearing up, Jamal Ahmed al Fadl walked into a U.S. embassy in Africa, established his bona fides as a former senior employee of Bin Ladin, and provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda. Corroborating evidence came from another walk-in source at a different U.S. embassy. More confirmation was supplied later that year by intelligence and other sources, including material gathered by FBI agents and Kenyan police from an al Qaeda cell in Nairobi.[3]

By 1997, officers in the Bin Ladin unit recognized that Bin Ladin was more than just a financier. They learned that al Qaeda had a military committee that was planning operations against U.S. interests worldwide and was actively trying to obtain nuclear material. Analysts assigned to the station looked at the information it had gathered and "found connections everywhere," including links to the attacks on U.S. troops in Aden and Somalia in 1992 and 1993 and to the Manila air plot in the Philippines in 1994–1995.[4]

The Bin Ladin station was already working on plans for offensive operations against Bin Ladin. These plans were directed at both physical assets and sources of finance. In the end, plans to identify and attack Bin Ladin's money sources did not go forward.[5]

In late 1995, when Bin Ladin was still in Sudan, the State Department and the CIA learned that Sudanese officials were discussing with the Saudi gov-

ernment the possibility of expelling Bin Ladin. U.S. Ambassador Timothy Carney encouraged the Sudanese to pursue this course. The Saudis, however, did not want Bin Ladin, giving as their reason their revocation of his citizenship.[6]

Sudan's minister of defense, Fatih Erwa, has claimed that Sudan offered to hand Bin Ladin over to the United States. The Commission has found no credible evidence that this was so. Ambassador Carney had instructions only to push the Sudanese to expel Bin Ladin. Ambassador Carney had no legal basis to ask for more from the Sudanese since, at the time, there was no indictment outstanding.[7]

The chief of the Bin Ladin station, whom we will call "Mike," saw Bin Ladin's move to Afghanistan as a stroke of luck. Though the CIA had virtually abandoned Afghanistan after the Soviet withdrawal, case officers had reestablished old contacts while tracking down Mir Amal Kansi, the Pakistani gunman who had murdered two CIA employees in January 1993. These contacts contributed to intelligence about Bin Ladin's local movements, business activities, and security and living arrangements, and helped provide evidence that he was spending large amounts of money to help the Taliban. The chief of the Counterterrorist Center, whom we will call "Jeff," told Director George Tenet that the CIA's intelligence assets were "near to providing real-time information about Bin Ladin's activities and travels in Afghanistan." One of the contacts was a group associated with particular tribes among Afghanistan's ethnic Pashtun community.[8]

By the fall of 1997, the Bin Ladin unit had roughed out a plan for these Afghan tribals to capture Bin Ladin and hand him over for trial either in the United States or in an Arab country. In early 1998, the cabinet-level Principals Committee apparently gave the concept its blessing.[9]

On their own separate track, getting information but not direction from the CIA, the FBI's New York Field Office and the U.S. Attorney for the Southern District of New York were preparing to ask a grand jury to indict Bin Ladin. The Counterterrorist Center knew that this was happening.[10] The eventual charge, conspiring to attack U.S. defense installations, was finally issued from the grand jury in June 1998—as a sealed indictment. The indictment was publicly disclosed in November of that year.

When Bin Ladin moved to Afghanistan in May 1996, he became a subject of interest to the State Department's South Asia bureau. At the time, as one diplomat told us, South Asia was seen in the department and the government generally as a low priority. In 1997, as Madeleine Albright was beginning her tenure as secretary of state, an NSC policy review concluded that the United States should pay more attention not just to India but also to Pakistan and Afghanistan.[11] With regard to Afghanistan, another diplomat said, the United States at the time had "no policy."[12]

In the State Department, concerns about India-Pakistan tensions often crowded out attention to Afghanistan or Bin Ladin. Aware of instability and

planned to brief cabinet-level principals and their deputies the following week, giving June 23 as the date for the raid, with Bin Ladin to be brought out of Afghanistan no later than July 23.[27]

On May 20, Director Tenet discussed the high risk of the operation with Berger and his deputies, warning that people might be killed, including Bin Ladin. Success was to be defined as the exfiltration of Bin Ladin out of Afghanistan.[28] A meeting of principals was scheduled for May 29 to decide whether the operation should go ahead.

The principals did not meet. On May 29, "Jeff" informed "Mike" that he had just met with Tenet, Pavitt, and the chief of the Directorate's Near Eastern Division. The decision was made not to go ahead with the operation. "Mike" cabled the field that he had been directed to "stand down on the operation for the time being." He had been told, he wrote, that cabinet-level officials thought the risk of civilian casualties—"collateral damage"—was too high. They were concerned about the tribals' safety, and had worried that "the purpose and nature of the operation would be subject to unavoidable misinterpretation and misrepresentation—and probably recriminations—in the event that Bin Ladin, despite our best intentions and efforts, did not survive."[29]

Impressions vary as to who actually decided not to proceed with the operation. Clarke told us that the CSG saw the plan as flawed. He was said to have described it to a colleague on the NSC staff as "half-assed" and predicted that the principals would not approve it. "Jeff" thought the decision had been made at the cabinet level. Pavitt thought that it was Berger's doing, though perhaps on Tenet's advice. Tenet told us that given the recommendation of his chief operations officers, he alone had decided to "turn off" the operation. He had simply informed Berger, who had not pushed back. Berger's recollection was similar. He said the plan was never presented to the White House for a decision.[30]

The CIA's senior management clearly did not think the plan would work. Tenet's deputy director of operations wrote to Berger a few weeks later that the CIA assessed the tribals' ability to capture Bin Ladin and deliver him to U.S. officials as low. But working-level CIA officers were disappointed. Before it was canceled, Schroen described it as the "best plan we are going to come up with to capture [Bin Ladin] while he is in Afghanistan and bring him to justice."[31] No capture plan before 9/11 ever again attained the same level of detail and preparation. The tribals' reported readiness to act diminished. And Bin Ladin's security precautions and defenses became more elaborate and formidable.

At this time, 9/11 was more than three years away. It was the duty of Tenet and the CIA leadership to balance the risks of inaction against jeopardizing the lives of their operatives and agents. And they had reason to worry about failure: millions of dollars down the drain; a shoot-out that could be seen as an assassination; and, if there were repercussions in Pakistan, perhaps a coup. The decisions of the U.S. government in May 1998 were made, as Berger has put

it, from the vantage point of the driver looking through a muddy windshield moving forward, not through a clean rearview mirror.[32]

### Looking for Other Options

The Counterterrorist Center continued to track Bin Ladin and to contemplate covert action. The most hopeful possibility seemed now to lie in diplomacy—but not diplomacy managed by the Department of State, which focused primarily on India-Pakistan nuclear tensions during the summer of 1998. The CIA learned in the spring of 1998 that the Saudi government had quietly disrupted Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles. They had arrested scores of individuals, with no publicity. When thanking the Saudis, Director Tenet took advantage of the opening to ask them to help against Bin Ladin. The response was encouraging enough that President Clinton made Tenet his informal personal representative to work with the Saudis on terrorism, and Tenet visited Riyadh in May and again in early June.[33]

Saudi Crown Prince Abdullah, who had taken charge from the ailing King Fahd, promised Tenet an all-out secret effort to persuade the Taliban to expel Bin Ladin so that he could be sent to the United States or to another country for trial. The Kingdom's emissary would be its intelligence chief, Prince Turki bin Faisal. Vice President Al Gore later added his thanks to those of Tenet, both making clear that they spoke with President Clinton's blessing. Tenet reported that it was imperative to get an indictment against Bin Ladin. The New York grand jury issued its sealed indictment a few days later, on June 10. Tenet also recommended that no action be taken on other U.S. options, such as the covert action plan.[34]

Prince Turki followed up in meetings during the summer with Mullah Omar and other Taliban leaders. Apparently employing a mixture of possible incentives and threats, Turki received a commitment that Bin Ladin would be expelled, but Mullah Omar did not make good on this promise.[35]

On August 5, Clarke chaired a CSG meeting on Bin Ladin. In the discussion of what might be done, the note taker wrote, "there was a dearth of bright ideas around the table, despite a consensus that the [government] ought to pursue every avenue it can to address the problem."[36]

## 4.2 CRISIS: AUGUST 1998

On August 7, 1998, National Security Advisor Berger woke President Clinton with a phone call at 5:35 A.M. to tell him of the almost simultaneous bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. Suspicion quickly focused on Bin Ladin. Unusually good intelligence, chiefly from

the yearlong monitoring of al Qaeda's cell in Nairobi, soon firmly fixed responsibility on him and his associates.[37]

Debate about what to do settled very soon on one option: Tomahawk cruise missiles. Months earlier, after cancellation of the covert capture operation, Clarke had prodded the Pentagon to explore possibilities for military action. On June 2, General Hugh Shelton, the chairman of the Joint Chiefs of Staff, had directed General Zinni at Central Command to develop a plan, which he had submitted during the first week of July. Zinni's planners surely considered the two previous times the United States had used force to respond to terrorism, the 1986 strike on Libya and the 1993 strike against Iraq. They proposed firing Tomahawks against eight terrorist camps in Afghanistan, including Bin Ladin's compound at Tarnak Farms.[38] After the embassy attacks, the Pentagon offered this plan to the White House.

The day after the embassy bombings, Tenet brought to a principals meeting intelligence that terrorist leaders were expected to gather at a camp near Khowst, Afghanistan, to plan future attacks. According to Berger, Tenet said that several hundred would attend, including Bin Ladin. The CIA described the area as effectively a military cantonment, away from civilian population centers and overwhelmingly populated by jihadists. Clarke remembered sitting next to Tenet in a White House meeting, asking Tenet "You thinking what I'm thinking?" and his nodding "yes."[39] The principals quickly reached a consensus on attacking the gathering. The strike's purpose was to kill Bin Ladin and his chief lieutenants.[40]

Berger put in place a tightly compartmented process designed to keep all planning secret. On August 11, General Zinni received orders to prepare detailed plans for strikes against the sites in Afghanistan. The Pentagon briefed President Clinton about these plans on August 12 and 14. Though the principals hoped that the missiles would hit Bin Ladin, NSC staff recommended the strike whether or not there was firm evidence that the commanders were at the facilities.[41]

Considerable debate went to the question of whether to strike targets outside of Afghanistan, including two facilities in Sudan. One was a tannery believed to belong to Bin Ladin. The other was al Shifa, a Khartoum pharmaceutical plant, which intelligence reports said was manufacturing a precursor ingredient for nerve gas with Bin Ladin's financial support. The argument for hitting the tannery was that it could hurt Bin Ladin financially. The argument for hitting al Shifa was that it would lessen the chance of Bin Ladin's having nerve gas for a later attack.[42]

Ever since March 1995, American officials had had in the backs of their minds Aum Shinrikyo's release of sarin nerve gas in the Tokyo subway. President Clinton himself had expressed great concern about chemical and biological terrorism in the United States. Bin Ladin had reportedly been heard to speak of wanting a "Hiroshima" and at least 10,000 casualties. The CIA reported

# 5

# AL QAEDA AIMS AT THE AMERICAN HOMELAND

## 5.1 TERRORIST ENTREPRENEURS

By early 1999, al Qaeda was already a potent adversary of the United States. Bin Ladin and his chief of operations, Abu Hafs al Masri, also known as Mohammed Atef, occupied undisputed leadership positions atop al Qaeda's organizational structure. Within this structure, al Qaeda's worldwide terrorist operations relied heavily on the ideas and work of enterprising and strong-willed field commanders who enjoyed considerable autonomy. To understand how the organization actually worked and to introduce the origins of the 9/11 plot, we briefly examine three of these subordinate commanders: Khalid Sheikh Mohammed (KSM), Riduan Isamuddin (better known as Hambali), and Abd al Rahim al Nashiri. We will devote the most attention to Khalid Sheikh Mohammed, the chief manager of the "planes operation."

**Khalid Sheikh Mohammed**

No one exemplifies the model of the terrorist entrepreneur more clearly than Khalid Sheikh Mohammed, the principal architect of the 9/11 attacks. KSM followed a rather tortuous path to his eventual membership in al Qaeda.[1] Highly educated and equally comfortable in a government office or a terrorist safehouse, KSM applied his imagination, technical aptitude, and managerial skills to hatching and planning an extraordinary array of terrorist schemes. These ideas included conventional car bombing, political assassination, aircraft bombing, hijacking, reservoir poisoning, and, ultimately, the use of aircraft as missiles guided by suicide operatives.

Like his nephew Ramzi Yousef (three years KSM's junior), KSM grew up in Kuwait but traces his ethnic lineage to the Baluchistan region straddling Iran and Pakistan. Raised in a religious family, KSM claims to have joined the Muslim Brotherhood at age 16 and to have become enamored of violent jihad at youth camps in the desert. In 1983, following his graduation from secondary

**Detainee Interrogation Reports**

Chapters 5 and 7 rely heavily on information obtained from captured al Qaeda members. A number of these "detainees" have firsthand knowledge of the 9/11 plot.

Assessing the truth of statements by these witnesses—sworn enemies of the United States—is challenging. Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when, or how questions of particular interest would be asked. Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting. We were told that our requests might disrupt the sensitive interrogation process.

