# EXHIBIT 96

**U. S. Department of Justice**
Office of the Inspector General

# A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (November 2004)



## Released Publicly June 2006

Office of the Inspector General

UNCLASSIFIED

This failure to send the information to the FBI, in our view, was also attributable to problems in how the detailees were instructed and supervised, and that these problems significantly impeded the flow of information between the CIA and the FBI. We discuss these systemic problems in detail in our analysis section later in this chapter.

### d.    OIG conclusion

In sum, the evidence shows that in January and March 2000, the CIA uncovered important intelligence information about Mihdhar and Hazmi:

- They were al Qaeda operatives who had traveled to Malaysia, where they were photographed meeting with other suspected al Qaeda operatives;

- They traveled to Bangkok with a third person;

- Mihdhar had a valid, multiple-entry U.S. visa; and

- Hazmi had traveled to Los Angeles in January 2000.

Yet, we found that the CIA did not share significant pieces of this information with the FBI – that Mihdhar had a U.S. visa and that Hazmi had traveled to Los Angeles. An FBI detailee at the CIA drafted a CIR to share this information with the FBI, but that information was not released by the CIA to the FBI. We were unable to determine why this did not occur. No one we interviewed said they remembered the CIR or why it was not sent to the FBI. We consider it a significant failure for this CIR not to be sent to the FBI.

In addition, the evidence shows that the limited information that was provided to FBI Headquarters – that Mihdhar traveled to Malaysia and met with other suspected al Qaeda operatives – was never documented by the FBI in any system that was retrievable or searchable, thus limiting the usefulness of the information that was shared. The FBI's only official record of having received this information was in the hard copies of the January 5 threat update, which was attached to the January 6 executive briefing, and Ted's e-mail summarizing information from his discussion with the CIA employee. We discuss this and other systemic problems in our analysis section below.

255

**B.    Hazmi and Mihdhar in San Diego**

### 1.    Introduction

The second set of events that may have led the FBI to discover Mihdhar and Hazmi's presence in the United States related to their stay in San Diego. As noted above, on January 15, 2000, Mihdhar and Hazmi boarded a flight in Bangkok, Thailand, for Los Angeles. They were admitted to the United States on non-immigrant visitor visas and authorized to remain in the U.S. until July 14, 2000. Shortly after arriving in Los Angeles, they traveled to San Diego, California, where they were aided in finding a place to stay by Omar al-Bayoumi. Bayoumi had been the subject of an FBI preliminary intelligence investigation that had been closed.

In late May 2000, Hazmi and Mihdhar rented a room in the residence of an FBI asset.[185] Mihdhar remained in San Diego until June 10, 2000, when he left the United States.[186] Hazmi remained in the San Diego area until approximately December 2000, when he moved to the Phoenix, Arizona area. In Phoenix, Hazmi lived for approximately three months with another September 11 hijacker, Hani Hanjour. In April 2001, Hazmi and Hanjour moved to New Jersey and remained on the East Coast until September 11.

While residing in San Diego in 2000, Mihdhar and Hazmi did not act in an unusual manner that would draw attention, but they did not attempt to hide their identities. Using the same names contained in their travel documents and known to at least some in the Intelligence Community, they rented an apartment, obtained driver's licenses from the state of California Department of Motor Vehicles, opened bank accounts and received bank credit cards, purchased a used vehicle and automotive insurance, took flying lessons at a local flying school, and obtained local phone service that included Hazmi's listing in the local telephone directory.

---

[185] This kind of individual is often referred to as an "informant" - the common vernacular for an individual providing information to an investigative agency. Within the FBI's foreign intelligence program, they are known as assets.

[186] Mihdhar departed from Los Angeles on Lufthansa Airlines.

Although Hazmi and Mihdhar were in San Diego for a significant period of time, the FBI did not learn of their presence there until after September 11, 2001. After September 11, much would be learned about Hazmi and Mihdhar's time in San Diego and the Intelligence Community's missed opportunities to find and investigate them before the terrorist attacks in which they participated. In this section, we describe the facts surrounding Hazmi and Mihdhar's residence in San Diego, including their associations with two persons known to the FBI.

