# EXHIBIT 160
## REDACTED FOR PUBLIC FILING

## PART 1 OF 2

REDACTED FOR PUBLIC FILING

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                                    )
IN RE:  TERRORIST ATTACKS ON            )        Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                          )        ECF Case
_____ )

This document relates to:  *All Actions*

**KINGDOM OF SAUDI ARABIA'S RESPONSE TO**
**PLAINTIFFS' CORRECTED AVERMENT OF FACTS AND EVIDENCE**
**IN SUPPORT OF THEIR CLAIMS AGAINST**
**THE KINGDOM OF SAUDI ARABIA AND DALLAH AVCO**

**REDACTED FOR PUBLIC FILING**

The Kingdom of Saudi Arabia ("Saudi Arabia") submits this response to Plaintiffs' Corrected Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco, ECF No. 9541-1.

Most of the paragraphs in Plaintiffs' Averment (73%) either are not cited at all in Plaintiffs' brief or are cited only in overbroad ranges that Plaintiffs proffer to support conclusory statements. ECF No. 9560-1 (version of Plaintiffs' brief highlighting such statements); ECF No. 9560-3 (table setting forth 1,565 such paragraphs).

The Court denied Saudi Arabia's and Dallah Avco's motion to strike the offending parts of Plaintiffs' brief and Averment. ECF No. 9562. It acknowledged that there are "legitimate questions as to whether [Plaintiffs'] citations are proper" and that, "[a]t the very least, the Plaintiffs violated the spirit of" the Court's briefing order. *Id.* at 5. Nevertheless, the Court reasoned that the "procedural posture . . . and the importance of the issues raised . . . weigh[ed] against excluding marginal portions of the Plaintiffs' filings," as did the "substantial delay" if Plaintiffs had to rewrite and refile. *Id.* The Court did not, however, revisit its order requiring facts to be set forth in the briefs. Accordingly, the Court can and should now disregard the parts of Plaintiffs' Averment that are improperly cited or not cited at all.

Nonetheless, because Plaintiffs' entire Averment remains in the record, Saudi Arabia has responded to each paragraph in this Averment. To the extent Saudi Arabia states that a fact is undisputed or otherwise conceded, that is for purposes of the present motion only. In the response to each Averment paragraph, Saudi Arabia has also made evidentiary objections. A full list of Saudi Arabia's evidentiary objections to the exhibits cited in Plaintiffs' brief or Averment is set forth in KSA Exhibit 161, which is referenced herein as the "Objections Chart." Plaintiffs have also attached to their opposition hundreds of exhibits that they do not cite in their brief or

**REDACTED FOR PUBLIC FILING**

Averment.  Those uncited exhibits are set forth in KSA Exhibits 162A and 162B.  To the extent an evidentiary objection is clear on the face of an uncited exhibit, that objection is stated in KSA Exhibit 162A.  To the extent Saudi Arabia does not raise an evidentiary objection to a particular exhibit or a portion of an exhibit, that is for purposes of this motion only and is not a concession that the exhibit or portions of the exhibit not cited by Plaintiffs contain admissible evidence.

Plaintiffs' Averment relies heavily on hearsay documents, including law enforcement interview summaries and preliminary investigative material.  To the extent Saudi Arabia's response cites to the same or other interview summaries and preliminary investigative material, that is done solely to provide context to Plaintiffs' assertions, and such documents are not offered for the truth of the matter asserted.  Saudi Arabia's position, as reflected in its reply brief and in Exhibits 161 and 162A, is that these interview summaries and preliminary investigative material are inadmissible.

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| I. | **U.S. FEDERAL LAW ENFORCEMENT AGENCIES DETERMINED THAT SAUDI ARABIA'S GOVERNMENT ESTABLISHED AND SUPPORTED A SUNNI-WAHHABI EXTREMIST NETWORK INSIDE THE U.S. THAT PROVIDED MATERIAL SUPPORT TO THE 9/11 HIJACKERS.** | There is no support for the assertion that Saudi Arabia established and supported a Sunni-Wahhabi extremist network that provided material support for the 9/11 hijackers. This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded: "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218 (footnote omitted).<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103.<br><br>In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11).<br><br>Moreover, Islam as practiced in Saudi Arabia is "Hanbali Salafism." Even Plaintiffs' purported expert Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr. ) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). Thus, Saudi Arabia would not support any extremist network that advocates violent jihad. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Since the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* Response to Pls. Aver. ¶ 48. Meanwhile, the United States has been and continues to be Saudi Arabia's longtime ally and strategic partner. Response to Pls. Aver. ¶ 52. As every authoritative U.S. government agency and panel commissioned to investigate the 9/11 hijackers has concluded, Saudi Arabia did not support its sworn enemy in an attack against its longstanding ally. |
| 1. | The December 2004 FBI/CIA Joint Assessment ("2004 FBI/CIA Joint Assessment") found "evidence [that] official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States…some of whom are associated with terrorism-related activity." Ex. 2, EO 3416. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2. | The 2004 FBI/CIA Joint Assessment determined that "[t]he Saudi Government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al-Qa'ida." Ex. 2, EO 3416. | The document cited contains the quoted language, but it does not indicate that this was the case prior to the September 11, 2001 attacks.<br><br>The FBI/CIA Joint Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 3. | The 2004 FBI/CIA Joint Assessment cited efforts by "suspected Saudi intelligence officers and cooptees" and "Saudi-funded clerics" to obtain intelligence inside the U.S. Ex. 2, EO 3416. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language, but does not indicate that this was the case prior to the September 11, 2001 attacks.  It also does not indicate whether the "intelligence" was related to the 9/11 attacks.<br><br>The FBI/CIA Joint Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  Pls. Ex. 2OO (EO 3416). |
| 4. | The 2004 FBI/CIA Joint Assessment also stated that "[t]he Saudi Government and private Saudi individuals support the propagation of the conservative Wahhabi-Salafi sect of Sunni Islami in the United States. Jihadists adhere to and interpret this sect's beliefs to justify their actions." Ex. 2, EO 3416. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language, but does not indicate that this was the case prior to the September 11, 2001 attacks.<br><br>The FBI/CIA Joint Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 5. | The 2004 FBI/CIA Joint Assessment concluded that the Saudi Government's actions regarding Al Qaeda put it in a "precarious situation" because it was "treating the group [al Qaeda] with special consideration." Ex. 2, EO 3416. | The document cited contains the quoted language.<br><br>The FBI/CIA Joint Assessment concluded, however, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>It further concluded that "[a] review of intelligence over the past two years indicates that the Government of Saudi Arabia (GSA) was neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida against the United States or other Western interests. Furthermore, no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida." Pls. Ex. 2OO (EO 3417).<br><br>It further stated that: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud." Pls. Ex. 2OO (EO 3417). |
| 6. | The 2004 FBI/CIA Joint Assessment states that the Al Haramain Islamic Foundation ("Al Haramain") was led by two Saudi government cabinet members. The Joint Assessment found that among the "stated goals" of Al Haramain are to "establish the Salafist Wahhabi fundamentalist form of Sunni Islam." Ex. 2, EO 3435. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language. It also states, however, that "[t]here is no evidence that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>It is disputed that two Saudi government cabinet members led Al Haramain. Plaintiffs have alleged that former Ministers of Islamic Affairs Abdullah Al Turki and Saleh Bin Abdulaziz Al ash-Sheikh led Al Haramain. Al Turki testified that he did not have involvement with Al Haramain. Pls. Ex. 97 (Turki Tr.) 64:2-20. Al ash-Sheikh also testified that he did not hold a position at Al Haramain. Pls. Ex. 123 (ash-Sheikh Tr.) 137:14-138:10, 143:14-148:5 (testifying that Al Haramain was working without a permit and that the Ministry of Islamic Affairs scrutinized the organization). |
| 7. | The 2004 FBI/CIA Joint Assessment found that:<br><br>Two Saudi cabinet members officially supervise [Al Haramain's] activities. The Minister of Islamic Affairs, Sheikh Saleh Bin Abdul Aziz Bin Mohammed Bin Ibrahim Al Shaykh, is the titular head and superintendent of [Al Haramain]. The foundation is part of the Saudi Joint Relief Committee, which is headed by the Minister of Interior, Prince Nayif bin Abdul-Aziz al-Sau'd, a member of the Saudi royal family and head of Mabahith. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language. The FBI/CIA Joint Assessment concluded, however, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>It is disputed that former Minister of Islamic Affairs Saleh Bin Abdulaziz Al ash-Sheikh led Al Haramain. Al ash-Sheikh testified that he did not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 2, EO 3435. | hold a position at Al Haramain. Pls. Ex. 123 (ash-Sheikh Tr.) 137:14-138:10, 143:14-148:5 (testifying that Al Haramain was working without a permit and that the Ministry of Islamic Affairs scrutinized the organization). |
| | | The U.S. government also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – is a "founder and leader," who "controlled AHF and was responsible for all AHF activities, including its support for terrorism." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). |
| 8. | The 2004 FBI/CIA Joint Assessment indicated that some Al Haramain offices "provided material support to the terrorist activities of al-Qa'ida around the world," including support for the Al Qaeda cells responsible for the 1998 U.S. Embassy bombings. Ex. 2, EO 3435. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the document cited contains the quoted language. The FBI/CIA Joint Assessment concluded, however, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| | | It further concluded that "[a] review of intelligence over the past two years indicates that the Government of Saudi Arabia (GSA) was neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida against the United States or other Western interests. Furthermore, no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida." Pls. Ex. 2OO (EO 3417). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 9. | The 2004 FBI/CIA Joint Assessment also observed that Prince Nayif "maintained for months after 11 September 2001 that no Saudis or Arabs had been involved in the attacks, but rather that the attacks were plots by the CIA and Israel's Mossad." Ex. 2, EO 3423. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the document cited contains the quoted language. The FBI/CIA Joint Assessment concluded, however, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).

It further concluded that "[a] review of intelligence over the past two years indicates that the Government of Saudi Arabia (GSA) was neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida against the United States or other Western interests. Furthermore, no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida." Pls. Ex. 2OO (EO 3417). |
| 10. | In addition to the 9/11 investigations conducted by the FBI, codenamed PENTTBOM and OPERATION ENCORE, the FBI established a separate Arabian Peninsula Squad ("AP Squad") which conducted a nearly two-decade long investigation of the role of Saudi Arabia, specifically its Embassy, personnel, and broader government infrastructure in providing either direct or indirect support for terrorism, including Al Qaeda. Ex. 13, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibits 13 and 2PP (EO 3482-83) are inadmissible hearsay. *See* Objections Chart. The Widener Declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Weidner Decl. ¶¶ 2-18; Ex. 2, EO 3434 (AP Squad established 2002); Ex. 2, EO 3482-83. | To the extent a response is required, the 2004 FBI/CIA Joint Assessment states that there was "a Middle East (Arabian Peninsula) Squad dedicated to the Saudi target." Pls. Ex. 2OO (EO 3434). It does not state that it conducted a "nearly two decade long investigation of the role of Saudi Arabia, specifically its Embassy, personnel, and broader government infrastructure in providing either direct or idirect support for terrorism, including Al Qaeda."

The FBI/CIA Joint Assessment concluded, however, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).

It further concluded that "[a] review of intelligence over the past two years indicates that the Government of Saudi Arabia (GSA) was neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida against the United States or other Western interests. Furthermore, no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida." Pls. Ex. 2OO (EO 3417).

Plaintiffs Exhibit 2PP (EO 3482-83) does not support the assertions in this paragraph. None of the unredacted text refers to an Arabian Peninsula Squad. |
| 11. | The FBI prepared a July 23, 2021 Electronic Communication ("July 2021 FBI EC") titled "Connections to the Attacks of September 11, 2001." Ex. 2, EO 3479. The purpose of this EC was to provide analysis that was "deemed essential for future case agents" of the FBI's counterterrorism | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | program "to understand the origin of the investigation" conducted by the FBI of Saudi Arabia after the 9/11 Attacks. Ex. 2, EO 3479. | To the extent a response is required, the document cited does not state that the purpose of the document was to provide analysis deemed essential for future case agents. Instead, it states that "[t]he purpose of this communication is to consolidate information related to the involvement of personnel and entities controlled by the Saudi Arabian Government (SAG), the Embassy of the Kingdom of Saudi Arabia (EKSA) and its affiliates within the United States with the attacks of September 11, 2001 . . . . This report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). <br><br> The document is also inadmissible hearsay. *See* Objections Chart. <br><br> The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 12. | The July 2021 FBI EC contained a series of specific factual findings made by the FBI addressing Saudi Arabia's "creation of and support and direction for a network of offices and personnel involved with militant Salafi Islamic activities and proselytization within the United States." Ex. 2, EO 3482. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, the document does not contain "a series of specific factual findings made by the FBI." Instead, it states that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The document is also inadmissible hearsay. *See* Objections Chart.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 13. | The July 2021 FBI EC found that a "Saudi (Wahhabi) / Salafi / militant network…was created, funded, directed and supported by the KSA [Kingdom of Saudi Arabia] and its affiliated organizations and diplomatic personnel within the U.S." Ex. 2, EO 3480. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document did not make this conclusion. Rather, it states that "a purpose of this communication is to document investigations and supporting documentation regarding the Saudi (Wahhabi)/Salafi/militant network that was created, funded, directed and supported by the KSA and its affiliated organizations and diplomatic personnel within the U.S." Pls. Ex. 2PP (EO 3480).<br><br>The document also states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 3479).  Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation.  This is particularly relevant due to a lack of resources and analytical assistance.  As such, writer has located relevant serials and have copied that information directly within this communication."  *Id.* (EO 3481). <br><br> The document is inadmissible hearsay.  *See* Objections Chart. <br><br> The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  Pls. Ex. 2A (EO 9-11). |
| 14. | The July 2021 FBI EC determined that "[a]s Saudi government officials and intelligence officers were directly operating and supporting the entities involved with this network, their involvement with the activities of these organizations/individuals would logically be supposed to have the knowledge or concurrence of the KSA government."  Ex. 2, EO 3480. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> To the extent a response is required, the document contains the quoted language, but does not make any "determin[ation]."  It states that "[t]his report should not be considered an intelligence assessment and is not intended as such."  Pls. Ex. 2NN (EO 3479).  Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation.  This is particularly relevant due to a lack of resources and analytical assistance.  As such, writer has located relevant serials and have copied that information directly within this communication."  *Id.* (EO 3481). <br><br> The document is inadmissible hearsay.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 15. | In addition, the July 2021 FBI EC stated that:<br><br>…there was located within the EKSA [Embassy of the Kingdom of Saudi Arabia] the offices of the Islamic Affairs Department and the office of Dawa (or Propagation). Investigation of the 9/11 hijackers and their support networks identified significant connections to these offices either directly or via the Saudi Arabian Consulate in Los Angeles.<br><br>Ex. 2, EO 3480. The FBI determined that Islamic Affairs Deputy Musaed Al Jarrah was a Saudi diplomat and "high level employee" who was "heavily involved with the movement and support of the Saudi Salafi network within the U.S. to include those members of the 9/11 hijacker support network in Southern California." Ex. 2, EO 3496. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The document is also inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the document contains the quoted language, but the portion quoted does not make any determinations. It states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 16. | In a May 2021 Electronic Communication ("May 2021 FBI EC"), the FBI confirmed the role of the Embassy in overseeing an extremist network of Saudi propagators inside the U.S., in particular the Southern California-based network led by Fahad Al Thumairy. Ex. 2, EO 0001-0014. The May 2021 FBI EC finds that Islamic Affairs Deputy Musaed Al Jarrah was "heavily connected/linked to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of Mohammed al-Muhannah[] and [Fahad Al] Thumairy." Ex. 2, EO 0004. The EC states that "Al-Jarrah is in fact a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhannah and Thumairy since their arrival in the United States." Ex. 2, EO 0004. | The May 2021 FBI EC did not make the determinations stated by Plaintiffs. The document says nothing about any "extremist network of Saudi propagators." Further, the document makes clear that the statements relating to Al Jarrah were based on a single unnamed "CHS" (or confidential human source) and that "[n]o additional information was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| I.A. | **Saudi Arabia's Wahhabi Islam preached violent jihad against non-believers.** | As detailed below, Saudi Arabia exclusively practices and endorses the quietist form of Hanbali Salafism. Even Plaintiffs' experts agree that this form of Islam does not support terrorism or attacks on the West. |
| 17. | Saudi Arabia follows a branch of Sunni Islam known as Wahhabism, named after the 18th Century religious scholar Muhammad ibn Abd Al-Wahhab, as its | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | state religion. Saudi Arabia's government is based on a centuries-old religious-political pact between the ruling al- Saud dynasty, the King and royal family which rules the Saudi political regime and its military, and the descendants of Abd Al-Wahhab, the Ash-Shaikh, who dictate the norms of Saudi religious, moral, educational, and cultural life. Ex. 149, Nakhleh Rpt. ¶¶ 26-28. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Nakhleh does not cite anything to support the assertions repeated in this paragraph.<br><br>The term "Wahhabism" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12. Islam as practiced in Saudi Arabia is more accurately referred to as "Hanbali Salafism." Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 18. | The term "Wahhabism" is an appropriate description of the sect of Islam followed in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi Arabia. Saudi Arabia holds the view that Wahhabi Islam is the *only* legitimate Islam and therefore should not be labeled as a sect of Islam. KSA Aver. at ¶ 4 n. 1 (describing the term Wahhabism as "misleading and derogatory"). As Plaintiffs' expert Nakhleh explains:<br><br>The Saudis regard the term [Wahhabism] as pejorative because it appears to characterize "their" Islam as merely one branch or version of Islam, as opposed to the Saudi belief that Wahhabism is *the only Islam* and represents Islam *in its entirety*. One can often hear it said among scholars of Islam, in relation to such designations: every Wahhabi is a Salafi, but not every Salafi is a Wahhabi.<br><br>Ex. 149, Nakhleh Rpt. ¶ 26 n. 7. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, the term "Wahhabism" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.<br><br>Islam as practiced in Saudi Arabia is referred to as "Hanbali Salafism." Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 19. | A fundamental tenet of Wahhabism is the duty of all Muslims to wage "jihad" against the perceived "enemies" of Islam. Ex. 149, Nakhleh Rpt. ¶ 30. Wahhabism is based on the notion of a millenarian violent struggle for the soul and survival of Islam, set to continue until the "end of days" when Islam will emerge victorious. Ex. 149, Nakhleh Rpt. ¶ 31. Wahhabis believe jihad must be done by every possible means, from the pen to the sword and with money from their pockets. Ex. 149, Nakhleh Rpt. ¶ 34. Salafi Wahhabi clerics – almost exclusively members of the religious establishment of Saudi Arabia – have long preached that violent jihad is the *only* recourse available to Muslims if they are to prevail in their existential struggle with the "enemies" of Islam. Ex. 149, Nakhleh Rpt. ¶ 35. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. <br><br> At his deposition, Nakhleh retreated from his opinions about Saudi religion set out in his report and repeated in this paragraph. <br><br> He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. <br><br> Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 20. | During the 20th Century, there was a doctrinal evolution in Wahhabism toward violent extremism inspired, at least in part, by the influence of foreign radical thinkers, whom the Saudi religious establishment embraced and came to regard as their own. Ex. 149, Nakhleh Rpt. ¶ 36. The most prominent of those thinkers, Egyptian Sayyid Qutb, represented the radical | The opinions in Plaintiffs Exhibit 149 (Nakhleh Rep.), which this paragraph repeats verbatim, should be excluded. *See* Objections Chart. <br><br> It is incorrect that the "Saudi religious establishment embraced" violent extremism. At his deposition, Nakhleh retreated from his opinions about Saudi religion set out in his report. <br><br> He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | extreme of the Muslim Brotherhood. Ex. 149, Nakhleh Rpt. ¶ 37. Sayyid Qutb ultimately had a totemic bearing on Wahhabi jihadist thinking. Ex. 149, Nakhleh Rpt. ¶ 37. Sayyid Qutb's works of the 1950s and 1960s promoted violent jihad against the "far enemy" and "infidel" nations such as the United States, France, Britain, and Israel. Ex. 149, Nakhleh Rpt. ¶ 37. After Sayyid Qutb was arrested and executed in Egypt in 1966, his brother Mohamed Qutb took up residence in Saudi Arabia, where he was warmly welcomed and given a position as a professor at a leading Saudi state university. Ex. 149, Nakhleh Rpt. ¶ 40. With Saudi government assistance, Mohamed Qutb was able to get his brother's books published and widely circulated. Ex. 149, Nakhleh Rpt. ¶¶ 36-40. | KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. <br><br> Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). <br><br> Nakhleh is incorrect that Sayyid Qutb was embraced by the Saudi religious establishment. As Saudi Arabia's expert David Rundell has explained, Qutb's method of reinterpreting the Quran was utterly unacceptable to the Saudi *ulema* and appalled the Saudi Grand Mufti. KSA Ex. 166 (Rundell Rep.) 16 & n.38. <br><br> Nakhleh further testified at his deposition that Sayyid Qutb believed that "the near enemy consisted of Muslim leaders whose behavior in their view was un-Islamic" and that when that occurred "his killing would be justified." KSA Ex. 165 (Nakhleh Tr.) 61:7-62:7. Nakhleh testified that bin Laden adopted that view of the Saudi government and the King of Saudi Arabia, and that, from 1994 to 2001, bin Laden criticized the Saudi Royal family and called for the King's removal from power. *Id.* at 61:7-19. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Nakhleh further acknowledged that the Muslim Brotherhood is illegal in Saudi Arabia, and has been illegal for decades, including before 9/11. *Id.* at 193:1-10. |
| 21. | Syrian Muhammad Surur built on Sayyid Qutb's legacy by advocating for the military-style organizational framework used by the Muslim Brotherhood to provide the political means to carry out jihad against the enemies of Islam. Ex. 149, Nakhleh Rpt. ¶¶ 41-42. Like Mohamed Qutb, Surur was given a prominent platform by Saudi Arabia as a university professor in Mecca. Ex. 149, Nakhleh Rpt. ¶ 41. Surur helped transition Wahhabi ideology out of quietism into bold activism. This extremist ideology in Saudi Arabia in the early 1990s was referred to as "Sururi-Qutbi Wahhabism." Ex. 149, Nakhleh Rpt. ¶¶ 41-43. | The opinions in Plaintiffs Exhibit 149 (Nakhleh Rep.), which this paragraph repeats, should be excluded. *See* Objections Chart.<br><br>It is incorrect that the "Saudi religious establishment embraced" violent extremism. At his deposition, Nakhleh retreated from his opinions about Saudi religion set out in his report.<br><br>He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").<br><br>Nakhleh further acknowledged that the Muslim Brotherhood is illegal in Saudi Arabia, and has been illegal for decades, including before 9/11. KSA Ex. 165 (Nakhleh Tr.) 193:1-10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Surur was not given a platform in Saudi Arabia or embraced by the Saudi *ulema*. He was actually expelled from Saudi Arabia because the Saudi *ulema* rejected his preaching, which it considered to be "radical." KSA Ex. 166 (Rundell Rep.) 42; KSA Ex. 165 (Nakhleh Tr.) 192:2-8.<br><br>The Islam practiced in Saudi Arabia is not referred to as "Sururi-Qutbi Wahhabism." That is *ipse dixit* in Nakhleh's report that is not supported by any citation. Pls. Ex. 149 (Nakhleh Rep.) ¶¶ 41-43. |
| 22. | The prevalence and acceptance by Saudi government of Wahhabi extremism is demonstrated by the violent jihadist literature widely distributed by Saudi Arabia inside and outside the Kingdom prior to the 9/11 Attacks. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this *ipse dixit* assertion is not supported by citation to any record evidence. |
| 23. | As a first example, Saudi government standard student textbooks from grade school through college (approved by the Ministry of Islamic Affairs ("MOIA")) included radical and violent Wahhabi jihadi doctrine. Ex. 149, Nakhleh Rpt. ¶¶ 55-60. Even when the U.S. government complained to Saudi Arabia about the textbooks after the 9/11 Attacks, Saudi Arabia refused to remove the violent jihadist material for at least a decade. Ex. 149, Nakhleh Rpt. ¶¶ 55-60; Ex. 2, EO 3604 (FBI cites CIA findings that Saudi | The opinions in Plaintiffs Exhibit 149 (Nakhleh Rep.), which this paragraph repeats, should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) incorrectly states Saudi student textbooks include "radical and violent Wahhabi jihadi doctrine." The report fails to cite any examples.<br><br>At his deposition, Nakhleh retreated from his opinions about Saudi religion set out in his report. He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | government texts contain doctrine which "jihadists often advocate" which "teach hatred" and "promotes hostility toward non-Muslims"). | violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").<br><br>Plaintiffs Exhibit 2NN (EO 3604) is inadmissible hearsay. *See* Objections Chart. It states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479) (emphasis added). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| 24. | As a second example, the Saudi government published violent jihadist materials used in the Kingdom's worldwide *da'wa* propagation efforts. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ recovered a copy of a pamphlet called "THE BOOK OF (Jihad)" published in 1997-1998 by the "Kingdom of Saudi Arabia – Islamic Guidance Center" under | Plaintiffs incorrectly assert that the Saudi government published violent jihadist materials.<br><br>The cited pamphlet states that it was published by the "Islamic Guidance Center." Pls. Ex. 528 (FBI 4139). There is no support for the assertion that it was used in the "Kingdom's worldwide da'wa propagation efforts."<br><br>With respect to this pamphlet, Al Bayoumi testified that "[t]here are some documents that would get posted on a message board on the mosque. Anybody can come and post whatever document or whatever paper that |

REDACTED FOR PUBLIC FILING

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Ministry of Islamic Affairs. Ex. 528, FBI 004139-45. The pamphlet is in English and is "FOREIGNERS GUIDANCE" to carry out violent jihad of war against all non-believers, including suicide missions. It described the preferred type of jihad when "[s]truggling against the people of injustice, innovation, and evil doers. This type of *Jihad* is best done through force if possible…." Ex. 528, FBI 004139-45 at 4144. "As for Jews, Christians and Magians, they have three choices: embrace Islam, pay the *jizya* or the war." Ex. 528, FBI 004139-45 at 4145. The Saudi pamphlet describes how a man who dies fighting for jihad is considered a martyr who will find his place in "the Jannah" (heaven), be given a wife "from the *Hoor al*-Een" (maidens of paradise) and receive other rewards. Ex. 528, FBI 004139-45 at 4145. | they put, and then at the masjid we don't necessarily allow that. So if there something that does not align with us, I will take it off and I will keep it in a file for it to be destroyed later on. . . . I do not keep it on the wall, anything that pertains to violence, theft, guns. We do not support [that]. . . . This is one of many documents that we had and this was not a document that came from the embassy. The sole stuff that came from the embassy was the Quran, religion books that pertained to doctrine." Pls. Ex. 120 (Bayoumi Tr.) 307:1-308:4.<br><br>It should also be noted that *The Book of Jihad* does not advocate Al Qaeda's view of jihad. It states that "jihad" is a collective duty, sanctioned by the head of state. Pls. Ex. 528, at 4 (FBI 4143). Al Qaeda, by contrast, preaches that "jihad" is an individual duty as argued by Abdullah Azzam in his pamphlet, *Defense of Muslim Lands*. *The Book of Jihad* further prohibits participants in jihad from "killing women or children who do not take part in the fight." *Id.* at 6 (FBI 4145). It thus rejects any form of terrorism. Plaintiffs' attempt to equate any use of the term jihad with terrorism is baseless. |
| 25. | As a third example, a 1995 official publication of the MOIA found at the King Fahad Mosque in Los Angeles after the 9/11 Attacks contains a sermon of Saudi Sheikh bin al- Uthaymeen preaching the policy that all non-Muslims should be put to death:<br><br>    "[O]ur doctrine states that if you    accept any religion other than Islam, | The cited document is not attached as an exhibit. Plaintiffs instead cite to Plaintiffs Exhibit 149 (Nakhleh Rep.), which should be excluded. *See* Objections Chart.<br><br>Plaintiffs incorrectly suggest that Sheikh bin al-Uthaymeen advocated violence. Plaintiffs' purported expert Meleagrou-Hitchens states in his book *Incitement* that the quitest strand of Salafism, which did not advocate violence and whose "main practice" is of a "peaceful Da'wah," |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | like Judaism or Christianity, which are not acceptable, you become an unbeliever. If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an." <br><br> Ex. 149, Nakhleh Rpt. ¶ 188. | is "most closely associated" with al-Uthaymeen.  Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:12-62:8, 70:21-72:1. |
| 26. | Further, prior to 9/11, the version of the Qur'an published by Saudi Arabia and distributed by the Kingdom inside the U.S. included annotations which described jihad in a warlike, violent manner and advocated violent jihad against non-believers.  Ex. 72, Madha Decl., Ex. 1 at 3 (annotation in footnote 1 describes jihad as "holy fighting…with full force of numbers and weaponry" as of "the utmost importance in Islam"). | The cited document does not not advocate "violent jihad against non-believers," nor does Saudi Arabia advocate any form of terrorism. <br><br> As David Rundell states, "the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and very specifically those that involve suicide."  KSA Ex. 166 (Rundell Rep.) 43. <br><br> Nakhleh acknowledged at his deposition that experts in Hanbali Salafism divide its adherents into three groups:  quietists, activists (or political Salafists), and jihadists.  KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs).  He conceded that Salafi quietists "do not . . . support violent jihad."  *Id.* at 137:18-138:4.  He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. <br><br> Plaintiffs' purported expert Meleagrou-Hitchens agrees.  Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

Plaintiffs also selectively quote Exhibit 72. The cited portion is in a footnote attached to text stating in full: "And fight in the Way of Allah, *those who fight you*, but transgress not the limits. *Truly, Allah likes not the transgressors*." Pls. Ex. 72 (Madha Decl.) Ex. 1 at 3-4 (emphasis added). |
| 27. | In 1998, Osama Bin Laden issued a fatwah stating that to "…kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it … kill the Americans and plunder their money wherever and whenever they find it." Ex. 3, 1998 fatwah by Osama bin Laden, "Declaration of the World Islamic Front for Jihad Against the Jews and Crusaders," Foreign Broadcast Information Services Report, Compilation of Usama Bin Ladin Statements 1994– January 2004 ("FBIS Rpt.") 58. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, it is undisputed that bin Laden issued this fatwa. |
| 28. | An elite group of religious leaders constituted a core group within the government of Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶ 46. Saudi Arabia has a *de facto* power sharing arrangement between its political leaders — the al Saud royal family, led by the King — and the Kingdom's *'ulama* of Wahhabi religious | The cited paragraphs of Plaintiffs Exhibit 149 (Nakhleh Rep.) do not support the notion that an "elite group of religious leaders constituted a core group within the government of Saudi Arabia." Paragraphs 44-46 of the Nakhleh Report do not cite any support for Nakhleh's *ipse dixit* assertions.

The paragraph of Plaintiffs Exhibit 150A (Kohlmann Rep.) does not relate to the statements made in this Averment Paragraph. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | scholars, also known as its Council of Senior Scholars, led by the Ash-Shaikh family. Ex. 149, Nakhleh Rpt. ¶ 46. The Ash-Shaikh are the keepers of the Wahhabi faith and act as the moral guides and guardians of the Saudi state and society, domestically and globally. Ex. 149, Nakhleh Rpt. ¶ 46. They have led the *'ulama* class and dominated the religious (Islamic) institutions of the Kingdom. Throughout its history the Saudi royal family based its very legitimacy to govern on edicts of the Kingdom's religious leaders, and there was a longstanding interdependence between the political and religious leadership of Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶¶ 44-46, Ex. 150A, Kohlmann 2022 Rpt. ¶ 23. | Both the Nakhleh and the Kohlmann Reports should be excluded. *See* Objections Chart.<br><br>The head of state of Saudi Arabia is the King, and the head of government is the Prime Minister. The Council of Senior Scholars functions as "something of a Supreme Court issuing decisions on public matters such as organ transplants, abortion and girls' education." KSA Ex. 166 (Rundell Rep.) 8. As Saudi Arabia's expert David Rundell has explained, the *ulema* constitute "junior partners in the political establishment." *Id.* |
| 29. | The very legitimacy of the monarchy rests on an alliance between the Saudi royal family and the *'ulama*, who serve as consultants. Ex. 149, Nakhleh Rpt. ¶ 44. The monarchy has institutionalized religious organizations within the state power structure. Ex. 149, Nakhleh Rpt. ¶ 49. The most powerful religious body is the state-funded Council of Senior Scholars, which provides religious approval for policies determined by the government. Ex. 149, Nakhleh Rpt. ¶ 47-48 (citing EO 3413- | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Nakhleh does not cite any support for the assertions made in paragraphs 44, 47, 48, or 49 of his report.<br><br>Plaintiffs Exhibit 316 purports to be an excerpt of the *Oxford Dictionary of Islam*. That excerpt is unrelated to the statements made in this paragraph.<br><br>Plaintiffs Exhibit 2OO (EO 3417), which Plaintiffs selectively excerpt, states: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud. Several concurrent factors have recently put pressure on the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 3442); Ex. 316, Oxford Dictionary of Islam (entry on "ulama"); Ex. 2, EO 3417 (the 2004 FBI/CIA Joint Assessment states that the Saudi royal family rely on Saudi religious leaders to "underwrite[] their legitimacy"). | Saudi royal family and strained its relationship with the *religious community*, which underwrites their legitimacy. Many Saudis perceived the royal family as increasingly corrupt, westernized, and less devoted to Islam. This is due in part to the presence of Western military, particularly American forces, in the Kingdom with the blessing of the Al Sauds." Pls. Ex. 2OO (EO 3417) (emphasis added).<br><br>It also states the conclusions of the FBI and the CIA that "[a] review of intelligence over the past two years indicates that the Government of Saudi Arabia (GSA) was neither complicit in nor had foreknowledge of terrorist acts perpetrated by al-Qa'ida against the United States or other Western interests. Furthermore, no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida." *Id.*<br><br>The Council of Senior Scholars functions as "something of a Supreme Court issuing decisions on public matters such as organ transplants, abortion and girls' education." KSA Ex. 166 (Rundell Rep.) 8. As Saudi Arabia's expert David Rundell has explained, the *ulema* constitute "junior partners in the political establishment." *Id.* |
| 30. | Saudi Arabia's religious leaders (including its Ministry of Islamic Affairs) are not "quietist" or peaceful in their religious beliefs, despite Saudi Arabia's highly misleading and incorrect assertions. KSA Aver. ¶¶ 5-7. The Saudi *'ulama* promoted the radical teachings of Sayyid Qutb and Muhammad Surur with a bolder more active philosophy. Ex. 149, Nakhleh Rpt. ¶¶ 37-43. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited paragraphs of Plaintiffs Exhibit 149 (Nakhleh Rep.) do not support these statements.<br><br>The Nakhleh report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | At his deposition, Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups  quietists, activists (or political Salafists), and jihadists.  KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs).  He conceded that Salafi quietists "do not . . . support violent jihad."  *Id.* at 137:18-138:4.  He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz.  *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees.  Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 31. | This extremist ideology in Saudi Arabia in the early 1990s was referred to as "Sururi-Qutbi Wahhabism."  Ex. 149, Nakhleh Rpt. ¶ 42. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded.  *See* Objections Chart.  The Nakhleh report also fails to cite any authority for the assertions made in paragraph 42 of his report that the ideology in Saudi Arabia is referred to as "Sururi-Qutbi Wahhabism." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | At his deposition, Nakhleh acknowledged that Saudi Arabia practices Hanbali Salafism. He further acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. |
| | | Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 32. | Wahhabi Islam as practiced by Saudi Arabia's religious elite includes violent jihad against non-believers as one of its foundational tenets, as demonstrated by numerous examples. Ex. 149, Nakhleh Rpt. ¶¶ 55-61; 188 (describing Saudi government publications defining Islam); Ex. 528, FBI 004139-45 ("Book of Jihad" collected from Omar Al Bayoumi's office, discussed at *infra* ¶¶ 890**,** 1276, 1333.) | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. |
| | | At his deposition, Nakhleh acknowledged that Saudi Arabia practices Hanbali Salafism. He further acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.

Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

With respect to Plaintiffs Exhibit 528, Al Bayoumi testified that "[t]here are some documents that would get posted on a message board on the mosque. Anybody can come and post whatever document or whatever paper that they put, and then at the masjid we don't necessarily allow that. So if there something that does not align with us, I will take it off and I will keep it in a file for it to be destroyed later on. . . . I do not keep it on the wall, anything that pertains to violence, theft, guns. We do not support [that]. . . . This is one of many documents that we had and this was not a document that came from the embassy. The sole stuff that came from the embassy was the Quran, religion books that pertained to doctrine." Pls. Ex. 120 (Bayoumi Tr.) 307:1-308:4.

It should also be noted that *The Book of Jihad* does not advocate Al Qaeda's view of jihad. It states that "jihad" is a collective duty, sanctioned by the head of state. Pls. Ex. 528, at 4 (FBI 4143). Al Qaeda, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | by contrast, preaches that "jihad" is an individual duty as argued by Abdullah Azzam in his pamphlet, *Defense of Muslim Lands*. *The Book of Jihad* further prohibits participants in jihad from "killing women or children who do not take part in the fight." *Id.* at 6 (FBI 4145). It thus rejects any form of terrorism. Plaintiffs' attempt to equate any use of the term jihad with terrorism is baseless. |
| 33. | Contrary to Saudi Arabia's incorrect assertions, KSA Aver. at ¶¶ 5-6, Plaintiffs' experts adopted the use of the term "quietist" as defining the *political stance* of showing deference to the King inside Saudi Arabia, and not as the *religious* views of the Wahhabists. Ex. 149, Nakhleh Rpt. ¶ 42 ("Surur…transitioned Wahhabi ideology out of quietism and into bold activism."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Plaintiffs' experts did not use the term "quietist" to define a political stance. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

Nakhleh retreated from his opinions about Saudi religion set out in his report. He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. |
| 34. | Receiving funding and diplomatic support overseas, Wahhabist religious leaders employed by the Saudi government were permitted and encouraged to promote their violent views in foreign countries through the Saudi embassies via the MOIA that served to quell overt criticism of the Saudi monarchy inside the Kingdom. Ex. 149, Nakhleh Rpt. ¶¶ 89-98; Ex. 102, Meleagrou-Hitchens Dep. 93:5-93:16 (while the Saudi religious establishment did not officially and openly advocate for the jihadism practiced by Osama Bin Laden, there are "examples of [the] Saudi religious establishment encouraging or helping disseminate works in the West that do come much closer to supporting violence against non-Muslims in Western countries."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. The cited paragraphs of the Nakhleh report also do not support the assertions in this paragraph.

Plaintiffs Exhibit 147 (Meleagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.

Nakhleh retreated from his opinions about Saudi religion set out in his report. He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.

Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").<br><br>The senior religious scholars of Saudi Arabia, including the Council of Senior Scholars and the Grand Mufti have a long and consistent record of condemning acts of terrorism that precedes the 9/11 attacks. *See* KSA Ex. 166 (Rundell Rep.) 43. |
| 35. | The term Saudi/Wahhabi or Sunni extremism is defined by the FBI (and herein) as an ideology to carry out terror attacks to advance a goal of establishing an Islamic caliphate over the entire world. Ex. 105, Youssef Dep. at 281:6-16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Youssef's opinions should be excluded. *See* Objections Chart. The cited portion of the Youssef transcript also does not support the assertions in this paragraph.<br><br>The FBI has never defined the religion practiced in Saudi Arabia as "an ideology to carry out terror attacks." Youssef is not qualified to make such a statement, on behalf of the FBI or otherwise. The FBI has asserted that as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>To the contrary, Saudi Arabia and the United States are longstanding allies and strategic partners, including in the fight against terrorism. *See* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40. <br><br> As Saudi Arabia's expert David Rundell states, "the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and very specifically those that involve suicide."  KSA Ex. 166 (Rundell Rep.) 43. |
| I.B. | **The creation of the Saudi Ministry of Islamic Affairs in 1993 allowed the Saudi government's religious elite to promote Wahhabi Islam overseas, in an attempt to keep peace inside the Saudi homeland.** | This assertion is unsupported by record evidence. |
| 36. | The presence of U.S. and other foreign troops inside Saudi Arabia to fight the Gulf War against Iraq at the invitation of the | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi King had spurned a movement among the Saudi religious leaders known as *al-Sahwa al-Islamiyya*, the Islamic Awakening. Ex. 149, Nakhleh Rpt. ¶¶ 67-88. | The presence of U.S. troops in Saudi Arabia to fight the Gulf War did not spurn "a movement among the Saudi religious leaders." Instead, the *Sahwah* was led by Muslim Brotherhood sympathizers and its leaders were jailed. KSA Ex. 166 (Rundell Rep.) 25; KSA Ex. 167 (Sageman Rep.) 78. |
| 37. | The *al-Sawha* movement led in July 1992 to the Memorandum of Advice (*Muthakkarat al-Nasiha*) signed by 107 Saudi clerics, religious activists, and intellectuals and delivered to the Saudi King. The Memorandum contained a series of demands which sought, *inter alia*, to strengthen the role of religious leaders and institutions inside Saudi Arabia and take steps to promote the propagation of Wahhabi Islam overseas through Saudi Embassies and Consulates and Islamic "charities". Ex. 149, Nakhleh Rpt. ¶¶ 67-69, 88-98. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>It is undisputed that the memorandum of advice did contain a series of demands. |
| 38. | The *al-Sahwa* and the Memorandum of Advice demonstrated that Saudi religious leaders had a radical agenda of intolerance and hostility toward the United States. Ex. 149, Nakhleh Rpt. ¶¶ 70-73. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>The *Sahwah* movement was not led by "Saudi religious leader." Instead, it was led by Muslim Brotherhood sympathizers and its leaders were jailed. KSA Ex. 166 (Rundell Rep.) 25; KSA Ex. 167 (Sageman Rep.) 78. |
| 39. | The *al-Sawha* movement exposed a significant rift among the political and religious leaders of Saudi Arabia. Ex. 149, | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Nakhleh Rpt. ¶ 101. It reflected the anger against the King because of the presence of U.S. soldiers in Saudi Arabia because of the Gulf War. Ex. 149, Nakhleh Rpt. ¶ 101. | Paragraph 101 of the Nakhleh report does not discuss the *Sahwah* movement or discuss any political rift among political and religious leaders.<br><br>The *Sahwah* movement was in fact led by Muslim Brotherhood sympathizers, not the Saudi religious leaders. Its leaders were eventually jailed. KSA Ex. 166 (Rundell Rep.) 25; KSA Ex. 167 (Sageman Rep.) 78.<br><br>Undisputed that Saudi Arabia allowed the United States to station its military within Saudi Arabia during the Gulf War, which demonstrates that Saudi Arabia and the United States have been longstanding allies. |
| 40. | King Fahd needed to grant some concessions to the religious leaders, given the breadth and potency of *al-Sahwa*. Ex. 149, Nakhleh Rpt. ¶ 93. King Fahd acquiesced to their demands to enhance and fund *da'wa outside* the Kingdom and accepted the radical agenda of the religious establishment to expand the promotion of Wahhabi Islam outside of the Kingdom — with a particular focus on Muslim-minority countries, led by the United States. Ex. 149, Nakhleh Rpt. ¶¶ 89-94. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Nakhleh does not cite anything to support the assertions repeated in this paragraph.<br><br>King Fahd did not make "concessions" in response to the *Sahwah* Movement. That movement was led by Muslim Brotherhood sympathizers and its leaders were jailed. KSA Ex. 166 (Rundell Rep.) 25; KSA Ex. 167 (Sageman Rep.) 78. Following the *Sahwah* Movement, the King took control over leadership appointments at universities, where the *Sahwah* Movement had been prevelent. KSA Ex. 167 (Sageman Rep.) 80.<br><br>On July 10, 1993, the King created the Ministry of Islamic Affairs and appointed Sheikh Abdullah Al Turki as its first minister. Sheikh Al Turki had demonstrated his loyalty to the Royal family and reported directly to the King. The new ministry assumed control over mosques, vetting sermons and Saudi efforts to promote Islam overseas. Thus, as Saudi Arabia's expert David Rundell explains, "the Ministry of Islamic Affairs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family." KSA Ex. 166 (Rundell Rep.) 45; KSA Ex. 167 (Sageman Rep.) 80. |
| 41. | King Fahd then agreed to the creation of the Saudi Ministry of Islamic Affairs and *Waqf* (Islamic Endowment), *Da'wa* (Propagation), and *Irshad* (Guidance) in 1993 to quell an uprising among Saudi Arabia's governing religious leaders. Ex. 149, Nakhleh Rpt. ¶ 88. As part of this new Ministry, the King agreed to the clerics' plan for a massive expansion of the Saudi government's *da'wa* operations to promote Wahhabism worldwide. This included a new Ministry of Islamic Affairs Da'wa office at the Saudi Embassy in Washington D.C. Ex. 149, Nakhleh Rpt. ¶¶ 50, 81, 89—90. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Nakhleh does not cite anything to support the statements made in paragraphs 50, 81, 88, or 89-90 of his report.<br><br>The Ministy of Islamic Affairs was not created "to quell an uprising among Saudi Arabia's governing religious leaders" or as any concession to the Sahwah Movement. On July 10, 1993, the King created the Ministry of Islamic Affairs and appointed Sheikh Abdullah Al Turki as its first minister. Sheikh Al Turki had demonstrated his loyalty to the Royal family and reported directly to the King. The new ministry assumed control over mosques, vetting sermons and Saudi efforts to promote Islam overseas. Thus, as Rundell explains, the Ministry of Islamic Affairs "was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family." KSA Ex. 166 (Rundell Rep.) 45; KSA Ex. 167 (Sageman Rep.) 80.<br><br>There is no evidence that the Ministry of Islamic Affairs resulted in a "massive expansion of the Saudi government's da'wa operations."<br><br>The term "Wahhabism" is pejorative, as even Plaintiffs' expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12. To the extent Plaintiffs suggest that Saudi Arabia was spreading violent jihad, that is incorrect. As Nakhleh has acknowledged, King Fahd and others in "the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." *Id.* at 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 42. | The King's strategy in establishing the Ministry and giving it permission to propagate Wahhabism in foreign countries was made to protect the royal family from internal strife and export the risk of violent jihad outside of the Kingdom's borders. Ex. 149, Nakhleh Rpt. ¶ 94; Ex. 150A, Kohlmann 2022 Rpt. ¶ 23 ("Wahhabi / Salafi fundamentalists in the Kingdom were willing to focus their ire on external enemies so long as the royal family supported their causes.") | Plaintiffs Exhibit 149 (Nakhleh Rep.) and Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart. The cited paragraphs in both reports cite no authority in support of the assertions repeated in this paragraph. <br><br> The Ministy of Islamic Affairs was not created "to protect the royal family from internal strife and export the risk of violent jihad outside of the Kingdom's borders." <br><br> On July 10, 1993, the King created the Ministry of Islamic Affairs and appointed Sheikh Abdullah Al Turki as its first minister. Sheikh Al Turki had demonstrated his loyalty to the Royal family and reported directly to the King. The new ministry assumed control over mosques, vetting sermons and Saudi efforts to promote Islam overseas. Thus, as Rundell explains, the Ministry of Islamic Affairs "was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family." KSA Ex. 166 (Rundell Rep.) 45; KSA Ex. 167 (Sageman Rep.) 80. |
| 43. | The *da'wa* programs overseas were a powerful populist tool to promote the legitimacy of the Saudi royal family; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | advance its objective to be perceived as leader of the Islamic world; and win its ongoing religious and political competition against Shia Iran. Ex. 150A, Kohlmann 2022 Rpt. ¶ 23. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 150A (Kohlmann Rep.) should be excluded, as should Exhibit 2PP (EO 3487) which the Kohlmann report quotes. *See* Objections Chart.<br><br>To the extent a response is required, the portion of the Kohlmann report cited quotes from Plaintiffs Exhibit 2PP (EO 3487). That document did not make any conclusion. Rather, it states that a "purpose of this communication is to document investigations and supporting documentation regarding the Saudi (Wahhabi)/Salafi/militant network that was created, funded, directed and supported by the KSA and its affiliated organizations and diplomatic personnel within the U.S." Pls. Ex. 2PP (EO 3480).<br><br>The document states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| 44. | Saudi government official Khalil al Khalil testified that "particularly at that time, Iran was really a big issue to Saudi Arabia, and they were really preaching the Khomeinism. And Saudis were so concerned that they may have an influence on the Muslims of the United States, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | whether Arabs or not Arabs." Ex. 113, Khalil Dep. 24:10-25:8; Ex. 188, KFM 0376-78 at 77 (letter from the Ibn Taymiyah Foundation to Saudi Arabia's coordinator for the King Fahad Mosque project, stating that the Foundation "since its inception has being [sic] established in line with the Kingdom of Saudi Arabia politically and spiritually" and was "born out of our deep conviction of the Kingdom's sacred role as the leader in the Muslim world."). | To the extent a response is required, Al Khalil was not a Saudi government official at the time of his testimony. He last served as the Vice Director of Islamic Affairs in the Embassy of Saudi Arabia in Washington, D.C. in 1995 and as a faculty member for Imam Muhammad bin Saud Islamic Uniersity in 2005. *See* Pls. Ex. 187 (KFM 91). <br><br> Undisputed that the quoted language is in Al Khalil's deposition. <br><br> Plaintiffs Exhibit 188 (KFM 0376-78) is inadmissible hearsay. *See* Objections Chart. |
| 45. | Saudi Arabia's policy to allow MOIA to operate without restriction *outside* of Saudi Arabia is demonstrated by a February 1999 letter sent by the MOIA's Washington, D.C., Embassy Head Khalid Al Sowailem to MOIA Propagator in San Diego, Omar Abdi Mohamed ("Abdi Mohamed" aka Omar Al Khatib). Ex. 132, DOJ 0001-32 at 013-015. The letter spells out an "advisory" to MOIA Propagators, directing them not to solicit any donations *inside* Saudi Arabia without proper authority. Ex. 132, DOJ 0001-32 at 013-015. The letter states that "collecting funds inside the Kingdom of Saudi Arabia is subject to certain regulations that must be observed." Ex. 132, DOJ 0001-32 at 013. By contrast, *no* restrictions or safeguards were placed by | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Plaintiffs Exhibit 132 does not support the assertion in the first sentence that Saudi Arabia had a policy "to allow MOIA to operate without retriction *outside* of Saudi Arabia." That propagators were advised not to solicit donations inside Saudi Arabia without proper authority does not mean that there was a policy to allow MOIA to operate without restrictions outside of Saudi Arabia. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MOIA on fundraising activities inside the U.S., and MOIA propagators in the U.S. (including Abdi Mohamed himself) were actively involved in collecting funds for a variety of extremist groups. | |
| 46. | The February 1999 letter of Sowailem was not produced by Saudi Arabia (though the Kingdom was required to produce any and all records that pertained to propagators it employed in Southern California who were under the supervision of Fahd al Thumairy) — it was only obtained because the FBI raided the home of Abdi Mohamed and produced the letter to Plaintiffs. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia produced responsive non-privileged documents located after a reasonable search, including documents from the Embassy and the Los Angeles Consulate even though those documents were not discoverable under the Vienna Conventions. |
| 47. | Another example of Saudi Arabia exporting extremism to avoid trouble inside the Kingdom comes from the 2004 FBI/CIA Joint Assessment, which reports that "in some instances, extremists who are troublesome to the regime in the Kingdom but not involved in punishable offenses are sent overseas on proselytizing or education missions." Ex. 2, EO 3429. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited exhibit contains the quoted language, but the document does not indicate whether this was the case prior to the 9/11 attacks. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The document also states the final conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| I.C. | **Prior to 9/11 Attacks, the Saudi government's religious leadership supported Al Qaeda, and Saudi Arabia made an implicit or explicit agreement with Osama Bin Laden to allow Al Qaeda to operate overseas, so long as they did not conduct attacks inside the Kingdom.** | This assertion is not supported by any record vidence. |
| 48. | Around the same time that it created MOIA and authorized Saudi Arabia's religious leadership to propagate Wahhabism overseas, Saudi Arabia made a similar bargain with Osama bin Laden and Al Qaeda. The 2004 FBI/CIA Joint Assessment stated that prior to the 9/11 Attacks the Saudi Government was in a "precarious position" concerning Al Qaeda and Osama Bin Laden. Ex. 2, EO 3416. Bin Laden was powerfully advancing religious arguments citing Ibn Taymiyah and others as the basis for opposing the presence of "infidel" U.S. and other foreign troops inside the Kingdom. Ex. 3, Foreign Broadcast Information Service ("FBIS") Compilation of Bin Laden Statements at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The first assertion is not supported by any citation to record evidence. Saudi Arabia did not make any "bargain" with Osama bin Laden or Al Qaeda.<br><br>Instead, during the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); KSA Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | 111 (PDF page 123) ("Muslim scholars of the world and Saudi Arabia have issued a fatwa [religious decree] for a Jihad against these forces that have dared to occupy our sacred places. The Holy Prophet, peace be upon him, said that infidels should be ousted from the Arab lands.") | Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 166 (Rundell Rep.) 26-30.

Plaintiffs' purported experts agree. *See* KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat).

Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks. In April 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets. KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11.

In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia. KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8.

In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Arabian Peninsula" and criticized the Saudi government: "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . . While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy. So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified"). <br><br> In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution. KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Al Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14. <br><br> The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course. In response, Saudi Arabia terminated diplomatic relations with the Taliban. KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3. <br><br> During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind"). |
| 49. | The 2004 FBI/CIA Joint Assessment found that while "on the one hand it [Saudi Arabia] was denouncing al-Qa'ida as a threat, yet on the other hand it was underestimating al-Qa'ida's vitality within the Kingdom and treating the group with special consideration." Ex. 2, EO 3416. The Assessment goes on to explain that the Saudi government's "primary course of action to counter al-Qa'ida prior to 11 September was to co-opt or coerce extremists in an effort to bring them into the fold, possibly with an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil." Ex. 2, EO 3417. The Joint Assessment cites reporting that Osama Bin Laden banned Al Qaeda operatives from carrying out proposed terror attacks inside Saudi Arabia prior to 9/11. Ex. 2, EO 3417. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document cited contains the quoted language. *See* Response to Pls. Aver. ¶ 48.<br><br>With respect to the last sentence, in January 1998, Saudi security forces intercepted at the Yemeni-Saudi border several Islamist militants attempting "to smuggle four Russian-made antitank missiles into Saudi Arabia," an attempt that the 9/11 Commission linked to Al Qaeda. KSA Ex. 163 (9/11 Rep.) 152; *see also id.* at 115 (describing what appears to be the same incident as "the Saudi government . . . quietly disrupt[ing] Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles"); KSA Ex. 167 (Sageman Rep.) 104-05 (discussing the smuggling attempt and a resulting "major crackdown" by "Saudi security forces"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited exhibit also contains the final conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 50. | Plaintiffs' expert Steve Simon similarly explained how in the years before the 9/11 Attacks Saudi Arabia and the U.S. had a "serious disagreement" over strategy regarding Al Qaeda and bin Laden. Ex. 127, Simon Dep. 37:8-18. Saudi Arabia decided "to keep bin Laden away from the kingdom and enter into an implicit – or as the FBI says, explicit or implicit, they weren't sure – bargain with Al-Qaeda and bin Laden such that the Saudis would not go after them if they did not go after the royal house of Saudi Arabia." Ex. 127, Simon Dep. 37:19-38:8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The opinion that Simon expressed in his deposition was not disclosed in his expert report and is inadmissible.<br><br>The statements in this paragraph are incorrect. During the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); KSA Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 166 (Rundell Rep.) 26-30; KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks.  In April 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets.  KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11. <br><br> In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia.  KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8. <br><br> In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the Arabian Peninsula" and criticized the Saudi Government:  "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . .  While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy.  So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "the near enemy" and of the King as a purported "apostate" whose "killing would be justified").<br><br>In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution.  KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Al Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14.<br><br>The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course.  In response, Saudi Arabia terminated diplomatic relations with the Taliban.  KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3.<br><br>During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia.  *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 51. | Saudi Arabia faced an internal threat from Bin Laden "that entailed keeping bin Laden out of the kingdom, and that entailed a certain tolerance for the activities of Al-Qaeda. And it was important for its other external interests to keep that side of things under wraps and undisclosed from the United States." Ex. 127, Simon Dep. 40:8-41:5. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The opinion that Simon expressed in his deposition was not disclosed in his expert report and is inadmissible.<br><br>The assertions in this paragraph are incorrect. During the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); KSA Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 166 (Rundell Rep.) 26-30; KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat).<br><br>Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks. In April 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets. KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11. |
| | | In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia. KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8. |
| | | In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the Arabian Peninsula" and criticized the Saudi government: "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . . While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy. So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified"). |
| | | In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution. KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Al Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14.

The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course. In response, Saudi Arabia terminated diplomatic relations with the Taliban. KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3.

During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind"). |
| 52. | Saudi Arabia's position was that of "Dr. Jekyll and Mr. Hyde": while it presented itself to the U.S. as an ally, Saudi Arabia appeased the religious extremists and allowed MOIA to export its virulently anti- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | American and pro-jihadist agenda inside the U.S. Ex. 149, Nakhleh Rpt. ¶¶ 144-45. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Nakhleh's statements are incorrect. Saudi Arabia and the United States are longstanding allies and strategic partners. *See* KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; Saudi Arabia's status as "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40.<br><br>Several individuals who Plaintiffs have proffered as experts, including Nakhleh, described Saudi Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See* KSA Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls," *in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed., 2009)) at 74 (describing Saudi Arabia as "pro-Western"); KSA Ex. 11 (Emile Nakhleh, Iran and the Middle East |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Amid Shifting Alliances) at 2 (describing the United States and Saudi Arabia as "allies"); KSA Ex. 12 (Simon Ex. 4) at 2 (describing Saudi Arabia as a "staunch" ally of the United States); *see also* KSA Ex. 165 (Nakhleh Tr.) 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States"). <br><br> Saudi Arabia did not "appease" religious extremists nor did it "export . . . virulently anti-American and pro-jihadist agenda inside the U.S." <br><br> As Nakhleh has acknowledged, King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). <br><br> Moreover, King Fahd created the Ministry of Islamic Affairs and appointed Sheikh Abdullah Al Turki as its first minister. Sheikh Al Turki had demonstrated his loyalty to the Royal family and reported directly to the King. The new ministry assumed control over mosques, vetting sermons and Saudi efforts to promote Islam overseas. Thus, as Rundell explains, the Ministry of Islamic Affairs "was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family." KSA Ex. 166 (Rundell Rep.) 45; KSA Ex. 167 (Sageman Rep.) 80. The Ministry of Islamic Affairs did not espouse any anti-American or pro-jihadist agenda. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 53. | In the decade prior to the 9/11 Attacks there was a marked convergence of views between Osama bin Ladin and Saudi religious authorities, including senior *'ulama*, regarding the waging of jihad against the United States. Ex. 149, Nakhleh Rpt. ¶ 130. Bin Ladin's views against the presence of the U.S. military on Saudi territory were consistent with the Hanbali-Ibn Taymiyah-Wahhabi doctrine of jihad and were widely shared among the senior religious leadership of Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶¶ 117 - 118. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.

Nakhleh does not cite any support for the assertions made in paragraphs 117, 118, or 130 of his report.

Osama bin Laden and senior ulama in Saudi Arabia did not share the same views. As Nakhleh has acknowledged, King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

During the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); KSA Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment: "The Kingdom of Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 166 (Rundell Rep.) 26-30; KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat).<br><br>Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks. In April 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets. KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11.<br><br>In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia. KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8.<br><br>In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Arabian Peninsula" and criticized the Saudi government: "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . . While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy. So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified"). <br><br> In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution. KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Al Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14. <br><br> The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course. In response, Saudi Arabia terminated diplomatic relations with the Taliban. KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3. <br><br> During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind"). |
| 54. | Osama Bin Ladin drew on the "long tradition of extreme intolerance" within one stream of minority-tradition Islam, from Ibn Taimiyyah, through the founders of Wahhabism and the Muslim Brotherhood, to Sayyid Qutb. Ex. 149, Nakhleh Rpt. ¶ 121 (quoting the findings of the 9/11 Commission); *See* 9/11 Commission Report at 362. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at .<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Saudi Arabia acknowledges that paragraph 121 of the Nakhleh report quotes the 9/11 Commission Report. That report also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 55. | Bin Ladin presented his obligatory jihad as a continuation of Ibn Taymiyya's definition and practice of jihad, saying that Islam was under attack and that the response must be by waging jihad, by all your means. Ex. 149, Nakhleh Rpt. ¶ 117; Ex. 2, EO 3417 (the "presence of Western military, particularly American forces" was a factor | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at . |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | which "strained" the relationship between the Saudi royal family and Saudi religious community). | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Nakhleh is incorrect that bin Laden's ideology was an extension of Ibn Taymiyyah's. Ibn Taymiyyah's discussed specifically what is permissible in armed combat with non-Muslims. Among other things, he forbade attacks on civilians and destruction of property. KSA Ex. 166 (Rundell Rep.) 6. Bin Laden's global jihadism, by contrast, called for terrorist attacks on civilians and property. Moreover, bin Laden's call for political violence was more in line with the ideology of Sayyid Qutb, Abdullah Azzam, and Ayman Zawahiri. *Id.* at 27. |
| 56. | Prior to the 9/11 Attacks, this view of the United States as an "enemy" of Islam and the religious requirement to do jihad against America was at the time prevalent and widely accepted in Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶ 136. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at .<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Moreover, Nakhleh cites nothing for this *ipse dixit* statement.<br><br>Saudi Arabia and the United States are longstanding allies and strategic partners. *See* KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40.<br><br>Several individuals who Plaintiffs have proffered as experts, including Nakhleh, described Saudi Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See* KSA Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls," *in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed., 2009)) at 74 (describing Saudi Arabia as "pro-Western"); KSA Ex. 11 (Emile Nakhleh, Iran and the Middle East Amid Shifting Alliances) at 2 (describing the United States and Saudi Arabia as "allies"); KSA Ex. 12 (Simon Ex. 4) at 2 (describing Saudi Arabia as a "staunch" ally of the United States); *see also* KSA Ex. 165 (Nakhleh Tr.) 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States").<br><br>Nakhleh has also acknowledged that King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 57. | Many Saudi officials at the MOIA and graduates of the government-run Imam Mohamed Ibn Saud Islamic University ("Imam Mohamed University") believed in bin Laden's cause of jihad and in helping jihadists carry out violent and "spectacular" attacks against the American symbols of power. Ex. 149, Nakhleh Rpt. ¶ 119. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Nakhleh also fails to cite any support for the *ipse dixit* statement repeated in this paragraph.

It is incorrect that "[m]any Saudi officials at the MOIA and graduates of . . . Imam Mohamed Ibn Saud Islamic University . . . believed in bin Laden's cause of jihad . . . ."

Saudi Arabia and the United States are longstanding allies and strategic partners. *See* KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40.

Several individuals who Plaintiffs have proffered as experts, including Nakhleh, described Saudi Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See* KSA Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls," *in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed., 2009)) at 74 (describing Saudi Arabia as "pro-Western"); KSA Ex. 11 (Emile Nakhleh, Iran and the Middle East Amid Shifting Alliances) at 2 (describing the United States and Saudi Arabia as "allies"); KSA Ex. 12 (Simon Ex. 4) at 2 (describing Saudi Arabia as a "staunch" ally of the United States); *see also* KSA Ex. 165 (Nakhleh Tr.) 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States").

As Nakhleh has also acknowledged, King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 58. | Many *'ulama* had animosity against the United States and shared bin Laden's views that the presence of U.S. troops in Saudi Arabia gave territory to a crusader infidel force and was an "insult" to the sanctity of the state and Islam that warranted the waging of jihad in response. Ex. 149, Nakhleh Rpt. ¶¶ 129, 132. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Nakhleh also fails to cite anything in support of the *ipse dixit* statements repeated in this paragraph.<br><br>The statements in this paragarph are incorrect. Saudi Arabia and the United States are longstanding allies and strategic partners. *See* KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Several individuals who Plaintiffs have proffered as experts, including Nakhleh, described Saudi Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See* KSA Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls," *in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed., 2009)) at 74 (describing Saudi Arabia as "pro-Western"); KSA Ex. 11 (Emile Nakhleh, Iran and the Middle East Amid Shifting Alliances) at 2 (describing the United States and Saudi Arabia as "allies"); KSA Ex. 12 (Simon Ex. 4) at 2 (describing Saudi Arabia as a "staunch" ally of the United States); *see also* KSA Ex. 165 (Nakhleh Tr.) 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States"). <br><br> As Nakhleh has also acknowledged, King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| **I.D.** | **Saudi government-run Imam Mohamed University educated and employed many of the elite group of MOIA officials deployed into the U.S. and three 9/11 hijackers.** | It is undisputed that certain MOIA employees and three of the 9/11 hijackers attended Imam Mohamed University. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 59. | Imam Mohamed University was operated by Saudi Arabia under the Saudi Ministry of Higher Education. Ex. 294, KSA 7795 (Muhammad bin Saud al Salem, Chancellor of Imam Mohamed University, was empowered to stipulate the extension of Jarrah's work in the Islamic Affairs Department of the Embassy in Washington, D.C.). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited document does not support the assertion that Imam University was "operated by Saudi Arabia under the Saudi Ministry of Higher Education." |
| 60. | Imam Mohamed University was based in Riyadh and had a branch in Buraidah, Qassim. Ex. 115, Mersal Dep. 14:24-15:4; Ex. 149, Nakhleh Rpt. ¶ 62. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed.<br><br>The Nakhleh Report should be excluded. *See* Objections Chart. |
| 61. | Before the 9/11 Attacks, Imam Mohamed University also had a U.S. branch located in Fairfax, Virginia, known as the Institute of Islamic and Arabic Sciences in America (IIASA). Ex. 118, Jarrah Dep. 73:8-74:5; Ex. 5, Youssef Rpt. 31. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The Nakhleh Report and the Youssef Report should be excluded. *See* Objections Chart. |
| 62. | Prior to the 9/11 Attacks, Imam Mohamed University was the leading religious training institution in Saudi Arabia and was used by Saudi Arabia to indoctrinate and spread Wahhabism and its concept of violent jihad against the West around the world. Ex. 149, Nakhleh Rpt. ¶¶ 62-66. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. Moreover, Nakhleh cites nothing for the *ipse dixit* statement that Imam Mohamed University was used "to indoctrinate and spread Wahhabism and its concept of violent jihad against the West around the world."

Nakhleh has acknowledged that King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). Given these concessions, it is implausible the quietist Saudi government would spread "violent jihad against the West." |
| 63. | Imam Mohamed University promoted anti-U.S. violent extremism prevalent among the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi government's religious elite and the course work at Imam Mohamed University taught that the use of violent jihad was necessary to win an ongoing war against non-believers and to propagate Islam around the world. Ex. 149, Nakhleh Rpt. ¶¶ 62-64; 72; 119; 132; 160; 162; 166; 212; 232. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded.  *See* Objections Chart.  Moreover, none of the cited paragraphs of the Nakhleh report discusses "the course work at Imam Mohamed University" or cite any support for the assertions repeated in that paragraph.<br><br>It is incorrect that the Saudi government promoted anti-U.S. violent extremism.  Nakhleh has acknowledged that King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad."  KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9.  Plaintiffs' purported expert Meleagrou-Hitchens agrees.  Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 64. | More than three dozen of the 107 signatories of the Memorandum of Advice were affiliated with Imam Mohamed University. Ex. 149, Nakhleh Rpt. ¶¶ 67-69. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded.  *See* Objections Chart.  Nakhleh cites nothing for the statement in this paragraph. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 65. | Students at Imam Mohamed University, like Thumairy, were employees of the Saudi government. On his February 1996 employment application for the Ministry of Islamic Affairs (submitted after he already had been chosen for the job), Thumairy confirmed that he "worked for the [Saudi] government" in an "official job" during his time at Imam Mohamed University and that he was paid a "monthly salary". Ex. 270, KSA 2670. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite no record evidence for the assertion that Al Thumairy's employment application was "submitted after he had already been chosen for the job."<br><br>The cited exhibit does not support the general statement that "[s]tudents at Imam Mohamed University" were employees of the Saudi government. |
| 66. | As detailed within, many of the key Saudi government officials involved in the Saudi extremist network inside the U.S. had a direct relationship with Imam Mohamed University, either because they were employed by Imam Mohamed University, and/or because they had attended Imam Mohamed University.<br><br>a. Saleh Al Ash-Sheikh, MOIA Minister, Ex. 71, Al Ash-Sheikh Resume; Ex. 123, Ash-Sheikh Dep. 19:22-20:11; 20:18-21:18; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite no support for the assertion that there was any "Saudi extremist network inside the U.S."<br><br>It is undisputed that certain Saudi government officials had an affiliation with or attended Imam Mohamed University. Many Imam Mohamed University graduates, such as Majed Al Mersal, were on the forefront of the fight against terrorism. *See* Response to Pls. Aver. ¶ 1274. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | b. Abdullah Al Turki, MOIA Minister and Rector of Imam Mohamed University, Ex. 97, Turki Dep. 23:20-25:4;<br><br>c. Khalil Al Khalil, Ex. 113, Khalil Dep. 15:18-16:5;<br><br>d. Majid Ghesheyan, employee, Ex. 236, KSA 1305-6;<br><br>e. Musaed Al Jarrah, , Ex. 236, KSA 1305-6; Ex. 118, Jarrah Dep. 59:9-61:8;<br><br>f. Khalid Al Sowailem, Ex. 269, KSA 2649 (certificate of study);<br><br>g. Saud Al Ghudaian, taught a course at the Imam Mohamed University, Ex. 126, Ghudaian Dep. 175:8-176:14;<br><br>h. Fahad Al Thumairy, Ex. 270, KSA 2670;<br><br>i. Omar Hamerman, Ex. 157, Hamerman LinkedIn at 4, identity confirmed by Bayoumi (see Ex. 120, Bayoumi Dep. 605:9-15); Ex. 2, ██████████████████ ████████████ *See also* Ex. 313, MPS 731_1-12 (Hamerman identity documents and other records, including medical | Plantiffs Exhibits 71, 2 (EO 2572), 2 (EO 3585), and 561 are inadmissible hearsay.  Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | certification "fit for employment," at 4, and Acknowledgment of Muslim Faith, at 12);<br><br>j. Omar Abdi Mohamed, Ex. 561, FBI 009011 at 9016-7 (regarding certificates);<br><br>k. Adel Al Sadhan, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;<br><br>l. Mutaeb Al Sudairy, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;<br><br>m. Majed Al Mersal, Ex. 115, Mersal Dep. 14:20-16:13;<br><br>n. Abdullah Al Jaithen, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;<br><br>o. Hamdan Al Shalawi, Ex. 2, EO 3585;<br><br>p. Mohamed Al Qudhaieen, Ex. 2, EO 3585. | |
| 67. | Of the 15 9/11 hijackers who were from Saudi Arabia, three attended Imam Mohamed University:<br><br>a. Saeed Al Ghamdi, Ex. 82, CIA 0242-304 at 290 (Ghamdi, hijacker on UAL flight 93, was educated at Imam Mohamed University); | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 82 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | b. Abd Al-Aziz Al-Umari, *See* 9/11 Commission Report at p. 232; Ex. 82, CIA 0242-304 at 278 (Umari, hijacker on AA flight 11, "Graduated Imam Mohamed University"); and<br><br>c. Muhammad Al Shehri, Ex. 82, CIA 0242-304 at 270 (Shehri, hijacker on UAL flight 175, "began his studies at [Imam Mohamed University's] branch in Abha and studied in Riyadh for a short time but returned to the university in Abha after failing his exams in Riyadh."). | The fact that a small number of bad actors attended Imam Mohamed University does not indicate that the university endorses this conduct. Ted Kaczynksi (the Unabomber) graduated from Harvard University. Many Imam Mohamed University graduates, such as Majed Al Mersal, were on the forefront of the fight against terrorism. *See* Response to Pls. Aver. ¶ 1274. |
| I.E. | **During the decade prior to the 9/11 Attacks, Saudi Arabia exported Sunni extremism through MOIA, Al Haramain, and other means, and ignored specific U.S. pleas to stop supporting terror, thereby putting America at grave risk.** | As set forth below, the assertions in this paragraph are unsupported by record evidence. |
| 68. | Plaintiffs' expert Steve Simon served as the Senior Director for Counterterrorism on the National Security Council between 1995 and October 1999 during the Clinton Administration. As Senior Director, Simon received information on all relevant issues involving Saudi Arabia through diplomatic and intelligence channels and received detailed, intensive, and continuous information about Saudi Arabia's cooperation on counterterrorism efforts. | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs have repeated certain statements regarding the qualifications of their purported expert Steve Simon found in his expert report. No response is required.<br><br>The cited paragraphs of the Simon report, however, do not support the statement that "between 1995 and October 1999. . . Simon received information on *all relevant issues* involving Saudi Arabia through diplomatic and intelligence channels and received detailed, intensive, and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Simon traveled on U.S. Government delegations to Saudi Arabia to discuss matters related to terrorism and counterterrorism and was present at meetings with representatives of the Saudi Royal Court. Simon was one of two officials in the U.S. Government policy apparatus whose full-time job was to prepare responses to the terrorism threat to the United States, including Al Qaeda, its affiliates, and its enablers. Simon took part in the approval and coordination process for counterterrorism operations from the Situation Room, briefed the President, Vice President, and National Security Advisor as required, and monitored telephone calls from the Oval Office when counterterrorism issues were on the agenda. Ex. 153, Simon Rpt. ¶¶ 2-6. | continuous information about Saudi Arabia's cooperation on counterterrorism efforts." |
| 69. | Throughout the 1990s Simon remained engaged in counterterrorism, threat assessment and relations with Saudi Arabia at a high level. Simon returned to government service as the National Security Council's Senior Director responsible for the Middle East and North Africa for the years 2011 and 2012, during the Obama Administration. Simon has 38 years' experience working on Middle Eastern security issues for the U.S. Government, | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs have repeated certain statements regarding the qualifications of their purported expert Steve Simon found in his expert report. No response is required. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | U.S. Government contractors, academia, research organizations and the private sector. His experience includes being appointed as an associate of the National Intelligence Council; consulting foreign governments on counterterrorism; and co-authoring a classic book on the rise of Al Qaeda. Ex. 153, Simon Rpt. ¶¶ 7-9. | |
| 70. | Saudi Arabia was not an "ally" of the United States, and the U.S. relationship with Saudi Arabia, while long-lasting, should be understood as transactional. The relationship is one of "mutual dependency" that includes episodes of extreme tension between the two nations. Prior to the 9/11 Attacks, the interests of the U.S. and Saudi Arabia materially diverged on significant matters involving counterterrorism and the response to the threat posed by Al Qaeda. On matters of counterterrorism and Al Qaeda prior to the 9/11 Attacks, Saudi Arabia effectively disregarded U.S. interests to advance its own political goals. Ex. 153, Simon Rpt. ¶¶ 13-14. | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded. *See* Objections Chart.<br><br>It is incorrect that Saudi Arabia was not an "ally" of the United States. Saudi Arabia and the United States are longstanding allies and strategic partners, including in the fight against terrorism. *See* KSA Ex. 8 (U.S. Dep't of State, U.S. Relations With Saudi Arabia – Bilateral Relations Fact Sheet (May 11, 2022)) (describing the "longstanding security" and "strong economic relationship" between the two countries; that Saudi Arabia is "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation"; and the "robust cultural and educational ties [between the countries] with tens of thousands of Saudi students studying in U.S. colleges and universities and scores of educational and cultural exchange visitors each year"), at https://www.state.gov/u-s-relations-with-saudi-arabia/; KSA Ex. 9 (U.S. Gov't Accountability Office, Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed, GAO-09-883, at 1 (Sept. 2009)) (writing that "[t]he U.S. government considers the Kingdom of Saudi Arabia a vital partner in combating terrorism and advancing other U.S. foreign policy priorities"), at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | https://www.gao.gov/assets/gao-09-883.pdf; KSA Ex. 166 (Rundell Rep.) 34-40.<br><br>Several individuals who Plaintiffs have proffered as experts, including Nakhleh, described Saudi Arabia as an ally of the United States before being retained by Plaintiffs in this matter. *See* KSA Ex. 10 (Emile A. Nakhleh, "Intelligence Sharing and Cooperation: Opportunities and Pitfalls," *in Combating Transnational Terrorism: Searching for a New Paradigm* 72 (Steve Tsang ed., 2009)) at 74 (describing Saudi Arabia as "pro-Western"); KSA Ex. 11 (Emile Nakhleh, Iran and the Middle East Amid Shifting Alliances) at 2 (describing the United States and Saudi Arabia as "allies"); *see also* KSA Ex. 165 (Nakhleh Tr.) 53:17-21 (testifying about "the long history of cooperation between Saudi Arabia and the United States").<br><br>So has Simon. *See* KSA Ex. 12 (Simon Ex. 4) at 2 (describing Saudi Arabia as a "staunch" ally of the United States).<br><br>Plaintiffs incorrectly state that, "[p]rior to the 9/11 Attacks, the interests of the U.S. and Saudi Arabia materially diverged on significant matters involving counterterrorism and the response to the threat posed by Al Qaeda." Prior to the 9/11 attacks, Saudi Arabia was at war with Al Qaeda and bin Laden. Saudi Arabia froze bin Laden's assets, stripped him of citizenship, and sought to extradite him from Sudan and Afghanistan. KSA Ex. 166 (Rundell Rep.) 39. As the 9/11 Commission Report states, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy." KSA Ex. 163 (9/11 Rep.), Executive Summary at 11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Simon admitted at his deposition that his report does not explain how any of the materials he reviewed informed his opinions, including the opinions set forth in paragraph 14.  Pls. Ex. 127 (Simon Tr.) 57:14-58:19.<br><br>Simon further testified that all of the following occurred *before* the September 11, 2001 attacks:  (1) bin Laden was an enemy of both the Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (with the United States) "put[] the most pressure on Sudan to expel or neutralize bin Laden," *id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment]" of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20. |
| 71. | While a member of the National Security Council during the 1990s Simon sat in on bilateral meetings with high-level officials of the Saudi Government, which were conducted both in person and over the telephone. These meetings included several phone calls from the Oval Office, between President Clinton and Saudi King Fahd bin Abdulaziz Al Saud.  Ex. 153, Simon Rpt. ¶ 15. | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded.  *See* Objections Chart.<br><br>Plaintiffs have repeated certain statements regarding the qualifications of their purported expert Steve Simon found in his expert report.  No response is required. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 72. | During high-level meetings between President Clinton and King Fahd bin Abdulaziz Al Saud, Simon witnessed the United States tell Saudi Arabia about the security risk entailed by Saudi Arabia's propagation of religious-ideological doctrine that provided justifications for jihad, and the mobilization of terrorist recruits pitted against American (and Israeli) interests. The United States gave Saudi Arabia's leadership an explicit message: Saudi Arabia was empowering jihadists through its support and funding of groups such as Al Haramain and Hamas and through its Ministry of Islamic Affairs; and we, the U.S., need you, Saudi Arabia, to stop.  Ex. 153, Simon Rpt. ¶ 15. | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded.  *See* Objections Chart. <br><br> Simon does not cite any support for the assertions made in paragraph 15 of his report. <br><br> Saudi Arabia in fact cooperated with the United States regarding the Al Qaeda threat in particular.  As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues.  The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular."  KSA Ex. 166 (Rundell Rep.) 28.  Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen.  The Saudis believe these were to be used against police stations."  *Id.*  Saudi Arabia shared this information with the United States, which "was concerned that they might be used against high-level visitors."  *Id.* |
| 73. | Despite this explicit warning, however, Saudi Arabia refused to change course and instead systematically evaded and denied the U.S. requests. At a time when the United States demanded a Saudi bulwark against Osama bin Laden and the escalating menace of Al Qaeda, Saudi Arabia, in effect, "played handmaiden to the 9/11 attacks."  Ex. 153, Simon Rpt. ¶¶ 14. | Plaintiffs Exhibit 153 (Simon Rep.) should be excluded.  *See* Objections Chart. <br><br> Simon does not cite any support for the assertions made in paragraph 14 of his report. <br><br> Saudi Arabia did not play "handmaiden to the 9/11 attacks."  Prior to the 9/11 attacks, Saudi Arabia was at war with Al Qaeda and bin Laden.  Saudi Arabia froze bin Laden's assets, stripped him of citizenship, and sought to extradite him from Sudan and Afghanistan.  KSA Ex. 166 (Rundell Rep.) 39.  As the 9/11 Commission Report states, "government officials of Saudi Arabia at the highest levels worked closely with top |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy." KSA Ex. 163 (9/11 Rep.), Executive Summary at 11.<br><br>Simon admitted at his deposition that his report does not explain how any of the materials he reviewed informed his opinions, including the opinions set forth in paragraph 14. Pls. Ex. 127 (Simon Tr.) 57:14-58:19.<br><br>Simon further testified that all of the following occurred *before* the September 11, 2001 attacks: (1) bin Laden was an enemy of both the Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (with the United States) "put[ ] the most pressure on Sudan to expel or neutralize bin Laden," *id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment]" of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20.<br><br>Saudi Arabia in fact cooperated with the United States regarding the Al Qaeda threat in particular. As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular." KSA Ex. 166 (Rundell Rep.) 28. Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | police stations." *Id.* Saudi Arabia shared this information with the United States, which "was concerned that they might be used against high-level visitors." *Id.* |
| 74. | More than once during these high-level discussions in the second half of the 1990s, the U.S. laid down a "marker" for the record, to make it clear to Saudi Arabia that it was playing with fire, and that its actions were dangerous and that more Americans would end up being the victims of terrorist attacks. Saudi Arabia was unresponsive to, and apparently unmoved by, these U.S. warnings. Saudi Arabia refused to act to assist the U.S. in countering the threat emanating from religiously motivated terrorism. Ex. 153, Simon Rpt. ¶ 16. | The Simon Report should be excluded. *See* Objections Chart.<br><br>Simon does not cite any support for the assertions made in paragraph 16 of his report.<br><br>Prior to the 9/11 attacks, Saudi Arabia was at war with Al Qaeda and bin Laden. Saudi Arabia froze bin Laden's assets, stripped him of citizenship, and sought to extradite him from Sudan and Afghanistan. KSA Ex. 166 (Rundell Rep.) 39. As the 9/11 Commission Report states, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy." KSA Ex. 163 (9/11 Rep.), Executive Summary at 11.<br><br>Saudi Arabia in fact cooperated with the United States regarding the Al Qaeda threat in particular. As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular." KSA Ex. 166 (Rundell Rep.) 28. Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against police stations." *Id.* Saudi Arabia shared this information with the United States, which "was concerned that they might be used against high-level visitors." *Id.*<br><br>Simon further testified that all of the following occurred *before* the September 11, 2001 attacks: (1) bin Laden was an enemy of both the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (with the United States) "put[] the most pressure on Sudan to expel or neutralize bin Laden," *id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment]" of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20. |
| 75. | A stark example of this is that "[d]espite high-level intervention by the U.S. government in early 1997, the Saudis universally refused to allow U.S. personnel access to al Qaeda's senior financial figure, al-Ghazi Madani al Tayyib, who had turned himself in to Saudi authorities." Ex. 7, 9/11 Commission's Terrorist Financing Monograph, at 39. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 7 (*Terrorist Financing Monograph*) contains the quoted language. It also makes clear, however, that the United States did not share intelligence with Saudi Arabia relating to Al Qaeda. Pls. Ex. 7 (*Terrorist Financing Monograph*) at 39 ("[T]he U.S. government did not . . . provide the Saudis with actionable intelligence about al Qaeda fund-raising in the Kingdom."). The 9/11 Report found that there was even a lack of cooperation within the U.S. government regarding the sharing of information, which was a contributing factor to the 9/11 attacks. KSA Ex. 163 (9/11 Rep.) 357. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 7 (*Terrorist Financing Monograph*) contains multiple levels of inadmissible hearsay. *See* Objections Chart. |
| 76. | Simon testified that following the August 1998 bombing of U.S. Embassies in Kenya and Tanzania, Vice President Gore urged the Saudis to put in place the kind of cooperation that had been lacking until then. Ex. 127, Simon Dep. 91:7-92:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Simon's testimony is inadmissible hearsay. *See* Objections Chart.<br><br>Simon further testified that all of the following occurred *during or before* 1998: (1) bin Laden was an enemy of both the Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (along with the United States) pressured Sudan to expel or neutralize bin Laden, *see id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment] of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20. |
| 77. | Following the murder of 19 U.S. Air Force personnel and injuries to many others in the June 1996 bombing of the Khobar Towers housing complex inside Saudi Arabia, the Saudi Government obstructed and misled | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the U.S. authorities about the Khobar bombing to avoid being forced to confront Iran, which plotted the attack. Simon states that "the Saudi [government] strategy was to run out the clock" and that "in the hours and days and weeks immediately after the bombing" which killed and injured scores of U.S. military personnel that "the Saudis were quite concerned to impede a U.S. understanding of the actual attack, its mechanisms, and most importantly, its perpetrators." Ex. 127, Simon Dep. 93:17-97:10. According to Simon, this was a harbinger for Saudi Arabia's failure to act robustly in countering the direct and burgeoning threat posed to the United States by Bin Laden and Al Qaeda. Ex. 153, Simon Rpt. ¶ 19. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 153 (Simon Rep.) should be excluded. *See* Objections Chart.<br><br>Simon in fact acknowledged that Saudi Arabia cooperated with the United States in the investigations of the Khobar Towers by, for instance, allowing the United States to watch interrogations of the suspects of the Khobar bombings, who were Saudi citizens, through one-way mirrors and allowing U.S. investigators to provide interrogation questions. Pls. Ex. 127 (Simon Tr.) 93:22-94:6, 95:10-13, 96:12-20.<br><br>In the late 1990s, Saudi Arabia cooperated with the United States regarding the Al Qaeda threat. As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular." KSA Ex. 166 (Rundell Rep.) 28. Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against police stations." *Id.* Saudi Arabia shared this information with the United States, which "was concerned that they might be used against high-level visitors." *Id.* |
| 78. | After the Khobar attacks, Osama bin Laden observed "[t]he Saudi people have remembered now what the ulema told them and they realise America is the main reason for their problems" and "[n]ow the people | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | understand the speeches of the ulemas in the mosques—that our country has become an American colony. They act decisively with every action to kick the Americans out of Saudi Arabia. What happened in Riyadh and Khobar [when 24 Americans were killed in two bombings] is clear evidence of the huge anger of Saudi people against America. The Saudis now know their real enemy is America." Ex 3, FBIS Compilation of Bin Laden Statements at 12 (PDF page 24). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 3 is inadmissible hearsay to the extent it is offered for the truth of the matter asserted. *See* Objections Chart.<br><br>It is undisputed that bin Laden is quoted as making these statements. |
| 79. | Nevertheless, Saudi Arabia specifically failed to cooperate with the United States on matters relating to Osama Bin Laden. The 2002 Joint Congressional Inquiry Report relied on the testimony of the former Chief of the CIA's "Alec Station" to conclude "it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Usama Bin Ladin." Ex. 84, Report of the US Senate Select Cttee on Intelligence and the US House Permanent Select Cttee on Intelligence (hereinafter "Congressional Joint Inquiry") Excerpt – "The 28 Pages" at 438. Specifically, the 2002 report states:<br><br>In a June 1997 memo to the DCI, Alec Station reemphasized the lack of Saudi cooperation and stated that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 84 (the "28 Pages") is inadmissible hearsay. *See* Objections Chart.<br><br>The paragraph does reflect the statements in Simon's report. However, Simon is incorrect. Prior to the 9/11 attacks, Saudi Arabia was at war with Al Qaeda and bin Laden. Saudi Arabia froze bin Laden's assets, stripped him of citizenship, and sought to extradite him from Sudan and Afghanistan. KSA Ex. 166 (Rundell Rep.) 39. As the 9/11 Commission Report states, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | there was little prospect of future cooperation regarding Bin Ladin. The former Chief of Alec Station thought that the U.S. Government's hope of eventually obtaining Saudi cooperation was unrealistic because Saudi assistance to the U.S. Government on this matter was contrary to Saudi national interests.<br><br>*Id.* According to Simon, these statements are an accurate portrayal of Saudi Government policy in the 1990s, as they mirror his own experiences of dealing with Saudi Arabia at the National Security Council and reflect the prevailing U.S. perception of Saudi Arabia's values and interests in the run-up to the 9/11 Attacks. Ex. 153, Simon Rpt. ¶¶ 17-18. | Ladin problem with diplomacy." KSA Ex. 163 (9/11 Rep.), Executive Summary at 11.<br><br>Simon further testified that all of the following occurred *before* the September 11, 2001 attacks: (1) bin Laden was an enemy of both the Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (with the United States) "put[] the most pressure on Sudan to expel or neutralize bin Laden," *id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment]" of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20.<br><br>Saudi Arabia in fact cooperated with the United States regarding the Al Qaeda threat in particular. As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular." KSA Ex. 166 (Rundell Rep.) 28. Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against police stations." *Id.* Saudi Arabia shared this information with the United States, which "was concerned that they might be used against high-level visitors." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 80. | Saudi Arabia provided support for the Taliban in Afghanistan prior to the 9/11 Attacks. In late 1995, the son of Saudi King Fahd, Abdul Aziz bin Fahd, personally arranged for a $100 million payment to the Taliban, "which was supporting Osama bin Laden at the time and prepared the way for Osama bin Laden to go to Afghanistan." Ex. 166, Robert Baer, Statement before the U.S. Commission on International Religious Freedom hearing, "Is Saudi Arabia a Strategic Threat: The Global Propagation of Intolerance," November 18, 2003, p. 10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 166 is inadmissible hearsay. *See* Objections Chart.<br><br>In Plaintiffs Exhibit 166, Baer states that the assertion that Abdul Aziz bin Fahd arranged a $100 million payment to the Taliban is a "stor[y]" that is "anecdotal." Moreover, Plaintiffs Exhibit 166 does not assert that any money was provided to the Taliban from Saudi Arabia. |
| 81. | Contrary to its claim, KSA Aver. ¶ 71, Saudi Arabia did not terminate diplomatic relations with the Taliban until two weeks after the 9/11 Attacks. KSA Aver. ¶ 71. A September 1998 State Department Cable shows that Saudi-Taliban relations deteriorated after Taliban leader Mullah Omar told a Saudi delegation that "the Saudi Government was 'illegitimate' because it was allowing U.S. troops to remain in the country." Ex. 134, State Department Cable – Islamabad, September 28, 1998, at 3. While Saudi Arabia recalled its Charge D'Affairs in Kabul and asked the Taliban's main representative to leave Saudi Arabia, diplomatic relations were not | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 134, 135, 136, and 137 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 134 discusses a September 1998 visit by Prince Turki Al-Faisal to Kandahar and states that the "MAIN TOPIC OF THE MEETING" was that "TURKI . . . REQUESTED THAT THE TALIBAN SURRENDER TERRORIST USAMA BIN LADIN AND OTHER ARAB MILITANTS RESIDENT IN AFGHANISTAN TO THE [SAUDI ARABIAN GOVERNMENT] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | severed. Ex. 134, State Department Cable – Islamabad, September 28, 1998, at 3. A December 1998 State Department Cable shows that Saudi Arabia continued to allow the Taliban to staff their embassy in Riyadh. Ex. 135, State Department Cable – Islamabad December 21, 1998 at 2. Contemporaneous documents show that the Taliban continued to staff an embassy and a consulate in KSA until at least 2001. Ex. 136, Islamic Emirate of Afghanistan Communications at 2, 6. A CNN press account confirmed that it was not until September 25, 2001 — two weeks after 9/11 (and three days after Bayoumi's arrest in the U.K.) — that Saudi Arabia terminated diplomatic relations with the Taliban government. Ex. 137, Saudis Break Diplomatic Ties with Afghanistan. | SINCE IT WAS CLEAR THAT THE TALIBAN COULD NOT CONTROL THEIR ACTIVITIES. MULLAH OMAR REPLIED THAT THE TALIBAN HAD NO INTENTIOIN OF SURRENDERING BIN LADIN OR ANY OTHER ARABS TO THE SAUDI GOVERNMENT." Ex. 134, at 2-3. Plaintiffs' proffered expert Simon likewise testified that, in 1998, Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment]" of the United States. *See* Pls. Ex. 127 (Simon Tr.) 30:15-31:10, 93:1-4.

Exhibit 134 further states that "THE SAUDI GOVERNMENT ANNOUNCED ON SEPTEMBER 22 THAT IT WOULD RECALL ITS CHARGE D'AFFAIRES IN KABUL AND THAT THE TALIBAN AFGHAN CHARGE SHAHABUDDIN DILAWAR WOULD HAVE TO LEAVE SAUDI ARABIA." *Id.* at 4.

Following the September 1998 visit by Prince Turki to Kandahar, "Prince Turki drafted some recommendations to the Crown Prince, including withdrawal of their chargé from Kabul, urging relief organizations to stop working with the Taliban, cut off all relations with the Taliban, reach out to Afghan groups, particularly Masood's Northern Alliance, which oppose the Taliban, and bringing the issue of the presence of bin Laden and other terrorist groups in Afghanistan to the Organization of the Islamic Conference. The KSA promptly implemented all these recommendations and suspended diplomatic relations with the Taliban. Only humanitarian aid to Afghan refugees and travel for the hajj continued to be allowed. From that time onwards, the KSA had no more substantial contact with the Taliban." KSA Ex. 167 (Sageman Rep.) 115 (citing Prince Turki, 2021, at 179-80; Prince Turki declaration, at FEC-PEC0049636; Steve Coll, *Ghost Wars: The Secret History of the CIA, Afghanistan, and Bin* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *Laden, from the Soviet Invasion to September 10, 2001*, New York: The Penguin Press, 2004, at 414-15). |
| 82. | Plaintiffs' expert Steve Simon concluded that "[i]n the decade leading up to 9/11, Saudi Arabia exported propagators on overseas missions for its Ministry of Islamic Affairs, including in the United States. During that time, Saudi Arabia was made aware that it was stoking the fires of extremism through its support and funding of charities such as Al Haramain, as well as its intensive and extensive propagation of its radical religious doctrine through its Ministry of Islamic Affairs, which justified the use of violence against impious Muslims and non-Muslims. Yet when the U.S. implored Saudi Arabia to desist from its actions fueling international terrorism, Saudi Arabia only poured more gasoline into the inferno." Ex. 153, Simon Rpt. ¶ 20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Simon Report should be excluded. *See* Objections Chart.<br><br>Simon does not cite any support for the assertions made in paragraph 16 of his report. Simon admitted at his deposition that his report does not explain how any of the materials he reviewed informed his opinions, including the opinions set forth in paragraph 14. Pls. Ex. 127 (Simon Tr.) 57:14-58:19.<br><br>Simon is incorrect that Saudi Arabia through the Ministry of Islamic Affairs propagated the use of violence against impious Muslims and non-Muslims.<br><br>On July 10, 1993, the King created the Ministry of Islamic Affairs and appointed Sheikh Abdullah Al Turki as its first minister. Sheikh Al Turki had demonstrated his loyalty to the Royal family and reported directly to the King. The new ministry assumed control over mosques, vetting sermons and Saudi efforts to promote Islam overseas. Thus, as Rundell explains, the Ministry of Islamic Affairs "was created to strengthen the Saudi government's position against radical clerics and the *Sahwah* Movement, which had rallied against the royal family." KSA Ex. 166 (Rundell Rep.) 45; KSA Ex. 167 (Sageman Rep.) 80. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As Plaintiffs' purported experts have acknowledged, King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz, were all quietists who "do not . . . support violent jihad." KSA Ex. 165 (Nakhleh Tr.) 137:18-138:4, 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 83. | The CIA met with Saudi counterparts and warned Saudi Arabia of the risk of violence resulting from Saudi Arabia's policy to pursue promote violent jihad outside of Saudi Arabia. Nevertheless, the Saudis downplayed the link between the Kingdom's own *da'wa* activities and violent jihad. Ex. 149, Nakhleh Rpt. ¶¶ 97; 142. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 149 is inadmissible. *See* Objections Chart.<br><br>Nakhleh offers no citation for the *ipse dixit* assertions that Plaintiffs cites in this paragraph. |
| 84. | It was only after Saudi Arabia itself was attacked by Al Qaeda in May 2003 that the Saudi government policy changed. Ex. 2, EO 3416 (2004 FBI/CIA Joint Assessment states that Saudi "policy has changed" after the May 2003 bombings by Al Qaeda inside Saudi Arabia); Ex. 127, Simon Dep. 98:14- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 99:21 (expert Simon citing how Saudi Arabia only started to address the dangers from Al Haramain and other terror issues "[a]fter 9/11, when it was too late."). | Plaintiffs Exhibit 2OO (EO3416) does discuss the "[r]ecent cooperation between Saudi intelligence and the USIC" and further states that, "[i]n the past, the Saudi Government . . . was denouncing al-Qa'ida as a threat, yet on the other hand it was underestimating al-Qai'da's vitality within the Kingdom." |
| | | The document also reflects the final conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| | | Prior to the 9/11 attacks, Saudi Arabia was at war with Al Qaeda and bin Laden. Saudi Arabia froze bin Laden's assets, stripped him of citizenship, and sought to extradite him from Sudan and Afghanistan. KSA Ex. 166 (Rundell Rep.) 39. As the 9/11 Commission Report states, "government officials of Saudi Arabia at the highest levels worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy." KSA Ex. 163 (9/11 Rep.), Executive Summary at 11. |
| | | Saudi Arabia in fact cooperated with the United States regarding the Al Qaeda threat well before the 9/11 attacks. As Saudi Arabia's expert David Rundell states, "[i]n March 1997, Saudi Defense Minister Prince Sultan bin Abdulaziz met with President Bill Clinton to discuss security issues. The Prince proposed a joint intelligence committee to share information regarding terrorism in general and bin Ladin in particular." KSA Ex. 166 (Rundell Rep.) 28. Moreover, "[i]n January 1998, the Saudis discovered suspected al-Qaeda operatives seeking to smuggle Sagger anti-tank missiles into the country from Yemen. The Saudis believe these were to be used against police stations." *Id.* Saudi Arabia |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | shared this information with the United States, which "was concerned that they might be used against high-level visitors." *Id.*<br><br>Further, Plaintiffs' proffered expert on which they rely for this paragraph (Simon) testified that all of the following occurred *before* the September 11, 2001 attacks: (1) bin Laden was an enemy of both the Saudi royal family and the Saudi state and would have been jailed had he remained in Saudi Arabia, *see* Pls. Ex. 127 (Simon Tr.) 17:10-15, 18:19-19:10, 19:7-20:12; (2) that Saudi Arabia (with the United States) "put[ ] the most pressure on Sudan to expel or neutralize bin Laden," *id.* at 24:2-9, 26:17-28:15; (3) bin Laden was a "threat to Saudi Arabia," *id.* at 29:11-18; (4) bin Laden considered the Saudi royal family to be illegitimate, *id.* at 30:4-8; (5) that Saudi Arabia (through Prince Turki) urged the Taliban to either extradite, detain, or kill bin Laden, at the "encourage[ment] of the United States, *id.* at 30:15-31:10, 93:1-4; and (6) that Saudi Arabia allowed FBI agents to "watch [contemporaneously] interrogations of the suspects of the [1996] Khober bombings" and to provide questions to the interrogators, *id.* at 93:22-96:20. |
| 85. | In an interview published in 2021, Saudi Arabia's current ruling Prince publicly admitted the fact that radical Sunni extremists working for Saudi Arabia played a major role in supporting extremist groups. Saudi Prince Mohamed bin Salman stated that:<br><br>    "I am having problems with the mosques in Saudi Arabia going on auto- pilot," he [Prince Mohamed bin Salman] said. "The country [Saudi Arabia] was hijacked years | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 133 is inadmissible hearsay. *See* Objections Chart.<br><br>The quotes from Plaintiffs Exhibit 133 further suggest that the imams were private imams and not employees of the government. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ago by a lot of extremist groups, and we are working hard to change that. We have a new minister of Islamic affairs. The man is fearless. He has already fired a thousand imams.<br><br>Ex. 133, Joel C. Rosenberg, Enemies and Allies 173 (Tyndale House 2021). | |
| **II.** | **SAUDI ARABIA'S NETWORK OF SUNNI EXTREMISM INSIDE THE U.S.** | Saudi Arabia did not have a "network of Sunni extremism inside the U.S." |
| **II.A.** | **The Saudi Embassy was the nerve center for the Saudi government extremist network inside the U.S.** | Saudi Arabia did not have an "extremist network inside the U.S." |
| 86. | The Saudi Embassy Islamic Affairs Deputy Musaed Al Jarrah admitted in July 2001 that "there are fifty propagators all over the United States under the supervision of the Embassy…." Ex. 293, KSA 7791. | Plaintiffs Exhibit 293 is not signed by Al Jarrah, but does contain his initials. The document does contain the quoted language. |
| 87. | After the 9/11 Attacks, the July 2021 FBI EC confirmed that the FBI "obtained a list of 50 US based clerics who were supported" by the Saudi Embassy. Ex. 2, EO 3491. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2NN (EO 3491) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, the exhibit contains the quoted language. However, it makes clear "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| 88. | Saudi government propagators reported to two offices located at the Saudi Embassy: 1) the Da'wa Office of the Ministry of Islamic Affairs ("MOIA") and 2) the Islamic Affairs Office of the Ministry of Foreign Affairs ("MOFA"). Ex. 2, EO 3480 (the July 2021 FBI EC found that "there was located within the EKSA [Saudi Embassy] the offices of the Islamic Affairs Department and the [MOIA] office of Dawa (or Propagation).") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2NN (EO 3480) is inadmissible hearsay. *See* Objections Chart.<br><br>The document also does not state that "government propagators reported to two offices located at the Saudi Embassy." There is no evidence for this proposition, and the admissible evidence shows that neither office had any substantive supervision over propagators.<br><br>Al Sowailem, who worked in the Da'wa Office at the Embassy, was Fahad Al Thumairy's nominal supervisor, but did not substantively oversee his work. *E.g.*, KSA Ex. 66 (KSA 1234) (July 1996 letter referring to Al Thumairy's deployment to Los Angeles); KSA Ex. 105 (Thumairy Ex. 836) (performance evaluation); KSA Ex. 106 (KSA 596) (approval of leave request); Pls. Ex. 107 (Thumairy Tr.) 114:23-115:10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. Pls. Ex. 107 (Thumairy Tr.) 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-167:19, 172:2-8. There is no admissible evidence that the Islamic Affairs office supervised any Saudi government propagators. |
| 89. | The two offices occupied the entire second floor of the four floor Saudi Embassy in Washington, D.C. and shared office space, phone numbers, switchboard, and administrative support staff. Ex. 129, Afifi Dep. 15:1-3(MOIA and Islamic Affairs Department located on same floor and section at the Embassy), 53:2-55:4 (Embassy offices for MOIA and Islamic Affairs Department used same phone number); Ex. 41 at 5-6 (Jarrah Dep. Ex. 753) (listing MOIA and Islamic Affairs Department Embassy personnel as part of same department with same main phone numbers); Ex. 118, Jarrah Dep. 44:17-55:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 41 is inadmissible hearsay and has not been authenticated. *See* Objections Chart.

None of the cited testimony or documents states that the "two offices occupied the entire second floor of the four floor Saudi Embassy," nor does it provide that the two offices shared office space. To the contrary, Ms. Afifi testified that the "medical" office also had offices on the second floor of the Embassy. Pls. Ex. 129 (Afifi Tr.) 51:4-10.

Ms. Afifi, who worked in the Islamic Affairs department, further testified that there was a general exchange number for the Islamic Affairs department and that this number did not receive calls for individuals in the Da'wah department. *Id.* at 49:12-22 (testifying that "[w]e don't receive any calls for Mr. Sowailem [in the Da'wah department] . . . [b]ecause they have their own number, different number"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 90. | The Embassy phone directory listed a single main Embassy number for "Islamic Affairs," 202-342-3700, and calls to that main Islamic Affairs number could be transferred to either MOIA Embassy officials or to the officials of MOFA's Islamic Affairs Department. Ex. 129, Afifi Dep. 53:2-55:4; Ex. 354, KSA 8440 (MOIA stationary listing 3700 number as official number in Embassy office); Ex. 118, Jarrah Dep. 135:2-137:21 (receptionist would transfer calls from 3700 main number); Ex. 118, Jarrah Dep. 141:4-143:17 (calls to Sowailem and Jarrah could both come in through main 3700 number); Ex. 41 (Jarrah Dep. Ex. 753) (Embassy phone directory). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 41 is inadmissible hearsay and has not been authenticated. *See* Objections Chart.<br><br>Ms. Afifi, who worked in the Islamic Affairs department, testified that there was a general exchange number for the Islamic Affairs department and that this number did not receive calls for individuals in the Da'wah department. Pls. Ex. 129 (Afifi Tr.) 49:12-22 (testifying that "[w]e don't receive any calls for Mr. Sowailem [in the Da'wah department] . . . [b]ecause they have their own number, different number"). |
| II.B. | **The MOIA Da'wah Office at the Embassy was responsible for MOIA propagators in the U.S. including Fahad Al Thumairy.** | |
| 91. | MOIA's Da'wah Office at the Embassy was established after MOIA was created in 1993. Ex. 113, Khalil Dep. 34:19-37:8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 92. | In 1995, Khaled Al-Sowailem, the General Director of MOIA's operation in Europe, the U.S., and Asia, was delegated to the newly established MOIA office at the Embassy in Washington D.C by MOIA Minister Abdullah Al-Turki.  Ex. 269, KSA 2649 (Sowailem's graduation from Imam Mohamed University High School); Ex. 264, KSA 2405 (Sowailem's graduation from Imam Mohamed University); Ex. 265, KSA 2420 (Employment Notice); Ex. 268, KSA 2643 (promotion referral for General Director of the Department of Dawa Abroad); Ex. 63, KSA 2614 approval from MOIA Minister Al Turki; Ex. 267, KSA 2609 (showing that Sowailem was the MOIA's Director for Europe, America, and Australia, when he was sent to direct MOIA's U.S. operations). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Sowailem was delegated to the Da'wah office in United States in 1995. |
| 93. | The importance that the MOIA attached to its U.S. office is demonstrated by the fact that the MOIA appointed Sowailem, who already held a position of higher standing, as its first Director. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs fail to cite record evidence for this assertion. |
| 94. | Sowailem was responsible for overseeing the day-to-day work of MOIA propagators, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | including Fahad al Thumairy in Los Angeles, and other Saudi government officials involved in Da'wah activities inside the U.S. Sowailem: | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | a. issued work rules, Ex. 382, DOJ 0010 (propagators in California directed to report to and cooperate with Thumairy); Ex. 132, DOJ 0001-32 at 011-0012 (propagators ordered to get written authorization "from the relevant authority" before leaving their post or taking a leave); Ex. 132, DOJ 0001-32 at 013-015 (propagators instructed not to solicit donations inside Saudi Arabia without express authorization); | Plaintiffs Exhibit 57 and 416 are inadmissible hearsay. Plaintiffs Exhibit 12C and 57 are improper summary exhibits. *See* Objections Chart.<br><br>None of the exhibits cited demonstrates that Al Sowaliem issued "work rules" or provided work assignments or instructions, or indicates any oversight over the day-to-day activities of any propagators. At most, they indicate that, over the course of more than five years, Al Sowailem received a total of two reports from propagators in the United States. *See* Pls. Ex. 301; Pls. Ex. 382. He also performed administrative tasks such as approving leave and filling out performance evaluations. |
| | b. provided work assignments and instructions, Ex. 132, DOJ 0001-32 at 021-023 (advisory concerning daily religious edicts issued by IIASA and available by telephone); ECF 4265, Ex. 32 at 16-17 (directing propagators to "strive to do the utmost" to convert "non-Muslims" inside the U.S., in particular "pilots"); | This is supported by the record evidence. Al Thumairy testified, for instance, that Al Sowailem was his nominal supervisor, but did not substantively oversee his work. *E.g.*, KSA Ex. 66 (KSA 1234) (July 1996 letter referring to Al Thumairy's deployment to Los Angeles); KSA Ex. 105 (Thumairy Ex. 836) (performance evaluation); KSA Ex. 106 (KSA 596) (approval of leave request); Pls. Ex. 107 (Thumairy Tr.) 114:23-115:10. |
| | c. requested and reviewed reports from the propagators, Ex. 301, KSA 8506 (Thumairy Oct 24, 1996 report); Ex. 132, DOJ 0001-32 at 018-020 (form filed by propagator with Embassy detailing his activities in San Diego); | Plaintiffs Exhibit 12C misattributes to Al Thumairy 9 calls made from the number ███ 0777 prior to April 2002 when he started using it. The subscriber for this number is Rose Mary Genovese, and the user is Denis Battochio (from July 3, 1999 through August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | d. prepared performance evaluations of the propagator's work, Ex. 297, KSA 8364 (Ghudaian 440), Ex. 206, KSA 2695-97;<br><br>e. interacted on a regular basis with propagators by phone, Ex. 12C ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████<br><br>Ex. 107, Thumairy Dep. 119:24-120:3 (the only individual at the Embassy Thumairy recalled having contact with was Sowailem).<br><br>f. made personal visits to propagators, including visits to Los Angeles and San Diego Ex. 95, Awad Dep. 22:3 – 29:8 (Deputy Consul General Awad testified that he met Sowailem on a work related matter in Los Angeles but refused to describe the | Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 pm that is not supported by the phone records. The phone records for Al Thumairy for this period were produced, but do not reflect this call. *See* Pls. Ex. 477 (FBI 564). Plaintiffs instead rely upon an FBI memorandum, which is hearsay and says that Al Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09 pm," not that Al Thumairy did so. Pls. Ex. 2JJ (EO 622).<br><br>Al Thumairy further testified that there may have been other individuals at the Embassy that he contacted by telephone and that he does not specially recall the phone calls he had with Al Sowailem. Pls. Ex. 107 (Thumairy Tr.) 119:14-23. Plaintiffs do not cite any evidence that other propagators called Al Sowailem.<br><br>Plaintiffs further miscite or misquote exhibits and testimony. ECF No. 4265 (Ex. 32, at 16-17) does not contain the word "pilots." Awad's testimony does not support the assertion that Al Sowailem "made personal visits to propagators." He also did not testify that he met Al Sowailem in Los Angeles.<br><br>Plaintiffs Exhibit 25 also does not indicate that Al Sowailem met with propagators. That document states that Al Sowailem traveled to Orange County in order to attend "the 8th international conference on the biography of the prohet."<br><br>Plaintiffs Exhibit 262 consists of copies of checks issued by the Embassy in Washington, D.C. They do not indicate that Al Sowailem oversaw any payments. Plaintiffs Exhibit 57, which purports to be a summary of checks, also does not indicate that Al Sowailem oversaw any payments. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | substance of that work, citing diplomatic immunity); Ex. 139, *U.S. v. Omar Abdi Mohamed*, Memorandum of Points and Authorities at 95 (propagator Abdi Mohamed admits that Sowailem visited him in San Diego); Ex. 285, KSA 5248 (Sowailem travels to Orange County);<br><br>g. recommended job bonuses and promotions, bonuses for "good work", Ex. 132, DOJ 0001-32 at 016-017 (awarding propagators a bonus "in appreciation of your efforts and activities") Ex. 298, KSA8427, Ex. 299, KSA8495;<br><br>h. approved work travel, Ex. 2, EO 0688 (Letter signed by Sowailem, stating "no propagator should leave his post or takes leave without first obtaining written authorization" and warning that "[w]hoever violates this guideline will be subject to disciplinary action[.]")<br><br>i. helped plan Ramadan visits of propagators to the U.S. Ex. 416, KSA 7591 (Bayoumi letter to Minister thanking Sowailem for his "excellent cooperation and coordination");<br><br>j. oversaw the payments made to the MOIA propagators around the United States, which were sent out from the Embassy | ECF No. 4265 (Ex. 32, at 7-8) is a letter signed by Abdulrahman bin Abdullah Al-Twaijri and does not mention Al Sowailem. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | account. *E.g.*, Ex. 262, KSA 1576, 1602; Ex. 57, *U.S. v. Mohamed*, Case No. 03CR3433-JAH, Gov. Ex. 28 & 29 (Qattan Dep. Ex. 418) (U.S. Government exhibit summary of checks paid by Saudi Arabia to San Diego propagators Abdi Mohamed); Ex. 132, DOJ 0001-32; ECF 4265, Ex. 32 at 7-8. | |
| 95. | Prior to the 9/11 Attacks, MOIA propagators in the U.S. supervised by Sowailem were associated with and provided material support to a variety of Sunni extremists and Sunni extremist organizations inside the U.S., including Al Qaeda, Al-Ittihad Al-Islamia, and Al Gama'a. Ex. 2, EO 0563 (money sent to Thumairy went to AIAI); and Ex. 542, FBI 00 ██████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2L (EO 563) and Plaintiffs Exhibit 542 are inadmissible hearsay.<br><br>Plaintiffs Exhibit 542 does not "not[e] the ties of AIAI to Osama Bin Laden."  Rather, it states that "[redacted name] noted that former AIAI leader, Mahmoud Issa from Pakistan/ Afghanistan, is rumored to know bin Laden.  [redacted name] added that [Omar Khadib, aka Omar Abdi Mohamed] is suspected of working for United States intellgience."<br><br>Plaintiffs Exhibit 2L (EO 565) also states that "AL-MIHDHAR and AL-HAZMI[] may not have arrived in southern California with an active support network."<br><br>None of the cited documents states that MOIA propagators were supervised by Al Sowailem. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | None of the cited documents states that MOIA propagators "were associated with and provided material support to a variety of Sunni extremists and Sunni extremist organizaitons inside the U.S., including Al Qaeda, Al-Ittihad Al-Islamia, and Al Gama'a." There is no record evidence that Al Qaeda was operating in the United States at all or that MOIA propagators provided material support to Al Qaeda.<br><br>The cited documents do not mention Al Gama'a at all. Plaintiffs Exhibit 2L (EO 563) states only that Al Thumairy distributed money to "█████████ . . . , associated with members of the Somali-based terrorist organization, Al-Ittihad Al-Islamia (AIAI)." The exhibit does not state that Al Thumairy knew that ████ was associated with AIAI or that ████ provided any of the money to AIAI. |
| 96. | The 2004 FBI/CIA Joint Assessment found that "a number" of MOIA propagators inside the U.S. "are either subjects of or are tied to counterterrorism investigations involving al- Qa'ida, Jama'at al-Tabigh (JT), or HAMAS." Ex. 2, EO 3431. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The 2004 FBI/CIA Assessment does not use the term "MOIA propagators." The document also does not discuss counterterrorism investigations prior to 9/11.<br><br>The same document contains the final conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 97. | The 2004 FBI/CIA Joint Assessment states "[c]onverting professional Americans to Islam was urged as a priority in order to help make inroads into American society and gain influence." This is because "[i]nformation on prominent American converts" was "most likely to help recruit individuals who might be helpful to Saudi interests." Ex. 2, EO 3431; Ex. 132, DOJ 0001-32 at 018 (report of Abdi Mohamed recording the number of "people converted to Islam"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The 2004 FBI/CIA Assessment contains the quoted language. However, the same document contains the final conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| II.C. | **The Islamic Affairs Department at the Embassy also supervised MOIA propagators, including Thumairy.** | There is no evidence that the Islamic Affairs Department at the Embassy supervised MOIA propagators. |
| 98. | The Islamic Affairs Department at the Embassy was led by Dr. Majed Al Ghesheyan and his Deputy Musaed Al Jarrah. Both Ghesheyan and Jarrah were Imam Mohamed University officials assigned to work at the Embassy. Ex. 236, KSA 1305-6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the assertion is undisputed. |
| 99. | Jarrah first started work at the Embassy in 1991. Ex. 118, Jarrah Dep. 72:9-13; Ex. 42, KSA 8594-8607 (Jarrah Dep. Ex. 782)(). The FBI concluded that Jarrah held a high-level position at the Embassy and was | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "closely associated with [Saudi Ambassador] Bandar bin Sultan." Ex. 2, EO 3496. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Jarrah first started work at the Embassy in 1991.<br><br>Plaintiffs Exhibit 2NN (EO 3496) is inadmissible hearsay. *See* Objections Chart.<br><br>The document also does not contain conclusions by the FBI. Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 100. | Jarrah's immediate predecessor at the Embassy was Khalil Al Khalil, who was an Imam Mohamed University official and the Chairman of the Ibn Taymiyah Foundation which operated the Ibn Taymiyah Mosque from 1987-1999 in Los Angeles and its nearby successor, the King Fahd Mosque, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | which opened in 1999 in Culver City, California. Ex. 49, KFM 381 (Ex. 195 showing Khalil as the Chairman of the Board of Trustees of the Ibn Taymiyah Foundation and agreeing to name change to King Fahd Mosque). | To the extent a response is required, these facts are undisputed. |
| 101. | In 1995, Khalil left his work at the Embassy and was appointed by the Saudi government to serve as the "General Supervisor" for the construction of the new King Fahad Mosque. Ex. 192, KFM 0403 (Ex. 198, Khalil signed letter as "General Supervisor on the construction of the 'King Fahd Mosque' in Los Angeles"); Ex. 129, Afifi Dep. 35:17-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 192 is inadmissible hearsay. *See* Objection Chart.

To the extent a response is required, the cited document and testimony do not support the assertion that the Saudi government appointed Al Khalil to be the "General Supervisor" for the construction of the King Fahad Mosque. Al Khalil testified that the Ibn Taymiyyah Foundation and the King Fahad Mosque were "not part of [the] Saudi Arabia government" and that they were "completely independent of the Saudi Arabian government" from 1995 up to the present time. Pls. Ex. 113 (Khalil Tr.) 366:20-367:15. |
| 102. | The FBI concluded that Jarrah was "a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhanna and Thumairy since their arrival in the United | Plaintiffs Exhibit 2NN (EO 3496) is inadmissible hearsay. *See* Objections Chart.

The document does not contain conclusions by the FBI. Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | States." Ex. 2, EO 0004.  Jarrah had "numerous contacts with terrorism subjects throughout the U.S." Ex. 2, EO 3496. | document states that the writer is "not investigating or re-investigating the 9/11 investigation.  This is particularly relevant due to a lack of resources and analytical assistance.  As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>The FBI also did not conclude that Jarrah was "a controlling, guiding, and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhannah and Thumairy since their arrival in the United States." Pls. Ex. 2A (EO 4).  That statement is based on single confidential human source or "CHS."  The FBI stated that "[n]o additional information was revealed outside of the CHS reporting." *Id.* (EO 4-5).<br><br>It is also incorrect.  Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office.  Pls. Ex. 107 (Thumairy Tr.) 417:5-418:9.  Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning to the United States.  Pls. Ex. 118 (Jarrah Tr.) 166:24-167:19, 172:2-8. |
| 103. | The 2004 FBI/CIA Joint Assessment found that "Al-Jarrah's official position is listed in USDS [State Department] records as embassy accountant, but his responsibilities are to manage and control all assignments | The cited document contains the quoted language.  It also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of Saudi Imams in the United States and facilitate the issuance of diplomatic visas for these individuals." Ex. 2, EO 3431. | |
| 104. | King Fahad Mosque Manager Usman Madha testified that Khalil and another Saudi government employee, MOIA propagator Tajuddin Shuaib, independently confirmed to him that Fahad Al Thumairy reported to Musaed Al Jarrah at the Saudi Embassy. Ex. 72, Madha Decl. ¶ 12; Ex. 128, Madha Dep. 31:14-32:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited portion of Plaintiffs Exhibit 72 and Madha's testimony is inadmissible hearsay and is not based on first-hand knowledge. Pls. Ex. 128 (Madha Tr.) 32:4-12 (testifying to his beliefs "based on information received from other people," not personal knowledge).

Plaintiffs Exhibit 72 does not state that Al Khalil or Shuaib "confirmed to [Madha] that Fahad Al Thumairy reported to Musaed al Jarrah." The cited paragraph says that "I believe [Al Thumairy] reported to Musaed Al Jarrah . . . ."

Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. Pls. Ex. 107 (Thumairy Tr.) 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning to the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-167:19, 172:2-8. |
| 105. | One of Jarrah's main tasks was the establishment and growth of Imam Mohamed University's U.S. branch in Fairfax, VA, the Institute for Islamic and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabic Sciences in America (IIASA). Ex. 2, EO 0422-23; Ex. 42, KSA 8594-8607 (Jarrah Dep. Ex. 782); Ex. 220, KSA 7741. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2J (EO 422-23) is inadmissible hearsay and is not based on first-hand knowledge.<br><br>The unredacted portion of Plaintiffs Exhibit 2J (EO 422-23) also does not state that Al Jarrah had any affiliation with IIASA. Plaintiffs Exhibits 42 and 220 do not state that one of Al Jarrah's main tasks was to establish and grow IIASA. These exhibits state only that Al Jarrah will be the Embassy representative for the comittee to purchase "the headquarters of the Islamic Sciences Institute in America." Pls. Ex. 42 (KSA 8604).<br><br>Al Jarrah testified that he did not work at IIASA and that he has "no affiliation" with the institute. Pls. Ex. 118 (Jarrah Tr.) 83:3-16, 90:5-11. |
| 106. | The IIASA sent out daily religious edicts via a phone link to MOIA propagators. Ex. 132, DOJ 0001-32 at 021-023. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 132 (DOJ 21-23) does not support the assertion that IIASA "sent out daily religious edicts via a phone link to MOIA propagators." The document states that, in 1996, IIASA had "set up a program for daily religious edicts that can be reached by telephone. Calls will be answered by a group of instructors from the Institute." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 107. | Khalil was replaced as Deputy of the Islamic Affairs Office at the Embassy by Musaed Al Jarrah. Ex. 129, Afifi Dep. 35:17-36:1 (Jarrah joined Embassy after Khalil left). Jarrah held a high-level position at the Embassy and was closely associated with Saudi Ambassador Bandar. Ex. 5, Youssef Rpt. 31; Ex. 2, EO 3496. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, it is undisputed that Al Jarrah first started work at the Embassy in 1991.

Plaintiffs Exhibit 2NN (EO 3496) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

The document does not contain conclusions or determinations by the FBI. Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| **II.D.** | **Additional Saudi government agents worked inside the U.S. as part of the network and reported to the Embassy.** | Plaintiffs cite no record evidence in support this assertion. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 108. | Saudi Arabia had numerous other officials inside the U.S. engaged in fueling and supporting religious extremism. Ex. 13, Weidner Decl. ¶¶ 4, 6, 11-18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Weidner Declaration has been stricken. *See* ECF No. 9562. There is no record evidence that Saudi Arabia had officials in the U.S. engaged in fueling and supporting religious extremism. |
| 109. | Dr. Soliman Al-Ali aka Sulaiman Al-Ali aka Soliman Ali Elay was President of International Islamic Relief Organization inside the U.S. and ran the Sanabel Al-Khair organization. Al-Ali was an Embassy official who was assigned to work in San Diego with Bayoumi and reported directly to Prince Bandar. Ex. 13, Weidner Decl. ¶ 15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Weidner Declaration has been stricken. *See* ECF No. 9562. It further cites to Plaintiffs Exhibit 2PP (EO 3478), which is inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 2PP (EO 3478) does not contain conclusions by the FBI. Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>Paragraph 15 of the Weidner declaration does not support the assertions concerning Sulaiman Alali. It states that "[a]nother Saudi subject whom I recognize as having worked in a similar capacity to Al Noshan was Sulaiman Alali (aka Soliman Ali Elay), whose associations were with Sanabel and IIRO." |
| 110. | Abdullah Al Noshan was employed through the Saudi Embassy at the IIASA in Virginia and handled Saudi government funding of religious officials working inside the U.S. Ex. 13, Weidner Decl. ¶¶ 14-15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Weidner Declaration has been stricken. *See* ECF No. 9562. It further cites to Plaintiffs Exhibit 2PP (EO 3478), which is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2PP (EO 3478) does not contain conclusions by the FBI. Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 111. | Muhammad Al Qahtani was a Saudi government religious official who worked in San Diego and attended the welcome party for the 9/11 hijackers hosted by Omar Al Bayoumi on February 17, 2000. Ex. 10K, MPS2023-059 Video Exhibit and MPS2023-059-TR Video Transcript at 14:27, 17:50. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 10K (MPS2023-059 14:27, 17:50), MPS2023-059, and MPS2023-059-TR do not indicate that "Qahtani was a Saudi government religious official." There was no "welcome party for the 9/11 hijackers hosted by Omar Al Bayoumi." Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madinah Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7, 714:24-715:18; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). To the extent Plaintiffs rely on the declaration of Plaintiffs' counsel Gavin Simpson to establish any facts, it is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| II.E. | **Omar Al Bayoumi was an agent of the Saudi government who provided material support and assistance to the hijackers.** | Al Bayoumi was not a cooptee of Saudi intelligence. |
| 112. | A June 14, 2017 FBI report indicated that Bayoumi "was paid a monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP) via then Ambassador Prince Bandar bin Sultan Alsaud." The FBI report states that<br><br>[t]he information Albayoumi obtained on persons of interest in the Saudi community in Los Angeles and San Diego and other issues, which met certain GIP intelligence requirements, would be forwarded to [Ambassador Prince] Bandar. Bandar would then inform the GIP of items of interest to the GIP for further investigation/vetting or follow up[.]<br><br>Ex. 2, EO 2638-39. A "cooptee" is a person who is not an official employee of a foreign government's intelligence service but who is given and agrees to carry out specific covert assignments to conduct intelligence for a foreign government inside the U.S. Ex. 344, U.S. Department of Defense publication "Hostile Intelligence | Plaintiffs Exhibit 2W (EO 2638-39) is inadmissible hearsay and is not based on personal knowledge. It is also double hearsay because it states that an unidentified source "reported the following information." *See* Objections Chart.<br><br>Al Bayoumi testified that he has never been a Saudi intelligence officer and has never had "any assignment for any Saudi intelligence or law enforcement agency." Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Commission further concluded that Al Bayoumi is an "unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218; *see also* KSA Ex. 167 (Sageman Rep.) 275-76, 280-82, 300-03 (opining that Al Bayoumi could not be a spy or intelligence officer because his "tradecraft was simply terrible"; among other things, he did not keep clandestine matters clandestine, he revealed his association with the Saudi government, he overtly met with Saudi government officials and visited the Los Angeles Consulate, he left a trail of personal communications from phones registered in his name, he brought witnesses to purportedly clandestine meetings, he brought the hijackers to his own apartment complex and left documentary evidence, including signing their lease, after he was arrested in the United Kingdom, and he stayed in England for another year to complete his degree). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Threat" DoD 5200.1-PH-2 (Nov. 1988) at 19. | |
| **II.F.** | **Islamic Affairs section at the Saudi Consulate in Los Angeles.** | |
| 113. | Within the Los Angeles Consulate there was a Ministry of Foreign Affairs, Islamic Affairs section that was managed in 2000 by Deputy Consul General Abdullah al Awad and staffed by one Consulate official, a Sunni extremist named Ismail Mana. Ex. 95, Awad Dep. 75:12-77:16; Ex. 306, KSA 7119 (Ex. 605, fax sent by Mana from the Islamic Affairs section of the Consulate); Ex. 110A, Mana Dep. 51:15-55:16; 64:4-20; 138:17-141:24; Ex. 72, Madha Decl. ¶¶ 19-20 (Mana was a member of Thumairy's radical, anti-U.S. group). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, there is a section in the Los Angeles Consulate that is responsible for Islamic affairs, trade, and culture. Pls. Ex. 95 (Awad Tr.) 73:8-75:6. Al Awad managed this section from 1995 to 1997, but did not manage it in 2000. *Id.* at 16:14-17:6 (testifying that he started work at the Consulate in October 1995), 75:12-76:7 (testifying that he was managing this section for the "first two years" after he arrived at the Consulate). Ismail Mana was a secretary in this section. *Id.* at 76:9-77:16.<br><br>Ismail Mana was not a "Sunni extremist" and Al Thumairy did not have a "radical, anti-U.S. group." Usman Madha admitted under cross-examination that he "understand[s] very little Arabic," could not "understand [Al Thumairy's] sermons," and "never personally heard Thumairy express any support for terrorism in any of his sermons." Pls. Ex. 128 (Madha Tr.) 38:3-39:17; *see* Pls. Ex. 72 (Madha Decl.) ¶¶ 18-19. Madha also testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | traditions like "celebrati[ng] . . . Thanksgiving." Pls. Ex. 128 (Madha Tr.) 60:18-61:18. |
| **II.G.** | **Saudi Arabia knowingly engaged in a long running illegal scheme to violate U.S. and international laws and diplomatic policy to establish its extremist network of MOIA officials inside the U.S.** | Saudi Arabia did not have an "extremist network of MOIA officials inside the U.S." |
| 114. | Prior to 9/11, Saudi Arabia knowingly engaged in a long-running scheme to violate international law and U.S. diplomatic accreditation policy to secure false diplomatic and consular level status to provide its MOIA officials with the cover they needed to reside and carry out their mission inside the U.S. Plaintiffs submit that the United States Government would not have extended diplomatic privileges to MOIA officials to enter the U.S., let alone reside and work for Saudi Arabia, had their actual jobs and status been disclosed by Saudi Arabia. These individuals include Sowailem himself and all the Saudi MOIA propagators given diplomatic status to enter and work inside the U.S. Ex. 152, Dunham Rpt. 12; *See also* Ex. 317, Senate Hearing, Testimony of Simon Henderson, PEC-KSA001302-PEC-KSA001339 at PEC-KSA001314 ("The Saudi Foreign Ministry | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite no record evidence supporting the first sentence in this paragraph.<br><br>The expert report of Lawrence Dunham should be excluded. Plaintiffs Exhibit 317 is inadmissible hearsay. *See* Objections Chart.<br><br>As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. As Rundell has explained, "diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. . . . Islam is the core ideology of Saudi Arabia. . . . [A]dvancing that belief is not only acceptable, but expected." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and its network of embassies provides a crucial structure for the propagation of Wahhabism and distributing state funds to support the growth of Wahhabism across the world. Until 9/11 it was not widely realized that Saudi embassies had Islamic affairs departments charged with this role. Saudi Arabia depicts this role of their embassies in innocent terms. But here in Washington, funds from the ambassador's wife were reaching Saudi individuals in California linked to 9/11. And several countries, including the US, have withdrawn diplomatic credentials from Saudis working in Islamic affairs departments because of links with terrorism."). | |
| 115. | In September 1995, when MOIA Minister al-Turki brought Khalid Al Sowailem to the U.S. to head MOIA's new Da'wah office in America, the Kingdom falsely described Sowailem to the U.S. as a diplomatic agent with the title of Attaché at its Embassy. Ex. 2, EO 1438 (describing Sowailem as an "attaché"); Ex. 26, Letter dated August 24, 2021 from Acting Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2Q (EO 1438) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited documents do not support the assertion that Minister Al Turki "brought Khalid Al Sowailem to the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | U.S. to head MOIA's new Da'wah office in America" or that Saudi Arabia falsely described Al Sowailem to the U.S.<br><br>Al Sowailem in fact worked in the Embassy and was a diplomat. *See* Pls. Ex. 26; *see* KSA Ex. 63 (KSA 2612) (August 29, 1995 administrative decision directing deployment); KSA Ex. 64 (KSA 2572) (May 13, 2000 administrative decision extending deployment). |
| 116. | According to U.S. State Department records, Sowailem served in that capacity from September 14, 1995 until September 14, 2003. Ex. 26, Letter dated August 24, 2021 from Acting Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq.; U.S. State Department website, copies of the DIPLOMATIC LIST from 1997 – 2002. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed. |
| 117. | However, Sowailem's actual job titles with the Kingdom were "Manager of Da'wah Europe and U.S." and "Director of the Da'wah Office in America." Ex. 59, KSA 1307- 1309 (Sadhan Dep. Ex. 498). In this capacity, Sowailem was not a diplomat but was, instead, responsible for promoting Saudi Arabia's religious agenda, overseeing MOIA's illegal network of propagators deployed throughout the U.S., and reporting back to his superiors in Riyadh. Ex. 152, Dunham Rpt. 11; Ex. 266, KSA 2512; Ex. 297, KSA 8364; Ex. 206, KSA 2695-97; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The expert report of Lawrence Dunham should be excluded. *See* Objections Chart.<br><br>Undisputed that Al Sowailem was the "Office Director" of the Da'wah Office located in the Embassy in Washington, D.C. The fact that he headed an office at an Embassy demonstrates that he was a diplomat. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 286, KSA 5250; Ex. 287, KSA 6673; Ex 289, KSA 6995; Ex. 107, Thumairy Dep. 52:16-21 ("[H]e [Sowailem] was the...administrative personnel who is responsible for us."). Given this misrepresentation, Sowailem should not have been allowed to enter the U.S. | Plaintiffs cite nothing for the assertion that promoting Saudi Arabia's religious agenda is improper or disqualifies him from being a diplomat.<br><br>As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. . . . Islam is the core ideology of Saudi Arabia. . . . [A]dvancing that belief is not only acceptable, but expected." *Id.*<br><br>Plaintiffs cite nothing to support their assertion that it was "illegal" for MOIA to send propagators to the United States.<br><br>Plaintiffs also incorrectly state that Al Sowailem was responsible for "overseeing" MOIA's propagators. For instance, as Al Thumairy testified, Al Sowailem assisted on administrative matters such as leave requests, but did not substantively oversee his work. Pls. Ex. 107 (Thumairy Tr.) 114:23-115:10. |
| 118. | A 1986 internal Saudi government "High Order" established rules for a secret Kingdom program to use false diplomatic titles and passports to open and staff new propagation offices inside foreign countries including the United States. Among other things, the High Order stipulated that the managers of propagation offices "…shall be diplomats and shall be given diplomatic passports, whereas the remaining Saudi employees and propagators shall be given | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs fail to cite any record evidence regarding any "secret Kingdom program to use false diplomatic titles and passports to open and staff new propagation offices inside foreign countries." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | special passports." (Emphasis added.). Ex. 61, KSA 8756-67 (Ex. 398A). | Plaintiffs Exhibit 61 does contain the quoted language. However, as David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. . . . Islam is the core ideology of Saudi Arabia. . . . [A]dvancing that belief is not only acceptable, but expected." *Id.* |
| 119. | Plaintiffs' expert Lawrence Dunham determined that Saudi Arabia evaded U.S. diplomatic accreditation rules requiring that diplomatic privileges would be granted only to individuals who supported the work of the embassy or consulate, and not for other work or purposes unrelated to diplomatic functions. Ex. 152, Dunham Rpt. 2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The Dunham Report should be excluded. *See* Objections Chart. <br><br> As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. . . . Islam is the core ideology of Saudi Arabia. . . . [A]dvancing that belief is not only acceptable, but expected." *Id.* <br><br> Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cities – many in places where we maintained no other diplomatic representation." *Id.* (citing General |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 120. | Dunham also concluded that, based on his experience, Saudi Arabia was instructed it could not accredit an embassy or consular officer or employee to work at a location other than at an embassy or consulate; perform duties outside the embassy or consulate unrelated to diplomatic work; work at a separate entity such as an international organization, mosque, school, charity, or similar establishment; or be a full-time student. Ex. 152, Dunham Rpt. 10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The expert report of Lawrence Dunham should be excluded. *See* Objections Chart.

Dunham's report contains the statements that Plaintiffs repeat in this paragraph, but that report does not cite any support for these assertions.

As David Rundell has explained, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cities – many in places where we maintained no other diplomatic representation." KSA Ex. 166 (Rundell Rep.) 33 (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 121. | Based on his examination of the evidence, Dunham deduced that Saudi Arabia falsely represented to the U.S. that its MOIA officials would work on diplomatic business at an Embassy or Consulate, and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | had those officials illegally conduct their non-diplomatic assignments for MOIA at various locations inside the U.S.  Ex. 152, Dunham Rpt. 3, 15; Ex. 212, KSA 6679. | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>The Dunham Report should be excluded.  *See* Objections Chart.<br><br>As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions.  KSA Ex. 166 (Rundell Rep.) 33.  "Diplomats are expected to promote their country's foundational ideas and contemporary policies to their host government and the local population. . . .  Islam is the core ideology of Saudi Arabia. . . . [A]dvancing that belief is not only acceptable, but expected."  *Id.*<br><br>Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate.  For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cities – many in places where we maintained no other diplomatic representation."  *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26).<br><br>With respect to Fahad Al Thumairy, the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate.  KSA Ex. 140 (Dunham Ex. 12) at 039 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City.").  Yet the State Department did not revoke his visa until March 21, 2003.  KSA Ex. 141 (KSA 6810) (diplomatic note). |
| 122. | For example, Saudi Arabia registered MOIA propagators Mutaeb Al-Sudairy and Adel Al-Sadhan, as members of the | The expert report of Lawrence Dunham should be excluded. Plaintiffs Exhibit 2M (EO 599) is inadmissible hearsay.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Embassy's administrative and technical staff (entitled to the higher level of privileges and immunities conferred by the Vienna Convention on Diplomatic Relations), but Sowailem assigned the two propagators to work in Missouri and Oklahoma, hundreds of miles away from the Saudi Embassy in Washington, D.C. Ex. 152, Dunham Rpt. 12, 20-21; Ex. 2, EO 0599 (Al-Sudairy was living in Missouri with Al-Qaeda member Ziyad Khaleel). | Undisputed that Al Sudairy and Al Sadhan were members of the Embassy's administrative staff. Both Al Sudairy and Al Sadhan worked in the Embassy. *See, e.g.*, Pls. Ex. 99 (Sadhan Tr.) 273:10-273:19, 287:22-288:5, 305:1-9; Pls. Ex. 119 (Sudairy Tr.) 199:11-20.<br><br>Plaintiffs do not cite any evidence that Al Sowailem "assigned the two propagators to work in Missouri and Oklahoma." Al Sudairy moved to Columbia, Missouri to study at a language institute affiliated with Missouri University in the Fall of 2000. Pls. Ex. 119 (Sudairy Tr.) 221:24-223:5, 268:18-21, 281:15-282:5. Al Sadhan moved to Oklahoma in 1999 to study at a language institute in Norman, Oklahoma. Pls. Ex. 99 (Sadhan Tr.) 284:8-285:7. |
| 123. | Saudi Arabia's intent to violate the rules is shown by a 2002 Saudi Royal Committee Report, which concluded that the Kingdom should expand on its sham diplomatic accreditation policy by obtaining even "better cover" and "legal official cover" for MOIA officials by giving them false titles at an embassy rather than a consulate:<br><br>…the Committee finds it useless for consulates to provide the services currently provided to Muslims by the delegates of Ministry of Islamic Affairs for the Islamic work abroad… the consular immunities and privileges are limited unlike the diplomatic immunities and privileges afforded by the Vienna Convention of 1961 which provides a better cover to the Ministry of Islamic Affairs' employees. It is also noted that the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' characterization of this document is based on an incorrect translation. The document does not contain any language regarding sham diplomatic accreditation, "better cover" or "legal official cover." The correct translation of this passage states that:<br><br>"[T]he committee believes that it will not be feasible for the consulates to provide services to Muslim communities which the employees of the Ministry of Islamic Affairs, Dawah and Guidance serve because consular immunities and privileges, according to the Vienna Convention on Consular Relations 1963, are limited when compared to the consular immunities and privileges of the Vienna Agreement for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | consular immunities have many drawbacks because they allow the local authorities to monitor and interfere and therefore do not provide the legal official cover that allows the Islamic work… Consequently, it is better to introduce the employees of Ministry of Islamic Affairs, Endowments, Da'wah and Guidance as attachés in the embassy's diplomatic corps…." Ex. 61, KSA 8756-67 at 62. | Diplomatic Relations 1961, which would provide better protection for the employees of the Ministry of Islamic Affairs, Dawah and Guidance.  In addition, consular immunities have a lot of issues and, therefore, do not provide the official and legal protection for Islamic work; making it possible for local authorities to interfere in the work of the consulate in addition to the fact that they set limits on the work of the consul to the city located within his/her jurisdiction.  Therefore, we believe it is better to present the employees of the Ministry of Islamic Affairs, Dawah and Guidance as attachés in the diplomacy system of the embassy, which provides a broader scope of work in the host country."  KSA Ex. 169 (KSA 8762). |
| 124. | Thus, following the 9/11 Attacks, rather than reconsidering whether it was an appropriate policy to fraudulently provide diplomatic cover for its religious personnel, the Saudi government decided to continue and expand its policy.  Ex. 152, Dunham Rpt. 13 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  This paragraph contains attorney argument, rather than a purported factual statement.  It is also based on an incorrect translation of Plaintiffs Exhibit 61.  *See* Response to Pls. Aver. ¶ 123. |
| 125. | Saudi Arabia further violated U.S. law by routinely hiring non-Saudi propagators to work for MOIA inside the U.S. without disclosing those propagators as Saudi government employees.  18 U.S.C. § 951 (anyone "other than a diplomatic or consular officer or attaché" who "acts in the United States as an agent of a foreign | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | government" must provide "prior notification to the Attorney General."); Ex. 152, Dunham Rpt. 10. These MOIA propagators included all the individuals who were assigned to work under Fahad al Thumairy in California, including Omar Abdi Mohamed and ████████ in San Diego. Ex. 152, Dunham Rpt. 17, n. 24; Ex. 2, EO 0690, 0692-0695; Ex. 415, KSA 8503 (Sowailem's letter nominating Thumairy to supervise California propagators). | The Dunham report should be excluded. Plaintiffs Exhibit 2N (EO693) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 415 does not state that Sharif Al Battikhi or Omar Abdi Mohamed were assigned to work under Fahad Al Thumairy. Al Thumairy testified that, although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work." Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. There is no admissible evidence to the contrary.<br><br>Al Thumairy testified that he does not know Omar Abdi Mohamed. Pls. Ex. 107 (Thumairy Tr.) 159:10-19. He also testified that he did not know whether ████████ was employed by the Ministry of Islamic Affairs. *Id.* at ████████ |
| 126. | According to Plaintiffs' expert Lawrence Dunham, these additional MOIA propagators, placed under the supervision of at least one Saudi propagator (Thumairy) as well as Sowailem, compounded Saudi Arabia's abuse in using diplomatic cover for its MOIA officials by adding a group of additional, nondisclosed, and illegal Saudi government employees to carry out assignments for Sowailem, Thumairy, and likely other MOIA officials inside the U.S. Ex. 152, Dunham Rpt. 17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Dunham Report should be excluded. *See* Objections Chart.<br><br>Al Thumairy testified that, although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work." Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. There is no admissible evidence to the contrary. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that Al Sowailem provided any substantive supervision over any Ministry of Islamic Affairs propagators. |
| 127. | Dunham further found, based on his experience, that it was illegal for Saudi Arabia to direct Sowailem and Thumairy to supervise a group of other Saudi Government officials working inside the U.S. or to pay a salary to MOIA propagators to work inside the U.S. for Saudi Arabia. Ex. 152, Dunham Rpt. 17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Dunham Report should be excluded. *See* Objections Chart.<br><br>Al Thumairy testified that, although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work." Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. There is no admissible evidence to the contrary.<br><br>There is no evidence that Al Sowailem provided any substantive supervision over any Ministry of Islamic Affairs propagators. |
| 128. | In addition to MOIA, Saudi Arabia's Imam Mohamed University secured false diplomatic status for its officials working inside the U.S. to provide them with cover to reside and carry out their mission inside the U.S. Ex. 2, EO 3534 ("The EKSA [Saudi Embassy] was known to finance the IIASA and its primary administrators and teachers were Saudi Arabian diplomats."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2NN (EO3534) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>Plaintiffs Exhibit 2NN (EO 3534) also does not state that Imam Mohamed University secured "false diplomatic status" for anyone. |
| 129. | Musaed Al Jarrah, the Embassy's Islamic Affairs Deputy who was responsible to "manage and control all assignments of Saudi Imams in the United States" was listed by Saudi Arabia to the State Department as "embassy accountant." Ex. 2, EO 3431. | The document cited contains the quoted language, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>It is not true that Al Jarrah managed and controlled "all assignments of Saudi Imams in the United States." For instance, Al Thumairy does not recall Al Jarrah. Pls. Ex. 107 (Thumairy Tr.) 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning to the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-167: 19, 172:2-8. |
| 130. | A letter written after the 9/11 Attacks in April 2002 by the Saudi Ambassador confirms that certain MOIA and other Saudi Government personnel in Washington, D.C. improperly worked as diplomats in locations that had not been registered with the Department of State. Ex. 203, KSA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 1219. Plaintiffs' expert Dunham further concluded this demonstrates how prior to the 9/11 Attacks Saudi Arabia abused the system to allow MOIA personnel and representatives of other agencies to illegally work inside the U.S. Ex. 152, Dunham Rpt. 18. | Plaintiffs Exhibit 203 is dated well after the 9/11 attacks. It does not reference any Ministry of Islamic Affairs employees at all and does not state that any Saudi government employees "worked as diplomats in locations that had not been registered with the Department of State." The Dunham Report should be excluded. *See* Objections Chart. |
| II.H. | **From at least 1992-1993, the Saudi government funded and ran the Ibn Taymiyah Mosque on Venice Boulevard in Los Angeles and provided support for two operational Sunni extremist cells in Southern California linked to the "Blind Sheikh", Al Qaeda, and other terror groups.** | Saudi Arabia did not fund or run the Ibn Taymiyah Mosque nor were there "two operational Sunni extremist cells in Southern California." |
| 131. | In the early 1980's, Khalil al-Khalil worked for the Saudi government in Los Angeles, California and was the first and only chairman of the Islamic Foundation of Sheikh Ibn Taymiyah ("Ibn Taymiyah Foundation"). Ex. 113, Khalil Dep. 11:19-24, 18:3-14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The cited testimony does not state that Khalil Al Khalil "worked for the Saudi government in Los Angeles, California" in the early 1980s. In the early 1980s, Dr. Al Khalil was a student at the University of Southern California. Pls. Ex. 187 (KFM 91). Undisputed that Dr. Al Khalil was the chairman of the Ibn Taymiyyah Foundation. Al Khalil testified, however, that the Ibn Taymiyyah |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Foundation and the King Fahad Mosque were "not part of [the] Saudi Arabia government" and that they were "completely independent of the Saudi Arabian government" from 1995 up to the present time. Pls. Ex. 113 (Khalil Tr.) 366:20-367:15. |
| 132. | That Mosque's board of directors and members comprised a group of individuals who were Sunni extremists or at the very least sympathetic to their cause, including Khalil, Turkish businessman Osman Kaldirim (who met Osama bin Laden in the 1980s, Ex. 121, Kaldirim Dep. 207:21 – 208:1), several of the founders of the Holy Land Foundation (ultimately designated a terrorist organization and shut down), and various individuals associated with the Egyptian Muslim Brotherhood, including Mohamed al Morsi, who would later become Egypt's President. Ex. 121, Kaldirim Dep. 16:1-17 (the mosque was called the "Muslim Student House" prior to being named the Ibn Taymiyah Mosque and eventually the King Fahd Mosque). *See also* Ex. 113, Khalil Dep. 12:1-10; Ex. 327, Muslim Student House. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited testimony does support any of the assertions in this paragraph, which Plaintiffs have copied from the Youssef expert report, other than: (1) Osman Kaldirim met Osama bin Laden in the 1980s, and (2) the mosque was called the "Muslim Student House" prior to being named the Ibn Taymiyyah Mosque.<br><br>Mr. Kaldrim testified that he met bin Laden in the 1980s to discuss the Russian occupation of Afghanistan and that he did so on behalf of the United States Department of Defense. Pls. Ex. 121 (Kaldirim Tr.) 207:21-209:3. |
| 133. | Ibn Taymiyah Foundation's ideology sprang from the Muslim Brotherhood movement in Egypt and its anti-U.S. writings, and particularly Sayyid Quib's book "Milestones." Ex. 5, Youssef Rpt. 25. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef also fails to cite any support for this *ipse dixit* assertion. |
| 134. | The Foundation was named after the medieval Islamic scholar Ibn Taymiyah, who provides the basis for Wahhabi religious beliefs. Ibn Taymiyah is known for his extensive writings on the role of jihad in not only defending Muslim lands but of taking the fight to the homelands of the aggressor. Ex. 149, Nakhleh Rpt. ¶¶ 8, 10, 43-45, 60; Ex. 121, Kaldirim Dep. 19:14 – 20:7. Osama Bin Laden cited Ibn Taymiyah for justification for terror attacks. *See* 9/11 Commission Report at 362 ("Usama Bin Ladin and other Islamist terrorist leaders draw on a long tradition of extreme intolerance within one stream of Islam (a minority tradition), from at least Ibn Taimiyah, through the founders of Wahhabism, through the Muslim Brotherhood, to Sayyid Qutb."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Nakhleh Report should be excluded. *See* Objections Chart.<br><br>Undisputed that the Ibn Taymiyyah Foundation was named after Ibn Taymiyyah.<br><br>It is incorrect that bin Laden's ideology was an extension of Ibn Taymiyyah's or that bin Laden "cited Ibn Taymiyah for justification for terror attacks." As Saudi Arabia's expert David Rundell has explained, Ibn Taymiyyah discussed specifically what is permissible in armed combat with non-Muslims. Among other things, he "forbade attacks on civilians and destruction of property." KSA Ex. 166 (Rundell Rep.) 6. Bin Laden's global jihadism, by contrast, called for terrorist attacks on civilians and property. Moreover, bin Laden's call for political violence was more in line with the ideology of Sayyid Qutb, Abdullah Azzam, and Ayman Zawahiri. *Id.* at 27. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 135. | The Foundation opened the Ibn Taymiyah Mosque on Venice Boulevard in Los Angeles in 1987, the same year that Khalil started and was assigned by Saudi Arabia to work as the Embassy's Islamic Affairs Deputy. Ex. 113, Khalil Dep. 12:11-13:11; Ex. 121, Kaldirim Dep. 21:8-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that the Ibn Taymiyyah Foundation opened the Ibn Taymiyyah Mosque on Venice Boulevard in Los Angeles in 1987. Undisputed that, in 1987, Dr. Al Khalil worked in Washington, D.C. as the Islamic Affairs Deputy in the Embassy. |
| 136. | The Ibn Taymiyah Mosque was funded and operated by Saudi Arabia. Ex. 121, Kaldirim Dep. 47:22-52:8 (describing assignment of Muhammad al-Turki to coordinate the Ibn Taymiyah and controlling donations via the Embassy); Ex. 72, Madha Decl. 13. The FBI found that its founding board member and director/Iman Tajuddin Shuaib was one of the "U.S. Based Clerics Paid by Saudi Arabia." Ex. 2, EO 3555-56. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Kaldirim did not testify that the Ibn Taymiyyah Mosque was "funded and operated by Saudi Arabia." Kaldirim testified that the Ibn Taymiyyah Foundation has always been "completely independent of the Saudi Arabian government." Pls. Ex. 121 (Kaldirim Tr.) 263:13-21. Dr. Al Khalil likewise testified that the Ibn Taymiyyah Foundation and the King Fahad Mosque were "not part of [the] Saudi Arabia government" and that they were "completely independent of the Saudi Arabian government" from 1995 up to the present time. Pls. Ex. 113 (Khalil Tr.) 366:20-367:15.

Paragraph 13 of the Madha declaration (Pls. Ex. 72) is inadmissible hearsay and is not based on first-hand knowledge (stating that I "learned |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that the Kingdom funded the Mosque's construction."). It also does not state that the Saudi Arabia "operated" the Ibn Taymiyyah Mosque or "founded" it.<br><br>Plaintiffs Exhibit 2PP (EO 3555-56) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2PP (EO 3555-56) also did not make any findings. The documents states that "[t]he purpose of this communication is to consolidate information related to the involvement of personnel and entities controlled by the Saudi Arabian Government (SAG), the Embassy of the Kingdom of Saudi Arabia (EKSA) and its affiliates within the United States with the attacks of September 11, 2001 . . . . This report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| 137. | Saudi government official Ibrahim Al Hiber was the Imam of the Ibn Taymiyah Mosque and continued in that role until MOIA sent Fahad al Thumairy to replace Hiber. Ex. 72, Madha Decl. ¶ 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undiputed that Al Hiber was the imam of the Ibn Taymiyyah Mosque prior to Al Thumairy. Al Thumairy was approved to work in MOIA's Da'wah Office in the United States and was sent to the Ibn Taymiyyah |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mosque in Los Angeles. KSA Ex. 49 (KSA 2684); KSA Ex. 50 (Ghudaian Ex. 452); KSA Ex. 51 (Ghudaian Ex. 433). |
| 138. | The Mosque's operations were overseen by two other Saudi government officials, Embassy Islamic Affairs Deputy Khalil and his protégé, Tajuddin Shuaib. Ex. 72, Madha Decl. ¶¶ 4, 8, 12; Ex. 121, Kaldirim Dep. 86:12 – 19 (Tajuddin Shuaib was the founding board member and director/Imam appointed by the board of the foundation). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The Madha declaration (Pls. Ex. 72) and the Kaldirim testimony (Pls. Ex. 121) do not state that Tajuddin Shuaib was a "Saudi government official[ ]." <br><br> Kaldirim testified that the Ibn Taymiyyah Foundation has always been "completely independent of the Saudi Arabian government." Pls. Ex. 121 (Kaldirim Tr.) 263:13-21, 267:15-268:5 (testifying that the Saudi government has never been involved in the management of the mosque or foundation and it never exerted control over the foundation or mosque). Dr. Al Khalil likewise testified that the Ibn Taymiyyah Foundation and the King Fahad Mosque were "not part of [the] Saudi Arabia government" and that they were "completely independent of the Saudi Arabian government" from 1995 up to the present time. Pls. Ex. 113 (Khalil Tr.) 366:20-367:15. Saudi Arabia also never provided operating funds for the mosque prior to the 9/11 attacks. Pls. Ex. 121 (Kaldirim Tr.) 278:5-279:1. |
| II.I. | **The Los Angeles extremist cell led by followers of the Blind Sheikh had direct links to Al Qaeda.** | There was no Los Angeles extremist cell. |
| 139. | In 1992-1993, the Ibn Taymiyah Mosque was identified by FBI investigators as a | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | "radicalized" mosque and an operations hub for Sunni extremists. According to Plaintiffs' expert Bassem Youssef, the former FBI Counterterrorism Communications Unit Chief, "a 'radicalized' Mosque is one where extremist activity takes place with the knowledge and approval of the mosque's Imam and leadership." Ex. 5, Youssef Rpt. 19. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
|  |  | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart |
|  |  | There is no record evidence that the Ibn Taymiyyah Mosque was a "radicalized" mosque or an "operations hub for Sunni extremists." |
|  |  | Al Khalil testified that the "philosophy" of the mosque was one of "openness." There were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no were no violent individuals or terrorists at the mosque. Pls. Ex. 113 (Khalil Tr.) 388:3-393:4. |
| 140. | The FBI determined that the Ibn Taymiyah Mosque was the operations hub for a terrorist network in Southern California led by the "Blind Sheik" Omar Abdel Rahaman. The network had two operational extremist cells: one at the Ibn Taymiyah Mosque, and a second, satellite cell at the Islamic Center of San Diego. The two California extremist cells were part of a larger Islamic extremist terrorist network in other cities of the U.S. and abroad. The network was made up of various Sunni extremists, including members of Rahman's group, Al Gama'a Al Islamiyah ("Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
|  |  | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |
|  |  | There is no record evidence supporting any of Youssef's *ipse dixit* assertions. The record evidence is to the contrary. Akram Alzamari, who attended the Ibn Taymiyyah Mosque in the mid to late 1990s, and visited up to "[o]nce to twice a day" testified that he had never heard that Omar |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Gama'a"), also known as "the Islamic Group." Ex. 5, Youssef Rpt. 16, 19-21. | Abdul Rahman visited the Ibn Taymiyyah Mosque. Pls. Ex. 101 (Alzamari Tr.) 17:16-18:3, 37:13-15; 38:14-17. Ismail Mana testified that the Rahman may have stopped "briefly once" at the Ibn Taymiyyah Mosque but that he "didn't return" because "[t]hey didn't agree with his opinions." Pls. Ex. 110A (Mana Tr.) 71:3-9. |
| 141. | Prior to the 9/11 Attacks, Al Gama'a was a close ally of Al Qaeda and the two groups worked in partnership with Al Qaeda on various terror operations. As explained by Plaintiffs' expert Youssef, Al Gama'a and Al Qaeda espoused the same extremist brand of Islamic religious fundamentalism which was aimed at the establishment of a caliphate imposing Islamic governance over the entire globe. Ex. 5, Youssef Rpt. 16. In October 1997, Al Gama'a was on the first list of foreign terrorist organizations designated by the U.S. Al Qaeda was added to that list in October 1999. Ex. 19A (from website at: https://www.state.gov/foreign-terroristorganizations). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>It is incorrect that prior to the 9/11 attacks Al Gama'a was a close ally of Al Qaeda. As Marc Sageman explains, al Gama'a and Al Qaeda were "strong rivals." Moreover, the "leadership of the al Gama'a Islamiya had rejected violence in 1997." KSA Ex. 167 (Sageman Rep.) 560-61. |
| 142. | FBI investigators led by then Special Agent Youssef, who personally observed and investigated activities of Al Gama'a operatives who attended the Ibn Taymiyah Mosque, "determined that members of Al Gama'a, including Sheikh Omar Abdel Rahman himself, held covert meetings at the Ibn Taymiyah Mosque, thus | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | establishing it as a trusted operational hub for Sunni extremist activities and planning of future terrorist attacks." Ex. 5, Youssef Rpt. 19-20. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's *ipse dixit* assertions.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |
| 143. | Abdel Rahaman visited California several times during 1992-1993 and his main base of operations during his visits to California was at the Ibn Taymiyah Mosque. Such visits required significant advance preparation with Saudi government official Imam Hiber, as well as the other Saudi government leadership of the Mosque. During one visit in 1993, following the February 1993 World Trade Center bombing, Abdel Rahaman lectured at the Ibn Taymiyah Mosque to a selected group of his followers. On several occasions, Abdel Rahaman also led the public prayers at the Ibn Taymiyah Mosque, including the Friday prayer. Ex. 5, Youssef Rpt. 20-21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's *ipse dixit* assertions. The record evidence is to the contrary. Akram Alzamari, who attended the Ibn Taymiyyah Mosque in the mid to late 1990s, and visited up to "[o]nce to twice a day," testified that he had never heard that Omar Abdul Rahman visited the Ibn Taymiyyah Mosque. Pls. Ex. 101 (Alzamari Tr.) 17:16-18:3, 37:13-15, 38:14-17. Ismail Mana testified that Rahman may have stopped "briefly once" at the Ibn Taymiyyah Mosque but that he "didn't return" because "[t]hey didn't agree with his opinions." Pls. Ex. 110A (Mana Tr.) 71:3-9. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |
| 144. | Plaintiffs' expert Youssef concluded that the operations of Al Gama'a and Abdel Rahaman at the Ibn Taymiyah Mosque had to be carried out with the express knowledge and approval of Imam Hiber, his Saudi Government superiors, and the leadership of the Mosque's Foundation. Abdel Rahaman's visit to California in April 1993, following the February 26, 1993 World Trade Center bombing, was widely reported by several news outlets, including CNN.<br>Ex. 5, Youssef Rpt. 21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's *ipse dixit* assertions. The record evidence is to the contrary. Akram Alzamari, who attended the Ibn Taymiyyah Mosque in the mid to late 1990s, and visited up to "[o]nce to twice a day" testified that he had never heard that Omar Abdul Rahman visited the Ibn Taymiyyah Mosque. Pls. Ex. 101 (Alzamari Tr.) 17:16-18:3, 37:13-15, 38:14-17. Ismail Mana testified that Rahman may have stopped "briefly once" at the Ibn Taymiyyah Mosque but that he "didn't return" because "[t]hey didn't agree with his opinions." Pls. Ex. 110A (Mana Tr.) 71:3-9.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 145. | The intense level of support that was provided to Abdel Rahaman by Imam Hiber and the Mosque showed that they all shared the same extremist ideology. Based on his first-hand observations, Plaintiffs' expert Youssef agreed with a 2004 FBI Report determining that "Al Hiber supported the spread of radical fundamentalist Islam." Ex. 5, Youssef Rpt. 21; Ex. 2, EO 0659. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 2M (EO 659) is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Plaintiffs Exhibit 2M (EO 569) contains the quoted language. It also states, however, that "AL-THUMAIRY DISLIKED AL-HIBER, KHALIL, AND SHUAIB, CONSIDERING AL-HIBER TOO POLITICAL FOR A RELIGIOUS OFFICE. . . . AL-THUMAIRY WAS VERY FUNDAMENTALIST (STRICT SALAFI) IN HIS BELIEFS, BUT WAS NOT CONSIDERED TO BE RADICAL OR EXTREMIST." |
| 146. | Hiber worked for Saudi Arabia at all relevant times and became a MOIA propagator soon after MOIA was formed in 1993. Ex. 244, KSA8509-10 at 8509 (Hiber identified by MOIA in March 1996 as propagator at Ibn Taymiyah Mosque); Ex. 296, KSA 8042-43 (explaining in March 1997 that Hiber was now working for MOIA in Riyadh and had been assigned to work as MOIA's Da'wah Director in Nairobi, Kenya); Ex. 5, Youssef Rpt. 1-2 and 21, n.12 (Hiber was the Imam of Ibn Taymiyah Mosque during Plaintiffs' expert Youssef's Al Gama'a Al Islamiyah investigation which began in 1992 and | Plaintiffs Exhibit 5 (Youssef Rep.) and Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>Undisputed that Al Hiber was a Ministry of Islamic Affairs employee during the relevant period. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ended in 1996); Ex. 149, Nakhleh Rpt. ¶ 50 (MOIA formed in 1993). | |
| 147. | While working for Saudi Arabia in Los Angeles, Hiber was assigned "tasks" by Saudi Prince Abdulaziz, including funding various individuals and groups in California. Ex. 296, KSA 8042-43. Thumairy later provided funding to one of those same individuals who was "associated with members of the Somali-based terrorist organization, Al-Ittihad Al-Islamia (AIAI)", Ex. 2, EO 0563, a group with ties to Osama Bin Laden. Ex. 542, FBI 007516-REV2021. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2L (EO 563) and Plaintiffs Exhibit 542 are inadmissible hearsay.<br><br>Undisputed that Prince Abdulaziz, in his private capacity, asked Al Hiber to distribute donations to the individuals identified in Plaintiffs Exhibit 296. Al Thumairy continued that practice after Al Hiber left the United States. Pls. Ex. 107 (Thumairy Tr.) 199:11-200:10.<br><br>Plaintiffs Exhibit 2L (EO 563) contains the quoted language. However, Plaintiffs Exhibit 2L also states that "AL-MIHDHAR and AL-HAZMI[ ] may have not arrived in southern California with an active support network." EO 565. |
| 148. | According to Plaintiffs' expert Youssef, the Ibn Taymiyah Mosque arranged for Abdel Rahman to stay at the homes of persons associated with the Mosque during at least one of Abdel Rahaman's visit to Los Angeles. Abdel Rahman was escorted around Southern California by ███████ ████████ | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 686, 566, and 165B are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's assertions that the Ibn Taymiyyah Mosque arranged for Abdel Rahman to stay at the homes of persons associated with the Mosque. The record evidence is to the contrary. Akram Alzamari, who attended the Ibn Taymiyyah Mosque in the mid to late 1990s, and visited up to "[o]nce to twice a day" testified |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮ Abdo Ghanem and Khaled Cherif. Ex. 5, Youssef Rpt. 21; Ex. 165B, https://www.latimes.com/archives/la-xpm-2002-mar-17-me- mosque17-story.html. Over the ensuing years until the 9/11 Attacks, Ghanem and Cherif remained at the Ibn Taymiyah Mosque and its successor, the King Fahad Mosque, as members of that same extremist group, which in time became led by Fahad al Thumairy. Ex. 72, Madha Decl. ¶ 19 (naming Ghanem and Cherif as part of Thumairy's group); Ex. 686, *U.S. v. Abdel Rahman* Tr. at 9629-31; Ex. 566, FBI 011752-11767 at 11764 ("Ghanem was a driver for…Rahman during the Blind Sheikh's visit [sic] Los Angeles"). | that he had never heard that Omar Abdul Rahman visited the Ibn Taymiyyah Mosque. Pls. Ex. 101 (Alzamari Tr.) 17:16-18:3, 37:13-15; 38:14-17. Ismail Mana testified that Rahman may have stopped "briefly once" at the Ibn Taymiyyah Mosque but that he "didn't return" because "[t]hey didn't agree with his opinions." Pls. Ex. 110A (Mana Tr.) 71:3-9. <br><br> The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). <br><br> Plaintiffs' Exhibit 165B is a March 17, 2002 newspaper article titled, "Inside a Complex Community," from the Los Angeles Times." That article is inadmissible hearsay, but states that Abdo Ghanem "says he supports jihad against Saudi Arabia." <br><br> Fahad Al Thumairy did not lead any extremist group, and it is implausible that if Al Thumairy was acting on behalf of Saudi Arabia that he would lead a group that included individuals who support jihad against Saudi Arabia. <br><br> Plaintiffs cite the Madha declaration (Pls. Ex. 72) stating that Al Thumairy was "extreme" and a member of a "group [that] held extreme, radical, and anti-American views," but Madha later admitted that he could not understand Al Thumairy's sermons and had never personally heard Al Thumairy support terrorism. *Compare* Pls. Ex. 72 (Madha Decl.) ¶¶ 18-19 *with* Pls. Ex. 128 (Madha Tr.) 38:3-39:17 (Al Thumairy gave sermons and led prayers in "Arabic"; Madha "understand[s] very little Arabic"; Madha "never personally heard Al Thumairy express any support for terrorism in any of his sermons"; and Madha "do[es] not know what |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy ever discussed with members of th[e] group" described in Madha's declaration). |
| | | Madha used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Pls. Ex. 128 (Madha Tr.) 60:18-61:18. |
| **II.J.** | **Rahman and Bin Laden had a close relationship and worked together on terror plots.** | Plaintiffs cite nothing for this *ipse dixit*. |
| 149. | Abdel Rahman was a prominent religious authority who was revered by Sunni extremists and notorious for the fatwa he issued to justify the 1981 assassination of Egyptian President Anwar Sadat that led to his imprisonment in Egypt. Ex. 5, Youssef Rpt. 17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.), which this paragraph copies verbatim, should be excluded. *See* Objections Chart.

Undisputed that Abdel Rahman issued a fatwa to justify the 1981 assasination of Egyptian President Sadat that led to his imprisonment. |
| 150. | Saudi Arabia played a key role in allowing Rahman to continue to promote his violent brand of jihad: Rahman was hosted in Saudi Arabia following his exile from Egypt. Rahman then travelled to Afghanistan to take part in jihad along with Osama Bin Laden and Egyptian Ayman Al Zawahiri. Al Zawahri and Abdel Rahman had shared | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | a prison cell in Egypt in the mid-eighties. Ex. 5, Youssef Rpt. 17; Ex. 75, State Dept Cable 88 Cairo 21161 (While in Saudi Arabia in 1988, Rahman spoke on clashes between Islamic extremist groups). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 75 is inadmissible hearsay and has not been authenticated. *See* Objections Chart.<br><br>Rahman was not "hosted" by Saudi Arabia. Plaintiffs Exhibit 75 says only that Rahman "spoke from Saudi Arabia by phone." There is no discussion of Saudi Arabia hosting Rahman, nor is there any discussion of Saudi Arabia playing any "key role in allowing Rahman to continue to promote his violent brand of jihad."<br><br>Undisputed that both Zawahiri and Abdel Rahman were in prison in the early 1980s. However, the two men did not have close ties and were strong rivals. KSA Ex. 167 (Sageman Rep.) 561. |
| 151. | According to Plaintiffs' expert Youssef, "[a]lthough Abdel Rahman was the spiritual leader of Al Gama'a and Zawahiri the leader of the Egyptian Islamic Jihad, both men consolidated their 'armies' in support of the mission of Bin Laden's Al Qaeda in Afghanistan." Ex. 5, Youssef Rpt. 17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef cites nothing for the *ipse dixit* assertion in this paragraph.<br><br>Youssef is also wrong. Al Gama and Al Zawahiri's Al Jihad were always rivals. They never consolidated their armies, and, after Al Gama's 1997 rejection of violence, the bitterness between Al Zawahiri and Al Gama's leadership only increased, leading to a polemic between them through a series of books criticizing each other. Al Gama's position is set forth in Karam Zuhdi et al., 2004, *The Strategy and Bombings of al Qaeda*; Isam |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Dirbalah, 2003, *Al Qaeda's Strategy – The Errors and Dangers*. Al Zawahiri's position is set forth in Ayman al-Zawahiri, 2001, *Knights Under the Prophet's Banner*. |
| 152. | Abdel Rahman and Bin Laden formed a close working relationship while leading mujahedin soldiers in Afghanistan in the 1980s, with Abdel Rahman serving as Bin Laden's trusted advisor and mentor. Their relationship was mutually beneficial as Abdel Rahaman's religious support conferred a legitimacy to Bin Laden and his cause, leading Bin Laden to provide funding for Abdel Rahman in the U.S. and for specific terror plots. Ex. 5, Youssef Rpt. 17. A State Department report addressed the close working relationship among various terror groups, including Al Gama'a, and how a "circle of mutual admiration nurtures the network of safe havens, bases, and logistical support." Ex. 16, State Dept INR Weekend Edition August 21, 1993. The report states that Osama Bin Laden "maintains financial and ideological ties to Sheikh Abdel-Rahman" and "Bin Ladin has funneled money to Abdel-Rahman through Sudanese NIF [Sudanese National Islamic Front] sources." Ex. 16, State Dept INR Weekend Edition August 21, 1993 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 16 is inadmissible hearsay. *See* Objections Chart.

It is incorrect that prior to the 9/11 attacks bin Laden had a close working relationship with Al Gama'a. As Sageman explains, al Gama'a and Al Qaeda were "strong rivals." Moreover, the "leadership of the al Gama'a Islamiya had rejected violence in 1997." KSA Ex. 167 (Sageman Rep.) 560-61.

There is no evidence, and Youssef fails to cite any, that bin Laden provided Abdel Rahman funding in the U.S. for specific terror plots. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 153. | Through the 1990s, Abdel Rahman and Bin Laden remained in contact using intermediaries. Despite his arrest in 1993, Abdel Rahman continued to issue fatwas in support of jihad and correspond with Bin Laden and others by way of messages carried by his visitors in prison. Abdel Rahman's longstanding, close association with Ayman al Zawahiri, the leader or Egyptian Islamic Jihad was a significant factor in Zawahiri's decision to join Al Qaeda and Bin Laden and eventually become Bin Laden's successor as the leader of Al Qaeda. Ex. 5, Youssef Rpt. 17-18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef fails to cite anything for the *ipse dixit* assertions repeated in this paragraph.<br><br>Abdel Rahman did not have a close association with Zawahiri. To the contrary, the two men were strong rivals. KSA Ex. 167 (Sageman Rep.) 561. |
| 154. | Al Gama'a members in California and elsewhere in the U.S. worked with members of other Sunni extremist groups to further their common jihadi goals. Ex. 5, Youssef Rpt. 22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef fails to cite anything for the *ipse dixit* assertions repeated in this paragraph. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 155. | As an example, Al Qaeda and Al Gama'a plotters sought Abdel Rahman's approval for a failed terrorist plot targeting "landmarks" in New York City, Also, the Los Angeles Al Gama'a members proposed an attack on a site in the Los Angeles area and sought Abdel Rahman's approval and Bin Laden's funding. This too was a foiled plot. Ex. 5, Youssef Rpt. 22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef fails to cite anything for the *ipse dixit* assertions repeated in this paragraph.<br><br>Al Qaeda was not involved at all in the "landmarks" plot, and at the time, in 1993, U.S. intelligence agencies and the FBI were not yet aware of its existence. KSA Ex. 167 (Sageman Rep.) 564. The U.S. intelligence community did not become aware of Al Qaeda until 1995. *Id.* |
| 156. | Al Gama'a and Al Qaeda members engaged in regular communication and coordination of their operational objectives. In 1993, Plaintiffs' expert Youssef successfully recruited a source close to Abdel Rahman. The source "was part of a communications chain that linked Abdel Rahman and Bin Laden and revealed how Abdel Rahman and Bin Laden worked together," providing "specific details about a planned terror bombing of a Masonic Lodge in West Los Angeles and disclosed how Abdel Rahman approved the attack and instructed his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's *ipse dixit* assertions. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | operatives to contact Bin Laden to obtain funding for the terror attack." Ex. 5, Youssef Rpt. 22. The source helped establish that Abdel Rahman and Bin Laden's partnership sought to use violence to achieve their common cause of establishing an Islamic caliphate. Ex. 5, Youssef Rpt. 22. | The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Al Qaeda had no U.S. presence in the early 1990s. As Sageman has explained, "it was in Khartoum[, Somalia] and focused on the U.S. presence in Somalia until 1994 when the U.S. withdrew from the country." KSA Ex. 167 (Sageman Rep.) 564. At the time, U.S. intelligence agencies and the FBI were not yet aware of Al Qaeda's existence. *Id.* The U.S. intelligence community did not become aware of Al Qaeda until 1995. *Id.* |
| 157. | In June 1993, U.S. authorities arrested Abdel Rahman, and in 1995, he was convicted in the Southern District of New York for, "leading a conspiracy to wage a war of urban terrorism against the U.S." Ex. 5, Youssef Rpt. 18. The conviction determined Abdel Rahman engaged in a terrorist conspiracy and was responsible for the February 26, 1993 bombing of the World Trade Center that killed six people and injured hundreds. He was also found guilty of leading the 1993 "landmarks plot" against various New York City targets, including the Lincoln and Holland Tunnels, and George Washington Bridge, which if successful, would have caused indescribable deaths and destruction. Ex. 5, Youssef Rpt. 18; Ex. 343, Indictment, *U.S.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 343 is inadmissible hearsay to the extent it is offered for the truth of the matters asserted. *See* Objections Chart.<br><br>Undisputed that Abdel Rahman was arrested and convicted of the charges made against him. Abdel Rahman was convicted of the Landmark Plot, not the 1993 bombing of the World Trade Center. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994); Ex. 688, *U.S. v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994), Tr. 20659:2 – 20664:17. | |
| 158. | The Second Circuit affirmed the conviction of Abdel Rahman based on evidence that, *inter alia*, in January 1993 Rahman publicly announced his support of "violent jihad"; that Rahman sponsored the February 1993 bombing of the World Trade Center; and that Rahman led a group of co-conspirators planning a "Spring 1993 bombing campaign" throughout New York City. Ex. 338, *United States v. Rahman*, 189 F.3d 88, 107, 124, 140 (2d Cir. 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Undisputed that the Second Circuit affirmed the conviction and that the quoted language is included in the opinion. |
| 159. | Based on Plaintiffs' expert Youssef's experience, he concluded that:  Bin Laden and his army of mujahedin fighters which came to be known as "Al Qaeda" played a supporting role for these 1993 terror plots against New York City targets and were closely linked not only to Abdel Rahman but to the terrorists who carried out the attacks.  Ramzi Yousef, the "mastermind" of the 1993 World Trade Center bombing — a terrorist operation that was carried out by Al Gama'a operatives with the approval of Abdel Rahman — was the nephew of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.<br><br>Youssef cites nothing for the assertion that is repeated in this paragraph.  Plaintiffs Exhibit 343 does not support any of the assertions in this paragraph.  That indictment makes no mention of bin Laden or Al Qaeda, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Khalid Sheikh Mohamed, who helped Al Qaeda organize the 9/11 Attacks that targeted the same buildings for destruction. Ex. 5, Youssef Rpt. 18; Ex. 343, *U.S. v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994), Indictment. | and there is no evidence that either was involved in the 1993 World Trade Center bombing. <br><br> Undisputed that Ramzi Yousef was the nephew of Khalid Sheikh Mohammed and that Khalid Sheikh Mohammed helped Al Qaeda organize the 9/11 attacks. |
| 160. | The 9/11 Commission states that "Yousef's instant notoriety as the mastermind of the 1993 World Trade Center bombing inspired [Khalid Sheikh Mohamed] to become involved in planning attacks against the United States." *See* 9/11 Commission Report at 147. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Undisputed that the 9/11 Commission Report contains the quoted language. The 9/11 Commission also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 161. | In separate interrogations, Ramzi Yousef and Khalid Sheikh Mohamed independently revealed their close and direct communications involving various terrorist plots, which included the 1994-95 "Bojinka" plot to bomb multiple aircraft flying from Asia to the U.S, a plan to crash a plane into CIA headquarters, and a plot to assassinate Pope John Paul II. Ex. 5, Youssef Rpt. 18, n. 11. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> Youssef cites nothing for the *ipse dixit* assertions that are repeated in this paragraph. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 162. | According to Plaintiffs' expert Youssef:<br><br>The ties between Bin Laden and Abdel Rahman are also reflected in Bin Laden's actions after Abdel Rahman's arrest and imprisonment in the United States. On May 26, 1998, Bin Laden and Zawahiri held a press conference to announce that they were joining forces with Islamic groups to form the "International Islamic Front" that would "do jihad against the Crusaders and Jews." Zawahiri introduced Abdel Rahman's two sons, who distributed a card entitled "The Fatwa" of the imprisoned Abdel Rahman, which urged the indiscriminate killing of Americans. Ex. 5, Youssef Rpt. 23-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef cites nothing for the *ipse dixit* assertions that are repeated in this paragraph. |
| 163. | The fatwa stated "[c]ut off all relations with [the Americans, Christians, and Jews], tear them to pieces, destroy their economies, burn their corporations, destroy their peace, sink their ships, shoot down their planes and kill them on air, sea, and land." Ex. 5, Youssef Rpt. 24, n. 18; Ex. 322, Peter L. Bergen, The Osama Bin Laden I Know: An Oral History of al Qaeda's Leader (Free Press 2006), 204-05. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Undisputed that Plaintiffs Exhibit 322 contains the quotation from Abdel Rahman's fatwa. That fatwa also criticizes Saudi Arabia, referring to Saudi Arabia as America's "clients." Pls. Ex. 322 (*The Obama bin Laden I Know*) at 204. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 164. | On May 28, 1998, Bin Laden told journalists that he held the American government, "responsible for its attack on that symbol of Islam, Sheikh Omar Abdel Rahman, one of the most prominent Islamic scholars whom God gave the courage to speak the truth….The imprisonment of Sheikh Omar is an attack on the Muslim religion and on Muslim countries. We hold the United States completely responsible for his imprisonment and the imprisonment of other Muslims in America." Ex. 5, Youssef Rpt. 24; Ex. 18B (from website at: https://www.meforum.org/435/usama-bin-ladin-american-soldiers-are-paper-tigers) | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 18B is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that this news article includes the quoted language. |
| 165. | The December 4, 1998 Presidential Daily Briefing to then President Clinton cited intelligence reporting that "Bin Laden and his allies are preparing for attacks in the US, including an aircraft hijacking to obtain the release of [Abdel Rahman]. …" *See* 9/11 Commission Report at 128-29. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that the 9/11 Commission Report contains the quoted language. The 9/11 Commission also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 166. | The weaponization of aircraft was not a new terror tactic in 2001. The homicidal use of aircraft was both "imaginable, and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | imagined." *See* 9/11 Commission Report at 345; Ex. 4, 9/11 Families United to Bankrupt Terrorism Foreseeability Timeline – Foreseeability of the September 11, 2001 Attacks on the U.S. Homeland. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 4 is inadmissible hearsay. *See* Objections Chart. Undisputed that the 9/11 Commission Report contains the quoted language, but Plaintiffs take it out of context. While the possibility of a "suicide hijacking operation" was "imaginable[ ] and imagined," it was judged to be "unlikely" and "an option of last resort." KSA Ex. 163 (9/11 Rep.) 345. "The CTC did not analyze how an aircraft, hijacked or explosives-laden, might be used as a weapon." *Id.* at 347. Richard Clarke "attributed his awareness more to Tom Clancy novels than to warnings from the intelligence community." *Id.* The 9/11 Commission Report cites the Egypt Air crash as well as the Pearl Harbor attacks. KSA Ex. 163 (9/11 Rep.) 345-46. The 9/11 Commission also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| II.K. | **The second Sunni extremist cell at the Islamic Center of San Diego.** | There were no Sunni Extremist cells at the Islamic Center of San Diego. |
| 167. | According to Plaintiffs' expert Youssef, in 1993, the FBI investigation "identified a second, related extremist cell for Al Gama'a and Al Qaeda in San Diego operating at the Islamic Center of San Diego (ICSD), also known as the Abu Bakr | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque," with "two principal active members of that cell at the ICSD: (1) Mohamed Zaky, a leader of that cell, and (2) ██████████████ ████████████████ Ex. 5, Youssef Rpt. 21. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's *ipse dixit* assertions.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>The FBI interviewed ████████████ on August 24, 1995, in relation to the death of Mohammad Zaky. ████████ was the ████████ of "Save Boznia Now," a legitimate non-government organization, of which Zaky had been the president. There is no evidence that the FBI either investigated ████████ or identified him as part of an extremist cell. Pls. Ex. 2V (EO 2572). There is no evidence that there was an extremist cell at the ICSD. |
| 168. | The FBI investigation learned that the ICSD also received support from Saudi Arabia. In fact, during the 1990s, the ICSD's former Imam and influential leader, ████████ ████████, was a MOIA employee paid through the Saudi Embassy, eventually reporting to Thumairy. Ex. 5, Youssef Rpt. 88. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). There is no admissible evidence supporting Youssef's assertions that the ICSD received support from Saudi Arabia. Plaintiffs Exhibit 5 (Youssef Rep.) cites to Plaintiffs Exhibit 2N (EO 692) for this assertion. That exhibit is inadmissible hearsay and does not state that Battikhi was paid through the Saudi Embassy. There is also no record evidence that ▮▮▮▮ reported to Al Thumairy. Al Thumairy testified that he did not supervise propagators in California. Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. |
| 169. | According to Plaintiffs' expert Youssef, the FBI became aware that, during one of Abdel Rahman's visits to California, members of the Sunni extremist cell at the ICSD attended a meeting with the "Blink Shiekh" at the Los Angeles Ibn Taymiyah Mosque. Ex. 5, Youssef Rpt. 21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no record evidence of any Sunni extremist cell at the ICSD or any of the other assertions in this paragraph, and Youssef fails to cite any. |
| 170. | As Plaintiffs' expert Youssef explained, the FBI investigation "revealed that Sunni extremist cells in Los Angeles and San Diego brought together individuals from various groups and nationalities who pledged allegiance to the same goal of an Islamic caliphate and worked together as an Islamic fundamentalist army targeting the U.S. as their primary enemy." Ex. 5, Youssef Rpt. 22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>There is no record evidence supporting any of the assertions in this paragraph, and Youssef fails to cite any. |
| 171. | Furthermore, according to Plaintiffs' expert Youssef:<br><br>The common cause of the various Sunni extremist groups is evidenced by the fact that members of those groups fought side-by-side in Bosnia in the mid-nineties, believing that they were joining together to participate in Jihad in the name of Islam. In 1993 and 1994, Sherif Kamel Eid, a prominent member of the Al Gama'a cell at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 21 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Ibn Taymiyah Mosque, and Mohamed Zaky, a leader of a radical Sunni extremist cell at the ICSD, traveled from California to Bosnia along with other California-based Sunni extremists to be part of the same Islamic fundamentalist army as Al Qaeda members Nawaf al Hazmi and Khalid al Mihdhar, who also fought in Bosnia in 1995. Eid and Zaky were both killed while fighting. Zaky's death occurred in 1995 in Chechnya.<br><br>Ex. 5, Youssef Rpt. 22-23; Ex. 21, *U.S. v Jayyousi*, 04cr3565 (S.D. Fla. Dec. 1, 2004), Complaint at ¶ 8 ("Zaky participated in fighting with Bosnian Muslims on two occasions between 1993 and 1994. He specialized in making videotapes of the fighting which he then used as part of his fundraising activities in the United States to support violent jihad. In May 1995, Zaky was killed while fighting against the Russians in Chechnya."). | The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Undisputed that Zaky fought in Bosnia and Chechnya. There is no record evidence supporting any of the other assertions in this paragraph, and Youssef fails to cite any. |
| 172. | After Zaky's death, Omar (aka "Forge") Hamerman took over a leadership role in the Sunni extremist cell in San Diego, managing Zaky's organization in San Diego called the Islamic Information Center of the Americas. Ex. 5, Youssef Rpt. 23; Ex. 69, Articles of Incorporation, Islamic Information Center of the Americas (May | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 4, 1993) (California Secretary of State entity information for the Islamic Information Center of the Americas, which lists Hamerman as the agent). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Plaintiffs Exhibit 69 states that Abdullah Muhammad, not Omar Hamerman, is the agent for service of process. There is no record evidence supporting any of the assertions in this paragraph, and Youssef fails to cite any.<br><br>Moreover, according to Plaintiffs Exhibit 21 cited by Plaintiffs, Jayyousi, not Hamerman, took over Zaki's position after his death. Pls. Ex. 21, ¶ 10. |
| 173. | Shortly before his death, Zaky confided to his close associate that he used the Islamic Information Center of the Americas as a cover for funding jihadist activity. Ex. 5, Youssef Rpt. 23; Ex. 691, *US v Jayyousi*, 04 Cr 3565 (S.D.Fla. Dec. 1, 2004) Complaint, Kavanaugh Affidavit at ¶ 17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 691 is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited paragraph of Plaintiffs Exhibit 691 does not state that Zaky confided to his close associate that he used the Islamic Information Center of the Americas as a cover for funding jihadist activity.  It states:  "In a later conversation on April 1, 1995, with a new representative for AWR in New Jersey, Zaky described one of his organizations, the 'Islamic Information Center Of The Americas,' as a 'covering . . . because they are tightening it on us, especially the fundraising story and all these things.'" |
| 174. | At a February 1995 meeting of the San Diego cell, during a discussion about which jihadist groups to financially support, one of the participants stated, "as long as there is slaughtering, we're with them. If there's no slaughtering, there's none ... that's it, buzz off." They also talked about their plans to publish a booklet titled "Terrorism Is A Duty and Force Is An Obligation" and have it distributed world-wide. Ex. 691, *US v Jayyousi*, 04 Cr 3565 (S.D.Fla. Dec. 1, 2004) Complaint, Kavanaugh Affidavit at ¶ 10, 16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 691 is inadmissible hearsay.  *See* Objections Chart.<br><br>Plaintiffs Exhibit 691 also does not reference any "San Diego cell."  The exhibit contains the quoted language, but the cited paragraph describes a conversation between Zaky and two other individuals, Daher and Jayyousi.  There is no record evidence that either were members of any San Diego "cell" or had any affiliation with the ICSD. |
| III. | **SAUDI ARABIA BUILT THE KING FAHAD MOSQUE IN LOS ANGELES, TOOK STEPS TO ENSURE THAT IT WOULD BE CONTROLLED BY THE KINGDOM'S RELIGIOUS LEADERSHIP, PAID ITS EXPENSES, AND INSTALLED THUMAIRY AS ITS IMAM** | Plaintiffs cite no evidence for this assertion.  Saudi Arabia did not build the King Fahad Mosque nor was it controlled by the Kingdom's religious leadership.  To the contrary, the King Fahad Mosque was built and run by the Ibn Taymiyyah foundation.  The foundation and the mosque were completely independent of the Saudi government.  *See* Pls. Ex. 121 (Kaldirim Tr.) 263:13-21; Pls. Ex. 113 (Khalil Tr.) 366:20-367:15.<br><br>Saudi Arabia also did not pay the mosque's expenses or construction.  A portion of those expenses were paid by a private donation of Prince Abdul |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Aziz bin Fahd. *See* Pls. Ex. 121 (Kaldirim Tr.) 108:1-109:4; *id.* at 110:20-24; *id.* at 113:6:8; *id.* at 246:1-21. |
| 175. | In September 1993, shortly after Abdel Rahman's last visit to California, Prince Abdelaziz, the son of then Saudi King Fahad, visited the Ibn Taymiyah Mosque in Los Angeles with his entourage and met with Dr. Khalil al Khalil, who at the time was the Saudi Embassy's Islamic Affairs Deputy. Ex. 187, KFM 0091-92. The Prince pledged to obtain funds to purchase land for a new mosque in honor of his father. This began the project that led to the building of the King Fahad Mosque. Shortly thereafter, the Saudi Embassy provided $1 million to the Ibn Taymiyah Foundation to purchase land. Ex. 188, KFM 0376-78; Ex. 191, KFM 0400; Ex. 121, Kaldirim Dep. 34-40. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited material does not establish facts concerning Abdel Rahman's "last visit to California" or that the Saudi Embassy provided $1 million to purchase the land. *See* Pls. Ex. 121 (Kaldirim Tr.) 34:22-23 (referring to Prince Abdul Aziz as the one who "wrote the check and sent it"). Instead, Prince Abdul Aziz and his father, the King, made a private donation. *Id.* at 34:8-35:6.<br><br>Ex. 188 is inadmissible hearsay. *See* Objections Chart. |
| III.A. | **Saudi Arabia successfully negotiated for total control of the Mosque, including 9 of 12 Board members and the appointment of the Imam.** | Plaintiffs cite no evidence to support this assertion. The record contradicts it. No response required.<br><br>As discussed below, the evidence shows that while seven new members were added to the Foundation's board, those seven new members "never communicated with" the active board members at the King Fahad Mosque, *see* Pls. Ex. 113 (Khalil Tr.) 191:8-14, and they were removed from the board because they were inactive, *see* Pls. Ex. 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). Contrary to Plaintiffs' assertion that Saudi Arabia negotiated for "total control," it was understood that the seven new members would |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "not object . . . to [or go] against the best wishes of the [five] founders" on the board. Pls. Ex. 113 (Khalil Tr.) 189:5-191:1. The fact that the new members did not control the board is demonstrated by the fact that they were removed by original members. |
| 176. | In June and July 1995, the Ibn Taymiyah Foundation was informed that the first $4 million in funding for construction of the new mosque was in a Saudi Embassy bank account and that Dr. Mohamed Abdel-Mohsen Al-Turki, an Imam Mohamed University professor and the brother of MOIA's Minister Abdullah Al-Turki, had been appointed by Saudi Arabia as its coordinator for the new mosque project. Ex. 189, KFM 0379-82; Ex. 190, KFM 0391. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 189 is inadmissible hearsay offered for the truth of the matter asserted. *See* Objections Chart.<br><br>To the extent a response is required, the cited material does not establish the relationship between former Minister Al-Turki and Abdel-Mohsen Al-Turki or that he was a professor at Imam Mohamed University. The cited material also does not establish that funding for construction of the King Fahd Mosque was in a Saudi Embassy bank account.<br><br>The record also establishes that the funding was a private donation from Prince Abdulaziz, not the Saudi government. *See* Pls. Ex. 121 (Kaldirim Tr.) 246:1-21; *id.* at 38:23-40:2 ("Because [the] prince was giving purely a donation, which [was] the condition [on which] we were accepting the money at the time. That he was not interested [in] any administrative type of things, but he wanted to make sure the project is built and his money is spent for the project."); Pls. Ex. 113 (Khalil Tr.) at 315:19-316:2 ("donation" to purchase land); *id.* at 317:4-9 ("donation" for construction). |
| 177. | Mohamed al-Turki held up the funding for the mosque until he could negotiate terms with the Ibn Taymiyah Foundation over the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | religious control of the mosque. Ex. 121, Kaldirim Dep. 41:22-42:20. Al-Turki's role was to make sure that the new mosque "does not go off of Islamic movements or Islamic preachings and things like that." Ex. 121, Kaldirim Dep. 44:10-45:2. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 121 (Kaldirim Tr.) is inadmissible hearsay not based on personal knowledge. *See* Pls. Ex. 121 (Kaldirim Tr.) 45:3-4 (this is "not my area"); *id.* at 44:2-3 (noting that information was conveyed to Dr. Khalil and "they were speaking Arabic. I can't speak Arabic very much."). *See* Objections Chart.<br><br>To the extent a response is required, the cited material does not state that funding was held up to negotiate religious control of the mosque. It states that Al-Turki and the Embassy "wanted to make sure that we have the money handled properly," Pls. Ex. 121 (Kaldirim Tr.) 41:6-7, and that the money donated for the King Fahd Mosque was "being spent . . . correctly" and that "the mosque is managed properly," *id.* at 43:23-24.<br><br>The cited material does contain the quote concerning Islamic preachings, however, Kaldirim testified that this was not based on his personal knowledge. *Id.* at 45:3-4 (this is "not my area"); *id.* at 44:2-3 (noting that information was conveyed to Dr. Khalil and "they were speaking Arabic. I can't speak Arabic very much."). |
| 178. | In July 1995, Khalil wrote two letters to Saudi Prince Abdulaziz to assure him that the Ibn Taymiyah Foundation was an arm of Saudi Arabia and that the Ministry of Islamic Affairs would appoint a Saudi imam to manage and supervise the Foundation's Mosque. In the first letter, which Khalil signed as "your loyal son," Khalil stated that Ibn Taymiyah Foundation was "the extension of the activities of the | Plaintiffs Exhibit 193 is inadmissible hearsay. *See* Objections Chart.<br><br>This paragraph refers to two letters but cites only one letter. Plaintiffs Exhibit 193 contains the materials quoted from it, but the paragraph is otherwise unsupported by the materials cited. The cited letter provides no assurances that the Foundation is an "arm of Saudi Arabia," nor does it state that the Ministry of Islamic Affairs would appoint a Saudi imam to manage and supervise the mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Kingdom and it is part of its organizations." Ex. 193, KFM 0420-21. | To the contrary, Khalil testified that the "Ibn Taymiyyah Foundation is completely independent of the Saudi Arabian government." Pls. Ex. 113 (Khalil Tr.) 366:20-367:15. He also testified that the King Fahd Mosque was likewise completely independent of the Saudi Arabian government. *Id.* at 367:6-11. |
| 179. | In his second letter to the Saudi Prince, Khalil described the Ibn Taymiyah Foundation as "Saudi since birth" and offered "visions" to restructure the board of the Ibn Taymiyah Foundation and the new King Fahad Mosque "because the important thing is to choose what serves the interest of the Da'wah and the interest of the country, and what has the approval of Your Highness and the acceptance and support of His Highness Prince Bandar bin Sultan [then Saudi Ambassador Bandar]." Ex. 189, KFM 0379-82 at 380-81. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 189 is inadmissible hearsay offered for the truth of the matter asserted. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 189 contains the quoted language, but Plaintiffs omit important context. Khalil confirmed that the "Ibn Taymiyyah Foundation is completely independent of the Saudi Arabian government." Pls. Ex. 113 (Khalil Tr.) 366:20-367:15. He also testified that the King Fahd Mosque was likewise completely independent of the Saudi Arabian government. *Id.* at 367:6-11. |
| 180. | Khalil also spelled out that Saudi Arabia "may choose, in cooperation with His Excellency Minister of Islamic Affairs or any other agency, those who can manage it and supervise its activities from among the Saudi propagators…." This confirmed that MOIA would appoint the propagator to manage and supervise the new mosque. Ex. 189, KFM 0379-82 at 380-81 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 189 is inadmissible hearsay offered for the truth of the matter asserted. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs Exhibit 189 contains the quoted language but does not "confirm[] that MOIA would appoint" an imam to manage and supervise the new mosque. As Plaintiffs Exhibit 189 states, the letter presents "visions to consider;" it does not confirm that they were adopted and carried out. |
| 181. | The final negotiations took place in a meeting in Riyadh attended by Mohamed al Turki, Khalil, and Prince Abdelaziz's lawyer and religious advisor Saad al Buraik, who was an outspoken anti-U.S. critic and proponent of violent jihad. Buraik came to Los Angeles to visit the Ibn Taymiyah Mosque and the King Fahad Mosque and met with Consulate officials. Ex. 113, Khalil Dep. 179:13-180:17; Ex. 85, Congressional Record May 7, 2002, National Review; Ex. 95, Awad Dep. 168:11-170:13. | Plaintiffs Exhibit 85 is inadmissible hearsay (including hearsay within hearsay) offered for the truth of the matter asserted. *See* Objections Chart.<br><br>This cited material does not provide the source or context for Buraik's alleged statements about the United States and jihad or establish that the person who made these alleged statements was the same person in attendance at the meeting in Riyadh.<br><br>The cited material does not reference "negotiations" but instead refers to a meeting in which it was agreed that the Saudi Embassy would not participate in the King Fahad Mosque project. Pls. Ex. 113 (Khalil Tr.) 181:9-182:4.<br><br>The cited material also does not establish that Mr. Buraik came to Los Angeles, that he came for the purpose of visiting the Ibn Taymiyah or King Fahad Mosques, or that he met with Consulate officials while there. *See* Pls. Ex. 95 (Awad Tr.) 168:11-170:13. The meetings Mr. Khalil recalled with Mr. Buraik occurred in Jeddah, not in the United States. *See* Pls. Ex. 113 (Khalil Tr.) 320:22-322:18; *id.* at 180:8-17. |
| 182. | An agreement was reached in which seven additional Saudi government officials were added to the Ibn Taymiyah Foundation Board. Six of the new board members represented Saudi Arabia's religious leadership, from its Ministry of Islamic Affairs at the Embassy and Riyadh headquarters; the Islamic Affairs | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Department of the Embassy; and Imam Mohamed University. The seventh board member was the Consul General in Los Angeles. As a result, the Board now had a total of 12 members, 9 of whom were Saudi government officials. Ex. 113, Khalil Dep. 180:18-182:21; Ex. 179, Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Taimiyyah (Kaldirim Dep. Ex. 179). | To the extent a response is required, the document does not state that the new board members "represented Saudi Arabia's religious leadership." Plaintiffs Exhibit 179 lists the specific titles of the seven new board members. The cited materials also do not establish that 9 of 12 board members were Saudi government officials. To the contrary, the cited testimony suggests that "seven . . . maybe eight of 12" "are Saudi government officials." Pls. Ex. 113 (Khalil Tr.) 187:1-3.

Moreover, the evidence shows that while seven new members were added to the board, those seven new members "never communicated with" the active members at the King Fahad Mosque, *see* Pls. Ex. 113 (Khalil Tr.) 191:8-14, and they were removed from the board because they were inactive, *see* Pls. Ex. 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). Contrary to Plaintiffs' assertion above that Saudi Arabia negotiated for "total control," it was understood by active board members that the seven new members would "not object . . . to [or go] against the best wishes of the [five] founders" on the Board. Pls. Ex. 113 (Khalil Tr.) 189:5-191:1. |
| 183. | After the agreement was reached in December 1995 the initial construction funds of $4 million were disbursed to the Ibn Taymiyah Foundation by Saudi Ambassador Prince Bandar. Ex. 191, KFM 0400. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 191 does not support aspects of Plaintiffs' assertion of fact. The document does not establish that agreement was reached in December of 1995, that the two checks written to the Ibn Taymyah and Ibn Taymiyah foundation are for purposes of initial construction funds, or that they were disbursed by Ambassador Bandar. The documents show two letters of credit totaling |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | $4 million from the Saudi Embassy to the foundation written in December of 1995.<br><br>The record also establishes that the funding was a private donation from Prince Abdulaziz, not the Saudi government. *See* Pls. Ex. 121 (Kaldirim Tr.) 246:1-21; *id.* at 38:23-40:2 ("Because [the] prince was giving purely a donation, which [was] the condition [on which] we were accepting the money at the time. That he was not interested [in] any administrative type of things, but he wanted to make sure the project is built and his money is spent for the project."); Pls. Ex. 113 (Khalil Tr.) at 315:19-316:2 ("donation" to purchase land); *id.* at 317:4-9 ("donation" for construction). |
| 184. | The seven new board members were made effective in a Certificate of Amendment of the Articles of Incorporation of the Ibn Taymiyah Foundation which was filed with the California Secretary of State on January 6, 1997. (Ex. 179, Kaldirim Dep. Ex. 179, Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Taimmiyah). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 179 contains the facts described. Khalil also testified that it was understood that the seven new members "will not object . . . to [or go] against the best wishes of the [five] founders" on the board and that they were added to expedite release of money to the foundation for construction of the mosque. Pls. Ex. 113 (Khalil Tr.) 189:5-191:1.<br><br>Moreover, the evidence shows that while seven new members were added to the board, those seven new members "never communicated with" the active members at the King Fahad Mosque, *see* Pls. Ex. 113 (Khalil Tr.) 191:8-14, and they were removed from the board because they were inactive, *see* Pls. Ex. 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | no participation . . . by the new board members"). Contrary to Plaintiffs' assertion above that Saudi Arabia negotiated for "total control," it was understood by active board members that the seven new members would "not object . . . to [or go] against the best wishes of the [five] founders" on the Board. Pls. Ex. 113 (Khalil Tr.) 189:5-191:1. |
| 185. | The King Fahad Mosque had its "Grand Opening" in July 1998, but was not yet completed at that time. The King Fahad Mosque did not open for services until the fall of 1999. Ex. 72, Madha Decl. ¶¶ 6, 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the assertion accurately describes Madha's testimony in Plaintiffs Exhibit 72. |
| 186. | An Ibn Taymiyah Foundation board resolution purportedly dated August 17, 2001 sought to remove all of the seven Saudi Government officials added in 1997 from the Ibn Taymiyah Foundation Board. Ex. 186, KFM 0082. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the document is dated August 17, 2001 on its face. The document also does not state that the board "sought to remove" the seven new board members that had been appointed as shown in Plaintiffs Exhibit 179; it states that those seven board members were removed, "effective today." The document also authorized Dr. Khalil, Dr. Kaldirim, and Shuaib to implement the decision "immediately." Pls. Ex. 186 (Kaldirim Ex. 185) at KFM 83.<br><br>Moreover, the evidence shows that while seven new members were added to the board, those seven new members "never communicated with" the active members at the King Fahad Mosque, *see* Pls. Ex. 113 (Khalil Tr.) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 191:8-14, and they were removed from the board because they were inactive, *see* Pls. Ex. 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). Contrary to Plaintiffs' assertion above that Saudi Arabia negotiated for "total control," it was understood by active board members that the seven new board members would "not object . . . to [or go] against the best wishes of the [five] founders" on the Board. Pls. Ex. 113 (Khalil Tr.) 189:5-191:1. |
| 187. | The Mosque's manager Usman Madha, however, testified that it was not until after the 9/11 Attacks that the Foundation acted to change its filings to remove all Saudi Government officials from the Board. Ex. 72, Madha Decl. ¶ 30. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the testimony does not support Plaintiffs' assertion. Madha testified that *he learned* of Dr. Khalil's instructions to Shuaib to change the foundation's filings to remove "all of the Saudi government officials who were members of the Foundation's Board" after the 9/11 Attacks. Pls. Ex. 72 (Madha Ex. 830) ¶ 30.

It does not say when Dr. Khalil purportedly gave those instructions to Shuaib or when Shuaib carried out the instructions. Plaintiffs Exhibit 186 also shows that the Foundation's Board authorized Dr. Khalil to "implement the above decision immediately, including the filing [of] all necessary forms with the Secretary of State for California," on August 17, 2001, showing that the Foundation took the first step to changing its filings on that date.

Dr. Khalil also testified that it was Dr. Kaldirim, and not himself, that instructed Shuaib to file a document concerning Board membership. Pls. Ex. 113 (Khalil Tr.) 401:19-22. And Dr. Khalil explained that what was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | significant to him was when the decision was made, whereas "[t]he implementation, that may take some time." *Id.* at 400:9-13. |
| 188. | The Ibn Taymiyah Foundation did not file an amendment with the California Secretary of State to remove the officials until over a year later, on September 17, 2002. Ex. 178 (Kaldirim Dep. Ex. 186) (Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Tammiyyah). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 178 is a document filed with the California Secretary of State on September 17, 2002, which states that the Ibn Tammiyyah Board has five members. It does not indicate when the membership was first reduced to that number or when that decision was made.

Plaintiffs Exhibit 186 shows that the Foundation's Board authorized Dr. Khalil to "implement the above decision [to remove seven members who had been added in 1995] immediately, including the filing [of] all necessary forms with the Secretary of State for California," on August 17, 2001, showing that the Foundation took the first step to changing its filings on that date.

And Dr. Khalil explained that what was significant to him was when the decision was made, whereas "[t]he implementation, that may take some time." Pls. Ex. 113 (Khalil Tr.) 400:9-13. |
| 189. | The circumstances demonstrate that it is likely that the Ibn Taymiyah Foundation Board resolution removing all Saudi officials' involving in the Mosque was initially prepared after the 9/11 Attacks and backdated to August 17, 2001 as an effort by the Saudi government to avoid | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | responsibility for the Mosque's involvement in the 9/11 Attacks. Ex. 5, Youssef Rpt. 29, n. 48. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, this is also improper attorney argument and does not even purport to assert a fact but instead argues for a particular factual inference. That inference is unsupported by the record evidence.<br><br>Youssef speculates that it is likely the Board backdated Plaintiffs Exhibit 186 to September 17, 2001, based solely on a misreading of Madha's testimony and the fact that the Foundation filed a document (Plaintiffs Exhibit 178) reflecting that its board had five members in September of 2002. But Madha did not testify that the Board backdated any document, nor did he testify to having any personal knowledge about when the Board made its decision concerning removal of seven members. He merely testified that he *learned* of instructions by Dr. Khalil to Shuaib to fly to Sacramento to change corporate filings after the 9/11 Attacks. *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 30. That testimony says nothing about when the Board made its decisions, and the details of the testimony are contradicted by Dr. Khalil's testimony. *See* Pls. Ex. 113 (Khalil Tr.) 401:19-22, 402:5-23 (Dr. Kaldirim gave the instructions; Shuaib drove and did not fly to Sacramento).<br><br>And Dr. Khalil explained that what was significant to him was when the decision was made, whereas "[t]he implementation, that may take some time." Pls. Ex. 113 (Khalil Tr.) 400:9-13. Thus, the fact that the Foundation filed a document with the California Secretary of State in September of 2002 in no way indicates that the decision to remove seven Board members was not made on August 17, 2001 or that the document reflecting the date of that decision was backdated. Consistent with Dr. Khalil's testimony that there are delays between the Board making a decision and submitting corresponding paperwork, Saudi Arabia's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | responses to Paragraphs 183 and 184 above demonstrated that the decision to add seven Board members was made in 1995, while the certification reflecting that decision was filed in 1997. |
| **III.B.** | **Saudi Arabia paid the expenses for the construction and day-to-day operation of the Mosque.** | Plaintiffs cite nothing to support this assertion, and the available evidence contradicts it. Some expenses for the Mosque were reimbursed by a private donation from Prince Abdulaziz that was disbursed through the Consulate *See* Pls. Ex. 113 (Khalil Tr.) at 383:17-384:7; Pls. Ex. 121 (Kaldirim Tr.) 108:1-109:4; *id.* at 110:20-24; *id.* at 113:6:8; *id.* at 246:1-21. |
| 190. | Saudi Arabia established accounts at the Saudi Embassy and Saudi Consulate to pay the mosque's expenses. Ex. 72, Madha Decl. ¶13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Madha's testimony at ¶ 13 of his declaration regarding what Kaldirim allegedly said is inadmissible hearsay offered for the truth of the matter asserted. *See* Objections Chart. |
| | | To the extent a response is required, Plaintiffs' statement is not supported by the cited material. Madha's testimony identifies a single account opened by the Embassy and transferred to the Consul General's office in Los Angeles. *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 13. Moreover, the account was not established by Saudi Arabia so that Saudi Arabia could pay mosque expenses. Rather, the account was funded with private donations. Mana, who worked at the Consulate, testified that a donation from the King was contributed to an account for the King Fahad Mosque. Contrary to Plaintiffs' allegation that Saudi Arabia established the account, this donation was "not . . . an official service from the government of Saudi Arabia or the Ministry of Foreign Affairs" and the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Consul General did not want that money "to be mixed with the – with the consulate's business." Pls. Ex. 110A (Mana Tr.) 110:14-22, 111:11-24. |
| 191. | The Kingdom provided all the funding for the construction of the King Fahad Mosque as well as the purchase of a building across the street for the Mosque's offices. Ex. 72, Madha Decl. ¶ 13; Ex. 194, KFM 0401-2; Ex. 192, KFM 0403; Ex. 258, KSA 1258 ($2 million Embassy check sent to Khalil for the Mosque's inauguration). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 72, ¶ 13, contains inadmissible hearsay; Plaintiffs Exhibit 192 and Plaintiffs Exhibit 194 are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Plaintiffs' assertion is not supported by the cited materials.  Madha testified that the Kingdom funded the Mosque's construction, but he did not state that the Kingdom provided *all* of the funding or reference the school.  *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 13.  Exhibits 192 and 194 likewise do not state that the Kingdom provided *all* of the funding for construction of the Mosque or that the building across the street was purchased for the purpose of serving as Mosque offices.  Plaintiffs Exhibit 258 concerns the inauguration of the Mosque, not construction.

Contrary to Plaintiffs' assertion, the record establishes that the funding was a private donation from Prince Abdulaziz, not the Saudi government. *See* Pls. Ex. 121 (Kaldirim Tr.) 246:1-21; *id.* at 38:23-40:2 ("Because [the] prince was giving purely a donation, which [was] the condition [on which] we were accepting the money at the time.  That he was not interested [in] any administrative type of things, but he wanted to make sure the project is built and his money is spent for the project."); Pls. Ex. 113 (Khalil Tr.) at 315:19-316:2 ("donation" to purchase land); *id.* at 317:4-9 ("donation" for construction). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 192. | In July 1998, Prince Abdulaziz pledged that Saudi Arabia would pay the operating expenses for the mosque, which were estimated at $500-600,000 annually. Ex. 121, Kaldirim Dep. 111:3- 112:18, 119:21-120:2. Prior to the 9/11 Attacks, the Saudi Embassy opened an account with $1 million under the name of the Mosque and transferred that account to the Consul General's office in Los Angeles. Ex. 72, Madha Decl. ¶ 13. A Board member also recalls that $500,000-$600,000 was received by the Consulate in 2000-2001 that was used to pay for the Mosque's expenses. Ex. 121, Kaldirim Dep. 110:3-113:8; Ex. 72, Madha Decl. ¶ 13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 72, ¶ 13, contains inadmissible hearsay; the cited testimony in Plaintiffs Exhibit 121 is also based on hearsay, not personal knowledge. *See* Objections Chart.

To the extent a response is required, the statement that "Saudi Arabia" would pay the operating expenses is not supported. Dr. Kaldirim repeatedly testified that funding for the Mosque from Prince Abdulaziz was a donation from the Prince, not the government. *See, e.g.*, Pls. Ex. 121 (Kaldirim Tr.) 108:22-109:4 ("And this money was donated by the government of Saudi Arabia? Actually it was coming through Prince Abdul Aziz bin Fahd."); *id.* at 110:20-24 ("donation"); *id.* at 113:4-8 ("donation").

And Madha acknowledges that Mana was involved with releasing funds to the Mosque, and Mana explained that funding the account was "not . . . an official service from the government of Saudi Arabia or the Ministry of Foreign Affairs" and the Consul General did not want that money "to be mixed with the – with the consulate's business." Pls. Ex. 110A (Mana Tr.) 110:14-22, 111:11-24.

Moreover, the witnesses quoted do not have personal knowledge of the facts at issue concerning the amount of money that was donated or details concerning the accounts. *See, e.g.*, Pls. Ex. 121 (Kaldirim Tr.) 108:18-21 ("The number, I don't know how much money he was given to be given to us, to the mosque, as a donation. But I heard around $500,000."); |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 118:22-119:11 ("Q. But you said before there was $500,000 that had been sent from the prince to the embassy to the consulate in Los Angeles that you understood that they were holding back on giving to the mosque. A. This is . . . our understanding, *but we did not have the fact. . . . We do not know exactly how much and what*.") (emphasis added).<br><br>Kaldirim also testified that he issued instructions to stop accepting donations from the Prince that came through the Consulate to pay operating expenses for the Mosque. *See* Pls. Ex. 121 (Kaldirim Tr.) 120:9-21. |
| 193. | The Saudi Consul General Salloum instructed the Consulate's Islamic Affairs Secretary Ismail Mana to oversee the dispersal of funds from this account to the Mosque. Ex. 72, Madha Decl. ¶ 13; Ex. 121, Kaldirim Dep. 121:14-122:20, 125:2-20; Ex. 110A, Mana Dep. 110:12-111:6, 113:9-114:8, 254:6-255:15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 72, ¶ 13, contains inadmissible hearsay; the cited testimony in Plaintiffs Exhibit 121 is also based on hearsay, not personal knowledge. *See* Pls. Ex. 121 (Kaldirim Tr.) 122:2-11 (basing testimony about Mana's role on what "it looks like" "from this letter"). *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' statement is partially inaccurate and incomplete. Mana's title was "translator," not "Islamic Affairs Secretary." Pls. Ex. 110A (Mana Tr.) 54:3-4.<br><br>Mana's testimony makes clear that Salloum asked him to manage donations received for the King Fahad Mosque, "[b]ut not as an official service from the government of Saudi Arabia or the Ministry of [F]oreign [A]ffairs." Pls. Ex. 110A (Mana Tr.) 110:14-22. And he clarified that the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | funds for the Mosque were "separate" from "the Consulate's business" and budget. *Id.* at 111:11-17. |
| 194. | Prior to the 9/11 Attacks, King Fahad Mosque expenses were routinely paid by Saudi Arabia through the Consulate. A Letter of Agreement dated December 8, 2000 and signed by the Saudi Consul General Salloum, Ibn Taymiyah Foundation Board member Kaldirim, and Thumairy (referenced as "Sheikh Fahad Althumairy"), shows that they met at the Saudi Consulate with a construction company and that the Consulate paid approximately $650,000 in additional construction costs for the Mosque, Ex. 34, KSA 7319-7320 at 7320 (Awad Dep. Ex. 466), and a separate letter shows that the funds were received by the Consulate from MOIA's Minister Sheikh, *Id.* at 7319. *See also* Ex. 680L, KSA 7304 (February 2001 bank check for KFM taxes of $7,051.09 paid by funds from the Minister of Islamic Affairs together with a contribution from the Consul General); Ex. 680M, KSA 7325 (February 2001 letter from Embassy Islamic Affairs Head Ghesheyan to Consul General Salloum with $30,000 check for payment of Mosque salaries). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the documents contain the quoted material, but contrary to Plaintiffs' claim that Mosque expenses were "routinely" paid "by Saudi Arabia," the records show that the cited expenses were paid by private donations. Plaintiffs Exhibit 34 (KSA 7319) refers to "a donation from the Custodian of the Two Holy Mosques," not a payment from Saudi Arabia, for $650,000. Similarly, Plaintiffs Exhibit 680L (KSA 7304) refers to a transfer from "His Eminence Minister of Islamic Affairs," and "a personal contribution . . . from the Consul General," not a payment from Saudi Arabia.

Contrary to Plaintiffs' assertion, the record establishes that funding – for land, construction, expenses, and the grand opening ceremony – from Prince Abdulaziz and his father were private donations, not the Saudi government as Plaintiffs assert. *See* Pls. Ex. 121 (Kaldirim Tr.) 246:1-21; *id.* at 38:23-40:2 ("Because [the] prince was giving purely a donation, which [was] the condition [on which] we were accepting the money at the time. That he was not interested [in] any administrative type of things, but he wanted to make sure the project is built and his money is spent for the project."); Pls. Ex. 113 (Khalil Tr.) at 315:19-316:2 ("donation" to purchase land); *id.* at 317:4-9 ("donation" for construction). The evidence shows that some of these private donations were disbursed through the Consulate *See* Pls. Ex. 113 (Khalil Tr.) at 383:17-384:7; Pls. Ex. 121 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Kaldirim Tr.) 108:1-109:4; *id.* at 110:20-24; *id.* at 113:6:8; *id.* at 246:1-21. |
| **III.C.** | **Thumairy was handpicked by MOIA's highest leaders to expand MOIA's operations in California, including the Sunni extremist cell in Los Angeles, and to take the helm of the new Mosque named after the Saudi King.** | Plaintiffs' assertion is not supported by any evidence. As described below, Al Thumairy was not handpicked by the Ministry of Islamic Affairs. He applied for a job within MOIA; was interviewed and hired in 1995 for a job in America; and was subsequently assigned to Los Angeles. *See, e.g., infra*, Responses to ¶¶ 228-229. |
| | | There was no "Sunni extremist cell" in Los Angeles. *See, e.g., infra*, Responses to ¶¶ 398, 412, 420-421. |
| | | And the evidence shows that Al Thumairy and "MOIA's highest leaders" (the Minister of Islamic Affairs) did not know each other. Al Thumairy testified: "Personally, I didn't know him [Minister Turki]." Pls. Ex. 107 (Thumairy Tr.) 28:8-22. |
| | | Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-24-125:1; *see also id.* at 126:9-21. |
| 195. | The selection of Thumairy for a five-year post to lead MOIA's expansion into California and become the first religious leader of the planned King Fahad Mosque in Los Angeles was an extraordinary, highly prized Saudi government appointment. Ex. 2, EO 3487 (MOIA offices "worldwide and in the U.S. played a key role in supporting the Saudi Arabian Government's objective to be perceived as the leader of the Islamic world"). Saudi Arabia and its Ministry of Islamic Affairs was particularly focused on the importance | Plaintiffs Exhibit 2CC (EO 3482-608) is inadmissible hearsay. |
| | | The cited materials also do not support Plaintiffs' assertions. Plaintiffs Exhibit 2CC (EO 3487) says nothing about Al Thumairy, his appointment, the prestige attached to it, the length of his post, southern California, or the King Fahad Mosque. There is no evidence that Al Thumairy was selected to "lead MOIA's expansion into California." And there is no evidence that he was the first religious leader of the King Fahad Mosque (he was not). Plaintiffs Exhibit 2CC (EO 3487) contains the quoted language, but that language speaks of the importance of Ministry of Islamic Affairs offices, and not about Al Thumairy. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of its religious propagation efforts in California and wanted to increase its religious influence there. Ex. 256, KSA 1234 (Khalid al-Sowailem, Director of the Da'wah Office in America, wrote to Saudi Ambassador Prince Bandar regarding Thumairy's appointment pursuant to Bandar's directives and instructions about the importance of having qualified propagators in the US. Sowailem stated that Thumairy had been appointed to work in Los Angeles due to the "importance of this territory and the lack of official Saudi Islamic propagators in it."). | Plaintiffs Exhibit 256 (KSA 1234) does not state or even suggest that Saudi Arabia or the Ministry of Islamic Affairs were "particularly focused" on California. To the contrary, the exhibit refers to the USA as a whole. *See* Pls. Ex. 256 (KSA 1234) ("importance of having qualified Saudi Islamic propagators on the Islamic scene *in the USA*"). The document contains the quoted language, but that language does not indicate a "particular" focus on California.<br><br>Plaintiffs' assertions that Al Thumairy's position was highly-prized and that the location of his role were particularly important is further contradicted by the fact that Al Thumairy was a junior Ministry of Islamic Affairs employee who had recently graduated from college. Plaintiffs Exhibit 256 (KSA 1234) is dated July of 1996, roughly a year after he received his Master's degree, *see* KSA Ex. 45 (KSA 2829), and roughly five months after he started working for MOIA, *see* KSA Ex. 170 (KSA 598). |
| 196. | Khalil stated that "[t]he King Fahd Mosque is very well known in Saudi Arabia" and that the "inauguration of the mosque was publicized on TV, and was attended by Crown Prince Abdullah." Ex. 90, Snell Decl., Ex. 5 at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portion of Plaintiffs Exhibit 90 (Snell Decl.), and Exhibit 5 thereto, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited document contains the quoted material. |
| 197. | Thumairy was granted Saudi Embassy and Consulate diplomatic titles that could only be issued pursuant to directions from high-level Saudi officials in the Ministry of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Islamic Affairs and the Ministry of Foreign Affairs. Ex. 256, KSA 1234. (Sowailem wrote to Saudi Ambassador Prince Bandar requesting Bandar order a Saudi officer to register Thumairy as a member of the Saudi Consulate in Los Angeles to "give him diplomatic immunity and formalize his presence). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the cited exhibit does not support Plaintiffs' assertion. The cited exhibit does not refer to "diplomatic titles" and instead refers to Al Thumairy becoming a member of the Saudi Consulate. It also does not state that becoming a member of the Saudi Consulate with diplomatic status could only be issued pursuant to directions from high-level officials within MOIA and MOFA. As Minister Turki – former Minister of MOIA – testified, "sometimes" someone deployed by the Ministry of Islamic Affairs to a foreign country might ask for help obtaining diplomatic credentials, but they could also make a request on their own through the local Embassy. Pls. Ex. 97 (Al Turki Tr.) 384:7-20. |
| 198. | Minister Turki testified that he did not think Thumairy would get diplomatic credentials because he was not a politician and that only a VIP with seniority would get diplomatic credentials. Nonetheless, Turki admitted that he could request that MOFA grant diplomatic credentials to a MOIA employee and that his life in the U.S. would be much easier as a bearer of a diplomatic passport. Ex. 97, Turki Dep. 86:6-18; 371:4-20; 375:21-376:16; 379:18-380:5; 383:11-23; 384:1-385:21; 386:24-387:24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the cited testimony does not support aspects of Plaintiffs' assertions, and Plaintiffs failed to establish a foundation for Minister Turki's testimony on the subject. The testimony does state that "life would become . . . easier" for the bearer of a diplomatic passport. Pls. Ex. 97 (Al Turki Tr.) 86:12-18. However, Minister Turki did not testify that he did not believe Al Thumairy would get diplomatic credentials because he was not a politician. Rather, he testified that "possibly" he might not receive such credentials "because he's not a politicians" but "possibly he might have been given a diplomatic |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | passport;" "I cannot recall the details . . . with the subject because that was a long time ago." *Id.* at 371:17-372:15.<br><br>Minister Turki testified that he believed diplomatic credentials were available to a someone in a senior post, not necessarily business people, and he thought one might need to be a VIP, but he clarified he did not know because "the regulation is with the Ministry of Foreign Affairs." *Id.* at 379:24-380:16. He also clarified that he did not know who precisely could get a diplomatic passport because "that's something that refers to the Ministry of Foreign Affairs." *Id.* at 379:12-14. He further testified that the determination of who received diplomatic credentials was not something the Ministry of Islamic Affairs "would pay that much attention to" and "if the Embassy feels that he will need or he fits to have diplomatic credentials, . . . then they might consider that." *Id.* at 376:7-16. *See also id.* at 380:23-381:3 ("As I said, and I still tell you, this is the policy of . . . the Ministry of Foreign Affairs. I don't know it."). |
| 199. | Thumairy would never have been hired by the MOIA for this high-profile position in Los Angeles without the approval and support of the MOIA's Minister Abdullah al Turki. | Saudi Arabia need not respond to this paragraph because it is Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph contains no evidentiary support and is improper attorney argument. There is no support for the proposition that Al Thumairy received a "high-profile position" or for the claim that he could only have received his position with "approval and support of" Minister Turki himself. The available evidence is to the contrary, as Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him know." Pls. Ex. 97 (Al Turki Tr.) 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally").<br><br>As explained below, Al Thumairy was in fact hired for a position within the Ministry of Islamic Affairs before assignment to Los Angeles was ever mentioned, and there is no evidence the Minister was involved in Al Thumairy's assignment to Los Angeles. *See infra* Responses to ¶¶ 228-229. |
| 200. | Saudi Government officials adhered to a strict hierarchical and patriarchal structure over its government officials with tight management controls that demanded strict loyalty. The recommendation of a trusted government official is practically mandatory for any position of importance and/or responsibility in the Saudi government. Ex. 64, KSA 2686-89 (Letter from Turki's MOIA Assistant Undersecretary, Ali Bin Fahad Al Ghaith, indicating Thumairy's appointment) (Turki Dep. Ex. 38); Ex. 97, Turki Dep. 123:18-124:20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited material merely reflects that Al Thumairy was appointed through routine processes that did *not* involve Minister Al Turki personally. Plaintiffs Exhibit 64 and the cited testimony say nothing about a patriarchal or hierarchical structure, and they do not mention tight controls or strict loyalty. They also do not suggest that the recommendation of a trusted government official is "practically mandatory" for a position of importance.<br><br>The available evidence is to the contrary, as Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him know." Pls. Ex. 97 (Al Turki Tr.) 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). This belies Plaintiffs' claim that a higher ranking official's recommendation is mandatory and that there is "tight management" by such officials over subordinate government officials. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 201. | Thumairy made false statements to hide his relationship with Minister Al Turki. Despite eyewitness testimony which showed that the two men had a close relationship, Thumairy testified that he never had a conversation with Al Turki; that he had not met or spoken to Al Turki before and didn't remember seeing Turki in California; and knew of Turki only "from the media." Ex. 72, Madha Decl. ¶ 6; Ex. 107, Thumairy Dep. 28:14-17, 30:12-31:7. Thumairy testified that he could not even recall whether Al Turki was MOIA's Minister when he was first hired, even though he applied and obtained his MOIA job through Minister Al Turki. Ex. 107, Thumairy Dep. 28:4-13 ("I don't remember whether he was the minister at the time I applied..."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph is not supported by the cited materials. The cited materials do not demonstrate that anything Al Thumairy said was false. The only testimony Plaintiffs cite for the proposition that Al Thumairy and Minister Al Turki "had a close relationship" is not based on personal knowledge, but rather Madha's statement in his declaration that it "appeared" to him that they knew each other. This appearance is based only on one or two observed interactions in 1998 and the fact that the Minister at one point used Al Thumairy's name. *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 6.<br><br>Al Thumairy testified that he recalled Minister Turki "was a minister. But I don't remember whether he was the minister at the time I applied or he was already done with his ministership." Pls. Ex. 107 (Thumairy Tr.) 28:8-13. This testimony is not indicative of a "false statement" given it took place more than 20 years after Al Thumairy allegedly interacted with Minister Turki.<br><br>Al Thumairy also acknowledged that he saw Minister Turki "in many gatherings," but he did not "personally remember that I spoke with him. I don't remember. It could be just a greeting." Pls. Ex. 107 (Thumairy Tr.) 28:18-29:7. This contradicts the claim that Al Thumairy testified he had never met or spoken to Minister Turki; he simply did not recall the details decades later. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited evidence also does not support the claim that Al Thumairy obtained his MOIA job through Minister Al Turki. In fact, Minister Al Turki played no personal role in Al Thumairy's hiring. He testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him know." Pls. Ex. 97 (Al Turki Tr.) 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). Further, Plaintiffs' implication that Al Thumairy would have had reason to hide a relationship with Minister Turki does not make sense. Minister Turki was openly opposed to Al Qaeda and was part of the team that went to Afghanistan in 1998, with CIA support, to demand that the Taliban extradite bin Laden for prosecution. *See supra* Response to ¶ 48. |
| 202. | Similarly, Turki claimed he did not even know Thumairy or where Thumairy was stationed in the U.S., Ex. 97, Turki Dep. 124:21-125:1; 144:19-145:8; 157:20-23, even though Thumairy had a high-profile position in California, Turki visited Thumairy in California, and Turki knew Thumairy on a first name basis. Ex. 72, Madha Decl. ¶ 6; Ex. 563, FBI 009071-REV2021 at 9072. | Plaintiffs' Exhibit 563 is inadmissible double-hearsay. *See* Objections Chart. Minister Turki did testify that he – a Minister, the equivalent of a cabinet level position – did not know Al Thumairy – a low-ranking employee– or where he was stationed, and he explained why. Turki Tr. 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). Plaintiffs' assertions that Al Thumairy had a high-profile position in California, that Al Turki visited Al Thumairy in California, and that Al Turki knew Al Thumairy on a first name basis are not supported by the cited evidence and are improper attorney argument. There is no cited material indicating that Al Thumairy's position was "high-profile." There is also no evidence that Al Turki went to California to visit Al Thumairy. To the contrary, the evidence shows he was there for other purposes, including to attend the grand opening of the King Fahad Mosque. *See* Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Ex. 72 (Madha Ex. 830) ¶ 6; Pls. Ex. 107 (Thumairy Tr.) 30:16-24 (Al Thumairy stating that he thought Minister Al Turki was an attendee). Madha's testimony also does not show that the two men knew each other on a first name basis – Madha (who does not speak Arabic) stated that when he saw them interact, Minister Turki used Al Thumairy's first name, which he could have just learned through an introduction at that time. |
| 203. | Thumairy repeatedly gave other incredible, false testimony to protect Turki and other MOIA superiors. As set forth in the next section, this included his claims that he decided to go to Los Angeles and run the Ibn Taymiyah Mosque on his own — when Thumairy knew that he was chosen and assigned to go to that Mosque by MOIA's leadership. Thumairy had no prior experience, work skills, or knowledge of English. The circumstances show that MOIA's highest officials selected Thumairy for the MOIA job in Los Angeles because of his skills in interacting with and providing leadership to Arabic-speaking men and his deep-rooted Wahhabi radical beliefs. Ex. 5, Youssef Rpt. 41. | Plaintiffs' allegations summarized in this paragraph, which are "set forth in the next section," are addressed in the paragraphs where purported support is provided. This paragraph is unsupported attorney argument to which Saudi Arabia need not respond. To the extent a response is required, Saudi Arabia notes that the facts alleged are not supported because there is no evidence cited.<br><br>This paragraph also relies on the Youssef Report, which should be excluded, particularly because Youssef is making credibility determinations. *See* Objections Chart.<br><br>There is no evidence that Al Thumairy was selected by MOIA's highest officials. *See supra* Responses to ¶¶ 199, 2020; *infra* Responses to ¶¶ 228-229.<br><br>Further, Plaintiffs' implication that Al Thumairy would have had reason to hide a relationship with Minister Turki does not make sense. Minister Turki was openly opposed to Al Qaeda and was part of the team that went to Afghanistan in 1998, with CIA support, to demand that the Taliban extradite bin Laden for prosecution. *See supra* Response to ¶ 48.<br><br>And the evidence contradicts Plaintiffs' assertion that Al Thumairy had "radical beliefs." *See infra* Response to ¶¶ 412, 423. |
| III.D. | **Thumairy at Imam Mohamed University** | No response required. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 204. | In 1992, Thumairy received his Bachelors' Degree from Imam Mohamed University. In May 1995, Thumairy received his Masters' Degree in Sharia (Islamic Law) from Imam Mohamed University's Judiciary Higher Institute. Ex. 680D, KSA 6927; Ex. 680H, KSA 6929; Ex. 107, Thumairy Dep. 24:17-25:5; Ex. 270, KSA 2670; Ex. 275, KSA 2829. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Thumairy received a Bachelors' Degree and a Masters' Degree in Islamic studies from Imam Mohamed University. Pls. Ex. 107 (Thumairy Tr.) at 474:1-18. |
| 205. | Imam Mohamed University was operated by Saudi Arabia under the Saudi Ministry of Higher Education. Ex. 294, KSA 7795. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited material – a letter from the Chancellor of the University concerning an extension of an employee – does not establish that Saudi Arabia operated the University or that it did so through a particular ministry. |
| 206. | Students at Imam Mohamed University were deemed employees of Saudi Arabia. On his February 1996 employment application for the Ministry of Islamic Affairs (submitted after he already had been chosen for the job), Thumairy confirmed that he "worked for the [Saudi] government" in an "official job" during his time at Imam Mohamed University and that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite no record evidence for the assertion that Al Thumairy's employment application was "submitted after he had already been chosen for the job." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | he was paid a "monthly salary." Ex. 270, KSA 2670. | The cited exhibit does not support the general statement that "[s]tudents at Imam Mohamed University" were employees of the Saudi government. |
| 207. | During his time at Imam Mohamed University, Thumairy went on two trips, a trip to Islamabad, Pakistan in 1990 and a five-week trip to Los Angeles, California during Ramadan in February-March 1994, the year before Thumairy received his Masters' degree and was nominated to become a MOIA Propagator in the U.S. to work in Los Angeles. Ex. 107, Thumairy Dep. 68:7-70:15, 74:9-75:23. Thumairy admitted that the trip to Pakistan was part of his schooling but claimed that his five-week trip to Los Angeles during the school year was a personal trip. Thumairy denied going to Ibn Taymiyah Mosque on that trip and could not remember whether he went to *any* mosque during the trip. Ex. 107, Thumairy Dep. 56:5-14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Thumairy testified that he did take a trip to Pakistan – when he was studying for his bachelor's degree – and that the trip was affiliated with his education. *See* Pls. Ex. 107 (Thumairy Tr.) 69:1-3.<br><br>He also testified that he took a trip to California during Ramadan in 1994 – when he was studying for his master's degree – and that this was a tourist trip. |
| 208. | Thumairy's studies at Imam Mohamed University for both his degrees were in Islamic Studies, Islamic Jurisprudence and Hadiths, and his Masters' dissertation was on the topic of what was permissible in Islam. Thumairy testified that his studies at Imam Mohamed University lasted six-and-a-half years or maybe a little bit longer. Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the paragraph contains the cited testimony. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 107, Thumairy Dep. 473:8-474:18, 483:19-485:8. | |
| 209. | Both the undergraduate and graduate curriculum in the 1990s that Thumairy studied at Imam Mohamed University included such topics as what is permissible in jihad, Dar al Harb (realm of war) and Dar al Islam (realm of peace), and the teachings of medieval Islamic scholar Ibn Taymiyah on jihad. These concepts are integral to Saudi religion and all-pervasive in Saudi textbooks from high school forward and would have been covered in depth in Thumairy's undergraduate and graduate level courses at Imam Mohamed University. Ex. 149, Nakhleh Rpt. ¶¶ 58-62, 160. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

This paragraph relies on the Nakhleh Report, which should be excluded. *See* Objections Chart. To the extent a response is required, the cited materials do not support Plaintiffs' assertion that the listed concepts are all-pervasive in Saudi textbooks, that they would have been covered in Al Thumairy's coursework, or the implication that Al Thumairy must have studied them and know about them. To the contrary, as Nakhleh admits, Al Thumairy testified that his studies were *not* related to the topics referenced. *See* Nakhleh Rep. ¶ 160. The cited material provides no basis for concluding what particular courses Al Thumairy took during his time at the University, and there is no basis to doubt Al Thumairy's testimony that he did not know about a series of specific doctrinal questions posed during his deposition. *See* Pls. Ex. 107 (Thumairy Tr.) 476:13-478:18. |
| 210. | At his deposition in this case, Thumairy denied that he had any knowledge of these topics, even though they were the foundation of his studies at Imam Mohamed University. Ex. 149, Nakhleh Rpt. ¶¶ 160-61; Ex. 107, Thumairy Dep. 473:8- 483:2. Thumairy claimed that he could not remember whether he had even studied Ibn Taymiyah at Imam Mohamed University. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the Nakhleh Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 107, Thumairy Dep. 65:17-66:2, 482:20-483:2. | Al Thumairy testified he did not know about the following specific issues: whether "jihadi Salafi doctrine perceives the world as a division between Dar al-Harb and Dar al-Islam," what is "meant by Dar al-Harb and Dar al-Islam;" "the jihadi Salafi view about certain countries;" that "jihadi Salafi doctrine permits jihad . . . against those countries that are considered as bilad harb." Thumairy Tr. 476:18-478:12.<br><br>The cited materials do not establish that these specific issues "were the foundation of his studies" as Plaintiffs claim. None of the cited materials cite any courses taken by Al Thumairy. The paragraph also confuses testimony about whether Al Thumairy studied particular topics (more than twenty years before his deposition) and whether at the time of his deposition he was familiar with the topics. Al Thumairy testified that he had no knowledge about "the jihadi Salafi doctrine that was espoused by Ibn Taymiyyah." *Id.* at 482:20-483:2.<br><br>As David Rundell explains, the phrasing of the questions to Al Thumairy was imprecise and used terminology (such as "jihadi-Salafi") that is not used in Islamic theology. Also, several of Al Thumairy's answers can be reasonably interpreted to mean that he disagrees with the views discussed (such as justifications for violent attacks) rather than that he has never heard of them. KSA Ex. 166 (Rundell Rep.) 47-48.<br><br>Similarly, Al Thumairy's testimony that he had no knowledge about "the jihadi Salafi doctrine that was espoused by Ibn Taymiyyah," *id.* at 482:20-483:2, could be interpreted to mean that he was not familiar with references by anyone in his field to Ibn Taymiyyah as a "jihadi Salafi," which would be reasonable. |
| III.E. | **MOIA Minister Turki and other high-level MOIA officials handpicked** | Plaintiffs' assertion is not supported by any evidence. As described below, Al Thumairy was not handpicked by the Ministry of Islamic Affairs. He applied for a job within MOIA; was interviewed and hired in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **Thumairy to be the first Imam of the King Fahad Mosque.** | 1995 for a job in America; and was subsequently assigned to Los Angeles. *See*, *e.g.*, *infra*, Responses to ¶¶ 228-229.<br><br>And the evidence shows that Al Thumairy and the Minister of Islamic Affairs did not know each other. Al Thumairy testified: "Personally, I didn't know him [Minister Turki]." Pls. Ex. 107 (Thumairy Tr.) 28:8-22.<br><br>Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-24-125:1; *see also id.* at 126:9-21. |
| 211. | Minister Turki and MOIA made a deliberate, carefully thought-out decision to pick Thumairy to work in the United States and send him to Los Angeles. A MOIA Deputy Minister wrote in April 1997 that the MOIA "spares no effort in sending propagators abroad with diligent accuracy to place the appropriate person in the appropriate workplace." Ex. 254, KSA 1168-73 at 1173. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited material contains the quoted material but does not support Plaintiffs' assertion that Minister Al Turki was personally involved in or made a decision regarding Al Thumairy's assignment to Los Angeles. To the contrary, Minister Al Turki testified: "I don't know [Al Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). |
| 212. | In 1995, following his graduation from Imam Mohamed University, Thumairy submitted a job application with the Minister of Islamic Affairs Abdullah al Turki. Ex. 126, Ghudaian Dep. 83:20-84:1 (the "job application…would be submitted | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to the minister"). The Minister made the hiring decision and referred Thumairy to the Propagators' Review Committee. Ex. 126, Ghudaian Dep. 85:16-86:5 ("The person would apply to the minister, and then the minister would find him fit, refer him to the committee for hiring. That's the way it works."), 92:15-23 (same). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the evidence contradicts Plaintiffs' assertion that Minister Al Turki personally made the hiring decision and referred Al Thumairy to the review committee. Al Ghudaian explained that an application would be submitted and "[t]he minister *or the deputy*" would determine "who would be submitted before the committee for an interview." Pls. Ex. 126 (Ghudaian Tr.) 93:4-10 (emphasis added). This does not state that the minister or deputy made the hiring decision but instead that they were involved in picking who would appear before the committee.<br><br>Minister Turki also testified: "I don't know [Al Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). |
| 213. | The October 1995 record of the "Propagators' Review Committee" shows that "Thumairy, Saudi national…was nominated for Da'wah in America." Ex. 669, KSA 6877-79 at 6878. This means that Minister Al Turki nominated and approved Thumairy to be hired as a MOIA propagator in the United States and that Al Turki or his Deputy forwarded the formal nomination to the committee for hiring. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the statement is contradicted by the record and cited testimony. Plaintiffs Exhibit 669 states that "the Committee reviewed" Al Thumairy's qualifications; that the Committee interviewed him; and that "the results [of the interview] were as follows: [Al Thumairy] was nominated for Da'wah in America." This indicates |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that the Committee "nominated" him for that position, not that Al Tuirki did so.<br><br>Further, testimony shows that it could be either "the minister *or the deputy*" who "decided which application was sent to the committee." Pls. Ex. 126 (Ghudaian Tr.). The testimony and cited materials also do not support the illogical suggestion that Minister Al Turki hired Al Thumairy (and other propagator) *before* sending them to the interview committee. |
| 214. | Saudi Arabia failed to produce Thumairy's original job application for the MOIA position or the formal nomination of Thumairy for the U.S. position that was prepared by Minister Al Turki. Those documents likely included information about how and why Minister Al Turki chose Thumairy to work for MOIA in America. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph contains no evidence and is entirely attorney argument. As described in the prior paragraph, Plaintiffs' assumption that Minister Turki nominated Al Thumairy for a U.S. position and prepared a document to that effect is unsupported by the record. There is no support for Plaintiffs' speculation that a nomination to interview Al Thumairy, which could have been made by a deputy, included a specific position, that it was in writing, or that it would have contained a written explanation of why an applicant was nominated. |
| 215. | Minister Turki formally confirmed Thumairy's appointment to "work in America" in December 1995. Ex. 234, KSA 0603. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this document contains the quoted words. It further references a prior memorandum |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "including . . . attachments . . . from the interviewing committee . . . indicating the nomination of" "Thumairy." Pls. Ex. 234 (KSA 603). |
| 216. | Saudi government official and Ibn Taymiyah Foundation Chairman Khalil al Khalil testified that he first met Thumairy in Saudi Arabia in 1996 when Thumairy paid him a visit. Khalil claimed that Thumairy merely wanted advice about studying English in the United States but hadn't yet made plans to go to the U.S. and never discussed going to Los Angeles. Ex. 113, Khalil Dep. 62:13-64:10. Yet by the time that Khalil and Thumairy met in 1996, MOIA had already decided to send Thumairy to the United States, and Thumairy was chosen to work in Los Angeles in or before March 1996. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Dr. Khalil testified that Al Thumairy visited him in Saudi Arabia "around 1996." Pls. Ex. 113 (Khalil Tr.) 62. The paragraph accurately states that Dr. Khalil testified that Thumairy wanted advice about the United States and did not discuss Los Angeles. It is also accurate that MOIA had approved Al Thumairy to work in the United States by the beginning of 1996. There is also evidence that Al Thumairy was assigned to Los Angeles in March 1996, but there is no evidence that this occurred before the alleged conversation with Dr. Khalil.<br><br>There is no evidence that Dr. Khalil was a government official when he said he first met Thumairy. To the contrary, his tenure as a Saudi diplomat in the U.S. Embassy had ended by that time. Pls. Ex. 187 (KFM 91-92); Pls. Ex. 113 (Khalil Tr.) 62:13-63:1 ("I was already back [in] Saudi Arabia" and had left the Embassy). |
| 217. | Thumairy told the 9/11 Commission that he "never met al-Khalil prior to coming to the U.S." Ex. 90, Snell Decl., Ex. 3 at 7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 7 is inadmissible hearsay offered for the truth of the matter asserted. *See* Objections Chart. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objections Chart.<br><br>Thumairy testified that he does not remember whether or not he made this statement to the 9/11 Commission. *See* Pls. Ex. 107 (Thumairy Tr.) 57:8-18. |
| 218. | When asked when he first met Khalil at his deposition, Thumairy initially testified that he first met Khalil "in Riyadh, prior to the travel [to the United States]….," Ex. 107, Thumairy Dep. 56:21-57: 3, but when confronted with his contradictory statement to the 9/11 Commission, Thumairy testified that he could not remember whether he met Khalil before he left Saudi Arabia. Ex. 107, Thumairy Dep. 57:8-59:10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' statement is inaccurate. Al Thumairy did not testify definitively that he first met Dr. Khalil in Riyadh; rather, he initially testified: "I *believe* it was in Riyadh, prior to travel." Pls. Ex. 107 (Thumairy Tr.) 57:2-3 (emphasis added). When asked whether he in fact told the 9/11 Commission that he did not meet Dr. Khalil before coming to the United States, Al Thumairy testified: "I do not remember. Even when I said just a little bit ago, when I told you prior to travel, I said I think. I don't really remember." *Id.* at 57:14-18. The alleged meeting occurred more than 20 years before Al Thumairy was asked about it at his deposition, and Al Thumairy's 9/11 Commission interview occurred more than 15 years before his deposition. |
| 219. | Embassy Islamic Affairs Office Deputy Jarrah was consulted on the decision to post Thumairy to Los Angeles. Ex. 2, EO 0422 (Jarrah "reportedly assigned Saudi imams | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | in the United States, including assigning [Thumairy] to the King Fahad Mosque.") | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Ex. 2J (EO 422) is inadmissible hearsay within hearsay. *See* Objections Chart. |
| | | To the extent a response is required, the cited material contains the quoted words but does not identify the basis for the alleged "report" about Al Jarrah's purported role in assigning imams in the United States and is therefore hearsay. |
| 220. | In May 2003, Thumairy told the FBI that he:<br><br>was recruited to work for the Saudi Consulate by an individual, Saud Al Abdullah, with whom he studied at the Mohamed Bin Al Saud University. At this University, Fahad obtained his Masters in Islamic Studies. Saud Al Abdullah is currently employed at the Islamic Ministry in Saudi Arabia.<br><br>Ex. 154, FBI 000001-000006-REV2021 at 2. "Saud al Abdullah" is Saud Al Abdullah Al Ghudaian, a senior MOIA official in charge of Da'wah abroad, the head of the department where Thumairy first reported to work at MOIA on March 25, 1996. Ex. 290, KSA 7016. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 154 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs' assertion is contradicted by admissible evidence. Al Thumairy testified that he did not remember saying what Plaintiffs Exhibit 154 attributes to him and that Saud Al Abdullah did *not* recruit him to work for the Saudi Consulate. Pls. Ex. 107 (Thumairy Tr.) 60:9-61:1. Al Thumairy also did not recall Saud Al Abdullah, from his studies at University or otherwise. *Id.* at 44:1-17.<br><br>Plaintiffs also cite no evidence that Saud Al Abdullah is the same person as Saud bin Abdullah al Ghudaian. |
| 221. | At his 9/11 Commission interview in February 2004, however, Thumairy "denied | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that he was sponsored for this particular position by any specific individual." Ex. 90, Snell Decl., Ex. 3 at 2. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 2, is proffered for impeachment, but cannot be used for that purpose because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objections Chart.<br><br>To the extent a response is required, the cited exhibit contains the quoted words. |
| 222. | The normal job requirements were waived for Thumairy to get the MOIA job. MOIA filed a request with Saudi Arabia's Director General of Civil Service in order to grant Thumairy a special waiver to exempt Thumairy from the competition requirement for the MOIA job in the United States. The waiver was granted but was subject to a mandatory condition: "provided he [Thumairy] is fluent in one of the foreign languages." Ex. 250, KSA 0600. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' assertion also misstates the record and is contradicted by the evidence. Rather than stating that *Al Thumairy* was somehow exempt from any requirement, Plaintiffs Exhibit 250 actually states the *job* that he applied for is "an exempted job." *See* Pls. Ex. 250 (Ghudaian Ex. 432) ("Subject: Nomination for an exempted job."); *see also id.* ("[T]he job he is nominated for is exempted from the competition requirement.").<br><br>MOIA did not file a request in order to grant Al Thumairy any kind of special waiver, as Plaintiff claim. Instead, on its face, Plaintiffs Exhibit 250 shows that MOIA requested an opinion from the Civil Service Department on Al Thumairy's nomination. Contrary to Plaintiffs' assertion that he was approved without meeting normal requirements for the job, Plaintiffs Exhibit 250 states that "it was evident that [Thumairy] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *meets the terms of taking the job he is nominated for*," including having the appropriate academic degree and passing an interview.<br><br>The document also does not state that any "waiver" was "granted" subject to a "mandatory condition" as Plaintiffs claim. In fact, it offers an opinion approving Al Thumairy's nomination provided he is fluent "in one of the foreign languages." Pls. Ex. 250 (Ghudaian Ex. 432). |
| 223. | At the time, however, Thumairy could not speak English or any other language aside from Arabic. Ex. 107, Thumairy Dep. 75:24-76:4; Ex. 113, Khalil Dep. 134:21:135:3. (Khalil admitted that Thumairy "doesn't speak English…" even *after* Thumairy had been in the U.S. for several years and supposedly studied English). Nevertheless, MOIA went ahead and ignored the language requirement and assigned Thumairy to the U.S. without the required job competition – demonstrating that Thumairy had special connections to get the MOIA job. | Al Thumairy testified that he could not speak English well at the time of a trip to the U.S. in 1994, though he could speak a few simple words. Pls. Ex. 107 (Thumairy Tr.) 75:24-76:4. He also explained that he wanted to go to the United States so that he could study English at a good university. *Id.* at 63:23-64:3. When Al Thumairy arrived in the United States, he spent his time studying English. *Id.* at 90:1-16 ("I was . . . dedicated all for studying.").<br><br>Plaintiffs have not established that there was a "language requirement" much less that MOIA ignored it in assigning Al Thumairy to the U.S. As noted, Al Thumairy studied English in the United States while employed by MOIA.<br><br>As discussed in response to the prior paragraph, contrary to Plaintiffs' assertion, the evidence does not show that there was any required job competition for Al Thumairy's position because "[t]he job . . . is exempted from the competition requirement." Pls. Ex. 250 (Ghudaian Ex. 432). Thus, Plaintiffs' evidence does not show that Thumairy had any special connections to get his job. |
| III.F. | **Thumairy had a close personal relationship with the MOIA Minister Abdullah Al-Turki.** | Plaintiffs' assertion is not supported by any citation to record evidence, and the available evidence contradicts it.<br><br>Al Thumairy testified: "Personally, I didn't know him [Minister Turki]." Pls. Ex. 107 (Thumairy Tr.) 28:8-22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-24-125:1; *see also id.* at 126:9-21. |
| 224. | King Fahad Mosque employee Usman Madha testified that he observed Thumairy and Turki together in California and that it appeared from their interactions that Minister Turki and Thumairy knew each other well. Madha heard Minister Turki address Thumairy as "Fahad". Ex. 72, Madha Decl. ¶ 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Madha's declaration contains the statements described, but those statements are contradicted by the record. Madha acknowledges implicitly that he does not actually know whether Thumairy and Minister Turki knew each other well, stating only that it "appeared" that way based on his observation of one or perhaps two interactions in 1998. Pls. Ex. 72 (Madha Ex. 830) ¶ 6.

The two people with personal knowledge on the subject both denied having any relationship. Al Thumairy saw Minister Turki "in many gatherings," but he did not "personally remember that I spoke with him. I don't remember. It could be just a greeting." Pls. Ex. 107 (Thumairy Tr.) 28:18-29:7.

Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-24-125:1; *see also id.* at 126:9-21. |
| 225. | MOIA Propagator Tajuddin Shuaib, who worked at the King Fahad Mosque and reported to Thumairy, admitted to the FBI that Thumairy was "very connected" to MOIA Minister Turki, and that Turki would | Plaintiffs Exhibit 563 is hearsay not subject to any exception and offered for the truth of the matter asserted. *See* Objection Chart.

The cited document does not support Plaintiffs' assertions. The document does not state that he reported to Thumairy. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | visit Thumairy in the U.S. Ex. 563, FBI 009071-REV2021 at 9072. | The exhibit contains the quoted material, but the assertion that Thumairy was "very connected" to Minister Turki does not appear to be based on personal knowledge. Further, it is contradicted by the record. Al Thumairy saw Minister Turki "in many gatherings," but he did not "personally remember that I spoke with him. I don't remember. It could be just a greeting." Pls. Ex. 107 (Thumairy Tr.) 28:18-29:7. |
| | | Minister Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Pls. Ex. 97 (Al Turki Tr.) 124:21-24-125:1; *see also id.* at 126:9-21. |
| 226. | Al-Turki was the Rector in charge of Imam Mohamed University when Thumairy attended that school as part of the Saudi Ministry of Education, from 1975 to 1993. Ex. 97, Turki Dep. 23:15-24:19. Thumairy received his bachelor's degree from Imam Mohamed University in June 1992 and continued to study at Imam Mohamed University. Ex. 680D, KSA 6927; Ex. 680H, KSA 6929; Ex. 270, KSA 2670. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the paragraph is undisputed. |
| 227. | Turki attended the "Grand Opening" of the King Fahad Mosque in 1998 as the MOIA's Minister at a time when Thumairy was MOIA's U.S. delegate in charge of California; the Imam of the Mosque; and the person responsible to handle high ranking Saudi visiting dignitaries such as Turki. Ex. 382, DOJ 0010; Ex. 107, Thumairy Dep. 89:14-96:7 (at his deposition, Thumairy denied both working | Undisputed that Minister Turki attended the Grand Opening in 1998 and that he was Minister at the time. |
| | | Undisputed that Al Thumairy was employed by MOIA at that time and was in California, where he was an imam at the King Fahad Mosque after it opened. Contrary to Plaintiffs' assertion, Al Thumairy testified that he worked as imam at the King Fahad Mosque. *See* Pls. Ex. 107 (Thumairy Tr.) 122:19-123:18. Al Thumairy's testimony is that he was not an official imam at *a different mosque*, the Ibn Taymiyyah Mosque. *Id.* at 89:23-91:20. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at the Saudi Consulate and working as the official Imam of the Mosque); Decl. of Gregory G. Rapawy (Doc No. 9370) ¶ ("In 1998, the King Fahad Mosque in Los Angeles opened, and Al Thumairy became a full-time imam there."); Ex. 121, Kaldirim Dep. 114:23-115:2. | Al Thumairy was not MOIA's delegate "in charge of California." Plaintiffs Exhibit 382 shows that others in California were informed Al Thumairy was noiminated to oversee propators there, but Thumairy did not perform this role.  *See* Pls. Ex. 107 (Thumairy Tr.) 143:4-5 ("I did not oversee anyone.").<br><br>Plaintiffs offer no evidence to support the assertion that Thumairy was responsible for handling high ranking Saudi visiting dignitaries, and the claim is contradicted by the record.  Pls. Ex. 113 (Khalil Tr.) 115:21-116:6 ("And was he [Thumairy] given responsibilities at the grand opening with regard to certain Saudi government officials?  No. . . . I saw him just with some visitors.").<br><br>Consistent with Khalil's testimony, Al Thumairy did acknowledge that Minister Turki might have been at the Grand Opening, Pls. Ex. 107 (Thumairy Tr.) 30:19-24, and that he might have interacted with Minister Turki to exchange greetings.  Pls. Ex. 107 (Thumairy Tr.) 28:18-29:7. |
| **III.G.** | **MOIA told Thumairy that he was being assigned to work at the Ibn Taymiyah Foundation in Los Angeles before he started work at MOIA.** | Plaintiffs' assertion is unsupported by citation to any record evidence.  As described below, Al Thumairy was hired by the Ministry of Islamic Affairs in 1995 and was only told that he was being assigned to Los Angeles after he was hired.  *See infra* Response to ¶¶ 228-229. |
| 228. | A MOIA document shows that it was at least two weeks *before* Thumairy started work that MOIA selected and assigned Thumairy to work at the Ibn Taymiyah Foundation in Los Angeles, which at that time ran the Ibn Taymiyah Mosque and was constructing the King Fahad Mosque. On March 11, 1996, Minister Turki's Deputy in charge of Da'wah wrote to MOIA's Director at the Saudi Embassy in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited materials contain the quoted words and indicate that Al Thumairy was assigned to work in Los Angeles and began formal employment at MOIA in March of 1996.  The evidence |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Washington, Khalid Al Sowailem, that: "I bring you the good news that a decision was made to hire Sheikh Fahad bin Ibrahim Al Thumairy as a successor to Sheikh Ibrahim Al Hiber at the Ibn Taymiyyah Foundation." Ex. 244, KSA 8509-10; Ex. 126, Ghudaian Dep. 273:15-274:21 (showing that the message was sent from the office of the Minister's Deputy in charge of Da'wah); Ex. 290, KSA 7016 (showing Thumairy first reported to work on March 25, 1996 at the Da'wah Department Abroad headed by Saud bin Abdullah al Ghudaian at MOIA's headquarters in Riyadh, Saudi Arabia). | also shows that a decision to hire Al Thumairy to work for MOIA within America was made months earlier: he successfully interviewed in October of 1995, Plaintiffs Exhibit 669, and MOIA confirmed his nomination to work for Da'wah in America in December of 1995, Plaintiffs Exhibit 234 (KSA603). Thus, the evidence shows that he was not hired for the specific purpose of filling a role in Los Angeles but instead applied for and was approved for a role in America. The decision to assign him to Los Angeles was made later.<br><br>Plaintiffs' assertion also inaccurately states that "Minister Turki's Deputy in charge of Da'wah" wrote Plaintiffs Exhibit 244 (KSA 8509). The cited testimony (Pls. Ex. 126 (Ghudaian Tr.) 273:15-274:21) confirms that Gaith was the Deputy, whereas Plaintiffs Exhibit 244 (KSA 8510) was signed by Saleh Karboaa, who was an "advisor to" deputy Gaith. Pls. Ex. 126 (Ghudaian Tr.) 274:14-18. |
| 229. | The March 11, 1996 MOIA communication also shows that before Thumairy was in communication with Minister Turki's Deputy and before he started work at MOIA, he already knew he was going to Los Angeles to replace Hiber. The MOIA communication shows that Thumairy was advised of his assignment and that Thumairy made a specific personal request for a tax exemption to live in Los Angeles. Ex. 244, KSA 8509-10 at 8510 ("brother Fahad [Thumairy] asks whether he may get tax exemption noting that he will reside in Los Angeles as required by work.") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 244 (KSA 8509) shows that, at some point before actually reporting to work his new job within MOIA in March of 1996, Al Thumairy was informed by MOIA that he would be working in Los Angeles. It also shows that Al Thumairy requested a tax exemption since he would be working in Los Angeles. The evidence also shows that a decision to hire Al Thumairy to work for MOIA within America was made months earlier: he successfully interviewed in October of 1995, Plaintiffs Exhibit 669, and MOIA confirmed his nomination to work for Da'wah in America in December of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 1995, Plaintiffs Exhibit 234 (KSA603). Thus, the evidence shows that he was not hired for the specific purpose of filling a role in Los Angeles but instead applied for and was approved for a role in America. The decision to assign him to Los Angeles and his request related to that were made later.<br><br>Plaintiffs' assertion also inaccurately states that the communication shows that Al Thumairy was in contact with "Minister Turki's Deputy." Plaintiffs Exhibit 244 (KSA 8510) is written by Saleh Karboaa, who was an advisor to a deputy MOIA minister but not himself a deputy. *See* Pls. Ex. 126 (Ghudaian Tr.) 274:14-18. |
| III.H. | **Saudi Arabia awarded Thumairy a fictitious diplomatic title to allow him to enter and stay in the U.S.** | There is no evidence that Al Thumairy's diplomatic documentation was fictitious or intended to deceive. To the contrary, Minister Turki explained that diplomatic credentials were issued so that "life would become . . . easier" for the bearer. Turki Tr. 86:12-18. In other words, the evidence shows that Thumairy obtained diplomatic credentials for convenience. Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note).<br><br>As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their contry's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 230. | The March 1996 MOIA fax message also shows that before Thumairy started work, Minister Turki's Deputy made the determination that Thumairy would be given a diplomatic title. The fax message asks MOIA Embassy Head Sowailem to confirm the name of the "job title that will be written in the passport" and proposes that Thumairy be given the diplomatic personnel job title "'Administrative Attaché' *as usual.*" (emphasis added). Ex. 244, KSA 8509-10 at 8510. | Plaintiffs' assertion is not supported by the evidence. Plaintiffs Exhibit 244 (KSA 8509) contains the quoted words and does indicate that a determination was made by March 1996 (before Al Thumairy formally started work but months after he had been interviewed and hired, *see* responses to ¶¶ 228-229) that Al Thumairy would receive a diplomatic passport with the title of Administrative Attache. Plaintiffs Exhibit 244 (KSA 8509) does not, however, indicate who made the determination, and Plaintiffs' speculation that one of Minister Turki's deputies made the determination is unsupported. Plaintiffs Exhibit 244 (KSA 8510) is not signed by a deputy; it is signed by an advisor to a deputy. *See* Pls. Ex. 126 (Ghudaian Tr.) 274:14-18. |
| 231. | The message shows that MOIA was routinely authorized by Saudi Arabia to use false diplomatic cover to allow MOIA personnel to travel and facilitate their stay inside the United States while they engaged in the performance of MOIA work that was inconsistent with their stated reason for being here. Ex. 152, Dunham Rpt. 13-14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the expert report of Lawrence Dunham should be excluded. *See* Objection Chart. Further, the assertion in this paragraph is neither fact nor informed opinion but is instead |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | speculation about the meaning of a document about which Dunham has no personal knowledge. Dunham is not an expert on what is or is not "routine[]" in Saudi Arabia.<br><br>The document also does not indicate that Al Thumairy's diplomatic documentation was false or intended to deceive. To the contrary, Minister Al Turki explained that diplomatic credentials were issued so that "life would become . . . easier" for the bearer. Pls. Ex. 97 (Al Turki Tr.) 86:12-18. In other words, the evidence shows that Al Thumairy obtained diplomatic credentials for convenience, not to deceive or to provide "false . . . cover."<br><br>Al Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note).<br><br>As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their contry's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*<br><br>Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 232. | In April 1996, Saudi Arabia provided Thumairy with false identification as an Embassy official; it issued a special passport for Thumairy which stated that Thumairy was an "Administrative Official" at the Saudi Embassy in Washington. Ex. 213, KSA 6882-6902 at 6884. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 213 shows that Al Thumairy was issued a special passport stating "Adm. Official, Saudi A. Embassy in U.S.A." The document does not support Plaintiffs' assertion that the identification was false. To the contrary, Minister Al Turki explained that diplomatic credentials were issued so that "life would become . . . easier" for the bearer. Pls. Ex. 97 (Al Turki Tr.) 86:12-18. In other words, the evidence shows that Al Thumairy obtained diplomatic credentials for convenience, not to deceive.

Al Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note).

As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |
| 233. | In stark contrast to his testimony to the 9/11 Commission, in the instant case, Thumairy testified that he never worked at the Embassy. Ex. 90, Snell Decl., Ex. 3 at 2 (Thumairy lied and said he was sent to the Saudi Embassy which, in turn, assigned him to the Saudi Consulate in Los Angeles where his role was to deal with any religious issues that arose at the Consulate); Ex. 107, Thumairy Dep. 83:11-13. Thumairy also testified he only visited the Embassy only once during his time in the U.S. for a quick visit and met MOIA Embassy Head and Director of Da'wah in the United States, Khalid Al Sowailem, the person consulted by Minister Turki's Deputy about giving Thumairy the "usual" Embassy "Administrative" title that Saudi Arabia used for MOIA officials. Ex. 101 Thumairy 443:17-444:8; 444:22-445:3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

This paragraph relies on inadmissible evidence. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 2, is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objections Chart.

The paragraph also contains improper attorney argument.

Plaintiffs correctly note that Al Thumairy testified in this case that he did not work at the Embassy. Pls. Ex. 107 (Thumairy Tr.)83:11-13.

Plaintiffs' assertion that he lied to the 9/11 Commission is unsupported. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 2 does not state that Al Thumairy said he worked at the Embassy, and in any event, he testified that he did not remember telling the 9/11 Commission what is written in the cited portion of Plaintiffs Exhibit 90 (Snell Decl. Ex. 3). *See* Pls. Ex. 107 (Thumairy Tr.)49:9-21.

Thumairy testified that his role was to answer religious questions at the King Fahad Mosque. Pls. Ex. 107 (Thumairy Tr.)436:21-437:4. He also testified that he dealt with "questions or consulations regarding family matters or religious matters" at the Consulate, though this was "sporadic." Thumairy Tr. 95:19-96:7. That is consistent with reports in Plaintiffs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Exhibit 90 (Snell Decl.) that he said he would "deal with any religious issues that arose at the consulate" and "answers such questions at the KFM." Pls. Ex. 90 (Snell Decl. Ex. 3) at 2. |
| 234. | Thumairy said that he couldn't remember how the "administrative official" title was put in his passport; all that he claimed to know was that the title was given by Saudi Arabia to "everyone who works in America" in their Special Passport. Ex. 244, KSA 8509-10; Ex. 107, Thumairy Dep. 81:21-82:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the testimony contains the quoted material, but Plaintiffs' description is inaccurate. Al Thumairy testified that he could not remember *who* assigned the title administrative official; he did not testify that he could not remember *how* the title was put in his passport. Pls. Ex. 107 (Thumairy Tr.)82:2-83:11. He testified that he got the passport by applying for it. He also clarified that he did *not* know what title was given to everyone; when he said everyone, he meant every Saudi who works abroad in America "would apply for a special passport. But what's written [i.e., what title is written in the passport] I don't know." *Id.* at 83:4-10. |
| 235. | Prior to the 9/11 Attacks, Saudi Arabia obtained five separate A-2 visas for Thumairy in May 1996, September 1996, July 1997, October 1998, and July 2000. Each of those visas obtained by Saudi Arabia falsely represented that Thumairy was an "Official" at the Saudi Embassy in Washington, D.C. Ex. 213, KSA 6882-6890 at 6884 at 87-88; Ex. 680G, at KSA 6892- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Dunham Report should be excluded. *See* Objection Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 93, 6896. Two of these visas also described Thumairy as an "Officer" at the Saudi Embassy. *See* Ex. 680G, at KSA 6888, 6892. All of the visas were issued by the U.S. based on information Saudi Arabia provided to the State Department. Ex. 152, Dunham Rpt. 14. | To the extent a response is required, the cited evidence does not support aspects of Plaintiffs' assertion. The cited record from May 1996 (KSA 6884) is not a visa; it is a special passport issued by Saudi Arabia. The A-2 visa from the fall of 1996 is dated October, not September. The visas using the word "Officer" describe Thumairy as an "Admin Officer."<br><br>The cited evidence does not establish that Saudi Arabia acted falsely or improperly. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*<br><br>Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 236. | Thumairy used the special passport and the visas containing false information that he was performing diplomatic work on repeated occasions to gain entry into the U.S. prior to the 9/11 Attacks. Ex. 213, KSA 6882-6890 at 6887-88; Ex. 680G, at KSA 6892-93, 6896. It was a criminal offense to knowingly use identification documents containing such false | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The expert report of Lawrence Dunham should be excluded. *See* Objection Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | information to enter the U.S. 18 U.S.C. §1546. Ex. 152, Dunham Rpt. 14. | To the extent a response is required, it is undisputed that Thumairy used his visas and passport to enter the United States, beginning in 1996, which is prior to the 9/11 Attacks. Plaintiffs have not established that the documents were false or improper. |
| | | As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |
| | | Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| | | The remaining assertions in this paragraph are legal claims to which no response is necessary. |
| 237. | Saudi Arabia never intended for Thumairy to work at its Embassy or Los Angeles Consulate. Rather, according to Plaintiffs' expert Dunham, "Saudi Arabia abused the system by giving Thumairy a diplomatic work title as cover to gain entry and perform non-diplomatic work for Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The Dunham report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabia inside the U.S." Ex. 152, Dunham Rpt. 13. | To the extent a response is required, Dunham has no basis to offer an opinion on Saudi Arabia's mental state. He also cites nothing to support his claim that the diplomatic work title was used to deceive, and the evidence is to the contrary. Minister Al Turki explained that diplomatic credentials were issued so that "life would become . . . easier" for the bearer. Pls. Ex. 97 (Al Turki Tr.)86:12-18. In other words, the evidence shows that Al Thumairy obtained diplomatic credentials for convenience, not to deceive. Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note).<br><br>Further, as David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*<br><br>Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 238. | As Plaintiffs' expert Dunham explained, Saudi Arabia knew that "the State | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Department required a foreign state's embassy and consular personnel to work on a full-time basis exclusively at an embassy or consulate and perform only the accepted functions of that embassy or consulate," noting that "Embassy officers and employees were subject to the additional requirement that they reside in the Washington, D.C. area. The specific locations of each embassy or consulate are approved by and registered with the State Department. Consular personnel were required to reside in the area in which their duties were being performed." Ex. 152, Dunham Rpt. 9. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The expert report of Lawrence Dunham should be excluded. *See* Objection Chart. <br><br> To the extent a response is required, the cited report contains the quoted material, but Dunham has not established the purported requirements. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* <br><br> Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). Such activity contradicts Dunham's suggestion about how the State Department interprets limitations on functions and locations of diplomatic personnel. |
| 239. | Plaintiffs' expert Dunham confirmed that, despite this knowledge and its obligations under the Vienna Convention, in late 1996, Saudi Arabia obtained "sham accreditation" for Thumairy as a diplomatic employee, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | registering "Thumairy with the State Department by filing a Notification of Appointment form DSP-111, which had to be signed by the Saudi Embassy's Chief of Mission or authorized deputy and authenticated with the Embassy's seal." Ex. 152, Dunham Rpt. 14-15. Though Dunham determined the form submitted by the Saudi Embassy for Thumairy was not produced by Saudi Arabia or the State Department, nevertheless, the December 5, 1996 response letter from the State Department confirmed that Saudi Arabia filed a DSP-111 which "represented to the U.S. that Thumairy was working with the title of Administrative Officer at the Consulate General in 'Los Angeles, CA.'" Thumairy never was an "administrative officer" and never worked in that role at either the Embassy or the Consulate. Ex. 152, Dunham Rpt. 9, 14-15; Ex. 212, KSA 6679 (State Department acknowledgement that the Embassy submitted Thumairy as an "administrative officer"); Ex. 107, Thumairy Dep. 83:11-13 (Q: "Did you ever work in the Saudi Embassy in the United States?" Thumairy: "No."); 100:7-10 (Q: "I take it, sir, you did not work as an administrative officer at the Saudi | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The expert report of Lawrence Dunham should be excluded. *See* Objection Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is contradicted by the record. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*<br><br>Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26).<br><br>With respect to Fahad Al Thumairy, the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Consulate in Los Angeles?" Thumairy: "Yes, correct."). | |
| 240. | From 1996 through the 9/11 Attacks, Saudi Arabia failed to comply with its continuing obligations to advise the State Department that Thumairy was not working at the Saudi Embassy or Consulate or to inform the U.S. about Thumairy's actual work for MOIA inside the U.S. Had Saudi Arabia complied with its obligations, Thumairy would not have been allowed to remain in the U.S. Instead, over a five-year period, Saudi Arabia continued to improperly use diplomatic cover to conceal and facilitate Thumairy's actual religious propagation work inside the U.S. Ex. 152, Dunham Rpt. 16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The expert report of Lawrence Dunham should be excluded. *See* Objection Chart. <br><br> To the extent a response is required, Plaintiffs' assertion is contradicted by the record – particularly the conclusion as to what would have happened had Saudi Arabia acted differently. In fact, the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note). <br><br> Further, Plaintiffs have not established any violation in the first place. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their contry's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 241. | Thumairy's work for MOIA in the U.S. constituted illegal, non-diplomatic activity outside the authorized diplomatic reporting structures of the Embassy and Consulate. Embassy and Consulate officials testified that they did not oversee Thumairy's work. Ex. 100, Qattan Dep. 33:7-36:13, and 63:24-64:20; Ex. 213, KSA 6882-6890 at 6884 (Thumairy Passport stating Thumairy is an administrative official at the Embassy). As Plaintiffs' expert Dunham explained, "[w]hether or not this is true, the Saudi Ambassador was responsible to exercise authority over all persons accredited as Embassy and Consular officials in the U.S. and was ultimately accountable to the U.S. Government for the actions of Embassy and Consulate staff, including Thumairy." Ex. 152, Dunham Rpt. 18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The expert report of Lawrence Dunham should be excluded. *See* Objection Chart.

To the extent a response is required, it is undisputed that Embassy officials did not oversee Thumairy's work.

The first sentence of this paragraph is a legal conclusion. Further, Plaintiffs have not established that Al Thumairy's work was illegal or unauthorized. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their contry's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*

Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 242. | Plaintiffs' expert Dunham concluded that because Saudi Arabia brought:<br><br>"Thumairy into the United States fraudulently under diplomatic cover and facilitated his residence in the country...," and, "based on his registration as a consular employee, Thumairy received a State Department consular identification card, a State Department issued driver's license, both of which are official United States Government forms of identification, and a tax exemption card." A consular identification card and driver's license "attested to his legitimacy in this country and could be used for identification in myriad situations," allowing Thumairy to avoid sales tax and exempting him from income tax.<br><br>Ex. 152, Dunham Rpt. 18; Ex. 107, Thumairy Dep. 100:7-101:22 (confirming he did not work as an administrative officer at the LA consulate but nevertheless had a diplomatic visa and diplomatic privileges). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The expert report of Lawrence Dunham should be excluded. *See* Objection Chart.<br><br>To the extent a response is required, Plaintiffs have not established that Al Thumairy's work was unauthorized, "fraudulent[]" or "cover." To the contrary, Minister Al Turki explained that diplomatic credentials were issued so that "life would become . . . easier" for the bearer. Pls. Ex. 97 (Al Turki Tr.) 86:12-18. In other words, the evidence shows that Al Thumairy obtained diplomatic credentials for convenience. In this way, Plaintiffs' assertion is correct that Al Thumairy received certain benefits, but they were not used to conceal what he was doing. Al Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host government and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |
| | | Moreover, in practice, "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 243. | According to Plaintiffs expert Dunham, after it obtained Thumairy's fraudulent accreditation as a consular official, "Saudi Arabia evaded the rules for motor vehicle use by consular personnel inside the U.S. that were established by the State Department," requiring consular personnel "to use a State Department (not private) driver's license; register any personal use vehicle with the State Department; and use diplomatic (not state) license plates." As Dunham noted, "[t]hese rules, however, were not followed in Thumairy's case" and, instead, Thumarairy "also obtained a California driver's license; registered his vehicle with the State of California; and | The expert report of Lawrence Dunham should be excluded. *See* Objection Chart. Plaintiffs Exhibit 46 is inadmissible. *See* Objection Chart. Plaintiffs have not established that Al Thumairy's work was unauthorized or "fraudulent." Al Thumairy performed his role as imam at the King Fahad Mosque openly, and the United States State Department was aware that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note). Regarding the assertion that Saudi Arabia "evaded the rules" because Al Thumairy obtained a driver's license and obtained California license |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | used California license plates." Ex. 152, Dunham Rpt. 18-19; Ex. 107, Thumairy Dep. 108:16 – 111:24; Ex. 46, State 33-40 (Awad Dep. Ex. 460) (Thumairy Car Registration Document). | plates on his car, the United States State Department was also aware of this issue. KSA Ex. 140 (Dunham Ex. 12) at 39-40. Yet, again, the State Department did not revoke Thumairy's visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note). |
| 244. | According to Plaintiffs expert Dunham, "Thumairy continued to enjoy official 'cover' and privileges and immunities until May 2003 when the United States Government determined that he was engaged in activities incompatible with his status and his appointment at the Los Angeles Consulate General was terminated by the U.S." Ex. 152, Dunham Rpt. 19; Ex 334, State 43 (State Department Communication to Saudi Embassy, May 23, 2003.) | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The expert report of Lawrence Dunham should be excluded. *See* Objection Chart.

Plaintiffs Exhibit 334 is inadmissible hearsay and is not authenticated. *See* Objection Chart.

To the extent a response is required, undisputed that Thumairy maintained a visa with diplomatic status until March 21, 2003 (not May 2003, as Plaintiffs claim). *See* KSA Ex. 141 (KSA 6810). However, the United States State Department was aware by October of 2000 that Al Thumairy was employed as an imam, rather than as an administrative officer in the Embassy or the Consulate. KSA Ex. 140 (Dunham Ex. 12) at 39 ("We understand that Mr. Al Thumairy is the head of the Mosque in Culver City."). Yet, the State Department did not revoke his visa until March 21, 2003. KSA Ex. 141 (KSA 6810) (diplomatic note).

Disputed to the extent Plaintiffs imply Al Thumairy's status was improper. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host goverhment and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.*<br><br>Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| **III.I.** | **Thumairy had no prior work experience and received no MOIA training before reporting for work at MOIA headquarters and being sent to the U.S.** | It is undisputed that Al Thumairy's job with MOIA was the first job he obtained after completing his education and obtaining a graduate degree in Islamic studies. These facts undermine Plaintiffs' assertions elsewhere (*e.g.*, ¶ 99) that the position for which Al Thumairy was hired was "high-profile." |
| 245. | When he started work with the MOIA at the end of March 1996, Thumairy had no prior work experience or training other than attending Imam Mohamed University. Thumairy testified that he did not receive any work training before he started his MOIA job, nor did he receive any work training from the Ministry after he was hired. Ex. 107, Thumairy Dep. 475:14-476:1. | Undisputed. These facts undermine Plaintiffs' assertions elsewhere (*e.g.*, ¶ 99) that the position for which Thumairy was hired was "high-profile." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 246. | Thumairy first reported to work on March 25, 1996 at the Da'wah Department Abroad headed by Saud bin Abdullah al Ghudaian at MOIA's headquarters in Riyadh, Saudi Arabia. Ex. 290, KSA 7016. Ghudaian was the MOIA official who Thumairy identified to the FBI in May 2003 as the individual who recruited him to work at MOIA. Ex. 154, FBI 000001- 000006-REV2021 at 2. | To the extent it is offered for its truth, Plaintiffs Exhibit 154 is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart.<br><br>Al Thumairy did first report to work on March 25, 1996, at the Dawah Abroad Department where Al Ghudaian was Director General. However, the remainder of Plaintiffs' assertion is contradicted by the record. Al Thumairy testified that he did not remember saying what Plaintiffs Exhibit 154 attributes to him (i.e., that Saud Al Abdullah recruited him), and he testified in this case that Saud Al Abdullah did *not* in fact recruit him to work for the Saudi Consulate. Pls. Ex. 107 (Thumairy Tr.)60:9-61:1.<br><br>Plaintiffs' also cite no evidence that Saud Al Abdullah, the subject of Plaintiffs Exhibit 154, is the same person as Saud bin Abdullah al Ghudaian, the author of Plaintiffs Exhibit 290 (KSA 7016). |
| 247. | At his deposition, Thumairy said that he could not remember Saud al Abdullah al Ghudaian at all, even though when he started at MOIA he worked directly under Ghudaian at MOIA's headquarters in Riyadh for nearly two months before he departed for the United States. Ex. 107, Thumairy Dep. 44:13-17; Ex. 290, KSA 7016 (Ex. 434, showing the Thumairy first appeared for work under Ghudaian). Nor could Thumairy recall the name of anyone else he worked with at MOIA headquarters. Ex. 107, Thumairy Dep. 44:18-23 ("I don't recall anybody."). | It is undisputed that Al Thumairy did not recall Al Ghudaian and could not recall the names of other people in that department. Plaintiffs Exhibit 290 (KSA 7016) shows that Al Thumairy's work in Al Ghudaian's department occurred more than 20 years before his deposition and was temporary and brief, as he had already been hired to work "in America" and was with Al Ghudaian's department "pending the completion of his travel procedures." Pls. Ex. 290 (KSA 7016).<br><br>In recalling events from more than 20 years prior, Al Thumairy testified: "Al Ghadyan, it's possible he was there. I don't know for certain. It could be Al Matrudi. I don't know." Pls. Ex. 107 (Thumairy Tr.)39:20-24. |
| 248. | Ghudaian himself recalled knowing Thumairy but said he did not remember | Undisputed that Al Ghudaian recalled knowing Al Thumairy as a MOIA employee, recalled not recruiting him, and likewise did not remember |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | recruiting him for the MOIA job, as Thumairy had told the FBI in May 2003. Ex. 126, Ghudaian Dep. 52:15-17, 53:1-24, 88:5-90:17. Ex. 154, FBI 000001-000006-REV2021 at 2; *see infra*. ¶¶220, 246. | whether he met Al Thumairy in person or the circumstances by which he knew of Al Thumairy. Pls. Ex. 126 (Ghudaian Tr.)52:15-53-24, 87:13-89:17.<br><br>To the extent it is offered for its truth, Plaintiffs Exhibit 154 is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart.<br><br>*See* Objection Chart. That document states that Al Thumairy said he was recruited by "Saud Al Abdullah," but Al Thumairy testified that he did not remember saying what Plaintiffs Exhibit 154 attributes to him (i.e., that Saud Al Abdullah recruited him), and he testified – consistent with Al Ghudaian's testimony – that Saud Al Abdullah did *not* in fact recruit him to work for the Saudi Consulate. Pls. Ex. 107 (Thumairy Tr.) 60:9-61:1. That is also what the 9/11 Commission interview summary says, although this document should not be considered. *See* Pls. Ex. 90 (Snell Decl. Ex. 3) at 2. |
| **III.J.** | **Thumairy arrived in the U.S., went to the Saudi Embassy, and then to Los Angeles.** | Al Thumairy testified that he did visit the Embassy upon his arrival in the United States, though he could not recall if he went immediately to the Embassy or went there at some point later. He did recall, however, that he did not reside in or around the Embassy and that the first place he resided was in Los Angeles. . Pls. Ex. 107 (Thumairy Tr.) 66:15-68:6. |
| 249. | MOIA's Personnel Office recorded that Thumairy began work inside the U.S. on May 22, 1996. Thumairy entered the U.S. based on Saudi Arabia's representation that he was a Saudi Embassy official in Washington, D.C. Ex. 249, KSA 0597. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, it is undisputed that MOIA records show Al Thumairy started work under the Dawah Office in America on May 22, 1996. |
| | | The cited evidence does not reveal the U.S.'s basis for admitting Thumairy, though his visa did list him as a Saudi Admin Official. As David Rundell has explained, there is nothing improper about posting religious personnel in diplomatic positions. KSA Ex. 166 (Rundell Rep.) 33. "Diplomats are expected to promote their country's foundation ideas and contemporary policies to their host goverhment and the local population…. Islam is the core ideology of Saudi Arabia. . . advancing that belief is not only acceptable, but expected." *Id.* |
| | | Moreover, in practice, the "the United States has thousands of State Department employees promoting American cultural values abroad sometimes in cities where we maintain no embassy or consulate. For example, between 1946 and 1978, the United States Information Agency maintained libraries in 426 foreign cites – many in places where we maintained no other diplomatic representation." *Id.* (citing General Accounting Office, Report to the Director, U.S. International Communication Agency, Feb. 1982, pp. iii, 24-26). |
| 250. | Thumairy told the 9/11 Commission in 2004 that the first place he went upon his arrival in the U.S. was the Saudi Embassy in Washington, D.C., and that "[t]he Embassy assigned him to the Saudi consulate in Los Angeles": | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | Al-Thumairy said he wanted to go to a place where he could learn English, so he chose the U.S. He stated that he did not choose Los Angeles, though. Once he was | The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. *See* Objection Chart. It also cannot be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | chosen to serve in the U.S., al-Thumairy said he was sent to the Saudi Embassy in Washington, D.C. The Embassy then assigned him to the Saudi consulate in Los Angeles.… <br><br> When asked who at the Saudi Embassy in Washington, D.C. made the decision to send him to Los Angeles, al-Thumairy said he could not recall, but noted that it was the person in charge of Islamic Affairs, who was new at the time. <br><br> Ex. 90, Snell Decl., Ex. 3 at 2. | proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objections Chart. <br><br> To the extent a response is required, the evidence contradicts aspects of Plaintiffs' assertions. The record shows that Al Thumairy applied for a job with MOIA in America, at least in part to learn English. Pls. Ex. 107 (Thumairy Tr.) 35:19-36:11. The application did not specify a location in America, and Al Thumairy was first approved for a position in America in late 1995, without specifying a location. *See id.*; *see* Pls. Ex. 669 (KSA 6878); Pls. Ex. 234 (KSA 603). <br><br> Regarding his assignment to Los Angeles, Al Thumairy testified that, as part of administrative procedures related to his job, while he was still in Riyadh, he expressed a desire to go to California. Pls. Ex. 107 (Thumairy Tr.) 50:22-51:5; *see also id.* at 47:15-48:18; 54:17-21. MOIA documents show that in March of 1996, several months after he was hired, MOIA in fact assigned Al Thumairy to Los Angeles. *See* Pls. Ex. 244 (KSA 8509). Consistent with this testimony, the 9/11 Commission indicates that Al Thumairy said "he was given the position [in Los Angeles] by the Ministry of Islamic Affairs." Pls. Ex. 90 (Snell Decl. Ex. 3) at 2. Al Thumairy testified that he did not recall telling the 9/11 Commission that the Embassy – or anyone within the Embassy – assigned him to the Consulate in Los Angeles, and that he did not in fact say that to the Commission. Pls. Ex. 107 (Thumairy Tr.) 48:19-23; *id.* at 50:13-20. <br><br> Al Thumairy also testified that he did visit the Embassy upon his arrival in the United States, though he could not recall if he went immediately to the Embassy or went there at some point later. He did recall, however, that he did not reside in or around the Embassy and that the first place he resided was in Los Angeles. Pls. Ex. 107 (Thumairy Tr.) 66:15-68:6. |
| 251. | Thumairy's statement to the 9/11 Commission is belied by the internal MOIA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | document from Minister Turki's Deputy which shows that Thumairy knew that he was appointed to work in Los Angeles based at the Ibn Taymiyah Mosque *before* he ever started work. Ex. 244, KSA 8509-10 (Ex. 433) (on March 11, 1996, MOIA's Riyadh HQ wrote to Sowailem, stating: "I bring you the good news that a decision was made to hire Sheikh Fahad bin Ibrahim Al Thumairy as a successor to Sheikh Ibrahim Al Hiber at the Ibn Taymiyyah Foundation."), Ex. 5, Youssef Rpt. 38. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.<br><br>To the extent a response is required, it is undisputed that the 9/11 Commission interview notes inaccurately state that the Embassy assigned Thumairy to Los Angeles after he arrived in America. Thumairy testified to that fact at his deposition. Thumairy Tr. 48:19-23; *id.* at 50:13-20.<br><br>As explained in response to ¶ 250 above, Thumairy applied for a position with MOIA to work for Dawah abroad in America. He was hired and expressed a desire to be assigned to Los Angeles. And while he was in Riyadh, MOIA assigned him to Los Angeles. *See* response to ¶ 250. |
| 252. | Saudi Arabia's June 2018 Answers to Interrogatories confirmed that Thumairy went to the Embassy in Washington, D.C. when he first arrived in the United States: "Thumairy visited the Saudi Embassy at or around the time he initially arrived in the United States to pick up an identification card…." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 27 (Interrogatory 15). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph accurately quotes the cited material. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 253. | Although Thumairy told the Commission that he "could not recall" the name of the person in charge of Islamic Affairs who made the decision to send him to Los Angeles, when later "asked if there was anybody at the Saudi Embassy in Washington, D.C. to whom he reported, al-Thumairy said that he had the most contact with Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. "Dr. Majid" Ghesheyan was head of the Islamic Affairs Department at the Saudi Embassy. Ex. 295, KSA 7930-33 at 933 (Ex. 424), identifying himself as Head of Islamic Affairs at MOFA). Ghesheyan's deputy was Musaed Al Jarrah, who was "new at the time" in his role in Islamic Affairs and had replaced Khalil Al Khalil. Ex. 2, EO 3487-3488 (Khalil Al Khalil was Ghesheyan's "deputy"); Ex. 129, Afifi Dep. 35:6-36:6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.<br><br>Plaintiffs Exhibit 2CC (EO 3453-608) is inadmissible hearsay. *See* Objection Chart.<br><br>To the extent a response is required, undisputed that Al Thumairy does not recall the name of the person who made the decision to assign him to Los Angeles.<br><br>It not true that Al Thumairy had the most contact at the Embassy with a Dr. Majid, and Al Thumairy did not recall telling the 9/11 Commission otherwise. Pls. Ex. 107 (Thumairy Tr.)116:1-117:15. Al Thumairy does not know a Dr. Majed and did not know one while he was working in Los Angeles. *Id.*<br><br>Plaintiffs Exhibit 295, a letter from 2002, lists Dr. Majid bin Hassan al Ghesheyan as Head of Islamic Affairs at the Embassy (it does not say head of Islamic Affairs at MOFA as Plaintiffs assert). |

216

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Pls. Ex. 129 (Afifi Tr.) is accurately quoted for the proposition that Mr. Jarrah came in after Khalil al Khalil left the office.

Plaintiffs Exhibit 90 (Snell Decl.) and Plaintiffs Exhibit 2CC contain the quoted material, except that no document states that Al Jarrah was "new at the time" and the paragraph does not explain what "time" is being referenced. |
| 254. | Thumairy also told the 9/11 Commission that "before he started working [in Los Angeles], he was a full-time student at UCLA" and that "only after that time did he start his job at the consulate…." Ex. 90, Snell Decl., Ex. 3 at 3. Thumairy told the Commission that "he spent about 60-70% of his time at the consulate, and about 20% at the KFM [King Fahad Mosque]," Ex. 90, Snell Decl., Ex. 3 (February 23, 2004, Memorandum for Record) at 3. Thumairy also told the Commission that he "wanted to clearly express that he did not consider his activities at the mosque to be 'work.'" Ex. 90, Snell Decl., Ex. 3 at 3. Rather, Thumairy told the Commission that "he volunteered his services" at the mosque. Ex. 90, Snell Decl., Ex. 3 at 3. At his deposition, Thumairy admitted that his statements to the Commission were false. Ex. 107, Thumairy Dep. 268:3 -269:13. He never worked at the Consulate and his activities at the Mosque were part of his MOIA work. Ex. 107, Thumairy Dep. 96:4- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.

To the extent a response is required, the cited exhibit contains the quoted material but is contradicted by the evidence in certain respects.

Regarding Al Thumairy studying at UCLA before beginning work at the Consulate, Al Thumairy testified that he freed "all my time to study" English when he first came to the United States. *See* Pls. Ex. 107 (Thumairy Tr.) 88:18:22.

Regarding the percentage of time spent at the Consulate and the Mosque after he began working, Al Thumairy testified that it is not true that he spent 60 to 70 percent of his time at the Consulate and that he did not recall telling the 9/11 Commission otherwise. *See* Thumairy Tr. 96:12- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 97:3, 98:18-99:9. Thumairy claims that that "[w]hat I believe is that I said that the Consul General was in charge of all Saudi citizens in general." Ex. 107, Thumairy Dep. 107:11-108:9. | 97:3. Al Thumairy testified that he was paid by the Ministry of Islamic Affairs and that he was an imam at the mosque. He further testified hat although he did not routinely work at the Consulate, he would answer religious questions there. Pls. Ex. 107 (Thumairy Tr.) 231:17-22. |
| | | Al Thumairy did *not* admit that his statements to the Commission were false. Regarding whether service at the Mosque is work, Al Thumairy did not recall saying what Plaintiffs Exhibit 90 (Snell Decl.) attributes to him. He clarified that "[f]rom one angle, it's correct; and from another it is incorrect," that what he did at the Mosque was not work. If work is "when you sign in and you sign out," he did not work because "that's not the nature of the mosque." Pls. Ex. 107 (Thumairy Tr.) 264:10-265:13; *see also id.* at 266:20-24 ("What I meant by work is that a mosque is not a place where work is performed in the formal fashion, like a government office."). |
| | | The last statement in the paragraph regarding the Consul General is taken out of context. Al Thumairy testified that he did not recall stating to the 9/11 Commission that the Consul General was his superior, as Plaintiffs Exhibit 90 (Snell Decl.) claims, and instead, what Al Thumairy recalled saying was that the Consul General was in charge of Saudis in general. |
| 255. | In addition, Thumairy initially testified at his deposition that "I don't remember how it happened" that he went to California but then stated "…it is my personal decision. I choose the place where to go." Ex. 107, Thumairy Dep. 47:15-48:6. But Thumairy told the 9/11 Commission that "he did not choose Los Angeles, though." Ex. 90, Snell Decl., Ex. 3 at 2. Moreover, Thumairy claimed he could not recall having a discussion with anyone at the Ministry of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Islamic Affairs about going to California or when such a discussion first took place. Ex. 107, Thumairy Dep. 48:7-10, 54:17-55:3. | because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart..<br><br>To the extent a response is required, the cited material contains the quoted words, but aspects of the paragraph are incomplete and contradicted by the record. The record shows that Al Thumairy applied and was selected for a job with MOIA in America without a particular location. Thumairy Tr. 35:19-36:11; Pls. Ex. 669 (KSA 6878); Pls. Ex. 234 (KSA 603). The statement in Plaintiffs Exhibit 90 that he did not choose Los Angeles is in the context of discussing this application, and it is correct that he did not select Los Angeles in his application.<br><br>Al Thumairy testified that he chose to go to California but clarified that, as part of administrative procedures related to his job, he expressed a desire to go to California and submitted a request to that effect. Pls. Ex. 107 (Thumairy Tr.) 50:22-51:5; *see also id.* at 47:15-48:18; 54:17-21. Ministry of Islamic Affairs documents show that in March of 1996, several months after he was hired, the ministry assigned Al Thumairy to Los Angeles. *See* Pls. Ex. 244 (KSA 8509). Consistent with this testimony, the 9/11 Commission indicates that Al Thumairy said "he was given the position [in Los Angeles] by the Ministry of Islamic Affairs," Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 2 – the position he testified he had requested.<br><br>Al Thumairy did *not* testify that he could not recall having a discussion with anyone at MOIA about going to California or when it took place. To the contrary, while he testified that he did not remember "the exact procedures," he did recall communicating with "administrative personnel" to request going to California and that he made this request while he was in Riyadh before going to the Embassy in the U.S. *See* Pls. Ex. 107 (Thumairy Tr.) 51:10-15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 256. | Thumairy further testified at his deposition that the only person he remembered speaking with was his Embassy MOIA supervisor Khalid Al Sowailem, who he did not know before traveling to the U.S. Ex. 107, Thumairy Dep. 51:6-54:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the paragraph is partially inaccurate. Al Thumairy testified that he requested being assigned to Los Angeles, and he could not remember "the exact procedures. But we had an administrative personnel that I would communicated with . . . in Islamic Affairs." Pls. Ex. 107 (Thumairy Tr.) 51:10-15. He also testified that he remembered communicating with Sowailem about "vacations and so forth." *Id.* Thumairy could not recall others he may have spoken with about his request to go to America. Pls. Ex. 107 (Thumairy Tr.) 52:16-54:21. |
| 257. | When asked by the 9/11 Commission about "to whom he reported" at the Embassy, Thumairy never mentioned Sowailem and only mentioned Islamic Affairs department head (Dr. Majed) Ghesheyan. Ex. 90, Snell Decl., Ex. 3 at 3-4. However, at his deposition, Thumairy claimed that he dealt with "Sowailem only" and had no recollection of Ghesheyan. Ex. 107, Thumairy Dep. 117:16-23. Thumairy testified "I don't remember but Khalid Al Sowailem." Ex. 107, Thumairy Dep. 52:22-53:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The report on Al Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Al Thumairy did deal with Al Sowailem from the Embassy and had no recollection of dealing with anyone else there while he was in Los Angeles.<br><br>Plaintiffs' assertion regarding Al Ghesheyan is contradicted by the record. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) does not purport to list all of the people Al Thumairy mentioned to whom he reported at the Embassy; it merely lists one person that he purportedly said he had the most contact with. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) does not use the name Al Ghesheyan. Regardless, it is untrue that Al Thumairy had the most contact at the Embassy with a Dr. Majid, and Al Thumairy did not recall telling the 9/11 Commission otherwise. Pls. Ex. 107 (Thumairy Tr.)116:1-117:15. Al Thumairy does not know a Dr. Majed and did not recall meeting someone by that name while he was working in Los Angeles. *Id.* |
| 258. | Contrary to the documentary evidence which showed that he was assigned by MOIA to work at the Ibn Taymiyah Foundation, Thumairy testified that "[w]hen I first went [to Los Angeles], I did not know which mosque would be there." Ex. 107, Thumairy Dep. 62:1-7. He claimed that he first decided to attend the Ibn Taymiyah Mosque "[a]fter I arrived to Los Angeles…" and further stated that: "I chose it because of the location and it was convenient." Ex. 107, Thumairy Dep. 64:4-12, 64:24-65:9. Thumairy testified that he "went and checked out the neighborhood and…saw the mosque" and "ended up | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' assertion is contradicted by the record and distorts the timeline to which Al Thumairy testified. When asked if he knew the mosque he would be assigned to work in when he went to California, Al Thumairy testified: "I was aware." Pls. Ex. 107 (Thumairy Tr.) 62:8-12. Al Thumairy went on to testify: "I knew that Ibn Taymiyyah Masjid was nearby, and this is why I live nearby there." *Id.* He clarified, however, that after he first arrived in Los Angeles, "I dedicated my time for studies" and "I was preoccupied with studies." *Id.* at 62:4-5; 61:7. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | getting an apartment nearby the mosque." Ex. 107, Thumairy Dep. 89:6-13. | Al Thumairy further testified that "it was before I decided to go to California" that he learned the Ibn Taymiyyah Mosque was in a good neighborhood. Pls. Ex. 107 (Thumairy Tr.) 63:15-24. He then clarified that *after* he arrived, he decided that he would start to work at the mosque, but did not become an official imam there. Pls. Ex. 107 (Thumairy Tr.) 88:18-90:20. |
| 259. | When asked if he spoke to anyone at the Mosque about working there he initially said "[n]o, I don't remember…" and then testified "[i]t was a spontaneous thing" and that after attending the Mosque "I would speak to the Imam" and that "at times when the Imam was not there" Thumairy "would lead the prayers and people recognized me." Ex. 107, Thumairy Dep. 89:14-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the exhibit contains the quoted material. |
| **III.K.** | **Thumairy was assigned to replace another MOIA Propagator in California, Ibrahim Al Hiber, but claimed he could not recall meeting him.** | Al Thumairy was Al Hiber's successor from MOIA at the Ibn Taymiyah Foundation (though not the Mosque). *See* Pls. Ex. 244 (KSA 8509). Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. *See* Pls. Ex. 107 (Thumairy Tr.) 86:16-22. While the Ibn Taymiyah Mosque was still operating, Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Thumairy to Sowailem referring to a "full-time English language course" over the previous four semesters). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy testified that Al Hiber "was in Los Angeles before I went there" and that Al Thumairy "[thought] he was an Imam at the Ibn Taymiyyah Mosque." Pls. Ex. 107 (Thumairy Tr.) (Pls. Ex. 107) at 86:16-87:7. Al Thumairy did not deny meeting Hiber but when asked, "[h]ad you ever met him before" Al Thumairy went to Los Angeles, Al Thumairy said no. *Id.* |
| 260. | The man that Thumairy was assigned to replace, Ibrahim Al Hiber, was a MOIA propagator and the Imam of the Ibn Taymiyah Mosque who hosted Sheikh Omar Abdul Rahman, the "Blind Sheikh" at the Mosque in 1993. Ex. 72, Madha Decl. ¶ 3; Ex. 5, Youssef Rpt. 20 ("We determined that during one visit in 1993 after the February 1993 World Trade Center bombing, Abdel Rahman gave a lecture at the Ibn Taymiyah Mosque to an invitation-only audience comprising a select group of his followers. Abdel Rahman also led the public prayers at the Ibn Taymiyah Mosque on several occasions, including the Friday prayer."). According to Plaintiffs' expert Youseff, "operations of Al Gama'a and Abdel Rahman at the Ibn Taymiyah Mosque had to be carried out with the express knowledge and approval of Imam Hiber, his Saudi Government superiors, and the leadership of the Mosque's Foundation." Ex. 5, Youssef Rpt. 21. | The Youssef report should be excluded. *See* Objections Chart.<br><br>Undisputed that Thumairy was Hiber's successor from MOIA at the Ibn Taymiyah Foundation. *See* Pls. Ex. 244 (KSA 8509). Notably, Plaintiffs Exhibit 244 (KSA 8509) refers to the Ibn Taymiyah Foundation, not the Ibn Taymiyah Mosque. As Madha explains, the Ibn Taymiyah Mosque was replaced by the King Fahad Mosque, and both were operated by the Ibn Taymiyah Foundation. Pls. Ex. 72 (Madha Ex. 830) ¶ 3.<br><br>Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. *See* Pls. Ex. 107 (Thumairy Tr.) 86:16-22. While the Ibn Taymiyah Mosque was still operating, Al Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Al Thumairy to Al Sowailem referring to a "full-time English language course" over the previous four semesters). To the extent Madha's declaration states that Al Thumairy was imam at the Ibn Taymiyah Mosque, Madha appears to speak of the Ibn Taymiyah Mosque and King Fahad Mosque without drawing a distinction. *See* Pls. Ex. 128 (Madha Tr.) 28:5-13 (Thumairy's responsibility was "to serve as an Imam at the King Fahad Mosque); *id.* at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 40:10-13 (denying that Thumairy was imam at any other mosque in Los Angeles).<br><br>Plaintiffs accurately quote from Youssef's report regarding Abdul Rahman, but his speculation is unfounded and concerns events from years before Al Thumairy arrived. Youssef cites no proof that Al Hiber hosted Rahman or that Rahman's presence at the mosque implied approval of Al-Hiber or the Saudi government.<br><br>The FBI has also asserted that during this period, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Moreover, as Saudi Arabia's expert Marc Sageman explained:<br><br>To Youssef, the visits of a legitimate Islamic scholar, who also happens to be a political advocate of violent jihad, like Sheikh Abdel Rahman, was an indication of the "extremism" and "like-mindedness" of the Ibn Taymiyah Mosque leadership. (20) Youssef does not refer to any litigation or prosecution that resulted from his investigations that would show there was a covert operational cell at one of the mosques he investigated. Without further evidence about the existence of such covert operational cells, Youssef's beliefs about them must be taken as just suspicions, not established facts.<br><br>Youssef is not shy about accusing people and places without any evidence to back him up. "The operations of Al Gama'a and Abdel Rahman at the Ibn Taymiyah Mosque had to be carried out with the express knowledge and approval of Imam Hiber, his Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Government superiors, and the leadership of the Mosque's foundation." (21) I am not aware of any Islamic<br><br>terrorist being prosecuted in California for terrorist activities (Youssef uses the word "operations") during Youssef's time there. I am skeptical that al Gama'a Islamiyah was running operations in California, let alone that they were carried out with the express knowledge of Saudi imams.<br><br>KSA Ex. 167 (Sageman Rep.) 563. |
| 261. | Thumairy admitted that he spoke "to the Imam" of the Ibn Taymiyah Mosque. Ex. 107, Thumairy Dep. 89:14-22. While the Imam immediately prior to Thumairy was Ibrahim Al Hiber, Thumairy testified that "I don't remember that I met him [Hiber] or talked to him." When asked about his knowledge of Ibrahim al-Hiber, Thumairy testified "I heard of him. He was in Los Angeles before I went there …. I think he [Hiber] was an Imam at the Ibn Taymiyah Mosque." When asked whether Hiber worked for the Ministry of Islamic Affairs, Thumairy claimed: "I don't know." Ex. 107, Thumairy Dep. 86:16-87:7; Ex. 244, KSA 8509-10 (Ex. 433, Thumairy was the "successor" to Hiber); Ex. 72, Madha Decl. ¶ 3 (Hiber was Imam prior to Thumairy); Ex. 5, Youssef Rpt. 21 (FBI investigation conducted by Plaintiffs' expert Youssef | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef report should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, aspects of Plaintiffs' assertion are inaccurate. It is undisputed that Hiber was an Imam at the Ibn Taymiyah Mosque prior to and for a time after Al Thumairy's arrival; that Al Thumairy remembered him as such but did not recall certain details of these events from more than twenty years earlier, including who employed Hiber.<br><br>Al Thumairy testified that Al Hiber "was in Los Angeles before I went there" and that Al Thumairy "[thought] he was an Imam at the Ibn Taymiyyah Mosque." Pls. Ex. 107 (Thumairy Tr.) 86:16-87:7. Al Thumairy did not deny meeting al Hiber but when asked, "[h]ad you ever |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | identified Hiber as Imam of Ibn Taymiyah Mosque prior to Thumairy's arrival). | met him before" Al Thumairy went to Los Angeles, Al Thumairy said no. *Id.* |
| | | To the extent the paragraph implies that Al Thumairy was imam at the Ibn Taymiyah Mosque, it is incorrect. Al Thumairy was Hiber's successor from MOIA at the Ibn Taymiyah Foundation. *See* Pls. Ex. 244 (KSA 8509). Notably, Plaintiffs Exhibit 244 (KSA 8509) refers to the Ibn Taymiyah Foundation, not the Ibn Taymiyah Mosque. As Madha explains, the Ibn Taymiyah Mosque was replaced by the King Fahad Mosque, and both were operated by the Ibn Taymiyah Foundation. Pls. Ex. 72 (Madha Ex. 830) ¶ 3. |
| | | Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. Ex. 107 at 86. While the Ibn Taymiyah Mosque was still operating, Al Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Al Thumairy to Al Sowailem referring to a "full-time English language course" over the previous four semesters). To the extent Madha's declaration states that Al Thumairy was imam at the Ibn Taymiyah Mosque, Madha appears to speak of the Ibn Taymiyah Mosque and King Fahad Mosque without drawing a distinction. *See* Pls. Ex. 128 (Madha Tr.)28:5-13 (Al Thumairy's responsibility was "to serve as an Imam at the King Fahad Mosque); *id.* at 40:10-13 (denying that Al Thumairy was imam at any other mosque in Los Angeles). |
| 262. | Contrary to record evidence, Thumairy testified that he was never the Imam at the Ibn Taymiyah Mosque. Ex. 107, Thumairy | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Dep. 91:13-20 ("No, I was not an official Imam"). Thumairy further testified that he was not appointed by the Ministry of Islamic Affairs to work as the Imam at the Ibn Taymiyah Mosque but rather "was all preoccupied with studies" of the English language and "dedicated [all of his] time for studies." Ex. 107, Thumairy Dep. 61:1-63:5; *see also* 88:15-22, 92:22-94:9. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs accurately quote Al Thumairy's testimony but erroneously argue it is inconsistent with the record evidence. There is no inconsistency. Al Thumairy was Al Hiber's successor from MOIA at the Ibn Taymiyah *Foundation*. *See* Pls. Ex. 244 (KSA 8509). Notably, Plaintiffs Exhibit 244 (KSA 8509) refers to the Ibn Taymiyah Foundation, not the Ibn Taymiyah Mosque. As Madha explains, the Ibn Taymiyah Mosque was replaced by the King Fahad Mosque, and both were operated by the Ibn Taymiyah Foundation. Pls. Ex. 72 (Madha Ex. 830) ¶ 3.<br><br>Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. Pls. Ex. 107 (Thumairy Tr.) 86:16-22. While the Ibn Taymiyah Mosque was still operating, Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Thumairy to Sowailem referring to a "full-time English language course" over the previous four semesters). To the extent Madha's declaration states that Al Thumairy was imam at the Ibn Taymiyah Mosque, Madha appears to speak of the Ibn Taymiyah Mosque and King Fahad Mosque without drawing a distinction. *See* Pls. Ex. 128 (Madha Tr.)28:5-13 (Thumairy's responsibility was "to serve as an Imam at the King Fahad Mosque; *id.* at 40:10-13 (denying that Thumairy was imam at any other mosque in Los Angeles). |
| 263. | Thumairy's testimony directly contradicts the MOIA communication which showed | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that he was appointed as the "successor" of Ibrahim Al Hiber at the Ibn Taymiyah Mosque. Ex. 244, KSA 8509-10 (Ex. 433). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs misstate the evidence, which is in fact consistent with Al Thumairy's testimony.

Al Thumairy was Al Hiber's successor from MOIA at the Ibn Taymiyah *Foundation*. *See* Pls. Ex. 244 (KSA 8509). Notably, Plaintiffs Exhibit 244 (KSA 8509) refers to the Ibn Taymiyah Foundation, not the Ibn Taymiyah Mosque, and it does not state that Al Thumairy would immediately work for the foundation full-time, as Plaintiffs imply. As Madha explains, the Ibn Taymiyah Mosque was replaced by the King Fahad Mosque, and both were operated by the Ibn Taymiyah Foundation. Pls. Ex. 72 (Madha Ex. 830) ¶ 3.

Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. Pls. Ex. 107 (Thumairy Tr.) 86:16-22. While the Ibn Taymiyah Mosque was still operating, Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Al Thumairy to Al Sowailem referring to a "full-time English language course" over the previous four semesters). To the extent Mr. Madha's declaration states that Al Thumairy was imam at the Ibn Taymiyah Mosque, Mr. Madha appears to speak of the Ibn Taymiyah Mosque and King Fahad Mosque without drawing a distinction. *See* Pls. Ex. 128 (Madha Tr.)28:5-13 (Thumairy's responsibility was "to serve as an Imam at the King Fahad |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mosque); *id.* at 40:10-13 (denying that Thumairy was imam at any other mosque in Los Angeles). |
| 264. | Usman Madha was a member of the congregation at the Ibn Taymiyah Mosque and testified that Thumairy was the Imam at the Mosque and that it was "common knowledge" that Thumairy worked for the Saudi Ministry of Islamic Affairs. Ex. 72, Madha Decl. ¶ 3. Similarly, Saudi Consulate official Ismail Mana testified that Thumairy was the Imam at the Ibn Taymiyah Mosque in Los Angeles. Ex. 110A, Mana Dep. 66:3-22. In February 1999, Omar Al Bayoumi confirmed Thumairy's role in his letter to MOIA's Minister Turki, which referred to Thumairy as "Sheikh Fahad al Thumairy, from the Ibn Taymeya [Taymiyah] Mosque in Los Angeles" and thanked Thumairy for his "excellent cooperation and coordination." Ex. 416, KSA 7591 (Ex. 445). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 416 is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Plaintiffs misstate the evidence, which is in fact consistent with Thumairy's testimony.

Thumairy was Hiber's successor from MOIA at the Ibn Taymiyah *Foundation*. *See* Pls. Ex. 244 (KSA 8509). Notably, Plaintiffs Exhibit 244 (KSA 8509) refers to the Ibn Taymiyah Foundation, not the Ibn Taymiyah Mosque, and it does not state that Thumairy would immediately work for the foundation full-time, as Plaintiffs imply. As Madha explains, the Ibn Taymiyah Mosque was replaced by the King Fahad Mosque, and both were operated by the Ibn Taymiyah Foundation. Pls. Ex. 72 (Madha Ex. 830) ¶ 3.

Al Hiber, unlike Al Thumairy, was an Imam at the Ibn Taymiyah Mosque. *See* Pls. Ex. 107 (Thumairy Tr.) 86:16-22. While the Ibn Taymiyah Mosque was still operating, Thumairy "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." *Id.* at 89:17-22. But he was not a formal imam there as he was then a full-time student; he became imam at the King Fahad Mosque after that opened. *Id.* at 90:1-3 (explaining that he was not an imam in the beginning of his time in the U.S. because he was studying English); KSA Ex. 171 (KSA 8490) (1998 letter from Al Thumairy to Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Sowailem referring to a "full-time English language course" over the previous four semesters). To the extent Madha's declaration states that Al Thumairy was imam at the Ibn Taymiyah Mosque, Madha appears to speak of the Ibn Taymiyah Mosque and King Fahad Mosque without drawing a distinction. *See* Pls. Ex. 128 (Madha Tr.)28:5-13 (Thumairy's responsibility was "to serve as an Imam at the King Fahad Mosque); *id.* at 40:10-13 (denying that Thumairy was imam at any other mosque in Los Angeles).

Al Bayoumi's reference to Thumairy, which does *not* call him an imam, is from February of 1999, after the King Fahad Mosque had replaced the Ibn Taymiyah Mosque, indicating that Al Bayoumi's use of the phrase "from 'Masjid Ibn Taymiyyah'" was similarly conflating the King Fahad Mosque with its predecessor and/or the foundation. Pls. Ex. 416 (KSA 7591).

Mana's testimony that Al Thumairy would "pray" and "greet" the congregation at the Ibn Taymiyah Mosque is consistent with Al Thumairy's testimony, and Mana described Al Thumairy "an imam" based on observing those activities, not based on knowing that Thumairy was a "formal" imam. Pls. Ex. 110A (Mana Tr.) 66:13-16. |
| 265. | Thumairy's testimony is contradicted by his own October 24, 1996 report to his supervisor, MOIA's Embassy Head Sowailem. Ex. 301, KSA 8506. That report shows that upon his arrival in Los Angeles, Thumairy immediately started work as a MOIA propagator and as Imam at the Ibn Taymiyah Mosque. Thumairy wrote "[i]n response to the forms sent for follow-up" to report that he "began actively participating in the management of the [Ibn Taymiyah] | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this assertion contains improper attorney argument. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Foundation and carrying out its Da'wah missions" together with "the Foundation's administrative work and follow-up on the staff" and had also met with "Saudi brothers such as students and others" and made "visits…to some mosques and centers in the area to get to know them and those responsible for them." As for studying, Thumairy's letter shows that he merely had "taken time out" to make "some individual efforts" to study English. Ex. 301, KSA 8506. | Further, Plaintiffs' assertion is incorrect. Plaintiffs Exhibit 301 is consistent with, and does not contradict, Thumairy's testimony. Thumairy testified that he "would lead prayers," "pray at the mosque," "speak to the Imam;" and "give the lesson or the speech during the Friday prayer." Pls. Ex. 107 (Thumairy Tr.) 89:17-22. This is consistent with the report in Plaintiffs Exhibit 301 that, "two to three times a week," Thumairy would "giv[e] lesson, thoughts, and general guidance." Plaintiffs Exhibit 301 does *not* state that Thumairy started working as an Imam at the mosque, and Thumairy's testimony confirms that the activities he performed at the mosque did not make him an imam.<br><br>Regarding Thumairy's testimony that after he arrived in the United States he was preoccupied with studying, this is confirmed by a 1998 letter from Thumairy to Sowailem reprting that Thumairy had been a full-time student for multiple semesters. *See* KSA Ex. 171 (KSA 8490). |
| 266. | Saudi Arabia failed to produce any subsequent report prepared by Thumairy after October 1996 for Sowailem or any other MOIA official about his work in California. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs have not demonstrated that there was any subsequent report prepared by Thumairy, and Thumairy testified that there was not. *See* Pls. Ex. 107 (Thumairy Tr.) 148:13-149:9. Saudi Arabia did, however, produce additional correspondence between Thumairy and Sowailem demonstrating Thumairy's duties in California. *See*, *e.g.*, KSA Ex. 171 (KSA 8490). |
| IV. | **THUMAIRY WAS AN AGENT IN THE SAUDI GOVERNMENT'S CHAIN OF COMMAND, WHO CONTROLLED A** | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **SUNNI EXTREMIST NETWORK, AND WAS IN CHARGE OF THE OPERATIONS OF THE SUPPORT NETWORK IN CALIFORNIA** | |
| **IV.A.** | **Thumairy interacted with Saudi Embassy officials regarding his work assignments.** | Al Thumairy interacted with Sowailem about administrative matters such as leave requests. Ex. 107, Thumairy Dep. 114:23-115:5. Al Sowailem also called the King Fahad Mosque and others "to check on things for Ramadan and so forth." Thumairy Tr. 150:8-12. When calling the King Fahad Mosque, Al Thumairy explained that Sowailem would "call me or Shuaib or anyone else." *Id.* at 19-21.<br><br>Al Thumairy's contact with the Embassy was thus administrative and sporadic. |
| 267. | Fahad Al Thumairy was from a well-known family in Saudi Arabia and had high level connections within the Saudi government, including MOIA's Minister Abdullah Al Turki and Saudi Prince Abdelaziz. Ex. 97, Turki Dep. 125:2-9; Ex. 72, Madha Decl. ¶ 6; Ex. 563, FBI 009071-REV2021 at 9072; Ex. 483, FBI ██████████ ████████████████████. | Exhibits 483 and 563, as well as the cited portion of Plaintiffs Exhibit 72 (Madha Ex. 830), are inadmissible. *See* Objections chart.<br><br>Plaintiffs' assertion is not supported by the record. The cited testimony refers to "an al Thumairy family or tribe," which Minister Turki said was "very well known," adding that "all Saudi[] famil[ies] are very well known to each other." Turki Tr. 125. This does not show that Fahad Al Thumairy was well connected with or even knew members of the Saudi government such as Minister Al Turki or Prince Abdul Aziz.<br><br>To the contrary, Minister Al Turki testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him know." Turki Tr. 124:21-24-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). Al Thumairy acknowledged that he saw Minister Al Turki "in many gatherings," but he did not "personally |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | remember that I spoke with him. I don't remember. It could be just a greeting." Thumairy Tr. 28:18-29:7.<br><br>The cited portion of the Madha Declaration is inadmissible because it is not based on personal knowledge. *See* Objections chart. Mr. Madha merely claims it "appeared" to him that Al Thumairy and Minister Al Tuirki knew each other based only on one or two observed interactions in 1998 and the fact that the Minister at one point used Al Thumairy's name. Pls. Ex. 72 (Madha Ex. 830) ¶ 6.<br><br>The purported connection to Prince Abdulaziz is based on inadmissible hearsay in Plaintiffs Exhibit 563 and Plaintiffs Exhibit 483. *See* Objections Chart. Plaintiffs Exhibit 563 merely refers to a connection to Al Thumairy's wife, not Al Thumairy, and offers no details to corroborate the nature of the alleged connection. Plaintiffs Exhibit 483 concerns a Wells Fargo account from which Al Thumairy distributed private charitable donations made by Prince Abdulaziz, but this does not establish a personal connection. Al Thumairy explained that he was continuing a practice of distributing charitable funds "that was done in the past and continued to be done," and Al Thumairy recalled that he was put in touch with the Prince's office through "the prior Imam before me," though he did not remember precisely. Thumairy Tr. 194:10-195:21. |
| 268. | MOIA selected Thumairy to lead its efforts to expand its propagation to a key location, California. In July 1996, MOIA U.S. Head Sowailem wrote to Ambassador Prince Bandar that Thumairy had been appointed to work in Los Angeles, California "due to the importance of the area." Ex. 302, KSA 8507. In September 1997, Sowailem wrote to MOIA headquarters stating that "due to the importance of California" he nominated | The evidence contradicts Plaintiffs' claim that Thumairy was hired to lead propagation efforts in a "key location.". The record shows that Thumairy applied for a job with MOIA in America, at least in part to learn English. Thumairy Tr. 35:19-36:11. The application did not specify a location in America, and Thumairy was first approved for a position in America in late 1995, without specifying a location. *See id.*; *see* Pls. Ex. 669 (KSA 6878); Pls. Ex. 234 (KSA 603).<br><br>Regarding his assignment to Los Angeles, Al Thumairy testified that, as part of administrative procedures related to his job, while he was still in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy "to be supervisor of propagators in California" Ex. 415, KSA 8503 (Ex. 439). | Riyadh, he expressed a desire to go to California. *See* Thumairy Tr. 50:22-51:5; *see also id.* at 47:15-48:18; 54:17-21. MOIA documents show that Al Thumairy applied, interviewed, and was hired in 1995 for a position in America (without specifying a location. *See* Pls. Ex. 669, Ex. 234 (KSA 603). Then, in March of 1996, several months after he was hired and consistent with his testimony, MOIA in fact assigned Al Thumairy to Los Angeles. *See* Pls. Ex. 244 (KSA 8509). This sequence shows that the decision to assign Al Thumairy to Los Angeles was not made by a the "highest-levels" within MOIA as Plaintiffs elsewhere claim.<br><br>Plaintiffs Exhibit 302 (KSA 8507) does not state or even suggest that Saudi Arabia or MOIA were particularly focused on California or viewed it as "key" to anything. To the contrary, the exhibit refers to the USA as a whole. *See* Pls. Ex. 302 (KSA 8507) ("importance of qualified Saudi propagators being in the Islamic arena *in America*") (emphasis added). The document contains the quoted language, but that language does not indicate a unique focus on California.<br><br>Regarding Plaintiffs Exhibit 415, the cited evidence shows that Sowailem nominated Thumairy to supervise propagators in California in 1997, nearly two years after MOIA decided to hire him to work in America. Al Thumairy explained, however, that he was not aware of this nomination and did not in fact supervise propagators in California, Pls. Ex. 107 (Thumairy Tr.) 143:10-147:10, and there is no evidence that he did so. |
| 269. | The MOIA propagator position in Los Angeles brought with it the Imamate for the new King Fahad Mosque, a highly prized appointment. Ex. 5, Youssef Rpt. 36. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Youssef also fails to cite any support for this *ipse dixit* assertion that this was a "highly prized appointment." |
| 270. | Plaintiffs' expert Youssef had extensive interactions with the Saudi government over the course of his career, including serving as the FBI's first legal Attache in Riyadh Saudi Arabia from 1996-2000. Ex. 5, Youssef Rpt. 3. Youssef stated that from his observations and experience, "the Saudi Government employed a strict hierarchy over its officials, particularly those working in a foreign country." Youssef concluded, based on applying his experience to the evidence, that "[d]uring the time Thumairy worked in Los Angeles he received directions and instructions from his government superiors on a regular basis and reported on his work to them." Ex. 5, Youssef Rpt. 42. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef fails to cite any support for this *ipse dixit* assertion that Thumairy received directions and instructions from his government superiors on a regular basis and reported his work to them. To the contrary, there is no documentary evidence of regular reports by Thumairy, and no documentary evidence of instructions to Thumairy.<br><br>Regarding the phone calls underlying Youssef's speculation, Al Thumairy and Al Sowailem did talk by phone about administrative matters such as leave requests. *See* Thumairy Tr. (Pls. Ex. 107) 114:23-115:5 ("there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations."). Al Sowailem also called the King Fahad Mosque and others "to check on things for Ramadan and so forth." *Id.* at 150:8-12. When calling the King Fahad Mosque, Al Thumairy explained that Sowailem would "call me or Shuaib or anyone else." *Id.* at 19-21. As Mr. Sageman explained, "[t]here is nothing unusual about making calls to one's administrative facilitator." *See* Sageman 582-585 (Sageman rebutting Youssef's speculation). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Regarding Youssef's unsupported assertion of a strict hierarchy, as Mr. Sageman explained, the opposite is true. *See* KSA Ex. 167 (Sageman Rep.) 581 (working away from headquarters and in foreign countries provides "more freedom of action," not less). |
| 271. | According to Plaintiffs' expert Youssef, "Thumairy engaged in a regular pattern of phone calls to various offices at the Saudi Embassy in Washington, D.C. including the offices of his MOIA supervisor Khalid al Sowailem and the Islamic Affairs Department run by Musaed al Jarrah." Ex. 5, Youssef Rpt. 42-43; Ex. 12C (Thumairy Calls to Saudi Embassy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. Plaintiffs Exhibit 12C is an improper summary exhibit. *See* Objections Chart.<br><br>To the extent a response is required, Al Thumairy and Al Sowailem did talk by phone about administrative matters such as leave requests. *See* Thumairy Tr. (Pls. Ex. 107) 114:23-115:5 ("there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations."). Al Sowailem also called the King Fahad Mosque and others "to check on things for Ramadan and so forth." *Id.* at 150:8-12. When calling the King Fahad Mosque, Al Thumairy explained that Al Sowailem would "call me or Shuaib or anyone else." *Id.* at 19-21.<br><br>Youssef, however, overstates the number of phone calls in his analysis. Plaintiffs Exhibit 12C misattributes to Thumairy 9 calls made from the number ████ 0777 prior to April 2002 when he started using it. The subscriber for this number is Rose Mary Genovese, and the user is Denis Battochio (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 pm which is not supported by the phone records. The phone records for Thumairy fo this period were produced, but do not reflect this call. *See* Pls. Ex. 477 (FBI 564). Plaintiffs instead rely upon a an FBI memorandum, which is hearsay, and says that Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09" not that Al Thumiary did so. Pls. Ex. 2JJ (EO 622). <br><br> Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. *See* Thumairy Tr. 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning the United States. Jarrah Tr. 166:24-167:15; 167:16-19, 172:2-8. |
| 272. | Thumairy admitted that Sowailem would call him on the phone. Sowailem also called MOIA propagator Shuaib. Ex. 107, Thumairy Dep. 150:6-21. Saudi Arabia did not produce any of its Embassy and Consulate phone call records of calls during the relevant time period which would show calls made to Thumairy — or Bayoumi. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Thumairy and Sowailem did talk by phone about administrative matters. Sowailem also called the King Fahad Mosque and others "to check on things for Ramadan and so forth." Thumairy Tr. 150:8-12. When calling the King Fahad Mosque, Thumairy explained that Sowailem would "call me or Shuaib or anyone else." *Id.* at 19-21. <br><br> Saudi Arabia complied fully with its discovery obligations. The cited evidence does not show that there are Embassy or Consulate phone records showing any calls to Thumairy or Bayoumi. |
| 273. | When the 9/11 Commission asked Thumairy "if there was anybody at the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi Embassy in Washington D.C. to whom he reported," Thumairy answered that "he had the most contact with Dr. Majid [Ghesheyan], who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The report on Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.<br><br>It is untrue that Thumairy had the most contact at the Embassy with a Dr. Majid, and Thumairy did not recall telling the 9/11 Commission otherwise. *See* Thumairy Tr. 116:1-117:15. Thumairy does not know a Dr. Majed and did not know one while he was working in Los Angeles. *See id.* The 9/11 Commission document does not use the name Ghesheyan.<br><br>Al Thumairy and a different person at the Embassy – Al Sowailem – did talk by phone about administrative matters such as leave requests. *See* Thumairy Tr. (Pls. Ex. 107) 114:23-115:5 ("there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations."). Al Sowailem also called the King Fahad Mosque and others "to check on things for Ramadan and so forth." *Id.* at 150:8-12. When calling the King Fahad Mosque, Al Thumairy explained that al Sowailem would "call me or Shuaib or anyone else." *Id.* at 19-21. |
| 274. | At his deposition, however, Thumairy claimed that he did not know Ghesheyan. Ex. 107, Thumairy Dep. 116:15-18, 417:5-21, 419:16-23. This is not credible, as it is contrary to Thumairy's statement to the 9/11 Commission statement – and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ghesheyan's role as a Board member of the King Fahad Mosque. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The report on Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.<br><br>To the extent a response is required, this is improper attorney argument, not a statement of fact or evidence.<br><br>Thumairy did testify to not knowing Ghesheyan and explained that the 9/11 Commission statement attributed to him was inaccurate. *See* Thumairy Tr. 116:1-117:15.<br><br>Plaintiffs cite no evidence demonstrating Ghesheyan's "role as a Board member." To the extent Plaintiffs are referring to the fact that seven Saudi officials were added to the board (*see* Plaintiffs Exhibit 179 (Kaldirim Ex. 179)), there is no evidence Ghesheyan was one of the seven, as they were identified by title, not name. Regardless, those seven "never communicated with" the active board members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). Thus, even assuming Ghesheyan were on the Board, that in no way contradicts Thumairy's testimony that Thumairy did not know Ghesheyan. |
| 275. | In addition, at his deposition Thumairy claimed that the only Embassy office he knew was the MOIA Office led by Sowailem — and that he did not know of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Islamic Affairs department at the Embassy — despite previously identifying the "Islamic Affairs" department led by Ghesheyan as his Embassy contact to the 9/11 Commission. Ex. 107, Thumairy Dep. 116:19-117:4. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The report on Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart.<br><br>To the extent a response is required, this is improper attorney argument, not a statement of fact or evidence. Thumairy also explained that the 9/11 Commission statement attributed to him was inaccurate. *See* Thumairy Tr. 116:1-117:15.<br><br>Moreover, Plaintiffs inaccurately describe Thumairy's testimony. Thumairy never stated that "the only Embassy office he knew was the MOIA Office led by Sowailem" or that he did not know "the Islamic Affairs department at the Embassy." To the contrary, when asked if he knew the Islamic Affairs Department at the Embassy, he testified: "I know the office at which Khaled Sowailem worked. It was called the Islamic Affairs." Thumairy Tr. 116:19-24. He did not know any other office related to Islamic work. |
| 276. | By contrast, Consulate Islamic Affairs Secretary (and Thumairy's assistant) Ismail Mana testified at his deposition that he knew of the Islamic Affairs Department at the Embassy and identified Majid al Ghesheyan by name. Ex. 110A, Mana Dep. 53:11-22, 120:6-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, there is no evidence showing that Mana was Thumairy's assistant. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mana – who worked at the Consulate – explained that the precise naming of Islamic Affairs within the Embassy and Consulate were complicated. *See* Mana Tr. 53:13-22. Mana testified that he did not know Ghesheyan personally and recalled Ghesheyan "probably at the Embassy," but never stated that he knew Ghesheyan worked in Islamic Affairs. *Id.* at 120:10-22.<br><br>Plaintiffs' statement is partially inaccurate and incomplete. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| 277. | The MPS production also revealed that in 1999, Bayoumi wrote letters to Ghesheyan, Sowailem, Thumairy, and MOIA Minister Turki, about the visit of MOIA propagators Mutaeb Al Sudairy and Adel Al Sadhan and lauded their "complete cooperation" and "advance coordination." Ex. 411, MPS 43_314; Ex. 678D, MPS 43_336; Ex. 413, MPS43_338, Ex. 414, MPS43_347 (faxed copy at Ex. 416, KSA 7591). | Plaintiffs Exhibits 678D, 411, 413, 414, and 416 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs quote the cited exhibits out of context. The cited exhibits thank various people for cooperating and coordinating a visit by Sudairy and Sadhan to several mosques so that they could "lead[ ] prayers, . . . lessons, and reflections." *E.g.*, Pls. Ex. 416 (KSA Ex. 7591). Bayoumi praised them for "prepar[ing] the people to focus on worship, learning, and the rejection of disputes and division." *Id.* |
| 278. | Thumairy made the unbelievable claim that he didn't remember *anyone* at the Embassy other than Sowailem and had contact with "Khalid Sowailem only." Ex. 107, Thumairy Dep. 52:22-53:9; 117:16-20; 443:10-15 (when asked "[w]ho else were you calling at the embassy other than Khalid Sowailem?" Thumairy claimed "I don't remember a thing."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this contains improper attorney argument and misstates the testimony.<br><br>Thumairy did not deny having contact with others at the Embassy, but he could only remember Sowailem's name more than twenty years later. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy did *not* say he only had contact with Sowailem. He was asked to whom he *reported*, and said only Sowailem, meaning he did not report to others. Thumairy Tr. 114:23-115:5. That does not mean he did not contact others.<br><br>The reference at Page 52 of the transcript concerns the specific issue of who assigned Thumairy to Los Angeles; the reference at page 117 concerns who Thumairy had the *most* contact with; and the reference at page 443 shows that Thumairy readily offered that there "may have been" calls with others at the Embassy but he did not remember who calls were to. Thumairy Tr. 442:22-4.<br><br>Sowailem was Thumairy's primary contact at the Embassy, and it is not surprising that he would not remember the names of other people with whom he might have had sporadic contact more than twenty years before. |
| 279. | But Madha testified that Saudi government officials Shuaib and Khalil both admitted to him that Thumairy reported to Embassy Islamic Affairs Deputy Musaed Al Jarrah. Ex. 128, Madha Dep. 31:14-32:12.; Ex. 72, Madha Decl. ¶ 12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited portion of Madha's declaration (which Plaintiffs' counsel drafted in the first instance) is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. *See* Madha Tr. 31:14-32:12 ("So it's not based on any personal information, it's just based on information received from other people? Yes."). <br><br>Plaintiffs Exhibit 72 (Madha Ex. 830) does not state that that Al Khalil or Shuaib "admitted" that Fahad Al Thumairy reported to Musaed al Jarrah. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited paragraph says that "I [that is, Madha] believed [Al Thumairy] reported to Musaed Al Jarrah…"<br><br>Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. *See* Thumairy Tr. 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning the United States. Jarrah Tr. 166:24-167:15; 167:16-19, 172:2-8. |
| 280. | A confidential human source reported to the FBI that Jarrah had "official responsibilities" from Saudi Arabia:<br><br>to manage and control all assignments of Saudi Imams in the United States and facilitate the issuance of diplomatic visas to these individuals. Saudi Arabian Imams who were assigned to the United States through this process reported to Al-Jarrah and he served as the coordinator of their activity while they were inside the United States. Ex. 2, EO 0004. | The May 2021 FBI EC did not make the determinations stated by Plaintiffs. The document makes clear that the statements relating to Al Jarrah were based on a single unnamed "CHS" or confidential human source and that "[n]o additional information was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5).<br><br>Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. *See* Thumairy Tr. 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning the United States. Jarrah Tr. 166:24-167:15; 167:16-19, 172:2-8.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 281. | Jarrah requested Thumairy's 2001 extension at the King Fahad Mosque and handled various other matters regarding Thumairy and the Mosque. Ex. 257, KSA 1256 (Ex. 423, March 2001 handwritten note of Jarrah requesting the urgent attention of the Ambassador to Thumairy's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | extension); Ex. 255, KSA 1204 (Ex. 425, Jarrah's initials on November 2001 letter urging that Thumairy be returned to Los Angeles after 9/11); Ex. 295, KSA 7930-33 (Ex. 424, discussing Jarrah's March 2002 trip to King Fahad Mosque to meet at Consulate with MOIA propagators Muhanna and Shuaib, members of Thumairy's extremist cell). | To the extent a response is required, the cited documents show that Jarrah sent certain reminders related to al Thumairy's extension and that it was expiring.<br><br>There is no evidence of the referenced extremist cell. |
| 282. | As determined by Plaintiffs' expert Youssef, "Thumairy's claim that he could not remember Musaed al Jarrah is not credible given Jarrah's position at the Islamic Affairs Department at the Saudi Embassy; the work relationship between Jarrah and Thumairy; and the phone records." Thumairy made a minimum of "64 calls from his home and cell phone between 2000-2003 to Jarrah's personal cell phone ███████6261)" Ex. 5, Youssef Rpt. 45. Given that there are missing phone records, the number of calls is potentially much greater. Ex. 5, Youssef Rpt. 135. At his deposition, Jarrah confirmed that ███ ███-6261 was his personal cell number. Ex. 43, Phone bill for Jarrah (Jarrah Dep. Ex. 760); Ex. 118, Jarrah Dep. 133:8-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart. In particular, it is inappropriate for Youssef to make credibility determination because that is the exclusive role of the factfinder.<br><br>As Mr. Sageman explains, the number of calls is overstated given that a number of them are very short in duration, indicating there was no connection. KSA Ex. 167 (Sageman Rep.) 584. Mr. Sageman also explains that, based on visa records, these calls could have been connected with an expiring visa. There is nothing incredible about failing to remember details of an administrative task from more than twenty years earlier.<br><br>Plaintiffs Exhibit 12D, purporting to list calls from Al Thumairy to Al Jarrah, is an improper summary exhibit. Plaintiffs Exhibit 12D contains 64 calls, but both Plaintiffs Exhibit 12D and Youssef's report misattribute |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | to Thumairy two calls made from the number ███0777 prior to April 2002 when he started using that number. The subscriber for this number is ██████████, and the user is ██████████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. Plaintiffs' assertion that the number of calls is potentially much greater is speculative and unsupported. |
| 283. | According to Plaintiffs' expert Youssef's phone analysis, "Thumairy made 5 calls from his home to Jarrah's cell phone in July 30, August 13, September 1 (2 calls), and September 2, 2000" and then "used his cell phone ██████-0777 to call Jarrah's cell phone 2 times in February and July of 2001, and then 57 times from June 12, 2002 to February 3, 2003." Ex. 12D (Thumairy calls to Jarrah). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12D, purporting to list calls from Al Thumairy to Al Jarrah, is an improper summary exhibit. Plaintiffs Exhibit 12D contains 64 calls, but both Plaintiffs Exhibit 12D and Youssef's report misattribute to Thumairy two calls made from the number ███0777 prior to April 2002 when he started using that number. The subscriber for this number is ██████████, and the user is ██████████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. Plaintiffs' assertion that the number of calls is potentially much greater is speculative and unsupported. |
| 284. | The FBI also found that Thumairy's assistant MOIA propagator Mohamed Al Muhanna "had numerous phone | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | connections with AL-THUMAIRY… and with AL-JARRAH." Ex. 2, EO 0708-709. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portion of Plaintiffs Exhibit 2N (EO 708-709) is inadmissible hearsay. *See* Objections chart.<br><br>The cited reference is not a formal FBI finding, there is nothing to determine how the writer reached the opinion he or she did, and details therein evidence that the report is inaccurate, as it states that Muhanna and Thumairy "founded . . . KFM." *Id.* at 708.<br><br>Muhanna was not Thumairy's assistant. He "was the Imam of the mosque when" Thumairy was away. And when Thumairy "returned, he continued to be like an assistant imam." He was "[a]n assistant of the Imamate at the mosque," not for Thumairy personally. Thumairy Tr. 228:18-24. |
| 285. | Regarding Sowailem, Thumairy claimed that Sowailem, the Director of Da'wah in the United States, only handled "administrative" functions like "vacations." Ex. 107, Thumairy Dep. 114:23-115:5 ("there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations.") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that, as Thumairy testified, Sowailem handled administrative functions like approving Thumairy's vacation requests. |
| 286. | Thumairy claimed that he only remembered that Sowailem worked for the "Ministry of Islamic Affairs" and did not know that Sowailem held the job title as MOIA's Director of Da'wah in the U.S. Ex. 107, Thumairy Dep. 131:8-20. But MOIA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited materials contain the quoted text, but there is no evidence of "regular correspondence." There is nothing remarkable about Thumairy not recalling Sowailem's precise title and role. Plaintiffs cite documents Thumairy received listing Sowailem's title, but Thumairy received that correspondence more than twenty years before his deposition. |
| 287. | Thumairy claimed that he only spoke to Sowailem "perhaps every two months or so." Ex. 107, Thumairy Dep. 115:6-10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' assertion misstates the testimony. Thumairy did *not* say he "only *spoke* to Sowailem." He was asked to whom he *reported*, and said only Sowailem. *See* Thumairy Tr. 114:23-115:5.<br><br>Thumairy also prefaced his answer regarding frequency of his calls to Sowailem by stating of these interactions from more than twenty years earlier: "I really don't remember exactly now, but I think perhaps every two months or so." Thumairy Tr. 115:6-10. |
| 288. | However, the number and pattern of Thumairy's phone calls to the Embassy are not consistent with his testimony or the times that Thumairy took his vacations and other "administrative" events. Ex. 5, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Youssef Rpt. 45-46; Ex. 12C(Thumairy Calls to Saudi Embassy). | To the extent a response is required, there is no inconsistency identified, and it is unclear what Plaintiffs are referencing to. To the extent they suggest phone records show that Thumairy spoke to more people than Sowailem, Thumairy never testified otherwise. He stated that he only "reported" to Sowailem, not that he never spoke with anyone else. Thumairy Tr. 114:23-115:5. |
| | | To the extent they suggest Thumairy spoke to Sowailem more frequently, Thumairy candidly prefaced his testimony by stating that he could not recall the precise details. Thumairy Tr. 115:6-10. |
| | | Plaintiffs Exhibit 12C is an improper summary exhibit. Among other things, Plaintiffs Exhibit 12C is inconsistent with the chart attached to the Youssef Report. *See* Youssef Rep. App. C. It also misattributes to Thumairy 9 calls made from the number ████0777 prior to April 2002 when he started using it. The subscriber for this number is █████████, and the user is █████████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |
| | | Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 pm which is not supported by the phone records. The phone records for Thumairy fo this period were produced, but do not reflect this call. *See* Pls. Ex. 477 (FBI 564). Plaintiffs instead rely upon a an FBI memorandum, which is hearsay, and says that Al Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09" not that Al Thumairy did so. Pls. Ex. 2JJ (EO 622). |
| 289. | Thumairy testified that he usually took his vacation during the summer. Ex. 107, Thumairy Dep. 273:12-14; Ex. 90, Snell Decl., Ex. 3 at 6-7. Yet Thumairy made | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | frequent calls to the Embassy throughout the year, including in the winter months. As Plaintiffs' expert Youssef's analysis demonstrated, "between same November 24, 1999 to February 29, 2000 period, Thumairy placed 54 calls to the Embassy, including calls to Sowailem (24 calls), as well as the general number of the Islamic Affairs department and other offices within the Saudi Embassy (30 calls)." Ex. 5, Youssef Rpt. 46, n. 117, Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef report should be excluded. The report on Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. *See* Objections Chart.<br><br>To the extent a response is required, there is no inconsistency between these calls and Thumairy's testimony. To the extent Plaintiffs suggest phone records show that Thumairy spoke to more people than Sowailem, Thumairy never testified otherwise. He stated that he only "reported" to Sowailem, not that he never spoke with anyone else. Thumairy Tr. 114:23-115:5.<br><br>Thumairy also never testified that the only administrative matters about which he called the Embassy related to travel.<br><br>To the extent Plaintiffs suggest Thumairy spoke to Sowailem more frequently than he recalled, Thumairy candidly prefaced his testimony by stating that he could not recall the precise details. Thumairy Tr. 115:6-10.<br><br>The number of calls is also not indicative of the number of conversations that took place, as calls of short duration suggest there was no connection.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is an improper summary exhibit with numerous misattributions and other errors. Among other things, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is inconsistent with the chart of phone calls attached to the Youssef Report. *See* Youssef Rep. App. A. Youssef's assertions are contradicted by Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000), which shows that Al Thumairy made 49 – not 54 – calls to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the Embassy from November 24, 1999 through February 29, 2000. According to Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000), this includes 18 – not 24 – calls to Sowailem's office phone or fax line, and 31 – not 30 – calls to other offices at the Embassy. |
| 290. | Plaintiffs' expert Youssef concluded that "[t]he calls demonstrate a routine of close interaction by Thumairy with his Saudi Government superiors," as shown "by the volume of calls made by Thumairy to Sowailem." Youssef cited, for example, "between September 15, 1999 – August 15, 2001, Thumairy placed 75 calls from his home phone to Sowailem" and "[o]f the 75 calls, 16 calls were to Sowailem's personal cell phone, 7 were made outside of normal business hours (3 to Sowailem's cell), and 9 were made on Saturday or Sunday." Youssef also concluded that "[i]n addition, during the same September 15, 1999 – August 15, 2001 period, Thumairy placed 164 calls to the general number for the Islamic Affairs department as well as other offices within the Saudi Embassy" and "[o]f those calls, 9 were made outside of business hours, and two were made on Saturday." Ex. 5, Youssef Rpt. 43; Ex. 12C (Thumairy Calls to Saudi Embassy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef report should be excluded. *See* Objections Chart.

To the extent a response is required, Youssef cites no evidence supporting his speculation about the *substance* of the calls.

Plaintiffs Exhibit 12C misattributes to Thumairy 9 calls made from the number ████ 0777 prior to April 2002 when he started using it. The subscriber for this number is ████████, and the user is ████ ████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.

Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 pm which is not supported by the phone records. The phone records for Thumairy fo this period were produced, but do not reflect this call. *See* Pls. Ex. 477 (FBI 564). Plaintiffs instead rely upon an FBI memorandum, which is hearsay, and says that Al Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09" not that Al Thumairy did so. Pls. Ex. 2JJ (EO 622). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | After removing these 10 improperly-included calls, Thumairy placed a total 53 calls to Sowailem at the Embassy between September 15, 1999 and August 15, 2001 (39 calls, and 14 faxes). Of these calls, only one was made outside of business hours (8:30 am to 5 pm) and 0 were made on Saturday or Sunday. Of the 5 calls by Thumairy to Sowailem's cell phone reflected in Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000), only one was made outside of business hours and one was made on Christmas. |
| | | Plaintiffs Exhibit 12C shows that during this same time period, Al Thumairy placed 143 calls to other offices at the Embassy. This includes 78 calls to the Cultural Mission at the Embassy. |
| 291. | As Plaintiffs' expert Youssef opined, this pattern of calls to Sowailem and the Islamic Affairs Department "after business hours and on weekends, demonstrates that Thumairy had important matters to raise with Sowailem, justifying calls outside of normal business hours. Ex. 5, Youssef Rpt. 46. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The Youssef report should be excluded. *See* Objections Chart. Youssef offers no suppor for his *ipse dixit* conclusion. |
| | | To the extent a response is required, Youssef's opinion is speculation not grounded in evidence. There are many reasons a person on the west coast would call others on the east coast after business hours. And there are many reasons a person would make phone calls after business hours in their own area. The timing of these calls in no way demonstrates that what was discussed was "important." |
| | | As explained further in the response to averment ¶ 290, after removing 10 improperly-included calls from Plaintiffs Exhibit 12C that are based upon misattribution and hearsay, the evidence establishes that Al Thumairy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | made a single call outside of business hours (8:30 am to 5 pm) – and 0 calls on Saturday or Sunday – to Al Sowailem at the Embassy between September 15, 1999 and August 15, 2001. During this time period, Al Thumairy also made 1 additional call to Sowailem's cell phone outside of business hours and another on Christmas. |
| 292. | Both Thumairy and Bayoumi were contacting Sowailem and other Embassy officers (including Jarrah and Sudairy) and Consulate officers ▮▮▮▮▮▮▮ in tandem at the precise times of critical events when Thumairy and Bayoumi prepared to receive and assist Al Qaeda hijackers Nawaf Al Hazmi and Khalid Al Mihdhar. Thumairy, Bayoumi, Sowailem, and other Embassy officers were interacting among each other about specific work tasks that went beyond Thumairy's personal "administrative" issues. Ex. 5, Youssef Rpt. 125-27. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef report should be excluded. *See* Objections Chart. Youssef offers no suppor for his *ipse dixit* conclusion.<br><br>This paragraph contains improper attorney argument and summaries of speculative theories without reference to any facts or evidence.<br><br>There is no evidence supporting the assertion that Thumairy and Bayoumi were preparing to receive and assist anyone.<br><br>There is no evidence cited that Thumairy and the others listed were discussing "specific work tasks." |
| **IV.B.** | **Thumairy worked directly with the nine Saudi government Board members of the King Fahad Mosque, all of whom participated in and were aware of Thumairy's work.** | Plaintiffs' assertion is contradicted by the record. As described in Response to ¶¶ 182, 184, and 186 above, Plaintiffs do not show there were nine Saudi government members on the board. Seven Saudi government members who were formally on the board "never communicated with" the active members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and were removed from the board because of their inactivity, *see* Pls. Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). There is no evidence that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | these inactive board members who did not even attend an annual Mosque meeting "participated in and were aware of" Al Thumairy's work at the Mosque. |
| 293. | IFSIT Board Chairman Khalil al Khalil ("Khalil") was a Saudi government official who (from 1987 to 1995) ran the Islamic Affairs department at the Embassy, worked for Imam Mohamed University, and (after 9/11) was appointed by the King to the Saudi Shura Council, the Saudi government deliberative body which advises the King. Ex. 187, KFM 0091- 92 (Khalil Resume). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, the paragraph misstates certain aspects of Khalil's resume. The document states that Khalil was "Vice Director of Islamic Affairs" at the Embassy, not that he ran it. The Shura is described as the National Parliament in Khalil's resume. |
| 294. | Khalil led the Ibn Taymiyah Foundation and its Mosque's operations. Ex. 72, Madha Decl. ¶ 9. Khalil lived in Saudi Arabia and visited the Mosque sporadically. Ex. 72, Madha Decl. ¶10. | Undisputed except that Khalil did not move back to Saudi Arabia until 1996. Khalil Tr. 14:5-8. |
| 295. | Khalil reported to MOIA's Deputy Minister Ammar on matters involving Thumairy. Ex. 113, Khalil Dep. 75:5-78:1; 302:13-19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Plaintiffs mischaracterize the testimony. Khalil testified about one instance in which he reported to Ammar that the FBI had come to the Mosque asking about Thumairy months after the 9/11 Attacks. Khalil said that the board decided that the Saudi Government should be informed of this fact. Khalil Tr. 75:20- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 76:13. The testimony does not show that Khalil reported generally to MOIA on matters involving Thumairy. Plaintiffs cite no other instances of "reporting" to MOIA on Thumairy.<br><br>Khalil also testified that he did not speak regularly with Ammar, Khalil Tr. 302:4-07. |
| 296. | Board Secretary and Treasurer Osman Kaldirim worked alongside Khalil to oversee the Mosque. Ex. 72, Madha Decl. ¶ 9. Although Kaldirim was apparently not a Saudi government official, he carried a Saudi National Guard ID and had a work permit to pursue his business interests in Saudi Arabia. Ex. 72, Madha Decl. ¶10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portions of ¶ 10 of the Madha Declaration are inadmissible, not based on personal knowledge, and are hearsay. *See* Objections Chart. The sentence concerning Kaldirim's ID card and work is not based on Madha's knowledge but instead on a purported document that is not in evidence or authenticated. |
| 297. | Board member Tajuddin Shuaib was a MOIA Propagator working under Thumairy and was given the title of "Director" of the Mosque. Ex. 382, DOJ 0010; Ex. 72, Madha Decl. ¶ 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, there is no evidence that Shuaib worked under Thumairy. Moreover, Thumairy explained that he was not aware of and never accepted the nomination referenced in Plaintiffs Exhibit 382, and he did not in fact supervise propagators. *See* Thumairy Tr. 143:10-148:16. |
| 298. | Tajuddin Shuaib was also Khalil Al Khalil's protégé and "allegedly helped | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Muslims who were dedicating themselves to Jihad travel into Saudi Arabia or Yemen for advanced indoctrination." Ex. 2, EO 0658. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portion of Plaintiffs Exhibit 2M (EO 658) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the hearsay on which Plaintiffs rely states that theassertion is only an allegation. There is no support cited for it. To the contrary, the document notes that Khalil "was a secular leader" and Shuaib was his protégé. *See* Pls. Ex. 2M (EO 658) (capitalization omitted). |
| 299. | Thumairy was not an IFSIT Board member but had signature authority on IFSIT checks and entered contracts on behalf of the Mosque. Ex. 680K, KSA 7272, 7275-7282 (Thumairy signed as "Imam" on Atlas carpets service contract); Ex. 34, KSA 7319-7320 at 7320 (Awad Dep. Ex. 466) (Thumairy co-signed Pert Construction contract). Thumairy personally handled the cash in the Mosque's contributions box. Ex. 680I, KSA 7104-5 (Saudi Ministry of Finance official noting that Thumairy opened the box and dispersed the cash). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited exhibit does not show that Thumairy had signature authority. He co-signed both documents, and there is no evidence that he had authority to sign documents for the Mosque or the Foundation on his own.<br><br>Plaintiffs Exhibit 680I does not demonstrate that Thumairy personally handled the cash in the Mosque's contribution box; it reveals that he was asked about it and reportedly knew what the money was spent on. |
| 300. | The 1997 amendment to IFSIT's Articles of Incorporation, Ex. 179 (Kaldirim Dep. Ex. 179) added the following seven members to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Mosque's board in addition to Khalil and Shuaib: | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the paragraph is accurate but omits that there were three additional members of the board besides Khalil and Shuaib at the time of the amendment. Further, while seven new members were added to the board, those seven new members "never communicated with" the active members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and they were removed from the board because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). |
| 301. | (1) *MOIA's Deputy Minister of Islamic Affairs* and (2) *MOIA's Assistant Deputy for Da'wah - Abdulaziz al Ammar.* Ammar was in the MOIA direct chain of command at MOIA above Thumairy and Sowailem. Ex. 245, KSA 0553-54 (Ammar Dep. Ex. 448) (Ammar letter confirming that the delegation of Thumairy "has already been terminated" and that "[t]he delegation of all Saudi employees [in the America Office] was terminated as of [August 2003]"). Ammar visited the Mosque for its Grand Opening in July 1998 and again in September 2000. Ex. 668, KSA 7362 [Sep. 2000]; Ex. 259, KSA 1261 (minutes of meeting discussing inauguration). Khalil immediately contacted Ammar when issues were raised about Thumairy. Ex. 113, Khalil Dep. 75:13-76:13, 77:1-8, 80:4-14. | Plaintiffs' assertion mischaracterizes Plaintiffs Exhibit 179 (Kaldirim Ex. 179) and omits important details.<br><br>Plaintiffs Exhibit 179 (Kaldirim Ex. 179) does not identify any of the seven new members by name; the amended added seven members by title such that whoever held that title would be on the board. Further, those seven "never communicated with" the active board members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members").<br><br>Regarding Ammar's placement within MOIA (which does not have a "chain of command"), the cited document (Plaintiffs Exhibit 245 (KSA 553)) does not show that Ammar was senior to Thumairy or Sowailem. Plaintiffs Exhibit 245 (KSA 553-54) does show that Ammar signed a letter confirming that the delegation of propagators in America, including |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy reported to Ammar when he returned to Saudi Arabia in 2001. Ex. 680F, KSA 6871 ("he has already started his work at the deputyship"). | Thumairy, was terminated in September of 2003, but Ammar is reporting a Committee decision, not a personal decision indicating his authority.<br><br>Plaintiffs Exhibit 259 (KSA 1260) does not show that Ammar visited the Mosque for its Grand Opening; it shows that he was on a Committee that met in Jeddah to discuss the opening ceremony. *See* Pls. Ex. 259 (KSA 1260).<br><br>Regarding the assertion about Khalil "immediately" contacting Ammar when "issues" were raised, Khalil in fact testified about *one* instance in which he reported to Ammar that the FBI had come to the Mosque asking about Thumairy months after the 9/11 Attacks. Khalil did not act immediately but testified that the board decided that the Saudi Government should be informed of this fact, and he reported to Ammar based on a prior relationship with him. Khalil Tr. 75:20-76:13.<br><br>Regarding the assertion that Thumairy reported to Ammar in 2001, Plaintiffs Exhibit 680F actually states that Thumairy began work with the Deputyship (i.e., the Deputy's Office), it does not state that Thumairy reported to Ammar. |
| 302. | (3) *MOIA's Director in the U.S. – Khalid Al Sowailem*. Sowailem was Thumairy's direct MOIA supervisor at the Embassy who regularly communicated with Thumairy, visited Los Angeles and San Diego prior to the 9/11 Attacks, evaluated and promoted Thumairy, and appointed Thumairy to supervise all MOIA propagators in California. Ex. 214, KSA 6903 (Sowailem's letter to Thumairy confirming his "nomination to supervise the propagators of the State of California" and referring to | Plaintiffs' assertion mischaracterizes Plaintiffs Exhibit 179 (Kaldirim Ex. 179) and omits important details.<br><br>The document does not identify any of the seven new members by name; the amended added seven members by title such that whoever held that title would be on the board. Further, those seven "never communicated with" the active board members at the King Fahd Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Thumairy as "Ministry's Delegate in America"); Ex. 297, KSA 8364 (Thumairy received a promotion in 1998 at the recommendation of Khalid Al Sowailem); Ex. 205, KSA 2692 (Thumairy received another promotion in 2000 following his assistance to Hazmi and Mihdhar); Ex. 285, KSA 5248 (Sowailem travels to Orange County). | This paragraph contains improper attorney argument and mischaracterizes the cited records.<br><br>Contrary to Plaintiff's assertion that Sowailem regularly communicated with Thumairy, Thumairy testified that they spoke infrequently, "perhaps every two months or so," though Thumairy did not recall precisely. Thumairy Tr. 115:6-10.<br><br>Sowailem did conduct Thumairy's performance evaluation, which Thumairy recalled as a routine "administrative procedure." Thumairy Tr. 169:22-4.<br><br>Regarding promotions, contrary to Plaintiffs' assertion, the documents show one promotion, not two. Thumairy explained that, as was typical, he would "write to [his] supervisor asking for a promotion. And then the supervisor will go through the necessary procedures." *Id.* at 171:22-172:4. Plaintiffs Exhibit 297 shows that Thumairy requested a promotion in 1998 and Sowailem asked that he be promoted to 9th Rank. Plaintiffs Exhibit 205 shows that, in 2000, Thumairy received the promotion to 9th Rank. There is no evidence supporting Plaintiffs' parenthetical assertion that Thumairy provided any assistance to Hazmi or Mihdhar, and there is no evidence that Thumairy's promotion was connected in any way to their arrival. To the contrary, the evidence shows that the promotion was in the workds for years. *See* Thumairy Tr. 173:4-9 ("[I]t takes years. Usually, the employees ask for the promotion years ahead, because it takes years for the procedures to go through.").<br><br>Regarding Plaintiffs Exhibit 214, the cited evidence shows that Sowailem reported to Thumairy that he had been nominated to supervise propagators in California in 1997. Al Thumairy explained, however, that he was not aware of this nomination and did not in fact supervise propagators in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | California, Thumairy Tr. 143:10-148:16, and there is no evidence that he did so.<br><br>Regarding the claim that Sowailem traveled to Los Angeles and San Diego before the 9/11 Attacks, the cited document (Plaintiffs Exhibit 285) actually shows that, in 1996, Sowailem was approved to travel for four days to Orange County to attend a conference "at Orange County city." |
| 303. | (4) *MOFA's Islamic Affairs Department Director – Dr. Majed Ghesheyan.* In his 9/11 Commission interview, Thumairy stated that he reported to "Dr. Majid" (Ghesheyan) in the Embassy's Islamic Affairs Department. Ex. 90, Snell Decl., Ex. 3 at 3-4. Thumairy also reported to Ghesheyan's deputy in the Embassy, Musaed Al Jarrah. Ex. 128, Madha Dep. 31:14-32:12; Ex. 72, Madha Decl. ¶ 12 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the report on Thumairy's 9/11 Commission interview, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3), is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart. Thumairy testified that the 9/11 Commission statement attributed to him was inaccurate. *See* Thumairy Tr. 116:1-117:15. The 9/11 Commission statement also does not use the name "Ghesheyan."<br><br>Plaintiffs cite no evidence demonstrating Al Ghesheyan's role as a Board member. Plaintiffs Exhibit 179 (Kaldirim Ex. 179) does not identify any of the seven new members by name; the amended added seven members by title such that whoever held that title would be on the board. Further, those seven "never communicated with" the active board members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | meetings;" "there has been no participation . . . by the new board members"). |
| | | Regarding the assertion that Thumairy reported to Ghesheyan, the cited portion of Madha's testimony is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. *See* Madha Tr. 31:14-32:12 ("So it's not based on any personal information, it's just based on information received from other people? Yes."). Further, Plaintiffs Exhibit 72 (Madha Ex. 830) does not state that Al Thumairy reported to Musaed al Jarrah. The cited paragraph says that "I believe [Al Thumairy] reported to Musaed Al Jarrah." |
| | | Al Thumairy does not recall Al Jarrah, who worked in the Islamic Affairs Office. *See* Thumairy Tr. 417:5-418:9. Al Jarrah recalls only one phone conversation with Al Thumairy in 2003 regarding Al Thumairy's difficulties returning the United States. Jarrah Tr. 166:24-167:15; 167:16-19, 172:2-8. |
| 304. | (5) *Saudi Consulate in Los Angeles Consul General* – Consul General Mohamed al Salloum oversaw the Mosque's finances and operation together with Thumairy, Mana, and Khalil. Ex. 121, Kaldirim Dep. 111:3-112:1 (Consul General Salloum doled out finances to "dictate" and "control" the mosque); Ex. 235, KSA 1230-31 (Ex. 187, evidencing work with Thumairy and Khalil to control the mosque). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, this paragraph contains improper attorney argument. |
| | | Plaintiffs' assertion also mischaracterizes Plaintiffs Exhibit 179 (Kaldirim Ex. 179) and omits important details. |
| | | Plaintiffs Exhibit 179 (Kaldirim Ex. 179) does not identify any of the seven new members by name; the amended added seven members by title |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | such that whoever held that title would be on the board. Further, those seven "never communicated with" the active board members at the King Fahad Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members").<br><br>Plaintiffs correctly identify the Consul General, but their assertion that he oversaw the Mosques finances and operation with Thumairy, Mana, and Khalil, is contradicted by the record. Khalil testified that the "Ibn Taymiyyah Foundation [which ran the Mosque] is completely independent of the Saudi Arabian government." Khalil Tr. 366:20-367:15. He also testified that the King Fahd Mosque was likewise completely independent of the Saudi Arabian government. *Id.* at 367:6-11.<br><br>Mr. Mana, who worked at the Consulate, testified that a donation from the King was contributed to an account for the King Fahad Mosque. But contrary to Plaintiffs' allegation that Saudi Arabia established the account, this donation was "not . . . an official service from the government of Saudi Arabia or the Ministry of Foreign Affairs" and the Consul General did not want that money "to be mixed with the – with the consulate's business." Mana Tr. 110:14-22, 111:11-24.<br><br>Plaintiffs Exhibit 235 (KSA 1230) does not show that the Consul General has control over the Mosque. To the contrary, it shows that the Board of the Ibn Taymiyyah Foundation was operating independently.<br><br>Kaldirim testified that in his opinion, the Consul General's decision to segregate a donation from the Saudi Royal Family into a separate account, then reimburse mosque expenses upon request rather than giving the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | entire donation to the mosque at once, was a desire to "control" the mosque. *See* Kaldirim Tr. 107:14-108:12 (referring to a "donation o[f] money", "money coming from the prince for helping our expenses and payments;" "he [Salloum] wanted to control the money"). That testimony is inadmissible because it is not based on personal knowledge. *See* Objections Chart. *See* also Kaldirim Tr. 108:20-109:23 (testifying based on what "I heard"; "I don't know" how he was managing the money; "[t]hat's what I was told;" "I have no idea" if the money was in a consulate bank account).<br><br>Regardless, the testimony does not demonstrate that the Consul General oversaw the mosque's finances as Plaintiffs claim; he oversaw distribution of the charitable contribution, which paid at most a portion of the Mosques expenses. Kaldirim testified that the Ibn Taymiyyah Foundation has always been "completely independent of the Saudi Arabian government." Kaldirim Tr. 263:13-21.<br><br>Further, Mr. Madha – on whom Plaintiffs extensively rely – contradicts their claim about who oversaw the Mosque's finances. *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 7 ("I was responsible for the handling of the Mosque's financial affairs"). |
| 305. | (6) Imam Mohamed University's Director of Da'wah Abroad and (7) its Director at its Institute of Islamic and Arabic Sciences in America ("IIASA") – IFSIT Board Director Khalil worked for Imam University and made trips back and forth to Saudi Arabia to report on his activities. Ex. 113, Khalil Dep. 19:4-20:10. A group of senior Imam Mohamed University officials led by the school's Vice-Rector visited Thumairy in August 1999. Ex. 240, KSA 8370. In | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs correctly identify the titles of two of the seven new members of the Ibn Taymiyyah Board added by the amendment in Plaintiffs Exhibit 179 (Kaldirim Ex. 179). Those seven "never communicated with" the active board members at the King Fahad |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | December 2000-January 2001, IIASA held an 8-day "Intensive Program" with "prominent scholars from [Imam Mohamed University]" at the Mosque. Ex. 535, FBI 4392-93, 4439. | Mosque, *see* Khalil Tr. 191:8-14, and they were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members"). |
| | | Undisputed that Khalil was Director of the Board, but Khalil did not work for Imam Mohamed Bin Saud University when he was working at the Embassy in the United States. Khalil Tr. 19:23-20:13 ("not working for them" "working with the ambassador . . . [a]t the embassy" but "my salary comes from the university, not from the embassy"). |
| | | The cited testimony does not reference any "trips back and forth" or state that Khalil "report[ed]" on his activities. To the contrary, the testimony is that Khalil reported to the president of the Department of Islamic Affairs "at the embassy." Khalil Tr. 20:13. |
| | | Plaintiffs Exhibit 240 does show that the Vice-Rector of "the Islamic University" was scheduled to visit Thumairy in 1999, though there is no reference to "[a] group of senior . . . officials" from the University. |
| | | Plaintiffs Exhibit 535 is inadmissible hearsay. *See* Objections Chart. The exhibit contains the quoted language. |
| 306. | Another longstanding member of the board was Saudi businessman Badr Al Aiban, who was an owner of Delta Oil, a large Saudi company who had worked together with Kaldirim. The Mosque's manager Usman Madha testified that he never saw Aiban at the Mosque. Ex. 72, Madha Decl. ¶10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the portion of the Madha Declaration cited (other than the assertion that Madha never saw Aiban at the Mosque) is inadmissible because it is not based on Madha's personal knowledge |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and relies on hearsay. *See* Pls. Ex. 72 (Madha Ex. 830) ¶ 10 ("I learned that"; "Mr. Kaldirim told me"). Madha did not testify or assert that Kaldirim and Aiban worked together, and there is no other evidence cited to support that assertion. |
| **IV.C.** | **Thumairy had frequent meetings in Los Angeles with Saudi government officials.** | Plaintiffs assertion is improper attorney argument and cites no supporting evidence. As described below, Al Thumairy did not have "frequent meetings" with Saudi government officials. Plaintiffs exaggerate certain events, for example, Al Thumairy being seen by an official at a large public gathering, and they claim other meetings occurred when there is no evidence such meetings took place. |
| 307. | Until he left the U.S. shortly before the 9/11 Attacks, Thumairy established Southern California as a key operations hub for MOIA. In addition to his nearly daily contacts with Saudi Consulate officials, Thumairy hosted numerous high level Saudi government officials, MOIA Propagators, and Saudi government agents. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. To the extent a response is required, this is unsupported attorney argument. Thumairy did not establish any operations hub in Southern California. Southern California was not a "key operations hub" for the Ministry of Islamic Affairs. Plaintiffs cite nothing to support their assertions regarding Thumairy's contacts with others, and, as discussed below, he did not host the people Plaintiffs claim. |
| 308. | The July 1998 "Grand Opening" of the King Fahad Mosque (held over a year before the actual opening of the Mosque in the fall of 1999) brought Saudi Prince Abdulaziz, MOIA's Minister Abdullah Al Turki, Deputy Minister Ammar, and U.S. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Director Khalid Al Sowailem, and numerous other high ranking Saudi Government dignitaries to Los Angeles. Thumairy was responsible for receiving the high-level guests. Ex. 72, Madha Decl. ¶¶ 6, 8; Ex. 121, Kaldirim Dep. 113:15-114:2; Ex. 74, MWL-IIRO 62626 (Ex. 797, Program for Inauguration of KFM); Ex. 107, Thumairy Dep. 150:22-151:4. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 74 is unauthenticated and inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, undisputed that the Grand Opening of the Mosque was in July of 1998 and undisputed that Prince Abdulaziz and Minister Turki attended. Also undisputed that Madha states that construction was not complete at that time and prayer services for the public did not begin until the fall of 1999.<br><br>The cited exhibits do not show that Ammar or Sowailem attended, though Thumairy did testify that Sowailem might have been there.<br><br>There is no cited evidence supporting the claim that Thumairy was responsible for receiving the high-level guests, and Khalil's testimony directly contradicts it. Khalil Tr. 115:21-116:6 ("And was he [Thumairy] given responsibilities at the grand opening with regard to certain Saudi government officials? No. . . . I saw him just with some visitors."). |
| 309. | Prior to the 9/11 Attacks, according to Khalil, "30…preachers from the KSA [Kingdom of Saudi Arabia]…held useful seminars, courses, lectures, and lessons" at the King Fahad Mosque. Ex. 50, KFM 0439-40. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 50 (Khalil Ex. 208) is inadmissible hearsay and the document has not been authenticated. *See* Objections Chart.<br><br>To the extent a response is required, the exhibit contains the quoted material. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 310. | Khalid Al Sowailem visited Los Angeles and San Diego and met with MOIA propagator Omar Abdi Mohamed. Ex 95, Awad Dep. 103:11-104:9; Ex. 2, EO 0722 ("Sowailem visited San Diego…with a group of about 9 other people…[and] met with [Abdi] Mohamed"); Ex. 682, Jan. 22, 2004 interview of Omar Abdi Mohamed by INS Officer Steven Schultz at 2490. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Ex. 2N (EO 722) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 682 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials contain the quoted text. If Plaintiffs Exhibit 682 (Mohamed Interview) is considered, it is noteworthy that it also states that part of the Saudi cultural mission was "preaching . . . no violence. . . [and] [t]each[ing] the people the good thing, the peaceful thing and I think concern of the terrorists was so strong among them." Pls. Ex. 682 (Mohamed Interview) at 2490. |
| 311. | MOIA Minister Abdullah al Turki visited with Thumairy in Los Angeles; on one occasion, the two men went together to a local university, Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO 2689 (Shuaib FBI statement). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha Declaration describes Thumairy and Minister Turki having one or perhaps two interactions in Los Angeles. Pls. Ex. 72 (Madha Ex. 830) ¶ 6. The two people with personal knowledge on the subject both denied knowing each other well. Al Thumairy saw Minister Turki "in many gatherings," but he did not "personally remember that I spoke with him. I don't remember. It could be just a greeting." Thumairy Tr. 28:18-29:7. Minister Turki testified: "I don't know [Thumairy.] I don't know |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | him then [at the time of his appointment], and I don't know him now." Turki Tr. 124:21-24-125:1; *see also id.* at 126:9-21. |
|  |  | Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 6 does not say that the men "went together" to a local university. Madha testified that he saw them at an event there. |
|  |  | Plaintiffs Exhibit 2W (EO 2689) is also inadmissible hearsay. *See* Objections Chart. |
| 312. | In December 1998 – January 1999, Thumairy hosted visiting MOIA propagators Adel Al Sadhan, Mutaeb Al Sudairy, and Majed Al Mersal in Los Angeles and at the Ibn Taymiyah Mosque and helped plan the visit of Sadhan and Sudairy with Bayoumi in San Diego and at the Al Madinah Mosque, the ICSD, and the Al Ribat Mosque. Ex. 304, KSA 9557-58 (Ex. 444); Ex. 416, KSA 7591 (Ex. 445); Ex. 119, Sudairy Dep. 78:1-15. | Plaintiffs Exhibit 416 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs cite no evidence that Thumairy "hosted" the visiting propagators.<br><br>The evidence shows that Sadhan and Sudairy participated in a Ramadan immate program in San Diego, and that Mersal did so in Los Angeles. There is no evidence that Thumairy "hosted" any of them. |
| 313. | In April 1999, four Saudi government officials - Khalil, Thumairy, Bayoumi, and Soliman Al-Ali – participated in a "MANA" seminar organized by Bayoumi and Soliman Al-Ali at the King Fahad Mosque offices. Ex. 10E, MPS902-CLIP Video Exhibit; Ex. 27, Madha Supp. Decl. ¶¶ 4-10 & Ex. 1-6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the supplemental Madha Declaration was stricken by the Court and there is no evidence identifying the individuals in the video clip at Ex. 10E or providing context as to what is being shown. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 314. | In July-August 1999, MOIA held a training forum for its propagators in Los Angeles and instructed its propagators to attend. Ex. 204, KSA 1268-1270 at 1270 (Ex. 499); Ex. 138, *U.S. v. Mohamed*, Ex. 23 (Saudi government document read into evidence at trial of propagator Abdi Mohamed marked "urgent" instructing him to attend the propagator forum in Los Angeles in July 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Thumairy was asked about this event and testified: "It's not that I was aware or unaware, I don't remember that.  If I was present or not present, if I was on vacation, I don't remember."  Thumairy Tr. 163:4-8; *see also id.* at 163:17-164:3 (testifying that it is not correct that Thumairy would necessarily have been contacted about such a forum; "[t]hey would contact the administrat[ion] of the mosque, and I was not involved in the administration of the mosque.").<br><br>Al Thumairy's passport shows that Thumairy entered the United States in late July of 1999, *see* Pls. Ex. 213 (KSA 6882) at 6893 (the date appears to be July 29, 1999, though it could be July 28).  There is therefore no evidence that Thumairy attended the forum, if it took place.<br><br>Plaintiffs Exhibit 138 is inadmissible hearsay.  *See* Objections Chart.  Plaintiffs Exhibit 138 also does not show that MOIA instructed its propagators to attend; it purportedly shows one particular propagator who was asked to attend. |
| 315. | In August 1999, the Imam Mohamed University Vice-Rector and committee members visited Thumairy. Ex. 240, KSA 8370. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, the document shows that a Vice-Rectorof the University was scheduled to visit and that Thumairy was asked to cooperate with the visitors. Plaintiffs Exhibit 240 does not show that the visit actually happened or that Thumairy played a role in the visit. |
| 316. | In December 1999, Thumairy hosted MOIA Propagators Abdullah Al Jaithen and Majed Al Mersal in Los Angeles, and the men had dinner at the King Fahad Mosque. Ex. 5, Youssef Rpt. 139-141; Ex. 184, KFM 0021 (Thumairy wrote check to Mosque for "iftar" - the evening meal held during Ramadan - on day that Jaithen and Mersal were in Los Angeles); Ex. 96, Jaithen Dep. 115:5-12; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart.

To the extent a response is required, there is no evidence that Thumairy hosted Jaithen or Mersal during their stay in Los Angeles in December 1999. Jaithen testified he and Mersal stayed in a hotel near the Mosque and had their iftar meal at the Mosque. He further testified that they had a meal with Thuamiry. Jaithen Tr. 115:3-24.

Thumairy wrote a check to the Mosque on December 20, 1999 for iftar. During Ramadan, however, there are 30 Iftar meals. Accordingly, the check may have been a contribution for all of these meals, not a meal for a particular date. |
| 317. | Jaithan and Mersal also ate dinner at Thumaiy's house while in Los Angeles. Ex. 96, Jaithen Dep,125:3-18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 318. | As detailed below, Thumairy met on various occasions in person and had significant ███ contacts with Omar Al Bayoumi and Consulate Secretary Ismail Mana, to establish and provide the support network for the 9/11 hijackers. Ex. 5, Youssef Rpt. 52, 184- 185 (documenting contacts between Bayoumi and Mana). | This paragraph is improper attorney argument and not discrete statements of fact or evidence.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>There is no evidence of "significant phone contacts" among these individuals.<br><br>There is no evidence of a support network for the 9/11 hijackers.<br><br>Plaintiffs' statement that Mana was "Secretary" is inaccurate. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4.<br><br>Youssef's opinions regarding alleged contacts between Al Bayoumi and Mana are speculative and unreliable. Youssef notes that Al Bayoumi made 12 calls to the general Consulate number, ███-6000, between January 26 and February 10, 2000. *See* Ex. 5 at 184. Youssef then speculates, absent any evidence, that "[i]t is likely that some or all of the calls that Bayoumi placed to ███-6000 were made to Ismail Mana." *Id.* Beyond such speculation, ████████████████████████ However, no phone records produced in this litigation evidence such a call.<br><br>There is also no evidence of "significant" "in person" contacts between Al Thumairy and Al Bayoumi. Al Bayoumi visited Los Angeles for personal reasons (to deal with administrative issues related to his visa, for example), and prayed at the King Fahad Mosque, where he met Thumairy. Bayoumi Tr. 215:18-22. Al Thumairy was an imam, so Bayoumi would ask him religious questions. *Id.* at 216:22-217:4. Bayoumi also directed others who had religious question to Thumairy: "Fahad doesn't answer |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the phone calls coming to him.  Maybe out of 50 calls, he would answer one.  So, for example, if I had someone who was asking a question which I should direct to him, or to another Imam or Sheikh, it was hard to get ahold of him.  It was hard to get him to answer the phone."  *Id.* at 451:14-23.  Al Bayoumi also explained that he might call Thumairy about picking up religious literature ("mushaffs").  *Id.* at 452:11-17.  Bayoumi recalled visiting the King Fahad Mosque "perhaps twice" total.  Bayoumi Tr. (Ex. 120) 347:22-348:16.  For his part, Al Thumairy did not remember Bayoumi.  Thumairy Tr. (Ex. 107) 312:6-8; *id.* at 308:5-7. |
| 319. | On February 1, 2000, Thumairy, Bayoumi, and Mana met at the King Fahad Mosque, immediately after Bayoumi held a meeting with the 9/11 hijackers. Ex. 92, Morgan Decl. ¶¶ 20, 21, 23, Ex. 112, Morgan Dep. 98:10-99:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> To the extent a response is required, Al Bayoumi did not hold a meeting with the 9/11 hijackers  He met the hijackers at a restaurant by chance.  *See, e.g.* KSA Resp. to Pls. Aver. Header XX.F; ¶¶ 1460, 1484, 1531, 1553. <br><br> That chance encounter took place on January 31, 2000 or February 1, 2000.  *See, e.g.* KSA Resp. to Pls. Aver. Header XX.F; ¶¶ 1460, 1484, 1531, 1553, 1567. <br><br> Contrary to Plaintiffs' assertion, Al Bayoumi, Al Thumairy and Mana all testified that they did not meet at the King Fahad Mosque.  *See infra* KSA Resp. to Pls. Aver. ¶¶ 1583-1585.  Al Bayoumi testified that he did not go to the Mosque after the chance encounter with the hijackers.  Pls. Ex. 120 (Bayoumi Tr.) 404:2-406:2, 418.  Al Thumairy does not remember ever meeting Al Bayoumi.  Pls. Ex. 107 (Thumairy Tr.) 493:20-494:8.  Mana likewise testified that he did not meet Morgan (who was with Bayoumi, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and who Mana refers to as the convert) at the King Fahad Mosque. Mana Tr. (Ex. 110A) 142:22-143:25 (referring to seeing Morgan "in a mosque in the Valley, in Reseda," "[n]ot the King Fahad mosque. . . . I didn't tell him [an investigator] King Fahad mosque. I believe they misunderstood what I have said that I met him in the mosque, but maybe they under King Fahad mosque and that's why they probably wrote the King Fahad mosque, but it was in Reseda."); Pls. Ex. 168 (Mana Decl.) ¶¶ 10, 15-16.<br><br>To support their contrary claim, Plaintiffs cite only the Morgan declaration, which was drafted in the first instance by Plaintiffs' attorneys and cherry picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. The accounts differ as to whether Al Bayoumi and Morgan went to the King Fahad Mosque after the Mediterranean restaurant. The 9/11 Commission comments that "Bin Don himself has been inconsistent about visiting the mosque. . . . Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17. |
| 320. | In September 2000, MOIA's Deputy Minister Ammar and his delegation visited Thumairy and Tajuddin Shuaib at the King Fahad Mosque. Ex. 668, KSA 7362. | Undisputed that Ammar had a trip to Los Angeles planned for September of 2000. There is no mention of a delegation in the cited document, and the document does not confirm that the trip in fact occurred.<br><br>Ammar's itinerary included being picked up at the airport by Shuaib and, as the 15th item on the trip, a meeting with Thumairy, Shuaib, and Kaldirim. *See* Pls. Ex. 668 (KSA 7362). |
| 321. | In October 2000, a former senior Saudi finance official visited the Mosque, met | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with Thumairy, and sent a report to Prince Abdulaziz. Ex. 680I, KSA 7104-5. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed. |
| 322. | The Imam of the Grand Mosque in Mecca, Sheikh Abdulrahman Al Sudais, visited Los Angeles during the summer of either 2000 or 2001. Ex. 50, KFM 0439 (Ex. 208). | Plaintiffs Exhibit 50 is inadmissible hearsay and has not been authenticated. *See* Objections Chart.<br><br>Undisputed except that the cited exhibit does not identify the title "Imam of the Grand Mosque in Mecca." |
| 323. | From December 29, 2000 – January 6, 2001, the Imam Mohamed University branch in the U.S., the Institute of Islamic and Arabic Sciences in America, held a program at the King Fahad Mosque "conducted by prominent scholars from [Imam Mohamed University]"). Ex. 535, FBI 4392-93, 4439. Saudi Arabia did not produce any documents about this program; it was only obtained because of an FBI search on Bayoumi's Office at Al Madinah Mosque. *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 535 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, nothing cited shows that the IIASA is the "Imam Mohamed University branch in the U.S." Al Thumairy was asked about this document at his deposition. He testified: "What I remember, as far as I'm reading the document now, is that there was an institute about that. But I don't have any details about it. . . . I don't remember [the program]." Pls. Ex. 107 (Thumairy Tr.) 133:14-134:19.<br><br>Suadi Arabia complied with its discovery obligations. Plaintiffs offer no basis for the implication that Saudi Arabia had a copy of this document.<br><br>Undisputed that Plaintiffs Exhibit 535 was produced by the FBI, but Plaintiffs cite nothing to substantiate their assertion that the document was obtained through a search of Bayoumi's office. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 324. | In August 2001, Thumairy hosted three men in Los Angeles who Khalil identified as extremists; one of the three men was a MOIA official who was invited by Thumairy invited to preach at the King Fahad Mosque. Ex. 113, Khalil Dep. 79:4-80:23. | Al Khalil's testimony on this subject is inadmissible hearsay and is not based on any personal knowledge. *See* Khalil Tr. 80:15-23 ("[*I]t came to me*"); 80:8-10 ("He told me that . . . ."). <br><br> Further, Al Khalil clarified that he did not know whether Al Thumairy "hosted" the men. *See* Khalil Tr. 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."), 393:5-17 (testifying that he had no personal knowledge "at all" of Al Thumairy hosting the men). <br><br> Plaintiffs cite nothing to support their assertion that one of the three men was "a MOIA official." Al Khalil also clarified that, by extremist, he did not mean that they presented a concern "here," meaning the U.S.; rather, "those guys were against the government" of Saudi Arabia. *Id.* 81:1-8. |
| **IV.D.** | **Thumairy worked with and was supervised by the Saudi Consulate on a daily basis.** | Plaintiffs' assertion that the Consulate supervised Al Thumairy on a daily basis is contradicted by the record. As discussed below (*e.g.*, Response to ¶¶ 325-329), the evidence Plaintiffs cite shows that some members of the Consulate attended prayer services regularly at the Mosque where Al Thumairy was imam, but as congregants not as Al Thumairy's supervisor. To the extent Al Thumairy had a supervisor for administrative matters, it was Al Sowailem – not someone from the Consulate. *See, e.g.*, *supra* KSA Resp. to Pls. Aver. ¶ 273. |
| 325. | Thumairy was visited regularly by the group of senior Consulate officials, led by Saudi Consul General Mohamed al Salloum, who attended the Mosque every week for Friday services. Ex. 107, Thumairy Dep. 106:19-107:6 (Consul General Salloum attended the Mosque every week); Ex. 95, Awad Dep. 33:11-34:9 (Deputy Consul General Awad | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, the cited testimony does not support Plaintiffs' assertion that a group of officials from the Consulate visited Thumairy regularly. Rather, the testimony shows that individuals who |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | regularly attended the Mosque), 40:23-41:15 (Thumairy was primary Imam); Ex. 124, Ibrahim Dep. 37:13-18, 67:12-23 (Sami Ibrahim attended Friday prayers). | worked at the Consulate individually attended services at the Mosque and interacted with Thumairy because he was the imam there. |
| 326. | Thumairy had frequent meetings with Saudi Consulate Islamic Affairs Secretary Mana. Ex. 72, Madha Decl. ¶ 19-20 (Thumairy and Mana were close and had meetings at the mosque); Ex. 110A, Mana Dep. 85:18-20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the cited portion of the Madha Declaration is inadmissible and based on hearsay, not personal knowledge. *See* Objections Chart. Madha claims a group met regularly at the Mosque, but he does not say that Mana was always with the group or "frequently" met with Thumairy. Madha also admitted that he "was not part of" this group and "thus was not privy to the conversations." Pls. Ex. 72 (Madha Ex. 830) ¶ 19.

Neither Mana nor Thumairy testified to having "frequent" meetings or a close relationship. In the cited portion of Mana's transcript, Mana mentions Thumairy asking him to lead Friday prayers but subsequently corrects himself and says it was actually Shuaib. Mana Tr. 86:11-15. And Thumairy could not specifically remember Mana. *See* Thumairy Tr. 219:10-13 ("Right now, I don't remember him. He may have been one of the employees there [at the Consulate] at the time.").

Mana testified that "he [Al Thumairy] didn't work with me. In the context of the consul. However, I [assited] him in translating his speeches, because he has to give some of those in the Arabic language. . . . |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | [H]e never sent me his text to the consul to translate . . . because [that is] not the job of the consul." Pls. Ex. 110A (Mana Tr.) 73:11-18. |
| 327. | *Consul General Salloum.* At his 2004 9/11 Commission interview, Thumairy admitted "[w]hen asked who was his superior, al-Thumairy said he reported to the Consul General." Ex. 90, Snell Decl., Ex. 3 at 3.Ex. 62, Thumairy Interview with 9/11 Commission at 6-7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) and Plaintiffs Exhibit 62 (Thumairy Ex. 813A) are inadmissible hearsay offered for the truth of the matters asserted. *See* Objections Chart.

Al Thumairy did not recall saying what the 9/11 Commission summary attributes to him and confirmed the statement is untrue. Thumairy Tr. 107:11-21. Thumairy clarified that "what I believe is that I said that the Consul General was in charge" of Saudi citizens in the area "in general." *Id.* at 108:4-9. |
| 328. | Consul General Salloum relied on Consulate Secretary Mana to be his eyes and ears at the King Fahad Mosque. Mana testified that he reported to Salloum about everything he observed at the Mosque: "[e]very detail that I received about the mosque, I brought to him [Salloum]." Ex. 110A, Mana Dep. 254:16-255:15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this is improper attorney argument and mischaracterizes Mana's testimony. Mana never testified that he was tasked with observing details about the Mosque generally or reporting them back to Salloum. Rather, in the context of being asked about his role in disbursing private donations from Prince Abdulaziz to the Mosque and Plaintiffs Exhibit 292 and Plaintiffs Exhibit 217 (a list of expenses from the Mosque to Mana and a record of expenses reimbursed), Mana |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | explained that the Consul General asked Mana to "make sure money is not misused or siphoned for other purposes." "[E]ach time any money is disbured is based on evidence from the mosque itself. They may send us [a] list of expenses, maintenance, utilities, maybe personnel, and each time we know which amounts should be . . . given to them and we give the exact amounts." Mana Tr. 113:11-114:8. Mana made clear that because Salloum was asked to do this because he was trusted "to supervise this donation to be properly disbursed and not misused." Mana Tr. 118:23-119:3; *see also id.* at 117:17-22 (describing Pls. Ex. 292 (Mana Ex. 608)); *id.* at 125:24-132:2 (describing Pls. Ex. 217 (Mana Ex. 609)). |
| | | Mana explained that "as far as going to the mosque and finding out who got the checks or which amount or something, I never did that. That's not my job." Mana Tr. 131:21-132:2. |
| | | The portion of the transcript Plaintiffs quote discusses Plaintiffs Exhibit 217 (Mana Ex. 609) ("this chart that you prepared", Mana Tr. 253:22-23). Mana's responsibility – which was outside of his ordinary job at the Consulate ("extra assignment"; "not part of his diplomatic mission or work") – is "basically a recordkeeping of what comes in and what goes out" so Salloum could ensure that the donations entrusted to him were spent "in the proper way." Mana Tr. 253:22-255:15. Thus, Mana was reporting recordkeeping details concerning funds requested by and donations disbursed to the Mosque; he was not generally observing every detail of the Mosque's activities as Plaintiffs claim. |
| | | Plaintiffs' statement that Mana was "Secretary" is inaccurate. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| 329. | Mana worked with Thumairy to oversee Saudi Arabia's funding of the Mosque and approve all expenditures. Ex. 72, Madha Decl. ¶ 13 (Usman Madha, the Mosque's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | financial employee testified that Saudi Arabia set up an expense account with $1 million under the name of the Mosque, and that "[t]he Consul General appointed a consulate employee, Ismail Mana, to oversee the account and approve any expenditures before authorizing payment…."); Ex. 110A, Mana Dep. 113:21-116:14, 256:2-257:19; Ex. 292, KSA 7193; Ex. 291, KSA 7146; Ex. 306, KSA 7119 (Ex. 605). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited portion of the Madha Declaration relies on hearsay and is not based on personal knowledge. *See* Objections Chart. *See also* Madha Tr. 52:22-54:3 (testimony based on "What Mr. Kaldirim told me"; no knowledge of how money got into the account).<br><br>Plaintiffs' assertion that Saudi Arabia funded the Mosque is incorrect, unsupported by the cited materials, and contradicted by available evidence.<br><br>The account was funded with private donations. Mr. Mana, who worked at the Consulate, testified that a donation was contributed to an account for the King Fahad Mosque. This donation was "not . . . an official service from the government of Saudi Arabia or the Ministry of Foreign Affairs" and the Consul General did not want that money "to be mixed with the – with the consulate's business." Mana Tr. 110:14-22, 111:11-24. Dr. Kaldirim likewise testified that funding for the Mosque at issue was a private donation, not the government. *See*, *e.g.*, Kaldirim Tr. 108:22-109:4 ("And this money was donated by the government of Saudi Arabia? Actually it was coming through Prince Abdul Aziz bin Fahd."); 110:20-24 ("donation"); 113:4-8 ("donation"). Mr. Mana explained that funding the account was "not . . . an official service from the government of Saudi Arabia or the Ministry of Foreign Affairs" and the Consul General did not want that money "to be mixed with the – with the consulate's business." Mana Tr. 110:14-22, 111:11-24.<br><br>The documents also do not support the claim that Thumairy worked with Mana to oversee the funding. Mana's role was to receive requests from the Mosque for specific amounts and to perform recordingkeeping of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | disbursements from an account containing charitable donations. *See* Response to ¶ 328. There is no evidence that Thumairy worked with him on this activity. |
| 330. | On January 31, 2000, Salloum wrote his own personal check for $12,000 to the Mosque with a note "King Fahad Mosque." Ex. 185, KFM 0034. That was the same date that Bayoumi travelled to the Los Angeles Consulate ostensibly to file for passports with his family. The following day, Bayoumi returned to the Consulate and met Mana, met the 9/11 hijackers at a restaurant, and went to the King Fahad Mosque to report to Mana and also Thumairy. Ex. 5, Youssef Rpt. 177-191. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 185 is inadmissible and has not been authenticated. *See* Objections Chart.<br><br>To the extent a response is required, Salloum did write a check for $12,000 to the Mosque dated January 31, 2000. That check was a personal donation from Salloum, not money from the Consulate. Ex. 113 (Khalil Tr.) 383:3-12. It is also undisputed that Bayoumi made one and only one trip to the Los Angeles Consulate on either January 31, 2000 or February 1, 2000.<br><br>Plaintiffs' assertion that Bayoumi made another trip the next day (the "two-trip" theory) is incorrect and refuted elsewhere. *See* Response to ¶ 1532. Plaintiffs' assertion that Bayoumi went to the Mosque after his chance encounter with the hijackers is refuted above. *See* Resposne to ¶ 319.<br><br>Plaintiffs' assertion that Bayoumi went to the Mosque to "report to" Mana and Thumairy is unsupported. The Youssef Report should be excluded. *See* Objections Chart. |
| 331. | *Deputy Consul General Ibrahim*. Thumairy told the 9/11 Commission that he worked alongside "Sami Ibrahim, Deputy Consul | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | General" at the Saudi Consulate. Ex. 90, Snell Decl., Ex. 3 at 3. When the FBI asked Thumairy in May 2003 "who were his friends/associates in the Los Angeles area" Thumairy "identified the Consulate General, Sammy." Ex. 154, FBI 000001-000006-REV2021 at 4. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph relies exclusively on inadmissible evidence. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) is inadmissible hearsay. To the extent it is introduced for its truth, Plaintiffs Exhibit 154 is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart.<br><br>To the extent a response is required, Al Thumairy testified that he knew Sami Ibrahim at the Consulate but that "he wasn't my friend." Al Thumairy Tr. 281:9-10. He testified that, to the extent interview summaries indicated Ibrahim was his friend or that most of his friends were from the Consulate, he did not remember making the statements and they are not correct. *Id.* at 281:9-282:3. For his part, Al Ibrahim testified that he attended services at the King Fahad Mosque, knew of Al Thumairy as an imam at the mosque but could not remember if he attended services when Al Thumairy was serving as imam, and that he had "zero" relationship with Thumairy. Ex. 124 (Ibrahim Tr.) 39:4-24. Al Ibrahim did not even know if Thumairy was a Saudi official. *Id.* at 40:15-21. |
| 332. | *Deputy Consul General Awad.* Thumairy also told the 9/11 Commission that "he worked most closely with two individuals" at the Consulate and named two different persons: "Said Jabreen and Abdullah Hawad [Awad]." Ex. 90, Snell Decl., Ex. 3 at 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Thumairy testified that he did not remember making the statement attributed to him in Plaintiffs Exhibit 90 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Snell Decl.) and that "I didn't work at the consulate, so that information is incorrect." Thumairy Tr. 104:17-105:3. Mana testified similarly. *See* Mana Tr. 74:3-4. Thumairy further explained that he did go to the Consulate for administrative matters but could not recall (more than twenty years later) the specific people he interacted with, although he remembered the Consul General and Sami Ibrahim, who came to Friday prayer. *Id.* at 105:4-106:4. |
| 333. | Abdullah Al Awad oversaw the Consulate's Islamic Affairs section and its Secretary Ismail Mana. Awad and Sami Ibrahim served as members of the Grand Opening committee for the King Fahad Mosque. Ex. 95, Awad Dep. 75:12-23, 76:9-77:16; Ex. 124, Ibrahim Dep. 108:16-109:5 (stating that he served on committee in consular capacity and is instructed not to answer further questions); Ex. 51, KFM 0426 (Ex. 209). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 51 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, undisputed that for a period of time Awad occupied the stated position and was senior to Mana. Undisputed that Awad and Ibrahim were on the Grand Opening committee.<br><br>Plaintiffs' statement that Mana was "Secretary" is inaccurate. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| 334. | *The Consulate Islamic Affairs Section and its Secretary Ismael Mana.* Thumairy told the FBI in May 2003 that he "works with 2 other individuals," namely ▮▮▮▮▮▮▮ (misspelled "▮▮▮▮▮▮▮▮") and Abdul Karim Bin Baz (misspelled "Abdul Karim Bimbas") in "the Islamic Affiars [sic] /Media Section" at the Consulate. Ex. 154, FBI 000001-000006- REV2021 at 2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent it is introduced for its truth, Plaintiffs Exhibit 154 is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart.<br><br>To the extent a response is required, Thumairy testified that the statement is incorrect and that he did not recall saying this to the FBI. *See* Thumairy Tr. 218:15-219:6.<br><br>▇▇▇ likewise testified that Al Thumairy never worked with ▇▇▇ at the Consulate. *See* Pls. Ex. ▇▇▇▇▇ 73:25-74:4.<br><br>Plaintiffs' statement that Mana was "Secretary" is inaccurate. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| 335. | Saudi Arabia obtained an A-2 diplomatic visa for Mana, an Algerian citizen, to work at the Consulate. Ex. 110A, Mana Dep. 44:2-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Mana testified as described. |
| 336. | Mana was the Secretary and sole employee of the Consulate's Islamic Affairs section and reported to Salloum and Awad. Ex 95, Awad Dep. 76:9-77:16; Ex. 306, KSA 7119. According to Mana, Bin Baz, who Thumairy identified to the 9/11 Commission in 2003, was "one of the vice consuls that handled the Islamic Affairs | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This assertion relies on inadmissible hearsay from Plaintiffs Exhibit 90 (Snell Decl. Ex. 3). *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Department for a short period of time." Ex. 110A, Mana Dep. 75:3-7. | To the extent a response is required, Plaintiffs Exhibit 306 appears unrelated to the assertion and does not support it.<br><br>Bin Baz is not identified in the 9/11 Commission interview notes, even if those were admissible. To the extent Plaintiffs are referring to the FBI interview notes from 2003, those are likewise inadmissible and incorrect. *See supra* response to ¶ 334.<br><br>To the extent a response is required, undisputed that Mana was subordinate to Al Awad for a period of time and to Al Salloum, the Consul General. Also undisputed that Mana identified Bin Baz as described. Mr. Mana testified that his title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| **IV.E.** | **Thumairy received special assignments from Saudi Prince Abdulaziz to provide funding and other support to individuals and organizations linked to terror.** | This assertion is improper attorney argument, is unsupported, and is inaccurate. Al Thumairy did not receive a "special assignment." Before Al Thumairy arrived in Los Angeles, his predecessor Al Hiber would distribute donations from the private office of Prince Abdulaziz to individuals performing religious work in southern California. After Al Thumairy replaced Al Hiber, Al Thumairy assumed the same function. There is no evidence that the individuals or organization receiving funds from the Prince's private office were linked to terror. There is likewise no evidence that Al Thumairy (or the Prince in his private capacity) had any knowledge of any link to terror. Nor is there any evidence that any "link[s] to terror" alleged by Plaintiffs had anything to do with the 9/11 attacks. |
| 337. | Saudi Arabia's Prince Abdulaziz was a senior member of Saudi Arabia's cabinet who had a leading role in Saudi Arabia's decision to build the King Fahad Mosque. Prince Abdulaziz held the government titles of Minister of State, Member of the Council | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of Ministers, and Head of the Prime Minister's Office. Ex. 140, KSA 8784 (Ex. 414); Ex. 50, KFM 0439-40 (Ex. 208). | To the extent a response is required, undisputed. |
| 338. | Prince Abdulaziz wired significant sums to Thumairy for distribution to various individuals and charities. The FBI produced a record showing that the Prince wired approximately $120,000 to Thumairy on three separate occasions in June 1999, November 2000, and in June 2001 for a total of $360,000. Ex. 5, Youssef Rpt. 48; Ex. 483, FBI 001033 at 1034, 1036. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 483 is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, two of the three referenced wires were from "Khalid bin Nasser Alassaf." Undisputed that these funds were sent to a seperate account Al Thumairy opened that was intended for distribution. As Al Thumairy explained, the funds were "personal charity," not government money, and Al Thumairy "opened a separate account so that the money doesn't mix with my own money." Thumairy Tr. 199:14-18; 203:20-24.

Al Thumairy further explained that, in distributing charitable donations from Prince Abdulaziz's private office, he was carrying on what had been done by his predecessor, Al Hiber. *See* Thumairy Tr. 199:11-200:10. |
| 339. | Thumairy could not recall when the Prince's funding first started or who contacted him to start it. Ex. 107, Thumairy Dep. 195:2-196:21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy was already involved in the funding scheme well prior to June 1999. A March 1997 document shows that Ibrahim Al Hiber (the MOIA propagator in Los Angeles prior to Thumairy), suggested to Prince Abdulaziz that Thumairy be assigned to oversee the funding. Ex. 296, KSA 8042-43 (Ex. 412). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument. There was no "funding scheme," and Plaintiffs have not put forward evidence to support that characterization.<br><br>Plaintiffs Exhibit 296 (KSA 8042-43) shows that in 1997, Al Hiber had been distributing private charitable donations sent by the Prince's Office to certain beneficiaries, and Al Hiber suggested transitioning responsibility for this activity to Al Thumairy.<br><br>It is undisputed that Al Thumairy could not recall precise details from more than twenty years prior to his deposition. He did, however, explain when asked who contacted him to distribute the charitable funds Al Hiber had been distributing, that it "must have been either someone working for the Prince's office or the previous Imam who was distributing the money before." Thumairy Tr. 195:16-24. Al Thumairy further explained that, in distributing charitable donations from Prince Abdulaziz's private office, he was carrying on what had been done by his predecessor (Al Hiber). *See* Thumairy Tr. 199:11-200:10. |
| 340. | Portions of the funds were distributed by Thumairy to Somali-run organizations in San Diego that were associated with the Somali-based terrorist organization Al Ittihad Al Islamia (AIAI), an ally of Al Qaeda. Ex. 2, EO 0563; Ex. 542, FBI 007516-REV2021 (noting the ties of AIAI to Osama Bin Laden). | Plaintiffs Exhibit 2L (EO 563) and Plaintiffs Exhibit 542 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 542 does not "not[e] the ties of AIAI to Osama Bin Laden." Rather, it states that "[redacted name] noted that former AIAI leader, Mahmoud Issa from Pakistan/ Afghanistan, is rumored to know bin Laden. [redacted name] added that [Omar Khadib, aka Omar Abdi Mohamed] is suspected of working for United States intellgience." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2L (EO 565) also states that "AL-MIHDHAR and AL-HAZMI[] may not have arrived in southern California with an active support network." <br><br> Plaintiffs Exhibit 2L (EO 563) states that Al Thumairy distributed money to " ▮▮▮▮▮ . . . , associated with members of the Somali-based terrorist organization, Al-Ittihad Al-Islamia (AIAI)." But the exhibit does not state that Al Thumairy knew that ▮▮ was associated with AIAI or that Abukar provided any of the money to AIAI. <br><br> Al Thumairy further explained that, in distributing charitable donations from Prince Abdulaziz's private office, he was carrying on what had been done by his predecessor (Hiber). *See* Thumairy Tr. 199:11-200:10. |
| 341. | According to a United Nations report: <br><br> AIAI began its alliance with Al-Qaida…in 1993 and Usama Bin Laden (deceased) devoted substantial funds towards the establishment of an AIAI-administered authority in Somalia, which supported the ultimate aim of setting up an Al-Qaida base of operations there. AIAI later supported Al-Qaida's bombing of the United States Embassies in Kenya and Tanzania on 7 August 1998. <br><br> Ex. 67B, UN Security Council Sanctions Listing for Al Ittihad Al Islamia. | Plaintiffs Exhibit 67-B is inadmissible hearsay and an unauthenticated, incomplete PDF a website. *See* Objections Chart. <br><br> The exhibit does not contain the quoted text. It appears Plaintiffs Exhibit 67-B is not the document Plaintiffs intended to cite. |
| 342. | Recipients associated with AIAI, including MOIA propagator Sharif Battikhi, visited Thumairy in-person each month to collect | Plaintiffs cite nothing to support their assertion that Battikhi or anyone else "associated with AIAI" received donations Thumairy distributed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | their money. Ex. 107, Thumairy Dep. 206:4- 207:4. | Thumairy's testimony contradicts Plaintiffs' assertion that Battikhi "visited Thumairy." Thumairy recalled a "Sharif" who was at the Mosque once per month "to give Friday sermon," as arranged by Shuaib. Thumairy Tr. 205:1-5. Thumairy would give this person a check on these occasions. *See id.* at 206:7-11. |
| 343. | An FBI source stated that the funds funneled through the King Fahad Mosque and being used by Thumairy originated with Osama Bin Laden. In 2004, the FBI questioned Saudi Arabia on the origin of the funds, but Saudi Arabia did not respond to the inquiry. Ex. 2, EO 0693 ("SD is awaiting response from leads sent to Riyadh…"). | The cited portion of Plaintiffs Exhibit 2N (EO 693) is inadmissible hearsay. *See* Objections Chart. <br><br> The statement is, on its face, an unsubstantiated "allegation." Pls. Ex. 2N (EO 693). There is no evidence of funds being "funneled through the King Fahad Mosque and being used by Thumairy." As just described, private donations were sent to Al Thumairy, which he distributed, consistent with the practice of his predecessor. *See supra* Response to ¶ 339. Nor is there any evidence that any funds Thumairy distributed originated with Bin Laden. <br><br> Plaintiffs' assertion that the FBI questioned "Saudi Arabia" and that Saudi Arabia did not respond misrepresents the document. The document says that "a lead to Riyadh was sent to identify the originator individual or organization;" it does not say the lead questioned "Saudi Arabia." It also says: awaiting a "response *from leads*," not a response from Saudi Arabia. <br><br> The unfounded accusation that the Mosque was linked to Bin Laden is contrary to the evidence. Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were *removed* from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Pls. Ex. 113 (Khalil Tr.) 388:3-393:4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 344. | In the wake of the Embassy bombings in Kenya and Tanzania, a foreign government advised the U.S. government that Bin Laden "pledged further financial support to AIAI and, in turn, the group is to work with UBL [Bin Laden] against Western interests and facilities." Ex. 2, EO 0361-0366 (at 0362). | The cited portion of Plaintiffs Exhibit 2N (EO 693) is inadmissible hearsay.  *See* Objections Chart.<br><br>The referenced material is found in Plaintiffs Exhibit 2KK (EO 362), and it is irrelevant to the matters at hand.  To the extent a response is required, the source and recipient of the information is redacted so it is unclear if Plaintiffs accurately describe the document, but it does contain the quoted text. |
| 345. | Of the funds received from Prince Abdulaziz, Thumairy withdrew $81,000. Ex. 483, FBI 001033 at 1038.  While Thumairy initially claimed that he gave the money to the King Fahad Mosque, he subsequently could not explain how he contributed the funds, and ultimately admitted he could not remember how much he contributed to the Mosque. Ex. 107, Thumairy Dep. 208:14-211:24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 483 is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 483 does state that there were cash withdrawals and checks to Thumairy for $81,015. Undisputed that Thumairy testified "most likely that was donation to help the mosque . . . pay bills."  Thumairy Tr. 208:20-23.  Thumairy also testified it was possible he used cash to make other distributions if he ran out of checks, but he could not remember those details.  *Id.* at 209:10-14. Also undisputed that Thumairy could not remember exactly how much money he contributed to the Mosque more than twenty years earlier. |
| 346. | Thumairy's initial claim that he donated the money to the Mosque was contradicted by other evidence. The King Fahad Mosque records contain only one $3,000 check from Fahad al Thumairy to the Mosque to pay for an iftar dinner. Ex. 5, Youssef Rpt. 149-50; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 184, KFM 0021. Prior to the 9/11 Attacks, Thumairy received a total of approximately $40,000 from the King Fahad Mosque, and apparently negotiated for the Mosque to pay him $700 per month towards his rent. Ex. 292, KSA 7193; Ex. 183, KFM 0002 - 0122. (checks and other payments to Thumairy). These funds were in addition to Thumairy's monthly salary that he was paid by the Saudi Embassy. Ex. 59, KSA1307-1309 at 1308 (Sadhan Dep. Ex. 498) (showing Thumairy as Rank 9 and a monthly salary of $6,940). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 183, which is not authenticated, is inadmissible. The Youssef report should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 183 is an improper compilation exhibit and Plaintiffs have not demonstrated that the totals of the more than 100 pages of records amount to "approximately $40,000."

To the extent a response is required, this paragraph contains improper attorney argument.

The cited evidence also does not contradict Thumairy's testimony, which made clear that his donations would be in cash if he ran out of checks, such that the absence of checks is unsurprising. *See* Thumairy Tr. 211:1-5. Plaintiffs also cite no evidence that the $3,000 check cited is the only check Thumairy ever wrote to the Mosque.

Similarly, Thumairy receiving money from the Mosque does nothing to contradict his claim that he paid the Mosque money. Both can of course true.

It is undisputed that Thumairy received a salary paid by the Embassy, though Plaintiffs cite nothing to support their assertion that the amount is in dollars rather than Riyals. It is also undisputed that the mosque paid half of Thumairy's rent, "[b]ut only in the last year." Thumairy Tr. 267:23-268:2. |
| 347. | A December 2002 letter from MOIA propagator Shuaib to Saudi Consul General Salloum confirms that Thumairy took | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | money but never contributed funds to the Mosque:<br><br>Before him [Thumairy], there were two sheikhs from Saudi Arabia, who joined the Foundation and who didn't receive any money during their tenure from the Foundation. They instead gave the Foundation money and further collected large sums of money to help foundation improve its charities and works. *That is something Fahad Thumairy never did.*<br><br>Ex. 680J, KSA 7137 (emphasis added). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' Ex. 680J does not contain KSA 7137.<br><br>KSA Exhibit 288 (KSA 7137) contains the quoted language but does not confirm that Thumairy took money without contributing to Mosque funds. Plaintiffs Exhibit 184 shows that Thumairy *did* contribute to the Mosque, and Shuaib's statement "[t]hat is something Fahad Thumairy never did" follows a sentence noting that prior Saudi imams "collected large sums of funds" for the Foundation. Even if Thumairy did not fundraise, that does not show he never gave money to the Foundation. |
| 348. | The full amount of money received and distributed by Thumairy for the Saudi government is uncertain. Thumairy's account records were not produced in this case by the FBI or Saudi Arabia. In February 2022, the Department of Justice advised Plaintiffs' counsel that Thumairy's bank account records were obtained by the FBI but intentionally destroyed in August 2005. Ex. 330, February 22, 2022 Email from Brian Netter. | The funds Al Thumairy received and distributed were not "for the Saudi government." Plaintiffs cite no support for that statement, and it is contrary to record evidence. Al Thumairy explained, the funds were "personal charity," and that he "opened a separate account so that the money doesn't mix with my own money." Thumairy Tr. 199:14-18; 203:20-24.<br><br>Undisputed that the amounts are uncertain and that Al Thumairy's account records were not produced. Saudi Arabia fully complied with its discovery obligations.<br><br>Plaintiffs Exhibit 330 is inadmissible hearsay. *See* Objections Chart. The document does show that DOJ informed Plaintiffs that FBI records indicate Thumairy bank records were destroyed in August 2005. |
| 349. | Saudi Arabia did not produce any documents concerning the funds sent to Thumairy from Prince Abdulaziz to | Saudi Arabia fully complied with its discovery obligations. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy until Plaintiffs filed a motion after receiving the FBI report about those funds. ECF No. 6577 at 34-36. Even then, Saudi Arabia only produced documents evidencing the wire transfers already documented by the FBI and did not provide documents showing how Thumairy was directed to distribute the funds or how he distributed the funds. Ex. 680X, KSA 8570 (showing transfer to Wells Fargo account in Los Angeles titled "AL BER Account." Ex. 225, KSA 8569 (showing Thumairy sending account name and number to receive transfers). | As Plaintiffs acknowledge, Saudi Arabia produced records concerning the ALBER account from which Thumairy distributed charitable donations sent by the Prince's private office. This private office is not part of the Saudi government. *See* Pls. Ex. 107 (Thumairy Tr.) 199:14-18 ("personal charity from the Emir"). Saudi Arabia fully complied with its discovery obligations. |
| 350. | Thumairy also "supervised" the distribution of monthly salaries paid by Prince Abdulaziz's office directly to a group of Imams and propagators inside the U.S. Ex. 354, KSA 8440, (Thumairy June 2000 letter requesting the payment of $9,000 from Prince Abdulaziz of "the monthly payments that are paid as salaries for some of the propagators and Imams who live in the USA by the Office of His Highness…" and acknowledging that "their disbursement is supervised by me."). | Undisputed. The private office is not part of the Saudi government. *See* Pls. Ex. 107 (Thumairy Tr.) 199:14-18 ("personal charity from the Emir"). |
| **IV.F.** | **After working in California for less than two years, Thumairy was named as the supervisor of MOIA propagators in** | Plaintiffs' assertion is improper attorney argument without any evidentiary support. As explained below, *see* Response to ¶ 351, Al Thumairy was never the supervisor of MOIA propagators in California. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **California, many of whom had links to extremism.** | Plaintiffs' assertion that many MOIA propagators in California had links to extremism is unsupported and contradicted by the record. Further, there is no evidence that any such extremism was related to jihad, as opposed to conservative beliefs. Further still, there is no evidence that any such extremism was linked in any way to the 9/11 attacks. And there is no evidence that Al Thumairy had any knowledge of any such extremism. |
| 351. | On September 12, 1997, Sowailem sent a letter to MOIA headquarters, nominating Thumairy to be the supervisor of MOIA's propagators in California. The letter stated:<br><br>Based on the Office's interest in propagators' affairs since this is a top priority over all the office's work, in order to facilitate some matters and procedures related to propagators, and due to the importance of California, I deem it appropriate to nominate Sheikh Fahad bin Ibrahim al Thumairy to be supervisor of propagators in California.<br><br>Ex. 415, KSA 8503 (Ex. 439). On September 24, 1997, MOIA headquarters approved Thumairy to be "a supervisor of propagators in the State of California." Ex. 243, KSA 8502. | Plaintiffs accurately quote the cited materials. However, there is no evidence that Al Thumairy was aware of or accepted the nomination. To the contrary, Al Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>Consistent with Al Thumairy's testimony, there is also no evidence of any supervisory work by Al Thumairy over other propagators such as reports on or evaluations of other propagators. |
| 352. | On January 14, 1998, Sowailem instructed Thumairy with a written direction "to supervise the propagators in the State of California" and specifically instructed | Plaintiffs mischaracterize the cited materials. Plaintiffs Exhibit 214 does not direct Al Thumairy to supervise propagators; it reports that the Dawah Department "approved your nomination to supervise" propagators in California. However, there is no evidence that Al Thumairy was aware of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy: "Please provide the Office with periodic reports on the activity of propagators." Ex. 214, KSA 6903 (Ex. 404). The letter had an attachment which was not produced by Saudi Arabia. | or accepted the nomination. To the contrary, Al Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10. <br><br> Consistent with Al Thumairy's testimony, there is also no evidence of any supervisory work by Al Thumairy over other propagators such as reports on or evaluations of other propagators. <br><br> Saudi Arabia fully complied with its discovery obligations. |
| 353. | Three days later, on January 17, MOIA Embassy Director Sowailem wrote to MOIA's propagators in California, telling them that Thumairy had been nominated and approved "to supervise the propagators working in the state of California" instructed the propagators to "[p]lease cooperate with him in everything that serves the *Da'wah* [propagation], in obedience to the Lord's command (cooperate for the sake of righteousness and piety)." Ex. 382, DOJ 0010. Neither this letter, nor the letters that Sowailem sent to the other MOIA propagators in California, were produced by Saudi Arabia. | Plaintiffs accurately quote the cited material. However, there is no evidence that Thumairy was aware of or accepted the nomination. To the contrary, Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10. <br><br> Consistent with Thumairy's testimony, there is also no evidence of any supervisory work by Thumairy over other propagators such as reports on or evaluations of other propagators. <br><br> Saudi Arabia fully complied with its discovery obligations. |
| 354. | MOIA documents confirming Thumairy's supervisory role were first obtained when the FBI raided the San Diego house of MOIA propagator Abdi Mohamed in 2004. Saudi Arabia did not produce any of the documents concerning Thumairy's supervisory role compelled to do so by this | This paragraph is improper attorney argument. <br><br> Plaintiff cites no documents "confirming" Al Thumairy's supervisory role. The only documents cited above state that he was nominated to supervise propagators in California, but there is no evidence that Al Thumairy was aware of or accepted the nomination. To the contrary, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Court. ECF No. 6577 at 12-13. Saudi Arabia never produced the letters that Sowailem sent to Abdi Mohamed and the other MOIA propagators in California directing them to report to Thumairy. | Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>Consistent with Al Thumairy's testimony, there is also no evidence of any supervisory work by Al Thumairy over other propagators such as reports on or evaluations of other propagators.<br><br>Saudi Arabia fully complied with its discovery obligations. |
| 355. | The extremist MOIA propagators working for Thumairy in California included Tajuddin Shuaib and Mohamed Al Muhanna in Los Angeles and Omar Abdi Mohamed, ███████████, and Abdimagid Mohamed Omar in San Diego. Ex. 239, KSA 7377-78; Ex. 2, EO 3555-3557 (Shuaib, along with Abdi Mohamed, on FBI list of U.S. based clerics paid by Saudi Arabia); Ex. 2, EO 0692 (listing three "Saudi government supported propagators in San Diego" including Abdi Mohamed, ███████ and Omar). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portions of Plaintiffs Exhibit 2CC and Plaintiffs Exhibit 2N (EO 3555-3557 and 0692) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph contains improper attorney argument.<br><br>Plaintiffs cite no evidence of extremist MOIA propagators and no evidence that any of the individuals mentioned worked for Thumairy in California. Thumairy testified that he never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>The cited materials do not state otherwise. Thumairy testified that he does not know Omar Abdi Mohammed. *See* Thumairy Tr. 159:10-19. He also testified that he did not know whether ███████████ was employed by the Ministry of Islamic Affairs. *See* Thumairy Tr. ███████. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 356. | Thumairy and several of the propagators working under him were paid through the Saudi Embassy. Ex. 57 (Qattan Dep. Ex. 418) (Checks Sent by Embassy to Omar Abdi Mohamed); Ex. 680P, KSA 7497-7511 (Embassy payroll list including payments to Thumairy, KSA 7497, Abdi Mohamed, KSA 7498, Shuaib, KSA 7499, and Battikhi, KSA 7500). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite no evidence that any of the individuals mentioned worked under Thumairy.  Thumairy testified that he never supervised propagators in California.  *See* Thumairy Tr. 143:10-147:10.<br><br>Plaintiffs Exhibit 57 is inadmissible hearsay and an unauthenticated summary exhibit that does not reveal the underlying sources.  *See* Objection Chart.<br><br>Plaintiffs Exhibit 680P (KSA 7497) is not a payroll list.  It is a "statement of the names of Saudi and contracting employees in the Islamic Affairs Division."  Pls. Ex. 680P (KSA 7502).  It does not list job titles and does not state that these individuals' salaries were paid through the Embassy.  The document is not related to distribution of regular salaries but instead shows "HRH Prince Abdullah's Bonus;" *i.e.*, this shows bonus payments Prince Abdullah made to Saudi and contracting employees in the Islamic Affairs Division. |
| 357. | Thumairy exercised strict day-to-day control over his group of propagators, evidenced by the fact that Thumairy became angry when he learned that an individual working under him had a second job. Ex. 2, EO 0676. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, this paragraph is attorney argument without any evidentiary support.<br><br>Plaintiffs cite no evidence that any "group of propagators" was "working under [Thumairy]." Thumairy testified that he never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>The cited potion of Plaintiffs Exhibit 2N (EO 676) is also inadmissible hearsay. *See* Objections Chart.<br><br>Even if it is considered, the document does not show any level of day-to-day control. To the contrary, it shows that religious workers allegedly receiving payment from the Saudi government for their religious work had so much freedom that they had other jobs. Plaintiffs Exhibit 2N (EO 676) reveals only that Thumairy believed people being paid to be religious workers should not take that money and then perform other jobs. |
| IV.G. | **While working under Thumairy, MOIA propagator Omar Abdi Mohamed became the U.S. leader of a terror group associated with Osama Bin Laden and ran a money laundering operation involving funds from two charities providing material support to Al Qaeda** | This assertion is improper attorney argument, and Plaintiffs cite no evidence to support it. And it is contradicted by the record. Abdi Mohamed did not work under Thumairy, who never supervised any MOIA propagators. *See, e.g., supra* Response to ¶ 351.<br><br>As explained below, in support of their allegations of money laundering and links a "terror group" with links to Bin Laden (which had nothing to do with the 9/11 attacks in any event), Plaintiffs cite an *indictment* against Abdi Mohamed. They fail to acknowledge, however, that, far from proving the indictment, Abdi Mohamed was *acquitted* on the charges related to funding the alleged terror group. *See* Pls. Exs. 20, 22 (Indictment stating counts I and II; form rendering "NOT GUILTY" verdict on those counts). |
| 358. | Omar Abdi Mohamed was a MOIA propagator in San Diego from 1995 through 2004. Ex. 2, EO 0685-0695. In Aug 1998, | Plaintiffs Exhibit 2N (EO 685-695) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Abdi Mohamed was issued a certificate by MOIA for his attendance at religious training held in Saudi Arabia. Ex. 132, DOJ 0001-32 at 024-026. | The cited materials do not state that Abdi Mohamed was a MOIA propagator from 1995 through 2004. |
| 359. | Abdi Mohamed was an extremist religious leader associated with the Somali Al Ittihad Al Islamia ("AIAI") group that was committed to Osama Bin Laden. Ex. 542, FBI 007516-REV2021; Ex. 2, EO 0345, 0362, 0648, 0576 ("MOHAMED was selected as the AIAI leader in the U.S. in the beginning of 2000."). | Plaintiffs Exhibit 542 and the quoted portions of Ex. 2I (EO 345, 362) and Pls. 2M (EO 648, 576) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 542 does not "note the ties of AIAI to Osama Bin Laden" Rather, it states that "[redacted name] noted that former AIAI leader, Mahmoud Issa from Pakistan/Afghanitsan, is <u>rumored</u> to know bin Laden. [redacted name] added that [Omar Khadib, AKA Omar Abdi Mohamed] is suspected of working for United States intellgience."<br><br>The documents on their face note that they are not substantiated. In a footer, they state: "This document contains neither recommandations nor conclusions of the FBI." *See*, *e.g.*, Ex. 2I (EO 362). |
| 360. | Abdi Mohamed was trained in a school run by Saudi Arabia, would have to have been recommended for his MOIA job by an "influential Islamic scholar", and "bragged" about working for MOIA. Ex. 2, EO 0675. | The quoted portion of Plaintiffs Exhibit 2N (EO 675) is inadmissible hearsay. *See* Objections Chart.<br><br>The purported information about the hiring process for MOIA propagators from an anonymous source is incorrect. There is no evidence, for example, that Thumairy was recommended by an influential scholar, and he applied for and was hired into his role in MOIA by applying for a position after graduating with a masters degree from a University. There is no evidence of training in a "Saudi-supported Madrassa" as Plaintiffs Exhibit 2N (EO 675) purports would have been required. |
| 361. | When Abdi Mohamed lived in Canada prior to being brought to work for Saudi Arabia in San Diego, he was an "outspoken proponent of jihad against non-Muslim movements in Somalia." Ex. 2, EO 0675, | The quoted portion of Plaintiffs Exhibit 2N (EO 675) is inadmissible hearsay. *See* Objections Chart.<br><br>The Youssef Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 0721. Plaintiffs' expert Youssef found, based on his extensive experience dealing with the Saudi Government, that "MOIA would have been aware of the details about Abdi Mohamed's history and background" – including Abdi Mohamed's extremism and connections with terror organizations – "before assigning him to work inside the U.S. in San Diego." Ex. 5, Youssef Rpt. 64. | Plaintiffs Exhibit 2N (EO 675) contains the quoted material, but comes from anonymous sources.<br><br>Youssef's speculation about what MOIA must have been aware of is unsupported *ipse dixit*. |
| 362. | Thumairy's supervisor and the MOIA's Embassy Head, Khalid Al Sowailem, personally traveled to San Diego and visited with Abdi Mohamed. Ex. 2, EO 0722; Ex. 682, Jan. 22, 2004 interview of Omar Abdi Mohamed by INS Officer ████████ at 2490. | The quoted portion of Plaintiffs Exhibit 2N (EO 722) and Plaintiffs Exhibit 682 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2N (EO 722) claims that Sowailem visited San Diego but he was with "about 9 other people." Sowailem allegedly "met with" "Mohamed" along with at least three others.<br><br>If Plaintiffs Exhibit 682 is considered, it is noteworthy that, in connection with Sowailem's visit, it also states that part of the Saudi cultural mission was "preaching . . . no violence. . . . Teach[ing] the people the good thing, the peaceful thing and I think concern of the terrorists was so strong among them." Plaintiffs Exhibit 682 at 2490. |
| 363. | Sowailem and his Saudi Embassy staff sent regular communications to Abdi Mohamed, including his monthly paychecks. Ex. 57 (Qattan Dep. Ex. 418) (Summary of Checks Paid to Abdi Mohamed). | Plaintiffs Exhibit 57 is inadmissible hearsay and an improper summary exhibit that has not been authenticated. *See* Objections Chart.<br><br>Plaintiffs cite no evidence of "regular communications." |
| 364. | In addition to working under Thumairy, Abdi Mohamed also had a close relationship with Bayoumi. FBI reports | Plaintiffs Exhibit 542 and the cited portion of Plaintiffs Exhibit 2I (EO 345) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | stated that Abdi Mohamed had a "'tight' connection" to Bayoumi, and that the two men regularly had lunch together. Ex. 542, FBI 007516-REV2021 at 7517; Ex. 2, EO 0345 ("OMAR KHADIB has been seen having lunch with AL-BAYOUMI on numerous occasions."). | Plaintiffs' assertion that Abdi Mohamed worked under Thumairy is contradicted by the record. The basis for that assertion, which is not cited, is that Al Thumairy was allegedly nominated to supervise propagators in southern California. ███████████████████████ ████████████████████████████████████████ ████████████████████████████████<br><br>Al Bayoumi did not have a "close" – or any – relationship with Abdi Mohamed. *See* Pls. Ex. 120 (Bayoumi Tr.) 501:3-5 (Bayoumi did not know him). |
| 365. | Bayoumi had a listing for Abdi Mohamed in his phone book. The listing is for "Omar AlKhateeb 282-6013/286-9465". Ex. 12BB, MPS688_9 (January 2000 typed list in Bayoumi "green folder"); Ex. 12AA, MPS738_37, 38 (handwritten address book). | Plaintiffs Exhibit 12AA (MPS 738) and Plaintiffs Exhibit 12BB (MPS 688) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>The handwritten phone book cited in Plaintiffs Exhibit 12AA (MPS 738) contains an entry with the name "Omar Al-Khatib" and the number "282-6013." Pls. Ex. 12AA (MPS 738_37).<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It is undisputed that the typed phone list contains an entry with the name "Omar AlKhateeb" and the numbers "282-6013" and "286-9465." Pls. Ex. 12BB (MPS 688_8). |
| 366. | Bayoumi placed two calls to Abdi Mohamed on the afternoon of January 25, 2000, while the hijackers were in Los Angeles and about to move to San Diego. The FBI determined that one of Bayoumi's calls was made to ████-8695, which numerous FBI reports identified as a number used by Abdi Mohamed. Ex. 2, EO 0647-649; Ex. 562, FBI 9041 at 9044; Ex. 560, FBI 8954-REV2021 at 8955 (Abdi Mohamed acknowledged his phone contact with Bayoumi). The second call was made to ████-9443. Ex. 515, FBI 3221 at 3228. That phone number was listed on Abdi Mohamed's business card, which was among the items found in the FBI's search of ████████████ and the FBI identified it as a contact number for the WSRA. Ex. 558, FBI 8883; Ex. 2, EO 0647. | Plaintiffs Exhibit 2M (EO 647-49), Plaintiffs Exhibit 558 (FBI 8883), Plaintiffs Exhibit 560 (FBI 8954), and Plaintiffs Exhibit 562 (FBI 9041) are inadmissible hearsay. *See* Objections Chart.<br><br>It is not disputed that Al Bayoumi called two numbers that Plaintiffs associate – based on hearsay sources – with Abdi Mohamed on January 25, 2000. No subscriber records were produced to verify that either number belonged to Mohamed. |
| 367. | Abdi Mohamed sent a WSRA fundraising letter to Bayoumi similar to a fundraising message he sent to Al Haramain in 2000. Ex. 391, MPS 43_193 (WSRA fundraising letter to Bayoumi). | Plaintiffs Exhibit 391 is inadmissible hearsay, and the document has not been authenticated. *See* objections Chart.<br><br>The letter is sent by "Omar Al-Khatib" and does not contain the names Abdi or Mohamed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The document does not reference or contain a "similar fundraising message" sent "to Al Haramain in 2000," and Plaintiffs do not cite any evidence of such a letter. |
| 368. | Thumairy claimed that he did not even know of Abdi Mohamed, but MOIA documents confirm that Mohamed was a propagator working directly under Thumairy's supervision. Ex. 107, Thumairy Dep. 159:10-19; Ex. 382, DOJ 0010. | This paragraph is improper attorney argument and is contradicted by the record evidence.<br><br>Undisputed that Thumairy testified he did not know Abdi Mohamed.<br><br>MOIA documents do not confirm that Mohamed was working under Thumairy's supervision. The only documents cited state that Thumairy was nominated to supervise propagators in California, but there is no evidence that Thumairy was aware of or accepted the nomination. To the contrary, Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>Consistent with Thumairy's testimony, there is also no evidence of any supervisory work by Thumairy over other propagators such as reports on or evaluations of other propagators. |
| 369. | As Plaintiffs' expert Youssef detailed, shortly "after MOIA assigned Abdi Mohamed to work under Thumairy in January 1998, records produced in an immigration fraud trial in the Southern District of California show that Abdi Mohamed initiated a money laundering operation, using a California corporation he helped establish called the 'Western Somalia Relief Agency' (WSRA)." Ex. 5, Youssef Rpt. 64-65. | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Youssef's report contains this sentence but the sentence has no cite to supporting evidence. *See* Youssef Rep. 64-65. Youssef is wrong that Abdi Mohamed was working under Al Thumairy's supervision. The only documents cited state that he was nominated to supervise propagators in California, but there is no evidence that Al Thumairy was aware of or accepted the nomination. To the contrary, Al Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Youssef's report contains this sentence but the sentence has no cite to supporting evidence. *See* Youssef Rep. 64-65.<br><br>Contrary to Youssef's assertion, Abdi Mohamed was found "***not guilty***" on Counts 1 and 2, Plaintiffs Exhibit 22 (*U.S. v. Mohamed* Verdict Form) at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3. |
| 370. | As Plaintiffs' expert Youssef explained due to "the Kingdom's strict reporting requirements, Abdi Mohamed would have reported his efforts and activities regarding WSRA to MOIA through Thumairy and Sowailem. Abdi Mohamed's WSRA activities were "precisely the type of activity he would be expected to perform as a MOIA employee." As Youssef further stated, "Abdi Mohamed had received specific written instructions from Sowailem not to solicit contributions inside Saudi Arabia without permission from MOIA, but no similar restriction was placed on his activities inside the U.S." Ex. 5, Youssef Rpt. 64-65, 65, n. 227. Ex. 132, DOJ 0001-32 at 013. | The Youssef Report should be excluded. *See* Objections Chart.<br><br>The premise underlying Youssef's speculation about what "would have" happened is unsupported and contradicted by the record. There were no "strict reporting requirements" for MOIA personnel, *see supra* Response to ¶ 370, Al Thumairy testified that he did not know Abdi Mohamed, see Thumairy Tr. 159:10-19, and Thumairy was not his supervisor. The only documents on which Plaintiffs rely state that he was nominated to supervise propagators in California, but there is no evidence that Al Thumairy was aware of or accepted the nomination. To the contrary, al Thumairy testified that he was not aware of the nomination and never supervised propagators in California. *See* Thumairy Tr. 143:10-147:10.<br><br>Further, to the extent it is considered, Plaintiffs Exhibit 132 (DOJ 13) reveals an effort by MOIA to ensure that "propagators assigned to foreign posts who arrive in the Kingdom of Saudi Arabia to collect donations" do not do so unless certain criteria are met. This directive is not about solicitation as Youssef asserted but appears to be an effort to place limits on funds flowing from Saudi Arabia based on "recommendations . . . by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | outside parties." This is no way indicates that MOIA supported unrestricted fundraising in the U.S.<br><br>Contrary to Youssef's specuation, Abdi Mohamed was found "***not guilty***" on Counts 1 and 2, Plaintiffs Exhibit 22 (*U.S. v. Mohamed* Verdict Form) at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3. |
| 371. | As demonstrated at Abdi Mohamed's trial, WSRA received 16 checks between December 1998 to May 2001 from two charities directly associated with Al Qaeda-- the Global Relief Foundation and the Al Haramain Islamic Foundation. Ex. 5, Youssef Rpt. 65; Ex. 20, *US v. Mohamed*, 3:03-cr-03433-JAH, Doc. 39, filed 03/26/04, Indictment at 4; 108507 SVS (March 2, 2000 receipt for $5,000 check from Al Haramain to WSRA). After 9/11, The U.S. designated the Global Relief Foundation and Al Haramain as Specially Designated Global Terrorists for their support to Al Qaeda. Ex. 19B (U.S. Treasury Department statement regarding the designation of the Global Relief Foundation); Ex. 321, PEC-KSA003344 (U.S. Treasury Department designation of Al Haramain). | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 20 (*U.S. v. Mohamed* Indictment) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 20 (*U.S. v. Mohamed* Indictment) is also an indictment containing allegations so does not establish what was "demonstrate[ed] . . . at trial." Plaintiffs cite evidence of only one check.<br><br>Youssef cites the same materials for the proposition that WSRA received checks from charities associated with Al Qaeda, but he cites Plaintiffs Exhibit 20 (*U.S. v. Mohamed* Indictment), which is an allegation that does not support the proposition.<br><br>In fact, Abdi Mohamed was found "***not guilty***" on Counts 1 and 2, Plaintiffs Exhibit 22 (*U.S. v. Mohamed* Verdict Form) at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3.<br><br>Undisputed that Treasury designated Global Relief Foundation on October 18, 2002 and Al Haramain on June 19, 2008. |
| 372. | Abdi Mohammed lied to the FBI about receiving funding from the Global Relief Foundation. Ex. 2, EO 0693-0694. About two years before WSRA received the Al Haramain check, Soliman Buthe, who was later designated as a terrorist financier by the U.S. Government based on his ties to Al Qaeda, personally met with Omar Bayoumi in San Diego. Then, in March 2000, while the 9/11 hijackers Hazmi and Mihdhar were living in San Diego, Al Haramain transferred $5,000 to Abdi Mohamed. Ex. 5, Youssef Rpt. 65, n. 229. | The cited portion of Plaintiffs Exhibit 2N (EO 693-694) is inadmissible hearsay. The Youssef Report should be excluded. *See* Objections Chart.<br><br>The document Plaintiffs cite to show that Abdi Mohammed lied is an FBI investigative update, not a finding of liability or proof from trial. In fact, Abdi Mohamed was found "***not guilty***" on Counts 1 and 2, Plaintiffs Exhibit 22 at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3.<br><br>Plaintiffs cite no evidence in this paragraph that Bayoumi met with Buthe in 1998 or that Buthe was later designated a terrorist financier. They rely on footnote 229 of the Youssef report, but Youssef has no citation after his assertion. To the extent Plaintiffs cite evidence supporting their assertion elsewhere, Saudi Arabia addresses it in the applicable paragraphs. |
| 373. | WSRA then sent the Al Haramain funds by way of Dahab Shil, a known "hawala" money transfer agent frequently used by Al Qaeda. Ex. 5, Youssef Rpt. 65. In fact, Al Qaeda ran Dahab Shil's office in Karachi, Pakistan, handling terrorist financing transactions from Somali extremists in the U.S. Ex. 5, Youssef Rpt. 65; Ex. 172, JTF- | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Regarding the $5,000 alleged transfer, Abdi Mohamed was found "***not guilty***" on Counts 1 and 2, Plaintiffs Exhibit 22 at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | GTMO Detainee Assessment of Mohammed Soliman Barre dated September 1, 2008, at 3, 5. | Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3.<br><br>Youssef cites nothing following his assertion that the funds were then sent to Dahab Shil.<br><br>Plaintiffs Exhibit 172 is inadmissible hearsay. *See* Objections Chart. |
| 374. | In March 2005, Abdi Mohamed was convicted for violations of federal law in the Southern District of California for lying to federal immigration officials to hide the facts of his employment with the Saudi Arabia's MOIA. Ex. 22, *US v. Mohamed*, 3:03-cr-03433-JAH, Dkt. 153 [Jury Verdict]. | Plaintiffs' statement is not supported by the cited material.<br><br>This verdict form shows that, Abdi Mohamed was found not guilty on Counts 1 and 2, and guilty on Counts 7 and 8. *See* Pls. Ex. 22 (*U.S. v. Mohamed* Verdict Form) at 2.<br><br>Notably, Abdi Mohamed was found "*not guilty*" on Counts 1 and 2, Plaintiffs Exhibit 22 (*U.S. v. Mohamed* Verdict Form) at 2 (emphasis added) (capitalization omitted), which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation." Pls. Ex. 20 (*U.S. v. Mohamed* Indictment) at 3. |
| 375. | The Department of Justice, however, declined to prosecute Abdi Mohamed for his "failure to register as a foreign agent" under 18 U.S.C. § 951. The reason given by the DOJ was "[d]ue to concerns of diplomatic relations" with Saudi Arabia. Ex. 681, *In re Mohamed*, File No. A44917640 (US DOJ Exec. Office Immigration Rev. April 22, 2004) U.S. Government Response at 4. | Undisputed that Mohamed was never prosecuted for failure to register as a foreign agent.<br><br>Undisputed that the government asserted that it did not prosecute for an alleged violation of 18 U.S.C. § 951 "[d]ue to concerns of diplomatic relations." *See* Pls. Ex. 681 (*In re Mohamed* Gov't Resp.to Brief in Support of Bond) at 4. Abdi Mohammed is identified as a "native and citizen of Somalia," not Saudi Arabia. *See id.* at 1. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 376. | In Abdi Mohamed's appeal of his conviction on immigration fraud, the Ninth Circuit reviewed the evidence received in the sentencing phase, finding that the MOIA propagator had received money from organizations that would later be designated Specially Designated Global Terrorists and that this money's destination was unknown, that he had undisclosed employment with the government of Saudi Arabia, and that he had extensive foreign travel despite no apparent income to support it. *United States v. Mohamed*, 203 F.App'x 879, 880 (9th Cir. 2006). The Ninth Circuit found these circumstances were "mysterious" and justified Abdi Mohamed's sentence because they were "so unusual as to differentiate his case from a normal case of immigration fraud." *United States v. Mohamed*, 203 F.App'x 879, 880 (9th Cir. 2006). | Undisputed that the Ninth Circuit's unpublished opinion contains the quoted material, but the court did not "review[] the evidence." <br><br> The Ninth Circuit also noted that the district court never found that Mohamed "committed acts jeopardizing national security. *United States v. Mohamed*, 203 F. App'x 879, 880 (9th Cir. 2006) ("There was no assertion . . . of finding that any of these circumstances had actually led to, or was intended to lead to, any harm."). |
| 377. | The 2002 Congressional Joint Inquiry Report confirmed the FBI had uncovered the trail of funds originating with the Saudi Government, passing through the King Fahad Mosque to Somali organizations in San Diego and on to Al Qaeda. Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 435 (referencing the KFM as the "Ibn Tamiyah Mosque"). | Plaintiffs Exhibit 84 is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs Exhibit 84 does not state that the FBI uncovered the trail of funds Plaintiffs describe. It says the "FBI *believes* that some of the funding actually *originated from Saudi Arabia*." Thus, the document refers to a theory, and it does not even allege the funds originated from the Saudi government. The investigating agent speculated that "this scheme *may* allow the Saudi Government" to provide funding through covert or indirect means. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Ultimately, the FBI/CIA Joint Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Commission Report also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." KSA Ex. 163 (9/11 Rep.) 171. |
| 378. | FBI reports state that Thumairy and other Saudi Embassy and Consulate officials funded extremists and terror organizations prior to 9/11, and specifically that "UBL [Usama Bin Laden] money" was "distributed" by Thumairy. Ex. 2, EO 0693. | The cited portion of Plaintiffs Exhibit 2N (EO 693) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs also misrepresent the document, which does not state that UBL money was distributed by Thumairy. Rather, the document says the FBI "is awaiting response from leads sent to Riyadh and to LA to follow up on the source of the Saudi funds, and the veracity of the original LA source allegation regarding the involvement of UBL money funneled through LA subject Al Thumairy and the Kin[g] Fahd Mosque." Pls. Ex. 2N (EO 693).<br><br>Thus, what Plaintiffs assert as fact was in reality an allegation, the veracity of which the FBI was still investigating.<br><br>Ultimately, the FBI/CIA Joint Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Commission Report also concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." KSA Ex. 163 (9/11 Rep.) 171. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| IV.H. | **While working under Thumairy, MOIA propagator and Saudi agent Sharif Battikhi was the leader of various extremist groups and handled funding.** | This assertion is unsupported attorney argument to which no response is required. Al Thumairy did not supervise propagators so Battikhi was never "working under" Al Thumairy. The basis for that assertion, which is not cited, is that Al Thumairy was allegedly nominated to supervise propagators in southern California. Al Thumairy explained, however, that he was not aware of this nomination and did not in fact supervise propagators in California, Pls. Ex. 107 (Thumairy Tr.) 143:10-147:10, and there is no evidence that he did so.<br><br>Plaintiffs' assertions that Battikhi was leader of an extremist group are based on inadmissible hearsay. In any event, there is no evidence that any such extremism was related to the 9/11 attacks. And there is no evidence that Al Thumairy was aware of any such extremism. |
| 379. | Sharif Battikhi was a MOIA propagator <span style="color:black">██████████████████████████████</span> <span style="color:black">████████████████████████</span> Ex. 245, KSA 0553 at 554, (Ammar Dep. Ex. 448, September 2003 letter from Deputy Minister Ammar listing Battikhi as a MOIA employee being "terminated"); <span style="color:black">██████████████</span>; Ex. 382, DOJ 0010. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br><span style="color:black">████████████████████████████</span> *See* Objections Chart.<br><br>The cited portion of Plaintiffs Exhibit 2N (EO 692-93) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 245 (KSA 553) shows that Battikhi was employed by the Ministry of Islamic Affairs but does not state that he reported to or worked under Fahad Al Athumairy. Thumairy testified that although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy Tr. 157:10-159:1. There is no admissible evidence to the contrary.<br><br>He also testified that he did not know whether Sharif Battikhi was employed by the Ministry of Islamic Affairs. *See* Thumairy Tr. 204:15-17. |
| 380. | Battikhi visited Thumairy once a month and Thumairy handed funding checks to him. Ex. 107, Thumairy Dep. 206:4-11, 206:23-207:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Thumairy's testimony contradicts Plaintiffs' assertion that Battikhi "visited Thumairy." Thumairy recalled a "Sharif" who was at the Mosque once per month "to give Friday sermon," as arranged by Shuaib. *See* Thumairy Tr. 205:1-5. Thumairy would give this person a check on these occasions. *Id.* at 206:7-11. |
| 381. | ███████████████ and the MPS production includes a Bayoumi videotape in which Battikhi can be seen at the ICSD Mosque. Ex. 2, EO ████ Ex. 10B (MPS890-CLIP Video Exhibit) 30:15; Ex. 5, Youssef Rpt. at ██ ██ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2N (EO 692-95) and Plaintiffs Exhibit 2S (EO 1759-60) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs' assertion that ████████ previously served as Imam of the ICSD Mosque relies solely upon such of inadmissible hearsay, namely a June 18, 2004 FBI summary memorandum providing "investigative |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | updates" for ██████ and two others who were named by an unidentified individual as "Saudi supported propagators living in San Diego." Pls. Ex. 2N (EO 692).<br><br>Plaintiffs' assertion that Al Bayoumi ████████████ ████ also rests on inadmissible hearsay, namely a September 24, 2001 FBI memorandum purporting to summarize an interview of ██████ ██████ *See* Pls. Ex. 2S (EO 1759-60). In that interview, ██████ admitted that he "never had a direct conversation with" Al Bayoumi, but also allegedly told the FBI that "he had seen [Al Bayoumi] in conversations with ████████." *Id.* at EO 1759. This does not establish a relationship.<br><br>Plaintiffs also cite a video in which ██████ can allegedly be seen at the ICSD Mosque. Al Bayoumi testified of ████████ "I didn't have a relationship with him, but I knew he was at the mosque, at the Islamic Center." Pls. Ex. 120 (Bayoumi Tr.) at 504:8-15. Again, presence at the ICSD does not establish a relationship with Al Bayoumi. |
| 382. | ████████████████████████████████████████████████████████████████ | Plaintiffs Exhibit ██ is inadmissible hearsay. *See* Objections Chart.<br><br>████████████████████████████████████████████████████████████████████████████████ |
| 383. | ████████████████, Battikhi received funds from MOIA propagator Ibrahim Al Hiber, Thumairy's predecessor | This paragraph contains improper attorney argument. Plaintiffs Exhibit 296 (KSA 8042) does not state that Battikhi worked to "propagate Wahhabi Islam in local jails." It says he was a propagators in the prisons |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at the King Fahad Mosque. According to a report from Hiber, Battikhi worked for MOIA to propagate Wahhabi Islam in local jails and at the U.S. Naval Base in San Diego. Ex. 296, KSA 8042-43 (Ex. 412). | and sea base; the word "Wahhabi" is not mentioned, and Plaintiffs' use of it is unsupported. The term "Wahhabism" is pejorative, as even Plaintiffs' expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.<br><br>Further, the document does not show that Battikhi "worked for MOIA." The evidence shows that Prince Abdulaziz, in his private capacity, asked Al Hiber to distribute donations to the individuals identified in Plaintiffs Exhibit 296 (KSA 8042). *See* Thumairy Tr. 199:11-200:10. Thus, to the extent Battikhi was a propagator in local jails, funding to do so came from private charitable donations, not as part of any work for MOIA. |
| 384. | | Plaintiffs Exhibit ███████, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent this allegation is relevant to this case, it appears to be related to Plaintiffs' charity-centered allegations. Saudi Arabia need not respond to this paragraph because the Court dismissed those allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| 385. | Battikhi was named as an unindicted co-conspirator in the Holy Land Foundation case. Ex. 341, *U.S. v. Holy Land Foundation for Relief and Development, et al.*, CR No. 3:04- CR-240-G, Doc No. 656, Prosecution's Trial Brief and Attachment A (List of Unindicted Co- Conspirators), May 29, 2007 (Sharif Battikhi identified as an | To the extent this allegation is relevant to this case, it appears to be related to Plaintiffs' charity-centered allegations. Saudi Arabia need not respond to this paragraph because the Court dismissed those allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>There is no alleged connection between the Holy Land Foundation or Hamas and the 9/11 attacks. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "HLF employee[], director[], officer[] and/or representative[] in Attachment A."). | |
| 386. | ███████████████████████ | Plaintiffs Exhibit ████████ is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent this allegation is relevant to this case, it appears to be related to Plaintiffs' charity-centered allegations. Saudi Arabia need not respond to this paragraph because the Court dismissed those allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | ███████████████████████ |
| 387. | Battikhi was still working for MOIA in September 2003; at that time MOIA shut down its U.S. operations and terminated Battikhi as a MOIA employee. Ex. 245, KSA 0553-54 (Ex. 448). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs Exhibit 245 (KSA 553) says Battikhi was a contractor in the charity section, where the evidence shows that he received private charitable donations from Prince Abdulaziz. *See* Thumairy Tr. 199:11-200:10 (Thumairy testifying about distribution of private charitable donations, carrying on from his predecessor, Hiber); Pls. Ex. 296 (KSA 8042) (Hiber listing Battikhi as a recipient of the Prince's private charitable donations). |
| 388. | Plaintiffs were not allowed to conduct discovery of Sharif Battikhi, his work | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | relationships with Thumairy and Bayoumi, his ties to Al Qaeda and other terror groups, and his involvement in the support network for the hijackers. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph is attorney argument, and it is incorrect. Plaintiffs were allowed to pursue extensive jurisdictional discovery, including to support their unfounded theories about Thumairy, Bayoumi, and the alleged support network for the hijackers. Saudi Arabia produced 5,785 documents (9,582 pages) to Plaintiffs, including voluntary productions of documents subject to the Vienna Conventions on Diplomatic and Consular Relations. The FBI produced more than 2,500 documents (more than 13,500 pages) in discovery. At Plaintiffs' request, the President then ordered a second FBI review that yielded more than 930 more documents (more than 4,000 pages). Other third parties have produced thousands more documents. Plaintiffs have taken testimony from 18 current or former officials or employees of Saudi Arabia, including current and former Ministers and Ambassadors and both Thumairy and Bayoumi. They have taken the testimony of eight third-party witnesses and obtained declarations from 11 more. |
| **IV.I.** | **MOIA propagator and Saudi agent Tajuddin Shuaib worked under Thumairy at the King Fahad Mosque.** | There is no evidence that Shuaib worked under Thumairy. While Thumairy was nominated for a position to oversee propagators, he explained that he was not aware of and never accepted the nomination, and he did not in fact supervise propagators. *See* Thumairy Tr. 143:10-148:16. |
| 389. | MOIA propagator Tajuddin Shuaib, who was a longstanding Ibn Taymiyah Foundation board member, was Khalid AlKhalil's "protégé" at the King Fahad Mosque. Ex. 72, Madha Decl. ¶ 8; Ex. 2, EO ▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2M (EO 658) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the document notes that Khalil "was a secular leader" and Shuaib was his protégé. *See* Pls. Ex. 2M (EO 658) (capitalization omitted).<br><br>Undisputed that Shuaib was a board member of the Ibn Taymiyah Foundation. |
| 390. | Shuaib was given the title of "Director" of the King Fahad Mosque, while Thumairy held the title of "Imam." Ex. 72, Madha Decl. ¶ 8. In January 1998 Thumairy was appointed as supervisor for "propagators in the State of California," which included Shuaib. Ex. 214, KSA 6903 (Ex. 404). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Thumairy was imam at the Mosque and Shuaib was director. There were several imams at the King Fahad Mosque, including Shuaib, who Khalil Al Khalil, the head of the Ibn Taymiyah Foundation that ran the King Fahad Mosque, testified was a "the main imam." Khalil Tr. 99:2-14.<br><br>There is no evidence that Thumairy supervised Shuaib. While Thumairy was nominated for a position to oversee propagators, he explained that he was not aware of and never accepted the nomination, and he did not in fact supervise propagators. *See* Thumairy Tr. 143:10-148:16. |
| 391. | The FBI reported that Shuaib "allegedly helped Muslims who were dedicating themselves to Jihad travel into Saudi Arabia or Yemen for advanced indoctrination." Ex. 2, EO 0658. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2M (EO 658) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the hearsay on which Plaintiffs rely states that the assertion is only an allegation. There is no support cited for it. To the contrary, the document notes that Khalil "was a secular leader" and Shuaib was his protégé. *See* Pls. Ex. 2M (EO 658) (capitalization omitted). |
| 392. | Although Shuaib was a MOIA propagator working at the King Fahad Mosque alongside Thumairy, Saudi Arabia did not produce his personnel files. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, there is no evidence cited in this paragraph.<br><br>Saudi Arabia fully complied with its discovery obligations in this case. |
| **IV.J.** | **MOIA propagator and Saudi agent Mohamed Al Muhanna worked as Thumairy's assistant.** | Plaintiffs' assertion that Muhanna was a "Saudi agent" is unsupported and untrue. He was a Ministry of Islamic Affairs employee who, after the hijackers had already left California, came to work at the King Fahad Mosque. KSA Ex. 172 (KSA 1277). He "was the Imam of the mosque when" Thumairy was away. And when Thumairy "returned, he continued to be like an assistant imam." He was "[a]n assistant of the Imamate at the mosque," not for Thumairy personally. Thumairy Tr. 228:18-24. |
| 393. | In late 2000, as Thumairy's five-year appointment in Los Angeles was coming to an end, MOIA had picked Mohamed Al | The first sentence is undisputed, and Plaintiffs Exhibit 289 also states that Thumairy "is widely accepted by the Muslim community." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Muhanna to be Thumairy's assistant. In November 2000, Sowailem sent a letter urging that Thumairy's term be extended, stating that Thumairy "is one of the best and distinguished propagators." Ex. 289, KSA 6995 (Ex. 461). Muhanna, like Thumairy, was well-connected to the Saudi Arabian Government. Ex. 566, FBI 011752-11767 at 11754 (Muhanna and Thumairy used their "influence" to keep ███████ at the Saudi Consulate. At the urging of MOIA Embassy Director Khalid Al Sowailem and Embassy Deputy Musaed Al Jarrah, however, MOIA decided to extend Thumairy's term in Los Angeles. Ex. 257, KSA 1256 (Ex. 423, handwritten note of Jarrah requesting the urgent attention of the Ambassador to Thumairy's extension). In March 2001, Ambassador Bandar wrote to MOIA's Minister Sheikh to request that Thumairy's term be extended and that a second MOIA propagator be named to "assist" Thumairy. Ex. 248, KSA 0589 (Ex. 204). | Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart. There is no evidence that Al Thumairy or Al Muhanna were "well-connected" to the government. To the contrary, the Minister of Islamic Affair testified: "I don't know [Thumairy.] I don't know him then [at the time of his appointment], and I don't know him now." Turki Tr. 124:21-24-125:1; *see also id.* at 126:9-21 (testifying that even though a senior official or minister would ultimately approve appointments by separate offices, this "doesn't mean, actually, you know the person personally"). Al Thumairy acknowledged that he saw Minister Turki "in many gatherings," but he did not "personally remember that I spoke with him. I don't remember. It could be just a greeting." Thumairy Tr. 28:18-29:7.

The assertion that Al Thumairy or Al Muhanna used their "influence" to keep ████ in place is based on "reporting" and not an FBI finding, and it is contradicted by the record. Thumairy testified that he could not remember ████. Thumairy Tr. ████████████████████ ███████████████████████████████████████

Undisputed that Al Sowailem asked the Ministry of Islamic Affairs to extend Al Thumairy's term, and that the Ministry did so.

Undisputed that the Ambassador wrote to Minister Al ash-Sheikh to request an extension for Al Thumairy because of his work "in serving the community" and that, "given the expanding area," "it will be good to delegate an assistant." |
| 394. | Muhanna, the man that MOIA chose as Thumairy's assistant and planned-successor, was an Imam Mohamed University graduate who King Fahad Mosque employee Usman Madha described as "a young, hot-headed, radical man who | The cited portion of the Madha Declaration is not based on personal knowledge and is inadmissible. *See* Objections Chart. *See also* Madha Tr. 45:7-11 ("So you did not have any conversation with Mr. Muhanna in which he expressed radical views to you, correct? Not to me personally."); *id.* at 46:13-16 ("[D]id Mr. Muhanna ever tell you that he was a devoted follower of Mr. Thumairy? No."). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | was a devoted follower of Mr. Al-Thumairy." Ex. 72, Madha Decl. ¶18-22; Ex. 128, Madha Dep. 61:24-62:4 (Muhanna was "always in the company of Mr. Thumairy"). | |
| 395. | Shortly after the 9/11 Attacks, Muhanna gave a sermon at the King Fahad Mosque in support of the 9/11 hijackers which led to his removal from the Mosque's management. Ex. 2, EO 3504; Ex. 128, Madha Dep. 68:3-70:22. | Plaintiffs Exhibit 2CC (EO 3504, is inadmissible hearsay. *See* Objections Chart. Madha's testimony regarding Muhanna's sermon is inadmissible hearsay. *See* Madha Tr. 46:17-47:2 (Mr. Madha admitting that his declaration contained references to a sermon Mr. Muhanna delivered in Arabic, when Mr. Madha does not understand Arabic); *id.* at 47:16-20 ("So you statement is based on Mr. Shuaib's impression and not your own personal impression of the sermon, correct? Correct."). The cited portion of Madha's deposition is also based on hearsay. *Id.* at 69:1:9 (Madha relaying what Mr. Shuaib told him about a sermon in a language Madha could not understand). The cited materials do not reference Muhanna being removed from the Mosque, and the evidence shows that his removal was based on "information they received from Mr. Khalid Sharif . . . who is of Syrian origins and was one of those barred from entering the mosque last year for causing trouble." *See* KSA Ex. 292 (KSA 1230). Consul General Salloum further states that Kaldirim and Khalil "are both working together . . . to give the position of imam to someone from another nationality." *Id.* at KSA 1231. Salloum concluded that because "the decision made about [Muhanna] was entirely based on rumors from one of the people in the community without being verified. . . . We hope you write to the Minister of Islamic Affairs to make him aware of this development and to return [Muhanna] to his job." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 396. | Saudi Arabia provided diplomatic privileges for Muhanna like those arranged for Thumairy, even though he did not work at the Embassy or Consulate. MOIA records show that Muhanna formally started work at the Mosque on April 3, 2001 (although it is unclear how long he was in Los Angeles prior to that date). Ex. 72, Madha Decl. ¶ 19; Ex. 680N, KSA 7349; Ex. 680R, KSA 7711. | Undisputed that Al Muhanna began working at the Mosque by April 3, 2001.<br><br>Plaintiffs Exhibit 680R does not show that Muhanna never worked at the Embassy or Consulate, and it does not show that Muhanna actually obtained diplomatic privileges, though it does show that Al Sowailem asked the Ministry of Islamic Affairs to instruct the mission to request "diplomatic cards for him and his family."<br><br>The cited portion of the Madha Declaration does not support Plaintiffs' assertions in this paragraph. Undisputed that Al Muhanna started work at the King Fahad Mosque many months after the hijackers left California. There is no evidence (or allegations) that Al Muhanna ever had any contact with the hijackers or had even heard of them. |
| 397. | The FBI's July 2021 EC concluded that Muhanna was "a leader and spiritual guide amongst a militant group that separated from the King Fahad Mosque"; "a close associate of Althumairy"; and "a Sunni Islamic extremist associated with a radical form of the Salafi ideology." Ex. 2, EO 3504.The EC also confirmed that after the 9/11 Attacks, Muhanna gave an "inflammatory speech at the King Fahd Mosque" that was "calling for jihad." Ex. 2, EO 3504-5. | The cited portion of Plaintiffs Exhibit 2CC (EO 3504-05), is inadmissible hearsay. *See* Objections Chart.<br><br>That document states that "[t]he purpose of this communication is to consolidate information related to the involvement of personnel and entities controlled by the Saudi Arabian Government ("SAG"), the Embassy of the Kingdom of Saudi Arabia (EKSA) and its affiliates within the United States with the attacks of September 11, 2001. . . . The report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479) (emphasis added). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at EO 3481. |
| 398. | The FBI's May 2021 EC found that Muhanna and Thumairy, were under the direction of the Embassy and part of the | This assertion is improper attorney argument and is contradicted by the record. In fact, the FBI's final conclusion is that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi government's extremist network in Southern California. Ex. 2, EO 0004. | furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>The FBI did not conclude that there was an extremist network in Southern California or that Thumairy and Muhanna were part of such a network or that they were under direction from the Embassy. The document references a single confidential human source, or "CHS," and allegations of extremism and a network in Southern California but concludes that "[n]o additional information was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5). The investigation into this issue "was closed in July 2007," *id.* at 5, with the conclusion that the FBI identified no individuals or groups responsible for the 9/11 Attack who had not been charged. Al Thumairy and Al Muhanna were never charged. |
| 399. | The EO production also disclosed that the FBI concluded that Muhanna "was trained by ALTHUMAIRY but was not as savvy." Ex. 2, EO 3613. | Plaintiffs Exhibit 2DD (EO 3612-16) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs misrepresent the document. It is not an FBI conclusion and does not purport to be. Rather, the document is labelled "Confidential Human Source Reporting," which is not a conclusion or even an allegation that has been investigated. |
| **IV.K.** | **Saudi Consulate Islamic Affairs Secretary, agent and official Ismail Mana was assigned to assist Thumairy at the Mosque and was a core member of Thumairy's extremist group.** | There is no proof that Mana was an "agent" other than his employment at the Los Angeles Consulate.<br><br>Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4.<br><br>There is no evidence that he was assigned to assist Thumairy at the Mosque. Mana worked at the Consulate, not the Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy had no extremist group. *See supra* ¶ 398. *See also* Thumairy Tr. 525:19-23. |
| 400. | [REDACTED] Mosque employee Usman Madha testified that he observed that Mana and Thumairy were close, and that Mana was part of Thumairy's extremist group which regularly met in the library of the Mosque. Ex. 72, Madha Decl. ¶ 19. Mana had "a fierce hatred of non-Muslims and held anti- America beliefs." Ex. 72, Madha Decl. ¶¶ 19-20. | Al Thumairy had no staff of propagators. While Al Thumairy was nominated for a position to oversee propagators in California, he explained that he was not aware of and never accepted the nomination, and he did not in fact supervise propagators. *See* Thumairy Tr. 143:10-148:16. There is no evidence such as reports or reviews of propagators by Al Thumairy to support Plaintiffs' assertion, nor is there testimony or evidence from propagators showing any supervision.<br><br>To the extent it is used for its truth, Plaintiffs Exhibit [REDACTED] is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart.<br><br>Al Thumairy testified that the statement is incorrect and that he did not recall saying this to the FBI. *See* Thumairy Tr. [REDACTED].<br><br>Plaintiffs' statement that Mana was "Secretary" is inaccurate. Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4.<br><br>Madha's testimony regarding the alleged "group" in ¶ 19 is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17.<br><br>Plaintiffs' allegation of an extremist group is inaccurate. *See supra* ¶ 398. *See also* Thumairy Tr. 525:19-23.<br><br>Madha's second-hand observation and assertion that Mana and Al Thumairy were close is contradicted by both men. Al Thumairy testified that he could not remember Mana but that he "may have been one of the employees [at the Consulate] at the time. Right now, I don't remember |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | him." Thumairy Tr. 219:7-13. Mana testified that he did not know who Al Thumairy was working for, Mana Tr. 66:23-67:4, did not work with Al Thumairy, *id.* at 72:18-20, that there was no regular group of people who spoke with Al Thumairy, *id.* at 77:15-25, and that his contact with Al Thumairy was limited to seeing him "when he g[a]ve the sermon," "sometimes" when Mana would "stop by after work to pray," and "sometimes" when Mana would translate. *Id.* at 84:22-85:8.<br><br>Madha's accusations about Mana's beliefs in ¶ 19 are inadmissible and not based on personal knowledge. *See* Objections Chart. Indeed, Madha admitted that his declaration is not based on his personal knowledge but on what he "learned." Pls. Ex. 72 (Madha Ex. 830) ¶ 19.<br><br>Mana also testified: "al Thumairy, I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Mana Tr. 247:3-7.<br><br>Regarding the accusation that Mana was anti-American or hated non-Muslims, Mana testified: ██████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████ This is nonsense. This is nonsense. I have never been involved with terrorists, never directed anyone, never given any direction to anyone or a statement that, you know, encourages these individuals to commit their crimes. I abhor these acts. . . . ████████████████████ ██████████████████████████████████ Mana Tr. 219:10-220:3. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 401. | ██████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit ██████████ is inadmissible hearsay. |
| | | To the extent a response is required, the document also does not state why or how ███████ ████████████████████████████████████, Mana testified that he disavowed any extremism: |
| | | ████████████████████████████████ ████████████████████████████████ ████████████████████████████ This is nonsense. This is nonsense. I have never been involved with terrorists, never directed anyone, never given any direction to anyone or a statement that, you know, encourages these individuals to commit their crimes. I abhor these acts. . . . ████████████████████ Mana Tr. 219:10-220:3. |
| 402. | ██████████████████████████ | Plaintiffs Exhibit ████████████ is inadmissible and contains multiple levels of hearsay. *See* Objections Chart. |
| | | The accusations against █████ are based on anonymous "source reporting" that was not substantiated. Plaintiffs Exhibit ████████████) is not an FBI finding or conclusion, but is an "update" on an ongoing investigation. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . | The FBI's final conclusion is that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>Other aspects of Plaintiffs Exhibit ▮▮▮▮▮▮▮▮▮ show it is not reliable. For example, the document states that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ but that is contradicted by the record. Al Thumairy testified that he could not remember Mana but that he "may have been one of the employees [at the Consulate] at the time. Right now, I don't remember him." Thumairy Tr. 219:7-13. Mana testified that he did not know who Al Thumairy was working for, Mana Tr. 66:23-67:4, did not work with Thumairy, *id.* at 72:18-20, that there was no regular group of people who spoke with Al Thumairy, *id.* at 77:15-25, and that his contact with al Thumairy was limited to seeing him "when he g[a]ve the sermon, "sometimes" when Mana would "stop by after work to pray," and "sometimes" when Mana would translate. *Id.* at 84:22-85:8. |
| 403. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | Plaintiffs Exhibit ▮▮▮▮▮▮▮▮ is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Moreover, Plaintiffs Exhibit ▮▮▮▮▮▮ is not an FBI finding or conclusion, but is ▮▮▮▮▮ on an ongoing investigation. The FBI's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████████████ | final conclusion is that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 404. | The Mosque's Board President Khalil al Khalil admitted that Mana embraced such conservative views that in 1998 the Mosque's Board decided to bar Mana from participating in Mosque activities. Ex. 113, Khalil Dep. 235:23-236:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs' assertion misrepresents the testimony. In the cited testimony, Khalil did not say anything about "conservative views" or that Mana's "views" had anything to do with the Mosque's decision not to have Mana lead prayers at the Mosque: "[D]id he ever officiate in terms of giving the prayer at the moque? He tried, but he wasn't allowed. So he did try, as you say, to lead the prayer at the mosque? Yes. And when you say he wasn't allowed, what does that mean? What happened? Means we – the management was not – based on the selection of the board not allow him to teach or to lead the prayers at King Fahad Mosque. Who made that decision? Board of trustees. All of you together? Not really together, but we were discussing it and that decisions was there and implemented." Khalil Tr. 235:23-236:18.

Plaintiffs' assertion that the Board "decided to bar Mana from participating in Mosque activities" is inaccurate. He was not allowed to lead prayers for a period of time, but there is no evidence he was "barred" from activities generally.

Khalil did mention conservative views later in the transcript, but he explained that by this he meant Mana was socially conservative and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | believed in homeschooling and particular roles for women. *Id.* at 237:8-16 ("[H]e wasn't allowing his kids to study in the schools, public or private . . . . His views were considered by us as very conservative. That's it."); *id.* at 13-24. |
| 405. | Khalil testified that even several years before the 9/11 Attacks the Board was concerned about behavior or thinking when it comes to the Islamic ideologies, we were so concerned about anybody will be active or will be conducting some activities, because we didn't see him [Mana] as a good example." Ex. 113, Khalil Dep. 235:23-238:24, 240:10-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs' misrepresent Khalil's testimony, which had nothing to do with terrorist attacks or ideologies supporting such attacks. Khalil referenced Mana's "conservative" views as the reason he was not allowed to give sermons but explained that he meant only that Mana was socially conservative and believed in homeschooling and particular roles for women. *Id.* at 237:8-16 ("[H]e wasn't allowing his kids to study in the schools, public or private . . . . His views were considered by us as very conservative. That's it."); *id.* at 13-24. |
| 406. | The documentary proof and other testimony, however, show that no restrictions were placed on Mana's activities at the King Fahad Mosque until well *after* the 9/11 Attacks. To the contrary, before the 9/11 Attacks, Mana was assigned by Saudi Consul General and Board Mosque member Salloum to handle various activities at the Mosque. These included overseeing the Mosque's finances and distributing the money provided by Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, there is no contradiction between the Board's decision and Mana's activities. The Board decided in 1998 that Mana should not "teach or . . . lead the prayers." Khalil Tr. 236:9-12. There is no evidence that he did so immediately after that decision. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabia to pay the bills and employee salaries of the Mosque. Ex. 72, Madha Decl. ¶ 13; Ex. 217, KSA 7194 (Ex. 609, spreadsheet prepared by Mana related to Mosque employees and expenses); Ex. 292, KSA 7193 (Ex. 608, memo from Mosque to "Sheikh Ismail Mana" concerning Mosque employees). | The Board did not ban Mana from all activities as Plaintiffs imply.<br><br>Moreover, the Consul General was not acting as a Board member. Plaintiffs Exhibit 179 shows that the Consul General was added to the Board (by title, not name), but that prior to the 9/11 attacks he (along with the holders of the other 6 Saudi titles added to the board) "were removed because they were inactive, *see* Plaintiffs Exhibit 186 (Kaldirim Ex. 185) ("the newly elected board members . . . have never attended any annual meetings;" "there has been no participation . . . by the new board members").<br><br>Consul General Salloum did not, and could not, have selected Mana to lead prayers in contravention of the Board's 1998 decision. He also did not ask Mana to "oversee the Mosque's finances." He did ask Mana to ensure that private donations from Saudi Royalty were distributed to the Mosque for Mosque expenses and not misdirected. Mana was *not* distributing money "provided by Saudi Arabia" but rather, private donations. Those donations were kept separate from Consulate money. *See* Responses to ¶¶ 328-329.<br><br>There is evidence that Mana eventually was allowed to lead prayers occasionally, but there is no indication that the Board disapproved of this decision. Mana Tr. 84 ("[S]ometimes I did sermons *when I'm invited to give a sermon*."). To the contrary, the manager of the Mosque and longtime board member Shuaib was the one who made the assignment. Mana Tr. 86:11-15. |
| 407. | In addition, prior to the 9/11 Attacks, Mana performed numerous tasks for Thumairy at the Mosque, including leading the Mosque prayers on occasion, sitting at the Mosque's reception desk, and serving as Thumairy's translator. Ex. 72, Madha Decl. ¶¶ 13, 20; | The cited portion of ¶ 20 of the Madha Declaration is inadmissible hearsay. *See* Pls. 72 (Madha Ex. 830) ¶ 20 ("Mr. Al Thumairy asked Mr. Mana").<br><br>Mana did not perform tasks "for Thumairy." Mana occasionally led Friday prayers, but that was at Shuaib's discretion. Mana Tr. 84 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 110A, Mana Dep. Decl. 84:8-85:20; Ex. 217, KSA 7194 (Ex. 609, spreadsheet prepared by Mana related to Mosque employees and expenses); Ex. 95, Awad Dep. 40:10-20 (Friday prayers). | ("[S]ometimes I did sermons *when I'm invited to give a sermon*."). To the contrary, the manager of the Mosque and longtime board member Shuaib was the one who made the assignment. Mana Tr. 86:11-15 ("Actually, not Fahad al- Thumairy that invited me. There was a director, Mr. Shuaib . . . and he assigned one particular Friday for me."). |
| | | Regarding translations, Mr. Mana explained that he translated for people at the Mosque generally – he was not "Thumairy's translator". Mana Tr. 106:25-107:2 ("you did translation at the mosque? For him *and for others*, yes."). Thumairy likewise testified that "[t]here were sermons, there were many people who would translate them. One of them was Sheikh Shuaib. There was a group of people. Right now, I don't remember them." Thumairy Tr. 220:6-11. |
| | | As described in responses to ¶¶ 328-329, any work Mana performed related to Mosque expenses was separate from his work at the Consulate and done to assist the Consul General (not Thumairy) in properly administering private charitable donations for the Mosque. |
| | | Mana also referenced sitting at the Mosque's reception desk, welcoming and assisting congregants as they entered the Mosque, but there is no evidence he did this for Thumairy. Mana Tr. 84;8-19. |
| 408. | Mana's ongoing roles at the Mosque are demonstrated by the March 2001 memo from the Mosque and Ibn Taymiyah Foundation which was addressed to "Sheikh Ismail Mana," in recognition of Mana's religious work at the Mosque. Ex. 292, KSA 7193 (Ex. 608). | As described in response to ¶ 407, Mana did participate in certain activities at the Mosque including occasionally giving Friday prayer and greeting people. |
| | | Plaintiffs Exhibit 292 (Mana Ex. 608) uses the term Sheikh to address Mana, but this does not demonstrate any religious work. Khalil testified that it was a mistake to address Mana as Sheikh because he did not have "the credential to be sheikh, and we [did] not recognize him to be sheikh." Khalil Tr. 239:20-240:3. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Dr. Kaldirim was asked if calling Mana Sheikh was "meant to be a sign of some respect as a religious figure? A. Yes and no." Kaldirim Tr. 124:2-4. He continued: "Ismail Mana is not a scholar or religious person . . . but he was working in the consulate, and probably Shuaib might, you know, to be kind, nice to him, so that he can bring the money . . . . That's why he might have called him sheikh. But he is not a sheikh. It's just honorary Shuaib to call him" that. *Id.* at 124:13-125:1. |
| 409. | Khalil claimed that the giving the title "Sheikh" to Mana in March 2001 memo was a "mistake" and "wrong" because "he [Mana] doesn't have the credential to be sheikh, and we are not recognize [sic] him to be sheikh." Ex. 113, Khalil Dep. 239:14-240:3. Yet Usman Madha and Deputy Consul General Awad acknowledged that prior to the 9/11 Attacks they saw Mana leading the Friday prayers and giving sermons at the King Fahad Mosque. Ex. 72, Madha Decl. ¶ 20; Ex. 95, Awad Dep. 40:10-20. | Undisputed that Khalil testified as described. Dr. Kaldirim also explained this issue. He was asked if calling Mana Sheikh was "meant to be a sign of some respect as a religious figure? A. Yes and no." Kaldirim Tr. 123:2-4. He continued: "Ismail Mana is not a scholar or religious person . . . but he was working in the consulate, and probably Shuaib might, you know, to be kind, nice to him, so that he can bring the money . . . . That's why he might have called him sheikh. But he is not a sheikh. It's just honorary Shuaib to call him" that. *Id.* at 124:13-125:1. <br><br> Mana did occasionally lead Friday prayers at Shuaib's discretion. Mana Tr. 84 ("[S]ometimes I did sermons *when I'm invited to give a sermon.*"); *id.* at 86:11-15 (Shuaib assigned prayers). |
| 410. | Indeed, in March 2002, Consul General Salloum wrote to MOIA Deputy Minister Abdulaziz Ammar to support Mana's request for funding from MOIA, citing an "appointment" that Ammar had with Mana during Ammar's visit to the King Fahad Mosque, which occurred in September 2000. Ex. 291, KSA 7146 (Ex. 607). Mana asked Ammar for money to allow Mana to | Salloum's letter in March 2002 was not supporting Mana's request for funding for Mana. Salloum asked Ammar "to put forth your good efforts to resolve the issue of the salary check for the mosque's employees." Mana was not a mosque employee. <br><br> Separately, Mana did ask Ammar for money to help bring religious counsel to people "in the jails of California," specifically "to cover the expenses of travel, accommodation, publications, mandatory health insurance for propagators in jails, and other administrative expenses." *See* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | pursue "propagation" activities inside California. Ex. 110A, Mana Dep. 93:1-6. | KSA Ex. 173 (KSA 7151). Mana "never received any feedback" from the Ministry on this request. Mana Tr. 92:18-93:6.<br><br>Mana also testified that he did not recall the "appointment" referenced in Plaintiffs Exhibit 291 (which is referenced as Plaintiffs Exhibit 607 in his deposition). Mana Tr. 94:13-96:3. |
| 411. | Mana stated that it was not until about 2005 that he was terminated by the Mosque's Foundation from mosque activities. This was around the same time that Mana was fired from the Saudi Consulate. Ex. 110A, Mana Dep. 223:4-15; 233:9-234:21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Mana was not fired. "Well, I was laid off. I wasn't fired for any mistake or any error or wrongdoing or anything." Mana Tr. 223:6-7.<br><br>There is also no evidence mana was "terminated by the Mosque's Foundation from mosque activities" in 2005. Similar to Dr. Khalil's testimony that Mana was told not to lead prayers in 1998 at the Board's direction, *see* Khalil Tr. 235:23-236:18, Dr. Kaldirim testified that Mana volunteered to give prayers a couple of times, and "[w]e saw that he was leading the prayer. We said, no. You are not allowed." Kaldirim Tr. 123:4-17. Kaldirim did not testify that this occurred in 2005, and there is no evidence of any action by the Foundation or Board in 2005. Niether Kaldirim nor Khalil testified that Mana was "terminated" from "mosque activities." He was told not to lead prayers.<br><br>It is unclear whether Mana received any new instructions in 2005 from the Foundation or anyone from the Mosque. Mana testified that 2005 was the last time he gave a sermon, but there is no indication he was excluded |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | from the Mosque or told he could not participate in prayers. Mana Tr. 233:21-234:21. |
| **IV.L.** | **Thumairy led the extremist cell at the King Fahad Mosque with Consulate Secretary Mana and Muhanna joined the group once he arrived in Los Angeles.** | Thumairy had no extremist cell at the Mosque. *See supra* Response to ¶ 398. *See* Thumairy Tr. 525:19-23.<br><br>Mana was not part of any group with Thumairy, and there was no group of the kind Plaintiffs allege for Muhanna to join. *See* Mana Tr. 77:15-25.<br><br>Mr. Mana's title was "translator," not "Islamic Affairs Secretary." Mana Tr. 54:3-4. |
| 412. | Thumairy was the leader of a group that "held extreme, radical, and anti-American views" and Thumairy himself was "hostile to Americans and Western culture, as well as anyone, including other Muslims, who did not follow Wahhabi beliefs." Ex. 72, Madha Decl. ¶ 18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's declaration discussing the alleged "group" was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, and is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17.<br><br>Madha's accusations about Al Thumairy's beliefs in ¶ 18 are inadmissible and not based on personal knowledge. *See* Objections Chart. Madha testified that Al Thumairy's prayers and sermons were in Arabic, that he understands very little Arabic, that he was not able to understand Al Thumairy's sermons, and that he never heard Al Thumairy express any support for terrorism. Madha Tr. 37:13-38:17. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Madha's accusations of an extremist group led by Al Thumairy are inaccurate. *See supra* ¶ 398. Al Thumairy denied them. *See also* Thumairy Tr. 525:19-23; *id.* at 227:11-19 (referring to Madha's statement as "a fabrication"). And Mana (who, unlike Madha, speaks Arabic and so was able to understand Al Thumairy's sermons) testified of Al Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Mana Tr. 247:3-7. |
| | | Al Thumairy further testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8. |
| | | Al Thumairy testified that he was not an "extremist Wahhabi cleric." Thumairy Tr. 522:10-13. |
| | | Moreover, Madha testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Madha Tr. 60:18-61:18. |
| 413. | Thumairy's extremist group "included Khaled Al Cherif (aka Khaled Abu Suleiman), Abdu Ghanem, Mustapha Kamel, Khalid Jalloud, Gamal Nagy, Abdul Hafiz Kebhaj (aka Abu Suhaib), Ismail Mana, and Mohamed Al Muhanna." Ex. 72, Madha Decl. ¶ 26. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Madha's declaration discussing the alleged "group" was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, and is inadmissible hearsay and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17.<br><br>Moreover, Declaration ¶ 26 describes a "group of protestors" including the invidiuals named, but Thumairy was not there. Madha Tr. 39:21-40:9.<br><br>To the extent a further response is required, as explained above, Thumairy did not have or lead an extremist group. *See supra* Response to ¶ 412. And he certainly did not "lead" the men identified. Indeed, while he vaguely recalled some of the names listed, he did not recall others at all. Thumairy Tr. 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem); *id.* at 219:7-13 (no recollection of Mana, but he "may have been one of the employees" at the Consulate at the time); *id.* at 244:19-245:10 (no recollection of Kebhaj but vaguely recalled a muezzin at the mosque . . . by the name of Abdelhafiz"). |
| 414. | ███████████████████████ ████████████████ At that time, the cell was led by the "Blind Sheikh" Abdul Rahman. Ghanem and ████ escorted Rahman around Los Angeles weeks before he was arrested for a wide-ranging terror conspiracy involving the 1993 World Trade Center bombing and other planned attacks on New York City resulting in his conviction and life imprisonment. Ex. 5, Youssef Rpt. 21, n.13. | The Youssef report should be excluded. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Youssef also cites nothing to show that ███████ ████████████████████████████████<br><br>The citation in Youssef's report (n.13) does not mention ████<br><br>Regardless, the alleged events took place years before Thumairy arrived. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 415. | ████████ was described by the FBI as "close associate of Thumairy" and a "hardcore, militant individual who supported the events of 9/11." Ex. 566, FBI ████████ at ███. The FBI also identified ███████ ████████████████████ ████████████████████ ████████████████████ ██████████ Ex. 566, FBI ████████ (2016 FBI Operation Encore report). | Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart.<br><br>The assertions quoted appear in the text, but they are attributed simply to "source reporting." The assertions are not an FBI finding or conclusion. Plaintiffs Exhibit 566 (FBI 11752) itself is an "update" on an ongoing investigation. The FBI's final conclusion is that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>Bayoumi did not "h[o]ld a meeting with the 9/11 hijackers" at the Mediterranean Restaurant. He had a chance encounter with them. There is no evidence that Bayoumi traveled to Los Angeles to meet the hijackers. Bayoumi and Morgan testified that this was a chance encounter. Bayoumi Tr. 725:19-8; Morgan Tr. 28:21-13 (testifying that he has no "personal knowledge of any facts indicating that Omar Al-Bayoumi's encounter with Nawaf Al Hazmi and Khalid al-Mihdhar at the restaurant in Los Angeles was anything other than a coincidence.").<br><br>Plaintiffs Exhibit 566 (KSA 11755) also states that ████████ ████████ at the time of the encounter. *See* Pls. Ex. 566 (KSA 11755). |
| 416. | Plaintiffs' expert ████████ ████████████████████ ████████████████████ ████████████████████ ██████████ Ex. 5, Youssef Rpt. 53-54. The 2016 FBI Operation Encore report cites the "close | The Youssef report should be excluded. Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>While Youssef purports to base his opinion on an investigation he was involved in, the FBI has asserted that as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | connectivity" of ███████ to Abdel Rahman. Ex. 566, FBI ████████████. | substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>The other sources Youssef cites are a newspaper article, which is inadmissible hearsay, and Plaintiffs Exhibit 566 (FBI 11764), which is also inadmissible hearsay and does not identify support for its assertion. *See* Youssef Rep. 54 n.158; *see* Objections Chart. |
| 417. | Khalil admitted to the 9/11 Commission that "[t]he Blind Sheikh…visited the mosque [the Ibn Taymiyah Mosque]" and that his followers "attempted to radicalize the mosque." Ex. 90, Snell Decl., Ex. 5 at 7. | Plaintiffs Exhibit 90 (Snell Decl. Ex. 5) at 7, is inadmissible hearsay. *See* Objections Chart.<br><br>The cited material also says that the alleged attempt to radicalize the Mosque occurred in 1990, years before Thumairy arrived. Demonstrating that Mosque leadership was not likeminded, this attempt "alarmed the mosque leadership, and they didn't want to accept anyone from that school of thought." Allegedly, "[t]here was another effort not too long before 9/11," when "[f]our individuals were thrown out of the mosque." Thumairy was *not* one of those individuals. Pls. Ex. 90 (Snell Decl. Ex. 5) at 7-8. According to the 9/11 Commission's interview notes, Khalil said Thumairy was " 'regular' " and "[t]here was nothing unusual in terms of his religiousness or practice of Islam." *Id.* at page 5. |
| 418. | Khalil stated that "not too long before 9/11" there was a group of individuals at the King Fahad Mosque who "were extreme." Ex. 90, Snell Decl., Ex. 5 at 8. Khalil specifically recalled several names of the members of the extremist group: "a Libyan named 'Abu Sulaiman,'" and "a Yemeni named 'Abdu'" and Khalil also provided the name of "Khalid Cherif." *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Decl. Ex. 5) at 8, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited material also says that the alleged attempt to radicalize the Mosque occurred in 1990, years before |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy arrived. This attempt "alarmed the mosque leadership, and they didn't want to accept anyone from that school of thought." The document does state that, "[t]here was another effort not too long before 9/11," when "[f]our individuals were thrown out of the mosque." Al Thumairy was *not* one of those individuals. Pls. Ex. 90 (Snell Decl. Ex. 5) at 7-8. According to the 9/11 Commission's interview notes, Khalil said Al Thumairy was " 'regular' " and "[t]here was nothing unusual in terms of his religiousness or practice of Islam." *Id.* at page 5.<br><br>Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Khalil Tr. 388:3-393:4. |
| 419. | The two individuals Khalil identified – "Khalid Cherif" aka "Abu Sulaiman," and "Abdu" Ghanem – match the members of extremist group led by Thumairy according to Madha. Ex. 72, Madha Decl. ¶ 26. ███████ ███████████████████████████ the Ibn Taymiyah Mosque when Thumairy's immediate predecessor Ibrahim Al Hiber was the Imam. Ex. 5, Youssef Rpt. 20-21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections chart.<br><br>The names identified from Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 8, are based on inadmissible hearsay. *See* Objections Chart. Further, that exhibit does not identify Abdu as Ghanem.<br><br>Madha's declaration discussing the alleged "group" was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, and is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17. |
| | | To the extent a response is required, the evidence contradicts Plaintiffs' speculation that Thumairy led Cherif, Ghanem, or a group of extremists. Declaration ¶ 26 describes a "group of protestors" including the invidiuals named, but Thumairy *was not there* and Madha never saw him at the Mosque again. Madha Tr. 39:21-40:9. Thumairy vaguely recalled other members of the alleged group, he did not recall Cherif or Ghanem. Thumairy Tr. 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem). |
| | | Plaintiffs Exhibit 90 (Snell Decl. Ex. 5) at 8, also *does not* list Thumairy as one of the individuals Al Khalil characterized as "extreme" and who attempted to take over the mosque before 9/11. *See* Pls. Ex. 90 (Snell Decl. Ex. 5) at 7-8. Further, according to the 9/11 Commission's interview notes, Khalil said Thumairy was "'regular' " and "[t]here was nothing unusual in terms of his religiousness or practice of Islam." *Id.* at page 5. |
| | | Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Khalil Tr. 388:3-393:4. |
| 420. | Khalil also independently confirmed, as Madha described, that the extremists met in the library at the King Fahad Mosque. Ex. 113, Khalil Dep. 55:22-58:7. Khalil stated | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that "[t]hose extremists were… thinking that if they have their hands in the mosque, they could really get more recruitment for their camps or for their ideology." Ex. 113, Khalil Dep. 56:9-14. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Khalil did *not* confirm what Madha described. Khalil described certain "really small groups, but they were annoying in the mosques, trying to be rebellious." "We stopped some of them. Excluded some of them. *We banned some of them before September 11th*." Khalil Tr. 56:9-19 (emphasis added). This makes clear that Khalil was talking about groups that were removed from the Mosque – an action that was never taken against Thumairy – consistent with the 9/11 Commission interview Plaintiffs cited above. *See* Pls. Ex. 90 (Snell Decl. Ex. 5) at 7-8 ("[t]here was another effort not too long before 9/11," when "[f]our individuals were thrown out of the mosque." Thumairy was *not* one of those individuals.); *see id.* at page 5 (Thumairy was " 'regular' " and "[t]here was nothing unusual in terms of his religiousness or practice of Islam.").<br><br>Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Khalil Tr. 388:3-393:4.<br><br>Thus, Khalil's testified that there was a group at the Mosque with conservative, but not violent views, that the Board found problematic, that their leaders were removed, and that Thumairy was not part of that group or its leadership. *See* Khalil Tr. 56:23-58:24 (describing them as a "[g]roup of visitor – those people who come to pray in the mosque [Thumairy was not a visitor]. Some of them from Yemen, some from Syria, some from this place or this place. . . . They are against America, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *against Saudi Arabia*. . . . I can't call them jihadists, but they tend to think that . . . they are the ones who are close to God and others are not . . . . So when we notice that, we worked hard to really see how to deal with them. . . . [S]ome of them had to be banned. . . . We tried to work to identify the names and to understand who were the guys who were . . . *leading those groups*, then they were banned. . . [A]nd we handed the police, so of, you know, the names." |
| 421. | Khalil claimed that the extremists started "immediately after the inauguration" (in July 1998) and "[t]hat they were really growing..." and that "[w]e tried to work to identify the names and to understand who were the guys who were dangerous or leading those groups…." Ex. 113, Khalil Dep. 58:13-21: 114:24 -115:1 (the inauguration was in July 1998). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Khalil and the Mosque leadership took steps to expel the leaders of any groups within the Mosque that they deemed too conservative, and that Khalil testified he noticed one such group in 1999 and banned its leaders. Notably, Thumairy was not among those leaders, and no actions were taken against him, confirming that, to the extent there was any group at the Mosque deemed too conservative, Thumairy was not part of it or its leader. *See* Khalil Tr. 56:9-19 (emphases added) (Khalil described certain "really small groups, but they were annoying in the mosques, trying to be rebellious." "We stopped some of them. Excluded some of them. *We banned some of them before September 11th*."); *id.* at 56:23-58:24 (describing the extremists as a "[g]roup of visitor – those people who come to pray in the mosque [Thumairy was not a visitor]. Some of them from Yemen, some from Syria, some from this place or this place. . . . They are against America, *against Saudi Arabia*. . . . I can't call them jihadists, but they tend to think that . . . they are the ones who are close to God and others are not . . . . So when we notice that, we |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | worked hard to really see how to deal with them. . . . [S]ome of them had to be banned. . . . We tried to work to identify the names and to understand who were the guys who were . . . *leading those groups*, then they were banned. . . [A]nd we handed the police, so of, you know, the names."). |
| | | Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Khalil Tr. 388:3-393:4. |
| 422. | Thumairy's leadership of the extremist cell at the King Fahad Mosque was the continuance of operations of the Sunni extremist cell at the Ibn Taymiyah Mosque that Plaintiffs expert <span>██████████████████</span> <span>███████████████</span> Thumairy inherited and further developed the existing Sunni extremist cell when he became the Imam for the MOIA in Los Angeles in 1996. Ex. 5, Youssef Rpt. 35. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The Youssef Report should be excluded. *See* Objections Chart. |
| | | The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |
| | | To the extent a response is required, Plaintiffs' assertion is improper attorney argument. As discussed above, Thumairy did not lead or participate in any extremist "cell" at the King Fahad Mosque. To the contrary, the cited testimony shows that any individuals or small groups |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that were deemed too conservative were banned from the Mosque and reported to police. *See* Response to ¶¶ 412, 420, 421.<br><br>Youssef's assertion is unsupported (*see* Youssef Rep. 35; no citations supporting second paragraph). In the paragraph prior to the assertion at issue, Youssef cites a 2003 FBI document alleging a link between Thumairy and an extremist network, but he ignores the FBI's final conclusion that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 423. | Thumairy was "hostile to Americans and Western culture" and only catered to "a small group of men who shared his particular extreme worldview." Ex. 72, Madha Decl. ¶ 18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's declaration discussing the alleged "group" was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, and is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17.<br><br>Madha's accusations about Thumairy's beliefs in ¶ 18 are inadmissible and not based on personal knowledge. *See* Objections Chart. Mr. Madha testified that Thumairy's prayers and sermons were in Arabic, that he understands very little Arabic, that he was not able to understand Thumairy's sermons, and that he never heard Thumairy express any support for terrorism. Madha Tr. 37:13-38:17. Thumairy referred to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Madha's statement as "a fabrication." Thumairy Tr. 227:11-19. And Mana (who, unlike Madha, speaks Arabic and so was able to understand Thumairy's sermons) testified of Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Mana Tr. 247:3-7. <br><br>Thumairy further testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8. |
| 424. | Thumairy "would come to the Mosque, lead prayers, meet with his group of male followers, and leave." Ex. 72, Madha Decl. ¶ 18 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>Madha's declaration discussing the alleged "group" was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, and is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17. |
| 425. | "Thumairy generally appeared distant and closed minded to the majority of worshippers and their opinions" and "was hostile to Americans and Western culture, as well as anyone, including other Muslims, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | who did not follow Wahhabi beliefs." Ex. 72, Madha Decl. ¶18. Thumairy "espoused a strict, virulent form of Wahhabist dogma." Ex. 72, Madha Decl. ¶ 18. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's accusations about Thumairy's beliefs in ¶ 18 of his declaration, which was written by Plaintiffs' counsel, Madha Tr. 21:11-23:2, are inadmissible and not based on personal knowledge. *See* Objections Chart. Mr. Madha testified that Thumairy's prayers and sermons were in Arabic, that he understands very little Arabic, that he was not able to understand Thumairy's sermons, and that he never heard Thumairy express any support for terrorism. Madha Tr. 37:13-38:17.<br><br>Thumairy referred to Madha's statement as a "fabrication." *See* Thumairy Tr. 227:11-19. And Mana (who, unlike Madha, speaks Arabic and so was able to understand Thumairy's sermons) testified of Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Mana Tr. 247:3-7.<br><br>Thumairy further testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8.<br><br>Thumairy specifically testified that he was not an "extremist Wahhabi cleric." Thumairy Tr. 522:10-13.<br><br>When asked about non-Muslims, Thumairy testified that he reached out to "many," "inside and outside the Mosque, myself and Shuaib would welcome them and receive them." Thumairy Tr. 213:4-8. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 426. | Usman Madha testified that Thumairy "did not have an office or keep regular hours at the King Fahad Mosque like a typical Imam serving his congregation." Ex. 72, Madha Decl. ¶ 18. Thumairy himself could not name a single member of the Mosque's congregation. Ex. 107, Thumairy Dep. 214:18-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, regarding Madha's testimony about Thumairy's presence at the Mosque, Thumairy testified: "I did not have a private office. . . . As an Imam, I would sit in the place of the prayers, mostly. Sometimes here, sometimes there. Any chair I can sit on, I would. There was no private office. . . . Every prayer time, I'm at the mosque." Thumairy Tr. 134:23-135:14.<br><br>It is incorrect that Thumairy could not remember a single member of the Mosque's congregation. Throughout his testimony, Thumairy remembered multiple names of people who came to pray and/or worked at the Mosque. For example, he recalled Sami and Consul General Salloum, Thumairy Tr. 284:19-22; Madha, *id.* at 226:22-24; Shuaib, *id.* at 120:19; Mohammed al Muhanna, *id.* at 121:1-2; al-Hiber, *id.* at 196; "Abdelhafiz," "the person who calls for a prayer," *id.* at 245:6-9; and Faisal al Muhanna, *id.* at 317:12-16.<br><br>When asked "who can you name, as members – as worshippers" at the Mosque, Thumairy replied, "I don't remember the names right now. It's been a long time. I wasn't always asking people about their names." Thumairy Tr. 214:18:24. He did, however, identify many individuals later in his deposition, as set forth above. He also clarified that he did not know the name of every person who came to the Mosque: "[t]hat's impossible" because of the large number of people who attended. Thumairy Tr. 565:7-22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It is not surprising that Thumairy would not remember the names of people who remember him. As Thumairy testified, it was well known that he was imam of the Mosque, and it is reasonable that someone who visited would know his name but he would not recognize theirs. *See* Thumairy Tr. 565:23-566:13. |
| 427. | Mana, a member of Thumairy's extremist group, identified a picture of the King Fahad Mosque library at his deposition, the site of the extremist cell's meetings. Ex. 110A, Mana Dep. 133:8-134:2. (discussing Ex. 610). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Thumairy had no extremist group at the Mosque, and Mana was not a member of any Thumairy or extremist group. *See supra* Responses to ¶¶ 398, 412. Further, the evidence shows that Thumairy was *not* part of the allegedly "extremist" group that met in the library. *See supra* Responses to ¶¶ 420, 421.<br><br>It is unremarkable that Mana would be able to identify a picture of a room in a Mosque he attended weekly (if not more frequently). |
| 428. | Plaintiffs' expert Youssef explains that "the clandestine practices of Thumairy's group as described by Madha and Khalil are similar to the practices of the extremist group ███████████ ███████████ ██████████ Ex. 5, Youssef Rpt. 51. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart. The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>To the extent a response is required, there was no "Thumairy" group. *See supra* Responses to ¶ 398, 412. Khalil made clear that Thumairy was *not* part of the group he deemed to be too conservative. *See supra* Responses to ¶¶ 420, 421.<br><br>Youssef's assertion is unsupported. He uses the words "clandestine practices," but he does not identify any such practices or show how the practices of one alleged group are similar to the practices of another. To the extent Youssef claims that meeting in a library in a well-attended Mosque is clandestine, he offers no support. |
| 429. | Despite his claim that he studied English full time in Los Angeles, Thumairy would not speak English while leading prayers and communicated only in Arabic with his trusted group. Ex. 107, Thumairy Dep. 216:12-24; Ex. 113, Khalil Dep. 134:1-5 (Thumairy "doesn't speak English"). | Thumairy's English study is not a "claim." It is well-documented. *See, e.g.*, KSA Ex. 171 (KSA 8490) (referring to completion of "four levels of study"); KSA Ex. 174 (KSA 8491) (letter verifying Thumairy's enrollment in Intensive English Program through UCLA Extension); KSA Ex. 175 (KSA 1717) (receipt for tuition payment); KSA Ex. 176 (KSA 5330) (receipt for student ID).<br><br>In contemporaneous documents, Thumairy requested to continue his studies because four semesters "is not enough to master the language and make good use of it for the spoken and written programs of Dawah". KSA Ex. 171 (KSA 8490). Thumairy's request for a subsequent extension was denied. KSA Ex. 177 (KSA 8467) ("refual of this request"). Thus, while Thumairy did study English, he was not fluent and chose to lead prayers in his native Arabic.<br><br>He did not reserve his use of Arabic for conversations with his (non-existent) "trusted group" as Plaintiffs imply. Rather, as Madha testified, he gave all sermons to the congregation in Arabic. Madha Tr. 44:15-16. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 430. | Plaintiffs' expert Youssef stated that he "learned that Islamic terror groups relied on their ability to communicate in Arabic to avoid detection by law-enforcement/intelligence agencies believing that these agencies have no Arabic speaking officers or agents who would be able to decipher their communications." Youssef also stated that "[a]dditionally, terrorist operatives utilized their familiarity of cultural, tribal and dialectical differences within the Arab world to vet individuals who would be considered outsiders." Ex. 5, Youssef Rpt. 51, n.147. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart. The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).
To the extent a response is required, the suggestion that Thumairy's use of Arabic was intended "to avoid detection" is contrary to the record. As demonstrated in the prior paragraph, Thumairy was trying to learning English, which makes little sense if his goal was to "avoid detection" by speaking exclusively in Arabic. *See supra* Response to ¶ 429. Further, speaking Arabic would not "avoid detection" because "many people would translate" sermons given in Arabic. Thumairy Tr. 220:6-11.

Plaintiffs' assertion that a native Arabic speaker using Arabic during prayer is a sign that they are trying to hide something from law enforcement is facially ridiculous. |
| 431. | The FBI found that "ALTHUMAIRY was very smart and everything he did was camouflaged." Ex. 2, EO 3613. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2DD (EO 3612-16), is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 2DD (EO 3612-16) is "Confidential Human Source" ("CHS") reporting. Pls. Ex. 2DD (EO 3612). Plaintiffs' assertion that the FBI "found" anything stated in this document is misleading. The document says that a CHS said that Thumairy was very smart and everything he did was camouflaged, but there is no indication the FBI verified the anonymous allegation.<br><br>The FBI's final conclusion was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 432. | Saudi Arabia claims that Madha's testimony should be discarded because he understands little Arabic and was not part of the private discussions held among the members of Thumairy's group. KSA Aver. ¶ 240. Madha was at the Mosque working and attending services every day and had close firsthand knowledge of the Mosque community and the members of Thumairy's group. Ex. 128, Madha Dep. 33:2-6; 58:18-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia Averment correctly describes the undisputed facts that Madha admitted he could not understand Al Thumairy's sermons and had never personally heard him support terrorism. *See* KSA Aver. ¶ 240.<br><br>It is also undisputed that Madha does not speak or understand Arabic. Given that facts, and the fact that the alleged discussions were in Arabic outside of his presence, Madha necessarily lacks personal knowledge and is testifying based on hearsay from others. He confirmed this at his deposition. *See* Madha Tr. 38:24-39:17 (not part of group; no personal |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | knowledge of the discussion); *see also id.* at 37:13-38:17 (Madha admitting that Thumairy's sermons were in Arabic, which he does not understand).<br><br>Regardless, Madha's accusations of an extremist group led by Al Thumairy are inaccurate as described above. *See supra* Response to ¶ 398. Al Khalil's testimony contradicts Madha's claim that Thumairy was leader of any such group. *See supra* Response to ¶¶ 420, 421.<br><br>Moreover, Madha testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Madha Tr. 60:18-61:18.<br><br>Al Thumairy denied Madha's accusations. *See* Thumairy Tr. 525:19-23; *id.* at 227:11-19 (referring to Madha's statement as "a fabrication").<br><br>Mana (who, unlike Madha, speaks Arabic and so was able to understand Thumairy's sermons) testified of Al Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Mana Tr. 247:3-7.<br><br>Al Thumairy further testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8. |
| 433. | Madha heard them express fierce hostility to Americans, non-Muslims, and anyone | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | who did not follow their extremist dogma. Ex. 72, Madha Decl. ¶ 18. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this statement misrepresents Madha's Declaration and his testimony. Nowhere in the declaration does Madha say he *heard* the alleged extremist group express anything extremist that he could actually understand. To the contrary, Madha confirmed at his deposition that he either was not present for the alleged expressions of hostility because he was not part of the group in which he claims they were exchanged, was not able to understand them because they were spoken in Arabic, or both. *See* Madha Tr. 38:24-39:17 (not part of group; no personal knowledge of the discussion); *see also id.* at 37:13-38:17 (Madha admitting that Thumairy's sermons were in Arabic, which he does not understand).<br><br>Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 18 is therefore inadmissible. *See* Objections Chart.<br><br>And Madha's assertions are incorrect for reasons asserted above. *See supra* Responses to ¶¶ 398, 412, 420, 421.<br><br>In any event, Madha testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Madha Tr. 60:18-61:18. |
| 434. | Madha personally witnessed the meetings that Thumairy led in the Mosque library with his small group and their exclusionary behavior towards others at the Mosque. Ex. 72, Madha Decl. ¶ 18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Madha's declaration goes far beyond simply stating that he witnesses a certain group of people meeting in the Mosque library. He makes assertions about those people's beliefs, which were necessarily derived from hearsay because Madha was not part of the group, did not hear their discussions, and could not understand them since they allegedly spoke in Arabic. *See* Madha Tr. 38:24-39:17 (not part of group; no personal knowledge of the discussion); *see also id.* at 37:13-38:17 (Madha admitting that Thumairy's sermons were in Arabic, which he does not understand). Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 18 is therefore inadmissible. *See* Objections Chart. |
| | | To the extent Madha's declaration (which Plaintiffs' counsel wrote) is considered, his claim that Thumairy was part of an extremist group is contradicted by the record evidence. *See supra* Responses to ¶¶ 398, 412, 420, 421. |
| | | In any event, Madha testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Madha Tr. 60:18-61:18. |
| 435. | Madha also witnessed the members of Thumairy's group go public immediately after the 9/11 Attacks by leading protests in support of the 9/11 hijackers and trying to take over the Mosque. Ex. 72, Madha Decl. ¶ 26. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Madha's testimony regarding the alleged "group" is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17.<br><br>Moreover, Declaration ¶ 26 describes a "group of protestors", but Thumairy was not there. Madha Tr. 39:21-40:9.<br><br>To the extent a further response is required, as explained above, Thumairy did not have or lead an extremist group. *See supra* Response to ¶¶ 398, 412, 420, 421. And he certainly did not "lead" the men in the group (of which he was not a part) described in Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 26. Indeed, while he vaguely recalled some of the names listed, he did not recall others at all. Thumairy Tr. 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem); *id.* at 219:7-13 (no recollection of Mana, but he "may have been one of the employees" at the Consulate at the time); *id.* at 244:19-245:10 (no recollection of Kebhaj but vaguely recalled a muezzin at the mosque . . . by the name of Abdelhafiz"). |
| 436. | Saudi Arabia ignores that Madha's testimony is confirmed by Khalil who admitted that extremists were meeting in the Mosque library since it opened and that the two individuals Khalil identified as part of the extremist group were independently identified by Madha to be part of Thumairy's group. Ex. 113, Khalil Dep. 56:20-58:17; Ex. 72, Madha Decl.¶ 19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's testimony regarding the alleged "group" in ¶ 19 is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the group, did not attend their meetings, and had no personal knowledge of what the group discussed. Madha Tr. 38:24-39:17. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, this statement is improper attorney argument. |
| | | Saudi Arabia does not "ignore[]" that Madha's testimony is confirmed by Khalil. As described above, Madha's testimony is *contradicted* by Khalil, who made clear that Thumairy was not part of the group of individuals that were deemed too conservative. *See supra* Responses to ¶¶ 420-421. |
| | | Al Khalil testified that the "philosophy" of the mosque was one of "openness." He further testified that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Khalil Tr. 388:3-393:4. |
| 437. | Saudi Arabia also ignores that those two individuals were also independently identified by Plaintiffs' expert Youssef, ███████████████████████ ████████ the Sunni extremist cell first organized by the "Blind Sheikh" at the Ibn Taymiyah Mosque. Ex. 5, Youssef Rpt. 50-51. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Youssef Report should be excluded. *See* Objections Chart. ██████ ████████████████████████████ ████████████████████████ To the extent a response is required, this statement is improper attorney argument. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia does not "ignore[]" Youssef's assertions. Saudi Arabia rebutted these exact assertions in response to ¶¶ 419 and 422 above and incorporates those responses herein. *See supra* ¶¶ 419, 422. |
| 438. | Mosque Manager Madha found jihadist literature in the Mosque Foundation's office building across the street from the Mosque that Madha believed must have belonged to Thumairy. Madha testified that: "The booklets advocated acts of violent jihad with pictures of guerilla fighters and guns. I did not see who placed those booklets inside the that [sic] building but believed, based on the specific location where I found the booklets and the limited group of people with access (including Mr. Al Khalil and Mr. Kaldirim) to that area, that the booklets must have been brought there by Mr. Al Thumairy." Ex. 72, Madha Decl. ¶16. | The quoted portion of Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 16 (Madha's assertion that Al Thumairy "must have been" the person who brought the literature referenced to the Mosque Foundation's office building) is inadmissible speculation not based on personal knowledge. *See* Objections Chart.<br><br>Madha testified he could not recall when the literature was placed in the office; he did not see who brought it to the office; he did not speak with whoever brought the materials; he does not know why the materials were brought there; he knew at least six people had access to the office and had "no idea" whether even more people did; and that "I personally have no knowledge" "that Mr. Al-Thumairy brought the materials into that building." *See* Madha Tr. 48:22-51:10.<br><br>Madha's speculation is also contradicted by record evidence. Al Thumairy testified that he never stored extremist literature or materials at the Mosque or in any buildings near the Mosque, and that he was never accused of doing so. *See* Thumairy Tr. 514:18-515:3. |
| 439. | Madha was questioned about the booklets at his deposition and repeated his opinion that given where he found the booklets, they likely belonged to Thumairy. Ex. 128, Madha Dep. 75:15-76:3; 78:20-79:17. Madha told Khalil and Shuaib about the booklets; neither of them could explain how the booklets ended up inside the Mosque office. *Id.* | Undisputed that Mr. Madha confirmed at his deposition that his testimony concerning who the referenced booklets belonged to was "opinion" and not fact. Madha Tr. 79:16-17.<br><br>The cited testimony from Plaintiffs Exhibit 128 (Madha Tr.) and Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 16 concerning who the booklets belonged to is inadmissible lay opinion under Rule 701 and inadmissible testimony not based on personal knowledge under Rule 602. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited portions of Madha's deposition testimony concerning what Al Khalil and Shuaib told him about the booklets is inadmissible hearsay. *See* Objections Chart. |
| | | Even if considered, Madha's testimony is unsupported speculation, which is contradicted by admissible evidence. Mr. Madha testified he could not recall when the literature was placed in the office; he did not see who brought it to the office; he did not speak with whoever brought the materials; he does not know why the materials were brought there; he knew at least six people had access to the office and had "no idea" whether even more people did; and that "I personally have no knowledge" "that Mr. Al-Thumairy brought the materials into that building." *See* Madha Tr. 48:22-51:10. |
| | | Al Thumairy testified that he never stored extremist literature or materials at the Mosque or in any buildings near the Mosque, and that he was never accused of doing so. *See* Thumairy Tr. 514:18-515:3. |
| 440. | Madha's eyewitness testimony was confirmed by the FBI reports in the Executive Order production that Thumairy (together with Muhanna) shipped 2000 boxes of extremist literature ███████████ at the Saudi Consulate in 2003. Ex. 2, EO 3470. | Madha's testimony was not eyewitness; he admitted it was opinion not based on personal knowledge. *See supra* Responses to ¶¶ 438-439. |
| | | Plaintiffs Exhibit 2CC (EO 3470), is inadmissible hearsay. *See* Objections Chart. |
| | | Regardless, Plaintiffs Exhibit 2CC does not support Plaintiffs' assertion. That document is "source reporting," Plaintiffs Exhibit 2CC at 3465, not an FBI finding or conclusion. This source reportedly claimed that Al Thumairy was connected to Al Qaeda, *id.* at EO 3469. |
| | | But in the FBI's ultimate conclusion, it found that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>The cited exhibit makes no reference to the King Fahad Mosque, and does not allege that Al Thumairy distributed extremist literature while he was in the United States. And Thumairy testified that he never did so. *See* Thumairy Tr. 514:18-515:3. |
| 441. | The King Fahad Mosque library had a 1995 official publication of the Ministry of Islamic Affairs containing a Saudi Sheikh's sermon preaching the policy that all non-Muslims should be put to death:<br><br>"[O]ur doctrine states that if you accept any religion other than Islam, like Judaism or Christianity, which are not acceptable, you become an unbeliever. If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph offers no citation or supporting evidence in Plaintiffs' original or corrected Averrment.<br><br>*See supra* Response to Averment ¶ 24 for a response to a similar assertion. |
| 442. | The Qur'an distributed by Saudi Arabia at the King Fahad Mosque prior to the 9/11 Attacks was a translation and annotation of that holy book which defines "Al-Jihad" as "holy fighting" with "full force of numbers and weaponry" and states that such jihad is given the utmost importance in Islam and is one of its pillars. Ex. 72, Madha Decl. ¶ 16 & Ex. 1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the exhibit attached to Madha's Declaration is inadmissible and incomplete. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Madha claims that "Saudi Arabia" provided religious materials and refers to Exhibit 1 of his declaration as a copy of "the Kingdom's annotated version of the Koran." Pls. Ex. 72 (Madha Ex. 830) ¶ 16. However, on its face, this is published by Darussalam, not the Saudi government.<br><br>There is no evidence that Thumairy endorsed a message of violence. To the contrary, Thumairy testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11 "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8.<br><br>Moreover, Saudi Arabia does not advocate any form of terrorism.<br><br>As David Rundell states, "the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and very specifically those that involve suicide." KSA Ex. 166 (Rundell Rep.) 43.<br><br>Nakhleh acknowledged at his deposition that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Meleagrou-Hitchens Tr. at 61:5-62:8 (agreeing that "quietists are submissive to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"); *id.* at 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"); *id.* at 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 443. | It states that "[b]y abandoning Jihad…Islam is destroyed and the Muslim fall into an inferior position; their honour is lost, their lands are stolen, their rule and authority vanish. Jihad is an obligatory duty in Islam on every Muslim, and he who tries to escape from this duty, or does not in his innermost heart wish to fulfill this duty, dies with one of the qualities of a hypocrite." Ex. 72, Madha Decl. ¶ 16 & Ex. 1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, the exhibit attached to Madha's Declaration is inadmissible and incomplete. *See* Objections Chart. <br><br> Madha claims that "Saudi Arabia" provided religious materials and refers to Exhibit 1 of his declaration as a copy of "the Kingdom's annotated version of the Koran." Pls. Ex. 72 (Madha Ex. 830) ¶ 16. However, on its face, this is published by Darussalam, not the Saudi government. <br><br> There is no evidence that Thumairy endorsed a message of violence. To the contrary, Thumairy testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Thumairy Tr. 478:14-479:8. <br><br> Moreover, Saudi Arabia does not advocate any form of terrorism. <br><br> As David Rundell states, "the senior religious scholars of Saudi Arabia have a long and consistent record of condemning acts of terrorism and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | very specifically those that involve suicide." KSA Ex. 166 (Rundell Rep.) 43. |
| | | Nakhleh acknowledged at his deposition that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. |
| | | Plaintiffs' purported expert Meleagrou-Hitchens agrees. Meleagrou-Hitchens Tr. at 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"); *id.* at 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"); *id.* at 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| V. | **THUMAIRY HAD EXTENSIVE AND LONG-STANDING CONTACTS WITH EXTREMISTS IN CALIFORNIA AND ELSEWHERE** | Plaintiffs' assertions are unsupported by admissible evidence. Moreover, purported contacts with purported extremists, who had nothing to do with the 9/11 attacks, are irrelevant. |
| V.A. | **Thumairy had links to other radicalized Mosques in California.** | There is no evidence of other "radicalized Mosques" in California or that Thumairy had "links" to them. Moreover, any such purported contacts that had nothing to do with the 9/11 attacks are irrelevant. |
| 444. | Plaintiffs' expert Youssef observed that Thumairy maintained links with other radicalized mosques in San Diego resembling what Youssef observed during | The Youssef Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | his 1992-1996 investigations of the ties between Los Angeles and San Diego Sunni extremist cells. This included the "significant phone contacts related to the 9/11 hijackers with Anwar Al Aulaqi, Imam of the Al Ribat Mosque, and ███████████ Ex. 5, Youssef Rpt. 52; Ex. 12A (Phone calls Nov. 1999 – Feb. 2000) | Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is an improper summary exhibit with numerous misattributions and other errors. *See* Objections Chart.<br><br>Among other things, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is inconsistent with the chart of phone calls attached to the Youssef Report. *See* Youssef Rep. App. A. With respect to Al Thumairy specifically, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) misattributes to Al Thumairy 20 calls made from, and 15 calls made to, the number ███████ 3362. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and ███████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the 3362 number. *See* Thumairy Tr. 316:3-7, 497:14-499:9.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also claims that Thuamiry made two on January 5, 2000 to the number ██████ 4469, which it claims belonged to Al Thumairy. There is no evidence that this number belonged to Al Thumairy.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) further relies on various hearsay FBI memoranda for the assertion that 29 calls were made by or involved Al Thumairy. The phone records in the case do not reflect any of these calls.<br><br>To the extent it is considered, Plaintiffs' assertion is unsupported or incorrect in multiple regards.<br><br>*First*, Youssef did not "observe" anything regarding Al Thumairy, and his opinions concerning Al Thumairy are based on speculation, not personal knowledge as the term "observation" would imply. Regarding Youssef's claim that he "observed" links to radicalized mosques "during [his] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | investigations of the ties between Los Angeles and San Diego Sunni extremist cells" from 1992-1996, the FBI has asserted that as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>*Second*, the term "other radicalized" mosques implies the King Fahad Mosque was "radicalized" in the first place, which is inaccurate and contradicted by the record discussed in preceding sections.<br><br>*Third*, Youssef's phone record analysis is inaccurate. Youssef claims (and Plaintiffs repeat here) that there are "significant phone contacts" purportedly between "Thumairy" and Al Awlaki, ███████, and Al Bayoumi – each of whom was imam or manager of a mosque in San Diego. Youssef's evidence (Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000)) is based on misattribution of phone numbers, as set forth above.<br><br>Further, Youssef's assertion of significant contacts and links between Al Thumairy and Al Awlaki, ███████, and Al Bayoumi is contradicted by the record. The evidence shows that Al Thumairy did not know, and could not remember calling Al Awlaki ███████. *See* Pls. Ex. 107 (Thumairy Tr.) 350:23-351:17. He likewise could not remember Al Bayoumi. *See id.* at 554:5-12.<br><br>*Fourth*, Youssef's speculation about the content of phone calls is contrary to the record evidence. Youssef claims (and Plaintiffs repeat) that the alleged phone contacts he cited between Al Thumairy and Al Awlaki, ███████, and Al Bayoumi "related to the 9/11 hijackers." But Youssef cites no testimony or evidence to support his speculation about the topics of any alleged conversations. Youssef purportedly deduces what they must have talked about from surrounding evidence. *See* Pls. Ex. 105 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Youssef Tr.) 231:9-21 ("I can tell you when I see a pattern of calling between two individuals and know something about who these people are based on source information and additional evidence that we have from other sources, that I can tell you, yes, I know what they're talking about."). But, the available evidence contradicts Youssef's speculation that the 9/11 hijackers must have been the subject of the alleged calls between Al Thumairy and the three individuals Plaintiffs identify:<br><br>***Al Awlaki.*** At the time when Al Thumairy was in the United States, before and for some time after the 9/11 attacks, Awlaki was known as a politically moderate Islamic preacher who opposed terrorism. *See* KSA Ex. 167 (Sageman Rep.) 51, KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) at 1, 28 (book by Plaintiffs' proffered expert describing Awlaki as "initially a revered mainstream Islamic preacher in America" who was once invited to speak at the Pentagon). Plaintiffs' own proffered expert also wrote that it was "hard to believe" that Awlaki's contact with the 9/11 hiackers was anything other than innocent. KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) a 24-25 ("That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy."). After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to the New York Times and Washington Times, and privately in an email to his younger brother describing the attacks as "horrible." *Id.* at 25-26; Meleagrou Hitches Tr. 311:13-314:14. In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. *See* KSA Ex. 178 (Sageman WAMY Rep.) 177. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, it is not a sign of "radicalization" or communication "related to the 9/11 hijackers" that Al Thumairy – an Imam in a mainstream Los Angeles mosque – and Awlaki – an Imam in San Diego who was known as mainstream – had phone contact.<br><br>████████████████████████████████████████ ███████████████████████, and a well-known supporter of interfaith dialogue and other religious institutions. ███████ ████████████████████████ █ ████████████████████████ ████████████████████████ Pls. Ex. 2P (EO 1237).<br><br>Again, it is not a sign of "radicalization" or communication "related to the 9/11 hijackers" that Al Thumairy – an Imam in a mainstream Los Angeles mosque – and ███████████████████████████████████ – had phone contact.<br><br>***Al Bayoumi.*** Al Bayoumi also visited Los Angeles for personal reasons (to deal with administrative issues related to his passport, for example), and prayed at the King Fahad Mosque, where he met Al Thumairy. Pls. Ex. 120 (Bayoumi Tr.) 215:18-22. Al Thumairy was an imam, so Al Bayoumi would ask him religious questions. *Id.* at 216:22-217:4. Al Bayoumi also directed others who had religious question to Al Thumairy: "Fahad doesn't answer the phone calls coming to him. Maybe out of 50 calls, he would answer one. So, for example, if I had someone who was asking a question which I should direct to him, or to another Imam or Sheikh, it was hard to get ahold of him. It was hard to get him to answer the phone." *Id.* at 451:14-23. Al Bayoumi also explained that he might |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | call Al Thumairy about picking up religious literature ("mushaffs"). *Id.* at 452:11-17. There is no record evidence contradicting Al Bayoumi's testimony that he contacted Al Thumairy for these innocuous reasons. It is purely speculative to conclude, as Youssef did, that particular phone contacts Al Bayoumi and Al Thumairy had must have "related to the 9/11 hijackers." |
| 445. | For instance, Thumairy called Anwar Al Aulaqi aka Awlaki in San Diego prior to the arrival of the hijackers. Ex. 5, Youssef Rpt. 52 n. 150; Ex. 476, FBI 000548-58 at 56; Ex. 474, FBI 000512-21 at 19; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Anwar Aulaqi, prior to the 9/11 Attacks, had already been identified by the FBI as a radical Sunni extremist with direct ties to with Al Qaeda. Ex. 5, Youssef Rpt. 109, 137; Ex. 566, FBI 011752-11767 at 11764 (FBI opened investigation against Aulaqi in 1999 due to his phone contact with an Al Qaeda agent); Ex. 2, EO 2804 (Aulaqi's communications also linked him to Hamas in 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 566 (FBI 11752) and Plaintiffs Exhibit 2X (EO 2804), are inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is an improper summary exhibit with numerous misattributions and other errors. *See* Objections Chart.

Among other things, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is inconsistent with the chart of phone calls attached to the Youssef Report. *See* Youssef Rep. App. A. With respect to Al Thumairy specifically, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) misattributes to Al Thumairy 20 calls made from, and 15 calls made to, the number ▮▮▮▮3362. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and ▮▮▮▮▮▮ from June 10, 2000 through April 29, 2002. See KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | with the 3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-7, 497:14-499:9.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also claims that Al Thumairy made two calls on January 5, 2000 to the number ▮▮▮▮4469, which it claims belonged to Al Thumairy. There is no evidence that this number belonged to Al Thumairy.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) further relies on various hearsay FBI memoranda for the assertion that 29 calls were made by or involved Al Thumairy. The phone records in the case do not reflect any of these calls.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) purports to show a total of 7 calls from Al Thumairy to numbers that Plaintiffs associate with Al Awlaki. However, two of these calls on January 4, 2000 were made from the number ▮▮▮▮3362, which Plaintiffs misattribute to Al Thumairy. Plaintiffs also rely solely upon a hearsay FBI memorandum as evidence that they transpired. In addition, these 7 calls misattribute 2 calls made on December 29, 1999 and January 4, 2000 to Al Awlaki. Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) shows that these calls were made to a number at the Al Ribat Mosque, and there is no evidence that Al Awlaki – rather than anyone else at the Mosque – was the recipient. The remaining 5 calls were made to a number that Plaintiffs associate with Al Awlaki based upon hearsay sources. No subscriber records were provided to verify that the number belonged to Al Awlaki. Thus, there is no admissible evidence that there were any calls between Al Thumairy and Al Awlaki.<br><br>Plaintiffs' assertion that Al Awlaki had been identified by the FBI as a radical Sunni extremist prior to the 9/11 Attacks is not supported by the evidence they cite. Plaintiffs Exhibit 2X (EO 2804) and Plaintiffs Exhibit |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 566 (FBI 11764) state only that the FBI had opened an investigation of Al Awlaki, not that the FBI had identified him as an extremist by that time. |
| | | Regardless, there is no evidence that Al Awlaki had been identified *by Al Thumairy* as an extremist. At the time when Al Thumairy was in the United States, before and for some time after the 9/11 attacks, Al Awlaki was known as a politically moderate Islamic preacher who opposed terrorism. *See* KSA Ex. 167 (Sageman Rep.) 51, KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) at 1, 28 (book by Plaintiffs' proffered expert describing Al Awlaki as "initially a revered mainstream Islamic preacher in America" who was once invited to speak at the Pentagon). |
| | | Plaintiffs' own proferred expert also wrote that it was "hard to believe" that Al Awlaki's contact with the 9/11 hiackers was anything other than innocent. KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) at 24-25 ("That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy."). After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to the New York Times and Washington Times, and privately in an email to his younger brother describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou Hitches Tr.) 311:13-314:14. In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY Rep.) 177. |
| | | Thus, it is not a sign of "radicalization" or communication "related to the 9/11 hijackers" that Al Thumairy – an Imam in a mainstream Los Angeles |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | mosque – and Al Awlaki – an Imam in San Diego who was known as mainstream – may have had phone contact. |
| 446. | Thumairy's calls to Aulaqi occurred as part of what Plaintiffs' expert Youssef determined were "Calling Circles" among Bayoumi and the Saudi Embassy on December 18-19, 1999 and December 27-29, 1999. Ex. 5, Youssef Rpt. 52, n. 150; Ex. 476, FBI 000548-58 at 56; Ex. 474, FBI 000512-521 at 0519; Ex. 12A (Phone Calls Nov. 1999 – Feb. 2000). A Calling Circle is a pattern of brief calls among various individuals which show familiarity beyond casual acquaintance between the participants. Ex. 5, Youssef Rpt. 14. The December 27-29 Calling Circle included a unique set of calls by Thumairy to ███ ███ in San Diego, who would assist the hijackers after their arrival in San Diego. Ex. 5, Youssef Rpt. 52 n. 150; Ex. 474, FBI000512-21 at 19. Nine weeks after Thumairy's call to ███ phone, that same phone was used to call Al Qaeda's operations base in Yemen. Ex. 5, Youssef Rpt. 52, n. 150; Ex. 2, EO 2801. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report, including his calling circle opinions, should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is an improper summary exhibit with numerous misattributions and other errors. *See* Objections Chart.<br><br>Among other things, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is inconsistent with the chart of phone calls attached to the Youssef Report. *See* Youssef Rep. App. A.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) misattributes to Bayoumi 35 calls – including 3 between December 18-19, 1999 and December 27-29, 1999 – made from or to a publicly-available phone line at the Al Medina Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15. For instance, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) shows a call on January 24, 2000 at 4:43 pm as a call from Al Bayoumi's cell phone to the Mosque, which obviously cannot be Al Bayoumi calling himself. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also misattributes to Al Bayoumi 52 calls made to the number ███6662, a number Plaintiffs concede was subscribed to Manal Bagader, Al Bayoumi's wife. Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) lists 52 calls from Al Bayoumi's cell phone to a "cellphone 'used by' Al Bayoumi (subscribed in Manal's name)."<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also attributes to Al Bayoumi 36 calls made from ███6652, another number subscribed to by Manal Bagader. *See, e.g.*, KSA Ex. 182 (FBI 9278). There is no evidence that Al Bayoumi made calls from this number.<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) lists at least 65 calls made by Al Bayoumi's cell phone ███7623) twice and therefore double counts those calls. The majority of these double-counted calls – 62 calls – are from the same two pages of phone records for March 1 through March 7, 2000. *Compare* Pls. Ex. 12A (Phone Chart Nov. 1999 to Mar. 2000) with KSA Ex. 116 (FBI 3246-47). The remaining 3 double-counted calls are calls to the KSA Embassy Cultural Mission (2022988814) on February 3, 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am. *Compare* Pls. Ex. 12A (Phone Chart Nov. 1999 to Mar. 2000) with KSA Ex. 115 (FBI 3231) and KSA Ex. 117 (FBI 3259).<br><br>Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also misstates the recipient's number of a call made by Al Bayoumi on March 10, 2000 at 12:27 pm. The call was made to 2022988813 (KSA Embassy Cultural Mission), not to 2023423700 (KSA Embassy Islamic Affairs) as stated in Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000). *Compare* Pls. Ex. 12A (Phone Chart Nov. 1999 to Mar. 2000) (citing FBI 3253) with KSA Ex. 117 (FBI 3253). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12A misattributes to Al Thumairy 20 calls made from, and 15 calls made to, the number ███████3362, including a call made to that number between December 18-19, 1999 and December 27-29, 1999. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ███████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the 3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-7, 497:14-499:9.

Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) also misattributes to Thumairy 2 calls made on January 5, 2000 to the number ███████4469, which the Plaintiffs Exhibit states also belongs to Al Thumairy. There is no evidence supporting that attribution.

Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) relies solely upon various hearsay FBI memoranda in support of assertions that 29 calls allegedly involving Al Thumairy and 4 calls allegedly involving Al Bayoumi occurred. *See* Pls. Ex. 12A (Phone Chart Nov. 1999 to Mar. 2000) (REF 1 column). None of these calls appear in the phone records that have been produced.

With respect to Plaintiffs' assertion that Al Thumairy placed a "unique set of calls" to ███████, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) relies solely upon hearsay sources in attributing to ███████ calls made to ███████4293. *See* Pls. Ex. 12A (Phone Chart Nov. 1999 to Mar. 2000) (REF 2 columns). No subscriber records were produced to verify that the number belonged to ███████

Regarding Plaintiffs' assertion that the same phone attributed to ███████ was used to call an Al Qaeda base in Yemen, the supporting document, Plaintiffs Exhibit 2X (EO 2801), is inadmissible. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The document states, however, that ▮▮▮▮ let Al Mihdhar use his phone to call Yemen. *See also* Pls. Ex. 455 (FBI 34). The alleged Al Qaeda operations base number in Yemen was the number for Al Mihdhar's father-in-law. *See* KSA Ex. 167 (Sageman Rep.) 496-97; Pls. Ex. 82 (CIA_267). There is no evidence that Al Thumairy's calls to ▮▮▮▮ from weeks earlier had anything to do with making arrangements for the hijackers to meet ▮▮▮▮. And there is no evidence that ▮▮▮▮ knew the hijackers were calling an alleged Al Qaeda operations base. Plaintiffs Exhibit 2A (EO 1-14) is the May 2021 Electronic Communication closing Operation Encore setting forth the final conclusions of the FBI. The FBI concluded that Al Thumairy, Al Bayoumi, and Al Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 447. | As Plaintiffs' expert Youssef determined, "Thumairy also placed a unique set of calls to ▮▮▮▮, Imam of the Islamic Center of San Diego (ICSD) on February 3, 2000 when Hazmi and Mihdhar first moved from Los Angeles to San Diego and attended the ICSD." Ex. 5, Youssef Rpt. 52, n. 150; Ex. 477, FBI 000559-72 at 0564; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) is an improper summary exhibt. *See* Objections Chart.

Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000)is an improper summary exhibit with numerous misattributions and other errors. *See* response to averment ¶ 446. Relevant here, Plaintiffs Exhibit 12A (Phone Chart Nov. 1999 to Mar. 2000) shows a total of 2 calls from Al Thumairy to a number Plaintiffs associate with ▮▮▮▮ based upon |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | hearsay sources. No subscriber records were produced to verify that the number belonged to ███████<br><br>In any event, there would be nothing suspicious about any phone contact between Al Thumairy and ███████████████, and a well-known supporter of interfaith dialogue and other religious institutions. ████████████████████████████████████████████████████████████████████████████████ Pls. Ex. 2P (EO 1237). |
| 448. | When asked about Aulaqi, Thumairy claimed that he had "never heard of him" and could not remember calling Aulaqi on the phone. Ex. 107, Thumairy Dep. 350:23-351:8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Al Thumairy testified he did not know Awlaki, could not remember hearing of him, and did not remember calling him. |
| 449. | Similarly, Thumairy claimed that he did not know of Imam Mezgouri of the Islamic Center of San Diego and could not recall speaking with him on the phone. Ex. 107, Thumairy Dep. 351:9-17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| V.B. | **Thumairy hosted radical Sheikh Al Wadi at the King Fahad Mosque.** | None of the evidence Plaintiffs cite indicates that Al Thumairy "hosted" Al Wadi. Al Thumairy did not know him and could not remember anything about Al Wadi's alleged visit. Pls. Ex. 107 (Thumairy Tr.) 351:24-352:13. There is no admissible evidence to the contrary. |
| 450. | In 2000, Fahad al Thumairy had substantive, significant in-person meetings and other contacts in California with Sheikh Muqbil Al Wadi, who founded "the most radical Islamic movement ever to be active in Yemen." Ex. 5, Youssef Rpt. 59. Sheikh al Wadi died in July 2001 in Saudi Arabia. Ex. 5, Youssef Rpt. 59, n 191; Ex. 350, Yemen Times Issue 30, July 24-30, 2000. | The Youssef Report should be excluded. *See* Objections Chart.<br><br>This assertion, essentially copied from Youssef's report, is unsupported. Youssef cites one source, Plaintiffs Exhibit 350. Plaintiffs Exhibit 350 is inadmissible hearsay and not based on personal knowledge of the declarant. *See* Objections Chart.<br><br>Regardless, it does not say that Al Wadi founded the most radical Islamic movement ever to be active in Yemen; it does not reference any meeting with Al Thumairy at all, much less "substantive, significant in-person meetings and other contacts in California," and it pre-dates Al Wadi's alleged death so obviously cannot support that aspect of Youssef's assertion. |
| 451. | The U.S. Department of Defense (DOD) classified Wadi as a "Radical religious figure[]" and listed him in a chart of al Qaeda network leaders, network operatives, and key members ("Chart of Al Qaeda Key Players"), including Osama Bin Laden. Ex. 175, JTF-GTMO Matrix of Threat Indicators at 7-8. A detainee's association with an individual from the Chart of Al Qaeda Key Players was a primary indictor for assessing a detainee's membership or affiliation with al Qaeda. Ex. 175, JTF-GTMO Matrix of Threat Indicators at 7-8. | Plaintiffs Exhibit 175 (JTF-FTMO Matrix for Enemy Combatants) is inadmissible hearsay. *See* Objections Chart.<br><br>The document contains the quoted language. Notably, association with an individual on the list is only one of dozens of indicators "for assessing a detainee's membership or affiliation with al-Qaida." Pls. Ex. 175 (JTF-FTMO Matrix for Enemy Combatants) at 7. Another indicator is affiliation or association with a list of mosques. *See id.* at 9. The King Fahad Mosque is not listed, nor is the ICSD or Al Ribat Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 452. | Wadi was trained and educated in Saudi Arabia and during the 1980s and 1990s and while in Yemen was financed by Saudi private and government funds. At a 1996 conference, Wadi asked God to destroy America and claimed his group was "preparing the people to fight America through jihad." Ex. 305, Laurent Bonnefoy, Institut Français du Proche-Orient. "Violence in Contemporary Yemen: State, Society and Salafism" at 339. | Plaintiffs Exhibit 305 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 305 states that Al Wadi was educated in the 1960s and 1970s at various Saudi religious institutions. Pls. Ex. 305 (Laurent Bonnefoy, *Violence in Contemporary Yemen: State, Society and Salafis*, 101 Muslim World 324 (2011)) at 338. The cited portion of the document does *not* state that Al Wadi was financed in Yemem "by Saudi private and government funds" in the 1980s and 1990s, as Plaintiffs claim.<br><br>Plaintiffs Exhibit 305 contains the quoted language, but it also states: "This quietist trend of Salafism typically condemns violence and violent operations targeting civilians. In fact, Wadi was highly critical of jihadi actions, at the global level as well as inside Yemen, from the early 1990s onward. During that time, he accused Usama bin Ladin, who was then trying to launch new wars after Afghanistan, of preferring to invest in weapons rather than in mosques." *Id.* at 338.<br><br>Contrary to Plaintiffs' assertion of Saudi support for Al Wadi, Plaintiffs Exhibit 305 states that Al Wadi was "expelled from Saudi territory." *Id.* at 339. It states "repression of the Salafis by the Saudi government during that time permanently affected al-Wadi's relation to politics and for a time lent force to his stiff criticism of Saudi leadership." *Id.* The article continues: "[I]ndependence from the Saudi monarchy appeared as particularly appealing to activists who were dismayed by the endorsement of certain Saudi policies (such as the presence of American and allied troops . . . .)." *Id.*<br><br>It further states: "For al-Wadi, this was not the case, because the war was one that would undoubtedly cause Muslim civilian casualties. . . . [T]he attacks of September 11, 2001 and other, similar operations were generally considered illegitimate and wrong . . . . In the post-9/11 period |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and after al-Wadi's death, condemnation of violence became a way for Yemen's Salafi movement to legitimize its position." *Id.* at 339-340. |
| 453. | As explained by Plaintiffs' expert Youssef, "[n]umerous jihadists were recruited for Al Qaeda from the various religious institutes that Wadi established in Yemen including, Abdu Ali Sharqawi aka 'Riyadh the Facilitator.'" Ex. 5, Youssef Rpt. 59. Sharqawi was a senior Al Qaeda member close to Bin Laden, who recruited Bin Laden's bodyguards, worked closely with 9/11 attack planner Mohamed Atef, and knew at least eleven of the September 11th hijackers. Ex. 174, JTF-GTMO Detainee Assessment of Mohammed Zarnuqi dated June 18, 2008 at 3, 11; Ex. 173, JTF-GTMO Detainee Assessment of Abdu Ali Sharqawi dated July 7, 2008 at 2, 9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Youssef Report should be excluded; Plaintiffs Exhibits 173 and 174 are inadmissible hearsay. *See* Objections Chart.<br><br>Youssef's report (and Plaintiffs' repetition of it) misstates significant aspects of the hearsay documents on which he relies, and omits relevant details. Plaintiffs Exhibit 174 says (at 11) that Muqbil Wadi "recruited at least two other" detainees "to travel to Pakistan for JT-related missionary work." It also does not say Al Wadi recruited them "for al Qaeda." Plaintiffs Exhibit 174 also says the purported recruitment "by [Wadi] in Yemen *possibly* indicates . . . al-Qaida affiliation." Pls. Ex. 174 (Zarnuqi JTF-GTMO Assessment) at 11 (emphasis added).<br><br>Plaintiffs Exhibit 173 says (at 2) Sharqawi "attended" an institute founded by Al Wadi, but it does not say Al Wadi recruited him to al Qaeda. Al Wadi is not mentioned in the "Recruitment and Travel" discussion in Plaintiffs Exhibit 173 at 3. This institute "houses 3,000 to 4,000 students." *Id.* at 2 n.2 (institute "engages in legitimate religious study while facilitating the recruitment and training of extremist elements"). |
| 454. | In 2000, Akram Alzamari observed Thumairy hosting Sheikh Wadi at the King Fahad Mosque. Ex. 101, Alzamari Dep. 125:23-126:5. Alzamari recalled seeing | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy greet Wadi on his arrival and invite Wadi to lunch. Ex. 101, Alzamari Dep. 126:23-127:5. Alzamari also remembered that he saw Thumairy and Wadi together on multiple occasions in the library of the Mosque. *Id.* Pursuant to this Court's Order, Alzamari's deposition was conducted by written questions. Plaintiffs were not allowed to watch the testimony live and had no opportunity to ask Alzamari follow-up questions. ECF No. 6322 (July 7, 2020 Order of Magistrate Judge Netburn denying Plaintiffs' motion for oral deposition after deposition by written questions). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Alzamari's testimony as to Al Wadi and Al Thumairy allegedly sitting in the Mosque library "a few times," Pls. Ex. 101 (Alzamari Tr.) 127:3-5, is inadmissible hearsay not based on personal knowledge. *See* Objections Chart. Alzamari admitted, "I was not present each time," which means his testimony about the two men sitting in the library is based on second hand information.<br><br>Plaintiffs omit critical portions of testimony concerning Al Thumairy and his alleged interactions with Al Wadi. Alzamari testified that he did not believe Al Thumairy knew the hijackers intended to harm people in the United States. Pls. Ex. 101 (Alzamari Tr.) 124:18-23. He also testified that it was not unusual for Al Thumairy to attempt to assist Saudis who visited the King Fahad Mosque. *Id.* at 122:8-16 ("Did Fahad al-Thumairy frequently attempt to assist other Saudis who visited the King Fahad Mosque? True. Yes.").<br><br>Alzamari did not testify that Al Thumairy "host[ed] Wadi." Alzamari claimed he was "aware of" "contact between" Al Thumairy and Al Wadi, but none of the contact Alzamari mentioned involved hosting. *Id.* at 125:14-126:5. Alzamari testified: "Q What did you know about the contacts of Fahad al-Thumairy with Sheikh Wadi? A I know that when he arrived, he greeted him. He was – they were in the library, and he invited him once for – for lunch. And I was invited, but I didn't go. And a few times the Sheikh came to the mosque and they sat in the library. I was not present each time." *Id.* at 126:23-127:5. |
| 455. | The arrangements that Thumairy made for Sheikh Wadi were similar to the logistical | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | support that Hiber and the Ibn Taymiyah Mosque provided for the "Blind Sheikh" Abdel Rahman when he visited Los Angeles in 1993. ████████ ████████ who was identified as a member of Thumairy's extremist cell at the Mosque. ████ handled rental leases and utilities for Wadi and told ████████ to limit his contacts with Wadi. Ex. 2, EO 0143; Ex. 72, Madha Decl. ¶ 19. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, both documents Plaintiffs cite – Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 19 and Plaintiffs Exhibit 2D (EO 143) are not based on persona knowledge and are inadmissible hearsay. *See* Objections Chart. Plaintiffs' assertion of similarities between "arrangements" that Al Thumairy allegedly made for Al Wadi and that Al Hiber allegedly made for Abdel Rahman in 1993 is unsupported.<br><br>There is no evidence that Al Thumairy made *any* arrangements for Al Wadi.<br><br>Moreover, Plaintiffs Exhibit 2D (EO 143) also does not mention Al Wadi or Al Thumairy making arrangements for him; it mentions a man named ████████ "making the apartment rental arrangements" for an individual identified as ████████ Plaintiffs Exhibit 2D (EO 143). There is no allegation that Al Thumairy directed ████ to make these arrangements.<br><br>Pls. Ex. 72 (Madha Decl.) ¶ 19 similarly does not mention Al Wadi or any arrangements Thumairy allegedly made for Al Wadi. Madha's testimony regarding the alleged "group" in ¶ 19 is inadmissible hearsay and not based on personal knowledge. Madha testified that he was *not* a member of the group, did not attend their meetings, and had no personal knowledge of what the group discussed. Pls. Ex. 128 (Madha Tr.) 38:24-39:17. Plaintiffs' assertion that Al Thumairy led an extremist cell at the Mosque is refuted above. *See supra* Response to ¶¶ 398, 412, 420, 421. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2D (EO 143) further contradicts Plaintiffs' theory that Al Thumairy was part of an extremist group at the Mosque with people like ██. The FBI reports that "KFM became angry with ██ and obtained [a] restraining order" against him. As discussed in response to ¶¶ 420 and 421 above, Mosque leadership reportedly expelled extremists, and reported them to the police, as this exhibit says happened to ██. The Mosque never attempted to take any similar action against Al Thumairy. |
| 456. | According to Plaintiffs' expert Youssef, "[o]ne of Sheikh al Wadi's supporters in the US posted on the internet contemporaneous information about [Wadi's] visit to California in 2000 and provided contact numbers for Wadi, including one in San Francisco, ██ 2791. Ex. 5, Youssef Rpt. 59-60. Ex. 39A, Internet Archive Affidavit at 23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 39A is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Youssef's assertion is incorrect and unsupported. It is true that Youssef makes the assertion, including that ██ 2791 is a "contact[] number[] for Wadi." In support, Youssef says: "I have reviewed captured views from the year 2000 of messages posted on the website which is named "Alsalafyoon.com." That document (Plaintiffs Ex. 39A at 23) is inadmissible hearsay and should not be considered for the truth of the matter asserted.<br><br>In any event, the captured view dated September 28, 2000, says "Shiekh Mukil arrived in usa LA, CA . . . To contact him call ██ 2791." *Id.* at 23. However, a subsequent post states: "This is the most recent number to contact sheikh mukbil ██-0210[.] The first [*i.e.*, the -2791 number] was the cell ***of the brother who greeted them*** *and toured* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *them. Use this updated number now.*" *Id.* (emphasis added). Thus, the very "captured views" Youssef claims he reviewed actually show that the 2791 number was not Wadi's number. It was the number of a different person (an unidentified person) who previously greet "Sheikh Mukbil" or "Shiekh Mukil." The name "Wadi" and "Muqbil" do not appear. |
| 457. | Between January 2000 and September 2000, Thumairy used his home phone in Los Angeles to place 12 calls to this same Wadi contact number—(███████ 2791— posted by Wadi's supporter. Ex. 5, Youssef Rpt. 60; Ex. 477, FBI 000559-72 at 0564; Ex. 471, FBI000591-601 at 0599; Ex. 480, FBI 000625-000633 at 0629, 0630, Ex.482 FBI 000645-000653 at 0650, 0651. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. *See* Objections Chart.

To the extent a response is required, Plaintiffs and their purported expert Youssef exaggerate the record – as this Court has already found – in claiming that Al Thumairy contacted Al Wadi based on these same alleged calls.

As described in the preceding paragraph (¶ 456), the 2791 number was not a "Wadi contact number." The online postings Youssef claims he reviewed to connect the -2791 number to Al Wadi and to calls placed from Al Thumairy's home phone, *see* Response to ¶ 456 and Plaintiffs Ex. 39A at 23, in fact show only calls with an unidentified person who claimed to have met with a person identified as "Shiekh [sic] Mukil," or "Mukbel," or "Mukbil" – the name "Al Wadi" does not appear in the document, nor does Muqbil. *See* Pls. Ex. 39A at 23 ("This is the most recent number to contact sheikh mukbil ███████-0210 The first [the -2791 number] *was the cell of the brother who greeted them and toured them.* Use this updated number now.") (emphasis added). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The timing of the calls from Al Thumairy's home phone also contradicts Plaintiffs' suggestion that Al Thumairy was contacting Al Wadi. The online posting begins on September 28, 2000, stating: "Sheikh Mukil arrived in usa LA, CA." The calls Plaintiffs and Youssef rely upon occurred between January 2000 and September 25, 2000. *See* Pls. Ex. 471 (FBI 410-29); Pls. Ex. 477 (FBI 559-72); Pls. Ex. 480 (FBI 625-633); Pls. Ex. 482 (FBI 645-53). Thus, the calls from Al Thumairy's home phone to the unidentified person began nine months before "Shiekh Mukil's" arrival in California. There is no evidence that Al Thumairy was placing calls to the 2791 number to contact Al Wadi.<br><br>The Court has already considered and rejected Plaintiffs' theory. As the Court explained when presented with the same phone contacts and online postings in support of Plaintiffs' motion for reconsideration to obtain more discovery: "At best, the evidence shows that the individual ████ ████████ . . . may have subsequently been in contact with another individual who is allegedly affiliated with al Qaeda." *See* ECF No. 6579, November 25, 2019 Reconsideration Order at 11 (denying requests for more discovery). |
| 458. | Between May 18 and 29, 2000, Thumairy traveled to San Francisco on a MOIA work trip authorized and paid for by the MOIA. Ex. 261, KSA 1535. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the evidence shows that Al Thumairy took a trip to San Francisco from May 24-28, 2000 (not May 18 to May 29). KSA Ex. 183 (KSA 8435). Al Thumairy recalled that the trip was for tourism and to do the Friday prayer at a mosque there. *See* Pls. Ex. 107 (Thumairy Tr.) 354:6-17. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 459. | On May 16, 2000, just prior to departing on this trip to San Francisco, Thumairy made two phone calls to ███████-2791. Ex. 479, FBI 000591-601 at 599 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4."

To the extent a response is required, the phone records show calls from Thumairy's home phone, to the 2791 number. But as explained in the response to ¶¶ 456-57 above, there is no evidence that the 2791 number was Al Wadi's or that Al Wadi was even in the U.S. at the time of the alleged calls in May of 2000. To the contrary, the document Youssef relied upon to attribute the 2791 number to Al Wadi states "the first [the -2791 number] *was the cell of the brother who greeted them and toured them.* Use this updated number now." Pls. Ex. 39A at 23 (emphasis added). It also states, on September 28, 2000 – more than four months after the calls Plaintiffs reference from May – that "Shiekh Mukil arrived in usa LA, CA . . . To contact him call ███████2791."

The Court considered this same evidence and said of it: "At best, the evidence shows that the individual whom Thumairy called . . . may have subsequently been in contact with another individual who is allegedly affiliated with al Qaeda." *See* ECF No. 6579, November 25, 2019 Reconsideration Order at 11 (denying requests for more discovery). |
| 460. | Despite the evidence of Thumairy's personal contacts with Sheikh Wadi and Wadi's recognized religious stature, Thumairy claimed that he did not know Wadi. Ex. 107, Thumairy Dep. 351:18-352:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, this assertion is improper attorney argument. It is undisputed that Thumairy testified that he did not remember Al Wadi. There is no evidence to contradict that testimony.<br><br>The record contradicts Plaintiffs' assertion of "personal contacts." As described above, the contacts alleged by Alzamari are not based on personal knowledge and are so fleeting ("a few" discussions, a greeting, and one lunch invitation) that it is unsurprising Thumairy would not be remember them twenty years later. *See* Responses to ¶¶ 454-455.<br><br>The contacts allegedly based on phone records show contacts with a *different person* before "Shaikh Mukil" – who Plaintiffs claim must be Wadi despite his name not appearing – even arrived in California. *See* Responses to ¶¶ 456-459. |
| **V.C.** | Thumairy had numerous phone contacts with radical extremists. | As described below, Plaintiffs do not establish that many of the alleged phone contacts involved Al Thumairy. They also do not establish that they involved radical extremists. Nor do they establish that the contacts had anything to do with extremism. The phone contacts were analyzed by the FBI, and its final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 461. | In May and July 2000, Thumairy made multiple phone calls to individuals at ██████████ in Santa Ana, CA, who were identified in an ████████ ███████████████████████ ███████████████████ Ex. 566, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | FBI ███████████████████ The LIFG was listed by the United Nations on October 6, 2001 as being associated with Al Qaida and Osama Bin Laden. *See* Ex. 67C, UN Security Council Sanctions Listing for Libyan Islamic Fighting Group. | Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited record does not state that Thumairy made multiple calls "to individuals at ███████████ who were identified in an FBI investigation." Plaintiffs Exhibit 566 (FBI 11762) states only that "Thumairy's phone . . . was in communication with [two numbers] multiple times between May 2000 and July 2000. These phones . . . were subscribed to ████████████████ ███████████████████." Pls. Ex. 566 (FBI 11762) (capitalization omitted). The record does not state the duration of the calls, that Thumairy placed them, and it does not state who if anyone received the calls. It is speculation that the calls were received by the particular people who were "subjects of FBI investigations." *Id.* at FBI 11762.<br><br>Plaintiffs Exhibit 566 (FBI 11752) is an Operation Encore Investigation Update and is hearsay. The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 462. | Thumairy also had "phone connectivity with fundraisers for the LIFG." Ex. 566, FBI 011752-011767 at 11763. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs Exhibit 566 (FBI 11752) contains the quoted material. However, the document is preliminary investigative material from the FBI's ongoing Operation Encore investigation, not its conclusion. The FBI considered this alleged connectivity specifically in the context of investigating whether Thumairy assisted the 9/11 hijackers. *See* Pls. Ex. 566 (FBI 11763). The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 463. | An employee of the ▮▮▮▮▮▮▮▮ was a leader of the LIFG in Canada and a suspected accomplice of Al Qaeda operative Ahmed Ressam, who planned the "Millennium Bombing" of the Los Angeles Airport at end of December 1999. Ex. 5, Youssef Rpt. 52-53; Ex. 566, FBI 011752-011767 at 011762. On December 14, 1999, U. S. custom agents foiled Ressam's plot when he attempted to enter the U.S. from Canada on a ferry boat to Washington State. Ex. 5, Youssef Rpt. 52; Ex. 566, FBI 011752-011767 at 11762-63. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, undisputed that the FBI Investigation Update includes the quoted language, though Plaintiffs Exhibit 566 (FBI 11752) does not provide the details Plaintiffs provide of the custom agent's efforts to foil Ressam's plot. Plaintiffs Exhibit 566 (FBI 11752) is not a final FBI conclusion. The Youssef Report cites nothing pertaining to this purported foiled plot. Youssef Rep. 52-53, n.153. |
| 464. | The FBI noted the concerning nature of "Thumairy's phone connectivity to ▮▮▮▮ ▮▮▮▮▮▮▮▮, associated with Ressam's AQ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [Al Qaeda] plot …." and concluded, "Thumairy's nexus to this earlier LA-based network linked to Ressam, LIFG and other AQ- associated elements is relevant in assessing his later assistance in arranging the meeting between the 9/11 hijackers and Bayoumi." Ex. 566, FBI 011752-011767 at 11763. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 566 (FBI 11752) contains the quoted material. However, the document is preliminary investigative material from the FBI's ongoing Operation Encore investigation, not its conclusion. The FBI considered this alleged connectivity specifically in the context of investigating whether Thumairy assisted the 9/11 hijackers. *See* Pls. Ex. 566 (FBI 11763). And the final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 465. | Plaintiffs' expert Youssef agreed with the FBI's reasoning, stating that Thumairy had a "nexus to terrorism from his personal and phone contacts that [was] confirmed by his contacts with the hijackers and the actions that he took to provide them with support." Ex. 5, Youssef Rpt. 53. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef improperly relies on an FBI investigative report while Operation Encore was ongoing. As noted above, the FBI considered this alleged connectivity specifically in the context of investigating whether Thumairy assisted the 9/11 hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *See* Pls. Ex. 566 (FBI 11763). The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 466. | Thumairy's passport, for example, shows that on August 26, 1999 he crossed the land border from the U.S. into Canada at Douglas, Canada, south of Vancouver, near where Ressam had moved in the fall of 1999 in advance of his planned Millennial attacks. Ex. 213, KSA 6882-6902 at 6894; Ex. 339, *U.S. v. Ressam*, 679 F.3d 1069, 1073 (9th Cir. 2012). Despite this hard proof of his travel near to where Ressam was based shortly before Ressam relocated there to put his attack plans into place, however, Thumairy told the 9/11 Commission that he never traveled outside of California except a trip to Disneyworld. Ex. 5, Youssef Rpt. 53, n. 13; Ex. 213, KSA6882-6902 at 6894; Ex. 90, Snell Decl., Ex. 3 at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef Report should be excluded. Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) is inadmissible hearsay to the extent it is offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objection Chart. *See* Objections Chart.

To the extent a response is required, Al Thumairy was asked at his deposition whether he had ever been to Canada. He responded: "We went by car to the city of Vancouver only, then returned. How long were you there? . . . Perhaps two days, possibly. Who were you with? My family." Pls. Ex. 107 (Thumairy Tr.) 355:22-7.

There is no evidence that Al Thumairy's family vaction to Vancouver was somehow connected to Ressam's plot. Plaintiffs suggestion that any such connection exists because Al Thumairy was in southwest Canada during the late summer of 1999, five months before Ressam's plot, is ridiculous.

By Youssef and Plaintiffs' logic – if this fact is an "example" of the kind of "nexus to terrorism" referenced in the preceding paragraph – then |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | anyone in southwest Canada in the late summer or fall of 1999, where Ressam had moved, likewise has a "nexus to terrorism." This unfounded speculation underscores the unreliability of Youssef's report and his failure to apply a reliable methodology.<br><br>Yousseff fails to cite the only admissible evidence available explaining what happened on that trip (Al Thumairy's testimony). He suggests, without proof, that Al Thumairy must have withheld the trip to Canada from the 9/11 Commission, but he cannot account for the fact that Al Thumairy readily testified under oath about that trip. The evidence shows Al Thumairy had nothing to conceal. |
| 467. | Thumairy contacted other extremists tied to Al Qaeda in 1999. On August 20, 1999, Thumairy placed a seven-minute call to the home phone in Saudi Arabia of two brothers who would subsequently become Guantanamo Bay detainees. Ex. 566, FBI 011752-011767 at 11762. The FBI noted that the elder of the two detainee brothers was linked to Al Qaeda's murder of Paul Johnson, a U.S. government contractor. Johnson's severed head was found in the older brother's residence following a shoot-out with Saudi security forces. in Saudi Arabia in 2004. Ex. 566, FBI 011752-011767 at 11762. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11752) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' first sentence is improper attorney argument.<br><br>Plaintiffs Exhibit 566 (FBI 11752) does not state that Al Thumairy placed a call. It says that "[c]ommunications analysis identified a call from Thumairy's phone." Pls. Ex. 566 (FBI 11762) (capitalization omitted). Plaintiffs Exhibit 566 (FBI 11752) does not reference Al Qaeda in describing Johnson's murder. Regardless, the quoted portion of Plaintiffs Exhibit 566 (FBI 11762) also demonstrates that Saudi Arabia was an active opponent – not a supporter – of extremists who targeted Americans. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *See* Pls. Ex. 566 (FBI 11762) (noting that "Saudi security forces" engaged in a shootout).<br><br>Plaintiffs Exhibit 566 (FBI 11752) also was not a conclusion; it was part of the FBI's ongoing Operation Encore. The FBI considered the material Plaintiffs describe in the context of investigating whether Al Thumairy assisted the 9/11 hijackers. *See* Pls. Ex. 566 (FBI 11763). And the final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| V.D. | **Thumairy hosted extremists at the Mosque in July 2001.** | This assertion comes from a mischaracterization of the testimony of Khalil al Khalil, who was a director of the King Fahad Mosque. As set forth below, Plaintiffs miscite his testimony. Al Khalil in fact clarified that he did not mean that Al Thumairy "hosted" the men. *See* Pls. Ex. (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."); 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>Moreover, there is no evidence Al Thumairy knew of their alleged extremism, and Khalil also clarified that, by extremist, he meant anti-Saudi, not anti-American, as described below. |
| 468. | Khalil admitted that Thumairy hosted three Saudi extremists in Los Angeles in July-August 2001 and brought them to the King Fahad Mosque. Ex. 113, Khalil Dep. 78:10-86:12. Khalil said he wasn't happy because Thumairy had hosted the men and allowed | Plaintiffs' misrepresent Al Khalil's testimony.<br><br>Al Khalil clarified that he did not know and could not say whether Al Thumairy "hosted" the men. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."); 393:5-17 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | one of them to preach at the Mosque. Ex. 113, Khalil Dep. 80:15-19. | (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>Al Khalil also testified that he was upset with Al Thumairy because, if Saudi officials were coming to the Mosque, he wanted to be informed because "I wanted to treat them in a good way, if they're . . . officials." Pls. Ex. 113 (Khalil Tr.) 82:1-9.  He made clear that "they were not doing anything wrong."  *Id.* at 81:23-82:1.  Al Khalil himself said he wanted to "host them for dinner."  *Id.* at 79:9-16.  He wanted to make sure that if "they were coming officially, probably the mosque would be informed. So my concern was were they really coming in official capacity or visiting, it was just curiosity."  *Id.* at 79:22-80:1.<br><br>Al Khalil testified that he then called Al Ammar to ask about the visitors and was told the Saudi Mabahith was looking for them.  *Id.* at 80:4-14. This statement is hearsay.  In any event, Al Khalil's concern at that point was that the visitors were anti-Saudi, not anti-American.  *Id.* at 81:1-8 ("And my concern was about Saudi Arabia, not about here.  Because those guys were against the government.").<br><br>There is also no evidence that Al Thumairy was aware the Saudi government was allegedly looking for the visitors.<br><br>Al Thumairy did not remember the visitors or Al Khalil's instruction.  *See* Pls. Ex. 107 (Thumairy Tr.)  397:15-398:12.  He testified that he did not "host" anyone (in the sense of arranging apartments for them) except for one incident when a sick man came from Saudi Arabia looking for medical treatment.  *See id.* at 401:2-8. |
| 469. | Khalil said that he had dinner with the three men and Thumairy at an apartment complex located near the corner of Sepulveda and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Venice Boulevard in Los Angeles. Ex. 113, Khalil Dep. 83:22-85:7. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Al Khalil testified as described. Thumairy did not remember the visitors or the dinner. *See* Pls. Ex. 107 (Thumairy Tr.) 397:15-398:17.<br><br>To the extent Al Khalil had dinner with the visitors, this underscores that having dinner with these alleged visitors was not suspicious or an indication of support for extremism as Plaintiffs' imply. Al Khalil worked actively to expel any purported extremists from the King Fahad Mosque. *See* Response to ¶¶ 420-421 above. |
| 470. | Khalil called MOIA Deputy Minister Abdulaziz Ammar to make a report and get information about the three men hosted by Thumairy. Ex. 113, Khalil Dep. 80:4-7. Ammar told Khalil that the Mabahith (the Saudi equivalent of the FBI) were looking for the men. Ex. 113, Khalil Dep. 80:4-10. Ammar identified one of the three men as a MOIA employee. Ex. 113, Khalil Dep. 83:1-3. Khalil also asked if the men were on vacation, and Ammar told him no. Ex. 113, Khalil Dep. 80:11-14. | Plaintiffs' assertion that Al Thumairy "hosted" the three men is contradicted by the evidence. Thumairy testified that he did not "host" anyone (in the sense of arranging apartments for them) except for one incident when a sick man came from Saudi Arabia looking for medical treatment. *See* Pls. Ex. 107 (Thumairy Tr.) 401:2-8.<br><br>Al Khalil clarified that he did not know and could not say whether Al Thumairy "hosted" the men. *See* Pls. Ex. (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."); 393:5-17 (testifying that he had no personal knowledge "at all" of Al Thumairy hosting the men).<br><br>Al Khalil did not testify that he called Ammar "to make a report." He called out of "curiosity," because he wanted to know if the visitors were officials from Saudi Arabia, in which case, Al Khalil wanted to know so he could "treat them in a good way." *Id.* at 82:1-9.<br><br>Plaintiffs' rely on inadmissible hearsay in the cited portion of the deposition concerning what Al Ammar reportedly said. *See* Objections |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Chart. Plaintiffs accurately describe portions of Al Khalil's hearsay testimony but leave out important context.<br><br>Al Khalil further stated that his concern at that point was that the visitors were anti-Saudi, not that they were anti-American. *Id.* at 81:1-8 ("And my concern was about Saudi Arabia, not about here. Because those guys were against the government."). |
| 471. | After speaking with Ammar, Khalil claimed that on August 19, 2001, he instructed Thumairy not to host any Saudis preaching at the Mosque without Khalil's permission. Ex. 113, Khalil Dep. 78:10-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Khalil clarified that he did not mean that Thumairy "hosted" the men Plaintiffs claim Al Thumairy hosted. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know.") 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>Al Khalil also testified that he was upset with Al Thumairy because he wanted to be informed if visitors who might be officials from Saudi Arabia came to the Mosque, because Al Khalil wanted to ensure that any visiting officials were treated well. Pls. Ex. 113 (Khalil Tr.) 79:9-82:9. Al Khalil also testified that he had a meeting with Al Thumairy to ask him not to meet at the Mosque with preachers from Saudi Arabia "without my knowledge" out of "concern" "about Saudi Arabia, not here. Because those guys were against [the Saudi] government." *Id.* at 80:15-81:8. |
| 472. | In July 2001, Thumairy and Faisal Al Muhanna jointly leased two short term rental apartments, units 2-120 and 1-135, at | Plaintiffs Exhibit 484 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Avalon Westside apartment complex in Los Angeles located on Sepulveda Boulevard. Ex. 484, FBI 001042-REV2021 (FBI report detailing Thumairy's Los Angeles apartment rentals at Avalon complex). Both Muhanna and Thumairy were listed as the residents of the apartments. Ex. 484, FBI 001042-REV2021 at 1044-46. | Al Thumairy provided important context about the Avalon complex. He testified that he resided at the Avalon apartment complex twice. *See* Pls. Ex. 107 (Thumairy Tr.) 331:4-7. He did not recall jointly leasing any apartments; that he did not have a roommate but lived with his family; that Faisal Al Muhanna would "help [Al Thumairy] in the translation with the English language" and "could have been with [him], could have been, during the time the lease was written." *Id.* at 323:23-325:5.<br><br>Al Thumairy also testified that he remembered "an old man who was sick, a Saudi national," "who contacted the mosque and we made a reservation for him at the Avalon." *Id.* at 331:10-18. This was the only person Al Thumairy recalled helping to get an apartment. *Id.* at 333:18-334:1 (describing a person being "treated at the UCLA Hospital, which was close to the residence where I stayed, and the reservation was on a monthly basis. I believe he stayed for a month, two months or three. Then he left.").<br><br>The 9/11 Commission summary of Al Thumairy's interview reports Al Thumairy assisting a sick man and his son with obtaining an apartment. Sageman described the FBI's investigation into the details of Thumairy's alleged statement to the Commission, and he notes that the FBI corroborated it and that "[t]he patient and his two sons stayed at the Avalon during July-August 2001" and the patient stayed in "apartment 120." KSA Ex. 167 (Sageman Rep.) 314-315. |
| 473. | The location of that apartment complex and the dates of Thumairy's lease match Khalil's testimony that he witnessed Thumairy host three extremists and had dinner with them at an apartment near Sepulveda and Venice in Los Angeles in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | August 2001. Ex. 113, Khalil Dep. 83:22-85:7. | To the extent a response is required, Plaintiffs' assertion is inaccurate and improper attorney argument.<br><br>Al Khalil clarified that he did not mean that Al Thumairy "hosted" the men. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know.") 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>The location of the apartment and the dates do not "match" Al Thumairy's alleged hosting of three "extremists." As described in response to ¶ 468 above, Al Thumairy did not "host" extremists.<br><br>And the hearsay document showing alleged rental details lists move in dates of "07/10/2001" and "07/03/2001." Pls. Ex. 484 (FBI 1044, 1046). That does not "match" alleged hosting in August of 2001.<br><br>Those details do match Al Thumairy's testimony that he helped secure an apartment for a sick man, detailed in the preceding paragraph. Mr. Sageman's review of the FBI documents led him to conclude that "[t]he patient and his two sons stayed at the Avalon during July-August 2001." KSA Ex. 167 (Sageman Rep.) 314-315 & nn.1287-1288 (citing KSA Ex. 184 (FBI 1053) (the lead of Thumairy allegedly providing housing at the Avalon for the hijackers was "covered"); Pls. Ex. 2N (EO 743-47)); *see also id.* at EO 738-40 (summary of interview with the treating doctor). |
| 474. | To secure the apartment for the extremists that Thumairy was hosting, MOIA Embassy Head Sowailem provided Thumairy with a July 5, 2001 letter stating that Thumairy was employed at the Embassy in Washington, D.C. and earned $60,000 per | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | year. Ex. 484, FBI 001042-REV2021 at 1045; Ex. 222, KSA 8414. | Plaintiffs Exhibit 484 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph contains improper attorney argument. There is no evidence that Thumairy secured any apartment for "extremists." *See* Response to ¶ 468 (refuting claim that Al Thumairy hosted extremists); ¶¶ 472-73 (refuting claim that Al Thumairy secured apartments for anyone other than a sick man seeking medical treatment at UCLA).<br><br>Al Khalil clarified that he did not mean that Al Thumairy "hosted" the men. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."), 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>Undisputed that Sowailem prepared a letter "To Whom It May Concern" certifying that Thumairy – who received his paychecks from the Embassy – was employed by the Embassy and stating his salary. *See* Pls. Ex. 222 (KSA 8414). |
| 475. | In the lease application, Faisal Al Muhanna wrote that he worked at the Saudi Embassy. Ex. 484, FBI 0001042-REV2021 at 1044-45. He listed ▮▮▮▮▮▮▮3574" as his Saudi Embassy work phone number. Ex. 484, FBI 001042-REV2021 at 1045. That Embassy number was Sowailem's direct line at MOIA's Embassy Office. Ex. 484, FBI 0001042-REV2021 at 1044-45. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 484 is inadmissible hearsay. *See* Objections Chart.<br><br>The assertion that the listed phone number was "Sowailem's direct line" is not supported by Plaintiffs Exhibit 484. Plaintiffs Exhibit 484 does not attribute any phone number to Al Sowailem. And the "to whom it may |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | concern" letter from Al Sowailem cited in the previous paragraph, Plaintiffs Exhibit 222, lists a different number.<br><br>Faisal Al Muhanna testified that he did not know Al Sowailem, *see* Ex. 108 (Al Muhanna Tr.) 74:7-18, and that during his time in the United States, he was a full time student. *Id.* at 13:5-15:19; 19:16-21:8; 23:2-13; 24:12-16; 33:6-34:11 (testifying about his schooling from 1995 through 2002). |
| 476. | On the lease application, Thumairy wrote down his home address of ▮▮▮ Huron Avenue, Culver City." Ex. 484, FBI 001042-REV2021-001046-REV2021 at 1045. That Huron Avenue rental home, just a block from the King Fahad Mosque, is the residence address that Thumairy had on file with the Embassy. Ex. 224, KSA 8454. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 484 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the application is not in evidence, and there is no evidence that Al Thumairy "wrote down" anything on it. The hearsay document does reference an address that is purportedly attributed to Al Thumairy, but it is as "the emergency contact" for someone else who was filling out the application.<br><br>It is undisputed that Al Thumairy lived at that address on Huron for a period of time and that Thumairy updated his address on file to the Huron Avenue address in 1999. But Al Thumairy did not recall when he moved out. *See* Pls. Ex. 107 (Thumairy Tr.) 260:10-13. He also testified that he could not remember if he was at Huron Avenue or the "housing where I moved, Sepulveda Boulevard" in the late summer of 2001. *Id.* at 260:23-261:2. |
| 477. | Thumairy claimed that he had no recollection of hosting the three men, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Khalil's instruction to him, or having dinner with Khalil. Ex. 107, Thumairy Dep. 397:10-398:22. Thumairy claimed that the only lodging he ever obtained was for a "sick man" who was named "al-Shamik or al-Shema or something along the lines." Ex. 107, Thumairy Dep. 400:1-8, 402:2- 8. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed.<br><br>The evidence also shows that Al Thumairy did not in fact host the three men. Khalil clarified that he did not mean that Al Thumairy "hosted" the men. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."), 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>It is unsurprising that Al Thumairy would not recall visitors to the mosque more than 20 years prior to his deposition. |
| 478. | Thumairy's statements and testimony about the "sick man" were inconsistent. When interviewed by investigators for the 9/11 Commission, Thumairy first said he saw the sick father and son at the Consulate; then, during his deposition, said the sick man called the Mosque. Ex. 90, Snell Decl. Ex. 3 at 5; Ex. 107, Thumairy Dep. 331:8-333:15. When first asked by the 9/11 Commission, Thumairy stated that he could only recount one occasion "around 1999" when he helped a "man…with his sick father" and "Thumairy volunteered that he did not find an apartment for these visitors or make any reservation for them." Ex. 90, Snell Decl., Ex. 3 at 4. Thumairy changed | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) is inadmissible hearsay to the extent it is being offered for its truth. It also cannot be proffered for impeachment because it is neither endorsed by Al Thumairy nor a verbatim transcript. *See* Objections Chart.<br><br>To the extent a response is required, Al Thumairy's alleged statements and testimony about assistance to the "sick man" are not inconsistent; to the contrary, they are consistent and were corroborated by an FBI investigation. Both reference Al Thumairy helping visitors secure |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | his testimony regarding the nature of his assistance to the sick man, admitting at his deposition that he helped a "old man" reserve an apartment to be rented on a month-to- month basis. Ex. 107, Thumairy Dep. 333:16-335:2. | housing only one time. *See* Pls. Ex. 62 (Thumairy Ex. 831A) at 4; Pls. Ex. 107 (Thumairy Tr.) 333:16-19. Both reference a sick person. *See id.* Both referenced being near UCLA hospital. *See* 9/11 Commission Interview at 4-5; Pls. Ex. 107 (Thumairy Tr.) 333:18-23. Both referenced a stay of up to three months. *See* Pls. Ex. 62 (Thumairy Ex. 831A) at 4-5; Pls. Ex. 107 (Thumairy Tr.) 333:23-334:1. As discussed above, Sageman described how the FBI investigated and corroborated Al Thumairy's statements. *See supra* Response to ¶ 473. |
| | | The purported inconsistencies are minor details, and because there is no transcript of the 9/11 Commission interview, it is impossible to know if the document accurately records what Al Thumairy said. The 9/11 Commission reports that Al Thumairy said he saw the sick father and son at the Consulate. Pls. Ex. 90 (Snell Decl. Ex. 3) at 5. But the discussion of this issue at Al Thumairy's deposition reveals why a transcript is so important: "Thumairy: And I remember also an old man who was sick, a Saudi national, who called the consulate and asked for someone to help him get an apartment . . . . He contacted the mosque and we made a reservation for him at the Avalon . . . Q: You said, sir, that he first contacted the consulate; isn't that right? Thumairy: No, no. He contacted the mosque. I forgot now, but I believe he contacted the mosque." Pls. Ex. 107 (Thumairy Tr.) 331:10-23. It is impossible to know if, during his interview with the 9/11 Commission, there was similar back and forth about details of this kind. |
| | | Plaintiffs claim that "Thumairy changed his *testimony* regarding the nature of his assistance." But Al Thumairy was not testifying before the 9/11 Commission; a hearsay summary asserts that he did not find an apartment for the visitors or make reservations for them, but the only admissible evidence is that Al Thumairy did make reservations for them as he testified. His testimony is consistent on this point and did not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | change. The FBI documents on which Plaintiffs rely regarding the lease application (Plaintiffs Exhibit 484) support his testimony. |
| 479. | Thumairy's claimed detailed recollection of information about an "old man" he supposedly met on one occasion (used as a substitute for the three Saudi extremists he was witnessed and documented as hosting) is at odds with the fact that he could repeatedly not remember names of persons, such as Musaed Al Jarrah, Ismail Mana, and Omar Al Bayoumi, individuals that he worked with closely over the course of years in the Saudi government, or the hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar. Ex. 107, Thumairy Dep. 424:23-427:2 (Thumairy denies knowing Jarrah and denies calling him despite 64 calls made by Thumairy to Jarrah's personal cell phone from 7/30/2000 to 2/3/2003 and despite Jarrah being instrumental in Thumairy extension to serve in Los Angeles in 2001.); Ex. 107, Thumairy Dep. 219:7-221:13; 224:17:225:23 (Thumairy claims to not remember Mana ▓▓▓▓▓▓▓▓ | Plaintiffs' assertion is improper attorney argument and mischaracterizes the record.<br><br>Plaintiffs' claim that Al Thumairy used the old man as a substitute for three Saudi extremists he allegedly hosted, each aspect of the claim is disputed and addressed above. *See* Response to ¶ 468 (refuting claim that Al Thumairy hosted extremists); ¶¶ 472-73 (refuting claim that Al Thumairy secured apartments for anyone other than a sick man seeking medical treatment at UCLA and discussing evidence corroborating Al Thumairy's testimony about the sick man).<br><br>Regarding Plaintiffs' assertion that Al Thumairy had a "detailed recollection" about the old man, they claim in consecutive paragraphs first that Al Thumairy recalled too few details (¶ 478) and now that he recalled too many. The evidence shows that Al Thumairy never claimed to have a detailed recollection of information about an old man. His testimony uses a generic description of "an old man who was sick, a Saudi national," Pls. Ex. 113 (Thumairy Tr.) 331:10-14, rather than providing such basic detail as a name. Thumairy also did not offer a date.<br><br>The evidence also shows, as described in response to the prior paragraph, that Al Thumairy had a consistent recollection of the general event: he recalled a sick person coming to seek medical treatment; he recalled providing some assistance with housing; and he recalled the person staying near the UCLA hospital.<br><br>Plaintiffs' assertion that his recollection of these general events is "at odds" with his inability to remember names from more than twenty years earlier is unsupported. During his three-day deposition, Al Thumairy was asked about dozens of people from events more than twenty years in his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 107, Thumairy Dep. 307:20-308:15 (Thumairy denies knowing Bayoumi and denies meeting with Bayoumi at the King Fahad mosque even after being confronted with Dr. Khalil's testimony to the 9/11 Commission that Bayoumi came to the KFM on a number of occasions and used to frequently come to visit Thumairy); Ex. 107, Thumairy Dep. 331:5-335:8; 343:19-347:1 (Thumairy confronted over his specific memory of the name and other details about a man he allegedly helped in Los Angeles, while he could not recall interaction with Hazmi and Mihdhar). | past. He did not remember some of the names he was asked about, as Plaintiffs note; he readily recalled others; and remembered others in vague terms or with prompting, in the same kind of generic way as he remembered the "old man." For example:

*Consul General Salloum and Sami Ibrahim*: "I do remember the Consul General, Dr. Sami . . . . And you're talking about Dr. Sami Ibrahim? Yes, that's the one, Sami Ibrahim." Pls. Ex. 113 (Thumairy Tr.) 105:24-106:23.

*Sowailem*: "I don't remember at this moment the exact procedure. But we had an administrative personnel that I would communicate with . . . . And he's the person that I would communicate with regularly regarding time of vacation and so forth. I mean the office in which there was a man called Al Sowaili, and he was affiliated with the Ministry of Islamic Affairs. Q Are you referring to Khalid Al Sowailem, sir? A Yes. Khalid Al Sowailem." *Id.* at 51:8-52:3.

*Madha*: "Counsel: Do you recall a man named Usman Madha, sir? Thumairy: I don't know the name . . . Where was he? Counsel: He worked at the mosque. Thumairy: Usman Madha? Counsel: Yes. Thumairy: Maybe Madha. There was an employee at the mosque by the name of Madha." *Id.* at 226:6-227:24.

*Mohammed al Muhanna*: "Thumairy: The last year, a man came. His name was al-Muhanna. He came in the last year. Counsel: Mohammed al-Muhanna? Thumairy: Yes, correct." *Id.* at 120:24-121:4.

*Abdelhafiz Kebhaj*: "Did you know a man named Abdelhafiz Kebhaj? I don't know. I don't remember him. There was a[] muezzin at the mosque |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | or the person who calls for a prayer by the name of Abdelhafiz. If that's him, I'm not sure." *Id.* at 244:19-245:10.<br><br>Contradicting Plaintiffs' accusation that Al Thumairy selectively claimed not to remember people, it is noteworthy that Al Thumairy acknowledged knowing people Plaintiffs have described as part of Al Thumairy's (non-existent) extremist cell. For example, he recalled Battakhi and Al Muhanna. *See id.* at 120:24-121:4, 204:15-205:5.<br><br>It is unsurprising that Al Thumairy would not remember the names of every person he might have interacted with or every person who remembered Al Thumairy. The events were long in his past, and he explained that it would be "impossible" to know the name of all the congregants at the King Fahad Mosque because there were so many. *Id.* at 565:7-22. Further, Al Thumairy testified, it was well known that he was imam of the Mosque, and it is reasonable that someone who visited would know his name but he would not recognize theirs. *See id.* at 565:23-566:13. |
| 480. | Neither Thumairy nor Faisal Al Muhanna could provide any explanation for their joint apartment rentals documented in the apartment complex records with dates corresponding precisely to Khalil's testimony about the visit from the Saudi extremists. Ex. 107, Thumairy Dep. 328:12-21; Ex. 108, Muhanna Dep. 60:13-18, 62:6-20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this assertion is improper attorney argument and is inaccurate.<br><br>As discussed in response to ¶ 473 above, the dates of the apartment rentals Plaintiffs reference do *not* align with Al Khalil's testimony (leases began in early July 2001; alleged hosting in August). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As also discussed above in response to ¶¶ 472-473, Al Thumairy provided an explanation in his testimony that was consistent with what the 9/11 Commission claims he said and with subsequent efforts by the FBI to corroborate Al Thumairy's explanation. |
| 481. | The FBI learned that in 2000-2001, groups Saudi males "like Sadhan and Sudairy" traveled to California, went to camps in Arizona, and met Thumairy privately. The FBI reported that Thumairy "always met them at a house to pray, but not at the Mosque, except for Friday prayers." The FBI further reported that "many at the King Fahd Mosque became concerned about this unusual trend, and the fact that the Mosque had no control over the travelers." Ex. 2, EO 0528. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2L (EO 528), is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the document does not identify any source for the alleged information, which came from a redacted name. Contrary to Plaintiffs' assertion that "[t]he FBI further reported" contents of this document, the FBI does not state in this document that it agrees with or has any evidence to support the unnamed source's accusation.

Further, the document does not state that Al Thumairy met with the alleged group "privately."

On its face, the document also states that Al Thumairy "was described by [BLANK] as being kind, knowledgable, and smart, and that he did not appear to be an extremist."

In any event, there is no evidence that the assertions in the cited document were substantiated. To the contrary, while the cited document was part of the Operation Encore investigation, the FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 482. | According to Plaintiffs' expert Youssef, Khalil's immediate call to senior MOIA official Ammar in Riyadh to provide a report and get information about the three men that Thumairy was hosting is "consistent with detailed Saudi Government oversight practices" of its officials working abroad. Ex. 5, Youssef Rpt. 62; *See also* Ex. 113, Khalil Dep. 79:7-80:23. Khalil said that Ammar was quickly able to identify one of the men as a MOIA employee and the others as subjects being sought by the Mabahith (Saudi FBI counterpart). Ex. 113, Khalil Dep. 80:8-10; 82:10-22. Youssef concluded, "[t]his shows how the MOIA was intimately aware of the activities and nature of the work of its officials and others inside the U.S." Ex. 5, Youssef Rpt. 62. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>The cited portion of Al Khalil's testimony is also inadmissible hearsay (Al Khalil repeating what Al Ammar allegedly said). *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is inaccurate in multiple respects. Al Thumairy testified that he did not "host" anyone (in the sense of arranging apartments for them) except for one incident when a sick man came from Saudi Arabia looking for medical treatment. *See See* Pls. Ex. 107 (Thumairy Tr.) 401:2-8. And Al Khalil clarified that he did not mean that Al Thumairy "hosted" the men. *See* Pls. Ex. 113 (Khalil Tr.) 107:11-23 ("I didn't know if he was hosting them, but I – he met with them. . . . He was really meeting with them. Hosting them, I don't know."), 393:5-17 (testifying that he had no personal knowledge " at all" of Al Thumairy hosting the men).<br><br>Further, Al Khalil did not testify that he called Al Ammar "to make a report." He called out of "curiosity," because he wanted to know if the visitors were officials from Saudi Arabia, in which case, Khalil wanted to know so he could "treat them in a good way." *Id.* at 82:1-9. And he did not say that Al Ammar was able to quickly identify one of the men as a Ministry of Islamic Affairs employee. He said "[o]ne of them, by the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | way, was working with the ministry. Others not." *Id.* at 82:15-19. He does not say that this information came from Al Ammar or how quickly.<br><br>There is also no evidence to support Youssef's *ipse dixit* regarding "oversight practices," and the record contradicts it. Far from demonstrating anything about routine oversight practices over its "officials working abroad," Al Ammar's alleged reaction applies only to individuals who the Mabahith was "looking for." Pls. Ex. 113 (Khalil Tr.) 80:8-10. If the hearsay testimony is believed, these were individuals about whom the Saudi government had suspicions, so the level of oversight applicable to them says nothing about oversight over officials working abroad who are *not* being pursued by Saudi law enforcement. Moreover, the hearsay testimony reports that the Mabahith was *looking for them*, which means the Saudi government did not know where these individuals were. This contradicts Youssef's assertion that "MOIA was intimately aware of the activities and nature of its officials and others inside the U.S." |
| 483. | As stated by plaintiffs' expert Youssef, "Evidently no action was taken by the MOIA in response to Khalil's report to Ammar about the extremists hosted by Thumairy" because " Saudi Arabia did not produce documents about the communications between Khalil and Ammar or the names of the MOIA employee or the other persons visiting Thumairy" that Khalil and Ammar discussed at the time the three Saudi men visited Thumairy. Ex. 5, Youssef Rpt. 62. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no support for Plaintiffs' assertion that Al Thumairy hosted extremists, *see supra* Response to ¶ 468, or that Al Khalil was "report[ing]" to Al Ammar, *see* Response to ¶ 482 (noting that Al Khalil called out of curiosity).<br><br>The Youssef Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia fully complied with its discovery obligations, As set forth above, the evidence shows that Al Thumairy did *not* host extremists. |
| **VI.** | **THUMAIRY LEFT LOS ANGELES JUST PRIOR TO THE 9/11 ATTACKS AND NEVER RETURNED TO THE KING FAHAD MOSQUE, BUT CONTINUED TO WORK IN CALIFORNIA TO PROMOTE THE SAUDI EXTREMIST NETWORK.** | Plaintiffs fail to cite any evidence in support of these false assertions, as detailed below. |
| **VI.A.** | **Thumairy suddenly and unexpectedly left Los Angeles shortly before the 9/11 Attacks and likely had some foreknowledge of the attacks.** | Al Thumairy's departure was not sudden or unexpected; it was planned and consistent with prior leave. *See infra* Responses to ¶¶ 484-486, 488.<br><br>Further, there is no evidence that Al Thumairy had any foreknowledge of the attacks. Indeed, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion regarding Al Thumairy.<br><br>The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>The 9/11 Commission specifically focused on alleged support by Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." EO 0491. |
| | | The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101–3. |
| 484. | Thumairy suddenly left California for Saudi Arabia shortly before the 9/11 Attacks. According to the testimony of Usman Madha, who worked at the King Fahad Mosque for the Islamic Foundation of Sheikh Ibn Taymiyah from 1998 to 2013, the timing of Thumairy's departure was unexpected. Ex. 72, Madha Decl. ¶¶ 5, 7, 24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 72 (Madha Decl.), ¶¶ 5, 7, and 24, is not based on personal knowledge and is inadmissible. *See* Objections Chart. Madha bases his supposed belief that Al Thumairy's departure was "sudden and unexpected" on his belief that Al Thumairy told anyone at the Mosque "including Shuaib" in advance of his vacation. But Madha testified that he does not actually know whether or not Al Thumairy told Shuaib about his upcoming vacation. Pls. Ex. 128 (Madha Tr.) 34:8-12 (Madha agreeing that he "do[es]n't know whether Mr. Thumairy actually informed others that he was planning to leave"). |
| | | To the extent a response is required, contrary to Plaintiffs' assertion of a "sudden" departure, Al Thumairy requested a vacation to run from late |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | August through September 22, 2001 by no later than August 13, 2001. *See* KSA Ex. 185 (KSA 8413) (handwritten note dated August 13, 2001: Thumairy request for twenty 26 days of vacation starting on August 27, 2001); KSA Ex. 186 (KSA 8377) (Letter dated August 13, 2001: "I am sending you a request by Sheikh Fahd bin Ibrahim Al Thumairy, who wishes to take regular leave for 26 days to begin on Monday 08/06/1422 AH [8/27/2001 AD]"). Consistent with the documentary evidence, Thumairy testified that he was "on vacation" at the time of the September 11 attacks. *See* Thumairy Tr. 360:17-22. |
| 485. | Thumairy had already taken his annual summer vacation two months earlier; he sent a letter to MOIA requesting his "normal vacation" on May 8, 2001, and his passport shows that he was in Saudi Arabia on June 17, 2001 and did not return to the U.S. until July 1, 2001. Ex. 680T, KSA 8423; Ex. 273, KSA 2783; Ex. 680G, at KSA 6895-96. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs' statement is inaccurate and mischaracterizes the evidence. It is true that Al Thumairy was on vacation beginning in June and ending in early July 2001 and that he subsequently planned a second summer vacation to begin in August and end in September. But Plaintiffs cite no evidence to support the suggestion that Al Thumairy was allowed only one vacation per summer. In fact, there was nothing unusual about him taking the second vacation in the summer of 2001, as he did the same thing in prior years.

During the summer of 1998, for example, Al Thumairy left the United States on June 29, returning on July 9, 1998, as demonstrated by passport records. *See* KSA Ex. 48 (KSA 6892) (entry stamp for July 9, 1998). Documents from Saudi Arabia's production show that this was a "vacation." *See* KSA Ex. 187 (KSA 591); KSA Ex. 188 (KSA 2768). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | He then left the United States for a second time, departing in August and returning in October 1998. *See* Pls. Ex. 680G (KSA 6893) (entry stamp for October 18, 1998). This second leave of the summer was also vacation (referred to in documents as "regular" or "casual" leave). KSA Ex. 189 (KSA 590) (seeking "regular leave"); KSA Ex. 190 (KSA 2784) (approving "casual leave" starting September 15, 1998). There was nothing sudden or unexpected about Al Thumairy doing the same in 2001. |
| 486. | Nevertheless, Thumairy testified that he decided to take a second personal vacation that summer and was in Europe on September 11, 2001. Ex. 107, Thumairy Dep. 360:17-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that Al Thumairy testified to taking (and in fact scheduled and took) a second vacation in the late summer / early fall of 2001, just as he had done in 1998. *See supra* Response to ¶ 485. Also undisputed that he testified he had returned to Saudi Arabia on vacation and, during that vacation, traveled to Europe and that he was in Europe on September 11, 2001. |
| 487. | MOIA propagator Shuaib admitted to Mosque manager Madha that Thumairy left the Mosque unexpectedly without telling Shuaib and that Shuaib had to scramble to find replacements for Thumairy in the Mosque's prayer schedule. Ex. 128, Madha Dep. 80:9-82:11. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's testimony is inadmissible hearsay. *See* Objections Chart.<br><br>Regardless, as noted above, Madha bases his supposed belief that Al Thumairy's departure was "sudden and unexpected" on the belief that Al Thumairy did not tell anyone at the Mosque "including Shuaib" in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | advance of his vacation. But Madha testified that he does not actually know whether or not Al Thumairy told Shuaib about his upcoming vacation. Pls. Ex. 128 (Madha Tr.) 34:8-12 (Madha agreeing that he "do[es]n't know whether Mr. Thumairy actually informed others that he was planning to leave").<br><br>Similarly, when asked, "[w]hy did you think Mr. Thumairy's departure was sudden and unexpected," Madha testified, "I have no idea." *Id.* at 81:4-9. At that point, Plaintiffs' counsel (which also wrote Madha's declaration in the first instance) engaged in a series of leading questions to elicit the testimony they now cite: "Q: And Mr. Shuaib, who scheduled the sermons, told you that he didn't know Mr. Thumairy was leaving, right? Objection. Form. A: That's correct. Q: And Mr. Shuaib had to scramble to find somebody to deliver the sermons; isn't that correct? Objection. Form. A: That's correct." Madha Tr. 81:20-82:11.<br><br>Regardless, the evidence shows that by August 13, at the latest, Al Thumairy had already requested leave from late August through September 22, 2001. So his absence from Los Angeles was not sudden and unexpected; at most, Madha's testimony establishes that he lacked personal knowledge of Al Thumairy's travel schedule. *See* KSA Ex. 186 (KSA 8377); KSA Ex. 185 (KSA 8413). |
| 488. | MOIA records show that Thumairy's request for leave was made at the last minute, with Thumairy asking on August 28, 2001 for the leave to begin the next day, less than two weeks before the 9/11 Attacks. Ex. 272, KSA 2767. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' assertion is also false and misrepresents the record. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy did not request leave "last minute" on August 28, 2001. He requested leave two weeks in advance of his August 27 vacation, submitting his hand-written letter to Al Sowailem on August 13, 2001. Al Sowailem forwarded the request that same day. *See* KSA Ex. 186 (KSA 8377); KSA Ex. 185 (KSA 8413). |
| | | Plaintiffs Exhibit 272, which is dated August 28, 2001, is *not* "Thumairy's request for leave" as Plaintiffs erroneously claim. Plaintiffs Exhibit 272 is a document from the personnel department formally approving a vacation Al Thumairy had requested weeks earlier. |
| | | Al Thumairy also testified that he submitted a request to extend this vacation by an additional five days on relatively short notice. *See* Pls. 107 (Thumairy Tr.) Ex. 465:24-466:19. He explained that the "administrative system" allows employees, once per year, to take five days of "emergency" leave, which is "not necessarily urgent;" rather "[a]nyone could take it" to "extend[] the vacation." *Id.* |
| 489. | Thumairy was in Saudi Arabia on September 3, 2001, when he obtained a private visa to exit Saudi Arabia. Ex. 680G, at KSA 6896. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that there is a stamp from September 3, 2001 in Al Thumairy's passport obtained in Saudi Arabia. Nothing in the document says it is a "private" visa, however. It is also undisputed that, while on vacation in Saudi Arabia during September of 2001, Al Thumairy left Saudi Arabia to travel to Europe and was fully authorized to do so. |
| 490. | Thumairy's sudden, unexpected departure from Los Angeles prior to the 9/11 Attacks | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | shows that he had some foreknowledge of those Attacks. Phone records show that Thumairy received two calls on his cell phone from ███████, whom Bayoumi had introduced to Hazmi and Mihdhar and who became close to the two hijackers. Ex. 670, FBI 008565-8566 at 8566. ███████ phone list (recovered by the FBI) included a listing for Thumairy's cell number ███-0777. Ex. 559, FBI 008913-14 at 14, *See also* Ex. 2, EO 0566 (number identified to Al Thumairy). On August 4, 2001, ███████ called Thumairy on that cell number, ███-0777, two times at 10:37am and 11:11am, both for three minutes. Ex. 670, FBI 008565-66. The two calls are the only calls that ███████ placed to Thumairy in the records produced by the FBI. Ex. 670, FBI 008565-8566 at 8566. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This discussion cites Plaintiffs Exhibit 559 and Plaintiffs Exhibit 2L (EO 566), both of which are inadmissible hearsay and not authenticated. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph contains improper attorney argument.<br><br>Plaintiffs' claim that Al Thumairy had foreknowledge is also contradicted by the evidence; illogical; and contrary to the finding of every U.S governmental investigation, *see supra* Response to Header VI, preceding ¶ 484.<br><br>As described in the responses to ¶¶ 485, 487, and 488 above, Al Thumairy's departure was not sudden or unexpected. On August 13, two weeks in advance, Al Thumairy requested a 26 day vacation to begin in late August and last into late September of 2001. This was his second summer vacation, which is consistent with prior years during his time in America. Thus, the factual premise of Plaintiffs' claim is incorrect.<br><br>It is also illogical to conclude that Al Thumairy had foreknowledge of the 9/11 attacks. As Sageman has explained, the Al Qaeda manual "stresses the importance of secrecy in operations," and "compartmentation" – "strict separation of different operations" – to protect an operation from discovery. KSA Ex. 167 (Sageman Rep.) 249-251. There would have been no reason for the hijackers to risk the operation by confiding its details to Al Thumairy, and there is no evidence that they did so. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs also fail to explain why, if Al Thumairy thought a sudden and unexpected departure was necessary, he requested leave on August 13 yet waited two weeks to leave. Further, in subsequent paragraphs, Plaintiffs discuss Al Thumairy's return to the United States. *See* ¶¶ 525-527. Someone with foreknowledge of the attacks who left the U.S. suddenly and unexpectedly would not return to the U.S. later in 2001.<br><br>The only evidentiary support Plaintiffs cite are two alleged phone calls between Al Thumairy and ▇▇▇▇▇▇ – who interacted with the hijackers in San Diego in 2000 – in August of 2001. Plaintiffs misattribute this phone number to Al Thumairy; the evidence shows this was not his phone number at the time of those alleged call. That number was not registered to Al Thumairy until April 22, 2002 – more than eight months *after* Plaintiffs claim ▇▇▇▇▇ called Al Thumairy. KSA Ex. 134 (FBI 365) ("Start Srv 04/22/2002; *see also* KSA Ex. 191 (FBI 368) (Al Thumairy's first bill, "Welcome to Cingular Wireless," dated April 22, 2002). Thus, the available evidence shows that the -0777 number was *not* Al Thumairy's cell phone at the time of the alleged calls with ▇▇▇▇▇▇ in August of 2001.<br><br>Further still, there is no evidence of any kind about the substance of these phone calls, and no evidence they were "received by" Al Thumairy. And the timing suggests they had nothing to do with the hijackers, since the calls were placed in early August of 2001, at least eight months after they had left Southern California. |
| **VI.B.** | **Saudi Arabia gave Thumairy two excellent performance reviews, a quick promotion, and an extension to continue serving in Los Angeles.** | Al Thumairy did receive excellent performance reviews because of his work serving the community and King Fahad Mosque, as described below. Al Thumairy also receied an extension for the same reason. Al Thumairy did not receive a quick promotion; more than two years after requesting a routine promotion based on time in service, Al Thumairy received it, increasing from level 8 to level 9 after more than four years working for the Ministry of Islamic Affairs. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 491. | Thumairy's Saudi Government superiors clearly approved of Thumairy's work as part of the extremist network. Thumairy received outstanding performance reviews, was commended for his "considerable Da'wah efforts," and his term in Los Angeles was extended. Ex. 297, KSA 8364; Ex. 300, KSA 8496-98; Ex. 206, KSA 2695-97. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the first sentence of this paragraph contains improper attorney argument and is inaccurate. Al Thumairy had no "extremist network." *See supra* Responses to ¶¶ 398, 412, 420, 21. And there is no evidence that superiors "approved" of non-existent extremism. |
| | | Al Thumairy did receive a positive performance review for his work as a religious advisor and eventually imam at the King Fahad Mosque, as the exhibits Plaintiffs cite demonstrate. And his initial five year term in Los Angeles was extended for two years. There is no evidence that the reasons for Thumairy receiving a promotion and extension are inaccurate. |
| | | Al Thumairy testified that he was not aware of his performance evaluation, "[b]ut this performance evaluation is something that happens to all employees. It's an administrative procedure all employees go through." Thumairy Tr. 169:22-170:4. |
| 492. | While in Los Angeles, MOIA rewarded Thumairy with a promotion at the first available opportunity in 2000. Ex. 205, KSA 2692 (confirms Thumairy's promotion in February 2000 to a level 9 "Propagator" and describes his job as "Field propagation of Islam (Da'wah), in addition to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs' assertion is contradicted by the record. Thumairy was not promoted from level 8 to level 9 until July |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | supervising the programs of the Islamic Foundation of Shaikh Ibn Taymiyyah"). | of 2000, *see* KSA Ex. 192 (KSA 2662). The document from February of 2000 is a preliminary step in the promotion process. Plaintiffs cite nothing to support their claim that July 2000 – four years and four months after Al Thumairy stated with MOIA – was "the first available opportunity" for a promotion. Al Thumairy explained that it took four years to receive a promotion, meaning he would have been eligibile in March or April of 2000. *See* Pls. Ex. 107 (Thumairy Tr.) 167:2-6.<br><br>The evidence also shows that Al Thumairy's promotion was far from "quick" as Plaintiffs claim. The process took more than two years. By February of 1998, Al Thumairy had asked for a promotion, and Al Sowailem submitted supporting paperwork to the Ministry of Islamic Affairs. *See* Pls. Ex. 297 (Ghudaian Ex. 440) (referring to a "request submitted" by Thumairy; Sowailem asking MOIA to "[k]indly nominate [Al Thumairy] to one of the office's vacancies on the 9th rank"); Pls. Ex. 107 (Thumairy Tr.) 172:17-173:9 (Al Thumairy testifying: "I'm the one who asked [Al Sowailem] prior [to him submitting the paperwork], because it takes years. Usually, the employees ask for the promotion years ahead, because it takes year for the procedures to go through."). Two years later, in February of 2000, the Ministry determined that Al Thumairy was eligible. KSA Ex. 193 (KSA 8544). Then in May of 2000, a committee recommended promoting Al Thumairy. *See* Pls. Ex. 271 (KSA 2693). In June, the Minister of Islamic Affairs signed off on the promotion and Al Thumairy was formally nominated. *See* KSA Ex. 194 (KSA 2688). Finally, in July of 2000, there was a formal administrative decision approving the nomination. *See* KSA Ex. 192 (KSA 2662). |
| 493. | Prior to his promotion, Thumairy was given at least two performance reviews by his superior at the Embassy, Sowailem. Ex. 206, KSA 2695-97; Ex. 300, KSA 8496-98. One month after Sowailem assigned | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy to supervise all MOIA propagators in California, Sowailem nominated Thumairy for an extraordinary early promotion in February 1998 based on what Sowailem described as Thumairy's "considerable Da'wah efforts." Ex. 297, KSA 8364; Ex. 5, Youssef Rpt. 47-48. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To these extent a response is required, undisputed that Al Thumairy's administrative supervisor, Al Sowailem, signed two performance evaluation documents. One of the documents is undated, so it is unclear if the evaluations were performed separately.

There was nothing extraordinary about Al Sowailem nominating Al Thumairy. As Al Thumairy explained, "I'm the one who asked [Al Sowailem] prior [to him submitting the paperwork], because it takes years. Usually, the employees ask for the promotion years ahead, because it takes year for the procedures to go through." Pls. Ex. 107 (Thumairy Tr.) 172:17-173:9. As shown in response to the prior paragraph, that is precisely what happened: it took more than two years for Al Thumairy to actually receive the promotion referenced in Al Sowailem's February 1998 letter.

There is no evidence of any connection between AlThumairy's promotion and his alleged nomination to supervise propagators in California. The only basis for an inference that Plaintiffs identify is the timing, but as explained in the preceding paragraph, while the alleged nomination occurred in 1998, Al Thumairy's promotion did not actually occur until two years later, in July 2000. Further, Al Thumairy himself initiated the promotion process, whereas he never even heard of the nomination – confirming there is no link between the two. *See* Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1 (Al Thumairy explaining that, although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work").

The Youssef Report should be excluded and does not support Plaintiffs' assertion. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 494. | Sowailem's nomination letter for Thumairy enclosed a "request" from Thumairy in support of his promotion. Ex. 297, KSA 8364. Saudi Arabia, however, did not produce Thumairy's request. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia produced documents that could be located after a reasonable search and fully complied with its discovery obligations. |
| 495. | Thumairy's job evaluations – both signed by Sowailem –evaluated Thumairy's work with the highest rating – "excellent." Plaintiffs' expert Youssef concluded that the evaluation with a missing or illegible date, Ex. 206, KSA 2695-97, was likely prepared immediately prior to Thumairy's promotion. Ex. 206, KSA 2695-97 (undated); Ex. 300, KSA 8496-98 (dated February 1998); Ex. 5, Youssef Rpt. 47-48, n.123. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, undisputed that Al Sowailem rated Al Thumairy's performance as excellent.<br><br>Regarding Youssef's speculation about the "likely" date of the undated document, no one with personal knowledge offered any testimony about the timing of Plaintiffs Exhibit 206. It is also unclear what Youssef means, but to the extent he speculates that Plaintiffs Exhibit 206 was likely prepared "immediately prior" to Al Thumairy's actual promotion in 2000 (rather than the initial request in 1998), there is no evidence to support that speculation. Indeed, Youssef does not even offer an explanation for the assertion, let alone evidence to support it. |
| 496. | In late 2000 and into early 2001, Sowailem and Jarrah both worked to submit requests to extend Thumairy's appointment in Los | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Angeles and to get an assistant (Mohamed Al Muhanna) assigned to help Thumairy. Ex. 289, KSA 6995 (Sowailem's 2000 request to extend Thumairy's appointment); Ex. 257, KSA 1256 (Jarrah's 2001 request to extend Thumairy's appointment, Ambassador Bandar's furtherance of that request to Shaikh Saleh Al Ash Shaikh). In November 2000, Sowailem sent a letter urging that Thumairy's term be extended. Ex. 289, KSA 6995. His letter demonstrated his work relationship with Thumairy, who he described as someone who was: "one of the best and distinguished propagators"; "widely accepted by the Muslim community"; "praised by the officials at the Saudi Consulate in Los Angeles." Ex. 289, KSA 6995. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph contains improper attorney argument. Plaintiffs' exaggerate the extent to which Al Sowailem or Al Jarrah pushed for the extension. In November of 2000, Al Sowailem sent a letter "suggest[ing]" that MOIA extend Thumairy's delegation. Pls. Ex. 289 (Awad Ex. 461). The only document cited concerning Al Jarrah, Plaintiffs Exhibit 257, is a note from Al Jarrah to the Office of the Ambassador reminding the office that Al Thumairy's delegation was expiring "in four days," and that MOIA had not received a draft letter from the Ambassador to the Minister of MOIA supporting Al Thumairy's extension. Pls. Ex. 257 (Qattan Ex. 423) at 1256. Al Jarrah's note included an attachment from the Ambassador to the Minister of Islamic Affairs (not from Al Jarrah), and that note states only: "I hope that Your Eminence may extend his [Al Thumairy's] delegation for two years." *Id.* at 1257.<br><br>There is even less support for Plaintiffs' assertion about Al Muhanna. Al Sowailem affirmatively suggested that Al Muhanna *not* be assigned to the King Fahad Mosque. In Plaintiffs Exhibit 289, Al Sowailem notes that the Ministry had already assigned Al Muhanna to the King Fahad Mosque. Al Sowailem recognizes Al Muhanna's academic credentials but then writes: "*If* you consider another propagator to the mosque, the services of Sheikh Mohammed al Muhanna could be used in *other Islamic* centers." Pls. Ex. 289 (Awad Ex. 461) (emphasis added). In other words, he is not advocating sending Al Muhanna to Los Angeles and says that *if* that happens, he can support centers other than the King Fahad Mosque.<br><br>As for Al Jarrah, he does not even mention Al Muhanna in Plaintiffs Exhibit 257. The Ambassador's note to the Minister proposed that the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Ministry "delegate an assistant" "given the expanding area." But it never mentions Al Muhanna. *See* Pls. Ex. 257 (Qattan Ex. 423) at 1257.<br><br>Plaintiffs Exhibit 257 states that Al Thumairy's extension is based on his "praised effort in the immate work and in serving the community through lectures or lessons over the past period," as well as his familiarity with the mosque. In Plaintiffs Exhibit 289, Al Sowailem offers similarly positive comments about Al Thumairy's work. There is no evidence that Al Thumairy was promoted for any reason other than his quality work as an imam at the Mosque. *See* Pls. Ex. 289 (Awad Ex. 461).<br><br>Regarding Plaintiffs' assertion that Al Sowailem's letter (Plaintiffs Exhibit 289) demonstrates a work relationship with Al Thumairy, the letter actually shows the opposite. In the letter, Al Sowailem does not describe his own observation of or experience with Al Thumairy but instead relies on the opinions of others. *See* Pls. Ex. 289 (Awad Ex. 461) (citing acceptance "by the Muslim community" and praise "by the officials at the Saudi Consulate"). |
| 497. | Thumairy, however, was not "widely accepted" as Sowailem stated; rather, he was "distant and closeminded to the majority of worshippers" and catered only to his a "small group of men who shared his particular extreme worldview." Ex. 72, Madha Decl. ¶ 18. Nor was Thumairy "praised by [Consulate] officials"; both senior Consulate officials who were deposed claimed they didn't know Thumairy (contrary to what Thumairy told investigators in 2003-2004) and didn't know of any praise for him. Ex. 124, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's testimony is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha admitted that he was not a member of the "small group" he claims existed and had no personal knowledge of what was discussed. Pls. Ex. 128 (Madha Tr.) 38:24-39:17. He also did not speak Arabic and could not understand Thumairy's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ibrahim Dep. 74:19-75:8; Ex. 95, Awad Dep. 97:23-98:19. | sermons.  Here therefore did not base his assertion that Thumairy had a particular worldview on personal knowledge.  *Id.* at 38:3-17. |
| | | To the extent a response is required, Plaintiffs' statement contains improper attorney argument and mischaracterizes the evidence. |
| | | Al Thumairy testified that he was welcoming of muslims and non-muslims, that he never heard criticism that he was "too closed," and that no one objected to his work for the Mosque or to him becoming imam.  Pls. Ex. 107 (Thumairy Tr.) 212:14-214:17. |
| | | Plaintiffs' assertion that there was no praise from Consulate officials is contradicted by the record.  Plaintiffs Exhibit 289 reports such praise.  Plaintiffs point to the testimony of just two Consulate officials, but Plaintiffs did not depose all Saudi Consulate officials, including the one Al Thumairy mentioned by name several times by name during his deposition – Consul General Saloum.  *See*, *e.g.*, Pls. Ex. 107 (Thumairy Tr.) 106:21-107:6 ("What I do remember is the Consul General Salloum . . . . I remember him coming every Friday to pray . . . with us at the mosque.  Just like many other people, visitors and employees from the consulate who came every Friday to pray.").  There is therefore no basis to conclude from the materials Plaintiffs cite that Consulate officials did not praise Al Thumairy's work.  And there is no reason to question the veracity of what Al Sowailem wrote in Plaintiffs Exhibit 289. |
| | | Regarding the testimony Plaintiffs did elicit, Al Awad and Al Ibrahim did not – and could not – testify about whether other people at the Consulate praised Al Thumairy.  Al Ibrahim was asked if he was "aware of praise within the consulated about" Al Thumairy.  He was instructed to answer "yes" or "no" whether you have "knowledge of the subject."  He testified: "I don't have any knowledge." Pls. Ex. 124 (Ibrahim Tr.) 75:2-8.  Al Awad's testimony was only that he did not personally praise Al Thumairy. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Pls. Ex. 95 (Awad Tr.) 97:23-98:19. These witnesses thus testified that they had no knowledge on the subject and did not personally praise Al Thumairy; that does not disprove anything Al Sowailem wrote in Plaintiffs Exhibit 289. |
| | | Plaintiffs' assertion that Al Awad and Al Ibrahim said they "didn't know Thumairy" is directly contradicted by their testimony. Al Awad was asked: "Sir, did you know a man named Fahad al-Thumairy while you were in Los Angeles?" He answered: "Yes." Pls. Ex. 95 (Awad Tr. 24:1-13). And Al Ibrahim obviously recalled Thumairy because he specifically remembered hearing Thumairy deliver Friday sermons at the Mosque. *See* Pls. Ex. 124 (Ibrahim Tr.) 67:20-23. |
| 498. | In March 2001, Embassy Islamic Affairs Deputy Jarrah sent a handwritten note four days before the expiration of Thumairy's term to urge the Ambassador to file the formal request for Thumairy's extension. Ex. 257, KSA 1256. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | In Plaintiffs Exhibit 257, Al Jarrah is not "urg[ing]" the Ambassador to do anything. First, he is writing to the Ambassador's office, not the Ambassador personally. Second, the note from Al Jarrah is a reminder that four days remain in Al Thumairy's term and an update that, as far as Al Jarrah was aware, the Ministry of Islamic Affairs had not yet received a draft regarding Al Thumairy's extension. There is no urging; Al Jarrah does not ask anyone to send the draft; he does not say someone should send it; he is simply providing an update and reminder. |
| 499. | Ambassador Bandar signed and approved that request in March 2001 to keep Thumairy in place "until the mosque matters are settled because of his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [Thumairy's] knowledge of all the matters." Ex. 248, KSA 0589. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 248 (Khalil Ex. 204) contains the quoted materials, but Plaintiffs omit important context explaining why Al Thumairy was extended. Immediately preceding the quote Plaintiffs include, the Ambassador's note states that Al Thumairy, "the mosque Imam delegated by the ministry, *has done a good job as an imam* and in *serving the sons of the community*, whether by lectures or lessons, and since [his] delegation period is approaching its end, [w]e hope to extend the delegation." Pls. Ex. 248 (Khalil Ex. 204) (emphasis added). Plaintiffs Exhibit 248 (Khalil Ex. 204) thus shows that Al Thumairy was extended because, in addition to his knowledge of all "the mosque['s] matters," he was a good imam and served the community. *Id.* |
| **VI.C.** | **Thumairy attended a MOIA event in Denmark on September 11, 2001.** | Undisputed. |
| 500. | Although the MOIA records produced by Saudi Arabia show that Thumairy went to Saudi Arabia for a second vacation in late August 2001, Thumairy left Saudi Arabia on September 6, 2001 and went on a MOIA "work trip" to attend a MOIA propagation conference in Denmark alongside Sowailem and other high level MOIA officials. Thumairy was at the conference with Sowailem on September 11, 2001. Ex. 272, KSA 2767; Ex. 680G, KSA 6895-96; Ex. 107, Thumairy Dep. 361:6-365:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the paragraph contains improper characterizations. The record does show that Al Thumairy took a second vacation in late August 2001 to Saudi Arabia. This was consistent with past practice and planned weeks in advance. *See supra* Response to ¶¶ 485, 488.<br><br>The record also shows that Al Thumairy left Saudi Arabia in September of 2001, though the cited materials do not appear to specify September 6 for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | a conference in Denmark. *See* Pls. Ex. 107 (Thumairy Tr.) 361:1-5 ("The vacation was in Saudi Arabia. But I traveled to attend a conference around the days when those events [of September 11] took place. Then I returned to Saudi Arabia."). He considered this a "work trip" "to attend the conference." *Id.* at 361:6-9.<br><br>Plaintiffs' assertion that Al Thumairy was "with Sowailem on September 11, 2001" and attended the conference "alongside" him is inaccurate. Al Thumairy testified that Sowailem was "present in the conference" where Al Thumairy was, as well, "but he was *not* with me." *Id.* at 364:23-24 (emphasis added).<br><br>Plaintiffs' assertion that Al Thumairy attended the conference alongside "other high level MOIA officials" is also inaccurate. Al Thumairy was asked who else from the Ministry attended, and he testified: "I don't remember. But I remember Sowailem was there also. And there was a large number of attendees from Europe." These attendees were "[n]ot necessarily" "working for the Ministry of Islamic Affairs." "There were officials from mosques there and Islamic centers." *Id.* at 362:9-21. The evidence does not reference any "high level" Ministry of Islamic Affairs officials. |
| 501. | Thumairy testified that "I don't remember anyone" at the conference other than Sowailem, couldn't recall details about the conference, and claimed that his role at the conference was "[j]ust attending" and that he did not give a lecture as reported in the newspaper article. Ex. 107, Thumairy Dep. 361:6-365:12 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' mischaracterize Al Thumairy's testimony. He did not testify that he could not remember "anyone" at the conference other than Al Sowailem. Instead, he testified that he could not remember anyone besides Al Sowailem "who worked |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | for the Kingdom of Saudi Arabia." Pls. Ex. 107 (Thumairy Tr.) 363:6-11. As discussed in the prior paragraph, he recalled other attendees in general terms: "there were a large number of attendees from Europe;" "[t]here were officials from mosques there and Islamic centers." *Id.* at 362:9-21.<br><br>Al Thumairy remembered attending "lecures and forums," among other details. *Id.* at 363:17-18.<br><br>Al Thumairy did not give a lecure at a prison. The referenced newspaper article (Plaintiffs Exhibit 47) is inadmissible hearsay. *See* Objections Chart. Al Thumairy explained that "[t]here was a proposal to visit some place, some mosques, and deliver lectures. But I did not deliver any lecture." Pls. Ex. 107 (Thumairy Tr.) 364:10-17. |
| 502. | Khalil recalled that when he saw Thumairy for the last time — in Saudi Arabia several weeks after the 9/11 Attacks — that Thumairy had just returned from yet another conference held in Budapest. Ex. 113, Khalil Dep. 68:20-70:10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Khalil testified that Al Thumairy had returned from a conference in Budapest, but that testimony is not based on Al Khail's personal knowledge. It is therefore inadmissible. *See* Objections Chart (other portions of the cited range also contain inadmissible hearsay).<br><br>Plaintiffs did not ask Al Thumairy about this alleged trip during his three-day deposition. |
| 503. | MOIA procedures required that work trips of MOIA officials be approved in writing in advance. Ex. 285, KSA 5248 (December 1996 approval by MOIA for Sowailem to | Plaintiffs' assertion is not supported by the record. Plaintiffs Exhibit 285 does not describe any Ministry of Islamic Affairs "procedures." It shows that during one trip in 1996, Al Sowailem received approval to attend a conference. But this is irrelevant to Al Thumairy's trip to Denmark. He |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | attend conference in Orange County). In addition, the extent of MOIA's control over its propagators is evidenced in a November 18, 1996 letter that was discovered in the possession of Abdi Mohamed during a search pursuant to a warrant served during his arrest. The letter affirmed that "no propagator should leave his post or take leave without first obtaining a written authorization from the relevant authority." It further warned that "Whoever violates this guideline will be subject to disciplinary action to include termination of service." The letter was signed by Sowailem. Ex. 2, EO 0356. | was already on approved vacation leave. *See supra* Response to ¶ 488. Plaintiffs cite nothing to support the strange suggestion that procedures required an employee to request "leave" from their vacation to attend a work conference.<br><br>Plaintiffs Exhibit 2I (EO 356) is inadmissible hearsay. The hearsay describes an unremarkable requirement by the Ministry of Islamic Affairs – mirrored by countless employers – that its propagators should not leave their assigned jobs without first asking permission. Submitting vacation requests for approval to human resources is not evidence of extensive control. |
| 504. | The facts of the MOIA event in Copenhagen in September 2001 became known only because of an article Plaintiffs discovered in an Arabic newspaper. Ex. 47, Ghudaian Ex. 453 (September 7, 2001 Al Jazirah article about MOIA program in Copenhagen, Denmark attended by various MOIA officials, including Thumairy, who scheduled was to deliver a lecture on September 11, 2001). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 47 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph is vague. Plaintiffs do not state *who* supposedly learned of the MOIA event in Copenhagen in September of 2001 only because of an article Plaintiffs discovered. The event was obviously not a secret, as it was written about in the newspaper and attended by hundreds of people, as Thumairy described. *See* Pls. Ex. 107 (Thumairy Tr.) 365:5-7 (referring to "hundreds of people"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, while the newspaper article reports some facts about the conference, the article cannot be treated as fact (and it is inadmissible anyway). The article was written before the conference had begun, not reporting on what had already occurred. Therefore, the schedule and prospective events mentioned in the article cannot be assumed to have happened. *See* Pls. Ex. 47 (Ghudain 453) at 1 (conference "is *to begin today*"). For example, Al Thumairy testified that he did not deliver a lecture at a prison, which the article reported he was scheduled to deliver *See* Pls. Ex. 107 (Thumairy Tr.) 364:10-17 ("There was a proposal to visit some place, some mosques, and deliver lectures. But I did not deliver any lecture."). <br><br>To the extent Plaintiffs are implying that *they* would not have found out about the conference in Copenhagen if they had not read the newspaper article they attach, that is contradicted by the record. During Al Thumairy's deposition, he readily offered details about the conference. He volunteered that he was in Europe at the time of the September 11 attacks and later specified he was in Copenhagen. *See* Pls. Ex. 107 (Thumairy Tr.) 364:20 (Al Thumairy responding that he was in Denmark, Copenhagen, when asked where he was on 9/11); *id.* at 360:17-365:12. |
| 505. | Saudi Arabia produced no documents about Thumairy's work trip to the MOIA forum in Denmark or to Budapest. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>To the extent a response is required, Saudi Arabia produced records after a reasonable search and complied with its discovery obligations. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that there are no documents evidencing the trip to Denmark is inaccurate. Saudi Arabia produced Al Thumairy's travel documents.<br><br>Plaintiffs have not established that there are any documents about Al Thumairy's trip to Denmark. They did not ask Al Thumairy if there are documents related to the trip, and he was already on approved leave when he attended so would have had no reason to seek additional leave.<br><br>Plaintiffs also have not established that a trip to Budapest ever happened. They have not identified any proof of it in Al Thumairy's travel records. They also did not ask Al Thumairy about it even though Al Khalil had already testified to the alleged trip before Al Thumairy was deposed. If they wanted information about the trip, they had an opportunity to ask. |
| **VI.D.** | **Following the 9/11 Attacks, Thumairy's extremist group, including his MOIA assistant Muhanna, protested in support of the 9/11 hijackers.** | As explained above, Al Thumairy had no "extremist group." *See supra* Responses to ¶¶ 398, 412, 420, 421. Al Thumairy could not have led or participated in the alleged protests, as he was not in the United States at the time. Pls. Ex. 128 (Madha Tr.) 39:21-40:9.<br><br>Muhanna was not Al Thumairy's assistant. He "was the Imam of the mosque when" Al Thumairy was away. And when Al Thumairy "returned, he continued to be like an assistant imam." He was "[a]n assistant of the Imamate at the mosque," not for Al Thumairy personally. Pls. Ex. 107 (Thumairy Tr.)228:18-24. |
| 506. | Usman Madha testified that on "[t]he Friday after the 9/11 Attacks" he "observed Tajuddin Shuaib give a sermon denouncing the horrendous terrorist acts" and that members of Thumairy's extremist group – including Khalid Cherif and Abdu Ghanem –started to protest the sermon and tried to provoke a physical altercation with Shuaib. | Regarding the alleged protest in the prayer room following the 9/11 attack, Madha testified that Thumairy was not even present for the alleged incident. Pls. Ex. 128 (Madha Tr.) 39:21-40:5. The suggestion that this incident was carried out by "Thumairy's group" is thus contrary to the evidence.<br><br>Madha's testimony regarding the alleged "group" is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 72, Madha Decl. at ¶ 26; Ex. 128, Madha Dep. 63:20-66:8. | testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Pls. Ex. 128 (Madha Tr.) 38:24-39:17.<br><br>Madha's accusations about Al Thumairy being extremist are inadmissible and not based on personal knowledge. *See* Objections Chart. Madha testified that Al Thumairy's prayers and sermons were in Arabic, that he understands very little Arabic, that he was not able to understand Al Thumairy's sermons, and that he never heard Al Thumairy express any support for terrorism. Pls. Ex. 128 (Madha Tr.) 37:13-38:17.<br><br>Madha's accusations of an extremist group led by Al Thumairy are also inaccurate. *See supra* ¶ 398. Al Thumairy denied them. *See also* Pls. Ex. 107 (Thumairy Tr.) 525:19-23; *id.* at 227:11-19 (referring to Madha's statement as "a fabrication"). And Mana (who, unlike Madha, speaks Arabic and so was able to understand Al Thumairy's sermons) testified of Al Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Pls. Ex. 110A (Mana Tr.) 247:3-7. Al Thumairy's testimony further contradicts the existence of any such group. While Al Thumairy vaguely recalled some of the names listed as alleged members of his alleged "group," he did not recall Cherif or Ghanem at all. Pls. Ex. 107 (Thumairy Tr.) 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem). Further, the evidence shows that Thumairy was not part of the allegedly "extremist" group that met in the library. *See supra* Responses to ¶¶ 420, 421.<br><br>Madha's testimony about the contents of Shuaib's sermon is inadmissible hearsay. *See* Objections Chart. It is noteworthy, however, that Plaintiffs have described Shuaib throughout as a propagator from the Ministry of Islamic Affairs, and it is undisputed that Al Thumairy – a Ministry |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | propagator in Los Angeles – likewise denounced the 9/11 attacks. The evidence shows that Al Thumairy would not have protested – and would have supported – a sermon like the one Shuaib allegedly delivered. Al Thumairy testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Pls. Ex. 107 (Thumairy Tr.)478:14-479:8. Al Thumairy specifically testified that he was not an "extremist Wahhabi cleric." *Id.* at 522:10-13. |
| 507. | Then, several weeks later Thumairy's assistant Muhanna delivered a Friday sermon at the Mosque that led MOIA propagator Shuaib, who was visibly upset, to admit to Madha that Muhanna was "incendiary and extremist", that "Muhanna made statements in support of the 9/11 terrorists", and that Muhanna claimed that "they [the 9/11 hijackers] had legitimate reasons to carry out the attack." Ex. 72, Madha Decl. ¶ 27; Ex. 128, Madha Dep. 68:3-69:9. | The Madha Declaration reporting the contents of Al Muhanna's sermon and Shuaib's reaction to it are hearsay and not based on personal knowledge. *See* Objections Chart. Al Muhanna delivered sermons in Arabic. *See* Pls. Ex. 128 (Madha Tr.) 44:8-17. Madha does not speak or understand Arabic, admitted that the sermon referred to in ¶ 27 of his declaration was in Arabic. *Id.* at 46:17-47:2. Regarding Shuaib's reaction to Al Muhanna's speech, Madha agreed that his statement is not based on Madha's own personal impression of the sermon. *Id.* at 47:16-20.<br><br>Al Muhanna also was not Al Thumairy's assistant. He "was the Imam of the mosque when" Al Thumairy was away. And when Al Thumairy "returned, he continued to be like an assistant imam." He was "[a]n assistant of the Imamate at the mosque," not for Al Thumairy personally. Pls. Ex. 107 (Thumairy Tr.). 228:18-24.<br><br>Al Thumairy was not present for the alleged sermon as described in the prior paragraph, and Al Muhanna arrived in Los Angeles in 2001 well after the hijackers had left Southern California. |
| 508. | Consul General Salloum likely witnessed Muhanna's sermon; Thumairy testified that | Plaintiffs' assertion is facially speculative. It is undisputed that, when Al Thumairy was at the Mosque, Consul General Salloum did attend some |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Consul General Salloum "came every Friday to pray with us" at the Mosque. Ex. 107, Thumairy Dep. 105:21-106:4, 106:19-107:6 ("What I do remember is the Consul General Salloum….I remember him coming every Friday to pray Friday with us at the mosque.") | Friday prayers. But Al Thumairy was not present for Al Muhanna's sermon. *See supra* Response to ¶ 507. There is no evidence that Al Salloum was present. |
| 509. | Madha reported to Mosque Board member Kaldirim about what Muhanna said in his sermon and recommended that immediate action be taken. Ex. 72, Madha Decl. ¶ 27. Madha attested that "[i]t was clear that Mr. Al Thumairy's fanatical group, now led by Mohamed Al Muhanna, were [sic] trying to take over the Mosque" and the decision was "[e]ventually" made that the "entire group including [Muhanna] were expelled from the Mosque." Ex. 72, Madha Decl. ¶ 28. | Madha's alleged report to Kaldirim of what Al Muhanna said is inadmissible hearsay. *See* Objections Chart. Madha necessarily relied on hearsay from Shuaib about what Al Muhanna allegedly said because he did not speak Arabic, as Madha admitted during his deposition. *See* Madha Tr. 44:8-17, 46:17-47:2, 47:16-20. Madha's account is also not corroborated by the record. Kaldirim testified about Al Muhanna's alleged sermon and did not mention hearing about it from Madha. He recalls Shuaib looking into it and hearing allegations of extremism from the FBI. *See* Pls. Ex. 121 (Kaldirim Tr.) 178:9-184:15. Regarding the alleged "take over" and Al Muhanna's speech, Al Thumairy was not even present. Pls. Ex. 128 (Madha Tr.) 39:21-40:5. The suggestion that this incident was carried out by "Thumairy's group" is thus contrary to the evidence; indeed, Madha's testimony is internally inconsistent, referring to the group as Al Thumairy's but saying it was "now led by Muhanna." Kaldirim also clarified that the alleged take over was about "the management and control of the mosque," and fundraising, Pls. Ex. 128 (Kaldirim Tr.) 232:16-21. It was a takeover "in the corporate sense," not that they "were extreme jihadists that were attempting to violently take over the mosque." *Id.* at 279:7-280:4. He did not mean that the group |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | were extreme jihadists attempting to violently take over the mosque. *Id.* (also noting that none of the men in the group were Saudis).<br><br>The assertion that "the entire group including Al Muhanna were expelled from the Mosque," is contradicted by the record. To the extent Madha meant that Al Thumairy himself was in the group, the statement is self-contradictory. Madha himself confirmed that Al Thumairy was never expelled from the Mosque. *See* Madha Tr. 41:7-9. So did Al Khalil and Kaldirim. *See* Pls. Ex. 113 (Khalil Tr.) 78:2-5; Pls. Ex. 121 (Kaldirim Tr.) 171:11-14. As for Al Muhanna, Kaldirim clarified that he was not expelled from the mosque but was informed "he should not be performing any function or activities in the mosque;" he was allowed to come to the mosque and pray. Pls. Ex. 121 (Kaldirim Tr.) 171:15-172:5.<br><br>Plaintiffs' attempt to link Al Muhanna's alleged speech – which they say happened "weeks" after 9/11, ¶ 507 – to the alleged expulsion is also contradicted by the record. Al Muhanna sent a fax about the Board's decision to prevent him from conducting certain activities (he was not expelled) on September 24, 2002 – approximately a year after the sermon at issue according to Plaintiffs' theory. KSA Ex. 195 (KSA 7376). In it, Al Muhanna said "[a] few days ago" Shuaib and Kaldirim asked him to stop Dawah activities in the Mosque. *Id.* This timing shows that Al Muhanna was not expelled based on his alleged sermon (from a year earlier).<br><br>Regarding accusations that there was an Al Thumairy group, the record shows no such group existed. *See supra* ¶ 398. Thumairy denied these allegations. *See also* Thumairy Tr. 525:19-23; *id.* at 227:11-19 (referring to Madha's statement as "a fabrication"). Moreover, while Al Thumairy vaguely recalled some of the names listed as alleged members of his alleged "group," he did not recall Cherif or Ghanem at all. Thumairy Tr. 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of Ghanem). Further, the evidence shows that Thumairy was not part of the allegedly "extremist" group that met in the library. *See supra* Responses to ¶¶ 420, 421.

Regarding accusations that the alleged Al Thumairy group was fanatical or extreme, Madha's testimony is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend their meetings, and had no personal knowledge of what the group discussed. Pls. Ex. 128 (Madha Tr.) 38:24-39:17.

Moreover, Madha testified that Al Thumairy's prayers and sermons were in Arabic, that he understands very little Arabic, that he was not able to understand AlThumairy's sermons, and that he never heard Thumairy express any support for terrorism. *Id.* 37:13-38:17.

Madha's accusations of extremism by Al Thumairy are also inaccurate. Thumairy testified that "any justification that anyone can come up with" to support "violent attacks of the kind that were carried out on 9/11" "is incorrect, because in Islam we criminalize aggresions against anyone. And we criticized that act back then, at the time. In Islam you cannot even hurt an animal, let alone human beings. So this justification is incorrect." Pls. Ex. 107 (Thumairy Tr.) 478:14-479:8. Al Thumairy specifically testified that he was not an "extremist Wahhabi cleric." Al Thumairy Tr. 522:10-13. And Mana (who, unlike Madha, speaks Arabic and so was able to understand Thumairy's sermons) testified of Thumairy: "I never heard him holding any extremist views. His sermons were limited to basic teachings of the faith, okay? Without enticing or encouraging or justify any terrorist act." Pls. Ex. 110A (Mana Tr.) 247:3-7. |
| 510. | At his deposition, Kaldirim described the sermon as "very conservative and…not | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | fitting with our understanding as an organization" and when asked what he meant said that Muhanna "was talking about September 11, I believe. And he was blaming different people, different things" for the 9/11 Attacks contrary to "our understanding" and the facts of what happened. Ex. 121, Kaldirim Dep. 178:11--181:12. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Kaldirim's testimony is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. It is clear from his testimony that he was not present for the sermon and is relaying what was reported by others. *See* Pls. Ex. 121 (Kaldirim Tr.) 179:24-182:21 ("Q. You said that he was talking about September 11th. Can you explain what it was that you understood he was talking about? A. *I was not in their congregation.* So these details were with Shuaib, our director. And when he said, yes, . . . his talk was not appropriate . . . . Q. I'm trying to understand what about it was not appropriate. . . . A. Whatever he said. *I don't know what he said.*") (emphasis added). |
| 511. | Madha was "responsible for handling the removal of several of those men [who were part of Thumairy's "fanatical" group] from the Mosque, including enlisting the help of the Culver City police." Ex. 72, Madha Decl. ¶ 28. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' assertion that the people who were removed following 9/11, when Al Thumairy was not even in the Mosque, "were part of Thumairy's 'fanatical' group" is contrary to the evidence. *See supra* Response to ¶ 509.<br><br>There is evidence that Al Khalil, a former Saudi employee in the Embassy's Islamic Affairs office, and Shuaib, a contractor with the Ministry of Islamic Affairs, along with others took steps to remove certain extremist (who they defined as individuals who were conservative and not open, but not violent) people from the Mosque in the past. But Plaintiffs' |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | attempt to link Al Muhanna's alleged speech – which they say happened "weeks" after 9/11, ¶ 507 – to Al Muhanna's alleged expulsion is contradicted by the record. Al Muhanna sent a fax about the Board's decision to prevent him from conducting certain activities (he was not expelled) on September 24, 2002 – approximately a year after the sermon at issue according to Plaintiffs' theory. KSA Ex. 195 (KSA 7376). In it, Al Muhanna said "[a] few days ago" Shuaib and Kaldirim asked him to stop Dawah activities in the Mosque. *Id.* This timing shows that Al Muhanna was not expelled based on his alleged sermon (from a year earlier). |
| | | Further, Al Thumairy was never removed from the Mosque so was not among the group referenced in Madha's declaration. Indeed, Madha himself confirmed that Al Thumairy was never expelled from the Mosque. *See* Pls. Ex. 128 (Madha Tr.) 41:7-9. So did Khalil and Kaldirim. Pls. Ex. 113 (Khalil Tr.) 78:2-5; Pls. Ex. 121 (Kaldirim Tr.) 171:11-14. |
| | | As for Al Muhanna, Kaldirim clarified that he was not expelled from the mosque but was informed – in September of 2002, *see* KSA Ex. 196 (KSA 7375) – that "he should not be performing any function or activities in the mosque;" he was allowed to come to the mosque and pray. Pls. Ex. 121 (Kaldirim Tr.) 171:15-172:5, 1795-11. There is no evidence that Al Muhanna was excluded from the Mosque or that the police were called to exclude him; Madha does not mention him in the quoted sentence. |
| 512. | Madha heard Muhanna tell Kaldirim that his expulsion from the Mosque for supporting the 9/11 hijackers "was not acceptable because it was the King of Saudi Arabia who had sent him to the Mosque." Ex. 72, Madha Decl. ¶ 28. | Madha's declaration is inadmissible hearsay (Madha testifying about what Al Muhanna told Kaldirim). *See* Objections Chart.<br><br>This paragraph misrepresents the record, including Madha's own declaration. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' description of the basis for Al Muhanna's alleged expulsion is doubly misleading.

*First*, there is no evidence from anyone, including Madha, suggesting that Al Muhanna's explusion from the Mosque was "for supporting the 9/11 hijackers." The suggestion is contradicted by all available sources. Even Madha's inadmissible hearsay declaration, written by Plaintiffs' attorneys in the first instance, does not state that Al Muhanna supported the hijackers. At most, it says (based on secondhand information) that Al Muhanna said "they had legitimate reasons to carry out the attack." Pls. Ex. 72 (Madha Ex. 830) ¶ 27. Al Muhanna was not even present in the United States when the hijackers passed through Southern California. *See* KSA Ex. 197 (KSA 1291) (formally assigned on January 22, 2001). Kaldirim's inadmissible hearsay testimony also does not support Plaintiffs' assertion that Al Muhanna's alleged expulsion was "for supporting the hijackers." Kaldirim said (based on secondhand information) that Al Muhanna was "blaming different people, different things" for 9/11. Pls. Ex. 121 (Kaldirim Tr.) 179:18-23. At most, this hearsay evidence shows that Al Muhanna expressed opinions about 9/11 after it happened; it does not show any "support" for the 9/11 hijackers.

*Second*, there is no evidence from anyone, including Madha, suggesting that Al Muhanna's expulsion from the Mosque was related to any speech he gave allegedly expressing opinions about 9/11. By Plaintiffs account, Al Muhanna delivered that sermon in the weeks after 9/11. *See* ¶ 507. The quoted portion of Madha's declaration concerning a conversation between Kaldirim and Al Muhanna informing the latter that he could not conduct certain activities at the Mosque, *see* Plaintiffs Exhibit 72 (Madha Ex. 830) ¶ 28, occurred in August or September *of 2002* – a year after the alleged sermon. *See* KSA Ex. 195 (KSA 7376) (fax dated September 4, 2002, in which Al Muhanna states that Kaldirim had a meeting with him "a few days ago" informing him that he could not conduct certain |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | activities at the Mosque). In Madha's Declaration ¶ 28, he does not state that the decision in September of 2002 to prevent Al Muhanna from leading prayers was made because of Al Muhanna's speech from a year earlier allegedly expressing opinions about 9/11. |
| | | Plaintiffs' insertion of the words "his expulsion from the Mosque for supporting the 9/11 hijackers" is entirely unsupported and creates a misleading link between two separate events that is unsupported even by Plaintiffs' inadmissible evidence, let alone admissible evidence. |
| | | Madha's hearsay testimony about Al Muhanna's reaction to the Board's decision in September of 2002 to restrict his activities at the Mosque is incomplete. *See* KSA Ex. 196 (KSA 7375) shows Al Muhanna's reaction. He was directed as part of his job to work at the Mosque, and he did not feel the Board's decision was justified. |
| 513. | Madha testified that after Muhanna's expulsion, he and Kaldirim were "summoned" by Saudi Consul General and Mosque Board member Salloum to attend a meeting at the Consulate. Ex. 72, Madha Decl. ¶ 29. At the meeting, Salloum "complained to Mr. Kaldirim about the removal of Mr. Al Muhanna." Salloum told them that he "did not believe that Mr. Al Muhanna had done anything wrong, or that there was any basis to remove him from the Mosque." Ex. 72, Madha Decl. ¶ 29. Salloum also told them that "no action should have been taken by the Mosque against [Muhanna] without consulting first with the Consul General." Ex. 72, Madha Decl. ¶ 29; Ex. 128, Madha Dep. 71:22- | Madha's declaration is inadmissible hearsay (Madha testifying about what Al Salloum said to Kaldirim). *See* Objections Chart. |
| | | There is admissible evidence of a meeting between Al Salloum and Shuaib in October of 2002 to address the Board's decision to restrict Muhanna's activities. *See* KSA Ex. 292 (KSA 1230). At this meeting, Shuaib explained that the Board's decision was based on "information they received from Mr. Khalid Sharif . . . who is of Syrian origins and was one of those barred from entering the mosque last year for causing trouble." *Id.* Al Salloum further states that Kaldirim and Al Khalil "are both working together . . . to give the position of imam to someone from another nationality." *Id.* at KSA 1231. Al Salloum concluded that because "the decision made about [Al Muhanna] was entirely based on rumors from one of the people in the community without being verified. . . . We hope you write to the Minister of Islamic Affairs to make him aware of this development and to return [Al Muhanna] to his job." *Id.* With this context, it is undisputed that Al Salloum did not believe any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 72:8 (Consul General Salloum said that "he didn't believe there was any reason to remove Mr. Muhanna from the mosque" and that "he didn't believe that Mr. Muhanna had done anything wrong.") | action should have been taken against Al Muhanna; that he did not do anything wrong; and that there was no basis to remove him as imam. |
| 514. | Khalil initially claimed at his deposition that local police were called and the extremists banned several weeks *before* 9/11, Ex. 113, Khalil Dep. 56:6-19, 59:7-60:21, but when questioned further Khalil admitted that he had no personal knowledge: he couldn't recall when the calls were made because "the management is there taking care of that" meaning "Sheikh Shuaib…and other stuff [staff] with him." Ex. 113, Khalil Dep. 60:22-61:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Al Khalil's testimony reveals that he and Mosque leadership actively excluded extremists from the Mosque, involving the police as necessary. *See* Pls. Ex. 113 (Khalil Tr.) 59:1-15 ("Isn't it true, sir, that you never told the police anything until after 9-11?  That's not true.  Isn't it true, sir, that you never contacted the police for assistance until after 9-11?  That's not true.  ***We contacted the police a number of times.***").

Plaintiffs' description of the testimony is misleading.  Al Khalil reaffirmed his testimony that one call happened on August 12, 2001, and he was asked "[w]hen did you call the police *on any other occasion* before 9/11?"  To which he responded, "I can't recall because, you know, the management is there taking care of that."  *See* Pls. Ex. 113 (Khalil Tr.) 60:22-61:3.  Thus, Khalil reaffirmed his testimony that the police were called multiple times before 9/11; he could not recall "when" before 9/11. |
| 515. | The "staff" member referenced by Khalil must have been Usman Madha, who testified that he "personally was responsible" for handling the removal of the members of Thumairy's extremist group | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and that he called the Culver City police weeks *after* the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 26-28. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' assertion is improper attorney argument and speculation. There is also no basis for Plaintiffs' speculation that Al Khalil was testifying about the one incident Madha recalled. As described in the prior paragraph, Al Khalil testified that the police were contacted multiple times. Al Khalil also never testified that Shuaib worked with only one staff member.<br><br>Plaintiffs' assertion that the people who were removed following 9/11, when Al Thumairy was not even in the Mosque, were part of Al Thumairy's "extremist group" is contrary to the evidence. *See supra* Response to ¶ 509. |
| 516. | On October 8, 2001, Khalil was in Saudi Arabia when he wrote a letter to Prince Abdulaziz which reported that there were "threats *after* the September 11 attacks" at the Mosque and noted that "[t]he police, however, were very cooperative." Ex. 50, KFM 0439-40 at 440, (emphasis added). Khalil's October 2001 letter confirms Madha's testimony that the police were contacted after the 9/11 Attacks because of the protests of Thumairy's extremist group led by MOIA propagator Muhanna. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 50 is inadmissible hearsay. *See* Objection Chart.<br><br>Plaintiffs' assertion is speculative and unsupported attorney argument. Al Khalil's statement reads: "There were threats after the September 11 attacks in New York and Washington. The police, however, were very cooperative." Pls. Ex. 50 (Khalil Ex. 208) at 3. There is no evidence that this statement relates to the alleged protests in Madha's declaration. Madha's testimony does not describe any "threats," and a more logical reading is that members of the Mosque or the Mosque itself faced external threats that were part of the backlash in America following 9/11. The next item on the list supports this reading, as it says "Saudi Arabia has become |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | under [suspicion] due to the presence of Saudi suspects in the attack and the linking between Osama bin Laden and the KSA. This requires to launch several programs to educate people about 'bin Laden' and his relationship to the Kingdom as well as the real Islam who rejects violence and terrorism. The Kingdom, thankfully, is a model for understanding, applying, and advocating Islam in a guided and insightful manner." Pls. Ex. 50 (Khalil Ex. 208) at 3.<br><br>Plaintiffs Exhibit 50 does nothing to confirm Madha's testimony.<br><br>Plaintiffs' assertion attributing protests in the Mosque after 9/11 to "Thumairy's extremist group", when Al Thumairy was not even in the Mosque, is contrary to the evidence. *See supra* Response to ¶ 509. |
| **VI.E.** | **Despite information about his extremism and connection to the hijackers, Saudi Arabia did nothing to investigate Thumairy.** | This statement is contradicted by the documentary record, which shows that allegations against Thumairy were considered and found to be false and unsubstantiated. |
| 517. | About five weeks after the 9/11 Attacks, MOIA propagator and Mosque Director Shuaib called Khalil in Saudi Arabia to tell him that a team of people, including CIA and FBI agents, had come to the King Fahad Mosque and shown Shuaib a photograph of Thumairy with the two hijackers. The photo was of Thumairy and the hijackers standing at the door, in front of the mosque on the Huron Street side. Ex. 113, Khalil Dep. 68:20-72:5. | Al Khalil's testimony is inadmissible hearsay. *See* Objections Chart. *See also* Pls. Ex. 113 (Khalil Tr.) 69:7-15 (testifying based on information Shuaib allegedly told Khalil in a phone call).<br><br>When asked "[w]hat was in those photographs?" Khalil testified, "I don't know." *Id.* at 70:17-21 ("Did it indicate that Thumairy . . . knew the two hijackers? I don't know."). The alleged photograph is not in the record and its purported existence is based solely on hearsay.<br><br>Al Khalil also testified that Al Thumairy said he did not know the hijackers and "was denying that picture." *Id.* at 72:8-73:5. When asked if Al Khalil believed Al Thumairy, Al Khalil testified, "I was happy when he denied" knowing the hijackers. . . . I said, probably this [accusations |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | associating Thumairy and the hijackers] is something not true." *Id.* at 73:6-19. |
| 518. | On October 19, 2001 Khalil once again contacted MOIA's Deputy Minister Ammar about Thumairy — this time to inform Ammar about Shuaib's report that the FBI had shown him a photograph of Thumairy with the two hijackers in front of the King Fahad Mosque. Ex. 113, Khalil Dep. 70:11-16; 76:8-16. It was exactly two months earlier that Khalil contacted Ammar to tell him that Thumairy was hosting three extremists at the Mosque and that Khalil claimed he warned Thumairy not to invite other Saudi preachers to the Mosque. Ex. 113, Khalil Dep. 76:8-78:1, 85:8-86:12. | Plaintiffs' statement contains improper attorney argument.<br><br>Al Khalil's testimony about Shuaib's report is inadmissible hearsay. *See* Objections Chart.<br><br>The cited testimony does indicate that Al Khalil informed Al Ammar that Shuaib had said that the FBI showed him a photograph allegedly showing Al Thumairy with the hijackers. There is no evidence that the photograph actually exists, much less what is in the photograph. *See supra* Response to ¶ 517.<br><br>There is no evidence that Al Khalil had contacted Al Ammar previously "about Thumairy." Plaintiffs' misrepresent the prior call by Al Khalil to Ammar described above. Al Khalil did not contact Ammar to tell him that Al Thumairy was hosting three extremists; he called Al Ammar to ask about the three visitors. Pls. Ex. 113 (Khalil Tr.) 108:3-6 ("I had concern, not with [Al Thumairy], about those guys. Have nothing to do with [Al Thumairy]. Just those guys came, and three guys, and so I wanted to know."). The call was prompted by curiosity about the visitors, not suspicion of Thumairy. *Id.* at 79:17-80:23 ("curiosity"). Al Khalil clarified that he had no knowledge of Al Thumairy hosting the three men. *Id.* at 107:11-23. He also testified that he only learned during the call with Ammar that the men were allegedly being looked for by the Saudi Mabahith. *Id.* at 80:8-10. Their alleged "extremism" was based on concerns about their anti-Saudi sentiment, not anti-American sentiment. *Id.* at 81:1-8.<br><br>Al Khalil did not warn Al Thumairy not to invite other Saudi preachers to the Mosque, and there is no evidence to the contrary. He asked Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy to inform Al Khalil before inviting preachers. *See id.* at 80:20-23. |
| 519. | At the time that Khalil contacted Ammar on October 19, 2001, Thumairy was working in Deputy Minister Ammar's office in Riyadh. Ex. 247, KSA 0580. | The evidence does not support Plaintiffs' assertion. The cited document says that Al Thumairy's deployment has ended and that he would start work at the end of his leave. It does not state where he will be working, and the document is not signed by Al Ammar; it is signed by a different Deputy Minister. |
| 520. | Shortly thereafter, Thumairy and Khalil met in Saudi Arabia, and Khalil told him about Shuaib's report about the FBI visiting the Mosque and the photograph. Ex. 113, Khalil Dep. 69:7-70:10. Khalil said that Thumairy "was denying" that the photograph was accurate. Ex. 113, Khalil Dep. 72:19-73:5. | Al Khalil's assertions about what Al Thumairy said are inadmissible hearsay, though it is undisputed that Al Khalil testified Al Thumairy denied knowing the hijackers. Specifically, Al Khalil testified that Al Thumairy said he did not know the hijackers and "was denying that picture." Pls. Ex. 113 (Khalil Tr.) 72:8-73:5. When asked if Al Khalil believed Al Thumairy, Al Khalil testified, "I was happy when he denied" knowing the hijackers. . . . I said, probably this [accusations associating Al Thumairy and the hijackers] is something not true." *Id.* at 73:6-19.<br><br>Al Thumairy testified that he was not told (by Al Khalil or anyone) that Shuaib had been shown photogrphs of the hijackers at the Mosque. Pls. Ex. 107 (Thumairy Tr.) 407:5-20. |
| 521. | Despite the serious allegations linking Thumairy to the hijackers at the Mosque, which came shortly after a separate report that Thumairy hosted three extremists at the Mosque in August 2001, Saudi Arabia conducted no investigation of Thumairy to find out whether he met or assisted the 9/11 hijackers. According to Thumairy, MOIA raised only one question to him: Deputy Minister Ammar stated to Thumairy that "the FBI visited the Mosque in Los Angeles and inquired about the Imam" and that | As described above, there was no "report" of Al Thumairy and three visitors; the visitors were not "extremists" in the sense of being anti-America; and there is no evidence that Al Thumairy "hosted" them. *See supra* Response to ¶ 518. The evidence did not raise any suspicions as to Al Thumairy.<br><br>There is no evidence of any "serious allegation" about Al Thumairy. Plaintiffs have cited an alleged photograph, but have not shown that there were even any contemporaneous allegations that the photograph or other evidence meant that Al Thumairy helped the hijackers or knew their plans.<br><br>Plaintiffs' assertion that there was "no investigation of Thumairy" is false. When the Embassy learned of the FBI's visit to the Mosque, it asked the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ammar "was just asking me [Thumairy] what that was all about." Ex. 107, Thumairy Dep. 21:4-22:14. MOIA Minister Shaikh asked Thumairy to prepare a statement for the file. Ex. 123 Ash-Shaikh Dep. 212:8-214:7; Ex. 246, KSA 0566 (Thumairy handwritten statement). Nothing more was done by Saudi Arabia, despite the questions raised about Thumairy's role with the hijackers. Ex. 123, Ash-Shaikh Dep. 212:8-214:7; Ex. 100, Qattan Dep. 225:8-227:10; Ex. 98, Shahri Dep. 98:1-5, 112:11-113:20. | Ministry of Foreign Affairs on October 18, 2001, to investigate Al Thumairy and not to allow him to return to the U.S. until further notice. KSA Ex. 198 (KSA 7658).

The Ministry of Foreign Affairs asked Al Ammar to conduct the investigation. KSA Ex. 199 (KSA 6595). Al Ammar questioned Al Thumairy, instructed him not to travel to the U.S., and asked him "why is he being asked about over there in America." KSA Ex. 200 (KSA 6964). Al Thumairy gave a statement answering that question. *See* KSA Ex. 201 (KSA 609). And Al Ammar passed the statement to the Minister for review, KSA Ex. 200 (KSA 6964). The issue was presented to the Prime Minister. KSA Ex. 202 (KSA 7978). Minister of Islamic Affairs Ash Shaikh informed fellow Ministers of Foreign Affairs, the Interor, and the Prime Minister that his office had interviewed Al Thumairy and taken his statement. KSA Ex. 203 (KSA 606).

In his statement, Al Thumairy said that he was "very confident of [his] innocence" and added, "I hope you [] inform the US authorities of my desire to meet with them—and I strongly support that—and will be happy to answer all of their questions and anything they want to know." KSA Ex. 201 (KSA 609).

In November of 2001, the Embassy and Ministry of Foreign Affairs exchanged cables asking whether the FBI was still seeking Al Thumairy, stating that there was no "official inquiry" and that Al Thumairy "is not accused of anything." KSA Ex. 204 (KSA 1776); Pls. Ex. 255 (Qattan Ex. 425); KSA Ex. 205 (KSA 1224). The Embassy also asked the Consulate for information, and the Consulate informed the Embassy that it did not believe Al Thumairy was suspected of anything. "The information about the FBI's inquiring about him was forwarded to him by Dr. Khalil |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | who later realized that **the issue was blown out of proportion.**" KSA Ex. 206 (KSA 1225) (emphasis added).<br><br>The Ministry of Foreign Affairs then reported that Al Thumairy could return to the U.S. because "it became clear that he was not found guilty of any wrongdoing." KSA Ex. 207 (KSA 612).<br><br>Thereafter, Al Thumairy was approved to return to the United States. *See* KSA Ex. 208 (KSA 1204); KSA Ex. 209 (KSA 568). He was allowed to enter the United States and was not questioned by the FBI upon his return in 2001.<br><br>Thus, the evidence shows that the Consulate, Embassy, Ministry of Foreign Affairs, and Ministry of Islamic Affairs looked into the circumstances of the FBI's alleged attempt to question Al Thumairy. They concluded the issue was blown out of proportion and that Al Thumairy was not a suspect.<br><br>If Al Thumairy was tasked with assisting the hijackers as Plaintiffs falsely allege, it would make no sense to allow him to return to the United States where he could be questioned by law enforcement. |
| 522. | When asked if he had been questioned about the report that the FBI had photographs of Thumairy standing with the hijackers, Thumairy testified it "never" happened and, regarding a discussion about the fact that there were photographs of Thumairy and the hijackers at the mosque, "No one told me something like that at all.". Ex. 107, Thumairy Dep. 407:5-20. | Undisputed. Al Khalil recalls matters differently. Al Khalil testified that Al Thumairy said he did not know the hijackers and "was denying that picture." Pls. Ex. 113 (Khalil Tr.) 72:8-73:5. When asked if Al Khalil believed Al Thumairy, Al Khalil testified, "I was happy when he denied" knowing the hijackers. . . . I said, probably this [accusations associating Thumairy and the hijackers] is something not true." *Id.* at 73:6-19. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 523. | Embassy Islamic Affairs Deputy Musaed Al Jarrah drafted the letter sent by the Embassy on November 9, 2001 to the Ministry of Foreign Affairs in Saudi Arabia, which stated that Thumairy was "far from being a suspect" and that "it is necessary that he returns now to his work as an Imam at the [King Fahad Mosque], especially with the advent of the month of Ramadan." Ex. 255, KSA 1204. The letter was signed by Vice Ambassador Qattan with Jarrah's initials, which show that Jarrah drafted the letter. Ex. 255, KSA 1204; Ex. 100, Qattan Dep. 217:13-222:4; Ex. 123, Ash-Shaikh Dep. 212:8-214:7; Ex. 118, Jarrah Dep. 545:16-546:23. | Undisputed. *See* response to averment ¶ 521. |
| 524. | On November 28, 2001, the King of Saudi Arabia himself approved the Embassy's request finding that Thumairy "may return to resume his work" because it had been "ascertained that he is clear" and "[t]he Embassy thinks it is important for him [Thumairy] to return and resume his work as the Imam of the mosque during this holy month." Ex. 251, KSA 0605. | Undisputed. *See* response to averment ¶ 521. |
| VI.F. | **After 9/11, Thumairy returned to Los Angeles to continue his assignment to support the Sunni extremist network.** | Al Thumairy returned to the United States after several months and after multiple Ministries confirmed that he was not a suspect. Al Thumairy returned to resume duties as Imam at the King Fahad Mosque. He did not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | work as part of an extremist network either before or after 9/11. *See supra* Response to ¶¶ 398, 412, 420, 421. |
| 525. | Contrary to the November 2001 message, it was never "ascertained that he [Thumairy] is clear" and Thumairy never returned to "work as the Imam of the mosque…." Ex. 251, KSA 0605. Madha, an employee and daily worshipper at the King Fahd Mosque, testified that Thumairy never returned to the Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 25. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs' assertion is improper attorney argument and is contradicted by the record.

As discussed in Response to ¶ 521, above, Al Thumairy was cleared by multiple Ministries, the Embassy, and the Consulate. Ultimately, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.

The 9/11 Commission specifically focused on alleged support by al-Bayoumi and al-Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.

The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." EO 0491.<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-03.<br><br>Operation Encore identified these calls in the first instance, investigated them, and concluded "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>As for Plaintiffs' assertion that Al Thumairy did not return to work at the King Fahad Mosque, there are multiple witnesses with personal knowledge who testified that Al Thumairy did return to the Mosque. *See* Pls. Ex. 107 (Thumairy Tr.) 405:15-19, 513:15-516:8 (Thumairy testifying that he returned to the Mosque; worked there every day; saw Madha at the Mosque; and that Madha's declaration is inaccurate); Pls. Ex. 121 (Kaldirim Tr.) 191:20-194:2 (Kaldirim testifying that Al Thumairy returned to the Mosque after September 11, 2001 and left in August or September of 2002); *id.* at 195:5-20 (Al Thumairy "may have led prayers;" "he's there as a person to lead the prayer;" and Kaldirim was aware of no instruction for Al Thumairy not to lead prayer) Al Khalil also confirmed that Al Thumairy was not expelled from the Mosque. Pls. Ex. 113 (Khalil Tr.) 78:2-5, 395:20-397:17. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 526. | Indeed, a U.S. government report, which was reviewed and commented on by Saudi Ambassador Prince Bandar, found that Thumairy was "expelled" from the King Fahad Mosque. Ex. 680E, KSA 6860-61. | Plaintiffs Exhibit 680E (KSA 6861) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that the Ambassador in any way approved of or agreed with the statements made in the hearsay document from an unknown source that Plaintiffs reference (Plaintiffs Exhibit 680E (KSA 6861)).<br><br>The report is inaccurate. Multiple witnesses testified that Al Thumairy was never expelled from the King Fahad Mosque. Al Khalil confirmed he was not. *See* Pls. Ex. 113 (Khalil Tr.) 78:2-5, 395:20-397:17. Madha said the same, *see* Pls. Ex. 128 (Madha Tr.) 41:7:9; Kaldirim did as well, *see* Pls. Ex. 121 (Kaldirim Tr.) 171:11-14. Al Thumairy also testified that he returned to the Mosque after the 9/11 attacks. Pls. Ex. 107 (Thumairy Tr.) 405:15-19, 513:15-516:8. This testimony confirms that Plaintiffs Exhibit 288 (KSA 6861) is not reliable or accurate. It contains other inaccuracies, as well, including that Al Thumairy was "recalled" in 2003. In fact, his visa was revoked and he was denied reentry to the United States because the U.S. State Department determined that Al Thumairy's work as an imam outside of a Consulate or Embassy was "incompatible with his status." *See supra* ¶ 231; KSA Ex. 141. |
| 527. | Thumairy did return to Los Angeles, however, on December 23, 2001, over a week after Ramadan ended. Ramadan 1422 ended December 15, 2001. Ex. 2, EO 3457 (reliable Los Angeles sources reported that Thumairy returned to Saudi Arabia in mid-August 2001 and did not return to Los Angeles until 12/24/2001); Ex. 680G, at KSA 6896 (Thumairy's passport confirms | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2CC is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Al Thumairy returned to Los Angeles in December of 2001. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | he entered the United States on 12/23/2001). | |
| 528. | Saudi Arabia cites Mosque Foundation Chairman Khalil's claim that Thumairy was not "expelled" from the Mosque, KSA Aver. ¶ 239. Khalil, however, testified that the last time he ever saw Thumairy was "a month and a week after September 11th" in Saudi Arabia. Ex. 113, Khalil Dep. 68:20-70:4. Khalil *never* saw Thumairy again in Los Angeles after the 9/11 Attacks. Ex. 113, Khalil Dep. 68:20-69:4 (The last time Khalil saw Thumairy was in October 2001 in Saudi Arabia). Khalil also repeatedly and falsely testified that Thumairy had not been named by Saudi Arabia as the Imam at the Mosque in the first place. Ex. 113, Khalil Dep. 99:23-104:8; 111:19-114:9; 163:18-165:7, 244:1-17, 284:3-285:16, 286:16-288:7, 288:10-21; 290:21-291:24; 310:2-15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia cited Al Khalil and Al Kaldirim's testimony to show that Al Thumairy was never expelled from the Mosque. Above, Saudi Arabia also cites Madha's and Al Thumairy's testimony to further confirm the same. *See supra* Response to ¶ 526.

Al Khalil testified that the last time he saw Al Thumairy was a month after the September 11 attacks in Saudi Arabia, but that does not mean he lacks awareness whether Al Thumairy was expelled given his role on the board. The fact that Khalil did not see Al Thumairy at the Mosque is not probative of Al Thumairy's presence at the Mosque because Al Khalil was in Saudi Arabia and his trips to the United States became infrequent. *See* Pls. Ex. 113 (Khalil Tr.) 14:17-22.

Kaldirim also testified that he personally saw Thumairy at the Mosque after 9/11. *See* Pls. Ex. 121 (Kaldirim Tr.) 191:20-194:2.

Al Khalil's testimony is more nuanced that Plaintiffs assert. Al Khalil said that "[o]thers may consider him [imam], because when somebody like him with qualification of Islamic studies, some people immediately called him imam or something . . . particularly when he led some prayers." Pls. Ex. 113 (Khalil Tr.) 100:5-11. As mosque director, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Kaldirim testified, an "imam" is someone that "leads prayer" and Al Thumairy did in fact lead prayer. Pls. Ex. 121 (Kaldirim Tr.) 269:7-21. |
| 529. | Numerous documents show that Thumairy did not return to the King Fahad Mosque after the 9/11 Attacks:<br><br>a. In March 2002, Consul General Salloum wrote to Deputy MOIA Minister Ammar that "no one is working now in the mosque except for the Foundation's Director [Shuaib] and another person[.]" The other "person" referenced by Salloum was Usman Madha. Ex. 291, KSA 7146; Ex. 72, Madha Decl. ¶ 7 (Madha worked at the Mosque from 1999 until 2013).<br><br>b. A March 2002 letter from Embassy Ambassador Qattan stated that Tajuddin Shuaib is the person managing the King Fahad Mosque — and did not mention Thumairy. Ex. 238, KSA 7366.<br><br>c. An April 2002 letter from the Embassy's Islamic Affairs department to Ambassador Bandar stated that Shuaib was the Director of the Mosque and referred to Mohamed Al Muhanna as the "Imam of the Mosque" but explains that Muhanna was not allowed "to interfere with management" of the Mosque. Ex. 295, KSA 7930-33 at 31, 33. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' statement contains improper attorney argument and is contradicted by the record. Multiple witnesses testified that Al Thumairy returned to the Mosque after the 9/11 attacks. *See* Pls. Ex. 107 (Thumairy Tr.) 405:15-19, 513:15-516:8 (Al Thumairy testifying that he returned to the Mosque; worked there every day; saw Madha at the Mosque; and that Madha's declaration is inaccurate); Pls. Ex. 121 (Kaldirim Tr.) 191:20-194:2 (Kaldirim testifying that Al Thumairy returned to the Mosque after September 11, 2001 and left in August or September of 2002); *id.* at 195:5-20 (Al Thumairy "may have led prayers;" "he's there as a person to lead the prayer;" and Kaldirim was aware of no instruction for Al Thumairy not to lead prayer). Al Khalil also confirmed that Thumairy was not expelled from the Mosque. Pls. Ex. 113 (Khalil Tr.) 78:2-5, 395:20-397:17. *See also* Pls. Ex. 303 (letter from December of 2001 refering to Al Thumairy was one of the imams of the King Fahad Mosque).<br><br>The documents Plaintiffs cite do not show otherwise. Plaintiffs Exhibit 291 speaks of people working at the Mosque and being paid by the Mosque, as the document is related to Mosque finances. It does not state or imply that Al Thumairy was not at the Mosque.<br><br>Plaintiffs Exhibit 238 says nothing about whether or not Al Thumairy was at the Mosque. It might imply that Al Thumairy had not be chosen by the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | d. Documents show that while in Los Angeles after the 9/11 Attacks Thumairy did not use King Fahad Mosque stationery or the Mosque's stamp as he did in correspondence he sent prior to 9/11. Compare Ex. 140, KSA 8784 (August 2001 letter from Thumairy to Prince Abdulaziz) to Ex. 226, KSA 8571 (December 2002 letter from Thumairy to Prince Abdulaziz).<br><br>e. The MOIA Embassy Office payroll records from November 2001 through 2003 show that while Muhanna was on the payroll, Thumairy was removed from the payroll and was compensated via some other means. Ex. 263, KSA 1782, 1800. | Foundation "to manage" the Mosque, but that is not probative of whether or not Thumairy attended the Mosque after 9/11 regularly, as multiple witnesses confirmed he did.<br><br>Plaintiffs Exhibit 295 similarly refers to Al Muhanna as imam at the Mosque but does not state or imply that Thumairy did not attend the Mosque. And Plaintiffs Exhibit 303 refers to Al Thumairy and Al Muhanna both as imams at the mosque.<br><br>Plaintiffs' comparison of Plaintiffs Exhibit 140 (from August 2001) and Plaintiffs Exhibit 226 (from December 2002) is not probative of whether Al Thumairy had returned to the Mosque after September 11, 2001. The record contains numerous documents sent by Al Thumairy from before September 11 that do not use Mosque Stationary or a Mosque stamp, which are nearly identical to Plaintiffs Exhibit 226. *See, e.g.*, KSA Ex. 185 (KSA 8413) (dated August 13, 2001 and containing similar fax stamp as Plaintiffs Exhibit 226). Moreover, Plaintiffs reference to Plaintiffs Exhibit 226 undermines their claim. Al Thumairy signed the document as "Imam of the King Fahad Mosque in Los Angeles," dating the letter December 12, 2002.<br><br>Plaintiffs Exhibit 263 is a payroll record that shows Muhanna was paid by the Embassy, while Al Thumairy was not. That is not probative of whether Al Thumairy was at the Mosque. Other payroll records confirm that he was at the Mosque after September 11, 2001. First, a document on Mosque letterhead that indicates it was prepared by Madha states that the Mosque owed Al Thumairy a salary through July of 2002. *See* KSA Ex. 210 (KSA 7196). |
| 530. | Thumairy continued to work as MOIA Propagator for the Kingdom in Los Angeles after the 9/11 Attacks but had no longer had the King Fahad Mosque to use as his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | platform for his extremist activities. Shuaib admitted to Madha that Thumairy returned to Los Angeles and "officiate[d] at other mosques." Ex. 128, Madha Dep. 41:10-13, 42:5-19. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that Al Thumairy was in Los Angeles as a MOIA propagator for a period of time after the September 11 attacks.<br><br>Undisputed that the King Fahad Mosque was not a platform for extremist activities after the September 11 attacks. However, Plaintiffs' assertion that Thumairy engaged in such activities ("his extremist activities") is inaccurate; as is the implication that the Mosque was a platform for such activities before the attacks. Plaintiffs cite nothing new to support those unfounded accusations, and the evidence they cited elsewhere was been refuted. *See supra* Response to ¶¶ 398, 412, 420, 421.<br><br>Plaintiffs' assertion that Al Thumairy officiated at other mosques is contradicted by the record, which shows that Al Thumairy was never a member of a mosque other than the King Fahad Mosque in Los Angeles after the September 11 attacks.<br><br>Madha testified: "You're not aware of Mr. Thumairy serving as an Imam or leader at any other mosque in Los Angeles, correct? A: Correct." Pls. Ex. 128 (Madha Tr.) 41:10-13. After a brief recess, Madha's counsel indicated that Madha wanted to clarify his last answer. He did not change his answer but added that Shuaib told him that Al Thumairy did officiate at other mosques as Imam "occasionally." *Id.* at 42:11-19. That testimony is inadmissible hearsay. *See* Objections Chart. Regardless, Madha confirmed that, to his knowledge, Al Thumairy "was not a full-time or permanent Imam at any other mosque." *Id.* at 43:4-7.<br><br>Al Thumairy testified that after the September 11 attacks, "I went to the mosque [King Fahad Mosque] every day, and I prayed there every day. I was seen by hundreds of people. And on Fridays, I would be seen by a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | thousand people." Pls. Ex. 107 (Thumairy Tr.) 407 22-408:10. Similar to Madha's testimony that Thumairy only "occasionally" officiated at other mosques but was never an Imam elsewhere in Southern California, Al Thumairy said that he went to the El-Khattab Mosque "once to perform the Friday prayer." *Id.* at 409:5-8. |
| 531. | One week after Thumairy returned to Los Angeles, Hamad Badr, Imam of the Long Beach Mosque, sent a December 30, 2001 letter to MOIA Minister Sheikh. Badr's letter proposed that Thumairy or Muhanna be delegated by MOIA to serve as the Imam of the Long Beach Mosque. Ex. 303, KSA 8532. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, it is undisputed that Plaintiffs Exhibit 303 appears to contain the information described, except it does not show that Badr was "imam" of the mosque. He signed as director and was seeking an imam for the mosque.

The document does not suggest that Al Thumairy was looking to join a different mosque, as he was not requesting to go to the Long Beach Mosque. Al Thumairy testified that he did not remember Badr. Pls. Ex. 107 (Thumairy Tr.) 322:18-323:4. And he testified that he did not remember Badr asking the Ministry of Islamic Affairs if Thumairy could become Imam at the Long Beach Mosque. *Id.* at 323:17-22.

Plaintiffs Exhibit 303 also refers to Al Thumairy, in December of 2021, as an imam "delegated to King Fahad Mosque." This supports Al Thumairy's testimony that he had returned to the Mosque after the September 11 attacks, contrary to Plaintiffs' assertion in ¶ 529. *See* Pls. Ex. 303 (Muhanna Ex. 677). |
| 532. | Badr was a "Saudi Sunni who follow[ed] an extremist Salafi ideology" and had direct ties to members of Thumairy's extremist | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | group, specifically Saudi Consulate Secretary ███████ Badr and ████ were attempting to install Sunni extremist leadership at the Long Beach Mosque. Ex. 2, EO 3470. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2CC (EO 3470) is inadmissible hearsay. *See* Objections Chart.<br><br>Regardless, Plaintiffs Exhibit 2CC does not support Plaintiffs' assertion. That document is "source reporting," Plaintiffs Exhibit 2CC (EO 3465), not an FBI finding or conclusion. In the FBI's ultimate conclusion, it found that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>As to the specific hearsay assertions from unidentified source reporting, it says that "in July 2003," Mana and Badr tried to establish control of the Islamic Center in Long Beach. Pls. Ex. 2CC (EO 3470). Al Thumairy was not mentioned as part of this effort; indeed, Al Thumairy was not even in the United States by that time.<br><br>As discussed above, Al Thumairy had no extremist group. *See supra* Response to ¶¶ 398, 412, 420, 421. |
| 533. | Badr likely prepared his letter to Minister Sheikh, sent one week after Thumairy's return to Los Angeles, after consulting with Thumairy. Phone records show that Thumairy called Badr 61 times from September 3, 1999 to July 20, 2001. Ex. 12H (Thumairy calls to Hamad Badr). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12H is an improper summary exhibit. Plaintiffs Exhibit 12H misattributes to Al Thumairy 5 calls made from the number ███████0777. The subscriber for this number is █████████████, and the user is ███████████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. Moreover, Plaintiffs attribute the number to Badr based on a single hearsay source. No subscriber records were produced to verify that the number belonged to Badr.<br><br>Further, Plaintiffs' assertion is speculative and improper attorney argument. Plaintiffs do not know what, if anything, was discussed on the calls between September 3, 1999 and July 20, 2001. They also do not cite any evidence such as phone calls showing additional contact between Al Thumairy and Badr shortly before Badr sent the letter. Plaintiffs thus speculate without evidence that Al Thumairy and Badr were in contact shortly before December 30, 2001, and they speculate about the substance of interactions that Plaintiffs guess must have happened, claiming they involved consultation about Badr's forthcoming letter. This speculative theory is not "likely." |
| 534. | Thumairy denied knowing Badr or the Long Beach Mosque and remembered nothing about Badr's request to MOIA for Thumairy to take the helm of that Mosque. Ex. 107, Thumairy Dep. 323:6-22 | Al Thumairy did not deny knowing Badr or the Long Beach Mosque; he testified that he did not remember either.<br><br>Plaintiffs' also mischaracterize Badr's letter to MOIA. Badr did not ask for "Thumairy to take the helm;" he asked if *either* Al Muhanna or Al Thumairy could be assigned as imam. |
| 535. | On January 14, 2002, MOIA Deputy Minister and Al Haramain Board member Tawfiq Al Sudairy, wrote to Sowailem to get an update on Badr's proposal to Minister Sheikh. Ex. 680U, KSA 8531. | The letter is dated January 15, 2002. It also is not addressed to Sowailem by name.<br><br>Plaintiffs' assertion that Deputy Minister Sudairy is an Al Haramain Board member is unsupported. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | This shows that there were efforts underway inside MOIA to get Thumairy a Mosque assignment to use as a platform for his extremist activities. | In Plaintiffs Exhibit 680U, Sudairy refers to Badr's request (Plaintiffs Exhibit 303) and asks what the Director of Dawah in the U.S. plans to do with the request. This does not show in any way that there were efforts inside MOIA to "get Thumairy a Mosque assignment." As with Plaintiffs Exhibit 303, Plaintiffs Exhibit 680U refers to a request to appointment *either* Al Thumairy or Al Muhanna. The document also does not reveal any "efforts" "inside MOIA." The request originated from Badr, not from "inside MOIA." And in Plaintiffs Exhibit 680U, Sudairy does not direct any particular action or seek a particular outcome; he simply asks what the Director of Dawah plans to do with the request.<br><br>Plaintiffs' assertion regarding a "platform for Thumairy's extremist activities" is refuted elsewhere. There was no extremist network, and Al Thumairy was not an extremist. *See supra* Response to ¶¶ 398, 412, 420, 421. |
| 536. | Thumairy falsely claimed that he was at the King Fahad Mosque for a "whole year after the 9/11 events" and "I went to the mosque every day." Ex. 107, Thumairy Dep. 405:7-19. But Thumairy could not name anyone who saw him at the Mosque after 9/11. Nor when asked could he identify the name of a single worshipper who attended the mosque. Ex. 107, Thumairy Dep. 408:2-14. | This paragraph contains improper attorney argument.<br><br>Al Thumairy's claim that he was at the Mosque for a year after the September 11 attacks is true, and it was corroborated by Kaldirim. *See* Pls. Ex. 121 (Kaldirim Tr.) (Kaldirim testifying that Al Thumairy returned to the Mosque after September 11, 2001 and left in August or September of 2002) *id.* at 195:5-20 (Al Thumairy "may have led prayers;" "he's there as a person to lead the prayer;" and Kaldirim was aware of no instruction for Al Thumairy not to lead prayer).<br><br>Al Thumairy explained that he would be seen by hundreds of people a day, maybe a thousand people on Fridays. *See* Pls. Ex. 107 (Thumairy Tr.) 408:5-14.<br><br>Al Thumairy named numerous individuals throughout his deposition who attended the Mosque. For example, he recalled Sami and Consul General Salloum, *Id.* at 284:19-22; Madha, *id.* at 226:22-24; Shuaib, *id.* at 120:19; |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mohammed al Muhanna, *id.* at 121:1-2; and "Abdelhafiz," "the person who calls for a prayer," *id.* at 245:6-9. |
| 537. | When detained at Los Angeles Airport in May 2003, Thumairy told the FBI that he "works as an Imam for various Mosques including the King Fahad Mosque (KFM) and the Omar Al Katab Mosque." Ex. 154, FBI 000001-000006-REV2021 at 2. The statement that Thumairy made to the FBI was false because (a) Thumairy no longer worked at the King Fahad Mosque after 9/11; and (b) as Thumairy admitted at his deposition, he never worked as an Imam at the Omar Al Khattab Mosque. Ex. 107, Thumairy Dep. 408:24-409:8. | To the extent it is offered for its truth, Plaintiffs Exhibit 154 is inadmissible hearsay. It may not be proffered for impeachment. *See* Objections Chart. This paragraph contains improper attorney argument. Plaintiffs assertions about what Al Thumairy told the FBI are incomplete, and their conclusion that Al Thumairy made false statemens to the FBI is unsupported. It is correct that Al Thumairy testified at his deposition that he never worked as an imam at the Omar Al Khattab Mosque, though he clarified that he went there once to perform the Friday prayer. *See* Pls. Ex. 107 (Thumairy Tr.) 409:5-8. He also testified that he did not recall saying what the FBI attributed to him. *See id.* at 408:24-4. There is no proof that he lied to the FBI. Even to the extent Al Thumairy told the FBI he had returned to the King Fahad Mosque, that statement would be true. Numerous witnesses and documents confirm that Al Thumairy had in fact returned to the King Fahad Mosque. *See supra* Response to ¶ 529. |
| 538. | There was a small grain of truth to Thumairy's statement to the FBI that he worked at "various mosques": he was working at an "underground" mosque in Los Angeles. Following the 9/11 Attacks, Thumairy and Muhanna "established an underground mosque in Los Angeles" where they promoted "extremist / militant / fundamentalist teachings" and oversaw the | Plaintiffs Exhibit 2CC (EO 3465-71), is inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 288 (KSA 6861) is inadmissible hearsay. *See* Objections Chart. There is no evidence that Al Thumairy worked at an "underground" mosque, and the record contradicts the claim. Plaintiffs Exhibit 288 (KSA 6861) is a hearsay document from an unidentified source. It contains |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | distribution of materials obtained from the MOIA that promoted "an extremist Sunni Salafi ideology" to Mosques around Los Angeles. Ex. 288, KSA 6861; Ex. 2, EO 3465-71. | numerous assertions that are demonstrably false. The key portion Plaintiffs rely upon is premised on the claim that Al Thumairy was "believed to have been ordered expelled" from the King Fahad Mosque. But no witness testified that Al Thumairy was expelled, and multiple witnesses testified that he was not. *See* Pls. Ex. 113 (Khalil Tr.) 78:2-5, 395:20-397:17 (Al Khalil testifying that Al Thumairy was not expelled); Pls. Ex. 128 (Madha Tr.) 41:7:9 (Madha testifying to the same); Pls. Ex. 121 (Kaldirim Tr.) 171:11-14 (Kaldirim testifying to the same). Al Thumairy also testified that he returned to the Mosque after the 9/11 attacks. Pls. Ex.107 (Thumairy Tr.) 405:15-19, 513:15-516:8. Similarly, no witness testified that Al Thumairy was an imam at other mosques, and Al Thumairy and Madha both denied it. *See supra* Response to ¶ 530. This testimony confirms that Plaintiffs Exhibit 288 (KSA 6861) is not reliable or accurate. It contains other inaccuracies, as well, including that Thumairy was "recalled" in 2003. *See supra* ¶ 231.<br><br>Plaintiffs Exhibit 2CC also does not support Plaintiffs' assertion. That document is "source reporting," Plaintiffs Exhibit 2CC (EO 3465), not an FBI finding or conclusion. In the FBI's ultimate conclusion, it found that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). Moreover, Plaintiffs Exhibit 2CC never states that Al Thumairy or Al Muhanna established the alleged underground mosque. *See* Pls. Ex. 2CC (EO 3469-3470) (asserting that ███████ have established storefront mosques; no mention of Al Thumairy doing the same). |
| 539. | Khalil confirmed that a Mosque at Overland and Venice Boulevard was established by the extremists who were banned from the | Al Khalil's testimony – on which Plaintiffs rely as the source for information on the Overland Mosque – disproves any connection between Al Thumairy and that mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | King Fahad Mosque. Ex. 113, Khalil Dep. 60:17-21 ("they went and they established a small mosque, Overland with Venice Boulevard, for them, because they were banned. They were not welcomed."). One of the "banned" individuals identified by Khalil at his deposition was Khalid Cherif, ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ████████████; Ex. 113, Khalil Dep. 61:10-18 (referring to Khalid Charif as "Abu Soleiman"). | The quoted portion of Al Khalil's testimony refers to the group who established that mosque as a group that was banned from the King Fahad Mosque. Al Thumairy was *not* banned from the King Fahad Mosque. *See* Pls. Ex. 128 (Madha Tr.) 41:7-9; Pls. Ex. 113 (Khalil Tr.) 78:2-5; Pls. Ex. 121 (Kaldirim Tr.) 171:11-14.

Al Khalil confirmed that unlike the group that established the Overland Mosque, who were "not welcomed" back at the King Fahad Mosque, Al Thumairy attended the King Fahad Mosque and was welcome. *See* Pls. Ex. 121 (Kaldirim Tr.) 191:20-194:2 (Kaldirim testifying that Al Thumairy returned to the Mosque after September 11, 2001 and left in August or September of 2002) *id.* at 195:5-20 (Al Thumairy "may have led prayers;" "he's there as a person to lead the prayer;" and Kaldirim was aware of no instruction for Thumairy not to lead prayer).

Plaintiffs Exhibit ███████████ is inadmissible hearsay. *See* Objections Chart. Regardless, Plaintiffs Exhibit ███ does not support Plaintiffs' assertion. That document is "source reporting," Plaintiffs Exhibit ███, not an FBI finding or conclusion. In the FBI's ultimate conclusion, it found that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).

As to the specific hearsay assertions from unidentified source reporting, it says that "in August 2003," ███ strongly attacked, among other things, "the U.S. . . . and . . . KFM [the King Fahad Mosque." Pls. Ex. 2CC (EO 3469-70). Al Thumairy was not even in the United States by that time. The document does nothing to link Al Thumairy to the allged payments, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | nor is there any suggestion that these payments from years after the 9/11 attacks had anything to do with those attacks. |
| 540. | Further, *after* Thumairy was denied entry to the U.S. in May 2003, Thumairy, along with Muhanna, continued to send extremist materials from Saudi Arabia to ▮▮▮▮ at the Saudi Consulate:<br><br>The overland mosque is receiving compact discs, books, pamphlets and audio and videotapes from Sunni Salafi extremists Muhammad Al- Muhanna and Fahad Al-Thumairy in Saudi Arabia. These materials, which advocate an extremist Sunni Salafi ideology, are being disseminated and left at moderate, mainstream Islamic mosques throughout the southern California area, almost always without the permission of the management of these mainstream mosques. [REDACTED] The discs are narrated by Al-Muhanna and contain Islamic sermons. [REDACTED] Al-Thumairy and Al-Muhanna recently sent 2000 boxes of the above listed material to ▮▮▮ at the Saudi Consulate in Los Angeles. These items were obtained by Al-Muhanna and Al-Thumairy from the Saudi Ministry of Islamic Affairs, who employed both of the individuals while they were in Los Angeles. | Plaintiffs Exhibit 2CC is inadmissible hearsay. *See* Objections Chart. It also does not support Plaintiffs' assertion. That document is "source reporting," Plaintiffs Exhibit 2CC (EO 3465), not an FBI finding or conclusion. This source reportedly claimed that Al Thumairy was connected to Al Qaeda, *id.* at EO 3469. But in the FBI's ultimate conclusion, it found that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>The cited exhibit makes no reference to the King Fahad Mosque, and does not allege that Al Thumairy distributed extremist literature while he was in the United States. And Al Thumairy testified that he never did so. *See* Pls. Ex.107 (Thumairy Tr.) 514:18-515:3. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 2, EO 3470. | |
| **VII.** | **THE ATTEMPTS OF SAUDI GOVERNMENT OFFICIALS TO HIDE THUMAIRY'S EXTREMIST ACTIVITIES** | As set forth below, Al Thumairy was not an "extremist," nor did he lead an "extremist" group. *See* Responses to Pls. Aver. ¶¶ 541-545, 551-552, 554-555, 557-558. There were no attempts to hide any purported extremist activities. |
| **VII.A.** | **Senior Saudi official and agent Jarrah went to the King Fahad Mosque in 2002 to meet with and provide support for the members of Thumairy's extremist group, including Cherif and Muhanna** | To the extent a response is required, Plaintiffs cite nothing in support of these unsubstantiated assertions. As set forth below, Al Thumairy was not an "extremist," nor did he lead an "extremist" group. *See* Responses to Pls. Aver. ¶¶ 541-545, 551-552, 554-555, 557-558.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 541. | In February 2002, the Saudi Embassy received a complaint from members of Thumairy's extremist group, including Khalid Cherif and Abdo Ghanem, that MOIA propagator Shuaib had been put in charge of the King Fahad Mosque and had thrown them out of the Mosque. Ex. 238, KSA 7366; Ex. 72, Madha Decl. ¶¶ 26-28. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Madha's testimony regarding the alleged "extremist group" is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend its meetings, and had no personal knowledge of what the group discussed, especially since he "understand[s] very little Arabic." Pls. Ex. 128 (Madha Tr.) 38:11-39:17. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, Plaintiffs Exhibit 72 (Madha Decl.) ¶ 26 describes a "group of protestors" including the individuals named, but Al Thumairy was not there. Pls. Ex. 128 (Madha Tr.) 39:21-40:9.

As explained above, Al Thumairy did not have or lead an extremist group. *See* Response to Pls. Aver. ¶ 412. And he certainly did not "lead" the men identified. Indeed, while he vaguely recalled some of the names of the purported members of the group, he did not recall others at all. Pls. Ex. 107 (Thumairy Tr.) 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem); *id.* at 219:7-13 (no recollection of Mana, but he "may have been one of the employees" at the Consulate at the time); *id.* at 244:19-245:10 (no recollection of Kebhaj but vaguely recalled a "muezzin at the mosque . . . by the name of Abdelhafiz").

Exhibit 238 (KSA 7366) reflects that the individuals identified made a "complaint against the head of the Ibn Tayimmia Foundation for choosing Tajuddin Shuaib to manage the King Fahad's Mosque without consulting the Muslim community there." That exhibit states: "Tajuddin Shuaib has prevented the persons mentioned above from entering the Mosque and accused them of arousing sedition, claiming that they talk about the *financial and administrative violations* at the Mosque and the Foundation." *Id.* (emphasis added). Nowhere does this exhibit state or suggest that the complainants were prevented from entering the mosque because of their purported extremism. |
| 542. | In March 2002, Saudi Embassy Deputy Musaed Al Jarrah traveled to Los Angeles to meet with the Consul General Salloum, MOIA propagator Muhanna, and MOIA propagator Shuaib to address the "complaint" made by Cherif and other members of Thumairy's extremist group. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 295, KSA 7930-33; Ex. 72, Madha Decl. ¶¶ 26-28. | To the extent a response is required, Madha's testimony regarding the alleged "extremist group" is inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. Madha testified that he was *not* a member of the alleged group, did not attend its meetings, and had no personal knowledge of what the group discussed, especially since he "understand[s] very little Arabic." Pls. Ex. 128 (Madha Tr.) 38:11-39:17.<br><br>Moreover, Plaintiffs Exhibit 72 (Madha Decl.) ¶ 26 describes a "group of protestors" including the individuals named, but Al Thumairy was not there. Pls. Ex. 128 (Madha Tr.) 39:21-40:9.<br><br>To the extent a further response is required, as explained above, Al Thumairy did not have or lead an extremist group. *See* Response to Pls. Aver. ¶ 412. And he certainly did not "lead" the men identified. Indeed, while he vaguely recalled some of the names of the purported members of the group, he did not recall others at all. Thumairy Tr. 256:22-257:1 (no recollection of Cherif); *id.* at 243:20-23 (no recollection of Ghanem); *id.* at 219:7-13 (no recollection of Mana, but he "may have been one of the employees" at the Consulate at the time); *id.* at 244:19-245:10 (no recollection of Kebhaj but vaguely recalled a "muezzin at the mosque . . . by the name of Abdelhafiz").<br><br>Exhibit 295 (KSA 7930-7933) reflects that a meeting was convened to address the complaint made by the individuals identified. Further, this exhibit confirms that the complaint made concerned purported financial and "administrative mismanagement in the Mosque," not any purported extremism. *Id.* (KSA 7933); *see id.* (KSA 7931-7932) ("They have a personal dispute with Khalil al Khalil, and one of them is driven by greed regarding the Mosque and asks to participate in its management as he considers himself among the Mosque's founders back when it was only an idea over ten years ago. Since there is no operational budget for the Mosque, the insistence of Khalil al Khalil to … call for donations during |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | his presence in the summer has disturbed the Mosques-goers and workers who have not received their allowances for a long time. So, this approach arouse curiosity within this subgroup to find out where these donations are being spent and request the Embassy to investigate with Khalil al Khalil regarding the financial violations that accompanied the construction of the Mosque."). |
| 543. | Salloum, Muhanna, Shuaib, and Jarrah refused to meet a "subgroup of three men" who they claimed were engaged in a personal dispute with Khalil, but they did meet with Khalid Cherif. Ex. 295, KSA 7930-33 at 32 (they met with a "second subgroup" which consisted "of one person named Khalid Sherif [Cherif].") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 295 (KSA 7930-7933) contains the information stated. That exhibit states that the individuals identified did not meet with the first subgroup of men because they "agreed that this subgroup was ill-intentioned since their dispute was personal and with al Khalil, and that meeting with them would encourage them to keep up what they were doing." *Id.* (KSA 7932); *see id.* (KSA 7931-7932) ("They have a personal dispute with Khalil al Khalil, and one of them is driven by greed regarding the Mosque and asks to participate in its management as he considers himself among the Mosque's founders back when it was only an idea over ten years ago. Since there is no operational budget for the Mosque, the insistence of Khalil al Khalil to … call for donations during his presence in the summer has disturbed the Mosques-goers and workers who have not received their allowances for a long time. So, this approach arouse curiosity within this subgroup to find out where these donations are being spent and request the Embassy to investigate with Khalil al Khalil regarding the financial violations that accompanied the construction of the Mosque."). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 544. | Jarrah then later met in private with Cherif. Ex. 295, KSA 7930-33 at 32 ("[a] closed meeting was held between Assistant Head of Islamic Affairs [Jarrah] and Mr. Khaled al Sharif [Cherif]."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 295 (KSA 7930-7933) contains the information quoted, except for the omission of the word "later" between "was" and "held." This exhibit states that the subgroup of men who had a "personal" dispute with Al Khalil "managed to influence [Cherif]," but Cherif "later retracted" and "apologized to [the imam of the mosque] regarding what he had done," such that he was permitted to meet with Al Jarrah and gain entry back into the mosque. *Id.* (KSA 7932). |
| 545. | Jarrah's report on the meeting describes Cherif — a longstanding extremist cell member who attended the Mosque — as someone who "cares about the Mosque and is one of the most prominent Mosques-goers." Ex. 295, KSA 7930-33 at 32. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 295 (KSA 7930-7933) contains the information quoted, but it does not characterize Cherif as an "extremist" or state that there was an extremist "cell" at the mosque. Plaintiffs cite nothing to support those characterizations. Further, Exhibit 295 does not support Plaintiffs' assertion that the author of the report was Al Jarrah. The letter relaying this report was signed by "Dr. Majid bin Hassan al Ghesheyan." Pls. Ex. 295 (KSA 7933). |
| 546. | Jarrah also reported that "[h]e [Cherif] maintains a relationship with the Imam of the Mosque." Ex. 295, KSA 7930-33 at 32. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | At that time, Thumairy and the Embassy still asserted that Thumairy was the King Fahad Mosque's Imam, even though he never returned to the Mosque after the 9/11 Attacks. And the record, ███████████ ███████████████████████ ███████ Ex. 12G █████████ ████████████████ | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 295 (KSA 7930-7933) contains the quoted language, but it does not support Plaintiffs' assertion that the author of the report was Al Jarrah. The letter relaying this report was signed by "Dr. Majid bin Hassan al Ghesheyan." Pls. Ex. 295 (KSA 7933).<br><br>The second sentence of this paragraph is unsupported by any citation. Contrary to Plaintiffs' assertion, the evidence shows that Al Thumairy was still at the King Fahad Mosque in 2002. Pls. Ex. 107 (Thumairy Tr.) 407:22-408:23; *see* Pls. Ex. 113 (Khalil Tr.) 78:2-5. There were several imams at the King Fahad Mosque, including Tajuddin Shuaib, who Al Khalil testified was "the main Imam." Pls. Ex. 113 (Khalil Tr.) 99:2-14.<br><br>Exhibit 12G is an improper summary exhibit. *See* Objections Chart.<br><br>Exhibit 12G misattributes to Al Thumairy 15 calls made from the number ██████0777 prior to April 2002. The subscriber for this number is ████ ██████████████, and the user is █████████████ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. Exhibit 12G also lists a call made on November 21, 2002 at 9:57 pm twice.<br><br>Exhibit 12G further attributes a number to █████ based on a single hearsay source. For that attribution, Exhibit 12G purports to rely on a source identified as █████ The █████ likely stands for ████████: In his report, Youssef claimed ████████████████████ ██████████████ Youssef Rep. 59 n.190. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs have not provided that ███████████ with their opposition, and that ████ is inadmissible hearsay in any event. Accordingly, there is no evidence that Al Thumairy had a continuing relationship with ████. |
| 547. | Saudi Arabia asserted diplomatic immunity every time plaintiffs asked Jarrah questions about his trip to Los Angeles and the King Fahad Mosque. Indeed, Jarrah repeatedly asserted that his trips to Los Angeles were in his "diplomatic capacity." Ex. 118, Jarrah Dep. 157:16-158:3, 172:20-173:19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Saudi Arabia properly asserted Vienna Convention protections as to Al Jarrah's trip to California, which was done in a diplomatic capacity. |
| 548. | Jarrah's report of his March 2002 trip to Los Angeles acknowledged that Muhanna was "not allowed by the Mosque's management to interfere with management…." Ex. 95, KSA 7930-33 at 33. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 295 contains the document labeled KSA 7930-7933, not Exhibit 95. Saudi Arabia will treat Plaintiffs as having cited Exhibit 295.<br><br>Exhibit 295 does not support Plaintiffs' assertion that the author of the referenced letter was Al Jarrah. The referenced letter was signed by "Dr. Majid bin Hassan al Ghesheyan." Pls. Ex. 295 (KSA 7933). The letter contains the quoted language. *Id.* |
| 549. | After these events, however, in July 2002, Muhanna received his MOIA performance evaluation: he was rated at the highest | Exhibit 680V (KSA 8511-8514) contains the quoted language and reflects that Al Muhanna received an "Excellent" performance rating. However, that exhibit does not support Plaintiffs' assertion regarding a purported |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | performance level of "excellent" by his MOIA superiors receiving all excellent marks and Muhanna was specifically lauded for "winning the trust of Muslim Community surrounding him" for the time period which included his notorious sermon at the King Fahad Mosque in support of the 9/11 hijackers and the huge controversy it engendered. Ex. 680V, KSA 8511-14. | sermon by Al Muhanna in support of the 9/11 hijackers. As explained above, there is no admissible evidence that Al Muhanna gave such a sermon. *See* Response to Pls. Aver. ¶ 395.<br><br>Madha's testimony regarding Al Muhanna's sermon is inadmissible hearsay. *See* Pls. Ex. 128 (Madha Tr.) 46:17-47:2 (Madha admitting that his declaration, drafted by Plaintiffs' counsel, contained references to a sermon Al Muhanna delivered in Arabic, when Madha does not understand Arabic); *id.* at 47:16-20 ("Q. So . . . your statement is based on Mr. Shuaib's impression and not your own personal impression of the sermon, correct? A. Correct."); *id.* at 69:1:9 (Madha relaying what Shuaib told him about a sermon in a language Madha could not understand). |
| 550. | In October 2002, Ambassador Prince Bandar wrote to Saudi Prince Abdulaziz to inform him that Muhanna had been given a formal termination letter by the Ibn Taymiyah Foundation Board. Ex. 239, KSA 7377-7378. The Ambassador's letter continued to defend Muhanna's support for the 9/11 hijackers, stating that the Mosque's budget was furnished by Saudi Arabia and that necessary measures should be taken because Muhanna's termination "would offend the Saudis in general" and that Muhanna should be returned to the Mosque "because he was wronged without any basis." Jarrah's name is handwritten on the letter. Ex. 239, KSA 7377-78. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 239 (KSA 7377-7378) contains the quoted language except that it does not contain the quoted word "would," but it makes no mention of Al Muhanna's purported "support for the 9/11 hijackers," let alone that the Ambassador "defend[ed]" the same.<br><br>As explained above, there is no admissible evidence that Al Muhanna gave a sermon purporting to support the 9/11 hijackers. *See* Response to Pls. Aver. ¶ 395. Madha's testimony regarding Al Muhanna's sermon is inadmissible hearsay. *See* Pls. Ex. 128 (Madha Tr.) 46:17-47:2 (Madha admitting that his declaration contained references to a sermon Al Muhanna delivered in Arabic, when Madha does not understand Arabic); |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *id.* at 47:16-20 ("Q. So . . . your statement is based on Mr. Shuaib's impression and not your own personal impression of the sermon, correct? A. Correct."); *id.* at 69:1:9 (Madha relaying what Shuaib told him about a sermon in a language Madha could not understand).

Further, Plaintiffs fail to quote parts of the letter that give necessary context to the language they do quote, which demonstrates that Prince Bandar's reference to Al Muhanna's termination "offend[ing] the Saudis" related to his concern that Saudi imams would be terminated "without any basis." Pls. Ex. 239 (KSA 7377-7378). The letter states:

"The Consul added that these two persons often tell those who are closest to them that they are about to end the presence of any Saudi in the mosque and intend to assign the imamate and the Propagation of Islam (Da'wah) in the mosque to people of other nationalities. Since the budget of the mosque is spent by Your Eminence to the Ibn Taymiyyah Foundation and those in charge of it, I hope that Your Eminence would take the necessary measures regarding these actions which offend the Saudis in general. I hope you may inform those in charge to stop these actions or otherwise you may halt the budget, and notify the authorities concerned regarding this matter. I hope you may emphasize the return of Sheikh Mohammed al Muhanna to undertake his duties in the mosque, because he was wronged without any basis." *Id.*

The Saudi government did not fund the mosque. Rather, Prince Abdulaziz provided funds in his personal capacity. Dr. Kaldirim repeatedly testified that funding for the mosque from Prince Abdulaziz was a donation from the Prince, not the government. *See* Pls. Ex. 121 (Kaldirim Tr.) 108:22-109:4 ("And this money was donated by the government of Saudi Arabia? . . . Actually it was coming through Prince Abdul Aziz bin Fahd."), 110:20-24 ("donation"), 113:6 ("donation"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| VII.B. | **Findings of Thumairy's extremism** | Al Thumairy was not an "extremist," nor did he lead an "extremist" group. *See* Responses to Pls. Aver. ¶¶ 541-545, 551-552, 554-555, 557-558.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 551. | The FBI May 2021 EC describes Thumairy as part of a "Southern California based network" of "Saudi Sunni extremists operating inside the United States…." Ex. 2, EO 0004. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 2 (EO 4), the May 2021 FBI EC, contains the quoted language. However, the quoted statements were based on a single unnamed "CHS," or confidential human source, and the document makes clear that "[n]o additional information was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 552. | Madha's account of the radical group he witnessed Thumairy lead at the Mosque is confirmed by the findings the report that the U.S. Government provided to the Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Embassy. The report stated that Thumairy and Mohamed Al Muhanna "held extremist views and cultivated extremist followers. These followers praised and supported the terrorist attacks of 11 September 2001." Ex. 237, KSA 6863-65; *See also*, KSA Aver. ¶ 239, Ex. 142. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, as discussed above, Al Thumairy did not lead or participate in any radical group at the King Fahad Mosque. *See* Responses to Pls. Aver. ¶¶ 412, 420-421, 598.<br><br>Exhibit 237 (KSA 6863-6865) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Exhibit 237 contains the quoted language, but that hearsay assertion is contradicted by the admissible evidence. Al Khalil testified that Al Thumairy was not expelled from the King Fahad Mosque. Pls. Ex. 113 (Khalil Tr.) 78:2-5. Moreover, when questioned about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified," Al Thumairy testified: "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone. And we criticized that act" – that is, the 9/11 attacks – "back then, at the time." Pls. Ex. 107 (Thumairy Tr.) 478:14-479:8. Moreover, Mana and Alzamari – who speak Arabic and heard Al Thumairy's sermons – described Al Thumairy as "never express[ing] any extremist or violent views" and denied ever hearing him "express any violent or extremist opinions." Mana Decl., ¶ 8; Pls. Ex. 101 (Alzamari Tr.) 134:15-135:12; *see also* <span style="background:black;color:black">███████</span><br><br>Further, as Saudi Arabia's expert Marc Sageman has explained, the origin of Exhibit 237 is unknown, and this report is inconsistent with the FBI assessment of the same year (2004) that "Al-Thumairy was very fundamentalist (strict Salafi) in his beliefs, but was not considered to be radical or extremist." Pls. Ex. 2M (EO 659). *See* KSA Ex. 167 (Sageman Rep.) 242. |

466

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 553. | Plaintiffs' expert Youssef explained that this document was likely produced by the State Department's Bureau of Intelligence and Research based on the lack of classification markings. Ex. 5, Youssef Rpt. 51, n. 148. Saudi Arabia did not provide any response or question the findings in the U.S. report; however, Saudi Ambassador Prince Bandar did forward the report to Saudi Minister of Foreign Affairs, Prince Saud al-Faisal, advising him to, "…please review and be advised, and take whatever action you see fit." Ex. 237, KSA 6863-65 at 6864, *See also*, KSA Aver. ¶ 239, Ex. 142. Based on Thumairy's testimony at deposition, as described above, the action Prince Saud al-Faisal chose to take was no action. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart. <br><br> Exhibit 237 (KSA 6863-6865) is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs' assertion that Saudi Arabia took no action in response to the report is incorrect. Exhibit 237 is dated January 27, 2004. As Saudi Arabia's expert Marc Sageman has explained, Minister Saleh al Al Ash Sheikh replied that he had received the report, had reassigned Al Thumairy to do office work in the ministry, and would not dispatch him to work abroad again. *See* Pls. Ex. 680E (KSA 6860); KSA Ex. 167 (Sageman Rep.) 242. <br><br> The translation cited by Plaintiffs, Exhibit 237 (KSA 6864), does not contain the quoted language (it instead says "For your review and appropriate action"); however, the translation of this exhibit provided by Saudi Arabia (KSA Ex. 142) does contain the quoted language. |
| 554. | Similarly, the 9/11 Commission Report cited "Thumairy's reported leadership of an extremist faction at the [King Fahad] mosque[;]" described Thumairy as "reputed to be an Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine[;]" and confirmed that "Thumairy appears to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | have been associated with a particularly radical faction within the local worshippers[.]"*See* 9/11 Commission Report at 216-17 | To the extent a response is required, Plaintiffs quote the 9/11 Commission Report out of context, omitting that the statements concerning Al Thumairy were based on "speculat[ion]." KSA Ex. 163 (9/11 Rep.) 216. The Report states: "Some have speculated that Fahad al Thumairy . . . may have played a role in helping the hijackers establish themselves on their arrival in Los Angeles. This speculation is based, at least in part, on Thumairy's reported leadership of an extremist faction at the mosque." *Id.* Plaintiffs also omit the Report's conclusion concerning Al Thumairy: "Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." *Id.* at 217.<br><br>The conclusion of the 9/11 Commission Report concerning Al Thumairy's non-involvement is consistent with the FBI's final conclusion, which is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>Further, the hearsay reports concerning Al Thumairy's purported "radical[ism]" reproduced in the 9/11 Commission Report are inconsistent with the FBI's 2004 assessment that "Al-Thumairy was very fundamentalist (strict Salafi) in his beliefs, but was not considered to be radical or extremist." Pls. Ex. 2M (EO 659). *See* KSA Ex. 167 (Sageman Rep.) 242. |
| 555. | As of September 2003, the FBI had determined that Fahad al Thumairy was a radical Islamic extremist, identifying him as "part of the Al-Qaida linked extremist Suroori network in Saudi Arabia." Ex. 2, EO 3469. The Suroori are described by the FBI as "violent jihadists" and a splinter | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | extremist group aligned with Al Qaeda. Ex. 2, EO 3468-69. | To the extent a response is required, Exhibit 2CC (EO 3468-3469) is inadmissible hearsay. *See* Objections Chart. |
| | | Exhibit 2CC contains the quoted language, but it does not reflect conclusions or determinations by the FBI. Rather, it consists of hearsay within hearsay – i.e., unidentified "[s]ource reporting," which itself was based on information "obtained through various sources." *Id.* (EO 3465, EO 3471). |
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 556. | As Plaintiffs' expert Emile Nakhleh explained, the "Surrori" were named after Muhammad Surur (1938-2016), a leading cleric and favorite among the Saudi government religious elite, whether intellectual or jihadi, who advocated "strict organizational discipline" and military tactics as a means of "operationalizing jihad." Ex. 149, Nakhleh Rpt. ¶¶ 41-43. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, the Nakhleh Report should be excluded. *See* Objections Chart. |
| | | The cited paragraphs of the Nakhleh Report contain the quoted language, but do not support Plaintiffs' assertion that Surur was a "favorite among the Saudi government religious elite." To the contrary, Muhammad Surur was a senior member of the Muslim Brotherhood, which Nakhleh describes as "anathema to Saudi Wahhabi-Salafis." Nakhleh Rep. ¶ 201; *see also* KSA Ex. 166 (Rundell Rep.) 41. |
| 557. | The 9/11 Commission stated that "[a]fter 9/11, Thumairy's conduct was a subject of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | internal debate among some Saudi officials…" and that "arguments arose within the Saudi government over whether to allow reputedly radical imams, including Thumairy, to work for the Saudi government in the United States." *See* 9/11 Commission Report at 217, 514, n. 12. The Commission observed that "[i]n May 2003, the U.S. government settled the matter, at least in Thumairy's case, by refusing to let him back into the country." *See* 9/11 Commission Report at 514, n. 12. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the 9/11 Commission Report contains the quoted language. However, the reason that Al Thumairy was not permitted back in the country had nothing to do with his alleged extremism. On March 21, 2003, the State Department revoked Al Thumairy's visa because he was engaging in activities incompatible with his status. *See* KSA Ex. 141 (KSA 6810) (diplomatic note). When he was denied entry, Al Thumairy was told that it was because his visa did not permit him to work outside a diplomatic facility. Thumairy Tr. 523:3-20 ("officials [at the] LA airport" told him that his "visa needed to change" because it required him to "work inside the diplomatic building," rather than "in the mosque"); *see also id.* at 524:4-12 (he was never told "entry was denied because of ties to terrorism," and he has no such ties).<br><br>Plaintiffs also omit the Report's conclusion concerning Al Thumairy: "Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217.<br><br>The conclusion of the 9/11 Commission Report concerning Al Thumairy's non-involvement is consistent with the FBI's final conclusion, which is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, the characterization of Al Thumairy as a "reputedly radical imam[]" is inconsistent with the FBI's 2004 assessment that "Al-Thumairy was very fundamentalist (strict Salafi) in his beliefs, but was not considered to be radical or extremist." Pls. Ex. 2M (EO 659). *See* KSA Ex. 167 (Sageman Rep.) 242. |
| 558. | Saudi Arabia cites to the testimony of three individuals to suggest that Thumairy did not express extremist views. KSA Aver. ¶¶ 237-240. Two of those individuals — Saudi Consulate Secretary Mana and ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ██████████████ The third individual, Alzamari, described himself as a friend of Thumairy. Ex. 101, Alzamari Dep. 18:22-21:16. He testified by written questions without genuine cross examination. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. ████████████████████████████████ ████████████████████████████████ ████████████ To the contrary, there is no evidence of any such support network or plan of assistance to the 9/11 hijackers – which has been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers. *See, e.g.*, Response to Pls. Aver. ¶ 143. Nor is there any evidence that Mana ever met or had knowledge of the hijackers when they were in California. Plaintiffs cite nothing to support their assertion that Mana was "Saudi Consulate Secretary"; Mana did not hold that position but was instead a translator. Pls. Ex. 110A (Mana Tr.) 54:3-4. ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████████ <br><br> Mana and Alzamari speak Arabic and heard Al Thumairy's sermons; based on that experience, they described Al Thumairy as "never express[ing] any extremist or violent views" and denied ever hearing him "express any violent or extremist opinions."  Mana Decl., ¶ 8; Pls. Ex. 101 (Alzamari Tr.) 134:15-135:12; ███████████████████ <br> Plaintiffs offer no first-hand account from any individual that Al Thumairy expressed any extremist or violent views. <br><br> ████████████████████████████████████ |
| **VII.C.** | **Saudi officials who worked with Thumairy prior to the 9/11 Attacks sought to distance themselves from Thumairy and MOIA's extremist network.** | To the extent a response is required, Plaintiffs cite nothing in support of the assertions that Al Thumairy was an "extremist" and that there existed an "extremist network."  The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  Pls. Ex. 2A (EO 9-11). |
| 559. | Saudi Consulate Deputy Consul General Ibrahim was identified by Thumairy to the FBI as his "friend" at the Consulate and Thumairy called Ibrahim's home number, his cell number, and his wife's cell phone.  Ex. 154, FBI 000001-000006-REV2021 at 4; Ex. 124, Ibrahim Dep. 96:3-100:11. Yet: | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | a. Ibrahim claimed that he attended the King Fahad Mosque around two Fridays each month. Ex. 124, Ibrahim Dep. 37:13-21. Ibrahim testified that "I know of him [Thumairy]" but claimed that he did not remember meeting Thumairy. Ex. 124, Ibrahim Dep. 39:4-8, 40:5-14.<br><br>b. When asked to describe his relationship with Thumairy, Ibrahim used one word: "Zero." Ibrahim testified that he could not recall meeting Thumairy. Ex. 124, Ibrahim Dep. 39:22-24, 40:5-14.<br><br>c. Ibrahim claimed he did not know that Thumairy was working for Saudi Arabia or its Ministry of Islamic Affairs. Ex. 124, Ibrahim Dep. 59:3-18. | To the extent a response is required, Exhibit 154 is inadmissible hearsay to the extent it is introduced for its truth. It may not be proffered for impeachment. *See* Objections Chart.<br><br>Plaintiffs quote Exhibit 154 out of context. The interview of Al Thumairy that is the subject of that exhibit states as follows: "When asked who were his friends/associates in the Los Angeles area, Fahad identified the Consulate General, Sammy. Fahad said he was not a social person and had no persons who he considered friends/associates with whom he spent time. When asked if he had any friends in the U.S., he only identified ▬▬▬▬▬▬ living in Texas." Pls. Ex. 154 (FBI 4-REV2021).<br><br>Ibrahim testified that he had no recollection of receiving any calls from Al Thumairy at any number. Pls. Ex. 124 (Ibrahim Tr.) 97:24-99:10.<br><br>Exhibit 124 contains the quoted language. |
| 560. | Ibrahim said he did not recall having phone conversations with Thumairy despite numerous records of telephone calls from Thumairy's phone number to Ibrahim's home number, his cell phone and his wife's cell phone. Ex. 124, Ibrahim Dep. 96:3-100:11. Shown MOIA Embassy Head Sowailem's November 2000 letter to extend Thumairy's term in Los Angeles, which claims that Thumairy "is praised by the officials at the Saudi Consulate in Los Angeles…," Ex. 289, KSA 6995, Ibrahim testified that he had no knowledge of praise | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Ibrahim did not recall having phone conversations with Al Thumairy. Al Ibrahim testified that he did not give out his home phone number to anyone besides his family and his wife's family, and that he did not recall ever getting a call from Al Thumairy on his home phone number, his cell |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | within the Consulate for Thumairy. Ex. 124, Ibrahim Dep. 74:19-75:8. | phone number, or his wife's phone number. Pls. Ex. 124 (Ibrahim Tr.) 96:3-100:11.<br><br>Plaintiffs accurately describe Al Ibrahim's testimony concerning Exhibit 289 (KSA 6995). |
| 561. | Saudi Consulate Deputy Consul General Awad, who led the Consulate's Islamic Affairs Section, was named by Thumairy to the 9/11 Commission as one of two persons he worked with most closely at the Consulate. Ex. 90, Snell Decl., Ex. 3 at 3 ("Al-Thumairy said he worked most closely with two individuals named Said Jabreen and Abdullah Hawad, both of whom helped him with administrative matters."). Yet:<br><br>a. Awad claimed he never met Thumairy in person and could not recall having any conversations with him. Ex. 95, Awad Dep. 48:15-49:15.<br><br>b. Awad acknowledged that Thumairy was the Imam at the King Fahad Mosque but claimed that he did not know that Thumairy was working as a Kingdom official or that he was paid by Saudi Arabia. Ex. 95, Awad Dep. 41:8-15, 48:7-13, 84:23-85:20, 98:21-99:11.<br><br>c. Awad claimed he did not know that Saudi Arabia registered Thumairy as a | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 90 at exhibit 3 is inadmissible hearsay. *See* Objections Chart.<br><br>Exhibit 90 at exhibit 3 contains the quoted language. However, Al Thumairy testified that he did not remember making the statement attributed to him in Exhibit 90 and that "I didn't work at the consulate, so that information is incorrect." Pls. Ex. 107 (Thumairy Tr.) 104:17-105:3. Mana testified similarly. *See* Pls. Ex. 110A (Mana Tr.) 74:3-4.<br><br>Al Thumairy further explained that he did go to the Consulate for administrative matters but could not recall (more than 20 years later) the specific people with whom he interacted, although he remembered the Consul General and Sami Ibrahim, who came to Friday prayer. Pls. Ex. 107 (Thumairy Tr.) 105:4-106:4.<br><br>Al Awad testified as described. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Consulate officer. Ex. 95, Awad Dep. 52:6-53:18, 56:8-19, 217:24-218:11.<br><br>d. Awad denied that he was one of the Consulate officials who had "praise" for Thumairy as stated by Sowailem. Ex. 95, Awad Dep. 98:11-19. | |
| 562. | Thumairy's employment by the Kingdom was common knowledge among persons who attended the Mosque, not only the Saudi Government officials who were Thumairy's co-employees assigned to handle Islamic Affairs. Ex. 72, Madha Decl. ¶ 3, 13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 72 (Madha Decl.) ¶¶ 3, 13 are inadmissible hearsay. *See* Objections Chart.<br><br>The Madha declaration, which was written by Plaintiffs' counsel in the first instance, does state that Al Thumairy's employment by the Kingdom was "common knowledge." Pls. Ex. 72 (Madha Decl.) ¶ 3; *see also* Pls. Ex. 128 (Madha Tr.) 21:11-19. However, that assertion is contradicted by the testimony of a director of the Mosque, Kaldirim, that he did not know Al Thumairy was a propagator sent by MOIA. *See* Response to Pls. Aver. ¶ 570. |
| 563. | When Plaintiffs' expert Youssef investigated the Ibn Taymiyah Mosque from 1992-1996, he immediately learned that Ibrahim Al Hiber, the mosque's Imam and Thumairy's predecessor, worked for Saudi Arabia. Al Hiber's Saudi government connection was common knowledge in the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque community. Ex. 5, Youssef Rpt. 70. | To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>There is no record evidence supporting any of Youssef's assertions.<br><br>Undisputed that Al Hiber was the imam of the Ibn Taymiyyah Mosque prior to Al Thumairy. Also undisputed that Al Hiber was a Ministry of Islamic Affairs employee during the relevant period. There is no admissible evidence that Al Hiber's Saudi government connection was "common knowledge." |
| 564. | Based on his experience with the Saudi Arabia government, it's strict governmental structure and the manner in which its Embassies and Consulates operated, Plaintiffs' expert Youssef concluded "it is implausible that high-ranking Saudi Consulate officials such as Ibrahim and Awad were not aware of the identity of every diplomat associated with the Consulate as well as the Embassy." Youssef noted that "Awad was responsible for the Consulate's Islamic Affairs section, and it is implausible to believe that he did not know that Thumairy worked for MOIA." Ex. 5, Youssef Rpt. 70. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart.<br><br>The FBI has asserted that, during this period, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>There is no record evidence supporting any of Youssef's assertions. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 565. | Consulate Secretary Ismail Mana was responsible for the Islamic Affairs section at the Consulate and was a regular attendee at the King Fahad Mosque. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Mana was an employee of the Consulate's Islamic Affairs section, and that he was subordinate to Awad for a period of time and to Salloum, the Consul General. However, Mana testified that his title was "translator," not "Consulate Secretary." Pls. Ex. 110A (Mana Tr.) 54:3-4. The person responsible for Islamic Affairs at the Consulate was Saad Al Jebreen. *See* Response to Pls. Aver. ¶ 1600.<br><br>Undisputed that Mana was a regular attendee at the King Fahad Mosque. |
| 566. | Mana claimed that he did not know that Thumairy was employed by Saudi Arabia and its Ministry of Islamic Affairs. Ex. 110A, Mana Dep. 66:23-67:4. Rather, Mana claimed that he believed Thumairy was a Mosque "employee" working "under the supervision of Mr. Tajuddin Shuaib." Ex. 110A, Mana Dep. 89:4-90:5. Yet Shuaib was a MOIA propagator who reported to Thumairy. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Mana testified as described, elaborating that he thought Al Thumairy was employed by the foundation of the Ibn Taymiyyah Mosque. Pls. Ex. 110A (Mana Tr.) 67:7-13.<br><br>The assertion that Shuaib reported to Al Thumairy is not supported by any citation or record evidence. |
| 567. | Usman Madha, an employee of the Ibn Taymiyah Foundation who was responsible | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for the Mosque's financial affairs and administration, worked with Mana on a regular basis because Mana was appointed by the Consul General to oversee the Mosque's expenditures. Madha testified, "I know from my meetings with Mr. Mana that he knew that Mr. Al Thumairy was paid by the Kingdom." Ex. 72, Madha Decl. ¶ 13. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite nothing to support the assertions in the first sentence of this paragraph.<br><br>Saudi Arabia did not pay the mosque's expenses. A portion of those expenses were paid by a private donation of Prince Abdul Aziz bin Fahd. Pls. Ex. 121 (Kaldirim Tr.) 108:22-109:4, 110:20-24, 113:6; *see* Responses to Pls. Aver. ¶¶ 328-329. Mana's role was to receive requests from the Mosque for specific amounts and to perform recording keeping of disbursements from an account containing charitable donations. *Id.*<br><br>Plaintiffs Exhibit 72, Madha Decl. ¶ 13, is inadmissible hearsay. *See* Objections Chart.<br><br>Moreover, Madha's assertion that Mana knew that Al Thumairy was working for the Kingdom is contradicted by Mana's testimony that he did not know that Al Thumairy was working for the Kingdom. *See* Response to Pls. Aver. ¶ 566. |
| 568. | Imam Mohamed University faculty member and Mosque Board Chair Khalil, as well as Board member Kaldirim, testified at their depositions that Thumairy was not the Imam of either the Ibn Taymiyah Mosque or the King Fahad Mosque; was not working for the Ministry of Islamic Affairs at the Mosque; but that Thumairy was one of the "students" who attended those mosques. Ex. 113, Khalil Dep. 97:7-100:18; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Khalil was Director of the Board, but Al Khalil did not work for Imam Mohamed Bin Saud University when he was working at the Embassy in the United |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 121, Kaldirim Dep. 84:3-20; 105:14-24, 258:24-259:22. | States. Pls. Ex. 113 (Khalil Tr.) 19:23-20:13 ("[n]ot working for them"; "working with the ambassador . . . [a]t the embassy," but "[m]y salary comes from the university, not from the embassy"). <br><br> Undisputed that Kaldirim was a Board member. <br><br> Undisputed that Al Khalil testified as described; he also testified that he understood that Al Thumairy was a "volunteer" at the mosque and would "lead the prayer sometimes." Pls. Ex. 113 (Khalil Tr.) 98:4-18, 99:23-100:2. He further testified: "Others may consider him [to be imam], because when somebody like him with qualification of Islamic studies, some people immediately called him imam or something, but particularly when he led some prayers." *Id.* at 100:5-9. <br><br> Undisputed that Kaldirim testified as described; he also testified that he understood that Al Thumairy was a "volunteer" at the mosque and "might have lead the prayers" that were part of the regular daily prayers at the mosque. Pls. Ex. 121 (Kaldirim Tr.)86:23-87:13. Kaldirim further testified that a definition of an "imam" is "the one who's leading the prayer" and that Al Thumairy did lead prayer. *Id.* at 269:11-21. |
| 569. | Khalil, however, previously admitted to the 9/11 Commission that Thumairy was part of the Mosque's "leadership." Ex. 90, Snell Decl., Ex. 5 at 6 (Khalil named Fahad al-Thumairy and Tajjudin Shuaib when asked to name the mosque leadership). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Exhibit 90 at exhibit 5, page 6, is inadmissible hearsay. *See* Objections Chart. <br><br> Page 6 of that exhibit purports to reflect that Al Khalil – when asked about a visiting scholar's statement that questions about marriages should be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | directed to the "mosque leadership" – stated that the "mosque leadership" "would have been either Fahad al-Thumairy or Tajjudin Shuaib." Pls. Ex. 90, at exhibit 5, page 6. |
| 570. | Khalil claimed that he did not know that Thumairy was a MOIA propagator. Ex. 113, Khalil Dep. 120:2-121:1. Khalil and Kaldirim made the remarkable claim that they had no idea that Saudi Arabia employed and appointed Thumairy (and Muhanna) to work at the Mosque. Ex. 121, Kaldirim Dep. 93:1-94:2, 130:3-17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph contains improper attorney argument to which no response is required.<br><br>Undisputed that Al Khalil testified that he did not understand Al Thumairy to be a MOIA propagator. Pls. Ex. 113 (Khalil Tr.)120:2-121:1.<br><br>As to the second sentence, Plaintiffs cite only Kaldirim's deposition testimony, not Al Khalil's, and therefore fail to support their assertion that Al Khalil "had no idea that Saudi Arabia employed and appointed Thumairy (and Muhanna) to work at the Mosque." Kaldirim testified as described. This testimony contradicts the statements in Madha's declaration, written by Plaintiffs' counsel in the first instance, that Al Thumairy's employment by the Kingdom was "common knowledge." Madha Decl. ¶ 3. |
| 571. | Usman Madha testified that Khalil and Kaldirim knew that Thumairy was the Mosque's Imam and a Saudi government official — it was common knowledge that Thumairy worked for MOIA — and that it was Khalil who told him that Thumairy reported to Embassy Islamic Affairs Deputy | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Jarrah. Ex. 72, Madha Decl. ¶¶ 12; Ex. 128, Madha Dep. 30:15-32:12. | The cited portions of the Madha declaration and transcript, *see* Madha Decl. ¶ 12; Madha Tr. 30:15-32:12, are hearsay.  *See* Objections Chart.<br><br>Madha testified as described with the exception that the cited materials do not reflect that "it was common knowledge that Thumairy worked for MOIA." |
| 572. | It was Khalil himself who in 1995 confirmed to the Saudi government — in consideration of their funding of the King Fahad Mosque's construction — that the MOIA Minister would choose a MOIA propagator to "manage…and supervise [the Mosque's] activities." Ex. 189, KFM 0379-0382 at 381. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, Exhibit 189 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs mischaracterize Exhibit 189.  It does not state that the "MOIA Minister would choose a MOIA propagator to "manage…and supervise [the Mosque's] activities."  Rather, it states that *Prince Abdul Aziz bin Fahd* "may choose, in cooperation with His Excellency Minister of Islamic Affairs or any other agency, those who can manage it and supervise its activities from among the Saudi propagators known for knowledge, balance, and love for the country's leadership."  Pls. Ex. 189 (KFM 381).<br><br>Al Khalil testified that the "Ibn Taymiyyah Foundation is completely independent of the Saudi Arabian government."  Pls. Ex. 113 (Khalil Tr.) 366:20-367:15.  He also testified that the King Fahad Mosque was likewise completely independent of the Saudi Arabian government.  *Id.* at 367:6-11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite no evidence for the assertion that the Saudi government funded the King Fahad Mosque's construction. To the contrary, Saudi Arabia did not build the King Fahad Mosque, nor was it controlled by the Kingdom's religious leadership. The King Fahad Mosque was built and run by the Ibn Taymiyyah Foundation; both board members from that foundation testified that the foundation and the mosque were completely independent of the Saudi government. Pls. Ex. 121 (Kaldirim Tr.) 263:13-21; Pls. Ex. 113 (Khalil Tr.) 366:20-367:15.<br><br>Saudi Arabia also did not pay the mosque's expenses. A portion of those expenses was paid by a private donation of Prince Abdul Aziz bin Fahd. Pls. Ex. 121 (Kaldirim Tr.) 108:22-109:4, 110:20-24, 113:6. |
| 573. | MOIA Minister Abdullah Turki had a close relationship with Thumairy and called him "Fahad." Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO 2687-90 at 2689 (according to MOIA propagator Shuaib, Thumairy was "very connected" to Turki and Turki would visit Thumairy in the U.S.). Turki, however, testified that while he "may have come across him [Thumairy]" he didn't know him personally. Ex. 97, Turki Dep. 124:10-125:1. | Paragraph 6 of the Madha Declaration is inadmissible because it is not based on personal knowledge. *See* Objections Chart. Madha merely claims it "appeared" to him that Al Thumairy and Turki knew each other based only on one or two observed interactions in 1998 and the fact that the Minister at one point during those interactions used Al Thumairy's first name. Madha Decl. ¶ 6.<br><br>Exhibit 2W (EO 2689) is inadmissible hearsay and is not based on personal knowledge. *See* Objections Chart. To the extent Exhibit 2W is admissible, it contains the quoted language.<br><br>Minister Al Turki testified as described. Al Thumairy acknowledged that he saw Minister Al Turki "in many gatherings," but he did not "personally . . . remember that I spoke with him. I don't remember. It could be just a greeting." Pls. Ex. 107 (Thumairy Tr.) 28:18-29:7. |
| 574. | Embassy Islamic Affairs Deputy Jarrah was identified by two Saudi government employees at the Mosque as the person to whom Thumairy reported. Madha testified | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that Saudi government officials Shuaib and Khalil both admitted to him that Thumairy reported to Embassy Islamic Affairs Deputy Jarrah. Ex. 72, Madha Decl. ¶ 12; Ex. 128, Madha Dep. 31:14-32:12; ]. This was confirmed by the FBI's determination that Jarrah was "heavily connected to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of [Muhanna] and Thumairy…." And "had been directing, controlling and funding…Thumairy…." Ex. 2, EO 0004. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, ¶ 12 of the Madha declaration and the cited portion of Madha's deposition, Madha Tr. 31:14-32:12, are inadmissible hearsay and not based on personal knowledge. *See* Objections Chart. When asked to provide the basis for his purported knowledge that Al Jarrah worked for the MOIA, Madha testified that his impression was based "only" on information conveyed to him by Al Khalil and Shuaib. Pls. Ex. 128 (Madha Tr.) 31:6-22.<br><br>The May 2021 FBI EC (Pls. Ex. 2A (EO 4)) contains the language quoted, but the FBI did not make the determinations stated by Plaintiffs. The document makes clear that the statements relating to Al Jarrah were based on a single unnamed "CHS" (or confidential human source) and that "[n]o additional information was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5). The investigation into this issue "was closed in July 2007." *Id.* (EO 5).<br><br>Al Thumairy testified he did not know Al Jarrah. Pls. Ex. 107 (Thumairy Tr.) 417:5-7. Al Jarrah recalls having only one phone conversation with Al Thumairy, which took place in 2003 concerning Al Thumairy's difficulties in returning to the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-168:8.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 575. | Jarrah testified that he could only remember one phone call with Thumairy in 2003 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | when Thumairy was in Saudi Arabia and "wanted to come back to his job [in the U.S.]." Ex. 118, Jarrah Dep. 166:24-170-7. But the available phone records show that while he was in the U.S. Thumairy called Jarrah's personal cell phone over 60 times. Ex. 12D (Thumairy calls to Jarrah). Ex. 471, FBI 000410-29 at 25-26 | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Exhibit 12D is an improper summary exhibit. Exhibit 12D contains 64 calls, but both Exhibit 12D and Youssef's report misattribute to Al Thumairy 2 calls made from the number ████ 0777 prior to April 2002 when he started using it. The subscriber for this number is ████ ████, and the user is ████████ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Saudi Arabia's expert Marc Sageman has also explained that the number of calls is overstated given that a number of them are very short in duration, indicating there was no connection. KSA Ex. 167 (Sageman Rep.) 584. Mr. Sageman has also explained that, based on visa records, these calls could have been connected with an expiring visa. As Plaintiffs assert, Al Jarrah did recall one phone call from Al Thumairy in or around 2003, which involved Al Thumairy "want[ing] to come back to his job" in the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-168:8. It is not surprising that Al Jarrah did not recall calls relating to an administrative task that may have occurred more than 20 years before his deposition.<br><br>Further, as Sageman has explained, "since the [alleged] calls between Sheikh Fahad and al-Jarrah started in the summer of 2000, they were too late for any alleged KSA government instruction or direction for Sheikh Fahad to help the future hijackers in Southern California when they needed help." KSA Ex. 167 (Sageman Rep.) 586. |
| 576. | Despite this documentary evidence, Jarrah testified that he didn't have any relationship | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with Thumairy and could not remember having any phone calls with Thumairy when Thumairy was working in the U.S. Ex. 118, Jarrah Dep. 150:15-151:20; 165:9-166:22; 176:23-177:7; Ex. 12D (Thumairy calls to Jarrah); Ex. 471, FBI 000410-29 at 425-426. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Exhibit 12D is an improper summary exhibit. Exhibit 12D contains 64 calls, but both Exhibit 12D and Youssef's report misattribute to Al Thumairy 2 calls made from the number ████0777 prior to April 2002 when he started using it. The subscriber for this number is ████████, and the user is ████████ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Al Jarrah testified as described.<br><br>As Saudi Arabia's expert Marc Sageman has explained, the number of calls is overstated given that a number of them are very short in duration, indicating there was no connection. KSA Ex. 167 (Sageman Rep.) 584. Further, as Sageman has explained, "since the [alleged] calls between Sheikh Fahad and al-Jarrah started in the summer of 2000, they were too late for any alleged KSA government instruction or direction for Sheikh Fahad to help the future hijackers in Southern California when they needed help." *Id.* at 586. |
| 577. | MOIA Director of Da'wah Abroad Saud Ghudaian was identified by Thumairy as the MOIA official and Imam Mohamed University professor who recruited him to work at MOIA. Ex. 154, FBI 000001-000006-REV2021 at 2. Ghudaian testified that all he knew was that Thumairy was a MOIA employee in America, but he could | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | not remember anything else, including if he ever met Thumairy. Ex. 126, Ghudaian Dep. 52:15-54:24. | To the extent a response is required, Exhibit 154 (FBI 2-REV2021) is inadmissible hearsay to the extent it is introduced for its truth. It may not be proffered for impeachment. *See* Objections Chart.<br><br>Further, Plaintiffs mischaracterize that exhibit. The relevant part of that exhibit states: "Fahad was recruited to work for the Saudi Consulate by an individual, Saud Al Abdullah, with whom he studied at the Mohammad Bin Al Saud University." Pls. Ex. 154 (FBI 2-REV2021).<br><br>Al Ghudaian testified as described. |
| 578. | Deputy Chief of Mission Ahmed Al Qattan, second-in-command behind Ambassador Bandar, ran Saudi Embassy operations for over two decades, and testified that he had never heard of MOIA's Fahad al Thumairy, Ex. 100, Qattan Dep. 30:1-7; did not know how Thumairy received an Embassy title in his passport, Ex. 100, Qattan Dep. 36:4-13; did not know eight-year Embassy veteran MOIA Director Khalid Al Sowailem, Ex. 100, Qattan Dep. 24:22- 25:1, 47:15-20; and, did not know that MOIA had a Da'wah office in America at the Embassy — or that MOIA had propagators working in the U.S. before the 9/11 Attacks. Ex. 100, Qattan Dep. 44:22-46:7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Qattan testified as described.<br><br>Plaintiffs cite nothing for the assertion that Al Qattan "ran Saudi Embassy operations for over two decades." |
| 579. | When shown the May 2000 letter from Embassy Director Khalid Al Sowailem to MOIA propagator Omar Abdi Mohamed in San Diego enclosing an award bonus check to Abdi Mohamed from the Embassy, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Qattan agreed that Sowailem's letter showed that the MOIA had propagators working in the U.S. prior to the 9/11 Attacks, yet still insisted that he had no knowledge of such MOIA propagators in the U.S. Ex. 100, Qattan Dep. 115:5-116:10; Ex. 56, *U.S. v. Mohamed*, Case No. 3:03-cr-03433-JAH, ECF 153 at19-20 (Qattan Dep. Ex. 416).. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the referenced testimony of Al Qattan, *see* Pls. Ex. 100 (Qattan Tr.) 115:5-116:10, is inadmissible because it is speculation not based on personal knowledge. *See* Objections Chart.<br><br>When asked whether "it appears" based on the referenced letter that MOIA had propagators working in the United States, Al Qattan answered – after the Kingdom's counsel objected on grounds of lack of foundation and calling for speculation – that Plaintiffs' counsel's "point of view is correct." Pls. Ex. 100 (Qattan Tr.) 115:8-115:18. |
| 580. | Plaintiffs' expert Youssef stated that based on his experience, "someone in Qattan's position was responsible for the day to day operation of the Saudi Embassy and Saudi Consulates in the U.S. and had to know about the MOIA's role in the U.S. (including its propagators); its Director Sowailem; and how Saudi Arabia shut down the MOIA in the U.S. in 2003." Youssef additionally concluded Qattan also would have known the "MOIA had propagators working inside the U.S. and in particular would have known about Thumairy's Consulate title and role at the King Fahad Mosque, which was a key U.S. posting; the extraordinary events involving the FBI investigation of Thumairy's involvement in providing support to the 9/11 hijackers; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart.<br><br>There is no record evidence supporting any of Youssef's assertions. Youssef is no expert on how a Saudi Embassy works. He was never assigned to one and has never worked for the Saudi government.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy's detention at LAX in 2003; and the U.S. expulsion of Thumairy." Ex. 5, Youssef Rpt. 71-73. | |
| **VIII.** | **THUMAIRY'S IMPLAUSIBLE DENIALS OF HIS RELATIONSHIPS WITH SAUDI GOVERNMENT OFFICIALS, THE HIJACKERS AND OTHERS** | As set forth below, Al Thumairy did not provide any "implausible" testimony. |
| **VIII.A.** | **Thumairy makes incredible claims that he cannot remember Bayoumi, Mana, Jarrah, Cherif, Hazmi, Mihdhar, and others.** | As set forth below, *see* Response to Pls. Aver. ¶¶ 581-589, there is nothing incredible about Al Thumairy's not being able to recall these individuals, particularly given that Al Thumairy encountered a large number of people by virtue of his position as imam at the King Fahd Mosque. |
| 581. | As detailed below, Fahad al Thumairy claimed to have no memory of most of the people he met and interacted with while in Los Angeles. For instance, Thumairy could not name a single worshipper from his time as Imam of the King Fahad Mosque. Ex. 107, Thumairy Dep. 214:9-215:16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Al Thumairy did not claim to have "no memory of most of the people he met and interacted with while in Los Angeles." When asked "who can you name, as members – as worshippers" at the Mosque, Al Thumairy replied, "I don't remember the names right now. It's been a long time. I wasn't always asking people about their names." Pls. Ex. 107 (Thumairy Tr.) 214:18-24. He clarified that of course he did not know the name of every person who came to the Mosque: "[t]hat's impossible" because of the large number of people who attended. *Id.* at 565:7-22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It is also unsurprising that Al Thumairy could not recall specific individuals when his deposition occurred more than 20 years after the events in question. |
| 582. | Further, Thumairy could not recall the name of any of his co-workers or supervisors during this time working at the MOIA in Riyadh. Nor could he recall ever talking to anyone about applying for a Ministry job in the United States. Ex. 107, Thumairy Dep. 36:22- 44:23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that, when asked for the names of his co-workers or supervisors in Riyadh, Al Thumairy testified: "I can't recall right now. I don't recall anybody." Pls. Ex. 107 (Thumairy Tr.) 44:18-23. Plaintiffs omit that Al Thumairy also testified that "it's possible" that "Al Ghadyan" and/or "Al Matrudi" were working at the MOIA in Riyadh, but that he did not "know for certain." *Id.* at 39:17-24.<br><br>It is not surprising that Al Thumairy was unable to recall the names of his MOIA co-workers in Riyadh or the process by which he applied for a Ministry job in the United States, when these events happened more than 25 years before his deposition. |
| 583. | Thumairy denied knowing Omar Al Bayoumi and denied meeting with Bayoumi at the King Fahad Mosque, even after being confronted with Khalil's testimony to the 9/11 Commission that Bayoumi came to the Mosque a number of times, often to visit Thumairy. Ex. 107, Thumairy Dep. 307:20-308:15. | Undisputed that Al Thumairy testified as described. However, Plaintiffs also mischaracterize Al Khalil's purported statements to the 9/11 Commission. The Memorandum for the Record states that "Khalil recognized Bayoumi," not that he "knew" Al Bayoumi. Pls. Ex. 90 (Snell Decl. Ex. 5) at 8.<br><br>Further, the FBI document shown to Al Thumairy is inadmissible hearsay. The admissible evidence is Al Khalil's testimony about the quoted language in the FBI document shown to Al Thumairy (Plaintiffs Exhibit 90 (Snell Decl.)). Al Khalil testified that he never saw Al Bayoumi with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy; that he only saw Al Bayoumi at the King Fahad Mosque "[t]wo or three times"; that Al Bayoumi "asked" Al Khalil "where is Fahad"; and that he did not know "what [Al Bayoumi] was coming" to the mosque "for." Pls. Ex. 113 (Khalil Tr.) 117:6-118:14. |
| 584. | Thumairy denied telling the FBI in a May 2003 interview that he was employed by the Saudi Consulate since 1996, that his assignment to the Consulate was recently extended for one year, and he worked with ▆▆▆▆▆▆ and Abdul Karim Bin Baz in the Islamic Affairs media section. Thumairy testified, "I don't remember that statement." Ex. 107, Thumairy Dep. 218:12-219:6. | Al Thumairy did not deny making that statement; instead, he testified that he did not "remember" making that statement and that the statement is "incorrect." Pls. Ex. 107 (Thumairy Tr.) 218:7-219:6. |
| 585. | Subsequently, Thumairy claimed to not remember Ismail Mana despite Mana stating that he translated for Thumairy during his sermons at the King Fahad Mosque. Thumairy claimed not to know Mana ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Ex. 107, Thumairy Dep. 219:7-221:13, 224:17- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 146 is an improper summary exhibit. *See* Objections Chart.<br><br>Al Thumairy testified that he did not remember Mana "[r]ight now," but acknowledged that Mana "may have been one of the employees" at the Consulate. Pls. Ex. 107 (Thumairy Tr.) 219:7-13.<br><br>▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 225:23; ██████████████ ██████████ | ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ <br><br>Plaintiffs Exhibit ██ does not purport to show ██████ ██. Instead, it purports to show a list of calls from "Thumairy to Faisal al Muhanna." |
| 586. | In the same vein, Thumairy claimed to not remember Khalid Cherif. ████████████████████ ████████████████████ ████████████████ Ex. 107, Thumairy Dep. 254:22-257:8; Ex. 12G ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ <br><br>████████████████████████ ████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | <br>Undisputed that Al Thumairy testified that he did not remember Khalid Cherif. |
| 587. | Similarly, Thumairy denied knowing Jarrah and denied calling Jarrah despite dozens of calls from Thumairy to Jarrah's phone in 2000. Ex. 107, Thumairy Dep. 424:23-427:1. | There is nothing incredible about Al Thumairy's lack of recollection of Al Jarrah. As Sageman explains, the number of calls is overstated given that a number of them are very short in duration, indicating there was no connection. KSA Ex. 167 (Sageman Rep.) 584. Sageman also explains that, based on visa records, these calls could have been connected with an expiring visa. *See id.* Al Jarrah did recall one phone call from Al Thumairy in or around 2003, which involved Al Thumairy "want[ing] to come back to his job" in the United States. Pls. Ex. 118 (Jarrah Tr.) 166:24-168:8. There is nothing incredible about failing to remember details of an administrative task that occurred more than 20 years earlier.<br><br>Further, as Sageman explains, "since the [alleged] calls between Sheikh Fahad and al-Jarrah started in the summer of 2000, they were too late for any alleged KSA government instruction or direction for Sheikh Fahad to help the future hijackers in Southern California when they needed help." KSA Ex. 167 (Sageman Rep.) 586. |
| 588. | Thumairy also denied knowing Nawaf Al Hazmi and Khalid Al Mihdhar. He also denied meeting with either of them. Ex. 107, Thumairy Dep. 340:15-348:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Thumairy testified that he did not know Al Hazmi and Al Mihdhar, and that he did not remember meeting with them. When asked whether Al Thumairy met with Al Hazmi, Al Thumairy testified: "Perhaps he's somebody who came to the mosque and prayed. And I don't know him. Maybe he came and prayed and then we greeted on the go. That could have happened. But I do not meet with people that I do not know." Pls. Ex. 107 (Thumairy Tr.) 342:14-20.<br><br>As set forth in KSA Averment ¶ 78, Al Thumairy only met the hijackers for a few minutes in an interaction that occurred over 20 years before his deposition. It is not surprising that he had no recollection of them.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 589. | Thumairy said he did not know Abdi Mohamed, a propagator working in California for Saudi Arabia during the time Thumairy was appointed to oversee all Saudi propagators in California. Ex. 107, Thumairy Dep. 159:10-18. Incredibly, Thumairy claimed he did not know he had been appointed supervisor of propagators until his deposition and claimed he had never seen the letter addressed to him by Sowailem and produced by Saudi Arabia to | Undisputed that Al Thumairy testified that he did not know Abdi Mohamed and that he did not oversee propagators in California.<br><br>There is no evidence that Al Thumairy was aware of or accepted the nomination described in Plaintiffs Exhibit 214. To the contrary, Al Thumairy testified that he was not aware of the nomination and never received the letter, and also that he never supervised propagators in California. Pls. Ex. 107 (Thumairy Tr.) 144:22-145:4, 145:13-18. Consistent with Al Thumairy's testimony, there is also no evidence of any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Plaintiffs in this litigation. Ex. 107, Thumairy Dep. 144:5-147:10; Ex. 214, KSA 6903 (shown to witness as al-Shahri Ex. 404). In fact, when Mohamed's residence was searched pursuant to his arrest, among Mohamed's belongings was correspondence from MOIA, dated January 17, 1998, informing him of Thumairy's nomination to supervisor of California propagators. Ex. 2, EO 0358. | supervisory work by Al Thumairy over other propagators such as reports on or evaluations of other propagators. Plaintiffs Exhibit 2I (EO 358) is inadmissible hearsay. *See* Objections Chart. |
| **VIII.B.** | **Thumairy evaded any inquiry about his relationships with the Saudi government agents and officials who formed and supported the Southern California extremist network.** | This assertion is not supported by any citation or record evidence. There is no record support that any of Al Bayoumi, Al Thumairy, Al Sowailem, Mana, Al Jaithen, Al Mersal, and others worked together on a plan to assist the two future 9/11 hijackers, Al Hazmi and Al Mihdhar. There is no evidence of any such support network or plan to assist to the 9/11 hijackers. This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers. The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218 (footnote omitted). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2K (EO 491). <br><br> The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-03. <br><br> In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 590. | Regarding Saudi government agent Omar Al Bayoumi, Al Thumairy claimed "I do not know Bayoumi" and that he did not have any relationship with Bayoumi. Ex. 107, Thumairy Dep. 306:2-308:15, 348:15-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Al Thumairy gave the quoted testimony. However, there is no admissible evidence that Al Bayoumi was a "Saudi government agent," other than his work for the Presidency |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of Civil Aviation. To the contrary, Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.<br><br>The 9/11 Commission concluded, that there is "no credible evidence that he [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218 (footnote omitted). |
| 591. | Thumairy, however, regularly worked with Bayoumi and knew him well:<br><br>a. Bayoumi and Thumairy exchanged 67 phone calls in the available phone records. Ex. 2, EO 2757-59; Ex. 5, Youssef Rpt. 102 n. 413.<br><br>b. Bayoumi admitted that he knew Thumairy and the two men met each other | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2X (EO 2757-59), Exhibit 12AA (MPS 738), Exhibit 90 (Snell Decl. Ex. 2) at 6, Exhibit 90 (Snell Decl. Ex. 5) at 8, Exhibit 12BB (MPS 688), Exhibit 413, Exhibit 414, Exhibit 421 (FBI 345-49), Exhibit |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | in person in Los Angeles at the King Fahad Mosque and Ibn Taymiyah Mosque, and once in San Diego. Ex. 120, Dep. 215:18-217:4; Ex. 90, Snell Decl., Ex. 2 at 6 (Bayoumi saw Thumairy in San Diego).<br><br>c. Bayoumi wrote correspondence to MOIA and Thumairy himself about the "coordination" and "cooperation" between Bayoumi and Thumairy for visiting MOIA propagators. Ex 414, MPS43_347 (February 1999 letter to MOIA Minister); Ex. 678D, MPS43_336 (1999 letter to Thumairy praising their "coordination"); Ex. 413, MPS43_338 (January 1999 letter to Sowailem giving thanks to Thumairy and praising his "complete cooperation" and "coordination").<br><br>d. Thumairy's own MOIA Embassy supervisor Khalil Al Sowailem admitted to the FBI that he met and knew Bayoumi and that Bayoumi was in San Diego and associated with the Al Madinah Mosque. Ex. 454, FBI 000012-14.<br><br>e. The Saudi government Board director of the King Fahad Mosque Khalil Al Khalil knew Bayoumi. Khalil told the 9/11 Commission that he knew Bayoumi because "Bayoumi used to come frequently to the mosque to see Fahad Al Thumairy" | 454 (FBI 12-14), and Exhibit 678D are inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no admissible evidence that "[Al] Thumairy . . . regularly worked with Bayoumi and knew him well."<br><br>The materials cited as support for Plaintiffs' assertion that "Bayoumi and Thumairy exchanged 67 phone calls in the available phone records" do not support that assertion. Plaintiffs Exhibit 2X purports to identify 67 "contacts" between December 16, 1998 and December 20, 2000, between "telephone numbers associated with Al-Bayoumi" and "telephone numbers associated with Fahad Al-Thumairy." However, Plaintiffs Exhibit 2X itself notes that one of the numbers allegedly "associated with Omar Al-Bayoumi" was a number for the "KCIC" ("Kurdish Community Islamic Center," Pls. Ex. 2X (2749-MDL), and two of the numbers allegedly "associated with Al-Thumairy" (a ███ number and a ███ number) were "subscribed to" others. *Id.* at 2757-MDL. (Saudi Arabia made this point in its Averment of Jurisdictional Facts and Evidence. ECF No. 9370-1, ¶¶ 230-231.) The cited footnote in Plaintiffs Exhibit 5 (Youssef Rep.) relies on Plaintiffs Exhibit 2X.<br><br>Al Bayoumi testified anyone could use the phones in the mosque and that he allowed others to use his cell phone. Pls. Ex. 120 (Bayoumi Tr.) 180:15-24, 181:18-182:13, 297:3-20, 467:5-15, 521:13-523:23, 524:8-525:3, 784:23-786:15. Al Thumairy testified that he did not remember the 3362 or 0777 numbers. Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 329:13-330:8.<br><br>Plaintiffs Exhibit 90 (Snell Decl.) and Plaintiffs Exhibit 120 (Bayoumi Tr.) do not support Plaintiffs' assertion that Al Bayoumi and Al Thumairy "met each other" in the "Ibn Taymiyah Mosque." In the cited portion of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and testified that Bayoumi stopped by on two or three occasions asking for Thumairy. Ex. 90, Snell Decl., Ex. 5 at 8; Ex. 113, Khalil Dep. 116:16-118:14, 311:2-8.<br><br>f. Bayoumi had home, work, fax, and cell phone listings for Thumairy in his handwritten address book and the January and October 2000 typed phone lists. Ex 12AA, MPS738_35; Ex. 12BB, MPS688_3; Ex 421, FBI 345.<br><br>g. As detailed herein, the testimony, phone records and correspondence show that Bayoumi and Thumairy shared the same network of contacts, including Sowailem; Shuaib; ███; Khalil; Abdi Mohamed; Aulaqi; and various individuals from San Diego at the February 2000 welcome party for the hijackers, including ICS ███ ████████████ | Al Bayoumi's deposition, he mentions the King Fahad Mosque, not the Ibn Taymiyah Mosque. Pls. Ex. 120 (Bayoumi Tr.) 220:8-11.<br><br>Plaintiffs Exhibit 90 (Snell Decl.) and Plaintiffs Exhibit 120 (Bayoumi Tr.) are hearsay and do not support Plaintiffs' assertion that Al Bayoumi and Al Thumairy "met each other . . . once in San Diego." Exhibit 2 of Plaintiffs Exhibit 90 (Snell Decl.) does not reflect "admi[ssions]" by Al Bayoumi. That hearsay document is a purported summary of an interview with Al Bayoumi, and at his deposition Al Bayoumi disputed the accuracy of the document. Pls. Ex. 120 (Bayoumi Tr.) 217:5-19, 483:1-484:15, 822:16-823:4. Moreover, Exhibit 2 of Plaintiffs Exhibit 90 (Snell Decl.) states that Al Bayoumi "recall[ed] seeing Al-Thumairy at a post-Ramadan 'Eid' festival for Saudi students" in San Diego, not that he "met" with Al Thumairy or interacted with him at that festival. At his deposition, Al Bayoumi denied ever seeing Al Thumairy in San Diego. Pls. Ex. 120 (Bayoumi Tr.) 220:5-7.<br><br>The materials cited as support for Plaintiffs' claim that "Bayoumi wrote correspondence to . . . Thumairy himself" do not support the assertion that Thumairy "regularly worked with Bayoumi and knew him well." Neither Plaintiffs Exhibit 413 nor Plaintiffs Exhibit 414 is "correspondence to . . . Thumairy." The only one that Plaintiffs describe as such correspondence, Plaintiffs Exhibit 678D (MPS 43_336), is a brief letter from Al Bayoumi to Al Thumairy thanking Al Thumairy for his "kind efforts in providing . . . Mutaeb Al-Sudairy and Adel Al-Sadhan" and others who "made a good mark" in the mosques they visited – which is the "coordination" to which Al Bayoumi referred in that letter. Pls. Ex. 678D (MPS 43_336).<br><br>Plaintiffs mischaracterize Plaintiffs Exhibit 413. In Plaintiffs Exhibit 413, Al Bayoumi "express[es] [his] appreciation for the efforts of" several individuals, including Al Thumairy; states that those individuals "demonstrated complete cooperation"; and commented that "coordination |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | was the factor that made the greatest mark in achieving" results. Pls. Ex. 413 (MPS 43_338).<br><br>Plaintiffs Exhibit 454 does not mention Al Thumairy. The exhibit describes Al Bayoumi as a "student in San Diego studying for his Masters degree," and states that "Al Bayoumi would call [Al Sowailem] every three to four months to talk about his education" and that "Al Bayoumi was looking for help in continuing his education." Pls. Ex. 454 (FBI 12).<br><br>Plaintiffs mischaracterize Saudi Arabia's relationship to the King Fahad Mosque in describing Al Khalil as "[t]he Saudi government Board director of the King Fahad Mosque." Al Khalil testified that he is the chairman of the Islamic Foundation of Sheikh Ibn Taymiyyah and has been since 1982. Pls. Ex. 113 (Khalil Tr.) 11:19-24. Al Khalil further testified that the foundation runs the King Fahad Mosque. *Id.* at 12:1-10. Al Khalil disclaimed any "formal link" between the "foundation and Saudi Arabia," *id.* at 158:18-159:21, and testified that there was complete independence between the foundation and the Saudi government. *Id.* at 366:7-367:15.<br><br>Plaintiffs Exhibit 90 (Snell Decl.) contains the quoted language, but does not support Plaintiffs' assertion that "Khalil told the 9/11 Commission that he knew Bayoumi." Plaintiffs Exhibit 90 (Snell Decl.) states that "Khalil recognized Bayoumi." Pls. Ex. 90 (Snell Decl. Ex. 5) at 8. Moreover, the quoted language in Plaintiffs Exhibit 90 (Snell Decl.) is contradicted by Al Khalil's testimony at his deposition, when asked about the quoted language in Plaintiffs Exhibit 90 (Snell Decl.). Al Khalil testified that he never saw Al Bayoumi with Al Thumairy; that he only saw Al Bayoumi at the King Fahad Mosque "[t]wo or three times"; that Al Bayoumi "asked" Al Khalil "where is Fahad"; and that he did not know "what [Al Bayoumi] was coming" to the mosque "for." Pls. Ex. 113 (Khalil Tr.) 117:6-118:14. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | The materials cited as support for Plaintiffs' assertion that "Bayoumi had home, work, fax, and cell phone listings for Thumairy" in three documents do not support that assertion. Plaintiffs Exhibit 12BB (MPS 688) and Plaintiffs Exhibit 421 (FBI 345-49) attributes only "H" and "C" numbers to Al Thumairy. Plaintiffs Exhibit 12AA (MPS 738) attributes four numbers to Al Thumairy, one of which is identified as "Home," one of which is identified as "Cell," and one of which appears to be identified as "Masjid Ibn Taymiyyah." Pls. Ex. 12AA (MPS 738_35).

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

The admissible evidence contradicts that the cited "typed phone lists" (Plaintiffs Exhibit 12BB (MPS 688) and Plaintiffs Exhibit 421 (FBI 345-49)) were prepared by Al Bayoumi. Al Bayoumi testified that those documents were phonebooks at Al Madinah Mosque; that he did not personally enter all of the phone numbers in those documents; that he did not do anything to confirm the accuracy of the phone numbers listed in those documents; and that it is possible some of the phone numbers in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5.

The last sub-paragraph in this paragraph is unsupported by any citation or record evidence.

The admissible evidence does not support Plaintiffs' assertion that there was a "February 2000 welcome party for the hijackers." Al Bayoumi testified that the function in February 2000 was "an honoring of volunteers at the mosque," and Al Hazmi and Al Mihdhar's apartment was used to "accommodate" families that had joined. Pls. Ex. 120 (Bayoumi Tr.) 460:12-462:3; *see id.* at 714:24-715:18. As Al Bayoumi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | explained: "Part of the families were females. And we have separation, where men and women don't mingle. So the people had to go and request for [Al Hazmi and Al Mihdhar] to use the apartment for the night to have dinner. So they did not approve easily, but eventually they approved." *Id.* at 460:19-461:7. |
| 592. | Saudi Consulate Islamic Affairs official Smail Mana Thumairy testified that he did not know Mana or that Mana worked at the Saudi Consulate. Ex. 107, Thumairy Dep. 216:23-218:2; 220:23-221:13; 226:1-5; 246:2-10. Thumairy also claimed that he could not recall *anyone* who worked at the Consulate's Islamic Affairs section. Ex. 107, Thumairy Dep. 219:14- 220:1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Thumairy testified that he did not remember Mana "[r]ight now," but acknowledged that Mana "may have been one the employees" at the Consulate. Pls. Ex. 107 (Thumairy Tr.) 219:7-13. Further, Mana testified that "officially there was no Islamic Affairs Department" at the Los Angeles Consulate. Pls. Ex. 110A (Mana Tr.) 54:14-55:3. |
| 593. | Thumairy, however, regularly worked with Mana and knew him well:<br><br>a. ███████████████████████████████████████████████████████████████. Mana was the sole full-time employee of the Islamic Affairs section at the Consulate and would answer questions from visitors and students about Islam. Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Dec. Ex. 3) at 3, Exhibit 154 (FBI 2-REV2021), Exhibit 456 (FBI 41), and Exhibit 566 (FBI 11754), are inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 12I is also an improper summary exhibit. *See id.* Exhibit 154 also may not be proffered impeachment purposes. *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 110A, Mana Dep. 55:2-56:13; Ex. 95, Awad Dep. 76:9-77:8.<br><br>b. Thumairy also admitted to the 9/11 Commission that he worked "closely" with Abdullah Awad — who ran the Consulate's Islamic Affairs section where Mana worked. Ex. 90, Snell Decl., Ex. 3 at 3.<br><br>c. Mana worked with Thumairy at the Ibn Taymiyyah Mosque and King Fahad Mosque and two men shared a close relationship. Ex. 72, Madha Decl. ¶ 20.<br><br>d. Mana was one of a group of men at the Mosque who had regular meetings together with Thumairy and espoused extreme, radical, and anti-American views. Ex. 72, Madha Decl. ¶ 19.<br><br>e. Thumairy asked Mana to lead Friday prayers at the Mosque. Ex. 72, Madha Decl. ¶ 20. Mana translated Thumairy's speeches at the mosque. Ex. 110A, Mana Dep. 73:4-18.<br><br>f. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | There is no admissible evidence that "Thumairy . . . regularly worked with Mana and knew him well."<br><br>Neither Exhibit 3 of Plaintiffs Exhibit 90 (Snell Decl.), nor Plaintiffs Exhibit 154, reflects "admi[ssions]" by Al Thumairy. Those hearsay documents are purported summaries of interviews with Al Thumairy. Al Thumairy testified at his deposition that he had never seen the documents before. Pls. Ex. 107 (Thumairy Tr.) 16:6-19:13. Moreover, Al Thumairy disputed the accuracy of the documents. *Id.* at 50:13-20, 60:9-61:8, 96:12-97:3, 107:11-108:15, 117:5-15, 123:23-124:11, 218:12- 219:6, 275:15-279:12.<br><br>Similarly, Plaintiffs Exhibit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Mana testified that he did not work with Al Thumairy at the Consulate. Pls. Ex. 110A (Mana Tr.) 73:4-18. Mana also testified that he was a volunteer at the King Fahad Mosque, not an employee. *Id.* at 83:17-24. Plaintiffs rely heavily on Plaintiffs Exhibit 72 (Madha Decl.), including Madha's claim that there was a "group of men" at the King Fahad Mosque that were led by Al Thumairy and who "held extreme, radical, and anti-American views." Pls. Ex. 72 (Madha Decl.) ¶ 19. Madha admitted at his deposition that he "understand[s] very little Arabic," could not "understand [Al Thumairy's] sermons," and "never personally heard Thumairy express any support for terrorism in any of his sermons." Pls. Ex. 128 (Madha Tr.) 38:3-39:17. Madha also admitted that he had no personal knowledge of Al Thumairy bringing extremist materials into the mosque or distributing them. *Id.* at 48:22-51:10. Madha testified that he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮<br><br>g. The Saudi Consul General Salloum appointed Mana Thumairyto oversee Saudi Arabia's funding of the King Fahad Mosque and approve all expenditures, and Mana was aware that Thumairy was being paid by the Kingdom. Ex. 72, Madha Decl. ¶ 13.<br><br>h. Mana and Thumairy were both at the King Fahad Mosque when Bayoumi went there immediately after his meeting with the two hijackers on February 1, 2000 at the Mediterranean Cafe. Ex. 92, Morgan Decl. ¶¶ 20-21 (Kaysan Morgan Dep. Exhibit 0789).<br><br>i. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>j. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | described the "group of followers" as followers of Al Thumairy simply because they purportedly "were always hanging around Mr. Thumairy." *Id.* at 65:13-21. Moreover, Madha acknowledged using the word "extreme" to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." *Id.* at 60:17-61:18.<br><br>At his deposition, Al Thumairy testified that Madha's claim was "incorrect" and "a fabrication." Pls. Ex. 107 (Thumairy Tr.) 227:11-19. When questioned about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified," Al Thumairy testified: "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone. And we criticized that act" – that is, the 9/11 attacks – "back then, at the time." *Id.* at 478:14-479:8. Moreover, Mana and Alzamari – who speak Arabic and heard Al Thumairy's sermons – described him as "never express[ing] any extremist or violent views" and denied ever hearing him "express any violent or extremist opinions." Pls. Ex. 168 (Mana Decl.) ¶ 8; Pls. Ex. 101 (Alzamari Tr.) 134:15-135:12; *see also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Mana testified that "Mr. Shuaib Tajuddin, who was the manager of the [King Fahad Mosque]," was the one who invited Mana to lead a Friday prayer. Pls. Ex. 110A (Mana Tr.) 86:6-15; *see id.* at 87:10-89:3.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

Plaintiffs Exhibit 92 (Morgan Decl.) does not support Plaintiffs' assertion that Al Bayoumi had a "meeting" with Al Hazmi and Al Mihdhar "on February 1, 2000 at the Mediterranean Cafe." That exhibit is a Declaration of Kaysan Morgan. It states that Al Bayoumi "overheard" Al Hazmi and Al Mihdhar "speaking Arabic and order coffee," and that Al Bayoumi "began talking to them after he heard them say something in Arabic." Pls. Ex. 92 (Morgan Decl.) ¶ 17.

The admissible evidence contradicts Morgan's speculation in Plaintiffs Exhibit 92 (Morgan Decl.) that "the restaurant meeting may have not been the coincidence I was led to perceive. *Id.* ¶ 30. Al Bayoumi affirmed at his deposition that the meeting was a coincidence. Pls. Ex. 120 (Bayoumi Tr.) 725:14-726:8. Moreover, Morgan admitted at his deposition that he has no personal knowledge of any facts indicating that Al Bayoumi's encounter with Al Hazmi and Al Mihdhar at a restaurant was anything other than a coincidence, and admitted that he does not know anything about any alleged preparations made for 9/11 hijackers. Pls. Ex. 112 (Morgan Tr.) 28:22-29:6, 80:10-14. This chance meeting is addressed in Response to Plaintiffs Averment Section XX.J.

Plaintiffs Exhibit 566 contains the quoted language, but does not support Plaintiffs' assertion that the exhibit reflects findings of the FBI. That exhibit a preliminary investigative report providing an "[u]pdate regarding ▮▮▮▮▮▮▮▮▮▮▮▮ and associated analysis." Pls. Ex. ▮▮▮▮▮▮▮ Moreover, the quoted language is an alleged summary of "[o]ther reporting." *Id.* at ▮▮▮▮.

Plaintiffs Exhibit ▮▮ contains the quoted language attributed to it, except that the first "Al Thumairy" does not appear in Plaintiffs Exhibit ▮▮

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | However, Plaintiffs omit that exhibit also states: ████████ ████████████████ ████████████████ ████████████████ ███████. |
| 594. | **Khalid Al Sowailem** Thumairy claimed that he dealt with "Sowailem only" or "only Sowailem" at the Embassy. Ex. 107, Thumairy Dep. 117:16-23; 118:17-21; 431:12-23.  When asked who else he called at the Embassy other than Sowailem, Thumairy offered: "I don't remember a thing." Ex. 107, Thumairy Dep. 443:5-15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  To the extent a response is required, Al Thumairy gave the quoted testimony. |
| 595. | Yet when asked in February 2004 by the 9/11 Commission who he reported to at the Embassy, Thumairy did not mention Sowailem and claimed that he had the "most contact" with Islamic Affairs Head Ghesheyan. Ex. 90, Snell Decl. Ex. 3 at 3-4. Thumairy now claims not to remember Ghesheyan, Ex. 107, Thumairy Dep. 417:17-21; 419:16-23, and that Sowailem was the only person he communicated with about administrative matters. Ex. 107, Thumairy Dep. 131:8-20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  Pls. Ex. 90 (Snell Decl. Ex. 3) at 3-4 is inadmissible hearsay.  *See* Objections Chart. |
| 596. | Thumairy also made the incredible claim that he could not remember that Sowailem was the director of Da'wah at the Embassy. Ex. 107, Thumairy Dep. 130:21-131:20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Thumairy's lack of memory about Al Sowailem's precise title does not demonstrate that Al Thumairy's testimony was not credible. Moreover, Al Thumairy did recall that Al Sowailem "worked for the Ministry of Islamic Affairs." Pls. Ex. 107 (Thumairy Tr.) 130:21-131:20. |
| 597. | Sowailem worked closely with Thumairy on a regular basis and oversaw Thumairy's work in California:<br><br>a. Thumairy made frequent calls to the Embassy and Sowailem's direct line which demonstrate that the men were discussing work matters. Ex. 5, Youssef Rpt. 45-46.<br><br>b. Sowailem nominated and in January 1998 appointed Thumairy as supervisor of MOIA propagators in California. Ex. 382, DOJ 0010 ; Ex. 243, KSA 8502-03 (Sageman Dep. Exh. MS-5).<br><br>c. Sowailem gave Thumairy two excellent performance reviews for his work as a MOIA propagator and supervisor in California. Ex. 300, KSA 8496-98 (Thumairy Exh. 0836) (Sowailem's February 1998 evaluation gave Thumairy perfect scores for management, observing work times, assuming higher responsibilities, appearance, and his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no admissible evidence that "Sowailem worked closely with Thumairy on a regular basis." To the contrary, Al Thumairy testified that he interacted with Al Sowailem only every "two months or so" and primarily about administrative matters such as leave requests. Pls. Ex. 107 (Thumairy Tr.) 114:23-115:10; *see* KSA Ex. 167 (Sageman Rep.) 585-86 (discussing calls between Al Thumairy and Al Sowailem).<br><br>Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088. This opinion is speculation that is not based on any recognized methodology.<br><br>Plaintiffs Exhibit 382 and Exhibit 243 both mention an "approv[al]" of Al Thumairy's "nomination" to supervise California-based "propagators." Those exhibits do not establish that Al Thumairy was ever actually |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | relationship with "Bosses, Coworkers, and Reviewers" and mentioned his knowledge of English); Ex. 206, KSA 2695-97 (undated evaluation of Sowailem likely from 2000 prior to Thumairy's promotion that gives Thumairy perfect scores for skill in implementation, ability to assume higher responsibilities, and good management, and maintaining good relationships with his co-workers).<br><br>d. Sowailem nominated Thumairy for an early promotion based on "his considerable Da'wah efforts." Ex. 297, KSA 8364 (Ghudaian Dep. Exh. 440).<br><br>e. Based on Sowailem's performance review, Thumairy received a promotion in 2000 as the "best and most competent employee, who met the promotion requirement." Ex. 680W, KSA 8547; Ex. 271, KSA 2693.<br><br>f. Sowailem observed in a November 2000 letter that Thumairy was "praised by the officials at the Saudi Consulate" and was "one of the best and distinguished propagators…." Ex. 289, KSA 6995 (Awad Dep. Exh. 461). | notified of the nomination or its approval. To the contrary, Al Thumairy testified that he "did not oversee anyone" and that he was unaware of any nomination to oversee propagators in California. Pls. Ex. 107 (Thumairy Tr.) 143:1-147:10.<br><br>Plaintiffs Exhibit 300 does not contain the quoted language attributed to it. Rather, that exhibit includes the following language: "1. Bosses"; "2. Coworkers"; and "3. Reviewers." Pls. Ex. 300 (KSA 8497). Al Thumairy testified that he did not know about Al Sowailem's evaluations of his performance and was not aware of the rating that Al Sowailem gave him. Pls. Ex. 107 (Thumairy Tr.) 172:5-16. There is no admissible evidence that Exhibit 206 and Exhibit 300 reflect evaluations for "supervis[ory] . . . work."<br><br>Plaintiffs Exhibit 297 contains the quoted language. Plaintiffs Exhibit 297 does not reflect a "nominat[ion] " by Al Sowailem, but instead is a request from Al Sowailem that Al Thumairy be nominated for a "9[th] rank" vacancy. Pls. Ex. 297 (KSA 8364).<br><br>There is no admissible evidence that Exhibit 297 concerns an "early promotion." That exhibit does not mention any promotion timeline. To the contrary, Al Thumairy testified that "[e]mployees always ask for promotions"; that "as an employee, they would write to their supervisor asking for a promotion"; and that "[u]sually" an employee will "ask for the promotion years ahead, because it takes years for the procedures to go through." Pls. Ex. 107 (Thumairy Tr.) 171:16-173:9.<br><br>Plaintiffs Exhibit 680W does not contain the quoted language attributed to it. Rather, that exhibit states that "[t]he best and most competent employee, who met the promotion requirements, was chosen." Pls. Ex. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | g. Thumairy admitted that Sowailem was his "boss." Ex. 107, Thumairy Dep. 305:11-306:9.<br><br>h. On September 11, 2001, Thumairy attended a MOIA work conference that Sowailem also attended in Copenhagen. Ex. 107, Thumairy Dep. 364:18-365:7. | 680W (KSA 8547). It also separately states that Thumairy was "nominated for promotion." *Id.*<br><br>Plaintiffs Exhibit 271 does not mention Al Sowailem's performance evaluation of Al Thumairy. |
| 598. | Embassy Islamic Affairs Department Deputy Musaed Al Jarrah Thumairy claimed that he did not know Jarrah. Ex. 107, Thumairy Dep. 417:5-7. He did not remember if he ever spoke to Jarrah on the telephone. Ex. 107, Thumairy Dep. 424:5-8. Thumairy worked with Thumairy and the Islamic Affairs Department on a regular basis:<br><br>a. The FBI found that Jarrah "was heavily connected to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of…Al Thumairy." Ex. 2, EO 0004.<br><br>b. Thumairy made 64 phone calls to Jarrah from July 30, 2000-February 3, 2003. Ex. 5, Youssef Rpt. 45 & n. 114.<br><br>c. Jarrah admitted knowing Thumairy in his "diplomatic capacity" in the context of his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2A (EO 4) and Exhibit 478 (FBI 574) are inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.<br><br>There is no admissible evidence that "Thumairy worked with [Al Jarrah] and the Islamic Affairs Department on a regular basis." To the contrary, Al Jarrah testified that he "didn't have any relationship with" Al Thumairy. Pls. Ex. 118 (Jarrah Tr.) 176:23-177:7; *see id.* at 172:13-15. Al Jarrah did recall one phone call in or around 2003, which involved Al Thaumiry "want[ing] to come back to his job" in the United States. *Id.* at 166:24-168:8.<br><br>The phone call assertions relying on Exhibit 5 (Youssef Rep.) should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | work for Saudi Arabia, and if he spoke to Thumairy and gave him a project, that was on behalf of Saudi Arabia. Ex. 118, Jarrah Dep. 156:7-157:5. He recalled that MOIA sent Thumairy to work in Los Angeles at the King Fahad Mosque. Ex. 118, Jarrah Dep. 176:23-177:4.<br><br>d. In March 2001, Jarrah wrote an urgent note to obtain an extension for Thumairy to continue work in Los Angeles. Ex. 257, KSA 1256, (Quattan Dep. Exh. 423). Thumairy claimed that he did not know about an extension or why Jarrah would be involved in getting his extension. Ex. 107, Thumairy Dep. 427:20-429:22. He did not remember speaking to anyone at the Embassy about his extension, Ex. 107, Thumairy Dep. 430:19-431:7, but then claimed that "the extension was based on my request" and that he made the request to Sowailem –"[h]e's the one I talked to." Ex. 107, Thumairy Dep. 431:12-23. Saudi counsel cited diplomatic immunity to block questions to Jarrah about his role in obtaining the emergency extension for Thumairy. Ex. 118, Jarrah Dep. 187:4-189:19.<br><br>e. Jarrah, Thumairy, Sowailem, Sadhan and Sudairy each received a Prince Abdullah bonus in 2001. Ex. 145, KSA 7506-22, | *See* ECF No. 9088. This opinion is speculation that is not based on any recognized methodology.<br><br>Plaintiffs Exhibit 2A does not support Plaintiffs' assertion that "[t]he FBI found that Jarrah 'was heavily connected to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of . . . Al Thumairy.'" The cited page in Plaintiffs Exhibit 2A "report[s]" what a confidential human source ("CHS") purportedly told the FBI "in March 2003," and "[n]o additional information" about Al Jarrah "was revealed outside of the CHS reporting and telephone information." Pls. Ex. 2A (EO 4-5). The FBI did not conclude that the "CHS" was credible.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11).<br><br>As Sageman explains, "since the [alleged] calls between Sheikh Fahad and al-Jarrah started in the summer of 2000, they were too late for any alleged KSA government instruction or direction for Sheikh Fahad to help the future hijackers in Southern California when they needed help." KSA Ex. 167 (Sageman Rep.) 586. Plaintiffs Exhibit 107 (Thumairy Tr.) does not support Plaintiffs' assertion that "Thumairy claimed that he did not know about an extension." At the cited portion of Plaintiffs Exhibit 107 (Thumairy Tr.), Al Thumairy testified that he had not previously seen a particular document and that he had no knowledge of any concerns about whether an extension would be given or about when an extension would be given. Pls. Ex. 107 (Thumairy Tr.) 427:20-428:23. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (Jarrah Dep. Exh. 770); Ex. 118, Jarrah Dep. 289:7-290:13. Saudi counsel blocked any questions concerning the bonus given to both Islamic Affairs and MOIA personnel. Ex. 118, Jarrah Dep. 314:23-315:22.<br><br>f. Jarrah held a closed-door meeting in 2002 with Khalid Cherif, a member of Thumairy's extremist group. Ex. 58, KSA 7930-7933 at 7932 (Qattan Dep. Ex. 424); Ex. 72, Madha Decl. ¶ 19.<br><br>g. The FBI identified Jarrah as the Embassy official responsible to place and oversee Saudi Imams at mosques in the US. Ex. 478, FBI 000569 at 574. | Plaintiffs Exhibit 118 (Jarrah Tr.) reflects that Saudi Arabia's counsel objected to certain lines of questioning based on Vienna Convention privileges. *See, e.g.*, Pls. Ex. 118 (Jarrah Tr.) 187:4-189:7, 314:23-315:22. However, Al Jarrah was permitted to answer questions about conversations he had with Al Thumairy and answer questions about what was on the face of Embassy documents. *Id.*<br><br>For their characterization of "Khalid Cherif," Plaintiffs rely on Plaintiffs Exhibit 72 (Madha Decl.), specifically, Madha's claim that there was a "group of men" at the King Fahad Mosque that were led by Al Thumairy and who "held extreme, radical, and anti-American views." Pls. Ex. 72 (Madha Decl.) ¶ 19. Madha testified that he described that group as followers of Al Thumairy simply because they purportedly "were always hanging around Mr. Thumairy." Pls. Ex. 128 (Madha Tr.) 65:13-21. Madha also acknowledged using the word "extreme" to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." *Id.* at 60:17-61:18.<br><br>Plaintiffs Exhibit 478 is hearsay and describes information purportedly provided to the FBI by a confidential human source. *See* Pls. Ex. 2A (EO 4-5) (noting that "[n]o additional information" about Al Jarrah "was revealed outside of the CHS reporting and telephone information"). The FBI did not conclude that the source was credible. The predicate for the Operation Encore investigation was "the theory that Al-Jarrah used his position as the Head of Islamic Affairs at the Saudi Arabian Embassy in Washington D.C. to oversee and direct the facilitation of the hijackers through his subordinates, Thumairy and Bayoumi." *Id.* at EO 3. However, "[n]o additional information was revealed," and as the FBI concluded: "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." *Id.* at EO 4-5, 11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 478 states that Al Hazmi and Al Mihdhar "do not appear to have arrived in southern California with an active local support network." Pls. Ex. 478 (EO 577-UPDATED). |
| 599. | **Embassy Islamic Affairs Department Head Dr. Majid Ghesheyan** Thumairy claimed he did not know Dr. Majid Ghesheyan. Ex. 107, Thumairy Dep. 417:17-21; 419:16-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 600. | When the 9/11 Commission asked "if there was anybody at the Saudi Embassy in Washington, D.C. to whom he reported, al-Al Thumairy said that he had the most contact with Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. "Dr. Majid" was Majid Ghesheyan who was the head of the Islamic Affairs department at the Embassy. Ex. 90, Snell Decl. Ex. 3 at 3-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 3-4, is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 90 (Snell Decl.) does not support Plaintiffs' assertion regarding what Al Thumairy "said" to the 9/11 Commission. Exhibit 3 of Plaintiffs Exhibit 90 (Snell Decl.) is a hearsay purported summary of an interview with Al Thumairy. Al Thumairy testified at his deposition that he had never seen the purported 9/11 Commission interview summaries before. Pls. Ex. 107 (Thumairy Tr.) 16:6-17:15. Moreover, Al Thumairy disputed the accuracy of those summaries. *Id.* at 50:13-20, 96:12-97:3, 107:11-108:15, 117:5-15, 123:23-124:11. |
| 601. | **MOIA Minister Turki and Deputy Minister Ammar** Thumairy claimed not to remember any MOIA officials visiting Los | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Angeles while he was there. Ex. 107, Thumairy Dep. 272:6-14; 274:11-24. "I only remember Sowailem who showed up for the inauguration….Otherwise I don't remember" Ex. 107, Thumairy Dep. 339:22-340:5. Thumairy claimed he did not remember the visit of Deputy Minister Ammar to Los Angeles in September 2000. Ex. 107, Thumairy Dep. 340:6-11. Yet:<br><br>a. Thumairy and MOIA Minister Turki knew each other well, and Turki visited Thumairy in Los Angeles. Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO 2689 (MOIA propagator Shuaib admits to FBI that "Turki would visit Althumairy when he visited the United States" and that Thumairy "has a very good reputation with Turki.")<br><br>b. Thumairy met and had dinner with the MOIA Deputy Minister Ammar in September 2000. Ex. 540, KSA 7362. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2689) and Plaintiffs Exhibit 540 are inadmissible hearsay. Plaintiffs Exhibit 72 (Madha Decl.) ¶ 6, is not based on personal knowledge. *See* Objections Chart.<br><br>The Al Thumairy deposition is not admissible evidence of Plaintiffs' assertion that Al Ammar "visit[ed] . . . Los Angeles in September 2000." Al Thumairy did not recall any such visit. Pls. Ex. 107 (Thumairy Tr.) 340:6-14. The only discussion of such a visit in is a description provided by Plaintiffs' counsel, which is not admissible evidence.<br><br>The materials cited as support for Plaintiffs' assertion that "Thumairy and MOIA Minister Turki knew each other well" do not support that assertion. Plaintiffs Exhibit 72 (Madha Decl.) was written by Plaintiffs counsel and the portion cited is not based on personal knowledge. Pls. Ex. 128 (Madha Tr.) 21:11-23:2. In that declaration, Madha states – based on observing one interaction between Al Thumairy and Al Turki" that "[i]t appeared" to him that the two "knew each other well." Pls. Ex. 72 (Madha Decl.) ¶ 6. Madha has no personal knowledge of the actual relationship, if any, between them. Madha also does not understand Arabic and does not know what, if anything, was discussed between Al Thumairy and Minister Al Turki. Pls. Ex. 128 (Madha Tr.) 46:24-47:2.<br><br>Plaintiffs Exhibit 2W is a hearsay report purporting to summarize an interview with Tajuddin Shuaib. That report states that "Althumairy has a very good reputation with Turki," but does not explain what it meant to have "a very good reputation," nor does the report explain Shuaib's basis for purportedly opining on the subject. Pls. Ex. 2W (EO 2689). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Turki testified that he has never known Al Thumairy. Pls. Ex. 97 (Turki Tr.) 124:21-125:1. Al Thumairy also testified that he did not personally know Al Turki. Pls. Ex. 107 (Thumairy Tr.) 28:14-29:11. |
| | | Plaintiffs Exhibit 2W states that Shuaib "never heard Althumairy give fundamental or political 'hukbas.'" Pls. Ex. 2W (EO 2688). |
| | | Plaintiffs Exhibit 540 is a document produced by the FBI, not a document produced by Saudi Arabia. That exhibit is an interview summary of Abdussattar Shaikh and does not support Plaintiffs' assertion that "Thumairy met and had dinner with the MOIA Deputy Minister Ammar in September 2000." Plaintiffs Exhibit 540 states that "Shaikh did not recognize" Al Thumairy's name. Pls. Ex. 540 (FBI 7363). To the extent Plaintiffs meant to attach Pls. Ex. 668 (KSA 7362), that exhibit is an itinerary for Al Ammar's visit to Los Angeles. It does not indicate that all the planned events actually occurred. |
| 602. | **Visiting Saudi propagators Sudairy, Sadhan, Jaithen, and Mersal** Thumairy claimed that he could not remember any MOIA propagators who visited the Mosque, and that he never had advance knowledge that propagators planned to visit. Ex. 107, Thumairy Dep. 297:5-298:23; 344:4-8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, this is undisputed. |
| 603. | Thumairy could not remember Majid Al Mersal, who visited the King Fahad Mosque twice during December 1998-January 1999 and again in December 1999, Ex. 107, Thumairy Dep. 287:14-291:6; Abdullah Al Jaithen, who was with Mersal in December 1999, Ex. 107, Thumairy Dep. 290:1-4, 294:5-23; or Adel Al Sadhan or | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mustaeb Al Sudairy. Ex. 107, Thumairy Dep. 301:7-18. | To the extent a response is required, Plaintiffs Exhibit 107 (Thumairy Tr.) is not admissible evidence of Plaintiffs' assertions regarding Al Mersal and Al Jaithen's visits. Al Thumairy did not recall either Al Mersal or Al Jaithen, and he did not testify about the details of their trips to Los Angeles. Pls. Ex. 107 (Thumairy Tr.) 287:8-24, 290:2-8, 294:5-23. Instead, the only discussion of those trips in Plaintiffs Exhibit 107 (Thumairy Tr.) are descriptions provided by Plaintiffs' counsel, which are not admissible evidence. |
| | | It is not surprising that Al Thumairy could not recall imams who visited the King Fahad Mosque for a short period of time more than 21 years before his deposition. |
| 604. | Thumairy worked closely with the visiting propagators and knew them well: a. Thumairy placed a series of five phone calls to Mersal in January-April 2000 during the time that the two hijackers were in Los Angeles and then San Diego. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). b. In early 1999, Bayoumi wrote Thumairy to commend him for his "kind efforts in providing us with brothers Musaeb al-Sudairy and Adel al-Sadhan" and observed "that coordination will be the starting point…." Ex. 678D, MPS43_336. c. Bayoumi wrote to MOIA's Minister Turki about the visit of Sadhan and Sudairy and expressed that he wished to thank | Plaintiffs Exhibit 12A is an improper summary exhibit with numerous misattributions and other errors. Plaintiffs Exhibit 12A shows a total of four calls in January-April 2000 from Thumairy to a number Plaintiffs associate with Mersal based upon hearsay sources. No subscriber records were produced to verify that the number belonged to Al Mersal. Plaintiffs Exhibit 414 and 678D are inadmissible hearsay. *See* Objections Chart. The cited materials do not support Plaintiffs' assertion that "Thumairy worked closely with the visiting propagators and knew them well." According to Plaintiffs, those materials show five alleged phone calls to one propagator over a four-month period, and two thank-you letters written by Al Bayoumi that were general courtesy letters of appreciation. That does not demonstrate that Al Thumairy had any close working relationship with Al Mersal, Al Sadhan, or Al Sudairy. In fact, the admissible evidence shows that Al Thumairy did not work closely with them and did not know them well. Al Thumairy did not recall Al Mersal, Al Sadhan, or Al Sudairy. Pls. Ex. 107 (Thumairy Tr.) 287:14-16, 301:7-11. Al Mersal testified that he met Al Thumairy for the first time during a visit to Los Angeles during Ramadan 1419 and that he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy for his "full cooperation and coordination." Ex. 414, MPS43_347. | had not previously known of Al Thumairy. Pls. Ex. 115 (Mersal Tr.) 91:12-17, 99:22-100:6, 102:18-21, 249:20-24. Al Sadhan and Al Sudairy testified that, before traveling to California during Ramadan 1419, they had never met Al Thumairy, and they have not met or worked with him since. Pls. Ex. 99 (Sadhan Tr.) 129:21-130:4, 381:20-382:8, 384:21-385:3, 387:5-14; Pls. Ex. 119 (Sudairy Tr.) 115:7-14, 186:10-23.

Plaintiffs Exhibit 12A attributes the phone number "███████1671" to Al Mersal. Pls. Ex. 12A (Phone chart of Phone calls Nov. 1999-Mar. 2000) at 35. For that attribution, Plaintiffs rely on documents identified with "FBI 345," "MPS688" and "MPS738." With respect to "FBI 345" and "MPS688," Al Bayoumi testified that he did not personally enter all of the phone numbers in those documents; that he did not do anything to confirm the accuracy of the phone numbers listed in the documents; and that it is possible some of the phone numbers in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. With respect to "MPS738," the page of that document on which Plaintiffs rely is inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 678D is a courtesy letter of thanks. As Al Bayoumi testified, "[g]enerally when somebody comes to visit . . . we thank everybody who is involved." Pls. Ex. 120 (Bayoumi Tr.) 271:24-15.

Plaintiffs Exhibit 414 is addressed to "the Minister of Islamic Affairs" and is also a courtesy letter of thanks. |
| 605. | Thumairy claimed he did not remember Omar Abdi Mohamed, a MOIA propagator who worked in San Diego. Ex. 107, Thumairy Dep. 159:10-19. Nor could Thumairy recall the organization which Abdi Mohamed used to launder money for groups associated with Al Qaeda, the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Western Somali Relief Agency, or that he had contacts with any Somali or other charities. Ex. 107, Thumairy Dep. 160:1-13. | To the extent a response is required, Plaintiffs Exhibit 107 (Thumairy Tr.) is not admissible evidence of Plaintiffs' assertions regarding "Omar Abdi Mohamed," "the Western Somali Relief Agency," or Al Thumairy's "contacts" with other charities. Al Thumairy did not recall Abdi Mohamed or the Western Somali Relief Agency, and did not recall whether he had any contacts with Somali charities. Pls. Ex. 107 (Thumairy Tr.) 159:10-19, 160:1-13. (Plaintiffs did not ask Al Thumairy about non-Somali charities. *See id.* at 160:7-13.) The only discussion of Abdi Mohamed in Plaintiffs Exhibit 107 (Thumairy Tr.) is a description provided by Plaintiffs' counsel, which is not admissible evidence. Plaintiffs' counsel did not even attempt to describe the Western Somali Relief Agency or Abdi Mohamed's alleged use of it. Al Thumairy's testimony that he did not remember contacts with Somali charities is not evidence that he had those contacts.<br><br>Plaintiffs' claims that Abdi Mohamed laundered money for groups associated with Al Qaeda is entirely unsupported. As discussed in Response to Plaintiffs Averment ¶ 374, Abdi Mohammed was acquitted on charges that he made knowingly false statements regarding funding for various charities, including al Haramain and WSRA. |
| 606. | Thumairy worked directly with Abdi Mohamed and knew him well:<br><br>a. Abdi Mohamed reported directly to Thumairy. Ex. 382, DOJ 0010.<br><br>b. Sowailem came out to San Diego and visited with Abdi Mohamed. Ex. 139, U.S. v. Omar Abdi Mohamed, Memorandum of Points and Authorities. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 139 (U.S. v. Omar Abdi Mohamed, Memorandum of Points and Authorities) and Exhibit 483 (FBI 1033-41) are inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | c. Thumairy funded Somali charity organizations tied to terror groups with money provided to him by Saudi Prince Abdulaziz. Ex. 483, FBI 001033-41; Ex. 5, Youssef Rpt. 48. | There is no admissible evidence that Al Thumairy "worked directly with Abdi Mohamed and knew him well."<br><br>Plaintiffs Exhibit 382 states that Al Thumairy was "approved . . . to supervise the propagators working in the State of California," and that the letter recipient should "cooperate with him in" promoting "propagation" activities. Pls. Ex. 382 (DOJ 10). The exhibit does not establish that the letter recipient ever in fact "cooperat[ed]" with Al Thumairy, how often that "cooperat[ion]" occurred, or what form that "cooperat[ion]" took. The exhibit also does not establish that Al Thumairy was ever actually notified of the nomination or its approval. To the contrary, Al Thumairy testified that he "did not oversee anyone" and that he was unaware of any nomination to oversee propagators in California. Pls. Ex. 107 (Thumairy Tr.) 143:1-147:10.<br><br>Plaintiffs Exhibit 139 is a 128-page document for which Plaintiffs provide no pin cite. Saudi Arabia has not been able to locate the alleged reference in the exhibit to Al Sowailem, nor has Saudi Arabia located any reference in the exhibit to Al Thumairy.<br><br>Plaintiffs Exhibit 483 does not mention Abdi Mohamed, nor does it mention the Western Somali Relief Agency. The exhibit also does not identify any particular referenced entity as a "Somali charity organization[ ]" and does not mention "tie[s] to terror groups."<br><br>The cited page of Plaintiffs Exhibit 5 (Youssef Rep.) does not mention Abdi Mohamed, nor does it mention the Western Somali Relief Agency. |
| 607. | **Anwar Al Aulaqi** Thumairy claimed that he had "never heard of him [Aulaqi]" and "I do not know him." Ex. 107, Thumairy Dep. 350:23-351:8. But Thumairy knew Aulaqi, who was a prominent Imam in San Diego | Plaintiffs Exhibit 12J is an improper summary exhibit. It misattributes to Al Thumairy two calls made in January 2000 from the number ███ 3362. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ███ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with a wide reputation. Thumairy, as well as Bayoumi, called Aulaqi concerning the preparations for the two hijackers and during the time they were getting settled in San Diego. Ex. 12J (Thumairy-Bayoumi Calls to Aulaqi). | at 1-2. In addition, Al Thumairy testified that he was not familiar with the 3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 497:14-499:9.<br><br>Plaintiffs Exhibit 12J misattributes to Al Bayoumi five calls from 1998-2000 from the number ███████6662. Plaintiffs concede that number was "subscribed to by his wife," Manal Bagadar. *See* Pls. Aver. ¶ 756; *see also* Pls. Ex. 2X (EO 2798).<br><br>Plaintiffs Exhibit 12J misattributes to Al Bayoumi three calls that were made from a publicly-available phone line at the Al Medina Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 785:23-786:15.<br><br>Plaintiffs Exhibit 12J also misattributes to Al Awlaki eight calls to numbers Plaintiffs associate with the Al Ribat Mosque – where Al Awlaki was the Imam – based upon several hearsay sources. There is no evidence that the recipient of those calls was Al Awlaki as Plaintiffs assert rather than anyone else at the Mosque.<br><br>There is no admissible evidence that ten of the calls referenced above transpired. *See* Pls. Ex. 12J (10 calls citing EO2759, EO 2760, and EO 608 UPDATED MDL in the REF 1 column). None of the telephone records produced in this litigation include any of the 10 calls, and Plaintiffs rely solely on hearsay FBI summaries as the basis for their assertions.<br><br>After removing these improperly included calls, Exhibit Exhibit 12J shows a total of five calls from Al Thumairy and four calls from Al Bayoumi to ██████ 1917, a number that Plaintiffs claim belonged to Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Awlaki. That claim, however, is based solely on hearsay. No subscriber records were produced to verify that the number belonged to Al Awlaki.<br><br>The attribution of phone numbers and phone calls in Exhibit 12J is unreliable. First, Exhibit 12J attributes any call from "Al Ribat Mosque" to "Aulaqi," without evidence supporting the attribution. Moreover, Plaintiffs Exhibit 12J purports to rely on a number of documents, including one identified as "FBI 345" (which Plaintiffs submitted as Plaintiffs Exhibit 421 (FBI 345-49)) and one identified as "MPS688." Al Bayoumi testified that he did not personally enter all of the phone numbers in those documents; that he did not do anything to confirm the accuracy of the phone numbers listed in those documents; and that it is possible some of the phone numbers in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. Additionally, the cited portions of many of the documents on which it relies ("EO 608 UPDATED MDL," "EO 2754," "EO 2759," "EO 2760," "EO 2802," "MPS738") are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12J does not support Plaintiffs' assertions regarding Al Awlaki's "prominen[ce]" or "reputation," nor does it support Plaintiffs' assertion that Al Thumairy or Al Bayoumi "called Aulaqi concerning the preparations for the two hijackers."<br><br>The admissible Evidence contradicts Plaintiffs' assertion that Al Thumairy or Al Bayoumi "called Aulaqi concerning the preparations for the two hijackers." The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, Al Bayoumi testified that he never instructed anyone else to assist any of the 9/11 hijackers, that he did not have knowledge or suspicion before the 9/11 attacks that Al Hazmi and Al Mihdhar were planning to commit terrorist attacks in the United States, and that his meeting of Al Hazmi and Al Mihdhar was a coincidence and was not planned in advance. Pls. Ex. 120 (Bayoumi Tr.) 724:2-17, 725:19-726:1. |
| | | Al Thumairy also testified that he never heard Al Hazmi or Al Mihdhar's names before the 9/11 attacks, that he did not recall ever meeting them, that he was never given instructions to assist them or any other 9/11 hijackers, that he never had discussions with anyone about them or any other 9/11 hijackers, that he did not do anything to assist them or any other 9/11 hijackers, that he did not instruct anyone else to assist them or any other 9/11 hijackers, and that he did not have any knowledge of any assistance to them or any other 9/11 hijackers. Pls. Ex. 107 (Thumairy Tr.) 490:11-493:2. |
| | | There is no evidence that Al Awlaki wittingly assisted the hijackers. Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being retained by Plaintiffs, that Al Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25. |
| | | After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to The New York Times and Washington Times, and privately in an email to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | his younger brother describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 311:12-314:14.<br><br>In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY) Rep. 177. |
| 608. | **Abduljalil Mezgouri** Thumairy claimed that he did not know the Imam of the Islamic Center of San Diego, and specifically did not know Abdeljalail Mezgouri. Ex. 107, Thumairy Dep. 351:9-17. But The ICSD had a longstanding relationship with the King Fahad Mosque and its predecessor Mosque, and ████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>████<br><br>The materials cited as support for Plaintiffs' assertion that "[t]he ICSD had a longstanding relationship with the King Fahad Mosque and its predecessor Mosque" do not support that assertion. ████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████ With respect to "MPS738," the cited portion of that document is inadmissible hearsay. *See* Objections Chart. |
| 609. | **Khalid Cherif** Thumairy claimed he did remember or know Cherif, or that Cherif had been expelled from the King Fahad Mosque for being an extremist. Ex. 107, Thumairy Dep. 254:22-255:4; 421:9-424:3. But Thumairy knew Cherif very well:<br><br>a. ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████<br><br>b. Cherif was identified as a member of the extremist group that Thumairy led at the King Fahad Mosque. Ex. 72, Madha Decl. ¶ 19.<br><br>c.Khalil described Cherif as a prominent extremist at the King Fahad Mosque who was expelled from the Mosque before the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>████████████████████████████ ████████████████████████████ ████████████████████████████<br><br>████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████<br><br>████████████████████████████ ████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 9/11 Attacks. Ex. 113, Khalil Dep. 61:10-62:4.<br><br>d. Jarrah wrote an April 2002 letter concerning a private meeting he held with Cherif. Jarrah reported that Cherif "maintains a relationship with the Imam of the Mosque…" which was a reference to Thumairy. Ex. 295, KSA 7930-7933 at 7932. Although Thumairy was no longer at the Mosque, he still described himself as the Mosque's Imam in his correspondence. Ex. 680Z, KSA 8795-97. | [REDACTED]<br><br>The cited portion of Plaintiffs Exhibit 72 (Madha Decl.) is not based on personal knowledge. *See* Objections Chart. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See id.*<br><br>There is no admissible evidence that "Thumairy knew Cherif very well."<br><br>Plaintiffs rely on Plaintiffs Exhibit 72 (Madha Decl.) written by Plaintiffs, Pls. Ex. 128 (Madha Tr.) 21:11-23:2, for their assertion that Cherif was part of an "extremist group that Thumairy led at the King Fahad Mosque." Specifically, Plaintiffs reply on Madha's claim that there was a "group of men" at the King Al Thumairy Mosque and who "held extreme, radical, and anti-American views." Pls. Ex. 72 (Madha Decl.) ¶ 19. Madha testified that he described that group as followers of Al Thumairy simply because they purportedly "were always hanging around Mr. Thumairy." Pls. Ex. 128 (Madha Tr.) 65:13-21. Madha also acknowledged using the word "extreme" to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." *Id.* at 60:17-61:18. Madha also does not understand Arabic. *Id.* at 46:24-47:2. He does not know what, if anything the men discussed, and no basis to state that they knew each other very well.<br><br>Plaintiffs Exhibit 113 (Khalil Tr.) does not support Plaintiffs' assertion that "Khalil described Cherif as a prominent extremist at the King Fahad Mosque who was expelled from the Mosque before the 9/11 Attacks." At |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the cited portion of that transcript, Plaintiffs asked Al Khalil to name the individuals that Al Khalil had identified as extremists at the King Fahad Mosque. The only names that Al Khalil specifically mentions are "Abu Sulaiman" and "Nadji," testifying that he "can't recall their names." Pls. Ex. 113 (Khalil Tr.) 61:10-18. Al Khalil also testified that the "philosophy" of the mosque was one of "openness" and that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. *Id.* at 388:3-393:4.<br><br>Plaintiffs Exhibit 295 contains the quoted language, but does not support Plaintiffs' assertion that the referenced "Imam of the Mosque" was Al Thumairy. The only "Imam of the Mosque" mentioned in that exhibit is "Sheikh Mohammed al Muhanna." Pls. Ex. 58 (KSA 7931).<br><br>Plaintiffs Exhibit 295 contains Al Jarrah's initials but was signed by "Dr. Majid bin Hassan al Ghesheyan." Pls. Ex. 58 (KSA 7933).<br><br>Plaintiffs Exhibit 680Z does contain the referenced "correspondence" in which Al Thumairy "described himself as the Mosque's Imam." But contrary to Plaintiffs' assertion, the evidence shows that Al Thumairy was still at the King Fahad Mosque in 2002. Pls. Ex. 107 (Thumairy Tr.) 407:22-408:23; *see* Pls. Ex. 113 (Khalil Tr.) 78:2-5. |
| 610. | **Abdo Ghanem** Thumairy claimed that he did not know Abdo Ghanem. Ex. 107, Thumairy Dep. 243:20-23. But Ghanem was another member of Thumairy's extremist group at the King Fahad Mosque | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | expelled from the Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶¶ 19; 27-28. | To the extent a response is required, Plaintiffs rely on Plaintiffs Exhibit 72 (Madha Decl.) written by Plaintiffs, Pls. Ex. 128 (Madha Tr.) 21:11-23:2, for their characterization of "Abdo Ghanem." Specifically, Plaintiffs reply on Madha's claim that there was a "group of men" at the King Fahad Mosque that were led by Al Thumairy and who "held extreme, radical, and anti-American views." Pls. Ex. 72 (Madha Decl.) ¶ 19. Madha testified that he described that group as followers of Al Thumairy simply because they purportedly "were always hanging around Mr. Thumairy." Pls. Ex. 128 (Madha Tr.) 65:13-21. Madha acknowledged using the word "extreme" to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." *Id*. at 60:17-61:18. Madha also does not understand Arabic. *Id*. at 46:24-47:2. He does not know what, if anything the men discussed, and no basis to state that they knew each other very well.<br><br>Al Khalil testified that the "philosophy" of the mosque was one of "openness" and that when he used the term "extremist" in speaking with the FBI when referencing the individuals who were removed from the mosque, he meant that there were individuals who did not believe in openness, who the mosque deemed as "conservative." However, there were no violent individuals or terrorists at the mosque. Pls. Ex. 113 (Khalil Tr.) 388:3-393:4. |
| 611. | **Akram Al Zamari** Thumairy claimed that he did not know Akram Al Zamari. Ex. 107, Thumairy Dep. 339:8-20. But the evidence showed:<br><br>a. Al Zamari was a good friend of Thumairy, and Thumairy asked Al Zamari to do favors from time to time. █████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | b. Al Zamari spoke with Thumairy about Sheikh Muqbil al-Wadi'I and knew about Thumairy's meeting and lunch with him. Ex. 101, Alzamari Dep. 125:23-127:5.<br><br>c. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and Al Zamari observed Thumairy with Hazmi coming out of the library. Ex. 101, Alzamari Dep. 128:17-23 ("… if… they were in the library with Sheikh Fahad and Nawaf al-Hazmi, that means they know each other.") | Exhibit 101 does not support Plaintiffs' assertion that "Al Zamari spoke with Thumairy about Sheikh Muqbil al-Wadi'I and knew about Thumairy's meeting and lunch with him." Alzamari testified that he "know[s] that when [Sheikh Muqbil] arrived [at the King Fahad Mosque], [Al Thumairy] greeted him. He was – they were in the library, and he invited him once for – for lunch." Pls. Ex. 101 (Alzamari Tr.) 126:23-127:5. This testimony does not show that Alzamari "spoke with Thumairy about Sheikh Muqbil," nor does the testimony show any formal "meeting" between Al Thumairy and Sheikh Muqbil. The testimony also does not establish that a lunch occurred, only that an invitation was extended.<br><br>As Saudi Arabia explained in its Averment of Jurisdictional Facts and Evidence, contemporaneous documents show that Al Thumairy could not have been in Los Angeles during the evening of June 9, 2000 or at any time on June 10, 2000. ECF No. 9370-1, ¶ 152. |
| 612. | **Hamad Al Badr** In December 2001, less than a week after Thumairy returned to Los Angeles after the 9/11 Attacks, Badr wrote to MOIA to request that Thumairy be assigned as an Imam at the Islamic Center of Long Beach. Ex. 303, KSA 8532 (Faisal Al Muhanna Dep. Ex. 677). Thumairy needed a new base of operations at the time because he never returned to the King Fahad Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 25; Ex. 128, Madha Dep. 35:17-36:1. Thumairy claimed that he could | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 303 does not support Plaintiffs' assertion regarding when "Thumairy returned to Los Angeles." Exhibit 303 does not address that subject.<br><br>Plaintiffs Exhibit 72 (Madha Decl.) and Plaintiffs Exhibit 128 (Madha Tr.) do not support Plaintiffs' assertion that Al Thumairy "never returned to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | not remember Badr or the Islamic Center. Ex. 107, Thumairy Dep. 322:12-323:22. | the King Fahad Mosque after the 9/11 Attacks." In both his declaration and at his deposition, Madha stated that he does not recall seeing Al Thumairy at the King Fahad Mosque after the 9/11 attacks, but he acknowledged at his deposition that he was not at the mosque 24 hours a day. Pls. Ex. 128 (Madha Tr.) 36:5-8. The evidence shows that Al Thumairy did return to the King Fahad Mosque after the 9/11 attacks. Pls. Ex. 107 (Thumairy Tr.) 407:22-408:23; *see* Pls. Ex. 113 (Khalil Tr.) 78:2-5. |
| 613. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████ |
| 614. | ████████████████ Thumairy claimed that he did not know ███████ or his father Ibrahim. Ex. 107, Thumairy Dep. 243:24-244:13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 615. | The evidence shows, however:<br><br>a. ████████████████████████████ Thumairy. ████ Ex. 101, Alzamari Dep. 49:12-19; 132:2-10.<br><br>b. Alzamari testified that ████ and Thumairy had a religious relationship and friendship. Ex. 101, Alzamari Dep. 45:20-46:13 and that ████ wanted to introduce Alzamari to Hazmi and Mihdar who came through Thumairy. Ex. 101, Alzamari Dep. 49:12-19.<br><br>c. Madha testified that he observed Thumairy and Mana speaking to ██████ on numerous occasions and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>███████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that the three men knew each other well. Ex. 72, Madha Decl. ¶ 31. | Alzamari's testimony that ▮▮▮▮ told him that the hijackers "came through" Al Thumairy, Pls. Ex. 101 (Alzamari Tr.) 132:2-10, is hearsay. It also does not indicate Al Thumairy asked ▮▮▮ to do anything. Alzamari testified he was "unaware" that Al Thumairy had ever asked ▮▮▮ to "look after" the hijackers. *Id.* 50:1-53:11. Moreover, ▮▮▮▮ introduction of the hijackers to Alzamari was in June 2000, not in January 2000 when the hijackers first came to Los Angeles. *See* Response to Pls. Aver. Section XX.B.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Al Thumairy testified that he never heard Al Hazmi or Al Mihdhar's names before the 9/11 attacks, that he did not recall ever meeting them, that he was never given instructions to assist them or any other 9/11 hijackers, that he never had discussions with anyone about them or any other 9/11 hijackers, that he did not do anything to assist them or any other 9/11 hijackers, that he did not instruct anyone else to assist them or any other 9/11 hijackers, and that he did not have any knowledge of any assistance to them or any other 9/11 hijackers. Pls. Ex. 107 (Thumairy Tr.) 490:11-493:2.

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11).

Plaintiffs Exhibit 72 (Madha Decl.), written by Plaintiffs, Pls. Ex. 128 (Madha Tr.) 21:11-23:2, states that Madha "could see from their close interactions with each other that Abu Khaled, Mr. Al Thumairy, and Mr. Mana knew each other very well." Pls. Ex. 72 (Madha Decl.) ¶ 31. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Madha does not understand Arabic. Pls. Ex. 128 (Madha Tr.) 46:24-47:2. He does not know what, if anything the men discussed, and no basis to state that they knew each other very well.<br><br>████████████████████████████████ " Pls. Ex. 107 (Thumairy Tr.) 219:7-13, 244:3-13, 556:23-557:9. Mana did not recall ████████████. Pls. Ex. 128 (Mana Tr.) 29:5-22; *see id.* at 39:4-16.<br><br>████████████████████████████████ |
| 616. | **Nawaf Al Hazmi and Khalid Al Mihdhar** Thumairy claimed that he did not know the two Al Qaeda hijackers. Ex. 107, Thumairy Dep. 340:15-341:3; 491:4-6. Thumairy explained that "I do not meet people that I do not know. I would not sit with someone I don't know. I would not convene with someone I don't know. I would not go somewhere with someone I don't know." Ex. 107, Thumairy Dep. 341:7-343:5. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs misquote Plaintiffs Exhibit 107 (Thumairy Tr.) in part, changing "don't" to "do not" in two instances. The exhibit reads: "I don't meet people that I don't know."<br><br>████████████████████████████████<br><br>KSA Exhibit 163 (9/11 Rep.) explains: "Thumairy undoubtedly met with and provided religious counseling to countless individuals during his tenure at the King Fahd mosque, so he might not remember two transients |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | like Hazmi and Mihdhar several years later." KSA Ex. 163 (9/11 Rep.) 217. |
| 617. | The facts herein show, however, that Hazmi and Mihdhar "came through" Thumairy and that he provided essential help to them upon and after their arrival to get settled in Southern California. Ex. 107, Thumairy Dep. 49:12-19; 132:2-10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiff Exhibit 107 (Thumairy Tr.) does not contain the quoted language. That language appears in Plaintiffs Exhibit 101 (Alzamari Tr.). Alzamari's testimony that ▉▉▉ told him that the hijackers "came through" Al Thumairy, Pls. Ex. 101 (Alzamari Tr.) 132:2-10, is inadmissible hearsay. It also does not indicate Al Thumairy asked ▉▉▉ to do anything. Alzamari testified he was "unaware" that Al Thumairy had ever asked ▉▉▉ to "look after" the hijackers. *Id.* at 50:1-53:11. Moreover, Johar's introduction of the hijackers to Zamri was in June 2000, not in January 2000 when the hijackers first came to Los Angeles. *See* Response to Pls. Aver. Section XX.B.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Moreover, Al Thumairy testified that he never heard Al Hazmi or Al Mihdhar's names before the 9/11 attacks, that he did not recall ever meeting them, that he was never given instructions to assist them or any other 9/11 hijackers, that he never had discussions with anyone about them or any other 9/11 hijackers, that he did not do anything to assist them or any other 9/11 hijackers, that he did not instruct anyone else to assist them or any other 9/11 hijackers, and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that he did not have any knowledge of any assistance to them or any other 9/11 hijackers. Pls. Ex. 107 (Thumairy Tr.) 490:11-493:2.<br><br>There is no evidence, and Plaintiffs fail to cite any, that Al Thumairy assisted the hijackers in any way. The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 618. | ███████████████ Ex. 107, Thumairy Dep. 339:5-7; 535:8-10, 555:10-16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 619. | The evidence is to the contrary:<br><br>a. The 9/11 Commission concluded "Thumairy's claim not to know ███████ is belied by ███████ contrary assertion." *See* 9/11 Commission Report at 217. According to one individual, ███████ visited the mosque frequently and was "very close" to radical followers of Thumairy. *See* 9/11 Commission Report at 514-15 n. 13.<br><br>b. ███████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portion of KSA Exhibit 163 (9/11 Rep.) 514-15 n.13, is inadmissible hearsay. *See* Objections Chart.<br><br>KSA Exhibit 163 (9/11 Rep.) 217, contains the quoted language and also states that "we [the 9/11 Commission] have not found evidence that Thumairy provided assistance to" Al Hazmi and Al Mihdhar. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | KSA Exhibit 163 (9/11 Rep.) 514-15 n.13, contains the quoted language and also states that "two witnesses we [the 9/11 Commission] interviewed who knew Thumairy and used to hear him preach at the King Fahd Mosque deny that he promoted extremism."<br><br>As Saudi Arabia explained in its Averment of Jurisdictional Facts and Evidence, contemporaneous documents show that Al Thumairy could not have been in Los Angeles during the evening of June 9, 2000 or at any time on June 10, 2000. ECF No. 9370-1, ¶ 152; *see also* Response to Pls. Aver. ¶ 1793.<br><br>Al Thumairy testified that he did not remember the 0777 number. *See* Pls. Ex. 107 (Thumairy Tr.) 329:13-330:8. The subscriber for this number is ▮▮▮▮▮▮, and the user is ▮▮▮▮▮▮ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████████████████████████  Plaintiffs Exhibit 559 does not contain any call detail records, and does not mention Al Thumairy leaving the United States.  Plaintiffs Exhibit 670 shows a call to the -0777, which as set forth above, was not registered to Al Thumairy at the time. |
| 620. | **Saudi Embassy Cultural Mission.** Thumairy made 103 phone calls to the Saudi Cultural Mission, but he could not remember who he called or why. Ex. 107, Thumairy Dep. 439:13-23; Ex. 12C (Thumairy calls to Saudi Embassy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 12C is an improper summary exhibit.  It misattributes to Al Thumairy nine calls made from the number ████0777 prior to April 2002 when he started using it.  The subscriber for this number is Rose ██████████, and the user is ██████████████ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002).  Al Thumairy did not become the subscriber for the number until April 22, 2002.  *See* KSA Ex. 168, at 3-5.

Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 p.m. which is not supported by the phone records.  The phone records for Al Thumairy for this period were produced, but do not reflect this call.  *See* Pls. Ex. 477 (FBI 564).  Plaintiffs instead rely upon an FBI memorandum, which is hearsay, and says that Al Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09 pm" not that Al Thumairy did so.  Pls. Ex. 2JJ (EO 622-UPDATED).

The attributions of "Cultural Mission" numbers in Plaintiffs Exhibit 12C are unreliable.  For those attributions, Exhibit 12C purports to rely in part on a source identified as "SACM Contacts."  That source (submitted by Plaintiffs with the file name "AMH0049_Saudi Arabia Cultural Mission (SACM) Contacts") is inadmissible hearsay.  Plaintiffs Exhibit 12C also |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | purports to rely on a source identified as "TU" and a source identified as "WL" for the "Cultural Mission" attributions. Plaintiffs have not provided those sources with their opposition. *See* Objections Chart. |
| 621. | **Institute of Islamic and Arabia Sciences in America (IIASA).** Thumairy claimed that he did not know the IIASA, which the FBI identified as a part of the Saudi government extremist network. Ex. 107, Thumairy Dep. 131:21-132:0; Ex. 2, EO 3534-42; Ex. 13, Weidner Decl. ¶¶ 11-18. But, Thumairy knew IIASA well:<br><br>a. Phone records also show that Thumairy called the number of the IIASA 39 times between November 24, 1999 and September 21, 2000. Ex. 12F (Thumairy calls to IIASA).<br><br>b. IASA held a 9-day "intensive program" at the King Fahad Mosque in December 2000. Ex. 535, FBI 4392-93, 4439.<br><br>c. A member of the IIASA sat on the Board of the King Fahad Mosque. Ex. 179 at 2 (Kaldrim Dep. Ex. 179).<br><br>d. IASA was the U.S. branch of Imam Mohamed University where Thumairy attended college and graduate school. Ex. 107, Thumairy Dep. 132. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2CC (EO 3534-42) and Exhibit 535 (FBI 4393) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 13 (Weidner Decl.) has been stricken. *See* ECF No. 9562<br><br>The materials cited as support for Plaintiffs' assertion that "the FBI identified" the "IIASA" "as a part of the Saudi government extremist network" do not support that assertion. Exhibit 107 is the transcript of Al Thumairy's deposition. At his deposition, Al Thumairy did not recall the IIASA. Pls. Ex. 107 (Thumairy Tr.) 131:21-132:9.<br><br>With respect to Plaintiffs Exhibit 2CC, Plaintiffs cite to a July 23, 2021 electronic communication ("EC") in which a "writer . . . located relevant serials" and "copied . . . information" from those serials "directly" into the EC. Pls. Ex. 2CC (EO 3481). The EC further states that it "should not be considered an intelligence assessment and is not intended as such." *Id.* at EO 3479. Thus, that EC does not reflect findings of the FBI as an institution. Moreover, the EC describes the IIASA as a "piece[ ] of Saudi proselytizing activity in the U.S.," not as part of an "extremist network." *Id.* at EO 3534. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is also no admissible evidence supporting Plaintiffs' assertion that "Thumairy knew IIASA well."<br><br>Plaintiffs Exhibit 12F is an improper summary exhibit. It misattributes to Thumairy 19 calls made from December 2000 through January 2001 from the number ███████0777. The subscriber for this number is ███████, and the user is ████████████ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>The attributions of "IIASA" numbers Plaintiffs Exhibit 12F are also unreliable. For those attributions, Plaintiffs Exhibit 12F purports to rely in part on sources identified as "EO606" and "EO2763." Plaintiffs Exhibit 2M (EO 606) does not contain any phone or fax numbers in the unredacted sections, and both sources are inadmissible hearsay in any event. *See* Objections Chart. Plaintiffs Exhibit 12F also purports to rely on other inadmissible hearsay ("MPS738" "MWLIIRO 60442" (an Arabic-language document for which Plaintiffs do not provide an English translation), "MWL IIRO 54875," "MWL IIRO 110877"). *See* Objections Chart. No subscriber records were produced to verify that any of the five telephone numbers belonged to the IIASA.<br><br>Plaintiffs Exhibit 535 contains the quoted language attributed to it, but states that the "program" would take place from December 29, 2000 to January 6, 2001. This exhibit does not mention Al Thumairy.<br><br>Plaintiffs Exhibit 179 does not mention Al Thumairy.<br><br>Plaintiffs Exhibit 107 (Thumairy Tr.) does not support Plaintiffs' assertions in the last subparagraph regarding the relation between IIASA and Imam Mohamed University. As previously noted, Al Thumairy did |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not recall the IIASA and so did not opine on its purported relationship with Imam Mohamed University. Pls. Ex. 107 (Thumairy Tr.) 131:21-132:9. |
| 622. | **Thumairy's post 9/11 activities.** Thumairy claimed that he was at the Mosque for a "whole year after the 9/11 events" and "I went to the mosque every day." Ex. 107, Thumairy Dep. 405:7-19. But Thumairy never returned to the Mosque after the 9/11 Attacks:<br><br>a. Usman Madha, who worked and attended services at the Mosque daily, testified that Thumairy never returned to the Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 24-25; Ex. 72, Madha Dep. 35:17-36:1.<br><br>b. Saudi government documents show that Thumairy did not return to the Mosque. Ex. 291, KSA 7146, Ex. 238, KSA 7366.<br><br>c. Khalil testified that the last time he saw Thumairy was in Saudi Arabia shortly after the 9/11 Attacks. Ex. 113, Khalil Dep. 68:20-70:10.<br><br>d. A U.S. government document produced by Saudi Arabia states that Thumairy was expelled from the King Fahad Mosque after the 9/11 Attacks because he held extremist views and cultivated extremist followers…] who "praised and supported the terrorist | Plaintiffs Exhibit 288 (KSA 6861) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 107 (Thumairy Tr.) contains the quoted language attributed to it, but mischaracterizes that language. Al Thumairy testified that he "was in Los Angeles for a whole year after the 9/11 events." Pls. Ex. 107 (Thumairy Tr.) 405:7-19.<br><br>Plaintiffs mislabel the "Madha Dep." as Exhibit 72. Plaintiffs Exhibit 72 is the Declaration of Usman Madha, while Plaintiffs Exhibit 128 is the transcript of Usman Madha's deposition. Saudi Arabia will treat Plaintiffs as having cited Plaintiff Exhibit 128 for the "Madha Dep."<br><br>The cited materials do not support Plaintiffs' assertion that "Thumairy never returned to the [King Fahad] Mosque after the 9/11 Attacks." To the contrary, the admissible evidence shows that Al Thumairy did return to the King Fahad Mosque after the 9/11 attacks. Pls. Ex. 107 (Thumairy Tr.) 407:22-408:23; Pls. Ex. 113 (Khalil Tr.) 78:2-5.<br><br>Plaintiffs Exhibit 72 (Madha Decl.) and Plaintiffs Exhibit 128 (Madha Tr.) do not support Plaintiffs' contrary assertion. In both his declaration and at his deposition, Madha stated that he does not recall seeing Al Thumairy at the King Fahad Mosque after the 9/11 attacks, but he acknowledged at his deposition that he was not at the mosque 24 hours a day. Pls. Ex. 128 (Madha Tr.) 36:5-8.<br><br>Plaintiffs Exhibit 238 and Plaintiffs Exhibit 291 do not support Plaintiffs' assertion that "Saudi government documents show that Al Thumairy did |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | attacks of 11 September 2001." Ex. 288, KSA 6861 (Khalil Dep. Ex. 211).<br><br>e. Thumairy could not name *anyone* who saw him at the Mosque after 9/11. Ex. 107, Thumairy Dep. 407:22-408:23. | not return to the Mosque." Neither of those documents even mentions Al Thumairy, let alone Al Thumairy's circumstances.<br><br>Plaintiffs Exhibit 288 contains the quoted language, but is hearsay and is contradicted by the admissible evidence. Al Khalil testified that Al Thumairy was not expelled from the King Fahad Mosque. Pls. Ex. 113 (Khalil Tr.) 78:2-5. Moreover, when questioned about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified," Al Thumairy testified: "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone. And we criticized that act" – that is, the 9/11 attacks – "back then, at the time." Pls. Ex. 107 (Thumairy Tr.) 478:14-479:8. Moreover, Mana and Alzamari – who speak Arabic and heard Al Thumairy's sermons – described Al Thuamiry as "'never express[ing] any extremist or violent views'" and denied ever hearing him "'express any violent or extremist opinions.'" Pls. Ex. 168 (Mana Decl.) ¶ 8; Pls. Ex. 101 (Alzamari Tr.) 134:15-135:12; *see also* ███████████████ |
| 623. | **Thumairy's evolving explanation of his work in Los Angeles** In his first interview with the U.S. investigators at Los Angeles airport in May 2003, Thumairy told the FBI that he had been employed by the Saudi consulate since 1996 and worked with ████████████ and Abdul Karim Bin Baz in the Islamic Affairs media section. Ex. 154, FBI 000001-000006- REV2021 at 02. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 154 (FBI 2-REV2021), is inadmissible hearsay to the extent it is introduced for its truth. It may not be proffered for impeachment. *See* Objections Chart.<br><br>Plaintiffs Exhibit 154 does not support Plaintiffs' assertions regarding what Al Thumairy "told the FBI." Plaintiffs Exhibit 154 is a purported summary of an interview with Al Thumairy. Al Thumairy testified at his deposition that he had never seen the document before. Pls. Ex. 107 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Thumairy Tr.) 18:19-19:13. Moreover, Al Thumairy disputed the accuracy of the documents. *Id.* at 60:9-61:8, 218:12- 219:6, 275:15-279:12. Exhibit 154 also does not state the location of the interview. |
| 624. | The 9/11 Commission and the FBI traveled to Riyadh, and in the presence of the Saudi Mabahith, interviewed Thumairy on February 23, 2004, and Thumairy stated that he worked at the Consulate in L.A. to deal with religious issues and spent 60-70% of his time working at the Consulate, and that for about 20% of his time "he volunteered his services at the KFM." Ex. 90, Snell Decl., Ex. 3 at 3. Thumairy claimed he reported to the Consul General at the Saudi Consulate and that his contact at the Embassy in Washington was "Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 90 (Snell Decl. Ex. 3) at 3-4, is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 90 (Snell Decl.) contains the quoted language but does not support Plaintiffs' assertions regarding what Al Thumairy "stated" or "claimed" to the 9/11 Commission. Exhibit 3 of Plaintiffs Exhibit 90 (Snell Decl.) is a purported summary of an interview with Al Thumairy. Al Thumairy testified at his deposition that he had never seen the purported 9/11 Commission interview summaries before. Pls. Ex. 107 (Thumairy Tr.) 16:6-17:15. Moreover, Al Thumairy disputed the accuracy of those summaries. *Id.* at 50:13-20, 96:12-97:3, 107:11-108:15, 117:5-15, 123:23-124:11. |
| 625. | At his deposition in June 2021, Thumairy claimed that he did not remember making the statements to U.S investigators that he worked at the Consulate. Ex. 107, Thumairy Dep. 218:8-219:6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 626. | Thumairy now claimed that "[t]here was no work that I would perform at the consulate. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | It was just visits, and sporadic ones." Ex. 107, Thumairy Dep. 95:17-21. Thumairy admitted that he had a diplomatic visa and diplomatic card but claimed not to know that he was registered as an administrative officer at the L.A. Consulate. Ex. 107, Thumairy Dep. 100:7-24. He claimed he had not read the diplomatic card that he carried for many years that afforded him immunity and did not obtain diplomatic license plates (as required) when he bought and registered his car in California. Ex. 107, Thumairy Dep. 101:17-22; 110:18-111:24. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 107 (Thumairy Tr.) contains the quoted language, but does not demonstrate that Al Thumairy's testimony was not credible. Plaintiffs' assertions in this paragraph assume the accuracy of purported summaries of prior interviews of Al Thumairy. Those summaries are inadmissible hearsay. *See* Objections Chart. Al Thumairy testified at his deposition that he had never seen the summaries before, Pls. Ex. 107 (Thumairy Tr.) 16:6-19:13, and he disputed their accuracy, *id.* at 50:13-20, 60:9-61:8, 96:12-97:3, 107:11-108:15, 117:5-15, 123:23-124:11, 218:12-219:6, 275:15-279:12.<br><br>Plaintiffs Exhibit 107 (Thumairy Tr.) does not support Plaintiffs' assertion that Al Thumairy "claimed he had not read the diplomatic card that he carried for many years." Al Thumairy tesitified that he "never went and read the details on the card." Pls. Ex. 107 (Thumairy Tr.) 101:17-22.<br><br>Plaintiffs Exhibit 107 (Thumairy Tr.) does not mention a "require[ment]" regarding "diplomatic license plates" and is not evidence of any such requirement. |
| IX. | **THE SAUDI GOVERNMENT ESTABLISHED ITS AGENT BAYOUMI INSIDE THE U.S.** | Al Bayoumi was an employee of the Presidency of Civil Aviation. He had no other agency relationship with Saudi Arabia. From June 1995 to April 2000, he was seconded to Dallah Avco to pursue his education in the United States. *See* KSA Aver. ¶ 20.<br><br>The 9/11 Commission stated, "we have seen no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | background find him to be an unlikely candidate for clandestine involvement with Islamist extremists."  KSA Ex. 163 (9/11 Rep.) 218 |
| **IX.A.** | **Saudi Arabia bent rules to send Bayoumi to the U.S. on a work assignment.** | Plaintiffs cite nothing in support of this false assertion. |
| 627. | Omar al-Bayoumi began working in the Jeddah office of the Presidency of Civil Aviation (PCA), a branch of the Saudi Ministry of Defense, in 1977 and remained on the books as an employee until his retirement in April 2014. Ex. 195, KSA 0629. | Plaintiffs Exhibit 195 does not describe the relationship between the "General Authority of Civil Aviation" (which is the "Governmental Authority" listed in Plaintiffs Exhibit 195) and the "PCA," and does not describe the relationship between the "PCA" and the "Ministry of Defense."  Otherwise, this is undisputed. |
| 628. | In August-September 1993, Bayoumi took his first trip to the U.S. Bayoumi claimed this was a solo, personal vacation in Florida for two months to study English. Ex. 120, Bayoumi Dep. 35:4-37:14. On August 25, 1993, while Bayoumi was in Florida, Mohamed al Salmi, the Director General of the PCA's Airways Engineering Department, requested Bayoumi be transferred from the Finance Department to the Airways Engineering Department. According to Salmi, Bayoumi was needed to help "implement the financial procedures and financial contracts." Ex 201, KSA 1054; Ex. 120, Bayoumi Dep. 38:15-43:11; Ex. 94, Anqari Dep. 24:18-27:17. | The cited materials do not support Plaintiffs' assertion regarding the dates of Al Bayoumi's trip to Florida.  None of the exhibits mention the dates of that trip.  Al Bayoumi testified that he did not remember the year of his first trip to the United States.  Pls. Ex. 120 (Bayoumi Tr.) 34:11-19.<br><br>The cited materials do not support Plaintiffs assertion that "Mohamed al Salmi" requested Al Bayoumi's transfer.  Plaintiffs Exhibit 201 states that "the Department coordinated with the Director General of the Airways Engineering Department concerning" Al Bayoumi's "assigned work," but does not state that the Director General – who at the time was Al Salmi, Pls. Ex. 94 (Anqari Tr.) 26:11-18 – made the request.  Plaintiffs Exhibit 94 is the transcript of Abdulaziz Al Anqari's deposition.  Al Anqari testified that he did not recall whether Al Salmi initiated the request. *Id.* at 27:11-17.  In Plaintiffs Exhibit 120, Al Bayoumi testified that the "head" of the Presidency of Civil Aviation Finance Department "chose" him for the transfer.  Pls. Ex. 120 (Bayoumi Tr.) 42:6-43:7.<br><br>Plaintiffs Exhibit 201 contains the quoted language attributed to it, but does not attribute that language to Al Salmi. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 629. | That was clearly not the actual reason for Bayoumi's transfer, however, because within four months after Bayoumi returned to Saudi Arabia from his Florida trip, Director Salmi began making arrangements for Bayoumi's move to San Diego. Ex. 87, DA 2267. From the outset, Bayoumi's Saudi Government work in California was handled surreptitiously and outside normal channels. In January 1994, the PCA prepared, and Director Salmi signed a "Purchase Requisition" for a "factory acceptance test" for an "air navigation project" with a PCA subcontractor; however, the funds were actually earmarked to pay for Bayoumi's travel to California, a weekly living allowance, and English training in San Diego starting in August 1994. Ex. 88, DA 2268; Ex. 87, DA 2267; Ex. 94, Anqari Dep. 30:9-31:13; 156:3-23. Saudi Arabia gave Bayoumi special treatment and permission to live and stay in California under unusual circumstances. According to Abdul Aziz Abdul Kreem Al Anqari, the PCA's Assistant to the President of Civil Aviation, a Saudi Government employee such as Bayoumi could take only 30 days of leave per year. Alternatively, the 30 days could be saved each year and then combined for a single leave of absence, but under no | Al Anqari testified that he did not have knowledge of Al Bayoumi's arrangement to study in San Diego and so "cannot answer any questions yes or no accurately." Pls. Ex. 94 (Anqari Tr.) 38:6-21.

Al Bayoumi testified that he did not use the funds he received from the "PCA subcontractor" for any illegal purpose. Pls. Ex. 120 (Bayoumi Tr.) 642:8-20.

There is no admissible evidence that Al Bayoumi had "Saudi Government work in California," that Al Bayoumi's secondment "was handled surreptitiously and outside normal channels," or that "Saudi Arabia gave Bayoumi special treatment and permission to live and stay in California under unusual circumstances." Al Bayoumi was a student and one of "between 45 and 50" other PCA students who had their education paid for under a similar arrangement as part of the Saudization program "where non-Saudi workers would be replaced by Saudi workers." Pls. Ex. 125 (Coombs Tr.) 48:6-49:13; *see also* Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).

There is no evidence that the leave given to Al Bayoumi was under "unusual circumstances." Al Bayoumi was given ordinary leave, and then extraordinary leave consistent with the Saudization program. *See* DA Ex. 91 at Arts. 28/1, 28/4, 28/22 (up to 30 days of "ordinary leave" per year – which can be rolled over to other years – and "extraordinary leave" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | circumstances could an employee take more than 90 days of leave in one year. Any further leave would require an "exceptional leave" that if granted, would be unpa*id*. Ex. 94, Anqari Dep. 238:21-240:16. | provided that total leave does not exceed more than six months in a three-year period). |
| 630. | The Saudi Government granted Bayoumi three times as much leave as the maximum permitted under its own regulations. In August - September 1993, Bayoumi took a 51 day leave from the PCA Finance Dept, and from August 1994 to May 1995, Bayoumi was granted a 90-day leave and then *two* more 90-day exceptional leaves. Ex. 283, KSA 4503, Ex. 207, KSA 4499; Ex. 208, KSA 4500; Ex 209, KSA 4501; Ex. 94, Anqari Dep. 253:4-254:25. No explanation was provided by Saudi Arabia for this unusual accommodation for Bayoumi. PCA Assistant President Anqari and head of human resources testified that Bayoumi was "an ordinary, low-level employee" and Bayoumi's job "was not of any special attention." Ex. 94, Anqari Dep. 166:21-25, 196:5-11, 248:1-21, 319:3-320:19, 322:11-323:12, 327:18-329:25. | There is no admissible evidence that Al Bayoumi's leave exceeded the maximum amount. At his deposition, Al Anqari explained that a department could request "exceptional leave" for an employee; that it was a "general routine of administrative procedure that goes for all employees, not only Bayoumi"; and that "[a]nyone can participate" in those procedures. Pls. Ex. 94 (Anqari Tr.) 71:20-73:11.<br><br>Al Bayoumi was given ordinary leave, and then extraordinary leave consistent with the Saudization program. *See* DA Ex. 91 at Arts. 28/1, 28/4, 28/22 (up to 30 days of "ordinary leave" per year – which can be rolled over to other years – and "extraordinary leave" provided that total leave does not exceed more than six months in a three-year period); *see* Pls. Ex. 94 (Anqari Tr.) 238:21-239:18 (nothing that some employees had saved up to 150 days of ordinary leave but could only take 90 days per year).<br><br>Plaintiffs misquote Plaintiffs Exhibit 94. At his deposition, Al Anqari used the phrase "special attention-worthy," not "special attention. Pls. Ex. 94 (Anqari Tr.) 329:21-25. Al Anqari also referred to himself as "an assistant to the president of Civil Aviation," not as the "Assistant President." *Id.* 230:20-231:8; *see id.* at 15:3-8.<br><br>Plaintiffs Exhibit 94 does not support Plaintiffs' assertion that Al Anqari was the "PCA . . . head of human resources." Al Anqari's testimony makes clear that the Human Resources Department was headed by "the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | director general of human resources," who was not Al Anqari. *Id.* 28:7-18.<br><br>There is no admissible evidence that Al Bayoumi had an "unusual accommodation." To the contrary, Saudi Arabia's treatment of Al Bayoumi was consistent with the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| IX.B. | **The Saudi Government made extraordinary arrangements to fund Bayoumi inside the U.S. through Ercan, its principal Magdi Hanna, and Dallah Avco.** | This assertion in this heading is unsupported by any citation or record evidence.<br><br>Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).<br><br>Al Bayoumi further testified that other than once or twice when Ercan paid "for tuition fees," Ercan "didn't pay anything [to him]" and that the documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 114:3-10; 703:4-704:14; *see id*. at 121:7-124:18, 672:18-673:8. |
| 631. | Bayoumi moved to California in August 1994. Five months earlier in March 1994, Saudi Arabia specifically directed Avco Overseas, a Saleh Kamel affiliated company, to pay Bayoumi's tuition for a 27-week English language course plus a weekly living allowance for 30 weeks. Ex. 87, DA 2267. From the time of Bayoumi's arrival in August 1994, Saudi Arabia provided him with substantial funding through its longstanding agent in Newport Beach, California, a company called Ercan (aka Ercan Engineering, Inc. or Ercan, Inc.), which was owned by Magdi Hanna. Ex. 86, Coombs Decl. 3-4. ████████████████ | Plaintiffs Exhibit 2V (EO 2565) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 87 also does not support Plaintiffs' assertion regarding the affiliation of Avco Overseas. That document does not mention any affiliation with Saleh Kamel.<br><br>Plaintiffs Exhibit 86 is Coombs' declaration. That exhibit does not support Plaintiffs' assertion that "Saudi Arabia provided [Al Bayoumi] with substantial funding through its longstanding agent in Newport Beach, California, a company called Ercan (aka Ercan Engineering, Inc. or Ercan, Inc.)." In that declaration, Coombs does not mention any "funding" that Ercan provided to Al Bayoumi, nor does he mention any agency relationship between Ercan and Saudi Arabia. Rather, Coombs describes Ercan as "a subcontractor of Dallah Avco." Pls. Ex. 86 (Coombs Decl.) 3.<br><br>There is no support for the assertion that Saudi Arabia provided Al Bayoumi with substantial funding through Ercan, since August 1994. Al Bayoumi's initial funding was provided by Avco Overseas Services / Textron. DA Ex. 50. Al Bayoumi testified that other than once or twice when Ercan paid "for tuition fees," Ercan "didn't pay anything [to him]" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████████ | and that the documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 114:3-10; 703:4-704:14; *see id*. at 121:7-124:18, 672:18-673:8. ████████████████████████████ |
| 632. | Saudi Arabia was known to funnel kickbacks through Ercan and another Saudi contractor Dallah Avco Trans Arabia Company ("Dallah Avco" or "Dallah") to conceal the origin of funds and improperly pay Saudi officials. Ex. 544, FBI 7995-REV2021 at 96. For example, ████████████ ████████████, ██ supervisor under the PCA's Air Navigation System Support ("ANSS") project reported money "regularly siphoned from PCA and diverted to upper management of PCA by manipulating invoices from subcontractors like Dallah Avco." Ex. 544, FBI 007995-REV2021 at 96. He further stated that "[t]hese invoices would be covered or marked on the books as local procurement." Ex. 544, FBI 7995-REV2021 at 96. He detailed a process where the President of the PCA may call Mohamed al-Salmi, Director General of Airways Engineering at the PCA and request cash. Al-Salmi would approach ████ to create a fictitious purchase order which was then approved by | Plaintiffs Exhibit 544 (FBI 7995-7998) is inadmissible hearsay. *See* Objections Chart. There is no admissible evidence of any such kickbacks. Plaintiffs also mischaracterize this hearsay summary as ████ testimony. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Salmi. Bashi described this practice as "common at PCA, Dallah, and AVCO." Ex. 544, FBI 7995-REV2021 at 96. ▮ also described "other allowances" at PCA that was basically providing a bonus or raise outside of the payroll system. Ex. 544, FBI 7995-REV2021 at 96. | |
| 633. | The Metropolitan Police Service recovered files belonging to Bayoumi including a May 1998 letter of recommendation Bayoumi obtained from Hanna stating that Hanna had known Bayoumi since August 1994, the same month that Bayoumi arrived in California. Ex. 678U, MPS 732_21. In November 1994, during his nine-day trip to Ercan's Newport Beach Offices, PCA Logistics Manager Samuel Coombs, a former U.S. Army Logistics Major hired by the Saudi PCA, held meetings with Hanna and Bayoumi. Ex. 86, Coombs Decl. 1 and 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678U (MPS 732_21) is inadmissible hearsay. *See* Objections Chart.<br><br>Coombs testified that he had only a single interaction with Al Bayoumi in November 1994; that the interaction was "[l]ess than ten minutes"; and that, at the time of his deposition, the interaction had taken place about 25 years ago. Pls. Ex. 125 (Coombs Tr.) 13:8-21. |
| 634. | When Coombs arrived at Ercan's office, he was met by Ercan's owner Magdi Hanna who took Coombs to an Ercan conference room where Hanna introduced Coombs to Bayoumi. Ex. 86, Coombs Decl. 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that Coombs makes this statement in his declaration. Coombs also testified that his interaction with Al Bayoumi in November 1994 was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the only personal interaction he ever had with Al Bayoumi; that the interaction was "[l]ess than ten minutes"; and that, at the time of his deposition and declaration, the interaction had taken place about 25 years ago. Pls. Ex. 125 (Coombs Tr.) 13:8-21. |
| 635. | Coombs reached out to greet Bayoumi, but Bayoumi refused to shake Coombs's hand, instead, condescendingly asking Coombs if he was Jewish. Coombs said that Bayoumi was "pleased" to learn that Coombs was not Jewish. Ex. 86, Coombs Decl 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 86 contains the quoted language. Coombs testified that his interaction with Al Bayoumi in November 1994 was the only personal interaction he ever had with Al Bayoumi; that the interaction was "[l]ess than ten minutes"; and that, at the time of his deposition and declaration, the interaction had taken place about 25 years ago. Pls. Ex. 125 (Coombs Tr.) 13:8-21.

Al Bayoumi testified that, "whether Jewish, Christian, atheist, [he] did not discriminate" and that he "treated people according to what [he] s[aw] from them." Pls. Ex. 120 (Bayoumi Tr.) 362:15-24. |
| 636. | Coombs testified that "Bayoumi asked me about a request that he had placed for one new car for himself." Coombs was unaware of Bayoumi's request and told Bayoumi that he would need to contact Director Salmi about the car. Ex. 86, Coombs Decl. 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Exxhibit 86 contains the quoted language, but does not support Plaintiffs' assertion that "Coombs was unaware of Bayoumi's request" for a "new car." In that declaration, Coombs does not state whether he was aware of the alleged "request." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Rather, Coombs states that he "told Mr. Al-Bayoumi that [he] was not the person responsible for authorizing the disbursement of funds" and that "he would have to bring that subject up with Mr. Al-Salmi." Pls. Ex. 86 (Coombs Decl.) 4.<br><br>Coombs further testified that his interaction with Al Bayoumi in November 1994 was the only personal interaction he ever had with Al Bayoumi; that the interaction was "[l]ess than ten minutes"; and that, at the time of his deposition and declaration, the interaction had taken place about 25 years ago. Pls. Ex. 125 (Coombs Tr.) 13:8-21. |
| 637. | Hanna and Bayoumi had already been working together for some time. Hanna told Coombs that Bayoumi was at Ercan that day because Bayoumi and his wife "wanted some additional furniture…" Ex. 125, Coombs Dep. 171:14-21. Hanna complained to Coombs that Bayoumi had been ordering Hanna around. Ex. 86, Coombs Decl. 4. Coombs testified that Hanna showed him an apartment complex in Costa Mesa, CA where Bayoumi had an apartment, and that Bayoumi "was nagging Mr. Hanna to get the apartment furnished with some nice furniture." Ex. 86, Coombs Decl. 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 86 (page 4) and Plaintiffs Exhibit 125 (171:14-21) are inadmissible hearsay. *See* Objections Chart.<br><br>The admissible evidence does not support Plaintiffs' assertion that "Hanna and Bayoumi had already been working together for some time." Al Bayoumi testified that he did not know Hanna and did not recall ever speaking with Hanna. Pls. Ex. 120 (Bayoumi Tr.) 102:14-103:14. Coombs testified that the statements he made about the alleged relationship between Al Bayoumi and Hanna were based on what Hanna had allegedly told him, and is accordingly hearsay. Pls. Ex. 125 (Coombs Tr.) 175:15-177:16. Coombs further testified that he only saw Al Bayoumi and Hanna interact once; that the interaction was "[l]ess than ten minutes"; that it was the only personal interaction he ever had with Al Bayoumi; and that, at the time of his deposition and declaration, the interaction had taken place about 25 years ago. *Id.* at 13:8-21, 177:2-16. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 638. | Bayoumi's name was always the first name in the list of students contained in the logistics budget because his expenses were significantly higher than the rest of the students, Bayoumi claimed unusual additional expenses, and he was considerably older in age than the other students and a married man with children. Ex. 86, Coombs Decl. 2; Ex. 125, Coombs Dep. 58:1-24 (stating that Bayoumi and his wife and kids were living with him in Southern California when he drove past their apartment years before Bayoumi's fake promotion to a "married status" position). | The Coombs declaration explains that Al Bayoumi's expenses were higher than the rest of the students because he "was considerably older in age than the other students and a married man. The other students were younger and mostly unmarried." Pls. Ex. 86 (Coombs Decl.) 2.

No evidence supports Plaintiffs' assertion Al Bayoumi had "unusual additional expenses." Coombs also testified that he did not know Al Bayoumi's actual living expenses, and that he did not know how the amounts paid to Al Bayoumi related to Al Bayoumi's actual living expenses, including after consideration of his family. Pls. Ex. 125 (Coombs Tr.) 56:11-58:24 ("Everyone – most of the other students were four years younger than [Al Bayoumi], and he was married. None of the other students were married, and most of them lived in like a dormitory, two of them to an apartment or four to an apartment or – but he didn't, of course. He had his wife there.").

There is no support for Plaintiffs' assertion that Al Bayoumi received a "'fake' promotion to a 'married status' position." In May 2000, Bayoumi was promoted to a position that included marital benefits. DA Ex. 14 (DA 82); DA Ex. 18 (DA 97). It is undisputed that Al Bayoumi was in fact married, and Al Bayoumi testified that he was entitled to this "married status" position, which provides additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9 (discussing the "married status" position). |
| 639. | Saudi Government supervisor PCA Director Salmi and another PCA officer both instructed Coombs to pay Bayoumi with funds from the PCA Logistics Department expense budget through Dallah Avco and Ercan in California. Under this arrangement Saudi Arabia paid Bayoumi $60,000 per | Plaintiffs Exhibit 86 (Coombs Decl. at 3) and Exhibit 125 (Coombs Tr. 59:12-60:12) are inadmissible hearsay and are not based on personal knowledge. *See* Objections Chart.

Al Bayoumi's pay is set forth in DA Exhibit 20. Al Bayoumi's pay was 10,893 SR monthly (approximately $2,900 per month and $35,000 per year) as of August 1995, *see* DA Ex. 20 (DA000517) and stayed at that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | year through Ercan and Dallah Avco in 1996, when the annual amount paid to Bayoumi was raised to $90,000. Ex. 86, Coombs Decl. 3; Ex. 125, Coombs Dep. 59:12- 60:12. | level until October 1998, when it modestly increased to 11,545 SR monthly (approximately $3,100 per month and $37,000 per year), *see id.* (DA000491). *See generally id.* DA000491 to DA000517 (pay slips from August 1995 to October 1998).<br><br>Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so).<br><br>The cited materials do not support Plaintiffs' assertion that Coombs was "instructed . . . to pay Bayoumi . . . through . . . Ercan in California." In his declaration, Coombs states that "AED Director Mr. Al-Salmi and/or another PCA official Alp Karli issued directions to authorize the distribution of funds through the Logistics Department to Dallah Avco, who subsequently paid the Saudi Arabian students, including Mr. Al-Bayoumi." Pls. Ex. 86 (Coombs Decl.) 3. There is no mention of payments through Ercan.<br><br>Coombs conceded at his deposition that he lacked personal knowledge regarding the amounts that Al Bayoumi was paid. *See* Ex. 125 (Coombs Tr.) 174:21-175:14 ("Q. And you had no knowledge during your time at Dallah Avco from 1994 to 1997 of whether Omar Al-Bayoumi received any salary or not, correct? . . . THE WITNESS: That's correct. . . . Q. And you had no knowledge during your time at the logistics department from 1994 to 1997 of whether Omar Al-Bayoumi received any salary or not, correct? A. Normal salary? No, I didn't know. I just knew about what was coming through my office."). Accordingly, his declaration and testimony regarding Al Bayoumi's pay are not based on personal knowledge and are instead based on hearsay regarding what he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | purportedly learned from other sources. *See* Ex. 86 (Coombs Decl.) at 3; Ex. 125 (Coombs Tr.) 59:12-60:12 (repeating what Al Salmi purportedly authorized). Further, Coombs's statements regarding hearsay of what Al Bayoumi was paid were based on his recollection 25 years after the events in question and demonstrably were incorrect. *See id.* |
| 640. | Coombs remembered the specific amount of Bayoumi's pay because Coombs's own salary at the time was $60,000 and Bayoumi was being paid the same amount for "expenses." Ex. 125, Coombs Dep. 59:12-21. | Plaintiffs mischaracterize Coombs' testimony. At his deposition, Saudi Arabia's counsel asked Coombs about a portion of his declaration that referred to Al Bayoumi receiving "approximately 60,000 per year for tuition and expenses," not simply "expenses." Pls. Ex. 125 (Coombs Tr.) 58:25-59:21 (discussing Pls. Ex. 86 (Coombs Decl.) 3). For comparison, Coombs received the same pay but without the tuition that Al Bayoumi needed to pay. *See* Pls. Ex. 125 (Coombs Tr.) 59:16-21. |
| 641. | The amounts that Saudi Arabia was paying Bayoumi "amazed" Coombs and made him think "I…wish I had [Bayoumi's] job." Ex. 125, Coombs Dep. 59:22-60:12. | As set forth in response to averment paragraph 640, Coombs was testifying about the amount of Al Bayoumi's tuition and expenses combined. Moreover, Coombs testified that he had been receiving the same base pay as Al Bayoumi (but without the tuition expenses). *See* Pls. Ex. 125 (Coombs Tr.) 59:16-21. |
| 642. | Bayoumi was paid "significantly higher" amounts than actual students being funded by the PCA. Ex. 86, Coombs Decl. 2. | The Coombs declaration states that Al Bayoumi's expenses were significantly higher than the rest of the students because he "was considerably older in age than the other students and a married man. The other students were younger and mostly unmarried." Pls. Ex. 86 (Coombs Decl.) 2. Coombs also testified that he did not know Al Bayoumi's actual living expenses, and that he did not know how the amounts paid to Al Bayoumi related to Al Bayoumi's actual living expenses. Pls. Ex. 125 (Coombs Tr.) 56:11-58:24 ("Everyone – most of the other students were four years younger than [Al Bayoumi], and he was married. None of the other students were married, and most of them lived in like a dormitory, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | two of them to an apartment or four to an apartment or – but he didn't, of course. He had his wife there."). |
| 643. | Bayoumi also sought reimbursement of unusual additional expenses, including payments for his wife to travel back and forth to Saudi Arabia, and cars for him and his wife. Ex. 86, Coombs Decl. 3. | Plaintiffs Exhibit 86 does not support Plaintiffs' assertion that Al Bayoumi "sought reimbursement" for "cars for him and his wife." In his declaration, Coombs states that, "on one occation, [he] saw a request that Mr. Al-Bayoumi wanted to get one new car for himself so that his wife could take possession of his car that was only a year old." Pls. Ex. 86 (Coombs Decl.) at 3. Coombs does not state whether the request was granted. |
| | | Plaintiffs cite no evidence that it was "unusual" for there to be expense reimbursements for means of family travel. Further, other than the travel for Al Bayoumi's wife and the request for a new car, Coombs at his deposition could not recall any other expenses (or reimbursement requests) as being allegedly unusual. Pls. Ex. 125 (Coombs Tr.) 131:7-13. |
| 644. | When Coombs complained to PCA Director Mohamed al-Salmi that Bayoumi's expenses were unusual and exorbitant, Coombs immediately "got corrected" by Salmi. Salmi told Coombs that Salmi wanted Bayoumi to stay in America, and instructed Coombs not to raise questions, because: "that's not for you to worry about." Ex. 125, Coombs Dep. 131:14-20, 139:17-20. | Pls. Ex. 125 (Coombs Tr.) 131:14-20, 139:17-21, is inadmissible hearsay. *See* Objections Chart. |
| | | Plaintiffs mischaracterize Samuel Coombs' testimony. Coombs was asked whether he ever complained to Al Salmi that the expenses were "unusual"; the word "exorbitant" does not appear in the transcript. Pls. Ex. 125 (Coombs Tr.) 131:14-17. |
| | | In his declaration, Coombs acknowledged that the budget for the Airways Engineering Logistics Department "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA." Pls. Ex. 86 (Coombs Decl.) 2. This was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).<br><br>Coombs also testified that he considered the expenses "unusual" because "other students didn't have cars." Pls. Ex. 125 (Coombs Tr.) 129:19-130:8. However, Coombs also testified that Al Bayoumi was married and that "[n]one of the other students [being paid to study abroad] were married." *Id.* at 55:21-56:20. Moreover, Coombs testified that he did not know whether Al Bayoumi had any children, that he did not know Al Bayoumi's actual living expenses, and that he did not know how the amounts paid to Al Bayoumi related to Al Bayoumi's actual living expenses. *Id.* at 56:21-58:25 ("Everyone – most of the other students were four years younger than [Al Bayoumi], and he was married. None of the other students were married, and most of them lived in like a dormitory, two of them to an apartment or four to an apartment or – but he didn't, of course. He had his wife there."). Al Bayoumi had children, and testified that he was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). |
| 645. | In April 1995, PCA Director Salmi issued a letter to Hanna of Ercan outlining the financial support to be provided to Bayoumi by Ercan. Ex. 125, Coombs Dep. 147:13-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 125 (147:13-23) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | This purported letter is not in the record. Coombs testified based on his memory of what a purported letter (from 25 years ago) said. He stated only that the letter "outlin[ed] the financial support of Omar Al-Bayoumi by Ercan and guaranteed by PCA/AE ANSS project account." Pls. Ex. (Coombs Tr.) 147:13-23.<br><br>Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so). |
| 646. | ██████████████████████████████ ████████ to support Bayoumi inside the U.S. At Saudi Arabia's suggestion, ██████ ████████████████████ mark up the cost of goods Ercan sold to Saudi Arabia to cover the added expenses for supporting Bayoumi. Ex. 125, Coombs Dep. 148:13-21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 125 (148:13-21) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 125 (Coombs Tr.) does not support Plaintiffs' assertions that Saudi Arabia "told," "suggest[ed]," or "agreed" to anything. At the cited section of the transcript, Coombs is asked whether the following statement (from a hearsay FBI interview summary) is correct: ███████████ ████████████████████████████████████ ████████████████████████████████████<br><br>Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so). |
| 647. | Saudi Arabia also arranged for ▮▮▮ to pay Bayoumi personally and directly in cash, rather than by check through Ercan. Ex. 544, FBI 7995-REV2021 (PCA supervisor ▮▮▮▮▮▮ describes how ▮▮▮ paid Ercan funds via cash payments). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 544 (FBI 7995-7998) is inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 544 does not support Plaintiffs' assertion that "Saudi Arabia also arranged for ▮▮▮ to pay Bayoumi personally and directly in cash, rather than by check through Ercan." Plaintiffs Exhibit 544 states that ▮▮▮ allegedly made payments to Al Bayoumi "at the behest of Al-Salmi" and that ▮▮▮ allegedly decided to "use[] cash generated by his car wash business and a diner he owned to funnel these payments to Al-Bayoumi." Pls. Ex. 544 (FBI 7997-REV2021).

When asked at his deposition about this hearsay assertion in Plaintiffs Exhibit 544 that ▮▮▮ paid him, Al Bayoumi testified that the allegation was not true. Pls. Ex. 120 (Bayoumi Tr.) 108:17-109:12.

Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 648. | In March 1996, PCA Director Salmi instructed that all checks payable by the PCA to Ercan should be issued instead to ███████████████. On that occasion, Salmi redirected a total of nearly $800,000 in funding for Ercan to Hanna personally. Ex. 440, DA 10582; ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 544 (FBI 7995-7998) is inadmissible hearsay. *See* Objections Chart. |
| | | The date on page DA010582 of Plaintiffs Exhibit 440 is written in Arabic, and no English translation is provided. |
| | | Plaintiffs Exhibit 544 does not support Plaintiffs' assertions of fact. That exhibit does not mention any instruction by Al Salmi regarding payments to Ercan or Hanna and does not mention the redirection of $800,000 in funding. |
| 649. | ███████████████████ ██████ a PCA supervisor who worked under ██████ admitted to the FBI that PCA Director Salmi instructed Ercan to pay Bayoumi $10,000 per month in cash. ██████ was personally aware that ██████ provided Bayoumi approximately $10,000 in cash each month at the request of PCA Director Salmi during the period ██████ had the contract with the Saudi PCA. According to ██████████████ laundered money through businesses in California to "funnel...payments" to Bayoumi. ██████ also told the FBI that PCA Director Salmi provided Bayoumi a "stipend" of $5,000 | Plaintiffs Exhibit 544 (FBI 7995-7998) is inadmissible hearsay. *See* Objections Chart. |
| | | There is no admissible evidence that ██████ paid Al Bayoumi $10,000 per month. To the contrary, the admissible evidence shows that Al Bayoumi did not receive the alleged "$10,000 per month" from ██████ (or Ercan). Pls. Ex. 120 (Bayoumi Tr.) 108:17-109:12. |
| | | There also is no admissible evidence that Al Salmi provided Al Bayoumi with a stipend of $5,000 per month. To the contrary, Al Bayoumi testified that he did not work with Al Salmi in person, that he did not have communications with Al Salmi, and that he did not know whether Al Salmi even knew who he was. *Id.* at 70:10-71:20. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | per month but was unsure whether that stipend was paid simultaneously with the other monthly amounts. Ex. 544, FBI 7995-REV2021. | |
| IX.C. | **Bayoumi had substantial dealings with his Saudi government funding agents, Hanna and Ercan, in California.** | To the extent a response is required, this assertion is unsupported by any citation or record evidence.  Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university."  Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so). |
| | | Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations.  *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment).  This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 650. | Coombs testified based on his personal observations that it was "clear…that Mr. Bayoumi knew Mr. Hanna" and explained that the two men "knew each other because Al-Salmi had hooked them up because that's where he [Bayoumi] was getting his money, was through them, and his apartment and stuff like that that was all being paid through Ercan." Ex. 125, Coombs Dep. 171:22-172:4. | Pls. Ex. 125 (Coombs Tr.) 171:22-172:4 is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs Exhibit 125 (Coomb Tr.) does not support Plaintiffs' assertion that Coombs testified about the relationship between Al Bayoumi and Magdi Hanna based on "personal observations." Coombs testified that the statements he made about that alleged relationship were based on what Hanna had allegedly told him. Pls. Ex. 125 (Coombs Tr.) 175:15-177:16. Coombs further testified that he only saw Al Bayoumi and Hanna interact once; that the interaction was "[l]ess than ten minutes"; that it was the only personal interaction he ever had with Al Bayoumi; and that, at the time of his deposition, the interaction had taken place about 25 years ago. *Id.* at 13:8-21, 177:2-16. |
| 651. | Bayoumi's handwritten address book, and Bayoumi's typed January 2000 and October 2000 phone lists, each contain Ercan's office and fax numbers and ▮▮▮▮▮ home and cell numbers. Ex. 12AA, MPS738_26; Ex. 12BB, MPS 688_7 (January 2000 typed list); Ex. 421, FBI 000345-49 at 0347 (Omar's Phone Book October 4, 2000). | Plaintiffs Exhibit 12AA (MPS 738), Exhibit 12BB (MPS688) and Exhibit 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart. <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br> Plaintiffs Exhibit 12AA (MPS 738_26) does not support Plaintiffs' assertion that the document contains ▮▮▮▮▮▮ cell number. The cell numbers attributed to "Ercan ▮▮▮▮▮▮▮ in the other cited materials do not appear on MPS 738_26. <br><br> The admissible evidence does not support Plaintiffs' assertions regarding the "typed January 2000 and October 2000 phone lists." Pls. Ex. 421 (FBI 345-349); Pls. Ex. 485 (FBI 1289-1338); Pls. Ex. 12BB (MPS 688). Al Bayoumi testified that those documents were phonebooks at Al Madinah Mosque; that he did not personally enter all of the phone numbers in those documents; that he did not do anything to confirm the accuracy of the phone numbers listed in those documents; and that it is possible some of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the phone numbers in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. |
| 652. | Within his typed January and October 2000 phone number lists, Bayoumi also included driving instructions to the office of Ercan and ████ in Newport Beach, California. Ex. 421, FBI 000345-49 at 347 (October 2000 typed list). | Plaintiffs Exhibit 421 (FBI 345-49) is inadmissible hearsay. *See* Objections Chart.<br><br>The admissible evidence does not support Plaintiffs' assertions regarding the "typed January 2000 and October 2000 phone lists." Al Bayoumi testified that Plaintiffs Exhibit 421 (FBI 345-49) was a phonebook at the Al Madinah Mosque; that he did not personally enter all of the information in those documents; that he did not do anything to confirm the accuracy of the information in those documents; and that it is possible some of the information in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. |
| 653. | The available phone records show that Bayoumi made 21 calls ████ ████ and Ercan's office numbers in 1999-2000. Bayoumi, ████, and Ercan likely exchanged numerous additional calls as the production did not include calls placed by Ercan or Magdi Hanna and included only a fraction of the time that Bayoumi worked with Magdi Hanna between 1994 and 2001. Ex. 12R (Bayoumi calls to ERCAN and ████ | Plaintiffs Exhibit 12R is an improper summary chart. *See* Objections Chart. It is based on false presumptions and inadmissible hearsay.<br><br>The attribution of phone numbers in Plaintiffs Exhibit 12R to Ercan and ████ is unreliable. Plaintiffs Exhibit 12R purports to rely on several documents, including the document identified with "MPS688" (a copy of which is included in Plaintiffs Exhibit 485 and Plaintiffs Exhibit 12BB (MPS 688)), a document identified with "MPS738" (a copy of which is included in Plaintiffs Exhibit 12AA (MPS 738)), and a document identified with "EO 3679" (a copy of which is included in Plaintiffs Exhibit 2DD). With respect to "MPS688," Al Bayoumi testified that he did not personally enter all of the phone numbers in that document; that he did not do anything to confirm the accuracy of the phone numbers listed in the document; and that it is possible some of the phone numbers in the document may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. As for the documents identified with "MPS738" and "EO 3679," those documents are inadmissible. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12R also does not support Plaintiffs' assertion that "Bayoumi made 21 calls ▮▮▮▮▮▮▮▮▮▮▮ and Ercan's office numbers in 1999-2000." Plaintiffs Exhibit 12R identifies three calls between July 1998 and January 2000 from a number labeled "Bayoumi Office." Al Bayoumi testified that the phone number on bills sent to "Omar al-Bayoumi d/b/a Masjid Al-Madina" was the mosque's phone number and that his name was listed on the bills because he was "responsible for the masjid maintenance and the operation." Pls. Ex. 120 (Bayoumi Tr.) 784:9-22. Al Bayoumi also testified that anyone could use the phones in the mosque. *Id.* at 180:15-24, 181:18-182:13, 297:3-20, 784:23-786:15. |
| 654. | At his deposition, Bayoumi claimed he did not know Magdi Hanna and could not recall meeting or speaking with him, collecting any money from Ercan, or having any contact with Ercan or employees of Ercan. Ex. 120, Bayoumi Dep. 101:13-102:1, 102:21-103:7, 104:16- 105:3. Bayoumi also claimed that he could not recall driving to Ercan's offices and had never been to Newport Beach, CA — even though Bayoumi had written down the driving instructions to the Ercan office in both his January 2000 and October 2000 phone lists and Samuel Coombs met Bayoumi and Hanna at Ercan's Newport Beach office in 1994, during Coombs only trip to Ercan in Southern California during his employment with PCA. and. Ex. 120, Bayoumi Dep. 103:15-104:15; Ex. 86, Coombs Decl. 3-4. | Plaintiffs Exhibit 86 is inadmissible hearsay to the extent it relies on Coombs repeating statements made to him by Magdi Hanna. *See* Objections Chart.<br><br>Plaintiffs mischaracterize Al Bayoumi's testimony. Al Bayoumi testified that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so. Pls. Ex. 120 (Bayoumi Tr.) 114:3-10.<br><br>The admissible evidence does not support Plaintiffs' assertion regarding the "January 2000 and October 2000 phone lists." Pls. Ex. 421 (FBI 345-349); Pls. Ex. 485 (FBI 1289-1338). These documents are inadmissible hearsay. *See* Objections Chart.<br><br>Al Bayoumi testified that those documents were phonebooks at the Al Madina Mosque; that he did not personally enter all of the information in those documents; that he did not do anything to confirm the accuracy of the information in those documents; and that it is possible some of the information in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. Moreover, with respect to the referenced |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "driving directions," Al Bayoumi testified that he did not remember who wrote those instructions. *Id.* at 104:9-12.<br><br>Finally, Plaintiffs rely on Coombs's statements, but the only admissible statements by Coombs concern the "[l]ess than ten minute[ ]" interaction between Hannah and Al Bayoumi that he witnessed in 1994. *See* Pls. Ex. 86 at 4; Pls. Ex. 125 (Coombs Tr.) 13:8-21. The remainder of Coombs's statements are hearsay. *See id.* at 176:15-23 ("Q. Your understanding of Omar Al-Bayoumi's relationship with Magdi Hanna came from statements made by Magdi Hanna, correct? A. Yes. Q. It was not something you yourself personally experienced – knew about? A. No."). |
| 655. | In July 1997, Bayoumi signed his U.S. Department of Justice Immigration and Naturalization Service immigration form to maintain his student visa. Bayoumi certified on that form that he had $27,858 for his costs to maintain himself as a student for nine months in the U.S. and that he was receiving the "[f]unds from another source" specifically: "Sponsor: ERCAN". Ex. 311, MPS720_6. | Plaintiffs Exhibit 311 contains the quoted language. |
| 656. | In May 1998, Hanna wrote Bayoumi a letter of recommendation on Ercan stationery stating that he had known him since August 1994. Ex. 678U, MPS 732_21. | Plaintiffs Exhibit 678 (MPS 732_21) is inadmissible hearsay. *See* Objections Chart.<br><br>It is undisputed that Ex. 678U contains this language. |
| 657. | Coombs, who personally met Bayoumi and Hanna together and saw their interactions, testified that Bayoumi's claim that he did not know Magdi Hanna was a lie and that "[h]e [Bayoumi] knew him [Hanna]." Ex. | Plaintiffs Exhibit 488 (FBI 1370-1373) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 125 contains the quoted language attributed to it, but Coombs in his testimony did not characterize Al Bayoumi's testimony as |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 125, Coombs Dep. 171:11-172:16. In February and September 1997, Bayoumi submitted INS Form I-20, Certificate of Eligibility for Non- Immigrant (F-1) Student Status, confirming his enrollment at United States International University ("USIU") and claiming that he was receiving funding from Ercan for tuition and living expenses. Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 488, FBI 001370-73 (Bayoumi's INS Forms I-20 listing Ercan as his "means of support" in February and again in September 1997, indicating Ercan was providing support in the amount of $27,858). | a "lie" and Coombs' testimony does not demonstrate that Al Bayoumi "lied" about his relationship with Hanna.<br><br>Coombs testified that the statements he made about the alleged relationship between Al Bayoumi and Hanna were based on what Hanna had allegedly told him, and are therefore hearsay. Pls. Ex. 125 (Coombs Tr.) 175:15-177:16. Coombs further testified that he only saw Al Bayoumi and Hanna interact once; that the interaction was "[l]ess than ten minutes"; that it was the only personal interaction he ever had with Al Bayoumi; and that, at the time of his deposition, the interaction had taken place about 25 years ago. *Id.* at 13:8-21, 177:2-16. |
| 658. | In March 2000, Bayoumi prepared an INS Form I-20 stating he would receive $29,535 in funding from Ercan for his tuition and living expenses, Ex. 211, KSA 6642-65 at 61, and shared that INS form with his work colleagues at the Saudi Consulate in Los Angeles. Ex. 211, KSA 6642-65 at 61. | Plaintiffs Exhibit 211 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 211 does not support Plaintiffs' assertion that Al Bayoumi "prepared" the cited form. The form indicates that it was "completed and signed . . . by a designated school official."<br><br>Plaintiffs Exhibit 211 also does not support Plaintiffs' assertion that individuals working at the Consulate were Al Bayoumi's "work colleagues." Nothing in that exhibit indicates Al Bayoumi ever worked for the Consulate. To the contrary, Plaintiffs Exhibit 211 indicates that, from the perspective of the Consulate, Al Bayoumi was simply a Saudi "citizen" who was in the United States to pursue his education. Pls. Ex. 211 (6642-6643). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, Al Bayoumi testified that he did not know anyone at the Consulate and that, when he called the Consulate, he "would call the reception and ask to speak to a designated person." Pls. Ex. 120 (Bayoumi Tr.) 297:3-7; *see id.* at 298:18-20. Al Bayoumi also testified that he was a full-time student while living in San Diego. *Id.* at 764:4-6. |
| 659. | The FBI recovered "numerous copies of communications between PCA and ERCAN dealing with purchase requests for procurement actions" including a letter from Saudi Arabia to ████ requesting that he pay for Bayoumi's expenses. Ex. 523, FBI 003891 (noting the attachment of copies of these numerous communications). | Plaintiffs Exhibit 523 (FBI 3891) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent Plaintiffs suggests that "copies of these numerous communications" are in the record, that is incorrect. Plaintiffs Exhibit 523 does not contain any such communications. |
| 660. | ████████████████████ | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088. This opinion is speculation that is not based on any recognized methodology.<br><br>████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| IX.D. | **Saudi Arabia provided additional funding for Bayoumi to work in the U.S. through Dallah Avco.** | To the extent a response is required, Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 661. | While Saudi Arabia was providing Bayoumi with funding through Ercan and Dallah, the Saudi government also placed Bayoumi on Dallah Avco's payroll. Ex. 2, EO 3326 ("Al-Bayoumi's rental application form listed his occupation as Assistant to the Director of Finance, DALLAH AVCO, Jeddah, Saudi Arabia."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2AA (EO 3326) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no admissible evidence that Al Bayoumi was paid simultaneously by Ercan and Dallah Avco. *See, e.g.*, Response to Pls. Aver. ¶¶ 647, 649.<br><br>Al Bayoumi testified that Dallah Avco paid his salary when he moved to San Diego "because [he] received a secondment." *Id.* at 66:1-11. As Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1. This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 662. | Dallah Avco is a subsidiary of Dallah Al Baraka Group LLC ("DABG") and Saudi government contractor specializing in providing services to Saudi Arabia's civil aviation agency, the Presidency of Civil Aviation ("PCA"). *In re Terrorist Attacks on September 11, 2001*, 11-3294-cv(L), Appellee Dallah Avco Trans Arabia Co. Ltd.'s Brief with Respect to Personal Jurisdiction, ECF No. 479 at 1-2; Ex. 111, Khalifa Dep. 22:16-25:17. | This is undisputed. |
| 663. | DABG was founded by Saleh Kamel, who the CIA has identified as a key figure in the al-Qaeda support network that provided widespread funding to al-Qaeda, National Islamic Front, Hamas and various mujahidin groups. Ex. 83, CIA-SUB_0020- | Plaintiffs Exhibit 78 (CIA 741), Exhibit 79 (CIA 809), and Exhibit 83 (CIA-SUB_0024) are inadmissible hearsay. *See* Objections Chart.

The cited materials do not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 78 mentions only the National Islamic Front ("NIF"). Plaintiffs Exhibit 79 (at CIA_000824 n.9) mentions financial institutions owned by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 30 at 0024; Ex. 78, CIA 720-804 at 741; Ex. 79, CIA 807-848 at 809, 823. | "Dallah al-Baraka" and/or "Shaykh Kamel" or in which Kamel was a "major shareholder" and states only that those institutions (not Kamel) "are alleged to be key conduits for funding the Islamic Resistance Movement (HAMAS)"; the exhibit does not state that the CIA made a finding that those institutions did so, nor does the exhibit state that "Shaykh Kamel" supported, or had knowledge of, any such funding.<br><br>Plaintiffs Exhibit 83 states that "Salih al-Kamel . . . reportedly ha[d] provided widespread funding to al-Qaʻida, HAMAS, and various mujahidin groups," not that the CIA made a finding that he did. Neither Plaintiffs Exhibit 79 nor Exhibit 83 provide the basis for the "reports" or "allegations" regarding Kamel or the financial institutions.<br><br>Plaintiffs alleged both Dallah Al Baraka and Sheikh Saleh Kamel supported Al Qaeda – including by relying on the same CIA reports – and this Court dismissed those claims. *See* ECF Nos. 632, 2312, *aff'd* 714 F.3d 118 (2d Cir. 2013) ("[Kamel and Dallah Al Baraka] are alleged to have provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations. These allegations are insufficient for proximate causation purposes . . . . Simply put, plaintiffs do not allege that [Kamel and Dallah Al Baraka] participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by [them] to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks. We are also not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda – as alleged by plaintiffs – proximately caused the September 11, 2001 attacks or plaintiffs' injuries. . . . The allegations, moreover, against [Kamel and Dallah Al Baraka] are conclusory.") . |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 664. | Dallah generally filled vacancies, payroll processing, and administrative support for the PCA's ANSS project, in Saudi Arabia. Ex. 111, Khalifa Dep. 30:3-34:14, 51:16-52:21. Dallah had no role in recruiting local (Saudi) recruits for the PCA, such as Omar Al Bayoumi, as the PCA would handle that themselves. Ex. 111, Khalifa Dep. 39:4-20. | As set forth in response to Plaintiffs' Averment paragraph 627, Al Bayoumi was already working for the PCA prior to his secondment to Dallah Avco. |
| 665. | Saudi Arabia used Ercan and Dallah Avco to sustain Bayoumi in the United States. Saudi Arabia purportedly could not second Bayoumi to an American company under Saudi law. *See* Ex. 448, MPS 727_176; Ex. 678Q, MPS 727_178; Ex. 678P, MPS 727_145.[1] So while Ercan would have attracted less attention as a cover for Bayoumi to carry out his true mission as a Saudi government agent, given its physical presence in the United States, Dallah was chosen instead because of its ongoing relationship with a U.S. subcontractor through the ANSS project in the United States. ECF No. 2927-2, para. 7-9; Ex. 5, Youssef Rpt. 73-75.<br><br>n.1: The May 11, 1995 letter from Ercan owner Magdi Hanna requesting that Bayoumi be seconded to Ercan should be understood as originating from the PCA. That is Saudi Arabia's general practice with respect to its contractors. Ex. 180, Kamel | Plaintiffs Exhibit 448 is only a cover sheet with no exhibit attached.<br><br>Plaintiffs Exhibit 678Q (MPS 727_145), ECF No. 2927-2, Exhibit 678P (MPS 727_145), Exhibit 86 (Coombs Decl.) 4, Exhibit 125 (Coombs Tr.) 168:21-169:6, Exhibit 180, Exhibit 103 (Kamel Dep) at 171:17-23, 196:13-207:33, and ECF No. 2927-2 (the Affirmation of Daniel Robert "Bob" Graham") are inadmissible hearsay. *See* Objections Chart. The Youssef Report should be excluded. *See id.*<br><br>Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088.<br><br>None of the materials support the assertion that there was any restriction on seconding Al Bayoumi to an American company under Saudi law. As previously noted, Plaintiffs Exhibit 448 is only a cover sheet. As for Plaintiffs Exhibit 678Q, the cited page purports to be a letter from Al Bayoumi, apparently written in his personal capacity, without any connection to whether Al Bayoumi could be seconded to an American company. As for Plaintiffs Exhibit 678P, the cited page purports to be a letter to Al Bayoumi. That page does not reflect a desire by Saudi Arabia to place Al Bayoumi with Ercan. Neither Saudi Arabia nor Ercan is |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13-207:23. This is further supported here because Hanna "was very frustrated" by Bayoumi, "that he didn't want to take orders from him. He didn't want to do what he wanted him to do. And everything in -- Omar would come to him and tell him things that he wanted, and ANSS didn't want to do." Ex. 125, Coombs Dep. 168:21-169:6; Ex.86, Coombs Decl. 4. | mentioned. There is a reference to a "Mr. Abdulaziz El Fekri [phonetic]," but there is no information provided about that individual's affiliation.<br><br>Moreover, the materials cited do not support the assertions regarding why Al Bayoumi was seconded to Dallah Avco. Neither mentions any choice made by Saudi Arabia to use Dallah Avco over Ercan for Al Bayoumi's secondment.<br><br>With respect to the assertion in the footnote that PCA would have initiated the request for Al Bayoumi's secondment, there is no admissible evidence to support that point. Plaintiffs Exhibit 103 (Kamel Tr.) is the Rule 30(b)(6) deposition of Dallah Avco. The witness had no personal knowledge regarding Al Bayoumi's secondment (or secondment practices in general during the time period) because he was not even employed by Dallah Avco until 2007 and never worked on the ANSS project. *See* Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge). That testimony is inadmissible against Saudi Arabai. Exhibit 180 is at least double hearsay: "information that was communicated to the [Rule 30(b)(6)] witness concerning knowledge that Alawi Kamel [a different Kamel than the Rule 30(b)(6) witness] had concerning the circumstances of the letter." Ex. 103 (Kamel Tr.) at 239:18-240:4.<br><br>Plaintiffs Exhibit 86 and Plaintiffs Exhibit 125 relate to Coombs, who testified that he was relying only on what Hannah told him (hearsay). *See* Pls. Ex. 125 (Coombs Tr.) 175:15-23 ("Q. And all of the statements you made were – the basis for those were things that Magdi Hanna told you, correct? A. Yeah.").<br><br>Al Bayoumi testified that he did not recall having any conversations about Ercan with anyone at the Presidency of Civil Aviation. Pls. Ex. 120 (Bayoumi Tr.) 105:4-7. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Bayoumi also testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. *Id.* at 724:18-725:13.

As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| 666. | Bayoumi was apparently not the only Saudi government official assigned to work in San Diego who was separately paid through Dallah Avco. The EO production included an FBI report that in September 1998, Dr. Soliman Al-Ali aka Soliman Ali Elay, together with Bayoumi, submitted a joint lease application for an apartment in La Jolla, California where Al-Ali would live in 1998-1999. On the joint lease application Al-Ali and Bayoumi listed Dallah Avco as their employer. ("Elay listed his business occupation as a consultant for DALLA Co., Saudi Arabia."); Ex. 2, EO 3553 ("During this time Albayoumi and Alali listed their employment with Dalla Company, Saudi Arabia"); Ex. 543, FBI 007968-REV2021 (realtor had seen the name "Omar AL-BAYOUMI" on the rental application). At | The first quoted language in the paragraph is not supported by a citation. That language appears in Plaintiffs Exhibit 2AA, and Saudi Arabia will treat Plaintiffs as having cited Plaintiffs Exhibit 2AA.

Plaintiffs Exhibit 2R (EO 1609), Exhibit 2AA (EO 3326), Exhibit 2CC (EO 3553), and Exhibit 543 (FBI 7968-REV2021) are inadmissible hearsay. *See* Objections Chart.

The cited materials do not support Plaintiffs' assertion that Al Bayoumi and "Dr. Soliman Al-Ali aka Soliman Ali Elay" "submitted a joint lease application" in September 1998. The cited materials describe the rental application as "Elay's rental application" ("or "Alali's rental application"") and state that Al Bayoumi was listed as "co-tenant/applicant/friend" or "co-tenant/friend." *See* Pls. Ex. 2AA (EO 3326); Pls. Ex. 2CC (EO 3553). Moreover, the materials do not mention the date on which the rental application was submitted. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | this time, Al-Ali was also an employee on the payroll of the Saudi Embassy in Washington, D.C. Ex. 145, KSA 7506-7522 at 7521 (showing Al-Ali receiving a 2000 bonus). *See also* Ex. 2, EO 1609 (fraudulently listing "Mana Life" as his employer). | Al Bayoumi testified that it is typical in the Islamic community to assist newcomers, even strangers, to that community, including by cosigning for an apartment. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24.<br><br>Plaintiffs Exhibit 2R does not support the assertion that anyone "fraudulently" listed their employer as "Mana Life." It is a hearsay statement purportedly from an individual employed by "Manufactures Life Insurance" ("ManuLife") stating that Al Bayoumi and Al Ali did not work for ManuLife. *See* Pls. Ex. 2R (EO 1609). Elsewhere, Plaintiffs assert that "Mana Life" was a separate organization from "Manufactures Life Insurance" ("ManuLife"). *See* Response to Pls. Aver. ¶¶ 810-11.<br><br>Moreover, the cited materials do not support Plaintiffs' assertion that "[a]t this time, Al-Ali was also an employee on the payroll of the Saudi Embassy in Washington, D.C." The cited page (KSA 7521) of Plaintiffs Exhibit 145, which Plaintiffs describe as "showing Al-Ali receiving a 2000 bonus," mentions an $800 "bonus" but does not state what that "bonus" was for. |
| 667. | Bayoumi's arrangement with Dallah Avco began in June 1995 and was renewed annually and approved each year by the Saudi Deputy Minister of Defense. Ex. 277, KSA 4345 (PCA decides to extend in 1999), Ex. 278, KSA 4346 (no objection from Deputy Minister of Defense), Ex. 279, KSA 4350 (1998 extension), Ex. 280, KSA 4353 (noting 1999 is the "fourth extendable year"). FBI records describe the arrangement as "an informal agreement" between Dallah and the PCA. Ex. 469, FBI 000281 at 282. | Plaintiffs Exhibit 469 (FBI 282) is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibits cited in this paragraph state that Al Bayoumi was seconded to Dallah Avco Company. The assertion that the secondment was "approved each year by the Saudi Deputy Minister of Defense" is unsupported. The exhibits either refer to or were signed by an individual with the title "Assistant Minister" – or, in one case, "First Assistant Minister" – of Defense and Aviation and General Inspector of Civil Aviation Affairs." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 469 contains the quoted language. The same sentence containing that language also states that the "informal agreement" grew out of the "Saudization philosophy."<br><br>As Al Bayoumi explained, the "Saudization program" was "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). As part of Saudization, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1. |
| 668. | On May 24, 1995, Alawi Mohamed Saeed Kamel (Managing Director of Dallah Avco and nephew of Saleh Kamel) sent a letter to the President of Civil Aviation, informing that Dallah Avco is currently in an "urgent need of the services of employee Mr. Omar Ahmed Mustafa al Bayoumi as an accountant." Ex. 181, Kamel Exhibit 121 (KSA 1029). | Plaintiffs misquote Plaintiffs Exhibit 181. That exhibit states that "Dallah Avco – air navigation system support project, is in dire need for the services of the presidency employee, Mr. Omar Ahmed Mustafa Al Bayoumi, as accountant based on the cooperation between the government and private sector."<br><br>Plaintiffs Exhibit 181 does not support Plaintiffs' assertion that "Alawi Mohamed Saeed Kamel" was "Managing Director of Dallah Avco and nephew of Saleh Kamel." The title listed for "Alawi Mohamed Saeed Kamel" in the letter is "Mandated Member." The exhibit does not mention "Saleh Kamel." |
| 669. | Dallah's 30(b)(6) witness, Ammar Kamel believes that despite the letter seemingly | Plaintiffs Exhibit 103 (Coombs Tr.) and Exhibit 180 are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | coming from Dallah "the PCA must have initiated the secondment" and "understands the reference in the letter to an 'urgent need' for Al-Bayoumi to refer to the PCA's urgent need to have Al-Bayoumi placed on the ANSS Project." Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23; 196:13-207:23. | Plaintiffs Exhibit 103 (Kamel Tr.) is the Rule 30(b)(6) deposition of Dallah Avco. The witness had no personal knowledge regarding Al Bayoumi's secondment (or secondment practices in general during the time period) because he was not even employed by Dallah Avco until 2007 and never worked on the ANSS project. *See* Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge). That testimony is inadmissible against Saudi Arabai. Exhibit 180 is at least double hearsay: "information that was communicated to the [Rule 30(b)(6] witness concerning knowledge that Alawi Kamel [a different Kamel than the Rule 30(b)(6) witness] had concerning the circumstances of the letter." Ex. 103 (Kamel Tr.) at 239:18-240:4.<br><br>Plaintiffs Exhibit 180 contains the quoted language, except that "the PCA" should read "that PCA." Ammar Kamel testified that he did not see documents each year that the request to renew Al Bayoumi's secondment came from PCA, nor did he inquire with anyone as to any specific year whether or not the renewal was initiated by Dallah Avco or PCA. Pls. Ex. 103 (Kamel Tr.) 269:10-20. He further testified that with respect to Plaintiffs Exhibit 180, he did not speak with the author of the document with respect the letter and never saw any interview notes about the letter in preparation for his testimony. Instead, he testified based on his own interpretation of the letter even though he was not personally involved in the ANSS project or Al Bayoumi's secondment. *Id.* at 270:14-272:5. |
| 670. | The ANSS project is based in Saudi Arabia, and nearly all of those who worked on that project were PCA employees working in Saudi Arabia. Ex. 111, Khalifa Dep. 30:14-34:21, 55:11-23, 76:3-21. There is no part of the ANSS project that would entail an employee performing work in the United States over a period of years. Ex. 111, | ECF No. 1712-1 (mis-labeled as 1712-2) is inadmissible hearsay. *See* Objections Chart.<br><br>Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Khalifa Dep. 76:23-77:5. Further, no Dallah Avco employees servicing the ANSS project would involve any work in the United States. Ex. 111, Khalifa Dep. 90:16-24. In fact, according to Dallah's chairman of the board, Dallah "has never been licensed or registered to do business in the United States," "never carried any activity at any time in the U.S.A.", "has never owned or leased property in the United States," "has never offered or advertised any activities or services within the United States," "has never had a branch office" in the United States, and has never had "a representative, an employee or an agent in the United States." ECF No. 1712-2. | program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 671. | PCA Director Salmi never informed PCA Logistics Manager Coombs that Bayoumi was also on Dallah Avco's payroll and thus receiving a salary and benefits on top of the other funds that he received from Ercan and Dallah Avco. | Plaintiffs' assertions in this paragraph are unsupported by any citation or record evidence.<br><br>The admissible evidence shows that Al Bayoumi was not being paid by Ercan. Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (testifying that Ercan may have "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so); *see also* Response to Pls. Aver. ¶ 660 (criminal complaint alleging that Ercan did not pay Al Bayoumi anything). |
| 672. | When shown the records of Bayoumi's arrangement, Coombs described it as | Plaintiffs Exhibit 86 (at 3) is inadmissible hearsay, and Plaintiffs Exhibit 125 (Coombs Tr.) at 36:8-37:25, 39:21-40:22, 45:16-22, 159:17-160:14 is |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "outside of the box" and "double-dipping." Ex. 125, Coombs Dep. 39:21-40:22; 45:16-22, 159:17-160:14. Coombs had never heard of such an arrangement being made for a PCA official. Ex. 86, Coombs Decl. 3. Coombs testified that these payments were made through a U.S. bank to Bayoumi. Ex. 125, Coombs Dep. 36:8-37:25. Coombs also testified before the 9/11 Commission and FBI about his time at the PCA that "something didn't seem right to me. It was out of line." Ex. 125, Coombs Dep. 67:24-68:10. | inadmissible hearsay and not based on personal knowledge. *See* Objections Chart.<br><br>Coombs's testimony and declaration were not based on personal knowledge and are inadmissible. Coombs's declaration stated "Mr. Al-Bayoumi was receiving a salary and benefits paid by Dallah Avco for working as a PCA employee in addition to and at the same time that Mr. Al-Bayoumi was being paid educational and other expenses from my Logistics Department budget" – the so-called "double dipping." Pls. Ex. 86 (Coombs Decl.) 3.<br><br>At the time of his 2021 declaration and deposition, Coombs was 77 years old, last worked for the PCA in 1997, and, when he worked for PCA (approximately 25 years ago), he was responsible only for the budget of the Logistics Department of the Airways Engineering Division. *See id.* at 1; Pls. Ex. 125 (Coombs Tr.) 22:10-20.<br><br>Coombs based his statements regarding "double dipping" in his declaration and testimony on his review of three documents shown to him by Kreindler & Kreindler over the course of five meetings. *See* Pls. Ex. 86 (Coombs Decl.) 3; Pls. Ex. 125 (Coombs Tr.) 22:5-25:18. He had never seen these documents before and had no personal knowledge about them. *See* Pls. Ex. 125 (Coombs Tr.) 27:16-19 ("Q. Now, you had never seen these three documents prior to being shown them by the Kreindler & Kreindler firm, correct? A. No, I had not.").<br><br>Prior to reviewing those documents in 2021, he was unaware of any "double dipping." *See id.* at 30:17-24 ("Q. Prior to being shown those documents, you had no reason to believe that Mr. Al. Bayoumi was receiving any salary and benefits . . . apart from any payments through the logistics department, correct?" Q. No, I was not aware of it at all."). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | At his deposition, Coombs conceded that none of the documents showed "double dipping." For the first document (DA 1016), Coombs testified the document came from a separate department than his Logistics Department and that he was "unaware of the meaning of this document." *Id.* at 31:2-32:19. For the second document (DA 2267), Coombs testified the document did "not show any payments to Omar Al-Bayoumi." *Id.* at 34:10-16. For the third document, Coombs testified that the document predated his employment at the PCA, did not state "how . . . payments were to be made to Omar Al-Bayoumi," and did not "indicate whether . . . payments . . . were made through the logistics department or by any other means." *Id.* at 36:8-11, 39:3-13. |
| | | Moreover, Coombs acknowledged the existence of the Saudization program and his knowledge of it. *See* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). Coombs also testified that Al Bayoumi was married and that "[n]one of the other students were married." Pls. Ex. 125 (Coombs Tr.) 55:21-56:20. |
| | | Further, Coombs testified that he did not know whether Al Bayoumi had any children, that he did not know Al Bayoumi's actual living expenses, and that he did not know how the amounts paid to Al Bayoumi related to Al Bayoumi's actual living expenses. *Id.* at 56:21-58:25. In addition to being married, Al Bayoumi did have children and was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). |
| 673. | Saudi Arabia claims that Bayoumi's arrangement with Dallah Avco was a "secondment," KSA Aver. ¶¶ 20, 21, 24, but Bayoumi's arrangement was atypical and barred by Saudi Arabia's own procedures. | Plaintiffs' assertion that "Bayoumi's arrangement was atypical and barred by Saudi Arabia's own procedures" is unsupported by any citation or record evidence. All of the contemporaneous documents state that Al Bayoumi was seconded to Dallah Avco. *See* Response to Pls. Aver. ¶ 667. |
| 674. | Saudi Arabia's policy was to forbid Saudi Government officials (such as Bayoumi) to be "seconded" to pursue their education if that education was paid for by the Saudi government. Ex. 94, Anqari Dep. 245:3-8, 269:1-270:22, 387:9-388:1. Saudi Arabia paid for Bayoumi's education, not Dallah Avco; therefore, secondment would not normally have been allowed. Ex. 103, Kamel Dep. 114:3-14; Ex. 427, DA 0092 ("the cost of [Bayoumi's] studies were not charged to Dallah Avco but to the [PCA]"). PCA Director Salmi issued his first direction to Dallah Avco in July 1995 (effective June 6, 1995), for Dallah Avco to add Bayoumi to its payroll as a full-time employee working as a "Senior Data Processing Technician" on an Air Navigation System Support (ANSS) airport project located in "JED" - Jeddah, Saudi | Plaintiffs Exhibit 427 (DA 92) is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs Exhibit 427 consists of an Arabic-language document, but does not contain an English translation of that document. Dallah Avco submitted a translation at DA Ex. 17. That document does not state that Dallah Avco did not "pay" Al Bayoumi but rather states that any "cost" incurred by Dallah Avco with respect to Al Bayoumi would be "charged" to the PCA. DA Ex. 17 at DA 92. <br><br> The cited pages of Plaintiffs Exhibit 94 (Anqari Tr.) do not support Plaintiffs' assertion that Al Bayoumi was a "Saudi Government official[]." Those pages do not mention Al Bayoumi's job titles or ranks. Al Bayoumi testified that, "[b]efore he went to San Diego," he "worked for the finance department for ANSS." Pls. Ex. 120 (Bayoumi Tr.) 68:20-23. <br><br> Further, the cited documents do not support the assertion that a Saudi employee could not pursue an education while "seconded." Anqari testified only that "[i]f the scholarship was at the expense of the government, then they would have . . . to stop the secondment. Otherwise – and if the expenses were to be borne by another entity, then the matter would be up to that other entity." Pls. Ex. 94 (Anqari Tr.) 387:19-25; *see* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabia. Ex. 433, DA 1016; Ex. 94, Anqari Dep. 88:20-89:14. | *also id.* at 245:3-8. That is, a Saudi employee could be seconded while receiving an education and be paid by the company to which the employee was seconded. *See id.* at 392:4-13 (agreeing that an employee could be "seconded to another entity and that other entity pays for the employee's education" without the secondment ending).<br><br>Here, Al Bayoumi testified that Dallah Avco paid his salary when he moved to San Diego "because [he] received a secondment." *Id.* at 66:1-11. It is reasonable for Dallah Avco to have placed him in an open position on the ANSS project payroll. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1. This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). Al Bayoumi testified that his government salary was suspended during his secondment and he was paid by Dallah Avco. Pls. Ex. 120 (Bayoumi Tr.) 759:18-760:21.<br><br>The cited pages of Plaintiffs Exhibit 94 (Anqari Tr.) do not support Plaintiffs' assertion in the last sentence in this paragraph. Al Anqari testified that he did not have knowledge of the pay provided to Airways Engineering personnel under the ANSS contract. |
| 675. | However, as Dallah itself knew, Bayoumi performed no work for Dallah Avco. *See* | Plaintiffs Exhibit 2AA (EO 3326), Exhibit 6 (page 515 n. 18), KSA Exhibit 163 (9/11 Report) 515 n.18, and Exhibit 319 (PEC-KSA 443) are |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 9/11 Commission Rpt. at 515 n. 18; Ex. 429, DA 0329; Ex. 125, Coombs Dep. 155:16- 157:9; Ex. 120, Bayoumi Dep. 73:7-75:11. FBI documents further confirm that Dallah had at least 50 "ghost employees" on its books to conceal their mission in foreign countries, including Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay. Ex. 319, PEC-KSA 000441 at 43; Ex. 125, Coombs Dep. 48:6-49:4; Ex. 2, EO 3326; Ex. 293, KSA 7791. | inadmissible hearsay.  *See* Objections Chart.  Plaintiffs Exhibit 125 (Coombs Tr.) at 155:16-157:9 is also inadmissible because Coombs lacked personal knowledge to testify about the document at issue (Dep. Ex. 811, DA 1016).  *See* Pls. Ex. 125 (Coombs Tr.) 31:8-11 (testifying never had seen the document); *id.* at 32:17-19 (testifying "unaware of the meaning" of the document). <br><br> The 9/11 Report states that "a fellow employee described Bayoumi as a 'ghost employee,' noting that he was one of many Saudis on the payroll who was not required to work."  KSA Ex. 163 (9/11 Rep.) 515 n.18. <br><br> Al Bayoumi testified he was seconded to Dallah Avco to pursue his education.  *See* Pls. Ex. 120 (Bayoumi Tr.) 74:6-13.  During that time period, he did not perform any goverment work.  He testified this was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations.  *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment).  This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs."  *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). <br><br> The materials cited as support for Plaintiffs' assertion that "FBI documents further confirm that Dallah had at least 50 'ghost employees' on its books to conceal their mission in foreign countries, including Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay," do not support that assertion.

Coombs testified that the term "ghost employee" just meant "student," that he had no first-hand knowledge of what the students were doing, and that he called them "ghost employees" only because several of them did not return after finishing their studies. Pls. Ex. 125 (Coombs Tr.) 134:18-137:10. He further explained that secondment to obtain an education was "common practice" as part of the Saudization program not that this had anything to do with concealing a mission in a foreign country. *Id.* at 47:20-55:18.

Plaintiffs Exhibit 2AA is an FBI investigative report on Soliman Ali Elay, and not mention any affiliation between Elay and the Saudi Embassy, and does not mention "ghost employees." Plaintiffs Exhibit 293 is a document produced by Saudi Arabia that does not mention Dallah Avco, Al Bayoumi, "Dr. Soliman Al-Ali aka Soliman Ali Elay," or "ghost employees." Plaintiffs Exhibit 319 consists of hearsay reports contained in an FBI document; these reports do not reference "Dr. Soliman Al-Ali aka Soliman Ali Elay" as being one of the "approximately 50" purported "ghost employee[s]" of Dallah. |
| 676. | Director Salmi entered similar orders to Dallah Avco to pay Bayoumi for ANSS jobs in the Kingdom in each year that Bayoumi continued to work for Saudi Arabia in the U.S. These jobs included not only Senior Data Processing Technician, but also "PCA/AE Budget Coordinator" and "DSS Programmer." Dallah Avco had none of these positions, and Bayoumi's role within the ANSS project did not change. Ex. 111, Khalifa Dep. 89:3-91:23. And | The first two sentences in this paragraph regarding payments to Al Bayoumi for ANSS jobs while in the United States and the job titles held by Al Bayoumi are unsupported by any citation or record evidence.

The cited pages of Plaintiffs Exhibit 111 do not support Plaintiffs' assertion regarding "Bayoumi's role within the ANSS project." Those pages do not mention Al Bayoumi's "role."

Moreover, there is no support for Plaintiffs assertions regarding that "none of these positions" existed. The cited testimony refers to positions at *Dallah Avco*, not positions on the *ANSS project*. *See* Pls. Ex. 111 (Khalifa |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | there would be no need to second a PCA employee to Dallah Avco to work in the United States. Ex. 111, Khalifa Dep. 98:10-99:20. | Tr.) 89:3-91:23. The ANSS project had the listed job titles. *See* DA Ex. 10 at 2315-2316; DA Ex. 11 at 3361.<br><br>Al Bayoumi testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1. This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 677. | Bayoumi, together with another PCA official Alp Karli, routinely prepared false time records to show that Bayoumi was working in Jeddah, Saudi Arabia on these jobs when in fact he was working as a clandestine agent for the Saudi Government in San Diego. Bayoumi signed these false records but never held any of these jobs. Ex. 429, DA 0329, Ex. 125, Coombs Dep. 155:16-157:9; Ex. 120, Bayoumi Dep. 73:7-75:11. | Plaintiffs Exhibit 125 (Coombs Tr.) at 155:16-157:9 is inadmissible evidence. *See* Objections Chart. Coombs lacked personal knowledge to testify about the document at issue (DA 1016). *See* Pls. Ex. 125 (Coombs Tr.) 31:2-18 (testifying he had never seen document and was "unaware of [its] meaning").<br><br>Plaintiffs provide no admissible evidence that Alp Karli was a "PCA official." Elsewhere, Plaintiffs rely on materials identifying Alp Kari as being affiliated with the Dallah Avco Company. *See* Pls. Aver. ¶ 702 (citing Pls. Ex. 426).<br><br>There is no evidence Al Bayoumi was a "clandestine agent." Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.<br><br>The timesheets say the "ANSS Program" was based in "Jeddah, Saudi Arabia," not that Al Bayoumi was located there. *See* Ex. 429. Although Al Bayoumi was given a job title, the purpose of his secondment was to receive an education and during that time period, Al Bayoumi was a full time employee. Al Bayoumi testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 678. | The PCA determined the job titles that Bayoumi would receive, and all the amounts paid to Bayoumi by Dallah Avco, including Bayoumi's salary, housing allowance, other allowance, and transportation. The PCA directed Dallah Avco to pay those amounts to Bayoumi. Ex. 122, Khan Dep. 51:21-52:6, 152:3-154:9, 163:7-164:1; Ex. 428, DA 0099 (Khan Dep. Ex. 86). | The cited materials do not support Plaintiffs' assertion that "[t]he PCA directed Dallah Avco to pay" Al Bayoumi a "housing allowance" or "other allowance." Plaintiffs Exhibit 428 lists amounts only for "Basic Salary" and "Transport Allow." Plaintiffs Exhibit 122 mentions a "Housing Allowance" and "Other Allowance," but does not explain what amounts, if any, were paid to Al Bayoumi as allowances for those items. |
| 679. | In April 1999, however, the Chairman of the Board of Dallah Avco wrote to the Saudi Arabia to terminate the secret arrangement and informed Saudi Arabia that it would no longer pay Bayoumi. Ex. 435, DA 1101; Ex. 436, DA 1102. | There is no evidence of a "secret arrangement." Plaintiffs Exhibit 435 and Exhibit 436 merely state that Dallah Avco considered Bayoumi's secondment over and indicated it did "not want to renew the secondment for another term." Ex. 435 (DA 1101); *see* DA Ex. 31 (DA 1102) (Dallah Avco translated version of Ex. 436). At that point, Al Bayoumi had been seconded for four years to Dallah Avco.<br><br>Al Bayoumi testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1. This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 680. | Saudi Arabia, via PCA Director General Salmi, immediately issued an order to Dallah Avco to take the steps necessary to keep Bayoumi on the payroll so that Bayoumi could "complete the task" assigned to him by the Kingdom. Ex. 437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 103, Kamel Dep. 180:10-182:3, 183:10-23. That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah. Ex. 182, Kamel Ex. 119 (DA 1110). On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 439, DA 1357. | Plaintiffs Exhibit 103 (Kamel Dep.) is inadmissible against Saudi Arabia because it is the Rule 30(b)(6) testimony of Dallah Avco by an individual lacking personal knowledge. *See* Objections Chart; Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge).<br><br>Saudi Arabia disputes any "order" was issued to Dallah Avco, that the secondment was "purported" rather than actual, and the implication that Al Bayoumi's "task" was anything other than related to his education.<br><br>Al Bayoumi testified that he had not completed "the educational studies that [he] planned to pursue in the United States" and that this was the "task" being referenced. Ex. 120 (Bayoumi Tr.) at 680:9-20. As of April 1999, Al Bayoumi had not yet completed his education. As set forth in response to Plaintiffs' Averment paragraph 681, Al Bayoumi earned his Masters Certificate from George Washington University in March 2000. He also continued to take classes at Keller Graduate School of Management and San Diego Community College's Continuing Education Center in 1999 and 2000.<br><br>It was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). Plaintiffs Exhibit 437 is a letter from Al Salmi stating the PCA "wants to second [Al Bayoumi] for one year only, so that he can complete the task for which the Presidency of Civil Aviation agreed to second him. Therefore, we hope that you renew the secondment of the said person for another year . . . ." Plaintiffs Exhibit 182 is a letter from Saaed Kamel to the President of Civil Aviation seeking to "approve the extension of the secondment period of [Al Bayoumi] for one more year." Plaintiffs Exhibit 439 is a letter from the President of Civil Aviation approving that extension. |
| 681. | From May 1999 through March 2000, Bayoumi attended seven continuing education short-courses run by ESI International (in association with George Washington University). Ex. 678AA, MPS732_821. Paperwork submitted to the Saudi Embassy indicated that these seven short-courses, each lasting two to five days, amounted cumulatively to a "Master's Certificate in Project Management." Ex. 680C, KSA 906-907. Bayoumi's certificates show that only two of the short-courses were held in Washington, D.C., both in late June 1999, Ex. 680A, KSA 734, 736 (Bayoumi Washington, D.C. | Plaintiffs Exhibit 680C shows that Al Bayoumi took a series of courses with the George Washington University and that these courses took place in San Diego and Washington, D.C. from May 1999 through March 2000. Pls. Ex. 680C (KSA 907). That exhibit also shows that Al Bayoumi earned a Master's Certificate in Project Management on March 3, 2000 in Washington D.C. *Id.* at KSA 906. To the extent Plaintiffs contend that Bayoumi only took courses at George Washington University during the relevant period, that is false. From February 1995 to August 1995, Bayoumi successfully completed English language courses at ELS Language Centers in San Diego. Pls. Ex. 320 (PEC-KSA1-35) (indicating Bayoumi finished with "Good" proficiency, meaning his English was "adequate for college or professional work"). From November 1995 to January 1997, Bayoumi was a full-time student at West Coast University, during which he completed 40 credit hours |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | certificates), whereas most of them were held in San Diego, Ex. 680B, KSA 735, 737, 1835 (Bayoumi San Diego certificates). Bayoumi completed his final short-course in San Diego between February 28 and March 3, 2000. *Id.* at KSA 735. Documents in the MPS production confirm that Bayoumi attended daily at a hotel in San Diego, Ex. 678Y, MPS732_361-368 (Bayoumi course paperwork, 02/28/00-03/03/00 in San Diego, CA), contrary to Bayoumi's claimed alibi that he went to Washington, D.C. for several weeks in February and March 2000. Ex. 120, Bayoumi Dep. 474:21-476:16; Ex. 90, Snell Dec, Ex. 2 at 5. | toward a master's degree in international business administration.  Pls. Ex. 120 (Bayoumi Tr.) 766:9-16; KSA Ex. 211 (KSA 1837); Pls. Ex. 320 (PEC-KSA1-44 to 46).   From January 1997 to December 1997, Bayoumi was a full-time student at United States International University, during which he completed the course of study he had started at West Coast University and earned a master's degree in international business administration.  KSA Ex. 212 (KSA 908); Pls. Ex. 320 (PEC-KSA1-30); Pls. Ex. 120 (Bayoumi Tr.) 768:19-769:12.  From the fall of 1998 to the summer of 1999, Bayoumi was a full-time student at the Keller Graduate School of Management, during which he attended classes relating to accounting for two semesters.  Pls. Ex. 320 (PEC-KSA1-67); Pls. Ex. 120 (Bayoumi Tr.) 771:5-772:11.  In 1998 and 1999, Bayoumi completed at least 10 or 12 courses at the San Diego Community College's Continuing Education Center, including courses related to small business management and computer skills.  Pls. Ex. 120 (Bayoumi Tr.) 772:12-776:3; KSA Ex. 213 (KSA 739); KSA Ex. 214 (KSA 740); KSA Ex. 215 (KSA 741). |
| 682. | Bayoumi returned to Saudi Arabia at the end of March 2000, as the funding arrangements that Saudi Arabia had made to pay Bayoumi through Dallah Avco were set to end, and reported in to PCA Director Salmi. Ex. 94, Anqari Dep. 104:15-105:20. | The cited pages of Plaintiffs Exhibit 94 (Anqari Tr.) do not support Plaintiffs' assertion.  Al Anqari testified that Al Bayoumi "worked for air navigation, and air navigation was headed by Mohammed Al-Salmi" that he did not know "who [Al Bayoumi's] immediate supervisor was."  Pls. Ex. 94 (Anqari Tr.) 105:11-20.  He did not mention Al Bayoumi's return to Saudi Arabia or "funding arrangements."<br><br>It is undisputed that at the end of March 2000, while the hijackers were still in San Diego, Al Bayoumi returned to Saudi Arabia for two months. |
| 683. | PCA Director Salmi, reported that on April 15, 2000, Bayoumi was "back in service" at his job for the Kingdom in Saudi Arabia. Ex. 233, KSA 0989. | Undisputed except that Plaintiffs Exhibit 233 states Al Bayoumi was "back to service," not "back in service." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 684. | Bayoumi, Director Salmi, and the PCA's President, continued to work on the Saudi Government's plan for Bayoumi to return to the U.S and on May 9, 2000, Bayoumi submitted a formal request to PCA Airways Engineering Director Mohamed al Salmi requesting an "unpaid study leave" to "complete my postgraduate study, PhD, in the United States of America." Ex. 228, KSA 0902. | Plaintiffs Exhibit 228 does not support Plaintiffs' assertion that there was a "Saudi Government[ ] plan for Bayoumi to return to the U.S." or that Al Salmi or the President of Civil Aviation were part of any such plan.<br><br>Plaintiffs Exhibit 228 is a May 9, 2000 letter from Al Bayoumi requesting an "unpaid study leave without any financial obligations assumed by the Presidency of Civil Aviation." |
| 685. | Simultaneously, Bayoumi was filing documents with the PCA to attend a PhD program in the U.S. and filing visa paperwork with the U.S. Consulate in Jeddah. Bayoumi did not reapply for a student visa but for a "B1/B2" business/tourist visa. That visa was issued by the U.S. Consulate to Bayoumi on May 10, 2000. Ex. 276, KSA 4337 (secondment); Ex. 66, KSA 0901 (Ex. 384); Ex. 452, KSA 8001. | The cited documents do not support the assertions regarding the type of visa for which Al Bayoumi applied. Plaintiffs Exhibit 452 contains images of Al Bayoumi's passport indicating he received a Type C visa for the United Kingdom valid from May 17, 2000 through November 17, 2000 and a type B1/B2 visa valid from May 10, 2000 through May 9, 2002.<br><br>Plaintiffs provide no evidence of what a B1/B2 visa means. As Plaintiffs assert, Al Bayoumi was applying to schools, and the Department of State provides that travel for application processes is aproper use of B1/B2 visas.<br><br>The Department of State's website states B1/B2 visas "are nonimmigrant visas for persons who want to enter the United States temporarily for business (visa category B-1), for tourism (visa category B-2), or for a combination of both purposes (B-1/B-2)." https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html. The Department of State provides "[a]ttend[ing] a scientific, educational, professional, or business convention or conference" and "[e]nrollment in a short recreational course of study, not for credit toward a degree" as examples of activities permitted on a B1/B-2 visa. *See id.* Further, under the "Study & |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Exchange" visa section, the Department of State provides a "Visitor Visa B" is appropriate "[f]or visiting schools before or during the application process." https://travel.state.gov/content/travel/en/us-visas/study.html. |
| 686. | Bayoumi's request to PCA Director Salmi for an "unpaid study leave" was supported by a forged document purporting to be a May 8, 2000, letter from George Washington University (GWU) accepting Bayoumi for its Ph.D. program. Ex. 229, KSA 0903. | Plaintiffs do not cite any evidence that Plaintiffs Exhibit 229 was forged. When asked about Plaintiffs Exhibit 229 at his deposition, Al Bayoumi testified that he did not "remember, ever, that I ever, ever faked anything." Pls. Ex. 120 (Bayoumi Tr.) 565:23-566:11. |
| 687. | The forged letter was faxed on May 8, 2000 from a 703 area code number in Virginia to Bayoumi in Saudi Arabia. The circumstances show that it is likely that Bayoumi called someone he worked with at the Saudi Embassy in Washington, D.C. to ask them to prepare the forged letter that Bayoumi needed to apply for the study leave. | This paragraph is unsupported by any citation or record evidence.<br><br>To the extent Plaintiffs are relying on Plaintiffs Exhibit 229, Al Bayoumi was asked about the exhibit at his deposition and testified that he did not "remember, ever, that I ever, ever faked anything." Pls. Ex. 120 (Bayoumi Tr.) 565:23-566:11.<br><br>There is no evidence that Al Bayoumi "called someone . . . at the Saudi Embassy in Washington, D.C. to ask them to prepare" the letter. Al Bayoumi testified that he did not even remember the letter. Pls. Ex. 120 (Bayoumi Tr.) 557:14-561:5.<br><br>There is no evidence that Al Bayoumi "worked with" anyone at the Saudi Embassy. Al Bayoumi testified that he was a full-time student while living in San Diego. Pls. Ex. 120 (Bayoumi Tr.) 764:4-6. |
| 688. | The GWU Registrar testified that the address on the letter did not belong to GWU, but to a separate company that ran a "Certificate Program" under GWU's name. That Certificate Program included the 2–3-day lectures for which Bayoumi had | Al Bayoumi testified that he did not remember the letter. Pls. Ex. 120 (Bayoumi Tr.) 557:14-561:5. Al Bayoumi also testified at his deposition that he never enrolled in George Washington University as a Ph.D. student. Instead, it is undisputed that Al Bayoumi enrolled in a Ph.D. program at Aston University in England. Pls. Ex. 120 (Bayoumi Tr.) 137:24-138:10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | previously received certificates. Ex. 196, KSA 0734-7. The GWU Registrar confirmed that the company operating the Certificate Program did not run any Ph.D. program for GWU and that the letter did not come from GWU. Ex. 162, GWU Registrar Decl. ¶ 7-11. | |
| 689. | Bayoumi had other forged documents purporting to be from GWU that were recovered by the MPS. Ex. 678X, MPS 732_307 (the MPS found in Bayoumi's possession an August 1999 letter on GWU "Law School" stationery signed by someone claiming to be the "Coarse [sic] Counselor" stating that Bayoumi "is enrolled in ESI International's Project Management Program and will be attending classes starting in September."). | Plaintiffs Exhibit 678X (MPS 732-307) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no admissible evidence Al Bayoumi "forged" any document or had any role in creating the cited document. Nor does the document itself indicate forgery.<br><br>Plaintiffs Exhibit 678X is a fax from "ESI INTERNATIONAL TEL: 7035583001" (shown in the header). ESI International operated Certificate Programs for George Washington University. *See* Pls. Ex. 162 (Amundson Decl.) ¶ 7. ESI International specifically operated programs for The George Washington University Law School – which matches the letterhead used. *See* Ex. 162 (Amundson Decl.) at Ex. D, 1 (referencing operation by ESI of the "Government Contracts Program of The George Washington University Law School").<br><br>Further, Plaintiffs Exhibit 678X, dated August 24, 1999, states Al Bayoumi "is enrolled in ESI International's Project Management program" and other evidence shows Al Bayoumi completed a Master's Certificate in Project Management on March 3, 2000. *See* Pls. Ex. 680C (KSA 906).<br><br>Finally, Al Bayoumi testified that he did not "remember, ever, that I ever, ever faked anything." Pls. Ex. 120 (Bayoumi Tr.) 565:23-566:11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 690. | On May 11, 2000, Salmi wrote to the PCA's Director of Personnel Affairs and Salaries stating that he had no objection to Bayoumi's 2-year educational leave request. Ex. 66, KSA 0901 (Ex. 384). | Plaintiffs misstate the title of the person to whom Al Salmi directed his letter. The correct title is "Personnel and Payroll Affairs Director." Pls. Ex. 66 (KSA901). |
| 691. | Bayoumi's atypical activities in the U.S. is demonstrated by the fact that his unpaid study leave request was promptly denied by PCA's Assistant President Anqari and Human Resources department on May 16, 2000. Ex. 94, Anqari Dep. 145:25-149:10; Ex. 200, KSA 0889, Ex. 199, KSA 0888. | At his deposition, Al Anqari referred to himself as "an assistant to the president of Civil Aviation," not as the "Assistant President." Pls. Ex. 94 (Anqari Tr.) 230:20-231:8; *see id.* at 15:3-8.<br><br>The cited materials do not support Plaintiffs' assertion that the leave request was "denied" by the "Human Resources department." Those materials show that Abdulaziz Al Anqari denied the request and that the Personnel Affairs (Human Resources) Department for the Presidency of Civil Aviation then communicated that decision to the Director General of Airways Engineering.<br><br>The cited materials also do not support Plaintiffs' assertion that Al Bayoumi's "activities" in the United States were "atypical." Al Anqari testified that the denial was because of "financial reasons" and because "the position [could not] remain vacant." Pls. Ex. 94 (Anqari Tr.) 148:23-149:24. Plaintiffs Exhibit 200 likewise states: "Unfortunately, the leave cannot be approved. The Presidency has provided him enough leaves before and the job cannot be left vacant."<br><br>There was nothing "atypical" about Al Bayoumi's "activities" in the United States. Al Bayoumi testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 692. | In rejecting the leave request, Anqari stated that Bayoumi had "enough leaves" and cited the money that PCA spent on Bayoumi's purported education as well as the job vacancy Bayoumi left open at the PCA in Saudi Arabia. Ex. 94, Anqari Dep. 149: 21- 15:23, 153:15-23, 162:20-23. | Plaintiffs Exhibit 94 does not support Plaintiffs' assertion that "[i]n rejecting the leave request, Anqari . . . cited the money that PCA spent on Bayoumi's purported education." Al Anqari pointed to the money that the Presidency of Civil Aviation would have had to spend on additional education, not the money that it had spent to date. Pls. Ex. 94 (Anqari Tr.) 150:12-23. Further, the reason given for the denial in Plaintiffs Exhibit 200 was: "The Presidency has already provided him enough leaves before and the job cannot be left vacant." |
| 693. | But the highest-level officials at the PCA immediately intervened to provide Bayoumi with special treatment outside of PCA's normal practices. Anqari's denial of Bayoumi's study leave "was overruled" by the PCA's President Ali Al-Khalaf, the "head of Civil Aviation." Ex. 94, Anqari Dep. 163:19-164:2. On May 23, 2000, the PCA issued a decree granting Bayoumi a two-year educational leave. Ex. 431, DA 0548. | Plaintiffs Exhibit 94 (Anqari Tr.) does not support Plaintiffs' assertion that "Ali Al-Khalaf" "overruled" Al Anqari or that Al Bayoumi received "special treatment outside of PCA's normal practices." Al Anqari testified that "the head of the Civil Aviation[ ] agreed or granted [Al Bayoumi's] request for t[he] study," which that person had "the right" to do, as Al Anqari's "role was only to pass" a proposal "to him." Pls. Ex. 94 (Anqari Tr.) 163:19-164:7. Further, Plaintiffs Exhibit 431 states Al Bayoumi would be receiving "a study leave for two years, without salary" and that the education would be "at [Al Bayoumi's] expense." Al Anqari did not recall whether Khalaf was the President of Civil Aviation at that time. *Id.* at 227:14-228:8.<br><br>The educational leave regulations state that leave is "without pay," but that limitation means only that the employee's civil service salary must be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | suspended, not that the employee cannot receive funding through other sources. DA Ex. 91 art. 28/19; DA Ex. 1 ¶194. |
| 694. | PCA Director Salmi also approved Bayoumi's study leave. The applicable rules required that Bayoumi could only request and obtain an "*unpaid* study leave," Ex. 228, KSA 0902 (emphasis added); Ex. 94, Anqari Dep. 238:21-240:16. | The cited materials do not support Plaintiffs' assertion that "PCA Director Salmi also approved Bayoumi's study leave." Plaintiffs Exhibit 228 is a letter from Al Bayoumi requesting "unpaid study leave." It does not mention an approval by "PCA Director Salmi." The cited pages of Plaintiffs Exhibit 94 (Anqari Tr.) do not mention an approval by "PCA Director Salmi."<br><br>Further, the educational leave regulations state that leave is "without pay," but that limitation means only that the employee's civil service salary must be suspended, not that the employee cannot receive funding through other sources. DA Ex. 91 art. 28/19; DA Ex. 1 ¶194. |
| 695. | But on May 29, 2000, PCA Director Salmi ordered that Bayoumi receive a "promotion" and substantial pay increase for a new job as a "Senior DSS Programmer" with Dallah Avco backdated to an effective date of April 13, 2000. Ex. 425, DA 0082. | Plaintiffs Exhibit 425 does not indicate Al Bayoumi received a promotion or a pay increase. Under the section "You are Authorized to Take the Necessary Action(s) as Indicated," the "Promote" box is not checked. Plaintiffs Exhibit 425 provides no indication of what Al Bayoumi's pay had been or would be in the future. Further, Plaintiffs Exhibit 425 does not refer to the position "Senior DSS Programmer." It refers to the position "Snr. DSS. Prog." without specifying whether "Prog." was an abbreviation for "Program," "Programmer," or something else. |
| 696. | Plaintiffs' expert Youssef determined "[a]lthough Bayoumi had no actual accounting or other work to show for it, and had not been attending school, yet his total pay from Dallah Avco more than doubled from SAR (Saudi Riyals) 11,546 per month (U.S. $3,078) in March 2000, to SAR 24,075 ($6,420) in April 2000, to SAR 26,304 ($7,014) for each month in July through December 2000." The exchange | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Al Bayoumi testified that, because he was married and had children, he was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). Al Bayoumi also testified that his prior pay of "11,546" Riyals per month was "nothing"; that he "deserve[d]" the higher amount that he started receiving in April 2000 because of his education and work experiences; and because at the time he "was paying for [his] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | rate of Saudi Riyals to U.S. Dollars is 3.75 Riyals to a Dollar. Ex. 5, Youssef Rpt. 80; Ex. 430, DA 0457-83 at 61-70. | studies from [his] salary." *Id.* at 697:4-11, 699:21-702:7; *see id.* at 705:16-706:8 (Al Bayoumi discussing his salary-related complaints to Airways Engineering). |
| 697. | Saudi Arabia did not produce any documents concerning Bayoumi's work or pay while he was at PCA headquarters for two months in April-May 2000. PCA's Logistics Manager Samuel Coombs testified that the PCA office led by Salmi handled and used large amounts of cash in ways that were not always transparent or free of suspicion. Ex. 86, Coombs Decl. 2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 86 (Coombs Decl.) states that the "budget" for the Airways Engineering Department's Logistics Department "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA." Pls. Ex. 86 (Coombs Decl.) 2. As Al Bayoumi testified, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).<br><br>Saudi Arabia fully complied with its discovery obligations. |
| 698. | Bayoumi was paid SAR 24,885 ($6,636) per month from January 2001 to August 2001, which covered the time Bayoumi still | Plaintiffs' assertion regarding payments to Al Bayoumi is unsupported by any citation or record evidence. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | lived in San Diego. Bayoumi and his family moved out of their San Diego apartment on June 23, 2001. Ex. 91, Ratchford Decl. ¶ 20. | Al Bayoumi did not "still live[] in San Diego" "from January 2001 to August 2001." Al Bayoumi testified that he moved to the United Kingdom in October 2000 to pursue "doctorate studies." Pls. Ex. 120 (Bayoumi Tr.) 756:3-14. Bayoumi moved to the United Kingdom first, and his family followed in June 2001. |
| | | Plaintiffs Exhibit 91 does not indicate that Ms. Ratchford had personal knowledge that Al Bayoumi stayed in San Diego until June 23, 2001. It states (on May 24, 2021) that "I checked the Parkwood Apartment files for the FBI and determined that Mr. al-Bayoumi and his family left the Parkwood Apartments on June 23, 2001." Pls. Ex. 91 (Ratchford Decl.) ¶ 20. |
| 699. | Bayoumi's pay from Dallah Avco sharply decreased, reflected in his pay stubs, *after* September 2001. September 2001 (SAR 12,033 - $3,209) Ex. 430, DA 0457-83 at 79 October 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 80; November 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 81; December 2001 (SAR 13,300 - $3,547) Ex. 430, DA 0457-83 at 82; January 2002 (SAR 12,667 - $3,378) Ex. 430, DA 0457-83 at 83. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs Exhibit 430 does not support Plaintiffs' assertion that "Bayoumi's pay from Dallah Avco" decreased "after September 2001." On August 5, 2001, Al Bayoumi's total compensation was 24,885 Riyals. Pls. Ex. 430 (DA 478). On September 5, 2001, Al Bayoumi's total compensation was 12,033 Riyals. *Id.* at DA 479. All subsequent pay records in Plaintiffs Exhibit 430 for pay dates after September 5, 2001 show compensation paid to Al Bayoumi that is lower than what he was paid on August 5, 2001 and higher than what he was paid on September 5, 2001. *Id.* at DA 480-483. |
| | | There is no evidence, and Plaintiffs have not cited any, that Al Bayoumi ever provided any money to the hijackers or assisted them financially in any way. Moreover, there is no evidence that Al Bayoumi's salary was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | tied in any way to the hijackers or to the 9/11 attacks. Further, any changes in pay coincide with changing circumstances for Al Bayoumi (such as pursuing his Ph.D. studies in England). |
| 700. | In sum, Bayoumi received at least three separate streams of regular funding from the Saudi government through Saudi contractors (in addition to other funding sources): his ANSS salary through Dallah Avco payroll, his $90,000 per year education stipend through Dallah Avco and Ercan and ultimately paid out of the PCA logistics budget to cover expenses, and at least $15,000 a month in cash through Ercan. Ex. 86, Coombs Decl. 3; Ex. 125, Coombs Dep. 23:7:14, 58:25-60:12; Ex. 35, FBI 007995-7998 (Bayoumi Dep. Ex. 679); Ex. 320, PEC-KSA1-000001-98 at 31; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680). | Plaintiffs Exhibit 35 (FBI 7995-7998) Exhibit 86 (page 3), and Exhibit 320 are inadmissible hearsay. Plaintiffs Exhibit 125 (Coombs Tr.) 23:7-14, 58:25-60:12 is testimony not based on personal knowledge. *See* Objections Chart.

There is no evidence that Al Bayoumi ever received "three separate streams of regular funding" at the same time or in the amounts asserted. Plaintiffs Exhibit 35 is a hearsay statement of an interviewee that was "not directly involved" in alleged payments being made to Al Bayoumi and did not know about the timing of any such payments. Pls. Ex. 35 (FBI 7997). This person purportedly stated Al Bayoumi received $10,000 monthly from ▮▮▮▮▮▮▮▮▮▮ (Ercan) and a $5,000 stipend through the PCA but "was not sure whether those stipends were paid simultaneously or not." *Id.*

Plaintiffs Exhibit 320 is a hearsay letter dated January 22, 1997 from Ercan to the United States International University stating Ercan had been paying $4,000 per month "since the start of this year and will continue to do so until the year 2000."

Plaintiffs Exhibit 36 is a hearsay immigration form stating that Ercan would "sponsor" Al Bayoumi's yearly educational expense of $27,858. *See* Pls. Ex. 36.

The actual admissible evidence shows that Ercan did not pay Al Bayoumi the amounts alleged by the interviewee in Plaintiffs Exhibit 35, the letter in Plaintiffs Exhibit 320, or the immigration form in Plaintiffs Exhibit 36. Pls. Ex. 120 (Bayoumi Tr.) 108:17-109:12 (denying $10,000 payments from Hanna or Ercan). Al Bayoumi testified that Ercan "didn't pay |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." *Id.* at 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (Ercan "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so.); *see also* Response to Pls. Aver. ¶ 660 (criminal complaint alleging that Ercan did not pay Al Bayoumi anything).<br><br>The remaining cited materials are Plaintiffs Exhibit 125 (Coombs Tr.) and Exhibit 86 (Coombs Decl.). Those are not based on personal knowledge and are inadmissible. Coombs's declaration stated "Mr. Al-Bayoumi was receiving a salary and benefits paid by Dallah Avco for working as a PCA employee in addition to and at the same time that Mr. Al-Bayoumi was being paid educational and other expenses from my Logistics Department budget" – so-called "double dipping." Pls. Ex. 86 (Coombs Decl.) 3.<br><br>At the time of his 2021 declaration and deposition, Coombs was 77 years old, last worked for the PCA in 1997, and, when he worked for PCA (approximately 25 years ago), he was responsible only for the budget of the Logistics Department of the Airways Engineering Division. *See id.* at 1; Pls. Ex. 125 (Coombs Tr.) 22:10-20.<br><br>Coombs based his statements regarding "double dipping" in his declaration and testimony on his review of three documents shown to him by Kreindler & Kreindler over the course of five meetings. *See* Pls. Ex. 86 (Coombs Decl.) 3; Pls. Ex. 125 (Coombs Tr.) 22:5-25:18. He had never seen these documents before and had no personal knowledge about them. *See* Pls. Ex. 125 (Coombs Tr.) 27:16-19 ("Q. Now, you had never seen these three documents prior to being shown them by the Kreindler & Kreindler firm, correct? A. No, I had not."). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Prior to reviewing those documents in 2021, he was unaware of any "double dipping." *See id.* at 30:17-24 ("Q. Prior to being shown those documents, you had no reason to believe that Mr. Al. Bayoumi was receiving any salary and benefits . . . apart from any payments through the logistics department, correct?" Q. No, I was not aware of it at all.").<br><br>Coombs also testified that none of the documents showed "double dipping." For the first document (DA 1016), Coombs testified the document came from a separate department than his Logistics Department and that he was "unaware of the meaning of this document." *Id.* at 31:2-32:19. For the second document (DA 2267), Coombs testified the document did "not show any payments to Omar Al-Bayoumi." *Id.* at 34:10-16. For the third document, Coombs testified that the document predated his employment at the PCA, did not state "how . . . payments were to be made to Omar Al-Bayoumi," and did not "indicate whether . . . payments . . . were made through the logistics department or by any other means." *Id.* at 36:8-11, 39:3-13.<br><br>Al Bayoumi testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15.<br><br>Coombs acknowledged the existence of the Saudization program and his knowledge of it. *See* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). Coombs also testified that Al Bayoumi was married and that "[n]one of the other students were married." Pls. Ex. 125 (Coombs Tr.) 55:21-56:20.<br><br>Moreover, Coombs testified that he did not know whether Al Bayoumi had any children, that he did not know Al Bayoumi's actual living expenses, and that he did not know how the amounts paid to Al Bayoumi related to Al Bayoumi's actual living expenses. *Id.* at 56:21-58:25. Al Bayoumi had children, and testified that he was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). Al Bayoumi also testified that pay of "11,546" Riyals per month was "nothing"; that he "deserve[d]" the higher amount that he started getting paid in April 2000 because of his education and work experiences; and that at that time he "was paying for [his] studies from [his] salary." *Id.* at 697:4-11, 699:21-702:7; *see id.* at 705:16-706:8 (Al Bayoumi discussing his salary-related complaints to Airways Engineering). |
| 701. | Saudi Arabia pressured Ercan and Dallah to continue paying and maintaining Bayoumi's cover in the United States or risk losing substantial lucrative contracts with the Saudi government. Ex 319, PEC-KSA 000441-43 at 42; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 423 (stating that Bayoumi was receiving money from Ercan, and that when he ▆▆▆▆ refused to pay Bayoumi a monthly salary for doing nothing, he was | To the extent a response is required, Plaintiffs Exhibit 84 (page 423), Exhibit 319 (PEC-KSA 442), and Exhibit 9 are inadmissible hearsay. *See* Objections Chart.<br><br>There is no admissible evidence that Saudi Arabia "pressured Ercan and Dallah to continue paying and maintaining Bayoumi's cover in the United States."<br><br>As to Ercan, Plaintiffs Exhibit 319 repeats a hearsay statement from an unnamed individual that its contract would be "jeopardized" if it did not provide financial support to Al Bayoumi. *See* Ex. 319 at 2501. Plaintiffs Exhibit 84 states an individual – whose name is redacted – was told Ercan |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | told that Ercan would lose its contract if it did not pay Bayoumi); Ex. 435, DA 1101; Ex. 436, DA 1102; Ex. 437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 439, DA 1357; Ex. 125, Coombs Dep. 143:7-148:21. Given Bayoumi's recurring access to substantial funds through Dallah Avco, sources confirm that Bayoumi had "seemingly unlimited" funds. Ex. 9, Joint Inquiry at 174. | "would lose their contract if he did not pay" Al Bayoumi.  Pls. Ex. 84 at 423.<br><br>The admissible evidence is Al Bayoumi's testimony that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university."  Pls. Ex. 120 (Bayoumi Tr.) 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 (Ercan "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so.); *see also* Response to Pls. Aver. ¶ ███████████<br>████████<br><br>As to Dallah Avco, Plaintiffs Exhibits 435, 436, 437, and 439 state Dallah Avco did not want to renew Al Bayoumi's secondment, but that PCA requested that the secondment be renewed.  *See* Pls. Ex. 435 (DA 1101); Pls. Ex. 437 (translated version at DA Ex. 31); Pls. Ex. 438; Pls. Ex. 439. None of the letters identifies any "pressure" on Dallah Avco.<br><br>There is also no evidence of Al Bayoumi having "unlimited" funds.  That statement refers to $400,000 used to pay for the Al Madinah Mosque in San Diego, not any funds personally held by Al Bayoumi.  *See* Pls. Ex. 9 (at 174) at BUR-PEC-32394.  Further, the statement was made in the context of an investigation of Al Bayoumi and "[t]he responsible responsible FBI agent said that she closed the inquiry because the original complaint [REDACTED] turned out to be false and she had developed no other information of such significance as to justify continuing the investigation."  *Id*.<br><br>Finally, there is no evidence of "cover" for Al Bayoumi.  Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| | | Al Bayoumi also testified that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| | | Moreover, Al Bayoumi testified that, because he was married and had children, he was entitled to additional benefits to "take care of the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). Al Bayoumi also testified that pay of "11,546" Riyals per month was "nothing"; that he "deserve[d]" the higher amount that he started getting paid in April 2000 because of his education and work experiences; and that at that time he "was paying for [his] studies from [his] salary." *Id.* at 697:4-11, 699:21-702:7; *see id.* at 705:16-706:8 (Al Bayoumi discussing his salary-related complaints to Airways Engineering). |
| 702. | In January 2002, United States government officials from the Departments of Justice and Treasury met with PCA representatives in Saudi Arabia. A report prepared by the PCA concerning the meeting shows that the PCA misled the U.S. government by claiming that "Bayoumi worked under contract for Dallah Avco." Ex. 426, DA 0089-90. In a letter to the PCA, Dallah Avco stated that Bayoumi was at all times a PCA employee. Dallah Avco also stated that one of the participants in this meeting, Alp Karli, "signed the minutes of [the] meeting as a representative of Dallah Avco" but that this was "incorrect" because Karli was "a coordinator and supervisor over the contractor Dallah Avco on behalf of the [PCA]." Ex. 426, DA 0089-90, Ex. 427, DA 0092-93. According to Dallah Avco, "at all times they're PCA subordinates" and "PCA says what are their positions. PCA says the job descriptions, their salaries, who | Plaintiffs Exhibit 426 (DA 0089-90), Exhibit 427 (DA 0092-93), and Exhibit 103 (Kamel Tr.) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 426 does not demonstrate that "the PCA misled the U.S. government" about Al Bayoumi's relationship with Dallah Avco. The quoted part states: "The purpose of the visit was to gather information about the period during which the employee Omar al Bayoumi worked under a contract with Dallah Avco Company Trans Arabia." There is no indication that the representatives of the PCA told the United States that Al Bayoumi "worked under a contract with Dallah Avco." In the portion of the report discussing what was conveyed to the United States, the report states: Al Bayoumi "was seconded to Dallah Avco." Pls. Ex. 426 (DA 91).<br><br>The admissible evidence shows that Al Bayoumi was seconded to Dallah Avco, that Dallah Avco "work[ed] under the umbrella of ANSS," and that Dallah Avco paid Al Bayoumi his salary during the secondment. Pls. Ex. 120 (Bayoumi Tr.) 65:14-67:9. Plaintiffs Exhibit 426 and Exhibit 427 both make clear that Al Bayoumi was seconded to Dallah Avco. *See* Pls. Ex. 426 (DA 91); Pls. Ex. 427 (DA 92).<br><br>Plaintiffs Exhibit 103 is the Rule 30(b)(6) deposition of Dallah Avco and is not inadmissible against Saudi Arabia. The witness had no personal |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | gets to leave, when do they leave, who gets --whatever administrative thinks -- how it comes from the PCA." Ex. 103, Kamel Dep. 23:19-25:3. | knowledge regarding Al Bayoumi's secondment (or secondment practices in general during the time period) because he was not even employed by Dallah Avco until 2007 and never worked on the ANSS project. *See* Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge). |
| 703. | After the 9/11 Attacks the FBI received information concerning a connection between Dallah Avco and Osama bin Laden. On October 10, 2001 the FBI San Diego office received information that "[a]s of 1998, Dallah Avco Trans Arabia Ltd was reportedly a subsidiary of the Al Baraka Investment and Development Company in Jeddah. … [It was also known as] Avco Dallah Company aka Dallah Avco Company [and] was linked to UBL. [Redacted] UBL was instructed to contact the company in June of 1998." Ex. 2, EO 2565. On October 13, 2001, the Director of the FBI did a trace of companies Bayoumi claimed to work for and "established" a "connection between Bin Laden and Dallah Avco" that warranted further investigation and potential declassification of evidence by the U.S. counterintelligence community. Ex. 2, EO 2549. | Plaintiffs Exhibit 2V (EO 2549, 2565) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2V does not support Plaintiffs' assertion that "the Director of the FBI did a trace of companies Bayoumi claimed to work for and 'established' a 'connection between Bin Laden and Dallah Avco.'" The cited document states "a request was made to [REDACTED] to conduct a trace" but does not identify to whom the request was made or who conducted a trace. Pls. Ex. 2V (EO 2565). Further, the document states only that "Avco Dallah Trans Arab aka Avco Dallah Company aka Dallah Avco Company was Linked to UBL. [REDACTED] UBL was instructed to contact the company in June of 1998." *Id.* The document identifies no "link" other than the purported instruction to UBL to contact Dallah Avco and does not state whether any such contact was made.<br><br>The document further reflects that the investigation was ongoing as of October 13, 2001. Plaintiffs Exhibit 2V states: "FBI San Diego is seeking additional details about the companies, the source of this information, and any specific details which further link Al-Bayoumi with the operations of these companies. For example, can intelligence confirm Al-Bayoumi's employment with Dallah? Is the source of the intelligence available for further tasking specific to this case? What intelligence is available which links the umbrella company, Al Baraka Investments, to Usama Bin Laden and/or Al Qaeda?" Pls. Ex. 2V (EO 2549).<br><br>The FBI's final conclusion was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]"  Pls. Ex. 2A (EO 9-11). Moreover, Al Bayoumi testified that he did not have knowledge or suspicion before the 9/11 attacks that Al Hazmi and Al Mihdhar were planning to commit terrorist attacks in the United States.  Pls. Ex. 120 (Bayoumi Tr.) 724:7-17. |
| IX.E. | **Bayoumi received the highest possible job performance ratings from Saudi Arabia during the time he was working to establish the Saudi government's California extremist network of support to the 9/11 hijackers.** | To the extent a response is required, this assertion is not supported by any citation or record evidence.  To the contrary, there is no support that Al Bayoumi, Al Thumairy, Al Sowailem, Mana, Al Jaithen, Al Mersal, and others worked together on a plan to assist the two future 9/11 hijackers, Al Hazmi and Al Mihdhar.  There is no evidence of any such support network or plan to assist to the 9/11 hijackers.  This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers.

The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy.  It concluded:  "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar.  Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives."  KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists."  *Id.* at 218.

The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2K (EO 491). The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-03. In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 704. | Bayoumi received job performance evaluations from Saudi Arabia, and an extraordinary salary increase in May 2000, that coincided with the time that he established the Saudi government's extremist network inside Southern California that provided material support to 9/11 hijackers Hazmi and Mihdhar in San Diego. Ex. 434, DA 1054. Saudi Arabia prepared two performance reviews of Bayoumi dated April 1999 and March 2000, as an "accountant" for the | Plaintiffs Exhibit 434 does not support Plaintiffs' assertion that Al Bayoumi received "an extraordinary salary increase in May 2000." Plaintiffs Exhibit 434 is a "Personnel Status Changes" form showing that Al Bayoumi's "Basic Salary" increased from 7740 Riyals to 9500 Riyals in April 2000. The form also changes Al Bayoumi's "Contract Type" from "Single" to "Married." Al Bayoumi testified that, because he was married and had children, he was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). Plaintiffs Exhibit 434 states that Al Bayoumi was given "school fees" of "USD 3,000 abroad for each child." Pls. Ex. 434 (DA 1055). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "Contracts and Financial Control Division" of the "Airways Engineering" Division of Saudi Arabia's Presidency of Civil Aviation. These reviews covered the time when Bayoumi was supposedly "seconded" as a "student" and while he was being paid by both Ercan and Dallah Avco. Ex. 198, KSA 0882; Ex. 197, KSA 0879. | There is no evidence that any of Al Bayoumi's salary was provided to the hijackers or used to support the hijackers. Nor is there any evidence that the Saudi government established any extremist network that provided material support to the 9/11 hijackers. <br><br> The FBI's final conclusion is that that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 10-11). Moreover, Al Bayoumi testified that he did not have knowledge or suspicion before the 9/11 attacks that Al Hazmi and Al Mihdhar were planning to commit terrorist attacks in the United States. Pls. Ex. 120 (Bayoumi Tr.) 724:7-17. <br><br> Saudi Arabia disputes the implication that Al Bayoumi was not seconded as a student. The admissible evidence shows that Al Bayoumi was seconded to Dallah Avco to pursue his education in the United States. *Id.* at 652:22-653:1. <br><br> Moreover, the admissible evidence shows that Al Bayoumi was not being paid by Ercan. Al Bayoumi testified that Ercan "didn't pay anything [to him]" and that documents promising payments to him were "only done so [he could] get accepted at the university." *Id.* at 703:4-704:14; *see id.* at 121:7-124:18, 672:18-673:8; *see also id.* at 114:3-10 ( Ercan "once or twice paid for tuition fees or something like that," but that "they didn't continue" to do so.). Plaintiffs' allegations that Al Bayoumi was simultaneously paid by Ercan and Dallah Avco are unsupported by any admissible evidence. *See* Response to Pls. Aver. ¶ 700. |
| 705. | In these evaluations, Bayoumi was described by the Kingdom as "persistent and hard working" and "known for his | Plaintiffs Exhibit 198 contains the quoted language; Plaintiffs Exhibit 197 does not. It is undisputed that Al Bayoumi received these comments in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | continuous ambitions toward development and better efforts" and he received the highest possible ratings from Saudi Arabia for his work. Ex. 198, KSA 0882; Ex. 197, KSA 0879. | his performance evaluations, but that does not mean he "was [so] described by the Kingdom." |
| IX.F. | **Saudi Arabia had Bayoumi use the cover of a student visa and "Saudization" to carry out his work for Saudi Arabia inside the U.S.** | To the extent a response is required, the assertion that Bayoumi used Saudization for "cover" is not supported by any citation or record evidence.

To the contrary, Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).

As Al Bayoumi explained, the "Saudization program" was "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). As part of Saudization, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1. |
| 706. | Foreign government officials living and working inside the U.S. are required to file a notification with the U.S. Attorney General. 18 U.S.C. § 951. No such notification was filed for Bayoumi during the seven years he lived and worked in the U.S. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited statute applies to an "agent of a foreign government," specifically defines that term, and contains several exclusions including specifically "any person engaged in a legal commercial transaction." 18 U.S.C. § 951(d)(4).<br><br>There is no admissible evidence that Al Bayoumi was a "[f]oreign government official[ ]" or was doing work for Saudi Arabia during his time in the United States. Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| | | Al Bayoumi also testified that he was seconded to the Dallah Avco to pursue his education in the United States and that he was in fact a full-time student during his time in the United States. Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 707. | As cover, Saudi Arabia had Bayoumi obtain and use a full-time student visa to enter, reside, and work in the U.S. from 1994 through 2000 and a business/tourist visa to enter, reside, and work in the U.S. from May 2000 through June 2000. Ex. 452, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | KSA 8001; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertion that "[a]s cover, Saudi Arabia had Bayoumi obtain and use a full-time student visa to enter, reside, and work in the U.S. from 1994 through 2000 and a business/tourist visa to enter, reside, and work in the U.S. from May 2000 through June 2000." Plaintiffs Exhibit 36 includes an Immigration and Naturalization Services form signed on February 3, 1999 by an admissions officer at U.S. International University, and Plaintiffs Exhibit 452 is a copy of a U.S. visa issued to Al Bayoumi on May 10, 2000. Neither shows that "Saudi Arabia had Bayoumi obtain" any U.S. visas for any purpose. Moreover, as set forth above, Al Bayoumi was in fact a student in the United States. *See* Response to Pls. Aver. ¶ 681.<br><br>Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Al Bayoumi also testified that he was seconded to the Dallah Avco project to pursue his education in the United States and that he was in fact a full-time student during his time in the United States. Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 708. | Ercan was used by Saudi Arabia to support Bayoumi's immigration status with the INS. Bayoumi's immigration forms filed in February and September 1997 stated that Bayoumi was pursuing educational programs in San Diego and that Ercan would pay support to Bayoumi at the rate of $4,000 per month until the year 2000. Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 211, KSA 6642-65 at 61; Ex. 340, USIU production at 31; Ex. 488, FBI 001370-73 at 373. | Plaintiffs Exhibit 488 (FBI 1373) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited materials do not support Plaintiffs' assertion that Saudi Arabia "used" Ercan "to support Bayoumi's immigration status with the INS." None of the materials reference any involvement by Saudi Arabia in procuring any support from Ercan to assist Al Bayoumi with his immigration status.<br><br>Plaintiffs Exhibit 488 states that ███████████████ Ercan – "told the agents that █ had never provided any financial support for" Al Bayoumi. Pls. Ex. 488 (FBI 1373). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 709. | Bayoumi enrolled at San Diego State University ("SDSU"). Ex. 320, PECKSA1-000001-98 at 71. Following his enrollment at SDSU, Bayoumi would enroll in English courses at ELS Language Centers in San Diego until mid-August 1995, but Bayoumi failed to attend classes at all between March 25, 1995 and April 23, 1995 and received "failure" or "poor" grades in about a third of his classes. Ex. 320, PEC-KSA1-000001-98 at 35-36. | Plaintiffs Exhibit 320 does not support Plaintiffs' assertion that "Bayoumi failed to attend classes" in which he had enrolled. Plaintiffs Exhibit 320 shows that, for a one-month period between March 25, 1995 and April 23, 1995, Al Bayoumi was not enrolled in class. Pls. Ex. 320 (PEC-KSA1-35).<br><br>Plaintiffs Exhibit 320 also shows that the grading system is intended to measure "English proficiency"; that a low score indicates that "English proficiency [is] inadequate for college or professional work"; and that a "full-time ESL program" is "recommend[ed]" for students receiving low scores. *Id.*<br><br>Plaintiffs Exhibit 320 also states that, by the end of his English courses, Al Bayoumi was assessed a "3" in English proficiency meaning his English was "adequate for college or professional work; no further ESL study needed." *Id.*<br><br>Finally, Plaintiffs Exhibit 320 states that Al Bayoumi took 20 graded courses and received between "Good" and "Excellent" grades in 8 of 20 courses, "Average" to "Above Average" in 6 of 20 courses, and "Poor" or "Failure" in 6 of 20 courses. *Id.* His "Cumulative GPA" was "2" or "Average." *Id.* |
| 710. | While SDSU records appear to state that Bayoumi had attendance rates in his English coursework ranging from 88.5% to 92%, Ex. 320, PEC-KSA1-000001-98 at 71, that is misleading and grossly overestimates his actual attendance. Bayoumi missed the first few weeks of both the fall and winter sessions and attended just 147 hours of class in total while enrolled out of a possible 480 "base" hours | Plaintiffs Exhibit 320 does not support Plaintiffs' assertion that Al Bayoumi "missed 333 hours of coursework out of a total of 480 possible 'base' hours while he was enrolled." As Plaintiffs concede, the "SDSU American Language Institute" calculated Al Bayoumi's attendance record in its "Intensive English for Communication Program" as falling between 88.5% and 92%, including in the same documents that Plaintiffs attempt to use to show much lower attendance rates. Pls. Ex. 320 (PEC-KSA1-71, 74-75, 78, 81-82). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of class. In other words, Bayoumi missed 333 hours of coursework out of a total of 480 possible "base" hours while he was enrolled. Ex. 320, PECKSA1- 000001-98 at 74 (noting that fall session began on August 30, 1994 but no Bayoumi attendance records until September 12, 1994); Ex. 320, PEC-KSA1-000001-98 at 72-73 (noting enrollment date of August 30 1994, but date Bayoumi began classes as September 22, 1994); Ex. 320, PEC-KSA1-000001-98 at 75 (comment noting that Bayoumi "[e]ntered the class late in the term"); Ex. 320, PEC-KSA1-000001-98 at 81 (no hours of attendance for first three weeks of spring 1995 session); Ex. 320, PEC-KSA1-000001-98 at 71 (noting that coursework was measured in hours, that there was a "base of 20 hours of instruction per week" divided into "general English" and "oral communication"); Ex. 320, PEC-KSA1-000001-98 at 74, Ex. 320, PEC-KSA1-000001-98 at 78, Ex. 320, PEC-KSA1-000001-98 at 81 (noting hours attended for "G" i.e. general English, "OC" i.e., oral communication, and "T" which is "Total" though at times the subtotal of G and OC does not add to T, which was likely the result of short hand); *id.* (20 hours per week over the sessions and including the first two weeks of fall session classes Bayoumi | No evidence supports Plaintiffs' calculations – which do not appear in the documents themselves – that Al Bayoumi actually only attended 147 out of 480 (30.6%) coursework hours. Plaintiffs also omit that the documents on which they rely include the following comments on Al Bayoumi': "Participated fully in class activities," "A pleasure to have in class," "A hardworking student," "Put forth a lot of effort and made steady progress in the class," "A hardworking student," "Very diligent and an asset to the class," "A positive and enthusiastic student," and "An outstanding student in every respect." Pls. Ex. 320 (PEC-KSA1-75).<br><br>Moreover, Plaintiffs Exhibit 320 does not support Plaintiffs' assertion that Al Bayoumi did not begin classes until September 22, 1994. Pages 72-73 of Plaintiffs Exhibit 320 show an arrival date of August 30, 1994 and list "Y" next to "Arrived." It then lists the "OC Entry" date ("Date Began OC Level," referring to "Oral Communications Class Section") as August 31, 1994, and lists "G Entry" date ("Date Began Gen Level," referring to "General Class Section") as September 22, 1994.<br><br>Finally, Plaintiffs Exhibit 320 does not state that Al Bayoumi missed the "first three weeks of spring 1995 session." There is no indication any classes were held from January 9 to January 30, 1995, or that Al Bayoumi missed them. *See* Ex. 320 at 81. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | missed equals 480 hours and adding up the "T" amounts yields 147 hours). | |
| 711. | From November 1995 through mid-1997 Bayoumi enrolled in classes at West Coast University ("WCU") and United States International University in San Diego ("USIU"). In December 1996, Bayoumi wrote to USIU requesting a transfer to finish his degree because WCU had financial problems. Ex. 38 (Bayoumi Dep. Ex. 683). And he enrolled in USIU beginning in the Winter Quarter of 1997. Ex. 320, PEC-KSA1-000001-98 at 29. | This is undisputed. |
| 712. | Bayoumi enrolled and attended 15 classes during this time, but the classes were only two months long in duration, and he was taking only 1-2 courses at a time. Ex. 320, PEC- KSA1-000001-98 at 44-46. Foreign intelligence officers often pose as students because they can easily obtain a student visa, pay tuition, enroll in classes with a light and flexible schedule but rarely attend classes (many of which do not take regular attendance) and have the freedom to conduct other activities without U.S. government officials noticing, *see* 9/11 Commission Report at 272; Ex. 5, Youssef Rpt. 74, as Bayoumi had already been doing for almost two years at this point. | Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088. This opinion is speculation that is not based on any recognized methodology.<br><br>Saudi Arabia does not dispute that Al Bayoumi enrolled in 15 classes at West Coast University from November 1995 to mid-1997. Plaintiffs Exhibit 320 is his transcript listing these courses. Except for his first term at West Coast University, Al Bayoumi took at least two courses every term (and three courses in two terms). Plaintiffs provide no evidence of what a typical or full course load was. His cumulative GPA was 3.52/4.0. *See id.* at 46.<br><br>There is no admissible evidence that Al Bayoumi was actually a "foreign intelligence officer" posing as a student. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded, and in any event, the cited portion does not offer any opinion regarding the supposed spycraft of posing as a student. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi continued to have ample time to perform his true function in the United States while in school. And his business studies were unrelated to his original reason for being here—to pursue English language coursework. | *See* Ex. 5 (Youssef Rep.) 74.  The 9/11 Report likewise does not mention using a "student" occupation as "cover."  It states that FBI agents in July 2001 advised of the "possibility" that Bin Laden may "send students to the United States to attend civil aviation schools."  KSA Ex. 163 (9/11 Rep.) 272.  Elsewhere, the 9/11 Report found Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamic extremists."  *Id.* at 218.

The admissible evidence shows that Al Bayoumi was not a "foreign intelligence officer."  Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency.  Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.

As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer."  KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304.  Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government.  *Id.* at 278.

Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers."  *Id.* at 297.

Al Bayoumi also testified that he was seconded to the Dallah Avco to pursue his education in the United States and that he was in fact a full-time student during his time in the United States.  Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13.  As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations.  *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 713. | An October 2000 email recovered by the FBI shows that during this time Bayoumi engaged in a pattern of fraud by paying a USIU professor named ▆▆▆▆▆▆ to prepare his coursework for him. Ex. 567, FBI 011777-011783 at 011782 (Bayoumi agrees to pay ▆▆▆▆ "what ever you suggest" to help him prepare "some assignments" and states to ▆▆▆▆ that he "helped me [Bayoumi] in the beginning…."); Ex. 340, USIU production at 50. | Plaintiffs Exhibit 567 (FBI011782-83) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited materials do not support Plaintiffs' assertion that "Bayoumi engaged in a pattern of fraud by paying a USIU professor named Hamid Rahman to prepare his coursework for him."<br><br>Plaintiffs Exhibit 340 does not contain the referenced email and does not mention ▆▆▆▆▆▆." The cited page is a letter informing Al Bayoumi that he was on "Academic Warning" because his GPA was below 3.0. *See* Pls. Ex. 340 at 50.<br><br>Elsewhere, Al Bayoumi's transcript shows that – as of the date of that letter – his cumulative GPA was 2.933. *See id.* at 62. After the following quarter, Al Bayoumi's GPA rose to 3.015. *See id.*<br><br>Plaintiffs Exhibit 567 includes an email from Al Bayoumi to ▆▆▆▆ ▆▆▆▆ dated October 23, 2000 – after Al Bayoumi had left for the United Kingdom. *See* Pls. Ex. 567 (FBI 11782) (discussing weather in Birmingham). Al Bayoumi asked for help in identifying "three key papers" in his "area of research." Al Bayoumi stated he knew it would |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | take ▮▮▮ "time," offered to compensate him for his "time" but not for his "help." *Id.* Al Bayoumi also states that ▮▮▮ had "helped [him] in the beginning," but does not state when or what that help consisted of. *Id.* ▮▮▮ response is hearsay but in any event does not provide evidence of "a pattern of fraud." ▮▮▮ told Al Bayoumi to "start looking for the papers you want to review" and that ▮▮▮ would "help [Al Bayoumi] write the reviews." *Id.* |
| 714. | During this time, in April 1996, Dallah Avco requested to extend Bayoumi's purported secondment for another year and the request is granted. Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710. The extension required coordination at the highest levels including the President of the PCA, the Deputy Minister of Defense and Aviation and the Assistant Minister of Defense and Aviation. Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710; Ex. 94, Anqari Dep. 101:24-103:19. And again, even though Dallah purportedly made the request, the request truly originated from Saudi Arabia but was made on Dallah letterhead. Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23. | Plaintiffs Exhibit 180 is inadmissible hearsay, and Plaintiffs Exhibit 103 (Kamel Dep.) is inadmissible testimony not based on personal knowledge. *See* Objections Chart.<br><br>There is no admissible evidence that the secondment extension "required coordination at the highest levels." Abdulaziz Al Anqari testified that a secondment approval was "a routine procedure" and fell within the "responsibilities" of the individuals involved. Pls. Ex. 94 (Anqari Tr.) 102:17-103:14.<br><br>Plaintiffs Exhibit 103 and Exhibit 180 do not support Plaintiffs' assertion that the secondment request "truly originated from Saudi Arabia." Plaintiffs Exhibit 103 is the Rule 30(b)(6) deposition of Dallah Avco. The witness had no personal knowledge regarding Al Bayoumi's secondment (or secondment practices in general during the time period) because he was not even employed by Dallah Avco until 2007 and never worked on the ANSS project. *See* Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge). That testimony is inadmissible against Saudi Arabai. Exhibit 180 is at least double hearsay: "information that was communicated to the [Rule 30(b)(6) witness concerning knowledge that Alawi Kamel [a different Kamel than the Rule 30(b)(6) witness] had concerning the circumstances of the letter." Ex. 103 (Kamel Tr.) at 239:18-240:4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, none of the cited pages of Plaintiffs Exhibit 103 (Kamel Tr.) discuss the April 1996 extension of Al Bayoumi's secondment. And Plaintiffs Exhibit 180 discusses the initiation of Al Bayoumi's secondment to Dallah Avco; it does not mention the April 1996 extension. |
| | | As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 715. | In early 1997, Dallah again requested to extend Bayoumi's purported secondment for another year. Ex. 443, KSA 4462. Again, this request should be understood as coming from the Saudi government. Ex. 180, Kamel Exhibit 127, Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23. This time before extending the purported secondment, the PCA human resources department requested additional information: The reasons for extending the secondment for a | Plaintiffs Exhibit 180 is inadmissible hearsay, and Plaintiffs Exhibit 183 (Kamel Dep.) is inadmissible testimony not based on personal knowledge. *See* Objections Chart. |
| | | Plaintiffs Exhibit 103 (Kamel Tr.) is the Rule 30(b)(6) deposition of Dallah Avco. The witness had no personal knowledge regarding Al Bayoumi's secondment (or secondment practices in general during the time period) because he was not even employed by Dallah Avco until 2007 and never worked on the ANSS project. *See* Pls. Ex. 103 (Kamel Tr.) 257:8-258:7 (witness confirming no personal knowledge). That testimony is inadmissible against Saudi Arabai. Exhibit 180 is at least double hearsay: "information that was communicated to the [Rule |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | third time? The reasons for Bayoumi's stay in the USA? For completing studies or other reasons? What type of study, major, or qualification does Bayoumi want to obtain, and when will he be done? Will Bayoumi continue in his position after returning, or will he leave his work? Ex. 281, KSA 4466. Mohammed al Salmi responded that the further secondment related to Saudization and that Bayoumi would pursue a master's degree in business administration that would be complete by the end of the secondment year (early 1998). Ex. 424, DA 0044. On May 6, 1997, Anqari authorizes the continued secondment for another year to complete a Master's in International Business Administration. Ex. 424, DA 0044. | 30(b)(6) witness concerning knowledge that Alawi Kamel [a different Kamel than the Rule 30(b)(6) witness] had concerning the circumstances of the letter." Ex. 103 (Kamel Tr.) at 239:18-240:4.<br><br>Moreover, none of the cited pages of Plaintiffs Exhibit 103 (Kamel Tr.) discuss the 1997 extension of Al Bayoumi's secondment. And Plaintiffs Exhibit 180 discusses the initiation of Al Bayoumi's secondment to Dallah Avco in 1995; it does mention the 1997 extension.<br><br>Plaintiffs Exhibit 424 does not support Plaintiffs' assertion that the secondment was authorized on May 6, 1997. Plaintiffs Exhibit 424 does not authorize the secondment.<br><br>Finally, there is no admissible evidence that the secondment was "purported" and not "actual." As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 716. | In July 1997, Bayoumi was placed on academic probation at USIU for failing to maintain a minimum G.P.A. Ex. 2, EO 1762; Ex. 340, USIU production at 49. Bayoumi was nevertheless awarded a master's degree from USIU in December 1997. Ex. 340, USIU production at 60 (showing graduation fee.). The academic record shows that despite being on probation in July 1997, Bayoumi did not return to take classes but took an "independent study" course on marketing in the Arabian Gulf to obtain his USIU degree. Ex. 340, USIU production at 61. | Plaintiffs Exhibit 2S (EO 1762) is inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia disputes that Al Bayoumi was put on "academic probation." Plaintiffs Exhibit 340 states Al Bayoumi was "automatically placed on Academic Warning" because his GPA was below 3.0. *See* Ex. Pls. 340 at 50. According to Al Bayoumi's transcript his cumulative GPA was 2.933 as of the date of that letter. *See id.* at 62. After the following quarter in which Al Bayoumi received an A in a course titled "Mkt Higher Ed. In Arabian Gulf," Al Bayoumi's GPA rose to 3.015. *See id.* |
| 717. | After the summer of 1997 Bayoumi did not complete any regular school courses. In its 2014 Operation Encore report, the FBI concluded that "Omar Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." Ex. 2, EO 0226. The few classes he did attend after the initial English courses had nothing to do with replacing Alp Karli, the purported reason for Bayoumi being in the U.S. in the first place, and Alp Karli confirmed Bayoumi was *overqualified* for Karli's job and would only need six months training to take over. Ex. 469, FBI 000281 at 283. In | Plaintiffs Exhibit 2F (EO 226) and Exhibit 469 (FBI 283) are inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia disputes that Al Bayoumi did not "complete any regular school courses" after the summer of 1997. To the contrary, the admissible evidence shows that after the summer of 1997 Al Bayoumi continued to complete school courses, including at community colleges in San Diego and through courses offered through George Washington University. Pls. Ex. 120 (Bayoumi Tr.) 772:12-778:4. Al Bayoumi also attended classes (but not the exams) at the Keller School of Management. *Id.* at 771:7-772:11; *see* Response to Pls. Aver. ¶ 681.<br><br>Plaintiffs cite no admissible evidence in support of that assertion. Plaintiffs Exhibit 2F contains the quoted language, but that language does not reflect a "conclu[sion]" of the FBI. The language appears in a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | fact, Bayoumi never took over Karli's position despite his multiple years of education that were supposedly to facilitate this promotion. *Compare* Ex. 469, FBI 000281 (listing Alp Karli as "Director of Finance" at PCA) *with* Ex. 37, Bayoumi Ex. 682 (Resume of Bayoumi not listing Director of Finance of similar senior position). | preliminary investigative report titled "Operation Encore Update (as of 20 March 2014). Pls. Ex. 2F (EO 14040-222-MDL). <br><br> Saudi Arabia disputes that Al Bayoumi's education had "nothing to do with replacing Alp Karli." Plaintiffs Exhibit 469 is hearsay purporting to be a report of an interview of Alp Karli in which Alp Karli contradicts Plaintiffs' assertion. The exhibit states: "In 1995, Al Bayoumi discussed with Karli the possibility to study abroad in order to achieve career advancement within the PCA. Karli recalled that Al Bayoumi had vacationed in the U.S. and as a result desired advanced education there. Karli explained that such requests are encouraged and are part and parcel of a program known locally as Saudization. Based upon Saudization, Saudi nationals are allowed leave from civil employment to pursue additional education abroad with the intent that they return to a civil position upon completion of the degrees or training. The Saudization philosophy resulted in an informal agreement between DA and the PCA in which Al Bayoumi has been, since June 1995, temporarily released from the PCA. . . . Al Bayoumi, as part of the agreement, was expected to obtain higher education degree(s) in the U.S. or other English speaking countries. As an aside from obtaining the degrees, Al Bayoumi was expected to improve his English reading and writing skills. . . ." Pls. Ex. 469 (FBI 281-282). The portions on which Plaintiffs rely state that, after Al Bayoumi completed all of his education in March 2002 (including a Doctorate), he would be "technically over qualified" based on that "level of education." Pls. Ex. 469 (FBI 283). The document does not state that any of Al Bayoumi's education (including that during the period 1997-2000) was unrelated to replacing Alp Karli. <br><br> At his deposition, Al Bayoumi also explained that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | during his secondment).  This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs."  *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). <br><br> Finally, Saudi Arabia disputes the suggestion that Al Bayoumi's education did not lead to career advancement.  Al Bayoumi's resume indicates he was promoted to "Budget Specialist" in approximately 2002, to "Technical Support Supervisor" in approximately 2009, and to "Chief Financial Inspector" in approximately 2013.  *See* Pls. Ex. 37 (at 5). |
| 718. | In April 1998, the President of the PCA asked the Assistant Minister of Defense and Civil Aviation to extend the purported secondment another year to May 1999. Ex. 438, DA 1126. Again, the request came from the highest levels of the PCA in close coordination with the Saudi defense ministry. On May 12, 1998, Anqari approved the purported secondment for another year. Ex. 438, DA 1126. | Plaintiffs Exhibit 438 is an Arabic-language documents for which no English translation is provided.  There is no evidence that this request came from "the highest levels of the PCA in close coordination with the Saudi defense ministry."  To the contrary, the admissible evidence is that a secondment approval was "a routine procedure" and fell within the "responsibilities" of the individuals involved.  Pls. Ex. 94 (Anqari Tr.) 102:17-103:14. <br><br> At his deposition, Al Bayoumi also explained that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations.  *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment).  This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 719. | A May 20, 1998, letter from Dr. Jamil Shami, the "Director, Academic Affairs" at the "National Guard Office" of the Saudi Embassy in Washington, DC falsely represented that "Al-Bayoumi was a candidate for a full scholarship from the Government of Saudi Arabia" including a "monthly living allowance." Ex. 678Z, MPS 732_449. Another letter dated September 21, 2000 from Jamil Al Shami of the Saudi Embassy was similarly drafted to support Bayoumi's cover. Ex. 678I, MPS 82_19. | Saudi Arabia disputes that Plaintiffs Exhibit 678Z contains a false representation. The letter states Al Bayoumi was "a candidate for a full scholarship from the Government of Saudi Arabia." Pls. Ex. 678Z (MPS 732_449). Plaintiffs provide no evidence that this was false.

Saudi Arabia disputes that Plaintiffs Exhibit 678I was "cover" for Al Bayoumi. Plaintiffs Exhibit 678I is a letter of recommendation for Al Bayoumi's application to Loughborough University in the United Kingdom. *See* Pls Ex. 678I (MPS 82_19).

There is no admissible evidence that Al Bayoumi needed or received "cover." Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.

As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.

Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.<br><br>Al Bayoumi also testified that he was seconded to the Dallah Avco to pursue his education in the United States and that he was in fact a full-time student during his time in the United States. Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 720. | To maintain his cover, Bayoumi enrolled for two semesters of classes at Keller School of Management in San Diego from November 1998 to June 1999. The school's records show that Bayoumi earned no credit for any classes at Keller. The November sessions indicate that he withdrew, and the June sessions are marked "unsatisfactory." Ex. 320, PEC-KSA1- 000001-98 at 67-70. | Saudi Arabia disputes that Al Bayoumi enrolled in classes to "maintain his cover." Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) at 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.<br><br>Al Bayoumi also testified that he was seconded to Dallah Avco to pursue his education in the United States and that he was in fact a full-time student during his time in the United States. Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) 2 (noting that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program).<br><br>With respect to his coursework at the Keller School of Management, Al Bayoumi testified that he "attended the classes" at that school, but "did not attend the exams" "[b]ecause the subjects were dry." Pls. Ex. 120 (Bayoumi Tr.) 771:7-772:11. Al Bayoumi also testified that he tried the classes twice because he was "not ashamed to try again." *Id.* at 804:3-15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 721. | Bayoumi claimed at his deposition that he attended classes in the Fall at Keller but did not sit for his exams "because the subjects were dry" and then enrolled in the same courses again the following Spring, saying that he was "not too ashamed to try again," and once again did not sit for his exams. Ex. 120, Bayoumi Dep. 772:1-7, 804:3-15. | This is undisputed. |
| 722. | In early 2000, Bayoumi enrolled in a second master's program at USIU on January 21, 2000, for the "Winter Quarter 2000," then withdrew on February 7, 2000, but nevertheless obtained a March 5, 2000 certification from USIU to support his student visa that he was a business administration student in a "full course of study." Ex. 340, USIU production at 54-55; Ex. 211, KSA 6642-65 at 61. | Plaintiffs do not provide evidence that Al Bayoumi "obtained a March 5, 2000 certification from USIU to support his student visa." Plaintiffs Exhibit 340 states that Al Bayoumi was "charged" certain fees associated with USIU on January 21, 2000 and was "credited" those fees on February 7, 2000. Pls. Ex. 340 at 55-56. Plaintiffs Exhibit 211 is an immigration form dated March 5, 2000 that sates Al Bayoumi expected to attend USIU from March 29, 2000 through June 30, 2002. Pls. Ex. 211 at KSA 6661. |
| 723. | Omar Al-Bayoumi was not part of a "Saudization" program, as suggested at KSA Aver. ¶¶ 17, 18. There is no evidence of other individuals working for Saudi Arabia who were given special treatment and funding similar to what was provided to Bayoumi or allowed to continue in that program for years without actually attending courses. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' assertions in this paragraph are unsupported by any citation or record evidence. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no admissible evidence that Al Bayoumi was given "special treatment and funding . . . without actually attending courses." |
| | | Al Bayoumi also testified that he was seconded to the Dallah Avco to pursue his education in the United States and that he was in fact a full-time student during his time in the United States. Pls. Ex. 120 (Bayoumi Tr.) 652:22-653:1; 764:4-13. As Al Bayoumi explained, it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. *Id.* at 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15. |
| | | Samuel Coombs also acknowledged that the budget for the Logistics Department of Airways Engineering "was also used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA.". Ex. 86 (Coombs Decl.) 2; *see* Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). Moreover, Coombs testified that Al Bayoumi was married and that "[n]one of the other students were married." Pls. Ex. 125 (Coombs Tr.) 55:21-56:20. Al Bayoumi also had children, and testified that he was entitled to additional benefits to "take care of the expenses of the children and the family as a whole, in addition to the salary." Pls. Ex. 120 (Bayoumi Tr.) 692:16-693:9; *see id.* at 754:19-755:11 (Al Bayoumi mentioning his children). |
| | | In addition, the admissible evidence shows that after the summer of 1997 Al Bayoumi continued attending classes, including at community colleges |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | in San Diego and through courses offered through George Washington University. Pls. Ex. 120 (Bayoumi Tr.) 772:12-778:4. Al Bayoumi also attended classes (but not the exams) at the Keller School of Management. *Id.* at 771:7-772:11. |
| **X.** | **PHONE CALL RECORDS** | |
| **X.A.** | **Bayoumi regularly maintained his relevant work information and contacts in a handwritten address book and "green folder."** | Plaintiffs fail to cite any support for the assertion that Bayoumi kept "relevant work" information and contacts in a handwritten phone book or "green folder." During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Pls. Ex. 120 (Bayoumi Tr.) 151:2-18, 152:15-21 |
| 724. | In September 2001, the Metropolitan Police Service ("MPS") seized a handwritten address book prepared by Bayoumi which constituted over 150 individual pages. Ex 12AA, (Bayoumi handwritten address book, transcribed with certified English translation; full version produced by MPS, including material found with the book). The entries in that phone book show that Bayoumi prepared and updated that handwritten address book during the course and scope of his job as a Saudi government agent in San Diego. | This paragraph contains improper attorney argument.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.

There is no record evidence regarding the creation and maintenance of Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Plaintiffs fail to cite any evidence that this phone book was created within the scope of his employment for the Saudi government. During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Pls. Ex. 120 (Bayoumi Tr.) 151:2-18, 152:15-21

To the extent that Plaintiffs are asserting that Al Bayoumi was a covert Saudi agent, that assertion is false. Al Bayoumi testified that he has never |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. *See* Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| 725. | In September 2001, the MPS also seized a "green folder" from Bayoumi which comprised a rolodex of work contacts that Bayoumi prepared and assembled during this time in San Diego. Ex. 12BB, MPS 688 at 2-15. The green folder included the typed list of "Omar's Phone Book" dated "January 26, 2000" and included numerous handwritten annotations and additions prepared by Bayoumi and kept in his green folder. | This paragraph contains improper attorney argument.

Plaintiffs Exhibit 12BB (MPS 688) is inadmissible hearsay. *See* Objections Chart.

Plaintiffs fail to cite any evidence supporting the assertion that Al Bayoumi prepared or assembled the information in Plaintiffs Exhibit 12BB (MPS 688).

The record also contains no evidence regarding the assemblage of items in the folder, including who placed any particular item in the folder or when such placement was done.

With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr). 781:19-784:5. As such, the typed phone list is inadmissible hearsay.

Plaintiffs cite no evidence that the information in the exhibit was created within the scope of his employment for the Saudi government. During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Pls. Ex. 120 (Bayoumi Tr.) 151:2-18, 152:15-21. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 726. | For example, Bayoumi's green folder has a typed entry for "Al Ghatani, Mohed Gen [Muhammad Al Qahtani]" in Omar's Phone Book with a San Diego phone number. Ex.12BB, MPS 688 at 3. On the reverse side of one of the typed pages, Bayoumi added handwritten contact information for Qahtani in Saudi Arabia. Ex.12BB, MPS 688 at 10 ("Sheikh Muhammad Al-Qahtani). Similarly, Bayoumi added a handwritten note to his green folder with Mutaeb Al Sudairy's contact information in Missouri. Ex. 12BB, MPS 688 at 2. | This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 12BB (MPS 688) is inadmissible hearsay. *See* Objections Chart.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that the typed phone list cited in Plaintiffs Exhibit 12BB (MPS 688), contains a typed entry with the name "Al Ghatani, Mohed Gen." and the number "565-0896." Pls. Ex. 12BB (MPS 688_ 3). The reverse side of one of the typed pages contains handwritten contact information for "Sheikh Mohammad Al-Khahany." *Id.* at MPS 688_10.<br><br>Al Bayoumi testified that Al Sudairy gave him the contact information in Missouri reflected in Exhibit 12BB (MPS 688_ 2). *See* Pls. Ex. 120 (Bayoumi Tr.) 278:11-12, 23, 279:1-10; *see also* Pls. Ex. 485 (FBI 1292); Pls. Ex. 12BB (MPS 688_2). |
| 727. | Bayoumi confirmed in written correspondence that his work was to "coordinate" and "cooperate" with other Saudi government officials. Ex. 411, MPS 43_314 (letter to Islamic Affairs Director Ghesheyan); Ex. 413, MPS 43_338 (letter to MOIA Embassy Director Sowailem). | Plaintiffs Exhibits 411 and 413 are inadmissible hearsay. *See* Objections Chart.<br><br>This paragraph contains improper attorney argument.<br><br>Plaintiffs' selective quotations of Plaintiffs Exhibits 411 (MPS43_314) and 413 (MPS43_338) are misleading, and neither supports the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi prepared his handwritten address book and green folder to record the names, numbers, and additional information about Saudi government officials and others with whom he was in regular contact as part of his work with the Saudi government and its extremist network inside the U.S. | proposition that Al Bayoumi's "work" was to "coordinate" and "cooperate" with other Saudi government officials.  To the contrary, Plaintiffs Exhibits 411 and 413 are two letters dated January 28, 1999, that Al Bayoumi drafted – in his role as a volunteer of the Al Madina Mosque – on the Mosque's letterhead and addressed to Al Ghesheyan and Al Sowailem, thanking them for, *inter alia*, the "coordination" and "cooperation" of Sheikhs Al Sudairy and Al Sadhan in "leading the prayers, lessons, and reflections" at various mosques, including the Al Madina Mosque.  *See* Pls. Ex. 413 (MPS43_338); *see also* Pls. Ex. 411 (MPS43_314).  The letters were also found in Bayoumi's possession, and there is no evidence that they were actually sent to Al Ghesheyan or Al Sowailem.  *See id.*<br><br>Plaintiffs fail to cite any evidence supporting the assertion that Al Bayoumi prepared or assembled the information in Plaintiffs Exhibits 12AA (MPS 738) or 12BB (MPS 688), the handwritten address book and green folder, respectively.<br><br>With respect to the handwritten address book in Plaintiffs Exhibit 12AA (MPS 738), there is no record evidence regarding its creation and maintenance.<br><br>With respect to the green folder in Plaintiffs Exhibit 12BB (MPS 688), the record also contains no evidence regarding the assemblage of items in the folder, including who placed any particular item in the folder or when such placement was done.  As to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers.  *See* Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay. Plaintiffs cite no evidence that the information in the exhibit was created within the scope of his employment for the Saudi government. During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Pls. Ex. 120 (Bayoumi Tr.) 151:2-18, 152:15-21. There was no "extremist network" in the United States nor is there any evidence that Bayoumi provided any support to such a network within the scope of his employment for the Saudi government. There is also no evidence that Al Bayoumi was "in regular contact" with the individuals named in the phone book. |
| 728. | For Plaintiffs' expert Youssef, Bayoumi's handwritten address book and green folder provide a "Rosetta Stone" to the phone numbers shared and used among the Saudi government officials involved in the extremist network inside the U.S. Ex. 5, Youssef Rpt. 120. | This paragraph contains improper attorney argument. The Youssef Report should be excluded. *See* Objections Chart. There is no evidence, and the Youssef Report cites none, that the phone book or green folder, or any of the numbers contained in those documents, were shared and used by Saudi government officials. Saudi government officials were not involved in any extremist network, nor is there any evidence that any such network existed. |
| 729. | After the 9/11 Attacks, law enforcement also found a third document prepared by Bayoumi, a separate typed list also called "Omar's Phone Book" and dated "October | Plaintiffs Exhibit 534 (FBI 4377-4381) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 4, 2000" in his office desk at the Al Madinah Mosque. Ex. 534, FBI 4377-4381. | Plaintiffs Exhibit 534, which is inadmissible hearsay, was found by law enforcement in the Al Madina Mosque. Plaintiffs cite no evidence that it was found in Al Bayoumi's office desk.<br><br>Plaintiffs' assertion that Bayoumi prepared the typed list is also unsupported and wrong. Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. |
| **X.B.** | **The significance of short duration phone calls** | |
| 730. | Short duration phone calls among Thumairy, Bayoumi, the Saudi Embassy, and others are significant, contrary to Saudi Arabia's allegation. KSA Aver. ¶¶ 224, 227. Plaintiffs' expert Youssef, the former FBI Counterterrorism Communications Unit Chief, testified that a patterns of short duration phone calls shortly before or after a significant event can evidence familiarity among the individuals and understanding of a common scheme. Ex. 5, Youssef Rpt. 14-15. | This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>Among other things, Youssef cites no basis for his assertions, and claimed at his deposition that his phone analysis methodology is classified and could not be disclosed. Pls. Ex. 105 (Youssef Tr.) 258:12-260:7. Accordingly, the court has no ability to test its reliability.<br><br>The short duration of phone calls is easily explained by calls going to voicemail and the caller hanging up. |
| 731. | Youssef found that it was highly significant that there was a large volume of short duration calls among Thumairy, Bayoumi, Saudi Embassy officials, Saudi Consulate officials, and others shortly prior to and | The Youssef Report should be excluded. *See* Objections Chart.<br><br>Among other things, Youssef cites no basis for his assertions, and claimed at his deposition that his phone analysis methodology is classified and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | following the arrival of the 9/11 hijackers in Los Angeles and at the same time as events related to logistical planning and support for the hijackers. Ex. 5, Youssef Rpt. 14-15. | could not be disclosed. Pls. Ex. 105 (Youssef Tr.) 258:12-260:7. Accordingly, the court has no ability to test its reliability.<br><br>The short duration of phone calls is easily explained by calls going to voicemail and the caller hanging up.<br><br>As set forth below, there is no evidence that any of the calls between Al Thumairy, Al Bayoumi, or any Saudi official related in any way to the hijackers.<br><br>Every current or former Saudi official or employee who has been asked at deposition has denied giving or knowing of any direction to anyone to provide any assistance to Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. Pls. Ex. 120 (Bayoumi Tr.) 721:22-724:17; Pls. Ex. 107 (Thumairy Tr.) 490:6-494:20; Pls. Ex. 118 (Jarrah Tr.) 598:23-599:11, 601:22-607:4; Pls. Ex. 168 (Mana Decl.) ¶¶ 3-16; Pls. Ex. 110A (Mana Tr.) 211:9-220:13, 263:15-264:2; Pls. Ex. 96 (Jaithen Tr.) 304:9-305:12, 306:21-309:16; Pls. Ex. 115 (Mersal Tr.) 289:10-291:16; Pls. Ex. 99 (Sadhan Tr.) 383:14-384:20, 386:13-391:15; Pls. Ex. 119 (Sudairy Tr.) 363:5-365:20, 367:17-370:15; Pls. Ex. 113 (Khalil Tr.) 362:7-365:10; Pls. Ex. 94 (Anqari Tr.) 335:9-341:15 (former Presidency of Civil Aviation official); Pls. Ex. 100 (Qattan Tr.) 222:6-16, 259:13-21 (former Embassy official, current Minister of State). |
| **X.C.** | **Thumairy had two cell phone numbers** | Plaintiffs' assertion is baseless and unsupported. There is no evidence that Al Thumairy had a cell phone during the period from December 1999 to March 2000. |
| 732. | There is evidence that Thumairy used the ████-3362 ("-3362") number as his mobile phone during the period from December 1999 through October 2000, contrary to Saudi Arabia's claim, KSA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Aver. ¶ 229. The FBI found that Thumairy used at least two cell phone numbers while he was in Los Angeles: first the -3362 number, and then, after October 2000, ▮▮ ▮▮-0777 ("-0777"). FBI reports determined that both the -3362 and -0777 cell numbers were used by Thumairy. Ex. 2, EO 2757-59; Ex. 2, EO 0552 (noting, at the time, "inexplicable…telephonic connections between Thumairy and a number of San Diego-based individuals prior to the arrival of AL MIHDHAR and AL-HAZMI..."). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2MM (EO 536-555-UPDATED) and Plaintiffs Exhibit 2OO (2748-2765-UPDATED) are inadmissible hearsay. *See* Objections Chart.

The FBI did not find that Al Thumairy used at least two cell phones while he was in Los Angeles. Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is a hearsay September 29, 2005 FBI memorandum that purports to summarize a review of underlying telephone records that are not enclosed with the memorandum. That 2005 FBI memorandum states that the -3362 number is a "can be reached (CBR) number" for Al Thumairy, but states that it was "subscribed to Faisal Al-Muhana [sic]." Pls. Ex. 2OO (EO 2757-UPDATED). The same document states that the -0777 number was "subscribed to Salah Al-Hatlani," but states, with no support, that the number was used by Al Thumairy between December 16, 1998 and December 20, 2000. *Id.*

Ex. 2MM (EO 536-555-UPDATED) is a hearsay August 12, 2009 FBI preliminary investigative memorandum. It references the -0777 number as "Al-Thumairy's cell phone" without providing any explanation or support. It does not mention the -3362 number. *Id.* at 552.

The subscriber records confirm that Al Thumairy was not the subscriber for either the -3362 or the -0777 number during the relevant period.

The subscriber records for the -3362 number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ▮▮▮ ▮▮▮▮▮ from June 10, 2000 through April 29, 2002, *see* KSA Ex. 168, at 1-2. |

634

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The subscriber records for the -0777 number list the subscriber as ███ ██████, and the user as ████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002, and Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 3-5.<br><br>Al Thumairy testified that he does not recall the -3362 number. Thumairy Tr. 316:3-17, 497:14-499:9. |
| 733. | The -3362 number was recorded by Bayoumi as Thumairy's cell phone number in three different documents: Bayoumi's handwritten address book; the Bayoumi January 2000 green folder typed phone list; and Bayoumi's October 2000 typed phone list. Ex. 12AA, MPS738_35; Ex. 12BB, MPS 688_3 (January 2000); and Ex. 421, FBI 000345-349 (October 2000). Saudi Arabia does not address Bayoumi's handwritten address book. The records prepared, maintained and updated by a Saudi employee for purposes of his work and in furtherance of the Saudi extremist network and the support plot do not constitute "inadmissible hearsay" as Saudi Arabia claims. KSA Aver. ¶ 231. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibits 12BB (MPS 688), 12AA (MPS 738), and 421 (FBI 345-349) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone lists, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5; *see also* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Pls. Ex. 12BB (MPS 688); Pls. Ex. 421 (FBI 345-349). As such, the typed phone lists are inadmissible hearsay. Furthermore, Plaintiffs' assertion that the documents were "prepared, maintained, and updated by a Saudi employee for purposes of his work and in furtherance of the Saudi extremist network and the support plot" is unsupported by any citation or record evidence. There is no evidence of a Saudi extremist network or support, much less that Al Bayoumi knowingly assisted or acted in furtherance of any such plot. Plaintiffs cite no evidence that the information in the phone books was created within scope of Al-Bayoumi's employment for the Saudi government or in furtherance of any purported extremist network. During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Pls. Ex. 120 (Bayoumi Tr.) 151:2-18, 152:15-21. |
| 734. | Plaintiffs' expert Youssef analyzed all the phone records including from Thumairy's landline to cross-check that the -3362 and -0777 numbers were used by Thumairy to make and receive calls. Ex. 5, Youssef Rpt. 6-8, 14-15, 120-122. Saudi Arabia did not hire a communications expert and has not done such an analysis. There is no evidence of a single call which is misattributed. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Youssef Report should be excluded. To the extent a response is required, Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088. His opinions regarding Al Thumairy's alleged use of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the -3362 and -0777 numbers are conclusory, speculative, and not based on any recognized methodology.<br><br>Furthermore, the admissible evidence directly contradicts Youssef's opinions. The subscriber records for the -3362 number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ▮▮▮▮▮▮ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Thumairy Tr. 316:3-17, 497:14-499:9.<br><br>Prior to April 2002, the subscriber records for the -0777 number list the subscriber as ▮▮▮▮▮▮▮, and the user as ▮▮▮▮▮▮, from July 3, 1999 until August 1, 2000 followed by Al Hatlani from October 1, 2000 through April 22, 2002. *See* KSA Ex. 168, at 3-4. The subscriber records further show Al Thumairy as the subscriber from April 22, 2002 through February 5, 2003. *See id.* at 5; KSA Ex. 134 (FBI 365-367). |
| 735. | The FBI and Plaintiffs' expert Youssef independently found a total of 67 calls between Thumairy and Bayoumi. Ex. 2, EO 2757-59; Ex. 5, Youssef Rpt. 102 n. 413. Those calls show various instances where Thumairy's landline and cell phones were used interchangeably by the two men to get in touch with each other, including:<br><br>• On December 19, 1999, Bayoumi used his Mosque office phone to call Thumairy's -3362 cell at 9:10pm (1 min.); at 10:17pm (3 mins.) Thumairy's landline called Bayoumi's cell; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is inadmissible hearsay. The Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12B, which is an improper summary exhibit, purports to summarize calls between Al Thumairy and Al Bayoumi. That exhibit misattributes to Al Bayoumi 11 calls that were made from a publicly-available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the mosque that Bayoumi testified were available for all to use, and there is no record evidence that it was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | • On January 19, 2000, Bayoumi used his cell phone to call Thumairy's landline at 8:23pm (1 min.); at 10:13pm (5 mins.) Thumairy used his - 3362 cell to call Bayoumi's cell;<br><br>• On December 17, 2000, Thumairy used his landline to call Bayoumi's Mosque office at 1:52pm (36 secs.); at 2:04pm (6 mins.), Bayoumi's Mosque office called Thumairy's - 0777 cell phone; at 2:30pm (1 min. 29 secs.) Thumairy's landline called Bayoumi's landline. Ex. 2, EO 2757-58. | Bayoumi – rather than anyone else at the mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15.<br><br>Plaintiffs Exhibit 12B misattributes to Al Thumairy four calls made from the number ▆▆▆ 3362 and 14 calls made to that same number. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ▆▆▆ from June 10, 2000 through April 29, 2002. See KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Thumairy Tr. 316:3-17, 497:14-499:9.<br><br>Plaintiffs Exhibit 12B misattributes to Thumairy eight calls made to the number ▆▆▆ 0777 prior to April 2002 when he started using it. The subscriber for this number is ▆▆▆▆▆▆▆ , and the user is ▆▆▆ ▆▆▆ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Plaintiffs Exhibit 12B relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all. *See* Pls. Ex. 12B (citing Pls. Ex. 2OO (EO 2757, EO 2758) in REF 1 column). None of these calls are reflected in any of the produced phone records.<br><br>After removing these improperly-included calls, Plaintiffs Exhibit 12B shows that there were a total of 31 – not 67 – calls between Al Bayoumi and Al Thumairy.<br><br>With respect to the specific calls referenced in Plaintiffs' assertion, Plaintiffs Exhibit 12B shows that Al Thumairy's home phone called Al Bayoumi's cell phone on December 19, 1999 at 10:17 pm and Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi's cell phone called Al Thumairy's home phone on January 19, 2000 at 8:23 pm.

No admissible evidence establishes that any of the remaining calls cited in Plaintiffs' assertion were between Al Bayoumi and Al Thumairy. According to Plaintiffs Exhibit 12B, these remaining calls were either: (1) made from the publicly-available phone line at the Al Madina Mosque (December 19, 1999 at 9:10 pm); (2) made to ████ 3362, a number misattributed to Al Thumairy for which he was not the subscriber (December 19, 1999 at 9:10 pm); (3) made to ████ 0777, a number misattributed to Al Thumairy for which he was not the subscriber (December 17, 2000 at 2:04 pm); or (4) supported solely by inadmissible hearsay rather than phone records (January 19, 2000 at 10:13 pm, December 17, 2000 at 1:52 pm, December 17, 2000 at 2:04 pm, December 17, 2000 at 2:30 pm).

Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is a hearsay September 29, 2005 FBI memorandum that purports to summarize a review of underlying telephone records that are not enclosed with the memorandum. That 2005 FBI memorandum states that the -3362 number is a "can be reached (CBR) number" for Al Thumairy, but states that it was "subscribed to Faisal Al-Muhana [sic]." Pls. Ex. 2OO (EO 2757-UPDATED). The same document states that the -0777 number was "subscribed to Salah Al-Hatlani," but claims, with no support, that the number was used by Al Thumairy between December 16, 1998 and December 20, 2000. Pls. Ex. 2OO (EO 2757-UPDATED).

Plaintiffs Exhibit 2MM (EO 536-555-UPDATED) is a hearsay August 12, 2009 FBI preliminary investigative memorandum. It references the -0777 number as "Al-Thumairy's cell phone" without providing any explanation or support. It does not mention the -3362 number. *Id.* at 552. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As discussed above, subscriber records confirm that Al Thumairy was not the subscriber for either the -3362 or the -0777 number during the relevant period. |
| 736. | Thumairy submitted a July 2001 joint lease application in which he admitted that he was using the -0777 number. Ex. 484, FBI 001042-REV2021 at 1045. A phone list seized by the FBI from Mohdar Abdullah shortly after the 9/11 Attacks listed the -0777 number as belonging to Thumairy. Ex. 559, FBI 008913-008914 at 8914. In January 2002, shortly after he returned to Los Angeles following the 9/11 Attacks, Thumairy instructed the phone company to forward calls from his home phone number to the -0777 number. Ex. 472, FBI 000508. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

This paragraph contains improper attorney argument.

Plaintiffs Exhibits 484 and 559 are inadmissible hearsay. *See* Objections Chart.

Plaintiffs cite a hearsay September 11, 2002 FBI memorandum purporting to document an interview with the Manager of the Avalon Westside Terrace Apartments. *See* Pls. Ex. 484 (FBI 1042-REV2021). According to the memorandum, a July 3, 2001 lease application for an apartment that was allegedly jointly leased by Al Thumairy and Al Muhanna listed Al Muhanna as the primary resident and Al Thumairy as "the emergency contact, and lists his address as ███ Huron Avenue, Culver City, telephone number as ████-0777." *Id.* at FBI 1045-REV2021. The memorandum does not attach a copy of the lease application. Furthermore, the memorandum does not establish whether Al Thumairy filled out the application – as opposed to the Manager, Al Muhanna, or anyone else – or listed the -0777 as his telephone number.

Plaintiffs also rely upon Al Mohdar Mohamed Abdullah Zeid's phone list, which was seized from his wallet in September 2001. *See* Pls. Ex. 559 (FBI 8914) (no translation provided). ███████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████████████████████████████████████████████████████████████████████ Prior to April 2002, the subscriber records for the -0777 number list the subscriber as ████████████████, and the user as ███████████, from July 3, 1999 until August 1, 2000 followed by Al Hatlani from October 1, 2000 through April 22, 2002. *See* Ex. 168, 3-4. The subscriber records further show Al Thumairy as the subscriber from April 22, 2002 through February 5, 2003. *See id.* at 5; KSA Ex. 134 (FBI 365-367). The January 2, 2002 billing record for Al Thumairy's home number contains a reference to forwarding the calls received at his home number to the -0777 number, which occurred well after the the hijackers had left California. *See* Pls. Ex. 472 (FBI 508). |
| 737. | Plaintiffs' expert Youssef determined that the calls made from the -0777 number from December 10, 2000 to August 15, 2001 match those of locations and phone numbers for individuals that were part of Thumairy's calling circle. Ex. 5, Youssef Rpt. 121-22. The timing of the calls on both the -3362 and -0777 numbers match the periods when Thumairy was in the U.S. Ex. 5, Youssef Rpt. 121-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Youssef Report should be excluded. *See* Objections Chart. Furthermore, the admissible evidence directly contradicts Youssef's opinions. The subscriber records for the -3362 number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ████████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The subscriber records for the -0777 number list the subscriber as ███ ████████, and the user as ███████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002, and Al Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 3-5.<br><br>The January 2, 2002 billing record for Al Thumairy's home number contains a reference to forwarding the calls received at his home number to the -0777 number, which occured well after the hijackers had left California). *See* Pls. Ex. 472 (FBI 508). |
| 738. | The -3362 and -0777 numbers were subscribed to by Saudi Arabia or its agents for Thumairy's use. A 2005 FBI report found that the -3362 number was "used by Al-Thumairy but subscribed to Faisal Al-[Muhanna]" and that the -0777 number was "subscribed to Salah Al- Hatlani but used by Al-Thumairy…." Ex. 2, EO 2757. The -3362 and -0777 numbers both were subscribed to by Muhanna and Hatlani using the identical Long Beach, California apartment address at ████████████ ████████. Ex. 552, FBI 008123-008152 at 8132.. The -0777 number was activated on October 3, 2000. Ex. 505, FBI 001591-001593 at 1593. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2OO (2748-2765-UPDATED) and Plaintiffs Exhibit 552 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is a hearsay September 29, 2005 FBI memorandum that purports to summarize a review of underlying telephone records that are not enclosed with the memorandum. That 2005 FBI memorandum states that the -3362 number is a "can be reached (CBR) number" for Al Thumairy, but states that it was "subscribed to Faisal Al-Muhana [sic]." Pls. Ex. 2OO (EO 2757-UPDATED). The same document states that the -0777 number was "subscribed to Salah Al-Hatlani," but states, with no support, that the number was used by Al Thumairy between December 16, 1998 and December 20, 2000. Pls. Ex. 2OO (EO 2757-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The subscriber records produced during this litigation for those numbers confirm that Al Thumairy was not the subscriber for either the -3362 or the -0777 numbers during the facts relevant to this litigation: (a) the subscriber records for the -3362 number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ▮▮▮▮▮ from June 10, 2000 through April 29, 2002, *see* KSA Ex. 168, at 1-2; and (b) the subscriber records for the -0777 number list the subscriber as ▮▮▮▮▮, and the user as ▮▮▮▮▮ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002, and Al Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 3-5.<br><br>The January 2, 2002 billing record for Al Thumairy's home number contains a reference to forwarding the calls received at his home number to the -0777 number, which occured well after the the hijackers had left California. *See* Pls. Ex. 472 (FBI 508).<br><br>It is undisputed that the subscriber records for the -3362 number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, with the address "576 N Bellflower Blvd Unit 241 Long Beach CA 90814-4232" listed as both the billing address and the place of primary use. *See* KSA Ex. 168, at 1-2.<br><br>The subscriber records for the -0777 number list the subscriber as Al Hatlani from October 1, 2000 through April 22, 2002, with the address "2045 Sawtelle Blvd Los Angeles CA 90025-6229" as the place of primary use and no billing address indicated. *See* KSA Ex. 168, at 3. Additional subscriber records for the -0777 number from that time period also list Al Hatlani as the subscriber, with the N Bellflower Blvd address listed only as the billing address. *See* Pls. Ex. 505 (FBI 1593). |
| 739. | Plaintiffs' expert Youssef opined that Saudi Arabia used Faisal Al Muhanna and Hatlani | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | as logistics agents for Thumairy and other Saudi government officials in California to obtain covert cell phone numbers for those officials. Muhanna and Hatlani subscribed to -3362 and -0777 and additional phone numbers at the same Long Beach, California address in this logistics role. Ex. 5, Youssef Rpt. 121-122 n. 508, 124-25. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The Youssef Report should be excluded. *See* Objections Chart. |
| | | There is no basis to assert that Saudi Arabia used Faisal Al Muhanna or Al Hatlani as "logistics agents" for Al Thumairy to obtain covert cell phones. When asked at his deposition whether he had ever had a "conversation with anyone at the consulate or anyone in the Saudi government about cell phones," Al Muhanna testified that "I don't believe so" and that he didn't recall any conversations. Pls. Ex. 108 (Muhanna Tr.) 110:5-10. |
| | | It would also make no sense for Al Thumairy to use covert cell phones to attempt to hide his contacts with Al Bayoumi. During the relevant period Al Thumairy and Al Bayoumi made numerous calls to each other from phones registered in their own name. *See* Response to Plaintiffs' Aver. ¶ 735. As Sageman explains, "[t]his refutes the hypothesis that the two men tried to keep their relationship clandestine, let alone that they were trying to use a "front man" to make it covert. . . . Youssef's hypothesis is only plausible if he ignores half of the data in the plaintiffs' own exhibit." KSA Ex. 167 (Sageman Rep.) 628-629. |
| | | Moreover, the -0777 number was in fact registered to Al Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 5. It would make no sense for Al Thumairy to later register a covert number in his own name. |
| 740. | The subscribers to -3362 and -0777, Muhanna and Hatlani, worked for (or claimed to work for) the Saudi government and had direct ties to Thumairy. Faisal Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Muhanna, the subscriber for the -3362 number, signed a July 2001 joint lease agreement with Thumairy for two apartments in a complex near the King Fahad Mosque. In that agreement, Muhanna represented that he was a "trainer" for the Saudi Embassy. Ex. 484, FBI 001042-1046 at 1044- 1045- (FBI report memorializing details of Thumairy's Los Angeles apartment rentals at Avalon complex). Muhanna provided the phone number for Khalid Al Sowailem at the Saudi Embassy as his contact number. *Id.*; Ex. 5, Youssef Rpt. 123, n. 512. Saleh Al Hatlani, the subscriber for the -0777 number, was a Saudi Consulate "Employee Affairs/Auditor" official during the same period that Thumairy was accredited as a Consulate officer. Ex. 680O, KSA 7492; Ex. 218, KSA 7341 (Hatlani listed on Consulate fax sheet). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded; Plaintiffs Exhibit 484 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs cite a September 11, 2002 FBI memorandum purporting to document an interview with the Manager of the Avalon Westside Terrace Apartments. *See* Pls. Ex. 484 (FBI 1042-1046-REV2021). According to the memorandum, a July 3, 2001 lease application for an apartment that was allegedly jointly leased by Al Thumairy and Al Muhanna listed Al Muhanna's occupation as a "Trainer" at the Saudi Embassy with a phone number of "(202) 944-3574." *Id.* at FBI 1044-1045. The memorandum does not attach a copy of the lease application. Furthermore, the memorandum does not establish who filled out the application.<br><br>There is no evidence that Al Muhanna was a Saudi government employee. Al Muhanna traveled to the United States in 1995 to "learn the language and to pursue graduate studies." From 1995 until 2002 he was a student. Pls. Ex. 108 (Muhanna Tr.) 13:11-17; 19:16- 21:8; 23:2-13; 33:6-34:5. Al Muhanna testified that he had never been a trainer at the embassy in Washington, and he had never described himself in that manner. *Id.* 63:5-17. He further testified that he had never jointly leased an apartment at the Avalon Westside Apartments with Al Thumairy. *Id.* 62:6-17.<br><br>It is undisputed that Al Hatlani is listed as an "Employees affairs auditor" on a "Statement of names and salaries of official employees at the Saudi Consulate in Los Angeles" in September 1998. Pls. Ex. 680O (KSA 7492). Al Hatlani is not referenced on Pls. Ex. 218 (KSA 7341) as Plaintiffs assert. |
| 741. | Thumairy made 503 calls from the landline at his home, number ███-0638, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | between September 1, 1999 and August 16, 2001 to phones subscribed to by Faisal Al Muhanna. Ex. 12E (Thumairy calls to Muhanna). The numbers called from Thumairy's landline include: ███-2666, ███-7776, ███-9966, ███-7110, and ███-3777. *Id.* Two of those numbers — ███-2666 and ███-7776 — were listed as belonging to Faisal Al Muhanna on the joint lease applications that Thumairy and Muhanna filed. Ex. 484, FBI 001042-REV2021 at 1043-1044. The remaining numbers – ███-9966, ███-7110, and ███-3777 – were each identified as associated with Faisal Al Muhanna based on publicly available sources. Ex. 53 (PeopleMap Report on Faisl Almuhanna "███7110") (Muhanna Dep. Ex. 674); Ex. 54 (PeopleMap Report on Faisal A Almuhana"███-9966") (Muhanna Dep. Ex. 675); Ex. 55 (Trans Union People Search on Faisal Ahmed Almuhana "███-3777") (Muhanna Dep. Ex. 676). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

This paragraph contains improper attorney argument.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) is an improper summary exhibit.  Plaintiffs Exhibits 53, 54, 55, and 484 are inadmissible hearsay.  *See* Objections Chart.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) misattributes to Al Thumairy 279 calls made from the number ███0777 prior to April 2002 when he started using it.  The subscriber for this number is ███ ███, and the user is ███ (from July 3, 1999 until August 1, 2000), and Al Hatlani (from October 1, 2000 through April 22, 2002).  Al Thumairy did not become the subscriber for the number until April 22, 2002.  *See* KSA Ex. 168, at 3-5.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) misattributes to Al Thumairy 2 calls made from the number ███4666.  The phone records for this number list the subscriber as Al Hatlani, not Al Thumairy.  *See* Pls. Ex. 506 (FBI 1710-1711).  There is no evidence that Al Thumairy ever used this number.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) contains duplicate entries that are not supported by the phone records on January 4, 2001 (11:05 am, 11:14 am, 12:55 pm, 1:57 pm), January 5, 2001 (1:49 pm, 7:08 pm), January 6, 2001 (2:57 pm, 8:21 pm), January 7, 2001 (9:02 pm), January 27, 2001 (8:10 pm), February 1, 2001 (5:23 pm), and February 2, 2001 (2:33 pm, 2:44 pm).  *See* Pls. Ex. 663 (FBI 1603). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | After removing thesef improperly-included calls, Exhibit 12E (Thumairy calls to Muhanna) shows that Al Thumairy made 224 calls to 3 numbers (███ 3777, ███ 7110, and ███ 9966) that Plaintiffs associate with Al Muhanna. Plaintiffs rely solely upon three "PeopleMap Reports" (Pls. Ex. 53 (PeopleMap Search on Faisl Almuhanna); Pls. Ex. 54 (PeopleMap Search on Faisal A Almuhanna); Pls. Ex. 55 (Trans Union People Search on Faisal Ahmend Almuhana)) in attributing those numbers to Al Muhanna, but such reports are inadmissible hearsay. No subscriber records were produced to verify that any of these three numbers belonged to Al Muhanna. |
| 742. | From December 3, 2000 to August 4, 2001, Thumairy made approximately 200 calls from his -0777 cellphone, which was subscribed to by Consulate Employee Affairs/Auditor official Hatlani, to number ███-2666, which was also subscribed to by Hatlani. Ex. 505, FBI 001591-001593 at 1591-1592; Ex. 663, FBI 001594-001693; Ex. 506, FBI 001708-1711 at 1710; Ex. 12E (Thumairy calls to Faisal Al Muhanna). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) is an improper summary exhibit. *See* Objections Chart.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) misattributes to Thumairy 279 calls made from the number ███0777 prior to April 2002 when he started using it. The subscriber for this number is ███, and the user is ███ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.

Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) misattributes to Thumairy 2 calls made from the number ███4666. The phone records for this number list the subscriber as Hatlani, not Thumairy. *See* Pls. Ex. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 506 (FBI 1710-1711). There is no evidence that Al Thumairy ever used this number.<br><br>Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) contains duplicate entries that are not supported by the phone records on January 4, 2001 (11:05 am, 11:14 am, 12:55 pm, 1:57 pm), January 5, 2001 (1:49 pm, 7:08 pm), January 6, 2001 (2:57 pm, 8:21 pm), January 7, 2001 (9:02 pm), January 27, 2001 (8:10 pm), February 1, 2001 (5:23 pm), and February 2, 2001 (2:33 pm, 2:44 pm). *See* Pls. Ex. 663 (FBI 1603).<br><br>After correcting the above errors, Plaintiffs Exhibit 12E (Thumairy calls to Muhanna) does not show that Al Thumairy made any calls to ▮▮-2666, which Plaintiffs assert was registered to Hatlani. |
| 743. | The numerous calls Thumairy made to other phone numbers for which Faisal Al Muhanna and Salah al Hatlani were the subscribers were likely calls to other Saudi government agents for whom Muhanna and Hatlani had obtained a cell phone number, and thus were listed as the subscribers. As plaintiffs' expert concluded, "[i]t is also reasonable to conclude that as a logistics agent for Saudi Arabia, Faisal al Muhanna was assigned to assist Thumairy" with their joint apartment rental. Ex. 5, Youssef Rpt. 124-25. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>The assertions in this paragraph are based on pure speculation. There is no evidence that any of the calls to the numbers set forth in the prior two paragraphs were to Saudi government agents.<br><br>There is also no evidence that Al Muhunna was a "logistics agent" for Saudi Arabia or that he was assigned to assist Al Thumairy in any way. Al Muhanna traveled to the United States in 1995 to "learn the language and to pursue graduate studies." From 1995 until 2002 he was a student. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Muhanna Tr. 13:11-17; 19:16- 21:8; 23:2-13; 33:6-34:5. There is no evidence that he was an employee or agent of the Saudi government. |
| 744. | At his deposition, Faisal Al Muhanna claimed that all he could recall about his relationship with Thumairy was that they spoke together about religious matters. Ex. 108, Muhanna Dep. 139:9-140:17. Thumairy said that Muhanna was "just one of the students who came on Fridays to pray at the [King Fahad M]osque" and that he may have spoken to Muhanna on the phone but could not recall anything else. Ex. 107, Thumairy Dep. 317:7-21, 318:5- 321:20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs mischaracterize Al Muhanna's testimony concerning his relationship with Al Thumairy by asserting that all Al Muhanna "could recall about his relationship with Thumairy was that they spoke together about religious matters." Al Muhanna actually testified, *inter alia*, that: (a) Al Thumairy was one of the individuals leading the prayers at the King Fahad Mosque, *see* Pls. Ex. 108 (Muhanna Tr.) 42:13-43:9; (b) if Al Muhanna "had a question about prayers, [he] would ask [Al Thumairy] if he was present in the mosque," *id.* at 45:4-6; (c) he sometimes spoke to Al Thumairy on the phone to "ask him questions about prayers or discuss prayers, talk about prayers," *id.* at 46:18-47:7; (d) he would see Al Thumairy at prayers, meetings for Saudi students and the Saudi community, family and social gatherings, *id.* at 49:2-17; (e) his family was familiar with Al Thumairy's family from the social gatherings, *id.* at 49:18-20; and (f) his wife would get together with Al Thumairy's wife at social gatherings, *id.* at 53:2-12. |
| | | Plaintiffs similarly mischaracterize Al Thumairy's testimony concerning his relationship with Al Muhanna. During his deposition, Al Thumairy testified, *inter alia*, that: (a) Al Muhanna came on Fridays to pray at the mosque, *see* Pls. Ex. 117 (Thumairy Tr.) 317:17-21; (b) sometimes Al Thumairy "needed help with translation, where [Al Muhanna] would help," *id.* at 318:1-4; (c) he would "expect there was communication" with Al Muhanna on the phone, although Al Thumairy could not recall the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | precise details of the conversations that had transpired nearly 20 years prior, *id.* at 319:13-18. |
| 745. | Muhanna claimed he could not remember any of the various phone numbers subscribed to under his name, including the -3362 number used by Thumairy. Ex. 108, Muhanna Dep. 62:21-63:4 (-7776); 89:6-20 (-2666); 91:19-21 (-3362); 110:11-13 (-7110); 116:3-5 (- 9966); 118:8-17 (-3777). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>To the extent a response is required, it is undisputed that Al Muhanna could not remember the following numbers from events that transpired nearly 20 years prior to his deposition: ██████-7776, ██████-2666, ██████-3362 (SSSSS), ██████-7110, ██████-9966, and ██████-3777.<br><br>Plaintiffs' assertion that that these numbers were "subscribed to under his name," however, is not supported by any citation. It is undisputed that one of the numbers – ██████-3362 – was subscribed under Al Muhanna's name, and Plaintiffs submitted the subscriber records for that number as an exhibit during Al Muhanna's deposition when questioning him about that number. *See* KSA Ex. 136 (Al Muhanna Ex. 671); Pls. Ex. 108 (Muhanna Tr.) 92:8-93:8.<br><br>With respect to the remaining numbers, however, Plaintiffs questioned Al Muhanna about them and Al Muhanna testified that he could not recall those numbers. *See* Pls. Ex. 108 (Muhanna Tr.) 62:21-63:4, 110:11-111:17, 112:22-116:5, 117:20-118:14. There is no admissible evidence linking any of the referenced phone numbers other than ██████-3362 to Al Muhanna. |
| 746. | Plaintiffs' expert Youssef explained that Muhanna and Hatlani are examples of a | The Youssef Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "front man" technique used by foreign governments to provide work telephones to operatives such as Thumairy who were employed abroad. Ex. 5, Youssef Rpt. at 125. Saudi Arabia only offers its improper attempt to use Muhanna and Hatlani as cover for Thumairy's acts. KSA Aver. ¶¶ 229-31. | There is no evidence that Al Muhunna was a "logistics agent" for Saudi Arabia or that he was assigned to assist Al Thumairy in any way. Al Muhanna traveled to the United States in 1995 to "learn the language and to pursue graduate studies." From 1995 until 2002 he was a student. Muhanna Tr. 13:11-17; 19:16- 21:8; 23:2-13; 33:6-34:5. There is no evidence that he was an employee or agent of the Saudi government. |
| | | It would also make no sense for Al Thumairy to use covert cell phones to attempt to hide his contacts with Al Bayoumi, as Youssef asserts. During the relevant period Al Thumariy and Al Bayoumi made numerous calls to each other from phones registered in their own name. *See* Response to Plaintiffs' Aver. ¶ 735. As Sageman explains, "this refutes the hypothesis that the two men tried to keep their relationship clandestine, let alone that they were trying to use a "front man" to make it covert. . . . Youssef's hypothesis is only plausible if he ignores half of the data in the plaintiffs' own exhibit." KSA Ex. (Sageman Rep.), at 628-29. |
| | | Moreover, the -0777 number was in fact registered to Al Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 5. It would make no sense for Al Thumairy to later register a covert number in his own name. |
| X.D. | **Bayoumi Office phone records** | |
| 747. | Bayoumi used his title as "The General Supervisor" of the Al Madinah Mosque in his correspondence with Saudi government officials, including MOIA's Minister and used his office at the Mosque to conduct Saudi government business. *E.g.*, Ex. 414, MPS 43_347 (Bayoumi letter to Minister); Ex. 411, MPS43_314 (Bayoumi letter to Islamic Affairs Department head | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ghesheyan); Ex. 413, MPS43_338 (Bayoumi letter to MOIA Embassy Director Sowailem). | Plaintiffs Exhibit 411, 413, and 414 are inadmissible hearsay. *See* Objections Chart. |
| | | This paragraph contains improper attorney argument. |
| | | To the extent a response is required, Saudi Arabia does not dispute that a business card for Al Bayoumi refers to him as General Supervisor of the Al Madina Mosque and that he used that title in the cited drafts of correspondence with the Minister of Islamic Affairs, Al Soweilem and Al Ghesheyan. *See* Pls. Exs. 411 (MPS43_314), 413 (MPS43_338), 414 (MPS 43_347). |
| | | Plaintiffs' assertion that Al Bayoumi "used his office at the Mosque to conduct Saudi government business," is not supported by the documents cited or any record evidence. To the contrary, the three letters cited by Plaintiffs show that he was acting in his capacity as a volunteer at the Al Madina Mosque. *See* Pls. Exs. 411, 413, 414 (expressing thanks for sending imams to lead prayer at the mosque). |
| 748. | Bayoumi had his own private office on the second floor of the Mosque with its own phone. Ex. 10C (MPS893-COMP Video Exhibit) from 01:53; Ex. 2, EO 1828-30 at 1829 (the FBI visited the Mosque in September 2001 and found the doorway from the hall into Bayoumi's office locked). Bayoumi subscribed to his office phone number ████████-3142 (- 3142") under the name OMAR ALBAYOUMI DBA MASJEDALMEDIANAH [sic]." Ex. 529, *e.g.*, FBI 004182-004185 (Bayoumi DBA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | This paragraph contains improper attorney argument. |
| | | Plaintiffs Exhibit 2S (EO 1828-1830) is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, it is undisputed that Al Bayoumi occasionally used an office on the second floor of the mosque which |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MASJEDALMADINAH July 9, 1998 Pacific Bell Statement). | contained a telephone with the phone number ███ -3142.  It is further undisputed that the subscriber records for that phone listed the owner as "OMAR ALBAYOUMI DBA MASJEDALMADIANAH [sic]." *See* Pls. Ex. 10C (MPS893-COMP); Pls. Ex. 2S (EO 1829); Pls. Ex. 529 (FBI 4182-4185).<br><br>However, Plaintiffs falsely assert  that the office and its telephone were private.  Plaintiffs Exhibit 2S (EO 1828-1830), which is hearsay, reports that one of the two doors to the office that Al Bayoumi sometimes used was locked at that particular time, but that the other door was unlocked. *See id.* at EO 1829.<br><br>Furthermore, anyone at the Al Madina Mosque was freely permitted to use the telephone in Al Bayoumi's office as well as a telephone in another office that shared the same phone line.  As Al Bayoumi testified, "the phone in the masjid was open for all to make phone calls.  There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone.  My presence would be once a week, once every other week or once a month.  Otherwise, the telephone is open for everyone . . . our students, Saudi students, would call the embassy, would call the consulate.  Who exactly called, I do not know."  Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7.<br><br>Al Bayoumi further testified that he spent only a little time at the Al Madina Mosque but that public use of the office telephone continued: "[m]any students, many people, many families would call – sometimes would use it to call.  Sometimes I'm not in the building.  Sometimes someone would go in, make the phone call, and leave.  It was available for everybody." *Id.* at 785:12-786:15. |
| 749. | Saudi Arabia's claim that Bayoumi registered the phone for the Mosque and "not for his personal use", KSA Aver. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ¶ 225.a., is incorrect. As shown by the calls he made on the phone, Bayoumi used the phone primarily for his Saudi government work in San Diego. Bayoumi used his phone at the Mosque to call the Saudi Embassy, Saudi Consulate, and various Saudi government officials, including Thumairy, Sudairy, and ██████ Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12L (Bayoumi calls to Saudi Counsulate); Ex. 12M (Bayoumi calls to IIASA); Ex. 12U (Bayoumi Mosque calls); Ex. 5, Youssef Rpt. 81-84 (Youssef concludes that "[b]ased on my review of the calls, the number and intensity of the calls show that Bayoumi is actively working and reporting on a day-to-day basis with other Saudi officials stationed in the U.S. including at the Embassy and Consulate."). | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. Plaintiffs Exhibits 12A, 12B, 12K, 12L, 12M, and 12U are improper summary exhibits. *See* Objections Chart.<br><br>Youssef's speculative opinions are contradicted by record evidence, which establishes that anyone at the Al Madina Mosque was freely permitted to use the two telephones that shared the phone line cited by Youssef. As Al Bayoumi testified, "the phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone . . . our students, Saudi students, would call the embassy, would call the consulate. Who exactly called, I do not know." Bayoumi Tr. 297:11-298:7.<br><br>Al Bayoumi further testified that he spent only a little time at the Al Madina Mosque but that public use of the office telephone continued: "[m]any students, many people, many families would call – sometimes would use it to call. Sometimes I'm not in the building. Sometimes someone would go in, make the phone call, and leave. It was available for everybody." *Id.* at 786:8-15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Even if Al Bayoumi made calls from that telephone to the Saudi Embassy, Saudi Consulate, or other Saudi government officials, there is no evidence that any of these calls were related to any purported government work.<br><br>During the relevant period in the United States, Al Bayoumi was a student and was not carrying out any work assignments for the Saudi government. KSA Aver. ¶¶ 18-21. Al Bayoumi also served as a volunteer at the Al Madina Mosque sometimes using the title "general supervisor." Bayoumi Tr. 151:2-18, 152:15-21. As a volunteer at the mosque, Al Bayoumi reached out to the Embassy and Consulate seeking donations, furniture, literature, and to request Ramadan preachers. *See, e.g.*, Bayoumi Tr. 157:7-158:2; KSA Ex. 102 (Bayoumi Ex. 685) at FBI 1343; Pls. Exs. 411, 413, 414.<br><br>As set forth in Response to Plaintiffs' Aver. ¶ 446, Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is riddled with errors and is unreliable. The same is true for Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy). *See* Response to Plaintiffs' Aver. ¶ 735.<br><br>Plaintiffs Exhibit 12K (Bayoumi calls to Saudi Embassy) is an improper summary exhibit. Among other things, Plaintiffs Exhibit 12K is inconsistent with the chart of phone calls attached to the Youssef Report. See Youssef Rep. App'x H. Plaintiffs Exhibit 12K misattributes to Al Bayoumi 48 calls that were made from a publicly-available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15. In addition, Plaintiffs Exhibit 12K contains 3 duplicate entries on February 3, 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am. Plaintiffs Exhibit 12K also misstates the recipient's number of a call made on March 10, 2000 at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 12:27 pm. The call was made to 2022988813, not 2023423700 as stated in Plaintiffs Exhibit 12K. Compare Pls. Ex. 12K (citing FBI 3253) with KSA Ex. 117 (FBI 3253).<br><br>Plaintiffs Exhibit 12L (Bayoumi calls to Saudi Consulate) is an improper summary exhibit. Plaintiffs Exhibit 12L misattributes to Al Bayoumi 8 calls that were made from a publicly-available phone line at the Al Madina Mosque. Plaintiffs Exhibit 12L contains a call on August 10, 2000 at 10:25 am that Plaintiffs duplicated based upon two copies of the same phone records.<br><br>Plaintiffs Exhibit 12M (Bayoumi calls to IIASA) is an improper summary exhibit. Plaintiffs Exhibit 12M misattributes to Al Bayoumi all 4 calls listed, which were made from the publicly-available phone line at the Al Madina Mosque. In addition, Plaintiffs Exhibit 12M relies solely upon inadmissible hearsay in attributing three different phone numbers to the IIASA. No subscriber records were produced to verify that any of the three telephone numbers belonged to IIASA.<br><br>Plaintiffs Exhibit 12U (Baoymi Mosque office calls) is an improper summary exhibit. Plaintiffs Exhibit 12U misattributes to Bayoumi all 418 calls listed, which were made from the publicly-available phone line at the Al Madina Mosque. In addition, Plaintiffs Exhibit 12U relies solely upon either inadmissible hearsay or no evidentiary support at all for nearly all of the names that Plaintiffs attribute to the numbers called. |
| 750. | On the few occasions when Bayoumi let someone else in his office make a call on his phone, Bayoumi kept records of the calls made by others on his office phone. The MPS production showed that Bayoumi noted on his office phone bill that three calls had been made by visiting Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain operatives in August 1998. Ex. 678G, MPS 43_433 (annotation showing "calls made by representatives of Al Haramain Foundation"). The fact that Bayoumi noted calls made by Al Haramain on his office phone bill is evidence that he carefully regulated the use of his office phone. | This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 678G (MPS43_433) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 678G (MPS43_433) identifies three international calls as being made by representatives from Al Haramain. There is no evidence of who made that notation. The charges for these calls, $26, were substantial, which explains the notation. There are no notations on any of the domestic calls and no evidence that Al Bayoumi or anyone else carefully regulated the use of the phone, which was open to anyone at the mosque. Bayoumi Tr. 297:11-298:7; 786:8-15. |
| 751. | Bayoumi's files and a videotape prepared by Bayoumi at the Al Madinah Mosque show that from the time that the Mosque opened in August 1998, Bayoumi specifically arranged for a payphone to be installed at the Mosque for the use of the congregants. Ex. 678F, MPS43_400-402 (August 1998 agreement for public payphone and Bayoumi's notes about it); Ex. 10C, MPS 893-COMP Video Exhibit and 10C-TR Video Transcript at 23:29-23:56. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>It is undisputed that Al Bayoumi signed an agreement in August 1998 for a payphone to be installed at the Al Madina Mosque. *See* Pls. Ex. 678F (MPS43_400). However, this is not inconsistent with the fact that anyone at the mosque was permitted to use the two office telephones that share the same number. |
| 752. | Plaintiffs' expert Youssef specifically reviewed Bayoumi's claims that "anyone" could use Bayoumi's office phone by comparing the call usage patterns on Bayoumi's office phone to the call usage on Bayoumi's cell phone, to Bayoumi's own | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | phone book, and relevant events. Youssef determined that in making calls to the Saudi Embassy "Bayoumi interchangeably used his Mosque office phone and cell phone to call the same Saudi Government numbers." Ex. 5, Youssef Rpt. 83 n. 325. Youssef found that Bayoumi made calls from his Mosque office to various Saudi government officials ahead of the trip of MOIA propagators Sadhan and Sudairy to San Diego. Ex. 5, Youssef Rpt. 102-3, n. 416-7. While Bayoumi claimed that "it could have been another person who called" MOIA propagator Sudairy in January- February 2000 (Ex. 120, Bayoumi Dep. 585:21-586:2), Youssef determined that "[t]he calls to Sudairy were placed from Bayoumi's Mosque phone and Bayoumi's cell phone" and that "[i]t would be a strange and unlikely coincidence for 'another person' as described by Bayoumi, to be calling Sudairy from both of those phones over this discrete two-week period." Ex. 5, Youssef Rpt. 172. Similarly, calls were made from Bayoumi's cell phone and office phone to ▮▮▮▮▮▮▮, who represented the Saudi government contractor funding Bayoumi's work for Saudi Arabia in San Diego. Ex. 5, Youssef Rpt. 77 n. 295. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef's opinions should be excluded for the reasons set forth in Saudi Arabia's motion to exclude. *See* ECF No. 9088. Youssef's opinions that calls made on a publicly-available phone at the Al Madina Mosque must have been made by Al Bayoumi are speculative, rely upon inadmissible hearsay, and are not based on any recognized methodology. There is no record evidence supporting any of Youssef's assertions regarding use of the phone.<br><br>Youssef opines that some of the calls made from the mosque phone could have been made by Al Bayoumi. This is undisputed. However, Al Bayoumi testified that he spent only a little time at the Al Madina Mosque but that public use of the office telephone continued: "[m]any students, many people, many families would call – sometimes would use it to call. Sometimes I'm not in the building. Sometimes someone would go in, make the phone call, and leave. It was available for everybody." Pls. Ex. 120 (Bayoumi Tr.) 786:8-15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 753. | Plaintiffs' expert Youssef's careful analysis is demonstrated by the fact that he noted certain specific calls on Bayoumi's Mosque office phone that may have been made by someone other than Bayoumi based on the timing of those calls, other events occurring at that time, and the phone numbers being called. Ex. 5, Youssef Rpt. 98 n. 401 (August 1998 call to ███████ parents may have been made by ███ himself); Ex. 5, Youssef Rpt. 157 n. 642 (January 2000 call from Bayoumi's office phone to a visiting MOIA propagator's relative). Ex. 496, FBI 001456 at 01459 (A call was made from Bayoumi's Mosque office to the Columbus, Ohio number of the husband of Jaithen's niece, Mohamed Bejadi); Ex. 48 (Trans Union People Search on Mohammad A Albejadi" ████-2175") ( Jaithen Dep. Ex. 581); Ex. 96, Jaithan Dep. 240:2-244:9 (Jaithen admitted that Bejadi was his niece's husband and that he was visiting his niece at the time the call was made; however, Jaithen denied that he knew Bayoumi). Youssef cautiously weighed all attendant circumstances when attributing calls from the office phone to Bayoumi. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. Plaintiffs Exhibit 48 (Trans Union People Search) is inadmissible hearsay. *See* Objections Chart.<br><br>Youssef's acknowledgment that many calls from the mosque number were likely made by individuals other than Al Bayoumi only underscores the fact that the mosque phone was open for anyone to use. Absent specific compelling circumstances involving each call, it is not possible to assume that any call from that line was made by Al Bayoumi, or any call to that line was picked up by Al Bayoumi. |
| 754. | Saudi Arabia's claim that the "phone line was available for the entire congregation of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the mosque to use", KSA Aver. ¶ 225.b. is incorrect, as the phone was in Bayoumi's private office; the pattern of calls shows that the phone was used by Bayoumi and not by the "entire congregation"; and Saudi Arabia does not point to any actual calls or other evidence showing that the line was regularly used by others and was generally "available." | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs fail to cite anything for this assertion. As set forth above, the unrebutted evidence is that the mosque phone was open to anyone to use and even Plaintiffs' expert acknowledges that individuals other than Al Bayoumi made calls from the mosque phone. |
| X.E. | **Bayoumi's calls to the King Fahad Mosque** | |
| 755. | Saudi Arabia's suggestion that Plaintiffs' expert Youssef "asserted that calls to and from" three King Fahad Mosque phone numbers "were also calls to and from Thumairy" is highly misleading and incorrect. KSA Aver. ¶ 228. Youssef explained how he considered in his analysis eight calls made by *Bayoumi* to the King Fahad Mosque. These calls were *in addition to* the 67 calls between Bayoumi and Thumairy on non-King Fahad Mosque numbers. Ex. 1, Youssef Rpt. 102 n. 413. Bayoumi's additional contact with the Mosque is relevant to various issues in the case and Bayoumi listed the Mosque numbers as contact numbers for Thumairy in his handwritten address book and on a sheet of paper that the FBI found in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>The Youssef Report should be excluded. Plaintiffs Exhibit 12AA (MPS 738), Plaintiffs Exhibit 414, Plaintiffs Exhibit 532 (FBI 4270), and Plaintiffs Exhibit 678D (MPS43_336) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12B, which is an improper summary exhibit, purports to summarize calls between Al Thumairy and Al Bayoumi. That exhibit misattributes to Al Bayoumi 11 calls that were made from a publicly-available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the mosque that Bayoumi testified were |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's desk. Ex. 12AA, MPS738_35; Ex. 532, FBI 4270. Youssef explained how Bayoumi's calls to the Mosque were related to specific times and events; for example, in December 1998, Bayoumi made three calls to the Mosque just before making a call to Thumairy's home phone, and within days of the arrival of two MOIA propagators who visited both Thumairy and Bayoumi as part of an advance trip to Los Angeles and San Diego. Ex. 5, Youssef Rpt. 102 n. 413. Bayoumi would later write MOIA and Thumairy to thank them for Thumairy's cooperation and coordination. Ex. 414, MPS43_347 (Bayoumi's letter to MOIA); Ex. 678D, MPS43_336 (Bayoumi's letter to Thumairy). | available for all to use, and there is no record evidence that it was Bayoumi – rather than anyone else at the mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15.<br><br>Plaintiffs Exhibit 12B misattributes to Al Thumairy four calls made from the number ███ 3362 and 14 calls made to that same number. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ████████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Pls. Ex. 117 (Thumairy Tr.) 316:3-17, 497:14-499:9.<br><br>Plaintiffs Exhibit 12B misattributes to Al Thumairy eight calls made to the number ███ 0777 prior to April 2002 when he started using it. The subscriber for this number is ████████, and the user is ████ ████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Plaintiffs Exhibit 12B relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all. *See* Pls. Ex. 12B (citing Pls. Ex. 2X (EO 2757, EO 2758) in REF 1 column). None of these calls are reflected in any of the produced phone records.<br><br>After removing these improperly-included calls, Plaintiffs Exhibit 12B shows that there were a total of 31 – not 67 – calls between Al Bayoumi and Al Thumairy.<br><br>With respect to the specific four calls in December 1998 referenced in Plaintiffs' assertion, all four calls were made from the publicly-available phone line at the Al Madina Mosque. There is no evidence that Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi – as opposed to anyone else at the mosque – made any of those calls. In addition, the first three referenced calls were made to the King Fahad Mosque. There is no evidence that Al Thumairy – as opposed to anyone else at that mosque – received any of those calls.

The Youssef Report does not explain the basis for the opinion that any calls to the mosque telephone number were made to Al Thumairy. It merely states:

"My Thumairy-Bayoumi Spreadsheet also includes those 67 calls, plus the 8 calls Bayoumi had with the King Fahad Mosque, together with citations to all relevant FBI and other records. As shown on that Spreadsheet, during the week prior to December 16, when Bayoumi used his Mosque phone to make his first call to Thumairy's home phone, Bayoumi also made calls from his Mosque phone to the King Fahad Mosque on December 9, 1998 at 2:37 p.m. (1 min.), December 14 at 1:27 (1 min.), and again on December 14 at 1:30 (2 min.)."

Youssef Rep. 102 n.413.

There is no record evidence regarding the creation and maintenance of Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. It is undisputed that the handwritten phone book cited in Plaintiffs Exhibit 12B (Pls. Ex. 12AA (MPS 738)), contains an entry with the name "Fahad Al-Thumairy" and four numbers: ▮▮▮▮▮ ▮▮▮▮▮ Ibn Taymiyyah," "TF ▮▮▮▮▮-0638 Home," ▮▮▮▮▮-1250," and "Cell. ▮▮▮▮▮-3362." Pls. Ex. 12AA (MPS 738_35).

Saudi Arabia does not dispute that a sheet of paper seized by the FBI from the Al Madina Mosque includes Al Thumairy's name along with three phone numbers. *See* Pls. Ex. 532 (FBI 4270). Plaintiffs assertions that it was seized from Al Bayoumi's desk, belonged to Al Bayoumi, and was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | written by Al Bayoumi are unsupported by any citation or factual evidence.<br><br>Plaintiffs Exhibits 414 (MPS43_347) and 678D (MPS43_336) are courtesy letters of thanks. As Al Bayoumi testified, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved." Pls. Ex. 117 (Thumairy Tr.) 271:24-272:15. |
| X.F. | **Bayoumi's missing cell phone records** | |
| 756. | The EO production also revealed that Bayoumi used another cell phone with the phone number ▇▇▇▇-6662 ("-6662") subscribed to by his wife. Ex. 2, EO 2797-2798. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 2QQ (EO 2797-2815-UPDATED) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2QQ (EO 2798-UPDATED) states that the number ▇▇▇-6662 is "subscribed to Manal A. Bagader," Al Bayoumi's wife. There is no admissible evidence that Al Bayoumi made any phone calls using his wife's cell phone, much less any specific calls.<br><br>Al Bayoumi frequently calls this number. It would make no sense for him to call himself from one cell phone to another cell phone. It is also one of the last calls he made before he got on the plane for Saudi Arabia on March 30, 2000, at 7:10 pm (4 min). *See* Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Pls. Ex. 402 (KSA 6464) (showing entry-exit |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | information).  This is consistent with a husband calling his wife just before leaving the airport. |
| 757. | The FBI prepared a 42-page "target-to-target phone analysis" of Bayoumi's use of that -6662 number as part of "the Yemeni/Saudi support cell in San Diego...." *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2QQ (EO 2797-2815-UPDATED) is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, the cited document references a 42-page spreadsheet entitled "Frequency Report for Phones Used by Al-Bayoumi, Al-Midhar and Al-Hazmi," but no such spreadsheet is attached to the exhibit.  *See* Pls. Ex. 2QQ (EO 2797-UPDATED). |
| 758. | Bayoumi used the -6662 cell phone number himself or lent that phone to others. The phone was used to call Anwar Aulaqi on the first day that it was in use, on November 20, 1998. The phone also called Aulaqi on April 20, 2000, when Bayoumi was in Saudi Arabia, indicating that Bayoumi had lent the phone to someone to use while Bayoumi was away. Ex. 2, EO 2759 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is inadmissible hearsay.  *See* Objections Chart.<br><br>Plaintiffs Exhibit 2QQ (EO 2798-UPDATED) states that the number ███████-6662 is "subscribed to Manal A. Bagader," Al Bayoumi's wife. Bagader remained in San Diego when Bayoumi traveled to Saudi Arabia. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It is unsurprising that Bayoumi's wife may have made calls during this period.

There is no evidence that November 20, 1998 was the first day that the phone was in use, as Plaintiffs misinterpret a statement in the cited document that notes only the beginning and ending dates of toll records that were provided to the FBI. *See, e.g.*, Pls. Ex. 2OO (EO 2749-UPDATED).

Even if Al Bayoumi had used his wife's phone to call Al Awlaki, on November 20, 1998 or at any other time, calls between the two would not be surprising given that Al Bayoumi testified that he knew Al Awlaki as a local imam and had spoken with him occasionally via telephone call to pass along the religious questions of others. *See, e.g.*, Bayoumi Tr. 482:12-18, 587:12-589:20.

There is no evidence that any of these calls had anything to do with the hijackers. |
| 759. | The FBI has records of the -6662 phone from November 20, 1998 through September 20, 2000, Ex. 2, EO 2749. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2OO (EO 2748-2765-UPDATED) is inadmissible hearsay. *See* Objections Chart.

The cited document states that the San Diego Division of the FBI obtained Grand Jury toll records for Airtouch cellular telephone number ███-6662 from November 20, 1998 through September 20, 2000. *See* Pls. Ex. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2OO (EO 2749-UPDATED). There is no evidence, however, that such records currently remain in the FBI's possession. |
| 760. | In addition, the phone calls of Saudi Consulate ▮▮▮▮▮▮ have not been produced (except where the FBI made a record of specific calls made by ▮▮ in its reports). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Plaintiffs' assertion is unsupported by any citation or record evidence. There is no evidence that any records of phone calls made by Mana are in the possession of the FBI but have not been produced. <br><br> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| X.G. | **Bayoumi used calling cards to make phone calls.** | |
| 761. | Omar Al Bayoumi obtained and used calling cards to make phone calls in 1999-2000. Calling cards purchased by persons who already have their own cell, office and home phones, are typically used to avoid leaving a digital footprint of their calls to others committing criminal activities. The MPS production shows that Bayoumi was buying calling cards through Khalid Al Yafai aka Abdul Rab (Yafai). In November and December 1999 Bayoumi paid Yafai by | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> This paragraph contains improper attorney argument. <br><br> To the extent a response is required, it is undisputed that Al Bayoumi purchased calling cards from Khalid Abdulrab in 1999. *See* Pls. Ex. 446, MPS 724_162, 170. Plaintiffs' assertion that calling cards are "typically |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | check for "calling cards." Ex. 446, MPS 724_40, 56. | used to avoid leaving a digital footprint of their calls to others committing criminal activities" is entirely unsupported. |
| 762. | On January 9, 2000, Bayoumi was in Los Angeles with Yafai, and Bayoumi placed a call from his cell phone to ███████-0034, the phone number of ███████ of 9278 Communications at ███████ ███████ Los Angeles, a business that sells calling cards. Ex. 2, EO 3676. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2DD (EO 3674-3689) is inadmissible hearsay. *See* Objections Chart.

As set set forth in Response to Plaintiffs Aver. ¶ 1425, Al Bayoumi did not travel to Los Angeles with Al Yafai on January 9, 2000.

Plaintiffs Exhibit 2DD (EO 3676), which is hearsay, states that Al Bayoumi's cellular telephone placed one call to the number ███████-0034 on January 9, 2000. The document attributes this number to ███████ and states that ███████ is "associated with 9278 Communications" which is a business that sells calling cards. There is no evidence that this call concerned calling cards. |
| 763. | On the evening of January 9, 2000, Bayoumi stayed overnight in Los Angeles with Yafai at the Half Moon Motel. Ex., 525, FBI 004009-004010; MPS 899-CLIP. During that night a series of calls were made on Bayoumi's cellphone to a 1-800 number into the early morning of January 10, 2000. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). These calls show that Bayoumi had just purchased new calling cards from | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

This paragraph contains improper attorney argument. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 9278 Communications and was trying to familiarize himself with the use of those calling cards. Ex. 2, EO 0631 (Bayoumi either checking minutes or "learning how to use them by listening to automated prompts"). | Plaintiffs Exhibit 2JJ (EO 628-636-UPDATED) is inadmissible hearsay. Ex. 12A is an improper summary exhibit. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Calls Nov. 1999 – Mar. 2000) contains numerous misattributions and other errors. Relevant here, Plaintiffs Exhibit 12A incorrectly lists 15 calls made from January 9, 2000 through the morning of January 10, 2000 from Al Bayoumi's cell phone to the number ███ 1373. The phone records show that the first 3 calls are correctly identified in Plaintiffs Exhibit 12A as being made to ███ 1373. *See* Pls. Ex. 515 (FBI 3223-3224). However, the remaining 12 calls referenced in Plaintiffs Exhibit 12A were actually made to ███ 0612, not to ███ 1373. *See id.*<br><br>As set set forth in Response to Plaintiffs' Aver. ¶ 1425, Al Bayoumi did not travel to Los Angeles with All Yafai on January 9, 2000. The video clip at Plaintiffs Exhibit 10I (MPS899-CLIP) shows Al Bayoumi, Khalid Al Yafai, and Hisham Al Kaaki visiting Rodeo Drive and other sites during an evening. There is no date on the video, and none of the three people mentions a date. Around one minute into the clip, Al Kaaki said, "We took everything from the Saudi National Consulate with us in the trunk of the car." Pls. Ex. 10I-TR (MPS899-CLIP-TR). This could not have happened on January 9, 2000, because it was a Sunday, and the Consulate in Los Angeles is closed on Saturdays and Sundays.<br><br>Bayoumi testified that the trip to Los Angeles on January 9, 2000 must have been with his family because he did not travel with anyone else. Pls. Ex. 120 (Bayoumi Tr.) 356:2-22.<br><br>It is undisputed that Al Bayoumi stayed overnight in the Half Moon Hotel in Los Angeles on January 9, 2000. It is also undisputed that Al Bayoumi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | made a series of calls on his cell phone that night to the numbers ███████ 1373 and ██████-0612.<br><br>There is no evidence, however, that Al Bayoumi "had just purchased new calling cards from 9278 Communications and was trying to familiarize himself" with their use relies upon inadmissible hearsay and speculation. *See* Pls. Ex. 2JJ (EO 628-636-UPDATED). Indeed, the cited document concedes that the FBI investigators only "believe[d]" the short duration of the calls indicated that Al Bayoumi was either checking the unused minutes for several calling cards or learning how to use them. *Id.* at EO 631-UPDATED. Furthermore, neither the cited document nor any other record evidence supports Plaintiffs' assertion that Al Bayoumi had "just purchased" any calling cards, much less from 9278 Communications. |
| 764. | The FBI determined that Mohdar Abdullah was in possession of a calling card from the same 9278 Communications in Los Angeles and that Abdullah used that calling card to make phone calls to Yemen. Ex. 2, EO 1119. | Saudi Arabia ██████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>██████████<br><br>████████████████████████<br>████████<br><br>████████████████████████<br>██████ ngeles" nor that the calling card was used to "make phone calls to Yemen." To the contrary, the cited document consists solely of an "FBI Event" note that "Mohdar Abdullah's calling card number was identified as '9278 Comm, PIN ██████-6303, 1-██████-9458.'" It then assigns someone to obtain a calling record for the card. Pls. Ex. 2P (EO 1119-1120). No additional information regarding the sale of the card, its alleged possession by Mohdar Abdullah, or its use is provided. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 765. | It is likely that Bayoumi provided 9278 Communications calling cards to Mohdar Abdullah. Abdullah admitted to the FBI that he made calls on behalf of the hijackers – including to flight schools –using calling cards. It is likely that Abdullah made these phone calls using calling cards that he had been given by Bayoumi. Ex. 2, EO 1119. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2P (EO 1119-1120), is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion relies upon inadmissible hearsay and unsupported speculation. The cited document consists solely of an "FBI Event" note that "Mohdar Abdullah's calling card number was identified as '9278 Comm, PIN ██████-6303, 1-███-9458.'" It then assigns someone to obtain a calling record for the card. Pls. Ex. 2P (EO 1119-1120). No additional information regarding the sale of the card, its alleged possession by Mohdar Abdullah Zeid, or its use is provided.<br><br>There is no evidence that Al Bayoumi ever provided Modhar Abdullah Zeid with any calling cards. There is also no evidence supporting the speculation that "[i]t is likely" that Zeid made telephone calls to flight schools on behalf of the hijackers using such cards.<br><br>███████████████████████████ *see* Pls. Ex. 120 (Bayoumi Tr.) 724:2-6; *id.* at 797:2-8 (Al Bayoumi never |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "assign[ed]" or "instruct[ed]" Zeid "to take care of" or "to assist the hijackers"). |
| 766. | The FBI has records of the calling card calls made by Bayoumi and others. Ex. 515, FBI 3221-34 at 23-24. Those records have not yet been produced. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains improper attorney argument.<br><br>Ex. 515 consists of telephone records that *were produced* by the FBI for Al Bayoumi's cell phone. That exhibit provides no support for the assertion that the FBI currently possesses records of calling card calls made by Al Bayoumi and others. |
| XI. | **BAYOUMI'S WORK FOR SAUDI ARABIA INSIDE THE U.S.** | |
| XI.A. | **Bayoumi coordinated and worked with high-ranking Saudi Embassy, Consulate, and MOIA officials to manage and promote the Saudi extremist network in San Diego** | There is no evidence of any "Saudi extremist network" in San Diego nor any evidence that Al Bayoumi coordinated or worked with anyone from the Saudi Embassy, Consulate, or MOIA to "manage" or "promote" any purported network. |
| 767. | Bayoumi had scores of phone contacts with Saudi officials from the MOIA and other Saudi Government agencies while he was in the United States. Ex. 5, Youssef Rpt. 81; Ex. 12K (Bayoumi calls to Saudi Embassy); Ex 12B (Calls between Bayoumi and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy); Ex 12A (Phone calls Nov. 1999 – Mar. 2000). | To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.

Youssef's "analysis" of the telephone records to attribute calls to Al Bayoumi and Al Thumairy is speculative, relies upon inadmissible hearsay, and is not based on any recognized methodology.

Plaintiffs Exhibits 12A, 12B, and 12K are improper summary exhibits and are replete with numerous inaccuracies and attributions that are either incorrect, unsupported, or rely solely upon inadmissible evidence.  Such inaccuracies include, *inter alia*, incorrect times, durations, numbers dialed, and recipients.  *See* Responses to Pls. Aver. ¶¶ 446, 735, 749. |
| 768. | The MPS recovered Bayoumi's handwritten address book, comprising more than 150 pages prepared in his own handwriting, which he compiled mainly during his time working for Saudi Arabia inside the United States. Ex. 12AA, . | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay.  *See* Objections Chart.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 769. | Bayoumi's handwritten address book was produced by the MPS in late March 2022, well after Bayoumi's deposition was conducted and only days before the filing of Plaintiffs' expert reports. The handwritten address book is mostly in Arabic and required time consuming, detailed review, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | transcription, translation and cross-checking for correspondence with the original entries by certified translators. Ex. 12AA, MPS738. | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 770. | Bayoumi's handwritten address book is evidence of Bayoumi's extraordinary contacts at all levels of the Saudi government, including within the highest levels of its religious elite. Bayoumi's role and capacity as a Saudi government official involved significant dealings with a variety of Embassy, Consulate, and MOIA officials. Ex. 12AA, MPS738. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>There is no evidence that Al Bayoumi personally knew the religious scholars appearing in the address book, as opposed to obtaining their contact information in the event he had questions. The page on which such numbers appear includes home, office, and fax numbers for many contacts, indicating the information was copied from other sources. *See* Pls. Ex. 12AA (MPS 738_82).<br><br>Furthermore, Plaintiffs' assertion does not link any individual name or names listed in the phone book to Saudi Arabia's government, much less to "all levels of the Saudi government." Nor does the mere existence of such a phone book constitute evidence that Al Bayoumi acted "as a Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | government official" with "significant dealings with a variety of Embassy, Consulate, and MOIA officials." |
| 771. | Bayoumi's handwritten address book contains a page entitled "Our Sheikhs and Scholars" comprised of contact information for fifteen of the most senior religious clerics in Saudi Arabia, including Sheikh Muhammad bin al-Uthaymeen and Sheikh Abdulaziz Bin Baz. Ex. 12AA, _82. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

To the extent a response is required, it is not diputed that the handwritten phone book cited in Plaintiffs Exhibit 12AA (MPS 738) contains a page entitled "Our Sheikhs and Scholars" with the names of Sheikh Muhammad bin Al Uthaymeen and Sheikh Abdulaziz Bin Baz and telephone numbers, *see* Pls. Ex. 12AA (MPS 738_82). Notably, both these sheikhs had rejected violent jihadism and specifically Al Qaeda. *See* Responses to Pls. Aver. ¶¶ 17, 25 (Plaintiffs' purported experts have acknowledged that both were quietists who rejected violent jihad).

Nor is there evidence that Al Bayoumi personally knew the religious scholars appearing in the address book, as opposed to obtaining their contact information in the event he had questions. The page on which such numbers appear include home, office, and fax numbers for many contacts, indicating the information was copied from other sources. *See* Pls. Ex. 12AA (MPS 738_82). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that the page is "comprised of contact information for fifteeen of the most senior religious clerics in Saudi Arabia" is unsupported by any evidence. |
| 772. | The FBI previously produced Bayoumi's January 2000 and October 2000 phone lists – but not Bayoumi's personal, handwritten address book. The FBI obtained Bayoumi's January 2000 phone list from the MPS; since it was the MPS who seized it from Bayoumi in September 2001. Ex. 2, EO 2425 (Bayoumi's residence and office locations were searched incident to his arrest and detention on September 21, 2001). The FBI obtained Bayoumi's October 2000 phone list from its search of Bayoumi's office at the Al Madinah Mosque in El Cajon, CA. Ex. 470, FBI 000335-344 at 339-340 ("On September 27, 2001, a federal search warrant was executed at the Masjid Al-Madina Al-Munawara during which a copy of Bayoumi's October 4, 2000 phone book was seized."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 2V (EO 2425-2431) and 470 (FBI 335-44) are inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' characterization of the two phone lists and the handwritten phone book as belonging to Al Bayoumi is speculative and conclusory.  *See* Pls. Ex. 2V (EO 2425-2431).  With respect to the two phone lists, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the typed lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers.  *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5.  As such, the typed phone lists are inadmissible hearsay.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Finally, there is no evidence regarding how the FBI obtained these documents. |
| 773. | Bayoumi testified at his deposition that he initially prepared the typed January 2000 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | phone list entitled "Omar's phone book" but claimed that "helpers, young men, volunteers" at the Mosque "would add names or take off names….." and that he "did not enter all of it" but that "[a]nybody can add or take off." Ex. 120, Bayoumi Dep. 71:24-73:10 and 81:7-84:20. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Bayoumi did not testify at his deposition that he "initially prepared" the January 2000 phone list. Al Bayoumi testified "the first ten names, I entered it. Then someone else came after me and entered and such. . . . A group of helpers, young men, volunteers helping in the community. . . . Then there was additions and subtractions. Anybody can add or take off." Pls. Ex. 120 (Bayoumi Tr.) 84:6-20. Al Bayoumi further explained that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See id.* at 781:19-784:5. As such, the typed phone list is inadmissible hearsay. |
| 774. | Bayoumi's claim is belied by the fact that Bayoumi's handwritten address book is more comprehensive and complete than the typed phone list, and that nearly all the names and phone numbers typed into the January 2000 and October 2000 phone lists also appear in Bayoumi's handwritten address book. Ex. 12AA, MPS738; Ex. 12BB, MPS688; Ex. 421, FBI00345-49. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738), Exhibit 12BB (MPS 688), and Exhibit 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' characterization of the two phone lists and the handwritten phone book as belonging to Al Bayoumi is unsupported by evidence. With respect to the two phone lists, Al Bayoumi testified that anyone at the Al Madina Mosque could add names |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and telephone numbers to the typed lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5; *see also* Pls. Ex. 12BB (MPS 688); Pls. Ex. 421 (FBI 345-49). As such, the typed phone lists are inadmissible hearsay.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Furthermore, Plaintiffs' assertion that "nearly all the names and phone numbers" in the typed lists appear in the phone book is not supported by record evidence. There are many differences between the typed lists and the phone book, and Plaintiffs offer no analysis of differences or similarities. |
| 775. | The MPS seized extensive photographs and videos of Bayoumi showing him meeting with and greeting various individuals, including Anwar Aulaqi, and hosting Saudi government religious officials in San Diego. Exhibits 10A through 10M (13 separate video exhibits dating from January 1998 through 2001); Exhibits 11A through 11N (numerous video screenshots from 10A-M, as well as individual photographs seized from Bayoumi). None of these photographs or videos were produced by Saudi Arabia during discovery, resulting in substantial delay as Plaintiffs were forced to get the materials by letters of request to the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, the materials cited are not indicative of a conspiracy. Keeping a record of any such meetings indicates the opposite. As the 9/11 Commision found, Al Hazmi and Al Mihdhar |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | U.K. Those photographs and videos show that Bayoumi had a central coordinating role for the Saudi government in San Diego to manage and provide support to Sunni extremist elements in California. Ex. 5, Youssef Rpt. 108, 111, 174-75; Youssef Decl. 28-36, 40, 45-59, 73. | distrusted Al Bayoumi precisely because of his proclivity to make video recordings. *See* KSA Ex. 163 (9/11 Rep.) 219.<br><br>Saudi Arabia does not dispute that it did not produce the materials cited by Plaintiffs. However, Plaintiffs have made no showing that any of these materials were within Saudi Arabia's possession, custody, or control, or that Saudi Arabia did not comply with its discovery obligations. Plaintiffs claim of "substantial delay" is unsupported by any record evidence. |
| 776. | The MPS also seized extensive correspondence that Bayoumi wrote to numerous Saudi government officials including the Minister of Islamic Affairs. Ex. 414, MPS43_347 (Letter from Bayoumi to MOIA Minister Turki; *see also* Ex. 416, KSA 7591 for faxed copy). Ex. 678D, MPS 43_336 and Ex. 413, MPS 43_338 (letters from Bayoumi to Thumairy and Embassy MOIA Director Khalid Al Sowailem thanking them for sending Sudairy and Sadhan); Ex. 408, MPS 43_387 (Bayoumi's December 2000 personal letter addressing Consul Sami Al Ibrahim, Vice Consul Saad Al Jabreen, and "Sheikh" Ismail Mana). Most of the relevant correspondence was never produced by Saudi Arabia during discovery. | Plaintiffs Exhibit 408, 413, 414, 416, and 678D are inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted correspondence on the mosque's letterhead to several Saudi government officials, including the Minister of Islamic Affairs, in which Al Bayoumi: (1) expressed gratitude for the dispatch of Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area, *see* Pls. Exs. 413, 414, 416, and (2) wished several officials a happy Eid, *see* Pls. Exs. 408, 678D. There is no evidence in the record to support Plaintiffs' characterization of these few letters as "extensive correspondence."<br><br>Saudi Arabia does not dispute that it did not produce most of the materials cited by Plaintiffs. However, Plaintiffs have made no showing that any of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | these materials were within Saudi Arabia's possession, custody, or control, or that Saudi Arabia did not comply with its discovery obligations. These documents were found in Al Bayoumi's possession in approximately 2001, and he is a former employee. Plaintiffs Exhibit 416 was produced by Saudi Arabia, and it has a fax heading at the top, indicating that it was sent. *See* Pls. Ex. 416. The other exhibits do not have a fax heading. |
| **XI.B.** | **Bayoumi's work relationship with the Saudi Embassy** | Al Bayoumi did not have any work relationship with the Saudi Embassy. |
| 777. | Based on the record to date, Plaintiffs' expert Youssef determined "Bayoumi had significant contacts with officials of the Saudi Embassy in Washington, D.C. and the Saudi Consulate in Los Angeles," noting that "[f]rom the date of his first call to the Saudi Embassy on January 19, 2000 through the last call on that phone on March 29, 2000 (immediately before Bayoumi left on his trip to Saudi Arabia), over a period of 70 days, Bayoumi made at least 99 calls to various numbers at the Saudi Embassy and 11 calls to the Los Angeles Consulate, apart from his other calls to Saudi Government officials such as Thumairy and Mutaeb al Sudairy." Ex. 5, Youssef Rpt. 82; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Youssef further determined that "Bayoumi made at least 30 cell phone calls to the MOIA/Islamic Affairs Department between January 19, 2000 and March 24, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Youssef's "analysis" of the telephone records to attribute calls to Al Bayoumi is speculative, relies upon inadmissible hearsay, and is not based on any recognized methodology. *See* Objections Chart.

Exhibit 12A is an improper summary exhibit. The numerous errors in Exhibit 12A are set forth in the Response to Averment ¶ 446. After removing the improperly included calls, Exhibit 12A shows that, between January 19, 2000 and March 29, 2000, Al Bayoumi made a total of (1) 97 calls – not 110 – to the Saudi Embassy and (2) 11 calls to the Los Angeles Consulate. Of the 97 calls to the Embassy, 30 were to the Islamic Affairs Department between January 19, 2000 and March 24, 2000. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 2000" and that "Bayoumi's calls to the Embassy and Consulate correspond to the time the hijackers arrived in Los Angeles and were relocated and settled in San Diego." Ex. 5, Youssef Rpt. 82-83. | Plaintiffs also do not provide evidence regarding the content of these calls. Record evidence shows these calls were made over a three-month period when Al Bayoumi was preparing to return to Saudi Arabia after a six-year stay in the United States. As set forth in the Responses to Plaintiffs Averment ¶¶ 1519-1531, the evidence shows that these calls had to do with Al Bayoumi's renewal of his and his family's passports, his request for Islamic materials for the mosque, and issues concerning his studies in the United States. |
| | | The FBI examined this very telephone activity and came to the final conclusion that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| | | There is no support for Plaintiffs' characterization of these calls as "significant contacts" with respect to the 9/11 attacks. |
| 778. | Plaintiffs' expert Youssef's analysis of Bayoumi's calls also revealed that he used his office phone at the Al Madinah Mosque to call the Embassy. Ex. 5, Youssef Rpt. 83. Bayoumi testified that calls from his Mosque office phone could have been made by any of the attendees of the Kurdish Mosque where his office was located. Ex. 120, Bayoumi Dep. 176:13- 177:1; 180:15-19; 181: 18-182:7. Youssef, however, analyzed the calls and determined that Bayoumi interchangeably used his Mosque office phone and cell phone to call the same Saudi Government numbers. The calls | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 2S (EO 1828-1830) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |
| | | Youssef's opinions that calls made or received on a publicly available phone at the Al Madina Mosque must have involved Al Bayoumi rely |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | made on Bayoumi's office phone were clearly made by Bayoumi to his fellow Saudi Government officials. Ex. 5, Youssef Rpt. 83, n. 325. In addition, a Mosque employee informed the FBI in September 2001 that the phone in Bayoumi's office had a separate number from the Mosque's number, that Bayoumi's office was locked and not used by others, and that "[n]obody normally goes into Al-Bayoumi's office...." Ex. 10G (MPS906-CLIP Video Exhibit) 00:00-01:12 (footage of Bayoumi and other individuals meeting in Bayoumi's office at Al Madinah Mosque showing the layout including the office door). | upon inadmissible hearsay and are not based on any recognized methodology.<br><br>Record evidence establishes that anyone at the Al Madina Mosque was freely permitted to use the two telephones that shared the phone line cited by Youssef. As Al Bayoumi testified, "the phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate. Who exactly called, I do not know." Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7. Al Bayoumi further testified that he spent only a little time at the Al Madina Mosque but that public use of the office telephone continued: "Many students, many people, many families would call – sometimes would use it to call. Sometimes I'm not in the building. Sometimes someone would go in, make the phone call, and leave. It was available for everybody." *Id.* at 786:8-15.<br><br>Indeed, Youssef acknowledges that certain calls made from the Al Madina Mosque phone line may have been made by someone other than Al Bayoumi. *See* Pls. Ex. 5 (Youssef Rep.) 157 n.642.<br><br>Plaintiffs' assertion that the office at the Al Madina Mosque that was occasionally used by Al Bayoumi was locked and not used by others relies solely upon inadmissible hearsay – a September 25, 2001 FBI memorandum that purports to summarize an interview of the ███████ the Al Madina Mosque. *See* Pls. Ex. 2S (EO 1828-1830). In any event, during that interview, the ██████ allegedly told the FBI agents that one of the two doors to the office that Al Bayoumi sometimes used was locked at that particular time, but that the other door was unlocked. *See id.* (EO 1829). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 779. | Bayoumi also had significant work correspondence with numerous Embassy MOIA and other Saudi government officials, most of which was withheld by Saudi Arabia and only produced by the MPS. *E.g.* Ex. 678D, MPS43_336 (Bayoumi letter to Thumairy; Ex. 413, MPS43_338 (January 1999 Bayoumi letter to MOIA Director Sowailem); Ex. 412, MPS43_337 (November 1998 Bayoumi letter to Los Angeles Saudi Consul General Salloum). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibits 412, 413, and 678D are inadmissible hearsay. *See* Objections Chart.

Al Bayoumi drafted correspondence – in his role as general supervisor at the Al Madina Mosque – to Al Thumairy and Al Sowailem in which Al Bayoumi expressed gratitude for the dispatch of Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area, *see* Pls. Ex. 678D (MPS43_336); Pls. Ex. 413 (MPS43_338). In a similar capacity, Al Bayoumi drafted correspondence on the Mosque's letterhead to Saudi Consul General Salloum providing an update on activities at the Al Madina Mosque. *See* Pls. Ex. 412 (MPS43_337). There is no evidence in the record to support Plaintiffs' characterization of these few letters as "significant work correspondence."

Although Plaintiffs assert that most of this correspondence was never produced by Saudi Arabia during discovery, there is no evidence that any of the cited two-decade-old correspondence was ever actually sent to Saudi Arabia, nor any evidence that the correspondence (if sent) remained in Saudi Arabia's possession, custody, or control. Indeed, several of the letters Plaintiffs rely upon appear to be earlier-dated versions of a letter that Al Bayoumi ultimately did send to the Minister of Islamic Affairs and that was produced by Saudi Arabia. *Compare*, *e.g.*, Pls. Ex. 416 (fax marking across the top indicating that it was actually sent), *with* Pls. Ex. 678D (MPS43_336); Pls. Ex. 413 (MPS43_338). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 780. | According to Plaintiffs' expert Youssef's analysis, Bayoumi's contacts with Saudi government officials "are not of the type that would be made by someone who was an 'accountant' or a 'student' pursuing business studies in San Diego." Ex. 5, Youssef Rpt. 83. Instead, the contacts "show a detailed, repeated pattern of interactions that Bayoumi had with Embassy officials related to specific tasks." Ex. 5, Youssef Rpt. 83. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Youssef's opinions – that Al Bayoumi's communications with Saudi government officials "are not of the type that would be made by someone who was an 'accountant' or a 'student' pursuing business studies in San Diego" and that the communications "show a detailed, repeated pattern of interactions that Bayoumi had with Embassy officials related to specific tasks" – are conclusory, speculative, and not based on any recognized methodology. Plaintiffs cite no admissible evidence to support these assertions.

With respect to Al Bayoumi's phone contacts with the Embassy or the Consulate, Plaintiffs also do not provide evidence regarding the content of these calls. Record evidence shows these calls were made over a three-month period when Al Bayoumi was preparing to return to Saudi Arabia after a six-year stay in the United States. As set forth in the Responses to Plaintiffs Averment ¶¶ 1519-1531, the evidence shows that these calls had to do with Al Bayoumi's renewal of his and his family's passports, his request for Islamic materials for the mosque, and issues concerning his studies in the United States.

The FBI examined this same telephone activity and came to the final conclusion that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  Pls. Ex. 2A (EO 9-11). |
| 781. | Based on a review of all calls between Embassy officials, Bayoumi and Thumairy, Plaintiffs' Expert Youssef determined that "the number and intensity of the calls show that Bayoumi [was] actively working and reporting on a day-to-day basis with other Saudi officials stationed in the U.S. including at the Embassy and Consulate." Ex. 5, Youssef Rpt. 84; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Exhibit 12A is an improper summary exhibit.  Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.

To the extent a response is required, Youssef's opinions regarding Al Bayoumi "actively working and reporting on a day-to-day basis with other Saudi officials" are conclusory, speculative, and not based on any recognized methodology.  Plaintiffs cite no admissible evidence to support these assertions.

The numerous errors in Exhibit 12A are set forth in the Response to Plaintiffs Averment ¶ 446.

With respect to Al Bayoumi's phone contacts with the Embassy or the Consulate, Plaintiffs also do not provide evidence regarding the content of these calls.  Record evidence shows these calls were made over a three-month period when Al Bayoumi was preparing to return to Saudi Arabia after a six-year stay in the United States.  As set forth in the Responses to Plaintiffs Averment ¶¶ 1519-1531, the evidence shows that these calls had to do with Al Bayoumi's renewal of his and his family's passports, his request for Islamic materials for the mosque, and issues concerning his studies in the United States. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI examined this very telephone activity and came to the final conclusion that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| XI.C. | **MOIA's Embassy Office** | |
| 782. | *MOIA's Embassy Director Sowailem.* Bayoumi's handwritten address book listed Sowailem's phone numbers for his office (the general number and direct line), fax, and cell. Ex.12AA, _53. Bayoumi's January and October 2000 typed phone books contained similar listings under "Khalid Asswailem" for the Embassy, including Sowailem's general office number ██████ 3700" and Sowailem's cell number ██████-2777," but had Sowailem's direct office number listed as ██████-3120" – which was crossed out in the handwritten address book and replaced with ██████-3547". Ex. 12AA, MPS738_53; Ex. 12BB, MPS 688_11; Ex. 421, FBI 349 (Oct.). Bayoumi's January 2000 typed phone book contained a separate listing for Sowailem not present in the handwritten address book with the phone number ██████-0211." Ex. 12BB, MPS 688_7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688), and 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

There is no evidence that the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688) and Exhibit 421 (FBI 345-49) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 783. | A January 28, 1999 letter from Bayoumi to Sowailem (which Saudi Arabia failed to produce and was only first uncovered in the MPS production) shows that Bayoumi and Sowailem had a work relationship related to the Saudi government's extremist network. Bayoumi thanked Sowailem for the "attentiveness" that he had devoted to the Al Madinah Mosque, noted the "complete cooperation" of Thumairy, MOIA and the Embassy Islamic Affairs Department and Saudi Consulate officials in handling the visit of MOIA propagators Adel Al Sadhan and Mutaeb Al Sudairy, and lauded the "complete cooperation" among the various Saudi government officials, stating that "coordination was the factor that made the greatest mark[.]" Ex.413, MPS 43_338. | Plaintiffs Exhibit 413 is inadmissible hearsay. *See* Objections Chart.<br><br>The cited letter does not "show[] that Bayoumi and Sowailem had a work relationship related to the Saudi government's extremist network." Al Bayoumi drafted a letter – in his role as general supervisor at the Al Madina Mosque – to Al Sowailem in which Al Bayoumi expressed gratitude for the dispatch of Al Sudairy and Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area. *See* Pls. Ex. 413 (MPS43_338). In the letter, Al Bayoumi extended his "deepest thanks and appreciation for the attentiveness you have devoted to this mosque," and also expressed his "appreciation for the efforts of brother Abdulaziz Al-Saleh; brother Fahad Al-Thumairy, the Imam of Masjid Ibn Taymiyyah (Los Angeles); and brother Saad Al-Jabreen (Islamic Affairs – Los Angeles), all of whom demonstrated complete cooperation. In fact, coordination was the factor that made the greatest mark in achieving these honorable results." *Id.*<br><br>Saudi Arabia does not dispute that it did not produce the letter cited by Plaintiffs. However, Saudi Arabia notes the draft letter was seized by the MPS. There is no evidence it was ever sent to Al Sowailem. Nor is there any evidence that the letter has since ever been in the possession, custody, or control of Saudi Arabia, or that Saudi Arabia did not comply with its discovery obligations. |
| 784. | As detailed below, Sowailem and others at the Embassy directed Bayoumi to fire the management of the Al Madinah Mosque, install a new Board, and hire a new radical Imam, who would attend the welcome party for Hazmi and Mihdhar. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite no evidence to support these conclusory assertions. *See* Responses to Pls. Aver. ¶¶ 1235-1246. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Moreover, in August 1998, Al Bayoumi sought to retain Sheikh Ameer as the imam of the Al Madina Mosque, and Sheikh Ameer remained in that position until after Al Bayoumi left for England. *See* Responses to Pls. Aver. ¶¶ 1240-1241. |
| 785. | The FBI seized a note from Bayoumi's Mosque office listing the names of Sowailem, Sadhan, and Sudairy, Thumairy's name and phone information, a reference to "90%" next to "(the League)," and a reference to the Secretary General of the Muslim World League in Mecca, Saudi Arabia. Ex. 532, FBI 4270. Bayoumi's handwritten address book also contained a list that included Imam Mohamed University's U.S. branch, "Khalid Al-Sowailem," and the "Muslim World League.". Ex. 12AA, MPS738_48. The FBI found that prior to the 9/11 Attacks that Saudi Arabia used the Muslim World League and its officer Abdullah Al Noshan to fund Al Qaeda and related groups, and that Noshan was tied financially to Sudairy, who worked under Sowailem. Ex. 13, Weidner Decl. ¶¶ 12-16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 532 are inadmissible hearsay. Exhibit 13 (Weidner Decl.) has been stricken. *See* ECF No. 9562, at 7-8; Objections Chart.

To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Saudi Arabia does not dispute that a sheet of paper seized by the FBI from the Al Madina Mosque includes several names, positions, locations, and telephone numbers. *See* Pls. Ex. 532 (FBI 4270). However, Plaintiffs' assertion that it was seized from Al Bayoumi's desk is unsupported by any citation or record evidence, nor is there any such evidence that the sheet of paper belonged to Al Bayoumi or was written by Al Bayoumi. As such, the sheet of paper is inadmissible hearsay.

Plaintiffs' assertions regarding the FBI's "findings" regarding the Muslim World League and Abdullah Al Noshan are based solely on Exhibit 13 (Weidner Decl.), which has been stricken by the court. *See* ECF No. 9562, at 7-8. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 786. | The MPS discovered a personal note of Bayoumi showing that he had spoken to Sowailem about Deputy Consul Abdullah Al Awad at the Saudi Consulate in Los Angeles. Ex. 678V, MPS 732_212-214 at 213. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678V (MPS 732_213) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute that the MPS seized a handwritten note that states "Abdullah Alawad Consulate / referred by Khalid Al Sowilam." Pls. Ex. 678V (MPS 732_213). However, Plaintiffs provide no evidence that Al Bayoumi drafted the short note. Moreover, there is no indication that Al Bayoumi spoke to Al Sowailem about Al Awad; the note just says: "referred by Khalid Al Sowilam." |
| 787. | When the FBI sought to question MOIA's U.S. Director Sowailem shortly after the 9/11 Attacks on October 8, 2001, he asserted diplomatic immunity but later agreed to answer some questions. Ex. 2, EO 3582. On October 25, 2001, Sowailem admitted to the FBI that he "knows Omar Ahmed Al Bayoumi professionally," had regular phone conversations with Bayoumi "every three to four months," and gave Bayoumi a tour of the Islamic section at the Saudi Embassy. Ex. 44 , FBI 000012-14. Sowailem claimed that Bayoumi was a "student" that his discussions with Bayoumi were "about his education" and Bayoumi's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608) and Exhibit 44 (FBI 12) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion that Al Sowailem asserted diplomatic immunity relies upon inadmissible hearsay, namely, a July 23, 2021 FBI memorandum that purports to summarize nearly 20 years worth of previous FBI memoranda and research that, in turn, relied upon speculation and hearsay. *See* Pls. Ex. 2PP (EO 3478-3608). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | request for a "scholarship from the government of Saudi Arabia." *Id.* | Plaintiffs' remaining assertions rely upon a draft FBI memorandum dated October 25, 2001, of a telephonic interview of Al Sowailem. *See* Pls. Ex. 454 (FBI 12). (Plaintiffs cite "Ex. 44," but that is the incorrect document.) That draft FBI memorandum is similarly inadmissible hearsay, purporting to document the drafter's interpretation of statements allegedly made by Al Sowailem during the interview. Furthermore, the memorandum bears additional indicia of unreliability, as it is in a draft format. |
| 788. | Saudi Arabia has provided no evidence to explain why MOIA's senior religious official in the U.S. would have regular discussions with Bayoumi about his alleged studies in business and finance. Also, as detailed below, the timing of the contacts and phone calls among Bayoumi, Thumairy, and Sowailem was not random but was tied in time to specific events, including the support that Thumairy and Bayoumi provided to the 9/11 hijackers. For example, Bayoumi called Sowailem's personal cell phone—███████ 2777,"— immediately after the welcome party that Bayoumi hosted for the 9/11 hijackers in February 2000. Ex. 12BB, MPS 688_11; Ex. 421, FBI 349; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) (Bayoumi called Sowailem's personal cell on 2/18/2000 at 7:58 p.m. and 2/19/2000 at 10:56 a.m.). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 12BB (MPS 688) and Exhibit 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart. Exhibit 12A is an improper summary exhibit.<br><br>To the extent a response is required, there is no evidence that the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688) and Exhibit 421 (FBI 345-49) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay.<br><br>Plaintiffs' assertion that there were "regular" communications between Al Sowailem and Al Bayoumi mischaracterizes the evidence. According to Plaintiffs' own Exhibit 12A, there were only 2 phone calls from any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | phone associated with Al Bayoumi to Al Sowailem: a February 18, 2000 call from Al Bayoumi's cell phone to a number that Plaintiffs claim was Al Sowailem's cell phone at 7:58 pm that lasted for 2 minutes, and a February 19, 2000 call from Al Bayoumi's cell phone to that number at 10:56 am that lasted for 6 minutes. *See* Pls. Ex. 12A. The document Plaintiffs rely upon to show Al Sowailem's number is hearsay. No subscriber records were produced to verify that the number belonged to Al Sowailem. In any event, according to that same chart, there were no calls from Al Sowailem to Al Bayoumi at any point in time. *See id.* <br><br> Plaintiffs' assertion that these two calls were somehow related to the party held at the hijackers' apartment is not supported by any evidence. There is also no evidence of what the substance of the calls was or that this was a "welcome party" for the hijackers. *See* Responses to Pls. Aver. Section XXII. |
| 789. | Bayoumi claimed not to remember Sowailem at all, despite visiting him at the Embassy, and having numerous contacts with him. Ex. 120, Bayoumi Dep. 170-:19-171:1; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) (Bayoumi called Sowailem's personal cell on 2/18/2000 at 7:58 p.m. (PST) when it was nearly 11 p.m. in Washington; and 2/19/2000 at 10:56 a.m | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Exhibit 12A is an improper summary exhibit with numerous misattributions and other errors. *See* Response to Pls. Aver. ¶ 446. Exhibit 12A shows that Al Bayoumi called a number that Plaintiffs associate – based on hearsay sources – with Al Sowailem's cell phone on February 18, 2000 at 7:58 pm and February 19, 2000 at 10:56 am. No subscriber records were produced to verify that the number belonged to Al Sowailem. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that there were "numerous" communications between Al Sowailem and Al Bayoumi mischaracterizes the evidence. Plaintiffs cite only two brief calls. *See* Response to Pls. Aver. ¶ 788.<br><br>Although not cited here, Plaintiffs have elsewhere referenced a letter that Al Bayoumi drafted a letter – in his role as general supervisor at the Al Madina Mosque – to Al Sowailem, dated January 28, 1999, expressing appreciation for, *inter alia*, Sheikhs Al Sudairy and Al Sadhan "leading the prayers, lessons, and reflections" at various mosques, including the Al Madina Mosque. Pls. Ex. 413. Plaintiffs' assertion that Al Bayoumi visited Al Sowailem at the Embassy is not supported by any citation or record evidence. Plaintiffs therefore can point to at most 3 communications between Al Bayoumi and Al Sowailem.<br><br>It is therefore not surprising that, when Al Bayoumi was asked during his June 2021 deposition – more than 20 years after those communications – who Al Sowailem was, Al Bayoumi answered "I don't remember." Pls. Ex. 120 (Bayoumi Tr.) 170:19-171:1. |
| 790. | *MOIA Embassy Propagators Mutaeb Al Sudairy and Adel Al Sadhan*. Bayoumi had contact information for both Sadhan and Sudairy in his handwritten address book. However, he claimed he could not remember where he was when he met the two MOIA propagators. Ex. 120, Bayoumi Dep. 231:11-21. The information Bayoumi possessed on Sadhan and Sudairy included their phone and address information in Saudi Arabia, as well as phone numbers in locations where Sadhan and Sudairy were assigned by Saudi Arabia to work inside the U.S. Ex.12AA, MPS738_24, 34, 76 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 12BB (FBI 1293-1301) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (Sadhan contacts in Oklahoma, Virginia, and Saudi Arabia); Ex. 12AA, MPS738_24 (Sudairy contacts in Missouri, Virginia). In Bayoumi's January 2000 phone number list, Sadhan is listed twice, as "Adel Assduhan," Ex. 12BB, MPS 688_3, and as "Assadhan, Adel." Ex. 12BB, MPS 688_5. In the same document, Sudairy is listed as "Assodairy, Muteiab." Ex. 12BB, MPS 688_5. | There is no evidence that the typed phone list in Plaintiffs Exhibit 12BB (MPS 688) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>Saudi Arabia similarly does not dispute that, when asked during his deposition "where were you when you first saw Sadhan and Sudairy," Al Bayoumi testified that he could not recall, which is not surprising given that it was more than 20 years prior. *Id.* at 231:11-17. |
| 791. | In June 1999, Saudi Arabia obtained diplomatic positions at the Saudi Embassy in Washington, D.C. for both men. Sadhan and Sudairy were then reassigned to other locations inside the U.S. Ex. 119, Sudairy Dep. 221:6-222:8. According to Sudairy, he moved to Missouri around mid-2000. Ex. 119, Sudairy Dep. 222:9-223:5. Sadhan claimed that he lived in the Washington, D.C. area and then after two to three months moved to Oklahoma. Ex. 99, Sadhan Dep. 209:16-19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Sudairy testified that, "[b]ecause west Washington city is a big city[,] [t]hey suggested that I move outside of Washington to continue the language studies." Pls. Ex. 119 (Sudairy Tr.) 198:1-199:9. Al Sudairy further explained that Al Sowailem "told me to look for a quiet city because Washington, D.C., was a crowded and noisy city. And I was kind of exhausted because of the difference in style." *Id.* at 221:17-23. Al Sudairy then moved to Missouri "[a]pproximately" before fall of the year 2000. *Id.* at 223:2-5.<br><br>Saudi Arabia also does not dispute that Al Sadhan testified that he lived in the Washington, D.C. area and then, two to four months later, moved to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Oklahoma. *See* Pls. Ex. 99 (Sadhan Tr.) 209:16-19, 233:20-24. Al Sadhan explained that he "moved from Washington to Oklahoma to study" because he "found a good offer for language education." *Id.* at 232:24-233:15.<br><br>Plaintiffs' assertion that Al Sadhan and Al Sudairy were "reassigned to other locations" is not supported by any citation or record evidence. To the contrary, Al Sadhan expressly denied having such an assignment: "I did not have an assignment. I had study." *Id.* at 239:3-9; *see also id.* at 271:1-8, 275:23-276:9, 278:7-19. Al Sudairy similarly testified that he moved to Missouri to study, and not to work. *See* Pls. Ex. 119 (Sudairy Tr.) 198:1-199:9, 221:17-23, 288:16-289:1. |
| 792. | On December 19, 1998, a call was made from Bayoumi's phone at the Al Madinah Mosque to one of the numbers for Sadhan that appears in Bayoumi's phone list-■■■-2849," which according to a Riyadh phone directory is the number for Sadhan's father. Ex. 5, Youssef Rpt. 102, n. 416; Ex. 44, Riyadh Telephone Directory (Sadhan Dep. Ex. 494). Even after being confronted with the local Riyadh telephone directory identifying his father as the individual associated with the number, Sadhan insisted that the number was unfamiliar to him and that he did not give the number to Bayoumi. Further, Sadhan insisted that he did not know Bayoumi. Ex. 99, Sadhan Dep. 186:11-188:5. According to his own testimony, Bayoumi maintained personal contacts with both Sadhan and Sudairy | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738), Exhibit 12BB (MPS 688), Exhibit 314, and Exhibit 533 are inadmissible hearsay. Exhibit 44 has not been authenticated. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>With respect to the entry for "Al Sadhan, Mohammad Abdulrahman Mohammad" in Plaintiffs Exhibit 44, Al Sadhan testified that name belonged to his father, but that "[i]t looks like it's an old number or the wrong number. I don't remember this number at all." Pls. Ex. 99 (Sadhan Tr.) 177:9-19; *see also id.* at 178:1-13, 182:5-8, 184:8-18, 186:24-187:7, 187:21-189:6. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | during their time in the U.S. Bayoumi testified that when he met Sudairy in person, Sudairy gave him his phone number in Missouri ▮▮▮ 7326") and email address, which Bayoumi wrote down on a slip of paper. Ex. 12BB, MPS688_2 (in "green folder"); Ex. 120, Bayoumi Dep. 278:11-12, 23, 279:1-23. Bayoumi wrote down Adel al-Sadhan's *kunya* – "Abu Malik" – together with Sadhan's home telephone number in Saudi Arabia on a piece of paper that he kept in his desk. Ex. 533, at FBI 4286. Phone records produced by MPS evidence a telephone call made on March 31, 2001, from Bayoumi to Sudairy's Missouri phone number ▮▮▮ 7326") that lasted thirty minutes. Ex. 314, MPS 118_23 (Bayoumi's Broadway communication phone record). | For Plaintiffs Exhibit 533, Al Bayoumi testified that the handwriting in the note regarding "Abu Malik" (Al Sadhan) was not his, and therefore this portion of the document is inadmissible hearsay. *See* Pls. Ex. 120 (Bayoumi Tr.) 299:18-303:2 (indicating that Al Bayoumi wrote the names Saad Al Shabreen and Ismail ▮▮▮ but not the name "Abu Malik"). The handwriting that Al Bayoumi testified was his – the number ▮▮▮ 6000" – appears distinct from the handwriting that Al Bayoumi testified was not his – the number ▮▮▮ 2849" – as can be seen from the distinctive "9"). *See* Pls. Ex. 533 at FBI004286.

Saudi Arabia also does not dispute that Al Sadhan testified – more than 20 years after their encounter – that he did not know Al Bayoumi and did not give him that phone number. *See id.* at 186:11-188:5. Telephone records confirm that a call was made from the publicly available phone at the Al Madina Mosque on December 19, 1998 to the number ▮▮▮ 2849." Pls. Ex. AMH002 (FBI 1419-1546) at FBI 1538. The call was made at 5:39 pm and lasted 1 minute or less. *See id.* There is no evidence that Al Bayoumi made the call. Indeed, as described above, this handwritten number appears not to be in Al Bayoumi's handwriting.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Saudi Arabia does not dispute that telephone records for a phone registered to Al Bayoumi called ▮▮▮ -7326" on March 31, 2001 for approximately 30 minutes. *See* Pls. Ex. 314. However, apart from this single call to Al Sudairy, Plaintiffs' assertion that Al Bayoumi "maintained personal contacts with both Sadhan and Sudairy during their time in the U.S." is not supported by any other citation or record evidence. |
| XI.D. | **MOFA's Islamic Affairs Department** | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 793. | Bayoumi had contact information in his handwritten address book for all four officials who led the Embassy's Islamic Affairs Department: (a) Dr. Majid Al Ghesheyan, (b) Sheikh Abdulaziz Al Saleh, (c) Musaed Al Jarrah, and (d) Abdulaziz Al Sultan. Ex. 12AA, MPS738_52. The office number for the Islamic Affairs Department was listed as ████ - 3700" which was the same office number for the MOIA office. Embassy pay records show that Ghesheyan, Saleh, Jarrah, and Sultan worked at the Saudi Embassy. Ex. 145, KSA 7506-22 at 7510. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738), and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that Embassy pay records show that Al Ghesheyan, Al Saleh, Al Jarrah, and Al Sultan each received a check dated June 15, 2001, with the records indicating that such checks were for "HRH Prince Abdullah's Bonus 2000." Pls. Ex. 145 (KSA 7510). However, the pay records do not state or otherwise indicate that any of the individuals who received such bonuses worked at the Saudi Embassy as Plaintiffs assert. *See id.* |
| 794. | *Embassy Islamic Affairs Department Chief Ghesheyan.* Bayoumi admitted that he "wrote to the Embassy over and over, until they sent a check" for the seed money for the Al Madinah Mosque. Ex. 678C, MPS 43_138-9 (Bayoumi's report to Habib). Ghesheyan sent Bayoumi the letter with the check in November 1998. Ex. 404, MPS 43_382. Bayoumi also wrote Ghesheyan in January 1999 about the visit of MOIA propagators Sadhan and Sudairy and | Plaintiffs Exhibit 411 and Plaintiffs Exhibit 678C are inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia does not dispute that Al Bayoumi drafted a letter – in his role as general supervisor at the Al Madina Mosque – to Saad Al Habib, dated August 26, 1999, regarding, *inter alia*, the "expansion and modifications" of the mosque. Pls. Ex. 678C (MPS43_139). In the letter, Al Bayoumi noted that he "wrote to the embassy repeatedly until they sent a check in $5,000 directly in the name of the Kurdish community." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | expressed "hope that the advance coordination continues." Ex. 411, MPS 43_314. | Saudi Arabia notes that the letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Habib. *Id.*<br><br>Saudi Arabia similarly does not dispute that Al Gheshyan sent a letter to Al Bayoumi on November 25, 1998, which stated, *inter alia*, "[w]ith reference to your letter requesting assistance in furnishing Masjid Al-Madinah Al-Munawarah – the Kurdish Community Islamic Center in the El Cajon area of San Diego. I am pleased to send you with this letter, the check numbered ███████468, dated 25/11/1998 AD in the amount of five thousand dollars. I would like you to receive the amount, sign the attached receipt, fill out the attached form, and return it to the Embassy address." Pls. Ex. 404 (MPS43_380). Plaintiffs' characterization of that check as "seed money for the Al Madinah Mosque" is unsupported: the letter says the check is intended to assist in "furnishing" the mosque. *See id.*<br><br>Saudi Arabia also does not dispute that Al Bayoumi drafted a letter – in his role as general supervisor of the Al Madina Mosque – on the mosque's letterhead to Al Gheshyan, dated January 28, 1999, expressing appreciation for, *inter alia*, Sheikhs Al Sudairy and Al Sadhan "leading the prayers, lessons, and reflections" at various mosques, including the Al Madina Mosque. Pls. Ex. 411 (MPS43_314). In the letter, Al Bayoumi also noted that "coordination and moral support were the factors that made the greatest mark" in the Sheikhs being able to so lead religious activities, and he "hope[d] that the advance coordination continues." *Id.* It should be noted that the letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Ghesheyan. *See id.* |
| 795. | When asked to whom he reported, Thumairy told the 9/11 Commission that "he had the most contact [at the Saudi Embassy] with Dr. Majid [Ghesheyan], who was responsible for Islamic Affairs at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs Exhibit 90 (Snell Decl. Ex. 3, at 3-4) is inadmissible hearsay. Although this is a declaration, Plaintiffs rely solely on an exhibit to the declaration that is hearsay. *See* Objections Chart. |
| | | Plaintiffs mischaracterize they hearsay they rely on. Plaintiffs cite to an FBI summary memorandum of a February 23, 2004 interview of Al Thumairy. *See* Pls. Ex. 90 (Snell Decl.), Ex. 3. In that interview, Al Thumairy was asked "who was his superior," to which he allegedly responded "the Consul General" – not Al Ghesheyan. *Id.* at 3. He was then asked if there was "anybody at the Saudi Embassy in Washington, D.C. to whom he reported," to which Al Thumairy allegedly responded that "*he had the most contact* with [Al Ghesheyan], who was responsible for Islamic Affairs at the Embassy," *id.* at 3-4 (emphasis added), not that he reported to Al Ghesheyan. |
| | | Plaintiffs' mischaracterization underscores the unreliability of hearsay summaries of interviews. When Al Thumairy was asked by Plaintiffs about this alleged statement to the FBI concerning his superior, he testified: "I don't remember stating it in that language. What I believe is that I said that the Consul General was in charge of all Saudi citizens in general." Pls. Ex. 107 (Thumairy Tr.) 108:4-9. Similarly, when Al Thumairy was asked by Plaintiffs about the alleged statement to the FBI regarding his contact with Al Ghesheyan, Al Thumairy testified that was incorrect. *See id.* at 116:1-117:15 (testifying that he did not know who Al Ghesheyan was, he did not know Al Ghesheyan at the Embassy, and he did not tell the FBI that he had the most contact with Al Ghesheyan). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XI.E. | **Embassy Islamic Affairs Official Sheikh Abdulaziz Al Saleh** | |
| 796. | As a result of their communications, Ghesheyan directed Bayoumi to send Sheikh Abdulaziz al Saleh the receipt for the Embassy's check for the Mosque – together with information demanded by the Embassy, including a data sheet listing all the names and nationalities of the Mosque board members. Ex. 375, MPS 43_381. According to a note written by Bayoumi and seized by the FBI from Bayoumi's office at the Al Madinah Mosque, "Sheikh Abdulaziz Al Saleh" was described as a "coordinator of the affairs of imams and propagators via the Ministry of Islamic Affairs." Ex. 531, FBI 4259. Bayoumi also sent letters to MOIA officials thanking Saleh for his coordination and assistance in planning the trip of MOIA propagators Sadhan and Sudairy to San Diego. Ex. 413, MPS 43_338. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Exhibit 413 and Exhibit 531 are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi drafted an undated letter to Abdulaziz Al Saleh purporting to enclose "a copy of the receipt for the check sent from the Embassy to assist in furnishing Masjid Al-Madinah Al-Munawarah" and a "letter from the Pakistani community, who sponsor the *Iftar* [meals to break the fast] for more than 400 people every Friday and Saturday during the month of Ramadan." Pls. Ex. 375 (MPS43_381) (brackets in original). <br><br> However, the letter bears no indicia that it was actually sent to Al Saleh. To the contrary, the letter is handwritten on lined paper, includes what appears to be a folded piece of paper used to place atop a portion of the text for editing purposes, and attaches neither a copy of the referenced receipt nor the letter from the Pakistani community. *See* Pls. Ex. 375 (MPS43_380) (containing a small portion of writing that appears to fit overtop the shaded middle section of MPS_381 as an attempted edit). Furthermore, Plaintiffs' assertion that Al Ghesheyan directed Al Bayoumi to send the receipt, "together with information demanded by the Embassy, including a data sheet listing all the names and nationalities of the Mosque |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | board members," is not supported by the letter or any other record evidence. |
| | | Saudi Arabia also does not dispute that a piece of paper seized from the Al Madina Mosque contains several different notes on it, including one that states "Sheikh Abdel Aziz Al Salim Da'wah office in the embassy Coordinator of the affairs of imams and propagators via the Ministry of Islamic Affairs." Pls. Ex. 531 (FBI 4259). Plaintiffs' assertion that the note, or any of the other notes on the piece of paper, was "written by Bayoumi" is not supported by any citation or record evidence. |
| | | Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted a letter on the Mosque's letterhead to Al Sowailem in which Al Bayoumi expressed gratitude for the dispatch of Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area. *See* Pls. Ex. 413 (MPS43_338). In the letter, Al Bayoumi also expressed his "appreciation for the efforts of brother Abdulaziz Al-Saleh; brother Fahad Al-Thumairy, the Imam of Masjid Ibn Taymiyyah (Los Angeles); and brother Saad Al-Jabreen (Islamic Affairs – Los Angeles), all of whom demonstrated complete cooperation." *Id.* It should be noted that the letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Sowailem. *See id.* |
| 797. | *Embassy Islamic Affairs Department Deputy Musaed Al Jarrah.* Bayoumi wrote an undated letter (likely July 1998) to Jarrah describing the Al Madinah Mosque and imploring Jarrah "to determine what can be sent according the available resources." Bayoumi tells Jarrah "your door is open" and "I place this matter in your | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | hands." Ex. 393, MPS 43_219. Bayoumi also wrote a letter to Jarrah dated July 21, 1998 expressing hope that "the scale of good deeds will weigh more heavily with the rewards from Allah Almighty, in favor of all those who joined in the call." Ex. 394, MPS 43_220. | To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi drafted an undated letter to Al Jarrah that stated, *inter alia*: "With reference to the telephone conversation regarding furnishings, Qur'ans, books and booklets. As you know, based on your vast experience in this field, you are better placed to determine what can be sent according to the available resources. . . . All it is, is that your door is open. . . . As for the library and classrooms, the rooms themselves are ready, 'of course without furniture, equipment, or books.' All it is, is that I place this matter in your hands, and you in turn should convey it to the responsible parties, may Allah grant them success." Pls. Ex. 393 (MPS43_219). Saudi Arabia disputes Plaintiffs' characterization of the letter as "imploring Jarrah." Furthermore, Saudi Arabia notes that the letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Jarrah. *See id.* <br><br> Plaintiffs Exhibit 394 and Plaintiffs Exhibit 393 are inadmissible hearsay. *See* Objection Chart. <br><br> Saudi Arabia also does not dispute that Al Bayoumi drafted a letter to Al Jarrah, dated July 21, 1998, seeking the assistance of the Islamic Affairs Department in outfitting the main prayer room of the Al Madina Mosque. Pls. Ex. 394 (MPS43_220). The letter states, *inter alia*: "I am enclosing to Your Excellency a copy of the letter addressed to His Excellency the Director of the Department of Islamic Affairs, as well as a copy of the cost estimate letter. This amount does not cover the entire building, but rather only the *Musalla* [main prayer room]. . . . And next month, the prayers will be performed in this mosque, which is *Masjid Al-Madinah Al-Munawarah*. There are more than 65 churches in this area. All we hope for is that the scale of good deeds will weigh more heavily with the rewards from Allah Almighty, in favor of all those who joined in the call with the loud voice of righteousness." *Id.* (brackets in original). It should |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | be noted that the letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Jarrah. *See id.* |
| 798. | Bayoumi falsely claimed at his deposition that his relationship with Jarrah was like that of "[a]ny student who needs anything would call the embassy" Ex. 120, Bayoumi Dep. 157:10-158:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, Plaintiffs do not provide any evidence that Al Bayoumi provided false testimony. Contrary to Plaintiffs' misleading characterization, Al Bayoumi was not asked by Plaintiffs to characterize his relationship with Al Jarrah; he was asked "how did you know Mussaed al Jarrah" following a question about a letter that Al Bayoumi wrote to Al Jarrah. Pls. Ex. 120 (Bayoumi Tr.) 157:7-11. In response, Al Bayoumi explained the circumstances in which he came to know Al Jarrah: "From the embassy's reception. . . . Any student that needs anything would call the embassy. Say they need furniture for the mosque, they would ask, who is responsible for that? They would say, okay, this is the person responsible for this matter. Therefore, they would contact that person who is responsible." *Id.* at 157:12-158:2. |
| | | Al Bayoumi, who was the general supervisor of the Al Madina Mosque, further testified that he would call the Islamic Affairs Department to request provision for the mosque of furniture, Qur'ans, books, and booklets, or the dispatch of propagators "to help with the prayer, the prayers of Taraweeh and so forth." *Id.* at 159:12-162:17, 224:2-225:24. |
| XI.F. | **Other Saudi Embassy religious officials** | |
| 799. | *Saudi Embassy Official Abdullah Al Noshan.* Bayoumi had an entire page in his handwritten address book for Noshan under | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the caption "Sheikh Abdullah Al Noshan." The page included an account number at Saudi American Bank and a "$" symbol, phone numbers for Noshan and "his office manager" in "Washington," phone and fax numbers for Noshan in New York City, and Noshan's email address. The address book listing for Noshan includes a reference to "Case Western." Ex. 12AA, MPS738_12. Bayoumi obtained a letter in May 1998 from the Embassy's National Guard Office to Case Western Reserve University in Cleveland stating that he had a full Saudi government scholarship and living allowance. Ex 678Z, MPS 732_449. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that the handwritten phone book cited in Plaintiffs Exhibit 12AA (MPS 738) contains a page with a note stapled on top that includes an account number, the name Sheikh Abdullah Al Noshan, several phone numbers, and an email address. *See* Pls. Ex. 12AA (MPS 738_12). Because this is a separate page that appears to have been stapled in the address book, it would be misleading to draw any inference from any difference that exists for this page as opposed to other pages where information was written directly in the address book.<br><br>Saudi Arabia does not dispute that the MPS seized a letter from Dr. Jamil Shami, Director of Academic Affairs at the Royal Embassy of Saudi Arabia's National Guard Office, to Dr. Sue Natrtker at Case Western Reserve University. *See* Pls. Ex. 678Z (MPS 732_449). This letter merely states that Al Bayoumi is a "candidate" and "applicant" for a scholarship and sought information from Case Western regarding Al Bayoumi's "credentials" and "academic eligibility." *Id.* The letter provides no indication of whether Al Bayoumi received a scholarship. *See id.* |
| 800. | Noshan (like Bayoumi) entered the U.S. on an F-1 (student) visa, but was employed in several capacities by the Embassy of the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Kingdom of Saudi Arabia in Washington, including the the Institute for Islamic and Arabic Studies in America (IIASA) associated with Imam Mohamed University. Ex. 13, Weidner Decl. ¶ 14-15. IIASA maintained links to suspected terrorist organizations and their supporters according to an FBI investigation and several of its staff members were Saudi nationals employed in an official capacity as administrative officers at the Embassy. Ex. 2, EO 3437. Noshan himself was the subject of FBI surveillance and was observed to be acting "in a manner consistent with a foreign intelligence officer." Ex. 2, EO 3437. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Exhibit 13 (the Weidner declaration) has been stricken. *See* ECF No. 9562, at 7-8; Objections Chart.<br><br>To the extent a response is required, Plaintiffs' only cited evidence (after exclusion of the Weidner declaration) is the December 2004 joint FBI-CIA intelligence report. *See* Pls. Ex. 2OO (EO 3414-3442). This document does not identify any link between Al Noshan and the 9/11 attacks. It states only that Al Noshan "act[ed] in a manner consistent with a foreign intelligence officer." *Id.* (EO 3437). Further, while the document states that IIASA "maintains links to suspected terrorist organizations and their supporters according to FBI investigation," it does not state that IIASA itself provided any material support for terrorism, nor specify what the "links" and "organizations" were. *Id.*<br><br>The admissible findings of the FBI-CIA report in Exhibt 2OO include: "There is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." *See id.* at EO 3416. |
| 801. | Noshan channeled large amounts of Saudi government funding to religious officials working inside the U.S. and was a "purchasing agent" for the Saudi Embassy and an associate of Saudi Embassy Islamic Affairs Deputy Jarrah and MOIA propagator Sudairy. Ex. 13, Weidner Decl. ¶ 15. Noshan was on the board of Sanabel al-Kheer (aka Sana Bell, Inc.) which invests | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | money in businesses in order to raise money for charities. He was also affiliated with of a number of Saudi charities, including the Muslim World League. Ex. 2, EO 3437. Noshan was connected, through monetary transactions, to an FBI subject in Kentucky whose name, address, and telephone numbers were recovered in an al Qaeda safehouse in Karachi. Ex. 2, EO 3437. | Exhibit 13 (Weidner Decl.) has been stricken. *See* ECF No. 9562, at 7-8; Objections Chart.<br><br>To the extent a response is required, Plaintiffs' only cited evidence (after exclusion of the Weidner declaration) is from a December 2004 joint FBI-CIA intelligence report. *See* Pls. Ex. 2OO (EO 3414-3442). This document merely states: "Al-Noshan is connected through monetary transactions and telephone calls to an FBI subject in Kentucky whose name, address, and telephone number were found in an al-Qa'ida safehouse in Karachi." *See id.* (EO 3437). It does not provide additional detail regarding Al Noshan's "connection" to the Kentucky individual, nor whether the Kentucky individual had even done anything wrong.<br><br>The admissible findings of the FBI-CIA report in Exhibt 2OO include: "There is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." *See id.* at EO 3416. |
| 802. | *Saudi Embassy official Soliman Al-Ali* Dr. Soliman Al-Ali aka Soliman Ali Elay worked for Saudi Arabia in a capacity similar to Al Noshan. Ex. 13, Weidner Decl. ¶ 15. Bayoumi was a close work associate of Al-Ali, who moved to the San Diego area in September 1998 and lived there for about one year. The two were so close that in 1998, Al-Ali used Bayoumi's address on his own bank information and listed Bayoumi as his emergency contact. In addition, on a California rental application, Al-Ali listed Bayoumi as a "co-tenant/friend" during a time when Al-Ali | Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. Plaintiffs Exhibit 13 (Weidner Decl.) has been stricken. *See* ECF No. 9562, at 7-8; Objections Chart.<br><br>Plaintiffs' only cited evidence (after exclusion of the Weidner declaration) is hearsay in Exhibit 2PP (EO 3553). That document states only that Al Ali was "believed to be a friend of Al-Gama al-Islamiyya supporter Zahir 'Abd Al-'Aziz, who reportedly has ties to Islamic extremist circles throughout the Balkans" – that is, Al Ali was "believed" to be a friend of someone who "reportedly" had ties to "extremist[s]." *Id.* Al Bayoumi was two steps removed: at most, Al Bayoumi had a connection with Al Ali, who purportedly had a connection with Al Aziz, who then purportedly had a connection with extremists. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and Bayoumi both claimed to be employed with Dallah Company in Saudi Arabia. Ex. 2, EO 3553 | |
| 803. | Al-Ali was a senior Saudi government official on the payroll of the Saudi Embassy. Ex. 145, KSA 7506-7522 at 7521 (showing Al-Ali receiving a 2000 bonus). Al-Ali was the President of the International Islamic Relief Organization ("IIRO") in the U.S. Ex. 2, EO 3478 at EO 3553. He was also a principal and member of the board of directors of Sanabel Al-Khair, the investment arm of the IIRO. Ex. 325, Sanabell 00090 (letter addressed to Al-Ali as a member of Sanabel's "Investment Committee."); Ex. 2, EO 3552 (Al-Ali was paid by Sanabell); Ex. 2, EO 3318 (According to Al-Ali's landlord, a number of Al-Ali's monthly rental bills were paid for by Sana Bell Co. checks). | Plaintiffs Exhibit 2AA (EO 3317-2333), Exhibit 2PP (EO 3478-3608), and Exhibit 325 are inadmissible hearsay. *See* Objections Chart. There is no evidence Al Ali was a "senior Saudi government official." The Embassy pay records show that "Ali Sulaiman Ali" received a check dated June 15, 2001, with the records indicating that such check was for "HRH Prince Abdullah's Bonus 2000." Pls. Ex. 145 (KSA 7521). However, the pay records do not state or otherwise indicate that "Ali Sulaiman Ali" was a "senior Saudi government official" as Plaintiffs assert. *See id.* Plaintiffs' assertions that Al Ali was the President of the International Islamic Relief Organization and was paid by Sanabell rely upon inadmissible hearsay in Exhibit 2PP. That document purports to summarize nearly 20 years worth of previous FBI memoranda and research, citing and discussing the contents of at least four documents in the FBI's files from 1997 through 2002, including at least one prior FBI memoranda, in the section on Al Ali alone – all of which are hearsay. *See* Pls. Ex. 2PP (EO 3553). Plaintiffs' assertion that Al Ali's monthly rental bills were paid for by Sana Bell Co. checks is based on multiple layers of hearsay. *See* Pls. Ex. 2AA (EO 3317-3323). The document states that, "[a]ccording to Elay's landlord, a number of Elay's monthly rental bills were paid for by checks from Sana-Bell Co." *Id.* (EO 3318). Plaintiffs' assertion that Al Ali was "also a principal and member of the board of directors of Sanabel Al-Khair, the investment arm of the IIRO," |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not only relies upon inadmissible hearsay – a letter from M. Yaqub Mirza to "Mr. Sulayman Al-Ali, Member, Investment Committee," dated March 27, 1998 – but mischaracterizes that letter as well. Pls. Ex. 325 (SANO-BELL 90). Although the letter identifies Al Ali as a Member of the Investment Committee, it does not state or otherwise indicate that Al Ali was a principal or a member of the board of directors. *See id.* To the contrary, the letter notes that "[s]everal of the Board members' term has expired" and recommends that someone such as Al Ali be appointed as a replacement – indicating that Al Ali was not a Board member at the time. *Id.* |
| 804. | The FBI July 2021 EC found that the IIRO and Sanabel had "connections…to terrorism," including employing Al Qaeda members and "utiliz[ing] funding for terrorism support…." Ex. 2, EO 3532; Ex. 13, Weidner Decl. ¶13; EO 3084 (FBI report cites links of Al- Ali and Sanibel to Hamas terrorist organization). The FBI also reported that Al-Ali's son, Amro, was known to have become a member of Al Qaeda in the Arabian Peninsula. Ex. 2, EO 3553. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. Plaintiffs Exhibit 13 (Weidner Decl.) has been stricken. *See* ECF No. 9562, at 7-8; Objections Chart.

After exclusion of Plaintiffs Exhibit 13 (Weidner Decl.), Plaintiffs' only cited evidence is Plaintiffs Exhibit 2PP (3478-3608). The hearsay document does not state that Al Bayoumi had any relationship with Amro (the son of Al Ali, who Plaintiffs claim Al Bayoumi knew). *See id.* (EO 3554). Moreover, although the document states Amro was a "known AQAP member," it also states he was "released by Saudi authorities" after a "short incarceration," indicating either that he was wrongly accused or that his association with AQAP was not strong. *Id.*

Moreover, the document contains multiple layers of hearsay as it purports to summarize nearly 20 years worth of previous FBI memoranda and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | research. For example, with respect to the memorandum's allegation that various entities such as the IIRO and Sanabel had "connections . . . to terrorism" and "utilized funding for terrorism support" – allegations quoted in Plaintiffs' assertion – the memorandum merely summarizes a previous FBI document, the name of which is redacted. *See id.* (EO 3532) ("See [redacted FBI document). This serial documents the extensive ties to the Saudi Arabian government as well as extensive ties to terrorisms – specifically AQ. AQ members were employed within these organizations and utilized funding for terrorism support and used the offices for cover for movement or personnel."). Plaintiffs' allegation that Al Ali's son, Amro, was known to have become a member of Al Qaeda in the Arabian Peninsula is again double (or more) hearsay, coming from a summary of another unnamed FBI document. *See id.* (EO 3554) ("Alali's son Amro Syliman Alali (Amro Alali) was a known AQAP member (see [redacted FBI document name])."). |
| 805. | Al-Ali and Bayoumi worked together to file a report on the activities and investments of IIRO-Sanabel to Ambassador Prince Bandar. The MPS production of Bayoumi's files included a December 15, 1998 letter from Al-Ali addressed directly to Ambassador Bandar, by which AlAli provided Bandar with a "report on what happened" with regard to the IIRO and Sanabel projects for which he was responsible. Al-Ali concluded: "I kindly request your review and direction as you [Ambassador Bandar] see fit." Ex. 374, MPS 43_348. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 374 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 374 does not indicate that Al Bayoumi and Al Ali "worked together" to create a report. *See* Pls. Ex. 374. The exhibit does not state Al Bayoumi had any involvement. It merely consists of two slightly different versions of a letter purportedly from Dr. Soliman Al Ali to Prince Bandar bin Sultan dated December 15, 1998. *See id.* Both versions of the letter include a report on "what happened to the office of the Relief Organization" as well as "what happened to the investments" of the "Sanabel Al-Khair |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Company." *Id.* (MPS43_348, 350). Both letters conclude similarly, although not identically. *Compare id.* (MPS43_348) ("I kindly request Your Highness to review and direct as you see fit.") *with id.* (MPS43_350) ("I kindly request your review and direction as you see fit."). <br><br> There is no evidence that either version of the letter was actually sent to Prince Bandar bin Sultan. One version of the letter bears no indicia that it was sent, *see id.* (MPS43_348-49), while the other is marked with a fax header that is indicative of it being sent *from* the fax number ▮▮▮▮ 0973 but does not establish to whom it was faxed, *id.* (MPS43_350-51). Neither letter references Al Bayoumi nor provides any indicia that he worked with Al Ali on drafting or filing any report. |
| 806. | Before sending the letter and IIRO-Sanabel report to Ambassador Bandar, Al-Ali sent his signed, handwritten draft of the letter by his fax ▮▮▮▮-0973) to Bayoumi. Bayoumi made edits and typed up both the letter and an accompanying one-page summary of accomplishments for transmission to Ambassador Bandar. One of Bayoumi's edits was to remove the Saudi Embassy from the letter's address line, indicating that this correspondence was being transmitted directly to Bandar. The phone records show Bayoumi used his Mosque office phone to call Al-Ali on December 14, 1998, the day before the letter was sent. Bayoumi then called Al-Ali on two further occasions on December 15, 1998 at 1:38pm and 2:28pm, before | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2AA (EO 3324-3332) is inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, there is no evidence that Al Bayoumi edited the letters in Plaintiffs Exhibit 374. *See* Response to Pls. Aver. ¶ 805. Plaintiffs Exhibit 374 consists of two slightly different versions of a letter purportedly from Dr. Soliman Al Ali to Prince Bandar bin Sultan dated December 15, 1998. *See* Pls. Ex. 374. Saudi Arabia does not dispute that both versions of the letter include a report on "what happened to the office of the Relief Organization" as well as "what happened to the investments" of the "Sanabel Al-Khair Company." *Id.* (MPS43_348, 350). Both letters conclude similarly, although not identically. *Compare* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | connecting to the main telephone line at the Mosque to fax the final letter to Al-Ali's fax number. Ex. 503, FBI 001531 at 1535; Ex. 2, EO 3327; Ex.679L, at FBI 9126. The report was sent to Ambassador Bandar the same day. | *id.* (MPS43_348) ("I kindly request Your Highness to review and direct as you see fit.") *with id.* (MPS43_350) ("I kindly request your review and direction as you see fit.").<br><br>It is not clear, however, that either version of the letter was actually sent to Prince Bandar bin Sultan. One version of the letter bears no indicia that it was sent, *see id.* (MPS43_348-49), while the other is marked with a fax header that is indicative of it being sent from the fax number ▮▮▮▮▮-0973 but does not establish to whom it was faxed, *id.* (MPS43_350-51). Neither letter references Al Bayoumi nor provides any indicia that he worked with Al Ali on drafting or filing any report. |
| 807. | Bayoumi was paid for his work on the Saudi government's IIRO-Sanabel extremist financing scheme. Just five days before the report to Ambassador Bandar was filed, on December 10, 1998, Bayoumi received a payment of $3,000 from an account at the First Virginia Bank in the name of "Sana-Bell Co." Ex. 2, EO 3326. The FBI found that "Bayoumi received approximately $15,000 from multiple transactions with [Al-Ali]." Ex. 2, EO 3084; Ex. 666, FBI 11624; Ex. 565, FBI 11489 (check from Al-Ali to Bayoumi); Ex. 564, FBI 010253 at 10254 (check from Al-Ali to Bayoumi's wife, Manal Bagader). For his part, Al-Ali was "largely funded by monies from Sana-Bell." Ex. 2, EO 3084. The payments to Bayoumi contemporaneous with his co-reporting with Al-Ali to Ambassador Bandar demonstrate | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2AA (EO 3324-3332), Exhibit 2Y (EO 3080-3085), and Exhibit 666 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertions that Al Bayoumi received payments largely rest on inadmissble hearsay. *See* Pls. Ex. 2AA (EO 3324-3332) (alleged $3,000 payment); Pls. Ex. 2Y (EO 3080-3085) (alleged $15,000 transations); Pls. Ex. 666 (FBI 11620-25) (alleged $15,000 transactions).<br><br>However, Saudi Arabia does not dispute that the produced banking records for Al Ali include a check for $200 to Al Bayoumi and a check for $165.85 to Manal Bagader, Al Bayoumi's wife. *See* Pls. Ex. 564 (FBI 10254); Pls. Ex. 565 (FBI 11489). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | that Bayoumi's efforts to advance the activities and "investments" of the Sanabel Al-Khair Company were part of his paid Saudi government job. | There is no evidence supporting Plaintiffs' assertion of "co-reporting with Al-Ali to Ambassador Bandar" or that any such involvement Al Bayoumi had with Sanabel had any relation to Al Bayoumi's regular employment. *See* Responses to Pls. Aver. ¶¶ 805-806. |
| 808. | Bayoumi had multiple entries of Soliman Al-Ali's contact information in his handwritten address book, including one that identified Al-Ali as "President of the Islamic Relief Organization." Ex. 12AA, MPS738_16L; Ex. 12AA, MPS738_50R. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

The cited handwritten phone book does not identify Al Ali as the "President" of the Islamic Relief Organization as Plaintiffs assert. Rather, it contains an entry with the name "Dr. Sulaiman Al-Ali" and the number "1800 955 4476," which is below an entry with the name "Islamic Relief Organization" and the number "(703) 536 4476." Pls. Ex. 12AA (MPS 738_16). |
| 809. | As an Embassy official, Saudi Arabia was responsible to ensure that Al-Ali resided in the Washington, D.C. area and worked only on Embassy business. Ex. 152, Dunham Rpt. 10. But Saudi Arabia assigned Al-Ali to live in San Diego and work alongside Bayoumi for nearly a year in 1998-1999. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 2, EO 3325-6. Bayoumi helped Al-Ali get settled in San Diego upon his arrival. Ex. 2, EO 3325-6. Al-Ali opened his bank account upon his arrival in September 1998 using Bayoumi's home mailing address and Bayoumi was listed on Al-Ali's September 1998 house lease as his "co-tenant /applicant / friend" and emergency contact. Ex. 2, EO 3325-6. | Plaintiffs Exhibit 2AA (EO 3324-3332) and Exhibit 152 are inadmissible hearsay. Exhibit 10 states a legal conclusion to which no response is required. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertions regarding Al Ali and Al Bayoumi rely solely upon multiple levels of inadmissible hearsay, namely, a November 2, 2001 FBI memorandum that purports to summarize numerous underlying documents that are not included within the record. *See* Pls. Ex. 2AA (EO 3324-3332). For example, the FBI memorandum alleges that Al Ali opened a Bank of America account using Al Bayoumi's home mailing address, but does not provide such account records. *See id.* (EO 3325). The FBI memorandum similarly alleges that Al Ali "was listed on [Al Ali's] rental application as a co-tenant/applicant/friend," but does not provide a copy of that application. *Id.* (EO 3326). |
| 810. | Al-Ali and Bayoumi were involved together in a Saudi government project called "Mana Co." or "Mana Life" used to recruit and train Saudi students as well as congregants of the King Fahad Mosque, including Ramez Noaman, who helped the 9/11 hijackers with flight lessons and other tasks. Ex. 10E, MPS902-CLIP Video Exhibit (showing training activity at offices of the King Fahad Mosque; includes distribution of "Mana" certificates and features Bayoumi reading aloud "Mana Co. We create the change for an amazing life."); Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 27 (Madha Supp. Decl.) has been stricken. *See* ECF No. 9562, at 8-9. *See* Objections Chart.<br><br>To the extent a response is required, the video in Plaintiffs Exhibit 10E does not indicate that "Al-Ali and Bayoumi were involved together in a Saudi government project called 'Mana Co.' or 'Mana Life' used to recruit and train Saudi students as well as congregants of the King Fahad Mosque, including Ramez Noaman, who helped the 9/11 hijackers with flight lessons and other tasks." The video depicts a room of men engaged in some type of activity; Al Bayoumi handing out certificates with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "MANA" written on top; and various images at the end in both Arabic and English, one of which states "MANA CO." followed by Arabic writing and then "We create the change for an amazing life." Pls. Ex. 10E. |
| 811. | Both Bayoumi and Al-Ali listed that "Mana" entity – as well as Dallah Avco – on leases and other financial documents as their employer. Ex. 2, EO 3325-6, 3553. The credit check run by the Parkwood apartments on February 4, 2000, for Bayoumi to act as the co-signer and guarantor of the hijackers' lease, showed that Bayoumi had listed "Mana Life" as his employer. Ex. 91, Ratchford Decl. Exhibit A, p. 31 (PDF page 38). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2AA (EO 3324-3332) and Exhibit 2PP (3478-3608) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 91 contains a credit report run by Experian with no indication why "Mana Life" was listed as an employer for Al Bayoumi. *See* Pls. Ex. 91 (Ratchford Decl.), Ex. A, at PDF p. 39. In any event, to the extent Al Bayoumi listed "Mana Life" as his employer, that is evidence that whatever activities Al Bayoumi engaged in with respect to "Mana" or Al Ali were outside the scope of any employment or agency relationship with Saudi Arabia. |
| 812. | *Sheikh Muhammad Al Qahtani.* Bayoumi's handwritten address book contains a listing for "Sheikh Muhammad Al-Qahtani" with a phone number of ▓▓▓▓▓-0896. Ex. 12AA, MPS738_75. That San Diego phone number was listed by Bayoumi in his October 2000 typed phone book for "Al Ghahtani, Mohed Gen" and on a Bayoumi handwritten page with the heading "Consulate General of Saudi Arabia." Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2A (EO 37-40), Exhibit 2MM (EO 536-555), Exhibit 12AA (MPS 738), Exhibit 421 (FBI 345-49), Exhibit 532, and Exhibit 679H are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 421, FBI 000345; Ex. 679H, FBI 4243. That number is a San Diego number and publicly available information shows that it was associated with the same apartment complex on ████████ in San Diego where ███████ lived. Ex. 2, EO 37 ████████ lived at apartment at ███ ████████████, EO 540 (Bayoumi lived at ████████ ██. Bayoumi also had a listing for "Sheikh Muhammad Al Qahtani" handwritten on the back of one of the pages of his January 2000 typed phone list with Qahtani's home and cell numbers in Saudi Arabia, which Bayoumi kept in his "green folder." Ex. 12BB, MPS 688_10. | To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. There is no evidence that the typed phone lists in Plainitffs Exhibits 12BB (MPS 688) and Exhibit 421 (FBI 345-49) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. Saudi Arabia similarly does not dispute that Plaintiffs Exhibit 679 contains a piece of paper with many separate handwritten notes that was seized by the FBI from the Masjid Al Madina Mosque. *See* Pls. Ex. 679H (FBI 4243). One of the notes on the top of the piece of paper states "Consulate General of Saudi Arabia" together with the address of the Consulate. *See id.* However, there is no evidence that the note belonged to Al Bayoumi or is in his handwriting. As such, the note is inadmissible hearsay. Saudi Arabia does not dispute that Al Bayoumi resided for a period of time at ████████████ or that ████████ resided for a period of time at ████████████, although Plaintiffs rely upon inadmissible hearsay – summary FBI memoranda that should be excluded from evidence, *see* Pls. Ex. 2A (EO 37-40); Pls. Ex. 2MM (EO 536-555) – in support of those assertions. |
| 813. | Qahtani was a Saudi government religious official working in San Diego in the period 1998-2000. Bayoumi referenced "Sheikh | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mohamed" in an August 1998 message to Hamerman, which shows that Qahtani was an associate of Hamerman. Ex. 383, MPS43_216█████████████. Saudi official Abdullah Al Noshan sent a check to a Mohamed Al Qahtani for over $15,000 in May 1998. Ex 315, MWL-IIRO 64943; Ex. 13, Weidner Decl. ¶ 15 (regarding the role of Al Noshan). Muhammad Al Qahtani was a featured guest at the welcome party for the 9/11 hijackers on February 17, 2000 and was at the event with Fathi Aidarus. Section XXII *infra*; Ex. 10K, MPS2023-059 Video Exhibit and 10K-TR Transcript 14:27, 17:50; Ex. 694, Youssef Decl. ¶¶ 73-76. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Exhibit 13 (Weidner Decl.) and 694 (Youssef Supp. Decl.) have been stricken. Plaintiffs Exhibit 383 and ██ are inadmissible hearsay. *See* ECF No. 9562, at 8-10; Objections Chart. To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi drafted a letter to an unidentified "Omar" that referenced, *inter alia*, a Sheikh Muhammad or Muhammed. *See* Pls. Ex. 383; Pls. Ex. ████. However, the letter does not provide any indication whether "Omar" refers to Hamerman or whether Sheikh Muhammad refers to Al Qahtani. *See id.* Furthermore, copies of the letter were seized by the MPS and the FBI and bear no indicia that they were actually sent to "Omar." *See id.* To the contrary, the letter has several indicators of being an early draft, as the same text is repeated in both Arabic and English. *See id.* Regardless, neither letter supports Plaintiffs' assertion that "Qahtani was an associate of Hamerman." There is no evidence Al Qahtani was a "featured guest" or that the party was a "welcome party" for the hijackers. Plaintiffs rely only on Plaintiffs Exhibit 694 – a stricken Youssef declaration. There is also no evidence that Al Qahtani was a "Saudi government religious official." *See also* Responses to Pls. Aver. ¶¶ 1675-1678 (mischaracterizations of Al Qahtani). |
| **XI.G.** | **Other Embassy Departments** | |
| 814. | *Jameel Al-Shami.* Bayoumi listed Dr. Jameel Al-Shami ████████-3344 of the Embassy's National Guard office in his handwritten address book, and in his phone | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | lists. Ex. 678W, MPS732_226 (copy of earlier page from Bayoumi's handwritten address book listing Shami at National Guard office); Ex. 12BB, MPS 688_4 (January 2000 typed phone list). Shami provided Bayoumi with fraudulent letters to support his student status inside the U.S., claiming that Bayoumi had a "scholarship. Ex. 12; Ex. 552, FBI 8143; Ex. 678Z, MPS 732_449 (Shami letter to Case Western Reserve University). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12BB (MPS 688), Exhibit 552, Exhibit 678W (MPS 732_226) (which Plantiffs have not attached as an exhibit), and Exhibit 678Z (MPS 732_449) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no evidence that the typed phone list in Plaintiffs Exhibit 12BB (MPS 688) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 678W and accordingly the page from the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that the MPS seized a letter from Dr. Jamil Shami, Director of Academic Affairs at the Royal Embassy of Saudi Arabia's National Guard Office, to Dr. Sue Natrtker at Case Western Reserve University. *See* Pls. Ex. 678Z (MPS 732_449). The letter, dated May 20, 1998, states that Al Bayoumi "is a candidate for a full scholarship from the Government of Saudi Arabia. The scholarship provides the student's tuition and required fees. The student will receive a monthly living allowance and bi-annual stipends for books, clothing and medical insurance. Please evaluate this student's credentials and notify us at your earliest convenience of the admission or academic eligibility of the applicant. A statement of eligibility is essential for the applicant to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | process his scholarship." *Id.* Plaintiffs' assertion that the letter was "fraudulent" is not supported by any evidence. Nor does the letter state Al Bayoumi had a scholarship; it only stated that Al Bayoumi was a "candidate" and an "applicant" for such a scholarship, not that he had received one. *Id.* |
| 815. | The Saudi Embassy Cultural Affairs department helped supervise and fund Saudi Student Clubs. Bayoumi had references in his handwritten address book to the Saudi Students Club and to the Cultural Affairs department at the Embassy. Ex. 12AA, MPS738_51, 53. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br> Plaintiffs' assertion that the Saudi Embassy Cultural Affairs department "helped supervise and fund Saudi Student Clubs" is not supported by any citation or record evidence. |
| 816. | Bayoumi met, associated with, befriended numerous students and young men less than half his age even though he had not earned a credit for a regular course since early 1997. Ex. 2, EO 2228 (Bayoumi indicated that he was the President of a Saudi Arabian Club at the university he attended). Bayoumi worked to recruit these younger men to assist him to carry out assignments and missions. Thumairy was also heavily | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2U (EO 2220-30) and Exhibit 90 (Ex. 2) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | involved in Saudi Student Clubs. Bayoumi and Thumairy both participated in a student event at the King Fahad Mosque in April 1999. Ex. 90, Snell Decl. Ex. 2 at 6 (Bayoumi recalls seeing Thumairy at Saudi Students Club event in San Diego); Ex. 301, KSA 8506 (October 1996 report of Thumairy); Ex. 144, KSA 8785-87 (September 2002 report of Thumairy filed with Los Angeles President of Saudi Students Club). | To the extent a response is required, the material does not support Plaintiffs' assertion that Al Bayoumi "met, associated with, befriended numerous students and young men less than half his age even though he had not earned a credit for a regular course since early 1997." Plaintiffs Exhibit 2U (EO 2228) is hearsay stating that Al Bayoumi told Abdussatar Shaikh that he "attended the United States International University where he took business classes," that "his trips to England were to attend school there," and that "he was President of a Saudi Arabian club at the university he attended." Pls. Ex. 2U (EO 2228). Plaintiffs Exhibit 90 states Al Bayoumi told the FBI that he recalled "seeing Al-Thumairy at a post-Ramadan 'Eid' festival for Saudi students, which was held at the Saudi Student Club's house in San Diego." Pls. Ex. 90 (Snell Decl.), Ex. 2, at 6. However, when Al Bayoumi was questioned by Plaintiffs regarding this alleged statement to the FBI, he denied making the statement and said no such Saudi Student Club even existed. *See* Pls. Ex. 120 (Bayoumi Tr.) 822:16-823:4.

There is thus no indication of the credits earned by Al Bayoumi, or that Al Bayoumi met, associated with, or befriended anyone as a student, or the age of those students. There is also no indication that Al Bayoumi "worked to recruit these younger men to assist him to carry out assignments and missions" and that Al Thumairy "was also heavily involved in Saudi Student Clubs." |
| 817. | Grossmont College records were collected by the FBI regarding membership forms for the Muslim Student Association; the records indicated that Mohdar Abduallah was a member. Ex. 2, EO 1298. Bayoumi's handwritten address book inexplicably contained contact information for Grossmont College despite this not being an | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | institution with which he was ever affiliated. Ex. 12AA, MPS738_34. | Plaintiffs Exhibit 2P (EO 1298-1300) and Exhibit 12AA (MPS 738) are inadmissible hearsay. *See* Objections Chart. |
| | | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| | | Plaintiffs' assertion that Grossmont College was "not [] an institution with which he was ever affiliated" is not supported by any cited material. |
| | | Plaintiffs rely solely upon inadmissible hearsay as support for their assertion that Mohdar Abdullah was a member of the Muslim Student Association at Grossmont College. According to an FBI memorandum, the FBI collected records of "different membership forms for the Muslim Student Association (MSA) at Grossmont College." Pls. Ex. 2P (EO 1298). Although the FBI did not produce those records, the memorandum purports to summarize their contents – another level of hearsay – and list the members of the Association for the Spring and Fall of 2000 as well as the Spring of 2001. *See id.* at (EO 1298-1300). The FBI memorandum includes the name "Mohdar Abdullah" in connection with the Spring 2000 list. *See id.* at (EO 1298). |
| 818. | Among Bayoumi's belongings seized by the MPS were various personal and business documents, business cards and scraps of paper with names and telephone numbers of individuals. Included in this information were telephone numbers associated with the Saudi Cultural Mission in Washington, D.C. including Mohammad Al-Sheikh and Abed Al-Sulieman with the following phone numbers: ███████-8869, 8817, 8850, and 8738. Ex. 552, FBI 8143. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 552 are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mohamed Al Sheikh's direct work and personal phone numbers were also recorded in Bayoumi's handwritten address book. Ex. 12AA, MPS738_52. | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Moreover, Plaintiffs Exhibit 552 is not a "belonging seized by the MPS." It is a hearsay FBI document purporting to state what was seized from Al Bayoumi. *See, e.g.*, Pls. Ex. 552 (FBI 8143) ("Additionally, seized during the search were various personal and business documents, business cards and scraps of paper with names and telephone numbers of individuals."). |
| **XI.H.** | **Bayoumi's work relationship with the Saudi Consulate in Los Angeles** | Al Bayoumi did not have any work relationship with the Saudi Consulate in Los Angeles. |
| 819. | At his deposition, Bayoumi claimed that "I do not know anyone at the consulate [the Saudi Consulate in Los Angeles]." Ex. 120, Bayoumi Dep. 297:3-7. When asked "is there anyone at the consulate who you knew?" Bayoumi answered "No." Ex. 120, Bayoumi Dep. 298:18-20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs omit context for Al Bayoumi's testimony. He did not deny calling individuals at the Consulate. He explained that he would call the Consulate but "would call the reception and ask to speak to a designated person." *See* Pls. Ex. 120 (Bayoumi Tr.) 297:5-7; *see also id.* at 296:12-297:1. |
| 820. | As detailed below, Bayoumi's claim is belied by evidence from Bayoumi's handwritten address book; his phone calls with Consulate officials; Bayoumi's personal trips to the Consulate and meetings with Consulate officials, including Bayoumi's videos; and documents, including relevant correspondence of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi that was not produced by Saudi Arabia but revealed for the first time in the MPS production. Bayoumi made multiple visits to the Consulate in preparation for the hijackers' arrival including on January 9, 2000, January 31, 2000 and February 1, 2000. | To the extent a response is required, Plaintiffs omit context for Al Bayoumi's testimony. He did not deny calling individuals at the Consulate. He explained that he would call the Consulate but "would call the reception and ask to speak to a designated person." *See* Pls. Ex. 120 (Bayoumi Tr.) 297:5-7; *see also id.* at 296:12-297:1. Moreover, there is no evidence that Al Bayoumi visited the Consulate on January 9, 2000 (a Sunday, when the Consulate would be closed). The evidence also shows that he visited the Consulate on either January 31, 2000 or February 1, 2000, but not on both days. *See* Response to Pls. Aver. ¶ 1532. |
| 821. | *Saudi Consul General Salloum.* Bayoumi's handwritten address book had contact information for Salloum. Ex. 12AA, MPS738_50, 52. The MPS production showed that on November 30, 1998, Bayoumi wrote to Saudi Consul General Mohamed Al Salloum about the establishment of Al Madinah Mosque and "the major role played by the [Saudi] government" in the establishment of the Mosque. Ex. 412, MPS 43_337. Bayoumi mentioned in his letter that he had "already spoken to brother [Consulate official] Saad al-Jabreen" about the project. *Id.* Thumairy told the 9/11 Commission that Salloum was his superior and the individual to whom he reported. Ex. 90, Snell Decl., Ex. 3 at 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 412 (MPS 43_337), Exhibit 12AA (MPS 738) and Exhibit 90 (Snell Decl. (Ex. 3)) are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br> The purported address book does not contain contact information for Al Salloum. It contains a page with a note at the top that states "His Excellency Ambassador Mohammad Abdulrahman Al-Salloum Consul General for Saudi Arabian Kingdom Los Angeles" but has no contact information. Pls. Ex. 12AA (MPS 738_50). The other pages cited by Plaintiffs list general contact information for the Consulate in Los Angeles: one entry provides the phone number, "La (310) 479-6000 - The Embassy," while the other entry provides the address, "The embassy in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Los Angeles 2045 Sawtelle Boulevard LA CA 90025." *Id.* at (MPS 738_52). Neither of those entries, however, references Al Salloum. *See id.* |
| | | Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted a letter on the Mosque's letterhead addressed to Saudi Consul General Salloum, dated November 30, 1998, providing an update on activities at the Al Madina Mosque. *See* Pls. Ex. 412 (MPS 43_337). The letter states, *inter alia*, "We recognize the major role played by the government of the Custodian of the Two Holy Shrines, may Allah preserve him, such as taking care of mosques and preserving them, as well as offering generous support, especially by providing Qur'ans, books, and carpets, as well as propagators specifically in the Holy Month of Ramadan. I have already spoken to brother Saad Al-Jabreen who showed his readiness to provide whatever is needed according to the available resources." *Id.* However, the letter was seized by the MPS and bears no indicia that it was actually sent to General Salloum. *See id.* |
| | | Plaintiffs provide no admissible evidence that Al Salloum was Al Thumairy's "superior" and the individual to whom Al Thumairy "reported." To the contrary, Al Thumairy testified: "What I believe is that I said that the Consul General was in charge of all Saudi citizens in general." Pls. Ex. 107 (Thumairy Tr.) 108:4-9. |
| 822. | On January 26, 1999, Bayoumi wrote again to Salloum to thank him for "the beautiful reception bestowed upon myself, Sheikh Mutaeb Al-Sudairy, and Sheikh Adel Al-Sadhan (guests from the Ministry of Islamic Affairs) by your Deputy….as well as the efforts of the brothers in the Islamic Affairs (Brother Saad Al-Jabreen) in providing us | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with some copies of the Qur'an…." Ex. 373, MPS 43_345. Bayoumi signed the letter "The General Supervisor." The letter demonstrates the high status that Bayoumi held among senior Consulate officials, and Bayoumi's role as chaperone of the important visiting MOIA propagators. | Plaintiffs Exhibit 373 (MPS 43_345) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted a letter dated January 26, 1999, on the Mosque's letterhead to Al Salloum. *See* Pls. Ex. 373 (MPS 43_345). In the letter, Al Bayoumi stated, *inter alia*: "Also, I would like to commend the beautiful welcome received by myself, Sheikh Mutaeb Al-Sudairy, and Sheikh Adel Al-Sadhan (guests from the Ministry of Islamic Affairs) from your Deputy, may Allah preserve him, as well as the efforts of the brothers in the Islamic Affairs (Brother Saad Al-Jabreen) in providing us with some copies of the Qur'an, which were immediately distributed to some of the mosques here." *Id.* Al Bayoumi signed the letter with his name and the title "The General Supervisor." *Id.* Saudi Arabia notes that the letter was seized by the MPS and bears no indicia that it was actually sent to General Salloum. *See id.*<br><br>The cited material does not indicate Al Bayoumi held "high status among senior Consulate officials" or had a "role as chaperone of the important visiting MOIA propagators." |
| 823. | *Saad Al Jabreen*. Bayoumi's handwritten address book has Jabreen's name and Consulate extension number under the title "Islamic affairs" along with the contact information for Deputy Consul General Awad and Consulate Secretary Ismail Mana. Ex. 12AA, MPS738_52. Bayoumi's personal notes include references to Jabreen with the Consulate's phone number. Ex. 533, FBI 4286. Bayoumi's January 1999 letter to MOIA Embassy Director Sowailem | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738), Exhibit 90 (Snell Decl. (Ex. 3)), 413 and 533 are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | thanks "Saad Al-Jabreen" of the Saudi Consulate – who Bayoumi describes as "Islamic Affairs' Los Angeles" – for his "complete cooperation" and "coordination" with Bayoumi, Thumairy, and Embassy Islamic Affairs Department official Saleh to organize a trip of MOIA propagators to San Diego. Ex. 413, MPS 43_338. Also in January 1999, Bayoumi corresponded with Jabreen at "Islamic Affairs / Consulate" thanking him for his assistance. Ex. 398, MPS 43_346. Thumairy admitted to the 9/11 Commission that Jabreen (and Abdullah Awad before him) was the individual he worked "most closely" with at the Consulate. Ex. 90, Snell Decl., Ex. 3 at 3. | To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia similarly does not dispute that the page bates-stamped "FBI 004286" of Plaintiffs Exhibit 533 contains a handwritten note by Al Bayoumi with the names "Saad Al Shabreen" and ▌▌▌▌▌ along with a telephone number for the Saudi Consulate. Pls. Ex. 533 (FBI 4286). Saudi Arabia disputes that the remaining handwriting on this page, or the other two pages that Plaintiffs elected to group together to form Plaintiffs Exhibit 533, is Al Bayoumi's. *See* Pls. Ex. 533. Furthermore, Al Bayoumi was specifically questioned by Plaintiffs at his deposition regarding "FBI 004286." He testified: "[s]o this point, there was a call. I called the embassy to inquire about the Quran books, and then they informed me the person – the designated personnel for this matter would be either Saad Al Shabreen or Ismail Mana" but that he did not know Al Jabreen and ▌▌▌▌▌ outside of this call. Pls. Ex. 120 (Bayoumi Tr.) 301:13-303:2.<br><br>Saudi Arabia similarly does not dispute that Al Bayoumi drafted a letter on the Al Madina Mosque's letterhead to Al Sowailem in which Al Bayoumi expressed gratitude for the dispatch of Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area. *See* Pls. Ex. 413 (MPS 43_338). In the letter, Al Bayoumi also expressed his "appreciation for the efforts of brother Abdulaziz Al-Saleh; brother Fahad Al-Thumairy, the Imam of Masjid Ibn Taymiyyah (Los Angeles); and brother Saad Al-Jabreen (Islamic Affairs - Los Angeles), all of whom demonstrated complete cooperation." *Id.* The letter was seized by the MPS and bears no indicia that it was actually sent to Al Sowailem. *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs also cite to an FBI summary memorandum – inadmissible hearsay – of a February 23, 2004 interview of Al Thumairy. *See* Pls. Ex. 90 (Snell Decl.), Ex. 3. In that interview, Al Thumairy allegedly said "that he worked most closely with two individuals named Said Jabreen and Abdullah Hawad, both of whom helped him with administrative matters. Jabreen replaced Hawad in this role." *Id.* However, the only admissible evidence is Al Thumairy's testimony: "No, I didn't work at the consulate, so that information is incorrect." Pls. Ex. 107 (Thumairy Tr.) 104:17-105:10.<br><br>Finally, Ismail Mana was not the "Consulate Secretary"; he was a translator at the Consulate. *See* KSA Aver. ¶ 49. |
| 824. | *Sami Al Ibrahim.* In December 2000, Bayoumi wrote to Saudi Deputy Consul Sami Al Ibrahim (who Bayoumi addressed as "Consul"), Jabreen, and Ismail Mana, which, according to Plaintiffs' expert Youssef's review, demonstrated a obvious closeness, "addressing them as 'brothers' and writing to them in a style and manner which showed that Bayoumi had a familiar relationship and intimacy with each of them." Ex. 408, MPS 43_387; Ex. 5, Youssef Rpt. 81 (Youssef providing his assessment of the Arabic used by Bayoumi). Saudi Arabia did not produce Bayoumi's December 2000 letter to the Consulate in its document production. Thumairy identified "Sammy" Ibrahim to the FBI in 2003 as his friend. Ex. 154, FBI 000001- 000006-REV2021 at 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 408 and Exhibit 154 are inadmissible hearsay. Exhibit 154 may not be proffered for impeachment. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, the term "brother" in Arabic does not denote intimacy, as demonstrated by the video of the "party" in which many individuals who did not previously know one another refer to each other as "brother." *See, e.g.*, Pls. Ex. 11K ("And we are welcoming the brothers, in fact . . . *whom we have not yet had the pleasure of meeting*.") (emphasis added).<br><br>Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted a letter dated December 29, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2000, on the Mosque's letterhead to "His Excellency The Consul of the Custodian of the Two Holy Shrines" with a note at the top indicating "[a] copy with greetings to Brother Saad Al-Jabreen." Pls. Ex. 408 (MPS 43_387). The letter states, *inter alia*, "I also cannot help but thank the brothers, His Excellency Doctor Sami Al-Ibrahim, Mr. Sami Al-Sadhan, Mr. Saad Al-Jabreen, and Sheikh Ismail Mana for the attentiveness they devoted towards us." *Id.* However, the letter is not addressed to Ismail Mana as Plaintiffs misleadingly assert. Furthermore, the letter was seized by the MPS and bears no indicia that it was actually sent to Al Ibrahim. *See id.* There is also no evidence that the letter was ever within Saudi Arabia's possession, custody, or control, or that Saudi Arabia did not comply with its discovery obligations. <br><br> Plaintiffs' assertion that Al Thumairy identified Al Ibrahim as his friend to the FBI in 2003 rests on inadmissible hearsay *See* Pls. Ex. 154 (FBI 000004-REV2021). The only admissible evidence is Al Thumairy's testimony that he knew Al Ibrahim from attendance at the King Imam Mosque for some Friday prayers, Pls. Ex. 107 (Thumairy Tr.) 105:21-107:6, but he was not someone that Al Thumairy considered a friend. *See id.* at 281:8-10, 16-22. |
| 825. | Bayoumi was also found in possession of various Consulate business cards, including those of Ibrahim, Jabreen and Sami Al Sadhan, and a note written by Bayoumi with contact information for ▮▮▮▮ and Jabreen. Ex. 678J, MPS 95_72, 704_73, 713_139 (three cards of Deputy Consul General Sami Al Ibrahim); Ex. 678L, MPS 95_106, 713_22 (two cards of Vice Consul Sami Al Sadhan); Ex. 444, MPS 713_11 (one card of Saad Al Jabreen); Ex. 120, | Plaintiffs Exhibit 444 (MPS 713_11, MPS 95_106, MPS 95_229, MPS 713_22), Exhibit 678J, Exhibit 678L and Exhibit 533 are inadmissible hearsay. *See* Objections Chart. <br><br> Saudi Arabia does not dispute that certain business cards were seized by the MPS from 34 Dymoke Street. Saudi Arabia also does not dispute that Plaintiffs Exhibit 533 (FBI 4286) contains a handwritten note by Al Bayoumi with the names "Saad Al Shabreen" and "▮▮▮▮▮▮▮," along with a telephone number for the Saudi Consulate. Pls. Ex. 533 (FBI 4286). However, the remaining handwriting on this page and the other two pages that Plaintiffs elected to group together to form Plaintiffs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi Dep. 301:8-303:2; Ex. 533, at FBI 4286 (Bayoumi's handwritten note with ▮▮▮▮ and Jabreen's names and Consulate phone number). | Exhibit 533, is not Al Bayoumi's handwriting. *See* Ex. 120 (Bayoumi Tr.) 299:18-301:7.<br><br>Further, Al Bayoumi explained the note on "FBI 004286": "[s]o this point, there was a call. I called the embassy to inquire about the Quran books, and then they informed me the person – the designated personnel for this matter would be either Saad Al Shabreen or ▮▮▮▮." Pls. Ex. 120 (Bayoumi Tr.) 302:20-303:2. Al Bayoumi testified that he did not know Al Jabreen or ▮▮▮▮ outside of this call. *Id.* at 302:9-303:2. |
| 826. | *Abdullah Al Awad.* Bayoumi had multiple listings for "Abdullah Al-Awad" and "Al-Awad" in his handwritten address book, together with Awad's extension at the Consulate. Ex. 12AA, MPS738_52. Awad was in charge of Islamic Affairs at the Consulate and oversaw Consulate Secretary Ismail Mana. Ex. 95, Awad Dep. 75:12-77:16. Bayoumi had Awad's name in his handwritten address book next to Mana's name and Saad Al-Jabreen. Bayoumi also had a handwritten note stating Awad's name and containing the notion "Consulate, through [MOIA's Embassy Director] Khalid Al Sowailem." Ex 678V, MPS 732_212-214 at 213. MOIA's Propagator Supervisor Thumairy admitted to the 9/11 Commission that Awad (followed by Jabreen in the same position) was the individual with whom he worked "most | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738), Exhibit 90 (Snell Decl. (Ex. 3)), and Exhibit 678V are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no admissible evidence that Al Thumairy "worked most closely" with Awad and Jabreen at the Consulate. The only admissible evidence is Al Thumairy's testimony: "No, I didn't work at the consulate, so that information is incorrect." Pls. Ex. 107 (Thumairy Tr.) 104:17-105:10. The cited material also does not support Plaintiffs' assertion that Al Thumairy was a "MOIA's Propagator Supervisor."<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | closely" with at the Consulate. Ex. 90, Snell Decl., Ex. 3 at 3. | Saudi Arabia does not dispute that Al Awad testified that he was "overseeing the Islamic Affairs section at the consulate" for "a period of time" when he first arrived as the deputy consul. Pls. Ex. 95 (Awad Tr.) 75:12-76:7. Al Awad also testified that Ismail Mana "was working in that particular Islamic Affairs section" at the time. *Id.* at 76:9-77:8. However, Mana was not the "Consulate Secretary"; he was a transaltor at the Consulate. *See* KSA Aver. ¶ 49.<br><br>Saudi Arabia does not dispute that the MPS seized a handwritten note that states "Abdullah Alawad Consulate/ referred by Khalid Al Sowilam." Pls. Ex. 678V (MPS 732_213). However, Plaintiffs provide no citation or record support that Al Bayoumi drafted the short note, and it is inadmissible hearsay. |
| 827. | On January 31, 2000, Awad met with Bayoumi and his family at the Saudi Consulate when they filed for passports. Awad's signature is on the passports issued for Bayoumi and his family dated February 1, 2000. Ex. 211, KSA 6642-6665 at 43; Ex. 143, KSA 7996-8000 at 7996 (Bayoumi passport) (Awad Dep. Ex. 464); Ex. 95, Awad Dep. 127:11- 128:22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Awad testified that he did not recall meeting with Al Bayoumi at the Los Angeles Consulate, and that he did not participate in the preparation of Plaintiffs Exhibit 211 (KSA 6643). Pls. Ex. 95 (Awad Tr.) 124:15-22; 125:13-127:8. Al Bayoumi made one trip to the Los Angeles Consulate on either January 31 or February 1, 2000, not two. *See* Response to Pls. Aver. ¶ 1532. |
| 828. | *Ismail Mana.* In a page with his Saudi Embassy and Consulate contacts, Bayoumi had listings for "Mana Islamic Affairs" and "Islamic affairs Ismail Mana" with Mana's extension number and fax number. Ex. | This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 533 (FBI 4286) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 12AA, MPS738  53. ████████ ████████████████████ ████████████ Bayoumi flatly denied knowing Mana at his deposition. Ex. 120, Bayoumi Dep. 302:15-17. | Saudi Arabia does not dispute that the page bates-stamped "FBI 004286" of Plaintiffs Exhibit 533 contains a handwritten note by Al Bayoumi with the names "Saad Al Shabreen" and ████████ along with a telephone number for the Saudi Consulate.  Pls. Ex. 533 (FBI 4286).  Saudi Arabia disputes that the remaining handwriting on this page, or the other two pages that Plaintiffs elected to group together to form Plaintiffs Exhibit 533, is Al Bayoumi's.  *See* Ex. 120 (Bayoumi Tr.) 299:18-301:7.<br><br>Plaintiffs' assertion that "Bayoumi flatly denied knowing ████ at his deposition" is misleading.  ████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████ *id.* at 302:20-303:2, ██████████████████████████ *Id.* at 302:15-17.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 829. | In a December 2000 letter to Mana, Bayoumi referred to Mana as "Sheikh," demonstrating that Bayoumi knew of Mana's role to lead the prayers at the King Fahad Mosque despite Bayoumi's assertion that he had only been the KFM between one and three time total. Ex. 120, Bayoumi Dep. 347:22-348:16. Consul General Salloum, who attended the King Fahad Mosque every week, similarly referred to Mana as "Sheikh" in correspondence to MOIA Deputy Minister Ammar. Ex. 216, KSA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 154 is inadmissible hearsay.  *See* Objections Chart. It also may not be proffered for impeachment.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 7150. King Fahad Mosque employees also wrote to Mana as "Sheikh." Ex. 292, KSA 7193 (March 2001 memo of Mosque to "Sheikh Ismail Mana" forwarded to the Embassy Islamic Affairs Department). Thumairy admitted to the FBI in May 2003 that he worked with [REDACTED], who Thumairy acknowledged was part of the Consulate's Islamic Affairs Section. Ex. 154, FBI 000001-000006-REV2021 at 2. | To the extent a response is required, Plaintiffs provide no support for the notion that use of the term "Sheikh" indicates Mana led prayers.<br><br>Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted a letter dated December 29, 2000 on the Mosque's letterhead to "His Excellency The Consul of the Custodian of the Two Holy Shrines" with a note at the top indicating "[a] copy with greetings to Brother Saad Al-Jabreen." Pls. Ex. 408 (MPS 43_387). The letter is hearsay, and states, *inter alia*, "I also cannot help but thank the brothers, His Excellency Doctor Sami Al-Ibrahim, Mr. Sami Al-Sadhan, Mr. Saad Al-Jabreen, and Sheikh Ismail Mana for the attentiveness they devoted towards us." *Id.* This letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Ibrahim. *See id.*<br><br>Plaintiffs' assertion that Al Thumairy admitted to the FBI in May 2003 that he worked with [REDACTED] in the Islamic Affairs Department relies upon inadmissible hearsay, namely a May 13, 2003 FBI memorandum purporting to summarize an interview of Al Thumairy. *See* Pls. Ex. 154. In that interview, Al Thumairy allegedly said that he worked with "2 other individuals, [REDACTED] and Abdul Karim Bimbas in the Islamic Affairs/Media Section." *Id.* at (FBI 000002-REV2021). The only admissible evidence is Al Thumairy's testimony that the statement was incorrect and that he did not remember making that statement. Pls. Ex. 107 (Thumairy Tr.) 218:12-219:6 ("No, that's incorrect. This form isn't correct."). Al Thumairy further explained "Right now, I don't remember him. He may have been one of the employees there at the time. Right now, I don't remember him." *Id.* at 219:10-13. |
| 830. | During two interviews with the FBI in November 2015, [REDACTED] stated that Bayoumi was a Saudi citizen who was treated with great respect inside the Saudi | Plaintiffs Exhibit 2A (EO 0041-47), Exhibit 89, Exhibit 345, Exhibit 457, and Exhibit 566 are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Consulate in Los Angeles, was well regarded by the people in the Consulate, and held a "very high status" when he entered the building. Ex. 2, EO 0044, Ex. 566, FBI 11755. ▮ further stated that "Bayoumi's status was higher than many of the Saudi persons in charge of the Consulate." Ex. 2, EO 0044. ▮ also stated that "Bayoumi had more clout at the Consulate than either Mohamed al-Muhanna or Thumairy, and that Bayoumi was considered higher in rank than the Consul General." Ex. 457, FBI 47; Ex. 345, Vasquez Decl. ¶20; Ex. 89, Gonzalez Decl. 20 (p. 7, two paragraphs erroneously numbered '20'). | Plaintiffs' assertions rely solely upon inadmissible evidence replete with multiple levels of hearsay and speculation. Plaintiffs cite to a January 11, 2016 FBI memorandum – drafted on January 8, 2016 – purporting to document an interview of ▮ that was conducted on November 12, 2015 – nearly 2 months prior. *See* Pls. Ex. 2A (EO 0041) (listing a "[d]ate drafted" of "1/08/2016"). The memorandum is inadmissible hearsay, a non-contemporaneous document summarizing the author's account of statements allegedly made by ▮ during that previous interview. *Id.* Plaintiffs also rely upon a January 15, 2016 FBI memorandum – drafted on November 17, 2015 – purporting to document an interview of ▮ that was conducted on November 13, 2015. *See* Pls Ex. 457 (FBI 46). The memorandum is similarly inadmissible hearsay, summarizing the author's account of statements allegedly made by ▮ during the second interview. *Id.* Plaintiffs' reliance upon an April 4, 2016 FBI memorandum is even more tenuous, as the 2016 memorandum is inadmissible hearsay that purports to summarize the inadmissible hearsay contained in the prior two FBI interview memoranda of ▮ – hearsay-within-hearsay. *See* Pls. Ex. 566.

The only admissible evidence is ▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████████ |
| | | Plaintiffs' reliance on the Declarations of Daniel Gonzalez and Efrain Vasquez, who are Plaintiffs' paid consultants, is misplaced. *See* Response to Pls. Aver. ¶ 1495. |
| **XI.I.** | **MOIA Propagators working in California** | |
| 831. | *MOIA's California Supervisor Thumairy.* Bayoumi's handwritten address book included Thumairy's phone numbers at the Mosque, and Thumairy's home, fax numbers and cell number ████████ 3362"). Ex. 12AA, MPS738_35. Bayoumi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | had separate listings for Thumairy in his January and October 2000 phone lists, and on a sheet of paper in his desk. Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 000345 (October 2000); Ex. 532, FBI 4270 (paper seized from Bayoumi's Mosque Office). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738), Exhibit 12BB (MPS 688), Exhibit 421 (FBI 345-49), and Exhibit 532 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>There is no evidence that the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688) and Exhibit 421 (FBI 345-49) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay.<br><br>Saudi Arabia does not dispute that a sheet of paper seized by the FBI from the Al Madina Mosque includes Al Thumairy's name along with three phone numbers. *See* Pls. Ex. 532 (FBI 4270). Plaintiffs assertions that it was seized from Al Bayoumi's desk, belonged to Al Bayoumi, and was written by Al Bayoumi are unsupported by any citation or factual evidence. As such, the sheet of paper is inadmissible hearsay. |
| 832. | Bayoumi and Thumairy spoke to each other 67 times between December 16, 1998 and December 20, 2000, and the timing of the calls closely match their joint work assignment to provide support for Hazmi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and Mihdhar. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Bayoumi began contacting the King Fahad Mosque on December 8, 1998 and called Thumairy directly—his first known contact directly with Thumairy—on December 16, 1998, just prior to the assignment of three MOIA propagators—Sudairy, Sadhan, and Mersal—to California at the beginning of Ramadan 1419 on December 20, 1998. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 12A is an improper summary exhibit and is riddled with mistakes. *See* Response to Pls. Aver. ¶ 446. <br><br> It appears that Plantiffs meant to cite to Plaintiffs Exhibit 12B, which purports to list calls between Al Bayoumi and Al Thumairy. That exhibit, however, is also an improper summary exhibit. <br><br> Plaintiffs Exhibit 12B misattributes to Al Bayoumi 11 calls that were made from a publicly available phone line at the Al Madina Mosque, including the purported "first known contact directly with Thumairy." The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi -- rather than anyone else at the Mosque -- that made those specific calls, including the call on December 16, 1998. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15. <br><br> Plaintiffs Exhibit 12B misattributes to Al Thumairy four calls made from the number ███████-3362 and 14 calls made to that same number. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ████████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the 3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-7, 497:14-499:9. <br><br> Plaintiffs Exhibit 12B misattributes to Al Thumairy eight calls made to the number ███████-0777 prior to April 2002 when he started using it. The subscriber for this number is ████████████, and the user is ████████████ (from July 3, 1999 until August 1, 2000), and Al-Hatlani |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Plaintiffs Exhibit 12B relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all. *See* Pls. Ex. 12B (citing EO 2757 and EO 2758 in REF 1 column). None of these calls are listed in the phone records that have been produced.<br><br>After removing these improperly included calls, Plaintiffs Exhibit 12B shows that there were a total of 31 – not 67 – calls between Al Bayoumi and Al Thumairy. |
| 833. | The close contacts between the two men are shown by the fact that when Thumairy started using a new cell phone ▮▮▮▮ 0777) in December 2000, Bayoumi shifted his calls to Thumairy over to that number. Ex. 5, Youssef Rpt. 122. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's "analysis" of the telephone records suffers from several flaws. It mistakenly attributes to Al Thumairy calls that were made to or from a 0777 telephone number for which he was not the subscriber. The subscriber for this number is ▮▮▮▮▮▮▮▮▮▮, and the user is ▮▮▮▮ ▮▮▮▮▮ (from July 3, 1999 until August 1, 2000), and Al-Hatlani (from October 1, 2000 through April 22, 2002). Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that Al Bayoumi "shifted his calls" to Al Thumairy to the 0777 number mischaracterizes the evidence. According to Plaintiffs' own chart, the last call Al Bayoumi made from his home or cell phones to Al Thumairy was on September 18, 2000, nearly three months prior. *See* Pls. Ex. 12B. From September 19, 2000 until December 1, 2000, Plaintiffs' chart does not attribute a single call as being made from Al Bayoumi to Al Thumairy. *See id.* On December 2, 2000, Plaintiffs' chart lists a single phone call from a phone line shared by two office telephones at the Al Madina Mosque that Al Bayoumi testified was available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made that specific call. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15; Pls. Ex. 12B.<br><br>From December 10, 2000 through December 17, 2000, Plaintiffs' chart lists six calls that were allegedly made from Al Bayoumi's home phone to the 0777 number. *See id.* However, there is no admissible evidence that these calls were ever made – they rely solely upon inadmissible hearsay rather than telephone records – and even if they were, the admissible evidence demonstrates that these calls would have been made to Al Hatlani, who was the subscriber for that number at the time. *See id.*; KSA Ex. 168, at 3-5.<br><br>Plaintiffs' chart also lists a single call on December 14 made from the publicly available phone line at the Al Madina Mosque to the 0777 number. *See* Pls. Ex. 12B.<br><br>After removing calls from the Al Madina Mosque phone lines and calls for which no admissible evidence exists to establish they transpired, Plaintiffs' own chart demonstrates that Al Bayoumi did not call Al Thumairy a single time from September 19, 2000 until two brief calls on September 2, 2001. *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 834. | Bayoumi sent Thumairy a letter thanking him for "providing" MOIA propagators and in other documents seized by the MPS, Bayoumi was found to have written Thumairy's name in his handwritten notes. Ex. 678D, MPS 43_336; Ex. 678V, MPS 732_212-214 at 214. In addition, Bayoumi had Thumairy arrange a donation for Al Madinah Mosque. Ex. 678C, MPS 43_138-9 at 139 ("Another check was delivered to them through Fahad Al Thumairy, Imam of *Masjid Al-Malik Fahad* [King Fahad Mosque], in the amount of 10,000 Riyals"). Bayoumi also frequently travelled to Los Angeles to meet with Thumairy, similar to Thumairy's practice to have his propagators working under him report directly in person on a regular basis. Ex. 90, Snell Decl., Ex. 5 at 8; Ex. 107, Thumairy Dep. 204:14-206:1, 207:22-208:10; ▮▮▮▮ came each month to meet with Thumairy and pick up a check); Ex. 483, FBI 001033 at 1034 ▮▮▮▮ received fourteen checks totaling $66,000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 90 (Snell Decl. (Ex. 5)), Exhibit 483, Exhibit 678C, Exhibit 678D, and Exhibit 678V are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Al Bayoumi did not "frequently" travel to Los Angeles to meet with Al Thumairy. There is evidence only of four trips over a four year period. *See* Response to Pls. Aver. ¶ 1589. For support, Plaintiffs' rely on inadmissible hearsay statements purportedly made by Al Khalil that "Bayoumi came to the King Fahd Mosque a number of times. . . . Bayoumi used to come frequently to the mosque to see Fahad Al-Thumairy." Pls. Ex. 90 (Snell Decl. (Ex. 5 at 8)). The only admissible evidence is Al Khalil's testimony: "[t]wo times or three times [Al Bayoumi] was just, you know, visiting the mosque. Indeed I didn't even see him [in] the mosque, just in my office, say hello. And that's it." Pls. Ex. 113 (Khalil Tr.) 116:20-23. Al Khalil further explained that "[t]wo or three times, that I saw him really come and just hi, how are you . . . he asked me once or twice, where is Fahad? . . . He just asked where is Fahad . . . My recollection twice, two times, three times." *Id.* at 117:10-118:14. Al Khalil also testified that he did not know what Al Bayoumi was coming to the Mosque for, *id.* at 118:4-5, and that he never saw Al Bayoumi together with Al Thumairy. *See id.* at 117:13-15.

Saudi Arabia does not dispute that Al Bayoumi – in his role as a general supervisor of the Al Madina Mosque – drafted a letter on the Mosque's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | letterhead to Al Thumairy in which Al Bayoumi expressed gratitude for the dispatch of Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan to San Diego in order to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area.  Pls. Ex. 678D (MPS 43_336).  This letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Thumairy.  *See id.*<br><br>Saudi Arabia also does not dispute that the MPS seized a piece of paper with several different notes on it, including one that states only the name "Fahad Al-Thumairy."  Pls. Ex. 678V (MPS 732_214).  Plaintiffs' assertion that the name, or any of the other notes on the piece of paper, was "written" by Al Bayoumi is not supported by any citation or record evidence.<br><br>Saudi Arabia does not dispute that Al Bayoumi – again in his role as a general supervisor of the Al Madina Mosque – drafted a letter to Saad Al Habib, dated August 26, 1999, regarding, *inter alia*, the "expansion and modifications" of the Mosque.  Pls. Ex. 678C (MPS 43_139).  In the letter, Al Bayoumi noted that the Embassy had sent $5000 "directly in the name of the Kurdish community," "[a]nother check was delivered to them through brother Fahd al Thumairy, Imam of the King Fahad Mosque, in an amount of SR 10,000 to do the chairs and for school service," and Al Hamdan "sent a check in an amount of 20,000 in my name."  *Id.*  This letter was seized by the MPS from Al Bayoumi and bears no indicia that it was actually sent to Al Habib.  *Id.*  Furthermore, Plaintiffs' characterization of the letter as "Bayoumi had Thumairy arrange a donation" is inconsistent with the plain language of the document, which states only that a donation was delivered through Al Thumairy.  *See id.*<br><br>Finally, Plaintiffs' assertion that Al Thumairy had a "practice to have his propagators working under him report directly in person on a regular basis" is not supported by any citation or record evidence. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 835. | *MOIA Propagator Omar Abdi Mohamed.* Bayoumi had phone, pager, and cell numbers for MOIA Propagator Omar Abdi Mohamed aka Omar Al-Khatib in his handwritten address book. Ex. 12AA, MPS738_37-38. Abdi Mohamed's relationship with Bayoumi was such that he addressed Bayoumi by his familial name "Abu Emad" (the name of Bayoumi's son) and as "His Eminence" within a fundraising letter. Abdi Mohamed requested funding for his Western Somali Relief Agency for "supporting and aiding our afflicted brethren everywhere." Ex. 391, MPS 43_193. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 391 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs provide no support for the notion that using the greeting "His Eminence" was anything more than flattery. They do not provide any other admissible evidence regarding the degree of the relationship between Abdi Mohamed and Al Bayoumi.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that the MPS seized a letter that was purportedly sent by "Omar Al-Khatib" to Al Bayoumi, or that the letter is addressed to "His Eminence Mr. Abu Emad Omar Al-Bayoumi [ ] Head of the Administration of Masjid Al-Madina Al-Munawarah, El Cajon City." Pls. Ex. 391 (MPS 43_193). Saudi Arabia similarly does not dispute that the letter requests contributions for distribution "among the Somali and Ogaden refugee camps in Somalia and in the Ogaden region . . . to the needy," and for the purchase and distribution of "shirts and shoes for one thousand needy children on the day of Eid" as well as "headscarves for one thousand women." *Id.* The letter closes with the statement "I ask Allah to use us for His obedience, and for the support and assistance of our afflicted brothers everywhere." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 836. | *MOIA Propagator* ████████. Bayoumi also had a relationship with MOIA Propagator ████████, who had previously served as Imam of the ICSD Mosque. Ex. 2, EO 1759, 0692. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 2N (EO 692-695) and Exhibit 2S (EO 1759-60) are inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, Plaintiffs' assertion that ████ ████████ previously served as Imam of the ICSD Mosque relies solely upon multiple levels of inadmissible hearsay, namely a June 18, 2004 FBI summary memorandum providing "investigative updates" for ████ and two others who were named by an unidentified individual as "Saudi supported propagators living in San Diego []." Pls. Ex. 2N (EO 692). |
| | | Plaintiffs' assertion that Al Bayoumi "had a relationship" with ████ greatly overstates the document on which Plaintiffs rely, a September 24, 2001 hearsay FBI memorandum purporting to summarize an interview of ████████. *See* Pls. Ex. 2S (EO 1759-60). In that interview, ████ admitted that he "never had a direct conversation with" Al Bayoumi and only "had seen [Al Bayoumi] in conversations with ████. *Id.* at (EO 1759). |
| 837. | *MOIA Propagator Tajuddin Shuaib.* Shuaib was named in Bayoumi's handwritten address book as "Ahmad Tajuddin" and Bayoumi listed Shuaib's home, car, and office numbers in Saudi Arabia. Ex. 12AA, MPS738_35L. Shuaib received warm, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | familiar correspondence from Bayoumi. Ex. 405, MPS 43_384. | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Sadui Arabia disputes the characterization of the correspondence as "warm" and "familiar." The nature of the correspondence speaks for itself. The record contains numerous letters from Al Bayoumi using flowery language, and Plaintiffs provide no other citations except for this standard language from Al Bayoumi.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that Al Bayoumi drafted – in his role as general supervisor of the Al Madina Mosque – a letter addressed to Ahmad Tajuddin, dated December 29, 2000, sending "congratulations and blessings on the blessed days of *Eid al-Fitr*." Pls. Ex. 405 (MPS 43_384). Al Bayoumi sent his best wishes: "May Allah grant you its repetition full of *Al-Khair* [goodness], rewards, and happiness, for you, your esteemed family, and all your children, for years and years to come. Hoping that Allah, and Allah alone, will accept your obedience, and reward you generously. May Allah grant you success and look after you. And peace, mercy, and blessings of Allah be upon you." *Id.* This letter was seized by the MPS and bears no indicia that it was actually sent to Tajuddin Shuaib. *See id.* |
| **XI.J.** | **Bayoumi's work relationship with senior officials in Saudi Arabia** | |
| 838. | *Minister of Islamic Affairs.* Bayoumi's phone book contained the number for the Minister's office at MOIA. Ex. 12AA, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MPS738_14. Bayoumi wrote directly to MOIA's Minister to thank MOIA Director Sowailem, the Embassy's Islamic Affairs Department official Saleh, and Thumairy for their coordination and cooperation in arranging the trip. Ex. 411, MPS 43_314. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Plaintiffs Exhibit 411 (MPS 43_314) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that Al Bayoumi drafted a letter on the Al Madina Mosque's letterhead to Al Ghesheyan, dated January 28, 1999, expressing appreciation for, *inter alia*, Sheikhs Al Sudairy and Al Sadhan "leading the prayers, lessons, and reflections" at various mosques, including the Al Madina Mosque in El Cajon. Pls. Ex. 411 (MPS 43_314). The letter was seized by the MPS and bears no indicia that it was actually sent to Al Ghesheyan. *See id.* |
| 839. | *MOIA Cooperative Office for Propagating to Communities.* This office under MOIA's supervision sent two clerics to meet with Bayoumi in June 1999. Ex. 399, MPS 681-2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 399 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Plaintiffs Exhibit 399, which is inadmissible hearsay, purports to be a letter from Dr. Ahmad Al Abdulatif and Al Shumaymari to Al Bayoumi on June 14, 1999, expressing appreciation for the "good reception and the hospitality" they received from Al Bayoumi and "all the brothers we met |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | in San Diego." Pls. Ex. 399 (MPS 68_2). However, Plaintiffs' assertion that the "Cooperative Office for Propagating to Communities . . . under MOIA's supervision sent two clerics to meet with Bayoumi in June 1999" is not supported by the letter. The letter does not mention any Cooperative Office or MOIA supervision, nor does it state that the two clerics were sent to meet Al Bayoumi. *See id.* |
| 840. | *Ahmed Al Hamdan.* Bayoumi's handwritten address book and typed phone lists had phone numbers for Hamdan's home, cell, office, and fax. Ex. 12AA, MPS738_83; Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 3485 (October 2000). Hamdan was a "high-ranking Saudi official who works as a Director within the Ministry of Finance." Ex. 2, EO 0483. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2LL (EO 0459-487); Exhibit 12AA (MPS 738), Exhibit 12BB (MPS 688), and Exhibit 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

There is no evidence that the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688) and Exhibit 421 (FBI 345-49) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that Al Hamdan was a "high-ranking Saudi official who works as a Director within the Ministry of Finance" quotes, and relies solely upon, an FBI memorandum that in turn purports to summarize an earlier FBI memorandum recounting an interview of Al Hamdan. *See* Pls. Ex. 2LL (EO 483) (citing "EC dated 10/20/2001"). This constitutes multiple levels of inadmissible hearsay. |
| 841. | Hamdan provided Bayoumi with funds for the Al Madinah Mosque after the Embassy approved the Mosque for funding. Ex. 371, MPS 43_320 (on November 24, 1998, Bayoumi sends wire instructions to Saudi Ministry of Finance Director Hamdan for a donation of nearly $25,000); Ex. 678C, MPS 43_138-9 at 139 (after Embassy contribution, Bayoumi arranged a check through Thumairy for 10,000 Saudi Riyals, and a check from Hamdan for $20,000); Ex. 678H, MPS 43_476 (Bayoumi ledger accounting for $20,000 from Hamdan). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 678C is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi – in his role as general supervisor of the Al Madina Mosque – drafted (1) an undated letter on the Mosque's letterhead to Al Hamdan requesting carpet for the Al Madina Mosque, *see* Pls. Ex. 371 (MPS 43_319), and (2) a letter dated November 24, 1998 to Al Hamdan providing the lowest quote received for "furnishing and setting up" the Mosque, which was $24,899.45 when added together with a hotel cost, together with banking account information. *See* Pls. Ex. 371 (MPS 43_320). The letters were seized by the MPS and bear no indicia that they were actually sent to Al Hamdan. *See* Pls. Ex. 371.

Saudi Arabia does not dispute that Al Bayoumi – again in his role as general supervisor of the Al Madina Mosque – drafted a letter to Saad Al Habib, dated August 26, 1999, regarding, *inter alia*, the "expansion and modifications" of the Mosque. Pls. Ex. 678C (MPS 43_139). In the letter, Al Bayoumi noted that he "wrote to the embassy repeatedly until they sent a check in $5,000 directly in the name of the Kurdish |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | community," "[a]nother check was delivered to them through brother Fahd al Thumairy, Imam of the King Fahad Mosque, in an amount of SR 10,000 to do the chairs and for school service," and Al Hamdan "sent a check in an amount of 20,000 in my name," which Al Bayoumi used to pay "the second premium amount and the insurance amount for the building for this year." *Id.* The letter was seized by the MPS and bears no indicia that it was actually sent to Al Habib. *Id.* Furthermore, Plaintiffs' characterization of Al Thumairy's involvement is misleading as the letter does not state that he "arranged" the check in the amount of SR 10,000, only that the check had been "delivered to them through him." *Id.* <br><br> Plaintiffs' characterization of the three letters – that Al Hamdan provided Al Bayoumi with funds for the Al Madina Mosque after the Embassy approved the Mosque for funding – is misleading. None of the letters mention Embassy "approv[al]" for funding, and the funds were provided by several sources rather than Al Hamdan alone. <br><br> Saudi Arabia also does not dispute that Plaintiffs Exhibit 678 (MPS 43_476) includes a handwritten note with a notation that states, *inter alia*, "From Al-Hamdan 20,000," although there is no record evidence that the note was written by Al Bayoumi. Pls. Ex. 678, MPS 43_476. As such, it is inadmissible hearsay. |
| **XI.K.** | **MOIA and Saudi government religious propagators** | |
| 842. | Bayoumi hosted at least 15 MOIA propagators in San Diego, many for a month or more at a time. These trips required significant work, coordination, and contacts with Embassy and other MOIA officials, including Thumairy. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs fail to offer any citation or evidentiary support for this assertion. |
| 843. | *MOIA Sheikh Ibrahim Al Zamil.* Bayoumi had phone listings for Sheikh Ibrahim Al Zamil, including his phone numbers and email address. Ex. 12AA, MPS738_79. Zamil was in San Diego at the same time as a group of four MOIA propagators sent by Saudi Arabia to lay the groundwork for establishing the Al Madinah Mosque and placing Bayoumi in charge of that Mosque. Ex. 370, MPS 43_310. Bayoumi took a videotape of those propagators visiting his home with leaders of the Al Ribat and ICSD Mosques. Ibrahim Al Zamil can be seen on that video. Ex. 11B, MPS890 Video Screenshots; Ex. 10B, MPS890-CLIP Video Exhibit at 28:25. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 370 are inadmissible evidence. *See* Objections Chart.

To the extent a response is required, Plaintiffs cite no material to support the assertion that "Ibrahim Al Zamil" was a "MOIA Sheikh" or was employed by MOIA at all.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Saudi Arabia does not dispute that Al Bayoumi sent a letter to Ahmed Al Hamdan on November 30, 1998 which referred to, *inter alia*, the purchase of the Al Madina Mosque by Saad Al Habib following a visit from some unidentified propagators sent by Muhammad Ibn Saud Islamic Univeristy and the Ministry of Islamic Affairs during Ramadan. *See* Pls. Ex. 370 (MPS 43_310). However, Plaintiffs' assertions that the visit referenced in the letter included Al Zamil or that MOIA propagators were sent "to lay the groundwork for establishing the Al Madinah Mosque and placing Bayoumi in charge of that Mosque," are not supported by any citation to record evidence, as the letter mentions none of these things. *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia does not dispute that Plaintiffs Exhibit 10B consists of a videotape of various unidentified individuals at Al Bayoumi's home, and Plaintiffs Exhibit 11B contains screenshots from that video. *See* Pls. Exs. 10B; 11B. However, Plaintiffs provide no citation or record support for the speculatory assertions that the individuals depicated in the video are the MOIA propagators, the "leaders of the Al Ribat and ICSD Mosques," or Al Zamil. |
| 844. | While Zamil was visiting San Diego, Bayoumi was his primary host and liaison. Ex. 2, EO 0788. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2N (EO 779-92) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the inadmissible hearsay relied upon by Plaintiffs states, *inter alia*, that "AL BAYOUMI welcomed two Saudi Arabian religious scholars to San Diego and the Al Medinah Manawara Majid, 511 South Magnolia, El Cajon, California. Though the scholars did not stay with AL BAYOUMI, he was their primary host and liaison while they were visiting San Diego. AL BAYOUMI was observed with Shaikh Ibrahim Bin Abdullah Zamel and Shaikh Abdullah Bin Saleh Al Ghassan." Pls. Ex. 2N (EO 788). It is not clear from the language of the document whether the two Shaikhs "observed with" Al Bayoumi were the same scholars for which he allegedly served as a primary host and liaison, which serves to highlight the inherent unreliability of the multiple levels of inadmissible hearsay from unidentified individuals in the document. |
| 845. | Zamil can be seen on Bayoumi's video of the paintball war games organized by | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi and Anwar Aulaqi. Ex. 2, EO 4042; Ex. 11A (FBI 013459 Video Screenshots) 01:21:08, 01:22:02. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2HH (EO 4019-4044) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited document – relying upon inadmissible hearsay – references paintball events in the San Diego area during 2001/2002, along with a list of individuals "who have been *possibly* identified as attendees." Pls. Ex. 2HH (EO 4041-42) (emphasis added). The document does not, however, identify Shaikh Ibrahim Bin Abdullah Zamel as a "possible" attendee, nor does it reference Zamel in any capacity. *See id.* Further, the two video screenshots cited are so low quality that no identification can be made of anyone. *See* Pls. Ex. 11A at 01:21:08, 01:22:02. |
| 846. | Bayoumi suggested to Habib that Zamil would be suitable to serve as an Imam at the Mosque. Ex. 410, MPS 43_225-28 at 226 (in August 1998, Bayoumi suggests to Habib that Shuwayhani serve as an Imam at the Al Madinah Mosque). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 410 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs mischaracterize the cited document to imply Al Bayoumi sponsored Zamil to be Imam. To the contrary, in response to some members of the Mosque requesting a new, "full-time Imam of Saudi nationality," – a request to which community |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | members strongly objected – Al Bayoumi wrote that he preferred that the then-current Imam continue instead of appointing a new Imam. *See* Pls. Ex. 410 (MPS 43_ 225-26). Indeed, Al Bayoumi praised the then-current Imam, noting that he would be "a more persuasive and articulate orator than many of those who are in our mosques in Saudi Arabia." *Id.* at (MPS 43_226). As a compromise, however, Al Bayoumi suggested that "one of the Sheikhs [ ] be sent over, such as brother Yusuf Al-Shuwayhani or Ibrahim Al-Zamil, or another Sheikh who could benefit others with his knowledge, even if he only stays for a short while." *Id.* |
| 847. | Bayoumi also sent messages to the Minister through Thumairy, as well as through the Minister's nephew Sudairy. Ex. 389, MPS 43_375 (Bayoumi asking Sudairy to send fax to Minister); Ex. 416, KSA 7591 (Ex. 445). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 389 and Plaintiffs Exhibit 416 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi sent a letter to the Minister of Islamic Affairs on February 7, 1999, expressing Al Bayoumi's appreciation for, *inter alia*, the assistance of Sheikh Mutaeb Al Sudairy and Sheikh Adel Al Sadhan in "leading the prayers, lessons, and reflections" at various mosques, including the Al Madina Mosque. *See* Pls. Ex. 416 (KSA 7591). Al Bayoumi also noted the cooperation of, *inter alia*, Al Thumairy in assisting with coordination for the visit by Sheikhs Al Sudairy and Al Sadhan. *See id.* Saudi Arabia also does not dispute that Al Bayoumi sent a letter to Sheikh Mutaeb Al Sudairy on April 7, 1999, stating, *inter alia*, that "I previously sent you a fax, the first was addressed to His Excellency the Minister, and the other was addressed to you personally, regarding the matter of Masjid Uthman |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Ibn Affan. Please, when you receive this fax, respond to those poor people who always ask aout you !!!!!" *See* Pls. Ex. 389 (MPS 43_375).<br><br>Plaintiffs' assertion that Al Bayoumi sent messages "to the Minister through Thumairy" is not supported by any citation or record evidence. |
| 848. | *Shaikh Abdullah Bin Saleh Al Ghassan.* Ghassan visited Bayoumi in San Diego during the year from September 1998 – August 1999 while Bayoumi and Soliman Al-Ali worked together there. Ex. 2, EO 0786, 0788. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2N (EO 779-92) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the inadmissible hearsay relied upon by Plaintiffs states, *inter alia*, that "[s]everal individuals from Saudi Arabia including Shaikh Ibrahim Bin Abdullah Zamal and Shaikh Abdullah Bin Saleh Al Ghassan visited San Diego while AL BAYOUMI and Ali lived there. . . . AL BAYOUMI welcomed two Saudi Arabian religious scholars to San Diego and the Al Medinah Manawara Majid, 511 South Magnolia, El Cajon, California. Though the scholars did not stay with AL BAYOUMI, he was their primary host and liaison while they were visiting San Diego. AL BAYOUMI was observed with Shaikh Ibrahim Bin Abdullah Zamel and Shaikh Abdullah Bin Saleh Al Ghassan." Pls Ex. 2N (EO 786, EO788).<br><br>It is not clear from the language of the document whether the two Shaikhs "observed with" Al Bayoumi were the same scholars for which he allegedly served as a primary host and liaison, which serves to highlight the inherent unreliability of the multiple levels of inadmissible hearsay from unidentified individuals in the document. Furthermore, the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | document relied upon reiterates twice that Shaikhs Zamel and Ghassan were *visiting San Diego*, and not Al Bayoumi, as Plaintiffs misleadingly assert. Finally, Plaintiffs' assertion that Al Bayoumi and Soliman Al Ali "worked together" in San Diego during the Shaikhs' visit finds no support anywhere in the cited document. |
| 849. | While Ghassan was visiting San Diego, Bayoumi was his primary host and liaison. Ex. 2, EO 0788. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2N (EO 779-92) is inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, the inadmissible hearsay relied upon by Plaintiffs states, *inter alia*, that "AL BAYOUMI welcomed two Saudi Arabian religious scholars to San Diego and the Al Medinah Manawara Majid, 511 South Magnolia, El Cajon, California. Though the scholars did not stay with AL BAYOUMI, he was their primary host and liaison while they were visiting San Diego. AL BAYOUMI was observed with Shaikh Ibrahim Bin Abdullah Zamel and Shaikh Abdullah Bin Saleh Al Ghassan." Pls. Ex. 2N (EO 788). It is not clear from the language of the document whether the two Shaikhs "observed with" Al Bayoumi were the same scholars for which he allegedly served as a primary host and liaison, which serves to highlight the inherent unreliability of the multiple levels of inadmissible hearsay from unidentified individuals in the document. |
| 850. | *Abdullah Al Jaithen and Majed Al Mersal.* Bayoumi had contact information for both Jaithen and Mersal on the same page in his handwritten address book. Ex. 12AA, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MPS738_59. In coordination with Thumairy, Bayoumi hosted these two propagators in December 1999-January 2000 shortly before the arrival of Hazmi and Mihdhar and took them to various locations in San Diego and also to Los Angeles. Ex. 304, KSA 9557-58; Ex. 10H (MPS896-CLIP Video Exhibit) various times including 5:13 (Bayoumi hosting Jaithen and Mersal at Sea World in San Diego). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br> Saudi Arabia does not dispute that Majed Al Mersal drafted a memorandum, dated January 25, 1999, documenting his participation in the Imamate and Propagation Program in North America at the Shaikh Ibn Taymiyyah Mosque during the months of December 1998 and January 1999. *See* Pls. Ex. 304 (KSA 9557). That memorandum, however, provides no support for Plaintiffs' assertion that Al Bayoumi "hosted" Al Jaithen or Mersal in December 1999-January 2000, "took them to various locations in San Diego and also to Los Angeles," or did so "[i]n coordination with Thumairy." <br><br> To the contrary, the memorandum does not even mention Al Bayoumi. *See id.* The video clip relied upon by Plaintiffs likewise provides no support for these assertions, as the mere presence of Al Bayoumi, Al Jaithen, and Al Mersal at Sea World is not evidence that Al Bayoumi hosted Al Jaithen or Mersal. *See* Pls. Ex. 10H. |
| 851. | *Mutaeb Al Sudairy and Adel Al Sadhan.* As detailed above, Bayoumi had extensive contact information for both Sadhan and Sudairy, who worked in MOIA's Riyadh headquarters when they were assigned to visit Bayoumi and Thumairy in California in December 1998-January 1999. Ex. 5, | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Youssef Rpt. 105-107. Bayoumi had contact information for both Sadhan and Sudairy in his handwritten address book. Ex. 12AA, MPS738_24, 34, 76 (Sadhan contacts in Oklahoma, New York, Virginia, and Saudi Arabia); Ex. 12AA, MPS738_24 (Sudairy contacts in Missouri, Virginia). And captured on video. Ex. 10D MPS894-CLIP Video Exhibit (with Ex. 11D Screenshots and Photos); and Ex. 10F MPS2023-003 Video Exhibit (with Ex. 11F Screenshots). | Plaintiffs' assertion that Al Sadhan and Al Sudairy were "assigned to visit Bayoumi and Thumairy in California" is unsupported by any documentary evidence. The admissible evidence establishes that Sheikhs Al Sudairy and Al Sadhan were sent to California to lead prayers and deliver lessons and reflections at the Al Madina Mosque and other mosques in the area. *See*, *e.g.*, Pls. Exs. 411, 414. |
| 852. | As discussed below, in April 1999, Bayoumi sent correspondence to Sudairy and Sadhan in Saudi Arabia via fax to MOIA headquarters, stating at the top of Sadhan's letter that it was "urgent" and was to be delivered to the Sheikh immediately. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 388 and Exhibit 389 are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi sent two letters, one each to Sheikhs Mutaeb Al Sudairy and Adel Al Sadhan, on April 7, 1999. *See* Pls. Exs. 388, 389. There is no indication, however, that either letter was sent via fax to MOIA headquarters. Although the letters request a response to a fax, that appears to be in reference to the fax mentioned in the preceding sentences of the letters. *See* Pls Ex. 388 (MPS 43_374) ("My dear brother. I previously sent you a fax, the first was addressed to His Excellency the Minister, but I did not receive a reply. Please, when you receive this fax, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | respond to those poor people who always ask about you !!!!!"); Pls. Ex. 389 (MPS 43_375) ("My dear brother. I previously sent you a fax, the first was addressed to His Excellency the Minister . . . . Please, when you receive this fax, respond to those poor people who always ask about you !!!!!"). |
| | | Furthermore, there is no evidence that Al Bayoumi stated "at the top of Sadhan's letter that it was 'urgent' and was to be delivered to the Sheikh immediately." That notation appears in markedly different handwriting and ink, indicating that it was likely written by someone else. *See* Pls. Ex. 388 (MPS 43_474). |
| 853. | *Sheikh Awad al Harbi.* MOIA propagator Awad Al Harbi is listed in Bayoumi's handwritten address book with landline and cellphone numbers in Saudi Arabia. Ex. 12AA, MPS738_37. Harbi visited Bayoumi in San Diego in September 1998, and Bayoumi's letter to Harbi shows that the two men were together at the Al Madinah Mosque and Anwar Aulaqi's Al Ribat Mosque. Ex. 396, MPS 43_335; Ex. 369, MPS 43_309. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 369, Exhibit 396, and Exhibit 12AA (MPS 738) are inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| | | Saudi Arabia does not dispute that Al Bayoumi sent one letter addressed "To Whom It May Concern" and another addressed to Al Harbi, both dated November 15, 1998. *See* Pls. Exs. 369, 396. In the letter addressed "To Whom It May Concern," Al Bayoumi noted that the Al Madina Mosque was in need of a propagator to lead prayers and lessons during Ramadan, and he requested that Al Harbi be sent for that purpose. *See* Pls. Ex. 396 (MPS 43_335). In the letter addressed to Al Harbi, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi stated, *inter alia*, that "[t]he brothers here, from Masjid Al-Madinah to Masjid Al-Ribat and even ELS, are sending their greetings to you." Pls. Ex. 369 (MPS 43_335). Thus, neither letter provides any support for Plaintiffs' assertions that Al Harbi "visited Bayoumi in San Diego in September 1998" or that "the two men were together at the Al Madinah Mosque and Anwar Aulaqi's Al Ribat Mosque." |
| 854. | *Four MOIA propagators.* In December 1997-January 1998, Bayoumi hosted a visit of MOIA propagators to San Diego who laid the groundwork for establishing the Al Madinah Mosque and placing Bayoumi in charge of that Mosque. Ex. 370, MPS 43_310. Bayoumi took a videotape of those propagators visiting his home with leaders of the Al Ribat and ICSD Mosques. Ex. 10B, MPS890-CLIP Video Exhibit. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 370 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi sent a letter to Ahmed Al Hamdan on November 30, 1998 which referred to, *inter alia*, the purchase of the Al Madina Mosque by Saad Al Habib following a visit from some unidentified propagators sent by Muhammad Ibn Saud Islamic Univeristy and the Ministry of Islamic Affairs during Ramadan. *See* Pls. Ex. 370 (MPS 43_310). However, Plaintiffs' assertion that the visit referenced in the letter "laid the groundwork for establishing the Al Medinah Mosque and placing Bayoumi in charge of that Mosque" is not supported by any citation to record evidence, as the letter mentions neither laying any groundwork nor placing Al Bayoumi in charge of the Al Madina Mosque. *See id.*<br><br>Saudi Arabia does not dispute that Plaintiffs Exhibit 10B consists of a videotape of various unidentified individuals at Al Bayoumi's home. However, Plaintiffs provide no citation or record support for the identity of the individuals depicted in the video or whether they are the MOIA propagators or "leaders of the Al Ribat and ICSD Mosques." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 855. | Ibrahim Al Zamil was present. Ex. 10B, MPS890-CLIP Video Exhibit. Bayoumi reported that three of the visiting propagators were from Imam Mohamed University and another one was from Umm Al-Qura University. Ex. 353, MPS727_202. Bayoumi had contact information in his handwritten address book for a MOIA propagator and Umm Al-qura professor named Sheikh Mohamed Al Barak, who was called from Bayoumi's Mosque phone in August 1998 by Al Haramain representatives. Ex. 12AA, MPS738_79; Ex. 678G, MPS 43_433. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 353 and Exhibit 12AA (MPS 738) are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. The phone book also does not identify "Sheikh Muhammad Al-Barak" as an Umm Al-Qra professor. *See id.* <br><br> Saudi Arabia does not dispute that the telephone records for the Al Madina Mosque reflect a call to the phone number "96655416050" on August 13, 1998 at 11:17 AM. Pls. Ex. 678G (MPS 43_433). Plaintiffs' characterization of the call as being made "from Bayoumi's Mosque phone" is unsupported by any citation or record evidence. To the contrary, the admissible evidence establishes that anyone at the Al Madina Mosque was freely permitted to use the two office telephones that shared a phone line with each other. As Al Bayoumi testified, "the phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone . . . our students, Saudi students, would call the embassy, would call the consulate. Who exactly called, I do not know." Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia does not dispute that Al Bayoumi sent a letter to Saad Al Habib during Ramadan 1998, which stated, *inter alia*, that "four propagators arrived with us this year, three of whom are from Al-Imam University, and the fourth is from Umm Al-Qura University." Pls. Ex. 353 (MPS 727_202). The cited letter, however, does not identify Al Barak as one of the four visiting propagators. |
| 856. | *Sheikh Yusuf Ali Al-Naqidan.* Naqidan is listed in Bayoumi's handwritten address book with multiple cell phone and landline numbers in Riyadh. Ex. 12AA, MPS738_8. Naqidan was a MOIA propagator who visited Bayoumi in San Diego in August 1999. Ex. 678H, MPS 43_476, 485 (Bayoumi's receipts and ledger confirm August 1999 visit of Naqidan). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia also does not dispute Plaintiffs Exhibit 678H includes a handwritten note with a notation that states, *inter alia*, "Sheikh Yusuf Al-Naqidan 42.40" – although there is no record evidence that the note was written by Al Bayoumi – along with a receipt from a restaurant in the amount of $42.40 that was paid for with Al Bayoumi's credit card. Pls. Ex. 678H (MPS 43_476,_485). Even assuming the two items are related, neither offers any support for Plaintiffs' assertion that Al Naqidan "visited Bayoumi" as opposed to simply eating together at the restaurant. |
| 857. | *Sheikh Hamud bin Muhammad Al-Shumaymari.* Shumaymari was a MOIA propagator who visited with Bayoumi in San Diego in June 1999. Ex. 399, MPS | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 681-2. Multiple numbers for Shumaymari in Saudi Arabia are listed in Bayoumi's handwritten address book. Ex. 12AA, MPS738_66. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 399 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia does not dispute that the handwritten phone book cited in Plaintiffs Exhibit 12AA (MPS 738), contains an entry with the name "Hmood Al-Shmairy" along with one – not multiple – number "67303431." Pls. Ex. 12AA (MPS 738_66).<br><br>Saudi Arabia does not dispute that Plaintiffs Exhibit 399, which is inadmissible hearsay, purports to be a letter from Dr. Ahmad Al Abdulatif and Al Shumaymari to Al Bayoumi on June 14, 1999, expressing appreciation for the "good reception and the hospitality" they received from Al Bayoumi and "all the brothers we met in San Diego." Pls. Ex. 399 (MPS 68_2). The letter, however, provides no support for Plaintiffs' implication that visiting Al Bayoumi was a central purpose of their trip. |
| 858. | *Dr. Ahmad Al Abdulatif.* Abdulatif, a MOIA propagator, accompanied Shumaymari on the 1999 trip to San Diego. Ex. 399, MPS 681-2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 399 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Saudi Arabia does not dispute that Plaintiffs Exhibit 399, which is inadmissible hearsay, purports to be a letter from Dr. Ahmad Al Abdulatif and Al Shumaymari to Al Bayoumi on June 14, 1999, expressing appreciation for the "good reception and the hospitality" they received from Al Bayoumi and "all the brothers we met in San Diego." Pls. Ex. 399 (MPS 68_2). |
| 859. | *Sheikh Al Sabeel.* Bayoumi made a note in his handwritten address book that he got a message from Islamic Affairs Department Head Ghesheyan and Jarrah that Sabeel would be visiting Bayoumi "in the 10th month" – i.e. the month of Shawwal after Ramadan. Ex. 12AA, MPS738_52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Furthermore, the note provides no support for Plaintiffs' assertion that Al Sabeel and Al Jarrah "would be visiting Al Bayoumi" – only that Al Sabeel would bring Al Jarrah to some unidentified place in the 10th month. *See id.* |
| 860. | *MOIA propagator Ghanim Saad Al Ghanim.* Ghanim's address and phone numbers in Saudi Arabia are listed in Bayoumi's handwritten address book. Ex. 12AA, MPS738_38. Bayoumi made a video recording of Ghanim prior to August 14, 1998, in which Bayoumi describes MOIA religious official Ghanim as the "first | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | visiting brother" to the Al Madinah Mosque. Ex. 10C (MPS893-COMP Video Exhibit); Ex. 10C-TR (MPS893-COMP-TR Video Transcript). | Plaintiffs Exhibit 10C, Exhibit 10C-TR, and Exhibit 12AA (MPS 738) are inadmissible hearsay.  *See* Objections Chart.

To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

Saudi Arabia also does not dispute that Plaintiffs Exhibit 10C, which is inadmissible hearsay, consists of a an undated video in which Al Bayoumi states, *inter alia*, that "on Friday, which is the day after tomorrow, one of the brothers will come from Saudi Arabia, his name is Ghanim Al-Ghanim.  And with God's will he will deliver the Friday khutbah for us, as well as the weekly lecture." Pls. Ex. 10C at 3:45-3:57; *see also* Ex. 10C-TR at 4.  According to Plaintiffs' translation, however, Al Bayoumi does not describe Al-Ghanim as the "first visiting brother" as Plaintiffs assert.  *See Id.* |
| 861. | *Abdul Hamid Al Saudi.* Bayoumi's records show that Saudi visited him in San Diego for Ramadan 1421, which was in November-December 2000. Ex. 376, MPS 698_151. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 376 is inadmissible hearsay.  *See* Objections Chart.

To the extent a response is required, Saudi Arabia does not dispute that Plaintiffs Exhibit 376 – which is inadmissible hearsay – purports to be a note from Dr. Abdulhamid bin Saad Al Saudi stating, *inter alia*, "I was pleased to have met my brothers here in San Diego, Calfironia, in Masjid Al-Madinah." Pls. Ex. 376.  Although the note suggests that Al-Saudi traveled to San Diego, it provides no support for Plaintiffs' assertion that Al Saudi "visited" Al Bayoumi specifically.  *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| **XI.L.** | **Bayoumi's work relationship with Imam Mohammad University** | Al Bayoumi had no work relationship with Imam Mohammad University. |
| 862. | *Khalil Al Khalil.* Khalil was a longstanding official of Imam Mohammad University and Chairman of the Ibn Taymiyah Foundation who previously worked in the Islamic Affairs Department at the Embassy. Ex. 113, Khalil Dep. 20:4-17, 45:18-46:13; Ex. 189, KFM 0379-0382 (Khalil Dep. Ex. 195) (Correspondence on letterhead from the Islamic Foundation of Sheikh ibn Taymiyyah signed by Khalil). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 189 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia does not dispute this paragraph. |
| 863. | Bayoumi had a close familiarity with Khalil, as shown in the video of them together with Thumairy and Soliman Al-Ali in April 1999. Ex. 10E (MPS902 Video Exhibit); Ex. 11E (MPS902 Video Screenshots); Ex. 27, Madha Supp. Decl. ¶ 8-9 & Ex. 4-5. Khalil admitted to the 9/11 Commission that Bayoumi "used to come frequently to the mosque to see Fahad Al-Thumairy." Ex. 90, Snell Decl., Ex. 5 at 8. In his 2019 testimony, Al Khalil confirmed Bayoumi's visits to the KFM to see Thumairy. Ex. 113, Khalil Dep. 117:24-118:14. Bayoumi's handwritten address book also has Khalil's cell number in Saudi Arabia. Ex. 12AA, MPS738_59. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 90 (Snell Decl. (Ex. 5)) are inadmissible hearsay. Exhibit 27 (Madha Supp. Decl.) has been stricken. *See* ECF No. 9562 at 8-9. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Saudi Arabia also does not dispute that Plaintiffs Exhibits 10E and 11E, contain undated images of Al Bayoumi, Al Thumairy, Soliman Al-Ali, and many other unidentified individuals. *See* Pls. Exs. 10E, 11E. The |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | undated images, however, do not support Plaintiffs' assertion that Al Bayoumi "had a close familiarity with Khalil" or that the images were taken in April 1999.<br><br>Plaintiffs' rely on hearsay from Al Khalil to support their assertion that Al Bayoumi "used to come frequently to the mosque to see Fahad Al Thumairy." *See* Pls. Ex. 90 (Snell Decl.),, Ex. 5 at 8. But the only admissible evidence is Al Khalil's testimony that he saw Al Bayoumi in Al Khalil's office at the King Fahad Mosque "[t]wo or three times, that I saw him really come and just hi, how are you. . . . he asked me once or twice, where is Fahad? . . . He just asked where is Fahad . . . My recollection twice, two times, three times." Pls. Ex. 113 (Khalil Tr.) 117:10-118:14. Al Khalil did not testify that the purpose of Al Bayoumi's visits to the Mosque was "to *see* Thumairy," as Plaintiffs assert. To the contrary, Al Khalil specifically testified that "I don't know what [Al Bayoumi] was coming for." *Id.* at 118:4-5. Al Khalil further testified that he never saw Al Bayoumi together with Al Thumairy. *See id.* at 117:13-15. |
| 864. | *Sheikh Yusuf al-Shuwayhani.* Shuwayhani's contact information is in Bayoumi's handwritten address book with a PO Box address in Saudi Arabia – including a landline number and one marked "cellular." Ex. 12AA, MPS738_8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 865. | Bayoumi had a close work relationship with Sheikh Yusuf al-Shuwayhani, Dean of Admission and Matriculation at Imam Muhammad University in Riyadh. Ex. 678S, MPS 732_4, 6 (July 1996 letter from Shuwayhani to Bayoumi); Ex. 678T, MPS 732_5 (July 1996 joint letter to Shuwayhani from Hamerman and Bayoumi); Ex. 410, MPS 43_225-28 at 226 (in August 1998, Bayoumi suggested to Habib that Shuwayhani serve as an Imam at the Al Madinah Mosque). Shuwayhani and Bayoumi worked together to arrange Hamerman's position at Imam Mohamed University, and Shuwayhani visited Bayoumi in San Diego. MPS732_4, 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 410, Exhibit 678S, and Exhibit 678T are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Hamerman did not have a "position" at Imam Mohamed University. He was merely a student there, as the documents on which Plaintiffs rely demonstrate. *See* Pls. Ex. 678S (MPS 732_4).

Saudi Arabia does not dispute that Al Bayoumi sent a letter to Saad Al-Habib on August 18, 1998 which provided, *inter alia*, Al Bayoumi's thoughts on the Imam of the Al Madina Mosque. *See* Pls. Ex. 410 (MPS 43_226). In response to some members of the Mosque requesting a new, "full-time Imam of Saudi nationality," – a request to which community members strongly objected – Al Bayoumi wrote that he preferred that the then-current Imam continue instead of appointing a new Imam, contrary to Plaintiffs' assertion. *See id.* at 225-26. Indeed, Al Bayoumi praised the then-current Imam, noting that he would be "a more persuasive and articulate orator than many of those who are in our mosques in Saudi Arabia." *Id.* at 226. As a compromise, however, Al Bayoumi suggested that "one of the Sheikhs [ ] be sent over, such as brother Yusuf Al-Shuwayhani or Ibrahim Al-Zamil, or another Sheikh who could benefit others with his knowledge, even if he only stays for a short while." *Id.*

Plaintiffs' assertion that Al Bayoumi "had a close work relationship with Sheikh Yusuf Al-Shuwayhani," is not supported by any record evidence. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite to two letters, one purportedly written by Al-Shuwayhani to Al Bayoumi on July 11, 1996, that discusses the status of Omar Hamerman's student visa, and another written by Al-Shuwayhani to the Dean of Ibn Saud Islamic University on July 27, 1996 regarding the student visa. *See* Pls. Ex. 678S, 678T. However, the letters constitutes inadmissible hearsay, and, in any event, provide no indication or support for any claim of a "close work relationship" between Al Bayoumi and Al-Shuwayhani. |
| 866. | *Omar "Forge" Hamerman.* Bayoumi had phone listings and an address in Saudi Arabia in his handwritten address book. Ex. 12AA, MPS738_37R. As shown in Section XI. C. below, ███████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ██████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Beyond the phone book, Plaintiffs cite no material supporting their assertions regarding ██████████ Contrary to those asserions, ████████ ███████████████ Also, although inadmissible, Saudi Arabia notes that FBI documents state that ████████ did not recognize Al Hazmi's photograph. *See* Pls. Ex. 2R (EO 1623). |
| 867. | *Institute of Islamic and Arabic Sciences in America (IIASA).* Bayoumi had listings in his handwritten address book for Imam Mohammed University's branch in the U.S. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 12AA, MPS738_48; Ex. 2, EO 0640 (IIASA is a subsidiary of Imam Mohammad University). Those listings for IIASA included references to MOIA's Embassy Director Sowailem and Embassy Islamic Affairs Department official Abdulaziz Al Saleh. Ex. 12AA, MPS738_48. Thumairy sent Bayoumi the information for an IIASA event held at the King Fahad Mosque in December 2000. Ex 535, FBI 4392-4394 (English version); Ex 679, FBI 4439 (Arabic version). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2M (EO 637-642) and Exhibit 12AA (MPS 738) are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br> Plaintiffs' assertion that "Thumairy sent Bayoumi the information for an IIASA event held at the King Fahad Mosque in December 2000" is not supported by the documents cited. Saudi Arabia does not dispute that Plaintiffs Exhibits 535 and 679, which were seized by the FBI from the Al Madina Mosque, include a flyer for such an event. *See* Pls. Ex. 535; Pls. Ex. 679 (FBI 4394, FBI 4439). However, the flyer offers no indication that it was sent either by Al Thumairy or to Al Bayoumi. The flyer does not mention either individual. *See id.* |
| XI.M. | **A June 2017 FBI report concluded that Bayoumi worked for Saudi Arabia in San Diego as a paid "cooptee" of Saudi intelligence and reported to the Saudi Embassy** | Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218. <br><br> Moreover, as Sageman explains, "the reliability of th[e] information" on which Plaintiffs rely "is questionable at best, no better than a rumor mill tainted by widespread public speculation." KSA Ex. 167 (Sageman Rep.) 296. Sageman also explains that, in particular, "[t]he allegation that al-Bayoumi reported directly to Prince Bandar, the ambassador, is very unlikely." *Id.* at 297. He goes on: "This is not how intelligence agencies work. The ambassador of a large embassy like the KSA Embassy in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Washington is far too busy to be a cooptee's case officer. Someone lower down the hierarchy and a full-time officer of the Saudi GID would have been the case officer." *Id.* |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government. In other words, [Al Bayoumi] would have been opposed to the hijackers." *Id.* |
| 868. | The EO production contained a June 2017 FBI EC prepared by the FBI's Washington Field Office entitled "Albayoumi / GIP Cooptee" which found that in the late 1990's until the 9/11 Attacks, Bayoumi was working inside the U.S. as a paid "cooptee" of Saudi Arabia's General Intelligence Presidency ("GIP"). Ex. 2, EO 2638-43. The FBI concluded that:

In the late 1990's and up to September 11, 2001, Omar Albayoumi was paid a monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP) via then Ambassador Prince Bandar bin Sultan Alsaud. The information Albayoumi obtained on persons of interest in the Saudi community in Los Angeles and San Diego and other issues, which met certain GIP intelligence requirements, would be forwarded to [Ambassador Prince] Bandar. Bandar would then inform the GIP of items of interest to the GIP for further investigation/vetting or follow up[.] Omar | Plaintiffs Exhibit 2W (EO 2638-43) is inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 2W (EO 2638-39) did not make any findings or state any conclusions. Instead, the document states that a redacted name reported the quoted information.

There is no admissible evidence that Al Bayoumi was a"cooptee" of Saudi Arabia's General Intelligence Presidency.

Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.

Moreover, as Sageman explains, "the reliability of th[e] information" on which Plaintiffs rely "is questionable at best, no better than a rumor mill tainted by widespread public speculation." KSA Ex. 167 (Sageman Rep.) 296. Sageman also explains that, in particular, "[t]he allegation that al-Bayoumi reported directly to Prince Bandar, the ambassador, is very unlikely." *Id.* at 297. He goes on: "This is not how intelligence agencies work. The ambassador of a large embassy like the KSA Embassy in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Albayoumi was a source of investigative interest following the 9/11 attacks for his support of 9/11 hijackers while living in California. Allegations of Albayoumi's involvement with Saudi intelligence were not confirmed at the time of the 9/ 11 Commission Report. The above information confirms these allegations.<br><br>Ex. 2, EO 2638-39. | Washington is far too busy to be a cooptee's case officer. Someone lower down the hierarchy and a full-time officer of the Saudi GID would have been the case officer." *Id.*<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government. In other words, [Al Bayoumi] would have been opposed to the hijackers." *Id.* |
| 869. | Another June 15, 2017 FBI report from the Washington Field Office stated that, while at the time of the 9/11 Commission Report it was suspected Bayoumi had "some type of affiliation with Saudi Arabian intelligence" that "[r]ecent source information confirmed that Albayoumi was, at the time of the 9/11 attacks, employed as a paid cooptee of Saudi Arabian intelligence services." Ex. 2, EO 3282-83.[2]<br><br>n.2: Spies have regularly been used to support terrorists and assassination attempts in foreign countries, including by the Kingdom of Saudi Arabia. The most prominent example was the murder of Jamal Khashoggi, a prominent Saudi journalist who was critical of his country's government, see: Jamal Khashoggi: Saudi murder suspect had spy training, BBC (Oct. 19, 2018), | Plaintiffs Exhibit 2AA (EO 3282-83) and the cited news article *Jamal Khasoggi: Saudi Murder Suspect Had Spy Training* BBC (Oct 19, 2018) are inadmissible hearsay. *See* Objections Chart.<br><br>Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.<br>Moreover, as Sageman explains, "the reliability of th[e] information" on which Plaintiffs rely "is questionable at best, no better than a rumor mill tainted by widespread public speculation." KSA Ex. 167 (Sageman Rep.) 296. Sageman also explains that, in particular, "[t]he allegation that al-Bayoumi reported directly to Prince Bandar, the ambassador, is very unlikely." *Id.* at 297. He goes on: "This is not how intelligence agencies work. The ambassador of a large embassy like the KSA Embassy in Washington is far too busy to be a cooptee's case officer. Someone lower down the hierarchy and a full-time officer of the Saudi GID would have been the case officer." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | https://www.bbc.com/news/world-middle-east-45918610 ("Turkish media identified Maher Abdulaziz Mutreb as being part of a 15-member team of suspected Saudi agents who flew into and out of Istanbul on the day of Mr Khashoggi's disappearance from the city's Saudi consulate on 2 October.") | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government. In other words, [Al Bayoumi] would have been opposed to the hijackers." *Id.* |
| 870. | A "cooptee" is a person who is not an official employee of a foreign government's intelligence service but who is given and agrees to carry out specific covert assignments to conduct intelligence for a foreign government inside the U.S. The U.S. Department of Defense defines a "co-optee" as a "[f]oreign official or visitor tasked to do particular tasks, such as spotting potential recruits or servicing drops." Ex. 344, U.S. Department of Defense publication "Hostile Intelligence Threat," DoD 5200.1-PH-2 (Nov. 1988), at 19. | Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218. As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government. In other words, [Al Bayoumi] would have been opposed to the hijackers." *Id.* at 297. |
| 871. | Plaintiffs' expert Youssef observed, "[t]he payments the Saudi Government made to Bayoumi via various private entities, as discussed herein, are a classic example of how a foreign government would provide funds for one of its agents working covertly | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Sageman explains that "Youssef is way off target." KSA Ex. 167 (Sageman Rep.) 604. He explains: "It makes absolutely no sense to argue that the Saudi government carefully hid its relationship with Al Bayoumi by having private entities pay him while allowing him to make more than a hundred calls to official Saudi government institutions like the embassy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | in a foreign country." Ex. 5, Youssef Rpt. 85. | or the consulate, which would reveal his relationship with the Saudi government far more than his source of income, which few people would know. A clandestine relationship is clandestine because it is hidden. Broadcasting this relationship by making a large number of obvious calls to the very entity with whom one allegedly has a hidden relationship not only violates clandestine tradecraft but also defies logic." *Id.*

Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.

As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.

Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.

Al Bayoumi also testified that he pursued his education in the United States during his secondment to a private company (Dallah Avco) and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) at 2 (noting that the budget for the Logistics Department of Airways Engineering "was . . . used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his knowledge of the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). |
| 872. | In addition, Bayoumi's contacts with the Kingdom's diplomatic missions, and elements of the Ministry of Islamic Affairs, were pervasive and extended to numerous Saudi Government institutions across the United States and abroad. The extent and scope of these communications and contacts are not consistent with simply calling his local embassy or consulate on occasion for information, and instead reflect a pattern of reporting evidencing his status as a covert agent of the Saudi Government, working under the direction of personnel in those diplomatic missions. | Plaintiffs' assertions in this paragraph are unsupported by any citation or record evidence.<br><br>Sageman explains that "Youssef is way off target." KSA Ex. 167 (Sageman Rep.) 604. He explains: "It makes absolutely no sense to argue that the Saudi government carefully hid its relationship with al-Bayoumi by having private entities pay him while allowing him to make more than a hundred calls to official Saudi government institutions like the embassy or the consulate, which would reveal his relationship with the Saudi government far more than his source of income, which few people would know. A clandestine relationship is clandestine because it is hidden. Broadcasting this relationship by making a large number of obvious calls to the very entity with whom one allegedly has a hidden relationship not only violates clandestine tradecraft but also defies logic." *Id.*<br><br>Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| 873. | Further, Bayoumi's frequent, irregular trips back to Saudi Arabia and to the Saudi Embassy in Washington D.C. every one to two months, particularly when considered in light of his other contacts with Saudi Government institutions and personnel, indicate a pattern of travel undertaken for purposes of operational meetings with superiors in the Saudi Government. | There is no evidence that Al Bayoumi's trips to Saudi Arabia were "irregular," or that he visited the Saudi Embassy in Washington, D.C. "every one to two months."<br><br>Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. The 9/11 Report further concluded that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XI.N. | **Bayoumi's contacts with Dallah Avco and PCA were related to his work inside the U.S. supporting the extremist network** | To the extent a response is required, this assertion is not supported by any citation or record evidence. Al Bayoumi testified that he pursued his education in the United States during his secondment to Dallah Avco and that it was a "common practice" for Saudi government employees to be seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1; *see id.* at 65:17-66:11 (testifying that Dallah Avco was paying him during during his secondment). This practice was part of the "Saudization program," which "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." *Id.* at 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) at 2 (noting that the budget for the Logistics Department of Airways Engineering "was . . . used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Pls. Ex. 125 (Coombs Tr.) 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). <br><br> As Al Bayoumi explained, the "Saudization program" was "aim[ed] at making Saudi nationals to replace foreign nationals in jobs." Pls. Ex. 120 (Bayoumi Tr.) 762:2-763:15; *see* Pls. Ex. 86 (Coombs Decl.) at 2 (noting that the budget for the Logistics Department of Airways Engineering "was . . . used, among other things, for paying Saudi Arabian students studying abroad who were PCA employees or aspiring employees of the PCA"); Pls. Ex. 94 (Anqari Tr.) 349:15-351:4 (testifying about the importance of Saudization as a policy goal of Saudi Arabia); Coombs Tr. 47:20-55:18 (testifying about his experience with the Saudization program, including that it was a common practice for Saudi businesses to pay for students' tuition as part of the program). As part of Saudization, it was a "common practice" for Saudi government employees to be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | seconded to private companies to pursue their educations. Pls. Ex. 120 (Bayoumi Tr.) 759:8-762:1. |
| | | There is no support that any of Al Bayoumi, Al Thumairy, Al Sowailem, Mana, Al Jaithen, Al Mersal, and others worked together on a plan to assist the two future 9/11 hijackers, Al Hazmi and Al Mihdhar. There is no evidence of any such support network or plan to assist to the 9/11 hijackers. This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers. |
| | | The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218. |
| | | The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2K (EO 0491). |
| | | The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar…" KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101–3. |
| | | In May 2021, the FBI closed Operation Encore and definitively concluded that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 874. | Bayoumi's Mosque phone records show that he made one call to Dallah Avco on January 10, 1999 at 5:06am. Ex 504, FBI 1542. That early morning call to Dallah Avco was the only call in Bayoumi's records to Dallah Avco. The call was immediately preceded by calls to the PCA Airways Engineering Department at 3:21am and 4:59am and followed by a call to PCA at 5:11am. Ex 504, FBI 1542. Bayoumi made a total of 13 calls to the PCA in July 1998, November 1998, January 1999, April 1999, and for the final time in January 2000. Ex. 12V (Bayoumi calls to Presidency Civil Aviation). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 504 (FB1 1542) does not establish the attribution of any dialed phone numbers.<br><br>Plaintiffs Exhibit 12V is an improper summary exhibit. It attributes to Bayoumi 13 calls that were made from a publicly available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the Mosque that Bayoumi testified were available for all to use, and there is no record evidence that it was Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; *id.* at 786:8-15. These calls include the 3 calls made on January 10, 1999 (3:21 am, 4:59 am, and 5:11 am) as well |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | as the 13 calls made in July 1998, November 1998, January 1999, April 1999, and January 2000.<br><br>Plaintiffs rely solely upon hearsay sources in attributing the two recipient numbers in Plaintiffs Exhibit 12V ▮▮▮▮ 3888 and ▮▮▮▮ 7717) to PCA Airways Engineering. No subscriber records were produced to verify that either of the two numbers belonged to PCA Airways Engineering.<br><br>Plaintiffs Exhibit 12V is also based on inadmissible hearsay. It purports to rely on Plaintiffs Exhibit 421 (FBI 345-49) and "MPS688" (Plaintiffs Exhibit 12BB (MPS 688)), and "MPS738" (Plaintiffs Exhibit 12AA (MPS 738)). There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. Al Bayoumi testified that he did not personally enter all of the phone numbers in those documents; that he did not do anything to confirm the accuracy of the phone numbers listed in the documents; and that it is possible some of the phone numbers in the documents may be incorrect. Pls. Ex. 120 (Bayoumi Tr.) 81:17-101:2, 781:11-784:5. |
| 875. | The timing of these calls show that they are related to ongoing events concerning to Bayoumi's work as a Saudi agent in San Diego. For example, Bayoumi called the PCA days after Dallah balked at extending Bayoumi's 'ghost employment' term and the PCA directed Dallah to extend Bayoumi's "secondment" to complete his "task" in San Diego. Ex. 435, DA 1101; Ex. 436, DA 1102; Ex. 215, KSA 705; Ex. 94, Anqari Dep. 114:5-124:25. | Al Bayoumi was not a "Saudi agent." Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| | | Plaintiffs Exhibit 436 (DA 1102) contains a document labeled DA001102, which is written in Arabic and does not contain an English translation. |
| | | Plaintiffs Exhibit 94 (Anqari Tr.) and Plaintiffs Exhibit 215 (Anqari Ex. 376) do not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 94 is the transcript of Al Anqari's deposition. In the cited portion of the transcript, Al Anqari disclaims knowledge of the circumstances surrounding the extension of Al Bayoumi's secondment. Plaintiffs Exhibit 215 (Anqari Ex. 376) is a document memorializing Al Bayoumi's extension; it does not explain the circumstances surrounding that extension. |
| XI.O. | **Upon his arrival in San Diego, Bayoumi assumed a leadership role in the Sunni extremist network in San Diego.** | To the extent a response is required, Al Bayoumi was not a Saudi agent. Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explained that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite no evidence of a "Sunni extremist network" in San Diego, and no such evidence exists. |
| 876. | When Omar Al Bayoumi first came to San Diego in 1994, the first place he went was the Islamic Center of San Diego (ICSD) Mosque. Ex. 120, Bayoumi Dep. 59:21-60:22. Bayoumi immediately met with ██████████████ helped Bayoumi find an apartment near the ICSD. Ex. 120, Bayoumi Dep. 60:23-64:7, 824:4-10; ███████████████████ ██████████████ Ex. 5, Youssef Rpt. 85. | Plaintiffs Exhibit ██████████ is inadmissible hearsay. The Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs' assertion that Al Bayoumi "immediately met" Hamerman. In the cited portion of the transcript, Al Bayoumi testified that he stayed at a hotel when he first arrived in San Diego; that he went to the Islamic Center of San Diego (ICSD) at some point in those first few days; that he spoke with many people at the ICSD about locating an apartment; that one of those people was Omar Hamerman; and that Hamerman helped him locate his first apartment, which was on Beadnell Way. *See* Pl. Ex. 120 (Bayoumi Tr.) 58:21-63:17<br><br>Al Bayoumi testified that it is typical in the Islamic community to assist newcomers, even strangers, to that community, including by cosigning for an apartment. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24. |
| 877. | Bayoumi's apartment application listed his emergency contact and personal reference as ██████████████ San Diego, California, telephone ████-1493. Bayoumi described his relationship with ██████████ as a "family friend." Ex. 2, EO 1511, 1615. | Plaintiffs Exhibit 2Q (EO 1511) and Exhibit 2R (EO 1615) are inadmissible hearsay. *See* Objections Chart.<br><br>The only admissible evidence is Al Bayoumi's testimony. ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ Al Bayoumi also testified that it is typical in the Islamic community to assist newcomers, even strangers, to that community, including by cosigning for an apartment. *Id.* at 737:24-739:24. |
| 878. | An FBI investigation of the extremist cell at the ICSD was ongoing in 1994, when Bayoumi arrived in San Diego. The FBI | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | identified ▮▮▮▮ together with the cell's leader Mohamed Zaky, as principal active members of that extremist cell. Ex 5, Youssef Rpt. 21-23; see also, Ex. 120, Bayoumi Dep. 147:16-24. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>Youssef's opinion is based on purported FBI material that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>As Sageman explains, "Youssef provides no evidence that al-Bayoumi was part of an extremist cell at the ICSD," nor does he demonstrate the existence of any such "extremist cells" in King Fahad Mosque or the ICSD; Youssef "only called Salafis 'Sunni extremists' and in his imagination organized them into a cell." KSA Ex. 167 (Sageman Rep.) 605, 614. |
| 879. | Bayoumi met and associated with ▮▮▮▮ during the same time that ▮▮▮▮ was directly linked to this extremist cell and a San Diego based entity known as the American Islamic Group ("AIG"). The ICSD cell was related to the extremist cell at the Ibn Taymiyah Mosque and members of the ICSD cell travelled to Los Angeles in 1993 to attend a covert meeting with "Blind Sheikh" Omar Abdel Rahman held at the Ibn Tayimiyah Mosque. | Plaintiffs Exhibit 5 (Youssef Rep.) and Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart.<br><br>The assertions in this paragraph are based on Youssef's characterization of his FBI work that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 5, Youssef Rpt. 19, 21-23, 85; Ex. 150A, Kohlmann 2022 Rpt. ¶28. | As Sageman explains, "Youssef provides no evidence that al-Bayoumi was part of an extremist cell at the ICSD," nor does he demonstrate the existence of any such "extremist cells" in King Fahad Mosque or the ICSD; Youssef "only called Salafis 'Sunni extremists' and in his imagination organized them into a cell." KSA Ex. 167 (Sageman Rep.) 605, 614.<br><br>Moreover, the Youssef Report contains no support for Plaintiffs' assertion regarding "a San Diego based entity known as the American Islamic Group ('AIG')." That report does not mention such an entity.<br><br>Kohlmann's opinions also should be excluded as speculation that is not based on any recognized methodology. Paragraph ▮ of Kohlmann's Report purports to reference connections between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – and Al Bayoumi. However, as Sageman explains, the links between Al Bayoumi and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 880. | The FBI observed that ▮▮▮▮▮ was extremely close to the leader of the ICSD extremist cell, Mohamed Zaky, who the FBI "identified as an International Radical Fundamentalist…leader." The U.S. Department of Justice labeled Zaky as a follower and supporter of Omar Abdul Rahman. ▮▮▮▮▮ was interviewed by the FBI in August 1995 and told them that he met Zaky at the ICSD in 1992. Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2V (EO 2572) is inadmissible hearsay, and Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2V (EO 2572) contains the quoted language and also purports to state that ▮▮▮▮▮ met Zaky at the ICSD in 1992. Plaintiffs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 150A, Kohlmann 2022 Rpt. ¶30; Ex. 2, EO 2572. | Exhibit 2V does not support Plaintiffs' assertion that "[t]he U.S. Department of Justice labeled Zaky as a follower and supporter of Omar Abdul Rahman." Plaintiffs Exhibit 2V does not mention any such labeling by the U.S. Department of Justice. Moreover, Plaintiffs Exhibit 2V does not indicate ███████ and Zaky were "extremely close." It states that Zaky was the President of "Save Bosnia Now" and that ███████ was the ███████████ for that organization. Pls. Ex. 2V (EO 2572) |
| | | Plaintiffs Exhibit 150A (Kohlmann Rep. ¶ 30 & n.21 ) purports to state that the U.S. Department of Justice labeled Zaky as a follower and supporter of Omar Abdul Rahman, relying on a hearsay brief filed by the United States in an unrelated case. None of this is admissible. |
| 881. | Zaky and ███████ were the key organizers behind AIG which, according to Plaintiffs' expert Evan Kohlmann, "remains arguably the most radical jihadi political faction to exist within U.S. borders in this past 30 years." Ex. 150A, Kohlmann 2022 Rpt. ¶28. Hamerman served as the "Vice President" of AIG's charitable arm, 'American World Wide Relief' (AWWR)." Ex. 693, FFX 0146. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 693 (FFX 146) is inadmissible hearsay, and Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart. |
| | | Moreover, although inadmissible hearsay, FBI documents on which Plaintiffs rely indicate ███████ was a student in Saudi Arabia between 1996 and 2001. He returned the United States only four times during that period for at most 10 weeks. *See* Pls. Ex. 2R (EO 1621-22); Pls. Ex. 2V (EO 2573). |
| 882. | Zaky fought in the same Islamic fundamentalist army as Al Qaeda members Hazmi and Mihdhar in Bosnia and was killed in the Spring of 1995 while "fighting | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with the Mujahadeen in Chechyna." Ex. 5, Youssef Rpt. 23; Ex. 2, EO 2572; Ex. 150A, Kohlmann 2022 Rpt. ¶31. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2V (EO 2572) is inadmissible hearsay. Exhibit 5 (Youssef Rep.) and Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart.<br><br>The assertions in this paragraph are based on Youssef's characterization of his FBI work that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Paragraph 31 of Plaintiffs Exhibit 150A (Kohlmann Rep.) purports to state that Zaky was killed in the Spring of 1995 in Bosnia; it does not purport to state any relation to Al Hazmi or Al Mihdhar. Indeed, Plaintiffs provide no evidence that Al Hazmi and Al Midhar were even Al Qaeda members at the time Zaky was purportedly killed. |
| 883. | After Zaky's death, ▮▮▮▮▮ assumed a leadership role of the extremist cell at the ICSD. Ex. 5, Youssef Rpt. 85; Ex. 150A, Kohlmann 2022 Rpt. ¶32. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) and Plaintiffs Exhibit 150A (Kohlmann Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The assertions in this paragraph are based on Youssef's characterization of his FBI work that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>To the extent a response is required, as Sageman explains, "Youssef provides no evidence that al-Bayoumi was part of an extremist cell at the ICSD," nor does he demonstrate the existence of any such "extremist cells" in King Fahad Mosque or the ICSD; Youssef "only called Salafis 'Sunni extremists' and in his imagination organized them into a cell." KSA Ex. 167 (Sageman Rep.) 605, 614; *see also* Response to Pls. Aver. ¶ 172. |
| 884. | In a February 1999 letter prepared by Bayoumi and seized by the MPS, Bayoumi specifically referred to Hamerman as "Al Emir." Ex. 384, MPS 43_217. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 384 (MPS43_217) is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Plaintiffs Exhibit 384 (MPS43_217) refers to Hamerman as "Al Emir." As Sageman explains, the referenced letter was a letter from Al Bayoumi to Saad Al Habib, "the person who paid for the establishment of the Al Madina Mosque, to tell him about the successful celebration of its first Ramadan and the visit of the two MoIA Ramadan preachers." KSA Ex. 167 (Sageman Rep.) 621. It has nothing to do with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | establishing a purported support network for the hijackers in California. *Id.* at 621-626. |
| | | Moreover, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 885. | Plaintiffs' expert Youssef states that from his knowledge and experience investigating Islamic extremist cells, ███████ █████ given to the leader of an extremist cell and was "an acknowledgement and sign of respect by Bayoumi of ████████ position as leader of the ICSD cell." Ex. 5, Youssef Rpt. 86. Youssef elaborated "that Omar Abdel Rahman was described as the 'Amir' of the Al Gama'a extremist group," and noted the FBI describes "a MOIA propagator in San Diego, ████████ as the 'Emir in charge' of Muslim Brotherhood cells in the U.S." Ex. 5, Youssef Rpt. 86, n.335; Ex. 75, State Dept Cable 88 Cairo 21161; Ex. 2, EO 3557. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 2CC (EO 3557) and Exhibit 75 (State Dep't Cable Cairo 21161) are inadmissible hearsay, and Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. As Sageman explains, the referenced letter was a letter from Al Bayoumi to Saad al-Habib, "the person who paid for the establishment of the Al Madina Mosque, to tell him about the successful celebration of its first Ramadan and the visit of the two MoIA Ramadan preachers." KSA Ex. 167 (Sageman Rep.) 621. It has nothing to do with establishing a purported support network for the hijackers in California. *Id.* at 621-626. ████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 886. | The MPS found a photograph of Hamerman in Bayoumi's possession with the time stamp date of January 19, 1999, which is consistent with Hamerman's trip to the U.S. Ex. 11D (MPS726 Photo Exhibits) (photo showing Hamerman, Bayoumi, Sadhan and others). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs do not cite admissible evidence identifying the individuals in the referenced photograph in Plaintiffs Exhibit 11D (MPS Photographs). Also, while the photograph appears have "19 1 '99" in the bottom corner, there is no indication that this is a date stamp, and even if it were, that the time stamp was accurate. Plaintiffs provide no other evidence of a trip that Hamerman took to the U.S. in January 1999.<br><br>Further, as Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 887. | Plaintiffs' expert Youssef states that from his knowledge and experience investigating Islamic extremist cells, the clothing "worn by Hamerman in this photo — his thobe, sash, and turban — is consistent with … Hamerman's role as leader of the extremist cell." Ex. 5, Youssef Rpt. 86, n. 335. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef lacks the necessary "knowledge and experience" to offer this opinion. The FBI has asserted |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |
| 888. | In 1994, Bayoumi also met a friend of Hamerman's, a man from Saudi Arabia named Saad Al Habib, at the ICSD. Ex. 120, Bayoumi Dep. 145:24-146:2, 147:5-24, 277:20-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs' assertion that Saad Al Habib was "a friend of Hamerman's." In the cited portion of the transcript, Al Bayoumi testified that Hamerman knows Al Habib, not that the two were friends. |
| 889. | Given Bayoumi's connections with Hamerman and the ISCD extremist cell, "Bayoumi's name had first surfaced at the FBI in 1995 in connection with other investigations." Ex. 131, DOJ Inspector General's November 2004 Review at 331. | Plaintiffs Exhibit 131 (PEC-KSA 562) contains the quoted language, but does not state that Al Bayoumi name had surfaced in connection with Hammerman or an "ICSD extremist cell." It states only that "Bayoumi's name had first surfaced at the FBI in 1995 in connection with other investigations."

Plaintiffs Exhibit 131 (PEC-KSA 563, 565) also states that "the San Diego FBI opened a preliminary inquiry on Bayoumi" on September 8, 1998, but that the inquired was "closed" on June 7, 1999 and that, as of that date, "he was no longer actively under investigation by the FBI." It further states that "[t]he FBI case agent told the OIG that she had no concrete information linking Bayoumi to any terrorist activities" and "that the allegations that gave rise to the preliminary investigation were not substantiated." *Id.* at PEC-KSA 565. The OIG concluded that it did "not believe that the FBI's actions with regard to Bayoumi and its decision to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | close the preliminary inquiry were inappropriate. *See id.* at PEC-KSA 565. |
| 890. | The FBI raid on Bayoumi's San Diego office after the 9/11 Attacks found extremist materials including a "Book of Jihad" published by the Islamic Guidance Center of Saudi Arabia which provides religious justification for martyrdom and suicide attacks. Ex 528, FBI 4139-45. | At his deposition, Al Bayoumi testified about Plaintiffs Exhibit 528 (FBI 4139). Pls. Ex. 120 (Bayoumi Tr.) 303:20-309:13. Al Bayoumi testified that he did not know where that document came from, but that "[t]here [were] some documents that would get posted on a message board in the mosque"; that "[a]nybody [could] come and post whatever document or whatever paper that they" want; and that "if there's something that [did] not align with us" – such as "anything that pertains to violence, theft, guns," which he and the mosque did "not support" – he would "take it off" and "keep it in a file" in his office "for it to be destroyed later on." *Id.* at 305:5-308:18.

*The Book of Jihad* also does not advocate Al Qaeda's view of jihad. It states that "jihad" is a collective duty, sanctioned by the head of state. Pls. Ex. 528 (FBI 4143). Al Qaeda, by contrast, preaches that "jihad" is an individual duty as argued by Abdullah Azzam in his pamphlet, *Defense of Muslim Lands*. *The Book of Jihad* further prohibits participants in jihad from "killing women or children who do not take part in the fight." Pls. Ex. 528 (FBI 4145). It thus rejects any form of terrorism. *The Book of Jihad* also mentions multiple "Kinds of *Jihad*," including "exerting the utmost power against onself to acquire religious knowledge" and "exerting the effort to rebut the dubiousness and desires with which the devil occupies man." Pls. Ex. 528 (FBI 4144). Plaintiffs' attempt to equate any use of the term jihad with terrorism is baseless. |
| 891. | Bayoumi immediately recognized the book from his files as an extremist text, as he made the claim that he must have removed the book from a message board at the Mosque and to "keep it in a file for it to be destroyed later on." Ex. 120, Bayoumi Dep. | Plaintiffs Exhibit 566 (FBI 11759) is inadmissible hearsay, and Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs assertion that Al Bayoumi "immediately recognized the book from his files as an extremist text." In response to a question about whether he "recall[ed]" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 303:20-309:13. A witness told the FBI a month after the 9/11 Attacks that Bayoumi was "always talking about how the Islamic community needs to take action" and that on several occasions Bayoumi told the witness that "they were 'at Jihad.'" Ex.566, FBI 11759. As explained by Plaintiffs' expert Youssef, "[t]he term 'jihad' [as] used …in the book found in Bayoumi's office and Bayoumi's comments" were understood as a call "to war against those who are perceived to be enemies of Islam." Ex. 5, Youssef Rpt. 86, n. 338. | Plaintiffs Exhibit 528 (FBI 4139), Al Bayoumi responded: "No." Pls. Ex. 120 (Bayoumi Tr.) 305:5-24. At that time, Al Bayoumi had only been shown a small portion of the document and had been denied the ability to review the document by Plaintiffs. *See id.* at 304:5-19. Without seeing the document, Al Bayoumi offered to "clarify." *Id.* at 306:1-2. Al Bayoumi then explained – in general – not referring to Plaintiffs Exhibit 528 that: "There are some documents that would get posted on a message board in the mosque. Anybody can come and post whatever document or whatever paper that they put, and then at the masjid we don't necessarily allow that. So if there's something that does not align with us, I will take it off and I will keep it in a file for it to be destroyed later on. I do not keep it on the wall for the public. I do not keep it on the wall, anything that pertains to violence, theft, guns. We do not support. In that case I would take it off the board, I would keep it in a file for the purpose of destroying it later." *See id.* at 307:1-20. Al Bayoumi then explained that this particular document would not have come from the Saudi Embassy because the Embassy only provided Qurans. *See id.* at 307:21-308:4.<br><br>Plaintiffs also mischaracterize Exhibit 528 (FBI 4139) – *The Book of Jihad*. Plaintiffs Exhibit 528 does not advocate Al Qaeda's view of jihad. It states that "jihad" is a collective duty, sanctioned by the head of state. Pls. Ex. 528 (FBI 4143). Al Qaeda, by contrast, preaches that "jihad" is an individual duty as argued by Abdullah Azzam in his pamphlet, *Defense of Muslim Lands*. *The Book of Jihad* further prohibits participants in jihad from "killing women or children who do not take part in the fight." Pls. Ex. 528 (FBI 4145). It thus rejects any form of terrorism. *The Book of Jihad* also mentions multiple "Kinds of *Jihad*," including "exerting the utmost power against onself to acquire religious knowledge" and "exerting the effort to rebut the dubiousness and desires with which the devil occupies man." Pls. Ex. 528 (FBI 4144). Plaintiffs' attempt to equate any use of the term jihad with terrorism is baseless. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XI.P. | **Through Bayoumi, Saudi Arabia recruited Hamerman as a Saudi government asset and Al Haramain operative** | To the extent a response is required, neither Bayoumi nor Hamerman was a Saudi government "asset." |
| | | Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency.  Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer."  KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304.  Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers."  *Id.* at 297. |
| | | The links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment)  were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego."  KSA Ex. 167 (Sageman Rep.) 504-505. |
| | | There is no evidence that Al Bayoumi recruited Hamerman for anything. |
| 892. | The circumstances show that Bayoumi's initial meeting and subsequent handling of Hamerman did not occur by chance but was part of a planned Saudi government operation to recruit Hamerman and support the Sunni extremist network in California. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertions in this paragraph are unsupported by any citation or record evidence. |
| | | Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| | | Sageman also explains that the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 893. | On July 11, 1996, Bayoumi received a letter from Yusuf Al Shuwayhani, Dean of Admission and Matriculation at Imam Muhammad University in Riyadh, which sets forth what it calls the "complete story of brother Omar Hamerman." In the letter Shuwayhani confirms that the Saudi government's goal is for Hamerman to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "become a *Da'aih* [Propagator]…." Ex. 678S, MPS 732_4,6. | Plaintiffs Exhibit 678S (MPS 732_4, 6) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs inaccurately quote Plaintiffs Exhibit 678S. The exhibit purports to provide "the story of Brother Omar Hamerman in full," which story includes Hamerman's "requesting postponement of his study . . . for the next semester"; "Student Affairs Deanship" sending "a letter to Saudi Ministry of Foreign Affairs to cancel the entry visa and issue him a visa for the next year"; and the Dean of Admission's request that Bayoumi read Hamerman the letter so that Hamerman knows that he "must call or go the Saudi embassy in Washington, D.C. and must bring his passport, the declaration of converting to Islam, and the number of this telegram so he may be issued the entry visa with the travel ticket." Pls. Ex. 678S (MPS 732_4, 6). Further, contrary to Plaintiffs' assertion, the exhibit does not purport to state that the Saudi government's goal is for Hamerman to "become a Da'aih [Propagator]." Yusuf al-Shuwayhani, the Dean of Admission and Matriculation at Imam Muhammad University, simply states: "And I ask Allah Almighty to grant him success in beneficial knowledge and righteous deeds, so he may become a preacher to the path of guidance and peace." Pls. Ex. 678S (MPS 732_6).<br><br>The links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 894. | Shuwayhani asked Bayoumi to call him with Hamerman to get some information, and then stated: "I [Shuwayhani] need to give you [Bayoumi] some instructions." Shuwayhani thanked Bayoumi for his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "personal efforts and dedication to this matter." Shuwayhani's letter shows that he had previously visited San Diego when Bayoumi was there: Shuwayhani asks Bayoumi to convey his greetings and regards to "[the beloved ones] and the brothers" at the ISCD and the Al Ribat Mosque, where Anwar Aulaqi was the Imam. Shuwayhani also shows the depth of his relationship with Bayoumi, signing the letter as "Your brother and *Mohebukom* [the one who loves you]." Ex. 678S, MPS 732_4,6. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 678S (MPS 732_4, 6) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 678S (MPS 732_4, 6) does not indicate when Shuwayhani purportedly travelled to San Diego nor does it indicate, at that time, that Al Awlaki was the imam at the Al Ribat Mosque.<br><br>Further, Plaintiffs Exhibit 678S (MPS 732_4, 6) purports to provide "the story of Brother Omar Hamerman in full," which story includes Hamerman's "requesting postponement of his study . . . for the next semester"; "Student Affairs Deanship" sending "a letter to Saudi Ministry of Foreign Affairs to cancel the entry visa and issue him a visa for the next year"; and the Dean of Admission's request that Bayoumi read Hamerman the letter so that Hamerman knows that he "must call or go the Saudi embassy in Washington, D.C. and must bring his passport, the declaration of converting to Islam, and the number of this telegram so he may be issued the entry visa with the travel ticket." Pls. Ex. 678S (MPS 732_4, 6).<br><br>In that context – in portions of the letter Plaintiffs misquote – Shuwayhani stated: "After you receive this letter, I would appreciate it if you could read it to Brother Omar Hamerman, then call me immediately; and Brother Omar Hamerman must be with you, because there is some information I need from him, and I have some instructions to give you. This will make an end to Brother Omar's matter, praise and gratitude be to Allah. And I ask Allah Almighty to grant him success in beneficial knowledge and righteous deeds, so he may become a preacher to the path of guidance and peace. I also thank you for your effort and dedication to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | his pursuit, and I ask Allah to keep you steadfast in that and to recompense and reward you with the best." Pls. Ex. 678S (MPS 732_6).<br><br>As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 895. | On July 27, 1996, Hamerman and Bayoumi sent a joint letter responding to Sheikh Shuwayhani. Hamerman expressed his thanks for "admitting me as a student" at Imam Mohamed University and stated that he called the Saudi Embassy to get his visa and tickets. Bayoumi wrote a greeting to the Shuwayhani at the bottom of the letter and asked for information about a rumor Bayoumi heard about Shuwayhani returning to the U.S. Ex. 678T, MPS 732_5. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678T, (MPS 732_5) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 678T (MPS 732_5) does not mention a "rumor." It states: "Also, you did not tell me about your interest in the job in Cincinnati." Pls. Ex. 678T (MPS 732_5).<br><br>As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 896. | ███████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.  ████████████████  ████████████████  ████████████████ |
| 897. | The MPS found Bayoumi in possession of the materials evidence that he worked to assemble for Hamerman's position at Imam Mohammad University: a copy of Hamerman's U.S. passport; a 1992 "Acknowledgement of Faith" of Hamerman to "declare that I am a Muslim"; and a Saudi Embassy Medical Report form for Hamerman finding that Hamerman was "fit for employment." Ex. 313, MPS 731_1-12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.  To the extent a response is required, Plaintiffs Exhibit 313 (MPS 731_1-12) contains the quoted language. However, Hamerman did not have a "position" of "employment" at Imam Mohammed University as Plaintiffs suggest. He was a student there. *See* Response to Pls. Aver. ¶ 896.  As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 898. | Upon his arrival in Saudi Arabia, Hamerman immediately met with Saad al Habib and, over the years, Bayoumi communicated with Habib concerning Hamerman. Ex. 353, MPS 727_202; Ex. 361, MPS 43_114; Ex. 364, MPS 43_136. <br><br> [REDACTED] | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit [REDACTED] Exhibit 353 (MPS727_202), and Exhibit 361 are inadmissible hearsay. *See* Objections Chart. <br><br> The cited materials do not support Plaintiffs' assertion that "[u]pon his arrival in Saudi Arabia, Hamerman immediately met with Saad al Habib." None of those materials discuss the timing between Hamerman's "arrival in Saudi Arabia" and his first encounter with Al Habib. <br><br> Moreover, the cited materials do not support Plaintiffs' assertion that "Bayoumi communicated with Al Habib concerning Hamerman." In Plaintiffs Exhibit 353 (MPS727_202), Al Bayoumi simply asks Al Habib to "[s]end [his] regards" to Hamerman. In Plaintiffs Exhibit 361 (MPS43_114), Al Bayoumi sends greetings to "the two Omars," but provides no further information about the identifies of those "Omars." [REDACTED] <br><br> As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 899. | Bayoumi's handwritten address book contained phone and address information for Hamerman which shows that Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabia provided housing for Hamerman in Riyadh at the Imam Mohammad University. Ex. 12AA, MPS738_35. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| | | The cited material does not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 12AA (MPS 738_35) does not mention Omar Hamerman. But even if it did, that would not indicate that Saudi Arabia provided housing for Hamerman at Imam Mohammad University. |
| | | As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| 900. | While Hamerman was ostensibly brought to Saudi Arabia as a student, he apparently did not take classes for years after he first arrived in Riyadh, Saudi Arabia in the Fall of 1996 to accept his position at Imam Mohammad University. Hamerman's online resume shows that he did not start coursework at Imam Mohammad University until five years later in the Fall | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, there is no admissible evidence regarding Hamerman's course of studies and the timing of those studies. Saudi Arabia notes that – although inadmissible – Plaintiffs have relied on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of 2001 and received a degree in 2005. Ex. 157, Hamerman LinkedIn. | ███████████████████████████ |
| 901. | A student at Imam Mohammad University is deemed to be an employee of Saudi Arabia's government. Ex. 270, KSA 2670 (Thumairy confirming that he was employed by Saudi Arabia while he was a student at Imam Mohammad University). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 270 (Ghudaian Ex. 450) does not support Plaintiffs' assertion of fact. An applicant's decision to list his studies at a particular school as an employment experience on an application does not establish that the school viewed or treated the applicant as an employee. |
| 902. | Al Haramain emails from 2000 produced in this litigation show that Hamerman was an Al Haramain operative who participated in Al Haramain strategy and planning meetings in Saudi Arabia about Al Haramain's operations in the U.S. The Al Haramain e-mails are from Abdulaziz Alshoumar in Saudi Arabia, who identified himself as part of Al Haramain's "USA Dawah Group." Alshoumar sent the e-mails using his e-mail address with Aramco, a Saudi Government owned entity. The e-mails show that Hamerman was a member of a 4-5 person Al Haramain committee that held regular meetings concerning Al Haramain's U.S. operations. Alshoumar | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' assertions in this paragraph are unsupported by any citation or record evidence. Plaintiffs appear to be relying on Plaintiffs Exhibit 33 (Emails from Al Shoumar), which includes documents containing the quoted language. Saudi Arabia will treat Plaintiffs as having cited Plaintiffs Exhibit 33.<br><br>Plaintiffs Exhibit 33 (Emails from Al Shoumar) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | writes that he could arrange a meeting together along with "Darwood, Nbil and Omar Hammerman." A February 19, 2000 Al Haramain e-mail from Abdulaziz Alshoumar in Saudi Arabia stated that:<br><br>Last Thursday we had a meeting at Al-Haramain office, brothers: Omar Hammerman, Dawood Rogers, Ali Jomaa, Khaleel and myself were there. In the meeting we discussed several things, however, the main topics were:<br><br>§ Our Dawah's strategy in the USA.<br>§ Activities Plan. | This paragraph contains improper attorney argument.<br><br>Plaintiffs Exhibit 33 (Emails from Al Shoumar) does not indicate Hamerman was an Al Haramain "operative." The emails indicate Hamerman was invited to a Al Haramain meeting about a Dawah strategy in the United States – Hamerman's home country. They make no mention of Hamerman being an "operative" of Al Haramain or that he was even a member of Al Haramain. |
| 903. | A February 25, 2000 Al Haramain e-mail from Alshoumar in Saudi Arabia states that Hamerman participated in an Al Haramain meeting where they "discussed our proposed plan for the coming 5 years." Ex. 33, Feb. 19, Feb. 25, & May 30, 2000 e-mails as PST file produced by Al Haramain. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 33 (Emails from Al Shoumar) is inadmissible hearsay. *See* Objections Chart.<br><br>*See* Response to Pls. Aver. ¶ 902. |
| 904. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit ██████████ is inadmissible hearsay. *See* Objections Chart.<br><br>████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ |
| 905. | ████████████████████████ June 27, 1997, days before senior Al Haramain member and Saudi government official Soliman al Buthe reported that he went to Oregon to establish of Al Haramain's U.S. operations. Ex. 2, EO 2573, 3435 (FBI/CIA Joint Assessment). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2V (EO 2573) is inadmissible hearsay. *See* Objections Chart.<br><br>████████████████████████ ████████████████████████ ████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████████████ ██████████████<br><br>Moreover, the cited materials do not support Plaintiffs' assertion that the ████████████ "days before . . . Saudi government official Soliman al Buthe reported that he went to Oregon to establish of Al Haramain's U.S. operations." The cited page of Plaintiffs Exhibit 2V does not mention Al Buthe or Al Haramain. The cited page of Plaintiffs Exhibit 2OO (EO 3435) states that the "al-Haramain Islamic Foundation" "opened an office in Ashland, OR, in 1997," but does not state the exact date, does not state that Al Buthe opened the office, and does not state that Al Buthe reported doing so. Moreover, Plaintiffs Exhibit 2OO (EO 3435) describes Al Buthe as "an officer of al-Haramain US," "a ranking official of al-Haramain international," and as a "Saudi-based" individual; it does not describe him as a Saudi government official. Finally, none of the cited materials indicate that ████████ traveled to Oregon at all. |
| 906. | ████████████ ████████ August 13, 1998, the date that the three-man Al Haramain delegation – including ████████ and Buthe – arrived in San Diego to meet with Bayoumi to discuss the Imam, religious control, and operation of the recently opened Al Madinah Mosque. Ex. 410, MPS43_225-228 (Bayoumi letter to Habib); Ex. 120, Bayoumi Dep. 186:11-192:2, 195:16-24, 197:10-20; Ex. 2, EO 2573. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2V (EO 2573) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertion that ████████ "on August 13, 1998." The cited page of Plaintiffs Exhibit 2V (EO 2573) lists August 13, 1998 as a date on which ████████ allegedly arrived in the United States, but does not mention ████████████ The cited pages of Plaintiffs Exhibit 120 (Bayoumi Tr.) do not mention |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████████████████████████████████████<br>█████████████<br><br>Moreover, the cited materials do not support Plaintiffs' assertion that the referenced "delegation" included ██████████ and Buthe." The cited page of Plaintiffs Exhibit 2V (EO 2573) does not mention the meeting, and Plaintiffs Exhibit 410 (MPS43_225-228) does not mention the names of the individuals from Al Haramain. Al Bayoumi testified that he did not remember the individuals in that "delegation." Pls. Ex. 120 (Bayoumi Tr.) 190:1-191:1.<br><br>Moreover, the referenced letter (which appears in Plaintiffs Exhibit 410 (MPS43_225-228) states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 410 (MPS43_225, 226).<br><br>Finally, although inadmissible hearsay, Plaintiffs rely on FBI documents indicating that █████████████████████████████████<br>████████████████████████████████████ |
| 907. | ██████████████████████<br>████████ January 3, 1999, when ██████████ came back to the Al Madinah Mosque and met with Bayoumi, and two visiting MOIA propagators, Adel Al Sadhan and Mutaeb Al Sudairy, who (as detailed below) were an advance team for the 9/11 hijackers. The MPS production included a date stamped photograph ("19 1 '99" or January 19, 1999) which included | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2V (EO 2573) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi, Omar Hamerman, Adel Al Sadhan. Ex. 11D (MPS894-CLIP Video Screenshots); Ex. 11D (MPS 726 Photographs); Ex. 2, EO 2573. | The cited materials do not support Plaintiffs' assertion that Saudi Arabia ███████████████ "on January 3, 1999." The cited page of Plaintiffs Exhibit 2V (EO 2573) lists January 3, 1999 as a date on which ████████ allegedly arrived in the United States, but does not mention ██████████████████ ██████████████████████████ to do anything. Plaintiffs Exhibit 11D (MPS Photographs) consists of images; it does not mention ███████████████████████████ ████████████<br><br>Moreover, the cited materials do not support Plaintiffs' assertion that "███████ came back to the Al Madinah Mosque and met with Bayoumi, and two visiting MOIA propagators, Adel Al Sadhan and Mutaeb Al Sudairy." Plaintiffs Exhibit 2V (EO 2573) does not mention ████████ activities on his alleged trip to the United States in January 1999. With respect to Plaintiffs Exhibit 11D (MPS Photographs), Plaintiffs do not cite admissible evidence identifying the individuals in the referenced screenshots and photographs. Moreover, Plaintiffs do not purport to identify Mutaeb Al Sudairy in those screenshots and photographs.<br><br>Plaintiffs' assertion regarding "an advance team" is unsupported by any citation or record evidence. To the contrary, and as the Court has observed, "[t]he FBI ultimately rejected [the] theor[y]" that Al Sadhan and Al Sudairy were an "advance team" for the 9/11 hijackers in its May 2021 electronic communication "clos[ing] Operation Encore." ECF No. 8862 at 25 (citing Plaintiffs Ex. 2A at EO 1-14). |
| 908. | ██████████████████ June 25, 2000, when Saudi Arabia sent ██████ back to San Diego to meet with Bayoumi as | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi was providing key assistance for the 9/11 hijackers. Ex. 2, EO 2573. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2V (EO 2573) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 2V (EO 2573) does not support Plaintiffs' assertion. The cited page of Plaintiffs Exhibit 2V lists June 25, 2000 as a date on which ▮▮▮▮▮▮ allegedly arrived in the United States, but does not mention "Saudi Arabia sen[ding] ▮▮▮▮ back to San Diego," does not mention Saudi Arabia wanting ▮▮▮▮▮ "to meet with Bayoumi," and does not mention any "assistance" provided by Al Bayoumi to "the 9/11 hijackers.<br><br>To the contrary, the FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). Moreover, Al Bayoumi testified that he did not have knowledge or suspicion before the 9/11 attacks that Al Hazmi and Al Mihdhar were planning to commit terrorist attacks in the United States. Pls. Ex. 120 (Bayoumi Tr.) 724:7-17. Al Bayoumi also testified that Al Hazmi and Al Mihdhar "tended to avoid" him. *Id.* at 754:19-755:11.<br><br>Finally, although inadmissible hearsay, Plaintiffs rely on FBI documents indicating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 909. | Hamerman's recruitment for Al Haramain, an organization directly linked to Al Qaeda and Osama Bin Laden, ▮▮▮▮▮▮▮▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>████████████████ *See* Objections Chart.<br><br>████████████████<br><br>Plaintiffs' assertion that Hamerman "recruit[ed] for Al Haramain" is unsupported by any citation or record evidence. There is no admissible evidence that Hamerman "recruit[ed] for Al Haramain." |
| 910. | Plaintiffs' expert Youssef also states that based on his knowledge and experience, including four years as FBI Legal Attache in Saudi Arabia between 1996-2000, that Bayoumi's conduct shows that he was "acting at the direction of his Saudi superiors to groom Hamerman as a Saudi Government operative." Ex. 5, Youssef Rpt. 87. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297.<br><br>As Sageman explains, the links between Al Bayoumi and Hamerman (e.g., Hamerman helping Al Bayoumi find an apartment) were "part of the Small World phenomenon [of fellow Muslims helping other Muslims] among a small pious Salafi community in San Diego." KSA Ex. 167 (Sageman Rep.) 504-505. |
| XI.Q. | **Bayoumi establishes himself as a leader within the Sunni extremist network in San Diego, which included Anwar Aulaqi, a radical extremist tied to Al Qaeda** | Plaintiffs cite no evidence of a "Sunni extremist network" in San Diego, and no such evidence exists. *See* KSA Ex. 167 (Sageman Rep.) 604-605. As Sageman explains, "Youssef provides no evidence that al-Bayoumi was part of an extremist cell at the ICSD," nor does he demonstrate the existence of any such "extremist cells" in King Fahad Mosque or the ICSD; Youssef "only called Salafis 'Sunni extremists' and in his imagination organized them into a cell." KSA Ex. 167 (Sageman Rep.) 605, 614.<br><br>As for Al Awlaki, Plaintiffs' own expert concluded – in his 2020 "peer-reviewed" book published by Harvard University Press, which Plaintiffs reference in Plaintiffs Averment ¶ 933 – that Al Awlaki was not radicalized until after the 9/11 attacks. Pls. Ex. 102 (Meleagrou-Hitchens |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Tr.) 315:18-316:16. Meleagrou-Hitchens also concluded in that book that Al Awlaki's interactions with the 9/11 hijackers were innocent. *Id.* at 128:22-134:9. |
| 911. | The FBI investigation conducted by Plaintiffs' expert Youssef in the mid 1990's found that the ICSD was supported by Saudi Arabia and that ███████████, a MOIA propagator, was the ICSD's former Imam and influential leader. Ex. 5, Youssef Rpt. 88; Ex. 210, KSA 0554; Ex. 2, EO 0692. Upon his arrival in California in 1994, Bayoumi immediately connected with the Sunni extremist cell at the ICSD through Hamerman and used Saudi government funding to establish himself as a prominent member at the ISCD. Ex. 120, Bayoumi Dep. 59:21-60:22, 61:23-62:17 (Bayoumi immediately went to ISCD and connected with Hamerman upon entering the United States) Ex. 355, MPS 727_142 (December 1994 ICSD letter thanking Bayoumi for his "abundant generosity"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2N (EO 0692) and Exhibit 355 (MPS727_142) are inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs rely on Youssef's characterizations of his purported FBI work that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>The cited materials do not support Plaintiffs assertion that Al Bayoumi "immediately connected with the Sunni extremist cell at the ICSD through Hamerman." Al Bayoumi testified that he stayed at a hotel when he first arrived in San Diego; that he went to the Islamic Center of San Diego (ICSD) at some point in those first few days; that he spoke with many people at the ICSD about locating an apartment; that one of those people was Omar Hamerman; and that Hamerman helped him locate his first |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | apartment, which was on Beadnell Way. *See* Pl. Ex. 120 (Bayoumi Tr.) 58:21-63:17. |
| | | Plaintiffs Exhibit 355 (MPS727_142) is a letter thanking Al Bayoumi for the "efforts [he] dedicated to [a] dinner party." It does not mention Hamerman at all. |
| 912. | The July 1996 letter of Sheikh Shuwayhani of Imam Mohammad University to Bayoumi shows that Bayoumi had previously hosted Shuwayhani in San Diego and introduced him to "beloved ones" and "the brothers" at the ICSD and the Al Ribat Mosque, where Anwar Aulaqi was the Imam. Ex. 678S, MPS 732_4,6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 678S, (MPS 732_4, 6) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Plaintiffs Exhibit 678S (MPS 732_4, 6) states: "please convey my greetings and regards to all the loved ones and brothers at the Islamic Center and the Rabat Mosque." Nowhere does the exhibit state that Al Bayoumi had previously hosted Shuwayhani in San Diego or that Al Bayoumi had introduced attendees of the ICSD to Shuwayhani. |
| 913. | Saudi funds helped found and support the Al Ribat Mosque and members of the San Diego extremist cell including Mohamed Zaky and Kifa Jayyousi who had been leaders of the Al Ribat Mosque before Aulaqi arrived. Ex. 5, Youssef Rpt. 88-89; Ex. 147, Hitchens Rpt. ¶ 27; Ex. 2, EO 0727. | Plaintiffs Exhibit 2N (EO 0727) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) and Exhibit 147 (Meleagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.

The cited portions of Plaintiffs Exhibit 2N (EO 0727) and Exhibit 147 (Meleagrou-Hitchens Rep.) do not support Plaintiffs' assertion of fact. Neither mentions "Mohamed Zaky and Kifa Jayyousi." Moreover, neither mention "funds" provided by the Saudi government for the Al Ribat Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited pages in Plaintiffs Exhibit 2N (EO 0727) states that the mosque was "funded by Jameel Faqeih, aka Jamil Faqih." The cited paragraph in Plaintiffs Exhibit 147 states that the mosque was "a beneficiary of [Muslim World League] funding," not Saudi government funding. Pls. Ex. 147 (Meleagrou-Hitchens Rep.) ¶ 27. |
| 914. | As evidenced below, Saudi Arabia worked with Al Haramain to establish, fund, and operate the Al Madinah Mosque in El Cajon through Bayoumi, Thumairy, numerous MOIA Propagators, Imam Mohammad University employee Omar Hamerman, Saudi officials Sowailem, Jarrah, and Ghesheyan, at the Saudi Embassy in Washington D.C. and Consulate in Los Angeles. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

There is no evidence to support Plaintiffs' assertions of fact in this paragraph. The admissible evidence shows that Saad Al Habib and his brother provided the funds to the property for the Al Madina Mosque; that Al Bayoumi assisted Al Habib with the logistics for the purchase and "helped get the mosque in shape to open"; that the "Kurdish community chose the name" of the mosque; that Al Bayoumi's interactions with the Embassy and Consulate with respect to the mosque were limited to requests for donations (*e.g.*, requests for Qurans or funds for furniture) or requests for propagators to visit during Ramadan; and that the mosque "community rejected" a request by Al Haramain members to participate in the mosque management. Pls. Ex. 120 (Bayoumi Tr.) 146:18-165:13, 197:10-198:10, 221:24-225:12.

Moreover, Plaintiffs Exhibit 487 (FBI 1349, 1350) states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two appointed periodically every three or four months"). *See also* Pls. Ex. 410 (MPS43_225, 226). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 915. | Bayoumi sent a letter to Saad Al Habib dated "Ramadan 1998," referring to Ramadan 1418, which started on December 31, 1997 and ended on January 28, 1998. Therein, Bayoumi stated that he hosted a group of Saudi government propagators: [F]our propagators arrived with us this year, three of whom are from the Imam [Muhammad Ibn Saud] University and the fourth is from Umm Al-qura University. I gathered them together with about thirty other persons from the Masjid al Ribat and Masjid Abu Bakr [the ICSD] in my house. Ex. 353, MPS 727_202. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 353 (MPS727_202) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 353 (MPS727_202) does not state he "hosted" four propagators or that they were "Saudi government propagators." |
| 916. | The MPS production included Bayoumi's videotape of the January 1998 gathering at his home, then located on Beadnell Way in San Diego, showing his Saudi government visitors and persons from Aulaqi's Al Ribat Mosque as well as the ICSD. Ex. 10B, MPS890-CLIP Video Exhibit. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs do not cite admissible evidence identifying the individuals, locations, or circumstances shown in Plaintiffs Exhibit 10B (MPS890-CLIP Video). |
| 917. | In November 1999, Bayoumi subsequently sent a report to a senior Saudi government Ministry of Finance official, Ahmed Al Hamdan, which described how four Saudi government propagators sent to San Diego by the Ministry of Islamic Affairs and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Imam Mohammad University for Ramadan 1418 played an instrumental role in the decision to purchase the Al Madinah Mosque. Ex. 370, MPS 43_310; Ex. 2, EO 0483 (describing Hamdan as "a high-ranking Saudi official who works as a Director within the Ministry of Finance"). | Plaintiffs Exhibit 2K (EO 0483) and Exhibit 370 (MPS43_310) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertion that "four Saudi government propagators . . . played an instrumental role in the decision to purchase the Al Madinah Mosque." Plaintiffs Exhibit 2K (EO 0483) describes Al Hamdan and his relationship with Al Bayoumi. Plaintiffs Exhibit 370 (MPS43_310) is not a "report" but a letter noting that Saad Al Habib "purchased" a building for the mosque "after a visit made by some *Du'aah* [propagators]." Plaintiffs Exhibit 370 (MPS43_310) does not state the number of propagators and does not state that Al Habib made the purchase because of the visit by those propagators. |
| 918. | Along with the MOIA propagators who visited San Diego over Ramadan 1418, and participating in the decision to purchase the Al Madinah Mosque, was Ibrahim Al Zamil. Ex. 370, MPS 43_310. Zamil would return to San Diego and assist Bayoumi in running the Mosque. Ex. 365, MPS 43_137 (August 1999 joint letter of Bayoumi and Zamil describes how they are working together on the Mosque project). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 365 (MPS43_137) and Exhibit 370 (MPS43_310) are inadmissible hearsay. *See* Objection Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 370 (MPS43_310) does not support Plaintiffs' assertion Al Zamil was involve din purchasing the Al Madina Mosque; it does not mention "Ibrahim Al Zamil." Nor is there support that "MOIA propagators" participated in the decision to purchase the mosque. *See* Response to Pls. Aver. ¶ 917. Plaintiffs Exhibit 365 (MPS43_137) does not indicate that Al Bayoumi was working with Al Zamil to run the mosque. This was a joint letter indicating that Al Zamil had served as a witness to a conversation where Al Bayoumi accused another individual of lying. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 919. | As shown by later visits of MOIA propagators, Bayoumi necessarily had numerous interactions with MOIA officials, including Thumairy and the Islamic Affairs Department at the Saudi Embassy, before and after the Ramadan 1418 visit of four propagators to San Diego. Ex. 120, Bayoumi Dep. 223:12-225:12 (Bayoumi testified that he called the Islamic Affairs Department at the Embassy to arrange for the propagators' visits); Ex. 411, MPS 43_314; Ex. 373, MPS 43_345; Ex. 413, MPS 43_338. Saudi Arabia did not produce any documents about that visit. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 373 (MPS43_345), Exhibit 411 (MPS43_314), and Exhibit 413 (MPS43_338) are inadmissible hearsay. *See* Objections Chart.<br><br>The cited materials do not support Plaintiffs proposition that "Bayoumi necessarily had numerous interactions with MOIA officials . . . before" Ramadan 1418. Ramadan 1418 took place in December 1997 and January 1998. *See* KSA Ex. 69 (Calendar for the Year 1998). Plaintiffs Exhibits 373, 411, and 413 all concern "Ramadan [19]99." Pls. Ex. 411 (MPS43_314); Pls. Ex. 413 (MPS43_338); *see* Pls. Ex. 373 (MPS43_345) (dated "1, 26, 99"). According to Plaintiffs Exhibit 411, that mosque "started at the beginning of August [19]98," which would have been after Ramadan 1418. |
| 920. | Bayoumi maintained a videotape report of a large Ramadan 1418 service held in San Diego that was led by Anwar Aulaqi and attended by Bayoumi and the four visiting MOIA and other Saudi government propagators. Ex. 10B (MPS890-CLIP Video Exhibit); Ex. 11B (MPS890-CLIP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs do not cite admissible evidence identifying the individuals, locations, or circumstances shown in Plaintiffs Exhibit 10B (MPS890-CLIP Video) and Plaintiffs Exhibit 11B (MPS890-CLIP Video Screenshots). There is no evidence the four individuals were associated with the "Saudi government" or MOIA. *See* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Response to Pls. Aver. ¶ 915.  Nor is there any evidence that any visitors from MOIA are shown in the videotape.<br><br>There is also no evidence that Al Bayoumi made or "maintained" any videos as "report[s]" intended for a third party.  To the contrary, Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency.  Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.  As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer."  KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304.  Sageman also explained that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government.  *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers."  *Id.* at 297. |
| 921. | Bayoumi claimed at his deposition that "I knew he [Aulaqi] was an Imam" but when asked "had you met him [Aulaqi] in person?" Bayoumi answered: "No." When asked if he had contact with Aulaqi "either in person or on the phone" Bayoumi claimed: "I don't remember." Ex. 120, Bayoumi Dep. 482:12-24. | Al Bayoumi gave this testimony, but also clarified later in his deposition that he did reach out to Al Awlaki "on occasions, like when there were dinners or something." Pls. Ex. 120 (Bayoumi Tr.) 589:9-16.  He further testified he knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so.  *Id.* at 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him"). |
| 922. | Bayoumi had Anwar Aulaqi's personal cell phone number and email address in his handwritten address book. Ex. 12AA, | Plaintiffs Exhibits 12AA (MPS 738) and 12BB (MPS 688) are inadmissible hearsay, and Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MPS738_82 (███████917" and ███████████). Bayoumi also had phone numbers for the Al Ribat Mosque in his handwritten address book. Ex. 12AA, MPS738_26. Bayoumi also kept Aulaqi's number in San Diego, ███-1917, as well as the Al Ribat Mosque numbers, in his January 2000 phone list. Ex. 12BB, MPS 688_3; Ex. 5, Youssef Rpt. 138. | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>There is no evidence that the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that as such he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |
| 923. | Bayoumi's claim that he never met Aulaqi in person was false. A video found in Bayoumi's possession by Scotland Yard shows Bayoumi and Aulaqi in January 1998 after an Eid sermon given by Aulaqi to mark the end of Ramadan 1418. The video shows a warm embrace and words of mutual recognition between Bayoumi and Aulaqi, demonstrating that the two men knew each other well. Ex. 147, Hitchens Rpt. ¶ 65; Ex. 10B (MPS890-CLIP Video Exhibit) 40:35-40:45; Ex. 11B (MPS890-CLIP Video Screenshots). | Plaintiffs Exhibit 147 (Meleagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.<br><br>The cited materials do not support Plaintiffs' assertion that the referenced video "shows Bayoumi and Aulaqi in January 1998 after an Eid sermon given by Aulaqi to mark the end of Ramadan 1418." The cited paragraph in Plaintiffs Exhibit 147 states that the video shows "a sermon . . . during Ramadan 1419 Hijri, which is circa January 1999." Pls. Ex. 147 (Meleagrou-Hitchens Rep.) ¶ 65.<br><br>Plaintiffs Exhibit 10B is an Arabic-language video for which Plaintiffs do not provide a translation. Plaintiffs mischaracterize the content of the video, including by providing an isolated screenshots in Plaintiffs Exhibit 11B of a supposed "warm embrace" between Al Bayoumi and Al Awlaki. The video actually shows a man who Plaintiffs claim is Al Bayoumi greeting about 40 different individuals (everyone that was nearby) over a four minute period at a social gathering that appears to be attended by dozens of people. *See* Pls. Ex. 10B (MPS 890-CLIP) at 36:38-40:48. Al Bayoumi greets each of these individuals – including the individual who Plaintiffs assert is Al Awlaki – in the exact same manner: a hug and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | handshake. The video demonstrates that was the standard greeting in this community as the exact same hug and handshake is performed by dozens of people in the background. Further, the suggestion that the video is nefarious is belied by the fact that it appears to be filmed by Al Bayoumi's young son who can be heard speaking to his "dad" on the film. *See also* Pls. Ex. 102 (Meleagreau-Hitchens Tr.) 183:13-19 (agreeing Al Bayoumi "certainly greeted a lot of people"). |
| | | Saudi Arabia disputes Plaintiffs' assertion that Al Bayoumi gave false testimony denying knowing Al Awlaki. Plaintiffs fail to provide context from his deposition. Al Bayoumi also testified that he did reach out to Al Awlaki "on occasions, like when there were dinners or something." Pls. Ex. 120 (Bayoumi Tr.) 589:9-16. He further testified he knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. *Id.* at 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him). |
| 924. | Aulaqi and Bayoumi organized a paintball war game event where the participants wore military fatigues and engaged in battle simulations. The participants included members of the ICSD and Al Ribat Mosques. Ex. 2, EO 4042. Mohdar Abdullah and a visiting MOIA propagator attended. Bayoumi made a video of the event and took video footage of Aulaqi, who was addressed as "Sheikh Anwar." Bayoumi can be seen and heard talking to | Plaintiffs Exhibit 2HH (EO 4042) is inadmissible hearsay. *See* Objections Chart. Plaintiffs do not cite admissible evidence identifying the individuals in Plaintiffs Exhibit 10A and Exhibit 11A, including that "Mohdar Abdullah and a visiting propagator attended." Neither document discloses who "made" or "took" the referenced video. An individual in the referenced video is referred to as "Anwar." The cited materials do not support Plaintiffs' assertion that Al Bayoumi was an "organize[r]" of "a paintball war game event." Plaintiffs Exhibit 2HH (EO 4041), lists Al Awlaki as the sole "organize[r]" of paintball |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Aulaqi. Ex. 10A (FBI013E459-CLIP Video Exhibit); Ex. 11A (FBI013459-CLIP Video Screenshots). | events "in the San Diego, California area during 2001/2002." However, that is unreliable because Al Awlaki had left San Diego by mid-2000. *See* KSA Ex. 163 (9/11 Rep.) 221. Plaintiffs Exhibit 10A and Plaintiffs Exhibit 11A do not disclose the organizers of the event. |
| 925. | On May 2, 2002, shortly before Bayoumi left England to return to Saudi Arabia, he went to the MPS in London, England and retrieved many of the original materials that had been seized from him in September 2001 including the videotape of him with other Saudi government officials and Anwar Aulaqi. Ex. 441, FMT Receipt 69/2002. The evidence receipt record signed by Bayoumi was produced by MPS in November 2023. The correspondence, videotapes, and other materials constitute Bayoumi reporting on his work for the Saudi government in the U.S. but not were produced by Saudi Arabia, despite their clear relevance. | Plaintiffs Exhibit 441 does not support Plaintiffs' assertion concerning when "Bayoumi left England to return to Saudi Arabia." That exhibit does not mention Al Bayoumi's travels.<br><br>Plaintiffs do not cite admissible evidence identifying the individuals in the referenced video.<br><br>There is no admissible evidence that "[t]he correspondence, videotapes, and other materials" Al Bayoumi retrieved from the MPS "constitute Bayoumi reporting on his work for the Saudi government in the U.S." There is no evidence that any of these videos were provided to anyone in the Saudi government, and the fact that they were taken from Al Bayoumi's apartment indicates that they never were in Saudi Arabia's possession, custody, or control.<br><br>Al Bayoumi also testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13.<br><br>As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278.<br><br>Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. |
| 926. | The 9/11 Commission recorded that during his interview "[Bayoumi] conceded having had contact with Anwar Aulaqi, with whom he claimed discussed religious matters and ideas similar to those he would discuss with other imams." Ex. 90, Snell Decl., Ex. 2 at 6. The statements to the 9/11 Commission took place in October 2003, before Aulaqi had been publicly designated as an Al Qaeda terrorist by the U.S. At his deposition in this litigation however, Bayoumi first claimed he had not met Aulaqi in person: Q: Sir, did you know Anwar Aulaqi? A: Anwar Aulaqi was a mosque Imam. Q: Did you know him when you were in San Diego? A: I knew he was an Imam, yes. Q: And did you know him – had you met him in person? A: No. Q: Did you have contact with him either in person or on the phone? A: I don't remember. Ex. 120, Bayoumi Dep. 482:12-24. | Plaintiffs Exhibit 90 (Snell Decl. Ex. 2) is inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia disputes Plaintiffs' assertion that Al Bayoumi gave false testimony denying knowing Al Awlaki. Plaintiffs fail to provide context from his deposition. Al Bayoumi also testified that he did reach out to Al Awlaki "on occasions, like when there were dinners or something." Pls. Ex. 120 (Bayoumi Tr.) 589:9-16. He further testified he knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. *Id.* at 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him"). |
| 927. | Bayoumi next claimed the interview statement about him recorded by the 9/11 Commission about contacting Aulaqi was not correct, stating "No. It might have been a question. But discussion in religious matters, no. I did not have time, to begin with, to discuss religious matters. I was | Saudi Arabia disputes Plaintiffs' assertion that Al Bayoumi gave false testimony. Plaintiffs omit the question that Al Bayoumi was responding to, which was: whether Al Bayoumi "recall[ed] telling" the 9/11 Commission that he "had contact with Anwar Aulaqi, with whom you discussed religious matters and ideas similar to those you discussed with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | busy with my studies." Ex. 120, Bayoumi Dep. 484:11-15. | other Imams." Al Bayoumi responded "[n]o" to the question regarding his recollection. Al Bayoumi also testified that he may have reached out to Al Awlaki if "there was an outstanding [religious] question that was asked and it required an answer," and that a "contact attempt . . . to get an answer" "could have been made to Anwar Aulaqi, to the Islamic Center, to any place which had Sheikhs." Pls. Ex. 120 (Bayoumi Tr.) 587:12-588:20. Al Bayoumi further testified he knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. *Id.* at 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him"). |
| 928. | As detailed below, two years after the videotape, Bayoumi and Aulaqi worked together to provide help to the 9/11 hijackers Hazmi and Mihdhar immediately after the hijackers arrival in San Diego. By the time Bayoumi was deposed in June 2021, Aulaqi had been designated by the U.S. as an Al Qaeda terrorist recruiter and supporter and was targeted and killed in a U.S. drone strike in Yemen in 2011 receiving much media coverage at the time. | There is no admissible evidence that "Bayoumi and Aulaqi worked together to provide help to the 9/11 hijackers Hazmi and Mihdhar." To the contrary, Al Bayoumi testified that any communications he may have had with Al Awlaki would have concerned "outstanding [religious] question[s] that [were] asked" or concerned certain "occasions, like when there were dinners or something." Pls. Ex. 120 (Bayoumi Tr.) 587:12-588:20, 589:9-16. Additionally, the FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). Al Bayoumi testified that he did not have knowledge or suspicion before the 9/11 attacks that Al Hazmi and Al Mihdhar were planning to commit |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | terrorist attacks in the United States.  Pls. Ex. 120 (Bayoumi Tr.) 724:7-17.  Al Bayoumi also testified that Al Hazmi and Al Mihdhar "tended to avoid" him.  *Id.* at 754:19-755:11.<br><br>There is also no evidence that Al Awlaki had knowledge of the hijacker's intentions or that he provided them with witting assistance.  In his 2020 "peer-reviewed" book published by Harvard University Press, which Plaintiffs reference in Plaintiffs Averment ¶ 933, Meleagrou-Hitchens concluded that Al Awlaki was not radicalized until after the 9/11 attacks.  Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 315:18-316:16.  Meleagrou-Hitchens also concluded in that book that Al Awlaki's interactions with the 9/11 hijackers were innocent.  *Id.* at 128:22-134:9.<br><br>"That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25.<br><br>After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to The New York Times and Washington Times, and privately in an email to his younger brother describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 319:19-320:14.<br><br>In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States.  KSA Ex. 178 (Sageman WAMY Rep.) 177. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 929. | Bayoumi's longstanding, close relationship with Aulaqi is significant. During his work at the FBI, Plaintiffs' expert Youssef became familiar with the history and ideology of Aulaqi, including his time as the Imam at the Al Ribat Mosque in San Diego and at the Dar al Hijrah Mosque in Falls Church, VA. Based on his background and knowledge, Youssef found that Aulaqi was a radical extremist with ties to Al Qaeda and other terror groups. In Youssef's opinion, Aulaqi had "a jihadist anti-U.S. mindset and world view similar to Omar Abdel Rahman ['Blind Sheikh']". Ex. 5, Youssef Rpt. 137-8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> Plaintiffs' assertion relies on Youssef's characterization of his FBI work that he testified was or might be classified and about which he would not answer questions on cross-examination. Pls. Ex. 105 (Youssef Tr.) 43:17-45:2, 46:19-47:20, 49:18-50:4, 92:11-21, 393:4-10. Moreover, the FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). <br><br> There is no admissible evidence that Al Bayoumi had a "longstanding, close relationship with Aulaqi." To the contrary, Al Bayoumi testified that any communications he may have had with Al Awlaki would have concerned "outstanding [religious] question[s] that [were] asked" or concerned certain "occasions, like when there were dinners or something." Pls. Ex. 120 (Bayoumi Tr.) 587:12-588:20, 589:9-16. <br><br> Moreover, Youssef's unsupported opinion regarding Al Awlaki is contradicted by the scholarship of another of Plaintiffs' experts, Alexander Meleagrou-Hitchens. In his 2020 "peer-reviewed" book published by Harvard University Press, which Plaintiffs reference in Plaintiffs Averment ¶ 933, Meleagrou-Hitchens concluded that Al Awlaki was not radicalized until after the 9/11 attacks. Pls. Ex. 102 (Meleagrou- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Hitchens Tr.) 315:18-316:16. Meleagrou-Hitchens also concluded in that book that Al Awlaki's interactions with the 9/11 hijackers were innocent. *Id.* at 128:22-134:9. *See* Response to Pls. Aver. ¶ 928. |
| 930. | In 1999 and 2000, Aulaqi had numerous connections with fundraisers for members of Islamic terror groups, including Al Qaeda. Ex. 2, EO 2804; *See* 9/11 Commission Report at 517 n. 33. This included phone contact with Ziyad Khaleel, who, according to Plaintiffs' Expert Youssef, was "an Al Qaeda operative who obtained communications equipment used by Osama Bin Laden and arranged fund transfers from a charity to accounts controlled by Bin Laden." Ex. 566, FBI 11764; Ex. 5, Youssef Rpt. 137, n. 551. | Plaintiffs Exhibit 2X (EO 2804) and Exhibit 566 (FBI 11764) are inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

The materials cited as support for the statement that "[i]n 1999 and 2000, Aulaqi had numerous connections with fundraisers for members of Islamic terror groups, including Al Qaeda," do not support that statement. The cited page in Plaintiffs Exhibit 2X refers to alleged "telephonic contacts" between Al Awlaki and "members of HAMAS and AL QAEDA," but does not refer to the timing of those contacts, nor does it identify those alleged "members" or their alleged roles in those organizations. Pls. Ex. 2A (EO 2804). The cited footnote in KSA Exhibit 163 (9/11 Rep.) states that "the FBI learned" during an investigation of Al Awlaki in 1999 and 2000 "that Aulaqi knew individuals . . . involved in raising money for . . . Hamas." KSA Ex. 163 (9/11 Rep.) 517 n.33. There is no mention of Al Awlaki knowing individuals raising money for Al Qaeda.

Further, the 9/11 Commission refuted that Khaleel funded Bin Laden, finding that it did not know where Al Qaeda funding came from. *See id.* at 169-72.

The FBI's final conclusion is that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 931. | In early 2000, Aulaqi held a meeting with a close associate of Omar Abdel Rahman. Ex. 170, Joint Congressional Inquiry at 178-9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs appear to cite Plaintiffs Exhibit 170 in error. Plaintiffs Exhibit 9 is the referenced "Joint Congressional Inquiry" report. It states an individual who allegedly met with Al Awlaki was "closely associated with" Rahman, but does not state any facts to support that assertion. Because Omar Abdel Rahman had been in prison since mid-1993 – seven years before the meeting with Al Awlaki – it is unlikely that meeting had any connection with Rahman. *See* KSA Ex. 167 (Sageman Rep.) 564.<br><br>Plaintiffs also omit important context. The same pages also state that "[t]he FBI closed its inquiry into the activities of [Al Awlaki] in March 2000" and that "[i]n the case closing memorandum, the agent asserted that the imam had been 'fully identified and does not meet the criterion for [further] investigation.'" Pls. Ex. 9 (BUR-PEC 32398-99). |
| 932. | In 2000, Aulaqi was the Vice President and California representative of a Yemen-based organization charity, the Charitable Society for Social Welfare, that was a front for funding terrorists. In 2004 a Brooklyn federal jury convicted the director of that charity's Brooklyn office for making false statements about his 1999 fundraising activities for the organization. The Government presented proof that "a majority" of the money collected by the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 329 and Exhibit 342 are inadmissible hearsay. Plaintiffs Exhibit 147 (Mealeagrou-Hitchens Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Charitable Society for Social Welfare was "not for charity but for terrorist organizations." Ex. 342, *US v. Mafhahi*, 03 Cr 412 (E.D.N.Y. February 17, 2004) Transcript at 460; Ex. 329, 1999 Form 999 filed May 14, 2000, Charitable Society for Social Welfare, Inc. at 4 (listing "Anwar Al Awlaqi" as "Vice President/CA"); Ex. 147, Hitchens Rpt. ¶ 32. | In his 2020 "peer-reviewed" book published by Harvard University Press, which Plaintiffs reference in Averment paragraph 933, Meleagrou-Hitchens concluded that Al Awlaki was not radicalized until after the 9/11 attacks. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 315:18-316:16. Meleagrou-Hitchens also concluded in that book that Al Awlaki's interactions with the 9/11 hijackers were innocent. *Id.* at 128:22-134:9. |
| 933. | Dr. Alexander Meleagrou-Hitchens (Hitchens) is a lecturer on Terrorism and Radicalization at King's College London, and a leading expert on Anwar Aulaqi who has conducted extensive research and compiled one of the world's most comprehensive repositories of all Aulaqi's writings and available recordings of his sermons, speeches, and other public utterances. He also authored the 2020 book *Incitement: Anwar al-Awlaki's Western Jihad,* published by Harvard University Press. Ex. 147, Hitchens Rpt. ¶¶ 1, 5, & Annex A. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 147 (Mealeagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.<br><br>In the 2020 book Plaintiffs reference, Meleagrou-Hitchens opined that Al Awlaki likely did *not* assist the hijackers. *See* Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 133:18-134:6 (quoting the book: "That Awlaki, even after openly associating with Al-Qaeda for around eight yours [sic] after 9/11, never made any claims against this suggests that he had no direct knowledge or involvement, otherwise, it would be hard to believe that during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its arch enemy.").<br><br>After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to The New York Times and Washington Times, and privately in an email to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | his younger brother describing the attacks as "horrible." KSA 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25; Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 319:19-320:14.<br><br>In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. *See* KSA Ex. 178 (Sageman WAMY Rep.) 177. |
| 934. | Hitchens provided his opinion that at the time that Aulaqi was in San Diego in 2000 he was a committed Salafi extremist and a proponent of violent jihad. Aulaqi adopted the same worldview as Al Qaeda that was highly antisemitic and saw Western culture as a violent and sinister force targeting the fabric of Muslim society and faith. Aulaqi's preaching was closely aligned with the basic religious training that Al Qaeda operatives received. Aulaqi justified the use of suicide bombings by adopting the same arguments crafted by Al Qaeda's leadership. Hitchens also observed that Aulaqi "converged closely in ideological and operational terms with Saudi Arabia's official program of da'wa (propagation) as implemented by its Ministry of Islamic Affairs at the time." Ex. 147, Hitchens Rpt. ¶¶ 10, 22, 73-93, 104, 123. Saudi Arabia's claim that Aulaqi was "known as a politically moderate Islamic preacher", | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 147 (Mealeagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.<br><br>Saudi Arabia disputes the assertions regarding Al Awlaki's views around 2000. In his 2020 "peer-reviewed" book published by Harvard University Press, which Plaintiffs reference in Plaintiffs Averment ¶ 933, Meleagrou-Hitchens concluded that Al Awlaki was not radicalized until after the 9/11 attacks. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 315:18-316:16. Meleagrou-Hitchens also concluded in that book that Al Awlaki's interactions with the 9/11 hijackers were innocent. *Id.* at 128:22-134:9. He changed his views only after being paid by Plaintiffs and offered no reasoned basis for this change.<br><br>Notably Meleagrou-Hitchens's book also identified the "Saudi religious establishment line" with "quietists" who "reject political involvement or political frames" and "call for absolute obedience to the legitimate ruler" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | KSA Aver. at ¶ 135, ignores the reality of Aulaqi's extremism prior to the 9/11 Attacks and the fact that Aulaqi was "misunderstood and underestimated by Western observers and analysts." Ex. 147, Hitchens Rpt. ¶ 123. | of any Muslim country they are based in, and identified the "main practices . . . they support" to include "peaceful *Da'wah*." *Id.* at 60:11-62:16. |
| 935. | Hitchens also detailed Aulaqi's long-standing direct and indirect relationship with elements of the Saudi state. One of Aulaqi's major benefactors was an Imam Mohammad University classmate of Thumairy who was in phone contact with Thumairy in 1999-2000. Ex. 147, Hitchens Rpt. ¶¶ 27-29; Ex 475, FBI 527; Ex 476, FBI 555; Ex 481 FBI 000634 at 639. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 147 (Mealeagrou-Hitchens Rep.) should be excluded. *See* Objections Chart.

The cited materials do not support Plaintiffs' assertion that Meleagrou-Hitchens "detailed Aulaqi's long-standing direct and indirect relationship with elements of the Saudi state." The cited paragraphs of Plaintiffs Exhibit 147 concern the founding and funding of the Al Ribat Mosque (which did not involve "elements of the Saudi state") (¶ 27); and concern Al Awlaki's alleged relationship with "a young Saudi Arabian businessman and entrepreneur in Colorado" (¶ 28) who allegedly attended university with Al Thumairy (¶ 29). Plaintiffs Exhibit 475, Exhibit 476, and Exhibit 481 are phone records of Al Thumairy's home address. This is neither a direct or indirect relationship with any element of the Saudi state.

Moreover, Plaintiffs Exhibit 475, Exhibit 476, and Exhibit 481 do not support Plaintiffs' assertion that "Thumairy . . . was in phone contact" with that classmate "in 1999-2000." Those exhibits do not attribute any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | particular phone number to which a call was made or received with any particular individual. Nor do the records identify the classmate or what the classmate's phone number supposedly was. |
| 936. | Osama Bassnan: Bayoumi also had a close relationship with Osama Bassnan in San Diego: the two men had frequent phone contact. Ex 566 FBI 11761; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 426. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 84 and Exhibit 566 (FBI 11761), are inadmissible hearsay. *See* Objections Chart.<br><br>The admissible evidence is Al Bayoumi's testimony that Osama Bassnan's "wife was friends with [his] wife" and that he had only "[s]uperficial knowledge" of Bassnan "from the mosque." Pls. Ex. 120 (Bayoumi Tr.) 586:19-587:1. The cited page of Plaintiffs Exhibit 566 also mentions the association between Al Bayoumi's wife and Bassnan's wife. |
| 937. | Bassnan lived across the street from Hazmi and Mihdhar's apartment in San Diego; was introduced to them by Bayoumi; and bragged to an FBI source that he did more for the hijackers than Bayoumi. Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 426. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 84 is inadmissible hearsay. *See* Objections Chart.<br><br>The cited page of Plaintiffs Exhibit 84 does not support Plaintiffs' assertion that Bassnan "bragged to an FBI source that he did more for the hijackers than Bayoumi." That page of the exhibit states that "[t]he Joint Inquiry . . . found, in FBI files," certain information, including allegedly |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that "Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did." Pls. Ex. 84 at 426.<br><br>The FBI and CIA concluded in their 2004 Joint Assessment that: "There is no information to indicate that either Omar al-Bayoumi or Osama Basnan materially supported the hijackers wittingly, were intelligence officers of the Saudi Government or provided material support for the 11 September attacks, contrary to media speculation." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 938. | On October 17, 1992, while Bassnan was working at the Saudi Embassy in Washington, D.C., Bassnan hosted a party to honor the "Blind Sheikh" Omar Abdel Rahman. Ex 566, FBI 11761. That same year the FBI and the State Department searched Bassnan's car and found jihadist and Al Qaeda related material. Ex. 9, Congressional Joint Inquiry at 176-77; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 428 (regarding Bassnan's affection for Osama Bin Laden). FBI reports show that Bassnan had a long history as "an extremist and supporter of Usama Bin Laden." Bassnan admitted that he knew and regularly spoke with members of Bin Laden's family in Saudi Arabia and the United States. Ex 566, FBI 11761. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 9, Exhibit 84, and Exhibit 566 (FBI 11761) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 9 does not support Plaintiffs' assertion that "the FBI and the State Department searched Bassnan's car" in 1992 "and found jihadist and Al Qaeda related material." The cited pages of Plaintiffs Exhibit 9 state that "[i]n May 1992, the State Department provided the FBI with a box of documents recovered from an abandoned car"; that [t]he documents were in Arabic, and one, a newsletter to supporters of the Eritrean Islamic Jihad (EIJ) Movement, provided updates on the EIJ's council and was marked 'confidential'"; and that "[t]he box contained letters addressed to Bassnan that discussed plans to import used cars to the United States." Plaintiffs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Exhibit 84 does not mention a car search or provide any indication that the EIJ Movement document was associated with violent jihad or Al Qaeda. |
| | | The cited page of Plaintiffs Exhibit 566 does not support Plaintiffs' assertion that "Bassnan admitted that he knew and regularly spoke with members of Bin Laden's family in Saudi Arabia and the United States." That page, which is hearsay, states that "[s]ources reported Bassnan knew BIN LADEN'S family in Saudi Arabia and he maintained communications with BIN LADEN family members in the US." |
| 939. | In 1999, Bassnan moved to San Diego and during this period eyewitnesses reported to the FBI that Bassnan was a fervent supporter of Osama Bin Laden and an advocate for suicide bombings to advance an extremist, anti-U.S. Islamic agenda. In a recorded conversation in September 2001, Bassnan referred to the hijackers, Hazmi and Mihdhar, in affectionate terms generally reserved for referring to one's own children. Ex. 2, EO 1754-55, 1774. | Plaintiffs Exhibit 2S (EO 1754-55, EO 1774) is inadmissible hearsay. *See* Objections Chart. <br><br> The FBI and CIA made the final conclusion in their 2004 Joint Assessment that: "There is no information to indicate that either Omar al-Bayoumi or Osama Basnan materially supported the hijackers wittingly, were intelligence officers of the Saudi Government or provided material support for the 11 september attacks, contrary to media speculation." Pls. Ex. 2OO (EO 3416). |
| 940. | In September 2000, Bassnan or an associate had phone and email contacts with Ramzi Binalshibh, a member of Al Qaeda's Hamburg cell. Ex. 29, 9/11 Commission Memorandum for the Record re: Interview of an FBI Agent, November 17, 2003 at 4. | Plaintiffs Exhibit 29 is inadmissible hearsay. *See* Objections Chart. <br><br> The cited page of Plaintiffs Exhibit 29, which is hearsay, does not support Plaintiffs' assertion that Bassnan "had phone and email contacts with Ramzi Binalshibh." Plaitiffs Exhibit 29 states that "Osama Basnan's [REDACTED] was in phone and email contact with Ramzi Binalshibh in September 2000." Plaintiffs Exhibit 29 continues that this other person ("[REDACTED]") "apparently met over the internet, as Binalshibh was looking for an American wife." Pls. Ex. 29 at 4. Thus, Plaintiffs Exhibit 29 states only that some unknown person had contact with Binalshibh about finding an American wife – not about extremism. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 941. | In January 1998, Saudi Ambassador Bandar sent Bassnan's wife a check for $10,000 and in May 1998 Saudi Ambassador Bandar sent Bassnan himself a check for $15,000. In February 1999, shortly after Bassnan and his wife moved to San Diego, Bassnan's wife began to receive checks for $2,000 per month from an account controlled by Princess Haifa, the wife of the Saudi Ambassador Prince Bandar. The checks were sent pursuant to a "standing order" on the account and continued through March 2002, for a total of $74,000. Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 427. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 84 is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, the cited page of Plaintiffs Exhibit 84 does not support Plaintiffs' assertion regarding the sender of the referenced $10,000 check.  That page states that the check was sent by Ambassador Bandar's wife.<br><br>As reported in the 2004 Joint FBI CIA Assessment:  "Extensive investigation by the FBI has not found any record of financial support to the hijackers from al-Bayoumi or Basnan, or that either man was aware of the hijackers' plans."  Pls. Ex. 2OO (EO 3432).  The FBI and CIA made the final conclusion that: "There is no informiaton to indicate that either Omar al-Bayoumi or Osama Basnan materially supported the hijackers wittingly, were intelligence officers of the Saudi Government or provided material support for the 11 September attacks, contrary to media speculation."  *Id.* at EO 3416. |
| **XI.R.** | **Saudi Arabia and Bayoumi help Al Haramain establish the Al Madinah Mosque in San Diego** | To the extent a response is required, this assertion is not supported by any citation or record evidence.<br><br>Saudi Arabia and Al Bayoumi did not help Al Haramain establish the Al Madina Mosque.  In fact, Al Bayoumi and the Al Madina Mosque firmly rejected Al Haramain's efforts to control the mosque and to appoint an imam. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, any purported ties between Al Madina Mosque and Al Haramain are peripheral to this litigation because Al Haramain was never implicated in the 9/11 attacks. KSA Ex. 167 (Sageman Rep.) 607-608. |
| 942. | In January 1998, Bayoumi hosted a group of four MOIA propagators in San Diego who helped devise the plans for the new Al Madinah Mosque, which would be funded by Al Haramain. Bayoumi confirmed these facts in letters to a senior Saudi government Finance official and the Consul General in Los Angeles. Ex. 370, MPS 43_310 (letter to Saudi Ministry of Finance official Hamdan confirming the four MOIA propagators laid groundwork for the mosque); Ex. 412, MPS 43_337 (Bayoumi states: "[w]e recognize the major role played by the [Saudi] government…" in the Mosque's development). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 370 and Exhibit 412 are inadmissible hearsay.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertions of fact. Plaintiffs Exhibit 370 notes that Saad Al Habib "purchased" a building for the Al Madina Mosque "after a visit made by some *Du'aah* [propagators]." Pls. Ex. 370 (MPS 43_310). The exhibit does not state the number of propagators, does not state that Al Habib made the purchase because of the visit by those propagators, and does not mention any role of those propagators in "devis[ing] the plans" for the mosque.<br><br>Plaintiffs Exhibit 412 does not mention any visit by particular propagators, nor does it mention any support provided by the Saudi government up to that point for the Al Madina Mosque. Instead, Plaintiffs Exhibit 412 informs the "the Consul" about the opening of the mosque, and refers to "the major role played by" the Saudi government in supporting Islam generally, "such as taking care of mosques and preserving them, as well as offering generous support, especially by providing Qur'ans, books, and carpets, as well as propagators specifically in the Holy Month of Ramadan." Pls. Ex. 412 (MPS 43_337). The letter merely solicits aid. Neither exhibit mentions Al Haramain. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 943. | In his testimony, Bayoumi did not mention the visit of the four propagators but claimed that his connection to the Al Madinah Mosque project started when he was contacted by Saad Al Habib, a friend of Hamerman and someone Bayoumi had known at the ICSD, who "showed interest in buying a property in the community so they can pray at." Bayoumi stated that Habib called over the phone from Saudi Arabia and then visited him in San Diego. Ex. 120, Bayoumi Dep. 148:4-149:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs' assertion that Al Habib was "a friend of Hamerman." Al Bayoumi testified that Hamerman knows Al Habib, not that the two were friends. Pls. Ex. 120 (Bayoumi Tr.) 277:20-24. Plaintiffs Exhibit 120 (Bayoumi Tr.) also does not support Plaintiffs' assertion that Al Habib "visited" Al Bayoumi "in San Diego." Al Bayoumi clarified that Al Habib "didn't come to visit" him, but instead "came to complete the documents for Al-Madina Mosque." *Id.* at 148:19-149:2. |
| 944. | On April 19, 1998, Saad Al Habib sent Bayoumi a check for $10,000 drawn on an account at the Al Rajhi Bank. Ex. 357, MPS43_102-103. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 357 (MPS 43_102-03) is inadmissible hearsay. *See* Objections Chart. |
| 945. | The MPS production included a letter from Saad Al Habib to Bayoumi stating that he was travelling to the U.S.,"arriving on Monday[,]" and going to "another city in America on Friday." The letter stated that Habib was working with the Saudi Embassy | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to get necessary documents for the real estate transaction to buy the building. Ex. 357, MPS43_102-103. | Plaintiffs Exhibit 357 (MPS 43_102-03) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 357 does not support Plaintiffs' assertion "that Habib was working with the Saudi Embassy to get necessary documents for the real estate transaction to buy the building." Plaintiffs Exhibit 357 simply refers to a "letter signed by [Al Habib's] wife to be authenticated by the Embassy" and Al Habib's alleged "concern[] that the authentication processs may take too long." Pls. Ex. 357 (MPS 43_102). |
| 946. | On April 30, 1998, Saad Al Habib's brother Mohamed Al Habib gave Omar Al Bayoumi a Power of Attorney to spend $545,000 to purchase a building for a mosque in El Cajon, California. Ex 664 FBI 4221-4222. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 664 (FBI 4221 22), is a power of attorney but it does not specify how much can be spent or that the purchase is for the purpose of building a mosque. |
| 947. | Al Haramain was in contact with the Al Habib brothers in Riyadh in April 1998, just before the funds were sent to Bayoumi. Ex. 158, FPDUS 22307 at 10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 158 is a U.S. phone record for Al Haramain, which does not support Plaintiffs' assertion. Nothing in Plaintiffs Exhibit 158 attributes any particular phone number to which a call was made or received with any particular individual. Moreover, even if some unknown person from Al Haramain |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | placed a call to one of the Al Habib brothers in April 1998, there is no evidence that any such call concerned the Al Madina Mosque. |
| 948. | Bayoumi received the funds from the Habib brothers and arranged for the purchase of the building. The building was to become a new Mosque for the Kurdish community in the San Diego. Although the Kurdish community's existing mosque was known as the Kurdish Community Islamic Center, the new building was renamed as Masjid al Madina al Munawara, after the holy city of Madina in Saudi Arabia. Ex. 120, Bayoumi Dep. 152:15- 154:23, 155:11-16; Ex. 530, FBI 004224-004227 [receipt of funds]. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited materials do not support Plaintiffs' assertion that "Bayoumi received the funds from the Habib brothers." Al Bayoumi testified that "Saad al Habib and his brother Mohamed" provided the funds to purchase the mosque, not that Al Bayoumi received those funds. Pls. Ex. 120 (Bayoumi Tr.) 155:11-16. Plaintiffs Exhibit 530 consists of "Escrow Instructions" stating that the "Buyer" ("Muhammad Abdul Aziz Soliman Al Habib") has "handed" Grossmont Escrow Co. "the sum of $10,000.00 to be deposited into escrow." Pls. Ex. 530 (FBI 4224).

Moreover, the cited materials do not support Plaintiffs' assertion that a building was "renamed." Al Bayoumi testified that "[t]he Kurdish community chose the name Al-Madina Munawwarah" "[d]irectly after" the building was purchased. Pls. Ex. 120 (Bayoumi Tr.) 153:8-154:23. |
| 949. | Despite handling over half a million dollars of money, Bayoumi claims to know virtually nothing about the Habib business or the origin of the funds. Ex. 120, Bayoumi Dep. 198:16-199:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this paragraph contains improper attorney argument, and vague and conclusory assertions. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The admissible evidence does not establish that Al Bayoumi "handl[ed] over half a million dollors of money." Al Bayoumi testified that "Saad al Habib and his brother Mohamed" provided the funds to purchase the mosque, not that Al Bayoumi received or "handl[ed]" those funds. Pls. Ex. 120 (Bayoumi Tr.) 155:11-16. |
| 950. | Saad Al Habib made it clear from the outset that it was his intention to have the new Al Madinah Mosque controlled by Saudi Arabia and to join forces with the radicalized Mosque in Los Angeles led by the MOIA's Fahad al Thumairy. On May 3, 1999, Saad Al Habib sent Bayoumi an authorization for the Al Madinah Mosque to be managed by the Saudi government-run Ibn Taymiyah Mosque, where Thumairy was Imam and nine Saudi government officials served on the Board. Further, Saad al Habib wrote to Bayoumi (whom Habib addressed as the "Mosqe [sic] Director" of the Al Madinah Mosque) regarding "Autherization [sic] for Mosque Service Management." The letter said "to insure contioue [sic] servece [sic]" that Habib authorized Bayoumi to contact "Ibn Taymiyah Est." "to look after and mange [sic]" the Al Madinah Mosque "because of their famouse [sic] name and good experince [sic] in this field." Ex. 678B, MPS 43_128-129 (authorization in Arabic and English, faxed May 4, 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678B (MPS 43_128-29) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 678B does not support Plaintiffs' assertion that Saudi Arabia had a role in controlling the Al Madina Mosque. Plaintiffs Exhibit 678B contains no reference to Saudi Arabia or any Saudi government entity, nor does it reference Al Thumairy. Rather, Plaintiffs Exhibit 678B (MPS 43_129), states that Al Habib wanted to keep his "FULL OWNERSHIP RIGHTS."<br><br>The Saudi government did not run the Ibn Taymiyyah Mosque or the Ibn Taymiyyah Foundation. Osman Kaldirim, a director of the Ibn Taymiyyah Foundation, testified that the Ibn Taymiyyah Foundation has always been "completely independent of the Saudi Arabian government." Pls. Ex. 121 (Kaldirim Tr.) 263:13-21. Dr. Al Khalil, the Chairman of the foundation, likewise testified that the Ibn Taymiyyah Foundation and the King Fahad Mosque were "not part of [the] Saudi Arabia government" and that they were "completely independent of the Saudi Arabian |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | government" from 1995 up to the present time.  Pls. Ex. 113 (Khalil Tr.) 366:20-367:15.<br><br>There is no admissible evidence that Al Thumairy "led" a "radicalized Mosque in Los Angeles."  There also is no admissible evidence that Al Thumairy holds or has ever held radical or extremist views, or supports or has ever supported terrorism.  When asked about "the view . . . that violent attacks of the kind that were carried out on 9/11 are justified" at his deposition, Al Thumairy answered:  "[A]ny justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone.  And we criticized that act back then, at the time.  In Islam you cannot even hurt an animal, let alone human beings.  So this justification is incorrect."  Pls. Ex. 107 (Thumairy Tr.) 478:14-479:8; *see also id.* at 515:4-16 (testifying that, while he was in Los Angeles, he was not "aware of anyone ever accusing [him] of giving extremist teachings, lessons or sermons" or "of being an extremist or of supporting terrorism").  Witnesses who speak Arabic and heard Al Thumairy's sermons describe him as "never express[ing] any extremist or violent views" and state that they have never heard him "express any violent or extremist opinions."  Pls. Ex. 168 (Mana Decl.) ¶ 8; Pls. Ex. 101 (Alzamari Tr.) 134:15-135:12; ████████ |
| 951. | Bayoumi assumed the title of "General Supervisor" of the Mosque and made business cards. *See, e.g.* Ex. 678A, MPS 43_72; Ex. 574, FBI 004273. Immediately after the building was purchased, Bayoumi moved in before anyone else and took the best office. Ex. 2, EO 2067- 2068. Saad Al Habib prepared a formal letter dated declaring that Bayoumi was "*Mushrif Al* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *Alaam*" - "The General Supervisor" - in charge of the Mosque. Ex. 417, MPS 43_202. Bayoumi got business cards with the title "General Supervisor." Ex. 11N Screenshot (MPS713_11 copy of Bayoumi's business card). | Plaintiffs Exhibit 2T (EO 2067-68), Exhibit 417 (MPS 43_202), and Exhibit 678A (MPS 43_72) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, it is undisputed that Al Bayoumi was a volunteer at the Al Madina Mosque and that he had business cards identifying him as "General Supervisor." |
| 952. | Bayoumi initially testified that he did not call the Embassy about the Mosque before it opened, but after being shown a handwritten letter, he wrote to Islamic Affairs Department Deputy Musaed Al Jarrah stating that such a call did occur, Bayoumi conceded: "Perhaps that transpired, yes." Ex. 120, Bayoumi Dep. 156:7-158:16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 120 (Bayoumi Tr.) contains the quoted language. It is not surprising that Al Bayoumi did not recall a letter or call that occurred 23 years before his deposition. |
| 953. | The handwritten note shows that prior to the opening of the Mosque, Bayoumi spoke on the phone and then wrote Embassy Islamic Affairs Department Deputy Musaed Al Jarrah. Ex. 393, MPS 43_219. Bayoumi wrote another letter to "His Excellency the generous brother / Musaed Al Jarrah" Jarrah on July 21, 1998 requesting funding for the mosque stating that "the scale of good deeds will weigh more heavily with the rewards from Allah Almighty, in favor of all those who joined in the call…." Ex. 394, MPS 43_220. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 393 and 394 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, with respect to the call referenced in Plaintiffs Exhibit 393 (a copy of which was also produced by the FBI (KSA Ex. 102 (FBI 1343)), Al Bayoumi testified that he did not remember whether he spoke with Al Jarrah or someone else, but that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "more likely" the call "was made to the reception or whoever receives the phone calls at the embassy." Pls. Ex. 120 (Bayoumi Tr.) 159:6-162:17.

The letters requesting funding from Saudi Arabia for the Mosque contradict Plaintiffs' allegations that Saudi Arabia had a role in founding and controlling the Mosque. Further, the letters appear to seek funding for "furniture, equipment, [and] books." Pls. Ex. 393 (MPS 43_219). |
| 954. | Bayoumi also had Mosque Board Chairman Mohamed Al Doski send a July 10, 1998 letter to Jarrah's superior Islamic Affairs Department Head Dr. Majed Ghesheyan. That letter requested that "you…commission your specific office responsible, to kindly send the furnishings / carpets, just as was done for the other mosques here." Ex. 392, MPS 43_218. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 392 (MPS 43_218) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Plaintiffs Exhibit 392 (MPS 43_218) does not support Plaintiffs' assertion that "Bayoumi also had Mosque Board Chairman Mohamed Al Doski send a July 10, 1998 letter." Al Bayoumi is not mentioned in the letter. Further, this letter seeking funding from Saudi Arabia for the Mosque contradicts Plaintiffs' allegations that Saudi Arabia had a role in founding and controlling the Mosque. |
| 955. | Bayoumi's phone records show that he made five calls to the Saudi Embassy in July 1998 from the phone in his Mosque office. Four of the calls were made to ███ ███-3700, the main number for the Embassy Islamic Affairs office. The other call was made to a fax line for the Islamic Affairs. Ex. 5, Youssef Rpt. 132-35; Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 12K (Bayoumi calls to Saudi Embassy); Ex.499, FBI 1516; Ex. 500, FBI 1521. The calls made to the main number ███████-3700 were typically answered by a receptionist and could have been forwarded to Musaed Al Jarrah or Khalid Al Sowailem. Bayoumi, Jarrah, and the receptionist Zeinab al Afifi all deny knowledge of this call and the ensuing 55 calls made by Bayoumi to the Islamic Affairs Department over the following 18 months. Ex. 120, Bayoumi Dep. 168:23-176:12; Ex. 118, Jarrah Dep. 57:12-58:19; 195:11-196:9; Ex. 12AA, MPS738_53R (Bayoumi's handwritten address book containing numbers for the Embassy Islamic Affairs office and Sowailem); Ex. 169 (Jarrah Dep. Ex. 764); 12K (Bayoumi calls to Saudi Embassy); Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 129, Afifi Dep. 209:22-214:6. | Plaintiffs Exhibit 12AA (MPS 738) and Exhibit 169 are inadmissible hearsay, and Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12B and Plaintiffs Exhibit 12K are improper summary exhibits. *See* Response to Pls. Aver. ¶¶ 735, 749. They also rely on inadmissible hearsay. *See, e.g.*, "MPS738," "EO610," "EO2751," "Emb Ph Book" (or "Emb PB"), "SACM Contacts," "Al Mubtaath Magazine." *See* Objections Chart. As for "MPS713" and "MPS732," Plaintiffs did not include those documents as exhibits.<br><br>Plaintiffs did not submit Plaintiffs Exhibit 169 ("Jarrah Dep. Ex. 764") with their opposition. Moreover, that exhibit – a spreadsheet purporting to identifying phone calls made by Al Thumairy or Al Bayoumi to the Embassy's Islamic Affairs Department – is based on false presumptions and inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 499 and Plaintiffs Exhibit 500 do not establish the attribution of any dialed phone numbers.<br><br>The cited "phone records" do not support Plaintiffs' assertion that "[f]our . . . calls were made to (202) 342-3700" from Al Bayoumi's Al Madina Mosque "office" phone in "July 1998." Those records show only three calls to that number in July 1998, all on July 27, 1998. Pls. Ex. 499 (FBI 1516).<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited page of Plaintiffs Exhibit 12AA (MPS 738) does not support the parenthetical accompanying the citation of that exhibit. That page does not refer to the "Embassy Islamic Affairs office." |
| | | The cited portions of the transcripts of Al Bayoumi's deposition, Al Jarrah's deposition, and Afifi's deposition do not support Plaintiffs' assertion that "all den[ied] knowledge of this call and the ensuing 55 calls made by Bayoumi to the Islamic Affairs Department over the following 18 months." Al Jarrah was asked generally whether he ever took a phone call from Al Bayoumi, not about any specific phone call. Pls. Ex. 118 (Jarrah Tr.) 195:11-196:9. Al Jarrah was also asked whether Afifi answerd one particular phone call on July 27, 1998. *Id.* at 58:3-12. Al Bayoumi was asked about whether he made certain calls in July 1998, Pls. Ex. 120 (Bayoumi Tr.) 174:15-21, not about "55 calls . . . over the following 18 months." Afifi was asked broadly about "49 calls" listed in a document purported to "summariz[e] the FBI materials." Pls. Ex. 129 (Afifi Tr.) 209:22-210:12. |
| | | Moreover, even assuming Al Bayoumi, Al Jarrah, and/or Afifi participated in certain calls, there is nothing unusual about their inability to remember specific calls more than 20 years later. As Afifi testified: "It's a long time ago. It's 20 years ago. I don't remember who called and who didn't call." *Id.* at 210:19-211:14. |
| 956. | In his September 2001 interviews with Scotland Yard, Bayoumi told the investigators that the Saudi Embassy and Consulate were directly involved in decisions concerning the operation of the Al Madinah Mosque and that "they told me that they are happy with what's going on." Ex. 450, MPS 365-401 Tr. 242:18-243:4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, the quoted language appears on page 243 in a discussion of "some Sheikhs" or "leaders" that were sent "in Ramadan . . . to lead prayer." It was those "Sheikhs" or "leaders" who were allegedly "happy with what's going on," not the Embassy or the Consulate. Pls. Ex. 450 (MPS 365-401) at 242:18-243:4. |
| | | Plaintiffs Exhibit 450 also states that people did not mention jihad in the Al Madina Mosque and that it was "forbidden" in that mosque to "talk about . . . politics or to create . . . problem[s]." *Id.* at 241:9-242:3. |
| 957. | Bayoumi told the investigators: And also the government of Saudi Arabia yeah I mean the Embassy because I open file over there and the Embassy and the Consulate and they send some sheikhs, I mean some leaders and Commandant for example to lead prayer over there. And they are happy with what's going on. Yeah, they told me that they are happy with what's going on. Ex. 450, MPS 365-401 Tr. 241:16-243:4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, Plaintiffs do not accurately quote the cited section of Plaintiffs Exhibit 450. That section reads: "And also the government of Saudi Arabia, yeah, I mean the Embassy – because I opened file over there in the Embassy and in the Consulate and they send some Sheikhs, I mean, some leaders in Ramadan, for example, to lead prayer over there. And they are happy with what's going on. Yeah, they told me that they are happy with what's going on." Pls. Ex. 450 (MPS 365-401, Interview of Bayoumi in MPS Custody) at 242:18-243:4. "They" refers to the "[s]heikhs" and "leaders," not the Embassy. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 958. | During those 2001 interviews, Bayoumi specifically identified Musaed Al Jarrah at the Embassy. Ex. 450, MPS 365-401 Tr. 494:14-495:2. At his deposition in June 2021, however, Bayoumi denied that he had any relationship with Musaed Al Jarrah. Ex. 120, Bayoumi Dep. 797:22-798:1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 120 (Bayoumi Tr.) and Exhibit 450 (MPS 365-401) are not inconsistent.  A person's ability to identify someone else does not establish a relationship between the two. |
| XI.S. | **Days after the August 1998 Embassy bombings carried out by Al Qaeda with Al Haramain's support, Bayoumi hosted and met with Al Haramain's leaders and worked with them to secure Saudi religious and operational control, supervision, and influence over the Al Madinah Mosque** | To the extent a response is required, the assertion that Al Haramain had Saudi religious and operational control over the Al Madina Mosque is not supported by any citation or record evidence.  To the contrary, Al Bayoumi and the Al Madinah Mosque rejected Al Haramain's request to appoint a regular imam and its attempt to control the mosque.  As Al Bayoumi wrote in an August 1998 letter to Saad Al Habib:   "The Imamate: Al-Harameen members talked about appointing a full-time imam of Saudi nationality. The community members objected to that strongly because 99% of the worshipers praying are Kurds, most of whom don't speak Arabic, and so is the case with their kids who don't speak other languages except for English and Kurdish. However, if the Imam is going to come every now and then, like in the month of Ramadhan and on some holidays to hold some lessons, then there is no disagreement on that."  "The Management: Members of al-Harameen say that there must be a participation in the management where half shall be elected from the community and the second half should be appointed by al-Harameen. This was rejected by the community in form and substance."  Pls. Ex. 487 (FBI 1349). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 959. | From the very outset, Bayoumi asserted Saudi Arabia's religious authority over the Al Madinah Mosque. One of Bayoumi's videos, recovered by MPS, shows that on August 14, 1998, visiting MOIA religious official Ghanim Saad Al Ghanim travelled from Saudi Arabia to deliver one of the first *khutbahs* (Friday sermons) at the Mosque. The tape can be dated by reference to a conversation on the tape with a contractor, who reads aloud and signs an invoice for renovation work; the invoice was found among Bayoumi's papers and shows that the contractor signed the invoice at the Mosque on Friday, August 14, 1998. Ex. 10C (MPS893-COMP Video Exhibit); Ex. 10C-TR (MPS893-COMP-TR Video Transcript); Ex. 11C (MPS893- COMP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 10C, Exhibit 10C-TR, and Exhibit 11C are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs do not cite admissible evidence identifying the individuals in Plaintiffs Exhibit 10C or 11C.<br><br>The cited materials do not support Plaintiffs' assertion that "Bayoumi asserted Saudi Arabia's religious authority over the Al M[e]dinah Mosque," either "[f]rom the very outset" or at any other time. The materials (to the extent translated into English) do not mention Saudi Arabia, or any of its agencies or instrumentalities. Plaintiffs claim that the video shows a "visiting MOIA religious official . . . deliver[ing] one of the first khutbahs (Friday sermons) at the Mosque." The delivery of a sermon by a "visiting MOIA religious official" does not show the "assert[ion] of" "religious authority" (or any "authority") by that visitor or by "MOIA."<br><br>The cited materials also do not identify Al Ghanim as a "MOIA religious official." He is identified as "one of the brothers who will come from Saudi Arabia, his name is Ghanim al-Ghanim." Pls. Ex. 10C (MPS893). |
| 960. | On a separate video report Bayoumi made prior to August 14, 1998, Bayoumi describes MOIA religious official Ghanim Saad Al Ghanim as the "first visiting brother" to the Al Madinah Mosque. Ex. 10C (MPS893-COMP Video Exhibit); Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 10C-TR MPS893-COMP-TR Video Transcript. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 10C and Plaintiffs Exhibit 10C-TR are inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, Plaintiffs do not cite admissible evidence identifying the individuals in Plaintiffs Exhibit 10C or 11C. |
| | | The cited materials do not support Plaintiffs' assertion that Al Bayoumi described an individual as the "first visiting brother." The materials do not contain that language. |
| | | The cited materials also do not support Plaintiffs' assertion that Al Bayoumi "made" the entire video or that the video was a "report." There is no admissible evidence that Al Bayoumi made any videos as "report[s]" intended for a third party. This video was found in Al Bayoumi's possession, indicating that it was not sent to anyone. |
| | | Moreover, Al Bayoumi testified that he has never been a Saudi intelligence officer, and that he has never had any assignment for any Saudi intelligence or law enforcement agency. Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13. |
| | | As Sageman explains, "it is very unlikely that [Al Bayoumi] was a Saudi intelligence officer." KSA Ex. 167 (Sageman Rep.) 300; *see id.* at 300-304. Sageman also explains that there was nothing unusual or "nefarious" about any contacts Al Bayoumi may have had with the Saudi government. *Id.* at 278. |
| | | Moreover, Sageman explains that, "[i]f al-Bayoumi was a cooptee of the GID, it would have been to spy on Saudi dissidents, who were against the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi government" – in other words, Al Bayoumi "would have been opposed to the hijackers." *Id.* at 297. <br><br> Finally, the cited materials do not identify Al Ghanim as a "MOIA religious official." He is identified as "one of the brothers who will come from Saudi Arabia, his name is Ghanim al-Ghanim." Pls. Ex. 10C (MPS893). |
| 961. | On August 7, 1998, Al Qaeda carried out the bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing hundreds and wounding thousands of people. Ex. 690, FBI.gov, FBI Famous Cases report on "East African Embassy Bombings." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, this is undisputed. |
| 962. | The Riyadh-based Al Haramain Islamic Foundation provided essential help to the Al Qaeda cells responsible for the Embassy bombings and provided material support to the terrorist activities of Al Qaeda around the world. Ex. 67A, UN Security Council Sanctions Listing on Al-Haramayn Foundation, Kenya ("When viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network."); Ex 19E, U.S. Treasury, "Treasury Designates Al Haramain Islamic Foundation." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 67A and Exhibit 19E are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, Plaintiffs Exhibit 67A and Plaintiffs Exhibit 19E in fact demonstrate that Saudi Arabia cooperated with the United States in sanctioning Al Haramain. Plaintiffs Exhibit 19E notes that Saudi Arabia had "joined the United States" in its efforts against Al Haramain and, "due to actions by Saudi authorities, [Al Haramain] has largely been precluded from operating in its own name." Pls. Ex. 19E at 1. Other exhibits relied upon by Plaintiffs note that "Saudis have been |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | victims of al-Qaida" and "are an important partner in the war on terrorist financing." Pls. Ex. 606 at 2. |
| 963. | In August 1998, Saleh Al Sheikh was MOIA's Vice Minister and second-in-command and, as such, supervised the operations of Al Haramain. Ex. 123, Ash-Sheikh Dep. 38:9-39:5; Ex. 73, Affidavit of Khalid Bin Obaid Azzahri ("Azzahri Decl.") ¶ 3 (PEC-KSA002765). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 73 (PEC-KSA002765-2766) is inadmissible hearsay. *See* Objections Chart. |
| | | Saleh Al Sheikh testified he did not hold a position with Al-Haramain. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-18. He was a member of a prospective board of directors relating to Al Haramain after the September 11 attacks. *Id*. at 154:5-16. This was not a board but a prospective board, which met about twice in order to close down the charity because of irregularities. *Id*. at 149:6-14, 153:12-154:2, 154:5-16. |
| | | The U.S. government has also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – is "founder and leader," who "controlled AHF and was responsible for all AHF activities, including its support for terrorism." Pls. Ex. 671 (June 2, 2004 Treasury Notice) at 3-4. |
| 964. | On the day of the bombing, MOIA was holding a propagators conference in Nairobi. The conference was attended by MOIA propagator Majed Al Mersal, who would subsequently be assigned to visit Thumairy in Los Angeles in December 1998, and return to visit Thumairy and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi in December 1999-January 2000, immediately before the arrival of hijackers Hazmi and Mihdhar. Ex. 115, Mersal Dep. 52:15-63:14, 80:15-22, 82:9-83:5, 84:3-8, 91:2-17, 172:24-178:4. | To the extent a response is required, Plaintiffs Exhibit 115 (Mersal Tr.) does not support Plaintiffs' assertion that "MOIA was holding a propagators conference in Nairobi" "[o]n the day of the bombing." Al Mersal testified that, at the time of the bombing, he "was done with the forum" he was attending in Nairobi, Kenya and as on safari but he did not recall whether the forum itself was over. Pls. Ex. 115 (Mersal Tr.) 61:10-62:9.<br><br>Plaintiffs Exhibit 115 (Mersal Tr.) also does not support Plaintiffs' assertion that Al Mersal was "subsequently . . . assigned to visit Thumairy in Los Angeles in December 1998." Al Mersal testified that he was assigned to visit the "King Fahad Mosque in Los Angeles," not to visit Al Thumairy specifically. Pls. Ex. 115 (Mersal Tr.) 80:10-18.<br><br>Plaintiffs Exhibit 115 (Mersal Tr.) does not support Plaintiffs' assertion that Al Mersal was also "assigned" to "return to visit Thumairy and Bayoumi in December 1999-January 2000." Al Mersal testified that he was assigned to "[o]ne of the mosques in San Diego." Pls. Ex. 115 (Mersal Tr.) 174:24-175:4.<br><br>Al Mersal's CV shows that he was at the forefront of the KSA's fight against terrorism. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. From 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, which is the KSA rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA. Pls. Ex. 52 at 2. |
| 965. | On August 13, 1998, less than a week after the U.S. Embassy bombings, a delegation of Al Haramain representatives from Saudi Arabia arrived in San Diego to meet with Bayoumi. The date of the arrival of the Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain delegation is demonstrated by various evidence further discussed below, including an Al Haramain travel log, Al Haramain phone records, Bayoumi's Mosque Office phone records, Bayoumi's correspondence, FBI records, and a business travel document. Ex.463, FBI 000145-REV2021 at 156; Ex. 500, FBI 001521; Ex. 2, EO 2573. The business card of senior Al Haramain officer Soliman Al Buthe, who also worked for the Saudi government, was found in Bayoumi's possession by the MPS. Ex. 11N Screenshot (MPS704_70 copy of Buthe's business card). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 11N, Exhibit 2V (EO 2573) and Exhibit 463 (FBI 156-REV2021) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertion that "[o]n August 13, 1998 . . . a delegation of Al Haramain representatives from Saudi Arabia arrived in San Diego to meet with Bayoumi." Plaintiffs Exhibit 2V states that ▮▮▮▮▮▮▮ arrived in the United States on August 13, 1997. It does not state that he arrived in San Diego on that date, that he was part of "a delegation of Al Haramain representatives," or that he traveled specifically "to meet with Bayoumi." Plaintiffs Exhibit 463 purports to memorialize a May 13, 2010 interview with ▮▮▮▮▮▮. It does not mention Al Haramain. Plaintiffs Exhibit 500 is a phone record for the Al Madina Mosque. Pls. Ex. 120 (Bayoumi Tr.) 784:9-22 (Al Bayoumi testifying that "d/b/a" phone records (such as Plaintiffs Exhibit 500) were the mosque's phone number and that his name was listed on the bills because he was "responsible for the masjid maintenance and the operation"). It does not mention Al Haramain.<br><br>The cited materials also do not support Plaintiffs' assertion that "Soliman Al Buthe . . . worked for the Saudi government." |
| 966. | Bayoumi remembered that there were three persons from Al Haramain but claimed he didn't know their names or titles and when asked to describe them testified: "Honestly, I don't remember them." Bayoumi claimed that he did not know if the men spoke English and heard them all speak Arabic. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 120, Bayoumi Dep. 190:1-190:7, 190:17-191:1, 194:24-195:15. | To the extent a response is required, Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs' assertion that Al Bayoumi "claimed he didn't know their titles." Al Bayoumi testified that the three people did not have titles. Pls. Ex. 120 (Bayoumi Tr.) 195:14-15. |
| 967. | Bayoumi admitted that the three men had all spoken to Saad al Habib in advance about their trip to San Diego but was unsure whether he had talked to Habib himself. Ex. 120, Bayoumi Dep. 191:16-192:6, 194:19-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 120 (Bayoumi Tr. 191:24-192:2) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Al Bayoumi is repeating what he was told about a conversation others had with Al Habib. Further, Al Bayoumi testified that he had not spoken to Al Habib about them before they arrived. *See* Pls. Ex. 120 (Bayoumi Tr.) 192:3-6. |
| 968. | Bayoumi claimed that he did not know how the Al Haramain meeting was planned or who made the arrangements, saying "I don't think there was a previous appointment." Ex. 120, Bayoumi Dep. 207:12-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this is undisputed. |
| 969. | Bayoumi claimed that "they showed up to the masjid and they expressed that they are from Al-Haramain organization, and they expressed their interest in taking care of the Imamate and the maintenance and all these | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | matters. Ex. 120, Bayoumi Dep. 191:16-192:2. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 970. | Bayoumi admitted that the Al Haramain representatives came to supervise and control the Mosque: "So the purpose of their presence was for them to appoint an Imam and also to overlook – to oversee the maintenance, the remodeling and the operation." Ex 487 FBI 1349- 52; Ex. 120, Bayoumi Dep. 191:2-8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 487 (FBI 1349-52) states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management. Pls. Ex. 487 (FBI 1349-50). |
| 971. | The circumstances show that Bayoumi must have had advance notice of Al Haramain's visit, and that Al Haramain arrived to take over the Al Madinah Mosque immediately after its opening because Al Haramain provided the funding for the Mosque through Saad al Habib and his family. As Plaintiffs' expert Youssef determined, "[t]he Foundation delegation was led by two of its most senior members, Soliman al Buthe and Mansour al Kadi." Ex. 28, Al-Buthe 0026; Ex. 442, FPDUS 14024; Ex. 487, FBI 001349 at 1350; Ex. 487, FBI | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 28 is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef's opinions are speculative and not based on any recognized methodology.<br><br>The cited materials do not support Plaintiffs' assertion that "Bayoumi must have had advance notice of Al Haramain's visit, and that Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 001349 at 1352; Ex. 5, Youssef Rpt. 93 and 98. | Haramain arrived to take over the Al M[e]dinah Mosque immediately after its opening because Al Haramain provided the funding for the Mosque through Saad al Habib and his family." Plaintiffs Exhibit 28 does not mention Al Bayoumi and, with respect to the "Al Medinah Mosque," references a "visit . . . to meet with Kurd community there." Pls. Ex. 28 (Al-Buthe 26). There is no mention of taking over and no mention of funding. Plaintiffs Exhibit 442 does not mention Al Bayoumi or the mosque at all. Plaintiffs Exhibit 487 does not mention Al Haramain providing funding to the mosque.<br><br>Plaintiffs Exhibit 487 also states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management. Pls. Ex. 487 (FBI 1349-50). |
| 972. | Kadi was head of Al Haramain's Africa Committee and a Board Director of Al Haramain-U.S. Kadi had direct ties to Wadih el Hage, who was convicted for his lead role as a conspirator in the 1998 U.S. Embassy bombings and served as a secretary to Osama Bin Laden. Evidence from the Embassy Bombings trial showed that Hage carried Kadi's business card and knew Kadi as "Abu Omar". Ex. 451 (photograph of business cards including for Al Kadi, admitted in evidence as Ex. 307 at 34 in *US v. Bin Laden,* S(7) 98 Cr. 1023 (S.D.N.Y. March 7, 2001)); Ex. 70, Al Haramain Islamic Foundation, Inc. Articles of Incorporation at 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 451 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertions in this paragraph, which Saudi Arabia understands to reference Kadi's alleged position at the time of the Al Haramain visit discussed in the Response to Plaintiffs Averment ¶ 971. Plaintiffs Exhibit 451 is an image of business cards that the Haefele Declaration describes simply as "Business cards" that are "Undated." ECF No. 9541, at 32. Plaintiffs Exhibit 70 are Articles of Incorporation filed on February 11, 1999 for Al Haramain Islamic Foundation, Inc. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 973. | Buthe was a Saudi Government official, a member of Al Haramain-Saudi Arabia's Europe and USA Committee and a Board Director of Al Haramain-U.S. Ex. 331, Buthe Declaration of Dec 9, 2009; Ex. 684, SVS 109191; Ex. 70, Al Haramain Islamic Foundation, Inc. Articles of Incorporation; Ex. 332, Buthe business cards [Ex. 96]; Ex. 335, State Dept. Memo. [Ex. 105]. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 70, Exhibit 331 (Buthe Decl.), Exhibit 332, Exhibit 335, and Exhibit 684B (109191 SVS) are inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the cited materials do not support Plaintiffs' assertion that "Buthe was a Saudi Government official," which Saudi Arabia understands to reference Al Buthe's alleged position at the time of the Al Haramain visit discussed in the Response to Plaintiffs Averment ¶ 971. Those materials state that, at that time, Al Buthe was an engineer (a "Landscaping Engineer") for the General Administration of Gardens and Beautification, City of Riyadh. Pls. Ex. 331, ¶ 2. |
| 974. | In September 2004, Buthe was designated by the U.S. Treasury Department for his links to terror based on his work for the U.S. branch of Al Haramain. As support for the designation, the Treasury Department cited that "[t]he investigation shows direct links between the U.S. branch [of Al Haramain] and Usama bin Laden." Ex. 19C, U.S. Treasury Press Release Sept 9, 2004, https://home.treasury.gov/news/press-releases/js1895. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this is undisputed. |
| 975. | The third member of the Al Haramain delegation was Omar Hamerman, the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | radical Sunni leader of the ICSD extremist cell that the FBI had previously investigated, and an Al Haramain operative. ████████████████████████████████ | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2V (EO 2572) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, ██████████████████████████████████████████████████ |
| 976. | Bayoumi's claim that he could not remember the names of the Al Haramain representatives is not credible, because of Bayoumi's longstanding, close Saudi government work and personal relationship with ██████ and also because Bayoumi wrote the name of the lead member of the delegation "Brother Mansour [Kadi]" in his letter to Saad al Habib about Al Haramain's visit. Ex. 487, FBI 1350; Ex 487, 1352. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 487 (FBI 1350, 1352) contains the quoted language, but does not demonstrate that Al Bayoumi's testimony was not credible. It is unsurprising that Al Bayoumi could not remember the names of people he interacted with more than twenty years ago. Plaintiffs have also not established that ██████ attended this meeting. |
| 977. | The two other Al Haramain representatives also arrived in San Diego on August 13, 1998 as shown by their travel log and Bayoumi's notation on his Mosque phone records of calls made by the Al Haramain | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | representatives on August 13. Ex. 28, Al-Buthe 0026; Ex. 678G, MPS43_433. These circumstances show that Kadi, Buthe, and Hamerman likely travelled to San Diego together. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 28 and Exhibit 678G (MPS 43_433) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no evidence that the Arabic handwriting on the phone records of Plaintiffs Exhibit 678G (MPS 43_433) containing the notation Plaintiffs reference is Al Bayoumi's handwriting, and it does not indicate which Al Haramain representatives allegedly made calls. |
| 978. | The MPS production showed that Bayoumi made a handwritten notation on his August 1998 phone bill next to three calls: two made on Aug 13, 1998 and another on August 19, 1998. Ex. 678G, MPS43_433. The notation reads: "calls made by representatives of Al Haramain Foundation." Ex. 678G, MPS 43_433. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678G (MPS 43_433) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no evidence that the Arabic handwriting on the phone records of Plaintiffs Exhibit 678G (MPS 43_433) containing the notation Plaintiffs reference is Al Bayoumi's handwriting, and it does not indicate which Al Haramain representatives allegedly made calls. |
| 979. | The first of these phone calls listed by Bayoumi as being made by the Al Haramain representatives on August 13, 1998 from Bayoumi's private office at the Al Madinah Mosque by Al Haramain was a 15-minute call to Saad Al Habib's cell | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | number ████ 5580) in Saudi Arabia at 10:40am. This call upon arrival by the Al Haramain representatives to report to Saad Al Habib further demonstrates that Al Haramain was involved in the funding for the Al Madinah Mosque through Habib. Ex. 5, Youssef Rpt. 98, n. 401; Ex. 120, Bayoumi Dep. 194:19-23. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef's opinions are speculative and not based on any recognized methodology.<br><br>Plaintiffs Exhibit 120 (Bayoumi Tr.) does not support Plaintiffs' assertion. Al Bayoumi testified that he did not remember whether he spoke with Saad Al Habib before the Al Haramain members visited the Al Madina Mosque. Pls. Ex. 120 (Bayoumi Tr.) 194:19-23. There is also no evidence that Al Haramain was involved in the funding for the Al Madinha Mosque through Al Habib and the fact that a call was placed from an Al Haramain representative to Al Habib cannot plausibly lead to such a conclusion. |
| 980. | The second phone call listed as being made by the Al Haramain representatives on August 13, 1998 was an 8-minute call to Sheikh Mohamed Al Barak ████ 6050) in Saudi Arabia at 11:17am. Ex. 12AA, MPS738_79L (Barak's number appears in Bayoumi's handwritten address book). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 981. | Bayoumi had Barak's phone numbers in his handwritten address book, including the cell | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | phone number called on August 13. Ex. 12AA, MPS738_79. Barak was a Saudi government religious official and professor at Um al-Qura University in Makkah, Saudi Arabia who, according to news reports, was arrested and detained in 2017 in Saudi Arabia. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, there is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Plaintiffs' assertions regarding Al Barak's employment and arrest are unsupported by any citation or record evidence. |
| 982. | On August 14, 1998, Buthe rented a car in San Diego. Ex. 442, FPDUS 14024. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 442 (FPDUS 14024) indicates that Buthe rented a car in San Diego on August 14, 1998, however, this document has not been authenticated. |
| 983. | On Monday, August 17, 1998, the Al Haramain representatives met with Bayoumi and members of the Kurdish community that attended the Al Madinah Mosque. Ex. 487, FBI 001349. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 487 (FBI 1349) demontrates that Al Bayoumi and the Al Madina Mosque rejected Al Haramain's request to appoint a regular imam and its attempt to control the mosque. As Al Bayoumi wrote in an August 1998 letter to Saad Al Habib: "The Imamate: Al-Harameen members talked about appointing a full-time imam of Saudi nationality. The community members objected to that strongly because 99% of the worshipers praying are Kurds, most of whom don't speak Arabic, and so is the case with their kids who don't speak other languages except for English and Kurdish. However, if the Imam is going to come every now and then, like in the month of Ramadhan and on some holidays to hold some lessons, then there is no disagreement on that." "The Management: Members of al-Harameen say that there must be a participation in the management where half shall be elected from the community and the second half should be appointed by al-Harameen. This was rejected by the community in form and substance." Pls. Ex. 487 (FBI 1349). |
| 984. | Plaintiffs' expert Youssef's phone call analysis found that same day, a call was placed from Bayoumi's Mosque office phone "to the number of the San Diego home of ▮▮▮▮▮▮ family, ▮▮▮▮▮▮ , at 1:20 p.m. (1 min.)." Ex. 500, FBI 001517 at 1519; Ex. 5, Youssef Rpt. 97-98. Bayoumi used his cell phone to call that same number on August 5, 2000, at 12:29 p.m. (4 min.), when ▮▮▮▮▮ was in the U.S. on another trip. Ex.490, FBI 1393; Ex. 2, EO 2573. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2V (EO 2573) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> To the extent a response is required, Al Bayoumi testified that anyone could use the phones in the mosque and that he allowed others to use his cell phone. *See* Pls. Ex. 120 (Bayoumi Tr.) 180:15-24, 181:18-182:13, 297:3-20, 467:5-15, 521:13-523:23, 524:8-525:3, 784:23-786:15. |
| 985. | Early in the next morning on August 18, 1998 Bayoumi wrote a "report at 3:10 a.m." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to "[m]y beloved brothers Muhammad / Saad / Saleh [al Habib]." The first page of the letter was addressed to Saad Al Habib, but at the end of the letter, Bayoumi made his plea to all three Habib brothers. Ex. 410, MPS 43_225-28 at 225, 228. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 410 (MPS 43_228) is inadmissible hearsay. *See* Objections Chart.<br><br>That document states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 410 (MPS 43_225, 226). |
| 986. | Bayoumi stated that Al Haramain had "talked about appointing a full-time Imam of Saudi nationality" and wanted to install "one half" of the Mosque's board and choose the Mosque's director and secretary. The community members objected because "99% of the worshippers are Kurds, most of whom don't know the Arabic language" and that Al Haramain was "interfering in our affairs…" Ex. 410, MPS 43_225-28 at 225-26. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 410 (MPS 43_228) is inadmissible hearsay. *See* Objections Chart.<br><br>That document states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 410 (MPS43_225, 226). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 987. | Bayoumi stated that if the management is "forcibly installed by Al-Haramain and other entities, it will lead to a financial and moral burden, and it may cause division….." Ex. 410, MPS 43_225-28 at 226-27. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 410 (MPS 43_228) is inadmissible hearsay. *See* Objections Chart.<br><br>That document states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 410 (MPS43_225, 226). |
| 988. | Bayoumi was concerned that the funding for the Mosque would end if Al Haramain's requests were not respected. Bayoumi wrote that "I hope I won't hear that this mosque was closed as a result of not properly understanding the situation… I have delivered this message, O Allah be my witness." Ex. 410, MPS 43_225-28 at 228. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 410 (MPS 43_228) is inadmissible hearsay. *See* Objections Chart.<br><br>The quoted language does not support Plaintiffs' assertion that "Bayoumi was concerned that the funding for the Mosque would end if Al Haramain's requests were not respected." Al Bayoumi testified that he was not concerned that Saad Al Habib and his brothers would withdraw their support for the Al Madina Mosque if Al Haramain's demands were not met. Pls. Ex. 120 (Bayoumi Tr.) 206:6-207:1. Al Bayoumi also |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | testified that Saad Al Habib was not a member of Al Haramain. *Id.* at 198:22-24.<br><br>The letter also states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 410 (MPS43_225, 226). |
| 989. | Based on Plaintiffs' expert Youssef's analysis, it is reasonable to conclude under all the circumstances, including "Al Haramain's demands that to name the Mosque's Imam and other leaders, and Bayoumi's concerns that the Mosque might be closed because of the community's reaction to those demands, that Al Haramain controlled the funding for the Mosque provided through Saad al Habib to Bayoumi." Ex. 5, Youssef Rpt. 98. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The letter referenced by Youssef (FBI 1349-1352, which is at Plaintiffs Exhibit 487) also states that the mosque community and Al Bayoumi "objected to" the request by Al Haramain to appoint the full-time imam of the mosque (Al Bayoumi "prefer[red] the current imam") and "rejected" the request by Al Haramain to appoint half of the mosque's management (Al Bayoumi suggested only "a member or two who comes periodically every three or four months"). Pls. Ex. 487 at FBI001349.<br><br>Moreover, Al Bayoumi testified that Saad Al Habib was not a member of Al Haramain. Pls. Ex. 120 (Bayoumi Tr.) 198:22-24. Al Bayoumi also testified that he was not concerned that Saad Al Habib and his brothers would withdraw their support for the Al Madina Mosque if Al Haramain's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | demands were not met. *Id.* at 206:6-207:1. There is no evidence that Al Haramain funded the Al Madina Mosque. |
| 990. | Shortly after the Al Haramain visit, the FBI opened a preliminary inquiry into Bayoumi. The FBI did not interview Bayoumi because they did not want to jeopardize "a large sensitive counterterrorism investigation involving an alleged terrorist organization." This was the second FBI investigation encompassing Bayoumi. The investigation was closed the following year. Ex. 170, Joint Congressional Inquiry at 174; Ex. 131, DOJ Review 257, 333. | Plaintiffs appear to cite Plaintiffs Exhibit 170 (FBI 24003-17) in error. Plaintiffs Exhibit 9 is the referenced "Joint Congressional Inquiry" report. Saudi Arabia will treat Plaintiffs as having cited Plaintiffs Exhibit 9 instead of Plaintiffs Exhibit 170.<br><br>Plaintiffs Exhibit 9 and Exhibit 131 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 9 does not support Plaintiffs' statement. It states that "[t]he responsible FBI agent said that she closed the inquiry [into Al Bayoumi] because the original complaint . . . turned out to be false and she had developed no other information of such significance as to justify continuing the investigion." Pls. Ex. 9 at 174. |
| 991. | During their 12-day trip in August 1998, the Al Haramain representatives rented a car and put over 2000 miles on it. Ex. 442, FPDUS 14024 (rental record showing that Buthe picked up car in San Diego on August 14, 1998 and returned on August 25). According to Plaintiffs' expert Youssef, Buthe and Kadi: ...travelled to the al Haramain office in Ashland, Oregon and back to San Diego – an approximately 1600-mile round trip drive. During the time that Buthe and Kadi traveled to Oregon, the Al Haramain office in Ashland placed a call to the San Diego family home of Omar Hamerman, the third member of the Al Haramain delegation sent by Saudi Arabia | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef's opinions are speculative and are not based on any recognized methodology. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to the U.S. in August 1998, on August 19 at 7:38 p.m. (4 min.). Buthe and Kadi were either calling Hamerman family home, or Hamerman accompanied Buthe and Kadi to Oregon and placed the call to his parents. Ex. 5, Youssef Rpt. 99-100. | |
| 992. | Significantly, during Buthe and Kadi's visit, Al Haramain offices called Thumairy at home from Al Haramain on August 22, 1998 at 7:58 p.m. (1 min.) and 9:30 p.m. (2 min.) and August 25, 1998 at 2:13 p.m. (3 min.). Ex. 5, Youssef Rpt. 100; Ex. 159, FPDUS 22329; Ex. 442, FPDUS 14024; Ex. 28, Al-Buthe 0026. In May 1999, Saad Al Habib would send Bayoumi his authorization (in Arabic and English) to have Bayoumi, as Mosque "Director," contact Thumairy's Ibn Taymiyah Mosque (also referring to Saudi Arabia's Ibn Taymiyah Foundation that ran the King Fahad Mosque) to take over the management and control of the Al Madinah Mosque. Ex. 678B, MPS 43_128-9 at 129 (Habib "Authorization [sic] for Mosque Service Management" faxed on May 4, 1999, authorizing Bayoumi to "contact Ibn Taimiah Est. to look after and mange [sic] this mosque"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 28 and Exhibit 678B (MPS43_129) are inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 678B (MPS43_129) contains the quoted language. But there is no evidence of any actual coordination between the Al Madina Mosque and the Ibn Taymiyyah Foundation or Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 993. | The timing of the Al Haramain calls to Thumairy in August 1998, coinciding with the visit of Buthe and Kadi, who both were later to have proven links to Al Qaeda; the visit of Hamerman, a known Sunni extremist leader and Al Haramain operative; and Al Haramain's meeting with Bayoumi at the Al Madinah Mosque, is significant. Plaintiffs' expert Youssef concluded that the "calls demonstrate a nexus among Thumairy, Bayoumi, Hamerman, and Al Haramain that would reoccur in several months with the arrival in California of two MOIA propagators sent as an advance team for the 9/11 hijackers." Ex. 5, Youssef Rpt. 100. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The "two MOIA propagators" referenced are Adel Al Sadhan and Mutaeb Al Sudairy. *See* Pls. Ex. 5 (Youssef Rep.) at 101-102. As the Court has already observed, "[t]he FBI ultimately rejected [that] theor[y] about Sadhan and Sudairy" in its May 2021 electronic communication "clos[ing] Operation Encore." ECF No. 8862, at 25 (citing Pls. Ex. 2A at EO 14040-11-MDL). |
| 994. | On September 24, 1998, Bayoumi wrote again to Saad al Habib to report that some members of the community were "very upset" about Al Haramain's involvement and were considering leaving the Mosque. Bayoumi suggested that he should meet with Al Haramain in advance of any additional meetings with the community to avoid a further problem. Ex. 409, MPS 43_224-221 at 224. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 409 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this is undisputed. |
| 995. | Bayoumi suggested to Habib that the names of the Board members of the Mosque "be requested and identified" so that the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | members could be "validated officially" by Habib. Ex. 409, MPS 43_224-221 at 223. Less than two months later, in November 1998, the Saudi Embassy Islamic Affairs Department would make a contribution to the Mosque and coordinate with Bayoumi to get a list of the Mosque's Board members. Ex. 404, MPS43_382 (Ghesheyan letter to Bayoumi transmitting $5,000 donation); Ex. 403, MPS43_376-379 (Saudi Embassy receipt and forms collecting information and "administrative data," including Board members' names); Ex. 375, MPS43_381-380 (Bayoumi letter to Al Saleh acknowledging the initiative). | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 404 (MPS43_382) and Exhibit 409 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited exhibits do not support Plaintiffs' assertion that "the Saudi Embassy Islamic Affairs Department . . . coordinate[d] with Bayoumi to get a list of the Mosque's Board members." Plaintiffs Exhibit 403 contains an "Information Form" providing information on "[t]he Islamic Center for the Kurdish Community." Pls. Ex. 403 (MPS43_377); *see also id.* at MPS43_379 ("Administrative Data"). Plaintiffs Exhibit 375 contains a purported letter from Al Bayoumi to "Abdulaziz Al-Saleh" that "enclosed a copy of" a receipt, as well as a "letter from the Pakistani community." Pls. Ex. 375 (MPS43_381). There is no evidence of any coordination directly between Al Bayoumi and "the Saudi Embassy Islamic Affairs Department." |
| 996. | Bayoumi's letter shows that Bayoumi was working to find the right means to bring Al Haramain into the Mosque. Bayoumi stated that while there was no need for a "a full-time Imam who does not speak the language of the people" that Al Haramain could send visiting Imams "every now and then…." Ex. 409, MPS 43_224-221 at 223. Bayoumi also said that "a dedicated office can be given to them [Al Haramain]" at the Mosque, and that "[t]hey [Al Haramain] can also be in charge of the library, and they will have the right to supervise the *Da'wah* [propagation] activities and the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 409 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Al Bayoumi testified that members of Al Haramain visited the Al Madina Mosque, and said "we want to do this and that, we want to manage the mosque"; that he "said, no, let's see what the community says, what their opinion is"; and that "the community said, we have our own language, we have our own situation and its different." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | library." *Id.* Bayoumi asked Habib to call him to discuss additional matters. Ex. 409, MPS 43_224-221 at 221 (Bayoumi noted with an asterisk, "please get in touch with me after reading this letter"). | Pls. Ex. 120 (Bayoumi Tr.) 207:12-208:5. Al Bayoumi also testified that he was not concerned that Saad Al Habib and his brothers would withdraw their support for the Al Madina Mosque if Al Haramain's demands were not met. *Id.* at 206:6-207:1. |
| 997. | As detailed below, Tawfiq Sudairy, a MOIA Deputy Minister and Al Haramain Board member, sent two visiting MOIA propagators to the Al Madinah Mosque in December 1998, and in June-July 1999 Bayoumi would visit the Saudi Embassy and be instructed to take steps to appoint a new Board at the Mosque and install a radical Imam handpicked and approved by Al Haramain, who welcomed the two 9/11 hijackers after Bayoumi brought them to San Diego. Ex. 368, MPS43_152, 144 (Bayoumi letter to Mahmoud Doski). | Plaintiffs Exhibit 368 (MPS43_152, 144) is inadmissible hearsay. *See* Objections Chart.<br><br>Tawfiq Al Sudairy was a member of a prospective board of directors relating to Al Haramain after September 11, 2001. Pls. Ex. 123 (Ash-Sheikh Tr.) 154:18-155:14. This was not a board but a prospective board, which met about twice in order to close down the charity because of irregularities. *Id.* at 149:6-14, 153:12-154:2, 154:5-16.<br><br>Plaintiffs Exhibit 368 (MPS43_152, 144) does not support Plaintiffs' assertion. Plaintiffs Exhibit 368 purports to be a July 4, 1999 letter from Omar Al Bayoumi to "Dr. Mahmoud Doski" (the "Chairman of the Board of Trustees of the Kurdish Community – Masjid Al Madinah Al Munawarah"), requesting information on the names of the members of the mosque boards; "the activities that are being carried out by each of them to serve" the mosque; changes to the composition of the mosque boards; "[t]he achievements in the field of Da'wah [propagation] and the activities that have been performed during the most recent period"; "[t]he priorities of needs and future plans that you see as necessary for the continuation of serving the Muslims, and the problems impeding the achievement of goals"; the relationship between the mosque and other mosques in the area; and youth "education and recreational programs." Pls. Ex. 368 (MPS43_152, 144).<br><br>There is no evidence that Al Bayoumi was "instructed" by anyone at the the Saudi Embassy, or anyone else, "to take steps to appoint a new board |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | at the Mosque" or to "install" an "Imam handpicked and approved by Al Haramain."<br><br>There also is no evidence that Nawaf Al Hazmi and Khalid Al Mihdhar ("the two 9/11 hijackers") were "welcomed" by any imam at the mosque.<br><br>Al Bayoumi testified that he did not drive Al Hazmi and Al Mihdhar to San Diego, that he never drove them anywhere, and that he did not know how they traveled from Los Angeles to to San Diego. Pls. Ex. 120 (Bayoumi Tr.) 728:23-729:8. |
| **XII.** | **AL QAEDA METICULOUSLY PLANNED FOR LOS ANGELES, CALIFORNIA AS THE ENTRY POINT INTO THE U.S. FOR ITS OPERATIVES NAWAF AL HAZMI AND KHALID AL MIHDHAR** | Plaintiffs fail to cite any evidence for the assertion that Al Qaeda meticulously planned for Los Angeles to be the entry point for Al Hazmi and Al Mihdhar. |
| 998. | Al Qaeda carried out the 1998 Embassy bombings by utilizing "the resources of a potent local network in place for almost a decade." Ex. 81, CIA 0017-36 at 31 (Meticulous and Adaptable). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 81 is inadmissible hearsay. *See* Objections Chart.<br><br>Al Qaeda did not rely on a local support network for the 1998 Embassy Bombings. Instead, as explained in KSA Exhibit 167 (Sageman Rep.): "The 1998 East Africa Embassy bombings relied on an existing AQ infrastructure left over from the days of AQ intervention in Somalia during its Sudanese exile. The participants in the twin bombings were AQ operatives. They did not rely on strangers or local sympathetic state |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | officials and definitely not on sympathetic KSA officials."  KSA Ex. 167 (Sageman Rep.) 251. |
| 999. | Al Qaeda forged partnerships with other terror groups, including AIAI and Al Gama'a, to carry out terror attacks. Ex. 80, CIA 0001-16 at 02 (CIA Analytic Report, "How Bin Ladin Commands a Global Terrorist Network," January 27, 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 80 is inadmissible hearsay.  *See* Objections Chart.

The cited material does not state that Al Qaeda "partner[ed]" with AIAI or Al Gama'a "to carry out terror attacks"; the material does not mention AIAI at all.  Rather, the cited material states only that Al Qaeda "develops relationships with sympathetic groups," and further, that bin Laden was a "linchpin for the operations of the Zawahiri faction of the Egyptian Islamic Jihad and increasingly so for hardliners in al-Gama'at al-Islamiyya."  Pls. Ex. 80 (CIA 2-3).

As Saudi Arabia's expert Marc Sageman explains "[n]eojihadi terrorist groups are quite different and may even fight each other in the field."  KSA Ex. 167 (Sageman Rep.) 559-60.  He further explains that the Egyptian al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other" by the first half of 2000, and "[t]he leadership of the al Gama'a Islamiya had rejected violence in 1997."  *Id.* at 560-61. |
| 1000. | While working as a special agent for the FBI, Plaintiffs' expert Youssef's investigation of Sunni extremist cells in Los Angeles an00d San Diego, found that those cells brought together individuals from various groups and nationalities, including | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | AIAI and Al Gama'a, who pledged allegiance to the same goal of an Islamic caliphate and worked together as an Islamic fundamentalist army targeting the U.S. as their primary enemy. Ex. 5, Youssef Rpt. 16 (Al Gama'a), 48 (AIAI). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The cited material also does not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 5 (Youssef Rep.) states that AIAI "had close ties to Al Qaeda" but cites no support for that proposition and does not explain what those "ties" supposedly were. Pls. Ex. 5 (Youssef Rep.) 48. Further, the report sets forth Youssef's characterization of his FBI work and for which he has refused to provide the factual basis.<br><br>Youssef also overstates his qualifications in asserting that he carried out any investigations in San Diego and Los Angeles. The FBI has asserted that during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Saudi Arabia's expert Marc Sageman explains that "[n]eojihadi terrorist groups are quite different and may even fight each other in the field." KSA Ex. 167 (Sageman Rep.) 559-60. He further explains that the Egyptian al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other" by the first half of 2000, and "[t]he leadership of the al Gama'a Islamiya had rejected violence in 1997." *Id.* at 560-61. |
| 1001. | Al Gama'a was led by the "Blind Sheikh" Omar Abdel-Rahman. Ex. 5, Youssef Rpt. 1-2. | Plaintifffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>This is undisputed. *See* KSA Ex. 167 (Sageman Rep.) 561 (explaining that Omar Abdel-Rahman was the head of Al Gama'a Islamiya, however he was never a trusted advisor or mentor to bin Laden). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1002. | In November 1997 Al Qaeda provided funding and tactical planning support to Al Gama'a to carry out the Luxor Attacks. Ex. 80, CIA 0001-16 at 03 (Bin Laden is the "linchpin for the operations of the Zawahiri faction of the Egyptian Islamic Jihad"). Terror plots in Canada and Jordan "attest[ed] to Bin Ladin's success in enlisting the aid of more loosely organized Sunni extremist networks." Ex. 81, CIA 0017-36 at 29 (Meticulous and Adaptable). The mid-1990s Masonic Lodge terror plot in Los Angeles was a joint Al Gama'a – Al Qaeda operation successfully thwarted by the FBI. Ex. 5, Youssef Rpt. 2, 22. | Plaintiffs Exhibit 80 and Plaintiffs Exhibit 81 are inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The cited material also does not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 80 states that bin Laden was the "linchpin for the operations of the Zawahiri faction of the Egyptian Islamic Jihad," but does not say that for Al Gama'a or the Luxor Attacks. Pls. Ex. 80 (CIA 3). Further, Plaintiffs Exhibit 81 states that the "individuals involved" in the referenced terrorist plots in Canada and Jordan "lacked formal membership in major terrorist organizations," not that they were members of Al Gama'a. Pls. Ex. 81 (CIA 29).<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) sets forth Youssef's characterization of his FBI work and for which he has refused to provide the factual basis. Youssef overstates his qualifications in asserting that he carried out any investigations in San Diego and Los Angeles. The FBI has asserted that during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>The quotes in this paragraph from Plaintiffs Exhibit 80 come from a January 1999 CIA intelligence report, written just months after the East Africa Embassies' bombings and before Al Qaeda ever tried to conduct any operations in the West. Pls. Ex. 80 (CIA 2). Plaintiffs Exhibit 81 is from November 2000. Pls. Ex. 81 (CIA 19). As discussed in KSA Exhibit 167 (Sageman Rep.), this early assessment is incorrect. KSA Ex. 167 (Sageman Rep.) 25-133. At the time, Al Qaeda did not have a wide network in some 60 countries and did not rely on local groups for operational support except for Jemaah Islamiyah. *Id.* at 252-53 (discussing cooperation between Al Qaeda and Jemaah Islamiyah and that the assistance provided by Jemaah Islamiyah was not assistance provided |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | by a separate non-Al Qaeda network, since the groups were deeply intertwined. "Nowhere else in the world did such a collaboration exist.").<br><br>Moreover, Plaintiffs Exhibit 81 inaccurately lumps together different terrorists groups into one, labeling it Al Qaeda. For instance, CIA attributed the Millennial attacks in Jordan and Canada (Ahmed Ressam's plot against LAX) to Al Qaeda, when retrospectively, they were carried out by the Khalden group, headed by Abu Zubaydah, who led a rival group at the time. KSA Ex. 167 (Sageman Rep.) 451.<br><br>Saudi Arabia's expert Marc Sageman explains "[n]eojihadi terrorist groups are quite different and may even fight each other in the field." *Id.* at 559-60. He further explains that the Egyptian al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other" by the first half of 2000, and "[t]he leadership of the al Gama'a Islamiya had rejected violence in 1997." *Id.* at 560-61. |
| 1003. | Prior to the 9/11 Attacks, a November 2000 CIA report found that Al Qaeda was highly adaptable to the requirements of each specific mission, and was "a highly skilled, resilient network with a wide range of methods of attack at its disposal." Al Qaeda observed "sound operational practices, making use of meticulous contingency planning completed far in advance of an operation." Ex. 81, CIA 0017-36 at 19 (CIA Analytic Report, "Bin Laden's Terrorist Operations: Meticulous and Adaptable," Nov. 2, 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 81 is inadmissible hearsay. *See* Objections Chart.<br><br>*See* Response to Pls. Aver. ¶ 1002. |
| 1004. | The 9/11 Commission sought to determine the genesis of the 9/11 Attacks based on | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | interviews of Khalid Sheikh Mohamed and other detainees. The Commission acknowledged that statements of Al Qaeda operatives and their supporters who were enemies of the U.S. could not be taken at face value and must be carefully evaluated and compared to other statements and evidence to determine the truth. *See* 9/11 Commission Report at 146. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>KSA Exhibit 163 (9/11 Rep.) is referring to statements of "detainees" in general, not specifically to the statements of Khalid Sheikh Mohamed. |
| 1005. | During questioning, Khalid Sheikh Mohammed ("KSM") was "protecting operatives in the United States" which "appeared to be a 'major part' of KSM's resistance efforts" and he carefully guarded his most important secrets by "withholding or lying about terrorist plots and operatives targeting the United States." *See* 9/11 Commission Report at 514 n. 4, citing CIA report, Intelligence Community Terrorist Threat Assessment (IICT), "Khalid Shaykh Muhammed's Threat Reporting – Precious Truths, Surrounded by a Bodyguard of Lies," Apr. 3, 2003, 4 – 5; SSCI Committee Study at 93, under the heading *"After the Use of the CIA's Enhanced Interrogation Techniques Against KSM Ends, the CIA Continues to Assess That KSM is Withholding and Fabricating Information."* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited portion of KSA Exhibit 163 (9/11 Rep.) is inadmissible hearsay.  That portion restates what the "CIA concluded" from an interview of Khalid Sheikh Mohammed; that is not a factual finding of the 9/11 Commission.  *See* Objections Chart.<br><br>During his interrogations Khalid Sheikh Mohammed confirmed the identities of several Al Qaeda members that were Americans or had easy access to the United States, like Iyman Faris, Majid Khan, Zacharias Moussaoui, Uzhair and Saifullah Paracha, Sajid Badat, and Dhiren Barot. *See* KSA Ex. 167 (Sageman Rep.) 256; *see also* Response to Pls. Aver. ¶ 1212 (detailing how Khalid Sheikh Mohamed gave interrogators the name of Dhiren Barot even though he had not been arrested). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1006. | Ramzi Yousef, who planned the 1993 World Trade Center bombing, was a nephew of Khalid Sheikh Mohamed and the two men were in close contact and operated as "freelance" terrorists. *See* 9/11 Commission Report at 59, 276. ("There were also rootless but experienced operatives, such as Ramzi Yousef and Khalid Sheikh Mohammed, who—though not necessarily formal members of someone else's organization—were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates."). Plaintiffs' expert Youssef determined "Khalid Sheikh Mohamed had direct lines of communication with Al Gama'a and other Sunni extremist groups and would have information about the Sunni extremist cells at the Ibn Taymiyah Mosque and the ICSD in San Diego." Ex. 5, Youssef Rpt. 18, 101-2. | Plaintiffs Exhibit 80 is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The cited material also does not support assertions regarding Khalid Sheikh Mohamed and the Ibn Taymiyah Mosque and the ICSD. Plaintiffs Exhibit 5 (Youssef Rep.) sets forth Youssef's characterization of his FBI work and for which he has refused to provide the factual basis. The FBI has asserted that during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>Saudi Arabia's expert Marc Sageman explains "[n]eojihadi terrorist groups are quite different and may even fight each other in the field." KSA Ex. 167 (Sageman Rep.) 559-60. He further explains that the Egyptian al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other" by the first half of 2000, and "[t]he leadership of the al Gama'a Islamiya had rejected violence in 1997." *Id.* at 560-61.<br><br>"There is no evidence that KSM had any direct lines of communications with Al Gama'a in 1999, as al Gama'a had repudiated violence two years before and especially AQ in 1998." *See id.* at 614 |
| 1007. | "[A] common thread r[an] between the first attack on the World Trade Center in February 1993 and the attacks on 11 September 2001" because Khalid Sheikh Mohamed "provided financial and logistic support for the 1993 operation" planned by his nephew. Ex. 82, CIA 0242-304 at 252. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 82 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited material also does not support Plaintiffs' assertion of fact to the extent it suggests the "common thread" consisted of more than Khalid Sheikh Mohamed. Saudi Arabia's expert Marc Sageman explains that, at the time of the 1993 World Trade Center Bombing, "[n]either KSM nor Basit [Ramzi Yousef] had any contact with bin Laden or AQ. They were just freelance bombers for the cause of the global neojihad." KSA Ex. 167 (Sageman Rep.) 122.

The evidence also shows that Khalid Sheikh Mohamed's assistance in the 1993 World Trade Center Bombings was providing $660 to Ramzi Yousef. *See* KSA Ex. 163 (9/11 Rep.) 147 ("KSM does not appear to have contributed any more substantially to this operation."). The 1993 bombing "inspired KSM to become involved in planning attacks against the United States," and his subsequent efforts were "the first time KSM took part in the actual planning of a terrorist operation." *Id.* |
| 1008. | Al Qaeda had been considering various hijacking plots starting in 1996, and Khalid Sheikh Mohamed claimed that he and Osama Bin Laden discussed a plot to hijack planes and crash them into buildings that same year. *See* 9/11 Commission Report at 154, 491 n. 34, 35. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that in late 1996, Khalid Sheikh Mohamed had a meeting with bin Laden in Jalabad, where Khalid Sheikh Mohamed discussed an idea to hijack ten planes in the United States and crash them into buildings. Bin Laden, was non-committal. KSA Ex. 167 (Sageman Rep.) 123. The actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. It was at this time that bin Laden told Khalid Sheikh Mohamed that "al Qaeda would support his proposal." KSA Ex. 163 (9/11 Rep.) 154-55; *see* KSA Ex. 167 (Sageman Rep.) 123-25. The nature and targets of the attack became clear later and Khalid Sheikh Mohamed did not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | choose to send Al Hazmi and Al Mihdhar to San Diego until December 1999. KSA Ex. 163 (9/11 Rep.) 157.<br><br>According to later-recovered documents from the Abbottabad compound where bin Laden was killed by U.S. forces in 2011, bin Laden himself wrote that "[t]he idea came to [him] when [he] heard about the plane piloted by al-Batouti." KSA Ex. 167 (Sageman Rep.) 125-26 (quoting KSA Ex. 79 (IMG-040538,"The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017))). This statement dates the idea for the 9/11 attacks significantly later than the date in KSA Exhibit 163 (9/11 Rep.) because the reference to "al-Batouti" appears to mean Gamal el-Batouti, the pilot of EgyptAir 990, who was widely reported to have intentionally crashed the plane into the ground. The EgyptAir 990 crash occurred on October 31, 1999, and reports of it spread through the media in November 1999. *Id.* |
| 1009. | In 1995, Ramzi Yousef was extradited to the U.S. for his role in the 1993 World Trade Center Bombing. Yousef's arrest reveals financial and logistical connections to Bin Laden, and Philippines authorities revealed Yousef's role in a plot to kill the Pope and to explode bombs on multiple U.S. airlines flying to the U.S from Asia (known as the "Bojinka" Plot). Ex. 419, Terry McDermott, "Early Scheme to Turn Jets Into Weapons," Los Angeles Times, June 24, 2002; Ex. 17, Philip, Shenon. "Broad Terror Campaign is Foiled by Fire in Kitchen, Officials Say." New York Times, Feb 12, 1995. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 17 and Plaintiffs Exhibit 419 are inadmissible hearsay. *See* Objections Chart.<br><br>The cited material also does not support Plaintiffs' assertion that Yousef had "financial and logistical connections to Bin Laden." The cited material mentions no such connection.<br><br>To the contrary, Saudi Arabia's expert Marc Sageman explains that, at the time of the 1993 World Trade Center Bombing, "[n]either KSM nor Basit [Ramzi Yousef] had any contact with bin Laden or AQ. They were just |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | freelance bombers for the cause of the global neojihad." KSA Ex. 167 (Sageman Rep.) 122. |
| 1010. | The 9/11 Plot was an adaptation of a component attack of the earlier "Bojinka" plot conceived by KSM and Ramzi Yousef in 1994 while in the Philippines. Ramzi Yousef, KSM's nephew, was behind the 1993 World Trade Center bombing. KSM divulged to U.S. interrogators after his capture in 2003 that Ramzi Yousef's successful attack on the World Trade Center inspired him to begin planning attacks against the United States. Ex. 151, Winer Rpt. ¶6.6.6.6; *See* 9/11 Commission Report at 147-148. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 151 (Winer Report) is an expert report that was not submitted against Saudi Arabia and is therefore inadmissible. *See* Objections Chart.<br><br>*See* Response to Pls. Aver. ¶ 1008. |
| 1011. | In an interview by British journalist Robert Fisk in 1997, Bin Laden warned of future attacks against the U.S. Bin Laden admitted to having supported fighters in street battles with U.S. forces in Somalia. Bin Laden further claimed that he sent faxes to King Fahd and heads of Saudi government agencies informing them of his intent to pursue jihad against Americans and that some Saudi Royals agreed with his position to expel Americans from the Gulf. Ex. 18, Fisk, Robert. "Muslim Leader Warns of a New Assault on U.S. Forces." The Independent, March 22, 1997. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 18 is inadmissible hearsay. *See* Objections Chart.<br><br>The Fisk article has numerous errors. For instance, it describes bin Laden as "the 44-year old billionaire Saudi dissident who led an army of Arab fighters against the Soviet occupation of Afghanistan." Pls. Ex. 18A (Fisk, Muslim leader warns of a new assault on US forces). In 1997, bin Laden was 40 years old, was not a billionaire, and his assets were frozen by the Saudi government. During the Afghan Soviet war, bin Laden led at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | most several dozen fighters; it was by no means an army. *See* KSA Ex. 167 (Sageman Rep.) 39-40, 42-45, 92-93.<br><br>*See* Response to Pls. Aver. ¶ 1008. |
| 1012. | On December 4, 1998, the Presidential Daily Brief to President Clinton stated that "Bin Ladin and his allies are preparing for attacks in the US, including an aircraft hijacking to obtain the release of [Shaikh Omar Abdul Rahman]...." a "senior Bin Ladin operative from Saudi Arabia" had plans to visit with his counterparts in the Al Gama'a organization tied to Rahman "to discuss options." *See* 9/11 Commission Report at 129. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited portion of KSA Exhibit 163 (9/11 Rep.) is inadmissible hearsay. *See* Objections Chart. Specifically, the cited portion of the 9/11 Report quotes a Presidential Daily Briefing, which is not a factual finding of the 9/11 Commission.<br><br>As set forth in Response to Plaintiffs Averment ¶ 1008, the actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. |
| 1013. | Khalid Sheikh Mohamed "provided inconsistent information about whether Bin Ladin first approved his proposal for what became the 9/11 attacks in late 1998 or in early 1999." *See* 9/11 Commission Report at 492 n. 38. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in Response to Plaintiffs Averment ¶ 1008, the actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. However, as set forth in KSA Exhibit 167 (Sageman Rep.), bin Laden's own writings recovered from the Abbottabad raid that killed him titled "The Birth of the Idea of September 11," states that: "The idea came to me when I heard about the plane piloted by al-Batouti. I turned to the brothers who were with me at the time, 'Why didn't he crash the plane |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | into a financial tower?" KSA Ex. 167 (Sageman Rep.) 125-26 (quoting KSA Ex. 79 (IMG-040538,"The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017))). This is a reference to the crash of EgyptAir 990 on October 31, 1999, where the pilot Al Batouti was recorded stating "I rely on God" before manually crashing the plane. *Id.* at 126. This was publicized in mid-November, thus putting the genesis of the 9/11 plot at the end of 1999. *Id.* |
| 1014. | Bin Laden's final decision to proceed with the 9/11 plot devised by Khalid Sheikh Mohamed had been made before March 1999 or April 1999. *See* 9/11 Commission Report at 154-55. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited material does not support Plaintiffs' assertion of fact. The cited material does not state that bin Laden had made a "final decision" to proceed with the 9/11 plot before March 1999 or April 1999. The cited material states that bin Laden "summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal" and then proceeds to detail various "discuss[ions]" regarding the plot in 1999. KSA Ex. 163 (9/11 Rep.) 154-55.

As set forth in Response to Plaintiffs Averment ¶ 1008, the actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. However, as set forth in KSA Exhibit 167 (Sageman Rep.), bin Laden's own writings recovered from the Abbottabad raid that killed him titled "The Birth of the Idea of September 11," states that: "The idea came to me when I heard about the plane piloted by al-Batouti. I turned to the brothers who were with me at the time, 'Why didn't he crash the plane into a financial tower?" KSA Ex. 167 (Sageman Rep.) 125-26 (quoting KSA Ex. 79 (IMG-040538,"The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017))). This is a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference to the crash of EgyptAir 990 on October 31, 1999, where the pilot al-Batouti was recorded stating "I rely on God" before manually crashing the plane. *Id.* at 126. This was publicized in mid-November, thus putting the genesis of the 9/11 plot at the end of 1999. *Id.* |
| 1015. | In early 1999, Osama Bin Laden directed Khallad Bin Attash to obtain a United States visa so that he could travel to the United States and obtain pilot training for the 9/11 Attacks. Ex. 423, Charge Sheet, *United States v. Khalid Shaikh Mohammad, et. al.*, Referral dated 4 April 2012, at 2, ¶ 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 423 is inadmissible hearsay. *See* Objections Chart.

According to Khalid Sheikh Mohammed, Al Hazmi and Al Mihdhar "had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam [Azzam] in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] [n]or al-Mihd[h]ar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. They obtained those visas in April 1999. KSA Ex. 167 (Sageman Rep.) 124. Khallad Bin Attash, however, was denied a visa. *Id.* at 125 n.453 As set forth in Response to Plaintiffs Averment ¶¶ 1008 and 1014, the actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. Bin Laden's own writings date the origin of the plot to mid-November 1999. |
| 1016. | On or about April 3, 1999, Khallad Bin Attash traveled to San'a, Yemen, and applied for a visa to travel to the United | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | States but was denied. Ex. 423, Charge Sheet, *United States v. Khalid Shaikh Mohammad, et. al.*, Referral dated 4 April 2012, at 2, ¶ 7. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 423 is inadmissible heasay. *See* Objections Chart. |
| | | Khallad Bin Attash was denied a visa to the United States. KSA Ex. 167 (Sageman Rep.) 125 n.453. As set forth in Response to Plaintiffs Averment ¶ 1008, the actual 9/11 conspiracy did not begin until March or April 1999, at the earliest. Bin Laden's own writings date the origin of the plot to mid-November 1999. |
| 1017. | On or about April 3, 1999, Nawaf Al Hazmi applied for and obtained a visa at the U.S. Consulate in Jeddah, Saudi Arabia which listed Los Angeles, California as his intended point of visitation and address in the U.S. Ex. 155, FBI 9/11 Hijacker Timeline at row 478. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 155 is inadmissible hearsay. *See* Objections Chart. |
| | | The hijackers' visa applications were destroyed according to routine United States Department of State document destruction practices in place in Jeddah. Pls. Ex. 30 (9/11 and Terrorist Travel Staff Report of the National Commission on Terrorist Attacks Upon the United States) at 9. The FBI reported inconsistent information on their destination. The United States Department of Justice review of FBI intelligence handling with respect to 9/11 reports that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 131 (KSA 484). The 9/11 Report states that Al Hazmi and Al Mihdhar's destination to San Diego was decided by Khalid Sheikh Mohammed in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157, 216. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1018. | On or about April 7, 1999, Khalid Al Mihdhar applied for and obtained a visa at the U.S. Consulate in Jeddah, Saudi Arabia which listed Los Angeles, California as his intended point of visitation and address om the U.S. Ex. 155, FBI 9/11 Hijacker Timeline at row 483. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 155 is inadmissible hearsay. *See* Objections Chart.

The hijackers' visa applications were destroyed according to routine United States Department of State document destruction practices in place in Jeddah. Pls. Ex. 30 (9/11 and Terrorist Travel Staff Report of the National Commission on Terrorist Attacks Upon the United States) at 9. The FBI reported inconsistent information on their destination. The United States Department of Justice review of FBI intelligence handling with respect to 9/11 reports that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 131 (KSA 484). The 9/11 Report states that Al Hazmi and Al Mihdhar's destination to San Diego was decided by Khalid Sheikh Mohammed in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157, 216. |
| 1019. | The close coordination carried out independently by Attash, Hazmi, and Mihdhar in applying for their visas demonstrates that at the time they were all acting on Osama Bin Laden's instructions to take the necessary steps to participate in what would become the 9/11 Attacks. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this paragraph does not refer to any admissible evidence and is argumentative. Contrary to Plaintiffs' argument, Saudi Arabia's expert Marc Sageman explains that "[t]he Qandahar Ramadan meetings of early December 1999, in retrospect, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | appear to be the first acts in furtherance of the planes operation, not al-Hazmi and al-Mihdhar getting their visas in April 1999 as they got these visas <u>prior</u> to knowing about the 9/11 operation." KSA Ex. 167 (Sageman Rep.) 128; *see also id.* at 124.<br><br>Moreover, according to Khalid Sheikh Mohamed, Al Hazmi and Al Mihdhar "had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam [Azzam] in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] [n]or al-Mihd[h]ar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. |
| 1020. | Of the selected hijackers, Hazmi and Mihdhar had the most established extremist credentials and had come into Al Qaeda's orbit as early as the mid-1990s. Ex. 82, CIA 0242-304 at 253 ("The Plot and the Plotters"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 82 is inadmissible hearsay. *See* Objections Chart. |
| 1021. | Mohamed Atta would be designated leader of the 9/11 Attacks, and Nawaf Al Hazmi would be designated as the deputy and second-in-command. Ex. 82, CIA 0242-304 at 262 ("The Plot and the Plotters" stating Atta was the "head" of the "council" in charge of the operation and al-Hazmi was his "deputy"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 82 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1022. | Plaintiffs' expert Bassem Youssef applied his extensive FBI experience investigating Islamic terror groups to the evidence and concluded that the choice of Los Angeles, California, as the initial destination of 9/11 hijackers Hazmi and Mihdhar would only have been made by Al Qaeda after detailed planning and discussion. Al Qaeda and other Islamic terrorist groups, as Youssef explained, "conducted substantial research, sometimes over several years in advance of an attack" and "would place operatives in a location to carry out an attack before all details about the attack itself had been determined." Ex. 5, Youssef Rpt. 100-101. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.

Youssef overstates his expereince.  The FBI has asserted that as an agent in the period prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations.  *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).

As Saudi Arabia's expert Marc Sageman states, many Al Qaeda attacks did not involve detailed planning and discussion, including the December 29, 1992 bombings in Aden, Yemen, and the January 2000 attack on the *USS The Sullivans*.  KSA Ex. 167 (Sageman Rep.) 609-10.

Moreover, there is no evidence of any support network in place for Al Hazmi and Al Mihdhar when they arrived in the United States as discussed in the Response to Plaintiffs Averment Sections XIX-XXV.  As Saudi Arabia's expert Marc Sageman has explained, KSA Ex. 167 (Sageman Rep.) 249-57, an Al Qaeda tradecraft manual was found in Manchester, England, and called the Manchester Manual.  KSA Ex. 216 (PECFOIA 41958-2133).  The manual instructs terrorist trainees to avoid Muslims and "famous Islamic places (mosques, libraries, Islamic fairs, etc.)."  *Id.* at PECFOIA 42008.  Such places might be monitored, and this would expose an operative to the risk of detection by the local security |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | services. In other words, Al Qaeda does not rely on any local network of sympathetic Muslims.<br><br>For the 9/11 operation, Khalid Sheikh Mohamed followed the Al Qaeda manual instructions of avoiding Muslim places by explicitly directing the 9/11 hijackers not to speak with any Muslims once in the United States. The only exception to this rule was Al Mihdhar and Al Hazmi, whom he instructed to contact Islamic centers or mosques to help them get settled in the country since they spoke no English and had no exposure to Western societies. Pls. Ex. 31 (KSM Statement) at 18, 36. |
| 1023. | Youssef concluded that Al Qaeda and its planners would never have decided on Los Angeles and San Diego as "the destination for Hazmi and Mihdhar unless there was an entrenched, verified support structure in place to ensure that its operatives would not be discovered and had sufficient help to safely carry out their plans." Ex. 5, Youssef Rpt. 101. As Youssef further explained: It is commonly known among counterterrorism and counterintelligence professionals that terrorist groups will deploy "advance teams" to a location to get the lay of the land in person before committing to send their operatives. The operatives themselves typically were not from the area where they planned to conduct their mission and needed assistance from persons on the ground familiar with the local area and customs. Ex. 5, Youssef Rpt. 101. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef overstates his expereince. The FBI has asserted that as an agent in the period prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>There is no evidence of any advance team sent prior to Al Hazmi or Al Mihdhar, as discussed in Response to Plaintiffs Averment Sections XIV-XVIII. There is also no evidence of any support network in place for Al Hazmi and Al Mihdhar when they arrived in the United States as discussed in the Response to Plaintiffs Averment Sections XIX-XXV. As Saudi Arabia's expert Marc Sageman has explained, an Al Qaeda |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | tradecraft manual was found in Manchester, England, and called the Manchester Manual. KSA Ex. 216 (PECFOIA 41958-2133). The manual instructs terrorist trainees to avoid Muslims and "famous Islamic places (mosques, libraries, Islamic fairs, etc.)." *Id.* at PECFOIA 42008. Such places might be monitored, and this would expose an operative to the risk of detection by the local security services. In other words, Al Qaeda does not rely on any local network of sympathetic Muslims.<br><br>For the 9/11 operation, Khalid Sheikh Mohamed followed the Al Qaeda manual instructions of avoiding Muslim places by explicitly directing the 9/11 hijackers not to speak with any Muslims once in the United States. The only exception to this rule was Al Mihdhar and Al Hazmi, whom he instructed to contact Islamic centers or mosques to help them get settled in the country since they spoke no English and had no exposure to Western societies. Pls. Ex. 31 (KSM Statement) at 18, 36. |
| 1024. | When Hazmi and Mihdhar travelled to Malaysia in January 2000, just prior to their arrival in California, they received lodging at an apartment and other support from members of an extremist network associated with the Jemaah Islamiah terrorist group. This "lodging and travel assistance" in Malaysia for the hijackers was "precisely" analogous to the kind of support Hazmi and Mihdhar would likely have received in California. *See* 9/11 Commission Report at 514 n. 5. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material in the present paragraph is from a footnote in the KSA Exhibit 163 (9/11 Rep.) referring to the support that Al Hazmi and Al Mihdhar received in Kuala Lumpur. As the Response to Plaintiffs Averement ¶ 1443 shows, along with the 9/11 Report, this support was not prearranged.<br><br>This footnote did not distinguish the assistance from this unique Malaysian Al Qaeda/Jemaah Islamiah network from unwitting assistance provided by a non-Al Qaeda network. *See* Response to Pls. Aver. ¶ 1443 (discussing stay in Kuala Lumpur in December 1999 and relationsihip |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | between Al Qaeda and Jamaah Islamiyah). This is a crucial distinction as local Al Qaeda networks certainly and wittingly assisted other Al Qaeda members passing through their area (the Malaysian case) while unwitting Muslims may have just assisted fellow Muslims asking them for help at the local mosque, which is what happened in California.<br><br>KSA Exhibit 163 (9/11 Rep.) 514 n.5, refers only to the type of assistance provided ("lodging and travel assistance provided by Hambali's minions"), not the type of network providing this assistance. Assistance to the future hijackers was given in Kuala Lumpur, where the hijackers stayed for only three to four days and Al Qaeda/Jemaah Islamiah was long established. But there is no evidence of any assistance given in Bangkok, even though the future hijackers stayed there twice as long (for an entire week). *See* Response to Pls. Aver. ¶ 1404 (discussing hijackers' stay in Bangkok).<br><br>Al Qaeda and Jemaah Islamiah did not have a presence in Bangkok, as it was not a friendly Muslim nation with lax security toward Muslims. Again, this demonstrates the uniqueness of Kuala Lumpur, where Al Qaeda/Jemaah Islamiah had a network firmly in place. Plaintiffs incorrectly generalize from Kuala Lumpur, while ignoring Bangkok, where the future hijackers finalized their plans and made their reservations to fly to Los Angeles. *See* Response to Pls. Aver. ¶ 1404 |
| **XIII.** | **SAUDI GOVERNMENT OFFICIALS COORDINATED IN ADVANCE TO SEND MOIA PROPAGATORS TO SOUTHERN CALIFORNIA AS A TEST-RUN FOR AL QAEDA** | There is no support whatsoever for this assertion. The MOIA propagators were sent to California to perform immate during Ramadan. There is no evidence that they conducted any "test run," that they reported or had any contact at all with Al Qaeda or the hijackers, or that they did anything at all to support the hijackers. |
| 1025. | Youssef found that "[t]he Ramadan 1419 (December 1998 – January 1999) visits of the MOIA Propagators Mutaeb Al Sudairy, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Adel Al Sadhan, and Majed Al Mersal to California are a textbook example of an 'advance team.'" Ex. 5, Youssef Rpt. 101. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef overstates his experience. The FBI has asserted that as an agent in the period prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).<br><br>There is no evidence of any advance team sent prior to Al Hazmi or Al Mihdhar, as discussed in Response to Plaintiffs Averment Sections XIV-XVIII. Chronologically, it would have been impossible for Al Sadhan, Al Sudairy, and Al Mersal to be an advanced team since they traveled to California in December 1998 and January 1999 (Ramadan 1419), well before the 9/11 conspiracy had even started. *See* Response to Pls. Aver. ¶ 1008. Nor is there any evidence Al Sadhan, Al Sudairy, or Al Mersal ever assisted Al Qaeda or the hijackers in any way. |
| 1026. | Based on his expert analysis of the evidence, Youssef determined the advance teams' assignment: …the MOIA propagators were assigned by their MOIA superiors to confirm the location where the hijackers would enter the U.S.; to scout out various places where the hijackers would ultimately live in California; and meet with the persons who would be responsible for the hijackers. In Los Angeles, they visited Thumairy, the King Fahad Mosque, and Ibn | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence of any advance team sent prior to Al Hazmi or Al Mihdhar, as discussed in Response to Plaintiffs Averment Sections XIV-XVIII. Chronologically, it would have been impossible for Al Sadhan, Al Sudairy, and Al Mersal to be an advance team since they traveled to California in December 1998 and January 1999 (Ramadan 1419), well before the 9/11 conspiracy had even started. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Taymiyah Mosque; and in San Diego, they visited Bayoumi, the Masjid Madina, the Islamic Center of San Diego, the Al Ribat Mosque (where Anwar al Aulaqi was the Imam), and the home of Abdussattar Shaikh, where Bayoumi sent the hijackers to live after they left his apartment complex. Ex. 5, Youssef Rpt. 101-102. | Saudi Arabia's expert Marc Sageman explains that this was not a scouting mission for many reasons, including Al Sudairy and Al Sadhan did not speak or understand English and were unfamiliar with Western culture, there is no record of any "report" of the alleged scouting mission (unlike others), and the trip occurred a year before bin Laden "conceived of crashing commercial airliners into commercial buildings." KSA Ex. 167 (Sageman Rep.) 352-54. |
| 1027. | As discussed above, Khalid Sheikh Mohamed communicated directly with Al Gama'a and other Sunni extremist groups and would know about the Sunni extremist cells at the Ibn Taymiyah Mosque and the ICSD in San Diego. Ex. 5, Youssef Rpt. 101. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

The cited material also does not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 5 (Youssef Rep.) sets forth Youssef's characterization of his FBI work and for which he has refused to provide the factual basis. Youssef also overstates his experience. The FBI has asserted that as an agent in the period prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008).

There is no evidence of any Sunni extremist cells at the Ibn Taymiyah Mosque and the ICSD in San Diego, and Plaintiffs fail to cite any. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia's expert Marc Sageman explains "[n]eojihadi terrorist groups are quite different and may even fight each other in the field." KSA Ex. 167 (Sageman Rep.) 559-60. He further explains that the Egyptian al Gama'a and Al Qaeda "were strong rivals and no longer collaborated with each other" by the first half of 2000, and "[t]he leadership of the al Gama'a Islamiya had rejected violence in 1997." *Id.* at 560-61. |
| **XIII.A.** | **Bayoumi coordinated with the Saudi Embassy, Saudi Consulate, Thumairy, and Aulaqi to plan for the visit of the two MOIA propagators.** | |
| 1028. | FBI documents first disclosed in the EO production show that Sadhan and Sudairy arrived in the U.S. on December 15, 1998. Ex. 2, EO 0629. | Plaintiffs Exhibit 2JJ (EO 0629) is inadmissible hearsay. *See* Objections Chart. |
| 1029. | Bayoumi's available phone records together with his correspondence show that, in advance of the arrival of Sadhan and Sudairy, Bayoumi made a series of calls with Saudi government officials related to the Al Madinah Mosque and the preparations for the visits of the MOIA propagators to Southern California. Ex. 5, Youssef Rpt. 103. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

The cited material also does not support Plaintiffs' assertion of fact. In Plaintiffs Exhibit 5 (Youssef Rep.), Youssef states that certain calls were made from the Al Madina Mosque to the Saudi Embassy and Los Angeles Consulate in November and December 1998, This telephone number is not Al Bayoumi's number but the Al Madinah Mosque office number, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | which was available for all.  Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls.  There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone.  My presence would be once a week, once every other week or once a month.  Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office.  But it's the same line.").  There is no evidence that Al Bayoumi made the calls, nor is there any evidence that these call relate to the arrival of Al Sadhan or Al Sudairy. |
| 1030. | On November 5, 1998, Bayoumi had a 10-minute call with Saad Al Habib, who organized the funding for the Al Madinah Mosque and a second call from Bayoumi to Habib for 19 minutes on November 30, and a third time for 9 minutes on December 19, immediately after MOIA propagators Sadhan and Sudairy arrived in San Diego.  Ex. 5, Youssef Rpt. 103; Ex. 12Y (Bayoumi calls to Saad Al Habib). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12Y is an improper summary exhibit.  Plaintiffs Exhibit 12Y misattributes to Al Bayoumi 12 calls that were made from a publicly-available phone line at the Al Medina Mosque.  The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls.  *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15.  These 12 calls include the November 5, November 30, and December 19, 1998 calls made from the Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12Y misattributes to Al Bayoumi 16 calls made from another number at the Masjid Al Munawara Mosque ▮▮▮▮ 2692). There is no evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls.<br><br>In addition, Plaintiffs rely solely on hearsay sources in attributing six of the seven recipient numbers in Plaintiffs Exhibit 12Y to Al Habib (including the three calls referenced in this paragraph). No subscriber records were produced to verify that any of these numbers belonged to Al Habib.<br><br>There is no evidence that any of these calls relate to the arrival of Al Sadhan or Al Sudairy. Moreover, Plaintiffs assert that Al Sadhan and Al Sudairy arrived in the United States on December 15, and so the December 19 call was not "immediately after" their arrival. |
| 1031. | Between Bayoumi's calls to Habib, and before the hijackers arrived, he placed 24 calls to the Saudi Embassy in Washington, D.C. including 9 calls to the Embassy's Islamic Affairs number for a total of 61 minutes. During this same period, Bayoumi also placed 4 calls to the Saudi Consulate in Los Angeles for a total of 33 minutes. Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12L (Bayoumi calls to Saudi Consulate). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It appears that Plaintiffs are asserting that from December 15, 1998 to January 15, 2000 (the date the hijackers arrived in California from Bangkok), Al Bayoumi made 24 calls to the Saudi Embassy and 4 calls to the Saudi Consulate. The summary exhibits cited by Plaintiffs (Plaintiffs Exhibit 12K and Plaintiffs Exhibit 12L) show far fewer calls.<br><br>Plaintiffs Exhibit 12K misattributes to Al Bayoumi 48 calls that were made from a publicly-available phone line at the Al Medina Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls.  *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15.  In addition, Plaintiffs Exhibit 12K contains three duplicate entries on February 3, 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am.  Plaintiffs Exhibit 12K also misstates the recipient's number of a call made on March 10, 2000 at 12:27 pm.  The call was made to 2022988813, not 2023423700 as stated in Plaintiffs Exhibit 12K.  *Compare* Pls. Ex. 12K (citing FBI 3253), *with* KSA Ex. 117 (FBI 3253).<br><br>Plaintiffs' assertion regarding calls made to the Saudi Embassy "[b]etween Bayoumi's calls to Habib, and before the hijackers arrived" does not provide sufficient information to identify which specific 24 and 9 calls Plaintiffs are referencing.  In fact, no consecutive 9 calls on Plaintiffs Exhibit 12K to the Islamic Affairs Department total 61 minutes, regardless of which calls are selected.<br><br>In any event, after removing the improperly-included calls referenced above and correcting the misstated recipient, Plaintiffs Exhibit 12K shows that Al Bayoumi did not make any calls to the Embassy, including the Islamic Affairs department, until January 19, 2000.<br><br>Plaintiffs Exhibit 12L is an improper summary exhibit.  Plaintiffs Exhibit 12L misattributes to Al Bayoumi eight calls that were made from a publicly-available phone line at the Al Medina Mosque.  Plaintiffs Exhibit 12L also contains a call on August 10, 2000 at 10:25 am that Plaintiffs duplicated based upon two copies of the same phone records.<br><br>Plaintiffs' assertion regarding calls made to the Saudi Consulate "[b]etween Bayoumi's calls to Habib, and before the hijackers arrived" does not provide sufficient information to identify which specific 4 calls Plaintiffs are referencing.  In fact, no consecutive 4 calls on Plaintiffs Exhibit 12L to the Saudi Consulate total 33 minutes, regardless of which |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | calls are selected. In any event, after removing the improperly-included calls referenced above, Plaintiffs Exhibit 12L shows that Al Bayoumi did not make any calls to the Saudi Consulate until January 26, 2000. |
| 1032. | Bayoumi correspondence recovered by the MPS shows that in January 1999 he sent three separate letters to Thumairy, Embassy Islamic Affairs Department Head Ghesheyan, and Embassy MOIA Office Head Sowailem that lauded their "coordination" and "advance coordination" to help arrange the visits of the MOIA propagators. Ex. 411, MPS 43_314 (January 28, 1999 letter to Ghesheyan); Ex. 413, MPS 43_338 (January 28, 1999 letter to Sowailem); Ex. 678D, MPS 43_336 (undated letter to Thumairy likely sent at same time). These documents were not produced by Saudi Arabia. | Plaintiffs Exhibits 411, 413, and 678D are inadmissible hearsay. *See* Objections Chart.<br><br>The cited material does not support Plaintiffs' assertion of fact to the extent Plaintiffs suggest the "coordination" was related to the 9/11 attacks. In the cited material, Al Bayoumi expresses gratitude for "coordination" relating to the offering of religious services during Ramadan in December 1998 and January 1999. *See* Pls. Ex. 411 (MPS 43_314), Pls. Ex. 413 (MPS 43_338), Pls. Ex. 678D (MPS 43_336).<br><br>Moreover, Plaintiffs do not cite any evidence that these letters were actually sent. The cited exhibits were found in Al Bayoumi's possession by the U.K. police, which is inconsistent with the assertion that they were sent. Moreover, Al Bayoumi is a former employee. There is no showing that these documents were in Saudi Arabia's possession, custody, or control. |
| 1033. | Bayoumi stated that he coordinated with Thumairy in advance of the December 1998-January 1999 MOIA propagator visit. Ex. 120, Bayoumi Dep. 271:10-274:22 (Bayoumi testified that Thumairy was "part of the group that got us a Hatip or somebody to preach during the month of Ramadan"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion of fact. Al Bayoumi testified that Al Thumairy was "part of the group that got us a Hatip or somebody to preach during the month of Ramadan." Pls. Ex. 120 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Bayoumi Tr.) 274:11-15. He did not testify that he "coordinated with Thumairy in advance." <br><br> Moreover, Al Bayoumi's letter thanks Al Thumairy for his efforts in relation to Al Sadhan's and Al Sudairy's visit as Ramadan propagators to Al Madinah Mosque. The full quote about the word coordination is, "that coordination will be the starting point from which we will excel in serving the Muslims in this country." Pls. Ex. 678D (MPS 43_336). Given the context of the Ramadan propagators' visits to Al Madinah Mosque, there can be no suggestion that this "coordination" refers to the 9/11 plot. |
| 1034. | On November 15, 1998, Bayoumi expressed the Al Madinah Mosque's "urgent need of a propagator" in a letter "To Whom it May Concern." This letter is likely in response to the October 27, 1998 letter of MOIA Deputy Minister Tawfiq Al Sudairy to MOIA's Embassy Director Sowailem asking that requests for propagator assignments be sent to his office. Ex. 219, KSA 7595 (Tawfiq Al Sudairy's letter). Bayoumi's letter cited the fact that another MOIA propagator visited the Mosque in September 1998, stating that "brother Awad al-Harbi was here in town two months ago" and "has the knowledge of the lessons and preachings needed by the community…." Ex. 396, MPS 43_335 (Bayoumi letter). Bayoumi also wrote to Al Harbi on the same date, in a letter confirming that Harbi was at the Masjid Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibits 369 and 396 are inadmissible hearsay. *See* Objections Chart. <br><br> The cited material also does not support Plaintiffs' assertion of fact that MOIA Deputy Minister Tawfiq Al Sudairy and Al Bayoumi were requesting "propagator[s]" generally. Al Sudairy's letter requests "mosques and Islamic institutions where it is appropriate to send Imams to lead the prayers during the holy month of Ramadan of this year 1419 AH," meaning December 1998 and January 1999. Pls. Ex. 219 (KSA 7595). On November 15, 1998, Al Bayoumi likewise requested "a propagator to lead people in the prayers of *Taraweeh* [Ramadan night prayers] and *Qiyam* [Ramadan late night prayers], and who would give some lessons during the Holy Month of Ramadan. Pls. Ex. 396 (MPS 43_335). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Madinah and the Masjid Al Ribat during his visit. Ex. 369, MPS 43_309. | |
| 1035. | Awad Al Harbi is listed in Bayoumi's handwritten address book with landline and cellphone numbers in Saudi Arabia. Ex. 12AA, MPS738_37; *See also* Ex. 2, EO 2114. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 2T (EO 2114) and 12AA (MPS 738) are inadmissible hearsay.  *See* Objections Chart.<br><br>The cited material also does not support Plaintiffs' assertion of fact. There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.  The handwritten phone book has an entry for "Eid Al-Harbi" and lists the number "874-5017" along with an address.  Pls. Ex. 12AA (MPS 738_37).  The handwritten phone book also has a separate entry for "Abdullah Al-Harbi" and the number ███ ███-819 [sic]," although it is unclear whether the two entries are related. *Id.*<br><br>Plaintiffs Exhibit 2T (EO 2114), does not refer to a "handwritten address book" of Al Bayoumi.  It states that a list of individuals and phone numbers – including of Awad Al Harbi – were found in an "office utilized by OMAR AL-BAYOUMI, at the Kurdish Mosque located at 511 South Magnolia, El Cajon, California" in "multiple documents consisting of business cards, desk blotters, telephone indices and miscellaneous business related documents."  Pls. Ex. 2T (EO 2113-14). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, with respect to the typed phone list, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. |
| 1036. | The EO production revealed that on November 20, 1998, Bayoumi obtained a new cell phone with the phone number ███-6662. Ex. 2, EO 2749. The FBI found that the 6662 number "was subscribed to by MANAL A. BAGADER [Bayoumi's wife], and used by her spouse, hijackers-associate OMAR AL-BAYOUMI, from 11/20/1998 to 03/09/2001….although tolls were only available through 9/20/2000." Ex. 2, EO 2798. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2X (EO 2749, 2798), is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2X states that the FBI obtained phone records for an Airtouch cellular telephone number ███-6662 from November 20, 1998 through September 20, 2000; it does not state that Al Bayoumi obtained a "new cell phone" on November 20, 1998. Pls. Ex. 2X (EO 2749). This cell phone was registered to Al Bayoumi's wife and there is no evidence that Al Bayoumi used that cell phone. *See* Response to Pls. Aver. Section X.F. |
| 1037. | The FBI states that they performed a "target-to-target phone analysis…for the Yemeni/Saudi support cell in San Diego, with particular emphasis on phone connectivity involving the number ███-6662." Ex. 2, EO 2798. To date, despite multiple requests from the Plaintiffs, the FBI has not produced the records of the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | calls. Plaintiffs have served a subpoena on the FBI to produce the records of calls made from the -6662 number. | Plaintiffs Exhibit 2QQ (EO 2798-UPDATED), is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited document references a 42-page spreadsheet entitled "Frequency Report for Phones Used by Al-Bayoumi, Al-Midhar and Al-Hazmi," but no such spreadsheet is attached to the exhibit. *See* Pls. Ex. 2QQ (EO 2797-UPDATED).<br><br>Plaintiffs served a subpoena on the FBI for these records on December 21, 2023, concurrently with their opposition to this motion, well after the jurisdictional discovery closed. *See* KSA Ex. 217 (Ashton Pls. Subpoena to FBI). |
| 1038. | On November 20, 1998, the first day that Bayoumi obtained his new cell phone, he placed a call to Anwar Aulaqi. Ex. 2, EO 2759. The two visiting propagators, Sadhan and Sudairy, would later go to Aulaqi's Al Ribat Mosque during their month in San Diego, evidencing that Bayoumi was likely communicating without Aulaqi about their imminent arrival. Ex. 5, Youssef Rpt. 108-109 (discussing Sadhan and Sudairy being shepherded to Bayoumi and going to the Al Ribat Mosque). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2X (EO 2759), is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2QQ (EO2798-UPDATED), states that the number ███-6662 is "subscribed to MANAL A. BAGADER." There is no evidence that November 20, 1998 was the first day that the phone was in use. That document notes only the beginning and ending dates of toll records that were provided to the FBI. *See, e.g.*, Pls. Ex. 2OO (EO 2749-UPDATED).<br><br>Even if Al Bayoumi had used his wife's phone to call Aulaqi, on November 20 or at any other time, calls between the two would not be surprising given that Al Bayoumi testified that he knew Anwar Aulaqi as |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | a local Imam and had spoken with him occasionally via telephone call to pass along the religious questions of others. *See*, *e.g.*, Pls. Ex. 120 (Bayoumi Tr.) 482:12-18, 587:12-589:16.<br><br>There is no evidence that any of these calls had anything to do with Al Sadhan or Al Sudairy. |
| 1039. | In November 1998, Bayoumi arranged for the Saudi Embassy in Washington, D.C. to provide direct financial assistance to the Al Madinah Mosque. On November 25, 1998, Embassy Islamic Affairs Department Head Majed Al Ghesheyan wrote a letter to Bayoumi with a $5,000 check for the Mosque. Ex. 404, MPS 43_382. Saudi Arabia did not produce any of these documents in its production. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 404 (MPS 43_933), is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit was found in Al Bayoumi's possession by the U.K. police. Al Bayoumi is a former employee and these documents are not in Saudi Arabia's possession, custody, or control. |
| 1040. | The receipt for the funds was signed by Ghazi M. Ahmad, the Finance Director for the Al Madinah Mosque. Ex. 403, MPS 43_376-379. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 403 (MPS 43_378), is inadmissible hearsay. *See* Objections Chart. |
| 1041. | ██████████ business card was among the items seized from Bayoumi's office at the Al Madinah Mosque and it lists his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | telephone number in Chula Vista, CA as ███-2080. Ex. 679I, FBI 4528. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 679I (FBI 4528), is inadmissible hearsay. *See* Objections Chart.<br><br>The cited material also does not support Plaintiffs' assertion of fact. The cited page is not in Plaintiffs Exhibit 679I, nor is ████████ business card in Plaintiffs Exhibit 679I. FBI 4528 is in the "REF2" exhibits to Plaintiffs Exhibit 12. That page is a picture of a business card for ████ ████ but does not state where the business card was found. |
| 1042. | Bayoumi called the phone number on ████ card on November 17, 1998 at 3:26 p.m. (2 mins.) and 3:40 p.m. (3 mins.) and again on January 2, 1999 at 11:11 a.m. (1 min.) Ex. 503, FBI 1532; Ex. 679L, at 9125. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 503 is a telephone bill for the phone at the Al Madinah Mosque. This number is not Al Bayoumi's number but the Al Madinah Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one phone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *id*. at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). There is no evidence that Al Bayoumi made these calls. |
| 1043. | As a condition for receipt of the funds, the Embassy's Islamic Affairs Department | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | required the Al-Madinah Mosque to complete an "Information Form" which asked about the Mosque's "activities" and for "Administrative Data" which included a list of the Board Members of the Mosque. Bayoumi collected the information, including the names, titles, and citizenship of eight Mosque leaders, and sent it to "Saleh" at the Embassy. Ex. 403, MPS43_376-379 (Saudi Embassy receipt and forms); Ex. 375, MPS43_381-380 (Bayoumi letter to Al Saleh). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion of fact. The cited material does not state that completing an "Information Form" was a "condition for receipt of the funds," and it does not say who collected the information on the form. |
| 1044. | Three of the Mosque leaders whose names were provided to the Saudi Embassy – Ghazi Ahmad, Hussein Al-Hilali and Omar Al-Barzanji – were invited by Bayoumi to the welcome party for 9/11 hijackers Hazmi and Mihdhar that Bayoumi hosted in February 2000. Ex. 10K MPS2023-059 Video Exhibit and 10K-TR Video Transcript, at 17:25, 17:14, 17:37. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 10K and Plaintiffs Exhibit 10-KR are inadmissible hearsay for the purposes used – the truth of self-identification. *See* Objections Chart.<br><br>There was no welcome party for the hijackers, as addressed in Response to Plaintiffs Averment Section XXII. |
| 1045. | The $5,000 contribution by the Embassy provided "seed money" for the Mosque that led to additional contributions to be made to the Mosque. Ex. 371, MPS 43_320 (on November 24, 1998, Bayoumi sends wire instructions to Saudi Ministry of Finance | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Director Hamdan for a donation of nearly $25,000); Ex. 678C, MPS 43_138-9 at 139 (after Embassy contribution, Bayoumi arranged a check through Thumairy for 10,000 Saudi Riyals, and a check from Hamdan for $20,000). | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 678C is inadmissible hearsay.  *See* Objections Chart.<br><br>The cited material does not support Plaintiffs' assertion of fact.  None of the material suggests a $5,000 contribution was "seed money."  The cited materials also do not state that Al Hamdan sent money to Al Bayoumi or for what purpose.<br><br>To the contrary, the admissible evidence shows that Al Bayoumi received $20,000 from Ahmed Hamdan in February 1999 because Al Bayoumi had been helping "one of [Al Hamdan's] kids" with "expenses for . . . study[ing]," and Al Hamdan sent a "specific amount for [the kid] to spend from."  Pls. Ex. 120 (Bayoumi Tr.) 573:16-22.  Al Bayoumi further wrote to Saad Al Habib on August 26, 1999 that he had received $20,000 "in my [own] name," and that Al Bayoumi used a portion of that amount to pay "the second premium amount and the insurance amount" for the mosque for the year.  Pls. Ex. 678C (MPS 43_139). |
| 1046. | Bayoumi correspondence recovered by the MPS shows that on November 30, 1998, Bayoumi wrote to Consul General Mohamed al Salloum at the Saudi Consulate in Los Angeles describing the establishment of the Al Madinah Mosque and stating that "[w]e recognize the major role played by the [Saudi] government…." Ex. 412, MPS 43_337. This document was not produced by Saudi Arabia. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 412 is inadmissible hearsay.  *See* Objection Chart.<br><br>The cited material does not support Plaintiffs' assertion of fact.  Plaintiffs mischaracterize the letter as one "recognize[ing] the major role played" by Saudi Arabia with respect to the El Cajon mosque.  To the contrary, Al Bayoumi wrote to Consul General Mohamed al Salloum at the Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Consulate to inform him of the existence of the mosque and to request assistance for the mosque: "I am pleased to inform you that Allah the Almighty has favored the city of El Cajon with a mosque called Masjid Al-Madinah Al-Munawarah, which we hope to become a . . . [beacon of goodness] and guidance to Muslims in San Diego County. . . . Enclosed please find information regarding the building and its location." Pls. Ex. 412 (MPS 43_337). Al Bayoumi then recognized the "major role" played by Saudi Arabia in "taking care of mosques and preserving them, as well as offering generous support, especially by providing Qur'ans, books, and carpets, as well as propagators specifically in the Holy Month of Ramadan." *Id.* Al Bayoumi did not state that Saudi Arabia had already provided such assistance with respect to the El Cajon mosque. Finally, Al Bayoumi stated that he had already spoken to another individual (Saad Al-Jabreen) about receiving that same assistance for the El Cajon mosque in the future. *See id.* ("I have already spoken to brother Saad Al-Jabreen who showed his readiness to provide whatever is needed according to the available resources."). |
| 1047. | Bayoumi made a series of calls immediately prior to the arrival of the two MOIA propagators: he called the Saudi Consulate on December 9, 1999 at 2:29pm for 7 minutes and then sent a fax to the King Fahad Mosque at 2:37pm. FBI 1537. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited material also does not support Plaintiffs' assertion of fact. Plaintiffs assert Al Bayoumi "made a series of calls immediately prior to the arrival of the two MOIA propagators" in December 1999, but they cite only one call and one fax.

Further, KSA Ex. 218 (FBI 1537), is in the "REF1" exhibits to Plaintiffs Exhibit 12 and is a telephone bill for the Al Madinah Mosque. This number is not Al Bayoumi's number but the Al Madinah Mosque office |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one phone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). There is no evidence that Al Bayoumi made these calls nor is there evidence of what was discussed on any of these calls. |
| 1048. | On December 14, 1998, the day before the arrival of Sadhan and Sudairy, Bayoumi called the Embassy Islamic Affairs number for 32 minutes at 12:55pm and then made two calls at 1:27pm (1 min.) and 1:30pm (2 mins.) to the ▮▮▮▮-1250, the number Bayoumi listed in his handwritten address book for Fahad Al Thumairy in Los Angeles, where Sadhan and Sudairy would arrive the next day. FBI 1537; Ex. 12AA, MPS738_35. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738_35), is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Further, KSA Ex. 218 (FBI 1537), is in the "REF1" exhibits to Plaintiffs Exhibit 12 and is a telephone bill for the Al Madinah Mosque. This number is not Al Bayoumi's number but the Al Madinah Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one phone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *id*. at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). There is no evidence that Al Bayoumi made these calls nor is there evidence of what was discussed on any of these calls.<br><br>The telephone number (310) 204-1250 is registered to the Islamic Foundation in Culver City, not to Al Thumairy. *See* KSA Ex. 219 (KFM 461-68).<br><br>Thus, there is no evidence that Al Bayoumi made the two calls to that number or that Al Thumairy received calls. |
| XIV. | **MOIA SENT AN ADVANCE TEAM OF PROPAGATORS SUDAIRY AND SADHAN TO CALIFORNIA TO EVALUATE AND PREPARE THE SAUDI EXTREMIST NETWORK FOR AL QAEDA OPERATIVES** | This assertion is not supported by any record evidence. There is no evidence that Al Sudairy or Al Sadhan were Sunni extremists or an advance team. |
| XIV.A. | **Saudi Agents Sudairy and Sadhan were Sunni extremists chosen for their California assignment by MOIA's leadership and Al Haramain.** | This assertion is not supported by any record evidence. There is no evidence that Al Sudairy or Al Sadhan were Sunni extremists or that Al Haramain had any involvement in the selection of imams to participate in the Ramadan imamate program. |
| 1049. | MOIA Deputy Minister Tawfiq Al Sudairy, the brother of Mutaeb Al Sudairy, was in charge of MOIA's Ramadan program and assigned MOIA propagators to travel to the U.S. for Ramadan 1419 (starting December 20, 1998) and Ramadan 1420 (starting | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | December 9, 1999). Ex. 119, Sudairy Dep. 14:4-14; Ex. 141, KSA 9538 (Tawfiq Al Sudairy signed letter as the "supervisor" of the MOIA's Ramadan 1420 program); Ex. 219, KSA 7595; Ex. 680Q, KSA 7597 (Tawfiq Al Sudairy letter to Sowailem coordinating plans for Ramadan 1419 program). Saudi Arabia produced MOIA's list of assignments made by Tawfiq Al Sudairy for Ramadan 1420 – but not for Ramadan 1419. Ex.221, KSA7805-08, Ex. 417 (telegram to Saudi Embassies with MOIA's Ramadan 1420 assignments). | To the extent a response is required, the record evidence shows that Tawfiq Al Sudairy was not directly involved in the assignment process. Mutaeb Al Sudairy testified that he chose the San Diego assignment in coordination with Khalid Al Sowailem. Pls. Ex. 119 (Sudairy Tr.) 49:20 – 52:4; 63:17-65:11; 71:12-20; 79:7-81:13.

Mutaeb Al Sudairy's brother, Tawfiq Al Sudairy, later became vice minister of the Ministry of Islamic Affairs but at the time leading up to Ramadan 1419H and Ramadan 1420H, he was the Ministry of Islamic Affairs assistant undersecretary for Islamic Affairs and supervisor of the Imamate Program. *See* KSA Ex. 220 (KSA 7596-97); KSA Ex. 108 (Ghudaian Ex. 446). |
| 1050. | MOIA Deputy Minister Tawfiq Al Sudairy was a Board member of SDGT organization Al Haramain. Ex. 39B Al Haramain Website, p. 5 (Exhibit 0477, Ash-Sheikh); Ex. 123, Ash-Shaikh Dep. 154:18-155:8 (MOIA's Minister claims that "[b]eing a deputy minister [of MOIA]" meant Tawfiq Al Sudairy was on the "prospective" board of directors of Al Haramain). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 39B (Al Haramain website) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the cited materials do not support Plaintiffs' assertion of fact. From 1998 to 2000, Tawfiq Al Sudairy was not MOIA Vice Minister, but an assistant undersecretary for Islamic Affairs. *See* KSA Ex. 220 (KSA 7596-97); KSA Ex. 108 (Ghudaian Ex. 446). He became a member of a prospective board of directors relating to Al Haramain after 9/11/2001. Pls. Ex. 123 (Ash-Sheikh Tr.) 155:13-14. This was not a board but a prospective board, which met about twice in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | order to close down the charity because of irregularities. Pls. Ex. 123 (Ash-Sheikh Tr.) 149:6-14, 153:12-154:2, 154:5-16.<br><br>Plaintiffs falsely imply that because Tawfiq Al Sudairy was on this prospective board, he was supportive of terrorism. In fact, the opposite is true, as Al Sudairy had a role in closing down Al Haramain. |
| 1051. | Beginning in 1998, the United States raised Al Haramain's involvement in terrorist financing with the Saudi government repeatedly, in different forms and through different channels. Ex. 7, 9/11 Commission's Terrorist Financing Monograph at 12. | Plaintiffs mischaracterize the material cited, which specifically states that it was "various al Haramain branches" not Al Haramain itself that may have been involved in terrorist financing. Pls. Ex. 7 (*Terrorist Financing Monograph*) at 12. At the time, the U.S. intelligence implicated "low-level officials . . . [in] various HIF offices outside of Saudi Arabia" (*Id.* at 115) but characterized the intelligence as weak (*Id.* at 116) and "simply not strong enough . . . to push the Saudi government to take aggressive action against the whole organization." (*Id.* at 118).<br><br>Plaintiffs Exhibit 7 (*Terrorist Financing Monograph*) contains multiple levels of inadmissible multiple hearsay. *See* Objections Chart. |
| 1052. | Tawfiq and Mutaeb Al Sudairy both worked in the same MOIA building and Mutaeb had previously been assigned by his brother Tawfiq to a Ramadan assignment in London for Ramadan 1418. Nevertheless, Mutaeb Al Sudairy claimed he did not know that his brother Tawfiq oversaw the Ramadan program or played any role in his assignment to California, or if his brother previously had an affiliation with Al Haramain. Ex. 119, Sudairy Dep. 39:8-19 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs mischaracterize the material cited. Tawfiq Al Sudairy supervised the imamate program, but this does not mean that he made individual assignments. For instance, Mutaeb Al Sudairy testified that he chose the San Diego assignment in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (assignment to London), 59:4-17 (assignment in 1419), 335:13-336:4 ("I don't know anything" about Tawfiq Sudairy's relationship with Al Haramain). | coordination with Khalid Al Sowailem. Pls. Ex. 119 (Sudairy Tr.) 49:20 – 52:4; 63:17-65:11; 71:12-20; 79:7-81:13.<br><br>Plaintiffs fail to cite any evidence that the two brothers worked in the same building.<br><br>Tawfiq Al Sudairy's affiliation with a prospective board that shut down Al Haramain was after 9/11/2001, when Mutaeb Al Sudairy was no longer in the D'awah Abroad Department. Pls. Ex. 123 (Ash-Sheikh Tr.) 149:6-14, 153:12-154:2, 154:5-16; 155:13-14.<br><br>By failing to disclose when these events occurred, Plaintiffs attempt to lump together events that are unrelated. |
| 1053. | Sudairy was the nephew of MOIA Minister Abdullah bin Turki. Ex. 2, EO 0789. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2N (EO 789) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit (EO 789) states "Mat'ab is the nephew of Doctor Abdulla bin Turki, President of the World Muslim League." It is not clear whether Abdulla bin Turki is the same person as Abdullah Abdel Mohsen Al Turki, who was the Minister of Islamic Affairs until early summer 1999. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1054. | Mutaeb Al Sudairy also taught Sharia courses for Al Haramain in the United States and Canada, according to a May 2001 list published in Saudi Arabia by Middle East news website Al Jazirah. Despite the evidence in the Saudi press document, Sudairy flatly denied involvement in Al Haramain at his deposition. Ex. 45, Al Jazirah news article (Sudairy Ex. 532), Ex. 119, Sudairy Dep. 328:17-334:14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 45 (Sudairy Ex. 532) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited materials do not support Plaintiffs' assertion of fact. Plaintiffs Exhibit 45 (Sudairy Ex. 532), dated May 12, 2001, states that one Al Haramain course was held in the U.S. "in coordination with Sheikh Mutaeb al Sudairy." At his deposition, Al Sudairy stated that he had "never done any courses inside Saudi Arabia or outside." Pls. Ex. 119 (Sudairy Tr.) 331:2-7. |
| 1055. | As a result of this close relationship, MOIA's decision to send Sudairy and Sadhan to Bayoumi's Al Madinah Mosque was likely coordinated with Al Haramain. MOIA's senior leadership supervised Al Haramain and appointed all its senior officials, including Tawfiq Sudairy, who sent Sadhan and Sudairy to California. Ex. 2, EO 3435. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the evidence shows that, there was no relationship, let alone a "close relationship" between the Ministry of Islamic Affairs, Tawfiq Al Sudairy, Mutaeb Al Sudairy and Al Haramain in 1998.<br><br>The Ministry of Islamic Affair's (and Tawfiq Al Sudairy's) involvement with Al Haramain, was mainly to close it down, and came after 9/11/2001. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that Al Haramain was involved in the Ministry of Islamic Affairs' assignment to of imams to the Al Madinah Mosque in the fall of 1998, three years prior to 9/11/2001. There is also no evidence that the Ministry of Islamic Affairs coordinated with Al Haramain in its assignment of Ramadan imams.<br><br>Plaintiffs Exhibit 2BB (EO 3425) does not state that MOIA's senior leadership supervised Al Haramain and appointed all of its senior officials.<br><br>Former Minister of Islamic Affairs Saleh Bin Abdulaziz ash-Sheikh testified that he did not hold a position at Al Haramain. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10, 143:14-148:5 (testifying that Al Haramain was working with a permit and that the Ministry of Islamic Affairs scrutinized the organization).<br><br>Tawfiq Sudairy became a member of a prospective board of directors relating to Al Haramain after 9/11/2001. Pls. Ex. 123 (Ash-Sheikh Tr.) 155:14. This was not a board, but a prospective board, which met about twice in order to close down the charity because of irregularities. *Id.* at 149:6-14, 153:12-154:2, 154:5-16.<br><br>Plaintiffs falsely imply that because Tawfiq Al Sudairy was on this prospective board, he was supportive of terrorism. In fact, the opposite is true, as Al Sudairy had a role in closing down Al Haramain. |
| 1056. | In August and September 1998 Bayoumi's letters to Saudi investor Saad Al Habib discussed how Bayoumi negotiated for Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain to provide an Imam for the Mosque during Ramadan. Ex. 487, FBI 001349-52 at 1349 ("if the Imam [from Al Haramain] is going to come every now and then, like in the month of Ramadhan and on some holidays to hold some lessons, then there is no disagreement on that"); Ex 409, MPS43_224-221 at 223 (confirming "as I have mentioned to you before, it is fine" for Al Haramain to send an Imam "every now and then"). | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 487 (FBI 1349) and 409 (MPS43_223) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited document shows that in his letter to Saad Al Habib dated August 18, [1998], Al Bayoumi and the Al Madina Mosque rejected Al Haramain's request to appoint a regular imam and its attempt to control of the mosque. "The [Al Haramain] members talked about appointing a full-time imam of Saudi nationality. The community members objected to that strongly … However, if the Imam is going to come every now and then … then there is no disagreement on that." Al Haramain also wanted to get control of the mosque by appointing half of its board, but the mosque rejected it. The Al Haramain members said "there must be … participation in the management where half shall be elected from the community and the second half should be appointed by [Al Haramain]." And this suggestion was rejected by the community entirely. Pls. Ex. 487 (FBI 1349).<br><br>By quoting portions of this letter out of context, Plaintiffs attempt to give the false impression that Al Haramain controlled the Al Madinah Mosque. |
| 1057. | Thus, Sadhan and Sudairy were sent to San Diego at the first Ramadan after Al Haramain controlled the mosque. Ex. 5, Youssef Rpt. 105. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, the cited document shows that in his letter to Saad al-Habib dated August 18, [1998], Al Bayoumi and the Al Madina Mosque rejected Al Haramain's request to appoint a regular imam and its attempt to control of the mosque. "The [Al Haramain] members talked about appointing a full-time imam of Saudi nationality. The community members objected to that strongly … However, if the Imam is going to come every now and then … then there is no disagreement on that." Al Haramain also wanted to get control of the mosque by appointing half of its board, but the mosque rejected it. The Al Haramain members said "there must be … participation in the management where half shall be elected from the community and the second half should be appointed by [Al Haramain]." And this suggestion was rejected by the community entirely. Pls. Ex. 487 (FBI 1349). |
| 1058. | Bayoumi was in constant contact with Habib as the plans to send Sadhan and Sudairy materialized and was also in contact upon their arrival in San Diego. *See supra* ¶¶ 945, 950, 1030, 1056. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Bayoumi contacted Habib during this time period. His correspondence communicated that he and the mosque had rejected Al Haramain's attempts to control the Al Madina Mosque. Pls. Ex. 487 (FBI 1349). |
| 1059. | Bayoumi arranged for Saudi government employee, Sunni extremist leader, and Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain operative Omar Hamerman to travel from Saudi Arabia to San Diego on January 3, 1999 (two weeks before the end of Ramadan 1419) to meet with the visiting ███████████ ███████████ ███████████ ██████ Ex. 120, Bayoumi Dep. 277:20-278:5 (Bayoumi confirms Hamerman was "with us" at the Mosque when Sudairy and Sadhan were there); Ex. 11, MPS 726_149 (photo 302, 305, showing Bayoumi with Hamerman and Sadhan). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit ████████ is inadmissible hearsay. *See* Objections Chart.

The extent a response is required, the cited documents do not support Plaintiffs' assertions. None of the cited material shows that Omar Hamerman was a Saudi government employee, a Sunni extremist leader, or an Al Haramain operative.

Plaintiffs Ex. 157 (Forge (Omar) Hamerman's LinkedIn webpage), dated 2019, has a gap between 1996 when he graduated from San Diego State University and 2001 when he started studying at Al-Imam Muhammad Ibn Saud Islamic University.

None of the cited material shows that Al Bayoumi arranged for Hamerman's travel to San Diego from KSA. |
| 1060. | MOIA's policy for its Ramadan program was to send only one propagator to a particular mosque for Ramadan. Ex. 221, KSA 7805-08. Contrary to protocol, MOIA sent both Sadhan and Sudairy to California. Sudairy claimed that this was because he found the program "extremely exhausting" and made a special request for Sadhan to accompany him to California. Ex. 119, Sudairy Dep. 80:9-83:17. No documents | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the cited exhibits do not support Plaintiffs' assertions. Plaintiffs Exhibit 221 (Qattan Ex. 417) refers to the Ramadan Imamate Program 1420H, not 1419H. At his deposition, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | were produced by Saudi Arabia regarding Sadhan and Sudairy's assignment. | Sudairy explained that he suffered from medical problems, which prevented him from doing any military service and forced him to graduate from school in six or seven years instead of the usual four years. Pls. Ex. 119 (Sudairy Tr.) 26:10-23. He also explained that based on his prior experience with the imamate program, he requested that he be accompanied by another propagator since he found the program exhausting. Pls. Ex. 119 (Sudairy Tr.) 63:11-64:10. There is no evidence to the contrary. |
| 1061. | Bassem Youssef stated that he was familiar with Ramadan evening prayers and that leading those prayers did not involve difficult or "exhausting" work. Ex. 5, Youssef Rpt. 106. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> Youssef is an evangelical Christian. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12. He has no purported expertise in Ramadan prayer and his report fails to cite any support the assertion that leading this prayer is not difficult or exhausting. |
| 1062. | Like Jarrah and Thumairy, Adel Al Sadhan and Mutaeb Al Sudairy graduated from Imam Mohamed University and were recruited to work at MOIA. Ex. 337, Sudairy CV; Ex. 99, Sadhan Dep. 23:14-24:6, 46:16-47:1; Ex. 119, Sudairy Dep. 58:6-59:3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, it is undisputed that Al Sadhan and Al Sudairy graduated from Imam Mohamed University. None of the cited evidence shows that they were "recruited" to work at the Ministry of Islamic Affairs. |
| 1063. | FBI investigators concluded that Sudairy and Sadhan had a "nexus to al-Qa'ida" Ex. 2, EO 0585, and that Sadhan was "a believer in a radical form of Sunni Salafiyism." Ex. 2, EO 3511. | Plaintiffs Exhibit 2M (EO 584) and Plaintiffs Ex. 2PP (EO 3511) are inadmissible hearsay.<br><br>The cited documents refute Plaintiffs' assertion. Plaintiffs Exhibit 2M (EO586) states "[Redacted] surround al-Sadhan and al-Sudairy's nexus to al-Qa'ida and their activities since departing from the US in 2001. . . there is no independent [redacted] information that they were working at the behest of a terrorist network." The document does not state that there was in fact any nexus to Al-Qai'da. Nor is there any evidence that Sadhan believed in any violent extremism. |
| 1064. | Sudairy lived with Al Qaeda agent Ziyad Khaleel in Missouri for four months in 2000, when Sudairy was supposed to be working at the Saudi Embassy in Washington. Ex. 2, EO 0599. | Plaintiffs Ex. 2M (EO 599) is inadmissible hearsay. *See* Objections Chart.<br><br>Al Sudairy lived with Ziyad Khaleel in Missouri for four months in the Fall of 2000. At the time, however, Al Sudairy was not supposed to be working at the Saudi Embassy. He testified that Al Sowailem, his supervisor, suggested he study English outside of Washington. Pls. Ex. 119 (Sudairy Tr.) 221:6-15, 223:2-5, 283:1-3.<br><br>As discussed below, there is no evidence that Khaleel was an Al Qaeda agent or that Al Sudairy knew him to be one. |
| 1065. | Sudairy and Khaleel opened a joint Post Office box together in Columbia, Missouri. Ex. 2, EO 3509. Sudairy met again with Al Qaeda agent Khaleel after 9/11 on two | Plaintiffs Ex. 2PP (EO 3509) is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | occasions in Saudi Arabia, where Khaleel resided after leaving the U.S. Ex. 2, EO 0599 ("Following Al Sudairy's return to Saudi Arabia in 2001 he met with Khaleel twice."). Sudairy's association with Ziyad Khaleel is significant because, while in Missouri, Khaleel purchased the satellite phone equipment and the phone minutes used by Osama Bin Laden to coordinate and carry out Al Qaeda's attacks against the United States. Ex. 5, Youssef Rpt. 104-5; Ex. 420, US v. bin Laden Ex. 592 (showing Khaleel's address in Columbia, Missouri when he purchased the phone for Bin Laden); Ex. 689, U.S. v. Osama Bin Laden, S(7) 98 Cr. 1023, (S.D.N.Y), May 1, 2001, Tr. at 5290:3 – 5292:20. | The document states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." Pls. Ex. 2NN (EO 3481).<br><br>Plaintiffs did not question Al Sudairy at his deposition about Khaleel.<br><br>Khaleel appears to have purchased a satellite telephone in October 1997, for Khalid Al Fawwaz, who was living in London at the time. Al-Fawwaz was a member of Al Qaeda and forwarded the telephone to Osama bin Laden, who used it until August 1998. Pls. Ex. 420 (Inmarsat-M LMES Registration). There is no evidence that Khaleel knew that al-Fawwaz was an al Qaeda member at the time of his purchase. In any event, this purchase was made three years before Al Sudairy moved in with Khaleel and there is no evidence that Al Sudairy knew about it.<br><br>Khaleel's phone purchase was first disclosed at the Osama bin Laden trial on March 20, 2001, well after Al Sudairy had lived with him. Pls. Ex. 689 (Bin Laden Trial Tr.) at 3028. *See* KSA Ex. 167 (Sageman Rep.) 505-506. "The choice of two Arabic speaking young men to room together in a small midwestern town is . . . not unusual . . . and does not implicate al-Sudairy as sympathetic to AQ . . . ." *Id.* |
| 1066. | Khaleel also "managed wire transfers from IARA [the Islamic American Relief Agency] to a [sic] bank accounts controlled by UBL [Osama Bin Laden]." Ex. 566, FBI 11764. | Plaintiffs Exhibit 566 (FBI 11764) is inadmissible hearsay. *See* Objections Chart.<br><br>It does not cite any support for this assertion. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1067. | Until 1999, the Islamic American Relief Agency was known as the Islamic African Relief Agency. According to the U.S. Treasury Department, the "U.S.-based branch" of the organization "is located in Columbia, Missouri, and was founded in 1985 as the 'Islamic African Relief Agency, United States Affiliate.' In 1999, the charity substituted 'American' for 'African' in its name." Ex. 5, Youssef Rpt. 104, n. 426. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) contains this assertion, but the cited weblink in note 426 at 104 of his report does not bring up either the Islamic African Relief Agency or the Islamic American Relief Agency. It simply links to the home site at the Department of Treasury. |
| 1068. | The U.S. Treasury designated IARA in October 2004 for its support of terrorism prior to the 9/11 Attacks, and specifically for supporting Al Qaeda, Osama Bin Laden, and AIAI, which MOIA propagator Omar Abdi Mohamed led in the U.S. Ex. 5, Youssef Rpt. 104; Ex. 19C, https://home.treasury.gov/news/press-release/js2025 (last accessed November 22, 2023). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The cited documents do not support Plaintiffs' assertions. The Department of Treasury did designate the Islamic African Relief Agency as a SDGT on October 13, 2004. *See* Pls. Ex. 19C (10/13/04 Dep't of Treasury Press Release), https://home.treasury.gov/news/press-releases/js2025. However, the Islamic African Relief Agency offices designated were located in Khartoum, Peshawar, Amman, and Ireland. The Department of Treasury statement did not implicate either Ziyad Khaleel or Omar Abdi Mohamed as suggested in Youssef's Report. Pls. Ex. 5 (Youssef Rep.) 104 n.427. |
| 1069. | Prior to the 9/11 Attacks, IARA's Los Angeles office listed phone number ██ ██-1250 as one of its office numbers. Ex. 5, Youssef Rpt. 104, n. 428. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. The document cited in note 428 at 104 of Plaintiffs Exhibit 5 (Youssef Rep.) is also inadmissible hearsay. |
| 1070. | That phone number ███████-1250 was listed in Bayoumi's handwritten address book and his January and October 2000 phone lists alternatively as the number for the Ibn Taymiyah Mosque, Fahad Al Thumairy, and the King Fahad Mosque. Ex. 12AA, MPS738_35 (Bayoumi handwritten address book); Ex.12BB, MPS 688_9 (Bayoumi "green folder" including January 2000 phone list) and Ex. 421, FBI 348 (Bayoumi October 2000 phone list), both showing "Masjid Al Malik Fahad", *i.e.* the King Fahad Mosque. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688), and 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | These exhibits states that the number for the Masjid Al Mailk Fahad is ███████ 1250. |
| 1071. | One FBI report states that Sudairy "attended [an] intensive English program" but that "faculty members were suspicious of him since he didn't appear interested in learning English and his peers believed that he was a Saudi Arabian intelligence agency officer." EO 0632. Two of Sudairy's teachers in Columbia, Missouri testified that Sudairy did not regularly attend classes and left for weeks at a time and acted so suspiciously that they called the FBI. Ex. 77, Chmielewski Decl. 2-3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2M (EO 632) is inadmissible hearsay.

Undisputed that Plaintiffs Exhibit 77 (Chmielewski Decl.) contains this language. |
| **XIV.B.** | **Sadhan and Sudairy are hosted by Thumairy and Bayoumi and went to the locations where the hijackers ultimately lived in California and met the persons who were responsible for them.** | Al Sadhan and Al Sudairy were not hosted by Al Thumairy or Al Bayoumi. |
| 1072. | Sadhan and Sudairy used their special Saudi government work passports to enter the U.S. Ex. 99, Sadhan Dep. 60:10-11; Ex. 119, Sudairy Dep. 181:21-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Al Sadhan and Al Sudairy testified that they traveled on government special passports. This testimony, however, does not support the assertion |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | in the title of this Section that they were "hosted Thumairy and Bayoumi," nor does it discuss any of their activities in Southern California. |
| **XIV.C.** | **Sadhan and Sudairy hold a prearranged meeting with Thumairy and see the new King Fahad Mosque in Los Angeles, where the 9/11 hijackers will be received.** | Al Sadhan and Al Sudairy did not have a pre-arranged meeting with Al Thumairy. |
| 1073. | Sadhan and Sudairy had advance arrangements to meet with Thumairy upon their arrival in the U.S. The FBI recorded that on his I-94 immigration form to enter the U.S., Sadhan listed Fahad Al Thumairy's phone number as his contact inside the U.S. Ex. 2, EO 0629. | Plaintiffs Exhibit 2M (EO 569) is inadmissible hearsay. The cited document is a purported summary, not the I-94 immigration form itself, and does not state what number was listed. Accordingly, there is no way to test the identification of Al Thumairy's number. Al Sudairy testified that he got several numbers and addresses from the Ministry of Islamic Affairs archives, which were printed for him on paper, and he took it with him on the trip. Pls. Ex. 119 (Sudairy Tr.) 135:3-10. Both AL Sadhan and Al Sudairy testified that they did not make any arrangements beforehand to meet Al Thumairy in Los Angeles. Pls. Ex. 99 (Sadhan Tr.) 383:6-21 (also testifying that Al Thumairy never gave them instructions to do anything and vice versa); Pls. Ex. 119 (Sudairy Tr.) 363:19-364:12 (same). Al Thumairy testified that he does not recall Al Sadhan or Al Sudairy visiting him in Los Angeles just prior to Ramadan 1419 and that he "do[es]n't know them." Pls. Ex. 107 (Thumairy Tr.) 301:12-18. |
| 1074. | Before this documentary evidence was produced, Sudairy and Sadhan both falsely claimed they had not planned to meet Thumairy. | Plaintiffs cite no support for the assertion in this paragraph. Both Al Sadhan and Al Sudairy testified that they had not planned to meet Al Thumairy in advance. Pls. Ex. 99 (Sadhan Tr.) 151:15-19 (testifying that he met Al Thumairy "accidentally during … one prayer."); *Id.* at 383:6-21 (also testifying that Thumairy never gave them instructions to do anything and vice versa); Pls. Ex. 119 (Sudairy Tr.) 363:24-364:3; 363:19-364:12 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy testified that he does not recall Al Sadhan or Al Sudairy visiting him in Los Angeles just before Ramadan 1419 and "do[es]n't know them." Pls. Ex. 107 (Thumairy Tr.) 301:12-18. |
| 1075. | Sadhan claimed that they arrived in Los Angeles and he "wanted to visit the King Fahad Mosque." When asked why, Sadhan said he "[j]ust felt like it" but had "[n]o" reason to visit the Mosque. When asked what he had heard about the Mosque he claimed "[n]othing." Ex. 99, Sadhan Dep. 59:2-14. | Undisputed that Al Sadhan provided this testimony. |
| 1076. | The King Fahad Mosque was closed when Sadhan and Sudairy arrived, so they next went to the Ibn Taymiyah Mosque. Ex. 99, Sadhan Dep. 59:15-22. Sadhan could not recall how they found the Ibn Taymiyah Mosque. Ex. 99, Sadhan Dep. 55:9-17 (went to Ibn Taymiyah); Ex. 99, Sadhan Dep. 62:8-24 (Sadhan and Sudairy took a taxi but don't remember where). Sadhan claimed that he met Thumairy "[a]ccidentally . . . during one prayer." Ex. 99, Sadhan Dep. 151:15-19. After prayer, the three men had dinner together. Ex. 99, Sadhan Dep. 66:2-5; Ex. 119, Sudairy Dep. 100:21-104:13, 105:8-21. | Undisputed that Al Sadhan provided this testimony. |
| 1077. | Thumairy claimed to have no recollection of Sadhan or Sudairy, even though | Al Thumairy testified that he had no recollection of Al Sadhan or Al Sudairy. Pls. Ex. 107 (Thumairy Tr.) 301:12-18. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | documents, phone calls, and Bayoumi's testimony show that Thumairy coordinated with Bayoumi and the Embassy concerning the two propagators and hosted them in Los Angeles. Ex. 107, Thumairy Dep. 301:7-18 (asked about the visit of Sadhan and Sudairy, Thumairy stated "I don't remember, and I don't know them"). | Plaintiffs cite no support for the assertion in this paragraph for the assertion that Al Thumairy coordinated with Al Bayoumi and the Embassy with respect to Al Sadhan's and Al Sudairy's visit. Al Sudairy and Al Sadhan both testified that Al Bayoumi did not assist them while they were in San Diego. Pls. Ex. 119 (Sudairy Tr.) 367:17-24; Pls. Ex. 99 (Sadhan Tr.) 387:1-4. |
| 1078. | Sadhan acknowledged that Fahad Al Thumairy was a "known name" within MOIA, and Sadhan had learned about Thumairy from his immediate supervisor, Saud Al Ghudaian, and Ghudaian's superior, MOIA Deputy Minister Abdulaziz Ammar. Ex. 99, Sadhan Dep. 154:20-155:24. Sadhan confirmed that Ammar was the "boss of my boss [Ghudaian]." Ex. 99, Sadhan Dep. 155:21-24. | At his deposition, Al Sadhan testified that he had heard about Al Thumairy and had learned about him through his colleagues in the department. Pls. Ex. 99 (Sadhan Tr.) 154:4-15. He did not recall which colleagues at work, but it could have been Saud Al Ghudaian, his boss, or it could have been Al Ammar, the deputy minister. Pls. Ex. 99 (Sadhan Tr.) 154:23-155:20. Plaintiffs state that Al Sadhan had "learned about" Al Thumairy in advance, but the testimony makes it clear that this was only a possibility. Pls. Ex. 99 (Sadhan Tr.) 154:23-24, 156:5-6.<br><br>Al Sadhan testified that Al Thumairy never provided him with directions to do anything and that he never provided Al Thumairy with any instructions and that after meeting Al Thumairy once at the mosque in Los Angeles in 1998, he never spoke to Al Thumairy again. Pls. Ex. 99 (Sadhan Tr.) 383:14-21; 384:-3. |
| 1079. | Sadhan and Sudairy's testimony regarding their time in Los Angeles is not credible given their admitted inability so speak English while they traveled in the United States. Sadhan claimed they took "[p]ublic" transportation such as "[b]uses," which he also claimed they used "many times…" to | This paragraph contains attorney argument, and no response is required.<br><br>The cited testimony does not support Plaintiffs' assertions. It is quite common for tourists in a foreign country to take public transportation even though they do not speak or read the local language. Al Sadhan testified many times that he did not specifically recall how he got around in Los Angeles. Pls. Ex. 99 (Sadhan Tr.) 62:10, 62:20, 62:24, 63:3, 66:12, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | get around Los Angeles. He also claimed they took a taxi but could not remember where they travelled by either bus or taxi. Sadhan and Sudairy also found a motel (which they could not identify) and located the King Fahad Mosque, the Ibn Taymiyah Mosque, and the Saudi Consulate, without any help. Ex. 99, Sadhan Dep. 62:8-63:3, 66:9-70:13, 99:10:16 (stayed in motel). | 67:2, 67:5, 67:8, 69:2-3. Furthermore, this was not Al Sadhan's first trip to the United States as he had already been a Ramadan Imam the previous year in Little Rock, Arkansas. He therefore had some familiarity with the United States by the time of his trip to Los Angeles in December 1998. |
| 1080. | Because the Kingdom did not produce documents about Sadhan and Sudairy or their assignment by MOIA to visit California, and the FBI did not produce the information that Sadhan's I-94 form listed Thumairy's phone number until the EO production, Plaintiffs did not have an opportunity to properly question Sadhan and Sudairy about their advance plans to meet with Thumairy. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia produced many documents concerning Al Sadhan and Al Sudairy and their visit to California. *See*, *e.g.*, Pls. Ex. 59 (Sadhan Ex. 498); Pls. Ex. 60 (Sadhan Ex 500); KSA Ex. 221 (KSA 7885).<br><br>As set forth above, Al Sadhan and Al Sudairy did not have advance plans to meet Al Thumairy. Pls. Ex. 99 (Sadhan Tr.) 151:15-19 (testifying that he met Al Thumairy "accidently … during one prayer."); Pls. Ex. 119 (Sudairy Tr.) 363:24-364:3. Al Thumairy testified that he does not recall Al Sadhan or Al Sudairy visiting him in Los Angeles just prior to Ramadan 1419 and that he "do[es]n't know them." Pls. Ex. 107 (Thumairy Tr.) 301:12-18. |
| 1081. | Plaintiffs' expert Youssef concluded, based on his knowledge of Saudi Government | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | operations, that Sadhan and Sudairy were instructed to meet "with Thumairy immediately upon their arrival in Los Angeles to discuss their mission." Ex. 5, Youssef Rpt. 107. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The assertion in Youssef's Report is unsupported speculation. Youssef has never been an employee of the Ministry of Islamic Affairs and does not purport to be an expert on that Ministry. |
| 1082. | As MOIA's lead official in California, Thumairy "would have been informed in advance that two MOIA Propagators were assigned to work in Thumairy's area of responsibility." Ex. 5, Youssef Rpt. 107. In arriving at this conclusion, Plaintiffs' expert Youssef reasoned that "Sudairy and Sadhan flew directly to Los Angeles, rather than San Diego, …and the first person they met upon arrival in California was Thumairy." *Id.* The record of Sadhan's I-94 immigration form, as well as Bayoumi's photographs and videos of the two men in San Diego discussed below, confirm Youssef's opinion. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Al Thumairy was not the Ministry of Islamic Affairs' "lead official" in California. He testified that he did not supervise any California propagators. Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. Nor is there any evidence that he had responsibility for supervising visiting Ramadan preachers. None of the photographs or videos of the two men in San Diego indicate that Al Thumairy would have been informed in advance of their arrival. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Sadhan and Al Sudairy both testified that they did not have advance plans to meet Thumairy. Pls. Ex. 99 (Sadhan Tr.) 151:15-19 (testifying that he met Al Thumairy "accidentally … during one prayer."); Pls. Ex. 119 (Sudairy Tr.) 363:24-364:3. Al Thumairy testified that he does not recall Al Sadhan or Al Sudairy visiting him in Los Angeles just prior to Ramadan 1419 and "do[es]n't know them." Pls. Ex. 107 (Thumairy Tr.) 301:12-18. |
| 1083. | Sadhan's and Sudairy's false testimony that they met Thumairy by accident, in light of the I-94 record and the evidence of the coordination among Bayoumi, Thumairy, Sowailem, and the Islamic Affairs Department in advance of their visit, evidences their attempt to conceal the purpose of their trip. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs cite nothing to support this attorney argument.

There is no evidence that the testimony of Al Sadhan or Al Sudairy is false or that they attempted to conceal the purpose of the trip. To the contrary, the purpose of their trip was well known, the Ramadan Imamate at the Al Madina Mosque, and they successfully accomplished their imamate mission. Pls. Ex. 99 (Sadhan Tr.) 389:8-15; Pls. Ex. 119 (Sudairy Tr.) 358:7-12.

Nor is there any evidence of coordination among Al Bayoumi, Al Thumairy, Al Sowailem, and the Embassy Islamic Affairs Department in advance of their visit. The evidence shows that the only coordination is that the Al Madina Mosque requested a Ramadan Imam, and the request went to Al Sowailem, who coordinated the assignment with Al Sudairy on the telephone. Pls. Ex. 119 (Sudairy Tr.) 49:20 – 52:4; 63:17-65:11; |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 71:12-20; 79:7-81:13. There is no evidence that Al Thumairy was involved at all in the process. |
| XIV.D. | **Thumairy, Bayoumi, the Saudi Embassy, and the Saudi Consulate coordinated to move Sadhan and Sudairy from Los Angeles to San Diego, in preparation to do the same for the 9/11 hijackers.** | Plaintiffs fail to cite any record evidence in support of this assertion.<br><br>As the responses to following paragraphs demonstrate, the evidence shows that there had been no coordination for the 1419H Ramadan imams move from Los Angeles to San Diego or that they knew anything about the future trip of the 9/11 hijackers a year later.<br><br>In fact, the consensus among scholars and intelligence officials, including Plaintiffs' own expert Brian Jenkins who reviewed the 9/11 operation for the plaintiffs, KSA Ex. 222 (Jenkins Rep.) 23-24, is that Osama bin Laden approved what became the 9/11 operation in March or April 1999, four or five months after the 1419H Imamate Program. *See also* KSA Ex. 163 (9/11 Rep.) 154; KSA Ex. 223 (*Masterminds of Terror*) at 114 (KSM's interview with Yosri Fouda in September 2002 before his capture); Pls. Ex. 31 (KSM Statement, after his capture, consistent with his pre-capture statement) at 4; KSA Ex. 167 (Sageman Rep.) 123-25.<br><br>According to the CIA review of the 9/11 Plot, the crucial planning meeting (attended by Al Hazmi) occurred in Qandahar in November-December 1999. Pls. Ex. 82 (CIA 256). It is not plausible that casing of an area was done before the approval of an operation, whose details were worked out almost a year later. All the evidence shows that Al Sadhan and Al Sudairy traveled to California to simply perform the 1419H Imamate at the Al Madina Mosque. There is no evidence that the trip was in preparation for the future trip of the hijackers more than a year later.<br><br>Furthermore, this Section title suggests that there was some sort of coordination between the Saudi Embassy, the Saudi Consulate, other |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | entities of the Saudi Arabian government and al Qaeda in the form of the 9/11 hijackers. There is no evidence of this. In 1998, the relationship between the KSA government and al Qaeda was one of overt hostility. Osama bin Laden had been stepping up his statements condemning the Saudi royal family. Pls. Ex. 3 (FBIS Report: Compilation of Usama Bin Ladin Statements) at 4-103; KSA Ex. 224 (*Letters from bin Laden*) (statements 7-20, especially statement 16, directed at Prince Sultan, Al Bayoumi's boss at the Saudi Presidency of Civil Aviation). <br><br> Moreover, the Saudi Arabian government, through Prince Turki, the chief of the Saudi Arabian external intelligence agency, was negotiating in the summer of 1998 with the Taliban government of Afghanistan to extradite bin Laden back to the KSA for him to stand trial. When the Taliban refused, the KSA government downgraded its diplomatic relationship with the Taliban. KSA Ex. 225 (*The Afghanistan File*) at 166-180. <br><br> This dispute between Saudi Arabia and the Afghan Taliban government, which happened in September 1998, three months before the 1419H Ramadan Imamate mission to San Diego, is confirmed in the United States State Department cable traffic at the time (September 28, 1998). Pls. Ex. 134 (9/28/98 State Dep't Cable Islamabad). During the late 1990s, the Saudi Arabian government conducted several waves of crackdowns in Saudi Arabia when bin Laden supporters in Saudi Arabia were arrested and even an alleged KSA attempt to assassinate bin Laden. The expert consensus on the hostility between Saudi Arabia government and al Qaeda, especially bin Laden, including financial sanctions imposed on him, during late 1998 is well documented in KSA Exhibit 167 (Sageman Rep.) 73-120. |
| 1084. | Bayoumi's phone usage after the arrival of Sadhan and Sudairy demonstrates the | Plaintiffs fail to cite any support for this assertion. There is no evidence of any advance coordination. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "advance coordination" that he described in his correspondence with Thumairy, and with the Saudi Embassy's most senior religious officials. | |
| 1085. | On December 16, 1998, the day after the arrival of Sadhan and Sudairy, Bayoumi made two calls to the Saudi Consulate at 3:23pm (2 mins.) and 3:26pm (6 mins.). Ex. 12L (Bayoumi calls to Saudi Consulate). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>The evidence does not show exactly when Al Sadhan and Al Sudairy arrived in Los Angeles. Plaintiffs speculate that they arrived in Los Angeles on December 15, 1998. Al Sadhan testified that "[w]e arrived before Ramadan by a day or two." Pls. Ex. 99 (Sadhan Tr.) 60:20-23. Since Ramadan 1419H started on December 19, 1998, KSA Ex. 69, this would make the arrival of the two imams in Los Angeles on December 17 or 18, 1998, after Plaintiffs allege the calls from Al Bayoumi to the Consulate took place. <br><br>Plaintiffs Exhibit 12L is an improper summary exhibit. *See* Objections Chart. Plaintiffs Exhibit 12L shows that telephone number ███-3142 called the Los Angeles consulate twice on December 16, 1998, at 3:23 PM for two minutes and at 3:26 PM for six minutes. This telephone number is not Al Bayoumi's number but the Al Madina Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *Id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). These calls could have been made by anyone. |
| 1086. | Both Sadhan and Sudairy stated they went to the Consulate that day, and it is likely that Bayoumi called the Consulate to speak with them or to a Consulate official about their arrival. Ex. 119, Sudairy Dep. 120:13-121:9; Ex. 99, Sadhan Dep. 59:23-60:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited testimony is that Al Sudairy did not know when they went to the Consulate, Pls. Ex. 119 (Sudairy Tr.) 122:5, and Al Sadhan testified that they arrived in Los Angeles a day or two after December 16, 1998. Pls. Ex. 99 (Sadhan Tr.) 60:22–23.

The statement "it is likely that" Al Bayoumi called the consulate to speak with them or an official about their arrival is speculation. As set forth in the Response to Averment paragraph 1085, the number that called the consulate was a number belonging to the Al Madina Mosque, which anyone could use. Moreover, the timing of the call was just before Ramadan. The consulate provided religious material to the Al Madina Mosque, which could explain the reason for the call.

The Al Madina Mosque telephone called the consulate several times before December 16, 1998 – twice on November 18, 1998, at 1:45 PM for 22 minutes and at 2:12 PM for 4 minutes; and twice on December 2, 1998, at 4:00 PM by fax and at 4:01 PM for 10 minutes; and on December 9, 1998, at 2:29 PM for 7 minutes. The same number continued to call the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | consulate after Al Sadhan and Al Sudairy's departure, for instance on January 26, 1999, at 12:07 PM for 4 minutes. Pls. Ex. 12L. This further suggests that the on December 16 did not relate to Al Sadhan or Al Sudairy. |
| 1087. | Later that same day, at 7:27pm (1 min), Bayoumi placed a call from his Mosque phone to Thumairy's home phone. This is the first known phone contact between Bayoumi and Thumairy. Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12K (Bayoumi calls to Saudi Embassy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
|  |  | Plaintiffs Exhibits 12B and 12K are improper summary exhibits. *See* Objections Chart. |
|  |  | Plaintiffs Exhibit Ex. 12B shows that telephone number ███-3142 made the call referenced in this paragraph. This telephone number is not Al Bayoumi's number but the Al Madina Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *Id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). The call could have been made by anyone. |
|  |  | Plaintiffs Exhibit 12K also misattributes to Al Bayoumi 48 calls that were made from a publicly available phone line at the Al Medina Mosque. In |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | addition, Plaintiffs Exhibit 12K contains 3 duplicate entries on February 3, 2000 at 12:11 pm and on March 22, 2000 at 8:39 am and 8:41 am. Plaintiffs Exhibit 12K also misstates the recipient's number of a call made on March 10, 2000 at 12:27 pm. The call was made to 2022988813, not 2023423700 as stated in Plaintiffs Exhibit 12K. *Compare* Pls. Ex. 12K (citing FBI 3253) *with* KSA Ex. 117 (FBI 3253). |
| 1088. | Sudairy claimed that he and Sadhan stayed in Los Angeles for "A few days. Exactly how many, I don't remember." Ex. 119, Sudairy Dep. 99:11-14. Sadhan said it was "about two days" and they did "nothing." Ex. 99, Sadhan Dep. 60:12-19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed. The full quote from Al Sadhan's deposition to the question of what they did in Los Angeles was, "Nothing. Nothing not normal." Pls. Ex. 99 (Sadhan Tr.) 60:18-19. |
| 1089. | On December 18, 1998 at 11:34am, a call was placed from Bayoumi's Mosque Office phone to the Saudi Embassy Islamic Affairs number (15 mins.). Ex. 12K (Bayoumi calls to Saudi Embassy). Bayoumi would have spoken to either Islamic Affairs Department Deputy Jarrah or MOIA Office Head Sowailem. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12K is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 1087.<br><br>Plaintiffs Exhibit 12K shows that telephone number ▮▮▮▮-3142 made the call referenced in this paragraph. This telephone number is not Al Bayoumi's number but the Al Madina Mosque office number, which was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | available for all. The "phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate." Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; "I had a telephone in my office, and there was a telephone in another office. But it's the same line." *Id.* at 784:9-785:11. The call could have been made by anyone.<br><br>The call was made to a number affiliated with the Saudi Embassy. There is no evidence of who was on the receiving end of the call. Even Plaintiffs' own Exhibit 12K states that "Khalid al Sowailem *or* Abelaziz al Saleem" (emphasis added) was the recipient and does not state that Al Jarrah received the call. |
| 1090. | Both Sadhan and Sudairy stated that they spoke with Sowailem about going to San Diego. Ex. 99, Sadhan Dep. 74:7-13; Ex. 119, Sudairy Dep. 64:17-65:11. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Sadhan and Al Sudairy gave this testimony. |
| 1091. | Bayoumi was in contact with Jarrah about the Al Madinah Mosque at this time, and he had just secured funding for the Mosque from the Saudi Embassy through the Islamic Affairs Department. Ex. 5, Youssef | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Rpt. 92 ("He spoke to and wrote Musaed al Jarrah, the Deputy who was running the Embassy's Islamic Affairs Department."); Ex. 12K (Bayoumi calls to Saudi Embassy). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) describes July 1998 correspondence, not correspondence in December 1998. Pls. Ex. 5 (Youssef Rep.) 92. The Al Madina Mosque was being inaugurated in July 1998 and required furniture and religious material. Al Bayoumi contacted Al Jarrah with respect to these requests. Pls. Ex. 120 (Bayoumi Tr.) 157:7-158:2; KSA Ex. 102 (FBI 1343). There is no evidence that Al Bayoumi ever discussed Al Sadhan or Al Sudairy with Al Jarrah.<br><br>Plaintiffs Exhibit 12K is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 1087. |
| 1092. | Bayoumi placed calls to phone numbers in Saudi Arabia for Sadhan's family home on December 19, 1998, at 5:39pm (1 min.) and to Sudairy's family home at 5:46pm (2 mins.), evidencing Sadhan and Sudairy's afternoon arrival. The first call was placed to the same number that Bayoumi entered in his handwritten address book for Adel Al Sadhan in Saudi Arabia ██████ 2849). Ex. 12AA, MPS738_24R. That same number is also in Bayoumi's January and October 2000 phone lists. Ex. 12BB, MPS 688_9 (January 2000) and Ex. 421, FBI 345 (October 2000), both showing "Adel | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that Al Bayoumi placed calls to Al Sadhan's family or Al Sudairy's family in the afternoon of December 19, 1998.<br><br>Plaintiffs Exhibit Ex. 44 (Riyadh Telephone Directory) is unauthenticated hearsay. Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688), and 421 (FBI 345-49) are inadmissible hearsay. The Youssef Report should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Assduhan [sic].". Youssef identified this number from a 1998 copy of a Riyadh phone book that he obtained when he was in Saudi Arabia working as FBI Legal Attache. Ex. 44 (Riyadh Telephone Directory) (Sadhan Dep. Ex. 494); Ex. 5, Youssef Rpt. 102, n. 416. According to that Riyadh phone book, the number is subscribed to Mohamed Abdelrahman Mohamed Al Sadhan, whom Sadhan acknowledged was his father. Ex. 99, Sadhan Dep. 177:9-14. | The cited exhibit shows that a call was made from ▮▮▮▮-3142 to a number in Saudi Arabia. This telephone number is not Al Bayoumi's number but the Al Madina Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one telephone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *Id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line." <br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. <br><br>With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. <br><br>To the extent Plaintiffs are right that the Saudi numbers belonged to Al Sadhan's and Al Sudairy's famlies, it is far more likely that Al Sadhan or Al Sudairy made these phone calls in order to tell them that they arrived |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | safely and give them Ramadan greetings; given the 11 hours difference between San Diego and Riyadh in the winter, it was already Ramadan in Saudi Arabia.<br><br>This is further supported by the fact that there is no evidence that the mosque number called these numbers in Saudi Arabia prior to December 19, 1998, which further shows that there was no prior coordination. |
| 1093. | The arrival date of December 19, 1998, is also supported by the fact that the month of Ramadan started the next day, December 20, and that when asked if he "met [Bayoumi] before Ramadan had started" Sudairy answered: "Yes, about." Ex. 119, Sudairy Dep. 143:19-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited materials do not support Plaintiffs' assertion. As Al Sudairy testified, Ramadan starts once the crescent of the moon is seen, in the evening. Pls. Ex. 119 (Sudairy Tr.) 143:12-14. In 1998, this happened on the evening of December 19. KSA Ex. 69. |
| 1094. | Significantly, at 2:20pm on December 19, 1998, Bayoumi placed a call from Mosque office phone to Saad Al Habib (9 mins.) in Saudi Arabia. Ex. 5, Youssef Rpt. 103. Thus, Habib was in the chain of information about the two visiting propagators and while he coordinated with Bayoumi about Hamerman's visit to San Diego of Hamerman, who would occur 2 weeks later. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. See Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited exhibit shows that telephone number ███████-3142 made the call referenced in this paragraph. This telephone number is not Al Bayoumi's number but the Al Madina Mosque office number, which was available for all. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7 (the "phone in the masjid was open for all to make phone calls. There is one telephone phone in my office, and there is another telephone in the other office, and that was open for anyone to call, at any time, anyone. My presence would be once a week, once every other week or once a month. Otherwise, the telephone is open for everyone. . . . [O]ur students, Saudi students, would call the embassy, would call the consulate."); *Id.* at 784:9-785:11 ("I had a telephone in my office, and there was a telephone in another office. But it's the same line."). There is no evidence of who made this call.<br><br>There is no evidence that this call related in any way to Al Sadhan or Al Sudairy. Al Habib provided much of the money for the Al Madina Mosque, which had started operating a few months before Ramadan 1419H (*see* Pls. Ex. 11C video screenshot stamped at 24:16:01, which reads "MASJED AL-MADINAH AL-MUNAWARAH; Dedicated On June 25 1998 To Worship; GOD FROM SAAD AL-HABIB"). It is unsurprising that calls were placed to him from the mosque phone. There are other calls to the same number (for instance on July 27, 1998 twice; August 13, 1998; September 23, 1998; November 30, 1998; March 18, 1999). Plaintiffs' characterization of Al Habib as being "in the chain of information about the two visiting propagators" assumes the existence of such a "chain," which is unsupported. |
| 1095. | Sadhan claimed that he and Sudairy were taken from Los Angeles to a hotel in San Diego by a car provided by "one of the community members". Ex. 99, Sadhan Dep. 73:5- 74:13, 87:23-88:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1096. | Sudairy claimed he didn't know that they would be assigned to the Al Madinah Mosque until a day or two after he arrived in San Diego. Ex. 119, Sudairy Dep. 83:23-84:18. Sudairy said that he and Sadhan were driven from Los Angeles to San Diego and told to call MOIA's Embassy Office upon arrival for further instructions. Ex. 119, Sudairy Dep. 85:12- 86:17. When they arrived, they called the MOIA Office. Ex. 119, Sudairy Dep. 89:17-23. Sudairy claimed that "[a] day or two after" their arrival, they were contacted by someone from the Kurdish community from the Al Madinah Mosque to pick them up and bring them to the Mosque. According to Sudairy, that was the first time he knew he was going to the Al Madinah Mosque. Ex. 119, Sudairy Dep. 86:4-17, 127:15-18, 129:10-17, 139:19-140:7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Al Sudairy provided this testimony. |
| 1097. | Sadhan claimed that he had "no contact" with Bayoumi while in San Diego, "except saying hello after the prayer…." and then testified "I don't remember him [Bayoumi] clearly"; "I don't know his name except | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | from the news only…"; and that "I don't know the man [Bayoumi]." Ex. 99, Sadhan Dep. 90:4-91:20, 186:17-187:7. When asked if he had a plan to meet someone at the Mosque when he first went there, Sadhan testified: "I don't remember." Ex. 99, Sadhan Dep. 90:9-12. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, undisputed that Al Sadhan provided this testimony. |
| 1098. | Sudairy recalled meeting Bayoumi at the Mosque but could not recall seeing him anywhere other than the Mosque. Ex. 119, Sudairy Dep. 139:19-140:7, 148:1-149:17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph misstates Al Sudairy's testimony. Al Sudairy testified that he didn't remember exactly how many times he saw Al Bayoumi, but it was many times and it was "mostly at the mosque." Pls. Ex. 119 (Sudairy Tr.) 148:20-23. He never testified that he saw Al Bayoumi only at the mosque. |
| 1099. | Plaintiffs' expert Youssef concluded, based on his expertise, that the "visiting MOIA propagators Sadhan and Sudairy were shepherded from their visit with Thumairy in Los Angeles directly to their host in San Diego, Omar al Bayoumi," and that Sadhan and Sudairy knew that Omar Al Bayoumi was their host in San Diego. Ex. 5, Youssef Rpt. 108. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Plaintiffs' expert Youssef, who is an evangelical Christian and not a Saudi, has never gone on a Ramadan Imamate Program and has never claimed that he accompanied any propagator on a Ramadan missions. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12. His purported expertise does not extend to how Ramadan Imamate missions are accomplished or reading minds, like knowing "that Sadhan and Sudairy knew that Omar al Bayoumi was their host in San Diego." Youssef's statements are simply speculation. *See* KSA Ex. 167 (Sageman Rep.) 615-16.<br><br>Both Al Sudairy and Al Sadhan testified that they did not know Al Bayoumi in advance. Pls. Ex. 119 (Sudairy Tr.) 139:19-140:7; 364:17-365:8 (also testifying that Al Bayoumi never provided him with instructions and never discussed any of the 9/11 hijackers with him); Pls. Ex. 99 (Sadhan Tr.) 71:1-72:21; (testifying that he had no contact with Al Bayoumi prior to arriving at the Al Madinah Mosque); Pls. Ex. 120 (Bayoumi Tr.) 788:9-789:15 (testifying that he never gave instructions to or received instructions from Al Sudairy and Al Sadhan). |
| 1100. | This was reaffirmed by the MPS production, which contains a photograph found in Bayoumi's possession of Bayoumi and Sudairy in the lobby of the hotel where Bayoumi arranged for Sadhan and Sudairy to stay upon their arrival in San Diego, with travel brochures on a stand and an elevator. There is a date stamp on the photo of '21 12 98 – December 21, 1998.' As explained below, a later photo recovered by the MPS from Bayoumi taken at the Eid Al Fitr service on January 19, 1999 after the end of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence in the record that Al Bayoumi arranged for Al Sadhan and Al Sudairy to stay at the motel.<br><br>The cited photograph dated December 21, 1998, is missing from Plaintiffs Exhibit 11D. In any case, December 21 is two days after the visiting imams had arrived in San Diego (*see* response to averment paragraph |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ramadan shows the camera date stamp is accurate. Ex. 11D (MPS726 Photo Exhibit). | 1092 above) and does not indicate whether Al Bayoumi had arranged for their stay at this specific motel. There is no evidence that Al Bayoumi arranged this hotel for Al Sadhan or Al Sudairy. |
| 1101. | A second photo in Bayoumi's possession shows Bayoumi with Sudairy at an observation deck overlooking San Diego harbor. This photo has the same date stamp of 21 12 98 and was taken on the same day. Ex. 11D (MPS726 Photo Exhibit). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The cited picture is missing from Plaintiffs Exhibit 11D. |
| 1102. | Contrary to the testimony of Sadhan and Sudairy, and contrary to Bayoumi's claims that he could not recall where he first saw Sadhan and Sudairy or where they stayed in San Diego, the photos obtained by the MPS evidence that Bayoumi was acting as host for the two MOIA propagators in San Diego. Ex. 120, Bayoumi Dep. 230:24-231:3, 231:11-17 (when asked "[w]here did Sadhan and Sudairy stay when they were in San Diego?" Bayoumi claimed: "I don't remember. I don't remember."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, none of the cited photographs were included in Plaintiffs' exhibits. From their descriptions, they do not support Plaintiffs statements. It is natural to forget non-significant memories after 23 years, like where two individuals that one has limited interaction with stayed. Nor is there any indication in the evidence that Al Bayoumi acted as host for them. Showing visitors around at a new place is common courtesy and does not demonstrate that Al Bayoumi "hosted" them. |
| XIV.E. | **Bayoumi brings Sadhan and Sudairy to stay at the Lemon Grove rooming house** | Plaintiffs cite nothing to support his assertion. It is false that Al Bayoumi brough Al Sadhan or Al Sudairy to stay at the Lemon Grove house of Dr. Abdusattar Sheikh, who was an FBI informant. Nor was that Shaikh's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **of Dr. Abdussattar Shaikh, the future safe house for three 9/11 hijackers.** | home a "safe house." Sheikh in fact notified the FBI that two guests named Nawaf and Khalid were staying at his house. Pls. Ex. 131 (PEC-KSA 493, 567). |
| 1103. | Shortly after their arrival, Bayoumi arranged for Sadhan and Sudairy to stay at the small rooming house of Dr. Abdussattar Shaikh on ███████████. in Lemon Grove, CA. Dr. Shaikh told the FBI that it was Bayoumi who introduced Sadhan and Sudairy to him. Ex. 537, FBI 7339. The rooming house in Lemon Grove was located on a back flag lot accessible by a driveway off a residential street and was 7.5 miles away from the Al Madinah Mosque at ███████████ in El Cajon, CA. Ex. 694, Youssef Decl. ¶ 42. | Plaintiffs Exhibit 694 (Youssef Decl.) is inadmissible. Plaintiffs Exhibit Ex. 537 (FBI 7339) is inadmissible hearsay. *See* Objections Chart.<br><br>Another summary of an FBI interview of Shaikh that Plaintiffs proffer as an exhibit but do not cite states that "Shaikh also hosted two Saudi scholars, Mutaib Al-Sudairy and Adel Al-Sadhan. Shaikh stated the scholars stayed with him after he saw their suitcases in the office of the mosque and offered them a place to stay." Ex. 540 (FBI 7363). At his deposition, Al Sudairy remembered that the motel where he and Al Sadhan were staying was uncomfortable, and they looked for another place to stay, but it was difficult to make a reservation in San Diego at the time because of some large event. They inquired with the mosque community about housing at any price. As they were talking to the old Kurdish imam of the mosque, an Indian worshipper, Shaikh, heard the request and introduced himself. He offered to host them. Pls. Ex. 119 (Sudairy Tr.) 164:23-170:23.<br><br>Bayoumi testified that he did not arrange for Al Sadhan or Al Sudairy to stay with Shaikh and that he did not know that they were staying at Shaikh's house. Pls. Ex. 120 (Bayoumi Tr.) 227:15-228:8, 229:13-230:13. There is no admissible evidence to the contrary. |
| 1104. | Bayoumi knew Dr. Abdussattar Shaikh, had him for dinner at his home, and kept Dr. Shaikh's phone numbers in his handwritten address book. Ex. 120, Bayoumi Dep. | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 230:14- 18; Ex. 12AA, MPS738_61 ("Dr. Abdussattar" with number "██ 8808"). | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Undisputed that Al Bayoumi had Shaikh for dinner at his home. |
| 1105. | The FBI found a note in Bayoumi's Mosque office that Bayoumi prepared for Sadhan and Sudairy when they were sent to stay at Abdussattar Shaikh's house. The note had Bayoumi's business card as "General Supervisor" of the Mosque attached by tape, and included other information handwritten by Bayoumi in Arabic, including Dr. Shaikh's address and phone number, as well as information for the San Diego mosques visited by Sadhan and Sudairy. Ex. 574, FBI 004273. | Plaintiffs Ex. 574 (FBI 4273) contains Al Bayoumi's business card, information about several mosques, and contains the telephone number of "Dr. Abdulsattar." It was not, however, provided by Bayoumi to Al Sadhan or Al Sudairy. Al Bayoumi testified that this note was not provided to anyone and was taped "on the tables outside" of the Al Madinah mosque. Pls. Ex. 120 (Bayoumi Tr.) 240:3-241:5. Indeed, this note could not have been given to Al Sadhan or Al Sudairy since it was found when the FBI searched the Al Madina Mosque. |
| 1106. | Bayoumi claimed that this note was taped up at the Al Madinah Mosque as contact information in the event of an "extreme emergency." Ex. 120, Bayoumi Dep. 512:9- 514:3. | Undisputed that Al Bayoumi provided this testimony. There is no evidence to the contrary. |
| 1107. | Bayoumi's explanation is nonsensical, as there is no reason to provide Shaikh's home phone number to the Al Madinah Mosque community, and the information was in Arabic, which was not the language used by the Mosque's congregation. Ex 410, MPS43_225-225 at 225 (Bayoumi letter | Plaintiffs Exhibits 409 (MPS43_223) and 410 (MPS43_225) are inadmissible hearsay. *See* Objections Chart.<br><br>The assertions in this paragraph are incorrect. Al Bayoumi explained that Dr. Shaikh's phone number was on the note because it listed the mosques in the neighborhood and Dr. Shaikh led the Masjid Uthman bin Affan. Pls. Ex. 120 (Bayoumi Tr.) 241:14-18. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | states "99% of the worshippers are Kurds, most of whom don't know the Arabic language"); and Ex 409, MPS43_224-221 at 223 (Bayoumi letter states that it "doesn't make sense" for Al Haramain to provide a full-time Saudi, Arabic-speaking Imam "who does not speak the language of the people"). | Most of the Al Madina Mosque congregants were Iraqi Kurds. As Al Bayoumi testified at his deposition, "They didn't only speak Kurdish. Some people spoke Arabic. They could read simple things in Arabic, like Masjid Al-Madina Munawwarah, Dr. Abdussattar's name. These things could be read by them in Arabic. What I was talking is the inability to understand a sophisticated lecture in Arabic." Pls. Ex. 120 (Bayoumi Tr.) 513:18-514:3, 779:17-780:23 (further testifying that most of the congregants were Iraqi Kurds, and that Iraqis use the Arabic alphabet, and therefore would be able to read the note."). |
| 1108. | Bayoumi later arranged for hijackers Hazmi and Mihdhar to stay at Abdussattar Shaikh's house, just as he did for Sadhan and Sudairy, as shown by the note in the hijackers' lease records written by Bayoumi that listed Shaikh's address and phone number as the forwarding contact information for the hijackers. Ex. 91, Ratchford Decl. ¶ 17; Ex 551, FBI 8059. | It is incorrect that Al Bayoumi arranged for Al Hazmi and Al Mihdhar to stay at Shaikh's house. <br><br> Al Bayoumi was not even in the United States during the time when arrangements for Al Hazmi and Al Mihdhar were made for them to move in with Dr. Shaikh. He appears to have re-entered the United States via British Airways at Phoenix International Airport on May 31 2000, and his cell phone bills showed that his cell phone activity in the United States resumed on that date. KSA Ex. 42 (KSA 8000) (31 May 2000 exit stamp from the U.K. on Al Bayoumi passport); Pls. Ex. 2GG (EO 3911, 3933); KSA Ex. 226 (FBI 3267–71); *see also* KSA Ex.42 (KSA 8001) (United States entry stamp on Al Bayoumi's passport that appears to say "Jun X1, 2000: or "Jul X1, 2000"). <br><br> May 31 2000 is the last possible date that Al Hazmi and Al Mihdhar moved out of the Parkwood Apartments and moved in with Dr. Shaikh. *See* KSA Ex. 89 (FBI 8028) (rental receipt showing that the lease at the Parkwood Apartments ended on May 31, 2000, but that notice was given on May 1, 2000); Pls. Ex. 131 (PEC-KSA 566) ("[I]n May 2000 Hazmi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and Mihdhar began renting a room in the home of an FBI informational asset."). <br><br> Ms. Ratchford states in her declaration that she believes that Al Bayoumi provided a forwarding address for Al Hazmi and Al Mihdhar because she "recognized his handwriting from having seen it before." Pls. Ex. 91 (Ratchford Decl.) ¶ 17. Even if true, this does not imply that Al Bayoumi arranged for the future hijackers to stay with Dr. Shaikh, because Al Bayoumi was not in the country at the time. <br><br> Although hearsay, the FBI materials cited by Plaintiffs also contradict Plaintiffs' assertion. A summary of an FBI interview of Shaikh dated September 24, 2001 states that Shaikh met the hijackers at the end of May through an Islamic Center of San Diego employee, ▮▮▮▮" who introduced them to him. Dr. Shaikh had put up a notice at that mosque advertising that he took boarders. Al Hazmi, who spoke and understood some English, asked him if he would rent them a room at his house, and Dr. Shaikh agreed. *See* Pls. Ex. 538 (FBI 7345). |
| 1109. | The two MOIA propagators stayed at Abdussattar Shaikh's house for about four weeks during December 1998-January 1999. Ex. 99, Sadhan Dep. 100:6-101:5 (Sadhan recalls they stayed with Dr. Shaikh for "28 or 29 days."). | Undisputed. |
| 1110. | Sudairy recalled that he met Abdussattar Shaikh at the Al Madinah Mosque but could not remember if Bayoumi introduced him to Shaikh. Sadhan claimed that he and Sudairy met Shaikh by chance at the | Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque and told Shaikh they wanted to leave their motel to which Shaikh offered a place for them to stay at his home for no cost. Ex. 119, Sudairy Dep. 170:8-16; Ex. 99, Sadhan Dep. 99:2-101:5. | |
| 1111. | Sadhan and Sudairy's story is not credible. Dr. Abdussattar Shaikh did not regularly attend the Al Madinah Mosque in El Cajon, CA. Rather, he founded, ran, and lived nearby the Uthman Mosque over seven miles away in Lemon Grove, CA. Bayoumi testified that Dr. Shaikh "has the Masjid Uthman bin Affan" and when asked "Did he [Abdussattar Shaikh] attend the Masjid Madina?" Bayoumi responded: "Rarely. Rarely that I would see him there.". Ex. 120, Bayoumi Dep. 241:14-22. | As set forth above, all of the admissible record evidence establishes that Al Bayoumi did not arrange for Al Sadhan or Al Sudairy to stay with the FBI's informant, Abdussattar Shaikh. |
| **XIV.F.** | **Dr. Shaikh was hired to perform tasks for the Saudi government.** | Plaintiffs cite nothing in support of this assertion. To the contrary, the FBI has confirmed that Dr. Shaikh was an FBI informant, not a Saudi employee or agent. Pls. Ex. 131 (PEC-KSA 566) ("[I]n May 2000 Hazmi and Mihdhar began renting a room in the home of an FBI informational asset."). |
| 1112. | As described below, Bayoumi worked with Dr. Shaikh to provide secure lodging for individuals in San Diego for the Saudi government. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite nothing to support this assertion. Bayoumi did not work with Dr. Shaikh to provide lodging for anyone. The FBI has confirmed that Shaikh was an FBI informant, not a Saudi asset, and would provide the FBI with information about the individuals staying at his house. Pls. Ex. 131 (PEC-KSA 493, 566-67). |
| 1113. | The FBI reported that "Abdusattar Shaikh was a Saudiphile who strived to be included in Arabian society." Ex. 2, EO 0727. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2N (EO 727) is inadmissible hearsay. *See* Objections Chart.

Shaikh was an FBI informant and would provide the FBI with information about the individuals staying at his house. Pls. Ex. 131 (PEC-KSA 493, 566-567). There is no evidence that he had any connection to the government of Saudi Arabia. |
| 1114. | Saudi Arabia's claim that Dr. Shaikh "did not see anything unusual", KSA Aver. ¶ 144, but ignores Shaikh's admission to the FBI *after* the 9/11 Attacks that he had seen Bayoumi and the hijackers acting together in a suspicious manner:

In Shaikh's opinion if anyone knew of Al-Hazmi and Al-Mihdhar's plans to conduct a terrorist attack it would have been Al- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 540 (FBI 7364) and Plaintiffs Ex. 2H (EO 279) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi given the body language and hushed tones he used when speaking to Al-Hazmi and Al-Mihdhar which indicated to Shaikh a secret understanding.<br><br>Ex. 540, FBI 007362-REV2021 at 7364. Dr. Shaikh also admitted to the FBI that he believed that Bayoumi "was an Agent of the government of Saudi Arabia." Ex. 2, EO 0279. | The evidence shows that Dr. Shaikh did not see anything unusual at the time that Al Hazmi and Al Mihdhar were staying with him. The Department of Justice, Office of Inspector General concluded that: "After the September 11 attacks, the FBI interviewed the asset [Dr. Shaikh] and asked about the conduct and activities of Hazmi and Mihdhar while they were living with the asset. In those interviews, the asset described them as quiet tenants who paid their rent. He said they were good Muslims who regularly prayed at the mosque. . . . The asset insisted that he noted no indicators of nefarious activity by Hazmi or Mihdhar that should have resulted in his reporting their identities to the FBI." Pls. Ex. 131 (PEC-KSA 492). In a footnote, the review states, "The FBI opened an investigation after September 11 to determine whether the asset was involved in the attack. The asset has consistently maintained after September 11 that he had no suspicions about Hazmi and Mihdhar. The results of a polygraph examination on his potential role were inconclusive. Based on its investigation, however, the San Diego FBI concluded that the informational asset had not been complicit in plotting the attacks." *Id.* at 492 n.198; *id.* at 493 ("Stan [the FBI Special Agent handling Dr. Shaikh] reported that the asset had told him contemporaneously that two Saudi national visitors were residing in a room at his residence. Stan said that the asset merely provided the first names of the boarders, Nawaf and Khalid. . . . According to Stan, the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny.").<br><br>Plaintiffs Exhibit 2H (EO 279) is a preliminary Operation Encore document. The final conclusions of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1115. | Sudairy testified that while he and Sadhan were staying at Dr. Shaikh's home in December 1998 – January 1999, that Dr. Shaikh left them alone in his own home and travelled to Saudi Arabia. Ex. 119, Sudairy Dep. 254:5-19. After Sudairy returned to Saudi Arabia from San Diego, he hosted Dr. Shaikh in Riyadh in January 1999. Ex. 119, Sudairy Dep. 254:23-255:6. | Undisputed. |
| 1116. | Bayoumi's handwritten address book had a phone number for Dr. Shaikh in Saudi Arabia. Ex. 12AA, MPS738_60. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.

It is undisputed that Planiitffs Exhibit 12AA has a number for Shaikh in Saudi Arabia. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1117. | Dr. Shaikh maintained contact with MOIA propagators Sadhan and Sudairy long after they left California. On November 27 and 28, 1999 Dr. Shaikh called ███████6003" - the Oklahoma number Bayoumi had in his handwritten address book for Sadhan. Ex. 12AA, MPS738_34. On December 5, 1999, Dr. Shaikh called ███████-0998" – the Virginia number Bayoumi had in his handwritten address book for Sudairy. Ex. 12AA, MPS738_24; Ex. 575, FBI 9691. Sadhan testified that he ran into Dr. Shaikh in Riyadh, Saudi Arabia "[b]y chance" two or three years later. Ex. 99, Sadhan Dep. 164:5-165-1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. Otherwise undisputed. |
| 1118. | Bayoumi urgently corresponded with Sadhan and Sudairy in April 1999 to get approval from MOIA's Minister for a project for Dr. Shaikh's Mosque in Lemon Grove, CA, while Saudi Arabia was providing funding for other mosques in San Diego. Ex. 392, MPS43_218 (July 1998 letter requesting Saudi Embassy to make donation for Al Madinah Mosque "just as was done for the other mosques here.") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited exhibit is a letter written by Dr. Mahmoud Al Doski on July 10, 1998. There is no reference to any correspondence between Al Bayoumi and Al Sadhan and Al Sudairy in April 1999, months later. Plaintiffs fail to cite evidence of any such correspondence. |
| 1119. | Photographs show that in May 1999, Bayoumi brought Dr. Shaikh to Los | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Angeles to meet with two additional Saudi government officials: Khalil Al Khalil and Thumairy. Ex. 11E (MPS Photographs); Ex. 27, Madha Supp. Decl. ¶¶ 7-10. These photographs show that the Saudi officials did additional vetting of Dr. Shaikh ahead of his assignment to harbor the extremist operatives who would become the 9/11 hijackers. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 27 (Madha Suppl. Decl.) is inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 27 (Madha Suppl. Decl.) has been stricken. *See* ECF No. 9562.<br><br>Plaintiffs also mischaracterize the stricken Madha supplemental declaration. Madha recognizes Al Khalil and Al Thumairy in the videoclips. There is nothing about Dr. Shaikh.<br><br>Even if some of the pictures show Dr. Shaikh, these pictures do not show Shaikh with Al Thumairy, or that "Saudi officials did additional vetting of Dr. Shaikh ahead of his assignment to harbor" the future hijackers.<br><br>The FBI concluded that Shaikh was not involved in any way in the attack: "The FBI opened an investigation after September 11 to determine whether the asset [Abdussatar Sheikh] was involved in the attack. The asset has consistently maintained after September 11 that he had no suspicions about Hazmi and Mihdhar. The results of a polygraph examination on his potential role were inconclusive. Based on its investigation, however, the San Diego FBI concluded that the informational asset had not been complicit in plotting the attacks." Pls. Ex. 131 ((PEC-KSA 492 n.198); *id.* at 493 ("Stan [the FBI Special Agent handling Dr. Shaikh] reported that the asset had told him contemporaneously that two Saudi national visitors were residing in a room at his residence. Stan said that the asset merely provided the first names of the boarders, Nawaf and Khalid. . . . According to Stan, the asset |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | did not describe his boarders as suspicious or otherwise worthy of further scrutiny."). <br><br> This conclusion was also stated in the 9/11 Commission working papers. "The FBI has investigated Muppet [Dr. Shaikh] and has concluded that he did not have advance knowledge of the attacks." KSA Ex. 227 (*Workplan: Issues Relating to the FBI Informant with Whom 9/11 Hijackers Nawaf al-Hazmi and Khalid al-Mihdhar*) at 11. |
| 1120. | Saudi Arabia's general assertions that during the relevant time Dr. Shaikh was an "FBI asset or informant" KSA Aver. ¶ 141, are belied by the evidence of Dr. Shaikh's active relationship in 1998-2000 with agents of Saudi Arabia and MOIA. Further, there is no evidence that Dr. Shaikh told the FBI anything about Sadhan, Sudairy, Hazmi, Mihdhar, or Bayoumi before the 9/11 Attacks. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The evidence overwhelmingly shows that Shaikh was an FBI informant, which the FBI calls an asset. Plaintiffs Exhibit 131 – DOJ Office of the Inspector General, *A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (November 2004)* – devotes two complete sections to FBI informant or asset Shaikh (at PEC-KSA 491-493 & PEC-KSA 566-572). Shaikh had been an FBI asset since May 14, 1994, until his handler retired in February 2002. *Id.* at 491. <br><br> The 9/11 Commission Report, KSA Ex. 163 (9/11 Rep.) 223, also reports that Al Hazmi and Al Mihdhar's landlord had "long-standing, friendly contacts among local police and FBI personnel." <br><br> Plaintiffs' assertions that Shaikh did not tell the FBI anything about Al Hazmi or Al Mihdhar before the 9/11 attacks contradicted by evidence. The DOJ Office of Inspector General review of FBI handling of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | intelligence before 9/11 reported that Shaikh had told his FBI handler contemporaneously that two Saudi national visitors were residing in a room at his residence and their names were Nawaf and Khalid. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 262.<br><br>In addition, a working document from KSA Ex. 227 (Workplan: Issues Relating to the FBI Informant with Whom 9/11 Hijackers Nawaf al-Hazmi and Khalid al-Mihdhar), at 11, reveals that Shaikh's codename at the FBI was "Muppet."<br><br>The same document states, "The FBI agent handling 'Muppet' prior to the attacks was aware that Muppet had two Saudi roommates named 'Nawaf' and 'Khalid,'" refuting Plaintiffs' allegations that "there is no evidence that Dr. Shaikh told the FBI anything about . . . Hazmi [or] Mihdhar." *Id.* at 11. |
| 1121. | The evidence is clear that the Saudi government was providing Dr. Shaikh with paying tenants and potentially funding his Uthman Mosque. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs fail to cite anything supporting this assertion.<br><br>There is no evidence that the Saudi government was providing Dr. Shaikh with paying tenants. In fact, Dr. Shaikh hosted Al Sudairy and Al Sadhan for free for a few days. After three days they wanted to leave so as not to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | impose on him, but Dr. Shaikh insisted that they stay. So, they insisted on paying him for their stay, which is what happened. Pls. Ex. 119 (Sudairy Tr.) 165:9-20. |
| **XIV.G.** | **Bayoumi introduces Sadhan and Sudairy to the members of the local community that the hijackers would meet one year later.** | Plaintiffs fail to cite any evidence in support of this assertion. |
| 1122. | Bayoumi reported to MOIA's Minister Abdullah Al Turki that Sadhan and Sudairy visited not only the Al Madinah Mosque but the "Abu Bakr [ICSD] Mosque" that Hazmi and Mihdhar would later attend; the "Al Ribat Mosque" where Anwar Al Aulaqi was the Imam; and the Uthman Mosque that Dr. Sheikh founded and operated. Ex. 414, MPS 43_347. | Pls. Ex. 414 is inadmissible hearsay. *See* Objections Chart.<br><br>That document is a courtesy appreciation letter addressed to the Minister of Islamic Affairs and states that Al Sudairy and Al Sadhan visited the Masjid Al Ribat and Masjid Uthman, among other mosques to deliver "lessons and reflections." |
| 1123. | Aulaqi, like Sudairy, had close contacts with Al Qaeda agent, Ziyad Khaleel, who lived in Columbia, Missouri. The FBI opened an investigation into Aulaqi in 1999 after Aulaqi had been contacted by Khaleel. Ex. 566, FBI 11764 ("KHALEEL's phone contact with AULAQI was a key substantiation to the FBI opening an investigation of AULAQI in June of 1999….."). | Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>The cited material does not support Plaintiffs' assertion of fact. The document mentions a telephone contact, singular in the text, between Ziyad Khaleel and Anwar Al Awlaki, leading the FBI to open an investigation of Al Awlaki in June of 1999. A single contact does not imply "close contacts," plural or any degree of closeness.<br><br>As set forth in the Response to Averment paragraph 1065, there is no evidence that Khaleel was an Al Qaeda agent. He was involved in the purchase of a satellite telephone for Al Fawwaz in London, who was an Al Qaeda agent and forwarded the telephone to Osama bin Laden. There is no evidence that Khaleel knew that Al Fawwaz was an Al Qaeda agent. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Instead of implicating Al Awlaki with Al Qaeda, the evidence shows that the FBI closed its investigation into Al Awlaki the next year, strongly suggesting that there was nothing further derogatory towards Al Awlaki in its investigation. *See* KSA Ex. 228 (*Objective Troy: A Terrorist, a President, and the Rise of the Drone*) at 63. |
| 1124. | Bayoumi had photographs, obtained by the MPS, of Bayoumi and Sudairy on a mountain trip. The pictures show Bayoumi with his arm around Sudairy and holding hands with Sudairy. These pictures conclusively disprove Sudairy's testimony that he only saw Bayoumi at the Mosque. Ex. 119, Sudairy Dep. 148:24-149:3 (when asked "[w]here, other than the mosque, did you see him [Bayoumi]?" Sudairy responded "I don't remember other than the mosque.") Ex. 11D (MPS726 Photo Exhibit). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plantiffs cite no evidence that the individual photographed in Plaintiffs Exhibit 11D is Al Sudairy. However, even if it is, that does not disprove anything in Al Sudairy's testimony. Al Sudairy testified that in San Diego he saw Al Bayoumi "[m]any times. I don't remember exactly. Mostly at the mosque." Pls. Ex. 119 (Sudairy Tr.) 148:20-23. He never testified that he saw Al Bayoumi only at the mosque. |
| 1125. | Ghazi Ahmad, the Finance Director for the Al Madinah Mosque, is also included in the second photo. His inclusion is significant because Ahmad signed the paperwork for the donation received by the Mosque from the Saudi Embassy, and because Ahmad would be invited by Bayoumi to the welcome party for the 9/11 hijackers a little over a year later in February 2000. *See infra* 1680. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite no evidence that an individual cited in an unspecified photo is Ghazi Ahmad. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There was no "welcome party" for the 9/11 hijackers hosted by Omar Al Bayoumi. Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madinah Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7, 714:24-715:18; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). <br><br> The remainder of the assertions are attorney argument to which no response is required. |
| XIV.H. | **Saudi government employee, Sunni extremist leader, and Al Haramain operative Omar Hamerman returned to San Diego to meet with Bayoumi, Sudairy and Sadhan.** | Plaintiffs fail to demonstrate that Hamerman was an "extremist leader" or an "Al Haramain operative" |
| 1126. | On January 3, 1999, less than five months after Saudi Arabia sent Hamerman to San Diego as part of the Al Haramain delegation to visit the King Fahad Mosque, Hamerman was sent back to San Diego. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ Ex. 120, Bayoumi Dep. 277:20-278:5 (Bayoumi states that Hamerman was "with us" at the Mosque over Ramadan when MOIA propagators Sudairy and Sadhan were there). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit ▆▆▆▆▆▆ is inadmissible hearsay. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ <br><br> There is no evidence that the Saudi government "sent" him to San Diego. Nor does the cited hearsay FBI document mention anything about Al Sudairy or Al Sadhan, let alone that Hamerman being sent to San Diego to meet with them. The Al Bayoumi deposition also does not state that Saudi Arabia sent Hamerman to San Diego to meet with Al Sudairy or Al Sadhan. |
| 1127. | The MPS production contains photographs in Bayoumi's possession of Hamerman, who Bayoumi addressed as "Al-Amir" visiting the Al Madinah Mosque. Ex. 393, MPS 43_219. One of the photographs shows Bayoumi in a jacket and tie flanked by Hamerman to Bayoumi's right and MOIA propagator Sadhan to Bayoumi's left (looking at the camera). Ex. 5, Youssef Rpt. 88, n. 347. Ex. 11, MPS 726_149 (photo 302). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The cited material does not support Plaintiffs' assertion of fact. Pls. Ex. 393 (MPS 43_219) does not contain photographs, but a letter that does not mention Hamerman or Al Sadhan. MPS 43_219 is a bill for the Al Madinah Mosque. There is no evidence as to the identity of the individuals in Plaintiffs Exhibit 11D (MPS 726_149). <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 393 is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) cites a photo, however, Plaintiffs cite no evidence that the individuals in the photo are Hamerman or Al Sadhan. However, even if these individuals are in the photograph, that would only |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | mean that the individuals were present at the celebration of Eid al-Fitr 1419H (date stamp January 19, 1999).<br><br>None of this supports the assertion that Haramain was a Sunni extremist leader or Al Haramain operative. Nor does it show that the Saudi government sent him to San Diego to meet with Bayoumi, Sudairy and Sadhan. |
| **XIV.I.** | **Saudi Arabia and its state controlled "charity" organization Al Haramain arrange for extremist Sheikh Abdulrahman Barzanjee to lead services and meet Sudairy and Sadhan, and to install Barzanjee as Imam in preparation for the arrival of the 9/11 hijackers.** | There is no evidence supporting any of the assertions in this heading. |
| 1128. | In addition to Sadhan and Sudairy, a visiting Imam – Sheikh Abdulrahman Barzanjee – was leading prayer services at the Al Madinah Mosque during Ramadan 1419. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs also cite nothing for this assertion. To the extent a response is required, the statement is undisputed. |
| 1129. | Photographs and videotape found in Bayoumi's possession show Barzanjee at the Al Madinah Mosque in January 1999. On one video, Barzanjee can be seen delivering the sermon at the Al Madinah Mosque on Eid Al Fitr, the celebration | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | following the end of the month of Ramadan. Ex. 10D (MPS894-CLIP Video Exhibit) 58:22; Ex. 11D (MPS894-CLIP Video Screenshots). | Plaintiffs also cite nothing for this assertion. To the extent a response is required, Plaintiffs point to no evidence that the individual identified in the video is Barzanjee. |
| 1130. | Ramadan ended on January 18, 1999. The date of the Eid Al Fitr service was the first day of the next month, Shawwal, or January 19, 1999. This aligns with the date stamp on the photos from the same event recovered by the MPS. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this assertion is undisputed. |
| 1131. | As detailed below, the congregants at the Mosque were captured on the video and include various individuals who, together with Barzanjee, would be invited by Bayoumi to attend his welcome party for 9/11 hijackers Hazmi and Mihdhar in February 2000. Ex. 10D (MPS894- CLIP Video Exhibit) 54:08; Ex. 11D (MPS894-CLIP Video Screenshots); Ex. 694, Youssef Decl. ¶¶ 60-100. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Ex. 694 (Youssef Decl.) has been stricken. *See* ECF No. 9562.

Plaintiffs do not identify any specific congregants in the video.

There was no "welcome party" for the 9/11 hijackers hosted by Omar Al Bayoumi. Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madinah Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7, 714:24-715:18; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████ |
| 1132. | One of the congregants attending Barzanjee's sermon was Hamerman. Ex. 10D (MPS894-CLIP Video Exhibit) 59.17; Ex. 11D (MPS894-CLIP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs do not cite any evidence that Hamerman or Barzanjee appear in the video. |
| 1133. | Like Hamerman, Barzanjee was an Islamic extremist aligned with Al Qaeda's anti-U.S. world view. Barzanjee became the European leader of Ansar Al-Islam, an Al Qaeda ally which was designated a foreign terrorist organization by the U.S. on March 22, 2004. It was first designated under Executive Order 13224 on February 23, 2003 for providing a safe haven to Al Qaeda in Northern Iraq. Ex. 2, EO 0423, 2798-99, 3519; Ex. 150A, Kohlmann 2022 Rpt. ¶¶ 72-74. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 150A (Kohlmann Rep.) should be excluded. Plaintiffs Exhibit 2J (EO 423), Plaintiffs Exhibit 2X (EO 2798-99), and Plaintiffs Exhibit 2NN (EO 3519) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2PP states that "[t]he purpose of this communication is to consolidate information related to the involvement of personnel and entities controlled by the Saudi Arabian Government (SAG), the Embassy of the Kingdom of Saudi Arabia (EKSA) and its affiliates within the United States with the attacks of September 11, 2001 . . . . This report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479). Moreover, the document states that the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." Pls. Ex. 2PP (EO 3481).<br><br>The cited materials also do not support Plaintiffs' assertion of fact, and Plaintiffs quote from them selectively and misleadingly. Plaintiffs depict Sheikh Abdulrahman Barzanjee as an Islamic extremist, allegedly affiliated with Al Qaeda's world view. However, the cited document states, "in April 2006 and August 2006, [redacted] and NSA, respectively, informed the FBI that they no longer consider BARZANJEE a subject of interest." Pls. Ex. 2X (EO 2799).<br><br>Kohlmann repeated the allegation from Operation Encore, based on open sources (according to Pls. Ex. 2PP (EO 3519) that Barzanjee was the European chief of Ansar Al Islam. Pls. Ex. 150A (Kohlmann Rep.) 25-26 & n.138. As shown in KSA Exhibit 167 (Sageman Rep.) 510, Barzanjee was never a chief of Anwar al-Islam, which was led by Mullah Krekar, who was exiled in Norway, where Barzanjee happened to reside. Ansar Al Islam was formed in Northern Iraq in September 2001, more than two and a half years after Ramadan 1419H and more than a year and a half after the mid-February 2000 party. *Id.* at 299.<br><br>In 2006, the NSA and another organization cleared Barzanjee. KSA Ex. 229 (*Jihadism in Norway*) at 121–34. Plaintiffs' own exhibits, Pls. Ex. 67C, include the United Nations Security Council narrative on imposing sanctions on Ansar Al Islam. That document lists 19 people related to Ansar Al Islam, but Barzanjee is not among them. |
| 1134. | According to a U.S. Treasury Department and U.N. Security Council reports, the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ansar al Islam group "came into being with the blessing of Bin Laden," who "participated in the foundation and funding" of the group. Ex. 150A, Kohlmann 2022 Rpt. ¶26 n. 139; Ex. 67, U.N. Security Council on Ansar Al-Islam. Ansar al Islam had "close links to and support from Al- Qaida"; and "received training and logistical assistance from Al- Qaida." Ex. 67, U.N. Security Council on Ansar Al-Islam. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 150A (Kohlmann Rep.) should be excluded. Plaintiffs Exhibit 67C is inadmissible hearsay. *See* Objections Chart.<br><br>None of this material supports the assertion that Sheikh Abdulrahman Barzanjee is connected with Ansar al-Islam, *see* Response to Averment paragraph 1133, and in fact Plaintiffs Exhibit 67 lists 19 people related to Ansar al-Islam, but Sheikh Barzanjee is missing from the list. |
| 1135. | In less than a year, the joint efforts of Bayoumi, MOIA, the Saudi Embassy Islamic Affairs Department, together with Saad Al Habib and Hamerman (working for Al Haramain) would lead to the installation of Barzanjee as the Imam of the Al Madinah Mosque and make Barzanjee the senior religious cleric representing the Mosque at the welcome party Bayoumi hosted for the 9/11 hijackers. Ex. 10K, MPS2023-059 Video Exhibit, 13:28-43, 16:52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Ex. 10K (MPS2023-059) does not support Plaintiffs' allegations that the Ministry of Islamic Affairs, the Saudi Embassy's Islamic Affairs Department, Saad Al Habib, or Hamerman had any role any appointment of Sheikh Abdulrahman Barzanjee as the Imam of the Al Madinah Mosque and the senior cleric representing the mosque at any function. There is no evidence at all for any of these assertions.<br><br>There was also no "welcome party" for the 9/11 hijackers hosted by Omar Al Bayoumi. Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madinah Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7; 714:24- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 715:18; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). |
| 1136. | Documents found in Bayoumi's possession show that Barzanjee reported to Saad Al Habib, as Barzanjee wrote to Habib in January 2001 when he decided to relinquish his Imam position at the Al Madinah Mosque and leave the U.S. when certain of his family members were barred from entering the country. Ex. 418, MPS 95_114-116. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 418 (MPS 95_114-95_116) is inadmissible hearsay. *See* Objections Chart.<br><br>In any event, the letter does not support the assertion that Barzanjee reported to Saad Al Habib. Moreover, instead of relinquishing the imam position at Al Madina Mosque, Sheikh Barzanjee states that he will not seek to become the imam of the mosque because he could not bring his adult children with him to the United States. The discussion in the letter for the imamate is completely focused on Ramadan. The $2000 check is for Shawwal (the month after Ramadan). |
| 1137. | Photos in Bayoumi's possession include one of Bayoumi with his arms around MOIA propagator Sudairy and Barzanjee at the Al Madinah Mosque. The time stamp on the photo is "19 1 99", or January 19, 1999, which is the date of the Eid Al Fitr service conducted on the videotape. Ex. 11D (MPS Photographs). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite no evidence that the individuals in the photograph are the individuals they claim. |
| 1138. | Screenshots from videos recovered by the MPS show Bayoumi with Hamerman and Sudairy at the event. Ex. 10D, MPS894-CLIP Video Exhibit, 1:00:38-39; Ex. 11D, MPS894-CLIP Video Screenshots. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite no evidence that the individuals in the photograph are the individuals they claim. |
| 1139. | Further photos were taken inside Bayoumi's Mosque office, and in one photograph, Sudairy is sitting behind Bayoumi's desk, with Sadhan sitting facing the desk to the left. Ex. 11D (MPS Photographs). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite no evidence that the individuals in the photograph are the individuals they claim. |
| 1140. | In another photo, Bayoumi is sitting behind his desk, with Sadhan is sitting facing the desk (hand raised next to his face) and Hamerman is sitting behind Sadhan. Ex. 11D (MPS Photographs). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs cite no evidence that the individuals in the photograph are the individuals they claim. |
| 1141. | In another photo, three men including Sudairy (center) and Bayoumi (right) are standing together with a child, while Sadhan is standing to the left with his back to the camera. Ex. 11D (MPS Photographs). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite no evidence that the individuals in the photograph are the individuals they claim.<br><br>None of the pictures cited in paragraphs 1137-1141 support the assertion that Saudi Arabia and Al Haramain arranged for Barzanjee to lead the services at the Al Madina Mosque or that they arranged for him to meet the 9/11 hijackers. These are simply pictures depicting the service and celebration of Eid al-Fitr 1419H, more than a year before the future hijackers' arrival in San Diego. Nor do the pictures support the assertion that Sheikh Barzanjee is an extremist. |
| XIV.J. | MOIA Propagator Majed Mersal visited Thumairy in Los Angeles and would return to visit Bayoumi in San Diego the following year, immediately before the arrival of the 9/11 hijackers. | Al Mersal visited Los Angeles and San Diego as part of the MOIA imamate program. He was not sent to meet with Al Thumairy or Al Bayoumi. |
| 1142. | MOIA propagator Majed Al Mersal was a 1994 graduate of Imam University's branch in Qassim province who was assigned to visit the Ibn Taymiyah Mosque in Los Angeles for Ramadan 1419 when Sadhan | Undisputed. However, none of the cited documents mention Al Sadhan or Al Sudairy. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and Sudairy were visiting San Diego. Ex. 52, Mersal CV; Ex. 304, KSA 9557-58. | |
| 1143. | While all MOIA visiting propagators were instructed to file a "detailed report" about their trips, Mersal's 1999 report was the only one produced by Saudi Arabia. Ex. 141, KSA 9538 (requesting a "detailed report"). None of the 1999 reports of San Diego visiting propagators Sadhan and Sudairy or the 2000 reports of Los Angeles visiting propagators Jaithen and Mersal (when he returned to California to visit Bayoumi in San Diego) were produced. | Plaintiffs Exhibit 141 contains only a cover page with no actual exhibit attached.  It is false that all Ministry of Islamic Affairs propagators were instructed to file detailed reports about their trip.  Al Sudairy testified that he does not remember preparing a report, that he never prepared any reports for Ramadan program trips, and that he does not believe it would have been "usual course."  Pls. Ex. 119 (Sudairy Tr.) 356:20-357:9.  Al Sadhan testified that he does not believe he prepared reports for his prior Ramadan trips and that he was not asked to prepare a report for his trip to San Diego.  Pls. Ex. 99 (Sadhan Tr.) 42:5-42:8; 151:20-152:4.  There is no evidence to the contrary. |
| 1144. | Mersal claimed to not remember anything about this trip, which was his first to the U.S. Ex. 115, Mersal Dep. 92:3-14, 96:2-97:16, 100:18-101:2, 102:9-15, 107:2-8, 111:14- 112:18, 124:8-20, 137:19-138:1. | Plaintiffs are incorrect that Mersal claimed to remember nothing about this trip.  Mersal recalled and testified that it was a long flight, in economy class; he stopped over in New York on the way to Los Angeles; he went to a small motel where he could hear the TV in adjacent rooms; he slept for a long time immediately after arrival; he went to the King Fahad Mosque (although his after-action report, Pls. Ex. 304 (Ghudaian Ex. 444), stated it was the Ibn Taymiyyah Mosque); he first went to the mosque for prayer time; he met Sheikh Fahad Al Thumairy; he sometimes led prayers and was assisting the main Imam; he helped answer the worshippers' questions about religious matters; Sheikh Fahad Al Thumairy did not have much time for him and did not pay much attention to him; and that Sheikh Fahad gave him a book regarding English.  Pls. Ex. 115 (Mersal Tr.) 86:1-107:1.  The portions of the transcript Plaintiffs cite are questions regarding the particulars of the trip, that one cannot be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | expected to remember when asked more than 20 years after the trip occurred. |
| 1145. | About his own report, Mersal claimed to have no memory of it and said "I don't know whether this report is an actual report." Ex. 115, Mersal Dep. 131:8-17. | Plaintiffs grossly mischaracterize the testimony. Mersal testified that he did not recall preparing the document, but he did not "deny" that it is his signature. Pls. Ex. 115 (Mersal Tr.) 113:16-114:8. He further testified that "I don't know whether this report is an actual report. But if it is, then I was thanking Dr. Saudi being among the officials who were in charge of the Da'wah abroad for making this opportunity available." *Id.* at 131:12-17. |
| 1146. | Mersal insisted at his deposition that he spent Ramadan 1419 at the King Fahad Mosque, even though Mersal's report confirmed that he went to the "Sheikh Ibn Taymiyyah Mosque in Los Angles [sic]." The King Fahad Mosque did not open until the Fall of 1999. Ex. 115, Mersal Dep. 118:14-121:5; Ex. 72, Madha Decl. ¶ 8. | It is undisputed that Mersal testified that he believed he spent Ramadan at the King Fahad Mosque. Both the King Fahad Mosque and the Ibn Taymiyyah Mosque were operated by the Ibn Taymiyyah Foundation. *See* Response to Pls. Aver. ¶ 100. |
| 1147. | Mersal's deposition claims are at odds with his own report, showing that he led numerous prayers and gave the Friday service at the Ibn Taymiyah Mosque. Ex. 304, KSA 9557- 58. | Mersal's recollection, as he testified, was that he performed services at the King Fahad Mosque. Pls. Ex. 115 (Mersal Tr.) 118:14-121:5. |
| 1148. | Mersal's letter further thanked Thumairy for his "good hospitality, coordination, and follow up." Ex. 304, KSA 9557-58. | The cited document contains this language. Mersal testified, however, that this this language is a common courtesy and that the letter also "thanked Allah and. . . the Minister. That's the normal . . . tradition of writing." Pls. Ex. 115 (Mersal Tr.) 134:5-135:2. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1149. | At his deposition, however, Mersal claimed that Thumairy "didn't pay me much attention." Ex. 115, Mersal Dep. 102:6-103:15. | Mersal testified that "I met Dr. Fahad al-Thumairy in Los Angeles. I didn't know him from before. And I remember that I asked him often about how I – how I could learn the English language. And I remember that he didn't have much time for me. He didn't pay me much attention. So it appeared to me that he had other concerns. He had a family. He had other work to take care of. So he did not pay me much attention. But regarding English, he gave me a book and he said – or suggested that I could sit at times other than praying times and read and learn. And I was only an ordinary person, which did not require Fahad to pay me much attention. Because he expected everyone to handle his own affairs. Pls Ex. 115 (Mersal Tr.) 102:18-15. |
| 1150. | Thumairy testified that he had no memory of Mersal or Mersal's visits to California or his phone calls with Mersal. Ex. 107, Thumairy Dep. 287:8-16, 290:2-20, 293:13-16. | Undisputed. |
| XV. | **BASED ON THE ADVANCE TEAM'S VISITS TO LOS ANGELES AND SAN DIEGO, SAUDI GOVERNMENT OFFICIALS, AL HARAMAIN, AND AL QAEDA MADE REPORTS AND TOOK INITIAL PREPARATORY STEPS FOR THE ARRIVAL OF THE TWO HIJACKERS IN CALIFORNIA** | Plaintiffs cite nothing for this assertion. Plaintiffs have not shown that the 1419H Ramadan Imamate Program visit to San Diego was part of "an advance team." An advance team would have explored the feasibility of carrying out a future mission in a given place. In the 9/11 plot, this would have been the feasibility of future hijackers learning how to fly airplanes. There is no evidence that Al Sadhan or Al Sudairy, who barely spoke English and had to rely on Al Madinah Mosque congregants for transportation, explored flight training during their trip to San Diego.

Furthermore, there is no evidence that KSA officials, Al Haramain, or al Qaeda made any relevant reports. The only report made about the imamate that year was done by Al Mersal, not part of the San Diego Ramadan imams who went to San Diego. Pls. Ex. 304. This report of Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mersal's 1419H imamate is not some sort of casing report. It only describes his own religious activities during his mission and does not describe the buildings or the environment of Southern California that would facilitate an al Qaeda mission in the future, whose goal would be flight training for al Qaeda terrorists.<br><br>In addition, there is no hint of collaboration between Saudi Arabia, Al Haramain, and al Qaeda in the record. To the contrary, the evidence is overwhelming that the relationship between Saudi Arabia and al Qaeda was one of overt hostility, not collaboration.<br><br>Nor have Plaintiffs provided any evidence that Al Haramain was involved in the 1419H Ramadan Imamate Program in San Diego or involved at all in the 9/11 plot. There is no evidence of Saudi Arabia's "initial preparatory steps" for the arrival of Al Hazmi and Al Mihdhar in California in January 2000.<br><br>In mid-1999, not even Al Hazmi or Al Mihdhar were part of the 9/11 Plot, which had just been approved. They got U.S. visas in Saudi Arabia in April 1999. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9-10. But, as Khalid Sheikh Mohammed, the organizer of the plot, testified, "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Where Al Hazmi and Al Mihdhar planned to go in the U.S. is not known with certainty. Their visa applications were destroyed according to routine State Department document destruction practices in place in Jeddah. The FBI reported inconsistent information on their destination. The DOJ review of FBI intelligence handling with respect to 9/11 reports that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9; Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 253. The 9/11 Commission Report states that Al Hazmi's destination to San Diego was decided by Khalid Sheikh Mohammed in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157.<br><br>The contents of this title demonstrate how Plaintiffs make allegations, which are not supported by any evidence, even in their own exhibits. |
| XV.A. | **"The General Supervisor" Bayoumi reported to his Saudi government counterparts at MOIA in Riyadh, the Embassy's MOIA Office and Islamic Affairs Department, and Thumairy about MOIA propagators Sadhan and Sudairy** | Plaintiffs cite nothing for this assertion.<br><br>Al Bayoumi was the "general supervisor" of the Al Madinah Mosque. This was in no way related to his work for the Saudi Government. The three letters cited below are letters of thanks, not reports, for sending two MOIA propagators to the Al Madinah Mosque for Ramadan 1419H. There is nothing operational in these letters concerning any potential 9/11 plot. |
| 1151. | Bayoumi sent three separate letters (not produced by Saudi Arabia) to Thumairy, Embassy Islamic Affairs Department Head Ghesheyan, and Embassy MOIA Office Head Sowailem in January 1999. Ex. 678D, MPS 43_336 (Thumairy); Ex. 411 MPS | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 43_314 (Ghesheyan); and Ex. 413, MPS 43_338 (Sowailem). None of those documents was produced by Saudi Arabia. | Plaintiffs Exhibits 411, 413, and 678D are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs do not cite any evidence that these letters were actually sent. The cited exhibits were found in Al Bayoumi's possession by the U.K. police, which is inconsistent with the assertion that they were sent. Moreover, Al Bayoumi is a former employee. |
| 1152. | Bayoumi's undated letter to Thumairy states that he is "glad to congratulate you [Thumairy] on the occasion of the blessed Eid al-Fitr" a holiday which started on January 18, 1998. Ex. 678D, MPS 43_336. | Plaintiffs Exhibit 678D is inadmissible hearsay. *See* Objections Chart.<br><br>That document contains a reference to Eid al-Fitr.<br><br>Nothing in this letter supports Plaintiffs' assertion in the title of this Section. |
| 1153. | The letter goes on to say "it is my honor to thank you [Thumairy] for your kind efforts in providing us with brother Mutaeb al-Sudairy and Adel al-Sadhan, who made a good mark, not only in Masjid al-Madinah but also in the other *Masadjid* [mosques] abu Bakr [ICSD], Omar Bin al-Khatab, uthman [Dr. Shaikh's Mosque], and al-Ribat [Aulaqi's Mosque]". Bayoumi ends by saying "coordination will be the starting point" and signs the letter as "The General Supervisor." Ex. 678D, MPS 43_336. | Plaintiffs Exhibit 678D is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit contains this language. Nothing in this letter supports Plaintiffs' assertion in the title of the Section.<br><br>Al Bayoumi's letter thanks Sheikh Fahad Al Thumairy for his efforts in relation to Al Sadhan's and Al Sudairy's visit as Ramadan propagators to Al Madina Mosque. The full quote about the word coordination is "that coordination will be the starting point from which we will excel in serving the Muslims in this country." There is no suggestion that this "coordination" refers to any sort of nefarious activity. |
| 1154. | Bayoumi's letter to Embassy MOIA Director Khalid Al Sowailem is dated January 28, 1999. He expresses thanks to Sadhan and Sudairy and also to Abdulaziz | Plaintiffs Exhibit 413 is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit contains this language. Nothing in this letter supports Plaintiffs' assertion in the title of the Section. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | al-Saleh, Thumairy, and Saad Al-Jabreen of the Saudi Consulate in Los Angeles – "all of whom demonstrated complete cooperation" and that "coordination was the factor that made the greatest mark…." Ex. 413, MPS 43_338. | This is a courtesy letter of thanks addressed to Khalid Al Sowailem for his role in facilitating the participation of two Ramadan preachers at the Al Madinah Mosque in 1419H.<br><br>Al Bayoumi testified that he did not coordinate with Al Thumairy or the Embassy regarding Sadhan's or Sudairy's visit. Instead, the mosque just asked for imams to lead the Ramadan prayer. Pls. Ex. 120 (Bayoumi Tr.) 270:21-271:7. He further testified that letters such as this were simply courtesy letters and that, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved." *Id.* at 271:24-272:15. |
| 1155. | Bayoumi then tells Sowailem "I surely hope that the advance coordination continues…." and signs his letter "[f]aithfully" as "The General Supervisor." Ex. 413, MPS 43_338. | Plaintiffs Exhibit 413 is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit contains this language. Nothing in this letter supports Plaintiffs' assertion in the title of the Section.<br><br>This is a courtesy letter of thanks addressed to Khalid Al Sowailem for his role in facilitating the participation of two Ramadan preachers at the Al Madinah Mosque in 1419H.<br><br>Al Bayoumi testified that he did not coordinate with Al Thumairy or the Embassy regarding Sadhan's or Sudairy's visit. Instead, the mosque just asked for imams to lead the Ramadan prayer. Pls. Ex. 120 (Bayoumi Tr.) 270:21-271:7. He further testified that letters such as this were simply courtesy letters and that, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved." *Id.* at 271:24-272:15.<br><br>The title of "General Supervisor" refers to the letterhead of the stationery, namely, the Al Madina Mosque, and not to any alleged 9/11 plot, as Plaintiffs' title of this Section suggests. Pls. Ex. 678D (MPS43_336). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Contrary to the suggestion in the titles of this Section of Plaintiffs' averment, there is nothing operational in this letter concerning any potential 9/11 plot, like the feasibility of attending flight schools in the San Diego area, which was the mission of Al Hazmi and Al Mihdhar in connection to the 9/11 Plot. |
| 1156. | Bayoumi's letter to Islamic Affairs Department Head Ghesheyan thanks him for "the attentiveness you [Ghesheyan] have devoted to this mosque [Al Madinah] and the other mosques in San Diego….." Bayoumi expresses his thanks to Sadhan and Sudairy and states "that coordination and moral support were the factors that made the greatest mark" and that "I surely hope that the advance coordination continues…." He signs his letter "The General Supervisor." Ex. 411, MPS 43_314. | Plaintiffs Exhibit 411 is inadmissible hearsay.  *See* Objection Chart.<br><br>The letter contains the language quoted in this paragraph. This is a courtesy letter of thanks addressed to Gheysheyan for his role in facilitating the participation of two Ramadan preachers at the Al Madina Mosque in 1419H.  Al Bayoumi testified that he did not coordinate with Al Thumairy or the Embassy regarding Sadhan's or Sudairy's visit. Instead, the mosque just asked for imams to lead the Ramadan prayer. Pls. Ex. 120 (Bayoumi Tr.) 270:21-271:7.  He further testified that, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved."  *Id.* at 271:24-272:15.<br><br>The title of "General Supervisor" refers to the letterhead of the stationary, namely, the Al Madinah Mosque, and not to any alleged 9/11 plot, as Plaintiffs' title of this Section suggests.  Pls. Ex. 678D (MPS43_336).<br><br>Contrary to the suggestion in the titles of this Section of Plaintiffs' averment, there is nothing operational in this letter concerning any potential 9/11 plot, like the feasibility of attending flight schools in the San Diego area, which was the mission of Al Hazmi and Al Mihdhar in California in connection to the 9/11 Plot. |
| 1157. | On February 7, 1999, Bayoumi also wrote to MOIA Minister Abdullah Al Turki | Plaintiffs Exhibit 414 and 416 are inadmissible hearsay.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | thanking him for authorizing the Ramadan 1419 visit of Sadhan and Sudairy (al Turki's nephew) to the Masjid Al Madina. The letter also thanked "Sheikh Khalid Al Sowailem and Sheikh Abdulaziz Al-Saleh, from Washington D.C." as well as Thumairy for their "excellent cooperation and coordination." Bayoumi signs as "General Supervisor". Ex. 414, MPS43_347; Ex. 416, KSA 7591. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The exhibit contains the quoted language. However, it is a courtesy letter of thanks addressed to the Minister of Islamic Affairs for the participation of two MOIA propagators at Al Madinah Mosque as part of the MOIA Ramadan Imamate Program for 1419H. Al Bayoumi testified that he did not coordinate with Al Thumairy or the Embassy regarding Sadhan's or Sudairy's visit. Instead, the mosque just asked for imams to lead the Ramadan prayer. Pls. Ex. 120 (Bayoumi Tr.) 270:21-271:7. He further testified that, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved." *Id.* at 271:24-272:15. The title of "General Supervisor" refers to the letterhead of the stationery, namely, the Al Madina Mosque, and not to any alleged 9/11 plot, as Plaintiffs' title of this Section suggests. Pls. Ex. 678D (MPS43_336). |
| 1158. | It was Bayoumi's practice to fax his letters to Saudi Arabia and to send letters to MOIA's Minister via MOIA propagators. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375. The copy of the Bayoumi letter to Minister Al Turki produced by Saudi Arabia shows that Bayoumi faxed the letter to someone else at MOIA first who then faxed it to the Minister. Ex. 416, KSA | Plaintiffs Exhibit 388, 389, and 416 are inadmissible hearsay. *See* Objections Chart. Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 7591. The Panasonic fax header on the document produced by Saudi Arabia matches the fax header from Thumairy's fax machine demonstrating that Bayoumi coordinated with MOIA propagators, including Thumairy, on joint work assignments. *See, e.g.*, Ex, 223, KSA 8441 (letter from Thumairy showing same Panasonic watermark), Ex. 273, KSA 2783 (same), Ex. 274, KSA 2794 (same). | The cited documents do not support Plaintiffs' assertions. The first two cited documents are letters of congratulations to Al Sadhan and Al Sudairy respectively on Eid al-Adha 1419H (Eid Mubarak). They post-date the visit of the two imams to San Diego, do not contain anything about coordination of assignments, and do not have any fax marks at their top. The letters include a request by Al Bayoumi for the two imams to keep contact with him after the completion of their imamate in San Diego. Both letters state: "Please, when you receive this fax, respond to those poor people who always ask about you," followed by five exclamation marks. Pls. Ex. 388 (MPS43_374); Pls. Ex. 389 (MPS43_375). |
| | | The next four cited letters have a mark at the top showing that they originated from a Panasonic fax system. There is no evidence that every fax with the same header was sent from the same fax machine as Plaintiffs suggest. There is no originating number in the fax header. |
| | | The fax headers also do not show that Al Bayoumi coordinated with any Ministry of Islamic Affairs propagators, including Al Thumairy, on joint work assignments. Al Bayoumi's letter to the Minister of Islamic Affairs was simply a letter of thanks for sending two propagators to the Al Madinah Mosque for Ramadan 1419H. This letter is post-dated (February 7, 1999) to the Ramadan mission, which ended within a day or two after Eid al-Fitr, January 19, 1999. Given that the letter is after the visit, it certainly does not show any coordination on work assignments, which must be done before the start of a mission. Pls. Ex. 416 (KSA 7591). |
| | | In terms of assignment of Ramadan Imamate propagators, Al Sudairy testified that it was coordinated between him and Al Sowailem in Washington, D.C., as Al Sudairy called him to inquire about mosques located in a warm weather area because of his health. Al Bayoumi was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not part of this process. Pls. Ex. 119 (Sudairy Tr.) 63:4-7, 64:17-65:11, 78:5-11, 80:10-81:24. The three cited letters by Al Thumairy were written more than one and two years after the cited Al Bayoumi letter and have nothing to do with coordination of any assignments or the Ramadan Imamate Program. Pls. Ex. 223 (KSA 8441); Pls. Ex. 273 (KSA 2783); Pls. Ex. 274 (KSA 2794). |
| **XV.B.** | **Bayoumi reported to his Al Haramain contact Saad Al Habib about Sadhan and Sudairy** | Plaintiffs fail to cite anything in support of this assertion. There is no evidence that Saad al-Habib, a rich Saudi investor who provided most of the funding for the construction and functioning of the Al Madina Mosque, was an Al Haramain contact. Nor does the letter cited in the paragraphs below support the claim that Al Bayoumi was reporting to Al Haramain about the two Ramadan preachers Al Sadhan and Al Sudairy. |
| 1159. | On February 12, 1999, Bayoumi wrote an "extremely urgent" request to his "dear brother" Saad al Habib asking him to contact Sudairy, Sadhan, and Omar Hamerman for information. Ex. 384, MPS 43_217 (produced by the FBI as Ex. 485, FBI 1338). | The cited material does not support Plaintiffs' assertion. The cited letter was not an "extremely urgent" request, but simply a letter to his friend Saad Al Habib, who was the main financial contributor for the establishment and functioning of the Al Madina Mosque, telling him the mosque's accomplishments and the visits of the two Ramadan imams at the mosque. He suggested Al Habib, either contact the two imams or Hamerman, whom both knew, and was also at the mosque during part of the Ramadan services and celebrations. The letter was marked, "Please, reply urgently," noting that Al Bayoumi had recently lost telephone contact with Habib, and he wanted to re-establish contact. Plaintiffs Exhibit 384 is inadmissible hearsay. *See* Objections Chart. The consensus among the three translators – one from the FBI, Pls. Ex. 485 (FBI 1338), another from New Scotland Yard, KSA Ex. 230 (MPS43- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | D916), and a third from a certified translator, Pls. Ex. 384 (MPS43_217) – is that the single phrase written at a slight angle on top of the page is "Please reply urgently" or "please replay [sic, reply] as soon as possible." |
| 1160. | Bayoumi wrote the note after he was unable to reach Habib on the phone. Ex. 384, MPS 43_217, Ex. 485, FBI 1338 ("I tried continuously to respond and to call, but I don't know if the cellphone was out of service or what."). | Plaintiffs Exhibit 384 is inadmissible hearsay. *See* Objections Chart.<br><br>This is otherwise undisputed. |
| 1161. | In his letter to Habib, Bayoumi wrote " Two brothers from the Ministry of Islamic Affairs visited with us... *Wakanat qaedatuhum masjidana* [their base was our mosque]. And I was coordinating with those who were responsible for them." Ex. 384, MPS 43_217. Bayoumi provided the names and phone numbers of the two MOIA propagators:<br><br>Mutaeb al-Sudairy. Telephone ██-4059<br><br>Adel al-Sadhan. Telephone ██-2849<br>Bayoumi then told Habib:<br><br>I want you to call them, and to take Al-Qurs [the disk] from Al-Khabbaz [the baker]. I have a lot to tell you, but the paper cannot handle it. Al-Amir [Emir] Omar Hamerman can convey a clear picture as well. | Plaintiffs' translation of this document is inaccurate. The document does not state "take . . . [the disk] from . . . [the baker]." Al Bayoumi testified that it states take the "loaf of bread" from the baker, which is a Saudi Arabian idiomatic expression, which means "when you want bread, you don't go and buy from the store, you get it directly from the baker, from the origin. And if you want the news from the origin, you want a correct news, you get them from the person involved . . . ." Pls. Ex. 120 (Bayoumi Tr.) 276:1-277:18; KSA Ex. 167 (Sageman Rep.) 622-23.<br><br>Plaintiffs Exhibit 384 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Ex. 384, MPS 43_217. |  |
| 1162. | Plaintiffs' expert Youssef, a native-level Arabic speaker (*see* Ex. 5, Youssef Rpt. 5), concluded that the Arabic words used by Bayoumi conveyed "a cautious, coded message to Habib to assure the safe, prompt relay of key information obtained by Sudairy and Sadhan from their trip to California as the advance team for the 9/11 hijackers." Ex. 5, Youssef Rpt. 112. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Youssef is not Saudi, and his opinion is based on a lack of understanding and an incorrect translation. The document does not state "take . . . [the disk] from . . . [the baker]." Al Bayoumi testified that it states take the "loaf of bread" from the baker, which is a Saudi Arabian idiomatic expression, which means "when you want bread, you don't go and buy from the store, you get it directly from the baker, from the origin. And if you want the news from the origin, you want a correct news, you get them from the person involved . . . ." Pls. Ex. 120 (Bayoumi Tr.) 276:1-277:18; KSA Ex. 167 (Sageman Rep.) 622-23. There is no support for the assertion that it is a coded message as Youssef speculates.<br><br>Moreover, there is nothing in the three versions of the translation of this letter provided by the FBI (Pls. Ex. 485 (FBI 1338)), Plaintiffs themselves (Pls. Ex. 384 (MPS43_217)), or the New Scotland Yard version provided in the original MPS material (KSA Ex. 230 (MPS43-D916_231-32)) that would indicate that this letter is anything but what it states – a message to re-establish communication between two friends and a brief account of the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | first Ramadan at the Al Madina Mosque, which had been funded by the recipient of the letter.<br><br>There is nothing to indicate "a cautious, coded message to Al Habib to assure the safe, prompt relay of key information obtained by Sudairy and Sadhan from their trip to California as the advance team for the 9/11 hijackers." To make this claim, Youssef skips the references to how well the Al Madina Mosque, mostly funded by al-Habib, was doing just a few months after opening its doors to worshippers. Instead, Youssef skips to the fact that Al Sadhan and Al Sudairy had come to the mosque for their Ramadan Imamate. Since Al Bayoumi could not talk with Al Habib because he no longer had his number, he asked his friend to call the two imams for more details about Ramadan and the mosque.<br><br>Moreover, the remainder of the record contradicts Youssef's speculation. At the time of the letter (February 12, 1999), bin Laden had not yet approved what became the 9/11 operation, which happened about March or April 1999, four months after the Ramadan 1419H imamate and two months after this letter. *See* KSA Ex. 222 (Jenkins Rep.) 23-24; KSA Ex. 163 (9/11 Rep.) 154; KSM's interview with Yosri Fouda in September 2002 before his capture, in KSA Exhibit 223, Yosri Fouda & Nick Fielding, 2003, *Masterminds of Terror*, New York: Arcade Publishing, at 114; Pls. Ex. 31 (KSM Statement, after his capture, consistent with his pre-capture statement) at 4; KSA Ex. 167 (Sageman Rep.) 123-25.<br><br>According to the CIA review of the 9/11 Plot, the crucial planning meeting (attended by Al Hazmi) occurred in Qandahar in November-December 1999. Pls. Ex. 82 (CIA_256). Furthermore, the two cited future hijackers, Al Hazmi and Al Mihdhar, were still two months short of requesting their U.S. visa. They got U.S. visas in Saudi Arabia in April 1999. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9-10. But, according to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Khalid Sheikh Mohammed, the organizer of the plot, "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15 (brackets in original).<br><br>The Department of Justice review of the FBI's handling of intelligence with respect to 9/11 reported that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9; Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 253. The 9/11 Commission Report states that Khalid Sheikh Mohammed chose to send Al Hazmi to San Diego in December 1999 in Karachi. KSA Ex. 163 (9/11 Rep.) 157. Given this chronology, the allegation that this was a coded letter in preparation for the future hijackers to go to California is not supported in either Plaintiffs' exhibits or the rest of the discovery material. |
| 1163. | Bayoumi declared: "*Wakanat qaedatuhum masjidana*" which means (referring to Sadhan and Sudairy's time in San Diego): "Their base was our mosque." MPS43_217. If Bayoumi intended to convey that Sadhan and Sudairy were hosted at their mosque (Al- Madinah), he would have used the Arabic word for "hosted". However, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | inserting the word "qaedatuhum" demands that it be read in light of the plot to bring Al-Qaeda to San Diego, specifically because Bayoumi's choice of the word "qaedatuhum" for "their base" denotes not simply a place to situate oneself or hang one's hat, but rather a source or hub from which further activity will follow. The nature of that activity can be confirmed by what Bayoumi signalled in his message: their "Qaeda," or base, had been approved for "Al-Qaeda." Ex. 694, Youssef Decl. ¶ 56. | Youssef's speculation is unsupported. Al Sadhan and Al Sudairy were assigned to the Al Madina Mosque for their 1419H Ramadan Imamate. Al Bayoumi was asked about his use of the word "base" in this letter at his deposition. He testified, "what I mean by base is we have five prayers and also lectures. So the person that gives the lecture can go give a lecture here and then go give a lecture in another masjid [mosque], but they, at the end of the day, they come and pray the prayer of Taraweeh [the long evening prayer during Ramadan] in this masjid. What I mean is – by it being the base is that's the masjid that they end up at, that's their base. That's where they end up after they go and give the lectures here and there, this is their base, this is where they come at the end of the day." Pls. Ex. 120 (Bayoumi Tr.) 270:2-16.<br><br>There is nothing in the letter signaling anything about "Al-Qaeda." As of the date of this letter, February 12, 1999, bin Laden had not yet approved what became the 9/11 operation, which happened about March or April 1999, four months after the Ramadan 1419H imamate and two months after this letter. *See* Response to Pls. Aver. ¶ 1162. |
| 1164. | Bassem Youssef opined that the Arabic words contain the message that during their trip to the Al-Madinah Mosque, Sadhan and Sudairy represented the agenda of Al Qaeda, and that Al Qaeda was established and welcome at the Al Madinah Mosque. Bayoumi was conveying to Habib that the plans for the Al Qaeda operatives in California could safely proceed. Ex. 5, Youssef Rpt. pp. 13, 112; Ex. 694, Youssef Decl. ¶¶ 56-57. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef Report should be excluded. *See* Objections Chart. The Youssef Declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | At the time of Al Bayoumi's letter of February 12, 1999, al Qaeda had not yet approved any operations in the United States and therefore did not yet have an agenda for the United States and had no plans yet for operatives in California. *See* Response to Pls. Aver. ¶ 1162. There is no evidence that an al Qaeda member was established at that mosque at any time. Nor is there any evidence that Habib had any connection whatsoever to Al Qaeda. |
| 1165. | Bayoumi further instructed that Habib should "take the disc from the baker," which Youssef noted was "a cryptic reference to getting closely held information directly from the source, i.e., Sadhan and Sudairy." Ex. 5, Youssef Rpt. 112. For Youssef, Bayoumi's covert nature using the phrase "the paper can't handle it," meant that some information was too sensitive to be written. Ex. 5, Youssef Rpt. 112. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Youssef is not Saudi, and his opinion is based on a lack of understanding and an incorrect translation. The document does not state "take. . . [the disk] from . . . [the baker]." Al Bayoumi testified that it states take the "loaf of bread" from the baker, which is a Saudi Arabian idiomatic expression, which means "when you want bread, you don't go and buy from the store, you get it directly from the baker, from the origin. And if you want the news from the origin, you want a correct news, you get them from the person involved . . . ." Pls. Ex. 120 (Bayoumi Tr.) 276:1-277:18. There is no support for the assertion that it is a coded message as Youssef speculates. |
| 1166. | In addition, Bayoumi included another code in his February 12, 1999 letter to Habib, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | one which used frequently by Bayoumi: *Al-Amur taseer ala ma yuram*, or "[t]hings are going well." A prior translation of these words, which is also correct in literal terms, stated that "matters are going as they should." However, upon examining the Arabic words from a larger series of Bayoumi's letters from across the MPS production, Bassem Youssef identified a significant number of instances in which Bayoumi deploys this same phrase in a series of letters that he writes to Habib. Ex. 364, MPS43_136; Ex. 409, MPS43_224-221; and Ex. 390, MPS43_229-230. As Youssef stated in his report, this wording demonstrates that Habib and Bayoumi shared a common understanding about certain operational matters of a high degree of sensitivity. Ex. 5, Youssef Rpt. 112. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart. <br><br> Youssef's opinion that writing "things are going well" indicates a nefarious plot is facially implausible and ridiculous.  The context of the letter is that Al Bayoumi was writing to a funder of the mosque.  The statement that "things are going well" means just that – things are going well. <br><br> This opinion demonstrates Youssef's lack of expertise, the failure to apply any reliable methodology, and that his conclusions are unreliable. <br><br> Youssef was prevented from working on the 9/11 investigation, despite his repeated requests to do so.  The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations.  *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). |
| 1167. | Bayoumi's repeated use of the phrase was his means of updating those to whom he reported on the "plan" they were jointly pursuing and confirming that things were proceeding according to that plan. This evidence is supplemented by the video of Bayoumi's casing report on the Capitol, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | during which Bayoumi referred to certain items he filmed being "in the plan." | At the time of the letter (February 12, 1999), bin Laden had not yet approved what became the 9/11 operation, which happened about March or April 1999, four months after the Ramadan 1419H imamate and two months after this letter. *See* KSA Ex. 222 (Jenkins Rep.) 23-24; KSA Ex. 163 (9/11 Rep.) 154; KSM's interview with Yosri Fouda in September 2002 before his capture, in KSA Exhibit 223, Yosri Fouda & Nick Fielding, 2003, *Masterminds of Terror*, New York: Arcade Publishing, at 114; Pls. Ex. 31 (KSM Statement, after his capture, consistent with his pre-capture statement) at 4; KSA Ex. 167 (Sageman Rep.) 123-25.<br><br>According to the CIA review of the 9/11 Plot, the crucial planning meeting (attended by Al Hazmi) occurred in Qandahar in November-December 1999. Pls. Ex. 82 (CIA_256). Furthermore, the two cited future hijackers, Al Hazmi and Al Mihdhar, were still two months short of requesting their U.S. visa. They got U.S. visas in Saudi Arabia in April 1999. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9-10. But, according to Khalid Sheikh Mohammed, the organizer of the plot, "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15 (brackets in original).<br><br>The Department of Justice's review of the FBI's handling of intelligence with respect to 9/11 reported that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 30 (*9/11 and Terrorist Travel*) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | at 9; Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 253. The 9/11 Commission Report states that Khalid Sheikh Mohammed chose to send Al Hazmi to San Diego in December 1999 in Karachi. KSA Ex. 163 (9/11 Rep.) 157.<br><br>The expression "things are going well" in a letter dated February 12, 1999 could not have been referring to the 9/11 plot, since there was no plan in place.<br><br>As set forth below, there was also no "casing" report on the capital. That video is nothing more than a straightforward tourist video, and there is no evidence that it was provided to anyone. |
| 1168. | Youssef's additional analysis identified Bayoumi's reference to "*Al Amir*" ▮ ▮ confirmed that Habib was close with ▮ and recognized ▮ role as the extremist cell "Emir" or leader. Bayoumi's statements demonstrate that he knew already how to contact ▮, and that "he had a covert relationship of trust with ▮," an Al Haramain operative. Ex. 5, Youssef Rpt. 112. As Youssef points out, Bayoumi also wrote that "everyone here is doing well" followed later by the claim that "matters are going as they should," indicating to Youssef, that they "share a common understanding about certain covert matters." Ex. 5 Youssef Rpt. 112. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>This paragraph contains unreliable speculation. The fact that Al Bayoumi referred to ▮ as "Al Amir" does not indicate that Al Habib was close to ▮ that Habib recognized ▮ role as an extremist cell leader. There was no extremist cell, and Plaintiffs fail to cite any evidence for this assertion.<br><br>There is also no evidence that ▮ was an Al Haramain operative or that Al Bayoumi had any covert relationship with ▮ Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi took pictures with ███████ in public, Pls. Ex. ████████████ which belies any suggestion that the relationship was covert. |
| | | This opinion demonstrates Youssef's complete lack of expertise, the failure to apply any reliable methodology, and that his conclusions are unreliable. |
| | | Youssef was prevented from working on the 9/11 investigation, despite his repeated requests to do so. The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). |
| 1169. | Bayoumi gave Habib Sudairy's phone number in Saudi Arabia--███-4059," which Sudairy confirmed as his number. Sudairy said it was possible that he gave his number to Bayoumi or that Bayoumi got the number "from the community." Ex. 119, Sudairy Dep. 172:3- 173:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | To the extent a response is required, this is undisputed. |
| 1170. | Sadhan denied knowing Bayoumi and giving him his phone number. Ex. 99, Sadhan Dep. 186:24-187:5 ("I don't know the man. How would I give him my number?"). Sadhan continued "I didn't give my number to anyone in the community because I don't like to be disturbed." Ex. 99, Sadhan Dep. 190:16-24. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Al Sadhan was asked at his deposition about a number "966-462-2849." He testified that he did not recognize this number, Pls. Ex. 99 (Sadhan Tr.) 181:3-182:8, and that he would not know how Al Bayoumi got a number he does not recognize, *id.* at 186:11-22.<br><br>Al Sadhan further testified that he did meet Al Bayoumi at the Al Madina Mosque, that he "didn't know him personally," and that he never spoke to him before meeting him for the first time at the mosque. *Id.* at 71:1-73:4, 90:13-22. To the extent Plaintiffs suggest that Sadhan testified that he did not know Al Bayoumi at all or never met him, that is incorrect. |
| 1171. | Bayoumi's handwritten address book contained the phone numbers for Sadhan and Sudairy next to each other. Ex. 12AA, MPS738_24. The phone number ▮▮▮-2849 that Bayoumi gave to Habib was subscribed to by Sadhan's father in Riyadh, Saudi Arabia. That number had been written down by Bayoumi in his handwritten address book and then crossed out. Ex. 12AA, MPS738_24; Ex. 44 (Riyadh Telephone Directory) (Sadhan Dep. Ex. 494); Ex. 5, Youssef Rpt. 102, n. 416; Ex. 99, Sadhan Dep. 176:4-10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 44 has not been authenticated. Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>Al Sadhan was asked at his deposition about a number ▮▮▮▮-2849." He testified that he did not recognize this number, Pls. Ex. 99 (Sadhan Tr.) 181:3-182:8, and that he would not know how Al Bayoumi got a number he does not recognize, *id.* at 186:11-22.<br><br>When asked about whether the number was his father's number, Al Sadhan testified that "[i]t looks like it's an old number or the wrong number. I don't remember this number at all." *Id.* at 177:15-19. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. It is undisputed that the number is crossed out in Plaintiffs Exhibit 12AA (MPS738_24). |
| 1172. | This crossed out phone number for Sadhan evidences that Bayoumi and Sadhan kept their contact information current from 1998 up until Bayoumi's handwritten address book was seized by the MPS in September 2001 that had Sadhan's current number. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, there is no evidence as to when the number was crossed out, and therefore nothing to suggest that Al Bayoumi kept Al Sadhan's number current from 1998 until September 2001. There is also no evidence that Al Sadhan had Al Bayoumi's contact information at all. |
| 1173. | Sadhan further claimed he did not recognize the work number "███-0401" listed by Bayoumi for Sadhan in Bayoumi's handwritten address book and in Bayoumi's January and October 2000 phone lists. Ex. 99, Sadhan Dep. 193:7-10; Ex. 12AA, MPS738_35; Ex. 12BB, MPS 688_3; Ex. 421, FBI 345. Documents produced by Saudi Arabia confirm that this is the main number at MOIA's headquarters used by the Da'wah Department abroad where Sadhan worked for MOIA in Riyadh. Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688) and 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart. <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 254, KSA 1168-73 at 72; Ex. 230, KSA 9450, Ex. 141, KSA 9538. | With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay.<br><br>Al Sadhan left the Ministry of Islamic Affairs D'awah Department in Riyadh shortly after his return in 1999 and was assigned to the United States. In his deposition 22 years later, he testified that he did not "know [that number] by heart. I don't memorize it." Pls. Ex. 99 (Sadhan Tr.) 194:11-16. |
| 1174. | Bayoumi claimed at his deposition that he wrote his February 12, 1999 letter because he wanted Habib to know about a "problem" with having sermons at the Mosque translated from Arabic into English and Kurdish. Ex. 120, Bayoumi Dep. 263:7-264:14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed. |
| 1175. | Bayoumi's explanation does not point to any text in the letter that addresses any translation problem at the Mosque and does not account for the cryptic language and careful secrecy if the letter had such a benign purpose. Plaintiffs' expert Youssef concluded that, in fact, Bayoumi's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | explanation shows that the letter's true purpose is for "Habib to get information from Sadhan and Sudairy about the suitability of Los Angeles and San Diego for Al Qaeda's 9/11 operatives." Ex. 5, Youssef Rpt. 113. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.<br><br>As shown above in the responses to paragraphs 1165, 1166, and 1167 above, there is no evidence of any "cryptic language and careful secrecy" in the letter.<br><br>Youssef's unsupported speculation is refuted by the record evidence.<br><br>At the time of the letter (February 12, 1999), bin Laden had not yet approved what became the 9/11 operation, which happened about March or April 1999, four months after the Ramadan 1419H imamate and two months after this letter. *See* KSA Ex. 222 (Jenkins Rep.) 23-24; KSA Ex. 163 (9/11 Rep.) 154; KSM's interview with Yosri Fouda in September 2002 before his capture, in KSA Exhibit 223, Yosri Fouda & Nick Fielding, 2003, *Masterminds of Terror*, New York: Arcade Publishing, at 114; Pls. Ex. 31 (KSM Statement, after his capture, consistent with his pre-capture statement) at 4; KSA Ex. 167 (Sageman Rep.) 123-25.<br><br>According to the CIA review of the 9/11 Plot, the crucial planning meeting (attended by Al Hazmi) occurred in Qandahar in November-December 1999. Pls. Ex. 82 (CIA_256). Furthermore, the two cited future hijackers, Al Hazmi and Al Mihdhar, were still two months short of requesting their U.S. visa. They got U.S. visas in Saudi Arabia in April 1999. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9-10. But, according to Khalid Sheikh Mohammed, the organizer of the plot, "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of their friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15 (brackets in original). |
| | | The Department of Justice's review of the FBI's handling of intelligence with respect to 9/11 reported that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9; Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 253. The 9/11 Commission Report states that Khalid Sheikh Mohammed chose to send Al Hazmi to San Diego in December 1999 in Karachi. KSA Ex. 163 (9/11 Rep.) 157. |
| **XV.C.** | **On April 7, 1999, Al Qaeda hijackers Hazmi and Mihdhar applied for their U.S. visas to Los Angeles, California; Bayoumi wrote urgent letters to Sadhan and Sudairy to take steps to prepare the safe house; and Saudi Arabia issued instructions to keep Bayoumi in San Diego to complete his work on the extremist network.** | Al Bayoumi did not write any letters to Al Sadhan and Al Sudairy to "take steps to prepare" any "safehouse." There was no extremist network in San Diego and Saudi Arabia did not issue any instructions so that Al Bayoumi could compete any work on the non-existent network. |
| 1176. | After returning to Saudi Arabia, Sudairy, Sadhan, and Mersal were all assigned by MOIA to travel to Mecca, Saudi Arabia for several weeks surrounding the 1419 hajj which took place during the last week of March 1999. Ex. 119, Sudairy Dep. 182:14-183:1; Ex. 231, KSA 9480-81 (MOIA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | assignment of Mersal to Mecca in March 1999 for hajj). | The cited materials suggest that Al Sudairy and Al Mersal were assigned to Hajj but are silent about Al Sadhan.<br><br>In his letter to Al Sudairy, Al Bayoumi writes: "By the way, I heard that you went to *Hajj*. May your *Hajj* be rewarded . . . ." Pls. Ex. 389 (MPS43_375). In the letter to Al Sadhan, written on the same day, there is no mention of Al Sadhan having gone to Hajj. Pls. Ex. 388 (MPS43_374). |
| 1177. | 9/11 hijackers Hazmi and Mihdhar were residing in Mecca at the same time as Sudairy and Sadhan visited for the hajj. Ex. 5, Youssef Rpt. 113-14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>This paragraph cites to Youssef's report, which simply states that Al Hazmi and Al Mihdhar were in Mecca at the same time as Al Sadhan and Al Sudairy. Youssef cites nothing for this claim. |
| 1178. | Plaintiffs' expert Youssef concluded that in "March 1999 Al Qaeda had collected information about the California network from Sadhan and Sudairy, reviewed its options, and decided to send Hazmi and Mihdhar to California as there was a trusted support network in place on the ground to assist the two men upon their arrival and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | allow them to safely live undetected in the U.S. for a substantial period of time." Ex. 5, Youssef Rpt. 113-14. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef cites nothing in his report supporting this wild speculation.<br><br>There is no evidence, as outlined in the Responses to Sections XIV and XV of Plaintiffs' Averment, that there was a "California network" that collected information on behalf of a future al Qaeda mission. Nor is there any evidence implicating Al Sadhan or Al Sudairy in this non-existent network. There is also no evidence that al Qaeda had collected information and reviewed options about the 9/11 operation at this early date of March 1999.<br><br>All evidence points to the start of the 9/11 operation in general terms no earlier than March-April 1999. In the original scheme of Spring 1999, there did not seem to be any West Coast component. The targets discussed were the White House, the Pentagon, the World Trade Center, and the U.S. Capitol. KSA Ex. 163 (9/11 Rep.) 155. However, the plot was launched in earnest in late 1999. The crucial planning meeting took place during Ramadan 1420 (December 1999) in Qandahar, Afghanistan, where details of the plot were being worked out. Al Hazmi was selected for pilot training at that meeting, and he had a Ramadan dinner with bin Laden and the other four pilot-training candidates. Pls. Ex. 82 (CIA, *11 September: The Plot and the Plotters*, 1 June 2003) at 249, 256. In March 1999, it did not seem that Al Hazmi and Al Mihdhar had yet been selected to participate in the plot.<br><br>Khalid Sheikh Mohammed, the operational leader of the plot, stated: "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of the friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States.  Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so."  Pls. Ex. 31 (KSM Statement) at 15; KSA Ex. 163 (9/11 Rep.) 155.<br><br>The decision to send Al Hazmi to San Diego was reached by Khalid Sheikh Mohammed after this meeting, in late December in Karachi.  KSA Ex. 163 (9/11 Rep.) 157.  Thus, the CIA, the FBI, the 9/11 Commission, and KSM's reporting both before and after his capture contradicts Plaintiffs' expert Youssef's speculation quoted in this paragraph.  Youssef provides no evidence for his claims and is wrong on his timing of March 1999 and the desired destination of Al Mihdhar in April 1999.<br><br>In terms of al Qaeda's collection of information about Southern California, this information did not come from Al Sadhan, Al Sudairy, or Al Bayoumi.  The 9/11 Commission reported:  "Much of his [KSM's] activity in *mid-1999* had revolved around the collection of training and informational materials for the participants in the planes operation.  For instance, he collected Western aviation magazines; telephone directories for American cities such as San Diego and Long Beach, California; brochures for schools; and airline timetables, and he conducted Internet searches on U.S. flight schools."  KSA Ex. 163 (9/11 Rep.) 157 (emphasis added to show the disparity between the timetable of the 9/11 Commission and the Ramadan Imamate Program, which occurred six months earlier).<br><br>There is no evidence whatsoever that Al Sadhan or Al Sudairy reported anything to Al Qaeda, either directly or indirectly.  Nor is there any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | evidence that Al Sadhan or Al Sudairy were aware of any plot to attack the United States. |
| 1179. | On April 3 (Hazmi) and April 7, 1999 (Mihdhar), applied for and were granted U.S. travel visas at the U.S. Consulate in Jeddah, Saudi Arabia. The applications of Hazmi and Mihdhar stated that their destination and address in the U.S. was Los Angeles, California. Prior to filing for their visas, the two hijackers had obtained new passports from Saudi Arabia on March 21 (Hazmi) and April 6, 1999 (Mihdhar) in Mecca. Ex. 155, FBI hijackers Timeline at 40; Ex. 30, 9/11 Commission Monograph on Terror Travel at 9-10; Ex. 309, Government Exhibit SD00103, *US v Moussaoui,* 1:01-cr-00455 (E.D.Va.); Ex. 8, FBI Summary of Pentbomb Investigation, Feb. 29, 2004, p. 41 for Mihdhar's 2001 passport; Ex. 2, EO 0605 (stating Hazmi and Mihdhar were issued visas in April 1999 in Jeddah, Saudi Arabia). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The hijackers' 1999 visa applications were destroyed according to routine State Department document destruction practices in place in Jeddah. The Department of Justice review of the FBI handling of information about the 9/11 attacks reported that Al Mihdhar's visa application listed New York as his intended destination in May 1999, not Los Angeles or San Diego and not January 2000. Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9; Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 253.

The FBI working draft of the chronology of events leading to 9/11 states that the hijackers listed the Sheraton Hotel, Los Angeles as their destination. Pls. Ex. 155, at 40. That document, however, is inadmissible hearsay. *See* Objections Chart.

Other evidence is also to the contrary. The 9/11 Commission Report states that Khalid Sheikh Mohammed, the operational leader of the planes operation, decided to send Al Hazmi to San Diego in December 1999. KSA Ex. 163 (9/11 Rep.) 157. Plaintiffs Exhibit 309 only shows Al Hazmi's passport, which had been issued in Mecca on March 21, 1999, and his U.S. visa issued in Jeddah on April 3, 1999. Plaintiffs do not cite Al Mihdhar's 1999 passport. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 8 is inadmissible hearsay.  *See* Objections Chart. |
| 1180. | On April 7, 1999, the time in Jeddah, Saudi Arabia was 10 hours ahead of the time in San Diego. Ex. 694, Youssef Decl. ¶ 44. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken.  *See* ECF No. 9562.<br><br>To the extent a response is required, this is undisputed. |
| 1181. | On April 7, 1999 in San Diego, hours after the two hijackers received their U.S. travel visas, Bayoumi wrote and faxed letters to both Sadhan and Sudairy. Bayoumi's letters to both men reference that Bayoumi had previously faxed letters to them for the attention of "His Excellency the Minister," MOIA's Minister Abdullah Al Turki. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375; Ex. 120, Bayoumi Dep. 263:10-1 (Bayoumi faxed letters overseas). None of this Bayoumi correspondence to MOIA was produced by Saudi Arabia. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 388 and 389 are inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, only Al Mihdhar received his U.S. visa on April 7, 1999, from the Jeddah U.S. consulate.  Al Hazmi received his visa on April 3, 1999, from the same consulate.  Pls. Ex. 309 (M-SDA-00002441); Pls. Ex. 30 (*9/11 and Terrorist Travel*) at 9. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that Al Bayoumi knew who Al Mihdhar or Al Hazmi were at this time. Moreover, at this time, the 9/11 attack had not even been formulated. *See* Response to Pls. Aver ¶ 1178.<br><br>Plaintiffs' attempt to connect these letters to the hijackers' receipt of U.S. travel visas is entirely unsupported. Neither of the letters, which are simply to give Eid greetings, mentions anything about the hijackers or the 9/11 plot. |
| 1182. | Bayoumi's initiative to write to the two MOIA propagators about a request that Bayoumi had made directly to MOIA's Minister shows that Bayoumi had a high, acknowledged status within the Saudi government and was working on project(s) together with MOIA. Ex. 694, Youssef Decl. ¶ 97. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>The evidence shows that Al Bayoumi did not send a request directly to the Minister of Islamic Affairs. The letters contain the same wording. The first paragraph states that Al Bayoumi had made a request to Al Sudairy and Al Sadhan for computer programs, but that he no longer needed those programs because someone else had provided them. The second paragraph states that Al Bayoumi had sent a fax to the Minister. That fax is dated February 7, 1999, and simply thanks the Minister for sending Al Sudairy and Al Sadhan to San Diego for the 1419H Ramadan Imamate Program. There is no request in that fax. Pls. Ex. 416 (KSA 7591). Plaintiffs Exhibit 416 is a courtesy letter and does not indicate that Al Bayoumi was working with anyone in the Ministry of Islamic Affairs on anything. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, the Minster never responded to this courtesy letter. Pls. Ex. 388 (MPS43_374) ("I previously sent you a fax, the first was addressed to His Excellency the Minister, but I did not receive a reply."). This further indicates that Al Bayoumi was not working with the Minister on anything. |
| 1183. | Bayoumi's letter to Sudairy states that his fax for the Minister was about "the matter of Masjid Uthman Ibn Affan" – the small Lemon Grove, CA Mosque run by Dr. Abdussattar Shaikh. Ex.694, Youssef Decl. ¶ 46; Ex. 12AA, MPS738_26 (listing phone number ███ 1135 Masjid Uthman Dr. Abdussattar"); Ex. 328, 9/11 Commission List of Mosques; Ex. 574, FBI 004273; Ex. 120, Bayoumi Dep. 513:2-3 ("Dr. Abdussattar…had the Uthman Mosque"). | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Plaintiffs are incorrect that Al Bayoumi's letter to Sudairy indicates that he raised with the Minister of Islamic Affairs "the matter of Masjid Uthman Ibn Affan."<br><br>The letter reads: "My dear brother: I previously sent you a fax, the first was addressed to His Excellency the Minister, and the other was addressed to you personally, regarding the matter of Masjid Uthman Ibn Affan." Pls. Ex. 389 (MPS43_375). Thus, only the letter addressed to Sudairy was with regard to the Masjid Uthman Ibn Affan.<br><br>The Masjid Uthman is not specifically mentioned in the letter to the Minister. It only appears in a list of San Diego mosques, where Ramadan |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | imams Al Sudairy and Al Sadhan led prayers and delivered sermons and lessons during their imamate: "Masjid al-Madinah al-Munawarah, Masjid Abu Bakr [also known as the ICSD], Masjid al-Ribat, and Masjid Uthman, as well as giving the *khutbah* [sermon] and the Eid prayer in Masjid Omar bin al-Khatab." Pls. Ex. 416 (KSA 7591) (which is the same document as Pls. Ex. 414 (MPS43_347). |
| 1184. | Bayoumi's interaction with MOIA and its highest official regarding Dr. Shaikh and his small, local Mosque was extraordinary. Bayoumi expected that his communication would be understood and acted upon. Bayoumi's unique efforts are also apparent from other letters in the MPS production, which show that Bayoumi helped arrange MOIA propagator visits to the Uthman Mosque and reported to high level MOIA officials about those visits. Ex. 414, MPS43_347 (Bayoumi's February 1999 letter to Minister); Ex. 413, MPS43_338 (Bayoumi's January 1999 letter to Sowailem); Ex. 694, Youssef Decl. ¶ 46. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibits 413 and 414 are inadmissible hearsay. *See* Objections Chart.<br><br>As set forth in the Response to Averment paragraph 1183, Al Bayoumi did not interact with the Ministry of Islamic Affairs and its highest official regarding Dr. Shaikh's small mosque. Moreover, the Minister never responded to Al Bayoumi's courtesy letter.<br><br>The fact that Al Bayoumi mentioned Dr. Shaikh and his small mosque to Al Sudairy, who not only stayed with Dr. Shaikh for four weeks, but also hosted Dr. Shaikh in Riyadh for a few days roughly two months before Al Bayoumi wrote his letter, does not indicate that Al Bayoumi was reporting about the Uthman Mosque to high-level Ministry of Islamic Affairs officials. Pls. Ex. 119 (Sudairy Tr.) 254:7-255:6. |
| 1185. | Bayoumi's letter to Sadhan was marked "very urgent" and specified that it must be | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | delivered immediately by hand "to the Sheikh himself." Bayoumi wrote to Sadhan "[d]o not procrastinate...you are precious to us." Ex. 388, MPS 43_374. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Sadhan is an imam and Al Bayoumi addresses him as "Sheikh Adel Al-Sadhan," as shown in his other letters, like Plaintiffs Exhibit 413 (MPS43_338) and Plaintiffs Exhibit 414 (MPS43_347). There is nothing unusual about this greeting. |
| 1186. | It is significant that Bayoumi stated in his letter to Sudairy that "I heard that you went to Hajj" and "May your Hajj be rewarded." Ex. 389, MPS 43_375. The Hajj occurred in Mecca in mid-March 1999. Ex. 5, Youssef Rpt. 113. Hazmi and Mihdhar were in Mecca at the same time that Sudairy and Sadhan attended Hajj. *Id.* Bayoumi did not say in the letter how he learned that Sudairy was at Hajj, which indicates that it was a matter of common understanding between the two men. Bayoumi likely gained that knowledge from Habib or Hamerman, who were in contact with Sadhan and Sudairy based on Bayoumi's February 1999 letter. Ex. 384, MPS 43_217; ▓▓▓▓▓▓▓▓▓ Hamerman had met with Sadhan and Sudairy, including during a reception in Bayoumi's private Mosque office, in San Diego in January 1999. Ex 11, MPS 726_147 (photo 298). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs Exhibits 384 and 389 are inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>None of the cited documents supports Plaintiffs' speculation that either al-Habib or Hamerman informed Al Bayoumi that Al Sudairy went to Hajj.<br><br>There is no evidence that Al Sadhan went to Hajj, as Plaintiffs allege. To the contrary, the evidence suggests strongly that Al Sadhan did not go to Hajj, as shown in the response to paragraph 1176 above.<br><br>Furthermore, there is no evidence that al-Habib or Hamerman ever met with Al Sadhan or Al Sudairy in Saudi Arabia. Al Bayoumi's February 12, 1999, letter to al-Habib was an invitation to contact the two imams to find out more details about how the mosque that al-Habib had just |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | established and funded had faired during its first Ramadan. The letter does not show that al-Habib ever contacted them.<br><br>Both Al Sadhan and Al Sudairy testified that they do not know and had never heard of Habib or Hamerman. Pls. Ex. 99 (Sadhan Tr.) 165:24-166:14, 191:18-21; Pls. Ex. 119 (Sudairy Tr.) 171:5-12, 179:12:23. There is no evidence to the contrary. |
| 1187. | Before making his urgent, extraordinary plea for Sadhan and Sudairy to get MOIA's Minister to act on Bayoumi's request concerning Dr. Shaikh's Mosque, Bayoumi stated to both Sadhan and Sudairy his hope that they would be "rewarded for being among *Al- Mujtahideen* [those who strive most diligently]". Ex. 388, MPS 43_374; Ex. 389, MPS 43_375. The Arabic term *Mujtahideen* is derived from the root word jihad and means the subject is striving or struggling towards a particular goal, with diligent purpose. In the context of Bayoumi's letter, the jihad that Bayoumi invokes here is their shared mission to provide support for the Al Qaeda operatives. Bayoumi's letter then conveyed the specific need - through reference to Masjid Uthman – for Saudi government officials to complete the arrangements that were being made for Dr. Shaikh to provide the safehouse accommodation in San Diego | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 388 and 389 are inadmissible hearsay. *See* Objections Chart.<br><br>As set forth in the Responses to Averment paragraphs 1182-1183, Al Bayoumi did not interact with the Minister of Islamic Affairs regarding Dr. Shaikh's small mosque. Instead, he sent a courtesy letter of thanks. *See* Pls. Ex. 416 (KSA 7591). The Minister never responded to Al Bayoumi's courtesy letter.<br><br>There is nothing in either letter regarding any "shared mission to provide support for the Al Qaeda operatives" or anything about Al Qaeda at all. Nor is there anything with respect to Dr. Shaikh providing a "safehouse accommodation in San Diego for the Al Qaeda operatives." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for the Al Qaeda operatives. Ex. 694, Youssef Decl. ¶ 49. | The FBI has confirmed that Dr. Shaikh was an FBI informant, not a Saudi employee or agent. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 335 ("[I]n May 2000 Hazmi and Mihdhar began renting a room in the home of an FBI informational asset."); KSA Ex. 163 (9/11 Rep.) 223 (the future hijackers' landlord had "long-standing, friendly contacts among local police and FBI personnel"). The Department of Justice Office of Inspector General review of the FBI's handling of intelligence before 9/11 also reported that Dr. Shaikh had told his FBI handler contemporaneously that two Saudi national visitors were residing in a room at his residence and their names were Nawaf and Khalid. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 262.<br><br>Dr. Shaikh's house was also not a "safehouse." A safehouse is a place where clandestine operators can accomplish a clandestine task or where they can stay, hidden from outside scrutiny. Dr. Shaikh's guesthouse was far from that. "When Hazmi and Mihdhar rented rooms from the asset [Dr. Shaikh] in 2000, two other persons also were renting rooms there." Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 261. Moreover, if it were a pre-arranged safehouse, the hijackers would have moved in immediately upon arriving in California. Instead, it took more than 4.5 months for the hijackers to move into the FBI informant's house.<br><br>Youssef's speculation to the contrary is baseless and demonstrates that his methodology and conclusions are entirely unreliable. |
| 1188. | Bayoumi's letter to Sudairy asking him to follow-up on the request to MOIA's Minister about "the matter" of Dr. Sheikh's Mosque was made immediately after the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 9/11 hijackers were cleared to travel into the U.S., demonstrating that Bayoumi was anxious to finalize arrangements that he, Sadhan, and Sudairy had made with Dr. Shaikh to host the two hijackers. Ex 694, Youssef Decl., Ex. 389, MPS 43_375. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 389 is inadmissible hearsay. *See* Objections Chart.

As set forth in the Responses to Averment paragraphs 1182-1183, Al Bayoumi did not interact with the Minister of Islamic Affairs regarding Dr. Shaikh's small mosque. Instead, he sent a courtesy letter of thanks. *See* Pls. Ex. 416 (KSA 7591). The Minister never responded to Al Bayoumi's courtesy letter.

There is nothing in any letter regarding finalizing any arrangements for Dr. Shaikh, an FBI informant, to host the hijackers. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 335 ("[I]n May 2000 Hazmi and Mihdhar began renting a room in the home of an FBI informational asset."); KSA Ex. 163 (9/11 Rep.) 223 (the future hijackers' landlord had "long-standing, friendly contacts among local police and FBI personnel").

Nor is there any evidence that Al Bayoumi had learned that Al Mihdhar had received a visa to enter the United States. There is also no evidence of arrangements for Dr. Shaikh to assist in the 9/11 conspiracy.

As of April 7, 1999, Al Hazmi and Al Mihdhar were not even part of any 9/11 plot. Khalid Sheikh Mohammed, the organizer of the plot, stated: "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of the friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United |

996

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. This is confirmed by the 9/11 Commission. In late 1999, "Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing." KSA Ex. 163 (9/11 Rep.) 155.<br><br>Moreover, the details of the 9/11 plot were worked out during Ramadan 1420H (early December 1999, eight months after April 7, 1999) at an al Qaeda high-level meeting in Qandahar. Al Hazmi was present at the December 1999 Qandahar meeting. Pls. Ex. 82 (CIA_256). The 9/11 Commission Report states that KSM prepared Al Hazmi for his trip to San Diego after this crucial meeting, in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157. Therefore, the timing of the evolution of the 9/11 operation contradicts Plaintiffs' false assertion that there had been an arrangement among various parties to use Dr. Shaikh's home as a "safehouse" for the future hijackers in April 1999. |
| 1189. | On the same day (April 7, 1999) that the second visa for the two hijackers was received, and Bayoumi wrote to Sadhan and Sudairy, PCA Director Salmi wrote a "Top Urgent" note to Dallah Avco, rejecting their request to end Bayoumi's "secondment" and instructing them to extend Bayoumi's term for another year because he needs "to complete the task under which the Presidency approved of his Secondment." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 432 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Ex. 432, DA 1004. That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah. Ex. 182, Kamel Ex. 119 (DA 1110). On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 6, DA 1119. | There is no evidence of any link between the hijackers receiving a visa to the United States and the request to extend Al Bayoumi's secondment.<br><br>As of April 7, 1999, Al Hazmi and Al Mihdhar were not even part of any 9/11 plot. Khalid Sheikh Mohammed, the organizer of the plot, stated: "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of the friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. This is confirmed by the 9/11 Commission. In late 1999, "Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing." KSA Ex. 163 (9/11 Rep.) 155.<br><br>Moreover, the details of the 9/11 plot were worked out during Ramadan 1420H (early December 1999, eight months after April 7, 1999) at an al Qaeda high-level meeting in Qandahar. Al Hazmi was present at the December 1999 Qandahar meeting. Pls. Ex. 82 (CIA_256). The 9/11 Commission Report states that KSM prepared Al Hazmi for his trip to San Diego after this crucial meeting, in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157. Therefore, the timing of the evolution of the 9/11 operation contradicts Plaintiffs' false assertion that there had been an arrangement among various parties to use Dr. Shaikh's home as a "safehouse" for the future hijackers in April 1999. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1190. | Two days later, on April 9, 1999, Bayoumi placed four calls to Saudi government offices at the Presidency of Civil Aviation, presumably to ensure that payments would continue through Dallah Avco after the PCA had intervened to ensure his extension. Ex. 12V (Bayoumi calls to Presidency Civil Aviation). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence of any link between the hijackers receiving a visa to the United States and the request to extend Al Bayoumi's secondment.<br><br>As of April 7, 1999, Al Hazmi and Al Mihdhar were not even part of any 9/11 plot. Khalid Sheikh Mohammed, the organizer of the plot, stated: "Nawaf Al-[Hazmi] and Khalid al-Mihdhar . . . had acquired U.S. visa[s] on their own accord in 1999 following the martyr death of the friend Hazam in the 1998 bombing of the U.S. Embassy in Nairobi, Kenya. They decided to obtain U.S. visas prior to traveling to Afghanistan to make themselves more attractive for any possible operation in the United States. Neither al-[Hazmi] or al-Mihdhar were aware of the September 11 operation prior to getting the visas, nor were they directed by Bin Laden, Sheikh Mohammed, or any other al Qaeda operative to do so." Pls. Ex. 31 (KSM Statement) at 15. This is confirmed by the 9/11 Commission. In late 1999, "Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing." KSA Ex. 163 (9/11 Rep.) 155.<br><br>Moreover, the details of the 9/11 plot were worked out during Ramadan 1420H (early December 1999, eight months after April 7, 1999) at an al Qaeda high-level meeting in Qandahar. Al Hazmi was present at the December 1999 Qandahar meeting. Pls. Ex. 82 (CIA_256). The 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Commission Report states that KSM prepared Al Hazmi for his trip to San Diego after this crucial meeting, in Karachi in December 1999. KSA Ex. 163 (9/11 Rep.) 157. Therefore, the timing of the evolution of the 9/11 operation contradicts Plaintiffs' false assertion that there had been an arrangement among various parties to use Dr. Shaikh's home as a "safehouse" for the future hijackers in April 1999. |
| | | Plaintiffs Exhibit 12V is an improper summary exhibit. Plaintiffs Exhibit 12V misattributes to Al Bayoumi 13 calls that were made from a publicly available phone line at the Al Medina Mosque. The phone line was shared by two office telephones at the mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the mosque – who made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15. These misattributed calls include the 4 calls made on April 9, 1999. |
| | | Plaintiffs rely solely upon hearsay sources in attributing the 2 recipient numbers in Plaintiffs Exhibit 12V ▮▮▮▮888 and ▮▮▮717) to PCA Airways Engineering. No subscriber records we▮▮▮ced to verify that either of the 2 numbers belonged to PCA Airways Engineering. |
| XV.D. | On April 11, 1999, four Saudi government officials - Bayoumi, Thumairy, Khalil, and Soliman Al-Ali - met at the King Fahad Mosque's offices in Culver City, CA, held a recruiting and training event, and identified at least one further individual to provide support to the 9/11 hijackers. | Plaintiffs fail to cite any evidence in support of the assertion that there was any recruiting event to assist the 9/11 hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1191. | Video footage, obtained by the MPS, shows an April 11, 1999 event held at the King Fahad Mosque's offices in Culver City, CA, just four days after the hijackers obtained their visas and Bayoumi sent his urgent requests concerning Dr. Shaikh's Mosque to Sadhan, Sudairy, and MOIA Minister Turki. The video confirms that Bayoumi met with the two Saudi government officials leading the King Fahad Mosque – Thumairy and Khalil Al Khalil – precisely where Hazmi and Mihdhar would be received upon their arrival in Los Angeles. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken. *See* ECF No. 9562.<br><br>The cited materials do not support Plaintiffs' contention of a link between the 9/11 hijackers and an apparently innocuous seminar held at the King Fahad Mosque for several dozen members of the Salafi Southern California community. Nothing in the video or screenshots shows Al Bayoumi interacting with either Al Khalil or Al Thumairy. Nor do Plaintiffs point to any discussion in the video that is remotely related to the 9/11 plot, which at this point in time in April 1999 had not been formulated.<br><br>There is also no evidence that Al Hazmi or Al Mihdhar were "received" at the King Fahad Mosque. Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. Al Khalil also testified that he has no information whatsoever about any senior Saudi official providing any instruction to Al Thumairy to assist the hijackers or any information about Al Thumairy actually providing instructions to anyone to assist the hijackers. Pls. Ex. 113 (Khalil Tr.) 362:7-21, 363:7-10 (testifying that he is not aware of any Saudi support to the hijackers). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  Pls. Ex. 2A (EO 9-11).  The 9/11 Commission also found no "evidence that Thumairy provided assistance to the two operatives."  KSA Ex. 163 (9/11 Rep.) 217. |
| 1192. | Photographs taken at the same event and showing the final stages of the construction at the King Fahad Mosque are date stamped April 11, 1999, a Sunday. Ex. 27, Madha Supp. Decl. ¶ 6, Ex. 2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken.  *See* ECF No. 9562.<br><br>There is nothing in the photographs that indicate any connection between the construction of the King Fahad Mosque and the 9/11 plot. |
| 1193. | Thumairy attended the event. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶ 7, Ex. 3 image 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken.  *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is nothing connecting Al Thumairy's attendance at an event in the King Fahad Mosque to the 9/11 plot. As set forth above, in April 1999, the 9/11 plot had not even been formulated.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). The 9/11 Commission also found no "evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. |
| 1194. | A fourth senior Saudi Embassy official was there: Soliman Al-Ali, who led the IIRO and Sanabel Al-Khair "charity" organizations in the U.S., reported to Ambassador Bandar, and was assigned to work alongside Bayoumi in San Diego. Ex. 374, MPS 43_348-351 (letter recovered by MPS in Bayoumi's possession sent from Al-Ali to Prince Bandar discussing his work at IIRO and Sanabel). Al-Ali is identified by his nametag at the event, and Bayoumi's statement that the seminar was "[p]repared and presented by Dr. Soliman bin Ali Al-Ali." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 374 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the cited documents are various letters by Soliman al-Ali to Prince Bandar, the Saudi Arabia Ambassador to the United States at the time. They do not state that al-Ali was a "senior Saudi Embassy official" or was assigned to work alongside Al Bayoumi in San Diego. The letters are dated December 1998, four months before the event in question and are irrelevant to this issue. Nor do Plaintiffs' cited materials in this paragraph show al-Ali's presence at this event. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1195. | Bayoumi and Khalil can be seen exchanging friendly banter with each other, and at another point Thumairy gets up from his seat at the back of the room, and Bayoumi comes and sits in the same seat. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶¶7-9 7 & Ex. 3-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken. *See* ECF No. 9562.<br><br>The cited materials again do not support Plaintiffs' linkage in the title of this Section between the 9/11 hijackers and this innocuous meeting for several dozen people at the King Fahad Mosque. The video shows people in a classroom situation, listening to lecturers and sometimes interacting with each other.<br><br>As set forth above, this event in April 1999 was well before the 9/11 plot was even formulated. |
| 1196. | The event involving the four Saudi government officials was "Seminar #2" in a "self-help" training course called "Mana Co." to "unleash the power within." The course was held in Arabic and was used by Saudi Arabia to recruit and train individuals for its extremist network. The participants were involved in various exercises, including breaking wooden boards. They each earned a certificate at the end of the event. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the video simply shows a seminar entitled Mana Co. "We create the change for an amazing life," attended by several dozen individuals seated in classroom chairs. There is no evidence cited or otherwise that this seminar was "used by Saudi Arabia to recruit and train individuals for its extremist network." Nor is there any |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | hint of any linkage between the seminar and the future 9/11 hijackers as suggested in the title of this Section. |
| 1197. | A day before the April 11, 1999 "Seminar #2" event in Los Angeles, Bayoumi received a certificate issued in his name and signed by Soliman Al-Ali, which stated that he completed the "unleash the power within" program on "April 10, 1999" evidencing that Bayoumi also attended the same course the day before. Ex. 12, MPS 681_41 (Mana Program Certificate). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited material in Plaintiffs Exhibit 12 is a series of telephone call charts, not a certificate of completion. In the MPS documents, in the electronic file labeled MPS 681 – D0863-X0290, in the paper file labeled PSS/14 D863, at OCR 41 (KSA Ex. [231]), there is a certificate of completion for Al Bayoumi indicating that he had completed a seminar "unleash the power within," signed by CEO Dr. Soliman al-Ali and dated April 10, 1999. It is unclear from this document whether it refers to the seminar on April 11, 1999, or a different seminar. |
| 1198. | One of the attendees at the event can be identified by his nametag as Ramez Noaman. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

None of the name tags in the cited exhibits is legible. |
| 1199. | Noaman later moved from Los Angeles to San Diego and would help the two 9/11 hijackers in San Diego with translations, flight lessons and other tasks. Ex. 2, EO | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 0307-0320 at 0308-0309 (Noaman was introduced to Mihdhar and Hazmi by Mohdar Abdullah and provided interpretation services and aided them in obtaining flying lessons). After the 9/11 Attacks, Noaman was deported from the U.S. to his native Yemen. Ex. 2, EO 4030. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2I (EO 308-09) and Plaintiffs Exhibit 2HH (EO 4030) are inadmissible hearsay.<br><br>█████████████████████████████████████ |
| 1200. | Another participant at the event was Abdul Hafiz Kebhaj. Ex. 27, Madha Supp. Decl. ¶ 7, Ex. 3 & Ex. 6. Kebhaj was a member of Thumairy's extremist group that regularly met in the library of the Mosque. Ex. 72, Madha Decl ¶ 7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken. *See* ECF No. 9562.<br><br>Fahad Al Thumairy was not an extremist and did not have an extremist group. Ismail Mana stated in a declaration that Al Thumairy "never expressed any extremist or violent views." KSA Ex. 77 (Mana Decl.) ¶ 8. "Based on my experience with Mr. Al Thumairy, he was a kind, gentle, moderate, and peaceful person." *Id.* Akram Alzamari, who came to pray three times a day at the King Fahad Mosque, also insisted that Al Thumairy was not an extremist. Pls. Ex. 101 (Alzamari Tr.) 39:8-10, 42:7-13.<br><br>Usman Madha asserted in a declaration Plaintiffs had drafted for him in the first instance that Al Thumairy "espoused a strict, virulent form of Wahhabist dogma." Pls. Ex. 72 (Madha Decl.) ¶ 18; *see* Pls. Ex. 128 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Madha Tr.) 16:10-15 (testifying that Plaintiffs drafted the declaration). He admitted under cross-examination, however, that he "understand[s] very little Arabic," could not "understand [Al Thumairy's] sermons," and "never personally heard Thumairy express any support for terrorism in any of his sermons." Pls. Ex. 128 (Madha Tr.) 38:3-39:17; *see* Pls. Ex. 72 (Madha Decl.) ¶¶ 18-19. Madha also testified that he used the word "extreme" vaguely to describe religious beliefs unrelated to terrorism, such as rejecting American traditions like "celebrati[ng] . . . Thanksgiving." Pls. Ex. 128 (Madha Tr.) 60:18-61:18. He further admitted that he never saw the hijackers at the mosque or anyone at the mosque, including Al Thumairy, interact with them. *Id.* at 14:5-15:21. |
| XV.E. | On May 10, 1999, Bayoumi returned to Los Angeles and introduced Abdussattar Shaikh to Thumairy and Khalil, who vetted Dr. Shaikh to undertake assignments for the Saudi government. | Plaintiffs cite nothing in support of this assertion. Dr. Shaikh was in fact an FBI informant, and the FBI determined that he was not complicit in the attacks. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 261 n.198 ("The FBI opened an investigation after September 11 to determine whether the asset [Dr. Shaikh] was involved in the attack. The asset has consistently maintained after September 11 that he had no suspicions about Al Hazmi and Al Mihdhar. The results of a polygraph examination on his potential role were inconclusive. Based on its investigation, however, the San Diego FBI concluded that the informational asset had not been complicit in plotting the attacks."); *id.* at 262 ("Stan [the FBI Special Agent handling Dr. Shaikh] reported that the asset had told him contemporaneously that two Saudi national visitors were residing in a room at his residence. Stan said that the asset merely provided the first names of the boarders, Nawaf and Khalid. . . . According to Stan, the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny."). <br><br> This conclusion was also stated in the 9/11 Commission working papers. "The FBI has investigated Muppet [Dr. Shaikh] and has concluded that he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | did not have advance knowledge of the attacks." 9/11 Commission, "Workplan: Issues Relating to The FBI Informant with Whom 9/11 Hijackers Nawaf al-Hazmi and Khalid al-Mihdhar Resided," at 11, June 6, 2003, declassified July 8, 2015, *available at* https://www.archives.gov/files/declassification/iscap/pdf/2012-048-doc17.pdf. |
| 1201. | In August 2003, Bayoumi told the FBI that he "visited the King Fahad Mosque with his eldest son…and Dr. Abdusattar Sheikh." Ex. 2, EO 0251. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2G (EO 251) is inadmissible hearsay. |
| 1202. | In his deposition, Bayoumi watered down his statement to the FBI, claiming he could only remember going to the Mosque with his son, "[b]ut with Dr. Shaikh, no, I don't remember." Ex. 120, Bayoumi Dep. 230:14-23. When shown his prior statement to the FBI that he visited the King Fahad Mosque with Dr. Shaikh, Bayoumi stated that it did not refresh his recollection. Ex. 120, Bayoumi Dep. 498:20-499:7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Al Bayoumi gave this testimony. |
| 1203. | Photographs from Bayoumi's May 10, 1999, trip to the King Fahad Mosque show that Bayoumi brought Dr. Shaikh with him. Khalil gave Bayoumi, a man named Joe Averna, and Bayoumi's son a tour of the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque. Khalil then held a sit-down meeting with Dr. Shaikh in Khalil's his private office across the street from the Mosque. Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken. *See* ECF No. 9562.<br><br>Plaintiffs fail to cite any evidence that Dr. Shaikh or Joe Averna is in these photos. |
| 1204. | Bayoumi then took Dr. Sheikh to the Ibn Taymiyah Mosque where Thumairy was the Imam at the time. A photo recovered by the MPS shows Bayoumi pictured outside the Ibn Taymiyah Mosque with Joe Averna, and Bayoumi's son. Ex. 27, Madha Supp. Decl. ¶ 10, & Ex. 5; MPS646(1)_6. In addition, Bayoumi's handwritten address book has contact information for the "Ibn Taymiyah Mosque" next to Thumairy's name. Ex 12AA, MPS738_35. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Madha supplemental declaration has been stricken. *See* ECF No. 9562.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>Plaintiffs fail to cite any evidence of who is in the photos they cite. KSA Ex. 289 (MPS646(1)_6) only shows two adults and a child. It does not show that Al Bayoumi took Dr. Shaikh to *see* the Ibn Taymiyyah Mosque, where Al Thumairy was an imam. |