# EXHIBIT 160
## REDACTED FOR PUBLIC FILING

## PART 2 OF 2

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1205. | When Bayoumi was deposed in this case in June of 2021, the MPS materials had not yet been produced. At his deposition Bayoumi denied that he ever went to "a mosque on Venice Boulevard in Los Angeles called the Imam [Ibn] Taymiyyah Mosque." Ex. 120, Bayoumi Dep. 220:8-11. However Bayoumi's notes, seized from his office, contained the address of the Ibn Taymiyah Mosque, "10915 Venice," and driving instructions from the 405 Freeway. Ex. 678V, MPS 732_212-214 at 214. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 678V (MPS 732_214) is inadmissible hearsay.

It is undisputed that Al Bayoumi gave this testimony. Plaintiffs Exhibit 678V does not appear to be driving instructions and merely states "Venice distance ½." |
| 1206. | Bayoumi told the 9/11 Commission that he visited the King Fahad Mosque during a visit with Dr. Joe [Averna] and REDACTED [Dr. Shaikh] and that "[a]ll 3 of them met Al-Thumairy at that time….". Ex. 90, Snell Decl., Ex. 2 at 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 90 (Snell Decl. Ex. 2) is inadmissible hearsay to the extent it is offered for its truth. *See* Objections Chart.

The 9/11 Commission concluded that "we have seen no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him [including Dietrich Snell, who participated in the interview of Al Bayoumi referenced in Plaintiffs Exhibit 90, Snell Decl. Ex. 2] and studied his background find him to be an unlikely candidate for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218. |
| 1207. | At his deposition, Bayoumi demurred when asked about Dr. Shaikh, answering "no" and "I don't remember" when asked if he brought Dr. Shaikh to the Mosque. Ex. 120, Bayoumi Dep. 230:19-23. This dissembling was strategic. Bayoumi brought Dr. Shaikh to meet with Thumairy and Khalil to coordinate with them about the plan – submitted by Bayoumi via Sadhan and Sudairy to MOIA's Minister – to have Saudi Arabia fund Dr. Shaikh to host Saudi government visitors in San Diego. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that Al Bayoumi could not recall if he made a trip with Dr. Shaikh to the King Fahd Mosque.

Plaintiffs' assertion that Al Bayoumi "dissembling was strategic" is attorney argument to which no response is required. There is no evidence whatsoever that Al Bayoumi brought Dr. Shaikh, an FBI informant, to meet with Al Thumairy or Al Khalil to coordinate about a plan to have Saudi Arabia host Saudi visitors in San Diego. There is also no evidence that Al Bayoumi submitted any such plan to the Minister of Islamic Affairs, as explained in the prior Section.

Plaintiffs' assertions are pure speculation. Even if the individuals in each of the pictures could be identified and they are in fact Dr. Shaikh and Joe Avena, the photos would only show that Al Bayoumi brought his minor son and Dr. Shaikh to visit the King Fahd Mosque, which was under construction, and met with Khalil Al Khalil. Al Bayoumi, his minor son and Avena then visited the Ibn Taymiyyah Mosque. Nothing suggests that Dr. Shaikh was being vetted for anything, and it would not make sense for Al Bayoumi to bring his minor son and a third party, Joe Avena, if someone was being vetted for a nefarious purpose. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| **XVI.** | **BAYOUMI MEETS WITH MOIA OFFICIALS SADHAN, SUDAIRY, AND SOWAILEM IN WASHINGTON, D.C. AND PREPARES A CASING VIDEO OF THE U.S. CAPITOL BUILDING TO ASSIST AL QAEDA IN SELECTING ITS TARGETS FOR THE "PLANES OPERATION" THAT WOULD BECOME THE 9/11 ATTACKS** | The video is not a casing video and there is no evidence that it was ever provided to Al Qaeda.<br><br>As detailed belong, it has nothing in common with actual Al Qaeda casing videos. Indeed, in the video, Bayoumi shows an interest in beautiful flower beds, old-fashioned lamps, water fountains, and even a squirrel running across the White House lawn. He introduces himself to other tourists along the way, and ends by filing the exterior of the hotel "where I live. This is nothing more than a simple tourist video. |
| 1208. | Bayoumi travelled from San Diego to Washington, DC on June 20. Ex. 312, MPS 724_126. Bayoumi placed a handwritten note on his travel itinerary which had a Virginia phone number ███████-4510" and the name of Mutaeb Al Sudairy: "Assudairi." Ex. 312, MPS 724_126; Ex. 12BB, MPS 688_5 (in October 2000 typed phone book, Bayoumi similarly translated Sudairy's name as "Assodairy"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12BB (MPS 688) is inadmissible hearsay. *See* Objections Chart.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>Undisputed that Plaintiffs Exhibit 312 contains the handwritten note and phone number. However, this phone number is different than the phone |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | number for "Assodairy, Muteiab" in Plaintiffs Exhibit 12BB (MPS 688_5) – ████-0998. |
| 1209. | In December 2023, the MPS produced video footage contained on a VHS videotape that the MPS seized from Bayoumi in September 2001 and produced as Ex. 11, MPS2023-003. The MPS record photograph of the actual VHS cassette shows that Bayoumi handwrote a small label on the videotape which read: "Washington trip 23, June 1999 – 4 July." Ex. 11, MPS2023-056, Record of Photography at DSC_0005. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. To the extent a response is required, this is undisputed. |
| 1210. | The VHS tape contained video footage lasting 1 hour 6 minutes 55 seconds, which was produced by the MPS in .MOV digital file format. The certified exhibit version of this file, with its accompanying label and timer is an exact copy of the footage produced. Ex. 10F (MPS2023-003 Video Exhibit) ("Bayoumi Washington trip videotape"); Ex 694, Youssef Decl. ¶ 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. To the extent a response is required, this is undisputed. |
| 1211. | Plaintiffs' expert Bassem Youssef served as an FBI Special Agent investigating terror groups in St. Louis and Southern California in the 1990s, and as the Chief of the FBI's Digital Media Exploitation Unit from 2003 to 2005 and Chief of the FBI's Communications Analysis Unit, from 2005 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to 2014. His work at the FBI included the review and analysis of video and other media evidence in major terrorism investigations. Ex. 694, Youssef Decl. ¶ 7. | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>The FBI has asserted that, when Youssef worked in St. Louis and Southern California, he was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). The FBI also prevented Youssef from working on the 9/11 attacks despite his requests and even though the 9/11 investigation was "the largest and most comprehensive investigation ever conducted by the FBI" involving half the FBI's agents. Pls. Ex. 105 (Youssef Tr.) 124:7-127:18. Instead, during the 9/11 investigation, he was assigned to a job "cataloging documents as in putting an identifying number or serial number on a document before storing the document" and he admitted that the job was not operational in nature. *Id.* at 128:10-129:20.<br><br>Youssef does not have substantial experience investigating Al Qaeda. Although Plaintiffs cite to Youssef's experience in the FBI's Communications Analysis Unit, his own colleagues testified in court that he was "a wallflower and not totally engaged and immersed in operational activity of our [FBI] terrorism investigations." Another colleague testified that Youssef was rarely engaged on the threats that were being addressed in his office and was frequently absent from the office (present only one day in November 2004, 11 days in December 2004). Every time an emergency came up, Youssef was not at the office and his subordinate had to do his job. A third colleague testified at the same trial that Youssef's absences affected his ability to act as unit chief. At the trial, the FBI maintained that Youssef's counterterrorism assistance before the 9/11 attacks was limited to that of a translator. Pls. Ex. 105 (Youssef Tr.) 124:7-139:22, 155:6-170:12, 174:16-183:21, 207:18-22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1212. | Youssef reviewed the Bayoumi Washington trip videotape. In his opinion, the Bayoumi Washington trip videotape contains Omar Al-Bayoumi's casing report of the U.S. Capitol Building in Washington, D.C. for the purpose of planning a future terrorist attack against the United States. According to Youssef, a casing report would not only seek to define the strengths and vulnerabilities of a target itself but would help determine the importance of a building as a symbol, its status or role in the society, and the perceived impact of attacking or destroying it. Youssef found that the Bayoumi Washington trip videotape was made for each of these aims. Ex. 694, Youssef Decl. ¶¶ 8-9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef declaration has been stricken. *See* ECF No. 9562.

The video is a simple tourist video, and there is no evidence to the contrary.

As set out in Saudi Arabia's expert Marc Sageman's report, Al Qaeda casing reports are nothing like this tourist video. *See* KSA Ex. 167 (Sageman Rep.) 257-59. For instance, during the operational planning for the 9/11 operation, KSM "sent Britani [real name Dhiren Barot] to the United States to case potential economic and 'Jewish' targets in New York City" and Washington, D.C. KSA Ex. 163 (9/11 Rep.) 150. At the time the 9/11 Commission Report was issued, Dhiren Barot had not yet been arrested and KSM had given his name to his interrogators. (This also refutes the claim that KSM was trying to protect people who had not yet been arrested.) Barot conducted his casing in the summer of 2000 and the spring of 2001.

Barot created four casing reports. "One was a 35-page report on the Citigroup Center in Manhattan, describing background information on the building, its height, number of floors, building material, pictures, and diagrams of the general layout. It then outlined the various supporting columns of the building, atrium, and other structural information. It described the security features of the building and its environment: locations of fire department, police station, religious building, traffic |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | signals and patterns, escape routes, and so on. It concluded with five possible plans of attack, weighing the benefits and risks of each. Almost as detailed was the 28-page casing report of the New York Stock Exchange, for which Barot suggested arson as the best method of attack. Another casing report combined the International Monetary Fund (IMF) Headquarters and the World Bank Headquarters located next to each other in Washington, D.C." KSA Ex. 167 (Sageman Rep.) 258. These detailed casing reports have nothing in common with Al Bayoumi's tourist video.<br><br>The Barot casing reports were also found on the hard drive of a captured computer in the Afghanistan-Pakistan area in 2004.<br><br>By contrast, there is no evidence that Al Bayoumi's video was ever sent to al Qaeda. There has never been a trace of the Al Bayoumi video found anywhere in al Qaeda's possession despite more than two decades of intensive searches worldwide for al Qaeda material. If it were a casing report, Al Bayoumi would not have it in his possession in England in September 2001.<br><br>Finally, the cited video would not be useful as a casing of a target to be attacked from the air, as was already decided for the 9/11 plot. How a building looks from the ground up is not very useful when seen from the air. In fact, bin Laden preferred the White House as the target of the airliner that crashed in Pennsylvania, but this was dropped in favor of the U.S. Capitol for "navigational reasons" because the White House was too small a building to be easily spotted from the air. Pls. Ex. 82 (CIA_261-62). Any video showing the U.S. Capitol from the ground would have been irrelevant to the 9/11 operation.<br><br>The cited video shows Al Bayoumi visiting various tourist attractions in Washington. The locations shown include the White House, the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Washington Monument, the Smithsonian Institute, the National Mall, the Capitol, the Saudi Embassy, and the Islamic Center of Washington, D.C. *See* Pls. Ex. 10F at 8:38-9:10, 9:30-13:03, 17:26-18:16, 23:11-23:57, 24:45-25:05, 29:50-30:10, 32:00-32:37, 33:12-33:26. About seven minutes of the video depict the outside of the Capitol, and about 16 minutes show the artwork inside. *Id.* at 33:12-33:26, 35:40-35:50, 38:23-41:34, 41:54-43:02, 57:34-1:01:35 (8 minutes 44 seconds of the Capitol exterior or adjacent areas; but note that 40:00-41:00, 57:34-57:47, 58:30-58:49, 1:00:15-1:00:47 do not show the Capitol itself); *id.* at 41:34-41:52, 43:02-57:34 (14 minutes 50 seconds of the Capitol interior). In the video Al Bayoumi shows an interest in beautiful flower beds, old-fashioned lamps, water fountains, and even a squirrel running across the White House lawn. He introduces himself to other tourists along the way, and ends by filing the exterior of the hotel "where I live." *See*, *e.g.*, *id.* at 17:49-17:55, 21:19-21:27, 29:58-30:11, 50:47-50:55, 1:00:16-1:00:45, 1:06:05-1:06:28. This is nothing more than a simple tourist video. |
| 1213. | The Bayoumi Washington trip videotape contains nearly 30 minutes of footage during which the Capitol Building is the principal or sole focus of his filming. The report runs from 33:12 (the first point at which Bayoumi declares "Capitol Hill – which is the American Congress") through 1:01:35 (where he signs off by stating his name and zooming in on the U.S. flag flying on the Capitol dome). Youssef Decl. ¶ 10; Ex. 10F (MPS2023-003 Video Exhibit); Ex. 10F-TR (MPS2023-003-TR Video Transcript): Ex. 11F (MPS2023-003 Video Screenshots). | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>As detailed in the response to averment paragraph 1212, this is not a casing video. Moreover, contrary to the claims of 30 minutes of footage in the video, there are only about 7 minutes depicting the outside of the Capitol building (it starts intermittently at 38:50 into the video, not at 33:12 which is a random far view of it from the Smithsonian Institute), with about 16 other minutes showing the artwork inside the Capitol, which are not even potentially relevant to an air operation. The video also shows other tourist attractions around the Washington, D.C. area, including the Saudi Embassy, the Islamic Center of Washington, the White House, the Smithsonian Institute, and the U.S. Supreme Court building, which again demonstrates that it is nothing more than a tourist video. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1214. | The video images are accompanied by Bayoumi's verbal commentary, mainly in Arabic with some words in English. As a native Arabic speaker, Youssef carefully studied the words used by Bayoumi in narrating the video. Youssef reviewed a full certified transcription and translation of the words spoken on Bayoumi Washington trip videotape. Ex. 10F-TR (MPS2023-003-TR Video Transcript). Youssef also reviewed the English captions on the certified Exhibit version. Ex. 10F (MPS2023-003 Video Exhibit, Ex. 694, Youssef Decl. ¶ 12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562. |
| 1215. | Youssef is fluent in Arabic and confirmed that the transcription and translation of the words spoken are accurate, and that the captions correspond precisely with when the words are heard on the video. The certified video exhibit includes a time which allows precise timecodes to be captured. Every item of speech is accompanied by corresponding text in English. Youssef also observed that some speech is inaudible, largely due to background noise and Bayoumi's use of a hushed voice. Ex. 694, Youssef Decl. ¶ 13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562. |
| 1216. | According to Youssef, the video bears the hallmarks of terror planning operations identified by law enforcement and | The Youssef declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | counterterrorism investigators in operational videos seized from terror groups including Al Qaeda that he has personally reviewed throughout his FBI career. Bayoumi's video footage and his narration are not that of a tourist. Ex. 694, Youssef Decl. ¶ 14. | As set forth in the Response to Averment paragraph 1212, the video is not a casing video and is nothing like the actual Al Qaeda casing reports that were prepared by Dhiren Barot. |
| 1217. | The Bayoumi Washington trip videotape addresses the structure of the Capitol, including its interior columns; the means of ingress and egress including staircases, front and rear entrances and exits; and the windows on all sides of the building. Bayoumi collected footage from various distances around the Capitol, from outside and inside the building, and from both sides. He documented other structures and areas around the building. Bayoumi also films and comments on the number of people in the building and on security personnel conducting patrols, including the Capitol police. Ex. 10F (MPS2023-003 Video Exhibit); Ex. 10F-TR (MPS2023-003-TR Video Transcript). | As set forth in the Response to Averment paragraph 1212, the video is not a casing video and is nothing like the actual Al Qaeda casing reports that were prepared by Dhiren Barot |
| 1218. | Bayoumi did not prepare the video for his personal use or to share with his family. Rather the video was prepared as a report to a specific audience, whom Bayoumi addresses on the video as his "esteemed | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>As set forth in the Response to Averment paragraph 1212, the video is not a casing video and is nothing like the actual Al Qaeda casing reports that were prepared by Dhiren Barot. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | brothers." Bayoumi announces on the tape: "We greet you, the esteemed brothers, and we welcome you from Washington." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 38:38. Bayoumi says: "This is the Congress. Here is where the decisions are made and the procedures are effected." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 38:51; Ex. 694, Youssef Decl. ¶ 16. | |
| 1219. | While viewing several people climbing scaffolding set up on the Mall, Bayoumi states "They say that our kids are demons. However, these are the demons of the White House." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 39:06. | Undisputed, but as set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1220. | Bayoumi then states: "In front of the Congress. There is no Power nor Strength except through Allah!" Ex. 10F-TR (MPS2023-003-TR Video Transcript) 39:36. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

To the extent a response is required, it is undisputed, but as set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1221. | Bayoumi focuses on a building next to the Capitol and states "we come back once more to this building, whose name I don't | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | know as of yet." Bayoumi then adds: "However, I will provide you with the results soon." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 40:47-55. Bayoumi's statement indicates that Bayoumi was likely given a specific assignment to identify and provide a report about the Capitol and its immediate vicinity. Ex. 694, Youssef Decl. ¶ 19. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef declaration has been stricken. *See* ECF No. 9562.

As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. There is no evidence that Al Bayoumi was given any specific assignment to identify and provide a report about the U.S. Capitol and its immediate vicinity.

In this specific portion of the video cited by Plaintiffs, Al Bayoumi is commenting on the Smithsonian Institute castle. He comments that "I don't know what it is called. This is a castle . . . This beauty in it. And I am not sure if this is a church or not, but we will find out now." Pls. Ex. 10F-TR (MPS2023-003-TR) at 33:30-33:54. It is clear that he is stating that he would try to find out the name of the castle on the national mall.

The assertion that this attempt to find the name of the Smithsonian Institute (which is not in the immediate vicinity of the Capitol) shows Al Bayoumi was likely given a specific assignment to provide a report shows the implausibility of Plaintiffs' assertions.

After the visit to the Capitol, the video shows a building, which Al Bayoumi narrates: "This is another building" (at 1:01:36 into the video). This video shows the U.S. Supreme Court building, which Al Bayoumi, who is not familiar with the U.S. government institutions, mistakes for the "Ministry of Justice" (at 1:01:52 into the video). As a tourist, Al Bayoumi did not know what he was looking at. Earlier in the video, he did not recognize the Washington Monument on the Mall. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1222. | Bayoumi estimated that "approximately 500" congregate in the Congress and stated: "500 plus. 500. Deciding the fate of the nation here." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 41:15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Bayoumi makes this statement in the video. As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1223. | Bayoumi observes the Capitol Building: "It has two entrances. One entrance is from this side." Ex. 10F-TR (MPS2023-003-TR Video Transcript). He addresses the structure and architectural features supporting the building: "And here you notice the columns." Ex. 10F- TR (MPS2023-003-TR Video Transcript) 46:09. Bayoumi films the Capitol dome from the outside, and from beneath it on the inside. He also focuses on a scale model of the Capitol, capturing its features as if from in the sky above. | As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1224. | Bayoumi films official vehicles parked next to the building, which he identifies as "[t]heir cars" and remarks: "You said that in the plan." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report.<br><br>Al Bayoumi's voice is unclear at this point in the video. He seems to say "Their cars" in Arabic and follows with an expression that sounds like "You said that in the plan" in English. Pls. Ex. 10F-TR (MPS2023-003-TR) at 58:17. However, it cannot be determined whether he was mumbling something in Arabic or was switching to English. |
| 1225. | Bayoumi collected video footage of security personnel inside and outside the building: "Here are some security officers, walking around the most important building." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 1:00:52. Youssef observed that Bayoumi was ranking the building as a target. Ex. 694, Youssef Decl. ¶ 24. Bayoumi characterized the Capitol and its inhabitants: "It is a workshop. Indeed, it is a workshop. Senators, employees, security personnel, visitors. All of them respectable." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1226. | At one point on the video, Bayoumi appears before the camera to deliver a greeting to his audience: "Peace, mercy and blessings of Allah be upon you. From the United States of America. Omar Al-Bayoumi from | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Capitol Hill. -- the Capitol Building." Ex. 10F- TR (MPS2023-003-TR Video Transcript) 58:50-59:16. Bayoumi then states: "Once again, my esteemed viewers, I greet you and I welcome you from the Capitol Hill." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 59:21-59:25. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that Al Bayoumi made these statements. As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report. |
| 1227. | Bayoumi's Washington trip videotape shows that Bayoumi was with the same two officials, Adel Al Sadhan and Mutaeb Al Sudairy, who had been sent to California by Saudi Arabia's Ministry of Islamic Affairs (MOIA) in December 1998-January 1999 as an "advance team" for the 9/11 hijackers. Bayoumi addressed Sudairy as "Sheikh Mutaeb" and states "He is the leader, he is our Emir for this trip." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:50-59:21. The presence of Sadhan and Sudairy together with Bayoumi is highly significant given Bayoumi's 1999 correspondence recovered by the MPS which (as discussed above) shows that Sadhan and Sudairy and their boss Sowailem were working together with Bayoumi to support Al Qaeda. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375; Ex. 694, Youssef Decl. ¶ 36. | The Youssef declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 388 and 389 are inadmissible hearsay. *See* Objections Chart.

As set forth in the Response to Plaintiffs Averment ¶ 1158, the cited materials do not support Plaintiffs' contention that Al Bayoumi, Al Sadhan, and Al Sudairy worked with Al Sowailem together to support Al Qaeda. There is no support for this assertion.

Al Sudairy and Al Sadhan appear to be present at the beginning of the video when they visit parts of Virginia, the outside of the Saudi Embassy in Washington, D.C., and the Islamic Center of Washington, D.C. They disappear from the rest of the video, and it is unclear whether the parts with them are taken the same day as when Al Bayoumi visited the tourist attractions on the Mall: the White House, the Washington Monument, the Smithsonian Institute, the Mall, the Capitol, and the U.S. Supreme Court. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1228. | At the time Bayoumi's Washington trip videotape was filmed, Sadhan and Sudairy had just moved to Washington, D.C. and were designated by Saudi Arabia as Embassy diplomats with full diplomatic immunity. Ex. 26, Letter dated August 24, 2021 from Acting Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq. An FBI report shows that Sadhan and Sudairy returned to the U.S. on June 13, 1999. Ex. 2, EO 0630. Bayoumi addressed a question to Sudairy as to how he was feeling "on this day" in Washington, D.C. adding "of course, this is the tenth day for you." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 03.46-03.50. This exchange was typical of the method used by Bayoumi in his videotapes to document his operational activities and memorialize dates and times. Ex. 694, Youssef Decl. ¶ 34. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report.<br><br>At the time of the video, Al Sadhan and Al Sudairy were diplomats working in the Saudi Embassy as administrative and technical staff of the Embassy. Undisputed that Al Bayoumi made the statements in the video. Al Sadhan and Al Sudairy were not part of any video of the Capitol.<br><br>Youssef's statement that this is typical of the method used by Al Bayoumi in his videotapes to document operational activities is unsupported. The tape is labeled "23, June 99 - 4 July." Pls. Ex. 11F (MPS2023-003 Video Screenshots) at 1. There would be no need for some convoluted way to document when the video was shot. |
| 1229. | MOIA Embassy Director Khalid Sowailem admitted to the FBI that he met Bayoumi at the Saudi Embassy and spent time with him in the Islamic Affairs office. Ex. 454, FBI 000012-14 at 0012. Sowailem acknowledged that his contact with Bayoumi went beyond student affairs, addressing issues concerning the Al- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Madinah Mosque. Ex. 454, FBI 000012-14 at 12; Ex. 2, EO 1438. This meeting between Sowailem and Bayoumi necessarily took place during Bayoumi's June-July 1999 Washington trip. Ex 454, FBI 000012-14. There is no evidence of another trip by Bayoumi to Washington. Bayoumi claimed he could not remember Sowailem. Ex. 120, Bayoumi Dep. 170:19-171:1 | Plaintiffs Exhibit 454 and Plaintiffs Exhibit 2Q (EO 1438) are inadmissible hearsay.<br><br>Undisputed that Al Bayoumi testified that he does not remember Al Sowailem. |
| 1230. | Bassem Youssef concludes that Sowailem was involved with Bayoumi, Sadhan, and Sudairy in a joint plan to assist Al Qaeda to carry out its "planes operation." Ex.694 Youssef Decl. ¶ 36. Youssef previously found that Sowailem was part of the phone calls held among Thumairy, Bayoumi, Sudairy (who worked under Sowailem), Aulaqi, and others preparing for the hijackers and assisting them upon and after their arrival. Ex. 5, Youssef Rpt. 218-219. Of note, Bayoumi called Sowailem's personal cell phone on Friday, February 18, 2000 (2 mins.) and Saturday February 19, 2000 (6 mins.) immediately following the welcome party Bayoumi hosted for the two hijackers in San Diego. Ex. 516, FBI 03235-49 at 3242; Ex. 12A (Phone calls Nov. 1999 – March 2000). Seated at the party among Bayoumi's close associates, | The Youssef declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no support for the assertion that Al Sowailem, Al Bayoumi, Al Sadhan, and Al Sudairy participated "in a joint plan to assist Al Qaeda to carry out its 'planes operation.'"<br><br>Plaintiffs cite to pages 218-219 of Plaintiffs Exhibit 5 (Youssef Rep.), which in turn reference phone calls that were made in December 2000 – almost a year after the hijackers' arrival in California (and at least 6 months after Al Mihdhar left the United States for Yemen). None is even relevant, much less supports Plaintiffs' assertion.<br><br>There was also no welcome party for the hijackers, as addressed in the Responses to Section XXII of the Averment.<br><br>Plaintiffs also cite no evidence that Muhammad Al Qahtani was a Saudi government religious official. *See* Response to Pls. Aver. ¶ 111. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | being introduced by name to the hijackers, was another Saudi government religious official, Muhammad Al Qahtani. Ex. 10K-TR (MPS2023-059-TR Video Transcript) 14:27 (Bayoumi mentioned "Sheikh Muhammad Al-Qahtani"), 17:50 (Qahtani introduces himself); Ex. 694 Youssef Decl. ¶¶ 36, 73-5. | Plaintiffs Exhibit 12A is an improper summary exhibit with numerous misattributions and other errors. *See* Response to Pls. Aver. ¶ 446. |
| 1231. | The timing of Bayoumi's Washington trip videotape, as well as the choice of the Capitol as its focus, is highly significant. Ex.694, Youssef Decl. ¶ 25. Bayoumi's trip to Washington, D.C., his meetings with MOIA's Sadhan, Sudairy, and Sowailem, and his casing of the Capitol Building, occurred at or around the same time that Al Qaeda was considering targets in Washington, D.C. for its "planes operation." *See* 9/11 Commission Report at 155. The 9/11 Commission found that Al-Qaeda's "planes operation" was discussed at a "series of meetings in the spring of 1999" near Kandahar in Afghanistan. *See* 9/11 Commission Report at 155. The "initial list of targets" included landmarks in Washington, D.C. and New York: "Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>The cited materials do not support Plaintiffs' assertion that the timing of Al Bayoumi's trip to Washington, D.C. in June – July 1999 was linked to al Qaeda's plot to commit the 9/11 attacks. The 9/11 Report states that discussions between KSM, Mohammed Atef (al Qaeda's chief of its military committee), and bin Laden discussed the "planes operation" in the spring of 1999 at the Matar complex near Qandahar. KSA Ex. 163 (9/11 Rep.) 155. KSM stated that the Qandahar meetings took place in March or April of 1999. Pls. Ex. 31 (KSM Statement) at 4. On the targets themselves, the 9/11 Commission stated that "all of them [KSM, Atef, bin Laden] wanted to hit the Capitol." KSA Ex. 163 (9/11 Rep.) 155. Thus, all the participants had already agreed to target the U.S. Capitol at least two months before Al Bayoumi's trip. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to hit the Capitol." *See* 9/11 Commission Report at 155. | |
| 1232. | The Commission concluded that United Flight 93, which took off from Newark bound for San Francisco, was intended to strike the Capitol or the White House. *See* 9/11 Commission Report at 44-45. The Commission wrote: "We are sure that the nation owes a debt to the passengers of United 93. Their actions saved the lives of countless others, and may have saved either the Capitol or the White House from destruction." *See* 9/11 Commission Report at 45. | Undisputed.<br><br>The 9/11 Commission also concluded that "we have seen no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218 (footnote omitted). |
| 1233. | Based on all the evidence, Bassem Youssef opined from his background and experience that the video footage Bayoumi prepared in Washington, D.C. was intended to be shown to Al Qaeda for the purposes of targeting the Capitol in its "planes operation." Ex. 694, Youssef Decl. ¶¶ 5-28. Bayoumi signed his video report with a personal "greeting" to the "esteemed brothers," an Islamic blessing, and a lingering image of the American flag: Omar Al- Bayoumi's visual prospectus for a terrorist attack on the U.S. Ex.694, Youssef Decl. ¶ 28. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>There is no evidence that Al Bayoumi's video was intended to be shown to Al Qaeda. As set forth in the Response to Averment paragraph 1212, this is a tourist video, not a casing report.<br><br>Moreover, as noted in paragraph 1231 above, Al Qaeda's discussion of targeting the Capitol occurred in April 1999, two months before Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi's trip to Washington. KSA Ex. 163 (9/11 Rep.) 155; Pls. Ex. 31 (KSM Statement) at 4. There was no need for Al Bayoumi's video "to be shown to Al Qaeda for the purpose of targeting the Capitol in its 'planes operation.'" There is also no evidence that Al Bayoumi knew anyone from al Qaeda at this date of June 1999; had any knowledge of the recent approval of the 'planes operation' (at that stage, only bin Laden, Atef, and KSM knew about it); or had ever attempted to send his video anywhere to al Qaeda. The video in fact was found in his belongings in September 2001 in Britain. |
| 1234. | Bayoumi claimed he visited Washington to attend a "professional development" non-credit "certificate program" course run by a company named ESI International, which contracted to use the name of George Washington University Ex. 120, Bayoumi Dep. 131:20 – 132:133:14; Ex. 93, Korn Ferry Decl. ¶¶ 7-8; Ex. 162, GWU Decl. ¶¶ 7-8. Bayoumi had ESI International's phone and address in his handwritten address book. Ex. 12AA, MPS738_67. Bayoumi received two course certificates for this program. Ex. 680A, at KSA 736 (June 21-25, 1999); Ex. 196, and at KSA 0734 (June 28-30, 1999). Bayoumi claimed that he "enrolled [and] got a degree from George Washington University…." Ex. 120, Bayoumi Dep. 129:3-6. This was | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. The evidence shows that Al Bayoumi received a Master's Certificate in Project Management from George Washington University on March 3, 2000, as he correctly stated in his deposition. Pls. Ex. 120 (Bayoumi Tr.) 129:4-6, 132:8-9; Pls. Ex. 93, ¶ 9; Pls. Ex. 680A (KSA 734, KSA 736); Pls. Ex. 680C (KSA 907); KSA Ex. 232 (KSA 726). KSA 726 is the actual diploma from George Washington University, School of Business and Public Management certifying that Omar Ahmed Al Bayoumi was awarded the Master's Certificate in Project Management, signed by Susan M. Phillips, Dean, School of Business and Public |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | verifiably not true. Ex. 162, GWU Decl. ¶¶ 6, 8. | Management, March 3, 2000, with the seal of George Washington University.<br><br>KSA 907 is Al Bayoumi's transcript from the George Washington University, dated March 22, 2000, showing that Al Bayoumi earned a Master's Certificate in Project Management on March 3, 2000, signed by Janet T. Pfister, Office of Student Affairs at the GWU School of Business and Public Management and authenticated by the Saudi Embassy in Washington. The diploma and transcript speak for themselves.<br><br>In addition, KSA 736 is a certificate that Al Bayoumi attended classes at GWU in Washington, D.C. from June 21-25, 1999; and KSA 734 is a certificate that he attended classes at GWU in Washington, D.C., from June 28-30, 1999. There is no basis for Plaintiffs' claim that Al Bayoumi gave false testimony in asserting that he earned a degree from George Washington University.<br><br>Moreover, these documents make clear that Al Bayoumi traveled to Washington, D.C. to complete these classes in late June 1999, and during that trip shot the tourist video. As set forth in the Response to Averment paragraph 1212, this is not a casing report.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 1235. | On July 4, 1999, immediately after returning to San Diego from visiting the Embassy, Bayoumi wrote a "Very Urgent and Important" letter to Mahmoud Doski, the Chairman of the Board of the Al Madinah Mosque, instructing him to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "provide us with a full report" on various issues "as soon as possible" including the names of everyone on the Mosque Boards and "the work being done by each on to serve this facility in detail"; the "achievements in the field of Da'wah"; and the relations of the mosque with the ICSD, Al Ribat Mosque, the Uthman Mosque [Dr. Shaikh's Mosque], and others. Bayoumi signed the letter as "General Supervisor" of the Al Madinah Mosque. Ex. 368 MPS 43_152,144 (Bayoumi letter to Doski). | Plaintiffs Exhibit 368 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the letter is irrelevant to Plaintiffs' claim in this Section that Al Bayoumi shot a casing video. The letter simply requests that the chairman of the board of the Al Madina Mosque provide information about the achievements of the mosque, its board of trustees, and its relationship with other mosques in San Diego. |
| 1236. | The timing and urgency of this letter evidences that Bayoumi acted pursuant to instructions he received from the Saudi Embassy to take immediate, decisive steps to put Al Haramain in control of the Al Madinah Mosque, which he did. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains attorney argument to which no response is required.<br><br>This paragraph is a non-sequitur. There is no evidence that the Saudi Embassy gave Al Bayoumi any instruction relating to the Al Madina Mosque or anything else. Al Haramain is not mentioned at all in this letter.<br><br>Contrary to Plaintiffs' allegation that Al Bayoumi took steps to put Al Haramain in control of the Al Madina Mosque, Plaintiffs' own exhibit shows that Al Bayoumi rejected attempts by Al Haramain to appoint an |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | imam at the mosque and its efforts to participate in the mosque's management. Pls. Ex. 410 (MPS43_225-28). |
| 1237. | Bayoumi's letter brought about the removal of Mahmoud Doski and the installation of a "new board" led by Sami Doski (who is not related to Mahmoud). Ex 367, MPS 43_150-51; Ex. 366, MPS 43_145-48. As detailed below, on February 17, 2000, Sami Doski (but not Mahmoud) would attend the welcome party for Hazmi and Mihdhar hosted by Bayoumi. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 366 and 367 are inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that Al Bayoumi's letter to Mahmoud Doski (Exhibit 368) brought about the installation of a new board of trustees for Al Madina Mosque.<br><br>Plaintiffs Exhibit 367 is dated July 23, 1999 and addressed to "Brother Sami." It wishes success to Brother Sami as the new chairman of the board of trustees of the Al Madina Mosque and successor to Mahmoud Doski. The letter refers to friction at the last board of trustees meeting on July 16, 1999, and suggests overcoming this friction through the extension of bridges of cooperation with everyone. Pls. Ex. 367 (MPS43_150-51). There is no mention of Al Bayoumi's July 4, 1999 letter (Exhibit 368) or any role it had in the change of the chairman of the board of trustees of the Al Madina Mosque.<br><br>The second letter cited in this paragraph (Exhibit 366) is a letter written by Al Bayoumi, dated July 23, 1999, to Saad al-Habib, the main funder and patron of Al Madina Mosque, and describes the friction at the July 16, 1999 Al Madina Mosque board of trustees meeting. It does not mention |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | why there was a change in the chairman of the board of trustees, nor does it mention Al Bayoumi's July 4, 1999 letter. Pls. Ex. 366 (MPS43_145-47).<br><br>The last sentence of the paragraph jumps to the party honoring Sheikh Abdulrahman Barzanjee in February 2000, 7 months later. Sheikh Barzanjee was one of the imams of the Al Madina Mosque during Ramadan 1420H (December 1999–January 2000). It would be natural for Sami Doski, as the chairman of the board of trustees of the mosque, to be present. |
| 1238. | Bayoumi's July 23, 1999, letter to Saad Al Habib stated that after his removal from the Board, Mahmoud Doski spoke out at a Mosque meeting that "he would not want anyone to be appointed by Habib" at the Mosque. Bayoumi responded to Mahmoud Doski, stating that "Habib is an owner who invested money…and he has the right to choose whom he wants to sponsor this facility…." Bayoumi also reported to Habib that he told Mahmoud that he "is not a member of the new board" and had no standing. Ex. 366, MPS 43_145-48. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 366 is inadmissible hearsay. *See* Objections Chart<br><br>Undisputed that the letter contains this language. There is nothing in this letter that mentions extremism, Al Haramain, or anything else supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |
| 1239. | Striking a different tone, just one year earlier Bayoumi lauded Mahmoud Doski as a leader at the Mosque and suggested to Habib that Doski be "given an encouraging bonus." Ex. 410, MPS 43_225-28 at 227. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 410 (MPS 43_228) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited exhibit is an August 18, 1998 letter from Al Bayoumi to Saad al-Habib, the main patron of the Al Madinah Mosque. The letter describes the mosque board of trustees meeting of August 17, 1998. At that meeting, the board rejected Al Haramain's attempt at appointing a full-time imam and taking control of the management of the mosque. Pls. Ex. 410.<br><br>The letter states that, at the meeting, the board also chose "Dr. Mahmoud" as the director of the mosque because he was a doctor, well respected in the community, honest, understanding, capable of compromise, and committed to Islam. *Id.* (MPS 43_227). It further states that he rejected any political discussions at the mosque. *Id.*<br><br>There is nothing in this letter supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |
| 1240. | Bayoumi's June 23, 1999 letter to Habib revealed that the goal in changing the Board was to replace the Imam of the Mosque, Ameer Bajelori. Bayoumi's letter cited complaints about "brother Amir" including his style of preaching, difficulty understanding him, the feeling that the Mosque was a "one-party headquarters", his failure to "call for the non- Muslims", and the general cleanliness and maintenance of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 366 is inadmissible hearsay. *See* Objections Chart |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Mosque. Ex. 366, MPS 43_145- 148 at 148. | The date of Plaintiffs Exhibit 366 is July 23, 1999, not June 23, 1999. Pls. Ex. 366. This letter does not mention anything about the goal of a change in the board of trustees.<br><br>With respect to the issue of "Brother Ameer," the letter states that the present board members "are interested in no one other than Brother Ameer." Pls. Ex. 366 (MPS43_145). Thus, the new board supported Brother Ameer, contrary to Plaintiffs' claim in this paragraph that Al Bayoumi changed the board in order to replace him.<br><br>Moreover, in the letter, Al Bayoumi was simply relaying complaints from American Muslims about Brother Ameer, "'We experience emotional moments with Brother Amir, but we don't know what he is saying, and we have the right to know what he is saying.' So I said, 'It would be better if one of you would stand up at the end of the *khutbah* [sermon] and briefly explain in three minutes what the sermon is about.' Our goal is to make Da'wah [propagation] to non-Muslims." Pls. Ex. 366 (MPS43_147) (brackets in original).<br><br>At the February 2000 party in honor of Sheikh Barzanjee, Al Bayoumi gave a plaque to Sheikh Ameer for his leading the prayers during Ramadan, which Barzanjee accepted on his behalf since Sheikh Ameer was not present. Pls. Ex. 10K (Video MPS2023-059) at 15:18. A year later, in January 2001, Sheikh Ameer was still an imam at the Al Madinah Mosque, according to Sheikh Barzanjee's letter. Pls. Ex. 418 (MPS95_114). There is no evidence that Al Bayoumi wanted to replace Sheikh Ameer Bajelori.<br><br>There is nothing in this letter supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1241. | Similar to Mahmoud Doski, less than one year earlier, Bayoumi had lauded Bajelori, reporting to Saad Al Habib that "he's a more persuasive and articular orator than many of those in our mosques in Saudi Arabia." Ex. 410, MPS 43_225-28 at 226. Bayoumi's change in position about the Mosque Board and Imam Bajelori show that he was acting in response to the directions of his Saudi Embassy superiors and acting quickly to carry out their orders. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 410 is inadmissible hearsay. *See* Objections Chart.

The cited material is the same letter cited in paragraph 1239 (Al Bayoumi's letter of August 18, 1998), relayng to al-Habib the details of the Al Madina Mosque board meeting the previous day. Pls. Ex. 410 (MPS43_225-28).

The letter does not name the imam and just calls him "the current Imam." There is no indication that this is Ameer Bajelori. Al Bayoumi praised the current imam for his Islamic knowledge, his persuasion, and his articulate orations. However, Al Bayoumi mentions that he spoke in Arabic, Kurdish, and *some* English.

If the imam mentioned in the 1998 letter is the same as the one mentioned in the 1999 letter, it appears that Ameer's limited English had become a problem a year later for the American worshippers at the Al Madina Mosque because they could not understand him as he was speaking in either Arabic or Kurdish, but not English. As Al Bayoumi pointed out in his 1999 letter, "[o]ur goal is to make *Da'wah* [propagation] to non-Muslims." Pls. Ex. 366 (MPS43_147) (brackets in original). This was difficult if local non-Muslims could not understand the preacher.

Plaintiffs' speculation that changes in the board of the mosque and in the imam at the Al Madina Mosque show that Al Bayoumi was acting in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | response to the directions of the Saudi Embassy have no evidentiary basis. The cited materials do not mention anything about the Saudi Embassy. There is no record evidence that Al Bayoumi received any instructions at all from the Saudi Embassy.<br><br>Moreover, there is nothing in this letter supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |
| 1242. | Bayoumi's June 23, 1999, letter to Saad Al Habib showed that questions were raised at the Mosque meeting about Bayoumi's practice of photographing and videotaping events. Bayoumi responded by telling the Mosque members that:<br><br>photographing conveys a clear picture of what is going on here. If you are an investor in a company, you will need to know the company's level of profit and loss. Is it too much for us to take some photos using our camera to reassure the owner about what is taking place on their property?<br><br>Ex. 410, MPS 43_225-28 at 226. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br>Plaintiffs Exhibit 410 is inadmissible hearsay. *See* Objections Chart.<br><br>This paragraph contains numerous factual errors. The letter from Al Bayoumi to Saad al-Habib is not from June 23, 1999, as stated in the paragraph, but from July 23, 1999. Furthermore, the language quoted in the paragraph comes from this July 23, 1999 letter, Pls. Ex. 366 (MPS43_146), and not from Pls. Ex. 410 (MPS43_226), as stated at the end of the paragraph. The quoted language is also not present in the translation provided in Pls. Ex. 366 (MPS43_146).<br><br>In any event, there is nothing in this letter supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |
| 1243. | Bayoumi then requested Habib send the Mosque a direct letter by fax confirming that Bayoumi was the Mosque's "general supervisor" and that Bayoumi "must be | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | referred to regarding everything related to the mosque's affairs," directing that Bayoumi be allowed to photograph and record lectures and sermons at the Mosque. Ex. 4 10, MPS 43_225-28 at 226. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains numerous factual errors. The quotes in this paragraph come from Al Bayoumi's July 23, 1999 letter, Pls. Ex. 366 (MPS43_148), not from Pls. Ex. 410 (MPS43_226), as stated at the end of this paragraph. Furthermore, the quotes differ from the translation provided in the exhibit, which states: "Al-Bayoumi has been appointed by us as General Supervisor of Masjid Al-Madinah Al-Munawarah, and you must defer to him on any matter concerning *Al-Masjid* [the mosque], *Al-Da'wah* [propagation], bringing preachers and lecturers, the video recording of lectures and sermons, as well as the allocation of offices according to the way he deems appropriate, and not to make any alterations to the building without his approval." Pls. Ex. 366 (MPS43_148) (brackets in original).<br><br>In any event, there is nothing in this letter supporting Plaintiffs' assertion in this Section that Al Bayoumi cased the Capitol. |
| 1244. | In the summer of 1999, the Saudi Embassy ensured Bayoumi's extremist coup at the Al Madinah Mosque was complete by sending more Saudi officials to back him in San Diego. Two MOIA propagators came to San Diego, including Sheikh Ibrahim Al Zamil, who had previously worked with Bayoumi to make the initial arrangements for the Mosque. Ex. 365, MPS 43_137; Ex. 2, EO 2069-2070. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2 (EO 2069-70) and Exhibit 365 are inadmissible hearsay. *See* Objections Chart.<br><br>Neither Al Bayoumi's letter to al-Habib dated August 28, 1999, Pls. Ex. 365 (MPS43_137), nor the FBI FD-302 of their September 2001 interview |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | with Ghazi Mohammed Ahmed, Pls. Ex. 2T (EO 2066-70), describes any extremist coup or any coup at all at the Al Madina Mosque. Nor do these two documents mention the Saudi Embassy.<br><br>Plaintiffs Exhibit 2T (EO 2069) also states that al-Habib sent al-Zamil to investigate Al Bayoumi's allegation that "the Kurdish mosque was discriminating against Arabs and the Kurdish members were using the mosque for political reasons." EO 2069. The fact that Al Bayoumi complained to al-Habib that people were using the mosque for political reasons is incompatible with Plaintiffs' contention that Al Bayoumi was an "extremist," trying to engineer an extremist coup at the mosque. Moreover, this document contains no mention of any Ministry of Islamic Affairs propagators or of any other sheikh being sent to San Diego by the Saudi Embassy. |
| 1245. | In an August 28, 1999 letter to Habib, Bayoumi reported that Zamil helped Bayoumi counter attacks made against him in the local community. Bayoumi reported that "Sheikh Ibrahim participates with the team." Ex. 365, MPS 43_137. Bayoumi stated that their efforts in defeating their opponents were successful; Bayoumi quoted from the Qur'an that: "*They planned, but Allah also planned. And Allah is the best of planners.*" Ex. 365, MPS 43_137. (italics in original). Zamil signed Bayoumi's letter "to bear witness" to what Bayoumi had told Habib. Ex. 365, MPS 43_137. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 365 is inadmissible hearsay. *See* Objection Chart.<br><br>The cited exhibit does not support Plaintiffs' assertion. Al Bayoumi's August 28, 1999 letter states that Sheikh Ibrahim al-Zamil was present in San Diego, but the reason for his presence is not specified. Pls. Ex. 365 (MPS43_137). This August 28, 1999 letter was a follow up of another letter dated August 26, 1999 that Al Bayoumi had sent to al-Habib. Pls. Ex. 678 (MPS43_138-39). In the earlier letter (August 26), Al Bayoumi told Habib that Sheikh Ibrahim al-Zamil had told him the previous |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|----------|---------------------|------------------------|
|          |                     | evening that Dr. Mahmoud [Doski, the former chairman of the Al Madinah Mosque board of trustees,] had brought the female realtor who had sold the building of the mosque the previous year to his office and she had said that Al Bayoumi had asked her to sell the building. Al Bayoumi was upset at this allegation, which was aimed at creating discord between Al Bayoumi and al-Habib, who owned the building. Al Bayoumi protested to al-Habib that he had done no such thing. Pls. Ex. 678C (MPS43_138).<br><br>Two days later, Al Bayoumi wrote al-Habib: "[A]fter our phone call, I called the Realtor and asked her, is it true that I listed the building for sale? She said: 'This is not correct.' I said to her: I was told that you mentioned that I listed the building for sale. She said, This is a lie and a fabrication." Pls. Ex. 365 (MPS43_137). Al Bayoumi continued: "I brought Sheikh Ibrahim Al-Zamil along with me. He spoke with her over the phone, and she confirmed to him that what was said about a sales listing by or through brother Omar [Al Bayoumi] was not true." *Id.* Al Bayoumi ended the letter: "I am writing you these words from the garden next to *Al-Masjid* [the mosque]. Sheikh Ibrahim has joined up with the team. I am writing to you to reassure you and myself that whoever they may be, '*They planned, but Allah also planned. And Allah is the best of planners.*' Thank you for your trust and your noble manners. This situation has given me sleepless nights, but I have been reassured after speaking with you! It is my pleasure to get my brother Ibrahim al-Zamil to bear witness to this. May Allah preserve you and look after you." *Id.* The letter was signed by both Al Bayoumi and al-Zamil. *Id.*<br><br>This context shows that Plaintiffs' assertions are baseless. Al-Zamil did not help Al Bayoumi counter attacks made against him, but was simply a witness to Al Bayoumi's version of events, which he authenticated by signing the August 28 letter alongside Al Bayoumi. The letter does not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | state that "Sheikh Ibrahim participates with the team." This is not the official translation provided in the exhibit. Instead, the translation states that Al Bayoumi was writing the letter from the garden next to the mosque and that al-Zamil had "joined up with the team." <br><br> Nowhere in the letter does Al Bayoumi state that "their efforts in defeating their opponents were successful." <br><br> There is nothing about an extremist coup at the Al Madina Mosque directed by the Saudi Embassy in the letter, as Plaintiffs alleged in the previous paragraph. Nor is there any mention of the Saudi Embassy allegedly sending Ministry of Islamic Affairs propagators to San Diego to ensure the backing of an extremist coup at the Al Madina Mosque by Al Bayoumi. |
| 1246. | With the new Board of the Mosque installed, Ameer Bajelori was demoted and extremist Sheikh Barzanjee was named as the Imam of the Al Madinah Mosque, and Barzanjee was the senior religious cleric who represented the Mosque at the welcome party Bayoumi hosted for the 9/11 hijackers. Ex. 10K, MPS2023-059 Video Exhibit at 13:28-43, 16:52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The cited material does not support Plaintiffs' assertions. There is no evidence presented that there was a new Al Madina Mosque board of trustees installed in the summer of 1999, just a change in its chairman. Nor is there any evidence that "Brother Ameer" was demoted. <br><br> At the February 2000 party in honor of Sheikh Barzanjee, Al Bayoumi gave a plaque to Sheikh Ameer for his leading the prayers during Ramadan, which Barzanjee accepted since Sheikh Ameer was not present. Pls. Ex. 10K (Video MPS2023-059) at 15:18. A year later, in January |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2001, Sheikh Ameer was still an imam at the Al Madina Mosque, according to Sheikh Barzanjee's letter. In fact, Sheikh Barzanjee recommended that Al Madina Mosque keep Sheikh Ameer as an imam and give him the money that was due to Sheikh Barzanjee. Pls. Ex. 418 (MPS95_114). There is no evidence that Al Bayoumi wanted to replace Sheikh Ameer Bajelori. |
| | | The evidence shows that Al Bayoumi recommended that al-Habib look for a Kurdish student studying at Al-Imam University for his religious knowledge and linguistic ability for all the congregants. *See* Pls. Ex. 366 (MPS43_148). The material is silent as to whether this meant that "Brother Ameer" would be demoted or not. |
| | | The evidence also does not support the allegation that Sheikh Abdulrahman Barzanjee was an extremist. *See* Response to Pls. Aver. ¶ 1133. |
| | | Nor does the evidence support Plaintiffs' allegation that Sheikh Barzanjee "was the senior religious cleric who represented the Mosque at the welcome party Bayoumi hosted for the 9/11 hijackers." As shown in the response to paragraph 1136, Sheikh Barzanjee turned down the invitation to become the imam of the Al Madina Mosque because he could not bring his family with him. Pls. Ex. 418 (MPS95_114). He was not the mosque's senior representative. |
| | | As set forth in the Responses to Plaintiffs Averment ¶¶ 1656, 1668-69, 1675, 1683, 1685, and 1687, the February 2000 gathering was not a welcome party for the hijackers. |
| XVII. | **PHONE CALL PATTERNS EVIDENCING COOPERATION** | No response is required because Plaintiffs' assertion contains improper attorney argument and no evidentiary support. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **OCCURRED DURING THE PERIOD FROM NOVEMBER 1999-FEBRUARY 2000 AMONG THUMAIRY, BAYOUMI, THE SAUDI EMBASSY, THE SAUDI CONSULATE (INCLUDING ▮▮▮ ANWAR AULAQI, AND OTHERS INVOLVED IN SUPPORTING THE PLOT** | To the extent a response is required, Plaintiffs' assertion relies on unsupported speculation as discussed in response to specific paragraphs below. There is no evidence of "cooperation" or that any of the alleged phone calls had any relation to "supporting the plot." Plaintiffs have no evidence of the substance of the calls, many of their allegations are based on misattribution of phone numbers, and evidence contradicts the existence of any cooperation or support. |
| 1247. | Phone activity between November 1999 – February 2000 among the individuals—Thumairy, Bayoumi, ▮▮▮ the Saudi Embassy (Sowailem and/or Jarrah), ▮▮▮ (Jaithen and Mersal), Sudairy, Aulaqi and ▮▮▮ — evidences collaboration to support 9/11 hijackers Hazmi and Mihdhar after their arrival in California. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Further, no response is required because Plaintiffs' assertion cites no evidentiary support. <br><br> To the extent a response is required, Plaintiffs' assertion relies on unsupported speculation as discussed in response to specific paragraphs below. There is no evidence of "collaboration" or that any of the alleged phone calls had any relation to "support [for the] 9/11 hijackers." Plaintiffs have no evidence of the substance of the calls, many of their allegations are based on misattribution of phone numbers, and evidence contradicts the existence of any cooperation or support. A specific discussion of the calls Youssef purports to analyze is included in Response to Plaintiffs Averment ¶¶ 1254-1265 below. |
| 1248. | According to Plaintiffs' expert Bassem Youssef, the former FBI Chief of the Communications Analysis Unit of the FBI's Counterterrorism Division, there were | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | spikes in calling activity involving Bayoumi, Thumairy, and the Saudi Embassy just before and immediately after the 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and San Diego. Ex. 5, Youssef Rpt. 4, 125-127. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinions regarding alleged "spikes in calling acitivity" are conclusory, speculative, and are not based on any recognized methodology. Plaintiffs cite no details in this paragraph to substantiate their assertion that there was a spike in calls, such as the number of calls or the phone numbers at issue and the grounds for attributing those numbers to Al Bayoumi, Al Thumairy, or the Saudi Embassy. A discussion of the specific calls Youssef purports to analyze is included in Response to Plaintiffs Averment ¶¶ 1254-1265 below. |
| 1249. | Former FBI Chief Youssef determined that the calls were made to discuss arrangements for the 9/11 hijackers' arrival and immediate care once they arrived. Ex. 5, Youssef Rpt. 125-126. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinions regarding the alleged content and purpose of certain telephone calls are conclusory, speculative and not based on any recognized methodology. There is no record evidence concerning the content of the alleged phone calls. A specific discussion of the timing, frequency, and attribution of specific calls Youssef purports to analyze is included in Response to Plaintiffs Averment ¶¶ 1254-1265 below. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1250. | Youssef determined:<br><br>The calls among these Saudi Government officials are directly related to key events associated with the operational support for the 9/11 hijackers, including:<br><br>the late 1999 visit of MOIA Propagators Abdullah al Jaithen and Majed al Mersal to Los Angeles and San Diego, who former FBI Special Agent and Unit Chief Youssef concluded were a second advance team (following Sadhan and Sudairy) sent by MOIA and its Deputy Tawfiq Sudairy to provide a secure in-person communications link between the support network in California and Al Qaeda to ensure that the final arrangements were in place in California shortly before sending Hazmi and Mihdhar to Los Angeles;<br><br>the arrival of Hazmi and Mihdhar on January 15, 2000 in Los Angeles, and the support provided by Thumairy, ▮▮▮▮ to the hijackers through the Sunni extremist cell that was long supported by Saudi Arabia and led by Thumairy at the King Fahad Mosque;<br><br>the transfer of the hijackers from Los Angeles to San Diego arranged by Thumairy, Bayoumi, ▮▮▮ and Sowailem | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinions that certain calls "are directly related to key events associated with the operation support for the 9/11 hijackers" are conclusory, speculative and not based on any recognized methodology. A specific discussion of the calls Youssef purports to analyze is included in Response to Plaintiffs Averment ¶¶ 1254-1265 below.<br><br>Plaintiffs' assertions about Al Jaithen, Al Mersal, and a purported "advance team" are contradicted by the record. Al Jaithen was never assigned to the Al Madina Mosque in San Diego, but rather to a mosque in Columbus, Ohio. *See* Response to Pls. Aver. ¶¶ 1272, 1293. Al Bayoumi testified that both imams (Al Jaithen and Al Mersal) visited the Al Madina Mosque, not that Al Jaithen was assigned to the mosque for the Ramadan Imamate Program. Pls. Ex. 120 (Bayoumi Tr.) 353:21-24. Only Al Mersal was assigned to Al Madina Mosque in San Diego. Since only Al Mersal stayed in San Diego for any period of time (about three weeks after his delayed departure from Saudi Arabia and the week he spent in Los Angeles), the alleged preparation for the future arrival of the terrorists would have fallen mainly on him. However, Al Mersal's antiterrorist credentials are impeccable. He was at the forefront of Saudi Arabia's fight against terrorism. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Pls. Ex. 52 (Mersal Curriculum Vitae) at 2. Furthermore, from 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, *id.*, which is the Saudi rehabilitation center near Riyadh for people arrested on terrorism charges in Saudi Arabia but who have no blood on their hands. It is implausible that Al Mersal could have been part of an advance team preparing the future hijackers' arrival given his lead role in Saudi Arabia's fight against terrorism, including Al Qaeda. As further set forth in the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | on or about February 2, 2000 to furnish the hijackers with support through the Sunni extremist cell supported by Saudi Arabia and led by Bayoumi at the ICSD, Al Ribat, and Al Madinah Mosques.<br><br>Ex. 5, Youssef Rpt. 126. | Response to Plaintiffs Averment ¶¶ 1450-1451, there is no evidence that Al Qaeda had arranged in advance for any support network.<br><br>Plaintiffs identify no support to the hijackers "by Thumairy, ██████" and there is no evidence supporting the existence of a "Sunni extremist cell" or Plaintiffs' assertion that Al Thumairy was its leader. Indeed, both the 9/11 Commission and the FBI concluded that there was no evidence of a witting support network in California for the two future hijackers. "[A]fter exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. A decade later, after reviewing all the new information from the Operation Encore investigation, the 9/11 Review Commission concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103. Finally, in its EC closing Operation Encore, the FBI concluded: "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). *See also supra*, Response to Pls. Aver. ¶¶ 398, 412, 420, 421.<br><br>████████████████████<br>he investigative theory that Al Thumairy tasked ████ to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | assist the hijackers in furtherance of the 9/11 plot has been firmly rejected by the FBI. It's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11).<br><br>There is no record evidence of any Sunni extremist cell at the ICSD or that Al Thumairy, Al Bayoumi, █████, or Al Sowailem transferred the hijackers, and Youssef fails to cite any. |
| 1251. | The FBI's findings echoed those of Plaintiffs' expert Youssef. The FBI found that:<br><br>[a]nalysis of al-Bayoumi and al-Thumairy's call activity indicates that the assistance provided to the hijackers likely involved a network of people including al-Bayoumi, al-Thumairy, Anwar al Aulaqi and an individual at the EKSA [Saudi Embassy] in Washington, D.C.<br><br>Ex. 2, EO 0584. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2JJ (EO 582-87-UPDATED), is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs' assertion relies upon a February 22, 2010 FBI memorandum, which is not an FBI "finding[]" as Plaintiffs erroneously state. This document purports to provide an "[o]verview" of Operation Encore's findings and repeats multiple levels of hearsay.<br><br>The FBI's actual conclusion, after fully exploring the theory Plaintiffs repeat as fact, contradicts Plaintiffs' assertion and Youssef's opinions. Operation Encore identified these calls in the first instance, investigated them, and concluded "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 1252. | The FBI also concluded that:<br><br>Telephone numbers assigned to the Saudi Arabian Embassy (SAE) in Washington, D.C., where Musaed al-Jarrah was the director of the Islamic Affairs Department, had significant telephonic contact with al-Thumairy and al-Bayoumi while the hijackers were in the Los Angeles and San Diego areas. There is evidence that al-Jarrah had possible links to al Qaeda and tasked al-Thumairy and al-Bayoumi with assisting the hijackers.<br><br>Ex. 2, EO 0227. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2KK (EO 222-27-UPDATED), is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs rely upon a March 20, 2014 FBI memorandum, which is not a "conclu[sion]" as Plaintiffs erroneously claim. Rather, the FBI memorandum purports to provide an "update" and contains multiple levels of hearsay. The FBI's actual conclusion, after fully exploring the theory Plaintiffs repeat as fact, contradicts Plaintiffs' assertion and Youssef's opinions. Operation Encore identified these calls in the first instance, investigated them, and concluded "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 1253. | Like the FBI, Youssef concluded that "based on the phone contacts there was an official or officials at the Embassy more senior to Thumairy who were involved in the plans to provide assistance to Hazmi and Mihdhar." Ex. 5, Youssef Rpt. 132. Youssef, however, further determined that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Khalid Al Sowailem or Musaed Al Jarrah, and possibly both, assigned Thumairy and Bayoumi to aid Hazmi and Mihdhar. Ex. 5, Youssef Rpt. 132-133. The FBI concluded that Jarrah was the Embassy official involved in the November 1999 – January 2000 planning calls simply because he was the "director of the Islamic Affairs Department." Ex. 2, EO 0227. However, the FBI failed to consider Sowailem's role as MOIA Director at the Embassy working next to Jarrah in the same Islamic Department office on the Embassy's second floor. Ex. 5, Youssef Rpt. 133. The FBI determined the main office number for the Islamic Department, ▮▮▮▮-3700, which was answered by the Department's receptionist and could be transferred to *either* Jarrah or Sowailem was in "significant telephonic contact" with Bayoumi and Thumairy. Ex. 5, Youssef Rpt. 133. | To the extent a response is required, Plaintiffs Exhibit 2KK (EO 222-27-UPDATED), is inadmissible hearsay. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs' assertion, like Youssef's report, also misstates the record. As an initial matter, the FBI's conclusion was nothing "like" Youssef's. In the cited portion of his report, Youssef cites Plaintiffs Exhibit 2KK (EO 227-UPDATED), and Plaintiffs Exhibit 2M (EO 584). These are 2010 and 2014 preliminary investigative materials generated by Operation Encore; they do not reflect the FBI's conclusion. The FBI's actual conclusion, after fully exploring the theory Plaintiffs repeat as fact, contradicts Plaintiffs' assertion and Youssef's opinions. Operation Encore identified these calls in the first instance, investigated them, and concluded "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11).<br><br>Youssef cites nothing to support his accusation that the FBI failed to adequately consider Al Sowailem's role. And in any event, Al Sowailem was Al Thumairy's administrative supervisor, which explains phone contact between the two. Pls. Ex. 107 (Thumairy Tr.) 70:19-21, 114:23-115:10, 117:16-118:21 (Al Thumairy testifying that Al Sowailem was his administrative director in the United States and that he contacted him periodically but could not estimate how frequently). Al Bayoumi also testified that he contacted the Embassy because "we . . . need[ed] propagators for the month of Ramadan." Pls. Ex. 120 (Bayoumi Tr.) 224:16-225:12; *see also id.* at 271:24-272:15 (referring to calls to the Embassy regarding imams coming for Ramadan). He called "to inquire |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "about" receiving Qurans. *Id.* at 302:20-321:2. He also called to get certain documents certified. *Id.* at 767:14-768:2.<br><br>As Sageman explained, there is no evidence that Al Thumairy and Al Bayoumi's calls with the Embassy were coordinated or unusual in any way. Youssef presents no evidence that Embassy officials directed them to support the hijackers or that the phone contacts Youssef cites were for anything other than innocuous purposes. Operation Encoure failed to prove the allegations Plaintiffs repeat. *See* KSA Ex. 167 (Sageman Rep.) at 635-36. |
| XVII.A. | **Thumairy-Bayoumi telephone records** | |
| 1254. | On December 6, 1999, Thumairy made a call from his home phone to Bayoumi's cell phone. This December 6th call is the second known call between the two men in phone records produced by the FBI. The first known call occurred one year earlier, prior to the December 1998 arrival of MOIA Propagators Sadhan, Sudairy, and Mersal in California. Ex. 5, Youssef Rpt. 127. As Youssef's call analysis determined, "[f]rom December 6, 1999 through February 4, 2000 — the day that Bayoumi finally arranged the payment and paperwork necessary for the hijackers to rent their apartment in San Diego — there was an unusually high volume of calling activity between Bayoumi and Thumairy" — 27 calls, evidencing coordination between the two men. Ex. 5, Youssef Rpt. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs Exhibit 12B is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 735.<br><br>Plaintiffs' and Youssef's assertions are not supported by the record. Among other things, Plaintiffs Exhibit 12B is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x B. Plaintiffs Exhibit 12B misattributes to Al Bayoumi 11 calls that were made from a publicly-available phone line at the Al Madina Mosque, including what Plaintiffs incorrectly reference as the "first known call" on December 16, 1998. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 127. Ex. 12B (Calls between Bayoumi and Thumairy). | Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15.<br><br>Plaintiffs Exhibit 12B misattributes to Al Thumairy four calls made from the number ███████ 362 and 14 calls made to that same number. The subscriber re██████ or this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ███████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 497:14-499:9.<br><br>Plaintiffs Exhibit 12B misattributes to Al Thumairy eight calls made to the number ███████ 777 prior to April 2002 when he started using it. The subscriber records for this number list the subscriber as ███████ ███████, and the user as ███████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. KSA Ex. 168, at 3-4. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See id.* at 5.<br><br>Plaintiffs Exhibit 12B relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all. *See* Pls. Ex. 12B (citing EO2757 and EO2758 in REF 1 column). None of the phone records produced in this case show these 22 calls.<br><br>After removing these improperly-included calls (some of which fall into multiple categories of the misattributions or lack of phone records noted above), Plaintiffs Exhibit 12B shows a total of 14 – not 27 – calls from December 6, 1999 through February 4, 2000, including the December 6, 1999 call from Al Thumairy's home phone to Al Bayoumi's cell phone.<br><br>Youssef's opinion that the call volume is unusually high is based on miscounting the actual volume. Further, the only record evidence of the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | substance of Al Bayoumi and Al Thumairy's phone interactions confirms that they were innocuous and not related to any "coordination" related to the hijackers. Al Bayoumi testified that he called Al Thumairy regarding religious questions from mosque patrons and mushaffs (religious literature), and that Al Thumairy frequently did not answer his phone. *See* Pls. Ex. 120 (Bayoumi Tr.) 451:1-23. |
| 1255. | The volume of calls between the two is potentially even higher, as there are no records for Thumairy's cell phone calls or Bayoumi's cell phone calls prior to January 9. Ex. 5, Youssef Rpt. 127. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The assertion in this paragraph is speculative on its face. Plaintiffs cite no evidence to establish that Al Thumairy even had a cell phone during the period Youssef was analyzing or that either Al Thumairy or Al Bayoumi were likely to have used cell phones to contact each other during this time, when both had home telephone numbers. |
| XVII.B. | **Thumairy-Bayoumi calls to the Embassy** | |
| 1256. | *Bayoumi's calls*. As Youssef determined, between January 19, 2000, and March 24, 2000, Bayoumi made 110 calls to the Saudi Embassy. Ex. 5, Youssef Rpt. 134. Of these 110 calls, Bayoumi made at least 39 calls from his cell phone to officials at the Islamic Affairs office at the Embassy. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 12A and 12K are improper summary exhibits. *See* Objections Chart.<br><br>Youssef's "analysis" of the telephone records to attribute calls to Al Bayoumi is speculative and relies on misattribution of numerous calls undermining his opinions. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | According to Youssef's analysis, the 39 calls include:<br><br>a. 32 calls to ▮▮▮▮-3700, which is the main number for MOIA's Islamic Affairs Department, which, according to Jarrah, incoming calls to that number could be transferred to Khalid Al Sowailem or Musaed Al Jarrah. Ex. 5, Youssef Rpt. 134; Ex. 118, Jarrah Dep. 137:8-21, 143:4-16 (receptionist would transfer calls to the -3700 number to the intended recipient);<br><br>b. Bayoumi made 2 calls to MOIA Director and Embassy official Sowailem's personal cell phone number on February 18 and 19, 2000; Ex. 5, Youssef Rpt. 134.<br><br>c. Bayoumi made 5 calls to the phone number for MOIA and Embassy official Mutaeb Al Sudairy (who reported to Sowailem) on January 24, 26, 30, and February 2 and 7, 2000. Ex. 5, Youssef Rpt. 134.<br><br>Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12K (Bayoumi calls to Saudi Embassy). | Among other errors, Plaintiffs Exhibit 12A is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x A.<br><br>Plaintiffs Exhibit 12A misattributes to Al Bayoumi 35 calls made from or to a publicly-available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15. For instance, Plaintiffs Exhibit 12A lists a call on January 24, 2000 at 4:43 pm as Al Bayoumi calling himself from his cell phone to the Mosque.<br><br>Plaintiffs Exhibit 12A misattributes to Al Bayoumi 52 calls made to the number ▮▮▮6662, a number Plaintiffs concede was subscribed to by Manal Bagader, Al Bayoumi's wife. Plaintiffs Exhibit 12A lists 52 calls as Al Bayoumi calling himself from his cell phone to a "cellphone 'used by' Bayoumi (subscribed in Manal's name)."<br><br>Plaintiffs Exhibit 12A misattributes to Al Bayoumi 36 calls made from ▮▮▮6652, another number subscribed to by his wife Manal Bagader. *See, e.g.*, KSA Ex. 233 (FBI 9273). There is no admissible evidence that Al Bayoumi ever used that phone.<br><br>Plaintiffs Exhibit 12A double-counts at least 65 calls made by Al Bayoumi's cell phone (▮▮▮7623). The majority of these double-counted calls – 62 calls – are from the same two pages of phone records for March 1 through March 7, 2000. *Compare* Pls. Ex. 12A, *with* KSA Ex. 116 (FBI 3246-47). The remaining three double-counted calls are calls to the KSA Embassy Cultural Mission (2022988814) on February 3, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|----------|---------------------|------------------------|
| | | 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am. *Compare* Pls. Ex. 12A, *with* KSA Ex. 115 (FBI 3231), KSA Ex. 117 (FBI 3259). |
| | | Plaintiffs Exhibit 12A also misstates the recipient's number of a call made by Al Bayoumi on March 10, 2000 at 12:27 pm. The call was made to 2022988813 (KSA Embassy Cultural Mission), not to 2023423700 (KSA Embassy Islamic Affairs) as stated in Plaintiffs Exhibit 12A. *Compare* Pls. Ex. 12A (citing FBI 3253), *with* KSA Ex. 117 (FBI 3253). |
| | | Plaintiffs Exhibit 12A also relies solely upon various hearsay FBI memoranda as evidence that four calls allegedly involving Al Bayoumi transpired at all. *See* Pls. Ex. 12A (REF 1 column). None of the phone records in the case reflect any of these calls. |
| | | After removing these improperly-included calls, Plaintiffs Exhibit 12A shows that between January 19, 2000 and March 24, 2000, Al Bayoumi made a total of (i) 97 calls – not 110 – to the Saudi Embassy, and (ii) 11 calls to the Los Angeles Consulate. Of the 97 calls to the Embassy, 30 – not 39 – were to (202) 342-3700, the main number for the Islamic Affairs Department. |
| | | Plaintiffs Exhibit 12A shows that Al Bayoumi called a number that Plaintiffs associate – based on hearsay sources – with Al Sowailem's cell phone on February 18, 2000 at 7:58 pm and February 19, 2000 at 10:56 am. No subscriber records were produced to verify that the number belonged to Al Sowailem. |
| | | Plaintiffs Exhibit 12A shows that Al Bayoumi called a number that Plaintiffs associate – based on hearsay sources – with Al Sudairy on January 26, January 30, and February 2, 2000. No subscriber records were produced to verify that the number belonged to Al Sudairy. Plaintiffs misattribute to Al Bayoumi calls made to that number on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | January 24 and February 7, 2000 from the publicly-available phone line at the Al Madina Mosque.<br><br>Plaintiffs Exhibit 12K is also inaccurate. Among other things, Plaintiffs Exhibit 12K is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x H. Plaintiffs Exhibit 12K misattributes to Al Bayoumi 48 calls that were made from a publicly-available phone line at the Al Madina Mosque.<br><br>In addition, Plaintiffs Exhibit 12K contains three duplicate entries on February 3, 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am. Plaintiffs Exhibit 12K also misstates the recipient's number of a call made on March 10, 2000 at 12:27 pm. The call was made to ███████8813, not ██████3700 as stated in Plaintiffs Exhibit 12K. *Compare* Pls. Ex. 12K (citing FBI 3253), *with* KSA Ex. 117 (FBI 3253).<br><br>After removing the improperly-included calls referenced above and correcting the misstated recipient, Plaintiffs Exhibit 12K shows that Al Bayoumi made 93 – not 110 – calls to the Saudi Embassy between January 19, 2000 and March 24, 2000. Of these 93 calls, 30 – not 39 – were made to the Islamic Affairs Department of the Embassy. According to Plaintiffs Exhibit 12K, these 30 calls were all made to 2023423700. Plaintiffs Exhibit 12K does not include any calls made to any number that Plaintiffs claim was Al Sowailem's cell phone or the referenced calls to Al Sudairy. |
| 1257. | Bayoumi did not provide any explanation for the extraordinary number of calls that he made to officials of the Islamic Affairs office. Ex. 120, Bayoumi Dep. 319:8-320:9 ("Q: Can you remember the name of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | anyone you spoke with at the Islamic Affairs department? A: No."). | To the extent a response is required, Plaintiffs provide no basis for concluding that the number of calls was "extraordinary," and, as discussed in the two preceding paragraphs, Plaintiffs overstate the number of calls to or from Al Bayoumi. Given the actual volume and the fact that Al Bayoumi was testifying more than 20 years after the calls, it is unsurprising that Al Bayoumi would remember that he called the Islamic Affairs Department without remembering who. *See* Pls. Ex. 120 (Bayoumi Tr.) 319:19-320:1 ("But I do remember that I did communicate with them, yes. . . . The Islamic Affairs department. But exactly who, I don't remember.").<br><br>Plaintiffs' assertion that Al Bayoumi did not provide any explanation for such calls is misleading. Al Bayoumi, who volunteered at the Al Madina Mosque, testified that he would call the Islamic Affairs Department to request provision for the Mosque of furniture, Qur'ans, books, and booklets, or the dispatch of propagators "to help with the prayer, the prayers of Taraweeh and so forth" during Ramadan. *Id.* at 159:12-162:17, 224:2-225:24. The call volume attributable to him is consistent with these innocuous explanations.<br><br>Further, as set forth in Response to Plaintiffs Averment ¶ 1519, the evidence demonstrates that Al Bayoumi's calls to the Embassy and Consulate dealt with the renewal of his and his family's passports, his request for Islamic materials for the mosque, and issues concerning his studies in the United States. |
| 1258. | *Thumairy's calls*. Between November 18, 1999 and February 16, 2000, Thumairy placed 33 calls from his home phone to officials of the Islamic Affairs office at the Embassy. Ex. 5, Youssef Rpt. 134. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | According to Youssef's analysis, these calls include:<br><br>a. Thumairy made 8 calls to ████-3700 the main number for the MOIA/Islamic Affairs Department; Ex. 5, Youssef Rpt. 134.<br><br>b. Thumairy placed 12 calls to the direct line for his supervisor, Khalid Al Sowailem; Ex. 5, Youssef Rpt. 134.<br><br>c. Thumairy made 6 calls to Sowailem's cell phone on December 7, 12, 25 and 27 (3 calls), 1999; Ex. 5, Youssef Rpt. 134.<br><br>d. Thumairy made 7 calls to MOIA numbers identified as fax numbers, all but one of which was to Sowailem's fax number. Ex. 5, Youssef Rpt. 135. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs cite Youssef's Report for call volumes, but they have included updated call volume charts purportedly showing Al Thumairy's call activity as Plaintiffs Exhibit 12A. To the extent Plaintiffs rely on Plaintiffs Exhibit 12A to support this paragraph, the document is an inadmissible, improper summary exhibit. *See* Objections Chart.<br><br>Youssef's "analysis" of the telephone records to attribute calls to Al Thumairy is speculative and not based on any recognized methodology. Plaintiffs and Youssef also misattribute calls to Al Thumairy and make various other errors.<br><br>Plaintiffs Exhibit 12A is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x A. Youssef's assertions are contradicted by Plaintiffs Exhibit 12A, which shows that Al Thumairy made 29 – not 33 – calls from his home phone to officials at the Islamic Affairs office at the Embassy from November 18, 1999 through February 16, 2000. These 29 calls include: (a) 8 calls to (202) 342-3700 the main number for the MOIA/Islamic Affairs Department, (b) 12 calls to (202) 944-3547, the line for Al Sowailem, and (c) 7 calls to fax numbers, including 6 to Al Sowailem's fax number.<br><br>Plaintiffs Exhibit 12A also shows that Al Thumairy made five – not six – calls to a number that Plaintiffs claim was Al Sowailem's cell phone. Plaintiffs Exhibit 12A does not show any call made from Al Thumairy's home phone to that number on December 12. Moreover, the document Plaintiffs rely upon to show Al Sowailem's number is hearsay. *See* Pls. Ex. 12A. No subscriber records were produced to verify that the number belonged to Al Sowailem. |
| 1259. | Thumairy testified in his deposition that he did not report to anyone at the Embassy and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | his contacts with Khalid Sowailem were "sporadic," "every two months or so" and about administrative like vacations. Ex. 107, Thumairy Dep. 114:23-115:10; 117:16-23; 118:6- 13; Ex. 5, Youssef Rpt. 135. Thumairy's phone calls, however, show that he had regular interactions with his Saudi government superiors at key times just prior to and after the arrival of Hazmi and Mihdhar in California. Ex. 12C (Thumairy calls to Saudi Embassy). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 12C is an improper summary exhibit. *See* Objections Chart.<br><br>Plaintiffs' assertions are based on misattributing phone calls to Al Thumairy, and the record shows that his calls are consistent with his testimony.<br><br>Among other errors, Plaintiffs Exhibit 12C is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x C. Plaintiffs Exhibit 12C misattributes to Al Thumairy nine calls made from the number ███0777 prior to April 2002 when he started using it. The subscriber records for this number list the subscriber as ████████, and the user as ████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. KSA Ex. 168, at 3-4. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See id.* at 5.<br><br>Plaintiffs Exhibit 12C also contains a call on February 1, 2000 at 12:09 pm which is not supported by the phone records. The phone records for Al Thumairy for this period were produced, but do not reflect this call. *See* KSA Ex. 127 (FBI 564). Plaintiffs instead rely upon an FBI memorandum, which is hearsay, and says that Al Bayoumi "called the SAUDI EMBASSY, 2023423700, at 12:09" not that Al Thumairy did so. Pls. Ex. 2JJ (EO 622-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, Plaintiffs' assertions – regarding the nature of Al Thumairy's calls and any coincidental timing to events that Plaintiffs allege are somehow important – are not supported by any citation or record evidence. |
| | | Saudi Arabia does not dispute that Al Thumairy testified that he did not report to anyone at the Embassy, but he also testified that he contacted Al Sowailem for administrative matters. Specifically, Al Thumairy testified, "Like I said, there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations." Pls. Ex. 107 (Thumairy Tr.) 114:23-115:10. |
| | | Regarding the frequency with which he contacted Al Sowailem, testifying more than 20 years after the fact, Al Thumairy explained that he did not "recall exactly" and "was guessing" when he said he called Sowailem every two months. *Id*. at 117:24-118:5. When pressed to give an estimate, he said "I can't really estimate, because I don't remember anything to base my estimate on. But what I do remember is that it was sporadic . . . ." *Id.* at 118:6-13. Plaintiffs' selective quotation of Al Thumairy's testimony leaves out explanation that he was "guessing" because he didn't "recall exactly." |
| | | The call records reflect that Al Thumairy made calls to the Embassy and to Al Sowailem with the same frequency both before the hijackers arrived (and before the 9/11 plot was conceived) and afterwards. As Sageman notes, Al Thumairy's calls fit "his pattern [of] dealing with his administrative issues throughout his stay in Los Angeles." KSA Ex. 167 (Sageman Rep.) at 498-501. |
| 1260. | Saudi Arabia did not produce faxes that Thumairy sent to the Embassy, despite the phone record evidence that Thumairy used his own phone to placed 27 calls to the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Embassy's fax numbers. Ex. 12C (Thumairy calls to Saudi Embassy). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12C is an improper summary exhibit. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph contains improper attorney argument. It also relies on Plaintiffs Exhibit 12C, which misattributes calls to Al Thumairy. *See supra* Response to Pls. Aver. ¶ 1259. Regardless, it is undisputed that telephone records list 27 phone calls from Al Thumairy's home number to phone numbers at the Embassy that may have been used to send or receive faxes at various points in time. *See* Pls. Ex. 12C. Saudi Arabia is aware of no evidence, however, that Al Thumairy actually sent any faxes to the Embassy, as opposed to dialing the incorrect extension or calling at a point in time when the fax machine was not in use. Saudi Arabia has complied with its discovery obligations and even voluntarily produced documents from the Embassy and Consulate that are barred from discovery under the Vienna Convention. |
| XVII.C. | **Thumairy-Saudi Consulate Secretary Mana** | |
| 1261. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | |  |
| 1262. | ███████████████ ███████████ ███████████████ Ex. 110A, Mana Dep. 134:8-135:22; Ex. 12I (███████ | Plaintiffs Exhibit ███████ and Plaintiffs Exhibit ███ are inadmissible hearsay. ███████ *See* Objections Chart.<br><br>Plaintiffs Exhibit ███ does not support the assertion that there were ███<br><br>There is also no evidence that ██████████ were related to the arrival of the hijackers in Los Angeles, more than 10 days in the future. As of January 5, the hijackers had not yet made their reservations |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | for their flight to LAX as the Response to Plaintiffs Averment ¶ 1404 shows. |
| 1263. | Additionally, Youssef raised concerns that "[t]The FBI produced only toll call records and not records of the local calls made from Thumairy's phone to nearby locations, so Plaintiffs are unaware of calls that Thumairy may have made to the Saudi Consulate where ███ worked or individuals in the neighborhood around the King Fahad Mosque." Ex. 5, Youssef Rpt. 135-6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Further, Youssef's opinion that Al Thumairy "may have made [calls] to the Saudi Consulate where ███ worked or individuals in the neighborhood around the King Fahad Mosque" is speculative on its face. Plaintiffs cite no evidence that such calls in fact occurred or that the FBI has records of local calls that it did not produce. |
| 1264. | ███████████████, Mana frequently visited the King Fahad Mosque and met with Thumairy regularly. Ex. 110A, Mana Dep. 39:20-25 (stating he attended "[b]efore it was even established"); 84:20-85:17 (describing situations where he saw Thumairy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Mana testified in response to the question "You attended the King Fahad mosque regularly back in the year 2000?" that "[b]efore even it was established, I was a member of the community there, before they built the mosque there. And after they built the mosque, I was there with the community involved in 2005." Pls. Ex. 110A (Mana Tr.) 39:20-25. In response to questions concerning how often he saw Al Thumairy in the year 2000, Mana testified: "Well, every Friday when he give the sermon, and there are also sometimes I translate |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | for him. Sometimes he asks another gentleman. I believe he was from Russell, who translated for him also, his sermon. And if I happened to stop by after work to pray, whenever the prayer time is up, you know, I can walk in, pray, and then leave. Sometimes he's there, sometimes he's not. So it's variable. . . . Like I said, it depends on my own schedule. If I leave the office let's say during the summertime, then the hours are long, and the prayer times, they catch me certain times or I walk in there and pray. If he's leading the prayer, I can see him there. If he's not, then we pray and then we leave. Okay? Somebody else leads the prayer. Sometimes I lead the prayer too. And somebody if the imam is not there." *Id.* at 84:20-85:17. |
| XVII.D. | **Calls to individuals assisting Thumairy and Bayoumi in providing support to the hijackers** | There is no evidence that Al Thumairy or Al Bayoumi supported the hijackers or received any assistance in doing so. Plaintiffs cite no evidence to support their assertion. To the extent Plaintiffs cite materials purportedly supporting their theory elsewhere, Saudi Arabia addresses that material in the paragraphs where it is cited. |
| 1265. | As detailed below, Bayoumi, Thumairy, and ▮▮▮ not only called each other but also called other individuals who directly supported the hijackers. For instance, ▮▮▮ called ▮▮▮; Thumairy called ▮▮▮ Aulaqi, Faisal Muhanna, ▮▮▮, and ▮▮▮ and Bayoumi called Khalid Al Yafai, Hashim Al Attas, ▮▮▮, Mohdhar Abdullah, ▮▮▮ and Abdullah Al Jaithen. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Objections Chart.<br><br>To the extent a response is required, this paragraph contains improper attorney argument. Regarding allegations that the listed individuals "directly supported the hijackers," Plaintiffs cite no evidence. To the extent Plaintiffs cite evidence purportedly supporting their allegations |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | against the listed individuals elsewhere, Saudi Arabia addresses that material in the paragraphs where it is cited.<br><br>Regarding Plaintiffs' claim that Al Bayoumi, Al Thumairy, and ███ called each other and other listed individuals, the exhibit on which they rely contains numerous errors and misattributions. Among other things, Plaintiffs Exhibit 12A is inconsistent with the chart of phone calls attached to Plaintiffs Exhibit 5 (Youssef Rep.). *See* Pls. Ex. 5 (Youssef Rep.) App'x A.<br><br>Plaintiffs Exhibit 12A also misattributes to Al Bayoumi 35 calls made from or to a publicly-available phone line at the Al Madina Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15. For instance, Plaintiffs Exhibit 12A lists a call on January 24, 2000 at 4:43 pm as Al Bayoumi calling himself from his cell phone to the Mosque.<br><br>Plaintiffs Exhibit 12A misattributes to Al Bayoumi 52 calls made to the number ███662, a number Plaintiffs concede was subscribed to by Manal B██████ Al Bayoumi's wife. For instance, Plaintiffs Exhibit 12A lists 52 calls as Al Bayoumi calling himself from his cell phone to a "cellphone 'used by' Bayoumi (subscribed in Manal's name)."<br><br>Plaintiffs Exhibit 12A misattributes to Al Bayoumi 36 calls made from ███6652, another number subscribed to by Manal Bagader. *See*, *e.g.*, KSA Ex. 233 (FBI 9273). There is no admissible evidence that Al Bayoumi ever used that phone. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12A double-counts at least 65 calls made by Al Bayoumi's cell phone (████7623). The majority of these double-counted calls – 62 calls – are from the same two pages of phone records for March 1 through March 7, 2000. *Compare* Pls. Ex. 12A, *with* KSA Ex. 116 (FBI 3246-47). The remaining three double-counted calls are calls to the KSA Embassy Cultural Mission (2022988814) on February 3, 2000 at 12:11 pm and March 22, 2000 at 8:39 am and 8:41 am. *Compare* Pls. Ex. 12A, *with* KSA Ex. 115 (FBI 3231), KSA Ex. 117 (FBI 3259).<br><br>Plaintiffs Exhibit 12A also misstates the recipient's number of a call made by Al Bayoumi on March 10, 2000 at 12:27 pm. The call was made to 2022988813 (KSA Embassy Cultural Mission), not to 2023423700 (KSA Embassy Islamic Affairs) as stated in Exhibit 12A. *Compare* Pls. Ex. 12A (citing FBI 3253), *with* KSA Ex. 117 (FBI 3253).<br><br>Plaintiffs Exhibit 12A misattributes to Al Thumairy 20 calls made from, and 15 calls made to, the number ████3362. The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ████████ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 497:14-499:9.<br><br>Plaintiffs Exhibit 12A also misattributes to Al Thumairy two calls made on January 5, 2000 to the number ████4469, for which there is no evidence of Al Thumairy's use. Remarkably, Plaintiffs Exhibit 12A lists those two calls as Al Thumairy calling himself from the number ████3362 to the number ████4469.<br><br>Plaintiffs Exhibit 12A also relies solely upon various FBI memoranda – inadmissible hearsay – as evidence that 29 calls allegedly involving Al Thumairy and four calls allegedly involving Al Bayoumi transpired at all. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *See* Pls. Ex. 12A (REF 1 column). None of the phone records produced in these case reflect these calls. *See* Objections Chart. <br><br> As it relates to the individuals referenced in this paragraph, Plaintiffs Exhibit 12A relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that any of the alleged calls made by ▮ transpired at all. *See* Pls. Ex. 12A (REF 1 column). This referenced exhibit and the exhibit created from it are inadmissible. *See* Objections Chart. No phone records were produced for any calls allegedly made by ▮ including the purported calls to ▮ In addition, all of the calls allegedly made by Al Bayoumi to a number that Plaintiffs associate with Al Jaithen were made from the publicly-available phone line at the Al Madina Mosque. There is no evidence that Al Bayoumi made those calls. Plaintiffs Exhibit 12A also does not contain any calls from Al Thumairy to ▮ as Plaintiffs assert. Furthermore, Plaintiffs rely solely upon hearsay sources in attributing the recipient numbers dialed by various phones to ▮ , Al Muhanna, ▮ Yafai, Attas, Abdullah, and ▮ , and Plaintiffs cite no source in attributing a number to Al Jaithen. No subscriber records were produced to verify that any of the calls made in Plaintiffs Exhibit 12A were to numbers that belonged to any of these individuals. |
| XVIII. | SAUDI ARABIA THROUGH ITS AGENCY MOIA ASSIGNED ABDULLAH AL JAITHEN AND MAJED AL MERSAL TO VISIT CALIFORNIA TO COORDINATE WITH THUMAIRY AND BAYOUMI ON THE PLANNING FOR THE ARRIVAL OF THE FIRST 9/11 HIJACKERS IN 2000. | The cited materials in this Section do not support Plaintiffs' contention that the Ministry of Islamic Affairs sent Abdullah Al Jaithen and Majed Al Mersal to California to coordinate on the planning for the future 9/11 hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar, who came to California in January 2000. <br><br> Both Al Jaithen and Al Mersal left Saudi Arabia before Al Qaeda held its crucial meeting in Qandahar in mid-December 1999, when they finalized the 9/11 plan. Pls. Ex. 82 (CIA_256). Chronologically, Plaintiffs' assertions are impossible, since the two Ramadan propagators left Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Arabia before Al Qaeda had decided on the major contours of the 9/11 plot.<br><br>Moreover, during the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); KSA Ex. 82 (Nakhleh Ex. 1) at 3417 (Joint CIA-FBI Assessment: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 4 (Rundell Rep.) 26-30.<br><br>Plaintiffs' purported experts agree. *See* KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat).<br><br>Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks. In April 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets. KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11.<br><br>In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia. KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8. |
| | | In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the Arabian Peninsula" and criticized the Saudi Government: "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . . While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy. So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified"). |
| | | In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution. KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14. |
| | | The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course. In response, Saudi Arabia terminated diplomatic |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | relations with the Taliban. KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3.<br><br>During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind").<br><br>It is implausible that Saudi Arabia would provide assistance to its enemy Al Qaeda in support of an attack against its staunch ally, the United States.<br><br>The FBI also investigated Plaintiffs' theory as part of Operation Encore. It firmly rejected this theory concluding that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>There is also no evidence that Saudi Arabia had any prior knowledge of the 9/11 attacks. The FBI and CIA have both concluded that Saudi Arabia had no such prior knowledge. Pls. Ex. 2OO (EO 3416) ("There is no evidence that either the Saudi Government or members of the Saudi royal |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."). |
| 1266. | Hazmi and Mihdhar were longstanding and committed Al Qaeda fighters personally selected by Osama Bin Laden to be part of the 9/11 plot. Ex. 82, CIA 0242-304 at 249, 253, 262 (CIA Report, *11 September: The Plot and Plotters* (June 1, 2003)). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1267. | Hazmi and Mihdhar each played a central role in carrying out the 9/11 Attacks. Hazmi was part of the council in charge of the 9/11 Attacks and served as deputy and "second-in-command" of the entire operation. Ex. 82, CIA 0242-304 at 262. Hazmi was the only non-pilot hijacker who participated in the series of final planning meetings of the four pilots for the 9/11 Attacks in mid-2001. Ex. 82, CIA 0242-304 at 261; Ex. 683, September 26, 2002 testimony of Mueller at 526. Mihdhar's role was likely as a coordinator and organizer of the non-pilot hijackers. Ex. 170, Joint Congressional Committee Inquiry (JICI 09/25/02), Declassified June 18, 2002 Statement of FBI Director Robert Mueller, at 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 170 and Plaintiffs Exhibit 683 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, it is undisputed that Al Hazmi and Al Mihdhar played a central role in carrying out the 9/11 attacks.<br><br>Al Hazmi was one of the designated pilots at the 9/11 operation planning meeting in December 1999 in Qandahar. Pls. Ex. 82 (CIA_256). However, Al Hazmi failed in his attempt to learn how to fly. He bid his time until December 2000, when Hani Hanjour came to pick him up in California. KSA Ex. 163 (9/11 Rep.) 221-23; Pls. Ex. 82 (CIA_257). After this failure, Al Hazmi rejoined the 9/11 plot and became the deputy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | to Mohammed Atta, the field commander of the plot inside the United States. Pls. Ex. 82 (CIA_262).<br><br>After accompanying Al Hazmi to California in the first half of 2000, Al Mihdhar left California on June 10, 2000, without permission. KSM wanted to drop him from the operation, but bin Laden interceded in favor of Al Mihdhar. Al Mihdhar was the last one to arrive in the United States in early July 2001, after one year of inactivity from the 9/11 operation. KSA Ex. 163 (9/11 Rep.) 237-40; Pls. Ex. 31 (KSM Statement) at 20-21.<br><br>This is confirmed by bin Laden in his handwritten papers found in Abbottabad. "We sent two young men to learn English in the USA: Rabia Nawaf Al-Hazmi and Khalid Al-Mihdhar. Both spent a year without achieving success, and they were sending messages to tell us the fact that they could not study and were unable to achieve success. Khalid Al-Mihdhar despaired and returned to Mecca because he felt ashamed from returning to Afghanistan to tell me of such failure." KSA Ex. 79 (IMG-040538, "The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017)). Nawaf Al Hazmi's kunya (nom de guerre) was Rabia al-Makki, and bin Laden clearly refers to him in his short memoir of the 9/11 attacks.<br><br>The statements by Robert Mueller at Plaintiffs Exhibit 170 are dated from 2002, before the FBI reached any conclusions from its investigation. |
| 1268. | In the Fall of 1999, Bin Attash, Hazmi, Mihdhar, and other Al Qaeda operatives personally selected by Bin Laden attended a terrorist training camp near Kabul. Bin Ladin visited the camp to meet with the elite group. *See* 9/11 Commission Report at 156-57; Ex. 423, May 31, 2011 Charge | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Sheet for Khalid Sheikh Mohamed, Walid Muhammad Salih Mubarak Bin 'Attash and other accused individuals, Charge I at ¶¶ 9-12, 22 (Mihdhar and Hazmi trained with Bin Attash in September 1999 and Hazmi alone in November 1999 in Karachi, Pakistan); Ex. 171, JTF-GTMO Detainee Assessment of Zohair Mohammed Said dated Nov. 25, 2008 (YM 569). | Plaintiffs Exhibit 423 is inadmissible hearsay. *See* Objections Chart.<br><br>In the Fall of 1999, Khallad bin Attash, Al Hazmi, Al Mihdhar, and other al Qaeda operatives selected by bin Laden attended a training camp at Mes Aynak, near Kabul. KSA Ex. 163 (9/11 Rep.) 156-57. There is no support for Plaintiffs' assertion that bin Laden visited the camp.<br><br>Plaintiffs Exhibit 171 (JTF-GTMO Detainee Assessment of Zohair Mohammed Said [Abu Bara al-Yemeni]) at 10, states that "[a]fter completing the course, the class traveled to Kandahar and visited UBL who lectured on the operational details of the East Africa bombings."<br><br>Khallad and Al Hazmi attended the 9/11 plot planning meetings in Qandahar during early Ramadan, which started on December 9, 1999. Pls. Ex. 82 (CIA_256). Al Hazmi and Khallad then traveled to Karachi to train under KSM for about two weeks in December 1999. KSA Ex. 163 (9/11 Rep.) 157; Pls. Ex. 31 (KSM Statement) at 7-8, 16-17. |
| 1269. | In early December, upon completion of the training, Hazmi and other trainees went to Karachi for an additional 1–2-week course taught by Khalid Sheikh Mohammed on various matters encompassing aircraft hijackings and aviation security. Ex. 423, Charge Sheet for Khalid Sheikh Mohamed, Walid Muhammad Salih Mubarak Bin 'Attash and other accused individuals, Charge I at ¶ 10-11. Hazmi learned that he and Mihdhar were to be involved in a martyrdom operation in the U.S. involving planes. *See* 9/11 Commission Report at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 423 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this is undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | 158; Ex. 31, Defense Exhibit 941 at 7 (¶ 10), US v Moussaoui, 1:01-cr-00455 (E.D.Va.). |  |
| 1270. | Contemporaneously, MOIA was finalizing the assignments of its propagators to various destinations for Ramadan 1420. MOIA Deputy Minister Tawfiq Al Sudairy oversaw the Ramadan 1420 propagator assignments. Ex. 141, KSA 9538; Ex. 5, Youssef Rpt. 105, n. 432. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Plaintiffs have failed to attach Plaintiffs Exhibit 141 to their filing. KSA 9538 is a letter to Sheikh Abdullah Al Jaithen, dated November 29, 1999; however the document can be found at KSA Exhibit 108. This letter predated the al Qaeda Qandahar 9/11 planning meeting, which took place in early Ramadan, which started on December 9, 1999. Although Tawfiq Al Sudairy signed the letter, there is no evidence that he was personally responsible for the assignments given to the participants in the imamate program. |
| 1271. | On November 29, 1999, Tawfiq Al Sudairy wrote a letter to Jaithen, assigning Jaithen to "Kismayo, Kenya" for the MOIA Ramadan program. Ex. 141, KSA 9538. Kismayo is not in Kenya but is a town in the south of Somalia, which borders Kenya. In turn, MOIA instructed Jaithen to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | "cooperate with the employees of the . . .Embassy." Ex. 141, KSA 9538. | Plaintiffs have failed to attach Plaintiffs Exhibit 141 to their filing. The letter contains the quoted language. The "Embassy" referenced in the letter is not the Saudi Embassy in Washington, D.C. |
| 1272. | On December 4, 1999, the Saudi Ministry of Foreign Affairs sent MOIA a list of propagator assignments for Ramadan 1420 to the Saudi Embassy in Washington, D.C. The list stated that Majed Al Mersal was assigned to visit the Al Madinah Mosque in San Diego and that Jaithen was assigned to visit the Mosque of the "Islamic Studies College" in Kismayo. Ex. 680S, KSA 7807-08. Saudi Arabia instructed its Embassy to take "the necessary action…in order to facilitate the mission" of the visiting propagators. Ex. 221, KSA 7805. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>On December 4, 1999, a cable from the Ministry of Foreign Affairs was faxed to 16 Saudi embassies, including Nairobi (but not Mogadishu) and Washington, D.C. accompanying a list of assignments for 51 Ramadan preachers. Pls. Ex. 221. On the accompanying list, Majed Al Mersal is assigned to the Al Madina Mosque in San Diego; Abdul Latif al-Amer to Omar Bin Al Khattab Mosque in Columbus (Ohio); Mansour al-Samari to the Islamic Dawah Mosque, in Minneapolis; and Abdullah Al Jaithen to the College of Islamic Studies in "Kimsawi," Kenya. *Id.* <br><br>The next day, on December 5, 1999, a fax was sent to Al Jaithen. The assignment to Kismayo, Kenya was replaced with Minneapolis, USA. *See* KSA Ex. 108 (KSA 9538). |
| 1273. | On December 11, 1999, however, Saudi Arabia instead obtained an A-2 official government business visa for Abdullah Al Jaithen to join Majed Al Mersal to visit Thumairy and Bayoumi in California. Ex. 571, FBI 004675-REV2021 - 04676-REV2021. Bayoumi confirmed at his | Saudi Arabia did not arrange for Al Jaithen to "visit Thumairy and Bayoumi in California." Al Jaithen stayed in San Diego for a night, left for Los Angeles for a night, and then traveled to Columbus, Ohio, where he spent the remainder of Ramadan giving "[l]essons in Islamic jurisprudence, Islamic creed, fasting, prayers, charity, [and] ethics" at the Omar El-Kattab Mosque. Pls. Ex. 96 (Jaithen Tr.) 85:18-86:19, 94:4-8, 123:3-16, 158:14-159:4, 161:5-10, 166:3-6. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | deposition that "[t]he two Sheikhs who visited Masjid Al-Madina were Abdullah Al Jaithen and Majed Al Mersal." Ex. 120, Bayoumi Dep. 353:12-24. | |
| XVIII.A. | **Al Jaithen was an Al Qaeda extremist with ties to Al Haramain.** | Plaintiffs fail to cite anything in support of this assertion. Al Jaithen in fact was a quietist Salafi, who studied under prominent quietist scholar Sheikh Mohammed Uthaymeen. Plaintiffs' expert Meleagrou-Hitchens states in his book *Incitement* that the quiest strand of Salafism, which did not advocate violence and whose "main practice" is of a "peaceful Da'wah," is "most closely associated" with al-Uthaymeen. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:12-62:8, 70:21-72:1.<br><br>There is no evidence Al Jaithen had any ties to Al Qaeda. |
| 1274. | MOIA propagators Majed Al Mersal and Abdullah Al Jaithen were both graduates of Imam Mohamed University and were both subsequently recruited to work at MOIA's office in Buraydah, Qassim. Ex. 52, Mersal CV; Ex. 40, Jaithen CV. | It is true that Al Mersal and Al Jaithen were both graduates of Imam Mohamed University and worked in Qassim. The fact that these individuals studied at this university or worked in that province does not indicate that they had extremist views.<br><br>In fact, Al Mersal's CV shows that he was at the forefront of the KSA's fight against terrorism. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Pls. Ex. 52, at 2. From 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, Pls. Ex. 52, at 2, which is the KSA rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA, but who have no blood on their hands. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1275. | "[Qassim] province was at the very heart of the strict Wahhabi movement in Saudi Arabia" and that several of the 9/11 hijackers were recruited through contacts at local universities and mosques there. The 9/11 Commission noted that one mosque in Qassim was known as a "terrorist factory." *See* 9/11 Commission Report at 233; Ex. 149, Nakhleh Rpt. ¶ 227. | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart.<br><br>KSA Exhibit 163 (9/11 Rep.) does not paint Qassim as a hotbed of extremism, as Plaintiffs suggest. The 9/11 Commission noted that one GTMO detainees had stated that some of the future 9/11 hijackers "were chosen by unnamed Saudi sheikhs who had contacts with al Qaeda. [Abdul Azziz al-] Omari, for example, is believed to have been a student of a radical Saudi cleric named Sulayman al Alwan. His mosque, which is located in al Qassim Province, is known among more moderate clerics as a 'terrorist factory.' The province is at the very heart of the strict Wahhabi movement in Saudi Arabia." KSA Ex. 163 (9/11 Rep.) 233. KSA Exhibit 163 (9/11 Rep.) does not state that several hijackers were "recruited through contacts at local universities and mosques there," as Plaintiffs allege. |
| 1276. | The English version of the "Book of Jihad" pamphlet that Bayoumi kept in his office at the Al Madinah Mosque was published by MOIA in Qassim Province. Ex.528, FBI 4139-45 ('Al Oasseem Zone'); Ex. 5, Youssef Rpt. 86. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>At his deposition, Plaintiffs' expert Nakhleh acknowledged that Saudi Arabia practices Hanbali Salafism. He further acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").<br><br>With respect to Plaintiffs Exhibit 528, Al Bayoumi testified that "[t]here are some documents that would get posted on a message board on the mosque. Anybody can come and post whatever document or whatever paper that they put, and then at the masjid we don't necessarily allow that. So if there something that does not align with us, I will take it off and I will keep it in a file for it to be destroyed later on. . . . I do not keep it on the wall, anything that pertains to violence, theft, guns. We do not support [that]. . . . This is one of many documents that we had and this was not a document that came from the embassy. The sole stuff that came from the embassy was the Quran, religion books that pertained to doctrine." Pls. Ex. 120 (Bayoumi Tr.) 307:1-308:4.<br><br>It should also be noted that *The Book of Jihad* does not advocate Al Qaeda's view of jihad. It states that "jihad" is a collective duty, sanctioned by the head of state. Pls. Ex. 528 (FBI 4143) at 4. Al Qaeda, by contrast, preaches that "jihad" is an individual duty as argued by Abdullah Azzam in his pamphlet, *Defense of Muslim Lands*. *The Book of Jihad* further prohibits participants in jihad from "killing women or children who do not take part in the fight." *Id.* at 6 (FBI 4145). It thus rejects any form of terrorism. Plaintiffs' attempt to equate any use of the term jihad with terrorism is baseless. |
| 1277. | Jaithen was recommended for his position at MOIA by Sheikh Abdullah Uthaymeen, a leading Saudi religious scholar who taught | It is true that Al Uthaymeen was Al Jaithen's teacher, mentor, and colleague. Plaintiffs' expert Meleagrou-Hitchens states in his book *Incitement* that the quietest strand of Salafism, which did not advocate |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at Imam Mohamed University in Qassim. Ex. 422, KSA 8927; Ex. 142, KSA 8921. Uthaymeen was Abdullah Al Jaithen's teacher, mentor, and colleague at Imam Mohamed University for years. Ex. 96, Jaithen Dep,29:2-31:23, 35:9-36:12. Jaithen taught for many years at Imam Mohamed University alongside Uthaymeen. Ex. 96, Jaithen Dep,20:15-21:12; 30:8-15. | violence and whose "main practice" of a "peaceful Da'wah," is "most closely associated" with Al Uthaymeen. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:12-62:8, 70:21-72:1.<br><br>Plaintiffs Exhibit 422 is inadmissible hearsay. *See* Objections Chart. |
| 1278. | Uthaymeen was, until his death in 2001, one of Saudi Arabia's most prominent and influential religious leaders and interpreter of Wahhabi-Salafi-Hanbali Islam. Ex. 149, Nakhleh Rpt. ¶ 183. Uthaymeen promoted a narrow, intolerant, exclusivist, and jihadist interpretation of Sunni Islam which advocated violent confrontation towards non-Wahhabi-Salafi adherents to Islam, including Shia Muslims and, of course, Christians, Jews, and others. Ex. 149, Nakhleh Rpt. ¶¶ 183-89. Uthaymeen was a prominent supporter of future SDGT designee Al Haramain organization. Ex. 39A, Internet Archive Affidavit at 11.(Uthaymeen states: "I was very pleased with what the [Al Haramain] Foundation has done both domestically and internationally…."). | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. Plaintiffs Exhibit 39A is inadmissible hearsay. *See* Objections Chart.<br><br>The most accurate term for the tradition that Saudi Arabia follows is "Hanbali Salafism." Saudis do not use the term "Wahhabi," which they consider derogatory.<br><br>Plaintiffs' purported expert Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). Plaintiffs' expert Meleagrou-Hitchens states in his book *Incitement* that the quitest strand of Salafism, which did not advocate violence and whose "main practice" of a "peaceful Da'wah," is "most closely associated" with Al Uthaymeen. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:12-62:8, 70:21-72:1. Nor does Plaintiffs Exhibit 149 (Nakhleh Rep.) support Plaintiffs' claim that Al Uthaymeen promoted a "jihadist interpretation of Sunni Islam which advocated violent confrontation towards non-Wahhabi-Salafi adherents to Islam, including Shia Muslims and, of course, Christian, Jews, and others." Plaintiffs Exhibit 149 (Nakhleh Rep.) 68-70, refers to a quote from Al Uthaymeen describing historical Islamic jurisprudence toward apostates, *i.e.*, Muslims who abandon Islam and convert to Judaism and Christianity. In Islam, as in Christianity, the penalty for apostasy is death. Christians administered this penalty from the 12th to the 17th centuries in Europe through many Inquisitions resulting in the killings of hundreds of thousands of people. Those historical facts obviously do not mean that modern Christians support violence against non-Christians. In the cited quote, Al Uthaymeen states factually what Islamic jurisprudence is with respect to apostasy without stating whether or not he advocated this measure being carried out in the present day. In no way did Al Uthaymeen advocate violent confrontation with Shia Muslims, Christians, or Jews. |
| 1279. | Uthaymeen's recommendation of Jaithen was clearly understood by MOIA religious officials to mean that Jaithen would promote the narrow and jihadist | Plaintiffs Exhibit 149 (Nakhleh Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | interpretation of Sunni Islam advocated by Uthaymeen. Ex. 149, Nakhleh Rpt. ¶¶ 186-7. | As set forth in the Response to Plaintiffs Averment ¶ 1278, Al Uthaymeen was a quietist and did not advocate violent jihad. A recommendation from him would thus demonstrate that Al Jaithen was a quietist Salafi, as was proven by his subsequent career. |
| 1280. | While in San Diego, hijacker Nawaf Al Hazmi listened to the recordings of Sheikh Uthaymeen and according to eyewitness Ramez Noaman, respected him. Ex. 2, EO 1277 (translated as "Binothimen"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2P (EO 1277) is inadmissible hearsay. *See* Objections Chart.<br><br>This exhibit states that Al Hazmi listened to "Binothimen." Plaintiffs present no evidence that "Binothimen" is Uthaymeen. |
| 1281. | Due to Uthaymeen's recommendation, MOIA gave Jaithen special treatment. Jaithen did not have to appear before the MOIA interviewing committee that reviewed and approved the Minister's recommendations for new propagators before they were hired. Ex. 142, KSA 8921 ("the two recommendations by the two sheikhs are enough and…he does not have to be interviewed at the Committee"). A senior member of MOIA and a member of the Interviewing Committee could not | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in the Response to Plaintiffs Averment ¶ 1278, and as even Plaintiffs' purported expert has written, Uthaymeen was a quietist and did not advocate violent jihad. A recommendation from him would thus demonstrate that Al Jaithen was a quietist Salafi. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | recall any other case when this happened. Ex. 126, Ghudaian Dep. 295:9-20. | |
| 1282. | In March 2003, Jaithen was one of 32 Saudi Sheikhs, many of whom were influential members of the Saudi clerical establishment, whose name was on a statement published on the website "Islam Today." The statement described the U.S. as "devoted to aggression and injustice"; that cooperation with America "is an act recognized as a major sin"; and that "jihad is the highest honor in Islam." Ex. 149, Nakhleh Rpt. ¶¶ 193-200; Ex. 167, Islam Today Article, March 2003. Jaithen denied making the statement yet could not explain why it was published with his name. Ex. 167, Islam Today Article, March 2003; Ex. 96, Jaithen Dep. 271:22-274:18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 167 is inadmissible hearsay. The Nakhleh Report should be excluded. *See* Objections Chart.

The article Plaintiffs cite is from May 2003, condemns the Al Qaeda jihadi bombings in Riyadh in May 2003, and condemns violence and terrorist attacks. Even if Al Jaithen signed it, that would only show that he condemned Al Qaeda.

Plaintiffs' expert Nakhleh in his report, Pls. Ex. 149 (Nakhleh Rep.) ¶¶ 193-200, refers to another statement, published two months earlier, condemning the March 2003 U.S. led invasion of Iraq. KSA Ex. 234 (Ibrahim bin Abdullah al-Dowaidh *et al.*, 2003, "Home Front vs. Challenges Nowadays (Religious Perspective), *Islam Today*, March 17). Nakhleh cites this statement as another indication of Al Jaithen's alleged belief in violent jihad.

There are many people who believed in 2003 and even more who believe today, in the United States and elsewhere, that the U.S. invasion of Iraq was unprovoked and unjustifiable. The run-up to the Iraq War generated the world's largest protest movement ever, KSA Ex. 235, (*see* Andrew Murray and Lindsey German, *Stop the War: The story of Britain's biggest mass movement*, at 3-5, 71-78 (Bookmarks 2005)), in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | February and March 2003, involving between six and ten million people worldwide, KSA Ex. 236 ((*Millions join global anti-war protests*, BBC, Feb. 17, 2003, *available at* http://news.bbc.co.uk/2/hi/1082urope/2765215.stm)). Opposition to this war does not make Al Jaithen an extremist or a violent jihadi. |
| 1283. | The FBI reported that Jaithen's name and phone numbers were found on a contact list seized from the residence of the spiritual adviser of Al Qaeda leader Abu Zubaidah, who was Osama Bin Laden's lieutenant and who is now detained at Guantanamo prison. Ex. 566, FBI 11760-61. | Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>The document also does not support the assertion that Jaithen was a violent jihadi. The citation is to a hearsay 2016 Operation Encore EC stating that Al Jaithen's name and phone number were found on a list of names in a residence in Medina (KSA) during a raid after the May 2003 bombings in Riyadh.<br><br>Two Saudi clerics, Ali Al Khudayr and Ahmad Al Khalidi, were arrested during the raid. Pls. Ex. 566 (FBI 11760). There is nothing unusual about two clerics having the name and phone number of another Saudi cleric. There is no evidence of what the relationship was (if any) between Al Jaithen and these individuals.<br><br>By 2016, it was known that Abu Zubaydah had never been a member of al Qaeda, or bin Laden's lieutenant, and or even involved in the 9/11 attacks. He is not included in the charge sheets in the 9/11 criminal case. Pls. Ex. 423. |
| 1284. | Jaithen's name and phone number were also found on a contact list located on a hard drive seized from an Al Haramain office. The materials were apparently seized by Saudi Arabia after the 9/11 Attacks, but not | Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit also does not support the assertion that Al Jaithen was a violent jihadi. Even if Al Jaithen's name and contact information was found in documents seized from an Al Haramain office, that would not indicate that Al Jaithen had any relationship with Al Haramain. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | produced by the Kingdom in this litigation. Ex. 566, FBI 11760-61. | Plaintiffs Exhibit 566 does not state that this purported hard drive was seized by Saudi Arabia, and there is no support for Plaintiffs' assertion that it was. Saudi Arabia has fully complied with its discovery obligations. |
| 1285. | | |
| 1286. | Majed Al Mersal also studied under Sheikh Mohamed Uthaymeen and Jaithen at Imam Mohamed University. Ex. 115, Mersal Dep. 24:17-25:7. | Majed Al Mersal was never an extremist. The fact that Al Mersal studied with Sheikh al-Uthaymeen and Al Jaithen, two quietist Salafis, who explicitly rejected violent jihadism, is a strong indicator that Al Mersal never advocated or promoted violent jihad.<br><br>This is confirmed by Al Mersal's subsequent career. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Pls. Ex. 52 (Mersal CV) at 2. Furthermore, from 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, *id.*, which is the Saudi Arabian rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA but who have no blood on their hands. Contrary to Plaintiffs' insinuation, Al Mersal was leading the fight against Saudi Arabia's fight against terrorism, including al Qaeda. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| **XVIII.B.** | **MOIA made extraordinary arrangements to send Jaithen with Mersal at the last minute in coordination with Thumairy.** | Plaintiffs offer nothing to support this assertion. |
| 1287. | Jaithen stated that he received a letter from MOIA assigning him to go to "America" but that he was not given any specific location to go inside the U.S. Ex. 96, Jaithen Dep. 66:21-67:7, 69:19-70:8, 71:8-15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>At his deposition, 22 years after his assignment to the United States for the 1420H Ramadan Imamate Program, Al Jaithen did not recall the details about how his assignment was made. Pls. Ex. 96 (Jaithen Tr.) 66:7-67:7. |
| 1288. | There was an undated handwritten note added to Tawfiq Sudairy's letter to Jaithen which penciled out "Kismayo, Kenya" and wrote "Minneapolis, U.S.A." Ex. 141, KSA 9538. There is no indication of when this note was added to the letter. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The evidence indicates that the handwritten change in the cited letter occurred on or about December 5, 1999. KSA Ex. 108 (KSA 9538). On December 4, 1999, a cable issued by the KSA Ministry of Foreign Affairs faxed to 16 KSA embassies throughout the world still listed Al Jaithen's assignment to "Kismayo," Kenya. Pls. Ex. 221 (KSA 7805, KSA 7807-08). According to this cable, on December 4, 1999, Al Jaithen was still assigned to Africa. However, the cited letter, KSA Ex. 108 (KSA 9538), with its handwritten modification changing the assignment from Kismayo |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | to Minneapolis, was faxed on December 5, 1999, indicating that the change occurred between December 4 and December 5, 1999. |
| 1289. | Contradicting the documentary evidence produced by Saudi Arabia, Jaithen denied that he was ever assigned by MOIA to go to Kismayo, Kenya, Somalia, or Minneapolis. Ex. 141, KSA 9538; Ex. 96, Jaithen Dep. 64:14-66:5, 195:18-196:3. | Al Jaithen testified that he does not recall, 22 years later, being assigned to Kenya or Kismayo, and he testified that he did not know that Kismayo was in Somalia. Pls. Ex. 96 (Jaithen Tr.) 64:17-66:5. He also testified that he did not recall being assigned to Minneapolis, Minnesota. *Id.* at 195:18-196:3. Plaintiffs' statement that Al Jaithen "denied" being assigned to these locations is incorrect. |
| 1290. | Jaithen claimed that he received a letter instructing him to travel to the U.S. and decide on his own, without reporting to his MOIA supervisors, where and when he would go in the U.S. Ex. 96, Jaithen Dep. 71:8-18, 294:8-17, 295:4-9. Saudi Arabia has not produced this alleged letter. | Al Jaithen testified that he recalled receiving a letter assigning him to "America." Pls. Ex. 96 (Jaithen Tr.) 66:18-67:7. He decided to go to California for a few days for treatment of his severe headaches. *See id.* at 60:18-21, 69:23-70:8. Saudi Arabia has produced multiple letters stating that Al Jaithen was assigned to perform the 1420H Ramadan Imamate in the United States. *See* Pls. Ex. 230 (KSA 9450); KSA Ex. 108 (KSA 9538). Saudi Arabia has fully complied with its discovery obligations. |
| 1291. | Each propagator assigned for a Ramadan visit, however, was given a specific assignment to visit a named city and mosque. That information was then provided in a list that was sent to the Saudi Embassy. Ex. 680S, KSA 7807-08. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The record evidence supports Jaithen's testimony that he was assigned to the United States. *See* Pls. Ex. 230 (KSA 9450); KSA Ex. 108 (KSA 9538). The evidence also demonstrates that more than one propagator was sometimes assigned to several cities. *See* Pls. Ex. 680S (KSA 7807-08) (three for London, three for Paris, two for Nairobi). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1292. | Propagators on Ramadan visits were instructed to travel at least two days before Ramadan began so that they would be at their assigned location before the start of the month. Ex 141, KSA 9538, (Nov. 29, 1999 letter of Tawfiq Al Sudairy to Jaithen states "make sure to travel at least two days before the month of Ramadan.") | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The November 29, 1999, letter to Al Jaithen instructed him to please make sure to travel at least two days before the month of Ramadan. KSA Ex. 108 (KSA 9538). However, Plaintiffs have not pointed to any evidence of instructions given to other propagators. |
| 1293. | The first day of the month of Ramadan 1420 was December 9, 1999. Ex. 14, 1420 Hijri Calendar. Therefore, Jaithen and Mersal were required to leave Saudi Arabia by December 7, 1999 for their Ramadan postings. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs' Exhibit 14 (Key to Islamic Hijri Calendar for 1420 Hijri) is inadmissible hearsay and has not been authenticated. *See* Objections Chart. Date calculations based on Exhibit 14 are unreliable. See Saudi Arabia's response to paragraph 1795 concerning Plaintiffs' Exhibit 15, which comes from the same source.<br><br>In the November 29, 1999 letter, KSA Ex. 108 (KSA 9538), Al Jaithen was instructed to leave at least before December 7, 1999, for his Ramadan Imamate. But, as the response to averment paragraph 1288 above shows, on or about December 5, 1999, there was a change in his assignment from Kismayo to Minneapolis that could explain a delay in his departure. Furthermore, there was a second change after December 5, 1999, from |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Minneapolis to Columbus, Ohio. Plaintiffs do not cite any instructions given to Al Mersal for the 1420H Ramadan Imamate Program. |
| 1294. | On December 6, 1999, Thumairy placed a call to Bayoumi's cell phone at 10:58pm (1 min.) This was the first known phone contact between Bayoumi and Thumairy since December 16, 1998, which was just prior to the Ramadan 1419 (December 1998-January 1999) visit of Sadhan and Sudairy to California. Ex. 5, Youssef Rpt. 126 and "Calls Between Bayoumi and Thumairy". | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

The cited material does not support Plaintiffs' assertion. Before January 2000, the telephone records are not complete and it cannot be determined whether Al Bayoumi called Al Thumairy in the period before December 6, 1999. |
| 1295. | On Tuesday, December 7, 1999, Thumairy placed calls from his home landline (███-0638) to:

- Saudi agent Bayoumi's cell phone at 7:17pm (2 mins.);

- MOIA Embassy Director Sowailem's cell phone at 8:28pm (1 min.); and

- MOIA propagator Mersal's cell phone at 8:30pm (3 mins.) Ex. 12A | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

There is no evidence that Al Bayoumi was a "Saudi agent," other than being an employee of the Presidency of Civil Aviation. Al Bayoumi testified that has never been a Saudi intelligence officer or "an agent for any Saudi law enforcement agency" or had "any assignment for any Saudi intelligence or law enforcement agency." Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13; *see* KSA Ex. 163 (9/11 Rep.) 218 (concluding that "[o]ur |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (Phone calls Nov. 1999 – Mar. 2000). | investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists"); KSA Ex. 167 (Sageman Rep.) 274-304.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit with numerous misattributions and other errors. *See* Response to Pls. Aver. ¶ 446. Plaintiffs Exhibit 12A shows that on December 7, 1999, Al Thumairy called (1) Al Bayoumi's cell phone at 7:17 pm (2 mins), (2) a number that Plaintiffs associate with Al Sowailem's cell phone based on hearsay sources at 8:28 pm (1 min), and (3) a number that Plaintiffs associate with Al Mersal's cell phone based on hearsay sources at 8:30 pm (3 mins). Pls. Ex. 12A. No subscriber records were produced to verify that either number belonged to Al Sowailem or Al Mersal.<br><br>There is no evidence that the call from Al Thumairy to Al Bayoumi is related to the second set of calls that occurred more than an hour later. |
| 1296. | Thumairy's 8:30 pm call to Mersal was the first known contact between Thumairy and Mersal in the records produced by the FBI. Ex. 5, Youssef Rpt. 139. Thumairy dialed '███████ 1671' for Mersal, which begins with the country code prefix for dialing Saudi Arabia of '966.' The phone number "███ 1671" was listed by Bayoumi in his handwritten address book and his January and October 2000 typed phone lists as Mersal's cell phone. Ex. 12AA, MPS738_59; Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 0345-49 at 345. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688) and 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit with numerous misattributions and other errors. *See* Response to Pls. Aver. ¶ 446. Plaintiffs Exhibit 12A shows that on December 7, 1999, Thumairy called a number that Plaintiffs associate with Al Mersal's cell phone based on hearsay sources at 8:30 pm. Pls. Ex. 12A. No subscriber records were produced to verify that the number belonged to Al Mersal.<br><br>In any event, this call was not the first contact between Al Mersal and Al Thumairy since Al Mersal had visited the Los Angeles for the Ramadan program the prior year and met Al Thumairy. Pls. Ex. 115 (Mersal Tr.) 91:9-17. |
| 1297. | The next day, December 8, 1999, Thumairy placed calls from his home landline to:<br><br>• the fax line for MOIA's Minister at 8:36am (1 min.);<br><br>• Saudi agent Bayoumi at 11:24am (1 min.), and; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an inadmissible summary exhibit. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | • Consulate Secretary ▮ at 2:25pm (1 min.).<br><br>Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | There is no evidence that Al Bayoumi was a "Saudi agent," other than being an employee of the Presidency of Civil Aviation. Al Bayoumi testified that has never been a Saudi intelligence officer or "an agent for any Saudi law enforcement agency" or had "any assignment for any Saudi intelligence or law enforcement agency." Pls. Ex. 120 (Bayoumi Tr.) 724:18-725:13; *see* KSA Ex. 163 (9/11 Rep.) 218 (concluding that "[o]ur investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists"); KSA Ex. 167 (Sageman Rep.) 274-304.<br><br>There is no evidence that any of these calls related to Al Mersal or Al Jaithen's travels. |
| 1298. | Saudi Consulate employee ▮ home phone number at the time was ▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1299. | Youssef explained that the "calls on December 7 and 8, 1999 comprise a 'call circle' showing that Thumairy contacting Mersal, Bayoumi, the Saudi Embassy and MOIA about the preparations for the trip of Mersal and Jaithen." Ex. 5, Youssef Rpt. 140; Ex. 5, Youssef Rpt. 5 and 14 (p. 5: "[t]he 'Calling Circle' investigative technique relies on the analysis of calls | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's own description of what a "calling circle" belies his conclusion. He states that a "calling circle" relies on "analysis of calls made by a subject to other telephone numbers on a regular basis." Pls. Ex. 5 (Youssef Rep.) 5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | made by a subject to other telephone numbers on a regular basis."; p. 14: ""Calling Circles" are frequent calls of short duration between two or more individuals or entities and they indicate familiarity between those individuals beyond casual acquaintance. A pattern of calls between individuals or entities shortly before or following a significant event is indicative of familiarity with and discussion of such event." ). | Under this definition, the seven calls listed in paragraphs 1294, 1295, and 1297 are not part of a "call circle," because they were not part of calls made on a regular basis. There is no evidence that Al Thumairy regularly called Al Bayoumi or Al Mersal prior to December 6, 1999. There is no evidence that Mana ever called Al Sowailem, the Ministry of Islamic Affairs numbers in Saudi Arabia, or Al Mersal's Saudi cell phone.

Indeed, there is no evidence that Mana and Al Sowailem knew each other, that Al Sowailem and Al Mersal knew each other, that Al Bayoumi and Al Mersal knew each other (before Ramadan 1420H), that Mana knew anyone who worked in the Ministry of Islamic Affairs in Saudi Arabia, or that Al Bayoumi knew anyone who worked in the Ministry of Islamic Affairs in Saudi Arabia.

Under Youssef's own definition, this is not a calling circle.

Further, there is no evidence at all about what (if anything) was discussed on any of these calls. Given the short duration of the calls, it appears that many went to voicemail. |
| 1300. | On December 11, 1999, Thumairy sent four faxes between 2:15 a.m. and 2:29 a.m. Los Angeles time to MOIA's Deputy Minister in Riyadh, Abdelaziz Al Ammar. Ex. 476, FBI 555. This fax number was listed as MOIA in Bayoumi's handwritten address book and typed phone list. Ex. 12AA, MPS738_14R ("The Minister / Ministry of Islamic Affairs" in Bayoumi handwritten address book); Ex. 12BB, MPS688_9 ("Ministry of Islamic Affairs F/473- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibits 12AA (MPS 738) and 12BB (MPS688) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | 0285/477- 3508" in January 2000 list). The faxes were not produced by Saudi Arabia. | There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone lists in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>The telephone records show that Al Thumairy's phone sent four faxes on December 11, 1999, to a number associated with the Ministry of Islamic Affairs. Pls. Ex. 476 (FBI 555). The cited materials show only that the number was associated with the Ministry in general but not specifically with the Deputy Minister of Islamic Affairs in Riyadh, Abdelaziz al-Ammar.<br><br>In any event, Al Thumairy was in regular contact with the Ministry of Islamic Affairs in Riyadh and the Da'wah office in Washington, D.C., for his administrative needs. There is no evidence of any link between these faxes and the assignment of Al Mersal to San Diego for the 1420H Ramadan Imamate Program. |
| 1301. | MOIA delayed Mersal's departure beyond its December 7, 1999, mandate and instead instructed Jaithen and Mersal to travel together to California on the third day of | The cited material does not support Plaintiffs'. There is no evidence presented that the Ministry of Islamic Affairs delayed Al Mersal's departure or instructed Al Mersal and Al Jaithen to travel together on the third day of Ramadan. The delay appears instead due to the two changes |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ramadan, Saturday, December 11, 1999. Saudi Arabia authorized and obtained an A-2 visa for Jaithen at the U.S. Embassy in Riyadh in order for him to enter the U.S. on official Saudi government business. Ex. 571, FBI 004675-REV2021 (showing that Jaithen had an "A-2" visa). | in Al Jaithen's assignment (from Kismayo to Minneapolis to Columbus, Ohio). *See* Response to Pls. Aver. ¶¶ 1272-1273, 1288-1289, 1293. |
| 1302. | To obtain Jaithen's A-2 visa, Saudi Arabia was required to prepare and file a diplomatic note with the Department of State containing "the government official's or employee's name, date of birth, position and title, place of assignment or visit, purpose of travel, a brief description of his or her duties, travel date, and the anticipated length of the tour of duty or stay in the United States." Ex. 346, State Department Visa Requirements. | Plaintiffs Exhibit 346 is a printout of a United States State Department website dated December 8, 2023. It does not set out the A-2 visa requirements in 1999. |
| 1303. | U.S. immigration records show that Saudi Arabia provided Jaithen's "intended address" inside the U.S. on his A-2 visa application as "Holiday Inn, Los Angeles, CA 90001." Ex. 571, FBI 004675-REV2021. | Plaintiffs Exhibit 571 is a record of Al Jaithen's I-94 (which is an arrival / departure record first filled out when landing in the United States) downloaded by an FBI agent at the Los Angeles field office. The I-94 states that the intended destination was "Holiday Inn, Los Angeles, CA 90001." Pls. Ex. 571 (FBI 4676-REV2021). Plaintiffs have not cited Al Jaithen's A-2 visa application. |
| 1304. | As it did for Jaithen, Saudi Arabia must have also authorized and assisted Mersal to obtain an A-2 visa to enter the U.S. on official Saudi government business. Ex. 346, State Department Visa Requirements. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Saudi Arabia did not produce the visas either MOIA propagator obtained from the U.S., or its A-2 visa submissions for either Jaithen or Mersal. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains attorney argument to which no response is required.<br><br>Plaintiffs Exhibit 346 is a printout of a United States State Department website dated December 8, 2023. It does not set out the A-2 visa requirements in 1999.<br><br>Al Jaithen's and Al Mersal's A-2 visa submissions, to the extent they still exists, would be in the possession of the U.S. government, not Saudi Arabia. |
| 1305. | Saudi government procedures required that its officials file formal trip reports before conducting official work travel. Ex. 285, KSA 5248 (December 1996 approval by MOIA for Sowailem to attend conference in Orange County). Saudi Arabia did not produce the trip reports or travel documents for either Jaithen or Mersal. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion that Saudi Arabia government procedures required that its officials file formal trip reports before conducting official work travel. Plaintiffs Exhibit 285 concerns Al Sowailem's 1996 domestic trip to attend a conference in California. It says nothing about the requirement to file a trip report for the 1420H Ramadan Imamate Program (which occurred three years after Al Sowailem's trip). The letter assigning Al Jaithen to the Ramadan Imamate Program does not state that he was required to provide a report on his trip. KSA Ex. 108 (KSA 9538). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1306. | Pursuant to their instructions from MOIA, Jaithen and Mersal left Saudi Arabia on the fourth day of the month of Ramadan – December 12, 1999 – contrary to the rules which requiring visiting propagators to leave at least two days prior to Ramadan and arrive in their assigned location before Ramadan. Ex 680AA, KSA 9638. This trip also contradicted MOIA's practice to send only one propagator for a Ramadan visit - not two. Ex. 221, KSA 7805-08. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited materials do not support Plaintiffs' assertions. The evidence, as outlined in the responses to paragraphs 1288 and 1293 above, strongly suggests that the delay in Al Jaithen's and Al Mersal's travel was due to two consecutive and very late changes of assignments for Al Jaithen's Ramadan Imamate. Plaintiffs Exhibit 680AA (KSA 9538) (there is no KSA 9638 in this exhibit) does not state that traveling at least two days prior to Ramadan is a required rule for Ramadan propagators.<br><br>Al Mersal was sent to the Al-Madina Mosque in San Diego and Al Jaithen to the Omar Ibn al Khattab Mosque in Columbus, Ohio.<br><br>In any event, there was no requirement that only one preacher could be sent to a single city for a Ramadan visit. *See* Pls. Ex. 221 (KSA 7807-08) (three for London, three for Paris, two for Nairobi). |
| 1307. | The only other known instance where two propagators were sent together on a Ramadan visit was when Sadhan and Sudairy visited Bayoumi during the prior year. Ex. 5, Youssef Rpt. 141-42. These and other facts set out below show that the Ramadan visit itself was not the purpose of the trip made by Jaithen and Mersal to California. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The evidence shows that the Ministry of Islamic Affairs sent three propagators to London, three to Paris, and two to Nairobi for the 1420H Ramadan Imamate Program. Pls. Ex. 221 (KSA 7807-08). Furthermore, Al Jaithen and Al Mersal were not sent together for Ramadan 1420H. Al Mersal was sent to San Diego and Al Jaithen to Columbus, Ohio.<br><br>There is no evidence that the purpose of the trip was anything other than for Al Jaithen and Al Mersal to lead prayers and give lessons during Ramadan. Pls. Ex. 115 (Mersal Tr.) 234:23-235:6; Pls. Ex. 96 (Jaithen Tr.) 204:14-207:17; 208:11-14; 216:3-21. |
| 1308. | Jaithen and Mersal arrived in the U.S. on December 12, 1999, and used their A-2 visas to enter the U.S. Ex. 571, FBI 004675-REV2021 - 04676-REV2021 (Jaithen's I-94 form arrival information); Ex. 232, KSA 9550 (Saudi Arabia Ministry of Interior record of Jaithen's departure from Saudi Arabia on the fourth day of Ramadan, 1420, December 12, 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1309. | Plaintiffs' expert Youssef concluded, based on his experience working with the Saudi Government, that Jaithen would not have been assigned to travel to Los Angeles and San Diego without written instructions from MOIA. Ex. 5, Youssef Rpt. 142. The instructions would have come from Deputy Minister Tawfiq Sudairy, the person in charge of the Ramadan program. Ex. 680AA, KSA 9638. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The cited materials do not support Plaintiffs' assertion of fact. Plaintiffs' expert Youssef has no experience working within the Saudi government. Moreover, Al Jaithen was never assigned to travel to either Los Angeles or San Diego. He was assigned to Columbus, Ohio, and he went there. He took a detour to Los Angeles for medical care and a much briefer one to San Diego for one night. He testified that he did not tell anyone in the Ministry of Islamic Affairs, about this detour, except for Mersal. Pls. Ex. 96 (Jaithen Tr.) 60:18-21, 69:23-70:21, 76:19-77:1, 112:2-8.

The cited materials also do not support the allegation that Al Jaithen's instructions to travel to Los Angeles and San Diego came from Ministry of Islamic Affairs Deputy Minister Tawfiq Al Sudairy since Al Jaithen was never assigned to Los Angeles or San Diego. |
| XVIII.C. | **On December 12, 1999, Mersal and Jaithen arrived in Los Angeles, stayed there for several days and met Thumairy.** | |
| 1310. | Jaithen and Mersal remembered meeting Thumairy on their trip to California, despite their limited recollection of any other details. Ex. 96, Jaithen Dep. 102:2-21, 210:3-9; Ex. 115, Mersal Dep. 246:20-247:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, this is undisputed. |
| 1311. | Jaithen claimed that, after their arrival on December 12, 1999, he and Mersal stayed in Los Angeles for 5-6 days at a motel near the King Fahad Mosque and that he went to | This is undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Mosque and taught lessons. Ex. 96, Jaithen Dep. 84:8-16, 85:6-9, 18-21. | |
| 1312. | Mersal, who had visited Thumairy the year before, confirmed that he stayed in Los Angeles but could not recall how long. Ex. 115, Mersal Dep. 194:24-195:3. Mersal testified that he and Jaithen did not work in Los Angeles, and he had no memory of being at the King Fahad Mosque with Jaithen. Ex. 115, Mersal Dep. 199:24-200:14. According to Mersal, the two men were "just passing through" on their way to San Diego. Ex. 115, Mersal Dep. 195:15-19 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph correctly describes Al Mersal's testimony.<br><br>Al Jaithen testified that he saw a doctor in Los Angeles to treat him for his chronic headaches. Pls. Ex. 96 (Jaithen Tr.) 60:18-21, 112:2-8. |
| XVIII.D. | **On December 12, 1999, Bayoumi held a meeting at the Al Madinah mosque with Khalid Al Yafai and Fathi Aidarus, both of whom would provide support for and attend the welcome party for the 9/11 hijackers.** | The Video MPS906 does not show that Al Bayoumi held a meeting. The video clip only shows that two people were present in his office as he introduced them and then a third came to join them. Pls. Ex. 10G.<br><br>The video clip does not show that al-Yafai or al-Aidarus ever provided support for the future 9/11 hijackers.<br><br>There was no welcome party for the hijackers. The February 2000 party is addressed in Response to Plaintiffs Averment Section XXII. In this Section, the cited material does not make any link between the people in Al Bayoumi's office on December 12, 1999, and the future hijackers, who at the time were respectively in Qandahar, Afghanistan, and Yemen. |
| 1313. | The day that Mersal and Jaithen arrived in the U.S., Bayoumi held and videotaped a meeting in his private office at the Al | Plaintiffs' Exhibit 14 (Key to Islamic Hijri Calendar for 1420 Hijri) is inadmissible hearsay and has not been authenticated. *See* Objections Chart. Date calculations based on Plaintiffs' Exhibit 14 are unreliable. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Madinah Mosque. Ex. 10, MPS906 MPS Video Exhibit. The date of the meeting is known because Bayoumi announces: "[s]o to you, the beloved of the Prophet Muhammad, we welcome you on this day, the 5th of the Holy Month of Ramadan, the year 1420 Hijri.". Ex. 10G, MPS906 MPS Video Exhibit at 00:17. The 5th day of Ramadan 1420 started on sunset on December 12, 1999, and ended at sunset on December 13, 1999. Ex. 14, 1420 Hijri Calendar. | See Saudi Arabia's response to paragraph 1795 concerning Plaintiffs' Exhibit 15, which comes from the same source.<br><br>The cited material does not support Plaintiffs' assertion of facts. Video MPS906 is a one-minute video clip, which opens with Al Bayoumi sitting behind an office desk and two people sitting in front of it. Pls. Ex. 10G. In the middle of the clip, a third person comes and sits down as well. Pls. Ex. 10G. There is no evidence that this is a meeting held by Al Bayoumi. Moreover, there is no connection between this video clip and the arrival of Al Mersal and Al Jaithen in Los Angeles. |
| 1314. | In the video, Bayoumi states that "we are transmitting this gathering from the *Masjid al-Madinah al-Munawara* in San Diego." Ex. 10G, MPS906 MPS Video Exhibit 00:43. The location of the meeting, as confirmed by Bayoumi, is "[i]n Omar's office" at the Mosque. *Id.* at 00:51. | This paragraph correctly quotes an excerpt from video MPS906. However, as described in Saudi Arabia's response to paragraph 1313, Plaintiffs mischaracterize the video in other ways. |
| 1315. | Bayoumi confirms the names of the individuals present, including a man who Bayoumi describes as "our dear brother, the visitor from Canada, our brother Fathi" and "Fathi Aidarus," who is sitting on the left of the frame (in grey thobe). Bayoumi also introduces Khalid Al Yafai, who is sitting on the right of the frame (in white thobe). Ex. 10G, MPS906 MPS Video Exhibit 00:56-1:06. | Video MPS906 is a short clip that introduces Dr. Ghanim Saeed, one of the elders of Al Madinah Mosque. Al Bayoumi does not seem to know his last name. Al Bayoumi also introduces Fathi Aidarus, but Al Bayoumi is uncertain about his name and Aidarus has to confirm it. This video thus shows that Al Bayoumi did not have a close relationship with these individuals (or familiarity with Aidarus). A quarter of the way into this short clip, a young man comes into the office and Al Bayoumi introduces him as Khalid al-Yafai, the imam of the mosque who led the Taraweeh evening prayer. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 1316. | Bayoumi describes Yafai as "Imam of the mosque, who leads us in the *Taraweeh prayer*." Ex. 11G, MPS906-CLIP Video Exhibit at 1:06. The Taraweeh prayer is the evening prayer during Ramadan. Ex. 164, Taraweeh Prayer. Thus, Yafai's presence in Bayoumi's office shows that the videotape was likely filmed during the evening of December 12, 1999. | This paragraph correctly quotes an excerpt from video MPS906. However, as described in Saudi Arabia's response to paragraph 1313, Plaintiffs mischaracterize the video in other ways, and their date calculations are based on inadmissible hearsay that is unreliable. |
| 1317. | At his deposition, Bayoumi claimed that he could not recall Fathi Aidarus. Ex. 120, Bayoumi Dep. 349:11-350:11. Yet the videotape clearly shows that Bayoumi described Aidarus as his "dear brother…from Canada" and ███████████████████ ███████████████ Ex. 10G, MPS906-CLIP Video Exhibit at 00:56; Ex. 12AA, MPS738_35; Ex. 12BB, MPS688_7; ██ ████████████ | Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688) and ███████ ██ are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay.<br><br>In the video, Al Baoyumi introduces Fathi Aidarus, but Al Bayoumi is uncertain about his name and al-Aidarus has to confirm it. Pls. Ex. 10G. Al Bayoumi introduces Aidarus as a visitor from Canada, indicating that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Aidarus was visiting. *Id.* This confirms that Al Bayoumi did not have familiarity with Aidarus, and it is unsurprising that Al Bayoumi could not recall him when asked about him at his deposition more than 20 years later. The phrase "dear brother" is an expression of courtesy and does not indicate a close relationship. |
| 1318. | Yafai and Aidarus were two of the young men whom Bayoumi had befriended and recruited in San Diego to serve as his subagents. Bayoumi would arrange for both Yafai and Aidarus to provide assistance for Hazmi and Mihdhar upon their arrival and invited them both to the welcome party held for the hijackers in the hijackers' apartment in Bayoumi's Parkwood housing complex. Ex. 10G, MPS906-CLIP Video Exhibit at 17:53, 18:58. | There is no evidence that Al Bayoumi befriended al-Yafai or Aidarus, let alone recruited them to serve as his "subagents," and Plaintiffs fail to cite any.<br><br>As KSA Exhibit 163 (9/11 Rep.) concluded, "we have seen no credible evidence that [Bayoumi] believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218 (footnote omitted).<br><br>Al Bayoumi testified that he never instructed anybody to assist any of the 9/11 hijackers, and there is no evidence to the contrary. Pls. Ex. 120 (Bayoumi Tr.) 724:2-6.<br><br>There is no evidence that Al Yafai ever met the future hijackers except during the February 2000 gather. Al Bayoumi hosted the gather in honor of Al Yafai, as well as two visiting sheikhs, and presented Al Yafai with a plaque thanking him for his leading the Taraweeh evening Ramadan prayers at Al Madina Mosque. It is unsurprising that Al Yafai attended a gathering at which he was to be honored.<br><br>The February 2000 party is addressed in Response to Plaintiffs Averment Section XXII. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| **XVIII.E.** | **Bayoumi hosted Jaithen and Mersal in San Diego.** | There is no evidence that Al Bayoumi hosted Al Jaithen or Al Mersal in San Diego. |
| 1319. | Three days after the arrival of Jaithen and Mersal, on Wednesday, December 15, 1999, Thumairy called Bayoumi at 2:23pm (4 mins.). Phone records and videotape show that Jaithen and Mersal were in San Diego within days after Thumairy's call. | Plaintiffs cite no evidence in support of this assertion.  In any event, there is nothing to imply any link between a call on December 15, 1999 and Al Mersal and Al Jaithen. |
| 1320. | Both Jaithen and Mersal denied having any memory of Bayoumi. Ex. 96, Jaithen Dep. 131:12-132:4 ("I don't know that man."); Ex. 115, Mersal Dep. 231:19-24. | Undisputed.  It is unsurprising that Al Jaithen and Al Mersal would not remember Bayoumi, who they met for a short period of time more than 20 years before their deposition. |
| 1321. | Jaithen and Mersal's claims are not credible. Jaithen and Mersal were assigned to visit Bayoumi at the Al Madinah Mosque and were hosted by Bayoumi during their trip to California. Ex. 120, Bayoumi Dep. 353:21-24 ("[t]he two Sheikhs who visited Masjid Al- Madina were Abdullah Al Jaithen and Majed Al Mersal.") | Al Jaithen was never assigned to the Al Madinah Mosque in San Diego, but rather to a mosque in Columbus, Ohio.  He also was not hosted by Al Bayoumi during his detour in California.  He may have seen Al Bayoumi from December 18 to 20, 1999.  It is unsurprising that he would not remember Al Bayoumi when asked about him at his deposition more than 20 years later.

Al Bayoumi testified that both imams visited Al Madinah Mosque, not that Al Jaithen was assigned to the mosque for the Ramadan Imamate Program.  Pls. Ex. 120 (Bayoumi Tr.) 353:21-4.  Only Al Mersal was assigned to Al Madinah Mosque in San Diego.  There is no evidence that the two imams were "hosted" by Al Bayoumi.

The Plaintiffs' implication in this paragraph is that Al Mersal was part of an "advance team" preparing the arrival of the future hijackers.  Since only Al Mersal stayed in San Diego for any time (about three weeks after his delayed departure from the KSA and the week he spent in Los |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Angeles), the alleged preparation for the future arrival of the terrorists would have fallen mainly on him. However, Al Mersal antiterrorist credentials are impeccable. He was at the forefront of Saudi Arabia's fight against terrorism. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Pls. Ex. 52 (Mersal CV) at 2. Furthermore, from 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, *id.*, which is the KSA rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA but have no blood on their hands. It is implausible that Al Mersal could have been part of an advance team preparing the future hijackers' arrival given his lead role in Saudi Arabia's fight against terrorism, including al Qaeda. |
| 1322. | Bayoumi's handwritten address book and his January and October 2000 typed phone lists contained contact information for both Jaithen and Mersal, including their cell phone, home phone, and work fax numbers. Ex. 12AA, MPS738_59; Ex. 12BB, MPS 688_3, 5; Ex. 421, FBI 0345-49. | Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS688) and 421 (FBI 345-49) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Otherwise undisputed. As Bayoumi testified, he recalled meeting both Mersal and Jaithen. Pls. Ex. 120 (Bayoumi Tr.) 353:21-24. |
| **XVIII.F.** | On December 18, and 19, 1999, there was a call chain among Thumairy, Bayoumi, Aulaqi, and the Days Inn, where Jaithen and Mersal were staying in San Diego. | As discussed, below, there was no "call chain." |
| 1323. | As Youssef's call analysis determined, on December 18, 1999, Thumairy called Bayoumi's cell phone from his home phone at 4:08pm (2 mins.), followed by a call to a Days Inn Motel in san Diego at 4:10. (13 mins.). Ex. 5, Youssef Rpt 145; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Thumairy's call to the Days Inn Motel, which was located at █████████ █████████ in San Diego is his first known call to the motel. The Day's Inn was within walking distance of the Islamic Center of San Diego, the mosque where Bayoumi led an entrenched Sunni extremist cell. Ex. 5, Youssef Rpt. 145-46; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Al Bayoumi did not lead any "entrenched Sunni extremist cell" and Plaintiffs fail to offer any evidence in support of this assertion. The 9/11 Commission concluded that it had "seen no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups. . . . [He was] an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.<br><br>Undisputed that call records reflect these calls. The record does not support the assertion that Thumairy's call to the Days Inn Motel was the first call to this motel, since the phone records are not complete. |
| 1324. | Youssef further identified that after calling Bayoumi and the Days Inn, "Thumairy called from his home to the home of Anwar al Aulaqi at 4:27pm" for 6 minutes. The 4:27pm call from Thumairy was the first call to Aulaqi in the FBI records. Ex. 5, | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Youssef Rpt. 146; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Undisputed that the call records reflect this call. Pls. Ex. 12A (phone chart of phone calls Nov. 1999-Mar. 2000) at 18. The phone records are not complete and it cannot be determined if this was the first call to Al Thumairy to Al Awlaki. |
| 1325. | As Youssef made clear "this type of calling activity is known as 'call chaining' where one call between two individuals is shortly followed by another call by one of the two individuals to a third individual. Ex. 5, Youssef Rpt. 146. Evidence of "call chaining," according to Youssef, "generally indicates that all the participants of the calling activity know one another and are communicating something in common to one another." Ex. 5, Youssef Rpt. 146. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> The phone records reflect calls from Al Thumairy to other numbers. This is not a call chain, where person A calls person B; person B calls person C; and person C calls person D. This is simply calls from Al Thumairy to three people during Ramadan, when it is common to exchange greetings. |
| 1326. | The connections, according to Youssef, are clear, "[I]n this case, Thumairy, Bayoumi, and Aulaqi knew one another well," as established by Thumairy's "four additional calls with Aulaqi on December 28-29, 1999 and January 12, 2000"; Bayoumi had six calls with Aulaqi in February 2000, "including three calls on the day that Bayoumi and Aulaqi worked together to make the arrangements for the hijackers to move into the Parkwood apartments in San Diego"; and Aulaqi featured in various videotapes prepared by Bayoumi. Ex. 5, Youssef Rpt. 146; Ex. 12A (Phone calls | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> Plaintiffs Exhibit 12A is an inadmissible summary exhibit. *See* Response to Pls. Aver. ¶ 446. <br><br> The cited material does not support Plaintiffs' allegation that Al Thumairy, Al Bayoumi, and Al Awlaki knew one another well. As shown in the general analysis of Al Thumairy's call pattern over a year, Al Thumairy call frequency increased dramatically during Ramadan. KSA Ex. 167 (Sageman Rep.) 462-65. Al Thumairy's calls to Al Awlaki occurred during Ramadan and shortly thereafter in 1420H. <br><br> Plaintiffs do not cite any calls between Al Bayoumi and Al Awlaki in December 1999; there are only purported calls from Al Thumairy to Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Nov. 1999 – Mar. 2000); Ex. 10A (FBI 013459 Video Exhibit) ("Paintballing"); Ex. 10B (MPS890-CLIP Video Exhibit). | Awlaki. The purported calls between Al Bayoumi and Al Awlaki occurred later in February 2000. There is no evidence of any connection between the December 1999 calls and the February 2000 calls.<br><br>Moreover, two of the purported six calls that Al Bayoumi had with Al Awlaki were calls placed to the Al Ribat Mosque. Pls. Ex. 12A (phone chart of phone calls Nov. 1999-Mar. 2000) at 49. There is no evidence that Al Awlaki received those calls. Moreover, Plaintiffs Exhibit 12A attributes the number ███ 1917 to Al Awlaki. However, Plaintiffs rely solely on hearsay sources as evidence that this number was associated with Al Awlaki. No subscriber records were produced to verify that the number belonged to Al Awlaki.<br><br>Al Bayoumi only knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. He did not know him well, as Plaintiffs' claim. Pls. Ex. 120 (Bayoumi Tr.) 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Aulaqi but would not have "discuss[ed] religious matters" with him"); *id.* at 589:9-16 (Al Bayoumi "reached out" to Al Awlaki "on occasion[]").<br><br>Thumairy testified that he did not know Al Awlaki and did not recall whether he ever called him. Pls. Ex. 107 (Thumairy Tr.) 350:23-351:8. |
| 1327. | The Bayoumi-Thumairy call chain continued the following day, December 19. Bayoumi called from his Al Madinah Mosque office to Thumairy's home at 9:10pm (1 min.) Thumairy called Bayoumi back on Bayoumi's cell phone at 10:17pm | Plaintiffs Exhibit 12A is an inadmissible summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>The cited material does not support Plaintiffs' assertion of fact that the three calls on December 19, 1999, are a continuation of a "call chain" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (3 mins.), followed again by a call from Thumairy to the same Days Inn Motel in San Diego at 11:40pm (16 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | because as shown in the response to paragraph 1325 the calls the previous day did not constitute a call chain.<br><br>On December 19, there was a call from the Al Madina Mosque to Al Thumairy, but it cannot be established that this call was made by Al Bayoumi since many people had access to the mosque telephone. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20; 297:11-20. Furthermore, Plaintiffs misattribute the number ▮▮▮▮3362 to Al Thumairy. The subscriber records for ▮▮▮▮3362 list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and ▮▮▮▮▮▮ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. Al Thumairy testified that he was not familiar with the -3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 497:14-499:9. |
| 1328. | Plaintiffs' expert Youssef opined, based on his expertise in communications analysis, that "Mersal and Jaithen were staying at the Days Inn Motel in San Diego on December 18 and 19, 1999, and that Thumairy's calls to the Days Inn Motel on those days were to Mersal and Jaithen." Ex. 5, Youssef Rpt. 146. Youssef's opinion was based on "the timing of the calls to the Days Inn Motel in San Diego immediately after Thumairy's calls to Bayoumi; the lack of other calls by Thumairy to that Motel; the location of that Motel near the ICSD; the presence of the visiting MOIA propagators Mersal and Jaithen in San Diego ostensibly to spend Ramadan at Bayoumi's mosque; Thumairy's welcome visit in Los Angeles with Mersal and Jaithen several days | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>It may be the case that Al Jaithen and Al Mersal stayed at the Days Inn Motel in San Diego on December 18-19, 1999, however, this cannot be definitively established.<br><br>There is no evidence at all that Al Thumairy, Al Jaithen, or Al Mersal discussed anything about planning for the future arrival of the 9/11 hijackers, as alleged in the title of this Section of the Averment.<br><br>The claim that Al Jaithen's and Al Mersal's presence in San Diego was "ostensibly to spend Ramadan at Bayoumi's mosque" is not supported by the evidence. Again, only Al Mersal was assigned to spend his Ramadan Imamate at Al Madina Mosque, not Al Jaithen, who just visited San Diego for two days and then spent his Ramadan Imamate in Columbus, Ohio. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | earlier; Thumairy's supervisory role over MOIA propagators in California; and the testimony that Mersal and Jaithen stayed at a San Diego motel." Ex. 5, Youssef Rpt. 146-147. All of which, according to Youssef, is "further confirmed by records from the Travelodge Hotel in Culver City, CA from the next day." Ex. 5, Youssef Rpt. 147. | Moreover, as set forth above, Al Mersal did lead Ramadan prayer in San Diego.<br><br>It is incorrect that Al Thumairy was the supervisor of Ministry of Islamic Affairs propagators in California. Pls. Ex. 107 (Thumairy Tr.) 143:10-147:19. |
| 1329. | A July 2009 FBI Report released in the EO production also concluded that "[i]t appears there was an important visitor staying at the Days Inn, Golden Triangle during this time…" and that given the phone calls it seems that ALBAYOUMI, AULAQI, ALTHUMAIRY, and ALMUHANNA [the subscriber of the cell phone used by Thumairy, as described above] were all involved with this visitor." Ex. 2, EO 0271. The FBI suggested that the important visitor could be Abdullah al Jaithen. Ex. 2, EO 0271. | Plaintiffs Exhibit 2G (EO 271) is inadmissible hearsay.<br><br>The exhibit does not state Jaithen stayed at this hotel. It states that "Since Aljraithen's whereabouts while he was in the U.S. are as yet unknown . . . it is possible he spent time in San Diego." Pls. Ex. 26 (EO 271). |
| XVIII.G. | **The videotape of Jaithen and Mersal hosted by Bayoumi at Sea World in San Diego** | |
| 1330. | On December 19, 1999, Bayoumi took Jaithen and Mersal on a side trip to Sea World in Mission Bay in San Diego. The MPS production produced in late March | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 2022 included a videotape of that trip. Ex. 10H (MPS896-CLIP Video Exhibit); Ex. 11H (MPS896- CLIP Video Screenshots). The date is stated by Bayoumi on the videotape. The videotape shows that Bayoumi's son Emad was also there and operated the camera. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this paragraph correctly describes the cited portions of the MPS896-CLIP Video Exhibit and MPS896-CLIP Video Screenshots. |
| 1331. | The videotape shows Bayoumi acting as the host for Jaithen and Mersal during their trip to California. The videotape also shows Jaithen and Mersal playing a vigorous game of air hockey at Sea World with Bayoumi acting as the play-by-play announcer. Ex. 10H (MPS896-CLIP Video Exhibit); Ex. 11H (MPS896-CLIP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion of fact that Al Bayoumi acted as the host for Al Jaithen and Al Mersal during their trip to California. The video clip MPS895-CLIP shows only that Al Bayoumi went with them to Sea World in San Diego, on December 19, 1999, just before sunset, and that they played air hockey there. |
| 1332. | The videotape also includes the three men joining in a prayer next to a garden with colorful plants at Sea World in San Diego. After consulting with Jaithen, Mersal observed that "this garden is their paradise in this life." Mersal continued, referring to the garden, – "it is for them in this life, and for us in the hereafter." Ex. 10H (MPS906-CLIP Video Exhibit) 04.27, 04.35. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This quote is taken out of context. Al Bayoumi asked Al Jaithen for a poem when they all arrived the garden at sunset. Al Mersal quoted the prophet Mohammed: "It is their paradise in this life. The Prophet, peace |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | be upon him, when he saw the wild and the gold, He said: 'It is for them in this life, and for us in the hereafter. Do not drink from vessels made of gold or silver, but do not pick it. They will know it was us.'" Pls. Ex. 10H. |
| 1333. | Mersal's invocation of an "us" versus "them" dogma, and the afterlife rewards for Wahhabi purists, represent the same exclusionary extremist views set forth in *Al-Jihad*, the "Book of Jihad" published by MOIA in Qassim Province, Saudi Arabia that Bayoumi kept in his desk at the Al-Madinah Mosque. Ex.528, FBI 4139-45. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The video clip MPS895-CLIP shows that Al Mersal quotes directly from the prophet Mohammed. This is not a Salafi interpretation of the quote or anything to suggest that it represents an "extremist view."

With respect to Plaintiffs Exhibit 528, Al Bayoumi testified that "[t]here are some documents that would get posted on a message board on the mosque. Anybody can come and post whatever document or whatever paper that they put, and then at the masjid we don't necessarily allow that. So if there something that does not align with us, I will take it off and I will keep it in a file for it to be destroyed later on. . . . I do not keep it on the wall, anything that pertains to violence, theft, guns. We do not support [that]. . . . This is one of many documents that we had and this was not a document that came from the embassy. The sole stuff that came from the embassy was the Quran, religion books that pertained to doctrine." Pls. Ex. 120 (Bayoumi Tr.) 307:1-308:4. *See also* Response to Pls. Aver. ¶ 1276.

Furthermore, Plaintiffs' accusation that Al Mersal alleged invocation of an "us" versus "them" represents an exclusionary extremist view is not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | supported by the video clip MPS906-CLIP nor any evidence in the discovery material. To the contrary, Al Mersal was a traditionalist quietist preacher, who rejected the type of extremism that Plaintiffs allege he believed in. Al Mersal was at the forefront of Saudi Arabia's fight against al Qaeda extremist and violent ideology. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Pls. Ex. 52 (Mersal CV) at 2. Furthermore, from 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, *Id.*, which is the KSA rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA but who have no blood on their hands. |
| **XVIII.H.** | **The audiotape recovered by the FBI from Bayoumi's office** | |
| 1334. | An audiotape recovered from Bayoumi's office at the Al Madinah Mosque, dated Ramadan 12, 1420 (which began at sunset on December 19, 1999 and ended at sunset on December 20, 1999), states that it contains "Sheikhs Majid / Abdullah / Khalid". Ex. 573, FBI 4114. Those Sheikhs likely are Majid Al Mersal, Abdullah Al Jaithen and Khalid Al Yafai. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph correctly describes the label on the audiotape, but the statement as to whom the "Sheikhs likely are" is speculative. Also, Plaintiffs' date calculations are unreliable. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1335. | Based on a record kept by Bayoumi at the Mosque, Majid Al Mersal and Abdullah Al Jaithen likely led the prayers on the evening of December 19 at the Al Madinah Mosque together with Khalid Al Yafai. Ex. 377, MPS698_145 (Abdullah Al Jaithen handwritten entry and signature in Bayoumi's ledger at Al Madinah Mosque). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, MPS698_145 contains a short poem attributed to Al Jaithen and dated 12 Ramadan 1420 AH. There is no authentication of Al Jaithen's signature in the record. It is possible that Al Jaithen and Al Yafai may have led the December 19, 1999 prayer at the Al Madina Mosque, but the cited evidence does not establish that. |
| 1336. | The audiotape, together with the videotape recorded one week earlier of Yafai and Aidarus in Bayoumi's office, shows that Bayoumi prepared Yafai to pray alongside the MOIA clerics and introduced Mersal and Jaithen to Yafai in advance of the assistance that Yafai would provide for the 9/11 hijackers. Ex. 10G (MPS906-CLIP Video Exhibit) 00:00-20:45. Yafai sat next to Hazmi and Emad Bayoumi at the welcome party that Bayoumi held for the hijackers on February 17, 2000. Youssef Decl. ¶ 70. Only a copy of the audiotape was produced by the FBI; Plaintiffs have subpoenaed the FBI to produce the actual audiotape. Ex. 11G (MPS906-CLIP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 694 (Youssef Decl.) has been stricken. *See* ECF No 9562.

The cited material does not support Plaintiffs' assertion of facts. The video clip MPS906-CLIP, Ex. 10G, is a one-minute video clip of Al Bayoumi introducing for the camera Khalid Al Yafai, Fathi Aidarus, and an elderly member of the Al Madinah Congregation. The clip was short and shows no discussion about preparation for anything.

There is no evidence that Yafai provided any assistance to the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The February 2000 party was not a welcome party for the hijackers. That party is addressed in the Response to Plaintiffs Averment Section XXII. |
| 1337. | On December 20, 1999 at 10:43 a.m., according to the Travelodge Hotels' computerized hotel register, "Abdullah A S Al Jraithen" and "AlBayoumi, Omar" checked into Room 214 at the Travelodge at 11180 Washington Place in Culver City, CA. In addition to their names, the record also states that the number of "guests" in the room was "2". Bayoumi's home address is listed as: "█████████ San Diego, CA 92111" and the phone number listed on the record — █████ 5941" — was Bayoumi's cell phone number. Ex 665, FBI 4012. | Plaintiffs Exhibit 665 contains this information. The telephone number listed is not Bayoumi's cell phone number. His number was ████ 7623.<br><br>Al Bayoumi, however, did not stay with Al Jaithen in the hotel room. Pls. Ex. 120 (Bayoumi Tr.) 339:2-20 (testifying that it's possible that he made the reservation but that he did not stay in the room); Pls. Ex. 96 (Jaithen Tr.) 135:8-137:11 (testifying that he does not recall staying at the Travelodge and that the only person he stayed with in California was Al Mersal). |
| 1338. | Jaithen claimed he did not remember checking into the Travelodge with Bayoumi and denied knowing Bayoumi, stating that he had departed before the date of the Travelodge stay Ex. 96, Jaithen Dep. 132:6-23, 135:8-137:21, 138:10-139:6. Bayoumi, while conceding it was possible he reserved the Travelodge hotel, denied going to the Travelodge Hotel with Jaithen, even after being confronted with evidence of his presence in the vicinity of the Travelodge | Al Jaithen testified, "I may have met him [Al Bayoumi], but I didn't know him." Pls. Ex. 96 (Jaithen Tr.) 131:12-19. He further testified that he did not recall the specific dates that he was in California. *Id.* at 149:2-151:2.<br><br>Al Bayoumi testified that it was possible that he made the reservation but that he did not stay in the room. Pls. Ex. 120 (Bayoumi Tr.) 339:2-20. Bayoumi did not deny taking Al Jaithen to the hotel. He testified that he didn't remember and that it is possible that he did so. *Id.* at 342:24-343:15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | during the day in question. Ex. 120, Bayoumi Dep. 339:2-340:1 341:22-342:23. | |
| 1339. | The Travelodge records of Jaithen and Bayoumi were only found because the FBI did a canvas of hotels to search for locations where the hijackers and others may have stayed in the Los Angeles area. Ex. 468, FBI-000238-REV2021, FBI Canvas of Motels Jan. 15, 2002. | Undisputed that the FBI located the record during a canvas of hotels. The date of the FBI discovery was January 11, 2002, not January 15, 2002. Pls. Ex. 527 (FBI 4012). |
| 1340. | Jaithen provided Travelodge with his passport identification upon check-in at the hotel. Travelodge's record contains a guest's passport number: "Passport #███████" Jaithen's immigration records for his entry into the U.S. confirm that this number, ███████, was Jaithen's Saudi Arabia passport number in December 1999. Ex. 527, FBI 4013; Ex. 571, FBI 004675-REV2021 - 04676-REV2021. | Undisputed. |
| 1341. | Bayoumi's records show that he was in Los Angeles and Culver City on December 20, 1999. Bayoumi made a purchase on that date in Los Angeles at a "Danny K. Designs" shop. Ex. 511, FBI 2804. | Undisputed. |
| 1342. | Bayoumi's debit card banking record shows that he made a purchase for $15.73 on "12/20 [1999]" from the "Chevron #███████ in Culver City, CA". That is a | Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | gas station located at ▮▮▮▮▮▮▮▮ ▮▮▮▮, Culver City, CA, which is directly across the street from the Travelodge. Ex. 511, FBI 2804; Ex. 76, Chevron Gas Station Culver City, CA. | |
| 1343. | The price of gas in Los Angeles in December 1999 was approximately $1.36 per gallon. Ex. 161, Gasoline Prices in Los Angeles County. | Undisputed. |
| 1344. | This means that Bayoumi purchased approximately 11.5 gallons of gas. The Days Inn Motel in San Diego is about 120 miles from the Travelodge in Culver City and about 2 ½ to 3 hours away by car. Ex. 5, Youssef Rpt. 148. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Paragraphs 1340-1344 are consistent with Al Bayoumi driving Al Jaithen from San Diego to the Travelodge hotel on December 20, 1999 and then driving back to San Diego. |
| 1345. | Thumairy told the FBI in 2003 that the Travelodge was the hotel where he customarily made reservations for visitors because of its close location to the King Fahad Mosque and its affordable rates. The Mosque is .3 miles from the Travelodge. Ex. 154, FBI 000001-000006-REV2021 at 04; Ex. 5, Youssef Rpt. 148. | Plaintiffs Exhibit 154 is inadmissible hearsay to the extent it is introduced for its truth. It cannot be used for impeachment. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Undisputed that the Travelodge is 0.3 miles from the King Fahad Mosque. None of this indicates that Al Thumairy was involved in the reservation for Al Jaithen at the Travelodge. |
| 1346. | After Jaithen and Bayoumi checked into the Travelodge at 10:43 a.m., Thumairy called Saudi Arabia's Institute for Islamic and Arabic Sciences in America in Virginia at 12:00 (1 min.) and 12:02 (4 mins.), | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 12A and 12B are improper summary exhibits. *See* Response to Pls. Aver. ¶¶ 446, 735. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | followed by a call to Embassy Islamic Affairs Saleh at 12:06 (4 mins.), and a third call to IIASA at 12:27 (11 mins.). Ex. 5, Youssef Rpt. 150; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Later in the afternoon, Thumairy placed a call from his home to Bayoumi's cell phone at 3:35pm (3 mins.) and then called Bayoumi again at 11:04pm (9 mins.). Ex. 5, Youssef Rpt. 150; Ex. 12B (Calls between Bayoumi and Thumairy). After that call, Thumairy used his home phone to call a number in Riyadh, Saudi Arabia from 11:49pm (37 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) | To the extent Plaintiffs imply that Al Thumairy's phone calls to Al Bayoumi, the Washington, D.C. area, and later to Riyadh were in any way connected with Jaithen's stay at the Travelodge hotel on December 20, 1999, the cited materials, even if accurate, do not support the inference. Al Thumairy made 21 telephone calls that day. There is no evidence as to what was discussed on these calls. These calls occurred during Ramadan, when Al Thumairy made and received more calls "inquiring about breaking the fast, the Iftar, the fast or the prayers during the month." Pls. Ex. 107 (Thumairy Tr.) 497:1-13. |
| XVIII.I. | **Jaithen, Mersal, and Bayoumi were at the King Fahad Mosque.** | The cited records in this Section do not support Plaintiffs' assertion of fact that Al Mersal or Al Bayoumi were at the King Fahad Mosque on the evening of December 20, 1999. |
| 1347. | On December 20, the day that Jaithen stayed at the Travelodge, Thumairy wrote a check from his personal account to the King Fahad Mosque for $3,000, noting "iftar," and designating the money for an Iftar meal at the Mosque during Ramadan. Ex. 184, KFM 0021; Ex. 5, Youssef Rpt. 149. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Undisputed. During Ramadan, however, there are 30 Iftar meals. Accordingly, the check may have been a contribution for all of these meals, not a meal for a particular date. |
| 1348. | Based on the document production from the Mosque, this is the only occasion when Thumairy wrote a check to the Mosque. The timing and the uncharacteristic nature of this donation during the visit of Jaithen and Mersal during Ramadan indicate it was for a special meal that Thumairy wanted to provide to his guests. Indeed, both Jaithen and Mersal said they attended an Iftar meal at the King Fahad Mosque. Ex. 115, Mersal Dep. 200:20-201:20; Ex. 96, Jaithen Dep. 115:5-12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The cited materials do not show that Al Jaithen and Al Mersal were at the King Fahad Mosque on the evening of December 20, 1999. There was nothing unusual or uncharacteristic about Al Thumairy's check. Al Thumairy testified that he paid for Iftar and other mosque expenses on other occasions. Pls. Ex. 107 (Thumairy Tr.) 208:14-23.

There is no evidence that Al Mersal was in Los Angeles on December 20 or that Al Jaithen attended any Iftar meal at the King Fahad Mosque on that particular date.

Al Jaithen's testimony is clear that the Iftar meal he had at the King Fahad Mosque was during the week he spent in Los Angeles for his medical care, that is from December 12-17, 1999. Pls. Ex. 96 (Jaithen Tr.) 100:14-115:12. Likewise, Al Mersal's recollection of the Iftar meal he had at the King Fahad Mosque was during his arrival in Los Angeles and prior to his travel to San Diego to assume his Ramadan Imamate assignment, and thus from December 12-17, 1999. Pls. Ex. 115 (Mersal Tr.) 195:18-19 ("I was just passing by on my way to San Diego"), 198:23-201:17.

Al Mersal did not remember whether Al Jaithen was with him at the King Fahad Mosque when he met Al Thumairy, or whether Al Jaithen had |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | stayed behind at the hotel. Pls. Ex. 115 (Mersal Tr.) 199:9-200:19. Furthermore, contrary to Plaintiffs' assertion, Al Mersal explicitly testified several times that he did not remember whether he had dinner with Al Thumairy. Pls. Ex. 115 (Mersal Tr.) 200:20-202:5. |
| 1349. | On December 21, Bayoumi and Jaithen checked out of the Travelodge at 1:22 p.m. Ex. 665, FBI 4012-13. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Al Bayoumi did not stay at the Travelodge on the night of December 20, 1999 and there is no evidence that he was in Los Angeles on December 21, 1999. Pls. Ex. 120 (Bayoumi Tr.) 339:2-20 (testifying that it's possible that he made the reservation but that he did not stay in the room); Pls. Ex. 96 (Jaithen Tr.) 135:8-137:11 (testifying that he does not recall staying at the Travelodge and that the only person he stayed with in California was Al Mersal). |
| 1350. | On the evening of December 21, Thumairy placed a call from his home to Bayoumi's cell phone at 10:50 (3 mins.). Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 477, FBI 000559 at 568. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12B is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 735.<br><br>To the extent a response is required, this is undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1351. | As Youssef's analysis shows, December 21, 1999 was "the fourth day in a row that Thumairy and Bayoumi had called each other" and that the next call between the men occurred on December 27, 1999. Ex. 5, Youssef Rpt. 150; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 478, FBI 000559 at 568. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Al Bayoumi's cell phone records during this period are not in the discovery record, and accordingly it is not possible to draw any conclusions about when or how often Al Thumairy and Al Bayoumi called each other. Al Thumairy also testified that he made and received more calls during Ramadan "inquiring about breaking the fast, the Iftar, the fast or the prayers during the month" and that he did not always know the identity of the individuals who called him. Pls. Ex. 107 (Thumairy Tr.) 497:1-13. |
| XVIII.J. | **Jaithen, Mersal, Bayoumi, and Thumairy gave incredible testimony to deny their relationships and hide the true purpose of their visit.** | This heading contains attorney argument and no response is required.<br><br>All of the evidence demonstrates that the only purpose of Al Jaithen's and Al Mersal's trip to southern California was for Al Mersal to participate in the imamate program and for Al Jaithen to receive medical treatment before leaving for Columbus, Ohio to participate in the imamate program. |
| 1352. | Jaithen claimed that MOIA instructed him to visit "America" but did not assign him to visit a specific location. Ex. 96, Jaithen Dep. 69:19-70:5. According to Jaithen, he decided on his own to visit California for personal reasons to seek medical treatment | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for an alleged headache condition. Ex. 96, Jaithen Dep. 60:16-21, 70:6-8. Jaithen claimed that he didn't even tell his MOIA superiors about his trip to California. Ex. 96, Jaithen Dep. 76:19-77:1. By contrast, Mersal claimed that MOIA assigned Jaithen to work in another U.S. city (Mersal could not recall where) and that Jaithen went with Mersal to California for several days before heading to his destination. Ex. 115, Mersal Dep. 188:4-23 ("Dr. Jaithen came to be with me a day or two before he leaves for that other destination."). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Al Jaithen testified that "I was not assigned to California, per se. I was assigned to do imamate and khutbahs in America, and I don't recall a specific location." Pls. Ex. 96 (Jaithen Tr.) 69:23-70:2. Later at his deposition, Al Jaithen remembered that he went to the Omar al-Khattab Mosque in Columbus, Ohio for his Ramadan Imamate. *Id.* at 86:2-96:22.<br><br>The rest of the paragraph is consistent with the evidence and the respective testimony of Al Mersal and Al Jaithen that they had both been assigned to perform their respective 1420H Ramadan Imamate Program in San Diego, for Al Mersal, and Columbus, Ohio, for Al Jaithen. On the way to his assignment, Al Jaithen traveled with Al Mersal to Los Angeles for medical treatment. Al Jaithen took this detour for medical reasons without telling anyone at the Ministry of Islamic Affairs, other than Al Mersal. Al Jaithen stayed in California for several days, before going on to his destination, Columbus, Ohio. *Id.* at 60:18-21, 69:23-70:21, 76:19-77:1, 112:2-8. |
| 1353. | Jaithen said that upon their arrival he and Mersal stayed in Los Angeles for 5-6 days at a motel near the King Fahad Mosque while Jaithen sought out the name of a neuro and brain specialty doctor for his headache condition, made an appointment, and received treatment. Jaithen, however, could not provide any identifying details, including the name of the doctor or whether the doctor's practice was a private or | Al Jaithen testified that he had been assigned to participate in the 1420H Ramadan Imamate Program in Columbus, Ohio. On the way to his assignment, Al Jaithen traveled with Al Mersal to Los Angeles for medical treatment. Al Jaithen took this detour for medical reason without telling anyone at the Ministry of Islamic Affairs, other than Al Mersal. Al Jaithen stayed in California for several days, before going on to his destination, Columbus, Ohio. Pls. Ex. 96 (Jaithen Tr.) 60:18-21, 69:23-70:21, 76:19-77:1; 112:2-8.<br><br>It is unsurprising that Al Jaithen could not recall specific details of a medical visit that occurred 22 years before his deposition. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | located within a hospital. Ex. 96, Jaithen Dep. 84:8-16, 85:6-9, 18-21, 112:2-115:4. | |
| 1354. | Despite his alleged headache condition, Jaithen is shown on Bayoumi's videotape (released by the MPS after his deposition) enjoying a spirited game of air hockey at Sea World in San Diego with Mersal. Ex. 10, MF-6.m4v (4:46-8:22). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The fact that Al Jaithen is playing air hockey is not inconsistent with the fact that he sought medical treatment or that he was suffering from headaches. Al Jaithen testified that he had been suffering from chronic headaches for 30 years and that "sometimes it would go away, other times I would need to go to bed for it to go away." Pls. Ex. 96 (Jaithen Tr.) 109:2-110:2. |
| 1355. | In response to questions, Mersal testified he could not remember more than 300 times in his deposition, including that he could not recall:

- which mosque he and Jaithen went to in San Diego;

- whether he and Jaithen went to any mosque other than the one to which he was assigned; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Al Mersal was asked specifics about events that occurred in a foreign country over 22 years prior to his deposition. His testimony that he could not recall these details is entirely credible. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | • whether he went with Jaithen to the King Fahad Mosque;<br><br>• the name of the Al Madinah Mosque that he was assigned to visit;<br><br>• anything about the congregants of that Mosque (including that they were predominantly Kurdish); or<br><br>• a single person he met at the Mosque or in San Diego (including Bayoumi).<br><br>Ex. 115, Mersal Dep. 141:13-142:21, 211:1-9, 212:1-213:24, 224:17-226:5, 231:19-233:7; Ex. 5, Youssef Rpt. 144 n. 582 (Mersal claimed he could not remember when he went to college, being in Nairobi when the US Embassy was bombed, who sent him to the United States twice, his own signature, the first time or even how many times he went on the hajj. In addition, he claimed he could "not remember" in response to over 60 questions regarding his time in Los Angeles.). | Contrary to Youssef's claim that Al Mersal did not remember when he attended college, Al Mersal testified that he graduated from college in 1415H. Pls. Ex. 115 (Mersal Tr.) at 17:7-19:9. Youssef ignores his actual testimony responding to the question. Al Mersal also gave the name and branch of his college, his course of study, and then shortly thereafter his date of graduation. *Id.*<br><br>Youssef also incorrectly claims that Al Mersal did not remember being in Nairobi when the U.S. Embassy was bombed. Al Mersal volunteered that he had been in Kenya when the bombing occurred. Pls. Ex. 115 (Mersal Tr.) 61:7-11. He also recalled that he was not in Nairobi, but on a safari trip. *Id.* at 62:10-63:1.<br><br>Al Mersal remembered applying to go on the Ramadan Imamate Program and being assigned to go to the United States twice under the program, but he did not remember who specifically assigned him to do that. Pls. Ex. 115 (Mersal Tr.) 75:1-77:16.<br><br>Youssef's claim that Al Mersal could not recall his signature is a gross distortion of the testimony. When shown a document that might have born his signature, Al Mersal testified: "The signature is not clear, but can you enlarge the document a little bit?" *Id.* at 113:19-21. Al Mersal continued: "There is a signature, and it looks similar to my signature. I don't remember. But I don't – I don't remember, and I don't – and I don't deny. But – it could be my signature, but I don't remember." The translator corrected, "I don't deny or confirm." *Id.* at 114:2-10. Al Mersal then clarified that he could not remember preparing the document that may have had his signature. *Id.* at 116:13-24.<br><br>Al Mersal also testified that he "went to Hajj a lot. I don't remember how many times." *Id.* at 161:3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It is unsurprising that Al Mersal could not recall other specific details of events that occurred more than 20 years before his deposition. |
| 1356. | Despite his claimed lack of memory on these subjects, Mersal vividly recalled that Jaithen "suffered from severe chronic headaches" when they were in California and the name of the painkiller medication that Jaithen was supposedly taking for his claimed condition. Ex. 115, Mersal Dep. 217:6-218:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | As set forth in the Response to Plaintiffs Averment ¶ 1355, Al Mersal recalled many details that Plaintiffs incorrectly claim he did not. Undisputed that Al Mersal recalled that Al Jaithen suffered from chronic headaches, and that he took a particular painkiller medication. |
| | | Any suggestion that Al Mersal was not being truthful because he was a jihadi extremist is false. Al Mersal's career shows that he has been at the forefront of Saudi Arabia's fight against al Qaeda extremist and violent ideology. He was a traditionalist quietist preacher, who totally rejected the type of extremism that Plaintiffs allege he believed in. From 2006 to 2008, he was the head of the scholarly team leading the Al Sakinah Campaign to Combat Extremism. Furthermore, from 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, which is the Saudi Arabian rehabilitation center near Riyadh for people arrested on terrorism charges in the KSA but have no blood on their hands. Pls. Ex. 52 (Mersal Curriculum Vitae) at 2. This shows that Al Mersal did not believe in an extremist ideology but was prominent in the Saudi Arabia's fight against this type of ideology. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1357. | Jaithen recalled that Thumairy hosted him and Mersal for dinner at Thumairy's home near the King Fahad Mosque. Ex. 96, Jaithen Dep. 125:3-24. Mersal did not recall having dinner with Thumairy or being at Thumairy's home. Ex. 115, Mersal Dep. 200:16-201:5, 201:6- 10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that Al Jaithen and Al Mersal gave this testimony. There is nothing to suggest that either was giving false testimony about their recollection of events that may have occurred more than 22 years prior to their deposition. |
| 1358. | Jaithen claimed that he went to San Diego for only one night and prayed at a Mosque he could not identify. Ex. 96, Jaithen Dep. 123:3-7. But Bayoumi admitted said that Jaithen gave a khutbah — the Friday sermon — at his Al Madinah Mosque. Ex. 120, Bayoumi Dep. 334:9-13, 335:10-13. The Fridays during Ramadan 1420 when Jaithen could have delivered a khutbah were December 17, 24, and 31, 1999 or January 7, 2000. Ex. 14, 1420 Hijri Calendar. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 14 is inadmissible hearsay and lacks authentication. *See* Objection Chart.<br><br>Al Bayoumi did not testify that Al Jaithen gave a khutbah on a Friday. When asked whether Al Jaithen delivered a khutbah, Al Bayoumi was careful to correct the questioner and testify that Al Jaithen "gave a lecture – a lecture, yes." Pls. Ex. 120 (Bayoumi Tr.) 334:9-11. Later, when Plaintiffs' counsel corrected himself and again asked, "you remember Abdullah Al Jaithen giving a lecture?," Al Bayoumi answered, "Yes." *Id.* at 335:10-13. |
| 1359. | Despite the clear evidence that Bayoumi brought the two MOIA propagators to Los | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Angeles and that he and Jaithen checked in to the Travelodge near the King Fahad Mosque on December 20, 1999, Jaithen claimed that he did not stay at the Travelodge — and that he did not know Bayoumi. Ex. 96, Jaithen Dep. 131:12-132:23. Mersal also denied knowledge of the Travelodge or ever being with Jaithen at the King Fahad Mosque. Ex. 115, Mersal Dep. 198:18- 22, 199:12-20, 273:4-275:4. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that Al Bayoumi "brought" or coordinated the visit of Al Mersal and Al Jaithen to Southern California for 1420H Ramadan.<br><br>Al Bayoumi may have helped Al Jaithen make a reservation and register at the Travelodge near the King Farm Mosque on December 20, 1999, as shown in the response to paragraph 1337 above.<br><br>In his testimony, Al Jaithen testified that he did not recall checking in at the Travelodge; not that he didn't do so. Pls. Ex. 96 (Jaithen Tr.) 132:15-23. As far as Al Bayoumi is concerned, Al Jaithen testified, "I may have met him, but I didn't know him." *Id*. at 131:18-19.<br><br>There is no evidence that Al Bayoumi brought Al Mersal to Los Angeles on December 20, 1999. Al Mersal's name is not on the electronic registration form for the Travelodge. As far as the visit to the King Fahad Mosque, Al Mersal testified that he remembered being with Al Jaithen in Los Angeles, but could not remember whether Al Jaithen was with him when he went to the King Fahad Mosque. Pls. Ex. 115 (Mersal Tr.) 198:23-199:20. |
| 1360. | Bayoumi flatly denied during his deposition that he arranged a place to stay for Jaithen or Mersal: "The answer is no." Ex. 120, Bayoumi Dep. 335:19-22. Bayoumi also said that "I do not stay in hotels unless I am with my family or if I'm alone on my own | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for studying purposes." Ex. 120, Bayoumi Dep. 342:24-343:15. | Plaintiffs mischaracterize Al Bayoumi's testimony. When shown the electronic registration for the Travelodge, Al Bayoumi testified, "there is two possible analyses to this. Perhaps I made a reservation for him as a guest who did not speak English, only speaks Arabic; I went ahead and made a reservation for him as a guest. The other analysis is that I gave him a ride to the hotel. But I did not stay in the hotel with him. I do not stay in hotels unless I am with my family or if I'm alone on my own for studying purposes." Pls. Ex. 120 (Bayoumi Tr.) 343:4-15.<br><br>There is no evidence that Al Bayoumi made any arrangement for Al Jaithen's or Al Mersal's stay in San Diego. |
| 1361. | Bayoumi claimed that he did not remember traveling anywhere with Jaithen and Mersal when they were in California. Ex. 120, Bayoumi Dep. 335:23-336:2. But as addressed above, the three men went to Sea World together and Bayoumi took them to Los Angeles on December 20. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Sea World is in San Diego. Al Bayoumi testified that he may have helped Al Jaithen make a reservation and register at the Travelodge near the King Farm Mosque on December 20, 1999, as shown in the response to paragraph 1337 above. There is no evidence that Al Mersal accompanied them to Los Angeles. |
| 1362. | Jaithen claimed he only spent 6-7 days in California and then decided on his own — without telling anyone at the Ministry other than his colleague Mersal — to go to Columbus, Ohio on a personal trip to visit his niece for the rest of the month of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ramadan. Ex.96, Jaithen Dep. 88:15-89:1. According to Jaithen, Mersal accompanied him from San Diego to Los Angeles airport, where the two men "split" and Jaithen boarded a flight. Ex. 96, Jaithen Dep. 87:24-89:9, 160:20-161:21. Mersal, however, testified that he "remained in San Diego" and did not go to any airport with Jaithen. Ex. 115, Mersal Dep. 219:10-220:2. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>Plaintiffs misstate Al Jaithen's testimony to suggest that he went to Columbus, Ohio on a personal trip to visit his niece and that he did not tell anyone at the Ministry of Islamic Affairs. His actual testimony was that his assignment for the Ramadan Imamate Program was the Ibn al Khattab Mosque in Columbus, Ohio. Pls. Ex. 96 (Jaithen Tr.) 69:23-70:2, 85:20-96:22. Al Jaithen testified that he did not tell anyone at the Ministry of Islamic Affairs, other than Al Mersal, that he would first visit California to seek medical treatment. *Id.* at 69:23-70:8, 72:5-7, 76:19-77:1. <br><br>Al Mersal and Al Jaithen were asked about events that occurred 22 years before their depositions. It is expected that there may be slight inconsistencies in how two different individuals recall the events. |
| 1363. | There is no documentary evidence to show that Jaithen went to Columbus, Ohio. Propagators such as Jaithen had to file a request to take personal leave and were not permitted to leave their posts without permission. *E.g.* Ex. 680T, KSA 8423 (Thumairy vacation request). Based on Youssef's experience, a Saudi government official travelling inside the U.S. on government business "would [not] disobey his written instructions and travel to a location in the U.S. without close consultation with his MOIA superiors." Ex. 5, Youssef Rpt. 142. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br>The evidence shows that the Al Madina Mosque phone called the number of Al Jaithen's niece in Columbus, Ohio twice (614 area code), on January 6, 2000, at 7:02 PM (3 minutes) and on January 7, 2000, at 7:29 PM (2 min). Pls. Ex. 12A (Phone calls Nov. 1999-Mar. 2000); Pls. Ex. 495 (FBI 1455), Pls. Ex. 496 (FBI 1459). This indicates that it is likely that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | someone from the mosque was trying to reach Al Jaithen in Columbus, Ohio.<br><br>Al Jaithen's trip was not personal leave. He testified that his assignment for the Ramadan Imamate Program was the Ibn al Khattab Mosque in Columbus, Ohio. Pls. Ex. 96 (Jaithen Tr.) 69:23-70:2, 85:20-96:22. There is also no basis for Youssef's opinions on how the Ministry of Islamic Affairs operates. He has no expertise on this subject matter. |
| 1364. | According to Jaithen, he attended the Omar Ibn al Khattab Mosque (which Jaithen described as a "famous mosque" in Columbus); met the Imam (who Jaithen could not name); and for the remainder of Ramadan gave lessons to worshippers there. Ex. 96, Jaithen Dep. 86:16-24, 93:1-94:11. Jaithen's story was contradicted by the fact that MOIA documents showed that another MOIA propagator worked at that same Omar Ibn al Khattab Mosque during Ramadan 1420. Ex. 680S, KSA7807-08. Jaithen claimed he never heard of that propagator or saw him during the time he allegedly was at that Mosque. Ex. 96, Jaithen Dep. 87:15-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 680S, the list of assignments for the 1420H Ramadan Imamate Program sent to various KSA embassies on December 4, 1999 (KSA 7807-08), is not determinative of final imamate assignments. In that exhibit, Al Jaithen was assigned to "Kimsawi" (probably Kismayo), Kenya but he did not go there as the documentary and video evidence is that he came to the United States. On December 5, 1999, he was reassigned to Minneapolis. *See* Response to Pls. Aver. ¶ 1288.<br><br>Al Mersal's testimony independently corroborated Al Jaithen's testimony that Al Jaithen had been assigned to a United States city outside of California. Pls. Ex. 115 (Mersal Tr.) 187:8-188:23, 214:24-217:5, 219:16-224:4. |
| 1365. | Neither Jaithen nor Mersal could explain why Bayoumi had their contact information | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | in his phone book. Jaithen suggested that Bayoumi may have found his numbers from the internet. Ex. 96, Jaithen Dep. 229:20-230-6. Mersal said he didn't know, and that Bayoumi was only someone he had heard about "from the media." Ex. 115, Mersal Dep. 257:2- 258:22. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is unsurprising that Al Mersal and Al Jaithen do not recall specific interactions that occurred 22 years before their deposition. |
| 1366. | Skeptically, Youssef noted, "Bayoumi claimed that he had no idea how the visit of the two propagators to the Mosque was arranged even though he was part of the call circle on December 7-8, 1999 with Thumairy, Mersal, and the Embassy to set up the plans for their trip." Ex. 5, Youssef Rpt. 149; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 120, Bayoumi Dep. 331:16-333:13, 335:19-336:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>As set forth in the Response to Averment paragraph 1299, there was no "call circle" on December 7-8, 1999 and there is certainly no evidence that Al Bayoumi was involved in any plans for Al Jaithen's and Al Mersal's trip. |
| 1367. | Thumairy denied any knowledge of Mersal, Jaithen, or Bayoumi whatsoever and claimed that he could recall nothing. Ex. 107, Thumairy Dep. 294:5-14 (no memory of Jaithen); 290:2-291:6 (no memory of Mersal); 306:10-307:1 ("I do not know Bayoumi."); 307:14-19 ("I don't remember anything…" about Bayoumi). Contrary to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's letters to Thumairy and other MOIA officials praising Thumairy for his cooperation and coordination, Thumairy claimed he had "nothing to do" with hosting visiting MOIA propagators and could not "remember anyone in particular." Ex. 107, Thumairy Dep. 294:24-295:10. | The cited material does not support any suggestion that Al Thumairy's testimony was incredible. As Al Thumairy explained, there may have been millions of people that came to the King Fahad Mosque while he was the imam. Although the visitors may have known him as imam, it is not possible for Al Thumairy to have known everyone who visited or who he may have met. Pls. Ex. 107 (Thumairy Tr.) 565:7-566:13.

Al Bayoumi's letter to Al Thumairy thanking him for his efforts is a reference to the previous year, Ramadan 1419H, relating to Al Sadhan and Al Sudairy. Al Bayoumi's letter did not state that Al Thumairy coordinated anything in relation to the Ramadan Imamate Program, but ended with "I hope . . . that coordination will be the starting point from which we will excel in serving the Muslims in this country." Pls. Ex. 678D (MPS4_336).

Al Bayoumi testified that he did not coordinate with Al Thumairy or the Embassy regarding Al Sadhan's or Al Sudairy's visit. Instead, the mosque just asked for imams to lead the Ramadan prayer. Pls. Ex. 120 (Bayoumi Tr.) 270:21-271:7. He further testified that this was a simple courtesy letter and that, "[g]enerally, when somebody comes to visit . . . we thank everybody who is involved." *Id.* at 271:24-272:15.

There is no evidence that Al Thumairy was involved in coordinating the arrival of Al Mersal or Al Jaithen. |
| 1368. | Jaithen testified that before he arrived in Los Angeles, he had never heard of the King Fahad Mosque or Thumairy and did not even know that Thumairy was a MOIA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | employee. Ex. 96, Jaithen Dep. 72:15-73:6, 103:12-104:1, 104:10-24. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Jaithen gave this testimony. |
| 1369. | Jaithen's statement is not credible. Mersal was his travelling companion and work colleague from the MOIA's Qassim office and had been posted to Thumairy's mosque the previous Ramadan. Further, Mutaeb Al Sudairy knew of Thumairy and that he was Imam of the King Fahad Mosque due to "an abundance of news" about that Mosque in Saudi Arabia. Ex. 119, Sudairy Dep. 108:21-109:8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion that Al Jaithen's testimony was not credible. Simply because two other individuals were aware of Al Thumairy does not mean that Al Jaithen was aware of him. There is also no reason for Al Jaithen to give false testimony on this point. Al Jaithen testified that he in fact met Al Thumairy when he was in Los Angeles. Pls. Ex. 96 (Jaithen Tr.) 102:2-17 (testifying that he met Al Thumairy at the King Fahad Mosque). |
| 1370. | MOIA instructed its propagators Mersal and Jaithen to "provide a detailed report" about their trip and to fill out a form providing details about "every organization" visited. Mersal acknowledged that preparing a report of the Ramadan visit was the "procedure" and "protocol." Ex. 141, KSA 9538; Ex. 115, Mersal Dep. 236:2-237:17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 141 is addressed to Jaithen, not to all propagators. Al Mersal testified that he did not recall whether he received a similar letter. Pls. Ex. 115 (Mersal Tr.) 178:5-18. |
| 1371. | Neither man could recall if they prepared these documents, and no documents were produced, indicating that the true nature of their trip could not be set forth in an official report due to its sensitive and covert nature. Ex. 115, Mersal Dep. 112: 23-113:4; Ex. 96, Jaithen Dep. 168:13-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Jaithen and Al Mersal could not recall whether they had prepared any report of their trip to the United States. There is no support for the assertion that this was because the nature of their trip was "sensitive" or "covert." There is no evidence that Al Jaithen or Al Mersal did anything sensitive or covert during this trip. |
| XIX. | **DURING THE FINAL WEEKS BEFORE THE ARRIVAL OF THE TWO 9/11 HIJACKERS, BAYOUMI, THUMAIRY, SOWAILEM, ▉▉▉, JAITHEN, MERSAL, AND OTHERS INCLUDING AULAQI WORK TOGETHER ON THEIR PLAN TO ASSIST HAZMI AND MIHDHAR** | There is no support for the assertion that Al Bayoumi, Al Thumairy, Al Sowailem, ▉▉▉, Al Jaithen, Al Mersal, and others including Al Awlaki worked together on a plan to assist the two future 9/11 hijackers, Al Hazmi and Al Mihdhar. There is no evidence of any such support network or plan to assist to the 9/11 hijackers. This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded: "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218 (footnote omitted).<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103.<br><br>In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 1372. | Weeks before the January 15, 2000 arrival of Hazmi and Mihdhar, during the second half of December 1999, the evidence shows | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | supporters of the plot organized through a series of phone calls and meetings. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | There is no support for this assertion. The 9/11 plot was highly compartmentalized and no one outside a few al Qaeda members knew about the plot. *See* Pls. Ex. 2A (EO 9). Nor did Al Hazmi or Al Mihdhar know about the details of the plot, which continued to evolve from the crucial planning meeting in Qandahar at the beginning of Ramadan 1420H (mid-December 1999) (Pls. Ex. 82 (CIA_256)) to its conclusion on September 11, 2001. They were simply told to undergo flight training in preparation for a martyrdom operation in which planes would be flown into unspecified targets. Pls. Ex. 31 (KSM Statement) at 16. |
| | | In fact, the 9/11 plot organizer and manager, Khalid Sheikh Mohammed ("KSM") was hesitant to send Al Hazmi and Al Mihdhar to the United States because of their lack of English and exposure to Western society. However, KSM was stuck with them because bin Laden personally wanted them to be part of the plot and they had previously obtained U.S. visas in anticipation for a terrorist operations to be conducted in the United States. KSM was worried because "there was no al Qaeda operative or facilitator in the United States to help al-Midhdar and al-Hazmi settle in the United States." Pls. Ex. 31 (KSM Statement) at 9. "Al Qaeda had no one in California to help the two." *Id.* at 17. |
| | | "Because of their deficiencies, [KSM] permitted al-Hazmi and al-Mi[h]dhar, unlike the other 9/11 hijackers, to go to the local mosque to request assistance and advice on functioning in American society, and [KSM] allowed the two, unlike the other hijackers, to contact him directly via internet chat in case they had urgent questions." *Id.* at 18. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The future hijackers followed KSM's instructions and, as Saudis, they gravitated to fellow Saudis and Yemenis who prayed at Salafi mosques in Los Angeles and San Diego. It is this group of Salafi Muslims who inadvertently helped the new visitors out of a sense of community among pious worshippers and who Plaintiffs mistake for a support network in Southern California. |
| 1373. | Plaintiffs' expert Youssef concluded, based on his analysis of "phone records, hotel registration documents, and evidence collected by the FBI," that the "purpose of the trip of Jaithen and Mersal was to use the cover of an official Saudi Government MOIA Ramadan 1420 trip to connect in person with the support network that Thumairy, Bayoumi, ███, Aulaqi, and others had established on the ground in California and confirm the final preparations for the arrival of Hazmi and Mihdhar in California." Ex. 5, Youssef Rpt. 145. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence that Al Jaithen and Al Mersal did anything to prepare for the hijackers' arrival, knew who they were, or knew of their plans. Pls. Ex. 115 (Mersal Tr.) 289:10-291:16 (testifying that he had never heard the hijackers names and never discussed them with anyone before the 9/11 attacks and that he was not aware of any instructions provided to anyone to assist the 9/11 hijackers); Pls. Ex. 96 (Jaithen Tr.) 306:21-308:15 (same).<br><br>Youssef's opinion is entirely unsupported. As demonstrated above, the phone records, hotel registrations, and evidence collected by the FBI do not show that the cited individuals formed a support network making preparation for the arrival of Al Hazmi and Al Mihdhar in California. Nor is there any evidence that Al Qaeda shared information about its operation with its enemy Saudi Arabia. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence of any such support network or plan of assistance to the 9/11 hijackers. This also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers. |
| | | The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218 (footnote omitted). |
| | | The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| | | The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| XIX.A. | **During the last week of 1999, Saudi Government officials coordinate among themselves, Aulaqi, and ▮▮▮▮ to make arrangements for the 9/11 hijackers.** | Plaintiffs cite nothing to support this assertion. There is no support that any Saudi Government officials coordinated with anyone to make arrangements for the 9/11 hijackers. |
| 1374. | On December 25, 1999, Thumairy made repeated calls to MOIA propagator ▮▮▮▮ ▮▮▮▮, who worked under Thumairy. ▮▮▮▮ was the "former Imam" of the ICSD and one of "three Saudi supported propagators living in San Diego…" Ex. 5, Youssef Rpt. 150, n. 614; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 473, FBI 0518-519; Ex. 476, FBI000548 at 551; Ex. 2, EO 0692-93. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 2N (EO 692-693) is inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 12A (Phone chart of Phone calls Nov. 1999 – Mar. 2000) is an inadmissible summary exhibit. *See* Response to Pls. Aver. ¶ 446.

The cited materials in this Section do not show a period of unique phone activity involving Al Thumairy, Al Bayoumi, Al Awlaki, the Saudi Embassy, and ▮▮▮▮. The phone calls merely show that Al Thumairy made a number of phone calls on December 25, 1999. There is no |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | evidence of what was discussed on those calls and no evidence that they involved in any way the hijackers.<br><br>█████ did not work under Al Thumairy. Al Thumairy testified that, although he may have been nominated to supervise propagators in California, he was never notified "of such a thing" and "did not perform that work." Pls. Ex. 107 (Thumairy Tr.) 157:10-159:1. There is no admissible evidence to the contrary. |
| 1375. | On December 25, Thumairy called █████ at 11:35am (1 min.), after which he called Consulate Secretary ████ at 11:43am (5 mins.) Later that day, Thumairy again called ████ at 3:46pm (5 mins.) with two subsequent call to ██████ at 3:51pm (1 min.) and 3:52pm (3 mins.), and a call to MOIA Embassy Director Sowailem's cell phone at 3:56pm (1 min.) Ex. 5, Youssef Rpt. 150, n. 614; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an inadmissible summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>The cited materials in this Section do not show a period of unique phone activity involving Al Thumairy, Al Bayoumi, Al Awlaki, the Saudi Embassy, and ██████. The phone calls merely show that Al Thumairy made a number of phone calls on December 25, 1999. There is no evidence of what was discussed on the calls were and no evidence that they involved in any way the hijackers.<br><br>There is also no evidence at all that ██████ had any contact with the hijackers at all or any contact with anyone who helped the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1376. | As determined by Youssef, Monday, December 27, 1999, began "a three-day period of unique phone activity involving Thumairy, Bayoumi, Aulaqi, the Saudi Embassy, and the San Diego apartment of ███████" who is the ████████ ████████████ that Bayoumi had befriended. Ex. 5, Youssef Rpt. 150. Bayoumi would record ████ on videotape at the Al Madinah Mosque together with Khalid Al Yafai. The ████ apartment was then located at ████ ██████████ San Diego, CA, almost directly across the street from the ICSD and Bayoumi's apartment. Ex. 2, EO 2781, 2792; Ex. 5, Youssef Rpt. 150-51. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 2X (EO 2781, EO 2792) is inadmissible hearsay. *See* Objections Chart.<br><br>Youssef repeats an investigative hypothesis from the FBI, Plaintiffs Exhibit 2MM (EO 699-714-UPDATED), that was thoroughly investigated and rejected during Operation Encore. The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>████████████████████████████████ |
| 1377. | While at home, Thumairy called the San Diego number ████████4293 ("-4293") eight times on the consecutive days of December 27, 28, and 29. Ex. 5, Youssef Rpt. 151. The FBI confirmed that the -4293 number corresponded to the San Diego apartment of ████████ on Beadnell | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Way. Ex. 2, EO 0057, 0548-49, 0559-60, 2781, 2812, 2971-72. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 2B (EO 57), 2L (EO 548-549, EO 559-560), 2X (EO 2781, EO 2812), and 2Y (EO 2971-2972) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the hearsay portions of the FBI documents cited by Plaintiffs are copy and pasted. There is no evidence, and Plaintiffs fail to cite any, that any of these calls were about the hijackers.<br><br>Al Thumairy testified that he had not heard the names Khalid Al Mihdhar or Nawaf Al Hazmi prior to the 9/11 attacks, that he had no recollection of ever meeting the hijackers, that he was never provided instructions to assist and never gave anyone else instructions to assist the hijackers, that he never assisted the hijackers in any way, and that he has no knowledge of anyone else assisting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 490:11-493:11.<br><br>The FBI has confirmed that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1378. | The FBI asked ▮▮▮▮▮ about calls made from his phone to Thumairy, Bayoumi, and Aulaqi, which (as detailed below) were part of a chain of calls involving those individuals and the MOIA Embassy Director Sowailem. Ex.455, FBI 33. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 455 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | These calls were all purportedly made from ▮▮▮▮▮ phone and do not constitute a "call chain" which is where person A calls person B, and person B calls person C. |
| 1379. | Bayoumi recorded the number dialed by Thumairy ▮▮-4293" in his handwritten address book next to the name "Fathi" and on the same page just above another listing for "Fathi Al-Aidarus" Ex. 12AA, MPS738_35. In his January 2000 typed phone list, Bayoumi had an entry for "Fathi Al Aidaroos" with the number ▮▮▮ 4293". Ex. 12BB, MPS688_7. ▮▮▮▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688), and ▮▮▮▮ ) are inadmissible hearsay. *See* Objections Chart. <br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten address book is inadmissible hearsay. <br><br>With respect to the typed phone lists in Plaintiffs Exhibits 12BB (MPS 688) and 421 (345-49), there is no evidence that the lists belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the lists, that he was not familiar with all of the names and numbers written on them, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone lists are inadmissible hearsay. |
| 1380. | The evidence shows that Thumairy made no other calls to ▮▮▮▮▮▮, before or after. Thumairy claimed that he | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | did not know ▮ and could not remember why he placed phone calls to ▮ in December 1999. Ex. 107, Thumairy Dep. 350:15-22. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that Al Thumairy's cell phone called the ▮ number. There is no evidence, however, that he called that number to reach ▮ Plaintiffs assert that there were two sheikhs staying in ▮ apartment during this time period, and it is possible that Al Thumairy's calls were to these visiting sheikhs. *See* Pls. Aver. ¶ 1384.<br><br>There is no evidence that ▮ and Al Thumairy ever met. Al Thumairy testified that he did not know ▮ Pls. Ex. 107 (Thumairy Tr.) ▮ |
| 1381. | The phone records show that Bayoumi used his cell phone to call ▮ at his -▮ number before and during the hijacker's arrival. Bayoumi's cell phone records produced by the FBI to date start on January 9, 2000, and include a phone call from Bayoumi to ▮ on January 11, 2000. Ex. 12Q (Bayoumi calls to ▮ ); Ex. 515, FBI 3224. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Ex. 12Q is an improper summary exhibit. *See* Objections Chart.<br><br>Exhibit 12Q purports to show Al Bayoumi's cell phone called the ▮ number, which Plaintiffs attribute to ▮ based solely upon several hearsay sources. No subscriber records were produced to verify the number belonged to ▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br><br> There is no evidence that any contact between Al Bayoumi and ▮▮▮ related in any way to the hijackers. Al Bayoumi testified that he did not remember ▮▮▮ or making calls to ▮▮▮ Pls. Ex. 120 (Bayoumi Tr.) ▮▮▮, which is consistent with ▮▮▮ which indicates that Al Bayoumi and ▮▮▮ were not familiar with each other. Al Bayoumi further testified, as confirmed by the FBI's investigation, that no one in the Saudi government instructed him to assist the hijackers and that he never instructed anyone else to assist the hijackers. *Id.* at 722:14-724:6. |
| 1382. | As determined by Youssef, less than two months after Thumairy's call to ▮▮▮ "Bayoumi would introduce ▮▮▮ to Hazmi and Mihdhar and ask ▮▮▮ to look after them"...hosting "the two hijackers at his apartment and help[ing] them navigate life in San Diego." Ex. 5, Youssef Rpt. 151. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) fails to cite any support for these assertions. There is no evidence that Al Bayoumi introduced ▮▮▮ to the hijackers, nor is there any evidence that Al Bayoumi asked ▮▮▮ to assist them. <br><br> Al Bayoumi testified that he did not remember ▮▮▮ or making calls to ▮▮▮ Pls. Ex. 120 (Bayoumi Tr.) ▮▮▮, which is consistent with ▮▮▮ which indicates that Al Bayoumi and ▮▮▮ were not familiar with each other. Al Bayoumi further testified, as confirmed |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | by the FBI's investigation, that no one in the Saudi government instructed him to assit the hijackers and that he never instructed anyone else to assist the hijackers. *Id.* at 722:14-724:6. |
| 1383. | Significantly, on March 2, 2000, the ▮▮▮ number of ▮▮▮ received one call from and placed two calls to the Yemen phone number ▮▮▮ 0578. Ex. 2, EO 2812, 2790. That Yemen number was connected to Al Qaeda's bombing of U.S. Embassies in East Africa and was identified as one used operationally by Al Qaeda. Ex. 2, EO 0006; 4052. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2X (EO 2790, EO 2812) and Plaintiffs Exhibit 2HH (EO 4052) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2A (EO 6) is the May 2021 Electronic Communication closing Operation Encore, which contains the final conclusions of the FBI that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>On March 2, 2000, ▮▮▮ residential telephone twice called a Yemeni number. The FBI found this contact significant because the Yemeni number was known to have been used by Al Qaeda operatives. A suicide bomber of the 7 August 1998 bombing of the U.S. Embassy in Nairobi unexpectedly had survived the attack and had immediately called this number. It was subscribed by Ahmad Al Hada, who was also Khalid Al Mihdhar's father-in-law. Pls. Ex. 82 (CIA_267); Pls. Ex. 2A (EO 6). According to hearsay FBI documents, the calls were made by Khalid Al Mihdhar. Pls. Ex. 455 (FBI 34). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Notably, at the time of the two March 2, 2000 calls, it appears that the number of Al Mihdhar's father-in-law was no longer an Al Qaeda communications hub in Yemen as bin Laden had stopped using it in August 1998. *See* KSA Ex. 167 (Sageman Rep.) 497. Even the FBI acknowledged that the "contacts on 3/2/00" were not with an Al Qaeda communications hub in Yemen but "with Yemeni phone of Mihdhar's father-in-law." Pls. Ex. 2QQ (EO 2812). |
| 1384. | According to the FBI interview of ███ ███, in December 1999 Bayoumi asked ███ to host two visiting Saudi Sheikhs at his apartment during Ramadan. ███ said that Bayoumi asked if the two Sheikhs could stay for the last ten days of Ramadan; ███ also recounted the Sheikhs stayed for the month, from mid-December to mid-January. Ex. 455, FBI 000032-38 at 38; Ex. 536, FBI 000069. ███ said that the two visiting Sheikhs were "well known Scholars of Islam who had traveled from Saudi Arabia to San Diego to visit and attend the ICSD." Ex. 455, FBI 000032. At his first interview, ███ could not remember the names of the two men and in his second interview described them as "Imam Muhammed" and "Imam Khal*id*." Ex. 455, FBI 000032-33; Ex. 536, FBI 000069. ███ ███ considered it a distinct honor to be | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibits 455 and 536 are inadmissible hearsay. *See* Objections Chart. The hearsay documents that Plaintiffs cite state that in 2008, Operation Encore agents interviewed ███ in San Diego and asked him about a number of calls made from his apartment line. He told them that at the end of December 1999, Al Bayoumi had asked him to host two visiting well-known sheikhs from Saudi Arabia at his apartment. ███ remembered them as "Imam Muhammad" and "Imam Khalid." They had come to visit and attend the ICSD. They stayed with him the last ten days of Ramadan (corresponding to 27 December 1999 to 7 January 2000). He believed that Al Bayoumi asked him to host them because he was single, living alone, and his apartment was near the ICSD. After some other answers, ███ attributed the calls to the two visiting sheikhs, but he had not given them permission to use his phone and he did not remember |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | asked to host the two Sheikhs at his home. Ex. 455, FBI 000032 at 38. | seeing or overhearing them using his phone in the apartment. Pls. Ex. 455 (FBI 32-33), Pls. Ex. 536 (FBI 68-69). ▮▮▮ did not remember these calls made more than seven and eight years before his FBI interview. However, ▮▮▮ memory about hosting the two Saudi imams is consistent over his interviews and their arrival dates is consistent with the timing of the phone calls from Al Thumairy, indicating that the calls from Al Thumairy to ▮▮▮ home number may have been to the two visiting Sheikhs. |
| 1385. | WExhen asked about series of calls made to and from his phone involving Thumairy, Bayoumi, and Aulaqi on December 27-29, 1999, ▮▮▮ ultimately claimed that the calls were made by the two visiting Sheikhs from Saudi Arabia. Ex. 455, FBI 000032 at 33. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 455 is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that the hearsay exhibit contains these statements. |
| 1386. | This Court ordered Saudi Arabia to provide documents about the "two Sheikhs" who visited San Diego in December 1999 as described by ▮▮▮ ECF 4696, July 22, 2019 Sealed Opinion & Order on PECs Motion to Compel. Saudi Arabia stated that "[a]fter a reasonable search, Saudi Arabia was unable to locate any documents regarding a trip to San Diego by two Sheikhs during the time period from November 1999 to January 2000." ECF 5200 at App. 5 ¶ 15. Saudi Arabia's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Undisputed that the Court ordered Saudi Arabia to search for documents regarding the two visiting Sheikhs. After a reasonable search, Saudi Arabia was not able to locate any such documents. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | response failed to even acknowledge the presence of MOIA propagators Jaithen and Mersal in San Diego during that period, who Bayoumi himself described as "Sheikhs" Majed and Abdullah. Ex. 573, FBI 4114. | There is no evidence that the two sheikhs were Saudi government employees. Furthermore Plaintiffs Exhibit 536 (FBI 69), cited by Plaintiffs, describes them as "Imam Muhammed" and "Imam Khalid," indicating that the two sheikhs were not Al Jaithen and Al Mersal. In any event, by December 27, 1999, the start date of the calls set out above, Al Jaithen was in Columbus, Ohio participating in the imamate program at the Omar El-Kattab Mosque. Pls. Ex. 96 (Jaithen Tr.) 85:18-86:19, 94:4-8, 123:3-16, 158:14-159:4, 161:5-10, 166:3-6. |
| 1387. | Thumairy claimed that he did not know ▮▮▮▮▮▮▮ and had no explanation for the phone calls made from his home in Culver City to ▮▮▮ in San Diego. Ex. 107, Thumairy Dep. 350:15-22. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that Al Thumairy testified that he did not know ▮▮▮▮ As set forth above, the call to ▮▮▮▮ home number occurred when there were two visiting sheikhs staying at Aidarus's home, indicating that Al Thumairy may have been attempting to reach them. There is no evidence that Al Thumairy or ▮▮▮▮ ever met. Even the exhibits cited by Plaintiffs, Pls. Ex. 455 (FBI 35), state that "▮▮▮▮ claimed he did not know Fahad Al Thumairy." |
| 1388. | Plaintiffs' expert Youssef concluded, "based on his analysis of all the telephonic activity among Thumairy, Bayoumi, Aulaqi, the Days Inn, ▮▮▮▮ and Sowailem, that Thumairy called the Days Inn (on December 18-19, 1999) and ▮▮▮▮ (on December 27-29, 1999) to speak with his fellow visiting MOIA | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | propagators Jaithen and Mersal." Ex. 5, Youssef Rpt. 152. The circumstances show that ▮▮▮▮▮ apartment was being used for operational purposes and that Thumairy was calling ▮▮▮▮ 's number to reach other Saudi government officials visiting San Diego who were coordinating with Thumairy, Bayoumi, and the Embassy to make arrangements for the arrival of the Al Qaeda operatives. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The two sheikhs staying at ▮▮▮▮ apartment were not Al Jaithen or Al Mersal for several reasons. Plaintiffs Exhibit 536 (FBI 69), cited by Plaintiffs, describes them as "Imam Muhammed" and "Imam Khalid" – two very different names than Abdullah Al Jaithen and Majed Al Mersal. Moreover, Al Jaithen had already left California for his imamate in Columbus, Ohio where his niece was living with her student husband. Pls. Ex. 96 (Jaithen Tr.) 85:18-86:19, 87:24-88:4, 94:4-8, 123:3-16, 158:14-159:4, 161:5-10, 166:3-6. As mentioned in the response to averment paragraph 1363, the January 6 and 7, 2000, calls from Al Madina Mosque to ▮▮▮▮▮ phone number provides further evidence of this.<br><br>Nor is there any evidence that ▮▮▮ apartment was being used for operational purposes or that the calls were linked in any way to the arrival of the hijackers to Los Angeles. Youssef's opinion is the height of speculation. |
| 1389. | Thumairy's calls to the ▮▮▮ occurred around the same time as calls he made to Sowailem, Aulaqi, and Bayoumi, which Youssef identified were "call chaining patterns in the December 27-29 contacts when Thumairy called the members of the group in succession" and included the following calls:<br><br>December 27 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 12:40pm (1 min.) – Thumairy calls Sowailem (cell)<br>12:42pm (1 min.) – Thumairy calls Sowailem (cell)<br>2:26pm (1 min.) – Thumairy calls ▮▮▮<br>2:41pm (1 min.) -Thumairy calls Sowailem (cell)<br>6:27pm (9 mins.) – Thumairy calls Bayoumi (cell)<br>11:36pm (1 min.) – Thumairy calls ▮▮▮<br>11:36pm (6 mins.) – Thumairy calls Bayoumi (cell)<br><br>December 28<br><br>11:42pm (1 min.) – Thumairy calls Embassy<br>11:43pm (2 mins.) - Thumairy calls Embassy Islamic Affairs<br>1:57pm (1 min.) – Thumairy calls ▮▮▮<br>10:24pm (1 min.) – Thumairy calls ▮▮▮<br>11:02pm (1 min.) – Thumairy calls Bayoumi (cell)<br>11:05pm (1 min.) – Thumairy calls ▮▮▮ (home)<br>11:07pm (1 min.) – Thumairy calls ▮▮▮ (home)<br><br>December 29<br><br>12:20am (2 mins.) – Thumairy calls Sowailem (fax) | Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>This paragraph does not set out a "call chaining pattern" where person A calls person B and person B calls person C. All of the calls were made by Al Thumairy. They were also all made during Ramadan, when as a religious leader Al Thumairy made and received more calls. Pls. Ex. 107 (Thumairy Tr.) 497:1-13.<br><br>This paragraph misstates that the calls that occurred on December 28, 1999 at 11:42 and 11:43 were in the PM. They were placed in the AM. *See* Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).<br><br>There is no evidence that any of these calls related in any way to the hijackers. The calls listed in this paragraph are a near duplicate of the calls investigated in Operation Encore. Ex. Ex. 2MM (EO 703-UPDATED). The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 12:35am (3 mins.) – Thumairy calls ███████<br><br>12:39am (2 mins.) – Thumairy calls ███████<br>1:06pm (1 min.) – Thumairy calls ███████<br>1:07pm (1 min.) – Thumairy calls Aulaqi (home)<br>1:07pm (1 min.) – Thumairy calls Al Ribat Mosque<br><br>Ex. 5, Youssef Rpt. 152; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 477, FBI 000559 at 568; Ex. 495, FBI 001453 at 1455. | |
| 1390. | The FBI found that "there was a unique pattern of telephonic contact" that they labeled as "The Set-Up Calls" meaning that they were "calls that occurred between a number of individuals who would later play an important role in assisting the hijackers." Ex. 2, EO 0631. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2M (EO 631) is inadmissible hearsay.<br><br>The FBI did not make any conclusions in this document. The document sets out a briefing of Operation Encore. The theories set forth in the document were thoroughly investigated. For a discussion of the evolution of Project Encore, *see* KSA Ex. 167 (Sageman Rep.) 422-60.<br><br>The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>Every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was no Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "[t]he circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218 (footnote omitted).<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103. |
| 1391. | Plaintiffs' expert Youssef concluded, based on his communications analysis expertise, that "this pattern of calls made by Thumairy, together with the sudden reengagement between Thumairy and Bayoumi; the history of calls of Thumairy, Bayoumi, Jaithen, Mersal, Aulaqi, and Sowailem (and other Embassy officials); and the coordinated activities that would shortly be carried out by Thumairy, Bayoumi, Aulaqi, and others for the hijackers in Los Angeles and San Diego was highly significant." Ex. 5, Youssef Rpt. 153. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence of a "sudden reengagement between Thumairy and Bayoumi." As noted in response to averment paragraph 1255, the record does not contain Al Bayoumi's cell phone records prior to January 9, 2000. There is no evidence that any of the calls between the other individuals, during Ramadan, has anything to do with the hijackers. Nor is there any evidence at all about coordination between any of these individuals concerning the hijackers.<br><br>Operation Encore identified these calls in the first instance, investigated them, and concluded "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1392. | Youssef determined these facts demonstrate "that the participants in the calls — Thumairy, Bayoumi, Sowailem, Jaithen, Mersal, and Aulaqi — were all | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | working/coordinating on an important matter/project that warranted the international travel of Jaithen and Mersal from Saudi Arabia to the U.S. to meet in person." Ex. 5, Youssef Rpt. 153. Youssef noted, "[t]he convergence of the events described herein and the date/time stamp of calls between the various individuals cannot be attributed to random events or happenstance." Ex. 5, Youssef Rpt. 153-54. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef offers no methodology or support for these opinions, which have been rejected by the FBI. There is no evidence of any coordination on an important matter/project as all the calls originated with Al Thumairy and there appear to be no side calls between the recipients of his calls, as would be expected if there was in fact coordination. Moreover, most of the calls are very short indicating that they likely went to voice mail. There is also no evidence that Al Mersal and Al Jaithen participated in any calls. As set forth above, Al Jaithen was already in Columbus, Ohio during the calls. |
| 1393. | Based on his analysis, Youssef conclude:<br><br>... that the meetings and contacts were for the express purpose of planning and coordinating an event or events involving these men. When viewed in context of the events occurring before and after these contacts, the project that these individuals must be working on is to handle the arrival of Hazmi and Mihdhar in California. The subsequent interactions of Hazmi and Mihdhar with the various members of this calling circle shows that the men are their advance team and support network, to assist in their preparation to participate in a mission inside the U.S. The inclusion of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As mentioned in the responses in this Section, there is no evidence of planning and coordinating in these calls. Furthermore, there is no evidence that the calls were related to the hijackers or that they are even linked in any way. There is not a shred of evidence that these phone calls were related to the future arrival of Al Hazmi and Al Mihdhar. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Aulaqi, a notorious terrorist recruiter and supporter, in this group makes this conclusion all the more obvious.<br><br>Ex. 5, Youssef Rpt. 153-54. | As the response to paragraph 1390 shows, these calls were investigated as part of Operation Encore. The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>All the authoritative government panels from the relevant agencies over the past 20 years reached a consensus with the same conclusion that there was no evidence of any witting support network for the hijackers.<br><br>Youssef's comment on Al Awlaki is an anachronism. Even Plaintiffs' purported expert Meleagrou-Hitches concluded, prior to being paid by Plaintiffs, that Al Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25. |
| 1394. | A 2009 FBI Operation Encore Report opening the full investigation of Thumairy confirms that Thumairy's calls "[d]uring a three day period at the end of 1999 [December 27-29, 1999] … are significant in that the pattern of contact, including individuals and frequency, does not appear to have been duplicated prior to nor after | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | this date." The Report defines the 3-day period as from "12/27/1999" to "12/29/1999." Ex. 2, EO 0559-60; 2971. | Plaintiffs Exhibits 2L (EO 559-560) and 2Y (EO 2971) are inadmissible hearsay. *See* Objections Chart.<br><br>The citation is to an FBI opening of a full investigation of Al Thumairy in 2009 (Pls. Ex. 2MM (EO 556-558-UPDATED)), which was mostly a cut and paste duplicate of the 2007 opening of Operation Encore (Pls. Ex. 2MM (EO 699-714-UPDATED)). The original opening of Operation Encore (EO 699-714-UPDATED) attempted to find evidence for its hypothesis that the future hijackers were vouched for or provided with "tazkia" to be able to plug into the San Diego Muslim community. The alleged evidence in support of this hypothesis was that the December 27-29, 1999, pattern of calls might have been related to Al Thumairy's provision of this tazkia. Pls. Ex. 2MM (EO 703-UPDATED). Operation Encore cut and pasted this portion of the opening EC onto half a dozen other ECs over the next two years, including into Plaintiffs Exhibit 2MM (EO 559-560-UPDATED) and Plaintiffs Exhibit 2Y (EO 2971-2972).<br><br>Operation Encore's tazkia hypothesis led nowhere as the FBI could not find any evidence supporting it, and it disappeared from Operation Encore's traffic. By 2016, the tazkia hypothesis and interest in Al Thumairy's December 1999 telephone calls had completely waned. Pls. Ex. 566 (FBI 11752-11767). For an analysis of the evolution of Operation Encore's investigation, *see* KSA Ex. 167 (Sageman Rep.) 422-460.<br><br>The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XIX.B. | **Al Qaeda holds a meeting in Malaysia shortly before sending Hazmi and Mihdhar to California in early January 2000.** | *See* Response to Plaintiffs Averment ¶ 1395. |
| 1395. | After receiving their training, Hazmi and Mihdhar had a final planning meeting with other Al Qaeda members in Malaysia before heading to the U.S. Bin Attash arrived in Malaysia ahead of Hazmi and Mihdhar for the meeting. Bin Attash travelled to Kuala Lumpur, Malaysia in the second half of December 1999. Bin Attash was followed about ten days later by Hazmi and Mihdhar. *See* 9/11 Commission Report at 158-9; Ex. 171, JTF-GTMO Detainee Assessment of Zohair Mohammed Said dated Nov. 25, 2008 at 4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The evidence shows that Al Hazmi and Al Mihdhar received slightly different training and flew to Malaysia separately, Al Hazmi from Karachi and Al Mihdhar from Yemen. Apparently, Al Hazmi arrived in Kuala Lumpur on January 4, 2000, and Al Mihdhar on the evening of January 5, 2000. KSA Ex. 163 (9/11 Rep.) 158-159, Pls. Ex. 171 (GTMO Detainee Assessment of Zohair Mohammed Said [Abu Bara al-Yemeni], ISN 569) at 4.<br><br>Walid bin Attash ("Khallad") and Zohair Said (Abu Bara al-Yemeni) had already traveled together and arrived in Kuala Lumpur around December 20, 1999. Khallad had long planned this trip to Kuala Lumpur for a new fitting of his leg prosthesis at the Endolite clinic. Shortly after they arrived, they contacted Riduan Isomuddin ("Hambali") to let him know where they were staying. As the senior al Qaeda member and the local chief of another terrorist group (the Jemaah Islamiyah, "JI," which collaborated with al Qaeda for terrorist training, logistics, funding, and operations) in the region, Hambali wanted to be kept informed of al Qaeda activities in Southeast Asia. He was also a friend of KSM and collaborated with KSM in several operations, including the Asian Pacific portion of the original 9/11 plot, which involved blowing up airliners over |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | East Asia and the Pacific. After their call, Hambali picked them up, brought them to his home for a meal, and then took them to the Endolite clinic, where the two visitors stayed for approximately ten days. KSA Ex. 163 (9/11 Rep.) 158; Pls. Ex. 171 (GTMO Detainee Assessment of Zohair Mohammed Said [Abu Bara al-Yemeni], ISN 569) at 4; KSA Ex. 237 (GTMO Detainee Assessment of Khallad, ISN 10014) at 3.<br><br>The two teams of Al Qaeda terrorists (Khallad and Abu Baraa on the one hand, Al Hazmi and Al Mihdhar on the other) traveled to Malaysia for different reasons. As the 9/11 Commission states, "Khallad was sent by Bin Laden to Kuala Lumpur to case U.S. airline flights in the Far East for possible future attacks there, whereas Hazmi and Mihdhar were on the first leg of their travel from Karachi to Los Angeles." KSA Ex. 163 (9/11 Rep.) 151, 490 n.25. The two teams happened to be at the same place and at the same time, but for different reasons and different missions. They stayed together for about three days in Kuala Lumpur. Their stay cannot be characterized as a planning meeting since the planning of the operation had already been done by Al Qaeda leaders in Qandahar and later by KSM in Karachi, both with Al Hazmi. Pls. Ex. 82 (CIA_256). Al Mihdhar had gone back home to Yemen before the Qandahar meetings. In Karachi, KSM prepared Al Hazmi to go to San Diego and instructed him "to go to the local mosque to request assistance and advice on functioning in American society" and stay in contact via internet chat in case he had urgent question. Since Al Qaeda had no one in California to help him and Al Mihdhar, KSM instructed Al Hazmi to contact fellow Muslims for help ("for example, about where to rent an apartment or find halal restaurants or grocery stores"). Pls. Ex. 31 (KSM Statement) at 17-18. |
| 1396. | Bin Attash had trained with both Hazmi and Mihdhar and was Bin Laden's trusted phone communications person. Ex. 5, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Youssef Rpt. 155 -56; Ex. 105, Youssef Dep. 123:10-22. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs Exhibit 105 (Youssef Decl.) has been stricken. *See* ECF No. 9562. |
| | | Plaintiffs cite only their expert Youssef. In his report, Youssef claims, "Attash was trusted by Osama bin Laden with handling phone communications on behalf of Al Qaeda." Pls. Ex. 5 (Youssef Rep.) 156. In a footnote, Youssef cites two sources, KSA Ex. 238 (Ali Soufan, *The Black Banners (Declassified)* 259 (2011)); and KSA Ex. 239 (*U.S. v. Bin Laden, et al.*, S.D.N.Y., S(7) 98 Cr. 1023, at 2007-36 (Mar. 1, 2002)). |
| | | Ali Soufan's book deals with Khallad, but only in terms of his involvement in the future *USS Cole* operation in Yemen. There is nothing about Khallad being the trusted handler of phone communications for al Qaeda. The transcript of the East Africa bombings case featured the testimony of Special Agent Steve Gaudin, Ali Soufan's FBI partner in their investigations in Yemen. Gaudin described Khallad's involvement in the East Africa bombings, namely, his instructions to failed Nairobi bomber Mohamed al-Owhali. Again, nowhere in the transcript is there anything about Khallad being a communications man for bin Laden or Al Qaeda. Yet, at his deposition, Youssef stated without further evidence that Khallad "is the communications man for bin Laden." Pls. Ex. 105 (Youssef Tr.) 123:21-22. |
| | | There is no other support for this assertion. Khallad's GTMO Detainee Assessment summarizes his career. Khallad became one of bin Laden's bodyguard, fought alongside the Taliban when he lost his leg, and then was assigned to the boat operation (which eventually led to the bombing |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of the *USS Cole*) until he was arrested in Yemen buying explosives in the spring of 1999, which forced bin Laden to assign him to the planes operations under KSM. Since he could not get a U.S. visa, he was assigned to participate in the Asian Pacific portion of the 9/11 operation of blowing up U.S. airliners over the Pacific simultaneously with the attacks in New York and Washington, D.C. In fact, in December 1999, KSM had sent Khallad to Kuala Lumpur to case and test U.S. Airliners' security, which he did before the arrival of Al Hazmi and Al Mihdhar in Malaysia. KSA Ex. 240 (GTMO Detainee Assessment of Hambali, ISN 10019); KSA Ex. 163 (9/11 Rep.) 155-156, 158-159.  Khallad was an operations man, not a communications man.<br><br>Khallad did play a small role in communications for the 9/11 operation, but only after April or May 2000, when bin Laden cancelled the Asian portion of the 9/11 plan, and Khallad only did so for KSM, not bin Laden. Up to mid-2000, Khallad was operationally involved the Asian Pacific portion of the operation. As KSM testified, after the cancellation of the East Asian portion of the planes operation, "Khallad and Abu Bara remained under Sheikh Mohammed's operational control, and Khallad helped Sheikh Mohammed keep in contact with Al Hazmi in the U.S. via internet chat. Sheikh Mohammed also was in direct internet chat with Al Hazmi during 2000.  After the bombing of the U.S.S. Cole in October 2000, Sheikh Mohammed transferred Khallad and Abu Bara to the control of al-Nashiri, the key operative in charge of the U.S.S. Cole bombing, so that they could be involved in future plotting in the Persian Gulf Area." Pls. Ex. 31 (KSM Statement) at 9-10.  So, for six months, from April to October 2000, Khallad was an internet chat (not telephone) communications intermediary between KSM and Al Hazmi, but not for bin Laden. |
| 1397. | When Hazmi, Mihdhar, and Bin Attash travelled to Malaysia for their meetings in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | December-January 2000 Al Qaeda had arranged in advance for a local support network to assist them. They received lodging and other support from members of an extremist network associated with the Jemaah Islamiah group. See 9/11 Commission Report at 151. The lodging was provided at the apartment of a Jemaah Islamiah member who made his home available at the request of the group's leader. *See* 9/11 Commission Report at 159; 490 n. 25 (citing an interview that "the al Qaeda guests were lodged at [a] condominium, an apartment on the outskirts of Kuala Lumpur"). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited materials show that the cited individuals did not travel to Malaysia for the purpose of meeting and there was no local support network. The evidence clearly shows that Al Hazmi and Al Mihdhar traveled to Malaysia to meet each other and go on to the United States, not for any meeting with Khallad. Khallad traveled to Malaysia to case and test U.S. airliners flying over the Pacific Ocean. He did not go there for a meeting with the future hijackers. The use of Malaysia as a transit point for Al Qaeda operatives was due to its lack of requirement of a visa for Muslims and its lax security measures. KSA Ex. 163 (9/11 Rep.) 158; Pls. Ex. 423 (Charge Sheet, *US v. Khalid Mohammad, et al.*) at 3; Pls. Ex. 31 (KSM Statement) at 7.<br><br>The cited materials do not support Plaintiffs' assertion that Al Qaeda had arranged in advance for a local support network to assist the incoming future hijackers, Khallad, and Abu Baraa. Hambali was already a senior member of Al Qaeda and "as a rule had to be informed of the activities of al Qaeda operatives in Southeast Asia." Pls. Ex. 31 (KSM Statement) at 8; KSA Ex. 240(GTMO Detainee Assessment for Hambali, ISN 10019) at 5; KSA Ex. 163 (9/11 Rep.) 158, 493 n.58. Hambali was assisting with KSM on the East Asia portion of the 9/11 attacks. Hambali came to Qandahar to meet personally with bin Laden and Abu Hafs to collaborate on operations. Also, in anticipation of a second wave of attacks in the U.S. after the 9/11 attacks, KSM had asked Hambali to find Malaysian or Indonesian pilots to participate in it. KSA Ex. 240 (GTMO Detainee Assessment of Hambali, ISN 10019) at 3, 5, 6, 8.; KSA Ex. 241 (GTMO Detainee Assessment of KSM, ISN 100024) at 9-10; KSA Ex. 163 (9/11 Rep.) 152, 490 n.26; Pls. Ex. 31 (KSM Statement) at 41. In other words, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Hambali and Jemaah Islamiyah were integral to Al Qaeda operations in East Asia. This was not a local support network, but a part of Al Qaeda in East Asia.<br><br>Under Hambali's control, Jemaah Islamiyah operatives helped passing al Qaeda members. In the last three days of their stay in Malaysia, the four visiting Al Qaeda members stayed at the apartment of Jemaah Islamiyah operative Yazid Sufaat, who was transitioning into the Al Qaeda biological weapons program, namely weaponized anthrax cultivation, under the supervision of Ayman Al Zawahiri. KSA Ex. 163 (9/11 Rep.) 151, 490 n.25; KSA Ex. 240 (GTMO Detainee Assessment of Hambali, ISN 10019) at 10; KSA Ex. 241 (GTMO Detainee Assessment of KSM, ISN 10024) at 7; Pls. Ex. 31 (KSM Statement) at 51. This dense collaboration between Al Qaeda and Jemaah Islamiyah, including overlap in membership, shows that the people who helped the four Al Qaeda members in Malaysia, were not a local support network "associated with the Jemaah Islamiyah group," but Jemaah Islamiyah and Al Qaeda members themselves.<br><br>Plaintiffs' false assertion that Al Qaeda members relied on local support networks for its operations in the West, like the United States, is addressed below in the Response to Section XIX.D of this Averment. |
| 1398. | Al Qaeda meetings in Malaysia involving Hazmi and Mihdhar were held at the apartment arranged through Jemaah Islamiah. Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003). The CIA found that arrangements were made for Mihdhar to be met at the airport upon his arrival in Malaysia. Ex. 82, CIA 0242- 304 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is nothing in the cited material about any arrangement for the lodging. It only says, "The Kuala Lumpur meetings were held in an |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003). | apartment belonging to Malaysian extremist Yazid Sufaat." Pls. Ex. 82 (CIA_258).  The CIA report also states: "We have no intelligence reporting on the substance of these meetings."  Pls. Ex. 82 (CIA_258). The reason for this lack of intelligence is simple:  when the report was written (it was issued on June 1, 2003), neither Khallad nor Hambali had been interrogated.  A year later, the 9/11 Commission had been able to digest the interrogations of Khallad, Hambali, and especially KSM, whose interrogation reports populate the footnotes at the end of its report.<br><br>There were no arrangements for Al Hazmi's and Al Mihdhar's lodging prior to Khallad's and Abu Baraa's arrival.  They found an initial place to stay and then called Hambali to let him know where they were staying. Hambali picked them up, and after a short visit to his home, took them to the Endolite clinic where Khallad had previously received treatment. Khallad and Abu Baraa stayed there for about ten days.  KSA Ex. 163 (9/11 Rep.) 158.  On December 30, 1999, Khallad left on his casing mission and flew to Bangkok.  On December 31, 1999, he flew from Bangkok to Hong Kong.  On January 1, 2000, he flew back to Bangkok; and on January 2, 2000, he returned to Kuala Lumpur.  Pls. Ex. 423 (Khallad Charge Sheet) at 3.  Khallad's return to Kuala Lumpur was "to facilitate onward travel for Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA # 77) from Kuala Lumpur to the United States."  *Id.* at 4. Apparently, Abu Baraa had stayed at the Endolite clinic and Khallad returned there to join him.  KSA Ex. 163 (9/11 Rep.) 159.<br><br>The 9/11 Commission stated, "Hazmi arrived in Kuala Lumpur soon thereafter and may even have stayed briefly with Khallad and Abu Bara at Endolite.  Mihdhar arrived on January 5, probably one day after Hazmi. All four operatives stayed at the apartment of Yazid Sufaat, the Malaysian JI member who made his home available at Hambali's request."  KSA Ex. 163 (9/11 Rep.) 159.  On the other hand, Abu Baraa's GTMO assessment states, "Detainee [Abu Baraa] and YM-10014 [Khallad] resided at a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | hospital for 10 to 14 days while YM-10014 was fitted for the prosthetic leg. Detainee and YM-10014 left the hospital and were driven to the home of Yazid Sufaat. The next day, 11 September 2001 hijacker Nawaf Al Hazmi arrived at the home. The next evening, the three of them went to a restaurant where they met another 11 September 2001 hijacker, Khalid al-Mihdhar." Pls. Ex. 171 (GTMO Detainee Assessment of Zohair Mohammed Said [Abu Bara al-Yemeni], ISN 569) at 4. The 9/11 Commission Report is based on Khallad's interrogation (at 159, 494 n.60) and the GTMO account is based on Abu Baraa's interrogation. A CIA report gives a third version, "Iraqi national and suspected al-Qa'ida operative Ahmad Hikmat Shakir al-Azzawi met al-Mihdhar and possibly others at the airport, where he had served as a ground employee assisting Arab travelers since 1999." Pls. Ex. 82 (CIA_258). <br><br> Plaintiffs fail to acknowledge, much less examine the relevant documents. There were no pre-arrangements for Khallad and Abu Baraa, who had to find a place to stay temporarily and then call Hambali, who took them to the clinic that Khallad had been to two years earlier when he was injured. The documents are silent about any arrangements for Al Hazmi or Al Mihdhar's lodging. |
| 1399. | Law enforcement investigators determined that Bin Attash used a pay phone near the apartment where he was staying to make calls to Bangkok and Yemen, including to Mihdhar's in-laws' home in Yemen to instruct Mihdhar to proceed to Malaysia. Ex. 5, Youssef Rpt. 156; Ex. 170, Joint Congressional Inquiry at 13 (attended the Malaysia meeting with Hazmi and Mihdhar). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 170 is not the Joint Congressional Inquiry but Director Mueller's statement for the Joint Intelligence Committee Inquiry. It has nothing on the Kuala Lumpur stay of Khallad or the future hijackers anywhere in the statement. The Congressional Joint Inquiry is actually Plaintiffs Exhibit 9, but, at page 13, it also has nothing about Khallad making phone calls in Kuala Lumpur.<br><br>Plaintiffs' expert Youssef claims that a photo provided by Malaysian intelligence showed Khallad used a pay phone near the apartment in which he was staying "to make calls to Yemen, Bangkok, and to Mihdhar's in-laws' home in Yemen in order to instruct Mihdhar to proceed to Malaysia." Pls. Ex. 5 (Youssef Rep.) 156. In notes 634 and 635 on the same page, Youssef cites Soufan's book, (KSA Ex. 238 (*The Black Banners* at 240-241, 288-289), the Congressional Joint Inquiry (Pls. Ex. 9), and the DOJ Inspector General Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (Pls. Ex. 131). These three sources deal with Khallad in Kuala Lumpur, however the latter two do not discuss any photo of Khallad at a pay phone. Soufan's book discusses a call that Khallad made to Fahd al-Quso (who was involved in the U.S.S. Cole bombing) in late December, almost a week before Khallad moved into Sufaat's apartment. None of the materials cited in Youssef's report state that "from this pay phone" Khallad called Al Mihdhar's in-laws' home to instruct Al Mihdhar to proceed to Malaysia.<br><br>In fact, it would have been chronologically impossible for law enforcement to have a photo of Khallad at the phone booth instructing Al Mihdhar to proceed to Malaysia because surveillance on Khallad and the others at Sufaat's apartment started when Al Mihdhar arrived in Kuala Lumpur and it was Al Mihdhar's arrival that triggered the surveillance. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *See* Pls. Ex. 131 (FBI's Handling of Intelligence Information Related to the September 11 Attacks) at 243-44. |
| 1400. | Based on his FBI knowledge from the relevant time, former Special Agent Youssef stated that Bin Attash had access to fraudulent passports and could have easily bypassed the normal legal systems to enter the U.S. himself. Ex. 105, Youssef Dep. 29:19-30:7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |
| | | The cited materials in this Section refute Plaintiffs' expert Youssef's claim that, based on his alleged FBI knowledge, Khallad could have easily bypassed the normal legal system to enter the U.S. with a fraudulent passport. Pls. Ex. 105 (Youssef Tr.) 29:19-30:7. The evidence in this Section provides that Khallad traveled on a fake passport under the alias Salah Saeed Mohammed Bin Yousaf to fly to Kuala Lumpur, Bangkok, Hong Kong, and Karachi. Pls. Ex. 423 (Khallad Charge Sheet) at 3-4. |
| | | However, the 9/11 Commission reported Khallad's U.S. visa application under a fake name was rejected. KSA Ex. 163 (9/11 Rep.) 155, 492 n.44. Moreover, bin Laden and KSM did not allow their subordinates to travel to the United States on false documents. None of the 9/11 hijackers traveled to the U.S. on false passports. In fact, none of the Yemeni candidates for the 9/11 operation, including Ramzi bin al-Shibh, who had spent years in Germany, was successful in obtaining a U.S. visa. For a while, KSM and bin Laden had planned to use those who could not get their U.S. visas in a simultaneous operation consisting of blowing up U.S. airliners over the Pacific Ocean. This part of the plan was created precisely because Yemenis like Khallad could not go to the U.S. In |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | January 2000, this East Asian portion of the 9/11 attacks plan was the reason for Khallad's presence in Kuala Lumpur, namely to case and test U.S. airline security in East Asian flights in furtherance of the 9/11 plot. Pls. Ex. 31 (KSM Statement) at 5-7; KSA Ex. 163 (9/11 Rep.) 156. |
| | | The chronology of Khallad's operations does not support the notion that he had been in California in summer 2000 as Youssef claimed at his deposition, at 29:1–30:7. Khallad flew back to Karachi from Kuala Lumpur on January 20, 2000. Pls. Ex. 423 (Khallad Charge Sheet) at 4. KSM debriefed him on his findings and then they traveled to Qandahar to report to bin Laden on his casing mission. Bin Laden cancelled the East Asian portion of the 9/11 plot in April–May 2000. Afterwards Khallad worked for KSM and helped KSM keep in contact with Al Hazmi in the U.S. via internet chat until after the bombing of the *USS Cole* in October 2000, when KSM transferred Khallad to the control of Al Nashiri, in charge of Al Qaeda operations in Yemen. Pls. Ex. 31 (KSM Statement) at 6-9, 37. Khallad's role in keeping in touch with Al Hazmi until the end of 2000 was confirmed by the fact that around December 2000, he provided 9/11 pilot Hani Hanjour with an email address to contact Al Hazmi. Pls. Ex. 423 (Khallad Charge Sheet) at 8. |
| | | The GTMO detainee assessments document the detainees' travels. The assessment for Khallad does not document any travel to the United States but documents his other travels. KSA Ex. 237 (GTMO Detainee Assessment for Khallad, ISN 10014). Nor does the GTMO assessment for KSM, which otherwise sets out information on numerous plots and dispatches of Al Qaeda members to the U.S., mention any dispatch of Khallad to the U.S. KSA Ex. 241 (GTMO Detainee Assessment for KSM, ISN 10024). |
| | | Plaintiffs' expert Youssef's alleged FBI knowledge from the relevant time was challenged in court by the FBI itself, which showed that his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | participation in counterterrorism investigations was limited to acting as a translator or cataloguing documents like putting an identifying number or serial number on them before storing them as original evidence. In fact, the FBI specifically rejected Youssef's participation in the 9/11 investigation. Pls. Ex. 105 (Youssef Tr.) 124:7-127:18.<br><br>In contrast to Youssef's wild speculation, the 9/11 Commission and the FBI actually investigated whether Khallad had ever been in the United States. The 9/11 Commission concluded, "[n]either we nor the FBI have found any travel documentation establishing Khallad's presence in the United States at any time." KSA Ex. 163 (9/11 Rep.) 216, 514 n.9. |
| 1401. | In December 1999 "the KFM [King Fahad Mosque] received a phone call from an individual in Malaysia." Ex. 2, EO 0520. The caller wanted to "speak with AL-THUMAIRY. . . regarding the imminent arrival of two brothers ... who needed their assistance." Those "two brothers" were Nawaf al Hazmi and Khalid al Mihdhar. Ex. 2, EO 0520. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2L (EO 520) is inadmissible hearsay. *See* Objections Chart.<br><br>The citation is to a confidential human source reporting ("CHS"), which is filled with internal contradiction and is contrary to the rest of the discovery material.<br><br>There are no records of calls to or from Malaysia or Indonesia to the King Fahad Mosque during the relevant period, nor are there any contemporaneous documents or testimony of such calls. *See* Pls. Ex. 2W (EO 2722) (an individual who worked at the King Fahad Mosque during the relevant period says that he does not recall any information of any calls from Malaysia or Indonesia to the King Fahad Mosque asking Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy to receive and look after the hijackers, and that he had no knowledge of Al Thumairy "knowing or helping the hijackers"). |

Al Thumairy testified that he had no recollection of ever meeting the hijackers, did not know who they were, never discussed the hijackers with anyone, that he never provided them or instructed anyone else to provide them with any assistance, and that he had no knowledge of the pending attacks. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 490:6-494:20; 516:24-517:15. Khalil Al Khalil and Osman Kaldirim, directors of the foundation overseeing the King Fahad Mosque, also testified that they have no information about any assistance that any Saudi officials or Thumairy provided to the hijackers. *See* Pls. Ex. 113 (Khalil Tr.) 362:7-363:10; 365:1-10 (also testifying that there is no truth to Plaintiffs' assertion that the King Fahad Mosque was "used as a conduit by the Kingdom of Saudi Arabia to assist the two California hijackers."); Pls. Ex. 121 (Kaldirim Tr.) 280:19-281:14.

There are other indications that the CHS source and information is unreliable. The confidential source is reported to have said that "[b]y the later half of 1999 . . . AL-THUMAIRY had brought in another imam, MOHAMMED AL-MUHANNA." Pls. Ex. 2L (EO 520). ████████

████████ The CHS document states that Khallad Bin Attash – an individual involved in the October 2000 bombing of the *USS Cole* – was at the King Fahad Mosque in the summer of 2000. Pls. Ex. 2L (EO 521). Both the 9/11 Commission and the FBI have concluded, however, that Khallad was never in the United States. KSA Ex. 163 (9/11 Rep.) 216, 514 n.9; *see* Response to Pls. Aver. ¶ 1400. The CHS document also states that Al Thumairy assigned ████ to pick up Al Hazmi and Al Mihdhar at the airport. Pls. Ex. 2L (EO 520). These assertions are categorically false. ████████

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████ The CHS also reported that Al Bayoumi was at the King Fahad Mosque every Friday. Pls. Ex. 2L (EO 521). That is contradicted by an analysis of Al Bayoumi's gas consumption, and there is no evidence supporting that claim. *See* KSA Ex. 167 (Sageman Rep.) 669-670; Pls. Ex. 120 (Bayoumi Tr.) 347:22-348:16 (testifying that he went to the King Fahad Mosque twice.). Moreover, as set forth in Response to Plaintiffs Averment ¶ 1404, it was chronologically impossible to know the hijacker's flight information in December 1999, since the hijackers made their reservations at the last minute after January 7, 2000. The FBI has categorically rejected the unsubstantiated statements given by the CHS. The final conclusion of the FBI following the Encore investigation was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1402. | Plaintiffs' expert Youssef concluded that from his experience at the FBI that the FBI assessed this information as credible. Ex. 5, Youssef Rpt. 155, n. 629. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The FBI has asserted that, when Youssef worked in St. Louis and Southern California, he was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). The FBI also prevented Youssef from working on the 9/11 attacks despite his requests and despite the fact that the 9/11 investigation was the "largest and most comprehensive investigation ever conducted by the FBI" involving more than half the FBI's agents. Pls. Ex. 105 (Youssef Tr.) 124:7-127:18. Instead, during the 9/11 investigation, he was assigned to a job "cataloging documents as in putting an identifying number o[r] serial number on a document before storing the document" and he admitted that the job was not operational in nature. *Id.* at 128:20-129:2, 129:11-20. Any appeal to Youssef's purported experience is suspect.<br><br>There is no evidence that the FBI ever assessed the information from the CHS as credible. It barely makes any appearance in the documents produced with the Executive Order Production. For instance, it is not mentioned in the Electronic Communication opening Al Thumairy's full investigation. Nor is this information mentioned in the Operation Encore updates of 2012, and 2014. Pls. Ex. 2KK (EO 273-276-UPDATED, EO 222-227-UPDATED).<br><br>Furthermore, as detailed in Response to Plaintiffs Averment ¶ 1402, the information provided by the CHS is false and unreliable. It is also chronologically impossible that Al Hazmi's and Al Mihdhar's flight information was conveyed in December 1999, when the reservations were not made until after January 7, 2000. *See* Response to Pls. Aver. ¶ 1404.<br><br>Finally, the FBI has categorically rejected the unsubstantiated statements given by the CHS. The final conclusion of the FBI following the Encore investigation was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1403. | Thumairy admitted that he received calls at the King Fahad Mosque. Ex. 107, Thumairy Dep. 102:22-103:4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Thumairy received phone calls at the King Fahad Mosque. There is no evidence that any of these calls related in any way to the hijackers. |
| 1404. | Thumairy had the flight information for Hazmi and Mihdhar in advance and sent ▓▓▓▓▓▓▓▓, a KFM worshiper and family friend of Saudi Consulate official ▓▓▓▓▓, to LAX on January 15, 2000 to meet the two hijackers at LAX and bring them to the Mosque to see Thumairy. Ex. 2, EO 0520. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2L (EO 520) is inadmissible hearsay.<br><br>The statements in this paragraph are categorically false. The evidence shows that it would have been impossible to learn Al Hazmi's and Al Mihdhar's flight information from the alleged December 1999 phone call from Malaysia; that ▓▓▓▓ did not pick them up at the airport; that ▓▓▓▓ was not a friend of ▓▓▓▓▓; and that he did not bring them to the Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The original plan was for the hijackers to fly from Kuala Lumpur to Los Angeles. "Hazmi and Mihdhar were sent to Kuala Lumpur before proceeding to their final destination – the United States. According to KSM, they were to use Yemeni documents to fly to Malaysia, then proceed to the United States using their Saudi passports to conceal their prior travels to and from Pakistan. KSM had doctored Hazmi's Saudi passport so it would appear as if Hazmi had traveled to Kuala Lumpur from Saudi Arabia via Dubai. . . . According to Khallad, Malaysia was an ideal destination because its government did not require citizens of Saudi Arabia and other Gulf states to have a visa. Malaysian security was reputed to be lax when it came to Islamist jihadists." KSA Ex. 163 (9/11 Rep.) 158. This was the plan when Al Hazmi arrived from Karachi around January 4, 2000, and Al Mihdhar from Dubai (and from Yemen the previous day) on the evening of January 5, 2000. KSA Ex. 163 (9/11 Rep.) 158-159; Pls. Ex. 155 (FBI Hijackers Timeline) at 51-52. That plan, however, changed.<br><br>Khallad needed money and had his father wire $36,000 to fellow Al Qaeda member Ibrahim al-Thawer ("Nibras") in Sanaa. The plan was for Nibras to fly to Singapore to give the money to Khallad. However, Khallad was worried that this was too suspicious for one person to carry so much cash and so he called another Al Qaeda friend, Fahd Al Quso, also in Yemen to accompany Nibras to Singapore. There is no evidence that this money was for the future hijackers, as KSM had already given them $8,000 each before they traveled to the United States. On January 4, 2000, Nibras and Al Quso left Sanaa for Dubai on the way to Bangkok. They had divided the money between them, carrying about $9,000 in each pant pocket. Their travel agent had told them that they could get a visa to Singapore at the Bangkok Airport. However, this turned out to be false, and Nibras and Al Quso got stuck in Bangkok and checked into a hotel. They called a mutual friend back in Sanaa and explained the situation. On |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | January 7, 2000, Khallad went to the Kuala Lumpur Airport to fly to Singapore but was told he needed a visa in advance to enter Singapore. From the airport, he called his Yemeni contact, who informed him that Nibras and Al Quso had also been denied entry to Singapore and were waiting for instruction at their hotel in Bangkok. Khallad called them at their hotel and told them to stay put as he would come to them. Ali Soufan (the former FBI Special Agent, who had interrogated Al Quso) (KSA Ex. 238 (*The Black Banners*)) at 239-40. (As noted in the Responses to Plaintiffs Averment ¶¶ 1396 and 1399, Youssef cites *The Black Banners* in his report several times.)<br><br>Khallad returned to the apartment and told Al Hazmi and Al Mihdhar about his immediate need to go to Bangkok to retrieve the money. The two future hijackers then "decided to go there as well, reportedly because they thought it would enhance their own cover as tourists to have passport stamps from a popular tourist destination such as Thailand. With Hambali's help, the three obtained tickets for a flight to Bangkok and left Kuala Lumpur together" on January 8, 2000. KSA Ex. 163 (9/11 Rep.) 159; Pls. Ex. 155, (FBI Hijackers Timeline) at 52; Pls. Ex. 423 (Khallad Charge Sheet) at 4.<br><br>In Bangkok, Khallad made sure the two sets of terrorists did not meet, again showing how seriously Al Qaeda took operational compartmentation. KSA Ex. 163 (9/11 Rep.) 159. He got his money from Nibras and Al Quso, who got a ticket back to Yemen and left. Al Hazmi and Al Mihdhar stayed 8 days in Bangkok and flew to Los Angeles on January 15, 2000. Khallad stayed a few more days in Bangkok and flew to Karachi from there on January 20, 2000. KSA Ex. 238 (*The Black Banners*) at 240; KSA Ex. 163 (9/11 Rep.) 159; Pls. Ex. 155 (FBI Hijackers Timeline) at 52; Pls. Ex. 423 (Khallad Charge Sheet) at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thus, Al Hazmi and Al Mihdhar had planned to fly from Kuala Lumpur to Los Angeles, but changed their mind on January 7, 2000, and flew to Bangkok with Khallad because they believed that a stay in Bangkok would enhance their cover as tourists. They made their plans and reservations for their continued travel to Los Angeles on United Airline Flight 002 on January 7, 2000, at the very earliest. Khallad, who was with them, could not have known their flight information until that day as well. Accordingly, no one could have called Al Thumairy with the future hijackers' flight information in December 1999 because they had not yet made their final reservations at that time.<br><br>There is no evidence that ▮ went to the airport to pick up the hijackers or that he brought the hijackers to the mosque to meet Al Thumairy. All of the evidence is to the contrary. ▮ |
| 1405. | Plaintiffs' expert Youssef's report detailed the evidence corroborating this information, including that the hijackers attended an Al Qaeda meeting in Malaysia immediately before traveling to California; ▮ met the hijackers and brought them to meet | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy at the King Fahad Mosque their first day in Los Angeles ; the support, including lodging, that ▮ provided for the hijackers after they left their meeting with Thumairy; Bayoumi and Aulaqi's meetings with and support for the hijackers; and the relevant phone contacts among the various participants. Ex. 5, Youssef Rpt. 155, 160-70. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth in the Responses to Pls. Aver. ¶¶ 1400-1404, there is no evidence that the hijackers attended an Al Qaeda meeting in Malaysia immediately before traveling to California. They simply stayed over in Kuala Lumpur for three to four days initially on their way to California. However, they changed their plans and flew to Bangkok instead. From Bangkok, they eventually traveled to California a week later.<br><br>There is no evidence that ▮ met the hijackers at the airport. ▮<br><br>There is no evidence that the day ▮ met the hijackers outside the King Fahad Mosque was the hijackers' first day in Los Angeles. ▮<br><br>▮ There is no evidence that either Al Thumairy or Al Awlaki ever supported the hijackers. And there is no evidence that the referred phone calls were related to the hijackers. |
| 1406. | Plaintiffs' expert Youssef testified at his deposition that senior Al Qaeda operative and current Guantanamo detainee Bin Attash was likely the individual who made | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the phone call to Thumairy because Attash was in Malaysia at the time to attend a meeting with Hazmi and Mihdhar; had trained with both of them; and was Bin Laden's communications person. Ex. 105, Youssef Dep. 123:10-22. Youssef also stated based on his FBI knowledge that at the time Attash had access to fraudulent passports and could have easily bypassed the normal legal systems to enter the U.S. Ex. 105, Youssef Dep. 30:1-7. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Khallad was in Kuala Lumpur in December 1999 to get fitted with a better leg prosthesis at a local clinic. He did not meet with the future hijackers until January 4, 2000. He could not have known the flight information on the future hijackers' trip to LAX because they did not make their final plans until after January 7, 2000, as shown in the Response to Plaintiffs' Averment ¶ 1404 above. After January 8, 2000, Khallad and the hijackers were no longer in Kuala Lumpur but in Bangkok. Bin Laden never had a "communications person," as shown in the Response to Plaintiffs Averment ¶ 1396. As to the possibility of Khallad traveling to the U.S. on a fraudulent passport, Khallad was already traveling on a fraudulent passport, which was denied a U.S. visa in April 1999, as shown in the Response to Plaintiffs Averment ¶ 1400.<br><br>The FBI has asserted that, when Youssef worked in St. Louis and Southern California, he was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). The FBI also prevented Youssef from working on the 9/11 attacks despite his requests and despite the fact that the 9/11 investigation was the "largest and most comprehensive investigation ever conducted by the FBI" involving more than half the FBI's agents. Pls. Ex. 105 (Youssef Tr.) 124:7-127:18. Instead, during the 9/11 investigation, he was assigned to a job "cataloging documents as in putting an identifying number o[r] serial number on a document before storing the document" and he admitted that the job was not operational in nature. *Id.* at 128:20-129:2, 129:11-20. His opinions are baseless and reflect his lack of relevant expertise. |
| 1407. | Early in the morning on January 2, 2000, Bayoumi made two calls from his Mosque | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | office to Saudi Arabia at 4:54am (2 mins.) and 4:56am (6 mins.) followed by a call to Thumairy at his home at 5:06am (3 mins.) Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>The three phone calls were made from the Al Madina Mosque and anyone there had access to the line and could have made the calls. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 784:9-785:11. There is no evidence that Al Bayoumi made those calls. Nor is there any evidence about the substance of the calls.<br><br>Furthermore, Plaintiffs misidentify Al Thumairy as the recipient of the call made at 5:06 am to the number ███ 3362. The subscriber records for ███ 3362 list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and ███ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2.<br><br>Moreover, as set forth in the Response to Plaintiffs Averment ¶ 1404, the hijackers had not made their flight plans as of January 2, 2000 and so none of these call could be about the hijackers' travels. |
| 1408. | As Youssef's analysis determined, no other calls between Thumairy and Bayoumi had occurred at any time close to this early morning hour, demonstrating the urgency of the call, such that "[o]f their 43 calls in the records produced to date, there were only four other morning calls, and the earliest | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | other morning call was at 11:24 a.m." Ex. 5, Youssef Rpt. 156. | Plaintiffs Exhibit 14 is inadmissible hearsay and lacks authentication. *See* Objection Chart.<br><br>The three phone calls were made from the Al Madina Mosque and anyone there had access to the line and could have made the calls. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 784:9-785:11. There is no evidence that Al Bayoumi made those calls. Nor is there any evidence about what the substance of the calls was and no basis to assume that the calls were urgent.<br><br>Furthermore, January 2, 2000 was 25 Ramadan 1420, and may have been Laylat Al Qadr (the "Night of Power," or "Night of Destiny"). Laylat Al Qadr is the anniversary of the night of the revelation of the Quran, and it occurs on "one of the last ten nights of the month of Ramadan," which are "particularly holy." *See* Ex. 242 (Concise Encyclopedia of Islam, *Laylat al-Qadr*), at 243-44. On those nights, many Muslims stay up all night at the mosque to pray. Many congregants were at the Al Madina Mosque that night, and some may have called others to give their greetings. |
| 1409. | On January 4 - 5, 2000, Hazmi and Mihdhar arrived in Kuala Lumpur, Malaysia for their meetings with Bin Attash. Ex. 155, FBI Hijackers Timeline at 52 (Mihdhar takes January 5 flight from U.A.E. to Malaysia); *See* 9/11 Commission Report at 181. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 155 is inadmissibly hearsay. *See* Objections Chart.<br><br>The cited material does not support Plaintiffs' assertion of fact that Al Hazmi and Al Mihdhar went to Kuala Lumpur for meetings with Khallad. They were there for different missions. Khallad was casing and exploring the weaknesses of airport security for the East Asia portion of the planes |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | operation, while Al Hazmi and Al Mihdhar were on their way to Los Angeles. Jihadi terrorists liked to use Kuala Lumpur because there was no visa requirement, and the Malaysian authorities had a reputation of lax security for the jihadi terrorists. KSA Ex. 163 (9/11 Rep.) 158. As mentioned in the Response to Plaintiffs Averment ¶¶ 1395 and 1396, the planning of the 9/11 operation occurred at the crucial planning meeting in Qandahar in early Ramadan 1420 (mid-December) and immediately afterward in Karachi, with KSM, not in Kuala Lumpur. |
| 1410. | On January 4, 2000, Thumairy used his cell phone to make six calls to the Travelodge in Culver City, CA between 3:19am and 3:44pm. Late that evening, Thumairy placed a call to Anwar Aulaqi's home number at 11:00pm (1 min.) followed by a call to the Al- Ribat Mosque where Aulaqi was the Imam at 11:04pm (3 mins.). Ex. 2, EO 0608. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Furthermore, January 4, 2000 was 27 Ramadan 1420, and may have been Laylat Al Qadr (the "Night of Power," or "Night of Destiny"). Laylat Al Qadr is the anniversary of the night of the revelation of the Quran, and it occurs on "one of the last ten nights of the month of Ramadan," which are "particularly holy." *See* Ex. 242 (Concise Encyclopedia of Islam, *Laylat al-Qadr*), at 243-44. On those nights, many Muslims stay up all night at the mosque to pray, which is consistent with the time of the calls. |
| | | There is no evidence that any of these calls were related to the future arrival of the hijackers in Los Angeles. On that day, the future hijackers had not yet made their reservations for their flight to Los Angeles as the Response to Plaintiffs Averment ¶ 1404 shows. |
| 1411. | About an hour after Thumairy's calls to Aulaqi, on Wednesday, January 5, 2000, ▉▉▉▉▉▉▉▉ telephoned Thumairy at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 12:12am (8 mins.) Five minutes into their eight-minute call, ▮ phoned Omar Al Bayoumi at 12:17am (2 mins.) This means there was a conference call among the three men lasting 2-3 minutes. Ex. 2, EO 0609, Ex. 566, FBI 011752 at 11754. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 2JJ (EO 609-UPDATED) and 566 are inadmissible hearsay. *See* Objections Chart.<br><br>There is no admissible evidenec reflecting any calls between ▮ and Al Bayoumi on January 5, 2000. Instead, Plaintiffs cite an electronic communication that is hearsay and that has numerous other verifiable errors. Pls. Ex. 2JJ (EO 603-615-UPDATED). For instance, it states that "On January 13, 2000, on January 15, 2000, Alhazmi and Almihdhar arrived at Los Angeles International Airport at 13:27 on United Airlines flight 2." *Id.* at EO 609-UPDATED, EO 621-UPDATED. Only the second date in this quote is correct.<br><br>Moreover, the document shows that ▮ was on a different phone call at the same time as the purported call with Al Bayoumi causing the author to question "is this time correct?" next to the description of this call. Pls. Ex. 2JJ (EO 609-UPDATED).<br><br>There is no support for the assertion that this was a conference call or even that ▮ had three-way calling enabled on his home phone. There is no evidence that ▮ made any other three-way calls.<br><br>There is also no evidence that these calls (if they occurred) were related to the arrival of the hijackers in Los Angeles, more than 10 days in the future. As of January 5, the hijackers had not yet made their reservations for their flight to LAX as the Response to Plaintiffs Averment ¶ 1404 shows. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1412. | The late-night timing of the call demonstrates the urgency of the men to make the final preparations for Hazmi and Mihdhar to travel to the U.S., and for Bayoumi to visit ███ at the Saudi Consulate and Thumairy at the King Fahad Mosque. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs cite nothing for this assertion.  It also contains attorney argument to which no response is required.

In any event, during Ramadan, pious Muslims stay up late praying and eating while resting during the day when they must fast.  As explained in Responses to Plaintiffs Averment ¶¶ 1408 and 1410, this is especially true during the last ten nights of the month.

Consistent with that religious and cultural practice, phone records during Ramadan 1420H shows that a disproportionate number of calls were made in the middle of the night.  This late-night calling therefore does not demonstrate any sense of "urgency" at all.  Nor is there any evidence relating these calls to the arrival of Al Hazmi and Al Mihdhar at LAX more than 10 days in the future.

None of these calls could have been about the final preparations for Al Hazmi and Al Mihdhar to travel to the United States.  As of January 5, 2000, the hijackers had not yet made their reservations for their flight to LAX as Response to Plaintiffs Averment ¶ 1404 shows. |
| 1413. | This contact evidence that Bayoumi and ███ had a relationship prior to and apart from their in-person meeting on February 1, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 2000 at the Saudi Consulate and at the King Fahad Mosque. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in Response to Plaintiffs Averment ¶ 1412 there is no admissible evidence that ▮ called Al Bayoumi on January 5, 2000, and even the hearsay statement cited by Plaintiffs questions the accuracy of this assertion.<br><br>Both Al Bayoumi and ▮ testified that the two men had no relationship and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) ▮<br><br>There is no admissible evidence to the contrary. |
| 1414. | The FBI concluded that "[c]ommunications analysis of telephone number associated with ▮ show contact with multiple individuals who assisted Hazmi and Mihdhar…." Ex. 566, FBI011752 at FBI 11754. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI does not make any conclusions in Plaintiffs Exhibit 566, which is an Operation Encore update. It states theories investigated as part of Operation Encore. The final conclusion of the FBI in closing Operation |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1415. | In addition to Bayoumi, the FBI recorded that ▮▮▮ had significant phone calls with ▮▮▮▮▮, who would host the two hijackers at his apartment. Ex. 566, FBI 11757. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI does not make any conclusions in Plaintiffs Exhibit 566, which is an Operation Encore update. It states theories investigated as part of Operation Encore. The final conclusion of the FBI in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11).<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that ▮▮▮ hosted the hijackers at his apartment when they arrived in Los Angeles in January 2000, as discussed in the Responses to Section XX.C of Plaintiffs' Averment. |
| 1416. | On January 6, 2000, just after midnight (recorded by the FBI as "00:53"), Thumairy used his cell to called Bayoumi's cell (5 mins.). Ex. 2, EO 2757. Later that day Bayoumi used his Mosque office phone to call Thumairy's cell at 6:15pm (1 min.); Thumairy's cell called Bayoumi's cell at 6:21pm (1 min.); and Bayoumi used his Mosque office phone to call Thumairy at 6:30pm (4 mins.). Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2X (EO 2757) is inadmissible hearsay. Plaintiffs Exhibits 12A (Phone calls Nov. 1999 – Mar. 2000) and 12B (Calls between Bayoumi and Thumairy) are improper summary exhibits. *See* Objections Chart.

Plaintiffs incorrectly claim that ▮▮▮▮-3362 is Thumairy's cell phone. Thumairy did not recall this number, which is subscribed to Faisal Al Muhanna from July 31, 1997 to February 27, 2000, KSA Ex. 136 (Muhanna Ex. 671), and registered to ▮▮▮▮ from June 10, 2000 to April 29, 2002, KSA Ex. 137 (Subscriber Information for ▮▮▮-3362). In addition, Plaintiffs rely solely upon a hearsay FBI memorandum as support that the two calls from the -3362 number even transpired. *See* Pls. Ex. 12B (citing Pls. Ex. 2X (EO 2757 in REF 1 column). None of the phone records for Al Bayoumi and Al Thumairy show either of these calls.

There is also no evidence that Al Bayoumi placed the calls from the mosque phone. Anyone at the mosque had access to the line and could have made the calls. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 784:9-785:11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is also no evidence that these two calls were related to the arrival of the hijackers in Los Angeles, more than 10 days in the future. On January 6, 2000, the hijackers had not yet made their reservations for their flight to LAX as the Response to Plaintiffs Averment ¶ 1404 shows. |
| 1417. | On January 6, 2000, using his Mosque office phone, Bayoumi called Thumairy and then placed a call at 7:02pm (3 mins.) to a number in Columbus, Ohio of the husband of Jaithen's niece. Ex. 5, Youssef Rpt. 157 n. 641 & 642; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 495, FBI 001453 at 1455 (Trans Union information for phone number of husband of Jaithen's niece). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that Al Bayoumi placed the calls from the mosque phone. Anyone at the mosque had access to the line and could have made the calls. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 784:9-785:11.<br><br>Plaintiffs incorrectly claim that the recipient of the call at 7:02pm (████ 3362) was Al Thumairy. This number was registered to Faisal Al Muhanna from July 31, 1997 to February 27, 2000, KSA. Ex. 136 (Muhanna Ex. 671), and registered to ████████ from June 10, 2000 to April 29, 2002, KSA Ex. 137 (Subscriber Information for ████-3362).<br><br>There is also no evidence that Al Bayoumi knew anyone in Columbus, Ohio. Only the cited call and the one cited in Plaintiffs' Aver. ¶ 1419 appear in the phone records spanning several years. Even Plaintiffs' expert Youssef states in note 642 of his report, "It is possible that Jaithen |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | used Bayoumi's phone to call his niece, or that Jaithen travelled to Columbus to visit his niece . . . and that Bayoumi or Mersal called Jaithen in Columbus." <br><br> As set forth above, at the time of this call, Al Jaithen was in Columbus, Ohio participating in the Ramadan imamate program. Pls. Ex. 96 (Jaithen Tr.) 85:18-86:19, 94:4-8, 123:3-16, 158:14-159:4, 161:5-10, 166:3-6. <br><br> Plaintiffs Exhibit 495 (FBI 1453-1455) is the Al Madinah Mosque telephone bill and does not show the Trans Union information for the phone number of the husband of Al Jaithen's niece. |
| 1418. | Ramadan 1420 ended at sunset on January 7, 2000. Ex. 14, 1420 Hijri Calendar. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 14 is inadmissible hearsay and lacks authentication. *See* Objection Chart. <br><br> To the extent a response is required, this is undisputed. |
| 1419. | On January 7, 2000 at 7:29 pm (2 mins.), Bayoumi made a call from his Mosque office phone to the same number in Columbus, Ohio of the husband of Jaithen's niece. Ex. 5, Youssef Rpt. 157, n. 641; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 496, FBI 001456 at 01459. At his deposition, Jaithen claimed "I don't know | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Omar al-Bayoumi." Ex. 96, Jaithen Dep. 227:2-5. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |
|  |  | Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |
|  |  | There is no evidence that Al Bayoumi placed the calls from the mosque phone. Anyone at the mosque had access to the line and could have made the calls. Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 784:9-785:11. |
|  |  | There is also no evidence that Al Bayoumi knew anyone in Columbus, Ohio. Only the cited call and the one cited in Plaintiffs Aver. ¶ 1417 appear in the phone records spanning several years. Even Plaintiffs' expert Youssef states in note 642 of his report, "It is possible that Jaithen used Bayoumi's phone to call his niece, or that Jaithen travelled to Columbus to visit his niece . . . and that Bayoumi or Mersal called Jaithen in Columbus." |
|  |  | As set forth above, at the time of this call, Al Jaithen was in Columbus, Ohio participating in the Ramadan imamate program. Pls. Ex. 96 (Jaithen Tr.) 85:18-86:19, 94:4-8, 123:3-16, 158:14-159:4, 161:5-10, 166:3-6. |
|  |  | Al Jaithen testified that he does not recall Al Bayoumi. This is not surprising given the very limited interaction between the individuals more than 22 years before Jaithen's deposition. |
| 1420. | On January 8, 2000, the Eid holiday, Hazmi and Mihdhar traveled from Kuala Lumpur, Malaysia to Bangkok. Ex. 155, FBI Hijackers Timeline at 52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 155 is inadmissibly hearsay. *See* Objections Chart. |
| **XIX.C.** | **The final preparations for the hijackers' arrival** | There is no evidence that Al Thumairy or Al Bayoumi made any "final preparations for the hijackers' arrival." |
| 1421. | On **Saturday, January 8, 2000**, Hazmi and Mihdhar traveled from Kuala Lumpur, Malaysia to Bangkok, continuing their preparations to enter the United States. Ex. 155, FBI Hijackers Timeline at 52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 155 is inadmissibly hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this is undisputed. |
| 1422. | On **Sunday January 9, 2000**, just six days before Hazmi and Mihdhar took their flight in to LAX, Bayoumi took a trip from San Diego to Los Angeles. Bayoumi stayed overnight together with two other people at a hotel in Culver City, CA. Hotel records recovered by the FBI showed that Bayoumi checked in a total of three guests (No. in Party: 3) to a room at the Half Moon Motel (address: ▓▓▓▓▓▓▓▓▓▓▓., Culver City, CA). Ex. 525, FBI 004009- 004010. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. There is however, no evidence of any connection between this overnight stay and the hijackers' arrival. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1423. | Bayoumi filled out the Motel registration card in his own handwriting and paid for the room on his bank debit card. He filled in his address as ▮▮▮▮▮▮▮▮," which was his actual current address in January 2000. The time of Bayoumi's check-in was not recorded on the Motel's record. Ex. 120, Bayoumi Dep. 355:1-8; Ex. 512, FBI 002805-002807 at 002806 (Bank of America record for "Half Moon Motel Culver City CA" for $47.04"); Ex. 525, FBI 004009-004010 at 004009 (Bayoumi Half Moon Motel guest registration card showing rate plus tax of $47.04 and "3" as "No. in Party") (Bayoumi Dep. Ex. 702). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. There is however, no evidence of any connection between this overnight stay and the hijackers' arrival. |
| 1424. | The Half Moon Motel where Bayoumi stayed was within walking distance of the King Fahad Mosque. It was also a just a one-minute walk from the Deano's Motel (address: ▮▮▮▮▮▮▮▮., Culver City, CA) where, as described below, Hazmi, Mihdhar, and Mohdar Abdullah would stay in June 2000 when they visited Los Angeles and met with Thumairy. Ex. 2, EO 0896 (2004 FBI report on its canvassing of "hotels and motels within walking distance of the King Fahad Mosque," including Deano's and the Half Moon Motel). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2O (EO 896) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this is undisputed. However, there is nothing connecting Al Bayoumi's stay at the Half Moon Motel on January 9, 2000, and the hijackers staying at Deano's Motel on June 9, 2000. The two events are five months apart and they took place at different motels. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1425. | Bayoumi videotaped six minutes from his January 9, 2000 trip to Los Angeles which was recovered by the MPS and produced in this litigation. Ex. 10I, MPS899-CLIP Video Exhibit. Plaintiffs prepared a certified transcript and translation of the tape. Ex. 10I-TR, MPS899-CLIP-TR Video Transcript. The video shows that Bayoumi was in Los Angeles with two Saudi men: Khalid Al Yafai and Hisham Al Kaaki. As detailed below, Bayoumi tasked Yafai to assist Hazmi and Mihdhar in their early weeks in the United States and Yafai attended the welcome party for the hijackers. Bayoumi would call Yafai 27 times from January 10 to February 20, 2000, when Yafai travelled to Saudi Arabia – and Yafai would return to San Diego in July 2000. Ex. 12N (Bayoumi calls to Khalid Al Yafai and Broadway Pizza); Ex. 11N Video Screenshots at 4 (image of Yafai in July 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 10I (MPS899-CLIP) could not have been filmed on January 9, 2000, as Plaintiffs allege. The video shows Al Bayoumi, Khalid Al Yafai, and Hisham Al Kaaki visiting Rodeo Drive and other sites during an evening. There is no date on the video, and none of the three people mentions a date. Around one minute into the clip, Al Kaaki said, "We took everything from the Saudi National Consulate with us in the trunk of the car." Pls. Ex. 10I-TR (MPS899-CLIP-TR). This could not have happened on January 9, 2000, because it was a Sunday, and the Consulate in Los Angeles is closed on Saturdays and Sundays.<br><br>Moreover, Plaintiffs speculate that the three Saudis shared one room at the Half Moon Motel that evening, as the receipt was for just one room, but a party of 3. Pls. Ex. 525 (FBI 409). Yet, Al Bayoumi's cell phone records purportedly summarized in Plaintiffs Exhibit 12N (Chart of Bayoumi calls to Al Yafai and Broadway Pizza), show that Al Bayoumi called Khalid Al Yafai's residence that same evening at 11:41 PM for 12 minutes, which would make no sense if the three men were together.<br><br>Al Bayoumi testified that this trip must have been with his family because he did not travel with anyone else. Pls. Ex. 120 (Bayoumi Tr.) 356:2-22. There is no evidence that this family trip had anything to do with the hijackers.<br><br>There is no evidence that Al Bayoumi ever tasked Al Yafai (or anyone else) to assist Al Hazmi or Al Mihdhar. Al Yafai attended the party held |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | in his honor. As seen in the video of that party, Al Yafai received a personal appreciation plaque. The party is addressed in the Responses to Section XXII of Plaintiffs' Averment.<br><br>Plaintiffs Exhibit 12N (Bayoumi calls to Al Yafai) is an improper summary exhibit. Plaintiffs Exhibit 12N misattributes to Bayoumi six calls that were made from a publicly available phone line at the Al Medinah Mosque to that same number. The phone line was shared by two office telephones at the mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the mosque – who made any of those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15.<br><br>Plaintiffs Exhibit 12N (Bayoumi calls to Al Yafai) contains two calls on January 15, 2000 at 9:42 pm and 10:10 pm that misstate the recipient's number. Plaintiffs Exhibit 12N asserts that both calls were made to ███6264, when phone records show that the calls were made to ███0682. *See* KSA Ex. 115 (FBI 3225). Plaintiffs Exhibit 12N also repeats a call on August 1, 2000 at 1:39 pm, when telephone records establish that only a single call was made. *See* KSA Ex. 243 (FBI 3286).<br><br>After removing these improperly included calls, Plaintiffs Exhibit 12N (Bayoumi calls to Al Yafai) shows that Al Bayoumi's cell phone made 23 calls from January 10 to February 20, 2000, to a number that Plaintiffs associate with Al Yafai based upon several hearsay sources. No subscriber records were produced to verify that the number belonged to Al Yafai. |
| 1426. | The tape shows that Bayoumi arranged for the three men to go to the Consulate; Kaaki states that "we took everything from the Saudi National Consulate with us in the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | trunk of the car." Ex. 10I, MPS899-CLIP Video Exhibit at 01:06. In addition, the men went to the King Fahad Mosque, as they discuss attending a prayer led by Imam Shuaib, the MOIA propagator at the Mosque working under Thumairy. *Id.* at 04:26. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 10I (MPS899-CLIP) could not have been filmed on January 9, 2000, as Plaintiffs allege. The video shows Al Bayoumi, Khalid Al Yafai, and Hisham Al Kaaki visiting Rodeo Drive and other sites during an evening. There is no date on the video, and none of the three people mentions a date. Around one minute into the clip, Al Kaaki said, "We took everything from the Saudi National Consulate with us in the trunk of the car." Pls. Ex. 10I-TR (MPS899-CLIP-TR). This could not have happened on January 9, 2000, because it was a Sunday, and the Consulate in Los Angeles is closed on Saturdays and Sundays.<br><br>There is no evidence from the video clip that the three visitors from San Diego prayed at King Fahad Mosque that day. They did not discuss attending a prayer led by Imam Shuaib. Instead, they talked about a novel by Egyptian writer Naguib Mahfouz and referred to one page of his book. Al Bayoumi claimed it was page 142, but Al Yafai responded, "It's 163, according to what Imam Shuaib said!" (Pls. Ex. 10I (MPS899-CLIP) at about four and a half minutes into the clip). This is the only time Imam Shuaib is mentioned in the clip. Contrary to Plaintiffs' assertion, they did not discuss attending a prayer led by Imam Shuaib.<br><br>There is also no evidence that Shuaib worked under Al Thumairy. |
| 1427. | Bayoumi coordinated his trip to LA on January 9, 2000 with Fahad Al-Thumairy. Bayoumi used his cell phone at 12:21 p.m. (1 min.), to call Thumairy's cell phone. Ex. 515, FBI 003221 at 23. Bayoumi's call to Thumairy shows that his stay was likely related to Bayoumi's trip to Los Angeles | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | since it occurred on the same day. Ex. 5, Youssef Rpt. 158. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth above, Plaintiffs Exhibit 10I (MPS899-CLIP) could not have been filmed on January 9, 2000. Moreover, there is no evidence that Al Bayoumi coordinated this trip with Al Thumairy. The short duration of the cited call suggests that no one picked up the call. Nor is there any evidence that the two ever met that day. |
| 1428. | On the same night that Bayoumi paid for a room at the Half Moon Motel for him, Yafai, and Kaaki, Bayoumi also checked into another room at a different Culver City hotel that both Bayoumi and Thumairy knew well: the Travelodge. Bayoumi had been to the Travelodge just three weeks earlier, on December 20, 1999, together with MOIA propagator Jaithen. Thumairy told the FBI he liked the Travelodge and made reservations there for Mosque visitors. Ex. 154, FBI 000001-000006-REV2021 at 04. Thumairy had extensive phone contacts with someone at the Travelodge in the days immediately preceding Bayoumi's January 9 visit. On Tuesday January 4, Thumairy called ███-1111, the number for the Travelodge, six times from his cell phone in a single day, Ex. 2, EO 0620-0621, indicating that he was connecting with a hotel guest there. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 2JJ (EO 620-621-UPDATED) and 154 (FBI 1-6) are inadmissible hearsay. *See* Objections Chart. Plantiffs Exhibit 154 may not be proffered for impeachment. *See* Objections Chart.<br><br>It is undisputed that on January 9, 2000, there was also a registration for Al Bayoumi at another hotel, the Travelodge, in Culver City, California. There is no evidence that Al Thumairy knew Al Bayoumi had that registration, or attempted to reach Al Bayoumi on this trip.<br><br>The phone calls referenced in this paragraph were made by a number registered to Faisal Al Muhanna, not Al Thumairy. Pls. Ex. 2JJ (EO 620-621-UPDATED); KSA Ex. 136 (Muhanna Ex. 671). There is no evidence that the calls were made by Al Thumairy at all. In any event, these were all calls 5 days before Al Bayoumi's visit to the Travelodge and there is no evidence that the calls were in any way related to Al Bayoumi's visit. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1429. | The circumstances show that Bayoumi's January 9, 2000 visit to the Travelodge had an operational purpose involving Thumairy. An incoming call on Bayoumi's cellphone at 8.24 p.m. was likely made to confirm the meeting approximately one hour later. Bayoumi used his room at the Travelodge for a short time: he checked into a third-floor room at 9:28 p.m. and checked out at 9:50 p.m., 22 minutes later. Ex 526, FBI 004011. This suggests he held a meeting in the room, likely with Thumairy. The check-in record shows that Bayoumi gave the Travelodge his old "█████████ address, FBI 4011, while 3 weeks earlier Bayoumi used his current "██████████ ███" address to register with Jaithen. Ex. 526, FBI004011; Ex. 665, FBI004012; Ex. 527, FBI004013. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The evidence shows that Al Bayoumi did not check in to the Travelodge and never used it. A comparison of the two computer generated registration records at the Travelodge by Al Bayoumi (his December 20, 1999, registration for Al Jaithen (Pls. Ex. 665 (FBI 4012-4013), and the present one on January 9, 2000 (Pls. Ex. 526 (FBI 4011)) shows that, although Al Bayoumi registered, he never was charged anything or paid anything for his stay, indicating that he never used the hotel for anything.<br><br>There is also no evidence that the incoming call on Al Bayoumi's cellphone at 8:24 PM from an unknown number had anything to do with the Travelodge registration. There is certainly no evidence to suggest that it was a confirmation for a meeting an hour later, since all evidence shows that Al Bayoumi did not use a room at the Travelodge.<br><br>The assertion that this call had to do with a meeting "likely with Thumairy" that did not take place is pure speculation. |
| 1430. | Bayoumi had another task to fulfil on his January 9 trip: getting calling cards. At 5.42 p.m. Bayoumi used his cell phone to call ████████-0034 (1 min.), which the FBI identified as the number for 9278 Communications (subscribed to ████████████), "a business that sells calling cards." Ex. 2, EO 3676-77. Phone | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | records show that Bayoumi made a series of calls to 1-800 numbers associated with calling cards, beginning at 10:53 p.m. into the early morning hours of January 10 (last call at 3.28am). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The FBI assessed that Bayoumi was "either checking the minutes" on the cards, "or learning how to use them by listening to the automated prompts." Ex. 2, EO 0631. Bayoumi was likely initiating the account balances and setting up his associate Yafai to use the cards. | Plaintiffs Exhibit 2DD (EO 3676) and Plaintiffs Exhibit 2JJ (EO 631-UPDATED) are inadmissible hearsay. Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Objections Chart.<br><br>Undisputed that Al Bayoumi called a number associated with a business that sold calling cards and later in the evening made a series of calls to a 1-800 number associated with calling cards. There is no evidence that Al Bayoumi was setting up anyone, including Al Yafai, to use the cards. There is no evidence that any of these calls had to do with the hijackers.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) incorrectly lists 15 calls made from January 9, 2000 through the morning of January 10, 2000, from Al Bayoumi's cell phone to the number ███ 1373. The phone records show that the first 3 calls are correctly identified in Plaintiffs Exhibit 12A as being made to ███ 1373. *See* Pls. Ex. 515 (FBI 3223-3224). However, the remaining 12 calls referenced in Plaintiffs Exhibit 12A were actually made to ███ 0612 rather than ███ 1373. *See id.*<br><br>There is no evidence, and plaintiffs fail to cite any, that Al Bayoumi tasked al-Yafai to assist the hijackers. |
| 1431. | Bayoumi stated at his deposition that he did not know and could not remember why he was in Culver City, CA on January 9, 2000. Ex. 120, Bayoumi Dep. 344:23-345:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Bayoumi testified that he could not remember why he went to Los Angeles on January 9, 2000, but testified that if he stayed in a hotel it would have been with his family. Pls. Ex. 120 (Bayoumi Tr.) 356:2-10.<br><br>It is unsurprising that Al Bayoumi could not recall details of a trip that occurred more than 20 years before his deposition. |
| 1432. | Bayoumi initially claimed that he traveled "[w]ith my family…" but had no recollection of being at the Travelodge ("#Guests: 1") or at the Half Moon Motel ("No. in Party: 3"). Ex. 526, FBI 004011; Ex. 525, FBI 004009; Ex. 120, Bayoumi Dep. 344:20-22; 356:2-6. Bayoumi insisted: "I do know that I travel with my family. I do not travel with anyone else." Ex. 120, Bayoumi Dep. 356:2-10. Yet Bayoumi's family consisted of five people at the time. Ex. 120, Bayoumi Dep. 356:2-357:2. When confronted with the fact that he had stayed overnight in a group of three persons, Bayoumi suggested he often took his children on his own "for some amusement park entertainment." Ex. 120, Bayoumi Dep. 356:2-357:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Bayoumi provided this testimony. It is unsurprising that Al Bayoumi could not recall details of a trip that occurred more than 20 years before his deposition. |
| 1433. | Yafai was questioned by the 9/11 Commission but, like Bayoumi, he withheld information about the Los Angeles trip: he claimed that he "went by himself" and visited the Saudi Consulate "to deal with a visa issue" and also visited the King Fahad | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque – but told the Commission that he couldn't remember who he met on the trip. Ex. 308, MFR 9/11 Commission Interview of Yafai, February 24, 2004 at 2, 7-8. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 308 (9/11 Commission Memorandum for the Record: Interview of Khalid Abdulrab al Yafai (Feb. 24, 2004)) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that Al Yafai knowingly withheld any information from the 9/11 Commission. |
| 1434. | On **January 10, 2000**, MOIA propagator Abdullah al Jaithen arrived back in Saudi Arabia from the U.S. Ex. Ex. 232, KSA 9550. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1435. | On **Tuesday, January 11, 2000**, Bayoumi used his cell phone to call the San Diego number for Saud Al Sudairy – the brother of Mutaeb Al Sudairy – at 3:07 p.m. (2 mins.). Bayoumi had the number for Saud Al Sudairy in his handwritten address book and his typed phone book. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12AA, MPS738_49; Ex. 12BB, MPS688_9; Ex. 522, FBI 3510 (Saud Alsudairy was the brother of Mutaeb and a Saudi Embassy official). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. Plaintiffs Exhibits 12AA (MPS 738) and 12BB (MPS 688) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 522 appears to be a financial receipt for Nawaf Al Hazmi and has nothing to do with Saud Al Sudairy or Al Bayoumi.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>Plaintiffs cite no evidence that the person Al Bayoumi called, a number in the United States ███ 0089) is Saud Al Sudairy, Mutaeb Al Sudairy's brother. Mutaeb Al Sudairy testified that his brother Faisal Al Sudairy worked at the Consulate in Los Angeles. Pls. Ex. 119 (Sudairy Tr.) 16:1-20:1. There is no evidence that Mutaeb Al Sudairy's other brother was in the United States at all or that this number belongs to him. |
| 1436. | The call to Saud Al Sudairy was followed by a call at 3:10 p.m. (1 min.) to San Diego student ███. This is the first known call from Bayoumi to ███ in the records that have been produced. Ex. 12Q (Bayoumi calls to ███). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's January 11 cell call to ▮ comes after the December 27 – 29, 1999 phone circle that included a flurry of 8 calls from Thumairy in Los Angeles to ▮ in San Diego. Ex. 5, Youssef Rpt. 159; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). As addressed later, ▮ was invited by Bayoumi to the welcome party for the hijackers and ▮ told the FBI that Bayoumi asked him to help Hazmi and Mihdhar. Ex. 455, FBI 000032-38 at 35-36. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 455 (FBI 32-38) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibits 12A (Phone calls Nov. 1999 – Mar. 2000) and 12Q (Phone chart of Bayoumi calls to ▮) are improper summary exhibits.<br><br>The FBI provided records for Al Bayoumi's cell phone starting on January 9, 2000. It is undisputed that Al Bayoumi's cell phone called the ▮ number, a number that Plaintiffs associate with ▮ based upon several hearsay sources, on January 11, 2000. No subscriber records were produced to verify the number belonged to ▮ The January 11, 2000 call to the number associated with ▮ comes two days after the start date of those records. It is not possible to determine if this was the first known call to that number.<br><br>▮▮▮▮▮▮▮▮▮<br><br>As shown in the Response to Plaintiffs Averment ¶¶ 1389 and 1393, Al Thumairy's calls on December 27-29, 1999, did not form a phone circle. The gathering honoring Al Yafai and Sheikh Abdulrahman Barzanjee is addressed later in Section XXII of Plaintiffs' Averment. There is no evidence that this call to ▮ is related to the 9/11 hijackers or their arrival. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1437. | The phone records show that Bayoumi also called ▇▇ in February 2000 (4 calls) and March 2000 (2 calls) during the time that ▇▇ was providing support to the hijackers, and a call was placed in March 2000 from ▇▇ phone to the number for the Al Qaeda operations center in Yemen. Ex. 5, Youssef Rpt. 159. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

This paragraph repeats the assertions of Response to Plaintiffs Averment ¶ 1383, incorrectly stating that ▇▇ phone called the number for the Al Qaeda operations center in Yemen in March 2000.

On March 2, 2000, ▇▇ residential telephone twice called a Yemeni number. The FBI found this contact significant because the Yemeni number was known to have been used by Al Qaeda operatives. A suicide bomber of the August 7, 1998, bombing of the U.S. Embassy in Nairobi had unexpectedly survived the attack and immediately called this number. It was subscribed by Ahmad Al Hada, who was also Khalid Al Mihdhar's father-in-law. Pls. Ex. 82 (CIA_267).

Notably, at the time of the two March 2, 2000 calls, it appears that the number of Al Mihdhar's father-in-law was no longer an Al Qaeda's communications hub in Yemen as bin Laden had stopped using it in August 1998. *See* KSA Ex. 167 (Sageman Rep.) 497. Even the FBI acknowledged that the "contacts on 3/2/00" were not with an "al Qaeda communications hub in Yemen" but "with Yemeni phone of Mihdhar's father-in-law." Pls. Ex. 2QQ (EO 2812).

The FBI interviewed ▇▇ and, according to the summary (which is hearsay), he said that Al Mihdhar had used his telephone to make a call to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Yemen on two occasions. The first time, Al Mihdhar paid him in cash for the call, but the second call was unauthorized and ▓▓▓ got upset with his roommate, whom he believed had made the call. Pls. Ex. 455 (FBI 34). |
| 1438. | On **Wednesday January 12, 2000**, Thumairy used his home phone to call Anwar Al Aulaqi at home at 9:40 (3 mins.) Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). This is the last of a series of 5 calls made by Thumairy to Aulaqi (including one call to the Al Ribat Mosque) between December 18, 1999 and January 12, 2000. Ex. 5, Youssef Rpt. 159. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>To the extent a response is required, it is undisputed that Al Thumairy called Al Awlaki on January 12, 2000, right after Eid Al Fitr. There is no evidence that this call had anything to do with the hijackers. |
| 1439. | On **Thursday, January 13, 2000**, Thumairy made two calls from his home to ▓▓▓ at home at 9:38-9:41 p.m (3 mins.) and 9:47-9:52 p.m. (5 mins.) Ex. 5, Youssef Rpt. 159; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). These calls continue the unique group of calls from Thumairy to ▓▓▓ that would culminate on | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | January 15, 2000 with the arrival of the hijackers. Ex. 5, Youssef Rpt. 159. | Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that these two calls had anything to do with the hijackers. Indeed, during the entire time that the hijackers were in Los Angeles (January 15, 2000 to February 3, 2000), there is only one call between ▮ and Al Thumairy indicating that the two were not working together to assist the hijackers.<br><br>█████████████████ |
| 1440. | Plaintiffs' expert Youssef concluded that the timing calls support his opinion that the Saudi government officials at the Embassy and in California, together with Anwar Al Aulaqi, were having discussions about their final preparations for the arrival of the Al Qaeda operatives. Ex. 5, Youssef Rpt. 159. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is inadmissible hearsay. *See* Objections Chart.<br><br>As set forth above, there is also no evidence, and Plaintiffs fail to cite any, that any of these calls were related in any way to the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XIX.D. | **Al Qaeda used meticulous preparation and would only have sent Hazmi and Mihdhar to California with a verified support structure to receive them and provide support to them.** | There is no support for this assertion. As detailed below, there was no local support network for the hijackers in California. |
| 1441. | U.S. intelligence and law enforcement found that Al Qaeda worked routinely with other like-minded groups such as Al Gama'a, AIAI, and Jemaah Islamiah, to achieve the specific geographical, logistical, and tactical goals necessary for each operation. The CIA found that Al Qaeda had a wide network in some 60 countries," "relationships with sympathetic groups and individuals," and "exploitation of contacts in certain Islamic relief organizations." Ex. 80, CIA 0001-0016 at 0002 (CIA Analytic Report produced in EO production entitled: "How Bin Ladin Commands a Global Terrorist Network," January 27, 1999). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The quotes in this paragraph come from a January 1999 CIA intelligence report, written just months after the East Africa Embassies' bombings and before Al Qaeda ever tried to conduct any operations in the West. Pls. Ex. 80 (CIA_1-16). As discussed in the Sageman report, this early assessment is incorrect. *See* KSA Ex. 167 (Sageman Rep.) 25-133. At the time, Al Qaeda did not have a wide network in some 60 countries and did not rely on local groups for operational support except for Jemaah Islamiyah. *Id.* at 252-53 (discussing cooperation between Al Qaeda and Jemaah Islamiyah and that the assistance provided by Jemaah Islamiyah was not assistance provided by a separate non-Al Qaeda network, since the groups were deeply intertwined. "Nowhere else in the world did such a collaboration exist.") . |
| 1442. | A CIA report of November 2000 found that Al Qaeda used detailed advance planning and was highly adaptable to the requirements of each specific mission, depicting it as a "a highly skilled, resilient network with a wide range of methods of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | attack at its disposal." Ex. 81, CIA 0017-36 at 19 (CIA Analytic Report produced in EO production entitled: "Bin Laden's Terrorist Operations: Meticulous and Adaptable," Nov. 2, 2000). The CIA concluded that Al Qaeda observed "sound operational practices, making use of meticulous contingency planning completed far in advance of an operation;" Ex. 81, CIA 0017-36 at 19. The CIA determined that Al Qaeda carried out the 1998 Embassy bombings using "the resources of a potent local network in place for almost a decade." The CIA found that separate plots in Canada and Jordan that "attest to Bin Ladin's success in enlisting the aid of more loosely organized Sunni extremist networks." Ex. 81, CIA 0017-36 at 19, 29, 31. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 81 (CIA_17-36) inaccurately lumps together different terrorists groups into one, labeling it Al Qaeda. For instance, the CIA attributed the Millennial attacks in Jordan and Canada (Ahmed Ressam's plot against LAX) to Al Qaeda. *See* Pls. Ex. 81. It is now known that they were carried out by the Khalden group, headed by Abu Zubaydah, who led a rival group at the time. KSA Ex. 167 (Sageman Rep.) 451. |
| 1443. | The 9/11 Commission found that when Hazmi, Mihdhar, and Attash travelled to Malaysia for their meetings in December-January 2000 Al Qaeda had arranged in advance for a local support network to assist them. They received lodging and other support from members of an extremist network associated with the Jemaah Islamiah group. See 9/11 Commission Report at 151. The lodging was provided at the apartment of a Jemaah Islamiah member | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The cited material does not support Plaintiffs' assertion about Al Hazmi, Al Mihdhar, and Khallad's advance arrangements prior to their trip to Kuala Lumpur in December 1999–January 2000 and fails to recognize the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | who made his home available at the request of the group's leader. *See* 9/11 Commission Report at 159; 490 n. 25 (citing an interview that "the al Qaeda guests were lodged at [a] condominium, an apartment on the outskirts of Kuala Lumpur"). | unique relationship between Al Qaeda and the Jemaah Islamiyah. *See* KSA Ex. 167 (Sageman Rep.) 252-53.<br><br>As the Response to Averment paragraph 1397 shows, the first to arrive in Malaysia were Khallad and Abu Baraa. They made their own arrangements and "contacted Hambali to let him know where they were staying, since he was to be kept informed of al Qaeda activities in Southeast Asia." KSA Ex. 163 (9/11 Rep.) 158. At that point Hambali supported them and instructed other Jemaah Islamiyah members, like Yazid Sufaat, to assist the Al Qaeda newcomers. *Id.* at 159. Thus, Khallad and Abu Baraa arrived, and then called Hambali, who, being the Al Qaeda leader in Southeast Asia, "as a rule had to be informed of the activities of al Qaeda operatives in Southeast Asia." Pls. Ex. 31 (KSM Statement) at 8; KSA Ex. 240 (GTMO Detainee Assessment for Hambali, ISN 10019) at 5; KSA Ex. 163 (9/11 Rep.) 158, 493 n.58.<br><br>Hambali was already assisting with KSM on the East Asia portion of the planes operation. He came to Qandahar to meet personally with bin Laden and Abu Hafs to collaborate on operations. Also, in anticipation of a second wave of attacks in the U.S. after the 9/11 attacks, KSM and Hambali collaborated in finding Malaysian or Indonesian pilots to participate in it. KSA Ex. 240 (GTMO Detainee Assessment of Hambali, ISN 10019) at 3, 5, 6, 8; KSA Ex. 241 (GTMO Detainee Assessment of KSM, ISN 100024) at 9-10; KSA Ex. 163 (9/11 Rep.) 152, 490 n.26; Pls. Ex. 31 (KSM Statement) at 4. In other words, Hambali and Jemaah Islamiyah were integral to al Qaeda operations in East Asia. This was not a local support network, but a part of al Qaeda in East Asia.<br><br>Under Hambali's control, Jemaah Islamiyah operatives helped passing Al Qaeda members. In the last three days of their stay in Malaysia, the four visiting Al Qaeda members stayed at the apartment of Jemaah Islamiyah operative Yazid Sufaat, who was transitioning into the al Qaeda biological |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | weapons program, namely weaponized anthrax cultivation, under the supervision of Ayman Al Zawahiri. KSA Ex. 163 (9/11 Rep.) 151, 490 n.25; KSA Ex. 240 (GTMO Detainee Assessment of Hambali, ISN 10019) at 10; KSA Ex. 241 (GTMO Detainee Assessment of KSM, ISN 10024) at 7; Pls. Ex. 31 (KSM Statement) at 51.<br><br>This dense collaboration between al Qaeda and Jemaah Islamiyah , including an overlap in membership, shows that the people who helped the four Al Qaeda operatives in Malaysia, were not a local non-al Qaeda support network "associated with the Jemaah Islamiah group," but Jemaah Islamiyah, with whom Al Qaeda had a special relationship, and al Qaeda members themselves. |
| 1444. | A June 2003 CIA report found that the Al Qaeda meetings involving Hazmi and Mihdhar in Malaysia were held at the apartment arranged through Jemaah Islamiah. Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003). The CIA found that arrangements were made for Mihdhar to be met at the airport upon his arrival in Malaysia. Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs rely on outdated material within this report. By June 1, 2003, the date of the dissemination of the cited material, the CIA had not yet incorporated the information from Khallad and KSM, who had been recently captured. At the time, the CIA still believed that the four conspirators met in Kuala Lumpur for "meetings [that] were held in an apartment belonging to Malaysian extremist Yazid Sufaat." Pls. Ex. 82 (CIA_258). But just after this statement, it admitted, "We have no intelligence reporting on the substance of these meetings, but on the basis of our analysis of timing and the roles of those who attended the meetings, the January 2000 meetings may have dealt with terrorist planning, possibly in connection with an attack in the United States." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | After the interrogations of Khallad, KSM, and Abu Baraa, it is now known that this analysis was not accurate. Khallad and Abu Baraa were sent to Kuala Lumpur to case and test the security measures for boarding U.S. airliners flying over East Asia. Al Hazmi and Al Mihdhar came to Kuala Lumpur on their way to Los Angeles. They had different missions and were there coincidentally, not to have last meetings to discuss their respective attacks. Both teams were in Kuala Lumpur because Malaysia did not require a visa for Muslims and "Malaysian security was reputed to be lax when it came to Islamist jihadists." KSA Ex. 163 (9/11 Rep.) 158.<br><br>The 9/11 Commission wrote its report more than a year after the cited material, benefitted from the interrogations of Khallad, Abu Baraa, Hambali, and KSM, and wrote a more accurate description of the so-called meetings. "All four operatives stayed at the apartment of Yazid Sufaat, the Malaysian JI member who made his home available at Hambali's request. According to Khallad, he and Hazmi spoke about the possibility of hijacking planes and crashing them or holding passengers as hostages, but only speculatively. Khallad admits being aware at the time that Hazmi and Mihdhar were involved in an operation involving planes in the United States but denies knowing details of the plan." KSA Ex. 163 (9/11 Rep.) 159. This new account shows that there were no planning meetings at Sufaat's home. The four operatives simply stayed at his home on instruction from Hambali, who was their superior and the Al Qaeda leader coordinating Al Qaeda activities in East Asia. |
| 1445. | The 9/11 Commission found that the "lodging and travel assistance" arrangements made by Al Qaeda through Jemaah Islamiah in Malaysia as "precisely" analogous to the kind of support Hazmi and Mihdhar would likely have received upon | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | their arrival in California. *See* 9/11 Commission Report at 514 n. 5. | The cited material in the present averment paragraph is from a footnote in the 9/11 Commission Report referring to the support that Al Hazmi and Al Mihdhar received in Kuala Lumpur. As the response to paragraph 1443 above showed, along with the 9/11 Commission Report, this support was not prearranged.<br><br>This footnote did not distinguish the assistance from this unique Malaysian Al Qaeda/ Jemaah Islamiyah network from unwitting assistance provided by non-Al Qaeda Muslims. This is a crucial distinction as local Al Qaeda networks certainly and wittingly assisted other al Qaeda members passing through their area (the Malaysian case) while unwitting Muslims may have just assisted fellow Muslims asking them for help at the local mosque, which is what happened in California.<br><br>It is important to compare similar situations. Page 514, note 5 of the 9/11 Commission Report refers only to the type of assistance provided ("lodging and travel assistance provided by Hambali's minions"), not the type of network providing this assistance. Assistance to the future hijackers was given in Kuala Lumpur, where the hijackers stayed for only 3–4 days and Al Qaeda / Jemaah Islamiyah was long established. But there is no evidence of any assistance given in Bangkok, even though the future hijackers stayed there twice as long (for an entire week). Al Qaeda and Jemaah Islamiyah did not have a presence in Bangkok, as it was not a Muslim friendly nation with lax security toward Muslims. Again, this demonstrates the uniqueness of Kuala Lumpur, where Al Qaeda / Jemaah Islamiyah had a network firmly in place. One cannot generalize from Kuala Lumpur and ignore Bangkok, where the future hijackers probably finalized their plans and made their reservations to fly to Los Angeles. |
| 1446. | The 9/11 Commission concluded that Hazmi and Mihdhar would not have been sent to Los Angeles without a support | Undisputed that the 9/11 Commission expressed this belief. The 9/11 Commission concluded, however, that "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | network in place. "We believe it is unlikely that Hazmi and Mihdhar—neither of whom in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance in advance from one or more individuals informed in advance of their arrival." *See* 9/11 Commission Report at 215. | Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218 (footnote omitted). The later discovery of new evidence strengthened these conclusions.

A decade later, a new 9/11 Review Commission was tasked to review and update the conclusions of the 9/11 Commission. It noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101–3. Thus, by 2015, despite a 14-year-long intense effort at discovering the existence of such a witting support network in California, the new Commission found no new evidence for it but recommended both FBI headquarters and Operation Encore to continue their respective investigations. *Id.* at 117.

Six years later, the FBI concluded their investigation found no evidence that Al Qaeda arranged for Hazmi and Mihdhar to receive assistance in advance of their arrival. It's final conclusion was that "Thumairy, Bayoumi, Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The conclusions of the FBI are corroborated by KSM's own admissions. He stated that he was worried about Hazmi's and Mihdhar's ineptitude and that ultimately, it was a "mistake in judgment on his part" to send them to the U.S. Pls. Ex. 31 (KSM Statement) at 16, 19. Because "al Qaeda had no one in California to help the two," *id.* at 9, 17, KSM tried to compensate for both their deficiencies and this lack of support in California by "permit[ing] al-Hazmi and al-Mi[h]dhar, unlike the other 9/11 hijackers, to go to the local mosque to request assistance and advice on functioning in American society, and Sheikh Mohammed allowed the two, unlike the other hijackers, to contact him directly via internet chat in case they had urgent questions," *id*. at 18. <br><br> Nevertheless, despite allowing Al Hazmi and Al Mihdhar to break Al Qaeda security rules, their mission failed as neither learned English or how to fly. Bin Laden made similar statements: "We sent two young men to learn English in the USA: Rabia Nawaf Al-Hazmi [al-Hazmi's kunya was Rabia al-Makki] and Khalid Al-Mihdhar. Both spent a year without achieving success, and they were sending messages to tell us the fact that they could not study and were unable to achieve success. Khalid Al-Mihdhar despaired and returned to Mecca because he felt ashamed from returning to Afghanistan to tell me of such failure. Rabia, however, stayed there." KSA Ex. 79 (IMG-040538, "The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017)). |
| 1447. | 9/11 Commission Staff Member Dietrich Snell testified that "[w]e determined that because Hazmi and Mihdhar were unfamiliar with the West and unable to speak and understand English, it was likely that arrangements had been made in advance for them to receive assistance upon | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | their arrival in California." Ex. 90, Snell Decl. ¶ 8. Saudi Arabia chose not to cross-examine Snell. | To the extent a response is required, it is undisputed that Snell stated that this was the belief of the 9/11 Commission at the time it issued its report. However, as set forth in the Response to Averment paragraph 1446, the 9/11 Review Commission and the FBI made subsequent final conclusions after additional investigation that no such arrangements were made. |
| 1448. | The FBI's July 2021 EC concluded that:<br><br>Due to the lack of preparedness of Alhazmi and Almihdar for the operation and residing in the West without arousing suspicion the existence of a support network would make operational sense. Investigation determined that a significant portion of the network assisting these two hijackers centered on offices affiliated with the KSA [Kingdom of Saudi Arabia] to include the Saudi Arabian Los Angeles Consulate, the King Fahd Mosque as well as multiple individuals associated with these locations and/or the Saudi Arabian government.<br><br>Ex. 2, EO 3486. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2NN (EO 3486) is inadmissible hearsay. *See* Objections Chart.<br><br>The document did not make any "conclusions." Instead, it states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Ex. 2NN (EO 3479). It also states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The quoted excerpt is a restatement of a hypothesis that the 9/11 Commission was investigating, but that was ultimately rejected by the Commission and later by the FBI. The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1449. | Consistent with the conclusions of the 9/11 Commission and the FBI, Plaintiffs' expert Youssef determined that that Al Qaeda used a "support network for 9/11 hijackers Hazmi and Mihdhar was provided by Saudi Government officials through the longstanding Sunni extremist cells in California that were supported by Saudi Arabia." Ex. 5, Youssef Rpt. 161. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Both the 9/11 Commission and the FBI concluded that there was no evidence of a witting support network in California for the two future hijackers. On Al Thumairy, "after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups." *Id.* at 218. A decade later, after reviewing all the new information from the Operation Encore investigation, the 9/11 Review Commission concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3. Finally, in its EC closing Operation Encore, the FBI concluded, "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 1450. | Youssef concluded, that based on his: experience and knowledge of Al Qaeda's tradecraft, it is inconceivable that Al Qaeda would send its two longstanding operatives Nawaf al Hazmi and Khalid al Mihdhar, who had never been to the West and did not speak English, to Los Angeles without having a detailed plan for their arrival. This plan would have included a support network with trusted individuals on the ground ready to help Hazmi and Mihdhar with transportation, lodging, translation, and other assistance from the moment that they arrived in Los Angeles. Where Hazmi and Mihdhar went and who they met upon their arrival provides a key to understanding the plan that Al Qaeda must have devised in advance for the two men. Ex. 5, Youssef Rpt. 160. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Youssef has demonstrated an utter lack of knowledge of Al Qaeda tradecraft. *See* KSA Ex. 167 (Sageman Rep.) 245-60. Plaintiffs Exhibit 31 sets out what KSM instructed Hazmi and Mihdhar to do in the United States and shows that there was no support network in place. Pls. Ex. 31 (KSM Statement) at 17-18. Youssef ignores these statements. Moreover, both the 9/11 Commission and the FBI concluded that there was no evidence of a witting support network in California for the two future hijackers. On Al Thumairy, "after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups." *Id.* at 218. A decade later, after reviewing all the new information from the Operation Encore investigation, the 9/11 Review Commission concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Finally, in its EC closing Operation Encore, the FBI concluded, "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 1451. | Furthermore, according to Youssef, "Al Qaeda would have arranged for Hazmi and Mihdhar to be met upon their arrival at LAX, particularly since they had never been to the U.S. and could not speak English" and that "[w]ithout someone to provide them with guidance, there was a much higher risk that the two operatives would be noticed as suspicious and come to the attention of law enforcement." Ex. 5, Youssef Rpt. 160. Youssef stated based on his knowledge from "other investigations that Al Qaeda operatives arriving in a new location for the first time would be trained to trust and work only with a person who was part of an established network with bona fides already verified by the organization" and "[s]uch arrangements would be made well in advance." Ex. 5, Youssef Rpt. 160. For Al Qaeda, "[n]othing would be left to chance, as even casual contacts, if not properly handled, could risk | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Youssef has demonstrated an utter lack of knowledge of Al Qaeda tradecraft. *See* KSA Ex. 167 (Sageman Rep.) 245-60. Plaintiffs Exhibit 31 sets out what KSM instructed Hazmi and Mihdhar to do in the United States and shows that there was no support network in place. Pls. Ex. 31 (KSM Statement) at 17-18. Youssef ignores these statements.

Even in the 9/11 plot, Youssef ignores that there were no local support networks. After meeting in Kuala Lumpur, Khallad, Al Hazmi, and Al Mihdhar traveled to Bangkok, where Al Hazmi and Al Mihdhar stayed twice as long as they did in Kuala Lumpur. This was a new location where they went for the first time. Yet, there is no evidence that anyone "who was part of an established network with bona fides already verified by the organization" was there to help them. *See* KSA Ex. 163 (9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the entire mission." Ex. 5, Youssef Rpt. 160. | Rep.) 159.  Moreover, when three Hamburg based pilots came to the United States for flight training, there had no support network awaiting them, even though for all of them, this was a new place where they came for the first time.  KSA Ex. 163 (9/11 Rep.) 223-24. |
| | | Nor did Al Qaeda's other operations around that same time involve the type of arrangements that Youssef speculates about.  There is no evidence that Richard Reid and Saajit Badat, the December 2001 shoe bombers, relied on pre-arranged support from local networks at all, let alone one established or with impeccable bona fides.  *See* KSA Ex. 167 (Sageman Rep.) 612-613. |
| | | In fact, Al Qaeda's traditional strategy for its deployed operatives abroad was exactly the opposite of what Youssef imagines it to have been. Al Qaeda specifically directed its operatives to *avoid* local Islamic sites and militants, as al Qaeda assumed these militants would already be monitored by the local police and contacting these militants might allow local authorities to detect the deployed al Qaeda operatives.  *See* KSA Ex. 216 (PECFOIA 42008). |
| | | Those were exactly the instructions KSM gave to all the hijackers of the 9/11 attacks, except for Al Hazmi and Al Mihdhar. Pls. Ex. 31 (KSM Statement) at 36. For his instructions to Al Hazmi, *see* the Response to Averment paragraph 1446 above.  Al Qaeda also followed the instructions in the Manchester Manual with respect to the London attacks of July 7, 2005; the failed copy-cat attacks two weeks later; and the 2006 airline liquid bombs plot.  *See* KSA Ex. 244 (Marc Sageman, 2019, *The London Bombings*, Philadelphia: University of Pennsylvania Press) at 114-152, 189-192, 193-233.  Indeed, with one exception unrelated to the 9/11 attacks that led to discovery by law enforcement, Al Qaeda did not use |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "local non-AQ network[s] or infrastructure." KSA Ex. 167 (Sageman Rep.) 251-53. |
| 1452. | Plaintiffs' expert Youssef further believed:<br><br>The actions of the hijackers Nawaf al Hazmi and Khalid al Mihdhar show that Al Qaeda arranged in advance for Fahad al Thumairy and members of his extremist cell at the King Fahad Mosque to meet and provide support for the two hijackers upon their arrival. The first person known to have met Hazmi and Mihdhar in Los Angeles was ▮▮▮▮▮▮, who regularly attended the King Fahad Mosque. ▮▮▮ then immediately brought Hazmi and Mihdhar to Fahad al Thumairy at the King Fahad Mosque where the two hijackers had a private conversation with Thumairy. As detailed below, the two hijackers lived in ▮▮▮▮ apartment during their time in Los Angeles. Ex. 5, Youssef Rpt. 160-61. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth in the Responses to Averment paragraphs 1450-1451, there is no evidence that Al Qaeda had arranged in advance for any support network.<br><br>There was no arrangement for ▮▮▮ to meet the hijackers, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 1453. | The EO production included a February 2010 Report on a FBI-CIA meeting to discuss Operation Encore, which concluded that: "HIJACKERS AL-HAZMI AND AL-MIHDHAR LANDED IN LOS ANGELES ON 15 JANUARY 2000. THE FIRST PLACE THEY VISITED WAS THE KING FAHAD MOSQUE IN CULVER CITY, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2M (EO 632) is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | CA WHERE AL-THUMAIRY WAS THE IMAM." Ex. 2, EO 0632. | There is no evidence as to the first place the hijackers visited when they landed in Los Angeles. The document Plaintiffs cite make clear that the statements contained in it are not conclusions, but rather hypothesis that are part of an "ongoing investigation." Pls. Ex. 2M (EO 636). |
| 1454. | Saudi Arabia's claim that it considered Al Qaeda as a "declared…enemy" is misleading and incorrect. KSA Aver. At ¶ 62. Saudi Arabia cites the Joint CIA-FBI Assessment, but that Assessment found that Saudi Arabia failed to act against Al Qaeda prior to the 9/11 Attacks because of "an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil." Ex. 2, EO 3417. Moreover, the Assessment found that Saudi Arabia's senior officials provided support for terror organizations including Al Qaeda outside Saudi Arabia and specifically in the U.S. and led the Al Haramain organization which provided key assistance to Al Qaeda. Ex. 2, EO 3416, 3435. The Assessment showed that it was not until after the May 2003 bombings in Saudi Arabia itself that Saudi Arabia took steps to crack down against Al Qaeda. Ex. 2, EO 3416, 3420. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Joint Assessment reflects the conclusions of the FBI and the CIA that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>The Assessment does not state that "Saudi Arabia failed to act against Al Qaeda prior to the 9/11 Attacks because of 'an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil.'" The full quote is, "Saudi Arabia's primary course of action to counter al-Qa'ida prior to 11 September was to co-opt or coerce extremists in an effort to bring them into the fold, possibly with an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil. USIC reporting indicates some al-Qa'ida members sought to conduct terrorist attacks in Saudi Arabia, but were banned from doing so at the direction of Usama Bin Laden." Pls. Ex. 2OO (EO 3417). The full quote shows that this is a hypothesis ("possibly"), not a "finding" as Plaintiffs allege.<br><br>The Assessment does not state or imply that "senior officials provided support for terror organizations including al Qaeda outside Saudi Arabia |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and specifically in the U.S." It also does not state that senior Saudi officials "led the al Haramain organization which provided key assistance to Al Qaeda." Instead, it states that the Ministry of Islamic Affairs Minister Sheikh Saleh bin Abdul Aziz bin Mohammed Al Ash-Sheikh "is the titular head and superintendent of HIF [Al Haramain Islamic Foundation]." Pls. Ex. 2BB (EO 3435). Ash-Sheikh testified, however, that he did not hold a position at Al Haramain. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10, 143:14-148:5 (testifying that Al Haramain was working with a permit and that the Ministry of Islamic Affairs scrutinized the organization). |
| | | The suggestion that Saudi Arabia was cooperating or supporting Al Qaeda is false. During the 1990s, Al Qaeda declared itself an enemy of both the United States and Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 47-48 (discussing Al Qaeda's calls for attacks on the United States); Pls. Ex. 2OO (EO 3417) (Joint CIA-FBI Assessment: "The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat to the security and survival of the Al Saud."); Pls. Ex. 113 (Khalil Tr.) 262:21-267:9 (in 1990, he heard bin Laden tell Prince Mohammed bin Faisal that he "doesn't recognize Saudi Arabia," the "king," the "crown prince," or the "royal family"); KSA Ex. 167 (Sageman Rep.) 65-117; KSA Ex. 166 (Rundell Rep.) 26-30. |
| | | Plaintiffs' purported experts agree. *See* KSA Ex. 165 (Nakhleh Tr.) 65:13-21 (agreeing that, "before the 9/11 attacks, there was a long and intense history of hostility between Saudi Arabia and Usama bin Ladin"); *id.* at 66:2-68:12 (agreeing that, by the late 1990s, the Saudi royal family perceived Al Qaeda as a threat). |
| | | Saudi Arabia took adverse actions against bin Laden and made numerous attempts to extradite bin Laden and to bring him to justice prior to the 9/11 attacks. In 1994, Saudi Arabia stripped bin Laden of his Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | citizenship and froze his assets. KSA Ex. 163 (9/11 Rep.) 57, 170, 497 n.113; Pls. Ex. 7 (*Terrorist Financing Monograph*) at 20; KSA Ex. 167 (Sageman Rep.) 76-77; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 60:3-11.<br><br>In April 1996, Saudi Arabia cooperated with the United States in an effort to expel bin Laden from Sudan; although Sudan ultimately did expel bin Laden, it refused to extradite him either to the United States or to Saudi Arabia. KSA Ex. 163 (9/11 Rep.) 62-63; KSA Ex. 167 (Sageman Rep.) 89-91; KSA Ex. 166 (Rundell Rep.) 26; KSA Ex. 165 (Nakhleh Tr.) 62:22-63:8.<br><br>In August 1996, bin Laden issued a "Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Shrines," in which he condemned both the United States and Saudi Arabia as enemies of Islam. KSA Ex. 167 (Sageman Rep.) 95-97 (quoting the August 1996 Declaration of Jihad, which called to "Expel the Polytheists from the Arabian Peninsula" and criticized the Saudi Government: "Instead of pushing the Army, the Guard, and the security men to confront the occupiers, the regime is using them to protect the occupiers, which is the highest degree of humiliation, insult, and treason. . . . While we know that the regime is fully responsible for what has afflicted the country and the people, the main disease and the cause of the affliction is the occupying US enemy. So, efforts should be pulled to kill him, fight him, destroy him."); *see* KSA Ex. 163 (9/11 Rep.) 47-48; KSA Ex. 166 (Rundell Rep.) 27-28; *see also* KSA Ex. 165 (Nakhleh Tr.) 61:7-62:21 (discussing Al Qaeda's denunciations of Saudi Arabia as purportedly "un-Islamic" and "the near enemy" and of the King as a purported "apostate" whose "killing would be justified").<br><br>In June 1998, Prince Turki Al Faisal bin Abdulaziz Al Saud, the head of the Saudi General Intelligence Directorate, and Sheikh Abdullah Al Turki, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | who had recently retired from his post as Saudi Arabia's first Minister of Islamic Affairs, traveled to Afghanistan with the support of the CIA to demand that the Taliban extradite bin Laden for prosecution. KSA Ex. 163 (9/11 Rep.) 115 (discussing Prince Turki's overture to the Taliban); KSA Ex. 167 (Sageman Rep.) 108-14 (more detailed discussion including Al Turki's participation); KSA Ex. 165 (Nakhleh Tr.) 63:15-64:14.<br><br>The Taliban initially agreed to extradite bin Laden, but, in September 1998, reversed course. In response, Saudi Arabia severely restricted diplomatic relations with the Taliban. KSA Ex. 167 (Sageman Rep.) 113-14; KSA Ex. 165 (Nakhleh Tr.) 64:15-65:3.<br><br>During the period from 1996 to 1998, there were assassination attempts against bin Laden that he or those around him attributed to Saudi Arabia. *See* KSA Ex. 163 (9/11 Rep.) 63 (in 1996, before leaving Sudan, bin Laden "had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both"); KSA Ex. 167 (Sageman Rep.) 102-03 (describing statements by bin Laden's bodyguard that the leader of a group that had unsuccessfully attempted to assassinate or kidnap bin Laden in 1997 had been paid by "the Saudi consulate in Peshawar"); *id.* at 115 (describing statements about a third attempt in 1998); *see also* KSA Ex. 165 (Nakhleh Tr.) 65:4-11 (conceding that he had heard "statements about" an "assassination attempt" on bin Laden that "Saudi Arabia was behind"). |
| 1455. | Saudi Arabia's claim that Al Qaeda was an "enemy" of Saudi Arabia is belied by the fact that upon their arrival in California Hazmi and Mihdhar went to the King Fahad Mosque. If Saudi Arabia's claim was correct, it made no sense for the Al Qaeda operatives to commence their terror | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | operation inside the U.S. by going to a Mosque named after the reigning Saudi King, operated by Saudi Arabia, and led by the Saudi government's diplomat-Imam Thumairy. | This paragraph contains attorney argument to which no response is required.<br><br>As set forth in the Response to Averment paragraph 1454, even Plaintiffs' purported experts have acknowledged that since the 1990s, Al Qaeda has been a declared enemy of Saudi Arabia and that Saudi Arabia was at the forefront of fighting Al Qaeda and trying to bring bin Laden to justice. |
| XX. | **FROM THE MOMENT OF THEIR ARRIVAL IN LOS ANGELES ON JANUARY 15, 2000, THE HIJACKERS RECEIVED SUPPORT FROM THE EXTREMIST NETWORK ESTABLISHED AND LED BY SAUDI GOVERNMENT OFFICIALS** | There is no evidence that the hijackers received support from extremist networks established and led by Saudi Government officials. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). Plaintiffs in this Section of their Averment fail to produce any evidence to the contrary. |
| 1456. | The support network for the hijackers was organized on the ground in California by three Saudi government officials, each working for a different Saudi government Ministry – Thumairy from MOIA; ███ a Consulate Islamic Affairs employee working for MOFA; and Bayoumi, an agent working under the PCA and Ministry of Defense. As detailed below, the MPS production revealed that another Saudi government official was directly involved with the hijackers: Sheikh Mohamed Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite nothing in support of this assertion.<br><br>There was no support network for the hijackers, much less one organized by Saudi government officials. This has been the consensus of all authoritative and determinative U.S. Government assessments, including |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Qahtani, attended the welcome party for the hijackers held at their apartment. | the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). |
| | | Al Thumairy has no recollection of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2. |
| | | ████ also had never heard the hijackers names prior to the 9/11 attacks and never met them. ████████████ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* There is no evidence at all to the contrary. |
| | | Al Bayoumi never instructed anyone to assist the hijackers. Pls. Ex. 120 (Bayoumi Tr.) 724:2-6. Nor did anyone instruct Al Bayoumi to assist the hijackers. *Id.* at 722:14-23. Other than referring Al Hazmi and Al Mihdhar to the apartment where he lived and assisting them in opening a bank account that same day so that they could lease an apartment, Al Bayoumi did not assist the hijackers in any way. *Id.* at 743:1-744:2. Al Bayoumi had no knowledge of the hijackers' intention to attack the United States. *Id.* at 724:7-17. |
| | | The relationships (or lack thereof) between these three individuals also refutes any suggestion that there was a support network. Al Bayoumi and ████ had no relationship at all and did not know each other. ████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | <br><br><br><br>Al Thumairy did not even recall Al Bayoumi, does not recall meeting with Al Bayoumi, and testified that he has no relationship with him. Pls. Ex. 107 (Thumairy Tr.) 493:12-494:5.<br><br>There is no evidence that Mohamed Al Qahtani provided support for the hijackers, nor is he mentioned at all in this Section of Plaintiffs' Averment. There is also no evidence that Al Qahtani was a Saudi official. |
| 1457. | Phone records show that at the key times Thumairy and Bayoumi coordinated their support for the hijackers with each other and MOIA's Embassy Director Khalid Al Sowailem; the Embassy Islamic Affairs office run by Musaed Al Jarrah; and MOIA propagators working under Sowailem and for MOIA in Saudi Arabia. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite nothing for this assertion, which is false.<br><br>There was no support network for hijackers and no directions form the Saudi Embassy in Washington, DC or the Saudi government to assist the hijackers. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). <br><br> Every current or former Saudi official or employee who has been asked has denied giving or knowing of anyone to provide any assistance to Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. Pls. Ex. 120 (Bayoumi Tr.) 721:22-724:17; Pls. Ex. 107 (Thumairy Tr.) 490:6-494:20; Pls. Ex. 118 (Jarrah Tr.) 598:23-599:11, 601:22-607:4; KSA Ex. 77 (Mana Decl.) ¶¶ 3-16; Pls. Ex. 110A (Mana Tr.) 211:9-220:13, 263:15-264:2; Pls. Ex. 96 (Jaithen Tr.) 304:9-305:12, 306:21-309:16; Pls. Ex. 115 (Mersal Tr.) 289:10-291:16; Pls. Ex. 99 (Sadhan Tr.) 383:14-384:20, 386:13-391:15; Pls. Ex. 119 (Sudairy Tr.) 363:5-365:20, 367:17-370:15; Pls. Ex. 113 (Pls. Ex. 113 (Khalil Tr.)) 362:7-365:10; Pls. Ex. 94 (Anqari Tr.) 335:9-341:15 (former Presidency of Civil Aviation official); Pls Ex. 100 (Qattan Tr) 222:6-16, 259:13-21 (former Embassy official, current Minister of State). |
| 1458. | Thumairy, ▮▮▮ and Bayoumi provided support to the hijackers through two longstanding and active Sunni extremist cells that operated in Los Angeles and San Diego with the support of Saudi Arabia for almost a decade. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs cite nothing for this assertion, which is false. <br><br> There was no support network for hijackers and no directions form the Saudi Embassy in Washington, DC or the Saudi government to assist the hijackers. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). |
| | | There is also no evidence of any "longstanding and active Sunni extremist cells that operated in Los Angeles and San Diego" and certainly no such cells that had the support of Saudi Arabia. |
| 1459. | The 9/11 Commission identified Thumairy as "a logical person to consider as a possible contact for Hazmi and Mihdhar" and stated that the hijackers "appear to have obtained assistance from the Muslim community, specifically the community surrounding the King Fahd Mosque in Culver City, one of the most prominent mosques in Southern California." *See* 9/11 Commission Report at 216-17. | The 9/11 Commission actually states that: "[t]he circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. |
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1460. | The 9/11 Commission investigation, however, was not able to penetrate Al Qaeda's tradecraft. The Commission stated that: "[a]fter the pair cleared Immigration and Customs at Los Angeles International Airport, we do not know where they went . . . . We do not pick up their trail until February 1, 2000, when they encountered Omar al Bayoumi . . ." *See* 9/11 Commission Report at 217. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | There is no support for the assertion that the 9/11 Commission was not able to penetrate al Qaeda's tradecraft. The 9/11 Commission did not refer to any al Qaeda tradecraft. It simply noted that it had not identified anyone who remembered seeing the hijackers from the time they cleared customs |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | at LAX airport to the chance meeting with Al Bayoumi at the Mediterranean restaurant, which Al Bayoumi himself revealed to New Scotland Yard during his interviews.<br><br>It was only in 2007, two and a half years after the publication of the 9/11 Commission Report, that the FBI identified ▮▮▮▮▮▮▮, who reported he saw the hijackers in Los Angeles. Pls. Ex. 465 (FBI 186–96). The FBI thoroughly investigated ▮▮▮ interactions with the hijackers and found them innocuous. It's final conclusion was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 1461. | As Youssef point out, the 9/11 Commission "did not know (as the FBI would later learn and acknowledge in various reports, including the FBI's July 2021 EC) that the 'first place' where Hazmi and Mihdhar went was the King Fahad Mosque where they met Thumairy immediately after they arrived on January 15, 2000." Ex. 5, Youssef Rpt. 161. As late as November 2005, FBI Los Angeles was still actively trying "to establish where the 9/11 hijackers stayed from 01/15-02/04/2000, prior to relocating to San Diego." Ex. 2, EO 3700. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence as to the first place the hijackers visited when they landed in Los Angeles. The portion of Plaintiffs Exhibit 5 (Youssef Rep.) cited by Plaintiffs relies on inadmissible hearsay, including the FBI's July 2021 EC. That document states that "[t]he purpose of this communication is to consolidate information related to the involvement of personnel and entities controlled by the Saudi Arabian Government (SAG), the Embassy of the Kingdom of Saudi Arabia (EKSA) and its affiliates within the United States with the attacks of September 11, 2001 . . . . This report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2NN (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>There is also no evidence that the hijackers immediately met Al Thumairy after they landed in Los Angeles. To the contrary, the undisputed evidence is that on an unknown date after they arrived, ███████████ ███████████████████████████████████ Al Thumairy has no recollection of this meeting, or ever meeting the hijackers, which is unsurprising given that as imam, he met many visitors to the mosque. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6; 565:7-566:13. |
| 1462. | Plaintiffs' expert Youssef concluded from the evidence he reviewed that "Thumairy was the MOIA's main designated contact person for Al Qaeda and the hijackers in Los Angeles and that Thumairy employed members of his extremist cell at the King Fahad Mosque, including Consulate official ██████ and ████████, to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | provide a support network for the hijackers." Ex. 5, Youssef Rpt. 162. | There is no support for this assertion. There was no support network for the hijackers and no directions form the Saudi Embassy in Washington, DC or the Saudi government to assist the hijackers. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)).<br><br>The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| **XX.A.** | **The Saudi government support network arranged for Hazmi and Mihdhar to be picked up at the airport.** | There is no evidence that there was any "Saudi government support network," or that Al Thumairy or Al Bayoumi arranged for Al Hazmi and Al Mihdar to be picked up from the airport. |
| 1463. | The FBI 2016 Operation Encore report concluded that " ███████ was taked by THUMAIRY to assist HAZMI and MIDHAR [sic] while they were in Los Angeles." Ex. 566, FBI 11757. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11757) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that Al Thumairy tasked ██████████ to assist Al Hazmi and Al Mihdhar. Nor is there any evidence that Al Thumairy wittingly assisted the hijackers. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Collaborative Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). |
| | | Plaintiffs cite the 2016 Operation Encore update.  When the previous 2012 and 2014 updates were released, the FBI Assistant Director, Counterterrorism Division was careful to specify that these updates were internal documents best characterized as setting out "as an investigative theory being pursued by the FBI and not as objective statements of fact." KSA Ex. 245 (McGarrity Decl.) ¶ 22.  The investigative theory that Al Thumairy tasked ███ to assist the hijackers in furtherance of the 9/11 plot has been firmly rejected by the FBI.  Its final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ."  Pls. Ex. 2A (EO 9-11). |
| | | Al Thumairy has no recollection of even meeting the hijackers.  Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6.  He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers.  *Id.* at 491:7-21, 492:11-493:2. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No one, including Al Thumairy, instructed ▮▮▮ to help Al Hazmi and Al Mihdhar. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As discussed in Responses to Averment paragraphs ▮▮▮ the statement quoted in Plaintiffs Exhibit 566 is misattributed to ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ |
| 1464. | Thumairy, Bayoumi, and ▮▮▮ arranged for Hazmi and Mihdhar to be met upon arrival by ▮▮▮ or another member of the Saudi government support network at Los Angeles airport and brought to the King Fahad Mosque. Hazmi and Mihdhar would not have been sent into the United States for the first time without being met and escorted from the airport. Ex. 5, Youssef Rpt. 160-63. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. This assertion is based entirely on Youssef's unsupported speculation. There is no evidence that either Al Bayoumi or Al Thumairy wittingly |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | assisted the hijackers or arranged for someone else to assist them. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Collaborative Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)).<br><br>Al Thumairy has no recollection of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2.<br><br>██████ also had never heard the hijackers names prior to the 9/11 attacks and never met them. ████████████████████ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* There is no evidence at all to the contrary.<br><br>Al Bayoumi never instructed anyone to assist the hijackers. Pls. Ex. 120 (Bayoumi Tr.) 724:2-6. Nor did anyone instruct Al Bayoumi to assist the hijackers. *Id.* at 722:14-23. Other than referring Hazmi and Mihdhar to the apartment where he lived and assisting them in opening a bank account that same day so that they could lease an apartment, Al Bayoumi did not assist the hijackers in any way. *Id.* at 743:1-744:2. Al Bayoumi had no knowledge of the hijackers' intention to attack the United States. *Id.* at 724:7-17. |
| 1465. | As expert Youssef identified, the phone records demonstrate Thumairy made calls from his home related to the travel of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Hazmi and Mihdhar to Los Angeles. For example, on Saturday, January 15, 2000, Thumairy called an unknown number in Saudi Arabia at 12:42 a.m. (3 min.). This call coincides with the hijackers flying on United Airlines from Hong Kong to Los Angeles, a non-stop 13-hour flight, that arrived at 1:27 p.m. in Los Angeles. Ex. 5, Youssef Rpt. 162; Ex. 2, EO 0609 (Youssef's report inadvertently cited to EO 0629; however, EO 0609 is the correct citation). | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The specific call cited (Al Thumairy's call to the KSA at 12:42 AM on January 15, 2000) is miscited in Youssef's report to EO 629 and again in Plaintiffs' averment to EO 609. The correct citation is EO 610. *See* Pls. Ex. 2JJ (EO 610-UPDATED). There is no evidence at all that a call to an unknown number in Saudi Arabia had anything to do with the hijackers. Nor is there any evidence that anyone in Saudi Arabia had knowledge that Hazmi or Mihdhar were in route to the United States. |
| 1466. | On January 15, 2000 Bayoumi received two incoming calls at 1:41 p.m. (1 min.) and 1:43 p.m. (1 min). An FBI report from the EO production shows that the FBI identified these calls as coming from phone number ███████-6662 ("-6662"). Ex. 515, FBI 3225; Ex. 2, EO 2750. The FBI determined that the -6662 number was subscribed to by Bayoumi's wife Manal Bagader but used by Bayoumi from November 1998 through September 2000. Ex. 2, EO 2798 (noting the cessation in activity coincides with Bayoumi's move to the United Kingdom). The calls from the -6662 number to Bayoumi shortly after the arrival of Hazmi and Mihdhar show that Bayoumi lent his -6662 phone to someone, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2X (EO 2750 and EO 2798) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2X (EO 2798) does not state that the cell phone number ███████-6662 was used by Bayoumi, or that it was only used through September 2000. Instead, it states the number was subscribed to Manal Bagader, Al Bayoumi's wife and that records "were only available through 9/20/2000." Pls. Ex. 2X (EO 2798). The document further states |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | likely the person who was assisting the hijackers or a trusted communications person. | it was subscribed to Bayoumi's wife from "11/20/1998 to 03/09/2001," not November 1998 to September 2000 as Plaintiffs allege. *Id.*<br><br>Plaintiffs Exhibit 2X (EO 2750) also does not state that Al Bayoumi received two calls from that number on January 15, 2000. Instead it states that Bayoumi's cellular records show "two unknown incoming calls . . . which are believed to be the two calls from Manal's cellular telephone." *Id.*<br><br>Even if these were calls between Al Bayoumi and his wife, there is no evidence that they had anything to do with the hijackers.<br><br>The assertion that Al Bayoumi lent this phone to someone else or used it himself is entirely unsupported. The evidence demonstrates that it was used by Bayoumi's wife. For instance, Al Bayoumi frequently calls this number – he would not call himself from one cell phone to another cell phone. It is also one of the last calls he made before he got on the plane for Saudi Arabia on March 30, 2000, at 7:10 PM (4 min). *See* Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Pls. Ex. 402 (KSA 6464) (showing entry-exit information). This is very consistent with a husband calling his wife just before leaving the airport. |
| 1467. | Thumairy called an unknown number in Santa Ana, California at 1:35 p.m. (1 min), and then called the home of Saudi Consulate Secretary ▮▮▮▮▮▮ at 1:59 p.m. (1 min). Ex. 474, FBI 000513, 000518. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that any of these calls had anything to do with the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy has no recollection of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2.<br><br>█████ also had never heard the hijackers names prior to the 9/11 attacks and never met them. ████████████████ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* There is no evidence at all to the contrary. |
| 1468. | The January 15, 2000 call from Thumairy to █████ at 1:59 p.m. is significant. The FBI's reports show that there were phone contacts between █████ and █████ █████ "prior to and directly following the key events of logistic assistance provided by █████ to HAZMI and MIDHAR." Ex. 566, FBI 011757. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11757) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that call between Al Thumairy and █████ or the calls between █████ home line and █████ home line had anything to do with the hijackers.<br><br>All of the evidence is to the contrary. Al Thumairy has no recollection of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████ also had never heard the hijackers names prior to the 9/11 attacks and never met them. ████████████████ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* There is no evidence at all to the contrary. ███████████████████████████████████████████████████████████████████████████████████████ |
| 1469. | Mana was close to the family of ████████ ████████████████████ Ex. 72, Madha Decl. ¶ 31; ████████████████ After prevaricating, Ismail Mana admitted he knew Ibrahim Johar aka Abu Khalid and his son Mohamed Johar, and that his (Mana's) wife knew Ibrahim Johar's wife. Ex. 110A, Mana Dep. 20:24-39:8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Madha's declaration (Pls. Ex. 72) was written by Plaintiffs' counsel. Pls. Ex. 128 (Madha Tr.) 21:11–23:2. It states only that Madha saw Sheikh Al Thumairy, Mana, and Mohammed Johar's father speak to each other at the mosque on "numerous occasions." Pls. Ex. 72 (Madha Decl.) ¶ 31. There is no mention of any interaction among them outside the mosque or that Mana interacted with Mohammed Johar.<br><br>Mana testified he did not know Johar's father's name and that he recognized the face of his son, Mohammed, as someone also praying at the mosque. Pls. Ex. 110A (Mana Tr.) 24:14. There was no prevarication. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████ |
| 1470. | ███████████████████ ███████████████████ Ex. 5, Youssef Rpt. 163-164; ███████████ According to expert Youssef, "the number and nature of the contacts that ███ had with the two hijackers, and the time they spent with him, shows that ███ was part of the support network." Ex. 5, Youssef Rpt. 64. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>███████████████████████<br><br>███████████████████████<br><br>There was no support network, as confirmed by all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Collaborative Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI:* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). <br><br> The undisputed evidence is that no one, including Al Thumairy, instructed ▮▮▮ to help Al Hazmi and Al Mihdhar. ▮▮▮ <br><br> Al Thumairy has no recollection of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2. |
| 1471. | The FBI found that "communications analysis of telephone numbers associated with ▮▮▮ show contact with multiple individuals who assisted HAZMI and MIDHAR…including a phone call to Bayoumi on 1/5/2000." Ex. 566, FBI | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 011752 at 11754. The 2014 FBI Operation Encore Report stated that ███ "never provided adequate explanation" for "his role aiding Bayoumi in facilitating the hijacker's arrival and settlement in California." Ex. 2, EO 0224. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 566 (FBI 11752) and Plaintiffs Exhibit 2KK (EO 224-UPDATED) are inadmissible hearsay.<br><br>There is no evidence that the telephone calls associated with Mana were related to the hijackers. He never met the hijackers and never provided any assistance at all to the hijackers. KSA Ex. 77 (Mana Decl.) ¶ 6.<br><br>███ purported January 5, 2000, phone call to Al Bayoumi is addressed in the Response to Averment paragraph 1411. Even the author of Plaintiffs Exhibit 566 questions whether the information is correct. There is a notation "is this time correct?" next to the description of this call. It could not have been correct, given that phone records show that ███ was on a different phone call at the time. Pls. Ex. 2JJ (EO 609-UPDATED).<br><br>The second quote in this paragraph is taken out of context. The full quote is: "[Redacted] is planning to approach ███ for an interview of his role aiding Bayoumi in facilitating the hijackers' arrival and settlement in California, for which ███ has never provided adequate explanation." Pls. 2KK (EO 224-UPDATED). The cited materials are both Operation Encore updates, not reports or findings. They were internal FBI documents that the FBI Assistant Director, Counterterrorism Division has clarified show "an investigative theory being pursued by the FBI and not as objective statements of fact." KSA Ex. 245 (McGarrity Decl.) ¶ 22.<br><br>The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| **XX.B.** | **Hazmi and Mihdhar were brought to the King Fahad Mosque to meet with Thumairy.** | Plaintiffs cite nothing to support this false assertion. |
| 1472. | Akram Alzamari, who attended the King Fahad Mosque in 2000, testified at his deposition by written questions that he was a good friend of Thumairy and described Mohamed Johar as his best friend. Ex. 101, Alzamari Dep. 38:22-39:4, 45:21-46:15, 47:9-12, 47:16-20, 20:17-21:16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. To the extent a response is required, this is undisputed. |
| 1473. | | Plaintiffs Exhibit ▮▮▮▮▮▮▮▮▮▮ is inadmissible hearsay and any ▮▮▮▮▮▮▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | [redacted] |
| 1474. | At his deposition by written questions, Alzamari did not recall that Johar used the phrase "look after" or the word "significant" but testified that Johar "told me exactly as this: They [Hazmi and Mihdhar] came through Sheikh Fahad. I wanted to -- I want to introduce you to two people." Ex. 101, Alzamari Dep. 132:2-18. Alzamari's confirmation that Johar told him that the hijackers "came through" Thumairy shows that Thumairy was overseeing the arrangements for Hazmi and Mihdhar and tasking Johar to provide them with support. | Alzamari's testimony about what Johar told him is hearsay. Alzamari also lacks firsthand knowledge of anything discussed between Johar and Al Thumairy. *See* Objections Chart.

Alzamari testified that [redacted] Among other things, it is untrue that Johar had told Alzamari that Al Thumairy had asked Johar for anything, that Johar had told Alzamari that he was supposed to look after those two people, or that Johar used the word "significant." Pls. Ex. 101 (Alzamari Tr.) 52:1–19.

Alzamari also had not met or heard of the hijackers in January 2000, when the hijackers first arrived and lived in Los Angeles. Johar introduced the hijackers to Alzamari in June 2000. *See* Pls. Ex. 101 (Alzamari Tr.) 49:12-50:6 (testifying that Johar mentioned the hijackers to him for the first time "a few days or maybe a couple weeks" before he introduced them to him); 67:12-15 (testifying that he only met the hijackers once); 77:14-78:20; 119:4-20 (testifying that the meeting was the night before one of the hijackers was leaving for Yemen, which was June 9, 2000).

[redacted]

There is no evidence at all that Al Thumairy was "overseeing the arrangements for Hazmi and Mihdhar." Al Thumairy has no recollection |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of even meeting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 340:15-341:3, 346:1-19, 348:1-9, 491:4-6. He never received any instructions from anyone to assist, instructed anyone to assist, or himself did anything to assist Al Hazmi, Al Mihdhar, or any other 9/11 hijackers. *Id.* at 491:7-21, 492:11-493:2.<br><br>The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A, EO 9-11. |
| 1475. | [REDACTED]<br><br>This is consistent with the 1:27pm arrival time of the hijackers in Los Angeles on January 15, 2000. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>[REDACTED] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1476. | ████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required this is undisputed. |
| 1477. | ████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 461 ████████████ ████ are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, this is undisputed. |
| 1478. | ████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibits █████████████ are inadmissible hearsay. Plaintiffs Exhibit 14 is inadmissible hearsay and lacks authentication. *See* Objections Chart. |
| | Ex. 14, 1420 Hijri Calendar. | ████████████ |
| 1479. | ████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibits █████ are inadmissible hearsay. *See* Objections Chart. |
| | | ████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | |  |
| 1480. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits ▮▮▮▮ are inadmissible hearsay.<br><br>▮▮▮▮ |
| 1481. | Plaintiffs' expert Youssef assessed that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████ x. 5, Youssef Rpt. 166. | Youssef makes an unwarranted logical leap when he argues that ██████████ ███████████████ There is no evidence for Youssef's conclusion and no logic to his reasoning. ████████████████ ████████████████ ████████████████ Youssef is an evangelical Christian and is not familiar with Islamic practice. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12. |
| XX.C. | **Hazmi and Mihdhar lived with Johar and were under his care during their time in Los Angeles.** | The hijackers did not live in Johar's apartment when they arrived in Los Angeles in January 2000 and were not under Johar's care. |
| 1482. | ██████████████ ██████████████ ██████████████ ██████████████ | Plaintiffs ████ ███████ is inadmissible hearsay. Alzamari also lacks any first-hand knowledge of Johar's discussions with his sister. The ████████████████ *See* Objections Chart. ████████████████ ████████████████ ████████████████ ut Operation Encore investigators, including ████████ repeatedly violated this process. They used "cut and paste" duplicates from previous reporting, which shows that the reporting could not be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████ ████████████████████ For examples of extensive cut and paste duplication, Operation Encore's Pls. Ex. 460 (FBI 96–106 CORRECTED VERSION (6/20/10)) is mostly a cut and paste duplicate of KSA Ex. 246 (FBI 79–95 CORRECTED VERSION (8/8/07)) despite the three years gap between interviews; and Pls. Ex. 463 (FBI 145–62 (6/21/10)) is mostly a duplicate of Pls. Ex. 461 (FBI 121–39 (1/16/08)) despite the two years gap between these interviews. Furthermore, one interview (████████ on 11/13/15) involving ████████ generated two very different reports, KSA Ex. 247 (FBI 244–46 (12/1/15)) and Pls. Ex. 457 (FBI 46–49 (1/15/15)). This last reporting was drafted on January 11, 2016, about two months after ████ interview, and disseminated four days later.  In at least one instance, a summary was prepared from notes so cursory that they are hard to make out.  *See* KSA Ex. ███████████ ████████████████████████).

On June 9, 2000, the night before Al Mihdhar left the United States for Yemen, a friend, Mohamed Johar, introduced Alzamari to Al Mihdhar and Al Hazmi for the first time at the King Fahad Mosque.  Pls. Ex. 101 (Alzamari Tr.) 61:18-62:20, 77:12-78:14, 119:4-20; KSA Ex. 163 (9/11 Rep.) 222.

Alzamari testified that he had no knowledge that Al Thumairy had "asked" or "task[ed]" Johar (or anyone else) with assisting the hijackers, Pls. Ex. 101 (Alzamari Tr.) 49:12-50:2; no knowledge of "any actual assistance that Fahad al-Thumairy provided to the two Saudi men who would later become the 9/11 hijackers," *id.* at 122:17-21; and no knowledge of "any person instructing Fahad al-Thumairy to assist the two Saudi men who would later become 9/11 hijackers," *id.* at 122:22-25. Furthermore, based on his extensive "interactions with Fahad al-Thumairy," Alzamari does not "believe that, prior to the 9/11 attacks, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Fahad al-Thumairy knew of the two Saudi men's intentions to harm people in the United States." *Id.* at 124:18-23.<br><br>████████████████████████<br><br>Johar did not tell Alzamari that the "men were living at his house"; instead, they "spen[t] [a] night or two" at the house, and Johar never told Alzamari that he had asked his sister to move out to accommodate the hijackers. *Id.* at 60:14-61:8. Moreover, the first time Alzamari had even heard of the hijackers was around June 2000. *See* Pls. Ex. 101 (Alzamari Tr.) 49:12-50:6 (testifying that Johar mentioned the hijacker to him for the first time "a few days or maybe a couple weeks" before he introduced them to him); 67:12-15 (testifying that he only met the hijackers once); 77:14-78:20; 119:4-20 (testifying that the meeting was the night before one of the hijackers was leaving for Yemen, which was June 9, 2000).<br><br>████████████████████████ |
| 1483. | At his deposition based on written questions, Alzamari claimed he was uncertain about how long the hijackers stayed with Johar, saying that Johar | Plaintiffs Exhibit ███████████) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | admitted to him that the hijackers "spend the night," which he interpreted as "a night or two." Ex. 101, Alzamari Dep. 58:2-59:2. Alzamari testified that Johar admitted to him that "he was having visitors stay with him and need [sic] the space in the house." Ex. 101, Alzamari Dep. 61:9-13. As a result, Alzamari stated that "he [Johar] told me that…[his] sister went to spend the night with her other sister" who lived in the building next door so that the hijackers could stay with Johar. Ex. 101, Alzamari Dep. 60:22 - 61:8; ██████████████ ████████████████████ | ████████████████████████████████ ████████████████████████████████ *See* Objections Chart.<br><br>Alzamari did not testify that Johar told him that the hijackers were staying at Johar's apartment in January 2000. The cited quotes are taken out of context. *See* Response to Plaintiffs Averment ¶ 1482. At his deposition, Alzamari was referring to a night later in 2000, when he met with Al Hazmi at the mosque and Al Hazmi asked him for help the next morning to go and fill out an application for ████████████████ ████████████. Al Hazmi stayed at Johar's apartment overnight and met with Alzamari the next day. Pls. Ex. 101 (Alzamari Tr.) 59:24-61:17, 77:14-23, 93:24-94:9; ████████████████<br><br>Alzamari specifically disputed ████████████ that the hijackers were living at Johar's house. "[H]e [Johar] did not tell me they live in his house. He say they spend the night in his house. So not living in his house." Pls. Ex. 101 (Alzamari Tr.) 60:15-8. ████████████ ████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | ███████████████████<br>███████████████████<br>███████████████████<br>██████████ ls. Ex. 101 (Alzamari Tr.) 59:24-61:17.<br>███████████████████<br>███████████████████<br>███████████████████<br>███████████████████<br>███████████████████<br>███████████████████ |
| 1484. | When the hijackers met Bayoumi and Kaysan Morgan at a restaurant on Venice Boulevard in Los Angeles on February 1, 2000, they told them that "they were living in an apartment nearby" that was "around the corner" from the restaurant. Ex. 92, Morgan Decl. ¶¶ 18-19. ██████████████ | The portion of the Morgan declaration (Pls. Ex. 92, ¶¶ 18-19) is inadmissible hearsay and not based on firsthand knowledge. *See* Objections Chart.<br><br>Morgan does not speak Arabic and had no ability to understand what was discussed at the chance meeting between Bayoumi, Morgan, and the hijackers at the Mediterranean restaurant. Pls. Ex. 112 (Morgan Tr.) 81:5-83:18 (testifying that because he doesn't understand Arabic, everything he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮; Ex. 114, Sultan Dep. 29:6-30:3, 30:21-31:13. | learned came "secondhand" from Al Bayoumi and the translations were not complete since not every sentence was translated).<br><br>Morgan gave at least eight versions of what happened on the day of Morgan's and Al Bayoumi's chance meeting with the hijackers at the Mediterranean restaurant. *See* KSA Ex. 167 (Sageman Rep.) 183-199. Plaintiffs only cite to the declaration which they drafted for Morgan in the first instance, which cherry-picks portions of the accounts selected by Plaintiffs' attorneys. The only person who understood what the hijackers said on that day was Al Bayoumi and there is no testimony from Al Bayoumi about where the hijackers said they were staying.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Pls. Ex. 114 (Sultan Tr.) 69:23-70:7. |
| 1485. | Based on his experience, Youssef explained that one technique he would "frequently use in studying a support network was to place himself in the shoes of the terror group's operatives, here Hazmi and Mihdhar," and using this technique, Youssef determined that it was "possible that the hijackers could have had a casual contact with an individual | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinion is belied by the fact that the hijackers stayed at the house of Abdussattar Shaikh, who was neither vetted nor trusted by Al Qaeda, but was instead a reliable and longtime FBI informant. *See also* Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 260-2, 335-41. Al Mihdhar stayed in Dr. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | such as ▇▇ but they would never have spent the amount of time they did with ▇▇ or stayed at ▇▇ house unless they knew that ▇▇ had been vetted and was a trusted member of their support network." Ex. 5, Youssef Rpt. 163-164. | Shaikh's house for at least ten days (leaving the country on June 10, 2000) and Al Hazmi for more than six months. *Id.* at 260. These contacts were far more extensive than the brief encounters the hijackers had with ▇▇ Youssef also has no demonstrated expertise of terrorist or Al Qaeda tradecraft. The FBI has asserted that, as an agent in the period prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). As Sageman has explained, KSA Ex. 167 (Sageman Rep.) 249-57, an Al Qaeda tradecraft manual was found in Manchester, England, and called the Manchester Manual. KSA Ex. 216 (PECFOIA 41956–2133). The manual instructs terrorist trainees to avoid Muslims and "famous Islamic places (mosques, libraries, Islamic Fairs, etc.)." *Id.* at PECFOIA 42008. Such places might be monitored, and this would expose an operative to the risk of detection by the local security services. In other words, Al Qaeda does not rely on local networks of sympathetic Muslims. For the 9/11 operation, KSM followed the Al Qaeda manual instructions of avoiding Muslim places by explicitly directing the 9/11 hijackers not to speak with any Muslims once in the United States. The only exception to this rule was Al Mihdhar and Al Hazmi, whom he instructed to contact Islamic centers or mosques to help them get settled in the country because they spoke no English and had no exposure to Western societies. Pls. Ex. 31 (KSM Statement) at 18, 36. |
| 1486. | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | Plaintiffs mischaracterize ▇▇▇▇▇▇▇▇▇▇▇▇ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | |
| 1487. | | This paragraph contains attorney argument to which no response is required.<br><br>Plaintiffs distort |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | There was, in fact, no support network for the hijackers, as every U.S. government body that has investigated the attacks has concluded. On Al Thumairy, the 9/11 Commission concluded that "after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups." *Id.* at 218. A decade later, after reviewing all the new information from the Operation Encore investigation, the 9/11 Review Commission concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3. In its EC closing Operation Encore, the FBI concluded, "After nearly twenty years after the attack, the FBI has not identified additional groups or |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 1488. | According to his own deposition testimony, ██████████████████████ | ██████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████████████████████████████████████████████████████████████████████████████ | ████████████████████████████████████████████████████████████████████████████ |
| 1489. | Bassem Youssef opined that the Al Qaeda trained hijackers would never have had this amount of contact with ████ unless he was a known, trusted member of their support network. Ex. 5, Youssef Rpt. 164. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.<br><br>As set forth in the Response to Averment paragraph ████████ had very limited interactions with the hijackers in January 2000.<br><br>Youssef's opinion is also belied by the fact that the hijackers stayed at the house of Abdussattar Shaikh, who was neither vetted nor trusted by Al Qaeda, but was instead a reliable and longtime FBI informant.  *See* response to averment paragraphs 1119–20 above for details about Dr. Shaikh's career as an FBI informant.  *See also* Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 260-2, 335-41.  Al Mihdhar stayed in Dr. Shaikh's house for at least ten days and Al Hazmi for more than six months.  *Id.* at 260.  These contacts were far more extensive than the brief encounters the hijackers had with ████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Youssef also has no demonstrated expertise of terrorist or Al Qaeda tradecraft. The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>As Sageman has explained, KSA Ex. 167 (Sageman Rep.) 249-57, an Al Qaeda tradecraft manual was found in Manchester, England called the Manchester Manual. KSA Ex. 216 (PECFOIA 41956–2133). The manual instructs terrorist trainees to avoid Muslims and "famous Islamic places (mosques, libraries, Islamic Fairs, etc.)." *Id.* at PECFOIA 42008. Such places might be monitored, and this would expose an operative to the risk of detection by the local security services. In other words, al Qaeda does not rely on any local network of sympathetic Muslims.<br><br>For the 9/11 operation, KSM followed the Al Qaeda manual instructions of avoiding Muslim places by explicitly directing the 9/11 hijackers not to speak with any Muslims once in the United States. The only exception to this rule was Al Mihdhar and Al Hazmi, whom he instructed to contact Islamic centers or mosques to help them get settled in the country since they spoke no English and had no exposure to Western societies. Pls. Ex. 31 (KSM Statement) at 18, 36. |
| 1490. | Bassem Youssef opined that "the two trained Al Qaeda operatives would never agree to live with random roommates or ask a stranger to recommend roommates for them to live with." Ex. 5, Youssef Rpt. 165-66. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinion is also belied by the fact that the hijackers not only stayed at the house of someone not vetted or trusted, but it was the house of a reliable and longtime FBI informant, Abdussattar Shaikh. *See* Response to Plaintiffs Averment ¶¶ 1119–20 above for details about Shaikh's career as an FBI informant. *See also* Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | at 260-62, 335-41. Mihdhar stayed in Dr. Shaikh's house for at least ten days and Hazmi for more than six months. *Id.* at 260. These contacts were far more extensive than the brief encounters the hijackers had with ██████<br><br>Youssef also has no demonstrated expertise of terrorist or Al Qaeda tradecraft. The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). |
| 1491. | Bassem Youssef opined that it was "highly unlikely that Al Qaeda's planners would allow Hazmi and Mihdhar, who did not speak English and had never been to the U.S. or any Western country, to stay unaccompanied at a hotel upon their arrival in Los Angeles." Ex. 5, Youssef Rpt. 169. Yossef further concluded that leaving the hijacker's unaccompanied "would have exposed the two men and the plot to substantial risk of discovery," stating "that the modus operandi of Al Qaeda was to arrange for its newly placed operatives to stay in a private home of a trusted associate, and the evidence here supports his opinion that Thumairy or ████ both of whom who were well acquainted with the ██████, asked ████ to host the hijackers in his apartment." Ex. 5, Youssef Rpt. 169; Ex. 72, Madha Decl. ¶ 31. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef also has no demonstrated expertise of Al Qaeda tradecraft. The FBI prevented him from working on the 9/11 attacks and asserted that, prior to that period, Youssef was nothing more than a translator and that he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>Youssef's opinion is also belied by the fact al Qaeda's planners allowed Al Hazmi and Al Mihdhar to stay unaccompanied in a hotel in Bangkok for twice as long as they stayed in Kuala Lumpur, and to stay unaccompanied at the house of an FBI informant, Dr. Shaikh, for six months. *See* Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*), at 260.<br><br>The hijackers did not stay at ████ house in January 2000, as detailed in Response to Averment paragraphs ████.<br><br>████ had "no relationship" with Al Thumairy; he knew him as "Sheikh Fahad," the imam of the mosque, but did not even know his last name. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████ Al Thumairy never gave ████ instructions to do anything, including assisting any of the 9/11 hijackers. *Id.* at ██████ <br><br> Both ████ and ████ testified that they were not friends, and merely saw each other at the King Fahad Mosque. The telephone records show that their residential phones were in regular contact, however, both testified that ████████ knew each other from the mosque and may have been friends. Pls. Ex. ████████ ad never heard the hijackers names prior to the 9/11 attacks and never met them. KSA Ex. ████████ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* There is no evidence at all to the contrary. |
| 1492. | Both the FBI and the 9/11 Commission staff canvassed hotels and motels in the neighborhood surrounding the King Fahad Mosque. Neither found any indication that Hazmi and Mihdhar stayed at a hotel or motel in January 2000. Ex. 2, EO 0896-97, 1891-93; Ex. 307, MFR June 23-24, 2004. They did locate Bayoumi's hotel stays in December 1999 and January 2000, as well as the hijackers' stay in June 2000. Ex. 665, FBI 4012-13. | Plaintiffs Exhibits 2O (EO 896-87) and 307 is inadmissible hearsay to the the extent it is being offered for the truth of the matter asserted. *See* Objections Chart. <br><br> Undisputed that hotels were canvassed. |
| 1493. | While Thumairy denied meeting the hijackers, Johar, or his father Ibrahim Johar aka Abu Khaled, Johar admitted to Alzamari that the hijackers "came through Sheikh Fahad" Thumairy, Ex. 101, | Undisputed that Al Thumairy testified that he did not recall Johar, his father, Ibrahim Johar, or the hijackers. He further testified that he never did anything to assist the hijackers, never gave instructions to anyone to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Alzamari Dep. 132:2-18, and Usman Madha testified that Thumairy (and Mana) knew Ibrahim Johar very well. Ex. 72, Madha Decl. ¶31, at Ex. 2 (identifying photographs of Ibrahim Johar aka Abu Khaled as a regular congregant at the King Fahad Mosque who frequently spoke with Thumairy and knew him well); Ex. 107, Thumairy Dep. 243:24-244:13, 556:1-557:9. | assist the hijackers, and never received instructions to assist the hijackers. Pls. Ex. 107 (Thumairy Tr.) 492:5-493:11.<br><br>██████████████████████████████████████ ██████████████████████████████████ The undisputed evidence is that they did not have a close relationship.<br><br>████████████████████████████████ ████████████████████████████<br><br>It is unsurprising that Al Thumairy would not recall Johar or his father when asked about them at his deposition, 21 years after the events in question. As the imam of the mosque, he met many worshippers, but did not remember all of them. Pls. Ex. 107 (Thumairy Tr.) 565:7-566:13 (testifying that while he was imam at the King Fahad Mosque, there may have been millions of visitors and that it would "be reasonable for someone who visited the King Fahad Mosque to know [his] name but [he did] not recognize their name").<br><br>The Madha declaration (Pls. Ex. 72) was written by Plaintiffs' counsel and the portion cited is not based on personal knowledge. Pls. Ex. 128 (Madha Tr.) 21:11-23:2. It states that he "observed Mr. Al Thumairy and Mr. Mana speaking to Abu Khaled on numerous occasions at the King Fahad Mosque, and I could see from their close interactions with each other that [Ibrahim Johar], Mr. Al Thumairy, and Mr. Mana knew each other very well.: Pls. Ex. 72 (Madha Decl.) ¶ 31. Madha, however, does not understand Arabic. Pls. Ex. 128 (Madha Tr.) 46:24-47:2. He does not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | know what, if anything the men discussed, and no basis to state that they knew each other very well. |
| 1494. | | |
| 1495. | | Plaintiffs Exhibit ████████████ and Plaintiffs Exhibit ████████ ████ are inadmissible hearsay to the extent they are submitted for the truth of ████████ purported statements. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | [REDACTED] but Operation Encore investigators clearly violated this process as they used "cut and paste" duplicates from previous reporting, which shows that the reporting could not be [REDACTED] For examples of extensive cut and paste duplication, Operation Encore's Pls. Ex. 460 (FBI 96–106 CORRECTED VERSION (6/20/10)) is mostly a cut and paste duplicate of KSA Ex. 246(FBI 79–95 CORRECTED VERSION (8/8/07)) despite the three years gap between interviews; and Pls. Ex. 463 (FBI 145–62-REV (6/21/10)) is mostly a duplicate of Pls. Ex. 461 (FBI 121–39 (1/16/08)) despite the two years gap between these |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | interviews. Furthermore, one interview (██████ on 11/13/15) involving both ██████ and ██████ generated two very different reports, KSA Ex. 247 (FBI 244–46 (12/1/15)) and Pls. Ex. 457 (FBI 46–49 (1/15/15)). This last reporting was drafted on January 11, 2016, about two months after ██████ interview and disseminated four days later. These examples contradict the statements in their declarations that the reporting represented the complete and accurate recording of the interviews. In at least one instance, a summary was prepared from notes so cursory that they are hard to make out. *See* ████████████████ ████████████ .<br><br>The FBI reporting is problematic when compared to New Scotland Yard reporting, which is uncontroversial. As mentioned above, the FBI intentionally does not record its interviews as the MPS does. This reliance on notes and memory introduces the possibility of distortions, misunderstanding, and inaccuracies between what the interviewee meant and said and the alleged memorialized text of the interview, which is a narrative reconstruction after the fact of what the agents writing the text believed what the interviewee said. This is compounded by cultural differences in the respective understanding of social reality by the interviewee and agents interviewing him, the difficulty in apprehending the references to vague words like "it," "he," "they," "them," . . . in regular conversation, and the ambiguity stemming from the idiosyncratic use of words by foreign born people. *See* KSA Ex. 167 (Sageman Rep.) 4.<br><br>This reporting by ██████ and ██████ also contradicts all previous ██████ reporting. In his first four interviews with Operation Encore, the summaries do not state that the hijackers had stayed at ██████ home in January 2000, quite the contrary. *See* Ex. 465 (FBI 186-96 (1/24/07)); Ex. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 466 (FBI 197-203 (1/29/07)); KSA Ex. 250 (FBI 204-07 (8/31/07)); Ex. 461 (FBI 121-39-REV2021 (1/16/08)).<br><br>There is further evidence that their reporting is unreliable. ███████ and ███████ reporting in Pls. Ex. 459 (FBI 76-78 CORRECTED VERSION (12/31/15)) was ignored in the Operation Encore 2016 update drafted and disseminated about four months later. Pls. Ex. 566 (FBI 11752-67 (4/4/16)). The update was careful to distinguish Al Hazmi's stay at ███████ apartment in June 2000 from ███████ and ███████ assertion that the hijackers stayed at ███ apartment in January 2000. The details in the narrative show that the update refers to the 2010 reporting about ███████ allegation that the hijackers may have stayed with ███ in January. The EC notes, "When questioned by investigators regarding this, ███ denied it. ███ was asked directly if he had ever assisted anyone in the same manner and to the same extent that he assisted Hazmi and Midhar, before or since, and he replied that he had not." Pls. Ex. 566 (FBI 11758). |
| 1496. | ████████████████████████ | ████████████████████████<br><br>*See* Response to Pls. Aver. ¶ 1488.<br><br>There is no evidence that ███ attempted to keep his interactions with the hijackers a secret. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | ███████████████ |  |
| 1497. | The 2014 FBI Summary Report found that "Al-Thumairy immediately assigned an individual to take care of them during their time in Los Angeles." The evidence indicates that individual is ███ Ex. 2, EO 0226. | Plaintiffs Exhibit 2KK (EO 226) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited document – Plaintiffs Exhibit 2KK (EO 226-UPDATED – is not a report, but an internal document updating the evolution of Operation Encore's investigation. According to former FBI Assistant Director of the Counterterrorism Division, the quoted statement is better characterized "as an investigative theory being pursued by the FBI and not as objective statements of fact." KSA Ex. 245 (McGarrity Decl.) ¶ 22.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1498. | As Youssef stated, this conclusion is further supported by the phone calls between ███ and ███ around the time of Johar's support to the hijackers. Although the call records themselves have not yet been produced, the 2016 FBI Report analyzed the records and found:<br><br>…significant phone connectivity between ███ and ███ prior to and directly following key events of logistic assistance provided by ███ to HAZMI and | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 566 (FBI 11757) is inadmissible hearsay. *See* Objections Chart.<br><br>Both ███ and Mana testified that they were not friends, and merely saw each other at the King Fahad Mosque. The telephone records show that their residential phones were in regular contact, however, both testified that ███ mother and Mana's wife knew each other from the mosque were either friends or acquaintances. ████████████ ███; Pls. Ex. 110A (Mana Tr.) 23:14-24:3, 28:11-28:24. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MIDHAR. This pattern of phone connectivity between ▮▮▮ and ▮▮▮ is not identifiable prior to the hijacker's arrival in Los Angeles and does not occur between ▮▮▮ and ▮▮▮ after the hijackers depart California.<br><br>Ex. 5, Youssef Rpt at 165; Ex. 566, FBI 011752 at 57. | |
| 1499. | Plaintiffs' expert Youssef explained that "the description in the FBI report is consistent with the type of communications analysis" that he regularly conducted with the FBI, and that "pattern and timing of phone calls between two individuals in relation to known events is routinely used to reach conclusions about the substance of the conversations of those individuals." Based on this analysis, Youssef determined that "[h]ere, the FBI identified a significant pattern of phone calls between ▮▮▮ and ▮▮▮ that was linked to the times when ▮▮▮ provided assistance to Hazmi and Mihdhar" and "that Johar provided such assistance in January 2000, immediately after the hijackers' arrival, and in June 2000, when Hazmi and Mihdhar returned and had dinner at Johar's older sister's apartment, and on a later occasion several weeks later when Hazmi returned and met | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef refused at his deposition to disclose his methodology, which he claimed is classified, and accordingly it is not possible to determine whether that methodology is reliable. ECF No. 9088, at 23-24.<br><br>Both ▮▮▮ and Mana testified that they were not friends, and merely saw each other at the King Fahad Mosque. The telephone records show that their residential phones were in regular contact, however, both testified that ▮▮▮ mother and Mana's wife knew each other from the mosque and may have been friends. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Pls. Ex. 110A (Mana Tr.) 23:14-24:3, 28:11-28:24.<br><br>There is no evidence that ▮▮▮ was instructed to assist the hijackers in any way. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. There is also no evidence that Mana even knew who the hijackers were or assisted them in any way. KSA Ex. 77 (Mana Decl.) ¶ 6.<br><br>There is no evidence that any of the calls were related in any way to the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | with Akram Alzamari." Ex. 5, Youssef Rpt. 169-170, n.694. | |
| 1500. | Plaintiffs' expert Youssef opined that the FBI's "report of phone connectivity [between ▇ and ▇ ties in directly with other phone calls made by Thumairy and Bayoumi, and ▇ and that based on this evidence " ▇ and ▇ were discussing matters pertaining to the two hijackers." Ex. 5, Youssef Rpt. 170. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Both ▇ and Mana testified that they were not friends, and merely saw each other at the King Fahad Mosque. The telephone records show that their residential phones were in regular contact, however, both testified that ▇ mother and Mana's wife knew each other from the mosque and may have been friends. ▇▇▇ Pls. Ex. 110A (Mana Tr.) 23:14-24:3, 28:11-28:24.<br><br>There is no evidence that ▇ was instructed to assist the hijackers in any way. ▇▇▇ There is also no evidence that Mana even knew who the hijackers were or assisted them in any way. KSA Ex. 77 (Mana Decl.) ¶ 6.<br><br>There is no evidence that any of the calls were related in any way to the hijackers. |
| 1501. | ▇▇▇ | ▇▇▇ |
| 1502. | ▇▇▇ | Undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████ | |
| 1503. | ████████████████ Plaintiffs' expert Youssef determined that ██████ █████ and that "[t]wo trained Al Qaeda operatives would not have left a bag with someone and returned to pick it up unless they knew that person was part of their support network." Ex. 5, Youssef Rpt. 170. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Undisputed that ████ gave this testimony.<br><br>Youssef was prevented from working on the 9/11 investigation, despite his repeated requests to do so. The FBI has asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008). He has no basis to assert what Al Qaeda operatives would or would not do.<br><br>Youssef's speculation that trained al Qaeda operatives would not have left a bag with someone and returned to pick it up unless they knew the person was part of their support network is similar his assertions (in Averment paragraphs 1490 and 1491) that trained al Qaeda operatives would not have roomed with someone unless they knew the person was part of their support network. The fact is that the hijackers moved into the house of and lived with an FBI informant. *See* Responses to Plaintiffs' Aver. ¶¶ 1490 and 1491.<br><br>As detailed above, there was no support network for the hijackers. This has been the consensus of all authoritative and determinative U.S. Government assessments, including the 2004 9/11 Commission (KSA Ex. 163 (9/11 Rep.) 217-18), the 2004 Joint FBI and CIA Intelligence Assessment (Pls. Ex. 2OO (EO 3416)), the 2015 9/11 Review Commission (KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3, 117), |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and the 2021 FBI EC on the Operation Encore Closing (Pls. Ex. 2A (EO 11)). |
| **XX.D.** | **Phone calls of Thumairy and Bayoumi show that they were coordinating their support for Hazmi and Mihdhar with Saudi government officials including MOIA Director Sowailem and the MOIA advance teams.** | Al Thumairy and Al Bayoumi did not coordinate any support for Al Hazmi and Al Mihdhar. There were no Ministry of Islamic Affairs "advance teams." |
| 1504. | The convergence of contacts among Saudi government officials after the arrival of Hazmi and Mihdhar in Los Angeles and during the planning for their move to San Diego demonstrate that Thumairy and Bayoumi were coordinating with various MOIA officials about the arrangements for the Al Qaeda operatives. This is shown by review of calls in January and February 2000, Ex. 12A, including:

a. Thumairy calls to MOIA Embassy Director Sowailem and the Embassy Ex. 12C;

b. Bayoumi calls to MOIA Embassy Director Sowailem and the Embassy, Ex. 12K; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

There is no evidence that Al Bayoumi or Al Thumairy coordinated the arrival of the hijackers with anyone.

Plaintiffs cite to numerous improper summary exhibits: Plaintiffs Exhibit 12A (*see* Response to Pls. Aver. ¶ 446); 12B (*see* Response to Pls. Aver. ¶ 735); 12C (*see* Response to Pls. Aver. ¶ 94); 12K (*see* Response to Pls. Aver. ¶ 749); 12L (*see* Response to Pls. Aver. ¶ 749).

Plaintiffs Exhibit 12X is also an improper summary exhibit. Plaintiffs Exhibit 12X misattributes to Al Bayoumi 3 calls that were made from a publicly available phone line at the Al Medinah Mosque. The phone line was shared by two office telephones at the mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the mosque – who made |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | c. Bayoumi calls to MOIA Embassy propagator/advance team member Sudairy, Ex. 12X;<br><br>d. Thumairy/Bayoumi calls to MOIA propagator/advance team member Mersal, Ex. 12X;<br><br>e. Bayoumi calls with the Consulate, likely to Consulate Secretary ▮▮▮▮ Ex. 12L; and<br>f. Thumairy's calls with Bayoumi, Ex. 12B. | those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15. |
| 1505. | Youssef determined these call patterns were "significant because they occur while Thumairy and Bayoumi were providing assistance to Hazmi and Mihdhar and reveal the links among the hijackers, Thumairy, Bayoumi, the advance team visit of Mersal who traveled with Abdullah al Jaithen to California in December 1999 – January 2000, and the advance team visit of Sudairy who traveled with Adel al Sadhan to California in December 1998 – January 1999." Ex. 5, Youssef Rpt. 171. As previously discussed, in the spring of 1999, Sudairy and Sadhan returned to the U.S. as MOIA propagators and diplomats under the direction of the Saudi Embassy. These calls occurred while the pair were in the U.S. Sudairy and Sadhan stayed in the U.S. until | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As detailed above, Al Mersal, Al Jaithen, Al Sudairy, and Al Sadhan were not advance teams. There is no evidence that they did anything other than lead Ramadan prayers and participate in the imamate program. There is also no evidence that any of these calls had anything to do with the hijackers.<br><br>As set forth above, all of the evidence is to the contrary. There is no evidence that Al Mersal, Al Jaithen, Al Sudairy, or Al Sadhan had ever heard of the hijackers before the 9/11 attacks or received any instruction to assist them. *See* Pls. Ex. 115 (Mersal Tr.) 289:10-291:16 (testifying |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | after the 9/11 Attacks. Ex. 5, Youssef Rpt. 171, n. 697. | that he had never heard the hijackers names and never discussed them with anyone before the 9/11 attacks and that he is not aware of any instructions provided to anyone to assist the 9/11 hijackers); Pls. Ex. 96 (Jaithen Tr.) 306:21-308:15 (same); Pls. Ex. 119 (Sudairy Tr.) 364:7-365:13 (same); Pls. Ex. 99 (Sadhan Tr.) 384:15-18 (testifying that he doesn't know the hijackers and has never spoken to them). |
| 1506. | **Monday January 17** Thumairy placed a call from his home phone to Bayoumi's cell phone at 10:59pm (6 min.). Ex. 5, Youssef Rpt. 170; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.\n\nPlaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.\n\nPlaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.\n\nUndisputed that this call was placed. There is no evidence that this call had anything to do with the hijackers. |
| 1507. | **Tuesday January 18** Thumairy phoned the Saudi Arabia cell phone number of MOIA propagator Majid Al Mersal at 11:20pm (2 min.). Mersal had just visited Los Angeles and San Diego with MOIA propagator Abdullah al Jaithen meeting with Thumairy and Bayoumi. Ex. 5, Youssef Rpt. 170-71; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Bayoumi had a listing in his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | handwritten address book "Mobile ███-1553 Majid" right under his listing for Jaithen, and his green folder typed list dated January 26, 2000 listed: "Al Mersal, Majid ███ 1553 C ███-71671 F ███ 0309." Ex. 12AA, MPS738_59; Ex. 12BB, MPS688_3. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibits 12AA (MPS738) and 12BB (MPS688) are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>There is no evidence that this purported call had anything to do with the hijackers. Al Mersal had never heard the hijackers names and never discussed them with anyone before the 9/11 attacks. He is not aware of any instructions provided to anyone to assist the 9/11 hijackers. Pls. Ex. 115 (Mersal Tr.) 289:10-291:16. |
| 1508. | This was the second [not first] Thumairy-Mersal call in the phone records and Thumairy would call Mersal again on February 8 (12 min.), March 3 (12 min.), March 12 (1 min.), and April 24 (8 min.). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | According to Youssef, the FBI may have been unaware of and did not investigate MOIA propagator Majed Al Mersal. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that these purported calls had anything to do with the hijackers. Al Mersal had never heard the hijackers names and never discussed them with anyone before the 9/11 attacks. He is not aware of any instructions provided to anyone to assist the 9/11 hijackers. Pls. Ex. 115 (Mersal Tr.) 289:10-291:16.<br><br>Al Mersal has also been on the forefront of Saudi Arabia's fight against Al Qaeda's ideology. From 2006 to 2008, he was the Head of the Scholarly Team leading the Al Sakinah Campaign to Combat Extremism, which in Saudi Arabia is defined as the beliefs advocating and supporting political violence, like terrorism. Pls. Ex. 52, at 2. From 2005 to the time of his deposition, Al Mersal was a member of the Mohammed bin Nayef Center for Care and Counseling, which is the Saudi Arabian rehabilitation center for people arrested on terrorist charges, but who have no blood on their hands. *Id.* at 2. This establishes that Al Mersal directly fought against Al Qaeda and its ideology. |
| 1509. | **Wednesday January 19** Bayoumi called Embassy Islamic Affairs at 8:27am (7 mins.) Thumairy used his cell phone to call Bayoumi at 10:13pm (5 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit.  *See* Response to Pls. Aver. ¶ 446.<br><br>The call on January 19, 2000, at 10:13 PM came from ███-3362, which was registered to Faisal al-Muhanna, not to Al Thumairy.  Al Thumairy testified that he was not familiar with this number. Pls. Ex. 107 (Thumairy Tr.) 316:3-317:21, 497:14–498:11.  In addition, Plaintiffs rely solely upon an FBI memorandum – inadmissible hearsay – as evidence that the call from the ███ number even occurred.  See Ex. 12B (citing EO2757 in REF 1 column).  None of the phone records produced in this case reflect this call.<br><br>There is also no evidence that any of these calls related in any way to the hijackers or that they are related in any way. |
| 1510. | **Thursday January 20** Bayoumi called Embassy Islamic Affairs at 11:03am (2 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  Plaintiffs Exhibit 12A is an improper summary exhibit.  *See* Objections Chart.<br><br>There is no evidence that this call is related in any way to the hijackers. |
| 1511. | **Monday January 24** Thumairy called the direct line of Khalid Al Sowailem at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 11:10am (1 min.) followed by a call to Embassy Islamic Affairs at 1:05pm (7 mins.) followed by calls to the direct line of Khalid Al Sowailem at 1:15pm (1 min.) and 1:18pm (22 mins.). Ex. 5, Youssef Rpt. 173; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that any of these calls are related in any way to the hijackers. |
| 1512. | That evening, Bayoumi placed a call from his Mosque office to Mersal at Mersal's Saudi Arabia office at 6:06pm (1 min.), followed by a call to Thumairy at 6:09pm (1 min.), followed by a call to the Virginia phone of Mutaeb Al Sudairy at 6:26pm (2 min.). Ex. 5, Youssef Rpt. 171; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>It cannot be determined that Al Bayoumi made any of these calls since anyone at the mosque had access to the mosque telephone. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20; 297:11-20. Plaintiffs also misattribute Al Thumairy as the recipient of the referenced call at 6:09 pm to ███ 3362. The subscriber records for this number list the subscriber as |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Muhanna from July 31, 1997 through February 27, 2000, and Jose Marquez from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2 at 1-2. In addition, Al Thumairy testified that he was not familiar with the -3362 number. *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-17, 497:14-499:9.<br><br>In any event, there is no evidence that any of these calls are related in any way to the hijackers. |
| 1513. | Based on Youssef's analysis, these were the first calls Bayoumi made to Mersal and Sudairy in the phone records. Bayoumi would call Sudairy another four times over the next two weeks, on January 26 (2 min.), January 30 (12 min.), February 2 (2 min.), and February 7 (5 min.). According to Youssef, he Bayoumi to Sudairy calls "are timed with the various preparations and actions made by Bayoumi and Thumairy for the move of the hijackers from Los Angeles to San Diego." Ex. 5, Youssef Rpt. 171. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>It is not possible to determine whether the first calls between Bayoumi's cell phone and Al Mersal and Al Sudairy were on January 24, 2000. Al Bayoumi's cell phone records prior to January 9, 2000 are not in the record. Al Bayoumi was in contact with Al Sudairy before this date, and met up with Al Sudairy in June 1999 in Washington, D.C. *See* Pls. Ex. 11F (MPS2023-0003 Video Screenshots).<br><br>In addition, some of these calls (January 24, 2000, February 7, 2000) were made from the phone at the Al Madinah Mosque. It is not possible to determine who made these calls since the phone was open for anyone to use. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20; 297:11-20.<br><br>There is no evidence that any of these calls related in any way to the hijackers. There is also no showing that these calls were timed with any preparation or other events involving the hijackers. |
| 1514. | The FBI found that the Bayoumi-Sudairy calls were "significant" and "coincide with significant logistic support of the hijackers." Ex. 2, EO 0593, 0598; Ex. 566, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | FBI 11765. The FBI found that Bayoumi reported to Sudairy once "the hijackers' affairs were in order." Ex. 2, EO 0598-99. The FBI determined that the "final phone call between SUDAIRY and BAYOUMI occurs 02/07/00 immediately after HAZMI and MIDHAR's apartment lease and living arrangements have been finalized and funds fronted by BAYOUMI." Ex. 566, FBI 11765. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2M (EO 593, 598) and Plaintiffs Exhibit 566 (FBI 11765) are inadmissible hearsay. *See* Objections Chart.<br><br>The FBI did not make any findings in these preliminary investigative documents. Plaintiffs Exhibit 2M sets forth an "investigative theory being pursued." KSA Ex. 245 (McGarrity Decl.) ¶ 22. It is also preliminary in nature and contains numerous misstakes. The full passage from which the quote is taken states: "Al-Bayoumi called Al Sudairy five (5) times while the hijackers were in San Diego with Al-Bayoumi. The dates of the calls are significant. The first set of calls are 24 January, 26 January, and 30 January 2000 – this was the week Al-Bayoumi met the hijackers in Culver City, CA and talked to them about coming to San Diego. The next call occurred on 2 February 2000. . . The last call occurred on 7 February 2000." The evidence shows that the hijackers were in Los Angeles, not San Diego when Al Bayoumi made his first four calls to Al Sudairy. *See* KSA Aver. ¶¶ 90, 97-108. Furthermore, the week of January 24, 26, and 30, 2000, was not the week Al Bayoumi met the hijackers. It was the week before his chance meeting with the hijackers at the Mediterranean restaurant. Pls. Ex. 120 (Bayoumi Tr.) 725:19-726:8.<br><br>The second document (Pls. Ex. 566 (FBI 11765)) is the 2016 Operation Encore update, another instance of an internal document outlining Operation Encore's "investigative theory being pursued" and not an assertion of objective fact. KSA Ex. 245 (McGarrity Decl.) ¶ 22.<br><br>The actual final conclusion of the FBI was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).<br><br>These calls also could not have been about the hijackers since Al Sudairy had never even heard their names before the 9/11 attacks. Pls. Ex. 119 (Sudairy Tr.) 364:7-365:13. |
| 1515. | Youssef carefully reviewed the phone records "in context and agreed" with the conclusions reached by the FBI, stating the "discrete group of calls from Bayoumi to Sudairy in the last week of January and first week of February 2000, together with the absence of similar phone contacts between Bayoumi and Sudairy until a single additional call in March 2001, shows that the calls are likely related to a work project shared by the two men." Ex. 5, Youssef Rpt. 172. Youssef further concluded, "[t]he timing of the calls from Bayoumi to Sudairy just before and after the hijackers' move from Los Angeles to San Diego, together with the facts surrounding Sudairy's prior visit to Los Angeles and San Diego [in December 1998-January 1999] and another call from Bayoumi to Sudairy in March 2001 tied to the cross-country trip of Hazmi and another 9/11 hijacker...strongly indicate that Bayoumi is reporting to Sudairy about Hazmi and Mihdhar." Ex. 5, Youssef Rpt. 172. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth above, the FBI did not make conclusions regarding these phone calls. Rather, the documents set forth "investigative theor[ies] being pursued." KSA Ex. 245 (McGarrity Decl.) ¶ 22.<br><br>It is not possible to determine whether the first calls between Bayoumi's cell phone and Al Sudairy were on January 24, 2000. Bayoumi's cell phone records prior to January 9, 2000 are not in the record. Al Bayoumi was in contact with Al Sudairy before this date, and met up with Al Sudairy in June 1999 in Washington, D.C. *See* Pls. Ex. 11F (MPS2023-0003 Video Screenshots).<br><br>There is no evidence of what was discussed on these calls and there is no basis at all for Youssef to assert that Al Bayoumi was reporting to Al Sudairy about Al Hazmi and Al Mihdhar. What is clear is that Al Sudairy had never even heard the hijackers names and never discussed them with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | anyone before the 9/11 attacks. Pls. Ex. 119 (Sudairy Tr.) 364:7-365:13. He is also not aware of any instructions provided to anyone to assist the hijackers. *Id.* |
| | | Nor is there any evidence that Al Bayoumi wittingly assisted the hijackers. The final conclusion of the FBI was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 1516. | As Youssef pointed out, Bayoumi had no explanation for his calls to Sudairy but testified that "it could have been another person who called" Sudairy. Ex. 5, Youssef Rpt. 172; Ex. 120, Bayoumi Dep. 585:10-586:2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |
| | | At his deposition more than 20 years after these purported call, Al Bayoumi could not recall the purpose of these calls, stating "I really don't remember. It could have been another person who called." Pls. Ex. 120 (Bayoumi Tr.) 585:10-586:2. This testimony is accurate. As set forth above, some of these calls were made from a phone at the Al Madinah Mosque that anyone at the mosque had access to. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20; 297:11-20. |
| 1517. | Youssef determined the "calls to Sudairy were placed from Bayoumi's Mosque | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | phone and Bayoumi's cell phone" and "[i]t would be a strange and unlikely coincidence for 'another person' as described by Bayoumi to be calling Sudairy from both of those phones over this discrete two-week period. Ex. 5, Youssef Rpt. 172. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef has no basis for his speculation that another person did not place the calls to Al Sudairy from the mosque phone. |
| 1518. | **Wednesday January 26** Bayoumi called the Saudi Consulate at 11:25 (5 mins.) followed by a call to Sudairy at 11:35am (2 mins.), who at the time was working in MOIA's Embassy office under Sowailem. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Bayoumi's handwritten address book and pattern of calls to the Islamic Affairs office at the Embassy shows that his calls to the Consulate were likely to Islamic Affairs and its sole employee Ismail Mana. Ex. 12AA, MPS738_52. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>There is no evidence that any of these calls related in any way to the hijackers. The calls to the Embassy and the Consulate more likely relate to the renewal of his passport and his request for Islamic literature for the mosque, which he picked up the following week at the Consulate. KSA Aver. ¶¶ 90-93. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no basis for the speculation that Al Bayoumi called Mana. Both Al Bayoumi and Mana testified that the two men had no relationship and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi). |
| 1519. | **Thursday January 27** Bayoumi called the Embassy Islamic Affairs number at 10:55am (6 mins.) Over a span of six consecutive workdays from Thursday January 27 through Thursday February 3, Bayoumi called the Embassy's Islamic Affairs number every day for a total of 10 calls. Bayoumi also called other Embassy numbers on January 27 at 11:04 (3 mins.) and 11:55 (3 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |
| | | Plaintiffs omit appropriate context for these calls. Immediately before and after the call to the Embassy's Islamic Affairs number, Al Bayoumi also called the Saudi Arabia Cultural Mission at 10:52 AM, 11:01 AM, and 11:03 AM. He then called other numbers at the Embassy at 11:04 AM and 11:55 AM. Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). |
| | | During these same six consecutive workdays, Al Bayoumi called the Saudi Embassy Cultural Mission, which is an office for Saudi students studying in the United States, 14 times (more than the 10 calls to MOIA office), and the Saudi Embassy general number 5 more times. At the same |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | time, he called Keller Graduate School 4 times, and his home office of the Presidency of Civil Aviation in the KSA once. *Id.* at 41-49.<br><br>There is no evidence that any of these calls had anything to do with the hijackers. Instead, the evidence indicates that these calls may have had to do with Bayoumi's renewal of his and his family's passports (which happened the following week), his request for Islamic materials for the mosque (which he also picked up the following week), and issues concerning his studies in the United States. When Al Bayoumi renewed his passport the following week, he brought his expiring passport, a copy of his U.S. Department of Justice I-20 certificate of eligibility for nonimmigrant status, and a letter from the Keller Graduate School confirming his enrollment in the school. *See* KSA Ex. 85 (Awad Ex. 463) at 6644, 6646-47. |
| 1520. | **Friday January 28** Bayoumi called Embassy numbers at 9:08am (1 min.) and 9:09am (2mins.); called the Saudi Consulate in Los Angeles at 9:13am (3mins.); called the Embassy at 9:15am (7 mins.); and called the Saudi Consulate again at 9:33am (1 min.) and 9:35am (10 mins.). Bayoumi then called the Embassy Islamic Affairs number at 10:59am (3 min.) and 11:02am (1 min.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Objections Chart.<br><br>As discussed in the response to averment paragraph 1519, Plaintiffs omit appropriate context for these calls. There is no evidence that any of these calls had anything to do with the hijackers. Instead, the evidence indicates that these calls may have had to do with Bayoumi's renewal of his and his family's passports (which happened the following week), his request for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Islamic materials for the mosque (which he also picked up the following week), and issues concerning his studies in the United States. |
| 1521. | **Sunday January 30** Bayoumi called MOIA Embassy propagator Sudairy at 3:15pm (10 mins). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Objections Chart.

Plaintiffs have not established that the number called ████-0998, belonged to Al Sudairy. The documents that Plaintiffs Exhibit 12A cites to support this assertion are inadmissible hearsay. Al Sudairy did not recall this phone number when asked at his deposition. Pls. Ex. 119 (Sudairy Tr.) 233:9-22.

In any event, even if Al Bayoumi did make this call to Al Sudairy, there is no evidence that it had anything to do with the hijackers, who Al Sudairy had never heard of until after the 9/11 attacks. Pls. Ex. 119 (Sudairy Tr.) 364:7-365:13. |
| 1522. | **Monday January 31** Bayoumi called the Embassy Islamic Affairs number at 9:54am (1 min.) and 9:56am (1 min.) and the Consulate at 9:58am (2 mins.), 10:00am (10 mins.) and 10:50am (3 mins.) Just before making the call to the Consulate at 10:50am, Bayoumi called Kaysan Morgan | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at 10:47am (3 mins.) Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that any of these calls had to do with the hijackers. Instead, the evidence indicates that these calls may have had to do with Bayoumi's renewal of his and his family's passports, his request for Islamic materials for the mosque, and issues concerning his studies in the United States. |
| 1523. | On January 31, Bayoumi drove to Los Angeles and went to the Saudi Consulate with his family to file their passport applications and visited the King Fahad Mosque. The trip was a rehearsal for Bayoumi's return trip to Los Angeles the following day with Kaysan Morgan. | Plaintiffs cite no evidence that Al Bayoumi made a trip to Los Angeles that was a "rehearsal" for the trip the following day.<br><br>The allegation of two trips to Los Angeles is addressed in the next Section, XX.E, and the evidence shows that there was only one trip. |
| 1524. | **Tuesday February 1** Bayoumi called the Saudi Consulate at 9:32am (5 mins.) and 9:53am (3 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>To the extent a response is required, this is undisputed. There is no evidence that these calls had to do with the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1525. | As discussed below in Section XX. F.-J., Bayoumi drove to Los Angeles with Kaysan Morgan on February 1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The alleged February 1, 2000 trip is addressed in the Responses to Section XX.F of Plaintiffs' Averment. |
| 1526. | Bayoumi used his cell phone to call the Embassy Islamic Affairs number at 12:09pm (6 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |
| | | To the extent a response is required, this is undisputed. There is no evidence that these calls had to do with the hijackers. |
| 1527. | **Wednesday February 2** Bayoumi called the Embassy Islamic Affairs number at 9:04am (4 mins.); the Saudi Consulate at 9:21am (2 mins.); and MOIA Embassy propagator Sudairy at 10:53am (2 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |
| | | Plaintiffs omit other context. On the same day, February 2, 2000, Al Bayoumi also called the Saudi Arabian Cultural Mission four times – at 9:24 AM, 10:51 AM, 11:59 AM, and 11:59 AM. He also called Keller Graduate School twice at 11:41 AM and 11:56 AM. Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). This indicates that the calls likely had to do with administrative matters relating to his education. When Al Bayoumi renewed his passport the same week, he brought his expiring passport, a copy of his U.S. Department of Justice I-20 certificate of eligibility for nonimmigrant status, and a letter from the Keller Graduate School confirming his enrollment in the school. *See* KSA Ex. 85 (Awad Ex. 463) at 6644, 6646-47. |
| | | Plaintiffs have not established that the number called, ███████-0998, belonged to Al Sudairy. The documents that Plaintiffs Exhibit 12A cites to support this assertion are inadmissible hearsay. Al Sudairy did not recall this phone number when asked at his deposition. Pls. Ex. 119 (Sudairy Tr.) 233:9-22. |
| | | In any event, even if Al Bayoumi did make this call to Al Sudairy, there is no evidence that this call or any of the other calls had anything to do with the hijackers, who Al Sudairy had not even heard of prior to the 9/11 attacks. Pls. Ex. 119 (Sudairy Tr.) 364:7-365:13. |
| 1528. | As discussed below in Section XXI. B., Hazmi and Mihdhar arrived in San Diego on February 2 or February 3, 2000. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1529. | **Thursday February 3** As Bayoumi was making arrangements for the hijackers in San Diego, Bayoumi called the Embassy Islamic Affairs number at 9:20am (5 mins.), 11:53am (2 mins.) and 12:09pm (3 mins.) With the hijackers now safely moved to San Diego, Thumairy reported in MOIA Embassy Director Sowailem at 11:41am (12 mins.). Ex. 5, Youssef Rpt. 193; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>There is no evidence that on February 3, Al Bayoumi was making arrangements for the hijackers in San Diego or even knew that they had arrived in San Diego. There is also no evidence that Al Thumairy's call to Sowailem had anything to do with the hijackers.<br><br>Al Thumairy testified that the first time he recalled hearing the names Hazmi and Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. There is no evidence that Sowailem ever knew who the hijackers were, had any contact with them, or assisted them in any way. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1530. | As Youssef determined, Bayoumi would not contact the Islamic Affairs number again until March 9, 2000. He did, however, make calls to the personal numbers of the Embassy's Islamic Affairs officials, including Mutaeb Al Sudairy (Bayoumi called Sudairy on February 7, 2000), and MOIA Embassy Director Sowailem (Bayoumi called Sowailem on February 18 and 19, 2000). Ex. 5, Youssef Rpt. 173; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The calls occurred around the time Bayoumi arranged a welcome party for the two hijackers. Ex. 5, Youssef Rpt. 201. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Youssef's theory that Al Bayoumi's calls to the Embassy's Ministry of Islamic Affairs Office stopped on February 3 because the hijackers were settled into Los Angeles makes no sense. The hijackers did not fill out the application to their apartment until February 4 and did not move into the apartment until February 5. KSA Ex. 163 (9/11 Rep.) 219. Yet, there are no calls from Al Bayoumi to the Embassy or Consulate on those dates.<br><br>Moreover, the hijackers' mission was to learn English and learn how to fly. They had not accomplished (or even attempted to accomplish that mission as of February 3). Yet, as Plaintiffs note, there is a stop in the communications between Al Bayoumi and the Consulate and Embassy after that date. This would make no sense if Al Bayoumi was actually tasked with assisting the hijackers and he was reporting back on the progress of that mission. A more realistic explanation is that by February 3, Al Bayoumi had gotten his and his families' passports renewed and had also picked up the Islamic material from the Consulate. These were the reasons for his earlier phone calls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, no one who inadvertently helped the hijackers in the months after they settled in San Diego had any telephone connectivity with the Saudi Embassy or Consulate. This is further proof that there was no support network, since there would be no reason for a support network to stop reporting to their purported supervisors while the mission is ongoing.<br><br>Plaintiffs have not established that the number Al Bayoumi called on February 7, 2000, (703) 536-0998, belonged to Al Sudairy. The documents that Plaintiffs Exhibit 12A cites to support this assertion are inadmissible hearsay. Al Sudairy did not recall this phone number when asked at his deposition. Pls. Ex. 119 (Sudairy Tr.) 233:9-22. In any event, there is no evidence that this call or any others had anything to do with the hijackers.<br><br>Moreover, Plaintiffs misattribute to Al Bayoumi the call on February 7 to a number they associate with Al Sudairy. The call was made from ███████ 3142, a publicly-available phone line at the Al Medinah Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque –who made that specific call. *See* Pls. Ex. 120 (Bayoumi Tr.) at 297:11-298:7; 786:8-15.<br><br>The party honoring Khalid al-Yafai and Sheikh Barzanjee is addressed in the Response to Section XXII of Plaintiffs' Averment. |
| 1531. | Bassem Youssef, former FBI Counterterrorism Communications Unit Chief, opined that "the call pattern closely matches the actions being made by Thumairy and Bayoumi to arrange and provide assistance to Hazmi and Mihdhar | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and shows that Thumairy and Bayoumi are receiving instructions from officials at Embassy's Islamic Affairs department about the assistance being provided for Hazmi and Mihdhar." Ex. 5, Youssef Rpt. 174. Youssef concluded that "Bayoumi's calls occur during the time Bayoumi is preparing for the arrival of the two hijackers in San Diego, and end once Hazmi and Mihdhar were in San Diego under Bayoumi's care." Ex. 5, Youssef Rpt. 174-175. Thumairy's calls to Mersal and Bayoumi's connection with Embassy MOIA propagator Sudairy provide additional validation. Sudairy and Mersal were part of the advance teams that visited California. Sudairy was tied to Al Qaeda by the FBI; Bayoumi's February 1999 correspondence with Habib marks Sudairy as an Al Qaeda representative; and Sudairy was sent by Sowailem. Ex. 5, Youssef Rpt. 174-75. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no basis whatsoever for Youssef's speculative opinion. There is no evidence at all that any of the calls in this Section relate in any way to the hijackers. Moreover, as explained in response to averment paragraph 1530, the pattern of Bayoumi's calls to the Embassy and the Consulate, which abruptly stop before the hijackers had signed a lease or accomplished anything in San Diego, demonstrates that the calls could not have concerned the hijackers. Instead, they likely concerned renewing his families' passports and obtaining Islamic materials for the mosque.<br><br>The FBI examined this very telephone activity and came to the final conclusion that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).<br><br>As detailed above, there is no evidence that Al Sudairy and Al Mersal were part of an advance team for the hijackers. It would have been chronologically impossible for Al Sudairy to be part of a team for an operation that had not yet been approved and started. *See* Pls. Ex. 82 (CIA_256). The evidence is that Al Mersal was not part of any jihadi network but on the contrary stood at the forefront of the KSA campaign against Al Qaeda and its ideology. Pls. Ex. 52, at 2.<br><br>There is no evidence that Al Sudairy was tied to Al Qaeda and Operation Encore never found any evidence for it. Al Bayoumi's correspondence |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | with al-Habib does not mark Al Sudairy as an Al Qaeda representative. It only describes him as a MOIA Ramadan propagator, who did his 1419H Ramadan imamate at the Al Madinah Mosque. *See* Response to Pls. Aver. ¶¶ 1163-1168. |
| **XX.E.** | **On Monday, January 31, 2000 Bayoumi brought his wife and their children to Los Angeles, went to the Saudi Consulate to renew their passports, and also went to the King Fahad Mosque.** | This statement is false and not supported by any evidence. |
| 1532. | Saudi Arabia incorrectly claims that Bayoumi went to Los Angeles "[o]n January 31…*or* February 1," KSA Aver. ¶ 90 (emphasis added), when Bayoumi went on January 31 with his family to renew their passports *and* on February 1, 2000 to meet Hazmi and Mihdhar. Ex. 5, Youssef Rpt. At 177-79. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs postulate a "two-trip theory," namely that Al Bayoumi traveled twice to Los Angeles: on January 31 and again on February 1, 2000. Overall, there is no evidence for two trips. There is only a question as to when the one trip took place: January 31 or February 1, 2000.<br><br>Al Bayoumi's gas consumption for the January – February 2000 period demonstrates that there was a single trip to Los Angeles. As detailed by Sageman, "Al Bayoumi bought fuel on 30 January for $18.48 at Texaco in San Diego and on 1 February for $19.42 at Shell in San Diego." KSA Ex. 167 (Sageman Rep.) 669 (citing FBI 2388, which is Pls. Ex. 509). Al Bayoumi had a used 1995 Nissan Altima, which had a tank capacity of 15.9 gallons and an average fuel consumption of about 24 mpg. *Id.* "Since Al Bayoumi went to several places that day, these detours must be added to the distance between his home and the consulate, namely stopping to get a passport picture, going to the consulate, getting lost on the way to the mosque and ending up at the restaurant." *Id.* The total trip would have been 280-300 miles. *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "In January, taking the average price per gallon at $1.36, he purchased gas on 2 January at Arco San Diego for $15.90 (11.7 gal); 9 January at Shell San Diego for $17.26 (12.7 gal); on 15 January at Shell San Diego for $17.27 (12.7 gal); on 22 January at Shell San Diego for $17.27 (12.7 gal); on 30 January at Texaco San Diego for $18.48 (13.6 gal); 1 February at Shell San Diego for $19.42 (14.3 gal); 5 February at Shell San Diego for $16.79 (12.3 gal); and 11 February for $17.08 (12.6 gal)." *Id.* (citing BANA ALB 0002 (which is KSA Ex. 251) and BANA ALB 00005 (which is KSA Ex. 252)). "This shows a gas consumption of about 12 gallons a week, with just one extra filling on 1 February of about 12 gallon," which indicates just one trip to Los Angeles." *Id.* <br><br> Al Bayoumi testified that he took only one trip to Los Angeles and there is no evidence that he brought his family to the Consulate. Pls. Ex. 120 (Bayoumi Tr.) 357:17-359:2 (testifying that he traveled to the Consulate with an American named Osama). Mana, who worked in the Consulate, testified that he only saw Al Bayoumi once on his single visit to the Consulate. KSA Ex. 77 (Mana Decl.) ¶¶ 10-16. The contemporaneous records from the Consulate describe only one trip. KSA Ex. 85 (Awad Ex. 463) at 6643. The 9/11 Commission also found only one trip to Los Angeles. KSA Ex. 163 (9/11 Rep.) 217-18. |
| 1533. | Bayoumi took his wife and children to get passport photos and the family then went together to the Saudi Consulate on January 31, 2000 to renew their passports. Ex. 10J (MPS892-CLIP Video Exhibit); Ex. 11J (MPS Photographs) (MPS726_8-12, photos 14-16, and 18-22). Photographs and videos taken that day of Bayoumi's family show Emad and Firas wearing the same collared button-down dress shirts as in their passport | Plaintiffs Exhibit 11J (MPS892-CLIP Video Screenshots) provides no date of when it was filmed. Pls. Ex. 10J (MPS892-CLIP Video Exhibit). Plaintiffs assert that it was probably filmed January 31, 2000, but the video is far more consistent with a date of January 9, 2000. *See* Response to Pls. Aver. ¶ 1429. Al Bayoumi and his family wear the same clothes as two sets of pictures also found in the MPS materials. KSA Ex. 253 (MPS 703, Bayoumi Photographs (D0886 XO318)) at photos 26, 39, 42, 44; KSA Ex. 254 (MPS 726, Bayoumi Photographs (D0884-X0351)) at photos 14–16, 18–22. The photos taken in front of King Fahad Mosque were taken at night, suggesting that Al Bayoumi and his family might |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | photos. Ex. 11J (MPS Photographs) (MPS703_97, photo 26; MPS703_102, photo 42); Ex. 211, KSA6642-65 at 6651, 6653 (Emad and Firas Bayoumi passports). | have spent the night in Los Angeles. ██████████ ██████████████████████████ *See* Pls. Ex. 526 (FBI 4011); Pls. Ex. 525 (FBI 4009). There is no evidence that the Al Bayoumi family got their passport photos on the day the cited video was filmed or that they went to the Saudi Consulate together. The passport photos are poorly reproduced. However, Omar Al Bayoumi's and his daughter Bayan's passport photos are clear enough to show that they are not wearing the same clothes as in the video and photographs. Pls. Ex. 143 (KSA 7996); Pls. Ex. 211 (KSA 6652). Firas's passport photo shows that he is wearing a shirt with a collar with curbed edges, while the video and photos in front of the mosque show a shirt with a collar with straight edges. Pls. Ex. 211 (KSA 6653). Emad's passport photo shows a dark shirt but is not clear enough to compare with the shirt with a distinguishable pattern that he wore in the video and photos in front of the mosque. *Id.* at 6651. There is also no evidence that Al Bayoumi's family came to the Consulate with him on January 31, 2000. Contrary to Plaintiffs' assertion that Al Bayoumi came with his family: "The said person checked with the consulate in Los Angeles . . . requesting renewal of his passport and passports of his family members because they expired. . . . The consulate issued passports to the said person, his wife Manal, and his children Emad, Bayan, and Firas." *Id.* at 6643. |
| 1534. | Saudi Government records support that Bayoumi and his family went to the Saudi Consulate in Los Angeles on January 31, 2000. According to a July 2003 "special report" on Bayoumi prepared by the Consulate, "[t]he said person [Bayoumi] checked with the consulate in Los Angeles | Plaintiffs Exhibit 211 does not state that Al Bayoumi visited the consulate with his family. It only states that Al Bayoumi visited the consulate. The evidence also demonstrates that Al Bayoumi did not visit the Consulate with his family. He brought his expiring passport, a copy of his U.S. Department of Justice I-20 certificate of eligibility for nonimmigrant status, and a letter from the Keller Graduate School confirming his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and met with colleague Abdullah Al Awad on 24/10/1420 AH (January 31, 2000 AD), requesting renewal of his passport and passports of his family members because they expired." Ex. 211, KSA 6642-6665 at 43. | enrollment in the school. *See* Pls. Ex. 211 (KSA 6644, KSA 6646-47), respectively. The last two items are specifically mentioned in the "special report." *Id.* at 6643. Also found in the file is a handwritten request by Al Bayoumi for renewal of his passport and his four family members, dated 24/10/1420H (January 31, 2000). *Id.* at 6649. This may be the source of the January 31, 2000 date in Plaintiffs Exhibit 211. |
| 1535. | Saudi Arabia's answers to interrogatories state that Bayoumi made a separate trip "on or around February 1, 2000" to Los Angeles with "Caysan Bin Don [Kaysan Morgan]" to "*pick up* a renewed passport." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13, 16; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10 (emphasis added). Saudi Arabia prepared its interrogatory answers after interviewing Bayoumi in 2018, but before the 2022 MPS production revealed that the Consulate sent out the Bayoumi family's passports to them by registered mail. Ex. 678K, MPS95_106 (registered mail envelope addressed to Bayoumi from Saudi Consulate, dated February 2, 2000); also at Ex. 449. | Saudi Arabia's interrogatory answers do not state that Al Bayoumi made a separate trip to the Consulate on February 1, 2000. It makes clear that the date that Al Bayoumi went to the Consulate is unclear and that it was "on or around February 1, 2000." Pls. Ex. 24 (June 12, 2018 KSA Responses to Interrogatory 10); Pls. Ex. 25 (Aug. 14, 2018 KSA Suppl. Response to Interrogatory 10). |
| 1536. | Bayoumi's visits to Los Angeles on both January 31 and January 1 are independently confirmed by the phone records, which show that on February 1, 2000 Bayoumi called his home at 7:11 p.m. (3 mins.) as he was returning to San Diego with Kaysan | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Morgan after visiting the Saudi Consulate and meeting Mana; meeting the hijackers at a restaurant; and meeting Mana (a second time) and Thumairy at the King Fahad Mosque. There is no similar call on January 31, which supports that Bayoumi was with his family. Ex. 515, FBI 3221 at 3230; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 92, Morgan Decl. ¶¶ 11-22 (¶22: "On the way home to San Diego, Mr. al-Bayoumi called his wife to tell her we were returning.") | There is no evidence that there were two trips to Los Angeles. The phone records do not confirm the "two-trip theory," because they are too ambiguous. There is no evidence of what was discussed on the calls or where Al Bayoumi was when he made the calls.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. |
| 1537. | Bayoumi and his family also visited the King Fahad Mosque on January 31, 2000. Bayoumi's wife took a photograph of Bayoumi with his three children in front of the King Fahad Mosque. Ex. 11J, MPS703_97 (photo 26). | There were multiple photographs of Al Bayoumi and his children at night in front of the King Fahad Mosque on the trip shown in the photographs Plaintiffs cite. KSA Ex. 253 (MPS 703, Bayoumi Photographs (D0886 XO318)) at photos 26, 39, 42, 44. As shown in the Responses to Averment paragraphs 1429 and 1533 above, the photos are undated, but the evidence suggests that they were taken on the January 9, 2000 trip. |
| 1538. | Bayoumi and his family went to the Beverly Hills shopping district and visited the Bijan store, as Hisham Kaaki discussed with Bayoumi three weeks earlier on their January 9, 2000 trip to Los Angeles. Ex. 11, MPS726_8-12 (photos 14-16, 18-22) (photos of Bayoumi family visiting stores in Beverly Hills including Bijan). | As shown in the Responses to Averment paragraphs 1429, 1533, and 1537 above, there is no evidence that Al Bayoumi and his family traveled to Los Angeles on January 31, 2000. Nor is there evidence that Al Bayoumi and Hisham al-Kaaki traveled to Los Angeles on January 9, 2000, as shown in the Response to Averment paragraph 1425. Neither the cited videos nor the cited pictures are dated. The evidence suggests that Al Bayoumi, Al Kaaki, and Al Yafai's trip took place in the fall of 1999, and that the Al Bayoumi family trip took place on January 9, 2000. |
| 1539. | Bayoumi can also be seen in the video footage with his cellphone kept in a small holster attached to his belt on his right hip. | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 10J, MPS892-CLIP Video Exhibit 58:19. Phone records show that Bayoumi used his cellphone on the morning of January 31, 2000 to call the Saudi Embassy Islamic Affairs number twice, at 9:54 a.m. (1 min.) and 9:56 a.m. (1 min.), and to make three additional calls to the LA Consulate at 9:58 a.m. (2 mins.), 10:00 a.m. (10 mins.) and 10:50 a.m. (3 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | There is no evidence that the cited video clip is from January 31, 2000 and there is no evidence the cited calls were made on the same day as the video. The call records also do not indicate where Al Bayoumi was when he placed the calls. |
| 1540. | Just before making his third call to the Consulate at 10:50 a.m. on January 31, 2000, Bayoumi placed a call to Kaysan Morgan at 10:47 a.m. (3 mins.). Ex. 515, FBI 3221 at 3230; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). These calls show that Bayoumi was engaged in coordinating arrangements for his return February 1, 2000 trip to Los Angeles with Morgan. Bayoumi was likely calling Smail Mana at the Consulate to confirm that Morgan would be joining Bayoumi the next day. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Plaintiffs' Aver. ¶ 446. There is no evidence of what was discussed on these calls. There is no evidence that Al Bayoumi was calling Mana at the Consulate. Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi). |
| 1541. | Bayoumi planned well in advance to make the two trips to Los Angeles on January 31 and February 1, 2000. For several months, Bayoumi had regularly attended Tuesday morning Toastmasters Club meetings at a San Diego hotel. Ex. 678R, at MPS732_2 (showing time and place of weekly meetings), and at MPS 732_308 (showing Bayoumi's membership since June 1999). But Bayoumi was missing from the "Schedule of Assignments" for the Club on Tuesday, February 1, 2000 and did not attend the meeting that day. Ex. 678R, at MPS 732_309 (showing schedule for January 4 through February 1, 2000). Instead, Bayoumi travelled to Los Angeles with Morgan to meet the hijackers. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 678R is inadmissible hearsay.  *See* Objections Chart.

As set forth above, there is no evidence that Al Bayoumi traveled to Los Angeles on both January 31 and February 1.  He traveled to Los Angeles once, and it could have been on either day.

There is also no evidence that Al Bayoumi traveled to Los Angeles to meet the hijackers.  As detailed below, Al Bayoumi and Morgan testified that this was a chance meeting.  Pls. Ex. 120 (Bayoumi Tr.) 725:19-726:8; Pls. Ex. 112 (Morgan Tr.) 28:21-29:13 (testifying that he has no "personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence").

Moreover, investigators only know about this chance meeting "because Bayoumi told law enforcement that it happened."  KSA Ex. 163 (9/11 Rep.) 218.  It would make no sense for Al Bayoumi to disclose to authorities this meetings if it was pre-arranged and clandestine. |
| XX.F. | **February 1, 2000: Bayoumi visits Los Angeles to set up Kaysan Morgan as his** | The assertions in this Section are false.  Plaintiffs rely almost exclusively on a declaration of Morgan that they drafted in the first insance, and which cherry-picks from multiple different and inconsistent versions that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **cover and meets Hazmi, Mihdhar, Mana (twice), and Thumairy.** | Morgan had reportedly given to the FBI. *See* KSA Ex. 167 (Sageman Rep.) 183-199. There are so many material inconsistencies in Morgan's prior versions, that the FBI spent a long session with Morgan and followed-up with a phone call in a failed attempt to deconflict his previous versions. KSA Ex. 246 (FBI 79 CORRECTED VERSION (8/8/07)). |
| | | The FBI also states that ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* at FBI 81. |
| | | The Sageman report details all of Morgan's various versions of what occurred on the trip to Los Angeles, labeled Morgan1 to Morgan8; the four Al Bayoumi versions, including his MPS interviews; and a summary of Smail Mana's versions of his short interaction with Morgan and Al Bayoumi at the Los Angeles Consulate that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. |
| | | There is no evidence that Al Bayoumi visited Los Angeles to set up Morgan as his cover. From a tradecraft perspective, there is no reason to bring a perfect stranger to a clandestine meeting because it breaks the secrecy of the meeting. The stranger is now privy to a meeting that he should never have been privy to and there is the possibility that the stranger might inform the authorities. Good tradecraft would have required Al Bayoumi to meet with the two terrorists in a clandestine place, either a hotel room or a witting person's home out of sight of any unwanted viewer. The cover story for a meeting is never an unwitting person because that person becomes a potential witness who might alert authorities. KSA Ex. 167 (Sageman Rep.) 683-84. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Furthermore, Al Bayoumi was the source of this meeting to New Scotland Yard, which shared it with the FBI. KSA Ex. 163 (9/11 Rep.) 218. He did so innocently as the MPS was questioning him about the strangers for whom he had guaranteed an apartment. He told the MPS that he had met them at a restaurant during a trip to Los Angeles and that he took along a convert. KSA Ex. 255 (MPS 374, Record of Tape Recorded Interview of Omar Al Bayoumi (9/23/01)) at 14–24. This was several days before the MPS revealed to him that the strangers were two hijackers who carried out the 9/11 attacks. KSA Ex. 256 (MPS 400, Record of Tape Recorded Interview of Omar Al Bayoumi (9/27/01)) at 4–5. If Al Bayoumi had wittingly assisted the future hijackers, it would have made no sense to reveal to the police how he met them and provided details to the police about a witness to the meeting. This makes no operational and clandestine sense, consistent with the 9/11 Commission's conclusions. KSA Ex. 163 (9/11 Rep.) 218. |
| 1542. | On February 1, 2000, Bayoumi returned to Los Angeles and visited the Saudi Consulate for a second day in a row, this time with Kaysan Morgan (then known as Kaysan Bin Don). Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13, 16; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10; *See* 9/11 Commission Report at 217. | As set forth above, there was only one trip to the Los Angeles and the Saudi Consulate. That trip occurred on January 31 or February 1, but not on both days. The 9/11 Commission Report does not state that Al Bayoumi returned to Los Angeles or visited the Saudi Consulate for a second day. It simply states that Al Bayoumi and Morgan met the future hijackers at a halal food restaurant on Venice Boulevard in Culver City. KSA Ex. 163 (9/11 Rep.) 217. |
| 1543. | Morgan was a 22-year-old native Californian who converted to Islam in 1999 at the Saudi Mosque operated by the Saudi Embassy in Washington, DC. Morgan was cut off by his family because of his | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | conversion to Islam and moved back to San Diego in late 1999. Bayoumi befriended Morgan at the Islamic Center of San Diego. Ex. 92, Morgan Decl. ¶¶ 5-7; Ex. 260, KSA 1403 (Washington Mosque was operated by the Saudi Embassy). In his interview with Scotland Yard Bayoumi referred to Morgan by his Islamic name "Osama" and described him as "white…[y]ou know, American…" and claimed that "I don't know his real name. I mean the American name." Ex.450, MPS393 at 191:7-22. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 260 does not state that any Washington Mosque was operated by the Saudi Embassy.<br><br>The other statements are undisputed. |
| XX.G. | **Bayoumi planned days in advance to bring Morgan on the trip to Los Angeles.** | Morgan's versions of the events vary widely and are inconsistent. Before Operation Encore was opened, the FBI tried hard to deconflict all of Morgan's versions.<br><br>KSA Ex. 246 (FBI 81). The Sageman Report discusses the numerous inconsistencies in Morgan's various versions. *See* KSA Ex. 167 (Sageman Rep.) 183-199.<br><br>Plaintiffs' own summary exhibit reflects only one call between Al Bayoumi and Morgan that occurred on January 31, 2000. Pls. Ex. 12P |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (Al Bayoumi calls to Kaysan Morgan). As discussed above, the one trip to Los Angeles occurred either on January 31, 2000 or February 1, 2000. There is no evidence of planning days in advance. |
| 1544. | As some point in January 2000, Bayoumi told Morgan that Bayoumi needed "to resolve his I-94 visa issue" and was "thinking about going across the border to Mexico to reset something or do something." Ex. 112, Morgan Dep. 95:20-97:5. According to Morgan, he "reacted very strongly in opposition" to Bayoumi going to Mexico. Bayoumi subsequently contacted Morgan and told him "that he decided to go to the Saudi Consulate to resolve his I-94 visa issue..." and asked Morgan to join him on the trip to Los Angeles. Ex. 112, Morgan Dep. 95:20-97:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Morgan did provide this testimony. Morgan's memory must have been mistaken, however, since the Saudi Consulate could not resolve a U.S. visa issue. Morgan's recollections of the events at issue are wildly inconsistent. *See* KSA Ex. 167 (Sageman Rep.) 183-199. Even the FBI noted that ███████████████ ████████ KSA Ex. 246 (FBI 81). |
| 1545. | Morgan testified that Bayoumi invited him on the trip to Los Angeles one or two days before they went there together. Morgan stated that Bayoumi told him they could visit a "halal restaurant" and "also asked if I had ever seen the new mosque in Culver City, the King Fahad Mosque, and that we could visit the mosque which was close to the Consulate and the restaurant." Ex. 92, Morgan Decl. ¶ 8-9; Ex. 112, Morgan Dep. 95:20-97:9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. The full quote from Morgan's declaration is "Mr. al-Bayoumi said that after going to the Consulate we could eat at a nearby Halal restaurant which he and his family had been to." Pls. Ex. 92 (Morgan Decl.) ¶ 9. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1546. | In his September 2001 interviews with Scotland Yard, Bayoumi admitted that he invited Morgan to join him on the trip the day before the two men went to Los Angeles. Bayoumi told investigators that he asked Morgan: "if you have time tomorrow can you come with me to the Embassy?" and according to Bayoumi, Morgan said "okay.' Ex. 450, MPS 393 at 687:20-24. | Plaintiffs Exhibit 450 (MPS 393) is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Al Bayoumi told MPS investigators that "I said if you have time tomorrow can you come with me to the embassy. [H]e said okay. I said can we bring some books." KSA Ex. 257 (MPS 394, Record of Tape Recorded Interview of Omar Al Bayoumi (9/25/01)) at 25. |
| 1547. | Bayoumi also admitted that he discussed with Morgan in advance going to the King Fahad Mosque during their trip to Los Angeles. Bayoumi told Scotland Yard that "[t]he reason why he [Morgan] come with me, he want to see, also, the new King Fahad Mosque in Los Angeles, big one." Ex. 450, MPS393 at 689:18-20. | Plaintiffs Exhibit 450 (MPS 393) is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Al Bayoumi made these statements to MPS investigators. |
| 1548. | In his 2003 statement to the 9/11 Commission Bayoumi admitted that he spoke to Morgan at the ICSD Mosque in San Diego on the morning of their trip to Los Angeles and told him that he needed to make a stop to get passport photos before heading to the Saudi Consulate. Ex. 90, Snell Decl., Ex. 2 at 3. | Plaintiffs Exhibit 90 (Snell Decl. Ex. 2) is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit states that when Al Bayoumi contacted the Saudi Consulate, he was advised by the secretary to bring 3 photographs of himself. "While at the Islamic Center of San Diego (ICSD) on the day he was to travel to Los Angeles, he discovered that he had only 2 photos with him. He mentioned this discovery to 'Osama' (*i.e.* Isamu Dyson) . . . Osama recalled a studio near the Consulate where one could obtain passport photos." KSA Ex. 258 (PEC-KSA 360) (10/18/03)). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1549. | Bayoumi's cell phone records show that he called Morgan three times on January 31, 2000 at 10:47am (3 mins.), 11:54am (1 min.), and 11:59am (1 min.). Ex. 12, FBI 03230; Ex. 2, EO 2751. The 10:47am call to Morgan was made immediately before Bayoumi made a call to the Saudi Consulate at 10:50am (3 mins.) This shows that Bayoumi called Mana at the Consulate immediately after confirming his plans to bring Morgan with him to Los Angeles on February 1. | Plaintiffs Exhibit 2X (EO 2751) is inadmissible hearsay. *See* Objections Chart.<br><br>The telephone records show that Al Bayoumi made three calls on January 31 to the number ▮▮▮▮-6525. KSA Ex. 115 (FBI 3230). The FBI later attributed this number to Morgan's cell phone, Pls. Ex. 2OO (EO 2751-UPDATED), however that document is inadmissible hearsay. At his deposition, Morgan testified: "[Al Bayoumi] contacted me. I can't tell you how, because it may have been at the mosque or it may have been in person while we were interacting with one another. I did not possess a cell phone at the time, as far as I recall. And so any conversations would have been face-to-face." Pls. Ex. 112 (Morgan Tr.) 95:23–96:6.<br><br>Plaintiffs' assertion that Al Bayoumi's call to the Saudi Consulate at 10:50 AM that morning was to Smail Mana is entirely unsupported.<br><br>Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana's only interaction with Al Bayoumi is that the two "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi). |
| 1550. | Bayoumi made one call to Morgan on February 1, 2000 after the two men had returned to San Diego at 9:50pm (1 min.). Ex. 2, EO 2751. | Plaintiffs Exhibit 2X (EO 2751) is inadmissible hearsay. *See* Objections Chart.<br><br>The telephone records show that Al Bayoumi made a call on February 1, 2000 to ▮▮▮▮-6525. KSA Ex. 115 (FBI 3230). The FBI later |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | attributed this number to Morgan's cell phone, Pls. Ex. 2OO (EO 2751-UPDATED), however that document is inadmissible hearsay. At his deposition, Morgan testified: "[Al Bayoumi] contacted me. I can't tell you how, because it may have been at the mosque or it may have been in person while we were interacting with one another. I did not possess a cell phone at the time, as far as I recall. And so any conversations would have been face-to-face." Pls. Ex. 112 (Morgan Tr.) 95:23-96:6. |
| 1551. | At his June 2021 deposition, Bayoumi contradicted his prior statements to Scotland Yard and the 9/11 Commission and the documentary evidence by claiming that he planned to go to Los Angeles "by myself, alone" and that he was driving his car down the street on his way to the Consulate in Los Angeles when he happened "by chance" to meet Morgan "on the road…[n]ext to my house." Bayoumi claimed that he stopped his car, told Morgan that he "was going to Los Angeles" and that Morgan "said he was free, let me come with you." Ex. 120, Bayoumi Dep. 364:21-366:19, 367:15-368:11. At the time Bayoumi gave that testimony, his prior statement to the MPS had not yet been produced. | The cited material does not support Plaintiffs' insinuation that Al Bayoumi lied at his deposition. His deposition occurred more than 20 years after the events and it is normal to forget insignificant details. |
| 1552. | Morgan testified at his 2021 deposition about Bayoumi's claim that the two men met by chance on the morning of the day that they went to Los Angeles: "No, that is | Undisputed that Morgan gave this testimony. However, Morgan's own prior assertions about the events of this day are wildly inconsistent. *See* KSA Ex. 167 (Sageman Rep.) 183-199. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | not a true statement." Ex. 112, Morgan Dep. 95:1-19. | |
| **XX.H.** | **Bayoumi brings Morgan to the Consulate as the set-up for their meeting with the hijackers and holds a private meeting with Mana.** | There is no evidence that Al Bayoumi brought Morgan to the Consulate as a set-up for their meeting with the hijackers. Al Bayoumi went to the Consulate to renew his and his family's passports. KSA Ex. 163 (9/11 Rep.) 217 (dating trip to February 1, 2000); KSA Ex. 85 (Awad Ex. 463) at 6643 (later Consulate report about visit), 6648 (application for passport dated January 31, 2000, with issuance date of February 1, 2000); KSA Ex. 42 (Bayoumi Ex. 739) at 7996 (passport showing issuance date of February 1, 2000); Pls. Ex. 120 (Bayoumi Tr.) 357:17-358:15 (identifying Morgan as "Osama"); Pls. Ex. 92 (Morgan Decl.) ¶¶ 5, 8 (describing invitation from Al Bayoumi to travel to Los Angeles "during January 2000").<br><br>Nor is there any evidence that Al Bayoumi had a private meeting with Mana. Before leaving the Consulate, Al Bayoumi picked up copies of the Quran for the Al Madinah Mosque from Mana. Mana and Al Bayoumi merely exchanged greetings for a minute or even less. Pls. Ex. 120 (Bayoumi Tr.) 383:13-384:5, 388:11-389:3 (describing Mana as a "person from . . . Islamic Affairs" who was a "non-Saudi" and who Al Bayoumi "didn't know"); 384:6-385:22; KSA Ex. 77 (Mana Decl.) ¶¶ 10-12, 14 (describing the interaction and explaining that he learned only later that the Saudi citizen whom he had met may have been Al Bayoumi); Pls. Ex. 110A (Mana Tr.) 134:8-135:3 (describing the interaction). |
| 1553. | Bayoumi invited Morgan to join him on the trip to Los Angeles as tradecraft to establish a plausible excuse for Bayoumi to meet the two Al Qaeda operatives and bring them to San Diego. With the help of Consulate Secretary Mana, Johar, and Thumairy, | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>The assertions in this paragraph are false and absurd. From a tradecraft perspective, there is no reason to bring a perfect stranger to a clandestine meeting because it breaks the secrecy of the meeting. The stranger is now |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Morgan and Bayoumi would go to the Saudi Consulate, the King Fahad Mosque, and then a Los Angeles restaurant, where Morgan would witness Bayoumi meeting the hijackers by "coincidence" – when that meeting was a set-up, and Morgan was being duped. Ex. 5, Youssef Rpt. 192. | privy to a meeting that he should never have been privy to and there is the possibility that the stranger might inform the authorities. Good tradecraft would have required Al Bayoumi to meet with the two terrorists in a clandestine place, either a hotel room or a witting person's home out of sight of any unwanted viewer. The cover story for a meeting is never an unwitting person because that person becomes a potential witness who might alert authorities. KSA Ex. 167 (Sageman Rep.) 683-84.<br><br>Moreover, if Plaintiffs were correct that Mana, Johar, and Al Thumairy were part of a scheme to support the hijackers (and as set forth above, they are not), there would be no reason at all for Al Bayoumi to come to Los Angeles to meet them at the restaurant. Mana, Johar, or Al Thumairy could have simply arranged for them to travel to San Diego and meet up with Al Bayoumi. The theory is implausible on its face.<br><br>Furthermore, Al Bayoumi was the source of this meeting to New Scotland Yard, which shared it with the FBI. KSA Ex. 163 (9/11 Rep.) 217. He did so innocently because the MPS was questioning him about the strangers for whom he had guaranteed an apartment. He told the MPS that he had met them at a restaurant during a trip to Los Angeles and that he took along a convert. KSA Ex. 255 (MPS 374, Record of Tape Recorded Interview of Omar Al Bayoumi (9/23/01)) at 14–24. This was several days before the MPS revealed to him that the strangers were two hijackers who carried out the 9/11 attacks. KSA Ex. 256 (MPS 400, Record of Tape Recorded Interview of Omar Al Bayoumi (9/27/01)) at 4–5. If Al Bayoumi had wittingly assisted the future hijackers, it would have made no sense to reveal to the police how he met them and provided details to the police about a witness to the meeting. This makes no operational or clandestine sense, as the 9/11 Commission observed. KSA Ex. 163 (9/11 Rep.) 218. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is also no evidence at all that Al Bayoumi's chance meeting with the hijackers at the restaurant was pre-arranged. Sageman summarizes each of the more than a dozen separate accounts of that meeting – none of them remotely suggest that the meeting was pre-arranged. KSA Ex. 167 (Sageman Rep.) 177-199. Al Bayoumi and Morgan, the only witnesses to the meeting, testified that this was a chance meeting. Pls. Ex. 120 (Bayoumi Tr.) 725:19-726:8; Pls. Ex. 112 (Morgan Tr.) 28:21-29:13 (testifying that he has no "personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence"). |
| 1554. | On September 23, 2001, when first asked by Scotland Yard about the purpose of his trip to Los Angeles with Morgan, Bayoumi stated: "first of all, to bring some books to the mosque." Ex. 450, Tr. 195:6-10. Bayoumi did not mention anything about going to the Consulate to get a passport renewed. Bayoumi said "[a]fter we gave the books, we went to - - tried to go to the King Fahad Mosque to pray there…. And I think we got lost at that time and we went to eat and we met these people [Hazmi and Mihdhar]." Ex. 450, Tr. 195:14-21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 450 (MPS 365-401) shows that Al Bayoumi told MPS investigators that the purpose of the trip was to pick up some "books for the mosque." |
| 1555. | Two days later, on September 25, 2001, after Bayoumi talked with his solicitor, Bayoumi changed his story to claim that he went to the Consulate with Morgan to "renew my passport." Bayoumi told the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MPS that "I remember I talked to my solicitor, not just book to bring, I went to Los Angeles to – first to renew my passport." Ex. 450, Tr. 540:14-17. Bayoumi's statement was false because Bayoumi had just been to the Consulate the day before with his family to renew their passports. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no basis for the assertion that Al Bayoumi "changed his story." He first told investigators that the purpose of the trip was to pick up books for the mosque. He then told the investigators that he "went to Los Angeles to . . . renew [his] passport." Both statement can be true, and the evidence shows that they are.<br><br>Plaintiffs incorrectly state that Al Bayoumi went to the Consulate twice. This incorrect theory is addressed in Response to Averment paragraphs 1532-1534 and 1544. |
| 1556. | Saudi Arabia prepared its answers to interrogatories after interviewing Bayoumi in May 2018. December 21, 2018 Opposition of Kingdom of Saudi of Arabia to Plaintiffs' Motion to Compel, Add. 2 (filed under seal). Saudi Arabia stated in its interrogatory answers that it "currently understands that Al Bayoumi visited the Saudi Consulate in Los Angeles on or around February 1, 2000, to pick up a renewed passport and religious materials (Qurans)." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10. Saudi Arabia also stated that Morgan "visited the Saudi Consulate in | This is undisputed. Saudi Arabia's interrogatory responses are accurate. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Los Angeles on or around February 1, 2000, accompanying Al Bayoumi." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 16. | |
| 1557. | Bayoumi did not "pick up a renewed passport" at the Saudi Consulate as stated in Saudi Arabia's answers to interrogatories. Bayoumi had already been to the Consulate the day before with his family to get new passports, and he admitted to Scotland Yard that the Saudi Consulate "send it [the new passport] by mail to me later." Ex.450, MPS 764:20-21. The MPS production confirmed that Bayoumi had in his possession a return receipt requested envelope with $4.96 postage from the Saudi Consulate in Los Angeles addressed to Bayoumi in San Diego and postmarked February 2, 2000, together with the Consulate business card of Vice Consul Sami Alsadhan. Ex. 678K, MPS 95_106. According to Plaintiffs' expert Youssef, that envelope probably contained Bayoumi's passports, which were issued at the Consulate on February 1. <br><br> Ex. 5, Youssef Rpt. 179-80; Ex. 211, KSA 6642-6665 at 43. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> As shown in the Response to Averment paragraph 1532 above, there is no evidence for Plaintiffs' "two-trip theory." There is also no dispute that Al Bayoumi went to the Consulate on either January 31, 2000 or February 1, 2000 to renew his and his families' passports. Pls. Ex. 211 (KSA 6648) (application for passport dated January 31, 2000, with issuance date of February 1, 2000); KSA Ex. 42 (Bayoumi Ex. 739) at 7996 (passport showing issuance date of February 1, 2000); Pls. Ex. 120 (Bayoumi Tr.) 381:11-382:13. It is unsurprising that Al Bayoumi would be unable to recall precisely whether the renewed passports were sent by mail, more than 20 years later. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1558. | Before arriving at the Consulate, Bayoumi went through the charade of insisting to Morgan that he needed to get new passport photos. As a result, Bayoumi stopped at a photographic shop in Los Angeles, supposedly to get additional photos. Ex. 92, Morgan Decl. ¶11. Bayoumi made no credit or debit card charges for photos (or any other items) while he was in Los Angeles on February 1, 2000. Ex. 509, FBI 2388, Ex. 513, FBI 002808 at 2809. Bayoumi's claim to Morgan that he needed new passport photos is belied by the facts that (1) Bayoumi had already submitted his passport photos at the Consulate on the day before, January 31, 2000; and (2) Bayoumi gave the Consulate a print of the identical five-year-old photo of Bayoumi used in Bayoumi's May 1995 Saudi passport. Bayoumi's 2000 passport used the same photo as his 1995 passport. Ex. 211, KSA 6642-65; Ex. 120, Bayoumi Dep. 408:23-409:5, 410:9-411:24. Bayoumi did not need new photos but told Morgan he did to reinforce his cover story about the reason for his trip to Los Angeles and to hide the fact that he had been to the Consulate the day before. Ex. 5, Youssef Rpt. 180. | This paragraph contains attorney argument to which no response is required.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Both Al Bayoumi and Morgan testified that they stopped on the way to Los Angeles so that Al Bayoumi could take passport photos. Pls. Ex. 92 (Morgan Decl.) ¶ 11; Pls. Ex. 120 (Bayoumi Tr.) 368:13-369:16 (testifying that he had to stop to take photos on the way to Los Angeles because he did not have the required number of photographs); *id.* at 412:4-8.<br><br>There is no evidence to the contrary. The fact that the credit and debit card records do not reflect photo charges can be explained if the purchases were made by cash.<br><br>There is no evidence that this was a charade. First, as set forth in the Responses to Averment paragraphs 1532-1534 and 1544, there was only one trip to Los Angeles and the Consulate, not two. Second, Al Bayoumi gave the Consulate two sets of photos, showing that he had to stop at a place to get an additional photo. His 2000 passport photo is identical to his 1995 passport photo. *See* KSA Ex. 42 (Bayoumi Ex. 739) at 7996; Pls. Ex. 211 (KSA 6644). However, the photo on his passport application, which he also gave to the Consulate, is clearly different thus corroborating his testimony. Pls. Ex. 211 (KSA 6648). |
| 1559. | On February 1, 2000, Bayoumi pulled up to the gate of the Saudi Consulate in Los | Plaintiffs Exhibit 110B (Mana Ex. 611) is inadmissible hearsay and has not been authenticated. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Angeles, spoke via an intercom in Arabic, and was given access to the private parking garage underneath the Consulate. Knew From the garage, Bayoumi and Morgan entered the Consulate from the garage into a private reception area. At his deposition, Mana was shown a chart of the Consulate and identified the "small lobby" off the garage where he met Morgan. Vice Consul Awad confirmed that the public entered the Consulate through the front door, while Consulate staff entered through the private parking area beneath the Consulate that was off limits to the public. Ex. 92, Morgan Decl. ¶11; Ex. 110A, Mana Dep. 170:3-6; Ex. 110B at 3 (Mana Dep. Ex. 611); Ex. 95, Awad Dep. 121:7-16. | Al Bayoumi testified that he parked in the underground parking and went into the Consulate from the entrance on the street level. Pls. Ex. 120 (Bayoumi Tr.) 377:3-13; 381:8-10. He and Morgan then went to the reception area, until the receptionist called his name. Al Bayoumi filled out the passport forms in that room. *Id.* at 381:15-383:3. He and Morgan then prayed, picked up the Islamic materials and left. *Id.* Mana testified that he brought the Islamic materials to Al Bayoumi and their interaction was limited to exchanging greetings. KSA Ex. 77 (Mana Decl.) ¶¶ 10-12, 14 (describing the interaction and explaining that he learned only later that the Saudi citizen whom he had met may have been Al Bayoumi); Pls. Ex. 110A (Mana Tr.) 134:8-135:3 (describing the interaction).<br><br>Al Awad did not testify that the parking area was private. He was asked if it was a "public parking area" and he testified that it was not. He did not answer additional questions about who was "allowed into the parking area" on Vienna Convention grounds. Pls. Ex. 95 (Awad Tr.) 121:11-122:2.<br><br>Mana testified that he met Morgan in a "small lobby" next to the reception area on the first floor. Pls. Ex. 110A (Mana Tr.) 169:3-170:8. |
| 1560. | There was no receptionist present in the Consulate's small back lobby off the parking area. Morgan saw Bayoumi use a phone to announce his presence. As shown in Bayoumi's handwritten address book, Bayoumi knew the Islamic Affairs extension of Consulate Secretary Mana. Bayoumi called Mana, and Mana greeted Bayoumi and Morgan in the small lobby. Bayoumi mentioned to Mana in Morgan's presence that he had not been at the | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 110B (Mana Ex. 611) is inadmissible hearsay and has not been authenticated. Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI production and the deposition testimony contains multiple versions of the visit to the consulate. The Sageman report details all of Morgan's various versions of what occurred on the trip to Los Angeles, labeled Morgan1 to Morgan8; the four Al Bayoumi versions, including his MPS interviews; and a summary of Smail Mana's versions of his short interaction with Morgan and Al Bayoumi at the Los Angeles Consulate |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Consulate for at least three months—even though Bayoumi had just been there the day before. Bayoumi's statement, along with the earlier passport photo charade, was tradecraft by Bayoumi to deceive Morgan into believing that the Consulate visit was a one-time event and to hide Bayoumi's activities in Los Angeles on the prior day, January 31. Mana, of course, likely saw Bayoumi on the prior day in Los Angeles and was a party to Bayoumi's deception of Morgan. The immunity afforded by the Consulate was impenetrable by law enforcement and provided cover for Bayoumi's plan. Ex. 5, Youssef Rpt. 181-82; Ex. 92, Morgan Decl. ¶¶ 12-15; Ex. 211, KSA 6642-6665 at 43; Ex. 12AA, MPS738_52L; Ex. 110A, Mana Dep. 169:20-170:8 (confirming that he met Morgan in the "small lobby, not the one by the entrance" of the Consulate, as Mana showed on Ex. 110B at 3 (Mana Dep. Ex. 611)). | that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. Plaintiffs' paragraph cherry-picks portions of these various and contradicting hearsay reports.<br><br>Al Bayoumi testified that when he and Morgan arrived at the Consulate, they were allowed to pull into the underground garage and proceeded to the reception area from the street level, where they were told to sit and wait. A female receptionist called Al Bayoumi and told him to fill out some forms and place the photos on them. Since it was around noon, they asked the receptionist for the prayer room. She pointed to a non-Saudi employee with a beard, who directed them to the prayer room, off the reception area, and told them that he would get the Qurans. Al Bayoumi and Morgan performed their prayers for about ten minutes and returned to the reception area. There, Al Bayoumi was told that the passport would be ready soon and that the Qurans were waiting to be picked up. He, Morgan, and a worker from the consulate took the books and loaded them in the car in the garage. He and Morgan drove off with the Qurans. Pls. Ex. 120 (Bayoumi Tr.) 377:3-390:16.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>There is no evidence that Al Bayoumi called Mana. Both Al Bayoumi and Mana testified that the two men had no relationship and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi). <br><br> There was only one trip to the Consulate as shown in the Responses to Averment paragraphs 1532–1534 and 1544 above. There is no evidence that Al Bayoumi getting a passport photo was a charade, as he needed an extra photo, as shown in the Response to Averment paragraph 1558. The evidence shows that Al Bayoumi had been to the Consulate three months before with Khalid Al Yafai and Hisham Al Kaaki, as shown in the Response to Averment paragraph 1425 above. Finally, as set forth in the Response to Averment paragraph 1553, from a tradecraft perspective, there is no reason to bring a perfect stranger to a clandestine meeting because it breaks the secrecy of the meeting. |
| 1561. | After meeting Mana, Bayoumi followed Mana into an interior, private room of the Consulate while Morgan waited in the small back lobby area. Mana identified the interior location of the office where he met Bayoumi on a floorplan of the Consulate. Bayoumi and Mana met inside the Saudi Consulate for about 20-30 minutes with Morgan waiting. Bayoumi returned to Morgan in the reception area carrying a box of Qur'ans and other religious materials. Morgan and Bayoumi then left the consulate in Bayoumi's car. Ex. 92, Morgan Decl. ¶15; Ex. 110A, Mana Dep. 145:15-16 (stating that he saw Bayoumi "inside the office of the Saudi affairs department" at the Consulate), 170:9-20; Ex. 110B at 3 (Mana Dep. Ex. 611). Bayoumi gave | Plaintiffs Exhibit 110B (Mana Ex. 611) is inadmissible hearsay and has not been authenticated. <br><br> Mana testified his "entire interaction" with the Saudi citizen he later learned was Al Bayoumi "lasted no more than one minute." KSA Ex. 77 (Mana Decl.) ¶ 12. He only exchanged greetings and never got Al Bayoumi's name. *Id.* Morgan's declaration, drafted by Plaintiffs' attorneys in the first instance, states that Al Bayoumi spoke "briefly" with the person later identified as Mana, and then recalls that Al Bayoumi left the reception area with the person later identified as Mana and then waiting "for at least 20 – 30 minutes," but did not observe whether they spoke further outside his presence. Pls. Ex. 92 (Morgan Decl.) ¶¶ 12, 15. <br><br> Both Al Bayoumi and Mana testified that the two men had no relationship and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | incredible testimony that he and Morgan entered through the front door of the Consulate, met with the receptionist in the public front reception room, and that he filled out passport forms in Morgan's presence. Ex. 120, Bayoumi Dep. 377:7-13, 381:11-382:24. | that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi. There is no evidence that they had any substantive discussion.<br><br>There is no basis for Plaintiffs' assertion that Al Bayoumi's testimony is incredible. His testimony and Mana's testimony are consistent and mutually reinforcing. As noted, Morgan has given multiple contradicting accounts of what happened during the trip to Los Angeles. Plaintiffs cherry-picked portions of those multiple accounts for the Morgan declaration (Pls. Ex. 92) that they drafted in the first instance. *See* KSA Ex. 167 (Sageman Rep.) 183-199. |
| 1562. | Bayoumi's access to the Consulate's private garage and private reception area and internal offices, as well as his frequent phone contacts and correspondence with Consulate and Embassy officials, demonstrate his status was that of a Saudi government official and not that of an average Saudi citizen visiting the Consulate for consular business. Ex. 5, Youssef Rpt. 181- 85. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.<br><br>As noted in the Response to Averment paragraph 1559, there is no evidence that the underground garage is "private." Nor is there any evidence that the reception area where the visitors were located was a "private" reception area. Bayoumi did not have access to the Consulate internal offices. Even if Morgan's account is credited, someone came to escort Al Bayoumi inside the consulate. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that Al Bayoumi's contacts with the Consulate and Embassy officials were unusual. Al Bayoumi was the general supervisor of the Al Madina Mosque, and his correspondence reflects requests concerning the mosque. *See* Response to Averment ¶ 1091 (requesting furniture and books); ¶¶ 1154-1156 (thanking officials for sending Ramadan preachers to the mosque). Moreover, as explained in the Response to Averment paragraph 1519, Al Bayoumi's calls were clustered around the renewal of his passport.<br><br>There was nothing unusual about how Al Bayoumi was treated at the Consulate. As Mana, a non-Saudi employee of the Consulate testified, "As Saudis, the Consulate is part of their territory, basically. Okay? So they are always welcome there. There's no – no appointment, I would say, no searching in detail of – they may remove their . . . telephones from them and leave them with security until they leave. But other than that, they don't search them. They don't do that. They welcome them as Saudis, and they're always respected and they're welcome in their own territory. They don't close the door in their face. And it's not like with any other not-Saudi who visits the consulate. They have to work through maybe appointments and security checks, and if they are approved to come in, they have to be waiting in the lobby, and when they are called someone will accompany them. And as such, you know, they go through a lot of procedures and security measures to meet the person they want to meet, and this is not the same with the Saudi." Pls. Ex. 110A (Mana Tr.) 179:22–180:16. |
| 1563. | Bayoumi brought religious materials from the Consulate from the Islamic Affairs section at the Consulate. Bayoumi had already been to the Consulate earlier that month on January 9 with Khalid Al Yafai and obtained religious materials at that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | time. Ex. 10I, MPS899- CLIP Video Exhibit and 10I-TR Transcript, at 01:06 (participant on trip with Bayoumi and Yafai confirms that they went to Consulate). | There is no evidence that Al Bayoumi had been at the Consulate on January 9, 2000, as shown in the Response to Averment paragraph 1425. Pls. Ex. 10I (MPS899-CLIP-VIDEO) has no date on it but it could not have been filmed on January 9, 2000, specifically because Hisham al-Kaaki mentioned that they had collected books from the Consulate. Pls. Ex. 10I (MPS 899-CLIP-VIDEO). January 9, 2000, was a Sunday, and the Consulate was closed. |
| 1564. | According to Plaintiffs' expert Youssef, "Bayoumi visited the Consulate on January 31, 2000 and February 1, 2000 and made a total of 12 calls to the Consulate number ████████-6000 from January 26, 2000 to February 10, 2000." Youssef determined:<br><br>...the volume and timing of these calls shows that Bayoumi was engaged in a project with individual(s) at the Consulate that was much more involved than getting new passports; indeed, Bayoumi continued calling the Consulate after the passport application was filed on January 31 and even after he visited the Consulate a second time with Kaysan Morgan on February 1. It is likely that some or all of the calls that Bayoumi placed to ████-6000 were made to ████████, because ████ identified Bayoumi to the FBI in his interviews. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>During this time period, Al Bayoumi called the Saudi Embassy Cultural Mission 14 times and the Saudi Embassy general number 5 more times. At the same time, he called Keller Graduate School 4 times, and his home office of the Presidency of Civil Aviation in the KSA once. Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).<br><br>There is no evidence that any of these calls had anything to do with the hijackers. Instead, the evidence indicates that these calls may have had to do with Al Bayoumi's renewal of his and his family's passports (which happened the following week), his request for Islamic materials for the mosque (which he also picked up the following week), and issues concerning his studies in the United States. When Al Bayoumi renewed his passport the following week, he brought his expiring passport, a copy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 5, Youssef Rpt. 184. | of his U.S. Department of Justice I-20 certificate of eligibility for nonimmigrant status, and a letter from the Keller Graduate School confirming his enrollment in the school. *See* KSA Ex. 85 (Awad Ex. 463) at 6644, 6646-47.<br><br>There is no evidence that any of these calls were placed to ███ Both Al Bayoumi and ███ testified that the two men had no relationship and did not know each other. Pls. Ex. ███████████████████ |
| 1565. | Additional connections between Bayoumi and ███ include Bayoumi had a listing for ███ in his handwritten address book; ███ employee at the Consulate; ███ identified a photograph of Bayoumi to the FBI in his interviews; Bayoumi met ███ at the Consulate and the King Fahad Mosque on February 1, 2000; ███ called Bayoumi on January 5, 2000; and ███ received a series of calls from Thumairy leading up to the date of the hijackers' arrival on January 15, 2000, and another call from Thumairy on February 14, 2000. Ex. 5, Youssef Rpt. 184; | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. Plaintiffs Exhibit 566 (FBI 11754) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Both Al Bayoumi and ███ testified that the two men had no relationship and did not know each other. Pls. Ex. ███████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Ex. 566, FBI 011752 at 11754; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | ███████████████████████████████████████ <br><br> ███ name was listed in an address book, alongside scores of other individuals. Pls. Ex. 12AA (MPS738_52). There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten address book is inadmissible hearsay. There is no evidence that Al Bayoumi knew ███ personally. ███ is not listed in Al Bayoumi's smaller "green folder" phone book, where Saad al-Jabreen is the one listed with the Los Angeles Consulate Islamic Affairs extension. Pls. Ex. 12BB (Bouyami phone book and green folder) at 10. Moreover, al-Jabreen is written twice ██████████ ███ in Al Bayoumi's large handwritten address book. Pls. Ex. 12AA (MPS738_52). <br><br> ███ was also not the only ████████████████ at the Consulate. This is confirmed by Al Bayoumi's two annual Eid al-Fitr letters of thanks to the Consulate. In his January 26, 1999, letter, Al Bayoumi singled out "the efforts of the brothers in the Islamic Affairs (Brother Saad Al-Jabreen) in providing us with some copies of the Qur'an, which were immediately distributed to some of the mosques here." ███ is not mentioned in this letter. Pls. Ex. 373 (MPS43_345). In his December 29, 2000, letter, which ████████████████████████, Al Bayoumi sent a personal copy to Al-Jabreen with his greetings, but not to ███ Pls. Ex. 408 (MPS43_387). Al Bayoumi also sent a separate Eid letter to Al Jabreen in January 1999. Pls. Ex. 398 (MPS43_346). <br><br> ███ did not identify a photograph of Al Bayoumi to the FBI. He only recognized Al Bayoumi's name from the news. KSA Ex. ██████████. ███ did not meet Al Bayoumi at the King Fahad Mosque, as shown in the Responses to Averment paragraphs ██████████. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████ for Al Thumairy when Al Thumairy gave his Friday khutbahs at the King Fahad Mosque. KSA ████████. It was natural that they called each other. There is no evidence that these calls were related to the hijackers.<br><br>There is no admissible evidence of a January 5, 2000 call from ████ to Al Bayoumi. Plaintiffs cite an electronic communication that is hearsay and that has numerous other verifiable errors. Pls. Ex. 2JJ (EO 603-615-UPDATED). For instance, it states that "On January 13, 2000, on January 15, 2000, Alhazmi and Almihdhar arrived at Los Angeles International Airport at 13:27 on United Airlines flight 2." *Id.* at EO 609-UPDATED, EO 621-UPDATED. Only the second date in this quote is correct.<br><br>Moreover, the document shows that ████ was on a different phone call at the same time as the purported call with Al Bayoumi causing the author to question "is this time correct?" next to the description of this call. Pls. Ex. 2JJ (EO 609-UPDATED).<br><br>Even the hearsay FBI document cited by Plaintiffs questions whether the reporting on the call is accurate– stating "Is this time correct?" Pls. Ex. 2JJ (EO 609-UPDATED). *See* Response to Pls. Aver. ¶ 1411. |
| 1566. | While Morgan and Bayoumi were together on February 1, 2000, Morgan observed that Bayoumi used his cell phone several times during the day. Ex. 92, Morgan Decl. ¶ 22. One call made by Bayoumi was at 12:09pm (6mins.) to the Islamic Affairs number ((202) 342-3700) at the Saudi Embassy in Washington, which was the fourth workday in a row that Bayoumi reported into the Islamic Affairs. Ex. 5, Youssef Rpt. 185; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). That call was at about the same time that Bayoumi claimed he was at the Consulate. Ex. 120, Bayoumi Dep. 375:11-13. | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>On February 1, 2000, Al Bayoumi made three calls after 10:00 AM. Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Two of them were clustered around noon, at 11:56 AM when he checked for his messages, and at 12:09 PM when he called the Saudi Embassy Islamic Affairs number. These calls did not occur around the time that Al Bayoumi claimed he was at the Consulate. At his deposition, he testified that it was "noon time . . . [a]pproximately . . . [b]ecause we performed the prayers at the consulate . . . the noon and afternoon prayers. We could combine them because we were traveling." Pls. Ex. 120 (Bayoumi Tr.) 375:11-21. Since Zuhr (noon) prayer is shortly after noon and Asr (afternoon) prayer is about 3 PM in the winter in Los Angeles, KSA Ex. 167 (Sageman Rep.) 141, this means that Al Bayoumi and Morgan came to the Consulate in early afternoon, after noon but before Asr.<br><br>The final call was at 7:11PM, to his home. Pls. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). |
| XX.I. | **Bayoumi, with Morgan as his American eyewitness, holds his staged "by chance" meeting with the hijackers.** | This assertion that the meeting was "staged" is baseless. Al Bayoumi's encounter with the hijackers was indeed by chance. Pls. Ex. 120 (Bayoumi Tr.) 725:14-726:8. As set forth below, the restaurant that Al Bayoumi intended to go to was a halal meat market. Its owner recommended that Al Bayoumi and Morgan go down the street to the Mediterranean restaurant. Pls. Ex. 120 (Bayoumi Tr.) 393:12-394:7; Pls. Ex. 92 (Morgan Decl.) ¶ 16 (recalling that the first place they tried "was not a restaurant but a halal meat market," and the "proprietor of the market told Mr. al-Bayoumi that there was a halal restaurant a short walk from the market"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The hijackers' knowledge of this restaurant was also the result of random events. ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████

There is no evidence that the February 1, 2000, meeting between Al Bayoumi and Morgan on the one hand and the two future hijackers on the other at the Mediterranean restaurant was staged or was anything other than a chance meeting. Even Morgan, whose declaration was drafted by Plaintiffs' attorneys in the first instance and whose own attorney was paid by Plaintiffs, admitted at his deposition that he did not have any "personal knowledge of any facts indicating that Omar Al Bayoumi's encounter with Nawaf Al Hazmi and Khalid Al Mihdhar at a restaurant in Los Angeles was anything other than a coincidence." Pls. Ex. 112 (Morgan Tr.) 28:22-29:6. |
| 1567. | After leaving the Consulate, Bayoumi and Morgan went to the nearby King Fahad Mosque for prayer. While at the Mosque, Morgan recalled that Bayoumi spoke to someone about a nearby place to eat. The two men then drove from the Mosque and parked in front of what Bayoumi stated was the restaurant – but turned out to be a halal meat market. The restaurant was a very | Al Bayoumi recalls going with Morgan directly from the Consulate to get lunch (having first prayed at the Consulate). Pls. Ex. 120 (Bayoumi Tr.) 390:17-392:5. Plaintiffs cite Morgan's declaration, which Plaintiffs wrote in the first instance, stating that before lunch, the two stopped at King Fahad Mosque to pray. Pls. Ex. 92 (Morgan Decl.) ¶ 16; Pls. Ex. 112 (Morgan Tr.) 43:19-23.

As summarized in the Sageman report, there are more than a dozen recitations of what occurred on February 1, 2000. Not one of those recitations states that Al Bayoumi and Morgan went to the King Fahad |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | short walk away, however. Ex. 92, Morgan Decl. ¶16. | Mosque, where someone directed them to the restaurant where they met the hijackers.<br><br>Chronologically, the first three versions of what happened after Al Bayoumi's and Morgan's visit to the Consulate comes from Al Bayoumi's New Scotland Yard interviews of September 2001. They were all consistent and showed that after the Consulate, they tried to go to the King Fahad Mosque, but got lost on the way, and, as they were hungry since it was late afternoon, went instead to the restaurant, where they eventually met the future hijackers. KSA Ex. 260 (MPS 390, Record of Tape Recorded Interview of Omar Al Bayoumi (9/25/01) at 17; KSA Ex. 257 (MPS 394, Record of Tape Recorded Interview of Omar Al Bayoumi (9/25/01)) at 26; KSA Ex. 261 (MPS 398, Record of Tape Recorded Interview of Omar Al Bayoumi (9/27/01)) at 5.<br><br>The next three versions came from Morgan's interviews with the FBI in early October 2001. In the first two, Morgan simply said that after leaving the Consulate, they went to the restaurant that Al Bayoumi had told him about. KSA Ex. 263 (FBI 4647 (10/7/01)); KSA Ex. 264 (FBI 4657-58) (10/8/01)). Morgan specified that he "believes the meeting could not have been planned" because "he and al-Bayoumi were originally supposed to go to a different restaurant. They found the restaurant Al-Bayoumi originally wanted to go to. However, the establishment advised they no longer serve sit down meals. They were only selling meat from the butcher shop portion of the establishment. The restaurant portion of the business was no longer in operation. The workers at this establishment recommended a place nearby where they could get halal food. Therefore, Al-Bayoumi and Dyson went to this second restaurant, and this is where the meeting with Al-Hazmi and Al-Mihdhar happened to occur." KSA Ex. 263 (FBI 4659–60 (10/8/01)). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | The next day, in his third version, Morgan repeated that he and Al Bayoumi had gotten lost on the way but found the restaurant and parked on the street. They walked inside, and Dyson saw that it was a butcher shop, with deli style refrigerated cases inside. There were no customers. Employees told Al Bayoumi in Arabic that they no longer served food, only meat, and operated as a butcher shop. The restaurant portion had closed. The employees recommended another halal restaurant close by and Morgan and Al Bayoumi walked there. It was a small Mediterranean café. KSA Ex. 264 (FBI 4665 (10/8/01)). |
|  |  | Three weeks later, the FBI flew Morgan to Los Angeles to identify the places he and Al Bayoumi had visited on February 1, 2000. His account of that day constitutes his fourth version of the events that day. "After leaving the Saudi Consulate, Dyson and Al-Bayoumi went to eat and proceeded to the first restaurant that Al-Bayoumi had in mind. . . they then parked near the restaurant." At the first restaurant, the "Mediterranean Halal Meat and Deli," they went inside, "the workers advised they no longer were serving sitdown meals, and only the butcher shop portion of the establishment was operating. They suggested a place nearby that served similar food Al-Bayoumi and Dyson were looking for. . . . After leaving the first restaurant, Al-Bayoumi and Dyson walked a short distance . . . into the Mediterranean Gourmet Restaurant. . . . Inspection of the restaurant revealed it was quite small with only a few tables as one walks in. The counter where one orders food and the kitchen is at the back of the establishment." The table where Al Bayoumi, Morgan, and the future hijackers sat was at the "corner of the restaurant, near the window." KSA Ex. 265 (FBI 4673–74 (11/1/01)). There is no mention of stopping at the King Fahad Mosque before the restaurant. |
|  |  | The next two versions came from Al Bayoumi. The eighth version was his interview with the FBI. "After leaving the Consulate, Al-Bayoumi and Isamu continued on to a halal restaurant at which Al-Bayoumi had |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | previously eaten with his family. After discovering that the restaurant was 'closed down', Al-Bayoumi and Isamu went to another nearby halal restaurant where they ate lunch." Pls. Ex. 572 (FBI 1059 (8/18/03)). The ninth version was his 9/11 Commission interview. "OAB repeated the saga of how, after mid-day prayer at the Consulate, he and Osama went to Venice Boulevard to eat, found the restaurant he had in mind was closed, but promptly found another restaurant practically next door, noting the photographs of dishes in the window. This restaurant was very small." KSA Ex. 258 (PEC-KSA 360 (10/18/03)).

Thus, the first nine chronological versions of events told independently by Al Bayoumi and Morgan and much closer in time to the events in question, all state that they went straight from the Consulate to the restaurant, contrary to Plaintiffs' assertion that after the Consulate visit, Al Bayoumi and Morgan drove to the King Fahad Mosque. Furthermore, four of these versions also specify that they got lost on the way and that the restaurant where Al Bayoumi wanted to go was now a meat market and no longer served food. The employees of the meat market directed them to the restaurant where they later met the future hijackers.

The narrative changes with Morgan's fifth version (overall the tenth) of events, which he provided to the 9/11 Commission and FBI combined. Now Morgan stated that he and Al Bayoumi drove to the King Fahad Mosque, where they prayed, and then drove to the restaurant Al Bayoumi had in mind. They went inside and realized that it was not a restaurant but a *halal* meat market. KSA Ex. 266 (PEC-KSA 382 (4/20/04)). "The proprietor of the market told al-Bayoumi that there was a halal restaurant a short walk from the market. Al-Bayoumi and Bin Don left the market and walked to the restaurant which is named the Mediterranean Café." KSA Ex. 267 (FBI 18–19CORRECTED VERSION (4/20/04)). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Three years later, the FBI re-interviewed Morgan for the sixth time (overall eleventh version) to deconflict the information from his previous interviews. At this interview, Morgan presented another version of events. When they arrived in Los Angeles, Al Bayoumi drove around to look for the restaurant where he had eaten before with his son. When they couldn't find it, they drove to the Consulate. From the Consulate, they drove to the King Fahad Mosque, where they prayed for only five or ten minutes because they were hungry. Before leaving the mosque, Al Bayoumi spoke to an unknown individual asking for suggestion of where to eat as Al Bayoumi had been told there was a restaurant nearby. They drove to the restaurant and realized, "they 'don't serve sit down meals.' Al-Bayoumi and Bin Don then walked a 'couple of store fronts' to another restaurant. . . . Al-Bayoumi and Bin Don entered, went up to the counter, ordered and then sat at a table next to the front window while they waited for their food to be prepared." KSA Ex. 246 (FBI 85–87 CORRECTED VERSION (8/8/07)).

Operation Encore re-interviewed Morgan in 2010, but the relevant sections in this reporting were simply "cut and paste" duplicates of the 2007 interview. Pls. Ex. 460 (FBI 96–106 (6/20/10)). Therefore, it cannot be counted as a different and new version of events since it is a copy of a previous account.

The next and Morgan's seventh version (overall twelfth) of events is Morgan's declaration, which Plaintiffs drafted for him in the first instance, and is the source of Plaintiffs' averment in the present paragraph. Before the trip, "Mr. al-Bayoumi said that after going to the Consulate we could eat at a nearby Halal restaurant which he and his family had been to." Pls. Ex. 92 (Morgan Decl.) ¶ 9. After they left the Consulate, "we drove to the King Fahad Mosque . . . We prayed at the mosque." *Id.* "After our prayers and after speaking to a man at the mosque about a place to eat nearby, Mr. al-Bayoumi suggested that we go to a nearby halal restaurant. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mr. al-Bayoumi drove from the King Fahad Mosque to the restaurant. . . . We found a parking place in front of what Mr. al-Bayoumi stated was the restaurant. We went inside and determined that this business was not a restaurant but a halal meat market. The proprietor of the market told Mr. al-Bayoumi that there was a halal restaurant a short walk from the market. Mr. al-Bayoumi and I left the market and walked to the restaurant which is named the Mediterranean Café. We ordered food over a counter, in a fashion similar to a fast-food restaurant. We then sat in an 'alcove' to wait while the food was prepared." *Id.* ¶ 16.<br><br>The next chronological version (Al Bayoumi's sixth and overall thirteenth) is Al Bayoumi's deposition. "[O]n the road after we left the embassy [*sic*], we were hungry and we wanted to get something to eat. So we went and ate." Pls. Ex. 120 (Bayoumi Tr.) 390:17-23 (6/10/21). It was not a place where he had eaten before. *Id.* at 391:5-7. He and Morgan "were looking for another restaurant that me and my family had eaten at before, but it was closed, I believe. And this one was next to it. *Id.* at 393:16-19. What attracted Al Bayoumi was "the way they had the meat hanging. And also the barbecue." *Id.* at 393:20-24. They decided to stop, go inside the restaurant, and eat there. *Id.* at 394:5-12.<br><br>The last version is Morgan's deposition (his eighth version and overall fourteenth). Morgan testified based on his declration that they drove to the King Fahad Mosque after the Consulate. "After our prayers and after speaking to a man at the mosque about a place to eat nearby, Mr. Al Bayoumi suggested that we go to a nearby halal restaurant." Pls. Ex. 112 (Morgan Tr.) 70:4-8. He clarified, "When we were traveling north to LA, Mr. al-Bayoumi stated that there was a restaurant that he wanted to take me to. We couldn't find that restaurant. The restaurant that we were directed to, we attempted to visit, it turned out not to be a restaurant, it turned out to be a halal meat market. They then informed us that they supplied a Mediterranean café nearby, of which we then walked to that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mediterranean café to have a meal." *Id.* at 72:5-17. "There was no longer a restaurant at the halal meat market, and the proprietor of that establishment directed us to the Mediterranean café." *Id.* at 73:17-23. Morgan testified that it was the market proprietor who suggested that they eat at the Mediterranean café to be helpful to them. Morgan testified that he did not know the market proprietor and had no reason to believe that Al Bayoumi knew him. The future hijackers, whom they later met at the Mediterranean café, had nothing to do with the meat market. *Id.* at 74:1-76:8.<br><br>Morgan also testified that he had no "personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence." *Id.* at 27:9-29:6. Nor did he have any knowledge of any instruction given by any official of the KSA to any person to assist any of the individuals who carried out the September 11 terrorist attacks. He also had no personal knowledge of instruction given to anyone to assist Al Hazmi or Al Mihdhar. And he did not know of any instructions that Al Bayoumi gave to any person to assist any of the 9/11 hijackers. *Id.* at 25:16-26:20.<br><br>In the last five versions, Al Bayoumi still maintained that they drove to the restaurant he had in mind, but it had become a meat market and were told of another halal restaurant nearby, where they ate lunch. Morgan changed his story, saying that they first drove to the King Fahad Mosque, where Al Bayoumi asked a stranger for some restaurant recommendations. But when they went there, it was a meat market that did not serve sit-down meals. The owner of the place directed them to the Mediterranean Gourmet restaurant, where they eventually met the hijackers. So, it is more accurate to say that regardless of whether they drove directly from the Consulate (10 out 14 versions) or drove to the King Fahad Mosque, where a stranger directed them to a local restaurant (3-4 out of 14 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | versions), both Al Bayoumi and Morgan are unanimous that they went to the wrong place, a meat market that did not serve sit-down meals. Either the owner or an employee of the meat market recommended that they go slightly down the street to the Mediterranean Gourmet restaurant. There is no evidence that Al Bayoumi knew either the employees or the owner of the meat market.<br><br>In all accounts that go into details, the recommendation to go to the Mediterranean Gourmet restaurant was made by a stranger, either the owner or an employee of the meat market. Despite their divergences on how they got to the halal meat market, the two firsthand witnesses of the meeting with the future hijackers at the Mediterranean Gourmet restaurant agree on this common account from the halal meat market onward. This is a critical detail, which is inconvenient to Plaintiffs' theory and therefore carefully ignored in the account they crafted in Morgan's declaration. This detail of going to the wrong place and being directed to their eventual destination by a stranger strongly implies that the meeting with the hijackers was not staged and indeed took place by chance. |
| 1568. | The Mediterranean Café was owned by Mustafa Ram Ram, who attended the King Fahad Mosque and who was a longstanding friend of Ismail Mana. Mana often ate at the Mediterranean Café and knew it well. ▇▇▇▇ ▇▇▇▇▇ that he may have told Bayoumi about the restaurant, and said that if he had been asked about a place to eat, he would have recommended the Mediterranean Café. The EO production disclosed that ▇▇▇▇▇ is ▇▇▇▇▇▇▇▇ | Plaintiffs Exhibit 566 (FBI 11755) is inadmissible hearsay. *See* Objections Chart.<br><br>Mana testified that he was friends with Mustafa Remram, an Algerian who owned the Mediterranean Gourmet restaurant. Pls. Ex. 110A (Mana Tr.) 100:4-101:. He testified at his deposition in April 2021 that he had known Remram for more than 10 years. *Id.* at 101:9-10.<br><br>There is no evidence that ▇▇▇▇ told Al Bayoumi about the restaurant. ▇▇▇▇ very strongly disputed this suggestion in his declaration and at his deposition. His interaction with Al Bayoumi at the Consulate was very short and limited to exchanging greetings. KSA Ex. ▇▇▇▇▇▇▇▇ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████ Ex. 110A, Mana Dep. 99:25-100:13, 101:2-8; Ex. ████████. | ████████████████████████████████████ <br><br> As the response to averment paragraph 1567 shows, both Al Bayoumi and Morgan agree that it was either the owner or an employee of the Mediterranean Halal Meat and Deli, who recommended the Mediterranean Gourmet restaurant to them, not ████ <br><br> Plaintiffs Exhibit ████████ states that ████ █ ████ because of ████ ████████████████████████████████████████ |
| 1569. | As previously discussed, Johar admitted that Hazmi and Mihdhar stayed at his apartment around the corner from the Mediterranean Café. Ex. 101, Alzamari Dep. 57:20- 58:2- 7 – 59;1, 61:7-8, 132:2-18 (the two men "came through" Thumairy, stayed at Johar's apartment, and Johar's younger sister went to stay with her older sister next door). | The hijackers did not stay at Johar's apartment in January 2000, and Johar never "admitted" that they had. <br><br> ████████████████████████████████ ████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████ ls. Ex. 114 (Sultan Tr.) 69:23-70:7.<br><br>Alzamari also did not testify that Johar told him that the hijackers were staying at Johar's apartment in January 2000. The cited quotes are taken out of context. At his deposition, Alzamari is referring to the night of June 19, 2000, when he met with Al Hazmi at the mosque and Al Hazmi asked him for help the next morning to go and fill out an application for ████████████████████ Al Hazmi stayed at Johar's apartment overnight and met with Alzamari the next day. Pls. Ex. 101 (Alzamari Tr.) 59:24-61:17, 77:14-23, 93:24-94:9.<br><br>████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | |  |
| 1570. | | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████ <br> ███████████████████████ |
| 1571. | The circumstances show that that Mana served as communications link between Thumairy and Bayoumi on one hand, and Johar on the other, and that Mana likely coordinated with Johar to bring Hazmi and Mihdhar to the restaurant to meet Bayoumi. ███████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit ████████████ is inadmissible hearsay. *See* Objections Chart. ███████████████████ <br><br> The final conclusion of the FBI was that "Thumairy, Bayoumi, al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that the "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). <br><br> There is no evidence that Mana served as a link between Al Thumairy and Al Bayoumi on the one hand and Johar on the other. <br><br> Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi).

Al Thumairy had no recollection of Al Bayoumi, does not recall meeting with Al Bayoumi, and testified that he has no relationship with him. Pls. Ex. 107 (Thumairy Tr.) 493:12-494:5. He also did not know Johar. *Id.* at 243:24-244:2.

Mana had never heard of Mihdhar or Hazmi prior to the 9/11 attacks. KSA Ex. 77 (Mana Decl.) ¶ 22.

Both ███ and Mana testified that they were not friends, and merely saw each other at the King Fahad Mosque. ███████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████

No one instructed Johar to help Al Hazmi and Al Mihdhar. ██████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████ Pls. Ex. 107 (Thumairy Tr.) 516:24-517:15 (Al Thumairy never "provide[d] any instructions to . . . Johar to do anything"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1572. |  | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is also no evidence of a support network for the hijackers in California, as also concluded by the consensus of all the U.S. Government panels specifically established to look into this issue, including the 9/11 Commission, the 2004 FBI-CIA Collaborative Intelligence Assessment, the 9/11 Review Commission, and the FBI in its 2021 EC closing Operation Encore. |
| 1573. | Youssef determined:<br><br>█████ did not enter the restaurant with Hazmi and Mihdhar even though it would be normal and expected for him to go inside with them and help them out. ████ actions were similar to the time he stepped aside out of earshot when he brought the two hijackers to Thumairy at the Mosque. His conduct demonstrates his understanding that Hazmi, Mihdhar, and Bayoumi were engaged in some covert activity separate from ████ role. Ex. 5, Youssef Rpt. 187. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth in the Response to Averment paragraph 1570, ████ did not walk Hazmi and Mihdhar to the Mediterranean restaurant from his apartment to meet with Al Bayoumi (who he had never heard of ████████ ████████████████<br><br>As set forth in the Response to Averment paragraph 1481, there was nothing nefarious about ████ stepping aside after he introduced the hijackers to Al Thumairy. ████ explained that when he introduced the hijackers to Al Thumairy, Al Thumairy was sitting in a part of the prayer room where the imam sits. ██████████████████████ ██████████████████████████<br><br>███████████████████ Youssef is an |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | evangelical Christian and is not familiar with Islamic practice. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12.<br><br>There is no evidence that Al Bayoumi was engaging in any covert activity with Hazmi and Mihdhar. Al Bayoumi and Morgan both testified that they met the hijackers by chance at the Mediterranean restaurant. Pls. Ex. 120 (Bayoumi Tr.) 725:19-726:8; Pls. Ex. 112 (Morgan Tr.) 28:21-29:13 (testifying that he has no "personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence"). |
| 1574. | Morgan and Bayoumi ordered food at the counter and sat at a table while the food was prepared. While they were waiting, Hazmi and Mihdhar entered the restaurant. Ex. 92, Morgan Decl. ¶16. | Undisputed. |
| 1575. | Bayoumi engaged Hazmi and Mihdhar in a conversation in Arabic and asked them to sit down with them. Morgan testified that the men met for "[a]t least 30 minutes" and discussed various matters, with Bayoumi providing translations for Morgan, concerning their home in Saudi Arabia; their current living arrangements in a nearby apartment; their arrival in the U.S. and plan to study English; their unhappiness in Los Angeles; Bayoumi's invitation to visit San Diego to see if they would want to move there; and phone numbers. Ex. 92, | Plaintiffs Exhibit 92 (Morgan Decl.) and Plaintiffs Exhibit 112 (Morgan Tr.), including the testimony about what Al Bayoumi and the hijackers discussed, is inadmissible hearsay. *See* Objections Chart. Morgan does not understand Arabic; everything he learned of the conversation came "secondhand" from Al Bayoumi and the translations were not complete since not every sentence was translated. Pls. Ex. 112 (Morgan Tr.) 81:5-83:18.<br><br>The Morgan declaration (Pls. Ex. 92) was also drafted by Plaintiffs' attorneys in the first instance and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of this chance meeting. *See* KSA Ex. 167 (Sageman Rep.) 177-201. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Morgan Decl. ¶16, 18-19; Ex. 112, Morgan Dep. 97:15-19. | Al Bayoumi testified that he had a short conversation with Hazmi and Mihdhar in Arabic. *See* Pls. Ex. 120 (Bayoumi Tr.) 399:11-400:1 ("Ordinary conversation. Where do you live? I said, we live in San Diego. And I told them that we were on our – we were going back home to San Diego now and that San Diego was a beautiful city with nice weather. . . . [T]hey said they were from Saudi Arabia."); *id.* at 402:7-9 ("I told them that we lived close to the Islamic Center in San Diego."); *id.* at 404:20-23 ("It was not that long of a time. Just Salaam-Alaikum ['peace be upon you'], we live in San Diego, we are leaving now."). <br><br> At no time during his conversation at the restaurant with Al Hazmi and Al Mihdhar did Al Bayoumi offer to help them in any way. Pls. Ex. 120 (Bayoumi Tr.) 726:23-727:2. At no time during his conversation at the restaurant with Al Hazmi and Al Mihdhar did Al Bayoumi invite them to San Diego or suggest that they come there. *Id.* at 796:9-13 ("[Y]ou're saying that I advised them. I did not advise them. I only told them that the weather is nice in San Diego and it's a beautiful city. Did I guide them? No."). |
| 1576. | Saudi Arabia's claim that Morgan "did not participate in the conversation at the restaurant," KSA Aver. ¶ 102, is incorrect, as Bayoumi translated the conversation for Morgan. Ex. 112, Morgan Dep. 82:14-84:4. | Morgan does not understand Arabic, everything he learned of the conversation came "secondhand" from Al Bayoumi and the translations were not complete since not every sentence was translated. Pls. Ex. 112 (Morgan Tr.) 81:5-83:18. Morgan never testified that he participated in the conversation. *Id.* |
| 1577. | Saudi Arabia incorrectly states that Bayoumi and the hijackers had a "short conversation," KSA Aver. ¶ 101, based on Bayoumi's claim that his encounter with Hazmi and Mihdhar lasted about two minutes. Ex. 120, Bayoumi Dep. 402:10-13 ("There was not much of a conversation. It | Plaintiffs Exhibit 450 is inadmissible hearsay. <br><br> Plaintiffs Exhibit 92 (Morgan Decl.) and Plaintiffs Exhibit 112 (Morgan Tr.) including the testimony about what Al Bayoumi and the hijackers discussed is inadmissible hearsay. *See* Objections Chart. Morgan does not understand Arabic, everything he learned of the conversation came "secondhand" from Al Bayoumi and the translations were not complete |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | was, like, a two-minute conversation."). Morgan testified that Bayoumi claim was wrong and that the meeting lasted "[a]t least 30 minutes." Ex. 112, Morgan Dep. 97:20-98:4. It is not possible that the various topics mentioned —with Bayoumi providing translation for Morgan — could have been addressed in less time. There are other contradictions in Bayoumi's description of the meeting between Bayoumi's 2021 deposition testimony and September 2001 during his con interview. For instance, Bayoumi told Scotland Yard that he ordered food or drinks after his conversation with Hazmi and Mihdhar had begun. Ex. 450, MPS365-401 Tr. 548:10-13. At his deposition, when asked if Hazmi and Mihdhar were eating, Bayoumi claimed that: "They finished, like us. They were getting done like us." Ex. 120, Bayoumi Dep. 397:13-14. | since not every sentence was translated. Pls. Ex. 112 (Morgan Tr.) 81:5-83:18.<br><br>The Morgan declaration (Pls. Ex. 92) was also drafted by Plaintiffs' attorneys in the first instance and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of this chance meeting. *See* KSA Ex. 167 (Sageman Rep.) 177-201.<br><br>Al Bayoumi provides the only first-hand account of what was discussed during this meeting. He recalled that conversation with the hijackers was very short. Pls. Ex. 120 (Bayoumi Tr.) 399:11-400:1 ("Ordinary conversation. Where do you live? I said, we live in San Diego. And I told them that we were on our – we were going back home to San Diego now and that San Diego was a beautiful city with nice weather. . . . [T]hey said they were from Saudi Arabia."); *id.* at 402:7-9 ("I told them that we lived close to the Islamic Center in San Diego."); *id.* at 404:20-23 ("It was not that long of a time. Just Salaam-Alaikum ['peace be upon you'], we live in San Diego, we are leaving now."). Morgan testified that it was about 30 minutes. Pls. Ex. 112 (Morgan Tr.) 97:15-98:4. |
| 1578. | Bayoumi admitted to Scotland Yard that he told the two hijackers: "I'm not from this city. And we going back now to San Diego. But if you need help or something like that, just call me. I think I gave them my phone number." Ex.10, MPS 193:11-16. Morgan stated that Bayoumi invited Hazmi and Mihdhar to visit San Diego to see if they would want to move to San Diego and that | Plaintiffs Exhibit 10 is not the MPS interview of Al Bayoumi. It appears that Plaintiffs are referring to Plaintiffs Exhibit 450.<br><br>Plaintiffs Exhibit 92 (Morgan Decl.), Plaintiffs Exhibit 112 (Morgan Tr.), including the testimony about what Al Bayoumi and the hijackers discussed, and Plaintiffs Exhibit 450 are inadmissible hearsay. *See* Objections Chart.<br><br>Morgan does not understand Arabic; everything he learned of the conversation came "secondhand" from Al Bayoumi and the translations |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi gave them his phone number. Ex. 92, Morgan Decl. ¶ 18. Saudi Arabia's claims (based solely on Bayoumi's answers to Saudi Arabia's leading deposition questions) that "[a]t no time during his conversation with Al Hazmi and Al Mihdhar did Al Bayoumi offer to help them in any way" and "at no time…did Al Bayoumi invite them to San Diego…" is contrary to Bayoumi's admissions and Morgan's testimony. KSA Aver. ¶¶103-104. | were not complete since not every sentence was translated. Pls. Ex. 112 (Morgan Tr.) 81:5-83:18.<br><br>The Morgan declaration (Pls. Ex. 92) was also drafted in the first instance by Plaintiffs' attorneys and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of this chance meeting. *See* KSA Ex. 167 (Sageman Rep.) 177-201.<br><br>Al Bayoumi provides the only first-hand account of what was discussed during this meeting. He recalled that the conversation with the hijackers was very short. Pls. Ex. 120 (Bayoumi Tr.) 399:11-400:1 ("Ordinary conversation. Where do you live? I said, we live in San Diego. And I told them that we were on our – we were going back home to San Diego now and that San Diego was a beautiful city with nice weather. . . . [T]hey said they were from Saudi Arabia."); *id.* at 402:7-9 ("I told them that we lived close to the Islamic Center in San Diego."); *id.* at 404:20-23 ("It was not that long of a time. Just Salaam-Alaikum ['peace be upon you'], we live in San Diego, we are leaving now."). Morgan testified that it was about 30 minutes. Pls. Ex. 112 (Morgan Tr.) 97:15-98:4. |
| 1579. | As Hazmi and Mihdhar were leaving, Bayoumi asked Hazmi and Mihdhar if they wanted a ride home, but they said no, because they could walk. Morgan testified that Hazmi and Mihdhar stated (with Bayoumi translating) that "they were living in an apartment nearby" that was "around the corner" from the restaurant. Ex. 92, Morgan Decl. ¶18-19. The 9/11 Commission confirmed those facts. *See* 9/11 Commission Report at 217 ("They | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 92 (Morgan Decl.) and Plaintiffs Exhibit 112 (Morgan Tr.) including the testimony about what Al Bayoumi and the hijackers discussed is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [Hazmi and Mihdhar] said they were living in an apartment near the restaurant but did not specify the address."). | Morgan does not understand Arabic; everything he learned of the conversation came "secondhand" from Al Bayoumi and the translations were not complete since not every sentence was translated.  Pls. Ex. 112 (Morgan Tr.) 81:5-83:18.<br><br>The Morgan declaration (Pls. Ex. 92) was also drafted in the first instance by Plaintiffs' attorneys and cherry picks portions of Morgan's conflicting accounts recorded by the FBI.  The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of this chance meeting.  *See* KSA Ex. 167 (Sageman Rep.) 177-201.<br><br>Al Bayoumi provides the only first-hand account of what was discussed during this meeting.  He did not recall that asking Hazmi or Mihdhar if they wanted a ride home nor did he testify that the hijackers told him that they lived in an apartment nearby around the corner.  Pls. Ex. 120 (Bayoumi Tr.) 404:11-23 (testifying that "[w]e were leaving, and they also were leaving.  But when we left, I don't know if they left also or if they remained in the restaurant.").<br><br>The 9/11 report does contain this language, but sources it to the interviews of Morgan on April 20, 2004 and October 8, 2001.  KSA Ex. 163 (9/11 Rep.) 217, 515 n.16.  As set forth above, Morgan has no first-hand knowledge of what was discussed because he does not speak Arabic. |
| 1580. | ██████████████████████████████████████████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 11M is not a map. As detailed in Response to Plaintiffs Averment ¶¶ 1482, 1495, and 1569, the hijackers did not stay in Johar's apartment in January 2000. ██████████████████████████ |
| 1581. | That apartment building is located on the same city block as the restaurant. No street had to be crossed to get from Johar's apartment to the restaurant; it was several buildings down from Venice Boulevard and around the corner from the restaurant. Morgan had no knowledge of Johar, or that Johar and his family lived in two apartments around the corner from the restaurant. The hijackers and Bayoumi admitted that they were staying at an apartment around the corner, not a hotel or motel, and as noted above, the FBI canvassed all nearby motels in January 2002 and found no trace of Hazmi and Mihdhar staying at any motel. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs cite no evidence in support of this assertion. As detailed in response to averment paragraphs 1482, 1495, and 1569, the hijackers did not stay in Johar's apartment in January 2000. Al Bayoumi did not "admit" that the hijackers were staying at an apartment. As set forth in the Response to Averment paragraph 1579, he gave no testimony as to where the hijackers were staying. With respect to the FBI canvassing the nearby hotels, Saudi Arabia's expert has opined it is likely that the hijackers paid for the room in cash (since they had not yet opened a bank account) and it is possible that their motel took them "off the books" and did not register them. KSA Ex. 167 (Sageman Rep.) 680. Moreover, some hotels may not have kept registration records 2 years later. |
| 1582. | The MPS production shows that Saudi Arabia's claim that Bayoumi disclosed his restaurant meeting with the hijackers to | Exhibit 450 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | investigators is highly misleading. KSA Aver. ¶107. Bayoumi was arrested by British police and questioned about various matters, including whether he had ever been a guarantor for anyone. Ex. 450, MPS 365-401 Tr. 118:12-15. It was only after lengthy back and forth with the police that Bayoumi finally told his story about meeting the hijackers at a restaurant. Ex. 450, MPS 365-401 Tr. 192:21. The MPS interview shows that Bayoumi tried to avoid discussing his ties with the hijackers until he knew that his relationship with them had been discovered. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs do not dispute that investigators only learned of Al Bayoumi's chance meeting with the hijackers because Al Bayoumi volunteered that information. *See* KSA Ex. 163 (9/11 Rep.) 218 ("We know about [the encounter] because Bayoumi told law enforcement that it happened.").<br><br>The transcript of Al Bayoumi's interview with the MPS interviewers shows that Al Bayoumi did not "tr[y] to avoid discussing his ties with the hijackers until he knew that his relationship with them had been discovered." He candidly disclosed that he remembered two people who came from Mecca, in late 1999 or 2000, and he met them in Los Angeles with a convert named Osama. KSA Ex. 255 (MPS 374, Record of Tape Recorded Interview of Omar Al Bayoumi (9/23/01) at 17–22. The investigators informed Al Bayoumi that Al Hazmi and Al Mihdhar were two of the 9/11 hijackers only four days later. KSA Ex. 256 (MPS 400, Record of Tape Recorded Interview of Omar Al Bayoumi (9/27/01)) at 4-5. Bayoumi was released without charges after the interviews. |
| XX.J. | **After meeting the hijackers, Bayoumi visited the King Fahad Mosque and reported to Thumairy and Mana before returning home to San Diego.** | The evidence does not support the assertion that after his chance meeting with the hijackers, Al Bayoumi visited the King Fahad Mosque and reported to Al Thumairy and Mana. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1583. | After the restaurant, Bayoumi and Morgan went to the King Fahad Mosque for the sunset prayer. Ex. 92, Morgan Decl. ¶20. | Plaintiffs cite only the Morgan declaration, which was drafted in he first instance by Plaintiffs' attorneys and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. The accounts differ as to whether Al Bayoumi and Morgan went to the King Fahad Mosque after the Mediterranean restaurant. The 9/11 Commission comments that "Bin Don [*i.e.*, Morgan] himself has been inconsistent about visiting the mosque. . . . Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17.<br><br>Al Bayoumi testified that after the restaurant, he and Morgan tried to find the mosque, but could not find it, and went home. Pls. Ex. 120 (Bayoumi Tr.) 403:23-405:16. |
| 1584. | At the Mosque, Morgan saw Bayoumi meet Mana for a second time that day. Bayoumi and Mana went into a conference room for a private talk for a few minutes. Ex. 92, Morgan Decl. ¶21; Ex. 460, FBI 000096 at 103 (May 17, 2010 interview of Morgan). | Plaintiffs cite the Morgan declaration, which was drafted in the first instance by Plaintiffs' attorneys and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. The 9/11 Commission comments that "Bin Don himself has been inconsistent about visiting the mosque" and further concludes that "[a]lthough Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17.<br><br>Mana testified that he did not see Al Bayoumi or Morgan at the King Fahad Mosque on the day they visited Los Angeles. *See* KSA Ex. 77 (Mana Decl.) ¶¶ 10, 15-16 ("I have never interacted with, spoken to, or |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | seen Mr. Al Bayoumi anywhere else, including at the King Fahad Mosque."); Response to Pls. Aver. ¶ 1602.<br><br>Mana likewise testified that he did not meet Morgan (who was with Al Bayoumi, and who Mana refers to as the convert) at the King Fahad Mosque. Mana Tr. (Ex. 110A) 142:22-143:25 (referring to seeing Morgan "in a mosque in the Valley, in Reseda," "[n]ot the King Fahad mosque. . . . I didn't tell him [an investigator] King Fahad mosque. I believe they misunderstood what I have said that I met him in the mosque, but maybe they under King Fahad mosque and that's why they probably wrote the King Fahad mosque, but it was in Reseda."); Pls. Ex. 168 (Mana Decl.) ¶¶ 10, 15-16. |
| 1585. | After Bayoumi came out of the conference room with Mana, Bayoumi then spoke separately with Thumairy. Ex. 92, Morgan Decl. ¶21. | Plaintiffs cite only the Morgan declaration, which was drafted in the first instance by Plaintiffs' attorneys and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201. The 9/11 Commission comments that "Bin Don [*i.e.*, Morgan] himself has been inconsistent about visiting the mosque" and further concludes that "[a]lthough Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17.<br><br>Mana testified that he did not see Al Bayoumi or Morgan at the King Fahad Mosque on the day they visited Los Angeles. *See* KSA Ex. 77 (Mana Decl.) ¶¶ 10, 15-16 ("I have never interacted with, spoken to, or seen Mr. Al Bayoumi anywhere else, including at the King Fahad Mosque."); Response to Pls. Aver. ¶ 1602.<br><br>Al Bayoumi denies that he went to the King Fahd Mosque that day. Pls. Ex. 120 (Bayoumi Tr.) 403:23-405:16. At his deposition, Al Thumairy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | did not recall ever meeting with Al Bayoumi. Pls. Ex. 107 (Thumairy Tr.) 493:24-494:2. |
| 1586. | According to Youssef, "[t]he type of brief private meetings that Morgan described between Mana, Thumairy, and Bayoumi shows that the men were familiar with each other" and "got directly to their work and did not need to spend time to introduce themselves or exchange pleasantries." Ex. 5, Youssef Rpt. 188-89. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinion is speculative and ignores the evidence, set forth in Response to Averment paragraph 1585, that Al Bayoumi did not meet with Mana and Al Thumairy at the King Fahad Mosque after going to the Mediterranean Restaurant. |
| 1587. | Based on what happened before and after Bayoumi's meetings with Mana and Thumairy at the Mosque, Bayoumi reported to Mana and Thumairy on his meeting with the hijackers and confirmed the plans to bring the hijackers to San Diego, which likely occurred the very next day, February 2. After Bayoumi met Mana and Thumairy, Morgan and Bayoumi left the Mosque before the evening prayer and headed back to San Diego. The approximate time of the sunset prayer that day was 5:26 p.m., and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 14 is inadmissible hearsay and lacks authentication. *See* Objections Chart.<br><br>Plaintiffs Exhibit 14 (Key to Islamic Hijri Calendar for 1420 Hijri) is inadmissible hearsay and has not been authenticated. *See* Objections Chart. Date calculations based on Exhibit 14 are unreliable. See |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the evening prayer was 6:49 p.m. Ex. 14, 1420 Hijri Calendar. | Response to Plaintiffs Averment ¶ 1795 concerning Plaintiffs Exhibit 15, which comes from the same source.<br><br>Plaintiffs cite nothing for the unsupported narrative and speculation in the first two sentences of this averment paragraph.<br><br>Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi).<br><br>Al Thumairy had no recollection of Al Bayoumi, does not recall meeting with Al Bayoumi, and testified that he has no relationship with him. Pls. Ex. 107 (Thumairy Tr.) 493:12-494:5. He also did not know Johar. *Id.* at 243:24-244:2.<br><br>Mana had never heard of Mihdhar or Hazmi prior to the 9/11 attacks. KSA Ex. 77 (Mana Decl.) ¶ 22. |
| 1588. | Bayoumi admitted to Scotland Yard investigators at his interview that the Mediterranean restaurant where he met with the 9/11 hijackers was "close to the King Fahad Mosque." Ex. 450, MPS365-401 Tr. 194:12-13. | Plaintiffs Exhibit 450 (MPS365-401) is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Al Bayoumi told MPS investigators that the restaurant was close to the King Fahad Mosque. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1589. | Bayoumi was familiar with the neighborhood surrounding the King Fahad Mosque and had repeatedly been to that neighborhood in the weeks prior to meeting the hijackers. Documentary evidence places Bayoumi at the King Fahad Mosque and/or the Ibn Taymiyah Mosque on the following days:<br><br>1999<br><br>a. January, Ex. 373, MPS43_345 (Bayoumi letter thanking Salloum for reception for MOIA guests Sadhan and Sudairy);<br><br>b. April 10, Ex. 10E, MPS902-CLIP Video Exhibit; Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4 (Bayoumi at Mosque premises with Thumairy and Khalil);<br><br>c. May 10, Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5 (Bayoumi with Khalil and Dr. Shaikh at King Fahad Mosque and Ibn Taymiyah Mosque); Ex. 90, Snell Decl. Ex. 2 at 6 (Bayoumi met Thumairy on visit);<br><br>d. December 20, Ex. 527, FBI 4012-13 (check-in at Travelodge, Culver City at 10:43 a.m.); | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 373 is inadmissible hearsay. *See* Objections Chart.<br><br>The evidence does not show that "Bayoumi was familiar with the neighborhood surrounding the King Fahad Mosque." He made four trips to the mosque over the course of four years, as set forth below.<br><br>Plaintiffs Exhibit 373 does not show that Al Bayoumi traveled to Los Angeles and does not place him at the King Fahad Mosque or the Ibn Taymiyyah Mosque on January 26, 1999. The letter simply thanks The Consul General for his "beautiful welcome" that his deputy provided for visiting Ramadan imams Al Sudairy and Al Sadhan for their visit to Los Angeles. There is no mention of a reception for the two propagators that Al Bayoumi attended in Los Angeles.<br><br>Plaintiffs Exhibit 10E (MPS902-CLIP-VIDEO) shows Al Bayoumi at a seminar held at the King Fahad Mosque office in April 1999.<br><br>Photographs from KSA Ex. 254 (MPS 726, Bayoumi Photographs (D0884-X0351)) at 478 show that Al Bayoumi and his son Emad visited the construction site of the King Fahad Mosque and the Ibn Taymiyyah Mosque with Drs. Abdussattar Shaikh and Joe Averna with a stamp on the photograph stating "10 05 99."<br><br>The Travelodge Hotel registration form (Pls. Ex. 527 (FBI 4012-13)) also shows that Al Bayoumi may have been present with Al Jaithen on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | e. December 21, Ex. 527, FBI 4012-13 (check-out at Travelodge, Culver City at 1:22pm);<br><br>2000<br><br>f. January 9, Ex. 525, FBI 4009-10 (check-in at Half Moon Motel, Culver City); Ex. 526, FBI 4011, (check-in at Travelodge, Culver City at 9:28pm and check-out at 9:50pm); Ex.10I, MPS899-CLIP-TR 04:26 (transcript of video of Bayoumi in Los Angeles discussing going to King Fahad Mosque);<br><br>g. January 10, Ex. 525, FBI 4009-10 (check-out at Half Moon Motel, Culver City), and<br><br>h. January 31, Ex. 11J, MPS703_97 (photo 26) (photos of Bayoumi with wife and children at Mosque). | December 20, 1999. There is no evidence that Al Bayoumi was in Los Angeles on December 21, 1999, when Al Jaithen checked out.<br><br>Al Bayoumi traveled to Los Angeles and the King Fahad Mosque and stayed at the Half Moon Motel on January 9, 2000. Pls. Ex. 525 (FBI 4009). His presence in Los Angeles the next day was from the same trip.<br><br>There is no evidence that Al Bayoumi made two trips to Los Angeles on January 31, 2000 and February 1, 2000. *See* Response to Pls. Aver. ¶¶ 1532–1541 above. |
| 1590. | Bayoumi claimed that he had never been to the Ibn Taymiyah Mosque on Venice Boulevard a few blocks south of the Mediterranean Restaurant, but the MPS found in Bayoumi's possession a photograph of Bayoumi at that Mosque on May 10, 1999. Ex. 120, Bayoumi Dep. 220:8-11; Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5. The name of the Mosque was | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | next to Thumairy's name in Bayoumi's handwritten address book. Ex. 12AA, MPS738_35. | At his deposition, Al Bayoumi was asked whether he had gone to "a mosque on Venice Boulevard in Los Angeles called the Imam Taymiyyah Mosque." Pls. Ex. 120 (Bayoumi Tr.) 220:8-11. Plaintiffs appear to have made an error in the name: they did not ask about the Ibn Taymiyyah Mosque, which could easily have confused Al Bayoumi. In an event, it would not be surprising if Al Bayoumi could not recall specific events that occurred more than 20 years prior to his deposition. There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 1591. | Bayoumi testified at his deposition that "Los Angeles was close to us. We could just take a ride there and come back. I wouldn't remember how many times we went." Ex. 120, Bayoumi Dep. 357:8-11. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. To the extent a response is required, undisputed. |
| 1592. | Bayoumi told Scotland Yard investigators in September 2001 that "I usually go to Los Angeles" and "if I go to there [Los Angeles], I go to the - - Embassy or to the King Fahad Mosque." Ex. 408, MPS 815:3, 817:22-818:1. By "Embassy," Bayoumi meant the Saudi Consulate in Los Angeles. Ex.450, MPS 873:1-4. Bayoumi told the investigators that sometimes he would meet "sheikhs and visitors, scholars…from Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 408 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Arabia" at the King Fahad Mosque. Ex. 450, Tr. 817:8-13. | Plaintiffs omit the context of this exchange. The MPS investigators were attempting to find out whether Al Bayoumi had gone to LAX on January 15, 2000, to pick up the future hijackers. "Did you travel to Los Angeles on the 15th January 2000?" KSA Ex. 261 (MPS 398, Record of Tape Recorded Interview of Omar Al Bayoumi (9/27/01)) at 30. Al Bayoumi paused and tried to remember, "15th January 2000 to Los Angeles? I regularly go to Los Angeles but eh . . . 15th Jan. . . 15th . . . only to renew my passport." *Id.* at 30–31. The investigators reminded Al Bayoumi that the trip to Los Angeles to renew his passport was on February 1, 2000. Al Bayoumi continued, "If I did I eh, I, I I went to the embassy." *Id.* at 31. One of the investigators asked him, "If you go, but did you go." *Id.* Al Bayoumi replied, "I'm not sure, not sure. I need to, if it, I need to remember this period ok if its during . . . in [R]amadan, because we have a lot of sheikhs and visitors, scholars came from Saudi Arabia and I sometimes joined them to King Fahad Mosque for example. . . . Yeah, if I were, I would be at the embassy or King Fahad Mosque." *Id.* at 31-32. Finally, the investigator broke down and asked what he really wanted to ask, "Did you go to the airport?" *Id.* at 32. |
| 1593. | Khalil told the 9/11 Commission that he knew Bayoumi because "Bayoumi used to come frequently to the mosque to see Fahad Al Thumairy." Ex. 90, Snell Decl., Ex. 5 at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 90 (Snell Decl., Ex. 5) is inadmissible hearsay to the extent it is being offered for the truth of the matter asserted. *See* Objections Chart.

Khalil clarified this statement at his deposition, stating that he had seen Al Bayoumi "two or three times he was . . . visiting the mosque. Indeed I |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | didn't even see him [at] the mosque, just in my office, say hello. And that's it. . . . Two or three times, that I saw him really come and just hi, how are you. That's it. . . . he asked me once or twice, where is Fahad? Just come to my office. I thought, I don't know, do you have his phone number. I said, yes. Call him." Pls. Ex. 113 (Khalil Tr.) 116:16–117:23. |
| 1594. | The King Fahad Mosque is a major landmark and "one of the most prominent Mosques in Southern California" and an easy two-minute drive only "a few blocks away" from the Mediterranean Café. *See* 9/11 Commission Report at 216-17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1595. | Bayoumi gave alternate versions of his story about getting lost trying to find the King Fahad Mosque, first claiming that it occurred before he and Morgan went to the restaurant (because they were "hungry") and later claiming that it was after they left the restaurant (because they were "exhausted"). In September 2001, Bayoumi told Scotland Yard investigators that he got lost trying to find the King Fahad Mosque *before* going to the restaurant. Ex. 10, MPS 195:15-21("we went to -- tried to go to the King Fahad Mosque to pray there….[a]nd I think we got lost at that time and we went to eat and we met these people [the hijackers]."); Ex. 10, MPS 545:12-17 ("I think I got lost…[a]nd we were hungry… | Plaintiffs Exhibit 90 (Snell Decl. & Exhibits) is inadmissible hearsay. *See* Objections Chart.<br><br>There are more than a dozen accounts of what occurred on February 1, 2000. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi. *See* KSA Ex. 167 (Sageman Rep.) 177-201. *See* Response to Pls. Aver. ¶ 1567.<br><br>It is unsurprising that there would be discrepancies when recounting an unremarkable event many years, and in the case of deposition testimony, more than 20 years after the event. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [a]nd then we went to the restaurant to eat."); Ex.450, MPS 765:6-11 ( "I get lost…. we were hungry at that time, and we went to eat."). In October 2003, Bayoumi told the 9/11 Commission that it was *after* leaving the restaurant that he got lost: "After leaving the restaurant, OAB [Bayoumi] tried to find the KFM [King Fahad Mosque]…but they could not find it…" Ex. 90, Snell Decl., Ex. 2 at 4. At his June 2021 deposition, Bayoumi claimed that it was *after* leaving the restaurant that he got lost: "On our way back to San Diego, we wanted to stop by King Fahad Mosque. But I got lost and we were exhausted, so I decided just to head home." Ex. 120, Bayoumi Dep. 405:12-16. | |
| 1596. | Morgan testified that Bayoumi was not telling the truth, because he and Bayoumi went to the King Fahad Mosque after their restaurant meeting with the two hijackers. Ex. 112, Morgan Dep. 98:10-99:12; Ex. 92, Morgan Decl. ¶¶ 20, 21, 23. | Plaintiffs cite the Morgan declaration, which was drafted by Plaintiffs' attorneys in the first instance and cherry-picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201; Response to Pls. Aver. ¶ 1567. The accounts differ as to whether Al Bayoumi and Morgan went to the King Fahad Mosque after the Mediterranean restaurant.<br><br>The 9/11 Commission comments, for instance, that "Bin Don himself has been inconsistent about visiting the mosque. . . .  Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17. |
| 1597. | Youssef determined that "Bayoumi's story about being unable to find the Mosque is evidence of his culpability as Bayoumi had a strong motive to hide the private meetings he had with Mana and Thumairy at the King Fahad Mosque." Youssef further explained, "[t]hose meetings, coming immediately after Bayoumi met with Hazmi and Mihdhar at the restaurant, demonstrate how the three men were working together to provide support for the hijackers." Ex. 5, Youssef Rpt. 191-92. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As the 9/11 Commission found, "Bin Don [*i.e.*, Morgan] himself has been inconsistent about visiting the mosque. . . . Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact." KSA Ex. 163 (9/11 Rep.) 218, 515 n.17.<br><br>The remainder of Youssef's speculation is unfounded.<br><br>Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi).<br><br>Al Thumairy had no recollection of Al Bayoumi, does not recall meeting with Al Bayoumi, and testified that he has no relationship with him. Pls. Ex. 107 (Thumairy Tr.) 493:12-494:5. He also did not know Johar. *Id.* at 243:24-244:2.<br><br>Mana had never heard of Mihdhar or Hazmi prior to the 9/11 attacks. KSA Ex. 77 (Mana Decl.) ¶ 22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1598. | Kaysan Morgan testified that he and Bayoumi left Los Angeles as it was getting dark and that Bayoumi called his wife on the trip home to San Diego. Ex. 92, Morgan Decl. ¶22. The phone records show that Bayoumi called home on February 1 at 7:11pm (3 mins.), around the time described by Morgan. On January 31, Bayoumi made no calls home during the late afternoon or early evening hours. The call provides further confirmation that Morgan and Bayoumi travelled to Los Angeles on February 1. Ex. 515, FBI 3230; Ex. 5, Youssef Rpt. 178, n. 720, Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Plaintiffs cite only the Morgan declaration, which was drafted by Plaintiffs' attorneys in the first instance and cherry picks portions of Morgan's conflicting accounts recorded by the FBI. The Sageman report summarizes the various accounts given by Morgan and Al Bayoumi of what occurred on that day. *See* KSA Ex. 167 (Sageman Rep.) 177-201.<br><br>Undisputed that the calling records show that Al Bayoumi did not place calls to his house on the evening of January 31, 2000. As set forth above, Al Bayoumi made a single trip to Los Angeles and that occurred on either January 31, 2000 or February 1, 2000. *See* Response to Pls. Aver. ¶ 1532. |
| 1599. | Plaintiffs' expert Youssef determined:<br><br>Bayoumi's charge records confirm that he purchased fuel on January 30, 2000 ($18.48 at Texaco in San Diego) and February 1, 2000 ($19.42 at Shell in San Diego). These charges show that Bayoumi filled up his fuel tank. Based on the approximate cost of gasoline in Los Angeles in January 2000 ($1.32/gal) and February 2000 ($1.41) and the approximate driving distance of 125 miles from Bayoumi's home in San Diego to the Saudi Consulate in Los Angeles, these fuel purchases are consistent with Bayoumi making two roundtrip visits to the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth in the Response to Averment paragraph 1532, the gas records reflect that there was only one trip to Los Angeles on either January 31, 2000 or February 1, 2000. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Consulate on January 31, 2000 and February 1, 2000. Ex. 5, Youssef Rpt. 178 n. 720; Ex. 509, FBI002388. | |
| **XX.K.** | **Mana and Bayoumi had an established Saudi government agency relationship.** | There is no evidence that Al Bayoumi was anything other than a civil servant in the Presidency of Civil Aviation. Mana was a foreign employee of the Saudi Arabian Consulate in Los Angeles. There is no evidence that providing assistance to the 9/11 hijackers would have been within their scope of either Al Bayoumi's or Mana's employment or agency. |
| 1600. | Contrary to Saudi Arabia's claim that Mana and Bayoumi had "no relationship," KSA Aver. ¶ 96, Bayoumi's contemporaneous documents recovered by the MPS confirm the work relationship between Mana and Bayoumi, including Bayoumi's handwritten address book, Ex. 12AA, MPS738_52 (containing the Consulate phone number with notations "Mana Islamic Affairs" and Mana's extension "Ex 240" and "Islamic affairs Ismail Mana 240" – the underscore is in the original); Bayoumi's green folder of contacts, Ex. 12BB, MPS688_9, 11 (containing listings for Mana's Islamic affairs number, extension, and fax); ███████ ████████████████████████ ████████████████████████ ████████████████ and the personal letter Bayoumi wrote to Mana and | Plaintiffs Exhibits 12AA (MPS 738), 12BB (MPS 688), 408, and 533 are inadmissible hearsay. Plaintiffs Exhibits 345 and 89 are inadmissible hearsay to the extent offered for the truth of what interviewees purportedly said. *See* Objections Chart.<br><br>Al Bayoumi and Mana had no relationship at all and did not know each other. Pls. Ex. 120 (Bayoumi Tr.) 302:15-303:2 (testifying that he did not know Mana and that he only wrote down his name because the embassy told him that Mana was the designated person to provide Qurans); Pls. Ex. 110A (Mana Tr.) 134:8-135:22 (testifying that he only met Al Bayoumi once when he provided Qurans and other religious material to him at the Consulate, and did not learn Al Bayoumi's name until after the 9/11 attacks); KSA Ex. 77 (Mana Decl.) ¶ 12 (Mana "exchanged greetings – *i.e.*, salams" – with the Saudi citizen he later learned was Al Bayoumi).<br><br>Plaintiffs cite to an address book that contains Mana's name. There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten address book is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | other Consulate officials which addressed Mana alone as "Sheikh," demonstrating Bayoumi's acknowledgement of Mana's religious role with Thumairy at the King Fahad Mosque. Ex. 408, MPS 43_387. The EO production disclosed that the FBI found ███████████ ██████ Ex. 2, EO 0609. ███████ admitted to the FBI during two interviews that Bayoumi enjoyed special status and rank at the Consulate. ████████████████ ███████████ | Nothing in that book indicates that Al Bayoumi and Mana worked together. Pls. Ex. 12AA (MPS 738). Instead, the unrebutted evidence is that Al Bayoumi received Islamic materials from the Islamic Affairs department at the Consulate for the Al Madinah Mosque. Pls. Ex. 373 (MPS43_345). ██████████████████████████ *See also* Pls. Ex. 398 (MPS43_346). |

Plaintiffs Exhibit 12BB (MPS688) is the "green folder." With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), there is no evidence that the list belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.

At the bottom of the page stamped 000008 is written Saudi Consulate Islamic affairs, which continues onto the page stamped 000010, where the extension 240 is for Saad Al Jebreen. Mana is not mentioned at all in this folder of contacts, showing that the alleged listing for Mana (Islamic affairs number, extension, and fax) is really Saad Al Jebreen's number, extension and fax. Al Bayoumi contacted Al Jebreen to provide materials for the Al Madinah Mosque. *See* Pls. Ex. 373 (MPS43_345); *see also* Pls. Ex. 398 (MPS43_346).

Plaintiffs Exhibit 408 (MPS43_387) is not a personal letter to Mana. To the contrary, it is a general letter of Eid al-Fitr greetings to the KSA Consul General in Los Angeles, with a personal copy to Saad Al Jebreen. It is similar to the letter of Eid al-Fitr greetings that Al Bayoumi had sent to the Consul General in 1419H, where he singled out Al Jebreen for his

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | provision of Qurans for the local mosques, and where Mana is not mentioned. Pls. Ex. 373 (MPS43_345). By 1421H Eid al-Fitr, Mana's name (with the honorific Sheikh) was added to the list of three other consular members, including al-Jabreen. Pls. Ex. 408 (MPS43_387).<br><br>The allegation about ██████████████████████ ██████████████████████████s addressed in the Responses to Averment paragraphs ███████████████████ above. The document reflecting this call is hearsay, and even the FBI questioned whether the information is correct. Pls. Ex. 2JJ (EO 609-UPDATED). ████████ ████████████████████████████████████████████████ ████████████<br><br>████ testified that he did not tell the FBI that Al Bayoumi had a "very high status" at the Consulate. ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ |
| 1601. | The relationship between Mana and Bayoumi is also shown by Bayoumi's meeting with Mana at the King Fahad Mosque after meeting the hijackers; Bayoumi's statement to Morgan in Mana's presence that Bayoumi had not been to the Consulate for three months when, in fact, Bayoumi had been at the Consulate the day before; and the coordination among | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>As set forth in the Responses to Averment paragraphs 1584–1586, the evidence shows that Mana and Al Bayoumi did not meet at the King Fahad Mosque after the meeting with the hijackers. As set forth in the Response to Averment paragraph 1532, Al Bayoumi only took one trip to Los Angeles and the Consulate on either January 31 or February 1, 2000. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi, Thumairy, Mana, and Johar to provide support for the hijackers. Ex. 5, Youssef Rpt. 184-5. | As set forth in the Response to Averment paragraph 1571, there was no coordination between Al Bayoumi, Al Thumairy, Mana, and Johar with respect to the hijackers. This was also the conclusion of all the authoritative U.S. Government panels established from 2004 to 2021 to investigate the issue of witting support for the hijackers. |
| 1602. | Mana admitted at his deposition that he saw Bayoumi and Morgan together at the King Fahad Mosque, ███████████████ ████████████████████████ ████████████████████ Ex. 110A, Mana Dep. 144:2-25; ███ The only date Mana could have seen Bayoumi and Morgan at the Mosque was February 1, 2000, when, as Morgan testified, he saw Bayoumi meet Mana at the Mosque. Morgan had never been to the King Fahad Mosque until Bayoumi took him there on February 1, 2000; there is no evidence that Morgan and Bayoumi ever returned to the Mosque together after February 1; and Morgan left San Diego in late February or March 2000 and has not seen Bayoumi since. Ex. 92, Morgan Decl. ¶¶ 9, 30. | Plaintiffs Exhibit 679K (FBI 9104) is inadmissible hearsay. *See* Objections Chart. Mana did not testify that he saw Al Bayoumi and Morgan at the King Fahad Mosque. In the portion of the deposition Plaintiffs cite, Mana was referring to seeing Al Bayoumi and Morgan at the Consulate, not the King Fahad Mosque. Pls. Ex. 110A (Mana Tr.) 144:2-25. Mana in fact testified that other than seeing Al Bayoumi at the Consulate, he never saw Al Bayoumi again. KSA Ex. 77 (Mana Decl.) ¶¶ 10, 14-16. Mana further testified that other than seeing Morgan at the Consulate, the only other interaction he had with Morgan was seeing him at a clothing store in Anaheim, CA and at a mosque in Reseda, CA. Both were several years after the September 11 attacks. *Id.* ¶ 17; Pls. Ex. 110A (Mana Tr.) 142:22–143:25, 172:14–174:19 (██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████). The remainder of this paragraph is based on the false assertion in the first sentence. |
| 1603. | Mana further admitted his relationship with Bayoumi by stating in his declaration that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | the "only reason I recall" the February 1, 2000 encounter with Morgan was "because this was the first time I have met a Jewish convert to Islam." Ex. 168, Mana Decl. ¶ 11. When confronted at his deposition with questions about whether Bayoumi told Mana that Morgan was a Jewish convert, Mana said: "I'll claim my Fifth Amendment for this." After being instructed by his lawyer to continue his answer, Mana claimed that he first heard that Morgan was Jewish years after February 1, 2000 from an individual Mana could not name. Ex. 110A, Mana Dep. 150:15-154:22. Mana's explanation made no sense; his testimony that the "only reason" he remembered meeting Morgan on February 1, 2000 was that Morgan was a Jewish convert means that Bayoumi — who invited Morgan on the trip — must have shared that information with Mana in advance of their meeting. Morgan did not mention the subject to Mana and the only person who could have provided Mana with that information was Bayoumi. Ex. 92, Morgan Decl. ¶¶ 12-15. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>At his deposition, Mana testified that he did not know that Morgan "was from Jewish background when he came to the consulate. I clarified this. . . . And as such, you know, it remained in my memory, okay, for the first time in my life I met a convert who was from Jewish family. But initially I did not know that. Absolutely. I clarified this." Pls. Ex. 110A (Mana Tr.) 156:22-157:10, 161:25-162:15. Mana found out much later that Morgan was a Jewish convert from an administrator of the Islamic Center of Reseda. He did not remember his name or the year. *Id.* at 150:15-154-22, 172:14-174:19.<br><br>Mana specifically rejected Plaintiffs' claim that Al Bayoumi told Mana that Morgan was a Jewish convert. *Id.* at 152:3-7. Mana also did not assert the Fifth Amendment in response; in fact he had already answered the question. He said he would "claim my Fifth Amendment" when Mana's counsel instructed him not to answer after Plaintiffs' counsel continued to badger Mana with the same question. Mana's counsel then instructed Mana to answer, and he repeated his answer. Pls. Ex. 110A (Mana Tr.) 152:3-154:6. The full exchange is set forth below?:<br><br>152<br>3 Q. . .So isn't it true, sir, that Mr. Bayoumi<br>4 told you that this man Bin Don was a convert?<br>5 MR. SHEN: Objection.<br>6 A.I don't recall having discussed the<br>7 matter with him at all.<br>8 Q.(BY MR. POUNIAN) Isn't it true, sir,<br>9 that Mr. Bayoumi told you that Mr. Bin Don was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 10 Jewish?<br>11 MR. SHEN:  Objection.<br>12 A. Like I said, I don't recall having<br>13 discussed this because it was a very brief encounter<br>14 with this Bayoumi, just to exchange greetings with<br>15 him in the office.<br>16 Q. (BY MR. POUNIAN)  Who told you Mr. Bin<br>17 Don was Jewish?<br>18 MR. SHEN:  Objection, asked and<br>19 answered –<br>20 MR. SWIFT:  Asked and answered.  I'm<br>21 instructing you not to answer.<br>22 MR. POUNIAN:  What are you talking<br>23 about?  You can't instruct him not to answer.<br>24 Q. (BY MR. POUNIAN)  Who told you Mr. Bin<br>25 Don was Jewish?  I want to know –<br><br>153<br>1 A. I mentioned it to you previously, sir.<br>2 It's in the record.<br>3 Q. I want to know –<br>4 A. It's in the record.  You can repeat the<br>5 camera or the video and you can get the answer.<br>6 Q. I would like to know the answer from you<br>7 now.  Who was it?<br>8 A. I said it before.<br>9 Q. And what did you say?<br>10 A. You can replay the video camera.  You can<br>11 hear the answer.<br>12 Q. Well, I would like to hear it now from<br>13 your lips, if you could, please, sir.  I would like |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 14 to – <br> 15 A.Sir, in this case I'll claim my Fifth <br> 16 Amendment for this. <br> 17 MR. SWIFT: No. Go ahead and answer <br> 18 the question. Answer the question. <br> 19 A.My counsel said I answer it. I repeat <br> 20 it. I repeat it. I didn't know when he came to the <br> 21 consulate that he was from Jewish background. It's <br> 22 only when I met the guy in the mosque in Reseda that <br> 23 the administrator there is the one who told me that <br> 24 he is from Jewish family background that lives in <br> 25 Santa Barbara. I said this and I repeat it. So <br><br> 154 <br> 1 please, and don't insist too much because it's <br> 2 already in the record. <br> 3 Q.(BY MR. POUNIAN) Who told you that <br> 4 Mr. Bin Don was Jewish, sir? <br> 5 A.I said one of the administrators of <br> 6 Islamic Center of Reseda. |
| 1604. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But earlier in 2004 or in late 2003, Mana had run into Morgan at a shopping mall in Anaheim, CA. At that time, Mana and Morgan specifically discussed "the negative consequences to Mr. al-Bayoumi of his trip to the Consulate." Ex. 92, Morgan Decl. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit ▮▮▮▮▮ is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ¶ 13. Mana confirmed meeting with Morgan at that mall. Ex. 168, Mana Decl. ¶ 17. Moreover, at his deposition, Mana claimed that he and others at the Consulate were in a "state of shock" after reading press accounts in 2003 about Bayoumi. Ex. 110A, Mana Dep. 193:7-194:16. The Consulate did an investigation immediately after that press report and sent a 31-page report to the Embassy on July 21, 2003. Ex. 211, KSA 6642-65. Mana clearly knew about Bayoumi and Morgan ███████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████ | Plaintiffs Exhibit 211 (KSA 6642-65) is not a 31-page report. It is a one page telegram and one page special report on Al Bayoumi that attaches files related to Al Bayoumi, including copies of his passport and his passport application. There is no evidence that Mana – a low-level non-Saudi employee – would have seen this document.<br><br>There is also no evidence that ███████ ████████████████████████████ ████████████████████████████ ████████████████████<br><br>Plaintiffs Exhibit ██████████ ████████████████████████████ ██████ When Mana first met Morgan, Morgan was using the name "Osama," Pls. Ex. 120 (Bayoumi Tr.) 357:24-358:15 and there would be no reason for Mana ████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████<br><br>████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1605. | According to Morgan, at the time, the whole restaurant encounter seemed to him to be coincidental, but, according to Plaintiffs' expert Youssef, "[t]his is exactly what Bayoumi intended as part of his tradecraft" as "Bayoumi knew that he needed a plausible excuse for meeting two Al Qaeda operatives and bringing them to San Diego." Based on his experience, Youssef surmised that "Bayoumi had to fear and assume that Hazmi and Mihdhar could be discovered by law enforcement at any time" and that "[i]nviting Morgan to join him on his trip to Los Angeles provided Bayoumi with his cover for meeting the hijackers" where "[i]f the two men were discovered, Bayoumi would (and ultimately did) claim that his meeting with them was a 'coincidence' and use Morgan as his witness." While Morgan believed Bayoumi for some time about the seeming nature of the meeting, Morgan "now acknowledges that the meeting may not have been the coincidence he was led to perceive, and he now believes that preparations had been made for the arrival of Hazmi and Mihdhar in California outside of his knowledge." Ex. 5, Youssef Rpt. 192; Ex. 92, Morgan Decl. ¶ 30. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Paragraph 30 of the Morgan declaration (Pls. Ex. 92) is not based on personal knowledge and is inadmissible. *See* Objections Chart.<br><br>Youssef lacks qualifications to opine on tradecraft. He was prevented from working on the 9/11 investigation, despite his repeated requests to do so. The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>Indeed, Yousef's opinion reflects a complete lack of understanding of tradecraft. From a tradecraft perspective, there is no reason to bring a perfect stranger to a clandestine meeting because it breaks the secrecy of the meeting. The stranger is now privy to a meeting that he should never have been privy to and there is the possibility that the stranger might inform the authorities. Good tradecraft would have required Al Bayoumi to meet with the two terrorists in a clandestine place, either a hotel room or a witting person's home out of sight of any unwanted viewer. The cover story for a meeting is never an unwitting person because that person becomes a potential witness who might alert authorities. KSA Ex. 167 (Sageman Rep.) 683-84.<br><br>Further, Al Bayoumi was the source of this meeting to New Scotland Yard, which shared it with the FBI. KSA Ex. 163 (9/11 Rep.) 217. He did so innocently as the MPS was questioning him about the strangers for whom he had guaranteed an apartment. He told the MPS that he had met them at a restaurant during a trip to Los Angeles and that he took along a convert. KSA Ex. 255 (MPS 374, Record of Tape Recorded Interview of Omar Al Bayoumi (9/23/01)) at 14–24. This was several days before the MPS revealed to him that the strangers were two hijackers who carried out the 9/11 attacks. KSA Ex. 256 (MPS 400 Record of Tape Recorded |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Interview of Omar Al Bayoumi (9/27/01)), at 4–5. If Al Bayoumi had wittingly assisted the future hijackers, it would have made no sense to reveal to the police how he met them and provided details to the police about a witness to the meeting. This makes no operational and clandestine sense, consistent with the 9/11 Commission's conclusions. KSA Ex. 163 (9/11 Rep.) 218.<br><br>Youssef is also not aware of standard Al Qaeda tradecraft, as instructed in the Manchester Manual. *See* KSA Ex. 216 (PECFOIA 41956-2133). As the Sageman report provides, the manual outlines some of the security precautions to be taken for meetings "between two members of the Organization [Al Qaeda] without being monitored by the security apparatus opposing the Organization." *Id.* at 41984. These precautions include identifying a meeting location; finding a proper cover for the meeting; specifying the meeting date and time; designating special signals between those who meet, especially if they do not know each other; as well as various measures during and after the meeting. *Id.* at 41987–92. In the intelligence jargon, this set of planning and precautions is called "contact instructions." The manual warns that the disadvantages of an in-person meeting are potential capture by the enemy, allowing the enemy to record the meeting, and disclosure of the appearance or identity of Al Qaeda operatives. *Id.* at 41991–92. The manual instructs trainees to avoid Muslims and "famous Islamic places (mosques, libraries, Islamic fairs, etc.)." *Id.* at 42008. Again, it is important to note that once again, Al Qaeda's modus operandi is to avoid meeting Muslims because they might be monitored, and this would expose an operative to the risk of detection by the local security services. In other words, Al Qaeda does not rely on any local network of sympathetic Muslims as Plaintiffs claim. The manual concludes that it is also best to "not meet in places where there are informers, such as coffee shops." *Id.* at 42009. For Al Qaeda tradecraft, a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "small place like the Mediterranean Gourmet restaurant would be a terrible place to meet." KSA Ex. 167 (Sageman Rep.) 249-50.<br><br>Youssef's opinion also makes no sense because, if he were right that there was a support network in Southern California (and there was not), there would be no reason for Al Bayoumi to have come to Los Angeles to meet the hijackers at all. The hijackers could have been directed to find Al Bayoumi at the ICSD in San Diego. If there was no support network in Southern California (as all investigations of the attacks have concluded), then the meeting at the restaurant must have been by chance, as no one would have directed the hijackers to meet at the restaurant. Pls. Ex. 120 (Bayoumi Tr.) 725:14-726:8.<br><br>Plaintiffs cite to a paragraph of Morgan's declaration that they drafted in the first instance. Morgan testified, however, that he demanded that the attorneys' include the term "outside of my knowledge" to that sentence. Pls. Ex. 112 (Morgan Tr.) 30:1-6; 80:2-14. He admitted that he did not have any "personal knowledge of any facts indicating that Omar al-Bayoumi's encounter with Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles was anything other than a coincidence." Pls. Ex. 112 (Morgan Tr.) 28:22-29:6. |
| **XX.L.** | **Bayoumi made advance arrangements for an apartment for Hazmi and Mihdhar before they arrived in San Diego.** | There is no evidence that Al Bayoumi made advance plans for an apartment for Hazmi and Mihdhar before they arrived in San Diego. In fact, Al Bayoumi had no idea that they were coming to San Diego. Pls. Ex. 120 (Bayoumi Tr.) 729:9-730:4. |
| 1606. | Before Hazmi and Mihdhar ever arrived in San Diego, Bayoumi visited the rental office at the Parkwood Apartments complex in San Diego about 5-6 times to see if apartments were available. Bayoumi told | Plaintiffs Exhibit 92 (Morgan Decl.) including Paragraph 25 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs drafted Morgan's declaration in the first instance. Pls. Ex. 112 (Morgan Tr.) 30:1-6. Al Bayoumi testified explicitly that he did not know |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Parkwood Manager Holly Ratchford that he wanted an apartment that was in "close proximity" to Bayoumi's own apartment in the same Parkwood complex. When Kaysan Morgan saw Hazmi and al-Mihdhar in San Diego and expressed his "surprise at their sudden arrival" Bayoumi admitted to Morgan "that he discussed setting up an apartment with his apartment complex manager prior to the arrival of al-Hazmi and al-Mihdhar in San Diego." Ex. 91, Ratchford Decl. ¶6; Ex. 92, Morgan Decl. ¶ 25. Bayoumi's admission to Morgan about his actions regarding setting up an apartment in San Diego before his purported first meeting with the hijackers at the Mediterranean Restaurant in Los Angeles, shows that his meeting with hijackers was a planned event and not just "a coincidence." | the hijackers were coming to San Diego and that he did not make any plans for them. Pls. Ex. 120 (Bayoumi Tr.) 729:9-730:4. <br><br> The Ratchford declaration states: that "Before Mr. al-Bayoumi brought al-Hazmi and al-Mihdhar to my office, Mr. al-Bayoumi visited my office approximately 5–6 times to see if there were any apartments available." Ratchford Decl. ¶ 6. However, there is no evidence that these visits to the rental office were related to a search for an apartment for the future hijackers. Al Bayoumi frequently checked to see if apartments were available to refer people to Parkwood Apartment Homes and receive a referral fee. In fact, he did so soon after he began renting an apartment at Parkwood Apartment, in June 1999, 8 months before he met the hijackers and 5 months before December 1999 when KSM dispatched them to San Diego. Ratchford Decl. ¶ 4 (move-in month for Al Bayoumi), ¶ 5 (for beginning of inquiries about available apartments); Pls. Ex. 31 (KSM Statement) at 28 (for dispatch date). <br><br> At his deposition, Al Bayoumi testified that if he referred somebody to the apartment complex, he would receive compensation "from the manager. She would give me $100, $200." Pls. Ex. 120 (Bayoumi Tr.) 733:14-734:17. He recalled that he received some compensation for his referral of the future hijackers and that this was one of the reasons for him telling them that there was an apartment available at his complex. *Id.* |
| 1607. | Phone records support the fact that Bayoumi began investigating another possible apartment for Hazmi and Mihdhar before their arrival. From January 12, 2000 to February 14, 2000, Bayoumi made a series of 15 phone calls to Hashim Attas, who was leaving his San Diego apartment. Bayoumi called Attas on January 12, | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. <br><br> There is no evidence that the phone calls between Hashim Attas and Al Bayoumi, from January 12, 2000, and February 14, 2000, were related to the search of an apartment for the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | January 15 (3 calls), January 16, January 17 (2 calls), January 19, January 25 (2 calls), January 27, January 28, February 9, February 11 (3 calls), February 14 (2 calls). The calls to Attas ended on February 14, 2000, the same day that Bayoumi placed a call to Attas's landlord, ▮▮▮▮▮▮▮, who called Bayoumi back the next day. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Indeed, this series of calls continued well after February 4, 2000 when the hijackers had already signed a lease for an apartment. |
| XXI. | **BAYOUMI AND THUMAIRY ARRANGE FOR HAZMI AND MIHDHAR TO MOVE TO SAN DIEGO** | The hijackers decided for themselves to go to San Diego, where they had been dispatched by KSM. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ There is no evidence that Al Bayoumi or Al Thumairy arranged for Al Hazmi and Al Mihdhar to move San Diego. Pls. Ex. 120 (Bayoumi Tr.) 728:23-730:4 (testifying that he had no idea that the hijackers were coming to San Diego and that he never made any plans for the hijackers to come to San Diego); Pls. Ex. 107 (Thumairy Tr.) 490:3-493:11 (testifying that he had not heard the names Khalid Al Mihdhar or Nawaf Al Hazmi prior to the 9/11 attacks, that he had no recollection of ever meeting the hijackers, that he was never provided instructions to assist and never gave anyone else instructions to assist the hijackers, that he never assisted the hijackers in any way, and that he has no knowledge of anyone else assisting the hijackers). The FBI has confirmed that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| **XXI.A.** | **Hazmi and Mihdhar are transported by car from Los Angeles to San Diego.** | There is no evidence that the hijackers were transported by car to Los Angeles. ████████████████████████████ ████████████████████████████████████ |
| 1608. | Thumairy and Bayoumi likely arranged for Hazmi and Mihdhar to be driven by car from Los Angeles to San Diego. Plaintiffs' expert Youssef opined that "Al Qaeda would use extraordinary care when operatives such as Hazmi and Mihdhar travelled from one location to another," choosing "a mode of transportation that would not allow their operatives to make a mistake, get lost, or be exposed to scrutiny." According to Youssef, the "operatives would be handled by trusted individuals at each stage of the process" and '[t]here would be a clear plan to avoid unnecessary risks." Ex. 5, Youssef Rpt. 193-4. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef has no expertise to testify on Al Qaeda's operations. He was prevented from working on the 9/11 investigation, despite his repeated requests to do so. The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>Youssef fails to cite any source for his speculation, which is contradicted by the record evidence. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████<br><br>There is no also evidence that Al Qaeda or any other local support network provided support for Al Hazmi's and Al Mihdhar's travels when they: (1) flew from Karachi to Kuala Lumpur or from Yemen to Dubai to Kuala Lumpur respectively; (2) flew from Kuala Lumpur to Bangkok, where they stayed a week in Bangkok (twice as long as in Kuala Lumpur); and (3) flew from Bangkok to the United States. Nor is there any evidence of Al Qaeda or any local support networks provided support for the future 9/11 pilots when they flew to the United States and traveled to Florida and around the United States by themselves. There is also no evidence of Al Qaeda or any local support network providing support for Zacarias Moussaoui's arrival to the United States. Pls. Ex. 31 (KSM Statement) at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 39. There is also no evidence of such support in contemporaneous Al Qaeda operations in Europe, like the shoe bomber plot or the Kleine Brogel plot. KSA Ex. 167 (Sageman Rep.) 246, 251-257.<br><br>In terms of Al Qaeda's tradecraft, its manual instructs trainees to avoid Muslims. KSA Ex. 216 (PECFOIA 42008). Al Qaeda's modus operandi is to avoid meeting Muslims because they might be monitored, and this would expose an operative to the risk of detection by local security services. In other words, Al Qaeda did not rely on any local network of sympathetic Muslims as Plaintiffs claim. This is confirmed in KSM's instructions to participants in the 9/11 attacks. "Sheikh Mohammed said that he explicitly told Mohammad Atta and the other pilots and muscle operatives not to speak with any Muslims once in the United States." Pls. Ex. 31 (KSM Statement) at 36.<br><br>The only exception to this Al Qaeda tradecraft concerned Al Hazmi and Al Mihdhar, whom KSM "instructed to contact an Islamic Center or Mosque to help them get settled in the country since they did not speak English." *Id.* Because of their lack of English and exposure to the West, "Sheikh Mohammed permitted al-Hazmi and al-Mi[h]dhar, unlike the other 9/11 hijackers, to go to the local mosque to request assistance and advice on functioning in American society." *Id.* at 18.<br><br>Al Hazmi and Al Mihdhar followed KSM's instructions and asked unwitting innocent pious Muslims at Salafi mosques to help them along the way. There is no evidence of any support by "trusted individuals at each stage of the process." Such non-Al Qada support would have been a violation of compartmentation and Al Qaeda tradecraft. The consensus conclusion from all U.S. Government panels from 2004 to 2021 established to investigate this issue of witting support was that there was |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | no evidence for such witting support despite two decades of intensive investigation. |
| 1609. | Thumairy and Bayoumi had previously arranged car transportation for the advance teams of MOIA visiting propagators between Los Angeles and San Diego was by car. Abdullah Al Jaithen recalled that he and Majid Mersal travelled from Los Angeles to San Diego by car. Ex. 96, Jaithen Dep. 123:17-124:15, 170:19-21. Sadhan and Sudairy also traveled the same Los Angeles-San Diego route by car driven by "someone from the community" (the King Fahad Mosque) through MOIA. Ex. 99, Sadhan Dep. 73:12-77:10. It is likely that Thumairy and Bayoumi made similar arrangements for Hazmi and Mihdhar. | ███████████████████████████████████████████████████████████████████████████████████████ <br><br> There is no evidence that Al Bayoumi or Al Thumairy arranged for Al Hazmi and Al Mihdhar to move San Diego. Pls. Ex. 120 (Bayoumi Tr.) 728:23-730:4 (testifying that he had no idea that the hijackers were coming to San Diego and that he never made any plans for the hijackers to come to San Diego); Pls. Ex. 107 (Thumairy Tr.) 490:3-493:11 (testifying that he had not heard the names Khalid Al Mihdhar or Nawaf Al Hazmi prior to the 9/11 attacks, that he had no recollection of ever meeting the hijackers, that he was never provided instructions to assist and never gave anyone else instructions to assist the hijackers, that he never assisted the hijackers in any way, and that he has no knowledge of anyone else assisting the hijackers). <br><br> The FBI has confirmed that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). <br><br> There is no evidence that Al Thumairy or Al Bayoumi had previously arranged the car transportation for Al Mersal, Al Jaithan, Al Sadhan, or Al Sudairy. None of the cited testimony supports this speculation. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1610. | ▮▮▮▮▮ told the FBI that Bayoumi himself drove Hazmi and Mihdhar to San Diego. Ex. 455, FBI 000032 at 35. | Plaintiffs Exhibit 455 (FBI 32) is inadmissible hearsay. *See* Objections Chart.<br><br>▮▮▮▮ was never deposed. Al Bayoumi testified expressly that this statement is false. ▮▮▮▮▮▮▮▮ |
| 1611. | ▮▮▮▮▮▮▮▮▮▮▮▮ claim does not make sense for several reasons. First, it is implausible, as Youseff explained, that the two hijackers would be dropped off at a bus station to take a bus to San Diego, as that "would gamble that the two men would have difficulty with getting tickets or getting off at the wrong station and becoming lost." Ex. 5, Youssef Rpt. 194; Ex. 567, FBI 11758. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮<br><br>As set forth in the Response to Plaintiffs Averment ¶ 1608, Youssef lacks any expertise to opine on Al Qaeda and the actual evidence is that Al Qaeda did not use local support networks in its operations.<br><br>Youssef's opinion is also entirely unsupported. By his logic, no tourist to the United States who does not speak English fluently would be able to buy tickets or travel without a local support network. |
| 1612. | Second, there is no evidence that there was a bus station in Santa Monica in 2000 or bus service from Santa Monica to San Diego; a press report shows that Santa Monica's bus station closed in 1994. Ex. 165A, https://www.latimes.com/archives/la-xpm-1994-10-01-me- 45234-story.html. | This newspaper article is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs present no evidence that there was no bus service that traveled from Santa Monica to San Diego (either directly or indirectly) in 2000. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1613. | Third, it made no sense for ▮ to take Hazmi and Mihdhar to Santa Monica as it was in the opposite direction both they - and ▮ - were going. ▮ | This paragraph contains attorney argument to which no response is required.<br><br>Santa Monica borders Culver City ▮ |
| 1614. | The 2016 FBI Operation Encore Report reviewed ▮ claims about taking Hazmi and Mihdhar to catch a bus and found them at odds with the fact that the hijackers would need assistance to obtain tickets and directions. Ex. 567, FBI 11758 | Plaintiffs Exhibit 567 (FBI 11758) is inadmissible hearsay. *See* Objections Chart.<br><br>This assertion is addressed in Response to Plaintiffs Averment ¶¶ 1612-1613.<br><br>Furthermore, other FBI investigative documents cited by Plaintiffs indicate that Al Hazmi spoke English at an elementary level. Dr. Shaikh, who lived with the hijackers, was able to communicate with them, although Dr. Shaikh knew no Arabic. Pls. Ex. 538 (FBI 7345-48), Pls. Ex. 540 (FBI 7362); *see also* Pls. Ex. 2P (EO 1238) (FBI reporting from an English school director, who reported that Al Hazmi called her on the phone to discuss his visa status). Al Hazmi and Al Mihdhar also bought a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | car and negotiated the purchase in broken English. KSA Ex. 163 (9/11 Rep.) 220. With their car, the two hijackers drove around by themselves identifying street signs without any evidence that they needed help. |
| **XXI.B.** | **While coordinating with Embassy and MOIA officials, Bayoumi claims to have a second "by chance" meeting with Hazmi and Mihdhar within a 1–2-day period, this time in San Diego.** | There is no evidence that Al Bayoumi was coordinating with any Embassy or Ministry of Islamic Affairs officials with respect to Al Hazmi and Al Mihdhar. Al Bayoumi did not know the hijackers were coming to San Diego and did nothing in preparation for their arrival. Pls. Ex. 120 (Bayoumi Tr.) 728:23-730:4.<br><br>The FBI has confirmed that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 1615. | Hazmi and Mihdhar likely arrived in San Diego on February 2, 2000, the day after they met Bayoumi and Morgan in Los Angeles, or February 3. Hazmi and Mihdhar were in San Diego by no later than February 3, 2000, based on a Parkwood Apartments document they signed on that date. Ex. 91, Ratchford Decl. ¶ 10; Ex. 679J, at 8024-5, 8035. | Plaintiffs Exhibit 679J (FBI 8024), is an apartment move-in/move out list, which was filled out, not by the hijackers or Al Bayoumi, but by Ratchford after she inspected the apartment on February 3, 2000, to get it ready to be leased to new customers. The hijackers signed the form, however, the date next to their signature is not filled in. The same form was filled out by Ratchford on June 2, 2000 after the hijackers moved out. It cannot be determined from this form that the hijackers were in San Diego on February 3, 2000. It is unclear whether Plaintiffs Exhibit 679J (FBI 8035), is dated February 3 or 5, 2000. |
| 1616. | According to Bayoumi, he first saw Hazmi and Mihdhar in San Diego when he happened to run into them at the ICSD. Ex. 90, Snell Decl., Ex. 2 at 3-4; KSA Aver. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ¶ 109. Bayoumi's account relies on a second unlikely "by chance" meeting between Bayoumi and the hijackers and is contrary to the evidence that Bayoumi was already searching for a suitable apartment in San Diego for Hazmi and Mihdhar before the two men arrived in San Diego. Ex. 91, Ratchford Decl. ¶ 6; Ex. 5, Youssef Rpt. 195. | As set forth in the Response to Plaintiffs Averment ¶¶ 1606-1607, there is no evidence that Al Bayoumi was searching for an apartment for the hijackers before they arrived in San Diego. Al Bayoumi did not know the hijackers were coming to San Diego and did nothing in preparation for their arrival. Pls. Ex. 120 (Bayoumi Tr.) 728:23-730:4.<br><br>Although Al Bayoumi did not know the hijackers were coming to San Diego, the hijackers may have sought out Al Bayoumi because they had recently met him in Los Angeles. KSM had instructed Al Hazmi and Al Mihdhar "to contact an Islamic Center or Mosque to help them get settled in the country since they did not speak English." Pls. Ex. 31 (KSM Statement) at 36. Because of their lack of English and exposure to the West, "Sheikh Mohammed permitted al-Hazmi and al-Mi[h]dhar, unlike the other 9/11 hijackers, to go to the local mosque to request assistance and advice on functioning in American society." *Id.* at 18.<br><br>The FBI has confirmed that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 1617. | As the hijackers transitioned to San Diego, Bayoumi reported to the Saudi Embassy Islamic Affairs officials. On February 2, 2000, Bayoumi called the Saudi Embassy Islamic Affairs for the fifth workday in a row at 9:04am (4 min.). He then called the Saudi Consulate at 9:21am (2 min.), and, subsequently, called Mutaeb Al Sudairy at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 10:53am (2 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | There is no evidence that Al Bayoumi's phone calls on February 2, 2000, to the Embassy and the Consulate were related to the hijackers. There is also no evidence that Al Bayoumi reported to any Embassy Islamic Affairs officials. On the same day, he made four calls to the Saudi Arabian Cultural Mission at 9:24 AM (1 min), 10:51 AM (1 min), 11:59 AM (1 Min), 11:59 AM (2 min), and two calls to the Keller Graduate School at 11:41 AM (4 min), and 11:56 AM (2 min). When Al Bayoumi renewed his passport the same week, he brought his expiring passport, a copy of his U.S. Department of Justice I-20 certificate of eligibility for nonimmigrant status, and a letter from the Keller Graduate School confirming his enrollment in the school. *See* KSA Ex. 85 (Awad Ex. 463) at 6644, 6646-47. This indicates that these calls related to his recent effort to renew his passport.<br><br>Plaintiffs have not established that the number called (703) 536-0998, belonged to Al Sudairy. The documents that Plaintiffs Exhibit 12A cites to support this assertion are inadmissible hearsay. Al Sudairy did not recall this phone number when asked at his deposition. Pls. Ex. 119 (Sudairy Tr.) 233:9-22. |
| 1618. | On February 3, Bayoumi called the Saudi Embassy Islamic Affairs number for the sixth workday in a row at 9:20am (5 mins.) Thumairy also called Sowailem's direct line at the Islamic Affairs department at 11:41am (12 mins.), and as Thumairy's call ended, Bayoumi called the Islamic Affairs number twice at 11:53am (2 mins.) and again at 12:09pm (3 mins.) Now that the hijackers had safely transitioned to San Diego and were under Bayoumi's care, | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence that any of the cited calls on February 3, 2000, were related to the hijackers. On the same day, Al Bayoumi called the Saudi Arabian Cultural Mission, which was responsible for Saudi students in the United States, again suggesting that all the calls related to administrative matters. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's repeated string of calls to the Embassy Islamic Affairs over the last six days ended. Ex. 5, Youssef Rpt. 193; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | There is no evidence that on February 3, 2000, Al Bayoumi was making arrangements for the hijackers in San Diego on February 3 or even knew that they had arrived in San Diego. *See* Pls. Ex. 120 (Bayoumi Tr.) 728:23-730:4 (testifying that he had no idea that the hijackers were coming to San Diego and that he never made any plans for the hijackers to come to San Diego). There is also no evidence that Al Thumairy's call to Al Sowailem had anything to do with the hijackers.<br><br>Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. There is no evidence that Al Sowailem ever knew who the hijackers were, had any contact with them, or assisted them in any way.<br><br>The fact that Al Bayoumi's calls to the Embassy's Islamic Affairs department ended on February 3 – even before the hijackers signed their lease on February 4 – proves that the calls could not have been about the hijackers. The hijacker's mission was to learn how to fly airplanes. They had not yet started their mission, and accordingly if Al Bayoumi was reporting to the Embassy he would have continued to do so after February 3. |
| 1619. | Thumairy made several calls to San Diego to confirm arrangements for the hijackers. On February 3, 2000, Thumairy called ▮▮▮▮▮▮▮ the Imam of the ICSD, at 11:39pm (2 mins.) and 11:43pm (2 mins.) These calls came after Thumairy's meetings with Hazmi and Mihdhar and occurred precisely with their arrival in San | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He has publicly condemned |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Diego and attendance at the ICSD Mosque, indicating Thumairy communicated with the ICSD's Imam about the two hijackers. According to Youssef's analysis, "[t]here is no other apparent reason why Thumairy, an Imam in Los Angeles, would call ▮▮▮▮ an Imam of the ICSD Mosque in San Diego, so late at night" and "[t]here were no prior calls between the two men and no subsequent calls until July." Ex. 5, Youssef Rpt. 5, 200; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | terrorism. The FBI's summary of an interview of ▮▮▮▮ states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Pls. Ex. 2P (EO 1237).<br><br>There is no evidence that any of these calls had anything to do with the hijackers. As imams at large southern California mosques it was not unusual for Al Thumairy and ▮▮▮▮ to correspond.<br><br>Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. |
| 1620. | As detailed below, Mezgouri attended the February 17, 2000 welcome party for Hazmi and Mihdhar hosted by Bayoumi. Ex. 10K (MPS2023-059 Video Exhibit); Ex. 11K (MPS2023-059-CLIP Video Screenshots); Ex. 694, Youssef Decl. ¶ 87-88. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 694 (Youssef Decl.) is inadmissible and has been stricken. *See* Objections Chart.<br><br>As detailed in the Response Plaintiffs Averment Section XXII, there was no welcome party for Al Hazmi and Al Mihdhar. The party was to honor those who had volunteered and led prayers at the Al Madina Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). |
| **XXI.C.** | **Hazmi and Mihdhar stayed with Bayoumi in San Diego for 2-3 days before Bayoumi helped get them their apartment.** | It would have been a serious violation of cultural norms to have the hijackers (two adult men) stay at Al Bayoumi's apartment in San Diego, where Al Bayoumi's wife and daughter also resided. As Al Bayoumi told MPS investigators, this did not happen and would have been impossible. *See also* KSA Ex. 269 (MPS376, Bayoumi Interview Transcript) at 13, KSA Ex. 270 MPS388, Bayoumi Interview Transcript) at 24, KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 13 ("No, not man . . . not man, no. . . . No, no, man, no but women yes . . . [b]ut men, no, no way."); KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 24 ("No, they didn't stay at my house."). |
| 1621. | Holly Ratchford, the Manager of the Parkwood Apartments complex in San Diego, testified that she first met Hazmi and Mihdhar when Bayoumi brought them to her office. Ratchford knew Bayoumi as a resident of the Parkwood complex. Ratchford stated that before Bayoumi came to the manager's office with the two hijackers, Bayoumi had already visited the office 5-6 times to see what apartments were available. Ex. 91, Ratchford Decl. ¶ 6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in the Response to Plaintiffs Averment ¶ 1606, Al Bayoumi frequently asked about available apartments because he received a referral fee. |
| 1622. | Parkwood Manager Ratchford testified that "Bayoumi introduced al-Hazmi and al-Mihdhar to me, telling me that they were his friends…" and that the two men "were | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | staying with him because they had just arrived in the United States and…that they needed to rent an apartment right away." Ex. 91, Ratchford Decl. ¶ 7. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 91 (Ratchford Decl.) ¶ 7, is inadmissible hearsay to the extent it is offered for the truth of the matter asserted, including the claim that Al Hazmi and Al Mihdhar were Al Bayoumi's "friends" who "were staying with him." *See* Objections Chart. Ratchford also lacks personal knowledge as to whether the hijackers were staying with Al Bayoumi.<br><br>It would have been a serious violation of cultural norms to have the hijackers (two adult men) stay at Al Bayoumi's apartment in San Diego, where Al Bayoumi's wife and daughter also resided. As Al Bayoumi told MPS investigators, this did not happen and would have been impossible. *See also* KSA Ex. 269 (MPS376, Bayoumi Interview Transcript) at 13, KSA Ex. 270 (MPS388, Bayoumi Interview Transcript) at 24, KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 13 ("No, not man . . . not man, no. . . . No, no, man, no but women yes . . . [b]ut men, no, no way."); KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 24 ("No, they didn't stay at my house.").<br><br>█████████████████████████████████████████ This also calls into question the accuracy of her declaration. |
| 1623. | Parkwood Manager Ratchford testified that she knew Bayoumi as generally polite and never in a rush — but that on this occasion Bayoumi appeared rushed, intense, and under pressure. Ratchford testified that Bayoumi's demeanor was "out of character" for him. Ex. 91, Ratchford Decl. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ¶¶ 4, 7. In his September 2001 statement to Scotland Yard, Bayoumi confirmed the Parkwood "manager knows me" and identified her as "Holly." Ex. 450, Tr. at 202:20, 203:7- 8. | To the extent a response is required, it is undisputed that this language is in Plaintiffs Exhibit 91 (Ratchford Decl.) and in the statements Al Bayoumi made to MPS investigators.<br><br>██████████████████████████████ This also calls into question the accuracy of her declaration. |
| 1624. | Ratchford testified that Bayoumi brought Hazmi and Mihdhar to her office "at least three days before they moved into the apartment…" on February 5 and recalled seeing the hijackers on "three different days…." Ex. 91, Ratchford Decl. ¶ 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 91 (Ratchford Decl.) did not state definitively that Al Bayoumi had brought Al Hazmi and Al Mihdhar to her office at least three days before they moved in. Instead, it states: "My recollection is that after Mr. al-Bayoumi introduced them to me, al-Hazmi and al-Mihdhar came to the Parkwood Apartments office on three different days before actually moving into Apartment 150. The first time was *likely* at least three days before they moved into the apartment, when they were accompanied by another man who helped translate for them." Pls. Ex. 91 (Ratchford Decl.) ¶ 8 (emphasis added).<br><br>██████████████████████████████ This also calls into question the accuracy of her declaration. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | There is no evidence that the hijackers were in San Diego on February 2, 2000. |
| 1625. | During the 2–3-day period before Hazmi and Mihdhar obtained their apartment, the two hijackers stayed with Bayoumi at his apartment. Bayoumi admitted to Ratchford that Hazmi and Mihdhar were "staying with him" and Bayoumi wrote down on the Parkwood's application forms that the "present address" of Hazmi and Mihdhar was Bayoumi's own apartment #152 at the Parkwood complex. Ex. 91, Ratchford Decl. ¶7, 12. There is no evidence that the hijackers stayed anywhere other than at Bayoumi's apartment, as Bayoumi himself admitted. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 91 (Ratchford Decl.) ¶ 7, is inadmissible hearsay to the extent it is offered for the truth of the matter asserted. *See* Objections Chart. Ratchford also lacks personal knowledge as to whether the hijackers were staying with Al Bayoumi.

It would have been a serious violation of cultural norms to have the hijackers (two adult men) stay at Al Bayoumi's apartment in San Diego, where Al Bayoumi's wife and daughter also resided. As Al Bayoumi told MPS investigators, this did not happen and would have been impossible. *See also* KSA Ex. 269 (MPS376, Bayoumi Interview Transcript) at 13, KSA Ex. 270 (MPS388, Bayoumi Interview Transcript) at 24, KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 13 ("No, not man . . . not man, no. . . . No, no, man, no but women yes . . . [b]ut men, no, no way."); KSA Ex. 260 (MPS390, Bayoumi Interview Transcript) at 24 ("No, they didn't stay at my house.").

The 9/11 Commission correctly concluded, "The rental application states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000, but Bayoumi denies it, and we have found no reason to dispute his denial." KSA Ex. 163 (9/11 Rep.) 219, 516 n.24. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████████████████████████████ This also calls into question the accuracy of her declaration. |
| 1626. | The 9/11 Commission stated that it would accept Bayoumi's denial of the statement he wrote down in the lease that the hijackers were staying at his apartment, 9/11 Commission at 516 n. 24, but the Commission did not have the additional evidence here, including Ratchford's testimony that Bayoumi admitted that the two men were "staying with him" and the proof that the hijackers stayed in Johar's apartment in Los Angeles and that Johar had his sister stay with her other sister. Ex. 91 Ratchford Decl. ¶ 7, Ex. 101, Alzamari Dep. 60:21 - 61:8; Ex. ██████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 91 (Ratchford Decl.) ¶ 7, is inadmissible hearsay to the extent it is offered for the truth of the matter asserted, including the claim that Al Hazmi and Al Mihdhar were Al Bayoumi's "friends" who "were staying with him. *See* Objections Chart. Ratchford also lacks personal knowledge as to whether the hijackers were staying with Al Bayoumi. Plaintiffs Exhibit ██████████ is inadmissible hearsay to the extent it is being offered for the truth of what interviewees purportedly said.

The 9/11 Commission correctly concluded, "The rental application states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000, but Bayoumi denies it, and we have found no reason to dispute his denial." KSA Ex. 163 (9/11 Rep.) 219, 516 n.24.

When the 9/11 Commission issued its report, ████████████████████████████████████████████████████████████████████████. This also calls into question the accuracy of Plaintiffs Exhibit 91 (Ratchford Decl.). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs are wrong that the hijackers stayed with Johar in January 2000. *See* Responses to Pls. Aver. ¶¶ 1482-1484, 1495-1496, 1570, 1579. |
| **XXI.D.** | **Bayoumi, with help from Aulaqi, provided material support and assistance to obtain an apartment for the hijackers.** | There is no evidence that Al Bayoumi wittingly assisted the hijackers. The very limited assistance he provided was a cultural practice of assisting newcomers to the community. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24.

There is also no evidence that Al Awlaki wittingly assisted the hijackers. Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being paid by Plaintiffs, that Al Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25. |
| 1627. | Bayoumi worked together with Anwar Al Aulaqi, the Imam of the Al Ribat Mosque in San Diego, to make the necessary arrangements for the two hijackers to obtain their apartment. As expert Youssef determined, Parkwood Manager Ratchford "recounted that on one occasion Hazmi and Mihdhar came into the rental office with a man who helped translate for them," stating the translator "wore a skull cap and had | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

Plaintiffs Exhibit 91 (Ratchford Decl.) does not state definitively that she recalls Al Awlaki accompanying the hijackers into her office or that he had seen him with Al Bayoumi. It states instead that it is "likely" that the person was the same person shown in a photograph attached to her declaration. Pls. Ex. 91 (Ratchford Decl.) ¶ 8. Ratchford further states, however, the person "worked for Alliant University in San Diego in its International Studies Department." *Id.* Al Awlaki never worked for |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | beatnik glasses, both of which are Aulaqi trademarks, and identified a photograph of Aulaqi as the person who likely accompanied Hazmi and Mihdhar." The manager also testified she saw Aulaqi and Bayoumi together occasionally. Ex. 91, Ratchford Decl. ¶8; Ex. 5, Youssef Rpt. 196. | Alliant University, as Plaintiffs' purported expert Meleagrou-Hitchens conceded. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 229:5-16. There are other indications that the person referred to in the Ratchford Declaration is not Al Awlaki. Ratchford states that the person accompanying the hijackers was in his 30s or 40s, but Al Awlaki was only 28 years old in February 2000. Ratchford states that Al Awlaki was wearing a "multi-colored skull cap" on his head. Pls. Ex. 91 (Ratchford Decl.) ¶ 8. There is no evidence of Al Awlaki ever wearing such a skull cap; instead in all the images of Al Awlaki in the record, including Exhibit B to Plaintiffs Exhibit 91 (Ratchford Decl.) and MPS890, he wore a white Kufi prayer cap. |
| 1628. | Aulaqi's involvement is further confirmed by phone records which show various direct contacts among Bayoumi, Thumairy, and Aulaqi during the relevant times, as well as a call by Aulaqi to the bank where Bayoumi took the hijackers an hour later to obtain a check and establish proof of assets necessary to rent an apartment. Ex. 5, Youssef Rpt. 196-97; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>Plaintiffs incorrectly state that there was a purported call from Al Awlaki to the bank where Al Bayoumi took the hijackers an "hour later to obtain a check." According to Plaintiffs Exhibit 12A, the call came from the Al Ribat mosque and there is no evidence that Al Awlaki made the call. According to Ex. 12A, the call was made at 2:33AM, not an hour before Al Bayoumi took the hijackers to the bank. As set forth in the Response to Plaintiffs Averment ¶ 1635, the call was also not to the same branch of the bank where Al Bayoumi took the hijackers.<br><br>There is no evidence that any of the calls on February 4, 2000 had anything to do with the hijackers. Al Bayoumi was asked about his calls to Al Awlaki at his deposition, and he testified: "I don't recall specifically calling him. But if I called him, that must have meant that there was an outstanding question that was asked and it required an answer. So, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | someone must have had a question that I directed to him to answer." Pls. Ex. 120 (Bayoumi Tr.) 587:12-588:7. He forwarded such questions "not necessarily [to] Anwar Aulaqi, per se. To anyone that could possibly answer the question." *Id.* at 587:12-589:16.

Plaintiffs claim that there was a call from Al Thumairy to Al Bayoumi, however the number was not Al Thumairy's number – instead it is registered to Faisal Al Muhanna. There is no evidence that any of these calls concern the hijackers. |
| 1629. | Bayoumi identified his own handwriting on the lease agreement documents, which Bayoumi prepared for himself, Hazmi, and Mihdhar. Ex. 120, Bayoumi Dep. 432:19-439:23; Ex. 679J, FBI 8023-60; Ex. 555, FBI 8276; Ex. 556, FBI 8278; Ex. 557, FBI 8280. Hazmi and Mihdhar signed various lease documents on February 3, 4, and 5, 2000. Ex. 91, Ratchford Decl. ¶10, 11, 15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Undisputed that Al Bayoumi identified his handwriting on certain lease agreements.

There is no evidence that Al Hazmi or Al Mihdhar signed any documents on February 3, 2000. As shown in the Response to Plaintiffs Averment ¶ 1615, the two documents dated February 3, 2000, were dated by Ratchford. The first document is the move-in/move-out form signed by Ratchford when the previous tenant had moved out, was countersigned by the hijackers later, as the space for the date next to his signature was left blank. The second document, also signed by Ratchford, is the Parkwood Apartments Community Policies list. When closely examined, it is unclear whether this second document is February 3 or 5, 2000. Pls. Ex. 679J (FBI 8035). *See* Response to Pls. Aver. ¶ 1615. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1630. | Bayoumi prepared two Parkwood "Application to Rent" forms, one for Hazmi and the other for Mihdhar, which included their names and their "present address" of ▮▮▮▮▮▮▮ SD CA 92111" and "previous address'" of "Saudi Arabia." Ex. 545, FBI 8026; Ex. 555 & 556, FBI 8276, 8278.The present address that Bayoumi listed for Hazmi and Mihdhar was Bayoumi's apartment (# 152) at the Parkwood complex. Bayoumi wrote his own name, address, and phone number as the sole person listed as "Personal References" for Hazmi and Mihdhar. Bayoumi described his "relationship" with Hazmi and Mihdhar as "friend." Bayoumi also wrote his name, address, and phone under "In Case of Emergency" on the forms, and again described his relationship to Hazmi and Mihdhar as "friend." Ex. 545, FBI 8027; Ex. 555, FBI 8277. Hazmi and Mihdhar signed both application forms prepared by Bayoumi. Ex. 555 & 556, FBI 8277, 8279. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1631. | Because Hazmi and Mihdhar had no credit or employment history, they needed a qualified guarantor to co-sign the lease. Ex. 91, Ratchford Decl. ¶ 13. Bayoumi filled out his "Application to Rent" form to co-sign the lease. Bayoumi listed ▮▮▮▮▮ a | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | reference to ▮▮▮▮▮▮▮ as his personal reference on the lease application for the hijackers' apartment. Bayoumi stated that ▮▮▮ was his "friend" and gave ▮▮▮ address as the Parkwood complex. Bayoumi put down his own phone number as ▮▮▮ Ex. 557, FBI 008280 at 8281; MPS 389:10-16 (Bashir lived in Parkwood complex). As detailed below, Bashir attended the February 17, 2000 welcome party for Hazmi and Mihdhar hosted by Bayoumi. | Plaintiffs cite nothing for the assertion that "▮▮▮ is a reference to ▮▮▮▮▮▮▮. There was no welcome party for Al Hazmi and Al Mihdhar, as discussed in the Response to Plaintiffs Averment Section XXII. |
| 1632. | On February 4, 2000, Bayoumi signed a credit check agreement and paid a $30 fee to permit Parkwood Apartments to obtain the credit report of Bayoumi necessary for him to qualify as guarantor. Ex. 547, FBI 8040; Ex. 91, Ratchford Decl. ¶ 13. The credit check was run that day and included in the Parkwood file. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that Al Bayoumi paid the $30 fee for a credit check. Plaintiffs Exhibit 91 (Ratchford Decl.) cites to Plaintiffs Exhibit 547 (FBI 8040), however, that document does not indicate who made the payment. |
| 1633. | Bayoumi's credit check showed that Bayoumi previously listed "Mana Life" at ▮▮▮▮▮▮▮ in La Jolla, CA as his employer. Ex. 549, FBI 8053-56. Bayoumi was shown the reference to Mana Life and claimed not to know what it was. Ex. 120, Bayoumi Dep. 436:8-14. The MPS production included Bayoumi's business | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | card listing him as a "Consultant" at Mana at the very same Fay Ave. La Jolla address listed on the credit check. Ex. 678O, MPS713_139 (Bayoumi's Mana business card, including email address manalifesa@aol.com). | To the extent it is offered for its truth, Plaintiffs Exhibit 678O is inadmissible hearsay. *See* Objections Chart.<br><br>Undisputed that Al Bayoumi gave this testimony. The credit check also states that Al Bayoumi listed "USIU" or United States International University – where Al Bayoumi was enrolled as a student – as his employer. Pls. Ex. 549 (FBI 8053). |
| 1634. | Parkwood Manager Ratchford testified that Hazmi and Mihdhar had a large amount of cash with them but were told (with Bayoumi or Aulaqi translating) they had to open a bank account in their own name, show sufficient proof of assets to pay the rent, and pay the initial deposit and rental payment by cashier's check, not cash. Ex. 91, Ratchford Decl. ¶¶ 9, 11, 14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 91 (Ratchford Decl.) does not state that Al Bayoumi or Al Awlaki translated this message to the hijackers. Otherwise, this is undisputed. |
| 1635. | On February 4, 2000, at approximately 2:33pm, Aulaqi placed a call to ▮▮▮▮-8400 (recorded by the FBI as one minute or two minutes). Ex. 2, EO 0612. That same phone number was listed on the business cards of Bank of America employees at its Balboa-Genessee branch in San Diego – where Bayoumi took the hijackers – recovered by the MPS from Bayoumi's personal files. Ex. 678N, MPS 712_15, MPS 713_138. Bayoumi also had an | Plaintiffs Exhibit 2JJ (EO 612-UPDATED) is inadmissible hearsay.<br><br>The referenced exhibit states that the call was made from the Al Ribat Mosque number, but there is no evidence that it was made by Al Awlaki. *See* KSA. Ex. 274 (MPS 713_132) (business card listing ▮▮▮▮▮▮▮ as the Al Rabat Mosque number). The call was also not made to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Instead, the cited document states that ▮▮▮▮▮▮▮▮▮▮▮▮▮ Pls. Ex. 2JJ (EO 612-UPDATED). The document does not state |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | October 2000 letter in his files bearing the signature of an employee of that same Bank of America branch, which purported to confirm that Bayoumi "has been a customer of Bank of America since February, 1994" and that "his average balance is $20,000." Ex. 310, MPS 720_16. That letter is likely another forged document by Bayoumi since he did not arrive in San Diego until September 1994. | whether this was AM or PM (though Plaintiffs Exhibit 12A states that it was 2:33 AM). <br><br> Plaintiffs did not attach Exhibit 678N (MPS 713_138). That document is attached as KSA Exhibit 274, and does not show that the number ▋▋-8400 was a number for the Balboa-Genesee branch. Instead, it states that the branch number was ▋▋-6720, and the general customer service number is ▋▋-8400. Plaintiffs also did not attach MPS 712_15, which is attached at KSA Exhibit 275 (stating that the general customer service number is ▋▋8400). <br><br> The FBI documents relied upon by Plaintiffs state that a call was placed to ▋▋-8400, not ▋▋-8400, and that the ▋▋-8400 is traced to the branch at Villa La Jolla Drive. Pls. Ex. 2JJ (EO 612-UPDATED). <br><br> There is no evidence that Plaintiffs Exhibit 310 is a forgery. On May 2, 1994, Al Bayoumi was in San Diego and applying to San Diego State University. KSA Ex. 276 (DA 2263). By August 1994, he had started an Intensive English Communications course at San Diego State University. KSA Ex. 277 (KSA 1828). Furthermore, Al Bayoumi's personal checks had printed on them, "valued customer since 1994." KSA Ex. 278 (FBI 4455). |
| 1636. | Approximately one hour after Aulaqi's call to the Bank of America's Balboa- Genessee branch in San Diego, Bayoumi walked Hazmi and Mihdhar from the Parkwood complex to that bank branch. Bayoumi translated for the two men as Mihdhar opened an account. Ex. 120, Bayoumi Dep. 440:14-441:19, 442:10-12. | As set forth in the Response to Plaintiffs Averment ¶ 1635, there is no evidence that Al Awlaki made this call. The call was also placed to a different Bank of America branch. According to Plaintiffs Exhibit 12A, the call was also placed at 2:33AM, not an hour before Al Bayoumi went to the bank with the hijackers. <br><br> Al Bayoumi testified that he assisted with translation, however, the hijackers also communicated independently with the bank teller. "But then they started speaking with the employee themselves, using sign |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | language, they communicated with him directly. . . . They spoke somewhat English. They had basic English." Pls. Ex. 120 (Bayoumi Tr.) 445:17-446:9. |
| 1637. | The Bank of America receipt for the cash shows that the hijackers' account was opened at 3:40 p.m. with the amount of $9,900. Ex. 550, FBI 8057. That receipt was shown to the Parkwood Apartments and placed in their file as the proof of funds to support their lease. Ex. 91, Ratchford Decl. ¶ 11. The $9,900 cash deposit made by Mihdhar was $100 less than the $10,000 amount that would trigger the bank to file a Currency Transaction Report with the U.S. government. 31 CFR 1010.311 (https://www.ecfr.gov/current/title-31/subtitle-B/chapter-X/part- 1010/subpart-C/section-1010.311). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This is undisputed. |
| 1638. | In addition, Bayoumi had the bank prepare the necessary certified check drawn in his name and payable to the Parkwood Apartments for $1,558 for Hazmi and Mihdhar's first month's rent, security deposit, and application fee. Ex. 91, Ratchford Decl. ¶ 14. Bayoumi returned along with Hazmi and Mihdhar to the Parkwood and handed Ratchford the check. Ex. 120, Bayoumi Dep. 443:14-444:1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Because the bank would not issue a certified check from a new account the same day that account was opened, Al Bayoumi, at a bank employee's suggestion, obtained a certified check from his own account. Pls. Ex. 120 (Bayoumi Tr.) 442:13-443:9 ("[T]he employee said, let them deposit the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | money in your account and issue the check from your account."); *id.* at 737:3-17 ("[T]he bank teller told us you can't issue a check unless you open an account. And if you open an account, it's going to require 24 hours for it to be active. And after that said, of course there's another way, that since you have an account with us, you can pay with a check from your account . . . and they will make a deposit."); *see* KSA Ex. 163 (9/11 Rep.) 219.<br><br>Al Bayoumi received reimbursement from Al Hazmi and Al Mihdhar at the same time that he obtained the certified check. KSA Ex. 91 (bank account statement showing same-day deposit and check for $1,558 each); Pls. Ex. 120 (Bayoumi Tr.) 442:22-443:13, 735:21-736:11 (reviewing KSA Ex. 91 (Bayoumi Ex. 737)); *id.* at 737:12-17 (testifying that "they made a deposit first, then the check went out," and that this happened "at the same time"); *see* KSA Ex. 163 (9/11 Rep.) 219. |
| 1639. | After Bayoumi helped Hazmi and Mihdhar make these banking arrangements, he made several repeated calls to Aulaqi beginning at 4:40pm (1 min.). Next, he called Aulaqi's Mosque at 4:42pm (1 min.) and 4:43pm (1 min.). Finally, at 4:55p, (2 mins.), Bayoumi called Thumairy's cell phone. Ex. 5, Youssef Rpt. 197; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>The telephone records show that Al Bayoumi placed a call to Al Awlaki's home phone (4:40 PM for 1 min). Then he called the Al Ribat Mosque payphone (4:42 PM for 1 min) and the Al Ribat Mosque fax number (4:43 for 1 min). Given the shortness of the calls, there is no evidence that anyone picked up the call.<br><br>The call at 4:55 was made to a number registered to Faisal Al Muhanna, not Al Thumairy. KSA Ex. 136 (Muhanna Ex. 671). |
| 1640. | Bayoumi testified at his deposition that he could not remember why he called Thumairy at the same time he was wrapping up the living arrangements for the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | hijackers in San Diego. Ex. 120, Bayoumi Dep. 447:3-22. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | As set forth in the Response to Plaintiffs Averment ¶ 1639, there is no evidence that this call was to Al Thumairy. Instead, it was placed to a number registered to Faisal Al Muhanna. |
| | | It is unsurprising that Al Bayoumi would not recall the reason for a single call made over 20 years before his deposition. |
| 1641. | When asked about why he spoke to Thumairy 22 times between December 6, 1999 to February 4, 2000, Bayoumi suggested that the calls that he made to Thumairy would have been requests for "mushaffs" (Qurans) or because "someone in the mosque was asking a question to which I needed an answer." Ex. 120, Bayoumi Dep. 452:5-17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The reference to 22 calls includes calls that were placed to or from a number that was registered to Faisal Al Muhanna, not Al Thumairy, and is therefore inaccurate. |
| | | Al Bayoumi also explained why there may be numerous calls to Al Thumairy: "First of all, let me tell you that if I called Fahad al-Thumairy ten times, he wouldn't answer. This is the first thing. And the second thing is that whenever I called Fahad al-Thumairy, it was regarding either mushaffs or a question from one of the mosque patrons. . . . Fahad doesn't answer the phone calls coming to him. Maybe out of 50 calls, he would answer one. So, for example, if I had someone who was asking a question which I should direct to him, or to another Imam or another Sheikh, it was hard to get hold of him. It was hard to get him to answer the phone." The calls were "either one or two things. Number one, if we needed the mushaffs. The second thing would be someone in the mosque asking a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | question to which I needed an answer. . . . [T]he calls were not necessarily coming from me. It could be from one of the worshippers in the mosque. . . . And it could be one of the worshippers asking – calling to ask a question. It's not necessarily me." Pls. Ex. 120 (Bayoumi Tr.) 451:1-453:12. |
| 1642. | Bayoumi also suggested that the calls to Thumairy on his phone may have been made by one of the worshippers in his mosque rather than himself. Bayoumi made the unlikely claim that his cell phone could have been used by "tens of people," none of whom Bayoumi could identify. Ex. 120, Bayoumi Dep. 452:19-453:12, 522:23-523:23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph contains attorney argument to which no response is necessary. Al Bayoumi testified that others used his phone and there is no evidence to the contrary. Pls. Ex. 120 (Bayoumi Tr.) 451:1-453:12. |
| 1643. | As to the 22 calls between Thumairy to Bayoumi between December 6, 1999 and February 4, 2000, Bayoumi said that he could not remember them. Ex. 120, Bayoumi Dep. 454:12-22. Bayoumi's testimony does not make sense and is contrary to the call pattern and sequence of events. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in the Response to Plaintiffs Averment ¶ 1641, the reference to 22 calls includes calls that were placed to or from a number that was registered to Faisal Al Muhanna, not Al Thumairy, and is therefore inaccurate. It is also not surprising that Al Bayoumi would not recall specific phone calls that may have been made 20 years before his deposition. As set forth in the Response to Plaintiffs Averment ¶ 1642, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi did explain why he, or someone else would borrow his phone to call Al Thumairy. Pls. Ex. 120 (Bayoumi Tr.) 451:1-453:12. |
| 1644. | Bassem Youssef opined that the:<br><br>calls show the relationships of Bayoumi, Aulaqi, and Thumairy to provide support for Hazmi and Mihdhar and are directly related to the arrangements being made by Bayoumi for Hazmi and Mihdhar. Bayoumi's call to Thumairy came immediately after Bayoumi obtained the bank check from his account and the Parkwood apartments had run a credit check of Bayoumi (at Bayoumi's expense). With the handoff of the hijackers to Bayoumi successfully made, Bayoumi did not place another call to Thumairy until July 11, 2000, the day before Bayoumi received a ticket for a moving violation in Culver City, California while turning onto a road in the direction of the King Fahad Mosque.<br><br>Ex. 5, Youssef Rpt. 198; Ex. 554, FBI 8238 (July 12, 2000 Culver City police ticket issued to Bayoumi). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence that Al Bayoumi, Al Awlaki, or Al Thumairy provided any witting support to the hijackers. The very limited assistance that Al Bayoumi provided was a cultural practice of assisting newcomers to the community. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24.<br><br>Al Thumairy testified that he had not heard the names Khalid Al Mihdhar or Nawaf Al Hazmi prior to the 9/11 attacks, that he had no recollection of ever meeting the hijackers, that he was never provided instructions to assist and never gave anyone else instructions to assist the hijackers, that he never assisted the hijackers in any way, and that he has no knowledge of anyone else assisting the hijackers. Pls. Ex. 107 (Thumairy Tr.) 490:3-493:11.<br><br>Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being paid by Plaintiffs, that Al Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25. <br><br> The call referenced in this paragraph was made to a number registered to Faisal Al Muhanna, not Al Thumairy. *See* Response to Pls. Aver. ¶ 1639. <br><br> The reason Al Bayoumi's calls to Al Thumairy's stopped is because the next month, Bayoumi left for Saudi Arabia and did not return until June. Pls. Ex. 120 (Bayoumi Tr.) 744:3-757:1. <br><br> As the 9/11 Commission concluded, "we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. It concluded the same thing about Al Bayoumi. "[W]e have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups." *Id.* at 218. Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* After reviewing the telephone analysis generated by Operation Encore, the 9/11 Review Commission concluded, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103. In 2021, the FBI in its authoritative closing of Operation Encore concurred, concluding that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  |  |
| 1645. | The hijackers could not move into their apartment until Bayoumi, Hazmi, and Mihdhar signed the Parkwood's guaranty contract on February 5, 2000. Pursuant to the guaranty, Bayoumi agreed "to guarantee unconditionally to Landlord…prompt payment by Resident [Hazmi and Mihdhar] of the rent, late charges, and all other charges, expenses and costs of every kind and nature, which are or may be due now or in the future to Landlord pursuant to the terms of the Rental Agreement." The guaranty specified that it "is a continuing one"; that Bayoumi's "liability…is direct, immediate, absolute, continuing, unconditional and unlimited"; provided for the recovery of attorney's fees and costs against Bayoumi in the event of a breach; and extended the guarantee to include "all renewals of the original lease term and month to month extensions…until the tenancy is terminated." Ex. 548, FBI 8047. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1646. | Hazmi and Mihdhar moved into Parkwood Apt. 150 that same day, February 5, 2000. Ex. 91, Ratchford Decl. ¶ 16; Ex. 546, FBI 008030. Their apartment was in Parkwood's 6401 Mt. Ada Rd. building, just to the east and a short walk from | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's building in the same complex at 6333 Mt. Ada Rd. | To the extent a response is required, this is undisputed. |
| 1647. | Plaintiffs' expert Youssef concluded that "[i]t is highly implausible that Bayoumi would co-sign the lease, sign the credit agreement, pay for the credit report, use his personal bank account to issue a check payable to the Parkwood, and designate himself personally responsible for all lease payments for an apartment for two individuals he claims he never met before and just happened to run into by chance at a Los Angeles restaurant." Ex. 5, Youssef Rpt. 198-99. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.<br><br>Youssef is an evangelical Christian.  Pls. Ex. 105 (Youssef Tr.) 382:14-385:12.  He has no purported expertise in Islamic culture.  Al Bayoumi testified that when he first arrived in the United States, an individual at the mosque guaranteed his lease.  Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24.<br><br>Plaintiffs incorrectly state that Al Bayoumi paid for a credit report and used his personal bank account to issue a check.  There is no evidence that Al Bayoumi paid for the credit report.  It is also undisputed that Al Bayoumi received reimbursement from Al Hazmi and Al Mihdhar at the same time that he obtained the certified check.  KSA Ex. 91 (Bayoumi Ex. 737) (bank account statement showing same-day deposit and check for $1,558 each); Pls. Ex. 120 (Bayoumi Tr.) 442:22-443:13, 735:21-736:11 (reviewing KSA Ex. 91 (Bayoumi Ex. 737)); *id.* at 737:12-17 (testifying that "they made a deposit first, then the check went out," and that this happened "at the same time"); *see* KSA Ex. 163 (9/11 Rep.) 219. |
| 1648. | Bayoumi himself admitted this fact during his deposition.  When asked about Abdussattar Shaikh's statement that | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi arranged for Sudairy and Sadhan to stay at Dr. Shaikh's house, Bayoumi said he would not make housing arrangements for individuals he did not know well, testifying "How do I not know them [Sudairy and Sadhan] well and how am I looking for a residence for them?" Ex. 120, Bayoumi Dep. 229:13-230:6. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Al Bayoumi testified that it was part of Islamic culture to help newcomers and that an individual at the mosque had done the same for him. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24.<br><br>Plaintiffs take Al Bayoumi's testimony regarding Al Sudairy and Al Sadhan out of context. He was asked whether he made housing arrangements to the two Ramadan imams and he testified that he was not involved. This is consistent with Al Sudairy's testimony: "And there was an Indian brother who offered to host us – he insisted on hosting us." "We were looking for a comfortable residence, and we were talking with the Imam and the community at the mosque that we are looking for a residence that – where it's not too far from the mosque. He was present and he was known to the community, a known personality. . . . And he knew we were looking for a residence, so he offered us what I told you earlier." Pls. Ex. 119 (Sudairy Tr.) 165:9-12, 166:18-167:18. |
| 1649. | As expert Youssef concluded, "[d]espite his denials, Bayoumi had every reason to help Sudairy and Sadhan with their travel arrangements." Ex. 5, Youssef Rpt. 199. The photographs, videotapes, and correspondence show that Bayoumi acted as Saudi government host for Sudairy and Sadhan during their visit to San Diego. Bayoumi's own contemporaneous letters to Minister Turki, MOIA Director Sowailem, Embassy Islamic Affairs Head Ghesheyan, and MOIA Propagator Supervisor | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs Exhibits 411, 413, 414, and 678D are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy reference cooperation and coordination among the Saudi officials, including Bayoumi, concerning the trip of Sudairy and Sadhan. Ex. 414, MPS43_347 (Minister Turki); Ex. 411, MPS 43_314 (Ghesheyan); Ex. 413, MPS 43_338 (Sowailem); Ex. 678D, MPS 43_336 (Thumairy). | Saudi Arabia has addressed Plaintiffs' assertions regarding Al Sudairy and Al Sadhan in Response to Plaintiffs Averment Sections XIV.A, B, C, D, E, and F.<br><br>There is no evidence that Al Bayoumi helped with Al Sudairy or Al Sadhan's living arrangements while they participated in the imamate program or that he acted as a "Saudi government host." *See* Response to Pls. Aver. ¶ 1648. |
| 1650. | And in contrast, as expert Youssef further concluded, "[a]s to Hazmi and Mihdhar, Bayoumi's admission is apt — there was no reason for Bayoumi to take the steps that he did for Hazmi and Mihdhar unless he already knew who they were." Ex. 5, Youssef Rpt. 199. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef is an evangelical Christian. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12. He has no purported expertise in Islamic culture. Al Bayoumi testified that when he first arrived in the United States, an individual at the mosque guaranteed his lease. Pls. Ex. 120 (Bayoumi Tr.) 737:24-739:24. |
| 1651. | Bayoumi admitted at his deposition that "I don't remember helping anyone" other than Hazmi and Mihdhar with an apartment rental nor could he recall ever signing a personal guaranty for anyone else. Ex. 120, Bayoumi Dep. 823:5-824:3. The assistance | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | he provided for Hazmi and Mihdhar was planned and arranged in coordination with Sowailem, Thumairy, Aulaqi, and likely others. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that the unwitting assistance Al Bayoumi provided to Al Hazmi and Al Mihdhar was planned and arranged in coordination with Al Sowailem, Al Thumairy, Al Awlaki, and others.<br><br>This was also the conclusion of the 9/11 Commission. "[W]e have seen no credible evidence that he [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups." KSA Ex. 163 (9/11 Rep.) 218. Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists." *Id*. The 9/11 Commission concluded the same thing about AlThumairy. "[W]e have not found evidence that Thumairy provided assistance to the two operatives." *Id*. at 217. Ten years later, after examining the Operation Encore investigation, the 9/11 Review Commission confirmed, "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 103. In 2021, the FBI in its authoritative closing of Operation Encore concurred. Pls. Ex. 2A (EO 11). Its final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" *Id*. at EO 9-11. |
| 1652. | Saudi Arabia's claim that it was "customary to help newcomers," KSA Aver. ¶ 117.a., is contrary to Bayoumi's own admission that the steps he took for individuals he | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | supposedly did not know were extraordinary, not customary. Saudi Arabia claims that Bayoumi himself received help from an "American person" but omits the detail that Bayoumi was connecting with Omar Hamerman, the leader in the extremist cell at the ICSD mosque – just as Bayoumi was connecting with Hazmi and Mihdhar upon their arrival. Ex. 5, Youssef Rpt. 85 ("shortly after his arrival in San Diego he met Forge aka Omar Hamerman at the ICSD and that Hamerman helped Bayoumi find an apartment near the ICSD"). | There is no record evidence supporting the assertion that Omar Hamerman was the leader of an extremist cell at ICSD. Plaintiffs cite only the *ipse dixit* statement of Youssef. Youssef could not testify about the basis for his assertions because the investigative material was "classified." Pls. Ex. 105 (Youssef Tr.) 44:16-50:4.<br><br>The FBI has also asserted that, during this period, Youssef was nothing more than a translator and he did not lead or substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30 (D.D.C. 2008). |
| 1653. | Bayoumi had no basis to expect a "referral fee" for an apartment he rented himself by co-signing a lease as guarantor for the two hijackers, contrary to Saudi Arabia's contention. KSA Aver. ¶ 117.b. There is no basis for such a fee to be paid to someone who signs the rental agreement. Nor is there any mention of such a fee being paid for the hijackers' rental in the testimony of apartment manager Ratchford; the Parkwood apartment records; in any of the prior investigative statements of Bayoumi; the 9/11 Commission report; or any of the FBI reports. Ex. 91, Ratchford Decl. ¶¶ 4-16. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Al Bayoumi testified that if he referred somebody to the apartment complex, he would receive compensation "from the manager. She would give me $100, $200." He recalled that he received some compensation for his referral of the future hijackers and that this was one of the reasons for him telling them that there was an apartment available at his complex. Pls. Ex. 120 (Bayoumi Tr.) 733:14-734:17.<br><br>Al Bayoumi frequently checked to see if apartments were available to refer people to Parkwood Apartment Homes and receive a referral fee. In fact, he did so soon after he began renting an apartment at Parkwood |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Apartments, in June 1999, 8 full months before he met the hijackers and much before December 1999 when KSM dispatched them to San Diego. Pls. Ex. 91 (Ratchford Decl.) ¶ 4 (move-in month for Al Bayoumi), ¶ 5 (for beginning of inquiries about available apartments); Pls. Ex. 31 (KSM Statement) at 28 (for when hijackers were dispatched to the United States). |
| 1654. | Plaintiffs' expert Youssef observed that: <br><br> ...from the perspective of Hazmi and Mihdhar, the story told by Bayoumi makes no sense unless the two men knew that Bayoumi was a member of their support network. The known and established discipline of trained terror operatives such as Hazmi and Mihdhar makes it highly implausible that they would meet a stranger by chance at a restaurant in Los Angeles, follow him to San Diego to meet him a second time, spend substantial time with him, and rely on him to the extent that they *did*. Hazmi and Mihdhar would never take such risks with a stranger. The nature and duration of the contacts that Hazmi and Mihdhar had with Bayoumi shows that they knew that Bayoumi was a trusted member of their network. Ex. 5, Youssef Rpt. 199-200. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. <br><br> The hijackers had very minimal interactions with Al Bayoumi. Al Bayoumi assisted them in renting their apartment in San Diego and he hosted a reception at their apartment to honor those who had volunteered and led prayers at the Al Madina Mosque during Ramadan. Other than that, Al Bayoumi only exchanged greetings with the hijackers when he saw them. KSA Averment ¶¶ 109-120. <br><br> By contrast, the hijackers lived with and spent far more time with a reliable FBI informant, Dr. Shaikh. Pls. Ex. 131 (*FBI's Handling of Intelligence Information Related to the September 11 Attacks*) at 261 n.198. Al Mihdhar stayed at Dr. Shaikh's residence for ten days. Al Hazmi stayed with Dr. Shaikh for more than six months. *See* KSA |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Averment ¶ 142.  This directly refutes Youssef's assertions the hijackers would only spend time with a member of a purported support network.<br><br>As set forth above, KSM was very concerned about Al Hazmi and Al Mihdhar because of their lack of English and Western exposure.  But he was stuck with them because bin Laden had personally selected them.  Because of their ineptitude, KSM allowed them to ask local Muslims for help and to contact him directly via Internet, both a violation of Al Qaeda tradecraft.  Pls. Ex. 31 (KSM Statement) at 16-18.  Al Hazmi and Al Mihdhar, failed in their mission to learn how to fly and even enroll in an English language school.  KSM testified, "the early mishap with Hazmi and Mihdhar was a mistake in judgment on his part."  *Id.* at 19.  When Al Mihdhar abandoned his partner Al Hazmi to return home, KSM wanted to fire him, but bin Laden interceded on his behalf.  *Id.* at 20.<br><br>Even bin Laden shared KSM's view that Al Hazmi and Al Mihdhar were failures.  "We sent two young men to learn English in the USA: Rabia Nawaf Al-Hazmi [Al Hazmi's kunya was Rabia al-Makki] and Khalid Al-Mihdhar.  Both spent a year without achieving success and they were sending messages to tell us the fact that they could not study and were unable to achieve success.  Khalid Al-Mihdhar despaired and returned to Mecca because he felt ashamed from returning to Afghanistan to tell me of such failure.  Rabia, however, stayed there."  CIA Abbottabad documents released in 2017, KSA Ex. 79 (IMG-040538, "The Birth of the Idea of 11 September," October 2003 (CIA Abbottabad documents released in 2017)).<br><br>Youssef lacks the expertise to opine on Al Qaeda tradecraft.  He was prevented from working on the 9/11 investigation, despite his repeated requests to do so.  The FBI has asserted that, as an agent prior to the 9/11 attacks, Youssef was nothing more than a translator and he did not lead or |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | substantively participate in any investigations. *Youssef v. FBI*, 541 F. Supp. 2d 121, 128-30, 132-33 (D.D.C. 2008).<br><br>The agents who actually worked on the investigation, and the FBI as an institution made the final conclusion that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| 1655. | On February 6, 2000 two calls were made from the pay phone across the street from the Parkwood Apartment to the home of ███████████. The Bayoumi family had previously used this phone. On the same day ███████ called the home of ██████████████, the brother-in-law of ██████████. Ex. 2, EO 0613. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2JJ (EO 613-UPDATED), is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence of who made the calls from that pay phone or what the calls were about. That document also does not state that the "Bayoumi family previously used this phone." It states that the cell phone of Al Bayoumi's wife called the payphone on Oct. 8, 1999 (well before the hijackers were in the United States). Pls. Ex. 2JJ (EO 606-UPDATED).<br><br>The call between the ████ household and ██████████ home is unlikely to have been between ██████████ and ██████. Both ██████ and ████ testified that they were not friends, and merely saw each other at the King Fahad Mosque. The telephone records show that their |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | residential phones were in regular contact, however, both testified that ███████████████████ knew each other from the mosque and may have been friends. ███████████████████ ███████████████████<br><br>In any event, there is no evidence that this call had to do with the hijackers. |
| **XXII.** | **BAYOUMI HELD A WELCOME PARTY FOR HAZMI AND MIHDHAR TO INTRODUCE THEM TO INDIVIDUALS WHO WOULD PROVIDE SUBSTANTIAL SUPPORT AND ASSISTANCE FOR THEM IN SAN DIEGO** | The cited materials in this section confirm that the party at the hijackers' apartment in mid-February 2000 was not a welcome party for the hijackers. It was a party to: (1) show appreciation for Khalid Al Yafai and Sheikh Amir for leading the Ramadan prayers at the Al Madina Mosque; they both received plaques in gratitude for their assistance during Ramadan; (2) to honor Sheikh Abdulrahman Barzanjee and to thank him for preaching during Ramadan; (3) to bring the main representatives of the Al Madina Mosque and the ICSD together to meet and get acquainted; and (4) to bid farewell to Sheikh Abdulrahman Barzanjee, who was returning to Norway to prepare for his new position, and to Khalid Abdulrab Al Yafai and Hashim Al Attas, who were imminently leaving for Saudi Arabia. |
| 1656. | Bayoumi held a welcome party for the hijackers shortly after their arrival in San Diego. Ex. 92, Morgan Decl. ¶ 24. Bayoumi used the get-together to introduce Hazmi and Mihdhar to members of the local Muslim community who would help them assimilate. The party was held at the apartment of the hijackers, located at ██████ ████████████, San Diego, CA. Ex. 5, Youssef Rpt. 200-202; Ex. 694, Youssef Decl. ¶¶ 60-102; Ex. 455, FBI | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. ECF No. 9562.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. Plaintiffs Exhibit 455 (FBI 032) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 000032 at 35-36 ▆▆▆▆▆ told the FBI that Bayoumi "went in person to ▆▆▆ apartment in which [sic] Al Bayoumi personally invited ▆▆▆ to the party for Al Mihdhar and Al Hazmi."). | The party at the hijackers' apartment in mid-February 2000 was not a welcome party for the hijackers. It was a party to: <br><br> (1) show appreciation for Al Yafai and Sheikh Amir for leading the Ramadan prayers at the Al Madina Mosque. *See* Pls. Ex. 120 (Bayoumi Tr.) 460:14-6 (describing the party as "an occasion where there was an honoring of volunteers at the mosque."); Pls. Ex. 10K (MPS2023-059), at 14:05-16 (Al Bayoumi praised Al Yafai, "Brother Khalid in fact made good efforts with the Masjid Al-Madinah Al-Munawarah during the Holy month of Ramadan this year. And praise be to God, he was the one leading the Taraweeh prayer in the mosque."); *id.* at 15:10-36 (both Khalid Abdulrab Al Yafai and Sheikh Amir received plaques in the video); *id.* at 27:48 (Al Yafai displays his plaque, which stated, "Masjid Al-Madinah Al-Munawarah – Many Thanks to Mr. Khalid Abdul Rab for his kind assistance – Omar Al Bayoumi, GS, Ramadan 2000"). <br><br> (2) to honor Barzanjee and to thank him for preaching during Ramadan. *See* Pls. Ex. 10K (MPS2023-059), at 3:34-55 (showing Barzanjee as the only guest who was served at the party). Barzanjee speaks for nearly a quarter of the video, and then Al Bayoumi introduces him to the guests who attended from the ICSD. *Id.* at 13:28-53. <br><br> (3) to bring the people from the Al Madina Mosque and the ICSD together to meet and get acquainted. *See* Pls. Ex. 450 (MPS 365-401, Tr. 362) (As Al Bayoumi told New Scotland Yard, "I brought – those people from other mosque and those from other mosque and try to make the relationship good with them . . . One is Al-Madinah Al-Munawarah . . . And this here from Islamic Center of San Diego); Pls. Ex. 10K (MPS2023-059), at 0:20-30; 16:52-19:13 (asking the attendees from the two mosques to introduce themselves). The video shows Hamouda, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | senior imam of the ICSD, and Barzanjee, who had preached at the Al Madina Mosque, sitting in the middle next to each other.<br><br>(4) to bid farewell to Barzanjee, who was returning to Norway to prepare for his new position, and to Khalid Al Yafai and Hashim Al Attas, who were imminently leaving for Saudi Arabia.  On the video, Al Bayoumi said, "And also, at the same time as well, there are some brothers, of course, who are traveling, namely brother Khalid, and brother Hashim," *id.* at 13:58-14:02.<br><br>The video makes clear that this is not in any way a party to introduce the hijackers to the community.  During the round of introductions, Khalid Al Mihdhar, did not introduce himself and he was not in the main room.  The round of introduction was interrupted just before the bedroom, behind the open door of which Nawaf Al Hazmi was sitting.  Al Bayoumi realized it, "Oh, I forgot there are people over here."  Al Hazmi introduced himself softly as "Nawaf Muhammad" but did not state his full name.  The attendees in the party, however, could not hear or see him.  Al Yafai can be heard in the video saying "Come on, raise your voice a bit now."  Another guest said, "Nawaf, Nawaf . . . show your face," *id.* at 18:41–52.  Al Hazmi's face does not appear at all on the video.  Plaintiffs' claim that parts of Al Hazmi's body (twice his hands, twice his arms, and once his pants) flashed before the camera – even if true they only did so for a total of 8.5 seconds out of a 29-minute video.  Al Mihdhar was seen three times, twice in the kitchen and once quickly transitioning from the bedroom into the kitchen, for a total of nine seconds out of a 29-minute video.<br><br>As the 9/11 Commission Report states, "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | themselves off camera, in a back room," and the kitchen. KSA Ex. 163 (9/11 Rep.) 219.<br><br>The party was also not originally planned to take place in the hijackers' apartment. Because some of the guests brought their families and because Islamic culture does not allow women and men to socialize together, Al Bayoumi asked the hijackers if the men could congregate in their apartment. The hijackers initially refused, but ultimately relented. Pls. Ex. 120 (Bayoumi Tr.) 460:12-463:23. |
| 1657. | Bayoumi asked Kaysan Morgan to videotape the party using Bayoumi's video camera. Ex. 92, Morgan Decl. ¶ 27. | This is undisputed. |
| 1658. | The MPS seized a copy of the videotape of the party from Bayoumi in September 2001. The MPS immediately shared a copy of the party videotape with the FBI. The copy of the party video produced in this litigation by the FBI was incomplete and did not include all the footage of the party seized by the MPS. The 9/11 Commission also viewed that incomplete version of the party video. Ex. 694, Youssef Decl. ¶ 61-62. | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>It is not known what version of the video MPS shared with the FBI. The version of the party video produced by the FBI is nearly the same as the version that was produced by MPS. Based on counsel's review, the video produced by MPS contains only four minutes of material not previously produced by the FBI. |
| 1659. | The MPS returned the bulk of the materials it seized from Bayoumi, including the original party videotape, to Bayoumi in May 2002. Ex. 678DD, MPS2023-100_20-22 (FMT Receipt 69/2002 showing restoration of seized materials to Bayoumi). | Plaintiffs Exhibit 678DD (MPS2023-100_20-22) appears to be the property receipt referenced in this paragraph. The document indicates that several items were returned to Al Bayoumi, but it is not possible to determine whether the "bulk" of the materials were returned or whether the party video was returned because the items are not sufficiently labeled. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1660. | In December 2023, the MPS released a copy of the complete party footage that it seized from Bayoumi in September 2001. The MPS 2023 production includes a video file, MPS2023-059, which the MPS identified as "a complete copy of the [MF/18] video in a .MOV format." ECF 9461-3 at 5. The digital file contains video footage lasting approximately 30 minutes. A certified copy of the file, with its accompanying label and timer and an exact copy of the footage produced is filed with the Court. Ex. 10K (MPS2023-059 Video Exhibit). | This is undisputed. |
| 1661. | Ex. 10K-TR (MPS2023-059-TR Video Transcript), is a transcript of the party video in Arabic that also contains translations of the Arabic words spoken on the party video. The transcription and translation of the words spoken are accurate. In addition, captions of the certified translations were added to the party video. Those captions correspond precisely with the certified translations and have been placed on the video at the time when the words are being spoken on the video. Every frame of the video has a time stamp, which is used as the basis for citing both the video and the transcript. Ex. 694, Youssef Decl. ¶ 13, 62-64. | The Youssef declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1662. | Ex. 11K (MPS2023-059 Video Screenshots) contains screenshots from Ex. 10K (MPS2023-059 Video Exhibit), each with its own time stamp. | This is undisputed, however, Plaintiffs have only included selective screen shots. |
| 1663. | Plaintiffs retained William Adams, a digital visualization expert with a production studio in the United Kingdom with extensive experience in producing demonstrative exhibits based on video evidence and image analysis. Ex.10K-Adams, Adams Decl. ¶¶ 1-4 & Annex 1. Mr. Adams applied standard, well-accepted techniques and software used in his field to produce a reconstruction of events based on the physical facts and available video footage. Mr. Adams explained the software and processes he applied in detail and how he cross-checked his work at each step. Ex. 10K-Adams, Adams Decl. ¶¶ 31-41. The work of Mr. Adams has previously been admitted into evidence by courts and governmental commissions in a variety of different types of matters. Adams Decl. ¶ 4. Based on his review of Ex. 10K (MPS2023-059 Video Exhibit), Mr. Adams successfully identified everyone who attended the party and was able to depict the position of each individual in the apartment at specific, defined times during the party with a high level of certainty. Ex. | The Adams declaration has been stricken. *See* ECF No. 9562. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 10K-Adams, Adams Decl ¶¶ 30-35. Mr. Adams prepared a set of Schematics which depict the presence and position of everyone who attended the party. Ex. 10K-Adams, Adams Decl. & Annexes 2-8. | |
| 1664. | The Schematics are an accurate depiction of the presence and positioning of all the people who attended the party. Ex. 694, Youssef Decl. ¶ 65. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The Adams and Youssef declarations have been stricken. *See* ECF No. 9562. |
| 1665. | The FBI's review of the phone call activity, including Bayoumi's calls to the caterer he hired to prepare and deliver the food for the party, determined that the party likely occurred on Thursday, February 17, 2000. Ex. 2, EO 2754-55. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2OO (EO 2754-55) is inadmissible hearsay. *See* Objections chart. <br><br> It is not clear when the party took place. The check for Sheikh Barzanjee was dated February 18, 2000. KSA Ex. 278 (FBI 4455). The date written on the outside of the party videotape is, 14-11-1420H, which corresponds to February 20, 2000. KSA Ex. 71 (Calendar for the Year 2000) (date conversion). |
| 1666. | A total of twenty-nine people attended the party and appear on Bayoumi's video | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | footage. Those 29 people are identified on digital visualizations prepared by Mr. Adams of everyone in the room, with labels containing the names by which they are identified. Ex. 10K- Adams, Adams Decl., Annexes 2-6. Mr. Adams also prepared 29 information graphics with the title "Individuals" to show everyone in the room was identified on the videotape. *Id.*, Annex 8. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams declaration has been stricken. *See* ECF No. 9562. |
| 1667. | **Omar Al-Bayoumi** is referred to throughout the video footage as "Abu Emad." Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 1 ("Abu Emad" Bayoumi). Bayoumi's eldest son **Emad Bayoumi** also attended the party. *Id.*, Person 26 (Emad). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams declaration has been stricken. *See* ECF No. 9562.<br><br>It is undisputed that Al Bayoumi and his son, Emad, attended the party. |
| 1668. | 9/11 hijacker **Nawaf Al-Hazmi**, introduced himself at the party as "Nawaf Muhammad" (Ex. 10K Video Exhibit at 18:41), while seated next to Bayoumi's son in the corner of the room. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 25 ('Nawaf' Al-Hazmi). Hazmi appears on the video footage multiple times, wearing a baseball cap, black dress-shirt and light-colored pants. There are seven (7) separate sightings of Hazmi and his movements | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams declaration has been stricken. *See* ECF No. 9562.<br><br>There is no clear picture of Al Hazmi in the video and none have been produced in any of the video screenshots. Al Hazmi's face does not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | through the apartment on the party video, as shown in Mr. Adams' schematics. Ex. 10K-Adams, Adams Decl., Annex 7 (diagram of movements), 'Nawaf' Al-Hazmi, N1-N7. | appear in the video at all. There are flashes of a black shirt or a body part, but it is impossible to determine who the individual is since there are many guests who wore black at the party. Even assuming that each instance is actually Al Hazmi, then a portion of his clothes or a body part (but not his face) appears for a total of 8.5 seconds of the 29-minute video.<br><br>Al Hazmi was in the entrance of his bedroom, with its door open but beyond the view of many of the guests. He was there when he was asked to introduce himself. At 18:36 into the video, the camera was shooting along the wall of the living room, but he was sitting inside his bedroom and cannot be seen. Someone with a clear view into the bedroom said, "Nawaf is here. Nawaf is over here." Al Bayoumi invited him to introduce himself. In a very soft voice he said, "Nawaf Muhammad" but did not disclose his full name. A guest is heard saying, "Come on, raise your voice a bit now." Most guests in the room, especially to Al Hazmi's left, could not see him as he was beyond the door of his bedroom. One said, "Nawaf, Nawaf . . . show your face." Emad Al Bayoumi, Omar Al Bayoumi's son, was closest to him, but he did not seem to talk to anyone.<br><br>This was clearly not a welcome party for the hijackers. As the 9/11 Commission commented, "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room" and the kitchen. In fact, Al Hazmi's face never appears in the video. KSA Ex. 163 (9/11 Rep.) 219. |
| 1669. | Emad Bayoumi and **Khalid Al Yafai** sat next to Hazmi at the party. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 27 (Khalid Al "Yafai"). The MPS tape shows Yafai smiling at Hazmi and openly encouraging "Nawaf" to introduce himself. Ex. 10K (MPS2023- 059 Video Exhibit); Ex. 11K (MPS2023-059 Video | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Screenshots). It is clear from the interaction between the two men that Yafai and Hazmi had developed a close relationship during the time that the hijackers were in California. Bayoumi admitted to the MPS that Yafai knew and spent time with Hazmi and Mihdhar in February 2000. Bayoumi's recounted an anecdote involving Yafai's stereo system. Bayoumi said that Yafai owned a "stereo for, you know, music and… said [to Hazmi and Mihdhar] I'll give you the stereo in your apartment. When I come back again, I will get it." Ex. 450, Tr. 233:20-234:1. | The Adams declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 450 is inadmissible hearsay. *See* Objections Chart.<br><br>As explained in Response to Pls. Aver. ¶ 1668, Al Hazmi cannot be identified in the video at all. At most, portions of his clothing or a body part flash across the video for 8.5 seconds of the 29-minute video. The video does not show anyone sitting next to Al Hazmi.<br><br>There is no evidence that Al Yafai and Al Hazmi had any relationship. Al Yafai did not encourage Al Hazmi to introduce himself. The video shows that as the round of introduction was interrupted by Ahmad Mustafa's attempt to recite a poem, an unknown guest noticed the interruption and urges the next person to introduce himself, whom he believes to be Emad since Al Hazmi is hardly visible. Al Bayoumi realizes that Al Hazmi might be skipped and said, "Oh, I forgot there are people over here." Another guest who saw Al Hazmi, urged, "Let Nawaf speak!" (meaning introduce himself.) Another speaker said, "Nawaf is here. Nawaf is over here." Al Bayoumi called him, "Nawaf." Al Hazmi then introduces himself in a very soft voice, "Nawaf Muhammad" –but does not disclose his last name. Ten seconds later, Al Yafai said, "Come on, raise your voice a bit now." Al Yafai spoke after Al Hazmi had introduced himself and did not encourage him to do so.<br><br>Plaintiffs completely distort the story of Al Yafai's stereo. Al Yafai was returning to Saudi Arabia and had a stereo at his rental place. At first, he thought of loaning it to the hijackers until he came back, but then he changed his mind and loaned to Emad, Al Bayoumi's son. The hijackers got upset at Al Bayoumi and stopped talking to him because they thought that Al Bayoumi had persuaded Al Yafai to loan the stereo to his son. At the time of Al Bayoumi's interview with New Scotland Yard, Emad still |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | had the stereo in England. Al Yafai never returned to California. Pls. Ex. 450 (MPS 365-401, Tr. 233-4). |
| 1670. | 9/11 hijacker **Khalid Al-Mihdhar** is seen multiple times on the video footage, wearing a white, long-sleeved polo-shirt and dark-colored pants with belt. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 22 (Khalid Al Mihdhar). Mihdhar appears in the main room as well as in the kitchen. There are three (3) separate sightings of Mihdhar and his movements through the apartment. Ex. 10K-Adams, Adams Decl., Annex 7 (diagram of movements), Khalid Al-Mihdhar, K1-K3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. The Adams declaration has been stricken. *See* ECF No. 9562. The video shows Al Mihdhar twice in the kitchen preparing food and just once quickly moving from the bedroom into the kitchen. Pls. Ex. 10K (MPS2023-059), at 15:05, 20:21, and 26:29. His sightings were about three seconds each, amounted to a total of nine seconds in a 29-minute video. Al Mihdhar was not introduced to the other guests and is never seen speaking to anyone. This was certainly not a welcome party for the hijackers. As the 9/11 Commission noted, "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room" and the kitchen. KSA Ex. 163 (9/11 Rep.) 219. "Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don." *Id.*, n.25 at 516. |
| 1671. | The video evidence shows that both Al-Qaeda operatives moved freely and frequently through the living room of the apartment, at ease among the guests. *Id.*, Annex 7 ("Diagram of movements of 'Nawaf' Al-Hazmi and Khalid Al-Mihdhar during the Bayoumi party video"). Hazmi and Mihdhar can be seen acting as co-hosts | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | together with Bayoumi of the welcome party held in their apartment. | The Adams declaration has been stricken. *See* ECF No. 9562.<br><br>The video shows Al Mihdhar twice in the kitchen preparing food and just once quickly moving from the bedroom into the kitchen. Pls. Ex. 10K (MPS2023-059), at 15:05, 20:21, and 26:29. His sightings were about three seconds each, amounted to a total of nine seconds in a 29-minute video. Al Hazmi's face is not shown at all and it can only be speculated that parts of his body are shown for a total of 8.5 seconds of the video. They are not shown at ease among the other guests, and they were not hosts. As set forth in Response to Pls. Aver. ¶ 1656, the party was relocated to the hijackers' apartment at the last minute because some guests brought their families and Islamic culture prevents women and men from socializing together.<br><br>This was certainly not a welcome party for the hijackers. As the 9/11 Commission noted, "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room." KSA Ex. 163 (9/11 Rep.) 219. "Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don." *Id.*, n. 25 at 516. |
| 1672. | Both hijackers help to prepare and serve the food for the party. Hazmi is shown serving a plate of dates to Sheikh Abdulrahman Barzanjee, Imam of Al-Madinah Mosque. *Id.*, Annex 7, N2. Mihdhar is shown preparing the salad in a large dish on the counter in the kitchen. *Id.*, Annex 7, K3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams declaration has been stricken. *See* ECF No. 9562.<br><br>It is not possible to determine if Al Hazmi serves the plate of dates to Sheikh Abdulraham Barazanjee since Al Hazmi's face is never shown in the video. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1673. | Both hijackers are shown standing at the front, alongside and at the shoulder of Bayoumi, during the main ceremonies Bayoumi orchestrated at the party. *Id.*, Annex 7, e.g. N3 and K1. Apart from the camera operator, Kaysan Morgan, who was tasked by Bayoumi to film the event, Ex. 92, Morgan Decl. ¶27, all the other attendees of the party were sitting during those ceremonies. This indicates the hijackers' distinctive and special status at the party. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The Adams declaration has been stricken. *See* ECF No. 9562. <br><br> The video never shows that the hijackers stood at the front with Al Bayoumi, but instead stayed in their bedroom or in the kitchen. As set forth in Response to Pls. Aver. ¶ 1656, Al Hazmi and Al Mihdhar appear at most in 8.5 and 9 seconds of the 29-minute video. <br><br> Barzanjee and Hamouda were the guests of honor and sat next to each other. |
| 1674. | Hazmi introduces himself (first name and father's name) in the round of introductions as "Nawaf Muhammad" (Ex. 10K Video Exhibit at 18:41). Hazmi is shown engaging in conversation with others including Khalid Al-Yafai and Bayoumi's son Emad, and is encouraged by other guests, on a first-name basis, to show himself more prominently and to speak to the gathering. Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059- TR), *e.g.* at 18:35-18:43 ("Let Nawaf speak!", "Nawaf, Nawaf… show your face!"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> As set forth in Response to Pls. Aver. ¶ 1656, the video shows that Al Hazmi stayed aloof from other guests, barely spoke, and only uttered his name in such a low voice that other guests asked him to speak louder and show his face. He also did not provide his full name. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1675. | A Saudi religious official, **Sheikh Muhammad Al-Qahtani**, whom Bayoumi gave special billing in front of all those gathered (Ex. 10K Video Exhibit at 14:27), attended the party. Qahtani introduced himself at the party as "Muhammad Salem from Saudi Arabia" (Ex. 10K Video Exhibit at 17:50). Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 14 (Sheikh Muhammad Al-Qahtani). On the video, Bayoumi describes Qahtani as a guest of honor, saying "*even* Sheikh Muhammad Al-Qahtani," – had not yet shown up, "he appears to be bailing on us, you know". Ex. 10K-TR (MPS2023-059-TR) 14:27-14:29; Ex. 694, Youssef Decl. ¶ 73. Qahtani later arrived at the party (an unseen speaker recognizes him and announces: "It's Sheikh Muhammad") in time to take part in the introductions. Ex. 10K-TR (MPS2023-059-TR) 16:58. | The Adams declaration and the Youssef declaration have been stricken. *See* ECF No. 9562.<br><br>The video shows that only three people were honored at the party. Hamouda, the senior imam at the ICSD, who was invited to provide a story, which he did for about three minutes. Pls. Ex. 10K (MPS2023-059), at 1:18-4:02. The second guest of honor was Barzanjee, who was also invited to provide a story, which he did for more than eight minutes, *id.* at 5:13-13:24. After the story, Al Bayoumi tells the audience, "Of course, this gathering of ours today – may Allah always bring us together in goodness, with His will, is for us to see these great faces, these glowing faces," nodding in the direction of the two imams, sitting side by side. *Id.* at 13:46-52. Both imams sat side by side along one of the long walls of the living room to the right of the camera. The third guest of honor is then introduced, Al Yafai, who was praised for leading the Taraweeh prayer at the Al Madina Mosque during the month of Ramadan and then received a plaque for leading the prayers during Ramadan, *id.* at 14:05-19, 14:47-15:18. Sheikh Amir also received a plaque but was absent and Barzanjee accepted it on his behalf.<br><br>There is no indication that Al Qahtani is an honored guest. There is also no evidence to support Plaintiffs' assertion that Al Qahtani is a "Saudi religious official." |
| 1676. | Qahtani sat against the wall on the left side of the room, and shortly after Qahtani's arrival at the party, Bayoumi can be seen motioning to the camera operator Kaysan Morgan and heard instructing him, in English, not to film that side of the room. This shows that Bayoumi's intention was to keep evidence of Saudi official Qahtani's presence at the party off the videotape. Ex. | The Adams declaration and the Youssef declaration have been stricken. *See* ECF No. 9562.<br><br>There is no evidence to support Plaintiffs' assertion that Al Qahtani is a "Saudi official."<br><br>There is also no support that Al Bayoumi intended to keep evidence of Al Qahtani's presence at the party off the videotape. Al Bayoumi himself mentions Al Qahtani in the video, Pls. Ex. 10K (MPS2023-059), at 14:25- |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 694, Youssef Decl. ¶ 73. Nonetheless, at a later moment, Morgan swung the camera round and captured a short sequence of the left side of the room, Ex. 10K (MPS2023-59 Video Exhibit) 28:36 (showing Qahtani engaged in conversation with Fathi Al-Aidarus, who was sitting next to him); Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 15 (Fathi Al-Aidarus). | 9, and Al Qahtani also introduces himself, *id.* at 17:50. If Al Bayoumi wanted to keep anything from this party a secret, it would make no sense for him to videotape it.<br><br>As Al Bayoumi explained to New Scotland Yard, several guests did not wish to be on camera for religious purposes. "They said, we don't want to be pictured, for religious purpose, you know . . . Because most of those, they are the leaders, you know, of the prayer, and they take pictures. Some people take—because there is two opinion about the taking of pictures or not, in Islam. Some scholars said no, and some scholars said yes. And they support the taking pictures, it doesn't hurt . . . But some people said no, it's forbidden to take pictures." Pls. Ex. 450 (MPS 365-401, Tr. 387-8). |
| 1677. | Bayoumi had listings for Sheikh Muhammad Al-Qahtani in his handwritten address book, and in his green folder found by the MPS. Ex. 12AA, MPS738_75R; Ex. 12BB, MPS688_10. Bayoumi's entries for Qahtani included a San Diego phone number, ▮▮▮▮ 0896, which public records show was associated with Qahtani's name under an address listing at ▮▮▮▮ Beadnell Way in San Diego, across Balboa Avenue and a short walk from the Islamic Center of San Diego ("ICSD") and Bayoumi's apartment. Ex. 694, Youssef Decl. ¶ 75. ▮▮▮▮ lived in the same Beadnell Way complex as Qahtani. Ex. 2, EO 2781, 2792 ▮▮▮▮▮▮▮▮ Beadnell Way). Bayoumi also made handwritten notes in his green folder of Qahtani's phone | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>Plaintiffs Exhibits 2X (EO 2781 and 2792), 12AA (MPS 738), and 12BB (MPS 688) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. See Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | numbers in Saudi Arabia. Ex. 12BB, MPS688_10. | Plaintiffs also falsely state that "███████ lived in the same Beadnell Way complex as Qahtani." The document they cite, Plaintiffs Exhibit 2X (EO 2792) states that ██████████ and his wife "signed a lease on the apartment at ████████████████████ In early 2000, ████████████ |
| 1678. | The Muslim World League production in this case shows that Qahtani received a $15,000 check from Saudi government funding agent Abdullah Al Noshan dated May 22, 1998. Ex. 315, MWL-IIRO 64943. The description and address of Qahtani as "Sheikh" by Bayoumi and others; Qahtani's introduction of himself as being "from Saudi Arabia;" and the funding from Noshan, all show that Qahtani was a Saudi government religious official and was likely working inside the United States for MOIA. Ex. 694, Youssef Decl. ¶ 76. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence that the Mohammed Al Qahtani referenced in Plaintiffs Exhibit 315 (MWLIIRO-00054943) is the same Al Qahtani that plaintiffs discuss in this section. Mohammed Al Qahtani is a common name in Saudi Arabia. In fact, one of the GTMO detainees was named Mohammed Al Qahtani, ISN US9SA-000063DP. Moreover, the check was issued more than a year and a half before the party (5/22/98) and more than 2,000 miles away (the check is issued in Falls Church, VA). Pls. Ex. 315.<br><br>Plaintiffs also cite nothing for the assertion that Abdullah Al Noashan is a "government funding agent." The check is a personal check and there is no evidence or explanation of how the Saudi government would distribute money through personal accounts.<br><br>There is also no evidence that anyone who receives a personal check of Al Noashan must be a Saudi government official (or that they are working for the Ministry of Islamic Affairs) as Plaintiffs speculate. Actual Ministry of Islamic Affairs employees, such as Fahad Al Thumairy, were paid by checks issued by the Saudi government. KSA Ex. 279 (KSA 5288). |
| 1679. | Several individuals at the party associated with the Al Madinah Mosque had financial dealings with Saudi Arabia. **Sheikh Abdulrahman Barzanjee**, was paid as Imam at the Al Madinah Mosque by | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | personal checks from Bayoumi. Ex. 5, Youssef Rpt. 201-2; Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 2 (Sheikh Barzanjee); Ex. 678E, MPS43_390, MPS527_17 (Bayoumi checks paid to Barzanjee). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>The Adams and Youssef declarations have been stricken. ECF No. 9562 <br><br>There is no connection at all between Sheikh Abdulrahman Barzanjee and the Saudi Arabian government. Al Bayoumi paid Barzanjee from a personal account for his work at the Al Madina Mosque. Pls. Ex. 678E (MPS43_390, MPS 527_17) (personal check from Al Bayoumi to Barzanjee stating that the payment was for "salary of Sheikh Abu Musleh for the month of Shawwal, 1420H" and for two months and 20 days). |
| 1680. | **Ghazi Ahmad**, Finance Officer at Al Madinah Mosque, signed the receipt for a $5,000 donation from the Saudi Embassy arranged by Bayoumi in November 1998, along with two Mosque Board Members present at the party who were also signatories to the Embassy's vetting paperwork: **Hussein Al Hilali** and **Omar Barzanji**. Ex. 403, MPS43_376-379; Ex. 10K- Adams, Adams Decl., Annexes 2-8, Person 7 (Ghazi Ahmad), Person 4 (Hussein Al-Hilali), and Person 12 (Omar Barzanji). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br>The Adams declaration has been stricken. ECF No. 9562. <br><br>The $5,000 check by the KSA Embassy was for furnishing the Al Madina Mosque. Ghazi Ahmad was the financial officer of the mosque and Hussein Al Hilali and Omar Al Barzanji were members of the board of the mosque. Pls. Ex. 403 (MPS43_376–9). The individuals who signed for the money, did so in their capacity as officers of the Al Madina Mosque. |
| 1681. | **Sami Doski**, was installed with Bayoumi's help as Chairman of the Al Madinah Mosque's Board of Trustees in July 1999 in direct coordination with the Saudi Embassy. Ex. 367, MPS43_150-151; Ex. 10K-Adams, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Adams Decl., Annexes 2-8, Person 9 (Sami Doski). | The Adams declaration has been stricken. ECF No. 9562. Plaintiffs Exhibit 367 is inadmissible hearsay. *See* Objections Charts.<br><br>Plaintiffs Exhibit 367 (MPS43_150-1) is a July 23, 1999 letter from Al Bayoumi congratulating Sami Doski on becoming chairman of the board of trustees of the "Kurdish Community." It informs him that the city had not yet approved the permit to modify an apartment. It also urged him to cooperate with Muslims of various identities. *Id.* There is nothing in the letter about Al Bayoumi helping to install Doski as Chairman of the Al Madina Mosque Board of Trustees in direct coordination with the Saudi Embassy. Neither the Saudi Embassy nor the word Saudi appears in the letter. |
| 1682. | ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>███████████████████████████████ ███████████████████████████████ ███████████████████████████████<br><br>There is no evidence that Barzanjee was even in the United States ███. There is also no evidence that Al Bayoumi ███████████████████████ Al Bayoumi testified that he did not see Zeid with the hijackers "at a mosque." Pls. Ex. 120 (Bayoumi Tr.) 486:19-488:15. ███████████████████████ ███████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████████████ |
| 1683. | Ex. 10K (MPS2023-059 Video Exhibit) contains the complete sections of footage from two particularly important moments at the party, where Bayoumi speaks to the whole group in his role as host. Plaintiffs' expert Youssef listened to these sections carefully in their original Arabic and reviewed the faithful English translation of Bayoumi's words. The first speech, when Bayoumi is kneeling in the center of the room, is Bayoumi's statement of the purpose of the party: "We are welcoming the brothers, in fact… whom we have not yet had the pleasure of meeting". Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 14:19. | The Youssef declaration has been stricken. ECF No. 9562.<br><br>As set forth in Response to Pls. Aver. ¶ 1656, the purpose of the party was not to welcome the hijackers. They barely make an appearance. Al Hazmi's face is not shown at all and Al Mihdhar does not speak. In total, the two appear for no more than 17.5 seconds of the 29-minute video.<br><br>The actual context of the video shows that Plaintiffs' claims are entirely baseless. The video shows that Al Bayoumi addressed the assembled audience three times. The first time was at the very beginning of the tape when he asked those present to introduce themselves for five minutes each. Pls. Ex. 10K (MPS2023-059), at 0:06-1:18. The second time was when Al Bayoumi greeted Sheikh Barzanjee, *id.* at 4:26-5:12. The third time is when Al Bayoumi praised Barzanjee, who had just finished his long parable that turned into a morality tale, *id.* at 13:28-16:48. This is where Plaintiffs lift from its context and distort one of Al Bayoumi comments and afterthought into an alleged "particularly important moments[ ] at the party."<br><br>Al Bayoumi's third address is 3:20 minutes in length. He starts by praising and introducing Sheikh Barzanjee (26 seconds). Then he mentions that they should also recognize some brothers who are traveling, Al Yafai and Al Attas (seven seconds). Al Bayoumi goes on to praise Al Yafai, who had led the Taraweeh prayers at the Al Madina Mosque during Ramadan (17 seconds). He then states "And we are welcoming the brothers, in fact . . . whom we have not yet had the pleasure of meeting" (six seconds). He then presents the plaques to both Al Yafai and Sheikh Barzanjee who accepted the one for Sheikh Amir, who was not present (1 min, 22 sec). He also presents a plaque of appreciation to Morgan from his two sons, Emad and Firas (23 seconds). Then, he asks the attendees to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | introduce themselves so that the two congregations from Al Madina Mosque and the ICSD would get to know each other (24 seconds). This was followed by the round of introductions, *id.* at 16:52-19:17. As noted above, Al Mihdhar does not introduce himself at all. Al Hazmi is sitting in his room and does not state his full name. He speaks so softly that other members of the party state that they cannot hear him. |
| 1684. | In the second speech, when Bayoumi stands at the front of the room next to the two Al Qaeda operatives and instigates a round of introductions, Bayoumi then tells the group: "Everyone should just state his name, so that the brothers will get to know his name". Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 16:28. | The context of this statement is addressed in Response to Pls. Aver. ¶¶ 1683 and 1684. <br><br> When Al Bayoumi asked the guests to introduce themselves, the two hijackers were not standing next to him. Pls. Ex. 10K (MPS2023-059), at 16:26-46. As the camera focused on Al Bayoumi, the hijackers were not seen at all. As noted above, Al Mihdhar does not introduce himself at all. Al Hazmi is sitting in his room and does not state his full name. |
| 1685. | Based on the words in Arabic spoken by Bayoumi and others at the party, Hazmi and Mihdhar were "the brothers" that Bayoumi was talking about in these two moments. The others at the party were already familiar with one another: they would meet each other regularly at their Mosques, community festivals and holiday celebrations like Eid, soccer games, or other events in the San Diego area. Hazmi and Mihdhar were the only individuals whom the local community had "not yet had the pleasure of meeting." Ex. 694, Youssef Decl. ¶ 82. | The Youssef declaration has been stricken. *See* ECF No. 9562. <br><br> The video shows that the referred to "brothers" were all the people present, not just the hijackers. Al Bayoumi asked, "everyone should state his name, and introduce himself to the brothers by name and so on, God willing, we'll get to know each other." Pls. Ex. 10K (MPS2023-059), 16:42-6. Most of the guests introduced themselves as brothers: "Your brother Abdulrahman al-Barzanjee," "Your brother in Allah, Sami Doski," "Your brother Muhammad Mawazini," "Your brother Omar San Barzanji," "Your brother Luwam Bashir," "Your brother Saoud Muhammad," "Your brother Adel Muhammad," "Your brother Abu al-Ezz," "Your brother Kamal Muharib," "Your brother Ahmad Muhammad Saleh Mustafa," "Your brother Maen Salahuddin Shahawani," "Your brother in Allah, Khalid Abdullah Saleh Abdul Rab al-Yafai," Your |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | brother Saad al-Tarabishi," and "Your brother Fouad Hamouda," *id.*, 16:52-19:13.<br><br>Plaintiffs' statement that the guests at this party "were already familiar with one another" is unsupported by the record evidence. As shown in the Response to Pls. Aver. ¶ 1656, one of the purposes of the party was to bring together the congregations of Al Madina Mosque and the ICSD to meet each other. As Al Bayoumi told New Scotland Yard, "I brought – those people from other mosque and those from other mosque and try to make the relationship good with them . . . One is Al-Madinah Al-Munawarah . . . And this here from Islamic Center of San Diego." Pls. Ex. 450 (MPS 365-401, Tr. 362). Al Bayoumi wanted each guest to introduce himself to everyone else instead of forming small groups. "In fact, we want to begin this gathering, God willing, with everyone, as the Sheikh suggested, introducing himself and just saying something, for about five minutes, okay? So that everyone benefits, so that we all benefit, instead of each one of us engaging in a separate discussion, and the next one engaging in a different subject, and so on." Pls. Ex. 10K (MPS2023-059), 0:20-30. |
| 1686. | Notwithstanding Hazmi's introduction of himself, several other men in the main room can be heard addressing "Nawaf" directly, including Bayoumi himself who is trying to move along the proceedings. Bayoumi is heard clearly repeating Nawaf's name to the group, before Bayoumi offers his own welcome to Hazmi in the form of a religious greeting: "Nawaf, may God greet you, Nawaf." Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 18:54. | The video shows that Al Hazmi's introduction was so soft that the guests asked him to speak louder and show himself, as he was barely heard and sitting beyond the door to his bedroom, invisible to most of the guests in the living room. When Al Hazmi introduced himself without his full name, his voice was drowned by Al Bayoumi asking loudly, "Saoud?" . . . "Where is Saoud?" Another guest responded, "Here is Saoud, over here." Al Bayoumi said, "Ah, may God greet you, Saoud." Pls. Ex. 10K (MPS2023-059), 18:37-46. Guests did not hear Al Hazmi, except those close to him. Al Yafai urged him, "Come on, raise your voice a bit now." Al Bayoumi, after greeting Saoud, greeted Al Hazmi in the same way as he greeted his other guests, "Nawaf, may God greet you, Nawaf." There |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | was nothing special about Al Hazmi's greeting, except that it was almost inaudible. |
| 1687. | Similarly, Bayoumi's request that everyone at the party should "state his name" was clearly orchestrated for the benefit of Hazmi and Mihdhar. It would have been totally redundant for the guests who already knew each other to announce their names in such a manner, some of them including the places they were from. The party was Bayoumi's means not only of introducing Hazmi and Mihdhar into the local community for the first time, but also of setting them up with, and documenting, a local support network of named and known individuals whom Bayoumi, their handler, could vouch for. It was clearly part of Bayoumi's operational strategy to record on video the members of this network as they announced their names aloud. Ex. 694, Youssef Decl. ¶ 84. | The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>The evidence shows that one of the major purposes of the party was for the prominent members of Al Madina Mosque to meet the prominent members of the ICSD, as shown in the Response to Pls. Aver. ¶ 1656 above. As Al Bayoumi told New Scotland Yard, "I brought – those people from other mosque and those from other mosque and try to make the relationship good with them . . . One is Al-Madinah Al-Munawarah . . . And this here from Islamic Center of San Diego." Pls. Ex. 450 (MPS 365-401, Tr. 362). Al Bayoumi wanted each guest to introduce himself to everyone else instead of forming small groups. "In fact, we want to begin this gathering, God willing, with everyone, as the Sheikh suggested, introducing himself and just saying something, for about five minutes, okay? So that everyone benefits, so that we all benefit, instead of each one of us engaging in a separate discussion, and the next one engaging in a different subject, and so on." Pls. Ex. 10K (MPS2023-059), 0:20-30.<br><br>As shown in the Response to Pls. Aver. ¶ 1686, Al Hazmi introduced himself in a barely audible manner and from a position difficult for the guests to see. Some asked him to speak louder and others to show his face. But Al Hazmi did neither as the round of introduction had moved on. Al Mihdhar did not even introduce himself and was not in the living room as the guests introduced himself.<br><br>There is no evidence that the guests at this party were part of any "support network" or assisted the hijackers. Al Bayoumi assisted the hijackers in renting their apartment and opening a bank account, however, this was done unwittingly as the 9/11 Commission, the 9/11 Review Commission, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | and the FBI firmly concluded. Mustafa was a roommate with the hijackers and had previously met them at the ICSD. <br><br> None of the other guests provided witting assistance to the hijackers either. |
| 1688. | The video shows that Bayoumi likely instructed Morgan not to film Hazmi or Mihdhar. While Mihdhar's face can be seen in several brief sequences when he is walking past, or the camera is being moved, Mihdhar's voice is not heard on the tape. Hazmi can be heard speaking on the tape, and while his face is not seen, the film captures Hazmi's black shirt, light-colored pants, arm, hand, and the bill of his baseball cap. Ex. 10K-Adams, Adams Decl., Annex 7 (diagram of movements). N1-7. As noted above in respect of Qahtani, Bayoumi is heard instructing Morgan about where and what to film at the party. Shortly after Bayoumi gave that instruction, as the persons on the left-hand side of the room could be heard introducing themselves, the camera was pointed up towards the ceiling. Ex. 10K (MPS2023-059 Video Exhibit) from c. 17:51. | The Adams declaration has been stricken. *See* ECF No. 9562. <br><br> If the party was in fact a welcome party for the hijackers (and it was not), it would make no sense for Al Bayoumi to film the party but not film the hijackers. There is no evidence that Al Bayoumi instructed Morgan not to film the hijackers. As the 9/11 Commission noted, "Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room." KSA Ex. 163 (9/11 Rep.) 219. "Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don." *Id.*, n.25 at 516. <br><br> As set forth in Response to Pls. Aver. ¶ 1676, certain guests did not want to be filmed for religious reasons. *See* Pls. Ex. 450 (MPS 365-401, Tr. 387-8). When those guests introduced themselves, the camera is pointed at the ceiling. |
| 1689. | It is significant that Bayoumi invited to the party several persons who went on to provide substantial support for Hazmi and Mihdhar during their time in San Diego. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi hand-picked these individuals because he knew and assessed that they were well-suited to provide the Al Qaeda operatives with important forms of support. Ex. 694, Youssef Decl. ¶ 86. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef declaration has been stricken. *See* ECF No. 9562.<br><br>There is no evidence that the guests at this party were part of any "support network" or assisted the hijackers. Al Bayoumi assisted the hijackers in renting their apartment and opening a bank account, however, this was done unwittingly as the 9/11 Commission, the 9/11 Review Commission, and the FBI firmly concluded. Mustafa was a roommate with the hijackers and had previously met them at the ICSD.<br><br>None of the other guests provided witting assistance to the hijackers either.<br><br>As set forth in Response to Pls. Aver. ¶ 1656, this was not a welcome party for the hijackers. |
| 1690. | The two Imams from the ICSD aka "Abu Bakr Mosque"were among those most regularly present at the Mosque premises. The hijackers regularly attended the ICSD Mosque, which was close to the Parkwood Apartments complex where they lived. **Sheikh Fouad Hamouda**, the elder or senior Imam, sits next to Barzanjee at the party, recites a parable, and introduces himself as "Fouad Hamouda." Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 29 (Sheikh Fouad); Ex. 694,Youssef Decl. ¶ 87. | The Youssef and Adams declarations have been stricken. *See* ECF No. 9562.<br><br>There is no evidence, and Plaintiffs cite none, that any of the imams of the ICSD provided any assistance to the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1691. | **Sheikh Abduljalil Mezgouri**, the second Imam from the ICSD Mosque is addressed by Bayoumi at the beginning of the video as "Sheikh" and introduces himself in the round of introductions as "Abduljalil Muhammad." Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) 00:10, 17:35; Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 11 (Sheikh Abduljalil). Youssef was able to confirm the identity and appearance of Mezgouri at the party based on the statements made on the videotape and his review of additional Bayoumi videos from the MPS production in which Mezgouri appears. Ex. 694, Youssef Decl. ¶¶ 88-89; Ex. 10L, MPS910-CLIP Video Exhibit. Mezgouri sat at the party on the left side of the room, wearing his white robe and cap (Ex. 10K Video Exhibit at 28:36). When Bayoumi was interviewed by the MPS upon his arrest in September 2001, he stated that it was Mezgouri who first spoke to the two Al Qaeda operatives upon their arrival in San Diego and arranged for them to meet up with Bayoumi. Ex. 450, Tr. 694:17-696:9 ("they asked the Imam 'where is Omar?'… And then I showed up"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef and Adams declarations have been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 450 is inadmissible hearsay. *See* Objections Chart.

There is no evidence, and Plaintiffs cite none, that Sheikh Abduljali of the ICSD provided any assistance to the hijackers.

At his New Scotland Yard interviews, Al Bayoumi said that, when he first met the hijackers in San Diego, he had been late for his prayers and the hijackers were already at the ICSD. "They were praying, and they finished. And they asked the Imam, where is Omar? Okay. And then I showed up. I prayed first . . . And the Imam told me that they asked – some people here asked – two, I think two – about Omar. I said, okay, I'm gonna pray right now." Pls. Ex. 450 (MPS 365-401, Tr. 694-6). Al Bayoumi elaborated on this account at his deposition. "They were already at the mosque, and I arrived late for the prayer and I met them there . . . they came and they said, peace be on you." "[A]fter the Imam finishes the prayer, he turns around to face those who are praying, just like that. So, after the prayer was finished, they were sitting and they – along with a group, and they inquired, is Omar al-Bayoumi here? At the time I was arriving late. I had just gotten there from outside. And he pointed at me, him and the group, and they said, that's Omar al-Bayoumi . . . I usually attend the prayer. Perhaps on that day I was late, therefore, the Imam's response was Omar should be coming or would be coming." "But what I remember is I went to the prayer – I arrived late at the prayer, and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | they were with the Imam and the group.  And they pointed at me, and they said, here is Omar . . . Those [who pointed at me] who were praying and the Imam.  I arrived later and somebody coming in late, and they were pointing at me and they were saying, this is Omar."  Pls. Ex. 120 (Bayoumi Tr.) 422:2-14, 427:15-428:22, 429:22-430:7.  There is no evidence that Mezgouri "arranged for" Al Bayoumi to meet the hijackers. |
| 1692. | ████████████████████████████████████████████████████████████████████████████████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.  Plaintiffs Exhibit 12W (chart of Al Thumairy calls to Al Bayoumi's welcome party attendants) is an improper summary exhibit.  Plaintiffs Exhibit 12W misattributes five calls to Al Thumairy that were made in July 2001 from the number ████0777.  The subscriber records for this number list the subscriber as █████████████, and the user as █████ █████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002.  Al Thumairy did not become the subscriber for the number until April 22, 2002.  *See* KSA Ex. 168, at 3-5.  Plaintiffs Exhibit 12W shows that Al Thumairy called ████2190 on February 3, 2000 at 11:43 pm, and an additional 15 times between July 22 and September 8, 2000.  Plaintiffs Exhibit 12W relies solely on hearsay |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | sources in associating that number with ███████ No subscriber records were produced to verify that the number belonged to ███████ |
| | | There is no evidence that any of these calls had anything to do with the hijackers. Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. |
| | | As set forth in Response to Pls. Aver. ¶ 1691, there is no evidence that Mezgouri assisted the hijackers in any way. |
| 1693. | Thumairy had phone contact with at least six persons who attended the party, including Bayoumi and ███████ Ex. 12W (Thumairy calls to persons at Bayoumi's welcome party). It is significant that Thumairy had contacts with the same group of individuals that Bayoumi invited to welcome Hazmi and Mihdhar to San Diego. Ex. 694, Youssef Decl. ¶¶ 91- 97. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The Youssef declaration has been stricken. *See* ECF No. 9562. |
| | | Plaintiffs Exhibit 12W is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 1692. Plaintiffs Exhibit 12W relies solely on hearsay sources as evidence of the identities of four of the recipients of the phone calls. No subscriber records were produced to verify that any of the numbers belonged to Aidarus, Alkhawaja, Mezgouri, or Tarabishi. With respect to the fifth recipient reflected in Plaintiffs Exhibit 12W – Nour at the number ███████ 2471 – Plaintiffs cite no documentary evidence at all linking that number to Nour. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As set forth in Response to Pls. Aver. ¶ 1656, this was not a welcome party for the hijackers.<br><br>There is also no evidence that the guests of this party provided any witting assistance to the hijackers. Nor is there any evidence that any of the calls that Al Thumairy had in Plaintiffs Exhibit 12W concerned the hijackers. The majority of calls occurred after Al Mihdhar had already left the United States on June 10, 2000.<br><br>Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6-493:11. |
| 1694. | Thumairy called ███████████ on August 6, 2000 at 12:43 p.m. and 2:22 p.m.. Ex. 12W (Thumairy calls to persons at Bayoumi's welcome party). ███ lived in the Parkwood Apartments and was named by Bayoumi as his friend and reference in the lease application that Bayoumi prepared for Hazmi and Mihdhar. Ex.557, FBI 008280 at 8281. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12W is an improper summary exhibit. *See* Response to Pls. Aver. ¶¶ 1692-93.<br><br>Plaintiffs Exhibit 12W does not cite anything showing that the number that Plaintiffs attribute to ███████████ is actually his number. Notably, the number that Plaintiffs attribute to ███████████ in Plaintiffs Exhibit 12W is different from the number Plaintiffs attribute to ████ in Plaintiffs Exhibit 12Z.<br><br>Even if Plaintiffs Exhibit 12W lists the correct number for ████ the purported calls from Al Thumairy to ████ were on August 6, 2000, well |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | after the hijackers had moved out of the Parkwood Apartments and after Al Mihdhar had already left the country. There is no evidence that any of these calls had anything do with the hijackers. There is also no evidence that █████████ did anything to assist the hijackers.<br><br>Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6 - 493:11. |
| 1695. | Bayoumi placed numerous calls to █████ █████ between June 21, 2000 and September 15, 2000. Ex. 12Z (Bayoumi calls to █████████ ). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12Z is an improper summary exhibit.<br><br>The number that Plaintiffs attribute to █████████ in Plaintiffs Exhibit 12W is different from the number Plaintiffs attribute to █████ in Plaintiffs Exhibit 12Z.<br><br>Even if Plaintiffs Exhibit 12Z lists the proper number for █████ the calls from Al Bayoumi to █████ start in June 2000 and there is no allegation that Al Bayoumi provided any assistance to them after that date. Al Mihdhar left the United States on June 10, 2000. There is no evidence that any of these calls had to do with the hijackers. |
| 1696. | ████████████████████████ ████████████████████████ Alkhawaja attended the party. Ex. 10K- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Adams, Adams Decl., Annexes 2-8, Person 24 (Maen); Ex. 694, Youssef Decl. ¶ 91. Allkhawaya is seen talking and gesturing to Hazmi at the party Ex. 10K Video Exhibit at c. 18:42-18:47. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams and Youssef declarations have been stricken. *See* ECF No. 9562.<br><br>Plaintiffs Exhibit 12W is an improper summary exhibit. *See* Response to Pls. Aver. ¶¶ 1692-93.<br><br>Plaintiffs Exhibit 12W cites to "MPS713_67" as the source for ▆▆▆▆▆▆ phone number, however that document is not included in Plaintiffs' exhibits.<br><br>Plaintiffs' claim that Maen Alkhawaja is seen talking and gesturing to Al Hazmi at the party is taken out of context. A more accurate description is that after Alkhawaja introduced himself, Ahmad Mustafa interrupted the round of introductions to try to recite a poem. Some people insisted on finishing the introductions first. Al Hazmi was the next person in the order but was sitting back from the circle of guests in his bedroom. The three people sitting near the door of the bedroom, Alkhawaja, Emad (Al Bayoumi's son), and Al Yafai gestured to Al Hazmi that he was next in the order of introduction. Al Hazmi complied and introduced himself in a soft voice, which was drowned by Al Bayoumi's voice, who was asking where Saoud was. Pls. Ex. 10K (MPS2023-059), at 18:16-44. There was no other interaction between Alkhawaja and Al Hazmi on the video.<br><br>Even if Plaintiffs Exhibit 12W states the correct number for ▆▆▆▆▆ the call from Al Thumairy was on August 8, 2000, well after Al Mihdhar had left the United States. There is no evidence that this call had anything to do with the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy testified that the first time he recalled hearing the names Al Hazmi and Al Mihdhar was in the media after September 11, that he does not recall meeting them, that he was never given instructions to assist the hijackers, and that he never instructed anyone else to assist them. Pls. Ex. 107 (Thumairy Tr.) 490:6‑493:11. |
| 1697. | Alkhwaja was identified in Bayoumi's handwritten address book as "Maen for car rental." Ex. 12AA, MPS738_25L. ▮▮▮▮▮▮ that Hazmi had approached him "interested in purchasing a used vehicle." Ex. 2, EO 1423. Although ▮▮▮▮▮ "did not have a vehicle to fit [Hazmi's] budget… he referred him to an individual of Moroccan descent known to ▮▮▮▮▮ as ▮▮▮▮▮▮▮ sold to [Hazmi] a blue Toyota Corolla." Ex. 2, EO 1423. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 2Q (EO 1423) and 12AA (MPS 738) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. The numbers associated with "▮▮▮ for Car Rental" in Plaintiffs Exhibit 12AA (MPS738_25) do not include "▮▮▮▮0325," which is the number Plaintiffs claim is ▮▮▮▮▮ number in Plaintiffs Exhibit 12W.<br><br>Plaintiffs Exhibit 2Q (EO 1423) does not state that Al Bayoumi or Al Thumairy was involved in any way in the hijackers' purchase of their car and there is no evidence indicating that this was the case. |
| 1698. | Bayoumi had a close personal relationship with ▮▮▮▮▮▮, the man who sold his Toyota Corolla to the hijackers. Bayoumi knew ▮▮▮ on first name terms as ▮▮▮▮▮ and can be heard referring to this name in a video recorded conversation at the mosque in which both | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | men shared Eid greetings in Arabic for wellness in life "and in the hereafter." Ex. 10L, MPS910-CLIP Video Exhibit at ▮▮▮. Bayoumi's handwritten address book contained a two-part entry for ▮▮▮▮, listing both his cellphone and his pager. Ex 12AA, MPS738_15R. | Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay. *See* Objections Chart. <br><br> There is no evidence of a close personal relationship between ▮▮▮▮ ▮▮▮ and Al Bayoumi. Greeting someone at the mosque is not a sign of a close relationship. For instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br><br> There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. Nor is ▮▮▮ name in the handwritten phone book indicative of a close relationship. There are scores of individuals listed in that book including dozens of numbers for service providers, such as carpet cleaners. *See* Pls. Ex. 12AA (MPS738_9). <br><br> There is no evidence that Al Bayoumi was involved in any way in the hijackers' car purchase. |
| 1699. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ arabishi attended the party. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 28 (Dr. Saad). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> The Adams declaration has been stricken. *See* ECF No. 9562. <br><br> Plaintiffs Exhibit ▮▮▮▮▮▮ is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit ███ is an improper summary exhibit.  *See* Response to Pls. Aver. ¶¶ ██ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████ ████████████████████████ ████████████████████████ ████████████████████ ████████████████████████ ████████████████████████ █████████████████████ |
| 1700. | ████████████████, who introduces himself as "Fathi Al-Aidarus." Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 15 (Aidarus). ████ ████████████████████ ████████████████████ ██████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. The Adams declaration has been stricken.  *See* ECF No. 9562.  Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | |  |
| 1701. | Aidarus sat next to Saudi official Qahtani at the party. Qahtani's first name was "Mohamed." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded.  *See* Objections Chart.

As shown in the Response to Pls. Aver. ¶ 1678, there is no evidence that Al Qahtani is a Saudi official.  There is also no evidence that Al Qahtani was the "Imam Mohamed" who had stayed with ▮▮▮  Plaintiffs have claimed that two Imams stayed with ▮▮▮ from December 27-29, 1999, *see* Pls. Aver. ¶¶ 1384-1386.  The party occurred in mid-February, long |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | after the visiting Imams had left. Moreover, Muhammed is an incredibly common name in Saudi Arabia.<br><br>It should also be noted that Plaintiffs' expert Youssef claims in his report that "Imam Muhammed" was actually Al Jaithen or Al Mersal. Yet here, Plaintiffs claim that "Imam Muhammed" is Mohammed Al Qahtani. This is just another example of Plaintiffs' ever shifting and inconsistent theories.<br><br>There is no evidence that ████ assisted the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1702. | The phone records contain 13 calls from Bayoumi's cell phone to ▮▮▮▮ starting on January 11, 2000 through June 25, 2000. Ex. 12Q (Bayoumi calls to ▮▮▮▮▮▮). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12Q is an improper summary chart. Plaintiffs Exhibit 12Q shows that Al Bayoumi's cell phone made 12 calls – not 13 – from January 11, 2000 through June 25, 2000 to a number that Plaintiffs associate with ▮▮▮▮ based upon several hearsay sources. No subscriber records were produced to verify that the number belonged to ▮▮▮▮<br><br>Al Bayoumi had previously met Aidarus, as he introduced Aidarus in Plaintiffs Exhibit 10G (MPS906), filmed on December 20, 1999. From the video, Al Bayoumi is uncertain of Aidarus's name and Aidarus needs to confirm it, indicating that the two did not have a close relationship. There is no evidence that any ▮▮▮▮▮▮ had anything to do with the hijackers. |
| 1703. | **Adel Muhammad Rafeea**, an administrator and Secretary at the ICSD, introduces himself on the party video as "Adel Muhammad." Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 18 (Adel); Ex. 694, Youssef Decl. ¶ 99 (Youssef determined Rafeea's identity based on his family name and other information on the video and public records, and document produced in the case). ▮▮▮▮▮▮ bank account to be used to receive a $5,000 USD wire | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams and Youssef declarations have been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 569 (FBI 13583) is inadmissible hearsay. *See* Objections Chart.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | transfer for Hazmi from Al-Qaeda. Ex. 569, FBI 013582-85 at 13583 (Hazmi was "alongside ███ at the bank counter when the money was withdrawn"); Ex. 570, FBI 013586-13588 at 13588 ███ Union Bank Statement showing 04/19 Withdrawal # ████ in the amount of $4,980.50 USD, the identical amount having been received by wire the previous day). | ████████████████████ |
| 1704. | **Hashim Al-Attas** introduces himself on the video and Bayoumi describes him as as one of the brothers present at the party, along with Yafai, who was imminently "travelling" (Ex. 10K Video Exhibit at c. 13:58). Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 6 (Attas). Attas' apartment was arranged by Bayoumi as backup accommodation. Ex. 5, Youssef Rpt. 208. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Adams declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>There is no evidence that Al Bayoumi attempted to find "backup accommodation" for the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1705. | The phone records show that Bayoumi called Attas 15 times from January 12, 2000 through February 14, 2000. Ex. 12O (Bayoumi calls to Hashim Al Attas). Bayoumi made various several calls to the landlord for Attas, evidently to inquire about the availability of his apartment. Bayoumi Rpt. 208. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12O (Bayoumi calls to Hashim Al Attas) is an improper summary exhibit. Plaintiffs Exhibit 12O shows that Al Bayoumi's cell phone made several calls from January 12, 2000 to February 14, 2000 to two numbers that Plaintiffs associate with Al Attas based upon several hearsay sources. No subscriber records were produced to verify that either of the numbers belonged to Al Attas.

Al Bayoumi testified that Al Attas was a fellow student at the language institute that Al Bayoumi attended. Pls. Ex. 120 (Bayoumi Tr.) 466:14-467:7. There is no evidence that calls between Al Bayoumi and Al Attas were related in any way to the hijackers.

There is no "Bayoumi Report" exhibit. Plaintiffs cite no evidence that Al Bayoumi called Al Attas's landlord. |
| 1706. | **Ahmad Mustafa** introduces himself on the video and recites a poem in Arabic at Bayoumi's prompting. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 23 (Ahmad Mustafa). Bayoumi arranged for Mustafa to move in with the hijackers for two weeks in March 2000, and Mustafa proceeded to set up internet and phone service for them. Ex. 5, Youssef Rpt. 209; Ex. 2, EO 2361. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Adams declaration has been stricken. *See* ECF No. 9562. Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2U (EO 2361) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that Al Bayoumi arranged for Mustafa to move in with the hijackers. A summary of Mustafa's interview with the FBI states that "MUSTAFA would see AL-HAZMI and AL-MIHDAR approximately once per week at the [ICSD] mosque, and at Friday night prayers at the mosque. AL-HAZMI and AL-MIHDAR were living at the Parkwood Apartments and told MUSTAFA that he could stay with them . . . " Pls. Ex. 2T (EO 1903). |
| 1707. | It was from this phone that Hazmi and Mihdhar made at least one call to the Al Qaeda operations number in Yemen. Ex. 520, FBI 3348; Ex. 2, EO 0506 (the July 2004 FBI Inspector General Report states that "[o]n March 20, 2000, a long-distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment [the Parkwood apartment rented by Bayoumi] to the known terrorist logistics phone number in Yemen"). Musafa told the FBI that Bayoumi "was a frequent visitor" to the apartment of Hazmi and Mihdhar and that Bayoumi was "often bringing food." Ex. 2, EO 2366. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2U (EO 2366) is inadmissible hearsay. *See* Objections Chart.<br><br>The quote is from the DOJ Office of Inspector General Review of the FBI's Handling of Intelligence Information, dated July 2004. "On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment to the known terrorist logistics phone number in Yemen." Pls. Ex. 2L (EO 0506). However, a later edition of the same document, dated November 2004, and released to the public in June 2006, revised this statement: "On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment *to a suspected* terrorist facility in the Middle East linked to al Qaeda activities." Pls. Ex. 131 (PEC-KSA000490) (emphasis added). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The number called in Yemen was the telephone number of Ahmad Al Hada, Al Mihdhar's father-in-law where his wife was staying. Al Mihdhar's wife had delivered a daughter Nada (Al Mihdhar's daughter) in early March 2000. Pls. Ex. 82 (CIA_000267); KSA Ex. 167 (Sageman Rep.) 497. |
| | | According to the FBI summary of Mustafa's interview, which Plaintiffs attach as an exhibit, "MUSTAFA did not know of any welcoming party that was held upon the arrival of AL-HAZMI and AL-MIHDHAR to the San Diego area." "During the time that MUSTAFA stayed with AL-HAZMI and AL-MIHDHAR, a party was hosted at their apartment in honor of the Imam of the Al Medina Mosque in El Cajon, California." Pls. Ex. 2T (EO 1904, 1906). |
| | | Al Bayoumi had minimal contact with the hijackers after the party, limited to exchanging greetings with them. Pls. Ex. 120 (Bayoumi Tr.) 742:18-743:4. Al Hazmi and Al Mihdhar avoided Al Bayoumi after he criticized them for inappropriate behavior in front of his children. *See* Pls. Ex. 120 (Bayoumi Tr.) 755:2-11 |
| 1708. | The FBI determined that Ahmad Mustafa was "the son of the founder of the violent Islamist organization, PIK [Partiya Islamiya Kurdistan], which is closely allied with ANSAR AL-ISLAM." Ex. 2, EO 2798. As described elsewhere, Ansar Al-Islam was the designated terrorist organization that would be led in Europe by Abdel Rahman Barzanjee, who attended the February 2000 party at the hijackers' apartment. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2X (EO 2798) is inadmissible hearsay. *See* Objections Chart. <br><br> There is no evidence that Ahmed Mustafa had any association with PIK. PIK has never been designated as one by the United States. The cited exhibit states only that "MUSTAFA's father is MOHAMMED ALI |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | MOSTAFA GABORI, aka, DR. MOHAMMED SALIH MOSTAFA, who founded the Islamic Party of Kurdistan, aka Parti Islami Kurdistan (PIK for short) in 1979. PIK's goal is to establish an Islamic state encompassing southeaster[n] Turkey and northwestern Iraq. GABORI, a Kurd, has resided in Riyadh, Saudi Arabia, for many years." Pls. Ex. 2X (EO 2799).<br><br>Moreover, there is no evidence that PIK is associated with Ansar Al-Islam and certainly not during the relevant period. Ansar Al-Islam was founded in 2001 and did not even exist in 2000. KSA Ex. 167 (Sageman Rep.) 299.<br><br>Moreover, as set forth in Response to Pls. Aver. ¶ 1133, Ansar Al-Islam was never headed by Abdel Rahman Barzanjee, who attended the party at the hijackers' party. Instead, it was led by Mullah Krekar. *Id.* The same document cited by Plaintiffs states that "in April 2006 and August 2006, [redacted] and NSA, respectively, informed the FBI that they no longer consider BARZANJEE a subject of interest." Pls. Ex. 2X (EO 2799). The United Nations Security Council narrative on imposing sanctions on Ansar Al-Islam lists 19 people related to Ansar Al-Islam, but Sheikh Barzanjee is missing from the list, while Mullah Krekar ("Najmuddin Faraj Ahmad") is on the list. Pls. Ex. 67-C; *See also* Brynjar Lia and Petter Nesser, 2016, "Jihadism in Norway: A Typology of Militant Networks in a Peripheral European Country," *Perspective on Terrorism*, Vol. 10, No. 6, at 121–34. |
| 1709. | **Nino Mawazini** also attended the party. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 10 ('Nino' Mawazini). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The Adams declaration has been stricken. *See* ECF No. 9562. |
| 1710. | Bayoumi placed calls to ▮▮▮▮▮▮ from January 9, 2000 to August 6, 2000. Ex. 12S (Bayoumi calls to ▮▮▮▮▮▮). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 12S (Bayoumi calls to ▮▮▮▮▮▮) is an improper summary exhibit. Plaintiffs Exhibit 12S shows that Al Bayoumi made 13 calls to two telephone numbers that Plaintiffs associate with "▮▮▮ based upon several hearsay sources. No subscriber records were produced to verify that either of the two telephone numbers belonged to ▮▮▮▮▮ |
| | | There is no assertion that any of these calls had anything to do with the hijackers. |
| 1711. | Bayoumi falsely told the 9/11 Commission that he "gave the dinner to honor Barzanjee…." Ex. 90, Snell Decl. Ex. 2 at 5. The 9/11 Commission Report cited the fact that "Bayoumi maintains that a visiting sheikh was the party's principal honoree," *See* 9/11 Commission Report at 516, n. 25. | Plaintiffs Exhibit 90 (Snell Decl. (Ex. 2)) is inadmissible hearsay. *See* Objections Chart. |
| | | As set forth in Response to Pls. Aver. ¶ 1656, the video clearly demonstrates that the reason for the party was to honor Barzanjee. As Al Bayoumi is heard on the video, "Our Sheikh, Abu Musleh, Sheikh Abdulrahman Al-Barzanjee. He is now the Imam of Masjid Al-Madinah Al-Munawarah. He was the Imam of Masjid Bilal in Oslo, and he came to visit us last year. We tried back then, but this year, praise be to Allah the Almighty, who has granted success, he has become the Imam of Masjid Al-Madinah Al-Munawarah. Of course, this gathering of ours today . . . is for us to see these great faces, these glowing faces. Ah, and also to introduce you to the Sheikh Abu Musleh." Pls. Ex. 10K (MPS2023-059), at 13:28–58. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1712. | Sheikh Barzanjee, however, was not "a visiting sheikh." To the contrary, precisely because of Bayoumi's efforts dating back to 1998, Barzanjee had become the permanent Imam of the Al Madinah Mosque. Ex. 10K Video Exhibit at c. 13:28-13:43 (Bayoumi states that Barzanjee "has become" and "is now the Imam of Masjid AlMadinah AlMunawarah [AlMadinah Mosque].") Correspondence found in Bayoumi's possession showed that Barzanjee remained in place at the AlMadinah Mosque throughout the time the hijackers were in San Diego, through the end of 2000. Ex. 418, MPS95_114-16 (Barzanjee letter to Habib dated January 8, 2001). Given Bayoumi's role in installing Barzanjee at the Al Madinah Mosque, and his role as General Supervisor of that mosque, Bayoumi plainly knew that Barzanjee was not a "visiting sheikh" and thus plainly sought to mislead the 9/11 Commission about the party through his statement. | Contrary to Plaintiffs' statement, the record evidence shows that Barzanjee was from Oslo, Norway and was a visiting Sheikh. Al Bayoumi in fact says in the video that he "was the Imam of Masjid Bilal in Oslo, and *he came to visit us* last year." Pls. Ex. 10K (MPS2023-059), at 13:28–58 (emphasis added).<br><br>Plaintiffs Exhibit 418 is inadmissible hearsay. *See* Objections Chart.<br><br>The correspondence cited by Plaintiffs does not show that Barzanjee "remained in place at the AlMadinah Mosque . . . through the end of 2000." That letter, dated January 2001 states that Barzanjee "sought to move to this country" to serve as the imam of the mosque, but could not do so because he could not bring his children. He signs the letter "Imam and orator of Masjid Bilal" and "Head of the Kurdish Islamic Association / Oslo." Pls. Ex. 418 (MPS 95_114-116). This indicates that Barzanjee was not in the United States through 2000. Moreover, on January 10, 2001 Al Bayoumi wrote a letter stating that Sheikh Abdulrahman (Barzanjee) would not be able to come to America because U.S. immigration would not allow him to bring all his children with him. This again indicates that Barzanjee was not in the United States. *Id.*<br><br>Plaintiff's assertion that Al Bayoumi sought to mislead the 9/11 Commission is false. As set forth in Response to Pls. Aver. ¶ 1656, the video clearly demonstrates that the reason for the party was to honor Barzanjee. As set forth above, Al Bayoumi introduced Barzanjee as a visitor. |
| 1713. | Bayoumi also told the 9/11 Commission that the party was moved to the hijackers' apartment because one of the men brought their wife to the party. Ex. 90, Snell Decl. Ex. 2 at 5. There is no basis for this story other than Bayoumi's say-so and the video | Plaintiffs Exhibit 90 (Snell Decl. (Ex. 2)) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs' insinuation that Al Bayoumi did not tell the truth to the 9/11 Commission has no basis. Al Bayoumi gave the same testimony at his deposition, Pls. Ex. 120 (Bayoumi Tr.) 460:12-463:12, and there is no |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | shows that the individuals attending the party went directly to the hijackers' apartment to attend the event. | evidence to the contrary. *See also* KSA Ex. 266 (PEC-KSA 384) (Morgan's interview with the 9/11 Commission stating that "Bin Don's next contact with al-Hazmi and al-Mihdhar occurred when al-Bayoumi invited Bin Don over for a party. Upon arriving at al-Bayoumi's residence in the Parkwood Apartments complex, Bin Don was met by al-Bayoumi out front and was told that the party had been moved to what turned out to be al-Hazmi's and al-Mihdhar's apartment.").<br><br>Plaintiffs Exhibit 10K (MPS2023-059) was filmed entirely inside the hijacker's apartment. It does not show that the attendees "went directly to the hijackers' apartment to attend the event." |
| 1714. | The 9/11 Commission stated that "[a]lthough [Morgan] has recalled that the party was intended to welcome Hazmi and Mihdhar to the community, this is belied by the hijackers' apparent decision to sequester themselves in the back room, and by the account of another party attendee." The other "party attendee" cited by the 9/11 Commission was Yafai. *See* 9/11 Commission Report at 517 n. 25. Yafai told the 9/11 Commission that "he did not talk to him [Hazmi] at the party"; "Hazmi may have been in the back room of the party" because "he doesn't recall seeing him [Hazmi] in the living room area"; and that he "had never met them [Hazmi and Mihdhar] before." Ex. 308, MFR 9/11 Commission Interview of Yafai, February 24, 2004 at 3. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As set forth in Response to Pls. Aver. ¶ 1656, the hijackers are barely visible in the video. Al Hazmi's face is not shown at all and at most portions of his body are shown for 8.5 seconds of the video. Al Mihdhar does not speak and he appears for nine seconds of the 29-minute video. They did not mingle or socialize with the other guests.<br><br>There is no evidence that Al Yafai met Al Hazmi or Al Mihdhar before the party or that he met them after the party. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1715. | The Commission also stated that there is only one brief sighting of Mihdhar on the tape. *See* 9/11 Comm Rpt. 516 n. 25 (Mohdar Abdullah "appears briefly"). The 9/11 Commission, however, never reviewed the complete party tape seized by the MPS. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>This paragraph mistakenly states that according to the 9/11 Commission Report, "Mohdar Abdullah" appears briefly. Mohdar Abdullah was not at the party and the cited footnote of the 9/11 Commission states that "Mihdhar appears briefly on the video." KSA Ex. 163 (9/11 Rep.) 516 n.25.<br><br>As set forth in Response to Pls. Aver. ¶ 1656, Al Mihdhar does not speak and he appears for nine seconds of the 29-minute video. This is entirely consistent with the 9/11 Commission's statement. There is no basis (and Plaintiffs' cite none) for the assertion that the 9/11 Commission never reviewed the complete party tape seized by the MPS.<br><br>As set forth above in Response to Pls. Aver. ¶ 1656, this was not a welcome party for the hijackers. *See also* Plaintiffs Exhibit 2W (EO 2739) ("no evidence has been found to support information from ISAMU DYSON [Morgan] that the dinner was a welcoming party for AL-HAZMI and AL-MIHDHAR. AL-MIHDHAR appears for a very short time on the videotape; AL-HAZMI is not seen at all. Other individuals who were present at the dinner have advised that AL-HAZMI and AL-MIHDHAR stayed in the back room of the apartment during the dinner."). |
| 1716. | While the 9/11 Commission discounted Kaysan Morgan's statement that Bayoumi held the party to welcome Hazmi and Mihdhar, the more comprehensive footage in Exhibit 10K, the MPS2023-059 Video | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Exhibit, shows that Morgan was correct. Bayoumi's contacts with and use of Morgan were part of his scheme to support the hijackers. The EO production identified that Morgan was using cellphone number ███-6525 at the relevant time. Ex. 2, EO 2751. The phone call records show that Bayoumi placed 18 calls to Morgan on that cell phone number in January-February 2000, coinciding with Bayoumi's arrangements to have Morgan accompany him to Los Angeles to meet the hijackers, and to film the party at which they would be welcomed and introduced. Ex. 12P (Bayoumi calls to Kaysan Morgan). | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> As set forth above in Response to Pls. Aver. ¶ 1656, the video clearly shows that this was not a welcome party for the hijackers.  *See also* Plaintiffs Exhibit 2W (EO 2739) ("no evidence has been found to support information from ISAMU DYSON [Morgan] that the dinner was a welcoming party for AL-HAZMI and AL-MIHDHAR.  AL-MIHDHAR appears for a very short time on the videotape; AL-HAZMI is not seen at all.  Other individuals who were present at the dinner have advised that AL-HAZMI and AL-MIHDHAR stayed in the back room of the apartment during the dinner."). <br><br> There is no evidence that Al Bayoumi's contacts with and use of Morgan were part of a scheme to support the hijackers.  Plaintiffs offer no evidence that any of these calls had to do with the hijackers. <br><br> Moreover, as shown in the Response to Pls. Aver. Section XXF and Response to Pls. Aver. ¶¶ 1553 and 1605, the assertion that Al Bayoumi used Morgan as some sort of cover makes no sense from a clandestine tradecraft perspective.  Nor would it make sense to film the party if was an effort to wittingly recruit individuals to assist the hijackers in furtherance of the September 11 attacks (of which there is no evidence). <br><br> The 9/11 Commission observed that the hijackers "may have been reconsidering the wisdom of living so close to the video camera-wielding Al Bayoumi, who Hazmi seemed to think was some sort of Saudi spy," and distanced themselves from him.  KSA Ex. 163 (9/11 Rep.) 219.  As that observation correctly implies, for Al Qaeda terrorists, the Saudi government was the enemy and not a source of support. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 12P (Bayoumi calls to Kaysan Morgan) is an improper summary exhibit. Plaintiffs Exhibit 12P shows that Al Bayoumi's cell phone made 17 – not 18 – calls in January/February 2000 to a number that Plaintiffs associate with Morgan based upon a single hearsay source. No subscriber records were produced to verify that the number belonged to Morgan. |
| 1717. | Bayoumi immediately reported to MOIA Director Sowailem at the Saudi Embassy after the party attended by Hazmi, Mihdhar, Qahtani and other Sheikhs. Bayoumi called Sowailem's personal cell phone on Friday, February 18, 2000 at 7:58 p.m. (2 mins.) and Saturday February 19, 2000 at 10:56 a.m. (6 mins.). Ex. 516, FBI 003242; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The Friday evening and weekend calls show that Bayoumi felt some urgency to report to Sowailem and confirm that everything was going according to plan. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. Plaintiffs Exhibit 12A shows that Al Bayoumi called a number that Plaintiffs associate with Al Sowailem's cell phone on February 18, 2000 at 7:58 pm (two mins) and February 19, 2000 at 10:56 am (six mins). No subscriber records were produced to verify that the number belonged to Al Sowailem.<br><br>Even if these calls were to Al Sowailem, there is no evidence that these calls are related to the hijackers nor any evidence that Al Sowailem ever knew who the hijackers were.<br><br>Al Bayoumi called Al Sowailem on numerous occasions to request support for the Al Madina Mosque and had previously received money from the Saudi Embassy for furnishing for the mosque. *See* Response to Pls. Aver. ¶ 1091 (requesting furniture and books); *see also* Response to Pls. Aver. ¶¶ 1154-1156 (thanking officials for sending Ramadan preachers to the mosque). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| XXIII. | **BAYOUMI AND THUMAIRY PROVIDED SUBSTANTIAL ADDITIONAL MATERIAL SUPPORT FOR THE AL QAEDA OPERATIVES** | The FBI's final conclusion in closing the 9/11 investigation is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| XXIII.A. | **Bayoumi and Aulaqi arranged for Mohdar Abdullah to provide support for Hazmi and Mihdhar.** | There is no evidence that Al Bayoumi or Al Awlaki arranged for Mohdar Abdullah Zeid to provide support for Al Hazmi or Al Mihdhar. |
| 1718. | The evidence shows that Bayoumi and Thumairy coordinated with Anwar Aulaqi in advance of the arrival of Hazmi and Mihdhar in San Diego, and that Bayoumi and Aulaqi worked in tandem to provide support to the two hijackers. Bayoumi introduced Hazmi and Mihdhar to Aulaqi, as Aulaqi appeared with the two hijackers at the Parkwood Apartments office shortly after Bayoumi first introduced the two men to the Parkwood Manager Ratchford. Ex. 91, Ratchford Decl. ¶¶ 6, 8. Hazmi and Mihdhar "reportedly respected Aulaqi as a religious figure and developed a close relationship with him." *See* 9/11 Commission Report at 211. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The evidence shows no coordination between Al Bayoumi, Al Thumairy, and Al Awlaki to support the hijackers. There is no evidence of such a coordination, whether before the hijackers arrived in San Diego or after their arrival as shown in the responses in Section XIX of this averment.<br><br>Al Bayoumi knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. Pls. Ex. 120 (Bayoumi Tr.) 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him); *id.* at 589:9-16 (Al Bayoumi "reached out" to Al Awlaki "on occasion"). Al Bayoumi did not ask or direct Al Awlaki to help Al Hazmi, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mihdhar, or any of the other 9/11 hijackers. *Id.* at 724:2-6 (testifying that he never instructed anybody to assist any of the 9/11 hijackers).<br><br>Plaintiffs claim that "Aulaqi appeared with the two hijackers at the Parkwood Apartments office shortly after Bayoumi first introduced the two men to the Parkwood Manager Ratchford." As set forth in the Response to Pls. Aver. ¶ 1627, the evidence is not clear whether this is in fact the case.<br><br>KSA Ex. 90 (Ratchford Decl.) states that the person who accompanied the hijackers "worked for Alliant University in San Diego in its International Studies Department." KSA Ex. 90 (Ratchford Decl.) ¶ 8. Al Awlaki never worked for Alliant University, as Plaintiffs' purported expert Meleagrou-Hitchens has conceded. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 229:5-16. Moreover, the Ratchford declaration states that the person accompanying the hijackers was in his 30s and 40s, but Al Awlaki was only 28 years old in February 2000. It further states that Al Awlaki was wearing a "multi-colored skull cap" on his head. KSA Ex. 90 (Ratchford Decl.) ¶ 8. There is no evidence of Al Awlaki ever wearing such a skull cap; instead in all the images of Al Awlaki in the record, including Pls. Ex. 10B (MPS 890, Exhibit B to the Ratchford Decl.) and, he wore a white Kufi prayer cap.<br><br>There is no evidence, and Plaintiffs fail to cite any, for the assertion that Al Bayoumi "introduced Hazmi and Mihdar to Aulaqi."<br><br>Plaintiffs quote from KSA Exhibit 163 (9/11 Rep.) selectively. The fuller quote is, "[w]e do not know how or when Hazmi and Mihdhar first met Aulaqi . . . Hazmi and Mihdhar reportedly respected Aulaqi as a religious figure and developed a close relationship with him." KSA Ex. 163 (9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Rep.) 221.  Thus, the 9/11 Commission made no conclusion about how Al Hazmi and Al Mihdhar met Al Awlaki. |
| 1719. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

To the extent a response is required, this is undisputed. |
| 1720. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

To the extent a response is necessary, this is undisputed. |
| 1721. | Mohdar Abdullah was first interviewed by the FBI eight days after the 9/11 Attacks, on September 19, 2001. Ex. 458, FBI 000050-57. Over the course of more than a decade, Abdullah provided statements to the FBI that Bayoumi introduced him to Hazmi and Mihdhar and asked him to "look | Plaintiffs Exhibits 458, 464, 467, 453 are inadmissible hearsay.  Pls. Ex. 89 (Daniel Gonzalez Decl.) is inadmissible hearsay to the extent it is offered for the truth of the matter asserted.

Gonzalez is a consultant to Plaintiffs' legal team.  Pls. Ex. 89 (Daniel Gonzalez Decl.); *see also* KSA Ex. 280 (Tim Golden and Sebastian Rotella, 2020, "The Saudi Connection: Inside the 9/11 Case That Divided |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | out" for the two men and help them acclimate to the area. Ex. 458, FBI 000050-57 at 50, 51 ; Ex. 464, FBI 000172-177 at 173 ; Ex. 467, FBI 0000208-222 at 209 (Abdullah Ex. 1F) ; Ex. 453, FBI 000007-11 at 0010, Abdullah Ex. 1I (December 2013) ; Ex. 89, Gonzalez Decl. ¶20. | the FBI," *The New York Times*, January 23, 2020, Updated September 12, 2021).<br><br>All admissible evidence shows that Al Bayoumi did not introduce Al Hazmi and Al Mihdhar to Zeid and that Al Bayoumi did not ask Zeid to look out for or to help the hijackers acclimate to the area.<br><br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br><br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████ *see* Pls. Ex. 120 (Bayoumi Tr.) 724:2-6; *id.* at 797:2-8 (Al Bayoumi never "assign[ed]" or "instruct[ed]" Zeid "to take care of" or "to assist the hijackers").<br><br>Plaintiffs' assertions to the contrary are based solely on inadmissible hearsay set forth in FBI interview summaries of Zeid. The numerous summaries are inconsistent. Of note, one summary which Plaintiffs do not cite, states that "[a]gain, Mohdar claimed he was not tasked by Al Bayoumi to assist the hijackers after they arrived in San Diego. Mohdar |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | claimed he was just helping out fellow Muslims who were new to the community."  Pls. Ex. 2GG (EO 3997).<br><br>Below is a chronological description of statements in the various hearsay summaries, as well as the first-hand admissible testimony regarding those statements, which indicates the serious and manifest errors in many of those summaries.<br><br>1.  2001 and 2002 Abdullah Zeid Interviews (Pls. Exs. 458, 464)<br><br>A week after the 9/11 Attacks, on September 18, 2001 (not on September 19, 2021 as Gonzalez states in his declaration, (Pls. Ex. 89 (Gonzalez Decl.) ¶ 12)), FBI agent Daniel Gonzalez and his partner interviewed Al Mohdar Abdullah Zeid.<br><br>That interview summary states: "Mohdar met and became acquainted with Nawaf Alhazmi and Khalid Almihdhar in 1999, after an introduction by Omar Ahmed Al-Bayoumi . . .  Omar brought Nawaf and Khalid to an Islam Mosque located on Saranac Street, Lemon Grove, CA, to make the introduction to Mohdar.  Omar asked Mohdar to become acquainted with Nawaf and Khalid, acclimate them to the area and assist in any way in their affairs."  Pls. Ex. 2R (EO 1578.<br><br>A summary of a custodial interview dated July 23, 2002, states that "Abdullah believes Omar Al-Bayoumi randomly chose him from the Mosque to be the individual to acclimate the hijackers to the United States, particularly San Diego, California."  Pls. Ex. 464 (FBI 173).<br><br>█████████████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|----------|---------------------|------------------------|
|          |                     |                        |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████████████████████████████████ |

**2. 2001 Al Bayoumi's New Scotland Yard Interviews**

When Al Bayoumi was taken into custody by MPS, he was also asked about Abdullah Zeid. Al Bayoumi acknowledged that he sometimes saw him at dinner at the mosque. "[I]n Ramadan we serve food for people who fast, you know. He sometimes come along." Pls. Ex. 450 (MPS 365‑401, Tr. 477:22‑478:4). However, Al Bayoumi knew Abdullah Zeid only from the mosque and did not see him often because they lived in distant neighborhoods and usually prayed at different mosques closer to their homes. KSA Ex. 281 (MPS 386, at 37); KSA Ex. 270 (MPS 388, at 2); KSA Ex. 282 (MPS 392, at 19-21); Pls. Ex. 450, at 476-8, 613-8.

Later, the New Scotland Yard officers confronted Al Bayoumi, "I put it to you [], Omar, that you brought Khalid and Nawaf to the mosque in Lemon Grove and introduced them to him . . . [a]nd you said for him to look after them and show them assistance." Al Bayoumi was surprised, "I brought them to Lemon Grove?" When New Scotland Yard insisted, Al Bayoumi said that the mosque in Lemon Grove belongs to Dr. Abdussatar. Pls. Ex. 450 (MPS 365‑401, Tr. 477:22‑478:4). KSA Ex. 283 (MPS 396, at 19). The confusion was the result of the faulty reporting in the September 18, 2001 interview memorandum (Pls. Ex. 2R (EO 1578)) and the confusion about the different mosques. In any event, Al Bayoumi strongly denied multiple times that he had asked Zeid to look after the hijackers.

Two days later, New Scotland Yard came back with the same allegation, "Are you certain you did not introduce these men to Mohadar Abdullah?" Bayoumi firmly replied, "No, I told you not at all." The police insisted, "And you didn't say to Mohadar ab duallah, give these men every

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | assistance you can." Bayoumi was indignant, "I told them to give them assistan[ce]. No . . ." Pls. Ex. 450 (MPS 365-401, Tr. 813:11-22); KSA Ex. 261 (MPS 398, at 30); *Id.* at 813-4. These denials came even before Al Bayoumi learned that Al Hazmi and Al Mihdhar were two of the 9/11 hijackers. KSA Ex. 256 (MPS 400, at 5 (9/27/01)), Pls. Ex. 450 (MPS 365-401, Tr. 833:10-20).<br><br>3. 2003 FBI Al Bayoumi Interview (Pls. Ex. 2G (EO 0255)).<br><br>The summary of Al Bayoumi's interview with the FBI from 2003 states that "AL-BAYOUMI did not introduce either KHALID or NAWAF to MOHDAR ABDULLAH, but believed that they knew each other from the mosque. AL-BAYOUMI recalled seeing ABDULLAH with KHALID and NAWAF at the mosque. AL-BAYOUMI did not instruct ABDULLAH to translate or to contact flight schools on their behalf, nor did he direct ABDULLAH to provide them with any assistance." Pls. Ex. 2G (EO 0255).<br><br>Al Bayoumi testified at his June 9, 2021 deposition that he remembered Zeid from the mosque. "He was a poor person and we showed him sympathy. We wanted to share meals with him at the mosque . . . [a]nd of course, he knew me because I was always on the move, coming in and going out." Pls. Ex. 120 (Bayoumi Tr.) 487:23-488-9. Al Bayoumi did not specifically remember seeing Zeid with Al Hazmi and Al Mihdhar. In response to his statement in the August 2003 FBI interview that he recalled seeing Zeid with the hijackers at the mosque, he said the sentence was worded incorrectly. Instead, he would say, "Perhaps I saw Khalid, Abdullah and Nawaf during the Eid. It's possible, but I don't remember seeing them in specific [*sic*]." *Id.* at 486:2-490:13. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Bayoumi denied that he ever asked Zeid to help the hijackers. *Id.* at 589:17-590:7, 797:2-8. |
| | | 4. 2007-2008 Operation Encore Interviews of Abdullah Zeid (Pls. Ex. 2GG (EO 405)), Pls. Ex. 2GG (EO 3997)). |
| | | Operation Encore investigators interviewed Zeid again around December 2007. *See* Pls. Ex. 2GG (EO 4050-7). |
| | | When Mohdar Abdullah Zeid was asked about Al Bayoumi, the summary reported, "Mohdar wanted SA (redacted) to know that he regrets his association with Omar Al Bayoumi. He is now convinced Al Bayoumi was not his friend for getting him involved with the two hijackers, NFI. Mohdar stated that Al Bayoumi drove the two hijackers, Nawaf and Khalid, from Los Angeles to San Diego, and subsequently introducing the hijackers to Mohdar in San Diego. Pls. Ex. 2GG (EO 4007). |
| | | Operation Encore returned to interview Mohdar Abdullah Zeid six months later. The summary states that "[a]gain, Mohdar claimed he was not tasked by Al Bayoumi to assist the hijackers after they arrived in San Diego. Mohdar claimed he was just helping out fellow Muslims who were new to the community. Mohdar stated he wanted to clarify that point because of their previous conversation . . . where Mohdar was asked if he knew about Taskia." Pls. Ex. 2GG (EO 3997). Curiously, none of the FBI's prior interview summaries indicates that Zeid had previously claimed that he wasn't tasked by Al Bayoumi to assist the hijackers. |
| | | Plaintiffs proffer this interview summary as an exhibit, but conspicuously omit it from their averment. |
| | | 5. 2011 Operation Encore Interview of Abdullah Zeid Ex. 467). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | On May 18-19, 2011, Gonzalez and his partner re-interviewed Abdullah Zeid in Sweden for two days. An FD 302 *entered into the FBI system three months later* stated, "Mohdar was introduced to Hazmi and Mihdhar after prayer service in January 2000 at the mosque where Bayoumi was an administrator and had an office. Bayoumi called Mohdar and invited him to an evening meal at the mosque. Bayoumi walked into the room with Hazmi and Mihdhar and then, after talking to Imam Anwar Aulaqi, Bayoumi walked over to Mohdar and introduced Hazmi and Mihdhar as two Saudi students who did not speak English and were new to San Diego. Bayoumi told Hazmi and Mihdhar that this was Mohdar. Mohdar understood this to indicate that Bayoumi had previously had a conversation with Hazmi and Mihdhar about him. Bayoumi asked Mohdar if he could help Hazmi and Mihdhar. Mohdar then sat next to Hazmi and ate a meal. Mohdar clarified to investigators that he was not instructed to look after Hazmi or Mihdhar while they were in the United States, but was asked by Bayoumi. Mohdar is a man and therefore nobody tells him what to do, and all the help he provided to Hazmi and Mihdhar was of his own accord." Pls. Ex. 467 (FBI 209); Pls. Ex. 2E (EO 158-9). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | **6.** _2013 Operation Encore Interviews of Abdullah Zeid (Pls. Ex. 453)_<br><br>In December 2013, Operation Encore investigators flew to Sweden to gather evidence against Zeid, whom they re-interviewed Zeid for two days, on December 19-20, 2013, and reported, "Abdullah was initially introduced to AL MIHDAR and AL HAZMI by Omar Al Bayoumi . . . Abdullah questioned why Al Bayoumi had asked him to look out for AL MIHDAR and AL HAZMI." Pls. Ex. 453 (FBI 10).<br><br>In its authoritative closing of Operation Encore, the FBI made the final conclusion that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . The NYO completed all logical and reasonable investigative steps . . . No potential criminal violations or priority threats to national security warranting further investigation were identified. All leads have been completed. The NYO is closing captioned matter . . . Lastly, the SDNY concurs with the closing of the investigation." Pls. Ex. 2A (EO 11). |
| 1722. | In his August 2011 statement, Abdullah told the FBI that Bayoumi invited him to an evening meal at the Al Madinah Mosque | Plaintiffs' Exhibits 467 (FBI 208-222) and 2F (EO 225) are inadmissible hearsay. _See_ Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (Abdullah described it as "the mosque where Bayoumi was an administrator and had an office"). Ex. 467, FBI 000208-222 at 209 (May 18- 19, 2011 interview of Abdullah). Anwar Aulaqi was also there. After Aulaqi and Bayoumi spoke, Bayoumi introduced Abdullah to "Hazmi and Mihdhar as two Saudi students who did not speak English and were new to San Diego." Ex. 467, FBI 0000208 at 209 (Abdullah Ex. 1F). Bayoumi "asked Mohdar [Abdullah] if he could help Hazmi and Mihdhar." Ex. 467, FBI 0000208 at 209 (Abdullah Ex. 1F). The 2014 FBI Operation Encore Report concluded that"Mohdar [Abdullah] played a key role facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar. Shortly after February 4, 2000, al-Bayoumi tasked Mohdar [Abdullah] to assist al-Hazmi and al-Mihdhar." Ex. 2, EO 0225. | As set forth in Response to Pls. Aver. ¶ 1721, the numerous summaries of Zeid's statements to the FBI are inconsistent on whether Al Bayoumi introduced the hijackers to Zeid and whether he asked Zeid to assist them. Of note, one summary which Plaintiffs conspicuously do not cite, states that "[a]gain, Mohdar claimed he was not tasked by Al Bayoumi to assist the hijackers after they arrived in San Diego. Mohdar claimed he was just helping out fellow Muslims who were new to the community." Pls. Ex. 2GG (EO 3997).

As also set forth in Response to Pls. Aver. ¶ 1721, both Al Bayoumi and ███ testified at their depositions that Al Bayoumi did not introduce the hijackers to Zeid nor did he instruct Zeid to assist the hijackers.

Plaintiffs incorrectly state that the FBI concluded anything in the 2014 FBI Operation Encore Update (Plaintiffs incorrectly label this a "Report"). Pls. Ex. 2F (EO 225). As the Assistant Director for the Counterterrorism Division stated when the FBI released the 2012 and 2014 Operation Encore updates: "In the interest of ensuring that neither the plaintiffs nor the public are misled by inaccurate or incomplete phrasing in what was meant to be an internal FBI document, the FBI wishes to make clear that this declassification decision should not be taken as an affirmation or confirmation of the statements in the 2012 Report . . . In retrospect, it would have been more appropriate to phrase the . . . sentence . . . and the statements . . . as an investigative theory being pursued by the FBI and not as objective statements of fact." KSA Ex. 245 (McGarrity Decl.) ¶ 22.

The FBI firmly rejected these investigative theories in closing the Operation Encore: "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . The NYO completed all logical and reasonable investigative steps." Pls. Ex. 2A (EO 11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 1723. | ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ On May 5, 2021, two days before the deposition was set to proceed, Abdullah filed a motion to quash stating that his testimony would "expose myself or my family to serious personal harm or retaliatory actions." ECF 6795 at 4. This Court denied the motion to adjourn the deposition, holding that the deposition would be deemed Confidential Information and Protected Material pursuant to the October 3, 2006 Protective Order. ECF 6794. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs' assertions are at a minimum misleading and at worse intentionally false. ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | |
| 1724. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs' assertions are false. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████ ███ ██████████████ ████████████ ███████████████ ████████ <br><br> ████████████████ <br><br> Following this exchange, there was a long discussion between the Swedish Judge and Swedish counsel for both sides concerning whether the questions sought information privileged under Swedish law. It was ultimately determined that nothing discussed in the presence of Saudi counsel was privileged. *Id.* at 406:1-411:21. <br><br> ██████████████████ ████████████████ ██████████████ ███████████████ █████████████ █████████ ██████████████ ███████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████████████████ |
| 1725. | ██████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. ████████████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | • ███████████████████████████████ ███████████████████████████████ ███████████████<br><br>There is no evidence supporting any such claim and they appear nowhere in Plaintiffs' Averment.<br><br>███████████████████████████████ ███████████████████████████████<br><br>███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ |
| 1726. | ███████████████████████ ███████████████████████ ██████████████████ █████████████ ██████████ ████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>███████████████████████████████ ███████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|----------|---------------------|------------------------|
| |  | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ |
| 1727. | ████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | |
| 1728. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████ | As set forth in Response to Pls. Aver. ¶¶ 1721 and 1726, ████████ ████████████████████ |
| 1729. | ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>*See* Response to Pls. Aver. ¶ 1725. |
| 1730. | ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████ | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  ████████████  ████████████ |
| 1731. | However, ████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.  Plaintiffs take excerpts from ████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ██████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ |
| 1732. | The 9/11 Commission concluded that "During the operatives' critical first weeks in San Diego, Mohdar Abdullah helped them. Translating between English and Arabic, he assisted them in obtaining California driver's licenses and with applying to language and flight schools. *See* 9/11 Commission Report at 220. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite a sentence from the 9/11 Commission Report without adequate context. The footnote for this statement does not mention Zeid. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *See* KSA Ex. 163 (9/11 Rep.) 517 n.30. The Commission was not able to interview Zeid, who was in custody at the time. *See* KSA Ex. 163 (9/11 Rep.) 517 n.31. Accordingly, the basis for this assertion was the prior FBI's summaries of Zeid's interviews. As set forth in Response to Pls. Aver. ¶¶ 1721 and 1725, those summaries of Zeid's interviews contain many misstatements and inaccuracies. |
| 1733. | Abdullah visited King Fahd Mosque and knew Thumairy. See 9/11 Commission Report at 217. As detailed below, Abdullah would bring Hazmi and Mihdhar to Los Angeles to meet with Thumairy on June 9, 2000. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs cite the following excerpt from the 9/11 Commission Report, "Thumairy's claim not to know Mohdar Abdullah is belied by Abdullah's contrary assertion[]. On the other hand, Thumairy undoubtedly met with and provided religious counseling to countless individuals during his tenure at the King Fahd mosque." KSA Ex. 163 (9/11 Rep.) 217.<br><br>Al Thumairy testified that he does not "know a man named Mohdar Abdullah." Pls. Ex. 107 (Thumairy Tr.) 339:5-7.<br><br>Zeid did not bring the hijackers to Los Angeles to meet with Al Thumairy on June 9, 2000. As discussed in Response to Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Aver. ¶ 1795 below, they could not have met with Al Thumairy, who was en route to Saudi Arabia at that time. |
| 1734. | Abdullah told the FBI that Thumairy officiated at an Islamic wedding at the King Fahad Mosque held for Abdullah's employer, who owned the San Diego gas station where Hazmi also worked in 2000. Ex. 464, FBI 000172-177 at 176. ■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' Exhibit 464 is inadmissible hearsay. *See* Objections Chart.<br><br>As set forth in Response to Pls. Aver. ¶¶ 1721 and 1725, the FBI summaries of Zeid's interviews contain many inaccuracies.<br><br>■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■<br><br>■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■ |
| XXIII.B. | **Bayoumi worked to assist Hazmi in an effort to obtain a student visa through Mahmoud Firas.** | There is no evidence presented that Al Bayoumi worked to assist Al Hazmi obtain a student visa through anyone, including Mahmoud Firas. Moreover, there was no need for the hijackers to take an English proficiency exam like the TOEFL to obtain a student visa. *See* Pls. Ex. 2P (EO 1238) (Director of Language Instruction Centrum, stating that "the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | process would take 3-4 months. . . [and would require] a bank statement, change of status tourist B-1 visa, a $100 fee to [the lawyer] and $130 fee to the Immigration and Naturalization Service (INS).").<br><br>Al Bayoumi was not involved in the visa extension process at all. Al Hazmi did obtain a regular visa extension, and was assisted by Dr. Shaikh, the long-term and reliable FBI informant. Dr. Shaikh filled out Al Hazmi's visa application. Pls. Ex. 692 (FBI 13591-94) (Al Hazmi's visa application dated July 7, 2000 and prepared by Abdussattar Shaikh). There is no evidence that Al Bayoumi was involved in this process. |
| 1735. | Bayoumi told U.K. investigators that he helped Hazmi and Mihdhar begin English language lessons at a local community college. Ex. 450, MPS389_560-61. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 450 (MPS 365-401) is inadmissible hearsay to the extent it is offered for the truth of the matter asserted. *See* Objections Chart.<br><br>The hearsay excerpt provides that Al Bayoumi only suggested to the hijackers where to take English lessons but did not help them begin their lessons. It states: "[B]ecause I was studying English and the other things, you know. I tried to give them the ideas where . . . to study. . . I remember now they went, I think, to the institute for free. Free -- you know, what do you call it, for community college. Yeah. They went there. . . I think, they went to second day or may in the same day, I'm not sure exactly. But I heard that they went to the . . . community college . . . in Clairemont area." Pls. Ex. 450 (MPS 365-401, Tr. 560:6-561:12). In this excerpt, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Bayoumi only suggested Clairemont Community College to the hijackers but did nothing more to help them enroll in an English language school.<br><br>The summaries of FBI interviews, which Plaintiffs attach as exhibits, indicate that only Ahmad Mustafa, the hijackers' roommate, and Mohdar Abdullah Zeid helped the hijackers by inquiring about the requirements needed for a school. Al Bayoumi was not involved. Ms. Alford, the director of the Language Institute Center, reported that on March 8, 2000, she received a call from "Ahmed," who inquired about an application in the English language program and left his (and the hijackers') residence phone number. In late March, "Nawaf" called her about changing his visa to a student visa. On April 5, 2000, "Mohdar" called and inquired about Nawaf's and Khalid's visa applications and left his (Zeid) residence phone number. Pls. Ex. 2P (EO 1238).<br><br>It is also notable that Al Hazmi and Al Mihdhar went to the Language Institute Center, not the Clairemont Community College, to attempt to enroll in English classes. *Id.* |
| 1736. | Mahmoud Firas operated a fraudulent scheme in which Firas took tests for Saudi nationals attempting to receive "Test of English as a Foreign Language" – "TOEFL" – accreditation. Ex. 687, *U.S. v. Firas*, 2:02-cr-00404-DRD-1 (D.N.J. 2002). Firas entered a guilty plea and was sentenced to 27 months imprisonment. 2:02-cr-00404-DRD-1, ECF No. 36, 37 (D.N.J. 2002); Ex. 336, "Student Visa Fraud Ring Broken by 58 Arrests, Government Says" *New York Times*, May 8, 2002. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibits 687 and 336 are inadmissible hearsay. *See* Objections Chart.<br><br>It is undisputed that Firas entered a guilty plea and was sentenced to 27 months imprisonment. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | https://www.nytimes.com/2002/05/08/national/student-visa-fraud- ring-broken-by-58-arrests-government-says.html. | |
| 1737. | The Bayoumi green folder typed phone list seized by the MPS contained 2 phone numbers for Mahmoud Firas. Bayoumi wrote down in his own handwriting the name "Faris" and the phone numbers ███-8383 and ████████-2222 next to the typed listings under the letter "F". Immediately above the listing, Bayoumi wrote "GMAT" and the name in Arabic "Abu Nasser" as the kunya for Mahmoud Firas. Ex. 12BB, MPS688_7 (reference to "Firas"); Ex. 120, Bayoumi Dep. 92:1-6 (Bayoumi admits his handwriting); | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12BB (MPS 688) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that the typed phone list contained in Plaintiffs Exhibit 12BB (MPS 688) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>It is undisputed that the word "Firas" is in the phonebook. Plaintiffs cite no evidence that "Faris" is Mahmoud Firas or that these numbers belong to Mahmoud Firas. Nor do Plaintiffs cite any evidence that "Abu Nasser" is Mahmoud Firas. |
| 1738. | ████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████████ | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>███████████████████<br><br>███████████████████<br><br>███████████████████<br><br>Al Bayoumi's school records show that he took the GMAT in March 2000, before March 22 as this was the date that supplementary copies of his score were sent to the universities of Surrey and Sheffield Hallam. KSA Ex. 284 (MPS 682, OCR 67). |
| 1739. | Between March 10 and March 15, 2000, ███████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ██ Bayoumi placed 20 calls to the -6662 cell number which (as discussed below) the FBI determined was at the center of the support network for the two hijackers. Ex. 2, EO 2797- 98; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2QQ (EO 2797) is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. <br><br> Plaintiffs' Exhibit 2QQ (EO 2798) states "██████6662 was a cell phone subscribed to Manal A. Bagader, and used by her spouse, hijackers-associate OMAR AL-BAYOUMI, from 11/20/1998 to 03/09/2001, per [redacted] and [redacted] although tolls were only available through 9/20/2000." <br><br> There is nothing in the report remotely suggesting that the FBI had determined that the number was "at the center of the support network for the two hijackers." <br><br> There also is no evidence of any support network for the hijackers as was the consensus conclusions of U.S. Government panels established from 2004 to 2021 to investigate the possibility of witting support for the hijackers. |
| 1740. | On March 15, 2000, Bayoumi made two calls to both of ████ numbers listed in his phone book: Bayoumi called ██████-8383 at 8:48am (1 min.), and Bayoumi called (909) ██-2222 at 8:49am (1 min.). Bayoumi then called Mohdar Abdullah at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 9:08am (1 min.). Ex 517, FBI 3255; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Bayoumi had introduced the hijackers to Abdullah and asked Abdullah to help them. Afterwards, Abdullah was with Hazmi daily. Ex. 89, Gonzalez Decl. ¶ 12-20; Ex. 467, FBI 000208-222 at 209, 211 (May 18-19, 2011 interview of Abdullah). | Plaintiffs Exhibit 12A (Phone calls Nov. 1999 – Mar. 2000) is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446. Pls. Ex. 12A shows the three referenced calls to numbers that Plaintiffs associate – based on hearsay sources – with ▮▮▮ and Abdullah. No subscriber records were produced to verify that any of the three numbers called belonged to ▮▮▮ or Abdullah.<br><br>Plaintiffs Exhibit 89 is inadmissible hearsay to the extent it is offered for its truth. Plaintiffs' Exhibit 467 is inadmissible hearsay. *See* Objections Chart.<br><br>As set forth in Response to Section XXIII.A of Plaintiffs' Averment, Al Bayoumi did not introduce the hijackers to Abdullah (Zeid) and never asked Zeid to assist the hijackers. Nor was Zeid with Hazmi daily.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Nor is there any evidence that these calls had anything do with the hijackers. Even if these calls were to ▮▮▮ as set forth in Response to Pls. Aver. ¶ 1738, Al Bayoumi took the GMAT in March 2000, and the word "GMAT" appears in Pls. Ex. 12BB (MPS 688_7) next ▮▮▮▮▮▮ |
| 1741. | Bayoumi then placed three calls to ▮▮▮ at 9:40am (1 min.), 11:40am (1 min.), and 12:54pm (2 min.). Ex. 517, FBI 003250 at | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 3256; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12A is an improper summary exhibit. *See* Response to Pls. Aver. ¶ 446.<br><br>██████████████████████<br><br>Nor is there any evidence that these calls had anything do with the hijackers. Even if these calls were to ██████ as set forth in Response to Pls. Aver. ¶ 1738, Bayoumi took the GMAT in March 2000, and the word "GMAT" appears in Pls. Ex. 12BB (MPS 688_7) ██████████████ |
| 1742. | On March 15, 2000 at 1:33pm, Nawaf Al Hazmi placed a call to ██████-3640 (2 mins). Ex. 520, FBI 3339. The number ██████-3640 was a TOEFL Testing Center. Ex. 685, TOEFL Informational Bulletin (Educational Testing Service 2001) at 44. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence that Al Hazmi made this call. The call was made from a residential telephone for Parkwood apartment 150, registered to Al Hazmi. However, Ahmad Mustafa was the hijackers' roommate and often used the phone. The call was made to the Sylvan Learning Center in Del Mar, California. This telephone number is also reported as Prometric Testing Center. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | According to FBI reports that Plaintiffs attach as exhibits, the FBI contacted the Prometric headquarters and requested searches of Al Hazmi, Al Bayoumi, and Al Mihdhar. None of these names appear in the Prometric database. Pls. Ex. 2BB (EO 3394-5).<br><br>There is no evidence that the call to the Sylvan Learning Center/Prometric Testing Center was a call inquiring about the TOEFL exam, as the center provided learning opportunities and testing for many subjects. Mustafa's name was not checked, and he was the more likely of the roommates to inquire about professional license examinations, given his future job at Microsoft. The hijackers did not need any English proficiency certification to extend their stay in the United States. In fact, Al Hazmi applied and got his extension without having to pass any English proficiency requirement. Pls. Ex. 692 (FBI 13591-5).<br><br>There is also no evidence that Al Bayoumi was involved at all in Al Hazmi's extension of his visa. The extension form was prepared by Dr. Shaikh, the long-term and reliable FBI informant. Pls. Ex. 692 (FBI 13591-94) (Hazmi visa application dated July 7, 2000 and prepared by Shaikh). |
| 1743. | After Hazmi's call to the TOEFL Testing Center, Bayoumi called ▮▮ 7 additional times on March 15, 2000. Ex. 517, FBI 3256. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence ▮▮▮▮ in Pls. Ex. 12BB (MPS 688_7) is ▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Nor is there any evidence that these calls had anything do with the hijackers. Even if these calls were to ▮ as set forth in Response to Pls. Aver. ¶ 1738, Al Bayoumi took the GMAT in March 2000, and the word "GMAT" appears in Pls. Ex. 12BB (MPS 688_7) ▮▮▮▮▮▮ ▮▮▮▮ |
| 1744. | Hazmi's 6-month visitor visa expired on April 2, 2000, and the length of stay granted by the immigration inspector (which controlled Hazmi's legal status) was set to expire on July 14, 2000. Ex. 30, 9/11 Commission Monograph Terrorist Travel at 10, 12. The timing of the Bayoumi's calls to ▮ when compared to Hazmi's call to the TOEFL center, shows that Bayoumi's calls were likely made to assist Hazmi get the English language certification necessary to obtain a student visa to stay in the U.S. past July 2000. Ex. 5, Youssef Rpt. 211. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.

There is no evidence that Hazmi ever applied for a student visa, or that an English language certification is necessary to obtain a student visa. *See* Pls. Ex. 2P (EO 1238) (exhibit submitted by Plaintiffs; Director of Language Instruction Centrum, stating that "the process would take 3-4 months. . . [and would require] a bank statement, change of status tourist B-1 visa, a $100 fee to [the lawyer] and $130 fee to the Immigration and Naturalization Service (INS).").

There is also no evidence that Al Bayoumi was involved at all in Al Hazmi's extension of his regular visa. The extension form was prepared by Dr. Shaikh, the long-term and reliable FBI informant. Pls. Ex. 692 (FBI 13591-94) (Al Hazmi's visa application dated July 7, 2000 and prepared by Shaikh). Moreover, Al Hazmi applied and got his extension |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | without having to pass any English proficiency requirement. *Id.* at FBI 13591-5. |
| 1745. | Firas submitted a letter in advance of the sentencing hearing which stated that he "agreed to cooperate with the government in this [TOEFL] investigation, and in some farther- reaching aspects of the activities of the Middle Eastern community with which he had contacts at a time when the latter aspect seemed very important in light of the then recent events of September 11, 2001." Ex. 687, *U.S. v. Firas*, 2:02-cr-00404-DRD-1, ECF No. 35 at 1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 687 is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence, and Plaintiffs fail to cite any that ███ had any interaction or dealing with the hijackers. |
| XXIII.C. | **Bayoumi rented a hotel suite in San Diego for a work assignment related to Hazmi and ███** | There is no evidence that Al Bayoumi rented a hotel suite for a work assignment related to Al Hazmi. |
| 1746. | During the peak of Bayoumi's contacts with ███ Bayoumi rented a penthouse suite for six nights at the Residence Inn by Marriott on ███████████████ in San Diego, CA. That hotel was a 3-mile drive from Bayoumi's home at the Parkwood Apartments. The room was rented for one person. The hotel record shows that Bayoumi checked in on the night of Friday, March 10 at 8:28pm, and checked out on the afternoon of Thursday, March 16, 2000 | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 679M (FBI 13495) is inadmissible hearsay. *See* Objections Chart. It is unclear which portions of Plaintiffs Exhibit 323 Plaintiffs rely upon. That exhibit contains multiple discrete documents that Plaintiffs did not cite specifically. Saudi Arabia objects to the extent |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | at 3:21pm. Ex. 679M, FBI 13492-13496 at 13495. The FBI records concerning Bayoumi's hotel room were not produced until March 2023, well after Bayoumi's deposition. Ex. 323, "FBI's Response to March 1, 2023, Letter from Kreindler & Kreindler", Item 7, received May 10, 2023. | these documents are offered for the truth of FBI 13492-493 or any document outside of Exhibit 7.<br><br>As set forth above, there is no evidence ███████████████████████████████████████ Accordingly, Plaintiffs cannot establish that Al Bayoumi made any calls to █████<br><br>There is also no evidence at all that this hotel room from March 10-16, 2000 had anything to do with ████ or with the hijackers, nor do Plaintiffs even make any attempt to explain how it could be related to ████ or the hijackers. |
| 1747. | The room was charged to Bayoumi's American Express credit card ($1,054.20), with his signature on file. Ex. 679M, at FBI 13495. Over the six-day period that the room was rented, the telephone in the hotel suite was used to make a total of eight (8) calls on four separate days. The charges for those calls were paid in cash upon check-out on March 16, 2000. Ex. 679M, at FBI 13496. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 679M (FBI 13496) is inadmissible hearsay. *See* Objections Chart.<br><br>There is also no evidence at all that this hotel room from March 10-16, 2000 had anything to do with ████ or with the hijackers, nor do Plaintiffs even make any attempt to explain how it could be related to ████ or the hijackers. |
| 1748. | Seven of the eight calls were made to ████ ████-4265. Ex. 679M, at FBI 13496. That | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | number was "subscribed to AOL [America Online]" showing that internet was being used. Ex. 2, EO 2755; Ex. 679M, at FBI 13496. The remaining call was made on March 15, 2000 to ▮▮▮▮-6442, a number subscribed to Southwestern Communications, Ex. 2, EO 2755. That call to Southwestern was billed by the hotel as a long-distance call at $4.24. Ex. 679M, at FBI 13496. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 679M (FBI 13496) and Plaintiffs Exhibit 2OO (EO 2755) are inadmissible hearsay. *See* Objections Chart.<br><br>There is also no evidence that this hotel room from March 10-16, 2000 had anything to do with ▮▮▮ or with the hijackers, nor do Plaintiffs even make any attempt to explain how it could be related to ▮▮▮ or the hijackers. |
| 1749. | The circumstances show that Bayoumi used the hotel suite for some operational purpose related to Hazmi and ▮▮▮ and that ▮▮▮ was likely visiting San Diego and stayed in the room. The Southwestern Communications number dialed from the hotel room was dialed again by Bayoumi on March 17, 2000, the day after he checked out of the room, shortly after Hazmi called Bayoumi on his cell. Ex. 2, EO 2755. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no evidence at all that this hotel room from March 10-16, 2000 had anything to do with ▮▮▮ or with the hijackers, nor do Plaintiffs even make any attempt to explain how it could be related to ▮▮▮ or the hijackers.<br><br>There is also no evidence that Firas was visiting San Diego at the time. |
| XXIII.D. | **Hazmi called Bayoumi's cell phone on March 17, 2000** | There is no evidence that it was Al Hazmi who called Al Bayoumi's cell phone on March 17, 2000. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1750. | On Thursday, March 17, 2000, Nawaf Al Hazmi used his home number at the Parkwood Apartments # 150 to call Bayoumi on his cell phone at 1:47pm (1 min.). Ex. 2, EO 2755. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' Exhibit 2OO (EO 2755) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited hearsay exhibit states: "On March 17, 2000, at 13:47, Al-Bayoumi's cellular telephone . . . received a one minute call from . . . home telephone number of Nawaf Al-Hazmi, Khalid Al-Mihdhar and Ahmed Mustafa." Pls. Ex. 2OO (EO 2755). Any of the three residents of that apartment could have made that call. In fact, it seems that for the month of March 2000, Mustafa was making most of the calls from this telephone, calling Microsoft in Washington state, a relative in Riyadh, and relatives in the United States. Pls. Ex. 520 (FBI 3331-44); Pls. Ex. 12A.<br><br>This is the only call that the phone in the hijacker's apartment ever made to Al Bayoumi's cell phone, which is further proof that Al Bayoumi was not part of any support network for the hijackers. |
| 1751. | Shortly after receiving that call from Hazmi, Bayoumi made a call on his cell phone at 1:57pm (1 min.) to the same ██ ██-6442 number for Southwestern Communications that had been called from the Residence Inn hotel suite two days earlier. Ex. 2, EO 2755; Ex. 518, FBI 3257. This evidences that Bayoumi likely made | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | both calls and that the calls had something to do with arrangements that Bayoumi was making for Hazmi. | Plaintiffs Exhibit 2OO (EO 2755) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence of what "Southwestern Communications" is or why these calls were placed. Plaintiffs cite no evidence that these calls had anything to do with Al Hazmi or Al Mihdhar. |
| **XXIII.E.** | **Bayoumi's operational -6662 cell phone was used to support the hijackers while Bayoumi was in Saudi Arabia.** | There is no evidence that the 6662 cell phone, which was registered to Al Bayoumi's wife, was used to support the hijackers while Al Bayoumi was in Saudi Arabia. |
| 1752. | The 9/11 Commission concluded that Bayoumi allowed the hijackers to make and receive calls on his cell phone for some period. *See* 9/11 Commission Report at 219 & 516 n. 26. | The 9/11 Commission Report refers only to the use of Al Bayoumi's cell phone (-7623) to call George Harb, Hashim Al Attas' landlord. Al Attas was leaving to go back home to Saudi Arabia and the hijackers explored the possibility of picking up his lease. The Commission stated, "Bayoumi apparently loaned them his cell phone to help them check out possibilities for new accommodations." KSA Ex. 163 (9/11 Rep.) 219. Contrary to Plaintiffs' claim that this was a 9/11 Commission "conclu[sion]," the word "apparently" in the sentence denotes uncertainty.<br><br>When asked at his deposition as to whether he let the hijackers use his cell phone, Al Bayoumi testified "I don't think so. But I don't remember." Pls. Ex. 120 (Bayoumi Tr.) 467:16-19. |
| 1753. | Bayoumi traveled to Saudi Arabia on March 31, 2000 for two months but made arrangements for Aulaqi, Thumairy, and other members of the support network to watch over Hazmi and Mihdhar while he was away. The circumstances show that Bayoumi gave his "operational phone" | Plaintiffs Exhibit 2OO (EO 2759) and Plaintiffs Exhibit 2QQ (EO 2798) are inadmissible hearsay. *See* Objections Chart.<br><br>Al Bayoumi traveled to Saudi Arabia on March 30, 2000. There is no evidence, and Plaintiffs fail to cite any, that he made any arrangements with anyone, including Al Awlaki, Al Thumairy, or others, to watch over the hijackers. There is no evidence of any witting support network for the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | █████-6662) to Hazmi or Mihdhar so that they could be in touch with other members of the support network in Bayoumi's absence. Ex. 2, EO 2759, 2798. | hijackers, as every authoritative government investigation has concluded. Nor is there any evidence that Al Bayoumi gave his wife's cell phone 6662 to the hijackers.<br><br>Plaintiffs Exhibit 2OO (EO 2759) states: "A cellular telephone number subscribed to Al-Bayoumi and believed to be used by his wife Manal (see above under historical review), █████-6662, made five calls to telephone number█████-1917 (Aulaqi's home telephone number). The calls were made on November 20, 1998; February 26, 1999; May 7, 1999; October 3, 1999; and April 19, 2000. Travel records and interview reports show that Al-Bayoumi was in Saudi Arabia on April 19, 2000."<br><br>The historical section of this document lists telephones associated with Al Bayoumi, "Airtouch cellular telephone number █████-6662, tolls received November 20, 1998 through September 20, 2000, subscribed to Omar Al-Bayoumi, C/O Manal Bagader, ██████████████, San Diego, California. From Al-Bayoumi's records found at the Kurdish Community Islamic Center (KCIC), █████-6662 is referred as Manal's phone number." The next paragraph in the document states, "Pacific Bell Wireless telephone number █████-0429, tolls received September 1, 2000, through July 28, 2001, subscribed to Manal Bagader." Pls. Ex. 2OO (EO 2749).<br><br>Thus, this document shows that Manal Bagader subscribed to the 6662 phone and was believed to have used it until about September 2000, when she switched companies (from Airtouch Cellular to Pacific Bell Wireless) and started using the number █████-0429. There is no hint that Al Bayoumi gave the 6662 phone to the hijackers.<br><br>Plaintiffs Exhibit 2QQ (EO 2798) states "[Investigators] requested that the author provide . . . target-to-target phone analysis . . . for the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Yemeni/Saudi support cell in San Diego, with particular emphasis on phone connectivity involving the number ██████-6662. ██████-6662 was a cell phone subscribed to Manal A. Bagader, and used by her spouse, hijackers-associated Omar al-Bayoumi, from 11/20/1998 to 03/09/2001, per [redacted] and [redacted] although tolls were only available through 9/20/2000. ANALYST NOTE: The cessation of activity on this phone in late September coincides with Al-Bayoumi's travel to the U.K. shortly thereafter, on 10/8/2000; he did not return to the U.S. until 11/30/2000. This number was subsequently assigned to . . . with an activation date of 6/23/2002."<br><br>There is no hint in this document that Al Bayoumi gave the 6662 telephone to the hijackers or that they used the 6662 telephone at all. The assertion that there is a "cessation of activity on this phone in late September [2000]" is explained in Pls. Ex. 2OO (EO 2749). In September 2000, Al Bayoumi's wife got a new cell phone number ██████-0429. *See also* Pls Ex. 12AA (MPS 738_29); Pls. Ex. 534 (FBI 4380) (post-October 4, 2000 phone book listing this as Al Bayoumi's wife's cell phone number). |
| 1754. | The FBI concluded that "phone connectivity involving the number ██████-6662" ("-6662") warranted "particular emphasis" in its analysis of the connections between subjects who provided support to Hazmi and Mihdhar from February to December 2000 and referred to this facet of the Saudi government support network for the hijackers as "the Yemeni- Saudi support cell in San Diego." Ex. 2, EO 2798. The principal "hijackers-associate" on whom the | Plaintiffs Exhibit 2QQ (EO 2798) is inadmissible hearsay. *See* Objections Chart.<br><br>This is a gross distortion of Plaintiffs Exhibit 2QQ (EO 2798). The relevant language is set forth in Response to Pls. Aver. ¶ 1753. The FBI did not make any conclusions in this document and there is no reference to anyone providing the 6662 phone to the hijackers.<br><br>As set forth in Response to Pls. Aver. ¶ 1753, activity on the 6662 number ceased in September 2000 because Al Bayoumi's wife got a new cell phone number ██████-0429. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | FBI focused was Omar Al-Bayoumi, as the FBI's detailed "analy[sis] for interconnectivity" – including a 42-page spreadsheet, and findings displayed in tabular and link chart formats – found that the -6662 number was "used by" Bayoumi for a period of at least two years, beginning November 20, 1998. Ex. 2, EO 2798. The FBI noted that activity on the -6662 number ceased when Bayoumi travelled to the U.K. in the fall of 2000. Ex. 2, EO 2798. | There is no evidence of witting support for the hijackers (including by any so-called "Yemeni-Saudi" cell), as concluded by all the government investigations from 2004 to 2021 that investigated this issue of potential support for the hijackers.<br><br>The 9/11 Commission concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218. The 9/11 Review Commission examined all new materials discovered in the decade after the 9/11 Commission Report, and concluded, "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex 164 (*The FBI: Protecting the Homeland in the 21st Century*, at 103). Finally, the authoritative FBI closing of Operation Encore EC states, "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 11). |
| 1755. | The Yemeni connection in the FBI-reported "Yemeni-Saudi support cell" was principally to and through Bayoumi's close associate Anwar Al-Aulaqi. Bayoumi introduced to Hazmi and Mihdhar to Aulaqi upon their arrival and he became a "'spiritual advisor' to the terrorists in San Diego." Ex. 2, EO2802; Ex. 91, Ratchford Decl. ¶¶ 6, 8. The FBI found that the -6662 number "made five calls to telephone | Plaintiffs Exhibit 2QQ (EO 2802) and Plaintiffs' Exhibit 2OO (EO 2759) are inadmissible hearsay.<br><br>As shown in the Response to Pls. Aver. ¶ 1753, the expression "Yemeni-Saudi support cell" was part of a request to find evidence for a working hypothesis, and not a conclusion. Pls. Ex. 2QQ (EO 2798). There is no evidence of witting support for the hijackers (including by any so-called "Yemeni-Saudi" cell), as concluded by all the government investigations from 2004 to 2021 that investigated this issue of potential support for the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | number ▓▓▓▓-1917 (Aulaqi's home telephone number). The calls were made on November 20, 1998; February 26, 1999; May 7, 1999; October 3, 1999; and April 19, 2000." Ex. 2, EO 2759. | As set forth in Response to Pls. Aver. ¶ 1718, there is no evidence that Al Bayoumi introduced Al Hazmi and Al Mihdhar to Al Awlaki.<br><br>There is also no evidence that Al Awlaki was the "spiritual adviser" of the hijackers in San Diego. While Al Awlaki was in the United States, he was still a moderate. Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being paid by Plaintiffs, that Al Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (*Incitement: Anwar al-Awlaki's Western Jihad*) at 24-25.<br><br>After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to the New York Times and Washington Times, and privately in an email to his younger brother describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 319:19-320:19.<br><br>In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY Rep.) 177.<br><br>Al Bayoumi knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. Pls. Ex. 120 (Bayoumi Tr.) |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him"); *id.* at 589:9-16 (Al Bayoumi "reached out" to Al Awlaki "on occasion").<br><br>Al Bayoumi did not ask or direct Al Awlaki to help Al Hazmi, Al Mihdhar, or any of the other 9/11 hijackers. *Id.* at 724:2-6 (testifying that he never instructed anybody to assist any of the 9/11 hijackers).<br><br>Plaintiffs Exhibit 2OO (EO 2759) indicates that "[a] cellular telephone number subscribed to Al-Bayoumi and believed to be used by his wife Manal . . . made five calls to . . . Aulaqi's home telephone number." There is no indication whether these calls were made to Al Awlaki, or his wife Gihan Mohsen Baker. |
| 1756. | The dates of the calls from the -6662 number to Aulaqi are significant and demonstrate that the number was used as an operational phone at the center of the Saudi government support network for Hazmi and Mihdhar. Ex. 2, EO 2798. The first call to Aulaqi, November 20, 1998, was on the same day that Bayoumi activated the number. FBI investigation found that while the number was "subscribed to" Bayoumi's wife, Manal Bagader, it was being "used by" Bayoumi. Ex. 2, EO 2798. That first call to Aulaqi was just a few weeks before | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2OO (EO 2759) is inadmissible hearsay. *See* Objections Chart.<br><br>As set forth above in Response to Pls. Aver. ¶1753, the 6662 number was registered to Al Bayoumi's wife. There is no evidence that it was being used by Al Bayoumi. There is also no indication whether the calls made |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the visit to San Diego of the advance team of MOIA propagators, Sadhan and Sudairy. | to Al Awlaki's home number were made to Al Awlaki, as opposed to his wife Gihan Mohsen Baker.<br><br>There is no evidence that any of the referenced calls related to Sadhan and Sudairy. As set forth in Response to Pls. Aver. Section XIV, Sadhan and Sudairy were not an advance team. |
| 1757. | The fifth and final -6662 call to Aulaqi, was on April 19, 2000, the day of two important milestones in the advancement of the 9/11 plot, namely: (1) Hazmi received his California Drivers' License from the DMV in San Diego, Ex. 679N, FBI 13538-13551, at FBI 13548 (listing "APP DATE" as 04/19/2000); Ex. 553, FBI 8202 (Hazmi License showing Issue Date of 04/19/2000); and (2) Hazmi received a $5,000 USD wire transfer from Al-Qaeda, via the bank account of Bayoumi's associate ███ ███████ (who attended the February 2000 welcome party hosted by Bayoumi). Ex. 2, EO 2798; Ex. 679O, FBI 13582-13588, at FBI 13583 (Hazmi was "alongside ███ at the bank counter when the money was withdrawn"); Ex. 679O, at FBI 13588 (████ Union Bank Statement showing 04/19 Withdrawal # ████ in the amount of $4,980.50 USD, the identical amount having been received by wire the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2QQ (EO 2798), Plaintiffs Exhibit 2OO (EO 2759) and Plaintiffs Exhibit 679O (FBI 13582-88) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence connecting (1) a call from Al Bayoumi's wife to Al Awlaki's home line and (2) Hazmi's receipt of a driver's license or his receipt of a wire transfer. Nor is there any evidence that Al Bayoumi or Al Awlaki had any involvement in Al Hazmi obtaining his driver's license or in Hazmi receiving a wire transfer.<br><br>The February 2000 party was not a welcome party for the hijackers. Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madina Mosque during Ramadan. Pls. Ex. 120 (Bayoumi Tr.) 460:12-461:7; 714:24-715:18; *see also* KSA Ex. 92 (FBI 4014-18) at 4017 (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | previous day); Ex. 2, EO 2759 (call to Aulaqi). | to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). |
| 1758. | The FBI noted that "Travel records and interview reports show that Al-Bayoumi was in Saudi Arabia on April 19, 2000," Ex. 2, EO 2759, so it was not Bayoumi who placed the April 19, 2000 call to Aulaqi. The April 19 call to Aulaqi shows that Bayoumi gave his -6662 phone to Hazmi or Mihdhar so that they could be in touch with other members of the support network, including Aulaqi, in Bayoumi's absence. It is significant that upon Bayoumi's return from Saudi Arabia on May 31, 2000 (arriving in San Diego on BA2289 at 4.55pm, Ex. 678BB, MPS783_3), the first call Bayoumi made from his cellphone was to the -6662 number. FBI3269 (call at 6.38pm from Bayoumi's cellphone ██ ██-7623 to the 6662 number). Wednesday, May 31, 2000, was the last day of the hijackers' lease at the Parkwood Apartments, and the same day they moved into Dr. Abdussattar Shaikh's boarding house in Lemon Grove, CA that Bayoumi had arranged for them. Ex. 155, FBI Hijackers' Timeline at 66; Ex. 91, Ratchford Decl. ¶ 19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' Exhibit 2OO (EO 2759) and Plaintiffs' Exhibit 155 are inadmissible hearsay. *See* Objections Chart.<br><br>As detailed above in Response to Plaintiffs' Aver. ¶ 1753, the ██ number was registered and used by Al Bayoumi's wife. *See* Pls. Ex. 2OO (EO 2749) ("Airtouch cellular telephone number ██████, tolls received November 20, 1998, through September 20, 2000, subscribed to Omar Al-Bayoumi, C/O Manal Bagader. . . From Al Bayoumi's records found at the Kurdish Community Islamic Center (KCIC), ██████ is referred as Manal's phone number."); Pls. Ex. 2OO (EO 2759) ("A cellular telephone number subscribed to Al-Bayoumi and believed to be used by his wife Manal…").<br><br>It is undisputed that Al Bayoumi was in Saudi Arabia on April 19. There is no evidence that Al Bayoumi gave the ██ phone to the hijackers. Indeed, telephone service was installed on March 4, 2000, in the hijackers' apartment. Pls. Ex. 520 (FBI 3335). The hijackers therefore had access to a phone and there would be no reason for Al Bayoumi to give them a cell phone. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The April 19 call was made from the ▮ number to Al Awlaki's home number. There is no indication whether these calls were made to Awlaki, as opposed to his wife Gihan Mohsen Baker.<br><br>Upon Al Bayoumi's return to the United States, the first call he made was to the ▮ number, which is his wife's cell phone. It makes perfect sense that this would be Al Bayoumi's first call. When Al Bayoumi flew for Saudi Arabia, one of the last calls he made on March 30, 2000, at 7:10 PM was also to his wife's cell phone ▮ Pls. Ex. 517 (FBI 3262).<br><br>There is no evidence that Al Bayoumi arranged for them to move to long-term FBI informant Abdussattar Shaikh's house. |
| 1759. | There was significant telephone contact between Aulaqi and Fahad Al-Thumairy following the April 19, 2000 call Aulaqi received from the -6662 number likely used by Hazmi and Mihdhar and the FBI reported in 2005 that: "Telephone ▮ 0638, subscribed to by AL-THUMAIRY at 4133 Huron Ave, Culver City, CA, received five calls from ANWAR NASSER AULAQI's San Diego telephone ▮-1917 between 12/18/1999 and 04/25/2000." Ex. 2, EO 2802. This means that FBI identified a call from Aulaqi to Thumairy on April 25, 2000. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2QQ (EO 2802) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that Manal Bagader ever gave her cell phone 6662 to the hijackers, as shown in Response to Pls' Aver. ¶¶ 1752-8 above.<br><br>The hearsay exhibit cited by Plaintiffs reports a total of five calls during a five-month period. There is no evidence that any of these small number of calls between two Salafi Imams had anything to do with the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1760. | The April 25, 2000 call from Aulaqi to Thumairy is consistent with the call in the phone records produced by the FBI of a call from Thumairy to Aulaqi on April 25, 2000 at 11:16pm (11 mins.) Ex. 479, FBI 000591-000601 at 0597; Ex. 12J (Thumairy-Bayoumi calls to Aulaqi). Aulaqi was likely reporting to Thumairy about Hazmi and Mihdhar's activities based on the April 19, 2000 call that Aulaqi received from them on the -6662 number, and the events involving Hazmi on that date. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

Plaintiffs Exhibit 12J is an improper summary exhibit.

Plaintiffs Exhibit 12J misattributes to Al Thumairy two calls made in January 2000 from the number ███████-3362.  The subscriber records for this number list the subscriber as Al Muhanna from July 31, 1997 through February 27, 2000, and as ███████████ from June 10, 2000 through April 29, 2002.  *See* KSA Ex. 168, at 1-2.  In addition, Al Thumairy testified that he was not familiar with the -3362 number.  *See* Pls. Ex. 107 (Thumairy Tr.) 316:3-7, 497:14-499:9.

Plaintiffs Exhibit 12J misattributes to Al Bayoumi five calls from 1998-2000 from the number ███████-6662.  Plaintiffs concede that number was "subscribed to by his wife," Manal Bagadar.  *See* Averment ¶ 756; *see also* Pls. Ex. 2QQ (EO 2798).  There is no admissible evidence that Al Bayoumi made any phone calls using his wife's cell phone, much less any specific calls such as those highlighted in Pls. Ex. 12J.

Plaintiffs Exhibit 12J misattributes to Al Bayoumi three calls that were made from a publicly-available phone line at the Al Madina Mosque.  The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi -- rather than anyone else at the Mosque -- that made those specific calls.  *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7; 786:8-15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Plaintiffs Exhibit 12J also misattributes to Al Awlaki eight calls to numbers Plaintiffs associate with the Al Ribat Mosque – where Al Awlaki was the Imam – based upon several hearsay sources. There is no evidence that the recipient of those calls was Al Awlaki as Plaintiffs assert rather than anyone else at the Mosque.<br><br>There is also no admissible evidence that 10 of the calls referenced above even transpired. *See* Pls. Ex. 12J (10 calls citing EO 2759, EO 2760, and EO 608 UPDATED MDL in the REF 1 column). None of the telephone records produced in this case show any of the 10 calls. Instead, Plaintiffs rely solely upon inadmissible hearsay contained in two FBI summary memoranda.<br><br>After removing the improper calls, Plaintiffs Exhibit 12J shows a total of five calls from Al Thumairy and four calls from Al Bayoumi to ▮▮▮▮▮ 1917, a number that Plaintiffs associate with Al Awlaki. This includes a call from Al Thumairy to that number on April 25, 2000 at 11:16 pm. However, Plaintiffs rely solely on hearsay sources as evidence that this number was associated with Al Awlaki. No subscriber records were produced to verify that the number belonged to Al Awlaki.<br><br>There is no evidence that Manal Bagader ever gave her cell phone 6662 to the hijackers, as shown in the Responses to Plaintiffs' Aver. ¶¶ 1752-8 above. There is also no evidence that Al Hazmi and Al Mihdhar made the April 19, 2000 call to Al Awlaki's home number. *See* Response to Pls. Aver. ¶ 1758.<br><br>Plaintiffs' assertion that the April 25, 2000 call from Al Awlaki to Al Thumairy was reporting "about Hazmi and Mihdhar's activities based on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the April 19, 2000 call that Aulaqi received from them on the -6662 number" consists of several levels of baseless speculation. |
| 1761. | Two other known calls from the -6662 number (among very few for which we have records) were calls made to the payphone (" █████ 9563") opposite the Parkwood Apartments at the Alta Dena Dairy store. The FBI described that payphone as "a phone the hijackers are believed to have used to call █████ █████ … on 02/07/00 [*i.e.* a few days after the hijackers moved into the Parkwood Apartments]." Ex. 2, EO 0606. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2JJ (EO 606) is inadmissible hearsay. *See* Objections Chart.

The hearsay document cited by Plaintiff reinforce that Manal Bagader used the 6662 telephone: "Interestingly, on 10/08/1999 at 12:57:00 PDT, █████-6662 (Al Bayoumi cell – wife) called █████-9563 Alta Dena Drive-in Dairy…" Pls. Ex. 2JJ (EO 606). This call to the nearest grocery store was well before the hijackers arrived in the United States.

There is no evidence that any of the calls made by Al Bayoumi's wife from the 6662 number had anything to do with the hijackers. |
| 1762. | On October 9, 1999, the -6662 number called Alta Dena payphone "about two hours after the ALTHUMAIRY call [to an unidentified number in the UK]." Ex. 2, EO 0606. The FBI highlighted the unidentified UK number █████ 1899 in its analysis because Thumairy made four calls to that number on December 5, 1999 – and it was at the start of the intense period of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2JJ (EO 606) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | phone contact among Thumairy, Bayoumi, ██████ Aulaqi, and the Saudi Embassy prior to the arrival of Hazmi and Mihdhar in Los Angeles. Ex. 2, EO 0606-0610. | Plaintiffs speculate that there is a relationship between a housewife's call to her nearest grocery store and a call from an imam of a mosque in Los Angeles, about 130 miles away, to an unidentified British phone number. This is the height of baseless speculation. There is no evidence that Manal Bagader's call to the grocery store was in any way related to Al Thumairy's call to the United Kingdom.<br><br>The calls between Al Thumairy, Al Bayoumi, and Al Awlaki are addressed in the Response to Pls. Aver. Sections XVIII.F and XIX.A, and deal with the visiting Ramadan preachers. There is no evidence that Ismail Mana or the Saudi Embassy was involved in these calls. Nor is there any evidence that any of these calls had anything to do with the hijackers. |
| 1763. | On March 14, 2000 there was another "call from 6662 to 9563 [Alta Dena Drive- in Dairy]…duration 1 minute." Ex. 2, EO 0606. This call fell in the middle of a ten-day period, March 10 through March 20, 2000, in which Bayoumi made 28 separate calls to the -6662 number and rented a room at the Marriott Residence Inn in San Diego. The calls and the hotel room rental are linked to Bayoumi's support to the hijackers, as, among other reasons, Bayoumi received a call from Hazmi on March 17, 2000. Ex. 2, EO2755. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2JJ (EO 606) and Plaintiffs Exhibit 2OO (EO 2755) are inadmissible hearsay. *See* Objections Chart.<br><br>As detailed above, the 6662 number was registered to and used by Al Bayoumi's wife. There is nothing unusual about Al Bayoumi calling his wife's cell phone number.<br><br>There is no evidence linking the room at the Marriot Residence Inn to the hijackers, as set forth in the Responses to Pls. Aver. ¶¶ 1746-49. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, as discussed in Response to Pls. Aver. ¶ 1750, there is no evidence of who placed the call to Al Bayoumi's cell phone from the hijackers' apartment (whether it was Mustafa or one of the hijackers).<br><br>However, the fact that there is only one potential call from the hijackers to Al Bayoumi in the entire discovery record is strong evidence that Al Bayoumi was not part of any support network assisting the hijackers. |
| 1764. | Bayoumi's listing for his wife Manal, from the October 4, 2000 version of the typed phone list he kept in his Mosque office, contains the following listing: "Manal ██ ██ - 0429." Ex. 534, FBI 4380. The -0429 cell number listed in that document, and not the -6662 number, was recorded by Bayoumi as the number for his wife in Bayoumi's handwritten address book. Ex. 12AA, MPS738_29R. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 534 (FBI 4380) and Plaintiffs Exhibit 12AA (MPS 738) are inadmissible hearsay.<br><br>As set forth in Response to Pls. Aver. ¶ 1753, in September 2000, Al Bayoumi's wife got a new cell phone number ██ ██ -0429. *See* Pls. Ex.2OO (EO 2749).<br><br>There is no record evidence regarding the creation and maintenance of Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. There is no evidence that the typed phone list contained in Exhibit 534 (FBI 4380) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>The listing for Al Bayoumi's wife in both the handwritten phone book and the typed phone list are after she received the new cell phone. *See* Pls. Ex. 12AA (MPS 738_29); Pls. Ex. 534 (FBI 4380) (post-October 4, 2000 phone book listing this as Al Bayoumi's wife's cell phone number). |
| 1765. | The FBI originally assigned the -6662 number to "Manal" – Bayoumi's wife – in an October 2001 review of various documents seized during its search of Bayoumi's Mosque office. Ex. 2, EO 2113-2115. However, no item of evidence shows that Bayoumi recorded - 6662 as his wife's phone number, and nowhere else in the production in this litigation has that attribution been made by any other party. The production range FBI 4113-4637 contains the FBI's "'1B' Evidence Items Seized During the Execution of a Search Warrant on Bayoumi's Office at the Masjid at Madina Kurdish Mosque in El Cajon, California." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>As detailed above in Response to Pls. Aver. ¶ 1753, the 6662 number was registered and used by Al Bayoumi's wife. *See* Pls. Ex. 2OO (EO 2749) ("Airtouch cellular telephone number ▮▮▮-6662, tolls received November 20, 1998, through September 20, 2000, subscribed to Omar Al-Bayoumi, C/O Manal Bagader . . . From Al-Bayoumi's records found at the Kurdish Community Islamic Center (KCIC), ▮▮▮-6662 is referred as Manal's phone number."); Ex. 2OO (EO 2759) ("A cellular telephone number subscribed to Al-Bayoumi and believed to be used by his wife Manal . . .").<br><br>As set forth in Response to Pls. Aver. ¶ 1753, in September 2000, Al Bayoumi's wife got a new cell phone number ▮▮-0429. *See* Pls. Ex. 2OO (EO 2749). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The phone books listing this new number are after she received this new cell phone. *See* Pls. Ex. 12AA (MPS 738_29); Pls. Ex. 534 (FBI 4380) (post-October 4, 2000 phone book listing this as Al Bayoumi's wife's cell phone number). |
| 1766. | Nowhere in the production in this litigation did Bayoumi include his -6662 number on a note or list. This demonstrates that the -6662 number was part of Bayoumi's tradecraft to establish an operational phone for Al-Qaeda's operatives inside the United States. The number is like the cell phone numbers that Faisal Al Muhanna and Saleh Al Hatlani procured for Thumairy. Thumairy used his cell phones to place numerous calls to other numbers subscribed to by Faisal Al Muhanna and Saleh Al Haatlani that were likely being used by other Saudi government officials working in California. Ex. 5, Youssef Rpt. 124-25. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Plaintiffs' assertion that Al Bayoumi would register a phone used for clandestine activity under his wife's name is ridiculous on its face, as every call made by that phone could easily be traced directly back to him.<br><br>Moreover, as set forth in Response to Pls. Aver. ¶ 730, Plaintiffs' assertion that Al Thumairy used cell phones registered to other individuals, such as Saleh Hatlani to hide his relationship with Al Bayoumi is equally baseless. During the relevant period, Al Thumairy and Al Bayoumi made numerous calls to each other from phones registered in their name. *See* Response to Pls. Aver. ¶ 735. As Sageman explains, Sageman, "this refutes the hypothesis that the two men tried to keep their relationship clandestine, let alone that they were trying to use a "front man" to make it covert . . .Youssef's hypothesis is only plausible if he ignores half of the data in the plaintiffs' own exhibit." KSA Ex. 167 (Sageman Rep.) 628-29. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, the 0777 number that Plaintiffs claim was a covert number used by Al Thumairy and originally registered to Al Hatlani, was in fact later registered to Al Thumairy from April 22, 2002 through February 5, 2003. *See* KSA Ex. 168, at 3-5. It would make no sense for Al Thumairy to later register a covert number in his own name. |
| **XXIII.F.** | **Bayoumi returned to San Diego before Hazmi and Mihdhar moved to Dr. Shaikh's rooming house.** | The paragraphs in this section do not even mention the hijackers. The evidence shows that Al Bayoumi arrived after the hijackers had moved to Dr. Shaikh's residence. |
| 1767. | The MPS found in Bayoumi's possession a copy of his airplane ticket for his return trip to San Diego. Bayoumi transited through London's Heathrow and Gatwick Airports on his way to San Diego but did not stay for a month in England, as Bayoumi testified. Ex. 2, EO 2411-12 (showing that Bayoumi returned to the U.S. on May 31, 2000 via British Airways flight 2289 from London/Gatwick to Phoenix). The ticket shows that Bayoumi returned to the U.S. from Saudi Arabia on May 31, 2000 with his final flight into San Diego scheduled to arrive at 4:55pm. Ex. 678BB, MPS783_3; Ex. 678CC, MPS797_1. | There is no copy of Al Bayoumi's plane ticket in the cited material or in the evidence in general. There is an unauthenticated copy of the reservations he made on British Airways to return from Jeddah to San Diego via London on May 31, 2000.<br><br>Plaintiffs Exhibit 678CC, MPS 797_1, is inadmissible hearsay. *See* Objections Chart.<br>Al Bayoumi's flight, BA 2289, was scheduled to land in San Diego at 4:55 PM. Pls. Ex. 678BB (MPS 783_3). This flight first landed at Sky Harbor International, Phoenix, where Al Bayoumi passed through U.S. immigration. Pls. Ex. 2V (EO 2410-1), Pls. Ex. 2GG (EO 3913). |
| 1768. | The phone records show that immediately upon his arrival back in the U.S., Bayoumi placed a call to the -6662 cell number on May 31, 2000 at 6:38pm (1 min.), as well as the following evening, June 1 at 9:33pm (1 | The assertions in this paragraph are false. As set forth in Response to Pls. Aver. ¶ 1758, upon Al Bayoumi's return to the United States, the first call he made was to the 6662 number, which is his wife's cell phone. It makes perfect sense that this would be Al Bayoumi's first call. When Al Bayoumi flew to Saudi Arabia, one of the last calls he made on March 30, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | min.). Ex. 519, FBI 03264-3271 at 3269. This was the operational phone that Bayoumi used for his support of the two hijackers. *See supra*. 1753. | 2000, at 7:10 PM was to his wife's cell phone 6662. Pls. Ex. 518 (FBI 3262).<br><br>There is no evidence that the 6662 number was an "operational phone" used for covert activity, given that it was registered in Al Bayoumi's wife's name. *See* Response to Pls. Aver. ¶ 1766.<br><br>By the time Al Bayoumi landed, the hijackers had moved out of the Parkwood apartments. *See* Response to Pls. Aver. ¶ 1108; *see also* Pls. Ex. 131 (OIG Rep.) at 256 (dating the hijackers' move to Shaikh's house to "late May 2000"). Even if the hijackers had moved on May 31, 2000, the lateness of the call, 6:38 PM, when Al Bayoumi was likely at the airport, suggests that the hijackers had already moved before Al Bayoumi returned. KSA Ex. (FBI 3269), Pls. Ex. 519 (FBI 3264-66), KSA Ex. 226 (FBI 3267-71). |
| 1769. | At his deposition, Bayoumi under a leading examination by Saudi Arabia's counsel, denied that he returned to San Diego and gave false testimony that he was in the United Kingdom and did not return to San Diego until July 2000. Ex. 120, Bayoumi Dep. 746:5-751:21. Saudi Arabia's counsel stated that Bayoumi's passport "says there's an entry into the United States of July 1, 2000" and had Bayoumi agree that he stayed "in the United Kingdom from May 31, 2000 until approximately July 1, 2000…." Ex. 120, Bayoumi Dep. 751:8-21. | Al Bayoumi was testifying about events that occurred more than 20 years ago. At his deposition, he was shown entry/exit records showing that he left Saudi Arabia for the United Kingdom on May 31, 2000. *See* Pls. Ex. 402, (KSA 6464). He was further shown his passport, which has an entry stamp to the United States that appears to state "July X1, 2000." KSA Ex.42 (KSA 8001).<br><br>Al Bayoumi testified that "I don't remember exactly. But it shows in my passports when I went to England and when I went to America. It shows exactly in the passport, the entrance . . . If you give me an exact date, I can verify against the passport and give you an exact answer." Pls. Ex. 120 (Bayoumi Tr.) 821:5-19.<br><br>This is the way that memory works. As Sageman, an expert psychiatrist, has explained, memory "is a narrative reconstruction of past events as new |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | details come to mind." KSA Ex. 167 (Sageman Rep.), at 7. It is not surprising that Al Bayoumi recalled a stay in the United Kingdom 20 years ago, when shown documentary evidence indicating that this was the case, especially given that is undisputed that he spent substantial time in the United Kingdom during that general time period. |
| 1770. | Bayoumi claimed that he spent over a month in the United Kingdom from May 31 until July 2000. When asked by Saudi counsel, "[W]hat were you doing in the United Kingdom during this time period?" Bayoumi replied: "I was preparing for starting my doctorate degree project." Ex. 120, Bayoumi Dep. 751:17-752:2. | *See* Response to Pls. Aver. ¶ 1769. |
| 1771. | Bayoumi later confirmed that he stayed in England for that month, and further testified "I lived at a dormitory, at the students' housing" which he said was located at "Aston University," which was in Birmingham, England. Ex. 120, Bayoumi Dep. 809:16-21, 811:24- 812:8. Bayoumi claimed that "I had a course – or not a course, something similar, called a prerequisite to prepare for the Ph.D." Ex. 120, Bayoumi Dep. 811:16-23. | *See* Response to Pls. Aver. ¶ 1769. |
| 1772. | While Bayoumi initially testified that the U.S. arrival stamp in his passport showed that he returned in July 2000, when later shown the document on cross-examination he admitted that the stamp was illegible. | *See* Response to Pls. Aver. ¶ 1769. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 120, Bayoumi Dep. 751:8-15 (statement by Saudi counsel Shen claiming the stamp read July 2000), 811:6-15 (Bayoumi could not read the U.S. entry date stamped in his passport); Ex. 95, Awad Dep. Ex. 464 at 01. | |
| 1773. | When confronted with his banking and phone records which showed charges on his personal card (which was different than the related card his wife held) made in the U.S. and call records for his personal cellular phone made from within the U.S. during the dates he previously testified he was in the U.K., Bayoumi changed his testimony and stated that he could not remember whether or not went to England that month. Ex. 120, Bayoumi Dep. 814:6-821:9; 818:23-819:15. | *See* Response to Pls. Aver. ¶ 1769. As Sageman, an expert psychiatrist, has explained, memory "is a narrative reconstruction of past events as new details come to mind." KSA Ex. 167 (Sageman Rep.), at 7. As new details come to light, memory works to reconstruct the narrative based on those details. |
| 1774. | Bayoumi's testimony that he was in the UK throughout this critical period, elicited by Saudi counsel based on counsel's own representation about the entry stamp, and embellished by Bayoumi in real time with fabricated details about an ambiguous "prerequisite to prepare for the PhD" and unverifiable "student housing," was untrue. Ex. 120, Bayoumi Dep. 818:23-819:15. | Plaintiffs' insinuation that Al Bayoumi testified untruthfully is false. As Sageman, an expert psychiatrist, has explained, memory "is a narrative reconstruction of past events as new details come to mind." KSA Ex. 167 (Sageman Rep.), at 7. As new details come to light, memory works to reconstruct the narrative based on those details. Al Bayoumi corrected his testimony based on his reconstructed memory when shown new details. |
| XXIII.G. | **Hazmi and Mihdhar return to Los Angeles and meet with Thumairy.** | Plaintiffs are incorrect that Al Hazmi and Al Mihdhar saw Al Thumairy on the evening of June 9, 2000. This meeting was impossible, since Al Thumairy was not in Los Angeles, but rather en route to Saudi Arabia as |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | shown by the stamp in passport indicating that he arrived in Riyadh on June 10, 2000.<br><br>Plaintiffs present an incorrect Islamic calendar for 1421H that they sourced from a random Bangladeshi internet site maintained by an individual for his personal use. *See* Pls. Ex. 15 (Key to Islamic Hijri Calendar for 1421 Hijri). That calendar is contrary to both the official Saudi Hijri calendar and the calendar used by Plaintiffs' own certified translator and demonstrates the implausibility of their assertions. |
| 1775. | ▮▮▮▮▮▮▮▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1776. | On Friday, June 9, 2000, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Ex. 524, FBI 4007, Ex. 3B; ▮▮▮▮▮▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Plaintiffs Exhibit 524 (FBI 4007-8) is a registration card for Deano's Motel with Zeid's information, and also stating that the make and model |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of his car is a Geo Metro. ███████<br>█████████████████████████<br>█████████████████████████ |
| 1777. | ██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>*See* Response to Pls. Aver. ¶ 1776. |
| 1778. | ██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>████████ Ex. 5, Youssef Rpt.<br>212-13. | Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>█████████████████████████<br>█████████████████████████<br>█████████████████████████<br>█████████████████████████<br>█████████████████████ |
| 1779. | ██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████ | Plaintiffs' mischaracterize ███<br>█████████████████████████<br>█████████████████████████<br>█████████████████████████<br>█████████████████████████<br>█████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | |
| 1780. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>The quoted portion of the deposition comes from Plaintiffs' counsel<br><br>*See* Response to Pls. Aver. ¶ 1779. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████ Alzamari testified at his deposition that the first time he met them was the night before Al Mihdhar traveled to Yemen, which was June 9, 2000. Pls. Ex. 101 (Zamari Tr.) 49:12-50:6 (testifying that Johar mentioned the hijacker to him for the first time "a few days or maybe a couple weeks" before he introduced them to him); 67:12-15 (testifying that he only met the hijackers once); 77:14-78:20; 119:4-20 (testifying that the meeting was the night before one of the hijackers was leaving for Yemen, which was June 9, 2000). |
| 1781. | ████████████████ | Plaintiffs mischaracterize the testimony, ████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 1782. | ████████████████████ ████████████████████ ████████████████████ ████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs mischaracterize ███████ ████████████████████ ████████████████████ ████████████████████ |
| 1783. | ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████ Ex. 467, FBI 000208-222 at 212-213 (May 18-19, 2011 interview of Abdullah). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 467 (FBI 208-222) is inadmissible hearsay. *See* Objections Chart. <br><br> As set forth in the Response to Pls. Aver. ¶ 1781, ██████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ██████████████████████████ ██████████████████<br><br>Plaintiffs Exhibit 467 (FBI 208-222) does not accurately state what Zeid had previously told the FBI. ████████████ ██████████████ |
| 1784. | The private meeting that Thumairy held with Hazmi and Mihdhar shows that he knew the two men well. Thumairy testified:<br><br>I don't meet people that I don't know. I would not sit with someone I don't know. I would not convene with someone I don't know. I would not go somewhere with someone I don't know. I would not meet with people I don't know.<br><br>Ex. 107, Thumairy Dep. 342:24-343:5. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>████████████████████████████<br><br>*See* Response to Pls. Aver. ¶ 1779.<br><br>Al Thumairy testified that he did not recall meeting the hijackers. Plaintiffs confronted him with the allegation that three people saw him meeting with Al Hazmi, yet he still denied it. "I don't meet people that I don't know. Perhaps he frequented the mosque or the Friday prayer. Perhaps he came to the mosque. Many people come and go. But I do not meet people that I don't know. And I do not know him whatsoever. . . I don't meet people that I don't know. Perhaps he's somebody who came to the mosque and prayed. And I don't know him. Maybe he came and prayed and then we greeted on the go. That could have happened . . . I |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | don't meet people that I don't know. I would not sit with someone I don't know. I would not convene with someone I don't know. I would not go somewhere with someone I don't know. I would not meet with people I don't know." Pls. Ex. 107 (Thumairy Tr.) 341:14-343:5.<br><br>Plaintiffs distort Al Thumairy's testimony and transform his emphatic statement that he did not know the hijackers into a statement that he must have known them well.<br><br>As set out in Response to Pls. Aver. ¶ 1793, this alleged meeting between the hijackers and Al Thumairy on June 9, 2000 could not have taken place as Al Thumairy was already en route to Saudi Arabia on the evening of June 9, 2000. |
| 1785. | As Plaintiffs' expert Youssef determined, "[t]his meeting employed a similar modus operandi to the prior instances when Thumairy met Hazmi and Mihdhar at the Mosque while ▮▮▮ stood nearby waiting for further instructions or when ▮▮▮ left the hijackers at the restaurant for their rendezvous with Bayoumi." Ex. 5, Youssef Rpt. 213. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>Youssef's opinion is speculation predicated on a host of false assumptions.<br><br>As detailed in the Response to Pls. Aver. ¶ 1481, there was nothing nefarious about ▮▮▮▮▮ stepping aside after he introduced the hijackers to Al Thumairy. ▮▮▮▮▮ explained that when he introduced the hijackers to Al Thumairy on the first day he met them, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy was sitting in a part of the prayer room where the imam sits. ███████████████████████████████ Youssef is an evangelical Christian and is not familiar with Islamic practice. Pls. Ex. 105 (Youssef Tr.) 382:14-385:12. ████████ also never brought the hijackers to the restaurant to meet with Al Bayoumi. *See* Response to Pls. Aver. ¶¶ 1495, 1570-72. Furthermore, as set out in Response to Pls. Aver. ¶ 1793, the alleged meeting on June 9, 2000 between the hijackers and Al Thumairy never took place as Al Thumairy was already en route to Saudi Arabia on the evening of June 9, 2000. |
| 1786. | Alzamari testified that he was introduced to the two hijackers in front of the King Fahad Mosque by Mohamed Johar, who at the time was his best friend. Ex. 101, Alzamari Dep. 61:18-62:3, 46:13-15, 47:16-20. Alzamari later testified that it was "Ibrahim Johar", Mohamed Johar's father, who introduced him to the hijackers, and then "Mohamed Johar introduced us by first name." Ex. 101, Alzamari Dep. 129:17-130:8. Alzamari testified by written questions and Plaintiffs had no opportunity for follow up questioning. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Alzamari's testimony clearly shows that it was Mohamed Johar, not his father Ibrahim, who introduced the hijackers to Alzamari. The portion of the deposition cited by Plaintiffs (Pls. Ex. 101 (Zamari Tr.) 129:17-130:8) reflects an obvious slip of the tongue, as shown by his multiple statements that it was Mohamed Johar who introduced him to the hijackers: "I got introduced to them [the hijackers] the first – and only time – the first time by Mohamed Johar." *Id.* at 57:5-7. "The night he [Mohamed Johar] introduced me to them." *Id.* at 61:21. "Mohamed Johar was standing there, and he had two other men [the hijackers], and later on another |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | joined [Zeid], and he introduced us to each other." *Id.* at 62:7-10. "the men [the hijackers and Zeid] Mohamed Johar introduced me to in front of the mosque." *Id.* at 77:6-7. "Mohamed Johar introduced me to the two men [the hijackers] . . . Mohamed Johar introduced me to the two men . . . Mohamed Johar introduced me to them, the Saudi men [who would later become the 9/11 hijackers] . . . He [Mohamed Johar] introduced me to them in front of King Fahad Mosque, Nawaf, Akram; Akram, Nawaf, and the other person, like that." *Id.* at 78:2-20. "The first time I saw them is … the initial meeting when they got introduced to me by Mohamed Johar." *Id.* at 79:14-16. "[A]t the beginning, it was Mohamed Johar introduced us by first name. Akram, Nawaf; Nawaf, Akram, and so on." *Id.* at 129:25-130:2. |
| 1787. | Around the time that he was introduced to the two hijackers, Alzamari testified that he saw Thumairy leaving the Mosque library together with Hazmi. Ex. 101, Alzamari Dep. 62:11-63:8, 128:7-16. Alzamari testified that it was obvious from the fact the two men were meeting in the library that they knew each other. Ex. 101, Alzamari Dep. 128:17-23. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Alzamari's testimony in Plaintiffs Exhibit 101 (Zamari Tr.) at 128:17-23 is not based on first-hand knowledge.<br><br>Alzamari testified that the "only [] interaction" he observed between Al Thumairy and either Al Hazmi or Al Mihdhar was "between Nawaf al-Hazmi and Sheikh Fahad when he left … the library the night of the meeting. There wasn't really enough time to describe or – or try to find out what kind of – you know, it was just they were exiting the library. That was the only one." Pls. Ex. 101 (Zamari Tr.) 106:5-14; 65:23-66:2 (testifying that the library at the mosque was on the first floor, not a separate building). Alzamari testified multiple times that "I didn't have |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | enough time to see how they interact[ed]." *id.* at 80:22-81:20; *see also id.* at 62:11-20; 65:11-22 ("Sheikh Fahad came out of the library, opened the door, Nawaf Hazmi came after him. Nawaf Hazmi turned to the left toward us, to the exit. Sheikh Fahad turned to the right, heading to his office."). <br><br> In the portion of the deposition cited by Plaintiffs, *id. at* 128:17-23, Alzamari only speculates that Al Thumairy knew Al Hazmi because they were both coming out of the library. *Id.* at 131:2-12 ("there was not enough time" to see them interact or to determine if Al Hazmi and Al Thumairy were "friendly"). |
| 1788. | Abdullah told the FBI that after the private meeting, ▉▉▉ Abdullah, and Thumairy had dinner together with Hazmi and Mihdhar, at the apartment of ▉▉▉▉▉, who was out of town. Ex. 467, FBI 000208-222 at 214 ("Thumairy was also present at the dinner, having arrived on his own."). ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 467 (FBI 208-222) is inadmissible hearsay. *See* Objections Chart <br><br> As detailed in Response to Pls. Aver. ¶¶ 1781-84, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Alzamari's recollection was that Al Thumairy and Al Hazmi walked out of the library together, as shown in Response to Pls. Aver. ¶ 1787. Alzamari did not see the two interact. <br><br> As detailed in Response to Pls. Aver. ¶ 1793, this purported meeting between the hijackers and Al Thumairy could not have taken place since |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Al Thumairy was already en route to Saudi Arabia. Nor could Al Thumairy have been at the dinner on June 9, 2000.<br><br>Plaintiffs Exhibit 467 (FBI 208-222) is the 2011 summary of the interview of Zeid. As set forth in Response to Pls. Aver. ¶ 1722, it is full of inaccuracies. |
| 1789. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| 1790. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████████████ Ex. 92, Morgan Decl. ¶ 18. | Plaintiffs Exhibit 101 is inadmissible hearsay.  Plaintiffs Exhibit 92 is inadmissible hearsay and not based on first-hand knowledge.  *See* Objections Chart<br><br>As detailed in Response to Section XX.C of Plaintiffs' Aver., the hijackers did not stay with ███████████████████████████████████████<br><br>███████████████████████████████████████<br><br>As set forth in Response to Pls. Aver. ¶¶ 1482-83, Alzamari firmly rejected the assertions in Pls. Ex. 101 and testified that it "contains many errors."  Pls. Ex. 101 (Zamari Tr.) 59:11-61:13. |
| 1791. | Abdullah told the FBI that on the next day, Saturday, June 10, 2000, Hazmi and Mihdhar met again with Thumairy in the morning at the "library across the street from the King Fahad Mosque" before Abdullah drove to the airport to drop off Mihdhar who was traveling to Yemen. Ex. 467, FBI 000208-222 at 214 (May 18-19, 2011 interview of Abdullah). | Plaintiffs Exhibit 467 (FBI 208-222) is inadmissible hearsay.  *See* Objections Chart.<br><br>As shown in Response to Pls. Aver. ¶¶ 1781-82, ████████████████████████████████████████████████████████████████████████████████████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 467 is the 2011 summary of the interview of Zeid. As set forth in Response to Pls. Aver. ¶ 1722, it is full of inaccuracies.<br><br>In any event, as detailed in Response to Pls. Aver. ¶ 1793, the purported meeting between Al Thumairy and the hijackers on June 9, 2000 or June 10, 2000 could not have taken place since Al Thumairy was already en route to Saudi Arabia. |
| 1792. | A videotape taken at Los Angeles airport on June 10, 2000 shows Hazmi, Mihdhar, and Abdullah going through security to walk Mihdhar to the airport gate for his trip to Yemen. Mihdhar was returning to report back in person to Al Qaeda about the knowledge he gained from his five months in California. Mihdhar would be the last of the 19 hijackers to arrive in the U.S. prior to the attacks. He likely played a role to help coordinate and organize the non- pilot hijackers. Ex. 5, Youssef Rpt. 213-4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>This paragraph contains numerous misstatements. Al Mihdhar did not return to Yemen to report to Al Qaeda in person. Instead, he left the United States without permission. The 9/11 Commission states that "Mihdhar Bail[ed] Out" once it was clear he failed in his mission to learn English and to learn how to fly. KSA Ex. 163 (9/11 Rep.) 221-22 (stating also that "Mihdhar's mind seems to have been with his family back in Yemen…").<br><br>Khalid Sheikh Mohammed stated that he wanted to remove Al Mihdhar altogether from the mission because Mihdhar had left the United States without permission, but that Bin Laden interceded. Pls. Ex. 31 (Stipulation for the Testimony of Khalid Sheikh Mohammed) at 20-1 (¶¶ 36, 38) ("Sheikh Mohammed immediately expressed his displeasure with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mihdhar having left the U.S. without permission and that he had left Hazmi alone in the U.S. Sheikh Mohammed said he told Mihdhar that he would not likely return to the U.S. but Bin Laden interceded into the disagreement and instructed Sheikh Mohammed to allow Mihdhar to return to the U.S. to continue his work. . . Sheikh Mohammed acknowledged that he did instruct Bin Attash (a.k.a. "Khallad") to contact al-Mihdhar in Yemen to summon him back to Afghanistan following al-Mihdhar's June 2000 unauthorized departure from the U.S. Al-Mihdhar had returned to Yemen to visit his wife. Sheikh Mohammed was upset at al-Mihdhar for leaving the U.S. and was prepared to exclude al-Mihdhar from the 9/11 operation; however, Bin Laden subsequently decided to reinstate al-Mihdhar.").<br><br>Bin Laden confirmed Khalid Sheikh Mohammed's account in his own draft about the 9/11 operation. "We sent two young men to learn English in America, Rabia Nawaf al-Hazmi [al-Hazmi's kunya was Rabia al-Makki] and Khalid al-Mihdhar. They spent a year without accomplishing anything and they sent messages to tell us that they could not study and were unable to achieve anything. Khalid al-Mihdhar despaired and returned to Mecca. He was too ashamed to return to Afghanistan to tell me in person. But Rabia stayed there while Khalid al-Mihdhar . . ." CIA Abbottabad documents released in 2017, KSA Ex. 79 (IMG-040538, "The Birth of the Idea of 11 September," October 2003).<br><br>There is also no evidence, and Plaintiffs fail to cite any, that Zeid is the person walking the hijackers through LAX security on June 10, 2000. |
| 1793. | Saudi Arabia's claim that "contemporaneous documents show that Al Thumairy could not have been in Los Angeles during the evening of June 9, 2000 | Al Thumairy could not have been in Los Angeles on the evening of June 9, 2000 because he was already en route to Saudi Arabia, through Washington, D.C. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | or at any time on June 10, 2000," KSA Aver. ¶ 152, is incorrect. Two witnesses – Mohdar Abdullah and Akram Alzamari – independently testified that Thumairy was in Los Angeles on June 9, 2000 and met with Hazmi and Mihdhar. Saudi Arabia claims that Thumairy was in Washington, D.C. on June 9, KSA Aver. ¶ 152. A., but Saudi Arabia's Answers to Interrogatories say otherwise. Saudi Arabia was asked to "[s]tate the date of each visit of Thumairy to the Saudi Embassy" and additional details about such visits. Ex. 24, June 12, 2018 KSA Responses to Interrogatories 27. Saudi Arabia's June 2018 Answers – prepared after Saudi Arabia's counsel met with Thumairy – stated that "Saudi Arabia currently understands that Al Thumairy visited the Saudi Embassy at or around the time that he initially arrived in the United States to pick up an identification card…." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 27. The record shows that Thumairy arrived in the U.S. in May 1996. Saudi Arabia never amended its answers to interrogatories to state that Thumairy ever visited the Saudi Embassy at another time. | Al Thumairy signed a letter on letterhead of the IFTA Office in Washington, D.C. dated 7 Rabi 'Al-awwal 1421, corresponding to June 9, 2000; he did not have this letterhead in his possession in Los Angeles and would have used it only in Washington, D.C. KSA Ex. 100 (Qattan Ex. 413) (Plaintiffs' certified translation showing date of June 9, 2000); Pls. Ex. 107 (Thumairy Tr.) 510:21-512:23, 566:21-569:3 (discussing this document); *see* KSA Ex. 71 (Calendar for the Year 2000) (date conversion).

Moreover, Al Thumairy's passport shows an entry stamp for Saudi Arabia that is dated 8 Rabi 'Al-awwal 1421, corresponding to June 10, 2000; at the time, taking into account the transit time between Los Angeles and Riyadh, the lack of direct flights, and the 10-hour time difference, it would have been impossible for Al Thumairy to leave Los Angeles the evening of June 9 and arrive in Riyadh on June 10. KSA Ex. 48 (Shahri Ex. 405) at (KSA 6893) (passport showing date stamp; translated at PDF page 40 of KSA Ex. 48); Pls. Ex. 107 (Thumairy Tr.) 505:4-510:20 (discussing this document and the time required for travel); *see* KSA Ex. 71 (Calendar for the Year 2000) (date conversion).

At their depositions, Zeid and Alzamari were asked about events that occurred more than 20 years prior. As detailed above, their memory of the events of that evening is poor and incomplete. ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████

Saudi Arabia's interrogatory responses, served on June 12, 2018, states that its responses were based on its "current[] understand[ing]." Pls. Ex. 24 (June 12, 2018 KSA Responses to Interrogatory 10). As set forth |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | above, Al Thumairy testified three years later in June 2021 that he must have been at the Embassy on June 9, 2000 given the letter he sent out under Embassy letterhead.<br><br>But, even if Al Thumairy did not visit the Embassy in Washington, D.C. on June 9, 2000, it still would have been impossible for Al Thumairy to have been in Los Angeles on the evening of June 9, 2000 and still arrive in Riyadh on June 10, 2000 as stated in his passport given the time difference (10 hours), lack of direct flights, and flight time. Currently, the fastest flight time from Los Angeles to Riyadh is approximately 18 hours, which means that someone who left Los Angeles on the evening of June 9, 2000 would arrive in Riyadh at least 28 hours later (on June 11, 2000), when factoring in the time difference. *See www.flightroutes.com/LAX-RUH#:~:text=The%20fastest%20way%20to%20fly,17%20hours%20and%2050%20minutes*, visited February 8, 2024. |
| 1794. | Thumairy testified that during the entire time he was in the U.S. he only made one visit to the Embassy but claimed he could not recall when he made that visit. Ex. 107, Thumairy Dep. 67:9-15, 443:17-444:8. Proof in addition to Saudi Arabia's answers to interrogatories shows that Thumairy's claimed sole Embassy visit occurred upon his arrival in the U.S. in 1996. Thumairy told the 9/11 Commission in February 2004 that "he was sent to the Saudi Embassy in Washington, D.C." when he first arrived in the U.S. Ex. 90, Snell Decl. Ex. 3 at 2. Thumairy testified that he first met Sowailem at the Embassy – which | Pls. Ex. 90, Pls. Ex. 90, Snell Decl. Ex. 3 at 2 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs misstate Al Thumairy's testimony. When shown KSA Ex. 100 (which is a letter signed by Al Thumairy on Embassy letterhead, that Plaintiffs' certified translation shows was dated June 9, 2000), Al Thumairy testified that the document shows he must have been at the Embassy on June 9, 2000. Pls. Ex. 107 (Thumairy Tr.) 511:2-412:23; *see also* Response to Pls. Aver. ¶ 1793.<br><br>Al Thumairy also testified that when he first came to the United States, he went straight to Los Angeles and did not remember whether he stopped in Washington, D.C. or New York. Pls. Ex. 107 (Thumairy Tr.) 66:15-67:2. He further testified that he visited the Embassy in Washington, D.C., but |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | necessarily occurred before Thumairy admits he saw Sowailem at the July 1998 King Fahad Mosque inauguration. Ex. 107, Thumairy Dep. 71:2-6, 339:22-340:5. | he did not remember whether it was during his first or subsequent trips. *Id.* at 57:12-6.<br><br>In terms of meeting Al Sowailem, Al Thumairy testified that it was "[m]ost likely at the embassy, at the offices in the embassy, on our way as I stopped on the way for transit . . . I did stop. But whether that was in the first travel or another subsequent travel, I don't remember. It could have been in my travel from Los Angeles to Riyadh for vacation, I could have stopped in New York, Washington, or Europe. I don't remember." *Id.* at 71:2-20.  Much later (and on the next day of his deposition), Al Thumairy also testified that he recalled Al Sowailem attending the inauguration of the King Fahad Mosque.  *Id.* at 339:22-340:5.  Al Thumairy did not testify, however, that he met with Al Sowailem at the inauguration. |
| 1795. | Saudi Arabia's date conversion of Thumairy's passport stamp into Saudi Arabia ("dated 8 Rabi 'Al-awwal 1421, corresponding to June 10, 2000") and claim that it "would have been impossible" for Thumairy to arrive is incorrect. KSA Aver. ¶ 152.b. The correct Gregorian date conversion of the Hijri date 8 Rabi 'Al-awwal 1421 is June 11, 2000 – *not* June 10. Ex. 15, 1421 Hijri Calendar. | Plaintiffs Exhibit 15 (Key to Islamic Hijri Calendar for 1421 Hijri) is inadmissible hearsay and has not been authenticated.  *See* Objections Chart.<br><br>Plaintiffs' assertions in this paragraph are incorrect and wholly misleading.<br><br>Plaintiffs Exhibit 15 is a calendar that Plaintiffs downloaded from a Bangladeshi website:  https://www.habibur.com.  This website entitled "Habib's Digital Garden" was created in September 2022 by Sanjir Habib, a software developer.  It states that: "[t]his website has been developed and is maintained by me personally.  As such is very much a personal website." https://notes.habibur.com/about/   The contents include, his personal blog and writing, and his Facebook post archives.<br><br>This website purports to contain a Hijiri calendar going back to 621 AD. The website states very clearly that this "calendar is procedurally |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | generated from hijiri 1st year to 1500." It is not an official calendar in any sense.<br><br>This "procedurally generated" calendar for 1421H (Gregorian year 2000) has 30 days for Safar (2nd month of the year) and 29 days for Rabi al-awwal (3rd month of the year). This is incorrect.<br><br>The official Saudi calendar for 1421H has 29 days for Safar and 30 days for Rabi al-awwal. KSA Ex. 71.<br><br>By mistakenly adding an extra day to Safar in 1421H, Sanjir Habib's "procedurally generated calendar" moves forward the Gregorian equivalent day by one day. In this erroneous calendar, 8 Rabi al-awwal 1421 is June 11, 2000; while in the official Saudi calendar, 8 Rabi al-awwal 1421 is June 10, 2000. KSA Ex. 71.<br><br>Even Plaintiffs' own certified translation of KSA Ex. 100 shows that 7 Rabi Al-awwal 1421 is June 9, 2000. *See* KSA Ex. 100 (KSA 8440). Al Thumairy's passport shows he arrived in Riyadh on 8 Rabi al-awwal 1421, which is June 10, 2000. KSA Ex. 48 (Shahri Ex. 405) at (KSA 6893); KSA Ex. 71. |
| 1796. | Flight schedules from June 2000 show that Thumairy could had numerous different options to take connecting flights from Los Angeles to Riyadh, Saudi Arabia that would have departed on June 10, 2000, and arrived on 8 Rabi 'Al-awwal 1421, June 11, 2000. Ex. 177, June 2000 OAG Itinerary. Saudi Arabia failed to produce any travel records | As set forth in Response to Pls. Aver. ¶ 1795, Al Thumairy landed in Riyadh on June 10, 2000. There is no flight schedule that would allow Al Thumairy to have flown from Los Angeles on the evening of June 9, 2000 (after a purported meeting with the hijackers), and arrived in Saudi Arabia on 8 Rabi al-awwal 1421H, June 10, 2000. This would have been impossible given the time difference, lack of direct flights, and travel time. *See* Response to Pls. Aver. ¶ 1793. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for Thumairy's trip home to Saudi Arabia other than Thumairy's passport. | |
| **XXIII.H.** | **Dr. Shaikh helped Hazmi prepare and submit his July 2000 visa extension request.** | It is undisputed that Shaikh, who was a longtime and reliable FBI informant, helped Hazmi prepare and submit his July 2000 visa extension. |
| 1797. | In a supplemental FBI production on December 14, 2023, the DOJ produced a copy of the I-539 form visa extension request that Dr. Abdussattar Shaikh prepared and submitted on behalf of Nawaf Al Hazmi in July 2000. Ex. 692, FBI 013591-013594. Dr. Shaikh signed the form as the preparer of the document for Hazmi and sent the form by registered mail to the INS on July 7, 2000. Ex. 692, FBI 013591-013594. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. Shaikh was also a long-term reliable FBI informant. KSA Ex. 163 (9/11 Rep.) 223 (describing a "housemate who rented [a] room to Hazmi and Mihdhar" who was "an apparently law-abiding citizen with long-standing, friendly contacts among local police and FBI personnel"); Pls. Ex. 131 (OIG Rep.) 256 & n.185 (referring to Shaikh as an "asset" or "informant"); *id.* at 260 & n.197 (stating that Shaikh had been an asset since 1994 and that in July 2003 was "given a $100,000 payment").<br><br>Starting in late May 2000, Shaikh rented a room to the hijackers in his home. Pls. Ex. 131 (OIG Rep.) 256 (dating the rental to "late May 2000"). Al Hazmi spent more time with Shaikh than with anyone else in San Diego – more than six months in total. Shaikh is deceased and was not deposed. The FBI summaries of his interviews that Plaintiffs attach as exhibits state that "[h]e [Shaikh] described their relationship as close; in many ways like a father and son." Pls. Ex. 2U (EO 2224). They prayed together every morning the Fajr prayer at around 5 AM. Shaikh lodged Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Mihdhar (for at least ten days) and Al Hazmi (for more than six months), helped the latter fill out his visa extension, open a bank account, and transfer ownership of the Toyota that he shared with Al Mihdhar to his sole possession. Pls. Ex. 2U (EO 2224-6). |
| | | The fact that Shaikh, an FBI informant, provided the most material assistance to the hijackers demonstrates that there was no support network for the hijackers. It also demonstrates that Al Qaeda did not vet the individuals who the hijackers interacted with in southern California as Plaintiffs' falsely claim. |
| | | The FBI did a full investigation of Shaikh and "concluded that the informational asset [Shaikh] had not been complicit in plotting the attacks." Pls. Ex. 131 (PEC-KSA 492). |
| **XXIII.I.** | **Bayoumi visited Los Angeles on July 12, 2000**. | There is no evidence and Plaintiffs do not even allege that Al Bayoumi's visit to Los Angeles on July, 2000 was related to the hijackers. This entire section is irrelevant. |
| 1798. | On 6:15 p.m. on July 12, 2000, Bayoumi was ticketed by Culver City, CA police for a moving violation, making an illegal right turn on red, at the corner of Robertson and Washington Blvd. Bayoumi was turning onto Washington Boulevard in the direction of the King Fahad Mosque, which was about a mile and a half ahead on that street. The police noted that Bayoumi had one male passenger. Bayoumi kept a copy of the ticket in a file recovered by the MPS. Ex. 445, MPS715_6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 445 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1799. | At the time, Bayoumi was not driving his own vehicle but a Geo Metro car rented from San Diego Car Rental. Ex. 445, MPS715_6; Ex. 2, EO 2087, 3954-55. The FBI recorded that a man named ▮▮▮▮▮ an English language student in San Diego, rented the vehicle being driven by Bayoumi. Ex. 2, EO 3954-55. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 445, Plaintiffs' Exhibit 2T (EO 2087), and Plaintiffs Exhibit 2GG (EO 3954) are inadmissible hearsay.  *See* Objections Chart. |
| 1800. | The police officer wrote on the ticket the date for Bayoumi to appear at the Culver Municipal Court – August 23, 2000 – and the phone number: ▮▮▮▮-3160." Ex. 445, MPS715_6. Bayoumi called that number from his cell phone the next day, July 13, 2000 at 4:30pm (6 mins.). Ex. 12, FBI 3284. Bayoumi called that number again on August 15, 2000 at 11:39am (5 mins.). Ex. 491, FBI 1398. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 445 is inadmissible hearsay.  *See* Objections Chart.<br><br>It is undisputed that Al Bayoumi's cell phone called ▮▮▮▮-3160 at the dates and times indicated. |
| 1801. | The following day, August 16, Bayoumi wrote a letter to change his address on file with the court. Ex. 445, MPS715_5. Bayoumi's notes show that he learned the amount owed for the ticket and sent a $132.00 check dated September 28 to the Culver court. Ex. 445, MPS715_4, 5. Bayoumi kept these records in his files and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 445 is inadmissible hearsay.  *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | they were found by the MPS in September 2001. | To the extent a response is required, this is undisputed. |
| 1802. | Bayoumi claimed that he had no recollection of the ticket. He also claimed that he could not remember making a phone call to the Culver City court about the ticket. Ex. 120, Bayoumi Dep. 456:6-457:13, 458:17-459:6. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Bayoumi could not recall a traffic ticket or calls he made more than 20 years before his deposition. |
| 1803. | Bayoumi's testimony that he couldn't remember getting the ticket is unbelievable given the fact that he was pulled over driving a car rented by someone else and had a series of interactions with authorities over more than two months to resolve the ticket. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>There is no basis to assert that this testimony is "unbelievable." There is nothing remarkable about a simple traffic ticket that he received more than 20 years before his deposition. |
| XXIII.J. | Bayoumi arranged in August 2000 for Yazeed Al Salmi to stay at Dr. Shaikh's house with Hazmi. | There is no evidence that Al Bayoumi arranged for Al Salmi to stay at Dr. Shaikh's house. Nor is there any evidence that Al Salmi's stay at Shaikh's house was in any way related to Al Hazmi. |
| 1804. | Another resident at Shaikh's rooming house in August 2000 was Yazeed Al Salmi, the nephew of Bayoumi's superior, Director | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mohamed Al Salmi at the Saudi civil aviation bureau. *See* 9/11 Commission Report at 518 n. 41. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1805. | On August 8, 2000, Yazeed Al Salmi arrived in San Diego and checked into the Comfort Inn La Mesa. Ex. 2, EO 0198; Ex. 2, EO 0987. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2F (EO 198) and Plaintiffs Exhibit 2O (EO 987) are inadmissible hearsay. *See* Objections Chart. |
| 1806. | Phone records show that in August 2000 Bayoumi placed three calls to Dr. Abdussattar Shaikh's home in Lemon Grove where Hazmi was living. The first call was on the day that Salmi arrived in San Diego, August 8, 2000, at 9:09pm (1 min.). Ex. 490, FBI 1393. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>It is undisputed that Al Bayoumi's cell phone placed these calls. There is no evidence that these calls concerned Al Salmi or the hijackers. |
| 1807. | On August 10, 2000, Bayoumi called the Comfort Inn La Mesa where Salmi was staying at 12:27pm (3 mins.) After that call, Bayoumi called Dr. Abdussattar Shaikh's house twice, once at 12:51pm (1 min.), and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | again at 12:52pm (1 min.). Ex. 491, FBI 1397 | Plaintiffs fail to cite any admissible evidence that Al Salmi was staying at this Comfort Inn. Undisputed that Al Bayoumi's cell phone placed these calls. The calls from Al Bayoumi to Shaikh are one minute each indicating that they went to voicemail. |
| 1808. | Salmi checked out of the Comfort Inn La Mesa on August 10, 2000. Ex. 2, EO 0987. Salmi told the FBI that Bayoumi took him to Dr. Shaikh's house and that he moved in there on Aug 10. Ex. 2, EO 0193. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
|  |  | Plaintiffs Exhibit 2F (EO 193) and Plaintiffs Exhibit 2O (EO 987) are inadmissible hearsay. *See* Objections Chart. |
|  |  | The FBI's reporting is inconsistent and unreliable and no conclusions can be drawn from the hearsay that Plaintiffs cherry-pick from one summary. |
|  |  | The one hearsay summary dated October 8, 2001 cited by Plaintiffs states: "In approximately August 2000, when AL-SALMI first arrived in San Diego, he went to the Boubaker Mosque and requested assistance. AL-SALMI was referred to OMAR AL-BAYOUMI. AL-BAYOUMI took AL-SALMI to visit ABDUSATAR (known to the FBI as ABDUSATAR SHAIKH) who rents rooms. AL-SALMI moved into ABDUSATAR's residence on August 10, 2000. Prior to moving into ABDUSATAR's residence, AL-SALMI stayed at a Comfort Inn. AL-SALMI is aware that OMAR AL-BAYOUMI is employed by Saudi Aviation with AL-SALMI's uncle. AL-SALMI advised that he did not know AL-BAYOUMI before AL-SALMI was referred to AL-BAYOUMI by the mosque." Pls. Ex. 2F (EO 0193-4). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Two days later, the FBI reported, "Upon arriving in San Diego, AL-SALMI went to the Abu Baker Mosque on Balboa Avenue in San Diego, where he met SHEIKH ABU SATAR. SHEIKH ABU SATAR rented AL-SALMI a room for approximately a month in Lemon Grove, California." Pls. Ex. 2T (EO 1898). |
| | | Three years later, the FBI reported, that upon arriving "to San Diego where he checked into the Comfort Inn until he could find a cheaper place to live. AL-SALMI visited the Islam Center where he met a man named ABDUSSATAR who rents rooms to students . . . Approximately 3–4 days after he arrived, he moved into this apartment where he first met NAWAF AL-HAZMI, which was approximately 3–4 days after he ha[d] arrived in San Diego." Pls. Ex. 2E (EO 180). |
| | | The only admissible evidence comes from Al Bayoumi's testimony that he did not take Yazid Al Sami to Shaikh's house for him to find a place to stay. Pls. Ex. 120 (Bayoumi Tr.) 508:15-509:15. |
| 1809. | During his deposition, Bayoumi denied knowing about anyone who stayed at Shaikh's rooming house, despite Bayoumi's ties to Hazmi, Mihdhar, Sudairy, Sadhan, and Salmi. Ex. 120, Bayoumi Dep. 510:2-14. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | It is undisputed that Al Bayoumi gave this testimony. As set forth above, including in response to parts XIV.E, there is no evidence that Al Bayoumi arranged for anyone to stay at Shaikh's house. |
| 1810. | Salmi told the FBI that he knew Bayoumi and his family, and that Bayoumi knew Nawaf Al Hazmi "well." Ex. 2, EO 1900. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Salmi stated that Bayoumi's son told him "that he [Bayoumi's son] had gone to Los Angeles for a day with Nawaf Alhazmi in September of 2000." Ex. 2, EO 1900. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2T (EO 1900) is inadmissible hearsay and is not based on first-hand knowledge. *See* Objections Chart.

The hearsay FBI summaries of Al Salmi's interviews are inconsistent.

Plaintiffs cite the FBI reporting of its interview with Al Salmi on October 4, 2001. It does not state that Al Salmi knew Al Bayoumi and his family or the basis of Al Salmi's statement that Al Bayoumi knew al-Hazmi well. Pls. Ex. 2T (EO 1900). Four days later, the FBI stated that al-Salmi did not know Al Bayoumi before being referred to him at the ICSD in the first days after arriving to San Diego. Pls. Ex. 2F (EO 0194).

The assertion by an unnamed FBI agent Al Salmi had told the agent that Bayoumi's son had told Al Salmi that he had gone to Los Angeles with Al Hazmi in September 2000 is multiple levels of inadmissible hearsay and not based on first-hand knowledge. |
| 1811. | On September 5, 2000, Hazmi deposited $1,900 in travelers checks in his Bank of America account. Hazmi received those travelers checks from Yazeed Al Salmi. Salmi had purchased $4,000 in the travelers checks in July 2000 in Saudi Arabia and he signed over $1,900 of his $4,000 traveler's checks to Hazmi. *See* 9/11 Commission Report at 222; Ex. 156, FBI Hijacker | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 156 (List of 9/11 hijackers' financial transactions from 6/21/1996 through 9/16/2001) and Plaintiffs Exhibit 2T (EO 2090) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Financial Transaction Spreadsheet at PDF 45. | To the extent a response is required, this is undisputed. The exhibits cited by Plaintiffs also show that Al Hazmi helped others with financial transactions. On September 11, 2000, Al Hazmi deposited $3,000 in cash in his account and got a cashier's check in the same amount for ▮▮▮▮▮ to whom Shaikh owed money, allowing Shaikh to avoid the expense of getting a cashier's check at his bank since al-Hazmi could get one at no charge from his account. Pls. Ex. 2T (EO 2090); Pls. Ex. 2Y (EO 3081); Pls. Ex. 156 (OCR 46). |
| XXIII.K. | **Bayoumi had significant contact with ▮▮▮▮▮, a close friend of Hazmi.** | As set forth below, Al Bayoumi did not have significant contact with Osama Awadallah. |
| 1812. | The EO production included FBI reports which showed that in August – October 2000, Bayoumi had significant phone contact with ▮▮▮▮▮ when ▮▮▮▮▮ was socializing with Nawaf Al Hazmi. An FBI report states that "▮▮▮▮▮…moved to ▮▮▮ Balboa Arms Drive, Apartment ▮▮▮ San Diego, California, telephone number ▮▮▮▮▮-0339 from approximately August 8, 2000 through January 1, 2001…." Ex. 2, EO 2761. The report states that: "From August 18, 2000 through October 1, 2000, Al-Bayoumi's cellular phone made thirteen calls to ▮▮▮▮▮-0339, the phone number for ▮▮▮▮▮ apartment on Balboa Arms Drive." Ex. 2, EO 2761. A spreadsheet of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2OO (EO 2761) is inadmissible hearsay. *See* Objections Chart.

Plaintiffs Exhibit 12T is an improper summary exhibit. Plaintiffs Exhibit 12T shows that Al Bayoumi's cell phone made 13 calls to a telephone number that Plaintiffs associate with ▮▮▮▮▮ based upon a single hearsay source. No subscriber records were produced to verify that the telephone number belonged to ▮▮▮▮▮ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | those calls is attached. Ex. 12T (Bayoumi calls to ███████████). | Plaintiffs Exhibit 2OO (EO 2761) states that ██████ moved to the apartment on Balboa Arms Drive on August 8, 2000 and that Al Bayoumi never called the telephone at Awadallah's prior residence.<br><br>After ██████████ moved to that apartment, which he shared with ██████ ███████████████████ Plaintiffs' improper summary Exhibit 12T lists 13 calls from Al Bayoumi to the apartment phone number. 9 of the 13 are one minute long indicating that they went to voicemail. Pls Ex. 12T. There is no evidence as to the substance of any of these calls or that Al Bayoumi was ever attempting to reach ███████.<br><br>The hearsay FBI summary cited by Plaintiffs indicates, that Al Bayoumi had a closer relationship with ██████████ roommates: "████████ also recognized the photograph of Omar Albayoumi . . . ████████ first met Albayoumi while living with the Saudi students off Balboa Avenue. Albayoumi would come to the apartment and visit the students . . . When ████████████ would encounter Albayoumi alone, Albayoumi would always ask after ████████ . . . ████████ stated that he would often come home and find his two roommate [*sic*] in conversation with Albayoumi." Pls. Ex. 2OO (EO 2761).<br><br>The fact that the number for the apartment is listed under █████████ ████████████████████████████ confirms this. |
| 1813. | Bayoumi wrote down the listing for phone number ███-0339 in his handwritten address book under "Farouq Al-Zouman and Nayef Al-Madi" Ex. 12AA, MPS738_36; the number is also in Bayoumi's typed phone list that the FBI | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | found in Bayoumi's Mosque office "Omar's [Bayoumi's] Phone Book October 4, 2000" under the listing ███████ █████████-0339 [sic]." Ex. 421, FBI 000345-49 at 347. | Plaintiffs Exhibits 12AA (MPS 738) and 421 (FBI 345) are inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. There is no evidence that the typed phone list contained in Plaintiffs Exhibit 421 (FBI 345-349) belonged to Al Bayoumi. To the contrary, Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that he was not familiar with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers. *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5. As such, the typed phone list is inadmissible hearsay.<br><br>It is undisputed that the phone number ████████-0339 is listed with Farouq Al Zouman and Nayef Al Madi ████████████████. |
| 1814. | A later phone number for ████████ (a different number than the one called by Bayoumi) was found in Hazmi's car after 9/11. *See* 9/11 Commission Report at 220. ████████████████ was a San Diego student who socialized with Hazmi and instructed Hazmi in the use of his computer, showing him how to surf the internet. Ex. 541, FBI 7417-REV2021 at 7418-19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 541 is inadmissible hearsay.<br><br>To the extent a response is required, it is undisputed that a different phone number for ████████ was found in Al Hazmi's car after 9/11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| **XXIV.** | **BAYOUMI, THUMAIRY, SOWAILEM, AND SUDAIRY OVERSEE THE 9/11 HIJACKERS' MOVE FROM SAN DIEGO TO VIRGINIA, AND SAUDI ARABIA ESTABLISHED AULAQI AT THE DAR AL HIJRAH MOSQUE IN VIRGINIA TO SERVE AS THE HIJACKERS' NEW EAST COAST BASE** | To the extent a response is required, Plaintiffs cite nothing to support their assertions in this header, which find no support in the record evidence. The named individuals did not "oversee" the hijackers' move from San Diego to Virginia, nor did Saudi Arabia "establish[]" Al Awlaki at the Dar Al Hijrah Mosque. *See* Response to Plaintiffs' Aver. ¶¶ 1817-1836. |
| 1815. | Bayoumi enrolled as a graduate student at Ashton University in Birmingham, England in October 2000. Ex. 2, EO 0256. On October 23, 2000, Bayoumi wrote an e-mail to a San Diego university professor at USIU from Birmingham, asking the professor to write a school paper for Bayoumi. Bayoumi offered to pay the professor "what ever [sic] you suggest for your time not for your help. You helped me in the beginning and I want to continue to be in the right truck [sic]." Ex. 567, FBI 11782. Bayoumi's reference to the help provided by the USIU professor "in the beginning" is presumably a reference to similar cheating of Bayoumi when he was registered at USIU in 1997. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2G (EO 256) and Plaintiffs Exhibit 567 (FBI 11782) are inadmissible hearsay. *See* Objections Chart.<br><br>It is undisputed that Al Bayoumi enrolled as a graduate student at Ashton University in Birmingham, England in October 2000.<br><br>Plaintiffs Exhibit 567 (FBI 11782) contains the quoted language, but it does not support the assertion that Al Bayoumi asked the professor "to write a school paper for Bayoumi." It simply states that Bayoumi requested "help" with "some assignments."<br><br>The last sentence of this paragraph contains attorney argument to which no response is required. There is no evidence that Al Bayoumi engaged in any "cheating" when he was registered at USIU in 1997. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1816. | Excerpts of another e-mail from August 2000 produced by the FBI show that Bayoumi asked someone else to "finish writing Omar's thesis" but was turned down because it was "cheating." Ex. 2, EO 1913. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2T (EO 1913) is inadmissible hearsay. *See* Objections Chart.<br><br>The cited exhibit contains the quoted language. However, the page cited purports to be a summary of an out-of-court declarant's email to Al Bayoumi; it is not an "excerpt[ ]" of that email. |
| 1817. | Bayoumi made a sudden decision to return to San Diego from England in early December 2000 before the end of the school term. On November 30, 2000, Bayoumi bought a flight ticket in Birmingham, UK, and flew to San Diego the next day, December 1. Ex. 514, FBI 002832 at 2833. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Plaintiffs Exhibit 514 (FBI 2833) reflects that Al Bayoumi bought a flight ticket in Birmingham, UK on November 30, 2000. That exhibit does not show that Al Bayoumi flew to San Diego the next day, December 1; it shows only that Al Bayoumi made credit card purchases in San Diego in early December (December 4).<br><br>Plaintiffs characterize Al Bayoumi's return to San Diego in early December as "sudden". The record evidence shows that Al Bayoumi flew to San Diego to be present for the birth of his daughter on December 11, 2000. KSA Ex. 285 (KSA 6657) (passport for Maria Al-Bayoumi listing birthday). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1818. | These circumstances show that Bayoumi was returning to California to deal with an important work assignment. On December 2, 2000, Bayoumi went to his office at the Al Madinah Mosque and placed only two calls: one to the personal cell phone of MOIA Embassy Director Khalid Al Sowailem at 6:49pm (14 min.), and a second call at 8:53pm (1 min.) to the home number of Fahad Al Thumairy. Ex. 497, FBI 001488-001491 at 1491. Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12B (Calls between Bayoumi and Thumairy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) and Plaintiffs Exhibit 12K (*Phone chart of Bayoumi calls to Saudi Embassy* (July 15, 1998 – Aug. 24, 2000)) are improper summary exhibits. *See* Response to Pls. Aver. ¶¶ 735, 749; Objections Chart.<br><br>The first sentence of this paragraph contains attorney argument – unsupported by any citation or record evidence – to which no response is required. To the extent a response is required, the record evidence shows that Al Bayoumi flew to San Diego to be present for the birth of his daughter on December 11, 2000. *See* KSA Ex. 285 (KSA 6657) (passport for Maria Al-Bayoumi listing birthday).<br><br>There is no evidence Al Bayoumi made the calls from the mosque phone because anyone at the mosque had access to the mosque telephone. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20, 297:11-20. |
| 1819. | This was the first call between Bayoumi and Thumairy since September 18, 2000. The next day, December 3, at 2:36pm (1 min.), Thumairy used his home phone to call Bayoumi's cell phone. Ex. 2, EO 2758. Ex. 12B (Calls between Bayoumi and Thumairy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2X (EO 2758) is inadmissible hearsay. Plaintiffs Exhibit 12B (Calls between Bayoumi and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy) is an improper summary exhibit. *See* Response to Plaintiffs' Aver. ¶ 735; Objections Chart.<br><br>There is no evidence Al Bayoumi made the calls from the mosque phone because anyone at the mosque had access to the mosque telephone. Pls. Ex. 120 (Bayoumi Tr.) 176:13-177:20, 297:11-20. |
| 1820. | Over the next three weeks, Bayoumi and Thumairy would call each other on the phone at least 20 more times. Ex. 12B (Calls between Bayoumi and Thumairy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) is an improper summary exhibit. *See* Response to Plaintiffs' Aver. ¶ 735; Objections Chart.<br><br>Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) misattributes to Al Bayoumi 11 calls that were made from a publicly-available phone line at the Al Medinah Mosque. The phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made those specific calls. *See* Pls. Ex. 120 (Bayoumi Tr.) 297:11-298:7, 786:8-15.<br><br>Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) misattributes to Al Thumairy four calls made from the number ▮▮▮▮3362 and 14 calls made to that same number. The subscriber records for this number list the subscriber as Faisal Almuhana from July 31, 1997 through February 27, 2000, and as ▮▮▮▮▮▮ from June 10, 2000 through April 29, 2002. *See* KSA Ex. 168, at 1-2. In addition, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Thumairy testified that he was not familiar with the -3362 number. *See* Thumairy Tr. 316:3-8, 15-17, 497:14-499:9. |
| | | Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) misattributes to Al Thumairy eight calls made to the number ███████0777 prior to April 2002 when he started using it. The subscriber records for this number list the subscriber as ██████████████, and the user as ████████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |
| | | Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all. *See* Pls. Ex. 12B (citing Pls. Ex. 2X (EO 2757, EO 2758) in REF 1 column). None of the phone records for both Al Bayoumi and Al Thumairy reflect these calls. |
| | | After removing these improperly-cited calls, Pls. Ex. 12B shows that there were no – not 20 – calls between Al Bayoumi and Al Thumairy over the next three weeks. |
| | | Even if Plaintiffs were correct that there were calls between Al Thumairy and Al Bayoumi, the referenced telephone calls would be consistent with calls that Al Thumairy and Al Bayoumi made to one another during Ramadan. *See* KSA Ex. 167 (Sageman Rep.) 708 ("Over the next three weeks, during Ramadan, al-Bayoumi and Sheikh Fahad called each other as they usually did during Ramadan."). There is no evidence that any of these calls had to do with the hijackers. Indeed, at the time, Al Mihdhar had already left the United States. |
| 1821. | Nevertheless, Bayoumi falsely claimed at his deposition that he did not speak to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Thumairy after going to England in October 2000. Ex. 120, Bayoumi Dep. 791:7-16. Bayoumi testified that he and Thumairy had "no conversations." Ex. 120, Bayoumi Dep. 790:23-791:6. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs mischaracterize Al Bayoumi's deposition testimony. The testimony (Bayoumi Tr. 790:23-791:16) states in full:<br><br>**Q.** What was the nature of your conversations [with Thumairy]?<br>**A.** There was no -- there was no conversations. Sometimes there were questions about the mosque or something like that. Sometimes we would -- we would order Quran, books of the Quran. And he is -- or he rarely answered.<br>**Q.** And when was the last time that you spoke with Fahad al-Thumairy?<br>**A.** I don't remember. It was a long time ago. I don't remember.<br>**Q.** Have you spoken to Fahad al-Thumairy after you moved from the United States to the United Kingdom in October of 2000?<br>**A.** No. No, I don't remember. No. |
| 1822. | Plaintiffs' expert Youssef concluded that "Bayoumi's quick return to San Diego, Bayoumi's call to Sowailem's cell phone, and the sharp spike in calls between Bayoumi and Thumairy, are likely related to [a] discussion of the arrangements being made to provide support for the arrival of 9/11 hijacker Hani Hanjour in San Diego on December 8, 2000, and the departure of Hanjour together with Nawaf al Hazmi from San Diego on December 11, 2000." Ex. 5, Youssef Rpt. 219. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Youssef also fails to provide any support for the *ipse dixit* and speculative assertion that the referenced series of events "likely" related to arrangements to support the hijackers.<br><br>The record evidence shows that Al Bayoumi flew to San Diego to be present for the birth of his daughter on December 11, 2000. *See* KSA Ex. 285 (KSA 6657) (passport for Maria Al-Bayoumi listing birthday).<br><br>There is no support for the assertion that any of the calls between Al Bayoumi and Al Thumairy concerned the hijackers. |
| 1823. | Hanjour spent three nights in San Diego likely with Nawaf Al Hazmi at Dr. Abdussattar Shaikh's house. Dr. Shaikh told the FBI that Hazmi had brought someone to the house just before Hazmi left in December, but Shaikh could not identify Hanjour's photo. Ex. 538, FBI 007342-REV2021 at 7346; *See* 9/11 Commission Report at 223 (Hani Hanjour arrived in San Diego on December 8, 2000 and left with Hazmi a few days later). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 538 is inadmissible hearsay. *See* Objections Chart.<br><br>Moreover, that exhibit contradicts the assertion that Hanjour "likely" stayed at Shaikh's house with Al Hazmi. It states that "Shaikh was shown a photograph of Hani Hanjour for a second time to determine if the unidentified individual [who Al Hazmi brought to stay at Shaikh's house] was [Hanjour]. Shaikh was unable to provide a description of the unidentified male, but was *positive* that he did not recognize Hani Hanjour." Pls. Ex. 538 (FBI 7346-7347) (emphasis added).<br><br>The parenthetical description for the KSA Exhibit 163 (9/11 Rep.) 223, is accurate. However, KSA Exhibit 163 (9/11 Rep.) also does not support the assertion that Hanjour "likely" stayed at Shaikh's house with Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Hazmi. KSA Exhibit 163 (9/11 Rep.) 223 states: "We do not know where Hanjour stayed." <br><br> Dr. Abdussattar Shaikh was a long-term and reliable FBI informant; after the 9/11 attacks, he underwent a full investigation by San Diego FBI, including a polygraph examination. Pls. Ex. 131 (PEC-KSA 492 & n.198). <br> "Based on its investigation, however, the San Diego FBI concluded that the informational asset [Dr. Shaikh] had not been complicit in plotting the attacks." *Id.* There is no evidence that Al Bayoumi or Al Thumairy interacted at all with Al Hazmi or Hanjour during this period. |
| 1824. | The FBI found that after Hazmi left San Diego that Dr. Shaikh corresponded with Hazmi via email. The FBI recorded that in December 2000, Shaikh sent an email to Hazmi in which he added greeting "to Hani." Ex. 539, FBI 007353-REV2021 at 7355. Shaikh told the FBI that "he knows many individuals named Hani"; "does not…know any Hanis which Alhazmi might know"; but "was not able to offer any explanation for the reference to Hani in his communication with Alhazmi." Ex. 539, FBI 007353-REV2021 at 7355. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Plaintiffs Exhibit 539 (FBI 7355) is inadmissible hearsay. *See* Objections Chart. <br><br> The exhibit contains the quoted language. However, Plaintiffs omit that Shaikh purportedly told the FBI that he knows many individuals named Hani because "this is a common middle-eastern name." <br><br> Dr. Abdussattar Shaikh was a long-term and reliable FBI informant; after the 9/11 attacks, he underwent a full investigation by San Diego FBI, including a polygraph examination. Pls. Ex. 131 (PEC-KSA 492 & n.198). <br> "Based on its investigation, however, the San Diego FBI concluded that the informational asset [Dr. Shaikh] had not been complicit in plotting the attacks." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1825. | On Dec 11, 2000, Hanjour made a Citbank ATM withdrawal of $101.50 at Bank of America in Lemon Grove, CA where Dr. Shaikh's rooming house was located. Ex. 679A, JICI 04/19/02 (FBI 0393) (excerpt from FBI Hani Hanjour Timeline). On the same morning Hazmi withdrew $300 from the same location. Ex. 155, FBI Hijackers Timeline at 111. Hazmi and Hanjour visited the Texaco station where they informed Mohdar Abdullah they would be leaving San Diego, which they did on December 11, 2000. Ex. 458, FBI 000050-57 at 56; *See* 9/11 Commission Report at 223. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 155 (FBI Hijackers Timeline), and Plaintiffs Exhibit 458 (FBI 56) are inadmissible hearsay. *See* Objections Chart.<br><br>The first sentence can neither be confirmed nor denied because the exhibit labeled as "Plaintiffs Exhibit 679A" purports to be a summary of Al Bayoumi's telephone bill, not an excerpt of a report concerning Hani Hanjour.<br><br>Plaintiffs Exhibit 155 (FBI Hijackers Timeline) at 111, purports to state that Al Hazmi withdrew $300 from a San Diego ATM; it does not mention the time of withdrawal or a "Lemon Grove" location.<br><br>Plaintiffs Exhibit 458 (FBI 56) and KSA Exhibit 163 (9/11 Rep.) contain the information cited in the last sentence, aside from Al Hazmi and Hanjour's purported departure date (December 11, 2000), which is not referenced.<br><br>Dr. Abdussattar Shaikh was a long-term and reliable FBI informant; after the 9/11 attacks, he underwent a full investigation by San Diego FBI, including a polygraph examination. Pls. Ex. 131 (PEC-KSA 492 & n.198).<br>"Based on its investigation, however, the San Diego FBI concluded that the informational asset [Dr. Shaikh] had not been complicit in plotting the attacks." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1826. | Shortly after Hazmi and Hanjour left, Bayoumi invited Dr. Shaikh to his home for dinner. Bayoumi videotaped Dr. Shaikh at the dinner. The date of that dinner can be set by the fact that Bayoumi is congratulated on the birth of his daughter, which occurred on ▉▉▉▉▉ 2000. Ex. 10M (MPS911-CLIP Video Exhibit); Ex. 11M (MPS911-CLIP Video Screenshots). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 10M (*Video of Dr. Shaikh at Bayoumi's Parkwood Apartments Home, Plus Bayoumi With Saudi Students* MPS911-CLIP Video Exhibit) shows two men inside of Bayoumi's home interacting with Al Bayoumi and his son. Al Bayoumi asks one man, who he addresses as Dr. Abdussatar, to recite a poem, a hadith, or any advice. The other individual is addressed as "Dr. Youssef." There is no date on the video, and there is no indication that this is "after Hazmi and Hanjour left."<br><br>Dr. Abdussattar Shaikh was a long-term and reliable FBI informant; after the 9/11 attacks, he underwent a full investigation by San Diego FBI, including a polygraph examination. Pls. Ex. 131 (PEC-KSA 492 & n.198).<br>"Based on its investigation, however, the San Diego FBI concluded that the informational asset [Dr. Shaikh] had not been complicit in plotting the attacks." *Id.* |
| 1827. | In early January 2001, Bayoumi convened a large gathering at the ICSD Mosque framed as an Aqiqa party for the recent birth of his daughter. The blessing was given by Sheikh Abduljalil Mezgouri and many of the same members of Bayoumi's cell at the ICSD Mosque were in attendance including Saad Tarabishi, Maen Alkhawaja, and Fathi Aidarus, all of whom had been at the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 10L (*Video of Ramadan 1421 (December 2000) – ICSD Mezgouri Eid Sermon and* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | welcome party for the hijackers. Ex. 11L (MPS910-CLIP Video Screenshots). | *Bayoumi's Aqiqa Party* MPS910-CLIP Video Exhibit) is an Arabic-language video for which Plaintiffs do not provide a translation. Plaintiffs Exhibit 11L (*Photo of Ramadan 1421 (December 2000) – ICSD Mezgouri Eid Sermon and Bayoumi's Aqiqa Party* MPS910-CLIP Video Screenshots) contains screenshots from the video.

Plaintiffs do not cite any record evidence supporting the first sentence. They also do not cite admissible evidence identifying the individuals in Plaintiffs Exhibit 10L (Video of Ramadan 1421) and Plaintiffs Exhibit 11L (Screenshots from Video of Ramadan 1421).

The video shows a party of Al Bayoumi's daughter. There is no evidence that that this party was "framed." There is also no evidence that there was any "cell" at the ICSD Mosque.

There was no "welcome party" for the 9/11 hijackers. *See  See* Response to Plaintiffs' Aver. Section XXII. Al Bayoumi hosted a reception at his apartment to honor those who had volunteered and led prayers at the Al Madina Mosque during Ramadan. Bayoumi Tr. 460:12-461:7, 714:24-715:18; *see also* KSA Ex. 92 (FBI 4017) (still image from video of event showing plaque from "Masjid Al-Madinah Al-Munawarah" giving "Many Thanks to Mr. Khalid Abdul Rab for his kind assistance," signed "Omar Al-Bayoumi" and dated "Ramadan 2000"). |
| 1828. | Also filmed at the Aqiqa party on Bayoumi's video camera was another Saudi resident of the Parkwood Apartments and former Saudi Embassy employee Osama Bassnan. Ex. 11L (MPS910-CLIP Video Screenshots). As discussed above, while working at the Saudi Embassy, Bassnan, hosted a party to honor the "Blind Sheikh" Omar Abdel Rahman in October 1993 just a | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 10L (Video of Ramadan 1421) is an Arabic-language video for which Plaintiffs do not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | few months before the Blind Sheikh visited the Ibn Taymiyah Mosque in Los Angeles. Ex 5, Youssef Rpt. 20, 90. | provide a translation. Plaintiffs Exhibit 11L (Screenshots from Video of Ramadan 1421) contains screenshots from the video. Plaintiffs do not cite admissible evidence identifying the individuals in Plaintiffs Exhibit 10L and Plaintiffs Exhibit 11L, let alone any such individual's occupations or place of residence.<br><br>The Youssef Report should be excluded. *See* Objections Chart.<br><br>Pls. Ex 566 (FBI 11761) – the source for Plaintiffs' assertions regarding the purported party to honor the "Blind Sheikh" – is inadmissible hearsay. *See* Objections Chart. Further, that source puts the date of the purported party on October 17, 1992 – not in October 1993. |
| 1829. | Bayoumi and Thumairy had five phone calls on December 9; three calls on December 10; and one call on December 11, the day that Hazmi and Hanjour left San Diego. Ex. 12B (Calls between Bayoumi and Thumairy). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 12B (Calls between Bayoumi and Thumairy) is an improper summary exhibit. *See* Objections Chart. Plaintiffs Exhibit 12B misattributes to Al Thumairy eight calls made to the number ███0777 prior to April 2002 when he started using it, including 2 of the calls on December 10 referenced in Plaintiffs' assertion. The subscriber records for this number list the subscriber as ███████, and the user as ███████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5.<br><br>Plaintiffs Exhibit 12B relies solely upon an FBI memorandum – inadmissible hearsay – as evidence that 22 calls transpired at all, including |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | all of the calls on December 9, 10, and 11 referenced in Plaintiffs' assertion. *See* Pls. Ex. 12B (citing Pls. Ex. 2X (EO 2757, EO2758) in REF 1 column). Despite the production of hundreds of pages of phone records for both Al Bayoumi and Al Thumairy, none of these 22 calls are reflected in the phone records.<br><br>After removing the improperly-included calls, Plaintiffs Exhibit 12B shows 0 calls between Bayoumi and Thumairy on December 9, 10, and 11.<br><br>Even if Al Thumairy and Al Bayoumi placed any of these calls, there is no evidence that any of these calls concerned the hijackers. Moreover, 4 of the calls on December 9, one of the calls on December 10, and the call on December 11 were 1 minute in length indicating that they likely went to voicemail. |
| 1830. | Hanjour and Hazmi travelled to Arizona, where they stayed until late March 2001. Ex. 5, Youssef Rpt. 219; Ex. 155, FBI Hijackers Timeline at 127-131. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 155 (FBI Hijackers Timeline), is inadmissible hearsay. *See* Objections Chart.<br><br>The timeline states that that Hanjour and Al Hazmi travelled to Arizona, where they stayed until late March 2001. Pls. Ex. 155 (FBI Hijackers Timeline) at 127-131. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1831. | In addition to being in frequent contact with Thumairy, Bayoumi was also in touch with the Saudi Government Institute for Islamic and Arabic Studies in America (IIASA). Between December 29, 2000 and January 6, 2001, IIASA held a "Shari'ah Intensive Program" at the King Fahd Mosque "conducted by prominent scholars from [Imam University in Saudi Arabia] and the US." A copy of the flyer for that program, faxed on Dec. 17, 2000, was found in the FBI's raid on Bayoumi's Mosque office. Ex. 535, FBI 4392-4394 (English version), and FBI 4439 (Arabic version). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 535 (FBI 4392-4393, FBI 4439) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 535 contains the quoted language attributed to it. The exhibit does not indicate when or where the FBI found it. The assertion that Al Bayoumi was "in touch" with IIASA is contradicted by Al Bayoumi's deposition testimony. *See* Pls. Ex. 120 (Bayoumi Tr.) 325:4-9 ("Q: Sir, when you went to Washington, did you go to the Institute of Islamic and Arabic Studies in America? A: No. Q: Have you ever been there? A: No."). There is also no evidence that Al Bayoumi attended any program at the King Fahad Mosque in December 2000 or January 2001. |
| 1832. | According to Plaintiffs's expert Youssef, "[o]n the afternoon of December 14, 2000, Bayoumi called Thumairy and then immediately called IIASA." Ex. 5, Youssef Rpt. 220: Ex.498, FBI 001492-1496 at 1496. Youssef further determined "Bayoumi called IIASA twenty more times over the next two months." Ex. 2, EO 2763; Ex. 12M (Bayoumi calls to IIASA) and "Thumairy called IIASA nineteen times during the same period." Ex. 12F (Thumairy calls to IIASA); Ex. 5, Youssef Rpt. 220-21. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2X (EO 2763) is inadmissible hearsay, and the Youssef Report should be excluded. *See* Objections Chart.<br><br>Youssef's assertion that Al Bayoumi called Al Thumairy on December 14, 2000 misattributes both the caller and the recipient of the referenced call. Plaintiffs Exhibit 12B shows a single call made on December 14, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2000 from the publicly-available phone line at the Al Medinah Mosque to ███ 0777. The Mosque phone line was shared by two office telephones at the Mosque that Al Bayoumi testified were available for all to use, and there is no record evidence that it was Al Bayoumi – rather than anyone else at the Mosque – that made the call on December 14, 2000. See Pls. Ex. 120 (Bayoumi Tr.) at 297:11-298:7, 786:8-15. In addition, the subscriber records for the recipient number, ███ 0777, list the subscriber as ███████████, and the user as ████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. <br><br> Plaintiffs Exhibit 12M is an improper summary exhibit. Plaintiffs Exhibit 12M misattributes to Al Bayoumi the calls, which were made from the publicly-available phone line at the Al Medinah Mosque, to the IIASA. As set forth above, there is no evidence that Al Bayoumi made those calls. In addition, Plaintiffs Exhibit 12M relies solely upon inadmissible hearsay in attributing three different phone numbers to the IIASA. No subscriber records were produced to verify that any of the three telephone numbers belonged to IIASA. <br><br> Plaintiffs Exhibit 12F is an improper summary exhibit. Both Plaintiffs Exhibit 12F and Youssef misattribute to Al Thumairy 19 calls made from December 2000 through January 2001 from the number ███ 0777. The subscriber records for this number list the subscriber as ███████ ████████, and the user as ████████████ from July 3, 1999 until August 1, 2000, followed by Al Hatlani from October 1, 2000 through April 22, 2002. Al Thumairy did not become the subscriber for the number until April 22, 2002. *See* KSA Ex. 168, at 3-5. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | After removing these 19 improperly-included calls, Plaintiffs Exhibit 12F shows that Al Thumairy made no calls – not 19 – after September 21, 2000 to any of the numbers that Plaintiffs associate with the IIASA.<br><br>Even if any of these calls took place, there is no evidence that any of these calls concerned the hijackers in any way. |
| 1833. | Also leaving San Diego around the same time as Hazmi and Hanjour was Anwar Al Aulaqi, the Imam of the Al Ribat Mosque who worked with Bayoumi to provide support Hazmi and Mihdhar. During the second half of November 2000 through December 2000, concurrent with the Ramadan 1421 holiday (Nov. 27, 2000 – Dec. 26, 2000), Aulaqi travelled to Saudi Arabia. Ex. 68, [September 21, 2001 Interview of Anwar Al Aulaqi] at 2 ("AULAQI reiterated that he had attended Ramadan in Saudi Arabia during mid-November through mid- December 2000"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 68, (FBI Interview of Anwar Al Awlaki (Sept. 21, 2001)) at 2, is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs cite nothing to support the assertion in the first sentence that Al Bayoumi "worked with" Al Awlaki to support the hijackers. To the contrary, there is no support that any of Al Bayoumi, Al Thumairy, Al Sowailem, Mana, Al Jaithen, Al Mersal, and others including Al Awlaki worked together on a plan to assist the two future 9/11 hijackers, Al Hazmi and Al Mihdhar. There is no evidence of any such support network or plan to assist to the 9/11 hijackers. This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-103.<br><br>In May 2021, the FBI closed Operation Encore and definitively concluded that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | In 2020, Plaintiffs' expert, Meleagrou-Hitchens, published a book regarding Al Awlaki in which he opined that Al Awlaki likely did *not* assist the hijackers. *See* Meleagrou-Hitchens Tr. 133:18-134:6 (quoting the book: "That Awlaki, even after openly associating with Al-Qaeda for around eight yours after 9/11, never made any claims against this suggests that he had no direct knowledge or involvement, otherwise, it would be hard to believe that during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its arch enemy."). <br><br> After the 9/11 attacks, Al Awlaki condemned the attacks both publicly to the New York Times and Washington Times, and privately in an email to his younger brother describing the attacks as "horrible." Meleagrou-Hitchens Tr. 319:19-320:14. <br><br> In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY Rep.) 177. <br><br> Further, the record evidence reflects that Al Bayoumi only knew Al Awlaki as the imam of the Al Ribat Mosque and occasionally asked him for religious guidance or suggested that others do so. Bayoumi Tr. 482:12-21; *see id.* at 483:9-13 (explaining that, if "one of the worshippers had a question," Al Bayoumi might have "directed him to Anwar or to the other Imam of the Islamic Center Abu Bakr"); *id.* at 484:11-15 (Al Bayoumi "might have [had] a question" for Al Awlaki but would not have "discuss[ed] religious matters" with him); *id.* at 589:9-16 (Al Bayoumi "reached out" to Al Awlaki "on occasion"). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1834. | While on this trip Aulaqi received an offer to become the Imam of the high- profile Dar al Hijrah Mosque in Falls Church, VA. Aulaqi's new position was brokered (and possibly funded) by the Riyadh-based World Assembly of Muslim Youth (WAMY). WAMY was led by Abdullah Al Turki, who served as MOIA's Minister until 1999. Ex. 349, WAMY SA2444. Aulaqi's contract with the Dar Al Hijrah Islamic Center for the Imam position was found in WAMY's records. Ex. 348, WAMY Intl 015165. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, Plaintiffs Exhibit 349 (WAMY SA2444) and Plaintiffs Exhibit 348 (WAMY Intl 15165) have not been properly authenticated and are inadmissible hearsay. *See* Objections Chart.

Plaintiffs fail to cite any record evidence to support the first and second sentences of this paragraph, which also contain improper attorney argument. Al Awlaki's position at the Dar al Hijrah Mosque was not "brokered" by the U.S. branch of WAMY. *See* KSA Ex. 167 (Sageman Rep.) 708-709; *see* KSA Ex. 178 (Sageman WAMY Rep.) 175-180. Plaintiffs Exhibit 348 (WAMY Intl 15165) is an unauthenticated contract – containing nothing indicating that the contract was executed – between Al Awlaki and the Dar Al-Hijrah Islamic Center that makes no mention of WAMY.

Plaintiffs Exhibit 349 (WAMY SA2444) reflects that Abdullah Al Turki was the Secretary General of WAMY in 1996. Plaintiffs fail to cite any record evidence to support the assertion that Al Turki served as MOIA's Minister until 1999. |
| 1835. | Aulaqi's contract is undated, but Aulaqi started his new job at the Dar Al Hijrah Mosque soon after returning from his Ramadan trip. Aulaqi's credit card records show that he did not use his card at any locations between Nov. 11, 2000, and Jan. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 6, 2001, when he made his first charge in Falls Church, VA, where the Dar Al Hijrah Mosque was located. Ex. 508, FBI 1845-51. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 348 (WAMY Intl 15165) is inadmissible hearsay and also has not been properly authenticated. *See* Objections Chart.<br><br>Plaintiffs Exhibit 348 is an unauthenticated contract – containing nothing indicating that the contract was executed – between Al Awlaki and the Dar Al-Hijrah Islamic Center that makes no mention of WAMY. It is undisputed that the document is undated. Plaintiffs fail to cite any record evidence to support the assertion in the first sentence that "Aulaqi started his new job at the Dar Al Hijrah Mosque soon after returning from his Ramadan trip." Al Awlaki's position at the Dar al Hijrah Mosque was not "brokered" by the U.S. branch of WAMY. *See* KSA Ex. 167 (Sageman Rep.) 708-709; *see* KSA Ex. 178 (Sageman WAMY Rep.) 175-180.<br><br>Plaintiffs Exhibit 508 (FBI 1847-1850) reflects several transactions in between November 11, 2000 and January 6, 2001, which do not specify a geographic location for the transaction. Admitted that January 6, 2001 is the date of the first charge where a location of Falls Church, Virginia is indicated. |
| 1836. | The U.S. branch of WAMY that arranged for Aulaqi's new position at the Dar al Hijrah Mosque was in the same town of Falls Church, VA, and was run by a Saudi Embassy officer who worked for MOIA inside the U.S.: Abdullah Bin Laden, a nephew of Osama Bin Laden. Saudi Arabia assigned Abdullah Bin Laden to work for MOIA inside the U.S. and teach at the Saudi Government's IIASA in Northern | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  | Virginia. Ex. 349, WAMY SA2444. Abdullah Bin Laden held the same position of "Administrative Officer" given by Saudi Arabia to Fahad Al Thumairy and other MOIA officials. Ex. 333, Affidavit of Abdullah Awad Binladin (Nov. 19, 2005) at 1. Throughout his time in the U.S., Saudi Arabia provided diplomatic cover for Bin Laden as an Administrative Officer even though he worked outside of the Saudi Embassy. *Id.* | To the extent a response is required, Plaintiffs Exhibit 349 (WAMY SA2444) and Plaintiffs Exhibit 333 (Affidavit of Abdullah Awad Binladin (Nov. 19, 2005)) are inadmissible hearsay. *See* Objections Chart.<br><br>Al Awlaki's position at the Dar al Hijrah Mosque was not "arranged" by the U.S. branch of WAMY. *See* KSA Ex. 167 (Sageman Rep.) 708-709; *see* KSA Ex. 178 (Sageman WAMY Rep.) 175-180. It is undisputed that the referenced branch of WAMY was located in Falls Church, Virginia.<br><br>Plaintiffs cite no admissible evidence for the assertion that Abdullah Bin Laden was a Saudi Embassy officer whom Saudi Arabia assigned to work for MOIA inside the U.S. and to teach at IIASA. The cited exhibit, Plaintiffs Exhibit 349, reflects only that the U.S. branch of WAMY assigned "[s]upervision tasks of [WAMY's] office in Washington" to Abdullah Bin Laden, and that Abdullah was then "a teacher at the Institute of Islamic and Arabic Studies in Imam Mohammed bin Saud Islamic University in Washington." Pls. Ex. 349 (WAMY SA2444). There is no mention of Saudi Arabia making these purported assignments.<br><br>Plaintiffs emphasize that Abdullah Bin Laden was a nephew of Osama Bin Laden, but there is no evidence that the former was a terrorist, linked to al Qaeda, or linked to the 9/11 terrorists. *See* KSA Ex. 178 (Sageman WAMY Rep.) 173-175. The exhibit on which Plaintiffs rely – Plaintiffs Exhibit 333, the purported affidavit of Abdullah Bin Laden – states the following, at 3: "I have never provided any material support or support of any nature whatsoever to al Qaeda or any other terrorist organization. To my knowledge, during the period I was involved with WAMY-US, that organization had no dealings or association with and provided no support to al Qaeda or any other terrorist organization."<br><br>Plaintiffs Exhibit 333 (Affidavit of Abdullah Binladin) at 2, contains the quoted language indicating Abdullah Bin Laden's purported title of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "administrative officer." That exhibit does not purport to state the titles held by Al Thumairy or others. This exhibit also does not support Plaintiffs' assertion that Saudi Arabia provided "diplomatic cover" to Abdullah Bin Laden even though he worked outside the embassy, stating to the contrary, at 2: "For several years before my return to Saudi Arabia in 2000, I was an administrative officer at the Saudi Arabian Embassy, and worked full time in various information technology roles for entities associated with the Embassy." |
| **XXIV.A.** | **Bayoumi called Sudairy on March 31, 2001 to discuss the arrangements for Hanjour and Hazmi's cross-country trip from Arizona to reconnect with Aulaqi in Virginia.** | To the extent a response is required, Plaintiffs cite no support for the assertions in this header, which find no support in the record evidence. *See* Response to Pls. Aver. ¶¶ 1837-1849. |
| 1837. | At the end of March 2001, 9/11 hijackers Hani Hanjour and Nawaf Al Hazmi left Arizona in Hazmi's Toyota Corolla and started heading east. Ex.155, FBI Hijackers Timeline at 130-31; Ex. 521, FBI 3380-81. Hanjour and Hazmi's apartment rental in Mesa, AZ outside of Phoenix ended on March 31, 2001. Ex. 155, FBI Hijackers Timeline at 131; Ex. 156, FBI Hijacker Financial Transaction Spreadsheet at 46. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 155 (FBI Hijackers Timeline) and Plaintiffs Exhibit 156 (List of 9/11 Hijackers' Financial Transactions from 6/21/1996 through 9/16/2001) are inadmissible hearsay. *See* Objections Chart. |
| 1838. | On March 30, Hanjour contacted the local Arizona utility company and advised that he was leaving. The utility company's records contained a forwarding address for Hanjour at 3159 Row Street in Falls Church, Virginia, the address of the Dar Al Hijrah | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mosque – where Anwar Aulaqi had moved from San Diego and was now the Imam. Ex. 155, FBI Hijackers Timeline at 131; *See* 9/11 Commission Report at 517 n. 35 ("Aulaqi took a position at the Dar al Hijra mosque in early 2001"); Ex. 2, EO 2805, 3401, 3404 (Dar Al Hijrah Mosque where Aulaqi was Imam located at ███████ in Falls Church, VA). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 155 (FBI Hijackers Timeline), Plaintiffs Exhibit 2X (EO 2805), and Plaintiffs Exhibit 2BB (EO 3401, 3404) are inadmissible hearsay. *See* Objections Chart.<br><br>Ex. 155 (FBI Hijackers Timeline) at 131, reflects that Hanjour provided his local utility two forwarding addresses. Plaintiffs omit the second address: 14625 Baltimore Avenue, Box 433, Laurel, MD 20707. |
| 1839. | A Broadwing Communications phone record produced by the MPS shows that Bayoumi placed a phone call on March 31, 2001 to "Columbia MO" number ███████ 7326" (30 min.). Ex. 314, MPS118_23 (Broadwing communications phone record of Bayoumi). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is not disputed. |
| 1840. | The number dialed by Bayoumi was that of MOIA propagator Mutaeb Al Sudairy. The MPS recovered a note in Bayoumi's green folder of contacts with the information "Mutaeb al-Sudairy ███████ 7326 Columbia MO." Ex. 12BB, MPS688_2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 12BB (MPS688) is inadmissible hearsay. *See* Objections Chart.<br><br>With respect to the typed phone list in Plaintiffs Exhibit 12BB (MPS 688), Al Bayoumi testified that anyone at the Al Madina Mosque could add names and telephone numbers to the list, that as such he was not familiar |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | with all of the names and numbers written on it, and that it was possible some of the phone numbers may have been incorrect as he did nothing to confirm the accuracy of the listed phone numbers.  *See* Pls. Ex. 120 (Bayoumi Tr.) 781:19-784:5.  As such, the typed phone list is inadmissible hearsay.<br><br>It is undisputed that Al Bayoumi testified that Al Sudairy gave him the phone number ("573 442 7326") reflected in Plaintiffs Exhibit 12BB (MPS688_2).  *See* Pls. Ex. 120 (Bayoumi Tr.) 278:11-23, 279:1-21. |
| 1841. | Bayoumi confirmed that he prepared the note in his handwriting. Ex. 120, Bayoumi Dep. 278:11-23. Bayoumi admitted that Sudairy gave him his Missouri contact phone number "when he come, when he arrive" in California. Ex. 120, Bayoumi Dep. 279:1-10 (Q: And did Mutaeb al-Sudairy give you his contact information? A. (In English) Yes.  When he come, yes."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the cited testimony does not specify that Al Sudairy gave Al Bayoumi his contact information when he arrived in California, only that Al Sudairy gave Al Bayoumi his contact information "when he come, when he arrive."  *Id.* at 279:7-8. |
| 1842. | Sudairy must have given Bayoumi the information after he arrived in the U.S. in June 1999. Sudairy claimed that he was not sent by Saudi Arabia to Missouri until the summer of 2000. Ex. 119, Sudairy Dep. 281:15-21. A February 2001 MOIA document confirmed that Sudairy's workplace was in Missouri. Ex. 59, KSA 1307-1309 (Sadhan Dep. Ex. 498). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Al Sudairy testified that he moved to Missouri in 2000.  Sudairy Tr. 281:15-21. Sudairy testified that he moved to Missouri "[a]pproximately after the spring," stayed for a few days to organize a lease before vacationing in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia, and then returned to Missouri for the start of the fall semester of an English language program. *Id.* 281:15-283:6. |
| 1843. | Plaintiffs' expert Youssef determined the last known time that Bayoumi and Sudairy had "phone contact... was their series of 5 calls in the last week of January and first week of February 2000, when Bayoumi was coordinating with Thumairy, Consulate diplomat ████████, and others for Hazmi and Mihdhar to move from Los Angeles to San Diego." Ex. 5, Youssef Rpt. 221-22; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Youssef Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 12A (Phone Chart of Phone Calls Nov. 1999 – March 2000) is an improper summary exhibit.<br><br>There is no evidence that Al Bayoumi coordinated with Al Thumairy, ████████ or anyone else for Al Hazmi and Al Mihdhar to move from Los Angeles to San Diego. |
| 1844. | At the time of Bayoumi's call to Sudairy on March 31, 2001, Hazmi and Hanjour were either on the road or about to depart from Arizona on their cross-country car trip to Virginia. On April 1, 2001 at 6:59 p.m., Hazmi was ticketed for speeding in Clinton, Oklahoma while heading east on U.S. Interstate 40. Ex 155, FBI Hijackers Timeline at 131. The driving distance from Mesa, Arizona to Clinton, Oklahoma is approximately 860 miles. The driving time is approximately 13 hours. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 155 (FBI Hijackers Timeline), is inadmissible hearsay. *See* Objections Chart.<br><br>The cited page of Plaintiffs Exhibit 155 (FBI Hijackers Timeline) purports to reflect that Al Hazmi was ticketed for speeding at 6:59 p.m. on April 1, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2001, but this page does not indicate in which direction Al Hazmi was traveling. |
| 1845. | Clinton is located about 86 miles west of Oklahoma City. Hazmi and Hanjour arrived in Front Royal, VA, about 61 miles west of Falls Church, VA, on April 3, 2001. Ex. 155, FBI Hijackers Timeline at 131 (showing that Hani Hanjour made ATM withdrawal at a "Handy Mart" in Front Royal, VA). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 155 (FBI Hijackers Timeline) is inadmissible hearsay. *See* Objections Chart. |
| 1846. | Based on the hijackers' location, heading, and destination, the timing of Bayoumi's call to Sudairy shows that Bayoumi made the call to coordinate the arrangements for Hazmi and Hanjour to meet with Sudairy and possibly also Sadhan. That meeting took place in Oklahoma, Missouri, or the hijackers met Sadhan in Oklahoma on April 1 and Sudairy in Missouri on April 2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs cite nothing to support the assertions in this paragraph. It is rank speculation that the call was made to coordinate arrangements for Al Hazmi and Al Mihdhar to meet with Al Sudairy and possibly Al Sadhan or that any such meeting occurred.<br><br>All of the admissible evidence is to the contrary. Al Sudairy and Al Sadhan both testified that they did not know the hijackers, and had never met or spoken to the hijackers. *See* Sudairy Tr. 365:9-13 (testifying that prior to the attacks Al Sudairy had never even heard of the hijackers' names); Sadhan Tr. 383:22-384:20. |
| 1847. | At the time, Sudairy's close MOIA associate Adel Al Sadhan was working for | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | MOIA in Norman, Oklahoma. Ex. 59, KSA 1307-1309 at 1309 (Sadhan Dep. 498) (February 2001 MOIA record shows that Sadhan's "workplace" is Oklahoma); Ex. 99, Sadhan Dep. 323:22-324:5, 328:24-329:19 (Sadhan had an apartment and registered his car in Oklahoma). Norman, Oklahoma was about 103 miles east of where Hazmi and Hanjour were pulled over by the police at about 7:00pm. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the characterization of Al Sadhan and Al Sudiary as "close MOIA associate[s]" is unsupported by any record evidence.<br><br>It is undisputed that Plaintiffs Exhibit 59 at KSA 1308 reflects that Al Sadhan's assigned workplace in February 2001 was in Oklahoma, but that exhibit does not indicate the city where Al Sadhan was working. |
| 1848. | Bayoumi had Sadhan's contact information, including his phone number in Oklahoma ▮▮▮▮▮6003") in his handwritten address book right next to his listing for Sudairy. Ex. 12AA, MPS738_24. Bayoumi had drawn a line through Sadhan's Oklahoma number. Sadhan left Oklahoma that April and was in Kansas on April 12, 2001. Ex. 60, KSA 5461. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 12AA (MPS 738_24, Bayoumi's handwritten address book) is inadmissible hearsay. *See* Objections Chart.<br><br>There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. |
| 1849. | The shortest driving route from Oklahoma City to Falls Church, VA was through Missouri. That route went about 100 miles south of Columbia, MO, where Sudairy was | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | located, and would have required only a short detour. Ex. 155, FBI Hijackers Timeline 130-31; FBI 3380-81; Ex. 5, Youssef Rpt. 222, n. 934. | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.

To the extent a response is required, the Youssef Report should be excluded.  Plaintiffs Exhibit 155 (FBI Hijackers Timeline) is inadmissible hearsay.  *See* Objections Chart.

Plaintiffs cite nothing (nor does Youssef, in the relevant portion of his report, Pls. Ex. 5 (Youssef Rep.) at 222, n.934) in support of the assertion that the shortest driving route from Oklahoma City to Falls Church, VA is through Missouri and would go about 100 miles south of Columbia, Missouri.  In fact, the shortest driving route from Oklahoma City to Falls Church, VA is through Arkansas, and there would be no short detour to Columbia, Missouri.[1] |
| XXV. | **THE CONNECTIONS BETWEEN THE CALIFORNIA SUPPORT CELL AND THE EAST COAST NETWORK FOR THE HIJACKERS ARE EVIDENCE OF A COORDINATED MATERIAL SUPPORT SYSTEM** | As set forth in the response to sections XV to XXII, there was no "California support cell," and there is no evidence of any "coordinated material support system."  This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers.

The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy.  It concluded:  "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar.  Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217.  On Al Bayoumi, it concluded:  "[W]e have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.  Our investigators who have dealt directly with him and studied his background find him to be an unlikely |

---

[1] KSA Ex. 287 (Google Maps, *Distance from Oklahoma City, Oklahoma to Falls Church, Virginia*, https://perma.cc/PAE8-U2KV).

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | candidate for clandestine involvement with Islamist extremists." *Id.* at 218 (footnote omitted). |
| | | The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2K (EO 491). |
| | | The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015). |
| | | In May 2021, the FBI closed Operation Encore and definitively concluded that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11). |
| 1850. | FBI phone analysis found that the home phone number of Saudi Consulate ████ 6549) received a call on June 14, 2001 at 9:31 a.m. (3 mins.) from the Falls Church, VA phone number used by Eyad Rababah | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and ▮▮▮▮▮▮▮▮▮ 4290). Ex. 2, EO 2703-5; Ex. 566, FBI 11756-57. As Plaintiffs' expert Youssef concluded, "[t]he call is significant" because, as discussed below Rababaah and ▮▮▮▮▮ were part of the East Coast network for the hijackers and, as discussed above, "...▮▮▮ played a key role along with Thumairy, Bayoumi, and Anwar Al Aulaqi in the California support network for hijackers Hazmi and Mihdhar." Ex. 5, Youssef Rpt. 222. | Plaintiffs Exhibit 2W (EO 2703-05) and Plaintiffs Exhibit 566 (FBI 11756-57) are inadmissible hearsay. The Youssef report should be excluded. *See* Objections Chart.<br><br>These hearsay exhibits state that a call was made from the home of Rababah and Chehazeh to the home of ▮▮▮▮▮▮ (who was a non-Saudi translator, not an "official" at the Los Angeles consulate). Mana Tr. 53:23-54:4. There is no evidence of who made the call, nor is there any evidence of who received the call. There is no evidence that this call had anything to do with the hijackers.<br><br>Other documents cited by Plaintiffs state that Rababah did not live at the Falls Church address. Pls. Ex. 2P (EO 1303) ("Alrababah did not live with ▮▮▮▮▮ in Falls Church. According to ▮▮▮▮▮ Alrababah resided in Connecticut and frequently traveled to Falls Church and would occasionally stay with ▮▮▮▮▮ on the weekends."). June 14, 2001 was a Thursday, and so it is unlikely that any such call would have been made by Rababah. Moreover, as set forth below, shortly after the 9/11 attacks, ▮▮▮▮▮ contacted the FBI to report his knowledge of Hanjour and Hazmi. *Id.* (EO 1310); Pls. Ex. 324 (Decl. of David Rush Ex. A, ¶¶ 17-20). This voluntary reporting would be entirely inconsistent with ▮▮▮▮▮ being part of any witting support network.<br><br>The 9/11 Report states that the last time that Rababah saw any of the hijackers was in May 2001. *See* KSA Ex. 163 (9/11 Rep.) 230. It further states that, "[w]ithin a few weeks, Hanjour, Hazmi, and several other operatives moved to Paterson[, New Jersey,] and rented a one-room apartment." *Id.* Thus, any call that was made in June 2001 from Falls Church could not have concerned any assistance to the hijackers. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | In addition, ▮▮▮ had never heard the hijackers' names prior to the 9/11 attacks and never met them. Plaintiffs Exhibit ▮▮▮▮▮▮ He never provided any assistance to the hijackers and has never instructed anyone to provide assistance to the hijackers. *Id.*<br><br>Another document cited by Plaintiffs, Pls. Ex. 2W (EO 2695), states that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Thus, to the extent that the referenced call was actually between ▮▮▮ and ▮▮ (which has not been established), the likelihood is that it concerned ▮▮▮▮'s job search.<br><br>Youssef's assertion that ▮▮▮, Al Thumairy, Al Bayoumi, and Anwar Al Aulaqi were part of a "California support network" or that they played a key role in wittingly helping the hijackers is baseless.<br><br>As set forth in the response to sections XV to XXII, there was no California support cell, and there is no evidence of any "coordinated material support system." This has also been the consensus conclusion of all the authoritative U.S. government agencies and panels commissioned to investigate this issue of possible support to the 9/11 hijackers. |
| 1851. | The FBI concluded that it "ascribes a high level of confidence that either ALRABABAH or ▮▮▮▮ made the phone call to ▮▮▮ based upon call patterns from target number ▮▮▮▮4290 directly before and after the call to ▮▮▮▮▮ Ex. 2, EO 2705. The FBI concluded that "[c]ommunications exploitation indicates ▮▮▮ had | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2705) and Plaintiffs Exhibit 2EE (EO 3703) are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | direct contact with known 9/11 facilitators before the September 11th attacks in New York and Washington DC." Ex. 2, EO 3703. | Plaintiffs Exhibit 2EE (EO 3703) does not contain the quoted language.<br><br>The FBI did not make any conclusions in these hearsay documents, which are preliminary investigative materials and inadmissible. The final conclusion of the FBI was that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 11).<br><br>██████ had never heard the hijackers' names prior to the 9/11 attacks and never met them. Plaintiffs Exhibit ████████████ He never provided any assistance to the hijackers and has never instructed anyone to provide assistance to the hijackers. *Id.* |
| 1852. | A March 2016 FBI Electronic Communication obtained the toll records of calls and presented the FBI's phone call analysis. The EC concluded that:<br><br>ALRABABAH and ████████ provided logistics assistance to 9/11 Hijackers HANJOUR and HAZMI, helping them find lodging and driving them between Virginia, Connecticut and New Jersey. In interviews, ALRABABAH and ██████ described the assistance they provided the Hijackers as emanating from a 'chance encounter,' | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2704) is inadmissible hearsay. *See* Objections Chart.<br><br>The FBI did not make any conclusions in this hearsay document, which is inadmissible preliminary investigative materials. The quoted statements are also objectively false and show that they are unreliable. There is no |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | neither pre-planned nor coordinated in advance. This communications exploitation analysis shows ALRABABAH and ███████████ S phone in Virginia in direct communication with the home phone of ███████████ met with Omar AL BAYOUMI, approximately one hour before BAYOUMI had a 'chance encounter' with HAZMI and MIDHAR in Los Angeles and then assisted them with travel and lodging in California. Ex. 2, EO 2704. | evidence that Al Bayoumi ever helped Hazmi and Mihdhar with "travel . . . in California." Pls. Ex. 2W (EO 2704). The final conclusion of the FBI was that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 [Review] Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Pls. Ex. 2A (EO 0011). |
| 1853. | Rababah, a Jordanian, and ███████, a Syrian, lived in Riyadh, Saudi Arabia before emigrating to the U.S. and settling in Virginia. Ex. 2, EO 1440-41. While living in Riyadh, ███████ worked for Saudi government as a teacher and had numerous high-level contacts with Saudi Government officials who reached out on his behalf to the Saudi Embassy in Washington. Ex. 2, EO 1302; ███████████████████████ ███████████████████████ ███████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Plaintiffs Exhibit 2Q (EO 1440-41), Plaintiffs Exhibit 2P (EO 1302), and Plaintiffs Exhibit 324 are inadmissible hearsay. See Objections Chart. Plaintiffs Exhibit 324 states that ███████ was a private travel agent in Saudi Arabia prior to coming to the United States on July 3, 2000. Pls. Ex. 324 (Rush Decl. Ex. A, ¶¶ 3-11). Plaintiffs Exhibit 2P (EO 1302) states that ███████ worked in tourism and, through that job, met several Saudi diplomats. After he entered the United States on July 3, 2000 (after Mihdhar had left the United States), he attempted to work at the Saudi embassy, but was unable to do so. Pls. Ex. ████████████ |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2P (EO 1304-06) describes the very limited interactions that ▮ had with the Hazmi and Hanjour.<br><br>The exhibits that Plaintiffs cite further state that, shortly after the 9/11 attacks, ▮ contacted the FBI to report his knowledge of Hanjour and Hazmi. Pls. Ex. 2P (EO 1310); Pls. Ex. ▮ This voluntary reporting would be entirely inconsistent with ▮ being part of any witting support network. |
| 1854. | The Saudi Embassy offered Chehazeh a teaching position at the Islamic Saudi Academy, the Arlington, VA school operated by Saudi Ministry of Education and the Embassy. ▮ Ex. 324, *Chehazeh v. Holder*, Civ. No. 09-cv-5684 (FSH) (Nov. 10, 2009), Ex. 324, Declaration of David Rush, Ex. A, ECF 2-1 at 2-4, 45, 133, 173. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2622), Plaintiffs Exhibit 2Q (EO 1478), and Plaintiffs Exhibit 324 are inadmissible hearsay. *See* Objections Chart.<br><br>Pls. Ex. 2W (EO 2622) purports to be a list of items taken from ▮ when he was taken into custody. Pls. Ex. 2Q (EO 1478) purports to be a summary of an interview with Rababah. Neither states anything about ▮ being offered any employment.<br><br>Pls. Ex. 324 (Rush Decl Ex. D) is a legal brief filed by Chehazeh in an immigration action and states that "[h]e was offered a position of employment with the Saudi Arabian Embassy, to teach Arabic, but lacked employment authorization and thus was unable to take the offer." *Id.* at 5. |
| 1855. | In March 2001, Chehazeh moved to Falls Church (along with his friend Rababah) to take the teaching job ▮ ; Ex.324, *Chehazeh v. Holder*, Civ. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | No. 09-cv- 5684 (FSH) (Nov. 10, 2009), Declaration of David Rush, Ex. A, ECF 2-1 at 2-4, 45, 133, 173. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2622), Plaintiffs Exhibit 2Q (EO 1478), and Plaintiffs Exhibit 324 are inadmissible hearsay.<br><br>Plaintiffs Exhibit 2W (EO 2622) purports to be a list of items taken from ▮▮▮▮▮ when he was taken into custody. Plaintiffs Exhibit 2Q (EO 1478) purports to be a summary of an interview with Rababah. Neither states anything about a teaching job. Plaintiffs Exhibit 324 states that, in February 2001, Chehazeh moved Falls Church, Virginia, "because I hoped that Saudi friends of mine could help me get a job at the Saudi embassy." Pls. Ex. 324 (Rush Decl. Ex. A, ¶ 14). The same exhibit states that Chehazeh lacked employment authorization and therefore could not work for the embassy. *Id.* Ex. D, at 5.<br><br>Other documents cited by Plaintiffs state that Rababah did not live at the Falls Church address. Pls. Ex. 2P (EO 1303) ("Alrababah did not live with ▮▮▮▮▮ in Falls Church. According to ▮▮▮▮▮ Alrababah resided in Connecticut and frequently traveled to Falls Church and would occasionally stay with ▮▮▮▮▮ on the weekends."). |
| 1856. | ▮▮▮▮▮ contacts at the Saudi Embassy included Saudi Attaché Abdul Rahman Alhosain. Ex. 2, EO 2619, 2622, 2623. In 2001, Abdulrahman Alhosain was on the U.S. State Department's list representing Saudi Arabia's Embassy in Washington D.C. Ex. 130, U.S. State Department Diplomatic List Fall 2001 at 7. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2619, 2622-23) is inadmissible hearsay. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2W (EO 2622-23) purports to be a list of items taken from ▮▮▮▮ when he was taken into custody. It does not discuss any of ▮▮▮▮ contacts at the embassy. |
| | | Plaintiffs Exhibit 2W (EO 2619) also does not state that ▮▮▮▮ had contacts with "Abdul Rahman Alhosain." It states that, according to Rababah, ▮▮▮▮ "had friends in the Saudi Embassy in Moscow from his country that had placed a call to help him attain a teaching position. He described the Moscow Officials as Talal Aciri (phonetic) and Mohammed Al Mansour who is the President of the Saudi School in Moscow. They were to have called Abdul Rahman A. Alhosain, telephone (202)298-8814, of the Saudi Arabian Cultural Mission in Washington D.C. for assistance." |
| 1857. | ▮▮▮▮ also had contacts with the Director General of the Islamic Saudi Academy, Suliman Naser Alfareh aka Sulaiman al Fraih. Ex. 2, EO 2622-23 (Business cards of Fraih and Alhosain were found in ▮▮▮▮'s wallet when seized by the FBI in October 2001.); Ex. 160, Fraih Letter from Islamic Saudi Academy. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2622-23) and Plaintiffs Exhibit 160 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 2W (EO 2622-23) purports to be a list of items taken from ▮▮▮▮ when he was taken into custody. There is no evidence that "Suliman Naser Alfareh" is the same person as Sulaiman al Fraih. Moreover, that ▮▮▮▮ had business cards for certain individuals does not demonstrate that he knew them or ever contacted them. |
| 1858. | ▮▮▮▮ also had contacts with the Saudi Consulate in Los Angeles where Mana worked; according to Rababah, ▮▮▮▮ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | placed phone calls to the Consulate "throughout 2000 and 2001." Ex. 2, EO 2695. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2W (EO 2695) is inadmissible hearsay. *See* Objections Chart.<br><br>The exhibit states that ▮▮▮▮ [sic] used the land-line telephone in their shared Virginia apartment to contact the Saudi Consulate in Los Angeles throughout 2000 and 2001. ▮▮▮▮ [sic] was attempting to get a job with the school associated with the Consulate. Al-Rababah stated he, himself, never contacted the Saudi Consulate in Los Angeles and he could not recall any contact with anyone in the Western United States." Pls. Ex. 2W (EO 2695).<br><br>Thus, even the exhibit cited by Plaintiffs explains that any calls to the Consulate related to ▮▮▮▮ attempts to secure employment. |
| 1859. | ▮▮▮▮ s address book had the phone number for Saudi Embassy official Omar Abu Ali, father of Al Qaeda terrorist Ahmed Omar Abu Ali who attended the Islamic Saudi Academy where ▮▮▮▮ was going to work. ▮▮▮▮ was an old friend of Omar Abu Ali. Ex. 2, EO 0402, 3601, 3619-3620. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2J (EO 402), Plaintiffs Exhibit 2CC (EO3601), and Plaintiffs Exhibit 2DD (EO3619-20) are inadmissible hearsay.<br><br>There is no evidence that a Saudi official working at the embassy named Omar Abu Ali was the father of the convicted terrorist Ahmed Omar Abu Ali. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Nor is there any evidence that ███████ personally knew or ever spoke to anyone named Omar Abu Ali or the convicted terrorist Ahmed Omar Abu Ali. Plaintiffs Exhibit 2J (EO 402) (which is hearsay) states only that ███████ worked with an individual, Omar Abu Ali, at the Saudi Consulate in Houston and that this individual later transferred to the Saudi Embassy in Washington, D.C. Plaintiffs Exhibit 2CC (EO 3601) and Plaintiffs Exhibit 2DD (EO 3619-20) (which are also hearsay) state that ███████ had a number in his telephone book for Omar Abu Ali, the father of convicted terrorist Ahmed Abu Ali. |
| 1860. | Shortly after moving to Falls Church, Rababah and ███████ aided several of the 9/11 hijackers in Virginia and New Jersey by arranging lodging, providing transportation, helping them obtain official state identification, and contacting flight schools. Ex. 2, EO 1471- 77, 1302-10; 2471-2474, 2618-24; *See* 9/11 Commission Report at 230. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2Q (EO 1471-77), Plaintiffs Exhibit 2P (EO 1302-10), Plaintiffs Exhibit 2V (EO 2471-74), and Plaintiffs Exhibit 2W (EO 2618-24) are inadmissible hearsay.

The 9/11 Report does not even mention ███████. There is no evidence that he provided any support to any of the hijackers. Indeed, the exhibits Plaintiffs cite state that ███████ had reservations about Hanjour and Hazmi because he believed they were "spies." Pls. Ex. 2Q (EO 1471); Pls. Ex. 2P (EO 1306) (███████ though that Hanjour and Hazmi were "religious spies with the 'Assass,'" who spy on Muslims to determine if they are acting according to Muslim religion.").

The 9/11 Report states that Rababah referred Hazmi and Hanjour to a friend who had an apartment to rent in Alexandria, Virginia. KSA Ex. 163 (9/11 Rep.) 230. It further states that Rababah "tried without success" |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | to get the Hazmi and Hanjour an apartment in Paterson, New Jersey.  And it states that, on May 8, 2001, he accompanied Hazmi, Hanjour, Ahmed Al Ghamdi, and Majed Moqed on a trip to Connecticut, where they "apparently called area flight schools and real estate agents."  Rababah never saw the hijackers again after that trip.  *Id.* <br><br> There is no evidence, and Plaintiffs fail to cite any, that Rababah provided witting assistance to the hijackers. |
| 1861. | The FBI found that Rababah and ▮▮▮▮▮ first described their initial encounter with the hijackers "at a 7-11 convenience store during a 'chance meeting', in a "uniquely similar fashion to the way that Bayoumi described his 'chance meeting' with Hazmi and Mihdhar in Los Angeles." Ex. 566, FBI 11756. But Rababah and ▮▮▮▮▮ ultimately admitted that they met the 9/11 hijackers Nawaf Al Hazmi and Hani Hanjour at the Dar Al Hijrah Mosque in Falls Church, VA where Anwar Aulaqi had moved and was now working as the Imam. *See* 9/11 Commission Report at 230 & 523 n. 75 (citing FBI report re interview of Rababah, June 10, 2002). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 566 is inadmissible hearsay.  *See* Objections Chart. <br><br> The 9/11 Report states that Rababah "was reluctant to admit meeting the hijackers at the mosque and initially told a story about meeting them for the first time at a store.  Rababah attributed his initial prevarication to wanting to protect the mosque from anti-Arab sentiment following September 11."  KSA Ex. 163 (9/11 Rep.) 523 n.76. |
| 1862. | The 9/11 Commission found that it shared the suspicion of investigators that Anwar Al Aulaqi tasked Rababah to help Hazmi and Hanjour "given the remarkable coincidence | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of Aulaqi's prior relationship with Hazmi." *See* 9/11 Commission Report at 230. | The 9/11 Commission stated the Commission's suspicion that Al Awlaki may have tasked Rababah to help Hazmi and Hanjour.<br><br>There is no evidence that Al Awlaki wittingly assisted the hijackers. Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being paid by Plaintiffs, that Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (Meleagrou-Hithchens Ex. 3) at 24-25.<br><br>After the 9/11 attacks, Awlaki condemned the attacks both publicly to the *New York Times* and *Washington Times*, and privately in an email to his younger brother, describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou-Hitchens Tr. 319:19-320:14).<br><br>In July 2001, Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol, and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY Rep.) 177. |
| 1863. | Anwar Al Aulaqi, who worked together with Thumairy and Bayoumi to support Hazmi and Mihdhar in California, left San Diego in late 2000, moved to Virginia, and became the Imam of the Dar Al Hijrah Mosque two months before Rababah and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ███████ met the hijackers there. As stated earlier, Aulaqi's position at the Dar al Hijrah Mosque was brokered for Aulaqi by the U.S. branch of the Riyadh-based organization the World Assembly of Muslim Youth, Ex. 348, WAMY Intl 015165, which was managed by Saudi Embassy and MOIA official Abdullah Bin Laden. Ex. 349, WAMY SA2444. | To the extent a response is required, Plaintiffs Exhibit 349 (WAMY SA2444) and Plaintiffs Exhibit 348 (WAMY Intl 15165) have not been properly authenticated and are inadmissible hearsay. *See* Objections Chart. |
| | | Plaintiffs Exhibit 348 is inadmissible hearsay and lacks authentication. Exhibit 349 is inadmissible hearsay. *See* Objection Chart. As set forth above, there is no evidence that Awlaki worked with Thumairy and Bayoumi to support Hazmi and Mihdar in California. |
| | | Plaintiffs' own expert Meleagrou-Hitchens concluded, prior to being retained by Plaintiffs, that Awlaki's interactions with the 9/11 hijackers were innocent: "That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy." KSA Ex. 94 (Meleagrou-Hithchens Ex. 3) at 24-25. |
| | | After the 9/11 attacks, Awlaki condemned the attacks both publicly to the *New York Times* and *Washington Times*, and privately in an email to his younger brother, describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou-Hitchens Tr. 319:19-320:14). |
| | | In July 2001, Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol, and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist while he was in the United States. KSA Ex. 178 (Sageman WAMY Rep.) 177. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The final conclusion of the FBI is that "Thumairy, Bayoumi, and Al Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| | | As set forth in Response to Pls. Aver. ¶¶ 1834-1835, Awlaki's position at the Dar Al-Hijrah mosque was not "brokered" by the U.S. branch of the World Assembly of Muslim Youth. Pls. Ex. 348 is an unauthenticated contract between Aulaqi and the Dar Al-Hijrah Islamic Center that makes no mention of WAMY. |
| 1864. | ▮▮▮▮ and Rababah moved into an apartment within walking distance of Dar Al Hijrah Mosque. ▮▮▮▮ sent Rababah to the Mosque to "contact the Emam for possible work." Ex. 2, EO 1468. On a Friday in late March 2001, Rababah met with Aulaqi in Aulaqi's office. On the same day, Rababah met Hazmi and Hanjour following services at the Mosque. When first questioned by the FBI, Rababah claimed that he met Hazmi and Hanjour at a convenience store, not Aulaqi's Mosque. He later admitted that he met the two hijackers at the Mosque and that he lied "to protect the mosque." Ex. 2, EO 1304, 1470; *See* 9/11 Commission Report at 523 n. 76. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Plaintiffs Exhibit 2Q (EO 1468, 1470) and Plaintiffs Exhibit 2P (EO 1304) are inadmissible hearsay. *See* Objections Chart. |
| | | None of these exhibits states that Rababah met with Awlaki on the same day that he met the hijackers. Plaintiffs Exhibit 2Q (EO 1468) states that he met with the "EMAN" of the Falls Church mosque, who Rababah is reported to have described as "being approximately 38 to 40 years of age and thin build, tall, with a full beard." Awlaki was only 29 years old in March 2001. *See* Pls. Ex. 147 (Meleagrou-Hitchens Rep.) ¶ 23 (stating that Aulaqi was "born on April 21, 1971 in Las Cruces, New Mexico). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The 9/11 Report states that Rababah "was reluctant to admit meeting the hijackers at the mosque and initially told a story about meeting them for the first time at a store. Rababah attributed his initial prevarication to wanting to protect the mosque from anti-Arab sentiment following September 11." KSA Ex. 163 (9/11 Rep.) 523 n.76. |
| 1865. | In May 2001, Rababah and ▆▆▆▆ helped the four hijackers to relocate to Paterson, New Jersey. On a May 9, 2001 trip to Paterson with the hijackers, Rababah "pointed out the public library, a pay phone located on the street which was reliable for cheap phone calls and also received incoming calls." Ex. 2, EO 1476. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.  Plaintiffs Exhibit 2Q (EO 1476) is inadmissible hearsay. *See* Objections Chart.  The hearsay exhibit contains the quoted language. It does not state that ▆▆▆▆ assisted the four hijackers to relocate to Paterson, New Jersey, or that he accompanied them to New Jersey. |
| 1866. | On June 14, 2001, at 9:31 a.m. (Eastern time), ▆▆▆▆ made the call to ▆▆▆▆ in California. The FBI states that the call to ▆▆▆ "lasted for 3 minutes." Ex. 2, EO 2705. After that call, ▆▆▆▆ called Rababah. Ex. 55, FBI 11756 (the FBI cites "other call activity on 6/14/2001" including a call to "RABABAH's work phone…"). That same evening Rababah called the payphone in Paterson, NJ. Ex. 2, EO 3152. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.  Plaintiffs Exhibit 2W (EO 2705), Plaintiffs Exhibit 55, and Plaintiffs Exhibit 2Z (EO 3152) are inadmissible hearsay. The Youssef report should be excluded. *See* Objections Chart.  Plaintiffs Exhibit 2W (EO 2705) states that a call was made from the home of Rababah and ▆▆▆▆ to the home of ▆▆▆▆. There is no |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | evidence of who made the call, nor is there any evidence of who received the call. There is no evidence that this call had anything to do with the hijackers.<br><br>Other documents cited by Plaintiffs state that Rababah did not live at the Falls Church address. Pls. Ex. 2P (EO 1303) ("Alrababah did not live with ███████ in Falls Church. According to ███████, Alrababah resided in Connecticut and frequently traveled to Falls Church and would occasionally stay with ███████ on the weekends."). June 14, 2001 was a Thursday, and so it is unlikely that any such call would have been made by Rababah. Moreover, as set forth below, shortly after the 9/11 attacks, ███████ contacted the FBI to report his knowledge of Hanjour and Hazmi. Pls. Ex. 2P (EO 1310); Pls. Ex. ██████████████████ This voluntary reporting would be entirely inconsistent with Chehazeh being part of any witting support network.<br><br>The 9/11 Report also states that the last time that Rababah saw any of the hijackers was in May 2001. KSA Ex. 163 (9/11 Rep.) 230. Thus, any call that was made in June 2001 from Falls Church could not have concerned any assistance to the hijackers.<br><br>Moreover, Mana had never heard the hijackers' names prior to the 9/11 attacks and never met them. Mana Decl. ¶ 6. He never provided any assistance to the hijackers and has never instructed anyone to provide assistance to the hijackers. *Id.*<br><br>Plaintiffs cite no evidence that after the call ███████ called Rababah. Plaintiffs Exhibit 55 is a "people search" for Faisal Ahmed Al Muhana and is irrelevant to the assertions in this paragraph. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2Z (EO 3152) (which is hearsay) states that, on June 14, 2001, Rababah made a call at 7:42 pm from his cell phone to a public telephone in Patterson, New Jersey. There is no evidence that this is the same payphone referenced in Plaintiffs Exhibit 2Q (EO 1476) (which is also hearsay), cited in the above paragraph. |
| 1867. | On the prior day, June 13, 2001, Khalid al Mihdhar received his U.S. visa in Jeddah, Saudi Arabia to return to the U.S. Ex. 30, 9/11 Commission Monograph on Terror Travel at 24. Also on June 13, Bayoumi obtained his tickets to travel from San Diego to England on June 23, 2001, and would fly from England to Jeddah, Saudi Arabia on June 29, 2001. Ex. 2, EO 1861; Ex. 450, MPS365-401 Tr. 887:8-17. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 2S (EO 1861) and Plaintiffs Exhibit 450 are inadmissible hearsay. *See* Objections Chart.

There is no evidence of any connection between Mihdhar's U.S. visa application and Al Bayoumi's travel from San Diego to the United Kingdom 10 days later, or his alleged travel to Jeddah thereafter. Al Bayoumi told the MPS investigators that he never met Mihdhar in Jeddah. Pls. Ex. 450 (Bayoumi MPS 365-401, Tr. 888:8-15). Al Bayoumi testified at his deposition that, after he moved to the United Kingdom to pursue his Ph.D. on October 9, 2000, he never had any discussions with Hazmi or Mihdhar, did not assist them in any way, and did not instruct anyone else to assist them. Bayoumi Tr. 756:3-22.

There is also no evidence that Al Bayoumi knew who Rababah or ███████ were, that they ever met, or that they ever spoke or interacted. |
| 1868. | During May and June 2001, ███████ made over 30 calls to Saudi Arabia. Ex. 2, EO 0839. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2O (EO 839) is inadmissible hearsay. *See* Objections Chart<br><br>There is also no evidence as to whom Chehazeh may have called in Saudi Arabia. |
| 1869. | At the end of June and early July 2001, Bayoumi was in Jeddah, Saudi Arabia at same time as Mihdhar. ▮▮▮▮ visited Bayoumi in Jeddah during this period. Ex. 2, EO 1621. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 2R (EO 1621) is inadmissible hearsay. |
| 1870. | Plaintiffs' expert Youssef concluded "[i]t is certainly conceivable that Mihdhar, who lived in Southern California for five months in 2000, used a known and trusted communications channel through ▮▮▮▮ ▮▮▮ to pass a simple message to Hazmi and Hanjour about getting his visa and his upcoming travel back to the U.S." Ex. 5, Youssef Rpt. 225. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>The Youssef report should be excluded. *See* Objections Chart.<br><br>This assertion is baseless speculation. ▮▮▮▮ never heard the hijackers names prior to the 9/11 attacks and never met them. ▮▮▮▮▮▮ He never provided any assistance to the hijackers, and has never instructed anyone to provide assistance to the hijackers. *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Furthermore, there was no need for Mihdhar to communicate with the other hijackers in the United States through an intermediary. As the 9/11 Report states, "KSM kept in fairly close touch with his operatives, using a variety of methods" including "email." KSA Ex. 163 (9/11 Rep.) 222. |
| 1871. | Plaintiffs' expert Youssef observed that "the June 2001 call from Rababah and ▆▆▆▆ to ▆▆ and the evidence of other calls establishes a direct link between the East Coast network (including Rababah, ▆▆▆▆, and Aulaqi) and the West Coast network (including Thumairy, Bayoumi, ▆▆▆, and Aulaqi) for the 9/11 hijackers. There was no formal discovery permitted of Saudi Government support of the 9/11 hijackers' East Coast network, including phone calls between the East Coast and West Coast networks; ▆▆▆▆▆▆ contacts and employment relationship with Saudi Arabia, and the involvement of Embassy official Abdullah Bin Laden in sponsoring Aulaqi to become the Imam of the Dar Al Hijrah Mosque. In Plaintiffs' expert Youssef's opinion, the connections between the East Coast network and the Southern California network are significant and require further investigation. Ex. 5, Youssef Rpt. 225. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

The Youssef report should be excluded. *See* Objections Chart.

As set forth in Response to Pls. Aver. ¶ 1211, there is no evidence who made or received the June 2001 call. Moreover, both Rababah and ▆▆▆▆▆▆ never saw the hijackers after May 2001 and thus, any such call could not have concerned the hijackers.

As detailed above and as found by every authoritative U.S. government agency and commission investigating the 9/11 attacks, there was no support network assisting the hijackers. The FBI thoroughly investigated the hijackers' activities on both the East and West Coasts and reached the final conclusion that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." Pls. Ex. 2A (EO 9-11). |
| 1872. | Bayoumi and his family moved out of their San Diego apartment on June 23, 2001. Ex. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 91, Ratchford Decl. ¶ 20. They departed for England that day. Ex. 2, EO 1861. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Pls. Ex. 2S (EO 1861) is inadmissible hearsay. *See* Objections Chart.<br><br>Al Bayoumi had moved from San Diego to the United Kingdom on October 9, 2000 to pursue his Ph.D. Bayoumi Tr. 756:3-9. Al Bayoumi's family stayed in San Diego until June 23, 2001 when they also moved to the United Kingdom as well. Ratchford Decl. ¶ 20. |
| 1873. | On June 29, 2001, Bayoumi flew from England to Jeddah, Saudi Arabia. Hijacker Khalid al Mihdhar, who Bayoumi had not seen since the previous year, was also in Jeddah preparing to return to the U.S. to carry out the 9/11 Attacks. Scotland Yard detectives questioned Bayoumi's story that it was "pure coincidence that you've met these people some months before in Los Angeles…you just happened to meet them there, and then suddenly again you're travelling to the country where they depart. That's, with everything else put together, Omar…you are a very unlucky person, or you are involved." Ex. 450, MPS365-401 Tr. 887:19- 888:10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibit 450 is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence that Bayoumi ever met Mihdhar in Jeddah in 2001. Bayoumi told the MPS investigators that this did not occur. Pls. Ex. 450 (Bayoumi MPS 365-401, Tr. 888:8-15). Bayoumi testified at his deposition that, after he moved to the United Kingdom to pursue his Ph.D. on October 9, 2000, he never had any discussions with Hazmi or Mihdhar, did not assist them in any way, and did not instruct anyone else to assist them. Bayoumi Tr. 756:3-22. |
| XXVI. | **IN THE FINAL DAYS LEADING UP TO THE 9/11 ATTACKS, BAYOUMI CALLED THUMAIRY AS THE FINAL** | To the extent a response is required, this statement is improper attorney argument without any citation to supporting evidence. There is no record evidence supporting Plaintiffs' speculation about the substance of any calls allegedly made between Thumairy and Bayoumi. The available |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | **PLANS FOR THE 9/11 ATTACKS WERE BEING MADE.** | evidence contradicts Plaintiffs' theory because, as discussed below, the one phone call they cite to show a connection between Thumairy and Bayoumi preceding September 11, 2001 was placed to a number in California, at a time when Thumairy was in Saudi Arabia. |
| 1874. | The commercial passenger flights targeted for the 9/11 Attacks were likely chosen in meetings held by Hazmi and Mohammed Atta on and before August 23, 2001. Ex.6, 9/11 Commission Rpt. 249. All 19 hijackers booked and purchased their tickets for the 9/11 Attacks between August 25 and September 5, 2001. *See* 9/11 Commission Rpt. 249. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' reference to Pls. Ex. 6 is inaccurate; that is not the 9/11 Commission Report. Saudi Arabia has attached the 9/11 Commission Report as KSA Exhibit 163.<br><br>To the extent a response is required, there is no evidence of any interactions between Al Bayoumi or Al Thumairy and the hijackers in August or September of 2001. And there is no evidence that either Al Bayoumi or Al Thumairy was involved in any way in the 9/11 plot. |
| 1875. | On Sunday, August 26, 2001, Khalid Al Mihdhar booked and purchased his ticket for American Airlines Flight 77 departing Washington Dulles at 8:10am on September 11, 2001. Ex. 679G, FBI 3984-5 (Mihdhar email showing flight booking). The next day, August 27, 2001, Hazmi purchased his ticket. *See* 9/11 Commission Rpt. 539 n. 85. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 679G (FBI 3984-85), is inadmissible hearsay. *See* Objections Chart.<br><br>There is no evidence of any interactions between Al Bayoumi or Al Thumairy and the hijackers in August or September of 2001. And there is |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | no evidence that either Al Bayoumi or Al Thumairy was involved in any way in the 9/11 plot. |
| 1876. | One week later, Sunday September 2, 2001, Omar Al Bayoumi used a "Go Bananas" calling card to place a call at 6:23pm (2 minutes 40 seconds) from Birmingham, England to Fahad Al Thumairy's home number in California. The phone record of this calling card call was produced by the MPS in December 2023. Ex.10, MPS2023-67_4. The time in California in September 2001 was 8 hours behind England – it was 10:23am in Culver City, CA. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | The cited document, MPS2023-67_4, was not submitted by Plaintiffs in either their original or corrected set of exhibits. |
| | | To the extent Plaintiffs are referring to the "Go Bananas" calling card entry showing a call on September 2, 2001, to █████ 0638, *see* Pls. Ex. 12AMH0128_MPS2023-088, that document states that the call had a duration of "65," not 2 minutes 40 seconds. There is a different document, which Plaintiffs did not cite or include in either their original or corrected set of exhibits so it is not before the Court, MPS 2023-078 – D4840, which has handwritten notes from an unknown source, but those notes are inadmissible hearsay, to the extent Plaintiffs try to put them before the Court. *See* Objections Chart. Plaintiffs cite nothing in this paragraph to attribute that calling card to Al Bayoumi. |
| | | In any event, the suggestion that Al Bayoumi contacted Al Thumairy on September 2, 2001 at Al Thumairy's home in California is contradicted by Plaintiffs' own assertions elsewhere in the averment and the evidence showing that Al Thumairy was in Saudi Arabia on that date. *See* Response to Pls. Aver. ¶¶ 485-489. As discussed there, Al Thumairy requested a vacation to run from late August through September 22, 2001 on August 13, 2001. *See* KSA Ex. 185 (KSA 8413) (handwritten note dated August 13, 2001: Thumairy request for 26 days of vacation starting on August 27, 2001); KSA Ex. 186 (KSA 8377) (Letter dated August 13, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | 2001: "I am sending you the request by . . . Sheikh Fahd bin Ibrahim Al Thumairi, who wishes to take regular leave for 26 days to begin on Monday [8/27/2001]"). Plaintiffs cite evidence confirming that Al Thumairy went to Saudi Arabia at this time. *See* ¶ 489 (citing Pls. Ex. 680G (KSA 6896), showing Al Thumairy obtained an exit visa for Saudi Arabia on September 3, 2001. Consistent with the documentary evidence, Al Thumairy testified that he was "on vacation" in Saudi Arabia and travelled from there to a conference in Europe at the time of the September 11 attacks. *See* Pls. Ex. 107 (Thumairy Tr.) 360:17-361:5. |
| 1877. | The reconnection between the two men nine days before the 9/11 Attacks shows that Bayoumi and Thumairy shared a joint work assignment to support the Al Qaeda hijackers and that Bayoumi checked in with Thumairy just before the 9/11 Attacks. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

To the extent a response is required, the assertions are contradicted by Plaintiffs' own assertions and the record evidence.

There was no "reconnection between the two men nine days before the 9/11 Attacks." The phone call cited in the prior paragraph allegedly establishing the "reconnection" Plaintiffs attribute to Al Bayoumi to Al Thumairy's home phone in California on September 2, 2001. Al Thumairy was in Saudi Arabia at that time. *See supra* Response to Pls. Aver. ¶ 1876; *see also supra* Response to Pls. Aver. ¶¶ 485-489.

Plaintiffs' claim that this September 2, 2001 phone call from England to California was from Al Bayoumi to Al Thumairy, and that the call must |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | have been related to the 9/11 attacks, underscores how unreliable and speculative Plaintiffs' phone records analysis is.<br><br>Plaintiffs' allegation of a shared joint work assignment to support the Al Qaeda hijackers is not only unsupported by the misattributed phone call Plaintiffs cite; it is contradicted by the available evidence. Indeed, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was no Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." KSA Ex. 163 (9/11 Rep.) 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | witting assistance to al-Hazmi and al-Mihdhar. . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101–3. |
| 1878. | Bayoumi's handwritten address book seized by the MPS in September 2001 contained the Go Bananas calling card with "PIN" number "████ 093". Ex. 12AA, MPS738_2-3. The MPS retrieved and produced Bayoumi's calling records from this phonecard, Ex. 12-AMH0128, MPS2023-88_3 showing that the card was used by Bayoumi to make international calls (to the USA and Saudi Arabia) in the period September 2–18, 2001. Bayoumi used that same Go Bananas calling card on September 2, 2001 to dial the "home" number written down by Bayoumi in his address book for Thumairy. Ex. 12AA, MPS738_35. The handwritten address book also contained various contacts Bayoumi collected on looseleaf notepad pages, business cards, bank statements, and other scraps of paper. Ex. 12AA, MPS738_2-6, Ex. 12AA, MPS738_86-95. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibit 12AA (MPS 738) is inadmissible hearsay, and Ex. 12-AMH0128 is not authenticated. *See* Objections Chart.

There is no record evidence regarding the creation and maintenance of Plaintiffs Exhibit 12AA (MPS 738) and accordingly the handwritten phone book is inadmissible hearsay. Plaintiffs also cite no evidence showing that the phone card was Al Bayoumi's. While Plaintiffs Exhibit 12AA (MPS738_3) contains what appears to be a photocopied image of a calling card with the referenced PIN number, there is no indication that this PIN number was "contained in" the handwritten address book as it was originally obtained by the MPS. The pages are scraps of handwritten notes; it is unclear how, when, or by whom the image of the calling card was overlayed on top. Further, Plaintiffs cite no evidence to show which individual(s) may have entered or updated the contact information contained in any of the handwritten documents Plaintiffs cite or when the writing may have occurred.

The cited exhibits appear to contain records of calls from this calling card, but there is no evidence in the record that Al Bayoumi made any of the calls documented in the referenced telephone records. The calling card records do show certain phone calls to numbers in the USA and Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Arabia during the time period cited, including one on September 2, 2001, to a number in the "USA or Canada" listed as "Home" for Al Thumairy in Pls. Ex. 12AA at MPS738_35. But this does not evidence any communication between Al Bayoumi and Al Thumairy because, among other reasons, Al Thumairy was in Saudi Arabia on September 2, 2001. *See supra* Response to Pls. Aver. ¶¶ 484-489, 1876. |
| 1879. | On September 2, 2001, Hani Hanjour, Nawaf Al Hazmi, and Khalid Al Mihdhar relocated from New Jersey to Maryland. Ex. 155, FBI Timeline at 247. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' Exhibit 155 is inadmissible hearsay. *See* Objections Chart. |
| 1880. | On September 8, 2001, Anwar Al Aulaqi left Virginia and flew to San Diego. Ex. 16, Judicial Watch FOIA at 29. On September 9, 2001, Aulaqi made a purchase at the Texaco gas station in La Mesa, CA where Mohdar Abdullah worked and where Hazmi had a job the year before. Ex. 507, FBI 1763. The next day, Abdullah and others who had known the hijackers were observed behaving suspiciously at the La Mesa Texaco. According to a witness, one of the group said "it is finally going to happen" as the others celebrated by giving each other high fives. *See* 9/11 Commission Report at 250. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 16 is a document from 1993 and does not support the asserted proposition about events in 2001. To the extent Plaintiffs are referring to the document bearing a stamp "Obtained by Judicial Watch via FOIA (January 2, 2013)," and bearing bates stamp "Awlaki-X," that document is not in the record and is inadmissible hearsay, to the extent Plaintiffs attempt to introduce it. *See* Objections Chart.<br><br>Plaintiffs cite nothing to establish the location of the purchase shown on Pls. Ex. 507 (FBI 1763). The entry states "Texaco Inc 61250220145" without listing a location. In any event, as Plaintiffs acknowledge, Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Hazmi was not in Southern California and had left more than a year before. |
| | | The quoted portion of the 9/11 Commission Report is inadmissible hearsay within hearsay. *See* Objections Chart. |
| | | Moreover, the 9/11 Commission Report itself states that the quote Plaintiffs cite was from "an uncorroborated witness account." KSA Ex. 163 (9/11 Rep.) 250. |
| | | Regardless, there is no evidence that either Al Bayoumi or Al Thumairy participated with the events described in any way. |
| 1881. | In Maryland on September 9, 2001, two days before the hijackings, Hazmi and Mihdhar left their personal possessions at the Ayah Islamic Center in Laurel MD. Ex. 155, FBI Timeline at 273. Ayah was the mosque in Laurel, MD run by the MOIA-led World Assembly of Islamic Youth. A WAMY employee and student at IIASA, Said Rageah, operated the Mosque. Ex. 347, WAMY Intl 163-164, 1535, 12439. The FBI recovered the bags on September 12, and they contained fruit, clothing, flight logs, and various other materials and a note that read "A Gift for the Brothers". Ex. 7, 9/11 Commission's Monograph on Terrorist Financing at 100. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Plaintiffs Exhibits 155, 347, and 7 are inadmissible hearsay. *See* Objections Chart. Plaintiffs Exhibit 347 is also an improper compilation exhibit that was not authenticated. *See* Objections Chart.

Referring to "the imam of the prayer center" where Hazmi and Mihdhar dropped off their bags in Maryland, Plaintiffs' Exhibit 7 notes that "[t]he FBI investigated his involvement with 9/11 for one and a half years. It ultimately concluded that he had no role in supporting the 9/11 attacks . . . " Pls. Ex. 7 at 100.

There is no evidence that the Ayah Islamic Center was "run by the MOIA-led World Assembly of Islamic Youth." The only evidence cited shows |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | that one program by Said Regeah was sponsored by WAMY and line items listing various bank records with amount of $700 and $1500 and Rajeah's name under the words "WAMY International." Pls. Ex. 347 at 163-64, 1535, 12439- 44. There is no evidence explaining what the records mean or establishing WAMY running the mosque or that MOIA "led" WAMY. |
| 1882. | **The 9/11 Attacks** On September 11, 2001, Al Qaeda carried out its coordinated attack on the United States and its Government by hijacking four commercial aircraft: American Airlines Flight 11 from Boston to Los Angeles; United Airlines Flight 175 from Boston to Los Angeles; American Airlines Flight 77 from Washington Dulles to Los Angeles; and United Airlines Flight 93 from Newark to San Francisco. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1883. | Hazmi, Mihdhar, Hani Hanjour, and two other hijackers boarded American Flight 77 from Washington Dulles Airport to Los Angeles. The flight took off at 8:20am. About one- half hour into the flight, the five Al Qaeda hijackers stormed the cockpit, took control of the aircraft, and crashed the plane into the Pentagon in Virginia at 9:37:46am. *See* 9/11 Commission Rpt. 33. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1884. | American Flight 11 took off from Boston at 7:59am and about twenty minutes into the flight was commandeered by five Al Qaeda | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | hijackers and crashed into the North Tower of the World Trade Center in New York City at 8:46:40am. *See* 9/11 Commission Rpt. 32. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1885. | United Flight 175 took off at 8:14am from Boston and was taken over by five Al Qaeda hijackers about thirty minutes into the flight and crashed into the South Tower of the World Trade Center in New York City at 9:03:11am. Ex.6, 9/11 Commission Rpt. 32. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1886. | United Flight 93 took off at 8:42am from Newark and about 45 minutes into the flight four Al Qaeda hijackers stormed the cockpit and the diverted plane toward its intended target, likely the U.S. Capitol Building in Washington. About 30 minutes after the plane was hijacked, the passengers fought back to regain control of the aircraft and Flight 93 crashed in a field in Shanksville, Pennsylvania at 10:03:11am. *See* 9/11 Commission Rpt. 33, 243-4, 326, 530 n. 141. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1887. | The coordinated attacks by Al Qaeda injured and killed all the passengers and crew aboard the four flights and thousands of people in New York City and at the Pentagon and caused massive property damage. Nawaf Al Hazmi, Khalid Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mihdhar, and Al Qaeda could not have been able to get safely established inside the U.S. to carry out their 9/11 plot undetected by law enforcement without the help of the Sunni extremist support network sponsored and led by Saudi Government officials in California. Plaintiffs' expert Youssef concluded that Al Qaeda chose Southern California as the beachhead for the 9/11 Attacks because of the longstanding Sunni extremist cells in Los Angeles and San Diego supported by the Saudi government through the Saudi Embassy, Consulate, Mana, Thumairy, and Bayoumi. Ex. 5, Youssef Rpt. 226. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 5 (Youssef Rep.) should be excluded. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion that Al Qaeda injured or killed all the passengers and crew aboard the four flights and thousands of people in New York City and at the Pentagon and caused massive property damage is undisputed.<br><br>The remainder of Plaintiffs' statement is improper attorney argument, conclusory and unsupported opinion on ultimate issues in the case, and contradicted by the record. As explained in Saudi Arabia's briefing, averment, and response to Plaintiffs' averment, there is no evidence of a Sunni extremist support network in southern California, and there is no evidence of any Saudi government support for such a network or for the hijackers. To the contrary, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | candidate for clandestine involvement with Islamist extremists." *Id.* at 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 1888. | As recently as 2009, then-Secretary of State Hillary Clinton wrote "Saudi Arabia remains a critical financial support base for al-Qaida, the Taliban, LeT and other terrorist groups...." Ex. 23, 12/30/2009 Secretary of State Hillary Clinton Cable. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 23 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs' selective quotation of then-Secretary of State Hillary Clinton's cable is misleading, as she was speaking with regards to private "donors in Saudi Arabia" and not the government itself.  Indeed, the cable repeatedly cites the extensive assistance and cooperation of the Saudi Arabian  government in halting the flow of such funds from private donors.  *See*, *e.g.*, Pls. Ex. 23 at 3 (noting that the Kingdom "has responded to terrorist financing concerns raised by the United States through proactively investigating and detaining financial facilitators of concern"); *id.* (citing "robust interaction and information sharing on the issue").<br><br>Regarding the September 11 attacks themselves, and Plaintiffs' allegations at issue, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy.  It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar.  Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217.  On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.  Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists."  KSA Ex. 163 (9/11 Rep.) 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).

The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3.

The final conclusion of the FBI is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged[.]" Pls. Ex. 2A (EO 9-11). |
| XXVII. | **BAYOUMI PREPARED AN AIRPLANE SKETCH AND VARIOUS FLIGHT PLANNING CALCULATIONS WHICH EVIDENCE HIS ASSISTANCE TO THE 9/11 HIJACKERS AND ADVANCE KNOWLEDGE OF THE 9/11 PLOT** | As set forth below, there is no connection between the mathematical equation and the 9/11 attacks. Even Plaintiffs' expert Barry Schiff stated that if he "saw [the sketch page] in and by itself," he "would have no reason to believe it had anything to do with anything." Pls. Ex. 104 (Schiff Tr.) 50:11-51:21. Moreover, Schiff acknowledged the hijackers did not actually use the equation to pilot the plane, as the flight paths did not match the solutions to the equation. *See id.* at 75:6-10.

The depicted equation and sketch is a derivation of the Pythagorean equation which is taught in high school algebra or geometry and that appears in multiple online forums and mathematic textbooks published before the 9/11 attacks. KSA Ex. 148 (Moss Rep.) 7 & Exs. Given |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Schiff's acknowledgement that this equation is not used in aviation and that it was, in fact, not used by the hijackers, the most plausible explanation is that Al Bayoumi was solving a simple math problem commonly presented in high school, where his son was a student at the time. |
| 1889. | On September 20, 2001, the Metropolitan Police Service ("MPS") seized various materials from the garage of Bayoumi's U.K. residence at 34 Dymoke Street, Birmingham, United Kingdom that Bayoumi brought from the U.S. Ex. 2, EO 2179-2181, 2289, 3805-06; *see* MPS production Ex. , MPS 43 *et seq.* (financial papers seized by MPS from garage at 34 Dymoke Street). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2U (EO 2179-81), is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 2U (EO 2179-81), states only that five videotapes were recovered during the search of Al Bayoumi's residence in Birmingham, England. This exhibit does not refer to any notepad. The exhibit number for "MPS 43" is missing, and Saudi Arabia has been unable to determine to which documents Plaintiffs are referring. |
| 1890. | Among the items recovered by the MPS was a "Note Pad" belonging to Bayoumi. Ex. 678M, MPS696_1-7 (copy of pages of PSS/34 "Note Pad" produced by MPS); *see also* Ex. 679B, FBI 1331-1337 (copy produced by FBI). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Plaintiffs Exhibits 678M and 679B identify the documents as a "Note Pad" found at 34 Dymoke Street but do not state who recovered the "Note Pad" or to whom it belonged. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1891. | That note pad was a "5" x 8" Junior Pad" with "100 Canary Sheets" made by a company named "TOPS" from "St. Charles, IL" and stated it was "MADE IN USA." Ex. 678M, MPS696_7 (cover page of PSS/34 "Note Pad"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1892. | The notepad included a handwritten sketch of an airplane along with an equation, notes, and calculations. Ex. 11N, MPS 999x_X0417 at 6 (West Midlands Police Print No. 2) (color photograph of "Bayoumi Airplane Sketch"); *see also* Ex. 678M, MPS696_4; and Ex. 679B, FBI 1331-1337 at 1334 (copies of page with airplane sketch). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1893. | The entire original notepad including the airplane sketch page was returned to Bayoumi on May 2, 2002. Ex. 678DD, MPS2023-100 FMT Receipt (slides 20-22; showing item no. 32 returned to Bayoumi as the "Notepad" marked "PSS/34"). The notepad was not produced by Saudi Arabia or Bayoumi in this litigation. Saudi Arabia should make the original notepad available in its entirety for inspection by the Plaintiffs. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs' argument that Saudi Arabia should make the notepad available for inspection is untimely. Plaintiffs have also made no showing that the notepad is in the possession, custody, or control of either Saudi Arabia or Al Bayoumi, and have not shown that Saudi Arabia has not fully complied with its discovery obligations. The property receipt is dated "02/05/02" – more than 20 years ago. *See* Pls. Ex. 678DD (MPS 2023_100) at 20-22. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1894. | It was not until March 2012, a decade later, that the FBI included Bayoumi's airplane sketch in its reports, well into the Operation Encore investigation. Ex. 2, EO 3659-3668, 3965-3967. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibit 2DD (EO3659-68), and Plaintiffs Exhibit 2GG (3965-3967), are inadmissible hearsay. <br><br> To the extent a response is required, neither Plaintiffs Exhibit 2DD nor Plaintiffs Exhibit 2GG state when the FBI obtained "Bayoumi's airplane sketch." The document states that the FBI interviewed ▮▮▮ had been regarding the sketch on March 5, 2012, and notes that ▮▮▮ had been shown the sketch at a "previous meeting" (for which the date is not provided). Pls. Ex. 2GG (EO 3965). At that previous meeting, ▮▮▮ did not see "any correlation between the equation on the document and piloting a plane." Only after being presented a "theory" by an FBI agent did ▮▮▮ see such a correlation. *See id.* |
| 1895. | At his deposition, Bayoumi was questioned — apparently for the first time — about his note pad. Ex. 120, Bayoumi Dep. 290:7-292:9. Bayoumi had never been previously questioned about the note pad by the MPS, FBI, or 9/11 Commission. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> To the extent a response is required, Al Bayoumi was never asked and did not testify about whether he had previously been questioned about the notepad. Plaintiffs' own allegations indicate that the notepad was seized by law enforcement in September 2001. *See supra* ¶ 1889. |
| 1896. | Saudi Arabia's security and intelligence agency, the Mabahith, did not mention | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bayoumi's note pad or the airplane sketch page in the letter it sent the FBI in November 2002. Ex. 2, EO 3978-80. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 2GG (EO 3978-80), is inadmissible hearsay.<br><br>To the extent a response is required, Plaintiffs Exhibit 2GG purports to be a memorandum from the Mabahith regarding an interview with Al Bayoumi, and that letter does not mention the airplane sketch or notepad. There is also no indication that there would have been any reason for the letter to mention either. |
| 1897. | Bayoumi admitted, under oath, that this page was in his handwriting. Ex. 120, Bayoumi Dep. 289:16-290:9. That page, as shown in a color photograph at Ex. 11N, includes:<br><br>• Bayoumi's sketch of an airplane;<br><br>• an equation written by Bayoumi, together with numbers inputted by Bayoumi into the equation;<br><br>• Bayoumi's description of variables for the equation of "h" the "hight" [sic] the plane from the earth in mile" [sic] and "d" as "distance from the plane to "hurrizen" [sic]; | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | • and additional numbers and calculations of Bayoumi.<br><br>Ex. 11N, MPS999_X0417 at 6. | |
| 1898. | Plaintiffs' expert Captain Barry Schiff applied his extensive aviation experience to determine the aviation and piloting significance, if any, of Bayoumi's handwritten airplane sketch page. Ex. 148, Schiff Report at 1-2. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Schiff did not apply his aviation experience to reach his conclusions, which should be excluded. *See* Objections Chart. As Saudi Arabia has explained in its motion to exclude Schiff's opinions, Schiff testified that if he "saw [the sketch page] in and by itself," he "would have no reason to believe it had anything to do with anything"; he concluded there was a connection to the 9/11 attacks only because of "the relationships between Mr. al-Bayoumi and the two Al-Qaeda terrorists." Pls. Ex. 104 (Schiff Tr.) 50:11-51:21. |
| 1899. | Cpt. Schiff's aviation experience includes 69 years of piloting 363 different types of aircraft, including the Boeing 757 and 767, the aircraft flown by the hijackers in the attacks, and serving as a Captain on major airlines. He served as an FAA designated check captain and instructor. He has published over 1,900 aviation-related articles and books. Ex. 148, Schiff Report at 1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, it is undisputed that Schiff represents that these are his qualifications. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1900. | Cpt. Schiff determined that the equation "is used in aviation to determine the line- of-sight distance to the horizon from an airplane at a given altitude." Ex. 148, Schiff Report at 2. | The Schiff Report should be excluded. *See* Objections Chart.<br><br>Plaintiffs omit important concessions that Schiff made at his deposition. He testified that he had never used the equation to navigate an airplane in 28,000 hours of flight time over six decades, Pls. Ex. 104 (Schiff Tr.) 36:2-9; Pls. Ex. 148 (Schiff Rep.) 1; that the equation is not used in any of the six "foundational aviation publications regarding navigation," Pls. Ex. 104 (Schiff Tr.) 18:15-31:9, or in any of the dozen books – including the three-volume book "The Proficient Pilot" – that Schiff himself wrote on aviation, *id.* at 39:13-42:1; that he has never tested any of his "few hundred" students on use of the equation during 14 years as a pilot examiner, *id.* at 32:8-33:1; and that, in a dozen years of supervising other pilots as a "check airman," he had never checked whether those pilots knew the equation, *id.* at 35:2-36:1.<br><br>Moss – also an experienced pilot – has opined that the equation is not commonly used in aviation. KSA Ex. 148 (Moss Rep.) 8-9. Schiff only identified a few instances in which he taught the equation to a "few" of his students, Pls. Ex. 104 (Schiff Tr.) at 32:16-33:7, stated that he personally used the equation "to know at what altitude I'd be able to see [an] airport," *id.* at 36:6-19, but called that "an advanced technique in aviation," *id.* at 37:3-5. That would go "above and beyond" what he would "expect others to do." *Id.* at 36:10-37:9. |
| 1901. | Cpt. Schiff testified that he used the equation as a pilot "to know at what altitude [he would] be able to see [an] airport" from a certain distance and had on occasion taught the equation and its use to student pilots. Ex. 104, Schiff Dep. 36:6-19, 38:9-19. | The Schiff Report should be excluded. *See* Objections Chart.<br><br>Schiff's testimony and the opinions of Saudi Arabia's expert, Moss, show that the equation is not used in aviation. *See* Response to Pls. Aver. ¶ 1900. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1902. | Contrary to Saudi Arabia's claim, KSA Aver. ¶ 243.a., that the equation is not used by pilots in-flight for aviation "navigation," Cpt. Schiff explained that the equation is used on the ground for pre-flight planning purposes. Ex. 104, Schiff Dep. 118:7-17, 180:4-17, 181:20-182:4, 185:4-10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the testimony that Plaintiffs cite does not state that the equation is used for "pre-flight planning purposes" by pilots. In the testimony, Schiff speculates the hijackers may have used the equation. *See* Pls. Ex. 104 (Schiff Tr.) 181:20-182:4 ("This was in the planning stages. We're talking about a formula that Mr. Bayoumi was working with which he felt might have been useful. It doesn't mean they used it. It doesn't mean they had to use it.").<br><br>Schiff's testimony and Moss's testimony show the equation is not used in aviation. *See* Response to Pls. Aver. ¶ 1900. |
| 1903. | Cpt. Schiff's core opinion, formulated using his expertise, is: "that the airplane sketch, equation, and calculations made by Mr. Bayoumi on Figure 1 [Ex. 11N, MPS999_X0417 at 6] are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks." Ex. 148, Schiff Report at 2. | Saudi Arabia does not dispute that Schiff offers that opinion. However, that opinion should be excluded because, as Saudi Arabia explains in its *Daubert* motion, that opinion is not based on Schiff's aviation expertise. *See* Response to Pls. Aver. ¶ 1898; Objections Chart. |
| 1904. | Cpt. Schiff analyzed the circumstances surrounding Bayoumi's involvement with the hijackers and Bayoumi's explanation of the sketch and formula, as well as the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | significance of the numbers used in the calculation. Ex. 148, Schiff Report at 10-11. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Schiff bases his conclusion on his purported analysis of "Bayoumi's involvement with the hijackers" and his assessment of Al Bayoumi's credibility. *See* Pls. Ex. 148 (Schiff Rep.) 10-11. As Saudi Arabia has explained in its *Daubert* motion, these are reasons why Schiff's ultimate opinion that the notepad was consistent with planning the 9/11 attacks must be excluded because he has no expertise in investigating terrorism and cannot opine on credibility as an expert. *See* Objections Chart. |
| 1905. | First, Cpt. Schiff determined that the "[k]ey pieces of information for the hijackers' planning the attacks to know would be from what distances and altitudes they would be able to see their targets[]" and that information was necessary to provide the hijackers "with the visual cues needed to fly the hijacked jetliners into their targets." Ex. 148, Schiff Report at 5. | The Schiff Report should be excluded. *See* Objections Chart.<br><br>At his deposition, Schiff conceded that the hijackers "[p]robably" did not actually use the equation to pilot a plane because their flight paths did not match the solutions to the equation. *See* Pls. Ex. 104 (Schiff Tr.) 75:6-10 ("Q. It does not appear that the hijackers used the solution to the equation to set the plane's altitude, correct? . . . THE WITNESS: Probably not, no."); *see also id.* at 55:5-56:22, 70:5-20, 71:16-74:12, 75:21-88:16.<br><br>As Moss explains, there is no meaningful relationship between the flight paths taken by the hijackers and the equation. KSA Ex. 148 (Moss Rep.) 12-16 (showing differences between solution to equation and flight paths). The equation merely shows a geometric relationship about what objects would be within the line of sight; however, the equation does not reasonably approximate how far a pilot can see an object on the ground because it does not account for other factors such as refraction, absorption, and distortion in the atmosphere. *See id.* at 8-9, 11, 14.<br><br>The actual equation solved for distances of 50 and 70 miles. A pilot could not identify a large object such as the Pentagon or World Trade Center, until a plane is within at least 5-10 miles. KSA Ex. 148 (Moss Rep.) 11. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1906. | Cpt. Schiff also determined that Bayoumi inserted two "distance variables" of 50 and 70 miles into his aviation equation to calculate the minimum altitudes at which an aircraft would have to be flown to see a target. Ex. 148, Schiff Report at 4. | The notepad indicates distances of 50 and 70 miles had been put into the equation. However, both Schiff's testimony and Saudi Arabia's expert Moss show that the equation is not used within the field of aviation, *see supra* ¶ 1900, and cannot (and was not) used to determine how high a plane must be flown to "see" an object, *see supra* ¶ 1905.<br><br>As Moss opined, a pilot could not identify a large object such as the Pentagon or World Trade Center, until a plane is within at least 5-10 miles. KSA Ex. 148 (Moss Rep.) 11. |
| 1907. | According to Cpt. Schiff, the variables chosen by Bayoumi to calculate the minimum altitudes at which an aircraft would fly to see a ground target from 50 and 70 miles away are significant from a piloting perspective to the hijackers who carried out the 9/11 Attacks. Ex. 148, Schiff Report at 4. Based on his extensive knowledge at the helm of the same commercial aircraft piloted by the hijackers, Cpt. Schiff concluded that the hijackers would plan to see their targets from 50-70 miles away to have sufficient time to successfully steer the aircraft into the targets. Ex. 148, Schiff Report at 4-6. Cpt. Schiff stated the figures of 50- and 70-miles inputted by Bayoumi constitute a "reasonable…range of distances to consider for the 9/11 attacks" that would "provide them [the 9/11 hijackers] with the visual cues needed to fly the hijacked jetliners into their targets." Ex. 148, Schiff Report at 4-6. | The Schiff Report should be excluded. *See* Objections Chart.<br><br>Schiff's testimony and Moss's report show that the equation could not be used to determine how far away one can "see" an object and was not used by the hijackers to do so. *See supra* ¶ 1905. As Moss opined, a pilot could not identify a large object such as the Pentagon or World Trade Center, until a plane is within at least 5-10 miles. KSA Ex. 148 (Moss Rep.) 11.<br><br>As Moss explains further, the flight path for flight AA 77 (which crashed into the Pentagon) shows the hijackers were flying at approximately 7,000 to 8,000 feet until 4.2 miles from the Pentagon; at that point, the hijackers "saw" the Pentagon (not 50-70 miles away) and realized they were not going to be able to navigate to the Pentagon, causing them to do a "330-degree descending turn to lose altitude and line up on the Pentagon. KSA Ex. 148 (Moss Rep.) 14-15 (plotting flight path for AA 77). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1908. | Second, Cpt. Schiff reviewed the available flight data and radar of the hijacked planes. He determined that the actions of the 9/11 hijackers in steering their aircraft were consistent with the 50–70-mile range that Bayoumi input into his equation. Cpt. Schiff found that American Flight 11 began its descent about 67 miles north of the World Trade Center, which Cpt. Schiff concluded was "a point from which the hijacker/pilot would have been able to see the target or surrounding landmarks." Ex. 148, Schiff Report at 6. | Schiff's conclusion that the notebook page was connected to the 9/11 attacks should be excluded because, as Saudi Arabia explains in its *Daubert* motion, that opinion is not based on Schiff's aviation expertise. *See* Objections Chart.<br><br>Moss explains that, for AA 77 (which crashed into the Pentagon), the flight path indicates the hijackers did not "see" the Pentagon until 4.2 miles away (not 50-70 miles away) because the hijackers maintained 7,000-8,000 feet of altitude until abruptly performing a circular turn to lose altitude. *See supra* ¶ 1907. |
| 1909. | Bayoumi struggled to explain his own equation, stating that it answered the question of "what is the distance of the road between San Diego to LA or Washington to other places. It's just an equation to measure distance. To Baltimore." Ex. 120, Bayoumi Dep. 291:21- 292:9. But even according to both Bayoumi and Cpt. Schiff, the sketch determines a straight-line distance from an altitude, not a road on the ground which would not typically proceed in a straight line for 50 to 70 miles as the Bayoumi Airplane Sketch depicted. Ex. 120, Bayoumi Dep. 291:16-20; Ex. 148, Schiff Report at 2. | Contrary to Plaintiffs' characterization, Al Bayoumi did not "struggle[ ]" to explain the equation. He testified he did not remember when he made the sketch, did not remember what the equation was for, and did not know what the accompanying numbers meant. *See* Pls. Ex. 120 (Bayoumi Tr.) 290:7-292:9. It is not surprising that Al Bayoumi had no recollection of a sketch made more than 20 years before he was deposed in June 2021. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1910. | According to Cpt. Schiff, Bayoumi's calculations allowed the hijackers of UAL Flight 93, which ultimately crashed in Shanksville, Pennsylvania, to understand when and at what minimum altitude they would be able to visually acquire their target. Ex. 148, Schiff Report at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, Schiff's conclusion that the notebook page was connected to the 9/11 attacks should be excluded because, as Saudi Arabia explains in its *Daubert* motion, that opinion is not based on Schiff's aviation expertise.  *See* Objections Chart.<br><br>Both Schiff's testimony and Saudi Arabia's expert Moss show that the equation is not used within the field of aviation, *see supra* ¶ 1900, and cannot (and was not) used to determine how high a plane must be flown to "see" an object, *see supra* ¶ 1905. |
| 1911. | For the final portion of the flight path, the hijackers of UAL Flight 93 selected an altitude of 5,000 feet which, Capt. Schiff explained, comports with the minimum altitude of 3,300 feet required to see a ground target at 70 miles that Bayoumi included in his calculations. Ex. 148, Schiff Report at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>To the extent a response is required, the Schiff Report should be excluded. *See* Objections Chart.<br><br>Both Schiff's testimony and Saudi Arabia's expert Moss show that the equation is not used within the field of aviation, *see supra* ¶ 1900, and cannot (and was not) used to determine how high a plane must be flown to "see" an object, *see supra* ¶ 1905. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Moreover, Schiff acknowledged the hijackers did not actually use the equation to pilot the plane, as the flight paths did not match the solutions to the equation. *See* Pls. Ex. 104 (Schiff Tr.) 75:6-10. |
| 1912. | Capt. ▮▮▮▮ told the FBI that a reasonable basis existed to believe the drawings and equations were used as part of the preparations of the al-Qaeda terrorists to carry out the 9/11 attacks. Ex. 148, Schiff Report at 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 148 (Schiff Rep.) at 8, is inadmissible hearsay because it repeats statements by third party, pilot ▮▮▮▮▮▮▮ *See* Objections Chart.<br><br>To the extent a response is required, pilot ▮▮▮▮▮▮ when first shown the equation did not see "any correlation between the equation on the document and piloting a plane." Pls. Ex. 2GG (EO 3965). Only upon prompting by FBI agents about a theory that the equation was connected with the 9/11 attacks did ▮▮▮▮ state that the equation "could be used to calculate a rate of decent [sic] when flying a plane." *Id.* ▮▮▮▮ "could not think of any other reason for the equation," *id.* at EO 3967, thus disagreeing with Plaintiffs' assertion (at ¶ 1910) that the equation was used to calculate a minimum altitude to "visually acquire [a] target."<br><br>As to ▮▮▮▮ statement that the equation could be used to calculate a rate of descent, both Plaintiffs' expert Schiff and Saudi Arabia's expert Moss disagree that the equation was or would be used in such a manner. *See* Pls. Ex. 148 (Schiff Rep.) 11 ("I disagree that the calculations were used to calculate a rate of descent toward a ground target. Under the circumstances of the 9/11 Attacks, there is no indication that such a constant descent rate was used or would be useful to strike the targets."); KSA Ex. 148 (Moss Rep.) 21 (agreeing with Schiff). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1913. | Bayoumi's calculation of "52-8=44" next to the line-of-sight equation "matches up with the final portion of UAL Flight 175, which navigated abeam the Robbinsville VOR and then toward the LaGuardia VOR." Ex. 148, Schiff Report at 8-9. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
|  |  | To the extent a response is required, the Schiff Report should be excluded. *See* Objections Chart. |
|  |  | With respect to the notation "52-8=44," Schiff testified that the hijackers would not have used these distances to navigate the airplane. According to Schiff, once the hijackers were approximately 50 miles from the World Trade Center, they would have been able to see the World Trade Center and "would [have] just navigate[d] into the target" without any need to calculate distances. Pls. Ex. 104 (Schiff Tr.) 177:5-17, 177:22-178:4. That is, the hijackers would have used "VOR navigation" – which both Schiff and Moss agree the hijackers did use – to navigate to a "VOR station" within visual sight of the World Trade Center and then would have manually flown into the World Trade Center. *See* Pls. Ex. 148 (Schiff Rep.) 6 (stating flight path data was consistent with use of VOR); KSA Ex. 148 (Moss Rep.) 16 (agreeing with Schiff that the hijackers likely used VOR navigation). |
|  |  | Schiff thus indicated that he had no reason to believe the "52-8=44" numbers "would have been important at all" to the hijackers. Pls. Ex. 104 (Schiff Tr.) 180:4-17. Moreover, the notebook contained two other columns of numbers in addition to "52-8=44." Pls. Ex. 11N (MPS 999x_4017_5). Schiff testified that, despite his best efforts, he could find no connection between any of those other numbers and any of the hijackers' flight paths. *See* Pls. Ex. 104 (Schiff Tr.) 116:15-118:1, 173:14-176:20. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1914. | The Robbinsville VOR, which was 44 miles from the World Trade Center, was a ground radio navigation aid located in Robbinsville, New Jersey that the hijackers of UAL Flight 175 were navigating towards as they made their approach to the World Trade Center. Ex. 148, Schiff Report at 8-9; Ex. 104, Schiff Dep. 90:3-18; 118:2-119:4, 149:19-150:3, 175:1-8; Ex. 326, Schiff Dep. Ex. 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, the Schiff Report should be excluded. *See* Objections Chart.<br><br>The flight path for UAL Flight 175 – depicted in Schiff's Report – shows the hijackers turned the plane toward the World Trade Center immediately after passing over the Yardley VOR and did not navigate toward the Robbinsville VOR. *See* Pls. Ex. 148 (Schiff Rep.) 5 (black line showing flight path); *see also* Pls. Ex. 106 (Moss Tr.) 121:5-9 ("It looks like he starts his turn right at Yardley."). |
| 1915. | Capt. Schiff concluded that Bayoumi's calculation of the distance of 44 miles from the Robbinsville VOR to the World Trade Center, together with the results of Bayoumi's line-of-sight equation, provided a practical flight planning tool for the 9/11 hijackers to know where and how a plane heading towards New York City from the southwest would "visually acquire the World Trade Center" to carry out the attacks. Ex. 148, Schiff Report at 9; Ex. 104, Schiff Dep. 182:9-21; Ex. 326, Schiff Dep. Ex. 8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Schiff's conclusion that the notebook page was connected to the 9/11 attacks should be excluded because, as Saudi Arabia explains in its *Daubert* motion, that opinion is not based on Schiff's aviation expertise. *See* Objections Chart.<br><br>Further, these numbers have no relationship to how the hijackers would have navigated or did navigate the planes. *See supra* ¶ 1913. |
| 1916. | Bayoumi prepared the various calculations himself and admitted that his calculations | Plaintiffs' misleadingly suggest that Al Bayoumi admitted the "calculations had some relevance to Washington, D.C." and the 9/11 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | had some relevance to Washington, D.C., one of the key targets of the 9/11 Attacks:<br><br>Q. And what was the purpose of preparing this document?<br><br>A. Perhaps to remember, memorize the equation.<br><br>Q. And what equation is that?<br><br>A. (In English) It's over there. I think -- (Through Interpreter) So I'm somebody who likes to read. I'm somebody who likes to be exposed to things. Perhaps this was an equation that we studied before in high school, and I was trying to remember whether I'm going to be able to figure out and solve it or not.<br><br>Q. And what is the equation for?<br><br>A. (In English) I don't know. (Through Interpreter) I don't know. It's just an equation.<br><br>Q. And what are -- there's a series of numbers on the bottom here. It says, 52 minus 8 is 44. And then there's a number of lines next to that, 44, 25, 80, 76, adding up | attacks. Al Bayoumi testified he did not recall when he made the writings in the notebook, what the purpose of the equation was, or what the numbers meant. Al Bayoumi's reference to "Washington" was just naming a list of different places from which one could calculate distance, including San Diego, Los Angeles, and Baltimore. Pls. Ex. 120 (Bayoumi Tr.) 290:10-292:9. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | to 225 and 20 -- what do these numbers mean, sir?<br><br>A. I don't remember.<br><br>Q. And the equation says, The height of the plane from the earth in miles. Do you see that, sir?<br><br>A. (In English) Yes.<br><br>Q. And what was the reason you were calculating the height of the plane from earth in miles?<br><br>MR. SHEN: Objection. For the record.<br><br>THE WITNESS: So, it's an equation like any other equation. Like, say, when they say what is the distance of the road between San Diego to LA or **Washington to other places**. It's just an equation to measure distance. To Baltimore. Ex. 120, Bayoumi Dep. 290:13-292:9 (emphasis added). | |
| 1917. | Bayoumi's drawing included an airplane sketch and memorialized in writing that the equation was for the "height the plane" and the ground target's "distance from the plane..." Ex. 11N, MPS999_X0417 at 6; *see also* Ex. 678M, MPS696_4. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Al Bayoumi's writings never specified a "ground target." Al Bayoumi wrote that "d" was the "distance from the plane to hurrizon [sic]." Pls. Ex. 11N (MPS 999x_4017_5). |
| 1918. | American Airlines Flight 77, the hijacked plane that was flown into the Pentagon by 9/11 hijackers Hazmi and Mihdhar, who Bayoumi met and supported in California, had a planned flight path from Dulles Airport outside Washington, D.C. to Los Angeles. *See* 9/11 Commission Report at 2-3, 217-219. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, this is undisputed. |
| 1919. | Saudi Arabia's counsel chose not to ask Bayoumi a single question about his aviation sketch page. Ex. 120, Bayoumi Dep. 721:15-798:12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia does not dispute that it did not ask Al Bayoumi a question about his writings in the notebook but disputes that any inference can be drawn from not asking questions. Al Bayoumi had already testified he did not recall when he made the writings in the notebook, what the purpose of the equation was, or what the numbers meant, which is unsurprising given that it was prepared more than 20 years before his deposition. *See* Pls. Ex. 120 (Bayoumi Tr.) 290:10-292:9. |
| 1920. | Having failed to ask any questions themselves, Saudi Arabia's counsel now suggest that the airplane sketch page may have been prepared because "Al Bayoumi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | had a teenaged son during the relevant period," KSA Aver. at ¶ 245. Bayoumi said no such thing, Ex. 120, Bayoumi Dep. 290:13-292:9, and Saudi Arabia's counsel did not raise the issue with Bayoumi when they had an opportunity to do so, which would have also provided an opportunity to cross examine Bayoumi on counsel's suggested explanation. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Al Bayoumi had no recollection in June 2021 of the purpose behind his writings made more than 20 years earlier.<br><br>It is undisputed that the equation on the sketch is a simple derivation of the Pythagorean theorem, which is taught in high school algebra or geometry and that appears in multiple online forums and mathematic textbooks published before the 9/11 attacks. KSA Ex. 148 (Moss Rep.) 7 & Exs. Given Schiff's acknowledgement that this equation is not used in aviation and that it was, in fact, not used by the hijackers, the most plausible explanation is that Al Bayoumi was solving a simple math problem commonly presented in high school, where his son was a student at the time. |
| 1921. | Saudi Arabia's claim that Schiff "conceded that the equation, standing alone, has no apparent connection to the 9/11 attacks," KSA Aver. ¶ 242, takes Schiff's testimony completely out of context, as Schiff explained that his opinions were not based upon the equation "standing alone" but the evidence in its entirety — the equation, together with the specific numbers of 50 miles and 70 miles that Bayoumi used in the equation; the altitude and distances measurements that Bayoumi obtained from the calculation, Bayoumi's airplane sketch, and his notes and calculations of distances — which showed that Bayoumi's aviation | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Schiff's testimony speaks for itself. Schiff explained that he reached his conclusion that Al Bayoumi's writings were connected to the 9/11 attacks based on his views about Al Bayoumi's connections to the hijackers, which are not opinions that he is qualified to give, as explained in Saudi Arabia's *Daubert* motion. *See supra* ¶¶ 1898, 1904; Objections Chart.<br><br>He testified that the equation itself has no apparent connection to the 9/11 attacks. Pls. Ex. 104 (Schiff Tr.) 50:11-51:21. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | sketch page had a direct relationship to the 9/11 Attacks. Ex. 148, Schiff Report at 11. | |
| 1922. | Saudi Arabia's claim that a pilot could not see buildings such as the World Trade Center from 50 miles and could only identify them from "within at least 5 to 10 miles," KSA Aver. ¶ 243.b., c., is wrong as a matter of empirical fact. Captain Schiff's experience is that a target like the World Trade Center could be seen by pilots from significantly more than 50 miles. Ex. 148, Schiff Report at 6; Ex. 104, Schiff Dep. 179:16-19 (from his experience, the World Trade Center could be seen from upwards of 70 miles). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required. Saudi Arabia does not dispute that Schiff offered the opinion that a pilot could identify the World Trade Center from 50 miles away. Another experienced pilot (Moss) explains that this opinion is wrong. KSA Ex. 148 (Moss Rep.) 11.<br><br>In any event, the flight path for AA 77 demonstrates the hijackers could not identify the Pentagon until approximately 4.2 miles away. *See supra* ¶ 1907. |
| 1923. | Saudi Arabia's pilot expert Douglas Moss agreed that the formula used by Bayoumi provided "a limiting theoretical floor" for where a pilot could first see an object on the horizon, Ex. 106, Moss Dep. 83:17-21 and knew of no other formula which provided such information. Ex. 106, Moss Dep. 68:4-8. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>To the extent a response is required, Moss testified contrary to Plaintiffs' assertion: "Q. Assuming the, as you said, the terrain was flat and spherical, this formula would tell you at what point you could first see that target; correct? A. If the terrain were totally flat, that formula has no validity. *But no, that formula is not applicable*." Pls. Ex. 106 (Moss Tr.) 68:17-23 (emphasis added). Moss explained that the formula provides a "geometric relationship" between a point in the sky and the horizon but |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | does not provide the distance at which one can "see" an object, which is affected by other factors including refraction, absorption, and distortion in the atmosphere. *See* KSA Ex. 148 (Moss Rep.) 8-9, 11, 14, 20. |
| 1924. | Moss was unfamiliar with the New York skyline; did not know that the twin towers of the World Trade Center had been New York's tallest landmark; and mistakenly believed that a pilot had to be within 5-10 miles of those towers to identify them. Ex. 106, Moss Dep. 94:18-95:15; Ex. 163, Heavey Decl. ¶¶ 3-8 (the World Trade Center towers were clearly visible by naked eye from the ground 30 miles away in Greenwich, Connecticut). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 163 (Heavey Decl.) has been stricken. *See* ECF No. 9562, at 9-10.<br><br>To the extent a response is required, Moss did not testify he was "unfamiliar with the New York skyline"; he testified he was familiar with the "final approach" into New York. *See* Pls. Ex. 106 (Moss Tr.) 94:18-24. He did not testify he "did not know" the World Trade Center was the tallest landmark in the past; he was asked an ambiguous question whether "there might be something taller than the World Trade Center" (without specifying time period), and agreed. *See id.* at 95:12-15. |
| XXVIII. | **SAUDI ARABIA'S STATE-RUN AL HARAMAIN AND OTHER "CHARITY" ORGANIZATIONS PROVIDED FINANCIAL AND MATERIAL SUPPORT AND ASSISTANCE FOR VIOLENT JIHAD CARRIED OUT BY AL QAEDA** | Saudi Arabia need not respond to this section or to this header because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>As described below, the charities were not state-run. Contrary to Plaintiffs' allegations, Saudi Arabia worked extensively as an ally with the United States in the war on terrorist financing. Saudi Arabia acted jointly, with the United States, to designate Al Haramain branches and other organizations and individuals as terrorists. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia is an enemy of Al Qaeda and practices a quietest version of Hanbali Salafism that is peaceful and opposes violence against the west.<br><br>Further, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place to support Al Qaeda's violent attacks. For example, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). And the 9/11 Commission Final Report concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 1925. | As set forth in Plaintiffs' complaints, pleadings, and other submissions to this Court, the Kingdom of Saudi Arabia's material support to Osama bin Laden and al Qaeda also included the tortious acts of the da'wah organizations established by the Saudi government to propagate the Wahhabi Islamist ideology throughout the world as a core function and duty of the Saudi state. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion is unsupported and improper attorney argument. As described below, Plaintiffs' allegations are baseless. Saudi Arabia worked extensively as an ally with |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the United States in the war on terrorist financing. Saudi Arabia acted jointly, with the United States, to designate Al Haramain branches and other organizations and individuals as terrorists.<br><br>Saudi Arabia is an enemy of Al Qaeda and practices a quietest version of Hanbali Salafism that is peaceful and opposes violence against the west.<br><br>Further, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place to support Al Qaeda's violent attacks. For example, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). And the 9/11 Commission Final Report concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 1926. | The Kingdom's Basic Law of Governance, expressly provides that "[t]he State shall … undertake its duty regarding the propagation of Islam (Da'wah)." Consolidated Amended Complaint ("CAC"), ECF No. 3463, at ¶ 59. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>The Consolidated Amended Complaint (ECF No. 3463) and the Affirmation of Evan Francois Kohlmann (ECF No. 2927-9) cited therein are inadmissible hearsay and are not evidence. *See* Objections Chart. To the extent those documents rely on any evidence, Plaintiffs have not put such evidence before the Court and Saudi Arabia need not respond to it.<br><br>To the extent a response is required, Saudi Arabia does not dispute that Saudi Arabia's Basic Law of Governance states, *inter alia*, "The State shall protect the Islamic Creed, apply the Sharia, encourage good and discourage evil, and undertake its duty regarding the Propagation of Islam (Da'wah)." |
| 1927. | Statements by the Saudi king and other senior Saudi officials confirm and reinforce this foundational principle that the global propagation of Wahhabi Islam is both a core function and duty of the Kingdom. *See id.* at ¶ 107 (King Fahd bin Abdul Aziz al Saud stating in a 1992 speech that "the Propagation of Islam is one of the most important functions of an Islamic state"); ¶ 108 (testimony from a senior Saudi government official explaining that the Saudi state's da'wah activities have been a "core policy and function of the Kingdom since its founding"). See also 9/11 Commission Final Report at p. 372 (confirming the "dedication of the [Saudi] government to propagating the Islamic | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>The Consolidated Amended Complaint (ECF No. 3463) and the Affirmation of Evan Francois Kohlmann (ECF No. 2927-9) cited therein are inadmissible hearsay and are not evidence. *See* Objections Chart. To |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | faith, particularly the Wahhabi sect that flourishes in Saudi Arabia"). | the extent those documents rely on any evidence, Plaintiffs have not put such evidence before the Court and Saudi Arabia need not respond to it.<br><br>Saudi Arabia disputes Plaintiffs' characterization that Saudi Arabia engages in "global" propagation of "Wahhabi" Islam, which is not supported by any citation to record evidence.<br><br>The term "Wahhabiist" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.<br><br>Saudi Arabia practices Hanbali Salafism. Plaintiffs' purported expert Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").<br><br>Further, Saudi Arabia does not dispute that the 9/11 Commission Final Report contains the quoted language, but that report also concluded that there is "no evidence that the Saudi government as an institution or senior |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi officials individually funded [Al Qaeda]." KSA Ex. 163 (9/11 Rep.) 171. |
| 1928. | To comply with this obligation, the Kingdom established several Saudi state da'wah organizations to serve as the principal instruments for conducting proselytizing activities and otherwise advancing the Wahhabi agenda across the globe, including but not limited to the Al Haramain Islamic Foundation, Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO") and the World Assembly of Muslim Youth ("WAMY"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

To the extent a response is required, this assertion is not supported by citation to any record evidence. There is no record evidence that these are "state" organizations of Saudi Arabia. The term "Wahhabiist" is pejorative, as even Plaintiffs' expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.

Saudi Arabia practices Hanbali Salafism. Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. *Id.* at 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 1929. | From the formation of al Qaeda in 1998 through the attacks of September 11, 2001, and even beyond that tragic day, these Wahhabi proselytizing organizations established, funded, directed, and controlled by the Saudi government and the Kingdom's Ministry of Islamic Affairs, Endowments, Da'wah and Guidance ("Ministry of Islamic Affairs"), acting in accordance with the policies set by the Saudi government, were responsible for providing extensive financial, material, logistical, ideological, and other forms of critical support that were essential to al Qaeda's development and transformation into a sophisticated, global terrorist organization with the ability to carry out large-scale attacks in countries around the world. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs cite no record evidence to support their assertions. Saudi Arabia objects to the claim that these organizations were directed and controlled by the Ministry of Islamic Affairs and to Plaintiffs other characterizations.<br><br>The term "Wahhabisst" is pejorative, as even Plaintiffs' expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12. Saudi Arabia practices Hanbali Salafism. Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. *Id.* at 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 1930. | Indeed, the tortious acts of the da'wah organizations in support of Osama bin Laden and al Qaeda, undertaken simultaneously as agents and alter-egos of the Kingdom in furtherance of their core mission to spread Wahhabi doctrine and practice, aided and abetted al Qaeda's attack of the United States on September 11, 2001. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, this paragraph contains improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. Saudi Arabia denies allegations that the it aided and abetted the September 11 attacks, that the organizations were alter egos of Saudi Arabia or that Saudi Arabia sought to further "Wahhabi doctrine," and each of Plaintiffs' unfounded allegations. Among other things |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | discussed below, the 9/11 Commission Final Report concluded that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." KSA Ex. 163 (9/11 Rep.) 171. Further, the term "Wahhabiist" is pejorative, as even Plaintiffs' expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12. Saudi Arabia practices Hanbali Salafism. Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. *Id.* at 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 1931. | Recently declassified U.S. government investigation records originating from the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), and other sources, as well as deposition testimony and materials produced in discovery proceedings, provide | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | new details documenting (1) the Kingdom's control and influence over the da'wa organizations at the highest levels of the state, including the Council of Ministers; (2) the Ministry of Islamic Affairs' extensive control, supervision, and direct involvement in the funding, operations, and activities of the da'wah organizations in the Kingdom and abroad; (3) the da'wah organizations' massive funding of al Qaeda, intimate involvement in all aspects of al Qaeda's operations, and the broad use of their infrastructures and resources to advance al Qaeda's terrorist agenda; and (4) U.S. intelligence assessments that senior Saudi government officials, as well as Saudi embassy staff around the world, were aware of and condoned the da'wah organizations' global support for al Qaeda and terrorism, as described herein. | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs' assertions are improper attorney argument that are not supported by citation to any record evidence. Plaintiffs reference but do not identify various materials purportedly supporting their theories. To the extent Plaintiffs identify those materials elsewhere in their averment, Saudi Arabia addresses the documents in the applicable paragraphs. To the extent a further response is required, Saudi Arabia denies Plaintiffs *ipse dixit* assertions. |
| 1932. | The evidence presented herein is supplemental to, but does not displace, the facts and evidence relating to the Saudi charities set forth in the Consolidated Amended Complaint ("CAC") (ECF Nos. 3463, 3463-1 through 3463-5), the *Ashton* Plaintiffs' Complaint, and all materials submitted by Plaintiffs in opposition to the Kingdom's motion to dismiss on November 9, 2017. *See* ECF Nos. 3780-3785. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Saudi Arabia objects to Plaintiffs' improper attempt to incorporate allegations and documents not submitted with its instant opposition. Plaintiffs must disclose and identify the evidence purportedly supporting their arguments so that Saudi Arabia has an opportunity to respond. To the extent a further response is required, Saudi Arabia denies Plaintiffs' allegations and reserves the right to address any allegations and evidence Plaintiffs specifically assert. |
| XXVIII. A. | **Al Haramain Islamic Foundation** | |
| 1933. | Defendant Al Haramain Islamic Foundation ("Al Haramain") was a Saudi-based ostensible charity, with dozens of branch offices spread throughout the world, "whose stated goals are to spread Islam, aid Muslims in difficulty, propagate the faith among non-Muslims, and establish the Salafist Wahhabi fundamentalist form of Sunni Islam." Ex. 2, EO 3414-3442 at 3435, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December 2004.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the section of the 2004 FBI/CIA Joint Assessment Plaintiffs quote begins with a header confirming that Al Haramain is a *nongovernmental* organization. Pls. Ex. 2OO (EO 3435-UPDATED). The document contains the quoted language describing the activities of this NGO, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1934. | Al Haramain served as an agent and alter-ego of the Kingdom of Saudi Arabia, controlled and directed by the highest levels of the Saudi government. Two members of the Saudi Council of Ministers officially supervise Al Haramain's operations and activities. *See id.* The Council of Ministers, also referred to as the "Cabinet," consists of the Prime Minister (the Saudi King), the Deputy Prime Minister (the Crown Prince), and 28 other ministers. Ex. 605, *Council of Ministers System*, https://www.saudiembassy.net/council-ministers-system-0 at Ex. 605. The Council, which meets weekly, and is attended by the King and/or his deputy, advises the King and is responsible for drafting and overseeing implementation of the internal, external, financial, economic, education, and defense policies as well as the general affairs of the State. *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> To the extent a response is required, Plaintiffs' assertion that "Al Haramain served as an agent and alter-ego of the Kingdom of Saudi Arabia, controlled and directed by the highest levels of the Saudi government" is not supported by any citation to record evidence. The cited document – Pls. Ex. 2OO (EO 3435-UPDATED) – refers to Al Haramain as a *nongovernmental* organization. Further, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations. Today's action marks the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). <br><br> Plaintiffs' assertion that Saudi Arabia controlled Al Haramain because two Saudi government cabinet members supervised Al Haramain activities is contrary to the record evidence. The U.S. government has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | concluded that "Aqeel Abdulaziz Al-Aqil," – not a member of the Saudi government – "is [Al Haramain's] founder and leader," who "controlled AHF and was responsible for all AHF activities." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). |
| | | Plaintiffs have alleged that former Ministers of Islamic Affairs Abdullah Al Turki and Saleh Bin Abdulaziz ash-Sheikh participated in Al Haramain. Abdullah Al Turki testified that he did not have involvement with Al Haramain. Pls. Ex. 97 (Al Turki Tr.) 64:2-20. Saleh Bin Abdulaziz ash-Sheikh also testified that he did not hold a position at Al Haramain. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10; 143:14-148:5 (testifying that Al Haramain was working without a permit and that the Ministry of Islamic Affairs scrutinized the organization). |
| | | Minister Al Ash-Sheikh also explained that the Ministry of Islamic Affairs was not supervising in the sense of leading the organization; it was "putting the organization under the microscope" to shut it down. Specifically, the Ministry "put its work under the microscope because it worked without a permit" and "it didn't have bylaws and it did not have authority." Pls. Ex. 123 (Ash-Sheikh Tr.) 146:5-147:11. And after scrutizing the organization, "the recommendation we made was to . . . shut it down. . . . Perhaps he [Khalid Bin Obaid Azzhari] believes that at the time the Ministry was supervising, but the truth is the Ministry was scrutinizing for the purpose of shutting [Al Haramain] down." *Id.* at 147:12-148:4. |
| | | Saudi Arabia does not dispute that Plaintiffs' assertion accurately states the members of the Council of Members and its role in "drafting and overseeing implementation of the internal, external, financial, economic, education, and defense policies as well as the general affairs of the State." *See* Pls. Ex. 605 at 1. However, Plaintiffs' assertions that the Council |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | meets weekly, is attended by the King and/or his deputy, and advises the King are not supported by the cited document. *See id.* |
| 1935. | According to the U.S. government, Al Haramain's total expenditures in 2000 exceeded $56 million. "The Government of Saudi Arabia provided more than one-half of this money via direct contributions and grants through various religious foundations." Ex. 608, TREASURY00009; Ex. 614, CIA 0675-679 at 675, *Al Haramain in Africa: Supporting Al- Ittihad Al-Islami and Other Terrorists*, March 22, 2002 (CIA reporting that Al Haramain is funded by the Saudi government); Ex. 620, CIA-SUB_0007-19 at 14, *Al-Haramain: Support for Extremists and Terrorists* [REDACTED], August 28, 2002 (CIA explaining that Al Haramain receives support from the Saudi government by submitting periodic reports to the Minister of Islamic Affairs). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> Plaintiffs Exhibits 608, 614, and 620 are inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, Plaintiffs omit critical information from later in time, after a more thorough analysis, and ignore record evidence that undermines their assertions. <br><br> Contrary to the claim that the Saudi government supported Al Haramain, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations. Today's action marks the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 608 – an undated Department of Treasury memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. The memorandum contains the quoted language, but also states that a "growing amount of money now, however, comes from grants from other countries, individual Muslim benefactors, and special campaigns, which target entities around the world. Pls. Ex. 608 (TREASURY 9). |
| | | Plaintiffs Exhibit 614 – a March 22, 2002 CIA memorandum – is similarly inadmissible hearsay, relying upon unidentified sources and speculation. The memorandum states that Al Haramain is "funded by the Saudi Government *and wealthy individuals* to proselytize and conduct charity work abroad," but also notes that when it was exposed that Al Haramain may have supported terrorist groups, the "US and Saudi Arabian Governments [ ] froze the assets of [Al Haramain's] Somali and Bosnian offices on 11 March." Pls. Ex. 614 (CIA_675) (emphasis added). This is consistent with Minister Al Ash-Sheikh's testimony that the Ministry of Islamic Affairs put Al Haramain under the microscope and tried to "shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 147:12-148:4. |
| | | Plaintiffs' Exhibit 620 – an August 28, 2002 CIA memorandum – is also inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 620. The memorandum states that Al Haramain "receives support from Riyadh by submitting periodic reports to the Minister for Islamic Guidance, Shaykh Salih Bin 'Abd al- 'Aziz. The Ministry of lslamic Guidance, in its supervisory role, coordinates on these reports." Pls. Ex. 620 (CIA-SUB_14). However, Saleh Bin Abdulaziz Ash-Sheikh testified that Al Haramain was working without a permit, so the purpose of such scrutiny and oversight by the Ministry of Islamic Affairs was to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5. Furthermore, the memorandum notes that "Riyadh—suspecting that Islamic militants redirect some of the government's charitable donations—has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services. Riyadh might be willing to take action against specific HIF employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." Pls. Ex. 620 (CIA-SUB_15). <br><br> Ultimately, the 2004 FBI/CIA Joint Assessment analyzed Al Haramain, which it referred to as a *non*governmental organization, and concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1936. | In conjunction with the Council's oversight, Saudi Arabia's Ministry of Islamic Affairs played a critical role in supervising, managing, and directing the operations and activities of Al Haramain, both in the years leading up to the attacks of September 11, 2001 and in the years that followed. Sheikh Saleh bin Abdul Aziz bin Mohammed bin Ibrahim al Ash-Sheikh, who was appointed as Deputy Minister of Islamic Affairs in 1416 AH (May 1995-May 1996), simultaneously served as the General Supervisor of Al Haramain. Ex. 630, Al Rajhi Exhibit- ARB 38 (October 17, 1997 letter from Saleh bin Abdul Aziz bin | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> Plaintiffs Exhibit 641 is inadmissible hearsay. *See* Objections Chart. <br><br> Plaintiffs' conclusory assertions are contradicted by the record evidence. Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Mohamed al Ash-Sheikh, "Deputy Minister of Islamic Affairs, Endowments, Da'wah, and Guidance and General Supervisor of Al-Haramain Islamic Foundation."); Al Rajhi Exhibit-ARB 39 at Ex. 641 (June 17, 1999 article, *Biography of Sheikh Saleh bin Abdel bin Mohamed bin Ibrahim Al Ash-Sheikh, Minister of Islamic Affairs, Endowments, Da'wah, and Guidance,* reporting that he "was appointed as Deputy Minister of Islamic Affairs, Endowments, Da'wah, and Guidance in 1416 AH (May 1995-May 1996 AD)," and that "he supervises the Al-Haramain Islamic Foundation and follows up on its work."). | States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |
| | | Plaintiffs' additional assertion that the "Ministry of Islamic Affairs played in a critical role in supervising, managing, and directing the operations and activities of Al Haramain" is not supported by any citation to record evidence and is contradicted by testimony from the Minister of Islamic Affairs and other sources. |
| | | Minister Ash-Sheikh testified that he had no role in Al Haramain, as did prior Minister Al Turki. *See* Pls. Ex. 97 (Al Turki Tr.) 64:2-20; Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10. |
| | | The U.S. government has also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – is the "founder and leader," who "controlled AHF and was responsible for all AHF activities, including its support for terrorism." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). This is consistent with Minister Ash-Sheikh's testimony that Al Haramain was working without a permit, so the purpose of government supervision was to provide scrutiny and oversight by the Ministry of Islamic Affairs and to "put [Al Haramain's] work under the microscope." As a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5. |
| | | Plaintiffs Exhibit 641 – a June 17, 1999 article from Al-Jazirah – is inadmissible hearsay and does not contain the quoted language. To the extent it is considered, the article also notes that Al Ash-Sheikh "pointed out that there are many government agencies" involved in Da'wah efforts, and that there is a separate role for charity organizations. Pls. Ex. 641 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (ARB-38772). This demonstrates that Al Haramain, a nongovernmental organization, was separate from the Ministry of Islamic Affairs. |
| 1937. | Ash-Sheikh was appointed to the role of Minister of Islamic Affairs in 1999, and continued to oversee the activities of Al Haramain through the September 11th attacks and in the years following that tragedy. Ex. 71, "Brief Resume" for Saleh bin Abdul Aziz bin Mohammed Al ash-Sheikh); Ex. 2, EO 3414-3442 at 3435 (According to the joint assessment of the FBI and CIA, "[t]he Minister of Islamic Affairs, Sheikh Saleh Bin Abdul Aziz Bin Mohammed Bin Ibrahim Al Shaykh, is the titular head and superintendent of HIF."). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. Saudi Arabia does not dispute that Saleh Bin Abdulaziz Al ash-Sheikh was appointed to the role of Minister of Islamic Affairs in 1999. Plaintiffs' assertion that he oversaw the activities of Al Haramain is contradicted by the record. Minister Al ash-Sheikh had no role in the organization. *See* Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10. He supervised Al Haramain in the sense of putting the organization "under the microscope," and that scrutiny resulted in a recommendation to "shut it down." *Id.* at 147:12-148:4. The U.S. government has concluded that "Aqeel Abdulaziz Al-Aqil" – not Minister Al ash-Sheikh or any other member of the Saudi government – was Al Haramain's "founder and leader," who "controlled AHF and was responsible for all AHF activities." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). The 2004 FBI/CIA Joint Assessment contains the quoted language, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1938. | As the Saudi government's appointed overseer of Al Haramain, Ash-Sheikh made clear that the Ministry of Islamic Affairs | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | was supervising the work and activities of Al Haramain and would provide Al Haramain with all that it needed to ensure its success. Ex. 630, Al Rajhi Exhibit-ARB 38 (Ash-Sheikh stating in 1997 that "Al-Haramain Islamic Foundation is working under our supervision"); Ex. 641, Al Rajhi Exhibit-ARB 39 (In a March 5, 1997 interview with Al Jazirah concerning his assignment to manage and supervise the activities of Al Haramain, Ash-Sheikh states that Al Haramain undertakes many tasks in the field of da'wah and "has propagators, offices, and schools abroad," and "we will seek to provide the Foundation with everything that it needs because this is important to us all."); Ex. 662, Al Rajhi Exhibit-ARB 40 at Ex. 662 (stating in 1999 that Al Haramain "is supervised by Deputy Minister of Islamic Affairs, Endowments, Da'wah, and Guidance – His Eminence Sheikh Saleh bin Abdel Aziz Al ash-Sheikh"). *See also* Ex. 123, Ash-Sheikh Dep. 154:18-155:8 (testifying that Tawfiq Sudairy, a Deputy Minister at the Ministry of Islamic Affairs, served on Al Haramain's board of directors). | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 641 is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs omit critical context regarding government scrutiny and oversight of Al Haramain. Minister Al ash-Sheikh testified that Al Haramain was working without a permit, so the purpose of such scrutiny and supervision by the Ministry of Islamic Affairs was to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5.<br><br>Regarding Tawfiq Sudairy, Minister ash-Sheikh testified that he believed Tawfiq Sudairy served on the "prospective board of directors" which "met once or twice and recommended that [Al Haramain] not be issued a license and to bring its work to conclusion." *Id.* at 154:5-155:8. As a result, "the recommendation from the Ministry of Islamic Affairs at that time was to shut down Al-Haramain charity." *Id.*<br><br>Plaintiffs' suggestion that Minister Al ash-Sheikh was the leader of Al Haramain is contradicted by the record. The U.S. government has also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – was Al Haramain's "founder and leader," who "controlled AHF and was responsible for all AHF activities." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). |
| 1939. | Saudi Arabia's Ministry of Interior shared and supported Ash-Sheikh's vision for Al | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain and called on all Saudi government sectors, businesses, and financial institutions to support Al Haramain's work. In a June 1, 1999 "Circular to All Government Administrations, Centers, Companies, and Banks," the Ministry of Interior's Governor in the Yanbu Province, Ibrahim bin Shakhbout al Sultan, informed that Al Haramain is supervised by the Ministry of Islamic Affairs and requested the Circular's recipients to "[p]lease cooperate with this Foundation in everything that serves the common good." Ex. 662, Al Rajhi Exhibit-ARB 40; | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Minister Al ash-Sheikh did not have a "vision" for Al Haramain and testified that he had no role in it. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10. The U.S. government has also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – was Al Haramain's "founder and leader," who "controlled AHF and was responsible for all AHF activities." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice).

Regarding the Saudi government's alleged supervision, Minister Al ash-Sheikh testified that Al Haramain was working without a permit, so the purpose of such scrutiny and supervision by the Ministry of Islamic Affairs was to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5. |
| 1940. | As both Deputy Minister and Minister of Islamic Affairs, Ash-Sheikh played a significant role in controlling and directing Al Haramain's banking activities. | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs' characterization of the cited documents as establishing that "Ash-Sheikh played a significant role in controlling and directing Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Haramain's banking activities" is conclusory and not supported by the cited documents. Although the cited documents contain the quoted language, Plaintiffs cite no evidence that Minister Al ash-Sheikh was directing Al Haramain's banking activities rather than performing regulatory oversight of the nongovernmental organization's banking activities. Furthermore, Minister Al ash-Sheikh testified that Al Haramain was working without a permit, so the purpose of such scrutiny and supervision by the Ministry of Islamic Affairs was to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5.<br><br>Plaintiffs also omit important context that the U.S. and Saudi governments worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |
| 1941. | During the 1998-2002 timeframe, while serving as Minister and Deputy Minister of | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Islamic Affairs, and simultaneously the General Supervisor of Al Haramain, Ash-Sheikh oversaw hundreds of Al Haramain accounts in various Saudi banks, including ▮ bank accounts at Al Rajhi Bank. ▮ | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit ▮ is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs' assertion that "Ash-Sheikh oversaw hundreds of Al Haramain accounts in various Saudi banks, including ▮ bank accounts at Al Rajhi Bank" is not supported by the cited documents, which relate solely to Al Haramain's financial records and do not reference any such oversight by Minister Al ash-Sheikh of the bank accounts. *See* Pls. Exs. ▮. The cited documents discuss ▮<br><br>▮ but Plaintiffs cite nothing to verify the accuracy of these records. *See id.*<br><br>Moreover, Plaintiffs omit critical context concerning the Saudi government's efforts to combat terrorist financing and evidence concerning Minister Al ash-Sheikh's alleged "oversight" of Al Haramain. Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>The U.S. government has also concluded that "Aqeel Abdulaziz Al-Aqil" – who is not a member of the Saudi government – was Al Haramain's "founder and leader," who "controlled AHF and was responsible for all AHF activities, including its support for terrorism." Pls. Ex. 671 at 3-4 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | This is consistent with Minister Al Ash-Sheikh's testimony that he had no substantive role in al Haramain, *see* Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10, and that he was "supervising" Al Haramain only in the sense of putting it "under the microscope" and recommending that the charity be "shut down." *Id.* at 147:12-148:4; 149:6-14, 153:12-154:2, 154:5-16 . |
| 1942. | During this same time period, while under the leadership and oversight of Ash-Sheikh, the Director of Al Haramain, Aqeel al Aqeel, and his deputy, Mansour al Kadi, used their personal accounts at Al Rajhi Bank to conduct business on behalf of Al Haramain, moving millions of dollars through those accounts in support of the charity's global activities. Ex. 593, TREASURY00021 (stating that Kadi, "al-Aqil's deputy and one of AHF's main leaders," is "implicated in working with al Aqil to support al Qaida terrorist activity"). Between 1998-2002, seven Al Rajhi Bank accounts belonging to Aqeel and Kadi took in a total of 89,677,415.00 SR in deposits (approximately $23.9 million), and transferred in excess of 88,062,240.00 SR (approximately $23.5 million). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart. Plaintiffs' assertion that Aqil Al Aqil and his deputy, Mansour al Kadi, were acting under the leadership and oversight of Minister Al ash-Sheikh is not supported by the cited document or by any record evidence. Plaintiffs' not only rely upon inadmissible hearsay, but misleadingly quote that hearsay as well. The cited document – an undated Treasury Department memorandum – states that "Al-Kadi is reportedly implicated in working with al Aqil to support al Qaida terrorist activity," citing unidentified hearsay sources as support. Pls. Ex. 593 (TREASURY 21). Furthermore, the cited document notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19). The Saudi government's efforts to combat terrorist financing contradicts Plaintiffs' assertion that Al Aqil was under Minister Al ash-Sheikh's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "leadership." *See* Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). Indeed, the Saudi government joined the United States in taking action against Al Haramain braches associated with Al Aqil. *See id.* at 3-4. Consistent with that effort, Minister Al ash-Sheikh testified that the Ministry of Islamic Affairs put Al Haramain "under the microscope," and recommended "shutting it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 147:12-148:4.<br><br>Plaintiffs' assertion regarding the alleged deposits and transfers from seven accounts purportedly belonging to Al Aqil and Al Kadi is not supported by any citation to record evidence. |
| 1943. | Moreover, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Saudi Arabia does not dispute that the cited document produced by Al Rajhi Bank indicates that<br><br>*See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ is not supported by any citation to record evidence. |
| 1944. | The CIA concluded that Aqeel was "providing funds to [Al Haramain] offices with terrorist ties in ways that will avoid foreign government scrutiny, such as using personal bank accounts." Ex. 620 CIA-SUB_0007-19 at 0008, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002; *id.* at 0013 ("Al-Haramain increasingly sends money to individuals' personal accounts in addition to transferring funds to branch office accounts. We have also noted transfers originated from senior HIF officials' personal accounts in Saudi Arabia to personal accounts of known HIF affiliates."). See also Ex. 593, TREASURY00017-29 at 0027, *Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224*, (stating that Aqeel was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 593 and 620 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs cite documents from the CIA and Treasury concerning Aqil's activities but omit critical context showing that Saudi Arabia took action against Aqil and did not knowingly support any terrorist financing.<br><br>To the extent a response for Plaintiffs Exhibit 620 is considered, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services. Riyadh might be willing to take action against specific HIF employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." Pls. Ex. 620 (CIA-SUB_15). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | The record indicates that Saudi Arabia indeed took action against Aqil and al Haramain. Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1, 3-4 (June 2, 2004 Treasury Notice). <br><br> This action to combat terrorist financing is consistent with Minister Al ash-Sheikh's testimony that he had no substantive role in al Haramain, *see* Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10, and that he was "supervising" al Haramain only in the sense of putting it "under the microscope" and recommending that the charity be "shut down." *Id.* at 147:12-148:4; 149:6-14, 153:12-154:2, 154:5-16 . <br><br> The 2004 FBI/CIA Joint Assessment analyzed Al Haramain, which it referred to as a *non*governmental organization, and concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1945. | Other Al Haramain officials ██████████ <br> ████████████████████ <br> ████████████████████ <br> ████████████████████ <br> ████████████████ <br> ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Plaintiffs Exhibits ██████████ are inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' characterization of the cited documents – ▮▮▮▮▮ – is not supported by the cited documents. *See* Pls. Exs. ▮▮▮. To the contrary, the cited documents relate to ▮▮▮ *See id.* |
| 1946. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 597, ▮▮▮▮▮ are inadmissible hearsay. |

597- ARB 38995, , respectively.

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ██████████████████████ ██████████████████ . *Id.* | To the extent a response is required, Saudi Arabia does not dispute that the cited documents contain the quoted language and relate to ████████████████████████████████████████████████████████████ |
| 1947. | ████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | To the extent a response is required, the cited document appears to show ███████████████████████████████████████████████ None of Plaintiffs' remaining assertions are supported by the cited document or any other citation to record evidence. |
| | | The record contradicts Plaintiffs' assertion that ████████████████████████████." Minister Al ash-Sheikh testified that he had no substantive role in al Haramain, *see* Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10, and that he was "supervising" al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [redacted] | Haramain only in the sense of putting it "under the microscope" and recommending that the charity be "shut down." *Id.* at 147:12-148:4; 149:6-14, 153:12-154:2, 154:5-16 . |
| | | To the extent Plaintiffs suggest Minister Al ash-Sheikh was aware of Al Haramain funding supporting violence, the record contradicts that assertion, as well. The 2004 FBI/CIA Joint Assessment analyzed Al Haramain, which it referred to as a *non*governmental organization, and concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1948. | Notwithstanding the evidence of Ash-Sheikh's personal involvement on behalf of the Ministry of Islamic Affairs in supervising Al Haramain's work and activities, his relationship with Al Haramain's high-ranking officials, and his direct oversight of Al Haramain's banking activities, Ash-Sheikh adamantly denied any relationship with Al Haramain during his March 23-24, 2021 deposition in this litigation. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

To the extent a response is required, there is no evidence of "personal involvement on behalf of the Ministry of Islamic Affairs" supervising Al Haramain's work. Nor is there evidence of "direct oversight" of banking activities. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Minister Al ash-Sheikh also explained that, while he had no role within Al Haramain, the Ministry of Islamic Affairs had supervision and oversight in the sense of putting the organization under the microscope and ultimately recommending that it be shut down. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14–138:10; 147:12–148:4. |
| 1949. | On the first day of his deposition, Ash-Sheikh was asked a series of questions concerning his relationship with Al Haramain, including: (1) "Did you hold a position with the Al-Haramain Islamic Foundation;" (2) "Sir, were you ever involved in any activities of the Al-Haramain Islamic Foundation;" and (3) "Sir, did you serve as chairman of the Al-Haramain Islamic Foundation?" In response to each of those questions, Ash-Sheikh answered "no." Ex. 123, Ash-Sheikh Dep. 137:14–138:10. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> To the extent a response is required, it is undisputed that Minister Al Ash-Sheikh testified as described. He also testified that Al Haramain was working without a permit, so the Ministry of Islamic Affairs "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14–148:5. |
| 1950. | Ash-Sheikh was also asked: "And is it your testimony that you have absolutely no relationship whatsoever with the Al-Haramain Islamic Foundation." Ash-Sheikh replied: "Yes. I do not recall every having | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | any relationship with Al-Haramain Foundation." *Id.* at pp. 139-140. | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the cited deposition testimony contains the quoted language except that "every" should be "ever." Pls. Ex. 123 (Ash-Sheikh Tr.) 139:21-140:6. Plaintiffs omit context that the Minister testified that Al Haramain was working without a permit, so the Ministry of Islamic Affairs "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." *Id.* at 143:14-148:5. |
| 1951. | On the second day of his deposition, Ash-Sheikh again denied his involvement with Al Haramain. During his testimony, Ash-Sheikh was provided with a copy of Al Haramain's webpage from 2003 at Ex. 39B (Exhibit 0477, Ash-Sheikh), which identifies Al Haramain's administration at p. 3:<br><br>**Foundation Administration** – The superintendent of all Foundation activities is the honorable **Shaykh Saleh Ibn Abdul-'Azeez Aal Shaykh**, Minister of Islamic Affairs, Endowments, Call and Guidance. He is the chairman of the administration board which follows the activities of the Foundation. The members of this board are a select number of outstanding scholar, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 39B is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' rely upon an alleged copy of Al Haramain's webpage that is inadmissible hearsay, and Minister Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | students of knowledge and those involved in da'wah to Allah. The director of Al-Haramain Foundation is **Sh. 'Aqeel 'Abdul-'Azeez Al-'Aqeel**." | Ash-Sheikh testified that it was inaccurate. Pls. Ex. 123 (Ash-Sheikh Tr.) 178:19-180:7.<br><br>Minister Al Ash-Sheikh clarified that Aqil was in charge of Al Haramain, while he [Minister Al Ash-Sheikh] was not involved in the operation of the organization. *Id.* at 186:16-3. Minister Al Ash-Sheikh testified that the Ministry of Islamic Affair's role was limited to scrutinizing the organization, which he explained was working without a permit, so the Ministry "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." *Id.* at 143:14-148:5.<br><br>Saudi Arabia notes that Plaintiffs Exhibit 39B contains the quoted language except that "administration" should be "administrative" and "scholar" should be "scholars." |
| 1952. | The webpage further identifies the composition of Al Haramain's "new administrative board" and indicates that the first meeting of the board was held in Ash-Sheikh's office at the Ministry of Islamic Affairs. Ex. 39B, Al Haramain's webpage from 2003 (Exhibit 0477, Ash-Sheikh), pp. 3-4:<br><br>**New Administrative Board for Al-Haramain Charitable Foundation** – Among the steps toward advancement of the work of Al-Haramain Charitable Foundation is the establishment of an Administrative Board which held its first meeting on Tuesday 24 if Dhul-Hijjah in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 39B is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the office of his eminence the Minister of Islamic Affairs, Endowments, Call and Guidance and the General Supervisor of the Foundation under his chairmanship. This was announced by the Foundation Director General, Sh. 'Aqeel Al-'Aqeel. | To the extent a response is required, Minister Al Ash-Sheikh testified that the hearsay document Plaintiffs quote is inaccurate. He explained that he did not hold a meeting of the administrative board in his office at any time. Pls. Ex. 123 (Ash-Sheikh Tr.) 187:5-12.<br><br>He also explained that Al Haramain was working without a permit, so did not have a formal board. *Id.* at 149:1-11. However, "there was a plan [to form] a board of directors. And the purpose of that board of directors, the plan for the [prospective] board of directors, was to scrutinize its work in order to shut it down." *Id.* "And the government noted that the financial and administrative procedures of that society were not proper . . . And it is one of the tasks of the Ministry of Islamic Affairs [] to subject the work of any improper institution to scrutiny, which requires a project or a plan to form a board of directors . . . And from there, the idea came for a prospective board of directors to study the situation of Al-Haramain Foundation. And what I remember is that the prospective board met once or twice and recommended that it not be issued a license and to bring its work to conclusion." *Id.* at 153:12-154:16.<br><br>The webpage contains the quoted language except that "if Dhul-Hijjah" should be "of Dhul Hijjah" and "Foundation under his chairmanship" should be "Foundation and under his chairmanship." *See* Pls. Ex. 39B. |
| 1953. | When asked about the webpage and the information indicating his direct association with Al Haramain, Ash-Sheikh claimed "That's incorrect." Ex. 123, Ash-Sheikh Dep. 178:13-180:7. Ash-Sheikh further denied holding a meeting of Al Haramain's administrative board in his office at any time. *Id.* at p. 187:5-12. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | This paragraph references (but does not cite) Plaintiffs Exhibit 39B. Plaintiffs' Exhibit 39B is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, it is undisputed that Minister Al Ash-Sheikh denied a direct association with Al Haramain and testified that he did not hold a meeting of Al Haramain's board in his office and that the hearsay document Plaintiffs reference is incorrect. As described in response to the preceding paragraph, Minister Al Ash-Sheikh testified that a prospective board met one or two times for the purpose of scrutinizing Al Haramain and shutting it down. *See supra* Response to Pls. Aver. ¶ 1952. |
| 1954. | Ash-Sheikh was also asked a series of questions concerning his relationship with Al Haramain's Director General, Aqeel al Aqeel (a/k/a Aqil al Aqil), including: (1) "Sir, when did you first meet Sheikh Al-Aqeel;" (2) "Was it before or after the 9/11 attacks;" and (3) "Could it have been before the 9/11 attacks, sir?" Ash-Sheikh responded to each question with "I don't remember." *See id.* at pp. 186:1-14. When asked if he was "involved with Sheikh Al-Aqeel in the operation of the Al-Haramain Islamic Foundation for years prior to the 9/11 attacks," Ash- Sheikh denied any such relationship with Aqeel, testifying: "Like I said yesterday, I answered it yesterday, the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. To the extent a response is required, the cited testimony is quoted accurately. Minister Al Ash-Sheikh was not involved with Aqil's operation of Al Haramain before or after the September 11 attacks. Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | answer is negative. No." *Id.* at pp. 186:16-187:3. | Ash-Sheikh also testified that the Ministry of Islamic Affairs "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5. |
| 1955. | Newly declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to Executive Order 14040, detail previously classified evidence relied upon by the U.S. government in support of its determination to designate Al Haramain's Saudi headquarters and multiple overseas branch offices as Specially Designated Global Terrorist ("SDGT") entities pursuant to Executive Order 13224. This new evidence not only describes Al Haramain's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but makes clear that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development and transformation into a sophisticated terrorist organization and its ability to carry out large-scale global attacks, including attacking the United States on September 11, 2001. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion is not supported by citation to any record evidence.<br><br>Notably, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1956. | First, in a Treasury Department document titled, *Al-Haramayn Islamic Foundation – Bosnia-Herzegovina, see* Ex. 608, TREASURY00009-11, the U.S. government explains that both confidential and unclassified information provided clear linkages between Al Haramain and terrorist groups and their activities in the Balkans region, thereby providing the decision to designate Al Haramain in Bosnia-Herzegovina as an SDGT pursuant to Executive Order 13224.<br><br>Statement of the Case: Based upon information available to the United States government, there is a reasonable basis to believe that the Al- Haramayn Islamic Foundation in Bosnia-Herzegovina (HIF) receives financial support from, and is acting for or on behalf of, is providing financial and material support for, or financial or other services to or in support of, or is otherwise associated with, terrorists and terrorist-related organizations listed in the Annex to Executive Order 13224. While much of the information concerning HIF comes from sensitive sources that cannot be disclosed, the following unclassified information clearly establishes HIF's links to terrorist activity. We believe that this information is generally reliable | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 608 is inadmissible Hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and, taken as a whole, supports the decisions to block the assets of the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (and its directors).<br><br>Ex. 608, TREASURY00009. | |
| 1957. | According to the U.S. government, Al Haramain's offices in Bosnia-Herzegovina were infiltrated by terrorist elements, which in turn provided financial and material aid to terrorist activities and terrorist organizations in the region, often with the active support of Al Haramain's leadership.<br><br>*Al-Haramayn Islamic Foundation's Ties to Terrorists*: [REDACTED] Additionally, HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements.<br><br>Given our understanding of the relationship between the Al-Haramayn Islamic Foundation and Specially Designated Global Terrorists (SDGT) and its potential for exploitation by employees with affiliations to or membership in SDGTs, it is reasonable to believe the Al-Haramayn Islamic Foundation is acting for or on | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 608 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 608 – an undated Department of Treasury memorandum – is inadmissible hearsay based on unidentified sources. The memorandum, relying upon unidentified third-party sources, contains the quoted language except that Plaintiffs omit several redactions and "with the consent if not active" should be "with the consent, if not active." Pls. Ex. 608 (TREASURY 11). Furthermore, Plaintiffs' characterization of the actions of the Bosnia-Herzegovina office of Al Haramain as "often with the active support of Al Haramain's leadership" is not supported by the document, which states only that "it is |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | behalf of, and providing financial and material support for, or financial or other services to or in support of terrorist activities and terrorist-related organizations, and doing so with the consent if not active support, of the NGO's leadership.<br><br>Ex. 608, TREASURY00011; Ex. 604 (Treasury Department's March 11, 2002 press release detailing the designation of the Bosnia-Herzegovina branch for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI, (al-Itihaad al-Islamiya), and others"). | reasonable to believe" that such conduct by the office was "with the consent, if not active support" of leadership. *Id.*<br><br>Plaintiffs Exhibit contains the quoted language except that there is no comma after "AIAI." Pls. Ex. 604. Furthermore, that press release also states: "[t]oday the Saudi government is joining us in this blocking action. . . . I just returned from a visit to the Persian Gulf, where I had the opportunity to meet with King Fahd and Crown Prince Abdullah, others in the Saudi government, and the leadership in Bahrain, Kuwait and the UAE. . . . The governments there, like elsewhere in the world, are eager to cut off terrorists' access to funds, wherever we may find them . . . This joint designation marks a new level of coordination in the international cooperation that has characterized the fight against international terrorism to date. I thank the Saudi leadership for taking this step with us, and I hope this is only the first of many similar joint designations we will undertake with other allied nations." *Id.* at 1.<br><br>Regardless, Plaintiffs omit that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |
| 1958. | Second, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation-Pakistan, see* Ex. 603, TREASURY00012-16, the U.S. government describes Al Haramain's global support for Osama bin Laden, al Qaeda, and related terrorist organizations via its branch | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | offices and representatives in Africa, Asia, Europe, and North America.<br><br>The Al-Haramayn Foundation (AHF) is one of the principal Islamic NGOs active throughout the world. AHF has been infiltrated by Al-Qaeda and has been used by al-Qaeda for cover and concealment of assets and material, according to military reporting. AHF "belongs to" the Usamah Bin Ladin-established "World Front of the Jihad Against Jews and Christians," which includes the Egyptian Gama Al- Islamiya, the Egyptian Islamic Jihad (EIJ), the Abu Sayyaf Group (ASG) and the Harakat Ul Ansar of Pakistan, according to military reporting. All these organizations are Specially Designated Global Terrorists pursuant to E.O. 13224. Prior to the removal of the Taliban from power in Afghanistan, AHF had links to the UBL-financed Makhtab al-Khidemat (MK). [REDACTED] MK is a Specially Designated Global Terrorist pursuant to E.O. 13224.<br><br>As of January 2003, it appears that numerous AHF field offices and representatives operating throughout Africa, Asia, Europe, and North America appeared to be providing financial and logistical support to Al-Qaeda. Terrorist | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 603 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 603 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and unnamed "military reporting." Pls. Ex. 603 (TREASURY 13-14). The memorandum contains the quoted language except that Plaintiffs omit many redactions and references to Exhibits – which are not included with the memorandum. *Id.* Plaintiffs' characterization of Al Haramain's alleged "global support" for terrorist organizations is not supported by the cited memorandum, which relates to support by individual "AHF field offices and representatives" rather than the entire organization. *Id.*<br><br>Regardless, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | organizations including Al-Itihaad Al-Islamiya, Egyptian Islamic Jihad, Lashkar I-Tayyiba were receiving funding from AHF and using AHF as a front for fundraising and operational activities.<br><br>In one instance later in 2003, a journalist suspected of meeting with Al-Qaeda and Taliban members in Afghanistan was also suspected of transferring funds on behalf of the Al-Qaeda-affiliated AHF, and forwarding videotapes from Al-Qaeda leaders to Al-Jazeera TV for broadcast.<br><br>Ex. 603, TREASURY00013. | |
| 1959. | According to the United States, Al Haramain's office in Pakistan employed individuals with ties to al Qaeda and provided financial support to Executive Order 13224 SDGTs Jamiat al Dawa ("JUD") and Laskhar E-Taibah ("LET").<br><br>At least two former AHF employees that worked in Pakistan are suspected of Al-Qaeda ties. One AHF employee in Pakistan is detained at Guantanamo Bay on "suspicion of financing Al-Qaeda operations."<br><br>*** | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 603 is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | AHF in Pakistan also supports Jamiat al Dawa (JUD) and Lashkar E-Taibah (LET), both Specially Designated Global Terrorist organizations pursuant to the authorities of E.O. 13224. After LET was officially banned in Pakistan on January 12, 2002, LET began using the name JUD to continue operating in Pakistan, [REDACTED].<br><br>A detained political official and admitted member of JUD, identifying AHF as one of three Non Governmental Organizations (NGO) financially supporting JUD, provided details about how JUD receives financial support, according to Department of Defense reporting. When JUD requires financial assistance, an estimate is sent to one of the three NGO's, among then AHF. Funds are then provided to JUD either in personal meetings, in which representatives from the NGO and JUD discuss the proposed estimate and reach an agreement, or by wire transfers, to a bank account in the name of the Sheikh in charge of JUD, according to Department of Defense reporting. During 1998-2001, the JUD detainee conducted four or five meetings with representatives from AHF.<br><br>Ex. 603, TREASURY00014-15. | To the extent a response is required, Plaintiffs Exhibit 603 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and unnamed "Department of Defense reporting." Pls. Ex. 603 (TREASURY 15). The memorandum contains the quoted language except that Plaintiffs omit redactions. *Id.* at (TREASURY 14-15).<br><br>Notably, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 1960. | The memorandum concludes that the designation of Al Haramain's offices in Pakistan pursuant to Executive Order 13224 is warranted based on the following:<br><br>Directed by an individual that is an Al-Qaeda facilitator, AHF in Pakistan is controlled by Al Qaeda.<br><br>By employing Al-Qaeda members suspected of supporting Al-Qaeda operations, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of Al-Qaeda.<br><br>By financially supporting LET in Pakistan, AHF is assisting, sponsoring or providing financial, material, or technological support for, or financial or other services to or in support of LET.<br><br>By maintaining bank accounts controlled by the MK Director, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of MK. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 603 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 603 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and unnamed "military . . . [and] Department of Defense reporting." Pls. Ex. 603 at (TREASURY 13-15).<br><br>Notably, Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 603, TREASURY00015-16. *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Pakistan for providing advanced weaponry to al Qaeda and affiliated militants). | |
| 1961. | Third, in a Treasury Department memorandum concerning the Designation of Al- Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224, see Ex. 593, TREASURY00017-29, the United States describes the support for al Qaeda and associated terror groups provided by Al Haramain's Saudi headquarters and its branch offices.<br><br>As of March 2004, information set forth below provides reason to believe that AHF, including its headquarters and all its branch offices, is one of the principal Islamic NGO's active throughout the world providing support for the Al Qaida network and promoting militant Islamic doctrine worldwide. AHF has been infiltrated by Al Qaida and has been used by al Qaida for cover and concealment of assets and material, according to military reporting. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. The memorandum contains the quoted language except that Plaintiffs omit many redactions and references to Exhibits which are not included with the memorandum. *See id.* at (TREASURY 19-20). Furthermore, while the exhibit is hearsay and should not be considered, Saudi Arabia notes that it also says, "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *** <br><br> Prior to the removal of the Taliban from power in Afghanistan, AHF was linked to Makhtab al-Khidemat (MK), [REDACTED]. MK, co-founded and financed by Usama bin Ladin (UBL), is an SDGT pursuant to the authorities of E.O. 13224 and the pre-cursor organization of Al Qaida. [REDACTED]. <br><br> *** <br><br> [REDACTED] In mid-April, AHF was "involved with" a group of sixty Afghan persons "trained to attack Westerners, [REDACTED]. Reportedly, one AHF employee believed to belong to Al Qaida is currently detained in Guantanamo, Cuba, [REDACTED]. <br><br> Ex. 593, TREASURY00019-20. *See also* Ex. 671 (Treasury Department's June 2, 2004 press release detailing the designation of Al Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, including Al Haramain's Director Aqil al Aqil). | these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19). <br><br> Plaintiffs Exhibit 671 contradicts multiple aspects of Plaintiffs' allegations. The document states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). <br><br> It also notes that Al Aqil, who is not a member of the Saudi government, was Al Haramain's leader. *Id.* at 3-4. |
| 1962. | The U.S. government further details the Ministry of Islamic Affairs' supervision over Al Haramain and its branch offices, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and Al Haramain Director Aqeel al Aqeel's use of personal bank accounts to transfer Al Haramain funds to branch offices with connections to terrorism, in ways that avoided government scrutiny.<br><br>According to the homepage for AHF in September 2002, AHF is headquartered in Riyadh, Saudi Arabia and maintains 14 offices in Saudi Arabia and is active in over 50 countries. At the time, the "superintendent of all [AHF] activities" was identified as the Honorable Shaykh Saleh Ibn Abdul-Azeez Ali Shaykh, Minister of Islamic Affairs, Endowments, and Call and Guidance. This Shaykh was also the Chairman of AHF's Administrative Board which "follows the activities of [AHF]." AHF's Director, at least until late 2003 or early 2004, was Aqeel Abdul- Azeel [Al-Aqil].<br><br>As of January 2003, the U.S. judged that AHF's Director Al-Aqil, who at the time managed AHF's business on a day-to-day basis, was providing funds to offices with terrorist ties in ways that avoided foreign government scrutiny, such as using personal bank accounts to transfer official AHF funds, according to diplomatic reporting. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. The memorandum contains the quoted language except that Plaintiffs omit many redactions and references to Exhibits which are not included with the memorandum. *See id.* at (TREASURY 20-21). Furthermore, the memorandum notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19).<br><br>Though Plaintiffs rely on hearsay for the point, it is undisputed based on admissible evidence that Al-Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – managed Al Haramain on a day-to-day basis. *See* Pls. Ex. 671 at 3-4 (activities of Al Haramain "took place under the control of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of AHF and a suspected al Qaida supporter. Al-Aqil has been identified as AHF's Chairman, Director General and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 593, TREASURY00020-21. | President in a variety of sources and reports. As AHF's founder and leader, Al-Aqil controlled AHF and was responsible *for all* AHF activities") (emphasis added).<br><br>Far from supporting Al-Aqil, Saudi Arabia worked jointly with the United States "in the war against terrorist financing" by designating the "Former Leader" of Al Haramain. *Id.* at 1. |
| 1963. | Aqeel is also described as an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia." Ex. 593, TREASURY00027. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. Plaintiffs misleadingly omit the introduction to the quoted statement to remove additional indicia of hearsay. The sentence reads in full "*Also in early 2004, [REDACTED] identified AL-AQIL as a suspected* Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia[.]" *See id.* at (TREASURY 27) (emphasis added). Furthermore, though the hearsay memorandum should |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Pls. Ex. 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1964. | The Treasury Department memorandum further identifies a senior Al Haramain official, Hisham Al-Mashari, as a "known operative in UBL's terrorist support network," who was involved in an initiative to "field a platform in Iraq, which extremists could use to support anti-U.S. activities." Ex. 593, TREASURY00021-22; Ex. 672, TREASURY00037-54 at 53, stating that "[f]ollowing the designation of the Al Qaida-affiliated AHF Bosnian branch, and the subsequent raid of the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Bosnian AHF office by Bosnian authorities on June 3, 2002, Al-Mashari ordered all AHF employees to say little and answer only specific questions in their area of expertise." In 2000, an individual in Turkey charged by the United Nations as a terrorist, and who reportedly admitted to engaging in militant preaching, received Al-Mashari's agreement to assist him relocate to Turkey. *Id.* at TREASURY00052. | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 593 and 672 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. The memorandum contains the quoted language except that Plaintiffs misleadingly omit the end of the sentence in the first quotation to remove additional indicia of hearsay. The full sentence reads "AHF's Hisham Al-Mashari is a known operative in UBL's terrorist support network, *according to the FBI.*" *Id.* at (TREASURY 21) (emphasis added). Plaintiffs similarly omit the beginning of the sentence in the second quotation to remove indications of allegations rather than findings. The full sentence reads "As of May 2003, AHF, identified as a Saudi-based NGO with ties to Al Qaida, was *reportedl*y pushing hard to field a platform in Iraq, which extremists could use to support anti-U.S. activities." *Id.* at (TREASURY 22) (emphasis added). Contrary to Plaintiffs' assertion, Al-Mashari is not referenced as having been involved in said initiative. *See id.* Furthermore, while the hearsay memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19).<br><br>Plaintiffs Exhibit 672 – another undated Treasury Department memorandum – is similarly inadmissible hearsay, relying upon unidentified sources and public reporting. *See* Pls. Ex. 672. While the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 39).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1965. | Al Haramain also established an office in Iran to move weapons into Afghanistan in 2001.<br><br>An AHF official that reportedly coordinated arms deals with the Al Qaida- affiliated Al-Zarqawi, was instrumental in establishing a branch of AHF in Iran [REDACTED]. The AHF branch in Iran was linked to efforts by "WAFA" to move weapons related items through Pakistan into Afghanistan during the conflict in Afghanistan in late 2001. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [REDACTED] WAFA Humanitarian Organization is a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.<br><br>Ex. 593, TREASURY00024. | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting."  Pls. Ex. 593.  The memorandum contains the quoted language, although Plaintiffs' assertion that Al Haramain "established an office in Iran to move weapons into Afghanistan" is not supported by the memorandum, which does not address the purpose of the establishment of the office in the first instance.  *See id.* at (TREASURY 24).  Furthermore, while the memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others."  *Id.* at (TREASURY 19).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions.  Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror."  Pls. Ex. 671 at 1(June 2, 2004 Treasury Notice). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1966. | According to the U.S. government, Al Haramain official Perouz Sedaghaty, who worked in Al Haramain's U.S. branch office in Ashland, Oregon, admitted to the FBI that he had received $500,000.00 from Osama bin Laden.<br><br>In late 2001, the senior AHF official in the U.S., Perouz [Seda] Ghaty, sought a license from OFAC to purportedly assist Afghan refugees in border camps in Iran on the Iranian/Afghanistan border. Following the dual-U.S. Embassy bombing attacks in East Africa in August 1998, Seda reportedly confided to an FBI source that he was "in trouble." When asked by the FBI source to elaborate, Seda said that he received $500,000 from UBL--"through Bosnia." Seda was described as a "fundamentalist" who has sought to convert prison inmates to the Islamic faith. As part of Seda's request to OFAC in November 2001, he reported that Shaykh Al-Aqil, identified as the President of AHF, agreed to Seda's proposal to fund $500,000 for assistance to Afghan refugees in border camps in Iran. On the U.S. AFH's tax form 990 for 2001 filed with the IRS, Al-Aqil is identified as | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. The memorandum contains the quoted language except that Plaintiffs omit a redaction and many references to Exhibits which are not included with the memorandum. *See id.* at (TREASURY 24). Furthermore, while the memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the President, Al-Kadi as the Vice President, Al-Buthe as the Treasurer, and Seda as the Secretary. The U.S. AHF branch's Articles of Incorporation and application to the IRS for tax-exempt status also list Al-Aqil and Al-Kadi as members of the board of directors.<br><br>As of March 2003, due to pressure from the U.S. on Saudi authorities to close AHF, Al-Aqil and Al-Kadi reportedly resigned from the U.S. AHF office, [REDACTED].<br><br>Ex. 593, TREASURY00024. | Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs' Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1967. | The Treasury memorandum also reports that Al Haramain's branch office in Albania was directly linked to Osama bin Laden and Egyptian Islamic Jihad ("EIJ").<br><br>UBL reportedly financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe, [REDACTED]. In 1998, the head of Egyptian Islamic Jihad (EIJ) in Albania was reportedly also the "accountant" for AHF in Albania, according to a French news report. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At this trial in Egypt, al-Nager reportedly voiced his support for UBL and Al Qaida's terrorist | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | attacks against the U.S. Embassies in Tanzania and Kenya.<br><br>Ex. 593, TREASURY00025. | upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. The memorandum contains the quoted language except that Plaintiffs omit a redaction and many references to Exhibits which are not included with the memorandum. *See id.* at (TREASURY 25). In addition, Plaintiffs misleadingly omit the end of the last sentence in the quotation to remove additional indicia of hearsay, which notes that al-Nager's reported voicing of support was "according to Agence France Presse." *Id.* Furthermore, while the memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1968. | As of early June 2000, Al Haramain's office in Ethiopia was providing support to the Al Ittihad Al Islamiya ("AIAI") terrorist organization that was engaged in attacks | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | against Ethiopian defense forces. Ex. 593, TREASURY00026. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 593 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 593 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources, "military reporting," and "diplomatic reporting." Pls. Ex. 593. Plaintiffs' assertion mischaracterizes the memorandum, which states that "[a]s of early June 2000, AHF in Ethiopia *reportedly* was providing support to AIAI, which in Ethiopia *has*, [sic] engaged in attacks against Ethiopian defense forces[.]" *Id.* at (TREASURY 26) (emphasis added). Furthermore, while the memorandum should not be considered, it also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 19).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1969. | In a fourth Treasury Department document, *Al-Haramayn Islamic Foundation – Somalia, see* Ex. 673, TREASURY00030-36, the U.S. government discusses Al Haramain's ties to al Qaeda and the Al Ittihad Al Islamiya ("AIAI") terrorist organization in Somalia.<br><br>The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al- Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members. [REDACTED].<br><br>The evidence indicates that even after AIAI was named in the Annex to E.O. 13224 and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 673 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 673 – a February 11, 2002 Treasury Department memorandum – is inadmissible hearsay that relies upon unidentified sources. The memorandum contains the quoted language except that Plaintiffs omit many references to Sources which are not indentified in the memorandum. *See id.* at (TREASURY 30).<br><br>Plaintiffs Exhibit 604 – a March 11 2002 Treasury Department press release contradicts Plaintiffs' assertions of Saudi government support for Al Haramain. In the document, the United States Treasury Secretary |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | subsequently designated by the United Nations under UNSCR 1333, Al-Haramain Somalia has continued to provide financial support and cover for AIAI operatives, and conceal their activities.<br><br>Ex. 673, TREASURY00030. *See also* Ex. 604 (Treasury Department's March 11, 2002 press release detailing the designation of Al Haramain in Somalia). | notes that "[t]oday the Saudi government is joining us in this blocking action. . . . I just returned from a visit to the Persian Gulf, where I had the opportunity to meet with King Fahd and Crown Prince Abdullah, others in the Saudi government, and the leadership in Bahrain, Kuwait and the UAE. . . . The governments there, like elsewhere in the world, are eager to cut off terrorists' access to funds, wherever we may find them . . . This joint designation marks a new level of coordination in the international cooperation that has characterized the fight against international terrorism to date. I thank the Saudi leadership for taking this step with us, and I hope this is only the first of many similar joint designations we will undertake with other allied nations." Pls. Ex. 604 at 1 (March 11, 2002 Treasury Notice). |
| 1970. | As of late September 2000, Al Haramain was one of the four most active NGO's in Somalia, and its activities included sending relief food to members of AIAI in AIAI military training camps and offices in Al Waq and Qoryoly, Somalia. Al Haramain further provided AIAI foreign trainers with food and medicine, and provided cover for AIAI operatives and concealed their activities. Ex. 673, TREASURY00033-35. According to the United States, the Al Haramain office in Mogadishu "is connected to Al-Qaida." Ex. 673, TREASURY00035. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 673 is inadmissible hearsay.<br><br>To the extent a response is required, Plaintiffs Exhibit 673 – a February 11, 2002 Treasury Department memorandum – is inadmissible hearsay that relies upon unidentified sources. The memorandum contains the quoted language except that Plaintiffs omit a redaction and a reference to a Source which is not identified in the memorandum. *See id.* at |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (TREASURY 35). In addition, Plaintiffs' assertion that "Al Haramain further provided AIAI foreign trainers with food and medicine" mischaracterizes the memorandum, which states that "Al Haramain *Somalia* provided AIAI foreign trainers with food and medicine . . . ." *Id.* at (TREASURY 34) (emphasis added). <br><br> Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice). <br><br> It also notes that Al Aqil – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – was Al Haramain's leader. *Id.* at 3-4. |
| 1971. | In a fifth Treasury Department memorandum concerning the Designation of Al- Haramain Foundation (AHF) locations in the United States, the Comoros Islands, and AHF official Soliman Al-Buthe pursuant to the authorities of E.O. 13224, *see* Ex. 672, TREASURY00037-54, the United States reveals that in 1998 it had received a list of seven suspected al Qaeda members in the Comoros, two of which were associated with Al Haramain. Ex. 672, TREASURY00043. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 672 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 672 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and public reporting. *See* Pls. Ex. 672. Plaintiffs accurately describe the memorandum, which should not be considered but also notes that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 39).<br><br>Plaintiffs Exhibit 671 provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1 (June 2, 2004 Treasury Notice).<br><br>It also notes that Al Aqil, who is not a member of the Saudi government, was Al Haramain's leader. *Id.* at 3-4. |
| 1972. | As to Soliman al Buthe (a senior Al Haramain official, Treasurer of Al Haramain's office in Ashland, Oregon, and chairman of Al Haramain's U.S. Committee with broad legal authority to act on behalf of Al Haramain in the United States), the U.S. government specifies that al Buthe (i) | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | worked closely with individuals providing material support for terrorism, (ii) provided support to Islamic extremists advocating jihad, (iii) served as a "clearinghouse" for moving Al Haramain funds from Saudi Arabia to the United States, and (iv) engaged in activities to prevent the dissolution of Al Haramain notwithstanding multiple Executive Order 13224 designations of Al Haramain branch offices and officials.<br><br>FBI investigation revealed that Al-Buthe, on behalf of AHF, entered into agreements to work closely with alleged terrorist supporter Sami Omar Al- Hussayen, who was charged by Federal prosecutors in Idaho with material support for terrorism. According to the Superseding Indictment, Al-Hussayen allegedly provided Internet and computer expertise to support and recruit for violent Jihad. This support was allegedly provided to AHF, Hamas, and a list of extremist websites, one or more of which contained explicit calls for violence against non-Muslims and urged visitors to participate in, or make financial contributions to support violent Jihad.<br><br>*** | Plaintiffs Exhibits 672 and 675 are inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 672 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and public reporting. *See* Pls. Ex. 672. The memorandum contains the quoted language except Plaintiffs' quotes appear in a different order than in the memorandum, Plaintiffs omit many references to Sources which are not indentified in the memorandum, and there are several minor typographical errors. *See id.* at (TREASURY 47-50).<br><br>With respect to the allegation that Al Buthe was working to prevent the dissolution of AHF, the memorandum notes that "[t]hese actions are in contradiction to the stated policy of the government of Saudi Arabia. On June 2, 2004, the Adviser to Saudi Crown Prince Abdullah stated that existing entities, including AHF, will be dissolved or have their assets folded into the Saudi National Entity for Charitable Work Abroad." *Id.* at (TREASURY 48 n.19) (citation omitted).<br><br>With respect to the allegation that Al Buthe acted as a clearinghouse for moving AHF funds to the U.S., the memorandum notes that "[t]hese actions run counter to Saudi government policy as stated on June 2, 2004. The Adviser to Saudi Arabia Crown Prince Abdullah explained that the Saudi National Entity for Charitable Work Abroad will be the sole vehicle through which all private Saudi donations will go to help those in need. According to the Saudi advisor, the purpose of this effort is to put in place new regulations and financial control mechanisms to ensure that people 'don't take advantage of our financial system or of our charities.' *Id.* at (TREASURY 48 n. 20) (citation omitted).<br><br>Furthermore, the memorandum states that "Saudi Arabia joined with the United States and designated additional [Al Haramain] offices in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | FBI investigation of one of the extremist websites revealed that Al-Buthe provided support to radical Saudi Shaykh Salman Al-Awdah. A government exhibit entered into evidence in the Idaho trial identifies al Buthe as the owner, Chairman/Managing Director, and billing contact for islamtoday.com. This website is identified as "owned" and "under the supervision of" Al-Awdah, according to public Internet sources.<br><br>***<br><br>As of April 2004, Al-Buthe appeared to be functioning as a clearinghouse for moving AHF funds from Saudi Arabia to the U.S. [REDACTED] Al-Buthe has been acting as the conduit for sending funds on behalf of AHF to the U.S. to pay at least $515,316 in legal fees between June 2003 and April 2004. These funds reportedly were to assist in the legal defense of himself, AHF, AHF leader Aqeel Al-Aqil and others, including Muhammad Jumal Khalifa.<br><br>***<br><br>As of mid-March 2004, Al-Buthe was working hard to prevent the "total dissolution" of AHF, [REDACTED]. | Indonesia, Kenya, Tanzania and Pakistan" when provided "evidence that these branches provided support to Specially Designated Global Terrorist organizations including Al Qaida, Jemaah Islamiyah, Al-Ittihad al-Islaymiya and others." *Id.* at (TREASURY 39).<br><br>Plaintiffs also cite to Plaintiffs Exhibit 674. This press release contradicts Plaintiffs' allegations of Saudi government support for Al Haramain, as it notes that "the United States and Saudi Arabia have jointly designated eleven branches of AHF . . . " Pls. Ex. 674 at 1 (June 2, 2004 Treasury Notice).<br><br>Plaintiffs mischaracterize a 2004 FBI/CIA Joint Assessment, asserting that Al Buthe provided over $700,000 to U.S.-based offices of Al Haramain. To the contrary, the report states that various individuals, including Al Buthe, have collectively provided over $700,000 to such offices. *See* Pls. Ex. 2OO (EO 3435-UPDATED).<br><br>Plaintiffs omit important context contradicting their allegations. The report states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." *Id.* at (EO 3416-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 672, TREASURY00047-50. *See also* Ex. 674 (Treasury Department's September 9, 2004 press release detailing the designation of Al Haramain branches in the United States, the Union of Comoros, and Al Haramain official Soliman al Buthe). *See also* Ex. 675, Affidavit in Support of an Application for Search Warrant, In the Matter of the Search of One story residential building located at 3800 S. Highway 99 in Ashland, Oregon, Case No. 04-4009, filed in Case No. 6:05-crd-60008-AA, Document No. 183-3, June 19, 2009, at ¶ 42 (stating that al Buthe entered the United States at least thirteen times between October 1997 and April 2001, transporting a total of $777,845.00 into the country); Ex. 2, 3414-3442 at 3435, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December 2004*, EO14040-003414-3442 at 3435 (stating that al Buthe "provided over $700,000 to the US-based offices of HIF," and that "[a]pproximately $600,000 of these funds came from al-But'he's personal account at the al-Rajhi Bank and Trust"). | |
| 1973. | ████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | ████████████████████ | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs Exhibit ████████████████████<br><br>████████████████████ is not supported by any citation to record evidence. |
| 1974. | Sheikh al Awda "was the shaykh of Saudi-based Salafi extremists Mohammed Al-Muhanna and Fahd Al-Thumairy, aka Fahd Al-Thumairi." Ex. 2, EO 0637-0641 at 640. According to the U.S. government, Thumairy "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks." Ex 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibits 607 and 2M (EO 637-642-MDL), are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs rely upon a June 16, 2010 FBI memorandum that is inadmissible hearsay, relying upon unidentified sources and third-person accounts. *See* Pls. Ex. 2M (EO 637-642-MDL). Plaintiffs' quote misleadingly omits the beginning of the sentence to remove additional indicia of hearsay, as the memorandum states "*According to [REDACTED source]* as of late May 2009, Shaykh Salman Odeh, variant Dr. Salman Al-Awdah, was the shaykh of Saudi-based Salafi extremists Mohammad Al-Muhanna and Fahd Al-Thumairy, aka Fahd Al-Thumairi." *Id.* at (EO 640-MDL) (emphasis added). Plaintiffs also omit this critical context: "Awda openly criticized Usama Bin Laden (UBL) a few years ago, apparently supporting a less violent type of jihad." *Id.*<br><br>Plaintiffs Exhibit 607 – an October 5, 2012 FBI memorandum which purports to provide an "update" of Operation Encore's years of prior research and memoranda, incorporating more than 10 years' worth of documents and memoranda previously drafted by the FBI – is replete with multiple levels of hearsay and speculation, referencing prior FBI documents that themselves summarize third-person accounts and speculation. *See* Pls. Ex. 607. The FBI did not make any conclusions in this document. The theories set forth in the document were thoroughly investigated. The FBI's final conclusion in closing Operation Encore was that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | Every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Thumairy. It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." KSA Ex. 163 (9/11 Rep.) 217.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 0491-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015), at 101–3. |
| 1975. | Next, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramain, Indonesia, see* Ex. 619, TREASURY00087-92, the U.S. government states that "Al-Haramain, Indonesia provides financial | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | support to the Indonesian NGO KOMPAK which, as described below, has multiple links to Jemaah Islamiyah (SDGT)." "KOMPAK was founded by senior Jemaah Islamiyah (JI) leader Agus Dwikarna (SDGT)." *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Indonesia for providing "financial, material and logistical support to Usama bin Laden's (UBL) al-Qaida network and other terrorist organizations"). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4. Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. Plaintiffs Exhibit 619 is inadmissible hearsay. *See* Objections Chart. To the extent a response is required, Plaintiffs Exhibit 619 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 619. Plaintiffs' quote misleadingly omits the beginning of the sentence to remove additional indicia of hearsay, as the memorandum states "*According to multiple source*s, Al-Haramain, Indonesia provides financial support to the Indonesian NGO KOMPAK which, as described below, has multiple links to Jemaah Islamiyah (SDGT)." *Id.* at (TREASURY 91) (emphasis added). Plaintiffs Exhibit 606 contradicts Plaintiffs' allegations that the Saudi government supported Al Haramain. In it, Treasury notes that "[l]ike the United States, the Saudis have been victims of al-Qaida. They are an important partner in the war on terrorist financing, and have taken important and welcome steps to fight terrorist financing" before listing the many ways in which Saudi Arabia has helped to fight terrorist financing. Pls. Ex. 606 at 2 (January 22, 2004 Treasury Notice). The press release further elaborated on such steps taken by Saudi Arabia, including: |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "- The Saudis worked with the United States to establish a U.S.-Saudi task force in [] Riyadh focused on combating terrorist financing and establishing initiatives to better regulate charities.<br><br>- On March 11, 2002, the United States and Saudi Arabia enacted the first joint designation by blocking the funds of the Somalia and Bosnia-Herzegovina branches of Al-Haramain because these branches were diverting charitable funds to terrorism. When it became apparent that Al-Haramain was continuing to operate under a new name in Bosnia-Herzegovina, the United States and Saudi Arabia joined in asking the UN to add the a/k/a, "Vazir," to the consolidated list.<br><br>- In August of 2002, Saudi Arabia joined the U.S. in the designation of Wa'el Julaidan, a key terrorist financier who had known associations with Usama bin Laden and headed several non-governmental organizations that provided financial and logistical support to al-Qaida.<br><br>- Saudi Arabia also supported the addition of the Jeddah-based terrorist financier, Yasin Al-Qadi, to the UN's consolidated list in October 2001."<br><br>*Id.* |
| 1976. | Finally, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramayn Kenya and Tanzania*, Ex. 676, TREASURY00094-101, states that "[t]he entire Al-Haramayn organization has long been suspected of providing various types of support to terrorist groups including Al-Qaeda, and its offices in Bosnia and Somalia were designated on March 11, 2002, pursuant to E.O. 13224, for providing | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | support to Al-Qaeda. Al-Haramayn's offices in Kenya and Tanzania are similarly being recommended for designation for providing financial and material support to Al-Qaeda and Al-Itihaad Al-Islamiya, both of which were designated on September 23, 2001 as part of the Annex to E.O. 13224." | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 676 (TREASURY 94-101) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 676 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 676 (TREASURY 94-101). The memorandum contains the quoted language. *See id.* at TREASURY 95.<br><br>Plaintiffs Exhibit 671 (June 2, 2004 Treasury Press Release) provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1.<br><br>It also notes that Al Aqil, who Plaintiffs do not even claim is a member of the Saudi government, was Al Haramain's leader. *Id.* at 3-4. |
| 1977. | The memorandum further indicates that "AHF officials in Kenya and Tanzania have been actively involved in supporting the planning and carrying out of terrorist attacks against US and Western targets, as well as other acts of violence. AHF's role appears to be to provide financial and logistical assistance to those who intend to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | conduct the attacks." Ex. 676, TREASURY00097. | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 676 is inadmissible hearsay. *See* Objections Chart. To the extent a response is required, Plaintiffs Exhibit 676 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 676 (TREASURY 94-101). The memorandum contains the quoted language. *See id.* at TREASURY 97.<br><br>Plaintiffs Exhibit 671 (June 2, 2004 Treasury Press Release) provides important context Plaintiffs omit about Treasury's actions. Plaintiffs Exhibit 671 states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1.<br><br>It also notes that Al Aqil, who Plaintiffs do not even claim is a member of the Saudi government, was Al Haramain's leader. *Id.* at 3-4. |
| 1978. | According to the U.S. government, Al Haramain employees affiliated with the branch office in Kenya, were arrested in November 1997 for plotting an attack on the U.S. Embassy in Nairobi (prior to the 1998 U.S. Embassy bombings). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | In late November 1997, based on information that Islamic activists associated with AHF were planning to an attack on the U.S. Embassy in Nairobi, Kenyan authorities arrested ten AHF staff members and deported them. The ten, including Abu Abdul Malik, an Algerian serving as an AHF project manager, were reportedly suspected of aiding the Al Itihaad Al Islamiya (AIAI), an organization designated as a Specially Designated Global Terrorist pursuant to E.O. 13224. According to Embassy contacts, AHF's numerous charitable activities in northeast Kenya provide a useful cover for sending funds and supplies to AIAI. These activities included the use of mosques in Garissa and Mandera where the imam or other officials allegedly have ties to AIAI. One Embassy contact was told by [REDACTED] AHF sent weapons and ammunition to AIAI during the August 1996 fighting near the town of Luuq in Somalia. AHF allegedly transported the material on board relief flights that took off from Nairobi's Wilson Airport.<br><br>Ex. 676, TREASURY00099. *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Kenya and Tanzania). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 676 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 676 – an undated Treasury Department memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 676 (TREASURY 94-101). The memorandum contains the quoted language. *See id.* at TREASURY 99.<br><br>Plaintiffs cite Plaintiffs Exhibit 606 (January 22, 2004 Treasury Press Release) but omit important context contradicting Plaintiffs' allegations that the Saudi government supported Al Haramain. In explaining the designation of Al Haramain's branch offices in Kenya and Tanzani, the press release noted that "[l]ike the United States, the Saudis have been victims of al-Qaida. They are an important partner in the war on terrorist financing, and have taken important and welcome steps to fight terrorist financing" before listing the many ways in which the Kingdom has helped to fight terrorist financing." *Id.* at 2. The press release further elaborated on such steps taken by Saudi Arabia, including:<br><br>- The Saudis worked with the United States to establish a U.S.-Saudi task force in Riyadh focused on combating terrorist financing and establishing initiatives to better regulate charities.<br><br>- On March 11, 2002, the United States and Saudi Arabia enacted the first joint designation by blocking the funds of the Somalia and Bosnia-Herzegovina branches of Al-Haramain because these branches were |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | diverting charitable funds to terrorism. When it became apparent that Al-Haramain was continuing to operate under a new name in Bosnia-Herzegovina, the United States and Saudi Arabia joined in asking the UN to add the a/k/a, "Vazir," to the consolidated list.<br><br>- In August of 2002, Saudi Arabia joined the U.S. in the designation of Wa'el Julaidan, a key terrorist financier who had known associations with Usama bin Laden and headed several non-governmental organizations that provided financial and logistical support to al-Qaida.<br><br>- Saudi Arabia also supported the addition of the Jeddah-based terrorist financier, Yasin Al-Qadi, to the UN's consolidated list in October 2001.<br><br>*Id.* |
| 1979. | The Kingdom of Saudi Arabia validated the Treasury Department's findings concerning Al Haramain's global support for terrorism, describing one of its principal da'wah organizations as "one of the biggest terror-financing operations in the world."<br><br>After the terrorist attacks on September 11, 2001, the U.S. Department of the Treasury initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists and their networks. By 2004, the U.S. Department of the Treasury and Saudi Arabia eliminated four branches of the Al-Haramain charity, one of the biggest terror-financing operations in the world and the funding organ and channel | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs Exhibit 677 – an information book on the many steps taken by Saudi Arabia to combat terrorist financing – contains the quoted language. *See* Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*). This document contradicts Plaintiffs' assertion that the Saudi government supported Al |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | for the Nairobi, Kenya and Dar es Salaam bombings in 1998.<br><br>***<br><br>Saudi Arabia, in joint investigations with the U.S., has identified 17 prominent financial facilitators that are directly associated with Daesh. These sources, and others like them, are being shut down. We have also succeeded in dissolving groups such as Al-Furqan, a charity that was a major conduit of financial and material support for terrorist groups, and the charity front Al-Haramain Islamic Foundation, notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns.<br><br>Ex. 677, The Kingdom of Saudi Arabia and Counterterrorism (2016), pp. 13, 86. | Haramain. In summarizing Saudi Arabia's steps, the book provides: "[T]he anti-terror partnership with the U.S. is irrevocable evidence that Saudi Arabia is taking a leading role in preventing the export and proliferation of the resources that extremists require to expand. Progress in blocking terrorism funding is also taking place because Saudi Arabia has instituted one of the world's strictest financial control systems. . . . Even with the steps we've already taken, with more to follow, it is only in partnership with the United States that we can eradicate terrorism and shut down its financing networks. There is no more significant issue that strongly binds our countries. We are at war with Daesh and Al Qaeda. The leader of Daesh, Abu Bakr al-Baghdadi, singled out Saudi Arabia as his principal enemy. No nation has greater incentive than we do to make sure that those who blow up our mosques, kill innocent civilians and distort our faith are denied access to the tools of murder and anarchy." *Id.* at 86-87. |
| 1980. | The CIA has assessed that senior Saudi government officials, including but not limited to the Minister of Interior, Prince Nayef bin Abdul Aziz al Saud, as well as Saudi embassy staff around the world, were aware of and condoned Al Haramain's global support for terrorism. Ex. 620, CIA-SUB_0007-19, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002. According to the CIA: | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay. The Simon Report, Ex. 153, should be excluded. *See* Objections Chart.<br><br>Plaintiffs Exhibit 620 – an August 28, 2002 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Some Saudi Government officials—such as Saudi Minister of Interior Prince Nayif bin Abd al-Aziz and some Saudi Embassy personnel—condone or ignore the activities of al-Haramain headquarters, field offices, and representatives that support terrorist and militant groups."<br><br>We judge that the large number of field offices and individuals linked to al-Qa'ida and associated terrorist groups and their connections within the Saudi Government—both in Saudi Arabic and abroad—contradict Riyadh's claim of ignorance of al-Haramain's activities.<br><br>"[REDACTED] that Prince Nayif is aware of al-Haramain's illicit activities in the Balkans [REDACTED]. Individuals working in Saudi Embassies in several countries appear to be witting of—and sometimes assist—HIF branch offices that support extremist groups."<br><br>Ex. 620, CIA-SUB_0008, CIA-SUB_0014 ("Several US officials discussed al-Haramain with Prince Nayif in February and March 2002, undermining any claim of ignorance by the Interior Minister, [REDACTED]."); Ex. 153, Expert Report of Steven Simon, ¶ 15 (Mr. Simon explains that as a member of the National Security | *See* Pls. Ex. 620 (CIA-SUB_7-19). The memorandum contains the quoted language, which specifically redacts the hearsay source for the allegation that Prince Nayif was aware of Al Haramain's illicit activities. *See id.* at CIA-SUB_8. The quoted language on discussions between US officials and Prince Nayef also redacts the nature of what was discussed, and the preceding sentence indicates the CIA's speculation of his awareness: "Saudi Minister of the Interior Prince Nayif *may* be aware of al-Haramain's illicit activities in the Balkans." *Id.* at CIA-SUB_14 (emphasis added).<br><br>Further, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific HIF employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." *Id.* at CIA-SUB_15.<br><br>Plaintiffs cite a 2002 CIA memorandum but omit that the 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>Simon's statements about the relationship between the United States and Saudi Arabia and whether such relationship constitutes an alliance is not based on any recognized methodology. Simon purports to recount in general terms what was said between officials from the two governments nearly 25 years ago, yet he offers no specifics that might permit the veracity of his allegations to be challenged. Further, Simon's testimony |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Council during the Clinton Administration, the United States explicitly told the Saudis that "the KSA was empowering jihadists through its support and funding of groups such as Al Haramain and Hamas and through its Ministry of Islamic Affairs; and we, the U.S., need you, the KSA, to stop."); *id.* at ¶ 20 ("The KSA was made aware that it was stoking the fires of extremism through its support of funding of charities such as Al Haramain, as well as its intensive and extensive propagation of its radical religious doctrine, which justified the use of violence against impious Muslims and non-Muslims. Yet when the U.S. implored the KSA to desist from its actions fueling international terrorism, Saudi Arabia only poured more gasoline into the inferno."). | regarding cooperation between the United States and Saudi Arabia before the 9/11 attacks contradicts any opinion that Saudi Arabia supported Al Qaeda or the 9/11 attacks. *See, e.g.*, Response to Pls. Aver. ¶ 70.

Plaintiffs Exhibits 671 and 677, among other sources, contradict Simon's conclusions. Plaintiff's Exhibit 671 (June 2, 2004 Treasury Press Release) states that Saudi Arabia worked jointly with the United States "in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations" as part of "a series of joint efforts between the United States and Saudi Arabia in the financial war on terror." Pls. Ex. 671 at 1.

It also notes that Al Aqil, who Plaintiffs do not even claim is a member of the Saudi government, was Al Haramain's leader. *Id.* at 3-4. Plaintiffs Exhibit 677 (*The Kingdom of Saudi Arabia and Counterterrorism*) details Saudi Arabia's efforts to combat terrorist financing. |
| 1981. | According to the joint assessment of the FBI and CIA, Prince Nayef "maintained for months after 11 September 2001 that no Saudis or Arabs had been involved in the attacks, but rather that the attacks were plots by the CIA and Israel's Mossad." Ex. 2, EO 3414-3442 at 3423. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the 2004 FBI/CIA Joint Assessment contains the quoted language, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). It further states that "no information indicates that the Saudi Government as an institution provides financial support to al-Qa'ida. . . . The Kingdom of Saudi Arabia (KSA) fears al-Qa'ida and has for years viewed the organization as a threat . . . ." *Id.* at EO 3417. |
| 1982. | In a separate report, *Saudi-Based Financial Support for Terrorist Organization [REDACTED]*, November 14, 2002, Ex. 609, CIA_000143-158, the CIA concluded that Saudi government officials were aware of, but turned a blind eye to, the Saudi da'wah organizations' support for terrorism.<br><br>Riyadh appears reluctant to pursue donors and police its NGOs. Domestic political considerations may also be preventing Riyadh from taking a harder line against terror finance.<br><br>Donors who are members of prominent merchant families often have business dealings or frequent interactions with the Saudi royal family, suggesting that Riyadh | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 609 (CIA_143-158) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 609 is a November 14, 2002 CIA memorandum relying upon unidentified sources and speculation. *See* Pls. Ex. 609 (CIA_143-158). The memorandum also notes many steps taken by Saudi Arabia to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee. [REDACTED] . . . Since |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | may be hesitant [to] move against their businesses and bank accounts, [REDACTED].<br><br>A few Saudi Government officials, such as Prince Nayif and Saudi Embassy personnel, have condoned or ignored the activities of NGO representatives that support terrorist and militant groups, [REDACTED].<br><br>See Ex. 609, CIA_000145. | 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." *Id.* at CIA_154. *See also* KSA Ex. 286 (Press Release, U.S. Dep't of the Treasury, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan* (Sept. 6, 2002)) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added).<br><br>Further, while Plaintiffs cite a 2002 CIA memborandum, they omit that the 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1983. | The CIA again emphasized Prince Nayef's knowledge of Al Haramain's support for terrorist organizations and militant groups, and the Saudi government's reluctance to clean up the Saudi charities.<br><br>**Al Haramain Islamic Foundation (HIF)** had field offices in some 50 countries, at least 20 of which are used by some officers to provide logistical, organizational, and financial support to al-Qa'ida and other extremist groups. A few Saudi Government officials, such as Prince Nayif and Saudi Embassy personnel, have condoned or ignored the activities of al-Haramain | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plantiffs Exhibit 609 (CIA_143-158) is inadmissible hearsay. *See* Objections Chart.<br><br>Plaintiffs Exhibit 609 is a November 14, 2002 CIA memorandum relying upon unidentified sources and speculation. *See* Pls. Ex. 609 (CIA_143-158). Contrary to Plaintiffs' improper attorney argument that the Saudi government was "reluctan[t] to clean up the Saudi charities," the memorandum notes the many steps taken by Saudi Arabia to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | headquarters, field offices, and representatives that support terrorist and militant groups, [REDACTED]. <br><br> *** <br><br> The Saudis have agreed to track the flow of charitable funds to foreign projects. Riyadh needs to establish an effective mechanism to monitor domestic and foreign charitable donations in order to uncover funding diverted to terrorists. <br><br> Despite this progress, Riyadh appears reluctant to pursue donors and clean up its NGOs. <br><br> Ex. 609, CIA_000150-151, 154-155. | number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee. [REDACTED] . . . Since 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." *Id.* at CIA_154. *See also* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). <br><br> Further, while Plaintiffs cite a 2002 CIA memorandum, they omit that the 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1984. | Sheikh Saleh bin Abdul Aziz bin Mohammed bin Ibrahim al Ash-Sheikh, Minister of Islamic Affairs, also condoned Al Haramain's involvement in terrorist activities. Notwithstanding the post-9/11 investigations and public designations of Al Haramain's overseas branch offices for their extensive and pervasive involvement in funding al Qaeda and other terror groups, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | . By March 13, 2004, the United States and Saudi Arabia had jointly designated Al Haramain's offices in Somalia and Bosnia-Herzegovina (March 11, 2002), its offices in Indonesia, Kenya, Tanzania, and Pakistan (January 22, 2004), and three months later jointly designated the Al Haramain offices in Afghanistan, Albania, Bangladesh, Ethiopia, Netherlands, and Aqeel al Aqeel (June 2, 2004). The designations of Al Haramain in the United States, Union of Comoros, Soliman al Buthe (September 9, 2004), and the Saudi headquarters (June 19, 2008), would follow thereafter. *See* Exs. 604, 606, 671, 674, 610. | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion that Minister Al ash-Sheikh "condoned Al Haramain's involvement in terrorist activities" and █████████████████ is not supported by the cited document. To the contrary, the ████████<br><br>████████████████████ Al Ash-Sheikh testified that Al Haramain was working without a permit, so the purpose of such scrutiny and supervision by the Ministry of Islamic Affairs was to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5. Nothing in Plaintiffs Exhibit ████████<br><br>Each of the five press releases Plaintiffs cite directly contradict their assertion that the Saudi government or its ministers condoned involvement in terrorist financing. To the contrary, before and after Plaintiffs Exhibit ██████████ was written, Saudi Arabia and the United States jointly worked to shut down multiple braches within Al Haramain when evidence of links to terrorism arose. *See, e.g.*, Pls. Ex. 604 (Mar. 11, 2002 Treasury Press Release) at 1 ("This joint designation marks a new level of coordination in the international cooperation that has |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | characterized the fight against international terrorism to date. I thank the Saudi leadership for taking this step with us, and I hope this is only the first of many similar joint designations we will undertake with other allied nations."); Pls. Ex. 606 (Jan. 22, 2004 Treasury Press Release) at 2 ("Like the United States, the Saudis have been victims of al-Qaida. They are an important partner in the war on terrorist financing, and have taken important and welcome steps to fight terrorist financing"); Pls. Ex. 610 (June 19, 2008 Treasury Press Release) ("The Kingdom of Saudi Arabia joined the United States in designating several branch offices of AHF and, due to actions by Saudi authorities, AHF has largely been precluded from operating in its own name."); Pls. Ex. 671 (June 2, 2004 Treasury Press Release) at 1 ("The United States and Saudi Arabian governments today announced yet further steps in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations. Today's action marks the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror."); Ex. 674 (noting that, "[s]ince March 2002, the United States and Saudi Arabia have jointly designated eleven branches of AHF."). |
| 1985. | Moreover, following the designation of Al-Haramain in Bosnia-Herzegovina, Ash-Sheikh purposely engaged in efforts to mislead the international community concerning Al Haramain's activities in the Balkans, as part of a scheme to evade economic sanctions imposed upon the organization. <br><br> Saudi Government officials also have tried to circumvent the asset freeze imposed on | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | HIF's Balkans office by supporting a misleading claim by HIF headquarters. Riyadh reacted to the US demarche in February on al-Haramain by issuing an official statement acknowledging "reports" of abuses by individuals affiliated with foreign offices of HIF. Riyadh publicly committed to take actions to prevent the abuses and jointly froze al-Haramain's assets in Bosnia and Somalia in March. Saudi Minister of Islamic Guidance Shaykh Salih then claimed to the press in early April that the al-Haramain office in Sarajevo was not engaged in illicit activities.<br><br>Riyadh also cooperated with HIF's plan in April 2002 to deflect international criticism by claiming there are two Saudi organizations with the name al-Haramain—al-Haramain al-Khayriyya and al-Haramain al-Masjed al-Aqsa Charity Foundation—and that only one is involved in questionable activities. Shaykh Salih supported this claim by telling the press that the US government apologized to the NGO for confusing the names after Riyadh froze the branch's assets jointly with the United States. | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion that Al Ash-Sheikh purposely engaged in efforts to mislead the international community is not supported by the hearsay Plaintiffs cite. Nothing they cite shows that Al Ash-Sheikh knew of illicit activities at the Al Haramain office referenced, and the evidence shows that Saudi Arabia was willing to work with the U.S. to shut down Al Haramain branches, repeatedly.<br><br>Further, while Plaintiffs cite a 2002 CIA hearsay memborandum, they omit that the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>They also omit that even the hearsay memorandum they cite says that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific HIF employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." Pls. Ex. 620 (CIA-SUB_15). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 620, CIA-SUB_0007-19 at 15, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002. | And they omit the string of evidence cited in the preceding paragraph confirming that Saudi Arabia worked jointly with the United States to combat terrorist financing. *See, e.g.*, Pls. Ex. 604 (Mar. 11, 2002 Treasury Press Release) at 1 ("This joint designation marks a new level of coordination in the international cooperation that has characterized the fight against international terrorism to date. I thank the Saudi leadership for taking this step with us, and I hope this is only the first of many similar joint designations we will undertake with other allied nations."); Pls. Ex. 606 (January 22, 2004 Treasury Press Release) at 2 ("Like the United States, the Saudis have been victims of al-Qaida. They are an important partner in the war on terrorist financing, and have taken important and welcome steps to fight terrorist financing"); Pls. Ex. 610 (June 19, 2008 Treasury Press Release) ("The Kingdom of Saudi Arabia joined the United States in designating several branch offices of AHF and, due to actions by Saudi authorities, AHF has largely been precluded from operating in its own name."); Pls. Ex 671 (June 2, 2004 Treasury Press Release) at 1 ("The United States and Saudi Arabian governments today announced yet further steps in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations. Today's action marks the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror."); Pls. Ex. 674 (Sept. 9, 2004 Treasury Press Release) at 1 (noting that, "[s]ince March 2002, the United States and Saudi Arabia have jointly designated eleven branches of AHF."). |
| 1986. | Importantly, Ash-Sheikh was overseeing and directing the operations and financial activities of Al Haramain notwithstanding the fact that it did not have a proper license from the Saudi government authorizing it to | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | conduct charitable work and open bank accounts in the Kingdom. During his deposition, Ash-Sheikh conceded that Al Haramain "did its work without a legal permit or a license." Ex. 123, Ash-Sheikh Dep. 136:23-137:12. *See also* pp. 144:24-149:11 (stating that "Al-Haramain worked without a permit," and that "it was not a licensed society'). Ash-Sheikh testified that after September 11, 2001, a prospective board of directors was established "to study the situation of Al-Haramain Foundation," and "the recommendation from the Ministry of Islamic Affairs at that time was to shut down Al-Haramain charity." *Id.* at 154:4-16. But Al Haramain was never shut down as Ash-Sheikh suggested. Ex. 610, Treasury Department's June 19, 2008 press release regarding the designation of Al Haramain's Saudi headquarters (stating that as of 2008, "AHF leadership has attempted to reconstitute the operations of the organization, and parts of the organization have continued to operate"). | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

To the extent a response is required, Plaintiffs misstate the record and omit important context. Plaintiffs cite no evidence that Al Ash-Sheikh was "overseeing and directing the operations of" Al Haramain. He was not. The U.S. government has concluded that "Aqeel Abdulaziz Al-Aqil," – as to whom there is no evidence that he was a Saudi official, nor do Plaintiffs make that claim – is [Al Haramain's] "founder and leader," who "controlled AHF and was responsible for all AHF activities." Pls. Ex. 671 (June 2, 2004 Treasury Press Release) at 3-4. Al Ash-Sheikh testified that he did not hold a position at Al Haramain. Pls. Ex. 123 (Ash-Sheikh Tr.) 137:14-138:10.

Minister Al Ash-Sheikh also explained his alleged "supervision," noting that the Ministry of Islamic Affairs was not supervising in the sense of leading the organization; it was "putting the organization under the microscope" to shut it down. Specifically, the Ministry "put its work under the microscope because it worked without a permit" and "it didn't have bylaws and it did not have authority." Pls. Ex. 123 (Ash-Sheikh Tr.) 146:5-148:5.

Further, contrary to Plaintiffs' assertion that "Al Haramain was never shut down," Saudi Arabia joined the United States in designating multiple branches of Al Haramain to freeze their assets between 2002 and 2004. *See* Pls. Exs. 604, 606, 610, 671, 674; *see also supra* Response to Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Aver. ¶ 1986. Pls. Ex. 610 (June 19, 2008 Treasury Press Release) itself notes that "[t]he Kingdom of Saudi Arabia joined the United States in designating several branch offices of AHF and, due to actions by Saudi authorities, AHF has largely been *precluded from operating in its own name*." *Id.* (emphasis added). |
| 1987. | Other high-ranking Al Haramain officials were also aware of, condoned, and participated in the organization's ongoing material, financial, logistical, and ideological support for terror groups and Islamic extremists. According to the CIA:

We judge that HIF Director Shaykh Aqil Ibn 'Abdul-'Aziz al-'Aqil, who manages al-Haramain's business on a day-to-day basis, is aware that funds in several field offices are being used to support terrorist and militant groups. [REDACTED] he almost certainly has been involved in suspicious money movements since 11 September.

[REDACTED] April 1999, al-Haramain used a centralized system that prohibits individuals from allocating funds without the personal approval of the foundation's director.

[REDACTED] Shaykh Aqil, other senior managers, and individuals at branch offices are at least aware that several branch offices | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 614 (CIA_675-679) and Plaintiffs Exhibit 620 (CIA-SUB_7-19) are inadmissible hearsay. *See* Objections Chart.

Plaintiffs' assertions concern Al Haramain officials, not Saudi government officials, so are irrelevant. Moreover, while Plaintiffs cite 2002 hearsay documents, they omit that the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).

While Plaintiffs Exhibit 620 (CIA-SUB_7-19) should not be considered, the memorandum confirms that – whatever may be true of Al Haramain officials – Saudi government officials were working to combat terrorist financing. For example, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific HIF employees if given clear |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | provide logistic support to Islamic extremists.<br><br>[REDACTED] Shaykh Aqil may have received funds from an unspecified organization [REDACTED] with extremist ties in the last few months. [REDACTED].<br><br>*Mujahidin* leaders frequently have coordinated funding support with senior al-Haramain managers, who were aware that their donations were being used for military support, [REDACTED]. The organization reportedly also has issued visas and identity papers to *mujahidin*, funded their recruitment and travel, and provided health care for wounded *mujahidin*, [REDACTED]. [REDACTED] 2001, *Chechen* mujahidin [REDACTED] received about [REDACTED] from al- Haramain, [REDACTED].<br><br>Ex. 620, CIA report, CIA-SUB 0007-19 at 14, *Al-Haramain: Support for Extremists and Terrorists* [REDACTED], August 28, 2002. See also Ex. 614, CIA_000675-679 at 675, CIA report, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, ("Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, | evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." Pls. Ex. 620 (CIA-SUB_15).<br><br>Similarly, while it also should not be considered, Plaintiffs Exhibit 614 notes that when it was exposed that Al Haramain might have supported terrorist groups, the "US and Saudi Arabian Governments . . . froze the assets of [Al Haramain's] Somali and Bosnian offices on 11 March." Pls. Ex. 614 (CIA_675). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and at least some top-level officials from HIF's headquarters condone the funding of extremist groups."). | |
| 1988. | The Saudi Arabian Monetary Authority ("SAMA") (a/k/a "Saudi Central Bank"), the Saudi government's central authority responsible for oversight and regulation of all banks and financial institutions in the Kingdom, not only condoned the activities of Al Haramain, but provided cover for Al Haramain to launder and transfer hundreds of millions of dollars to destinations throughout the world via numerous accounts at Saudi banks, without fear of government scrutiny and/or sanctions. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Saudi Arabia denies Plaintiffs' unsupported accusations. The record shows that Saudi Arabia did not condone any activities by Al Haramain that involved funding terrorism; to the contrary, as discussed above, *see, e.g.*, Responses to Pls. Avers ¶¶ 1984-1985, Saudi Arabia worked jointly with the United States to combat terrorist financing and to shut down Al Haramain braches engaged in such activities. Further, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1989. | █████████████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion mischaracterizes<br><br>Documents cited above, for example in Response to Pls. Avers. ¶¶ 1984-1985, confirm that the Saudi government actively combated terrorist financing and took steps against Al Haramain when it learned of reasons to be concerned about Al Haramain's activities. |
| 1990. | | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| |  | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs Exhibit [REDACTED] The record further establishes that Saudi Arabia was scrutinizing Al Haramain's activities. *See* Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5 (Minister Ash-Sheikh testified that Al Haramain was working without a permit, so the Ministry of Islamic Affairs "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down").<br><br>Plaintiffs' assertion mischaracterizes [REDACTED] |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | ████████████████████ |
| 1991. | ████████████████ | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

To the extent a response is required, Plaintiffs cite a ████████████████████████ *See id.* Furthermore, Al Ash-Sheikh testified that Al Haramain was working without a permit, so it was placed under the scrutiny and supervision of the Ministry of Islamic Affairs in order to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Tr.) 143:14-148:5. The work to shut Al Haramain was already underway, with the first branch being shut down by 2002, *see* Pls. Ex. 604, but by ████████████████████████, Plaintiffs cite no evidence showing that Saudi Arabia had reason to shut down branches and operations within Saudi Arabia. |
| 1992. | Soon thereafter, the Saudi Minister of Justice, Abdullah Mohammed Ibrahim al Sheikh, also issued a statement instructing that Al Haramain and other Saudi charities (Muslim World League, International Islamic Relief Organization, and World Assembly of Muslim Youth) are permitted to operate under the Kingdom's laws and regulations. Ex. 612, Al Rajhi Exhibit-ARB 35. As previously discussed, as of the date of the Minister's statement (March 21, 2004), six Al Haramain offices had been designated by the United States and United Nations for their support for al Qaeda and other terror groups, with an additional five offices and the head of Al Haramain (Aqeel al Aqeel) to be designated three months later. | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs cite a March 21, 2004 statement from Abdullah Mohammed Ibrahim al Sheikh permitting the named Saudi charities to continue operating under Saudi Arabia's laws and regulations. Pls. Ex. 612 (Rajhi Ex. ARB 35). By that date, Minister Al Ash-Sheikh testified that Al Haramain was working without a permit, so it was placed under the scrutiny and supervision of the Ministry of Islamic Affairs in order to "put [Al Haramain's] work under the microscope," and as a result "the recommendation we made was to not give it permission and to place all of its financial works under the control of the government and to shut it down." Pls. Ex. 123 (Ash-Sheikh Tr.) 143:14-148:5.

As Plaintiffs note, as of the Minister's statement, it was clear that Saudi Arabia was scrutinizing Al Haramain and taking action against its branches where evidence supported doing so. Plaintiffs cite nothing to suggest that Saudi Arabia had reason to believe the charities should not be permitted to operate "under the Kingdom's laws and regulations," and subject to its supervision, within Saudi Arabia. |
| 1993. | CIA reporting released pursuant to Executive Order 14040, dating to both prior to and after the 9/11 attacks, additionally | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | provides a wealth of new evidence demonstrating Al Haramain's global support for al Qaeda. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the record shows that Saudi Arabia did not condone any activities by Al Haramain that involved funding terrorism; to the contrary, as discussed above, *see, e.g.*, Responses to Pls. Aver. ¶¶ 1984-1985, Saudi Arabia worked jointly with the United States to combat terrorist financing and to shut down Al Haramain branches engaged in such activities. Further, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1994. | For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, Ex. 79, CIA 000807-848, the CIA assessed that al Qaeda infiltrated and used Al Haramain's overseas offices for funding and other resources for years prior to the 9/11 attacks.<br><br>[REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan…. All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include … Al-Haramayn Islamic Foundation.<br><br>***<br><br>[REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.<br><br>Ex. 79, CIA_000808, 817. | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 79 (CIA_807-848) is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 79 – a January 11, 1999 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation.  *See* Pls. Ex. 79 (CIA_807-848).  While it should not be considered, the memorandum connects Al Qaeda to nongovernmental organizations and private individuals, not to the Saudi Arabia government.  *Id.* at CIA_807.  It confirms that Saudi Arabia formally exiled Osama Bin Laden in 1994.  *Id.*  And it states that "the exploits of Islamic radicals like Usama Bin Ladin convinced the government of the need to clamp down on private individuals and NGOs whose financial support was contrary to Saudi national interests but perceived by outsiders as reflecting the intent of the Saudi Government," and thus "Riyadh has closed foreign offices of some NGOs and fired employees."  *Id.* at CIA_816.<br><br>This is consistent with Saudi Arabia's efforts after September 11 to combat terrorist financing.  *See supra* Responses to Pls. Avers. ¶¶ 1984-1985 (citing evidence showing joint U.S.-Saudi efforts to combat terrorism financing).<br><br>Further, Plaintiffs Exhibit 79 is a CIA analysis from its Office of Transnational Issues, dated January 1999.  The findings were full of errors, like al Qaeda was represented in some 60 countries.  Pls. Ex. 79 (CIA_810).  The worldwide hunt for al Qaeda members only found them in very few countries:  Afghanistan, Pakistan, Malaysia, Iran (after 9/11), Saudi Arabia, and Yemen.  The findings of this analysis are tentative, as "possible connections."  *Id.* (CIA 811).  The document includes a heavily |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
|  |  | redacted excerpt of this CIA analysis, with the title of "Saudi-backed NGOs [w]ith [p]ossible [t]ies to Usama [b]in Laden." *Id.* (CIA 822).<br><br>While Plaintiffs cite hearsay CIA documents from 1999 with such errors, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1995. | The report further details Al Haramain's support for Osama bin Laden, certain terror groups, and the mujahideen in the Balkans.<br><br>Employees at Al Haramayn offices in Albania, Azerbaijan, Kenya, and possibly Tanzania, have been funded by or have acted on behalf of Usama Bin Ladin: [REDACTED].<br><br>***<br><br>[REDACTED] the Al-Haramayn office in Nairobi was a front for the Al-Ittihad Al-Islami, an Usama Bin Ladin-backed Islamic insurgent group engaged in politically motivated violence in Somalia and Ethiopia.<br><br>***<br><br>Al Haramayn offices have supported other terrorist groups. [REDACTED] for | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 79 (CIA_807-848) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 79 relies upon hearsay from unidentified sources and speculation. *See* Pls. Ex. 79 (CIA_807-848). While it should not be considered, the memorandum connects Al Qaeda to nongovernmental organizations, not to Saudi Arabia. *Id.* at CIA_807. It confirms that Saudi Arabia formally exiled Osama Bin Laden in 1994. *Id.* And it states that "the exploits of Islamic radicals like Usama Bin Ladin convinced the government of the need to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | example, it has been particularly involved in providing financial and logistical support to the Bosnian mujahedin. [REDACTED] the NGO also has associated with Egyptian terrorists. Ayman Al-Zawahiri – the [blank] was a onetime Al Haramayn leader.<br><br>Ex. 79, CIA_000819-820. | clamp down on private individuals and NGOs whose financial support was contrary to Saudi national interests but perceived by outsiders as reflecting the intent of the Saudi Government," and thus "Riyadh has closed foreign offices of some NGOs and fired employees." *Id.* at CIA_816.<br><br>This is consistent with Saudi Arabia's efforts after September 11 to combat terrorist financing. *See supra* Responses to Pls. Avers. ¶¶ 1984-1985 (citing evidence showing joint U.S.-Saudi efforts to combat terrorism financing).<br><br>Further, Plaintiffs Exhibit 79 is a CIA analysis from its Office of Transnational Issues, dated January 1999. The findings were full of errors, like al Qaeda was represented in some 60 countries. Pls. Ex. 79 (CIA_810). The worldwide hunt for al Qaeda members only found them in very few countries: Afghanistan, Pakistan, Malaysia, Iran (after 9/11), Saudi Arabia, and Yemen. The findings of this analysis are tentative, as "possible connections." *Id.* (CIA 811). The document includes a heavily redacted excerpt of this CIA analysis, with the title of "Saudi-backed NGOs [w]ith [p]ossible [t]ies to Usama [b]in Laden." *Id.* (CIA 822).<br><br>While Plaintiffs cite hearsay CIA documents from 1999 with such errors, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1996. | In a report titled, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, Ex. 80, CIA_00002-16, the CIA describes how Osama bin Laden and al Qaeda used Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Haramain and other purported charities for funding, travel assistance, covert employment, and weapons smuggling.<br><br>In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support. Employees—ranging from accountants to directors—of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to move weapons and supplies.<br><br>Employees of the Azerbaijan-based al-Haramayn office, for example, have regularly diverted resources to Bin Ladin and his associates since 1995, [REDACTED]. The former head of the Baku office and its logistical chief, both associated with Bin Ladin, directed much of this activity, including channeling funds and weapons. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 80 (CIA_1-16) is inadmissible hearsay.<br><br>To the extent a response is required, Saudi Arabia exiled Osama Bin Laden in 1994, consistent with Saudi Arabia's efforts after September 11 to combat terrorism and Al Qaeda. *See supra* Responses to ¶¶ 1994-1995 (citing evidence showing joint U.S.-Saudi efforts to combat terrorism financing).<br><br>Further, while Plaintiffs cite hearsay CIA documents from 1999, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>Plaintiffs' assertion that Osama bin Laden and Al Qaeda used Al Haramain and other charities mischaracterizes the memorandum, which notes that such alleged use was not of the charitable organizations as a whole, but rather employees "of a few NGO branch offices." Pls. Ex. 80 (CIA_7). The memorandum specifically states that the CIA was "unable to determine if the organizations' home office are witting." *Id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 80, CIA_000007. | As described above, Saudi Arabia repeatedly participated with the United States in jointly shutting down Al Haramain branch offices. *See supra* Responses to Pls. Avers. ¶¶ 1984-1985. |
| 1997. | In a subsequent report titled, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, Ex. 613, CIA_000210-236, , the CIA further describes the use of purported charitable organizations, like Al Haramain, by Osama bin Laden for critical resources in support of terrorist activities.<br><br>The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons. Most Islamic terrorist groups maintain relationships with several NGOs, which protects them from the closure of any one organization. Terrorists typically penetrate NGOS by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices, including senior management positions, are staffed by extremists.<br><br>***<br><br>Usama Bin Ladin has established close relationships with employees in several al-Haramayn offices, [REDACTED] and has used these ties to divert resources to support | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 613 (CIA_210-236) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 613 (CIA_210-236) notes that the NGOs "are exploited by *individual employees* with ties to extremists" and that "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters." *Id.* at CIA_213 (emphasis added). To that end, "[s]enior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." *Id.*<br><br>If the document is considered, it is noteworthy that Saudi Arabia's approach to Al Haramain is consistent with this assessment: Saudi Arabia joined with the United States to shut down branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | his terrorist agenda, [REDACTED]. Some of these employees probably [blank] either planted or coopted by Bin Ladin after they began working for the NGO.<br><br>Ex. 613, CIA_000210-211, 217. | These acts to combat terrorist financing are consistent with steps Saudi Arabia actioned before the September 11 attacks, such as Saudi Arabia exiling Osama Bin Laden in 1994.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 1999, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 1998. | In *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, Ex. 614, CIA_000675-679, the CIA details Al Haramain's extensive support for terror groups in Africa.<br><br>In Africa, HIF maintains a presence in about a dozen countries and supports several extremist groups, particularly Somalia's al-Ittihad al-Islami (AIAI), [REDACTED]. Al-Haramain employees also provide cover and logistic support for al-Qa'ida cells, including those involved in the 1998 U.S. Embassy bombings in Kenya and Tanzania. Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 614 (CIA_675-679) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs omit important context confirming that Saudi Arabia combatted terrorist financing, including by taking action against Al Haramain. While the document should not be considered, Plaintiffs Exhibit 614 notes that when it was exposed that Al Haramain may have supported terrorist groups, the "US and Saudi |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *** <br><br> **Backing Somalia-Based AIAI** – Al-Haramain's top priority in Africa is supporting the Somali AIAI faction, [REDACTED]. AIAI—designated by the U.S. Government as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI with financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities. <br><br> In 2002, HIF arranged travel for AIAI members to Saudi Arabia, probably to help them avoid anticipated U.S. military action in Somalia. <br><br> In 2001, HIF provided humanitarian cover for unidentified Arabs traveling to Somalia to train AIAI military recruits, [REDACTED]. <br><br> In 1999, HIF maintained villas in Somalia used to store explosives and train AIAI members for jihad operations, [REDACTED]. | Arabian Governments . . . froze the assets of [Al Haramain's] Somali and Bosnian offices on 11 March." *Id.* at CIA_675. <br><br> The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674. <br><br> Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Al-Haramain also supports AIAI from its offices and refugees camps in Kenya.<br><br>Ex. 614, CIA_000675-676. | |
| 1999. | The CIA report further explains Al Haramain's role in the 1998 U.S. Embassy bombings and the aid it provided to al Qaeda fighters.<br><br>**Providing Cover for al-Qaida** – In addition to its support of African Islamic terrorist groups, Al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 U.S. Embassy bombings.<br><br>In 2002, Al-Haramain's office in Tanzania hid 14 extremists—at least some of whom were probably al-Qa'ida fighters fleeing Afghanistan—in the Kiwalani mosque in Dar es Salaam, [REDACTED]. While staying at the mosque, the fighters provided training to local extremists.<br><br>In 1998, the Kenyan Government deregistered HIF for providing support to the terrorist cells that planned and carried out the bombing of the US Embassy in Nairobi, [REDACTED]. HIF and other | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 614 (CIA_675-679) is inadmissible hearsay. *See* Objections Chart. To the extent a response is required, Plaintiffs omit important context confirming that Saudi Arabia combatted terrorist financing, including by taking action against Al Haramain. While the document should not be considered, Plaintiffs Exhibit 614 notes that when it was exposed that Al Haramain may have supported terrorist groups, the "US and Saudi Arabian Governments . . . froze the assets of [Al Haramain's] Somali and Bosnian offices on 11 March." *Id.* at CIA_675.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | NGOs diverted funds and helped import materials needed to build the bombs.<br><br>Ex. 614, CIA_000676. | Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2000. | The CIA also discloses that Al Haramain's humanitarian activities in Africa were undertaken with the goal of recruiting young men for jihad.<br><br>**Humanitarian, but With a Militant Agenda** – Even Al-Haramain's ostensibly legitimate activities in Africa, such as building mosques and Islamic schools, are undertaken with the goal of creating an environment conducive to militancy.<br><br>HIF's limited relief operations and infrastructure construction projects in Africa are targeted to help only Muslim communities and propagate the fundamentalist Salafist brand of Sunni Islam.<br><br>HIF's schools, mosques, and publications espouse Salafism's rigid orthodoxy and attack opposing secular and religious—including other Islamic doctrines—[REDACTED]. These efforts complement HIF employees' efforts to recruit young | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 614 (CIA_675-679) is inadmissible hearsay. *See* Objections Chart. To the extent a response is required, Plaintiffs omit important context confirming that Saudi Arabia combatted terrorist financing, including by taking action against Al Haramain. While the document should not be considered, Plaintiffs Exhibit 614 notes that when it was exposed that Al-Haramain may have supported terrorist groups, the "US and Saudi Arabian Governments . . . froze the assets of [Al Haramain's] Somali and Bosnian offices on 11 March." *Id.* at CIA_675.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Africans for the jihad against the enemies of Islam.<br><br>Ex. 614, CIA_000675. | Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2001. | In *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002, Ex. 615, CIA_000178-189, the CIA assessed that Al Haramain was also recruiting young men for jihad and terrorist activities in the Balkans region.<br><br>In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED].<br><br>Ex. 615, CIA_000186. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 615 (CIA_178-189) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 615 contains the quoted language, which alleges the involvement of "local offices of NGOs" rather than the organizations as a whole. *Id.* at CIA_186.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2002. | In an August 28, 2002 CIA report, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, Ex. 620, CIA-SUB 0007-19, the CIA provides extensive evidence of Al Haramain's support for Islamic extremists and terrorists, and connections to al Qaeda and other militant groups.<br><br>**Ties to al-Qa'ida** – [REDACTED] at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe, and North America, as well as its headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qa'ida. In some cases, [REDACTED] financial support or collusion in terrorist plots. [REDACTED].<br><br>Some of the ties are to key al-Qa'ida officials or ongoing plots.<br><br>[REDACTED] November 2001, unspecified al-Haramain officials met with the leadership of Wafa, an NGO with close ties to al-Qa'ida. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay.<br><br>To the extent a response is required and the exhibit is considered, Plaintiffs Exhibit 620 notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific HIF employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." *Id.* at CIA-SUB_15. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [REDACTED] HIF offices in Indonesia and Pakistan support al-Qa'ida and other extremist groups [REDACTED].<br><br>Documents seized during SFOR raids in the Balkans [REDACTED] suggest that employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo support al-Qa'ida and affiliated groups. Individuals in each of these offices have been funded by or worked with Bin Ladin, [REDACTED].<br><br>Bosnian authorities found e-mails in June 2002 from al-Qa'ida members on computers confiscated from the al-Haramain office in Travnik, Croatia. The e-mails contained instructions to attack an SFOR base in Tuzla, according to press reporting.<br><br>Al-Haramain offices in at least five African countries—Comoros Islands, Djibouti, Kenya, Somalia, Tanzania, and probably in Ghana—support al-Qa'ida and affiliated terrorist groups.<br><br>[REDACTED] former HIF director in Tanzania Mummar al-Turki Abdul Wahab Dahil helped coordinate involvement in the 1998 US Embassy bombing in that country. | The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [REDACTED] Dr. Omar Shams Idris, the HIF director in Tanzania, may have provided funds for a possible terrorist attack in Mombasa, Kenya, as of April 2002.<br><br>Al-Haramain's Saudi headquarters delivered [REDACTED] cash [REDACTED] to Ramzi ben Mizauni Benfraj, the head of the Tanga, Tanzania office. Mizauni reportedly threw a party in Dar es Salaam to celebrate the 11 September attacks and, as of May, was attempting to gain Tanzanian citizenship illegally through the purchase of false documents.<br><br>Elias Ali Noor, a Somali employee of Al-Haramain in Somalia, may have ties to USS Cole suspects, [REDACTED].<br><br>Ex. 620, CIA-SUB_0010-11. | |
| 2003. | Al Haramain provided financial and logistic support to other terrorist groups, such as al-Ittihad al-Islamiya ("AIAI"), an Islamic terror group in Somalia, HAMAS, and Egyptian Islamic Jihad. Ex. 620, CIA-SUB_0011. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs mischaracterize the document. The memorandum alleges that the local branch office directors of Al Haramain in Jakarta and Tanzania – and not the entire Al Haramain organization – provided financial and logistic support to other terrorist groups. *See id.* at CIA-SUB_11. In addition, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific [Al Haramain] employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." *Id.* at CIA-SUB_15.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2004. | Al Haramain provided similar support to Islamic extremists and foreign fighters in Bosnia and Chechnya.<br><br>The HIF in Bosnia during the 1990s funded and supported the foreign *mujahidin* battalion in Zenica, transported *mujahidin*, provided logistic and financial support for its members, and conducted propaganda activities, [REDACTED].<br><br>[REDACTED] HIF provided about one-third of the total funds being funneled from the Persian Gulf to support the Chechen insurgency in the Caucuses.<br><br>Ex. 620, CIA-SUB_0012. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay. *See* Objections Chart. To the extent a response is required, Plaintiffs Exhibit 620 contains the quoted language alleging that the local branch office of Al Haramain in Bosnia – and not the entire Al Haramain organization – provided support to extremists. *See id.* at CIA-SUB_12. In addition, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific [Al Haramain] employees if given clear evidence of their ties to al-Qa'ida. Considerable private funding continues to elude Saudi officials' detection." *Id.* at CIA-SUB_15.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2005. | The CIA report provides additional details concerning Al Haramain's activities in Africa, Asia, and Europe.<br><br>[REDACTED] al-Haramain's top priority in Africa is supporting the AIAI faction, [REDACTED]. AIAI—designated by the US Department of Treasury under Executive Order 13224 as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities. [REDACTED]. Ex. 620, CIA-SUB_0017.<br><br>In addition to its support of African Islamic terrorist groups, al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 US Embassy bombings. *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 620 (CIA-SUB_7-19) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Saudi Arabia notes that, as the quoted portions make evident, local branch offices of Al Haramain and individual actors at those offices allegedly provided support to extremists, not the entire Al Haramain organization. *See id.* In addition, the memorandum notes that "Riyadh – suspecting that Islamic militants redirect some of the government's charitable donations – has stepped up efforts to monitor private funding to Islamic causes and the activities of Saudi-based NGOs through intelligence and security services, [REDACTED]. Riyadh might be willing to take action against specific [Al Haramain] employees if given clear evidence of their ties to al-Qa'ida. Considerable private |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Al-Haramain also misuses its status as a charitable organization to fund Islamist political parties and civic groups in East African countries—including Tanzania, Djibouti, and Comoros Islands. In some instances, the funding extends to supporting sectarian violence, [REDACTED]. Ex. 620, CIA-SUB_0018.<br><br>Al-Haramain uses its presence in Indonesia to support extremist groups and is poised for expansion in the region. [REDACTED]. *Id.*<br><br>[REDACTED] Ahmad al-Amoudi—the Jakarta office director who served tours for al-Haramain in Pakistan, Bangladesh, and Azerbaijan in the 1990s—may have been involved in *mujahidin* recruitment. *Id.*<br><br>[REDACTED] al-Amoudi met [REDACTED] with Jafar Umar Thalib, leader of the Indonesian extremist group Laskar Jihad; al-Amoudi also noted that al-Haramain was working with Thalib on several ongoing "projects." *Id.*<br><br>Al-Haramain has built 25 mosques and schools in Indonesia and asserted control over mosque leadership positions to radicalize the local population. *Id.* | funding continues to elude Saudi officials' detection." *Id.* at CIA-SUB_15.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | [REDACTED] funds were transferred from an HIF headquarters account in Saudi Arabia at al-Rajhi bank to an al-Ansar Welfare Trust in Kashmir. [REDACTED] al-Ansar Welfare Trust is a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujandin, which have been listed by the United States as terrorist groups. *Id.* [REDACTED] individuals in the HIF offices in the Balkans are supporting extremist groups. *Id.*<br><br>Employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo have been funded by or have acted on behalf of Usama Bin Ladin, [REDACTED]. *Id.*<br><br>Employees at al-Haramain have a long history of supporting the Chechens and foreign *mujihidin* movement … an al-Haramain employee, provided funds and supplies to Chechen *mujahidin* leaders. including several individuals tied to al-Qa'ida. Ex. 620, CIA-SUB_0019.<br><br>[REDACTED] al-Haramain officials have couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization. *Id.* | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2006. | A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, Ex. 609, CIA_000143-158, indicates that an Al Haramain official served on a committee of Jemaah Islamiyah, an al Qaeda linked terrorist group in Indonesia, dedicated to funding the training of jihadists and amassing weapons to wage a religious war that will create an Islamic state in Indonesia. Ex. 609, CIA_000152. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 609 (CIA_143-158) is inadmissible hearsay.<br><br>To the extent a response is required, Plaintiffs Exhibit 609 alleges that a single official with a local branch office of Al Haramain – and not the entire Al Haramain organization – served on a committee of Jemaah Islamiyah. *Id.* at CIA_152. Furthermore, the memorandum notes the many steps taken by Saudi Arabia to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee. [REDACTED] . . . Since 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." *Id.* at CIA_154.<br><br>The record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* KSA Ex. 286 (Sept. 6, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . .  Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia."); *see also* Pls. Exs. 604, 606, 671, 674.<br><br>Further, while Plaintiffs cite hearsay CIA documents from 2002, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2007. | More recent intelligence reporting by the U.S. government, declassified and released pursuant to Executive Order 14040, further reinforces the findings of U.S. and international investigations that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development into a sophisticated terrorist organization capable of attacking the United States on September 11, 2001. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, this assertion is not supported by citation to any record evidence.  Moreover, this statement is unrelated to Saudi Arabia.  Saudi Arabia exiled Osama Bin Laden in 1994.  *See supra* Response to Pls. Avers. ¶¶ 1994, 1995.  And the record confirms that Saudi Arabia joined with the United States to shut down Al Haramain |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | branches repeatedly and is enemies with Al Qaeda. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, the 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2008. | For instance, a July 23, 2021 FBI report, Connections to the *Attacks of September 11, 2001*, Ex. 2, 3478-3608, asserts the following about Al Haramain.<br><br>Alharamain foundation is a Saudi Arabian Islamic "NGO" or "charity" who had multiple offices worldwide designated as terrorist supporting entities by the United States for their support of AQ related groups. Within the U.S. the Alharamain office was located in Portland, Oregon and was later specifically designated along with its primary operator Suliman Albouthe.<br><br>The Al Haramayn or Al Haramain Islamic Foundation (AIF) has been reported as a Saudi Arabian funded Islamic charitable organization that distributes books, video/cassette tapes and leaflets which espouse radical Islamic thoughts. AIF has been utilized as a front organization for supporting and facilitating the movement of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608-UPDATED), is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, regarding allegations that Al Haramain is Saudi Arabian funded, the record confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly and is enemies with Al Qaeda. *See* Pls. Exs. 604, 606, 671, 674. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Islamic Mujahadin into areas of Kosovo, Chechnya, Pakistan, Afghanistan and Bosnia. [REDACTED].<br><br>In [REDACTED] is identified as [REDACTED] of the Al Haramain Foundation. It is further stated in [REDACTED] that "an African chapter of the Jeddah, based group was identified in a 1999 State Department report as one of the suspect terrorist groups operating in Nairobi, Kenya, before the bombing of the U.S. Embassy there in 1998.<br><br>Ex. 2, 3567-3568. | Plaintiffs also omit that the cited document states that "[t]he report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP (EO 3479-UPDATED). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have [sic] copied that information directly within this communication." *Id.* at EO 3481-UPDATED.<br><br>While Plaintiffs cite FBI investigative theories about topics dismissed from the case, the FBI's final conclusion on the core jurisdictional inquiry is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2009. | Al Haramain is also linked to various members of the Sunni-Wahhabi extremist network established in the United States by the Saudi government to provide material support to the September 11 hijackers. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, there was no extremist network established in the United States by the Saudi government, as explained elsewhere in Saudi Arabia's Responses to Plaintiffs' Averment.<br><br>The record also confirms that Saudi Arabia joined with the United States to shut down Al Haramain branches repeatedly. *See* Pls. Exs. 604, 606, 671, 674.<br><br>Further, every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion: that there was no Saudi complicity and no support network in place.<br><br>The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy. It concluded, "[t]he circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives." 9/11 Commission Rep. 217. On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups. Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-103.<br><br>Operation Encore concluded that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2010. | Omar Abdi Mohamed (a/k/a Omar al Khateeb), an employee of the Ministry of Islamic Affairs, established the Western Somali Relief Organization ("WSRO") in San Diego, CA, which he allegedly used to launder money for charities associated with al Qaeda. According to the U.S. government, Mohamed "has been specifically 'tasked' by the Saudi Arabian government in intelligence gathering missions in his employment as a 'propagator' for that government" and "received over $100,000 as payment for his employment." Ex. 616, *In the Matter of Omar Abdi Mohamed – Government Response to Respondent's Brief in Support of Bond*, ECF No. 3930-1, pp. 2, 4; *see also* p. 7 (stating that Mohamed "also received $5,000 from the Al-Haramain Foundation"). Abdi Mohamed's activities during this relevant time period were | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 616 (Gov't Resp. to Resp't Br. in Supp. of Bond, *In the matter of Omar Abdi Mohamed*, File No. A44 917 640, ECF No. 3930-1) is inadmissible hearsay.<br><br>To the extent a response is required, Plaintiffs misrepresent the record. Whatever Plaintiff Exhibit 616 – an inadmissible hearsay document – says about Abdi Mohamed receiving funding, Abdi Mohamed was found "***not guilty***" on charges related to these allegations, Pls. Ex. 22 (Jury Verdict Form, *United States v. Mohamed*, Case No. 03CR3433-JAH, ECF No. 153) at 2 (counts 1 and 2, which charged him with false statements concerning WSRA's funding, alleging that "in truth and in fact, between |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | supervised and directed by Fahad al Thumairy. *See* Ex. 382, DOJ 0010. | December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation." Pls. Ex. 20 (Superseding Indictment, *United States v. Mohamed*, Case No. 03CR3433-JAH, ECF No. 39) at 2-3. |
| | | Plaintiffs' assertion that Omar Abdi Mohamed's activities were supervised and directed by Fahad Al Thumairy is not supported by the cited document, which states only that Al Thumairy had been nominated to "supervise the propagators" working in the state of California. *See* Pls. Ex. 382 (DOJ 9-10). Al Thumairy testified that he did not know Abdi Mohamed, Pls. Ex. 107 (Thumairy Tr.) 159:10-19, and Al Thumairy was not his supervisor. The only documents on which Plaintiffs rely state that he was nominated to supervise propagators in California, but there is no evidence that Al Thumairy was aware of or accepted the nomination. To the contrary, Al Thumairy testified that he was not aware of the nomination and never supervised propagators in California. Pls. Ex. 107 (Thumairy Tr.) 143:1-147:10. |
| | | Further, Plaintiffs Exhibit 616 (Gov't Br. on Mohamed Bond) does not support Plaintiffs' assertion. The document alleges that Omar Mohamed allegedly told investigators at various times that he was a "volunteer" for the Western Somali Relief Organization, then that he was the director, then that he was Treasurer. *Id.* at 6-7. No evidence was provided to support any of these claims, and Plaintiffs Exhibit 616 contains no allegation that he established the Organization. *See id.* Furthermore, Plaintiffs Exhibit 616 contains no allegations or references to any alleged money laundering. *See id.* |
| 2011. | Abdullah Al Jaithen, an official from the Ministry of Islamic Affairs in Saudi Arabia, traveled to Los Angeles, CA in December 1999 and met with Omar Al Bayoumi and Fahad al Thumairy, just weeks prior to the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | arrival of 9/11 hijackers Nawaf Al Hazmi and Khalid Al Mihdhar in the United States on January 15, 2000 at the Los Angeles International Airport.<br><br>Ex. 468, FBI 000238-REV2021. "A review of Bayoumi's telephone book showed an entry for Dr. Abdullah Al Joaithen, with the numbers ▬ 0877 and C (cell) ▬ 4240." Ex. 586, FBI report, Encore Investigation Update, Review and Analysis: Interview [REDACTED] (Nov. 2015), p. 9. "Additional analysis of '▬ 0877' yielded information from another government service reporting "Dr. 'Abdallah Al-Juhayn ▬ 0877' was found on a confiscated hard drive from an October 6, 2001 raid on the Al-Harramayan [a Tier 1 Terrorist Support Entity' offices in [REDACTED]." *Id.* at 10. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 468 (FBI 238-240-REV2021) and 586 (April 4, 2016 FBI Electronic Communication, *ENCORE Investigation Update*) are inadmissible hearsay. *See* Objections Chart.<br><br>Saudi Arabia has addressed Plaintiffs allegations regarding Al Jaithen in its Response to Pls. Aver. Section XVIII.A.<br><br>Plaintiffs Exhibit 586 also does not support the assertion that Al Jaithen was associated with Al Haramain. Even if Al Jaithen's name and contact information was found in documents seized from an Al Haramain office, that would not indicate that Al Jaithen had any relationship with Al Haramain. |
| XXVIII. B. | **Muslim World League** | |
| 2012. | Established by the Kingdom of Saudi Arabia in 1962, the Muslim World League ("MWL") has for years served as an important instrument through which the Saudi government has propagated Wahhabi Islam throughout the Islamic world, providing it and other Saudi-based da'wah organizations with extensive funding and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | resources in support of that objective. Ex. 2, 3478-3608 at 3541-3542, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021 ("Many of these charities were known to have supported AQ and related groups both financially and operationally throughout the world. MWL was the organization under which the International Islamic Relief Organization (IIRO) and others such as World Assembly of Muslim Youth (WAMY) operated at an international level."). *See also* Ex. 2, 3414-3442 at 3436, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004 (stating that Saudi Arabia used the MWL "to spread Wahhabi ideology throughout the world"). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 2PP (EO 3478-3608-UPDATED), is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 2PP (3478-3608-UPDATED). The memorandum also states that "[t]his report should not be considered an intelligence assessment and is not intended as such." *Id.* at EO 3479-UPDATED. Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at EO 3481-UPDATED.

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).

The 2004 FBI/CIA Joint Assessment contains the quoted language, but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2013. | The MWL is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. Deposition testimony and documents produced in the MDL litigation demonstrate that the Kingdom (the Saudi king) appoints MWL leadership (who are themselves high-ranking government officials with years of service to the Kingdom), provides the MWL with nearly all of its funding, and oversees and directs the MWL's operations and activities in accordance with the policies of the Saudi government. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, this assertion is not supported by citation to any record evidence. Saudi Arabia disputes Plaintiffs' assertions of control and that MWL is an alter-ego. Where Plaintiffs cite the deposition testimony purportedly supporting their assertion, Saudi Arabia addresses it. |
| 2014. | Senior officials of the MWL have acknowledged that the MWL receives virtually all of its funding from the Saudi government. Dr. Abdullah al Turki, who served as Secretary General of the MWL from approximately 2000 through 2016, acknowledged that the MWL received 80,000,000.00 Saudi riyals ("SR") annually from the Saudi government. Ex. 97, Turki Dep. 223:19-224:11; Ex. 617, Turki Exhibit 44 (MWL Secretariat General report | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | indicating the MWL received an annual 80,000,000.00 subsidy from the Saudi government). *See also* Ex. 97, Turki Dep. 91:4-23 (confirming that the Saudi government provided funding for the MWL). | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 617 (Turki Ex. 44) is inadmissible hearsay.  The cited potion of Plaintiffs Exhibit 97 (Turki Tr.) 223:19-224:11 is inadmissible because it is not based on personal knowledge.  *See* Objections Chart.<br><br>To the extent a response is required, Al Turki's testimony regarding the purported 80 million Saudi riyal annual subsidy – cited by Plaintiffs – is inadmissible because he lacked personal knowledge.  Plaintiffs asked Al Turki to read off the subsidy from Plaintiffs Exhibit 617 (Turki Ex. 44), even though he explained that the report had been submitted by others at the Muslim World League before he took over his post and that he had no personal knowledge regarding the report.  Pls. Ex. 97 (Turki Tr.) 211:21-213:5; 221:11-222:6. |
| 2015. | The CIA has also assessed that the MWL "is funded exclusively by the Saudi government and has served as an umbrella for other Saudi-based NGOs." Ex. 613, CIA_000210- 236, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 613 (CIA_210-236) is inadmissible hearsay.  *See* Objections Chart |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs Exhibit 613 – an April 9, 1999 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation.  *See* Pls. Ex. 613 (CIA_210-236).  The memorandum notes that the NGOs "are exploited by individual employees with ties to extremists" and that "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters."  *Id.* at CIA_213.  To that end, "[s]enior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse."  *Id.* <br><br> The document also states that MWL headquarters avoid extremist causes.  *Id.* |
| 2016. | The Ministry of Defense and Aviation has also financed the activities of the MWL and International Islamic Relief Organization. Ex. 2, 3478-3608 at 3580-3581, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> Plaintiffs Exhibit 2PP (EO 3478-3608-UPDATED), is inadmissible hearsay.  See Objections Chart. <br><br> To the extent a response is required, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation.  *See* Pls. Ex. 2PP (EO 3478-3608-UPDATED).  The memorandum alleges that the Ministry of Defense and Aviation "has been |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | associated with the financing" of the Muslim World League and the International Islamic Relief Organization, not that it funded the two charities. *See id.* at EO 3580-3581-UPDATED.<br><br>The memorandum also states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP (EO 3479-UPDATED). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at EO 3481-UPDATED.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2017. | Dr. Abdullah al Turki further testified that as Secretary General of the MWL, he and other officials of the MWL were issued Saudi diplomatic passports for travel outside of the Kingdom in support of MWL activities. Ex. 97, Turki Dep. 75:5-76:21; *see also* p. 79:4-12 (Turki asked the Saudi king to grant diplomatic passports for seven officials of the MWL). Ex. 618, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid (Obaid Dep.) 120:10-123:9 (Dr. Obaid traveled with a diplomatic passport during his tenure as MWL Secretary General.); Ex. 618, Obaid Dep. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 174:19-175:3 (testifying that former MWL Secretary General Abdullah Omar Naseef submitted requests to the Saudi government to issue diplomatic passports to representatives of the MWL). | To the extent a response is required, Plaintiffs mischaracterize the testimony of both Al Turki and Al Obaid, and their testimony does not support Plaintiffs' assertion. Both Al Turki and Al Obaid testified that they had previously received a diplomatic passport as a function of their prior government service and that Saudi Arabia's policy allowed such recipients to keep their diplomatic passports after government service. *See* Pls. Ex. 97 (Turki Tr.) 75:5-17; Pls. Ex. 618 (Obaid Tr.) 122:20-123:7. Thus, contrary to Plaintiffs' assertion, they were not "issued Saudi diplomatic passports . . . in support of MWL activities." In addition, Plaintiffs misleadingly imply that Saudi Arabia issued diplomatic passports to representatives of the Muslim World League upon requests made by Al Turki and Abdullah Omar Aseef. To the contrary, Al Obaid testified that another MWL representative's request for such passports was denied by Saudi Arabia, *see* Pls. Ex. 618 (Obaid Tr.) 174:4-17, and Al Turki testified that he did not recall any response to his letter requesting such passports. *See* Pls. Ex. 97 (Turki Tr.) 78:16-79:3. |
| 2018. | Dr. Abdullah al Obaid, who served as Secretary General of the MWL from 1995 through 2000, testified that King Fahd bin Abdul Aziz al Saud nominated him for the Secretary General position. Ex. 618, Obaid Dep. 26:5-23 (when asked who nominated him to serve as Secretary General of the MWL, Obaid responded "the Saudi government, King Fahd."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Al Obaid testified that the Constituent Council of the Muslim World League appointed him to serve |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | as Secretary General after his nomination by King Fahd to be considered for the position. *See* Pls. Ex. 618 (Obaid Tr.) 26:5-27:4. |
| 2019. | During his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." Ex. 618, Obaid Dep. 27:5- 28:14; Ex. 621, ¶ 5 (Obaid Dep. Ex. 55). In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations operating outside of the Kingdom. Ex. 618, Obaid Dep. 37:6-24. *See also* Ex. 622, at ¶ 8 (Turki Dep. Ex. 45 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL in support of the foreign policies of the Kingdom. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Al Obaid testified that the Supreme Council does *not* have responsibility for Saudi Arabia's Islamic policy abroad. *See* Pls. Ex. 618 (Obaid Tr.) 45:21-46:4. Al Obaid also testified that he did not agree with the assertion in Plaintiffs Exhibit 622 (Fahad Decl.) ¶ 8 Plaintiffs quote that the Council was an arm of the Saudi government. *See* Pls. Ex. 618 (Obaid Tr.) 42:20-44:12.<br><br>Plaintiffs' assertion that Al Obaid "oversaw and directed the activities of the MWL" is conclusory and not supported by any citation to record evidence. And the assertion that he did so in support of foreign policies of Saudi Arabia as an arm of the Saudi government is contradicted by his testimony. |
| 2020. | Dr. Obaid confirmed that the MWL received 80,000,000.00 SR annually from the Saudi government, acknowledging that the annual grant was "the principal source | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of funding for the Muslim World League." Ex. 618, Obaid Dep. 133:9-13. Obaid testified that the 80,000,000.00 SR was "everything to the League," and indicated that any other sources of money received by the MWL were de minimus. *Id.* 133:9-134:12. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' misstate the testimony. Al Obaid testified that the MWL also received millions of Riyals from other sources besides the Saudi government to cover rent for the building owned by the Muslim World League. Pls. Ex. 618 (Obaid Tr.) 134:4-16. Plaintiffs' counsel used the word de minimus, not the witness, who did not agree with the question. There was also an objection to the translation. *Id.* |
| 2021. | Dr. Obaid additionally confirmed that the MWL had received more than 5 billion SR from the Saudi government since it was established. Ex. 618, Obaid Dep. 135:11-137:14; Ex. 623, (Obaid Dep. Ex. 59. *See also* Ex. 624, Expert Report of Dr. Matthew Levitt, March 9, 2020, p. 30 ("David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in Congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs, that by some estimates … Saudi funding for the MWL had exceeded $75 billion."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 624 (Levitt Rep.), was not submitted by Plaintiffs as an expert report against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See* ECF No. 5266 at 1 n.1 (setting expert |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | discovery schedule in charities case; list of Defendants does not include Saudi Arabia). Further, Plaintiffs Exhibit 624 (Levitt Rep.) quotes from inadmissible hearsay and should not be considered for the purpose here, which is to use an expert merely to read hearsay into the record. *See* Objections Chart. |
| | | To the extent a response is required, Dr. Levitt's opinions are speculative, rely upon multiple levels of inadmissible hearsay, and are not based on any recognized methodology. *See* Pls. Ex. 624 (Levitt Rep.). Plaintiffs' quote of Levitt's Report omits additional indicia of hearsay and speculation, as the full statement reads: "David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs that, by some estimates *he read during the George W. Bush administration*, Saudi funding for the MWL had exceeded $75 billion." *Id.* at 30 (emphasis added). |
| 2022. | Consistent with the Kingdom's obligation to spread Wahhabi doctrine and practice across the globe, the MWL has for many years published and distributed numerous booklets, newsletters, and periodicals in multiple languages, including English and Arabic, that have focused on the proselytization of Saudi Arabia's (and al Qaeda's) Wahhabi Islamist ideology. In this respect, the MWL publications have promoted a hardline Wahhabi creed, including overt support for violent jihad and calling on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | Plaintiffs Exhibit 150B (Kohlmann Charities Rep.), was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266 at 1 n.1 (setting |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Allah." Ex. 150B, Kohlmann 2020 Rpt. ¶¶ 36 and 42. | expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>Plaintiffs Exhibit 150B (Kohlmann Charities Rep.) should be excluded and should not be considered for the purpose it is used here, which is solely to quote hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertions regarding Saudi Arabia's alleged "obligation to spread Wahhabi doctrine and practice across the globe" and the assertion that Saudi Arabia and Al Qaeda share an ideology is unsupported, offensive, and incorrect. The only source cited, Kohlmann's Charities Report, does not mention Saudi Arabia at all in the cited section. *See* Pls. Ex. 150B (Kohlmann Charities Rep.) ¶¶ 36, 42.<br><br>The term "Wahhabism" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.<br><br>Saudi Arabia practices Hanbali Salafism. Plaintiffs' purported expert Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. KSA Ex. 165 (Nakhleh Tr.) 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | quietism is "peaceful Da'wah"); *id.* at 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"); *id.* at 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 2023. | For instance, in the September 1981 edition of The Muslim World League Journal, Ex. 625, an article titled *Rabita-Sponsored Auqaf Conference Resolutions*, pp. 59-64, reports on the MWL's third annual conference held jointly with the Ministers of Auqaf and Islamic Affairs in Mecca, Saudi Arbia. The participants in the conference adopted multiple resolutions memorialized in writing by the MWL, including calling on "Muslim countries to promote the spirit of Jihad in the Muslim armies, determine ways and means of coordinating among themselves in the field of joint military industries, so that the Muslim Ummah may be able to defend itself against any aggression." According to the MWL:<br><br>The Conference appeals to all Islamic governments to prepare all sections of the Ummah for Jihad, with special reference to the youth who must be given special training in Jihad in all its aspects, i.e. Jihad through self-sacrifice, sacrifice of property and life. To achieve this aim, scientific | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 625 (Sept. 1981 MWL Journal Vol 9 No. 11) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 625 – a copy of the September 1981 edition of The Muslim World League Journal – is inadmissible hearsay, as is the cited article contained therein. *See* Pls. Ex. 625 (Sept. 1981 MWL Journal Vol 9 No. 11). Nothing in the document indicates that the Muslim World League endorsed the views of the author or agreed with them. The Journal contains editorials, and this was not one of them.<br><br>There is nothing to indicate that Saudi Arabia supported the views expressed either. To the contrary, as described in Response to Pls. Aver. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | methods should be adopted and applied with the help of experts in this field.<br><br>The Conference appeals to all Islamic governments to extend assistance and support to Ulema and teachers so as to enable them to play an effective role in mobilizing the Ummah for Jihad and to lead the Ummah back to the fold of Allah through wisdom and good exhortation.<br><br>Appeals to all Muslim countries to establish training camps for Mujahideen in countries that are capable of organizing these camps. Camps belonging to the Palestine Liberation Organization and other Islamic Jihad organizations may be utilized in this regard and Muslim youth exhorted upon to join these camps which should be provided with adequate number of qualified Dawah workers for religious orientation and guidance.<br><br>***<br><br>Appeals to Muslim countries to encourage preparation of in-depth studies on Jihad and other Islamic military theories as a comparative study with modern military system. Military terminology must be unified so also the methods of military training and coordination in all Muslim | ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | countries. This factor is indispensable for a unified Islamic Jihad.<br><br>***<br><br>Appeals to Islamic countries to extend their support to Muslim "Mujahideen" who are struggling against colonialism, aggression, and tyranny and also to provide them with all that may be required to help in achieving their Islamic goals through every possible and legitimate means. Special emphasis should be given to Mujahideen in Palestine, Afghanistan, Western Somalia, Eritrea, Moro, Patani, etc., etc.<br><br>Appeals to Islamic countries to intensify mass-media programmes on the obligation of Jihad and its methods. Efforts should also be made by the mass- media to highlight the activities of the Mujahideen.<br><br>Ex. 625, pp. 62-63. | |
| 2024. | In the July/August 1991 edition of The Muslim World League Journal, Ex. 626, an article titled *Jihad With Money in the Way of Allah*, see pp. 62-63, the author explains that the participation in jihad with one's wealth and one's life is essential to the teachings of Islam. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | This doctrine of "Jihad" is characterized by its clear objective, which is "for God" and "for upholding the word of God".… Jihad with wealth and lives is emphasized in the Holy Qur'an and Hadith (Tradition) (quoting verses).<br><br>\*\*\*<br><br>It is thus quite clear that Jihad with one's wealth and with one's life is an essential part of the teachings of Islam. Yet Jihad with one's wealth "takes precedence" over Jihad with life in several verses of the Holy Qur'an, calling the Believers to Jihad, because of finance being indispensable for supplying the army with its needs (and on many occasions its requirements may far exceed its demand for manpower). Hence, in view of the unlimited material needs of war, a person may contribute money towards Jihad if he does not personally join it for reasons of physical weakness, illness or distance from the scene of confrontation with the enemy.<br><br>\*\*\*<br><br>Since Jihad with wealth and life is an obligatory duty, the believers will respond to the call to Jihad by offering their wealth and lives and will not take leave from | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 626 (July/Aug. 1991 MWL Journal Vol 19 Nos. 1, 2) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 626 – a copy of the July/August 1991 edition of The Muslim World League Journal – is inadmissible hearsay, as is the cited article contained therein. *See* Pls. Ex. 626 (July/Aug. 1991 MWL Journal Vol 19 Nos. 1, 2). Nothing in the document indicates that the Muslim World League endorsed the views of the author or agreed with them. The Journal contains editorials, and this was not one of them.<br><br>There is nothing to indicate that Saudi Arabia supported the views expressed either. To the contrary, as described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | performing what is incumbent on them by virtue of their faith.<br><br>Ex. 626, pp. 62-63. | |
| 2025. | In the June 29, 1992 edition of the Al Alam Al Islami, an Arabic publication of the MWL, Ex. 627, an article titled *The Lessons to be Learned from the Immigration of the Prophet*, authored by Sheikh Abdullah al Aqeel who served as the MWL Deputy Secretary General and the Secretary General of the MWL Supreme Mosque Council, also calls on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs Exhibit 627 – a copy of an article from the June 29, 1992 edition of Al Alam Al Islami – is inadmissible hearsay.  *See* Objections Chart.<br><br>There is nothing to indicate that Saudi Arabia supported the views expressed in this article.  To the contrary, as described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2026. | Just a month later, in the August 31, 1992 edition of the Al Alam Al Islami, the MWL acknowledged the role it and other Saudi charities played in providing weapons and ammunition in support of the jihad during Soviet-Afghan conflict. See *More than a* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *Million and a Half a Million of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan*, Ex. 628:<br><br>Through the Saudi Red Crescent, the Islamic Relief Organization, and the Muslim World League, the government and people of Saudi Arabia provided in-kind and financial support to the Afghani mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 628 – a copy of an article from the August 31, 1992 edition of Al Alam Al Islami – is inadmissible hearsay. *See* Objections Chart.<br><br>In addition, Plaintiffs' assertion that "MWL acknowledged the role it . . . played" is not supported by the article, which states the opinion of the article's author and not any statement or acknowledgement by the Muslim World League. *See* Pls. Ex. 628 (Article "More than a Million and a Half of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan").<br><br>Moreover, Plaintiffs omit the well-documented fact that the United States government likewise provided billions of dollars of support to the Afghani mujahideen. KSA Ex. 167 (Sageman Rep.) 28-29, 58-59. |
| 2027. | The February 1994 edition of The Muslim World League, Ex. 629, in an article titled *Child Upbringing in Islam*, see pp. 30-34, advocates for children participating in jihad.<br><br>A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin. Taking part in the battle fought in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Allah's cause can be done by sacrificing one's life and wealth.<br><br>Ex. 629, p. 34. *See also* Ex. 629, *Palestine: The Blessed Land*, pp. 40-43 at 43 ("When the enemy occupies the land of Islam, Jihad becomes obligatory on every Muslim."). | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 629 – a copy of the February 1994 edition of The Muslim World League Journal – is inadmissible hearsay, as are the two cited articles contained therein. *See* Objections Chart.<br><br>The document indicates (at 4) that the views expressed do not necessarily represent the Muslim World League or editorial board's view.<br><br>There is nothing to indicate that Saudi Arabia supported the views expressed either. To the contrary, as described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2028. | In the November 2, 1992 edition of the Al Alam Al Islami, Ex. 631, an article titled *Calling For Their Victory in Their Jihad Against the Serbs: Bin Baz Called to the Islamic Governments and Peoples to Support the Muslims in Bosnia and Herzegovina*, Sheikh Abdul Aziz bin Baz, Grand Mufti of the Kingdom of Saudi Arabia and Chairman of the Councils of the Muslim World League in Mecca, calls for all Islamic governments and Muslims around the world "to support Muslims in Bosnia and Herzegovina so that they are enabled to strike their enemy, the Serbs, and their enemy's supporters with men, money, arms, and supplication." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 631 – a copy of an article from the November 2, 1992 edition of Al Alam Al Islami – is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | There are so many verses and hadiths about the obligation of exercising Jihad against the enemies and about supporting the oppressed. It is the duty of all Islamic governments and peoples to support the oppressed with men, arms, money, and supplication as much as possible. | Plaintiffs' first quote omits the introduction to the sentence, which calls upon "Islamic governments and peoples in all the countries that love peace and love to support the afflicted." *Id.*<br><br>As described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2029. | Sheikh Abdul Aziz bin Baz issued a similar call in 1994 for money and arms for Bosnian Muslims. See the January 1994 edition of The Muslim World League Journal, Ex. 632, *Bosnia Issue Top of the Agenda, GCC Summit, MWL Meeting and Bosnia Solidarity Day*, pp. 17- 20 at 19 ("A similar appeal was made by Sheikh Abdul Aziz bin Baz, Chairman of the 60 member MWL Constituent Assembly. It is the duty of Muslims to support the Bosnian Muslims with arms, money, and whatever they can provide, he sa*id.*"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 632 – a copy of the January 1994 edition of The Muslim World League Journal – is inadmissible hearsay, as is the cited article contained therein.  *See* Objections Chart.<br><br>To the extent a response is required, the article condemned extremism, noting that the Secretary General of the Muslim World League had addressed the session by stating that "the tragic situation in the Muslim world has driven some of its sons knowingly or unknowingly to support extremism and distance themselves from applying reason and wisdom while propagating Islam."  Pls. Ex. 632 at 19. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | This is consistent with other sources described in Response to Pls. Aver. ¶ 2022, showing that Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2030. | In the September 1995 edition of The Muslim World League Journal, Ex. 633, *Latest Developments in Bosnia, Croatia's Stunning Success and its Implication*, pp. 26-31, a MWL spokesman echoed Sheikh Abdul Aziz bin Baz's call to help the Muslims of Bosnia- Herzegovina with money and arms.<br><br>A spokesman of the MWL called on the Muslim states to rush to the support of the Bosnia people who were facing single-handed the barbaric Serb aggression abandoned by the world and its organizations to receive the barbaric bloody blows alone from the Serb aggressors. It supported the call of Shaikh Abdul Aziz bin Baz, Chief Mufti of Saudi Arabia, urging the Muslims to back the Bosnian people with whatever means they can by way of money, arms and prayers.<br><br>Ex. 633, p. 27. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 633 – a copy of the September 1995 edition of The Muslim World League Journal – is inadmissible hearsay, as is the cited article contained therein. *See* Objections Chart.<br><br>As described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2031. | In the August-September 1993 edition of Al Alam Al Islami, Ex. 634, *Imam of Holy Haram Calls for Assistance to Kashmiris*, the MWL called on the Islamic world to provide all out support to the Muslims in | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Kashmir. "The Muslims should supply the Kashmiris with material and moral support, including money, military hardware and men in order to protect themselves against the heretic Indian occupation and regain all their legitimate rights." *Id.* | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 634 – a copy of an article from the August-September 1993 edition of Al Alam Al Islami – is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the article contains the quoted language except that Plaintiffs misleadingly omit the ending of the quote – "he said" – without an ellipsis. In addition, Plaintiffs' assertion that "MWL called on the Islamic world" is not supported by the article, which quotes the Imam of the Holy Haram in Makkah and does not constitute any statement or "call" by the Muslim World League. *See* Pls. Ex. 634.<br><br>As described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2032. | Finally, the MWL maintains a subsidiary organization known as the "Fiqh Council," which was established in 1977 by the MWL Constituent Council. Overseen by the Secretary General of the MWL, the Fiqh Council is comprised of Sunni clerics who are responsible for parsing religious rulings and issuing resolutions and recommendations. Like the MWL Journal | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and the Al Alam Al Islami publications, the MWL Fiqh Council has also endorsed both the concept of armed jihad generally, as well as specifically the obligation to support armed fighters with financial support through charitable channels. Ex. 150B, Kohlmann 2020 Rpt. ¶ 49. | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart. |
| 2033. | The Fiqh Council's *Fourth Resolution on Collection and Distribution of Zakah and Oshr in Pakistan*, Ex. 635, admonishes readers to carry out "armed jihad" in the face of an "ideological and intellectual onslaught by athiests, Jews, Christians, and other enemies… It is the duty of Muslims as well to confront them with the same arms and equipments that are used against Islam… Since the purpose of armed Jihad is to raise the word of Almighty Allah high as this purpose is achieved through fighting in the cause of Allah, it is also achieved through the work of Da'wah to the religion of Almighty Allah, and preparation of preachers and their assistance in order to carry out their mission, so both words would be considered as Jihad." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 635 – the Fiqh Council's Fourth Resolution – is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion that the Resolution "admonishes readers to carry out 'armed jihad'" is not supported, as the Resolution addressed a question regarding the meaning of a translated word rather than admonishing or calling on any particular course of action. *See* Pls. Ex. 635. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | As described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2034. | Other MWL Fiqh Council resolutions emphasize the importance of aiding refugees who "so that Mujahideen are assured that their families behind them are not lost and they can continue their Jihad with strength and steadfastness. No doubt, any disturbance or weakness on this front will have a damaging impact of Jihad." *See* the Fiqh Council's *Seventh Resolution on Payment of Zakah's Portion of Mujahideen for Their Education, Health and Media Projects*, Ex. 636. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 636 – the Fiqh Council's Seventh Resolution – is inadmissible hearsay. *See* Objections Chart. The Resolution contains the quoted language. *See* Pls. Ex. 636. In addition, Plaintiffs' assertion that the Resolution "emphasize [sic] the importance of aiding refugees" is not supported, as the Resolution addressed a question regarding the permissibility of spending of a fund collected for Afghan Mujahideen to execute their educational, health and media projects. *See id.*<br><br>As described in Response to Pls. Aver. ¶ 2022, Saudi Arabia practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2035. | The United States-based operations of the MWL have been a target of FBI investigations for the MWL's links to al Qaeda and Hamas, advocacy of jihad, and connections to Saudi intelligence and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | members of the Sunni-Wahhabi extremist network established in the United States by the Saudi government to provide material support to the September 11 hijackers upon their arrival in the U.S. | reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs' assertion contains attorney argument unsupported by any citation to record evidence.  As explained elsewhere in Saudi Arabia's responses to this averment, there was no extremist network established in the United States by the Saudi government to provide material support to the September 11 hijackers.  Every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.<br><br>The 9/11 Commission Report specifically focused on alleged support by Al Bayoumi and Al Thumairy.  It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar.  Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives."  KSA Ex. 78 (9/11 Rep.) 217.  On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.  Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists."  *Id.*, at 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded that "[t]here is no evidence that either the Saudi Government or members of |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO ( EO 3416-UPDATED).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to change the 9/11 Commission original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-103.<br><br>Operation Encore concluded that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).<br><br>Further, as described in Response to Pls. Aver. ¶ 2022, the term Wahhabi is offensive and inapplicable to Saudi Arabia, which practices Hanbali Salafism and is "quietist" – that is, peaceful and opposed to attacks on the West. |
| 2036. | A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists the New York office of the MWL as one of its "additional offices under the title 'Saudi Arabian Offices:' Muslim World League (MWL), 134 26th Street, New York NY." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP, EO 3478-3608, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 2PP (EO 3478-3608). Further, Plaintiffs' assertion that the telephone directory was obtained "from the Saudi Embassy" is not supported by the memorandum. *See id.* at 3532-3533. To the contrary, the memorandum does not state where the directory was obtained from. *See id.*<br><br>The memorandum also states that "[t]he report should not be considered an intelligence assessment and is not intended as such." *Id.* at 3479. Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2037. | The registered president of the MWL in the United States was Abdullah al Noshan. Noshan is connected through monetary transactions and telephone calls to an FBI subject in Kentucky whose name, address, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and telephone number were found in an al Qaeda safehouse in Karachi. Ex. 2, 3414-3442 at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the 2004 FBI/CIA Joint Assessment contains hearsay allegations regarding al Noshan. That portion of the document is inadmissible. *See* Objections Chart. The asserted connections between Noshan and Al Qaeda – that Noshan was connected with a person whose was found in a purported Al Qaeda safe house – does not show anything.<br><br>In the admissible portion of the document, the joint assessment states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2038. | Noshan was also associated with the Saudi government funded Institute of Islamic and Arabic Sciences of America ("IIASA") in the United States. Ex. 2, EO 3478-3608 at 3536, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. IIASA, which received financial support from Ambassador Bandar bin Sultan bin Abdul Aziz al Saud and the Saudi Embassy in Washington, D.C., operated as a satellite campus of the Al | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Imam Muhammad Ibn Saud University in Riyadh, Saudi Arabia ("Imam University"). *Id.* at 3534 (stating that "IIASA was one of the many pieces of Saudi proselytizing activity in the U.S."). | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 2PP, EO 3478-3608, is inadmissible hearsay.  *See* Objections Chart.

To the extent a response is required, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation.  *See* Pls. Ex. 2PP (EO 3478-3608).  Plaintiffs' assertions are not supported by the memorandum.  The memorandum does not reference any funding or financial support provided to the IIASA by Ambassador Bandar bin Sultan bin Abdul Aziz al Saud or the Saudi Embassy in Washington, D.C., as Plaintiffs allege.  *See id.*  Nor does the memorandum state that the IIASA operated as "a satellite campus" of the Al Imam Muhammad Ibn Saud University in Riyadh, only that the two education institutions were "affiliated."  *Id.* at 3535.

The memorandum also states that "[t]he report should not be considered an intelligence assessment and is not intended as such."  *Id.* at 3479.  Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance.  As such, writer has located relevant serials and have copied that information directly within this communication."  *Id.* at 3481.

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ."  Pls. Ex. 2A (EO 9-11). |
| 2039. | According to the FBI, IIASA "maintains links to suspected terrorist organizations | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and their supporters," Ex. 2, EO 3414-3442 at 3437, and individuals that worked at IIASA were "recruiting individuals into extremist views." Ex. 2, EO 3478-3608 at 3535. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP, EO 3478-3608, is inadmissible hearsay.  *See* Objections Chart.<br><br>Plaintiffs cite the 2004 FBI/CIA Joint Assessment, which concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>The other document Plaintiffs cite, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation. *See Pls.* Ex. 2PP (EO 3478-3608).  The memorandum states that "[t]he report should not be considered an intelligence assessment and is not intended as such."  *Id.* at 3479.  Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation.  This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication."  *Id.* at 3481.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2040. | During a search of MWL's office space in New York in 2005, the FBI discovered a document titled *First Annual Ijtima of Mujahideen and Jhaad Conference*, dated 1991. This document was from Tehreek-E-Jihaad, Sherpur House, Karachi, Pakistan, and included sign-up sheets. The conference was: "To publicize Jihad on an international and inter-Islamic level." Ex. 2, EO 3478-3608 at 3542, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. *See id.* at 3565-3566 (indicating that the MWL office in Falls Church, VA is also home to several Hamas front organizations). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 2PP, EO 3478-3608, is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 2PP (EO 3478-3608). The memorandum states that "[t]he report should not be considered an intelligence assessment and is not intended as such." *Id.* at 3479. Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2041. | According to the FBI, Noshan was an associate of Musaed Al Jarrah from the Ministry of Islamic Affairs division in the Saudi Embassy in Washington, D.C. Ex. 2, EO 3478- 3608 at 3542. Jarrah was a known Saudi intelligence officer in the Islamic Affairs division, *id.* at 3488, and "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks" along with Fahad al Thumairy and Omar al Bayoumi. Ex. 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP, EO 3478-3608, and Plaintiffs Exhibit 607, an October 5, 2012 FBI memorandum, are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion mischaracterizes the FBI's findings, which contradict their assertions.<br><br>The July 23, 2021 FBI memorandum is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 2PP (EO 3478-3608). The report is not an FBI conclusions and states that "[t]he report should not be considered an intelligence assessment and is not intended as such." *Id.* at 3479 . Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 607 – an October 5, 2012 FBI memorandum which purports to provide an "update" of Operation Encore's years of prior research and memoranda, incorporating more than 10 years' worth of documents and memoranda previously drafted by the FBI – is replete with multiple levels of hearsay and speculation, referencing prior FBI documents that themselves summarize third-person accounts and speculation. *See* Pls. Ex. 607. Plaintiffs' quotation of the memorandum is misleading, as the memorandum purports to document an investigation into individuals who *may have* provided substantial assistance to al-Hazmi and al-Midhar. *See id.* at 3. Al Jarrah, Al Bayoumi, and Al Thumairy were named as subjects of the investigation, but the memorandum explicitly notes that the FBI had not determined that any assistance allegedly provided by them was done so with "knowledge that al-Hazmi and al-Midhar were here to commit an act of terrorism." *Id.* at 4. <br><br> The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2042. | Noshan was observed by FBI surveillance acting in a manner consistent with a foreign intelligence officer. Ex. 2, EO 3414-3442 at 3437. *See also id.* at 3487 ("One of the roles of the Islamic Affairs office was to provide intelligence on local Islamic populations and to provide cover for the movement of [REDACTED]. Saudi Arabian 'non-governmental organizations' (NGO), i.e. 'charities', supplemented this | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | activity with large funding streams as well as cover for personnel."). | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 2PP, EO 3478-3608 (the second source Plaintiffs cite and quote), is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the 2004 FBI/CIA Joint Assessment on its face does not conclude that Noshan was an intelligence officer. Regardless, the document concludes that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).

The July 23, 2021 FBI memorandum quoted by Plaintiffs is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Pls. Ex. 2PP (EO 3478-3608). The memorandum also states that "[t]he report should not be considered an intelligence assessment and is not intended as such." *Id.* at 3479. Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.

The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2043. | CIA reporting released pursuant to Executive Order 14040 provides additional details concerning the MWL's support for | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Osama bin Laden and al Qaeda while acting as an arm of the Saudi government. | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, there is no support for the allegation that MWL was acting as an arm of the Saudi government at all, *see supra* Response to Pls. Aver. ¶ 2019, much less that it was doing so in support of Osama bin Laden and al Qaeda.<br><br>Saudi Arabia exiled bin Laden in 1994 and is a long-time enemy of al Qaeda, which it has attempted to combat in joint efforts with the United States. *See, e.g.*, Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980. |
| 2044. | For instance, in the CIA report, *Sketch of a South Asia-Based Terrorist Training and Logistic Network* [REDACTED], Ex. 637, CIA_000058-62 at 60, the CIA states that "the MAK [Maktab al-Khidmat] is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin." MAK, also known as the "Bureau of Services," was established by Osama bin Laden and Abdullah Azzam to provide | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | logistical support to mujahideen forces in Afghanistan and channel recruits into the country during the Soviet-Afghan conflict. *See* 9/11 Commission Final Report at pp. 56, 434. | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 637 – an undated CIA report – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart.<br><br>Plaintiffs rely on CIA documents but fail to note that the 2004 FBI/CIA Joint Assessment concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED).<br><br>Plaintiffs cite the 9/11 Commission Report, which concludes that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." KSA Ex. 163 (9/11 Rep.) 171. |
| 2045. | A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, Ex. 609, CIA_000143-158, indicates that al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa served in official roles with the MWL.<br><br>Some reporting indicated the MWL is the parent organization of the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY), is affiliated with more than a dozen other NGOs worldwide, and has its own offices in more than 30 countries. Several of Bin Ladin's associates, including | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 609 – a November 14, 2002 CIA memorandum – is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Wa'il Julaydan and Muhammad Jamal Khalifah, were MWL representatives, according to [REDACTED] press reporting. [REDACTED] funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL.<br><br>Ex. 609, CIA_000150. | To the extent a response is required, Exhibit 609 notes the many steps taken by Saudi Arabia to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee. [REDACTED] . . . Since 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." *Id.* at 154. *See also* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added).<br><br>This is consistent with other documents cited above evidencing Saudi Arabia's extensive efforts to combat terrorist financing alongside the United States. *See, e.g.*, (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980.<br><br>Plaintiffs rely on CIA documents but fail to note that the 2004 FBI/CIA Joint Assessment concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2046. | In another CIA report, *Islamic Terrorists: Using Nongovernmental Organizations* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *Extensively*, April 9, 1999, Ex. 613, CIA_000210-236, the CIA describes the resources that da'wah organizations like the MWL can provide to a terrorist organization.<br><br>The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons.<br><br>Ex. 613, CIA_000210. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 613, CIA 210-236, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 613 notes that the NGOs "are exploited by individual employees with ties to extremists" and that "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters." *Id.* at 213. To that end, "[s]enior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." *Id.*<br><br>Documents cited above evidence Saudi Arabia's extensive efforts to combat terrorist financing alongside the United States. *See, e.g.*, Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980.<br><br>Further, Plaintiffs rely on CIA documents but fail to note that the 2004 FBI/CIA Joint Assessment concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2047. | In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, Ex. 638, CIA_000500-563, the CIA describes how al Qaeda member Wa'el Hamza Jelaidan used his high-ranking positions in the Saudi da'wah organizations like the MWL and IIRO to divert money to al Qaeda.<br><br>Wa'el Hama A. Julaydan. Longtime Bin Ladin associate and IFTSC senior official Wa'el Hamza Julaydan (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 638, CIA 500-563, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs reference "Julaydan" but fail to acknowledge that Saudi Arabia worked with the United States, as allies in the war on terrorist financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added).<br><br>This and other documents cited above evidence Saudi Arabia's extensive efforts to combat terrorist financing alongside the United States. *See, e.g.*, Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 638, CIA_000544. | Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980.<br><br>Further, Plaintiffs rely on CIA documents but fail to note that the 2004 FBI/CIA Joint Assessment concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2048. | Lastly, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, Ex. 79, CIA_000807-848 at 823, the CIA assessed that the MWL was "used as a cover organization for several of Usama's associates: [REDACTED]." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 79, CIA 807-848, is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs omit information from Plaintiffs Exhibit 79, which states that "the exploits of Islamic radicals like Usama Bin Ladin convinced the government of the need to clamp down on private individuals and NGOs whose financial support was contrary to Saudi national interests but perceived by outsiders as reflecting |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | the intent of the Saudi Government," and thus "Riyadh has closed foreign offices of some NGOs and fired employees . . . ." Pls. Ex. 79 (816). |
| | | This and other documents cited above evidence Saudi Arabia's extensive efforts to combat terrorist financing alongside the United States. *See, e.g.*, Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980. |
| | | Further, Plaintiffs Exhibit 79 is a CIA analysis from its Office of Transnational Issues, dated January 1999. The findings were full of errors, like al Qaeda was represented in some 60 countries. Pls. Ex. 79 (CIA_810). The worldwide hunt for al Qaeda members only found them in very few countries: Afghanistan, Pakistan, Malaysia, Iran (after 9/11), Saudi Arabia, and Yemen. The findings of this analysis are tentative, as "possible connections." *Id.* (CIA 811). The document includes a heavily redacted excerpt of this CIA analysis, with the title of "Saudi-backed NGOs [w]ith [p]ossible [t]ies to Usama [b]in Laden." *Id.* (CIA 822). |
| | | While Plaintiffs cite hearsay CIA documents from 1999 with such errors, Plaintiffs rely on CIA documents but fail to note that the 2004 FBI/CIA Joint Assessment concluded "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416-UPDATED). |
| 2049. | Dr. Matthew Levitt, a former counterterrorism intelligence analyst with the FBI and Deputy Assistant Secretary for Intelligence and Analysis at the Department of the Treasury, has offered additional details concerning the MWL's material and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | financial support for Osama bin Laden, Islamic militants, and terror organizations around the globe.<br><br>• According to an unclassified CIA document released in 1996, the MWL has been tied to supporting a variety of terrorist groups. This report stated that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants.<br><br>• The Somali terrorist group Al Itihaad Al Islaami, designated under Executive Order 13224, derived part of its revenue from the MWL and its subsidiary, the IIRO.<br><br>• The MWL has sent cash to Islamic guerillas in the Philippines.<br><br>• Osama bin Laden himself covertly funded several terrorist organizations through the MWL.<br><br>• The MWL also provided non-financial material support such as arms and documents to "militants in | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 624, the Levitt Report, was not submitted by Plaintiffs as an expert report against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See* Objections Chart. Further, the cited portions of Plaintiffs Exhibit 624, the Levitt Report, should be excluded because Levitt is merely reporting hearsay documents and performing no analysis requiring any expertise. *See* Objections Chart. To the extent a response is required, Dr. Levitt's opinions are speculative.<br><br>Plaintiffs' assertion relies upon incomplete quotations of Dr. Levitt's report, repeatedly omitting words from the report that provide additional indicia of hearsay and speculation. For example, the second through fourth bullets should read, in full:<br><br>- "*Likewise, according to an International Crisis Group report*, the Somali terrorist group al-Itihaad al-Islaami, designated under Executive Order 13224, derived part of its revenue from the MWL and its subsidiary, the IIRO, *although it is unknown whether the MWL and IIRO were aware of the usage of these funds.*"<br><br>- "*According to investigative journalist David E. Kaplan*, the MWL has sent cash to Islamic guerillas in the Philippines." |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Afghanistan and Tajikistan," according to a CIA report.<br><br>Ex. 624, Expert Report of Dr. Matthew Levitt, March 9, 2020, pp. 31-32. | - "*According to Jimmy Gurule, a former U.S. Treasury Department official and law professor at Notre Dame*, Osama bin Laden himself covertly funded several terrorist organizations through the MWL." "<br><br>Pls. Ex. 624 at 30-31 (emphasis added).<br><br>Regardless, documents cited above evidence Saudi Arabia's extensive efforts to combat terrorist financing and al Qaeda, alongside the United States. *See, e.g.*, Pls. Ex. 677 (*The Kingdom of Saudi Arabia and Counterterrorism*), Pls. Ex. 671 (June 2, 2004 Treasury Notice), *supra* Response to Pls. Aver. ¶¶ 1979-1980. |
| 2050. | The MWL was directly responsible for and involved in the establishment of the Rabita Trust for the Repatriation of the Pakistanis Stranded in Bangladesh ("Rabita Trust"), which was designated as an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity by the U.S. government immediately following the September 11 attacks. Ex. 150B, Kohlmann 2020 Rpt. ¶¶50, 51, 57. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Regardless, the Kohlmann Report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia.<br><br>In ¶ 51, Kohlmann reference "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2051. | Documents produced in this litigation by defendants MWL, IIRO, and Wa'el Hamza Jelaidan make clear that the MWL appointed senior MWL and IIRO officials to serve as Rabita Trust's corporate officers and Board of Trustees, held significant oversight and control over Rabita Trust's operations and activities, and exerted executive authority over Rabita Trust's leaders, including Jelaidan, an Executive Order 13224 designee. *Id.* at ¶ 51. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia. *See* Objections Chart.<br><br>Regardless, the Kohlmann Report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia.<br><br>In ¶ 51, Kohlmann reference "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2052. | The founding "deed" of the Rabita Trust indicates that the initial Board of Trustees for the organization included: Saudi Prince Talal bin Abdul Aziz al Saud (Co-Chairman), MWL Secretary General Dr. Abdullah Omar Naseef (Vice-Chairman), and MWL Assistant Secretary General Syed Amin Aqeel Attas (Director General). An amendment in March 2000 included MWL Secretary General Dr. Abdullah bin Saleh al Obaid and International Islamic Relief Organization (IIRO) Secretary | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | General Dr. Adnan Khalil Basha to leadership roles. *Id.* at ¶ 52. | Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart. |
| | | Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia. |
| | | In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2053. | An October 14, 2000 letter issued on Rabita Trust letterhead lists the following individuals as board members of the organization: Prince Talal bin Abdul Aziz al Saud (Co- Chairman), MWL Secretary General Dr. Abdullah bin Saleh al Obaid (Vice Chairman), Wa'el Jelaidan (Director General), IIRO Secretary General Dr. Adnan Khalil Basha, IIRO Eastern Province office Supervisor General Prince Turki bin Fahd bin Jalawy al Saud, and MWL Riyadh | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Office chief Mohammed bin Abdallah al Dubaiban. *Id.* at ¶ 53. | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia.  *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia).  *See* Objections Chart.<br><br>Further, Plaintiffs reference a letter but then cite their expert's report.  The cited portion of Plaintiffs Exhibit 150B, Kohlmann Report ¶ 53, should be excluded because Kohlmann is being utilized merely to report hearsay, without performing analysis requiring any expertise.  *See* Objections Chart.<br><br>Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*."  Pls. Ex. 150B ¶ 50 (emphasis added).  This is irrelevant to allegations against Saudi Arabia.<br><br>In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury.  He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan.  *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2054. | Jelaidan's resume, produced in this litigation, acknowledges in 1992 becoming | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | a "Project Director of the Rabita Trust... As a Project Director, I supervised the construction of 1000 residential units in the province of Punjab." According to Jelaidan's account, "in 1998, I was appointed as the Secretary General of the Rabita Trust by the Muslim World League." In February 2000, Jelaidan was appointed to the Rabita Trust Board of Trustees. *Id.* at ¶ 54. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart. |
| | | Further, Plaintiffs reference a resume but then cite their expert's report. The cited portion of Plaintiffs Exhibit 150B, Kohlmann Report ¶ 54, should be excluded because Kohlmann is being utilized merely to report hearsay, without performing analysis requiring any expertise. *See* Objections Chart. |
| | | Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia. |
| | | In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2055. | Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan. For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad*." A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi Arabia and Islamabad, Pakistan: *Makkah Office: c/o Muslim World League, P.O. Box 537, Makkah; and Islamabad Office: c/o Muslim World League, H-8/1, Islamabad*. Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General, Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia.*" *Id.* at ¶ 55. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 150B, the Kphlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.

Further, Plaintiffs reference a series of letters but then cite their expert's report. The cited portion of Plaintiffs Exhibit 150B, Kohlmann Report ¶ 55, should be excluded because Kohlmann is being utilized merely to report hearsay, without performing analysis requiring any expertise. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia. |
| | | In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2056. | Rabita Trust and its employees also operated out of the IIRO's branch office in Islamabad, Pakistan. A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad.*" An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1 - Pitrus Bokari Road.*" *Id.* at ¶ 56. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>Further, Plaintiffs reference a series of letters but then cite their expert's report. The cited portion of Plaintiffs Exhibit 150B, Kohlmann Report ¶ 56, should be excluded because Kohlmann is being utilized merely to report hearsay, without performing analysis requiring any expertise. *See* Objections Chart.<br><br>Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia.<br><br>In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2057. | On October 12, 2001, the U.S. government designated Rabita Trust as a SDGT "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida." *Id.* at ¶ 57. *See also* ¶¶ 58-62 (explaining Rabita Trust's | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | coordinated efforts to limit its exposure following the September 11 attacks). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.

Further, Plaintiffs reference a Treasury Department designation but then cite their expert's report. The cited portion of Plaintiffs Exhibit 150B, Kohlmann Report ¶ 55, should be excluded because Kohlmann is being utilized merely to report hearsay, without performing analysis requiring any expertise. *See* Objections Chart.

Regardless, the Kohlmann report attributes the Rabita trust to "MWL – in conjunction with the government of *Pakistan*." Pls. Ex. 150B ¶ 50 (emphasis added). This is irrelevant to allegations against Saudi Arabia.

In ¶ 51, Kohlmann references "Jalaidan" and his connection with the Rabita trust, noting in ¶ 57 that the trust was designated by Treasury. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2058. | The MWL and its senior leadership also played key roles in facilitating the activities of another Executive Order 13224 SDGT known as the Al Haramain Al Masjed Al Aqsa Foundation, which the MWL acknowledged in its 2002 annual report was founded in 1990 and "started its activities under the banner of the Muslim World League in 1419 AH" [corresponding to 1998]. *Id.* at ¶ 64. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.

Regardless, Kohlmann references Al Haramain Al Masjed Al Aqsa and quotes (at ¶ 67) a Treasury Department press release designating the foundation based on ties to Julaidan. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2059. | Officials of Al Haramain Al Masjed Al Aqsa Foundation simultaneously served as members of IIRO's Board of Directors. Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001 indicate that Al Haramain Al Masjed Al Aqsa Foundation officials Mohammed bin Abdullah al Debyban and Mohammed bin Abdullah Taibah were IIRO board members along with IIRO Secretary General Adnan Basha. Debyban and Taibah were also serving as IIRO board members in 1999, as indicated in the Minutes of the 2nd Meeting of the IIRO Board of Directors held on May 8, 1999. *Id.* at ¶ 65. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>Regardless, Kohlmann references Al Haramain Al Masjed Al Aqsa and quotes (at ¶ 67) a Treasury Department press release designating the foundation based on ties to Julaidan. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2060. | An undated organizational chart of the MWL lists six key sub-entities within the MWL umbrella that report directly to the MWL Secretary General, including the Al Haramain Al Masjed Al Aqsa Foundation. *Id.* at ¶ 66. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.

Regardless, Kohlmann references Al Haramain Al Masjed Al Aqsa and quotes (at ¶ 67) a Treasury Department press release designating the foundation based on ties to Julaidan. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Julaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| 2061. | In May 2004, the U.S. government designated Al Haramain Al Masjed Al Aqsa Foundation pursuant to Executive Order 13224 for "funneling dollars to Al-Qaida." According to the Treasury Department:<br><br>The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation (AHAMAA) has significant financial ties to the Bosnia-based NGO Al Furqan, and al Qaida financier Wael Hamza Julaidan… As a member of the Board of Directors for AHAMAA, Julaidan opened three bank accounts on behalf of the NGO between 1997 and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts.<br><br>*Id.* at ¶ 67. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266, at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>Regardless, Kohlmann references Al Haramain Al Masjed Al Aqsa and quotes (at ¶ 67) a Treasury Department press release designating the foundation based on ties to Julaidan. He fails to mention that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added). |
| XXVIII. C. | **International Islamic Relief Organization** | |
| 2062. | Defendant International Islamic Relief Organization ("IIRO"), a subsidiary body of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the Muslim World League ("MWL") and an agent and alter ego of the Saudi government, was similarly used as an instrument by the Saudi government to spread Wahhabi-Salafi Islam. Ex. 618, Obaid Dep. 75:9-76:12 (explaining that the IIRO works under the umbrella of the MWL); Ex. 621, ¶ 12 (Obaid Dep. Ex. 55). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | To the extent a response is required, Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. Dr. Abdullah al Obaid testified that IIRO was "working under the same umbrella of the Muslim World League." Pls. Ex. 618 (Obaid Tr.) 76:1-12. That does not, however, support Plaintiffs' assertions that the International Islamic Relief Organization was "an agent and alter ago of the Saudi government" or that it was "used as an instrument by the Saudi government to spread Wahhabi-Salafi Islam." |
| | | As discussed in the preceding section, Plaintiffs did not establish that MWL was an alter ego of the Saudi government, *see supra* Response to Pls. Aver. ¶ 2019, or that it was used to spread "Wahhabism." To the contrary, Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan – the member of MWL upon whom Plaintiffs focused – with the U.S. Treasury and the United Nations. *See* KSA Ex. 286 (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | *our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added).<br><br>The term "Wahhabism" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12.<br><br>Saudi Arabia practices Hanbali Salafism. Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. *See id.* at 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.<br><br>Plaintiffs' purported expert Meleagrou-Hitchens agrees. *See* Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| 2063. | The MWL sought approval from the Saudi government to establish the IIRO in 1978. Ex. 618, at pp. 73:6-74:6. *See also* Ex. 639, p. 5 (Basha Exhibit 134) (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | between October 7-10, 1997. Ex. 639, p. 5 (Basha Exhibit 134). | denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 639 (Basha Ex. 134) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Dr. Abdullah al Obaid testified that the Muslim World League was required to seek approval from the Saudi government "before establishing a committee or an organization" and did so with respect to the IIRO. *See* Pls. Ex. 618 (Obaid Tr.) 73:6-74:6.<br><br>Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. None of the cited exhibits assert or imply that IIRO was an alter ego of Saudi Arabia, and the fact that it has its own constitution demonstrates that it is a discrete organization. The document establishes that the Board of Directors of the organization – and not the Saudi Arabian government – is the policy-making body of the organization that makes binding decisions. *See* Pls. Ex. 639 (Basha Ex. 134) at 6. |
| 2064. | The MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors, and also serves as the Chairman of the IIRO General Assembly. Ex. 618, Obaid Dep. 70:12-71:2; *see also* Exs. 640 & 653, Transcript, February 20-21, 2019 Deposition of Adnan Basha (Basha Dep.), 54:1-20, 99:10-21. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | nominating individuals to serve as the IIRO Secretary General. Ex. 640, Basha Dep. 100:4-10. | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion that the Secretary General of the MWL is equivalent to the position of a Saudi government minister is unsupported and incorrect.  Plaintiffs cite no evidence that the Secretary General of the MWL is a position in the Saudi government of any kind – it is not – let alone a position equivalent to minister.  Plaintiffs misleadingly put "minister" in quotations, but that word does not appear in the cited document.  Indeed, nothing in the text remotely related to Plaintiffs' assertion, which is attorney argument, not a fact supported by the evidence.<br><br>Dr. Abdullah al Obaid testified that he served as the IIRO's Chairman of the Board of Directors "because of my work with the Muslim World League."  Pls. Ex. 618 (Obaid Tr.) 70:12-71:2.  Al Obaid did not testify regarding any service as the Chairman of the IIRO General Assembly.<br><br>Adnan Basha testified that the "Secretary General of the League is the chairman of the board of directors of the IIRO, and the chairman of the general assembly" and that "[b]ecause of his position as the Secretary General in the League, he is the chairman of the IIRO."  Pls. Ex. 640 (Basha Tr.) 54:5-20.  He also testified that his nomination "has nothing to do with Royal decrees," and he was not aware of a government official even being consulted about – much less controlling – the nomination.  *Id.* at 100:11-101:2.<br><br>Basha also testified that he was nominated to the position of Secretary General of the IIRO by "[t]he Secretary General of the League, the head of the executive committee in the board of directors of the IIRO."  Ex. 640 at 100:4-10.  Basha did not testify, as Plaintiffs assert, that the Secretary General of the MWL is "responsible" for such nominationsr.  *See id.* |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2065. | The IIRO Board of Directors is the highest policy-making body of the IIRO and its decisions are binding upon the executive body. Ex. 639, p. 6 (Basha Exhibit). MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. Ex. 640, Basha Dep. 128:18- 130:14. *See also* Ex. 642, (Basha Dep. Ex. 137) (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 639 (Basha Ex. 134) and Plaintiffs Exhibit 642 (Basha Ex. 137), are inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is improper attorney argument.  The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied.<br><br>It is undisputed that the IIRO "Board of Directors is the highest policy-making body of the organization and its decisions are binding upon the executive body."  Pls. Ex. 639 at 6.  This confirms that the IIRO is an independent organization, not an alter ego of the Saudi Arabian government, as Plaintiffs claim.<br><br>Saudi Arabia does not dispute that Adnan Basha testified that MWL officials, including the Secretary General, held a number of seats on the IIROSA Board of Directors on September 20, 2000 when a meeting of the IIROSA Board of Directors was held.  *See* Pls. Ex. 640 (Basha Tr.) at 128:18-130:23.  Basha did not testify that was always the case, nor did his |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | testimony support Plaintiffs' assertion that such MWL officials directly influence the policies and activities of the IIRO. *See id.*<br><br>Plaintiffs Exhibit 642 (Basha Ex. 137) – the September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors – do not support Plaintiffs' assertion that MWL officials "directly influence the policies and activities of the IIRO." *See* Pls. Ex. 642. |
| 2066. | The Council of Ministers, advisors to the Saudi king, also hold seats on the IIRO Board of Directors and exercise control and influence over the IIRO's budget, operations, and activities. Ex. 642, (Basha Dep. Ex. 137) (Sheikh Mostafa bin Mohamed Idris, identified as "Royal Court Advisor, Acting head of the Special Committee of the Council of Ministers," served as an IIRO board member from at least 1998-2001.). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 642 (Basha Ex. 137) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is not supported by the cited Minutes, which establish only that a single member of the Council of Ministers – Sheikh Mostafa bin Mohamed Idris, identified as "Royal Court Advisor, Acting head of the Special Committee of the Council of Ministers" – was a member of the IIROSA Board of Directors on the date that the Sixth Meeting was held. Pls. Ex. 642. The Minutes do not state the time period that Idris served as a Board member, that any other individuals on the Council of Ministers served as a Board member, |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | or that the Council of Ministers exercised any "control and influence over the IIRO's budget, operations, and activities." *See id.* |
| | | The document also reflects that Idris – the only member of the Council of Minister Plaintiffs identify on the IIRO Board – was not in attendance. Thus, the document shows that the IIRO Board discussed "approval of the estimated budget of the organization" for the year without any participation from the Council of Ministers. *Id.* at 4. This contradicts Plaintiffs' assertion that the Council of Ministers exercised control and influence over the budget. |
| 2067. | The IIRO's domestic offices in Saudi Arabia are headed by members of the Saudi Royal Family, who are themselves officials of the Saudi government. Ex. 643, pp. 12-13 (Basha Dep. Ex. 133); Ex. 639, pp. 9-16 (Basha Dep. Ex. 134. As heads of those offices, Saudi Royal Family members directed and supervised the operations and activities of the IIRO, and provided annual generous donations to the offices. *Id.* at p. 11 (Prince Saud bin Abdul Mohsin contributed 11,000,000.00 SR); *id.* at p. 33 (Prince Sultan bin Abdul Aziz al Saud provided 5,000,000.00 SR to the IIRO office in Somalia, more than half of the total funds earmarked for projects in Somalia that year). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | Plaintiffs Exhibit 639 (Basha Ex. 134) and Plaintiffs Exhibit 643 (Basha Ex. 133) are inadmissible hearsay. *See* Objections Chart. |
| | | Plaintiffs' assertion is improper attorney argument and is contradicted by the documents they cite. According to Plaintiffs Exhibit 639, many of the IIRO domestic offices in Saudi Arabia are not headed by members of the Saudi Royal Family. *See* Pls. Ex. 639 (Basha Ex. 134) at 9-16 (offices in |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Makkah, Yanbu, Buraida, Unaizah, and Gizan have no reference to any individual with a royal title). |
| | | Plaintiffs cite nothing to support their assertion that these individuals were "officials of the Saudi government," rather than acting in their private capacities when donating to or working with IIRO branches. Testimony from the Basha Deposition, which Plaintiffs' counsel omit and attempted to instruct the witness not to give, confirms that "[w]hen the IIRO receives donations from government officials or members of the Royal Family, *they are providing these donations in their personal capacities,* and without any government obligations." Pls. Ex. 640 (Basha Tr.) 64:5-15 (after the preceding answer, Plaintiffs' Counsel: "Again, I didn't ask in what capacity the donations were provided. . . . [Counsel for the witness]: Objection. He's given a precise answer to your question . . . . He's going to answer it the way he wants to answer it. [Plaintiffs' counsel]: That's not how depositions work."). |
| | | Plaintiffs also cite nothing to support the claim that the individuals listed with various titles by each branch office "directed and supervised the operations and activities of the IIRO." To the contrary, the Report highlights the Board of Directors – "the highest policy-making body of the organization [whose] decisions are binding upon the executive body" – and the Secretariat General, "the executive wing of the IIROSA." Pls. Ex. 639 (Basha Ex. 134) at 6. |
| 2068. | Prince Sultan provided 500,000.00 SR to the IIRO every six months. Ex. 640, Basha Dep. 78:14-18. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs omit important context to give the misleading impression of Saudi government support. Testimony from the Basha Deposition, which Plaintiffs' counsel attempted to instruct the witness not to give, confirms that "[w]hen the IIRO receives donations from government officials or members of the Royal Family, *they are providing these donations in their personal capacities,* and without any government obligations." Pls. Ex. 640 (Basha Tr.) 64:5-15 (after the preceding answer, Plaintiffs' Counsel: "Again, I didn't ask in what capacity the donations were provided. . . .[Counsel for the witness]: Objection. He's given a precise answer to your question. . . . He's going to answer it the way he wants to answer it. [Plaintiffs' counsel]: That's not how depositions work."). |
| 2069. | The IIRO has been clear that the central focus of the organization since its establishment has been Islamic propagation on behalf of the Saudi state. Ex. 644, (Basha Dep. Ex. 138), September 12, 2000 letter from IIRO Secretary General Adnan Basha to the Minister of Islamic Affairs, Saleh al Ash-Sheikh, advising that "*your* Organization, the International Islamic Relief Organization in the Kingdom of Saudi Arabia, has placed at the top of its priorities since its establishment to make the Islamic propagation a central foundation | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | of its activities and a targeted goal of its programs." (Emphasis added). | Plaintiffs Exhibit 644 (Basha Ex. 138) – a September 12, 2000 letter from Adnan Basha to Saleh Bin Abdulaziz ash-Sheikh – is inadmissible hearsay. *See* Objections Chart. <br><br> To the extent a response is required, Plaintiffs' emphasis on "your" is misleading given the word's colloquial connotation in context. There is no indication or evidence to support Plaintiffs' speculation that the use of the translated word "your" negates the fact that IIRO had an independent Board of Directors acting as "the highest policy-making body" of the organization whose "decisions are binding." Pls. Ex. 639 (Basha Ex. 134) at 6. Plaintiffs cite no evidence to support the speculation that the IIRO was not acting on behalf of its Board in support of its mission but was instead acting on behalf of Minister Ash-Sheikh and the Ministry of Islamic Affairs, which had no seat on the board. |
| 2070. | Secretary General Basha explains that all of the activities of the IIRO are directly connected to the "propagation mission," including supporting 1,000 propagators in countries around the world. <br><br> Therefore, all the activities of the Organization, such as supporting of the orphans, relief of the affected, sheltering of the refugees, as well as providing health and educational care and seasonal programs, etc., were connected with the propagation mission. This also applies to the Organization's programs of supporting the propagators, which now included about 1,000 propagators in more than 20 countries. *Id.* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> Plaintiffs Exhibit 644 (Basha Ex. 138) is inadmissible hearsay. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2071. | Secretary General Basha further seeks to coordinate propagation activities with the Ministry of Islamic Affairs, and additionally asserts that all of the IIRO's propagation activities are properly attributed to the Saudi government. *See id.* (stating that "all of our efforts are attributed to our beloved Kingdom which raised the banner of the Islamic propagation and undertook the propagation duties"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 644 (Basha Ex. 138) is inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs misstate the document.  Basha does not assert that IIRO propagation activities are "properly" attributed to the Saudi government.  *See* Pls. Ex. 644 (Basha Ex. 138).  To the contrary, he makes clear that IIRO has propagation activities, and the Ministry of Islamic Affairs has separate activities, and Basha would like to coordinate among the two.<br><br>Plaintiffs' statement also contains improper attorney argument that conflates Basha expressing that his private charitable works are contributing to the nation he loves with working for the government.  Neither evidence nor logic supports this position. |
| 2072. | The Ministry of Islamic Affairs has exercised significant and repeated control over the IIRO's operations and banking activities. Documents produced by the IIRO make clear that (1) Ministry representatives | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | headed IIRO overseas branch offices and held signatory authority over the IIRO's bank accounts in those countries; (2) Ministry representatives chaired committees responsible for supervising the activities of IIRO overseas branch offices; and (3) the IIRO cooperated and coordinated with the Ministry of Islamic Affairs on overseas activities and projects. *See, e.g.,* Ex. 645, (Basha Dep. Ex. 140) (June 2, 2001 administrative notification from IIRO Secretary General Adnan Basha announcing the establishment of a committee to manage the IIRO branch office in Mauritania. The committee members include Ahmad bin Gharm Allah al Zaharani, the supervisor of the Ministry of Islamic Affairs office at the Saudi Embassy in Mauritania, who is given signatory authority over the office's bank account.); Ex. 646, (Basha Dep. Ex. 139) (January 16, 2002 notification from IIRO Secretary General Adnan Basha regarding Administrative Decision No. 185, establishing an executive committee to oversee the activities of the IIRO branch office in Chad. Jalwai Abd al Karim al Ashqar, from the Islamic Affairs office in the Saudi Embassy in Chad, will act as the chairman of the committee and have signatory authority over the IIRO's bank | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 645 (Basha Ex. 140); Plaintiffs Exhibit 646 (Basha Ex. 139); Plaintiffs Exhibit 647 (IIRO 35077-35081); Plaintiffs Exhibit 648 (Basha Ex. 145); Plaintiffs Exhibit 649 (Basha Ex. 141); and Plaintiffs Exhibit 650 (Basha Ex. 146) are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' cited evidence does not support the three assertions they make, but even if it did, "cooperation" between IIRO and the Ministry does not evidence "control." Similarly, Ministry representatives having roles in branch offices does not show that the Ministry controlled IIRO's operations or that these represetatives were acting in their government capacity. To the contrary, IIRO had an independent Board of Directors acting as "the highest policy-making body" of the organization whose "decisions are binding." Pls. Ex. 639 (Basha Ex. 134) at 6. Nothing Plaintiffs cite indicates any Ministry control of that Board.<br><br>Plaintiffs Exhibit 645 (Basha Ex. 140) shows that a person reportedly "responsible for Islamic affairs in the Saudi Embassy" was added to a committee to manage a branch office and was one of three signatories on an IIRO account. But the document states that "[n]o withdrawals or disbursements shall be made for the expenses of the Office, projects and programs except by direct and written authorization by the Secretary |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | accounts.); Ex. 647, IIRO 35077-35081 (April 2, 2002 meeting minutes discussing a committee established at the request of the Minister of Islamic Affairs for the purpose of distributing a million dollars in aid, donated by the Saudi King, for flood victims in Indonesia. The committee is headed by the Ministry of Islamic Affairs, and members include the representative of the Saudi Embassy in Jakarta, the manager of the Al Haramain Islamic Foundation branch office in Jakarta, and the manager of the IIRO branch office in Jakarta.); Ex. 648, (Basha Dep. Ex. 145 (January 15, 1999 administrative notice from IIRO Secretary General Adnan Basha announcing that based on the approval of the Minister of Islamic Affairs, Abd as Samd Muhammad al Barada'ei al Ansari will be seconded to the IIRO to serve as the manager of the IIRO branch office in Albania for one year and the Ministry will continue to pay his salary and allowances.); Basha Exhibit 141 at Ex. 649 (September 18, 2001 letter from IIRO Secretary General Basha to Ibrahim bin Mohammed al Habar, the religious affairs attaché at the Saudi Embassy in Addis Ababa, Ethiopia, serving simultaneously as the chairman of the Supervising Committee supervising the IIRO office in Ethiopia. The letter attests to | General." Pls. Ex. 645 (IIRO 287198). This does not evidence any control by the Ministry over that branch, much less over the entire IIRO. Rather, it confirms that the IIRO Secretary General and independent board retained control.<br><br>Plaintiffs Exhibit 646 (Basha Ex. 139) shows the same for a different branch office.<br><br>Plaintiffs Exhibit 647 (IIRO 35077-35081) shows that the Ministry coordinated with IIRO's local office in Jakarta to oversee distribution of a $1 million donation to help disaster relief efforts following a flood. Such donations were private: "When the IIRO receives donations from government officials or members of the Royal Family, *they are providing these donations in their personal capacities,* and without any government obligations.." Pls. Ex. 640 (Basha Tr.) 64:5-15 (emphasis added).<br><br>PLaintifs Exhibit 648 (Basha Ex. 145) and Plaintiffs 650 (Basha Ex. 146) show that the Ministry seconded or sent employees to work for IIRO branches. Secondments are not evidence that the entity supplying the employee somehow controls the entity receiving the employee.<br><br>Regarding Plaintiffs Exhibit 649 (Basha Ex. 141), Plaintiffs claim that the letter attests to the direct involvement of representatives of the Ministry of Islamic Affairs in the IIRO Ethiopia office, but the letter does not say that |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the direct involvement of representatives of the Ministry of Islamic Affairs in the IIRO Ethiopia office and the organization's activities.); Ex. 650, (Basha Dep. Ex. 146) (June 24, 1999 letter from IIRO Secretary General Adnan Basha to Sa'uud bin Abd Allah bin Talib, Advisor and Supervisor for Financial and Administrative Affairs at the Ministry of Islamic Affairs, expressing thanks for the Ministry's cooperation with the IIRO and sending Abd as Samd Muhammad al Barada'ei al Ansari to work as the manager of the IIRO branch office in Albania for one year.). | |
| 2073. | IIRO overseas branch offices and their employees have also received diplomatic immunity in the host country. Ex. 643, p. 32 (Basha Exhibit 133) ("Some of the external offices of the IIRO enjoy diplomatic immunity and exemption from customs and excise."). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. <br><br> Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> Plaintiffs Exhibit 643 (Basha Ex. 133) is inadmissible hearsay. *See* Objections Chart. |

REDACTED FOR PUBLIC FILING

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | To the extent a response is required, Plaintiffs cite nothing to suggest that because IIRO employees obtain diplomatic immunity in order to "allow for effective supervision and efficient performance" at branch offices," Plaintffs Exhibit 643 (Basha Ex. 133) at 32, or that the Saudi government therefore obtained control of IIRO. To the contrary, Plaintiffs Exhibit Ex. 643 (Basha Ex. 133) confirms that "[t]he Board of Directors is the highest authority and its decisions are binding." Pls. Ex. 643 at 10. |
| 2074. | ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ occurred during periods when U.S. intelligence assess that the IIRO was actively supporting al Qaeda, the Taliban, Hamas, Egyptian Islamic Jihad, and affiliated terrorist groups in Southeast Asia such as Abu Sayyaf Group and Jemaah Islamiya, to name a few. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs Exhibit ████████ ███████████████████████████ – is inadmissible hearsay. *See* Objections Chart.<br><br>███████████████████████████ ███████████████████████████ ███████████████████████████ *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs' assertion that U.S. intelligence assessed IIRO's alleged support of various groups is not supported by any citation to record evidence. |
| 2075. | Newly declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to Executive Order 14040, detail previously classified evidence relied upon by the U.S. government in support of its determination to designate the IIRO's branch offices in the Philippines and Indonesia, and the IIRO Executive Director of the IIRO's Eastern Province branch, Abd al Hamid Sulaiman al Mujil, as Specially Designated Global Terrorists ("SDGTs") pursuant to Executive Order 13224. This new evidence not only describes IIRO's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but makes clear that IIRO's support was essential to al Qaeda's development and transformation into a sophisticated global terrorist organization and its ability to carry out global attacks. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs' assertions are unsupported by any evidence. To the extent Plaintiffs cite evidence elsewhere that purports to support Plaintiffs' allegations, Saudi Arabia will address it there.<br><br>Further, this allegation is irrelevant to claims against Saudi Arabia. |
| 2076. | In a Treasury Department memorandum concerning the Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Indonesia Branches, Ex. 652, TREASURY00102-121, the U.S. government explains the bases for the designations of Mujil and the branch offices as SDGTs pursuant to Executive Order 13224.<br><br>Bases for Designation of Individual and Two Entities – Background Information – The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, the Taliban, and Hamas, as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), Jemaah Islamiyah (JI), and Al Ittihad Al Islamiya (AIAI). The IIRO's parent organization is the Muslim World League [MWL], also headquartered in Saudi Arabia.<br><br>***<br><br>[REDACTED] with its official activities to support Muslims in need, the IIRO provides assistance to radical Islamic movements. Indeed, IIRO's support for terrorist | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 652 – an undated Department of Treasury memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | organizations began in the early 1990s and continues through to at least the first half of 2006, as discussed below.<br><br>\*\*\*<br><br>Bases for Designation of Dr. Abd Al-Hamid Al-Mujil – Dr. Abd Al-Hamid Al-Mujil [Al-Mujil] has served as director of the IIRO Eastern Province branch [IIRO-EP] since at least April 2004.<br><br>\*\*\*<br><br>**Al-Mujil Provides Financial Support to Al Qaida, JI, and the ASG** – [REDACTED] Al-Mujil has a long history of providing support to terrorist groups. Al-Mujil provided donor finds directly to al Qaida, particularly for Islamic fighters, according to a report [REDACTED].<br><br>In the late 1990s, Al-Mujil provided direct financial assistance to ASG leaders Abdurajak Janjalani and Ustadz Ibrahim Ali [Ali] via ASG supporter Mahmoud Abd Al-Jalil Afif.<br><br>Ex. 652, TREASURY00106-108. | |
| 2077. | The memorandum further describes Mujil's control over the Philippines and Indonesia | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | branch offices and their support for terrorist organizations Abu Sayyaf Group and Jemaah Islamiyah.<br><br>**Al-Mujil Asserts Control Over IIRO Southeast Asia Branches** – [REDACTED] IIRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI. In line with Al-Mujil's decision-making responsibilities, in Feb 2006 IIRO-EP's Al- Mujil planned to visit Thailand in order to inspect IIRO-THA, [REDACTED]. In addition, Al-Mujil often "adjudicated" (possibly meaning authorize payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [REDACTED] in January 2006.<br><br>Ex. 652, TREASURY00109. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 652 – an undated Department of Treasury memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart. |
| 2078. | According to the U.S. government, IIRO's branch in the Philippines was (1) headed by Osama bin Laden's brother-in-law and al Qaeda official, Mohammed Jamal Khalifa, who maintained closed relationships with other senior al Qaeda members and | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | financiers; (2) provided Abu Sayyaf Group members with transit assistance to Afghanistan for military training; and (3) additionally provided support for terrorist attacks conducted by Abu Sayyaf Group.<br><br>**Bases for Designation of the IIRO Philippines Branch [IIRO-PHL] – Background on Al Qaida Control of IIRO-PHL** – [REDACTED] The Philippine branch of the IIRO [IIRO-PHL] was founded some time in the [blank]ly 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah [Khalifah]. While working as the director of IIRO- PHL, Khalifah maintained close relations with UBL and al Qaida and has maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). [REDACTED] Khalifah came to the Philippines from Afghanistan to establish the IIRO office there at the suggestion and facilitation of Julaidan.<br><br>[REDACTED] Khalifah also maintained ties to ASG officials while in the Philippines [REDACTED]. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 652 – an undated Department of Treasury memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *** [REDACTED] as of 2005, the IIRO-PHL, maintained offices in Manila and in various cities in the Mindanao region of the Philippines. [REDACTED] **IIRO-PHL Senior Official Provided Support for Recent ASG Terrorist Attack** – [REDACTED]. This bombing killed three people and wounded 41. [REDACTED**] IIRO-PHL Provides Financial and Material Support to ASG** – [REDACTED] According to July 2004 Department of Defense reporting, IIRO was believed to have [illegible] [REDACTED] in the Southern Philippines for extremists transiting to and from Indonesia. The IIRO also provided documentation and other aid to assist these extremists. *** According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the "mujahidin." Khalifah stated that he wanted | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the ASG and the MILF to train together to establish alliances among the groups.<br><br>Ex. 652, TREASURY00110-113. | |
| 2079. | Abd al Hamid Sulaiman al Mujil served under the leadership of Prince Turki bin Jalwai al Saud, who was the head of the IIRO's Eastern Province branch in Saudi Arabia. According to the deposition testimony of IIRO Secretary General Adnan Basha, (1) the IIRO became aware of financial irregularities at the Eastern Province branch and formed a committee to investigate; (2) an audit revealed that the Eastern Province branch was willfully violating IIRO financial regulations by sending money to the accounts of overseas IIRO branch offices (including Pakistan) to implement projects without advising or seeking permission from IIRO headquarters and/or the IIRO General Secretariat; (3) the audit further discovered that IIRO Eastern Province officials were paying cash for projects without expense vouchers or receipts, also in violation of IIRO regulations; and (4) Secretary General Basha asked Prince Turki to cease these practices, but the Prince refused to comply with his request. Ex. 653, Basha Dep. 265:13-278:19. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 653 (Basha Tr.) 265:13-278:19 is inadmissible hearsay. *See* Objections Chart. Basha testified he did not recall receiving a copy of the audit. *See* Pls. Ex. (Basha Tr.) 274:15-18.<br><br>To the extent a response is required, Plaintiffs omit critical testimony about Prince Turki. The audit did not find that money went to illicit purposes but found that certain regulations concerning record keeping and prior authorization were not being followed. Plaintiffs assert that Secretary General Basha asked Prince Turki to cease practices that violated those regulations, and that he refused. Rather than proceed as he wished – as a member of the Royal family that Plaintiffs claimed "controlled" the branch – Prince Turki bin Fahad bin Jiluwi *resigned*. *See* Pls. Ex. 653 (Basha Tr.) 265:13-278:19. This demonstrates that the IIRO Secretary General and Board retained control of its own operations, and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | members of the Saudi Royal family who might have participated in various capacities with IIRO, did not control the organization. |
| 2080. | Secretary General Basha explained that Prince Turki resigned as the head of the Eastern Province branch following the auditor's findings. Prince Turki resigned "[b]ecause he did not wish to implement the recommendations of the auditor." According to Basha, "I recall that the auditor's report connected all the violations to requests from the Prince." Ex. 653, Basha Dep. 271:19-274:1. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 653 (Basha Tr.) 265:13-278:19 is inadmissible hearsay. *See* Objections Chart. Basha testified he did not recall receiving a copy of the audit. *See* Pls. Ex. (Basha Tr.) 274:15-18.

To the extent a response is required, while Basha testified about "violations" found by the auditor, the violations concerned sending money directly to overseas IIRO branch offices for the implementation of projects in order to more quickly implement those projects, as requested by donors, rather than going through the General Secretary and making some payments without documentation. *See* Pls. Ex. 653 (Basha Tr.) 265:13-278:19. There is no indication that the auditor found any intent to divert money to illicit purposes. Further, it is undisputed that Basha testified that Prince Turki bin Fahad bin Jiluwi resigned because the IIRO was insisting on taking steps the Prince did not wish to take, confirming that he did not control the branch. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2081. | According to the U.S. government, Prince Turki was an important al Qaeda donor with links to Khalid Sheikh Mohammed ("KSM"), the "principal architect of the 9/11 attacks." *See* 9/11 Commission Final Report at p. 145.<br><br>A limited body of uncorroborated CIA reporting from [REDACTED] separate sources suggests [REDACTED] the youngest of [REDACTED] full brothers, and Turki Bin Fahd Jiluwi, have had contact with individuals tied to al-Qa'ida and other terrorist organizations.<br><br>***<br><br>In early 2003, KSM identified an individual name Bin Jiluwi, who may be identifiable with Turki Bin Fahd Jiluwi, an important al-Qa'ida donor who hails from a minor line in the Saudi royal family. Separate sensitive reporting indicates that Bin Jiluwi is a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO), and NGO. According to foreign government service sensitive reporting, Riyadh suspects Bin Jiluwi has embezzled more than $3 million from IIRO. The Mabahith has been investigation his activities. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' reference to the 9/11 Commission Final Report is misleading. The report does not support Plaintiffs' assertion that Prince Turki bin Fahad bin Jiluwi was an al Qaeda donor or that he had links to Mohammed – only the quote that Khalid Sheikh Mohammed was the architect of the attacks is in the report. *See* KSA Ex. 163 (9/11 Rep.) 145. In fact, the report concludes that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." *Id.* at 171.<br><br>The 2004 FBI/CIA Joint Assessment likewise states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>And the source confirms that the Saudi government did not condone the activity attributed to Prince Turki bin Fahad bin Jiluwi based on the Mabahith investigating it. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ex. 2, EO 3414-3442 at 3418-3419, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004. | Moreover, Plaintiffs assert that Prince Turki bin Fahad bin Jiluwi was a donor, but testimony from the Basha Deposition, which Plaintiffs' counsel omit attempted to instruct the witness not to give, confirms that "[w]hen the IIRO receives donations from government officials or members of the Royal Family, *they are providing these donations in their personal capacities,* and without any government obligations." Pls. Ex. 640 (Basha Tr.) 64:10-23 (after the preceding answer, Plaintiffs' Counsel: "Again, I didn't ask in what capacity the donations were provided. . . . Counsel for the witness: Objection. He's given a precise answer to your question . . . . He's going to answer it the way he wants to answer it. Plaintiffs' counsel: That's not how depositions work."). |
| 2082. | CIA reporting released pursuant to Executive Order 14040 provides new evidence detailing the IIRO's global support for al Qaeda while serving as an agent and alter-ego of the Saudi government. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs cite no evidence to support their assertions. And the record evidence shows that the CIA concluded the Saudi government did not support al Qaeda. The 2004 FBI/CIA Joint Assessment states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2083. | For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, Ex. 79, CIA_000807-848, the CIA assessed that al Qaeda infiltrated and used IIRO overseas offices in Afghanistan, Pakistan, Yemen, Azerbaijan, and other countries for funding, travel documents, and other resources for years leading to the September 11 attacks.<br><br>[REDACTED] foreign offices of several Saudi-based NGOs have been infiltrated by al-Qa'ida operatives. [REDACTED]. As a result, funds from several Saudi NGOs continue to be diverted to al-Qa'ida and other Islamic extremists. Saudi NGOs with the strongest links to Usama include:<br><br>The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED].<br><br>***<br><br>[REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 79 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. Plaintiffs omit important context undermining Plaintiffs' allegation that IIRO was an alter ego of Saudi Arabia. The memorandum notes that "the exploits of Islamic radicals like Usama Bin Ladin convinced the government of the need to clamp down on private individuals and NGOs whose financial support was contrary to Saudi national interests but perceived by outsiders as reflecting the intent of the Saudi Government," and thus "Riyadh has closed foreign offices of some NGOs and fired employees . . . ." Pls. Ex. 79 (CIA 816).<br><br>Further, Plaintiffs Exhibit 79 is a CIA analysis from its Office of Transnational Issues, dated January 1999. Its findings were full of errors, like that Al Qaeda was represented in some 60 countries. Pls. Ex. 79 (CIA_810). The worldwide hunt for al Qaeda members only found them in very few countries: Afghanistan, Pakistan, Malaysia, Iran (after 9/11), |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | and other Gulf charities with respect to aiding Arabs in Afghanistan…. All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include the International Islamic Relief Organization (IIRO), Al-Haramayn Islamic Foundation, Lajnat Al-Birr Al-Islamiya (LBI), and the Muwafaq Foundation.<br><br>***<br><br>[REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.<br><br>***<br><br>International Islamic Relief Organization. Based in Jeddah, IIRO is a subsidiary of the Muslim World League (MWL) and one of the most prominent Islamic NGOs based in the Gulf…. Usama Bin Ladin apparently has extensive contact with Afghani and Pakistani offices of the IIRO.<br><br>[REDACTED] 1997, [REDACTED], Usama employed an Algerian named Abu Zayid who worked at an IIRO office, presumably in Yemen. | Saudi Arabia, and Yemen. The findings of this analysis are also tentative, called "possible connections." *Id.* (CIA 811). The document includes a heavily redacted excerpt of this CIA analysis, with the title of "Saudi-backed NGOs [w]ith [p]ossible [t]ies to Usama [b]in Laden." *Id.* (CIA 822).<br><br>While Plaintiffs cite hearsay CIA documents from 1999 with such errors, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahedin to fight in Chechnya.<br><br>Ex. 79, CIA_000808, 817; 818. *See also* Ex. 79, CIA_000811 (*Usama Bin Ladin: Possible Saudi Contacts and Financial Links*, identifying the IIRO as one of the Saudi-backed charities "of primary concern," along with Al Haramain, Muslim World League, and World Assembly of Muslim Youth.). | |
| 2084. | In a subsequent report titled, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, Ex. 613, CIA_000210-236, the CIA further describes the use of purported charitable organizations, like IIRO, by al Qaeda and other terrorists for material, financial and logistical assistance in support of their extremist activities.<br><br>Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associate in 1995 as they plotted to bomb at least 12 U.S. airliners in East Asia. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 613 – an April 9, 1999 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart.<br><br>To the extent a response is required, the memorandum notes that the NGOs "are exploited by individual employees with ties to extremists" and |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *** <br><br> Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED]. The director of the IIRO office in Baku, Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad, acted after Riyadh had adopted control measures over the IIRO. <br><br> **A Closer Look: IIRO's Ties to Terrorism** – Individuals with militant sympathies are exploiting their positions in the Saudi-based IIRO to provide financial and logistical support to terrorists and other extremists, [REDACTED]…. IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities, [REDACTED]…. Most IIRO funding is drawn from private donations, collections campaigns in mosques and schools, and small IIRO-run retail shops throughout Saudi Arabia, according to [REDACTED. Major donors include members of the Saudi royal family, [REDACTED]…. A few IIRO branches have turned to illegitimate means of | that "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters." Pls. Ex. 613 (CIA 213). To that end, "[s]enior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." *Id.* <br><br> The portions of the document Plaintiffs cite also contradict their allegations. For example, the document notes "Saudi efforts to curb terrorist use of the IIRO," which contradicts Plaintiffs' assertion that the IIRO is an alter ego of Saudi Arabia. *Id.* (CIA 220). The document also notes that most IIRO funding "is drawn from private donations," which means it does not come from the government. *Id.* (CIA 221). <br><br> Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | financing their operations – including narcotics trafficking and counterfeiting – further increasing their independence and ability to support terrorism, [REDACTED]. Ex. 613, CIA_000216, 220, 221. | |
| 2085. | In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, Ex. 638, CIA_000500-563, the CIA describes the IIRO as one of the "Islamic Charities Supporting Al-Qa'ida," and further indicates that al Qaeda member and financier, Wa'el Hamza Jelaidan, used his position at the IIRO and other da'wah organizations to fund al Qaeda.<br><br>*Wa'el Hama A. Julaydan*. Longtime Bin Ladin associate and IFTSC senior official *Wa'el Hamza Julaydan* (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 638 – an October 18, 2001 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. the record contradicts Plaintiffs' assertion that the IIRO is an alter ego of Saudi Arabia. The cited document refers to Jelaidan's ties to Al Qaeda. Plaintiffs omit that Saudi Arabia acted jointly with the United States, as allies in the war on terror financing, to designate Jalaidan with the U.S. Treasury and the United Nations. *See* KSA Ex. 286 |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida.<br><br>Ex. 638, CIA_000525, 544. | (Sept. 6, 2002 Treasury Press Release) ("Today the United States *and Saudi Arabia jointly* designated" Julaidan; "[w]e are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. . . . Today's designation follows a series of joint actions *with our allies* in the war on terrorist financing, which . . . include[s] . . . joint action with Saudi Arabia.") (emphasis added).<br><br>Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2086. | A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations* [REDACTED], Ex. 609, CIA_000143-158, indicates that the IIRO office in the Philippines, founded by al Qaeda member Mohammed Jamal Khalifa, was used to fund the Abu Sayyaf Group and recruit Muslims for military training.<br><br>Muhammad Jamal Khalifa, a brother-in-law of Bin Ladin, was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters. Khalifah founded several Islamic charities and served as the director of the International Islamic Relief | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Organization (IIRO) NGO in Manila, according to press [REDACTED] reporting. Khalifah was a close associated of World Trade Center bomber Ramzi Yousef until his arrest. [REDACTED] Khalifah currently runs several Asian and African construction and gem businesses [REDACTED] which we believe he is using to launder money for al-Qa'ida. <br><br> *** <br><br> ASG probably also receives funds from Saudi-based NGOs, including the Dar Al-Hijra Foundation and IIRO. Dar Al-Hijra is headquartered in Riyadh and focuses on mobilizing Islamic activities in the Philippines, [REDACTED]. It has links to al-Qa'ida and other extremist groups in the Philippines, including the Moro Islamic Liberations Front, according to sensitive reporting. IIRO has used its field offices [for] cover, travel, and funding to support extremists worldwide. <br><br> [REDACTED] the Philippines offices was opened by Bin Ladin's brother-in-law Khalifah. <br><br> Ex. 609, CIA_000149, 152. | Exhibit 609 – a November 14, 2002 CIA memorandum – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart. <br><br> To the extent a response is required, Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied.Contrary to Plaintiffs' assertion that the IIRO is an alter ego of Saudi Arabia used to fund al Qaeda, the memorandum notes the many steps taken by Saudi Arabia to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee [REDACTED] . . . Since 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." Pls. Ex. 609 (CIA 154). <br><br> Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2087. | In CIA report, *Sketch of a South Asia-Based Terrorist Training and Logistic Network [REDACTED]*, Ex. 637, CIA_000058-62 at 60, the CIA states that "the MAK [Maktab al-Khidmat] is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin." MAK, also known as the "Bureau of Services," was established by Osama bin Laden and Abdullah Azzam to provide logistical support to mujahideen forces in Afghanistan and channel recruits into the country during the Soviet-Afghan conflict. *See* 9/11 Commission Final Report at pp. 56, 434. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 637 – an undated CIA report – is inadmissible hearsay, relying upon unidentified sources and speculation. *See* Objections Chart.<br><br>Plaintiffs cite the 9/11 Commission Report, but that document contradicts their claims. The report concludes that there is "no evidence that the Saudi government as an institution or senior Saudi officials individually funded Al Qaeda." KSA Ex. 163 (9/11 Rep.) 171.<br><br>Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2088. | FBI investigations have targeted the IIRO's office in Northern Virginia and its officers. According to the FBI, Tariq Al Suwaidan, who is listed in the public records as the Secretary/Treasurer for the IIRO in Falls | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Church, VA, is a Muslim Brotherhood leader and an unindicted coconspirator in the Holy Land Foundation terrorism financing case.<br><br>Al Suwaidan is believed to be the leader of the Muslim Brotherhood and has "extremist inclinations." Al-Suwaidan was banned from the U.S. in 2000 following his comments "Palestine will not be liberated but through Jihad. Nothing can be achieved without sacrificing blood. The Jews will meet their end at our hands." In 2007, Al-Suwaidan was listed by the U.S. federal prosecutors, along with a group of U.S. Muslim Brotherhood members, as an unindicted co- conspirator in the terrorism financing case against the Holy Land Foundation for Relief and Development which was convicted along with its leaders of financing Hamas. Al-Suwaiden is known for his anti-Semetic remarks, hate for Jews, and push for electronic Jihad among youth.<br><br>Ex. 2, EO 3478-3608 at 3547-3578, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the July 23, 2021 FBI memorandum states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2089. | Soliman Al-Ali, who served as the director of the IIRO office in Northern Virginia, has been linked to members of the Sunni-Wahhabi extremist network established in | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the United States by the Saudi government that provided material support to the September 11 hijackers, including Omar Al Bayoumi. According to the U.S. government, Bayoumi "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks." Ex. 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1).<br><br>Sulaiman Alali – Summary: Sulaiman Alali was associated with IIRO and other "charities" and global investment entities such as Global Chemical [REDACTED]. Alali was paid by Sanabell and had a physical and financial connection to Omar Albayoumi. Alali returned to Saudi Arabia prior to 9/11 but has at least one son, Amro, who joined Alqaeda. According to open source, Alali was the president of IRO and a major shareholder of Global Chemical. Alali's son Amro is a known AQAP member.<br><br>Sulaiman Al-Ali, who is the Director of the International Islamic Relief Organization's (IIRO) in the United States. Al-Ali is believed to be a friend of Al- Gama al-Islamiyya supporter Zahir 'Abd Al-'Aziz, who reportedly has ties to Islamic extremist circles throughout the Balkans. Al-Ali | No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 2PP (EO 3478-3608) and 607 are inadmissible hearsay. *See* Objections Chart.<br><br>There is no Sunni-Wahhabi extremist network in the United States that provided any material support to the 9/11 hijackers.<br><br>Every United States government agency and commission that has investigated the 9/11 attacks has come to the same conclusion that there was not Saudi complicity and no support network in place.  The 9/11 Commission specifically focused on alleged support by Al Bayoumi and Al Thumairy.  It concluded, "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar.  Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives."  KSA Ex. 163 (9/11 Rep.) 217.  On Al Bayoumi, it concluded, "we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.  Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists."  *Id*. at 218.<br><br>The 2004 FBI-CIA Collaborative Intelligence Assessment concluded, that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  Pls. Ex. 2OO (EO 3416).<br><br>The 9/11 Review Commission noted the establishment of Operation Encore, which reviewed the evidence and re-interviewed specific individuals, and concluded that "this new information is not sufficient to |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | reportedly maintains a telephone number of [REDACTED], which is subscribed to by the "International Relief Organization," [REDACTED] Falls Church, VA 22046-4417. A corporate record for International Relief Organization, Inc., at [REDACTED] Falls Church, VA 22041 with [REDACTED] (Alali) listed as President.<br><br>Ex. 2, EO 3478-3608 at 3552-3553, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar . . . ." KSA Ex. 164 (9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century*, March 2015) at 101-3.<br><br>Operation Encore concluded "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).<br><br>Plaintiffs Exhibit 607 – an October 5, 2012 FBI memorandum which purports to provide an "update" of Operation Encore's years of prior research and memoranda, incorporating more than 10 years' worth of documents and memoranda previously drafted by the FBI – is replete with multiple levels of hearsay and speculation, referencing prior FBI documents that themselves summarize third-person accounts and speculation. *See* Pls. Ex. 607.<br><br>The FBI ultimately rejected theories presented in this "update," as noted above. *See* Pls. Ex. 2A (EO 9-11).<br><br>The July 23, 2021 FBI memorandum on which Plaintiffs rely states that "[t]he report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2090. | FBI records further describe the close relationship between Soliman Al-Ali and Omar Al Bayoumi, including payments to Bayoumi.<br><br>Alali used an address associated with Albayoumi on banking information in 1998. At a business in La Jolla, CA Alali listed Albayoumi (Omar Baymi) as his emergency POC. While residing in California at one address Albayoumi was listed as Alali's rental application as a co-tenant/friend. During this time Albayoumi and Alali listed their employment with Dalla Company, Saudi Arabia.<br><br>Banking records from 10/21/1998 to 08/05/1999 noted that Alali deposited 32 checks from Sanabell totaling over $128,000. Sanabell also directly paid rent and other expenses. During the same period Alali paid Albayoumi almost $7000.<br><br>Ex. 2, EO 3478-3608 at 3553, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the July 23, 2021 FBI memorandum states that "[t]he report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2091. | A telephone directory from the Saudi Embassy in Washington, D.C. obtained by | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | the FBI in 2002 lists the Northern Virginia office of the IIRO as one of its "additional offices under the title 'Saudi Arabian Offices:' International Islamic relief Organization (IIRO), Falls Church." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |
| | | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |
| | | Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart. |
| | | To the extent a response is required, Plaintiffs' assertion that the telephone directory was obtained "from the Saudi Embassy" is not supported by the memorandum. *Id.* (EO 3532-33). To the contrary, the memorandum does not state where the directory was obtained. *See id.* |
| | | The memorandum also states that "[t]he report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2092. | FBI investigations concluded that the IIRO branch in the United States was also operating as the "Success Foundation," itself linked to al Qaeda and Hamas.<br><br>The Success Foundation and its management, like many Saudi-based charities operating in the United States, appear to be connected to a number of individuals and organizations associated with subjects of al-Qa'ida investigations, and with individuals associated with militant Palestinian causes. According to USIC, the foundation may also be involved in money laundering for HAMAS.<br><br>Ex. 2, EO 3414-3442 at 3436, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, the 2004 FBI/CIA Joint Assessment on which Plaintiffs rely contradicts their allegations. It states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2093. | Sheikh Saleh al Buraik, who served as the religious advisor to Prince Abdul Aziz bin Fahd al Saud (son of the late King Fahd bin Abdul Aziz al Saud), and has issued anti-American lectures and advocated for violent jihad, has stated that the IIRO is involved in all areas of jihad which can be trusted with money "to buy a thousand missiles." | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | May the peace and blessings of Allah be upon him. I hope that you will reach an understanding with the company's management in order to state the good, beneficial Islamic point of view. Praise be to Allah, we know that the Islamic Relief Organization is an official agency under the command, care, and sponsorship of the country. It has big, clear, and strong projects in all areas of Jihad, in addition to the relief projects and orphan sponsorship projects. This also applies to the trusted people whom we know. This means that if someone comes to you and gives you money saying, 'Oh, brother, take this. You are going to Afghanistan,' just take it and hand it over to Sayyaf, or hand it over to Hekmatyar. Or, use it to buy a thousand missiles and take them there. If you can hold the trust, we say, 'May Allah reward you with goodness'. And if you come and hand it over to the Islamic Relief Organization, it is a reliable and well-known agency and we do not doubt about it.<br><br>Ex. 654, The Islamic Library, Lessons of Sheikh Saad Buraik, *Explaining the Meaning of Jihad for Support*, p. 3095. | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 654 – a quote from a book by Sheikh Saad Buraik – is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, as discussed above, the IIRO is not an agency under the control f Saudi Arabia. IIRO had an independent board responsible for its decisiosn that was not controlled by the government. *See* Response to Pls. Aver. ¶ 2065. |
| XXVIII. D. | **World Assembly Of Muslim Youth** | |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2094. | Along with the Al Haramain Islamic Foundation, Muslim World League ("MWL"), and International Islamic Relief Organization ("IIRO"), defendant World Assembly of Muslim Youth ("WAMY") is a controlled agent and alter-ego of the Kingdom of Saudi Arabia, sponsored and funded by the Saudi government for the purpose of spreading the conservative form of Wahhabi Islam across the globe and in the United States. Ex. 2, EO 3414- 3442 at 3430, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' assertion is improper attorney argument. The cited materials do not address the standard for showing an entity is an alter ego of a parent, nor do they show that such a standard is satisfied. As discussed in the preceding sections, there is no evidence that Al Haramain, MWL, or IIRO were alter egos of the Saudi government. In the section concerning Al Haramain, Saudi Arabia detailed the "series" of actions Saudi Arabia took to shut down various Al Haramain branches as part of a joint effort with the United States to combat terrorist financing. Saudi Arabia also refuted allegations that the government controlled the organization. As discussed in the section concerning MWL, Saudi Arabia likewise took steps against MWL that are irreconcilable with the entity being an alter ego of Saudi Arabia, and Saudi Arabia refuted allegations of control. Regarding IIRO, Saudi Arabia's responses above again show that the organization was independent of the Saudi government and that Saudi Arabia took steps jointly with the United States to combat terrorist financing where evidence supported such action. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Regarding allegations that Saudi Arabia spread Wahhabism, the term "Wahhabism" is pejorative, as even Plaintiffs' purported expert Nakhleh recognizes. *See* KSA Ex. 165 (Nakhleh Tr.) 152:6-12. Saudi Arabia practices Hanbali Salafism. Nakhleh acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. *Id.* at 134:4-137:17; *see id.* at 138:14-19 (admitting there is a spectrum of Hanbali Salafists' beliefs). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He admitted that in the 1990s the quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9. |
| | | Plaintiffs' purported expert Meleagrou-Hitchens agrees. Pls. Ex. 102 (Meleagrou-Hitchens Tr.) 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist"). |
| | | Saudi Arabia likewise denies allegations that WAMY was an alter ego of the government as detailed below. The one source Plaintiffs cite, the 2004 FBI/CIA Joint Assessment, it does not support Plaintiffs' conclusory assertion. *See* Pls. Ex. 2OO (EO 3414-42). Instead, it concludes "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." *Id.* at 3416. |
| 2095. | WAMY's leadership is dominated by high-ranking officials of the Saudi government, including the Minister of Islamic Affairs | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | who simultaneously served as the president of WAMY for over twenty years. Ex. 655, Transcript, October 23, 2019 Deposition of Dr. Saleh al Wohaibi (Wohaibe Dep.) 28:16-19 (testifying that the president of WAMY is appointed by the Saudi government); *id.* at 29:1-30:17 (stating that the Minister of Islamic Affairs served as the president of WAMY from the establishment of the Ministry of Islamic Affairs in 1993, until 2013-2014); *id.* at 70:6-72:18 (testifying that WAMY Secretary General, Maneh bin Hammad al Johani, simultaneously served as a member of the Shura Council, the formal advisory body of the Saudi government, also referred to as the Consultative Assembly of Saudi Arabia). | pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs misleadingly omit testimony directly contradicting their assertion. The witness testified that "no ministry or office of the Saudi government controlled the day-to-day operations of WAMY." Pls. Ex. 655 (Wohaibi Tr.) 148:13-18 (witness confirming the statement is correct).<br><br>Specifically regarding the Minister of Islamic Affairs, WAMY's witness (who was being deposed as a 30(b)(6) representative and as a fact witness), testified, "There was no intereference of the Ministry in WAMY's matters. There was no control, no day-to-day control, neither weekly nor monthly nor yearly control over WAMY's businesses. And I say this as I was the General Secretary." Pls. Ex. 655 (Wohaibi Tr.) 147:16-148:6.<br><br>Plaintiffs also cite nothing to establish that the WAMY Secretary General's participation on the Shura Council means that he is working for the government when acting as WAMY's Secretary General, and the record confirms he was not. *See* Pls. Ex. 655 (Wohaibi Tr.) 146:14-147:1; *see also id.* at 147:7-15 (the positions are "separate, different, completely"). |
| 2096. | WAMY consistently received annual funding from the Saudi government in the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | amount of 5,250,000.00 Saudi riyals ("SR"), between 1995 through 2002. Ex. 655, Wohaibi Dep. 31:2-8, 35:23-36:13. That payment was transmitted to WAMY's Secretary General from the Minister of Islamic Affairs. *Id.* at 31:13-32:8; *see* Ex. 656, (Wohaibi Dep. Ex. 316) (Letter from the Minister of Islamic Affairs and President of WAMY, Abdullah bin Abdul Mohsen al Turki, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, described as "the annual financial support for the Word Assembly of Muslim Youth."); Ex. 657, (Wohaibi Dep. Ex. 317) (February 21, 2001 letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash-Sheikh, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, "which represents the annual report for the World Assembly of Muslim Youth."); Ex. 658, (Wohaibi Dep. Ex. 318) (Letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash-Sheikh, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, described as "the annual financial support for the Word Assembly of Muslim Youth."). *See also* E. 659, (Wohaibi Dep. Exhibit 319)(May 10, 1994 letter indicating that WAMY would | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 659 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, WAMY and its representative and General Secretary explained important context that Plaintiffs omit concerning the donation from the government. The "5.25 million Saudi riyals" constitutes a "tiny fraction" of WAMY's budget – "2 to 3 percent or less." Pls. Ex. 655 (Wohaibi Tr.) 150:1-10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | report to the Ministry of Islamic Affairs at the end of each fiscal year with a closing statement identifying the amounts spent by the organization). | |
| 2097. | In addition to the annual grants, the Ministry of Islamic Affairs made other financial contributions to WAMY in support of da'wah activities, often approved by royal decree. Ex. 660, (Wohaibi Dep. Ex. 322) (500,000.00 SR contribution from the Ministry for "Da'wah activities of the World Assembly as approved in the Royal Order No. 9/B/25515"); Ex. 661, (Wohaibi Dep. Ex. 323) (indicating that the 500,000.00 SR contribution was the first payment of a 1,000,000.00 SR donation to WAMY). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs' statement omits important context.  Pls. Ex. 661 (which was exhibit 323 in the deposition), refers to a 3,500,000 SR check.  The witness confirmed that this was a *private* "donation from the King himself."  *See* Pls. Ex. 655 (Wohaibi Tr.) 154:11-21.  The exhibit also refers to a 1,000,000 SR contribution, *id*. at 154:22-156:1, and Pls. Ex. 660, and shows payment of half of that amount.  Pls. Ex. 655 (Wohaibi Tr.) 150:1-10, 154:22-156:1.  This was a dotnation from the Ministry of Islamic Affairs, in addition to the 5,250,000 SR annual donation that represented "a tiny fraction" (2-3 percent) of WAMY's budget.  Pls. Ex. 655 (Wohaibi Tr.) 150:1-10, 154:22-156:1. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | WAMY's witness confirmed that there were "no other donations," *id*. at 155:24-156:1, so the Ministry's contributions remained a "tiny fraction" of WAMY's budget. |
| 2098. | During the 1992-2002 time period, the Supreme Council for Islamic Affairs also provided funding to WAMY. Ex. 655, Wohaibi Dep. 43:7-44:15. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

To the extent a response is required, Plaintiffs omit important context. WAMY's witness testified that, in addition to the annual grant from the government, the government provided "particular donations" "for specific projects." *See* Pls. Ex. 655 (Wohaibi Tr.) 42:23-43:21. This only happened "twice or three times" from 1992 to 2002. *Id.* |
| 2099. | Prior to the establishment of the Ministry of Islamic Affairs, WAMY was funded by the Ministry of Higher Education and its predecessor, the Ministry of Education. Ex. 655, Wohaibi Dep. 41:5-42:22. *See also* Ex. 576, (Wohaibi Dep. Ex. 320) (indicating that WAMY received 105,750,000.00 SR from the Saudi government). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 576 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs omit important context concerning timing. As described in Response to Plaintiffs Averment ¶¶ 2097-2098, during the period relevant to this case, the Saudi government provided at most a "tiny fraction" of WAMY's budget. Plaintiffs Exhibit 576 is a letter from 1993, which purports to calculate all government donations before that time. That backward-looking total concerning donations "since" WAMY's "establishment" is irrelevant. |
| 2100. | WAMY also received financial contributions from the Saudi king in support of WAMY's activities. Ex. 577, (Wohaibi Dep. Ex. 321) (November 2, 2002 letter from Dr. Saleh bin Soliman al Wohaibi acknowledging receipt of a 400,000.00 SR check from the king in support of a WAMY program.); Ex. 661, (Wohaibi Dep. Ex. 323) (3,500,000.000 SR financial contribution to WAMY from the king in support of shariah courses). Ex. 655, Wohaibi Dep. 46:15-47:20 (Dr. Wohaibi testified that there were other contributions to WAMY from the king prior to 2002.). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 577 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs omit that WAMY's witness confirmed that both of the referenced contributions were "private, personal" donations from King Fahd and not government contributions. Pls. Ex. 655 (Wohaibi Tr.) 154:3-21. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | |
| 2101. | CIA and FBI reporting released pursuant to Executive Order 14040 provides new evidence demonstrating WAMY's role in terrorism funding and recruiting, sponsoring military training camps, facilitating the movement of funds in support of Islamic extremism, and funding terrorist groups and Executive Order 12334 Specially Designated Global Terrorists ("SDGT"), as illustrated by the following reports. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Plaintiffs cite no evidence to support their conclusory assertions. Saudi Arabia addresses Plaintiffs' purported evidence, to the extent any is cited, below. |
| 2102. | In a CIA report titled, *Saudi-Based Financial Support for Terrorist Organization [REDACTED]*, November 14, 2002, Ex. 609, CIA_000143-158, the CIA states that WAMY's global influence among Muslim youth established the organization as a prominent recruiting hub for Islamic extremists. Ex. 609, CIA_000151 ("WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups."). *See also* Ex. 615, CIA_000178-189 at 186, *Al-Qa'ida Still Well Positioned to Recruit Terrorists* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *[REDACTED]*, July 1, 2002 ("In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al- Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED]."); *id.* at 185 ("Groups such as the World Association for Muslim Youth observe students in schools and offer scholarships for religious training in the Middle East."). | Plaintiffs Exhibits 609 and 615 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 609 does not provide a single example of a recruit for any extremist group through WAMY, and as Sageman explains, there is no evidence of such a recruit through WAMY. *See* KSA Ex. 178 (Sageman WAMY Rep.) 268-69.<br><br>Moreover, the document contradicts Plaintiffs' assertion that nongovernmental organizations are alter egos of Saudi Arabia, noting the many steps taken by the government to assist in the war on terrorist financing: "Since 9/11, Riyadh has responded to a number of US requests to staunch the flow of funds to terrorists from the Kingdom. [REDACTED] . . . Even before 9/11, Saudi authorities made some efforts to crack down on donors; they detained or investigated Muhammad Jamal Khalifah [REDACTED] Jamjoom family members [REDACTED] Khalid bin Mahfuz [REDACTED] Wa'il Julaydan [REDACTED] and Adil Batterjee [REDACTED] . . . Since 9/11, Riyadh has responded to our requests to freeze the assets of al-Qadi and to designate Julaydan as a terrorist." Pls. Ex. 609 (CIA 154).<br><br>Plaintiffs Exhibit 615 also does not provide a single example of WAMY spotting and assessing suitable recruits for terrorism among young men who sought assistance from humanitarian organizations. And, consistent with Plaintiffs Exhibit 609, Mr. Sageman explains that the Saudi government had already set up strong supervisions of non governmental organizations. *See* KSA Ex. 178 (Sageman WAMY Rep.) 156-64.<br><br>Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2103. | In addition to recruiting, WAMY has sponsored and funded military training camps for Muslim youth.<br><br>[REDACTED] paramilitary training camps [REDACTED] including a large camp near [REDACTED] have offered Muslim youths training. [REDACTED] training at such camps included weapons handling, firing, and explosives [REDACTED]. Training appears to be sponsored by various NGOs, including the World Association of Muslim Youth and the Foundation of Islamic Tarbiya (education).<br><br>Ex. 615, CIA_000178-189 at 185, CIA report, *Al-Qaʿida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 615 is inadmissible hearsay. *See* Objections Chart.<br><br>Mr. Sageman explains that WAMY has never been implicated in any paramilitary training. *See* KSA Ex. 178 (Sageman WAMY Rep.) 151-52. Plaintiffs raised one such allegation in their case against WAMY, but that was based on a newspaper article in Pakistan, and the allegation is refuted.<br><br>Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2104. | The CIA has further assessed that WAMY facilitated the transfer of money to overseas destinations in support of the proliferation of Islamic extremism. Ex. 78, CIA_000720- | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | 804 at 744, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions.*<br><br>[A] Saudi NGO whose personnel often pursue an extremist agenda, [REDACTED] WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia. In some cases, WAMY puts foreigners requesting aid in direct contact with Saudi donors who are looking for worthwhile Islamic causes; WAMY sometimes will broker requests with potential donors if the NGO has an ideological interest.<br><br>Ex. 78, CIA_000744. *See also* Ex. 79, CIA_000807-848 at 827, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999:<br><br>WAMY has long been alleged to be a financier of Islamic extremists. [REDACTED]. WAMY provides funding for the Palestinian Islamic Resistance Movement (HAMAS); Egypt's Islamic Jihad and Gama'at al-Islamiyya; and an Islamic movement in Kurdistan. WAMY also supports the Dutch office of the Saudi-supervised Al-Waqf Al-Islami; WAMY Secretary General Dr. Mani Al- Gohani | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 78 and 79 are inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 78 is CIA "research paper" from its Office of Transnational Issues, dated from November 1997, when the agency's knowledge of neojihadi terrorist organizations was very primitive. For instance, the CIA was not even aware of al Qaeda's name. It called it "Usama Bin Laden's Islamic Army." Pls. Ex. 78 (CIA 722, 728, 735, 736). At one point, it stated that bin Laden provided $50 million toward a project. *Id.* (CIA 736). In fact, a year after this cited a report, in November 1998, the CIA still considered that $300 million was a reasonable estimate of his fortune. The 9/11 Commission staff monograph on terrorist financing finally dispelled this myth in 2004, reporting that bin Laden received about a million dollars per year from 1970 to 1994. Pls. Ex. 7 (9/11 Commission Staff Monograph on Terrorist Financing) at 20. These claims make Plaintiffs Exhibit 78's reliability questionable. This paper is a historical reminder of how little the CIA knew about al Qaeda and other terrorist organizations at the time.<br><br>The allegations of WAMY officials couriering private Saudi donations to Islamic groups in Afghanistan and Bosnia are vague and no evidence for these allegations have surfaced in the past two decades. WAMY maintained a hospital in Afghanistan in the 1990s, but there is no evidence |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | (a.k.a. al-Jihani) and Imad al-Din Ismail Bakri, a representative of the Waqf office in Eindoven, are longtime friends. [REDACTED] WAMY has an office in Macedonia, [REDACTED] which has received financial support from the SHC and other Saudi NGOs.<br><br>[REDACTED] the Stalk of Goodness, an NGO established in 1991 by WAMY members, operated extensively in Albania and Macedonia. The latter office was shut down in February 1995 because the charity was channeling funds from Al Haramayn, the IIRO, and Waqf al-Islami to spread Islamic fundamentalism throughout Macedonia.<br><br>Ex. 2, EO 3414-3442 at 3438, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, ("WAMY offices in other countries are directly funding HAMAS-affiliated NGOs, including the UK-based charity Interpal and the Palestinian zakat (tithing) committees."). | that WAMY money or WAMY officials acted as couriers for bin Laden. *See* KSA Ex. 178 (Sageman WAMY Rep.) 191–201.<br><br>Plaintiffs Exhibit 79 is another CIA analysis from its Office of Transnational Issues, dated January 1999. By then, the CIA had finally labeled Bin Laden's organization as al Qaeda. But its findings were still full of errors, like al Qaeda was represented in some 60 countries. Pls. Ex. 79 (CIA_810). The worldwide hunt for al Qaeda members only found them in very few countries: Afghanistan, Pakistan, Malaysia, Iran (after 9/11), Saudi Arabia, and Yemen. The findings of this analysis are tentative, as "possible connections," including WAMY. *Id.* (CIA 811). Plaintiffs' quote comes from a heavily redacted excerpt of this CIA analysis, with the title of "Saudi-backed NGOs [w]ith [p]ossible [t]ies to Usama [b]in Laden." *Id.* (CIA 822). The specific section on WAMY starts, "WAMY has long been alleged to be a financier of Islamic extremists." *Id.* (CIA 826). The start of the allegation is redacted, which makes it impossible to address its validity. Yet, despite such allegation, there is no evidence that WAMY had any ties to Bin Laden or was a financier of Islamic extremists in the last two decades. In fact, WAMY has never been designated a specially designated global terrorist either by the U.S. Treasury or the U.N. Security Council. The use of the words "possible," "alleged," and the like shows that the analysis was tentative and had no hard evidence against WAMY.<br><br>The 2004 FBI/CIA Joint Assessment contains the quoted language but also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).<br><br>Regarding EO 3438, it makes allegations against Abdullah Binladen and states, "The FBI is monitoring WAMY's US activities." Pls. Ex. 2OO |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | (EO 3438). However, after a raid of its offices and years of investigation, the FBI has found nothing nefarious in his handling of WAMY USA, except of course that he shares a surname with his Osama bin Laden. *See* Response to Pls. Aver. ¶¶ 2107, 2109. |
| 2105. | Part of WAMY's funding went to the Taibah International Aid Association in Bosnia-Herzegovina, designated as a Specially Designated Global Terrorist ("SDGT") entity by the U.S government on May 6, 2004 for funneling money to al Qaeda. See Treasury Department press release at Ex. 578. According to the CIA:<br><br>The Sarajevo Taibah office has received regular funding from banks and individuals with ties to al-Qa'ida…. The office received approximately $140,000 from WAMY-Jeddah, probably the World Association for Muslim Youth, in May 2001. [REDACTED]. WAMY is suspected of supporting terrorists.<br><br>Ex. 585, CIA-SUB_0031-33 at 32, CIA report, *Taibah: Linking Extremists in the Balkans and the United States [REDACTED]*, December 12, 2002. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 585 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 585 is a 2002 CIA report that is full of errors, calling into question its reliability. It mentions Mustapha Ait Idir as an employee of the cited entity, Taibah International Aid Association. Pls. Ex. 585 (CIA-SUB 31). The U.S. Government imprisoned him in Guantanomo Bay for seven years before releasing him without charges. He won his habeas corpus case in the U.S. Supreme Court, and the district court reviewing the evidence against him stated, "To allow enemy combatancy to rest on so *thin* a reed would be inconsistent with this Court's obligation . . . to protect petitioners from the risk of erroneous detention." (Italics in original). Mem & Order at 11, *Boumediene v. Bush*, Case No. 04-cv-01166 (RJL) (D.D.C. Nov. 20, 2008), ECF No. 276 (emphasis in original). *See* KSA Ex. 178 (Sageman WAMY Rep.) 203–08 (on Idir and the lack of reliability of documents |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | like that cited here). While the report is unreliable generally, even in this CIA report, the words "probably" and "suspected" denote uncertainty.

After years of investigation, WAMY has never been sanctioned by the U.S. Treasury Department as a Specially Designated Global Terrorist or by the U.N. Security Council. Plaintiffs Exhibit 578 is a Treasury Department press release concerning other organizations.

Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2106. | Additional CIA reporting has tied WAMY to Osama bin Laden. Ex. 79, CIA_000807-848 at 820-821, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999 (stating Osama bin Laden has funded offices of Lajant al Bir al Islamiya, which is closely affiliated with WAMY); *id.* at 826 (describing "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin"). | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Plaintiffs Exhibit 79 is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, Plaintiffs Exhibit 79 is unreliable for reasons discussed in Response to Plaintiffs Averment ¶ 2104. Moreover, the findings of this analysis as applicable here are tentative, as "possible |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | connections," including WAMY. Pls. Ex. 79 (CIA 811). The CIA's analysis has numerous indicia of unreliability. It claimed that "WAMY Chairman [was] Abdallah Al-Muhaidib." *Id.* (CIA 826). WAMY never had a chairman position.<br><br>WAMY's Secretary General was Dr. Maneh al-Johani from 1986 to 2002 (the relevant time period in the present litigation), followed by Dr. Saleh al-Wohaibi from 2002 onward. Pls. Ex. 655 (Wohaibi Tr.) 20:11–25:14. It is unclear who Abdallah Al-Muhaidib is. The CIA's inaccuracies on such basic facts as WAMY's leadership undermines its "possible" claims about WAMY.<br><br>In fact, there is no evidence that Bin Laden ever funded offices of Lajnat al-Birr al-Islamiyah (LBI), an NGO affiliated with WAMY until 1993, when it severed its relationship with Adel Batterjee, LBI's executive director who was forced to resign from LBI. KSA Ex. 178 (Sageman WAMY Rep.) 54–66. There is no evidence that WAMY's alleged chairman was a supporter of Osama bin Laden or al Qaeda. There is no evidence that WAMY was a financier of Islamic extremists. Pls. Ex. 79 (CIA 826). There is no evidence that Osama bin Laden funded LBI. LBI raised money from private solicitations in Saudi Arabia, not from Peshawar, where bin Laden was located before 1989. KSA Ex. 178 (Sageman WAMY Rep.) 54–66.<br><br>Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Ex. 2OO (EO 3416). |
| 2107. | The United States-based branch office of WAMY, headed by Abdullah bin Laden, | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | has been targeted by U.S. authorities for its ties to al Qaeda, Islamic extremism, and recruitment. Ex. 79, CIA_000807-848 at 826, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999 ("The Bin Ladin family probably contributed to WAMY, especially given that Abullah Bin Ladin, Usama's half-brother, heads the WAMY office in Falls Church, Virginia."). | April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 79 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, Plaintiffs Exhibit 79 is unreliable for reasons discussed in Response to Plaintifs Averment ¶¶ 2104, 2106.<br><br>Further, Abdullah Binladin was not Osama bin Laden's half-brother, Pls. Ex. 79 (CIA 826), but his half-nephew. As Sageman explains, Plaintiffs attempt to build a case of guilt by family name. KSA Ex. 178 (Sageman WAMY Rep.) 173. There is no allegation that Abdullah Binladin was a terrorist, linked to al Qaeda, or linked to the 9/11 terrorists. In his sworn declaration, Abdullah Binladin stated that his mother was one of the 54 children of Bin Laden's father, making her Osama bin Laden's half-sister. Pls. Ex. 333 (Binladin Aff.) at 1. Abdullah was therefore one of Osama's numerous half-nephews. *Id.* He had not seen his half-uncle since approximately 1990. *Id.* In 1991, while he was working as an administrative officer at the Saudi Arabian Embassy in Washington, he established WAMY–US, a Virginia non-profit corporation with its office in northern Virginia. *Id.* at 2. He worked for WAMY–US as a volunteer and represented WAMY at various events. *Id.* at 2-3. He swore that he never provided support of any nature whatsoever to al Qaeda or any other terrorist organization. *Id.* at 3. To his knowledge, during the period he |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | was involved with WAMY–US, that organization had no dealing or association with and provided no support to al Qaeda or any other terrorist organization. *Id.* In the 1990s, three FBI agents interviewed him regarding his family's ties to his uncle Osama. *Id.* He cooperated fully with them, and the U.S. government never took any actions against him or WAMY–US when he was associated with it. *Id.* He returned to Saudi Arabia in late 2000 and WAMY appointed a successor for WAMY–US. *Id.* at 2. He concluded, "I have never provided support to any terrorist, terrorist group, or terrorist activity. I was appalled by the horrific events of September 11, 2001, and I reject and condemn such violence." *Id.* at 4. *See also* KSA Ex. 178 (Sageman WAMY Rep.) 173–74. |
| | | Contrary to Plaintiffs' general allegations, the memorandum also notes that "the exploits of Islamic radicals like Usama Bin Ladin convinced the government of the need to clamp down on private individuals and NGOs whose financial support was contrary to Saudi national interests but perceived by outsiders as reflecting the intent of the Saudi Government," and thus "Riyadh has closed foreign offices of some NGOs and fired employees . . . ." Pls. Ex. 79 (CIA 816). |
| | | Further, while Plaintiffs purport to rely on CIA documents, they omit that the CIA concluded that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2108. | A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists WAMY as one of its "additional offices under the title 'Saudi Arabian Offices:' World Assembly of Musim Youth (WAMY), 4516 Old | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Columbia Pike, PO Box 8096, Falls Church, VA." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. | reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the July 23, 2021 FBI memorandum does not support Plaintiffs' assertion that the telephone directory was obtained "from the Saudi Embassy". *Id.* (EO 3532-33). To the contrary, the memorandum does not state where the directory was obtained from. *See id.*<br><br>The memorandum also states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex. 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| 2109. | Ibrahim Abdullah, who served as director of WAMY's office in Virgina after Abdullah bin Laden, was the subject of an FBI investigation for his association with al Qaeda and Hamas.<br><br>Ibrahim S. Abdullah, until recently the director of the World Assembly of Muslim Youth (WAMY) US office in Annandale, VA, was a Saudi-funded graduate student at George Mason University. FBI investigation determined that Abdullah holds a Saudi passport and is associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records.<br><br>Ex. 2, 3414-3442 at 3429, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, Dr. Ibrahim Abdullah, was a Saudi student in the Washington, D.C. area at the time. *See* KSA Ex. 178 (Sageman WAMY Rep.) 174. He took over as director of WAMY USA, a position he held from 1999 to 2004. *Id.* During his tenure, the management of WAMY USA was vested in a Board of Directors. *Id.* Although WAMY USA already had bank accounts, it had no funds, no employees, and no activities. *Id.* It took Dr. Abdullah about four months to get the office running. He started receiving all his funds from WAMY headquarters in Saudi Arabia, hired a secretary, and got some projects going. *Id.* He denied that WAMY camps, which were part of his projects, promoted any sort of violence. *Id.* He got his Ph.D. in 2004 and two days before his scheduled departure back to Saudi Arabia, around late June or early July 2004, he was arrested on an alleged visa violation that he was receiving money from WAMY while on a student visa. *Id.* He denied that WAMY ever paid him as he was a volunteer. *Id.* His lawyer advised him to plead guilty to expedite his departure, which he did and left the country soon afterward. *See id.* (citing Ibrahim Sulayman Abdullah Mar. 2, 2019 Decl.). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Despite investigating WAMY USA, neither the FBI, the Department of Justic, or the U.S. Department of Treasury brought any charges or sanction against WAMY, WAMY USA, Abdullah Binladin, or Ibrahim Abdullah.  In 2004, when the Joint Assessment was written, WAMY USA was being investigated, but this investigation led nowhere as no charges or sanctions were ever brought against it.  KSA Ex. 178 (Sageman WAMY Rep.) 174–75.<br><br>The Joint Assessment also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere."  Pls. Ex. 2OO (EO 3416). |
| 2110. | The FBI also investigated Mohammed Rafique Quaidr Harunani, a WAMY official in the United States, for his connections to al Qaeda.<br><br>A FBI source reports that Mohammed Rafique Quaidr Harunani, of Orlando, FL, is expected to manage and lead [WAMY's] five-year plan's implementation in the United States.<br><br>Harunani, a Uganda-born Kenyan citizen of Pakistani origin, is under investigation for his ties to WAMY and al-Qa'ida subjects in the United States.<br><br>FBI information also links Harunani to Abdullah Bin Ladin and WAMY through | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>To the extent a response is required, in 2004, when the Joint Assessment Plaintiffs cite was written, the FBI was investigating WAMY USA.  However, the investigation led nowhere as no charges or sanctions were ever brought against it either by the Department of Justice or the U.S. Treasury Department.  The Joint Assessment in this section was simply |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | his company, Discover Islam, reportedly one of the linchpins of the five-year plan.<br><br>Ex. 2, EO 3414-3442 at 3438. | examining the possibility that WAMY was promoting terrorist ideology. Nothing came out of this investigation.<br><br>The Joint Assessment also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2111. | WAMY's office in Virginia was also closely associated with the Saudi government funded Institute of Islamic and Arabic Sciences of America ("IIASA") in the United States. Ex. 2, EO 3478-3608 at 3535. FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. IIASA, which received financial support from Ambassador Bandar bin Sultan bin Abdul Aziz al Saud and the Saudi Embassy in Washington, D.C., operated as a satellite campus of the Al Imam Muhammad Ibn Saud University in Riyadh, Saudi Arabia ("Imam University"). *Id.* at 3534 (stating that "IIASA was one of the many pieces of Saudi proselytizing activity in the U.S."). Several of IIASA's staff members have been Saudi nationals employed in an official capacity as administrative officers at the Embassy. Ex. 2, EO 3414-3442 at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the* | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the July 23, 2021 FBI memorandum does not support many of Plaintiffs' assertions.<br><br>The memorandum does not reference any funding or financial support provided to the IIASA by Ambassador Bandar bin Sultan bin Abdul Aziz al Saud or the Saudi Embassy in Washington, D.C., as Plaintiffs allege. Nor does the memorandum state that the IIASA operated as "a satellite campus" of the Al Imam Muhammad Ibn Saud University in Riyadh, only |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | *United States*, December 2004 ("IIASA is funded by the Embassy."). | that the two education institutions were "affiliated." Pls. Ex. 2PP (EO 3535). Similarly, the memorandum does not support Plaintiffs'' assertion that WAMY's Virginia office was "closely" associated with the IIASA, only that they were "associated." *Id.*<br><br>The memorandum also states that "[t]he report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP, EO 3479 (emphasis added). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* at 3481.<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11).<br><br>Regarding the 2004 FBI/CIA Joint Assessment, in 2004, when the Joint Assessment was written, the FBI was investigating WAMY USA. However, the investigation led nowhere as no charges or sanctions were ever brought against it either by the Department of Justice or the U.S. Treasury Department. There is no evidence that WAMY ever supported al Qaeda in the United States or anywhere around the world. *See* KSA Ex. 178 (Sageman WAMY Rep.) 273-74. There is no evidence that WAMY funded or had any relationship with IIASA.<br><br>The Joint Assessment also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416). |
| 2112. | According to the FBI, IIASA "maintains links to suspected terrorist organizations and their supporters," Ex. 2, EO 3414-3442 at 3437, and individuals that worked at IIASA were "recruiting individuals into extremist views." Ex. 2, EO 3478-3608 at 3535. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.

Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.

Pls. Ex. 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart.

To the extent a response is required, the 2004 FBI/CIA Joint Assessment cited by Plaintiffs ultimately concludes that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Pls. Ex. 2OO (EO 3416).

In 2004, when the Joint Assessment was written, the FBI was investigating WAMY USA and raided its premises in the summer of 2004. However, the investigation led nowhere as no charges or sanctions were ever brought against it either by the Department of Justice or the U.S. Treasury Department. There is no evidence that WAMY recruited |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | individuals into extremist views. There is no evidence that WAMY had any relationship with IIASA.<br><br>The July 23, 2021 FBI memorandum Plaintiffs cite states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481).<br><br>The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2113. | A raid of an al Qaeda safehouse uncovered "an address utilized by an individual that listed their employer as the IIASA and their supervisor as being Abdullah Bin Laden." Ex. 2, EO 3478-3608 at 3535. | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | Plaintiffs Exhibit 2PP (EO 3478-3608) is inadmissible hearsay. *See* Objections Chart. |
| | | The July 23, 2021 FBI memorandum Plaintiffs cite states that "[t]his report should not be considered an intelligence assessment and is not intended as such." Pls. Ex 2PP (EO 3479). Moreover, the document states that the writer is "not investigating or re-investigating the 9/11 investigation. This is particularly relevant due to a lack of resources and analytical assistance. As such, writer has located relevant serials and have copied that information directly within this communication." *Id.* (EO 3481). |
| | | As discussed in Response to Plaintiffs Averment ¶¶ 2107, 2109, there is no evidence that Abdullah Binladin was ever associated with al Qaeda and there is no evidence of an Al Qaeda safehouse in the United States. Even if a raid of an Al Qaida safehouse revealed the address used by an individual who listed their employer as IIASA and their supervisor as Abdullah Bin Laden, this shows nothing. |
| | | The FBI's final conclusion is that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack" and that, "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged . . . ." Pls. Ex. 2A (EO 9-11). |
| 2114. | FBI's investigations have also targeted WAMY for recruiting at U.S. schools and universities. Ex. 2, 3414-3442 at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004 ("The FBI is also examining the possibility that al-Qa'ida or other radical Islamic | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | extremists are recruiting at U.S. schools and universities. State-sponsored Islamic student organizations, such as WAMY, are specifically targeting students at universities and public schools in the United States to promote their Islamic ideology."). | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case. <br><br> To the extent a response is required, the 2004 FBI/CIA Joint Assessment does not support Plaintiffs' assertion that WAMY was "recruiting" at U.S. schools as universities. To the contrary, the Joint Assessment states that it was examining the possibility that radical Islamic extremists were "recruiting" at such schools and universities, while WAMY was alleged to have targeted – not recruited – students to promote the Islamic ideology. Pls. Ex. 2OO (EO 3429). The document was written when the FBI was investigating WAMY USA. However, the investigation led nowhere as no charges or sanctions were ever brought against it either by the Departmnt of Jistice or the U.S. Treasury Department. There is no evidence that WAMY was recruiting students for terrorism at U.S. schools and universities. <br><br> The Joint Assessment also states that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or that they had foreknowledge of terrorist operations in the Kingdom or elsewhere." Ex. 2OO (EO 3416). |
| 2115. | Indeed, WAMY youth camps in the United States were used to advocate for violent extremism and jihad and indoctrinate young Muslims. <br><br> In July 1996, WAMY held a youth camp in Okeechobee, Florida that included seminars overseen by senior WAMY officials in the | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | United States. As part of the program, an operations manager for WAMY charitable activities named Suleman Ahmer presented a lecture to campers titled, "Jihad, The Misunderstood Word." Ahmed professed to have "spent some months in Bosnia, and I've spent some time in Chechnya where we have active wars going on, and there are certain things I've come across they're very educational and also very motivational, they'll motivate you. You've been hearing negative things about jihad right, so you should hear something positive also…. If the Chechens come up and they fight, if the Bosnians come up and they fight you call them terrorists! This is unfair…without jihad the evil forces will overwhelm you and that's why Allah has given you so much promises to you, to people who do jihad, to people who struggle." Ahmer described the challenge during the Bosnian war of indoctrinating non-Arabic-speaking European Muslims in fundamentalist Islamic principles: "the Bosnians were well away from Islam…. They couldn't even say the word 'jihad.'They used to call 'mujahedin,' 'muhajedin.' It took them many months to learn the right word." According to Ahmer, after witnessing the dramatic entrance of mujahideen fighters into the Bosnian conflict, local Bosnian | Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 150B, the Kohlmann charities report, was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See, e.g.*, ECF No. 5266 at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>The cited portion of Plaintiffs Exhibit 150B should be excluded because Kohlmann is used merely to repeated hearsay, not performan any analysis requiring expertise. *See* Objections Chart.<br><br>To the extent a response is required, "the narrative flow of Kohlmann's paragraph is misleading to convey that Ahmer tried to convince the young Muslims at the camp to take to violent jihad. He does so by distorting Ahmer's lecture through juxtaposition of unrelated quotes and omission of their context. . . . Ahmer's lecture was proselytism, not for violent jihad but for Islam. He did start by saying that he had spent some months in Bosnia and Chechnya and saw things that had motivated him and hoped would also motivate his audience. Kohlmann omits Ahmer's illustration of what he meant in a vignette from his student days, when a friend complained that non-Muslims were so numerous and Muslims so few. He became depressed and felt overwhelmed until another person reframed the issue for him that Haq, truth, was like a light and darkness was just an absence of light. This brought him to the topic of jihad. 'What is jihad? The word comes from the word jihad, which means to struggle. What we have understood of the word is that it is a struggle and an effort to establish Islam in the world. This is jihad. There are all these different |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Muslims vowed, "'if this is really, if this is what Islam teaches you, we are fools if we don't practice Islam.' See, jihad, how it establishes Islam?" In response to criticisms of the violent extremist indoctrination taking place at WAMY summer youth camps inside Saudi Arabia, WAMY Secretary General al-Wohaibi has insisted that it is "not possible to control" all of the content being disseminated during the presentations at the camps.<br><br>Ex. 150B, Kohlmann 2020 Rpt. | levels when you want to establish Islam in the world. Where do you start first? Yourself. That is why Jihad when you fight against evil, when we fight against temptation, we are trying to make jihad and bring jihad into ourselves, our communities, societies, and our world.'" KSA Ex. 178 (Sageman WAMY Rep.) 115 (quoting KSA Ex. 293, Suleman Ahmer, 1996, "Jihad, the Misunderstood Word," transcript of a lecture given at WAMY – Okeechobee Summer Da'wah Camp, July 26, 1996, at 1–2).<br><br>"Kohlmann goes on to ignore Ahmer's teaching that there is no compulsion in Islam. 'Every person has a right to choose. If this person is a non-Muslim, right, he has a right to choose. If you go to him and say, "Do you want to become a Muslim?" and he says, "No, I don't want to be a Muslim," then fine. There's no compulsion. He has a right to live in peace with you no problem.'" KSA Ex. 178 (Sageman WAMY Rep.) 115 (quoting Ahmer, 1996, at 3).<br><br>"Ahmer then went on to say, 'when the Muslims are attacked you have to defend yourself.' Ahmer explained, and this is the full quote that Kohlmann condenses, 'When I was flying to Orlando yesterday, I was going through details of how Russians are killing the Muslims in Chechnya. What is their crime? Just because they are Muslim, right? They [the Russians] are coming in, they are sealing whole villages and they are bombing them. They are not allowing kid, women, men to leave. What is this? If the Chechens come up and they fight, if the Bosnians come up and they fight, you call them terrorists! This is unfair. Under no circumstances are we allowed to just sit down and let them kill us. And if they fight, they have a right to fight. So, jihad has many forms, from individual struggle, to struggle to establish Islam, to a struggle to protect ourselves, this is all jihad.'" KSA Ex. 178 (Sageman WAMY Rep.) 115-16 (quoting Ahmer, 1996, at 3). |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | "Ahmer went on to talk about the importance of the struggle to establish Islam, which he also calls jihad, meaning struggle. 'Why is it so important? Because without jihad the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle. It's not for us as Muslims, it's not a matter of choice that, yes, I want to establish Islam or, no, I don't want to establish Islam. It doesn't work. It is a responsibility on every one of us, on each one of us, a responsibility to make sure that Islam is established.'" KSA Ex. 178 (Sageman WAMY Rep.) 116 (quoting Ahmer, 1996, at 3). |
| | | "The above paragraph was a different topic, namely the duty of proselytism of Islam, from that of the previous paragraph, violent jihad to defend yourself. Yet, by juxtaposing the two sentences from these two different paragraphs, Kohlmann links them together and the reader would naturally understand that the two uses of the word jihad are the same, namely violent jihad. So, by Kohlmann's quick juxtaposition of two unrelated and different meanings of the word jihad and omission of the sentences between these two different uses of the word jihad, the reader would assume that the sentence 'without jihad, the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle' refers to violent jihad, while from the context, it refers to proselytism as its illustrating vignette and commentary discusses the duty to spread the gift of Allah to the world." KSA Ex. 178 (Sageman WAMY Rep.) 116. |
| | | "Kohlmann claims that Ahmer then went on to discuss the challenge of indoctrinating Bosnians, who were non-Arabic-speaking European Muslims, in fundamentalist Islamic principles. Ahmer said no such thing. The story about the Bosnian is not about indoctrination but gratitude for help from other Muslims. Ahmer had moved on to a third and unconnected topic, namely that Muslims help each other, and Allah helps |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | them. Ahmer started the story saying that Muslims came spontaneously at their own expense from all over the Muslim world to defend their Bosnian Muslim brothers. The full quote is, 'They [the foreigners] went to the front and started fighting against the Serbs who had attacked the Muslims. You know what? They didn't even ask questions. They just went, took a gun and started fighting. And you know who was really amazed? The Bosnians were really surprised. They saw these people coming in and going to the front and fighting and dying and they said, "Thank you very much. Thanks a lot, guys. But tell us, who gave you money to come? Who sent you?" They [foreigners] said, "Nobody." They [Bosnians] said, "Really? Nobody gave you money to come? But why did you come? We thank you and are very appreciative that you are dying for our honor and our lives but WHY? WHY? What made you come?" They [foreigners] said, "We are Muslims. We are Muslims and Allah has told us you must make jihad, that if your brother and sister is being killed, you should be the first one to die for them." They [Bosnians] said, "Really?" Because the Bosnians were well away from Islam at that time, they said "Really?!" They couldn't even say the world "jihad." They used to call "mujahedin," "muhajedin." It took them many months to learn the right word. They said if this really, if this is what Islam teaches you, we are fools if we don't practice Islam. See, jihad, how it establishes Islam??'" KSA Ex. 178 (Sageman WAMY Rep.) 116-17 (quoting Ahmer, 1996, at 6). <br><br> "In order to make sure that the campers understood the meaning of his lecture, Ahmer summarized it. 'Until this point, we have talked about three things. <br><br> 1. What is Jihad? |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | 2. Why is it so important? Because we have to establish the deen [way] of Allah and we talked about why is it important that each one of us make jihad and struggle for the deen of Islam.<br><br>3. How Allah will help us and how Allah is helping us in such instances.' "<br><br>KSA Ex. 178 (Sageman WAMY Rep.) 117 (quoting Ahmer, 1996, at 9).<br><br>"The rest of the lecture seems to be about proselytizing a Salafi version of Islam. This is not extremist indoctrination as Kohlmann argues but simply Salafi proselytism." KSA Ex. 178 (Sageman WAMY Rep.) 118.<br><br>"The last four lines in Kohlmann's paragraph 161 have nothing to do with the above Suleman Ahmer lecture in Florida in 1996. They refer to a cable written in 2006 (about a decade after the above lecture) by the political officer at the U.S. consulate in Jeddah, who interviewed the then WAMY Secretary General Dr. Saleh al-Wohaibi on multiple topics. This is a different secretary general than the one that was in charge of WAMY at the time of the above lecture, Dr. Maneh al-Johani, who died in 2002 and was replaced by Dr. al-Wohaibi. When the political officer complained about an anti-American lecture accusing Saudi journalists of being agents of the West, given by a Sheikh al-Break [sic] at a WAMY summer camp in 2006 in Saudi Arabia, Dr. al-Wohaibi replied, 'although it was unfortunate that al-Break comments sparked such controversy in the media, it is "not possible to control" all the information given during these lectures. WAMY is a major organizer of summer camps for children . . . and its focus is to encourage youth to engage in positive activities, such as sport and religious study during their summer vacation. If some lectures share extremist ideologies with the children, it is unintentional.' This cable strongly implies that this sheikh gave his lecture in the summer of 2006, five years after the 9/11 attacks and much |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | too late to have played any role in them." KSA Ex. 178 (Sageman WAMY Rep.) 118 (citing Pls. Ex. 150B (Kohlmann Rep.) 49 n.237 and quoting FED-PEC0210330–1).<br><br>"The two events are unrelated, referred to different lectures, given by different lecturers, a decade apart, and in different countries. The juxtaposition of these two unrelated items and the omission of the end of Dr. al-Wohaibi's quote makes it appear that the WAMY Secretary General at the time (Dr. al-Johani) was *condoning* the first lecture while this is not the case." *See* KSA Ex. 178 (Sageman WAMY Rep.) 114–18. |
| 2116. | Sheikh Anwar Al Aulaqi, a senior member of al Qaeda and spiritual member to 9/11 hijackers Nawaf Al Hazmi, Khalid Al Mihdhar, Hani Janjour, Ahmed Al Ghamdi, and Majed Moqed while they were in the United States plotting and preparing for the September 11 attacks, simultaneously had a close association with WAMY's branch office in the United States and its officers. According to deposition testimony in this litigation, WAMY invited Al Aulaqi to give lectures at WAMY summer camps in the U.S. on multiple occasions, distributed audio tapes featuring Al Aulaqi's sermons, and further WAMY coordinated with Al Aulaqi in his capacity as Imam of the Dar al Hijrah Mosque in Northern Virginia. *See* Transcript, October 21, 2019 Deposition of | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 580 and 581 are inadmissible hearsay. *See* Objections Chart.<br><br>The cited portions of Plaintiffs Exhibit 579 cited are inadmissible because they are testimony not based on personal knowledge. *See* Objections |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | Ibrahim Abdullah, Ex. 579, at pp. 71-72, 75-78, 82, 87-88. See also Ex. 580, WAMY SA 1519 (Abdullah Dep. Ex. 283); Ex. 581, WAMY Int'l EO15165-15168 (Abdullah Dep. Ex. 285). | Chart. Ibrahim Abdullah lacked personal knowledge regarding the contract, as he testified that (1) he had not seen the contract prior to deposition preparation, (2) the contract was not produced from his offices, (3) he did not know why WAMY would have a copy of the contract, and (4) he did not know when WAMY may have received the copy of the contract. *See* Pls. Ex. 579 (Abdullah Tr.) 89:17-91:21.<br><br>To the extent a response is required, at the time Plaintiffs' reference before the September 11 attacks, Awlaki was known as a politically moderate Islamic preacher who opposed terrorism. *See* KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) at 1, 28 (book by Plaintiffs' proffered expert describing Awlaki as "initially a revered mainstream Islamic preacher in America" who was once invited to speak at the Pentagon).<br><br>Plaintiffs' own proffered expert also wrote that it was "hard to believe" that Awlaki's contact with the 9/11 hiackers was anything other than innocent. KSA Ex. 94 (Meleagrou-Hitchens Ex. 3) at 24-25 ("That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy.").<br><br>After the September 11 attacks, Al Awlaki condemned the attacks both publicly to the New York Times and Washington Post, and privately in an email to his younger brother describing the attacks as "horrible." *Id.* at 25-26; Pls. Ex. 102 (Meleagrou Hitches Tr.) 311:13-314:14.<br><br>In July 2001, Al Awlaki preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon demonstrating that the government never viewed him as an extremist |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | while he was in the United States.  *See* KSA Ex. 178 (Sageman WAMY Rep.) 177. |
| 2117. | Sheikh Saleh al Buraik, a WAMY employee who provided anti-American lectures at WAMY summer youth camps, has urged Muslims to engage in violent jihad on the battlefield or become a financial supporter of jihad.<br><br>May the peace and blessings of Allah be upon him. The most sublime favor of Jihad is that it is the pillar and peak of religion. The five pillars are: Shahadah [Declaration of faith], prayer, Zakat, Hajj, and fasting. And Jihad for the sake of Allah is the pillar that guards, preserves, and governs them. Bear in mind that Jihad is the pillar and peak of religion. Brothers, I would say: Jihad has a high status, which is neither attainable nor accessible by everyone. It is a very, very great status. Do not be surprised by the lack of the Mujahideen or those who make their way to Jihad.  Why?  Because no people were found qualified to obtain the high status. But least of all, if you are not in the battlefield frontline, in the right side, in the rear, or in the left side, you could be at least a supporter of Jihad, a collector of donations for Jihad, an advocate of Jihad. You should keep your | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts."  ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023.  ECF No. 3946, at 31-37; ECF No. 8862.  Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibits 582 and 583 are inadmissible hearsay.  *See* Objections Chart.<br><br>To the extent a response is required, significant portions of the second paragraph are lifted verbatim from Kohlmann's report (Pls. Ex. 150B), at 55–56.  This report was not submitted by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia.  *See*, *e.g.*, ECF No. 5266 at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia).  *See* Objections Chart.<br><br>There is also no evidence that Sheikh Saad (not Saleh, as Kohlmann called him, and Plaintiffs repeat here in error) al-Buraik is a WAMY employee.  Plaintiffs Exhibit 583 is an article from FrontPageMag.com, a notorious Islamophobic online magazine that spreads online conspiracy |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | prayer at night and day for Jihad and for the Mujahideen.<br><br>Ex. 582, The Islamic Library, Lessons of Sheikh Saad Buraik, *The Favor of Jihad Over Other Acts*, p. 3091. *See also* Frontpage Magazine; *Saudis Spread Hate Speech in the U.S.*, September 16, 2002, Ex. 583 (identifying Buraik as an employee of WAMY, and discussing the dissemination of hate literature in the U.S. by Saudi officials via WAMY's Virginia office, IIASA, and the Saudi Embassy, Islamic Affairs Office). | theories. It is full of errors and identifies Abdullah Binladin (spelled Ben Laden in the article), the former president of the U.S. office WAMY, as the brother of Osama bin Laden. Such inaccuracies*, see* Response to Plaintiffs Averment ¶ 2107, call the reliability of this source into question.<br><br>Plaintiffs (and Kohlmann) cited Plaintiffs Exhibit 582, a stand-alone quote from the Internet, without context or authentication. The full lecture or book is not available. Given Kohlmann's tendency to distort evidence, *see* Response to Plaintiffs Averment ¶ 2115, Plaintiffs' characterization cannot be accepted. *See generally* KSA Ex. 178 (Sageman WAMY Rep.) 121. |
| 2118. | Sheikh Buraik has also advocated for using jihad to spread the Islamic faith.<br><br>O brothers, Islam spread when the blood of its companions was shed on the land of Jihad. The Islamic conquests expanded when the blood of the companions, the followers, and the Muslim soldiers was shed on the land of the East and the West. This is the Sunnah of Allah, and Jihad goes on until the judgment day. This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this | Saudi Arabia need not respond to this paragraph because it is not specifically cited in Plaintiffs' brief and therefore violates the Court's April 17, 2023 order that "[t]he parties' briefs . . . must set forth all pertinent facts," which "may not be accomplished by incorporating by reference other documents such as . . . averments of facts." ECF No. 9026, at 4.<br><br>Saudi Arabia need not respond to this paragraph because the Court dismissed Plaintiffs' charity-centered allegations in March 2018 and denied reconsideration in February 2023. ECF No. 3946, at 31-37; ECF No. 8862. Saudi Arabia should not be required to respond further to a theory that is out of the case.<br><br>Plaintiffs Exhibit 584 is inadmissible hearsay. *See* Objections Chart.<br><br>To the extent a response is required, the second paragraph comes from Kohlmann's report. Pls. Ex. 150B at 56. This report was not submitted |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | way. O servants of Allah, many people were known for their thought, good intention, and sincerity only after they died. Their name spread and their status was known. Sayyid Qutb, may Allah have mercy on his soul, was known to you. On his way for execution, he was asked to apologize or to say something to please those around him or to get his death sentence changed to life imprisonment or something like this. What did he say? "The index finger, which testifies to Allah's monotheism five times a day, refuses to apologize to the tyrants." Allah is the greatest, O servant of Allah. This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood.<br><br>Ex. 584, Sheikh Saad Buraik, *The Martyr of Jihad, Abdullah Azzam*. | by Plaintiffs against Saudi Arabia and cannot be relied upon in Plaintiffs' case against Saudi Arabia. *See*, *e.g.*, ECF No. 5266 at 1 n.1 (setting expert discovery schedule in charities case; list of Defendants does not include Saudi Arabia). *See* Objections Chart.<br><br>Plaintiffs' specific quote comes from a eulogy, "The Martyr of Jihad, Abdullah Azzam," that Sheikh Buraik gave around 1990 in memory of Sheikh Abdullah Azzam, who had just been assassinated. Pls. Ex. 584. The date of this eulogy is between November 24, 1989, when Sheikh Abdullah Azzm was assassinated and August 30, 1991 when Jamil al-Rahman, whom Sheikh Buraik named in this eulogy was also assassinated. *See* KSA Ex. 167 (Sageman Rep.) 30–59 (discussing the role of Sheikh Abdullah Azzam in the Afghan resistance to the Soviet invasion of the 1980s).<br><br>As the title of the talk makes clear, this is a eulogy and the jihad is the Afghan jihad of the 1980s, which the U.S. Government funded and supported along with Saudi Arabia. The eulogy opened with a summary of its main points: "In Islam, there are men who sacrificed their worldly life with its pleasures to uphold the word of Allah, and who devoted their time and efforts for the sake of Allah. Though we might feel sad at the death of the heroes, consolation is all about the paradise. In this article, you find consolation to the Muslims for the loss of the nation's deceased and the father of Jihad in this era, Sheikh Abdullah Azzam." Pls. Ex. 584 at 1. Sheikh Buraik went on to talk about the assassination of Azzam on November 24, 1989. *Id*. at 3-4. Then Sheikh Buraik discussed the piety of Sheikh Abdullah Azzam. *Id*. at 4-6. This brings us to the section of the eulogy, "Jihad and its importance in spreading religion," where the deaths or martyrdom of jihadi leaders would not stop the spread of Islam. *Id*. at 6-7 (capitalization omitted0. On the contrary, their martyrdom would inspire people to take to Islam and spread the religion. *Id*. at 7-10. |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | This is the context of the relevant paragraph: "O brothers, Islam spread when the blood of its companions was shed on the land of Jihad. The Islamic conquests expanded when the blood of the companions, the followers, and the Muslim soldiers was shed on the land of the East and the West. This is the Sunnah of Allah, and Jihad goes on until the judgment day. This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia [(ancient Arabic for "path" or "way")] of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this way. O servants of Allah, many people were known for their thought, good intention, and sincerity only after they died. Their name spread and their status was known." Pls. Ex. 584 at 6. Sheikh Buraik then named Sayyid Qutb, *id.*, the Egyptian ideologue, who was executed in prison on August 29, 1966, during the Gamal Abdel Nasser regime in Egypt. On the day of Qutb's execution, he was given a chance to renounce his ideas, but he refused and died as a martyr, like Sheikh Abdullah Azzam. Sheikh Buraik commented, "This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood. . . . Azzam is like him [Qutb]. And before them there are the imams of the Da'wah in Najd and all over the world. When they offered their blood to Allah, monotheism spread, the Da'wah spread, and their thoughts spread." Pls. Ex. 584 at 6. <br><br> Sheikh Buraik was clearly praising Azzam and Qutb, who were preachers, not soldiers. They died for what they believed and therefore became martyrs to their cause. As a result, their reputation and their ideas spread, inspiring new people to take their cause. Sheikh Buraik could have made the same point about the early Christian martyrs who died for their cause and helped spread Christianity during the Roman Empire. They were not soldiers, and did not spread religion through violence, but through their |

| Para No. | Plaintiffs' Averment | Saudi Arabia's Response |
|---|---|---|
| | | faith, for which they were willing to die.  In this context, the meaning of jihad is that of a struggle for the sake of God, and not violence.<br><br>Contrary to Plaintiffs' insinuation, Sheikh Buraik does not preach violent jihad, but faith and sacrifice for the cause.  This is not an attempt to indoctrinate vulnerable young Muslims to go on and carry out the 9/11 attacks.  There does not seem to be any relationship between this eulogy and WAMY and Plaintiffs present none.  *See generally* KSA Ex. 178 (Sageman WAMY Rep.) 119–21. |

**REDACTED FOR PUBLIC FILING**

Date:  March 4, 2023

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*