# EXHIBIT 163

# THE 9/11
# COMMISSION
# REPORT

with his colleagues on the floor of the command center. In a brief moment of reflection, he was recorded remarking that "This is a new type of war."[241]

He was, and is, right. But the conflict did not begin on 9/11. It had been publicly declared years earlier, most notably in a declaration faxed early in 1998 to an Arabic-language newspaper in London. Few Americans had noticed it. The fax had been sent from thousands of miles away by the followers of a Saudi exile gathered in one of the most remote and impoverished countries on earth.

2

# THE FOUNDATION OF
# THE NEW TERRORISM

## 2.1 A DECLARATION OF WAR

In February 1998, the 40-year-old Saudi exile Usama Bin Ladin and a fugitive Egyptian physician, Ayman al Zawahiri, arranged from their Afghan headquarters for an Arabic newspaper in London to publish what they termed a fatwa issued in the name of a "World Islamic Front." A fatwa is normally an interpretation of Islamic law by a respected Islamic authority, but neither Bin Ladin, Zawahiri, nor the three others who signed this statement were scholars of Islamic law. Claiming that America had declared war against God and his messenger, they called for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it."[1]

Three months later, when interviewed in Afghanistan by ABC-TV, Bin Ladin enlarged on these themes.[2] He claimed it was more important for Muslims to kill Americans than to kill other infidels. "It is far better for anyone to kill a single American soldier than to squander his efforts on other activities," he said. Asked whether he approved of terrorism and of attacks on civilians, he replied: "We believe that the worst thieves in the world today and the worst terrorists are the Americans. Nothing could stop you except perhaps retaliation in kind. We do not have to differentiate between military or civilian. As far as we are concerned, they are all targets."

*Note: Islamic names often do not follow the Western practice of the consistent use of surnames. Given the variety of names we mention, we chose to refer to individuals by the last word in the names by which they are known: Nawaf al Hazmi as Hazmi, for instance, omitting the article "al" that would be part of their name in their own societies. We generally make an exception for the more familiar English usage of "Bin" as part of a last name, as in Bin Ladin. Further, there is no universally accepted way to transliterate Arabic words and names into English. We have relied on a mix of common sense, the sound of the name in Arabic, and common usage in source materials, the press, or government documents. When we quote from a source document, we use its transliteration, e.g., "al Qida" instead of al Qaeda.*

Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.

In August 1996, Bin Ladin had issued his own self-styled fatwa calling on Muslims to drive American soldiers out of Saudi Arabia. The long, disjointed document condemned the Saudi monarchy for allowing the presence of an army of infidels in a land with the sites most sacred to Islam, and celebrated recent suicide bombings of American military facilities in the Kingdom. It praised the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 bombing in Aden, and especially the 1993 firefight in Somalia after which the United States "left the area carrying disappointment, humiliation, defeat and your dead with you."[3]

Bin Ladin said in his ABC interview that he and his followers had been preparing in Somalia for another long struggle, like that against the Soviets in Afghanistan, but "the United States rushed out of Somalia in shame and disgrace." Citing the Soviet army's withdrawal from Afghanistan as proof that a ragged army of dedicated Muslims could overcome a superpower, he told the interviewer: "We are certain that we shall—with the grace of Allah—prevail over the Americans." He went on to warn that "If the present injustice continues . . . , it will inevitably move the battle to American soil."[4]

Plans to attack the United States were developed with unwavering single-mindedness throughout the 1990s. Bin Ladin saw himself as called "to follow in the footsteps of the Messenger and to communicate his message to all nations,"[5] and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam.

## 2.2 BIN LADIN'S APPEAL IN THE ISLAMIC WORLD

It is the story of eccentric and violent ideas sprouting in the fertile ground of political and social turmoil. It is the story of an organization poised to seize its historical moment. How did Bin Ladin—with his call for the indiscriminate killing of Americans—win thousands of followers and some degree of approval from millions more?

The history, culture, and body of beliefs from which Bin Ladin has shaped and spread his message are largely unknown to many Americans. Seizing on symbols of Islam's past greatness, he promises to restore pride to people who consider themselves the victims of successive foreign masters. He uses cultural and religious allusions to the holy Qur'an and some of its interpreters. He appeals to people disoriented by cyclonic change as they confront modernity and globalization. His rhetoric selectively draws from multiple sources—Islam, history, and the region's political and economic malaise. He also stresses grievances against the United States widely shared in the Muslim world. He



©Reuters 2004

*Usama Bin Ladin at a news conference in Afghanistan in 1998*

inveighed against the presence of U.S. troops in Saudi Arabia, the home of Islam's holiest sites. He spoke of the suffering of the Iraqi people as a result of sanctions imposed after the Gulf War, and he protested U.S. support of Israel.

### Islam

Islam (a word that literally means "surrender to the will of God") arose in Arabia with what Muslims believe are a series of revelations to the Prophet Mohammed from the one and only God, the God of Abraham and of Jesus. These revelations, conveyed by the angel Gabriel, are recorded in the Qur'an. Muslims believe that these revelations, given to the greatest and last of a chain of prophets stretching from Abraham through Jesus, complete God's message to humanity. The Hadith, which recount Mohammed's sayings and deeds as recorded by his contemporaries, are another fundamental source. A third key element is the Sharia, the code of law derived from the Qur'an and the Hadith.

Islam is divided into two main branches, Sunni and Shia. Soon after the

activity. He and the cleric Azzam had joined in creating a "Bureau of Services" (Mektab al Khidmat, or MAK), which channeled recruits into Afghanistan.[22]

The international environment for Bin Ladin's efforts was ideal. Saudi Arabia and the United States supplied billions of dollars worth of secret assistance to rebel groups in Afghanistan fighting the Soviet occupation. This assistance was funneled through Pakistan: the Pakistani military intelligence service (Inter-Services Intelligence Directorate, or ISID), helped train the rebels and distribute the arms. But Bin Ladin and his comrades had their own sources of support and training, and they received little or no assistance from the United States.[23]

April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaeda) as a potential general headquarters for future jihad.[24] Though Azzam had been considered number one in the MAK, by August 1988 Bin Ladin was clearly the leader (*emir*) of al Qaeda. This organization's structure included as its operating arms an intelligence component, a military committee, a financial committee, a political committee, and a committee in charge of media affairs and propaganda. It also had an Advisory Council (Shura) made up of Bin Ladin's inner circle.[25]

Bin Ladin's assumption of the helm of al Qaeda was evidence of his growing self-confidence and ambition. He soon made clear his desire for unchallenged control and for preparing the mujahideen to fight anywhere in the world. Azzam, by contrast, favored continuing to fight in Afghanistan until it had a true Islamist government. And, as a Palestinian, he saw Israel as the top priority for the next stage.[26]

Whether the dispute was about power, personal differences, or strategy, it ended on November 24, 1989, when a remotely controlled car bomb killed Azzam and both of his sons. The killers were assumed to be rival Egyptians. The outcome left Bin Ladin indisputably in charge of what remained of the MAK and al Qaeda.[27]

Through writers like Qutb, and the presence of Egyptian Islamist teachers in the Saudi educational system, Islamists already had a strong intellectual influence on Bin Ladin and his al Qaeda colleagues. By the late 1980s, the Egyptian Islamist movement—badly battered in the government crackdown following President Sadat's assassination—was centered in two major organizations: the Islamic Group and the Egyptian Islamic Jihad. A spiritual guide for both, but especially the Islamic Group, was the so-called Blind Sheikh, Omar Abdel Rahman. His preaching had inspired the assassination of Sadat. After being in and out of Egyptian prisons during the 1980s, Abdel Rahman found

refuge in the United States. From his headquarters in Jersey City, he distributed messages calling for the murder of unbelievers.[28]

The most important Egyptian in Bin Ladin's circle was a surgeon, Ayman al Zawahiri, who led a strong faction of the Egyptian Islamic Jihad. Many of his followers became important members in the new organization, and his own close ties with Bin Ladin led many to think of him as the deputy head of al Qaeda. He would in fact become Bin Ladin's deputy some years later, when they merged their organizations.[29]

### Bin Ladin Moves to Sudan

By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum.[30] Bin Ladin agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad.[31] While agents of Bin Ladin began to buy property in Sudan in 1990,[32] Bin Ladin himself moved from Afghanistan back to Saudi Arabia.

In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport. With help from a dissident member of the royal family, he managed to get out of the country under the pretext of attending an Islamic gathering in Pakistan in April 1991.[33] By 1994, the Saudi government would freeze his financial assets and revoke his citizenship.[34] He no longer had a country he could call his own.

Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tuc-

son, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus.[35]

Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)[36]

Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well.[37] The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders.[38] Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.[39]

This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid-1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK.[40] Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson.[41] Al Khifa recruited American Muslims to

almost every corner of the Muslim world. His vision mirrored that of Sudan's Islamist leader, Turabi, who convened a series of meetings under the label Popular Arab and Islamic Conference around the time of Bin Ladin's arrival in that country. Delegations of violent Islamist extremists came from all the groups represented in Bin Ladin's Islamic Army Shura. Representatives also came from organizations such as the Palestine Liberation Organization, Hamas, and Hezbollah.[51]

Turabi sought to persuade Shiites and Sunnis to put aside their divisions and join against the common enemy. In late 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States. Not long afterward, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security. Bin Ladin reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983. The relationship between al Qaeda and Iran demonstrated that Sunni–Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations. As will be described in chapter 7, al Qaeda contacts with Iran continued in ensuing years.[52]

Bin Ladin was also willing to explore possibilities for cooperation with Iraq, even though Iraq's dictator, Saddam Hussein, had never had an Islamist agenda—save for his opportunistic pose as a defender of the faithful against "Crusaders" during the Gulf War of 1991. Moreover, Bin Ladin had in fact been sponsoring anti-Saddam Islamists in Iraqi Kurdistan, and sought to attract them into his Islamic army.[53]

To protect his own ties with Iraq, Turabi reportedly brokered an agreement that Bin Ladin would stop supporting activities against Saddam. Bin Ladin apparently honored this pledge, at least for a time, although he continued to aid a group of Islamist extremists operating in part of Iraq (Kurdistan) outside of Baghdad's control. In the late 1990s, these extremist groups suffered major defeats by Kurdish forces. In 2001, with Bin Ladin's help they re-formed into an organization called Ansar al Islam. There are indications that by then the Iraqi regime tolerated and may even have helped Ansar al Islam against the common Kurdish enemy.[54]

With the Sudanese regime acting as intermediary, Bin Ladin himself met with a senior Iraqi intelligence officer in Khartoum in late 1994 or early 1995. Bin Ladin is said to have asked for space to establish training camps, as well as assistance in procuring weapons, but there is no evidence that Iraq responded to this request.[55] As described below, the ensuing years saw additional efforts to establish connections.

**Sudan Becomes a Doubtful Haven**

Not until 1998 did al Qaeda undertake a major terrorist operation of its own, in large part because Bin Ladin lost his base in Sudan. Ever since the Islamist regime came to power in Khartoum, the United States and other Western governments had pressed it to stop providing a haven for terrorist organizations. Other governments in the region, such as those of Egypt, Syria, Jordan, and even Libya, which were targets of some of these groups, added their own pressure. At the same time, the Sudanese regime began to change. Though Turabi had been its inspirational leader, General Omar al Bashir, president since 1989, had never been entirely under his thumb. Thus as outside pressures mounted, Bashir's supporters began to displace those of Turabi.

The attempted assassination in Ethiopia of Egyptian President Hosni Mubarak in June 1995 appears to have been a tipping point. The would-be killers, who came from the Egyptian Islamic Group, had been sheltered in Sudan and helped by Bin Ladin.[56] When the Sudanese refused to hand over three individuals identified as involved in the assassination plot, the UN Security Council passed a resolution criticizing their inaction and eventually sanctioned Khartoum in April 1996.[57]

A clear signal to Bin Ladin that his days in Sudan were numbered came when the government advised him that it intended to yield to Libya's demands to stop giving sanctuary to its enemies. Bin Ladin had to tell the Libyans who had been part of his Islamic army that he could no longer protect them and that they had to leave the country. Outraged, several Libyan members of al Qaeda and the Islamic Army Shura renounced all connections with him.[58]

Bin Ladin also began to have serious money problems. International pressure on Sudan, together with strains in the world economy, hurt Sudan's currency. Some of Bin Ladin's companies ran short of funds. As Sudanese authorities became less obliging, normal costs of doing business increased. Saudi pressures on the Bin Ladin family also probably took some toll. In any case, Bin Ladin found it necessary both to cut back his spending and to control his outlays more closely. He appointed a new financial manager, whom his followers saw as miserly.[59]

Money problems proved costly to Bin Ladin in other ways. Jamal Ahmed al Fadl, a Sudanese-born Arab, had spent time in the United States and had been recruited for the Afghan war through the Farouq mosque in Brooklyn. He had joined al Qaeda and taken the oath of fealty to Bin Ladin, serving as one of his business agents. Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States. Also testifying about al Qaeda in a U.S. court was L'Houssaine Kherchtou, who told of breaking with Bin Ladin because of Bin Ladin's professed inability to provide him with money when his wife needed a caesarian section.[60]

In February 1996, Sudanese officials began approaching officials from the

United States and other governments, asking what actions of theirs might ease foreign pressure. In secret meetings with Saudi officials, Sudan offered to expel Bin Ladin to Saudi Arabia and asked the Saudis to pardon him. U.S. officials became aware of these secret discussions, certainly by March. Saudi officials apparently wanted Bin Ladin expelled from Sudan. They had already revoked his citizenship, however, and would not tolerate his presence in their country. And Bin Ladin may have no longer felt safe in Sudan, where he had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both. In any case, on May 19, 1996, Bin Ladin left Sudan—significantly weakened, despite his ambitions and organizational skills. He returned to Afghanistan.[61]

## 2.5 AL QAEDA'S RENEWAL IN AFGHANISTAN (1996–1998)

Bin Ladin flew on a leased aircraft from Khartoum to Jalalabad, with a refueling stopover in the United Arab Emirates.[62] He was accompanied by family members and bodyguards, as well as by al Qaeda members who had been close associates since his organization's 1988 founding in Afghanistan. Dozens of additional militants arrived on later flights.[63]

Though Bin Ladin's destination was Afghanistan, Pakistan was the nation that held the key to his ability to use Afghanistan as a base from which to revive his ambitious enterprise for war against the United States.

For the first quarter century of its existence as a nation, Pakistan's identity had derived from Islam, but its politics had been decidedly secular. The army was—and remains—the country's strongest and most respected institution, and the army had been and continues to be preoccupied with its rivalry with India, especially over the disputed territory of Kashmir.

From the 1970s onward, religion had become an increasingly powerful force in Pakistani politics. After a coup in 1977, military leaders turned to Islamist groups for support, and fundamentalists became more prominent. South Asia had an indigenous form of Islamic fundamentalism, which had developed in the nineteenth century at a school in the Indian village of Deoband.[64] The influence of the Wahhabi school of Islam had also grown, nurtured by Saudi-funded institutions. Moreover, the fighting in Afghanistan made Pakistan home to an enormous—and generally unwelcome—population of Afghan refugees; and since the badly strained Pakistani education system could not accommodate the refugees, the government increasingly let privately funded religious schools serve as a cost-free alternative. Over time, these schools produced large numbers of half-educated young men with no marketable skills but with deeply held Islamic views.[65]

Pakistan's rulers found these multitudes of ardent young Afghans a source



of potential trouble at home but potentially useful abroad. Those who joined the Taliban movement, espousing a ruthless version of Islamic law, perhaps could bring order in chaotic Afghanistan and make it a cooperative ally. They thus might give Pakistan greater security on one of the several borders where Pakistani military officers hoped for what they called "strategic depth."[66]

It is unlikely that Bin Ladin could have returned to Afghanistan had Pakistan disapproved. The Pakistani military intelligence service probably had advance knowledge of his coming, and its officers may have facilitated his travel. During his entire time in Sudan, he had maintained guesthouses and training camps in Pakistan and Afghanistan. These were part of a larger network used by diverse organizations for recruiting and training fighters for Islamic insurgencies in such places as Tajikistan, Kashmir, and Chechnya. Pakistani intelligence officers reportedly introduced Bin Ladin to Taliban leaders in Kandahar, their main base of power, to aid his reassertion of control over camps near

planned to brief cabinet-level principals and their deputies the following week, giving June 23 as the date for the raid, with Bin Ladin to be brought out of Afghanistan no later than July 23.[27]

On May 20, Director Tenet discussed the high risk of the operation with Berger and his deputies, warning that people might be killed, including Bin Ladin. Success was to be defined as the exfiltration of Bin Ladin out of Afghanistan.[28] A meeting of principals was scheduled for May 29 to decide whether the operation should go ahead.

The principals did not meet. On May 29, "Jeff" informed "Mike" that he had just met with Tenet, Pavitt, and the chief of the Directorate's Near Eastern Division. The decision was made not to go ahead with the operation. "Mike" cabled the field that he had been directed to "stand down on the operation for the time being." He had been told, he wrote, that cabinet-level officials thought the risk of civilian casualties—"collateral damage"—was too high. They were concerned about the tribals' safety, and had worried that "the purpose and nature of the operation would be subject to unavoidable misinterpretation and misrepresentation—and probably recriminations—in the event that Bin Ladin, despite our best intentions and efforts, did not survive."[29]

Impressions vary as to who actually decided not to proceed with the operation. Clarke told us that the CSG saw the plan as flawed. He was said to have described it to a colleague on the NSC staff as "half-assed" and predicted that the principals would not approve it. "Jeff" thought the decision had been made at the cabinet level. Pavitt thought that it was Berger's doing, though perhaps on Tenet's advice. Tenet told us that given the recommendation of his chief operations officers, he alone had decided to "turn off" the operation. He had simply informed Berger, who had not pushed back. Berger's recollection was similar. He said the plan was never presented to the White House for a decision.[30]

The CIA's senior management clearly did not think the plan would work. Tenet's deputy director of operations wrote to Berger a few weeks later that the CIA assessed the tribals' ability to capture Bin Ladin and deliver him to U.S. officials as low. But working-level CIA officers were disappointed. Before it was canceled, Schroen described it as the "best plan we are going to come up with to capture [Bin Ladin] while he is in Afghanistan and bring him to justice."[31] No capture plan before 9/11 ever again attained the same level of detail and preparation. The tribals' reported readiness to act diminished. And Bin Ladin's security precautions and defenses became more elaborate and formidable.

At this time, 9/11 was more than three years away. It was the duty of Tenet and the CIA leadership to balance the risks of inaction against jeopardizing the lives of their operatives and agents. And they had reason to worry about failure: millions of dollars down the drain; a shoot-out that could be seen as an assassination; and, if there were repercussions in Pakistan, perhaps a coup. The decisions of the U.S. government in May 1998 were made, as Berger has put

it, from the vantage point of the driver looking through a muddy windshield moving forward, not through a clean rearview mirror.[32]

**Looking for Other Options**

The Counterterrorist Center continued to track Bin Ladin and to contemplate covert action. The most hopeful possibility seemed now to lie in diplomacy— but not diplomacy managed by the Department of State, which focused primarily on India-Pakistan nuclear tensions during the summer of 1998. The CIA learned in the spring of 1998 that the Saudi government had quietly disrupted Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles. They had arrested scores of individuals, with no publicity. When thanking the Saudis, Director Tenet took advantage of the opening to ask them to help against Bin Ladin. The response was encouraging enough that President Clinton made Tenet his informal personal representative to work with the Saudis on terrorism, and Tenet visited Riyadh in May and again in early June.[33]

Saudi Crown Prince Abdullah, who had taken charge from the ailing King Fahd, promised Tenet an all-out secret effort to persuade the Taliban to expel Bin Ladin so that he could be sent to the United States or to another country for trial. The Kingdom's emissary would be its intelligence chief, Prince Turki bin Faisal. Vice President Al Gore later added his thanks to those of Tenet, both making clear that they spoke with President Clinton's blessing. Tenet reported that it was imperative to get an indictment against Bin Ladin. The New York grand jury issued its sealed indictment a few days later, on June 10. Tenet also recommended that no action be taken on other U.S. options, such as the covert action plan.[34]

Prince Turki followed up in meetings during the summer with Mullah Omar and other Taliban leaders. Apparently employing a mixture of possible incentives and threats, Turki received a commitment that Bin Ladin would be expelled, but Mullah Omar did not make good on this promise.[35]

On August 5, Clarke chaired a CSG meeting on Bin Ladin. In the discussion of what might be done, the note taker wrote, "there was a dearth of bright ideas around the table, despite a consensus that the [government] ought to pursue every avenue it can to address the problem."[36]

## 4.2 CRISIS: AUGUST 1998

On August 7, 1998, National Security Advisor Berger woke President Clinton with a phone call at 5:35 A.M. to tell him of the almost simultaneous bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. Suspicion quickly focused on Bin Ladin. Unusually good intelligence, chiefly from

the yearlong monitoring of al Qaeda's cell in Nairobi, soon firmly fixed responsibility on him and his associates.[37]

Debate about what to do settled very soon on one option: Tomahawk cruise missiles. Months earlier, after cancellation of the covert capture operation, Clarke had prodded the Pentagon to explore possibilities for military action. On June 2, General Hugh Shelton, the chairman of the Joint Chiefs of Staff, had directed General Zinni at Central Command to develop a plan, which he had submitted during the first week of July. Zinni's planners surely considered the two previous times the United States had used force to respond to terrorism, the 1986 strike on Libya and the 1993 strike against Iraq. They proposed firing Tomahawks against eight terrorist camps in Afghanistan, including Bin Ladin's compound at Tarnak Farms.[38] After the embassy attacks, the Pentagon offered this plan to the White House.

The day after the embassy bombings, Tenet brought to a principals meeting intelligence that terrorist leaders were expected to gather at a camp near Khowst, Afghanistan, to plan future attacks. According to Berger, Tenet said that several hundred would attend, including Bin Ladin. The CIA described the area as effectively a military cantonment, away from civilian population centers and overwhelmingly populated by jihadists. Clarke remembered sitting next to Tenet in a White House meeting, asking Tenet "You thinking what I'm thinking?" and his nodding "yes."[39] The principals quickly reached a consensus on attacking the gathering. The strike's purpose was to kill Bin Ladin and his chief lieutenants.[40]

Berger put in place a tightly compartmented process designed to keep all planning secret. On August 11, General Zinni received orders to prepare detailed plans for strikes against the sites in Afghanistan. The Pentagon briefed President Clinton about these plans on August 12 and 14. Though the principals hoped that the missiles would hit Bin Ladin, NSC staff recommended the strike whether or not there was firm evidence that the commanders were at the facilities.[41]

Considerable debate went to the question of whether to strike targets outside of Afghanistan, including two facilities in Sudan. One was a tannery believed to belong to Bin Ladin. The other was al Shifa, a Khartoum pharmaceutical plant, which intelligence reports said was manufacturing a precursor ingredient for nerve gas with Bin Ladin's financial support. The argument for hitting the tannery was that it could hurt Bin Ladin financially. The argument for hitting al Shifa was that it would lessen the chance of Bin Ladin's having nerve gas for a later attack.[42]

Ever since March 1995, American officials had had in the backs of their minds Aum Shinrikyo's release of sarin nerve gas in the Tokyo subway. President Clinton himself had expressed great concern about chemical and biological terrorism in the United States. Bin Ladin had reportedly been heard to speak of wanting a "Hiroshima" and at least 10,000 casualties. The CIA reported

**Detainee Interrogation Reports**

Chapters 5 and 7 rely heavily on information obtained from captured al Qaeda members. A number of these "detainees" have firsthand knowledge of the 9/11 plot.

Assessing the truth of statements by these witnesses—sworn enemies of the United States—is challenging. Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when, or how questions of particular interest would be asked. Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting. We were told that our requests might disrupt the sensitive interrogation process.

We have nonetheless decided to include information from captured 9/11 conspirators and al Qaeda members in our report. We have evaluated their statements carefully and have attempted to corroborate them with documents and statements of others. In this report, we indicate where such statements provide the foundation for our narrative. We have been authorized to identify by name only ten detainees whose custody has been confirmed officially by the U.S. government.[2]

school, KSM left Kuwait to enroll at Chowan College, a small Baptist school in Murfreesboro, North Carolina. After a semester at Chowan, KSM transferred to North Carolina Agricultural and Technical State University in Greensboro, which he attended with Yousef's brother, another future al Qaeda member. KSM earned a degree in mechanical engineering in December 1986.[3]

Although he apparently did not attract attention for extreme Islamist beliefs or activities while in the United States, KSM plunged into the anti-Soviet Afghan jihad soon after graduating from college. Visiting Pakistan for the first time in early 1987, he traveled to Peshawar, where his brother Zahid introduced him to the famous Afghan *mujahid* Abdul Rasul Sayyaf, head of the Hizbul-Ittihad El-Islami (Islamic Union Party). Sayyaf became KSM's mentor and provided KSM with military training at Sayyaf's Sada camp. KSM claims he then fought the Soviets and remained at the front for three months before being summoned to perform administrative duties for Abdullah Azzam. KSM next took a job working for an electronics firm that catered to the communications needs of Afghan groups, where he learned about drills used to excavate caves in Afghanistan.[4]

Between 1988 and 1992, KSM helped run a nongovernmental organization

(NGO) in Peshawar and Jalalabad; sponsored by Sayyaf, it was designed to aid young Afghan mujahideen. In 1992, KSM spent some time fighting alongside the mujahideen in Bosnia and supporting that effort with financial donations. After returning briefly to Pakistan, he moved his family to Qatar at the suggestion of the former minister of Islamic affairs of Qatar, Sheikh Abdallah bin Khalid bin Hamad al Thani. KSM took a position in Qatar as project engineer with the Qatari Ministry of Electricity and Water. Although he engaged in extensive international travel during his tenure at the ministry—much of it in furtherance of terrorist activity—KSM would hold his position there until early 1996, when he fled to Pakistan to avoid capture by U.S. authorities.[5]

KSM first came to the attention of U.S. law enforcement as a result of his cameo role in the first World Trade Center bombing. According to KSM, he learned of Ramzi Yousef's intention to launch an attack inside the United States in 1991 or 1992, when Yousef was receiving explosives training in Afghanistan. During the fall of 1992, while Yousef was building the bomb he would use in that attack, KSM and Yousef had numerous telephone conversations during which Yousef discussed his progress and sought additional funding. On November 3, 1992, KSM wired $660 from Qatar to the bank account of Yousef's co-conspirator, Mohammed Salameh. KSM does not appear to have contributed any more substantially to this operation.[6]

Yousef's instant notoriety as the mastermind of the 1993 World Trade Center bombing inspired KSM to become involved in planning attacks against the United States. By his own account, KSM's animus toward the United States stemmed not from his experiences there as a student, but rather from his violent disagreement with U.S. foreign policy favoring Israel. In 1994, KSM accompanied Yousef to the Philippines, and the two of them began planning what is now known as the Manila air or "Bojinka" plot—the intended bombing of 12 U.S. commercial jumbo jets over the Pacific during a two-day span. This marked the first time KSM took part in the actual planning of a terrorist operation. While sharing an apartment in Manila during the summer of 1994, he and Yousef acquired chemicals and other materials necessary to construct bombs and timers. They also cased target flights to Hong Kong and Seoul that would have onward legs to the United States. During this same period, KSM and Yousef also developed plans to assassinate President Clinton during his November 1994 trip to Manila, and to bomb U.S.-bound cargo carriers by smuggling jackets containing nitrocellulose on board.[7]

KSM left the Philippines in September 1994 and met up with Yousef in Karachi following their casing flights. There they enlisted Wali Khan Amin Shah, also known as Usama Asmurai, in the Manila air plot. During the fall of 1994, Yousef returned to Manila and successfully tested the digital watch timer he had invented, bombing a movie theater and a Philippine Airlines flight en route to Tokyo. The plot unraveled after the Philippine authorities discovered Yousef's bomb-making operation in Manila; but by that time, KSM was safely



*Khalid Sheikh Mohammed, mastermind of the 9/11 plot, at the time of his
capture in 2003*

back at his government job in Qatar. Yousef attempted to follow through on
the cargo carriers plan, but he was arrested in Islamabad by Pakistani authori-
ties on February 7, 1995, after an accomplice turned him in.[8]

KSM continued to travel among the worldwide jihadist community after
Yousef's arrest, visiting the Sudan, Yemen, Malaysia, and Brazil in 1995. No clear
evidence connects him to terrorist activities in those locations. While in Sudan,
he reportedly failed in his attempt to meet with Bin Ladin. But KSM did see
Atef, who gave him a contact in Brazil. In January 1996, well aware that U.S.
authorities were chasing him, he left Qatar for good and fled to Afghanistan,
where he renewed his relationship with Rasul Sayyaf.[9]

Just as KSM was reestablishing himself in Afghanistan in mid-1996, Bin
Ladin and his colleagues were also completing their migration from Sudan.
Through Atef, KSM arranged a meeting with Bin Ladin in Tora Bora, a moun-
tainous redoubt from the Afghan war days. At the meeting, KSM presented the
al Qaeda leader with a menu of ideas for terrorist operations. According to
KSM, this meeting was the first time he had seen Bin Ladin since 1989.
Although they had fought together in 1987, Bin Ladin and KSM did not yet
enjoy an especially close working relationship. Indeed, KSM has acknowledged

that Bin Ladin likely agreed to meet with him because of the renown of his nephew, Yousef.[10]

At the meeting, KSM briefed Bin Ladin and Atef on the first World Trade Center bombing, the Manila air plot, the cargo carriers plan, and other activities pursued by KSM and his colleagues in the Philippines. KSM also presented a proposal for an operation that would involve training pilots who would crash planes into buildings in the United States. This proposal eventually would become the 9/11 operation.[11]

KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide. He thought the operation might appeal to Bin Ladin, who had a long record of denouncing the United States.[12]

From KSM's perspective, Bin Ladin was in the process of consolidating his new position in Afghanistan while hearing out others' ideas, and had not yet settled on an agenda for future anti–U.S. operations. At the meeting, Bin Ladin listened to KSM's ideas without much comment, but did ask KSM formally to join al Qaeda and move his family to Afghanistan.[13]

KSM declined. He preferred to remain independent and retain the option of working with other mujahideen groups still operating in Afghanistan, including the group led by his old mentor, Sayyaf. Sayyaf was close to Ahmed Shah Massoud, the leader of the Northern Alliance. Therefore working with him might be a problem for KSM because Bin Ladin was building ties to the rival Taliban.

