# EXHIBIT 164

UNCLASSIFIED

# (U) The FBI: Protecting the Homeland in the 21st Century

(U) Report of the Congressionally-directed

## (U) 9/11 Review Commission

To

**(U) The Director of the Federal Bureau of Investigation**

By

(U) Commissioners

Bruce Hoffman
Edwin Meese III
Timothy J. Roemer

(U) March 2015

UNCLASSIFIED

# CHAPTER V
## (U)  NEW INFORMATION RELATED TO THE 9/11 ATTACKS

(U)  The 9/11 Commission noted in its final report that it had "endeavored to provide the most complete account of the events of September 11" but conceded nonetheless that "[n]ew information will inevitably come to light."[326]  Consistent with this, the Review Commission's congressional mandate included an "assessment of any evidence now known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001."[327]

(U)  To fulfill this mandate, the Review Commission conducted multiple interviews of key personnel at FBI Headquarters and in the field to identify any new information related to the 9/11 attacks, with a special emphasis on identifying any previously unknown co-conspirators.  The Review Commission traveled to the New York and San Diego field offices to speak with FBI personnel who have continued to investigate the 9/11 attacks and received briefings at FBI Headquarters from several of the lead investigators and analysts on new evidence that has come to light since the 9/11 Commission's 2004 report.  Finally, the Review Commission made requests for information specifically on possible links between the San Diego-based hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar, as well as the pre-9/11 activities of Anwar al-Aulaqi.  Given the time and resources available, it was beyond the scope of the Review Commission's activities to re-interview every witness or to review all of the documents related to the FBI's investigation of the 9/11 attacks.  The FBI's investigation since 9/11 has involved over 500,000 leads, over 167,000 interviews, and millions of pages of documents.[328]

(U)  The Review Commission found that the FBI, to its credit, still has the 9/11 attacks and any potential conspiracy surrounding them, under active investigation.  The Review Commission also investigated two claims of allegedly new evidence reported in the press—an FBI source with purported access to Usama bin Laden (UBL) in the early 1990s and a Sarasota family that was alleged to have suspiciously left the United States shortly before the 9/11 attacks.  This chapter captures and reviews the results of the Review Commission's inquiry into these four topics.

---

326 (U)  *The 9/11 Commission Report*, xvii.
327 (U)  Public Law 113-6 and 113-76. (2013-2014); statement of Chairman Barbara Mikulski, *Congressional Record*, March 11, 2013: S1305.
328 (U)  FBI Briefing, *Overview of 9/11 Investigation*, April 25, 2014.

> **(U)  Key Points**
>
> - (U)  Based on the available information obtained and considered, the Review Commission concludes that there is no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.
>
> - (U)  There is new evidence, however, that confirms and strengthens the cases against previously known co-conspirators who are awaiting trial.
>
> - (U)  The Review Commission also concludes that media reports regarding a possible FBI source with access to UBL in the early 1990s or suspicions regarding a Saudi family resident in Sarasota before the 9/11 attacks did not hold up under scrutiny.
>
> - (U)  The Review Commission commends the FBI for continuing its active investigation into the 9/11 attacks.

## (U) FBI Investigations

(U)  The FBI's initial investigation into the 9/11 attacks was named PENTTBOM.  This effort remains open and active.  Subsequent to the initial 9/11 Commision report, the FBI opened a subfile within this investigation to sharpen the focus on the lingering allegations that the circle of 9/11 conspirators may be wider.  The 9/11 Review Commission reviewed the status of  both the PENTTBOM and subfile teams.

