# EXHIBIT 178

Marc Sageman, M.D., Ph.D.
402 King Farm Blvd, Ste 125-222
Rockville, MD 20850


August 6, 2020


**In Re Terrorist Attacks on September 11, 2001, 03-MDL-1570 (GBD)**


Dear Mr. Omar Mohammedi,


You have retained me in the above litigation as an expert to address certain issues beyond the ken of the factfinder. My qualifications are outlined in my attached C.V. I have been qualified as an expert witness on terrorism in multiple federal jurisdictions including the SDNY. In the process of attaining opinions in this matter, I have reviewed the complete discovery material produced by all seven sets of plaintiffs as well as the World Assembly of Muslim Youth (henceforth WAMY) that you have sent me on a hard drive, which total more than hundreds of thousands of pages. These documents are too numerous to list.

This report is divided into four parts. The first describes my methodology and that of two of the plaintiffs' experts used to address the relevant issues. The second outlines the evolution of al Qaeda and the 9/11 terrorists in order to provide a chronological context to plaintiffs' allegations. The third addresses the plaintiffs' multiple allegations against WAMY in chronological order in order to assess them in their respective contexts. The fourth provides my opinion on the pertinent issues in this litigation concerning WAMY in terms of the 9/11 attacks.

## I.        Methodology

An expert report meant to educate a factfinder must reach its opinions based on accepted scientific methodology according to the *Daubert* standard. This section covers the methodology used in deriving the opinions proffered in this report. This is basically the same methodology that I have used in multiple scientific peer-reviewed publications.[1]

---

[1] See Marc Sageman, 2017, *Turning to Political Violence: The Emergence of Terrorism*, Philadelphia: University of Pennsylvania Press, at xiv–xxii; and Marc Sageman, 2019, *The London Bombings*, Philadelphia: University of Pennsylvania Press, at 3–8.

for Peshawar in order to help put an end to the Afghan Civil War.[195] By the time he returned to Peshawar, al Qaeda had shrunk to about 60 trained members.[196] Bin Laden had already decided to move to Sudan with his organization and most of his resources were transferred there. Not much is known about bin Laden's activities during this return to Peshawar. Al Qaeda was not very active in the fight against the Kabul regime to the frustration of the ansar still involved in supporting the Afghan mujahedin.[197]

During this period, an al Qaeda member conducted the organization's first act of political violence outside of the Afghan theater. It was a bizarre attempt on the life of former Afghan King Zahir Shah, who was in exile in Rome. The perpetrator was a Portuguese convert, Paulo Jose de Almeida Santos, who had come to participate in the Afghan conflict on the invitation of some Afghans during Umra, the lesser pilgrimage to Mecca. He arrived in March 1990 (a year after the Soviet withdrawal), trained in an al Qaeda camp and was recruited into the organization. After the fall of Khost in 1991, al Qaeda had grown close to Gulbuddin Hekmatyar, who threatened to kill the king if he dared to come back and re-establish the monarchy. That gave Almeida Santos the idea to go and kill the king. As al Qaeda was still informal at the time, he briefed bin Laden in Peshawar about his intention. When he asked whether it was permissible to attack the king if a child was present, bin Laden replied, "No, no way… We are Muslims, we do not eliminate children." At the end of the discussion, bin Laden was non-committal and did not give Almeida Santos any order. He went to Rome in November 1991 and got invited to the king's house for coffee. After an hour sipping coffee with the king, Almeira Santos stabbed him. The king barely survived. The perpetrator did not defend himself at trial: "It was an act of war in a country that was not at war, so I had to pay the consequences."[198]

---

[195] Lacey, 2009, at 154–6; Coll, 2008, at 381.
[196] This is Hamid's estimate since al Qaeda provided him with most of its forces for an operation in Afghanistan. Hamid and Farrall, 2015, at 178.
[197] For instance, see Hamid, n.d., AFGP-2002-600092, passim; Hamid and Farrall, 2015, at 177–92.
[198] Almeida Santos's interview is translated and published in Bergen, 2006, at 116–20. The initiative came from the perpetrator and, from the perpetrator's confession, it is unclear whether it was sanctioned by al Qaeda, which of course did nothing to stop him. To my knowledge, al Qaeda or bin Laden never took credit for this assassination attempt.

Bin Laden and most of his deputies, Abu Ubaydah, Abu Hafs, Mustafa Abu al-Yazid (Sheikh Saeed al-Masri), and Salim, moved to Khartoum in late 1991[199] or early 1992,[200] leaving behind two consolidated camps, Jihadwal and al-Faruq. Mustafa Hamid used al-Faruq for his Furqan Project, the training of Uzbek, Tajik, and Chechen cadres for the Islamic liberation of their respective countries.[201] However, by the end of 1994, bin Laden closed both camps and their skeleton crew including Hamid left for Khartoum in early 1995.[202] Al Qaeda no longer had any presence in Afghanistan and Pakistan after that, leaving the training of Islamist militants to its rival, Khalden.

The Afghan Peshawar phase of al Qaeda is important to understand because during that period, all Arab Afghans mingled with each other as they formed the Arab expatriate community in Peshawar. Their association, even if they did not collaborate, may have given the appearance of being together, mutually supporting each other. As the narrative makes clear, this was far from what happened on the ground. Toward the end of this phase, bin Laden became critical of the royal family and Saudi charities turned away from him. He seemed to have raised his own money during his tours in the kingdom and had his own money. Many of the plaintiffs' allegations come from this period, which is why I described it in such detail.

## F. A Saudi Charity in Peshawar: Lajnat al-Birr al-Islamiya

Before leaving Peshawar, let us focus on a Saudi charity, which is at the center of the allegation that WAMY materially supported al Qaeda and the 9/11 terrorists. We have already encountered it in the dispute about the *al-Tahadi* (Challenge) project between the MaK in the

---

[199] Ali Mohammed claimed that he helped transport him to the Sudan in 1991 at his plea agreement hearing, *U.S. v. Ali Mohamed*, S.D. New York, S(7) 98 Cr. 1023 (LBS), October 20, 2000, at 27, at PEC-WAMY015985.

[200] Julaidan, in Bergen, 2006, at 129.

[201] Hamid and Farrall, 2015, at 197–205.

[202] Abu 'Ata al-Sharqi, 1994, "Report from Afghanistan," West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/10/Abu-Ata-Al-Sharqi-Reports-from-Afghanistan-Translation.pdf; Vahid Brown, 2008, "Abu'l Walid al-Masri: A Biographical Sketch," West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2011/06/Abul-Walid.pdf

persons of its executives Azzam and Julaidan and Egyptian humanitarian Ahmed Said Khadr.[203] Adel Batterjee from Lajnat al-Birr al-Islamiya (Islamic Benevolence Committee, LBI) was its main financier.[204] Before the present litigation, there have been very few documents about LBI, except for scans of a few scraps of paper found on a computer file in a 2002 police raid of another charity in Sarajevo. Much of the allegations about WAMY's alleged support of al Qaeda focus on LBI's head in Peshawar, Adel Batterjee.

Batterjee was born in 1946 into a rich family in Jeddah, Saudi Arabia. His family made its fortune through pharmaceuticals. A profile written by FBIS (Foreign Broadcast Information Center, which later became the Open Source Center) and dated July 2005 reports that he graduated from the University of Kansas in 1968 with a degree in mathematics.[205] Adel Batterjee became a wealthy businessman in his own right and also volunteered for charity work. In the mid-1980s, he wanted to get involved in humanitarian work in support of the Afghan refugees. At some time in the mid-1980s, Batterjee approached WAMY Secretary General, Dr. Maneh al-Johani, with the idea of creating an organization under the auspices of WAMY to work with Afghan refugees.[206]

The exact date of the foundation of LBI is not clear. Dr. Noorwali was vague about this date in his two declarations and at his deposition. This is not unusual for people who are raised and work every day under the Hijri calendar to have difficulties converting it to the Gregorian calendar. I also have trouble doing this conversion and rely on various tools available on the Internet. Let me try to approximate this date. A typed LBI document dated March 1989 stated, "In the few years that LAJNAT AL-BIRR was established…"[207] indicating that LBI was already a few years old. LBI's 7th meeting of its council of supervisors took place on July 13, 1993.[208]

---

[203] BUR-PEC-005651–74; Anas and Hussein, 2019, at 203–204, who seem make this incident more serious than it was; Hegghammer, 2020, at 422–5; Wright, 2006, at 126–7; and Michelle Shephard, 2008, *Guantanamo's Child: The Untold Story of Omar Khadr*, Mississauga, Ontario: John Wiley & Sons Canada, Ltd, at 33–4.
[204] BUR-PEC-005672.
[205] PEC-WAMY019289. This FBIS analysis is so full of errors that I will not use it beyond this piece of information.
[206] Dr. Abdul Wahab Noorwali's Deposition Transcript (henceforth Dr. Noorwali deposition), July 24, 2019, at 228.
[207] WAMYSA031288, WAMYSA031306.
[208] WAMYSA1235455, Noorwali deposition, Exhibit 266.

Dr. Noorwali stated in his second declaration that LBI's board met on an annual basis.[209] Backtracking six years gives 1987 as its first meeting, probably its foundation meeting. So, I estimate 1987 as LBI's foundation year. This is confirmed in a mid-1990s petition requesting a change of name from LBI to WAMY (Pakistan), which states that LBI started to function in 1987[210] and that it had established the Imam Abu-Hanifa Teachers Training Institute in Peshawar, which had graduated 38 teachers in 1987.[211]

When Batterjee approached Dr. al-Johani with his proposal, WAMY was in the business of receiving ideas for potential projects from its overseas offices in various countries. If a project fit with WAMY policies, WAMY would seek funding for that project. If not, it was not funded. So, WAMY's funding was project specific, not organization specific. WAMY's policy was not to send any funds unless they were being allocated for specific projects and activities. When a project was funded, WAMY sent money from its bank account in Saudi Arabia to the project or its chapter carrying out this project. When the project was completed, the chapter overseeing the project sent a project report and financial statement. WAMY's finance department reviewed all incoming funds and deposits and properly allocated them to these specific projects based on the annual budget. This department reviewed all the invoices, requested transactions, and project finance documentation, including the provision of aid to individuals or funding of projects. WAMY's field offices in various countries would send all project invoices to the appropriate office in Saudi Arabia (Pakistan came under the Jeddah office) to confirm the expenditures. WAMY's accountants reviewed these documents and submitted their approval. Once the finance department gave its approval, the chief accountant reviewed the requests and had to give his approval before a project was funded or a check was sent.[212]

There was a policy of tight supervision of all the projects at WAMY's headquarters in Riyadh. There were monthly meetings to discuss the progress of each project. WAMY Saudi Arabia followed up on every project, including a field review if necessary. If project reports and financial reports were not received, WAMY sent someone from Jeddah to review the project on

---

[209] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 4, 2019 [I assume that the date 4/3/2019, which appears at 14 of the document, refers to the European way of writing dates], henceforth Noorwali declaration II, at 8.
[210] LBI Summary sheet, at WAMYSA028420.
[211] See WAMY028427.
[212] Noorwali declaration II, at 4–6.

the ground and get financial records. Annual external audits were carried out for all projects to authenticate WAMY's accounting procedures and track where it spent its money. In 2008, there was a massive flood in Jeddah that destroyed or carried away many records that were lost.[213]

Apparently after Dr. al-Johani accepted his proposal, Batterjee agreed to this bookkeeping requirement and they created LBI, which operated as a separate and independent charity in Jeddah and Peshawar under WAMY's auspices and chapter. Batterjee was never a WAMY executive[214] or even a WAMY employee to my knowledge and from my review of the discovery material. To implement LBI, Dr. al-Johani established a board of supervisors in Saudi Arabia, of which he appointed himself the chairman and to which he invited Dr. Noorwali to become a member from its inception. This board held annual meetings to review LBI's proposed projects for the year, grant its approval if warranted, and supervise Batterjee's handling of the specific projects in the field.[215]

Batterjee was in charge of the operations in the field. LBI operated in Pakistan and Afghanistan and provided social welfare assistance and support programs for the needy; established and supported orphanages, schools and educational programs in Peshawar and Afghanistan, hospitals and primary health care; provided university scholarships; funded technical and vocational training programs; and established teachers and special education training programs, like the Abu Hanifa Institute in Peshawar. It also operated camps for refugees in Afghanistan as well as a 100-bed hospital in Paktia, Afghanistan and was involved with orphanage centers inside Afghanistan.[216]

In its first two years of operation, LBI sponsored over 10,000 orphans; established and operated 12 orphan support centers, four specialized clinics, and five surgical hospitals inside Afghanistan; and supported eight emergency teams inside Afghanistan. It printed and distributed more than 900,000 textbooks annually. It also established and supported nine girls' schools, three secondary schools for boys, 205 primary schools inside Afghanistan, and two vocational training centers.[217] In 1989, LBI proposed at least two new projects to WAMY: the establishment of an

---

[213] Noorwali declaration II, at 6–7.
[214] FED-PEC0049569.
[215] Noorwali deposition, July 24, 2019, at 226–9, 231–2; Noorwali declaration II, at 8. Dr. Noorwali is listed as a founder of LBI in WAMYSA031300.
[216] Noorwali declaration II, at 8–9; WAMYSA031300.
[217] WAMYSA031308.

LBI office inside Afghanistan starting January 1, 1989, and costing U.S. $118,718, of which LBI would finance half through private donations,[218] and an agricultural and water resources development project that started in Kunar Province Afghanistan in February 1989, with an estimated cost of U.S. $444,622, of which LBI had already started to fund from private donations and requested from WAMY only 40% to 45% of funding.[219]

In 1989, LBI had an estimated budget of more than U.S. $8 million. The major part of this budget was funded through private donations from the citizens of Saudi Arabia.[220] WAMY provided funds for less than half of the cost of each project as can be seen from the above two examples. So, in addition to receiving funds from WAMY for specific projects, LBI also undertook fundraising activities on its own to support its projects. WAMY was not involved in any LBI fundraising. Initially and for at least three years, Batterjee kept extensive and thorough records of LBI's activities. He routinely provided written operation reports for LBI projects for discussion at annual LBI board [of supervisors] meetings.[221] For example, for each of the two projects mentioned in the previous paragraph, LBI provided a very detailed budget.[222]

In October 1988, LBI tried to register as a voluntary agency with support from the Saudi Red Crescent for Afghan Refugees in Pakistan,[223] but its application was turned down in May 1989 by the central government of Pakistan in Islamabad for unknown reasons.[224] The Commissioner for Afghan refugees in Peshawar appealed this rejection in November 1989 by noting that Western and United Nations humanitarian organizations were experiencing donor fatigue in contrast to Islamic charities that needed encouragement.[225] The appeal worked and the Commissioner for Afghan Refugees notified LBI in June 1990 that the Government of Pakistan had no longer any objections to their application.[226] Finally, on March 12, 1991, Lajnat al-Birr al Islamiah was formally registered with the North-West Frontier Province of Pakistan.[227]

---

[218] WAMYSA031309–14.
[219] WAMYSA031293–8 and WAMYSA031301.
[220] WAMYSA031308.
[221] Noorwali declaration II, at 8, 10.
[222] WAMYSA031289–92, and WAMYSA031302–4, respectively.
[223] WAMYSA063930.
[224] WAMYSA063931.
[225] WAMYSA027705.
[226] WAMYSA027716.
[227] WAMYSA057751, WAMYSA031896.

So, at least up to 1989, Batterjee complied with the strict WAMY bookkeeping requirements allowing WAMY to keep track of the funds it disbursed for each specific project. This was an important date because, as shown in a previous section, al Qaeda dramatically contracted after the defeat of Jalalabad in the first half of that year. Most of its members were discouraged with bin Laden's leadership, left and went home or joined even more extreme groups. Facing intense criticism in Peshawar, bin Laden returned to Saudi Arabia for the next two years and did not return to Pakistan. The al Qaeda camps functioned at a much lower level than before and eventually closed down in early 1994. In fact, al Qaeda moved to Sudan in 1992 and left a skeleton crew in Afghanistan until even this last contingent also moved to Sudan in early 1994.

As a prominent member of the Arab ansar supporting Afghans, Batterjee no doubt interacted with other prominent members of this expatriate community, including Azzam, bin Laden, Julaidan, Abdel Said Khadr…[228] Even if, as a hypothetical, one assumes for the sake of argument that he helped members of this community, given WAMY's control of its funds that were totally earmarked for specific pre-approved projects, he would have done so out of his own money or money that he had raised himself, independent of WAMY funds.

While Batterjee certainly associated with Arab Afghans who later became terrorists, they were freedom fighters (as defined by the United States) at the time. They were not yet considered terrorists and had not yet conducted any terrorism operations. That would come much later. However, with the departure of many of the foreigners from Peshawar, it seems that Batterjee became much closer to Afghan warlord Gulbuddin Hekmatyar. People who were in Peshawar at the time told me that Batterjee was at Hekmatyar's side around Kabul when this warlord, who had just been appointed prime minister of Afghanistan, tried to conquer Kabul in April 1992. When Hekmatyar failed to do so and Afghanistan disintegrated into a civil war of former mujahedin fighting against each other, a sort of free for all, completely destroying the dream of the Arab ansar of establishing an Islamic state in Afghanistan, Batterjee became disillusioned and left Afghanistan and Pakistan.

This appears to be when he gradually neglected his reporting requirement to WAMY. His relationship with WAMY deteriorated in terms of his financial, administrative, and reporting

---

[228] BUR-PEC-005651–74.

obligations. He disregarded WAMY's procedures and it no longer became clear to the board of supervisor what he was doing. He gave the LBI board incomplete evidence of projects performed or reported on them after the fact. Although WAMY made available a support team for him, he avoided it and started to conduct his operations alone. Dr. Noorwali was part of a financial management team to help him, but Batterjee refused to cooperate with it. He became a one-man show.[229]

WAMY's progressive disappointment with Batterjee's accounting practices came to a head in the summer of 1992. WAMY's secretary general and his two assistants met with Batterjee in Jeddah on July 7, 1992 to sort this out. They all agreed to freeze LBI's donation collections for three months until they could reach an agreement with the Saudi authorities. They also asked Batterjee for a report about the activities of LBI. Two days later, WAMY's secretary general sent a letter to the Saudi authorities explaining the relationship between WAMY and LBI. On July 11, 1992, the WAMY Board of Trustees met and resolved to freeze the activities of LBI.[230] WAMY's progressive disappointment with Batterjee was compounded by the fact that he also carried out some activities in Sudan and Bosnia, which had not been pre-approved by the LBI supervisory council.[231] WAMY Secretary General Dr. Maneh al-Johani forced Batterjee's resignation from LBI altogether and appointed Dr. Hasan Bahafzallah as the interim LBI executive director for a period of six months. The exact date of Batterjee's dismissal is not positively known but his replacement with Dr. Bahafzallah is well documented. Minutes of the WAMY Board of Trustees dated January 13, 1993 indicate that Batterjee was still the LBI executive director and a member of the LBI council of supervisors.[232] However, at the 7th Annual meeting of LBI supervisory council on July 8, 1993, the dismissal of Batterjee was mentioned and the council approved Dr. Bahafzallah's appointment for another six months, starting July 21, 1993.[233] Counting six months backward from that date suggests that Dr. Bahafzallah's was first

---

[229] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 30, 2018, Exhibit Noorwali 254, henceforth Noorwali declaration I, at 5–6; Noorwali declaration II, at 11–2; Noorwali deposition, July 24, 2019, at 236–9.
[230] WAMYSA1235429–34.
[231] Letter from Dr. al-Johani to Prince Salman bin Abdul Aziz, May 11, 1993, at WAMYSA061345. The date in the translated document is wrong. The Arabic document is dated 19/11/1413, which corresponds to May 11, 1993.
[232] WAMYSA1235442–3.
[233] WAMYSA1235458.

appointed on January 22, 1993, implying that Batterjee was dismissed before that date but after January 13, 1993.

Although WAMY now no longer had any relationship with Batterjee, it discovered that Batterjee tried to solicit donations in the kingdom in a fraudulent manner and ran into trouble with the Saudi authorities.[234] Unbeknownst to WAMY, Batterjee had created a different organization, Benevolence International Foundation, in Chicago. In his corrected declaration Enaam Arnaout stated that BIF was founded in 1992, opened its first office in Fort Lauderdale, Florida in 1993 and later that year moved its office to Illinois.[235] However, the documentary evidence shows that the Benevolence International Foundation (BIF, or *Monathamat al-Birr al-Dawaliyya* in Arabic) was incorporated on March 30, 1992, in the State of Illinois with an address in Burbank, Cook county. Batterjee and two other Saudis were listed as its officers.[236] According to its statutes,[237] BIF was "established as an international charity foundation having Liechtenstein as its country of domicile … its head office in the city of Chicago and … an executive office in the city of Jeddah."[238] There was no mention of either WAMY or LBI in the document. On April 4, 1992, Batterjee and two others opened a new account (separate from LBI) with Emirates Bank International Limited in Peshawar for BIF.[239] About nine months later, on January 2, 1993, BIF was registered as a society in Peshawar, listing its address as Park Road, University Town, Peshawar (same address as LBI).[240] BIF received tax-exempt status from Illinois on February 11, 1993.[241] The next day, an agent tried to register BIF as a non-profit in Florida, listing Batterjee as its president.[242] A BIF annual report dated February 23, 1993 lists Adel Batterjee its president, secretary, and one of its directors.[243]

---

[234] Noorwali declaration I, at 6; Noorwali declaration II, at 12.
[235] PEC-WAMY009091.
[236] FED-PEC0049416–8.
[237] WAMYSA057723–44.
[238] WAMYSA057723.
[239] WAMYSA031887. See WAMYSA064048 for the constitution of this organization, called Benevolence International Organization.
[240] WAMYSA034246, WAMYSA064048.
[241] FED-PEC0056680.
[242] FED-PEC0056678–9. For some reason, Florida revoked its authority to transact business in Florida on August 26, 1994. FEC-PEC056675.
[243] FED-PEC0061795.

