# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*All Actions*

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE RENEWED MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA [ECF No. 9368]

### [CORRECTED]

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel and Co-Chairs for the Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*Co-Chairs and Liaison Counsel of the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for <u>Ashton</u> Plaintiffs*

December 20, 2023
Corrected: January 17, 2024

REDACTED FOR PUBLIC FILING

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

II. THE LEGAL STANDARDS REQUIRING DENIAL OF THE MOTION ......................5

    A. Congress Designed JASTA to Ensure that the FSIA Posed No Impediment to a Merits Determination of Plaintiffs' Claims. .....................................5

    B. Rule 56 Standards Govern and Require Denial of the Present Motion. ...............10

    C. The Court Should Draw Adverse Inferences as to Culpability from the Flagrantly False Testimony of Saudi Arabia's Witnesses. ...................................12

III. STATEMENT OF FACTS ...................................................................................12

    A. The Kingdom's Jihadist-Supporting Platform in Southern California ................12

    B. The Kingdom's Support of Thumairy's Support to Extremists...........................19

    C. The Kingdom's Support of Bayoumi's Support to Extremists............................23

    D. Thumairy and Bayoumi Routinely Hosted and Looked After Extremists Associated With Al Qaeda in Their Roles For the Saudi Government ................28

        1. Thumairy and Bayoumi Receive, Host and Handle Logistics for MOIA Extremists Adel Al Sadhan and Mutaeb Al Sudairy.....................28

        2. Thumairy and Bayoumi Host and Handle Logistics for MOIA Extremists Mersal and Jaithen ....................................................32

        3. Thumairy and Bayoumi Provided Material Support and Assistance to Numerous Other Extremist Agents From the MOIA Enterprise ..........35

    E. Additional Saudi Officials and Agents Worked With Thumairy and Bayoumi in Furtherance of the MOIA's Extremist Support Network..................36

    F. Saudi Arabia's Officials and Agents Mobilized Their Tested Mechanism for Hosting Extremists to Provide an Essential Support Network for the Hijackers. .......................................................................................39

        1. Saudi Arabia's Narrative is Unbelievable...................................................39

        2. The Evidence Shows That Saudi Arabia's Agents Organized an Essential Support Network for the Hijackers...............................................41

IV. LEGAL ARGUMENT.........................................................................................54

    A. Saudi Officials in California Acted Well Within the Scope of Their Employment or Agency in Supporting the Hijackers. ..........................................54

        1. The Most Expansive Scope of Agency Standards Apply to the Present Inquiry ..........................................................................................54

i

        2.     Plaintiffs' Evidence Readily Satisfies This Standard of Agency and Respondeat Superior .................................................................................59

  B.    The Evidence Shows That Saudi Officials Engaged in Tortious Acts .................63

        1.     Tortious Acts Through Officials and Agents ...............................................63

  C.    Plaintiffs' Evidence Readily Demonstrates Jurisdictional Causation....................68

  D.    Saudi Arabia is Subject to Jurisdiction Based on its Sponsorship of Al Qaeda Through State Controlled Charities .......................................................68

V.    CONCLUSION....................................................................................................70

REDACTED FOR PUBLIC FILING

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance Techn. Grp., LLC v. Achieve 1, LLC*, 2013 WL 143500 (E.D. Va. Jan. 11, 2013) ........ 64

*Babcock v. Jackson*, 191 N.E.2d 279 (N.Y. 1963) ....................................................... 55

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
    999 F.3d 808 (2d Cir. 2021)....................................................................................... 11

*Bereswill v. Yablon*, 160 N.E.2d 531 (N.Y. 1959)...................................................... 64

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*,
    581 U.S. 170 (2017).............................................................................................. 9, 10

*Bradford Trust Co. of Boston v. Merrill Lynch*, 805 F.2d 49 (2d Cir. 1986) .............. 21

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022)................... 54

*Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019) ...................... 12

*Corley v. Vance*, 365 F. Supp. 3d 407 (S.D.N.Y. 2019)................................................ 63

*Curley v. AMR Corp.*, 153 F.3d 5 (2d Cir. 1998) ........................................................ 55

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)......................................................... 11

*Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) ............. 56

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386 (2d Cir. 2001)............................. 55

*Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180 (2d Cir. 2002) .................................. 10

*Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199 (App. Div. 2007) ............................ 58

*Fountain v. Karim*, 838 F.3d 129 (2d Cir. 2016).................................................... 58, 60

*Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42 (2d Cir. 2021) ................................. 11

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................. 11, 64, 66, 69

*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021)....................................... 69

*In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018)........ passim

*In re: Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132318 (S.D.N.Y. Aug. 10, 2023).......... 69

*Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986) ................................ 10, 11

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ..................... 69

*Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613 (8th Cir. 1983) ........................... 21

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004) ........ 6, 11

*Land v. Forgione*, 114 N.Y.S.3d 464 (App. Div. 2019) ............................................... 64

*Lisa M. v. Henry Mayo Newhall Mem. Hosp.*, 907 P.2d 358 (Cal. 1995) ................... 56

*Mamani v. Berzain*, 309 F. Supp. 3d 1274 (S.D. Fla. 2018).................................... 21

*Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76 (Pa. 2023)........................................... 64

*Mary M. v. City of Los Angeles*, 814 P.2d 1341 (Cal. 1991) ................................. 56, 57

*Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325 (1960)........................................... 11

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) ....................................................... 54

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)............................... 5, 6, 11

*Owens v. Sudan*, 531 U.S. 884 (D.C. Cir. 2008) ........................................................... 6

*Padula v. Lilarn Properties Corp.*, 644 N.E.2d 1001 (N.Y. 1994) ............................. 55

*Peralta v. United States*, 475 F. Supp. 3d 1086 (C.D. Cal. 2020) .............................. 57

*Perez v. City and Cnty. of San Francisco*, 75 Cal. App. 5th 826 (2022).................. 57, 60

*Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676 (Cal. 1986).......................... 56, 57, 59

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1 (2d Cir. 1996)........................... 55

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017)........................... 10, 11

REDACTED FOR PUBLIC FILING

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ................... 6
*Proietti v. Civiletti*, 603 F.2d 88 (9th Cir. 1979) ................................................................. 57
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........................................ 12, 62
*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979) ............................................................ 58
*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) ................................................. 8
*Robinson v. United States*, 649 A.2d 584 (D.C. 1994) ......................................................... 9
*Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608 (1975) ................................................ 57
*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) ................................................. 5, 6, 8
*Sokolow v. P.L.O.*, 60 F. Supp. 3d 509 (S.D.N.Y. 2014) (Daniels, J.) ..................................... 54
*Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404 (S.D.N.Y. 2009) ........................ 7
*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) .................................................... 25
*United States v. Delgado*, 903 F.2d 1495 (11th Cir. 1990) .................................................. 66
*United States v. Ellis*, 461 F.2d 962 (2d Cir. 1972) ........................................................... 25
*United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016) ................................................. 12
*United States v. Martinez*, 844 F. Supp. 975 (S.D.N.Y. 1994) ............................................. 66
*USAA Cas. Ins. Co. v. Permanent Mission of the Rep. of Namibia*,
    681 F.3d 103 (2d Cir. 2011) .................................................................................. 7
*Usoyan v. Republic of Turkey*, 6 F. 4th 31 (D.C. Cir. 2021) ......................................... 8, 9, 10
*Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017) ..................................... 6
*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002) ..................... 11
*Warren v. Byrne*, 699 F.2d 95 (2d Cir. 1983) ................................................................... 66
*Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586 (N.D. Fla. May 11, 2023) .................. 63
*Weiss v. Nat'l Westminster Bank, PLC*, 768 F.3d 202 (2d Cir. 2014) ................................. 63, 64
*Wright v. West*, 505 U.S. 277 (1992) .............................................................................. 12
*Zappia Middle East Const. Co. Ltd v. Emirate of Abu Dhabi*, 215 F.3d 247 (2d Cir. 2000) ....... 10

**Statutes**
18 U.S.C. § 2239A(b)(1) ............................................................................................. 68
18 U.S.C. § 2333(d) .............................................................................................. 63, 69
18 U.S.C. § 2339A .................................................................................................. 66
28 U.S.C. § 1605(a)(3) ............................................................................................... 9
28 U.S.C. § 1605(a)(5) ...................................................................................... 7, 9, 67
28 U.S.C. § 1605(a)(5)(A) .......................................................................................... 67
28 U.S.C. § 1605B .................................................................................................... 5
28 U.S.C. § 1605B(b)(2) ............................................................................................ 63
28 U.S.C. § 1605A .................................................................................................... 6
Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016)
    (codified at 28 U.S.C. § 1605B) ("JASTA") .......................................................... passim

**Other Authorities**
162 Cong. Rec. S2845 (May 17, 2016) .................................................................. 6, 54, 69
Executive Order 14040, "Declassification Reviews of Certain Documents Concerning
    the Terrorist Attacks of September 11, 2001, Sept. 3, 2001 ....................................... 1
H. Rept. 104-383 - Comprehensive Antiterrorism Act of 1995 (Dec. 5, 1995) ......................... 6
National Commission on Terrorist Attacks upon the United States. The 9/11 Commission
    Report: Final Report of the National Commission on Terrorist Attacks Upon the

REDACTED FOR PUBLIC FILING

United States, Washington, DC, 2004 ................................................................ passim
*Restatement (Second) Conflict of Laws* § 145 (1971) ...................................... 55
*Restatement (Second) of Torts* § 876 ............................................................. 68
*Restatement (Second) of Torts* § 876(b) (1979) .......................................... 64

**Rules**

Fed. R. Civ. Pro. 12(b)(1) ............................................................................... 10
Fed. R. Civ. Pro. 12(b)(6) ................................................................................. 6
Fed. R. Civ. Pro. 54(b) ................................................................................... 63
Fed. R. Civ. Pro. 56 .................................................................................... 2, 10
Fed. R. Evid. 803(6) ...................................................................................... 26
Fed. R. Evid. 803(8) ...................................................................................... 21
Fed. R. Evid. 803(8)(A)(iii) ............................................................................. 21

REDACTED FOR PUBLIC FILING

## I.     **INTRODUCTION**

This Court's 2018 Memorandum Decision and Order, *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018) ("2018 Decision"), directed the parties to engage in limited jurisdictional discovery to address two specific issues: (1) the "nature . . . of the agency" for the Saudi government of Omar Al Bayoumi, Fahad Al Thumairy and the collaborators who worked with them to assist the September 11 hijackers; and (2) whether their support for the hijackers fell within the "scope of [their] agency" for the Saudi government. *Id.* at 651.

The record developed through jurisdictional discovery, and long-secret investigative materials declassified pursuant to Executive Order 14040 (E.O.), now provides overwhelming evidence that Bayoumi, Thumairy, Ismail Mana, and additional Saudi government officials and agents were acting within the core of their functions for the Kingdom of Saudi Arabia in coordinating an essential support network for pro-jihadist extremists, including the first-arriving 9/11 hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar. That evidence shows that:

(1)     Bayoumi, Thumairy, and Mana were officials and agents serving as part of a covert and illegal Saudi government platform established to promote and support the Saudi Ministry of Islamic Affairs' extremist agenda in the United States;

(2)     the officials and agents tasked by the Saudi Arabia to work in this enterprise had extensive supportive dealings with terrorists in their work;

(3)     their core work for Saudi Arabia regularly involved hosting and supporting pro-jihadist extremists on missions to the United States;

(4)     Saudi Arabia imbued the officials and agents it tasked to work in the enterprise with diplomatic protections and/or cover to shield their illegal activities from scrutiny of U.S. authorities; and

(5)     Saudi Arabia's officials and agents acted in close coordination with one another and others to mobilize an essential support network for Hazmi and Mihdhar, who were "ill-prepared for a mission in the United States" and were "unlikely" to have come to America without arranging in advance to receive assistance," leveraging the very resources provided to them by the Saudi government to do so.

REDACTED FOR PUBLIC FILING

This evidence goes well beyond what is required for Plaintiffs to satisfy their modest "burden of production" on the attribution inquiry. Plaintiffs meet that burden by showing simply that there is some evidence sufficient to raise a genuine issue of material fact on the issue, consistent with Rule 56 standards. *See infra* § II.B. Plaintiffs readily satisfy this test through evidence showing that the hosting of and provision of support to jihadists was a core function and foreseeable risk of Saudi Arabia's extremist MOIA enterprise, and that Saudi officials and agents were acting within their core functions and the command hierarchy governing their work in supporting the hijackers. *See infra* § III.A.

The Court already has ruled that Plaintiffs have established that Saudi Arabia's officials and agents committed tortious acts that "caused" Plaintiffs' injuries for purposes of jurisdiction. 2018 Decision, 298 F. Supp. 3d at 650-51. Although those questions are not open to further challenge here, *see infra* § IV.B., there now is compelling and damning additional evidence corroborating the facts and theories Plaintiffs offered on those points from the outset. *See infra* § III.F. This evidence includes highly incriminating videos of the welcome party Bayoumi hosted for the hijackers (never exploited by the FBI); Bayoumi's own hand-written line of sight calculation for navigating a plane to a target on the ground; phone records, testimony and other evidence confirming the Saudi agents' coordination of support for the hijackers; documents and videos showing that Thumairy and Bayoumi hosted other Al Qaeda-linked extremists in advance of Hazmi and Mihdhar's arrival, in circumstances mirroring their hosting of the hijackers; a chilling video seized just produced by British authorities showing Bayoumi "casing" the U.S. Capitol for an attack; and U.S. government findings that the Saudi network that aided the hijackers had extensive connections to terrorism.

REDACTED FOR PUBLIC FILING

The very nature of the arguments Saudi Arabia offers in its renewed motion confirms that discovery and the E.O. have uncovered evidence supporting Plaintiffs' positions on all of these points. Saudi Arabia acknowledges that the standards governing motions for summary judgment inform the present inquiry. KSA Br. 13. Yet its motion rests extensively on pleas that the Court should credit the Kingdom's preferred evidence and dubious interpretations of it, *id.* at 13-30, and blindly endorse its witnesses' self-serving denials, *id.* at 17-18, 23, 25, despite objective evidence demonstrating that their denials are implausible and false, and even though they are known to have lied about these very issues in the past. Putting aside the implausibility of the Kingdom's narrative, its approach necessarily acknowledges that evidence supports Plaintiffs' theories – if that were not so, it would not be required to spend its entire brief arguing the evidence. This alone confirms that Saudi Arabia is not entitled to dismissal.

Even more basically, Saudi Arabia conspicuously avoids the key "scope of agency" and attribution issue, which is the sole question that remains unresolved to establish jurisdiction pursuant to the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B) ("JASTA"). Saudi Arabia offers no discussion of relevant agency law principles, and the word agency appears only three times – once in a quotation of JASTA's text, and twice in reference to the FBI. To the extent that the motion can be understood to address agency or respondeat superior questions at all, it is only insofar as it claims that the evidence does not show that Thumairy and Bayoumi were acting at the direction of more senior officials in supporting the hijackers, a claim that is both factually wrong and fails to address the relevant (*or any*) respondeat superior legal test, which does not hinge on evidence that Saudi Arabia's officials and agents acted pursuant to an express directive.

REDACTED FOR PUBLIC FILING

The Kingdom's unwillingness to engage the very question the Court directed the parties to address through discovery reflects its recognition that it has no credible argument to make on the agency issue. The evidence is clear that Saudi Arabia deployed its officials and agents to serve in an illegal government enterprise that was extensively intertwined with terrorism, so that the agents were acting within their core mission when they helped integrate the hijackers into the United States. The evidence also shows that Bayoumi and Thumairy acted at all times in accordance with the directives of more senior Saudi officials, which separately establishes that they were acting within the scope of their agencies and employment.

The additional evidence now available also cures the identified deficiencies that led the Court to decline jurisdiction based on Plaintiffs' claims arising from the Kingdom's funding and sponsorship of Al Qaeda via purported charities. Those theories thus provide an additional, independent basis for jurisdiction under JASTA.

To provide context, this brief begins with an overview of the applicable legal standards and then a statement of the key evidence bearing on the agency inquiry. While the Court has already resolved for purposes of jurisdiction that the Kingdom's officials and agents engaged in tortious acts that "proximately caused" Plaintiffs' injuries, 2018 Decision, 298 F. Supp. 3d at 650, Plaintiffs also detail the mosaic of key new evidence that corroborates their provision of substantial assistance and material support to the hijackers, and their awareness of the hijackers' connection to terrorism. Plaintiffs' treatment of that evidence in no way implies that those issues are open to dispute in the present jurisdictional context. Those questions have been resolved in Plaintiffs' favor for purposes of jurisdiction already. Any further inquiry concerning the sufficiency of evidence to establish those elements of Plaintiffs' underlying tort theories is an issue for the merits. Nonetheless, the body of diverse evidence developed through discovery and declassification

REDACTED FOR PUBLIC FILING

thoroughly refutes Saudi Arabia's arguments. Prudential considerations and the public interest in these matters demands that Plaintiffs refute Saudi Arabia's false narrative on these points.

## II.      THE LEGAL STANDARDS REQUIRING DENIAL OF THE MOTION

### A.      Congress Designed JASTA to Ensure that the FSIA Posed No Impediment to a Merits Determination of Plaintiffs' Claims.

As the 2018 Decision recognized, a court applying JASTA's immunity exception is called upon to make only the *jurisdictional* determination of whether plaintiffs' claims present a case of the nature described in 28 U.S.C. § 1605B. 298 F. Supp. 3d at 642. With respect to JASTA's elements that the case be one in which the plaintiff's claims involve injuries "caused by" a "tortious act or acts" of a foreign state or attributable to it, the Court's role at the jurisdictional phase is merely to evaluate whether the plaintiffs' facts bring the case within the requirements of an actionable tort and satisfy the relaxed standard of jurisdictional causation. *See, e.g., Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017) (vacated in part on other grounds) ("Establishing material support and causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits."); *Rux v. Republic of Sudan*, 461 F.3d 461, 472 (4th Cir. 2006) ("[j]urisdictional causation [under the FSIA] is distinct from the substantive causation element of a claim."), 2018 Decision, 298 F. Supp. 3d at 645 n.8 ("Whether Plaintiffs will ultimately be able to provide proof of causation sufficient to prevail on the substantive causes of action they assert against Saudi Arabia … is a question separate and apart from the jurisdictional one raised here.").

Saudi Arabia's arguments, however, necessarily presume that JASTA's requirement that the case involve a "tortious act or acts" makes the ultimate sufficiency of the evidence to satisfy each element of Plaintiffs' substantive tort claims jurisdictional in nature, and subject to evidentiary resolution on a motion to dismiss with no merits discovery. To this end, Saudi Arabia

REDACTED FOR PUBLIC FILING

spends most of its motion arguing about whether Plaintiffs can "establish" the substantive elements of "material support," "knowledge," and "causation" for their substantive Anti-Terrorism Act ("ATA") claims through admissible evidence. KSA Br. 15; 23-24, n.23; 25. This deeply misunderstands the dividing line between JASTA's distinct jurisdictional and merits inquiries.

