# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:

*All Actions*

---

### PLAINTIFFS' AUTHORIZED SURREPLY MEMORANDUM OF LAW IN OPPOSITION TO THE RENEWED MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA [ECF No. 9368]

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel and Co-Chairs for the
Plaintiffs' Executive Committee for Personal
Injury and Death Claims on behalf of the
Plaintiffs*

Sean P. Carter
Stephen A. Cozen
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*Co-Chairs and Liaison Counsel of the
Plaintiffs' Executive Committee for
Commercial Claims on behalf of Plaintiffs*

Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

April 19, 2024

REDACTED FOR PUBLIC FILING

## <u>TABLE OF CONTENTS</u>

GLOSSARY .................................................................................................................... iv

I.    The Scope of Thumairy's and Bayoumi's Agency or Employment with the Saudi Government is the Sole Remaining Jurisdiction Question. ................................................ 1

II.   Thumairy's and Bayoumi's Support for the Hijackers Was within the Scope of Their Agency or Employment with the Saudi Government. ......................................................... 4

III.  Even if Other Merits Facts Were Relevant to Jurisdiction, Plaintiffs Provide Far More Than Prima Facie Evidence Supporting Their Claims. ..................................................... 9

CONCLUSION .............................................................................................................. 20

REDACTED FOR PUBLIC FILING

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804 (2d Cir. 1994) ................................... 10

*Ball v. Metallurgie Hoboken-Ovespelt, S.A.*, 902 F.2d 194 (2d Cir. 1990).................................................. 4

*Bovarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017) .......................... 2

*Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49 (2d Cir. 1986)............................................................ 10

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022) ................................................ 2

*Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240 (10th Cir. 2009) .......................................... 2

*Cronin v. Hertz Corp.*, 818 F.2d 1064 (2d Cir. 1987).......................................................................... 5

*Diaz v. Carcamo*, 253 P.3d 535 (Cal. 2011) .................................................................................. 5

*Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180 (2d Cir. 2002) ............................................................ 3

*Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) ........................................................................ 5

*Gentile v. Cnty. of Suffolk*, 129 F.R.D. 435 (E.D.N.Y. 1990), *aff'd,* 926 F.2d 142 (2d Cir. 1991) .......... 10

*In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023) ........................ 10

*In re: Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 631 (S.D.N.Y. 2018) ................... 1, 9

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ................................................ 9

*Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676 (Cal. 1986)............................................................ 4

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017)......................................................... 3

*Proitetti v. Civiletti*, 603 F.2d 88 (9th Cir. 1979) ............................................................................ 5

*Republic of Austria v. Altmann,* 541 U.S. 677 (2004) ...................................................................... 2

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)............................................................................ 4

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) ........................................................... 2, 3

*Spanierman Gallery v. Merritt,* 2003 WL 22909160 (S.D.N.Y. Dec. 9, 2003) ........................................ 9

*Tokio Marine Mgmt., Inc. v. M/V Zim Tokyo*, 1993 WL 322869 (S.D.N.Y. Aug. 17, 1993) ................... 9

*U.S. v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ............................................................................ 10

*U.S. v. Anderson*, 747 F.3d 51 (2d Cir. 2014) .........................................................................7, 9, 10

*U.S. v. Bari*, 599 F.3d 176 (2d Cir. 2010) ..................................................................................... 10

*U.S. v. Canieso*, 470 F.2d 1224 (2d Cir. 1972)................................................................................ 9

*U.S. v. Davidson*, 308 F. Supp.2d 461 (S.D.N.Y. 2004) ...................................................................... 9

REDACTED FOR PUBLIC FILING

*U.S. v. Jaramillo-Montoya*, 834 F.2d 276 (2d Cir. 1987) ............................................................ 9

*U.S. v. Kassir*, 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) ............................................................ 17

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ............................................................................... 13

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ........................................................... 7

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) ................................................................. 10

*USAA Cas. Ins. Co. v. Permanent Mission of the Rep. of Namibia*, 681 F.3d 103 (2d Cir. 2012) ............... 3

*Usoyan v. Rep. of Turkey*, 6 F.4th 31 (D.C. Cir. 2021) ............................................................. 2, 3

**Statutes**

28 U.S.C. § 1605(a)(5) ............................................................................................................ 2

28 U.S.C. § 1605B(b) .............................................................................................................. 2

28 U.S.C. § 1605B(b)(2) .......................................................................................................... 5

**Other Authorities**

H.R. Rep. No. 94-1487 ............................................................................................................ 2

National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission
    Report: Final Report of the National Commission on Terrorist Attacks Upon the United
    States (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf. ..........9, 10, 11, 20

Paula Dalley, *Destroying the Scope of Employment*, 55 Washburn L.J. 637 (Summer 2016) .................... 5

**Rules**

Fed. R. Civ. P. 43 .................................................................................................................. 4

Fed. R. Civ. P. 56 .................................................................................................................. 3

Fed. R. Evid. 1006 ................................................................................................................ 13

Fed. R. Evid. 801(d)(2) ........................................................................................................... 9

Fed. R. Evid. 803 ................................................................................................................. 10

Fed. R. Evid. 803(6) ............................................................................................................. 10

Fed. R. Evid. 803(8) ............................................................................................................. 10

Fed. R. Evid. 807 ................................................................................................................. 10

REDACTED FOR PUBLIC FILING

# GLOSSARY

### Individuals

| | |
|---|---|
| Abdullah | Mohdhar Abdullah (aka Zeid), San Diego |
| Aidarus | Fathi Aidarus, ICSD attendee, San Diego |
| **Al-Ali** | **Soliman Al-Ali aka Ali Elay, Saudi diplomat, Saudi Embassy, Washington, DC, President of the IIRO in the U.S., Principal Sanabel Al-Khair, Saudi agent, San Diego** |
| Alzamari | Akram Alzamari, KFM attendee, Los Angeles |
| **Ammar** | **Abdelaziz al Ammar, MOIA Deputy Minister, MOIA HQ, KSA, IFSIT Board Director** |
| Aulaqi | Anwar Al Aulaqi aka Awlaki, Imam of the Al Ribat Mosque, San Diego and Imam of the Dar Al-Hijrah Mosque, Falls Church, VA |
| **Bandar** | **Bandar bin Sultan, Ambassador, Saudi Embassy, Washington, DC** |
| Barzanjee | Sheikh Abdulrahman Barzanjee, Imam of Al-Madinah Mosque, El Cajon, CA |
| **Bayoumi** | **Omar Al Bayoumi, ICSD attendee, and General Supervisor, Al Madinah Mosque** |
| Bin Laden | Osama bin Laden, "Emir" of AQ |
| **Ghesheyan** | **Dr. Majid Ghesheyan, Saudi diplomat and Head, Islamic Affairs Department, Saudi Embassy, Washington, DC, IFSIT Board Director** |
| Habib | Saad Al Habib, KSA, Al Madinah Mosque |
| **Hamerman** | **Omar (aka Forge) Hamerman, Imam Mohamed Univ. employee, member of Al Haramain U.S. committee, and "Emir" of San Diego extremist cell** |
| Hanjour | Hani Hanjour, 9/11 hijacker, Saudi Arabia |
| Hanna | Magdi Hanna, President, Ercan, Newport Beach, CA |
| Hazmi | Nawaf al Hazmi, 9/11 hijacker, Saudi Arabia |
| Hitchens | Dr. Alexander Meleagrou-Hitchens, Plaintiffs' expert |
| **Jaithen** | **Abdullah Al Jaithen, MOIA Propagator, Qassim Province, Saudi Arabia** |
| **Jarrah** | **Musaed Al Jarrah, Saudi diplomat and Deputy, Islamic Affairs Department, Saudi Embassy, Washington, DC** |

REDACTED FOR PUBLIC FILING

| | |
|---|---|
| Johar | Mohamed Johar, KSM attendee, Los Angeles |
| Kaaki | Hisham Al Kaaki, San Diego |
| Khaleel | Ziyad Khaleel, AQ procurement agent, Columbia, MO |
| **Khalil** | **Khalil al Khalil, Imam Mohamed University official, former Deputy, Islamic Affairs Department, Saudi Embassy, Washington, DC, and Chairman of the Board, IFSIT, Los Angeles** |
| Madha | Usman Madha, Manager, KFM, Los Angeles |
| **Mana** | **Ismail Mana, Saudi diplomat and Islamic Affairs Section Secretary, Saudi Consulate LA, KFM overseer, attendee, Los Angeles** |
| **Mersal** | **Majed Al Mersal, MOIA Propagator, Qassim Province, KSA** |
| Mihdhar | Khalid al Mihdhar, 9/11 hijacker |
| Morgan | Kaysan Morgan (aka Bin Don), ICSD attendee, San Diego |
| **Muhanna** | **Mohamed Al Muhanna, MOIA Propagator and Saudi diplomat, Saudi Consulate, Los Angeles** |
| Nakhleh | Dr. Emile A. Nakhleh, Plaintiffs' expert |
| Noaman | Ramez Noaman, Los Angeles and San Diego |
| **Noshan** | **Abdullah Al Noshan, Saudi Embassy, IIASA, and Muslim World League official** |
| **Qahtani** | **Muhammad Al Qahtani, Saudi government religious MOIA official** |
| Rahman | Sheikh Omar Abdel Rahman ("Blind Sheikh"), "Emir" of Al Gama'a (convicted of terrorism charges in the Southern District of New York and sentenced to life in prison) |
| Ratchford | Holly Ratchford, Manager, Parkwood Apartments, San Diego, CA |
| **Sadhan** | **Adel Al Sadhan, MOIA Propagator and Saudi diplomat, Saudi Embassy, Washington, DC & Norman, OK** |
| Sageman | Marc Sageman, Defendant KSA's expert |
| Salmi | Yazeed Salmi, nephew of Mohamed Al Salmi, San Diego |
| Schiff | Barry Schiff, Plaintiffs' expert |