We have nonetheless decided to include information from captured 9/11 conspirators and al Qaeda members in our report. We have evaluated their statements carefully and have attempted to corroborate them with documents and statements of others. In this report, we indicate where such statements provide the foundation for our narrative. We have been authorized to identify by name only ten detainees whose custody has been confirmed officially by the U.S. government.[2]

school, KSM left Kuwait to enroll at Chowan College, a small Baptist school in Murfreesboro, North Carolina. After a semester at Chowan, KSM transferred to North Carolina Agricultural and Technical State University in Greensboro, which he attended with Yousef's brother, another future al Qaeda member. KSM earned a degree in mechanical engineering in December 1986.[3]

Although he apparently did not attract attention for extreme Islamist beliefs or activities while in the United States, KSM plunged into the anti-Soviet Afghan jihad soon after graduating from college. Visiting Pakistan for the first time in early 1987, he traveled to Peshawar, where his brother Zahid introduced him to the famous Afghan *mujahid* Abdul Rasul Sayyaf, head of the Hizbul-Ittihad El-Islami (Islamic Union Party). Sayyaf became KSM's mentor and provided KSM with military training at Sayyaf's Sada camp. KSM claims he then fought the Soviets and remained at the front for three months before being summoned to perform administrative duties for Abdullah Azzam. KSM next took a job working for an electronics firm that catered to the communications needs of Afghan groups, where he learned about drills used to excavate caves in Afghanistan.[4]

Between 1988 and 1992, KSM helped run a nongovernmental organization

months in Afghanistan. By 1998, Hambali would assume responsibility for the Malaysia/Singapore region within Sungkar's newly formed terrorist organization, the JI.[20]

Also by 1998, Sungkar and JI spiritual leader Abu Bakar Bashir had accepted Bin Ladin's offer to ally JI with al Qaeda in waging war against Christians and Jews.[21] Hambali met with KSM in Karachi to arrange for JI members to receive training in Afghanistan at al Qaeda's camps. In addition to his close working relationship with KSM, Hambali soon began dealing with Atef as well. Al Qaeda began funding JI's increasingly ambitious terrorist plans, which Atef and KSM sought to expand. Under this arrangement, JI would perform the necessary casing activities and locate bomb-making materials and other supplies. Al Qaeda would underwrite operations, provide bomb-making expertise, and deliver suicide operatives.[22]

The al Qaeda–JI partnership yielded a number of proposals that would marry al Qaeda's financial and technical strengths with JI's access to materials and local operatives. Here, Hambali played the critical role of coordinator, as he distributed al Qaeda funds earmarked for the joint operations. In one especially notable example, Atef turned to Hambali when al Qaeda needed a scientist to take over its biological weapons program. Hambali obliged by introducing a U.S.-educated JI member, Yazid Sufaat, to Ayman al Zawahiri in Kandahar. In 2001, Sufaat would spend several months attempting to cultivate anthrax for al Qaeda in a laboratory he helped set up near the Kandahar airport.[23]

Hambali did not originally orient JI's operations toward attacking the United States, but his involvement with al Qaeda appears to have inspired him to pursue American targets. KSM, in his post-capture interrogations, has taken credit for this shift, claiming to have urged the JI operations chief to concentrate on attacks designed to hurt the U.S. economy.[24] Hambali's newfound interest in striking against the United States manifested itself in a spate of terrorist plans. Fortunately, none came to fruition.

In addition to staging actual terrorist attacks in partnership with al Qaeda, Hambali and JI assisted al Qaeda operatives passing through Kuala Lumpur. One important occasion was in December 1999–January 2000. Hambali accommodated KSM's requests to help several veterans whom KSM had just finished training in Karachi. They included Tawfiq bin Attash, also known as Khallad, who later would help bomb the USS *Cole*, and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. Hambali arranged lodging for them and helped them purchase airline tickets for their onward travel. Later that year, Hambali and his crew would provide accommodations and other assistance (including information on flight schools and help in acquiring ammonium nitrate) for Zacarias Moussaoui, an al Qaeda operative sent to Malaysia by Atef and KSM.[25]

Hambali used Bin Ladin's Afghan facilities as a training ground for JI recruits. Though he had a close relationship with Atef and KSM, he maintained JI's institutional independence from al Qaeda. Hambali insists that he did not

discuss operations with Bin Ladin or swear allegiance to him, having already given such a pledge of loyalty to Bashir, Sungkar's successor as JI leader. Thus, like any powerful bureaucrat defending his domain, Hambali objected when al Qaeda leadership tried to assign JI members to terrorist projects without notifying him.[26]

### Abd al Rahim al Nashiri

KSM and Hambali both decided to join forces with al Qaeda because their terrorist aspirations required the money and manpower that only a robust organization like al Qaeda could supply. On the other hand, Abd al Rahim al Nashiri—the mastermind of the *Cole* bombing and the eventual head of al Qaeda operations in the Arabian Peninsula—appears to have originally been recruited to his career as a terrorist by Bin Ladin himself.

Having already participated in the Afghan jihad, Nashiri accompanied a group of some 30 mujahideen in pursuit of jihad in Tajikistan in 1996. When serious fighting failed to materialize, the group traveled to Jalalabad and encountered Bin Ladin, who had recently returned from Sudan. Bin Ladin addressed them at length, urging the group to join him in a "jihad against the Americans." Although all were urged to swear loyalty to Bin Ladin, many, including Nashiri, found the notion distasteful and refused. After several days of indoctrination that included a barrage of news clippings and television documentaries, Nashiri left Afghanistan, first returning to his native Saudi Arabia and then visiting his home in Yemen. There, he says, the idea for his first terrorist operation took shape as he noticed many U.S. and other foreign ships plying the waters along the southwest coast of Yemen.[27]

Nashiri returned to Afghanistan, probably in 1997, primarily to check on relatives fighting there and also to learn about the Taliban. He again encountered Bin Ladin, still recruiting for "the coming battle with the United States." Nashiri pursued a more conventional military jihad, joining the Taliban forces in their fight against Ahmed Massoud's Northern Alliance and shuttling back and forth between the front and Kandahar, where he would see Bin Ladin and meet with other mujahideen. During this period, Nashiri also led a plot to smuggle four Russian-made antitank missiles into Saudi Arabia from Yemen in early 1998 and helped an embassy bombing operative obtain a Yemeni passport.[28]

At some point, Nashiri joined al Qaeda. His cousin, Jihad Mohammad Ali al Makki, also known as Azzam, was a suicide bomber for the Nairobi attack. Nashiri traveled between Yemen and Afghanistan. In late 1998, Nashiri proposed mounting an attack against a U.S. vessel. Bin Ladin approved. He directed Nashiri to start the planning and send operatives to Yemen, and he later provided money.[29]

Nashiri reported directly to Bin Ladin, the only other person who, according to Nashiri, knew all the details of the operation. When Nashiri had difficulty finding U.S. naval vessels to attack along the western coast of Yemen, Bin

Ladin reportedly instructed him to case the Port of Aden, on the southern coast, instead.[30] The eventual result was an attempted attack on the USS *The Sullivans* in January 2000 and the successful attack, in October 2000, on the USS *Cole*.

Nashiri's success brought him instant status within al Qaeda. He later was recognized as the chief of al Qaeda operations in and around the Arabian Peninsula. While Nashiri continued to consult Bin Ladin on the planning of subsequent terrorist projects, he retained discretion in selecting operatives and devising attacks. In the two years between the *Cole* bombing and Nashiri's capture, he would supervise several more proposed operations for al Qaeda. The October 6, 2002, bombing of the French tanker *Limburg* in the Gulf of Aden also was Nashiri's handiwork. Although Bin Ladin urged Nashiri to continue plotting strikes against U.S. interests in the Persian Gulf, Nashiri maintains that he actually delayed one of these projects because of security concerns.[31] Those concerns, it seems, were well placed, as Nashiri's November 2002 capture in the United Arab Emirates finally ended his career as a terrorist.

## 5.2 THE "PLANES OPERATION"

According to KSM, he started to think about attacking the United States after Yousef returned to Pakistan following the 1993 World Trade Center bombing. Like Yousef, KSM reasoned he could best influence U.S. policy by targeting the country's economy. KSM and Yousef reportedly brainstormed together about what drove the U.S. economy. New York, which KSM considered the economic capital of the United States, therefore became the primary target. For similar reasons, California also became a target for KSM.[32]

KSM claims that the earlier bombing of the World Trade Center taught him that bombs and explosives could be problematic, and that he needed to graduate to a more novel form of attack. He maintains that he and Yousef began thinking about using aircraft as weapons while working on the Manila air/Bojinka plot, and speculated about striking the World Trade Center and CIA headquarters as early as 1995.[33]

Certainly KSM was not alone in contemplating new kinds of terrorist operations. A study reportedly conducted by Atef, while he and Bin Ladin were still in Sudan, concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties. The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling the Bojinka concept. Such a study, if it actually existed, yields significant insight into the thinking of al Qaeda's leaders: (1) they rejected hijackings aimed at gaining the release of imprisoned comrades as too complex, because al Qaeda had no friendly countries in which to land a plane and

then negotiate; (2) they considered the bombing of commercial flights in midair—as carried out against Pan Am Flight 103 over Lockerbie, Scotland—a promising means to inflict massive casualties; and (3) they did not yet consider using hijacked aircraft as weapons against other targets.[34]

KSM has insisted to his interrogators that he always contemplated hijacking and crashing large commercial aircraft. Indeed, KSM describes a grandiose original plan: a total of ten aircraft to be hijacked, nine of which would crash into targets on both coasts—they included those eventually hit on September 11 plus CIA and FBI headquarters, nuclear power plants, and the tallest buildings in California and the state of Washington. KSM himself was to land the tenth plane at a U.S. airport and, after killing all adult male passengers on board and alerting the media, deliver a speech excoriating U.S. support for Israel, the Philippines, and repressive governments in the Arab world. Beyond KSM's rationalizations about targeting the U.S. economy, this vision gives a better glimpse of his true ambitions. This is theater, a spectacle of destruction with KSM as the self-cast star—the superterrorist.[35]

KSM concedes that this proposal received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity. Although Bin Ladin listened to KSM's proposal, he was not convinced that it was practical. As mentioned earlier, Bin Ladin was receiving numerous ideas for potential operations—KSM's proposal to attack U.S. targets with commercial airplanes was only one of many.[36]

KSM presents himself as an entrepreneur seeking venture capital and people. He simply wanted al Qaeda to supply the money and operatives needed for the attack while retaining his independence. It is easy to question such a statement. Money is one thing; supplying a cadre of trained operatives willing to die is much more. Thus, although KSM contends he would have been just as likely to consider working with any comparable terrorist organization, he gives no indication of what other groups he thought could supply such exceptional commodities.[37]

KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons. Though KSM speculates about how Bin Ladin came to share his preoccupation with attacking America, Bin Ladin in fact had long been an opponent of the United States. KSM thinks that Atef may have persuaded Bin Ladin to approve this specific proposal. Atef's role in the entire operation is unquestionably very significant but tends to fade into the background, in part because Atef himself is not available to describe it. He was killed in November 2001 by an American air strike in Afghanistan.[38]

Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal. The plot was now referred to within al Qaeda as the "planes operation."[39]

**The Plan Evolves**

Bin Ladin reportedly discussed the planes operation with KSM and Atef in a series of meetings in the spring of 1999 at the al Matar complex near Kandahar. KSM's original concept of using one of the hijacked planes to make a media statement was scrapped, but Bin Ladin considered the basic idea feasible. Bin Ladin, Atef, and KSM developed an initial list of targets. These included the White House, the U.S. Capitol, the Pentagon, and the World Trade Center. According to KSM, Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted to hit the Capitol. No one else was involved in the initial selection of targets.[40]

Bin Ladin also soon selected four individuals to serve as suicide operatives: Khalid al Mihdhar, Nawaf al Hazmi, Khallad, and Abu Bara al Yemeni. During the al Matar meetings, Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing. KSM had not met them. His only guidance from Bin Ladin was that the two should eventually go to the United States for pilot training.[41]

Hazmi and Mihdhar were Saudi nationals, born in Mecca. Like the others in this initial group of selectees, they were already experienced mujahideen. They had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995. By the time Hazmi and Mihdhar were assigned to the planes operation in early 1999, they had visited Afghanistan on several occasions.[42]

Khallad was another veteran mujahid, like much of his family. His father had been expelled from Yemen because of his extremist views. Khallad had grown up in Saudi Arabia, where his father knew Bin Ladin, Abdullah Azzam, and Omar Abdel Rahman (the "Blind Sheikh"). Khallad departed for Afghanistan in 1994 at the age of 15. Three years later, he lost his lower right leg in a battle with the Northern Alliance, a battle in which one of his brothers died. After this experience, he pledged allegiance to Bin Ladin—whom he had first met as a child in Jeddah—and volunteered to become a suicide operative.[43]

When Khallad applied for a U.S. visa, however, his application was denied. Earlier in 1999, Bin Ladin had sent Khallad to Yemen to help Nashiri obtain explosives for the planned ship-bombing and to obtain a visa to visit the United States, so that he could participate in an operation there. Khallad applied under another name, using the cover story that he would be visiting a medical clinic to obtain a new prosthesis for his leg. Another al Qaeda operative gave Khallad the name of a person living in the United States whom Khallad could use as a point of contact on a visa application. Khallad contacted this individual to help him get an appointment at a U.S. clinic. While Khallad was waiting for the letter from the clinic confirming the appointment, however, he was arrested by Yemeni authorities. The arrest resulted from mistaken identity: Khallad was driving the car of another conspirator in the ship-bombing plot who was wanted by the Yemeni authorities.[44]

Khallad was released sometime during the summer of 1999, after his father and Bin Ladin intervened on his behalf. Khallad learned later that the al Qaeda leader, apparently concerned that Khallad might reveal Nashiri's operation while under interrogation, had contacted a Yemeni official to demand Khallad's release, suggesting that Bin Ladin would not confront the Yemenis if they did not confront him. This account has been corroborated by others. Giving up on acquiring a U.S. visa and concerned that the United States might learn of his ties to al Qaeda, Khallad returned to Afghanistan.[45]