### 2.    Hazmi and Mihdhar's association with Bayoumi

Omar al-Bayoumi is a Saudi Arabian national who came to the United States in 1993. In early 2000 he had been living with his wife and four children in San Diego for at least four years. Although he described himself to others in San Diego as a graduate student in business administration, he took classes intermittently and was not enrolled in a program of study. He did not work in the United States and received a monthly stipend of $4,000 plus "other allowances," ranging from $465 to $3,800 each month, from Dallah/Avco, a Saudi contractor to the Presidency of Civil Aviation.[187] Bayoumi was active in the San Diego Muslim community and was involved in the establishment of several mosques in the United States.

In September 1998, the FBI's San Diego Field Office opened a preliminary inquiry on Bayoumi based on allegations raised by the manager in the apartment complex where he was living at the time. The manager alleged that Bayoumi had received a suspicious package from the Middle East, and the maintenance worker for the apartment complex had noted strange wires in Bayoumi's bathroom. In addition, the manager reported frequent gatherings of young Middle Eastern males at Bayoumi's apartment on weekend nights.

The FBI case agent conducted a limited investigation of Bayoumi, but the preliminary inquiry was closed in June 1999 and was not converted to a full

---

[187] Bayoumi was employed by the Saudi Presidency of Civil Aviation from 1975 until 1995 and became a contractor for the organization beginning in 1995.

field investigation.[188]   As a result, the FBI was no longer investigating Bayoumi at the time that Hazmi and Mihdhar met Bayoumi in February 2000. However, the following paragraphs describe what was later learned about Bayoumi's interactions with Hazmi and Mihdhar.

On February 1, 2000, Bayoumi traveled by car from San Diego to Los Angeles, to resolve a visa issue at the Saudi consulate.  Bayoumi invited an associate, Isamu Dyson, to accompany him.[189]   Dyson provided the following account to the FBI of the trip with Bayoumi.[190]

Dyson said that at the time of the invitation, Bayoumi mentioned a Los Angeles restaurant serving halal food where they could eat lunch after Bayoumi's meeting at the consulate.[191]   After Bayoumi spent approximately one hour at the Saudi consulate, he and Dyson went to the restaurant but discovered it had been converted to a butcher shop.  The butcher shop employees recommended another nearby halal restaurant, the "Mediterranean Gourmet."  Bayoumi and Dyson walked to that restaurant.  While they were eating there, Hazmi and Mihdhar entered the restaurant and the four talked in Arabic.  Although Dyson had limited Arabic language skills, he said that Bayoumi kept him apprised of the content of the conversation.  Hazmi and Mihdhar told Bayoumi that they were in the United States to study English, but they did not like living in Los Angeles.  Bayoumi invited the men to visit San Diego and offered to assist them.  Bayoumi provided the men with his phone number.  Bayoumi and Dyson left the restaurant, and after stopping at a nearby mosque for sunset prayers, returned to San Diego.  Dyson asserted that the encounter with Hazmi and Mihdhar seemed to be a coincidental meeting.

Within several days of the meeting, Hazmi and Mihdhar accepted Bayoumi's invitation and traveled to San Diego.  In San Diego, Bayoumi

---

[188] In Section IV B 1 of this chapter, we examine the investigative steps taken by the FBI in this preliminary inquiry and assess the appropriateness of the decision to close the inquiry.

[189] Dyson is an American Caucasian who converted to Islam.  He has since changed his name to Caysan Bin Don.

[190] Dyson provided the information to the FBI in an interview after September 11.

[191] Halal is an Arabic word meaning "lawful" or "permitted."

arranged for Hazmi and Mihdhar to rent an apartment on Mount Ada road in the same apartment complex where Bayoumi lived.  Bayoumi also co-signed their lease.  Shortly after Hazmi and Mihdhar moved into the apartment, Bayoumi hosted a party to introduce them to the local Muslim community.