After meeting with Bin Ladin, KSM says he journeyed onward to India, Indonesia, and Malaysia, where he met with Jemaah Islamiah's Hambali. Hambali was an Indonesian veteran of the Afghan war looking to expand the jihad into Southeast Asia. In Iran, KSM rejoined his family and arranged to move them to Karachi; he claims to have relocated by January 1997.[14]

After settling his family in Karachi, KSM tried to join the mujahid leader Ibn al Khattab in Chechnya. Unable to travel through Azerbaijan, KSM returned to Karachi and then to Afghanistan to renew contacts with Bin Ladin and his colleagues. Though KSM may not have been a member of al Qaeda at this time, he admits traveling frequently between Pakistan and Afghanistan in 1997 and the first half of 1998, visiting Bin Ladin and cultivating relationships with his lieutenants, Atef and Sayf al Adl, by assisting them with computer and media projects.[15]

According to KSM, the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam marked a watershed in the evolution of the 9/11 plot. KSM claims these bombings convinced him that Bin Ladin was truly committed to attacking the United States. He continued to make himself useful, collecting news articles and helping other al Qaeda members with their outdated computer equipment. Bin Ladin, apparently at Atef's urging, finally decided to give KSM the green light for the 9/11 operation sometime in late 1998 or early 1999.[16]

KSM then accepted Bin Ladin's standing invitation to move to Kandahar and work directly with al Qaeda. In addition to supervising the planning and preparations for the 9/11 operation, KSM worked with and eventually led al Qaeda's media committee. But KSM states he refused to swear a formal oath of allegiance to Bin Ladin, thereby retaining a last vestige of his cherished autonomy.[17]

At this point, late 1998 to early 1999, planning for the 9/11 operation began in earnest. Yet while the 9/11 project occupied the bulk of KSM's attention, he continued to consider other possibilities for terrorist attacks. For example, he sent al Qaeda operative Issa al Britani to Kuala Lumpur, Malaysia, to learn about the jihad in Southeast Asia from Hambali. Thereafter, KSM claims, at Bin Ladin's direction in early 2001, he sent Britani to the United States to case potential economic and "Jewish" targets in New York City. Furthermore, during the summer of 2001, KSM approached Bin Ladin with the idea of recruiting a Saudi Arabian air force pilot to commandeer a Saudi fighter jet and attack the Israeli city of Eilat. Bin Ladin reportedly liked this proposal, but he instructed KSM to concentrate on the 9/11 operation first. Similarly, KSM's proposals to Atef around this same time for attacks in Thailand, Singapore, Indonesia, and the Maldives were never executed, although Hambali's Jemaah Islamiah operatives did some casing of possible targets.[18]

KSM appears to have been popular among the al Qaeda rank and file. He was reportedly regarded as an effective leader, especially after the 9/11 attacks. Co-workers describe him as an intelligent, efficient, and even-tempered manager who approached his projects with a single-minded dedication that he expected his colleagues to share. Al Qaeda associate Abu Zubaydah has expressed more qualified admiration for KSM's innate creativity, emphasizing instead his ability to incorporate the improvements suggested by others. Nashiri has been similarly measured, observing that although KSM floated many general ideas for attacks, he rarely conceived a specific operation himself.[19] Perhaps these estimates reflect a touch of jealousy; in any case, KSM was plainly a capable coordinator, having had years to hone his skills and build relationships.

**Hambali**

Al Qaeda's success in fostering terrorism in Southeast Asia stems largely from its close relationship with Jemaah Islamiah (JI). In that relationship, Hambali became the key coordinator. Born and educated in Indonesia, Hambali moved to Malaysia in the early 1980s to find work. There he claims to have become a follower of the Islamist extremist teachings of various clerics, including one named Abdullah Sungkar. Sungkar first inspired Hambali to share the vision of establishing a radical Islamist regime in Southeast Asia, then furthered Hambali's instruction in jihad by sending him to Afghanistan in 1986. After undergoing training at Rasul Sayyaf's Sada camp (where KSM would later train), Hambali fought against the Soviets; he eventually returned to Malaysia after 18

months in Afghanistan. By 1998, Hambali would assume responsibility for the Malaysia/Singapore region within Sungkar's newly formed terrorist organization, the JI.[20]

Also by 1998, Sungkar and JI spiritual leader Abu Bakar Bashir had accepted Bin Ladin's offer to ally JI with al Qaeda in waging war against Christians and Jews.[21] Hambali met with KSM in Karachi to arrange for JI members to receive training in Afghanistan at al Qaeda's camps. In addition to his close working relationship with KSM, Hambali soon began dealing with Atef as well. Al Qaeda began funding JI's increasingly ambitious terrorist plans, which Atef and KSM sought to expand. Under this arrangement, JI would perform the necessary casing activities and locate bomb-making materials and other supplies. Al Qaeda would underwrite operations, provide bomb-making expertise, and deliver suicide operatives.[22]

The al Qaeda–JI partnership yielded a number of proposals that would marry al Qaeda's financial and technical strengths with JI's access to materials and local operatives. Here, Hambali played the critical role of coordinator, as he distributed al Qaeda funds earmarked for the joint operations. In one especially notable example, Atef turned to Hambali when al Qaeda needed a scientist to take over its biological weapons program. Hambali obliged by introducing a U.S.-educated JI member, Yazid Sufaat, to Ayman al Zawahiri in Kandahar. In 2001, Sufaat would spend several months attempting to cultivate anthrax for al Qaeda in a laboratory he helped set up near the Kandahar airport.[23]

Hambali did not originally orient JI's operations toward attacking the United States, but his involvement with al Qaeda appears to have inspired him to pursue American targets. KSM, in his post-capture interrogations, has taken credit for this shift, claiming to have urged the JI operations chief to concentrate on attacks designed to hurt the U.S. economy.[24] Hambali's newfound interest in striking against the United States manifested itself in a spate of terrorist plans. Fortunately, none came to fruition.

In addition to staging actual terrorist attacks in partnership with al Qaeda, Hambali and JI assisted al Qaeda operatives passing through Kuala Lumpur. One important occasion was in December 1999–January 2000. Hambali accommodated KSM's requests to help several veterans whom KSM had just finished training in Karachi. They included Tawfiq bin Attash, also known as Khallad, who later would help bomb the USS *Cole*, and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. Hambali arranged lodging for them and helped them purchase airline tickets for their onward travel. Later that year, Hambali and his crew would provide accommodations and other assistance (including information on flight schools and help in acquiring ammonium nitrate) for Zacarias Moussaoui, an al Qaeda operative sent to Malaysia by Atef and KSM.[25]

Hambali used Bin Ladin's Afghan facilities as a training ground for JI recruits. Though he had a close relationship with Atef and KSM, he maintained JI's institutional independence from al Qaeda. Hambali insists that he did not

discuss operations with Bin Ladin or swear allegiance to him, having already given such a pledge of loyalty to Bashir, Sungkar's successor as JI leader. Thus, like any powerful bureaucrat defending his domain, Hambali objected when al Qaeda leadership tried to assign JI members to terrorist projects without notifying him.[26]

### Abd al Rahim al Nashiri

KSM and Hambali both decided to join forces with al Qaeda because their terrorist aspirations required the money and manpower that only a robust organization like al Qaeda could supply. On the other hand, Abd al Rahim al Nashiri—the mastermind of the *Cole* bombing and the eventual head of al Qaeda operations in the Arabian Peninsula—appears to have originally been recruited to his career as a terrorist by Bin Ladin himself.

Having already participated in the Afghan jihad, Nashiri accompanied a group of some 30 mujahideen in pursuit of jihad in Tajikistan in 1996. When serious fighting failed to materialize, the group traveled to Jalalabad and encountered Bin Ladin, who had recently returned from Sudan. Bin Ladin addressed them at length, urging the group to join him in a "jihad against the Americans." Although all were urged to swear loyalty to Bin Ladin, many, including Nashiri, found the notion distasteful and refused. After several days of indoctrination that included a barrage of news clippings and television documentaries, Nashiri left Afghanistan, first returning to his native Saudi Arabia and then visiting his home in Yemen. There, he says, the idea for his first terrorist operation took shape as he noticed many U.S. and other foreign ships plying the waters along the southwest coast of Yemen.[27]

Nashiri returned to Afghanistan, probably in 1997, primarily to check on relatives fighting there and also to learn about the Taliban. He again encountered Bin Ladin, still recruiting for "the coming battle with the United States." Nashiri pursued a more conventional military jihad, joining the Taliban forces in their fight against Ahmed Massoud's Northern Alliance and shuttling back and forth between the front and Kandahar, where he would see Bin Ladin and meet with other mujahideen. During this period, Nashiri also led a plot to smuggle four Russian-made antitank missiles into Saudi Arabia from Yemen in early 1998 and helped an embassy bombing operative obtain a Yemeni passport.[28]

At some point, Nashiri joined al Qaeda. His cousin, Jihad Mohammad Ali al Makki, also known as Azzam, was a suicide bomber for the Nairobi attack. Nashiri traveled between Yemen and Afghanistan. In late 1998, Nashiri proposed mounting an attack against a U.S. vessel. Bin Ladin approved. He directed Nashiri to start the planning and send operatives to Yemen, and he later provided money.[29]

Nashiri reported directly to Bin Ladin, the only other person who, according to Nashiri, knew all the details of the operation. When Nashiri had difficulty finding U.S. naval vessels to attack along the western coast of Yemen, Bin

Ladin reportedly instructed him to case the Port of Aden, on the southern coast, instead.[30] The eventual result was an attempted attack on the USS *The Sullivans* in January 2000 and the successful attack, in October 2000, on the USS *Cole*.

Nashiri's success brought him instant status within al Qaeda. He later was recognized as the chief of al Qaeda operations in and around the Arabian Peninsula. While Nashiri continued to consult Bin Ladin on the planning of subsequent terrorist projects, he retained discretion in selecting operatives and devising attacks. In the two years between the *Cole* bombing and Nashiri's capture, he would supervise several more proposed operations for al Qaeda. The October 6, 2002, bombing of the French tanker *Limburg* in the Gulf of Aden also was Nashiri's handiwork. Although Bin Ladin urged Nashiri to continue plotting strikes against U.S. interests in the Persian Gulf, Nashiri maintains that he actually delayed one of these projects because of security concerns.[31] Those concerns, it seems, were well placed, as Nashiri's November 2002 capture in the United Arab Emirates finally ended his career as a terrorist.

## 5.2 THE "PLANES OPERATION"

According to KSM, he started to think about attacking the United States after Yousef returned to Pakistan following the 1993 World Trade Center bombing. Like Yousef, KSM reasoned he could best influence U.S. policy by targeting the country's economy. KSM and Yousef reportedly brainstormed together about what drove the U.S. economy. New York, which KSM considered the economic capital of the United States, therefore became the primary target. For similar reasons, California also became a target for KSM.[32]

KSM claims that the earlier bombing of the World Trade Center taught him that bombs and explosives could be problematic, and that he needed to graduate to a more novel form of attack. He maintains that he and Yousef began thinking about using aircraft as weapons while working on the Manila air/Bojinka plot, and speculated about striking the World Trade Center and CIA headquarters as early as 1995.[33]

Certainly KSM was not alone in contemplating new kinds of terrorist operations. A study reportedly conducted by Atef, while he and Bin Ladin were still in Sudan, concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties. The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling the Bojinka concept. Such a study, if it actually existed, yields significant insight into the thinking of al Qaeda's leaders: (1) they rejected hijackings aimed at gaining the release of imprisoned comrades as too complex, because al Qaeda had no friendly countries in which to land a plane and

then negotiate; (2) they considered the bombing of commercial flights in midair—as carried out against Pan Am Flight 103 over Lockerbie, Scotland—a promising means to inflict massive casualties; and (3) they did not yet consider using hijacked aircraft as weapons against other targets.[34]

KSM has insisted to his interrogators that he always contemplated hijacking and crashing large commercial aircraft. Indeed, KSM describes a grandiose original plan: a total of ten aircraft to be hijacked, nine of which would crash into targets on both coasts—they included those eventually hit on September 11 plus CIA and FBI headquarters, nuclear power plants, and the tallest buildings in California and the state of Washington. KSM himself was to land the tenth plane at a U.S. airport and, after killing all adult male passengers on board and alerting the media, deliver a speech excoriating U.S. support for Israel, the Philippines, and repressive governments in the Arab world. Beyond KSM's rationalizations about targeting the U.S. economy, this vision gives a better glimpse of his true ambitions. This is theater, a spectacle of destruction with KSM as the self-cast star—the superterrorist.[35]

KSM concedes that this proposal received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity. Although Bin Ladin listened to KSM's proposal, he was not convinced that it was practical. As mentioned earlier, Bin Ladin was receiving numerous ideas for potential operations—KSM's proposal to attack U.S. targets with commercial airplanes was only one of many.[36]

KSM presents himself as an entrepreneur seeking venture capital and people. He simply wanted al Qaeda to supply the money and operatives needed for the attack while retaining his independence. It is easy to question such a statement. Money is one thing; supplying a cadre of trained operatives willing to die is much more. Thus, although KSM contends he would have been just as likely to consider working with any comparable terrorist organization, he gives no indication of what other groups he thought could supply such exceptional commodities.[37]

KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons. Though KSM speculates about how Bin Ladin came to share his preoccupation with attacking America, Bin Ladin in fact had long been an opponent of the United States. KSM thinks that Atef may have persuaded Bin Ladin to approve this specific proposal. Atef's role in the entire operation is unquestionably very significant but tends to fade into the background, in part because Atef himself is not available to describe it. He was killed in November 2001 by an American air strike in Afghanistan.[38]

Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal. The plot was now referred to within al Qaeda as the "planes operation."[39]

**The Plan Evolves**

Bin Ladin reportedly discussed the planes operation with KSM and Atef in a series of meetings in the spring of 1999 at the al Matar complex near Kandahar. KSM's original concept of using one of the hijacked planes to make a media statement was scrapped, but Bin Ladin considered the basic idea feasible. Bin Ladin, Atef, and KSM developed an initial list of targets. These included the White House, the U.S. Capitol, the Pentagon, and the World Trade Center. According to KSM, Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted to hit the Capitol. No one else was involved in the initial selection of targets.[40]

Bin Ladin also soon selected four individuals to serve as suicide operatives: Khalid al Mihdhar, Nawaf al Hazmi, Khallad, and Abu Bara al Yemeni. During the al Matar meetings, Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing. KSM had not met them. His only guidance from Bin Ladin was that the two should eventually go to the United States for pilot training.[41]

Hazmi and Mihdhar were Saudi nationals, born in Mecca. Like the others in this initial group of selectees, they were already experienced mujahideen. They had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995. By the time Hazmi and Mihdhar were assigned to the planes operation in early 1999, they had visited Afghanistan on several occasions.[42]

Khallad was another veteran mujahid, like much of his family. His father had been expelled from Yemen because of his extremist views. Khallad had grown up in Saudi Arabia, where his father knew Bin Ladin, Abdullah Azzam, and Omar Abdel Rahman (the "Blind Sheikh"). Khallad departed for Afghanistan in 1994 at the age of 15. Three years later, he lost his lower right leg in a battle with the Northern Alliance, a battle in which one of his brothers died. After this experience, he pledged allegiance to Bin Ladin—whom he had first met as a child in Jeddah—and volunteered to become a suicide operative.[43]

When Khallad applied for a U.S. visa, however, his application was denied. Earlier in 1999, Bin Ladin had sent Khallad to Yemen to help Nashiri obtain explosives for the planned ship-bombing and to obtain a visa to visit the United States, so that he could participate in an operation there. Khallad applied under another name, using the cover story that he would be visiting a medical clinic to obtain a new prosthesis for his leg. Another al Qaeda operative gave Khallad the name of a person living in the United States whom Khallad could use as a point of contact on a visa application. Khallad contacted this individual to help him get an appointment at a U.S. clinic. While Khallad was waiting for the letter from the clinic confirming the appointment, however, he was arrested by Yemeni authorities. The arrest resulted from mistaken identity: Khallad was driving the car of another conspirator in the ship-bombing plot who was wanted by the Yemeni authorities.[44]

Khallad was released sometime during the summer of 1999, after his father and Bin Ladin intervened on his behalf. Khallad learned later that the al Qaeda leader, apparently concerned that Khallad might reveal Nashiri's operation while under interrogation, had contacted a Yemeni official to demand Khallad's release, suggesting that Bin Ladin would not confront the Yemenis if they did not confront him. This account has been corroborated by others. Giving up on acquiring a U.S. visa and concerned that the United States might learn of his ties to al Qaeda, Khallad returned to Afghanistan.[45]

Travel issues thus played a part in al Qaeda's operational planning from the very start. During the spring and summer of 1999, KSM realized that Khallad and Abu Bara, both of whom were Yemenis, would not be able to obtain U.S. visas as easily as Saudi operatives like Mihdhar and Hazmi. Although Khallad had been unable to acquire a U.S. visa, KSM still wanted him and Abu Bara, as well as another Yemeni operative from Bin Ladin's security detail, to participate in the planes operation. Yet because individuals with Saudi passports could travel much more easily than Yemeni, particularly to the United States, there were fewer martyrdom opportunities for Yemenis. To overcome this problem, KSM decided to split the planes operation into two components.[46]

The first part of the planes operation—crashing hijacked aircraft into U.S. targets—would remain as planned, with Mihdhar and Hazmi playing key roles. The second part, however, would now embrace the idea of using suicide operatives to blow up planes, a refinement of KSM's old Manila air plot. The operatives would hijack U.S.-flagged commercial planes flying Pacific routes across East Asia and destroy them in midair, possibly with shoe bombs, instead of flying them into targets. (An alternate scenario apparently involved flying planes into U.S. targets in Japan, Singapore, or Korea.) This part of the operation has been confirmed by Khallad, who said that they contemplated hijacking several planes, probably originating in Thailand, South Korea, Hong Kong, or Malaysia, and using Yemenis who would not need pilot training because they would simply down the planes. All the planes hijacked in the United States and East Asia were to be crashed or exploded at about the same time to maximize the attack's psychological impact.[47]

**Training and Deployment to Kuala Lumpur**
In the fall of 1999, the four operatives selected by Bin Ladin for the planes operation were chosen to attend an elite training course at al Qaeda's Mes Aynak camp in Afghanistan. Bin Ladin personally selected the veteran fighters who received this training, and several of them were destined for important operations. One example is Ibrahim al Thawar, or Nibras, who would participate in the October 12, 2000, suicide attack on the USS *Cole*. According to KSM, this training was not given specifically in preparation for the planes operation or any other particular al Qaeda venture. Although KSM claims not to have been involved with the training or to have met with the future 9/11 hijackers at Mes

Aynak, he says he did visit the camp while traveling from Kandahar to Kabul with Bin Ladin and others.[48]

The Mes Aynak training camp was located in an abandoned Russian copper mine near Kabul. The camp opened in 1999, after the United States had destroyed the training camp near Khowst with cruise missiles in August 1998, and before the Taliban granted al Qaeda permission to open the al Faruq camp in Kandahar. Thus, for a brief period in 1999, Mes Aynak was the only al Qaeda camp operating in Afghanistan. It offered a full range of instruction, including an advanced commando course taught by senior al Qaeda member Sayf al Adl. Bin Ladin paid particular attention to the 1999 training session. When Salah al Din, the trainer for the session, complained about the number of trainees and said that no more than 20 could be handled at once, Bin Ladin insisted that everyone he had selected receive the training.[49]

The special training session at Mes Aynak was rigorous and spared no expense. The course focused on physical fitness, firearms, close quarters combat, shooting from a motorcycle, and night operations. Although the subjects taught differed little from those offered at other camps, the course placed extraordinary physical and mental demands on its participants, who received the best food and other amenities to enhance their strength and morale.[50]

Upon completing the advanced training at Mes Aynak, Hazmi, Khallad, and Abu Bara went to Karachi, Pakistan. There KSM instructed them on Western culture and travel. Much of his activity in mid-1999 had revolved around the collection of training and informational materials for the participants in the planes operation. For instance, he collected Western aviation magazines; telephone directories for American cities such as San Diego and Long Beach, California; brochures for schools; and airline timetables, and he conducted Internet searches on U.S. flight schools. He also purchased flight simulator software and a few movies depicting hijackings. To house his students, KSM rented a safehouse in Karachi with money provided by Bin Ladin.[51]

In early December 1999, Khallad and Abu Bara arrived in Karachi. Hazmi joined them there a few days later. On his way to Karachi, Hazmi spent a night in Quetta at a safehouse where, according to KSM, an Egyptian named Mohamed Atta simultaneously stayed on his way to Afghanistan for jihad training.[52]

Mihdhar did not attend the training in Karachi with the others. KSM says that he never met with Mihdhar in 1999 but assumed that Bin Ladin and Atef had briefed Mihdhar on the planes operation and had excused him from the Karachi training.[53]

The course in Karachi apparently lasted about one or two weeks. According to KSM, he taught the three operatives basic English words and phrases. He showed them how to read phone books, interpret airline timetables, use the Internet, use code words in communications, make travel reservations, and rent an apartment. Khallad adds that the training involved using flight simulator com-

puter games, viewing movies that featured hijackings, and reading flight sched-
ules to determine which flights would be in the air at the same time in different
parts of the world. They used the game software to increase their familiarity with
aircraft models and functions, and to highlight gaps in cabin security. While in
Karachi, they also discussed how to case flights in Southeast Asia. KSM told them
to watch the cabin doors at takeoff and landing, to observe whether the captain
went to the lavatory during the flight, and to note whether the flight attendants
brought food into the cockpit. KSM, Khallad, and Hazmi also visited travel agen-
cies to learn the visa requirements for Asian countries.[54]

The four trainees traveled to Kuala Lumpur: Khallad, Abu Bara, and Hazmi
came from Karachi; Mihdhar traveled from Yemen. As discussed in chapter 6,
U.S. intelligence would analyze communications associated with Mihdhar,
whom they identified during this travel, and Hazmi, whom they could have
identified but did not.[55]

According to KSM, the four operatives were aware that they had volun-
teered for a suicide operation, either in the United States or in Asia. With dif-
ferent roles, they had different tasks. Hazmi and Mihdhar were sent to Kuala
Lumpur before proceeding to their final destination—the United States.
According to KSM, they were to use Yemeni documents to fly to Malaysia, then
proceed to the United States using their Saudi passports to conceal their prior
travels to and from Pakistan. KSM had doctored Hazmi's Saudi passport so it
would appear as if Hazmi had traveled to Kuala Lumpur from Saudi Arabia via
Dubai. Khallad and Abu Bara went to Kuala Lumpur to study airport security
and conduct casing flights. According to Khallad, he and Abu Bara departed for
Malaysia in mid-December 1999. Hazmi joined them about ten days later after
briefly returning to Afghanistan to attend to some passport issues.[56]

Khallad had originally scheduled his trip in order to receive a new prosthe-
sis at a Kuala Lumpur clinic called Endolite, and Bin Ladin suggested that he
use the opportunity to case flights as well. According to Khallad, Malaysia was
an ideal destination because its government did not require citizens of Saudi
Arabia or other Gulf states to have a visa. Malaysian security was reputed to be
lax when it came to Islamist jihadists. Also, other mujahideen wounded in com-
bat had reportedly received treatment at the Endolite clinic and successfully
concealed the origins of their injuries. Khallad said he got the money for the
prosthesis from his father, Bin Ladin, and another al Qaeda colleague.[57]

According to Khallad, when he and Abu Bara arrived in Kuala Lumpur they
contacted Hambali to let him know where they were staying, since he was to
be kept informed of al Qaeda activities in Southeast Asia. Hambali picked up
Khallad and Abu Bara and brought them to his home, enlisting the help of a
colleague who spoke better Arabic. Hambali then took them to the clinic.[58]

On December 31, Khallad flew from Kuala Lumpur to Bangkok; the next
day, he flew to Hong Kong aboard a U.S. airliner. He flew in first class, which
he realized was a mistake because this seating assignment on that flight did not
afford him a view of the cockpit. He claims to have done what he could to case

the flight, testing security by carrying a box cutter in his toiletries kit onto the flight to Hong Kong. Khallad returned to Bangkok the following day. At the airport, the security officials searched his carry-on bag and even opened the toiletries kit, but just glanced at the contents and let him pass. On this flight, Khallad waited until most of the first-class passengers were dozing, then got up and removed the kit from his carry-on. None of the flight attendants took notice.[59]

After completing his casing mission, Khallad returned to Kuala Lumpur. Hazmi arrived in Kuala Lumpur soon thereafter and may even have stayed briefly with Khallad and Abu Bara at Endolite. Mihdhar arrived on January 5, probably one day after Hazmi. All four operatives stayed at the apartment of Yazid Sufaat, the Malaysian JI member who made his home available at Hambali's request. According to Khallad, he and Hazmi spoke about the possibility of hijacking planes and crashing them or holding passengers as hostages, but only speculatively. Khallad admits being aware at the time that Hazmi and Mihdhar were involved in an operation involving planes in the United States but denies knowing details of the plan.[60]

While in Kuala Lumpur, Khallad wanted to go to Singapore to meet Nibras and Fahd al Quso, two of the operatives in Nashiri's ship-bombing operation. An attempt to execute that plan by attacking the USS *The Sullivans* had failed just a few days earlier. Nibras and Quso were bringing Khallad money from Yemen, but were stopped in Bangkok because they lacked visas to continue on to Singapore. Also unable to enter Singapore, Khallad moved the meeting to Bangkok. Hazmi and Mihdhar decided to go there as well, reportedly because they thought it would enhance their cover as tourists to have passport stamps from a popular tourist destination such as Thailand. With Hambali's help, the three obtained tickets for a flight to Bangkok and left Kuala Lumpur together. Abu Bara did not have a visa permitting him to return to Pakistan, so he traveled to Yemen instead.[61]

In Bangkok, Khallad took Hazmi and Mihdhar to one hotel, then went to another hotel for his meeting on the maritime attack plan. Hazmi and Mihdhar soon moved to that same hotel, but Khallad insists that the two sets of operatives never met with each other or anyone else. After conferring with the ship-bombing operatives, Khallad returned to Karachi and then to Kandahar, where he reported on his casing mission to Bin Ladin.[62]

Bin Ladin canceled the East Asia part of the planes operation in the spring of 2000. He evidently decided it would be too difficult to coordinate this attack with the operation in the United States. As for Hazmi and Mihdhar, they had left Bangkok a few days before Khallad and arrived in Los Angeles on January 15, 2000.[63]

Meanwhile, the next group of al Qaeda operatives destined for the planes operation had just surfaced in Afghanistan. As Hazmi and Mihdhar were deploying from Asia to the United States, al Qaeda's leadership was recruiting and training four Western-educated men who had recently arrived in Kandahar. Though they hailed from four different countries—Egypt, the United Arab

Emirates, Lebanon, and Yemen—they had formed a close-knit group as students in Hamburg, Germany. The new recruits had come to Afghanistan aspiring to wage jihad in Chechnya. But al Qaeda quickly recognized their potential and enlisted them in its anti-U.S. jihad.

## 5.3 THE HAMBURG CONTINGENT

Although Bin Ladin, Atef, and KSM initially contemplated using established al Qaeda members to execute the planes operation, the late 1999 arrival in Kandahar of four aspiring jihadists from Germany suddenly presented a more attractive alternative. The Hamburg group shared the anti-U.S. fervor of the other candidates for the operation, but added the enormous advantages of fluency in English and familiarity with life in the West, based on years that each member of the group had spent living in Germany. Not surprisingly, Mohamed Atta, Ramzi Binalshibh, Marwan al Shehhi, and Ziad Jarrah would all become key players in the 9/11 conspiracy.

### Mohamed Atta

Mohamed Atta was born on September 1, 1968, in Kafr el Sheikh, Egypt, to a middle-class family headed by his father, an attorney. After graduating from Cairo University with a degree in architectural engineering in 1990, Atta worked as an urban planner in Cairo for a couple of years. In the fall of 1991, he asked a German family he had met in Cairo to help him continue his education in Germany. They suggested he come to Hamburg and invited him to live with them there, at least initially. After completing a course in German, Atta traveled to Germany for the first time in July 1992. He resided briefly in Stuttgart and then, in the fall of 1992, moved to Hamburg to live with his host family. After enrolling at the University of Hamburg, he promptly transferred into the city engineering and planning course at the Technical University of Hamburg-Harburg, where he would remain registered as a student until the fall of 1999. He appears to have applied himself fairly seriously to his studies (at least in comparison to his jihadist friends) and actually received his degree shortly before traveling to Afghanistan. In school, Atta came across as very intelligent and reasonably pleasant, with an excellent command of the German language.[64]

When Atta arrived in Germany, he appeared religious, but not fanatically so. This would change, especially as his tendency to assert leadership became increasingly pronounced. According to Binalshibh, as early as 1995 Atta sought to organize a Muslim student association in Hamburg. In the fall of 1997, he joined a working group at the Quds mosque in Hamburg, a group designed to bridge the gap between Muslims and Christians. Atta proved a poor bridge, however, because of his abrasive and increasingly dogmatic personality. But

cousin's ensuing effort to persuade Jarrah to depart from "the path he was tak-ing" proved unavailing.[101] Yet Jarrah clearly differed from the other hijackers in that he maintained much closer contact with his family and continued his intimate relationship with Senguen. These ties may well have caused him to harbor some doubts about going through with the plot, even as late as the summer of 2001, as discussed in chapter 7.

After leaving Afghanistan, the four began researching flight schools and aviation training. In early January 2000, Ali Abdul Aziz Ali—a nephew of KSM living in the UAE who would become an important facilitator in the plot—used Shehhi's credit card to order a Boeing 747-400 flight simulator program and a Boeing 767 flight deck video, together with attendant literature; Ali had all these items shipped to his employer's address. Jarrah soon decided that the schools in Germany were not acceptable and that he would have to learn to fly in the United States. Binalshibh also researched flight schools in Europe, and in the Netherlands he met a flight school director who recommended flight schools in the United States because they were less expensive and required shorter training periods.[102]

In March 2000, Atta emailed 31 different U.S. flight schools on behalf of a small group of men from various Arab countries studying in Germany who, while lacking prior training, were interested in learning to fly in the United States. Atta requested information about the cost of the training, potential financing, and accommodations.[103]

Before seeking visas to enter the United States, Atta, Shehhi, and Jarrah obtained new passports, each claiming that his old passport had been lost. Presumably they were concerned that the Pakistani visas in their old passports would raise suspicions about possible travel to Afghanistan. Shehhi obtained his visa on January 18, 2000; Atta, on May 18; and Jarrah, on May 25.[104] Binalshibh's visa request was rejected, however, as were his three subsequent applications.[105] Binalshibh proved unable to obtain a visa, a victim of the generalized suspicion that visa applicants from Yemen—especially young men applying in another country (Binalshibh first applied in Berlin)—might join the ranks of undocumented aliens seeking work in the United States. Before 9/11, security concerns were not a major factor in visa issuance unless the applicant already was on a terrorist watchlist, and none of these four men was. Concerns that Binalshibh intended to immigrate to the United States doomed his chances to participate firsthand in the 9/11 attacks. Although Binalshibh had to remain behind, he would provide critical assistance from abroad to his co-conspirators.

Once again, the need for travel documents dictated al Qaeda's plans.

## Travel

It should by now be apparent how significant travel was in the planning undertaken by a terrorist organization as far-flung as al Qaeda. The story of the plot includes references to dozens of international trips. Operations required travel,

as did basic communications and the movement of money. Where electronic communications were regarded as insecure, al Qaeda relied even more heavily on couriers.

KSM and Abu Zubaydah each played key roles in facilitating travel for al Qaeda operatives. In addition, al Qaeda had an office of passports and host country issues under its security committee. The office was located at the Kandahar airport and was managed by Atef. The committee altered papers, including passports, visas, and identification cards.[106]

Moreover, certain al Qaeda members were charged with organizing passport collection schemes to keep the pipeline of fraudulent documents flowing. To this end, al Qaeda required jihadists to turn in their passports before going to the front lines in Afghanistan. If they were killed, their passports were recycled for use.[107] The operational mission training course taught operatives how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for "cleaning" visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.[108]

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.[109]

## 5.4 A MONEY TRAIL?

Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. KSM provided his operatives with nearly all the money they needed to travel to the United States, train, and live. The plotters' tradecraft was not especially sophisticated, but it was good enough. They moved, stored, and spent their money in ordinary ways, easily defeating the detection mechanisms in place at the time.[110] The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.