> **(U)  Key Individuals In This Chapter**
>
> **Nawaf al-Hazmi:**  9/11 hijacker on Flight 77 who spent time in San Diego in 2000.
>
> **Khalid al-Mihdhar:**  9/11 hijacker on Flight 77 who spent time in San Diego in 2000.
>
> **Omar al-Bayoumi:**  Manager of Kurdish Community Islamic Center (KCIC). Assisted al-Hazmi and al-Mihdhar as well as al-Sadhan and al-Sudairy during their respective times in San Diego.
>
> **Fahad al-Thumairy:**  Imam at the King Fahad mosque near Los Angeles and accredited diplomat at the Saudi consulate in Los Angeles who met al-Hazmi and al-Mihdhar.
>
> **Mohdhar Abdullah:**  Befriended and provided assistance to al-Hazmi and al-Mihdhar during their time in San Diego.
>
> **Khalid Sheik Mohammed (KSM):**  Mastermind of the 9/11 attacks.

(U)  The 9/11 Commission detailed how al-Hazmi and al-Mihdhar arrived in Los Angeles in January 2000, but evidence regarding their initial activities was still incomplete.  The 9/11 Commission inquired into whether Fahad al Thumairy—an imam at the King Fahad mosque in

101

Los Angeles and an accredited diplomat at the Saudi Arabian consulate from 1996 until 2003—"may have played a role in helping the hijackers establish themselves on their arrival in Los Angeles."[329]  Based on the evidence available at the time, the 9/11 Commission concluded that there was no evidence that al-Thumairy provided assistance to al-Hazmi and al-Mihdhar.[330]

(U)  The 9/11 Commission further considered the support that Omar al-Bayoumi provided to the hijackers and the circumstances of their meeting on February 1, 2000, at a restaurant in Culver City, a few blocks from the King Fahad mosque.[331]  Despite a number of questions regarding al-Bayoumi's version of the events that day—particularly that he accidently encountered al-Hazmi and al-Mihdhar in the restaurant after overhearing their Gulf Arabic accents—coupled with his assistance to the hijackers after they moved to San Diego at his suggestion, the 9/11 Commission nonetheless concluded that al-Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists."[332]

(U)  In a July 2004 summary of its investigation into al-Bayoumi the FBI similarly determined that "evidence and intelligence do not indicate that al-Bayoumi had advance knowledge of the terrorist attacks of 9/11/2001 or knowledge of al-Hazmi's and/or al-Mihdhar's status as Al Qaeda operatives" or "that the assistance provided by al-Bayoumi to al-Hazmi and al-Mihdhar was witting."

(U)  The 9/11 Commission also detailed that Mohdar Abdullah was a close associate of al-Hazmi and al-Mihdhar when they lived in San Diego.  Abdullah denied knowing of the attacks in advance but the 9/11 Commission reported that Abdullah was aware of al-Hazmi and al-Mihdhar's extremist views and al-Mihdhar's involvement with the Islamic Army of Aden.  Abdullah himself sympathized with those views.[333]  In May 2004, the 9/11 Commission learned that Abdullah had reportedly bragged to fellow inmates that he had known in advance of al-Hazmi and al-Mihdhar's plans to conduct a terrorist attack.[334]  There are various accounts of the alleged bragging and neither the FBI nor the 9/11 Commission was able to confirm the veracity of this new information.[335]  The 9/11 Commission heard some speculation that al-Hazmi had called Abdullah in late August 2001 and leaked information that "something big was going to happen."[336]  The 9/11 Commission did not in the end identify Abdullah as a witting supporter of the hijackers.

(U)  The subfile team began its review of several individuals of interest in 2007.  In describing its work to the Review Commission, the team identified the collection of information it had

---

329 (U)  *The 9/11 Commission Report*, 216.
330 (U)  Ibid., 217. A 2012 FBI summary of the status of the effort reported, however, that al-Thumairy "immediately assigned an individual to take care of al-Hazmi and al-Mihdhar during their time in the Los Angeles area."
331 (U)  *The 9/11 Commission Report*, 217.
332 (U)  *The 9/11 Commission Report*, 217-18.
333 (U)  *The 9/11 Commission Report*, 218.
334 (U)  Abdullah was detained in an immigration facility after pleading guilty to immigration charges for fraudulently claiming he was a Somali asylee.
335 (U)  *The 9/11 Commission Report*, 218-19.
336 (U)  *The 9/11 Commission Report*, 249.