Up to February 1993, BIF was not active. However, at the end of February 1993, which was the start of Ramadan when Muslims give to charity, BIF distributed leaflets soliciting donations for education of Muslim children for two bank accounts in Saudi Arabia. It listed its address as P.O. Box 7600 Jeddah 21472 and five phone numbers in Jeddah, Ottawa, Canada, Chicago, Khartoum, and Zagreb.[244] The leaflets were very similar to authentic LBI leaflets soliciting funds for orphans. The authentic LBI leaflets gave different bank accounts and an address in Jedda (P.O. Box 9072 Jeddah 21413), Riyadh, Medina, and Dammam. Both leaflets had the same logo of two hands touching over a globe. WAMY's secretariat was notified about this deception on 25–6 February 1993.[245] Charitable organizations must be accredited in Saudi Arabia and solicitation of cash donations requires authorization from the Saudi government. WAMY (and LBI functioning under its auspices) was accredited and had such authorization to raise money in the kingdom, but not BIF, which had nothing to do with WAMY and was completely separate from LBI. Because of the similarity of the names (the use of the noun al-Birr, benevolence, in both) and logos between LBI and BIF, WAMY believed that it was inappropriate for Batterjee to use this similarity which might confuse potential donors about these two organizations.[246]

As a result, WAMY through its Secretary General Dr. al-Johani immediately sent Batterjee (incidentally addressing him not as the LBI executive director since he was no longer with LBI, but as the BIF chairman) a letter on 26 February 1993 to the effect that WAMY had "learnt about your formation of an organization bearing the name Benevolence International Foundation. Since the similarity between the Foundation [BIF] and the Benevolence Islamic Committee [LBI] within the Assembly [WAMY] is clear, in terms of the unified emblem of both of them and their role and function, I request of your Excellency that this be in consideration in the future, since it may have a confusing effect on the dealers and the donors, despite the fact that the two are not organizationally or administratively related. I urge you to alert those who deal with your organization to be observant of that issue, if the Foundation's [BIF] emblem and name remain the same, since the Assembly [WAMY], along with its affiliate Benevolence Committee [LBI], is not responsible for the Foundation's [BIF] activities or advertisements. I also wish to

---

[244] WAMYSA057782, WAMYSA034247.
[245] See and contrast WAMYSA057782, WAMSA029936.
[246] Noorwali deposition, July 24, 2019, at 256–9; Noorwali declaration II, at 12–3.

alert those who cooperate with the Foundation [BIF], in donation-collection within the Kingdom, to not confuse the Committee [LBI] and the Foundation [BIF], considering the importance of this matter."[247]

About two and a half months later, on May 11, 1993, Dr. al-Johani also informed Prince (now King) Salman bin Abdul Aziz, who was coordinating Islamic relief in Afghanistan, about Batterjee's dismissal from LBI and apparent deception to try to pass his personal charity (BIF) as LBI, an approved charity functioning under the sponsorship of WAMY. "The *former* [LBI] executive director Sheikh Adel Batterjee has proactively done some activities in Sudan, Bosnia and Herzegovina, which were not pre-approved by the supervisory council. He has also done some activities related to fund-raising domestically, which were questionable to the officials in Makah [Mecca] as well as in the Ministry of Interior. The Assembly's [WAMY] Board of Trustees has convened and made a decision to review the Committee's [LBI] activities and define the reasons that have led to some administrative violations. Following that, the supervisory council convened and made a decision to appoint a new executive director and dismiss Sheikh Adel Batterjee from the Committee's administration." Dr. al-Johani summed up the current situation: "Sheikh Adel Batterjee is no longer associated with the administration of the Benevolence Committee [LBI]. He has also resigned from the supervisory council. I have recently known that he has formed a foundation under the name 'Benevolence International Foundation' [BIF] that has offices in a number of countries overseas. Its logo resembles the logo of the Benevolence Committee [LBI]. Likewise, its name indicates such resemblance. I have written him a letter in which I asserted that the Assembly [WAMY] is not responsible for this organization [BIF]. I also emphasized that the similarities between both names should not [be] exploited to do any activities that might be ascribed to the Assembly [WAMY]. Such an organization [BIF] does not have an official presence within the Kingdom."[248] As BIF's fraudulent attempts to raise money in the kingdom brought WAMY and LBI under the scrutiny of the Kingdom's security services, Dr. al-Johani requested from the prince that both WAMY and LBI be allowed to continue to raise money for the needy Muslims all over the world.[249]

---

[247] FED-PEC0114419.
[248] WAMYSA061345. Italics added for emphasis.
[249] WAMYSA061346.

Dr. Noorwali, an LBI board of supervisor member, later confirmed that WAMY Secretary General Dr. al-Johani had forced Batterjee to resign at the early 1993 meeting of the WAMY Board of Trustees because of Batterjee's because of his multiple reporting failures and apparent fraudulent attempt to raise money in the kingdom and to confuse potential donors.[250] Minutes of the LBI board of supervisor annual meeting on July 8, 1993 confirmed that Dr. Hasan Bahafzallah had replaced Batterjee as LBI executive director.[251] Batterjee's resignation from LBI in early 1993 completely ended his relationship with WAMY. LBI, now without Batterjee, continued to work independently, but still under the umbrella of WAMY.[252] Batterjee's dismissal from LBI generated some strong antagonism between him and WAMY, which required the intervention of several prominent third parties to smooth things between them.[253]

Apparently, despite Batterjee's complete dismissal from LBI in early 1993, the confusion generated by him persisted and the WAMY Board later decided to dissolve LBI and replace it with a WAMY field office in July 1995. "This was done in order to clearly cut ties with Adel Batterjee and to ensure that his activities with BIF were not attributed to or affiliated with WAMY."[254] On July 26, 1995, the Saudi Ministry of Interior issued an order to shut down LBI and close its headquarters in the Kingdom of Saudi Arabia. Around that time, Dr. Esam al-Filali replaced Dr. Hasan Bahafzalllah as LBI executive director. On April 2, 1996, WAMY's secretary general sent a proposal to the Saudi Ministry of Islamic Affairs to liquidate LBI and transfer its funds back to WAMY. On May 23, 1996, the WAMY Board of Trustees issued its decision to liquidate LBI and to form a committee to oversee LBI's liquidation process.[255] Six days later, Dr. al-Filali resigned and Dr. Ibrahim Saleh Abul-Ela was appointed in its place to undertake the liquidation and dissolution of LBI. On June 2, 1996, The Saudi Ministry of Interior instructed WAMY to deposit LBI's funds into the account of the Saudi Ministry of Islamic Affairs. On June 14, 1996, the LBI dissolution committee discussed the procedures of dissolving LBI, its employees' affairs, its projects, and deal with its income and expenditures.[256] On June

---

[250] Noorwali declaration II, at 11–13; Noorwali deposition, July 24, 2019, at 236–9, 259.
[251] WAMYSA1235458; Noorwali deposition, July 24, 2019, at 239–40.
[252] Noorwali deposition, July 24, 2019, at 239.
[253] Noorwali deposition, July 24, 2019, at 244–5; WAMYSA1235456.
[254] Noorwali declaration II, at 13. See also WAMYSA065181–5.
[255] WAMYSA032007–13.
[256] WAMYSA032014–20.

24, 1996, the Saudi Ministry of Islamic Affairs issued a letter directing LBI to stop its activities, close its headquarters and submit an inventory of its properties. On October 2, 1996, LBI transferred Saudi SR 8,130,982 (about $ 2 million), the sum total of LBI's funds, to the account of the Saudi Ministry of Islamic Affairs. On March 4, 1997, WAMY's secretary general cancelled a number of jobs at the WAMY office in Pakistan. The Saudi Ministry of Islamic Affairs then reimbursed WAMY the amount of LBI's money in order to continue WAMY's financial commitments for specific projects that had been initiated by LBI.[257] The Peshawar post office box number 1055 that both LBI and WAMY used for its correspondence belonged to the Abu Hanifa Teachers Training Institute in Peshawar.[258] Batterjee had also used it when he was in Peshawar up to 1993. This complete dissolution of LBI and the establishment of WAMY (Pakistan) was a clean break between LBI and WAMY (Pakistan), which replaced it Pakistan. As Dr. Noorwali stated, "the relationship with Adel Batterjee was cut, ended, and he used to carry out his activities in Benevolence International Foundation, of which we do not know any details. And our offices in the field, whether in Pakistan or other regions, did not deal with Benevolence International Foundation."[259]

As Drs. Bahafzallah and al-Filali took over as LBI chairmen, respectively, they submitted LBI to annual external auditing by the Pakistani firm of Sidat Hyder Qamar Maqbook & Co., a representative of Arthur Anderson.[260] LBI was operating in Pakistan and Afghanistan only, and its total expenditures for the year 1993–4 was Rs 59.7 million (U.S. $ 1.9 million)[261]; 1994–5, Rs 47.3 million (U.S. $ 1.5 million)[262]; 1995–6, Rs 43.4 million (U.S. $1.38 million).[263] The 1996–7 audit report specified that the organization petitioned to change its name to WAMY in December 1996 and the permission was granted in July 1997.[264] Afterwards, the organization was called WAMY-Pakistan Office. There was no mention of Benevolence International Foundation or BIF anywhere in the audit reports. From all the audits carried out when the organization was still

[257] WAMYSA065183–5.
[258] WAMYSA065185.
[259] Noorwali deposition, July 24, 2019, at 267.
[260] WAMYSA018660–83.
[261] WAMYSA018683, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.
[262] WAMYSA018683, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.
[263] WAMYSA018671, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.
[264] WAMYSA018655.

named LBI,[265] it was clear that LBI had its main assets in Pakistan and Afghanistan, and not in Bosnia or Sudan.[266]

As for Batterjee's involvement with BIF, according to USA Fitzpatrick's proffer and as per the minutes of BIF's Board of Directors on March 15, 1993, Batterjee and his two other board members were replaced by Arnaout as executive director and two others. At that point, nothing much had been accomplished in the United States.[267] This was confirmed by an Arnaout memorandum stating that he had learned that Batterjee had incorporated BIF in the United States but had not yet conducted any business through that entity. "Mr. Arnaout convinced Mr. Batterjee to let him run BIF-USA as a Muslim charity, and, with $50,000 of seed money provided by Mr. Batterjee, began the operations of BIF-USA in May 1993…. Mr. Arnaout assumed full control of BIF-USA and at all times ran that organization as an independent business with no affiliations to LBI or any of the organizations run by Mr. Batterjee. Mr. Arnaout did have occasional contacts with Mr. Batterjee, and on a couple of occasions met individuals associated with LBI or other charitable organizations."[268] This change of directors was reflected in the paperwork submitted to the state of Illinois.[269] The minutes of the BIF meeting of September 15, 1994 showed that Arnaout was its executive director and Loay Bayazid its president. BIF had offices in Chicago, Jeddah, and Sudan.[270] There was no mention of a BIF office in Pakistan. Nor is there any mention of WAMY in any of the early BIF documents. LBI and BIF clearly were different and separate Islamic charities.

### G.  Re-emergence of al Qaeda in Sudan

BIF but not LBI followed al Qaeda to Sudan. The four years that bin Laden and al Qaeda spent there are relatively neglected in the al Qaeda literature.[271] Apparently, bin Laden had

---

[265] WAMYSA018648–83.

[266] See also the report on LBI at WAMYSA065181–5.

[267] BUR-PEC-014544.

[268] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Defendant's Sentencing Memorandum, filed June 9, 2003, at 3–4.

[269] FED-PEC0049420.

[270] PEC-WAMY009236.

[271] The standard reference books on the history of al Qaeda leading to the 9/11 attacks like Anonymous (Scheuer) (2002), Coll (2004), Bergen (2006), and Wright (2006) devote only a few pages to this long episode, which lasted almost as long as the initial Afghan/Peshawar period

carefully prepared his move to Khartoum at the invitation of the new Sudanese government.[272] He sent a team to explore the possibility of the move and it came back with a positive recommendation. He then sent a small contingent to prepare the ground for the move. Jamal al Fadl, a Sudanese member of al Qaeda, was tasked to rent or buy real estate to facilitate al Qaeda's relocation. Bin Laden invested heavily in the Sudanese economy to generate a stream of revenue for al Qaeda. In quick succession, he created Wadi al-Aqiq, a holding company for his various enterprises that included the Laden International Company (for export), Taba Investment, and al-Hijra Construction for road and other infrastructure construction.[273] The Sudanese government sometimes paid bin Laden in real estate. He also had an agricultural company, al Thimar al-Mubaraka, which had a huge one-million-acre farm at al-Damazin, which employed approximately 4,000 people and from which he exported sesame, peanuts, white corn, and gum Arabic.[274] Rumors of bin Laden's wealth were picked up by the C.I.A., which believed that he had invested $50 million in a local bank.[275] As we saw in the previous estimate of his wealth, this seems much beyond bin Laden's financial capability.

Bin Laden of course did not forget military training for al Qaeda. He set up a refresher training camp for weapons and explosives at the Damazin farm.[276] Several journalists have accused al Qaeda of sending some of its members to Bosnia.[277] However, they did not provide

---

from al Qaeda's creation to its departure to the Sudan and the later Afghan period when it returned to Afghanistan from the Sudan to the 9/11 attacks. Each of these periods lasts about four years. The exception is the Combating Terrorism Center monograph, Clint Watts, Jacob Shapiro, Vahid Brown, 2007, *Al-Qaida's (Mis)Adventures in the Horn of African*, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2010/06/Al-Qaidas-MisAdventures-in-the-Horn-of-Africa.pdf. Unfortunately, much of what we know about this crucial period of al Qaeda's evolution comes from Jamal al Fadl, who turned out to be an unreliable source.

[272] Testimony of al Fadl, *U.S. v. Usama bin Laden et al*, S.D.N.Y., S(7) 98 Cr. 1023-LBS, henceforth Fadl testimony, February 6, 2001, at 233–4.

[273] Fadl testimony, February 6, 2001, at 240–3.

[274] Wright, 2006, at 168, Mohamed Zeki Mahjoub, in Bergen, 2006, 126–8.

[275] Anonymous (Scheuer, the CIA chief of the station dedicated to bin Laden), 2002, at 123. In fact, the CIA greatly overestimated bin Laden's wealth until the 9/11 Commission investigation.

[276] Fadl testimony, February 6, 2001, at 244–6. This must have been later on during bin Laden's stay in the Sudan, since Mahjoub, who ran the farm until May 1993 swore there were no terrorist activities that took place there (Bergen, 2006, 128) and the instructors (Sayf al-Islam and Sayf al-Adl) that al Fadl named did not come to the Sudan until after their stay in Somalia, as we shall soon see.

[277] Kohlmann, 2004; Bergen, 2006, at 108; and Coll, 2008, at 399, 409.

Winer's quotes refer to an Arabic book *Islamic Views* allegedly written by WAMY and printed by the Saudi government's armed forces printing press. All references to this book are circular: Steve Emerson, David Kane, Jonathan Levin, but no production to the actual documents. I am told that WAMY never published a book entitled *Islamic Views*. Nor was the book ever produced by plaintiffs' experts. I cannot comment on third hand allegations (Winer, citing Emerson, citing other documents, which he could not read in the original since Emerson does not read Arabic) without seeing the original in context.

Finally, Winer produces a last example for his allegation that WAMY's ideological support of al Qaeda taken from the Canadian Revenue Agency's (CRA) audit of WAMY Canada, dated August 23, 2011.[447] Winer's quote is, "Muslims in the east … have always enjoyed the tolerance and good treatment of Islam… [u]unfortunately [sic], Western Christians preferred and still prefer to be the enemies of Islam and Muslims."[448] This must be a misquotation because it does not make sense: "Muslims … have always enjoyed the tolerance and good treatment of Islam!?" Indeed, this is not the original quote. The CRA document actually states, "Christians living with Muslims in the east … have always enjoyed the tolerance and good treatment of Islam."[449] By cutting off the beginning of the quote, Winer made his statement nonsense, while the CRA statement does make sense.

However, the CRA also relies on secondary sources and therefore must be verified as well. It admits that the quote came from a Muslim World League pamphlet, which was allegedly distributed by WAMY (Canada). The pamphlet is *A Dialogue on the Internet: MWL Series on Islam, No. 29*, by Dr. Arafat el-Ashi.[450] As can be seen from its title, this is a Muslim World League document, distributed by the MWL, not by WAMY. As will be discussed later, at one point, the director of WAMY Canada was also an employee of the MWL and may have mixed documents from these two organizations. The context of the quote is a series of questions asked

---

website, https://www.investigativeproject.org/4730/emerson-with-judge-pirro-no-go-islamic-zones.

[447] Winer report, paragraph 12.11.3, at 103, the original CRA document is at PEC-WAMY031447–68.

[448] Winer report, paragraph 12.11.3.1, at 103.

[449] Canada Revenue Agency, Audit of the World Assembly of Muslim Youth, August 23, 2011, at 18 (PEC-WAMY031464).

[450] Dr. Arafat El Ashi, *A Dialogue on the Internet: MWL Series on Islam, No. 29*, Etobicoke, Ontario: Muslim World League, Canadian Office, PEC-WAMY030087.

on the Internet by a student. The relevant question seems to be question 7: "How would you assess modern day Islam–Christian relations?"[451] The full answer is, "Modern Muslim Christian relationship is of two types: Christians living with Muslims in the east. These have always enjoyed the tolerance and good treatment of Islam and Muslims. Unfortunately, Western Christian preferred and still prefer to be the enemies of Islam and Muslims. One example is the colonial rule of Muslim countries committed by Christian powers in the 19[th] century. Muslims are always ready to improve this relationship if Christians do their part."[452] The last two sentences, omitted by the CRA and Winer, clearly downplay the hostility implied in the quote taken out of context.

Winer concludes this section by arguing that the above and similar material written, published, and/or disseminated by WAMY prior to the 9/11 attacks, provided religious and ideological justification for jihad and Islamic martyrdom, two concepts that were among the foundations for justifying al Qaeda's program of suicide bombings and terrorist attacks. However, nothing that Winer presented justified suicide bombings or terrorist attacks. Some were anti-Semitic and other deeply prejudicial, but nothing mentioned or advocated suicide attacks or terrorism.

### 2.  Kohlmann's Allegations about Suleman Ahmer

In his attempt to implicate WAMY in trying to indoctrinate young Muslims to fight jihad, Kohlmann provides the example of a lecture, "Jihad, the Misunderstood Word," by Suleman Ahmer presented at a WAMY camp in Okeechobee, Florida on July 26, 1996.[453] He quotes from the lecture that Ahmer had spent months in Bosnia and Chechnya and saw things that were very motivational and was going to motivate the children. Ahmer was going to tell them positive things about jihad. Ahmer said that if the Chechens and Bosnians fight, they were called terrorists. Immediately after this statement, Kohlmann quotes him, "without jihad the evil forces will overwhelm you and that's why Allah has given you so much promises to you, to people who do jihad, to people who struggle." Kohlmann goes on to comment, "Ahmer described the challenge during the Bosnian war of indoctrinating non-Arabic-speaking European Muslims in fundamentalist Islamic principles," and illustrates it by quoting Ahmer saying that Bosnians did

---

[451] PEC-WAMY030086.
[452] PEC-WAMY030087.
[453] Kohlmann report, paragraph 161, at 48.

not know the word mujahedin. After seeing the foreign mujahedin fight, they began to practice Islam. Kohlmann concludes with a last quote from Ahmer, "See, jihad, how it establishes Islam?"[454]

The narrative flow of Kohlmann's paragraph is that Ahmer tried to convince the young Muslims at the camp to take to violent jihad. He does so by distorting Ahmer's lecture through juxtaposition of unrelated quotes and omission of their context. In fact, he uses this device of juxtaposition and omission repeatedly throughout his report. Ahmer's lecture was proselytism, not for violent jihad but for Islam. He did start by saying that he had spent some months in Bosnia and Chechnya and saw things that had motivated him and hoped would also motivate his audience. Kohlmann omits Ahmer's illustration of what he meant in a vignette from his student days, when a friend complained that non-Muslims were so numerous and Muslims so few. He became depressed and felt overwhelmed until another person reframed the issue for him that Haq, truth, was like a light and darkness was just an absence of light. This brought him to the topic of jihad. "What is jihad? The word comes from the word jihad, which means to struggle. What we have understood of the word is that it is a struggle and an effort to establish Islam in the world. This is jihad. There are all these different levels when you want to establish Islam in the world. Where do you start first? Yourself. That is why Jihad when you fight against evil, when we fight against temptation, we are trying to make jihad and bring jihad into ourselves, our communities, societies, and our world."[455]

Kohlmann goes on to ignore Ahmer's teaching that there is no compulsion in Islam. "Every person has a right to choose. If this person is a non-Muslim, right, he has a right to choose. If you go to him and say, 'Do you want to become a Muslim?' and he says, 'No, I don't want to be a Muslim,' then fine. There's no compulsion. He has a right to live in peace with you no problem."[456] Ahmer then went on to say, "when the Muslims are attacked you have to defend yourself." Ahmer explained, and this is the full quote that Kohlmann condenses, "When I was flying to Orlando yesterday, I was going through details of how Russians are killing the Muslims in Chechnya. What is their crime? Just because they are Muslim, right? They [the Russians] are

---

[454] Kohlmann report, paragraph 161, at 48.
[455] Suleman Ahmer, 1996, "Jihad, the Misunderstood Word," transcript of a lecture given at WAMY – Okeechobee Summer Da'wah Camp, July 26, 1996, at 1–2.
[456] Ahmer, 1996, at 3.

coming in, they are sealing whole villages and they are bombing them. They are not allowing kid, women, men to leave. What is this? If the Chechens come up and they fight, if the Bosnians come up and they fight, you call them terrorists! This is unfair. Under no circumstances are we allowed to just sit down and let them kill us. And if they fight, they have a right to fight. So, jihad has many forms, from individual struggle, to struggle to establish Islam, to a struggle to protect ourselves, this is all jihad."[457]

Ahmer went on to talk about the importance of the struggle to establish Islam, which he also calls jihad, meaning struggle. "Why is it so important? Because without jihad the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle. It's not for us as Muslims, it's not a matter of choice that, yes, I want to establish Islam or, no, I don't want to establish Islam. It doesn't work. It is a responsibility on every one of us, on each one of us, a responsibility to make sure that Islam is established."[458]

The above paragraph was a different topic, namely the duty of proselytism of Islam, from that of the previous paragraph, violent jihad to defend yourself. Yet, by juxtaposing the two sentences from these two different paragraphs, Kohlmann links them together and the reader would naturally understand that the two uses of the word jihad are the same, namely violent jihad. So, by Kohlmann's quick juxtaposition of two unrelated and different meanings of the word jihad and omission of the sentences between these two different uses of the word jihad, the reader would assume that the sentence "without jihad, the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle" refers to violent jihad, while from the context, it clearly refers to proselytism as its illustrating vignette and commentary discusses the duty to spread the gift of Allah to the world.

Kohlmann claims that Ahmer then went on to discuss the challenge of indoctrinating Bosnians, who were non-Arabic-speaking European Muslims, in fundamentalist Islamic principles. I read the lecture very carefully and Ahmer said no such thing. The story about the Bosnian is not about indoctrination at all, but gratitude for help from other Muslims. Ahmer had moved on to a third and unconnected topic, namely that Muslims help each other, and Allah helps them. Ahmer started the story saying that Muslims came spontaneously at their own

---

[457] Ahmer, 1996, at 3.
[458] Ahmer, 1996, at 3.

expense from all over the Muslim world to defend their Bosnian Muslim brothers. The full quote is, "They [the foreigners] went to the front and started fighting against the Serbs who had attacked the Muslims. You know what? They didn't even ask questions. They just went, took a gun and started fighting. And you know who was really amazed? The Bosnians were really surprised. They saw these people coming in and going to the front and fighting and dying and they said, 'Thank you very much. Thanks a lot, guys. But tell us, who gave you money to come? Who sent you?' They [foreigners] said, 'Nobody.' They [Bosnians] said, 'Really? Nobody gave you money to come? But why did you come? We thank you and are very appreciative that you are dying for our honor and our lives but WHY? WHY? What made you come?' They [foreigners] said, 'We are Muslims. We are Muslims and Allah has told us you must make jihad, that if your brother and sister is being killed, you should be the first one to die for them.' They [Bosnians] said, 'Really?' Because the Bosnians were well away from Islam at that time, they said 'Really?!' They couldn't even say the world 'jihad.' They used to call 'mujahedin,' 'muhajedin.' It took them many months to learn the right word. They said if this really, if this is what Islam teaches you, we are fools if we don't practice Islam. See, jihad, how it establishes Islam??"[459]

In order to make sure that the campers understood the meaning of his lecture, Ahmer summarized it. "Until this point, we have talked about three things.