As the Supreme Court has directed, an FSIA exception to immunity must be governed by Congress's "basic objectives" in enacting the particular provision. *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017). JASTA's "purpose . . . is to provide civil litigants with the broadest possible basis … to seek relief against … countries … that have provided material support, directly or indirectly." JASTA § 2(b), 130 Stat. at 853. To facilitate and ensure those benefits, the lead sponsors explained that the Act's text was crafted to "incorporate" the flexible approach and analysis of "cases like *Kilburn*, *Rux*, and *Owens*." 162 Cong. Rec. at S2845. Those decisions, in turn, confirm that Plaintiffs' required showing as to causation and the foreign state's tortious conduct is "modest" at the jurisdictional phase, and is satisfied by plausible factual allegations satisfying the requirements of an actionable tort. *See Owens v. Sudan*, 531 F.3d 884, 894 (D.C. Cir. 2008) (rejecting Sudan's argument that heightened burden applies to jurisdictional elements of §1605A and holding that standard for assessing sufficiency of plaintiff's factual showing is "'similar to that of Rule 12(b)(6)'") (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)). Stated another way, Congress crafted JASTA's text in a way that simply requires terrorism victims to show that their factual allegations bring their claim within the parameters of an actionable tort, to facilitate the Act's core purpose of ensuring "full access" to court to "pursue" terrorism claims on the merits.

To be sure, the Second Circuit has held, in the context of the tortious activity exception, that it is sometimes necessary in determining jurisdiction to "touch upon" a fact that also bears on

6

the merits of the underlying tort claim, to confirm that the tort alleged by the plaintiff is cognizable as to the foreign state defendant. *See USAA Cas. Ins. Co. v. Permanent Mission of the Rep. of Namibia*, 681 F.3d 103, 108 n.24 (2d Cir. 2011). In *USAA*, the Second Circuit found it appropriate to assess whether the construction omission alleged was "in fact tortious under the law of the State of New York," *id.* at 108, in deciding whether § 1605(a)(5) provided jurisdiction. To resolve that question, the court identified the "omission *alleged*" in the complaint, *id.* (emphasis supplied), and then evaluated whether it implicated a duty of care owed by the foreign state defendant. This inquiry was necessary in the jurisdictional context because the foreign state defendant had relied upon third-party contractors to conduct the construction work, making it unclear whether the foreign state owed any duty that it could have breached. *Id.* at 105, 108-09 ("The omission alleged … is the *Contractors' failure* to 'shore up' the party wall between the Mission's property and the adjoining townhouse.") (emphasis supplied). Because the construction obligation at issue involved a nondelegable duty under New York law, and the defendant "*allegedly* breached" that duty, the Court held that there was jurisdiction and the case could proceed to a merits determination as to whether the obligation was in fact breached. *Id.* at 114.

Courts also sometimes find it appropriate to undertake discrete inquiries relating to scope of employment or agency questions in evaluating jurisdiction, as this Court found warranted here. *See* 2018 Decision, 298 F. Supp. 3d at 640, 651 (citing cases). Such a scope of employment or agency inquiry may be necessary to determine the baseline question whether the alleged torts are cognizable in a case against the foreign state. *See, e.g., Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 414 (S.D.N.Y. 2009) (permitting jurisdictional discovery on scope of agency). But these limited excursions into specific facts bearing on the scope of agency issue do not present an occasion to address the sufficiency of the evidence concerning the ultimate question

REDACTED FOR PUBLIC FILING

of whether the purported agent did in fact breach a legal obligation causing plaintiff's injuries, pursuant to applicable substantive standards. Those are merits questions.

These authorities underscore the line between jurisdictional and merits inquiries in cases arising from a foreign state defendant's alleged torts. In particular, they show that limited excursions into discrete matters relating to the merits are appropriate if necessary to ascertain whether the tortious acts or omissions alleged are actionable as to the foreign state defendant. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 145-46 (2d Cir. 2001) ("The proper question at the jurisdictional threshold is whether this claim is cognizable as a 'tortious act or omission' caused by the Malaysian government under New York law.").[1] Such a limited inquiry that touches upon the merits is appropriate where the facts leave doubt about whether the allegedly tortious acts that form the basis of the plaintiff's claim are attributable to, or actionable against, the foreign state defendant, a focused exercise that allows the Court to "weed out the most insubstantial cases without posing too high a hurdle to surmount at a threshold stage of the litigation." *Rux,* 461 F.3d at 473. However, JASTA's jurisdictional and merits inquiries are not "coterminous," *Robinson v. Malaysia*, 269 F.3d at 142, as the Kingdom suggests. To the contrary, whether the evidence ultimately shows the commission of a tort—here, one of a heinous dimension—is a merits question. *See Usoyan v. Republic of Turkey*, 6 F. 4th 31, 47 (D.C. Cir. 2021).

The D.C. Circuit's decision in *Usoyan* underscores this line between jurisdiction and the merits in FSIA cases involving alleged tortious acts of a foreign state. There, the court considered jurisdiction under the non-commercial tort exception for claims arising from a physical confrontation between Turkish security officials and protestors during President Recap Erdogan's

---

[1] *See also id.* at 142 (question at jurisdictional phase is whether tortious acts alleged "*could* [] render the Malaysian government liable for a tort under New York law") (emphasis supplied).

REDACTED FOR PUBLIC FILING

May 2017 visit to the United States. *Id.* at 36-37. The plaintiffs alleged that Turkey and its agents committed tortious acts, including assault and battery, subjecting Turkey to jurisdiction under § 1605(a)(5). The court's analysis focused primarily on whether the conduct alleged was immunized by the discretionary function exclusion, an issue the court resolved in the plaintiffs' favor. *Id.* at 38. In so ruling, the court made clear that its jurisdictional analysis did not provide occasion to decide whether the alleged conduct in fact occurred or was tortious: "Importantly, we do not base our conclusion on whether Turkey's actions were justifiable; that is a merits question, not a jurisdictional one." *Id.* at 47. Obviously, whether Turkey's actions were justifiable goes to the heart of whether they were tortious. *See Robinson v. United States*, 649 A.2d 584, 587 (D.C. 1994) (recognizing "justifiable and excusable cause" defense to assault and battery).

The Supreme Court's *Helmerich* decision, which preceded *Usoyan*, confirms this framework. The Supreme Court addressed the jurisdictional requirements of the FSIA's expropriation exception, which withdraws a foreign state's immunity "in any case … in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). The Court held that the exception's requirement that the case be one where "property was taken in a certain way (in violation of international law)" was jurisdictional, *Helmerich,* 581 U.S. at 174, and required more for jurisdiction than a "non-frivolous argument." *Id.* at 178. Instead, a court applying the exception must assess whether the plaintiff's "factual allegations [] make out a legally valid claim that" property was taken in violation of international law. *Id.* at 174. If that jurisdictional issue depends on factual development, "the trial judge may take evidence and resolve relevant factual disputes," even though those facts also touch upon the merits. *Id.* However, "the trial court normally need not resolve, as a jurisdictional matter, disputes about whether a party actually held rights in that property; those questions remain for the merits phase of the litigation." *Id.*

REDACTED FOR PUBLIC FILING

*Helmerich* thus makes clear that a trial court applying an FSIA immunity exception must take care to preserve the line between its jurisdictional requirements and the merits of the plaintiff's claim. *Id.* Only facts that are essential to jurisdiction are subject to resolution during the jurisdictional phase. *Id.* In keeping with this approach, JASTA's requirement that the case involve a "tortious act" plays the same role as the expropriation exception's requirement that the case involve a "right" that has been placed in issue. Just as the Supreme Court recognized that an expropriation plaintiff's entitlement to prevail on the "right" placed in issue is a merits question that need not be established for jurisdiction, a JASTA plaintiff's right to prevail on commission of a "tortious act or acts"—here, ones that took the lives of 2,977 people—is one that "remain[s] for the merits phase of the litigation." *Id.*; *see also Usoyan*, 6 F.4th at 47.

## B.     Rule 56 Standards Govern and Require Denial of the Present Motion.

Where discovery has been completed as to a disputed jurisdictional fact, the court proceeds much as it would in deciding a motion for summary judgment under Rule 56. "While a 12(b)(1) motion cannot be converted into a Rule 56 motion, Rule 56 is relevant to the jurisdictional challenge in that the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings." *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). A court resolving a factual dispute after discovery is thus called upon to consider "evidence outside the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle East Const. Co. Ltd v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). The court's review of the parties' written submissions is governed by the Rule 56 "material issue of fact" standard. *Id.* Where the facts are not "not readily ascertainable from [the written submissions] or turn[] on questions of credibility," the foreign state defendant may obtain dismissal only by prevailing at an evidentiary hearing. *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 76 n.6 (2d Cir. 2017) (quoting *Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (per

REDACTED FOR PUBLIC FILING

curiam)). The foreign state defendant bears the ultimate burden of proof at any such hearing.[2] *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 52 n.3 (2d Cir. 2021) (citing *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241-42 (2d Cir. 2002)); *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816–17 (2d Cir. 2021) ("Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply.")

Applying these standards to the scope of agency and employment issue, this Court proceeds much as it would in deciding a motion for summary judgment, *provided that the fact interjected by the Kingdom has in fact been the subject of jurisdictional discovery*. Where discovery has been conducted as to a particular fact, the Court's inquiry focuses on whether Plaintiffs have met their modest "burden of production" to offer evidence sufficient to show that there is a genuine issue of material fact. Plaintiffs readily satisfy their modest burden. Plaintiffs may rely on circumstantial evidence[3] and expert testimony[4] to meet their burden. Saudi Arabia, moreover, cannot prevail by arguing its preferred reading of the facts or interpretations of contested facts. *Peterson*, 876 F.3d at 76 n.6.[5]

---

[2] Again, this burden shifting regime applies only to disputed facts that are *jurisdictional* in nature.

[3] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-99 (2003) (statute is presumed to permit proof by circumstantial evidence unless it expressly so prohibits); *Halberstam v. Welch*, 705 F.2d 472, 480 (D.C. Cir. 1983) ("[A]bsent a confession, an agreement between conspirators must generally be inferred from circumstantial evidence revealing a common intent[.]"); *see also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

[4] *See, e.g., Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131-32 (D.C. Cir. 2004) (plaintiff satisfies burden of production under FSIA's state-sponsored terrorism exception with declaration providing expert opinion and observation); *Owens*, 864 F.3d at 787 ("The testimony of expert witnesses is of crucial importance in terrorism cases because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain.").

[5] In addition, to the extent the Kingdom interjects factual claims on issues as to which Plaintiffs have not been afforded discovery, as is true of its sophistic claims concerning Saudi Arabia's alleged relationship with and policy towards Al Qaeda and merits issues generally, Plaintiffs retain the benefit of their factual allegations and evidence. Factual disputes on such matters are not subject to resolution absent discovery. *Kamen*, 791 F.2d at 1011.

REDACTED FOR PUBLIC FILING

**C.**    **The Court Should Draw Adverse Inferences as to Culpability from the Flagrantly False Testimony of Saudi Arabia's Witnesses.**

Plaintiffs may rely on the factfinder's disbelief of the Kingdom's fact witness testimony, including a witness's feigned forgetfulness, in satisfying their FSIA burden. Disbelief of any part of a witness's testimony permits the factfinder to discredit the witness's entire testimony. *See, e.g., Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 229 (S.D.N.Y. 2019) ("[I]f the Court finds that any portion of a witness's testimony was intentionally untruthful or misleading, the Court can elect, under the doctrine of *falsus in uno falsus in omnibus*, to reject the entirety of the witness's testimony."). The factfinder also may draw an inference of the disbelieved witness's consciousness of wrongdoing that may establish liability. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'") (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)); *United States v. Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016) ("Such false testimony permits a reasonable jury to infer consciousness of wrongdoing.").

Here, Saudi Arabia's motion hangs almost entirely on pleas that the Court should credit the self-serving denials of its own witnesses and others directly implicated in providing the support network for the hijackers. The objective evidence casts immense doubt on the credibility of their testimony and claims of forgetfulness, and, in numerous cases, shows the outright falsity of their statements. Saudi Arabia cannot sustain its burden by citing such disputed testimony. In fact, the evidence that the witnesses were untruthful is itself evidence of culpability.

**III.    STATEMENT OF FACTS**

**A.    The Kingdom's Jihadist-Supporting Platform in Southern California**

REDACTED FOR PUBLIC FILING

When September 11 hijackers Nawaf Al Hazmi and Khalid Al Mihdhar arrived in Los Angeles on January 15, 2000, "ill-prepared for a mission in the United States," *9/11 Commission Report* at 215, the Saudi government already had for a decade been operating a robust platform for promoting Wahhabi extremism[6] and jihadist causes in Southern California. AV ¶¶ 10-85. The Saudi government created and operated this network to advance the radical agenda of its then-powerful religious officials and Ministry of Islamic Affairs ("MOIA"). AV ¶¶ 36-47. The Saudi government provided massive funding to support MOIA's mission to spread the extremist Wahhabi/Salafi variant of Islam globally. Ex. 2, EO 3414-42.[7] The operational nerve centers of this network were the Islamic Affairs departments of the Saudi Embassy in Washington, D.C. and Saudi Consulate in Los Angeles, and the Saudi government-funded and controlled King Fahad Mosque in Culver City, CA. AV ¶¶ 86-113, 131-138; EO 3486. To support the extremist enterprise's operations, the Saudi government secretly funded a network of individual operatives with extensive ties to terrorism, including Thumairy and Bayoumi themselves. EO 3414-42; EO 3478-3608. Saudi Arabia also funded and directed several ostensible "charities" as part of this enterprise. AV ¶¶ 1925-2118; EO 3435-3438; EO 3532-33, 3541-51, 3567-69.

Hazmi and Mihdhar went almost immediately to the King Fahad Mosque upon arriving in the United States. This was by clear design, not happenstance. As the 9/11 Commission found, the September 11 operation was the "product of years of planning," *9/11 Commission Report* at 366, and carried out with an exacting attention to security precautions. Given this emphasis on operational security, the 9/11 Commission correctly concluded that it was implausible that

---

[6] Saudi Arabia chafes at the term "Wahhabism," but it is the accurate term for the intolerant brand of Islam promoted by Saudi Arabia, as confirmed by its usage by the 9/11 Commission, FBI, CIA, and preeminent scholars.

[7] Citations to Executive Order 14040 ("EO") documents are to EO documents found in Exhibit 2 to the accompanying Declaration of Robert T. Haefele. Citations to other Exhibits ("Ex. __") are to exhibits attached to the Haefele Declaration or the James Gavin Simpson Declaration.

REDACTED FOR PUBLIC FILING

Al Qaeda would have sent Hazmi and Mihdhar to America "without arranging to receive assistance from one or more individuals informed in advance of their arrival." *9/11 Commission Report* at 215. Indeed, "[n]either had spent any substantial time in the West and neither spoke much, if any, English." *Id*. Yet they were tasked to integrate into the United States without detection and begin covert preparations for the most sophisticated terrorist operation in history, directly under the nose of U.S. law enforcement and intelligence. Al Qaeda knew Hazmi and Mihdhar desperately needed help and cover from U.S.-based collaborators who could be trusted to provide assistance without raising suspicions and had the necessary resources to attend to the hijackers' myriad needs. Al Qaeda would not have left those arrangements to chance. AV ¶¶ 1441-1455.

The Saudi government's Wahhabi network was ideally suited to provide that assistance. First, it was ideologically aligned with Al Qaeda's global jihad. Indeed, these officials and agents had extensive connections to Al Qaeda and terrorism, making this network a known and trustworthy resource. Plaintiffs' Averments of Fact ("AV") ¶ 5. Second, it was responsible for supporting jihadists traveling to the United States as part of its core work. This is confirmed by the network's role in supporting the travels of numerous other extremists with terrorist connections prior to and after Hazmi and Mihdhar's arrival, in ways that mirror the support Saudi Arabia's agents provided to the hijackers. AV §§ XIV., XVII. Third, the Saudi government charged Thumairy and Bayoumi and their material support network to carry out covert activities in the United States. AV ¶ 875. Saudi Arabia also imbued it with diplomatic protections and resources for carrying out such operations. AV ¶ 230. It was, in these and other respects, ready-made for the task at hand.

REDACTED FOR PUBLIC FILING

These features of this material support network in the United States are fully supported by new and more complete versions of evidence Saudi Arabia previously urged this Court to credit, including the 2004 FBI/CIA Joint Assessment of Saudi Arabian Support of Terrorism and the Counterintelligence Threat to the United States (the "Joint Assessment"), Ex. 2 (Executive Order 14040 ("EO")) 414-42. In particular, the Joint Assessment expressly confirms:

(1)     the MOIA U.S. operation's extremist nature and terrorist connections[8];

(2)     its dedication to spreading Wahhabi Islam in the United States and Wahhabism's ideological alignment with violent jihadism[9];

(3)     the MOIA U.S. officials', agents', and co-optees' involvement in conducting intelligence activities[10];

(4)     Saudi Arabia's abuses of diplomatic privileges to support the enterprise[11]; and

---

[8] *See, e.g.,.* EO 3414-42 at 3416 ("official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States…some of whom are associated with terrorism-related activity."); *id.* at 3431 ("a number" of MOIA propagators inside the U.S. "are either subjects of or are tied to counterterrorism investigations involving al-Qa'ida, Jama'at al-Tabigh (JT), or HAMAS"); *id.* at 3431 ("FBI investigations indicate that some of the stipend recipients [on the payroll of the Islamic Affairs Department at the Saudi Embassy in Washington] have ties to terrorism"); *id.* at 3439 ("Several radical imams preaching in the United States … are paid a salary or stipend by the Embassy of the Kingdom of Saudi Arabia," and "[m]ore than a dozen of these individuals are or have been subjects of FBI counterterrorism investigations, with HAMAS and/or al-Qa'ida links"; *id.* at 3430 (ostensible charities sponsored and funded by the Saudi government to spread Wahhabi-Salafi Islam in the United States "have provided assistance to fighters traveling to and from jihad areas, employed individuals directly involved in terrorist attacks against the United States and other countries, and provided lodging and other logistical support to individuals training for or involved in jihad").

[9] *See, e.g.,* E.O. 3414-42 at 3916 ("[t]he Saudi Government and private Saudi individuals support the propagation of the conservative Wahhabi-Salafi sect of Sunni Islami in the United States. Jihadists adhere to and interpret this sect's beliefs to justify their actions."); *id.* at 3430 ("Much of the Saudi energy and money in the United States appear to have focused on spreading the conservative form of Wahhabi-Salafi Islam practiced in Saudi Arabia. Salafism, which follows a rigid interpretation of seventh-century Islam, calls for a rigorous and literal interpretation of Shari'ah (Islamic law) and espouses breaking with Western values and modernization."); *id.* ("The Saudi Government sponsors and funds a number of NGOs operating in the United States for this purpose [of spreading Wahhabi-Salafi Islam].

[10] *See, e.g.,* EO 3414-42 at 3426 ("The GSA conducts intelligence activities within the United States using both traditional and nontraditional methods"); *id.* ("At present, the FBI is investigating [redacted] based on suspected intelligence affiliation and/or intelligence collection. Of these, nearly half are affiliated with the embassy's [redacted] which oversees proselytizing activity across the United States"); *id.* at 3427 ("For the most part, the Islamic Affairs/Da'wah Division manages its intelligence collection activities … independently from the GIP or the Mabahith"); *id.* at 3416 ("Saudi-funded clerics" engaged in intelligence activities in the United States); *id.* at 3431 (describing intelligence activities of Omar Abdi Mohammed as directed by Saudi Embassy's Islamic Affairs Office).

[11] *See, e.g.,,* EO 14146-423 at 3426 ("particular NGO leaders and 'friends' of the royal family have come to the United States on Saudi diplomatic passports and visas, although they have never physically worked at Saudi diplomatic establishments" and "FBI has been working closely with the Department of State (USDS) and USIC to identify

REDACTED FOR PUBLIC FILING

(5)    that numerous platform operatives were "tied to counterterrorism investigations involving al-Qa'ida, Jama' al-Tabigh (JT), or HAMAS." EO 3414-42.