REDACTED FOR PUBLIC FILING

| Shaikh | Dr. Abdussattar Shaikh, Founder and operator of the Uthman Mosque, Lemon Grove, CA |
| --- | --- |
| **Sheikh** | **Saleh Al Ash-Sheikh, MOIA Minister, MOIA HQ, KSA** |
| **Shuaib** | **Tajuddin Shuaib, MOIA Propagator, IFSIT Board Director, Los Angeles** |
| Simon | Steve Simon, Plaintiffs' expert |
| Snell | Dietrich L. Snell, Esq., Senior Counsel to the 9/11 Commission |
| **Sowailem** | **Khalid Al Sowailem, Saudi diplomat, MOIA U.S. Director of Da'wah, Saudi Embassy, Washington, DC, IFSIT Board Director** |
| **Sudairy** | **Mutaeb Al-Sudairy, registered MOIA Propagator, Saudi Embassy, Washington, DC & Columbia, MO** |
| **Thumairy** | **Fahad Al Thumairy, MOIA Propagator Supervisor and Saudi diplomat, Saudi Consulate, Los Angeles** |
| Wadi | Sheikh Muqbil Al Wadi |
| Yafai | Khalid Al Yafai aka Abdul Rab, ICSD attendee, San Diego |
| Youssef | Bassem Youssef, Plaintiffs' expert |

**\*Bold-face text denotes Government of Saudi Arabia officials or employees**

<u>Acronyms</u>

| AQ | Al Qaeda |
| --- | --- |
| CIA | United States Central Intelligence Agency |
| DOJ | United States Department of Justice |
| EO | Executive Order on Declassification Review of Certain Documents Concerning the Terrorist Attacks of September 11, 2001, Exec. Order 14040 |
| FBI | United States Federal Bureau of Investigation |
| ICSD | Islamic Center of San Diego |
| IIRO | International Islamic Relief Organization, Saudi Arabia |
| IFSIT | Islamic Foundation of Sheikh Ibn Taymiyah, KFM's owner and operator, Saudi Arabia |

REDACTED FOR PUBLIC FILING

| KFM | King Fahad Mosque, Culver City, CA |
|---|---|
| KSM | Khalid Sheikh Mohamed |
| KSA | Kingdom of Saudi Arabia |
| LA | Los Angeles, CA |
| LAX | Los Angeles International Airport |
| MOIA | Ministry of Islamic Affairs |
| MOIA HQ | Ministry of Islamic Affairs headquarters, Riyadh, Saudi Arabia |
| MPS | Metropolitan Police Service |
| PCA | Presidency of Civil Aviation |
| SD | San Diego, CA |
| TOEFL | Test of English as a Foreign Language |
| USIU | United States International University |

**Citation Forms**

¶[#      Refers to that paragraph number in Plaintiffs' Averments of Facts and Evidence (ECF 9488-1) and in Plaintiffs' Response to Defendants' Exhibit 160 (filed herewith as Ex. 700 to First Declaration of Robert T. Haefele), except where the "¶" is part of an Exhibit ("Ex.") citation.

(#)      Refers to that page number in Defendant Saudi Arabia's Reply Memorandum (ECF 9610)

REDACTED FOR PUBLIC FILING

## I.  The Scope of Thumairy's and Bayoumi's Agency or Employment with the Saudi Government is the Sole Remaining Jurisdiction Question.

KSA's reply doubles down on its misguided claim that this Court must rule on the merits to decide if it has jurisdiction (4-6). Contrary to KSA's theory, JASTA's text eliminating immunity for a "tortious act or acts," does not eliminate any line between jurisdiction and the merits.[1]

As this Court found in its 2018 Decision, the substantive proofs applicable to Plaintiffs' tort claims are distinct from JASTA's jurisdictional requirements (a holding KSA persists in ignoring). 298 F. Supp. 3d at 631, 645 n.8 (S.D.N.Y. 2018). The Court concluded that Plaintiffs had satisfied JASTA's threshold tortious act and causation requirements already,[2] and that the sole jurisdictional question requiring further inquiry was the nature of Thumairy's and Bayoumi's agencies. *Id.* at 651. Judge Netburn affirmed the distinction between jurisdiction and the merits throughout discovery, ECF 6577 at 4-6, and again emphasized the "narrow scope" of the "only issues that are at play right now" in setting the structure for the present briefing, referring specifically to "the issues of agency and the like." April 11, 2023 Tr. at 23; *see also* Feb. 26, 2019 Tr. at 31 ("We are here on jurisdictional discovery[,] . . . not . . . on merits discovery."). KSA's motion disregards these rulings and directives and would have the Court go straight to closing argument before merits discovery.

This Court applied the correct approach in its 2018 Decision. Contrary to KSA's claims, JASTA's "tortious act" language merely identifies the class of claims courts are empowered to hear and is satisfied by identification of an actionable tort that forms the basis of the suit. Opp. 5-8. This reading is inherent in the fact that the FSIA addresses *only* foreign states' "amenability to suit," and not the circumstances under which they are liable on the merits. *Cassirer v. Thyssen-Bornemisza*

---

[1] To the extent the merits of the underlying tort claim were incorporated into the jurisdictional inquiry, as KSA argues, foreign states would be exposed to discovery on all merits elements at the jurisdictional stage.

[2] Even if a claim to immunity could be predicated on challenges to the merits of a plaintiff's tort claim, the Court found that KSA failed to offer any competent factual challenge in its motion to dismiss. KSA may not use its renewed motion as a do-over, to advance arguments it waived in moving to dismiss in the first instance.

REDACTED FOR PUBLIC FILING

*Collection Found.*, 596 U.S. 107, 113 (2022); *see also Republic of Austria v. Altmann,* 541 U.S. 677, 700 (2004) (sovereign immunity "merely raises a jurisdictional defense," not a "substantive defense on the merits"). This structure lies at the heart of the Second Circuit's controlling holding that immunity under the FSIA's tort-related exceptions is not "coterminous" with the merits of the plaintiff's substantive tort claims. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (2d Cir. 2001).

JASTA's text makes this line all the more clear, by stating that it removes immunity in "any case" in which damages "*are sought*" for a relevant tortious act. § 1605B(b) (emphasis supplied). That statutory phrasing necessarily refers to a prospective claim to relief. *See Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1245 (10th Cir. 2009) (per curiam) ("[A] 'defendant from whom significant relief is sought' does not mean a 'defendant from whom significant relief may be obtained.'"). The House Report on the FSIA underscores this conclusion, explaining that the term "tortious act" in the FSIA refers to the types of "causes of action" covered. H.R. Rep. No. 94-1487 at 21. The FSIA's structure, text, and history thus all show the phrase "tortious act or acts" focuses on whether a plaintiff has identified a valid claim (and not entitlement) to relief in tort.

KSA's efforts to invoke *Bovarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.,* 581 U.S. 170 (2017) and *Robinson*, and to distinguish *Usoyan v. Rep. of Turkey*, 6 F.4th 31 (D.C. Cir. 2021), mischaracterize those decisions and are without merit. *Helmerich* did not involve JASTA or § 1605(a)(5) at all. It did, however, confirm the critical line between the FSIA's jurisdictional requirements and the merits of a plaintiff's substantive causes of action, *Helmerich,* 581 U.S. at 174, the very line KSA's arguments propose to eliminate.[3] *Robinson*, meanwhile, concerned whether the tort at issue (committed by a third party) was attributable to the foreign state. Opp. 8. *Robinson* did not address (much less require proof) whether the conduct at issue was in fact tortious. *Robinson*, 296

---

[3] *Helmerich's* statement that resolution of jurisdictional facts under the expropriation exception may also resolve the merits *Helmerich*, 581 U.S. at 187, simply recognizes that, in some cases, the jurisdictional question whether property was taken in violation of international law may be the only issue in dispute.

REDACTED FOR PUBLIC FILING

F. 3d at 145. To the contrary, the Court explicitly directed that district courts "do[] not . . . decide a case on the merits in order to decide if [they] have jurisdiction," *id.* at 141. *Robinson* thus makes clear that a limited inquiry into questions of attribution may be appropriate to determine if a cognizable cause of action has been presented as against the foreign state, but that the determination of liability for that tort is a merits inquiry. KSA does not engage this distinction, or for that matter the Second Circuit's decision in *USAA Cas. Ins. Co. v. Permanent Mission of the Rep. of Namibia*, 681 F.3d 103 (2d Cir. 2012), which affirmed this line between jurisdiction and the merits that this Court properly drew. *Id.* at 108 n.24; *see* Opp. 7.

KSA similarly mischaracterizes *Usoyan,* which it discounts by claiming that Turkey did not contest whether the actions at issue were tortious (5). In fact, *Usoyan* specifically noted that Turkey "disputed" the merits of plaintiffs' tort claims, challenging both the factual account of the altercation and asserting that its agents' actions were "justified." *Usoyan,* 6 F.4th at 37, 47. The Court's holding that those challenges raised a "merits question, not a jurisdictional one," *id.* at 47, was unambiguous, and not a "passing remark" (5). The district court decision also noted these factual challenges, but likewise held that their resolution was unnecessary because they were "not material" to the immunity inquiry. *Usoyan v. Rep. of Turkey,* 438 F. Supp. 3d 1, 8, 9, 21 n.4 (D.D.C. 2020).

KSA fares no better in summarily claiming that the Court can resolve sharply contested factual disputes in its favor, without a hearing and by crediting the implausible and contradicted denials of its witnesses submitted solely in the form of written deposition transcripts. As KSA's own citations make explicit, a court may resolve factual disputes in favor of a foreign state defendant on the basis of the paper submissions only where the facts "*are readily ascertainable*" and do not "*turn on questions of credibility.*" *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 76 n.6 (2d Cir. 2017) (quoting *Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (per curiam)) (emphasis supplied). This standard mirrors the one courts apply under Rule 56, and incorporates fundamental principles

REDACTED FOR PUBLIC FILING

of due process and essential traditions of the American judicial system. *See* Fed. R. Civ. P. 43, Advisory Committee Note on 1996 Amendment ("The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truth telling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition."). Here, the record is complex and sharply disputed, with witness credibility central to those disputes, and KSA cannot meet its ultimate burden of persuasion by pointing to dubious denials in deposition transcripts.[4]

## II.   Thumairy's and Bayoumi's Support for the Hijackers Was within the Scope of Their Agency or Employment with the Saudi Government.