Travel issues thus played a part in al Qaeda's operational planning from the very start. During the spring and summer of 1999, KSM realized that Khallad and Abu Bara, both of whom were Yemenis, would not be able to obtain U.S. visas as easily as Saudi operatives like Mihdhar and Hazmi. Although Khallad had been unable to acquire a U.S. visa, KSM still wanted him and Abu Bara, as well as another Yemeni operative from Bin Ladin's security detail, to participate in the planes operation. Yet because individuals with Saudi passports could travel much more easily than Yemeni, particularly to the United States, there were fewer martyrdom opportunities for Yemenis. To overcome this problem, KSM decided to split the planes operation into two components.[46]

The first part of the planes operation—crashing hijacked aircraft into U.S. targets—would remain as planned, with Mihdhar and Hazmi playing key roles. The second part, however, would now embrace the idea of using suicide operatives to blow up planes, a refinement of KSM's old Manila air plot. The operatives would hijack U.S.-flagged commercial planes flying Pacific routes across East Asia and destroy them in midair, possibly with shoe bombs, instead of flying them into targets. (An alternate scenario apparently involved flying planes into U.S. targets in Japan, Singapore, or Korea.) This part of the operation has been confirmed by Khallad, who said that they contemplated hijacking several planes, probably originating in Thailand, South Korea, Hong Kong, or Malaysia, and using Yemenis who would not need pilot training because they would simply down the planes. All the planes hijacked in the United States and East Asia were to be crashed or exploded at about the same time to maximize the attack's psychological impact.[47]

**Training and Deployment to Kuala Lumpur**

In the fall of 1999, the four operatives selected by Bin Ladin for the planes operation were chosen to attend an elite training course at al Qaeda's Mes Aynak camp in Afghanistan. Bin Ladin personally selected the veteran fighters who received this training, and several of them were destined for important operations. One example is Ibrahim al Thawar, or Nibras, who would participate in the October 12, 2000, suicide attack on the USS *Cole*. According to KSM, this training was not given specifically in preparation for the planes operation or any other particular al Qaeda venture. Although KSM claims not to have been involved with the training or to have met with the future 9/11 hijackers at Mes

as did basic communications and the movement of money. Where electronic communications were regarded as insecure, al Qaeda relied even more heavily on couriers.

KSM and Abu Zubaydah each played key roles in facilitating travel for al Qaeda operatives. In addition, al Qaeda had an office of passports and host country issues under its security committee. The office was located at the Kandahar airport and was managed by Atef. The committee altered papers, including passports, visas, and identification cards.[106]

Moreover, certain al Qaeda members were charged with organizing passport collection schemes to keep the pipeline of fraudulent documents flowing. To this end, al Qaeda required jihadists to turn in their passports before going to the front lines in Afghanistan. If they were killed, their passports were recycled for use.[107] The operational mission training course taught operatives how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for "cleaning" visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.[108]

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.[109]

## 5.4 A MONEY TRAIL?

Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. KSM provided his operatives with nearly all the money they needed to travel to the United States, train, and live. The plotters' tradecraft was not especially sophisticated, but it was good enough. They moved, stored, and spent their money in ordinary ways, easily defeating the detection mechanisms in place at the time.[110] The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.

### General Financing

As we explained in chapter 2, Bin Ladin did not fund al Qaeda through a personal fortune and a network of businesses in Sudan. Instead, al Qaeda relied primarily on a fund-raising network developed over time. The CIA

now estimates that it cost al Qaeda about $30 million per year to sustain its activities before 9/11 and that this money was raised almost entirely through donations.[111]

For many years, the United States thought Bin Ladin financed al Qaeda's expenses through a vast personal inheritance. Bin Ladin purportedly inherited approximately $300 million when his father died, and was rumored to have had access to these funds to wage jihad while in Sudan and Afghanistan and to secure his leadership position in al Qaeda. In early 2000, the U.S. government discovered a different reality: roughly from 1970 through 1994, Bin Ladin received about $1 million per year—a significant sum, to be sure, but not a $300 million fortune that could be used to fund jihad.[112] Then, as part of a Saudi government crackdown early in the 1990s, the Bin Ladin family was forced to find a buyer for Usama's share of the family company in 1994. The Saudi government subsequently froze the proceeds of the sale. This action had the effect of divesting Bin Ladin of what otherwise might indeed have been a large fortune.[113]

Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. When Bin Ladin arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fund-raising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in the 1980s.[114]

Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.[115] Some individual donors surely knew, and others did not, the ultimate destination of their donations. Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, *zakat*. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause.[116]

Al Qaeda also collected money from employees of corrupt charities.[117] It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation.[118] Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[119]

In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank

accounts.[120] Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.

It does not appear that any government other than the Taliban financially supported al Qaeda before 9/11, although some governments may have contained al Qaeda sympathizers who turned a blind eye to al Qaeda's fundraising activities.[121] Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)[122]

Still, al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight.[123] Al Qaeda also sought money from wealthy donors in other Gulf states.

Al Qaeda frequently moved the money it raised by *hawala*, an informal and ancient trust-based system for transferring funds.[124] In some ways, al Qaeda had no choice after its move to Afghanistan in 1996: first, the banking system there was antiquated and undependable; and second, formal banking was risky due to the scrutiny that al Qaeda received after the August 1998 East Africa embassy bombings, including UN resolutions against it and the Taliban.[125] Bin Ladin relied on the established hawala networks operating in Pakistan, in Dubai, and throughout the Middle East to transfer funds efficiently. Hawaladars associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fund-raisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or core al Qaeda members used banks while in Afghanistan.[126]

Before 9/11, al Qaeda spent funds as quickly as it received them. Actual terrorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, training camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin provided approximately $10–$20 million per year to the Taliban in return for safe haven. Bin Ladin also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided startup funds to new groups or money for specific terrorist operations.[127]

Al Qaeda has been alleged to have used a variety of illegitimate means, particularly drug trafficking and conflict diamonds, to finance itself. While the drug trade was a source of income for the Taliban, it did not serve the same purpose for al Qaeda, and there is no reliable evidence that Bin Ladin was involved in or made his money through drug trafficking.[128] Similarly, we have seen no persuasive evidence that al Qaeda funded itself by trading in African conflict diamonds.[129] There also have been claims that al Qaeda financed itself through

**Building New Capabilities: The CIA**

The after-action review had treated the CIA as the lead agency for any offensive against al Qaeda, and the principals, at their March 10 meeting, had endorsed strengthening the CIA's capability for that role. To the CTC, that meant proceeding with "the Plan," which it had put forward half a year earlier—hiring and training more case officers and building up the capabilities of foreign security services that provided intelligence via liaison. On occasion, as in Jordan in December 1999, these liaison services took direct action against al Qaeda cells.[72]

In the CTC and higher up, the CIA's managers believed that they desperately needed funds just to continue their current counterterrorism effort, for they reckoned that the millennium alert had already used up all of the Center's funds for the current fiscal year; the Bin Ladin unit had spent 140 percent of its allocation. Tenet told us he met with Berger to discuss funding for counterterrorism just two days after the principals' meeting.[73]

While Clarke strongly favored giving the CIA more money for counterterrorism, he differed sharply with the CIA's managers about where it should come from. They insisted that the CIA had been shortchanged ever since the end of the Cold War. Their ability to perform any mission, counterterrorism included, they argued, depended on preserving what they had, restoring what they had lost since the beginning of the 1990s, and building from there—with across-the-board recruitment and training of new case officers, and the reopening of closed stations. To finance the counterterrorism effort, Tenet had gone to congressional leaders after the 1998 embassy bombings and persuaded them to give the CIA a special supplemental appropriation. Now, in the aftermath of the millennium alert, Tenet wanted a boost in overall funds for the CIA *and* another supplemental appropriation specifically for counterterrorism.[74]

To Clarke, this seemed evidence that the CIA's leadership did not give sufficient priority to the battle against Bin Ladin and al Qaeda. He told us that James Pavitt, the head of the CIA's Directorate of Operations, "said if there's going to be money spent on going after Bin Ladin, it should be given to him. . . . My view was that he had had a lot of money to do it and a long time to do it, and I didn't want to put more good money after bad."[75] The CIA had a very different attitude: Pavitt told us that while the CIA's Bin Ladin unit did "extraordinary and commendable work," his chief of station in London "was just as much part of the al Qaeda struggle as an officer sitting in [the Bin Ladin unit]."[76]

The dispute had large managerial implications, for Clarke had found allies in the Office of Management and Budget (OMB). They had supplied him with the figures he used to argue that CIA spending on counterterrorism from its baseline budget had shown almost no increase.[77]

Berger met twice with Tenet in April to try to resolve the dispute. The Deputies Committee met later in the month to review fiscal year 2000 and 2001 budget priorities and offsets for the CIA and other agencies. In the end,

Tenet obtained a modest supplemental appropriation, which funded counterterrorism without requiring much reprogramming of baseline funds. But the CIA still believed that it remained underfunded for counterterrorism.[78]

**Terrorist Financing**

The second major point on which the principals had agreed on March 10 was the need to crack down on terrorist organizations and curtail their fund-raising.

The embassy bombings of 1998 had focused attention on al Qaeda's finances. One result had been the creation of an NSC–led interagency committee on terrorist financing. On its recommendation, the President had designated Bin Ladin and al Qaeda as subject to sanctions under the International Emergency Economic Powers Act. This gave the Treasury Department's Office of Foreign Assets Control (OFAC) the ability to search for and freeze any Bin Ladin or al Qaeda assets that reached the U.S. financial system. But since OFAC had little information to go on, few funds were frozen.[79]

In July 1999, the President applied the same designation to the Taliban for harboring Bin Ladin. Here, OFAC had more success. It blocked more than $34 million in Taliban assets held in U.S. banks. Another $215 million in gold and $2 million in demand deposits, all belonging to the Afghan central bank and held by the Federal Reserve Bank of New York, were also frozen.[80] After October 1999, when the State Department formally designated al Qaeda a "foreign terrorist organization," it became the duty of U.S. banks to block its transactions and seize its funds.[81] Neither this designation nor UN sanctions had much additional practical effect; the sanctions were easily circumvented, and there were no multilateral mechanisms to ensure that other countries' financial systems were not used as conduits for terrorist funding.[82]

Attacking the funds of an institution, even the Taliban, was easier than finding and seizing the funds of a clandestine worldwide organization like al Qaeda. Although the CIA's Bin Ladin unit had originally been inspired by the idea of studying terrorist financial links, few personnel assigned to it had any experience in financial investigations. Any terrorist-financing intelligence appeared to have been collected collaterally, as a consequence of gathering other intelligence. This attitude may have stemmed in large part from the chief of this unit, who did not believe that simply following the money from point A to point B revealed much about the terrorists' plans and intentions. As a result, the CIA placed little emphasis on terrorist financing.[83]

Nevertheless, the CIA obtained a general understanding of how al Qaeda raised money. It knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities.[84] Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl, whom we have mentioned earlier in the report.[85] After the 1998 embassy bombings, the U.S. government tried to develop a clearer picture of Bin Ladin's finances. A U.S.

interagency group traveled to Saudi Arabia twice, in 1999 and 2000, to get information from the Saudis about their understanding of those finances. The group eventually concluded that the oft-repeated assertion that Bin Ladin was funding al Qaeda from his personal fortune was in fact not true.

The officials developed a new theory: al Qaeda was getting its money elsewhere, and the United States needed to focus on other sources of funding, such as charities, wealthy donors, and financial facilitators. Ultimately, although the intelligence community devoted more resources to the issue and produced somewhat more intelligence,[86] it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system. The CIA was not able to find or disrupt al Qaeda's money flows.[87]

The NSC staff thought that one possible solution to these weaknesses in the intelligence community was to create an all-source terrorist-financing intelligence analysis center. Clarke pushed for the funding of such a center at Treasury, but neither Treasury nor the CIA was willing to commit the resources.[88]

Within the United States, various FBI field offices gathered intelligence on organizations suspected of raising funds for al Qaeda or other terrorist groups. By 9/11, FBI agents understood that there were extremist organizations operating within the United States supporting a global jihadist movement and with substantial connections to al Qaeda. The FBI operated a web of informants, conducted electronic surveillance, and had opened significant investigations in a number of field offices, including New York, Chicago, Detroit, San Diego, and Minneapolis. On a national level, however, the FBI never used the information to gain a systematic or strategic understanding of the nature and extent of al Qaeda fundraising.[89]

Treasury regulators, as well as U.S. financial institutions, were generally focused on finding and deterring or disrupting the vast flows of U.S. currency generated by drug trafficking and high-level international fraud. Large-scale scandals, such as the use of the Bank of New York by Russian money launderers to move millions of dollars out of Russia, captured the attention of the Department of the Treasury and of Congress.[90] Before 9/11, Treasury did not consider terrorist financing important enough to mention in its national strategy for money laundering.[91]

### Border Security

The third point on which the principals had agreed on March 10 was the need for attention to America's porous borders and the weak enforcement of immigration laws. Drawing on ideas from government officials, Clarke's working group developed a menu of proposals to bolster border security. Some reworked or reiterated previous presidential directives.[92] They included

- creating an interagency center to target illegal entry and human traffickers;

The Defense Department favored strong action. Deputy Secretary Wolfowitz questioned the United States' ability to deliver Bin Ladin and bring him to justice. He favored going after Bin Ladin as part of a larger air strike, similar to what had been done in the 1986 U.S. strike against Libya. General Myers emphasized the Predator's value for surveillance, perhaps enabling broader air strikes that would go beyond Bin Ladin to attack al Qaeda's training infrastructure.[256]

The principals also discussed which agency—CIA or Defense—should have the authority to fire a missile from the armed Predator.[257]

At the end, Rice summarized the meeting's conclusions. The armed Predator capability was needed but not ready. The Predator would be available for the military to consider along with its other options. The CIA should consider flying reconnaissance-only missions. The principals—including the previously reluctant Tenet—thought that such reconnaissance flights were a good idea, combined with other efforts to get actionable intelligence. Tenet deferred an answer on the additional reconnaissance flights, conferred with his staff after the meeting, and then directed the CIA to press ahead with them.[258]

A few days later, a final version of the draft presidential directive was circulated, incorporating two minor changes made by the principals.[259]

On September 9, dramatic news arrived from Afghanistan. The leader of the Northern Alliance, Ahmed Shah Massoud, had granted an interview in his bungalow near the Tajikistan border with two men whom the Northern Alliance leader had been told were Arab journalists. The supposed reporter and cameraman—actually al Qaeda assassins—then set off a bomb, riddling Massoud's chest with shrapnel. He died minutes later.