Within a few weeks of moving into the apartment, Hazmi and Mihdhar filed a 30-day notice to vacate the apartment, apparently to move to another apartment.  However, they later rescinded the vacate notice and continued to lease the apartment until June 2, 2000.[192]

The apartment manager told the FBI that Bayoumi paid Hazmi and Mihdhar's first month's rent and security deposit because they had not yet established a local bank account and the apartment complex would not accept cash.  A review of Bayoumi and Mihdhar's financial records after September 11, 2001, indicate that Bayoumi was reimbursed for this expense on the same day it was paid.[193]

### 3.    Hazmi and Mihdhar's communications

On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment to a suspected terrorist facility in the Middle East linked to al Qaeda activities.  (See section III, A, 2 above.)  A record of the call was captured in the toll records.  After the September 11 attacks, the call was identified through a record check.

---

[192] Bayoumi left the United States for some of the time Hazmi and Mihdhar lived in the apartment.  INS records do not indicate when Bayoumi left the country, but the records indicate that he obtained a United States visa in Jeddah on May 10, 2000, and returned to the United States on May 31, 2000.  Bayoumi left the United States permanently in July 2001 and was living in England on September 11, 2001.

[193] Bayoumi's bank records show a cash deposit in the exact amount of the rent and security deposit ($1,558).  Mihdhar's financial records also indicate that he opened an account with a deposit of $9,900 in cash within seven minutes of Bayoumi's cash deposit, which suggests that they were in the bank together.

### 4. Hazmi and Mihdhar's association with an FBI asset beginning in May 2000

Sometime in May 2000, Hazmi and Mihdhar moved out of the apartment Bayoumi had found for them on Mount Ada Road and moved as boarders into the home of an asset of the FBI's San Diego Field Office.[194]  Hazmi and Mihdhar met the asset at the mosque they attended.[195]  Mihdhar stayed at the asset's residence until June 10, 2000, when he left the United States.  Hazmi resided in the asset's house until December 10, 2000, when he moved to Arizona.

### a. Background on the FBI asset

In 1994, the asset was recruited by San Diego FBI Special Agent who we call "Stan."  The FBI had interviewed the asset in connection with a bombing investigation several years before.  Stan remained the asset's handling agent – or "control agent" – until Stan retired in February 2002.[196]

The asset was opened as an asset on May 14, 1994.[197]  He worked as an informational source, providing to the FBI information acquired in his normal daily routine.  He normally was questioned about specific individuals who were under investigation by the FBI, although he occasionally volunteered information that he thought might be relevant.  According to Stan, during some

---

[194] The OIG was not able to interview the asset.  The Joint Intelligence Committee Inquiry had attempted to interview the asset without success.  The Committee then submitted interrogatories that the asset declined to answer, asserting his Fifth Amendment privilege.  The asset indicated through his attorney that if subpoenaed by the Committee, he would not testify without a grant of immunity.

[195] There is some dispute about whether Hazmi and Mihdhar actually responded to an advertisement for boarders posted by the asset or whether they were introduced to the asset. The OIG did not have access to the witnesses who could address this issue.

[196] Stan was interviewed twice by the JICI staff, and he testified before the Joint Intelligence Committee.  After his retirement from the FBI, Stan declined repeated requests for an OIG interview.  The OIG does not have authority to subpoena individuals and cannot compel former Department of Justice employees to submit to an interview.

[197] Initially the asset was not paid.  In July 2003, the asset was given a $100,000 payment and closed as an asset.

periods, he would talk to the asset several times per day, but there were periods in which he did not talk to him for several weeks or months. Stan said that many of their conversations were about family matters, the informational asset's health, and other non-substantive issues.

In 1996, the asset began renting out rooms in his home. Prior to September 11, 2001, he had 14 different boarders in his house, including Hazmi and Mihdhar. When Hazmi and Mihdhar rented rooms from the asset in 2000, two other persons also were renting rooms there.

### b.   Information from asset on Hazmi and Mihdhar

It is not clear what information the asset provided to the FBI about Hazmi and Mihdhar before the September 11 attacks.