### General Financing

As we explained in chapter 2, Bin Ladin did not fund al Qaeda through a personal fortune and a network of businesses in Sudan. Instead, al Qaeda relied primarily on a fund-raising network developed over time. The CIA

now estimates that it cost al Qaeda about $30 million per year to sustain its activities before 9/11 and that this money was raised almost entirely through donations.[111]

For many years, the United States thought Bin Ladin financed al Qaeda's expenses through a vast personal inheritance. Bin Ladin purportedly inherited approximately $300 million when his father died, and was rumored to have had access to these funds to wage jihad while in Sudan and Afghanistan and to secure his leadership position in al Qaeda. In early 2000, the U.S. government discovered a different reality: roughly from 1970 through 1994, Bin Ladin received about $1 million per year—a significant sum, to be sure, but not a $300 million fortune that could be used to fund jihad.[112] Then, as part of a Saudi government crackdown early in the 1990s, the Bin Ladin family was forced to find a buyer for Usama's share of the family company in 1994. The Saudi government subsequently froze the proceeds of the sale. This action had the effect of divesting Bin Ladin of what otherwise might indeed have been a large fortune.[113]

Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. When Bin Ladin arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fund-raising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in the 1980s.[114]

Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.[115] Some individual donors surely knew, and others did not, the ultimate destination of their donations. Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, *zakat*. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause.[116]

Al Qaeda also collected money from employees of corrupt charities.[117] It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation.[118] Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[119]

In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank

accounts.[120] Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.

It does not appear that any government other than the Taliban financially supported al Qaeda before 9/11, although some governments may have contained al Qaeda sympathizers who turned a blind eye to al Qaeda's fundraising activities.[121] Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)[122]

Still, al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight.[123] Al Qaeda also sought money from wealthy donors in other Gulf states.

Al Qaeda frequently moved the money it raised by *hawala*, an informal and ancient trust-based system for transferring funds.[124] In some ways, al Qaeda had no choice after its move to Afghanistan in 1996: first, the banking system there was antiquated and undependable; and second, formal banking was risky due to the scrutiny that al Qaeda received after the August 1998 East Africa embassy bombings, including UN resolutions against it and the Taliban.[125] Bin Ladin relied on the established hawala networks operating in Pakistan, in Dubai, and throughout the Middle East to transfer funds efficiently. Hawaladars associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fund-raisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or core al Qaeda members used banks while in Afghanistan.[126]

Before 9/11, al Qaeda spent funds as quickly as it received them. Actual terrorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, training camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin provided approximately $10–$20 million per year to the Taliban in return for safe haven. Bin Ladin also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided startup funds to new groups or money for specific terrorist operations.[127]

Al Qaeda has been alleged to have used a variety of illegitimate means, particularly drug trafficking and conflict diamonds, to finance itself. While the drug trade was a source of income for the Taliban, it did not serve the same purpose for al Qaeda, and there is no reliable evidence that Bin Ladin was involved in or made his money through drug trafficking.[128] Similarly, we have seen no persuasive evidence that al Qaeda funded itself by trading in African conflict diamonds.[129] There also have been claims that al Qaeda financed itself through

manipulation of the stock market based on its advance knowledge of the 9/11 attacks. Exhaustive investigations by the Securities and Exchange Commission, FBI, and other agencies have uncovered no evidence that anyone with advance knowledge of the attacks profited through securities transactions.[130]

To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks. Ultimately the question is of little practical significance. Al Qaeda had many avenues of funding. If a particular funding source had dried up, al Qaeda could have easily tapped a different source or diverted funds from another project to fund an operation that cost $400,000–$500,000 over nearly two years.

### The Funding of the 9/11 Plot

As noted above, the 9/11 plotters spent somewhere between $400,000 and $500,000 to plan and conduct their attack. The available evidence indicates that the 19 operatives were funded by al Qaeda, either through wire transfers or cash provided by KSM, which they carried into the United States or deposited in foreign accounts and accessed from this country. Our investigation has uncovered no credible evidence that any person in the United States gave the hijackers substantial financial assistance. Similarly, we have seen no evidence that any foreign government—or foreign government official—supplied any funding.[131]

We have found no evidence that the Hamburg cell members (Atta, Shehhi, Jarrah, and Binalshibh) received funds from al Qaeda before late 1999. It appears they supported themselves. KSM, Binalshibh, and another plot facilitator, Mustafa al Hawsawi, each received money, in some cases perhaps as much as $10,000, to perform their roles in the plot.[132]

After the Hamburg recruits joined the 9/11 conspiracy, al Qaeda began giving them money. Our knowledge of the funding during this period, before the operatives entered the United States, remains murky. According to KSM, the Hamburg cell members each received $5,000 to pay for their return to Germany from Afghanistan after they had been selected to join the plot, and they received additional funds for travel from Germany to the United States. Financial transactions of the plotters are discussed in more detail in chapter 7.

### Requirements for a Successful Attack

As some of the core operatives prepared to leave for the United States, al Qaeda's leaders could have reflected on what they needed to be able to do in order to organize and conduct a complex international terrorist operation to inflict catastrophic harm. We believe such a list of requirements would have included

- leaders able to evaluate, approve, and supervise the planning and direction of the operation;
- communications sufficient to enable planning and direction of the operatives and those who would be helping them;

- a personnel system that could recruit candidates, vet them, indoctrinate them, and give them necessary training;
- an intelligence effort to gather required information and form assessments of enemy strengths and weaknesses;
- the ability to move people; and
- the ability to raise and move the necessary money.

The information we have presented about the development of the planes operation shows how, by the spring and summer of 2000, al Qaeda was able to meet these requirements.

By late May 2000, two operatives assigned to the planes operation were already in the United States. Three of the four Hamburg cell members would soon arrive.

# 7

# THE ATTACK LOOMS

## 7.1 FIRST ARRIVALS IN CALIFORNIA

In chapter 5 we described the Southeast Asia travels of Nawaf al Hazmi, Khalid al Mihdhar, and others in January 2000 on the first part of the "planes operation." In that chapter we also described how Mihdhar was spotted in Kuala Lumpur early in January 2000, along with associates who were not identified, and then was lost to sight when the group passed through Bangkok. On January 15, Hazmi and Mihdhar arrived in Los Angeles. They spent about two weeks there before moving on to San Diego.[1]

**Two Weeks in Los Angeles**
Why Hazmi and Mihdhar came to California, we do not know for certain. Khalid Sheikh Mohammed (KSM), the organizer of the planes operation, explains that California was a convenient point of entry from Asia and had the added benefit of being far away from the intended target area.[2]

Hazmi and Mihdhar were ill-prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English.[3]

It would therefore be plausible that they or KSM would have tried to identify, in advance, a friendly contact for them in the United States. In detention, KSM denies that al Qaeda had any agents in Southern California. We do not credit this denial.[4] We believe it is unlikely that Hazmi and Mihdhar—neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival.[5]

KSM says that though he told others involved in the conspiracy to stay away from mosques and to avoid establishing personal contacts, he made an exception in this case and instructed Hazmi and Mihdhar to pose as newly arrived

Saudi students and seek assistance at local mosques. He counted on their breaking off any such relationships once they moved to the East Coast.[6] Our inability to ascertain the activities of Hazmi and Mihdhar during their first two weeks in the United States may reflect al Qaeda tradecraft designed to protect the identity of anyone who may have assisted them during that period.

Hazmi and Mihdhar were directed to enroll in English-language classes upon arriving in Southern California, so that they could begin pilot training as soon as possible. KSM claims to have steered the two to San Diego on the basis of his own research, which supposedly included thumbing through a San Diego phone book acquired at a Karachi flea market. Contradicting himself, he also says that, as instructed, they attempted to enroll in three language schools in Los Angeles.[7]

After the pair cleared Immigration and Customs at Los Angeles International Airport, we do not know where they went.[8] They appear to have obtained assistance from the Muslim community, specifically the community surrounding the King Fahd mosque in Culver City, one of the most prominent mosques in Southern California.

It is fairly certain that Hazmi and Mihdhar spent time at the King Fahd mosque and made some acquaintances there. One witness interviewed by the FBI after the September 11 attacks has said he first met the hijackers at the mosque in early 2000. Furthermore, one of the people who would befriend them—a man named Mohdar Abdullah—recalled a trip with Hazmi and Mihdhar to Los Angeles in June when, on their arrival, the three went to the King Fahd mosque. There Hazmi and Mihdhar greeted various individuals whom they appeared to have met previously, including a man named "Khallam." In Abdullah's telling, when Khallam visited the al Qaeda operatives at their motel that evening, Abdullah was asked to leave the room so that Hazmi, Mihdhar, and Khallam could meet in private. The identity of Khallam and his purpose in meeting with Hazmi and Mihdhar remain unknown.[9]

To understand what Hazmi and Mihdhar did in their first weeks in the United States, evidently staying in Los Angeles, we have investigated whether anyone associated with the King Fahd mosque assisted them. This subject has received substantial attention in the media. Some have speculated that Fahad al Thumairy—an imam at the mosque and an accredited diplomat at the Saudi Arabian consulate from 1996 until 2003—may have played a role in helping the hijackers establish themselves on their arrival in Los Angeles. This speculation is based, at least in part, on Thumairy's reported leadership of an extremist faction at the mosque.[10]

A well-known figure at the King Fahd mosque and within the Los Angeles Muslim community, Thumairy was reputed to be an Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine. Some Muslims concerned about his preaching have said he "injected non-Islamic themes into his guidance/prayers at the [King Fahd] Mosque" and had followers "supportive of the events of September 11, 2001."[11] Thumairy appears to have associ-

ated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States. After 9/11, Thumairy's conduct was a subject of internal debate among some Saudi officials. He apparently lost his position at the King Fahd mosque, possibly because of his immoderate reputation. On May 6, 2003, Thumairy attempted to reenter the United States from Saudi Arabia but was refused entry, based on a determination by the State Department that he might be connected with terrorist activity.[12]

When interviewed by both the FBI and the Commission staff, Thumairy has denied preaching anti-Western sermons, much less promoting violent jihad. More to the point, he claimed not to recognize either Hazmi or Mihdhar. Both denials are somewhat suspect. (He likewise denied knowing Omar al Bayoumi—a man from San Diego we will discuss shortly—even though witnesses and telephone records establish that the two men had contact with each other. Similarly, Thumairy's claim not to know Mohdar Abdullah is belied by Abdullah's contrary assertion.) On the other hand, Thumairy undoubtedly met with and provided religious counseling to countless individuals during his tenure at the King Fahd mosque, so he might not remember two transients like Hazmi and Mihdhar several years later.[13]

The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives.[14]

We do not pick up their trail until February 1, 2000, when they encountered Omar al Bayoumi and Caysan Bin Don at a halal food restaurant on Venice Boulevard in Culver City, a few blocks away from the King Fahd mosque. Bayoumi and Bin Don have both told us that they had driven up from San Diego earlier that day so that Bayoumi could address a visa issue and collect some papers from the Saudi consulate. Bayoumi heard Hazmi and Mihdhar speaking in what he recognized to be Gulf Arabic and struck up a conversation. Since Bin Don knew only a little Arabic, he had to rely heavily on Bayoumi to translate for him.[15]

Mihdhar and Hazmi said they were students from Saudi Arabia who had just arrived in the United States to study English. They said they were living in an apartment near the restaurant but did not specify the address. They did not like Los Angeles and were having a hard time, especially because they did not know anyone. Bayoumi told them how pleasant San Diego was and offered to help them settle there. The two pairs then left the restaurant and went their separate ways.[16]

Bayoumi and Bin Don have been interviewed many times about the February 1, 2000, lunch. For the most part, their respective accounts corroborate each other. However, Bayoumi has said that he and Bin Don attempted to visit the King Fahd mosque after lunch but could not find it. Bin Don, on the other

hand, recalls visiting the mosque twice that day for prayers, both before and after the meal. Bin Don's recollection is spotty and inconsistent. Bayoumi's version can be challenged as well, since the mosque is close to the restaurant and Bayoumi had visited it, and the surrounding area, on multiple occasions, including twice within six weeks of February 1. We do not know whether the lunch encounter occurred by chance or design. We know about it because Bayoumi told law enforcement that it happened.[17]

Bayoumi, then 42 years old, was in the United States as a business student, supported by a private contractor for the Saudi Civil Aviation Authority, where Bayoumi had worked for over 20 years.[18] The object of considerable media speculation following 9/11, he lives now in Saudi Arabia, well aware of his notoriety. Both we and the FBI have interviewed him and investigated evidence about him.

Bayoumi is a devout Muslim, obliging and gregarious. He spent much of his spare time involved in religious study and helping run a mosque in El Cajon, about 15 miles from San Diego. It is certainly possible that he has dissembled about some aspects of his story, perhaps to counter suspicion. On the other hand, we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.[19] Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists.

**The Move to San Diego**
By February 4, Hazmi and Mihdhar had come to San Diego from Los Angeles, possibly driven by Mohdar Abdullah. Abdullah, a Yemeni university student in his early 20s, is fluent in both Arabic and English, and was perfectly suited to assist the hijackers in pursuing their mission.[20]

After 9/11, Abdullah was interviewed many times by the FBI. He admitted knowing of Hazmi and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden (a group with ties to al Qaeda) back in Yemen. Abdullah clearly was sympathetic to those extremist views. During a post-9/11 search of his possessions, the FBI found a notebook (belonging to someone else) with references to planes falling from the sky, mass killing, and hijacking. Further, when detained as a material witness following the 9/11 attacks, Abdullah expressed hatred for the U.S. government and "stated that the U.S. brought 'this' on themselves."[21]

When interviewed by the FBI after 9/11, Abdullah denied having advance knowledge of attacks. In May 2004, however, we learned of reports about Abdullah bragging to fellow inmates at a California prison in September–October 2003 that he had known Hazmi and Mihdhar were planning a terrorist attack. The stories attributed to Abdullah are not entirely consistent with each other. Specifically, according to one inmate, Abdullah claimed an unnamed individual had notified him that Hazmi and Mihdhar would be arriv-

ing in Los Angeles with plans to carry out an attack. Abdullah allegedly told the same inmate that he had driven the two al Qaeda operatives from Los Angeles to San Diego, but did not say when this occurred. We have been unable to corroborate this account.[22]

Another inmate has recalled Abdullah claiming he first heard about the hijackers' terrorist plans after they arrived in San Diego, when they told him they planned to fly an airplane into a building and invited him to join them on the plane. According to this inmate, Abdullah also claimed to have found out about the 9/11 attacks three weeks in advance, a claim that appears to dovetail with evidence that Abdullah may have received a phone call from Hazmi around that time, that he stopped making calls from his telephone after August 25, 2001, and that, according to his friends, he started acting strangely.[23]

Although boasts among prison inmates often tend to be unreliable, this evidence is obviously important. To date, neither we nor the FBI have been able to verify Abdullah's alleged jailhouse statements, despite investigative efforts.

We thus do not know when or how Hazmi and Mihdhar first came to San Diego. We do know that on February 4, they went to the Islamic Center of San Diego to find Omar al Bayoumi and take him up on his offer of help. Bayoumi obliged by not only locating an apartment but also helping them fill out the lease application, co-signing the lease and, when the real estate agent refused to take cash for a deposit, helping them open a bank account (which they did with a $9,900 deposit); he then provided a certified check from his own account for which the al Qaeda operatives reimbursed him on the spot for the deposit. Neither then nor later did Bayoumi give money to either Hazmi or Mihdhar, who had received money from KSM.[24]

Hazmi and Mihdhar moved in with no furniture and practically no possessions. Soon after the move, Bayoumi used their apartment for a party attended by some 20 male members of the Muslim community. At Bayoumi's request, Bin Don videotaped the gathering with Bayoumi's video camera. Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room.[25]

Hazmi and Mihdhar immediately started looking for a different place to stay. Based on their comment to Bayoumi about the first apartment being expensive, one might infer that they wanted to save money. They may also have been reconsidering the wisdom of living so close to the video camera–wielding Bayoumi, who Hazmi seemed to think was some sort of Saudi spy. Just over a week after moving in, Hazmi and Mihdhar filed a 30-day notice of intention to vacate. Bayoumi apparently loaned them his cell phone to help them check out possibilities for new accommodations.[26]

Their initial effort to move turned out poorly. An acquaintance arranged with his landlord to have Mihdhar take over his apartment. Mihdhar put down a $650 deposit and signed a lease for the apartment effective March 1. Several weeks later, Mihdhar sought a refund of his deposit, claiming he no longer

intended to move in because the apartment was too messy. When the landlord refused to refund the deposit, Mihdhar became belligerent. The landlord remembers him "ranting and raving" as if he were "psychotic."[27]

Hazmi and Mihdhar finally found a room to rent in the home of an individual they had met at a mosque in San Diego. According to the homeowner, the future hijackers moved in on May 10, 2000. Mihdhar moved out after only about a month. On June 9, he left San Diego to return to Yemen. Hazmi, on the other hand, stayed at this house for the rest of his time in California, until mid-December; he would then leave for Arizona with a newly arrived 9/11 hijacker-pilot, Hani Hanjour.[28]

While in San Diego, Hazmi and Mihdhar played the part of recently arrived foreign students. They continued to reach out to members of the Muslim community for help. At least initially, they found well-meaning new acquaintances at the Islamic Center of San Diego, which was only a stone's throw from the apartment where they first lived. For example, when they purchased a used car (with cash), they bought it from a man who lived across the street from the Islamic Center and who let them use his address in registering the vehicle, an accommodation "to help a fellow Muslim brother." Similarly, in April, when their cash supply may have been dwindling, Hazmi persuaded the administrator of the Islamic Center to let him use the administrator's bank account to receive a $5,000 wire transfer from someone in Dubai, in the United Arab Emirates (this was KSM's nephew, Ali Abdul Aziz Ali).[29]

Hazmi and Mihdhar visited other mosques as well, mixing comfortably as devout worshippers. During the operatives' critical first weeks in San Diego, Mohdar Abdullah helped them. Translating between English and Arabic, he assisted them in obtaining California driver's licenses and with applying to language and flight schools. Abdullah also introduced them to his circle of friends; he shared an apartment with some of those friends near the Rabat mosque in La Mesa, a few miles from the hijackers' residence.[30]

Abdullah has emerged as a key associate of Hazmi and Mihdhar in San Diego. Detained after 9/11 (first as a material witness, then on immigration charges), he was deported to Yemen on May 21, 2004, after the U.S. Attorney for the Southern District of California declined to prosecute him on charges arising out of his alleged jailhouse admissions concerning the 9/11 operatives. The Department of Justice declined to delay his removal pending further investigation of this new information.[31]

Other friends of Abdullah also translated for Hazmi and Mihdhar and helped them adjust to life in San Diego. Some held extremist beliefs or were well acquainted with known extremists. For example, immediately after 9/11, Osama Awadallah, a Yemeni whose telephone number was found in Hazmi's Toyota at Washington Dulles International Airport, was found to possess photos, videos, and articles relating to Bin Ladin. Awadallah also had lived in a house where copies of Bin Ladin's fatwas and other similar materials were distributed

to the residents. Omar Bakarbashat, a Saudi, also met Hazmi and Mihdhar at the Rabat mosque. He admitted helping Hazmi to learn English and taking over the operatives' first apartment in San Diego after they moved out. Bakarbashat apparently had downloaded stridently anti-American Web pages to his computer's hard drive.[32]

Another potentially significant San Diego contact for Hazmi and Mihdhar was Anwar Aulaqi, an imam at the Rabat mosque. Born in New Mexico and thus a U.S. citizen, Aulaqi grew up in Yemen and studied in the United States on a Yemeni government scholarship. We do not know how or when Hazmi and Mihdhar first met Aulaqi. The operatives may even have met or at least talked to him the same day they first moved to San Diego. Hazmi and Mihdhar reportedly respected Aulaqi as a religious figure and developed a close relationship with him.[33]

When interviewed after 9/11, Aulaqi said he did not recognize Hazmi's name but did identify his picture. Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed. He described Hazmi as a soft-spoken Saudi student who used to appear at the mosque with a companion but who did not have a large circle of friends.[34]

Aulaqi left San Diego in mid-2000, and by early 2001 had relocated to Virginia. As we will discuss later, Hazmi eventually showed up at Aulaqi's mosque in Virginia, an appearance that may not have been coincidental. We have been unable to learn enough about Aulaqi's relationship with Hazmi and Mihdhar to reach a conclusion.[35]

In sum, although the evidence is thin as to specific motivations, our overall impression is that soon after arriving in California, Hazmi and Mihdhar sought out and found a group of young and ideologically like-minded Muslims with roots in Yemen and Saudi Arabia, individuals mainly associated with Mohdar Abdullah and the Rabat mosque. The al Qaeda operatives lived openly in San Diego under their true names, listing Hazmi in the telephone directory. They managed to avoid attracting much attention.

### Flight Training Fails; Mihdhar Bails Out
Hazmi and Mihdhar came to the United States to learn English, take flying lessons, and become pilots as quickly as possible. They turned out, however, to have no aptitude for English. Even with help and tutoring from Mohdar Abdullah and other bilingual friends, Hazmi and Mihdhar's efforts to learn proved futile. This lack of language skills in turn became an insurmountable barrier to learning how to fly.[36]

A pilot they consulted at one school, the Sorbi Flying Club in San Diego, spoke Arabic. He explained to them that their flight instruction would begin with small planes. Hazmi and Mihdhar emphasized their interest in learning to fly jets, Boeing aircraft in particular, and asked where they might enroll to train

on jets right away. Convinced that the two were either joking or dreaming, the pilot responded that no such school existed. Other instructors who worked with Hazmi and Mihdhar remember them as poor students who focused on learning to control the aircraft in flight but took no interest in takeoffs or landings. By the end of May 2000, Hazmi and Mihdhar had given up on learning how to fly.[37]

Mihdhar's mind seems to have been with his family back in Yemen, as evidenced by calls he made from the apartment telephone. When news of the birth of his first child arrived, he could stand life in California no longer. In late May and early June of 2000, he closed his bank account, transferred the car registration to Hazmi, and arranged his return to Yemen. According to KSM, Mihdhar was bored in San Diego and foresaw no problem in coming back to the United States since he had not overstayed his visa. Hazmi and Mohdar Abdullah accompanied him to Los Angeles on June 9. After visiting the King Fahd mosque one last time with his friends, Mihdhar left the country the following day.[38]

KSM kept in fairly close touch with his operatives, using a variety of methods. When Bin Ladin called KSM back from Pakistan to Afghanistan in the spring of 2000, KSM asked Khallad (whom we introduced in chapter 5) to maintain email contact with Hazmi in the United States. Mihdhar's decision to strand Hazmi in San Diego enraged KSM, who had not authorized the departure and feared it would compromise the plan. KSM attempted to drop Mihdhar from the planes operation and would have done so, he says, had he not been overruled by Bin Ladin.[39]

Following Mihdhar's departure, Hazmi grew lonely and worried that he would have trouble managing by himself. He prayed with his housemate each morning at 5:00 A.M. and attended services at the Islamic Center. He borrowed his housemate's computer for Internet access, following news coverage of fighting in Chechnya and Bosnia. With his housemate's help, Hazmi also used the Internet to search for a wife (after obtaining KSM's approval to marry). This search did not succeed. Although he developed a close relationship with his housemate, Hazmi preferred not to use the house telephone, continuing the practice he and Mihdhar had adopted of going outside to make phone calls.[40]

After Mihdhar left, other students moved into the house. One of these, Yazeed al Salmi, stands out. In July 2000, Salmi purchased $4,000 in traveler's checks at a bank in Riyadh, Saudi Arabia. On September 5, Hazmi deposited $1,900 of the traveler's checks into his bank account, after withdrawing the same amount in cash. It is possible that Hazmi was simply cashing the traveler's checks for a friend. We do not know; Salmi claims not to remember the transaction. After 9/11, Salmi reportedly confided to Mohdar Abdullah that he had previously known terrorist pilot Hani Hanjour. After living in the same house with Hazmi for about a month, Salmi moved to the La Mesa apartment shared by Abdullah and others.[41]

By the fall of 2000, Hazmi no longer even pretended to study English or take flying lessons. Aware that his co-conspirators in Afghanistan and Pakistan would be sending him a new colleague shortly, he bided his time and worked for a few weeks at a gas station in La Mesa where some of his friends, including Abdullah, were employed. On one occasion, Hazmi told a fellow employee that he was planning to find a better job, and let slip a prediction that he would become famous.[42]

On December 8, 2000, Hani Hanjour arrived in San Diego, having traveled from Dubai via Paris and Cincinnati. Hazmi likely picked up Hanjour at the airport. We do not know where Hanjour stayed; a few days later, both men left San Diego. Before departing, they visited the gas station in La Mesa, where Hazmi reportedly introduced Hanjour as a "long time friend from Saudi Arabia." Hazmi told his housemate that he and his friend "Hani" were headed for San Jose to take flying lessons and told his friends that he would stay in touch. Hazmi promised to return to San Diego soon, and he and Hanjour drove off.[43]

Hazmi did not sever all contact with his friends in San Diego. According to Abdullah, after Hazmi left San Diego in December 2000, he telephoned Abdullah twice: in December 2000 or January 2001, Hazmi said he was in San Francisco and would be attending flight school there; about two weeks later, he said he was attending flight school in Arizona. Some evidence, which we will discuss later, indicates that Hazmi contacted Abdullah again, in August 2001. In addition, during the month following Hazmi's departure from San Diego, he emailed his housemate three times, including a January 2001 email that Hazmi signed "Smer," an apparent attempt to conceal his identity that struck the housemate as strange at the time. Hazmi also telephoned his housemate that he and his friend had decided to take flight lessons in Arizona, and that Mihdhar was now back in Yemen. That was their last contact. When the housemate emailed Hazmi in February and March of 2001 to find out how he was faring, Hazmi did not reply.[44]

The housemate who rented the room to Hazmi and Mihdhar during 2000 is an apparently law-abiding citizen with long-standing, friendly contacts among local police and FBI personnel. He did not see anything unusual enough in the behavior of Hazmi or Mihdhar to prompt him to report to his law enforcement contacts. Nor did those contacts ask him for information about his tenants/housemates.

## 7.2 THE 9/11 PILOTS IN THE UNITED STATES

### The Hamburg Pilots Arrive in the United States

In the early summer of 2000, the Hamburg group arrived in the United States to begin flight training. Marwan al Shehhi came on May 29, arriving in Newark on a flight from Brussels. He went to New York City and waited there for

Mohamed Atta to join him. On June 2, Atta traveled to the Czech Republic by bus from Germany and then flew from Prague to Newark the next day. According to Ramzi Binalshibh, Atta did not meet with anyone in Prague; he simply believed it would contribute to operational security to fly out of Prague rather than Hamburg, the departure point for much of his previous international travel.[45]

Atta and Shehhi had not settled on where they would obtain their flight training. In contrast, Ziad Jarrah had already arranged to attend the Florida Flight Training Center (FFTC) in Venice, Florida. Jarrah arrived in Newark on June 27 and then flew to Venice. He immediately began the private pilot program at FFTC, intending to get a multi-engine license. Jarrah moved in with some of the flight instructors affiliated with his school and bought a car.[46]

While Jarrah quickly settled into training in Florida, Atta and Shehhi kept searching for a flight school. After visiting the Airman Flight School in Norman, Oklahoma (where Zacarias Moussaoui would enroll several months later and where another al Qaeda operative, Ihab Ali, had taken lessons in the mid-1990s), Atta started flight instruction at Huffman Aviation in Venice, Florida, and both Atta and Shehhi subsequently enrolled in the Accelerated Pilot Program at that school. By the end of July, both of them took solo flights, and by mid-August they passed the private pilot airman test. They trained through the summer at Huffman, while Jarrah continued his training at FFTC.[47]

The Hamburg operatives paid for their flight training primarily with funds wired from Dubai by KSM's nephew, Ali Abdul Aziz Ali. Between June 29 and September 17, 2000, Ali sent Shehhi and Atta a total of $114,500 in five transfers ranging from $5,000 to $70,000. Ali relied on the unremarkable nature of his transactions, which were essentially invisible amid the billions of dollars flowing daily across the globe.[48] Ali was not required to provide identification in sending this money and the aliases he used were not questioned.[49]

In mid-September, Atta and Shehhi applied to change their immigration status from tourist to student, stating their intention to study at Huffman until September 1, 2001. In late September, they decided to enroll at Jones Aviation in Sarasota, Florida, about 20 miles north of Venice. According to the instructor at Jones, the two were aggressive, rude, and sometimes even fought with him to take over the controls during their training flights. In early October, they took the Stage I exam for instruments rating at Jones Aviation and failed. Very upset, they said they were in a hurry because jobs awaited them at home. Atta and Shehhi then returned to Huffman.[50]

In the meantime, Jarrah obtained a single-engine private pilot certificate in early August. Having reached that milestone, he departed on the first of five foreign trips he would take after first entering the United States. In October, he flew back to Germany to visit his girlfriend, Aysel Senguen. The two traveled to Paris before Jarrah returned to Florida on October 29. His relationship with her remained close throughout his time in the United States. In addition

to his trips, Jarrah made hundreds of phone calls to her and communicated frequently by email.[51]

Jarrah was supposed to be joined at FFTC by Ramzi Binalshibh, who even sent the school a deposit. But Binalshibh could not obtain a U.S. visa. His first applications in May and June 2000 were denied because he lacked established ties in Germany ensuring his return from a trip to the United States. In September, he went home to Yemen to apply for a visa from there, but was denied on grounds that he also lacked sufficient ties to Yemen. In October, he tried one last time, in Berlin, applying for a student visa to attend "aviation language school," but the prior denials were noted and this application was denied as well, as incomplete.[52]

Unable to participate directly in the operation, Binalshibh instead took on the role of coordinating between KSM and the operatives in the United States. Apart from sending a total of about $10,000 in wire transfers to Atta and Shehhi during the summer of 2000, one of Binalshibh's first tasks in his new role as plot coordinator was to assist another possible pilot, Zacarias Moussaoui.[53]

In the fall of 2000, KSM had sent Moussaoui to Malaysia for flight training, but Moussaoui did not find a school he liked. He worked instead on other terrorist schemes, such as buying four tons of ammonium nitrate for bombs to be planted on cargo planes flying to the United States. When KSM found out, he recalled Moussaoui back to Pakistan and directed him to go to the United States for flight training. In early October, Moussaoui went to London. When Binalshibh visited London in December, he stayed at the same 16-room dormitory where Moussaoui was still residing. From London, Moussaoui sent inquiries to the Airman Flight School in Norman, Oklahoma.[54]

Confronting training or travel problems with Hazmi, Mihdhar, Binalshibh, and Moussaoui, al Qaeda was looking for another possible pilot candidate. A new recruit with just the right background conveniently presented himself in Afghanistan.