102

reviewed. The majority of the materials, including those obtained from a New Scotland Yard search of al-Bayoumi's London apartment in late 2001, had been received by the FBI before the 9/11 Commission issued its report. The only new evidence came from re-interviews of specific individuals. For example, the FBI had interviewed Mohdar Abdullah on several occasions prior to the 9/11 Commission's 2004 report and then in 2007 and 2008. During a 2011 interview Abdullah confirmed that he had provided on his own accord various types of assistance to the hijackers in San Diego. He also reiterated that he had discussions with al-Hazmi regarding the latter's jihadist beliefs but said he did not believe that al-Hazmi was saying they should be terrorists. Abdullah also denied telling his cellmates that he had advance knowledge of the 9/11 attacks. The Review Commission did not discover anything new in the post-9/11 Commission interviews of Abdullah that would definitively change the 9/11 Commission's conclusions regarding Abdullah's pre-9/11 activities.

**(U) Finding:** The Review Commission finds that this new information is not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar. The Review Commission notes that there is ongoing internal debate within the FBI between the original PENTTBOM team and the subfile team regarding the potential significance of some of this information. The Review Commission recognizes the importance of strong internal engagement between the PENTTBOM and the subfile teams. The Review Commission recommends that the FBI leadership review both perspectives and continue the investigation accordingly.

## (U)  Guantanamo Bay Trial Preparation

(U)  The second effort devoted to uncovering new evidence involves the trial preparations for the al-Qa'ida defendants currently held at Guantanamo Bay. This effort focuses on examination of materials obtained both pre- and post-2004, including materials from the Abbottabad raid, search warrants, and the recorded conversations of key individuals. None of this evidence identifies any additional participants in the planning or carrying out of the 9/11 attacks. This evidence does strengthen and enhance the cases against existing plotters.[337]

**(U) Finding:** The Review Commission finds that this new evidence further substantiates and strengthens previously known connections between hijackers and other plotters and reinforces the cases against them.[338]

## (U)  Alleged FBI Source with Access to Usama bin Laden

(U)  On February 25, 2014, the *Washington Times* reported that the FBI had "placed a human source in direct contact with Osama bin Laden in 1993 and ascertained that the al Qaeda leader was looking to finance terrorist attacks in the United States."[339]  The article claimed to be

---

337 (U)  Memorandum for the Record, October 24, 2014.
338 (U)  Ibid.
339 (U)  Guy Taylor and John Solomon, "EXCLUSIVE: FBI had human source in contact with bin Laden as far back as 1993," *Washington Times,* February 25, 2014, http://www.washingtontimes.com/news/2014/feb/25/fbi-source-had-contact-with-osama-bin-ladin-in-1993 (accessed on November 19, 2014).

derived from the courtroom testimony of a Supervisory Special Agent, who in the 1990s was in charge of a counterterrorism squad in the Los Angeles Field Office, on which Special Agent Bassem Youssef worked.  Youssef had developed the confidential source referenced in the *Washington Times* article.  According to the witness, Youssef's source was close with Omar Abdel-Rahman, a radical Egyptian cleric living in the United States known as the "Blind Sheik," who was subsequently convicted on terrorist charges arising from the 1993 bombing of New York City's World Trade Center.  The *Washington Times* reported that the witness, Youssef's former supervisor, testified that Youssef arranged to have the source travel overseas to meet personally with UBL and that UBL "had a target [a Masonic lodge] picked out for an explosion in the Los Angeles area."[340]