1. What is Jihad?
2. Why is it so important? Because we have to establish the deen [way] of Allah and we talked about why is it important that each one of us make jihad and struggle for the deen of Islam.
3. How Allah will help us and how Allah is helping us in such instances."[460]

In any case, Kohlmann's quotes in paragraph 161 do not seem very controversial. From time immemorial, people have a right to defend themselves when invaded and killed, as happened to Poland in 1939, Russia in 1941, and Muslims in Bosnia and Chechnya in the 1990s. It does not matter what people call it, resistance, freedom fight, jihad, or terrorism. In fact, during World War II, French resistance fighters were called terrorists by the Vichy government. Only after the withdrawal of Nazi forces from France, were they retrospectively called the glorious

---

[459] Ahmer, 1996, at 6.
[460] Ahmer, 1996, at 9.

*résistants*. Many Islamic scholars called Afghanistan (1980s), Bosnia (early 1990s), and Chechnya (both 1994-6 and 1999-2002) a legitimate defensive jihad. Indeed, the U.S. government condemned the Soviet invasion in Afghanistan, the Serbian aggression against Muslims in Bosnia, and the Russian intervention in Chechnya during both rounds of the Chechen War. The rest of the lecture seems to be about proselytizing a Salafi version of Islam. This is not extremist indoctrination as Kohlmann argues but simply Salafi proselytism.

The last four lines in Kohlmann's paragraph 161 have nothing to do with the above Suleman Ahmer lecture in Florida in 1996. They refer to a cable written in 2006 (about a decade after the above lecture) by the political officer at the U.S. consulate in Jeddah, who interviewed the then WAMY Secretary General Dr. Saleh al-Wohaibi on multiple topics.[461] This is a different secretary general than the one that was in charge of WAMY at the time of the above lecture, Dr. Dr. Maneh al-Johani, who died in 2002 and was replaced by Dr. al-Wohaibi. When the political officer complained about an anti-American lecture accusing Saudi journalists of being agents of the West, given by a Sheikh al-Break [sic] at a WAMY summer camp in 2006 in Saudi Arabia, Dr. al-Wohaibi replied, "although it was unfortunate that al-Break comments sparked such controversy in the media, it is 'not possible to control' all the information given during these lectures. WAMY is a major organizer of summer camps for children … and its focus is to encourage youth to engage in positive activities, such as sport and religious study during their summer vacation. If some lectures share extremist ideologies with the children, it is unintentional."[462] This cable strongly implies that this sheikh gave his lecture in the summer of 2006, five years after the 9/11 attacks and much too late to have played any role in them.

So, clearly the two events are unrelated, referred to different lectures, given by different lecturers, a decade apart, and in different countries. The juxtaposition of these two unrelated items and the omission of the end of Dr. al-Wohaibi's quote makes it appear that the WAMY Secretary General at the time (Dr. al-Johani) was *condoning* the first lecture while this is definitely not the case. This is another example of Kohlmann's tendency to juxtapose unrelated items and to omit their context, and won't be the last one in his report.

### 3. Kohlmann's Allegations against Sheikh Buraik

---

[461] Kohlmann report, FN 237, at 49, citing FED-PEC0210330–1.
[462] FED-PEC0210330–1.

Kohlmann later returns to Sheikh Saad [not Saleh as Kohlmann calls him] al-Buraik, if it is the same Sheikh mentioned in the U.S. State Department cable of the previous section, in paragraphs 183 and 184.[463] Let me first start with paragraph 184.[464] At first glance, this series of quotes seems concerning: "Islam spread when the blood of its companions was shed on the land of jihad… This religion will only spread by Jihad… If you die in the land of … Jihad, you are with the martyrs… This is how religions spread… no idea spreads unless its people water it with their own blood." This conjures up images of suicide bombers (martyrs) murdering people in order to spread Islam. However, Kohlmann's quotes are taken out of context distorting their original meaning in order to give this impression.

The above quotes come from a eulogy, "The Martyr of Jihad, Abdullah Azzam," that Sheikh Buraik gave around 1990 in memory of Sheikh Abdullah Azzam, who had just been assassinated.[465] As the title of the talk makes clear, this is a eulogy and the jihad is the Afghan jihad of the 1980s, which the U.S. Government funded and supported along with Saudi Arabia. The eulogy opened with a summary of its main points: "In Islam, there are men who sacrificed their worldly life with its pleasures to uphold the word of Allah, and who devoted their time and efforts for the sake of Allah. Though we might feel sad at the death of the heroes, consolation is all about the paradise. In this article, you find consolation to the Muslims for the loss of the nation's deceased and the father of Jihad in this era, Sheikh Abdullah Azzam." Sheikh Buraik went on to talk about the assassination of Azzam on November 24, 1989.[466] Then Sheikh Buraik discussed the piety of Sheikh Abdullah Azzam. This brings us to the section of the eulogy, "Jihad and its importance in spreading religion," where the deaths or martyrdom of jihadi leaders would not stop the spread of Islam. On the contrary, their martyrdom would inspire people to take to Islam and spread the religion.

---

[463] Kohlmann report, paragraph 183, at 55. His footnote 276, at 55 specifically cites the above State Department cable.

[464] Kohlmann report, at 56.

[465] The date of the eulogy can be approximated by the fact that Sheikh Buraik named Jamil al-Rahman, the Salafi commander in Kunar Valley, as one of the leaders of the Afghan jihad, who was not dead, and whose death would not end the Afghan jihad. Jamil al-Rahman was assassinated on August 30, 1991. So, the eulogy must have been given before his death. See part II of this report for the role of Sheikh Abdullah Azzam in the Afghan jihad. See Sheikh Saad Buraik, 1990, "The Martyr of Jihad, Abdullah Azzam."

[466] See section II.E of this report.

The full version of the relevant paragraph is: "O brothers, Islam spread when the blood of its companions was shed on the land of Jihad. The Islamic conquests expanded when the blood of the companions, the followers, and the Muslim soldiers was shed on the land of the East and the West. This is the Sunnah of Allah, and Jihad goes on until the judgment day. This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia[467] of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this way. O servants of Allah, many people were known for their thought, good intention, and sincerity only after they died. Their name spread and their status was known." Sheikh Buraik then named Sayyid Qutb, the Egyptian ideologue, who was executed in prison on August 29, 1966 during the Gamal Abdel Nasser regime in Egypt. On the day of Qutb's execution, he was given a chance to renounce his ideas, but he refused and died as a martyr, like Sheikh Abdullah Azzam. Sheikh Buraik commented, "This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood… Azzam is like him [Qutb]. And before them there are the imams of the Da'wah in Najd and all over the world. When they offered their blood to Allah, monotheism spread, the Da'wah spread, and their thoughts spread."[468]

It is clear from the fuller quote that Sheikh Buraik was praising Azzam and Qutb, who were preachers, not soldiers. They died for what they believed and therefore became martyrs to their cause. As a result, their reputation and their ideas spread, inspiring new people to take their cause. Sheikh Buraik could have made the same point about the early Christian martyrs who died for their cause and helped spread Christianity during the Roman Empire. In fact, his mention of monotheistic religions in general may have been such a referral. They were not soldiers, and did not spread religion through violence, but through their faith, for which they were willing to die. In this context, the meaning of jihad is that of a struggle for the sake of God, and not violence. What is clear from this analysis of the context of Kohlmann's carefully selected quotes is that

---

[467] Although the Arabic word Sharia has come to mean Islamic law, in the context that it is used here, it reverts back to its original etymology, namely "path" or "way," like sheep finding a path to water (a permanent well) in a nomadic society.
[468] Buraik, 1990.

there is no evidence that WAMY, through Sheikh Buraik's lectures, was trying to or even did indoctrinate vulnerable young Muslims to go on and carry out the 9/11 attacks.

Again, through his previously demonstrated rhetorical device of juxtaposition of unrelated items and careful omission of the context, Kohlmann leads a reader to draw erroneous conclusions. Although I found the quote from his paragraph 183 on the Internet, I could not find the full lecture to provide its context. At this point, given Kohlmann's tendency to juxtapose unrelated quotes and to omit crucial contextual meaning, I need more information to assess his claim. Furthermore, it is unclear whether these two lectures involved WAMY at all. They seem to be two separate lectures and their footnotes are not connected to a WAMY organization or website.[469] A quote, like any document, is the start and not the end of any investigation for any scholar.

In the following paragraph 185, Kohlmann places Sheikh Buraik at an IIRO youth camp in Saudi Arabia.[470] Looking at the footnote citing this third lecture, WAMY is not mentioned[471] and what Sheikh Buraik might have said at a 2006 summer youth camp[472] is irrelevant as to whether WAMY had anything to do with the 9/11 attacks, which occurred five years before the lecture. The U.S. State Department cable cited in the footnote is thirdhand information. Again, I need more information about this specific lecture and its context to analyze it in connection to WAMY and the 9/11 attacks.

Kohlmann has not shown a nexus between the 1996 Ahmer Florida lecture and the undated (but probably given in 1990) Buraik lectures and the 9/11 attacks. To my knowledge, none of the future 9/11 terrorists, their trainers, or their funders were present at the Okeechobee WAMY camp or listened to Buraik's lectures, one of which seemed to have taken place after the attacks. There were not many people involved in the 9/11 attacks, perhaps three dozen at most. None were present in Florida at this time. Several came to Florida, but this was four or five years after the lecture was given and there is no evidence that any attended a WAMY camp.

---

[469] Kohlmann report, FN 277 and FN 278, at 56.

[470] Kohlmann report, at 56.

[471] Kohlmann report, FN 279, at 56.

[472] The date of the cable is October 9, 2006. It refers to a conversation that the Riyadh U.S. Embassy political officers had with the IIRO secretary general on September 18, 2006 and refers to a lecture Sheikh al-Break gave this summer, meaning the summer 2006. See U.S. Embassy Riyadh cable, "IIRO Secretary-General Talks of Saudi Programs and Expansions," dated 9 October 2006, released by Wikileaks, at FED-PEC0220554–6.

### 4. Plaintiffs' Experts' Lumping of all Salafis Together

Neither Winer nor Kohlmann explain the process of how WAMY's activities may result in terrorism. Proselytism of any creed is a legitimate activity and the combination of charity and missionary activities are legitimately performed by many evangelical organizations, whether they are Christian or Salafi, as pointed out in the quote from the Dutch General Intelligence and Security Service (AIVD) cited in Levitt's report.[473] This particular report focuses on Saudi Salafi imams in the Netherlands, but that was not how young Dutch neo-jihadis got radicalized as I found out in my own field research in the Netherlands. They were radicalized through their own informal leaders, who were not connected to Salafi mosques in the Netherlands.[474] WAMY had no role in the radicalization of Dutch terrorists and Levitt's quote is irrelevant to this litigation.

All three experts focus on al Qaeda's ideology, which calls for the restoration of Islamic grandeur of the 7th and 8th centuries and defense of the Muslim community (or what they view as the Muslim community, namely other people that are like them, which I call the neo-ummah) through violence against the "far enemy," namely the West and especially the United States, which they view as attacking Muslims around the world.[475] The three plaintiffs' experts present no evidence at all that WAMY is preaching this type of ideology. The reason for this is simple: WAMY's ideology is not al Qaeda's ideology. WAMY's ideology, quietist Salafism, is one that al Qaeda members despise and refer to as madkhalism, from Rabi al-Madkhali, a Salafi scholar, who preached obedience to one's ruler. Madkhalis may still resent the West for its past imperialism in the Middle East, but there is a huge gap between resentment and taking action, which the Madkhalis avoid. Madkhalis and neo-jihadis are constantly engaged in shouting matches on the Internet and neo-jihadis use the derogatory expression "dollar scholars" for

---

[473] Expert report of Dr. Matthew Levitt, at 29. The quote is from an AIVD report, "Saudi influences in the Netherlands. Links between the Salafi mission, radicalization processes and Islamic terrorism," at 3, posted on June 1, 2005 is available at https://english.aivd.nl/publications/publications/2005/01/06/saudi-influences-in-the-netherlands.

[474] This is essentially corroborated in Janny Groen and Annieke Kranenberg, 2010, *Women Warriors for Allah: An Islamist Network in the Netherlands*, Philadelphia: University of Pennsylvania Press, and Bart Schuurman, 2017, *Becoming a European homegrown jihadist: A multilevel analysis of involvement in the Dutch Hofstadgroup*, 2002 – 2005, Leiden: Ph.D. dissertation, Leiden University.

[475] See my summary of this ideology in Marc Sageman, 2004, *Understanding Terror Networks*, Philadelphia: University of Pennsylvania Press, at 1–24.

Pakistan were raided by authorities after the 9/11 attacks.[586] Again, the person in charge of WAMY-Pakistan's social section and was in the office at the time of the alleged raid testified that this raid did not happen. Nor did he recall that any WAMY employee was questioned for delivering a bin Laden audiotape at the time.[587]

Likewise, Rustum Shah Mahmand, a former Home and Interior Secretary in Pakistan, former Pakistani Ambassador to Afghanistan, former Commissioner for Afghan refugees in Pakistan, and former member of WAMY's Advisory Board in Pakistan stated that "I never heard or received any negative report about WAMY doing anything outside their charter/mission. There were never any allegations of WAMY funding mujahedeen or Al Qaeda or being associated with them in any manner…. Upon my information and a government representative at that time WAMY Peshawar Pakistan offices were not raided in 2002. Even if an organization is raided after 9/11 does not establish any guilt. During the NGO-raid period, many innocent people were captures [sic], tortured, and released. After 2002 WAMY has been operating without issues in Pakistan."[588]

Secretary Mahmand's mention that many people were captured, tortured, and released around that time provides a clue that dovetails with my personal experience of journalism in Pakistan where one event is transformed into an unrelated event. As we shall later see, a Sudanese WAMY employee, Adel Hassan Hamad, was captured in a joint Pakistani-U.S. raid on his home in July 2002 in Peshawar, three months before this alleged bin Laden courier incident. I suspect, and this is only speculation but consistent with the speculations in Winer's and Kohlmann's reports, that the Peshawar rumor mill transformed this arrest into a raid on the WAMY office in Peshawar in connection to the courier incident. In any case, there is no evidence that the vague newspaper story based on third hand information, which forms the basis of both Winer's and Kohlmann's identical allegation, is true. Neither of them bothered to fact check the story before including this allegation in their respective reports. As the quip about the Peshawar rumor mill went, this story is simply too good to check.

---

[586] Transcript of the deposition of Dr. Saleh al Wohaibi, October 23, 2019, henceforth Dr. al Wohaibi deposition, at 123.

[587] Ibrahim Anwar deposition, at 292.

[588] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y. No 03-MD-1570 (GBD)(FM), Declaration of Rustum Shah Mahmand, May 8, 2020, at 2.

### 4. Allegation about WAMY Training Fighters in Pakistan

Winer alleges that WAMY trained fighters[589] and cites Steve Emerson's testimony before the 9/11 Commission as his source. Emerson, whom I already established as an unreliable source, cites an article in a Pakistani newspaper *The News*, which had allegedly been translated by FBIS.[590] I was surprised because *The News* is the largest English language newspaper of Pakistan. The article, written by Arif Jamal in English, is entitled "By the Book, for the Book," and describes the Jamiat Taleba (also seen spelled Talaba, Tulaba, or Talba) Arabia (Arabic Student Group), which "remains little known outside its own circles."[591] The organization was founded in 1975 and is the only Pakistani student association which is consciously Pan-Islamic in its ideology. Most of its members come from madrassas controlled by the Jamaat Islami, a conservative Islamic political party in Pakistan, which is a member of WAMY.[592] Jamal goes on to write, "WAMY is also involved in religious and jehadi training for its member organizations. It also has a very close working relationship with many other Islamic and Islamist societies, engaged in proselytize [sic] and jehadi activities around the globe. These include, among others, the Jamiatul Khaira of Qatar, Ittehadul Munzamat Al-Tulabiyya or Kuwait, and the Muslim United Students Association of Maldives."[593]

From the longer quote, it seems that the author is speculating that WAMY is involved in Jihadi training for a lot of Islamic organizations in the world. None of the other three organizations named are violent military organizations. Jihad has many meanings and WAMY is certainly not providing military training for the other organizations. If Jamal meant that WAMY was involved in military training for Jamiat Talaba Arabia, he did not provide any evidence for it in his article. Nowhere else in the discovery material did I see WAMY involved in military training for any organization. Without any more evidence, this allegation is similar to Chris Hedges's reporting that Batterjee was the chairman of WAMY.

[589] Winer report, paragraph 12.13.2, at 110.
[590] BUR-PEC-064049.
[591] Arif Jamal, 2001, "By the Book, for the Book," *The News (Islamabad)*, March 25, 2001, FBIS Document Number: FBIS-NES-2001-0326 (FED-PEC0236350–2). The quote is from FED-PEC0236350.
[592] Its membership certificate is at WAMYSA056841.
[593] FED-PEC0236350.

The article states that *members* of Jamiat Talaba Arabia were involved in Afghanistan since the beginning and fought for Gulbuddin Hekmatyar's Hizb Islami, the largest recipient of U.S. military aid during that conflict. After the Soviet withdrawal, some of its members fought in Kashmir under the jihadi organization, Hizbul Mujahideen. The Jamiat Arabia, not WAMY, "organizes military training programmes every year after the annual convention at different places in Pakistan and Azad Kashmir. All Jamiat members are required to undergo military training even if they do not wage jehad. The annual exercise, spread over 15 to 30 days, refreshes their military skills." Although most sensational, the military training is not as important as the educational training the members undergo every year. They spend 35 days training for teaching Hadith, another ten days sharpening their oratory skills, and honing on their skills in Arabic throughout the year. Because of this emphasis on Arabic, "[t]he knowledge of the Arabic language of the members of the Jamiat Talaba Arabia is better than those from the madrassas of other sects."[594]

So, it appears that this student association that focuses on Arabic and religious education is also involved in some form of military training of its members. It is unclear how much WAMY was involved in this martial activity. On the other hand, there is evidence for WAMY's support of the Jamiat's educational programs.[595] The Jamiat never fought as a group and has not been designated a terrorist organization. However, some of its members individually joined other organizations as freedom fighters or terrorists, depending on which side the reader is. In any case, whatever aid WAMY provided to the Jamiat, if any was far removed from the 9/11 attacks. None of the 9/11 terrorists ever had any involvement with the Jamiat. Nor is there any evidence that the Jamiat ever provided any type of support to al Qaeda or the 9/11 terrorists. So, any WAMY aid to the Jamiat could not flow into the 9/11 attacks and was too far removed to be a proximate causation for the 9/11 attacks.

### E. Ahmad Ajaj's Manual Envelope

---

[594] FED-PEC0236351.
[595] See for instance the letter of the president of Jamiat Talaba Arabia thanking WAMY for sending the Jamiat copy of a book on the life of Muhammad as a gift for its library, WAMYSA056840.

The "WAMY" "arrest" google search also turned up a story on Ahmad Ajaj. On February 26, 1993, the same day when WAMY sent a letter to Batterjee to tell him to cease and desist from deceptively mimicking LBI, a truck bomb exploded in the basement parking lot of the World Trade Center in New York. One of the convicted conspirators involved in this terrorist act was Ahmed Ajaj. Kohlmann seems to implicate WAMY in this terrorist act: "When … Ahmed Ajaj was arrested in New York, authorities seized an envelope from him containing Arabic-language terrorist training manuals. The envelope was marked with the letterhead of BIF, with the notation explaining that BIF is a branch of the 'World Assembly of Muslim Youth.'" His citation for this claim was the 2001 trial of "*U.S. v. Usama bin Laden et al*, S(7) 98 Cr. 1023 (LBS) United States District Court, Southern District of New York. Government Exhibit 2800-A."[596]

Ahmad Ajaj was indeed arrested on September 1, 1992 when he arrived at John F. Kennedy International Airport as he was proceeding through immigration. He was carrying in his bag manuals and notebooks on bomb making and clandestine tradecraft.[597] After the World Trade Center bombing, the FBI arrested him in relation to that bombing since he had been traveling with the master-bomber, Ramzi Yousef. He was convicted on nine counts of having played a role in the early stages of the conspiracy to bomb the World Trade Center and sentenced to 240 years in prison. The manual and the envelope containing the manual were entered into evidence at his trial as government exhibit 2800-A.

The exhibit number is consistent with Kohlmann's paragraph, but the rest of Kohlmann's information is false. Ajaj was tried in *U.S. v. Mohammad Salameh*, et al, S.D.N.Y., No S593CR.180 (KTD). He was the fourth defendant listed at that trial, which took place between October 4, 1993 and May 24, 1994. This was the trial about the 1993 World Trade Center bombing. The trial that Kohlmann cites was the trial of the 1998 East Africa U.S. Embassies' bombings, *U.S. v. Usama bin Laden, et al*, S.D.N.Y., S(7) 98 Cr. 1023 (LBS), which took place between February 5, 2001 and July 10, 2001.[598] There was also a manual entered in that trial,

---

[596] Kohlmann report, paragraph 195, FN 295, at 58.
[597] *U.S. v. Salameh et al*, S.D.N.Y., S593CR.180 (KTD), October 4, 1993, at 21–2.
[598] *U.S. v. Usama bin Laden, et al*, S.D.N.Y., S(7) 98 Cr. 1023 (LBS).

Three weeks later, at a Senate testimony on July 31, 2003, Emerson added in the name of the trial in his citation, "United States of America v. Usama bin Laden, et al, S5 93 CR 180, Government Exhibit 2800-A."[606] I am not sure why Emerson added the name of the wrong case in his second testimony, but Kohlmann followed him in his error. However, Kohlmann knew the correct cite for *U.S. v. Usama bin Laden et al* and so corrected his mention in his report, not realizing that the original case number was right, but the name of the case was wrong.

Although Kohlmann's citation is to a primary source, it is obvious that he did not really look it up or he would have seen that he referred to the wrong trial. Nor did he see BIF on the envelope or any notation on it explaining that BIF was a branch of WAMY. I suspect that Kohlmann just quoted Emerson and put the correct case number for *U.S. v. Usama bin Laden et al*, not realizing that it was the wrong case. What is disturbing is his attempt to disguise his taking a shortcut by citing a primary source which he did not consult, as he preached that he would do whenever possible in his methodology section.