These facts concerning the nature of the MOIA enterprise are further corroborated by the FBI's July 23, 2021 Electronic Communication entitled "[REDACTED] Connections to the Attacks of September 11, 2001," (the "July 2021 EC"), Ex. 2 (EO 3478-3608-MDL), summarizing key findings of the Arabian Peninsula Squad (the "APS"). As the former head of the APS, Brian Weidner, testifies in his declaration, the APS was formed in response to evidence uncovered in the FBI's 9/11 investigation revealing that "Saudi government institutions, personnel, and agents inside the United States were fueling and supporting religious extremism." Ex. 13 (Weidner Decl.) ¶ 4. These "activities posed a serious threat to the national security of the United States." *Id*. Weidner attests that the July 2021 EC "contains what I recognize as specific overall factual findings of the AP Squad, based on our investigations into the operations of the Saudi Arabian Government on American soil, which I supervised until 2008." *Id.* at ¶ 16.

The APS's specific factual findings collected and summarized in the July 2021 EC document Saudi Arabia's "creation of and support and direction for a network of offices and personnel involved with militant Salafi Islamic activities and proselytization within the United States." EO 3482. It further confirms the presence of Saudi intelligence officers within the Embassy's Islamic Affairs office and Islamic Affairs personnel's involvement in carrying out intelligence in the United States. EO 3487-3490. It also documents the APS's determinations that various entities funded by and operating within the Kingdom's Wahhabi/Salafi proselytizing network were closely tied to terrorism and Al Qaeda. EO 3487-88, 3491-93, 3532-54, 3567-69.

---

individuals of concern who have diplomatic status"); *id.* (discussing "abuse of the [diplomatic] licenses"); ("[Mussaed] Al-Jarrah's official position is listed in USDS records as embassy accountant, but his responsibilities are to manage and control all assignments of Saudi Imams in the United States and facilitate the issuance of diplomatic visas for these individuals").

REDACTED FOR PUBLIC FILING

The testimony of Plaintiffs' experts, and evidence upon which they rely, augment and give context to the factual evidence concerning the nature of Saudi Arabia's MOIA enterprise. Emil Nakhleh, the founding Director and Senior Analyst of the CIA's Political Islam Strategic Analysis Program, explains the Saudi state's embrace of extremist Wahhabi doctrine, pursuant to the religious-political pact between the Saudi royal family and the Al-Ash Sheikh, the religious leaders who have provided religious legitimacy for the Al Saud's rule since the inception of the modern Saudi state. AV ¶¶ 28-29. Nakhleh describes the violent nature of Wahhabi doctrine and its advocacy that it is the duty of Muslims to wage "jihad" against the perceived "enemies" of Islam, *id*. ¶¶ 19-21, and the Saudi state's active efforts to promote and export its most extreme and violent interpretations. *Id*. ¶¶ 23-26. Nakhleh explains that the Saudi government created the MOIA in 1993 to placate the most violent and anti-American elements of the Kingdom's religious establishment, and provided the MOIA with resources and platforms within its embassies and consulates to promote its agenda outside Saudi Arabia, without restriction. *Id.* ¶¶ 36-42.

Nakhleh and Steven Simon, who served as the Senior Director for Counterterrorism on the National Security Council from 1995 and October 1999, detail how the United States warned the Saudi government that its funding and support for the MOIA's extremist agenda and activities "was empowering jihadis" and "that its actions were dangerous and that more Americans would end up becoming the victims of terrorist attacks" if Saudi Arabia persisted. Until Saudi Arabia itself was targeted in May of 2003, however, "the KSA was unresponsive to, and apparently unmoved by, these U.S. warnings." AV ¶¶ 72-74; *see also* Joint Assessment at 3416-17 (describing how Saudi government treated Al Qaeda with "special consideration" prior to the May 2003 Riyadh bombings but that "this policy changed" following those attacks). Instead, Saudi Arabia "played handmaiden to the 9/11 attacks." AV ¶ 73; Ex. 153 (Simon Report) ¶ 14.

REDACTED FOR PUBLIC FILING

The evidence amassed in discovery shows that the MOIA enterprise in Southern California was a hub of this extremist activity and was deeply intertwined with terrorism from its inception. Musaed Al Jarrah, Deputy of the Islamic Affairs Department at the Saudi Embassy, confirmed that "there are fifty propagators all over the United States under the supervision of the Embassy …" AV ¶ 86. Many of those propagators were stationed in Southern California, where they worked under the supervision of Thumairy and formed the nucleus of a radical platform first established by Saudi Arabia over a decade earlier. AV ¶¶ 351-357, 831-37.

Plaintiffs' expert Bassem Youssef testifies, based on his firsthand investigative experience, that Saudi Arabia created, supported, and operated a platform for Sunni extremists, centered at the mosques of the Ibn Taymiyah Foundation in Los Angeles (the Ibn Taymiyah Mosque and its successor, the King Fahad Mosque), and three mosques in San Diego (the Islamic Center of San Diego (ICSD), the Al Ribat Mosque, and the Al Madinah Mosque). *See, e.g.*, AV ¶¶ 444, 913, 1026, 1250. While investigating an operational cell of the Al Gama'a Al Islamiyah terrorist organization in the early 1990s, Youssef learned that Saudi Arabia had funded the Ibn Taymiyah Mosque and deployed a radical Saudi *government* cleric, Ibrahim Al Hiber, to serve as its Imam. AV ¶¶ 145-146. Contemporaneous documents produced in discovery confirm that the Ibn Taymiyah Foundation was itself an "extension of the activities of the Kingdom and part of its organization." AV ¶ 178.

Under Hiber's leadership, the mosque served as the operational headquarters for Al Gama'a in Los Angeles, and on numerous occasions hosted Al Gama'a's religious leader, Sheikh Omar Abdel Rahman, the notorious "Blind Sheikh." AV ¶¶ 260, 1001. Throughout the 1990s, the Blind Sheikh and his Al Gama'a organization were close allies of and collaborators with Osama bin Laden and Al Qaeda. *See* AV ¶¶ 1002, 1006; Ex. 5 (Youssef Report). 2, 22, 18,

18

101-102. During one of his visits to Los Angeles, the mosque arranged for two members of its extremist cell to house and escort Rahman around Southern California. AV ¶¶ 148, 414. Those two individuals remained part of that extremist cell in the ensuing years, and became followers of Thumairy when he assumed its leadership. AV ¶¶ 415-417.

Over the decade following its establishment and through September 11, 2001, the Saudi government's MOIA platform in Southern California served continuously as a hub for promoting jihadism and for hosting, supporting, and providing cover for Islamist extremists and terrorists. Thumairy and Bayoumi, both of whom are "known to have provided substantial assistance" to hijackers Hazmi and Mihdhar, were key members of this radical enterprise, and simultaneously officials and agents of the Saudi government in those roles. AV ¶¶ 1972, 2089. Their collaborators working within that framework included Ismail Mana, Mutaeb Al Sudairy, Adel Al Sadhan, Majed Al Mersal, Abdullah Al Jaithen, Khalid Al Sowailem, Musaed Al Jarrah, Mohamed Al Muhanna, Omar Abdi Mohamed, and ████████████ among others. All of those individuals were also officials and agents of the Saudi government and many of them, again like Thumairy and Bayoumi, had extensive ties to terrorism and Al Qaeda. *See, e.g.*, AV ¶¶ 168, 355, 358-378, 379-387, 393-399, 400-411, 412-443, 1049-1073, 1266-1371.

## B.     **The Kingdom's Support of Thumairy's Support to Extremists**

Thumairy was a senior official and agent of the MOIA network, tasked by the Kingdom to advance its extremist agenda in the U.S. within a highly centralized operation. AV ¶¶ 195-483. MOIA leadership hand-picked Thumairy to lead its nerve center at the Ibn Taymiyah Mosque, in anticipation of completion of the King Fahad Mosque. AV ¶¶ 195-203, 211-223. The circumstances indicate that Thumairy's only qualifications for this appointment were his pedigree from the radical Imam Mohamed University and extremism. AV ¶¶ 245-248. Saudi Arabia illegally imbued Thumairy with diplomatic credentials for this role, falsely representing to the

REDACTED FOR PUBLIC FILING

United States that he would work as an "Administrative Official" at the Saudi Embassy. AV ¶¶ 230-244. Thumairy's true work for Saudi Arabia instead involved cultivating and leading jihadist extremists from his post at the King Fahad Mosque, and supervising and secretly channeling funds to a network of jihadist agents working for Saudi Arabia in the same capacity. AV ¶¶ 267-483. Thumairy worked within a highly structured operation, in which he reported systematically to superiors at the Consulate, Embassy, and MOIA. AV § VII; ¶¶ 104, 220, 279, 301-303, 327. In addition, the Saudi government monitored and oversaw day-to-day activities at the King Fahad Mosque through several Consular officials. AV §§ III, VII. Thumairy's role and status within the MOIA enterprise is confirmed and corroborated by a broad array of evidence, including *inter alia*:

(1)    the FBI-CIA Joint Assessment findings concerning the nature and structure of the MOIA operation itself; EO 3414-42;

(2)    internal Kingdom records concerning Thumairy's MOIA hiring and selection to serve as a MOIA official in California and head of the King Fahad Mosque, and Thumairy's appointment as "supervisor of the propagators in California" "due to the importance of California;" *see, e.g.*, AV ¶¶ 195, 268, 351;

(3)    official MOIA directives to Thumairy to "supervise the propagators in the State of California" and to prepare reports on their activities; *see, e.g.*, KSA 6903; AV ¶¶ 302, 352, 353;

(4)    testimony and evidence showing that Thumairy lacked the training, experience, and English language proficiency necessary to perform any legitimate function for Saudi Arabia in the United States; *see, e.g.*, AV ¶¶ 203, 223, 245-248, 429;

(5)    banking records and FBI findings confirming that Thumairy distributed stipends and payments to extremist propagators in California; *see, e.g.*, AV ¶¶ 267, 340, 348-350, 378, 382;

(6)    Saudi government records showing the Kingdom's deliberate scheme to mischaracterize Thumairy's role and position to the U.S. government in order to improperly imbue him with protected diplomatic status; *see, e.g.*, AV ¶¶ 230-244;

(7)    call patterns, performance reviews, witness testimony, Saudi government protocols and reporting requirements, and other evidence showing that Thumairy worked in a highly centralized structure and regularly reported on his activities to the Saudi Consulate, Embassy, and MOIA; *see, e.g.*, AV ¶¶ 104, 253, 257, 270, 279, 301, 303, 327;

REDACTED FOR PUBLIC FILING

(8)    the FBI-CIA's joint finding that Embassy Islamic Affairs Deputy Jarrah was responsible for "manag[ing] and control[ling] all assignments of Saudi Imams in the United States," EO 3431, and "had a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California" and "directed and controlled and funded the activities of Almuhanna ( ) and Althumairy;" *see, e.g.*, EO 3496-97; AV ¶¶ 16, 102, 103, 129, 280;[12]

(9)    Kingdom records and FBI findings that Thumairy received special assignments from Prince Abdulaziz bin Fahad Al Saud (then the Kingdom's Minister of State, a Member of the Council of Ministers, and Head of the Prime Minister's Office) to transfer funds to Al Qaeda fronts in the U.S.; *see, e.g.*, AV ¶¶ 337-350;

(10)   Telephone and FBI investigative records showing that the Saudi government used a "front man" to acquire phones and phone service for Thumairy and other enterprise officials; *see, e.g.*, AV ¶ 746;

(11)   California Department of Transportation records confirming Thumairy's deliberate violation of laws and protocols governing the registration and use of automobiles by foreign government officials imbued with diplomatic credentials; *see, e.g.*, AV ¶ 243;

(12)   internal Saudi government documents and official records submitted to the State of California showing that the King Fahad Mosque was established as an arm of Saudi Arabia and controlled through MOIA and diplomatic officials, several of whom had ties to terrorism; *see, e.g.*, AV ¶¶ 178-184;

(13)   numerous official visits by high-ranking Saudi officials to the King Fahad Mosque, underscoring its importance to Saudi Arabia's Wahhabi enterprise in the United States; *see, e.g.*, AV ¶¶ 181, 202, 225, 227, 294, 301, 320, 322, 573;

(14)   internal Saudi government records and other evidence establishing Thumairy's role and responsibility for hosting Saudi government delegations during missions to

---

[12] Saudi Arabia argues that the FBI's investigative findings on Jarrah are inadmissible hearsay because the statements referenced are "not the FBI's own 'activity'" and are unreliable and are unreliable because their sources are not identified. KSA Br. 15-16 and n.13. Both parts of this argument are incorrect. The FBI's findings are part of a public record admissible under Fed. R. Evid. 803(8). "This rule is premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." *Bradford Trust Co. of Boston v. Merrill Lynch*, 805 F.2d 49, 54 (2d Cir. 1986). The fact that the findings do not address the FBI "office's activities," Rule 803(8)(A)(i), is immaterial because they are admissible as "factual findings from a legally authorized investigation[.]" Rule 803(8)(A)(iii). The FBI's reliance on undisclosed sources does not render its findings unreliable. *See, e.g.*, *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618-19 (8th Cir. 1983) (the "fact that findings are based in part on hearsay or on confidential sources not divulged to opposing party does not ipso facto render the findings so untrustworthy as to be inadmissible.") (internal quotation marks and citation omitted). Nor does the FBI's later expression of any different view of its findings. *Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1295-96 (S.D. Fla. 2018) ("[T]he fact that the Three Prosecutors' Report was subsequently disregarded by different prosecutors who were appointed . . . to replace its authors . . . is no reason to find that the Report falls outside the Rule 803(8)(A)(iii) exception.").

REDACTED FOR PUBLIC FILING

California, including extremists deployed by the MOIA under suspicious circumstances; *see, e.g.*, AV ¶¶ 450-460, 468-483, 1072;

(15) phone records, communications, witness testimony and other evidence confirming Thumairy's regular involvement in receiving radicals upon their arrival in the U.S. and hosting them while in Los Angeles; *see, e.g.*, AV ¶¶ 444-483;

(16) U.S. government assessments, percipient witness testimony, and other evidence that Thumairy had terrorist connections and led a radical cell at the King Fahad Mosque that included extremists supportive of the September 11th attacks; *see, e.g.*, AV ¶¶ 412-443;

(17) Thumairy's extensive dealings with other members of the MOIA enterprise, including Bayoumi himself, and Thumairy's attempts to conceal and falsely disclaim those relationships and interactions; *see, e.g.*, AV ¶¶ 227, 479, 534, 583, 584, 587, 1493;

(18) the MOIA's appointment in late 2000 of Mohamed Al Muhanna, who according to U.S. government findings, percipient witness testimony, and other evidence was a virulent extremist who gave a speech at the King Fahad Mosque after 9/11 praising the hijackers, to serve as Thumairy's assistant; *see, e.g.*, AV ¶¶ 393-399;

(19) internal Saudi government documents reflecting the MOIA's efforts to sustain Thumairy's deployment to the United States even after he was implicated in supporting the hijackers, and to support him in establishing an alternative underground mosque when he and the members of his extremist group were expelled from the King Fahad Mosque after 9/11; *see, e.g.*, AV ¶¶ 506-509, 526, 538, 622;

(20) internal Saudi government records showing that the Kingdom took no action to investigate Thumairy after being notified that the FBI was looking to question him after the 9/11 attacks, and had shown a mosque representative a picture of Thumairy with the hijackers, and despite the fact that the same official had been notified just weeks earlier that Thumairy was hosting three radicals at the mosque; *see, e.g.*, AV ¶¶ 517-524;

(21) internal Saudi government records and witness testimony documenting the efforts of the Saudi Consulate and Embassy to restore Muhanna to his leadership role at the King Fahad Mosque, after he was removed by the congregation for delivering a sermon in support of the 9/11 attacks, and showing that the MOIA awarded him the highest performance evaluation after those events; *see, e.g.*, AV ¶¶ 512-513, 549;

(22) FBI findings that Thumairy and Muhanna were shipping extremist literature to California after they were compelled to return to Saudi Arabia; *see, e.g.*, AV ¶¶ 438-440;

REDACTED FOR PUBLIC FILING

(23)     evidence showing that the mosques associated with the Ibn Taymiyah Foundation
         (the Ibn Taymiyah Mosque and the King Fahad Mosque) operated as centers for
         jihadist indoctrination and planning, from the early 1990's through the September
         11 attacks, all while under the control and leadership of Saudi government religious
         officials; *see, e.g.,* AV ¶¶ 131-148, 169-171, 450-460, 468-483, 506-516;

(24)     Thumairy's efforts to conceal the circumstances leading to his deployment to Los
         Angeles, and his true role, function, and activities in the United States, through
         demonstrably false statements to U.S. investigators and implausible and false
         testimony at his deposition; *see, e.g.*, AV ¶¶ 203, 210, 217-218, 220-221, 230-244.

## C.     The Kingdom's Support of Bayoumi's Support to Extremists

Bayoumi was a covert member of Saudi Arabia's Wahhabi network in the United States.

AV ¶¶ 112, 870-872, 876-891, 1371, 1573. Based on new intelligence not available to the 9/11

Commission or at the time of the FBI-CIA Joint Assessment, the FBI definitively determined in

2017 that Bayoumi was a "cooptee" of Saudi intelligence who received a monthly stipend from

the Saudi government:

> In the late 1990's and up to September 11, 2001, Omar Albayoumi
> was paid a monthly stipend as a cooptee of the Saudi General
> Intelligence Presidency (GIP) via then Ambassador Prince Bandar
> bin Sultan Alsaud. The information Albayoumi obtained on persons
> of interest in the Saudi community in Los Angeles and San Diego
> and other issues, which met certain GIP intelligence requirements,
> would be forwarded to [Ambassador Prince] Bandar.  Bandar would
> then inform the GIP of items of interest to the GIP for further
> investigation/vetting or follow up[.]
>
> Omar Albayoumi was a source of investigative interest following
> the 9/11 attacks for his support of 9/11 hijackers while living in
> California. *Allegations of Albayoumi's involvement with Saudi
> intelligence were not confirmed at the time of the 9/11 Commission
> Report. The above information confirms these allegations.*

EO 3282-83 (emphasis supplied), AV ¶ 868.

The Saudi government went to extraordinary lengths to place and keep Bayoumi in

Southern California from 1994 through August 2001, making all the more clear its awareness and

REDACTED FOR PUBLIC FILING

support for his covert work.[13] Bayoumi was nominally employed with the Saudi Presidency of Civil Aviation ("PCA"), a government agency. In January 1994, the PCA funneled funds for Bayoumi to relocate to California and for his living expenses through a sham Purchase Requisition with a subcontractor. AV ¶¶ 628-629. PCA Director General Mohamed Al Salmi signed the Requisition. *Id.* Once Bayoumi was in California, the PCA acting through Salmi engineered a series of sham "secondments" with contractor (and co-Defendant) Dallah Avco ("Dallah") under which Bayoumi ostensibly worked as a data processing technician while taking ESL and later MBA courses as a "student." AV ¶¶ 661-703, 706-723. In fact, Bayoumi performed no work for Dallah, *id.*, and seldom attended classes through 1997, *id.*, and stopped almost altogether thereafter. *Id.*

Bayoumi's failure to do any work for Dallah or to regularly attend classes was so apparent to Dallah administrators that, in April 1999, Dallah wrote Director General Salmi asking that PCA discontinue Bayoumi's secondment. AV ¶¶ 679-680. PCA refused. Instead, Salmi demanded that Dallah ask PCA to renew the secondment, *id.*, which Dallah immediately did. *Id.* That same month, PCA also prepared a performance review of Bayoumi—for a sham job—in which it gave him its highest ratings and described him as "persistent and hard working" and "known for his continuous ambitions toward development and better efforts." AV ¶¶ 704-705.