Plaintiffs produced ample evidence that Thumairy's and Bayoumi's support for the hijackers was within the scope of their agency or employment. *See* Opp. 12-39. In its Reply, KSA tries by sleight of hand to change the legal standard for respondeat superior liability and then falls back on a demonstrably fictional story of what Thumairy's and Bayoumi's jobs actually were.

KSA does not dispute that New York and California law on the scope of agency are materially the same (20). Both states apply the respondeat superior doctrine, under which an employer is vicariously liable for the misdeeds of its employees or agents committed within the scope of employment or agency, which is determined based on enterprise risk principles.[5]

---

[4] KSA has not asked for a hearing. The Court thus may properly deny its motion by finding that Plaintiffs have met their modest burden of production on the sole remaining jurisdictional question of agency. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (plaintiff may meet jurisdictional production burden through averments of fact). If, however, the Court goes beyond the adequacy of Plaintiffs' *prima facie* showing, to decide disputed issues of jurisdictional fact, it must hold and Plaintiffs request that it hold an evidentiary hearing. KSA also makes misleading claims about the scope of discovery (6 n.2). Discovery on agency was "narrowly circumscribed" and the bulk of the evidence came from the EO and MPS productions. Plaintiffs were not permitted to examine KSA's witnesses on that new evidence but would do so at a hearing. Even as to the limited discovery afforded, KSA selectively invoked objections to prevent discovery on key matters. *See, e.g.*, Second Declaration of Robert T. Haefele (filed herewith).

[5] *See Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) ("[F]or an employee to be regarded as acting within the scope of his employment, the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected."); *Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676, 678 (Cal. 1986) ("[W]here the question is one of vicarious liability, the inquiry should be whether the risk was one that may fairly be regarded as typical or broadly incidental to the enterprise undertaken by the employer.").

REDACTED FOR PUBLIC FILING

KSA tries to eliminate vicarious liability, arguing that "Plaintiffs have no evidence that Saudi Arabia *directed* Al Thumairy or Al Bayoumi to assist the 9/11 hijackers." (19) (emphasis added). Putting aside the substantial evidence showing that KSA officials *did* direct Thumairy and Bayoumi, Opp. 12-39, this argument fails because Plaintiffs do not have to show express direction by KSA to establish respondeat superior liability. *See, e.g., Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) ("[T]he fact that Karim lacked explicit permission does not end the [respondeat superior] inquiry.").[6]

In arguing that Plaintiffs must prove that the Saudi government expressly directed its agents' specific torts, KSA tries to evade liability by rewriting agency law to eliminate vicarious liability and require direct fault of the principal.[7] This fault requirement is contrary to New York law, *see, e.g., Cronin v. Hertz Corp.*, 818 F.2d 1064, 1068 (2d Cir. 1987) ("When we talk of vicarious liability, we are not looking for the employer's fault . . . ."), as well as California and general common law.[8]

This argument also is contrary to JASTA itself, which abrogates sovereign immunity for claims caused by "a tortious act or acts of the foreign state **or of any official, employee, or agent of that foreign state** while acting within the scope of his or her office, employment or agency . . . ." 28 U.S.C. § 1605B(b)(2) (emphasis added). KSA's specific direction requirement would reduce JASTA to covering only those torts in which the sovereign is a direct participant, while erasing its express coverage of agents' tortious acts that are characteristic of the principal's wrongful enterprise.

Faced with JASTA's clear application to tortious acts committed within the scope of an individual's agency or employment, KSA again falls back on the implausible (and contradicted)

---

[6] *See also Proitetti v. Civiletti*, 603 F.2d 88, 90 n.1 (9th Cir. 1979) ("It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's [authority].").

[7] *See* Paula Dalley, *Destroying the Scope of Employment*, 55 Washburn L.J. 637, 643 (Summer 2016) ("[A] principal who actually authorizes conduct that itself constitutes a tort is directly liable for the tort . . . . There is no need for respondeat superior liability in any of those cases . . . .").

[8] *See Diaz v. Carcamo*, 253 P.3d 535, 538 (Cal. 2011) ("Respondeat superior, a form of vicarious liability, makes an employer liable, irrespective of fault, for [acts] by its employee in the scope of employment."); Dalley, 55 Washburn L.J. at 643 ("[T]he essence of vicarious liability, as opposed to direct liability, is precisely the employer's *lack* of fault.") (emphasis in original).

REDACTED FOR PUBLIC FILING

claims that Thumairy and Bayoumi were in the United States as, respectively, a "quietist" imam and an accountant furthering his education (20, 25). Plaintiffs have already shown that these cover stories do not withstand scrutiny. Opp. 19-23 (Thumairy's radicalism); 23-27 (Bayoumi's lack of accounting or data processing work or class attendance); 39-41 (Thumairy and Bayoumi's assistance to the hijackers). KSA's Reply does not and cannot show otherwise. The evidence shows that Thumairy and Bayoumi were part of an extremist platform KSA created to advance MOIA's radical anti-American agenda closely intertwined with terrorism. Opp. 12-39. This evidence renders Saudi Arabia vicariously liable for its agents' support for the hijackers, regardless of express direction.

Further, the proof shows that senior Saudi officials did in fact "direct" Thumairy and Bayoumi (1, 15, 19).[9] The two men were part of a MOIA-led militant extremist network headed by Sowailem, Sudairy, Sadhan, and other more senior Saudi officials[10] Prior to the 9/11 Attacks, Saudi Arabia was not a U.S. "ally" nor AQ's "sworn enemy." Rather, MOIA joined with AQ to lead a campaign of violent jihad directed against the U.S.[11] KSA's claim that MOIA was "quietist" (1, 25, 26, 43) misappropriates a domestic political term that has no bearing on the anti-U.S. campaign that MOIA promoted.[12] Saudi Arabia brought MOIA officials, including Thumairy, as well as Bayoumi, into the U.S. under false pretenses. ¶¶114-30, 706-23. The facts compel the inference that AQ sent

---

[9] Recognizing this, KSA renews its baseless argument to eviscerate the evidence by asking the Court to "disregard the parts of Plaintiffs' Averment that are improperly cited or not cited at all" in Plaintiffs' briefs (14). Plaintiffs already addressed this issue (ECF 9504 at 2-3). There are no uncited Averment paragraphs, and KSA's claim that paragraphs are "improperly" cited is pure *ipse dixit* that is refuted by the Court's and KSA's own citation conventions.

[10] Annex 1 to this Brief, Ex. 701, is a chart of the Saudi government extremist network that operated inside the U.S.

[11] Official MOIA publications found at both the KFM and Al Madinah Mosque espoused violent jihad against non-believers. ¶¶ 441-443, 890-91. MOIA's Minister Ash-Sheikh led the Al Haramain organization, ¶¶1936-41, which KSA admitted (in 2016) had been "one of the biggest terror-financing operations in the world," funded the AQ U.S. Embassy bombings in 1998, and was "notoriously tied to Osama bin Laden." ¶1957. Saudi cleric Uthmayeen was not "peaceful" (49) but supported Al Haramain and violent jihad. ¶¶25, 1279. In the years immediately prior to 9/11, the U.S. warned KSA's leadership that KSA was endangering U.S. citizens by "empowering jihadists" via MOIA and Al Haramain. ¶72. Nakhleh compared KSA to "Dr. Jekyll and Mr. Hyde" because it claimed to be a U.S. ally while MOIA was exporting its virulently anti-U.S. and pro-jihadist agenda into the U.S. ¶52.

[12]"Quietism" describes how Saudi religious officials acquiesce to the domestic rule of their government leaders including the King. It has nothing to do with the violent jihadism promoted by MOIA overseas. ECF 9163 at 57-59. Wahhabism is the branch of Islam in Saudi Arabia and is not a "pejorative term." (43). *Id.* at 68; ¶18.

REDACTED FOR PUBLIC FILING

its first operatives for the 9/11 Attacks to Los Angeles and San Diego only because of its trust in the

MOIA-led support network established there. *See U.S. v. Anderson*, 747 F.3d 51, 66 (2d Cir. 2014).

Saudi Arabia recycles the same lie Thumairy told the 9/11 Commission, ¶254, now claiming

that Bayoumi did his extensive religious work as a "volunteer." (2, 17, 21, 23, 47). Yet Bayoumi

hosted and personally worked with over 25 MOIA and other Saudi government religious officials in

San Diego;[13] reported to numerous high-level Saudi government officials;[14] worked with MOIA and

Al Haramain as "General Supervisor" to establish Al Madinah Mosque and install extremist cleric

Barzanjee as its Imam;[15] teamed up with the existing Sunni extremist cell, and recruited its leader,

████████, as a Saudi propagator and Al Haramain operative;[16] and enlisted AQ operative Aulaqi

and a cadre of like-minded young men to provide critical support to the hijackers.[17]

This evidence further confirms the FBI's 2017 finding of Bayoumi's "involvement with

Saudi intelligence…" as a "cooptee", ¶868, and contradicts Saudi Arabia's false cover stories that

Bayoumi was in the U.S. as a "PCA employee" (21) and "accountant" (20). Bayoumi's arrangement

was hardly "similar" to genuine students (22) as he did not attend school; had unusual demands and

"exorbitant" expenses; was paid "significantly higher than actual students"; and other employees

---

[13] These include (as shown in Annex 1) over 20 MOIA officials ¶¶839, 842-861; Embassy official Al-Ali, who reported to Bandar and headed the IIRO and Sanabel Al-Khair organizations in the U.S., found by the FBI to have had "connections…to terrorism" and employed AQ members ¶¶ 802-811; and Saudi religious official Qahtani, who received payments from Noshan ¶¶812-13. KSA's suggestion that Bayoumi worked merely to "type up and edit a report" with Al-Ali (23) ignores their year-long relationship and multi-faceted work for KSA in Southern California. ¶¶802-11.
[14] Bayoumi's files detail his contacts across KSA's religious elite, from MOIA HQ including its Minister, leading "Sheikhs and Scholars," MOIA propagators, religious educators, Mosque officials, and Islamic officials at the Saudi Embassy and Consulate. ¶¶724-9; Ex. 12AA and 12BB (Bayoumi's handwritten address book and "green folder"). His contacts included listings for the Embassy's Noshan (denoted with a "$" sign), who had links to AQ funding, ¶¶799-801; and MOIA's Shuaib, the propagator working under Thumairy, for whom Bayoumi kept contact details in KSA. ¶1116.
[15] Bayoumi's title ("*Mushrif Al Alaam*" in Arabic) had a known meaning among KSA officials; it was used by ████████ ¶1936; Ghesheyan at KSA's religious printing complex, Ex. 12AA, MPS 738_24; and Khalil for the KFM project, ¶101. Bayoumi supported and was not "opposed" (55) to Al Haramain. *See infra* n.31.
[16] ████████ (23 n. 13) was "Emir" of the San Diego extremist cell and recruited by KSA. ¶¶167-72, 885-87 893-910. A member of that cell was ultimately convicted for terror support; the affirming opinion cited evidence also submitted here. *United States v. Jayyousi*, 657 F.3d 1085, 1094-5 (11th Cir. 2011); *see* Ex. 5 (Youssef Rpt.) at 23 n.16, 88-89, 138.
[17] Aulaqi and Bayoumi organized a paintball war game event in early 1998. The participants (including a visiting MOIA propagator) wore military fatigues and engaged in battle simulations. Bayoumi videotaped the event. ¶924; Ex. 10A.