On September 10, Hadley gathered the deputies to finalize their three-phase, multiyear plan to pressure and perhaps ultimately topple the Taliban leadership.[260]

That same day, Hadley instructed DCI Tenet to have the CIA prepare new draft legal authorities for the "broad covert action program" envisioned by the draft presidential directive. Hadley also directed Tenet to prepare a separate section "authorizing a broad range of other covert activities, including authority to capture or to use lethal force" against al Qaeda command-and-control elements. This section would supersede the Clinton-era documents. Hadley wanted the authorities to be flexible and broad enough "to cover any additional UBL-related covert actions contemplated."[261]

Funding still needed to be located. The military component remained unclear. Pakistan remained uncooperative. The domestic policy institutions were largely uninvolved. But the pieces were coming together for an integrated policy dealing with al Qaeda, the Taliban, and Pakistan.

# 7

# THE ATTACK LOOMS

## 7.1 FIRST ARRIVALS IN CALIFORNIA

In chapter 5 we described the Southeast Asia travels of Nawaf al Hazmi, Khalid al Mihdhar, and others in January 2000 on the first part of the "planes operation." In that chapter we also described how Mihdhar was spotted in Kuala Lumpur early in January 2000, along with associates who were not identified, and then was lost to sight when the group passed through Bangkok. On January 15, Hazmi and Mihdhar arrived in Los Angeles. They spent about two weeks there before moving on to San Diego.[1]

**Two Weeks in Los Angeles**
Why Hazmi and Mihdhar came to California, we do not know for certain. Khalid Sheikh Mohammed (KSM), the organizer of the planes operation, explains that California was a convenient point of entry from Asia and had the added benefit of being far away from the intended target area.[2]

Hazmi and Mihdhar were ill-prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English.[3]

It would therefore be plausible that they or KSM would have tried to identify, in advance, a friendly contact for them in the United States. In detention, KSM denies that al Qaeda had any agents in Southern California. We do not credit this denial.[4] We believe it is unlikely that Hazmi and Mihdhar—neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival.[5]

KSM says that though he told others involved in the conspiracy to stay away from mosques and to avoid establishing personal contacts, he made an exception in this case and instructed Hazmi and Mihdhar to pose as newly arrived

Saudi students and seek assistance at local mosques. He counted on their break-ing off any such relationships once they moved to the East Coast.[6] Our inabil-ity to ascertain the activities of Hazmi and Mihdhar during their first two weeks in the United States may reflect al Qaeda tradecraft designed to protect the identity of anyone who may have assisted them during that period.

Hazmi and Mihdhar were directed to enroll in English-language classes upon arriving in Southern California, so that they could begin pilot training as soon as possible. KSM claims to have steered the two to San Diego on the basis of his own research, which supposedly included thumbing through a San Diego phone book acquired at a Karachi flea market. Contradicting himself, he also says that, as instructed, they attempted to enroll in three language schools in Los Angeles.[7]

After the pair cleared Immigration and Customs at Los Angeles International Airport, we do not know where they went.[8] They appear to have obtained assis-tance from the Muslim community, specifically the community surrounding the King Fahd mosque in Culver City, one of the most prominent mosques in Southern California.

It is fairly certain that Hazmi and Mihdhar spent time at the King Fahd mosque and made some acquaintances there. One witness interviewed by the FBI after the September 11 attacks has said he first met the hijackers at the mosque in early 2000. Furthermore, one of the people who would befriend them—a man named Mohdar Abdullah—recalled a trip with Hazmi and Mihdhar to Los Angeles in June when, on their arrival, the three went to the King Fahd mosque. There Hazmi and Mihdhar greeted various individuals whom they appeared to have met previously, including a man named "Khal-lam." In Abdullah's telling, when Khallam visited the al Qaeda operatives at their motel that evening, Abdullah was asked to leave the room so that Hazmi, Mihdhar, and Khallam could meet in private. The identity of Khallam and his purpose in meeting with Hazmi and Mihdhar remain unknown.[9]

To understand what Hazmi and Mihdhar did in their first weeks in the United States, evidently staying in Los Angeles, we have investigated whether anyone associated with the King Fahd mosque assisted them. This subject has received substantial attention in the media. Some have speculated that Fahad al Thumairy—an imam at the mosque and an accredited diplomat at the Saudi Arabian consulate from 1996 until 2003—may have played a role in helping the hijackers establish themselves on their arrival in Los Angeles. This specula-tion is based, at least in part, on Thumairy's reported leadership of an extrem-ist faction at the mosque.[10]

A well-known figure at the King Fahd mosque and within the Los Ange-les Muslim community, Thumairy was reputed to be an Islamic fundamental-ist and a strict adherent to orthodox Wahhabi doctrine. Some Muslims concerned about his preaching have said he "injected non-Islamic themes into his guidance/prayers at the [King Fahd] Mosque" and had followers "support-ive of the events of September 11, 2001."[11] Thumairy appears to have associ-

ated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States. After 9/11, Thumairy's conduct was a subject of internal debate among some Saudi officials. He apparently lost his position at the King Fahd mosque, possibly because of his immoderate reputation. On May 6, 2003, Thumairy attempted to reenter the United States from Saudi Arabia but was refused entry, based on a determination by the State Department that he might be connected with terrorist activity.[12]

When interviewed by both the FBI and the Commission staff, Thumairy has denied preaching anti-Western sermons, much less promoting violent jihad. More to the point, he claimed not to recognize either Hazmi or Mihdhar. Both denials are somewhat suspect. (He likewise denied knowing Omar al Bayoumi—a man from San Diego we will discuss shortly—even though witnesses and telephone records establish that the two men had contact with each other. Similarly, Thumairy's claim not to know Mohdar Abdullah is belied by Abdullah's contrary assertion.) On the other hand, Thumairy undoubtedly met with and provided religious counseling to countless individuals during his tenure at the King Fahd mosque, so he might not remember two transients like Hazmi and Mihdhar several years later.[13]

The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives.[14]

We do not pick up their trail until February 1, 2000, when they encountered Omar al Bayoumi and Caysan Bin Don at a halal food restaurant on Venice Boulevard in Culver City, a few blocks away from the King Fahd mosque. Bayoumi and Bin Don have both told us that they had driven up from San Diego earlier that day so that Bayoumi could address a visa issue and collect some papers from the Saudi consulate. Bayoumi heard Hazmi and Mihdhar speaking in what he recognized to be Gulf Arabic and struck up a conversation. Since Bin Don knew only a little Arabic, he had to rely heavily on Bayoumi to translate for him.[15]

Mihdhar and Hazmi said they were students from Saudi Arabia who had just arrived in the United States to study English. They said they were living in an apartment near the restaurant but did not specify the address. They did not like Los Angeles and were having a hard time, especially because they did not know anyone. Bayoumi told them how pleasant San Diego was and offered to help them settle there. The two pairs then left the restaurant and went their separate ways.[16]

Bayoumi and Bin Don have been interviewed many times about the February 1, 2000, lunch. For the most part, their respective accounts corroborate each other. However, Bayoumi has said that he and Bin Don attempted to visit the King Fahd mosque after lunch but could not find it. Bin Don, on the other

hand, recalls visiting the mosque twice that day for prayers, both before and after the meal. Bin Don's recollection is spotty and inconsistent. Bayoumi's version can be challenged as well, since the mosque is close to the restaurant and Bayoumi had visited it, and the surrounding area, on multiple occasions, including twice within six weeks of February 1. We do not know whether the lunch encounter occurred by chance or design. We know about it because Bayoumi told law enforcement that it happened.[17]

Bayoumi, then 42 years old, was in the United States as a business student, supported by a private contractor for the Saudi Civil Aviation Authority, where Bayoumi had worked for over 20 years.[18] The object of considerable media speculation following 9/11, he lives now in Saudi Arabia, well aware of his notoriety. Both we and the FBI have interviewed him and investigated evidence about him.

Bayoumi is a devout Muslim, obliging and gregarious. He spent much of his spare time involved in religious study and helping run a mosque in El Cajon, about 15 miles from San Diego. It is certainly possible that he has dissembled about some aspects of his story, perhaps to counter suspicion. On the other hand, we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.[19] Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists.

**The Move to San Diego**
By February 4, Hazmi and Mihdhar had come to San Diego from Los Angeles, possibly driven by Mohdar Abdullah. Abdullah, a Yemeni university student in his early 20s, is fluent in both Arabic and English, and was perfectly suited to assist the hijackers in pursuing their mission.[20]

After 9/11, Abdullah was interviewed many times by the FBI. He admitted knowing of Hazmi and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden (a group with ties to al Qaeda) back in Yemen. Abdullah clearly was sympathetic to those extremist views. During a post-9/11 search of his possessions, the FBI found a notebook (belonging to someone else) with references to planes falling from the sky, mass killing, and hijacking. Further, when detained as a material witness following the 9/11 attacks, Abdullah expressed hatred for the U.S. government and "stated that the U.S. brought 'this' on themselves."[21]

When interviewed by the FBI after 9/11, Abdullah denied having advance knowledge of attacks. In May 2004, however, we learned of reports about Abdullah bragging to fellow inmates at a California prison in September–October 2003 that he had known Hazmi and Mihdhar were planning a terrorist attack. The stories attributed to Abdullah are not entirely consistent with each other. Specifically, according to one inmate, Abdullah claimed an unnamed individual had notified him that Hazmi and Mihdhar would be arriv-

ing in Los Angeles with plans to carry out an attack. Abdullah allegedly told the same inmate that he had driven the two al Qaeda operatives from Los Angeles to San Diego, but did not say when this occurred. We have been unable to corroborate this account.[22]

Another inmate has recalled Abdullah claiming he first heard about the hijackers' terrorist plans after they arrived in San Diego, when they told him they planned to fly an airplane into a building and invited him to join them on the plane. According to this inmate, Abdullah also claimed to have found out about the 9/11 attacks three weeks in advance, a claim that appears to dovetail with evidence that Abdullah may have received a phone call from Hazmi around that time, that he stopped making calls from his telephone after August 25, 2001, and that, according to his friends, he started acting strangely.[23]

Although boasts among prison inmates often tend to be unreliable, this evidence is obviously important. To date, neither we nor the FBI have been able to verify Abdullah's alleged jailhouse statements, despite investigative efforts.

We thus do not know when or how Hazmi and Mihdhar first came to San Diego. We do know that on February 4, they went to the Islamic Center of San Diego to find Omar al Bayoumi and take him up on his offer of help. Bayoumi obliged by not only locating an apartment but also helping them fill out the lease application, co-signing the lease and, when the real estate agent refused to take cash for a deposit, helping them open a bank account (which they did with a $9,900 deposit); he then provided a certified check from his own account for which the al Qaeda operatives reimbursed him on the spot for the deposit. Neither then nor later did Bayoumi give money to either Hazmi or Mihdhar, who had received money from KSM.[24]

Hazmi and Mihdhar moved in with no furniture and practically no possessions. Soon after the move, Bayoumi used their apartment for a party attended by some 20 male members of the Muslim community. At Bayoumi's request, Bin Don videotaped the gathering with Bayoumi's video camera. Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room.[25]

Hazmi and Mihdhar immediately started looking for a different place to stay. Based on their comment to Bayoumi about the first apartment being expensive, one might infer that they wanted to save money. They may also have been reconsidering the wisdom of living so close to the video camera–wielding Bayoumi, who Hazmi seemed to think was some sort of Saudi spy. Just over a week after moving in, Hazmi and Mihdhar filed a 30-day notice of intention to vacate. Bayoumi apparently loaned them his cell phone to help them check out possibilities for new accommodations.[26]

Their initial effort to move turned out poorly. An acquaintance arranged with his landlord to have Mihdhar take over his apartment. Mihdhar put down a $650 deposit and signed a lease for the apartment effective March 1. Several weeks later, Mihdhar sought a refund of his deposit, claiming he no longer

intended to move in because the apartment was too messy. When the landlord refused to refund the deposit, Mihdhar became belligerent. The landlord remembers him "ranting and raving" as if he were "psychotic."[27]

Hazmi and Mihdhar finally found a room to rent in the home of an individual they had met at a mosque in San Diego. According to the homeowner, the future hijackers moved in on May 10, 2000. Mihdhar moved out after only about a month. On June 9, he left San Diego to return to Yemen. Hazmi, on the other hand, stayed at this house for the rest of his time in California, until mid-December; he would then leave for Arizona with a newly arrived 9/11 hijacker-pilot, Hani Hanjour.[28]