After the September 11 attacks, the FBI interviewed the asset and asked about the conduct and activities of Hazmi and Mihdhar while they were living with the asset. In those interviews, the asset described them as quiet tenants who paid their rent. He said they were good Muslims who regularly prayed at the mosque.   The asset said that Hazmi and Mihdhar often would go outside when using their cellular telephones. The asset insisted that he noted no indicators of nefarious activity by Hazmi or Mihdhar that should have resulted in his reporting their identities to the FBI.[198]

The asset was asked what information he provided to Stan about Hazmi and Mihdhar before September 11. In these interviews, the asset provided conflicting accounts regarding the information on Hazmi and Mihdhar that he had disclosed to Stan. The agent who interviewed the asset -  this agent had taken over as the asset's control agent after Stan's retirement from the FBI - told us that the asset said he told Stan about his boarders in general terms, although he had not fully identified Hazmi and Mihdhar. The control agent said that the asset later said that he had not told Stan about the boarders at all.

---

[198] The FBI opened an investigation after September 11 to determine whether the asset was involved in the attack. The asset has consistently maintained after September 11 that he had no suspicions about Hazmi and Mihdhar. The results of a polygraph examination on his potential role were inconclusive. Based on its investigation, however, the San Diego FBI concluded that the informational asset had not been complicit in plotting the attacks.

Although Stan declined to be interviewed by the OIG, after September 11, his FBI supervisors had interviewed him about the asset.  Stan also had discussed the asset with co-workers and was interviewed by, and subsequently testified in, a closed session before the Joint Intelligence Committee.[199]  Stan reported that the asset had told him contemporaneously that two Saudi national visitors were residing in a room at his residence.  Stan said that the asset merely provided the first names of the boarders, Nawaf and Khalid.  Stan contended that he had asked the asset for the boarders' last names but never received them and did not follow up.  He said that the asset told him that his boarders were in the U.S. on valid visitors' visas, and they planned to visit and to study while they were in the country.  In addition, Stan said that the asset told him that he believed that the two boarders were good Muslims because of the amount of time that they spent at the mosque.  Stan stated that he did not recall the asset ever telling him that either of the boarders had moved out.  According to Stan, the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny.  Stan reported that he never obtained Hazmi and Mihdhar's full identities from the asset and that he did not conduct any investigation of them.

### 5.    OIG conclusion

In sum, the FBI did not obtain information about Mihdhar's and Hazmi's time in San Diego, either as a result of the Bayoumi preliminary inquiry or from the asset.  In the analysis section of this chapter, we evaluate Stan's actions with regard to Hazmi and Mihdhar and whether he should have pursued additional information about who was living with one of his assets.

### C.    Mihdhar's association with Khallad, the purported mastermind of the Cole attack

The third potential opportunity for the FBI to acquire information about Hazmi and Mihdhar occurred in January 2001, when a joint FBI/CIA source identified an al Qaeda operative in photographs of the January 2000 Malaysia meetings that Hazmi and Mihdhar had attended.  However, the FBI has

---

[199] The OIG was permitted to review the transcripts of Stan's testimony before the Joint Intelligence Committee's Inquiry.

would not have been cause for concern because the Saudi government was considered an ally of the United States.

In addition, the case agent explained that more intrusive investigative techniques could not be conducted because of the restrictions of the Attorney General FCI Guidelines in effect at the time. No meaningful surveillance could be conducted, no bank records or other financial records could be sought, and very little investigative activity beyond fully identifying the individual could be done.

In sum, we do not believe that the FBI's actions with regard to Bayoumi and its decision to close the preliminary inquiry were inappropriate. The agent conducted logical investigative steps that were permitted under the Attorney General Guidelines in effect at the time, such as checking FBI records for information, asking other intelligence agencies for information about the subject, and asking agents to query their sources about the subject, but the agent did not uncover any information to support the allegations. The Guidelines did not permit the case agent to engage in more intrusive investigative techniques, such as a clandestine search of Bayoumi's property, obtaining his telephone or financial records, or secretly recording his conversations.

Although the Attorney General Guidelines would have permitted a subject interview of Bayoumi prior to closing the preliminary inquiry, the decision not to conduct an interview appeared warranted, given its possible effect on an ongoing significant investigation.