**The Fourth Pilot: Hani Hanjour**

Hani Hanjour, from Ta'if, Saudi Arabia, first came to the United States in 1991 to study at the Center for English as a Second Language at the University of Arizona. He seems to have been a rigorously observant Muslim. According to his older brother, Hani Hanjour went to Afghanistan for the first time in the late 1980s, as a teenager, to participate in the jihad and, because the Soviets had already withdrawn, worked for a relief agency there.[55]

In 1996, Hanjour returned to the United States to pursue flight training, after being rejected by a Saudi flight school. He checked out flight schools in Florida, California, and Arizona; and he briefly started at a couple of them before returning to Saudi Arabia. In 1997, he returned to Florida and then, along with two friends, went back to Arizona and began his flight training there in earnest. After about three months, Hanjour was able to obtain his private

meeting or having any contact with Atta. Ani says that shortly after 9/11, he became concerned that press stories about the alleged meeting might hurt his career. Hoping to clear his name, Ani asked his superiors to approach the Czech government about refuting the allegation. He also denies knowing of any other Iraqi official having contact with Atta.

These findings cannot absolutely rule out the possibility that Atta was in Prague on April 9, 2001. He could have used an alias to travel and a passport under that alias, but this would be an exception to his practice of using his true name while traveling (as he did in January and would in July when he took his next overseas trip). The FBI and CIA have uncovered no evidence that Atta held any fraudulent passports.

KSM and Binalshibh both deny that an Atta–Ani meeting occurred. There was no reason for such a meeting, especially considering the risk it would pose to the operation. By April 2001, all four pilots had completed most of their training, and the muscle hijackers were about to begin entering the United States.

The available evidence does not support the original Czech report of an Atta–Ani meeting.[70]

student visa, both of them had to persuade INS inspectors that they should be admitted so that they could continue their flight training. Neither operative had any problem clearing Customs.[71]

After returning to Florida from their trips, Atta and Shehhi visited Georgia, staying briefly in Norcross and Decatur, and renting a single-engine plane to fly with an instructor in Lawrenceville. By February 19, Atta and Shehhi were in Virginia. They rented a mailbox in Virginia Beach, cashed a check, and then promptly returned to Georgia, staying in Stone Mountain. We have found no explanation for these travels. In mid-March, Jarrah was in Georgia as well, staying in Decatur. There is no evidence that the three pilots met, although Jarrah and Atta apparently spoke on the phone. At the end of the month, Jarrah left the United States again and visited Senguen in Germany for two weeks. In early April, Atta and Shehhi returned to Virginia Beach and closed the mailbox they had opened in February.[72]

By the time Atta and Shehhi returned to Virginia Beach from their travels in Georgia, Hazmi and Hanjour had also arrived in Virginia, in Falls Church. They made their way to a large mosque there, the Dar al Hijra mosque, sometime in early April.[73]

As we mentioned earlier, one of the imams at this mosque was the same Anwar Aulaqi with whom Hazmi had spent time at the Rabat mosque in San Diego. Aulaqi had moved to Virginia in January 2001. He remembers Hazmi

from San Diego but has denied having any contact with Hazmi or Hanjour in Virginia.[74]

At the Dar al Hijra mosque, Hazmi and Hanjour met a Jordanian named Eyad al Rababah. Rababah says he had gone to the mosque to speak to the imam, Aulaqi, about finding work. At the conclusion of services, which normally had 400 to 500 attendees, Rababah says he happened to meet Hazmi and Hanjour. They were looking for an apartment; Rababah referred them to a friend who had one to rent. Hazmi and Hanjour moved into the apartment, which was in Alexandria.[75]

Some FBI investigators doubt Rababah's story. Some agents suspect that Aulaqi may have tasked Rababah to help Hazmi and Hanjour. We share that suspicion, given the remarkable coincidence of Aulaqi's prior relationship with Hazmi. As noted above, the Commission was unable to locate and interview Aulaqi. Rababah has been deported to Jordan, having been convicted after 9/11 in a fraudulent driver's license scheme.[76]

Rababah, who had lived in Connecticut, New York, and New Jersey, told investigators that he had recommended Paterson, New Jersey, as a place with an Arabic-speaking community where Hazmi and Hanjour might want to settle. They asked for his help in getting them an apartment in Paterson. Rababah tried without success. He says he then suggested that Hazmi and Hanjour travel with him to Connecticut where they could look for a place to live.[77]

On May 8, Rababah went to Hazmi and Hanjour's apartment to pick them up for the trip to Connecticut. There he says he found them with new roommates—Ahmed al Ghamdi and Majed Moqed. These two men had been sent to America to serve as muscle hijackers and had arrived at Dulles Airport on May 2. Rababah drove Hanjour to Fairfield, Connecticut, followed by Hazmi, who had Moqed and Ghamdi in his car. After a short stay in Connecticut, where they apparently called area flight schools and real estate agents, Rababah drove the four to Paterson to have dinner and show them around. He says that they returned with him to Fairfield that night, and that he never saw them again.[78]

Within a few weeks, Hanjour, Hazmi, and several other operatives moved to Paterson and rented a one-room apartment. When their landlord later paid a visit, he found six men living there—Nawaf al Hazmi, now joined by his younger brother Salem, Hanjour, Moqed, probably Ahmed al Ghamdi, and Abdul Aziz al Omari; Hazmi's old friend Khalid al Mihdhar would soon join them.[79]

Atta and Shehhi had already returned to Florida. On April 11, they moved into an apartment in Coral Springs. Atta stayed in Florida, awaiting the arrival of the first muscle hijackers.[80]

Shehhi, on the other hand, bought a ticket to Cairo and flew there from Miami on April 18. We do not know much more about Shehhi's reason for traveling to Egypt in April than we know about his January trip to Morocco.

Shehhi did meet with Atta's father, who stated in a post-9/11 interview that Shehhi just wanted to pick up Atta's international driver's license and some money. This story is not credible. Atta already had the license with him and presented it during a traffic stop on April 26 while Shehhi was still abroad. Shehhi spent about two weeks in Egypt, obviously more time than would have been needed just to meet with Atta's father. Shehhi could have traveled elsewhere during this time, but no records indicating additional travel have been discovered.[81]

Shehhi returned to Miami on May 2. That day, Atta and Jarrah were together, about 30 miles to the north, visiting a Department of Motor Vehicles office in Lauderdale Lakes, Florida, to get Florida driver's licenses. Back in Virginia, Hazmi and Hanjour were about to leave for Connecticut and New Jersey. As the summer approached, the lead operatives were settled in Florida and New Jersey, waiting for the rest of their contingent to join them.[82]

## 7.3 ASSEMBLING THE TEAMS

During the summer and early autumn of 2000, Bin Ladin and senior al Qaeda leaders in Afghanistan started selecting the muscle hijackers—the operatives who would storm the cockpits and control the passengers. Despite the phrase widely used to describe them, the so-called muscle hijackers were not at all physically imposing; most were between 5' 5" and 5' 7" in height.[83]

### Recruitment and Selection for 9/11

Twelve of the 13 muscle hijackers (excluding Nawaf al Hazmi and Mihdhar) came from Saudi Arabia: Satam al Suqami, Wail al Shehri, Waleed al Shehri, Abdul Aziz al Omari, Ahmed al Ghamdi, Hamza al Ghamdi, Mohand al Shehri, Majed Moqed, Salem al Hazmi, Saeed al Ghamdi, Ahmad al Haznawi, and Ahmed al Nami. The remaining recruit, Fayez Banihammad, came from the UAE. He appears to have played a unique role among the muscle hijackers because of his work with one of the plot's financial facilitators, Mustafa al Hawsawi.[84]

Saudi authorities interviewed the relatives of these men and have briefed us on what they found. The muscle hijackers came from a variety of educational and societal backgrounds. All were between 20 and 28 years old; most were unemployed with no more than a high school education and were unmarried.[85]

Four of them—Ahmed al Ghamdi, Saeed al Ghamdi, Hamza al Ghamdi, and Ahmad al Haznawi—came from a cluster of three towns in the al Bahah region, an isolated and underdeveloped area of Saudi Arabia, and shared the same tribal affiliation. None had a university degree. Their travel patterns and information from family members suggest that the four may have been in contact with each other as early as the fall of 1999.[86]

Five more—Wail al Shehri, Waleed al Shehri, Abdul Aziz al Omari, Mohand al Shehri, and Ahmed al Nami—came from Asir Province, a poor region in southwestern Saudi Arabia that borders Yemen; this weakly policed area is sometimes called "the wild frontier." Wail and Waleed al Shehri were brothers. All five in this group had begun university studies. Omari had graduated with honors from high school, had attained a degree from the Imam Muhammad Ibn Saud Islamic University, was married, and had a daughter.[87]

The three remaining muscle hijackers from Saudi Arabia were Satam al Suqami, Majed Moqed, and Salem al Hazmi. Suqami came from Riyadh. Moqed hailed from a small town called Annakhil, west of Medina. Suqami had very little education, and Moqed had dropped out of university. Neither Suqami nor Moqed appears to have had ties to the other, or to any of the other operatives, before getting involved with extremists, probably by 1999.[88]

Salem al Hazmi, a younger brother of Nawaf, was born in Mecca. Salem's family recalled him as a quarrelsome teenager. His brother Nawaf probably recommended him for recruitment into al Qaeda. One al Qaeda member who knew them says that Nawaf pleaded with Bin Ladin to allow Salem to participate in the 9/11 operation.[89]

Detainees have offered varying reasons for the use of so many Saudi operatives. Binalshibh argues that al Qaeda wanted to send a message to the government of Saudi Arabia about its relationship with the United States. Several other al Qaeda figures, however, have stated that ethnicity generally was not a factor in the selection of operatives unless it was important for security or operational reasons.[90]

KSM, for instance, denies that Saudis were chosen for the 9/11 plot to drive a wedge between the United States and Saudi Arabia, and stresses practical reasons for considering ethnic background when selecting operatives. He says that so many were Saudi because Saudis comprised the largest portion of the pool of recruits in the al Qaeda training camps. KSM estimates that in any given camp, 70 percent of the mujahideen were Saudi, 20 percent were Yemeni, and 10 percent were from elsewhere. Although Saudi and Yemeni trainees were most often willing to volunteer for suicide operations, prior to 9/11 it was easier for Saudi operatives to get into the United States.[91]

Most of the Saudi muscle hijackers developed their ties to extremists two or three years before the attacks. Their families often did not consider these young men religious zealots. Some were perceived as devout, others as lacking in faith. For instance, although Ahmed al Ghamdi, Hamza al Ghamdi, and Saeed al Ghamdi attended prayer services regularly and Omari often served as an imam at his mosque in Saudi Arabia, Suqami and Salem al Hazmi appeared unconcerned with religion and, contrary to Islamic law, were known to drink alcohol.[92]

Like many other al Qaeda operatives, the Saudis who eventually became the muscle hijackers were targeted for recruitment outside Afghanistan—probably in Saudi Arabia itself. Al Qaeda recruiters, certain clerics, and—in a

few cases—family members probably all played a role in spotting potential candidates. Several of the muscle hijackers seem to have been recruited through contacts at local universities and mosques.[93]

According to the head of one of the training camps in Afghanistan, some were chosen by unnamed Saudi sheikhs who had contacts with al Qaeda. Omari, for example, is believed to have been a student of a radical Saudi cleric named Sulayman al Alwan. His mosque, which is located in al Qassim Province, is known among more moderate clerics as a "terrorist factory." The province is at the very heart of the strict Wahhabi movement in Saudi Arabia. Saeed al Ghamdi and Mohand al Shehri also spent time in al Qassim, both breaking with their families. According to his father, Mohand al Shehri's frequent visits to this area resulted in his failing exams at his university in Riyadh. Saeed al Ghamdi transferred to a university in al Qassim, but he soon stopped talking to his family and dropped out of school without informing them.[94]

The majority of these Saudi recruits began to break with their families in late 1999 and early 2000. According to relatives, some recruits began to make arrangements for extended absences. Others exhibited marked changes in behavior before disappearing. Salem al Hazmi's father recounted that Salem—who had had problems with alcohol and petty theft—stopped drinking and started attending mosque regularly three months before he disappeared.[95]

Several family members remembered that their relatives had expressed a desire to participate in jihad, particularly in Chechnya. None had mentioned going to Afghanistan. These statements might be true or cover stories. The four recruits from the al Ghamdi tribe, for example, all told their families that they were going to Chechnya. Only two—Ahmed al Ghamdi and Saeed al Ghamdi—had documentation suggesting travel to a Russian republic.[96]

Some aspiring Saudi mujahideen, intending to go to Chechnya, encountered difficulties along the way and diverted to Afghanistan. In 1999, Ibn al Khattab—the primary commander of Arab nationals in Chechnya—reportedly had started turning away most foreign mujahideen because of their inexperience and inability to adjust to the local conditions. KSM states that several of the 9/11 muscle hijackers faced problems traveling to Chechnya and so went to Afghanistan, where they were drawn into al Qaeda.[97]

Khallad has offered a more detailed story of how such diversions occurred. According to him, a number of Saudi mujahideen who tried to go to Chechnya in 1999 to fight the Russians were stopped at the Turkish-Georgian border. Upon arriving in Turkey, they received phone calls at guesthouses in places such as Istanbul and Ankara, informing them that the route to Chechnya via Georgia had been closed. These Saudis then decided to travel to Afghanistan, where they could train and wait to make another attempt to enter Chechnya during the summer of 2000. While training at al Qaeda camps, a dozen of them heard Bin Ladin's speeches, volunteered to become suicide operatives, and eventually were selected as muscle hijackers for the planes operation. Khallad says he met a number of them at the Kandahar airport, where they were help-

ing to provide extra security. He encouraged Bin Ladin to use them. Khallad claims to have been closest with Saeed al Ghamdi, whom he convinced to become a martyr and whom he asked to recruit a friend, Ahmed al Ghamdi, to the same cause. Although Khallad claims not to recall everyone from this group who was later chosen for the 9/11 operation, he says they also included Suqami, Waleed and Wail al Shehri, Omari, Nami, Hamza al Ghamdi, Salem al Hazmi, and Moqed.[98]

According to KSM, operatives volunteered for suicide operations and, for the most part, were not pressured to martyr themselves. Upon arriving in Afghanistan, a recruit would fill out an application with standard questions, such as, What brought you to Afghanistan? How did you travel here? How did you hear about us? What attracted you to the cause? What is your educational background? Where have you worked before? Applications were valuable for determining the potential of new arrivals, for filtering out potential spies from among them, and for identifying recruits with special skills. For instance, as pointed out earlier, Hani Hanjour noted his pilot training. Prospective operatives also were asked whether they were prepared to serve as suicide operatives; those who answered in the affirmative were interviewed by senior al Qaeda lieutenant Muhammad Atef.[99]

KSM claims that the most important quality for any al Qaeda operative was willingness to martyr himself. Khallad agrees, and claims that this criterion had preeminence in selecting the planes operation participants. The second most important criterion was demonstrable patience, Khallad says, because the planning for such attacks could take years.[100]

Khallad claims it did not matter whether the hijackers had fought in jihad previously, since he believes that U.S. authorities were not looking for such operatives before 9/11. But KSM asserts that young mujahideen with clean records were chosen to avoid raising alerts during travel. The al Qaeda training camp head mentioned above adds that operatives with no prior involvement in activities likely to be known to international security agencies were purposefully selected for the 9/11 attacks.[101]

Most of the muscle hijackers first underwent basic training similar to that given other al Qaeda recruits. This included training in firearms, heavy weapons, explosives, and topography. Recruits learned discipline and military life. They were subjected to artificial stresses to measure their psychological fitness and commitment to jihad. At least seven of the Saudi muscle hijackers took this basic training regime at the al Faruq camp near Kandahar. This particular camp appears to have been the preferred location for vetting and training the potential muscle hijackers because of its proximity to Bin Ladin and senior al Qaeda leadership. Two others—Suqami and Moqed—trained at Khaldan, another large basic training facility located near Kabul, where Mihdhar had trained in the mid-1990s.[102]

By the time operatives for the planes operation were picked in mid-2000, some of them had been training in Afghanistan for months, others were just

only a handful of al Qaeda operatives who, according to KSM, was aware of the full details of the planned planes operation. Abu Turab taught the operatives how to conduct hijackings, disarm air marshals, and handle explosives. He also trained them in bodybuilding and provided them with a few basic English words and phrases.[108]

According to KSM, Abu Turab even had the trainees butcher a sheep and a camel with a knife to prepare to use knives during the hijackings. The recruits learned to focus on storming the cockpit at the earliest opportunity when the doors first opened, and to worry about seizing control over the rest of the plane later. The operatives were taught about other kinds of attack as well, such as truck bombing, so that they would not be able to disclose the exact nature of their operation if they were caught. According to KSM, the muscle did not learn the full details—including the plan to hijack planes and fly them into buildings—before reaching the United States.[109]

After training in Afghanistan, the operatives went to a safehouse maintained by KSM in Karachi and stayed there temporarily before being deployed to the United States via the UAE. The safehouse was run by al Qaeda operative Abd al Rahim Ghulum Rabbani, also known as Abu Rahmah, a close associate of KSM who assisted him for three years by finding apartments and lending logistical support to operatives KSM would send.

According to an al Qaeda facilitator, operatives were brought to the safehouse by a trusted Pakistani al Qaeda courier named Abdullah Sindhi, who also worked for KSM. The future hijackers usually arrived in groups of two or three, staying at the safe house for as long as two weeks. The facilitator has identified each operative whom he assisted at KSM's direction in the spring of 2001. Before the operatives left Pakistan, each of them received $10,000 from KSM for future expenses.[110]

From Pakistan, the operatives transited through the UAE en route to the United States. In the Emirates they were assisted primarily by al Qaeda operatives Ali Abdul Aziz Ali and Mustafa al Hawsawi. Ali apparently assisted nine future hijackers between April and June 2001 as they came through Dubai. He helped them with plane tickets, traveler's checks, and hotel reservations; he also taught them about everyday aspects of life in the West, such as purchasing clothes and ordering food. Dubai, a modern city with easy access to a major airport, travel agencies, hotels, and Western commercial establishments, was an ideal transit point.[111]

Ali reportedly assumed the operatives he was helping were involved in a big operation in the United States, he did not know the details.[112] When he asked KSM to send him an assistant, KSM dispatched Hawsawi, who had worked on al Qaeda's media committee in Kandahar. Hawsawi helped send the last four operatives (other than Mihdhar) to the United States from the UAE. Hawsawi would consult with Atta about the hijackers' travel schedules to the United States and later check with Atta to confirm that each had arrived. Hawsawi told

the muscle hijackers that they would be met by Atta at the airport. Hawsawi also facilitated some of the operation's financing.[113]

The muscle hijackers began arriving in the United States in late April 2001. In most cases, they traveled in pairs on tourist visas and entered the United States in Orlando or Miami, Florida; Washington, D.C.; or New York. Those arriving in Florida were assisted by Atta and Shehhi, while Hazmi and Hanjour took care of the rest. By the end of June, 14 of the 15 muscle hijackers had crossed the Atlantic.[114]

The muscle hijackers supplied an infusion of funds, which they carried as a mixture of cash and traveler's checks purchased in the UAE and Saudi Arabia. Seven muscle hijackers are known to have purchased a total of nearly $50,000 in traveler's checks that were used in the United States. Moreover, substantial deposits into operatives' U.S. bank accounts immediately followed the entry of other muscle hijackers, indicating that those newcomers brought money with them as well. In addition, muscle hijacker Banihammad came to the United States after opening bank accounts in the UAE into which were deposited the equivalent of approximately $30,000 on June 25, 2001. After his June 27 arrival in the United States, Banihammad made Visa and ATM withdrawals from his UAE accounts.[115]

The hijackers made extensive use of banks in the United States, choosing both branches of major international banks and smaller regional banks. All of the hijackers opened accounts in their own name, and used passports and other identification documents that appeared valid on their face. Contrary to numerous published reports, there is no evidence the hijackers ever used false Social Security numbers to open any bank accounts. While the hijackers were not experts on the use of the U.S. financial system, nothing they did would have led the banks to suspect criminal behavior, let alone a terrorist plot to commit mass murder.[116]

The last muscle hijacker to arrive was Khalid al Mihdhar. As mentioned earlier, he had abandoned Hazmi in San Diego in June 2000 and returned to his family in Yemen. Mihdhar reportedly stayed in Yemen for about a month before Khallad persuaded him to return to Afghanistan. Mihdhar complained about life in the United States. He met with KSM, who remained annoyed at his decision to go AWOL. But KSM's desire to drop him from the operation yielded to Bin Ladin's insistence to keep him.[117]

By late 2000, Mihdhar was in Mecca, staying with a cousin until February 2001, when he went home to visit his family before returning to Afghanistan. In June 2001, Mihdhar returned once more to Mecca to stay with his cousin for another month. Mihdhar said that Bin Ladin was planning five attacks on the United States. Before leaving, Mihdhar asked his cousin to watch over his home and family because of a job he had to do.[118]

On July 4, 2001, Mihdhar left Saudi Arabia to return to the United States, arriving at John F. Kennedy International Airport in New York. Mihdhar gave







**American Airlines Flight 11**

Left to right, *Mohamed Atta,* pilot*; Waleed al Shehri, Wail al Shehri, Satam al Suqami, Abdulaziz al Omari,* hijackers







**United Airlines Flight 175**

Left to right, *Marwan al Shehhi,* pilot*; Fayez Banihammad, Ahmed al Ghamdi, Hamza al Ghamdi, Mohand al Shehri,* hijackers







**American Airlines
Flight 77**

Left to right,
*Hani Hanjour,* pilot*;
Nawaf al Hazmi,
Khalid al Mihdhar,
Majed Moqed, Salem
al Hazmi,* hijackers

**United Airlines
Flight 93**

Left to right,
*Ziad Jarrah* pilot*;
Saeed al Ghamdi,
Ahmad al Haznawi,
Ahmed al Nami,*
hijackers






his intended address as the Marriott Hotel, New York City, but instead spent one night at another New York hotel. He then joined the group of hijackers in Paterson, reuniting with Nawaf al Hazmi after more than a year. With two months remaining, all 19 hijackers were in the United States and ready to take the final steps toward carrying out the attacks.[119]

## Assistance from Hezbollah and Iran to al Qaeda

As we mentioned in chapter 2, while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah, which is based mainly in southern Lebanon and Beirut. Al Qaeda members received advice and training from Hezbollah.

Intelligence indicates the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Ladin's return to Afghanistan. Khallad has said that Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the USS *Cole*, but was rebuffed because Bin Ladin did not want to alienate his supporters in Saudi Arabia. Khallad and other detainees have described the willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al Qaeda.[120]

Our knowledge of the international travels of the al Qaeda operatives selected for the 9/11 operation remains fragmentary. But we now have evidence suggesting that 8 to 10 of the 14 Saudi "muscle" operatives traveled into or out of Iran between October 2000 and February 2001.[121]

In October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November. A top Hezbollah commander and Saudi Hezbollah contacts were involved.[122]

Also in October 2000, two future muscle hijackers, Mohand al Shehri and Hamza al Ghamdi, flew from Iran to Kuwait. In November, Ahmed al Ghamdi apparently flew to Beirut, traveling—perhaps by coincidence—on the same flight as a senior Hezbollah operative. Also in November, Salem al Hazmi apparently flew from Saudi Arabia to Beirut.[123]

In mid-November, we believe, three of the future muscle hijackers, Wail al Shehri, Waleed al Shehri, and Ahmed al Nami, all of whom had obtained their U.S. visas in late October, traveled in a group from Saudi Arabia to Beirut and then onward to Iran. An associate of a senior Hezbollah operative was on the same flight that took the future hijackers to Iran. Hezbollah officials in Beirut and Iran were expecting the arrival of a group during the same time period. The travel of this group was important enough to merit the attention of senior figures in Hezbollah.[124]

Later in November, two future muscle hijackers, Satam al Suqami and Majed

Moqed, flew into Iran from Bahrain. In February 2001, Khalid al Mihdhar may have taken a flight from Syria to Iran, and then traveled further within Iran to a point near the Afghan border.[125]

KSM and Binalshibh have confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. They deny any other reason for the hijackers' travel to Iran. They also deny any relationship between the hijackers and Hezbollah.[126]

In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers. There also is circumstantial evidence that senior Hezbollah operatives were closely tracking the travel of some of these future muscle hijackers into Iran in November 2000. However, we cannot rule out the possibility of a remarkable coincidence—that is, that Hezbollah was actually focusing on some other group of individuals traveling from Saudi Arabia during this same time frame, rather than the future hijackers.[127]

We have found no evidence that Iran or Hezbollah was aware of the planning for what later became the 9/11 attack. At the time of their travel through Iran, the al Qaeda operatives themselves were probably not aware of the specific details of their future operation.

After 9/11, Iran and Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists associated with al Qaeda. A senior Hezbollah official disclaimed any Hezbollah involvement in 9/11.[128]

We believe this topic requires further investigation by the U.S. government.

## 7.4 FINAL STRATEGIES AND TACTICS

### Final Preparations in the United States

During the early summer of 2001, Atta, assisted by Shehhi, was busy coordinating the arrival of most of the muscle hijackers in southern Florida—picking them up at the airport, finding them places to stay, and helping them settle in the United States.[129]

The majority settled in Florida. Some opened bank accounts, acquired mailboxes, and rented cars. Several also joined local gyms, presumably to stay fit for the operation. Upon first arriving, most stayed in hotels and motels; but by mid-June, they settled in shared apartments relatively close to one another and Atta.[130] Though these muscle hijackers did not travel much after arriving in the United States, two of them, Waleed al Shehri and Satam al Suqami, took unusual trips.

On May 19, Shehri and Suqami flew from Fort Lauderdale to Freeport, the Bahamas, where they had reservations at the Bahamas Princess Resort. The two were turned away by Bahamian officials on arrival, however, because they

began to make purchases suggesting that the planning was coming to an end. In mid-August, for example, they bought small knives that may actually have been used in the attacks. On August 22, moreover, Jarrah attempted to purchase four GPS units from a pilot shop in Miami. He was able to buy only one unit, which he picked up a few days later when he also purchased three aeronautical charts.[170]

Perhaps most significant, however, was the purchase of plane tickets for September 11. On August 23, Atta again flew to Newark, probably to meet with Hazmi and select flights. All 19 tickets were booked and purchased between August 25 and September 5.[171]

It therefore appears that the attack date was selected by the third week of August. This timing is confirmed by Binalshibh, who claims Atta called him with the date in mid-August. According to Binalshibh, Atta used a riddle to convey the date in code—a message of two branches, a slash, and a lollipop (to non-Americans, 11/9 would be interpreted as September 11). Binalshibh says he called Atta back to confirm the date before passing it to KSM.[172]

KSM apparently received the date from Binalshibh in a message sent through Binalshibh's old Hamburg associate, Zakariya Essabar. Both Binalshibh and KSM claim that Essabar was not privy to the meaning of the message and had no foreknowledge of the attacks. According to Binalshibh, shortly after the date was chosen, he advised Essabar and another Hamburg associate, Said Bahaji, that if they wanted to go to Afghanistan, now was the time because it would soon become more difficult. Essabar made reservations on August 22 and departed Hamburg for Karachi on August 30; Bahaji purchased his tickets on August 20 and departed Hamburg for Karachi on September 3.[173]

Binalshibh also made arrangements to leave for Pakistan during early September, before the attacks, as did Ali and Hawsawi, the plot facilitators in the UAE. During these final days, Binalshibh and Atta kept in contact by phone, email, and instant messaging. Although Atta had forbidden the hijackers to contact their families, he apparently placed one last call to his own father on September 9. Atta also asked Binalshibh to contact the family of one hijacker, pass along goodbyes from others, and give regards to KSM. Jarrah alone appears to have left a written farewell—a sentimental letter to Aysel Senguen.[174]

Hazmi, however, may not have been so discreet. He may have telephoned his former San Diego companion, Mohdar Abdullah, in late August. Several bits of evidence indicate that others in Abdullah's circle may have received word that something big would soon happen. As noted earlier, Abdullah's behavior reportedly changed noticeably. Prior to September 11, both he and Yazeed al Salmi suddenly became intent on proceeding with their planned marriages. One witness quotes Salmi as commenting after the 9/11 attacks, "I knew they were going to do something, that is why I got married." Moreover, as of August 2001, Iyad Kreiwesh and other employees at the Texaco station where Hazmi had worked suddenly were anticipating attention from law enforcement

authorities in the near future. Finally, according to an uncorroborated witness account, early on the morning of September 10, Abdullah, Osama Awadallah, Omar Bakarbashat, and others behaved suspiciously at the gas station. According to the witness, after the group met, Awadallah said "it is finally going to happen" as the others celebrated by giving each other high fives.[175]

### Dissent within the al Qaeda Leadership

While tactical preparations for the attack were nearing completion, the entire operation was being questioned at the top, as al Qaeda and the Taliban argued over strategy for 2001. Our focus has naturally been on the specifics of the planes operation. But from the perspective of Bin Ladin and Atef, this operation was only one, admittedly key, element of their unfolding plans for the year. Living in Afghanistan, interacting constantly with the Taliban, the al Qaeda leaders would never lose sight of the situation in that country.

Bin Ladin's consistent priority was to launch a major attack directly against the United States. He wanted the planes operation to proceed as soon as possible. Mihdhar reportedly told his cousin during the summer of 2001 that Bin Ladin was reputed to have remarked, "I will make it happen even if I do it by myself."[176]

According to KSM, Bin Ladin had been urging him to advance the date of the attacks. In 2000, for instance, KSM remembers Bin Ladin pushing him to launch the attacks amid the controversy after then-Israeli opposition party leader Ariel Sharon's visit to the Temple Mount in Jerusalem. KSM claims Bin Ladin told him it would be enough for the hijackers simply to down planes rather than crash them into specific targets. KSM says he resisted the pressure.[177]

KSM claims to have faced similar pressure twice more in 2001. According to him, Bin Ladin wanted the operation carried out on May 12, 2001, seven months to the day after the *Cole* bombing. KSM adds that the 9/11 attacks had originally been envisioned for May 2001. The second time he was urged to launch the attacks early was in June or July 2001, supposedly after Bin Ladin learned from the media that Sharon would be visiting the White House. On both occasions KSM resisted, asserting that the hijacking teams were not ready. Bin Ladin pressed particularly strongly for the latter date in two letters stressing the need to attack early. The second letter reportedly was delivered by Bin Ladin's son-in-law, Aws al Madani.[178]

Other evidence corroborates KSM's account. For instance, Mihdhar told his cousin that the attacks were to happen in May, but were postponed twice, first to July, then to September. Moreover, one candidate hijacker remembers a general warning being issued in the al Qaeda camps in July or early August, just like the warnings issued two weeks before the *Cole* bombing and ten days before the eventual 9/11 attacks. During the midsummer alert, al Qaeda members dispersed with their families, security was increased, and Bin Ladin disappeared for about 30 days, until the alert was canceled.[179]

While the details of the operation were strictly compartmented, by the time

of the alert, word had begun to spread that an attack against the United States was coming. KSM notes that it was generally well known by the summer of 2001 that he was planning some kind of operation against the United States. Many were even aware that he had been preparing operatives to go to the United States, leading some to conclude that al Qaeda was planning a near-term attack on U.S. soil. Moreover, Bin Ladin had made several remarks that summer hinting at an upcoming attack and generating rumors throughout the worldwide jihadist community. Bin Ladin routinely told important visitors to expect significant attacks against U.S. interests soon and, during a speech at the al Faruq camp, exhorted trainees to pray for the success of an attack involving 20 martyrs. Others have confirmed hearing indications of an impending attack and have verified that such news, albeit without specific details, had spread across al Qaeda.[180]

Although Bin Ladin's top priority apparently was to attack the United States, others had a different view. The Taliban leaders put their main emphasis on the year's military offensive against the Northern Alliance, an offensive that ordinarily would begin in the late spring or summer. They certainly hoped that this year's offensive would finally finish off their old enemies, driving them from Afghanistan. From the Taliban's perspective, an attack against the United States might be counterproductive. It might draw the Americans into the war against them, just when final victory seemed within their grasp.[181]

There is evidence that Mullah Omar initially opposed a major al Qaeda operation directly against the United States in 2001. Furthermore, by July, with word spreading of a coming attack, a schism emerged among the senior leadership of al Qaeda. Several senior members reportedly agreed with Mullah Omar. Those who reportedly sided with Bin Ladin included Atef, Sulayman Abu Ghayth, and KSM. But those said to have opposed him were weighty figures in the organization—including Abu Hafs the Mauritanian, Sheikh Saeed al Masri, and Sayf al Adl. One senior al Qaeda operative claims to recall Bin Ladin arguing that attacks against the United States needed to be carried out immediately to support insurgency in the Israeli-occupied territories and protest the presence of U.S. forces in Saudi Arabia. Beyond these rhetorical appeals, Bin Ladin also reportedly thought an attack against the United States would benefit al Qaeda by attracting more suicide operatives, eliciting greater donations, and increasing the number of sympathizers willing to provide logistical assistance.[182]

Mullah Omar is reported to have opposed this course of action for ideological reasons rather than out of fear of U.S. retaliation. He is said to have preferred for al Qaeda to attack Jews, not necessarily the United States. KSM contends that Omar faced pressure from the Pakistani government to keep al Qaeda from engaging in operations outside Afghanistan. Al Qaeda's chief financial manager, Sheikh Saeed, argued that al Qaeda should defer to the Taliban's wishes. Another source says that Sheikh Saeed opposed the operation, both out of deference to Omar and because he feared the U.S. response to an

above deputy chief of a section within the Counterterrorism Division at FBI headquarters.