(U)  The Review Commission interviewed Youssef.  He said that "99 percent of the story was accurate."[341]  He explained that from late 1992 to early 1993, Abdel-Rahman was "spewing anti-Egypt stuff at the mosque" but was not calling for attacks in or against the United States.  In 1993, Youssef identified an individual, the aforementioned confidential source, who was in frequent contact with Abdel-Rahman—but not directly with UBL.  Youssef learned from the source's wife and from two other informants about a plot to bomb a Masonic Lodge in Los Angeles "because it was frequented by Jews."[342]  The plotters had sought Abdel-Rahman's approval who, in granting it, had mentioned in passing that "when they wanted to do something overseas," they should "talk to Usama" in order to obtain financing.[343]  At the time, Abdel-Rahman was one of UBL's spiritual advisers.  According to Youssef, he reported to FBI Headquarters in 1994 that "UBL is building an Islamic army, has a lot of money, and is charismatic" but, according to Youssef, UBL was not at that stage known to be "a criminal or a terrorist."[344]  This is consistent with other, contemporaneous, USIC assessments.[345]  With respect to the plot against the Masonic Lodge, Youssef stated that it had nothing to do with either UBL or al-Qa'ida and, in any event, never materialized.  Moreover, the source in question was in fact in direct contact with Abdel-Rahman, and not directly with UBL.  Youssef said that the source was killed while fighting in Chechnya in 1995.[346]

(U)  The Review Commission also reviewed an affidavit dated March 11, 2014, provided for the same trial that was described in the *Washington Times* account.  The affiant, a Supervisory Special Agent currently assigned to the Los Angeles Field Office, stated that he had recently reviewed Youssef's source files from the 1990s.  The affidavit confirmed that Youssef first met the confidential source in June 1993 and recruited him as a source two months later.  The

---

340 (U)  Ibid. The actual testimony is less clear. The Supervisory Special Agent actually testified, "[Youssef] was able to develop two sources that were directly involved with Abdel Rahman. . .. [T]he one source came back, had direct contact with Osama bin Laden. He had indicated to Abdel Rahman that he had a target picked out for an explosion in the Los Angeles area, I believe it was a Masonic lodge. Abdel Rahman went and told him to go get money from Usama back in the Middle East." See Testimony of Edward Curran, *Bassam Youssef* vs. *Federal Bureau of Investigation, et. al.*, CA No. 03-1551 (September 15, 2010). It is unclear to whom the term "he" refers.
341 (U)  Memorandum for the Record, November 10, 2014.
342 (U)  Ibid.
343 (U)  Ibid.
344 (U)  Ibid.
345 (U)  John Miller and Michael Stone, *The Cell* (New York: Hyperion, 2002): 137-138.
346 (U)  Memorandum for the Record, November 10, 2014.

104

recognizes that any expansion in the government's law enforcement and intelligence powers will raise civil liberties concerns in the Congress, among the American people, and within the FBI itself. These concerns will need to be addressed.

**(U)  Recommendation 10:**  The Review Commission recommends that Congress continue to provide the FBI with the authorities and state-of-the art tools it needs both to counter growing threats to US national security and to protect the freedoms of American citizens.

- (U)  In this complex and dynamic environment, the Review Commission recommends that the FBI correspondingly continue to review, strengthen, and refine its internal safeguards for the protection of civil liberties. To this end, the FBI Director should establish an independent advisory group reporting directly to him to include several outside experts—technical, legal, and civic— to provide regular review of the effectiveness of existing safeguards and of the Bureau's compliance with them.

- (U)  The goal should be to make the Director aware of potential problems in time to fix them, before they become real problems that he learns of from the Department of Justice (DOJ) Inspector General, a whistleblower, or the media.

**(U)  Strategic Plan**

**(U)  Finding 11:**  The effort to develop a long-term comprehensive strategic vision and plan to integrate the national and international responsibilities of a global intelligence-driven investigative service is complicated by some problems that the Bureau can fix on its own, but others will require the involvement of DOJ, DNI, and Congress.