The fact that LBI and WAMY are shown as the return address on the envelope carrying a terrorist manual does not necessarily imply that WAMY had anything to do with the manual or Ajaj or the World Trade Center bombing. At the Salameh trial, there was no mention of any LBI or WAMY marking on the manual itself. Even though I have not been able to inspect the exhibit, I suspect that it is an envelope large enough to include a more than a hundred-page manual. Such large envelopes were rare in Peshawar and Ajaj or whoever gave him the manual took one of the few large envelopes available and put the manual in it. Such manuals were common in Peshawar at the time and not necessarily associated with a specific organization or training camp. As Hamid recalled, "Training notes on explosives and other topics proliferated to the extent that they were sold in photocopy centres in Peshawar. The owners of these shops were holding their own copies–without the knowledge of the owners of the notes–and then sold them to young Arabs. The copies they held included various types of notes, papers and books. One day, in a moment of humour, one of the Arabs said, 'Young people are taking photocopies of everything that falls into their hands, even a copy of the Qur'an.'"[607] As we do not know the origin of either the manual or the envelope containing it, it is too much of a stretch to implicate WAMY for the 1993 World Trade Center bombing or even the 9/11 Terrorists since the perpetrators of that

---

[606] FN 257, at PEC-WAMY000111.
[607] Hamid and Farrall, 2015, at 141.

terrorist bombing had nothing to do with bin Laden, al Qaeda, or the people who later perpetrated the 9/11 attacks.

### F.  WAMY's Alleged Funding of al Qaeda in Bosnia

Both Winer and especially Kohlmann allege that WAMY funded al Qaeda in Bosnia. As noted in section II.G of this report, al Qaeda never fought as a group in Bosnia. There was an exploratory visit to Bosnia by al-Fadl, definitely an al Qaeda member, to assess the situation there or individuals who might have formerly been members of al Qaeda and might have gone to Bosnia, but from my reading of al Qaeda history, I did not see any evidence that al Qaeda as a group fought in Bosnia.

The issue of al Qaeda's alleged presence in Bosnia is a good opportunity to use a comparative analysis. Expeditions like al Qaeda's venture into Somalia leave documentary traces. The existence or absence of such traces provides a strong indication of whether an organization like al Qaeda had sent troops to Bosnia. A comparison of al Qaeda documents captured by U.S. troops after their invasion of October 2001 in relation to Somalia and Bosnia invites the type of comparative analysis that Kohlmann claims to be using in his report but in fact does not. These documents were posted on West Point's Combating Terrorism Center website for all scholars to examine. Such a comparative analysis of the evidentiary traces left behind by al Qaeda for its activities in Bosnia and Somalia respectively would test the main thesis of Kohlmann's book that al Qaeda fought in Bosnia. If the traces are similar, this would be a good indication that al Qaeda sent squads of members to both these countries. If the evidence left behind is one sided, this is an indication that al Qaeda sent troops to only one country. If there is no evidence left behind, then it would appear that al Qaeda did not send troops to either country. As demonstrated in section II.G of this report, the documents illustrate that al Qaeda sent about two dozen al Qaeda members to Somalia to train Islamic Somali rebels but is silent on a similar expedition to Bosnia. First, there were after-action reports from al Qaeda leaders for Somalia but not Bosnia in the captured al Qaeda documents in Afghanistan after the U.S. invasion of October 2001. Second, al Qaeda leaders referred to their expedition in Somalia as the "Africa Corps." There was never any similar mention of an expedition in Bosnia as the "European Corps." Third, very senior al Qaeda leaders like Abu Ubaydah al-Banshiri, Abu Hafs al-Masri, Sayf al-Adl...

visited and operated in Somali. There were no such visits to Bosnia during the Bosnian conflict at all. The only documented visit was low level member Jamal al-Fadl going to Zagreb to assess the situation on the ground, and perhaps Abu Zubair al-Madani but it is unclear whether the latter went there as an al Qaeda member or had left al Qaeda to fight in Bosnia. He went there allegedly to establish training camps, but nothing came of this plan as he was killed early in the fighting. In any case, Abu Zubair's lonely presence in Bosnia is qualitatively different from al Qaeda's presence in Somalia during approximately the same time in history. Fourth, there was no al Qaeda camp in Bosnia unlike the well-documented al Qaeda camps in Somalia. In his book on Bosnia, Kohlmann lumps all the Islamist foreign fighters together and assumes they are al Qaeda. Bin Laden probably did want to help the Bosnians and establish an al Qaeda base in Europe, but nothing came of it. As just shown, a comparative analysis of the evidentiary traces left behind by al Qaeda strongly suggests that al Qaeda did not have of a presence or fight as a group in Bosnia, unlike its expedition to Somalia.

Let us examine Winer's and Kohlmann's specific allegations about Bosnia.

### 1.  Winer's Allegations

In his paragraphs 12.12.13 to 12.12.16, Winer's allegations center on Islamic charity Third World Relief Agency (TWRA) but he provides no evidence that al Qaeda or bin Laden was in Bosnia. Winer noted that WAMY (Jeddah) transferred ATS 399,067.15 to TWRA on March 25, 1992, according to a German report.[608] This money transfer happened more than a week before the outbreak of hostilities in early April 1992.[609] There is no mention in the German

---

[608] [German] Federal Office of Criminal Investigation, 2003, *Expert Report Concerning the Area – Financial Investigations [for the International Court of Criminal Justice for the former Yugoslavia relating to TWRA]*, ST 54-2 – 185/02, Meckenheim, August 28, 2003 (FED-PEC0106588–650), at 58 (FED-PEC0106645). I believe that Winer has his date wrong, as the date of this transaction is 1992 and not 2002 as written in his report. This transaction amounted to about $34,000 at the time. This of course pales compared to the total amount of donations made to TWRA during the Bosnian war, which reached more than $200 million. It appears from the German report that $80 million cash had unknown destination, at 61 (FED-PEC0106648).
[609] Chuck Sudetic, 1998, *Blood and Vengeance: One Family's Story of the War in Bosnia*, New York: W. W. Norton & Company, at 101.

report where the money went, but neither bin Laden nor al Qaeda is mentioned in this report in connection to Bosnia.[610]

Winer goes on to claim that the head of TWRA Elfatih Ali Hassanein (I believe that this is his real name, not the variations in Winer's report) "served at the same time as the director of the WAMY Austria and Eastern Europe [office]." His evidence is in footnote 212.[611] In the footnote, he refers to an internal WAMY report[612] that shows on 30/2/92 [sic], "Mr. Fateh Ali Hussein, Director of the Office of WAMY office in Austria and Eastern Europe" sending a letter to Dr. Ahmed Totonji, identified in the previous line as "Secretary of the Union of Muslim Students in Italy," about "Paying amounts of money to associations for specific projects."[613] The previous page of the same document lists a Dr. Fatih Ali Hassanein, "Director of the Office of the seminar in Austria," receiving a letter from Dr. al-Johani on 15/3/1413H (corresponding to September 12, 1992) "Thanking for efforts in Bosnia and Herzegovina."[614]

WAMY has denied that Hassanein ever worked for it or that it had an office in Austria. Hassanein was involved as a volunteer in some WAMY projects in Austria and the Balkans, and it is impossible to know how these volunteers represent themselves to journalists or in correspondence. For instance, in a summary of the activities sponsored by WAMY during 1993, there is a mention that a camp in Albania was not held because Dr. Hassanein was too busy.[615] On January 30, 1994, WAMY Secretary General Dr. al-Johani sent a letter to Dr. Hassanein, "WAMY representative in Austria," regarding the preparation of a translation of the Holy Quran in the languages of Eastern European countries. Dr. al-Johani asked Dr. Hassanein to send a report about the progress of this project.[616] On October 18, 1994, under the letterhead of the Islamic Council for East Europe, Dr. Hassanein, as its executive director, invited the WAMY Secretary General to attend and participate in the Council's Second Conference in Istanbul.[617] On October 25, 1994, under the letterhead and logo of the Third World Relief Agency (Verein Zur

---

[610] Wael Julaidan was mentioned in connection to bin Laden and al Qaeda, but only in the context of U.S. litigation about him, not al Qaeda in the context of Bosnia (FED-PEC0106601).
[611] Winer report, paragraph 12.12.14, FN 212, at 109.
[612] Document 3912-36, Filed 2/28/18, no Bates stamp.
[613] Document 3912-36, Filed 2/28/18, no Bates stamp, at 3.
[614] Document 3912-36, Filed 2/28/18, no Bates stamp, at 2.
[615] WAMYSA1105168.
[616] WAMYSA1235382.
[617] WAMYSA1235383.

Unterstutzung der 'Dritten Welt', TWRA), Dr. Hassanein told the WAMY Secretary General that he had received books and mentioned that he needed copies of the Holy Quran translated in French, English, and German.[618] On October 26, 1994, WAMY Secretary General apologized to Dr. Hassanein, "the Executive Director of the Islamic Council of Eastern Europe," for not being able to attend the conference because of previous commitments.[619]

The importance of this correspondence between Dr. Hassanein and Dr. al-Johani is that one can check how they address each other and compare the letterheads and logo of Dr. Hassanein's organizations to LBI and WAMY USA, one a known independent organization under the sponsorship of WAMY (LBI) and the other a WAMY field office (WAMY USA). This is another example of comparative analysis touted by Kohlmann in his methodological section but fails to use in his report. When WAMY Saudi Arabia writes to the director of one of its field offices, it uses the director's title. For instance, when Assistant Secretary General Dr. Babear wrote to Abdullah Binladen, the director of WAMY USA, it addressed Binladen as "Director of the North American Office."[620] When the director of a field office writes to either the WAMY Secretary General or Assistant Secretary General, he signs the letter, Director of WAMY, (country field office), like Engineer Talha al-Jarad, Director of WAMY, Canada.[621] Since Dr. Hassanein was never addressed as director of Austrian office and never signed his correspondence with WAMY as director of WAMY, Austria, this suggests that Dr. Hassanein was not a director of a WAMY field office.

Was TWRA an organization under the sponsorship of WAMY, like LBI was from 1987 to 1996? We can compare the letterhead and logo of LBI to TWRA. Since LBI was under the sponsorship of WAMY, it was allowed to write under its name (Lajnat Al-Birr Al-Islamiah) the name of World Assembly of Muslim Youth in smaller print and in parentheses.[622] However, neither TWRA nor the Islamic Council for East Europe, the two organizations headed by Dr. Hassanein, wrote World Assembly of Muslim Youth in smaller print and in parentheses in their

---

[618] WAMYSA1235384.
[619] WAMYSA1235381.
[620] See WAMY SA 4484.
[621] See PEC-WAMY030899–900.
[622] See for instance, WAMYSA028420–8 on each page on the letterhead in English and WAMYSA061335 for the same in Arabic.

respective logo.[623] This suggests that neither organizations affiliated with Dr. Hassanein were under the sponsorship of WAMY. In other words, a comparison of WAMY's correspondence with Dr. Hassanein and its own field offices or organization under its sponsorship supports WAMY's statement that Dr. Hassanein was nothing more than just a volunteer for them.

Winer rejects WAMY's denial and a fragmented list of some communications between Dr. Hassanein and others was enough for him to conclude that Dr. Hassanein was both chairman of TWRA and director of WAMY-Austria. As I repeat several times in this report, a document is only the beginning of an investigation about its contents, which must be validated in terms of accuracy. In this one document, Hassanein's name is spelled two different ways and his position is also given two different titles. This list of WAMY communications is obviously not a primary source on these communications, but a secondary quick summary, which was then translated with unknown accuracy. Winer does not refer to the communications themselves (unlike me in the preceding paragraph), which would of course have been primary sources. This is quite a burden of evidence to put on this document in order to make it another centerpiece of Winer's argument that Dr. Hussanein was a WAMY director at the time of the Bosnian War.

This may strike the reader as a very thin basis for making a strong positive statement that Dr. Hassanein is director of WAMY-Austria, but it does not deter Winer who confidently goes on to restate that, in addition to being chairman of TRWA, Dr. Hassanein was doing "simultaneous work on behalf of bin Ladin and Al Qaeda, and his simultaneous work for WAMY."[624] His reference was another footnote, where he simply repeats that "Hassanein was simultaneously the head of TWRA and a facilitator for Qaeda, while he was also the head of WAMY's Vienna office … as described in an extensive 1996 article in The Washington Post."[625] He quotes at length from the article, which was written by John Pomfret on September 22, 1996.[626] The article makes no mention of WAMY at all. It mentions bin Laden as a *donor* to TWRA, *not a recipient* of TWRA money, and makes no mention of al Qaeda at all. So, Dr. Hassanein is *not* described as a *facilitator for* al Qaeda, but a possible *beneficiary* of bin Laden's

---

[623] See the logos of TWRA and the Islamic Council for East Europe at WAMYSA1235384 and WAMYSA1235383 respectively.
[624] Winer report, paragraph 12.12.14, at 109.
[625] Winer report, FN 213.
[626] John Pomfret, 1996, "Bosnia's Muslims Dodged Embargo," *The Washington Post*, September 22, 1996, at A01.

money. Nor is there anything in the article about Dr. Hassanein doing work on behalf of bin Laden and al Qaeda. He might just have been a beneficiary of bin Laden's generosity. Winer's claim of Dr. Hassanein's simultaneous work for WAMY and al Qaeda is not supported by Pomfret's article, the source of his claim.

In speculating on Dr. Hassanein's role in Bosnia, Winer gave the analogy to Batterjee's alleged role as chairman of WAMY and referred (again) to Hedges' *New York Times* article. The implication from Hedges' article was that a former relief worker could be involved in military activities and still be "unofficially" but technically not officially with the charity. In other words, nothing would change except the official label of his involvement with "WAMY."[627] However, as shown in section II.F, Batterjee was never a chairman of WAMY or a WAMY employee. There is no evidence that Batterjee used WAMY funds for Bosnia in later 1992. WAMY funded LBI's *projects* in Afghanistan and Pakistan. In any case, any funding to Bosnian mujahedin would not go to al Qaeda, as it was not present in Bosnia, as demonstrated in section II.G. Therefore, any support for Bosnian fighters would not flow to the 9/11 terrorists.

Winer's four paragraphs on Bosnia are very confusing and poorly sourced. They are more argumentative than substantive in terms of providing any evidence that WAMY funded al Qaeda in Bosnia. Although Winer lists an Interpol Fusion Taskforce document in his references,[628] he does not cite it. The document references TWRA and Dr. Hassanein but makes no mention of either WAMY or al Qaeda or bin Laden.[629] On the other hand, it states, "During 1988/1989, he [Hassanein] was the president of IIRO."[630]

As shown in section II.G of this report, al Qaeda and bin Laden were not in Bosnia. Winer's allegation was that TWRA provided funding for fighters in Bosnia. Since neither al Qaeda nor bin Laden were there, they did not receive any money from TWRA. If anything, bin Laden might have given money to some of the fighters in Bosnia, but he certainly did not receive any money intended for Bosnia, whether from TWRA or even, under the hypothetical that Winer is right, WAMY. It is irrelevant whether WAMY Eastern Europe and TWRA shared the same

---

[627] Winer report, paragraph 12.12.16, at 110.
[628] Interpol Fusion Taskforce, 2003, *Financing of Terrorism: Interim Analytical Report Executive Directorate*, March 2003, at PEC-WAMY040296–45.
[629] PEC-WAMY040232–4.
[630] PEC-WAMY040232. This was a repeat of an earlier mention, "During 1988/1989, he was the president of IIRO." PEC-WAMY040224.

leadership as Winer claims, whatever money was distributed by TRWA went to Bosnia, not al Qaeda. If anything, according to Pomfret's article, al Qaeda might have provided money for Bosnia. If so, the flow of money was from al Qaeda to Bosnia, not the other way around. So, even assuming Winer's arguments are right about WAMY supporting Bosnia, this support would not have gone to al Qaeda or the 9/11 terrorists. If anything, this would have taken money away from resources that could have gone to al Qaeda and the 9/11 terrorists.

### 2. Kohlmann's Allegations

Kohlmann with his book Al-Qaida's Jihad in Europe[631] is of course the champion of the claim that al Qaeda fought in Bosnia and established a foothold on the European continent. I have already dealt with the methodological flaws of his book in the methodology section. In this section, I address the specific claims against WAMY in his report.

Kohlmann tries to tie WAMY, Bosnia, and al Qaeda in ten paragraphs of his report: 162–3, 174, 196–203.

### a) Kohlmann's paragraphs 162 – 3

In paragraph 162, Kohlmann wrote, "from the early days of the Bosnian war, WAMY was 'deeply involved' in supporting Saudi jihadists seeking to take part in the conflict. A WAMY representative was quoted in *The New York Times* …"[632] This is of course Chris Hedges' flawed *New York Times* article that wrongly claimed that Batterjee was WAMY's chairman.[633] The second quote in the first paragraph is from the same article and was uttered by some unknown Saudi official, who was clearly not Batterjee, and has nothing to do with WAMY.[634] However, Kohlmann's juxtaposition of the two quotes from different people makes it seem that the second quote is also attributable to a "WAMY representative" and when he said that "most of the money raised for relief has been turned over to the Bosnians for weapons," it may seem that this was WAMY's money when it fact it is not what the anonymous Saudi official said or even implied. Kohlmann's juxtaposition of unrelated items to give the impression that they are related seems to be one of his favorite methodological devices.

---

[631] Evan Kohlmann, 2004, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, Oxford: BERG.
[632] Kohlmann report, at 49.
[633] FED-PEC0057642–4, FED-PEC0057644.
[634] The quote is from the last paragraph of FED-PEC0057643.

The quote from paragraph 163 is from the same article and describes WAMY flying back wounded Saudi fighters and providing free medical care in a Saudi German hospital. I am not sure whether the article is correct, but I have not checked it because providing medical care is a legitimate humanitarian activity. As a physician, I swore to not discriminate and to give the same medical care to everyone who needed it.

### a) Kohlmann's Paragraph 174

This paragraph centers on TWRA and alleges that WAMY transferred money to TWRA. This is similar to Winer's allegations in the previous section. Again, TWRA was not al Qaeda and did not fund al Qaeda. Even if bin Laden's contribution to TWRA is substantiated, the flow of money was not from TWRA to bin Laden and the 9/11 terrorists but in the opposite direction, from bin Laden to TWRA. So, if substantiated, any WAMY contribution to TWRA was not support for al Qaeda or the 9/11 Terrorists.

### b) Kohlmann's Paragraphs 196–203

All eight of these paragraphs deal with BIF. WAMY is not mentioned at all. The implicit allegation in these paragraphs is that BIF is the same thing as LBI, which is a subsidiary of WAMY. This has been dealt extensively in section II.F of this report. WAMY had nothing to do with BIF, and therefore the allegations in these paragraphs are not relevant to this litigation since they do not make any explicit allegations against WAMY. Furthermore, these paragraphs are based on USA Fitzgerald evidentiary proffer in *Arnaout*, filed on January 6, 2003,[635] (Kohlmann cites this proffer eight times in the framework of these paragraphs)[636] and we saw that there are some serious of factual problems with this proffer since it confused BIF with LBI.

### 3. No Relationship Between Bosnia and the 9/11 Attacks

Although WAMY did not fund or support al Qaeda in Bosnia because al Qaeda was not in Bosnia as a group, Bosnia did have a small contribution to the 9/11 attacks. As part II of this report showed, there were three 9/11 terrorists who had been involved in Bosnia: KSM, Khalid al-Midhar, and Nawaf al-Hazmi. KSM went twice to Bosnia, in early 1992 and again in 1995. His stays were very short, and there is no evidence that he took part in the fighting. During his second trip there, he worked for an Egyptian charity, the Egyptian Humanitarian Relief

---

[635] BUR-PEC-014501–97. Kohlmann gives the wrong date (January 31, 2003) for the filing of this proffer.
[636] Kohlmann report, FN 296, 299, 300, 302, 303, 304, 310, 313, at 59–62.

Agency.[637] There is no evidence that he received any support from either WAMY or projects that WAMY funded.

Al-Midhar and al-Hazmir were childhood friends from Mecca and very little is known about their stay in Bosnia, only that they had been there.[638] Although the Congressional Joint Inquiry wrote that al-Hazmi first traveled to Afghanistan in 1993 as a teenager and came into contact with a key al Qaeda facilitator in Saudi Arabia in 1994, this is unlikely. At that time, the U.S. intelligence community still lumped all Islamist Arab militants into al Qaeda,[639] and al Qaeda was mostly gone from Afghanistan and kept just a skeleton crew there until it withdrew all forces in 1994. That skeleton crew mostly trained central Asians in Project Furqan. I strongly suspect that al-Hazmi trained in a non-al Qaeda camp like Khalden in 1993. The Bosnian conflict ended at the end of 1995. Both friends came to Afghanistan in 1996 and joined al Qaeda shortly thereafter. They volunteered for the 9/11 conspiracy in the spring of 1999 and carried out it first concrete steps when they got their U.S. visas from Saudi Arabia in April 1999, as noted in section II.K of this report. As shown earlier, the 9/11 attacks conspiracy began in early 1999, as one of the Plaintiffs' experts correctly noted.[640] Even assuming for argument's sake the hypothetical that Saudi charities, including WAMY, materially supported Saudi fighters in Bosnia (and plaintiffs' experts failed to show this), this gap of four years between the time when they were in Bosnia and not even members of al Qaeda to the inception of the 9/11 conspiracy is simply too large to be proximately linked to the 9/11 attacks.

### G.  WAMY's Alleged Support of the Mujahedin in Chechnya II

---

[637] McDermott and Meyer, 2012, at 93.

[638] U.S. Senate Select Committee on Intelligence and U.S. House Permanent Select Committee on Intelligence, 2002, *Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, December 2002, at 131 ("In 1995, al-Hazmi and al-Mihdhar traveled to Bosnia to fight with other Muslims against the Serbs.") (PEC-WAMY040280–1136, at PEC-WAMY040462); 9/11 Commission Report, at 155; Terry McDermott, 2005, *Perfect Soldiers: The Hijackers: Who They Were, Why They Did It*, New York: HarperCollins Publishers, at 191.

[639] For instance, just in the very next sentence from the one quoted in the preceding footnote, the *Joint Inquiry* wrote, "Al-Hazmi came into contact with al-Qa'ida leader Abu Zubaydah … in 1996." As seen in part II of this report, Abu Zubaydah was never al Qaeda and certainly not in 1996 when he ran Khalden, a camp rival to al Qaeda and which al Qaeda forced him to close in 2000.

[640] As noted in Brian Jenkins's report, at 23.

None of the plaintiffs' experts claim that WAMY supported the Chechen mujahedin against the Russians in the first Chechen War (1994–6) despite the fact that both bin Laden and BIF explored ways to help the Chechens. They were right: al Qaeda was not present in Chechnya either during the first or the second round of the war.