In April 2000, Bayoumi temporarily returned to Saudi Arabia and his ostensible work for PCA, as the funding arrangements Saudi Arabia had designed to pay Bayoumi were set to end. AV ¶¶ 682-684. The next month, Bayoumi requested that PCA place him on educational leave for two years, effective June 4, 2000. AV ¶¶ 684, 690. Bayoumi supported his request with a forged document Bayoumi falsely attributed to George Washington University, listing a property address

---

[13] *See also* Plaintiffs' Brief in Opposition to the Renewed Motion to Dismiss of Dallah Avco, also filed today.

REDACTED FOR PUBLIC FILING

the University did not own and sent from a fax number in Virginia. AV ¶¶ 686-689. After Bayoumi's request met initial resistance, AV ¶ 692, PCA President Ali Al-Khalaf intervened to overrule the objections and grant Bayoumi's request for an additional two years' educational leave in the United States. AV ¶ 693. At the same time, PCA also awarded Bayoumi a "promotion" to "Senior DSS Programmer" with Dallah, AV ¶¶ 694-695, and a substantial raise that more than doubled his monthly pay from March 2000 to December 2000, *id.*, all for performing no work for either Dallah or PCA itself.

Throughout the time he was in the United States and operating with the false cover and funding streams provided by Saudi Arabia, Bayoumi played a central role in coordinating and supporting the MOIA's extremist program in Southern California, including by hosting extremists with ties to Al Qaeda. *See, e.g.*, AV ¶¶ 876-891, 911-941, 959-997, 1319-1322, 1330-33, 1620, 1631, 1649, 1683, 1757. In that context, Bayoumi worked in close coordination with Thumairy and other Saudi officials in the Kingdom's Embassy and Consulate, as well as senior MOIA officials in Saudi Arabia. AV ¶¶ 767-776. Bayoumi's role and scope of work as a key operative of Saudi Arabia's Wahhabi network in the United States is amply evidenced by, *inter alia*:

> (1)    Bayoumi's over 150-page phone book, in his own handwriting, reflecting his extraordinary level and scope of contacts with other members of the MOIA enterprise in the United States, senior MOIA and Saudi government officials in Saudi Arabia, MOIA propagators deployed to the United States on missions, and Saudi Embassy and Consulate officials; AV ¶¶ 724-729;[14]

---

[14] Saudi Arabia argues that Bayoumi's phone book is inadmissible hearsay. KSA Br. 27. It is not. First, the phonebooks are offered and admissible for purposes other than to establish the truth of their contents—*i.e.*, whose phone number was whose—including as evidence of Bayoumi's association with the persons listed, including their roles in the MOIA enterprise, in his own handwriting. *See United States v. Ellis*, 461 F.2d 962, 970 (2d Cir. 1972) ("[A]ddress books belonging to one defendant, containing names of other defendants, are not hearsay and are admissible as circumstantial evidence showing association."); *see also United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (affirming admission of address books listing phone number of defendant Al Qaeda supporter as "not hearsay" where the "government did not rely on them to establish that the phone number listed next to Al-Moayad's name was, in fact, his phone number."). Second, the evidence shows that Bayoumi prepared the handwritten phonebooks to record contacts for his role in the MOIA enterprise and related activities, and that the typewritten phonebooks were prepared

25

REDACTED FOR PUBLIC FILING

(2)    documentary, video and photographic evidence produced by the Metropolitan Police Service ("MPS") after fact witness depositions concluded, which document Bayoumi's extensive dealings with and role hosting Saudi religious officials, including relationships Bayoumi implausibly denied in interviews and his deposition in this case; AV ¶¶ 793-813; documentary and phone record evidence showing Bayoumi's specific and extensive contacts with Saudi Embassy-based religious officials, including MOIA Embassy Director Sowailem, MOIA Embassy Propagators Sadhan and Sudairy, Ministry of Foreign Affairs Department of Islamic Affairs Embassy Officials Ghesheyan, Saleh, Jarrah, and Sultan, and Embassy official Noshan; AV ¶¶ 782-813, 1084-1111, 1815-1822;

(3)    documentary evidence, also provided by the MPS and never produced by Saudi Arabia, showing that Bayoumi worked with another undisclosed member of the MOIA enterprise, Soliman Al-Ali, to prepare a report to Saudi Ambassador Bandar concerning a suspicious diversion of funds from one of the "NGOs" sponsored and funded by the Saudi government to spread Wahhabism in the United States; AV ¶¶ 802-06, 1191-1194;

(4)    bank records and other evidence showing extensive financial transactions and interactions between Bayoumi and Al-Ali, whom Bayoumi unbelievably claimed he did not know; AV ¶¶ 666, 802-811, 2089;

(5)    correspondence between Bayoumi and MOIA and other Saudi government officials, most of which was never produced by Saudi Arabia, along with video and other evidence, confirming Bayoumi's work coordinating visits of and hosting MOIA extremists and role in the funding and logistics of the Saudi government's MOIA and Wahhabi platform in the United States; AV ¶¶ 1049-1150;

(6)    phone record evidence and witness testimony establishing Bayoumi's extensive contacts and coordination with Thumairy, including witness testimony and video evidence showing that Bayoumi traveled to Los Angeles and the King Fahad Mosque frequently to meet with Thumairy; AV ¶¶ 1388-94, 1410-1440;

(7)    evidence (including phone records, travel records, correspondence, FBI investigative records, and witness testimony) reflecting Bayoumi's efforts to secure MOIA religious and operational control over the Al Madinah Mosque, in coordination with MOIA and Al Haramain officials; AV ¶¶ 942-997;

(8)    Bayoumi's numerous visits to the Saudi Embassy and Consulate, including his three coordination visits to the Consulate immediately before the transfer of the hijackers to San Diego; AV ¶¶ 777-781; 819-30;

---

by Bayoumi and mosque employees for purposes of the mosque's operations. As such, the phonebooks are records of a regularly conducted activity under F.R.E. 803(6), which encompasses records of any "regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit." Finally, even if they were hearsay, Plaintiffs' experts may properly rely on the phone books.

REDACTED FOR PUBLIC FILING

(9)     Consular official ████ statements to the FBI that Bayoumi had a "very high status" when he entered the Consulate, that "Bayoumi's status was higher than many of the Saudi persons in charge of the Consulate," and that "Bayoumi had more clout at the Consulate than either Mohamed al-Muhanna or Thumairy, and that Bayoumi was considered higher in rank than the Consul General." AV ¶ 830;

(10)    Bayoumi's ties to and working relationships with Al Qaeda-linked radicals associated with the Saudi government's religious enterprise, including covert MOIA propagators ████ and Abdi Mohamed, covert agent and ardent bin Laden supporter Bassnan, and Al Haramain officials Saad Al Habib, ████████████, Soliman Al Buthe, and Mansour Kadi; AV ¶¶ 381 (████), 365-67 (Mohamed), 936-37 (Bassnan), 1159-69 (Habib);

(11)    Video, phone record and other evidence reflecting Bayoumi's close ties to Al Qaeda recruiter and leader Anwar Al Aulaqi, and Bayoumi's attempts to falsely dissemble about that relationship; AV ¶¶ 922-928;

(12)    the remarkable actions undertaken by Saudi government officials and Bayoumi to establish and maintain his cover story as a "student" on secondment to Dallah Avco; AV ¶¶ 661-682;

(13)    percipient witness testimony showing that Bayoumi falsely denied knowing Magdi Hanna, the Ercan official Saudi Arabia tasked with channeling funds to Bayoumi, including by marking up the cost of goods Ercan sold to Saudi Arabia to cover payments to Bayoumi; ¶¶ 650-660;

(14)    business and official records establishing that Bayoumi was at all times an employee of the Saudi government, and that his purported secondment to Dallah Avco was not permissible under the contract documents between Dallah Avco and Saudi Arabia; AV ¶¶ 639-49, 661-680;

(15)    the FBI's findings that Bayoumi was "living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed;" AV ¶ 717;

(16)    Bayoumi's use of calling cards acquired through a subagent, despite the fact that he already had a cell and multiple landline phones, indicating tradecraft to avoid leaving a digital footprint of incriminating calls; AV ¶¶ 761-766;

(17)    academic records and other evidence establishing that Bayoumi did not actually pursue any legitimate course of study while in the United States, and engaged in blatant fraud to maintain his cover story as a student, all while instead occupying himself with work to advance the MOIA enterprise in the U.S.; AV ¶¶ 706-723;

(18)    a broad spectrum of evidence showing that Bayoumi has systematically sought to conceal and downplay his contacts and work with members of the MOIA operation, Saudi government officials, and known jihadists. *e.g.*, AV ¶¶ 921-924.

REDACTED FOR PUBLIC FILING

**D.** **Thumairy and Bayoumi Routinely Hosted and Looked After Extremists Associated With Al Qaeda in Their Roles For the Saudi Government**

Thumairy and Bayoumi regularly hosted extremists on missions to the United States as a feature of their core work for the MOIA. They did so in coordination with senior Saudi government Islamic Affairs officials, and in circumstances that mirror their mobilization of support for and hosting of Hazmi and Mihdhar. *See, e.g.*, AV ¶¶ 111, 307-324, 450-460, 468-483, 521, 767-792, 799-813, 854-861, 911-943, 956, 959-997, 1072-1151, 1319-1322, 1330-1333.

1.   Thumairy and Bayoumi Receive, Host and Handle Logistics for MOIA Extremists Adel Al Sadhan and Mutaeb Al Sudairy

Mutaeb Al Sudairy and Adel Al Sadhan were both MOIA propagators and Saudi Embassy officials. AV ¶¶ 122, 277, 312. The FBI determined that Sudairy and Sadhan had a "nexus to al-Qa'ida." AV ¶¶ 1063. While working for the MOIA under false diplomatic cover, Sudairy moved to Missouri in mid-2000, where he lived for four months with an Al Qaeda procurement agent, Ziyad Khaleel. AV ¶¶ 122, 930, 1064-1065, 1123. Khaleel was a key Al Qaeda operative in the United States: while living in Missouri, Khaleel acquired and delivered a satellite phone and battery pack for Osama bin Laden, which bin Laden used to orchestrate the 1998 Embassy bombings. Khaleel also "managed wire transfers from IARA [the Islamic American Relief Agency to a [sic] bank accounts controlled by UBL [Osama Bin Laden]." AV ¶ 930; 1066; Ex. 566, FBI 11764. In 2004, the United States designated the IARA, based on its support for Al Qaeda, Osama Bin Laden, Hamas, and Al Ittihad Al Islamia ("AIAI"), the terror group led by Omar Abdi Mohamed in the U.S. AV ¶ 1068.

Senior MOIA officials first deployed Sadhan and Sudairy to the United States in 1998. They arrived in Los Angeles in December 1998. AV ¶¶ 312, 851, 997, 1028, 1109, 1115, 1227. Records declassified pursuant to President Biden's E.O. show that Sadhan listed Thumairy as his U.S. point of contact on his I-94 immigration entry form, establishing an advance arrangement for

REDACTED FOR PUBLIC FILING

Thumairy to receive and host the two propagators. AV ¶ 1073. At their depositions preceding the declassification of those records, however, Sadhan and Sudairy falsely claimed that there were no advance arrangements for Thumairy to receive them. AV ¶¶ 1073-1079. Instead, they concocted implausible stories that they met him (*their U.S. point of contact*) entirely by chance, and then navigated throughout Los Angeles on public transportation and taxis without his assistance, despite the fact that neither spoke any English. *Id*. Thumairy, meanwhile, claimed to have no recollection of Sadhan or Sudairy. AV ¶ 1077. In fact, a broad spectrum of evidence confirms that Thumairy coordinated with Bayoumi and senior Saudi officials concerning the two propagators and hosted them in Los Angeles. AV ¶¶ 1073-1083.

Indeed, the documents seized by British authorities from Bayoumi's residence and produced by the MPS (*but not by Saudi Arabia*), include four letters Bayoumi sent to MOIA officials concerning their "advance coordination" of Sudairy's and Sadhan's mission. AV ¶¶ 794, 1032, 1084, 1155-1156. In particular, Bayoumi wrote to Thumairy himself in January 1999, thanking him "for your kind efforts in providing us with brother Mutaeb Al-Sudairy and Adel Al-Sadhan." AV ¶¶ 604, 1152-1153. In a January 28, 1999 letter to MOIA Embassy Director Sowailem, Bayoumi thanked Sudairy, Sadhan, Thumairy, Abdulaziz Al Saleh, and Consulate official Jabreen for their "complete coordination." AV ¶¶ 277, 727, 783, 1032, 1154. Bayoumi also wrote to Embassy Islamic Affairs Head Ghesheyan, to thank him for coordinating the Sudairy and Sadhan mission, and separately to Minister of Islamic Affairs Al Turki, to thank him for approving the deployment and expressing appreciation for the "great cooperation and coordination" efforts of Thumairy, Sowailem, and Al Saleh. AV ¶¶ 277, 727, 794, 1032. The coordination described in Bayoumi's own letters is corroborated by phone records showing an

REDACTED FOR PUBLIC FILING

intensity of calls from Bayoumi with Thumairy, the Saudi Embassy, and the Consulate, contemporaneous with the arrival of Sudairy and Sadhan. AV ¶¶ 1084-1102.

Photos and other evidence show that Bayoumi actively hosted, looked after, and helped Sadhan and Sudairy establish themselves in San Diego, following their stay in Los Angeles, and that he remained in contact with them as they engaged in undisclosed work for the MOIA elsewhere in the United States. As part of these efforts, Bayoumi arranged for Sudairy and Sadhan to stay at the boarding house of Abusattar Shaikh, the same guesthouse where he would later arrange lodging for Hazmi and Mihdhar. AV ¶¶ 1103-1111. Photos, Bayoumi's own documents, and FBI evidence indicate that Shaikh was a close associate of Bayoumi, whom Bayoumi coopted to provide assistance relative to Bayoumi's work for the MOIA enterprise, including in particular lodging for individuals the Saudi government tasked Bayoumi to look after in San Diego. *See, e.g.*, *id.*; AV ¶¶ 1112-1121, 1201-1207, 1804-1811, 1823-1826. Bayoumi's communique to MOIA Minister Al Turki also made a point of reporting that Sadhan and Sudairy visited the Al Ribat Mosque while in San Diego, which was headed at the time by Al Qaeda recruiter Anwar Al Aulaqi. AV ¶ 1122. Aulaqi would become a key spiritual guide for Hazmi and Mihdhar, and his Al Ribat Mosque would serve as a key hub of support for the hijackers. AV ¶ 1755.

A new video, seized from Bayoumi's residence after 9/11 and produced just days ago by the MPS, reveals that Bayoumi also looked after Sadhan and Sudairy in Washington, D.C., in June of 1999. Shot by Bayoumi himself, the video shows Bayoumi driving with Sahdan and Sudairy in a car and taking them to sites in the D.C. area. Bayoumi jokes with Sahdan and Sudairy and addresses them in familiar terms, making clear that the three know one another well. Sadhan tries to conceal his face with a map. In later sections of the same videotape, and as discussed below, Bayoumi conducts a classic target "casing" of the U.S. Capitol for an attack. AV ¶ 1208-1233.

REDACTED FOR PUBLIC FILING

The video and related evidence is of critical importance, as Bayoumi, Sadhan and Sudairy all attempted (falsely) to minimize their familiarity and interactions with one another in their depositions. Indeed, throughout Sadhan's deposition, he reiterated no less than 18 times that he did not even know Bayoumi, except what he learned from the news. *See* Ex. 99, Tr. of Sadhan 91:7-8 (I don't know his name except from the news only."); 96:7-12 ("I do not remember the person's name or remember his image, what he looked like. But I learned from the news that he was one of the mosque visitors or patrons."); *see, e.g.,* 104:9-12 ("I don't know Omar al-Bayoumi to begin with, so how is he going to introduce me to another person."); 123:9-10 ("I do not know Bayoumi as a person."); 130:3-5 ("I didn't know Omar in person to begin with, leave alone knowing each other."); 130:8-9 ("I didn't know the man and never met him.").

As noted above, Sadhan and Sudairy both had a "nexus to al-Qa'ida" and remained in the United States for extended periods under Saudi-provided false diplomatic cover, performing undisclosed work for the MOIA. Bayoumi's seized records include communications and other documents showing that he remained in contact with Sudairy and Sadhan and was coordinating with others about their work for the MOIA. AV ¶¶ 792, 851-852, 1837-1849. These records include an "extremely urgent" coded fax message Bayoumi sent to Al Haramain representative Saad Al Habib, after Bayoumi tried repeatedly but was unable to reach him by phone. AV ¶¶ 1159-60. Referring to Sadhan and Sudairy, Bayoumi advised Habib that "Two brothers from the Ministry of Islamic Affairs visited with us…Their base was our mosque. And I was coordinating with those who were responsible for them." AV ¶ 1161; Ex. 348, MPS43_217. Bayoumi provided Habib with their names and phone numbers and asked him to contact them directly, so that Habib could "take the disk from the baker." *Id*. Bayoumi went on to explain that he had much to tell Habib but that the "paper cannot handle it" and that "[████ Omar Hamerman can provide a picture as well."

REDACTED FOR PUBLIC FILING

*Id*. ███████ was a convert recruited to the Saudi government MOIA enterprise by Bayoumi, who held a leadership role in the Al Haramain Islamic Foundation, a Specially Designated Global Terrorist (SDGT) organization. AV ¶¶ 878-879, 892-910. The communication thus shows Bayoumi's involvement in secretive matters also involving MOIA officials Sadhan and Sudairy; the extremist leader of a radical jihad organization recruited to the Saudi Wahhabi enterprise by Bayoumi; and a senior representative of Al Qaeda's most notorious front charity.

2.  Thumairy and Bayoumi Host and Handle Logistics for MOIA Extremists Mersal and Jaithen

Thumairy and Bayoumi were similarly tasked to host and handle logistics for MOIA's U.S. deployments of MOIA propagators Mersal and Jaithen. MOIA first sent Mersal to Los Angeles in December 1998-January 1999, in the same period that Thumairy hosted Sadhan and Sudairy and when they were with Bayoumi in San Diego. AV ¶¶ 1142-1150. Mersal's base during that mission was the Ibn Taymiyah Mosque and Mersal's report to MOIA thanked Thumairy for his "good hospitality, coordination, and follow up." AV ¶¶ 1142, 1146, 1148.

Mersal returned with Jaithen in December 1999, and the two were supported via the same mechanism employed for Sudairy and Sadhan and, very shortly after, the hijackers. *See, e.g*., AV ¶¶ 316, 604, 850, 1266-1371, 2011. The circumstances surrounding Jaithen's last-minute inclusion in the mission were highly irregular, and indicate his personal selection for an unusual assignment. AV ¶¶ 1287-1309. As occurred when Sadhan and Sudairy arrived in 1998, there was again a concentrated call circle among Bayoumi, Thumairy, and MOIA officials at the Embassy, Consulate and in Saudi Arabia, just as Mersal and Jaithen were embarking for and traveling to the United States. AV ¶¶ 1299-1300, 1247-1264. Jaithen's immigration records show that the Saudi government secured an A-2 official government work visa for his mission, and that he and Mersal were assigned to go first to Los Angeles. AV ¶¶ 1273, 1301-1303. Testimony and other evidence

REDACTED FOR PUBLIC FILING

indicate that they stayed in Los Angeles for 5 or 6 days and that the King Fahad Mosque was their base. AV ¶¶ 1311, 1353.