REDACTED FOR PUBLIC FILING

were warned never to question Bayoumi's special treatment. ¶¶636-44.[18] Saudi Arabia successfully opposed all intelligence discovery to hide Bayoumi's true role.[19] Now it offers facile arguments that since Bayoumi's actions occurred "out in the open" he could not have been a "covert agent" (23); when in fact Bayoumi's public-facing work with the San Diego Muslim community provided him both the platform and the cover from which to report in private to MOIA, and to coordinate with Saudi Embassy and Consulate employees, including Thumairy, while "hiding in plain sight."

Similarly, Thumairy was part of a MOIA hierarchy chain and reported to Sowailem and Jarrah. ¶¶16, 104, 491-99, 597.[20] Thumairy never returned to the KFM after the 9/11 Attacks; rather, he continued in Los Angeles doing his primary work for KSA, coordinating its jihadist network right up until U.S. authorities shut down MOIA's activities in 2003. ¶¶525-40.[21] Thumairy's shifting claims and false testimony show both culpability and knowledge. ¶¶590-626.[22]

---

[18] KSA compounds this fraud by citing Bayoumi's "enrollment" at Keller Graduate School in 2000. (17) Bayoumi registered for classes at Keller in 1998 and 1999 but never earned any credits, ¶720; then registered again on January 21, 2000, but *withdrew* on February 7. Ex. 320 at 54. On March 6, 2000, Bayoumi got USIU to prepare an INS form falsely representing that he left Keller to take classes at USIU, which never happened. Ex. 211, KSA 6661. The INS form also shows that KSA kept open its second line of funding for Bayoumi via Ercan through at least 2000, as confirmed by his phone calls in February 2000 to Ercan and Hanna. *Id.*; Ex. 12R.

[19] KSA's claim that its intelligence agency was "working to stop" AQ (21-22) is improper absent discovery and is contrary to evidence that KSA did not act against AQ until 2003, only after AQ launched terror attacks inside KSA. ¶84.

[20] KSA misleadingly argues that Thumairy "never accepted a supervisory position" (28) despite his appointment by Sowailem as *Mushrif* – supervisor – of California propagators; Sowailem's instructions to those supervisors to report to Thumairy; and, Sowailem's evaluations of Thumairy. ¶597. Thumairy admitted that one of those propagators came to Los Angeles every month to report to him and pick up a check. ¶380. Bayoumi similarly made regular trips to Los Angeles to report to and coordinate with Thumairy. The FBI reported on at least four MOIA propagators working under Thumairy prior to 9/11. ¶¶355, 357.

[21] Numerous admissible U.S. government reports identify Thumairy as an extremist. ¶¶551-57. Eyewitness testimony and phone records show he had private in-person meetings at the KFM and phone contacts with Wadi. The DOD report classifying Wadi as a "[r]adical religious figure" associated with AQ, ¶¶451-53, is admissible, despite KSA's claims (54). *See infra* n.26. Contrary to KSA's denial (29), Madha found violent extremist literature at the Mosque that could only have been placed there by Thumairy, ¶¶438-40, and an FBI report determined that Thumairy shipped extremist materials to Mana in Los Angeles. ¶540. Khalil testified that Thumairy hosted extremists at the KFM; confirmed with Ammar at MOIA HQ that one of those extremists worked for MOIA; and told Thumairy not to invite Saudis to preach at KFM without permission, but took no further action. ¶¶468-71.

[22] Thumairy told the 9/11 Commission that he reported to Ghesheyan at the Embassy and did not mention Sowailem, but testified here that he dealt with "Sowailem only" and didn't know Ghesheyan or his deputy Jarrah. ¶¶257, 594-98. Thumairy told the FBI he worked with ██████ but testified here that he didn't know ██████ ¶¶592-93. Thumairy claimed that he did not know Bayoumi, ¶¶590-91, or Sadhan and Sudairy, ¶¶602-04, or Sowailem's MOIA job in the U.S. ¶597.

REDACTED FOR PUBLIC FILING

Saudi Arabia persists (3, 27, 44, 25) in ignoring this Court's determination that "neither the 9/11 Commission Report, nor any other governmental report, adequately and specifically refutes Plaintiffs' allegations." 2018 Decision, 298 F.Supp.3d at 650. Saudi Arabia now adds the FBI's inadmissible prosecutorial opinions in a May 2021 Memo "administratively closing" Operation Encore,[23] while ignoring detailed findings from the 2004 FBI/CIA Joint Assessment about MOIA's support for AQ and the FBI's newly declassified July 2021 EC about the "Saudi (Wahhabi)/Salafi/ militant network…created, funded, directed and supported by the KSA… in the U.S." from the FBI Arabian Peninsula Squad's two-decade long probe of KSA. ¶¶1-15.

Saudi Arabia's support network was indispensable in providing AQ with its beachhead for the 9/11 Attacks. The mission that Bin Laden hand-picked Hazmi and Mihdhar to carry out required sustained, meticulous planning for their reception and assistance in California. Thumairy and Bayoumi, with the guidance of MOIA and Saudi Embassy officials, filled these critical roles.

### III. Even if Other Merits Facts Were Relevant to Jurisdiction, Plaintiffs Provide Far More Than Prima Facie Evidence Supporting Their Claims.

Saudi Arabia treats evidence in isolation to distort its import and refuses to draw inferences from its totality, as required.[24] The motion is premised on the false exculpatory testimony of involved Saudi government officials and their agents. Saudi Arabia asks the Court to credit their denials, while objecting to the binding admissions of those same plot participants,[25] and makes

---

[23] Prosecutorial decisions in an FBI closing memo are not "factual findings." *U.S. v. Davidson*, 308 F. Supp.2d 461, 476 (S.D.N.Y. 2004). The same May 2021 Memo, did, however, find that Thumairy led a "Southern California based network" of "Sunni extremists." ¶16.

[24] "[W]e consider the evidence presented 'in its totality, not in isolation….'" and "inferences [are] drawn from the totality of the evidence." *Anderson*, 747 F.3d at 59; *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (requiring consideration of all facts "taken collectively, not . . . in isolation").

[25] The prior statements of Saudi officials and agents, including to FBI and 9/11 Commission investigators, are admissible because they were verified by government agency subject-matter experts and are not hearsay. FRE 801(d)(2); *Spanierman Gallery v. Merritt*, 2003 WL 22909160, at *5–6 (S.D.N.Y. Dec. 9, 2003); *Tokio Marine Mgmt., Inc. v. M/V Zim Tokyo*, 1993 WL 322869, at *9 (S.D.N.Y. Aug. 17, 1993). Similarly, Bayoumi's KSA work correspondence and his handwritten address book and "green folder" seized from him by the MPS are not hearsay. *Id*; *U.S. v. Jaramillo-Montoya*, 834 F.2d 276, 278 (2d Cir. 1987) (address book of co-conspirator is not hearsay); *U.S. v. Canieso*, 470 F.2d 1224, 1232 n.8 (2d Cir. 1972) (letters found in defendant's possession "were receivable as adopted admissions"). The records also are

REDACTED FOR PUBLIC FILING

repeated claims of "no evidence" or "coincidence" contrary to law enforcement factual findings.[26] Saudi Arabia's claims of "no evidence" necessarily insist that only direct evidence should be considered, despite the covert nature of the enterprise, and its motion systematically attempts to decouple damning circumstantial evidence from related events, evidence, and context. The record, viewed in its *entirety*, shows that Saudi Arabia's agents were directly involved at "critical stages of the conspiracy that cannot be explained by happenstance…."[27] Saudi Arabia's operation to support AQ was directed from inside its Embassy, Consulate, and Mosques under its control.[28]

**December 1998-February 1999** Sadhan and Sudairy visited Thumairy in Los Angeles and Bayoumi in San Diego as an "advance team" to assess Southern California as an AQ base. ¶¶1025-26. Bayoumi recruited Shaikh to board Sadhan and Sudairy at his secluded Lemon Grove house.[29]