While in San Diego, Hazmi and Mihdhar played the part of recently arrived foreign students. They continued to reach out to members of the Muslim community for help. At least initially, they found well-meaning new acquaintances at the Islamic Center of San Diego, which was only a stone's throw from the apartment where they first lived. For example, when they purchased a used car (with cash), they bought it from a man who lived across the street from the Islamic Center and who let them use his address in registering the vehicle, an accommodation "to help a fellow Muslim brother." Similarly, in April, when their cash supply may have been dwindling, Hazmi persuaded the administrator of the Islamic Center to let him use the administrator's bank account to receive a $5,000 wire transfer from someone in Dubai, in the United Arab Emirates (this was KSM's nephew, Ali Abdul Aziz Ali).[29]

Hazmi and Mihdhar visited other mosques as well, mixing comfortably as devout worshippers. During the operatives' critical first weeks in San Diego, Mohdar Abdullah helped them. Translating between English and Arabic, he assisted them in obtaining California driver's licenses and with applying to language and flight schools. Abdullah also introduced them to his circle of friends; he shared an apartment with some of those friends near the Rabat mosque in La Mesa, a few miles from the hijackers' residence.[30]

Abdullah has emerged as a key associate of Hazmi and Mihdhar in San Diego. Detained after 9/11 (first as a material witness, then on immigration charges), he was deported to Yemen on May 21, 2004, after the U.S. Attorney for the Southern District of California declined to prosecute him on charges arising out of his alleged jailhouse admissions concerning the 9/11 operatives. The Department of Justice declined to delay his removal pending further investigation of this new information.[31]

Other friends of Abdullah also translated for Hazmi and Mihdhar and helped them adjust to life in San Diego. Some held extremist beliefs or were well acquainted with known extremists. For example, immediately after 9/11, Osama Awadallah, a Yemeni whose telephone number was found in Hazmi's Toyota at Washington Dulles International Airport, was found to possess photos, videos, and articles relating to Bin Ladin. Awadallah also had lived in a house where copies of Bin Ladin's fatwas and other similar materials were distributed

to the residents. Omar Bakarbashat, a Saudi, also met Hazmi and Mihdhar at the Rabat mosque. He admitted helping Hazmi to learn English and taking over the operatives' first apartment in San Diego after they moved out. Bakarbashat apparently had downloaded stridently anti-American Web pages to his computer's hard drive.[32]

Another potentially significant San Diego contact for Hazmi and Mihdhar was Anwar Aulaqi, an imam at the Rabat mosque. Born in New Mexico and thus a U.S. citizen, Aulaqi grew up in Yemen and studied in the United States on a Yemeni government scholarship. We do not know how or when Hazmi and Mihdhar first met Aulaqi. The operatives may even have met or at least talked to him the same day they first moved to San Diego. Hazmi and Mihdhar reportedly respected Aulaqi as a religious figure and developed a close relationship with him.[33]

When interviewed after 9/11, Aulaqi said he did not recognize Hazmi's name but did identify his picture. Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed. He described Hazmi as a soft-spoken Saudi student who used to appear at the mosque with a companion but who did not have a large circle of friends.[34]

Aulaqi left San Diego in mid-2000, and by early 2001 had relocated to Virginia. As we will discuss later, Hazmi eventually showed up at Aulaqi's mosque in Virginia, an appearance that may not have been coincidental. We have been unable to learn enough about Aulaqi's relationship with Hazmi and Mihdhar to reach a conclusion.[35]

In sum, although the evidence is thin as to specific motivations, our overall impression is that soon after arriving in California, Hazmi and Mihdhar sought out and found a group of young and ideologically like-minded Muslims with roots in Yemen and Saudi Arabia, individuals mainly associated with Mohdar Abdullah and the Rabat mosque. The al Qaeda operatives lived openly in San Diego under their true names, listing Hazmi in the telephone directory. They managed to avoid attracting much attention.

### Flight Training Fails; Mihdhar Bails Out

Hazmi and Mihdhar came to the United States to learn English, take flying lessons, and become pilots as quickly as possible. They turned out, however, to have no aptitude for English. Even with help and tutoring from Mohdar Abdullah and other bilingual friends, Hazmi and Mihdhar's efforts to learn proved futile. This lack of language skills in turn became an insurmountable barrier to learning how to fly.[36]

A pilot they consulted at one school, the Sorbi Flying Club in San Diego, spoke Arabic. He explained to them that their flight instruction would begin with small planes. Hazmi and Mihdhar emphasized their interest in learning to fly jets, Boeing aircraft in particular, and asked where they might enroll to train

on jets right away. Convinced that the two were either joking or dreaming, the pilot responded that no such school existed. Other instructors who worked with Hazmi and Mihdhar remember them as poor students who focused on learning to control the aircraft in flight but took no interest in takeoffs or landings. By the end of May 2000, Hazmi and Mihdhar had given up on learning how to fly.[37]

Mihdhar's mind seems to have been with his family back in Yemen, as evidenced by calls he made from the apartment telephone. When news of the birth of his first child arrived, he could stand life in California no longer. In late May and early June of 2000, he closed his bank account, transferred the car registration to Hazmi, and arranged his return to Yemen. According to KSM, Mihdhar was bored in San Diego and foresaw no problem in coming back to the United States since he had not overstayed his visa. Hazmi and Mohdar Abdullah accompanied him to Los Angeles on June 9. After visiting the King Fahd mosque one last time with his friends, Mihdhar left the country the following day.[38]

KSM kept in fairly close touch with his operatives, using a variety of methods. When Bin Ladin called KSM back from Pakistan to Afghanistan in the spring of 2000, KSM asked Khallad (whom we introduced in chapter 5) to maintain email contact with Hazmi in the United States. Mihdhar's decision to strand Hazmi in San Diego enraged KSM, who had not authorized the departure and feared it would compromise the plan. KSM attempted to drop Mihdhar from the planes operation and would have done so, he says, had he not been overruled by Bin Ladin.[39]

Following Mihdhar's departure, Hazmi grew lonely and worried that he would have trouble managing by himself. He prayed with his housemate each morning at 5:00 A.M. and attended services at the Islamic Center. He borrowed his housemate's computer for Internet access, following news coverage of fighting in Chechnya and Bosnia. With his housemate's help, Hazmi also used the Internet to search for a wife (after obtaining KSM's approval to marry). This search did not succeed. Although he developed a close relationship with his housemate, Hazmi preferred not to use the house telephone, continuing the practice he and Mihdhar had adopted of going outside to make phone calls.[40]

After Mihdhar left, other students moved into the house. One of these, Yazeed al Salmi, stands out. In July 2000, Salmi purchased $4,000 in traveler's checks at a bank in Riyadh, Saudi Arabia. On September 5, Hazmi deposited $1,900 of the traveler's checks into his bank account, after withdrawing the same amount in cash. It is possible that Hazmi was simply cashing the traveler's checks for a friend. We do not know; Salmi claims not to remember the transaction. After 9/11, Salmi reportedly confided to Mohdar Abdullah that he had previously known terrorist pilot Hani Hanjour. After living in the same house with Hazmi for about a month, Salmi moved to the La Mesa apartment shared by Abdullah and others.[41]

By the fall of 2000, Hazmi no longer even pretended to study English or take flying lessons. Aware that his co-conspirators in Afghanistan and Pakistan would be sending him a new colleague shortly, he bided his time and worked for a few weeks at a gas station in La Mesa where some of his friends, including Abdullah, were employed. On one occasion, Hazmi told a fellow employee that he was planning to find a better job, and let slip a prediction that he would become famous.[42]

On December 8, 2000, Hani Hanjour arrived in San Diego, having traveled from Dubai via Paris and Cincinnati. Hazmi likely picked up Hanjour at the airport. We do not know where Hanjour stayed; a few days later, both men left San Diego. Before departing, they visited the gas station in La Mesa, where Hazmi reportedly introduced Hanjour as a "long time friend from Saudi Arabia." Hazmi told his housemate that he and his friend "Hani" were headed for San Jose to take flying lessons and told his friends that he would stay in touch. Hazmi promised to return to San Diego soon, and he and Hanjour drove off.[43]

Hazmi did not sever all contact with his friends in San Diego. According to Abdullah, after Hazmi left San Diego in December 2000, he telephoned Abdullah twice: in December 2000 or January 2001, Hazmi said he was in San Francisco and would be attending flight school there; about two weeks later, he said he was attending flight school in Arizona. Some evidence, which we will discuss later, indicates that Hazmi contacted Abdullah again, in August 2001. In addition, during the month following Hazmi's departure from San Diego, he emailed his housemate three times, including a January 2001 email that Hazmi signed "Smer," an apparent attempt to conceal his identity that struck the housemate as strange at the time. Hazmi also telephoned his housemate that he and his friend had decided to take flight lessons in Arizona, and that Mihdhar was now back in Yemen. That was their last contact. When the housemate emailed Hazmi in February and March of 2001 to find out how he was faring, Hazmi did not reply.[44]

The housemate who rented the room to Hazmi and Mihdhar during 2000 is an apparently law-abiding citizen with long-standing, friendly contacts among local police and FBI personnel. He did not see anything unusual enough in the behavior of Hazmi or Mihdhar to prompt him to report to his law enforcement contacts. Nor did those contacts ask him for information about his tenants/housemates.

## 7.2 THE 9/11 PILOTS IN THE UNITED STATES

### The Hamburg Pilots Arrive in the United States

In the early summer of 2000, the Hamburg group arrived in the United States to begin flight training. Marwan al Shehhi came on May 29, arriving in Newark on a flight from Brussels. He went to New York City and waited there for

Mohamed Atta to join him. On June 2, Atta traveled to the Czech Republic by bus from Germany and then flew from Prague to Newark the next day. According to Ramzi Binalshibh, Atta did not meet with anyone in Prague; he simply believed it would contribute to operational security to fly out of Prague rather than Hamburg, the departure point for much of his previous international travel.[45]

Atta and Shehhi had not settled on where they would obtain their flight training. In contrast, Ziad Jarrah had already arranged to attend the Florida Flight Training Center (FFTC) in Venice, Florida. Jarrah arrived in Newark on June 27 and then flew to Venice. He immediately began the private pilot program at FFTC, intending to get a multi-engine license. Jarrah moved in with some of the flight instructors affiliated with his school and bought a car.[46]

While Jarrah quickly settled into training in Florida, Atta and Shehhi kept searching for a flight school. After visiting the Airman Flight School in Norman, Oklahoma (where Zacarias Moussaoui would enroll several months later and where another al Qaeda operative, Ihab Ali, had taken lessons in the mid-1990s), Atta started flight instruction at Huffman Aviation in Venice, Florida, and both Atta and Shehhi subsequently enrolled in the Accelerated Pilot Program at that school. By the end of July, both of them took solo flights, and by mid-August they passed the private pilot airman test. They trained through the summer at Huffman, while Jarrah continued his training at FFTC.[47]

The Hamburg operatives paid for their flight training primarily with funds wired from Dubai by KSM's nephew, Ali Abdul Aziz Ali. Between June 29 and September 17, 2000, Ali sent Shehhi and Atta a total of $114,500 in five transfers ranging from $5,000 to $70,000. Ali relied on the unremarkable nature of his transactions, which were essentially invisible amid the billions of dollars flowing daily across the globe.[48] Ali was not required to provide identification in sending this money and the aliases he used were not questioned.[49]

In mid-September, Atta and Shehhi applied to change their immigration status from tourist to student, stating their intention to study at Huffman until September 1, 2001. In late September, they decided to enroll at Jones Aviation in Sarasota, Florida, about 20 miles north of Venice. According to the instructor at Jones, the two were aggressive, rude, and sometimes even fought with him to take over the controls during their training flights. In early October, they took the Stage I exam for instruments rating at Jones Aviation and failed. Very upset, they said they were in a hurry because jobs awaited them at home. Atta and Shehhi then returned to Huffman.[50]

In the meantime, Jarrah obtained a single-engine private pilot certificate in early August. Having reached that milestone, he departed on the first of five foreign trips he would take after first entering the United States. In October, he flew back to Germany to visit his girlfriend, Aysel Senguen. The two traveled to Paris before Jarrah returned to Florida on October 29. His relationship with her remained close throughout his time in the United States. In addition

88. Shehhi and other members of the group used to frequent a library in Hamburg to use the Internet. According to one of the librarians, in 1999 Shehhi, unprompted, inveighed against America, and boasted that "something was going to happen" and that "there would be thousands of dead people." FBI electronic communication, summary of testimony of Angela Duile on Aug. 28, 2003, at Mzoudi trial, Oct. 27, 2003. Another witness who lived in the same dormitory as Motassadeq testified that in late 1998 or early 1999, he overheard a conversation in which Motassadeq told someone that "we will do something bad again" and that "we will dance on their graves." The conversation also contained a reference to the "burning of people." FBI electronic communication, summary of testimony of Holger Liszkowski on Sept. 9, 2003, at Mzoudi trial, Nov. 17, 2003. On another occasion, according to the same witness, Motassadeq apparently identified Atta as "our pilot." Another witness recalled Atta ominously observing in 1999 that the United States was not omnipotent and that "something can be done." German BKA investigation of Bahaji, summary of interrogation of Nickels on Nov. 20, 2001.