## 2.    The FBI's handling of the informational asset

As described above, in May 2000 Hazmi and Mihdhar began renting a room in the home of an FBI informational asset. An FBI San Diego Special Agent who we call "Stan" was the asset's control agent since the asset was opened in 1994. The asset had provided the FBI with significant information over the years and was considered a reliable source. He was well known in the Muslim community. He often rented rooms in his house to Muslim men in the community who needed temporary housing. At the time that Hazmi and Mihdhar moved in with him, he had two other individuals renting rooms in his house. Mihdhar lived with the asset until June 10, 2000, when he left the

United States, and Hazmi remained as a boarder at the asset's home until December 2000.

According to Stan, the asset told Stan that two young Saudis who had recently come to the United States to visit and study had moved in as boarders. The asset described them as good Muslims who often went to the mosque and prayed. The asset provided Stan with their first names but little other identifying information. Stan did not obtain any additional information from the asset about the boarders, such as their last names, and he did not conduct any investigation of them.

Had Stan pursued information about Hazmi and Mihdhar, he might have uncovered the CIA information about them. In addition, he might have created a record in FBI computer systems about Hazmi and Mihdhar's presence in San Diego, which would have provided the FBI with additional information and avenues of investigation when it began to search for them in August 2001. For these reasons, we examined Stan's actions with regard to the asset.

In interviews with the JICI staff and in congressional testimony, Stan stated that the informational asset primarily provided information about the activities and identities of persons in the Muslim community in San Diego who were the subjects of FBI preliminary inquiries or full field investigations.[268] Stan said that the asset volunteered some information about other individuals as well. He said he thought that the asset had good judgment about which individuals might pose a threat and that his reporting had been "consistent" over the years. We reviewed the asset's file and noted the asset provided information on a regular basis on a variety of different individuals and topics. Although we could not evaluate the asset's judgment from the file, we consider Stan's description of the asset's reporting to be apt.

Stan also stated that he was aware that the asset had boarders in his house over the years, and the fact that two new boarders had moved in with the asset did not arouse suspicion. He noted that the asset volunteered that the two boarders were living with him soon after they moved in, but the asset provided the information about his boarders as part of a personal conversation and not

---

[268] As noted above, Stan has retired from the FBI and declined to be interviewed by the OIG.

because the asset believed that it had any significance. Stan stated the information provided from the asset was that the two boarders were from Saudi Arabia, which, according to Stan, was not a country that the United States had placed on the list as a threat to national security. Stan said that the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny. He also asserted that he was prohibited from further pursuing the information about Hazmi and Mihdhar, including documenting the information that he had obtained, because of the Attorney General Guidelines in effect at the time.

In examining Stan's actions, we first considered whether the Attorney General's FCI Guidelines were applicable to the situation involving Hazmi and Mihdhar. As suggested by Stan, the Attorney General's FCI Guidelines were designed to ensure that the FBI opened preliminary inquiries and conducted investigations only if the required predicating information was present. Because there were no allegations or information provided to Stan that Hazmi and Mihdhar were terrorists or agents of a foreign power, we agree that Stan did not have sufficient information to open a preliminary inquiry and actively investigate Hazmi and Mihdhar.

We also considered whether, at a minimum, Stan could have attempted to obtain additional information about people who were living with his informational asset, such as their full names, and whether he was required to document the information on Hazmi and Mihdhar that he had received from his asset. First, we reviewed FBI policies and procedures for handling assets. Those policies did not require Stan to obtain information from an informational asset about people living in the asset's house or to conduct record checks to obtain this information. In addition, the policies do not appear to require Stan to have documented information received from the asset about anyone living with him, or to even document their full identities if he had obtained that information.

We also interviewed several FBI agents who were on Stan's counterterrorism squad and asked them whether it would have been their practice to seek additional information about boarders living with an informational asset and what, if anything, they would have done with this information. We found no consensus among them about whether information on boarders like Hazmi and Mihdhar who lived with an informational asset should have been obtained and documented. Some agents stated that they would have pursued more information about boarders living with an

337