One of the *Cole* case agents read the lead with interest, and contacted "Jane" to obtain more information. "Jane" argued, however, that because the agent was designated a "criminal" FBI agent, not an intelligence FBI agent, the wall kept him from participating in any search for Mihdhar. In fact, she felt he had to destroy his copy of the lead because it contained NSA information from reports that included caveats ordering that the information not be shared without OIPR's permission. The agent asked "Jane" to get an opinion from the FBI's National Security Law Unit (NSLU) on whether he could open a criminal case on Mihdhar.[80]

"Jane" sent an email to the *Cole* case agent explaining that according to the NSLU, the case could be opened only as an intelligence matter, and that if Mihdhar was found, only designated intelligence agents could conduct or even be present at any interview. She appears to have misunderstood the complex rules that could apply to this situation.[81]

The FBI agent angrily responded:

> Whatever has happened to this—someday someone will die—and wall or not—the public will not understand why we were not more effective and throwing every resource we had at certain "problems."
>
> Let's hope the National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, UBL, is getting the most "protection."

"Jane" replied that she was not making up the rules; she claimed that they were in the relevant manual and "ordered by the [FISA] Court and every office of the FBI is required to follow them including FBI NY."[82]

It is now clear that everyone involved was confused about the rules governing the sharing and use of information gathered in intelligence channels. Because Mihdhar was being sought for his possible connection to or knowledge of the *Cole* bombing, he could be investigated or tracked under the existing *Cole* criminal case. No new criminal case was needed for the criminal agent to begin searching for Mihdhar. And as NSA had approved the passage of its information to the criminal agent, he could have conducted a search using all available information. As a result of this confusion, the criminal agents who were knowledgeable about al Qaeda and experienced with criminal investigative techniques, including finding suspects and possible criminal charges, were thus excluded from the search.[83]

The search was assigned to one FBI agent, and it was his very first counterterrorism lead. Because the lead was "routine," he was given 30 days to open an intelligence case and make some unspecified efforts to locate Mihdhar. He started the process a few days later. He checked local New York databases for

criminal record and driver's license information and checked the hotel listed on Mihdhar's U.S. entry form. Finally, on September 11, the agent sent a lead to Los Angeles, because Mihdhar had initially arrived in Los Angeles in January 2000.[84]

We believe that if more resources had been applied and a significantly different approach taken, Mihdhar and Hazmi might have been found. They had used their true names in the United States. Still, the investigators would have needed luck as well as skill to find them prior to September 11 even if such searches had begun as early as August 23, when the lead was first drafted.[85]

Many FBI witnesses have suggested that even if Mihdhar had been found, there was nothing the agents could have done except follow him onto the planes. We believe this is incorrect. Both Hazmi and Mihdhar could have been held for immigration violations or as material witnesses in the *Cole* bombing case. Investigation or interrogation of them, and investigation of their travel and financial activities, could have yielded evidence of connections to other participants in the 9/11 plot. The simple fact of their detention could have derailed the plan. In any case, the opportunity did not arise.

**Phoenix Memo**

The Phoenix memo was investigated thoroughly by the Joint Inquiry and the Department of Justice Inspector General.[86] We will recap it briefly here. In July 2001, an FBI agent in the Phoenix field office sent a memo to FBI headquarters and to two agents on international terrorism squads in the New York Field Office, advising of the "possibility of a coordinated effort by Usama Bin Ladin" to send students to the United States to attend civil aviation schools. The agent based his theory on the "inordinate number of individuals of investigative interest" attending such schools in Arizona.[87]

The agent made four recommendations to FBI headquarters: to compile a list of civil aviation schools, establish liaison with those schools, discuss his theories about Bin Ladin with the intelligence community, and seek authority to obtain visa information on persons applying to flight schools. His recommendations were not acted on. His memo was forwarded to one field office. Managers of the Usama Bin Ladin unit and the Radical Fundamentalist unit at FBI headquarters were addressees, but they did not even see the memo until after September 11. No managers at headquarters saw the memo before September 11, and the New York Field Office took no action.[88]

As its author told investigators, the Phoenix memo was not an alert about suicide pilots. His worry was more about a Pan Am Flight 103 scenario in which explosives were placed on an aircraft. The memo's references to aviation training were broad, including aeronautical engineering.[89] If the memo had been distributed in a timely fashion and its recommendations acted on promptly, we do not believe it would have uncovered the plot. It might well, however, have sensitized the FBI so that it might have taken the Moussaoui matter more seriously the next month.

## Zacarias Moussaoui

On August 15, 2001, the Minneapolis FBI Field Office initiated an intelligence investigation on Zacarias Moussaoui. As mentioned in chapter 7, he had entered the United States in February 2001, and had begun flight lessons at Airman Flight School in Norman, Oklahoma. He resumed his training at the Pan Am International Flight Academy in Eagan, Minnesota, starting on August 13. He had none of the usual qualifications for flight training on Pan Am's Boeing 747 flight simulators. He said he did not intend to become a commercial pilot but wanted the training as an "ego boosting thing." Moussaoui stood out because, with little knowledge of flying, he wanted to learn how to "take off and land" a Boeing 747.[90]

The agent in Minneapolis quickly learned that Moussaoui possessed jihadist beliefs. Moreover, Moussaoui had $32,000 in a bank account but did not provide a plausible explanation for this sum of money. He had traveled to Pakistan but became agitated when asked if he had traveled to nearby countries while in Pakistan (Pakistan was the customary route to the training camps in Afghanistan). He planned to receive martial arts training, and intended to purchase a global positioning receiver. The agent also noted that Moussaoui became extremely agitated whenever he was questioned regarding his religious beliefs. The agent concluded that Moussaoui was "an Islamic extremist preparing for some future act in furtherance of radical fundamentalist goals." He also believed Moussaoui's plan was related to his flight training.[91]

Moussaoui can be seen as an al Qaeda mistake and a missed opportunity. An apparently unreliable operative, he had fallen into the hands of the FBI. As discussed in chapter 7, Moussaoui had been in contact with and received money from Ramzi Binalshibh. If Moussaoui had been connected to al Qaeda, questions should instantly have arisen about a possible al Qaeda plot that involved piloting airliners, a possibility that had never been seriously analyzed by the intelligence community.

The FBI agent who handled the case in conjunction with the INS representative on the Minneapolis Joint Terrorism Task Force suspected that Moussaoui might be planning to hijack a plane. Minneapolis and FBI headquarters debated whether Moussaoui should be arrested immediately or surveilled to obtain additional information. Because it was not clear whether Moussaoui could be imprisoned, the FBI case agent decided the most important thing was to prevent Moussaoui from obtaining any further training that he could use to carry out a potential attack.[92]

As a French national who had overstayed his visa, Moussaoui could be detained immediately. The INS arrested Moussaoui on the immigration violation. A deportation order was signed on August 17, 2001.[93]

The agents in Minnesota were concerned that the U.S. Attorney's Office in Minneapolis would find insufficient probable cause of a crime to obtain a criminal warrant to search Moussaoui's laptop computer.[94] Agents at FBI headquarters believed there was insufficient probable cause. Minneapolis therefore

challenging Rice to imagine the day after an attack posits a strike that kills "hundreds" of Americans. He did not write "thousands."

## Institutionalizing Imagination:
## The Case of Aircraft as Weapons

Imagination is not a gift usually associated with bureaucracies. For example, before Pearl Harbor the U.S. government had excellent intelligence that a Japanese attack was coming, especially after peace talks stalemated at the end of November 1941. These were days, one historian notes, of "excruciating uncertainty." The most likely targets were judged to be in Southeast Asia. An attack was coming, "but officials were at a loss to know where the blow would fall or what more might be done to prevent it."[11] In retrospect, available intercepts pointed to Japanese examination of Hawaii as a possible target. But, another historian observes, "in the face of a clear warning, alert measures bowed to routine."[12]

It is therefore crucial to find a way of routinizing, even bureaucratizing, the exercise of imagination. Doing so requires more than finding an expert who can imagine that aircraft could be used as weapons. Indeed, since al Qaeda and other groups had already used suicide vehicles, namely truck bombs, the leap to the use of other vehicles such as boats (the *Cole* attack) or planes is not far-fetched.

Yet these scenarios were slow to work their way into the thinking of aviation security experts. In 1996, as a result of the TWA Flight 800 crash, President Clinton created a commission under Vice President Al Gore to report on shortcomings in aviation security in the United States. The Gore Commission's report, having thoroughly canvassed available expertise in and outside of government, did not mention suicide hijackings or the use of aircraft as weapons. It focused mainly on the danger of placing bombs onto aircraft—the approach of the Manila air plot. The Gore Commission did call attention, however, to lax screening of passengers and what they carried onto planes.

In late 1998, reports came in of a possible al Qaeda plan to hijack a plane. One, a December 4 Presidential Daily Briefing for President Clinton (reprinted in chapter 4), brought the focus back to more traditional hostage taking; it reported Bin Ladin's involvement in planning a hijack operation to free prisoners such as the "Blind Sheikh," Omar Abdel Rahman. Had the contents of this PDB been brought to the attention of a wider group, including key members of Congress, it might have brought much more attention to the need for permanent changes in domestic airport and airline security procedures.[13]

Threat reports also mentioned the possibility of using an aircraft filled with explosives. The most prominent of these mentioned a possible plot to fly an explosives-laden aircraft into a U.S. city. This report, circulated in September 1998, originated from a source who had walked into an American consulate in East Asia. In August of the same year, the intelligence community had received information that a group of Libyans hoped to crash a plane into the

World Trade Center. In neither case could the information be corroborated. In addition, an Algerian group hijacked an airliner in 1994, most likely intending to blow it up over Paris, but possibly to crash it into the Eiffel Tower.[14]

In 1994, a private airplane had crashed onto the south lawn of the White House. In early 1995, Abdul Hakim Murad—Ramzi Yousef's accomplice in the Manila airlines bombing plot—told Philippine authorities that he and Yousef had discussed flying a plane into CIA headquarters.[15]

Clarke had been concerned about the danger posed by aircraft since at least the 1996 Atlanta Olympics. There he had tried to create an air defense plan using assets from the Treasury Department, after the Defense Department declined to contribute resources. The Secret Service continued to work on the problem of airborne threats to the Washington region. In 1998, Clarke chaired an exercise designed to highlight the inadequacy of the solution. This paper exercise involved a scenario in which a group of terrorists commandeered a Learjet on the ground in Atlanta, loaded it with explosives, and flew it toward a target in Washington, D.C. Clarke asked officials from the Pentagon, Federal Aviation Administration (FAA), and Secret Service what they could do about the situation. Officials from the Pentagon said they could scramble aircraft from Langley Air Force Base, but they would need to go to the President for rules of engagement, and there was no mechanism to do so. There was no clear resolution of the problem at the exercise.[16]

In late 1999, a great deal of discussion took place in the media about the crash off the coast of Massachusetts of EgyptAir Flight 990, a Boeing 767. The most plausible explanation that emerged was that one of the pilots had gone berserk, seized the controls, and flown the aircraft into the sea. After the 1999–2000 millennium alerts, when the nation had relaxed, Clarke held a meeting of his Counterterrorism Security Group devoted largely to the possibility of a possible airplane hijacking by al Qaeda.[17]

In his testimony, Clarke commented that he thought that warning about the possibility of a suicide hijacking would have been just one more speculative theory among many, hard to spot since the volume of warnings of "al Qaeda threats and other terrorist threats, was in the tens of thousands—probably hundreds of thousands."[18] Yet the possibility was imaginable, and imagined. In early August 1999, the FAA's Civil Aviation Security intelligence office summarized the Bin Ladin hijacking threat. After a solid recitation of all the information available on this topic, the paper identified a few principal scenarios, one of which was a "suicide hijacking operation." The FAA analysts judged such an operation unlikely, because "it does not offer an opportunity for dialogue to achieve the key goal of obtaining Rahman and other key captive extremists. . . . A suicide hijacking is assessed to be an option of last resort."[19]

Analysts could have shed some light on what kind of "opportunity for dialogue" al Qaeda desired.[20] The CIA did not write any analytical assessments of possible hijacking scenarios.

One prescient pre-9/11 analysis of an aircraft plot was written by a Justice Department trial attorney. The attorney had taken an interest, apparently on his own initiative, in the legal issues that would be involved in shooting down a U.S. aircraft in such a situation.[21]

The North American Aerospace Defense Command imagined the possible use of aircraft as weapons, too, and developed exercises to counter such a threat—from planes coming to the United States from overseas, perhaps carrying a weapon of mass destruction. None of this speculation was based on actual intelligence of such a threat. One idea, intended to test command and control plans and NORAD's readiness, postulated a hijacked airliner coming from overseas and crashing into the Pentagon. The idea was put aside in the early planning of the exercise as too much of a distraction from the main focus (war in Korea), and as too unrealistic. As we pointed out in chapter 1, the military planners assumed that since such aircraft would be coming from overseas; they would have time to identify the target and scramble interceptors.[22]

We can therefore establish that at least some government agencies were concerned about the hijacking danger and had speculated about various scenarios. The challenge was to flesh out and test those scenarios, then figure out a way to turn a scenario into constructive action.

Since the Pearl Harbor attack of 1941, the intelligence community has devoted generations of effort to understanding the problem of forestalling a surprise attack. Rigorous analytic methods were developed, focused in particular on the Soviet Union, and several leading practitioners within the intelligence community discussed them with us. These methods have been articulated in many ways, but almost all seem to have at least four elements in common: (1) think about how surprise attacks might be launched; (2) identify telltale indicators connected to the most dangerous possibilities; (3) where feasible, collect intelligence on these indicators; and (4) adopt defenses to deflect the most dangerous possibilities or at least trigger an earlier warning.

After the end of the Gulf War, concerns about lack of warning led to a major study conducted for DCI Robert Gates in 1992 that proposed several recommendations, among them strengthening the national intelligence officer for warning. We were told that these measures languished under Gates's successors. Responsibility for warning related to a terrorist attack passed from the national intelligence officer for warning to the CTC. An Intelligence Community Counterterrorism Board had the responsibility to issue threat advisories.[23]

With the important exception of analysis of al Qaeda efforts in chemical, biological, radiological, and nuclear weapons, we did not find evidence that the methods to avoid surprise attack that had been so laboriously developed over the years were regularly applied.

Considering what was not done suggests possible ways to institutionalize imagination. To return to the four elements of analysis just mentioned:

1. The CTC did not analyze how an aircraft, hijacked or explosives-laden, might be used as a weapon. It did not perform this kind of analysis from the enemy's perspective ("red team" analysis), even though suicide terrorism had become a principal tactic of Middle Eastern terrorists. If it had done so, we believe such an analysis would soon have spotlighted a critical constraint for the terrorists—finding a suicide operative able to fly large jet aircraft. They had never done so before 9/11.

2. The CTC did not develop a set of telltale indicators for this method of attack. For example, one such indicator might be the discovery of possible terrorists pursuing flight training to fly large jet aircraft, or seeking to buy advanced flight simulators.

3. The CTC did not propose, and the intelligence community collection management process did not set, requirements to monitor such telltale indicators. Therefore the warning system was not looking for information such as the July 2001 FBI report of potential terrorist interest in various kinds of aircraft training in Arizona, or the August 2001 arrest of Zacarias Moussaoui because of his suspicious behavior in a Minnesota flight school. In late August, the Moussaoui arrest was briefed to the DCI and other top CIA officials under the heading "Islamic Extremist Learns to Fly."[24] Because the system was not tuned to comprehend the potential significance of this information, the news had no effect on warning.

4. Neither the intelligence community nor aviation security experts analyzed systemic defenses within an aircraft or against terrorist-controlled aircraft, suicidal or otherwise. The many threat reports mentioning aircraft were passed to the FAA. While that agency continued to react to specific, credible threats, it did not try to perform the broader warning functions we describe here. No one in the government was taking on that role for domestic vulnerabilities.

   Richard Clarke told us that he was concerned about the danger posed by aircraft in the context of protecting the Atlanta Olympics of 1996, the White House complex, and the 2001 G-8 summit in Genoa. But he attributed his awareness more to Tom Clancy novels than to warnings from the intelligence community. He did not, or could not, press the government to work on the systemic issues of how to strengthen the layered security defenses to protect aircraft against hijackings or put the adequacy of air defenses against suicide hijackers on the national policy agenda.

The methods for detecting and then warning of surprise attack that the U.S. government had so painstakingly developed in the decades after Pearl Harbor

did not fail; instead, they were not really tried. They were not employed to ana-
lyze the enemy that, as the twentieth century closed, was most likely to launch
a surprise attack directly against the United States.

## 11.2 POLICY

The road to 9/11 again illustrates how the large, unwieldy U.S. government
tended to underestimate a threat that grew ever greater. The terrorism fostered
by Bin Ladin and al Qaeda was different from anything the government had
faced before. The existing mechanisms for handling terrorist acts had been trial
and punishment for acts committed by individuals; sanction, reprisal, deter-
rence, or war for acts by hostile governments. The actions of al Qaeda fit nei-
ther category. Its crimes were on a scale approaching acts of war, but they were
committed by a loose, far-flung, nebulous conspiracy with no territories or cit-
izens or assets that could be readily threatened, overwhelmed, or destroyed.

Early in 2001, DCI Tenet and Deputy Director for Operations James Pavitt
gave an intelligence briefing to President-elect Bush, Vice President–elect
Cheney, and Rice; it included the topic of al Qaeda. Pavitt recalled conveying
that Bin Ladin was one of the gravest threats to the country.[25]

Bush asked whether killing Bin Ladin would end the problem. Pavitt said
he and the DCI had answered that killing Bin Ladin would have an impact,
but would not stop the threat. The CIA later provided more formal assessments
to the White House reiterating that conclusion. It added that in the long term,
the only way to deal with the threat was to end al Qaeda's ability to use
Afghanistan as a sanctuary for its operations.[26]

Perhaps the most incisive of the advisors on terrorism to the new adminis-
tration was the holdover Richard Clarke. Yet he admits that his policy advice,
even if it had been accepted immediately and turned into action, would not
have prevented 9/11.[27]

We must then ask when the U.S. government had reasonable opportunities
to mobilize the country for major action against al Qaeda and its Afghan sanc-
tuary. The main opportunities came after the new information the U.S. gov-
ernment received in 1996–1997, after the embassy bombings of August 1998,
after the discoveries of the Jordanian and Ressam plots in late 1999, and after
the attack on the USS *Cole* in October 2000.

The U.S. policy response to al Qaeda before 9/11 was essentially defined
following the embassy bombings of August 1998. We described those decisions
in chapter 4. It is worth noting that they were made by the Clinton adminis-
tration under extremely difficult domestic political circumstances. Opponents
were seeking the President's impeachment. In addition, in 1998–99 President
Clinton was preparing the government for possible war against Serbia, and he

6. June 2001: FBI and CIA officials do not ensure that all relevant information regarding the Kuala Lumpur meeting was shared with the *Cole* investigators at the June 11 meeting.

7. August 2001: the FBI does not recognize the significance of the information regarding Mihdhar and Hazmi's possible arrival in the United States and thus does not take adequate action to share information, assign resources, and give sufficient priority to the search.

8. August 2001: FBI headquarters does not recognize the significance of the information regarding Moussaoui's training and beliefs and thus does not take adequate action to share information, involve higher-level officials across agencies, obtain information regarding Moussaoui's ties to al Qaeda, and give sufficient priority to determining what Moussaoui might be planning.

9. August 2001: the CIA does not focus on information that Khalid Sheikh Mohammed is a key al Qaeda lieutenant or connect information identifying KSM as the "Mukhtar" mentioned in other reports to the analysis that could have linked "Mukhtar" with Ramzi Binalshibh and Moussaoui.

10. August 2001: the CIA and FBI do not connect the presence of Mihdhar, Hazmi, and Moussaoui to the general threat reporting about imminent attacks.

responsible for making it work. Pavitt underscored the responsibility of the particular field location where the suspects were being tracked at any given time. On the other hand, he also said that the Counterterrorist Center was supposed to manage all the moving parts, while what happened on the ground was the responsibility of managers in the field.[35]

Headquarters tended to support and facilitate, trying to make sure everyone was in the loop. From time to time a particular post would push one way, or headquarters would urge someone to do something. But headquarters never really took responsibility for the successful management of this case. Hence the managers at CIA headquarters did not realize that omissions in planning had occurred, and they scarcely knew that the case had fallen apart.

The director of the Counterterrorist Center at the time, Cofer Black, recalled to us that this operation was one among many and that, at the time, it was "considered interesting, but not heavy water yet." He recalled the failure to get the word to Bangkok fast enough, but has no evident recollection of why the case then dissolved, unnoticed.[36]

6. June 2001: FBI and CIA officials do not ensure that all relevant information regarding the Kuala Lumpur meeting was shared with the *Cole* investigators at the June 11 meeting.

7. August 2001: the FBI does not recognize the significance of the information regarding Mihdhar and Hazmi's possible arrival in the United States and thus does not take adequate action to share information, assign resources, and give sufficient priority to the search.

8. August 2001: FBI headquarters does not recognize the significance of the information regarding Moussaoui's training and beliefs and thus does not take adequate action to share information, involve higher-level officials across agencies, obtain information regarding Moussaoui's ties to al Qaeda, and give sufficient priority to determining what Moussaoui might be planning.

9. August 2001: the CIA does not focus on information that Khalid Sheikh Mohammed is a key al Qaeda lieutenant or connect information identifying KSM as the "Mukhtar" mentioned in other reports to the analysis that could have linked "Mukhtar" with Ramzi Binalshibh and Moussaoui.

10. August 2001: the CIA and FBI do not connect the presence of Mihdhar, Hazmi, and Moussaoui to the general threat reporting about imminent attacks.

responsible for making it work. Pavitt underscored the responsibility of the particular field location where the suspects were being tracked at any given time. On the other hand, he also said that the Counterterrorist Center was supposed to manage all the moving parts, while what happened on the ground was the responsibility of managers in the field.[35]

Headquarters tended to support and facilitate, trying to make sure everyone was in the loop. From time to time a particular post would push one way, or headquarters would urge someone to do something. But headquarters never really took responsibility for the successful management of this case. Hence the managers at CIA headquarters did not realize that omissions in planning had occurred, and they scarcely knew that the case had fallen apart.

The director of the Counterterrorist Center at the time, Cofer Black, recalled to us that this operation was one among many and that, at the time, it was "considered interesting, but not heavy water yet." He recalled the failure to get the word to Bangkok fast enough, but has no evident recollection of why the case then dissolved, unnoticed.[36]

The next level down, the director of the al Qaeda unit in CIA at the time recalled that he did not think it was his job to direct what should or should not be done. He did not pay attention when the individuals dispersed and things fell apart. There was no conscious decision to stop the operation after the trail was temporarily lost in Bangkok. He acknowledged, however, that perhaps there had been a letdown for his overworked staff after the extreme tension and long hours in the period of the millennium alert.[37]

The details of this case illuminate real management challenges, past and future. The U.S. government must find a way of pooling intelligence and using it to guide the planning of and assignment of responsibilities for *joint operations* involving organizations as disparate as the CIA, the FBI, the State Department, the military, and the agencies involved in homeland security.

### Institutional Management

Beyond those day-to-day tasks of bridging the foreign-domestic divide and matching intelligence with plans, the challenges include broader management issues pertaining to how the top leaders of the government set priorities and allocate resources. Once again it is useful to illustrate the problem by examining the CIA, since before 9/11 this agency's role was so central in the government's counterterrorism efforts.

On December 4, 1998, DCI Tenet issued a directive to several CIA officials and his deputy for community management, stating:"We are at war. I want no resources or people spared in this effort, either inside CIA or the Community."[38] The memorandum had little overall effect on mobilizing the CIA or the intelligence community.[39]

The memo was addressed only to CIA officials and the deputy for community management, Joan Dempsey. She faxed the memo to the heads of the major intelligence agencies after removing covert action sections. Only a handful of people received it. The NSA director at the time, Lieutenant General Kenneth Minihan, believed the memo applied only to the CIA and not the NSA, because no one had informed him of any NSA shortcomings. For their part, CIA officials thought the memorandum was intended for the rest of the intelligence community, given that they were already doing all they could and believed that the rest of the community needed to pull its weight.[40]

The episode indicates some of the limitations of the DCI's authority over the direction and priorities of the intelligence community, especially its elements within the Department of Defense. The DCI has to direct agencies without controlling them. He does not receive an appropriation for their activities, and therefore does not control their purse strings. He has little insight into how they spend their resources. Congress attempted to strengthen the DCI's authority in 1996 by creating the positions of deputy DCI for community management and assistant DCIs for collection, analysis and production, and administration. But the authority of these positions is limited, and the vision of central management clearly has not been realized.

The DCI did not develop a management strategy for a war against Islamist terrorism before 9/11. Such a management strategy would define the capabilities the intelligence community must acquire for such a war—from language training to collection systems to analysts. Such a management strategy would necessarily extend beyond the CTC to the components that feed its expertise and support its operations, linked transparently to counterterrorism objectives. It would then detail the proposed expenditures and organizational changes required to acquire and implement these capabilities.

DCI Tenet and his deputy director for operations told us they did have a management strategy for a war on terrorism. It was to rebuild the CIA. They said the CIA as a whole had been badly damaged by prior budget constraints and that capabilities needed to be restored across the board. Indeed, the CTC budget had not been cut while the budgets had been slashed in many other parts of the Agency. By restoring funding across the CIA, a rising tide would lift all boats. They also stressed the synergy between improvements of every part of the Agency and the capabilities that the CTC or stations overseas could draw on in the war on terror.[41]

As some officials pointed out to us, there is a tradeoff in this management approach. In an attempt to rebuild everything at once, the highest priority efforts might not get the maximum support that they need. Furthermore, this approach attempted to channel relatively strong outside support for combating terrorism into backing for across-the-board funding increases. Proponents of the counterterrorism agenda might respond by being less inclined to loosen the purse strings than they would have been if offered a convincing counterterrorism budget strategy. The DCI's management strategy was also focused mainly on the CIA.

Lacking a management strategy for the war on terrorism or ways to see how funds were being spent across the community, DCI Tenet and his aides found it difficult to develop an overall intelligence community budget for a war on terrorism.

Responsibility for domestic intelligence gathering on terrorism was vested solely in the FBI, yet during almost all of the Clinton administration the relationship between the FBI Director and the President was nearly nonexistent. The FBI Director would not communicate directly with the President. His key personnel shared very little information with the National Security Council and the rest of the national security community. As a consequence, one of the critical working relationships in the counterterrorism effort was broken.

### The Millennium Exception
Before concluding our narrative, we offer a reminder, and an explanation, of the one period in which the government as a whole seemed to be acting in concert to deal with terrorism—the last weeks of December 1999 preceding the millennium.

it on the front lines in Afghanistan). According to KSM, the plot was to receive financing from a variety of sources, including associates of co-conspirator Wali Khan and KSM's own funds. Intelligence reports, interrogations of KSM, Nov. 26, 2003; Jan. 9, 2004; Feb. 19, 2004. On activities during the summer of 1994, see Intelligence reports, interrogations of KSM, May 3, 2003; July 12, 2003; Nov. 10, 2003; Feb. 21, 2004; Feb. 24, 2004.

8. On recruiting Wali Khan in Karachi, see FBI report of investigation, interview of Abdul Hakim Murad, Apr. 13, 1995; Intelligence report, interrogation of KSM, July 12, 2003 (in which KSM recounts how he knew Wali Khan from Afghanistan). On the testing of the timer, see Brief for the United States of America, *United States v. Ramzi Ahmed Yousef,* No. 98-1041(L) (2d Cir. filed Aug. 25, 2000), pp. 85–86, 88–91. The latter explosion caused the death of a passenger and extensive damage to the aircraft, which was forced to make an emergency landing in Okinawa. In 1996, Yousef was convicted on charges arising out of the Bojinka plot, including the bombing of the Philippine Airlines flight. See ibid., p. 8. On KSM's travels, see generally Intelligence report, interrogation of KSM, July 12, 2003. Yousef managed to escape to Pakistan, but his accomplice, Murad—whom KSM claims to have sent to Yousef with $3,000 to help fund the operation—was arrested and disclosed details of the plot while under interrogation. Contrary to Murad's confession, in which he described his intended role as one of the five operatives who would plant bombs on board the targeted aircraft, KSM has said that Murad's role was limited to carrying the $3,000 from Dubai to Manila. Intelligence reports, interrogations of KSM, Feb. 19, 2004; (two reports); Feb. 24, 2004; Apr. 2, 2004. This aspect of KSM's account is not credible, as it conflicts not just with Murad's confession but also with physical evidence tying Murad to the very core of the plot, and with KSM's own statements elsewhere that Murad was involved in planning and executing the operation. Intelligence reports, interrogations of KSM, Aug. 18, 2003; Jan. 9, 2004; Feb. 24, 2004 (in which KSM also claims that while he was in Qatar in February 1995, he and Yousef consulted by telephone regarding the cargo carrier plan, and Yousef proceeded with the operation despite KSM's advice that he hide instead). We have uncovered no evidence that KSM was present at the guesthouse in Islamabad where Yousef's arrest took place, as has been suggested in the press.