- (U)  Strategic planning is hindered by the Bureau's one-year budget cycle, which contrasts with the five-year cycle of most USIC members who are funded by the defense budget. The bifurcated budget process runs through the contrasting evaluations of DOJ and FBI's Office of the Director of National Intelligence budget offices and eventually on to the Congressional committees of jurisdiction, which are similarly divided between intelligence and law enforcement interests.

**(U)  Recommendation 11:**  The Review Commission recommends that the FBI develop a comprehensive strategic vision—and a five-year, implementable, metric-based strategic plan— that would integrate its expanding national and global missions, as well as its intelligence and law enforcement mandates.

- (U)  The FBI's strategic planning must be top-down, comprehensive, long term, and done in close coordination with the DNI, the Attorney General, the Office of Management and Budget, and Congressional committees of jurisdiction. All these stakeholders must be more aligned in their commitment to the Bureau's critical mission to integrate intelligence and law enforcement.

- (U)  The strategic plan under the Director's leadership should integrate division-level strategic plans, drive allocation of resources, direct support functions, and track with a dynamic, multi-year threat assessment.

- (U)  The plan must enable the professionalization of FBI analysis, improvement in the HUMINT program, long-term strengthening of the LEGAT program, and the acceleration of S&T initiatives.

- (U)  The Director's plan should aim to upgrade over time the Bureau's key business processes—including information technology, human resources, security, contracting, and procurement.

**(U)  Continued Investigation of 9/11 Attack**

**(U)  Finding 12:**  The FBI has continued to investigate the 9/11 attacks to determine whether any additional individuals should be held responsible for the attacks.  Although the additional evidence uncovered since the 9/11 Commission report strengthens the cases against already identified co-conspirators, the Review Commission finds there is no new evidence to date that would change the 9/11 Commission's findings regarding responsibility for the 9/11 attacks. Contrary to media reports, the FBI did not have a source in the 1990's with direct access to UBL nor was there credible evidence linking the Sarasota, Florida, family to the 9/11 hijackers.

**(U)  Recommendation 12:**  The 9/11 Review Commission recommends the FBI continue its thorough investigation into the 9/11 attacks and, after the trials of the conspirators conclude, capture the lessons learned through the investigation, and provide detailed briefings to Director Comey and the relevant congressional oversight committees.

117

UNCLASSIFIED

## (U)  CONCLUSION

(U)  In conclusion, the FBI has made strides in the past decade but needs to accelerate its implementation of reforms to complete its transformation into a threat-based, intelligence-driven organization.  The increasingly complex and dangerous threat environment it faces will require no less.  The Review Commission believes that the FBI's vision of the future should be one in which criminal investigation, counterintelligence, intelligence collection and analysis, and S&T applications are seen as complementary core competencies of a global intelligence and investigative agency.

- (U)  The Bureau must work toward a culture that integrates its best efforts into both criminal and national security missions; where its highly skilled people intersect synergistically in mission support; but where its core competencies still are nurtured by distinct professional disciplines requiring their own investment strategies, specialized training, and discipline-managed career services.

- (U)  The FBI will fulfill its domestic intelligence role when its analysts and collectors, like its special agents, are grounded in criminal investigation; have ready access to state-of-the-art technology; continuously exploit the systems, tools, and relationships of the national intelligence agencies; and both cultivate and benefit from robust CONUS and OCONUS collaborative relationships that widen the Bureau's access to investigative leads and reportable intelligence.

- (U)  Achieving these ambitious goals should not be a zero-sum game between intelligence and law enforcement.  It should mean a continued FBI commitment to a growing criminal investigation mission, to a tighter and smoother integration of intelligence analysts and collectors into the USIC, to a more strategic approach to its growing international footprint, and to greater investment in closer collaborative relationships with US and foreign partners.  Accomplishing all this will be hard in any case, but impossible without a firm commitment from FBI leadership and support from the DNI and Congress to accelerate reform.

UNCLASSIFIED