Kohlmann makes allegations against WAMY during the second Chechen War in paragraphs 166–7. In paragraph 166, he quotes at length from an article, "The Chechen Tragedy – The Reality and the Required Role," that Dr. al-Johani published in Al Jazeera on January 15, 2000. Kohlmann, who does not speak or read Arabic fluently, provided a citation to an Internet link (its URL is strangely repeated twice in two of his footnotes) to the newspaper, which is no longer functioning, and a bates stamp to the Arabic version of this article.[641] However, the plaintiffs provided their own English translation of selected excerpts with passages in bold script for emphasis from the Arabic in the discovery material.[642] The English translation follows immediately the Arabic version. Kohlmann's translation is different from the plaintiffs' translation. The first long quote in his paragraph is simply Dr. al-Johani's recapping the history of the Chechen tragedy and praising the Chechen mujahedin who fought Russian aggression and "deserve our support, prayers, and all of our energies to support them so that they would defeat the enemy again."[643] Does this mean that WAMY sent military aid to the Chechen mujahedin, as the quote implies?

Dr. al-Johani went on to list what WAMY actually did in support of the Chechens, which consisted of setting up a Youth Committee to distribute aid and dawa and then to send in two convoys of aid to the Chechen people.

1. The dispatch of two containers of 20 tons each, containing foodstuffs, clothing, blankets and medical supplies for the Chechen refugees.

2. The purchase of two ambulances to transfer the wounded to hospitals.

3. Distribution of foodstuffs, clothing and blankets to Chechen refugees.

4. Implementation of the fast-breaking project for the Chechen refugees.

5. Defining places for the refugees, determining an aid program for them and studying their needs.

---

[641] Kohlmann report, FN 242 and FN 243, at 50. The citation is to FEC-PEC0233836–43.
[642] FED-PEC0233844–51.
[643] Kohlmann report, paragraph 166, at 50.

6. Conducting Da'awa and media activities to teach people about the Chechen issue.

7. Participation in programs about aid to Chechnya on the satellite station Iqra.

8. Implementation of mail campaign in the Riyadh area to explain the Chechen tragedy.

9. Dispatch of more than twenty tons of dates for the Chechen refugees.

10. Holding a press conference on the state of the Chechen refugees.

11. Participation in several radio and television programs, interviews in the press and lectures to explain this important issue.[644]

WAMY also did more of the same in cooperation with other charities. As Dr. al-Johani summarized, "All of our aid program to the Chechen people, which is the program of the Joint Saudi Committee for Aid to Kosovo and Chechnya, is expressed in four fields: administrative programs, media coverage, field visits, implementation of diverse aid programs."[645] What is missing from this long list is military aid to the mujahedin. By omitting the full quote from al-Johani's article, Kohlmann again gives the impression that WAMY had sent military aid to Chechen fighters.

Kohlmann goes on to provide a second lengthy quote from Dr. al-Johani's article:

"The question that arises is: What do the Chechen Muslims need from us today? They need money to buy weapons and gear…. The young children should know their cause. We should motivate them to donate to them and console them as much as we can. The Islamic awakening is growing, praise be to Allah. Perhaps this is what worries the Communist East and the polytheistic West. They fear that they will wake up some day to find the Muslims ordering them to pay the tribute."[646]

This quote sounds very ominous: "money to buy weapons and gear … young children should know their cause. We should motivate them … The Islamic awakening is growing … polytheistic West … fear that they will wake up some day to find the Muslims ordering them to pay the tribute." This last reference implies that Muslim forces will conquer the West and force non-Muslims to pay the Jizya, the tribute that non-Muslim subjects pay to their Muslim conquerors. However, the full version of Dr. al-Johani's article is the following:

**"The question is asked: What do the Chechen Muslim need from us today?**

---

[644] FED-PEC0233848–9.
[645] FED-PEC0233850.
[646] Kohlmann, at 50.

1. **They need money to buy arms and ammunition**

2. They need food, cover, medicines and tents.

3. They need preachers and Da'awa material to create Islamic awareness. They are Sunnis and have had Islam hidden from them for almost 70 years and they have adhered to it in difficult circumstances almost like the inquisition. Today, they are yearning to return to its principles.

4. They need us to pray for them in our prayers.

5. **They need praise for their jihad and for their resolve, and that we should halt the tongues which are trying to describe their Jihad as national or that they did not prepare or organize themselves properly.**

6. They need a united Islamic stand, which should start with the individual, on the family level and the nation and homeland as a whole. Every small child must know about this issue and we must encourage them to donate and we will assist them as much as we can with this tragedy. We will reduce our leisure times and will tell our children that this is our nation's minimal contribution of conscience, to those who are being destroyed only because they are Muslim. We will boycott every Russian product and each and every one of us will give part of his income to help them.

7. There is no choice but to let the Islamic voice against the Russian aggression be heard on every plane, official and unofficial, by urging the Islamic countries and people to protest against the Russian government's aggression in every place and to every international organization in the world."[647] (Bold script in the original provided by plaintiffs)

There two quotes are different. As mentioned, Kohlmann does not speak or read Arabic with any type of fluency to be able to translate the passages himself and he certainly does not use the translation that the plaintiffs provided. He completely omits from his two quotes what WAMY actually did and implies that WAMY is providing money to the Chechen mujahedin to buy weapons and gear. Dr. al-Johani does say that the mujahedin need money for weapons and ammunition, but he does not commit his own organization to supply them with money for this purpose. I could not find Kohlmann's last two sentences in his quote in the translation provided

---

[647] FED-PEC0233850–1.

167

by the plaintiffs. The translation provided states that, in summary, "Al-Juhani proclaims that victory is near because the Islamic reawakening is growing and Russia's situation is less stable."[648] There is nothing about "the Communist East and the polytheistic West" or their "fear that they will wake up some day to find the Muslims ordering them to pay the tribute." I am not sure where Kohlmann got that. But these two passages are again examples of Kohlmann's methodological use of strategic omissions and clever juxtapositions to distort the meaning of the contents of a document.

In paragraph 167, Kohlmann quotes former WAMY president Minister of Islamic Affairs Sheikh al-Sheikh who, in January 2000, sent Dr. al-Johani a note and a check for SR 20,000 for the Muslims in Chechnya. There was no controversial statement in the note. However, in the footnote citing the note, Kohlmann refers to a second document, where Dr. Johani was allegedly "discussing the collection of monetary donations and informing that a WAMY delegation made contact with the fighters."[649] Usually, the juxtaposition of two items without any other comment implies that they are linked: "WAMY's SR 20,000 … WAMY delegation … contact with the fighters." I looked up this second document, and it is an article from February 1995, from the *first* Chechen War, or five years before the donation was made![650] The article described that WAMY had sent a fact-finding delegation to Chechnya, where it visited camps of about half-a-million refugees fleeing the capital Grozny. So, this was about five years before Minister al-Sheikh's donation to the Chechens in the *second* Chechen War. The article further reported that the team had entered Chechnya "through Baku in Azerbaijan. Contact was made with the fighters who gave them gruesome pictures of the dead and the dying in the siege by Russian forces and the inhuman conditions many people are living under."[651]

Right after the quote about Minister al-Sheikh's note, Kohlmann quotes Dr. al-Johani's thank you note to the minister for his generous donation. In the footnote citing this new quote, Kohlmann writes "See also FED-PEC 234930-234931 (WAMY Secretary General Dr. Maneh al-Johani explaining that 'WAMY's office in Chechnya along with other Islamic social

---

[648] FED-PEC0233851.
[649] Kohlmann report, FN 244, at 51. The document is FED-PEC0233243–4.
[650] Mahmood Saberi, "Wamy begins aid campaign for Muslims of Chechnya," *Saudi Gazette*, February 24, 1995, at FED-PEC0234243–4.
[651] FED-PEC0234244.

support for al Qaeda, as Kohlmann and Winer imply. In fact, in this interview, Dr. Noorwali implicitly rejects al Qaeda's ideology.

Winer stretches Dr. Noorwali's explanation beyond recognition in a bizarre argument that leads him to adopt false premises ("providing Islamic fighters in Chechnya and elsewhere during that period: First, funding for weapons to fight with…"[667]), shows his lack of understanding of the definitional problem of the concept of terrorism, and makes him jump to an erroneous conclusion based on his own false premises: "I assess that this merger of 'self-defense' into 'terrorism' is what happened with WAMY's operations in the field, as it acted as the 'mother' of organizations such as IIRO and Benevolence [I assume that Winer means al-Birr, which perpetuates the confusion between BIF and LBI] and others who provided ongoing direct support to al Qaeda."[668]

In effect, neither Kohlmann nor Winer present any evidence that WAMY funded Hamas or the Palestinian Islamic Jihad. They just distort the meaning of Dr. Noorwali's words to imply that WAMY funded Palestinian terrorists. What is surprising is that it was Kohlmann and Winer among the plaintiffs' experts who made this charge, because they are not experts on Hamas. Another of the plaintiffs' experts, Matthew Levitt, promotes himself as an expert on Hamas and has written a controversial book on this organization. In his report, Levitt wisely refrains from linking WAMY, Hamas, and al Qaeda. This absence of a link between Palestinian and al Qaeda fund raising was explicitly noted by the 9/11 Commission Staff on Terrorist Financing. "[C]ontrary to some public reports, we have not seen substantial evidence that al Qaeda shares a fund-raising infrastructure in the United States with Hamas, Hezbollah, or Palestinian Islamic Jihad. None of the witnesses we interviewed, including the FBI's leading authorities on terrorist financing generally and its expert on Palestinian extremist fund-raising specifically, reported evidence of this overlap, although supporters of Palestinian extremist groups travel in the same general circles as suspected al Qaeda supporters and have some contact with them. In fact, there is far more evidence of fund-raising collaboration between Hamas and Hezbollah than between either of these groups and al Qaeda, according to the FBI official responsible for tracking these group's funding."[669]

---

[667] Winer report, paragraph 12.13.5, at 111.
[668] Winer report, paragraph 12.13.5, at 111–2.
[669] Roth, Greenburg, and Wille, 2004, at 24.

In any case, as Kohlmann pointed out, the Union of Good only received money from the outside world to fund Palestinian projects. It did not fund non-Palestinian organizations like al Qaeda. Any money sent to the Union of Good, which was designated SDGT in 2008 (seven years after 9/11), would not have flowed to al Qaeda or the 9/11 terrorists. Each Middle Eastern terrorist organization is unique: lumping them together demonstrates a lack of understanding for them. This allegation that WAMY funded Palestinian organizations is not relevant to the 9/11 attacks, which are the subject of the present case.

### I.   WAMY–US/ WAMY USA's Alleged Support of Terrorism

In paragraph 173 of his report, Kohlmann writes, "[t]here are numerous other connections linking WAMY to international terrorist organizations and terrorist financing. In fact, the U.S. branch of WAMY was incorporated in 1992 by Usama bin Laden's own nephew Abdullah in Falls Church, Virginia."[670] However, Kohlmann makes no other allegation except for the fact that the head of WAMY–US was a half-nephew of al Qaeda's leader. There is not even an allegation on how WAMY–US spent its money, just that all its funding came from WAMY Saudi Arabia. So, I take it that the link between WAMY to international terrorism was just a family link–guilt by association, or more precisely guilt by family. There is no allegation that Abdullah Binladin (this is how he spells his name) was a terrorist, linked to al Qaeda, or linked to the 9/11 terrorists.

The 9/11 Commission failed to find evidence of American funds for al Qaeda: "there is little hard evidence of substantial funds from the United States actually going to al Qaeda. A CIA expert on al Qaeda financing believes that any money coming out of the United States for al Qaeda is 'minuscule.' Domestic law enforcement officials, acknowledging the possibility of schemes that they have not identified, generally state it is impossible to know how much, if any, funding al Qaeda receives out of the United States. These officials agree that any funds al Qaeda raises in the United States amount to much less than is raised by other terrorist groups, such as Hamas and Hezbollah, and that the United States is not a primary source of al Qaeda funding."[671]

In his sworn declaration, Abdullah Binladin stated that his mother was one of the 54 children of bin Laden's father, making her Osama bin Laden's half-sister. Abdullah was

---

[670] Kohlmann report, at 52.
[671] Roth, Greenburg, and Wille, 2004, at 24.

therefore one of Osama's numerous half-nephews. He had not seen his half-uncle since approximately 1990. In 1991, while he was working as an administrative officer at the Saudi Arabian Embassy in Washington, he established WAMY–US, a Virginia non-profit corporation with its office in northern Virginia. He worked for WAMY–US as a volunteer and represented WAMY at various events. He swore that he never provided support of any nature whatsoever to al Qaeda or any other terrorist organization. To his knowledge, during the period he was involved with WAMY–US, that organization had no dealing or association with and provided no support to al Qaeda or any other terrorist organization. In the 1990s, three FBI agents interviewed him regarding his family's ties to his uncle Osama. He cooperated fully with them and the U.S. government never took any actions against him or WAMY–US when he was associated with it. He returned to Saudi Arabia in late 2000 and WAMY appointed a successor for WAMY–US. He concluded, "I have never provided support to any terrorist, terrorist group, or terrorist activity. I was appalled by the horrific events of September 11, 2001 and I reject and condemn such violence."[672]

Binladin's successor was Dr. Ibrahim Abdullah, who was a Saudi student in the Washington, D.C. area and had encountered Binladin as a student. When he came back to the United States to study for his Ph.D. in Information Technology at George Mason University in 1999, Binladin asked him to take over his position as a WAMY USA (he called it differently than Binladin) representative. He accepted the offer. He volunteered for WAMY (he has always been a volunteer even later as a director and was never compensated for his work) and came to the office once a month to develop its website. After three months, he took over as director of WAMY USA, a position he held from 1999 to 2004. During his tenure, the management of WAMY USA was vested in a Board of Directors, who were mostly students. Although WAMY USA already had bank accounts, it had no funds, no employees and no activities. It took Dr. Abdullah about four months to get the office running. He started receiving all his funds from WAMY headquarters in Saudi Arabia, hired a secretary, and got some projects going. He denied that WAMY camps, which were part of his projects, promoted any sort of violence. He got his Ph.D. in 2004 and two days before his scheduled departure back to Saudi Arabia, around late June or early July 2004, he was arrested on an alleged visa violation that he was receiving money

---

[672] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y., No. 03 MDL 1570 (RCC), Affidavit of Abdullah Awad Binladin, November 19, 2005.

from WAMY while on a student visa. He denied that WAMY ever paid him as he was a volunteer. His lawyer advised him to plead guilty in order to expedite his departure, which he did and left the country soon afterward. A few days after his arrest, the WAMY USA office was raided.[673]

### 1. WAMY USA Links with Anwar al-Awlaki and to the 9/11 Terrorists

Kohlmann alleges that WAMY USA was connected to the 9/11 terrorists through Anwar al-Awlaki, the imam of the Dar al-Hijrah Mosque in northern Virginia. Kohlmann calls al-Awlaki a senior member of al Qaeda in the Arabian Peninsula (AQAP) and the "spiritual mentor" of no less than five 9/11 terrorists: Nawaf al-Hazmi, Khalid al-Midhar, Hani Hanjour, Ahmed al-Ghamdi, and Majed Moqed.[674]

To put these allegations in context, it is important first to summarize al-Awlaki's life history. Anwar al-Awlaki was born in 1971 in New Mexico where his father was a graduate student at the time. His family returned to Yemen six years later, and al-Awlaki spent the next thirteen years in Sanaa. He graduated from Yemen's only private school in 1989. He did not come from a religious family and was not religious growing up. After a year teaching, he got a scholarship to study hydrology at Colorado State University where he studied for four years, from 1990 to 1994, when he got his B.S. in civil engineering. However, during his first winter break, he met someone from the Tablighi Jamaat, became more religious and was elected president of the school's Muslim Student Association for two years. He became politically conscious during the first Gulf War, when the United States military started bombing Baghdad in January 1991. He was also inspired by the jihad in Afghanistan. During the winter break of his sophomore year, he went to Afghanistan to join the fight, but he was disappointed as he did "nothing." He married a distant cousin in the summer of 1994 and started working at an engineering firm in Denver. However, his heart was not in hydrology but in Islam and he got a part time job as an imam at the Al-Noor Mosque in Denver. In 1996, his reputation for preaching grew and the Al-Ribat Mosque in San Diego hired him as its head imam. He was a Salafi but not yet a neo-jihadi. He started taping his lectures on the "Life of the Prophet" in 2000 and his lectures became very popular among Muslims, who tried to learn about their religion. His

---

[673] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y., No. 03 MDL 1570 (RCC), Declaration of Ibrahim Sulayman Abdullah, March 2, 2019, henceforth Abdullah declaration II.
[674] Kohlmann report, paragraph 186, at 56.

lectures were fairly straight forward, with a Salafi bent to them. As the other mosque in the city was quite liberal, most Islamist militants in San Diego came to pray at this mosque. Given his contacts with suspected militants, the FBI opened an investigation on him in 1999 but closed the inquiry the next year. He was arrested twice for soliciting (prostitution) in San Diego. During his last year in San Diego, Nawaf al-Hazmi and Khalid al-Midhar came to worship at his mosque. It seems a stretch to call him their "spiritual mentor," as he seldom met at length with them. However, he was the spiritual mentor of the overall mosque.[675]

In 2000, al Awlaki got accepted into a doctorate program at the George Washington University, which coincided with a job offer as an imam at the Dar Al-Hijrah Mosque in Falls Church, Virginia. He accepted both offers, left San Diego in June for an extended stay in Yemen and Saudi Arabia and arrived in Virginia in January 2001 to start his job.[676] This job would later lead to a lot of speculations, including Kohlmann's. As journalist Scott Shane accurately wrote, "Later the mosque would have to fend off hyperventilating accusations of guilt by association with terrorists, notably Awlaki himself, and would be given a scurrilous label in the right-wing media, 'the 9/11 mosque.' Given that subsequent history, the motive of Dar Al-Hijrah leaders when they offered Awlaki a job as imam at the end of 2000 was more than a little ironic: they hired him specifically because they were worried about the dangers of radicalization. They feared that Dar Al-Hijrah, in suburban Falls Church, Virginia, was losing young people to a nearby, more overtly militant storefront mosque … Dar al Arqam [where] a charismatic bioscientist named Ali al-Timimi was drawing young people with a hard line: [no voting, no serving in the military]."[677] Dar Al-Hijrah was far more accommodating and wanted to keep young Muslims from drifting to Dar al Arqam. In 2001, by all reliable accounts, al-Awlaki was a Salafi but not yet a neo-jihadi.

---

[675] See the twelve volume FBI file on Anwar al-Awlaki (spelled Aulaqi in the FBI file), available at https://vault.fbi.gov/anwar-nasser-aulaqi. See also Scott Shane, 2015, *Objective Troy: A Terrorist, a President, and the Rise of the Drone*, New York: Tim Duggan Books, at 47–65.

[676] Shane, 2015, at 64–5. Al-Awlaki gave the same timeline to the FBI SA Wade Ammerman, who interviewed him on September 15, 17, and 19, 2001. See the FBI 302 on these three interviews in his file.

[677] Shane, 2015, at 64. To compound the irony further, since the mosque is one of the largest one in the region and in the vicinity of the Central Intelligence Agency, a lot of Muslim CIA officers, whom I know, also prayed there.

After the 9/11 attacks, al-Awlaki emailed his younger brother about the attacks: "I personally think it was horrible. I am very upset about it." When the FBI came to interview him on September 15, he "stated that he absolutely 'strongly condemns the attacks'."[678] When the FBI returned two days later with photographs, he recognized Nawaf al-Hazmi from San Diego but not the others.[679] The FBI file later revealed that one of the mosque regulars remembered that al-Hazmi and another 9/11 terrorist, Hani Hanjour, had come to the mosque earlier that summer to ask whether al-Awlaki could help them find an apartment. The FBI started a second full field investigation on al-Awlaki and conducted electronic (emails and telephone) and physical surveillance on him starting September 26, 2001 and continuing until he left the United States at the end of March 2002. As al-Awlaki was articulate, he became the focus of many media interviews and appeared on multiple television channels. His sermons from that period were taped (and monitored by the FBI) and some are still available on the Internet. I listened to some of his early lectures dating from 2000 to 2002: they have a Salafi bent and start with stories from either the Quran, the hadith, or the lives of his companions. Al-Awlaki advocated a type of moral equivalence that disturbed many Americans: he simultaneously condemned the terrorist attacks on the United States, which killed 3,000 innocent Americans and the U.S. attacks on Muslims, which also killed many innocent Muslims. He saw himself as a bridge between Muslims and non-Muslims.[680]

Al-Awlaki became one of the most sought-after Muslim speakers in the country. In July 2001, he preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon. No one was scandalized by his lectures.[681] He was constantly on the move, as he told the FBI. "Over the past six months, Aulaqi has traveled quite extensively. In mid-August [2001], he took a three-week trip to Sanaa… For the past three weeks, Aulaqi traveled every weekend. Over the weekend of 9/1/01, he traveled to Chicago to attend the Islamic Society of America Conference [His lecture there was "Tolerance: A Hallmark of Muslim Character."[682]]. He was also in the United Kingdom on the weekend of 8/25/01, and last

---

[678] FBI 302 of Aulaqi, dated 9/15/2001, at 2.
[679] FBI 302 of Aulaqi, dated 9/17/2001, at 1–2.
[680] Shane, 2015, at 82–105.
[681] Shane, 2015, at 99, 101–2.
[682] Shane, 2015, at 99.

weekend, 9/9/01 he spoke in San Diego at a conference … organized by the Muslim Student Association."[683]

In March 2002, a multi-agency task force conducted Operation Green Quest over a two-day period in northern Virginia raiding Muslim institutions, businesses and homes. In one home, federal agents handcuffed the wife and daughter of a prominent Muslim leader at gunpoint and held them for four hours, not allowing them to get their head scarves. Al-Awlaki reacted in his next sermon: "So this is not now a war on terrorism…. This is a war against Muslims… it is happening here in America, that is claiming to be fighting this war for the sake of freedom while it's infringing on the freedom of its own citizens–because they're Muslim, for no other reasons." But instead of a violent response to this provocation, al-Awlaki advocated a civil right struggle for Muslims to stand for their rights against government intervention: "there are no rights unless there is struggle for those rights. And the history of America in that sense is very clear. African Americans in this country had to go through a struggle. Their rights were not handed to them."[684]

So, even though Kohlmann tries to build a case against WAMY USA through guilt by association, his various attributes of al-Awlaki up to the 9/11 terrorist attacks do not stand up to scrutiny. Al-Awlaki later became a leader of AQAP, but this probably happened around 2008, about seven years after the 9/11 attacks. As far as being a "spiritual mentor" to five 9/11 terrorists, "[t]he label that later came to be paired with Awlaki's name–'spiritual advisor' to one [al-Hazmi] or both [and al-Midhar] future hijackers–appears in early FBI documents but seems to be based on nothing more specific than the vague recollections of worshippers who thought they had seen the men, or at least Hazmi, in the imam's office."[685] I have not seen any evidence of al-Awlaki interacting with either Ahmed al-Ghamdi or Majed Moqed, and Kohlmann does not provide any in this report. Al-Awlaki seems to have had a close association with WAMY USA for a few months when he was the imam of Dar Al-Hijrah, which was located about seven minutes away from the WAMY USA office. WAMY may have distributed his early sermons, but they were not radical, extreme, or neo-jihadi. In fact, I learned a lot from them when I listened to them. He only started having controversial lectures when he released *Constants on the Path of Jihad* four years later from Yemen. WAMY invited him to lecture at several WAMY USA

---

[683] FBI 302 of Aulaqi, dated 9/15/2001, at 1–2.
[684] Quoted in Shane, 2015, at 104, 118.
[685] Shane, 2015: 114.

camps, but he probably only lectured at local ones. He certainly did not lecture at the summer 2002 camps in Texas referred to in Kohlmann's report because he was already out of the country as he left in March 2002.[686] At the same time, he spoke on national television, the U.S. Congress, and the Pentagon, none of which are known to be hotbeds of radicalism. Being a prominent preacher and within minutes of WAMY USA, he did coordinate some activities with WAMY USA like meeting with a visiting scholar,[687] but there was nothing wrong with that.