Mersal and Jaithen were assigned to go directly from Los Angeles to Bayoumi's mosque in San Diego, where Bayoumi was again responsible for attending to their needs and handling logistics. On the day they arrived in San Diego, video evidence shows that Bayoumi held (and recorded for reporting purposes) a meeting in his office with two young men, Fathi Aidarus and Khalid Al Yafai, he had recruited and coopted to carry out tasks for him, and who would play key roles in the support network for Hazmi and Mihdhar. AV ¶¶ 1313-1318. After Mersal and Jaithen arrived later that day, Bayoumi carefully attended to their needs and lodging, as confirmed by photos, videos, and hotel records. AV ¶¶ 1319-1351. This evidence shows that Bayoumi was wholly dedicated to looking after the MOIA delegation, and that he maintained a close relationship with them. An audio recording confirms that he arranged for Yafai to pray with Mersal and Jaithen. AV ¶¶ 1334-1346. Phone records also reflect ongoing coordination activities among Bayoumi, Thumairy, Anwar Al Aulaqi, Mersal and Jaithen, during the time Bayoumi was attending to Mersal and Jaithen in San Diego. AV ¶¶ 1247-1265.

During Jaithen's and Mersal's mission to San Diego, Bayoumi personally shepherded Jaithen back to Los Angeles and secured a room for him at a Travelodge near the King Fahad Mosque, where a hotel receipt produced by the FBI shows the two stayed together in a room. AV ¶¶ 1337-1346. Phone records and other evidence indicate that they were there to meet with Thumairy at the King Fahad Mosque, in coordination with and reporting to officials at the MOIA run Institute for Islamic and Arabic Sciences in America, Saudi Embassy, and back in Saudi Arabia. AV ¶¶ 1337-1346.

REDACTED FOR PUBLIC FILING

Like Sadhan and Sudairy, Jaithen was an extremist with ties to Al Qaeda. He and Mersal worked for the MOIA in Qassim Province, an area the 9/11 Commission described as at "the very heart of the strict Wahhabi movement in Saudi Arabia." AV ¶¶ 1274-1275. Several of the 9/11 hijackers were recruited through contacts at local universities and mosques there, and one mosque in Qassim was known as a "terrorist factory." *Id.*; *9/11 Commission Report* at 233; Ex. 149, Nakhleh Report at 80. The English version of the "Book of Jihad" pamphlet that Bayoumi kept in his desk at the Al Madinah Mosque was published by MOIA in Qassim Province. AV ¶ 1276. Jaithen was a mentee of one of Saudi Arabia's most prominent extremist scholars, and Jaithen's own writings and social media posts reflect his adherence to and support for jihadism and clerics detained for links to terrorism. AV ¶¶ 1277-1279. In 2003, Al Jaithen's name was found on a laminated "contact list" recovered in a raid of a villa where two prominent Al Qaeda-linked clerics were hiding, along with terrorist materials. AV ¶ 1283. His name and phone number were also found on a hard drive seized from Al Haramain. AV ¶ 1284. In 2018, long after U.S. pressure to strengthen counter-terror measures, the MOIA sanctioned Jaithen based on evidence of his jihadist extremism. AV ¶ 1285; Ex. 227, KSA 8875. Mersal was, in turn, a protégé of Jaithen. AV ¶ 1286.

In relation to Plaintiffs' inquiries concerning the purpose of the Jaithen and Mersal mission and their interactions with Bayoumi and Thumairy, the Kingdom's witnesses again offered implausible claims at their depositions, which have been exposed by the subsequent E.O. and MPS productions. For instance, Jaithen made the incredible claim that he received a letter (never produced) instructing him to travel to the U.S. and decide on his own, without reporting to his MOIA supervisors, where and when he would go in the U.S. AV ¶¶ 1289-1290. In fact, however, U.S. immigration records show that Saudi Arabia provided Jaithen's "intended address" on his A-2 visa application as "Holiday Inn, Los Angeles, CA 90001." AV ¶ 1303. Mersal and Jaithen both

REDACTED FOR PUBLIC FILING

attempted to minimize their interactions with Thumairy, despite the fact that they were in Los Angeles for 5-6 days and stayed in a motel near the King Fahad Mosque. AV ¶ 1311. Both also denied remembering Bayoumi at all, AV ¶ 1320, despite the videos, hotel records, phone calls, and other evidence showing Bayoumi's attentive hosting and handling of logistics during their mission. AV ¶¶ 1321-1322.

3.     Thumairy and Bayoumi Provided Material Support and Assistance to Numerous Other Extremist Agents From the MOIA Enterprise

Discovery and declassified records establish that Thumairy and Bayoumi hosted and supported many other extremists, in their roles as Saudi officials and MOIA enterprise agents. For example, Khalil Al Khalil, a long-time Saudi official who spearheaded Saudi Arabia's establishment of the King Fahad Mosque, testified that Thumairy "host[ed]" three Saudi extremists in Los Angeles in July-August 2001 and brought them to the King Fahad Mosque. AV ¶ 324, 468. At least one was a MOIA official. *Id.* Khalil assessed that they were radicals, and was so alarmed by his interactions with them that he contacted MOIA Deputy Minister Abdulaziz Ammar to make a report and get information about them. AV ¶ 470. Ammar told Khalil that the Mabahith were looking for the men. *Id.* Evidence shows that Thumairy secured an apartment for the three, with the assistance of MOIA Embassy head Sowailem. AV ¶ 472.

Percipient witness testimony establishes that Thumairy also hosted Sheikh Muqbil Al Wadi at the King Fahad Mosque in 2000, and had significant contacts with him. AV ¶¶ 450-460. Prior to his death in July 2001, the U.S. Department of Defense (DOD) classified Wadi as a "[m]ember of, or affiliation with, al-Qaida and the al-Qaida Network." AV ¶ 451. Wadi founded a notorious jihad enterprise in Yemen, AV ¶ 450. and in 1996 (four years before being warmly received by Thumairy) publicly asked God to destroy America and claimed his group was "preparing the people to fight America through jihad." AV ¶ 452.

35

In the wake of Al Qaeda's attacks on the U.S. Embassies in Kenya and Tanzania in 1998, Bayoumi hosted and supported a delegation of Al Haramain officials, who were seeking to assert control over the Al Madinah mosque with Bayoumi's assistance. AV ¶¶ 959-997. Investigations later revealed that Al Haramain was directly involved in supporting the Embassy attacks. AV ¶¶ 1955, 1976-80. One senior member of the Al Haramain delegation hosted by Bayoumi, Al Buthe, was subsequently designated by the United States for his role in supporting Al Qaeda. AV ¶ 1992. Telephone records and analysis indicate that Bayoumi's support for the delegation and efforts to install Al Haramain in the mosque were directed by Saudi officials. AV ¶¶ 965-997. At the time, Al Haramain was headed by MOIA's Minister, ███████████████████████ ██████████████████████ AV ¶¶ 1936-1942. Al Haramain was one of the organizations that comprised the MOIA enterprise, according to the FBI-CIA Joint Assessment and findings of the APS. Ex. 2, EO 3430, 3435; EO 3567-69. Separate CIA finished intelligence establishes that "[i]ndividuals working in Saudi Embassies in several countries appear to be witting of—and sometimes assist—[Al Haramain] branch offices that support extremist groups." AV ¶ 1980.

**E.**    **Additional Saudi Officials and Agents Worked With Thumairy and Bayoumi in Furtherance of the MOIA's Extremist Support Network.**

In their roles as Saudi government officials and MOIA agents, Thumairy and Bayoumi worked as part of a largely covert network that included dozens of other Saudi government officials and agents. *See supra* pp 14-16. A number of these individuals were undisclosed and paid secretly (and illegally) by the Saudi government, while others were imbued with false diplomatic cover and credentials. AV ¶¶ 114-130. These additional Saudi officials and agents working as part of the MOIA network included Ismail Mana, Mutaeb Sudairy, Adel Al Sadhan, Majed Al Mersal, Abdullah Al Jaithen, Khalid Al Sowailem, Musaed Al Jarrah, Mohamed Al Muhanna, Omar Abdi Mohamed, and ██████████, among others. *See generally* AV §§ IV, VII, XIV, XVIII.

REDACTED FOR PUBLIC FILING

Consistent with the extremist and pro-jihadist nature of the MOIA enterprise, many of them had material ties to Al Qaeda and terrorism and used the resources the Saudi government provided to support terrorist activity. *See, e.g.*, AV ¶ 359 (Mohamed), ██ (████████), 1064 (Sudairy); *see generally* AV ¶ 2; EO 3416. The activities of Mana and Abdi Mohamed within the context of their MOIA roles further illustrate both the extremist nature of the MOIA enterprise and Bayoumi's and Thumairy's central roles in it.

It is undisputed that Mana was a Saudi Consular officer, AV ¶ 400, and that he met with Bayoumi immediately before Bayoumi's meeting with Hazmi and Mihdhar. AV ¶ 1560. Bayoumi's handwritten phone book produced by the MPS includes multiple entries for Mana at the Saudi Consulate, identifying him as "Islamic Affairs." AV ¶ 1600. Correspondence and notes also produced by the MPS further confirm that Bayoumi knew Mana well and worked with him. *Id.* The evidence shows that Mana also worked closely with Thumairy, and that Mana's official work for the Consulate's Islamic Affairs section extended to the financial and religious affairs of the King Fahad Mosque. AV ¶¶ 407-410. ████████████████████████████████████ ████████████████████████████████████. Witness testimony indicates that Bayoumi returned to the King Fahad Mosque after his meeting with the hijackers, where he met with Mana and Thumairy. AV ¶ 1601. Further still, ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████

Like other of the MOIA operatives, Mana was a virulent extremist. A member of the Mosque, Usman Madha, has testified in this litigation that Mana and Thumairy were close, and that Mana was a member of a radical faction led by Thumairy that met regularly and privately in

REDACTED FOR PUBLIC FILING

the library of the mosque. AV ¶ 400. Madha has further testified that Mana "had a fierce hatred of non-Muslims and held anti-American beliefs." *Id.* ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████; *see also 9/11 Commission Report* 216-17 (noting Thumairy's "leadership of an extremist faction at the mosque," and that he had followers who were "'supportive of the events of September 11, 2001.'").

Abdi Mohamed was, in turn, a covert MOIA propagator working in California, under the direct supervision of Thumairy and more senior Islamic Affairs officials in the Saudi Embassy and Consulate. AV ¶¶ 358-363. Saudi Arabia initially sought to cast doubt on this arrangement and evade production of its own documents confirming it, until the Department of Justice provided Plaintiffs with a copy of the letter from Embassy MOIA Director Sowailem, seized in a raid of Abdi Mohamed's residence, confirming Thumairy's appointment and directing Abdi Mohamed and other propagators in California to report to Thumairy. AV ¶¶ 368-378, 589. Saudi Arabia thereafter miraculously found the letter in its own files, but still has never produced other communications from Sowailem to Thumairy and other propagators in California, which unquestionably exist. AV ¶ 354. Thumairy implausibly denied knowing of Abdi Mohamed, despite overwhelming evidence to the contrary. AV ¶ 368.

While serving as a covert agent for the MOIA in the United States, Abdi Mohamed was a terrorist who used the resources and infrastructure MOIA provided to support Osama bin Laden. AV ¶¶ 358-378. While being paid and working for Saudi Arabia under the supervision of Thumairy and other Saudi officials, Mohamed was the U.S. leader of AIAI, a terrorist organization designated by the U.S. and UN based on its close alliance with and ties to Al Qaeda. AV ¶¶ 340-

REDACTED FOR PUBLIC FILING

344, 359. Throughout the time he was engaging in those activities and leading AIAI, Abdi Mohamed was subject to strict reporting obligations and oversight by his employer the MOIA. AV ¶¶ 362-372, 503.

Other Saudi officials and agents working with Bayoumi and Thumairy in the MOIA enterprise had similar connections to terrorism. AV ¶¶ ████████████), 939-940 (Bassnan).

**F.**   **Saudi Arabia's Officials and Agents Mobilized Their Tested Mechanism for Hosting Extremists to Provide an Essential Support Network for the Hijackers.**

    1.    Saudi Arabia's Narrative is Unbelievable.

Saudi Arabia's arguments concerning the circumstances leading to Hazmi's and Mihdhar's seamless integration into the United States, and the immediate support they received from like-minded radicals for their attack preparations, are anchored in an utterly implausible theory predicated on a series of unbelievable coincidences. Saudi Arabia posits that Al Qaeda deployed Hazmi and Mihdhar to the United States with no advance plans for assistance, and then by pure happenstance they went immediately to the precise mosque that was the Saudi government's established receiving point in California for MOIA extremists linked to Al Qaeda. At that mosque, which just happened to be headed by an extremist MOIA propagator with deep ties to terrorism (Thumairy), Hazmi and Mihdhar had the good fortune to secure immediate assistance and housing from a congregation member whose family was close to both Thumairy and Consular official Mana, Mohamed Johar, whom Saudi Arabia theorizes they met by pure chance. Fortunately for the hijackers, Johar was willing to fully dedicate himself and go to extraordinary lengths to accommodate and support them during their two weeks in Los Angeles.

Johar is relieved from this burden, in Saudi Arabia's telling, when the lightning bolt of coincidence strikes again, and the hijackers go to a restaurant in Los Angeles and meet Bayoumi, who lives in San Diego but happens to be in Los Angeles that day. This chance encounter occurs

REDACTED FOR PUBLIC FILING

immediately after Bayoumi happens to have had a private meeting with Mana at the Consulate and then stopped at the King Fahad Mosque. The terrorists' remarkable good fortune continues when Bayoumi strikes up a (allegedly short) conversation with the hijackers and happens to mention that he lives in San Diego, the precise city Al Qaeda leadership had designated as the best location for them to settle and begin their attack preparations. Without hesitation, the hijackers pack up and embark for San Diego two days later, where they again by pure coincidence run into Bayoumi, who according to Saudi Arabia never encouraged them to relocate to San Diego and never offered to help them in any way. This is especially fortunate for the terrorists, as Bayoumi is immediately available and amenable to go to extraordinary lengths to get them settled in San Diego, including by securing housing in his apartment complex, assuming legal and financial responsibilities by co-signing their lease, and providing funds just below the suspicious activity reporting threshold to help them open a bank account. Through this series of coincidences and happenstance encounters, the hijackers miraculously track the precise mechanism previously used to receive and support visiting MOIA radicals with ties to terrorism, who were sent first to Thumairy's mosque in Los Angeles for support, and then to Bayoumi to be hosted in San Diego.

The good fortune resulting from their separate chance encounters with Bayoumi in America's second and seventh largest cities (within a period of two days) is then amplified when Bayoumi hosts a party at their apartment, which happens to be attended by a radical cleric who was the European leader of an Al Qaeda affiliate. In the ensuing months, a coalition of Bayoumi's associates who share the terrorists' worldview, including several individuals who also happened to attend the party at Bayoumi's invitation, take remarkable actions to assist them. All of this sheer luck leads to the hijackers' seamless settlement in San Diego and the provision of the support they precisely required to commence their attack preparations.

REDACTED FOR PUBLIC FILING

By another remarkable coincidence, as a raid of Bayoumi's apartment immediately after the attacks revealed, Bayoumi had prepared and was in possession of a drawing of a plane, alongside a calculation used to discern the distance at which a target on the ground will be visible from a certain altitude. AV ¶¶ 1889-1924. The raid also uncovers a videotape, shot and narrated by Bayoumi and prepared for an audience he addresses as the "dear brothers," in which he surveys the U.S. Capitol Building at length, repeatedly noting its orientation to other landmarks (and especially the Washington Monument, the highest landmark in the Washington), and carefully films and notes the Capitol's structural features, entrances, and security posts. AV ¶¶ 1208-1246. Again, the Kingdom assures that there is an innocent explanation for why these items are in the possession of its agent, who provided early and essential assistance to Al Qaeda members who were tasked to use a plane as a weapon and navigate it to targets on the ground, including the U.S. Capitol specifically.

Not surprisingly given the facial unbelievability of Saudi Arabia's narrative, the evidence shows that its theory of remarkable coincidences is demonstrably untrue.[15] *See* AV §§ XVIII-XXIV.

2.  The Evidence Shows That Saudi Arabia's Agents Organized an Essential Support Network for the Hijackers.

The 9/11 Commission determined that it was "unlikely that Hazmi and Mihdhar … would have come here without arranging to receive assistance from one or more individuals informed in advance of their arrival." *9/11 Commission Report* at 215; 2018 Decision at 648 (quoting same).

---

[15] Again, the Court has already confirmed the sufficiency of plaintiffs' jurisdictional showings that Bayoumi, Thumairy and their agents committed tortious acts, 2018 Decision, 298 F. Supp. 3d at 658, and that this support for the hijackers satisfies JASTA's jurisdictional causation requirement. *Id.* at 650-51. Although any further evidentiary inquiry is reserved for the merits phase, the intense public interest in these matters and prudential considerations require that Plaintiffs' briefly survey the evidence demonstrating that Saudi Arabia's irrelevant arguments on these points are entirely without merit.

REDACTED FOR PUBLIC FILING

Beyond the hijackers' lack of preparedness, the Commission noted Al Qaeda's meticulous planning and the fact that Al Qaeda made "precisely such arrangements – in the form of lodging and travel assistance – … when the first contingent of operatives (including Hazmi and Mihdhar) journeyed to Kuala Lumpur in late 1999 and early 2000." *9/11 Commission Report* at 514 n.5. As these findings indicate and Plaintiffs' expert testimony explains, Al Qaeda would not have sent Hazmi and Mihdhar to Los Angeles and directed them to settle in San Diego without arranging for a trusted support structure to help them. AV ¶¶ 1441 - 1455.

Hazmi and Mihdhar arrived in the United States on January 15, 2000. AV ¶¶ 1250, 1461. The 9/11 Commission concluded that Thumairy was a "logical person to consider as a possible point of contact for the hijackers." AV ¶ 1459. The Commission found Thumairy's claim that he did not recognize the hijackers and his denials of promoting "violent jihad" to be "suspect." *9/11 Commission Report* at 217. The Commission could not, however, reach any determination of his role as their point of contact, because it was unable to ascertain their whereabouts during their first two weeks in Los Angeles. *Id.*

The FBI subsequently determined, and witness testimony confirms, that the terrorists went immediately on their arrival to the King Fahad Mosque, where Thumairy was the Imam by appointment of the Saudi government. AV ¶ 1461. Hazmi and Mihdhar then received immediate and critical assistance from Johar, who has acknowledged that the hijackers interacted with Thumairy. AV ¶¶ 1486-1487. Witness testimony and other evidence establishes that Johar's family members were close to both Thumairy and Mana. AV ¶1493. ██████████████, a close friend of both Thumairy and ██████ at the time, later told the FBI "that he was told by ██████ that Fahad al-Thumairy, the imam of the King Fahad Mosque, had asked him to look after two very significant people." AV ¶ 1473. ██████████ attested in this litigation that ██████ "told me exactly as this: They

42

REDACTED FOR PUBLIC FILING

[Hazmi and Mihdhar] came through Sheikh Fahad. I wanted to -- I want to introduce you to two people." AV ████.

For the two weeks that followed, Johar looked after the hijackers' every need, including housing, transportation, and day-today living requirements. AV ¶¶ 1482-1503. He admitted in his deposition to being "relieved" when they moved to San Diego, given how demanding they were of him. AV ¶ 1486. Johar testified that he did not see the hijackers interact with anyone other than himself and Thumairy during this period. AV ¶ 1487. Given Al Qaeda's *modus operandi* and operational security requirements, these circumstances indicate that the hijackers viewed Johar to be a trusted member of their support network and were cognizant of the need to avoid interactions with unvetted strangers. AV ¶¶ 1489-1491.