---

admissible on other grounds. *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (handwritten planner is admissible business record); *U.S. v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (phone book proves links among conspirators).
[26] FBI, CIA, and State Department factual reports are admissible as FRE 803(6) business records or FRE 803(8) public records. *Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54 (2d Cir. 1986); *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *7 (S.D.N.Y. Mar. 9, 2023) (admitting CIA reports); *Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 827 (2d Cir. 1994) (admitting detective's report "based upon other officers' reports of interviews they had conducted in this necessarily lengthy and involved investigation."); *Gentile v. Cnty. of Suffolk*, 129 F.R.D. 435, 453 (E.D.N.Y. 1990) (NYS Commission report admitted because the "agency as a whole qualified as an expert" and "[w]hatever hearsay it relied upon was, we find, adequately evaluated and filtered within its capacity as expert"), *aff'd*, 926 F.2d 142 (2d Cir. 1991). KSA has consistently cited FBI and CIA reports as reliable. *E.g.*, ECF 3668 at 20-22; ECF 3851 at 15. None of the cases KSA now cites as involving interim and preliminary agency proposals, submissions, and "recommendations" (7) involve law enforcement fact findings like those here. KSA cannot meet its burden of showing untrustworthiness in the FBI's Encore investigation by misconstruing three words ("seeks to prove") in two Encore reports (9). Nor does KSA have any legitimate basis to claim bias in the FBI's investigation where Plaintiffs hired two Encore agents long after they retired. Indeed, KSA chose not to question either of those agents about their declarations, which outlined FBI guidelines for preparing interview reports. Ex. 89, Gonzalez Decl.¶¶12-22; Ex. 345, Vasquez Decl. ¶¶8-14. The 9/11 Commission extensively relied on FBI reports, including form "302" interviews, as well as its own interview memos. 9/11 Comm. Rpt. 450, 456 n. 80. The grounds for admission of hearsay in those records under the specific or residual exceptions, FRE 803, 807, are particularly compelling here because Plaintiffs (unlike KSA) had no genuine opportunity to collect evidence concerning key facts until after the FBI's factual findings were first declassified and released (2021 through 2023), largely after depositions were closed.
[27] *Anderson*, 747 F.3d at 60. *See also U.S. v. Bari*, 599 F.3d 176, 178 (2d Cir. 2010) ("[t]aking all of the evidence together… there were 'too many coincidences'").
[28] "[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Anderson*, 747 F.3d at 73.
[29] Sadhan and Sudairy did not find Shaikh's remote rooming house "by chance" (46). Bayoumi arranged their stay, as Shaikh admitted. ¶1103. Bayoumi hosted Sadhan and Sudairy throughout their visit to San Diego, as shown in his photographs and video. ¶¶1099-1101, 1124, 1137-38. Bayoumi knew Shaikh well for several years, and Shaikh met the two propagators at Bayoumi's Al Madinah Mosque, despite not worshipping there regularly. ¶¶1104, 1111. Bayoumi handwrote a note with various contact information, including Shaikh's, for Sadhan and Sudairy ¶¶1105-07. In 2000, Bayoumi similarly arranged for Hazmi, Mihdhar, and Salmi to stay with Shaikh. ¶¶1108, 1804-09. Bayoumi continuously

REDACTED FOR PUBLIC FILING

With Bayoumi as their guide, Sadhan and Sudairy marked the trail the hijackers would later follow; they attended Al Madinah Mosque and were introduced to three extremists with ties to AQ: Aulaqi, Barzanjee, and ███████. ¶¶1122-23, 1127, 1137-40.[30] Sadhan's and Sudairy's advance planning roles in the AQ support plot were confirmed by Bayoumi's letter to his Al Haramain contact Habib.[31] Bayoumi urged Habib to call MOIA HQ officials and "████" Hamerman to convey approval for San Diego as "their *Qaeda*," *i.e.* base, signaling it was ready to receive AQ operatives.[32]

    **April 3 and 7, 1999** Hazmi and Mihdhar obtained entry visas, listing Los Angeles as their destination. KSA wrongly labels as "conjecture" (41) the unanimous findings of U.S. government authorities (the FBI, CIA, and the 9/11 Commission) that AQ would never have deployed Hazmi and Mihdhar to California unless a trusted network was in place to receive and support them.[33]

---

updated his entries for Sadhan and Sudairy to reflect their contact information at various assigned MOIA workplaces, and grouped them together with Shaikh on the same page in his address book, ¶1171 (Ex. 12AA, MPS738_24).

[30] In 2000, Aulaqi was a radical, anti-Semitic extremist who had "a jihadist anti-U.S. mindset and world view similar to that of Omar Abdul Rahman." ¶929, 934. KSA dredges up misleading arguments about Hitchens' prior book (38) and ignores his extensive newer expert analysis of Aulaqi's pre-9/11 extremist speeches and writings, showing that Aulaqi was a violent jihadist when he worked with Thumairy and Bayoumi to assist the hijackers. ECF 9163 at 62-63. ███████ was identified as an extremist cell leader from an FBI investigation, his radical jihadi associations, Bayoumi's description of him as an "████" and his unique garb, as shown in Bayoumi's video and photos. ¶¶878-87. FBI reports found that Barzanjee became the European leader of AQ affiliate Ansar al-Islam. ¶1133-34.

[31] Habib's Al Haramain role is shown by the evidence, *inter alia*, that upon the opening of Al Madinah Mosque in August 1998 – days after AQ carried out its Embassy bombings with Al Haramain's help – Habib had a high-level Al Haramain delegation from Saudi Arabia visit the Mosque to assume control over its operations and install a Saudi Imam. ¶¶967, 969-71, 979, 985-89. Bayoumi was not "opposed" to Al Haramain's efforts (55); to the contrary, he reported on and successfully kept in check initial objections to Al Haramain among members of the Mosque Board, and in 1999 worked with MOIA to overturn the Mosque's leadership, install those who were plaint to KSA's agenda, and replace its moderate Imam with the radical Barzanjee. ¶¶950, 985-97, 1235-46.

[32] ¶¶1163-65. Bayoumi wrote "*wakanat qaedatuhum masjidana* [their base was our Mosque]" and referred cryptically to the transfer of sensitive information ("take the disk from the baker"). *Id.*; Ex. 384. KSA's contrary claim about the Arabic letter's meaning (48) are counsel's argument unsupported by expert translation.

[33] ¶¶1441-48. AQ's *modus operandi* was demonstrated, *inter alia*, by its use of a local network in Malaysia to assist the two hijackers just before their travel to California. ¶1024. The unchallenged declaration of 9/11 Commission investigator Snell, whom Saudi Arabia opted not to depose, confirms this. Ex. 90, Snell Decl. ¶ 8. KSA's "no-network theory" (45) recycles unreliable, inadmissible hearsay from CIA interrogations of AQ terrorist KSM. The 9/11 Commission refused to credit the very KSM statements relied on by KSA and Sageman, citing CIA findings that KSM lied to conceal AQ's enablers in the U.S. 9/11 Comm. Rpt. 215, 514 n.4; ¶1005. Plaintiffs strenuously objected to KSA's attempts via Sageman to use KSM's statements. ECF 9092 at 48-55. Since KSM was a "sworn enem[y]" of the U.S., the 9/11 Commission only used his statements where it could "corroborate them…." 9/11 Comm. Rpt. 146. Plaintiffs cited to one instance where the 9/11 Commission did just that and included KSM's "substitution" statement as an exhibit for the Court, but never intended for KSM's statement to be placed in evidence. *Id.* 158; ¶1269. It is wrong for KSA to harness KSM's statements in this way. KSA also mischaracterizes U.S. government reports to prop up its bogus argument that U.S. authorities "rejected" findings of AQ's reliance on local networks (41). *See supra* n.26.

REDACTED FOR PUBLIC FILING

Plaintiffs present evidence showing that AQ arranged for Hazmi and Mihdhar to be materially supported by existing, Saudi government-controlled extremist cells, founded in the early 1990s by the "Blind Sheikh" Abdul Rahman.[34] That evidence is not based on any "classified" data.[35]

**April 7, 1999** Bayoumi got word that Hazmi and Mihdhar had obtained U.S. visas and took immediate steps to advance the support plan. Bayoumi wrote and faxed urgent letters to MOIA HQ officials Sadhan and Sudairy, referencing Shaikh's small Uthman Mosque in Lemon Grove, CA, to get approval from MOIA's Minister for their plan to use Shaikh's house (where Sadhan and Sudairy had stayed in December 1998 and January 1999) to lodge the AQ operatives. ¶¶1181-88. In his letters, Bayoumi individually addressed Sadhan and Sudairy as "*al-Mujtahideen*" – a derivative of *jihad* – in recognition of these two MOIA HQ officials' shared extremist mission to support AQ. *Id.*

**April 11, 1999** Days after the hijackers' visa approvals, Thumairy, Bayoumi, Khalil, and Al-Ali held a recruitment and training event at KFM's offices[36] attended by Noaman,[37] who later assisted Hazmi and Mihdhar with translation, flight lessons, and other tasks. ¶¶810, 1199.

**May 10, 1999** Bayoumi took Shaikh to Los Angeles to meet with Khalil and Thumairy, confirming Shaikh's role as a Saudi agent and facilitator in San Diego. ¶¶1203-1207.[38]

---

[34] ¶¶139-48, 152, 412-14. Youssef observed (and Khalil admitted) that the Blind Sheikh visited Ibn Taymiyah Mosque and led a radical group there. *Id*; Snell Decl., Ex. 5 at 7-8. KSA misleadingly cites ████████████████████ ███████████████████████████████████████████████████████ KSA repeats Sageman's misguided attack on eyewitness and KFM Manager Madha (51, 55), who observed first-hand that Thumairy was leading the KFM extremist cell and had to call the police to remove members of that cell, including Thumairy's MOIA assistant Muhanna, who led protests after 9/11 *in support of* the 9/11 hijackers. ECF 9092 at 38-41; ¶¶412-14,423-26, 432-39, 511-16.

[35] KSA's "classified" information claim (53) is bogus – it made a strategic decision not to question Youssef. Ex. 105, Youssef Dep., Ex. 47:14-20. The claim is addressed in Plaintiffs' *Daubert* pleadings. ECF 9163 at 36-38.

[36] KSA's claim that "[n]o evidence shows" the Foundation or KFM "was funded or controlled by Saudi Arabia" (53) is hogwash. Nine of the twelve Board members were KSA officials, including its Chairman Khalil and Sowailem, and KSA built KFM and provided the operational funding for IFSIT and its KFM. ¶¶182-84, 191-94, 329.

[37] Noaman is identified by name on Bayoumi's video and his Arabic name tag is legible. ¶1198; Ex. 10E, 31:03; Ex. 703.

[38] KSA's claim that "[t]here is no evidence that Al Thumairy knew Shaikh" (57) is contradicted by Bayoumi's admission that he brought Shaikh to L.A. to meet Thumairy, and Bayoumi's May 10, 1999 photos, showing Shaikh at the KFM with Khalil, and at the Ibn Taymiyah Mosque where Thumairy was working at the time. ¶¶1203-06.