89. Intelligence reports, interrogations of Binalshibh, Oct. 7, 2002; May 20, 2003.

90. Intelligence report, interrogation of Binalshibh, May 20, 2003. A detainee has confirmed Binalshibh's account about being advised to go to Afghanistan rather than trying to travel directly to Chechnya. The detainee dates the Slahi meeting to October 1999. Intelligence report, interrogation of detainee, Oct. 17, 2003. The detainee, however, also suggests that Slahi and Binalshibh may have met earlier in 1999 in Frankfurt, through a mutual acquaintance. Intelligence report, interrogation of detainee, Oct. 27, 2003. The acquaintance apparently tells a different story, claiming that Slahi introduced him to Binalshibh and Jarrah at Slahi's home in 1997 or 1998, and that he later lived with them in Hamburg. Intelligence report, interrogation of detainee, July 2, 2003.

91. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8; Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Mar. 4, 2003; May 20, 2003.

92. On meetings with Atef and Bin Ladin, see Intelligence reports, interrogations of Binalshibh, Dec. 10, 2002; Mar. 4, 2003; Mar. 31, 2003; Intelligence report, interrogation of KSM, Feb. 20, 2004. Atta reportedly had between two and five meetings with Bin Ladin before leaving Kandahar and was the only 9/11 hijacker who knew the entire scope of the operation from the outset. Intelligence report, comments of Binalshibh on Atta, Apr. 21, 2003.

93. Intelligence report, interrogation of Binalshibh, Dec. 10, 2002. According to KSM, Bin Ladin designated Hazmi to be Atta's second in command. Intelligence report, interrogation of KSM, Feb. 20, 2004.

94. In addition, Atta obtained a new passport in June 1998, even though his current one was still valid for nearly a year, a sign that he may have been following the al Qaeda practice of concealing travel to Pakistan. Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 11.

95. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001; Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003. Motassadeq continued to handle some of Shehhi's affairs even after Shehhi returned to Hamburg. Most importantly, in March 2000, Motassadeq paid Shehhi's semester fees at the university, to ensure Shehhi's continued receipt of scholarship payments from the UAE. Ibid.

96. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001. After 9/11, Motassadeq admitted to German authorities that Shehhi had asked him to handle matters in a way that would conceal Shehhi's absence. Motassadeq also would claim later that he did not know why his friends had gone to Afghanistan, saying he thought they were planning to go fight in Chechnya. For assistance provided by both Motassadeq and Bahaji, see Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 13–14.

97. Jarrah encountered a minor problem during his return trip to Hamburg. On January 30, 2000, while transiting Dubai on his way from Karachi to Germany, Jarrah drew questioning from UAE authorities about an overlay of the Qu'ran that appeared on one page of his passport. The officials also noticed the religious tapes and books Jarrah had in his possession, but released him after he pointed out that he had lived in Hamburg for a number of years and was studying aircraft construction there. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 13.

98. Intelligence report, interrogation of Binalshibh, Sep. 24, 2002; FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 11, 13. According to a KSM interrogation report, Shehhi may have been present for at least some of the training that Atta and Binalshibh received in Karachi. Intelligence report, interrogation of KSM, Mar. 31, 2004.

99. Intelligence report, interrogation of Binalshibh, Nov. 6, 2003. Binalshibh and the others kept their distance from Zammar even before visiting Afghanistan and getting their instructions from Bin Ladin and Atef. Ibid.

100. On Atta, see FBI analytic report, "The 11 September Hijacker Cell Model," Feb. 2003, p. 28. On Jarrah, see German BKA report, investigative summary re Jarrah, July 18, 2002. Note that although Jarrah's attitude was now much more congenial, he told Senguen nothing about being in Afghanistan. On Shehhi's wedding celebration, see German BKA report, investigative summary re Shehhi, July 9, 2002; on his changed appearance and behavior, see FBI electronic communication, summary of testimony of Mohamed Abdulla Mohamed Awady on Oct. 24, 2003, at the Mzoudi trial, Dec. 5, 2003.

101. German BKA report, investigative summary re Jarrah, July 18, 2002.

102. On Ali Abdul Aziz Ali, also known as Ammar al Baluchi, see FBI report, "Summary of Penttbom Investi-

gation," Feb. 29, 2004, p. 78. Ali, in turn, would ship these materials to his uncle, KSM, in Karachi. Intelligence report, interrogation of Ali Abdul Aziz Ali, Feb. 11, 2004. On Jarrah, see German BKA report, investigative summary re Jarrah**,** July 18, 2002. Following his sudden decision to study aircraft engineering in Hamburg, Jarrah had expressed interest in becoming a pilot around the end of 1998, well before he traveled to Afghanistan. According to Senguen, Jarrah told her about friends of his who had interrupted their studies to join the Germany army so that they could become pilots. Jarrah's pre-Afghanistan interest in aviation also is confirmed by a January 22, 1999, email recovered after the September 11, 2001, attacks, in which Jarrah told a friend from Beirut that he might "come next year and . . . have something to tell about airplanes." Ibid. On Binalshibh, see Intelligence report, interrogation of Binalshibh, Sept. 24, 2002.

103. Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003, pp. 10–11. Zacarias Moussaoui later would benefit from the results of all this research. Following his August 2001 arrest, the FBI discovered among his possessions a fax copy of an advertisement for U.S. flight schools. According to Binalshibh, notes in the margin of the advertisement were written by Atta. Intelligence report, interrogation of Binalshibh, Dec. 19, 2002.

104. DOS record, NIV applicant detail, Marwan al Shehhi, Mohamed Atta, Ziad Jarrah, Nov. 8, 2001. The visa applications were destroyed by the State Department according to routine document handling practices before their significance was known.

105. DOS records, visa applications of Ramzi Binalshibh, May 17, 2000; June 15, 2000; Oct. 25 2000. CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 9–10; German BKA report, investigative summary re Binalshibh, July 4, 2002. Atta had twice explored the possibility of obtaining a U.S. green card shortly before his November 1999 trip to Afghanistan. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8. Both Binalshibh and Jarrah listed the same person as a point of contact in the United States, an Indonesian national who had previously lived in Hamburg. Although this individual knew some members of the Hamburg cell, including Mohamed Atta and Razmi Binalshibh, there is no indication that any of the hijackers actually contacted him while they were in the United States. See German BKA report, investigative summary re Jarrah**,** July 18, 2002. Binalshibh had applied for a visa years earlier along with Fuad Bazarah, a co-worker in Yemen whose father contacted the U.S. embassy on Binalshibh's behalf. Bazarah obtained a visa application and moved to Los Angeles, but Binalshibh's application was denied. Bazarah would later live in Los Angeles with Ramez Noaman, an individual who knew Nawaf al Hazmi in San Diego. FBI electronic communication, "Penttbom," Oct. 23, 2001.

106. Intelligence report, interrogation of KSM, Sept. 9, 2003; CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1. On the role of KSM, see, e.g., Intelligence report, interrogation of Binalshibh, Oct. 11, 2002. On the role of Abu Zubaydah, see, e.g., Intelligence report, biographical information on Abu Zubayda, Feb. 25, 2002. Al Qaeda also relied on outside travel facilitators, including fraudulent document vendors, corrupt officials, travel agencies, and smugglers, to help move operatives around the world by obtaining fraudulent documents, arranging visas (real or fake), making airline reservations, etc. See CIA analytic report, "Clandestine Travel Facilitators: Key Enablers of Terrorism," Dec. 31, 2002; CIA analytic report, Al Qaeda travel issues, Jan. 2004.

107. On passport collection schemes, see Intelligence report, interrogation of KSM, Sept. 9, 2003. On recycled passports, see Intelligence report, Collection of passports June 7, 2002.

108. See Intelligence reports, interrogations of KSM, Nov. 12, 2003; May 25, 2004; CIA analytic report, Al Qaeda travel issues, Jan. 2004, pp. 1, 3, 19. A detainee has admitted attending several security and specialized courses, including ones in counterfeiting and seal removal. Intelligence report, interrogation of al Qaeda associates, Apr. 11, 2002. Atta reportedly learned alteration techniques in Afghanistan, cleaning Ramzi Binalshibh's passport of its Pakistani visa and travel cachets. CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1.

109. Intelligence report, Information on Mujahideen Travel, Mar. 13, 2002.

110. Intelligence report, interrogation of KSM, July 25, 2003. A small amount of the plot's backing came from Shehhi's own funds. He received a salary from the UAE military, which was sponsoring his studies in Germany, through December 23, 2000. Binalshibh apparently used some of this money to wire just over $10,000 to Shehhi in the United States and pay some of his own plot-related expenses. Adam Drucker interview (Jan. 12, 2004); FBI Report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 20–22.

111. CIA analytic report, "Terrorism: Amount of Money It Takes to Keep al-Qa'ida Functioning," Aug. 7, 2002; CIA analytic report, "Terrorism: Al-Qa'ida Operating on a Shoestring," undated (post-9/11); Frank G. interview (Mar. 2, 2004).

112. In the wake of the East Africa embassy bombings, the NSC led trips to Saudi Arabia in 1999 and 2000 to meet with Saudi officials on terrorist financing. These meetings, and subsequent interviews of Bin Ladin family members in the United States, helped the U.S. government revise its understanding of Bin Ladin's wealth. Rick Newcomb interview (Feb. 4, 2004); William Wechsler interview (Jan. 7, 2004).

113. See William Wechsler interview (Jan. 7, 2004); Rick Newcomb interview (Feb. 4, 2004); Frank G. interview (Mar. 2, 2004); Frank G. and Mary S. briefing (July 15, 2003). See also DOS cable, State 035243, "January 2000 Meeting Regarding UBL Finances," Feb. 27, 2000; DOS cable, Riyadh 000475, "The Saudi Binladin Group: Builders to the King," Feb. 16, 1999; Treasury memo, Office of Foreign Asset Control to DOS, Draft Cable on Meet-

ing with Two of UBL's Brothers, May 19, 2000; Youssef M. Ibrahim, "Saudis Strip Citizenship from Backers of Militants," *New York Times*, Apr. 10, 1994, p. 15; "Saudi Family Disassociates Itself from 'Terrorist' Member," Associated Press, Feb. 19, 1994.

114. Frank G. and Mary S. briefing (July 15, 2003); Frank G. interview (Mar. 2, 2004); Intelligence report, interrogation of KSM, July 30, 2003; Robert Block, "In War on Terrorism, Sudan Struck a Blow by Fleecing Bin Laden," *Wall Street Journal*, Dec. 3, 2001, p. A1. Despite substantial evidence to the contrary and his own assertion that Bin Ladin arrived in Afghanistan with no money, KSM has told his interrogators that he believes the bulk of the money (85–95 percent) for the planes operation came from Bin Ladin's personal fortune. Intelligence reports, interrogations of KSM, July 30, 2003; Apr. 5, 2004; June 15, 2004.

115. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Support for Terrorist Organizations, CTC 2002-40117CH, Nov. 14, 2002. The United States was not a primary source of al Qaeda funding, although some funds raised in the United States may have made their way to al Qaeda or its affiliated groups. Frank G. and Mary S. briefing (July 15, 2003).

116. Frank G. interview (Mar. 2, 2004); CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," CTC 2002-40029CH, Feb. 27, 2002.

117. CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002; CIA analytic report, spectrum of al Qaeda donors, CTC 2003-30199HC, Oct. 30, 2003; Frank G. interview (Mar. 2, 2004).

118. CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999; CIA analytic report, "Gauging the War against al-Qa'ida's Finances," CTC 2002-30078CH, Aug. 8, 2002; CIA analytic report, paper on Al-Haramain, CTC 2002-30014C, Mar. 22, 2002.

119. CIA analytic report, "Al Qa'ida's Financial Ties to Islamic Youth Programs," CTC 2002-40132HCX, Jan. 17, 2003; CIA analytic report, Al Qaeda Financial Network, CTC 2002-40094H, Aug. 7, 2002.

120. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Links of Al Qaeda Operative, CTC 2002-30060CH, June 27, 2002.

121. Frank G. and Mary S. briefing (July 15, 2003). The Taliban's support was limited to the period immediately following Bin Ladin's arrival in Afghanistan, before he reinvigorated fund-raising efforts. By 9/11, al Qaeda was returning the favor, providing substantial financial support to the Taliban.

122. David Aufhauser interview (Feb. 12, 2004). We have found no evidence that Saudi Princess Haifa al Faisal provided any funds to the conspiracy, either directly or indirectly. See Adam Drucker interview (May 19, 2004).

123. On limited Saudi oversight, see Bob Jordan interview (Jan. 14, 2004). In Saudi Arabia, *zakat* is broader and more pervasive than Western ideas of charity, in that it functions not only as charity but also as social welfare, educational assistance, foreign aid, a form of income tax, and a source of political influence.

124. A *hawala*, at least in the "pure" form, transfers value without the use of a negotiable instrument or other commonly recognized method for the exchange of money. For example, a U.S. resident who wanted to send money to a person in another country, such as Pakistan, would give her money, in dollars, to a U.S.-based hawaladar. The U.S. hawaladar would then contact his counterpart in Pakistan, giving the Pakistani hawaladar the particulars of the transaction, such as the amount of money, the code, and perhaps the identity of the recipient. The ultimate recipient in Pakistan would then go to the Pakistani hawaladar and receive his money, in rupees, from whatever money the Pakistani hawaladar has on hand. As far as the sender and ultimate recipient are concerned, the transaction is then complete. The two hawaladars would have a variety of mechanisms to settle their debt, either through offsetting transactions (e.g., someone in Pakistan sending money to the United States using the same two hawaladars), a periodic settling wire transfer from the U.S. hawaladar's bank to the Pakistani hawaladar's bank, or a commercial transaction, such as the U.S. hawaladar paying a debt or an invoice, in dollars, that the Pakistani hawaladar owes in the United States. Hawalas typically do not have a large central control office for settling transactions, maintaining instead a loose association with other hawaladars to transfer value, generally without any formal or legally binding agreements. See Treasury report, "A Report to Congress in Accordance with Section 359 of the [USA PATRIOT Act]" Nov. 2002; Treasury report, "Hawala: The Hawala Alternate Remittance System and its Role in Money Laundering," undated (prepared by the Financial Crimes Enforcement Network in cooperation with INTERPOL, probably in 1996).

125. Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report Al-Qa'ida Financiers, CTC 2002-30138H, Jan. 3, 2003. Moreover, because al Qaeda initially was living hand to mouth, there was no need to store funds.

126. CIA analytic report, "Pursuing the Bin Ladin Financial Target," CTC 01-40003HCS, Apr. 12, 2001; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003.

127. For al Qaeda spending, see Frank G. and Mary S. briefing (July 15, 2003). The 1998 U.S. embassy bombings in East Africa cost approximately $10,000. CIA analytic report, "Gauging the War on Terrorism: Most 11 September Practices Still Viable," Jan. 30, 2002; Intelligence report, interrogation of KSM, June 3, 2003. Although there is evidence that al Qaeda experienced funding shortfalls as part of the cyclical fund-raising process (with more money coming during the holy month of Ramadan), we are not aware of any intelligence indicating that terror-

qualified as an extremist while he was in Los Angeles, it does appear that both the Saudi Arabian government and the leadership of the mosque attempted to discipline him in the summer of 2002 and early 2003 for espousing extremist views. Thumairy denies incurring any such disciplinary measures. Fahad al Thumairy interviews (Feb. 23–25, 2004); FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003. On Bayoumi, see Khalil A. Khalil interview (Feb. 24, 2004). Bayoumi and Thumairy had numerous telephonic contacts between December 1998 and December 2000. Specifically, Bayoumi called Thumairy's home telephone 10 times during this period, and Thumairy called Bayoumi's cellular and home phones 11 times between December 3 and December 20, 2000. FBI electronic communication, "Fahad Al-Thumairy," Nov. 20, 2002. Bayoumi recalls consulting with Thumairy, solely on religious matters, both by telephone and in person at the mosque. Omar al Bayoumi interview (Oct. 16–17, 2003). As to Thumairy's contact with Mohdar Abdullah, see FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. According to one individual, Abdullah visited the mosque frequently and was "very close" to radical followers of Thumairy. FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002.

14. We have checked, for example, the records for apartments where Thumairy is known to have placed Saudi visitors during 2001. The most intriguing lead concerns an Arabic-speaking taxicab driver, Qualid Benomrane, who was arrested on immigration charges in early 2002. When asked to look at a series of photographs that included the 19 hijackers involved in the 9/11 attacks, Benomrane responded ambiguously, seeming first to pick out the photographs of Hazmi and Mihdhar but then denying that he recognized them. Later in the interview, Benomrane told the FBI about driving "two Saudis" around Los Angeles and to San Diego's Sea World after being introduced to them by Thumairy at the King Fahd mosque before 9/11. According to Benomrane, someone at the consulate had asked Thumairy to assist the two Saudis, who had recently arrived in Los Angeles and had moved to an apartment near the mosque. FBI electronic communication, "Fahad Althumairy," Sept. 4, 2002; Ashour E. interview (May 20, 2004); FBI reports of investigation, interviews of Qualid Moncef Benomrane, Mar. 7, 2002; Mar. 13, 2002; May 23, 2002. Working with agencies of the U.S. government, we have attempted to locate and interview Benomrane overseas, since he was deported in 2002. After checking many possible avenues of corroboration for this story, our investigation has not substantiated the hypothesis that Benomrane's "two Saudis" were Hazmi and Mihdhar. In fact, we have established that Benomrane did not obtain a taxi license, or even a driver's license, until months after he could be supposed to have chauffeured Hazmi and Mihdhar. Moreover, before his deportation, Benomrane described the two Saudis as sons of a sick father who was seeking medical treatment in Los Angeles. Ibid. We have found evidence corroborating this account.

15. FBI document made available to the Commission; Caysan Bin Don interview (Apr. 20, 2004); Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004). In Bin Don's presence, Bayoumi met with a still-unidentified consular employee whom Bayoumi already knew and whom Bin Don says he saw in Anaheim as recently as November 2003. The employee provided Bayoumi with Qur'ans and other religious materials during the February 1, 2000, meeting. Omar al Bayoumi interview (Oct. 16–17, 2003). At the time of the February 1, 2000, restaurant encounter, Bin Don, a U.S. citizen, went by the name Isamu Dyson.

16. Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001.

17. See Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001. Bin Don himself has been inconsistent about visiting the mosque. In his initial interviews, he recalled praying with Bayoumi at the consulate before lunch and visiting the mosque only once, after the meal; when we interviewed him recently, however, he stated that both prayer sessions took place at the mosque. For Bayoumi's visits to Los Angeles, see FBI report of investigation, recovery of hotel records, Jan. 15, 2002. Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact.

18. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); FBI report of investigation, "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," undated; FBI letterhead memorandum, investigation of Bayoumi, Apr. 15, 2002. While in San Diego, Bayoumi was officially employed by Ercan, a subsidiary of a contractor for the Saudi Civil Aviation Administration, although a fellow employee described Bayoumi as a "ghost employee," noting that he was one of many Saudis on the payroll who was not required to work. In April 2000, Bayoumi received a promotion and his status was also adjusted from "single" to "married" (despite the fact that he was already married). As a result, his salary was raised and his "other allowances" stipend increased significantly, from approximately \$465 to \$3,925 a month, remaining at that level until December 2000. In January 2001, the stipend was reduced to \$3,427. It stayed constant until August 2001, when Bayoumi left the United States. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); Richard L. Lambert prepared statement, June 26, 2003, pp. 7–9; FBI reports of investigation, interviews of Samuel George Coombs, Apr. 8, 2002; July 24, 2002; Aug. 26, 2002.

19. On Bayoumi's activities, see FBI electronic communication, interview of Bayoumi, Sept. 17, 2003. Although Bayoumi admits knowing Thumairy, no telephone records document any contact between the two just before Bayoumi's lunch with Hazmi and Mihdhar in Los Angeles. Nor do individuals who regard Thumairy as an extremist

place Bayoumi in Thumairy's circle of associates. KSM has denied knowing Bayoumi. Intelligence report, interrogation of KSM, Aug. 18, 2003.

Bayoumi was once the subject of an FBI counterterrorism investigation, prompted by allegations about him that appear to have been groundless. On the closing of the investigation, see FBI electronic communication, "Omar Ahmed Al Bayoumi," June 7, 1999. Another possible source of suspicion is his passport, which contains a cachet that intelligence investigators associate with possible adherence to al Qaeda. It is a marking that can be obtained by especially devout Muslims. Although we believe the marking suggests the need for further inquiry, it is not the kind of fraudulent manipulation that would conclusively link the document with a terrorist organization. INS records, copy of Bayoumi passport; CIA analytic report, Al-Qa'ida Travel Issues, CTC 2004-40002H, Nov. 14, 2003, pp. ii, 18.

20. On Abdullah's assistance to the hijackers, see FBI electronic communication, Abdullah investigation, May 19, 2004. In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, California." FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. Bayoumi, however, denies even introducing Hazmi and Mihdhar to Abdullah, much less asking him to assist them. Omar al Bayoumi interview (Oct. 16–17, 2003).

21. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; FBI electronic communication, "Osama Bassnan," Oct. 17, 2001; FBI report of investigation, interview of Mohdar Abdullah, Sept. 22, 2001; FBI electronic communication, "Shareef Abdulmuttaleb el Arbi," Feb. 4, 2003. For the possibility of the notebook belonging to someone else, see FBI report, Behavioral Analysis Activity, Oct. 4, 2001.

22. FBI electronic communication, interview of Charles Sabah Toma, May 18, 2004.

23. On Abdullah's claims of advance knowledge, see FBI electronic communication, interview, May 17, 2004. On Abdullah's telephone use after August 25, 2001, and acting strangely, see FBI report of investigation, interview, Sept. 24, 2001; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; Danny G. interviews (Nov. 18, 2003; May 24, 2004).

24. The hijackers' mode of transportation and the exact date of their arrival in San Diego are not known. On their locating Bayoumi on February 4 and his assistance, see Richard L. Lambert prepared statement, June 26, 2003, pp. 6–7; Omar al Bayoumi interview (Oct. 16–17, 2003); FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–5, 2003. The rental application states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000, but Bayoumi denies it, and we have found no reason to dispute his denial. According to Bayoumi, he was in such a hurry to complete the rental transaction that he signed the application form without reading it. Bayoumi also denies receiving any money from Hazmi or Mihdhar for helping them with the apartment. Omar al Bayoumi interview (Oct. 16–17, 2003). On opening an account, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 12.

Contrary to highly publicized allegations, we have found no evidence that Hazmi or Mihdhar received money from another Saudi citizen, Osama Bassnan.

25. Omar al Bayoumi interview (Oct. 16–17, 2003). According to Bayoumi, he originally intended to hold the party at his own apartment, but moved it to the hijackers' apartment when one of the guests created an awkward social circumstance by bringing his wife; Bayoumi solved the problem by having the friend's wife stay with his own wife in Bayoumi's apartment and moving the party to the hijackers' residence. Bayoumi maintains that a visiting sheikh was the party's principal honoree. Ibid. Although Bin Don has recalled that the party was intended to welcome Hazmi and Mihdhar to the community, this is belied by the hijackers' apparent decision to sequester themselves in the back room, and by the account of another party attendee. Caysan Bin Don interview (Apr. 20, 2004); Khalid Abdulrab al Yafai interview (Feb. 24, 2004). Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don. Bayoumi videotape of party (provided by the FBI).

26. On the hijackers' efforts to relocate, see Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004); FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 17. Telephone records indicate that on February 9 and February 14, 2000, Bayoumi's cell phone was used to call the landlord of the operatives' acquaintance, Hashim al Attas, who had decided to vacate his apartment. On February 15, 2000, when the landlord returned a page from Bayoumi's cell phone, Hazmi answered the phone. Steve O. interview (Nov. 17, 2003); FBI report of investigation, interview of George Harb, Oct. 30, 2001. Hazmi and Mihdhar appear to have used Bayoumi's cell phone until telephone service (subscribed in Hazmi's name) was installed in their apartment.

27. FBI report of investigation, interview of George Harb, Sept. 16, 2001. The hijackers may actually have lived in Attas's apartment for a short while. Bayoumi has stated that he recalls hearing that Hazmi and Mihdhar moved into the apartment for two weeks but then returned to their original apartment while Bayoumi was in Washington, D.C. FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–6, 2003. This account is confirmed by Attas's girlfriend, who recalls that Attas met Mihdhar and Hazmi either through friends or at the mosque, and that the pair moved into Attas's apartment for approximately two weeks before moving out and taking Attas's furnishings with them. FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

28. Interview (Apr. 23, 2004). Hazmi and Mihdhar did not officially vacate their first apartment until May 31, 2000. FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-SD, serial 1445). The exact details

of the hijackers' move to their final San Diego address are not altogether clear, as their landlord—who has been interviewed many times by the FBI and once by us—has provided various accounts of how he first met them. See also FBI electronic communication, Penttbom investigation, Oct. 3, 2001. On Mihdhar's travels, see Interview (Apr. 23, 2004); FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 46. On Hazmi's departure, see FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

29. On the purchase of the car, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing Bank of America records). Law enforcement officials recovered the blue 1988 Toyota from the parking lot at Dulles International Airport on September 11. On the wire transfer, see FBI report of investigation, interview, Sept. 17, 2001. After 9/11, the mosque administrator came forward because he feared he had unwittingly aided the hijackers. He recalled Hazmi and Mihdhar arriving at the mosque on their own and describing themselves as clerks employed by the Saudi Arabian government. The two said they needed help finding a school where they could study English, which neither spoke well enough, in the administrator's opinion, to permit them to become pilots. The administrator also suspected that Mihdhar might have been an intelligence agent of the Saudi government. After first declining Hazmi's request for a loan, the administrator agreed to permit him to use the administrator's bank account to receive the $5,000 wire transfer. Claiming to have been suspicious of the entire transaction, the administrator distanced himself from Hazmi and Mihdhar, but not before they had received the assistance they needed. Ibid. We have no evidence contradicting the administrator's account.

30. On visits to other mosques, see FBI letterhead memorandum, investigation of Ali Ahmad Mesdaq, Jan. 28, 2002; FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002. On Bayoumi's assistance, see Richard L. Lambert prepared statement, June 26, 2003, p. 7; FBI electronic communication, "Jay Steven Barlow," Sept. 24, 2002. On April 12, 2000, Hazmi registered for a one-month class in conversational English. FBI report, "Hijackers Timeline," Nov. 14, 2003 (Apr. 12, 2000, entry, citing Bank of America records).

31. Even before learning of Abdullah's alleged jailhouse conversations, we attempted to interview him in November 2003, while he was incarcerated and awaiting deportation. Through counsel, Abdullah refused to be interviewed unless he was released from custody. The U.S. Department of Justice declined to obtain an order of use immunity so that Abdullah's testimony could be compelled. See Commission letter to Daniel Levin, DOJ, Dec. 31, 2003; DOJ letter, Daniel Levin to the Commission, Jan. 5, 2004. On Abdullah's deportation, see FBI electronic communication, Abdullah investigation, July 1, 2004. Abdullah appears to be at liberty in Yemen, although he claims Yemeni authorities are watching him. H. G. Reza, "Deported Friend of Terrorists in Report," *Los Angeles Times*, June 17, 2004, p. A31.