9. Intelligence report, interrogation of KSM, July 12, 2003. KSM's presence in Bosnia coincided with a police station bombing in Zagreb where the timing device of the bomb (a modified Casio watch) resembled those manufactured by KSM and Yousef in the Philippines for the Manila air operation. FBI report, Manila air investigation, May 23, 1999. On the Sudanese trip and Afghanistan, see Intelligence report, interrogation of SM, July 12, 2003 (in which KSM also claims to have encountered Sayf al Adl while in Yemen; apparently KSM has not divulged the substance of this meeting).

10. Intelligence report, interrogation of KSM, Jan. 9, 2004. In another interrogation report, however, KSM downplays the significance of his relationship to Yousef in enabling him to meet with Bin Ladin. Specifically, KSM notes that Yousef was not a member of al Qaeda and that Yousef never met Bin Ladin. Intelligence report, interrogation of KSM, Feb. 19, 2004.

11. Intelligence reports, interrogations of KSM, July 12, 2003; Jan. 9, 2004; Feb. 19, 2004. With respect to KSM's additional proposal to bomb cargo planes by shipping jackets containing nitrocellulose, KSM states that Bin Ladin expressed interest in changing the operation so that it would involve a suicide operative. Intelligence report, interrogation of KSM, Nov. 10, 2003.

12. Intelligence report, interrogation of KSM, Feb. 19, 2004.

13. Probably inflating his own role, KSM says he and a small group of colleagues, including Yousef and Wali Khan, were among the earliest advocates of attacking the United States. KSM asserts that Bin Ladin and some of the other jihadist leaders concentrated on overthrowing Arab regimes and argued for limiting confrontation with the United States to places like Somalia. On KSM's description of Bin Ladin's agenda, see Intelligence report, interrogation of KSM, Nov. 13, 2003. As discussed in chapter 2, we do not agree with this assessment. On Bin Ladin's reactions to KSM's proposal, see Intelligence reports, interrogations of KSM, July 12, 2003; Jan. 9, 2004; Feb. 19, 2004. On KSM's intent to target the United States and Bin Ladin's interest in Somalia, see Intelligence report, interrogation of KSM, Nov. 13, 2003.

14. On KSM's independence, see Intelligence report, interrogation of KSM, Jan. 9, 2004. Even after he began working with Bin Ladin and al Qaeda, KSM concealed from them his ongoing relationship with Sayyaf. Intelligence report, interrogation of KSM, July 30, 2003. Although KSM says he would have accepted the support of another organization to stage a 9/11-type operation, there is no evidence he ever peddled this idea to any other group. Intelligence report, interrogation of KSM, Feb. 19, 2004. On his travels after meeting Bin Ladin, see Intelligence report, interrogation of KSM, July 12, 2003. Hambali also was one of the founders of Konsojaya, a Malaysian company run by a close associate of Wali Khan. FBI report, Manila air investigation, May 23, 1999. Hambali claims he was asked to serve on the company's board of directors as a formality and insists that he did not recognize the "Arabs" who were to run the company or play any role in its operations. Intelligence report, interrogation of Hambali, Nov. 19, 2003.

15. Intelligence reports, interrogations of KSM, July 12, 2003; Feb. 19, 2004 (two reports). KSM maintains that he provided similar services for other mujahideen groups at this time, including the Libyan Islamic Fighting Group and a group headed by Abu Zubaydah. Intelligence report, interrogation of KSM, Feb. 19, 2004.

16. On KSM's understanding of Bin Ladin's commitment, see Intelligence report, interrogation of KSM, Feb.

19, 2004. On KSM's assistance to al Qaeda, see Intelligence reports, interrogations of KSM, July 12, 2003 (two reports). On Bin Ladin's decision to approve 9/11 operation, see Intelligence report, interrogation of KSM, Jan. 9, 2004. KSM has observed that the East Africa bombings and the subsequent bombing of the USS *Cole* yielded a recruiting bonanza for al Qaeda, as increasing numbers of Arab youth became enamored of the idea of waging jihad against the United States. Intelligence report, interrogation of KSM, Sept. 5, 2003.

17. On KSM's decision to move to Kandahar, see Intelligence report, interrogation of KSM, Jan. 9, 2004. On the media committee, see Intelligence report, interrogation of KSM, July 12, 2003 (in which KSM also says that as head of the media committee, he would take charge of producing the propaganda video al Qaeda issued following the bombing of the USS *Cole*). On the oath, see Intelligence report, interrogation of KSM, Nov. 13, 2003 (in which KSM also claims his reluctance stemmed from a concern that he would lose the ability to persevere with the 9/11 operation should Bin Ladin subsequently decide to cancel it).

18. On a possible Southeast Asian operation, see Intelligence report, interrogation of Hambali, Sept. 4, 2003. On a possible U.S. operation, see Intelligence reports, interrogations of KSM, June 27, 2003; July 14, 2003. On a possible Israeli operation, see Intelligence report, interrogation of KSM, June 30, 2003. On other possible targets discussed with Atef, see Intelligence report, interrogation of Hambali, Sept. 4, 2003 (Thailand); Intelligence report, interrogation of KSM, Apr. 4, 2004 (Singapore, Indonesia, Maldives).

19. For an example of KSM's popularity, see Intelligence report, interrogation of al Qaeda facilitator, Oct. 11, 2002. See also Intelligence report, interrogation of Abu Zubaydah, Nov. 7, 2002; Intelligence report, interrogation of Nashiri, Feb. 10, 2003.

20. Intelligence reports, interrogations of Hambali, Jan. 14, 2003; Mar. 5, 2004.

21. Rohan Gunaratna, *Inside Al Qaeda: Global Network of Terror* (Columbia Univ. Press, 2002), pp. 187, 199.

22. On the trip to Karachi, see Intelligence report, interrogation of Hambali, Sept. 12, 2003. On Hambali's relationship with Atef and receipt of al Qaeda funds, see Intelligence report, interrogation of Hambali, Mar. 5, 2004. Al Qaeda began providing funds to JI for terrorist operations as early as 1999. Intelligence report, interrogation of detainee, Mar. 3, 2004.

23. On Hambali's role as coordinator, see Intelligence report, interrogation of detainee, Mar. 4, 2004. On Sufaat, see Intelligence report, interrogation of KSM, Apr. 12, 2003; Intelligence report, interrogation of detainee, Apr. 30, 2003. In 1987, Sufaat received a bachelor's degree in biological sciences, with a minor in chemistry, from California State University, Sacramento. Sufaat did not start on the al Qaeda biological weapons program until after JI's December 2000 church bombings in Indonesia, in which he was involved. Intelligence report, interrogation of Hambali, Sept. 8, 2003. On Sufaat's schooling, see Intelligence report, interrogation of detainee, Dec. 14, 2001.

24. Intelligence report, interrogation of KSM, June 9, 2003. KSM also maintains that he persuaded Hambali to focus on "soft" targets in Singapore, such as oil tankers, the U.S. and Israeli embassies, and Western airlines. Intelligence report, interrogation of KSM, June 24, 2003.

25. As discussed in greater detail in section 5.2, Khallad was sent by Bin Ladin to Kuala Lumpur to case U.S. airline flights in the Far East for possible future attacks there, whereas Hazmi and Mihdhar were on the first leg of their travel from Karachi to Los Angeles, where they would arrive on January 15, 2000. Intelligence report, interrogation of KSM, July 31, 2003. On Hambali's assistance at KSM's request, see Intelligence report, interrogation of KSM, July 31, 2003; Intelligence report, interrogation of Khallad, Aug. 8, 2003. On assistance to Moussaoui, see Intelligence report, interrogation of KSM, Mar. 24, 2003; Intelligence report, interrogation of detainee, Apr. 9, 2002. According to statements attributed to Hambali and Sufaat, in each of these instances the al Qaeda guests were lodged at Sufaat's condominium, an apartment on the outskirts of Kuala Lumpur. Intelligence report, interrogation of detainee, Jan. 22, 2002; Intelligence reports, interrogations of Hambali, Sept. 8, 2003; Sept. 12, 2003.

26. On Hambali's relationship with Bin Ladin, see Intelligence reports, interrogations of Hambali, Aug. 29, 2003; Sept. 5, 2003 (in which Hambali also explains his relationship with al Qaeda as follows: he received his marching orders from JI, but al Qaeda would lead any joint operation involving members of both organizations). On Hambali's objections, see Intelligence report, interrogation of KSM, July 8, 2003. On KSM's coordination with Hambali, see Intelligence report, interrogation of KSM, Apr. 17, 2003. On KSM's recognition of Hambali's domain, see Intelligence report, interrogation of KSM, Aug. 18, 2003. According to KSM, his close relationship with Hambali prompted criticism from Bashir, the JI leader, who thought Hambali should focus more directly on Indonesia and Malaysia instead of involving himself in al Qaeda's broader terrorist program. Indeed, KSM describes Hambali as an al Qaeda member working in Malaysia. Intelligence report, interrogation of KSM, Aug. 18, 2003. Nashiri observes that al Qaeda's standard security practice dictated that no senior member could manage terrorist activities in a location where another senior member was operating. Intelligence report, interrogation of Nashiri, Jan. 14, 2003. Yet al Qaeda's deference to Hambali's turf apparently had limits. Khallad says he and Hambali never discussed the intended Southeast Asia portion of the original 9/11 plan. Intelligence report, interrogation of Khallad, Apr. 27, 2004.

27. On Nashiri's recruitment, see FBI report of investigation, interview of Nasser Ahmad Naser al Bahri, a.k.a. Abu Jandal, Sept. 17–Oct. 2, 2001. On Nashiri's refusal to swear allegiance, see Intelligence report, interrogation of

KSM, Nov. 21, 2003. On Nashiri's idea for his first terrorist operation and his travels, see Intelligence reports, inter-rogations of Nashiri, Nov. 21, 2002; Dec. 26, 2002.

28. Intelligence report, interrogation of Nashiri, Dec. 26, 2002. Although Nashiri's account of this episode dates his return to Afghanistan in 1996, the 1997 date is likely more accurate. On Nashiri's involvement in the missile-smuggling and embassy-bombing plots, see Intelligence report, seizure of antitank missiles in Saudi Arabia, June 14, 1998; FBI report of investigation, interview of Mohammad Rashed Daoud al Owahli, Sept. 9, 1998, p. 6.

29. For Nashiri's version, which may not be true, see Intelligence report, interrogation of Nashiri, Dec. 26, 2002. On communication between Nashiri and Bin Ladin about attacking U.S. vessels, see Intelligence report, inter-rogation of Nashiri, Nov. 21, 2002. The reporting of Nashiri's statements on this subject is somewhat inconsistent, especially as to the exact timing of the original proposal. Some corroboration does exist, however, for Nashiri's claim that the original proposal was his. A detainee says that 9/11 hijacker Khalid al Mihdhar told him about the maritime operation sometime in late 1999 and credited Nashiri as its originator. Intelligence report, interrogation of detainee, Dec. 2, 2001.

30. Intelligence report, interrogation of Nashiri, Jan. 27, 2003. Nashiri claims not to have had any telephone or email contact with Bin Ladin while planning the *Cole* operation; rather, whenever Bin Ladin wanted to meet, he would have an al Qaeda member travel to Pakistan to summon Nashiri by telephone. Ibid.

31. As an example of Nashiri's status, see FBI report of investigation, interview of Abu Jandal, Sept. 17–Oct. 2, 2001 (in which Nashiri is described as widely known to be one of al Qaeda's most committed terrorists and, accord-ing to one of his mujahideen colleagues, so extreme in his ferocity in waging jihad that he "would commit a ter-rorist act 'in Mecca inside the Ka'aba itself' [the holiest site in Islam] if he believed there was a need to do so"). On Nashiri's role on the Arabian Peninsula, see Intelligence report, interrogation of Khallad, Jan. 14, 2004. Nashiri also enjoyed a reputation as a productive recruiter for al Qaeda. See Intelligence report, interrogation of Abu Zubay-dah, Aug. 29, 2002. On Nashiri's discretion, see, e.g., Intelligence report, interrogation of Nashiri, Nov. 20, 2002. On Nashiri seeking Bin Ladin's approval, see Intelligence report, interrogation of KSM, Jan. 14, 2004. On the *Lim-burg* operation, see Intelligence report, interrogation of Nashiri, May 21, 2003. On Nashiri's security concerns, see Intelligence report, interrogation of Nashiri, Feb. 20, 2003.

32. See Intelligence reports, interrogations of KSM, July 1, 2003; Sept. 5, 2003.

33. For KSM's learning from the first World Trade Center bombing and his interest in a more novel form of attack, see Intelligence report, interrogation of KSM, July 1, 2003. For KSM's interest in aircraft as weapons and speculation about striking the World Trade Center and CIA, see Intelligence report, interrogation of KSM, Feb. 19, 2004. KSM has stated that he and Yousef at this time never advanced the notion of using aircraft as weapons past the idea stage. Intelligence report, interrogation of KSM, Apr. 2, 2004.

After 9/11, some Philippine government officials claimed that while in Philippine custody in February 1995, KSM's Manila air plot co-conspirator Abdul Hakim Murad had confessed having discussed with Yousef the idea of attacking targets, including the World Trade Center, with hijacked commercial airliners flown by U.S.-trained Mid-dle Eastern pilots. See Peter Lance, *1000 Years for Revenge: International Terrorism and the FBI—the Untold Story* (HarperCollins, 2003), pp. 278–280. In Murad's initial taped confession, he referred to an idea of crashing a plane into CIA headquarters. Lance gave us his copy of an apparent 1995 Philippine National Police document on an interrogation of Murad. That document reports Murad describing his idea of crashing a plane into CIA headquar-ters, but in this report Murad claims he was thinking of hijacking a commercial aircraft to do it, saying the idea had come up in a casual conversation with Yousef with no specific plan for its execution. We have seen no pre-9/11 evidence that Murad referred in interrogations to the training of other pilots, or referred in this casual conversa-tion to targets other than the CIA. According to Lance, the Philippine police officer, who after 9/11 offered the much more elaborate account of Murad's statements reported in Lance's book, claims to have passed this added information to U.S. officials. But Lance states the Philippine officer declined to identify these officials. Peter Lance interview (Mar. 15, 2004). If such information was provided to a U.S. official, we have seen no indication that it was written down or disseminated within the U.S. government. Incidentally, KSM says he never discussed his idea for the planes operation with Murad, a person KSM regarded as a minor figure. Intelligence report, interrogation of KSM, Apr. 2, 2004.

34. Intelligence report, 1996 Atef study on airplane hijacking operations, Sept. 26, 2001.

35. Intelligence reports, interrogations of KSM, July 12, 2003; Nov. 6, 2003. Abu Zubaydah, who worked closely with the al Qaeda leadership, has stated that KSM originally presented Bin Ladin with a scaled-down version of the 9/11 plan, and that Bin Ladin urged KSM to expand the operation with the comment, "Why do you use an axe when you can use a bulldozer?" Intelligence report, interrogation of Abu Zubaydah, May 16, 2003. The only possible corroboration we have found for Abu Zubaydah's statement is Khallad's suggestion that Bin Ladin may have expanded KSM's original idea for an attack using planes. Intelligence report, interrogation of Khallad, Apr. 22, 2004. Neither Abu Zubaydah nor Khallad claims to have been present when KSM says he first pitched his proposal to Bin Ladin in 1996.

36. For the scheme's lukewarm reception, see Intelligence report, interrogation of KSM, Nov. 6, 2003. For Bin Ladin's response, see Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 19, 2004.

37. Intelligence report, interrogation of KSM, Feb. 19, 2004.

38. For KSM's joining al Qaeda, see Intelligence report, interrogation of KSM, Nov. 13, 2003. KSM has provided inconsistent information about whether Bin Ladin first approved his proposal for what became the 9/11 attacks in late 1998 or in early 1999. Compare Intelligence reports, interrogations of KSM, Aug. 18, 2003; Jan. 9, 2004; Feb. 19, 2004; Apr. 3, 2004. For KSM's antipathy to the United States, see Intelligence report, interrogation of KSM, Feb. 19, 2004. For Atef's role, see Intelligence report, interrogation of KSM, Jan. 9, 2004. For Atef's death, see DOS report, "Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224," Dec. 31, 2001.

39. Intelligence report, interrogation of KSM, Aug. 18, 2003.

40. Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 20, 2004; Apr. 30, 2004. An earlier KSM interrogation report, however, states that Bin Ladin preferred the Capitol over the White House as a target. Intelligence report, interrogation of KSM, Apr. 17, 2003. KSM has admitted that his statement in a post-9/11 interview with Al Jazeera reporter Yosri Fouda—that an al Qaeda "reconnaissance committee" had identified 30 potential targets in the United States during the late 1990s—was a lie designed to inflate the perceived scale of the 9/11 operation. Intelligence report, interrogation of KSM, Feb. 23, 2004. For the specific targets, see Intelligence report, selection of 9/11 targets, Aug. 13, 2003 (citing KSM interrogation).

41. For the four individuals, see Intelligence report, interrogation of KSM, Aug. 18, 2003. Abu Bara al Yemeni is also known by the names Abu al Bara al Taizi, Suhail Shurabi, and Barakat. Ibid. KSM has also stated that he did not learn of the selection of Hazmi and Mihdhar for the planes operation until November 1999. Intelligence report, interrogation of KSM, Apr. 2, 2004. For Mihdhar's and Hazmi's eagerness, see Intelligence reports, interrogations of KSM, Jan. 9, 2004; Feb. 20, 2004 . For Bin Ladin's instruction, see Intelligence report, interrogation of KSM, Feb. 20, 2004. Hazmi obtained a B-1/B-2 multiple-entry visa issued at Jiddah, Saudi Arabia, on April 3, 1999; Mihdhar obtained the same type of visa at the same location on April 7, 1999. DOS records, NIV applicant details for Hazmi and Mihdhar, Nov. 8, 2001. Hazmi and Mihdhar both obtained new passports shortly before they applied for visas. FBI report, "Summary of Penttbom Investigation," Jan. 31, 2003, p. 9.

42. For Hazmi and Mihdhar's city of birth, see CIA analytic report, "11 September: The Plot and the Plotters," CTC 2003-40044HC, June 1, 2003, pp. 49–50. For their travel to Bosnia, see Intelligence report, interrogation of Saudi al Qaeda member, Oct. 3, 2001. For their visits to Afghanistan, see Intelligence reports, interrogations of detainee, Feb. 5, 2002; Feb. 11, 2002; Intelligence reports, interrogations of Saudi al Qaeda member, Oct. 2, 2001; Oct. 18, 2001.

43. Intelligence reports, interrogations of Khallad, June 25, 2003; Sept. 5, 2003.

44. For Khallad's visa application under a false name and its rejection, see DOS record, visa application of Salah Saeed Mohammed bin Yousaf (alias for Khallad), Apr. 3, 1999; Intelligence report, interrogation of Khallad, Aug. 20, 2003. Khallad's visa denial was based not on terrorism concerns but apparently on his failure to submit sufficient documentation in support of his application. See DOS record, NIV applicant detail, Mar. 31, 2004. For Khallad's 1999 mission to Yemen, see Intelligence report, interrogation of Khallad, Aug. 20, 2003. For the U.S. point of contact, see Intelligence report, interrogation of Khallad, Aug. 22, 2003. Khallad claims he cannot remember his U.S. contact's full name but says it sounded like "Barzan." According to the CIA, "Barzan" is possibly identifiable with Sarbarz Mohammed, the person who resided at the address in Bothell, Washington, that Khallad listed on his visa application as his final destination. Ibid. For his contacts with "Barzan" and his arrest, see ibid.; Intelligence report, interrogation of Khallad, Aug. 20, 2003. Nashiri has confirmed that Khallad had been assigned to help procure explosives for the ship-bombing plot, and that his arrest caused work on the operation to stop temporarily. Intelligence report, interrogation of Nashiri, Feb. 21, 2004.

45. For the interventions, see Intelligence report, interrogation of Khallad, Aug. 20, 2003. Khallad has provided inconsistent information as to his release date. Ibid. (June 1999); Intelligence report, interrogation of Khallad, Jan. 6, 2004 (August 1999). Khallad's brother reportedly has confirmed that Khallad was released from custody only after negotiations with the Yemeni director for political security in which a deal was struck prohibiting Khallad and his associates from conducting operations in Yemen. Intelligence report, interrogation of detainee, Oct. 1, 2002. For his giving up on a visa and his return to Afghanistan, see Intelligence reports, interrogations of Khallad, July 31, 2003; Aug. 22, 2003.

46. For KSM's realization of visa complications, see Intelligence report, interrogation of KSM, Aug. 18, 2003. According to both KSM and Khallad, Abu Bara never applied for a U.S. visa. Intelligence report, interrogation of KSM, Feb. 20, 2004; Intelligence report, interrogation of Khallad, Feb. 17, 2004. KSM has noted that Ramzi Binalshibh, another Yemeni slated early on to participate in the 9/11 attacks, likewise would prove unable to acquire a U.S. visa the following year. Intelligence report, interrogation of KSM, Jan. 7, 2004. For KSM's desire to keep Khallad and Abu Bara involved, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Saudis being chosen for the planes operation, see Intelligence reports, interrogations of KSM, Jan. 7, 2004; Jan. 23, 2004. For KSM's splitting the operation into two parts, see Intelligence report, interrogation of KSM, Aug. 18, 2003; Intelligence report, interrogation of Khallad, Apr. 27, 2004.

47. For the second part of the operation, see Intelligence report, interrogation of KSM, Aug. 18. 2003. For the

alternate scenario, see Intelligence report, interrogation of KSM, Apr. 30, 2004; Intelligence report, interrogation of Khallad, Apr. 21, 2004. Khallad has provided contradictory statements about the number of planes to be destroyed in East Asia. Intelligence reports, interrogations of Khallad, Aug. 13, 2003; Apr. 5, 2004. According to Khallad, Thailand, South Korea, Hong Kong, and Malaysia were likely origins of the flights because Yemenis did not need visas to enter them. Intelligence report, interrogation of Khallad, Aug. 13, 2003. For the importance of simultaneity, see Intelligence report, interrogation of KSM, Aug. 18, 2003.

48. For the four operatives' training, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For the elite nature of the course and Nibras's participation, see Intelligence reports, interrogations of Khallad, Sept. 8, 2003; Sept. 11, 2003; Intelligence report, interrogation of KSM, July 15, 2003. For KSM's view, see ibid.; Intelligence report, interrogation of KSM, Aug. 18, 2003. For KSM's visit, see Intelligence report, interrogation of KSM, Feb. 20, 2004.

49. For a description of the camp and the commando course, see Intelligence report, interrogation of KSM, July 15, 2003. For Bin Ladin's interest and the decision on the number of trainees, see Intelligence report, interrogation of Khallad, Sept. 8, 2003.

50. For the nature of the commando course, see Intelligence report, interrogation of Khallad, Sept. 8, 2003. KSM claims that the course proved so rigorous that Mihdhar quit after a week and returned to his family in Yemen. Intelligence report, interrogation of KSM, Aug. 18, 2003. However, two of Mihdhar's al Qaeda colleagues who were present during the training have provided different accounts. Khallad apparently has stated both that Bin Ladin pulled Mihdhar and Nawaf al Hazmi out of the course early and that Mihdhar actually completed the course. See Intelligence reports, interrogations of Khallad, Sept. 1, 2003; May 21, 2004. See also FBI report of investigation, interview of Abu Jandal, Oct. 2, 2001 (indicating that Mihdhar completed the course).

51. For instruction on Western culture and travel, see Intelligence reports, interrogations of KSM, Mar. 24, 2003; June 15, 2004; Intelligence report, interrogation of Khallad, Aug. 21, 2003. For KSM's mid-1999 activity and Bin Ladin's payment, see Intelligence report, interrogation of KSM, Feb. 20, 2004. According to KSM, he received a total of $10,000 from Bin Ladin for 9/11-related expenses. Intelligence report, interrogation of KSM, Apr. 5, 2004.

52. For Khallad, Abu Bara, and Hazmi's travels, see Intelligence report, interrogation of KSM, May 30, 2003. Khallad has provided a second version, namely that all three traveled together to Karachi. Intelligence report, interrogation of Khallad, July 31, 2003. For Hazmi and Atta's simultaneous presence in Quetta, see Intelligence reports, interrogations of KSM, Feb. 20, 2004; Mar. 31, 2004. KSM maintains it was a coincidence. Ibid.

53. Intelligence report, interrogation of KSM, Mar. 31, 2004. In his initial post-capture statements, KSM claimed that Mihdhar did not have to attend the training because he had previously received similar training from KSM. Intelligence report, interrogation of KSM, Mar. 24, 2003. KSM subsequently expressed uncertainty about why Bin Ladin and Atef excused Mihdhar from the training. Intelligence report, interrogation of KSM, Feb. 20, 2004.

54. For the varying accounts of the course's length, see Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 20, 2004; Intelligence reports, interrogations of Khallad, Nov. 6, 2003; July 31, 2003. For KSM's description, see Intelligence reports, interrogations of KSM, Mar. 24, 2003; Aug. 18, 2003; Feb. 20, 2004. For Khallad's description, see Intelligence report, interrogation of Khallad, Apr. 5, 2004. KSM says that he permitted the trainees to view Hollywood films about hijackings only after he edited the films to cover the female characters. Intelligence report, interrogation of KSM, Nov. 10, 2003. For the use of game software and discussions of casing flights, see Intelligence report, interrogation of Khallad, Nov. 6, 2003. For KSM's instructions regarding casing, see Intelligence report, interrogation of Khallad, July 31, 2003. For visits to travel agencies, see Intelligence report, interrogation of Khallad, Aug. 13, 2003.

55. For the travels of Khallad, Abu Bara, and Hazmi via Karachi, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Mihdhar's travel from Yemen, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350, serial 24808).

56. For the operatives' knowledge, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hazmi and Mihdhar being sent to Malaysia, see Intelligence report, interrogation of KSM, July 29, 2003. For passport doctoring, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For casing, see Intelligence report, interrogation of KSM, July 29, 2003. For Khallad and Abu Bara's departure, as well as Hazmi's travel, see Intelligence report, interrogation of KSM, July 31, 2003. Khallad maintains that Abu Bara did not participate in the casing operation and simply traveled to Kuala Lumpur as Khallad's companion. Intelligence report, interrogation of Khallad, May 30, 2003.

57. For the trip's original purpose and Bin Ladin's suggestion, see Intelligence report, interrogation of Khallad, July 31, 2003. On Malaysia, Endolite, and the financing of Khallad's trip, see Intelligence report, interrogation of Khallad, Aug. 22, 2003.

58. On informing Hambali, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hambali's assistance, see Intelligence report, interrogation of Khallad, July 31, 2003; Intelligence report, interrogation of Hambali, Sept. 4, 2003. For the colleague who spoke Arabic, see Intelligence report, interrogation of Khallad, May 30, 2003.

59. For the dates of Khallad's travel, his mistake in seating, and his other efforts to case flights, see Intelligence reports, interrogations of Khallad, July 31, 2003; Aug. 21, 2003. Khallad says he put the box cutter alongside tubes

of toothpaste and shaving cream with metallic exteriors, so that if the metal detector at the airport was triggered, the inspector would attribute the alarm to the other items. He also carried art supplies, which he hoped would explain the presence of a box cutter if anyone asked. Ibid.

60. For Khallad's return to Kuala Lumpur, see Intelligence report, interrogation of Khallad, May 30, 2003. For Hazmi's arrival and stay at the clinic, see Intelligence report, interrogation of Khallad, July 31, 2003. For Mihdhar's arrival, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350, serial 24808). For their stay at Sufaat's apartment, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 11; Intelligence report, interrogation of Khallad, Aug. 22, 2003. For Khallad's discussions with Hazmi and Khallad's knowledge of the operation, see Intelligence report, interrogation of Khallad, July 31, 2003.

61. For the Bangkok meeting, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 49–50. For relocation of the meeting to Bangkok, see Intelligence reports, interrogations of Khallad, Aug. 18, 2003; Jan. 7, 2004. Fahd al Quso, a close friend of Khallad's, accompanied Nibras on the trip to Bangkok to take money to Khallad. Quso claims that the amount was $36,000. FBI report of investigation, interview of Quso, Jan. 31, 2001. Khallad claims that it was only $10,000 to $12,000. Intelligence reports, interrogations of Khallad, May 30, 2003; Aug. 18, 2003. Khallad has identified contradictory purposes for the money: a donation to charities benefiting amputees, see Intelligence report, interrogation of Khallad, Aug. 8, 2003; and to advance the ship-bombing operation, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. Khallad has explicitly denied giving any of the money he received from Nibras and Quso to Hazmi and Mihdhar. Intelligence reports, interrogations of Khallad, Aug. 8, 2003; Jan. 7, 2004. Given the separate reporting from KSM that he gave Hazmi and Mihdhar $8,000 each before they traveled to the United States, we have insufficient evidence to conclude that the Nibras/Quso money helped finance the planes operation. Intelligence report, interrogation of KSM, June 15, 2004. For Hazmi and Mihdhar's interest in traveling to Bangkok, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For Hambali's assistance, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For Abu Bara's return to Yemen, see Intelligence report, interrogation of Khallad, May 30, 2003.

62. For the hotel arrangements, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For the two groups not meeting with each other, see Intelligence report, interrogation of Khallad, Aug. 18, 2003. For Khallad's subsequent actions, see Intelligence report, interrogation of Khallad, July 31, 2003.

63. For Bin Ladin's cancellation of the East Asian operation, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hazmi and Mihdhar's departure, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For their arrival in Los Angeles, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-CG, serial 4062; 265A-NY-280350-302, serial 7134).

64. On Atta's family background, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing FBI electronic communication from Cairo dated Sept. 13, 2001); CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 23. For details on his study in Germany, see German Bundeskriminalamt (BKA) report, investigative summary re Atta, June 24, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4. Atta's host family in Hamburg soon asked him to move out. Between 1993 and 1998, Atta shared a one-bedroom apartment in Hamburg with a fellow student, who moved out after having problems with Atta and was succeeded by another roommate. See German BKA report, investigative summary re Atta, June 24, 2002. On Atta's character, see German BKA investigation of Said Bahaji, summary of interrogation of Shahid Nickels on Oct. 30, 2001.

65. On the Muslim student association in Hamburg, see Intelligence report, interrogation of Ramzi Binalshibh, Oct. 2, 2002. On the Muslim-Christian working group and Atta, see German BKA investigation of Bahaji, summary of interrogation of Michael Krause on Oct. 11, 2001; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001. Much of the information about Atta and his friends in Hamburg comes from Nickels, a German national who converted to Islam while in high school and spent considerable time with Atta's circle between 1997 and 1999. Nickels testified at the trials in Germany of Mounir el Motassadeq and Abdelghani Mzoudi on 9/11-related charges.

66. German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001, pp. 8, 15; federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003. On Atta's fundamentalism, see FBI electronic communication, "Khaled A. Shoukry," June 17, 2002.