When al-Awlaki was in the United States, until his departure, he had no links to terrorism at all. As mentioned, right after the 9/11 attacks, the FBI became suspicious of him again and opened a full field investigation that filled 12 volumes and more than 6,000 pages. They surveilled him every day, physically and electronically, and listened to his phone conversations. Yet, they could not build a case against him. However, during their surveillance they discovered that he regularly used escort services in Virginia and the District of Columbia. They tried to build a criminal case against him for crossing state lines to hire the services of prostitutes, but it was so weak that the prosecutors turned it down. They also discovered that he had lied when he came to the United States in 1990 by claiming that he was born in Yemen in order to hold onto his college scholarship. He applied for a social security card with this false place of birth and got a U.S. passport with this social security card in 1993. This type of passport fraud had a ten-year statute of limitation. So, a warrant for his arrest was issued in June 2002 in Colorado. However, when the prosecutor found out that al-Awlaki had corrected this false information when he sought a replacement for his social security card in 1996, he withdrew the warrant. More than a decade after these events, the FBI was unequivocal: "Extensive investigation by the FBI has not developed any evidence that Awlaki had advance knowledge of or any involvement in the 9/11 attacks, nor has the FBI developed evidence that he knowingly provided support to any hijacker in furtherance of that plot."[688] Kohlmann's quote from President Barak Obama at the end of

---

[686] Kohlmann, in FN 280, at 56, is referring to WAMYSA030079 – 81. Al-Awlaki was invited in May 2002 to give lectures at these camps in July 2002 after he had already left the United States in March 2002.

[687] WAMY SA 1519. I believe Dr. Abdullah in his deposition, gives the wrong date for this note. See Dr. Ibrahim Abdullah's Deposition Transcript (henceforth Dr. Abdullah deposition), October 21, 2019, at 67. It cannot be about 2000 because al-Awlaki was still in San Diego until June and in Yemen for the rest of his time. The note was written in 2001, after al-Awlaki came to Virginia and became one of the imams of Dar Al-Hijrah.

[688] Shane, 2015, at 106–25, the quote is at 113.

paragraph was about al-Awlaki *after* he had joined al Qaeda in the Arabian Peninsula, or about him after 2008, seven years after the 9/11 attacks. It did not pertain to al-Awlaki in 2001, which is the time period at issue in the present litigation.

Had Kohlmann again applied the "comparative analysis" he claims to use, he would have compared al-Awlaki to other people involved in the 9/11 plot: KSM, Ramzi bin al-Shibh, Mustafa al-Hawsawi, Ali Abd al-Aziz Ali (Ammar al-Baluchi), and Walid bin Attash (Khallad) or even people who knew about it: Said Bahaji and Zakariya Essabar. All seven of them have something in common: they all went to Afghanistan days before the attack after they were warned about it. Al-Awlaki, on the other, stayed put and did not leave the country. This is a strong indicator that he did not know anything about it and was not involved as the FBI realized. Six months later, he did flee the United States, but for a totally different reason. He had just discovered from one of the escort services he used that FBI agents regularly interviewed it about all the prostitutes he had hired and had a whole file on him. Realizing that it would completely destroy his reputation as an imam, he fled the country almost immediately to escape the scandal.[689]

Kohlmann's allegation that WAMY supported the 9/11 terrorist through its link with Anwar al-Awlaki is based on guilt by association compounded by anachronism, projecting backward to 2001 al-Awlaki's 2009–11 involvement with AQAP. Although AQAP has the name al Qaeda in it, it is a different organization from al Qaeda and was only created in its final version, the one that al-Awlaki was associated with, in January 2009 from the merger of two branches of the remains of Saudi and Yemeni neo-jihadis,[690] more than *seven* years after the 9/11 attacks.

### J.   WAMY Canada Alleged Funding of Terrorism

Three plaintiffs' experts allege that WAMY funded terrorism through its Canadian office, WAMY Canada. They all refer to the same document, namely the Canadian Revenue Agency's (CRA) audit of WAMY Canada.[691] Their allegations are similar: a) WAMY Canada had

---

[689] Shane, 2015, at 106–9, 116–21. His FBI file is full of details of his sexual escapades, almost every other week, on December 13, 2001; January 8 and 18, 2002; February 4, 2002…
[690] Shane, 2015, at 31, 40.
[691] Levitt report, at 29; Winer report, paragraph 12.12.12, at 108; Kohlmann report, paragraphs 190–4, at 57–8. The document they are referring to is the CRA's audit of WAMY dated August

significant financial irregularities and deficient accounting practices;[692] b) WAMY (Saudi Arabia) maintained substantial control over WAMY Canada, which was of concern because of adverse reporting on WAMY (Saudi Arabia) providing support to terrorist organizations;[693] c) WAMY Canada was closely associated with BIF Canada and BIF USA, in that it shared a common bank account and a common director (WAMY Canada and BIF Canada);[694] d) WAMY (unspecified, but I suspect that they meant WAMY Canada) provided funds to BIF USA and/or BIF Canada, which "provided resources to entities engaged in terrorist activities";[695] and e) WAMY Canada distributed "literature and other material produced by WAMY Saudi Arabia which 'in our view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change.'"[696]

   Before dealing with these allegations, let us first put them in context. WAMY Canada's first director, Mohammed al-Khatib declared that WAMY USA director Binladin had approached him to represent WAMY USA in Canada, to which al-Khatib agreed around 1997.[697] WAMY Canada was incorporated on December 10, 1997.[698] Al-Khatib applied for income tax registration for Canadian charities on June 7, 1998, listing his home address as the WAMY Canada's address.[699] WAMY Canada was registered with CRA as a charity for tax exempt status

---

23, 2011 (Winer has the wrong date in his FN 209) which is an audit of WAMY (Canada) from January 1, 2000 to December 31, 2003 (Kohlmann in paragraph 191 has the wrong terminal date); its accompanying letter dated January 5, 2012; and appendix A, stating the relevant provisions of the Income Tax Act. It is present in multiple places in the discovery material, and Kohlmann refers specifically to FED-PEC0218179–203. I use PEC-WAMY031447–68 because it appears to be the CRA's own file on WAMY Canada (PEC-WAMY030839–1430, PEC-WAMY031431–611) and contains copies of what the CRA used as evidence for its claims.
[692] Kohlmann report, paragraph 191, at 57–8. In this paragraph, Kohlmann wrote that the CRA audit was from January 1, 2000 to December 31, 2000, it was to December 31, 2003. See CRA Audit, at 1 (PEC-WAMY031447).
[693] Kohlmann report, paragraph 192, at 58; Levitt report, at 29.
[694] Kohlmann report, paragraph 193, at 58; Levitt report, at 29, which adds that BIF was on the U.N.'s list of entities tied to al Qaeda; Winer, paragraph 12.12.12., at 108, which adds that the Canadian and USA branches of BIF also shared a common director, Arnaout, who had pled guilty to racketeering charges in the U.S. for providing financial assistance to individuals engaged in violent activities overseas.
[695] Kohlmann report, paragraphs 190, 193, at 57–8; Winer, paragraph 12.12.12, at 108.
[696] Kohlmann report, paragraph 194, at 58.
[697] Declaration of Mohammed al-Khatib, March 29, 2018, henceforth Khatib declaration, at 1.
[698] WAMYSA057575–9.
[699] WAMYSA057580–1.

The CRA Audit links BIF-Canada and BIF-USA with the fact that Arnaout was a director for both organizations. It then quoted Arnaout's guilty plea that he provided assistance to people engaged in violent activities overseas. Both of these facts are true, as opposed to the CRA Audit's last item, namely that Batterjee was chairman of WAMY (Saudi Arabia) as well as the founder of BIF-USA. Its citations for this last claim were Chris Hedges' *New York Times* article and a 2006 Danish Institute of International Studies paper written by … Kohlmann.[726] It concludes that these three items indicated that "WAMY maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities."[727] In turn, Kohlmann quotes this CRA Audit passage in full in his report.[728]

This is an example of a circular echo effect: Kohlmann make allegations (his 2006 DIIS Paper), which are picked up by the CRA, which are then cited by Kohlmann in his report as evidence for his original allegations! The CRA allegations continued to be based on a quick investigation of third-hand information by the Canadian administration, which does not stand up to more rigorous scrutiny. It did not conduct any more serious investigation in the field, but to its credit it interviewed the target of its audit but did not ask them about the adverse reporting on WAMY. I have already addressed the absence of relationship between WAMY and BIF in section II.G of this report.

In summary, the evidence that WAMY funded BIF-USA is based on a false attribution to a wire transfer that probably did not come from WAMY. The link between BIF-Canada and BIF-USA is true, but not between WAMY and BIF-USA, based on Hedges' ubiquitous but flawed article and Kohlmann's own allegations.

### 5. WAMY Canada's Literature Promoting Intolerance and Violence

Finally, Kohlmann echoes the CRA Audit section 2.4 "Lack of Public Benefit / Promotion of Intolerance"[729] alleging that WAMY–Canada distributed "literature and other

---

[726] CRA Audit, FN 48, at 14 (PEC-WAMY031460), which states that "BIF appears to have been established by Mr. Batterjee as an affiliate of WAMY (Saudi Arabia)" citing Evan Kohlmann, 2006, *The Role of Islamic Charities in International Terrorist Recruitment and Financing*, Danish Institute for International Studies Working Paper No 2006/7, available at PEC-WAMY000654–76.
[727] CRA Audit, at 14 (PEC-WAMY031460).
[728] Kohlmann report, paragraph 190, at 57.
[729] PEC-WAMY031463–5.

material produced by WAMY–Saudi Arabia which 'in our view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change.'"[730] The evidentiary basis for this allegation is an MWL pamphlet, a reference in a scholarly article to David Kane's affidavit, and a book by Maududi handed over by WAMY Canada during its 2004 audit.

WAMY is not MWL. They are two different charities and al-Khatib was also an MWL officer. Kane's affidavit was already addressed in the section on ideology. Providing Maududi's book to the CRA auditor does not mean that WAMY Canada was distributing it. The pamphlet and the book apart, the reference to Kane's affidavit came from a quick search that resulted in finding an article that referenced Kane's affidavit. This is again typical of an administrative investigation, which relies on easily available public information, usually online and without context, and of questionable reliability.

In addition, as argued in the previous section, the alleged promotion of intolerant and violence in Canada is not a proximate causation of the 9/11 attacks since, to my knowledge, none of the 9/11 terrorists were in Canada in the mid-2000 to March 2001 and attended a WAMY camp.

In summary, all three plaintiffs' experts cite the CRA Audit as key evidence for their case that WAMY funded or contributed to the 9/11 attacks. This is a weak argument because of the weak evidentiary basis of the CRA Audit allegations based on a quick Internet search resulting in information that has been debunked later on, and the fact that any of these specific allegations are not proximate causation to the 9/11 Attacks.

### K.  WAMY Employees Helping al Qaeda (Adel Hassan Hamad)

Kohlmann devotes five paragraphs to former WAMY employee Adel Hassan Hamad as a key link between WAMY and al Qaeda.[731] Both he and Winer also implicitly refer to Hamad's GTMO case when they discussed the fact that DoD analysts refer to WAMY as a "Tier 1 NGO" or a "Tier 1 Counterterrorism NGO target."[732] I have already addressed this DoD labeling earlier.

---

[730] Kohlmann report, paragraph 194, at 58. The quote is from PEC-WAMY031463–4.
[731] Kohlmann report, paragraphs 168–72, at 51–2.
[732] Kohlmann report, paragraph 159, at 47; Winer report, at paragraph 12.10.3, at 101.

Let us now focus on Kohlmann's allegations about Hamad as a link between WAMY and al Qaeda. First, let us examine his background and the context of these allegations.

### 1. Hamad's Background

Adel Hassan Hamad was born in 1958 in northern Sudan. His father was a physician's assistant, which meant that he was a physician in the rural area where Hamad grew up. After high school, Hamad studied air conditioning at a trade school in Alexandria, Egypt. After graduation, he returned to Sudan, where he worked on the air conditioning system of a textile factory. He joined the Muslim Brotherhood in 1984 but grew disillusioned and stopped attending meetings two years later. In 1986, he got a job with Lajnat al-Daawa al-Islamiya (LDI, the Committee of Islamic Appeal), a Kuwaiti charity. It sent him to Peshawar to work as a schoolteacher at the Hira Institute in Pabbi with Afghan refugee children and help with administrative tasks and some food delivery. In 1987, he married back in Sudan and returned with his bride to Pabbi. They eventually had five daughters.[733]

The director of LDI's Peshawar office was Zahed Sheikh Mohammed, KSM's older brother, a moderate Muslim Brother, who has never been accused of being involved in any violent action. After finishing college in the United States, KSM was hired by LDI and came to Peshawar. Since Hamad and KSM circulated in the same circles and worked for the same company for a short time, it is possible that they met. When his later attorney asked Hamad whether he met KSM, Hamad replied that it was possible, but he did not remember him and had never been introduced to him by his brother. There were a lot of ansar working in Peshawar in the late 1980s.[734]

In 1993, Hamad was promoted to do some administrative work and bookkeeping at the LDI main office in Peshawar, where he moved his family. At the same time, he completed a master's degree in Peshawar in 1995. Over time, Kuwaiti funding for LDI dried up and Hamad was laid off in 1999. He tried his hand importing small electronic goods from Xinjiang Province,

---

[733] Steven Wax, 2008, *Kafka Comes to America: Fighting for Justice in the War on Terror: A Public Defender's Inside Account*, New York: Other Press, at 47–55, 98–103. Steven Wax was Hamad's attorney. See also PEC-WAMY029012; FED-PEC0141770–86.

[734] Terry McDermott and Josh Meyer, 2012, *The Hunt for KSM: Inside the Pursuit and Takedown of the Real 9/11 Mastermind, Khalid Sheikh Mohammed*, New York: Little, Brown and Company, at 34–9; Wax, 2008, at 103; Department of Defense, 2006, JTF-GTMO Detainee Assessment, Khalid Shaykh Muhammad, ISN: US9KU-010024DP, December 8, 2006, at 3.

China for several months until he got hired by WAMY Pakistan in 2000 to be the chief administrator for its Chamkani hospital in Paktia Province, Afghanistan. The hospital had a reputation for excellence and its small staff worked and lived together there for 22 to 25 days straight with 6 to 8 days off. Hamad returned to Peshawar to be with his family on his days off. They lived in a second-floor apartment of a building where the first floor housed fellow humanitarian, Mammar Ameur, who was registered as a U.N. refugee from Algeria. By mid-2002, many Arab speakers had left Pakistan and the Sudanese government closed the school where Hamad's children were studying. Since he wanted them to continue their education, he faced the choice of returning home with his family or moving with them to Islamabad, where there was an Arabic-language school. The family left for its annual trip back to Sudan in June still undecided. During the trip, it decided to stay in Khartoum while Hamad returned to Peshawar on July 14. On July 18, 2002, very early in the morning, an ISI Directorate squad accompanied by an American officer stormed his building looking for an al Qaeda safehouse. The search failed to find anything compromising and the assault team turned to the American, who told them to book both Hamad and Ameur.[735]

## 2. Kohlmann's Allegations

In paragraph 168, Kohlmann accurately quotes from the unclassified transcripts of the proceedings of the Combatant Status Review Tribunal (CSRT) for Adel Hassan Hamad (ISN940).[736] In paragraph 169, Kohlmann stated that Hamad worked for LDI before WAMY and that LDI was later designated an SDGT on January 9, 2003 (the U.N. followed suit on February 20, 2003). He then quotes from a Treasury Department press release that gave additional background, "LDI is one of the most active Islamic NGO to give logistical and financial support to the mujahedeen operating in the Pakistan-Afghanistan area." The press release went on to

---

[735] Steven Wax, 2008, at 104–106. See FED-PEC141772; PEC-WAMY029012; WAMY SA E00 1088–91; WAMY SA E00 1093.

[736] The first quote in this paragraph is from the allegation 3.a.1. (at 1) stating that he had been employed by WAMY in Pakistan and Afghanistan for about one and a half years before his arrest. The next two quotes are his replies that he was the manager of the WAMY hospital in Afghanistan and after September 2001, he returned to WAMY's main office from where he distributed aid supplies to the refugee camps in Pakistan (at 2–3).

claim that several LDI employees were al Qaeda members, including Ramzi Yousef and KSM, who was the "head of the Peshawar branch of LDI from 1988 to 1995."[737]

Kohlmann quotes the Treasury Department press release accurately but as shown in section II.J of this report, Abdul Basit Abdul Karim (Ramzi Yousef's real name) was never a member of al Qaeda. He came to Peshawar in 1991, underwent training at Khalden (a non-al Qaeda camp and its big rival) and stayed there teaching courses on bomb making.[738] To my knowledge, Abdul Karim never worked for LDI. KSM did work for LDI for a short time in 1987, but he was not its director.[739] This was his older brother Zahed, as the summary of the evidence of Hamad's Administrative Review Board that Kohlmann also quotes, clearly states.[740] Nor was KSM a member of al Qaeda at the time he worked for LDI. He joined much later, in early 1999, as shown in section II.J of this report. These Treasury allegations, on the basis of which some organizations are designated SDGT, are examples of poor research and investigation, as have been illustrated throughout this report.

Kohlmann ends paragraph 169, "Hassan met with Khalid Sheikh Mohammed (KSM) while working at the same refugee camp run by LDI. That camp, the Jelazee Refugee Camp, was overseen by KSM's brother, Zahid Al-Sheikh."[741] Kohlmann quotes the military prosecutor in Hamad's ARB proceedings, and not the answer given by Hamad. Here is the full exchange between Hamad and his prosecutor:

> Designated Military Officer: The Detainee met Khalid Sheikh Mohammed at the Jelazee Refugee Camp in 1987. Khalid Sheikh Mohammed operated a "cultural center" located at the camp. The center was used to prepare Afghan people who had been recruited for the jihad against the Russians.

---

[737] "Protecting Charitable Organizations – I: Additional Background Information on Charities Designated Under Executive Order 13224," U.S. Department of the Treasury Resource Center, available at https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-i.aspx#ldi.

[738] MacDermott and Meyer, 2012, at 41. See also the transcripts of *U.S. v. Ramzi Yousef et al*, S.D.N.Y., No. S1293CR.180 (KTD) tried from May 29 to September 5, 1996.

[739] Wax, 2008, at 102–3; MacDermott and Meyer, 2012, at 34–8; JTF-GTMO KSM Assessment, at 3.

[740] See FED-PEC0181050, paragraph b.2. Kohlmann cites this document in FN 248, at 51.

[741] Kohlmann report, paragraph 169, at 51.

Detainee: I never met Khalid Al Sheikh and I don't have any personal relationship with him. I used to see him from afar and I know that he had a cultural center for some Afghani students to prepare them for fighting the Russian forces in the Afghani jihad against the Russians.

Designated Military Officer: Khalid Sheikh Mohammed's older brother, Zahid Al-Sheikh, was the director of the Jelazee Refugee Camp *and LDI in Peshawar, Pakistan*.

Detainee: *Zahid Al-Sheikh was a former manager of LDI* and not the manager of the camp.[742]

Please note that Kohlmann's omission in italics contradicts the Treasury false allegation that KSM was LDI's director, which of course is a far more serious indictment of LDI and Hamad because KSM is of course directly linked to the 9/11 attacks. As seem in so many parts of his report, this type of careful and subtle anachronisms and critical omissions in quoting documents is a hallmark of Kohlmann's methodology.

In paragraph 170, Kohlmann quotes accurately from Hamad's JFT GTMO Detainee Assessment that *at the time* Hamad was employed by LDI, LDI was *now* assessed to have been a Tier 2 NGO, that is one that had demonstrated the intent and willingness to support terrorist organizations willing to attack US persons. It was downgraded on March 3, 2004. However, the lack of consistency among U.S. government analysts whether at the Department of Defense or Department of Treasury is shown by the fact that they rated WAMY and LDI in opposite ways. JTF GTMO analysts assessed WAMY as a Tier 1 NGO but LDI only as a Tier 3. Yet, Treasury analysts saw it the opposite way. Treasury analysts correctly never designated WAMY as an SDGT but designated LDI as one and the U.N. followed suit the next month.

As the 9/11 Commission staff on Financing Terrorist had stated, once designated by Treasury, it was difficult to get delisted for a multitude of reasons. However, a decade later, the U.N. established an office of the Ombudsman to look into the complaints of wrongful listing of innocent companies. On September 4, 2013, the Security Council Al-Qaida Sanctions Committee deleted Lajnat Al Daawa Al Islamiya from its sanction list after a careful full field investigation by the office of the ombudsman.[743] This greatly weakens Kohlmann's insinuation that LDI

---

[742] Department of Defense, Summary of Administrative Review Board Proceedings for ISN 940, at FED-PEC0141773–4. Italics added to emphasize what Kohlmann omitted in his account.
[743] https://www.un.org/press/en/2013/sc11109.doc.htm.

supported terrorists. Though LDI has nothing to do with WAMY, Kohlmann is trying to implicate Hamad as a material supporter of al Qaeda with one organization (LDI), which may imply that he continued support of al Qaeda when he went to work for another organization, WAMY. Of course, all of this is just insinuation as neither JFT GTMO nor anyone else has ever shown that Hamad ever supported al Qaeda or any terrorist organizations in the first place.