On February 1, 2000, the hijackers went to the Mediterranean Café and met with Bayoumi. AV ¶¶ 1567-1570, 1588. Prior to that meeting, it is undisputed that Bayoumi visited the Saudi Consulate, where he met in a non-public area with Mana, and then stopped at the King Fahad Mosque. AV ¶¶ 1542, 1556, 1567. Bayoumi arranged to bring a credulous new convert to Islam who did not speak Arabic, Cayson Morgan, with him on the trip. AV ¶¶ 1532–1582. Bayoumi implausibly insisted at his deposition that he did not arrange for Morgan to go with him in advance, but instead saw him on the street that morning and asked Morgan to come. AV ¶¶ 1546-1552. This testimony conflicts with (among other evidence) Bayoumi's own account to Scottland Yard in a recorded interview that was not yet produced at the time of the deposition, and was refuted as well by Morgan. AV ¶¶ 1546-1552. The circumstances indicate that the invitation for Morgan to accompany him was an exercise in tradecraft by Bayoumi, the Saudi intelligence cooptee, designed to establish a cover story to conceal the true purpose of the trip. AV ¶ 1553. Bayoumi and Saudi Arabia have offered different and evolving stories about the purpose of the trip, but they all center

REDACTED FOR PUBLIC FILING

on the basic idea that Bayoumi needed to obtain or pick up a new passport. AV ¶¶ 1523, 1532-1535, 1548. Bayoumi even made a point to stop and pretend to get passport pictures taken on his way to Los Angeles with Morgan, to embellish this alibi. AV ¶¶ 1558.

Evidence produced by the MPS and other discovery establishes that Bayoumi did not need to go to the Consulate that day for any renewed passport, and that he did not need or purchase new passport photos. AV ¶¶ 1533, 1557-1558. To the contrary, photographic, video and other evidence shows that Bayoumi had gone to the Consulate with his family the day prior. AV ¶¶ 1533, 1537-1539, 1557-1558. Arrangements were made to mail the passports to Bayoumi, which a postmarked envelope from the Consulate seized in the UK raid of Bayoumi's apartment confirms. AV ¶¶ 1534-1535. The photo in the renewed passport, meanwhile, is the same photo Bayoumi used for his passport five years earlier. AV ¶ 1558. This and other evidence indicates that the story that Bayoumi needed to go to the Consulate on February 1 to pick up a passport was concocted to conceal the true purpose of the trip.

On arrival that day, Bayoumi was admitted to the Consulate's secure parking garage, and entered the Consulate with Morgan through the garage entrance reserved for Consulate staff. AV ¶ 1559. Bayoumi made a call and was greeted by Islamic Affairs official Mana. AV ¶ 1560. An array of evidence establishes that Bayoumi knew Mana well already, but Bayoumi and Mana have falsely claimed otherwise. AV ¶¶ 318, 825, 828, 1262, 1565. In Morgan's presence, Bayoumi falsely remarked to Mana that he had not been to the Consulate in months, when in fact he was there the prior day. AV ¶ 1560. Mana then took Bayoumi to a private area and met with him for 20-30 minutes, while Morgan waited in the lobby. AV ¶ 1561. Then they went to the King Fahad Mosque, where Morgan observed Bayoumi speaking with someone. AV ¶ 1567. Morgan has testified that Bayoumi brought him back to the King Fahad Mosque after meeting the hijackers at

REDACTED FOR PUBLIC FILING

the Mediterranean Café, where Morgan observed Bayoumi speaking with Thumairy and Mana. AV ¶¶ 1583–1585. Bayoumi has denied this second visit, claiming (in an ever-evolving story of the day) that he got lost trying to find the mosque. AV ¶ 1595. Witness testimony, videos, photographs, and other evidence belie this claim, and establish that Bayoumi was intimately familiar with the area, and visited the King Fahad Mosque frequently. AV ¶¶ 1596-1598. Mana, meanwhile, admitted seeing Bayoumi and Morgan at the King Fahd Mosque on an unspecified date. AV ¶ 1602. That encounter could only have occurred on that same day. AV ¶ 1602.

Between the trips to the King Fahad Mosque, Bayoumi went with Morgan to the Mediterranean Café, where it is undisputed he met and spoke in Arabic with the hijackers. AV ¶¶ 1574-1577. The Café was owned by Mana's close friend. AV ¶ 1568. The circumstances and evidence indicate, and Plaintiffs' expert Youseff has opined, that the meeting was pre-planned but staged to lead Morgan, who did not speak Arabic, to believe that it was a chance encounter. AV ¶¶ 1567-1582. On reflection, Morgan has testified that he now believes it was not a coincidence. AV ¶¶ 1605-1606. Bayoumi and Saudi Arabia have attempted to minimize his conversation with the hijackers at the Café, suggesting it lasted only two minutes, but Morgan has testified that it lasted "[a]t least 30 minutes." AV ¶¶ 1575, 1577. Bayoumi's 2021 deposition account of the conversation conflicts as well with his own statements to Scotland Yard in 2001, which had not been produced at the time of his deposition. AV ¶ 1577. Saudi Arabia also makes the remarkable claim that "[a]t no time during his conversation with Al Hazmi and Al Mihdhar did Al Bayoumi offer to help them in any way" and "at no time…did Al Bayoumi invite them to San Diego…" AV ¶ 1578. Morgan's detailed account of the translation of the conversation Bayoumi provided to Morgan in real time indicates otherwise, as do the events that followed the meeting.

REDACTED FOR PUBLIC FILING

In the period immediately before the hijackers' arrival and through their meeting with Bayoumi, phone records show an intensive and unusual call circle among Thumairy, Bayoumi, ███, and MOIA Embassy Director Sowailem. AV ¶¶ 1247-1265. ███ also calls ███, as confirmed by the FBI's finding that there was "significant phone connectivity between ███ and ███ prior to and directly following key events of logistic assistance provided by ███ to HAZMI and MIDHAR. This pattern of phone connectivity between ███ and ███ is not identifiable prior to the hijacker's arrival in Los Angeles and does not occur between ███ and ███ after the hijackers depart California." AV ¶¶ 1498-1500. During this period, Bayoumi and Thumairy both also place calls to MOIA propagator Mersal, the extremist who had just visited with both of them, and Bayoumi called Al Qaeda-linked Sudairy as well. AV ¶¶ 1299, 1313, 1319-1329. These calls and Plaintiffs' expert's analysis of them establish coordination among the callers for mobilizing the support network for the hijackers, consistent with the 9/11 Commission's conclusion that Al Qaeda would have made arrangements in advance for them to receive assistance upon their arrival.[16]

Discovery has also established that Bayoumi began looking for an apartment for the hijackers *before* they came to San Diego. The manager of Bayoumi's apartment complex testified that Bayoumi visited the rental office 5-6 times before the hijackers arrived, to inquire about the availability of an apartment in "close proximity" to his own. AV ¶ 1606. And when Morgan saw the hijackers in San Diego within days of the alleged chance encounter at the Mediterranean Café' and expressed surprise, Bayoumi admitted to Morgan "that he discussed setting up an apartment

---

[16] Contrary to Saudi Arabia's claim that Plaintiffs overstate and misattribute these calls, KSA Br. 26-28, the phone records and calls they reflect objectively occurred. Plaintiffs proffer expert testimony from the FBI's former head of Communications Analysis, analyzing the calls and explaining the significance of short-duration calls. AV ¶¶ 730-31. Saudi Arabia has offered no qualified expert rebuttal testimony and no credible argument that a single call is misattributed.

REDACTED FOR PUBLIC FILING

with his apartment complex manager prior to the arrival of al-Hazmi and al-Mihdhar in San Diego." *Id.* Phone records also indicate that Bayoumi investigated the possible availability of the apartment of Hashim Attas, who would later befriend Hazmi and Mihdhar, calling both Attas and his landlord. AV ¶ 1607.

Within one or two days of their alleged chance encounter with Bayoumi, at which the Kingdom claims Bayoumi neither invited them to San Diego nor offered to assist them in any way, the hijackers arrived in San Diego and met Bayoumi at the Islamic Center of San Diego (ICSD). AV ¶ 1615. The circumstances indicate that Bayoumi and Thumairy arranged for the hijackers to be taken to San Diego by car, and that claims that they took a bus are not credible. AV ¶¶ 1608-1614. The Kingdom claims that the hijackers ran into Bayoumi at the ICSD again by chance, their second alleged happenstance encounter with him in one or two days, occurring in separate cities. AV ¶ 1616. It is beyond dispute that Bayoumi immediately proceeded to provide substantial assistance to the hijackers, including, *inter alia*, finding them an apartment in his complex, co-signing their lease as a guarantor, and transferring $9,900 from his bank account to open a bank account in their names. AV ¶¶ 1625, 1627-1650. Witness testimony and other evidence also indicate that the hijackers stayed at Bayoumi's apartment for 1-2 days, before their apartment was ready. *Id.* Bayoumi admitted at his deposition that he had never helped any stranger in a remotely similar way. AV ¶ 1652.

Just as Bayoumi was providing this critical assistance, there was once again a concentrated pattern of phone calls among Bayoumi, Thumairy, Saudi Islamic Affairs officials, and others. Bayoumi called the Islamic Affairs department repeatedly in the days leading up to February 3, and then stopped calling once the hijackers were safely settled in San Diego. AV ¶ 1256, 1513, 1618. On February 2, Bayoumi also called Sudairy. AV ¶ 1256, 1513, 1618. Thumairy, in turn,

REDACTED FOR PUBLIC FILING

called the Islamic Affairs office on February 3, in close sequence to two calls to the office by Bayoumi. AV ¶ 1618. Thumairy also called the Imam at the ICSD late that night. AV ¶ 1619. The ICSD's Imam was the first person the hijackers met on arrival in San Diego that very day, when they went to the ICSD to make contact with Bayoumi AV ¶ 1619.

Witness testimony and phone records establish that Anwar Al Aulaqi coordinated with Thumairy and Bayoumi to get the hijackers settled in San Diego. AV ¶¶ 1627-1655. Holly Ratchford testified that a man matching Aulaqi's description and photograph visited the rental office with the hijackers. AV ¶ 1627. Phone records also demonstrate a call circle among Aulaqi, Bayoumi and Thumairy, coinciding with the hijackers' settlement in San Diego. AV ¶ 1628. Aulaqi also called the bank where the hijackers went with Bayoumi to obtain a certified check for their apartment, an hour before they went there. AV ¶¶ 1635-1636. As discussed below, Mohdar Abdullah, a close friend of Aulaqi's family in Yemen and an associate of both Aulaqi and Bayoumi, was one of the individuals "tasked" by Bayoumi to provide assistance to the hijackers during this time. AV ¶¶ 1494, 1722. Aulaqi would become a key spiritual advisor to the hijackers and, after the attacks, a formal leader of Al Qaeda in the Arabian Peninsula. AV ¶1755.[17]

Two weeks after helping the hijackers settle in San Diego by securing them housing, bank accounts and other assistance, Bayoumi held a welcome party for the hijackers at their apartment, which was videotaped by Morgan at Bayoumi's instruction. AV ¶ 1657. The MPS seized the *complete* party video in the raid of Bayoumi's residence, and produced it in this litigation. AV ¶¶ 1658-1660. The complete version produced by the MPS (after jurisdictional fact depositions concluded) is different from the version the FBI produced to Plaintiffs, and the duration and

---

[17] Contrary to Saudi Arabia's claim that Aulaqi was a "moderate," KSA Br. 8, his role as religious advisor to the hijackers, his ascent to a leadership role in Al Qaeda, and other evidence demonstrate his radicalism.

REDACTED FOR PUBLIC FILING

content of the complete video show that it is also different from and more complete than the one the FBI provided to the 9/11 Commission. AV ¶ 1658. Plaintiffs hired digital image analysis experts and translators, to analyze the full video and provide certified transcripts, English subtitles, and digital schematics identifying and showing the location of the participants during the party. AV ¶¶ 1661-1663.

The translation and analysis of the full video confirms that it was organized by Bayoumi, Thumairy, and their collaborators, to introduce the hijackers to a carefully curated group of like-minded community members and religious leaders, who could be trusted to look after the hijackers and cocoon them in a protective support network. Contrary to the 9/11 Commission's understanding based on the incomplete video it reviewed, the complete video confirms that the hijackers attended and participated in the party throughout, and that they held special status at the event. AV ¶¶ 1668-1674, 1683-1687. Bayoumi oversees the event, and the introductions and discussions make clear that the primary purpose is to introduce Hazmi and Mihdhar to the attendees. AV ¶¶ 1683-1687. Evidencing its secretive purpose, Bayoumi instructs Morgan not to film areas of the room where certain sensitive participants are sitting, including the hijackers and Sheikh Mohammed Al Qahtani, a Saudi religious official. AV ¶¶ 1676, 1688. The party is attended as well by Abdulrahman Barzanjee, the radical cleric Bayoumi installed as the Imam at the Al Madinah Mosque who held a leadership role in SDGT Ansar Al Islam. AV ¶¶ 1690, 1712. The remaining attendees included a veritable "who's who" of like-minded community members who would mobilize essential support for the hijackers in the ensuing months. AV ¶¶ 1675-1710.

The content of the full video and additional evidence also demonstrate that Bayoumi sought to deceive investigators about the party's purpose. For example, Bayoumi claimed that the party was held to honor a "visiting sheikh" who was departing the U.S., Barzanjee. AV ¶ 1711. In fact,

REDACTED FOR PUBLIC FILING

Barzanjee had been installed as the permanent Imam at the Al Madinah Mosque by Bayoumi himself, and Bayoumi's correspondence seized by the MPS shows that Barzanjee remained in the U.S. through the end of 2000. AV ¶ 1712. Further, Bayoumi's own captured statements on the video indicate that the purpose of the event was to "welcome[] the brothers, in fact … whom we have not yet had the pleasure of meeting," AV ¶ 1683, plainly referring to Hazmi and Mihdhar. The record now available also indicates that Bayoumi misled investigators when he claimed that the party was moved to the hijackers' apartment from his own at the last minute, again in an apparent attempt to obscure its true purpose. AV ¶ 1713.

The available evidence, including phone records, also show that Bayoumi coordinated the party with MOIA officials and reported to them after it concluded. Bayoumi's phone records show that he called Embassy MOIA head Sowailem's personal cell phone twice in the days immediately after the February 17 party, on Friday the 18th at 7:58 p.m. for two minutes, and again on Saturday the 19th at 10:56 a.m. for six minutes. AV ¶ 1230. The timing of these calls, coming immediately after the party and made after business hours to Sowailem's personal cell phone, indicate the Bayoumi was reporting on the party. *Id.* In addition, the available evidence and circumstances indicate that Qahtani, the Saudi religious official Bayoumi instructed Morgan to avoid capturing on the video, was a Saudi government Islamic Affairs official. AV ¶¶ 1675-1678.

In the wake of the party, the attendees invited by Bayoumi and others coopted by him mobilized to provide the hijackers the precise support they needed to successfully carry out their preparations, and the evidence establishes that Bayoumi continued to play a key role. AV §§ XXIII-XXIV. The support delivered through this mechanism included transportation; lodging (apartment then safehouse); purchase of a car, arranging driver's license and auto insurance; identifying flight schools and taking flight lessons; regular translation assistance, English lessons

REDACTED FOR PUBLIC FILING

and form-filling; U.S. identification, visa and immigration matters; banking services and credit guarantees; receipt of funds from Al Qaeda by wire transfer; setup and training in digital communications, including Internet, email and online message exchange; telephone communications, including cell phone and landlines, to make and receives calls to/from Al Qaeda and the Saudi support network; medical care, meals, and sustenance through companionship; assimilation into U.S. culture and society; spiritual reinforcement and religious guidance. AV §§ XXIII.A-E.[18]

As part of this continuing support enterprise, Bayoumi again arranged housing for the hijackers in Lemon Grove, California at the guesthouse of Abusattar Shaikh. AV ¶ 1108. Bayoumi's attempts to deny his involvement in doing so, meanwhile, rest on his claim that he was in the UK at the time, which the evidence now shows were false. AV ¶¶ 1767-1774. In addition, phone records and other evidence indicate that Bayoumi engaged in a fraudulent scheme to help Hazmi obtain the English certification necessary to obtain a student visa to stay in the United States after July 2000, in coordination with an individual named ██████. AV ¶¶ ██████. Bayoumi also loaned one of his cell phones to the hijackers during a period when he was outside the United States, to facilitate their contact with the support network. AV ¶¶ 1752-1754. Bayoumi and other members of the California support network also provided support for the hijackers' move to the East Coast, as reflected by phone and FBI investigative records. AV ¶¶ 1837-1849.

Thumairy remained active in the support network as well, in coordination with Bayoumi. In June of 2000, Hazmi and Mihdhar returned to Los Angeles, along with Mohdar Abdullah, in advance of Mihdhar traveling to Yemen. Upon arrival, they went to the King Fahad Mosque to

---

[18] Saudi Arabia's claim that Bayoumi did not direct anyone to help the hijackers, KSA Br. 21-22, is belied by Mohdar Abdullah's answers to investigators, the FBI's findings, and the circumstantial evidence of this aid. AV ¶¶1721-22.

REDACTED FOR PUBLIC FILING

meet with Thumairy, as well as Johar. AV ¶ 1778. Based on his percipient observations of the interactions among the men, which he could "remember vividly," Abdullah testified that it was clear that Thumairy knew Hazmi and Mihdhar already, from when they first arrived in Los Angeles. AV ¶ 1779.[19] The hijackers stayed in Los Angeles for two more days, and Abdullah testified that Thumairy held two private meetings with them. AV ¶ 1781. Those meetings occurred at a critical operational moment, given Mihdhar's impending travel to Yemen. AV ¶ 1791.

The MPS production includes several pieces of damning additional evidence of Bayoumi's witting involvement in assisting the hijackers' terrorist mission. Among these is a notepad seized in the raid of Bayoumi's residence on September 20, 2001, which included a drawing of an airplane alongside an equation, notes and calculations.[20] Plaintiffs' aviation expert and pilot Captain Barry Schiff has testified that the equation "is used in aviation to determine the line-of-sight distance to the horizon from an airplane at a given altitude." AV ¶ 1900. It allows a pilot to calculate "at what altitude he would be able to see [an] airport" from a certain distance. AV ¶ 1901. Captain Schiff has opined "that the airplane sketch, equation, and calculations made by Mr. Bayoumi on Figure 1 [Ex. 11N, MPS 999x_X0417 Bayoumi Airplane Sketch at 2; Ex. 485, FBI 1334] are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks." AV ¶ 1903. Captain Schiff explains that "[k]ey pieces of information for the hijackers' planning the attacks to know would be from what distances and altitudes they would be able to see their targets[]" and that information was necessary to provide the hijackers "with the visual cues needed to fly the hijacked jetliners into their targets." AV ¶

---

[19] Saudi Arabia's denial that this meeting occurred because Thumairy allegedly was not in Los Angeles at this time, KSA Br. 9, rests on an inaccurate date conversion and is belied by eyewitness accounts of the meeting. AV ¶¶ 1793-1796.

[20] Remarkably, the FBI overlooked the existence of the drawing entirely until 2012. As such, it does not appear that Bayoumi was ever questioned about it until his deposition in this case.