REDACTED FOR PUBLIC FILING

**June 23-July 4, 1999** A Bayoumi videotape shows that he went to the Saudi Embassy to report to Sadhan and Sudairy – whom MOIA had just deployed under cover as diplomats, ¶1228 – as well as Sowailem.[39] That same videotape contains Bayoumi's casing report of the U.S. Capitol, ¶1224, prepared at the very time AQ was scoping the potential targets for its attack, including the Capitol. ¶1231. Bayoumi's chilling video narration confounds defense claims of a "run-of-the-mill tourist visit" (2, 48), showing Bayoumi did not act alone but was following instructions from his Embassy MOIA superiors. He addresses his "esteemed brothers" to "report in detail" about "results" pursuant to a "plan," using anti-U.S. rhetoric and documenting the Capitol's structural features and security in a manner consistent with AQ protocols. ¶¶1212-30; Ex. 10F; Ex. 704.[40]

**December 1999-February 2000** Intense phone activity took place among Bayoumi, Thumairy, ███ Sowailem, the Embassy Islamic Affairs number, Sudairy, Mersal, and other members of the support network regarding the arrangements for the hijackers prior to and after their arrival in the U.S. on January 15, 2000. ¶¶1248-53, 1504. Saudi Arabia uses misdirection to attack Plaintiffs' phone charts (1, 38),[41] bereft of any rebuttal to the evidence that: (a) Bayoumi made calls using the phone in his Mosque office – his line was not "shared" (15 n.8, 48 n.40);[42] and

---

[39] KSA failed to disclose Bayoumi's 1999 Embassy visits, which it now brazenly describes as a "vacation" (34). Ex. 24, June 12, 2018 KSA Resp. Interrog.14. Yet Sowailem admitted to the FBI in October 2001 that he knew Bayoumi "professionally" from meeting him at the Embassy, which must have occurred in June 1999. ¶¶787-88. Sowailem sought to cover his work relationship with Bayoumi by making the nonsensical claim he talked with Bayoumi "every three to four months…about his education." *Id.* Yet the timing of Bayoumi's phone calls – including to Sowailem's personal cellphone at night on weekends – corresponded closely with the support for the hijackers provided by Thumairy and Bayoumi. ¶¶1504-31, 1717, Ex. 12K. Bayoumi falsely claimed not to remember Sowailem at all but testified that he went to the Embassy once to "certify" documents and met "inside the Embassy" with "someone" he could not identify who worked "[p]erhaps in Islamic Affairs or in the studying affairs." ¶789; Ex. 120, Bayoumi Dep. 317:7-320:9.

[40] Bayoumi states: "I will report to you in detail" (23:23); "I will provide you with the results soon." (40:47-55); and "You said that in the plan." (58:18). KSA's claim that the tape was innocuous because Bayoumi filmed artwork, lamp posts, and a squirrel (48) is belied by his narration and focus on the Capitol's security, structural features, and surroundings.

[41] Plaintiffs have submitted errata to correct minor, good faith errors in certain phone charts included in Ex. 12, including those that resulted from FBI production of duplicate records. None of these errors went to the accuracy or reliability of Plaintiffs' exhibits, which properly summarize and attribute cited phone numbers and their call data, and thus are admissible. FRE 1006; *U.S. v. Yousef*, 327 F.3d 56, 157-58 (2d Cir. 2003).

[42] Bayoumi's Mosque office was a private, locked room not accessed by others with a "Single Line" phone. Its call usage patterns matched Bayoumi's other phones and tracked with Bayoumi's presence in San Diego Bayoumi paid bills by personal check and made annotations when he allowed others to make calls. ¶¶748-54, 778; Ex. 12U; ECF 9163 at 46-47

REDACTED FOR PUBLIC FILING

(b) Thumairy was the user, albeit not the named subscriber, of cell phones -3362 and -0777 (2, 29).[43] The FBI and Youssef independently confirmed that Bayoumi and Thumairy exchanged at least 67 calls and placed phone calls to report in to the Embassy and Sowailem at key junctures in the plot.[44]

**December 12, 1999- January 9, 2000** The second "advance team" of Mersal and Jaithen visited Thumairy and Bayoumi to conduct final vetting. ¶1373.[45] Bayoumi's video footage shows Mersal reciting extremist dogma about the rewards that await "us" in the afterlife. ¶¶1332-33.[46]

**December 18-19, 27-29, 1999** Thumairy engaged in unique "chains" of successive phone calls to Sowailem, Bayoumi, Aulaqi, Mersal, Jaithen, and ████ to plan for the hijackers' arrival. ¶¶1323-28, 1376-94. The calls followed anomalous patterns and were not "unrelated" (15), because, *inter alia,* Thumairy made three calls to Aulaqi, a fellow extremist mentor for the hijackers in San

---

& n. 52-54. KSA cannot identify a single call on that line misattributed to Bayoumi. The Mosque's main number was handled, billed, and paid for separately, and Bayoumi arranged a payphone for the "benefit of the congregants." *Id.*
[43] Bayoumi's listings in work documents, including his main handwritten address book and "green folder," both seized from his possession in September 2001, are admissions that the -3362 number was Thumairy's cell. *See supra* n.25. Bayoumi also admitted this in a typed phone list and handwritten notes the FBI seized from his Mosque office in September 2001. Thumairy similarly admitted to his -0777 number in a lease document, and Mohdar confirmed the same in a handwritten phone listing. Expert analysis found matching call patterns between both the cell phones and Thumairy's other phones, and the FBI made findings that Thumairy used the -3362 and -0777 numbers. Both numbers were subscribed to, successively, at the same Long Beach, CA apartment by two men who claimed to work at the Saudi Embassy and Consulate, whom Youssef assessed as classic "front men." ¶¶732-46; ECF 9163 at 45-46 & n. 50-51. KSA tries to confuse matters by citing subscribers from different irrelevant time periods, but KSA does not, and cannot, deny that Thumairy was reached at those numbers, nor does it identify any specific calls misattributed to Thumairy.
[44] ¶735. KSA's claims that these calls were "innocuous" and "about religious questions" (17) are belied by the *timing* of Bayoumi's calls (and in-person visits). For example, the two men had a unique series of 27 calls between December 6, 1999 and February 4, 2000, culminating in a final call just minutes after Bayoumi walked the hijackers into the bank, set up their account, and made guarantor arrangements for their apartment. Ex. 12B; ¶¶1254, 1638-39. Bayoumi falsely claimed not to remember these calls, ¶1643, while Thumairy falsely claimed not to even know Bayoumi. ¶590. Bayoumi visited KFM at least six times during this same period: on December 20-21, 1999; and on January 9-10, January 31, and February 1, 2000 (when he met in private with Mana and Thumairy shortly after meeting the hijackers). ¶¶1584-85, 1589. KSA's claim that calls occurred "with the same frequency before the hijackers arrived . . . and afterwards" (17) is based on challenged expert testimony, ECF 9092 at 25-30, and is demonstrably false.
[45] As Bayoumi admitted, Jaithen was sent by MOIA to San Diego – not "Columbus." (49) ¶1273. No document supports Jaithen's purported alibis that he went from California to Ohio or to a "specialized hospital" for severe headaches (49), which is refuted by Bayoumi's video of Jaithen vigorously playing air hockey on December 19, 1999. ¶1354. Contrary to KSA's claim (50), Jaithen and Mersal met Thumairy. ¶¶1311, 1328, 1347-48, 1357.
[46] Mersal invoked the same message as contained in MOIA's "Book of Jihad," which Bayoumi kept in his Mosque desk. Extolling the rewards of the afterlife is part of the jihadist religious justification for suicide attacks. ¶¶890-91. KSA says Mersal worked at a MOIA "terrorist rehabilitation center" (50) but that happened *post*-9/11; there was no discovery; and, that center only offers further proof of the grave dangers manifested by MOIA's *pre*-9/11 extremism.

REDACTED FOR PUBLIC FILING

Diego (and later in Virginia), with whom Bayoumi would coordinate in the support plot; and eight calls to ███████, whom Bayoumi groomed and introduced to help the hijackers. ¶¶1251, 1381-94.

**January 5, 2000** ██████ placed a call shortly after midnight to Thumairy – and then conferenced in Bayoumi. ¶¶1411-12. The call occurred just as Hazmi and Mihdhar arrived in Malaysia and AQ was finalizing its plans for them to travel to L.A. ¶1409.[47]

**January 9, 2000** Bayoumi's hotel records, phone calls, and video footage show he travelled to Los Angeles and stayed overnight with Yafai and Kaaki – not with his family – to visit the Consulate and KFM, hold a private evening meeting with Thumairy at the Travelodge, and set up communications including buying calling cards. ¶¶1422-33; Ex. 705 (Bayoumi L.A. visits).

**January 15, 2000** Hazmi and Mihdhar arrived at LAX and were picked up by █████ who brought them to Thumairy at the KFM.[48] █████ admitted that Hazmi and Mihdhar "came through" Thumairy, and that his family made way for them to stay at █████'s L.A. apartment near the KFM.[49] The circumstances show that Thumairy was AQ's trusted advance point of contact in Los Angeles to receive and support the hijackers. ¶1462.

**January 31-February 1, 2000** Bayoumi visited Los Angeles *twice* on consecutive days to execute the plan for the hijackers' move to San Diego. Saudi Arabia tries to prop up its two-decades

---

[47] The timing of this three-way conference call among key members of the covert support network, just as Hazmi and Mihdhar were *en route* to the U.S., shows that it was about their arrival. Less than a month later, on February 1, 2000, the same three men would meet at the KFM after Bayoumi met the hijackers in L.A. KSA's claim that Bayoumi and █████ had "[n]o call record" (18) and "no relationship" (51) is further belied by Bayoumi's Consulate calls and his address book listing of ███ name and extension at the Consulate ("Islamic Affairs █████"); Bayoumi's letter addressed to ███ as "Sheikh"; and Bayoumi's meetings with ███ at the Consulate and KFM. ¶¶829, 1561, 1584, 1600.

[48] ¶¶1464-75. Within minutes of the hijackers' arrival, Bayoumi received two calls from his -6662 cellphone, and Thumairy called █████, who was in touch with ███. ¶¶1466-69. KSA calls it "unsurprising" that Thumairy called █████ a dozen times (18) but ignores that their flurry of calls ended once the hijackers had arrived at LAX. ¶¶1261-64, 1468, 1498.