32. On Awadallah, see FBI electronic communication, interview of Osama Awadallah, June 6, 2002; FBI electronic communication, interview of Osama Awadallah, Feb. 4, 2003. On Bakarbashat, see FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI electronic communication, Penttbom investigation, Apr. 11, 2002. Another associate of Hazmi and Mihdhar allegedly referred to them after the September 11 attacks as "more than heroes." FBI letterhead memorandum, "Diah Thabet," Oct. 25, 2002.

33. On Anwar Aulaqi, see Wade A. interview (Oct. 16, 2003). The FBI investigated Aulaqi in 1999 and 2000 after learning that he may have been contacted by a possible procurement agent for Bin Ladin. During this investigation, the FBI learned that Aulaqi knew individuals from the Holy Land Foundation and others involved in raising money for the Palestinian terrorist group Hamas. Sources alleged that Aulaqi had other extremist connections. FBI electronic communication, background searches, Feb. 3, 2000; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, interview, Oct. 8, 2002. None of this information was considered strong enough to support a criminal prosecution. For evidence of possible early contacts between Hazmi/Mihdhar and Aulaqi, see Steve O. interview (Nov. 17, 2003), noting that four calls took place between Aulaqi's phone and Bayoumi's phone on February 4, 2000, the day Bayoumi helped Hazmi and Mihdhar find an apartment and perhaps lent them his phone.

One witness remembered meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque. This same witness recalled seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002; FBI report of investigation, interview of Anwar Aulaqi, Sept. 25, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2002.

34. FBI reports of investigation, interviews of Anwar Aulaqi, Sept. 17, 2001; Sept. 19, 2001.

35. Aulaqi took a position at the Dar al Hijra mosque in early 2001. By the time we sought to interview him in 2003, he had left the United States, reportedly returning to Yemen. We attempted to locate and interview him in Yemen, working with U.S. agencies and the Yemeni government, as well as other governments that might have knowledge of his whereabouts. Those attempts were unsuccessful.

36. Whereas Hazmi managed to speak broken English, Mihdhar did not even have this much command of the language, which he appeared uninterested in learning. Interview (Apr. 23, 2004); FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On April 4, 2000, Hazmi took his first flying lesson, a one-hour introductory session at the National Air College in San Diego. Exactly one month later, Hazmi and Mihdhar purchased flight equipment from an instructor at the

Sorbi Flying Club in San Diego. On May 5, both of them took a lesson at Sorbi, followed by a second lesson at the same school five days later. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 18.

37. On the Sorbi Flying Club, see FBI report of investigation, interview of Khaled al Kayed, Sept. 15, 2001. For other instructors' views, see FBI electronic communication, Penttbomb investigation, Apr. 11, 2002.

38. On Mihdhar's phone calls, see, e.g., FBI report, "Hijackers Timeline," Nov. 14, 2003 (Mar. 20, 2000, entry, citing 265A-NY-280350-19426). On Mihdhar's travels, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 17. On KSM's views, see Intelligence report, interrogation of KSM, May 19, 2003. On Mihdhar's status, see INS record, NIIS record of Mihdhar, June 10, 2000.

39. On KSM's communication methods, see Intelligence report, interrogation of KSM, Oct. 15, 2003. Even here, the West Coast operatives' language limitation posed a problem, as KSM had to send emails in Arabic using the English alphabet. Ibid. In addition to having his nephew Ali Abdul Aziz Ali transmit funds to the operatives in the United States, KSM used Ali as an intermediary for telephone messages. Intelligence report, interrogation of detainee, Jan. 7, 2004. On Khallad's role, see Intelligence reports, interrogations of KSM, Oct. 15, 2003; Aug. 18, 2003; Intelligence report, interrogation of Khallad, Feb. 17, 2004. On KSM's annoyance with and views on Mihdhar, see Intelligence reports, interrogations of KSM, June 15, 2004; May 19, 2003.

40. Intelligence report, interrogation of Khallad, Feb. 17, 2004; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2001; FBI electronic communication, interview, July 26, 2002; Interview (Apr. 23, 2004); FBI electronic communication, Penttbom investigation, Sept. 15, 2001. Both KSM and Khallad were aware of Hazmi's interest in finding a bride, and KSM reportedly went so far as to promise Hazmi a monthly stipend of $700 in the event he succeeded in marrying. Intelligence reports, interrogations of KSM, Aug. 6, 2003; Jan. 9, 2004. Although Hazmi did not use his housemate's telephone to make calls, he apparently received calls on it, including calls from an individual named Ashraf Suboh, who called the house 16 times between July 20 and November 18, 2000. Suboh's name and address appear in a printed email recovered during searches at an al Qaeda site in Pakistan in May 2002. The document was dated Jan. 9, 2001, and included his name and a mailing address. FBI letterhead memorandum, San Diego investigation, July 2, 2002.

41. Salmi arrived in San Diego on August 7, 2000, and three days later moved into the house where Hazmi resided. Omar al Bayoumi—who reported (at least nominally) to Salmi's uncle at the Saudi Civil Aviation ministry—found this accommodation for Salmi, although Salmi claims not to have known Bayoumi before coming to San Diego. FBI report of investigation, interview of Yazeed al Salmi, Oct. 8, 2001. On Salmi's move to Abdullah's house in La Mesa, see FBI report of investigation, interview of Salmi, Sept. 21, 2001. On possible financial links, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-302, serial 59279); FBI electronic communication, Information and questions re Salmi interview, June 9, 2004; FBI report of investigation, interview of Salmi, June 17, 2004. For Salmi's possible link to Hanjour, see FBI report of investigation, interview of Abdullah, July 23, 2002. We made efforts with the assistance of the FBI to interview Salmi, but without success. The FBI interviewed Salmi on its own in June 2004 but failed to ask about his reported childhood ties to Hanjour. FBI report of investigation interview of Yazeed al Salmi, June 14, 2004.

42. At KSM's direction, Khallad notified Hazmi that another operative, who turned out to be Hanjour, would be joining Hazmi soon. Intelligence report, interrogation of Khallad, Feb. 17, 2004. On Hazmi's work at the gas station and his statement about becoming famous, see FBI report of investigation, interview, May 21, 2002. The owner of the gas station, Osama Mustafa, and the manager of the station, Iyad Kreiwesh, have both been the subject of FBI counterterrorism investigations. The investigations did not yield evidence of criminal conduct. Thumairy, the Saudi imam in Los Angeles, allegedly presided over Kreiwesh's wedding at the King Fahd mosque, witnessed by Abdullah and Benomrane, likely around September 2000. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; 4377 Parks Avenue, San Diego record, "Application to Rent and Rental Deposit," Sept. 21, 2000.

43. On Hanjour's travel to San Diego, see INS record, NIIS record of Hanjour, Dec. 8, 2000. Hazmi's housemate remembers him taking an unexplained trip to the San Diego airport around this time. FBI report of investigation, interview, Sept. 24, 2001. On Hanjour and Hazmi leaving San Diego and the visit to the gas station, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001. On Hazmi's comment to his housemate, see Interview (Apr. 23, 2004). Although Hazmi's housemate claims that the "Hani" whom Hazmi introduced him to is not the same person pictured in Hanjour's photograph, we have little doubt that the housemate did in fact see Hanjour on the day he and Hazmi left San Diego. Ibid.; FBI electronic communication, Penttbom investigation, Sept. 15, 2001.

44. On Hazmi's contact with Abdullah, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On Hazmi's contact with his housemate, see FBI reports of investigation, interviews, Sept. 24, 2001; July 26, 2002. On Hazmi's contact to acquaintances in San Diego, see Danny G. interviews (Nov. 18, 2003; May 24, 2004).

45. For Shehhi's arrival, see INS record, NIIS record of Shehhi, May 29, 2000; Customs record, secondary inspection record of Shehhi, May 29, 2000. For Shehhi going to New York City, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 30, 2000, entry citing Dresdner bank records). For Atta's travel to the Czech Republic,

see ibid. (June 2, 2000, entry citing Teletype, Sept. 21, 2001, 280350-PR, serial 111). Upon entry, Atta received the customary authorization to stay six months as a tourist. For Atta's arrival in Newark on June 3, 2000, see INS record, non-NIIS record of Atta, June 3, 2000. For Atta's apparent motivation, see CIA analytic report, "11 September: The Plot and the Plotters," CTC 2003-40044HC, June 1, 2003, p. 13; Intelligence reports, interrogations of Binalshibh, Oct. 2, 2002; Mar. 3, 2004.

46. Demonstrating Atta and Shehhi's uncertainty regarding flight schools, Atta emailed a New Hampshire school on June 5, 2000, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-302, serial 3975); and inquired with a New Jersey school on June 22, 2000, see ibid. (citing 265A-NY-280350-NK, serial 15965). As they looked at flight schools on the East Coast, Atta and Shehhi stayed in a series of short-term rentals in New York City. Ibid. (June 19, 2000, entry citing 265A-NY-280350-302, serials 80926, 86069; June 25, 2000, entry citing 265A-NY-280350-302, serial 74902). For Jarrah's travel and training, see INS record, NIIS record of Jarrah, June 27, 2000; FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah living with instructors, see ibid. For Jarrah purchasing a vehicle, see FBI briefing materials, Penttbom, Dec. 10–11, 2003, p. 150 (citing 265A-NY-280350-302, serials 21113, 66098).

47. For Atta and Shehhi visiting the Oklahoma school, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 2, 2000, entry citing FBI electronic communication, Sept. 13, 2001). For Moussaoui's enrollment, see Superseding Indictment, *United States v. Moussaoui*, Crim. No. 01-455-A (E.D. Va. filed July 16, 2002), para. 44. For Atta's initial training in Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 7, 2000, entry citing 265A-NY-280350-TP-5382). Atta and Shehhi did not take their return flight to New York, and there are no travel records indicating how they traveled from Oklahoma to Florida. Ibid. (July 7, 2000, entry citing FBI electronic communication, Sept. 19, 2001). For Atta and Shehhi's enrollment in the advanced course, see ibid. (July 17, 2000, entry citing 265A-NY-280350, serial 4234; 265A-NY-280350-CE, serial 632). The two also soon rented an apartment and opened a joint bank account. Ibid. (July 13, 2000, entry citing 265A-NY-280350-TP-5679; July 7, 2000, entry citing 265A-NY-280350-302-16752). Atta bought a car. FBI briefing materials, Penttbom, Dec. 10–11, 2003, p. 150. For their solo flights, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 30, 2000, entry citing 265A-NY-280350-CE-624, 632). For passing the test, see ibid. (Aug. 14, 2000, entry citing 265A-NY-280350-302, serials 9715, 26590). For Atta and Shehhi continuing training, see ibid. (Sept. 1, 2000, entry citing 265A-NY-280350-2435). For Jarrah's training, see ibid. (June 27, 2000, entry citing 265A-NY-280350-TP (FD-302), serial 1442).

48. Ali reportedly received the money sent to the United States from KSM in Pakistan and via courier. Intelligence reports, interrogations of detainee, Feb. 11, 2004 (two reports). Ramzi Binalshibh wired some funds withdrawn from Shehhi's bank account in Germany, a total of more than $10,000 in four transfers between June 13 and September 27, 2000. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 16–17; German BKA (Bundeskriminalamt) report, investigative summary re Binalshibh, July 4, 2002, pp. 39–41.

49. Adam Drucker interview (Jan. 12, 2004); wire transfer documents (provided by the FBI), pp. 6–37. Ali did provide identification for his initial wire transfer to Hazmi in April that, along with some contact information he provided when he made subsequent transfers, helped the FBI unravel his aliases after 9/11. Intelligence reports, interrogations of detainee, Feb. 11, 2004 (two reports).

50. The applications of Atta and Shehhi for student status include the same supporting financial documentation. See INS record, Atta application to change status, Sept. 19, 2000; INS record, Shehhi application to change status, Sept. 15, 2000. For Atta and Shehhi's enrolling at Jones Aviation, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Sept. 23, 2000, entry citing SunTrust Financial Records). For Atta and Shehhi's behavior, see FBI report of investigation, interview of Ivan Chirivella, Sept. 15, 2001. For their failure, haste, and return to Huffman, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 4, 2000, entry citing 265A-NY-280350-TP, serial 1474; 265A-NY-280350-302, serial 1361).

51. For Jarrah's certificate, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's leaving the United States, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 7, 2000, entry citing 265A-NY-280350-302-7134). For Jarrah and Senguen's travel to Paris, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's return to the United States, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 29, 2000, entry citing INS NIIS Report; 265A-NY-280350-302, serial 7134). For their telephone contact, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For their email contact, see FBI electronic communication, Penttbom investigation, Sept. 18, 2001, p. 5.

52. For Binalshibh's deposit, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (June 27, 2000, entry citing 265A-NY-280350-TP (FD-302), serial 1442; 265A-NY-280350-TP, serial 9500). For his May and June visa applications, see DOS records, Binalshibh visa applications, May 31, 2000; July 18, 2000; FBI briefing materials, Penttbom, Dec. 10–11, 2003, pp. 136–137; CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 10, 12. For his September application in Yemen, see DOS record, Binalshibh visa application, Sept. 16, 2000. For his October application in Berlin, see DOS record, Binalshibh visa application, Nov. 1, 2000. Even after the last application was rejected, Binalshibh sought ways to get a visa, such as by marrying a U.S. citizen. He corresponded by email with a woman in California, but Atta told him to discontinue this effort. Intelligence report, interrogation of Binalshibh, Sept. 24, 2002.