67. German BKA report, investigative summary re Binalshibh, July 4, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4; FBI report of investigation, interview of Fuad Omar Bazarah, Apr. 9, 2004; Intelligence report, interrogation of Binalshibh, Sept. 24, 2002. Binalshibh used various names, such as Ramzi Omar and Ramzi al Sheiba. In May 1998, months before he was expelled from school, German authorities had issued a warrant to arrest and deport "Ramzi Omar." German BKA report, investigative summary re Binalshibh, July 4, 2002. But Binalshibh was no longer using this alias, so the German authorities did not discover that he and Ramzi Omar were the same person until after the attacks of September 11. Ibid.

68. Intelligence report, interrogation of Binalshibh, Oct. 2, 2002; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001; German BKA report, investigative summary re Binalshibh, July 4, 2002.

88. Shehhi and other members of the group used to frequent a library in Hamburg to use the Internet. According to one of the librarians, in 1999 Shehhi, unprompted, inveighed against America, and boasted that "something was going to happen" and that "there would be thousands of dead people." FBI electronic communication, summary of testimony of Angela Duile on Aug. 28, 2003, at Mzoudi trial, Oct. 27, 2003. Another witness who lived in the same dormitory as Motassadeq testified that in late 1998 or early 1999, he overheard a conversation in which Motassadeq told someone that "we will do something bad again" and that "we will dance on their graves." The conversation also contained a reference to the "burning of people." FBI electronic communication, summary of testimony of Holger Liszkowski on Sept. 9, 2003, at Mzoudi trial, Nov. 17, 2003. On another occasion, according to the same witness, Motassadeq apparently identified Atta as "our pilot." Another witness recalled Atta ominously observing in 1999 that the United States was not omnipotent and that "something can be done." German BKA investigation of Bahaji, summary of interrogation of Nickels on Nov. 20, 2001.

89. Intelligence reports, interrogations of Binalshibh, Oct. 7, 2002; May 20, 2003.

90. Intelligence report, interrogation of Binalshibh, May 20, 2003. A detainee has confirmed Binalshibh's account about being advised to go to Afghanistan rather than trying to travel directly to Chechnya. The detainee dates the Slahi meeting to October 1999. Intelligence report, interrogation of detainee, Oct. 17, 2003. The detainee, however, also suggests that Slahi and Binalshibh may have met earlier in 1999 in Frankfurt, through a mutual acquaintance. Intelligence report, interrogation of detainee, Oct. 27, 2003. The acquaintance apparently tells a different story, claiming that Slahi introduced him to Binalshibh and Jarrah at Slahi's home in 1997 or 1998, and that he later lived with them in Hamburg. Intelligence report, interrogation of detainee, July 2, 2003.

91. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8; Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Mar. 4, 2003; May 20, 2003.

92. On meetings with Atef and Bin Ladin, see Intelligence reports, interrogations of Binalshibh, Dec. 10, 2002; Mar. 4, 2003; Mar. 31, 2003; Intelligence report, interrogation of KSM, Feb. 20, 2004. Atta reportedly had between two and five meetings with Bin Ladin before leaving Kandahar and was the only 9/11 hijacker who knew the entire scope of the operation from the outset. Intelligence report, comments of Binalshibh on Atta, Apr. 21, 2003.

93. Intelligence report, interrogation of Binalshibh, Dec. 10, 2002. According to KSM, Bin Ladin designated Hazmi to be Atta's second in command. Intelligence report, interrogation of KSM, Feb. 20, 2004.

94. In addition, Atta obtained a new passport in June 1998, even though his current one was still valid for nearly a year, a sign that he may have been following the al Qaeda practice of concealing travel to Pakistan. Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 11.

95. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001; Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003. Motassadeq continued to handle some of Shehhi's affairs even after Shehhi returned to Hamburg. Most importantly, in March 2000, Motassadeq paid Shehhi's semester fees at the university, to ensure Shehhi's continued receipt of scholarship payments from the UAE. Ibid.

96. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001. After 9/11, Motassadeq admitted to German authorities that Shehhi had asked him to handle matters in a way that would conceal Shehhi's absence. Motassadeq also would claim later that he did not know why his friends had gone to Afghanistan, saying he thought they were planning to go fight in Chechnya. For assistance provided by both Motassadeq and Bahaji, see Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 13–14.

97. Jarrah encountered a minor problem during his return trip to Hamburg. On January 30, 2000, while transiting Dubai on his way from Karachi to Germany, Jarrah drew questioning from UAE authorities about an overlay of the Qu'ran that appeared on one page of his passport. The officials also noticed the religious tapes and books Jarrah had in his possession, but released him after he pointed out that he had lived in Hamburg for a number of years and was studying aircraft construction there. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 13.

98. Intelligence report, interrogation of Binalshibh, Sep. 24, 2002; FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 11, 13. According to a KSM interrogation report, Shehhi may have been present for at least some of the training that Atta and Binalshibh received in Karachi. Intelligence report, interrogation of KSM, Mar. 31, 2004.

99. Intelligence report, interrogation of Binalshibh, Nov. 6, 2003. Binalshibh and the others kept their distance from Zammar even before visiting Afghanistan and getting their instructions from Bin Ladin and Atef. Ibid.

100. On Atta, see FBI analytic report, "The 11 September Hijacker Cell Model," Feb. 2003, p. 28. On Jarrah, see German BKA report, investigative summary re Jarrah, July 18, 2002. Note that although Jarrah's attitude was now much more congenial, he told Senguen nothing about being in Afghanistan. On Shehhi's wedding celebration, see German BKA report, investigative summary re Shehhi, July 9, 2002; on his changed appearance and behavior, see FBI electronic communication, summary of testimony of Mohamed Abdulla Mohamed Awady on Oct. 24, 2003, at the Mzoudi trial, Dec. 5, 2003.

101. German BKA report, investigative summary re Jarrah, July 18, 2002.

102. On Ali Abdul Aziz Ali, also known as Ammar al Baluchi, see FBI report, "Summary of Penttbom Investi-

gation," Feb. 29, 2004, p. 78. Ali, in turn, would ship these materials to his uncle, KSM, in Karachi. Intelligence report, interrogation of Ali Abdul Aziz Ali, Feb. 11, 2004. On Jarrah, see German BKA report, investigative summary re Jarrah**,** July 18, 2002. Following his sudden decision to study aircraft engineering in Hamburg, Jarrah had expressed interest in becoming a pilot around the end of 1998, well before he traveled to Afghanistan. According to Senguen, Jarrah told her about friends of his who had interrupted their studies to join the Germany army so that they could become pilots. Jarrah's pre-Afghanistan interest in aviation also is confirmed by a January 22, 1999, email recovered after the September 11, 2001, attacks, in which Jarrah told a friend from Beirut that he might "come next year and . . . have something to tell about airplanes." Ibid. On Binalshibh, see Intelligence report, interrogation of Binalshibh, Sept. 24, 2002.

103. Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003, pp. 10–11. Zacarias Moussaoui later would benefit from the results of all this research. Following his August 2001 arrest, the FBI discovered among his possessions a fax copy of an advertisement for U.S. flight schools. According to Binalshibh, notes in the margin of the advertisement were written by Atta. Intelligence report, interrogation of Binalshibh, Dec. 19, 2002.

104. DOS record, NIV applicant detail, Marwan al Shehhi, Mohamed Atta, Ziad Jarrah, Nov. 8, 2001. The visa applications were destroyed by the State Department according to routine document handling practices before their significance was known.

105. DOS records, visa applications of Ramzi Binalshibh, May 17, 2000; June 15, 2000; Oct. 25 2000. CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 9–10; German BKA report, investigative summary re Binalshibh, July 4, 2002. Atta had twice explored the possibility of obtaining a U.S. green card shortly before his November 1999 trip to Afghanistan. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8. Both Binalshibh and Jarrah listed the same person as a point of contact in the United States, an Indonesian national who had previously lived in Hamburg. Although this individual knew some members of the Hamburg cell, including Mohamed Atta and Razmi Binalshibh, there is no indication that any of the hijackers actually contacted him while they were in the United States. See German BKA report, investigative summary re Jarrah**,** July 18, 2002. Binalshibh had applied for a visa years earlier along with Fuad Bazarah, a co-worker in Yemen whose father contacted the U.S. embassy on Binalshibh's behalf. Bazarah obtained a visa application and moved to Los Angeles, but Binalshibh's application was denied. Bazarah would later live in Los Angeles with Ramez Noaman, an individual who knew Nawaf al Hazmi in San Diego. FBI electronic communication, "Penttbom," Oct. 23, 2001.

106. Intelligence report, interrogation of KSM, Sept. 9, 2003; CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1. On the role of KSM, see, e.g., Intelligence report, interrogation of Binalshibh, Oct. 11, 2002. On the role of Abu Zubaydah, see, e.g., Intelligence report, biographical information on Abu Zubayda, Feb. 25, 2002. Al Qaeda also relied on outside travel facilitators, including fraudulent document vendors, corrupt officials, travel agencies, and smugglers, to help move operatives around the world by obtaining fraudulent documents, arranging visas (real or fake), making airline reservations, etc. See CIA analytic report, "Clandestine Travel Facilitators: Key Enablers of Terrorism," Dec. 31, 2002; CIA analytic report, Al Qaeda travel issues, Jan. 2004.

107. On passport collection schemes, see Intelligence report, interrogation of KSM, Sept. 9, 2003. On recycled passports, see Intelligence report, Collection of passports June 7, 2002.

108. See Intelligence reports, interrogations of KSM, Nov. 12, 2003; May 25, 2004; CIA analytic report, Al Qaeda travel issues, Jan. 2004, pp. 1, 3, 19. A detainee has admitted attending several security and specialized courses, including ones in counterfeiting and seal removal. Intelligence report, interrogation of al Qaeda associates, Apr. 11, 2002. Atta reportedly learned alteration techniques in Afghanistan, cleaning Ramzi Binalshibh's passport of its Pakistani visa and travel cachets. CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1.

109. Intelligence report, Information on Mujahideen Travel, Mar. 13, 2002.

110. Intelligence report, interrogation of KSM, July 25, 2003. A small amount of the plot's backing came from Shehhi's own funds. He received a salary from the UAE military, which was sponsoring his studies in Germany, through December 23, 2000. Binalshibh apparently used some of this money to wire just over $10,000 to Shehhi in the United States and pay some of his own plot-related expenses. Adam Drucker interview (Jan. 12, 2004); FBI Report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 20–22.

111. CIA analytic report, "Terrorism: Amount of Money It Takes to Keep al-Qa'ida Functioning," Aug. 7, 2002; CIA analytic report, "Terrorism: Al-Qa'ida Operating on a Shoestring," undated (post-9/11); Frank G. interview (Mar. 2, 2004).

112. In the wake of the East Africa embassy bombings, the NSC led trips to Saudi Arabia in 1999 and 2000 to meet with Saudi officials on terrorist financing. These meetings, and subsequent interviews of Bin Ladin family members in the United States, helped the U.S. government revise its understanding of Bin Ladin's wealth. Rick Newcomb interview (Feb. 4, 2004); William Wechsler interview (Jan. 7, 2004).

113. See William Wechsler interview (Jan. 7, 2004); Rick Newcomb interview (Feb. 4, 2004); Frank G. interview (Mar. 2, 2004); Frank G. and Mary S. briefing (July 15, 2003). See also DOS cable, State 035243, "January 2000 Meeting Regarding UBL Finances," Feb. 27, 2000; DOS cable, Riyadh 000475, "The Saudi Binladin Group: Builders to the King," Feb. 16, 1999; Treasury memo, Office of Foreign Asset Control to DOS, Draft Cable on Meet-

ing with Two of UBL's Brothers, May 19, 2000; Youssef M. Ibrahim, "Saudis Strip Citizenship from Backers of Militants," *New York Times*, Apr. 10, 1994, p. 15; "Saudi Family Disassociates Itself from 'Terrorist' Member," Associated Press, Feb. 19, 1994.

114. Frank G. and Mary S. briefing (July 15, 2003); Frank G. interview (Mar. 2, 2004); Intelligence report, interrogation of KSM, July 30, 2003; Robert Block, "In War on Terrorism, Sudan Struck a Blow by Fleecing Bin Laden," *Wall Street Journal*, Dec. 3, 2001, p. A1. Despite substantial evidence to the contrary and his own assertion that Bin Ladin arrived in Afghanistan with no money, KSM has told his interrogators that he believes the bulk of the money (85–95 percent) for the planes operation came from Bin Ladin's personal fortune. Intelligence reports, interrogations of KSM, July 30, 2003; Apr. 5, 2004; June 15, 2004.

115. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Support for Terrorist Organizations, CTC 2002-40117CH, Nov. 14, 2002. The United States was not a primary source of al Qaeda funding, although some funds raised in the United States may have made their way to al Qaeda or its affiliated groups. Frank G. and Mary S. briefing (July 15, 2003).

116. Frank G. interview (Mar. 2, 2004); CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," CTC 2002-40029CH, Feb. 27, 2002.

117. CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002; CIA analytic report, spectrum of al Qaeda donors, CTC 2003-30199HC, Oct. 30, 2003; Frank G. interview (Mar. 2, 2004).

118. CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999; CIA analytic report, "Gauging the War against al-Qa'ida's Finances," CTC 2002-30078CH, Aug. 8, 2002; CIA analytic report, paper on Al-Haramain, CTC 2002-30014C, Mar. 22, 2002.

119. CIA analytic report, "Al Qa'ida's Financial Ties to Islamic Youth Programs," CTC 2002-40132HCX, Jan. 17, 2003; CIA analytic report, Al Qaeda Financial Network, CTC 2002-40094H, Aug. 7, 2002.

120. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Links of Al Qaeda Operative, CTC 2002-30060CH, June 27, 2002.

121. Frank G. and Mary S. briefing (July 15, 2003). The Taliban's support was limited to the period immediately following Bin Ladin's arrival in Afghanistan, before he reinvigorated fund-raising efforts. By 9/11, al Qaeda was returning the favor, providing substantial financial support to the Taliban.

122. David Aufhauser interview (Feb. 12, 2004). We have found no evidence that Saudi Princess Haifa al Faisal provided any funds to the conspiracy, either directly or indirectly. See Adam Drucker interview (May 19, 2004).

123. On limited Saudi oversight, see Bob Jordan interview (Jan. 14, 2004). In Saudi Arabia, *zakat* is broader and more pervasive than Western ideas of charity, in that it functions not only as charity but also as social welfare, educational assistance, foreign aid, a form of income tax, and a source of political influence.

124. A *hawala*, at least in the "pure" form, transfers value without the use of a negotiable instrument or other commonly recognized method for the exchange of money. For example, a U.S. resident who wanted to send money to a person in another country, such as Pakistan, would give her money, in dollars, to a U.S.-based hawaladar. The U.S. hawaladar would then contact his counterpart in Pakistan, giving the Pakistani hawaladar the particulars of the transaction, such as the amount of money, the code, and perhaps the identity of the recipient. The ultimate recipient in Pakistan would then go to the Pakistani hawaladar and receive his money, in rupees, from whatever money the Pakistani hawaladar has on hand. As far as the sender and ultimate recipient are concerned, the transaction is then complete. The two hawaladars would have a variety of mechanisms to settle their debt, either through offsetting transactions (e.g., someone in Pakistan sending money to the United States using the same two hawaladars), a periodic settling wire transfer from the U.S. hawaladar's bank to the Pakistani hawaladar's bank, or a commercial transaction, such as the U.S. hawaladar paying a debt or an invoice, in dollars, that the Pakistani hawaladar owes in the United States. Hawalas typically do not have a large central control office for settling transactions, maintaining instead a loose association with other hawaladars to transfer value, generally without any formal or legally binding agreements. See Treasury report, "A Report to Congress in Accordance with Section 359 of the [USA PATRIOT Act]" Nov. 2002; Treasury report, "Hawala: The Hawala Alternate Remittance System and its Role in Money Laundering," undated (prepared by the Financial Crimes Enforcement Network in cooperation with INTERPOL, probably in 1996).

125. Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report Al-Qa'ida Financiers, CTC 2002-30138H, Jan. 3, 2003. Moreover, because al Qaeda initially was living hand to mouth, there was no need to store funds.

126. CIA analytic report, "Pursuing the Bin Ladin Financial Target," CTC 01-40003HCS, Apr. 12, 2001; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003.

127. For al Qaeda spending, see Frank G. and Mary S. briefing (July 15, 2003). The 1998 U.S. embassy bombings in East Africa cost approximately $10,000. CIA analytic report, "Gauging the War on Terrorism: Most 11 September Practices Still Viable," Jan. 30, 2002; Intelligence report, interrogation of KSM, June 3, 2003. Although there is evidence that al Qaeda experienced funding shortfalls as part of the cyclical fund-raising process (with more money coming during the holy month of Ramadan), we are not aware of any intelligence indicating that terror-

238. CIA memo, Black to Clarke, Jan. 25, 2001. For a Joint Staff view, see, e.g., Scott Gration interview (Mar. 3, 2004). The mission commander for the Predator flights, Air Force Major Mark A. Cooter, had registered his opposition to redeploying the aircraft back in December 2000: "given the cost/benefit from these continued missions it seems senseless." DOD letter, Cooter to Alec B., "Continued Flight Operations," Nov. 14, 2000 (attached to CIA memo, Black to DCI and others, Predator Operation, Nov. 17, 2000).

239. See NSC memo, Summary of Conclusions of Deputies Committee meeting, Apr. 30, 2001. This document noted a consensus in favor of reconnaissance missions commencing in July. But DDCI McLaughlin told us that he and Black believed that no such decision had been made at the meeting. Hadley told us he believed that a decision had been made at the meeting to fly such missions. See John McLaughlin interview (Jan. 2, 2004). See also CIA briefing materials, "Summary of April 30, 2001 Deputies Committee meeting," May 3, 2001; Stephen Hadley meeting (Jan. 31, 2004). For Rice's perspective, see Condoleezza Rice meeting (Feb. 7, 2004).

240. Allen described the "quibbling" over financing the Predator program as "ridiculous." Charles Allen interview (Jan. 27, 2004). For a CIA senior management perspective, see, e.g., John McLaughlin interview (Jan. 21, 2004). The Defense Department's view is suggested in CIA briefing materials, "Summary of April 30, 2001 Deputies Committee meeting," May 3, 2001.

241. George Tenet interview (Jan. 28, 2004); Charles Allen interview (Jan. 27, 2004).

242. John Maher III interview (Apr. 22, 2004); Scott Gration interview (Mar. 3, 2004); John Jumper interview (Mar. 3, 2004).

243. On Hadley's efforts and directions, see NSC memo, Hadley to McLaughlin, Wolfowitz, and Myers, "Re: Predator," July 11, 2001. On Rice's intervention, see Condoleezza Rice meeting (Feb. 7, 2004).

244. On the Deputies Committee meeting, see NSC memo, Biegun to executive secretaries, July 31, 2001; CIA memo, Campbell to McLaughlin, Pavitt, and others, Aug. 2, 2001. The White House told us that it cannot find a formal Summary of Conclusions for this meeting.

245. NSC memo, Hadley to Armitage, Wolfowitz, Myers, and McLaughlin, resolving Predator issues, Aug. 3, 2001 (including McLaughlin's handwritten comment); NSC email, Clarke to Rice and Hadley, "Need to place a call to Tenet," Aug. 8, 2001.

246. John Maher III interview (Apr. 22, 2004); John Jumper interview (Mar. 3, 2004); see also Scott Gration interview (Mar. 3, 2004).

247. NSC memo, Clarke to Rice, "Observations at the Principals Meeting on Al Qida," Sept. 4, 2001 (text italicized here is underlined in the original).

248. Ibid.

249. Ibid.

250. Condoleezza Rice testimony, Apr. 8, 2004.

251. CIA memo, Black to Tenet, Sept. 4, 2001.

252. Various interviews with participants, as well as the Maher memo (see note 255 below), make it clear that the meeting focused on Predator, not the presidential directive.

253. Condoleezza Rice meeting (Feb. 7, 2004).

254. Ibid.; NSC memo, Cressey to Rice, September 4 PC on counterterrorism, Sept. 3, 2001.

255. CIA memo, Maher to limited group, "Principals Committee meeting, Sept. 4, 2001," Sept. 4, 2001. We have not found a formal summary of conclusions, which would usually be prepared after a Principals Committee meeting.

256. Ibid.

257. Ibid.

258. Ibid.

259. NSC memo, Clarke to CSG members, Sept. 7, 2001.

260. On Massoud's assassination, see Coll, *Ghost Wars*, pp. 574–575. On the Sept. 10 meeting, see NSC memo, Biegun to executive secretaries, "Summary of Conclusions for Sept. 10, 2001 Deputies Committee meeting on Afghanistan, India and Pakistan," Sept. 26, 2001. Note that the agenda for this meeting, distributed on September 7, 2001, listed its topics as "Pakistan, India, and Afghanistan"; the Summary of Conclusions, written after 9/11, flipped the order of the topics.

261. NSC memo, Hadley to Tenet, Sept. 10, 2001.

# 7 The Attack Looms

1. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 16.

2. Intelligence report, interrogation of KSM, May 19, 2003. Although KSM's stated reasons for sending Hazmi and Mihdhar to California do not seem especially compelling, we have uncovered no evidence tending to establish any more plausible explanation for the California destination. The possibility that the two hijackers were pursuing another al Qaeda mission on the West Coast, while certainly conceivable—see, e.g., CIA analytic report,

"Alternate View: Two 11 September Hijackers Possibly Involved in Previous US Plot," CTC 2002-30064, July 5, 2002—conflicts with the organization's preference for having its 9/11 operatives concentrate on that mission exclusively.

3. Intelligence reports, interrogations of KSM, May 19, 2003; Aug. 14, 2003.

4. Intelligence report, interrogation of KSM, Aug. 18, 2003. According to Hambali, in late 1999 or early 2000 KSM sent an al Qaeda operative named Issa al Britani to visit Hambali in Malaysia. At the end of the visit, Issa provided Hambali with two addresses—one in the United States ("possibly in California") and one in South Africa—and told Hambali he could contact "people in those locations" if he "needed help." Hambali claims he never contacted anyone at either address or passed either address to anyone else, and claims not to remember the addresses. Intelligence report, interrogation of Hambali, Sept. 12, 2003. In an assessment of KSM's reporting, the CIA concluded that protecting operatives in the United States appeared to be a "major part" of KSM's resistance efforts. For example, in response to questions about U.S. zip codes found in his notebooks, KSM provided the less than satisfactory explanation that he was planning to use the zip codes to open new email accounts. CIA report, Intelligence Community Terrorist Threat Assessment, "Khalid Shaykh Muhammed's Threat Reporting—Precious Truths, Surrounded by a Bodyguard of Lies," Apr. 3, 2003, pp. 4–5.

5. Notably, as discussed in chapter 5, precisely such arrangements—in the form of lodging and travel assistance provided by Hambali's minions—were in place when the first contingent of operatives (including Hazmi and Mihdhar) journeyed to Kuala Lumpur in late 1999 and early 2000.

6. Intelligence report, interrogation of KSM, May 19, 2003.

7. Intelligence reports, interrogations of KSM, May 19, 2003; Aug. 14, 2003. KSM also has stated that in addition to providing Hazmi and Mihdhar with a San Diego telephone book, he gave them another directory "possibly covering Long Beach, California." Intelligence report, interrogation of KSM, June 15, 2004.

8. Although Hazmi and Mihdhar told immigration authorities on January 15, 2000, that they would be staying at the Sheraton Hotel in Los Angeles, their names do not appear in the hotel's registration records for the second half of January. FBI searches of the records of other hotels near the airport and smaller establishments in Culver City failed to locate the hijackers, as did our own investigation. See FBI report, "Hijackers Timeline," Nov. 14, 2003 (Apr. 3, 1999, entry, citing 265A-NY-280350-CG, serial 4062; 265A-NY-280350-302, serial 7134); Commission investigation in Culver City; Vicki G. interview (Sept. 30, 2003).

9. For the FBI source's claims, see FBI letterhead memorandum, Penttbom investigation, Oct. 8, 2002. For Abdullah's recollections, see FBI report of investigation, interview of Mohdar Abdullah, Jan. 15, 2002. Other reporting indicates that Hazmi and Mihdhar spent time at the King Fahd mosque. A scholar lecturing at the mosque was reportedly approached by either Hazmi or Mihdhar about performing a wedding ceremony. Khalil A. Khalil interview (Feb. 24, 2004). On "Khallam," see FBI electronic communication, "Fahad Althumairy," Sept. 4, 2002; FBI electronic communication, "Ziyat Kharfan," Jan. 8, 2002 (giving description of visitor with whom Hazmi and Mihdhar met at mosque). The Khallam story has never been corroborated. The FBI considered the possibility that Khallam might be Khallad, the al Qaeda member whose role in the 9/11 plot and the *Cole* attack we discussed in chapter 5. This speculation was based on reporting that Khallad was in the United States in June 2000 and was seen in the company of Fahad al Thumairy, an imam at the mosque. FBI electronic communication, investigation of *Cole* bombing, interview of witness, Mar. 19, 2003; CIA cable, source reporting, Mar. 18, 2003. Neither we nor the FBI have found any travel documentation establishing Khallad's presence in the United States at any time. We doubt that the person allegedly seen with Thumairy actually was Khallad.

10. Patrick J. McDonnell, "Saudi Envoy in L.A. Is Deported," *Los Angeles Times*, May 10, 2003, p. B1; Michael Isikoff and Daniel Klaidman, with Jamie Reno, "Failure to Communicate," *Newsweek*, Aug. 4, 2003, p. 34. As of January 2000, Thumairy was employed by the Saudi Arabian Ministry of Islamic Affairs, Religious Endowments and Religious Guidance, to act as the consulate's liaison to the mosque. FBI electronic communication, "Fahad Al Thumairy," Sept. 4, 2002. Before 9/11, Saudi imams employed by the ministry often were dispatched to help serve Muslim communities around the world, sometimes—as in Thumairy's case—with diplomatic status in the host country. On Thumairy's leadership, see FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003; FBI letterhead memorandum, investigation of Mohamed Ibrahim Aliter, Dec. 2, 2002.

11. FBI electronic communication, "Abdulaziz Alroomi," Apr. 2, 2003.

12. FBI letterhead memorandum, investigation of Khaled Charif, Dec. 4, 2002. After 9/11, arguments arose within the Saudi government over whether to allow reputedly radical imams, including Thumairy, to work for the Saudi government in the United States. FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003. In May 2003, the U.S. government settled the matter, at least in Thumairy's case, by refusing to let him back into the country. DOS memo, Karl Hoffman to the Commission, June 8, 2004, and the attached materials.

13. On Thumairy's religious views, see FBI letterhead memorandum, investigation of Mohamed Aliter, Dec. 2, 2002; Fahad al Thumairy interviews (Feb. 23–25, 2004). However, two witnesses we interviewed who knew Thumairy and used to hear him preach at the King Fahd mosque deny that he promoted extremism. Sami A. Mekhemar interview (Apr. 21, 2004); Interview (Apr. 23, 2004). Despite the disparate views as to whether Thumairy

qualified as an extremist while he was in Los Angeles, it does appear that both the Saudi Arabian government and the leadership of the mosque attempted to discipline him in the summer of 2002 and early 2003 for espousing extremist views. Thumairy denies incurring any such disciplinary measures. Fahad al Thumairy interviews (Feb. 23–25, 2004); FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003. On Bayoumi, see Khalil A. Khalil interview (Feb. 24, 2004). Bayoumi and Thumairy had numerous telephonic contacts between December 1998 and December 2000. Specifically, Bayoumi called Thumairy's home telephone 10 times during this period, and Thumairy called Bayoumi's cellular and home phones 11 times between December 3 and December 20, 2000. FBI electronic communication, "Fahad Al-Thumairy," Nov. 20, 2002. Bayoumi recalls consulting with Thumairy, solely on religious matters, both by telephone and in person at the mosque. Omar al Bayoumi interview (Oct. 16–17, 2003). As to Thumairy's contact with Mohdar Abdullah, see FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. According to one individual, Abdullah visited the mosque frequently and was "very close" to radical followers of Thumairy. FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002.

14. We have checked, for example, the records for apartments where Thumairy is known to have placed Saudi visitors during 2001. The most intriguing lead concerns an Arabic-speaking taxicab driver, Qualid Benomrane, who was arrested on immigration charges in early 2002. When asked to look at a series of photographs that included the 19 hijackers involved in the 9/11 attacks, Benomrane responded ambiguously, seeming first to pick out the photographs of Hazmi and Mihdhar but then denying that he recognized them. Later in the interview, Benomrane told the FBI about driving "two Saudis" around Los Angeles and to San Diego's Sea World after being introduced to them by Thumairy at the King Fahd mosque before 9/11. According to Benomrane, someone at the consulate had asked Thumairy to assist the two Saudis, who had recently arrived in Los Angeles and had moved to an apartment near the mosque. FBI electronic communication, "Fahad Althumairy," Sept. 4, 2002; Ashour E. interview (May 20, 2004); FBI reports of investigation, interviews of Qualid Moncef Benomrane, Mar. 7, 2002; Mar. 13, 2002; May 23, 2002. Working with agencies of the U.S. government, we have attempted to locate and interview Benomrane overseas, since he was deported in 2002. After checking many possible avenues of corroboration for this story, our investigation has not substantiated the hypothesis that Benomrane's "two Saudis" were Hazmi and Mihdhar. In fact, we have established that Benomrane did not obtain a taxi license, or even a driver's license, until months after he could be supposed to have chauffeured Hazmi and Mihdhar. Moreover, before his deportation, Benomrane described the two Saudis as sons of a sick father who was seeking medical treatment in Los Angeles. Ibid. We have found evidence corroborating this account.

15. FBI document made available to the Commission; Caysan Bin Don interview (Apr. 20, 2004); Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004). In Bin Don's presence, Bayoumi met with a still-unidentified consular employee whom Bayoumi already knew and whom Bin Don says he saw in Anaheim as recently as November 2003. The employee provided Bayoumi with Qur'ans and other religious materials during the February 1, 2000, meeting. Omar al Bayoumi interview (Oct. 16–17, 2003). At the time of the February 1, 2000, restaurant encounter, Bin Don, a U.S. citizen, went by the name Isamu Dyson.

16. Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001.

17. See Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001. Bin Don himself has been inconsistent about visiting the mosque. In his initial interviews, he recalled praying with Bayoumi at the consulate before lunch and visiting the mosque only once, after the meal; when we interviewed him recently, however, he stated that both prayer sessions took place at the mosque. For Bayoumi's visits to Los Angeles, see FBI report of investigation, recovery of hotel records, Jan. 15, 2002. Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact.

18. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); FBI report of investigation, "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," undated; FBI letterhead memorandum, investigation of Bayoumi, Apr. 15, 2002. While in San Diego, Bayoumi was officially employed by Ercan, a subsidiary of a contractor for the Saudi Civil Aviation Administration, although a fellow employee described Bayoumi as a "ghost employee," noting that he was one of many Saudis on the payroll who was not required to work. In April 2000, Bayoumi received a promotion and his status was also adjusted from "single" to "married" (despite the fact that he was already married). As a result, his salary was raised and his "other allowances" stipend increased significantly, from approximately $465 to $3,925 a month, remaining at that level until December 2000. In January 2001, the stipend was reduced to $3,427. It stayed constant until August 2001, when Bayoumi left the United States. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); Richard L. Lambert prepared statement, June 26, 2003, pp. 7–9; FBI reports of investigation, interviews of Samuel George Coombs, Apr. 8, 2002; July 24, 2002; Aug. 26, 2002.