In paragraph 171, Kohlmann correctly quotes from Hamad's JFT-GTMO Detainee Assessment that Hamad was captured with Mammar Ameur, who had been "assessed as an Al-Qaida facilitator due to his associations and employment with WAMY, who has ties to extremist organizations."[744] In paragraph 172, Kohlmann quotes from Ameur's own JFT-GTMO Detainee Assessment,[745] which never states that Ameur ever worked for WAMY. Ameur worked for only Afghan Reconstruction (ARCON), the Egyptian Human Relief Organization (EHRO), the African Muslim Agency (AMA), a U.N. refugee, and ran a honey shop. There is no mention of WAMY as an employer for Ameur at all.[746] The only mention of WAMY in Ameur's JTF GTMO assessment is in connection to Ameur's neighbor, Adel Hamad, who worked for WAMY.[747]

So, twice in three paragraphs, Kohlmann was faced with contradictions in the documents he not only reviewed but cited. In both cases, he simply ignored the one that did not directly or indirectly implicate WAMY and quoted only from the one that did. This is not accepted methodology, which directs experts to evaluate all the evidence and draw conclusions from a careful analysis of it. Kohlmann simply buries the exonerating evidence and emphasizes only the incriminating one. A sounder methodological statement, based on a *comparative analysis* of the relevant documents involved, would state: on the weight of the evidence, namely the actual listing of Ameur's curriculum vitae in his own JTF-GTMO assessment, the summary of his ARB

---

[744] Kohlmann report, paragraph 171, at 52, quoting Hamad's detainee assessment: Department of Defense, 2005, JTF-GTMO Detainee Assessment, Adel Hassan, ISN: US9SU-000940P, March 25, 2005, at 7 (PEC-WAMY029017 or FEC-PEC0197478)

[745] Kohlmann report, paragraph 172, FN253, at 52.

[746] Department of Defense, 2005, JTF-GTMO Detainee Assessment, Mammar Ameur, ISN: US9AG-000939DP, April 13, 2005, at 2 (PEC-WAMY029020).

[747] Department of Defense, 2005, JTF-GTMO Detainee Assessment, Mammar Ameur, ISN: US9AG-000939DP, April 13, 2005, at 5 (PEC-WAMY029023).

proceedings,[748] and his summarized sworn statement at his Combatant Status Review Tribunal (CSRT),[749] it is far more likely than not that Ameur never worked for WAMY. Instead, Kohlmann avoids doing the very comparative analysis of all the relevant documents that he claimed to be using in his methodology section, and selectively quotes only the ones that support the argument of the plaintiffs' lawyers who retained him that WAMY supported al Qaeda.

      Kohlmann concludes his remarks about Hamad, "According to the DOD, other Guantanamo Bay prisoners like Hamad who were working under the auspices of WAMY were 'likely using [their] employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network.'"[750] His quote is not from Hamad's JTF-GTMO detainee assessment but to his former downstairs neighbor Ameur[751] as previously mentioned. This is surprising: why would Kohlmann not quote from Hamad's own JTF-GTMO detainee assessment? First, let us look at the actual sentence in Ameur's assessment that Kohlmann quotes. It states, "Detainee was likely using *his* employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network."[752] I put in italics the word that Kohlmann modified in the quote. The statement was clearly only referring to Ameur and not to other GTMO prisoners. As we just saw, Ameur's former employers were ARCON, EHRO, and AMA. There is no mention of WAMY at all. Kohlmann's juxtaposition of WAMY to this statement incriminates WAMY when WAMY was never mentioned in the original statement. Kohlmann did not just rely on grammatical understanding of relevance to incriminate WAMY, he changed "his" to "their" in the original sentence to lump WAMY together with ARCON, EHRO, and AMA as one of the NGOs facilitating funds and personnel for al Qaeda. I have no idea if the allegations about the other NGOs are correct or not and it is not this report's task to find out. But, clearly WAMY was not included in the original list of incriminated organization. This intentional inclusion of WAMY is just another example of Kohlmann's manipulations of documents to give the impression that

---

[748] https://assets.documentcloud.org/documents/77596/isn-939-mammar-ameur-administrative-review-board.pdf.
[749] https://assets.documentcloud.org/documents/77597/isn-939-mammar-ameur-combatant-status-review.pdf.
[750] Kohlmann report, paragraph 172, at 52.
[751] PEC-WAMY029020, paragraph 3.b.
[752] PEC-WAMY029020, italics added to show how Kohlmann modified the original sentence quoted.

they support his contention that WAMY funded al Qaeda when such allegation is not present in the original document.

Nevertheless, I believe that Kohlmann did capture the spirit of JTF GTMO analysts, who strongly believed that all Islamist charities materially supported al Qaeda and classified them all as terrorist organizations. My comments in the previous paragraph were more about how Kohlmann inadvertently revealed his methodology of intentionally changing the contents of documents to make them consistent with his claim. The surprise is that he did not have to do that at all. Hamad's own JFT-GTMO detainee assessment contained the same pithy sentence (now correctly referring to WAMY) summarizing the JTF GTMO analysts' blatant prejudice against all Islamist charities: "Detainee was likely using his employment in Non Governmental Organizations (NGOs) to facilitate funds and/or personnel for Al-Qaida and/or its global terrorist network. Detainee was always employed by organizations that espoused radical Islamic views and/or assisted individuals who were part of Al-Qaida or were associated with Usama Bin Laden (UBL). Detainee was always associated with Islamic radicals, yet claimed to have avoided any participation in jihad or terrorist activities."[753] In other words, Hamad and all humanitarians like him in Peshawar were all guilty by association with organizations that JTF GTMO analysts assumed were all terrorist organizations.

As mentioned in my methodology section, the documents are the start of an investigation, not its end. So, what happened to Hamad and his downstairs neighbor Ameur?

### 3. Follow up Investigation of Hamad

Hamad's supervisor at WAMY-Pakistan testified in a deposition that Hamad worked for him as the administrative officer of the WAMY Hospital in Chamkani, Afghanistan.[754] WAMY Secretary General al-Wohaibi testified that Hamad did not have any access to WAMY funds. After his arrest, WAMY conducted an internal investigation, which revealed that Hamad had no relation to anything else except for providing relief and aid, medical aid or supplies, follow up schools, and follow up agricultural programs. He could not have diverted any aid materials under his control because he did not have access to it. WAMY's programs were very specific and

---

[753] PEC-WAMY029012 or FEC-PEC0197473.
[754] Ibrahim Anwar Deposition, at 293–7.

assigned or destined to hospitals, to schools, food supplies, agricultural programs, and Hamad was committed to these programs.[755]

Steven Wax's book is about Hamad, who was assigned to Public Defender Wax as a client by the court. He tells his Kafkaesque experience trying to defend his client when he was denied documents and even the nature of the allegations against his client. He finally got the CSRT and ARB proceedings and Hamad gave him five more pages stating the ARB's assessment of the situation. Wax saw it all as guilt by association. There was nothing in the material that Hamad had ever been on a battlefield, been a terrorist, or harmed anyone. He had never been accused of financing terrorism or being an arms runner. His material support role was not demonstrated but assumed. While WAMY was listed as a Tier 1 NGO by JFT GTMO analysts, no one else in the government ever listed it on any antiterrorism watchlist. No one including the CIA, FBI, or the military had ever bothered trying to confirm or refute Hamad's account that he was a full-time humanitarian without any connection to terrorism.[756]

Hamad underwent a CSRT review conducted by a three-member panel CSRT. It decided that Hamad met the criteria for the designation of Enemy Combatant, but the decision was not unanimous. An army major rejected the notion of guilt by association and found insufficient the allegation that Hamad be classified as an enemy combatant. He argued that, even if LDI and WAMY had supported terrorist organizations, it did not incriminate all their employees. Doing so would declare all physicians, nurses, and aid workers (like Hamad) enemy combatants. "To reach such a conclusion would provide for unconscionable results."[757] The dissenter even questioned the *JFT-GTMO Matrix of Threat Indicators for Enemy Combatants*.[758] "Even if these NGO's provided some support to these 'terrorist ideals and causes', this fact would not qualify them as being 'associated forces that are engaged in hostilities against the U.S. or its coalition partners.' Otherwise, every NGO that has some members who provided some support engaged in hostilities against the U.S. or its coalition partners would qualify as 'associated forces'."[759] The dissenter concluded his opinion,

---

[755] Dr. al Wohaibi deposition, at 126–9.
[756] Wax, 2008, at 109–11.
[757] The dissent is at WAMYSA571159–61, the quote is at WAMYSA571160.
[758] PEC-WAMY013648–64. This is the guideline discussed in section III.A.
[759] WAMYSA571160.

In essence, the Unclassified Summary (R1) amounts to saying that the Detainee is an enemy combatant because he was employed by NGO's that provided some support for "terrorist ideals and causes" and because he "came in contact" with al Qaida members. While this information may raise some suspicion, it does not provide a basis for an enemy combatant determination. Absent any allegations that the Detainee himself "directly supported hostilities in aid of enemy armed forces", the Unclassified Summary (R1) fails to even state a prima facie case that he has been properly classified as an enemy combatant. Simply stated, even assuming all the allegations in Exhibit R1 are accurate, the Detainee does not meet the definition of an enemy combatant. Consequently, the Detainee has constructively been denied his right to prepare and participate in the Tribunal. The Detainee could not prepare for an overall allegation that he is an enemy combatant when the supporting allegations do not even qualify him as an enemy combatant. Based upon this failure to even state a prima facie case and upon the analysis of the classified evidence (see Enclosure (3)(b)), the Author finds that the Detainee has been improperly classified as an enemy combatant.[760]

Wax and his team conducted a full field investigation in Afghanistan, Pakistan, and Sudan of Hamad's constant protests that he had nothing to do with terrorism. They traveled to Kabul, met with Hamad's former colleagues at the 60-bed surgical and gynecological hospital, of which he had been the administrator. They went to Pakistan and talked to the staff of WAMY Pakistan as well. They made some videos of their interviews.[761] They went to Sudan and talked to his family. They enlisted the help of the Sudanese Foreign Minister. Finally, Hamad was discharged from GTMO on December 10, 2007. He landed in Khartoum at 1 A.M. on December 13. As his Habeas Corpus lawyer wrote, "Upon arrival in his country, the Sudanese intelligence authorities who took custody of Adel brought him inside the terminal and gave him a beautiful new jallabiyah and kufi. After a short debriefing, he was taken to a hospital for a checkup and then driven home. At 5 A.M. he was reunited with his family after five years, four months, and twenty-five days of imprisonment."[762]

---

[760] WAMYSA571161.

[761] WAMYSA571238–46.

[762] Wax, 2008, at 215–36, 267–328, the quote is from 327.

Ameur was also released ten months later, on October 6, 2008, and went back to Algeria. It is easy to make uncorroborated allegations and refuse to seriously investigate them as Hamad's legal team did and documented their findings. On the basis of all the evidence, and not on just flawed interrogations conducted at GTMO, Hamad's history is unlike any confirmed enemy combatant I have studied. He and Ameur sued the U.S. government for their imprisonment, but their respective suits were dismissed for lack of subject matter jurisdiction. With Hamad and Ameur, like with hundreds of JFT-GTMO detainees, the initial accusations were never confirmed. They were quietly released without fanfare toward the end of the George W. Bush presidency when there was no evidence to try them even in military proceedings stacked against them.

Contrary to Kohlmann's reliance on unsubstantiated allegations in unreliable JTF-GTMO detainee assessments, the weight of the evidence generated from field investigation[763] does not support the allegation that Hamad was a link between WAMY and al Qaeda.

### L.  WAMY Allegedly Sponsored Ansar al Islam

Kohlmann claimed that WAMY sponsored an event in late 2002 featuring an Ansar al-Islam commander.[764] Since the event occurred after the 9/11 attacks, WAMY's alleged involvement in it could not have had any role the 9/11 attacks. I did not look further into this allegation on that basis.

Section III has systematically and thematically analyzed all the plaintiffs' experts' allegations that WAMY funded or materially supported al Qaeda and refuted each and every one of them. In the process of evaluating plaintiffs' experts' claims in their report, I noticed a disturbing pattern of violations of accepted social scientific methodology that undermine the basis of their opinions. It is this pattern that I now wish to address.

---

[763] This evidence that I reviewed comes from the investigation carried by Steven Wax's team and described in Wax, 2008. It includes affidavits from Hamad's family, photographs corroborating Hamad's narrative, and video testimonies from Hamad's work colleagues.
[764] Kohlmann report, paragraph 177, at 53–4.

## IV.    Opinion

In this part, I focus on Kohlmann's and Winer's reports because Jenkins does not make any allegations against WAMY and Levitt barely mentions it in his report. In arguing that WAMY provided material support to the 9/11 terrorists, Kohlmann and Winer have tried "to distill a common, accepted narrative."[765] In fact, the historiography of al Qaeda[766] and the alleged Islamic charity support for it are deeply contested in the scholarly literature.[767] Instead of addressing this complexity, they used flawed methodology to craft a narrative that is simple, linear, compressed, and wrong. Their flawed methodology violated common rules of the scientific method with their over-reliance on unreliable secondary sources; lumping unrelated things together and neglecting disconfirming evidence; disregarding the complex evolution of al Qaeda, Islamic charities, and the 9/11 conspiracy and straightening these convoluted narratives into linear ones that leave out critical information; and compressing time to generate anachronistic and chronologically impossible arguments. Kohlmann also stands out with his use of clever juxtapositions of unrelated material to imply a link between them and strategic omissions of critical parts of documents that contradict his arguments. Both plaintiffs' experts also neglect to address the court's guidance on proximate causation in their allegations about the 9/11 attacks.

Let me now illustrate the pattern of violations of the scientific method in their methodology.

### A.  Over-reliance on Flawed Secondary Sources

I assume that plaintiffs' attorneys provided their experts with access to the full discovery material upon which to form an opinion based on their expertise. The discovery material is full

---

[765] Kohlmann report, paragraph 12, at 4.

[766] See part II of this report.

[767] See Jonathan Benthall and Jérôme Bellion-Joudan, 2009, *The Charitable Crescent: Politics of Aid in the Muslim World*, London: I.B. Tauris; Abdel-Rahman Ghandour, 2002, *Jihad Humanitaire: Enquête sur les ONG islamiques*, Paris: Flammarion; Robert Lacy and Jonathan Benthall, eds., 2014, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond*, Berlin: Gerlach Press; Marie Juul Petersen, 2015, *For Humanity or for the Umma? Aid and Islam in Transnational Muslims NGOs*, London: Hurst & Company; and Ibrahim Warde, 2007, *The Price of Fear: The Truth Behind the Financial War on Terror*, Berkeley, California: University of California Press, for a few academic studies on this topic.

of primary source documents helpful to arrive at such opinion. This litigation has generated many primary source documents, which are priceless for true counterterrorist scholars and have been incorporated in new research.[768] Yet, all of plaintiffs' experts' reports are relatively devoid of references to such documents. Even Jenkins's narrative of The Road to 9/11 lacks a single citation to the discovery material. Instead, Kohlmann, Levitt, and Winer rely on secondary sources that have been shown to be unreliable since the time of their appearance. Below are just a few examples of their over-reliance on flawed secondary sources.

### 1. JTF GTMO Documents

Both Kohlmann and Winer start their respective sections on WAMY by accusing it of funding al Qaeda on the basis of Department of Defense JTF GTMO documents.[769] Later in his account, Kohlmann again uses these same documents to accuse Adel Hassan Hamid, a WAMY employee, of providing WAMY funds directly to al Qaeda.[770] In his section on WAMY, Kohlmann cites these documents 13 times, and Winer three times. Neither one of them bothers to ask whether these documents are reliable in terms of their respective contents. As previously mentioned in my methodology section, a document is only the start of a serious investigation, not its end. One must ascertain its credibility, reliability, context, and purpose.

The JTF GTMO documents are particularly unreliable as a source for legal proceedings. They appear to be internal documents, not to be shared with the outside public. They were classified secret, have been leaked, and now appear in the discovery material and in the public domain. The internal Matrix used by JTF GTMO analysts was simply a guidance for interrogation and assessment of the detainees. As shown in section III.A of this report, it was to be used "***not as evidence to prove a detainee's guilt or innocence***" (italics and bold script in the original for emphasis).[771] Its list of NGO associated forces[772] is not consistent with even with the low standards of Treasury's list of SDGT (see the next section). As the anonymous dissenter in Hamad's CSRT review argued, the Matrix was flawed because it was far too broad to be useful

---

[768] See Bergen, 2006; Bergen and Cruickshank, 2012; Cragin, 2008; Farrall, 2017; Hamid and Farrall, 2015; Hegghammer, 2020; and Wright, 2006, for some scholars using documents uncovered in this litigation.
[769] Kohlmann report, paragraph 159, at 47–8; Winer report, paragraph 12.10.3, at 101–2.
[770] Kohlmann report, paragraphs 168–72, at 51–2.
[771] PEC-WAMY013648.
[772] At PEC-WAMY013664.

to distinguish any real enemy combatants from innocent bystanders.[773] To my knowledge, the Matrix list, protected by the shroud of secrecy, has never been examined for credibility and reliability. Science requires that evidence be examined and tested to establish at least credibility and reliability, something that the Matrix lacks. To my knowledge, its reliability as a source as evidence has never been tested according to the preponderance of evidence standard required in civil litigation.

The JFT GTMO Detainee Assessments, upon which Kohlmann extensively relied on for five paragraphs of his report, are just as flawed as evidence. I do not want to argue that all the information that they contained was not credible and unreliable, but they consist mainly of analysts' speculations about a given detainee. In fact, after viewing dozens of them about people, with whose history I am familiar, I only found parts of their section 4 useful, namely the parts that deal with a detainee's prior history and capture information. The rest is often unreliable. Take for instance, two of the very few cases that have undergone outside impartial scrutiny in a court of law, Lakhdar Boumediene and Mustafa Ait Idir. Although they have nothing to do with this litigation, the assessment and process they underwent at JFT GTMO are the same as Hamad's and Ameur's in this litigation, who have not had the opportunity of such outside examination.

Both Boumediene and Idir were picked up in Bosnia for allegedly planning a terrorist plot against the U.S. Embassy in Sarajevo.[774] They were mentioned by President Bush in his January 29, 2002, State of the Union Address, "Our soldiers, working with the Bosnian government, seized terrorists who were plotting to bomb our embassy."[775] At the time of their respective assessments in 2008, they were both assessed to be "a HIGH risk, as he is likely to pose a threat to the US, its interests, and allies."[776] Boumediene and Idir were assessed to be of medium and high intelligence value respectively to report on Bosnia based NGOs. In other

---

[773] WAMYSA571160.

[774] Department of Defense, 2008, JTF-GTMO Detainee Assessment Lakhdar Boumediene, ISN US4AG-010005DP, April 1, 2008, at 4; Department of Defense, 2008, JTF-GTMO Detainee Assessment Mustafa Ait Idr, ISN US4AG-010004DP, June 30, 2008, at 4.

[775] George W. Bush, 2002, *The President's State of the Union Address*, The United States Capitol, Washington, D.C., January 29, 2002, available at https://georgewbush-whitehouse.archives.gov/news/releases/2002/01/20020129-11.html.

[776] Same wording for both detainees, at 2 of their respective assessments, just cited in the preceding FN.

words, despite having very little intelligence value (seven years of detention for intelligence on NGOs), they continued to be interrogated regularly up to the time of their respective assessments. When they did not confess to their interrogators' various accusations, the assessment was that they were deceptive. Their respective assessments took place more than *six* years after Bosnian authorities had completed their investigation and concluded, "the Investigative Judge and Prosecutor found no firm evidence that the suspects were involved in terrorist activities…. Due to the lack of evidence for the charges against these men, the investigative bodies suggest that the suspects be released from detention."[777]

Both Boumediene and Idir became famous for having submitted a writ of *habeas corpus* that was heard by the U.S. Supreme Court, which opined that the constitutionally guaranteed right of *habeas corpus* review applied to Guantanamo detainees.[778] The petition went to a *civilian* U.S. District Court for the District of Columbia, where both the government and the petitioners presented their respective cases. The court ruled for the petitioners, ordered that their writ of habeas corpus be granted, and ordered their release. As to the government evidence (basically similar to the allegations against Hamad in their respective detainee assessments), the court declared, "[t]o allow enemy combatancy to rest on so *thin* a reed would be inconsistent with this Court's obligation … to protect petitioners from the risk of erroneous detention" (italics in the original).[779] Boumediene and Idir were sent back to Bosnia and eventually released, with Boumediene choosing to live in France. Despite their assessment of being a high risk of threat to the U.S., they have lived quiet lives for the past decade.[780]

In the process of writing their book, Boumediene and Idir had two of their collaborators interview the Army analyst who had been responsible for their arrests in Bosnia and later became one of JFT GTMO's analysts in charge of their case. In his interview, the analyst said that the government would classify Boumediene and Idir as recidivists if they wrote a book. He continued, "They had not provided enough intelligence when they were fresh and new and bright

---

[777] Affidavit of Bosnian Prime Minister Behmen, reproduced in Lakhdar Boumediene and Mustafa Ait Idir, 2017, *Witnesses of the Unseen: Seven Years in Guantanamo*, Stanford, California: Stanford University Press, at 239.

[778] *Boumediene et al v. George W. Bush et al*, 553 U.S. 723 (2008).

[779] *Lakhdar Boumediene, et al., v. George W. Bush, et al*., U.S.D.C. District of Columbia, Civil Case No. 04-1166 (RJL), Memorandum Order U.S. District Judge Richard J. Leon, November 20, 2008, at 11.

[780] Boumediene and Idir, 2017.

and shiny. They had not provided anything of value." The interrogators and their boss were "very frustrated, because there was a lot of pressure from the legal teams, the *habeas* teams." Finally, the analyst concluded, "Seven years [in captivity]. That's inexcusable. The government knew they didn't have the intelligence on them. They interrogated them. They didn't get intelligence on them. They interrogated other people, and didn't get intelligence that would implicate their involvement. And they still held onto them for seven years. That doesn't make any sense. And at what cost?" This analyst contradicts the assessments on Boumediene and Idir, which he might have written in the first place. He concluded, "I'm honored to be part of this [interview]. And I'm eager to be on the record for you, because I want my story to be told as well. Part of my story is that I was involved in Bosnia. Part of my story is that I was involved in GTMO. And I want to be able to lend credence to their story by saying, 'Yeah, it's true. We didn't have intelligence on these guys. This was a wrong time, wrong place kind of thing.' And we can argue about whether or not that was an acceptable, appropriate, justifiable thing to do. But what certainly is not up for debate is that it should not have taken seven years to rectify that problem."[781]

So, despite spending years using various mild forms of torture allowed by the Department of Defense for the JTF GTMO,[782] the task force was unable to generate any form of useful intelligence on Boumediene and Idir. I admit that they were not the type of torture practices by the CIA, but they seem to have been just as unreliable.[783] My goal in presenting Boumediene's and Idir's cases is to challenge the credibility and reliability of the type of JTF GTMO documents that both Kohlmann and Winer used in relation to Hamad and WAMY. Their context was the hostile world reaction to the U.S. government's illegal attempts to escape international law and the Geneva Conventions. Their purpose was to provide some covert justification for GTMO's unjustifiable detention, no matter how transparently deceptive they were, as the dissenter in Hamad's CSRT review pointed out.