REDACTED FOR PUBLIC FILING

1905. The 50 and 70 mile variable Bayoumi used for his calculations correspond to "reasonable…range of distances to consider for the 9/11 attacks" that would "provide them [the 9/11 hijackers] with the visual cues needed to fly the hijacked jetliners into their targets." AV ¶¶ 1906-1907. Further still, the variables and details Bayoumi used correspond closely to the manner in which the planes were piloted to their targets on 9/11. AV ¶ 1908. When questioned about the drawing and calculation for the first time at his deposition, Bayoumi demonstrably dissembled, stating that it related to "what is the distance of the road between San Diego to LA or Washington to other places. It's just an equation to measure distance. To Baltimore." AV ¶¶ 1909, 1916. But as Bayoumi was forced to admit, and Captain Schiff has verified, the equation has absolutely nothing to do with a distance calculation of that nature. AV ¶ 1909.

The raid also uncovered a videotape, shot and narrated by Bayoumi and prepared for an audience he addresses as the "esteemed brothers," in which he surveys the U.S. Capitol at length. AV ¶¶ 1213, 1217. Bayoumi repeatedly orients the Capitol to other surrounding landmarks (and especially the Washington Monument, the highest landmark in the Washington), and carefully films and notes the Capitol's structural features, entrances, and security posts. AV ¶ 1217, 1223. Bayoumi makes remarks throughout reflecting hostility to the West and Congress, including the Senators who "make all the decisions." AV ¶¶ 1218-1219. The narration and manner in which Bayoumi addresses his audience indicate that he prepared it as a report, pursuant to an assignment. AV ¶ 1216. His focus on the Capitol's orientation to other structures, the areas surrounding the building, and its security posts, structural elements, and means of egress, match the requirements and *modus operandi* for an Al Qaeda target casing assessment. AV ¶ 1216. As the 9/11 Commission noted, the Capitol was a primary target of the 9/11 attacks, and Flight 93 was headed there until heroic passengers on board crashed it into the ground in Shanksville, PA. AV ¶ 1232.

REDACTED FOR PUBLIC FILING

## IV.    **LEGAL ARGUMENT**

### A.    **Saudi Officials in California Acted Well Within the Scope of Their Employment or Agency in Supporting the Hijackers.**

This case involves application of respondeat superior and attribution standards to an unusual enterprise—a foreign government operation established to conduct covert intelligence activities and to promote jihadism in the United States, in service of the agenda of an official government Ministry that sponsored and promoted terrorism. Despite the unique context, traditional legal principles for agency liability apply. *See* 162 Cong. Rec. at S2845 (Sen. Cornyn) (JASTA "incorporates traditional principles of vicarious liability and attribution, including doctrines such as respondeat superior [and] agency"). These principles, which Saudi Arabia fails entirely to address, make clear that Saudi Arabia cannot evade responsibility for the foreseeable terrorist risks inherent in its pro-jihadist enterprise and support network in the United States prior to the September 11 attacks, including the actions undertaken by multiple of its officials and agents, in coordination with one another, to host and support the hijackers.

### 1.    The Most Expansive Scope of Agency Standards Apply to the Present Inquiry

In FSIA cases involving state law claims, courts must apply forum state choice of law rules. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 110 (2022); *see generally* 28 U.S.C. § 1606 (where sovereign immunity does not apply, a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"). This Court also has applied forum choice of law rules in a case involving both federal Antiterrorism Act and state law claims. *Sokolow v. P.L.O.*, 60 F. Supp. 3d 509, 523 (S.D.N.Y. 2014) (Daniels, J.); *see generally O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) ("[M]atters left unaddressed in [a

REDACTED FOR PUBLIC FILING

federal statute] are presumably left to the disposition provided by state law."). New York choice of law rules thus apply to the agency issues related to Plaintiffs' claims.

New York courts determine choice of law on an issue-by-issue basis within a case, so that different states' laws may govern particular issues, such as the scope of an agency relationship. *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n.1 (2d Cir. 2001) (citing, *inter alia*, *Babcock v. Jackson*, 191 N.E.2d 279, 284-85 (N.Y. 1963)). "In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Properties Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994). This entails two separate inquiries: "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.* New York courts also look for guidance to the factors listed in *Restatement (Second) Conflict of Laws* § 145 (1971).[21] These factors are: (a) the place where the conduct causing the injury occurred; (b) the place where the conduct causing the injury occurred,; and (c) the place where the relationship, if any, between the parties is centered. *Restatement*, § 145(2). When there is no actual conflict between the most interested state's and New York's laws, "New York [courts] will dispense with a choice of law analysis," *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998), and apply New York law.

In determining what law governs the scope of the agency relationship between the Kingdom and Bayoumi, Thumairy, Jarrah, Mana, and their collaborators, the relevant contact jurisdictions are:

(1)    place of Plaintiffs' injuries—New York, Pennsylvania, or Virginia;

---

[21] Courts applying federal common law conflict of law principles likewise consult the *Restatement 2d* § 145 factors. *See, e.g., Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 14 (2d Cir. 1996) (finding both federal common law and state conflict of law principles to support applying § 145 factors).

REDACTED FOR PUBLIC FILING

(2)     <u>place of conduct</u>—California;

(3)     <u>places of domicile, residence, nationality, business</u>—California, Saudi Arabia, various American states;

(4)     <u>place where agency relationship was centered</u>—California.

The weight of these contacts points to California as having the strongest potential interest.[22] Under California law, the respondeat superior doctrine governing the scope of agency serves *both* conduct-regulating and loss-allocating purposes. *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1343 (Cal. 1991) (recognizing three rationales for applying respondeat superior: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury."). Here, the first and third rationales (and the second with respect to certain Plaintiffs) give California the strongest interest in having its agency law apply to whether the conduct on its soil of Bayoumi, Thumairy, and Mana is attributable to Saudi Arabia.

Under California law, the respondeat superior doctrine determines a principal's liability for its agent's conduct, applying the same liability standard to agency as to employment relationships. *Lisa M. v. Henry Mayo Newhall Mem. Hosp.*, 907 P.2d 358, 360 n.2 (Cal. 1995) ("[Cal.] Civil Code section 2338, which has been termed a codification of the respondeat superior doctrine, is not limited to employer and employee, but speaks more broadly of agent and principal[.]"). Respondeat superior means that "an employer is vicariously liable for his employee's torts committed within the scope of the employment." *Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676, 678 (Cal. 1986). The employer's liability is determined based on the nature of the enterprise it operated and whether the employee's actions were foreseeable within that specific context:

---

[22] The Court should rule out applying the law of Saudi Arabia. *See Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 21 (D.D.C. 2011) ("Consistent with . . . other FSIA cases, United States domestic law remains more appropriate in state-sponsored terrorism cases than foreign law.").

REDACTED FOR PUBLIC FILING

> A risk arises out of the employment when in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one that may fairly be regarded as typical or broadly incidental to the enterprise undertaken by the employer. *Accordingly, the employer's liability extends beyond his actual or possible control of the employee to include risks inherent in or created by the enterprise.*

*Id.* (cleaned up) (emphasis supplied). The emphasis on the nature of the enterprise in assessing foreseeability is critical. *Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 618-19 (1975) (unlike the test for negligence, where "'foreseeability' means a level of probability which would lead a prudent person to take effective precautions[,] . . . 'foreseeability' as a test for Respondeat superior" is based on "the context of the particular enterprise").

Thus, in assessing an agent's acts, past similar conduct by the agent or others is powerful evidence that they were reasonably foreseeable and within the scope of the agency. *Id.* at 620 (activity that was "customary incident of the employment relationship" was within its scope); *Perez v. City and Cnty. of San Francisco*, 75 Cal. App. 5th 826, 833 (2022) (same). Moreover, "[t]ortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment. So may acts that do not benefit the employer or are willful or malicious in nature." *Mary M.*, 814 P.2d at 1344 (citations omitted). Since conduct in *disregard* of express orders may be within the scope of agency or employment, it is axiomatic that express orders or instruction are not required for acts to be within the scope. *Proietti v. Civiletti*, 603 F.2d 88, 90 n.1 (9th Cir. 1979) ("It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's [authority]."). The same agency principles apply to public and private employers alike. *Id.; Peralta v. U.S.*, 475 F. Supp. 3d 1086, 1094 (C.D. Cal. 2020) (applying to U.S. Government).

REDACTED FOR PUBLIC FILING

The Court therefore must apply California agency law unless it finds that New York agency law is not materially different with respect to enterprise risk. Here, it may reasonably so find. *See* 2018 Decision, 298 F.Supp.3d at 643 n.7 ("[T]he relevant [agency law] principles under New York and California law are largely the same."). New York likewise applies the respondeat superior doctrine to both agency and employment. *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (App. Div. 2007) ("Under the doctrine of respondeat superior, a principal is liable for the negligent acts committed by its agent within the scope of the agency."). New York also recognizes the same enterprise risk conception of respondeat superior that California does. *See Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (respondeat superior "encompasses the far more elastic idea of liability for any action which can fairly and reasonably be deemed an ordinary and natural incident or attribute of that act") (internal quotation marks and citation omitted); *id.* at 1282 ("[For an employee to be regarded as acting within the scope of his employment, the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected. As indicated earlier, it suffices that the tortious conduct be a natural incident of the employment. *Hence, general rather than specific foreseeability has carried the day even in cases where employees deviated from their assigned tasks.*") (emphasis supplied).

Under New York law, too, past similar conduct of enterprise participants is evidence that an agent's present acts are within the scope of agency. *Fountain v. Karim,* 838 F.3d 129, 134 (2d Cir. 2016) (evidence of employee's "past practice" supports finding of implied authority). New York likewise does not require express orders or instruction for acts to be within the scope of agency. *Id.* ("[T]he fact that Karim lacked explicit permission does not end the inquiry; if it did, the government could escape liability for its employees' torts by failing to complete necessary paperwork or miscommunicating messages to its employees."). Thus, if the Court finds that New

REDACTED FOR PUBLIC FILING

York recognizes the same enterprise risk conception of the scope of agency or employment that California does, it may apply materially identical New York law.

        2.    <u>Plaintiffs' Evidence Readily Satisfies This Standard of Agency and Respondeat Superior</u>

The evidence Plaintiffs obtained through discovery and declassification demonstrates overwhelmingly that Thumairy, Bayoumi, Mana and the other implicated officials acted within the scope of their agency for the Saudi government when they aided hijackers Hazmi and Mihdhar.

*First*, the MOIA support network for pro-jihadist extremists in Southern California itself shows that Thumairy and Bayoumi's aid to the hijackers was part of a broader Saudi government enterprise. The declassified 2004 FBI/CIA Joint Assessment and the FBI's July 2021 Electronic Communication confirm that the MOIA network was ideologically aligned with violent jihadism, that its operatives were tied to terrorist organizations including Al Qaeda and were engaged in intelligence activity, and that the Saudi government abused diplomatic privileges to gain these operatives entry into the United States. *Supra* § III.A. Plaintiffs' experts confirm that the Saudi government funded a mosque in Los Angeles that was operational headquarters for Al Gama'a Al Islamiyah, a terrorist organization and close ally of bin Laden and Al Qaeda. *Id.* In light of the Saudi government's support for jihadist extremists in Southern California working closely with terrorist organizations, Thumairy and Bayoumi's aid to the hijackers was of a piece and thus was well within the scope of their agency. *See Perez v. Van Groningen*, 719 P.2d at 678 (vicarious liability is appropriate where "the risk was one that may fairly be regarded as typical or broadly incidental to the enterprise undertaken by the employer.").

*Second*, Thumairy and Bayoumi's hosting of and support for other extremists in Southern California in addition to the hijackers further demonstrates that their aid to the latter was foreseeable within the scope of their agency for the Saudi government. *See, e.g., Perez v. San*

REDACTED FOR PUBLIC FILING

*Fran.*, 75 Cal. App. 5th at 833 (respondeat superior liability found where employee's activity was consistent with "customary" practice); *Fountain*, 838 F.3d at 134 (employee's "past practice" supports finding of implied authority). Before hosting and supporting the hijackers in early 2000, Thumairy and Bayoumi provided the same forms of support for Sudairy and Sadhan in late 1998, into 1999, and for Mersal and Jaithen in 1999. *Supra* § III.D.1.-2. In both cases, the Saudi government deployed the extremists to Los Angeles and their arrival was preceded by a flurry of telephone calls among Thumairy, Bayoumi, and MOIA officials at the Saudi Embassy, the Saudi Consulate in Los Angeles, and in Saudi Arabia. *Id.* Upon their arrival, first Sudairy and Sadhan and then Mersal and Jaithen were met by Thumairy and initially based their operations at the King Fahad Mosque. *Id.* After a short period of time, each moved on to San Diego, where Bayoumi found them housing (Sudairy and Sadhan stayed at the same boarding house where the hijackers later stayed), integrated them into the community, and maintained close relationships with them for the duration of their stays in the United States. *Id.* This recurring pattern of providing support for extremists deployed by MOIA to the United States likewise shows that Thumairy and Bayoumi's support for the hijackers was well within the scope of their agency for the Saudi government.[23]

*Third*, the common terrorist connections of persons Thumairy and Bayoumi hosted and supported in Southern California also show that their aid to the hijackers was within the scope of their agency. Like the hijackers, Sudairy and Sadhan were connected with Al Qaeda. *Id.* § D.1.

---

[23] Saudi Arabia devotes much energy to arguing that Sadhan-Sudairy and Jaithen-Mersal were not "advance teams" for the hijackers because of a lack of evidence of the former's overt assistance to the hijackers. KSA Br. 25-26. The evidence concerning their links to Al Qaeda and circumstances surrounding their deployments and hosting by the same network used to support the hijackers support the roles as advance teams, but the relevance of this evidence does not depend on such a finding. Thumairy and Bayoumi's assistance to Sadhan and Sudairy and to Jaithen and Mersal through the same Los Angeles to San Diego also shows that giving material support to pro-jihadist, terrorism-connected persons coming to the United States was within the scope of their employment for the Saudi government. This pattern of assisting Al Qaeda-linked operatives also provides evidence that Thumairy and Bayoumi, and their superiors, knew they were supporting terrorists when they aided Hazmi and Mihdhar.

REDACTED FOR PUBLIC FILING

Thumairy also hosted Sheikh Muqbil Al Wadi at the King Fahad Mosque in 2000. *Id.* § D.3. The U.S. Department of Defense thereafter classified Wadi as a member or affiliate of Al Qaeda or the Al Qaeda network. *Id.* Bayoumi also hosted a delegation of Al Haramain officials visiting the U.S. days after Al Haramain had provided support for the U.S. Embassy bombings. *Id.* Here again, Thumairy's and Bayoumi's repeated acts of assistance to Al Qaeda supporters visiting the U.S. demonstrate that their aid to the hijackers was within the scope of their agency for the Saudi government.

*Fourth*, the evidence shows that multiple Saudi officials and agents coordinated closely with one another, using government facilities and resources, in arranging support for the hijackers. This coordination reflects that those officials and agents were acting within the official capacities and pursuant to the directions of one another and others. Indeed, the calls and other evidence showing contemporaneous reporting to Consular and Embassy officials, including Sowailem, coinciding with key support activities, evidences that those agents were working pursuant to instructions from superiors and within their designated chain of command.

*Fifth,* the extraordinary lengths to which the Saudi government went to place and keep Bayoumi in the U.S. before and after he aided the hijackers, and to maintain the deployments of Thumairy and Muhanna, further support the conclusion that this aid was within the scope of his agency. The Saudi PCA kept Bayoumi in the U.S. from 1994 to 2000 under a series of sham "secondments," or appointments. *Supra* § III.C. In fact, Bayoumi seldom attended the classes and never did any work for Dallah, to the point that Dallah asked PCA to end the secondment in 1999, which PCA refused to do for another year, during which time Bayoumi provided material support to the hijackers. *Id.* After Saudi Arabia learned that Thumairy was implicated in the FBI's 9/11 investigation, and that Muhanna had been expelled from the King Fahad Mosque for giving a

REDACTED FOR PUBLIC FILING

sermon in support of the hijackers, Saudi Arabia actively worked to maintain their deployments. AV ¶¶ 535-540. The Saudi government's determination and manufacturing of pretenses to keep Bayoumi in the U.S. both before and after he aided the hijackers provide yet further support for the conclusion that his covert activities, including this aid and his provision of similar aid to other visiting extremists, were within the scope of his agency for the Saudi government. Its efforts to sustain Thumairy and Muhanna indicate the same conclusion for them.

*Sixth*, and finally, numerous Saudi government fact witnesses' submission of transparently false testimony about Thumairy and Bayoumi's activity in the United States all-but demands disbelief and an inference of culpability. For example, while Bayoumi worked for the Saudi government for over 20 years, starting in 1977 at age 19, the Kingdom stated in its sworn discovery responses that it has *no knowledge or documentation of who supervised Bayoumi's government work*. Ex. 24 (6/12/18 KSA Rog Resps.), Resp. 5. Equally implausibly, both Sadhan and Sudairy testified that they had no advance arrangement to meet Thumairy when they arrived in the U.S. and that they met him in Los Angeles entirely by chance, even though Sadhan had *named Thumairy as his U.S. point of contact on his I-94 immigration form. Supra* § III.D.1. Sadhan also repeatedly testified that he does not know, and never met or spoke with, Bayoumi, when there is evidence seized by the MPS of Bayoumi videotaping Sadhan and Sudairy when the three traveled to Washington, D.C. AV ¶ 1227. These repeated submissions of obviously false statements and testimony by Saudi Arabia and its agents invite if not demand disbelief by the finder of fact and a strong inference of the Kingdom's culpability for Thumairy and Bayoumi's actions in its employ. *Reeves*, 530 U.S. at 147 ("[T]he factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.") (cleaned up).

REDACTED FOR PUBLIC FILING

In its renewed motion, Saudi Arabia relies on Bayoumi and Thumairy's denials that anyone ordered them to aid the hijackers, KSA Br. 14-17, *or that they assisted the hijackers at all*, *id.* at 17-25, notwithstanding the evidence and the Court's finding that they did. The Court should disregard these arguments. They do not address the relevant respondeat superior inquiry or test, and instead conflate the jurisdiction and merits inquiries. Further, they rest on self-serving witness testimony that is not credible and insufficient to carry Saudi Arabia's burden in any case.

## B.     The Evidence Shows That Saudi Officials Engaged in Tortious Acts

### 1.     Tortious Acts Through Officials and Agents

The Court already determined that Plaintiffs have established, for purposes of jurisdiction, that Saudi officials and agents engaged in the tortious acts that "caused" Plaintiffs' injuries. 2018 Decision, 298 F. Supp. 3d at 650. While those issues are settled for the jurisdictional phase, the evidence available fully corroborates those conclusions.

JASTA requires that Plaintiffs state a cognizable claim for tortious conduct that constitutes more than negligence. 28 U.S.C. § 1605B(b)(2), (d). Plaintiffs' causes of action include primary and secondary claims under the Anti-Terrorism Act (ATA)[24], and state-law claims for aiding and abetting, conspiracy, and gross negligence.[25] For ATA primary liability, the inquiry focuses on the provision of "material support" with "knowledge" of the recipient's connection to terrorism. *Weiss v. Nat'l Westminster Bank, PLC,* 768 F.3d 202, 205, 208 (2d Cir. 2014). This knowledge can be

---

[24] The Court has held that JASTA's secondary liability cause of action is unavailable against foreign states. *See* ECF No. 8862 (Feb. 7, 2023 Mem. Decision and Order) at 14-19. Plaintiffs respectfully preserve their argument that they are entitled to maintain § 2333(d) aiding and abetting and conspiracy claims against Saudi Arabia. *See* ECF No. 7432 (Plaintiffs' Mem. of Law in Support of Rule 54(b) Motion) at 11-21.