[49] ¶¶1482-1503. These facts show that Thumairy did ask "███ to assist the hijackers" (41) and are confirmed by the FBI's findings of "significant phone connectivity between ███ and ███ prior to and directly following key events of logistical assistance provided by ███ to Hazmi and Mihdhar," ¶1571. KSA's defense that "███s wife and ███s mother knew each other" (56) does not explain the FBI's assessment that the ██████████ matched up with ███s support. Morgan confirmed that the hijackers told Bayoumi (who translated for Morgan) that they were staying at an "apartment" that was "around the corner" – the exact location of ███'s apartment. ¶1484. The FBI and 9/11 Commission canvassed local hotels and found no evidence of a January 2000 hotel stay by Hazmi and Mihdhar. ¶1492.

REDACTED FOR PUBLIC FILING

old deceit that Bayoumi made only "one trip" (35) to Los Angeles, but the U.K. Government's MPS production of Bayoumi's photos and videos ends all doubt. *First*, on January 31, Bayoumi went with his family to get passport photos, file passport applications at the Consulate, and go to the KFM.[50] *Second*, on February 1, Bayoumi returned to Los Angeles with Morgan and went through the charade of getting passport photos and going to the Consulate (where he met in private with Mana) as the prelude for a staged "by chance" restaurant meeting with the hijackers.[51] That staged meeting gave Bayoumi the cover of an alternative backstory. ¶1605.[52] Indeed, Morgan would at the time perceive meeting the hijackers as "coincidental." *Id.* In reality, Bayoumi had already searched for an apartment for the two AQ operatives.[53] After leaving the restaurant, Bayoumi and Morgan went to the KFM, where Bayoumi met in private with Mana and Thumairy. ¶¶1583-96. The timing and sequence of events belie Saudi Arabia's argument that those meetings were not about the hijackers (35 n. 27) and Bayoumi's shifting exculpatory claims that he "got lost" and couldn't find KFM,

---

[50] ¶¶826, 1533-40. The MPS production contains photos and video footage of Bayoumi's wife and children in Los Angeles on January 31 wearing the same clothes (and his wife using the same pose) as in their passport pictures, showing that they went with Bayoumi to file passport applications at the Consulate on that day. ¶1533; Ex. 705 (Bayoumi L.A. visits). KSA's own records confirm two trips – and its complicity. A KSA report shows Bayoumi was at the Consulate on January 31, 2000 "and met with colleague [Awad]" regarding passport renewals. ¶1534. A Bayoumi note recovered by the MPS shows he saw Awad "through…Sowailem." ¶826. KSA's interrogatory answers show Bayoumi returned "on or around February 1, 2000" with Morgan to "*pick up* a renewed passport." ¶1535 (emphasis added). Bayoumi admitted that when he went to the Consulate with Morgan, he did not meet Awad – only Mana and staff. Ex. 120 (Bayoumi Dep.) 389:12-390:14.

[51] ¶¶1542-82. Among other lies (¶¶1554-55, 1561), Bayoumi falsely testified that he did not invite Morgan on the trip until he was driving to the Consulate and happened to see Morgan walking down the street. ¶1551. Yet Bayoumi admitted to the MPS, and Morgan testified, that Bayoumi invited him 1-2 days in advance. ¶¶1544-52. Also, Bayoumi told Morgan in Mana's presence that he had not been to the Consulate for three months, ¶1560, despite his visit there the day before. Bayoumi's call home on February 1 on his way back to San Diego further confirms the date. ¶1598.

[52] KSA argues that it made no sense for Bayoumi to bring Morgan and meet the hijackers in public (2, 36), but those were facets of tradecraft to establish Bayoumi's cover – and the ploy worked until now. Bayoumi's stop for photos was not "genuine" (25) – it was demonstrably a ruse, because Bayoumi's passport renewal had already been submitted and he went for passport pictures with his family the previous day. In any event, the photo used in Bayoumi's 2000 passport was identical to the one in his 1995 passport. ¶1558; Ex. 705. KSA falsely claims that Bayoumi "voluntarily" told law enforcement about meeting the hijackers (2, 33, 36) when in fact it was only after the MPS arrested Bayoumi and questioned him over two days about his involvement with the 9/11 hijackers that Bayoumi told his story about the restaurant meeting. ¶1582. Bayoumi's MPS interview and Morgan confirm that Bayoumi offered to help the hijackers, invited them to San Diego, and gave them his phone number. ¶1578.

[53] Contrary to Saudi Arabia's claims (37), Bayoumi admitted his prior apartment search to Morgan, ¶1606, and Ratchford testified that Bayoumi came to her office multiple times to check on apartments for Hazmi and Mihdhar "in close proximity" to his own. *Id.*; Ex. 91, ¶6. Saudi Arabia chose not to cross-examine Ratchford.

REDACTED FOR PUBLIC FILING

¶¶1595-97, show his intent to conceal their true purpose. Evidence of Bayoumi's trip on the eve of

his meeting with Hazmi and Mihdhar, coupled with Saudi Arabia's denial of that trip (now proven

false), followed by Bayoumi's second visit to the Consulate, his "chance" meeting with the hijackers,

and his meetings with Thumairy and Mana, lays bare the careful preparations made by the Saudi

government's support network for the hijackers.

**February 2, 2000** Bayoumi and Thumairy arranged for the two AQ operatives to be driven

to the ICSD Mosque in San Diego,[54] where they asked for, met, and went home with Bayoumi.[55]

Bayoumi introduced them to Aulaqi.[56] Bayoumi and Thumairy reported daily to the Embassy, to

Sudairy and Sowailem.[57] But for Bayoumi's material support, the hijackers could not have moved

into their own apartment on February 5. Contrary to the defense that Bayoumi had "innocent

motives" to help Saudis (1), Bayoumi admitted that he would not arrange housing for Saudis unless

he knew them "well," ¶1648, and could not point to anyone else he helped in such ways.[58] ¶1651.

---

[54] It was not mere "speculation" (37) that Hazmi and Mihdhar were driven to San Diego; rather, it was the assessment of the FBI and Plaintiffs' expert based on AQ's established *modus operandi* and the hijackers' inability to understand English or navigate for themselves. ¶¶1608, 1614; *U.S. v. Kassir*, 2009 WL 910767, at *4 (S.D.N.Y. Apr. 2, 2009)(citing cases allowing expert testimony on AQ's methods). █████'s story of taking the two men to a Santa Monica bus station confounds logic, as there was no such station at the time, and █████ was headed to work in downtown L.A. MOIA's advance teams charted the path when they made the same L.A.-San Diego trip by car. The hijackers' journey brought them not to a San Diego bus station, but to the ICSD to meet Bayoumi. ¶¶1609, 1611-13, 1616.

[55] Bayoumi told the MPS that the hijackers came to find him after "afternoon or evening" prayer at ICSD Mosque, Ex. 450, 694:29-695:9, and that he helped them find their apartment "the next day, not the first day." *Id.*, 698:12-699:9. Bayoumi also admitted to the MPS that he and the hijackers went from ICSD to Parkwood Apartments "by my car." *Id.*, 564:15-566:11, at 565:10. The evening meeting at ICSD could only have been on February 2, as Ratchford testified that the hijackers were at the Parkwood office on three successive days before moving in on February 5, and the hijackers signed documents together with Ratchford on February 3, 2000. Ex. 91 ¶¶8, 10.

[56] Contrary to KSA's claims (23, 38), Ratchford described and identified Aulaqi as the associate of Bayoumi who translated for the hijackers, Ex. 91 ¶8. On February 4, Aulaqi called ahead to the same bank branch where Bayoumi took the hijackers, ECF 9092 at 67-68 n. 307-12; and Bayoumi phoned Aulaqi after going to that bank. ¶1639.

[57] Bayoumi made a series of five calls to Sudairy in late January and early February 2000 that the FBI found to be "significant" and "coincide[d] with significant logistic support of the hijackers." ¶¶1512-14. Bayoumi called the Islamic Affairs number at the Embassy (where Sowailem and Sudairy worked) for six consecutive weekdays in a row until February 3, 2000, at which point the hijackers were getting settled in San Diego. Ex. 12A.

[58] KSA also relies on Bayoumi's fictitious claim, made for the first time at his deposition, that he helped the hijackers to "get a referral fee." (1, 37) Bayoumi, a co-signatory on the lease, was not eligible for a referral fee and there is no record of any such payment in the FBI's investigations, including in Bayoumi's prior statements. ¶1653.

REDACTED FOR PUBLIC FILING

**February 13, 2000** Bayoumi submitted a form for Hazmi and Mihdhar confirming his plan

to move them to Shaikh's house, Ex. 91 ¶17, which ultimately occurred in May 2000.

**February 17, 2000** Bayoumi held a welcome party for Hazmi and Mihdhar, as Morgan

testified, Ex. 92, ¶24, and which is clearly evidenced by the video footage seized from Bayoumi. In

it, Bayoumi announced: "[w]e are welcoming the brothers, in fact… whom we have not yet had the

pleasure of meeting." ¶¶1683-85. The "brothers" were the hijackers.[59] Bayoumi addressed Hazmi by

his first name: "Nawaf, may God greet you, Nawaf." ¶1686. The tape shows that the hijackers acted

as co-hosts – standing at the front alongside Bayoumi, preparing food and serving the guests,

moving through the room at ease and engaging in conversation – not hiding in a "back room," as

KSA wrongly claims (39 n.31).[60] KSA repeats Bayoumi's falsehoods about the party,[61] fails to explain

the presence of its MOIA-employed religious official Qahtani;[62] and ignores the key support given to

the hijackers by Bayoumi's invitees, including a future roommate, communications assistance with

computer, internet, and phone, to stay in touch with AQ, purchase of a car, wire transfers, medical

care, assimilation, flight lessons, and furtherance of the plot. ¶¶1656-1717; Ex. 702; Ex. 703.

**February 18-19, 2000** On the next two evenings immediately following the welcome party,

Bayoumi reported to Sowailem in Washington, DC on his personal cell. ¶1717.

---

[59] KSA's claim that "[t]he guests did not know one another because they were from different congregations" (39) is contradicted by extensive photo and video evidence of inter-Mosque events in San Diego, dating back at least five years to 1995, including Eid gatherings, communal meals, and volleyball and soccer matches. ¶1685; Ex. 703; Ex. 709. The only "brothers" whom this extremist network had "not yet had the pleasure of meeting" were Hazmi and Mihdhar.