19. On Bayoumi's activities, see FBI electronic communication, interview of Bayoumi, Sept. 17, 2003. Although Bayoumi admits knowing Thumairy, no telephone records document any contact between the two just before Bayoumi's lunch with Hazmi and Mihdhar in Los Angeles. Nor do individuals who regard Thumairy as an extremist

place Bayoumi in Thumairy's circle of associates. KSM has denied knowing Bayoumi. Intelligence report, interrogation of KSM, Aug. 18, 2003.

Bayoumi was once the subject of an FBI counterterrorism investigation, prompted by allegations about him that appear to have been groundless. On the closing of the investigation, see FBI electronic communication, "Omar Ahmed Al Bayoumi," June 7, 1999. Another possible source of suspicion is his passport, which contains a cachet that intelligence investigators associate with possible adherence to al Qaeda. It is a marking that can be obtained by especially devout Muslims. Although we believe the marking suggests the need for further inquiry, it is not the kind of fraudulent manipulation that would conclusively link the document with a terrorist organization. INS records, copy of Bayoumi passport; CIA analytic report, Al-Qa'ida Travel Issues, CTC 2004-40002H, Nov. 14, 2003, pp. ii, 18.

20. On Abdullah's assistance to the hijackers, see FBI electronic communication, Abdullah investigation, May 19, 2004. In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, California." FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. Bayoumi, however, denies even introducing Hazmi and Mihdhar to Abdullah, much less asking him to assist them. Omar al Bayoumi interview (Oct. 16–17, 2003).

21. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; FBI electronic communication, "Osama Bassnan," Oct. 17, 2001; FBI report of investigation, interview of Mohdar Abdullah, Sept. 22, 2001; FBI electronic communication, "Shareef Abdulmuttaleb el Arbi," Feb. 4, 2003. For the possibility of the notebook belonging to someone else, see FBI report, Behavioral Analysis Activity, Oct. 4, 2001.

22. FBI electronic communication, interview of Charles Sabah Toma, May 18, 2004.

23. On Abdullah's claims of advance knowledge, see FBI electronic communication, interview, May 17, 2004. On Abdullah's telephone use after August 25, 2001, and acting strangely, see FBI report of investigation, interview, Sept. 24, 2001; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; Danny G. interviews (Nov. 18, 2003; May 24, 2004).

24. The hijackers' mode of transportation and the exact date of their arrival in San Diego are not known. On their locating Bayoumi on February 4 and his assistance, see Richard L. Lambert prepared statement, June 26, 2003, pp. 6–7; Omar al Bayoumi interview (Oct. 16–17, 2003); FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–5, 2003. The rental application states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000, but Bayoumi denies it, and we have found no reason to dispute his denial. According to Bayoumi, he was in such a hurry to complete the rental transaction that he signed the application form without reading it. Bayoumi also denies receiving any money from Hazmi or Mihdhar for helping them with the apartment. Omar al Bayoumi interview (Oct. 16–17, 2003). On opening an account, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 12.

Contrary to highly publicized allegations, we have found no evidence that Hazmi or Mihdhar received money from another Saudi citizen, Osama Bassnan.

25. Omar al Bayoumi interview (Oct. 16–17, 2003). According to Bayoumi, he originally intended to hold the party at his own apartment, but moved it to the hijackers' apartment when one of the guests created an awkward social circumstance by bringing his wife; Bayoumi solved the problem by having the friend's wife stay with his own wife in Bayoumi's apartment and moving the party to the hijackers' residence. Bayoumi maintains that a visiting sheikh was the party's principal honoree. Ibid. Although Bin Don has recalled that the party was intended to welcome Hazmi and Mihdhar to the community, this is belied by the hijackers' apparent decision to sequester themselves in the back room, and by the account of another party attendee. Caysan Bin Don interview (Apr. 20, 2004); Khalid Abdulrab al Yafai interview (Feb. 24, 2004). Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don. Bayoumi videotape of party (provided by the FBI).

26. On the hijackers' efforts to relocate, see Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004); FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 17. Telephone records indicate that on February 9 and February 14, 2000, Bayoumi's cell phone was used to call the landlord of the operatives' acquaintance, Hashim al Attas, who had decided to vacate his apartment. On February 15, 2000, when the landlord returned a page from Bayoumi's cell phone, Hazmi answered the phone. Steve O. interview (Nov. 17, 2003); FBI report of investigation, interview of George Harb, Oct. 30, 2001. Hazmi and Mihdhar appear to have used Bayoumi's cell phone until telephone service (subscribed in Hazmi's name) was installed in their apartment.

27. FBI report of investigation, interview of George Harb, Sept. 16, 2001. The hijackers may actually have lived in Attas's apartment for a short while. Bayoumi has stated that he recalls hearing that Hazmi and Mihdhar moved into the apartment for two weeks but then returned to their original apartment while Bayoumi was in Washington, D.C. FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–6, 2003. This account is confirmed by Attas's girlfriend, who recalls that Attas met Mihdhar and Hazmi either through friends or at the mosque, and that the pair moved into Attas's apartment for approximately two weeks before moving out and taking Attas's furnishings with them. FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

28. Interview (Apr. 23, 2004). Hazmi and Mihdhar did not officially vacate their first apartment until May 31, 2000. FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-SD, serial 1445). The exact details

of the hijackers' move to their final San Diego address are not altogether clear, as their landlord—who has been interviewed many times by the FBI and once by us—has provided various accounts of how he first met them. See also FBI electronic communication, Penttbom investigation, Oct. 3, 2001. On Mihdhar's travels, see Interview (Apr. 23, 2004); FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 46. On Hazmi's departure, see FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

29. On the purchase of the car, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing Bank of America records). Law enforcement officials recovered the blue 1988 Toyota from the parking lot at Dulles International Airport on September 11. On the wire transfer, see FBI report of investigation, interview, Sept. 17, 2001. After 9/11, the mosque administrator came forward because he feared he had unwittingly aided the hijackers. He recalled Hazmi and Mihdhar arriving at the mosque on their own and describing themselves as clerks employed by the Saudi Arabian government. The two said they needed help finding a school where they could study English, which neither spoke well enough, in the administrator's opinion, to permit them to become pilots. The administrator also suspected that Mihdhar might have been an intelligence agent of the Saudi government. After first declining Hazmi's request for a loan, the administrator agreed to permit him to use the administrator's bank account to receive the $5,000 wire transfer. Claiming to have been suspicious of the entire transaction, the administrator distanced himself from Hazmi and Mihdhar, but not before they had received the assistance they needed. Ibid. We have no evidence contradicting the administrator's account.

30. On visits to other mosques, see FBI letterhead memorandum, investigation of Ali Ahmad Mesdaq, Jan. 28, 2002; FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002. On Bayoumi's assistance, see Richard L. Lambert prepared statement, June 26, 2003, p. 7; FBI electronic communication, "Jay Steven Barlow," Sept. 24, 2002. On April 12, 2000, Hazmi registered for a one-month class in conversational English. FBI report, "Hijackers Timeline," Nov. 14, 2003 (Apr. 12, 2000, entry, citing Bank of America records).

31. Even before learning of Abdullah's alleged jailhouse conversations, we attempted to interview him in November 2003, while he was incarcerated and awaiting deportation. Through counsel, Abdullah refused to be interviewed unless he was released from custody. The U.S. Department of Justice declined to obtain an order of use immunity so that Abdullah's testimony could be compelled. See Commission letter to Daniel Levin, DOJ, Dec. 31, 2003; DOJ letter, Daniel Levin to the Commission, Jan. 5, 2004. On Abdullah's deportation, see FBI electronic communication, Abdullah investigation, July 1, 2004. Abdullah appears to be at liberty in Yemen, although he claims Yemeni authorities are watching him. H. G. Reza, "Deported Friend of Terrorists in Report," *Los Angeles Times*, June 17, 2004, p. A31.

32. On Awadallah, see FBI electronic communication, interview of Osama Awadallah, June 6, 2002; FBI electronic communication, interview of Osama Awadallah, Feb. 4, 2003. On Bakarbashat, see FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI electronic communication, Penttbom investigation, Apr. 11, 2002. Another associate of Hazmi and Mihdhar allegedly referred to them after the September 11 attacks as "more than heroes." FBI letterhead memorandum, "Diah Thabet," Oct. 25, 2002.

33. On Anwar Aulaqi, see Wade A. interview (Oct. 16, 2003). The FBI investigated Aulaqi in 1999 and 2000 after learning that he may have been contacted by a possible procurement agent for Bin Ladin. During this investigation, the FBI learned that Aulaqi knew individuals from the Holy Land Foundation and others involved in raising money for the Palestinian terrorist group Hamas. Sources alleged that Aulaqi had other extremist connections. FBI electronic communication, background searches, Feb. 3, 2000; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, interview, Oct. 8, 2002. None of this information was considered strong enough to support a criminal prosecution. For evidence of possible early contacts between Hazmi/Mihdhar and Aulaqi, see Steve O. interview (Nov. 17, 2003), noting that four calls took place between Aulaqi's phone and Bayoumi's phone on February 4, 2000, the day Bayoumi helped Hazmi and Mihdhar find an apartment and perhaps lent them his phone.

One witness remembered meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque. This same witness recalled seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002; FBI report of investigation, interview of Anwar Aulaqi, Sept. 25, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2002.

34. FBI reports of investigation, interviews of Anwar Aulaqi, Sept. 17, 2001; Sept. 19, 2001.

35. Aulaqi took a position at the Dar al Hijra mosque in early 2001. By the time we sought to interview him in 2003, he had left the United States, reportedly returning to Yemen. We attempted to locate and interview him in Yemen, working with U.S. agencies and the Yemeni government, as well as other governments that might have knowledge of his whereabouts. Those attempts were unsuccessful.

36. Whereas Hazmi managed to speak broken English, Mihdhar did not even have this much command of the language, which he appeared uninterested in learning. Interview (Apr. 23, 2004); FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On April 4, 2000, Hazmi took his first flying lesson, a one-hour introductory session at the National Air College in San Diego. Exactly one month later, Hazmi and Mihdhar purchased flight equipment from an instructor at the

Sorbi Flying Club in San Diego. On May 5, both of them took a lesson at Sorbi, followed by a second lesson at the same school five days later. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 18.

37. On the Sorbi Flying Club, see FBI report of investigation, interview of Khaled al Kayed, Sept. 15, 2001. For other instructors' views, see FBI electronic communication, Penttbomb investigation, Apr. 11, 2002.

38. On Mihdhar's phone calls, see, e.g., FBI report, "Hijackers Timeline," Nov. 14, 2003 (Mar. 20, 2000, entry, citing 265A-NY-280350-19426). On Mihdhar's travels, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 17. On KSM's views, see Intelligence report, interrogation of KSM, May 19, 2003. On Mihdhar's status, see INS record, NIIS record of Mihdhar, June 10, 2000.

39. On KSM's communication methods, see Intelligence report, interrogation of KSM, Oct. 15, 2003. Even here, the West Coast operatives' language limitation posed a problem, as KSM had to send emails in Arabic using the English alphabet. Ibid. In addition to having his nephew Ali Abdul Aziz Ali transmit funds to the operatives in the United States, KSM used Ali as an intermediary for telephone messages. Intelligence report, interrogation of detainee, Jan. 7, 2004. On Khallad's role, see Intelligence reports, interrogations of KSM, Oct. 15, 2003; Aug. 18, 2003; Intelligence report, interrogation of Khallad, Feb. 17, 2004. On KSM's annoyance with and views on Mihdhar, see Intelligence reports, interrogations of KSM, June 15, 2004; May 19, 2003.

40. Intelligence report, interrogation of Khallad, Feb. 17, 2004; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2001; FBI electronic communication, interview, July 26, 2002; Interview (Apr. 23, 2004); FBI electronic communication, Penttbom investigation, Sept. 15, 2001. Both KSM and Khallad were aware of Hazmi's interest in finding a bride, and KSM reportedly went so far as to promise Hazmi a monthly stipend of $700 in the event he succeeded in marrying. Intelligence reports, interrogations of KSM, Aug. 6, 2003; Jan. 9, 2004. Although Hazmi did not use his housemate's telephone to make calls, he apparently received calls on it, including calls from an individual named Ashraf Suboh, who called the house 16 times between July 20 and November 18, 2000. Suboh's name and address appear in a printed email recovered during searches at an al Qaeda site in Pakistan in May 2002. The document was dated Jan. 9, 2001, and included his name and a mailing address. FBI letterhead memorandum, San Diego investigation, July 2, 2002.

41. Salmi arrived in San Diego on August 7, 2000, and three days later moved into the house where Hazmi resided. Omar al Bayoumi—who reported (at least nominally) to Salmi's uncle at the Saudi Civil Aviation ministry—found this accommodation for Salmi, although Salmi claims not to have known Bayoumi before coming to San Diego. FBI report of investigation, interview of Yazeed al Salmi, Oct. 8, 2001. On Salmi's move to Abdullah's house in La Mesa, see FBI report of investigation, interview of Salmi, Sept. 21, 2001. On possible financial links, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-302, serial 59279); FBI electronic communication, Information and questions re Salmi interview, June 9, 2004; FBI report of investigation, interview of Salmi, June 17, 2004. For Salmi's possible link to Hanjour, see FBI report of investigation, interview of Abdullah, July 23, 2002. We made efforts with the assistance of the FBI to interview Salmi, but without success. The FBI interviewed Salmi on its own in June 2004 but failed to ask about his reported childhood ties to Hanjour. FBI report of investigation interview of Yazeed al Salmi, June 14, 2004.

42. At KSM's direction, Khallad notified Hazmi that another operative, who turned out to be Hanjour, would be joining Hazmi soon. Intelligence report, interrogation of Khallad, Feb. 17, 2004. On Hazmi's work at the gas station and his statement about becoming famous, see FBI report of investigation, interview, May 21, 2002. The owner of the gas station, Osama Mustafa, and the manager of the station, Iyad Kreiwesh, have both been the subject of FBI counterterrorism investigations. The investigations did not yield evidence of criminal conduct. Thumairy, the Saudi imam in Los Angeles, allegedly presided over Kreiwesh's wedding at the King Fahd mosque, witnessed by Abdullah and Benomrane, likely around September 2000. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; 4377 Parks Avenue, San Diego record, "Application to Rent and Rental Deposit," Sept. 21, 2000.

43. On Hanjour's travel to San Diego, see INS record, NIIS record of Hanjour, Dec. 8, 2000. Hazmi's housemate remembers him taking an unexplained trip to the San Diego airport around this time. FBI report of investigation, interview, Sept. 24, 2001. On Hanjour and Hazmi leaving San Diego and the visit to the gas station, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001. On Hazmi's comment to his housemate, see Interview (Apr. 23, 2004). Although Hazmi's housemate claims that the "Hani" whom Hazmi introduced him to is not the same person pictured in Hanjour's photograph, we have little doubt that the housemate did in fact see Hanjour on the day he and Hazmi left San Diego. Ibid.; FBI electronic communication, Penttbom investigation, Sept. 15, 2001.

44. On Hazmi's contact with Abdullah, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On Hazmi's contact with his housemate, see FBI reports of investigation, interviews, Sept. 24, 2001; July 26, 2002. On Hazmi's contact to acquaintances in San Diego, see Danny G. interviews (Nov. 18, 2003; May 24, 2004).

45. For Shehhi's arrival, see INS record, NIIS record of Shehhi, May 29, 2000; Customs record, secondary inspection record of Shehhi, May 29, 2000. For Shehhi going to New York City, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 30, 2000, entry citing Dresdner bank records). For Atta's travel to the Czech Republic,

2002. For his training at Pan Am International Flight Academy and completion by March 2001, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 8, 2001, entries citing 265A-NY-280350, serial 2870; 265A-NY-280350-PX, serials 334, 1033). For the Academy's instructor's reaction, see FBI report of investigation, interview of James Milton, Apr. 12, 2002; FBI electronic communication, Penttbom investigation, Sept. 16, 2001, pp. 2–3. For his perseverance, see ibid., p. 3. For vacating their apartment, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Mar. 31, 2001, entry citing 265A-NY-280350-PX, serial 762). During the cross-country drive, Hazmi received a speeding ticket in Oklahoma on April 1, 2001. Ibid. (citing 265A-NY-280350-W, serial 693, items k2453, k2454; 265A-NY-280350-OC, serial 1541; 265A-NY-280350-302, serials 58753, 58757). For arrival in Virginia, see ibid. (citing 265A-NY-280350-NH, serial 1859).

65. For Atta's training at Huffman, see, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (Nov. 19, 2000, entry citing 265A-280350-TP-5382). For Atta's certificate, see ibid. (Nov. 20, 2000, entry citing FAA records). For Shehhi's training at Huffman, see FBI report of investigation, interview of Erik Seiberlich, Sept. 12, 2001. For Shehhi's certificate, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 20. For Atta and Shehhi taking the commercial pilot test, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Dec. 19, 2000, entry citing 265A-NY-280350-302-9715, serial 26590). For Atta and Shehhi's commercial pilot licenses, see ibid. (Dec. 21, 2000, entries citing FAA records; 265A-NY-280350-302-2340). For Atta and Shehhi's simulator training, see ibid. (Dec. 30, 2000, entry citing 265A-NY-280350-302, serial 1177). For Jarrah's training, see ibid. (Dec. 15, 2000, entries citing 265D-NY-280350-1399, serial 8048).

66. For Jarrah's trip to Beirut and return trip with Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Senguen accompanying Jarrah to flight training, see German BKA report, investigative summary re Jarrah, July 18, 2002, p. 60. According to Binalshibh, Senguen visited Jarrah in order to verify that he actually was studying to become a pilot. Intelligence report, interrogation of Binalshibh, June 9, 2004. For Jarrah's second trip to Beirut and visiting Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002; FBI electronic communication, Penttbom investigation, Sept. 18, 2001, p. 5.

67. For Atta's trip to Germany and meeting with Binalshibh, see Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Dec. 10, 2002; FBI Penttbom timeline briefing (Dec. 10–11, 2003). For Atta giving money to Binalshibh, see ibid. For Atta returning to Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 10, 2001, entry citing INS NIIS report; 265A-NY-280350-302, serial 7134). For Binalshibh's trip to Afghanistan, see FBI Penttbom timeline briefing (Dec. 10–11, 2003).

68. For Shehhi's trip, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 11 and 12, 2001, entries citing 265A-NY-280350-TP, serials 11182, 11183; 265A-NY-280350-OUT, serials 2248, 2256, Intelligence report). We do not have information on what Shehhi did in Morocco. Atta's cell phone was used on January 2 to call the Moroccan embassy in Washington, D.C. before Shehhi left. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing cellular telephone records). Shehhi's trip occurred at a time when Abdelghani Mzoudi, one of the Hamburg cell associates, was also in Morocco. Mzoudi claims he went home to Morocco to get married but could not because he was injured in a car accident there. German BKA report, investigative summary re Mzoudi, Jan. 13, 2003, p. 43. He denies having met with Shehhi, and neither German nor U.S. investigators have uncovered evidence of a meeting. See Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004. For Shehhi's family contacting the UAE embassy, which contacted Hamburg police, and the UAE official's search, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 23. For Shehhi's call home, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-BN-98). For the search being called off, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 24.

69. Reports that Atta was in the Prague airport on May 30–31, 2000, and that he was turned back because he lacked a visa appear to be a case of mistaken identity: a Pakistani traveler with a name similar to Atta's attempted to enter the Czech Republic from Saudi Arabia via Germany but was forced to return to Germany because he lacked a valid Czech visa. CIA cable, report re traveler to Prague, Dec. 8, 2001.

70. For Czech source reporting and credibility assessment, see CIA briefing (Jan. 28, 2004); Eliska T. interview (May 20, 2004). For the information being reported to CIA, see CIA briefing (Jan. 28, 2004). For the leak and the ministers' statements, see CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). On April 4, 2001, Atta cashed an $8,000 check at a bank in Virginia Beach; he appears on a bank surveillance tape. For FBI evidence of Atta being in Virginia Beach, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 4, 2001, entry citing 265A-NY-280350-302-615, 688, 896, 898). For FBI evidence of Atta being in Coral Springs, see ibid. (Apr. 11, 2001, entries citing 265A-NY-280350-302, serial 381; 265A-NY-280350-MM, serials 3817, 5214). For Czech government finding no evidence of Atta's presence and having evidence that Ani was not in Prague, see CIA briefing (Jan. 28, 2004). Aside from scrutinizing various official records, the Czech government also reviewed surveillance photos taken outside the Iraqi embassy. CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). None of the people photographed that day resembled Atta, although the surveillance only operated from 8:00 A.M. to 3:00 P.M. CIA cable, review of surveillance photos, Feb. 27, 2002. For Ani's denials of any meetings and request to superiors, see CIA briefing (Jan. 28, 2004); Intelligence report, interrogation of Ahmad Khalil Ibrahim Samir al Ani, Oct. 1, 2003. For KSM's denial of the meeting, see Shirley interview (Apr. 29, 2004). Binalshibh has stated that Atta and

he were so close that Atta probably would have told him of a meeting with an Iraqi official. Intelligence report, interrogation of Binalshibh, Oct. 2, 2002. Binalshibh also stated that Bin Ladin was upset with Iraqi leader Saddam Hussein for committing atrocities against Iraqi Muslims, and that Bin Ladin would never have approved such a meeting. Intelligence report, interrogation of Binalshibh, Oct. 4, 2002. For Atta not using an alias during his July 2001 trip, see FBI memo, Penttbom investigation, Jan. 14, 2002.

71. Atta was admitted as a tourist for an eight-month stay, even though the legal limit for tourists is six months. Shehhi was admitted for a four-month "business" stay. The Atta and Shehhi applications to change status were ultimately adjudicated on July 17 and August 9, 2001. Each received until October 1, 2001, to complete his studies. For Atta's INS inspection, see INS records, NIIS record of Atta, Jan. 10, 2001; copy of Atta's Egyptian passport; Atta's inspection results; student/school form presented by Atta; primary and secondary inspectors interviews (Mar. 25, 2004). For Shehhi's INS inspection, see INS records, NIIS record of Shehhi, Jan. 18, 2001; Shehhi's inspection results; primary inspector interview (Mar. 26, 2004); secondary inspector interview (Mar. 22, 2004).

72. For Atta and Shehhi staying in Norcross and Decatur, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 25, 2001, entry citing 265A-NY-280350-3631; 265A-NY-280350-AT-141). For the plane rental in Lawrenceville, see ibid. (Jan. 31, 2001, entry citing 265A-NY-280350, serial 13850). These locations are all near Atlanta. For return to Virginia, see ibid. (citing 265A-NY-280350-NF-48). For mailbox rental, see ibid. (Feb. 20, 2001, entry citing 265A-NY-280350-NF-48, 51). For check cashing, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 26. For return to Georgia, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 21, 2001, entry citing 65A-NY-280350-302, serial 49563). For Jarrah staying in Decatur, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Mar. 15, 2001, entry citing 265A-NY-280350, serial 15661). For Atta-Jarrah call, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's apparent visit with Senguen, see INS records, NIIS record for Jarrah, Feb. 25, 2001 (with departure date of Mar. 30, 2001); NIIS record for Jarrah, Apr. 13, 2001. For Atta and Shehhi returning to Virginia Beach, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 3, 2001, entry citing FBI electronic communication, Sept. 17, 2001). For Atta closing the mailbox, see ibid. (Apr. 4, 2001, entry citing FBI electronic communication, Sept. 18, 2001).

73. For Atta and Shehhi arriving in Virginia, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 3, 2001, entry citing 265A-NY-280350-302-615, 688, 896, 898). For Hazmi and Hanjour arriving in Virginia, see ibid. (Apr. 4, 2001, entry citing 265A-NY-280350-NH, serial 1859). For their attendance at the Dar al Hijra mosque, see FBI electronic communication, request for interviews, Aug. 6, 2002.

74. For Aulaqi moving to Virginia, see FBI electronic communication, analysis related to Penttbom investigation, Oct. 23, 2001. For his denial of contacts with Hazmi and Hanjour, see FBI report of investigation, interview of Anwar Aulaqi, Sept. 17, 2001.

75. The apartment was already occupied by two other individuals. The al Qaeda operatives spent little time with their roommates, but did mention at one point that they had considered going to Afghanistan for jihad. FBI report of investigation, interview of Ahmad Ahmad, Oct. 4, 2002. For Hazmi and Hanjour meeting Rababah, see FBI electronic communication, request for interviews of certain individuals, Aug. 6, 2002. For Rababah seeking work at the mosque, his meeting them, and his assistance in finding them an apartment, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002. For Hazmi and Hanjour renting the apartment, see FBI report of investigation, interview of Derar Mohammed Saleh, Jan. 16, 2003.

76. For FBI agents' suspicions, see Jim B. interview (Nov. 6, 2003). Rababah was reluctant to admit meeting the hijackers at the mosque and initially told a story about meeting them for the first time at a store. Rababah attributed his initial prevarication to wanting to protect the mosque from anti-Arab sentiment following September 11. FBI report of investigation, interview of Eyad al Rababah, June 10, 2002; Robert B. interview (Nov. 6, 2003). For Rababah's deportation, see Peter A. interview (Oct. 10, 2003).

77. FBI report of investigation, interview of Eyad al Rababah, June 10, 2002.

78. For Rababah going to the apartment and finding new roommates, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002. For the trips to Connecticut and New Jersey, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 8, 2001, entries citing 265A-NY-280350-NH, serial 1859); FBI electronic communication, summary of Penttbom investigation, June 3, 2002. For the telephone calls, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 8, 2001, entry citing 265A-NY-280350-NH, serial 1859). For return to Connecticut and Rababah not seeing the hijackers again, see ibid. (May 10, 2001, entry citing 265A-NY-280350-NH, serial 1859); FBI report of investigation, interview of Eyad al Rababah, June 10, 2002.

79. For the apartment rental in New Jersey, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002; FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 21, 2001, entry citing 265A-NY-280350-302, serials 25453, 25445). For the landlord finding six people, see FBI report of investigation, interview of Jimi Nouri, Sept. 19, 2001. Although no specific evidence places Omari in the apartment, the muscle hijackers based in New Jersey likely lived together, as they apparently conducted other activities jointly, such as obtaining identification cards. See, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 1, 2001, entries citing 265A-NY-280350-FD-302, serials 4718, 11815, 20900, 21529).

80. For Atta's renting the apartment, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-

280350-302, serial 381; 265A-NY-280350-MM, serial 3817). For Shehhi's presence in Florida, see, e.g., ibid. (Apr. 13, 2001, entry citing 265A-NY-280350-302, serial 17575).

81. For Shehhi's ticket purchase, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 13, 2001, entry citing 265A-NY-280350-302, serial 17575; Apr. 18, 2001 entry citing 265A-NY-280350-CG, serial 1928; 265A-NY-280350-302, serial 16379; Apr. 19, 2001, entry citing CIA report; 265A-NY-280350-302, serial 17575). For Shehhi's visit with Atta's father, see ibid. (Apr. 20, 2001, entry citing CIA report). For Atta having license during April 26, 2001, traffic stop and Shehhi spending two weeks abroad, see ibid. (citing 265A-NY-280350-MM, serial 2746; May 2, 2001, entry citing 265A-NY-280350-302, serial 16379; 265A-NY-280350-CG, serial 1928); FBI Penttbom timeline briefing (Dec. 10-11, 2003).

82. For Shehhi's return, see INS record, NIIS record of Shehhi, May 2, 2001. For Atta and Jarrah obtaining driver's licenses, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 2, 2001, entry citing 265A-NY-280350-MM, serial 59). Also on May 2, Atta and two unidentified companions appeared at the Miami District Immigration Office, where an inspector reduced Atta's authorized length of stay by two months, correcting the mistake made back in January. Interview of inspector (Mar. 25, 2004).

83. For a description of the muscle hijackers, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 34–52.

84. On Banihammad, see CIA analytic report, "Facilitating Disaster: An Overview of 11 September Finance," CTC 2002-40093H, Aug. 22, 2002, p. 4

85. Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002; Saudi Arabian Mabahith briefing (Oct. 17, 2003) (disclosing that two of the muscle hijackers had married shortly before joining the plot and only one, Wail al Shehri, was employed, as a physical education teacher).

86. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 25.

87. Ibid.

88. Ibid., p. 26.

89. Ibid., p. 25. On Nawaf's efforts on behalf of his brother, see CIA analytic report, "Afghanistan Camps Central to 11 September Plot: Can al-Qa'ida Train on the Run?" CTC 2003-40071CH, June 20, 2003, p. 1; Intelligence report, interrogation of detainee, Oct. 18, 2001.

90. Intelligence report, interrogation of Binalshibh, Feb. 18, 2004; Intelligence report, interrogations of KSM and another detainee, Feb. 18, 2004; Intelligence report, interrogation of Abu Zubaydah, Feb. 19, 2004; Intelligence report, interrogation of Nashiri, Feb. 2004; Intelligence report, interrogation of detainee, Feb. 18, 2004.

91. Intelligence report, interrogation of KSM, Jan 7, 2004. Khallad agrees about the recruit pool, but also argues that operatives' ethnicity was important for symbolic reasons, citing the Nairobi and Dar es Salaam embassy bombings and the planes operation as examples. In the planes operation, Khallad notes, Bin Ladin selected operatives from Mecca (Mihdhar and the Hazmi brothers) and would have used more had they been available. Moreover, with respect to the remaining Saudi muscle hijackers, Khallad claims Bin Ladin chose them because he wanted the 9/11 attacks to resound across Saudi Arabia, especially among the southern tribes and those of the hijackers themselves. According to Khallad, Bin Ladin wanted operatives from strong tribal areas of Saudi Arabia and chose two Saudi brothers from the al Shehri tribe, of which their father was a leader. Intelligence report, interrogation of Khallad, Feb. 18, 2004.

92. CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 24, 26. According to Saudi authorities, none of the hijackers had any record of extremist activity, but Satam al Suqami and Salem al Hazmi both had minor criminal offense records. Saudi Arabian Mabahith briefing (Oct. 17, 2003).

93. CIA analytic report, "Afghanistan Camps Central to 11 September Plot," June 20, 2003, pp. 1–2.

94. For trainer's comments, see Intelligence report, interrogation of detainee, Feb. 8, 2002. For Omari's, Ghamdi's, and Shehri's backgrounds, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 27; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002.

95. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002. According to Saudi authorities, a substantial number of the hijackers isolated themselves and became religious only within a few months of leaving the Kingdom. All but Ahmad al Haznawi, who called his aunt to inquire about his sick mother, ceased contact with their families about six months before the attacks. Saudi Arabian Mabahith briefing (Oct. 17, 2003).

96. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July, 17, 2002.

97. On Khattab, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26, n. 2. For KSM's claim, see Intelligence report, interrogation of KSM, May 15, 2003. For difficulties traveling to Chechnya, see also Saudi Arabian Mabahith briefing (Oct. 17, 2003).

98. Intelligence reports, interrogations of Khallad, Sept. 5, 2003; Mar. 26, 2004; Jan. 8, 2004; Jan. 7, 2004. Khallad claims he also encouraged Salem al Hazmi to participate in a suicide operation. Intelligence report, interrogation of Khallad, Apr. 13, 2004.

99. Intelligence reports, interrogations of KSM, May 15, 2003; Jan. 9, 2004; Oct. 21, 2003. KSM does acknowl-