---

[781] Boumediene and Idir, 2017, 253, 256, 265–6.
[782] See Boumediene and Idir, 2017, at 260. I refused to use the euphemism Enhanced Interrogation Techniques that deceptively hides their true nature and are not compatible with a liberal democracy.
[783] Senate Select Committee on Intelligence, 2014, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program, Findings and Conclusions, Executive Summary*, December 3, 2014, PEC-WAMY033905–4429.

In support for Hamad, former Chief of Staff to the Secretary of State during the relevant period 2002–5, Lawrence Wilkerson, provided a sworn declaration, which is a real indictment of the JTF GTMO process and documents. He declared that "many of the prisoners detained at Guantanamo had been taken into custody without regard to whether they were truly enemy combatants, or in fact whether many of them were enemies at all … many of the detainees were, in fact, victims of incompetent battlefield vetting …  simply innocent civilians picked up on a very confused battlefield or in the territory of another state such as Pakistan."[784] Most of the prisoners were turned over by either Afghan or Pakistani forces and "often absolutely no evidence relating to the detainee was turned over, so there was no real method of knowing why the prisoner had been detained in the first place…. While Mr. Hamad was brought to Guantanamo after August 2002, I have no reason to believe that any more thorough process was used to determine whether his seizure or transfer to Guantanamo was justified."[785]

Wilkerson explained the reasons for continued detentions of innocent victims at GTMO. "I came to understand that there were several different reasons for refusal to release detainees in Guantanamo, even those who were likely innocent…. At least part of the problem was that it was politically impossible to release them. The concern expressed was that if they were released … the leadership of the Defense Department would be left without any plausible explanation to the American people, whether the released detainee was subsequently found to be innocent by the receiving country, or whether the detainee was truly a terrorist and, upon release were it to then occur, would return to the war against the U.S. Another concern was that the detention efforts at Guantanamo would be revealed as the incredibly confused operation that they were. Such results were not acceptable to the Administration and would have been severely detrimental to the leadership at DOD. Another part of the political dilemma originated in the Office of Vice President Richard B. Cheney, whose position could be summed up as 'the end justifies the mean,' and who had absolutely no concern that the vast majority of Guantanamo detainees were innocent, or that there was a lack of useable evidence for the great majority of them. If hundreds

---

[784] *Adel Hamad v. George Bush et al*, District of Columbia, CV 05-1009 JBD, Declaration of Colonel Lawrence B. Wilkerson (RET), March 24, 2010 (WAMYSA014776–84), at WAMYSA014779.
[785] WAMYSA014780.

of innocent individuals had to suffer in order to detain a handful of hardcore terrorists, so be it. That seemed to be the philosophy that ruled in the Vice President's Office."[786]

Wilkerson explained his involvement in the Hamad case, "I have made a personal choice to come forward and discuss the abuses that occurred because knowledge that I served in an Administration that tortured and abused those it detained at the facilities at Guantanamo Bay and elsewhere and indefinitely detained innocents for political reasons has marked a low point in my professional career and I wish to make the record clear of what occurred. I am also extremely concerned that the Armed Forces of the United States, where I spent 31 years of my professional life, were deeply involved in these tragic mistakes."[787]

Wilkerson's declaration is a strong indictment of GTMO and the generation of JTF GTMO assessments. The point of this whole section is that a true scholar or expert cannot just accept at face value any document, let alone JFT GTMO documents. By now the reader knows my mantra: a document is just the start and not the end of an investigation. Documents must be analyzed for their credibility, reliability, and context which affects their meaning, and their purpose, which could be some sort of political deception on the writer's part.

### 2. Treasury Administrative Documents

Kohlmann and Winer (and the CRA) also like to use the U.S. Treasury Department designation of some NGOs as SDGT as evidence for WAMY's alleged support for al Qaeda. Although the Treasury Department has never designated WAMY itself as an SDGT, Kohlmann and Winer used justifications in other designations to accuse WAMY indirectly of supporting al Qaeda. Many scholars have criticized Treasury's process of designation for its lack of transparency, inaccuracies, and unfairness.[788] Even the 9/11 Commission commented on the low standards of the Treasury Department's investigation for a designation as an SDGT. "The administrative record needed to justify a designation can include newspaper articles and other

---

[786] WAMYSA014781.
[787] WAMYSA014784.
[788] For instance, see Ibrahim Warde, 2007, *The Price of Fear: The Truth Behind the Financial War on Terror*, Berkeley, California: University of California Press, and Robert Lacey and Jonathan Benthall, eds., 2014, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond*, Berlin: Gerlach Press, especially chapters 8 and 9: 199–257.

hearsay normally deemed too unreliable for a court of law."[789] The 9/11 Commission staff explained, "In the United States … the power to designate derives from the executive's power to wage war against foreign enemies. As a result, the executive may rely on *less evidence than is required in a criminal or civil trial*. The judicial review that is afforded a designation is *extremely deferential to the executive's judgment*. In other countries, a designation is viewed as a judicial or quasi-judicial act, in which the accused is afforded a right to answer the charges and the standard of evidence is at least as high as would be needed to sustain a civil lawsuit."[790] The result of this low evidentiary bar and deference to the executive branch is that "[a] designated entity can challenge the designation in court, but its chances of success are limited. The legal standard for overturning the designation is favorable to the government, and the government can rely on classified evidence that it can show to the judge but not defense counsel, depriving the designated entity of the usual right to confront the evidence against it."[791]

Kohlmann has cited Treasury's press releases on the designations of BIF, Batterjee, and LDI as SDGT as strong evidence that WAMY supported al Qaeda and the 9/11 terrorists. The Benevolence International Foundation was indeed designated by Treasury's Office of Foreign Assets Control (OFAC). The 9/11 Commission staff used it as a case study in its monograph. BIF had been under intensive FBI full field investigation since 1998. On the basis of foreign intelligence reports, the FBI started its investigation of BIF, which featured surveillance, digging through garbage (which was very fruitful as BIF threw everything out), recruitment of inside sources, scrutiny of bank accounts, telephone bills (but not yet electronic surveillance) and so on. However, the FBI was unable to trace BIF's money directly to its ultimate destination overseas and therefore could not open a criminal case against Arnaout or BIF.[792]

After the 9/11 attacks, Congress passed the USA Patriot Act loosening the prior requirement for an electronic surveillance warrant, which was then approved on BIF. While a criminal case required strong evidence to convict a person, the same was not true for administrative procedures. On the basis of a clarification by the USA Patriot Act, OFAC "could freeze the assets belonging to a suspected terrorist supporter 'during the pendency of an

---

[789] Roth, Greenburg, and Wille, 2004, at 112.
[790] Roth, Greenburg, and Wille, 2004, at 84, italics added.
[791] Roth, Greenburg, and Wille, 2004, at 112.
[792] Roth, Greenburg, and Wille, 2004, at 95–7.

- He also refers to the CRA audit citation of an MWL pamphlet as evidence that WAMY supported the 9/11 terrorists (12.11.3). WAMY is not MWL.

- He then turns to WAMY's alleged financial support of al Qaeda and bin Laden, by claiming that WAMY funded LBI, which was one of the three charities that bin Laden and al Qaeda relied on (12.12.1 to 12.12.11). WAMY did fund some LBI projects in Pakistan until 1996 when LBI became WAMY Pakistan. However, LBI was not one of the three major charities funding al Qaeda. This was BIF, which an FBI informant alleged that it funded al Qaeda *in Sudan*. LBI never operated in Sudan. Here, there is a confusion of two different and separate organizations and an anachronism. WAMY forced the resignation of Batterjee from LBI in early 1993. WAMY never had anything to do with BIF. Not only does Winer confuse LBI with BIF, he also perseveres in believing that Batterjee was a chairman of WAMY as erroneously reported in the *New York Times*.[986]

- He then cites the CRA audit as evidence that WAMY supported the 9/11 terrorists (12.12.12). I have already addressed this issue in both Levitt's and Kohlmann's sections as they made the same argument.[987]

- He goes on to cite WAMY's alleged support of TWRA in the Bosnian War as evidence of WAMY's support of the 9/11 terrorists (12.12.13 to 12.12.16, 12.13.3). However, al Qaeda did not fight in Bosnia and any financial or military support by some possible intermediary organization to the Bosnian fighters did not flow to the 9/11 terrorists.[988]

- He repeats that a WAMY employee was a courier for bin Laden in Islamabad in 2002 as evidence that WAMY supported the 9/11 terrorists (12.13.1). I have already addressed this issue in the Kohlmann section as he made the same allegation.[989]

- He alleges that WAMY trained some Pakistani student group as evidence that WAMY supported the 9/11 terrorists (12.13.2). Again, even if true, which it is probably not, this training would not have helped the 9/11 terrorists. There was no connection between these Pakistani students and the 9/11 terrorists.[990]

---

[986] See sections III.C.2, IV.A.3.a and IV.A.4 of this report.
[987] See sections III.J and IV.A.7 of this report.
[988] See section III.F.1 of this report.
[989] See section III.D.3 of this report.
[990] See section III.D.4 of this report.

- He also cites the same article by Dr. al-Johani in support for Chechen victims as evidence that WAMY provided weapons to Chechen fighters and evidence that WAMY supported the 9/11 terrorists (12.13.3). I already addressed this issue as Kohlmann made the same point.[991]

- He quoted Dr. Noorwali comments on jihad as evidence that WAMY supported the 9/11 terrorists (12.13.4). I have also already addressed this issue as Kohlmann made the same point.[992]

Winer concluded, "these facts, coupled with additional information set forth in the documentation that I have reviewed, provide examples of how WAMY funded al Qaeda and associated Islamic terrorist organizations and separatist movements; provided them with financial and logistical support; helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones; provided weapons to al Qaeda, as well as Islamic soldiers and terrorists involved in affiliated or associated causes; recruited young Muslims to join separatist organizations and causes, including becoming martyrs for Islam; served as distribution channel for transmitting information and documents to and from al Qaeda and within and among Islamic terrorist organizations and associated separatist movements; disseminated hate speech against Christians and Jews designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against 'infidels;' and urged young Muslims to take up arms against secular, non-Islamist societies."

Winer has shown no evidence for the allegations in his conclusion. As mentioned throughout this report, I have not been impressed by his review of "additional information" and I found his ignorance about al Qaeda or the content of the discovery material surprising in a retained expert. Specifically in relation to the 9/11 terrorists, he definitely has not shown that WAMY "funded" them; "provided them with financial and logistical support;" "helped recruit them and facilitate their movement;" "provided them with weapons [the box cutters?];" "[again] recruited them… to become martyrs for Islam;" "served as their communication system;" and "urged them to take up arms against [the United States]." Nor is WAMY's proselytism of al-Madkhali's version of Salafism the same as global neo-jihadi ideology. In fact, they are very hostile to each other. Winer makes a detailed set of claims about what he has shown in his

---

[991] See section III.G of this report.
[992] See section III.H of this report.

268

conclusion, but even a superficial reading of his report, let alone a detailed one as done in the present report, shows that he has no evidence supporting these claims. He has shown no evidence whatsoever that WAMY supported the 9/11 terrorists in any way.

Winer anticipated his failure to find any evidence for WAMY's funding of the 9/11 terrorists by borrowing a famous argument articulated by former Defense Secretary Donald Rumsfeld that "absence of evidence is not evidence of absence."[993] Of course Rumsfeld uttered this expression in response to questions about Iraq's connection to the 9/11 attacks and its possession of weapons of mass destruction. The point was of course that, just like Winer argues that such help would be clandestine and unlikely to be recorded, Iraq's link to the 9/11 attacks and possession of WMDs would have been clandestine and difficult to trace. As we now know, Secretary Rumsfeld was spectacularly wrong about both claims, undermining the justification for invading Iraq, and led the United States and its allies into an unprovoked attack on and invasion of Iraq. In that case, absence of evidence was indeed evidence of absence. Here, again, the fact that a claim is false is the most parsimonious explanation for the fact that there is absence of evidence for that claim. A presumption that a claim is false must therefore be the default assumption behind any absence of evidence. This implies that the burden of proof lies squarely on the side of the people claiming any wrongdoing to find evidence of this wrongdoing. I hope that Winer is not arguing that the defendants have the burden of proving their innocence in the face of the absence of evidence of any wrongdoing. From a scientific point of view, the law is right: it is the plaintiffs' burden of proof by a preponderance of the evidence (a lower standard than for scientific conclusions) that WAMY played a role in the 9/11 attacks.

### H.  Opinion about the evidence that WAMY Supported the 9/11 Terrorists

My opinion with a reasonable degree of professional certainty is that the plaintiffs' experts have failed to show any evidence that WAMY has ever supported the 9/11 terrorists.

The plaintiffs' experts kick up a lot of irrelevant dust and falsely claim that it is really smoke, which is indicative of a fire somewhere. It is just dirt and there is no fire. Their respective

---

[993] Donald Rumsfelt, 2002, Press Conference, NATO Headquarters, Brussels, June 6, 2002, available at https://www.nato.int/docu/speech/2002/s020606g.htm. This is the essence of Winer's argument in section 9 of his report entitled, "*Would You Expect the Internal Records of Charities That Were Involved in Supporting al Qaeda to Document Their Support for al Qaeda? If not, why not?*" at 55–67.

reports lack balanced and nuanced investigations of the facts and instead repeat the same old worn-out accusations against Islamic charities that have long been discredited. In essence, their reports are akin to legal briefs that simply advocate for their sides, not expert reports relying on sound methodology to help the factfinder understand the factual issues at hand, beyond his or her ken.

Despite the lack of any evidence that WAMY or LBI helped al Qaeda, let's play devil's advocate and assume a hypothetical that Batterjee, while he was LBI's executive director in Peshawar, provided some money to Arab Afghans who later became part of al Qaeda during its historical first frontier phase. This appears to be what Winer hints at, but his report is marred by his great confusion of that time, place, and actors. As some of the documents captured in the 2002 raid on the BIF office in Sarajevo demonstrate, the MaK and other Islamic charities supported Afghan refugees, Afghan mujahedin, and Arab Afghans, including those who later became al Qaeda. At the time, LBI was present in Peshawar as an independent organization but under the sponsorship of WAMY, which funded some of its specific programs.

The point of this hypothetical exercise is to draw its implications for any possible hypothetical WAMY involvement in the 9/11 attacks.

First, this hypothetical contribution to what later became al Qaeda was very remote in time, about a decade before the 9/11 attacks, and that in the interval, al Qaeda was on the verge of bankruptcy several times: after the disaster of Jalalabad in 1989, the loss of its income in Sudan around 1995, the loss of its assets in Sudan when it was expelled from that country, and the decrease of its income in the second half of 1998, all described in part II of this report. The point is that these lean times wiped out any contribution that might have been made to al Qaeda in the late 1980s or early 1990s in Peshawar and such a contribution would no longer have been available for use in the 9/11 attacks. In other words, this hypothetical contribution in 1988–91 would have been too remote to have had any influence on the 9/11 attacks.

Second, I keep writing "that later became al Qaeda" because the al Qaeda of 1988–91 was very different from the al Qaeda of 2001. Al Qaeda of 1988 was still fighting to liberate Afghanistan from the Soviet Union and its puppet regime in Kabul, therefore a *de facto* ally of the United States and the West against Soviet aggression, and not yet a terrorist organization. It was fighting on the same side as the United States. Al Qaeda of 2001 was definitely a terrorist organization bent on attacking its enemy the United States. There is a huge interval between al

270

survived, WAMY funded less than half of their respective budgets. WAMY's money was earmarked for specific projects to support Afghan refugees and victims and required Batterjee to provide detailed bookkeeping records of his spending. Because of this tight accounting requirement, it was less likely that any contribution of LBI funds to Arab Afghans who later became al Qaeda would have come from WAMY funds that required pre-approval for specific projects. It was far more likely that such hypothetical contribution would have come from Batterjee's own funds (he was independently wealthy) or money that he had raised him, as he had no reporting requirements on this money in contrast to WAMY money, which required both pre-approval for spending and was tightly supervised from WAMY headquarters. He had a much freer hand in disposing of his own money as he pleased than with WAMY's funds. So, had Batterjee provided money to people of al Qaeda of 1988–91, it was more likely than not to have come from his own money (his own wealth or money that he had raised independently from WAMY) rather than from WAMY funds.

Fifth, around 1991 and up to early 1993, Batterjee started neglecting his bookkeeping reporting duties back to WAMY Saudi Arabia. This lack of reporting blinded WAMY leadership in Jeddah or Riyadh as to what Batterjee was actually doing in the field. WAMY's leaders were therefore not aware at all whether any of its money might have been diverted to Arab Afghans who were of course not part of their pre-approved charitable projects. In other words, had Batterjee actually provided money to al Qaeda at the time, WAMY's leaders lacked the awareness that they were assuming a role in "terrorist activities" as Batterjee was hiding his activities from them, let alone aware being aware of any role that they might have had in relation to the 9/11 attacks a decade later. In part, because of this "one-man show" attitude on Batterjee's part and his neglect of keeping WAMY leadership informed of his activities, WAMY's secretary general forced him to resign from LBI, severing his connection to WAMY. Although there is no clear evidence that Batterjee materially supported al Qaeda, assuming that he did for the sake of the hypothetical, he would have kept WAMY's leadership in the dark about it through his neglect of his bookkeeping duties. WAMY's leaders would not have been aware of this contribution. In other words, WAMY's leaders would not have been aware of playing any role in al Qaeda's later activities, including the 9/11 attacks.

I went through this hypothetical exercise to show that, even assuming plaintiffs' experts' claim that Batterjee materially supported al Qaeda in the late 1980s and early 1990s in Peshawar,

and, again, there is no evidence for it, this contribution would have been too remote to have any influence on the 9/11 attacks; a contribution to the al Qaeda of 1988–91 was not one to the al Qaeda of 2001 that carried out the 9/11 attacks; any contribution to the al Qaeda of 1988–91 was in support for a U.S. ally and not an enemy that carried out the 9/11 attacks; any LBI contribution to al Qaeda in the 1988–91 framework was more likely than not to have come from Batterjee own resources and not from WAMY; and had such contribution taken place, WAMY's leaders would not have been aware of it and therefore also not aware of playing any role in the 9/11 attacks. In other words, even assuming this hypothetical, any Batterjee support to al Qaeda in 1988–91 was simply too remote for WAMY to have contributed to the 9/11 attacks.

As I showed in part II of this report, al Qaeda rebuilt its financial network in its third Afghan phase from late 1998 onward. The source of this money is unknown, as the 9/11 Commission Report and its staff repeatedly emphasized. This is the money that funded the 9/11 attacks, and there is no evidence at all that WAMY played any role in this attack.

### I.  My Concluding Opinion

In conclusion, after carefully weighing the evidence for and against WAMY's alleged support for the 9/11 terrorists, my opinion within a reasonable degree of professional certainty is that there is a lack of evidence of any proximate WAMY contribution to the 9/11 attacks, both in the discovery material and in the plaintiffs' experts' reports.

Did WAMY participate in the 9/11 attacks? And did it aid and abet the people involved in the attacks? To answer the first question, from all the evidence reviewed, there is no evidence that WAMY participated in these attacks, planned them, trained any of the perpetrators of these attacks, or requested them to carry out the attacks. In terms of the second question, there is no evidence at all in the discovery material that WAMY encouraged any of the 9/11 terrorists to carry out the 9/11 attacks; knowingly provided funds to them for the 9/11 attacks; maintained any relationship with any of them; provided them with funds that went to support the 9/11 attacks; expressed a desire and intention to assist them commit the 9/11 attacks; and had any relationship with them at all for any duration of time.

As shown in part III of this report, the plaintiffs' experts have tried to implicate WAMY in supporting Arab Afghans at the first frontier phase of al Qaeda, Bosnian fighters, the 1993 World Trade Center bombers, al Qaeda in its second Sudanese phase, Kashmiri fighters,

Chechen fighters, Palestinians, Indian terrorists in the 1980s, 1990s, and even after 9/11/2001…
None have any relations to al Qaeda, except al Qaeda itself, since al Qaeda was not involved in
Bosnia, the 1993 World Trade Center bombing, Kashmir, Chechnya, Palestine, or India. WAMY
did not contribute to any fighters in Bosnia, Kashmir, Chechnya, Palestine, or India. Even if
some of its contributions for war refugees in these regions might have trickled to the respective
fighters in these theaters, al Qaeda was not involved there, and therefore such contribution could
not flow to al Qaeda or the 9/11 terrorists. WAMY was not involved in the 1993 World Trade
Center bombing.

Al Qaeda was of course present in Sudan during its second historical phase, but there is
no evidence that WAMY was involved in funding al Qaeda during the second phase of its
history. Such claims are based on a confusion between LBI, which of course is connected to
WAMY, and BIF, which is not. Nor was WAMY involved in al Qaeda's third Afghan phase of
its history. So, none of WAMY's charitable acts bear any definite and specific, articulable
connection to the 9/11 attacks or those who carried them out. Plaintiffs' experts fail to show that
any of WAMY's charitable acts was used to help fund or facilitate the 9/11 attacks in any
meaningful way.

Nor did WAMY's field offices or organizations under its sponsorship contribute to the
9/11 attacks. WAMY has bookkeeping reporting requirements for its field offices or
organizations it sponsors in order to make sure that its money earmarked to specific projects are
spent according to pre-approved plans. When the executive director of an independent
organization under WAMY sponsorship (Batterjee, the executive director of LBI) stopped
fulfilling his obligations to keep WAMY informed of his activities in the field and tried to solicit
donations fraudulently, WAMY forced him to resign in early 1993 and completely severed any
link that WAMY had with him. When another one of WAMY's field directors (al-Khatib, the
director of WAMY Canada) failed in his reporting obligations, he was fired in 1999. He was
rehired in 2000 in the hope that he would improve, and when he failed again in his duties, he was
again fired in 2001. This demonstrates that WAMY takes its supervision of the funds earmarked
for its specific pre-approved projects very seriously and does not hesitate to fire local leaders not
abiding by its rules. There is no evidence that either WAMY field office contributed to the 9/11
attacks.

274

So, we are left with the remote hypothetical that some WAMY funds might have been diverted during al Qaeda's first frontier phase of its history through Batterjee. WAMY did all that it could to prevent such a potential diversion through strict bookkeeping reporting requirements. Even assuming for the sake of argument this hypothetical, as we did in the previous section, such a hypothetical diversion of WAMY funds would have been too remote to be a link in the causation chain leading to the 9/11 attacks for WAMY to have played any role in these attacks.

From all of our understanding of the 9/11 attacks, the conspiracy that led to them emerged around early spring of 1999 and their funding came from the last influx of money that al Qaeda received and started around December 1998. The source of this funding is not known, and plaintiffs' experts make no allegation that WAMY contributed to this last infusion of money that went to al Qaeda and funded the 9/11 terrorists. In short, there is no evidence that WAMY contributed in any way to the 9/11 attacks.

Marc Sageman, M.D., Ph.D.

275