[25] *See* CAC Counts XII and XIII; *see also Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586, at *8 n.10 (N.D. Fla. May 11, 2023) ("To the extent Plaintiffs are pursuing a gross negligence claim, that claim would not be barred by the JASTA exception's 'mere negligence' exclusion because gross negligence requires more than 'mere negligence.'") (applying Florida law); *cf. Corley v. Vance*, 365 F. Supp. 3d 407, 455 (S.D.N.Y. 2019) ("[G]ross negligence differs in kind as well as degree from ordinary negligence.") (cleaned up) (applying New York law).

REDACTED FOR PUBLIC FILING

inferred from evidence that the donor knows the recipient is associated with a terrorist organization or exhibits deliberate indifference to whether they are aiding a terrorist organization. *Id.* It does not require specific knowledge of, or intent to advance, a particular attack. *Id.* Plaintiffs' state law aiding and abetting claims impose liability for providing "substantial assistance" with awareness of the primary tortfeasor's role in an overall tortious scheme. [26] Conspiracy liability turns on an "agreement." *Bereswill v. Yablon*, 160 N.E.2d 531, 533 (N.Y. 1959) (a "conspiracy depends upon a combination of two or more persons intentionally participating in the furtherance of a preconceived scheme or design"); *Halberstam,* 705 F.2d at 481 ("once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy"). Even before merits discovery, Plaintiffs' evidence readily satisfies these standards.

Initially, the FBI concluded that Bayoumi and Thumairy are "are known to have provided substantial assistance" to Hazmi and Mihdhar. The 9/11 Review Commission Report, in turn, affirmed that Thumairy "immediately assigned an individual to take care of" Hazmi and Mihdhar on arrival. 9/11 Review Comm'n, at 102 n.330. This evidence alone refutes Saudi Arabia's arguments of "no assistance" by Thumairy or that Bayoumi's critical aid was insubstantial. See 2018 Decision, 298 F. Supp. 3d at 650.

As surveyed above, an expansive and diverse body of objective evidence provides overwhelming support for these conclusions about Bayoumi and Thumairy, and their close coordination with additional Saudi officials and agents to support the hijackers. 9/11 Commission,

---

[26] *See, e.g., Land v. Forgione*, 114 N.Y.S.3d 464, 466 (App. Div. 2019); *Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76, 84-85 (Pa. 2023); *Alliance Techn. Grp., LLC v. Achieve 1, LLC*, 2013 WL 143500, at *5 (E.D. Va. Jan. 11, 2013); *see generally Restatement (Second) of Torts* § 876(b) (1979) (defendant is liable for aiding and abetting where it "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (defendant must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" and "the defendant must knowingly and substantially assist the principal violation"). The Anti-Terrorism Act applies the same standard. *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016), § 2(a)(5) (adopting *Halberstam* standard).

REDACTED FOR PUBLIC FILING

CIA findings, expert testimony and other evidence shows that Hazmi and Mihdhar were "ill prepared" for their mission, and that Al Qaeda would not have sent them to the U.S. without arranging in advance for trusted persons to receive and help them. The fact that they went directly on arrival to the King Fahad Mosque, by itself, provides compelling evidence that Thumairy was their point of contact, especially given his terrorist connections and appointed role to receive and host extremists on arrival in Los Angeles. The ensuing circumstances surrounding the unqualified assistance the hijackers received while in Los Angeles, and their interactions with Thumairy and persons associated with him, further establish Thumairy's central role in the support network.

This function is additionally corroborated by the evidence of intensive coordination among Thumairy, Bayoumi, ███ Sowailem and other relevant actors immediately preceding the hijackers' arrival, and Bayoumi's support for their ensuing settlement in San Diego. Phone call analysis, hotel and travel records, witness testimony and other evidence show concentrated and unusual contacts among these key members of the support network, immediately before and coinciding with the support for the hijackers. The totality of the evidence surrounding the circumstances of Bayoumi's meeting with the hijackers at the Mediterranean Café, including the fact that it was preceded by his secretive meeting with Mana at the Consulate and followed by a meeting with Mana and Thumairy at the King Fahad Mosque, show that the meeting was planned. The fact that the hijackers moved to San Diego followed immediately after that meeting, placed unqualified trust in Bayoumi to help them, and the remarkable efforts undertaken by Bayoumi to get them settled, which are essentially uncontested, make this all the more clear. The nature and timing of these contacts among these people within close orbit of the hijackers, leading directly to an uninterrupted chain of support from the moment of their arrival, evidences the existence of a

REDACTED FOR PUBLIC FILING

witting support network and the central involvement of Bayoumi, Thumairy, and Mana, working in coordination with additional Saudi agents and officials.

Abundant evidence further shows that Thumairy, Bayoumi, Mana, Sowailem, and those they enlisted to support the hijackers were extensively tied to jihadist extremism and terrorism. We now also know, solely due to the E.O. declassification and MPS production, that Bayoumi was a Saudi intelligence cooptee and that his possessions seized just after the attacks reveal that he prepared a damning aviation "line of sight" calculation and "target casing" video of the Capitol.[27]

This and the additional evidence surveyed in the Averment easily satisfy the material support, substantial assistance, and awareness requirements for Plaintiffs' ATA and aiding and abetting tort claims. The aid provided through the support network included, inter alia, housing, bank accounts, transportation, flight training enrollment, communications assistance, and logistical help. These fall squarely within the ATA's definition of material support, *see* 18 U.S.C. § 2339A, and, particularly given the hijackers' lack of preparedness and the nature of their mission, undeniably constitute substantial assistance. *Halberstam,* 705 F.2d at 484 & n.13 (even minimal aid constitutes "substantial assistance" if the act encouraged is "particularly bad or opprobrious").

The Saudi agents' awareness of the hijackers' connections to terrorism and role in an overall tortious enterprise are, in turn, established by their own ties to terrorism and extremist views; their intelligence experience and training; the sequence and nature of their concentrated dealings leading to the provision of the precise forms of assistance the hijackers most needed to

---

[27] Saudi Arabia tries to distract from this evidence by emphasizing he FBI's decision not to *criminally* prosecute Thumairy, Bayoumi, or Jarrah. KSA Br 2. This does not evidence their innocence. *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990) ("[W]e cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty."). The factfinder therefore may not so infer. *United States v. Martinez*, 844 F. Supp. 975, 981 (S.D.N.Y. 1994) ("[T]he Court cannot infer from the Government's decision not to prosecute Cristobal that Cristobal is, in fact, not guilty."). This is particularly so given the higher standard of proof required for criminal prosecution than is required here. *Warren v. Byrne*, 699 F.2d 95, 97 (2d Cir. 1983) (because, *inter alia*, "the rules of law and burdens of proof in the civil and criminal proceedings were substantially different, dismissal of the criminal charges against appellants was not determinative of the issues in this case.").

REDACTED FOR PUBLIC FILING

assimilate into the United States and begin preparations for the attacks without detection; their deceitfulness to U.S. investigators and at their depositions; and the broader spectrum of evidence documenting the extensive involvement of the MOIA enterprise in supporting Al Qaeda.[28] This evidence also establishes the "agreement" for purposes of conspiracy liability.

Moreover, although not required, the evidence also demonstrates *specific* knowledge of the specific tort in which Hazmi and Mihdhar were engaging. Bayoumi's sub-agents helped Hazmi and Mihdhar to find and enroll in flight classes. *Supra* § III.F. Bayoumi himself created a sketch drawing of an airplane alongside an equation, notes and calculations that are consistent with the flight plan the hijackers used in the September 11 attacks. *Supra* § II.F.1. Perhaps most chillingly and damningly, Bayoumi also shot a video of himself surveying the U.S. Capitol Building, detailing its structural features, and providing orientation to it in relation to surrounding landmarks. *Supra* § II.F. This is stark evidence that Bayoumi and his Saudi Government cohorts aiding Hazmi and Mihdhar knew not just that they were Al Qaeda terrorist operatives, but that they were in the United States to engage in the very terrorist acts that they carried out on September 11.

The record now available likewise shows that Plaintiffs have offered cognizable claims against Saudi Arabia for gross negligence. To be sure, Saudi Arabia's creation and operation of a (largely covert) platform in the United States to support the MOIA's pro-jihadist agenda, and population of it with extremists with terrorist connections (like Thumairy and Bayoumi) was grossly negligent. The record demonstrates a reasonable connection between that gross negligence and Plaintiffs' injuries, through the facts that it was available to and used by Al Qaeda to support

---

[28] The tortious conduct evidence showing Saudi Arabia's creation and operation of the MOIA enterprise, and resulting support for terrorism and the hijackers, satisfies the FSIA's tort exception for jurisdiction, 28 U.S.C. § 1605(a)(5), as well. These acts involve several torts committed entirely in the United States, satisfying the "entire tort" rule. *See* 2018 Decision at 639. Further, the creation and operation of the MOIA enterprise to support extremism violated myriad U.S. laws and imperiled U.S. national security, and thus falls outside the discretionary function exception, 28 U.S.C. § 1605(a)(5)(A). Whereas JASTA excludes claims negligence claims, the tort exception does not.

REDACTED FOR PUBLIC FILING

its operations, including the hijackers. This gross negligence of Saudi Arabia provides an additional basis for jurisdiction under JASTA, which is not dependent on a finding that Saudi Arabia's agents acted within the scope of their agency and employment in assisting the hijackers.

**C.      Plaintiffs' Evidence Readily Demonstrates Jurisdictional Causation**

The Court correctly found that Plaintiffs satisfy JASTA's jurisdictional causation standard. 2018 Decision, 298 F. Supp. 3d at 650-51. JASTA requires only a "reasonable connection" between a foreign state's tortious acts and the plaintiffs' injuries. *Id.* at 645. The various forms of assistance Thumairy and Bayoumi coordinated fit squarely within the ATA's definition of "material support," 18 U.S.C. § 2239A(b)(1), reflecting Congress's determination that these categories of aid serve to enable acts of terrorism. For common law aiding and abetting, courts consider, *inter alia*, "the nature of the act encouraged, the amount of assistance given by the defendant, . . . [and] his relation to the other and his state of mind[.]" *Restatement (Second) of Torts* § 876, cmt. D. For conspiracy, the showing of a defendant's agreement subjects it to liability for harm resulting from an overt act done in furtherance. *Halberstam,* 705 F.2d at 477.

The evidence confirms that the support Thumairy and Bayoumi provided and coordinated for Hazmi and Mihdhar was critical to the September 11th plot. The *9/11 Commission Report* found that Hazmi and Mihdhar desperately needed assistance to settle in the United States and begin preparations for their mission. *9/11 Commission Report* at p. 215. The evidence that Thumairy and Bayoumi provided this essential assistance far exceeds the modest requirement of a reasonable connection between tortious acts and injuries to establish jurisdictional causation.

**D.      Saudi Arabia is Subject to Jurisdiction Based on its Sponsorship of Al Qaeda Through State Controlled Charities**

Plaintiffs previously moved for reconsideration of the 2018 Decision, to the extent it declined to authorize jurisdiction based on Plaintiffs' theories that Saudi Arabia aided and abetted

REDACTED FOR PUBLIC FILING

Al Qaeda and the September 11th attacks, through funding and government resources that flowed through alleged charities (the charity-related theories), based on the Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). *See* ECF Nos. 7431, 7481. The Court held that reconsideration was not warranted, however, based on its conclusion that § 2333(d) does not apply to foreign states. ECF No. 8862. In response to Saudi Arabia's motion, Plaintiffs renew and preserve their arguments that JASTA's secondary liability cause of action is available as to Saudi Arabia, and that jurisdiction lies based on this directly tortious conduct by the Saudi government.

In the context of the present motion, Plaintiffs also submit that the attribution principles incorporated into JASTA's immunity exception, and flowing from Plaintiffs' state law secondary liability theories, provide separate bases for concluding that the charity-related theories are sufficient to establish jurisdiction. JASTA's sponsors explained that the term "agent" incorporated principles of vicarious liability into JASTA's immunity exception,[29] and aiding and abetting and conspiracy are forms of vicarious liability. *Halberstam*, 705 F.2d at 479. This Court also has now held that state substantive law aiding and abetting and conspiracy claims flow through JASTA's immunity exception. *See In re: Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *5 (S.D.N.Y. Aug. 10, 2023). Because *Kaplan* and *Honickman* reflect the standards applicable to the vicarious liability inquiry under JASTA's immunity exception, and governing Plaintiffs' state law aiding and abetting claims, the principles announced in those decisions are available to Plaintiffs here. For the reasons discussed in Plaintiffs' motion for reconsideration, jurisdiction is established under those cases, pursuant to the charity-related theories. *See* ECF Nos. 7432, 7740

---

[29] 162 Cong. Rec. S2845-01 at S2845 (Sen. Cornyn), S2846 (Sen. Schumer).

REDACTED FOR PUBLIC FILING

In addition, the evidence now available bolsters Plaintiffs' charity-related theories in important respects. For example, the FBI-CIA Joint Assessment and other evidence show that charities like Al Haramain were part of the MOIA enterprise and closely tied to its leadership.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

AV ¶¶ 1936-1938, 1940-1942. ████████████████████████████████

███████████████ AV ¶ 1939. █████████████████████████████████

█████████████████████████████████████████████████ AV ¶ 1941. This support continued after U.S. officials expressly raised Al Haramain's terrorist activities with Saudi officials. AV ¶¶ 68-73, 1051, 1980. Declassified CIA intelligence further shows that Saudi government officials in its embassies and consulates were involved in Al Haramain's terrorist activities, and that senior Saudi officials knew of and condoned Al Haramain's terrorist actions. AV ¶¶ 1980, 1982-1983, 1987.

This evidence cures the identified deficiencies that led the Court to decline jurisdiction based on the charity-related theories. It augments the showing as to the government's control over the charities and use of them for government purposes, bolstering the showing that they are agents of the government. The direct involvement of government officials in Al Haramain's terrorist acts provides an additional basis for attribution, that does not depend on the charities being agents. The details concerning the scope of resources that flowed through these entities, and reflecting the broader extent of the Saudi government's support, the showing as to the reasonable connection between the support and conduct and Plaintiffs' injuries.

## V.    <u>**CONCLUSION**</u>

For all of the reasons set forth, Saudi Arabia's renewed motion to dismiss should be denied.

██████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

Dated: December 20, 2023  Respectfully submitted,
Corrected: January 17, 2024

MOTLEY RICE LLC  COZEN O'CONNOR

By: /s/ Robert T. Haefele  By: /s/ Sean P. Carter
Robert T. Haefele  Sean P. Carter
Jodi Westbrook Flowers  Stephen A. Cozen
Donald A. Migliori  Scott Tarbutton
28 Bridgeside Boulevard  One Liberty Place
Mount Pleasant, South Carolina 29464  1650 Market Street, Suite 2800
Tel.: (843) 216-9184  Philadelphia, Pennsylvania 19103
Email: rhaefele@motleyrice.com  Tel.: (215) 665-2105
  Email: scarter@cozen.com

*Liaison Counsel and Co-Chairs for the*  *Co-Chairs and Liaison Counsel of the*
*Plaintiffs' Executive Committee for Personal*  *Plaintiffs' Executive Committee for*
*Injury and Death Claims on behalf of the*  *Commercial Claims on behalf of Plaintiffs*
*Plaintiffs*

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

71

REDACTED FOR PUBLIC FILING

**Errata Sheet to Plaintiffs' Brief in Opposition the Saudi Arabia's Renewed Motion to Dismiss (Corrected: 1/17/2024)**

| Page | Change From: | Change To: | Description |
|------|-------------|-----------|-------------|
| | | | Corrections to address typographical and formatting errors, to conform spellings, naming and other conventions, and to clarify identifications. |
| 19 | 2261 | 1972, 2089 | Errata about which Plaintiffs previously advised counsel for KSA and Dallah Avco, based on inadvertent citation to paragraphs beyond the range of numbered paragraphs. |
| 19 | 311 | 411 | Correct a typographical error where the end range was intended to be 411, not 311. |
| 19 | 343 | 443 | Correct a typographical error where the end range was intended to be 443, not 343. |
| 20 | 301, 303 | 301-303 | Correct a typographical error where the range was intended to include 301-303 |
| 24 | *Id.* | AV ¶¶ 704-705 | Correct to include inadvertently omitted citation to source for quotes. |
| 24 | AV ¶ 690 | AV ¶¶ 684, 690 | Correct to include inadvertently omitted pin-cite source. |
| 25 | 868-873 | 767-776 | Correct to address inadvertent omission of citation to averment section aligned with the statements asserted in the brief. |
| 26 | 2261, 2265 | 666, 802-811, 2089 | Changes about which Plaintiffs previously advised counsel for KSA and Dallah Avco, based on inadvertent citation to paragraphs beyond the range of numbered paragraphs. |
| 26 | "arrival of hijackers" | "transfer of hijackers to San Diego" | Correction providing correct chronology and specificity as to location |
| 27 | 926 | 922 | Correction to range of averment paragraphs intended to be cited. |
| 27 | 654, 657 | 650-660 | Correction to range of averment paragraphs intended to be cited. |
| 27 | 682 | 680 | Correction to range of averment paragraphs intended to be cited (reduction). |
| 28 | "Mutaeb al Sudairy was a MOIA propagator and Adel al Sadhan was a fellow MOIA official." | "Mutaeb Al Sudairy and Adel Al Sadhan were both MOIA propagators and Saudi Embassy officials." | Correction of factual error and inadvertent omission |
| 30 | 1122 | 1755 | Correction to averment paragraph intended to be cited. |

| 32 | "leadership roles in the U.S. arm of SDGT Makhtab al-Khademat and SDGT Al Haramain Islamic Foundation." | To: "a leadership role in the Al Haramain Islamic Foundation, a Specially Designated Global Terrorist (SDGT) organization." | Correction providing correct and more precise factual information |
|---|---|---|---|
| 32 | "Los Angeles in 1999, immediately after" | To: "Los Angeles in December 1998-January 1999, in the same period that" | Correction providing correct and more specific chronological information |
| 32 | 1266-1371 (move to next paragraph) | | Addresses erroneous placement of citation by moving cite to the next paragraph. |
| 32 | Delete: 963 | | Removes erroneous insertion of 963 |
| 32 | Delete: 1340 | | Removes duplicative reference to 1340 (which is included in range inserted here from preceding paragraph). |
| 33 | "At the end of" | "During" | |
| 36 | AV ¶ 2036 | AV ¶¶ 1955, 1976-80 | Correction to range of averment paragraphs intended to be cited. |
| 36 | 1941 | 1942 | Correction to range of averment paragraphs intended to be cited. |
| 36 | 114 | 114-130 | Correction to range of averment paragraphs intended to be cited. |
| 54 | "a jihadism" | "jihadism" | Correction of grammatical error |
| 59 | II.A. | III.A. | Correcting "supra" erroneous reference from II.A. to III.A. (in the Brief). |
| 60 | "supports" | "forms of support" | Clarification of meaning |
| 60 | II.D1-.2. | III.D1-2. | Correcting "supra" erroneous reference from II.D1-.2. to III.D1-2. (in the brief) |
| 61 | II.C | III.C. | Correcting "supra" erroneous reference from II.C. to III.C. (in the brief) |
| 62 | II.D.1. | III.D.1 | Correcting "supra" erroneous reference from II.D.1. to III.D.1 (in the brief) |
| 62 | "from Bayoumi's house" | "by the MPS" | Clarification of information source |
| 67 | II.F. | III.F. | Correcting "supra" erroneous reference from II.F. to III.F. (in the brief) |
| 67 | II.F.1. | III.F.1. | Correcting "supra" erroneous reference from II.F.1. to III.F.1. (in the brief) |
| 70 | 72 | 73 | Correction to range of averment paragraphs intended to be cited. |