[60] The 9/11 Commission never had the more "complete" MPS videotape now before this Court, which shows, *inter alia*: both Mihdhar and Hazmi standing with Bayoumi during the party's main ceremonies; Mihdhar preparing food alongside Bayoumi in the kitchen and walking among the guests in the main room; and Hazmi serving dates to Barzanjee, and interacting with others including Bayoumi's son and Yafai, in a manner which shows they already knew one another well. ¶¶1656-71; Ex. 10K.

[61] Bayoumi falsely told the 9/11 Commission that the party was to "honor Barzanjee" – a "visiting Imam" – "before his return to Norway…" (39 & n.33). Yet Bayoumi is heard on video heralding Barzanjee as Al Madinah Mosque's permanent Imam, and correspondence from Bayoumi's work files confirms that Barzanjee remained as Imam through the end of 2000, *i.e.* the entire time the hijackers were in San Diego. ¶1712.

[62] Contrary to KSA's claims (40 n. 34), Bayoumi is heard at the welcome party telling Morgan "don't film here" while gesturing to where Qahtani was sitting, ¶1676, Ex. 10K (17:27-30), and it can be inferred that Bayoumi gave Morgan similar directions about the hijackers, given that they (like Qahtani) only appear on the footage for brief moments, and Hazmi's face is not shown even though his introduction is the focus of much discussion. ¶1688.

REDACTED FOR PUBLIC FILING

**March 17, 2000** Hazmi called Bayoumi.[63]

**April 19, 2000** Hazmi used Bayoumi's -6662 phone to call Aulaqi.[64]

**May 31, 2000** Saudi Arabia's alibi that "Bayoumi was out of the country" when Hazmi and Mihdhar moved into Shaikh's house (40) is belied by proof that Bayoumi planned for over a year, with three MOIA officials, for the hijackers to stay with Shaikh and that Bayoumi's return to San Diego was timed for the day of the hijackers' move.[65]

**June 9-10, 2000** Two eyewitnesses confirmed Thumairy met in private with Hazmi and Mihdhar at the KFM; Abdullah was in "shock" Thumairy knew the two men.[66]

**Four months in 2000** Sudairy lived with AQ operative Khaleel in Missouri. ¶¶1064-65.

**December 2000** Bayoumi flew back from UK and reconnected with Sowailem and Thumairy to coordinate the departure of Hazmi and Hanjour from San Diego. ¶¶1818-23.

---

[63]The call occurred as Bayoumi was trying to help Hazmi get fraudulent TOEFL certification to extend Hazmi's visa, ¶¶1735-51, not to "help Al Hazmi pass an English proficiency test…." (40).

[64] The FBI found that the -6662 number belonged to Bayoumi and was used as part of a "Yemeni-Saudi support cell" for the hijackers. ¶¶756-58, 1754-55. The Aulaqi call was made on the same day that Hazmi got his driver's license and received a $5,000 wire from AQ, showing that the phone was likely used by the hijackers to communicate with Aulaqi. ¶¶1757-58. The FBI refused to produce Bayoumi's -6662 phone records and its analysis of them to Plaintiffs.

[65] *See supra* n.29. KSA falsely claims that Bayoumi stayed in a U.K. dormitory in June 2000; this lie cannot be excused by a "hard-to-read" passport stamp (40 n. 35). Bayoumi's flight ticket and call records show he returned to the U.S. and was in San Diego for the hijackers' move to Shaikh's house. ¶¶1767-74. KSA cites reports that Shaikh has been an FBI informant (13, 56) but does not rebut the evidence that he had been co-opted by Bayoumi and was working for KSA when Hazmi and Mihdhar lived with him. Nor does KSA acknowledge that Shaikh was duplicitous with the FBI, withheld material information regarding Hazmi, and invoked the Fifth Amendment when the OIG sought to question him. ¶¶1112-14. Coordinated planning of Bayoumi, Sadhan, Sudairy, Sowailem, Thumairy, and MOIA HQ laid the groundwork for Shaikh to host the hijackers. Moreover, Shaikh travelled to meet Sadhan and Sudairy in KSA, and placed calls to them at their workplaces in the U.S. Shaikh had a Saudi cellphone number that Bayoumi kept in his address book. ¶¶1115-17. A Bayoumi video shows that Shaikh dined with Bayoumi at his home in December 2000 shortly after Hazmi and Hanjour left San Diego. ¶1826. The FBI reported that in December 2000, Shaikh emailed Hazmi with a greeting to "Hani," yet Shaikh claimed that the note had nothing to do with hijacker Hani Hanjour, who had just visited San Diego to pick up Hazmi. ¶1824. Hanjour would pilot AA flight 77 into the Pentagon.

[66]Three eyewitnesses' testimony (corroborated by prior FBI statements) shows that Thumairy had at least three meetings with the hijackers, ¶¶1477-81, 1779-87, contrary to KSA's claims that he met them only "once" (1, 25, 41, 58). KSA fails to conjure an alibi for Thumairy by citing to an unreliable and unproven "official" calendar and an airport passport stamp. (3, 42). KSA did not produce Thumairy's flight records from June 2000, nor evidence about the Hijri date conversion used at its airport where his passport was stamped. Plaintiffs cite a uniformly accurate (and fact-checked) Hijri date conversion chart relied on by KSA's own expert, Sageman. KSA Ex. 167, Sageman Rpt. 704 n. 2361. KSA's criticism of that chart as the work of a "Bangladeshi hobbyist[]" (3) does not flag anything unreliable about its methodology. KSA's alternate alibi that Thumairy was at the Washington, DC Embassy, not Los Angeles, is belied by *inter alia*, KSA's answers to interrogatories, and Thumairy's testimony and admissions, which confirm that he made only one Embassy visit, shortly after his arrival in 1996. ¶¶1793-94.

19

REDACTED FOR PUBLIC FILING

**March 31-April 1, 2001** Sudairy and likely also Sadhan met with Hazmi and Hanjour as the hijackers' traveled cross-country, contrary to Saudi Arabia's denials (46). Bayoumi called Sudairy at his assigned workplace in Columbia, MO to arrange that meeting, and kept handwritten notes of Sudairy's contact details, as well as three cities on the hijackers' planned route east.[67] Bayoumi also handwrote Hazmi's AQ codename for the 9/11 Attacks - "Rabi'ah Ibn Ka'ab" – and linked it to Sudairy's "Columbia, Missouri" location.[68] Bayoumi's notes reveal intimate knowledge of Hazmi's AQ mission and show that Bayoumi and Sudairy were not outsiders to AQ's plot (33).[69]

**June 14, 2001** The call ███ received from the Virginia apartment of two individuals who worked with Aulaqi to support Hazmi and other 9/11 hijackers on the East Coast was not a "cursory" matter (51 n. 44) but evidences a link between the East and West Coast support networks for AQ operatives. ¶¶1850-71. The ███ call was timed with Mihdhar's return to the U.S. ¶1867-73.

**August 3, 2001** Saudi Arabia claims that Abdullah had no relationship with Thumairy (56), yet Abdullah called Thumairy weeks before the 9/11 Attacks, and Thumairy abruptly planned to leave his post in Los Angeles and travel overseas days before the 9/11 Attacks.[70]

**September 2, 2001** Bayoumi called Thumairy days before the 9/11 Attack. ¶1876-78.

## CONCLUSION

For all of the reasons set forth, KSA's renewed motion to dismiss should be denied.

---

[67] Bayoumi's handwritten note with the hijackers' route also included Sadhan's cell number with a New York "917" area code. Ex. 706 (Hijackers' Cross-Country Trip), MPS738 5 and MPS688 2.

[68] Ex. 12AA, MPS 738 5; 9/11 Comm. Rpt. 166; KSA Ex. 223 at 112-13. In violation of the requirement for accredited Embassy diplomats to live and work in Washington, DC, a MOIA "workplace" document shows that Sadhan was assigned to Oklahoma and Sudairy to Missouri. ¶¶1842, 1847.

[69] Likewise, Schiff concluded that Bayoumi's notepad equation and aviation sketch were flight planning preparations to gauge the key visual cues necessary for AQ to carry out the 9/11 Attacks, contrary to KSA's misleading claims, which are addressed in the *Daubert* pleadings. ECF 9163 at 25-26, 65-69. Bayoumi admitted that the purpose of the equation "was to remember, to memorize the equation" and cited U.S. cities including "Washington" – one of AQ's targets - as examples of visual distances from the air that he sought to calculate. ¶1916. KSA's counsel did not ask Bayoumi a single question about the aircraft descent calculation and sketch, yet KSA now makes the baseless claim that it was a "high-school math assignment" (2, 34), contrary to Bayoumi's own testimony, the assistance he provided to the hijackers, his Capitol casing video, and all reasonable inferences.

[70] ¶¶484-90. **Thumairy** was with Sowailem at a MOIA forum in Denmark on September 11, 2001. ¶¶500-05.

REDACTED FOR PUBLIC FILING

Dated: April 19, 2024                           Respectfully submitted,

MOTLEY RICE LLC                                  COZEN O'CONNOR

By: /s/ Robert T. Haefele                        By: /s/ Sean P. Carter
Robert T. Haefele                                Sean P. Carter
Jodi Westbrook Flowers                           Stephen A. Cozen
Donald A. Migliori                               Scott Tarbutton
28 Bridgeside Boulevard                          One Liberty Place
Mount Pleasant, South Carolina 29464             1650 Market Street, Suite 2800
Tel.: (843) 216-9184                             Philadelphia, Pennsylvania 19103
Email: rhaefele@motleyrice.com                   Tel.: (215) 665-2105
                                                 Email: scarter@cozen.com
*Liaison Counsel and Co-Chairs for the*
*Plaintiffs' Executive Committee for Personal*   *Co-Chairs and Liaison Counsel of the*
*Injury and Death Claims on behalf of the*       *Plaintiffs' Executive Committee for*
*Plaintiffs*                                      *Commercial Claims on behalf of Plaintiffs*


KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

REDACTED FOR PUBLIC FILING



